

# SALE OF THE PARTNERSHIP INTERESTS IN KANSAS PIPELINE COMPANY

## K-PIPE (SELLER)

&

## MIDCOAST ENERGY RESOURCES INC (BUYER)

## November 9, 1999

**ENBRIDGE MIDCOAST ENERGY INC**
1100 Louisiana Ste 3300
Houston, TX 77002

## Legal Department Copy



GOVERNMENT
EXHIBIT
G-1

ENB 00215
EM001-006695

# TABLE OF CONTENTS

| Document | Tab No. |
|---|---|
| Letter of Intent | 1 |
| Amendment to Letter of Intent | 2 |
| Escrow Agreement (November 5, 1999) | 3 |
| Asset Purchase Agreement and Schedules | 4 |
|   – First Amendment | 4A |
| K-Pipe Letter to Midcoast (November 5, 1999) | 5 |
| Escrow Agreement (November 8, 1999) | 6 |
| Bishop Pipeline Company Stockholder's and Director's minutes approving dividend of Butcher Interest | 7 |
| Bishop Gas Transmission Co. Stockholder's and Director's minutes approving dividend of Butcher Interest | 8 |
| Conveyances of the Partnership Interests of Kansas Pipeline Company, MarGasCo Partnership, Mid-Kansas Partnership and Riverside Pipeline Company, L.P. | 9 |
| Bill of Sale | 10 |
| Certificate of Seller | 11 |
| Certificates of Buyers | 12 |
| Assumption Agreement | 13 |
| Guaranty (pursuant to MarGasCo PDA) | 14 |
| Butcher Interest Partnership General Partnership Agreement | 15 |
| Credit Agreement between Butcher Interest Partnership and Bank of America, N.A. | 16 |
| K-Pipe Group, Inc. Certificate | 17 |
| Compliance Certificates of Mid Louisiana Gas Company and K-Pipe Group, Inc. | 18 |

ENB 00216

ENB 00217

September 30, 1999

Midcoast Energy Resources, Inc.
1100 Louisiana, 29th Floor
Houston, TX 77002

Attn:  Mr. Dan Tutcher
       President and CEO

Dear Sir:

      This letter sets forth the intentions of Midcoast Energy Resources, Inc. and K-Pipe Holdings Partners, L.P. concerning a proposed transaction (the "Transaction") whereby two (2) wholly-owned subsidiaries (existing or to be hereafter formed) of Midcoast Energy Resources, Inc. (collectively, "Buyer") would purchase from K-Pipe Holdings Partners, L.P. ("Seller") the following (the "Assets"): (i) Bishop Pipeline Company's partnership interest in Kansas Pipeline Company, MarGasCo Partnership, Mid-Kansas Partnership, and Riverside Pipeline Company L.P. (such partnerships referred to collectively as the "Companies"); (ii) Synergy Pipeline Company's partnership interest in Kansas Pipeline Company, MarGasCo Partnership and Mid-Kansas Partnership ; (iii) all files, books, records and the data necessary or appropriate for the continued operation of the businesses of the Companies; (iv) all transferable approvals, authorizations, consents, licenses, orders and other permits associated or connected to the operation of the businesses of the Companies; and (vi) option rights to purchase the Butcher Interests; all as may be mutually agreed upon by the parties under a definitive agreement covering the Transaction.

      By executing this letter, Buyer and Seller confirm their intentions specified herein with respect to the Transaction; however, except for the provisions of paragraph 4 hereof which is intended to be legally binding and enforceable and which shall survive the termination of this letter of intent, this letter of intent is not intended to constitute a contract or an offer to enter into a contract, nor to be binding upon either of the parties or create any legal obligations or rights between the parties.

      This letter of intent supersedes and replaces all prior offers and negotiations between Buyer (or Midcoast Energy Resources, Inc. on behalf of Buyer) and Seller.  It is the intention of Buyer and Seller to proceed with the proposed Transaction as follows:

1.    Seller shall sell the Assets to Buyer for a purchase price (the "Purchase Price") of either (a) $187,868,000.00 cash (with the $10,000,000.00 sinking fund restricted cash reserve as a part of the Assets), less all debt to be assumed by Buyer pertaining to the Assets , but expressly excluding

1

ENB 00218

EM001-006698

severance obligations of the Companies and other liabilities identified in the definitive purchase agreement (the "Assumed Debt") or (b) $182,068,000.00, free of all debt (without the $10,000,000.00 sinking fund restricted cash reserve as a part of the Assets), including all charges, liens, security interests or other similar encumbrances, save and except (i) liens and security interests securing the Assumed Debt, if applicable, and (ii) the following contract rights and interests (as will be more specifically identified in the definitive purchase agreement), together with the security interests retained to secure such contracts rights and interests, which are to be executed between Dennis M. Langley and Kansas Pipeline Company or MarGasCo Partnership, as applicable, prior to the sale of the stock of The Bishop Group, Ltd., a Kansas corporation, to Seller, which contract obligations of Kansas Pipeline Company or MarGasCo Partnership, as applicable, are to be assumed by Buyer (collectively, the "Assumed Obligations"):

a.  A perpetual Net Revenue Interest equal to fifty percent (50%) of the annual revenues (after deductions for cost of gas sold and third party transportation costs) realized from the operation of the assets of Kansas Pipeline Company and MarGasCo Partnership in excess of twenty-nine million five hundred thousand dollars ($29,500,000) per calendar year, commencing as of the effective time of such sale by Dennis M. Langley to Seller;

b.  A Quitclaim from Kansas Pipeline Company to Dennis M. Langley or his designee and a License Agreement between Kansas Pipeline Company, ("Licensor") and Dennis M. Langley or his designee, ("Licensee"), as to use of currently existing rights-of-way of Kansas Pipeline Company for telecommunications and for transportation of natural gas, respectively, subject to the following:

   i.   the License is granted to the extent and only to the extent that (x) Licensor has the right to grant such license pursuant to such rights-of-way and (y) the rights-of-way provide for additional multiple pipelines;

   ii.  Licensee is prohibited from the transporting of natural gas or other substances through any pipeline now or hereafter located within said rights-of-way which will be, directly or indirectly, sold or delivered to customers of the Kansas Pipeline Company or MarGasCo Partnership along the route of the pipeline of Kansas Pipeline Company as it now exists and may hereafter be expanded; and

2

ENB 00219

EM001-006699

c.    The contract rights of Dennis M. Langley, or his designee, for the joint development of natural gas projects involving expansion of the pipeline of Kansas Pipeline Company and certain other energy related projects, currently being negotiated between Seller and Dennis M. Langley.

2.    The purchase price will be paid at closing, with a post-closing true up of items of debt, payables and receivable as of the closing date. Closing is anticipated to occur on or about October 30, 1999. The effective time of the transaction will be September 30, 1999.

3.    The option for the Butcher Interests shall be exercisable by Buyer at any time on or before the expiration of three years from the closing by payment of the sum of six million five hundred thousand dollars ($6,500,000) cash to Seller.

4.    The consummation of the Transaction shall be contingent, among other things, on the negotiation, execution and delivery of the definitive agreement and on the completion by Buyer of a satisfactory review of the financial and legal aspects of the business, properties, assets and liabilities pertaining to the Transaction and Buyer's acceptance of the final terms and provisions of the Assumed Obligations which are currently being negotiated between Seller and Dennis M. Langley. Seller agrees to provide Buyer and it's representatives full access and opportunity to examine the books, records, contracts and other documentation relating to the Assets.

5.    Seller and Buyer agree to keep this letter strictly confidential and will not disclose its provisions to any third party without the other party's consent, except for disclosure to the parties, directors, officers, attorneys, accountants and financial advisors on a "need to know" basis, and neither party will make any public disclosure or publicity release pertaining to the existence of this letter of intent or of the subject matter contained herein without having first obtained the written consent of the other party. The confidentiality letter executed by the parties is incorporated herein and made a part hereof.

6.    Immediately hereafter, Buyer and Seller shall commence in good faith the negotiation and preparation of the definitive agreement governing the Transaction, including the detailed terms and conditions of the Transaction, as well as such representations and warranties, covenants, conditions precedent, indemnities and other provisions as are normal for a transaction of this nature. Seller and Buyer shall promptly file the necessary documentation and applications for approval under the federal Hart Scott Rodino Act, with Buyer paying all such filing fees.

3

ENB 00220

EM001-006700

7.   Each party will be solely responsible for its own costs in connection with the Transaction including, without limitation, legal and accounting costs; provided, however, that in the event that Buyer fails to execute a definitive agreement, Buyer shall pay Seller a breakup fee of $20,000.00, as Buyer's sole obligation hereunder to Seller.

8.   Seller shall assign to Buyer all of Seller's or its affiliates' rights pursuant to the representations, warranties, covenants, indemnities and guarantees received by Seller upon its acquisition of the stock of Bishop Group Ltd.

9.   Seller covenants not to negotiate or communicate with any other potential purchasers of the Assets for a period of 45 days from the date hereof.

If the above correctly sets forth your understanding of the intentions of both parties with respect to the Transaction, please so indicate by executing the enclosed copy of this letter in the space provided below and returning it to the undersigned not later than 9:00 a.m. central time on October 1, 1999. Either party may terminate this agreement at any time prior to the execution of the definitive agreements without liability.

Very truly yours,

K-Pipe Holdings Partners, L.P.,
a Delaware limited partnership

By:   Signal Capital Associates, L.P.,
      a Delaware limited partnership,
      the general partner of
      K-Pipe Holdings Partners, L.P.

By:   Jeff Furman,
      its general partner

By:   _____
      Jeff Furman

ACCEPTED AND AGREED TO this
___1___ day of _October_ 1999

Midcoast Energy Resources, Inc.

By: _____
    Dan Tutcher, President and
    Chief Executive Officer

4

ENB 00221

EM001-006701

ENB 00222

November 4, 1999

Midcoast Energy Resources, Inc.
1100 Louisiana, 29ᵀᴴ Floor
Houston, TX 77002

Attn:   Mr. Dan C. Tutcher
        President and CEO

Re:     Amendment to Letter of Intent

Dear Sir:

This letter agreement amends the Letter of Intent dated September 30, 1999 (the "Letter of Intent"), by and between Midcoast Energy Resources, Inc. ("MERI") and K-Pipe Holdings Partners, L.P. ("K-Pipe") ("Seller") concerning a proposed transaction (the "Transaction") whereby Seller, acting hereunder through its Delaware subsidiary, K-Pipe Merger Corporation, would cause the following (the "Assets") to be sold and transferred to two (2) wholly-owned subsidiaries of MERI (now formed and known as Midcoast Kansas Pipeline, Inc. and Midcoast Kansas General Partner, Inc., both Delaware corporations) (collectively, the "Buyers"): (i) Bishop Pipeline Company's partnership interest in Kansas Pipeline Company, MarGasCo Partnership, Mid-Kansas Partnership, and Riverside Pipeline Company, L.P. (such partnerships referred to collectively as the "Companies"); (ii) Synergy Pipeline Company's partnership interest in Kansas Pipeline Company, MarGasCo Partnership and Mid-Kansas Partnership; (iii) all files, books, records and the data necessary or appropriate for the continued operation of the business of the Companies; (iv) all transferable approvals, authorizations, consents, licenses, orders and other permits associated or connected to the operation of the businesses of the Companies; and (vi) option rights to purchase the Butcher Interests.

Notwithstanding any provisions of the Letter of Intent to the contrary, MERI and K-Pipe agree as follows:

1. Contemporaneously with the execution of this letter agreement by Buyers and Seller, Buyers and Seller will enter into the Escrow Agreement attached hereto as Exhibit "A" and made a part hereof (the "First Escrow Agreement"), and Buyers will cause the sum of fourteen million dollars ($14,000,000.00) (the "First Escrow Amount") to be deposited with escrow agent named therein (the "First Escrow Agent").

2. On November 5, 1999, Buyers and Seller will execute and deliver to each other the original of that certain Asset Purchase Agreement attached hereto as Exhibit "B" and made a part hereof (the "Asset Purchase Agreement") and Seller and Buyers will then

263A. 11/04/99

ENB 00223

EM001-006703

jointly direct the First Escrow Agent to pay to Buyers the First Escrow Amount, together with all interest earned thereon. In the event the Asset Purchase Agreement is not executed and delivered by Buyers by 7:00 PM, EST, November 5, 1999 (the occurrence of such event being hereby deemed to be a breach of contractual obligation of Buyers to Seller) the First Escrow Agent shall disburse the First Escrow Amount, together with all interest earned thereon, to Seller. Such sum is considered by the parties to be the actual damages suffered by Seller by reason of such event and not a penalty, and the payment thereof to Seller shall operate as a complete release and discharge of Buyers from further liability to Seller with respect to the transaction.

3.  On or before 10:00 AM, EST, November 8, 1999: (i) Buyers and Sellers will enter into the Escrow Agreement attached hereto as Exhibit "C" and made a part hereof (the "Second Escrow Agreement") with the escrow agent named therein (the "Second Escrow Agent"); and (ii) Buyers will cause a sum equal to the amount of the Preliminary Cash Consideration (as defined in the Asset Purchase Agreement) to be deposited into escrow with the Second Escrow Agent (the "Second Escrow Amount").

4. K-Pipe Holdings Partners will cause BGL Limited and/or one of its affiliates to form with the Buyer a General Partnership for the sole purpose of owning the Butcher Interest.

Except as amended hereby, the Letter of Intent shall remain in force and effect as originally written.

If the above correctly sets forth your understanding of the amendment with respect to the Transaction, please so indicate by executing the enclosed copy of this letter in the space provided below and returning it to the undersigned.

Very truly yours,

**K-Pipe Holdings Partners, L.P.,**
a Delaware limited partnership

By:  **Signal Capital Associates, L.P.,**
a Delaware limited partnership,
the general partner of
K-Pipe Holdings Partners, L.P.

By:  **Jeffrey Furman,**
its general partner

ENB 00224

EM001-006704

By: _____
Alice Dill, Attorney-In-Fact
For Jeffrey Furman

ACCEPTED AND AGREED TO
this 3rd day of November, 1999

**Midcoast Energy Resources, Inc.**

By: _____

263A. 11/04/99

ENB 00225

EM001-006705

ENB 00226

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT, is made and entered into the 5ᵗʰ day of November, 1999, by and among K-PIPE MERGER CORPORATION, a Delaware corporation, ("Seller"), MIDCOAST KANSAS PIPELINE, INC., a Delaware corporation, and MIDCOAST KANSAS GENERAL PARTNER, INC., a Delaware corporation, (collectively, "Buyer") and COOPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., "RABOBANK NEDERLAND", NEW YORK BRANCH ("Escrow Agent").

### WITNESSETH:

WHEREAS, pursuant to an Asset Purchase Agreement a final execution draft of which, together with substantially all its Exhibits, is annexed hereto (the "Purchase Agreement"), Seller would agree to sell and transfer, or cause to be sold and transferred, to Buyer, and Buyer would agree to acquire and purchase from Seller (but unless the Purchase Agreement is executed is not obligated to purchase and acquire from Seller) , certain Partnership Interests (as defined in the Purchase Agreement), together with certain other assets, rights, properties, holdings and interests, all as more fully set forth in the Purchase Agreement; and

WHEREAS, Seller and Buyer desire that Escrow Agent act as escrow agent, and Escrow Agent is willing to do so, all upon the terms and conditions hereinafter set forth; and

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto agree as follows:

1. **Appointment**.  Buyer and Seller hereby jointly appoint Escrow Agent to act as escrow agent under this Escrow Agreement.  Simultaneously with the execution of this Escrow Agreement, Buyer shall deliver and deposit with Escrow Agent the sum of fourteen million dollars ($14,000,000) (the "Escrow Amount"), to be held in escrow pursuant to the terms and conditions hereof, which Escrow Amount shall be free and clear of all encumbrances.

2. **Acceptance**.  Escrow Agent hereby and agrees to act as escrow agent and to hold and dispose of all the Escrow Amount deposited to it pursuant to this Escrow Agreement, and all net income earned thereon, in accordance with the terms, conditions, provisions and instructions herein contained.  During the continuance of this Escrow Agreement, the Escrow Amount shall be invested and reinvested by Escrow Agent pursuant to Section 3 hereof.

3. **Investment of Funds**. The Escrow Amount escrowed hereunder shall be held in a U.S. government securities fund, money market fund or other similarly conservative investment selected by Buyer.  Buyer shall receive all income and incur all losses associated with the investments made in accordance with this Escrow Agreement, with such amounts being paid to Buyer upon termination of the escrow created pursuant hereto.

4. **Disbursement of Funds**.  Unless otherwise agreed in writing by the parties, the Escrow Agent shall promptly disburse the Escrow Amount (plus the interest thereon but less all

ENB 00227

EM001-006707

expenses incurred by the Escrow Agent hereunder) to Buyer upon delivery on or before 5:00 PM, EST, November 8, 1999 of written confirmation to Escrow Agent by Buyer and Seller jointly that Buyer has executed and delivered the Purchase Agreement to Seller (which may be executed and delivered by facsimile). In the event such written notice is not timely received, Escrow Agent shall continue to hold the Escrow Amount (plus all interest thereon) pending joint written instructions from Buyer and Seller.

### 5. Termination.

This Escrow Agreement shall terminate when the Escrow Amount has been fully released or distributed in accordance with the provisions of Section 4 above.

### 6. Duties.

The duties of Escrow Agent are only as herein specifically provided ministerial in nature and not discretionary and the Escrow Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement. Escrow Agent shall have no obligation or liability hereunder except as a depository to retain the Escrowed Property and to dispose of the same in accordance with the terms hereof. Escrow Agent shall not be liable for any mistake of fact or error in judgment, or for any acts or provisions of any kind taken suffered or omitted in good faith and believed by it to be authorized or within the rights or powers conferred by this Escrow Agreement, unless there be shown willful misconduct or gross negligence. Escrow Agent shall not be liable for default by any party hereto because of such party's failure to perform any duties or obligations said party has agreed to perform, and shall have no responsibility to seek performance by any party; nor shall it be liable for the lapse or barring of any rights under any statutes of limitation in respect to any documents or items deposited with it hereunder. The Escrow Agent shall have no duty as to the collection or protection of the Escrow Amount or income thereon, nor as to the preservation of any rights pertaining thereto, beyond the safe custody of any such funds actually in its possession.

### 7. Limitation of Liability.

Escrow Agent shall not be liable in any respect on account of the identity, authority, or rights of persons executing or delivering, or purporting to execute or deliver, any document or item, and may rely absolutely and be fully protected in acting upon any item, document, or other writing believed by it to be authentic in performing its duties hereunder. In the performance of its duties hereunder, the Escrow Agent shall be entitled to rely upon any signature believed by it in good faith to be genuine and signed by any party hereto or an authorized officer or agent thereof, and shall not be required to investigate the truth or accuracy of any statement contained in any such document or instrument. The Escrow Agent may assume that any Person purporting to give any notice in accordance with the provisions of this Agreement has been duly authorized to do so. Escrow Agent may, as a condition to the disbursement of money or property, require from the payee or recipient a receipt thereof, and, upon final payment or distribution, require a release from any liability arising out of its execution or performance of this Escrow Agreement. Buyer agrees, jointly and severally, to indemnify and hold Escrow Agent harmless from and against any and all costs, expenses (including reasonable attorneys' fees) and losses incurred in connection with the performance of its duties hereunder, except in the case of Escrow Agent's willful misconduct or gross negligence. Escrow Agent, at its option, may institute any interpleader action, suit or proceeding it deems appropriate to determine judicially any dispute between Buyer and Stockholder which may arise hereunder.

ENB 00228

EM001-006708

**8. Fees & Legal Counsel.** All fees and expenses of Escrow Agent shall be paid by Buyer jointly and severally. In the event of any dispute hereunder, Escrow Agent may consult with counsel of its own choice (including in-house counsel) and shall be entitled to reimbursement for its expenses, including out-of-pocket expenses and reasonable attorneys' fees (with such fees and expenses being paid by Buyer). Escrow Agent shall have full and complete authorization and protection for any action taken or suffered by it hereunder in good faith and in accordance with the advice of such counsel.

**9. Replacement Escrow Agent.** Escrow Agent may resign at any time by giving thirty (30) days' prior written notice to all parties hereto, but will continue to serve until a successor is appointed. Stockholder and Buyer will jointly have the right at any time and with or without cause to remove Escrow Agent by a jointly written notice to Escrow Agent. In the event of the resignation or removal of Escrow Agent or in the event Escrow Agent for any reason is unable to serve or fails to continue to serve as agent hereunder, Stockholder and Buyer shall in writing appoint a successor escrow agent, which is mutually acceptable to both Stockholder and Buyer. Any successor escrow agent will have the same rights and duties as the original Escrow Agent and be governed by the terms and conditions set forth in this Escrow Agreement, including but not limited to the terms and conditions relating to resignation, removal and succession set forth in this paragraph 9. If no successor Escrow Agent shall have been appointed within ten business days of a notice of resignation by the Escrow Agent, the Escrow Agent's sole responsibility shall thereafter be to hold the Escrow Amount until the earlier of (i) its receipt of designation of a successor Escrow Agent, or (ii) termination of this Agreement in accordance with its terms.

**10. Miscellaneous.**

(a) Any notices, requests, demands and other communications required or permitted under this Escrow Agreement shall be deemed to be effectively given and deemed received (i) when hand delivered; (ii) one business day after deposit with a national recognized overnight courier who has agreed to deliver the next day or (iii) upon sending a telecopy (with receipt electrically confirmed, in each case, address as follows:

If to Seller:

K-Pipe Merger Corporation
c/o SCALP
750 Lexington Avenue, 30th Floor
New York, New York
Telephone: (212) 826-0770
Telecopier: (212) 826-0077

RLC-AssetExcl.-10/25/99                    3

ENB 00229

EM001-006709

with a copy to:

Howard Teig, CPA
510 Jericho Turnpike, Suite 320
Jericho, New York 11753
Telephone: (516) 931-5506
Telecopier: (516) 931-5327

If to Buyer to:

Midcoast Kansas Pipeline, Inc.
Midcoast Kansas General Partner, Inc.
1100 Louisiana, Suite 2900
Houston, Texas 77002
Attn: General Counsel
Telephone: (713) 650-8900
Telecopier: (713) 650-3232

with copy to:

Ronald L. Chachere, Esq.
Suite 970, 615 N. Upper Broadway
Corpus Christi, Texas 78401
Telephone: (361) 883-2356
Telecopier: (361) 883-2357

If to Escrow Agent:

Rabobank, International
New York Branch
245 Park Avenue, 36th Floor
New York, NY 10167
Attn: Chris Kortland
Telecopier: (212) 922-0969

or to such other person or address as such party may direct the other parties in writing. This Escrow Agreement may not be modified or amended except in a writing signed by all parties hereto.

(b) Except as provided in paragraph 9 hereof, neither this Escrow Agreement, nor any of the rights, duties or obligations of any party hereunder, may be assigned or otherwise delegated by such party without the prior written consent of all other parties hereto, which will not be unreasonably withheld.

ENB 00230

EM001-006710

The invalidity or unenforceability of any provision of this Escrow Agreement shall not affect the validity or enforceability of the remaining provisions hereof.

(e) This Escrow Agreement may be executed in counterparts and the counterparts, taken together, shall be deemed to form one original instrument and may be executed by facsimile.

(f) Buyer and Seller agree to execute, acknowledge and deliver to each other and to Escrow Agent any further writings, documents, instruments or agreements reasonably necessary to give full force and effect to the provisions of the Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be duly executed as of the day and year first above written.

MIDCOAST KANSAS PIPELINE, INC.

By: _____
Name: _Richard Robert_
Title: _Chief Financial Officer and Treasurer_

MIDCOAST KANSAS GENERAL PARTNER, INC.

By: _____
Name: _Richard Robert_
Title: _Chief Financial Officer and Treasurer_

ENB 00231

EM001-006711

**K-PIPE MERGER CORPORATION**

By: _Harry J. Austin_
Name: _Larry J. Austin_
Title: _President_


**COOPERATIEVE CENTRALE RAIFFEISEN-
BOERENLEENBANK B.A., "RABOBANK
NEDERLAND", NEW YORK BRANCH**


By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

ENB 00232

EM001-006712

# K-PIPE MERGER CORPORATION

By: _____
Name: _____
Title: _____


# COOPERATIEVE CENTRALE RAIFFEISEN-
# BOERENLEENBANK B.A., "RABOBANK
# NEDERLAND", NEW YORK BRANCH

By: _____
Name:     J.W. den Baas
Title:    Managing Director

By: _____
Name:     Chris G. Kortlandt
Title:    Vice President

4

ENB 00234

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made and entered into as of November 5, 1999, by and among K-PIPE MERGER CORPORATION, a Delaware corporation (the "Seller"), MIDCOAST ENERGY RESOURCES, INC., a Texas corporation ("MERI"), MIDCOAST KANSAS PIPELINE, INC., a Delaware corporation ("Midcoast Pipeline"), and MIDCOAST KANSAS GENERAL PARTNER, INC., a Delaware corporation ("Midcoast General Partner"). Midcoast Pipeline and Midcoast General Partner are hereinafter sometimes collectively referred to as the "Buyers". The Seller, MERI and the Buyers are hereinafter sometimes collectively referred to as the "Parties" and individually as a "Party".)

## RECITALS

WHEREAS, the Seller has contracted to acquire the businesses known as Kansas Pipeline Company, MarGasCo Partnership, Mid-Kansas Partnership and Riverside Pipeline Company (more specifically defined herein as the "Assets");

WHEREAS, the Seller desires to sell or cause to be sold to the Buyers, and the Buyers desire to purchase the Assets;

WHEREAS, the Buyers are wholly owned direct or indirect subsidiaries of MERI;

WHEREAS, this Agreement contemplates a transaction in which the Buyers will purchase, and the Seller will sell or cause to be sold to the Buyers, the Assets for the consideration hereinafter specified;

## AGREEMENT

In consideration of the mutual agreements, promises and covenants set forth herein and the recitals set forth above, and other good and valuable consideration, the receipt and adequacy of which are acknowledged, the Parties hereto, intending to be legally bound, agree as follows.

## ARTICLE I
## DEFINITIONS

1.1 <u>Defined Terms</u>. As used herein, the following terms shall have the following meanings:

*Adverse Consequences* shall mean all debts, obligations, losses, costs of investigation and defense, damages, liabilities, claims, judgments, awards, settlements, taxes, penalties, fines, assessments and other costs and expenses (including any prejudgment interest in any litigated or arbitrated matter) which may be incurred, made or levied; provided, however, that such term shall not include any punitive or exemplary damages.

ENB 00235

EM001-006715

*Adjustment Amount* shall have the meaning set forth in Section 2.3(b).

*Adjustment Value* shall have the meaning set forth in Section 2.3(b).

*Affiliated Entity or Affiliate, Entities or Persons* shall be deemed Affiliated as to each other to the extent: a) one of the Entities directly or indirectly controls, or is controlled by, the operations of the other, or the direct or indirect control of one of the Entities is exercised by the officers, directors, stockholders, or partners of the other Entity (whether or not such persons exercise such control in their capacities as officers, directors, stockholders, or partners); and b) one of the Entities directly or indirectly owns, and/or its officers, directors, stockholders or partners (limited or general) directly or indirectly own, a five percent (5%) or greater interest in the capital and/or profits of the other Entity. By way of illustration, if Corporation A owns 51% of the stock of Corporation B, which owns 51% of the stock of Corporation C, which owns 51% of the stock of Corporation D; then each of A, B, C and D would be an Affiliate of each and every one of the other three corporations.

*Agreement* shall mean this Asset Purchase Agreement, including the preamble, recitals, schedules and exhibits hereto, all of which are hereby incorporated herein by reference and made a part hereof.

*Agreement-Related Litigation* shall have the meaning set forth in Section 9.5.

*Assets* shall mean all of those Partnership Interests together with certain other assets, properties, rights, holdings and interests described or referred to on Schedule 1.1(A) hereto.

*Butcher Interests* shall have the meaning set forth on Schedule 1.1(B) hereto.

*Buyers' Disclosure Schedule* shall mean that schedule from the Buyers to the Seller to be delivered upon the execution of this Agreement, and updated, subject to the approval of the Seller, and redelivered at Closing, which sets forth certain disclosures concerning the Buyers and their businesses.

*Buyers' Indemnified Parties* shall have the meaning set forth in Section 6.2.

*Buyers' Indemnified Party* shall have the meaning set forth in Section 6.2.

*Buyers' Revised Adjustment Value* shall have the meaning set forth in Section 2.3(c).

*Close* shall mean the concluding of the Transaction.

*Closing* shall mean a meeting for the purpose of concluding the Transaction to be held at the place and on the date fixed in accordance with Section 2.6.

*Closing Approval* shall mean the expiration or early termination of any waiting period pursuant to the HSR Act in connection with Filing Number 20000034.



ENB 00236

EM001-006716

*Closing Date* shall mean the date upon which the Preliminary Cash Consideration is paid to the Seller by the Escrow Agent pursuant to the Escrow Agreement.

*Code* shall mean the Internal Revenue Code of 1986, as amended.

*Companies* shall mean collectively MGC, MID-KANSAS, KPC, and RIVERSIDE.

*Companies' Financial Statements* shall have the meaning set forth in Section 3.5.

*Cut-Off Date* shall mean November 5, 1999 at 4:00 p.m. central time.

*Debt* shall mean (i) the principal of long term debt, current principal portion of long term debt, and the principal portion of short term notes payable of the Companies, all as defined by generally accepted accounting principles, and (ii) the debt obligations of Syenergy described in Schedule 1.1(C), but specifically shall not include the Retained Liabilities.

*Effective Time* shall mean 12:01 a.m. as of the Closing Date.

*Entity* shall mean any corporation, proprietorship, partnership (general or limited), trust, estate, foundation, association or any other entity or group.

*Environmental Claim* shall mean any action, cause of action, claim, investigation, demand or notice by any Person alleging liability under or non-compliance with any Environmental Law.

*ERISA* shall mean The Employee Retirement Income Security Act of 1974, as amended.

*Escrow Agent* shall mean Cooperative Centrale Raiffeisen-Boerenleenbank B.A., "Rabobank International", New York branch.

*Escrow Agreement* shall mean the Agreement attached hereto as Schedule 2.6.

*Excluded Assets* shall have the meaning set forth in Section 2.5.

*GAAP* shall mean generally accepted accounting principles consistently applied.

*Gas Contracts* shall have the meaning set forth in Section 3.16.

*Governmental Authority* shall mean the federal government, any state, county, municipal, local or foreign government and any governmental agency, bureau, commission, authority or body.

*HSR Act* shall mean The Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

*Indemnified Party* shall have the meaning set forth in Section 6.4(a).

*Indemnifying Party* shall have the meaning set forth in Section 6.4(a).

ENB 00237

EM001-006717

*Judgment* shall mean any judgment, writ, injunction, order or decree of or by any court, judge, justice or magistrate, including any bankruptcy court or judge, having appropriate jurisdiction, and any adjudicative order of or by a Governmental Authority.

*KPC* shall mean Kansas Pipeline Company, a Kansas general partnership.

*Law* shall mean the common law and any statute, ordinance, code or other law, rule, regulation, order, requirement or procedure enacted, adopted, promulgated, applied or followed by any Governmental Authority or court.

*Lien* shall mean any mortgage, lien or encumbrance, which (i) creates or confers an interest in property to secure payment or performance of a liability, obligation or claim, or which retains or reserves such an interest for such purpose; (ii) grants to any Person the right to purchase or otherwise acquire, or obligates any Person to sell or otherwise dispose of, or otherwise results or may result in any Person acquiring, any property or interest in property; (iii) restricts the transfer of, or the exercise of any rights in or the enjoyment of any benefits arising by reason of ownership of, any property; or (iv) otherwise constitutes an interest in, or claim against, property, whether arising pursuant to any Law, Judgment or any binding contract.

*Material Adverse Effect* shall mean any change, event, occurrence or state of facts which is or which would reasonably be expected to lead to an adverse change or effect on in the business or operations pertaining to the Assets and/or Adverse Consequences as the case may be, which is material to the Assets other than any change or effect (i) arising out of general economic conditions, (ii) arising with respect to the industry to which the Assets are related, but not specifically relating to the Assets, (iii) arising out of or as a result of the public announcement of the Transaction, or (iv) arising out of events or facts set forth on the Seller's Disclosure Schedule or the Buyers' Disclosure Schedule. No change or event shall be material unless it is individually greater than $250,000 (not including multiples of revenues or earnings in the case of changes or events affecting the revenue or earnings of the relevant company).

*MID-KANSAS* shall mean Mid-Kansas Partnership, a Kansas general partnership.

*MRG* shall mean MarGasCo Partnership, an Oklahoma general partnership.

*Partnership Interests* shall mean one-hundred percent (100%) of the partnership interests in each of KPC, MGC, MIDKANSAS, and RIVERSIDE.

*Pending Claims* shall have the meaning set forth in Section 3.6.

*Partnership Debt Instruments* shall mean the debt obligations of SYENERGY and MGC described in Schedule 1.1(C).

*Person* shall mean any natural person, corporation, limited liability company, general or limited partnership, joint venture, trust, association, unincorporated entity of any kind or Governmental Authority.

ENB 00238

EM001-006718

*Preliminary Cash Consideration* shall mean a sum of cash equal to $179,216,444, plus or minus the Adjustment Amount as defined in Section 2.3(b) below and minus the Debt as of the Closing.

*Purchase Price* shall mean the Preliminary Cash Consideration, as adjusted at and following Closing as set forth in Article II.

*Revised Adjustment Amount* shall have the meaning set forth in Section 2.3(c).

*Revised Adjustment Value* shall have the meaning set forth in Section 2.3(c).

*Representatives* shall mean officers, employees, legal counsel, financial advisors, accountants or other authorized representatives of any of the Parties, to be provided access to information.

*Retained Liabilities* shall have the meaning set forth in Section 2.4.

*RIVERSIDE* shall mean Riverside Pipeline Company, L.P., a Kansas general partnership.

*Seller's Disclosure Schedule* shall mean that schedule from the Seller to the Buyers to be delivered upon the execution of this Agreement, and updated, subject to approval of the Buyers, and redelivered at the Closing, which sets forth certain disclosures concerning the Seller and its Partnership Interests.

*Seller's Revised Adjustment Value* shall have the meaning set forth in Section 2.3(c).

*Subsidiary* shall mean in reference to any entity, any corporation, limited liability company, limited partnership or general partnership, a majority of the outstanding voting securities or voting control of which are owned directly or indirectly by such entity.

*SYENERGY* shall mean Syenergy Pipeline Company, L.P., a Kansas limited partnership.

*Taxes* shall mean all Federal, state, local, foreign and other taxes of any kind, including without limitation, those on or measured by or referred to as income, gross receipts, sales, use, ad valorem, franchise, profits, withholding, payroll, employment, excise, severance, stamp, occupation, value added, windfall profits taxes, customs duties or similar fees and assessments of any kind, including interest, penalties and additions to tax or additional amounts imposed by any governmental authority with respect thereto.

*Tax Returns* shall mean all returns, declarations, reports, information returns and statements with respect to Taxes of whatsoever kind.

*Third Party Claim* shall have the meaning set forth in Section 6.4.

*Threshold* shall have the meaning set forth in Section 6.5.

*Transaction* shall mean the transaction contemplated by this Agreement.

ENB 00239

EM001-006719

*True-up Date* shall have the meaning set forth in Schedule 2.3(b).

1.2 Additional Terms. Terms not set forth in Section 1.1, but otherwise defined in the body of this Agreement, shall have the specific meanings attributed to them in the text. Terms in the singular shall have the same meanings when used in the plural and vice versa.

## ARTICLE II
## PURCHASE AND SALE

2.1 Purchase and Sale. Upon the terms and subject to the terms and conditions of this Agreement at the Closing, but effective as of the Effective Time, the Buyers will purchase directly from the Affiliates of the Seller that own the Assets, and the Seller will cause its Affiliates that own the Assets to sell and transfer to the Buyers, the Assets for the Purchase Price.

2.2 Preliminary Cash Consideration. The Buyers agree to pay to the Seller, at the Closing, the Preliminary Cash Consideration with the adjustments set forth in Section 2.3.

2.3 Adjustments.

     (a)     The Preliminary Cash Consideration shall be paid to the Seller at Closing.

     (b)     The Preliminary Cash Consideration paid to the Seller at Closing shall be increased or decreased (as the case may be) (with such difference being paid in cash as hereinafter provided by either the Buyers or the Seller, as the case may be) to the extent the Adjustment Value (based on the Seller's estimate as provided below) is greater or less than Twenty-Five Thousand Dollars ($25,000) (such difference is referred to as the "Adjustment Amount"). "Adjustment Value" shall be calculated on a consolidated basis as of the True-up Date, in accordance with GAAP, for the Companies as set forth on Schedule 2.3(b). The Seller shall submit to the Buyers its good faith estimate of the Adjustment Value as of and including November 4, 1999.

     (c)     After the True-up Date, the Seller and the Buyers shall true up Seller's estimate of the Adjustment Value made prior to True-up Date. The Revised Adjustment Value or Revised Adjustment Amount shall be determined based on Schedule 2.3(b) as follows:

     (i)     Seller shall submit to the Buyers, not more than thirty (30) days after the True-up Date, its good faith estimate of the Adjustment Value as revised based on any information then available to the Seller (the "Revised Adjustment Value"). The Seller shall also provide the Buyers with the work papers and back-up materials used in preparing its estimated Revised Adjustment Value.

     (ii)     Within thirty (30) days after receiving the Revised Adjustment Value from the Seller, the Buyers shall prepare and deliver to the Seller a detailed statement as to their calculation of the Adjustment Value (the "Buyers' Revised Adjustment Value").


ENB 00240

EM001-006720

(iii)   If the Seller has any objections to the Buyers' Revised Adjustment Value calculation, it shall deliver a detailed statement describing its objections to the Buyers and setting its calculation of the Revised Adjustment Value (the "Seller's Revised Adjustment Value") within thirty (30) days after receiving the Buyers' Revised Adjustment Value calculation. The Seller and the Buyers shall use reasonable efforts to resolve any such objections themselves. If they do not resolve such objection within thirty (30) days after the Seller has delivered its statement of objections, the Buyers and the Seller shall select an accounting firm mutually acceptable to them which shall resolve any remaining objections. If they are unable to agree on the choice of accounting firm, they shall select a nationally-recognized accounting firm by lot (after excluding their respective regular outside accounting firms), which such selection shall occur no later than ten (10) days following the expiration of the foregoing thirty (30) day time period. The determinations made by the accounting firm so selected shall be set forth in writing and shall be conclusive and binding upon all parties hereto. The determinations made by the accounting firm shall be delivered to the Buyers and the Seller no later than thirty (30) days following selection of the accounting firm. The Seller and the Buyers shall revise the statement of the Revised Adjustment Value as appropriate to effect the resolution of any objections thereto pursuant to this Section 2.3 and such revised statement shall be the Revised Adjustment Value. The difference (positive or negative) between the Revised Adjustment Value and the Adjustment Value shall be paid by the Seller or the Buyers, as appropriate, within three (3) business days after the final determination of the Revised Adjustment Amount.

(iv)   In the event the Buyers and the Seller submit any unresolved objections to an accounting firm for resolution as provided in this section, they shall share responsibility for the fees and expenses of the accounting firm as follows:

(A)   if the accounting firm resolves all of the unresolved objections in favor of the Buyers, the Seller shall be responsible for all of the fees and expenses of the accounting firm;

(B)   if the accounting firm resolves all of the unresolved objections in favor of the Seller, the Buyers shall be responsible for all of the fees and expenses of the accounting firm;

(C)   if the accounting firm resolves some of the unresolved objections in favor of the Buyers and the rest of the unresolved objections in favor of the Seller, the Buyers shall be responsible for the fraction of the fees and expenses of the accounting firm equal to (x) the difference between the Revised Adjustment Value and the Buyers' Revised Adjustment Value, divided by (y) the difference between the Seller's Revised Adjustment Value and the Buyers' Revised Adjustment Value.

Example #1:

If the Buyers' Revised Adjustment Value is 100, the Revised Adjustment Value is 125, and the Seller's Revised Adjustment Value is 175, then the Buyers shall pay 25/75 or 1/3 of the fees and expenses of the accounting firm, and the Seller shall pay the remaining 2/3.

ENB 00241

EM001-006721

$$125-100 \quad = \quad 25 \text{ or } 1/3$$

$$175-100 \quad\quad 75$$

Example #2:

> If the Buyers' Revised Adjustment Value is 50, the Revised Adjustment Value is 150, and the Seller's Revised Adjustment is 200, then the Buyers' shall pay 100/150 or 2/3 of the fees and expenses of the accounting firm, and the Seller shall pay the remaining 1/3.

$$150-50 = \quad 100 \text{ or } 2/3$$

$$200-50 \quad\quad 150$$

(v)    The Buyers shall make the books and records of the Companies and its Affiliates available for inspection, review and copying to the Seller and its accountants and other representatives. The Buyers shall cooperate with the Seller and will make the work papers and backup materials used in preparing the statement of the Buyers' Revised Adjustment Value available to the Seller and its accountants and other representatives in each case at reasonable times and upon reasonable notice at any time during (A) the preparation by the Buyers of the statement of Buyers' Revised Adjustment Value, (B) the review by the Seller of the statement of Buyers' Revised Adjustment Value, and (C) the resolution by the Buyers and the Seller of any objections thereto.

2.4  <u>Assumption of Debt</u>.  Subject to the Closing, the Buyers agree to pay or cause to be paid, substantially simultaneous with the Closing, all indebtedness evidences by the Partnership Debt Instruments. The Buyers shall pay any and all principal, interest, make whole premium, and any and all other premiums, costs, fees (including assumption fees), penalties, due or which may be due at Closing or at any date thereafter, pursuant to the terms of the Partnership Debt Instruments. The Partnership Debt Instruments are identified in the Seller's Disclosure Schedule. Except for the Debt, the Buyers shall not assume by virtue of this Agreement or transactions contemplated hereby, and shall have no liability for, any liabilities of the Seller (or any Affiliates of the Seller) of any kind, character or description whatsoever (the "Retained Liabilities").

2.5  <u>Excluded Assets</u>.  The following assets associated with the businesses of the Companies are specifically excluded from the purchase and sale contemplated by this Agreement:

(a)  The Butcher Interests;

(b)  The $10,000,000 principal balance in the Cash Reserve Account held in the name of Syenergy Pipeline Company, L.P. at State Street Bank and Trust Company, Boston, Massachusetts; and

(c)  Any and all causes of action, tort or breach of contract, or otherwise, held by Companies and/or their Affiliated Entities against Western Resources, Inc. and/or OneoK, Inc. or their Affiliated

ENB 00242

EM001-006722

Entities arising out of or related to the failure of Western Resources, Inc. to sell Companies and/or their Affiliated Entities the gas local distribution company assets and business which is now KGS, a division of OneoK, Inc.

2.6 <u>Closing</u>. On November 8, 1999, the Preliminary Cash Consideration and all documents required by Section 2.7 shall be deposited by the Parties with the Escrow Agent pursuant to the Escrow Agreement attached hereto as Schedule 2.6. The Closing of the Transaction shall occur at the offices of LeBoeuf, Lamb, Greene & MacRae LLP, 125 West 55th Street, New York, NY 10019-5389, commencing at 10:00 A.M., local time, on November 9, 1999, unless extended by reason of any cure periods which the Buyers or the Seller may have pursuant to Article VIII with which to cure a breach of warranty, a misrepresentation or perform a covenants, in which event the Closing shall occur on the first day following such cure period or the date otherwise mutually agreed to by the Parties.

2.7 <u>Deliveries at Closing</u>. At Closing, (i) the Seller will deliver to the Buyers the various certificates, instruments and documents referred to in Section 7.2, (ii) the Buyers will deliver to the Seller the various certificates, instruments and documents referred to in Section 7.3, (iii) the Seller will deliver to the Buyers such instruments of assignment, conveyance and transfer, with general warranty of title, and otherwise in form and content mutually acceptable to the Seller and the Buyers, as shall be necessary to transfer and convey to the Buyers all of the Assets, (iii) the Escrow Agent will deliver the Preliminary Cash Consideration to the Sellers, and (v) the Buyers will deliver to the Seller such instruments which evidence, in form and content reasonably acceptable to the Seller, compliance with the provisions of Section 2.4 hereof.

2.8 <u>Apportionments</u>. The Buyers shall be responsible for the actual payment of all ad valorem and property taxes with respect to the Assets for the calendar year in which the Closing occurs; provided, however, that the Seller shall reimburse the Buyers for its pro rata share of such taxes to the extent not previously paid by the Seller. An estimate of such taxes shall be made at the Closing and such amount shall be paid to the Buyers at Closing. The ad valorem and property taxes for the year of Closing for which the Seller is responsible shall be determined by applying a fraction based on the number of days in the calendar year prior to the Effective Time to such taxes for the calendar year. Payment of any amount owed by the Buyers to the Seller or by the Seller to the Buyers shall be made within thirty (30) days after the actual ad valorem and property taxes with respect to the Assets for the calendar year in which Closing occurs have been determined.

2.9 <u>Purchase Price Allocation</u>. Within sixty (60) days from Closing, the Buyers will provide to the Seller a schedule of the Buyers' estimated allocation of the Purchase Price among the Assets acquired.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES REGARDING THE SELLER AND THE COMPANIES

ENB 00243

EM001-006723

Except as provided in this Agreement and except as set forth in the Seller's Disclosure Schedule (each section of which qualifies all of the relevant representations or warranties), the Seller represents and warrants to the Buyers as follows:

3.1 Corporate Organization, Qualification and Power. The Seller and each of the Companies is duly formed, validly existing and in good standing under the Laws of the jurisdiction of its formation, and is duly qualified to conduct its business and each is in good standing in every other jurisdiction in which its business is conducted, except where failure to be so qualified, licensed or to be in good standing would not have a Material Adverse Effect. The Seller and each of the Companies has the power to own or lease its respective properties and to carry on its business as now being conducted, wherever located.

3.2 Authorization of Agreement and the Transaction. The Seller has all requisite corporate power and authority to approve, authorize, execute and deliver this Agreement and to consummate the Transaction. This Agreement and the consummation of the Transaction by the Seller have been duly and validly authorized by the Seller's Board of Directors and no other corporate proceedings on the part of the Seller are necessary to authorize this Agreement or to consummate the Transaction.

3.3 Enforceable Agreement. This Agreement has been duly and validly executed and delivered by the Seller and, assuming it constitutes the valid and binding agreement of MERI and the Buyers, constitutes a valid and binding obligation of the Seller, enforceable against the Seller according to its terms, subject to bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting the enforceability of contractual obligations and creditor's rights generally and by the application of equitable principles by courts of competent jurisdiction, sitting at law or in equity.

3.4 No Conflicts, Violations, Breaches or Defaults. Except as set forth on the Seller's Disclosure Schedule or in this Section 3.4, the execution and delivery of this Agreement by the Seller and its performance of the obligations hereunder and the consummation of the Transaction, do not (a) conflict with or result in any breach of any provision of the Articles of Incorporation, as amended, or Bylaws, as amended, of the Seller or the Companies; (b) require any consent, approval, authorization or permit of, or filing with, or notification to, any Governmental Authority, except (i) in connection with the applicable requirements, if any, of the HSR Act; (ii) the filing of appropriate documents with the relevant authorities of states in which the Seller or any of its Affiliates or Subsidiaries is authorized to do business, (iii) approvals, if any, required of the Federal Energy Regulatory Commission ("FERC") and any Governmental Authorities having jurisdiction over the Seller or any of its Affiliates or Subsidiaries; (iv) approvals of the lenders to Seller; or (v) where the failure to obtain such consent, approval, authorization or permit, or to make such filing or notification, would not have a Material Adverse Effect or materially adversely affect the ability of the Seller to consummate the Transaction; (c) except as would not have a Material Adverse Effect, conflict with or result in a breach or violation of, or constitute a default under, or result in (or create in any party the right to cause) the acceleration of any performance required by the Seller under, (i) any Judgment or Law to which it is subject or bound (subject to any consents, approvals, authorizations, permits, filings or notifications required under (b) above), or (ii) any mortgage, bond,

ENB 00244

EM001-006724

indenture, agreement, contract, license or other instrument or obligation to which the Seller is subject or bound; or (d) result in the creation of any Lien on any of the assets of the Seller, its Subsidiaries and Affiliates, which would have a Material Adverse Effect, except for liens created under this Agreement, Schedules or Exhibits hereto and related transactions and as accepted by the Buyers.

3.5 <u>Financial Statements</u>. The consolidated balance sheets and the related consolidated statements of earnings, stockholders' equity and cash flows (including the related notes thereto) of the Companies for and as of December 31, 1997 and 1998 and for and as of June 30, 1999 (collectively, "Companies' Financial Statements") and included in Seller's Disclosure Schedule, have been prepared in accordance with GAAP applied on a basis consistent with prior periods (except as otherwise noted therein), and present fairly the financial position of the Companies as of their respective dates, and the consolidated results of their operations and their cash flows for the periods presented therein (subject, in the case of the unaudited interim financial statements, to normal year-end adjustments and except that the unaudited interim financial statements do not contain all of the footnote disclosure required by GAAP).

3.6 <u>Litigation</u>. Except as set forth on the Seller's Disclosure Schedule (the "Pending Claims"), there is no action, suit, claim, governmental investigation, arbitration or other proceeding pending, or, to the actual knowledge of the Seller's present or former officers, threatened in writing, against the Companies or their present Affiliates, the Seller, any of its Subsidiaries or any of the Affiliates which, if adversely determined, would have a Material Adverse Effect.

3.7 <u>Taxes</u>. The Companies have timely filed all material Tax Returns required to be filed (taking into account extensions approved by Governmental Authorities) and as of the Effective Time will have paid all Taxes for periods prior to the Effective Time to be due and have provided reserves in accordance with GAAP in their respective financial statements for any Taxes that have not been paid, whether or not shown as being due on any Tax Returns, except as set forth in the Seller's Disclosure Schedule or where the failure to pay or provide for such Taxes would not have a Material Adverse Effect, and (i) no material claim for unpaid Taxes has been asserted against the Companies or the Assets in writing by a tax authority or has become a Lien (except for Liens for Taxes not yet due and payable or for Taxes that are being disputed in good faith by appropriate proceedings and that have been reserved against in accordance with GAAP) against Assets or the property of the Companies, except as to such matters as would not have a Material Adverse Effect, (ii) as of the date of this Agreement, no audit of any material Tax Return of the Companies is being conducted by a tax authority, and (iii) as of the date of this Agreement, no extension of the statute of limitations on the assessment of any Taxes has been granted by the Companies and is currently in effect.

3.8 <u>Environmental Laws and Regulations</u>. Except as set forth on Seller's Disclosure Schedule, the Companies and their present Affiliates, the Seller and each of its Subsidiaries and the Affiliates (a) are in compliance with Environmental Laws (as defined below) except for noncompliance that will not have a Material Adverse Effect, and (b) have not received written notice of, or to the actual knowledge of any of the present or former officers of the Companies and their present Affiliates, the Seller, its Subsidiaries and the Affiliates, are the subject of an Environmental Claim which would have a Material Adverse Effect. The term "Environmental Laws" shall mean any state or federal

ENB 00245

EM001-006725

environmental statute or regulation, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (collectively, "Environmental Laws").

3.9 <u>Compliance with Applicable Laws</u>.  Except as set forth on the Seller's Disclosure Schedule or for violations that will not have a Material Adverse Effect, the businesses of the Companies and their present Affiliates, the Seller, its Subsidiaries and the Affiliates are not being conducted in violation of any Laws.

3.10 <u>Title to Properties</u>. The Companies and their present Affiliates, the Seller and each of its Subsidiaries and the Affiliates have good and marketable title to, or valid leasehold interests in, all their respective material properties and assets except for such as are no longer used or useful in the conduct of their respective businesses or as have been disposed of in the ordinary course of business and except for defects in title, easements, encroachments, restrictive covenants and similar encumbrances or impediments that would not have a Material Adverse Effect.  All such assets and properties of the Companies, other than assets and properties in which the Companies have leasehold interests, are free and clear of all Liens except for Liens that would not have a Material Adverse Effect and those set forth on the Seller's Disclosure Schedule.

3.11 <u>Employee Benefit Matters</u>.

(a) The Seller has furnished to the Buyers true and complete copies of all material employee benefit plans within the meaning of Section 3(3) of ERISA that covers employees, directors, former employees or former directors of the Companies, all as listed on the Seller's Disclosure Schedule. In addition, the Seller has furnished all trust agreements or insurance contracts forming a part of any such employee benefit plans maintained by or for the Companies, a copy of the most recent determination letter for any such employee benefit plan which is an employee pension benefit plan within the meaning of Section 3(2) of ERISA and is intended to comply with Section 401(a) of the Code, and a copy of the most recent Form 5500, if applicable.

(b) Each of the employee benefit plans maintained by or for the Companies is in substantial compliance with all applicable Laws including ERISA and the Code, except for any noncompliance that would not have a Material Adverse Effect

(c) No employee benefit plan is a "multiemployer plan" as such term is defined in Section 4001(a)(3) of ERISA or Section 414(f) of the Code or a multiemployer plan described in clauses (i) or (ii) of Section 3(37)(A) of ERISA; or is a part of a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(d) There are no pending, threatened, or anticipated claims (other than routine claims for benefits or immaterial claims) by, on behalf of or against any of the employee benefit plans or any trusts related thereto that would have a Material Adverse Effect.

ENB 00246

EM001-006726

3.12 <u>Broker's Fees</u>. The Seller has not employed any investment bank, broker, finder, consultant or other intermediary which would be entitled to any fee or commission from the Buyers in connection with this Agreement or the Transaction.

3.13 <u>Absence of Certain Changes or Events</u>. Since December 31, 1998, the Companies and their present Affiliates, the Seller and its Subsidiaries and the Affiliates have conducted their business in all material respects in the ordinary course consistent with past practice, and there is not and has not been: (i) any change which has had a Material Adverse Effect, or (ii) any condition, event or occurrence which is reasonably likely to have a Material Adverse Effect.

3.14 <u>Labor Matters</u>. As of the date of this Agreement, neither the Companies nor their present Affiliates, nor the Seller nor any of its Subsidiaries or the Affiliates, is a party to or bound by, and none of their employees is subject to, any collective bargaining agreement relating to the term and conditions of employment for any group of employees (any such agreement, memorandum or document, a "Collective Bargaining Agreement"), and as of the date of this Agreement there are no labor unions or other organizations representing or, to the knowledge of any of the present or former officers of the Companies or their present Affiliates, the Seller, purporting to represent, any employees employed by the Seller or its Subsidiaries. As of the date of this Agreement, no labor union is currently engaged in or, to the knowledge of any of the present or former officers of the Companies or their present Affiliates or the Seller, threatening, organizational efforts with respect to any employees of the Seller or any of its Subsidiaries.

3.15 <u>Year 2000 Compatibility</u>. Except as set forth on the Seller's Disclosure Schedule, the Companies have developed and are executing a plan (the "Y2K Plan") to address significant year 2000 compatibility issues. In the case of certain equipment with imbedded chips where testing for year 2000 compliance is impossible or impractical, the Y2K Plan may include plans and strategies for replacing such capability with redundant capacity within the Companies or with alternative third party sourcing with comparable quality and pricing, excluding any provider of basic services and utilities.

3.16 <u>Gas Contracts</u>. All material gas sales, purchase and transportation contracts (the "Gas Contracts") to which the Companies, or either of them, is a party or is otherwise bound are listed on the Seller's Disclosure Schedule. Copies of all such Gas Contracts, together with all amendments, modifications, revocations and notices pertaining thereto have been delivered or made available to the Buyers. Except as set forth and expressly noted on the Seller's Disclosure Schedule, none of the Companies or their present Affiliates, or the Seller, its Subsidiaries and the Affiliates is party to any arrangement under which it will be obligated, by virtue of a prepayment arrangement, a "take-or-pay" arrangement or any other arrangement, to transport or deliver hydrocarbons at some future time without then or thereafter receiving full payment therefor, or to pay for hydrocarbons or their transportation without then receiving such hydrocarbons.

3.18 <u>No Defaults</u>. Except as set forth on the Seller's Disclosure Schedule, to the actual knowledge of the present and former officers of the Companies or their present Affiliates, the Seller, its Subsidiaries and the Affiliates, (i) none of the Seller, its Subsidiaries and the Affiliates is in breach or default under any term or provision of any of the Gas Contracts, except where such breaches or

ENB 00247

EM001-006727

defaults would not, either individually or in the aggregate, have a Material Adverse Effect, (ii) all of the Gas Contracts are in full force and effect, and constitute legal, valid and binding obligations of the Companies, and to the Companies and their present Affiliates and the Seller's knowledge, the other Parties thereto except where the failure to be in full force and effect and legal, valid and binding would not have a Material Adverse Effect, (iii) none of the Companies and their present Affiliates has received any written notice from any other party indicating any intent to rescind or dishonor any material provision contained in any of the Contracts. Except as set forth on the Seller's Disclosure Schedule, none of the Companies and their present Affiliates, the Seller, its Subsidiaries and the Affiliates is a party to any contract to sell any portion of its assets other than in the ordinary course of business.

3.18 Insurance. To the actual knowledge of the present and former officers of the Companies and their present Affiliates, the Seller, its Subsidiaries and the Affiliates, the Companies or their Affiliates maintain in effect insurance on their respective assets as described on the Seller's Disclosure Schedule and such insurance policies are in full force and effect on the date hereof and will remain in effect through the Closing. To the actual knowledge of the present and former officers of the Companies and their present Affiliates, the Seller, its Subsidiaries and the Affiliates, none of the Companies and their Affiliates is in default with respect to any provision contained in any insurance policy covering any portion of their assets, except where such default would not have a Material Adverse Effect.

3.19 Tariffs. To the actual knowledge of the present and former officers of the Companies and their present Affiliates and the Seller, except as set forth on the Seller's Disclosure Schedule or for noncompliance that will not have a Material Adverse Effect, all operations of any of the Companies which are subject to a tariff approved by FERC are in compliance with each such tariff.

3.20 Gas Imbalances. To the actual knowledge of the present and former officers of the Companies and their present Affiliates, the Seller, its Subsidiaries and the Affiliates, as of September 30, 1999 the KPC and MRG imbalances are as set forth in the Seller's Disclosure Schedule.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF MERI AND BUYERS

Except as set forth in th e Buyers' Disclosure Schedule (each section of which qualifies the correspondingly numbered representation or warranty) MERI and the Buyers jointly and severally represent and warrant to the Seller as follows:

4.1 Corporate Organization, Qualification and Power. Each of MERI and the Buyers is a corporation duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and is duly qualified to conduct its business in every other jurisdiction in which its business is conducted, except where failure to be so qualified or licensed would not have a Material Adverse Effect on the Seller. Each of MERI and the Buyers has the corporate power to own or lease its respective properties and to carry on its business as now being conducted, wherever located.

ENB 00248

EM001-006728

4.2 Authorization of Agreement and the Transaction. MERI and the Buyers have all requisite corporate power and authority to approve, authorize, execute and deliver this Agreement and to consummate the Transaction. This Agreement and the consummation of the Transaction by MERI and the Buyers have been duly and validly authorized by the Boards of Directors of MERI and each of the Buyers and no other corporate proceedings on the part of MERI or either of the Buyers are necessary to authorize this Agreement or to consummate the Transaction.

4.3 Enforceable Agreement. This Agreement has been duly and validly executed and delivered by MERI and the Buyers and, assuming it constitutes the valid and binding agreement of the Seller, constitutes a valid and binding obligation of each of MERI and the Buyers, enforceable against each of them according to its terms, subject to bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting the enforceability of contractual obligations and creditor's rights generally and by the application of equitable principles by courts of competent jurisdiction, sitting at law or in equity.

4.4 No Conflicts, Violations, Breaches or Defaults. The execution and delivery of this Agreement by each of MERI and the Buyers and their performance of the obligations hereunder and the consummation of the Transaction, do not (a) conflict with or result in any breach of any provision of the respective Articles of Incorporation, Certificate of Incorporation or Bylaws of MERI or the Buyers; (b) require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority, except (i) in connection with the applicable requirements, if any, of the HSR Act; (ii) approvals, if any, required of Governmental Authorities having jurisdiction over MERI or either of the Buyers; or (iii) where the failure to obtain such consent, approval, authorization or permit, or to make such filing or notification, would not have a Material Adverse Effect on MERI or the Buyers or materially adversely affect the ability of the Buyers to consummate the Transaction; (c) except as would not, individually or in the aggregate, have a Material Adverse Effect, conflict with or result in a breach or violation of, or constitute a default under, or result in (or create in any party the right to cause) the acceleration of any performance of MERI or the Buyers under, (i) any Judgment or Law to which they are subject or bound (subject to any consents, approvals, authorizations, permits, filings or notifications required under (b) above), or (ii) any mortgage, bond, indenture, agreement, contract, license or other instrument or obligations to which MERI or either of the Buyers are subject or bound; or (d) result in the creation of any Lien on any of the assets of MERI or either of the Buyers which would have a Material Adverse Effect on MERI or either of the Buyers.

4.5 Litigation. There is no action, suit, claim, governmental investigation, arbitration or other proceeding pending, or, to the actual knowledge of the officers of MERI or either of the Buyers, threatened in writing, against MERI or either of the Buyers which, if adversely determined would have a Material Adverse Effect.

4.6 Taxes. Each of MERI and the Buyers and its Subsidiaries has (a) filed all material Tax Returns that they are required to file through the date hereof and shall prepare and file all material Tax Returns required to be filed after the date hereof and on or before the Closing and (b) paid or provided for the payment of all Taxes due and owing for the periods covered by such Tax Returns

ENB 00249

EM001-006729



and all Taxes, if any, required to be paid for which no return is required, except in either case where the failure to file such returns or to pay or provide for such Taxes would not have a Material Adverse Effect.

4.7. Environmental Laws and Regulations. Except as set forth on the Buyers' Disclosure Schedule or for non-compliance that will not have a Material Adverse Effect, MERI and each of the Buyers and each of its Subsidiaries (a) are in compliance with Environmental Laws, and (b) have not received written notice of, or, to the actual knowledge of the officers of MERI or either of the Buyers, is the subject of an Environmental Claim.

4.8 Compliance with Applicable Laws. Except as set forth on the Buyers' Disclosure Schedule or for violations that will not have a Material Adverse Effect, the businesses of MERI and the Buyers and its Subsidiaries are not being conducted in violation of any Laws.

4.9 Broker's Fees. Neither MERI nor either of the Buyers has employed any investment bank, broker, finder, consultant or other intermediary which would be entitled to any fee or commission from the in connection with the Transaction.

## ARTICLE V
## CONDUCT PENDING THE CLOSING AND COVENANTS

5.1 Conduct of Business by the Seller. Except as set forth in this Agreement or on the Seller's Disclosure Schedule, the Seller covenants and agrees that prior to Closing, unless MERI and the Buyers otherwise agree in writing or as otherwise contemplated by this Agreement, it will cause the Companies to conduct their business and day to day operations in the ordinary and usual course of business, consistent with its past custom and practice, and will seek to preserve intact the business organizations and goodwill of the Companies keep in full force and effect all material rights, licenses, permits and franchises relating to such businesses, and maintain satisfactory relationships with suppliers, customers and others having business relationships with the Companies. The Seller specifically agrees that, prior to Closing, unless MERI and the Buyers otherwise agree in writing or as otherwise contemplated by this Agreement, neither the Seller nor any its Seller's Subsidiaries or Affiliates, will:

(a) except as contemplated by this Agreement, take any action which would render, or which reasonably may be expected to render, any representation or warranty made by it in this Agreement untrue in any material respect at the Effective Time;

(b) take any action that would, or that could reasonably be expected to, cause any condition to Closing, as set forth in Article VII hereof, to not be satisfied; or

(c) authorize, propose or announce an intention to do any of the foregoing, or enter into any contract or agreement to do any of the foregoing.

5.2 All Reasonable Efforts. Subject to the terms and conditions herein, each of the Parties shall use reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things

ENB 00250

EM001-006730



necessary, proper or advisable under applicable Laws to consummate and make effective the Transaction (but shall not be required to file or prosecute any lawsuits or administrative proceedings, or otherwise expend any sums in excess of $200,000 in connection with its reasonable efforts), including using reasonable efforts to obtain all necessary or appropriate waivers, consents and approvals, to effect all necessary registrations, filings and submissions, including, but not limited to, (i) filings under the HSR Act and any other submissions required by any Governmental Authority, including FERC, and (ii) required approvals under the applicable Laws and to lift any injunction or other legal bar to the Transaction (and, in such case, to proceed with the Closing as expeditiously as possible).

5.3 <u>Access to/Confidentiality of Information</u>.  Upon reasonable notice, the Seller, MERI, and the Buyers shall (and shall cause their Subsidiaries and the Affiliates to) afford to each other's Representatives, so that they may evaluate the Transaction, reasonable access during normal business hours throughout the period prior to the Closing, to all properties, personnel, books and records and other information as reasonably requested under the circumstances, and, during such period, furnish promptly to such Representatives the specific information concerning the Assets and the business, properties and personnel, including, but not limited to, that listed on the Seller's Disclosure Schedule. Each of MERI and the Buyers agrees that it will not, and will cause its Representatives not to, use any information obtained pursuant to this Section 5.3 for any purpose unrelated to the consummation of the Transaction.

5.4 <u>Publicity</u>. The Parties will consult with each other and will mutually agree upon any press releases or public announcements pertaining to the Transaction and shall not issue any such press releases or make any such public announcements prior to such consultation and agreement.

5.5 <u>Employee Matters</u>. MERI and the Buyers shall cause the Companies after the Closing to maintain and continue to pay the healthcare insurance, dental insurance, life insurance, disability insurance premiums, car purchase and/or lease payments and/or car allowances and auto insurance currently in effect as of the date of Closing of this Agreement, or substantially comparable benefits, for all employees of the Companies and its Affiliates as of the date of Closing for a period of six (6) months after Closing, with the exception of those employees and other persons listed on Schedule 5.5. After said six (6) month period, upon termination of any such employees, the Companies shall provide all such employees all of the Federal COBRA benefits mandated relating to any of the above described employee benefits.

5.6 <u>MERI's and the Buyers' Diligence</u>. MERI and the Buyers acknowledge that they have conducted an extensive investigation of the financial condition and the properties and operations of the Companies and that during the course of such investigation, the Seller has caused the facilities, books, records and personnel of the Companies to be made available to MERI and the Buyers, and have caused to be provided to MERI and the Buyers such other information with respect to the Companies as they have requested.  MERI and the Buyers have received from the Seller all information which they have requested to their satisfaction, and MERI and the Buyers have been given the opportunity to discuss the Assets and the business and prospects of the Companies and to have such representatives answer any questions regarding the Assets and the business of the Companies, all of

ENB 00251

EM001-006731

which questions have been answered to their satisfaction, and to obtain any additional information which MERI or the Buyers possess that is necessary to verify the accuracy of the information supplied during the course of such investigation. MERI and the Buyers have had access to the Assets and to the facilities and properties of the Companies and have inspected them to their satisfaction. Further, MERI and the Buyers acknowledge that (i) they have been advised that the Companies have certain Pending Claims, including without limitation a rate case by KPC, pursuant to Section 4 of the Natural Gas Act, (ii) the outcomes of Pending Claims, including the rate case, are impossible to predict, (iii) the Seller is not making any representations or warranties of any kind or nature with respect to the Pending Claims (including the rate case) including without limitation with respect to the outcome thereof, (iv) the outcome of the Pending Claims, including the rate case, could have a Material Adverse Effect and (v) the Preliminary Cash Consideration and the assumption of obligations pursuant to Section 2.4 hereof and the consummation of the Transaction by MERI and the Buyers are based on their independent evaluation of the Pending Claims, including the rate case. As a result of the foregoing, as of the Closing, and without any further action required and except as specifically set forth in Article VI hereof, MERI and the Buyers, on behalf of themselves and all of their Affiliates, shall be deemed to release and discharge, as of the Closing, the Seller and its Subsidiaries and each of their former and present officers, directors, stockholders, employees, agents and representatives from and against all claims which could be made in any Agreement-Related Litigation pursuant to Rule 10(b)-5 of the Exchange Act or common law fraud.

5.7 <u>Representations Cut-Off</u>. On or prior to the Cut-Off Date, MERI and the Buyers must submit to the Seller a statement (the "Representations Statement") describing in detail any breaches of representations or warranties by Seller then known to MERI or either of the Buyers. The Seller will then have 30 days to cure said breaches of representations or warranties. MERI and the Buyers will be barred from seeking any indemnities or other remedies hereunder or from refusing to Close pursuant to Section 7.2(b) for any breaches of representations or warranties by the Seller known to MERI or either of the Buyers prior to the Cut-Off Date and not set forth in the Representations Statement.

5.8 <u>Employee Benefits</u>. MERI and the Buyers agree that after the Closing it will not allow the Companies (or any successor or assign thereof) to take any action or omit to take any action which would, directly or indirectly, reduce any COBRA benefits being made available or which may be due to employees of the Companies after the Closing for any employees terminated prior to the Closing or within 6 months after Closing.

5.9 <u>Update Representations</u>. MERI and the Buyers, on one hand, and the Seller, on the other hand, each shall promptly notify the other party in writing if they become aware after the date hereof and before the Closing of any fact, information or condition that causes or constitutes a breach of any representation or any warranty made by them in this Agreement, whether such fact, information or condition (i) existed (whether or not known by the representing/warranting party for representations or warranties not predicated on such Party's knowledge) before the date hereof (a "Breach Event") or (ii) came into existence after the date hereof (a "Subsequent Development"). Such fact, information or condition shall be set forth in a supplemental schedule specifying the applicable section

ENB 00252

EM001-006732

of this Agreement to which such information relates (a "Supplemental Schedule"). The Supplemental Schedule shall be delivered to the other party, and if not objected to in writing within five (5) business days of delivery, shall amend and, if applicable, replace the section of the original Seller's Disclosure Schedule or Buyers' Disclosure Schedule to which it relates. If objected to in writing within five (5) business days of delivery, the Supplemental Schedule shall not be deemed to amend the relevant Disclosure Schedule.

5.10 <u>Tax Matters</u>. The Seller shall be responsible for the payment of Taxes which relate to the Companies and which are attributable to time periods up to and including the Closing Date (whether or not the liability, obligation or claim for such Taxes exists as of such date), including Taxes imposed on the Seller as a result of the transfer of the Assets to the Buyers. The Buyers shall be responsible for the payment of Taxes which relate to the Companies and which are attributable to time periods beginning after the Closing Date. The party which has the primary obligation to do so under applicable law shall file any Tax Return that is required to be filed in respect of Taxes, and that party shall pay the Taxes shown on such Tax Return.

**ARTICLE VI**
**INDEMNIFICATION; REMEDIES**

6.1. <u>Survival of Representations and Warranties</u>. The representations, warranties and agreements of the Parties made herein shall survive Closing, any investigation by the Parties, and the execution and delivery of the documents contemplated by this Agreement, and shall continue in force and effect until terminated, as hereinafter provided in Sections 6.2 and 6.3.

6.2 <u>General Indemnity by the Seller</u>. The Seller agrees to protect, defend, indemnify and hold MERI and the Buyers, their successors and assigns as to all or part of the assets of the Companies (collectively, the "Buyers' Indemnified Parties" and individually a "Buyers' Indemnified Party") harmless from and against and shall reimburse the Buyers' Indemnified Parties for, all Adverse Consequences to the Buyers' Indemnified Parties and the Companies, or any of them, which arise from any of the following:

(a) the breach of any of the Seller's representations and warranties contained in this Agreement;

(b) any severance obligation (excluding Federal COBRA benefits) to any employees or consultants listed on Schedule 6.2; and

(c) all actions, suits, proceedings, demands, assessments, costs and expenses (including reasonable attorneys' fees and expenses of investigation and defense) incident to any such breach.

The representations and warranties of Seller under Article III and the indemnity obligations of Seller under this Section 6.2 shall terminate and be of no further force and effect as of 10:59 a.m. central time on October 29, 2000, except as to matters which are the subject of a written claim

ENB 00253

EM001-006733

made to the Seller by any and all Buyers' Indemnified Parties prior thereto and except for matters covered by Section 3.7 (which shall survive until the expiration of the applicable statute of limitations period with respect to such Taxes). Further, the Seller shall not be liable to MERI and/or the Buyers for any breaches of representations or warranties of which MERI or either or the Buyers had actual knowledge (without any duty of inquiry) as of the Cut-Off Date.

6.3 <u>General Indemnity by MERI and the Buyers</u>. MERI and the Buyers agree to protect, defend, indemnify and hold the Seller harmless from and against, and shall reimburse the Seller for, all Adverse Consequences which arise from any of the following:

(a) the breach of any of MERI's and the Buyers' representations and warranties contained in this Agreement; and

(b) all actions, suits, proceedings, demands, assessments, costs and expenses (including reasonable attorneys' fees and expenses of investigation and defense) incident to any such breach.

The representations and warranties of MERI and the Buyers under Article IV and the indemnity obligations of MERI and the Buyers to the Seller under this Section 6.3 shall terminate and be of no further force and effect as of 10:59 a.m. central time on October 29, 2000, except as to matters which are the subject of a written claim made to MERI and/or the Buyers by the Seller prior thereto. Further, MERI and the Buyers shall not be liable to the Seller for any breaches of representations or warranties of which the Seller had actual knowledge (without any duty of inquiry) as of the Cut-Off Date.

6.4 <u>Matters Involving Third Parties.</u>

(a) If any third party shall notify any Party (the "Indemnified Party") with respect to any claim ("Third Party Claim") that may give rise to a claim for indemnification against any other Party (the "Indemnifying Party") under this Article 6, then the Indemnified Party shall promptly (and in any event within five (5) business days after receiving notice of the Third Party Claim) notify the Indemnifying Party thereof in writing.

(b) The Indemnifying Party will have the right to assume and thereafter conduct the defense of the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party; provided, however, that the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably) unless the judgment or proposed settlement involves only the payment of money damages and does not impose an injunction or other equitable relief upon the Indemnified Party.

(c) Unless and until the Indemnifying Party assumes the defense of the Third Party Claim as provided in subsection 6.4(b) above, however, the Indemnified Party may defend against the Third Party Claim in any manner it reasonably may deem appropriate.



ENB 00254

EM001-006734

(d) In no event will the Indemnified Party consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party which consent shall not be withheld unreasonably.

6.5 Monetary Limitations on the Seller's Indemnification. Notwithstanding anything herein to the contrary, in no event and under no circumstances shall the Seller be required to pay any amounts to the Buyers' Indemnified Parties under or in connection with the Seller's warranties, representations and indemnities under this Agreement to the extent such amounts for any single claim (other than claims in connection with a breach of the representations and warranties in Section 3.7 for which the Seller shall be liable from the first dollar of Adverse Consequences as a result of a breach of the representations and warranties in Section 3.7) are less than Two Hundred Fifty Thousand Dollars ($250,000) (the "Threshold"); provided, however, that once the Threshold for a claim is met, the Seller shall be liable for all Adverse Consequences from such claim (and not just the amount that exceeds the Threshold). Notwithstanding the foregoing, the Seller's liability to all Buyers' Indemnified Parties for all Adverse Consequences from all claims under this Article VI shall not exceed Five Million Dollars ($5,000,000) in the aggregate. For purposes of this Section 6.5, the representations and warranties of the Seller contained in this Agreement shall be read without giving effect to any "Material Adverse Effect" exception.

6.6 Computation of Adverse Consequences.

(a) Computation of Losses. The amount of any Adverse Consequences for which indemnification is provided under this Article VI shall be reduced by (x) any related tax benefits to be received by the Indemnified Party as a result of such Adverse Consequence, and (y) any insurance recovery if and when actually received or realized, in each case in respect of such Adverse Consequence. Any such recovery shall be promptly repaid by the Indemnified Party to the Indemnifying Party following the time at which such recovery is realized or received pursuant to the previous sentence, minus all reasonably allocable costs, charges, and expenses incurred by the Indemnified Party in obtaining such recovery.

(b) Characterization of Indemnification Payments. All amounts paid by any of the Parties, as the case may be, under this Article VI shall be treated as adjustments to the Purchase Price for purposes of all relevant Taxes.

6.7 Exclusive Remedy if Closing Occurs. The provisions of this Article VI shall constitute the exclusive remedy of the Parties if Closing shall occur with respect to any claims or Adverse Consequences resulting from or arising out of the provisions of this Agreement and any other claims or Adverse Consequences, whether based on tort, contract, Law, or otherwise, resulting from or arising out of the Transaction which may be asserted after the Closing.

6.8 Post-Closing Access. From and after the Closing, MERI and the Buyers shall afford to authorized representatives of the Seller reasonable access during normal business hours to the

ENB 00255

EM001-006735

Assets and related records and personnel as the Seller may reasonably require to prosecute or defend any claim, litigation, or investigation by any Governmental Authority or third party or pursuant to Article VI hereof (including without limitation tax audits); provided, that the Seller shall reimburse MERI and the Buyers for all reasonable out-of-pocket expenses and costs incurred in connection therewith.

## ARTICLE VII
## CONDITIONS

7.1 <u>Conditions to Each Party's Obligation to Close</u>. The obligations of each of the Parties to consummate the Transaction is subject to the satisfaction, or mutual waiver, on or prior to the Closing of each of the following conditions:

(a) <u>Injunction</u>. There shall not be in effect any Law or any Judgment directing that the Transaction not be consummated; provided, however, that prior to invoking this condition each Party shall use all reasonable efforts to have any such Judgment vacated; and there shall have been no Law enacted or promulgated which would make consummation of the Transaction illegal.

(b) <u>HSR Act</u>. Any waiting period (and any extension thereof) applicable to the consummation of the Transaction under the HSR Act shall have expired or shall have been earlier terminated.

(c) <u>Escrow Agreement</u>. All conditions precedent to Closing under the Escrow Agreement shall have been satisfied or otherwise excused.

7.2 <u>Additional Conditions to the Obligation of the Buyers to Close</u>. The obligation of the Buyers to consummate the Transaction is subject to satisfaction, or, to the extent permitted by Law, waiver on or prior to the Cut-Off Date of each of the following conditions:

(a) <u>Performance</u>. The Seller shall have performed, in all material respects, all the obligations required to be performed by it under this Agreement at or prior to the Closing.

(b) <u>Representations and Warranties</u>. The representations and warranties of the Seller under this Agreement shall be true and correct, in each such case as of the date of this Agreement and as of the Cut-Off Date as though made on the Cut-Off Date (except that representations and warranties that speak as of a specific date shall be true and correct as of such date), provided that for purposes of determining the satisfaction of the foregoing, such representations and warranties shall be deemed true and correct if the failure or failures of such representations and warranties to be so true and correct have not caused and could not reasonably be expected to cause a Material Adverse Effect; provided further, however, that to assert this Section 7.2(b) as a reason for not Closing the Transaction, MERI and the Buyers must provide written notice to the Seller at or prior to the Cut-Off Date asserting its right to refuse to Close pursuant to this Section 7.2(b).

ENB 00256

EM001-006736

(c) _Ownership of Assets_. The Seller, through its wholly owned subsidiary, shall have acquired ownership of the Assets.

(d) _Deliveries_. MERI and the Buyers shall have received at the Closing the following documents:

(i) a certificate dated the Closing and executed by the Chief Executive Officer or President of the Seller certifying to the fulfillment of the conditions specified in Sections 7.2(a), (b), (c), and (e);

(ii) assignment of the Assets in form and content reasonably satisfactory to the Buyers; and

(iii) an executed assumption agreement in the form of that attached hereto as Schedule 7.2(c)(iii) assuming the debt obligations of Syenergy described in Schedule 1.1(C).

(e) _Consents and Approvals_. All other consents, approvals and authorizations legally required to be obtained to consummate the Transaction shall have been obtained from all Governmental Authorities and third persons, except for such consents, approvals and authorizations the failure of which to obtain would not have a Material Adverse Effect (assuming for purposes of this Section 7.2(e) that the Closing shall have been effected).

7.3 _Additional Conditions to the Seller's Obligation to Close_. The obligation of the Seller to consummate the Transaction is subject to satisfaction, or, to the extent permitted by Law, waiver on or prior to the Closing of each of the following conditions:

(a) _Performance_. MERI and the Buyers shall have performed, in all material respects, all the obligations required to be performed by them under this Agreement at or prior to the Closing.

(b) _Representations and Warranties_. The representations and warranties of MERI and the Buyers under this Agreement shall be true and correct, in each such case as of the date of this Agreement and as of the Closing as though made on the Closing Date (except that representations and warranties that speak as of a specific date shall be true and correct as of such date), provided that for purposes of determining the satisfaction of the foregoing, such representations and warranties shall be deemed true and correct if the failure or failures of such representations and warranties to be so true and correct have not caused and could not reasonably be expected to cause a Material Adverse Effect.

(c) _Deliveries_. The Seller shall have received at the Closing Date the following documents:

(i) a certificate dated the Closing and executed by the Chief Executive Officer or President of both MERI and each of the Buyers certifying to the fulfillment of the conditions specified in Sections 7.3(a), (b) and (d); and

(ii) an executed guaranty in the form of that attached hereto as Schedule 7.3.

ENB 00257

EM001-006737

(d) Consents and Approvals. All consents, approvals and authorizations legally required to be obtained to consummate the Transaction shall have been obtained from all Governmental Authorities and third persons (including those listed in Section 3.4), except for such consents, approvals and authorizations the failure of which to obtain would not have a Material Adverse Effect (assuming for purposes of this Section 7.3(d) that the Closing shall have been effected).

7.4 Frustration of Closing Conditions. Neither the Seller nor the Buyers may rely on the failure of any condition set forth in Section 7.1, 7.2 or 7.3, as the case may be, to be satisfied if such failure was caused by such Party's failure to use reasonable efforts to consummate the Transaction contemplated by this Agreement, or otherwise occurred because of a breach of this Agreement by such Party.

## ARTICLE VIII
## TERMINATION AND REMEDIES

8.1 Termination. This Agreement may be terminated and the Transaction may be abandoned at any time prior to the Closing:

(a) by the mutual written consent of the Parties;

(b) by any Party, if:

(i) any court of competent jurisdiction in the United States, or some other Governmental Authority, shall have issued an order, decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the Transaction and such order, decree, ruling or other action shall have become final and nonappealable; provided, however, that the Party seeking to terminate this Agreement under this Section 8.1(b)(i) shall have used its reasonable commercial efforts to remove such injunction, order or decree; or

(ii) the Transaction shall not have been consummated by December 8, 1999 (plus any cure periods permitted by either 8.1(c) or (d) below); provided, that the right to terminate this Agreement pursuant to this Section 8.1(b)(ii) shall not be available to any Party whose failure to fulfill any of its obligations under this Agreement results in the failure of the Transaction to occur on or before such date.

(c) by MERI and the Buyers if there has been a misrepresentation or breach of warranty or failure to perform a covenant on the part of Seller, in each case of which Seller has been given notice in writing by MERI or the Buyers on or prior to the Cut-Off Date and which has not been cured by Seller or the Seller within thirty (30) days of such notice and which misrepresentation, breach or failure to perform (provided, however, that no cure period need be given as to a failure to make the deliveries required by Section 2.7), in the aggregate with all other misrepresentations, breaches or failures to perform, caused or would cause a Material Adverse Effect.

ENB 00258

EM001-006738

(d) by Seller if there has been a misrepresentation or breach of warranty or failure to perform a covenant on the part of MERI or the Buyers of which MERI or the Buyers have been given notice in writing by Seller or the Seller and which has not been cured by MERI or Buyers, as the case may be, within thirty (30) days of such notice and which misrepresentation, breach or failure to perform (provided, however, that no notice or cure period need be given as to a failure to make the deliveries required by Section 2.7 or to timely execute and deliver the Escrow Agreement or to timely make deposits with the Escrow Agent as set forth in the Escrow Agreement), in the aggregate with all other misrepresentations, breaches, or failures to perform, caused or would cause a Material Adverse Effect.

8.2 _Effect of Termination_. In the event of the termination and abandonment of this Agreement pursuant to Section 8.1, this Agreement shall become void and have no effect, provided, however, that any such termination shall not affect any Party's ability to seek damages or specific performance for breach of this Agreement; further provided, however, if MERI or the Buyers terminates this Agreement pursuant to Section 8.1(c) or if Seller or the Seller terminates this Agreement pursuant to Section 8.1(d) and at the time of termination (a) the non-breaching Party shall have been legally permitted to and shall have offered in writing (i) to waive all misrepresentations, breaches or failures to perform on the part of the defaulting Party (other than the deliveries required to be made at Closing to the non-defaulting Party pursuant to Section 2.7) as to which the defaulting Party has been given notice in writing by the non-defaulting Party and (ii) to proceed with the Closing, and (b) all of the conditions to Closing set forth in Article VII required to be fulfilled by the non-breaching party shall have either been fulfilled or waived by the breaching party, then the breaching Party shall thereupon be obligated to pay to the non-breaching Party (within 3 days after termination) the sum of $15,000,000 cash (the "Fee"), as agreed liquidated damages and as the sole remedy of the non-defaulting Party for the failure or refusal of the defaulting party to close the Transaction. Specifically, however, if the Buyers have not timely submitted a Representation Statement or if all matters listed on the Representation Statement have been cured, then if the Buyers refuse to Close on November 9, 1999 (other than a failure by the Seller to make the deliveries required by Section 2.7), then the Fee shall be paid by the Buyers on November 10, 1999.

**ARTICLE IX**
**GENERAL PROVISIONS**

9.1 _Expenses_. Whether or not the Transaction is consummated, all costs and expenses, incurred in connection with this Agreement and the Transaction shall be paid by the Party incurring such expense, except that any filing fee under the HSR Act shall be paid by MERI.

9.2 _Modification or Amendment_. This Agreement may be amended by an instrument in writing executed and delivered on behalf of each of the Parties hereto at any time prior to the Closing.

9.3 _Waiver_. The conditions to each of the Parties' obligations to consummate the Transaction are for the sole benefit of such Party and may be waived, at any time prior to the Closing, by such Party in whole or in part to the extent permitted by Law. Any agreement on the part of a Party to any

ENB 00259

EM001-006739

extension or waiver shall be valid only if set forth in writing signed on behalf of such Party, and shall not be inferred by the failure of any such Party to assert any of its rights hereunder. Waiver of any provision of this Agreement or of any breach hereof shall be a waiver of only said specific provision or breach and shall not be deemed a waiver of any other provision or any future breach hereof.

9.4 <u>Notices</u>. All notices, documents, or other communications to be given hereunder shall be in writing and shall be deemed validly given if delivered by messenger, facsimile transmission (with a confirming copy sent by overnight courier), or express overnight delivery, or sent by certified mail, return receipt requested, as follows:

(a) If to Seller, to:

K-Pipe Merger Corporation
c/o SCALP
750 Lexington Avenue, 30th Floor
New York, NY 10022
Telephone:        (212) 826-0770
Telecopier:       (212) 826-0077

with a copy to:

Howard Teig, CPA
510 Jericho Turnpike, Suite 320
Jericho, NY 11753
Telephone:        (516) 931-5506
Telecopier:       (516) 931-5327

(b) If to MERI and/or Seller, to:

Midcoast Energy Resources, Inc.
1100 Louisiana, Suite 2950
Houston, TX 77002
Attn: General Counsel
Telephone: (713) 650-8900
Telecopier: (713) 650-3232

with a copy to:

Ronald L. Chachere, Esq.
615 N. Upper Broadway, Suite 970
Corpus Christi, Texas 78401
Telephone: (361) 883-2356
Telecopier: (361) 883-2357

ENB 00260

EM001-006740

or such other Persons or addresses as may be designated in writing by the Party to receive such notice. Any notice delivered by messenger shall be deemed received when such delivery is tendered; notices sent by facsimile transmission shall be deemed received upon faxed confirmation of receipt; notices mailed in the manner provided above, shall be deemed received on the third day after such are postmarked; and notices delivered by other methods shall be deemed received when actually received by the addressee or its authorized agent.

9.5 <u>Governing Law; Jurisdiction; Venue</u>. This Agreement shall be governed by, and construed and enforced in accordance with, the Laws of the State of Kansas, without giving effect to the principles of the conflicts of law thereof. The Parties agree that the Federal Court of the District of Kansas shall have exclusive jurisdiction and venue to hear and determine any claims or disputes between the parties hereto, pertaining directly or indirectly to this Agreement, the Transaction, any additional agreements or to any matter arising out of, in connection with or related to any thereof (collectively, "Agreement-Related Litigation"). Each Party expressly submits and consents in advance to such jurisdiction in any action or proceeding commenced in such courts, hereby waiving personal service of the summons and complaint or other process or papers issued therein and agreeing that service of such summons and complaint or other process or papers may be made by registered or certified mail addressed to the relevant Party at the address set forth in Section 9.4, which service shall be deemed made upon receipt thereof. The exclusive choice of forum set forth in this Section shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action under this Agreement to enforce the same in any appropriate jurisdiction.

9.6 <u>Entire Agreement</u>. This Agreement, including the Schedules, constitute the entire agreement and understanding of the Parties with respect to the Transaction and supersedes any and all prior agreements, representations and understandings relating to the subject matter hereof. There are no representations or warranties except as specifically set forth in this Agreement.

9.7 <u>Construction</u>. The section and article headings contained in this Agreement are inserted for convenience of reference only and shall not affect the meaning or interpretation of this Agreement. The preamble hereof, the recitals hereto, and all schedules attached hereto are hereby incorporated herein by reference and made a part hereof.

9.8 <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective successors and assigns, to the extent allowed hereby. Nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement, except as provided in Section 6.2.

9.9 <u>Assignment</u>. None of the Parties may assign any rights or delegate any obligations provided for in this Agreement without the prior written consent of all the other Parties, which consent shall not be unreasonably withheld. Any assignment in violation of the preceding sentence shall be void. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns.

ENB 00261

EM001-006741

9.10 Counterparts. This Agreement may be executed in any number of separate counterparts, each of which shall be deemed to be an original, but which together shall constitute one and the same instrument and may be executed by facsimile.

9.11 Obligations of Subsidiaries. Whenever this Agreement requires a Subsidiary of MERI or either of the Buyers to take any action, such requirement shall be deemed to include an undertaking on the part of MERI and/or either of the Buyers, as the case may be, to cause such Subsidiary to take such action and a guarantee of the performance thereof. Whenever this Agreement requires a Subsidiary of the Seller to take any action, such requirement shall be deemed to include an undertaking on the part of the Seller to cause such Subsidiary to take such action and a guarantee of the performance thereof.

9.12 Severability. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability or the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable or equitable provision shall be substituted therefor in order to carry out, so far as may be valid or enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

9.13 Costs and Fees. In connection with Agreement-Related Litigation (regardless of whether the action alleges breach of contract, tort, violation of a statute, or any other cause of action), the prevailing Party will be entitled to recover from the nonprevailing Party its reasonable costs in bringing or defending such claims, including its reasonable attorneys' fees, accounting fees, professional and/or expert witness fees, court costs, and travel and out-of-pocket expenditures incurred in preparation for and during such proceedings. If a Party prevails on some aspects of its claims but not on others, the court shall apportion any award of costs in bringing or defending such claims in such manner as it deems equitable.

9.14 Cy Pres. The doctrine of *Cy Pres* shall be applicable to the Agreement such that in interpreting the terms and conditions hereunder the intentions of the parties are to be carried out as near as may be, when it would otherwise be impossible or illegal to give it literal effect. In any dispute arising out of this Agreement, the doctrine of *Cy Pres* shall be applied by the Court.

ENB 00262

EM001-006742

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

K-PIPE MERGER CORPORATION

By _____
Name: Larry J. Austin
Title: President

MIDCOAST ENERGY RESOURCES, INC.

By _____
Name:
Title:

MIDCOAST KANSAS PIPELINE, INC.

By _____
Name:
Title:

MIDCOAST KANSAS GENERAL PARTNER, INC.

By _____
Name:
Title:

JF 128072.1   03211 00482

30

ENB 00263

EM001-006743

**ASSET PURCHASE AGREEMENT**
**SCHEDULE PREAMBLE**

Seller's Disclosure Schedule

This Preamble is attached to and made a part of the attached Seller's Disclosure Schedule, which has been delivered by the Seller to Midcoast Energy Resources, Inc, a Nevada corporation, Midcoast Kansas Pipeline, Inc., a Delaware corporation, and Midcoast Kansas General Partner, Inc., a Delaware corporation pursuant to the terms of the Asset Purchase Agreement dated as of November 5, 1999, by and among such parties (the "Agreement"). Capitalized terms used but not defined in this Preamble shall have the meaning given them in the Agreement.

Any information set forth in the Seller's Disclosure Schedule that is not required to be disclosed pursuant to the Section of the Agreement to which such Section of the Seller's Disclosure Schedule relates is provided for informational purposes only and shall not be construed as expanding or modifying the Seller's representation or warranty contained therein.

The disclosure of a particular item or matter in a Section of the Seller's Disclosure Schedule shall not be construed as an admission by the Seller that such item or matter falls within the scope of any materiality threshold or other qualifications or limitations set forth in the representation or warranty to which section of the Seller's Disclosure Schedule relates.

ENB 00264

EM001-006744

# ASSET PURCHASE AGREEMENT
# SELLER'S DISCLOSURE SCHEDULE

### Schedule 1.1(A)
### List of Assets

100% of the partnership interests in MarGasCo Partnership, an Oklahoma general partnership consisting of Syenergy Pipeline Company, L.P. owning a 99.9% general partnership interest and Bishop Pipeline Company owning a .1% general partnership interest.

100% of the partnership interests in Mid-Kansas Partnership, a Kansas general partnership consisting of Syenergy Pipeline Company, L.P. owning a 99.9% general partnership interest and Bishop Pipeline Company owning a .1% general partnership interest.



100% of the partnership interests in Kansas Pipeline Company, formerly known as Riverside Pipeline Partnership, a Kansas general partnership consisting of Syenergy Pipeline Company, L.P. owning a 99.9% general partnership interest and Bishop Pipeline Company owning a .1% general partnership interest.

100% of the partnership interests in Riverside Pipeline Company, L.P., a Kansas general partnership consisting of Kansas Pipeline Company, formerly known as Riverside Pipeline Partnership owning a 50% general partnership interest and Syenergy Pipeline Company, L.P. owning a 50% general partnership interest.

All files, books, records and data necessary or appropriate for the continued operation of the Companies.

All transferable approvals, authorizations, consents, licenses, orders and other permits associated or connected to the operation of the businesses of the Companies.

ENB 00265

EM001-006745

### Schedule 1.1(B)
### Description of the Butcher Interests

The property described as the *Butcher Interests* shall mean one and one-half percent (1.5%) of the *Adjusted Gross Pipeline Proceeds*, as defined below. *Butcher Interests* shall burden the assets of the *Pipeline*, the *New KansMo Partnerships*, the *KansOk Partnerships*, the *KansMo Assets* and the *KN Assets* and run with the land (the easements and rights-of-way) as well as run with the personal and/or mixed property; i.e., the *Butcher Interests* shall burden and run with all of the above assets, and as such shall survive and be superior to any transfer, hypothecation, pledging, encumbrances, merger, reorganization, sale, consolidation, etc. Of the *Pipeline*, the *New KansMo Partnerships*, the *KansOk Partnerships*, the *KansMo Assets* and the *KN Assets* and/or any of the *Entities* which now or hereafter own any of the same. For purposes of this Exhibit 1.1(B), *Adjusted Gross Pipeline Proceeds* shall mean: (i) the total proceeds received from transportation of all natural gas transported through all or any portion of the *Pipelines* free and clear of, and without deduction for, all costs and expenses (except as provided below) incurred in transporting such natural gas and any and all taxes, and (ii) the gross spread between total proceeds received through the sale by the *Entities* owning the *Pipelines* of natural gas that is transported through all or any portion of the *Pipelines* and *Pipelines'*, and/or *Entities* owning the *Pipelines*, cost of acquiring such natural gas, free and clear of, and without deduction for, all costs and expenses incurred in connection therewith and any and all taxes; provided, however, that *Adjusted Gross Pipeline Proceeds* in either of the above cases shall not include actual conservation taxes, *KCC, OCC* and/or *MCC* fees and/or assessments, *FERC* Administrative Cost Assessments and Gas Research Institute fees, third party and/or *Affiliated Entity* marketing and/or brokerage fees, local distribution company and/or pipeline transportation fees, and/or other similar costs, fees, taxes, assessments, and/or expenses which are approved in writing by *TCW* in its reasonable discretion (collectively, the *Passthrough Expenses*), all of which *Passthrough Expenses* must be collected by the *Entities* owning the *Pipelines*. Notwithstanding the foregoing, in no event shall *Passthrough Expenses* include costs, fees, taxes, assessments and/or expenses listed in the *Pipeline Budgets*, as defined in the *TCW Loan Documents*, or any other costs, fees, assessments and/or expenses not specifically provided for in this Exhibit. *Adjusted Gross Pipeline Proceeds* shall include, without limitation, any prepayments received under transportation or sales contracts for natural gas to be delivered in the future or any other payments received relating to the transportation or sale of natural gas, including without limitation payments for capacity, standby-capacity, or other payments respecting such transportation or sales contracts, however characterized. For purposes of this Schedule 1.1(B), the definitions, meanings and explanations attributable to the italicized words herein shall be those attributed to them in a Restated and Amended Butcher Agreement dated

ENB 00266

EM001-006746

April 15, 1990 by and between Butcher Resources, Inc., The Bishop Group, Ltd. and Kansas Transmission, Inc. and in the *General Agreement* dated June 22, 1990 by and between OKM Gas Pipeline Company, L.P., OKM Gas partners, L.P., The Bishop Group, Ltd., Management Resources Group, Ltd., The Bishop Corporation, Bishop Engineering, Inc., Kansas Gas Marketing, Inc., Bishop Pipeline Company, Kansas Natural, Inc., KansOk, Inc., Riverside Pipeline Company, Kansas Pipeline Company, Mid-Kansas Gas, inc. and Energy Resource Management, Inc., both of which agreements are incorporated herein by reference thereto.

EM001-006747

ASSET PURCHASE AGREEMENT
SELLER'S DISCLOSURE SCHEDULE

Schedule 1.1(C)
Partnership Debt Instruments

1.      All of the debt of Syenergy Pipeline Company, L.P. ("Syenergy") owed to the certain Noteholders described below as set forth in the $91,000,000 Long Term Note dated June 15, 1992, as amended and all related Loan Documents, including mortgages, deeds of trust, security agreements and guarantees, in the approximate amount of $63,000,000 and a Make Whole Premium and all other fees and costs as set forth in the Note ("Note").

| | |
|---|---|
| Promissory Note. No. R-2 | The Northwestern Mutual Life Insurance Company |
| Promissory Note. No. R-4 | Teachers Insurance & Annuity Association of America |
| Promissory Note. No. R-10 | Sigler & Co. |
| Promissory Note. No. R-11 | Pearlfish & Co. |
| Promissory Note. No. R-12 | Mac & Co. |
| Promissory Note No. R-5 | Northwestern National Life Insurance Co. |

2.      All of the debt owed by Syenergy pursuant to the revolving line of credit with Chase Manhattan Bank under that certain Credit Agreement dated June 15, 1992, as amended, in the approximate amount of $6,000,000 ("Syenergy Credit Agreement"), and all other fees and costs as set forth in the Syenergy Credit Agreement.

3.      All of the debt owed by MarGasCo Partnership ("MarGasCo") pursuant to the revolving line of credit with Chase Manhattan Bank under that certain Amended and Restated Credit Agreement dated June 15, 1992, as amended, with Stand By Letters of Credit issued in the approximate amount of $1,300,000 ("MarGasCo Credit Agreement"), and all other fees and costs as set forth in the MarGasCo Credit Agreement.

ENB 00268

EM001-006748

## Schedule 2.3(b)
## Calculation of Adjustment Value

**Definitions:**

<u>Adjustment Amount</u> = Adjustment Value minus $25,000.

<u>Adjustment Value</u> = the sum of the positive working capital accounts of the Companies on the True-up Date minus the sum of the negative working capital accounts. The balances of positive and negative working capital accounts to be determined in accordance with generally accepted accounting principals.

<u>True-up Date</u> = The Closing Date defined herein.

### Positive Working Capital Accounts

<u>Cash</u>: All cash, currency on hand, money market funds, cash held as margin requirement and excess equity in the MarGasCo gas futures account, commercial paper and other cash or cash equivalents of the Companies; except, for purposes of the calculation of the Adjustment Amount, the $10,000,000 (ten million dollar) principal balance in the Cash Reserve Account held in the name of Syenergy Pipeline Company, L.P. shall not be considered part of the Cash accounts nor any other component of working capital of the Companies.

<u>Accounts Receivable</u>: All accounts receivable of the Companies and all Affiliates accrued as of the True-up Date less the sum of those accounts receivable more than 90 days from the True-up Date and Allowance for Doubtful Accounts less than 90 days from the True-up Date. The Buyers will compensate the Seller for any Accounts Receivable accrued as of the True-up Date and ultimately collected from any source that were originally excluded from the calculation of Adjustment Value.

<u>Accrued Interest Earned</u>: Accrued interest earned as of the True-up Date for all cash accounts of the Companies and all Affiliates including all interest credited to the Cash Reserve Account held in the name of Syenergy Pipeline Company, L.P. representing any balance in the account in excess of the $10,000,000 principal balance.

<u>Gas Marketing Contracts and Futures Account</u>: The net unrealized gain/(loss) on the True-up Date of all natural gas contracts held in the MarGasCo's Gas Futures account and MarGasCo gas sales contracts. If account has a net unrealized loss, account represents a negative working capital account.

<u>Prepaid Expenses</u>: The sum of all working capital accounts representing the payment for goods and/or services that will be provided subsequent to the True-up Date. Prepaid Expenses will specifically include the $100,000.00 paid by Kansas Pipeline Company to Flight Options, Inc. pursuant to the Flight Options Binder Agreement dated October 1999.

ENB 00269

**Negative Working Capital Accounts**

**Accounts Payable:**  all accounts payable of the Companies and all Affiliates accrued as of the True-up Date representing payments owed for goods and/or services received prior to the True-up date but not yet paid.

**Accrued Interest Payable:**  accrued interest payable as of the Closing Date on all debt of the Companies and all Affiliates including but not limited to the Revolving Credit Agreement with Chase Manhattan Bank and the MarGasCo revolving Credit Agreement with Chase Manhattan Bank.  Accrued Interest Payable will not include any Make Whole Premium on the Syenergy Pipeline Company's $91 million Senior Secured Debt. Accrued Interest through October 29, 1999 on the Syenergy Pipeline Company's $91 million Senior Secured Note in the amount of $1,987,973.53 has been included as a reduction to the Preliminary Cash Consideration and will not be a reduction to the Adjustment Value.  Accrued Interest Payable will be increased $16,705.66 for each day Closing is after October 29, 1999. Accrued Interest Payable will be decreased $16,705.66 for each day Closing is before October 29, 1999.

**Natural Gas Purchases:**  Accrued natural gas purchases as of the True-up Date for the Companies and all Affiliates.

**Over/Under Retained Compressor Fuel and Lost and Unaccounted for Gas:**  The net balance of accrued fuel retainage subject to FERC Fuel Adjustment less actual compressor fuel and lost and accounted for gas subject to FERC Fuel Adjustment.

**Accrued Income Taxes:**  Accrued federal and state income taxes of the Companies and all Affiliates as of the True-up Date less all estimated income taxes paid. Accrued Income taxes shall be estimated as of the True-up Date for purposes of calculating the Adjustment Value such estimates to be  revised in preparation of the Revised Adjustment Value.

**Accrued Property Taxes:**  accrued property taxes payable for the Companies and all Affiliates as of the True-up Date based on the 1999 property tax assessments.

**Other Accrued Liabilities:**  the sum of all other working capital accounts representing payments owed for goods and services received prior to the True-up Date not yet paid including, but not limited to, accrued payroll and benefits payable, trade accounts payable and accrued legal/professional fees.

ENB 00270

EM001-006750

## Positive Working Capital Accounts

| | | |
|---|---|---|
| Cash | | 200,000.00 |
| Accounts Receivable | | |
| Total Accounts Receivable | 5,324,247.21 | |
| Less: Accounts Receivable in excess of 90 day from True-up Date | (1,694,317.92) | |
| Less: Total Allowance for Doubtful Account | (794,532.96) | |
| Plus: Allowance for Doubtful Accounts in excess of 90 days from True-up Date | | 694,000.00 |
| Net Accounts Receivable: | 3,529,396.33 | 3,529,396.33 |
| Accrued Interest Earned | | 45,000.00 |
| Net Unrealized Gain/(Loss) in Gas Futures Account | | 489,500.00 |
| Other Prepaid Expenses | | 394,000.00 |
| **Total Positive Working Capital Adjustment** | | 4,657,896.33 |

## Negative Working Capital Accounts

| | | |
|---|---|---|
| Accounts Payable | | (2,190,168.00) |
| Accrued Interest Expense | | (18,000.00) |
| Natural Gas Purchases (800,000.00) | | |
| Over Retainage of Compressor Fuel subject to refund | | (212,000.00) |
| Accrued Income Taxes | | |
| Accrued Income Tax Expense | (1,640,000) | |
| Estimated Income Taxes Paid | 1,650,000 | |
| Net Accrued Income Taxes | 10,000 | 10,000 |
| Accrued Property Taxes | | (480,000.00) |
| Other Accrued Liabilities | | (240,000.00) |
| **Total Negative Working Capital Adjustment** | | (3,930,168.00) |
| **Adjustment Value** | | 727,728.00 |
| Working Capital Allowance in Purchase Price (25,000) | | |
| Adjustment Amount | | 702,728.33 |



ENB 00271

EM001-006751

ASSET PURCHASE AGREEMENT
SELLER'S DISCLOSURE SCHEDULE

Schedule 2.6
Escrow Agreement

EM001-006752

## Section 3.4
### List of Material Contracts that would be breached as a result of the consummation of the Asset Purchase Agreement and those items described in the Schedules, Exhibits and related documents.

Note

Syenergy Credit Agreement

MarGasCo Credit Agreement

The Operative Agreements as defined in the Note

General Partnership Agreement of Kansas Pipeline Company dated May 11, 1998, as amended, among Syenergy Pipeline Company, L. P. and Bishop Pipeline Company.

Amended and Restated Agreement of General Partnership of MarGasCo Partnership dated October 30, 1991, as amended, among Syenergy Pipeline Company, L.P., Bishop Pipeline Company and OKM Gas Pipeline Company, L.P.

Amended and Restated Agreement of General Partnership of KansOk Partnership dated October 30, 1991, as amended, among Syenergy Pipeline Company, L.P., Bishop Pipeline Company and OKM Gas Pipeline Company, L.P.

Amended and Restated Agreement of Limited Partnership of Riverside Pipeline Company, L. P. dated October 30, 1991, as amended, among Syenergy Pipeline Company, L.P. and Riverside Pipeline Partnership.

Amended and Restated Agreement of General Partnership of Kansas Pipeline Partnership dated October 30, 1991, as amended, among Syenergy Pipeline Company, L.P., Bishop Pipeline Company and OKM Gas Pipeline Company, L.P.

Amended and Restated Agreement of General Partnership of Mid-Kansas Partnership dated October 30, 1991, as amended, among Syenergy Pipeline Company, L. P., Bishop Pipeline Company and OKM Gas Pipeline Company, L.P.

ENB 00273

EM001-006753

Amended and Restated Limited Partnership Agreement of Syenergy Pipeline Company, L.P. dated October 30, 1991, as amended, among Bishop Pipeline Company, Chase Manhattan Capital Corporation, EON-Syenergy DR II Company and Bishop Gas Transmission Company.

ENB 00274

EM001-006754

## Section 3.6
### List of any pending claims*

1. FERC Docket Nos. CP96-152-000, RP95-212, RP95-395 and PR94-3000. (Complaint and Riverside's Application for Interstate Rates as a Consolidated Entity and KansOk Rate Case.); and App. Ct. Case No. 97-1710—A FERC Order was issued on April 30, 1998, Order which: (i) granted the Bishop entities' Motion for Rehearing in part; (ii) granted the Bishop entities' rates that approximately equaled the Bishop entities' then existing rates; and (iii) directed the Bishop entities to consolidate assets into one interstate entity effective May 11, 1998. The Bishop entities were ordered to file a Rate Case on or before September 11, 1999. Said assets of KPP, KOP, RPCLP, were consolidated into Riverside Pipeline Partnership . n/k/a Kansas Pipeline Company, also a Kansas Partnership, as of May 11, 1998. Third parties have petitioned for rehearing which is still pending. Existing transportation contracts with MGE and Kansas Gas Service are filed with FERC awaiting ruling from FERC as to acceptance of any material deviations from the form of service agreements. Certain parties have appealed certain issues to the United States Court of Appeals in the District of Columbia Circuit, Case No. 97-1710. Counsel is HEW.

2. FERC Docket , Kansas Pipeline Company, RP99-485-000, represents the Section 4 Rate Case of Kansas Pipeline Company, filed on or about September 1, 1999. In a draft order made available September 29, 1999, the Commission ordered KPC's tariff sheets, accepted and suspended, to be effective March 1, 2000, subject to refund and the outcome of a hearing and ordered a prehearing conference within twenty (20) days of the issuance of their Order.

3. Missouri Public Service Commission Docket No. GR-98-167. This proceeding is an annual ACA proceeding by the MPSC of charges paid by MGE to its supplier and related matters. In September of 1999, MPSC Staff recommended a disallowance of about $4,500,000 of charges paid by MGE to Mid-Kansas during the July 1, 1997, through June 30, 1998 time period and said they were reducing their recommended disallowance in the GR96-450 case from approximately $4,500,000 to approximately $3,500,000. The MPSC Staff also recommended the case not proceed until a decision in GR96-450 is issued.

---

* Disclosure of a claim includes disclosure of all public filings and other disclosure made by the Seller to MERI and the Buyers related to the claims, which filings and disclosures are incorporated herein by reference.

EM001-006755

4. <u>Missouri Public Service Commission Docket No. GR-96-450</u>. These proceedings are an annual ACA review by the MPSC of charges paid by MGE to its supplier and related matters. While the MPSC Staff in June of 1998 recommended a disallowance of about $4,500,000 of charges paid by MGE to Mid-Kansas/Riverside ("Mid-Kansas") during the July 1, 1996 through June 30, 1997, time period, Mid-Kansas and MGE have opposed this recommendation. Mid-Kansas filed a Writ of Prohibition in Cole County, Missouri Circuit Court, Case No. CV198-1505CC and received a temporary restraining order, which was later quashed. However, Mid-Kansas has appealed two separate Motions to Dismiss, which were denied by the MPSC. One Motion dealt with the MPSC's lack of jurisdiction because of the aforementioned settlement. The other Motion to Dismiss is based upon the Staff's failure to file sufficient evidence. Both issues are on appeal in Case No. CV-199-53-CC in the Circuit Court of Cole County, Missouri. In the interim, the Court in Case No. CV-199-53-CC has ruled the MPSC may take no further action until further order of the Court. Oral arguments were scheduled in the appeal on July 1, 1999 in the Cole County Circuit Court, Cole County, Missouri. In an Order dated July 26, 1999 the Circuit Court of Cole County denied Mid-Kansas's Motion to Dismiss for Insufficiency of Evidence, but agreed with Mid-Kansas that the MPSC should not have issued a finding as to the Settlement of 1995 without first holding a hearing and taking evidence and therefore remanded the matter to the MPSC. Counsel is S&K and STK.

Mid-Kansas has appealed and has filed an appeal of the decision by the Circuit Court to the Court of Appeals in Mid-Kansas/Riverside v. MPSC, Case No. WD-57560.

5. <u>Reimbursement by KNI</u>. This dispute arises out of the sale to KNI of certain contracts, KNI agreed to reimburse The Bishop Entities for certain costs of construction work in progress. The Bishop Entities have invoiced KNI for such costs and have been reimbursed for all such costs, except for the invoice of February 25, 1997, which invoice was for in excess of $500,000, but less than $600,000. Last year, KNI representatives disputed Two Hundred Twenty Seven Thousand Three Hundred Seventy Six and 71/100 Dollars ($227,376.71) of the final bill.

6. <u>TransOk Lease</u>. KOP and by assignment, KPC has a long-term Lease with Transok, LLC, for the lease of up to 90,000 MCF per day. A Settlement Agreement and Amendment III to the TransOk Lease were negotiated and executed between the parties both on April 1, 1999. In FERC Docket, TransOk, L.L.C. No. CP97-738-008, the FERC issued a notice on September 28, 1999, that due to the Lease Amendment between KPL and TransOk requiring any person desiring to be heard or protest to file a motion to intervene or protest by or before October 8, 1999. KPC intends to intervene in the case if it is not already an intervenor. Counsel is HEW.

7. <u>Billing Disputes with MGE</u>. MGE has indicated verbally, by letter and in pleadings before FERC, in the event of any attempt by Kansas Pipeline Company to charge or collect rates higher than MGE interprets under the Riverside I contract (even if authorized by FERC), it may claim a breach of contract and not pay any such amounts it deems billed in excess of the contract rates. MGE has asserted by letter that Riverside/MKP is

ENB 00276

EM001-006756

in breach of its contractual obligations by seeking a higher generally applicable rate, even if it does not assert to collect it from MGE. MGE has indicated to KPC its belief that the 2% escalator clause under the Mid-Kansas II Agreement and/or the Riverside I Agreement is no longer applicable. Riverside/MKP has responded previously and explained its position that it was not in breach of its contractual obligations. As of December 31, 1996, MGE disputes approximately Two Hundred Sixty Nine Thousand Three Hundred Seventy Four and 25/100 Dollars ($269,374.25) billed by MKP to MGE for the period covering October, 1995, through December 31, 1996, but has not paid only One Hundred Twenty Thousand Three Hundred Forty Two and 72/100 Dollars ($120,342.72) of that amount. MGE alleges that certain reservation charges since after October 1, 1995, improperly include: (i) the difference between 51.8¢ and 57.32¢ of Riverside's FERC approved rates from October 1, 1995, to 1996; and the difference between 51.8¢ and 58.64¢ from October 1, 1996 to date; and (ii) KPP's surcharge for increased property taxes from and after January, 1996. Since the implementation of the KPP rates in August, 1997, after the KCC Settlement in Docket No. 190,362-U, et.al., KPP's charges include any property tax component. MGE has paid these KPC rates since the implementation of these KCC Settlement Rates. Since implementation of the transportation-only contract with MGE on June 1, 1998, MGE has not paid the two-percent (2%) increase contained in the Riverside I Agreement, alleging it no longer has to pay that 2% increase. FERC has agreed to review the two percent (2%) escalator in KPC's Section 4 rate case now pending. Also, since May 11, 1998, MGE has been paying $20,000 to $30,000 per month less than what KPC believes was approved by FERC related to fuel costs and the full MDQ in all three (3) zones. KPC does not agree with these underpayments being made by MGE and continues to bill these amounts to MGE.

8. <u>Billing Dispute with Kansas Gas Service</u>. Kansas Gas Service (KGS), the successor owner of the Kansas LDC, has asserted in communications with KPC that it believes under the existing contracts and the Settlement reached in KCC Docket No. 97-WSRG-312-PGA, et.al., the rates of KPC will decrease by August of 2001, to the then-existing Williams' rates and continue thereafter for a three-year period, then reverting back to KPC's then authorized FERC rates, but not to exceed a cost of service as to KGS of greater than approximately $27.3 million. Kansas Pipeline Company disagrees with KGS' interpretation. Also, by KPC's calculation, KGS has underpaid KPC's invoices to date by approximately $617,000 since May of 1998, reflecting KGS' differing interpretation of what the FERC's April 30, 1998 Order meant when it granted the Clients a rate as one interstate pipeline, equal to the then existing rates of KOP, KPP and Riverside.

9. <u>KGS Lawsuit, Case No. 99 C 06574</u>. Recently KGS filed a lawsuit in Johnson County, Kansas District Court, Case No. 99 C 06574. KPC has caused said case to be removed to the United States District Court for the District of Kansas (Kansas City Division) Case No. 99-2268 KHV. KGS is seeking, among other things, to have the court interpret, and possibly set aside, KGS's existing contracts with KPC.

ENB 00277

EM001-006757

On or about June 30, 1999, KPC filed a Motion to Dismiss or Stay, which proposes to dismiss or stay these proceedings until KPC's Section 4 case is complete. KGS has sought to remand the case to State Court. On or about October 28, 1999, the Federal court remanded the case to State court without ruling on KPC's Motion to Stay or Dismiss.

10. <u>Mountain Energy Corporation</u>. In a May 27, 1999, Nathan Harbour, attorney for Mountain Energy Corporation alleges actions taken by MarGasCo which he claims violates Mr. Rick Pemberton's Stock Purchase Agreement with Mountain Iron & Supply Company dated November 30, 1993, and he claims tortiously interferes with the business relationship of Mountain Energy and violates the Kansas Uniform Trade Secrets Act, K.S.A. 60-3320, <u>et seq.</u> Mountain Energy claims damages. He threatens a suit for injunctive relief and damages unless there is a prompt resolution of this matter.

11. <u>Kansas Pipeline Company</u> has appealed its 1998 Oklahoma Ad Valorem taxes, paid all the taxes due and seeks a refund of approximately $100,000. Said appeal is pending.

12. <u>FERC OCA Audit Docket No. FA99-3-003</u>. During 1999 the OCA office of FERC has been conducting a compliance audit of KPC's books and records. OCA has submitted Data Requests to which KPC has responded. The audit is still pending.

13. <u>Condemnation Appeal, Case No. CV-197-36 CC</u>. BPC, KPP and/or Riverside are parties to a condemnation suit in the Court of Appeals for the State of Missouri, Case No. CV-197-36CC, relating to an easement condemned successfully for the construction of a pipeline ultimately by KNI.

14. <u>Johnson County Condemnation. Johnson County Parks and Recreation District v. Fred Faly et al, Case No. 99-C-11-984 Johnson County District Court, Johnson County, Kansas</u>. Johnson County has recently (Sept. 1999) filed a condemnation action seeking to acquire for title to land and create a new public park. The Petition seeks to condemn the property, subject to easements, covenants and restrictions currently of record.

15. Below is a list of certain other regulatory/appeal proceedings in which the Companies or their Affiliates is involved:

ENB 00278

EM001-006758

**Matters Before the FERC or Appeal Therefrom**

| Docket No. | Case Caption | KPC Status[1] | Counsel |
|---|---|---|---|
| CP96-152-000 | In the Matter of Riverside Pipeline Company, L.P. [Section 7 Filing] (See 97-1710, D.C. Circuit Court of Appeals | P | HEW |
| No. 97-1710 | In the United States Court of Appeals for the District of Columbia Circuit RE: Kansas Pipeline Partnership, Riverside Pipeline Company, L.P. and KansOk Partnership v. Federal Energy Regulatory Commission [Petition for Review of FERC Orders in CP96-152-000, et.al.] | P | HEW |
| CP96-477-000 | KN Interstate Gas Transmission Company | I | HEW |
| CP97-738-000 | TransOk, Inc. | P | HEW |
| CP97-118-000 | Indicated Land Owners vs. Riverside Pipeline Company, L.P. | P | HEW |
| CP98-645-000 | In the Matter of Trunkline Gas Company Application for Abandonment | I | HEW |
| ER96-1446-000 | KC United Corporation | I | HEW |
| RP96-348-000 | Panhandle Eastern Pipeline Company | I | HEW |
| RP97-29-000 | PEPL Tariff Protest | I | B/C |
| No. 98-1048 – In the United States Court of Appeals for the District of Columbia Circuit | In the United States Court of Appeals for the District of Columbia Circuit RE: Panhandle Eastern Pipe Line Company vs. FERC [Appeal of PEPL Tariff Protest (RP97-29)] | I | B/C |
| RP98-165/RP183-07 | Williams Gas Pipelines Central, Inc. | I | HEW |
| RP98-117-000 | KN Interstate Gas Transmission Co. | I | HEW |
| RP98-118-000 | KN Interstate Gas Transmission Co. | I | HEW |
| RP99-16-000 | Williams Gas Pipelines Central, Inc. | I | HEW |
| RP99-485-000 | Kansas Pipeline Company, Rate Case, Section 4 | P | HEW |

**Matters Before the MPSC or Appeal Therefrom**

| Case No. | Description | KPC Status | Counsel |
|---|---|---|---|
| GR96-450 | In the matter of Missouri Gas Energy's Cost Adjustment Tariff Revisions to be viewed in Its 1996-1997 Annual Reconciliation Adjustment Account | I | S&K STK |

[1] I = Intervenor
P = Party

SF 128300.1  05211 00482

ENB 00279

EM001-006759



| V199-53CC | State of Missouri, ex.rel. Riverside Pipeline Company, L.P. and Mid-Kansas Partnership v. The Missouri Public Service Commission – Division I [Writ of Review from GR96-450] See WD-57560, Missouri Court of Appeals | P | S&K STK |
| GR-98-167 | In the Matter of Missouri Gas Energy's Purchased Gas Adjustment Factors to be Reviewed in its 1997-1998 Actual Cost Adjustment | I | S&K |
| GR-99-304 | In the Matter of Missouri Gas Energy's Purchased Gas Adjustment Factors to be Reviewed in its 1998-1999 Actual Cost Adjustment | I | S&K |
| GO-96-243 | In the Matter of Missouri Gas Energy's Cost Incentive Mechanism | I | S&K |
| GO-97-409 | In the Matter of the Operation of the Purchased Gas Adjustment Clause of Missouri Gas Energy, a division of Southern Union Company | I | S&K |
| GO-97-422 | In the Matter of the Investigation in the PGA/ACA Process | I | S&K |

HEW    =  Heller, Ehrman, White & McAulliff of Washington, DC
S&K     =  Stewart & Keevil of Columbia, Missouri
STK    =  Shugart, Thompson & Kilroy of Kansas City, Missouri
B/C     =  Bryan Cave LLP
Logan  =  Fred Logan of Logan & Logan

ENB 00280

EM001-006760

ASSET PURCHASE AGREEMENT
SELLER'S DISCLOSURE SCHEDULE

### Section 3.8
### Violations of Environmental laws by the Companies or their Affiliates

None.

ENB 00281

EM001-006761

Section 3.9
**Violations of any laws by the Companies**

None, except for any laws which may be violated by virtue of any default in the Note, the Operative Agreements, MarGasCo Credit Agreement and/or Syenergy Credit Agreement, and/or the Partnership Agreements of Syenergy Pipeline, LP and its Affiliated Entities, which violations may arise out of this Asset Purchase Agreement, the transactions related hereto, including all transactions disclosed in the Schedules & Exhibits hereto and related transactions.

EM001-006762

SECTION 3.10
NOVEMBER 5, 1999

### Section 3.10
### Title to Properties

1.     As referred to in Schedules 3.6, certain Easements and Rights of Way associated with the sale of certain contracts in September and November of 1996 ("Sales Contracts" and "Closing Agreement") to KN Energy, Inc. ("KN"), and KN Interstate Service Transmission Co. ("KNT") were retained by KPC's predecessors, KPP, Riverside and/or Bishop Pipeline Company as to the rights of way for natural gas lines in addition to the first line laid by KNI and/or KN.

2.     The Companies are in the process of assigning these retained rights from Bishop Pipeline Company, Riverside and KPP to KPC.  The Companies are in the process of complying with its obligations regarding said easements as set forth in those Sales Contracts and the Closing Agreement, as well as seeking the compliance of KN and KNI regarding the same.

3.     All liens, encumbrances, mortgages, deeds of trust, financing statements, UCC's and security interests securing the Note, the Syenergy Credit Agreement and the MarGasCo Credit Agreement, or otherwise described as the Security Documents or Operative Agreements in the Note.

EM001-006763

### Section 3.11
### List of all Employee Benefit Plans

1. HMO and PPO Medical Insurance provided by Blue Cross and Blue Shield of Kansas City; Group Policy No. 146490000001.

2. Dental Insurance provided by Guarantee Life Insurance Company; Group Policy No. 01-D002316

3. Kansas Pipeline Company 401(k) Plan  Contract I.D. number 91 652407 with Equitable Life Insurance, Momentum Select Administrative Services

4. Life and Accidental Death & Dismemberment Insurance provided by Business Men's Assurance Company of America, Group Policy No. BGGR090614.

5. Long Term Disability Insurance provided by UNUM Life Insurance Company of America; Group Policy No. 0511983

6. Vision Insurance provided by Vision Service Plan, Group Policy No. 12 119645 0001 0001

7. Section 125 Plan consisting of Flexible Spending Benefit and Dependent Care Spending provided by Benefit America Group Policy No. 261438

8. Voluntary Products in Section 125 Plan provided by Colonial Insurance Company Group BCN No. E7189749-0000.

ENB 00284

EM001-006764

ASSET PURCHASE AGREEMENT
SELLER'S DISCLOSURE SCHEDULE

SECTION 3.15
NOVEMBER 5, 1999

## Section 3.15
### Year 2000 Compatibility

Seller and the Companies define Year 2000 compliance as the following:

The capability of a system to provide all of the following functions:

(a)     handle date information before, during and after January 1, 2000, including but not limited to accepting date input, providing date output and performing calculations on dates or portions of dates;

(b)     function accurately and without interruption before, during and after January 1, 2000, without any change in operations associated with the advent of the new century;

(c)     respond to two-digit year-date input in a way that resolves the ambiguity as to century in a disclosed, defined and predetermined manner; and

(d)     store and provide output of date information in ways that are unambiguous as to century.

The Companies have accessed its internal systems and devices and feel confident that they meet the above definition, however, Companies' systems and devices, like that of any other service company has potential for problems created by other systems outside of the company. Therefore, the Seller cannot represent, warrant or guarantee that the Companies will be unaffected by the Year 2000 problem. The Companies are currently accessing that impact on our services. In light of that, the Companies have developed contingency plans in the event there is such an occurrence.

ENB 00285

EM001-006765

### Section 3.16
### List of all material gas sales, purchase, and transportation contracts
### (the Gas Contracts)

Gas Purchase Agreement between Greeley Gas Company and Kansas Pipeline Company, L.P., dated July 20, 1989 and amendments and exhibits thereto, if any.

Gas Sales and Purchase Agreement between Kansas Pipeline Partnership and United Cities Gas Company dated December 17, 1992 and amendments and exhibits thereto, if any.

Natural Gas Sales Agreement between United Cities Gas Co. and MarGasCo Partnership dated April 20, 1993 and amendments and exhibits thereto, if any.

Rate Schedule SCT-NN Small Customer Transportation Contract No. 110199 – 103100-1 SCT-NN dated March 23, 1999 between Kansas Pipeline Company and Greeley Gas Company, and Amendments and Exhibits thereto, if any.

Riverside I Agreement dated between Missouri Gas Energy, a division of Southern Union Company and Riverside Pipeline Company, L.P. dated February 24, 1995 and amendments and exhibits thereto, if any.

Mid-Kansas II Firm Gas Purchase Contract between Missouri Gas Energy, a division of Southern Union Company and Mid-Kansas Partnership dated February 24, 1995 and amendments and exhibits thereto, if any.

Gas Purchase Agreement between The Kansas Power and Light Company and Kansas Natural Partnership dated October 3, 1991 and amendments and exhibits thereto, if any.

Gas Transportation Service Agreement between The Kansas Power and Light Company and Kansas Natural Partnership dated October 3, 1991 and amendments and exhibits thereto, if any.

Form of Service Agreement Rate Schedule FT Contract No. FT 91-10-01 between Riverside Pipeline Company, L.P. and The Kansas Power and Light Company dated October 3, 1991 and amendments and exhibits thereto, if any.

Gas Transportation Service Agreement between The Kansas Power and Light Company and KansOk Partnership dated October 3, 1991 and amendments and exhibits thereto, if any.

ENB 00286

EM001-006766

Gas Transportation Service Agreement between The Kansas Power and Light Company and Kansas Pipeline Partnership dated October 3, 1991 and amendments and exhibits thereto, if any.

Gas Transportation Service Agreement between Kansas Power and Light Company and Kansas Natural Partnership dated October 3, 1991 and amendments and exhibits thereto, if any.

Form of Service Agreement Rate Schedule FT Contract No. FT-91-10-01 between Riverside Pipeline Company, L.P. and The Kansas Power and Light Company dated October 3, 1991 and amendments and exhibits thereto, if any.

Gas Transportation Service Agreement between Kansas Power and Light Company and KansOk Partnership dated October 3, 1991 and amendments and exhibits thereto, if any.

Gas Purchase Agreement between The Kansas Power and Light Company and Kansas Pipeline Company, L.P. dated August 8, 1988 and amendments and exhibits thereto, if any.

Firm Gas Purchase Contract (Paola and Osawatomie, Kansas) between Western Resources, Inc. and Kansas Pipeline Partnership dated February 28, 1995 and amendments and exhibits thereto, if any.

Firm Gas Purchase Contract (Ottawa, Kansas) between Western Resources, Inc. and Kansas Pipeline Partnership dated February 28, 1995.

Firm Gas Purchase Contract (Johnson and Wyandotte Counties, Kansas) between Western Resources, Inc. and Kansas Pipeline Partnership dated February 28, 1995.

Gas Transportation Service Agreement between Western Resources, Inc. and Kansas Pipeline Partnership dated February 28, 1995.

Amended and Restated Agreement of Lease and Amended and Restated Operating Agreement between TransOk, Inc., and KansOk Partnership dated April 24, 1992 and amendments and exhibits, thereto.

Settlement Agreement between Transok, LLC, KansOk Partnership, Kansas Pipeline Company, Bishop Pipeline Company, MarGasCo Partnership, Kansas Natural and KansOk, Inc. dated April 1, 1999, and amendments and exhibits thereto.

Rate Schedule IT Interruptible Transportation Service Form of Transportation Agreement Contract No. 060198-053100-2-IT between Kansas Pipeline Company, L.P. and Greeley Gas Company, a Division of Atmos Energy Corporation dated June 1, 1998, and amendments and exhibits thereto.

Rate Schedule IT Interruptible Transportation Service Form of Transportation Agreement Contract No. 060198-053100-3-IT between Kansas Pipeline Company, L.P. and United Cities Gas Company, a Division of Atmos Energy Corporation dated June 1, 1998, and amendments and exhibits thereto.



ENB 00287

EM001-006767

Rate Schedule IT Interruptible Transportation Service Form of Transportation Agreement Contract No. 060198-053100-1-IT between Kansas Pipeline Company, L.P. and MarGasCo Partnership dated June 1, 1998, and amendments and exhibits thereto.

Rate Schedule IT Interruptible Transportation Service Form of Transportation Agreement Contract No. 090198-083100-1-IT between Kansas Pipeline Company, L.P. and Oneok Gas Marketing Company dated September 1, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Allen Press dated November 23, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Alvamar Country Club dated September 7, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and American Camper dated October 21, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Aramark dated April 27, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Asphalt Plant Sales dated April 21, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Auto Plaza Car Wash dated January 12, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and B & G Plating dated July 9, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and BDP d/b/a Duds n Suds dated October 22, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Barbour Concrete dated April 4, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Beverly Health and Rehabilitation dated September 26, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Brandon Woods Retirement Community dated January 12, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Brannon Sand & Gravel dated May 22, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Brown Cargo Van dated December 31, 1996, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and CINTAS dated June 8, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Cargill dated September 24, 1999, and amendments and exhibits thereto.

EM001-006768

Natural Gas Sales Contract between Petro Source Gas Ventures and Century Concrete dated January 16, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Chronicle Publishing (KAKE TV) dated December 8, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Claflin Farmers Coop dated February 17, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Coffey County Hospital dated November 3, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Coleman Company dated November 21, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Colgate Palmolive dated September 10, 1996, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Continental Cast Stone dated March 10, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Cooper, Inc. a/k/a Fabric Care Center dated June 16, 1998, and amendments and exhibits thereto.



Natural Gas Sales Contract between Petro Source Gas Ventures and Cornejo & Sons, Inc. dated September 22, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Country Kitchen dated April 3, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Crown Automotive dated March 1, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Curtis Manufacturing dated January 21, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and DeLine Box dated April 14, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Decatur Good Samaritan Center dated May 14, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Desoto Schools dated July 1, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Douglas County dated October 14, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Earth Grains Company dated April 8, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and East Heights United Methodist dated July 16, 1997, and amendments and exhibits thereto.

EM001-006769

Natural Gas Sales Contract between MarGasCo Partnership and Eaton Corporation dated September 24, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and El Dorado Correctional dated November 19, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Elkhart Schools dated June 8, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Ellsworth Correctional dated November 19, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and FCMP, Inc. dated June 27, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and FMC Corporation dated April 3, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Ferroloy Foundry dated May 8, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and First Methodist Lawrence dated February 12, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and First United Methodist ICT dated February 12, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Fowler Schools dated January 21, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Fowler Skilled Nursing dated June 25, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Free State Brewing dated February 26, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and GNB Battery dated November 19, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and GT Sales & Manufacturing dated March 16, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Garage Door Group dated May 18, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Garden City Community College dated December 12, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Tom Garner dated May 27, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Georgia Pacific dated (undated) , and amendments and exhibits thereto.

SF 128300.1   05211 00482

ENB 00290

EM001-006770

Natural Gas Sales Contract between MarGasCo Partnership and Golf Course Superintendents dated September 2, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Good Shepherd Catholic Church dated June 30, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Green Thumb Gardens dated April 27, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Greensburg Schools dated May 23, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Gregory, Inc. dated December 11, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Hanston Schools dated June 18, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Hehr International dated March 24, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Hoechst Marion Roussel dated October 1, 1991, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Holliday Sand & Gravel dated July 1, 1993, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Huff's Gardens dated October 4, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Hugoton USD 210 dated June 8, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Idaho Timber Corporation dated March 9, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Immaculata High Schools dated August 9, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Industrial Chrome, Inc. dated May 14, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Inland Paperboard & Packaging, Inc. dated April 7, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and J & P Cattle dated May 1, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Jardine-Edison Junior Academy dated September 16, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and KC Container dated March 8, 1999, and amendments and exhibits thereto.

EM001-006771

Natural Gas Sales Contract between MarGasCo Partnership and Kansas City, Kansas dated August 3, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Kreonite dated June 4, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and LMB Corporation a/k/a Mt. Oread dated August 11, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Kansas Dept. of Administration (Lansing Correctional) dated November 19, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Lawrence Housing Authority dated August 10, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Lawrence Presbyterian Manor dated January 20, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and City of Leavenworth dated October 30, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Lennox Industries dated October 10, 1996, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Liberal Good Samaritan Hospital dated June 20, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Liberty Hall dated February 12, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Liebherr Mining Equipment dated June 21, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Little Joes Car Wash dated May 26, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Lone Tree Retirement dated July 17, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Lyon County Health Dept., dated March 11, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Macon Municipal Utilities dated April 23, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Maize Schools dated May 3, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Corporation and Meade District Hospital dated September 9, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Meridian Laundry dated January 27, 1998, and amendments and exhibits thereto.

ENB 00292

EM001-006772



Natural Gas Sales Contract between Petro Source Gas Ventures and Metropolitan Baptist Church dated May 1, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Miami County Medical Center dated July 1, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Montezuma USD #371 dated June 8, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Morrow Foundry dated May 27, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and College Church of Nazarene dated February 1, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Corporation and Omega Concrete dated April 16, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and PERG Building (Block Asset) dated March 5, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Packer Ware dated October 26, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Pawhuska Public Schools dated April 7, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Penny's Concrete dated August 9, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Petroleum Building dated December 1, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Phillips Pipeline dated September 25, 1996, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Phillips Pipeline dated September 12, 1991, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Phillips Pipeline dated August 1, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Phillips Pipeline dated October 10, 1996, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Phillips Pipeline dated May 6, 1994, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Players Sport Bar dated September 13, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Plaza West Care Center dated December 19, 1996, and amendments and exhibits thereto.

EM001-006773



Natural Gas Sales Contract between MarGasCo Partnership and Purina Mills dated February 2, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and RACO Car Wash dated March 6, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and RSA Microtech (Ruffin) dated July 28, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Rainbow Mental Health Facility dated May 20, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Rawlins County Health dated August 6, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Reuter Organ dated February 16, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Riverview Condominium dated May 12, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Ron Wright dated June 1, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Roto-Mix dated May 23, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Corporation and Satanta District Hospital dated July 1, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Satanta USD 507 dated June 8, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Seiling Public Works dated December 10, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Sisters of St. Joseph dated August 6, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Standard Motor Products dated September 11, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Star Lumber and Supply dated January 13, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Sterling Farmers Coop dated February 17, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Corporation and Stevens County Hospital dated June 25, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Sublette Schools dated June 23, 1998, and amendments and exhibits thereto.

ENB 00294

EM001-006774

Natural Gas Sales Contract between MarGasCo Partnership and Sunrise Garden Center dated January 25, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Superior Automotive dated November 12, 1996, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Superior Linens dated November 13, 1995, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Town of Taloga dated December 29, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Tamko, Inc. dated December 22, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Overland Pizza Company dated January 26, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Kansas Dept. of Admn. (Topeka Correctional) dated November 19, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Corporation and Trinity Association dated July 3, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Udall Schools dated September 2, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Village Inns of Wichita dated July 31, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Vivi Public Works dated December 10, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and W.W. Manufacturing dated January 15, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Wallace Energy dated July 9, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Watkins Steel dated June 30, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Wellington Farmers Coop dated October 28, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Corporation and Wichita County Health Center dated August 11, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Williamette Industries dated August 23, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Williams Foods dated February 4, 1999, and amendments and exhibits thereto.

EM001-006775

Natural Gas Sales Contract between Petro Source Gas Ventures and Youthville United Methodist dated May 18, 1998, and amendments and exhibits thereto.

Petro Source Gas Ventures Agreements and Petro Source Corporation Agreements were acquired by MarGasCo Partnership pursuant to an Agreement with Petro Source Corporation dated September 22, 1998, and amendments and exhibits thereto.

**Miscellaneous Agreements:**

Settlement Agreement between Western Resources, Inc., The Bishop Group, Ltd., Bishop Pipeline Company, Kansas Pipeline Operating Company, Kansas Pipeline Partnership, Riverside Pipeline Partnership, Mid-Kansas Partnership, Syenergy Pipeline Company, L.P., Riverside Pipeline Company, L.P., Citizens' Utility Ratepayer Board and the Staff of the Kansas Corporation Commission dated July 9, 1997.

Settlement, Release, Indemnity and Assignment Agreement effective February 24, 1995 between Southern Union Company, a division of which is Missouri Gas Energy and each of the following entities, jointly and severally: The Bishop Group, Ltd., Bishop Pipeline Company, Kansas Natural Partnership, Kansas Pipeline Partnership, KansOk Partnership, Mid-Kansas Partnership, Riverside Pipeline Partnership, Riverside Pipeline Company, L.P., Syenergy Pipeline Company, L.P., Kansas Pipeline Operating Company and MarGasCo Partnership.

Settlement Agreement and Release – Linchpin and Wraparound Issues made on the 28th day of February, 1995 by and between Western Resources, Inc., The Bishop Group, Ltd., Bishop Pipeline Company, Kansas Pipeline Operating Company, Kansas Natural Partnership, KansOk Partnership, Kansas Pipeline Partnership, Riverside Pipeline Partnership Mid-Kansas Partnership, Syenergy Pipeline Company, L.P., Riverside Pipeline Company, L.P.

Settlement Agreement and Release – Regulatory Issues made on the 28th day of February, 1995 by and between Western Resources, Inc. The Bishop Group, Ltd., Bishop Pipeline Company, Kansas Pipeline Operating Company, Kansas Natural Partnership, KansOk Partnership, Kansas Pipeline Partnership, Riverside Pipeline Partnership Mid-Kansas Partnership, Syenergy Pipeline Company, L.P., Riverside Pipeline Company, L.P.

Limited Release of Western Resources to Southern Union Company (1995).

EM001-006776

ASSET PURCHASE AGREEMENT
SELLER'S DISCLOSURE SCHEDULE

Section 3.18
Breaches of any Gas Contracts or written notices from any
party indicating an intent to rescind or dishonor any Gas Contract

1.    See Section 3.6 "Pending Claims" describing KGS filed lawsuit, which alleges KPC's breach of the KCC Settlement Agreement and other agreements and requests a monetary judgment and setting aside all of KGS's contracts with KPC as a remedy.

2.    See Section 3.6 "Pending Claims", describing that MGE has indicated to KPC its belief that the 2% escalator clause under the Mid-Kansas II Agreement and/or the Riverside I Agreement is no longer applicable.

EM001-006777

SECTION 3.19
NOVEMBER 5, 1999

### Section 3.19
### Noncompliance with any tariff

None, except for those tariff provisions set forth in CP96-152-000 and/or RP99-485-000 and related dockets which have not yet been adopted by FERC in its current form.

ENB 00298

EM001-006778

ASSET PURCHASE AGREEMENT
SELLER'S DISCLOSURE SCHEDULE

Section 3.20
Gas Imbalances

KPC - <$97,282>

MarGasCo - <$12,168.60>

36

ENB 00299

EM001-006779

ASSET PURCHASE AGREEMENT
SELLER'S DISCLOSURE SCHEDULE

### Section 5.1
### Exceptions to Ordinary Course Covenants

1.      Prior to or substantially simultaneous with Closing, MERI and the Buyers are providing funds to pay off or cause to be paid off and/or purchase or cause to be purchased the Notes, Security Documents and/or the Operative Agreements and the Make Whole Premium applicable thereto and related costs.

2.      Prior to or at Closing, KPC will have executed and/or delivered a Purchase Agreement, Management Agreements, Master Interchange Agreements and Owners Agreements to purchase an interest in a Beechjet 400 airplane not to exceed 25% and a 6.25% interest in a Hawker 800 airplane.

3.      Any and all terminations of employment contracts and/or consulting agreements, or other documents, necessary to carry out the provisions of Schedule 6.2 hereto.

4.      All other transactions necessary or required to consummate or carryout the transactions contemplated by or set forth in the Asset Purchase Agreement and it Schedules and/or Exhibits.

5.      Prior to Closing, KPC will execute a guaranty of certain obligations of K-Pipe Merger Corporation under that certain Stock Purchase Agreement dated October 25, 1999 by and between by and between K-Pipe Merger Corporation, and Dennis M. Langley.

ENB 00300

EM001-006780

ASSET PURCHASE AGREEMENT
SELLER'S DISCLOSURE SCHEDULE

### Section 6.2
**Employees or Non-Employees which Seller Indemnifies the Buyers
against as to Severance Obligations**

1. Dennis M. Langley
2. Steve Korb
3. Lynette Shaw
4. Brandon Glenn
5. Tracey Lebeau
6. Frank LaMere (Non-Employee)
7. Howard Lubow
8. Yvette Korb
9. Nate Beyer d/b/a Brown Dog (Non-Employee)
10. Wallace McKinney
11. Tino Monaldo, Chtd. (Non-Employee)
12. With respect to Overland Consulting, Inc. ("OCI"), at or before Closing OCI shall have forever released and waived all of its rights described in the last two sentences of paragraph 4 of its Consulting Agreement with KPC and its Affiliated Entities, dated April 1, 1997, regarding its option to terminate said Consulting Agreement in the event of a "change of control" as defined therein.

ENB 00301

EM001-006781

ASSET PURCHASE AGREEMENT
SELLER'S DISCLOSURE SCHEDULE

Section 7.2(c)(iii)
[Assumption Agreement re Debt Obligations of Syenergy]

ENB 00302

EM001-006782

PURCHASE AND AGREEMENT
SELLER'S DISCLOSURE SCHEDULE

Schedule 7.3
[Guaranty (Parent)]

40

ENB 00303

EM001-006783

BUYER'S DISCLOSURE SCHEDULE

Section 4.1    No exceptions.

Section 4.2    No exceptions.

Section 4.3    No exceptions.

Section 4.4    No exceptions.

Section 4.5    No exceptions.

Section 4.6    No exceptions.

Section 4.7    No exceptions.

Section 4.8    No exceptions.

Section 4.9    No exceptions.

A

ENB 00305

EM001-006785

# FIRST AMENDMENT
## TO
## ASSET PURCHASE AGREEMENT

This First Amendment to Asset Purchase Agreement is made and entered into as of December 15, 1999 by and among K-PIPE MERGER CORPORATION, a Delaware corporation (the "Seller"), MIDCOAST ENERGY RESOURCES, INC., a Texas corporation ("MERI"), MIDCOAST KANSAS PIPELINE, INC., a Delaware corporation ("Midcoast Pipeline"), and MIDCOAST KANSAS GENERAL PARTNER, INC., a Delaware corporation ("Midcoast General Partner"). Midcoast Pipeline and Midcoast General Partner are hereinafter sometimes collectively referred to as the "Buyers". The Seller, MERI and the Buyers are hereinafter sometimes collectively referred to as the "Parties" and individually as a "Party".)

## RECITALS:

A.     The Parties hereto entered into a Asset Purchase Agreement dated as of November 5, 1999 (the "Original Agreement").

B.     The Parties hereto now desire to amend the Original Agreement.

## AGREEMENT:

In consideration of the mutual agreements, promises and covenants set forth herein, and the recitals set forth above, the Parties hereto, intending to be legally bound, agree as follows:

1.     <u>Amendment.</u>

(a)     <u>Section 2.3(c)(i)</u>. Section 2.3(c)(i) of the Original Agreement is hereby amended to read in its entirety as follows: "(i) Seller shall submit to Buyers, not later than January 24, 2000, its good faith estimate of the Adjustment Value as revised based on any information then available to the Seller (the "Revised Adjustment Value"). The Seller shall also provide Buyers with the work papers and back-up materials used in preparing his estimated Revised Adjustment Value."

(b)     <u>Section 2.3(c)(ii)</u>. Section 2.3(c)(ii) of the Original Agreement is hereby amended to read in its entirety as follows: "(ii) Within sixty (60) days after receiving the Revised Adjustment Value from the Seller, Buyers shall prepare and deliver to the Seller a detailed statement as to its calculation of the Adjustment Value (the "Buyers' Revised Adjustment Value")."

2.     <u>Miscellaneous.</u> The Original Agreement as amended hereby, and as may be further amended in accordance with the terms of the Original Agreement, is referred to in the Original Agreement as the "Agreement." Except as amended hereby, the Original Agreement remains in full force and effect.

ENB 00306

EM001-006786

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the date first above written.

**K-PIPE MERGER CORPORATION**

By: _____
Name: _____
Title: _____


**MIDCOAST ENERGY RESOURCES, INC.**

By: _____
    Richard Robert
    Treasurer and Chief Financial Officer


**MIDCOAST KANSAS PIPELINE, INC.**

By: _____
    Richard Robert
    Treasurer and Chief Financial Officer


**MIDCOAST KANSAS GENERAL PARTNER, INC.**

By: _____
    Richard Robert
    Treasurer and Chief Financial Officer

ENB 00307

EM001-006787

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the date first above written.

**K-PIPE MERGER CORPORATION**

By: *Larry J. Austin*
Name: Larry J. Austin
Title: President

**MIDCOAST ENERGY RESOURCES, INC.**

By: _____
    Richard Robert
    Treasurer and Chief Financial Officer

**MIDCOAST KANSAS PIPELINE, INC.**

By: _____
    Richard Robert
    Treasurer and Chief Financial Officer

**MIDCOAST KANSAS GENERAL PARTNER, INC.**

By: _____
    Richard Robert
    Treasurer and Chief Financial Officer

ENB 00308

TOTAL P.02

EM001-006788

# LeBoeuf, Lamb, Greene & MacRae, L.L.P.

A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

**FAX TRANSMISSION**

ONE EMBARCADERO CENTER
SAN FRANCISCO, CA 94111
TELEPHONE: (415) 951-1100
FAX: (415) 951-1180
IF ANY TRANSMISSION PROBLEMS: (415) 951-1100

| From: | Cynthia Morelli | Date: | January 24, 2000 |
|-------|-----------------|-------|------------------|
| ID#: | 3423 | Page: | 1 of 2 |

If you have any questions regarding this transmission, please contact:
Serena Chobanian at 415-951-1131.

| To: | Fax Number | Confirming Telephone Number | Client/Matter Number |
|-----|-----------|-----------------------------|----------------------|
| Chris Kaitson | 713-653-6710 | 713-650-8900 | 05211-482 |

**Comments/Message:**

Chris,

Attached please find K-Pipe Merger Corporation's signature page to the First Amendment to our Asset Purchase Agreement.

Regards,
Cynthia

S FACSIMILE TRANSMISSION CONTAINS CONFIDENTIAL AND/OR LEGALLY PRIVILEGED INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL(S) NAMED ON THE TRANSMISSION SHEET. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION OR THE TAKING OF ANY ACTION IN RELIANCE ON THE CONTENTS OF THIS FACSIMILE TRANSMISSION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE CALL US COLLECT IMMEDIATELY SO THAT WE CAN ARRANGE FOR RETURN OF THE DOCUMENTS TO US AT NO COST TO YOU. THANK YOU.

ENB 00309

```
                    *********************
                    ***   TX REPORT   ***
                    *********************

    TRANSMISSION OK

    TX/RX NO              1560
    CONNECTION TEL             914159511179
    SUBADDRESS
    CONNECTION ID
    ST. TIME              01/18 15:41
    USAGE T               00'28
    PGS. SENT             3
    RESULT                OK
```

# MIDCOAST ENERGY RESOURCES, INC.

**1100 Louisiana Street, Suite 2900, Houston, Texas  77002**
**Post Office Box 61865, Houston, Texas  77208 - 1865**
**(713) 650-8900,   FAX: (713) 653-6710**

## F A X   C O V E R   S H E E T

**DATE:**  January 18, 2000

**TO:**  Cynthia McArthur Morelli      **PHONE:**  415-951-1158
LeBoeuf, Lamb                  **FAX:**  415-951-1179

**FROM:**  Chris Kaitson            **PHONE:**  (713) 650-8900
General Counsel            **FAX:**  (713) 653-6710

**RE:**  Kansas Pipeline

Number of pages including cover sheet:   3

## MESSAGE:  ATTACHED IS THE PARTIALLY EXECUTED FIRST AMENDMENT TO THE ASSET PURCHASE AGREEMENT FOR KPC.

ENB 00310

EM001-006790

# MIDCOAST ENERGY RESOURCES, INC.

1100 Louisiana Street, Suite 2900, Houston, Texas  77002
Post Office Box 61865, Houston, Texas  77208 - 1865
(713) 650-8900,   FAX: (713) 653-6710

## F A X   C O V E R   S H E E T

**DATE:**   January 18, 2000

**TO:**     Cynthia McArthur Morelli      **PHONE:**     415-951-1158
            LeBoeuf, Lamb                 **FAX:**       415-951-1179

**FROM:**   Chris Kaitson                 **PHONE:**     (713) 650-8900
            General Counsel               **FAX:**       (713) 653-6710

**RE:**     Kansas Pipeline

Number of pages including cover sheet:    3

## MESSAGE:   ATTACHED IS THE PARTIALLY EXECUTED FIRST AMENDMENT TO THE ASSET PURCHASE AGREEMENT FOR KPC.

### CONFIDENTIALITY NOTICE
THIS FACSIMILE CONTAINS INFORMATION THAT IS CONFIDENTIAL OR PRIVILEGED, OR BOTH.
THIS INFORMATION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED
ON THE FACSIMILE COVER LETTER.  ANY DISCLOSURE, COPYING, DISTRIBUTION OR USE OF
THIS INFORMATION BY ANY PERSON OTHER THAN THE INTENDED RECIPIENT IS PROHIBITED.
IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR, PLEASE NOTIFY US BY TELEPHONE
IMMEDIATELY AT (713) 650-8900 SO THAT WE CAN ARRANGE FOR THE RETRIEVAL OF THE
TRANSMITTED DOCUMENTS AT NO COST TO YOU.

ENB 00311

5

ENB 00312

EM001-006792

### K-PIPE MERGER CORPORATION
#### c/o SCALP
750 Lexington Avenue, 30th Floor
New York, New York

Midcoast Kansas Pipeline, Inc.
Midcoast Kansas General Partner, Inc.
Midcoast Energy Resources, Inc.
1100 Louisiana, Suite 2900
Houston, Texas 77002

Gentlemen:

Reference is made to that certain Asset Purchase Agreement (the "Asset Purchase Agreement") dated as of November 5, 1999, by and among K-Pipe Merger Corporation ("K-Pipe"), as Seller, and Midcoast Energy Resources, Inc. and Midcoast Kansas Pipeline, Inc. and Midcoast Kansas General Partner, Inc. (collectively, "Midcoast"), as Buyers. This letter agreement is being executed contemporaneously with the execution and delivery of the Asset Purchase Agreement and as an amendment thereto. A Closing has been set under the Asset Purchase Agreement for November 9, 1999. Midcoast, at its sole option, can cause the Closing to be extended to no later than November 15, 1999 by written notice of extension to K-Pipe, but, as a condition subsequent to such extension, at the Closing Midcoast will pay to K-Pipe $21,500 for each day the Close is delayed beyond November 9, 1999, in addition to the Preliminary Cash Consideration. In addition, if Midcoast has not timely submitted a Representation Statement or if all matters listed on the Representation Statement have been cured, then if the Close under the Asset Purchase Agreement does not occur on or prior to November 15, 1999 for any reason (other than a failure by K-Pipe to make the deliveries required by Article III of the Purchase Agreement) then Midcoast will pay to K-Pipe $15,000,000 on November 16, 1999, as K-Pipe's sole remedy for Midcoast's failure to Close, unless K-Pipe has specifically agreed in writing to further delay the Close. Midcoast acknowledges that K-Pipe is relying on this letter in undertaking other financial obligations to third parties, which third parties are acknowledged by Midcoast to be donee or creditor beneficiaries Midcoast agrees that such third parties may pursue claims they may have against Midcoast. This agreement is binding on and shall inure to the benefit of the parties hereto and all beneficiaries hereof.

Very truly yours,

K-PIPE MERGER CORPORATION

By: *Larry J. Austin*
Name: Larry J. Austin
Title: President

*Larry J. Austin*

ENB 00313

EM001-006793

Accepted and Agreed to:

MIDCOAST KANSAS PIPELINE, INC.

By: _____
Name: *Richard Robert*
Title: *CFo & Treasurer*

MIDCOAST KANSAS GENERAL PARTNER, INC.

By: _____
Name: *Richard Robert*
Title: *CFo & Treasurer*

MIDCOAST ENERGY RESOURCES, INC.

By: _____
Name: *Richard Robert*
Title: *CFo & Treasurer*

457477 01                                    2

ENB 00314

EM001-006794