(d) This Escrow Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such State. Any suit, action or proceeding arising out of, under or in connection with this Agreement shall be brought in any court in New York. All parties hereto submit to the jurisdiction and venue of all courts in the State of New York (both Federal and State) for the purpose of any such suit, action or proceeding. The invalidity or unenforceability of any provision of this Escrow Agreement shall not affect the validity or enforceability of the remaining provisions hereof.

(e) This Escrow Agreement may be executed in counterparts and the counterparts, taken together, shall be deemed to form one original instrument and may be executed by facsimile.

(f) Buyer and Seller agree to execute, acknowledge and deliver to each other and to Escrow Agent any further writings, documents, instruments or agreements reasonably necessary to give full force and effect to the provisions of the Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be duly executed as of the day and year first above written.

MIDCOAST KANSAS PIPELINE, INC.

By:
Name: Richard Robert
Title: CFO & Treasurer

MIDCOAST KANSAS GENERAL PARTNER, INC.

By:
Name: Richard Robert
Title: CFO & Treasurer

K-PIPE MERGER CORPORATION

By:
Name: Larry J. Austin
Title: President

KLC-AssetEsc2-10/29/99

6

ENB 00315

EM001-006795

11- 8-99; 3:28PM;LEBOEUF LAMB NY

COOPERATIEVE CENTRALE RAIFFEISEN-
BOERENLEENBANK B.A., "RABOBANK
NEDERLAND", NEW YORK BRANCH

By: _____
Name: _____
Title: _____

BANK OF AMERICA, N.A.
(As Administrative Agent and Separately as a Lender)

By: _____
Name: _____
Title: _____

RLC-AssetEx2-10/29/99

7

ENB 00316

11/01/99  MON 14:29  [TX/RX NO 9216]

EM001-006796

## K-Pipe Merger Corp

November 8, 1999

Rabobank Nederland, New York Branch
245 Park Avenue
37th Floor
New York, NY 10167

Attn. Chris Kortlandt

Dear Sir:

We hereby ask you to execute the following wire transfers for value November 8, 1999:

| | |
|---|---|
| Amount: | $122,594,852 |
| To: | Chase Manhattan Bank |
| ABA#: | 021-000-021 |
| Account#: | 189-0-07993 |
| Further Credit to: | AC Dennis M. Langley |
| Account #: | CSD 7939631 |
| Reference: | Stock Purchase Agreement |

We appreciate your attention.

Very truly yours,

K-Pipe Merger Corp.

By:
Name:    Larry J. Austin
Title:    President

**ENB 00317**

EM001-006797

**K-Pipe Group, Inc. (Survivor or merger with K-Pipe Merger Corp)**

November 9, 1999

Utrecht-America Finance Co.
c/o Rabobank Nederland, New York Branch
245 Park Avenue
37th Floor
New York, NY 10167

Attn. Chris Kortlandt

Dear Sir:

You are hereby irrevocably instructed and authorized to debit our account, reference pre-payment K-Pipe Merger Corp loan in full. Our account number at your bank is #18313.

We appreciate your attention.

Very truly yours,

K-Pipe Group, Inc. (survivor of
merger with K-Pipe Merger Corp)

By:
Name:        Larry J. Austin
Title:       President

ENB 00318

EM001-006798

# K-Pipe Merger Corp

November 8, 1999

Rabobank Nederland, New York Branch
245 Park Avenue
37th Floor
New York, NY 10167

Attn. Chris Kortlandt

Dear Sir:

We hereby request a drawdown of $123,345,000 under the Promissory Note dated as of November 8, 1999 and ask you to credit the proceeds of the loan to our account (#18313) at your Bank. In addition, you are hereby authorized to debit our account for an up-front fee of $750,000.   Any amount remaining in the account at the end of the day should be used to reduce our outstanding loan balance.

We appreciate your attention.

Very truly yours,

K-Pipe Merger Corp.

By:
Name:     Larry J. Austin
Title:       President

ENB 00319

EM001-006799

November 8, 1999

Rabobank Nederland
245 Park Avenue
New York, NY 10167-0062

Dear Sirs:

Pursuant to our Escrow Agreement and Escrow Account 18359, this is our joint written notice to you, as Escrow Agent, to deliver the Escrowed Property on Tuesday November 9, 1999 before 4:00 p.m. EST as set forth in section 4 of the Escrow Agreement.

Very Truly Yours,

Buyers:            Midcoast Kansas Pipeline, Inc.

                   by _____

                   Midcoast Kansas General Partner, Inc.

                   by _____

Bank of America:   Bank of America, N.A.

                   by _____

ENB 00320

6

ENB 00321

EM001-006801

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT, is made and entered into the 8th of November, 1999, by and among K-PIPE MERGER CORPORATION, a Delaware corporation, ("Seller"), MIDCOAST KANSAS PIPELINE, INC., a Delaware corporation, and MIDCOAST KANSAS GENERAL PARTNER, INC., a Delaware corporation, (collectively, "Buyer") and COOPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., "RABOBANK NEDERLAND", NEW YORK BRANCH ("Rabobank," as escrow agent (in such capacity, the "Escrow Agent")), AND BANK OF AMERICA, N.A. as administrative agent and separately as a lender ("Bank of America").

### WITNESSETH:

WHEREAS, pursuant to an Asset Purchase Agreement, dated as of November 5, 1999 (the "Purchase Agreement"), Seller has agreed to sell and transfer, or cause to be sold and transferred, to Buyer, and Buyer has agreed to acquire and purchase from Seller, certain Partnership Interests (as defined in the Purchase Agreement), together with certain other assets, rights, properties, holdings and interests, all as more fully set forth in the Purchase Agreement; and

WHEREAS, Buyer is obtaining the funds with which to purchase the Partnership Interest and to fund the Escrow account inter alia through a credit facility with the Bank of America;

WHEREAS, Seller, Buyer and Bank of America desire that Escrow Agent act as escrow agent, and Escrow Agent is willing to do so, all upon the terms and conditions hereinafter set forth; and

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto agree as follows:

1. **Appointment.** Buyer, Seller and Bank of America hereby jointly appoint Escrow Agent to act as escrow agent pursuant to this Escrow Agreement. Simultaneously with the execution of this Escrow Agreement, Bank of America at the specific instance and request of Buyer, shall deliver and deposit with Escrow Agent the following: (i) Bank of America will deposit $198,100,000.00 (the "Escrow Amount"), (by wire transfer to Bank of New York ABA 021.0000-18 for credit to Rabobank Nederland, New York, for credit to account 802-6002-533, for further credit to Midcoast Energy Resources Inc. Escrow Account 18359) (ii) Buyer will deposit the documents referenced on Schedule 1, attached hereto, (the "Buyer Closing Documents"), and (iii) Seller will deposit the documents referenced on Schedule 2, attached hereto (the "Seller Closing Documents") (collectively, the Escrow Amount and the Closing Documents are referred to as the "Escrowed Property"), to be held in escrow pursuant to the terms and conditions hereof.

2. **Acceptance.** Escrow Agent agrees to act as escrow agent and to hold and dispose of all Escrowed Property deposited to it pursuant to this Escrow Agreement, and all net income earned thereon, in accordance with the terms, conditions, provisions and instructions herein contained. During

RLC-AssetEsc2.-10/29/99

1

ENB 00322

EM001-006802

the continuance of this Escrow Agreement, the Escrow Amount shall be invested and reinvested by Escrow Agent pursuant to Section 3 hereof.

      3. **Investment of Preliminary Cash Consideration.** The Escrow Amount escrowed hereunder shall be held in a U.S. government securities fund, money market fund or other similarly conservative investment selected by Buyer. Buyer shall receive all income and incur all losses associated with the investments made in accordance with this Escrow Agreement, with such amounts being paid to Buyer upon termination of the escrow created pursuant hereto.

      4. **Disbursement of Escrowed Property.** Subject only to the fulfillment of the condition precedent that Buyer and Bank of America jointly give written notice to Escrow Agent to deliver the Escrowed Property, Escrow Agent is hereby authorized and directed to remit and deliver the Escrowed Property on Tuesday, November 9, 1999, before 4:00 p.m., EST, as follows:

    (a)    the sum of $112,695,895.00 shall be transferred to the Seller, at its Rabobank Nederland, New York account;

    (b)    the sum of $73,288,380.29 shall be wired to State Street Bank & Trust Company, Boston, Massachussetts, for the benefit of the following noteholders (collectively, the "Noteholders"): Northwestern Mutual Life Insurance Company, Teachers Insurance & Annunity Association of America, Sigler & Co., Mac & Co., and Northwestern National Life Insurance Co., as follows:
State Street Bank and Trust Company
ABA No. 011000028
DDA Act No. 99039901
Reference: Synergy Pipeline Company, L.P.

    (c)    the sum of $6,012,164.38 shall be wired to Chase Manhattan Bank, as follows: ABA 021000021, Commercial Loan Dept. 7315, 1111 Fannin 9th Floor, Attn: Doug Catron, Reference: Synergy Pipeline.

    (d)    the sum of $6,100,000.00 to Bank of America, N.A., Houston, Texas, for the benefit of Butcher Interest Partnership, Account No. 3751410195, ABA 121000358, Butcher Interest Partnership, Bank of America, Attn: Corporate Loans.

    (e)    the balance of the Escrow Amount, if any, including accrued interest, less a sum equal to the amount of any expenses due the Escrow Agent pursuant to this Escrow Agreement, shall be wired to or for the benefit of Buyer, as follows: Midcoast Energy Resources, Inc. ABA 111000614, Bank One Texas, N.A., Account #: 1820764841;

    (f)    the Buyer Closing Documents shall be delivered to Seller; and

ENB 00323

EM001-006803

8. <u>Fees & Legal Counsel</u>.  All fees and expenses of Escrow Agent shall be paid by Buyer.  In the event of any dispute hereunder, Escrow Agent may consult with counsel of its own choice (including in-house counsel) and shall be entitled to reimbursement for its expenses, including out-of-pocket expenses and reasonable attorneys' fees (with such fees and expenses being paid by Buyer).  Escrow Agent shall have full and complete authorization and protection for any action taken or suffered by it hereunder in good faith and in accordance with the advice of such counsel.

9. <u>Replacement Escrow Agent</u>.  Escrow Agent may resign at any time by giving thirty (30) days' prior written notice to all parties hereto, but will continue to serve until a successor is appointed.  Seller and Buyer will jointly have the right at any time and with or without cause to remove Escrow Agent by a jointly written notice to Escrow Agent.  In the event of the resignation or removal of Escrow Agent or in the event Escrow Agent for any reason is unable to serve or fails to continue to serve as agent hereunder, Seller and Buyer shall in writing appoint a successor escrow agent, which is mutually acceptable to both Seller and Buyer.  Any successor escrow agent will have the same rights and duties as the original Escrow Agent and be governed by the terms and conditions set forth in this Escrow Agreement, including but not limited to the terms and conditions relating to resignation, removal and succession set forth in this paragraph 9.  If no successor Escrow Agent shall have been appointed within ten business days of a notice of resignation by the Escrow Agent, the Escrow Agent's sole responsibility shall thereafter be to hold the Escrow Amount until the earlier of (i) its receipt of designation of a successor Escrow Agent, or (ii) termination of this Agreement in accordance with its terms.

10. <u>Miscellaneous</u>.

(a)  Any notices, requests, demands and other communications required or permitted under this Escrow Agreement shall be deemed to be effectively given and deemed received (i) when hand delivered; (ii) one business day after deposit with a national recognized overnight courier who has agreed to deliver the next day or (iii) upon sending a telecopy (with receipt electrically confirmed, in each case, address as follows:

If to Seller:

        K-Pipe Merger Corporation
        c/o SCALP
        750 Lexington Avenue, 30th Floor
        New York, New York
        Telephone:  (212) 826-0770
        Telecopier:  (212) 826-0077

        with a copy to:

        Howard Teig, CPA
        510 Jericho Turnpike, Suite 320
        Jericho, New York  11753
        Telephone:  (516) 931-5506
        Telecopier:  (516) 931-5327

RLC-AssetEsc2.-10/29/99

4

ENB 00324

EM001-006804

If to Buyer to:

> Midcoast Kansas Pipeline, Inc.
> Midcoast Kansas General Partner, Inc.
> 1100 Louisiana, Suite 2900
> Houston, Texas 77002
> Attn: General Counsel
> Telephone: (713) 650-8900
> Telecopier: (713) 650-3232

> with copy to:

> Ronald L. Chachere, Esq.
> Suite 970, 615 N. Upper Broadway
> Corpus Christi, Texas 78401
> Telephone: (361) 883-2356
> Telecopier: (361) 883-2357

If to Escrow Agent:

> Rabobank International
> New York Branch
> 245 Park Avenue, 36th Floor
> New York, NY 10167
> Attn: Chris Kortland
> Telecopier: (212) 922-0969

If to Bank of America to:

> Bank of America, N.A.
> Houston Main Banking Center
> 700 Louisiana Street
> Energy Finance Division, 8th Floor
> Houston, Texas 77002
> Attn: Patrick M. Delaney

or to such other person or address as such party may direct the other parties in writing. This Escrow Agreement may not be modified or amended except in a writing signed by all parties hereto.

(b) Except as provided in paragraph 9 hereof, neither this Escrow Agreement, nor any of the rights, duties or obligations of any party hereunder, may be assigned or otherwise delegated by such party without the prior written consent of all other parties hereto, which will not be unreasonably withheld.

ENB 00325

EM001-006805

(c) This Escrow Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and permitted assigns.

(d) This Escrow Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such State. Any suit, action or proceeding arising out of, under or in connection with this Agreement shall be brought in any court in New York. All parties hereto submit to the jurisdiction and venue of all courts in the State of New York (both Federal and State) for the purpose of any such suit, action or proceeding. The invalidity or unenforceability of any provision of this Escrow Agreement shall not affect the validity or enforceability of the remaining provisions hereof.

(e) This Escrow Agreement may be executed in counterparts and the counterparts, taken together, shall be deemed to form one original instrument and may be executed by facsimile.

(f) Buyer and Seller agree to execute, acknowledge and deliver to each other and to Escrow Agent any further writings, documents, instruments or agreements reasonably necessary to give full force and effect to the provisions of the Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be duly executed as of the day and year first above written.

MIDCOAST KANSAS PIPELINE, INC.

By: _____
Name: _Richard Robert_____
Title: _CFO & Treasurer_____

MIDCOAST KANSAS GENERAL PARTNER, INC.

By: _____
Name: _Richard Robert_____
Title: _CFO & Treasurer_____

K-PIPE MERGER CORPORATION

By: _____
Name: _Larry J. Austin_____
Title: _President_____

ENB 00326

EM001-006806

**COOPERATIEVE CENTRALE RAIFFEISEN-
BOERENLEENBANK B.A., "RABOBANK
NEDERLAND", NEW YORK BRANCH**

By: _____
Name: _____
Title: _____

**BANK OF AMERICA, N.A.**
**(As Administrative Agent and Separately as a Lender)**

By: _____
Name: _____
Title: _____

RLC-AssetEsc2.-10/29/99

ENB 00327

EM001-006807

7

ENB 00328

EM001-006808

BISHOP PIPELINE COMPANY

WRITTEN CONSENT

OF

SOLE STOCKHOLDER

as of

November 8 , 1999

The undersigned, being the sole stockholder of Bishop Pipeline Company (the "Corporation"), hereby consents to the adoption of the following resolutions as if such resolutions had been adopted at a duly convened meeting of the stockholders of the Corporation:

Removal and Replacement of Board of Directors

RESOLVED, that the directors of the Corporation immediately prior to the effective date hereof be removed without cause; and

RESOLVED, that the following individual be appointed to be the sole director of the Corporation as of the effective date hereof:

Larry J. Austin

Dividend of Butcher Interest

RESOLVED, that the Corporation dividend its entire interest in the Butcher Interest (as such term is defined in that certain Asset Purchase Agreement dated as of November 5, 1999 (the "Asset Purchase Agreement") among K-Pipe Merger Corporation, a Delaware corporation, as seller, and Midcoast Energy Resources, Inc., a Nevada corporation ("MERI"), Midcoast Kansas Pipeline, Inc., a Delaware corporation ("Midcoast Pipeline"), and Midcoast Kansas General Partner, Inc., a Delaware corporation ("Midcoast General Partner"), as buyers) to the sole stockholder of the Corporation; for the sake of clarity the entire interest of the Corporation in the Butcher Interest consists of the 27.2488% interest owned by the Corporation prior to the date of this Consent and the

SF 128646.1 05211 00482

-1-

ENB 00329

EM001-006809

6.0846% interest dividended to the Corporation effective the date of this Consent by Bishop Gas Transmission Co., a wholly owned subsidiary of the Corporation.

IN WITNESS WHEREOF, this Consent shall be effective as of November 8, 1999.

SOLE STOCKHOLDER:

K-Pipe Group, Inc.

By: _____
Name: Larry J. Austin
Title: President

-2-

ST 138646.1 05211 00482

ENB 00330

EM001-006810

BISHOP PIPELINE COMPANY

WRITTEN CONSENT
OF
SOLE DIRECTOR
as of
November 8, 1999

The undersigned, being the sole director of Bishop Pipeline Company (the "Corporation"), hereby consents to the adoption of the following resolutions as if such resolutions had been adopted at a duly convened meeting of the board of directors of the Corporation:

Removal and Replacement of Officers

    RESOLVED, that the officers of the Corporation immediately prior to the effective date of this Consent to the extent they have not resigned be, and they hereby are, removed without cause;

    RESOLVED, that the persons specified on Schedule I hereto be, and they hereby are, as of the date of this Consent, elected to hold the offices set forth directly across from their respective names on such Schedule I, each to hold office until their successors shall have been duly chosen and shall qualify.

Dividend of Butcher Interest

    RESOLVED, that the Corporation hereby declares a dividend to its sole stockholder comprised of the Corporation's entire interest in the Butcher Interest (as such term is defined in that certain Asset Purchase Agreement dated as of November 5, 1999 (the "Asset Purchase Agreement") among K-Pipe Merger Corporation, a Delaware corporation, as seller, and Midcoast Energy Resources, Inc., a Nevada corporation ("MERI"), Midcoast Kansas Pipeline, Inc., a Delaware corporation ("Midcoast Pipeline"), and Midcoast Kansas General Partner, Inc., a Delaware

SF 128646.1 05211 00482

-1-

ENB 00331

EM001-006811

11/04/99  16:49 FAX ~~  ~~~ ~~~~

corporation ("Midcoast General Partner"), as buyers) to
the sole stockholder of the Corporation; for the sake
of clarity the entire interest of the Corporation in
the Butcher Interest consists of the 27.2488% interest
owned by the Corporation prior to the date of this
Consent and the 6.0846% interest dividended to the
Corporation effective the date of this Consent by
Bishop Gas Transmission Co., a wholly owned subsidiary
of the Corporation.

IN WITNESS WHEREOF, this Consent shall be effective as of
November 8, 1999.

                                SOLE DIRECTOR

                                Darry J. Austin

SF 128648.1 05211 00482                        -2-

ENB 00332

EM001-006812

SCHEDULE I

Officers of the Corporation

President          Larry J. Austin

Secretary          Linda Austin

Treasurer          Larry J. Austin

SF 128648.1 05211 00482

-3-

ENB 00333

EM001-006813

8

ENB 00334

EM001-006814

BISHOP GAS TRANSMISSION CO.

**WRITTEN CONSENT**

**OF**

**SOLE STOCKHOLDER**

as of

November 8, 1999

The undersigned, being the sole stockholder of Bishop Gas Transmission Co. (the "Corporation"), hereby consents to the adoption of the following resolutions as if such resolutions had been adopted at a duly convened meeting of the stockholders of the Corporation:

<u>Removal and Replacement of Board of Directors</u>

RESOLVED, that the directors of the Corporation immediately prior to the effective date hereof be removed without cause; and

RESOLVED, that the following individual be appointed to be the sole director of the Corporation as of the effective date hereof:

Larry J. Austin

<u>Dividend of Butcher Interest</u>

RESOLVED, that the Corporation dividend its entire interest in the Butcher Interest (as such term is defined in that certain Asset Purchase Agreement dated as of November 5, 1999 (the "Asset Purchase Agreement") among K-Pipe Merger Corporation, a Delaware corporation, as seller, and Midcoast Energy Resources, Inc., a Nevada corporation ("MERI"), Midcoast Kansas Pipeline, Inc., a Delaware corporation ("Midcoast Pipeline"), and Midcoast Kansas General Partner, Inc., a Delaware corporation ("Midcoast General Partner"), as buyers) to the sole stockholder of the Corporation.

SF 126642.1 05211 00482

ENB 00335

EM001-006815

11/04/99  16:45 FAX 212 626 0010

IN WITNESS WHEREOF, this Consent shall be effective as of
November 8, 1999.

SOLE STOCKHOLDER:

Bishop Pipeline Company

By: _Larry J. Austin_
Name:  Larry J. Austin
Title: President

ar 128642.1 05211 00462

ENB 00336

EM001-006816

BISHOP GAS TRANSMISSION CO.

WRITTEN CONSENT
OF
SOLE DIRECTOR
as of
November 8, 1999

The undersigned, being the sole director of Bishop Gas Transmission Co. (the "Corporation"), hereby consents to the adoption of the following resolutions as if such resolutions had been adopted at a duly convened meeting of the board of directors of the Corporation:

**Removal and Replacement of Officers**

    RESOLVED, that the officers of the Corporation immediately prior to the effective date of this Consent to the extent they have not resigned be, and they hereby are, removed without cause;

    RESOLVED, that the persons specified on Schedule I hereto be, and they hereby are, as of the date of this Consent, elected to hold the offices set forth directly across from their respective names on such Schedule I, each to hold office until their successors shall have been duly chosen and shall qualify.

**Dividend of Butcher Interest**

    RESOLVED, that the Corporation hereby declares a dividend to its sole stockholder comprised of the Corporation's entire interest in the Butcher Interest (as such term is defined in that certain Asset Purchase Agreement dated as of November 5, 1999 (the "Asset Purchase Agreement") among K-Pipe Merger Corporation, a Delaware corporation, as seller, and Midcoast Energy Resources, Inc., a Nevada corporation ("MERI"), Midcoast Kansas Pipeline, Inc. ("Midcoast Pipeline"), and Midcoast Kansas General Partner, Inc., a Delaware

SF 126645.1 05211 00482

-1-

ENB 00337

EM001-006817

11/04/99  16:45 FAX 212 826 0010

corporation ("Midcoast General Partner"), as buyers) to
the sole stockholder of the Corporation.

IN WITNESS WHEREOF, this Consent shall be effective as of
November 8, 1999.

SOLE DIRECTOR

Larry J. Austin

SF 128645.1 05211 00182                    -2-

ENB 00338

EM001-006818

SCHEDULE I

Officers of the Corporation

| President | Larry J. Austin |
| Secretary | Linda Austin |
| Treasurer | Larry J. Austin |

ENB 00339

EM001-006819

KANSAS PIPELINE COMPANY

WRITTEN CONSENT
OF
GENERAL PARTNER
as of
November 9, 1999

The undersigned, being the general partner of Kansas Pipeline Company (the "Company"), hereby adopts the following resolutions:

Assumption Agreement

RESOLVED, that the undersigned general partner hereby adopts, approves, and ratifies that certain Assumption Agreement dated as of November __, 1999 between the Company and Syenergy Pipeline Company, L.P.

IN WITNESS WHEREOF, this Consent shall be effective as of November 9, 1999.

GENERAL PARTNER:

SYENERGY PIPELINE COMPANY, L.P.

BY:  BISHOP PIPELINE COMPANY
     its General Partner

By: _____
Name: Larry J. Austin
Title: President

SF 128796.1 05211 00482                          -1-

ENB 00340

EM001-006820

SYENERGY PIPELINE COMPANY, L.P.

WRITTEN CONSENT
OF
GENERAL PARTNER
as of
November 9, 1999

The undersigned, being the general partner of Syenergy Pipeline Company, L.P. (the "Company"), hereby adopts the following resolutions:

**Assumption Agreement**

      RESOLVED, that the undersigned general partner hereby adopts, approves, and ratifies that certain Assumption Agreement dated as of November __, 1999 between the Company and Kansas Pipeline Company.

IN WITNESS WHEREOF, this Consent shall be effective as of November 9, 1999.

GENERAL PARTNER:

BISHOP PIPELINE COMPANY

By: _Larry J. Austin_
Name: Larry J. Austin
Title: President

SF 128794.1 05211 00482
11/5/99 6:46 PM

-1-

ENB 00341

EM001-006821

K-PIPE GROUP, INC.

WRITTEN CONSENT
OF
SOLE DIRECTOR
as of
November 9, 1999

The undersigned, being the sole director of K-Pipe Group, Inc. (the "Corporation"), hereby consents to the adoption of the following resolutions as if such resolutions had been adopted at a duly convened meeting of the board of directors of the Corporation:

<u>Butcher Interest Partnership</u>

RESOLVED, that the Corporation hereby adopts, approves, and ratifies that certain Butcher Interest Partnership Agreement dated as of November 9, 1999 among the Corporation and Midcoast Energy Resources, Inc.

IN WITNESS WHEREOF, this Consent shall be effective as of November 9, 1999.

SOLE DIRECTOR

Larry J. Austin

-1-

ENB 00342

EM001-006822

9

ENB 00343

CONVEYANCE OF 00.1% OF THE PARTNERSHIP INTERESTS
of
KANSAS PIPELINE COMPANY AND MARGASCO PARTNERSHIP
to
MIDCOAST KANSAS PIPELINE, INC.

WHEREAS, Bishop Pipeline Company owns  00.1% of the partnership interests of Kansas Pipeline Company, a Kansas limited partnership ("KPC"); and MarGasCo Partnership, an Oklahoma General Partnership ("MGC"), (KPC and MGC being hereinafter collectively referred to as the "Companies");

WHEREAS, Bishop Pipeline Company desires to sell, convey and assign said 00.1% of the partnership interests of the Companies to Midcoast Kansas Pipeline, Inc., a Delaware corporation;

NOW, THEREFORE, in consideration of the premises  and for and in consideration of sum of ten dollars ($10.00) cash and other good and valuable consideration, the receipt and sufficiency of all of which is hereby acknowledged and confessed by Bishop Pipeline Company ("Assignor"), Assignor does hereby sell, convey and assign to Midcoast Kansas Pipeline, Inc. ("Assignee"), 00.1% of the partnership interests of the Companies, including the capital accounts, distribution rights, voting rights and all other rights and interests attributable to such percentage partnership ownership of the Companies (collectively, the "Partnership Interests").

For the same consideration recited hereinabove, Assignor represents and warrants to Assignee that Assignor is the owner and holder of the Partnership Interests and that Assignor has good right and authority to convey the Partnership Interests to Assignee.

EXECUTED and effective as of November 9, 1999.

BISHOP PIPELINE COMPANY

By: _Larry J. Austin_
Name: _Larry J. Austin_
Title: _President_

ENB 00344

EM001-006824

CONVEYANCE OF 99.9% OF THE PARTNERSHIP INTERESTS
of
KANSAS PIPELINE COMPANY AND MARGASCO PARTNERSHIP
to
MIDCOAST KANSAS GENERAL PARTNER, INC.

WHEREAS, Syenergy Pipeline Company, L.P. owns 99.9% of the partnership interests of Kansas Pipeline Company, a Kansas limited partnership ("KPC"), and MarGasCo Partnership, an Oklahoma General Partnership ("MGC"), (KPC and MGC being hereinafter collectively referred to as the "Companies");

WHEREAS, Syenergy Pipeline Company, L.P. desires to sell, convey and assign said 99.9% of the partnership interests of the Companies to Midcoast Kansas General Partner, Inc., a Delaware corporation;

NOW, THEREFORE, in consideration of the premises and for and in consideration of sum of ten dollars ($10.00) cash and other good and valuable consideration, the receipt and sufficiency of all of which is hereby acknowledged and confessed by Syenergy Pipeline Company, L.P. ("Assignor"), Assignor does hereby sell, convey and assign to Midcoast Kansas General Partner, Inc. ("Assignee"), 99.9% of the partnership interests of the Companies, including the capital accounts, distribution rights, voting rights and all other rights and interests attributable to such percentage partnership ownership of the Companies (collectively, the "Partnership Interests").

For the same consideration recited hereinabove, Assignor represents and warrants to Assignee that Assignor is the owner and holder of the Partnership Interests and that Assignor has good right and authority to convey the Partnership Interests to Assignee.

EXECUTED and effective as of November 9, 1999.

SYENERGY PIPELINE COMPANY, L.P.
By: Bishop Pipeline Company,
    Its General Partner

By: _____
Name: _____
Title: _____

NYB 438508.1 05211 00482
11/9/99 10:35 AM

ENB 00345

EM001-006825

CONVEYANCE OF 00.1% OF THE PARTNERSHIP INTERESTS
of
MID-KANSAS PARTNERSHIP
to
MIDCOAST KANSAS PIPELINE, INC.

WHEREAS, Bishop Pipeline Company owns  00.1% of the partnership interests of Mid-Kansas Partnership, a Kansas general partnership (hereinafter referred to as the "Company");

WHEREAS, Bishop Pipeline Company desires to sell, convey and assign said 00.1% of the partnership interests of the Company to Midcoast Kansas Pipeline, Inc., a Delaware corporation;

NOW, THEREFORE, in consideration of the premises and for and in consideration of sum of ten dollars ($10.00) cash and other good and valuable consideration, the receipt and sufficiency of all of which is hereby acknowledged and confessed by Bishop Pipeline Company ("Assignor"), Assignor does hereby sell, convey and assign to Midcoast Kansas Pipeline, Inc. ("Assignee"), 00.1% of the partnership interests of the Company, including the capital accounts, distribution rights, voting rights and all other rights and interests attributable to such percentage partnership ownership of the Company (the "Partnership Interests").

For the same consideration recited hereinabove, Assignor represents and warrants to Assignee that Assignor is the owner and holder of the Partnership Interests and that Assignor has good right and authority to convey the Partnership Interests to Assignee.

EXECUTED and effective as of November 9, 1999.

BISHOP PIPELINE COMPANY

By: _____
Name: _____
Title: _____

11/7/99 4:36 PM                                    1

ENB 00346

EM001-006826

CONVEYANCE OF 99.9% OF THE PARTNERSHIP INTERESTS
of
MID-KANSAS PARTNERSHIP
to
MIDCOAST KANSAS GENERAL PARTNER, INC.

WHEREAS, Syenergy Pipeline Company owns 99.9% of the partnership interests of Mid-Kansas Partnership, a Kansas general partnership (hereinafter referred to as the "Company");

WHEREAS, Syenergy Pipeline Company desires to sell, convey and assign said 99.9% of the partnership interests of the Company to Midcoast Kansas General Partner, Inc., a Delaware corporation;

NOW, THEREFORE, in consideration of the premises and for and in consideration of sum of ten dollars ($10.00) cash and other good and valuable consideration, the receipt and sufficiency of all of which is hereby acknowledged and confessed by Syenergy Pipeline Company ("Assignor"), Assignor does hereby sell, convey and assign to Midcoast Kansas General Partner, Inc. ("Assignee"), 99.9% of the partnership interests of the Company, including the capital accounts, distribution rights, voting rights and all other rights and interests attributable to such percentage partnership ownership of the Company (the "Partnership Interests").

For the same consideration recited hereinabove, Assignor represents and warrants to Assignee that Assignor is the owner and holder of the Partnership Interests and that Assignor has good right and authority to convey the partnership Interests to Assignee.

EXECUTED and effective as of November 9, 1999.

SYENERGY PIPELINE COMPANY, L.P.
By:   Bishop Pipeline Company
      Its General Partner

By: _____
Name: _____
Title: _____

NYC 310765.1 05211 00482
11/9/99 9:49 AM

ENB 00347

CONVEYANCE OF 50% OF THE PARTNERSHIP INTERESTS
of
RIVERSIDE PIPELINE COMPANY, L.P.
to
MIDCOAST KANSAS PIPELINE, INC.

WHEREAS, Kansas Pipeline Company owns 50% of the partnership interests of Riverside Pipeline Company, L.P. (hereinafter referred to as the "Company");

WHEREAS, Kansas Pipeline Company desires to sell, convey and assign said 50% of the partnership interests of the Company to Midcoast Kansas Pipeline, Inc., a Delaware corporation;

NOW, THEREFORE, in consideration of the premises and for and in consideration of sum of ten dollars ($10.00) cash and other good and valuable consideration, the receipt and sufficiency of all of which is hereby acknowledged and confessed by Kansas Pipeline Company ("Assignor"), Assignor does hereby sell, convey and assign to Midcoast Kansas Pipeline, Inc. ("Assignee"), 50% of the partnership interests of the Company, including the capital accounts, distribution rights, voting rights and all other rights and interests attributable to such percentage partnership ownership of the Company (the "Partnership Interests").

For the same consideration recited hereinabove, Assignor represents and warrants to Assignee that Assignor is the owner and holder of the Partnership Interests and that Assignor has good right and authority to convey the partnership Interests to Assignee.

EXECUTED and effective as of November 9, 1999.

KANSAS PIPELINE COMPANY

By: Syenergy Pipeline Company, L.P.
Its General Partner

By:  Bishop Pipeline Company
Its General Partner

By: _Larry L. Austin_
Name: _Larry E. Austin_
Title: _President_

NYC 310769.1 05211 00482

ENB 00348

EM001-006828

CONVEYANCE OF 50% OF THE PARTNERSHIP INTERESTS
of
RIVERSIDE PIPELINE COMPANY, L.P.
to
MIDCOAST KANSAS GENERAL PARTNER, INC.

WHEREAS, Syenergy Pipeline Company, L.P. owns 50% of the partnership interests of Riverside Pipeline Company, L.P. (hereinafter referred to as the "Company");

WHEREAS, Syenergy Pipeline Company, L.P. desires to sell, convey and assign said 50% of the partnership interests of the Company to Midcoast Kansas General Partner, Inc., a Delaware corporation;

NOW, THEREFORE, in consideration of the premises and for and in consideration of sum of ten dollars ($10.00) cash and other good and valuable consideration, the receipt and sufficiency of all of which is hereby acknowledged and confessed by Syenergy Pipeline Company, L.P. ("Assignor"), Assignor does hereby sell, convey and assign to Midcoast Kansas General Partner, Inc. ("Assignee"), 50% of the partnership interests of the Company, including the capital accounts, distribution rights, voting rights and all other rights and interests attributable to such percentage partnership ownership of the Company (the "Partnership Interests").

For the same consideration recited hereinabove, Assignor represents and warrants to Assignee that Assignor is the owner and holder of the Partnership Interests and that Assignor has good right and authority to convey the Partnership Interests to Assignee.

EXECUTED and effective as of November 9, 1999.

SYENERGY PIPELINE COMPANY, L.P.
By:  Bishop Pipeline Company
     Its General Partner

By: _____
Name: _____
Title: _____

ENB 00349

EM001-006829

**10**

ENB 00350

EM001-006830

<u>Bill of Sale</u>

FOR AND IN CONSIDERATION of the sum of ten dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and confessed, Syenergy Pipeline Company, L.P., Bishop Pipeline Company and Kansas Pipeline Company hereby sell, convey, assign and deliver to Midcoast Kansas General Partner, Inc. and Midcoast Kansas Pipeline, Inc., in the respective percentages in which they acquired the partnership interests of Kansas Pipeline Company, MarGasCo Partnership, Riverside Pipeline Company, L.P., and Mid-Kansas Partnership (collectively, the "Companies"), the following:

(a) all files, books, records and data necessary or appropriate for the continued operation of the Companies; and

(b) all transferable approval, authorizations, consents, licenses, orders and other permits associated or connected to the operation of the businesses of the Companies.

Executed and effective as of November 9, 1999.

SYENERGY PIPELINE COMPANY, L.P.

By Bishop Pipeline Company,
Its General Partner

By: _Larry J. Austin_

Name: _Larry J. Austin_

Title: _President_

BISHOP PIPELINE COMPANY

By: _Larry J. Austin_

Name: _Larry J. Austin_

Title: _President_

NTB 4J0450.1 05211 00482

ENB 00351

EM001-006831

KANSAS PIPELINE COMPANY
By Syenergy Pipeline Company, L.P.
Its General Partner

By Bishop Pipeline Company
Its General Partner

By: *Larry J. Austin*

Name: *Larry J. Austin*

Title: *President*

By Bishop Gas Transmission Company
Its General Partner

By: *Larry J. Austin*

Name: *Larry J. Austin*

Title: *President*

NY8 436450.1 05211 00482

-2-

ENB 00352

EM001-006832

11

ENB 00353

EM001-006833

## CERTIFICATE OF SELLER

Pursuant to Section 7.2(d)(i) of the Asset Purchase Agreement by and among K-Pipe Merger Corporation, a Delaware corporation ("Seller") and Midcoast Energy Resources, Inc., a Texas corporation ("MERI"), Midcoast Kansas Pipeline, Inc., a Delaware corporation ("Midcoast Pipeline"), and Midcoast Kansas General Partner, Inc., a Delaware corporation ("Midcoast General Partner") dated November 5, (the "Agreement"), the undersigned hereby certifies to MERI, Midcoast Pipeline, and Midcoast General Partner the following:

1. Seller has performed, in all material respects, all the obligations required to be performed by it under the Agreement at Closing.

2. The representations and warranties of Seller under the Agreement are true and correct, in each such case as of the date of the Agreement and as of the Closing as though made on the Closing Date (except that representations and warranties that speak as of a specific date shall be true and correct as of such date), provided that for purposes of determining the satisfaction of the foregoing, such representations and warranties shall be deemed true and correct if the failure or failures of such representations and warranties to be so true and correct have not caused and could not reasonably be expected to cause a Material Adverse Effect.

3. The Seller, in all material respects, has obtained good and marketable title to and ownership of the Assets (as defined in the Agreement).

4. All consents, approvals and authorizations legally required to be obtained to consummate the Transaction (as defined in the Agreement) have been obtained from all Governmental Authorities and third persons except for such consents, approvals and authorizations the failure of which to obtain would not have a Material Adverse Effect.

Dated: November 9, 1999

K-PIPE MERGER CORPORATION

By: _Larry J. Austin_
Name: Larry J. Austin
Title:  President

SF 128746.1 05211 30482
11/5/99 12:00 PM

ENB 00354

EM001-006834

12

ENB 00355

## CERTIFICATE OF MIDCOAST ENERGY RESOURCES, INC., MIDCOAST KANSAS PIPELINE, INC. AND MIDCOAST KANSAS GENERAL PARTNER, INC.

Pursuant to Section 7.2(d)(i) of the Asset Purchase Agreement by and among K-Pipe Merger Corporation, a Delaware corporation ("Seller") and Midcoast Energy Resources, Inc., a Texas corporation ("MERI"), Midcoast Kansas Pipeline, Inc., a Delaware corporation ("Midcoast Pipeline"), and Midcoast Kansas General Partner, Inc., a Delaware corporation ("Midcoast General Partner") dated November 5 (the "Agreement"), the undersigned hereby certifies to Seller the following:

1.  MERI, Midcoast Pipeline and Midcoast General Partner have performed, in all material respects, all the obligations required to be performed by them under the Agreement at Closing.

2.  The representations and warranties of MERI, Midcoast Pipeline and Midcoast General Partner under the Agreement are true and correct, in each such case as of the date of the Agreement and as of the Closing as though made on the Closing Date (except that representations and warranties that speak as of a specific date shall be true and correct as of such date), provided that for purposes of determining the satisfaction of the foregoing, such representations and warranties shall be deemed true and correct if the failure or failures of such representations and warranties to be so true and correct have not caused and could not reasonably be expected to cause a Material Adverse Effect.

3.  All consents, approvals and authorizations legally required to be obtained to consummate the Transaction (as defined in the Agreement) have bene obtained from all Governmental Authorities and third persons except for such consents, approvals and authorizations the failure of which to obtain would not have a Material Adverse Effect.

DATED: November 9, 1999.

MIDCOAST ENERGY RESOURCES, INC.

By:_____
Name:
Title:

MIDCOAST KANSAS PIPELINE, INC.

By:_____
Name:
Title:

NYC 310771.1 05211 00482

ENB 00356

EM001-006836

MIDCOAST KANSAS GENERAL PARTNER, INC.

By:_____

Name:

Title:

NYC 310771.1  05211 00482

–2–

ENB 00357

EM001-006837

13

ENB 00358

EM001-006838

## ASSUMPTION AGREEMENT

This Assumption Agreement ("Assumption Agreement"), is made this 9th day of November 1999, by and between Syenergy Pipeline Company, L.P. (hereafter "Syenergy") and Kansas Pipeline Company (hereafter "Company").

WHEREAS, K-Pipe Merger Corporation, a Delaware corporation ("Seller"), Midcoast Energy Resources, Inc., a Texas corporation ("MERI"), Midcoast Kansas Pipeline, Inc. a Delaware corporation ("Midcoast Pipeline") and Midcoast Kansas General Partner, Inc. a Delaware corporation ("Midcoast General Partner") (Midcoast Pipeline and Midcoast General Partner are hereinafter sometimes collectively referred to as the "Buyers") entered into a Asset Purchase Agreement, dated November 5, 1999, which, among other things, provides for the sale of Kansas Pipeline Company ("KPC") to Buyers;

WHEREAS, as a condition of the closing of the Asset Purchase Agreement, KPC is to assume certain debt obligations of Syenergy, as described on Exhibit "A" hereto ("Debt");

WHEREAS, Syenergy and Company are both owned by Seller.

In consideration of One Dollar ($1.00), the mutual covenants and promises contained herein and other good and valuable consideration, receipt of which is hereby acknowledged, Company and Syenergy agree that Company's signature hereto constitutes the agreement of Company to fully and unconditionally assume and agree to discharge any and all obligations of Syenergy arising out of or related to the Debt as if it had been the primary obligor thereon.

Company, Syenergy, Seller and Buyers each represent and warrant to each other that it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and is duly qualified to conduct business in every other jurisdiction in which its business is conducted, except where failure to be so qualified or licensed would not be material.

Company has the requisite power and authority to approve, authorize, execute and deliver this Agreement and to consummate this Agreement. This Agreement and its consummation by Company has been duly and validly authorized by Company and no other proceedings on the part of Company are necessary to authorize this Agreement or its consummation.

This Agreement has been duly and validly executed by Company and Syenergy, it constitutes the valid and binding agreement of Company, enforceable against it according to its terms.

The execution of and delivery of this Agreement by the Company and its performance of the obligations hereunder, including its execution, delivery and performance, do not (a) conflict with or result in any breach of any provision of the formation or charter documents of the Company; (b) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental authority except where the failure to obtain such consent, approval, authorization or permits or to make such filing or notification, would not have a

ENB 00359

EM001-006839

material effect on the Company or materially affect the ability of the Company to consummate this Agreement; and (c) conflict with or result in a breach or violation of, or constitute a default under, or result in (or create in any party the right to cause) the acceleration of any performance of the Company under (i) any judgment or law to which they are subject or bound (subject to any consents, approvals, authorizations, permits, filings or notifications required under (b) above; or (ii) any mortgage, bond, indenture, agreement, contract, license or other instrument or obligation to which Company is subject or bound; or result in the creation of any lien on any of the assets of the Company which would have a material effect on the Company.

This Agreement and the obligations of the parties hereunder, shall be interpreted, construed, and enforced in accordance with the laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

Except as otherwise provided for herein, any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and mutually executed amendments. It is stipulated that oral modifications and amendments hereto or other parole evidence shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or other adjudication.

If any provision of this Agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the latter shall control and this Agreement shall be deemed modified accordingly, but in other respects the Agreement shall continue in full force and effect, subject to the modifications necessary to preserve the intent and considerations due the parties as set forth in this Agreement.

The title and subtitles of articles, paragraphs and subparagraphs of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of or in any way influence the interpretations of this Agreement.

This Agreement may be executed in multiple counterparts, each of which shall be in an original, but all of which shall be deemed to constitute one instrument. This Agreement or any document executed in connection herewith shall be binding upon such signator party, if said signature is delivered by telecopier or other like transmission.

The parties hereby agree to execute, acknowledge and deliver to each other any further writings, documents, transfers, acknowledgments, instruments, powers of attorney, authorizations, filings, applications, reports, etc. that may be reasonably required to give full force and effect to the provisions of this Agreement, and to take such further actions reasonably required in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

**ENB 00360**

EM001-006840

IN WITNESS WHEREOF, the parties have hereto set their hands the date and year first written above or consent to the terms hereof as if executed on such date.

Syenergy Pipeline Company, L.P.
By: Bishop Pipeline Company,
    its General Partner

By: _Larry J. Austin_
Name: _Larry J. Austin_
Title: _President_

Kansas Pipeline Company
By: Syenergy Pipeline Company, L.P.
    its General Partner
By: Bishop Pipeline Company
    its General Partner

By: _Larry J. Austin_
Name: _Larry J. Austin_
Title: _President_

3

ENB 00361

EM001-006841

EXHIBIT "A"

1.    All of the debt of Syenergy Pipeline Company, L.P. ("Syenergy") owed to the certain Noteholders described below as set forth in the $91,000,000 Long Term Note dated June 15, 1992, as amended and all related Loan Documents, including mortgages, deeds of trust, security agreements and guarantees, in the approximate amount of $63,000,000 and a Make Whole Premium and all other fees and costs as set forth in the Note ("Note").

Promissory Note. No. R-2     The Northwestern Mutual Life Insurance Company
Promissory Note. No. R-4     Teachers Insurance & Annuity Association of America
Promissory Note. No. R-10    Sigler & Co.
Promissory Note. No. R-11    Pearlfish & Co.
Promissory Note. No. R-12    Mac & Co.
Promissory Note No. R-5      Northwestern National Life Insurance Co.

2.    All of the debt owed by Syenergy pursuant to the revolving line of credit with Chase Manhattan Bank under that certain Credit Agreement dated June 15, 1992, as amended, in the approximate amount of $6,000,000 ("Syenergy Credit Agreement"), and all other fees and costs as set forth in the Syenergy Credit Agreement.

4

ENB 00362

EM001-006842

14

ENB 00363

EM001-006843

## GUARANTY
(Parent)

FOR VALUE RECEIVED, Midcoast Energy Resources, Inc. (the "Guarantor"), pursuant to the requirements of the Project Development Agreement dated October 24, 1999, by and between MarGasCo and MRG, hereby unconditionally and irrevocably guaranties to Management Resources Group, L.L.C. and to all of its individual or corporate members or owners (collectively, "MRG"), their successors, transferees and assigns, the payment and performance by MarGasCo Partnership, a wholly-owned indirect subsidiary of Guarantor (the "MarGasCo") and Kansas Pipeline Company ("KPC"), also an indirect subsidiary of Guarantor (collectively, the "Subsidiaries"), all liabilities, obligations, covenants and agreements of the Subsidiaries contained in i) the Project Development Agreement dated October 25, 1999, between MRG and MarGasCo, ii) the Consulting Agreement dated October 25, 1999, between KPC and MRG, iii) the Guaranty by KPC to MRG, et al. dated November 2, 1999 (subject to all time, monetary and other limitations set forth in the agreement as to which KPC's guaranty is applicable), and iv) the Project Development and MRG Interest Agreement between MRG and KPC (subject to the terms and provisions of the Option Agreement dated October __, 1999, by and among KPC, MarGasCo and MRG). The foregoing guaranty shall not create any greater liability of Guarantor to MRG that is created by the original obligors to MRG pursuant to each of said aforementioned agreements. Guarantor further agrees to pay any and all out-of-pocket expenses (including attorneys' fees) which may be paid or incurred by MRG in enforcing any rights under this Guaranty. This Guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment and performance by the Subsidiaries of the obligations and liabilities described herein and not of collectability only and is in no way conditioned upon any requirement that MRG first attempt to collect any amounts due and owing from the Subsidiaries or any other party primarily or secondarily liable with respect thereto or resort to any security or other means of obtaining payment of any amounts due and owing to MRG or upon any other contingency whatsoever.

The Guarantor hereby waives promptness, diligence and notice as to the obligations and covenants contained herein and acceptance of this Guaranty, and waives any other circumstance which might otherwise constitute a legal or equitable discharge, release or defense of a guarantor or surety , or that might otherwise limit the obligations of the Guarantor hereunder. The Guarantor hereby agrees that it shall not be entitled to consent to, or receive any notice of, any amendment or modification of, or waiver, release, consent or extension with respect to, or assignment of any agreement giving rise to any obligation guaranteed hereunder, and the Guarantor hereby acknowledges that any such amendment, modification, waiver, release, consent, extension or assignment shall not affect the Guarantor's obligations hereunder. The Guarantor hereby agrees that this Guaranty shall automatically be reinstated if and to the extent that for any reason any payment of the Subsidiaries or on behalf of the Subsidiaries is rescinded or must otherwise be restored, whether the result of any proceedings in bankruptcy or reorganization or erwise.

ENB 00364

EM001-006844

The Guarantor also agrees as follows:

1.     Cy Pres.  The doctrine of Cy Pres shall be applicable to this Agreement such that in interpreting the terms and conditions hereunder the intentions of the Guarantor and the beneficiaries hereof are to be carried out as near as may be, when it would otherwise be impossible or illegal to give it literal effect.  In any dispute arising out of this Agreement, the doctrine of Cy Pres shall be applied.

2.     Agreement Governed by the Laws of Kansas.  This Agreement and the obligations of the Guarantor hereunder, shall be interpreted, construed, and enforced in accordance with the laws, and not the laws pertaining to choice of conflict of laws, of the state of Kansas.

3.     Agreement Subject to Laws.  If any provision of this Agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the latter shall control and this Agreement shall be deemed modified accordingly, but in other respects this Agreement shall continue in full force and effect, subject to the modifications necessary to preserve the intent and considerations due the parties as set forth in this Agreement.

4.     Severability.  Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal or enforceable in any other jurisdiction.

5.     Jurisdiction and Venue.  Any suit, action or proceeding with respect to, arising under or in connection with this Agreement or the enforcement may be brought in any court in Kansas.  The Guarantor hereby submits to the jurisdiction and venue of any and all such courts in Kansas for the purpose of any such suit, action or proceeding.

6.     Further Assurances.  The Guarantor hereby agrees to execute, acknowledge and deliver to each other any further writings, documents, transfers, acknowledgments, instruments, powers of attorney, authorizations, filings, applications, reports, etc. that may be reasonably required to give full force and effect to the provisions of this Agreement.

Dated:  November 9, 1999

MIDCOAST ENERGY RESOURCES, INC.

By: _____

Name:

Title:

–2–

ENB 00365

EM001-006845

15

ENB 00366

EM001-006846

BUTCHER INTEREST PARTNERSHIP

GENERAL PARTNERSHIP AGREEMENT

This General Partnership Agreement (the "Agreement") is entered into by and between Mid Louisiana Gas Company, a Delaware corporation ("MIDLA") and K-Pipe Group, Inc., a Kansas corporation ("K-Pipe"), as of the 8th day of November, 1999.

WHEREAS, K-Pipe owns that certain property and rights described in Schedule A attached hereto (the "Butcher Interest");

WHEREAS, K-Pipe desires to form a partnership in order to enhance its ability to transfer interests in the Butcher Interest and for the purpose of refinancing the Butcher Interest debt; and

WHEREAS, MIDLA desires to enter into a partnership with K-Pipe to accomplish the aforesaid purposes;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I

Name and Formation of Partnership

The name of the Partnership is Butcher Interest Partnership (the "Partnership"). Subject to the provisions hereof, the Partners designate the Partnership as a Delaware general partnership.

ARTICLE II

Purpose and Business of the Partnership

The sole purpose and business of the Partnership is to own and finance, and to provide for the operation and maintenance of, the Butcher Interest. The Partnership shall not acquire any assets other than the Butcher Interest, obtain any loans other than for the financing or refinancing of the transaction provided for in Article VIII hereof, hire any employees, or otherwise conduct any business other than that necessary to or for the ownership, financing, operation and maintenance of the Butcher Interest.

ARTICLE III

Partnership Interests

1

ENB 00367

EM001-006847

K-Pipe and MIDLA each hold a General Partner interest, and shall be known collectively as the "General Partners" or the "Partners."

## ARTICLE IV

### Place of Business of the Partnership

The location of the principal place of business of the Partnership and where the Partnership's records are kept is 8325 Lenexa Drive, Suite 400, Lenexa, Kansas 66214. The Partners may, from time-to-time, change the principal place of business of the Partnership.

## ARTICLE V

### Term of the Partnership

The Partnership commenced on the date hereof and shall continue until December 31, 2010, unless earlier terminated as a result of: (i) the cessation of any Partner to exist as a legal entity; (ii) the determination by all the Partners that the Partnership should be dissolved; or (iii) the sale of substantially all of the Partnership's property.

## ARTICLE VI

### Capital Contributions; Capital Account

6.01. As soon as all of the necessary consents and approvals have been secured in order to make the transfer effective, K-Pipe shall assign or otherwise transfer to the Partnership all contracts, rights, permits and entitlements relating to the Butcher Interest, and shall convey to the Partnership all right, title and interest of K-Pipe in and to all other assets comprising the personal property of the Butcher Interest. In consideration for the assignment to the Partnership of these contracts, rights, permits and entitlements and the conveyance of all person property, K-Pipe shall be credited with a capital contribution in an amount equal to six million five hundred thousand dollars ($6,500,000) and its capital account shall be credited accordingly simultaneously with the transfer.

6.02. MIDLA shall contribute an aggregate amount of two hundred twenty-five thousand dollars ($225,000) to the Partnership and its capital account shall be credited accordingly.

6.03  Each Partner's capital account shall be re-determined as appropriate to reflect profits, losses, or distributions allocated or made to such Partner, and shall be

2

ENB 00368

EM001-006848

maintained in accordance with federal income tax accounting principles and Treasury Regulations Section 1.704-1(b).

## ARTICLE VII

### Refinancing Transaction

Contemporaneously with the formation of the Partnership, the Partnership shall enter into a credit agreement with Bank of America (the "Butcher Interest Partnership Credit Agreement") pursuant to which the Partnership shall obtain loans in the amount of six million one hundred thousand dollars ($6,100,000), which loans are secured by Partnership property and guaranteed by each of the Partners. Upon receipt of the loan proceeds, the Partnership shall distribute six million two hundred twenty-five dollars ($6,225,000) to K-Pipe, and K-Pipe's capital account shall be reduced accordingly.

## ARTICLE VIII

### Additional Contributions

No Partner shall be required to make additional capital contributions. However, in the event that additional capital contributions are necessary for the continuance of the business of the Partnership, each Partner may elect to make all or part of any such additional capital contributions, in which event such Partner's capital account shall be credited accordingly, and the sharing percentages described in Article X shall be adjusted to reflect the relative capital accounts of the Partners.

## ARTICLE IX

### Return of Contributions

The capital contributions of each Partner shall be returned to it, if at all, upon the termination of the Partnership or earlier at the discretion of the Partners. A Partner shall not have the right to demand and receive property other than cash in return of its capital contribution.

## ARTICLE X

### Distribution of Cash, Allocation of Profits and Losses

All profits, losses, and credits shall be allocated and distributions shall be made 55% to K-Pipe and 45% to MIDLA. Distributions of funds shall be made by the Partners

3

ENB 00369

EM001-006849

at such times and in such amounts as the Partners deem appropriate.

## ARTICLE XI

### Power, Rights and Duties of the Partners

Subject to the provisions of this Agreement, the Partners shall have exclusive management and control of the business of the Partnership and all decisions regarding the management and affairs of the Partnership shall be made jointly and unanimously by the Partners. The Partners shall have all the rights and powers of a partner as provided by the Uniform Partnership Laws of Delaware and as otherwise provided by law, and any action taken by the Partners shall constitute the act of and serve to bind the Partnership.

## ARTICLE XII

### Transfers

A Partner may not transfer its interest as a partner, in whole or in part, or voluntarily withdraw from the Partnership, without the consent of all the other Partners.

## ARTICLE XIII

### Options to Purchase and Sell

13.01  Midcoast shall have the option, at any time on or after May 9, 2000, to purchase the Partnership interest of K-Pipe at a purchase price as determined herein. Such option to purchase shall be exercisable by written notice from Midcoast to K-Pipe of its intent to purchase such interest given at least thirty (30) days in advance of the date upon which Midcoast intends to exercise its option.

13.02  MIDLA's option price shall be equal to (i) 100% of K-Pipe's initial capital account (as determined after the distribution made pursuant to Article VII hereof), if the notice is provided to K-Pipe by November 9, 2000; (ii) 111% of the amount determined in clause (i) if the notice is provided after November 9, 2000, but before November 9, 2001; and (iii) 121% of the amount determined in clause (i) if the notice is provided after November 9, 2001.

13.03  The closing of any purchase of K-Pipe's interest pursuant to Section 13.01 hereof shall be held at the principal offices of Midcoast or at such other place as MIDLA may designate in the option notice on the date specified by Midcoast in the option notice. At the closing of any purchase of K-Pipe's interest, K-Pipe will deliver its interest free and

ENB 00370

EM001-006850

clear of all liens, security interests and other encumbrances other than any liens and security interests created under or pursuant to the Butcher Interest Partnership Credit Agreement, and shall deliver such other instruments and documents as may be necessary for the effective transfer hereof. At the closing of the purchase of K-Pipe's interest, MIDLA shall deliver to K-Pipe cash or certified or official bank check in the amount of the total purchase price.

13.04  K-Pipe shall have the option, at any time on or after November 9, 2000, to sell its Partnership interest to MIDLA at a purchase price as determined herein. Such option to sell shall be exercisable by written notice from K-Pipe to MIDLA of its intent to sell such interest given at least thirty (30) days in advance of the date upon which K-Pipe intends to exercise its option.

13.05  K-Pipe's option price shall be equal to (i) 89% of K-Pipe's initial capital Account (as determined after the distribution made pursuant to Article VII hereof), if the notice is provided to MIDLA by November 9, 2001; and (ii) 99% of K-Pipe's initial capital account (as determined after the distribution made pursuant to Article VII hereof) if the notice is provided after November 9, 2001.

13.06  The closing of any sale of K-Pipe's interest pursuant to Section 13.04 hereof shall be held at the principal offices of K-Pipe or at such other place as K-Pipe may designate in the option notice on the date specified by K-Pipe in the option notice. At the closing of any purchase of K-Pipe's interest, K-Pipe will deliver its interest free and clear of all liens, security interests and other encumbrances other than any liens and security interests created under or pursuant to the Butcher Interest Partnership Credit Agreement, and shall deliver such other instruments and documents as may be necessary for the effective transfer hereof. At the closing of the purchase of K-Pipe's interest, Midcoast shall deliver to K-Pipe cash or certified or official bank check in the amount of the total purchase price.

## ARTICLE XIV

### Dissolution

The Partnership shall be dissolved and terminated upon (i) the expiration of the term of the Partnership as provided in Article V of this Agreement; or (ii) upon a Partner's

ENB 00371

EM001-006851

bankruptcy or cessation to exist as a legal entity, unless a successor partner has been admitted pursuant to Article XII and a new or amended Agreement is executed by the successor Partner within one hundred twenty (120) days after the removal of said last remaining Partner.  Upon dissolution and termination of the Partnership, the Partners shall pay all debts and liabilities of the Partnership and shall distribute the remaining assets in accordance with the Partner's respective positive Capital Accounts.

ARTICLE XV

Notices

All notices and other communications required or permitted by this Agreement or by law to be served upon or given to a party hereto shall be deemed duly served and given when received after being delivered by hand or sent by registered or certified mail, return receipt requests, postage prepaid, addressed as follows:

if to K-Pipe, to:       K-Pipe Group, Inc.
                        c/o SCALP
                        750 Lexington Avenue, 30th Floor
                        New York, New York  10022

if to MIDLA, to:        Mid Louisiana Gas Company
                        1100 Louisiana, Suite 2900
                        Houston, Texas 77002
                        Attn: General Counsel

Any Partner may change its address for the purpose of this Article XV by giving written notice of such change to the other Partners in the manner provided in this Article XV.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

K-PIPE GROUP, INC.

By: _____
Name: _____
Title: _____

MID LOUISIANA GAS COMPANY

ENB 00372

EM001-006852

By: _____
Name: *Richard Robert*
Title: *Chief Financial Officer and Treasurer*

ENB 00373

EM001-006853

SCHEDULE A
to
BUTCHER INTEREST PARTNERSHIP
GENERAL PARTNERSHIP AGREEMENT

*Butcher Interest* means one and one-half percent (1.5%) of the *Adjusted Gross Pipeline Proceeds*, as defined below. *Butcher Interests* shall burden the assets of the *Pipeline*, the *New KansMo Partnerships*, the *KansOk Partnerships*, the *KansMo Assets* and the *KN Assets* and run with the land (the easements and rights-of-way) as well as run with the personal and/or mixed property; i.e., the *Butcher Interests* shall burden and run with all of the above assets, and as such shall survive and be superior to any transfer, hypothecation, pledging, encumbrances, merger, reorganization, sale, consolidation, etc. Of the *Pipeline*, the *New KansMo Partnerships*, the *KansOk Partnerships*, the *KansMo Assets* and the *KN Assets* and/or any of the *Entities* which now or hereafter own any of the same. For purposes of this Schedule A, *Adjusted Gross Pipeline Proceeds* shall mean: (i) the total proceeds received from transportation of all natural gas transported through all or any portion of the *Pipelines* free and clear of, and without deduction for, all costs and expenses (except as provided below) incurred in transporting such natural gas and any and all taxes, and (ii) the gross spread between total proceeds received through the sale by the *Entities* owning the *Pipelines* of natural gas that is transported through all or any portion of the *Pipelines* and *Pipelines'*, and/or *Entities* owning the *Pipelines*, cost of acquiring such natural gas, free and clear of, and without deduction for, all costs and expenses incurred in connection therewith and any and all taxes; provided, however, that *Adjusted Gross Pipeline Proceeds* in either of the above cases shall not include actual conservation taxes, *KCC*, *OCC* and/or *MCC* fees and/or assessments, *FERC* Administrative Cost Assessments and Gas Research Institute fees, third party and/or *Affiliated Entity* marketing and/or brokerage fees, local distribution company and/or pipeline transportation fees, and/or other similar costs, fees, taxes, assessments, and/or expenses which are approved in writing by *TCW* in its reasonable discretion (collectively, the *Passthrough Expenses*), all of which *Passthrough Expenses* must be collected by the *Entities* owning the *Pipelines*. Notwithstanding the foregoing, in no event shall *Passthrough Expenses* include costs, fees, taxes, assessments and/or expenses listed in the *Pipeline Budgets*, as defined in the *TCW Loan Documents*, or any other costs, fees, assessments and/or expenses not specifically provided for in this Exhibit. *Adjusted Gross Pipeline Proceeds* shall include, without limitation, any prepayments received under transportation or sales contracts for natural gas to be delivered in the future or any other payments received relating to the transportation or sale of natural gas, including without limitation payments for capacity, standby-capacity, or other payments respecting such transportation or sales contracts, however characterized. For purposes of the Financing Statement, the definitions, meanings and explanations attributable to the italicized words herein shall be those attributed to them in a Restated and Amended Butcher Agreement dated April 15, 1990 by and between Butcher Resources, Inc., The K-Pipe Group, Ltd. and Kansas Transmission, Inc. and in the *General Agreement* dated June 22, 1990 by and between OKM Gas Pipeline Company, L.P., OKM Gas partners, L.P., The K-Pipe Group, Ltd., Management Resources Group, Ltd., The K-Pipe Corporation, K-Pipe Engineering, Inc.,



ENB 00374

EM001-006854

Kansas Gas Marketing, Inc., K-Pipe Pipeline Company, Kansas Natural, Inc., KansOk, Inc., Riverside Pipeline Company, Kansas Pipeline Company, Mid-Kansas Gas, inc. and Energy Resource Management, Inc., both of which agreements are incorporated herein by reference thereto.

## END.

ENB 00375

EM001-006855

16

ENB 00376

EM001-006856

# CREDIT AGREEMENT

between

BUTCHER INTEREST PARTNERSHIP

as Borrower

BANK OF AMERICA, N.A.

as Lender

---

$6,100,000

November 8, 1999

F:\data\wp\116\1099\10992350L114.wpd/bd:11/9/99:11:17 AM

ENB 00377

EM001-006857

## CREDIT AGREEMENT

THIS CREDIT AGREEMENT is made as of November 8, 1999, by and between BUTCHER INTEREST PARTNERSHIP, a Delaware general partnership (herein called "Borrower"), whose sole general partners are K-PIPE GROUP, INC., a Kansas corporation ("K-PIPE") and MID LOUISIANA GAS COMPANY, a Delaware corporation ("MLGC") and BANK OF AMERICA, N.A.(herein called "Lender"). In consideration of the mutual covenants and agreements contained herein the parties hereto agree as follows:

## ARTICLE I - Definitions and References

Section 1.1     Defined Terms .  As used in this Agreement, each of the following terms has the meaning given to such term in this Section 1.1 or in the sections and subsections referred to below:

"Adjusted Base Rate" means the Base Rate plus the Applicable Margin; *provided* that the Adjusted Base Rate charged by any Person shall never exceed the Highest Lawful Rate.

(i)     "Adjusted Eurodollar Rate" means, for any Eurodollar Loan for any Interest Period therefor, the rate per annum equal to the sum of the Applicable Margin plus the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) determined by Lender to be equal to the quotient obtained by dividing the Eurodollar Rate for such Eurodollar Loan for such Interest Period by 1 minus the Reserve Requirement for such Eurodollar Loan for such Interest Period; *provided* that no Adjusted Eurodollar Rate charged by any Person shall ever exceed the Highest Lawful Rate. The Adjusted Eurodollar Rate for any Eurodollar Loan shall change whenever the Applicable Margin or the Reserve Requirement changes.

(ii)

(iii)     "Affected Loans" has the meaning given that term in Section 3.8.

(iv)

(v)     "Affected Type" has the meaning given that term in Section 3.8.

(vi)

(vii)     "Affiliate" means, as to any Person, each other Person that directly or indirectly (through one or more intermediaries or otherwise) controls, is controlled by, or is under common control with, such Person. A Person shall be deemed to be "controlled by" any other Person if such other Person possesses, directly or indirectly, power

(viii)

(a)     in the case of a public company, to vote 20% or more, and in the case of a non-public company, to vote 50% or more, of the securities (on a fully diluted basis) having ordinary voting power for the election of directors or managing general partners; or

(b)     to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Agreement" means this Credit Agreement.

F:\data\wp\11-0\099\1099250d.114.wpd:txl:11/9/99:11:17 AM

i

ENB 00378

EM001-006858

"<u>Applicable Lending Office</u>" means, for each Type of Loan, the Eurodollar Lending Office or Domestic Lending Office of Lender (or of an Affiliate of Lender) designated for such Type of Loan on the signature pages hereof or such other office of Lender (or an Affiliate of Lender) as Lender may from time to time specify to Lender and Borrower by written notice in accordance with the terms hereof as the office by which its Loans of such Type are to be made and maintained.

"<u>Applicable Margin</u>" means for each Eurodollar Loan, two hundred Basis Points (200bp), and for each Base Rate Loan, fifty Basis Points (50bp).

"<u>Bankruptcy Code</u>" means the United States Bankruptcy Code of 1979, as amended from time to time and any successor statute or statutes, together with all rules and regulations promulgated with respect thereto.

"<u>Base Rate</u>" means, for any day, the rate per annum equal to the higher of (a) the Federal Funds Rate for such day plus fifty Basis Points (50 bp) and (b) the Prime Rate for such day. Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Rate shall be effective on the effective date of such change in the Prime Rate or Federal Funds Rate. As used in this definition, "<u>Prime Rate</u>" means the per annum rate of interest established from time to time by Lender as its prime rate, which rate may not be the lowest rate of interest charged by Lender to its customers.

"<u>Base Rate Loan</u>" means a Loan which bears interest at the Base Rate.

"<u>Base Rate Margin</u>" means the margin added to a Base Rate Loan as set forth in the definition of "Applicable Margin".

"<u>Basis Point</u>" and "<u>bp</u>"means one one-hundredth of one percent (0.01%).

"<u>Borrowing</u>" means a borrowing pursuant to <u>Section 2.2</u> or a Continuation or Conversion of existing Loans into a single Type (and, in the case of Eurodollar Loans, with the same Interest Period) pursuant to <u>Section 2.3</u>.

"<u>Borrowing Notice</u>" means a written or telephonic request, or a written confirmation, made by Borrower which meets the requirements of <u>Section 2.2</u>.

"<u>Business Day</u>" means a day, other than a Saturday or Sunday, on which commercial banks are open for business with the public in Houston, Texas. Any Business Day in any way relating to Eurodollar Loans (such as the day on which an Interest Period begins or ends) must also be a day on which, in the judgment of Lender, significant transactions in Dollars are carried out in the interbank eurocurrency market.

"<u>Butcher Revenue Interest</u>" means that certain one and one-half percent (1.5%) revenue interest burdening properties of KPC, Mid-Kansas, MarGasCo and Riverside acquired by Borrower pursuant to the Partnership Agreement and as more particularly described in Schedule A to the Partnership Agreement.

**ENB 00379**

EM001-006859

"Cash Equivalents" means Investments in:

(a)     marketable obligations, maturing within twelve months after acquisition thereof, issued or unconditionally guaranteed by the United States or an instrumentality or agency thereof and entitled to the full faith and credit of the United States;

(b)     certificates of deposit, demand deposits, eurodollar time deposits, overnight bank deposits and bankers' acceptances, with maturities of no more than one year from the date of acquisition, issued by or acquired from or through Lender or any bank or trust company organized under the laws of the United States or any state thereof and having capital surplus and undivided profits aggregating at least $100,000,000; and

(c)     money-market funds.

"Collateral" means all property of any kind which is subject to a Lien in favor of Lender or which, under the terms of any Security Document, is purported to be subject to such a Lien including the Butcher Revenue Interest.

"Continuation" shall refer to the continuation pursuant to Section 2.3 hereof of a Eurodollar Loan as a Eurodollar Loan from one Interest Period to the next Interest Period.

"Continuation/Conversion Notice" means a written or telephonic request, or a written confirmation, made by Borrower which meets the requirements of Section 2.3.

"Conversion" shall refer to a conversion pursuant to Section 2.3 or Article III of one Type of Loan into another Type of Loan.

"Default" means any Event of Default and any default, event or condition which would, with the giving of any requisite notices and the passage of any requisite periods of time, constitute an Event of Default.

(a)     "Default Rate" means, at the time in question  with respect to any Base Rate Loan or any amount paid by Lender pursuant to Section 6.9, the rate per annum equal to five percent (5%) above the Adjusted Base Rate then in effect and  with respect to any Eurodollar Loan, the rate per annum equal to five percent (5%) above the Adjusted Eurodollar Rate then in effect for such Loan; *provided* in each case that no Default Rate charged by any Person shall ever exceed the Highest Lawful Rate.

(b)

(c)     "Distribution" means  any dividend or other distribution made by Borrower on or in respect of any stock, partnership interest, or other equity interest in Borrower (including any option or warrant to buy such an equity interest), or  any payment made by Borrower to purchase, redeem, acquire or retire any stock, partnership interest, or other equity interest in Borrower (including any such option or warrant).

(d)

(e)     "Dollars" and "$" means the lawful currency of the United States.

(f)

F:\data\wp11\01099\1099236d.114.wpd/bd:11/9/99:11:17 AM

ENB 00380

EM001-006860

(g)    "Domestic Lending Office" means the office of Lender specified as its "Domestic Lending Office" below its name on its signature page hereto, or such other office as Lender may from time to time specify to Borrower.

(h)

"Environmental Laws" means any and all Laws relating to the environment or to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes into the environment including ambient air, surface water, ground water, or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes.

"Eurodollar Loan" means a Loan that bears interest at the Adjusted Eurodollar Rate.

"Eurodollar Margin" means the margin added to a Eurodollar Loan as set forth in the definition of "Applicable Margin".

"Eurodollar Rate" means, for any Eurodollar Loan within a Borrowing and with respect to the related Interest Period therefor, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) appearing on Telerate Page 3750 (or any successor page) as the London interbank offered rate for deposits in Dollars at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period.  If for any reason such rate is not available, the term "Eurodollar Rate" means, for any Eurodollar Loan within a Borrowing and with respect to the related Interest Period therefor, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) appearing on Reuters Screen LIBO Page as the London interbank offered rate for deposits in Dollars at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period; *provided, however,* if more than one rate is specified on Reuters Screen LIBO Page, the applicable rate shall be the arithmetic mean of all such rates (rounded upwards, if necessary, to the nearest 1/100 of 1%).

"Eurodollar Lending Office" means the office of Lender specified as its "Eurodollar Lending Office" below its name on the signature page hereto (or, if no such office is specified, its Domestic Lending Office), or such other office of Lender as Lender may from time to time specify to Borrower.

"Event of Default" has the meaning given to such term in Section 8.1.

"Facility Amount" means $6,100,000.

(a)    "Federal Funds Rate" means, for any day, the rate per annum (rounded upwards, if necessary, to the nearest 1/100th of one percent) equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of Dallas, Texas on the Business Day next succeeding such day, *provided* that if the day for which such rate is to be determined is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business

ENB 00381

Day, and if such rate is not so published for any day, the Federal Funds Rate for such day shall be the average rate quoted to Lender on such day on such transactions as determined by Lender.

(b)

(c) "Fiscal Quarter" means a three-month period ending on March 31, June 30, September 30 or December 31 of any year.

(d)

(e) "Fiscal Year" means a twelve-month period ending on December 31 of any year.

(f)

(g) "GAAP" means those generally accepted accounting principles and practices which are recognized as such by the Financial Accounting Standards Board (or any generally recognized successor).

(h)

(i) "Guarantor" means Midcoast or any other Person who has guaranteed some or all of the Obligations and who has been accepted by Lender as a Guarantor.

(j)

(k) "Hazardous Materials" means any substances regulated under any Environmental Law, whether as pollutants, contaminants, or chemicals, or as industrial, toxic or hazardous substances or wastes, or otherwise.

(l)

(m) "Hedging Contract" means any agreement providing for options, swaps, floors, caps, collars, forward sales or forward purchases involving interest rates, commodities or commodity prices, equities, currencies, bonds, or indexes based on any of the foregoing, any option, futures or forward contract traded on an exchange, and any other derivative agreement or other similar agreement or arrangement.

(n)

"Highest Lawful Rate" means the maximum nonusurious rate of interest that Lender is permitted under applicable Law to contract for, take, charge, or receive with respect to the Obligations.

"Indebtedness" of any Person means Liabilities in any of the following categories:

(a)   Liabilities for borrowed money;

(b)

(c)   Liabilities constituting an obligation to pay the deferred purchase price of property or services;

(d)

(e)   Liabilities evidenced by a bond, debenture, note or similar instrument;

(f)

(i)   Liabilities which would under GAAP be shown on such Person's balance sheet as a liability, and are payable more than one year from the date of creation thereof (other than reserves for taxes and reserves for Contingent Obligations);

(ii)

(g)   Liabilities arising under Hedging Contracts;

(h)

(i)   Liabilities constituting principal under leases capitalized in accordance with GAAP;

(j)

(k)   Liabilities arising under conditional sales or other title retention agreements;

F:\data\wp\116\1099\1099250d.114.wpd;bd;11/9/99;11:17 AM

ENB 00382

EM001-006862

(l)

(m)      Liabilities owing under direct or indirect guaranties of Liabilities of any other Person or otherwise constituting obligations to purchase or acquire or to otherwise protect or insure a creditor against loss in respect of Liabilities of any other Person (such as obligations under working capital maintenance agreements, agreements to keep-well, or agreements to purchase Liabilities, assets, goods, securities or services), but excluding endorsements in the ordinary course of business of negotiable instruments in the course of collection;

(n)      Liabilities (for example, repurchase agreements, mandatorily redeemable preferred stock and sale/leaseback agreements) consisting of an obligation to purchase or redeem securities or other property, if such Liabilities arises out of or in connection with the sale or issuance of the same or similar securities or property;

(o)

(p)      Liabilities with respect to letters of credit or applications or reimbursement agreements therefor;

(q)

(r)      Liabilities with respect to payments received in consideration of oil, gas, or other minerals yet to be acquired or produced at the time of payment (including obligations under "take-or-pay" contracts to deliver gas in return for payments already received and the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment); or

(s)

(t)      Liabilities with respect to other obligations to deliver goods or services in consideration of advance payments therefor.

(u)

(v)      "Interest Payment Date" means  with respect to each Base Rate Loan, the last day of each Fiscal Quarter, and  with respect to each Eurodollar Loan, the last day of the Interest Period that is applicable thereto; *provided* that the last day of each calendar month shall also be an Interest Payment Date for each such Loan so long as any Event of Default exists under Section 8.1 (a) or (b).

(w)

(x)      "Interest Period" means, with respect to each particular Eurodollar Loan in a Borrowing, the period specified in the Borrowing Notice or Continuation/Conversion Notice applicable thereto, beginning on and including the date specified in such Borrowing Notice or Continuation/Conversion Notice (which must be a Business Day), and ending one, two or three months thereafter, as Borrower may elect in such notice; *provided* that:  any Interest Period which would otherwise end on a day which is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day; and  any Interest Period which begins on the last Business Day in a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day in a calendar month.

(y)

(z)      "Internal Revenue Code" means the United States Internal Revenue Code of 1986, as amended from time to time and any successor statute or statutes, together with all rules and regulations promulgated with respect thereto.

(aa)

ENB 00383

EM001-006863

"Investment" means any investment, made directly or indirectly, in any Person or any property, whether by acquisition of shares of capital stock, indebtedness or other obligations or securities or by loan, advance, capital contribution or otherwise (other than current trade and customer accounts) and whether made in cash, by the transfer of property, or by any other means.

"KPC" means Kansas Pipeline Company, a Kansas general partnership.

"Law" means any statute, law, regulation, ordinance, rule, treaty, judgment, order, decree, permit, concession, franchise, license, agreement or other governmental restriction of the United States or any state or political subdivision thereof or of any other foreign country or any department, province or other political subdivision thereof.

"Liabilities" means, as to any Person, all Indebtedness, liabilities and obligations of such Person, whether matured or unmatured, liquidated or unliquidated, primary or secondary, direct or indirect, absolute, fixed or contingent, and whether or not required to be considered pursuant to GAAP.

"Lien" means any interest in property securing Liabilities owed to, or a claim by, a Person other than the owner of such property, whether such interest is based on common law, statute, or contract, and including, but not limited to, the lien or security interest arising from a mortgage, ship mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt, or a lease, consignment, or bailment for security purposes (other than true leases or true consignments), liens of mechanics, materialmen, and artisans, maritime liens and reservations, exceptions, encroachments, easements, rights of way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting property which secure Liabilities owed to, or a claim by, a Person other than the owner of such property (for the purpose of this Agreement, Borrower and any of its Subsidiaries shall be deemed to be the owner of any property which it has acquired or holds subject to a conditional sale agreement, financing lease, or other arrangement pursuant to which title to the property has been retained by or vested in some other Person for security purposes), and the filing or recording of any financing statement or other security instrument in any public office.

"Loan" means the term loan made by Lender to or for the benefit of Borrower pursuant to this Agreement.

"Loan Documents" means this Agreement, the Note, the Security Documents and all other agreements, certificates, documents, instruments and writings at any time delivered in connection herewith or therewith (exclusive of term sheets and commitment letters).

"MarGasCo" means MarGasCo Partnership, an Oklahoma general partnership.

(a)    "Material Adverse Change" means a material and adverse change, from the state of affairs represented or warranted in any Loan Document, to Borrower's financial condition, Borrower's properties, Borrower's ability to timely pay the Obligations, or the enforceability of the material terms of any Loan Documents.
(b)

F:\data\wp\1116\1099\10992504.114 wpd:bd:11/9/99:11:17 AM

ENB 00384

(c)     "Maturity Date" means the earlier of (i) November 9, 2000 and (ii) the date demand for payment of the Obligations is made by Lender pursuant to Section 2.1 hereof.

(d)

(e)     "Midcoast" means Midcoast Energy Resources, Inc.

(f)

(g)     "Mid-Kansas" means Mid-Kansas Partnership, a Kansas general partnership.

(h)

(i)     "Note" has the meaning given to such term in Section 2.1.

(j)

(k)     "Obligations" means all Liabilities from time to time owing by any Restricted Person to Lender under or pursuant to any of the Loan Documents.  "Obligation" means any part of the Obligations.

(l)

(m)     "Other Taxes" has the meaning given that term in Section 3.10(b).

(n)

(o)     "Partners" means K-Pipe and MLGC.

(p)

(q)     "Partnership Agreement" means the Butcher Interest Partnership General Partnership Agreement dated November __, 1999, between Borrower and K-Pipe and pursuant to which Borrower will, on the terms and conditions specified therein, acquire the Butcher Revenue Interest.

(r)

(s)     "Permitted Liens" means liens under the Security Documents.

(t)

(u)     "Person" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization or joint venture, Tribunal, or any other legally recognizable entity.

(v)

(w)     "Regulation A" means Regulation A of the Board of Governors of the Federal Reserve System as from time to time in effect.

(x)

(y)     "Regulation D" means Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect.

(z)

(aa)    "Regulation U" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect.

(bb)

(cc)    "Reserve Requirement" means, at any time, the maximum rate at which reserves (including any marginal, special, supplemental, or emergency reserves) are required to be maintained under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) by member banks of the Federal Reserve System against "Eurocurrency liabilities" (as such term is used in Regulation D).  Without limiting the effect of the foregoing, the Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (a) any category of liabilities which includes deposits by reference to which the Adjusted Eurodollar Rate is to be determined, or (b) any category of extensions of credit or other assets which include Eurodollar Loans.

(dd)

F:\data\wpl14\1099\1099250d.114.wpd:bd:11/9/99:11:17 AM

ENB 00385

EM001-006865

(ee)    "Restricted Person" means any of Borrower and each Guarantor.

(ff)

(gg)    "Riverside" means Riverside Pipeline Company, L.P., a Kansas limited partnership.

(hh)

(ii)    "Security Documents" means all security agreements, deeds of trust, mortgages, chattel mortgages, pledges, guaranties, financing statements, continuation statements, extension agreements and other agreements or instruments now, heretofore, or hereafter delivered by any Restricted Person to Lender in connection with this Agreement or any transaction contemplated hereby to secure or guarantee the payment of any part of the Obligations or the performance of any Restricted Person's other duties and obligations under the Loan Documents.

(jj)

(kk)    "Subsidiary" means, with respect to any Person, any corporation, association, partnership, limited liability company, joint venture, or other business or corporate entity, enterprise or organization which is directly or indirectly (through one or more intermediaries) controlled by or owned fifty percent or more by such Person.

(ll)

(mm)   "Taxes" has the meaning given that term in Section 3.10(a).

(nn)    "Tribunal" means any government, any arbitration panel, any court or any governmental department, central bank or comparable agency, commission, board, bureau, agency or instrumentality of the United States or any state, province, commonwealth, nation, territory, possession, county, parish, town, township, village or municipality, whether now or hereafter constituted or existing.

(oo)

(pp)    "Type" of Loan is determined by reference to the interest rate applicable to such Loan and the currency in which such Loan is denominated, with a Base Rate Loan and a Eurodollar Loan being different Types of Loans, Loans in Dollars and Canadian Dollars being different Types of Loans and Eurodollar Loans having different Interest Periods being different Types of Loans.

(qq)

(rr)    "United States" means the United States of America.

(ss)

(tt)    "Year 2000 Compliant" means, in regard to any Person, that all software, hardware, firmware, equipment, goods or systems utilized by or material to the business operations or financial condition of such Person, will properly perform date sensitive functions before, during and after the year 2000.

(uu)

(vv)    Section 1.2.    Exhibits and Schedules: Additional Definitions .  All Exhibits and Schedules attached to this Agreement are a part hereof for all purposes.

(ww)

(xx)    Section 1.3.    Amendment of Defined Instruments .  Unless the context otherwise requires or unless otherwise provided herein the terms defined in this Agreement which refer to a particular agreement, instrument or document also refer to and include all renewals, extensions, modifications, amendments and restatements of such agreement, instrument or document; provided that nothing contained in this section shall be construed to authorize any such renewal, extension, modification, amendment or restatement.

(yy)

ENB 00386

EM001-006866

(zz)     Section 1.4.     <u>References and Titles</u> .  All references in this Agreement to Exhibits, Schedules, articles, sections, subsections and other subdivisions refer to the Exhibits, Schedules, articles, sections, subsections and other subdivisions of this Agreement unless expressly provided otherwise.  All references in this Agreement to any Person refer to such Person's successors and assigns unless expressly provided otherwise.  Titles appearing at the beginning of any subdivisions are for convenience only and do not constitute any part of such subdivisions and shall be disregarded in construing the language contained in such subdivisions.  The words "this Agreement", "this instrument", "herein", "hereof", "hereby", "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.  The phrases "this section" and "this subsection" and similar phrases refer only to the sections or subsections hereof in which such phrases occur.  The word "or" is not exclusive, and the word "including" (in its various forms) means "including without limitation".  Pronouns in masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

(aaa)

(bbb)     Section 1.5.     <u>Calculations and Determinations</u> .  All calculations under the Loan Documents of interest chargeable with respect to Eurodollar Loans and of fees shall be made on the basis of actual days elapsed (including the first day but excluding the last) and a year of 360 days.  All other calculations of interest made under the Loan Documents shall be made on the basis of actual days elapsed (including the first day but excluding the last) and a year of 365 or 366 days, as appropriate.  Each determination by a Lender of amounts to be paid under <u>Article III</u> or any other matters which are to be determined hereunder by a Lender (such as any Eurodollar Rate, Adjusted Eurodollar Rate, Business Day, Interest Period, or Reserve Requirement) shall, in the absence of manifest error, be conclusive and binding.  Unless otherwise expressly provided herein or unless Lender otherwise consents all financial statements and reports furnished to Lender hereunder shall be prepared and all financial computations and determinations pursuant hereto shall be made in accordance with GAAP.

(ccc)

(ddd)     Section 1.6.     <u>Joint Preparation; Construction of Indemnities and Releases</u> .  This Agreement and the other Loan Documents have been reviewed and negotiated by sophisticated parties with access to legal counsel and no rule of construction shall apply thereto which would require or allow any Loan Document to be construed against any party because of its role in drafting such Loan Document.  All indemnification and release provisions of this Agreement shall be construed broadly (and not narrowly) in favor of the Persons receiving indemnification from or being released.

(eee)

ARTICLE II - <u>The Term Loan</u>

1.     Section 2.<u>Commitment to Lend; Note</u> .  Subject to the terms and conditions hereof, Lender agrees to make a term Loan to Borrower upon Borrower's request on the Closing Date in the amount of the Facility Amount.  The obligation of Borrower to repay to Lender the term Loan made by Lender, together with interest accruing in connection therewith, shall be evidenced by a promissory note (herein called Lender's "<u>Note</u>") made by Borrower payable to the order of Lender in the form of <u>Exhibit A</u> with appropriate insertions.  The amount of principal owing on Lender's Note at any given time shall be the amount of the term Loan theretofore made by Lender minus all payments of principal theretofore received by Lender on

F:\data\wp\114\1099\1099230d.114.wpd;bd:11/9/99;11:17 AM

ENB 00387

such Note.  Interest on the Note shall accrue and be due and payable on each Interest Payment Date as provided herein and therein.  The Note shall be due and payable as provided herein and therein, and shall be due and payable in full on demand made by Lender (wether or not an Event of Default has occurred or is continuing), but if no such demand is made, on the Maturity Date.  Borrower hereby acknowledges that Lender, in its sole and absolute discretion, may make demand for payment on the Note at any time and without liability to Borrower for making such demand. Borrower may not reborrow any amounts paid hereunder.

2.

3.        Section 2.Request for Term Loan .  Borrower must give to Lender written notice (or telephonic notice promptly confirmed in writing) of the Borrowing of the term Loan to be advanced by Lender.  Such notice constitutes a "Borrowing Notice" hereunder and must:

4.

(a)       specify that the initial Borrowing shall consist of a Base Rate Loan; and

(b)

(c)       be received by Lender not later than 10:00 a.m., Houston time, on the Business Day on which such Borrowing is to be made.

(d)

(e)Such written request or confirmation must be made in the form and substance of the "Borrowing Notice" attached hereto as Exhibit B, duly completed.  Such telephonic request shall be deemed a representation, warranty, acknowledgment and agreement by Borrower as to the matters which are required to be set out in such written confirmation.  If all conditions precedent to such Borrowing have been met, Lender will on the date requested promptly make such Borrowing available to Borrower in Dallas, Texas.

(f)

5.        Section 2.Continuations and Conversions of Existing Loans .  Borrower may make the following elections with respect to Loans already outstanding: to convert Base Rate Loans to Eurodollar Loans; to convert Eurodollar Loans to Base Rate Loans on the last day of the Interest Period applicable thereto; to continue Eurodollar Loans beyond the expiration of such Interest Period by designating a new Interest Period to take effect at the time of such expiration.  In making the foregoing elections, Borrower may combine existing Loans made pursuant to separate Borrowings into one new Borrowing or divide existing Loans made pursuant to one Borrowing into separate new Borrowings, *provided* that Borrower may have no more than two (2) Borrowings of Loans outstanding at any time, all Base Rate Loans constituting one Loan, each borrowing consisting of Eurodollar Loans made by Lender at one time and for a particular Interest Period constituting one Loan.  To make any such election, Borrower must give to Lender written notice (or telephonic notice promptly confirmed in writing) of any such Conversion or Continuation of existing Loans, with a separate notice given for each new Borrowing.  Each such notice constitutes a "Continuation/Conversion Notice" hereunder and must:

6.

(a)       specify the existing Loans which are to be continued or converted;

(b)

(i)        specify  the aggregate amount of any Borrowing of Base Rate Loans into which such existing Loans are to be continued or converted and the date on which such Continuation or Conversion is to occur, or  the aggregate amount of any Borrowing of Eurodollar Loans into which such existing Loans are to be continued or converted, the date on which such Continuation or Conversion is to occur (which shall be the first day of the Interest Period which is to apply to such Eurodollar Loans), and the length of the applicable Interest Period; and

F:\data\wp\11\01099\1099230d.11<.wpd.bd.11/3/99:11:17 AM

ENB 00388

EM001-006868

(ii)

(iii)    be received by Lender not later than 10:00 a.m., Houston time, on  the day on which any such Continuation or Conversion to Base Rate Loans is to occur, or  the third Business Day preceding the day on which any such Continuation or Conversion to Eurodollar Loans is to occur.

(iv)

(v)Each such written request or confirmation must be made in the form and substance of the "Continuation/Conversion Notice" attached hereto as Exhibit C, duly completed.  Each such telephonic request shall be deemed a representation, warranty, acknowledgment and agreement by Borrower as to the matters which are required to be set out in such written confirmation. Each Continuation/Conversion Notice shall be irrevocable and binding on Borrower.  During the continuance of any Default, Borrower may not make any election to convert existing Loans into Eurodollar Loans or continue existing Loans as Eurodollar Loans.  If (due to the existence of a Default or for any other reason) Borrower fails to timely and properly give any Continuation/Conversion Notice with respect to a Borrowing of existing Eurodollar Loans at least three (3) days prior to the end of the Interest Period applicable thereto, such Eurodollar Loans shall automatically be converted into Base Rate Loans at the end of such Interest Period. No new funds shall be repaid by Borrower or advanced by Lender in connection with any Continuation or Conversion of existing Loans pursuant to this section, and no such Continuation or Conversion shall be deemed to be a new advance of funds for any purpose; such Continuations and Conversions merely constitute a change in the interest rate applicable to already outstanding Loans.

(vi)

7.    Section 2.Use of Proceeds .  Borrower shall use the proceeds to finance the acquisition of the Butcher Revenue Interest by distribution of $6,100,000 along with other consideration to K-Pipe pursuant to the Partnership Agreement.  In no event shall the funds from any Loan be used directly or indirectly by any Person for personal, family, household or agricultural purposes or for the purpose, whether immediate, incidental or ultimate, of purchasing, acquiring or carrying any "margin stock" (as such term is defined in Regulation U) or to extend credit to others directly or indirectly for the purpose of purchasing or carrying any such margin stock.  Borrower represents and warrants that Borrower is not engaged principally, or as one of Borrower's important activities, in the business of extending credit to others for the purpose of purchasing or carrying such margin stock.

8.

9.    Section 2.Interest Rates .  As provided in the Note: (i) each Base Rate Loan shall bear interest on each day outstanding at the Adjusted Base Rate in effect on such day; (ii) each Eurodollar Loan shall bear interest on each day during the related Interest Period at the related Adjusted Eurodollar Rate in effect on such day; and (iii) if an Event of Default has occurred and is continuing, all Loans shall bear interest on each day outstanding at the applicable Default Rate.  Past due payments of principal and interest shall also bear interest at the rates and in the manner set forth in the Note.

10.

11.    Section 2.Optional Prepayments and Payment of Breakage Costs .  (a) Subject to applicable provisions of this Agreement, Borrower shall have the right at any time or from time to time to prepay Loans and to convert Loans of one Type or with one Interest Period into Loans of another Type or with a different Interest Period; *provided, however,* that (i) Borrower shall give Lender notice of each such prepayment or conversion of all or any portion of a Eurodollar

F:\data\wp111\1099\1099250d.114<wpdbd:11/9/99:11:17 AM

ENB 00389

EM001-006869

Loan no less than three (3) Business Days prior to prepayment or conversion, (ii) any Eurodollar Loan may be prepaid or converted only on the last day of an Interest Period for such Eurodollar Loan or as otherwise provided in Section 2.6(b), (iii) Borrower shall pay all accrued and unpaid interest on the amounts prepaid or converted, and (iv) no such prepayment or conversion shall serve to postpone the repayment when due of any Obligation , (v) the aggregate amount of all partial prepayments of the Note equals $1,000,000 or any higher integral multiple of $1,000,000, and (vi) so long as Borrower does not make any prepayments which would reduce the unpaid principal balance of all Loans to less than $100,000 without first either (a) terminating this Agreement or (b) providing assurance satisfactory to Lender in its discretion that Lender' legal rights under the Loan Documents, including the Security Documents, are in no way affected by such prepayment.

12.

13.      (b)  Borrower may prepay all or any portion of the principal amount of a Loan bearing interest at a Eurodollar Rate; *provided* that if Borrower makes any such prepayment other than on the last day of the applicable Interest Period, Borrower (i) with such prepayment, shall pay all accrued interest on the principal amount prepaid, and (ii) on demand, shall reimburse the Lender and hold the Lender harmless from all losses and expenses incurred by the Lender as a result of such prepayment, including, without limitation, any losses and expenses arising from the liquidation or reemployment of deposits acquired to fund or maintain the principal amount prepaid ("breakage costs").  Such breakage costs with respect to the prepayment of Eurodollar Loans shall be calculated as though the Lender funded the principal amount prepaid through the purchase of Dollar deposits in the London interbank market having a maturity corresponding to such Interest Period and bearing an interest rate equal to the Eurodollar Rate for such Interest Period, whether in fact that is the case or not.   Lender's determination of the amount of any such reimbursement shall be conclusive in the absence of manifest error.

14.

## ARTICLE III - Payments to Lender

1.      Section 3. General Procedures

2.

3.      (a)  Borrower will make each payment which it owes under the Loan Documents to Lender at the office of Lender in Dallas, Texas.  All payments of principal or interest required pursuant to this Agreement or the Note shall be made in Dollars and in immediately available funds.

4.

5.      (b)  All payments by Borrower shall be without set-off, deduction or counterclaim, and in immediately available funds.  Each such payment must be received by Lender not later than 11:00 a.m., Houston time, on the date such payment becomes due and payable.  Any payment received by Lender after such time will be deemed to have been made on the next following Business Day.  Should any such payment become due and payable on a day other than a Business Day, the maturity of such payment shall be extended to the next succeeding Business Day, and, in the case of a payment of principal or past due interest, interest shall accrue and be payable thereon for the period of such extension as provided in the Loan Document under which such payment is due.  Each payment under a Loan Document shall be due and payable at the place provided therein and, if no specific place of payment is provided, shall be due and payable at the place of payment of Lender's Note.  When Lender collects or receives money on account

ENB 00390

EM001-006870

of the Obligations, Lender shall distribute all money so collected or received, and Lender shall apply all such money so distributed, as follows:

6.

7.　　(i)　　first, for the payment of all Obligations which are then due (and if such money is insufficient to pay all such Obligations, first to any reimbursements due Lender under <u>Section 6.9</u> or 9.4 and then to the partial payment of all other Obligations then due in proportion to the amounts thereof);

8.

9.　　(ii)　　then for the prepayment of amounts owing under the Loan Documents (other than principal on the Note) if so specified by Borrower;

10.

11.　　(iii)　　then for the prepayment of principal on the Note, together with accrued and unpaid interest on the principal so prepaid; and

12.

13.　　(iv)　　last, for the payment or prepayment of any other Obligations.

14.

15. All payments applied to principal or interest on any Note shall be applied first to any interest then due and payable, then to principal then due and payable, and last to any prepayment of principal and interest in compliance with <u>Sections 2.6</u> and <u>2.7</u>.

16.

17.　　Section 3.<u>Intentionally Omitted</u> .

18.

19.　　Section 3.<u>Intentionally Omitted</u> .

20.

21.　　Section 3.<u>Intentionally Omitted</u> .

22.

23.　　Section 3.<u>Increased Cost and Reduced Return</u> .

24.

(a)　　If, after the date hereof, the adoption of any applicable Law or any change in any applicable Law or any change in the interpretation or administration thereof by any Tribunal or compliance by Lender (or its Applicable Lending Office) with any request or directive (whether or not having the force of Law) of any such Tribunal:

(b)

　　(i)　　shall subject Lender (or its Applicable Lending Office) to any tax, duty, or other charge with respect to any Eurodollar Loans, its Note, its obligation to make Eurodollar Loans or change the basis of taxation of any amounts payable to Lender (or its Applicable Lending Office) under this Agreement or its Note in respect of any Eurodollar Loans (other than taxes imposed on the overall net income of Lender by the jurisdiction in which Lender has its principal office or such Applicable Lending Office);

　　(i)　　shall impose, modify, or deem applicable any reserve, special deposit, assessment, or similar requirement (other than the Reserve Requirement utilized in the determination of the Adjusted Eurodollar Rate) relating to any extensions of credit or other assets of, or any deposits with or other liabilities or commitments of, Lender (or its Applicable Lending Office); or

(i)      shall impose on Lender (or its Applicable Lending Office) or the London interbank market any other condition affecting this Agreement or its Note or any such extensions of credit or liabilities or commitments;

and the result of any of the foregoing is to increase the cost to Lender (or its Applicable Lending Office) of making, converting into, continuing, or maintaining any Eurodollar Loans or to reduce any sum received or receivable by Lender (or its Applicable Lending Office) under this Agreement or its Note with respect to any Eurodollar Loans, then Borrower shall pay to Lender on demand such amount or amounts as will compensate Lender for such increased cost or reduction.  If Lender requests compensation by Borrower under this Section 3.5(a), Borrower may, by notice to Lender, suspend the obligation of Lender to make or continue Loans of the Type with respect to which such compensation is requested, or to convert Loans of any other Type into Loans of such Type, until the event or condition giving rise to such request ceases to be in effect; *provided* that such suspension shall not affect the right of Lender to receive the compensation so requested.

1.      Section 3.Limitation on Types of Loans .  If on or prior to the first day of any Interest Period for a Eurodollar Loan:
2.
(a)      Lender determines (which determination shall be conclusive) that by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the applicable Eurodollar Rate for such Eurodollar Loan for such Interest Period; or
(b)
(c)      Lender determines that the Adjusted Eurodollar Rate will not adequately and fairly reflect the cost to the Lender of funding such Eurodollar Loans for such Interest Period;
(d)
(e)then Lender shall give Borrower prompt notice thereof specifying the relevant amounts or periods, and so long as such condition remains in effect, the Lender shall be under no obligation to make additional Eurodollar Loans, continue such Type of Eurodollar Loans or convert Base Rate Loans into such Type of Eurodollar Loans, and Borrower shall, on the last day(s) of the then current Interest Period(s) for the outstanding Eurodollar Loans of the effected Type, either prepay such Loans or convert such Loans into Base Rate Loans in accordance with the terms of this Agreement.
(f)
3.      Section 3.Illegality .  Notwithstanding any other provision of this Agreement, in the event that it becomes unlawful for Lender or its Applicable Lending Office to make, maintain, or fund Eurodollar Loans hereunder, then Lender shall promptly notify Borrower thereof and Lender's obligation to make or continue Eurodollar Loans and to convert Base Rate Loans into Eurodollar Loans shall be suspended until such time as Lender may again make, maintain, and fund Eurodollar Loans (in which case the provisions of Section 1.5 shall be applicable).
4.
5.      Section 3.Treatment of Affected Loans .  If the obligation of Lender to make a particular Type of Loan or to continue, or to convert Loans of any other Type into, Loans of a particular Type shall be suspended pursuant to Section 3.5, 3.6 or 3.7 (Loans of such Type being herein called "Affected Loans" and such Type being herein called the "Affected Type"), Lender's Affected Loans shall be automatically converted into Base Rate Loans on the last day(s) of the then current Interest Period(s) for Affected Loans (or, in the case of a Conversion required by

ENB 00392

EM001-006872

Section 3.7 hereof, on such earlier date as Lender may specify to Borrower with a copy to Lender and, unless and until Lender gives notice as provided below that the circumstances specified in Section 3.5, 3.6 or 3.7 that gave rise to such Conversion no longer exist:

6.

(a)    to the extent that Lender's Affected Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to Lender's Affected Loans shall be applied instead to its Base Rate Loans; and

(b)

(c)    all Loans that would otherwise be made or continued by Lender as Loans of the Affected Type shall be made or continued instead as Base Rate Loans, and all Loans of Lender that would otherwise be converted into Loans of the Affected Type shall be converted instead into (or shall remain as) Base Rate Loans.

(d)

7.    Section 3.Compensation .  Upon the request of Lender, Borrower shall pay to Lender such amount or amounts as shall be sufficient (in the reasonable opinion of Lender) to compensate it for any loss, cost, or expense (including loss of anticipated profits) incurred by it as a result of:

8.

(a)    any payment, prepayment, or Conversion of a Eurodollar Loan for any reason (including, without limitation, the acceleration of the Loans pursuant to Section 8.2 on a date other than the last day of the Interest Period for such Loan; or

(b)

(c)    any failure by Borrower for any reason (including, without limitation, the failure of any condition precedent specified in Article IV to be satisfied) to borrow, convert, continue, or prepay a Eurodollar Loan on the date for such borrowing, Conversion, Continuation, or prepayment specified in the relevant notice of borrowing, prepayment, Continuation, or Conversion under this Agreement.

(d)

9.    Section 3.Taxes .

10.

(i)    Any and all payments by Borrower to or for the account of Lender hereunder or under any other Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto; *excluding,* in the case of Lender, taxes imposed on its income, and franchise taxes imposed on it, by the jurisdiction under the Laws of which Lender (or its Applicable Lending Office) is organized or any political subdivision thereof (all such non-excluded taxes, duties, levies, imposts, deductions, charges, withholdings, and liabilities being hereinafter referred to as "Taxes").  If Borrower shall be required by Law to deduct any Taxes from or in respect of any sum payable under this Agreement or any other Loan Document to Lender,  the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this section) Lender receives an amount equal to the sum it would have received had no such deductions been made,  Borrower shall make such deductions, and  Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Law.

(ii)

(b)    In addition, Borrower agrees to pay any and all present or future stamp or documentary taxes and any other excise or property taxes or charges or similar levies which arise from any

ENB 00393

EM001-006873

payment made under this Agreement or any other Loan Document or from the execution or delivery of, or otherwise with respect to, this Agreement or any other Loan Document (hereinafter referred to as "Other Taxes").

(c)

(d)     Borrower agrees to indemnify Lender for the full amount of Taxes and Other Taxes (including any Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this section) paid by Lender and any liability (including penalties, interest, and expenses) arising therefrom or with respect thereto.

(e)

(f)     If Borrower is required to pay additional amounts to or for the account of Lender pursuant to this section, then Lender will agree to use reasonable efforts to change the jurisdiction of its Applicable Lending Office so as to eliminate or reduce any such additional payment which may thereafter accrue if such change, in the judgment of Lender, is not otherwise disadvantageous to Lender and in the event Lender is reimbursed for an amount paid by Borrower pursuant to this Section 3.9, it shall promptly return such amount to Borrower.

(g)

(h)     Within thirty (30) days after the date of any payment of Taxes, Borrower shall furnish to Lender the original or a certified copy of a receipt evidencing such payment.

(i)

(j)     Without prejudice to the survival of any other agreement of Borrower hereunder, the agreements and obligations of Borrower contained in this section shall survive the payment in full of the Note.

(k)

## ARTICLE IV - Conditions Precedent to Lending

1.     Section 4. Documents to be Delivered . Lender has no obligation to make the initial Loan unless Lender shall have received all of the following, at Lender's office in Houston, Texas, duly executed and delivered and in form, substance and date satisfactory to Lender:

2.

(a)     this Agreement and any other documents that Lender is to execute in connection herewith;

(b)

(c)     the Note;

(d)

(e)     a Guaranty signed by Midcoast and a Security Agreement signed by Borrower;

(f)

(g)     certain certificates of Borrower including:

(1)     an "Omnibus Certificate" of the Secretary or Assistant Secretary and of the President or Chief Financial Officer of each of the Partners, which shall contain the names and signatures of the officers of Borrower authorized to execute Loan Documents and which shall certify to the truth, correctness and completeness of the following exhibits attached thereto:  a copy of resolutions duly adopted by the Board of Directors of each of the Partners and in full force and effect at the time this Agreement is entered into, authorizing the execution of this Agreement and the other Loan Documents delivered or to be delivered in connection herewith and the consummation of the transactions contemplated herein and therein; and  a copy of the Partnership Agreement and all amendments thereto; and

F:\data\wp\1141099\10992304.114.wpd:bd:11/9/99:11:17 AM

ENB 00394

EM001-006874

(i)     a "Compliance Certificate" of the President or the Chief Financial Officer of each of the Partners, of even date with such Loan, in which such officer certifies to the satisfaction of the conditions set out in Sections 4.2(a), (b), (c) and (d);

(a)     all other conditions set forth in the Partnership Agreement shall have occurred in order for Borrower to acquire the Butcher Revenue Interest;

(b)

(c)     documents similar to those specified in subsection (d)(i) of this section with respect to each Guarantor and the execution by it of its guaranty of Borrower's Obligations; and

(d)

(e)     a favorable opinions of legal counsel for Restricted Persons, substantially in the form set forth in Exhibit D.

(f)

2.      Section 4. Additional Conditions Precedent . Lender has no obligation to make the Loan, unless the following conditions precedent have been satisfied:

3.

(a)     all representations and warranties made by any Restricted Person in any Loan Document shall be true on and as of the date of such Loan (except to the extent that the facts upon which such representations are based have been changed by the extension of credit hereunder) as if such representations and warranties had been made as of the date of such Loan;

(b)

(c)     no Default shall exist at the date of such Loan;

(d)

(e)     no Material Adverse Change shall have occurred;

(f)

(g)     each Restricted Person shall have performed and complied with all agreements and conditions required in the Loan Documents to be performed or complied with by it on or prior to the date of such Loan;

(h)

(i)     the making of such Loan shall not be prohibited by any Law and shall not subject Lender to any penalty or other onerous condition under or pursuant to any such Law; and

(j)

(i)     Lender shall have received all documents and instruments which Lender has then requested, in addition to those described in Section 4.1 (including opinions of legal counsel for Restricted Persons and Lender; corporate documents and records; documents evidencing governmental authorizations, consents, approvals, licenses and exemptions and certificates of public officials and of officers and representatives of Borrower and other Persons), as to the accuracy and validity of or compliance with all representations, warranties and covenants made by any Restricted Person in this Agreement and the other Loan Documents, the satisfaction of all conditions contained herein or therein, and all other matters pertaining hereto and thereto. All such additional documents and instruments shall be satisfactory to Lender in form, substance and date.

(ii)

ARTICLE V - Representations and Warranties

F:\data\wp\114\1099\10992504.114.wpd:bd:11/9/99:11:17 AM

ENB 00395

To confirm Lender's understanding concerning Borrower and Borrower's business, properties and obligations and to induce Lender to enter into this Agreement and to extend credit hereunder, Borrower represents and warrants to Lender that:

1.      Section 5.No Default.  No event has occurred and is continuing which constitutes a Default.

2.

3.      Section 5.Organization and Good Standing .  Borrower is a general partnership validly existing and in good standing under the Laws of Delaware, having all powers required to carry on its business and enter into and carry out the transactions contemplated hereby.

4.

5.      Section 5.Authorization .  Borrower has duly taken all action necessary to authorize the execution and delivery by it of the Loan Documents to which it is a party and to authorize the consummation of the transactions contemplated thereby and the performance of its obligations thereunder.  Borrower is duly authorized to borrow funds hereunder.

6.

(a)      Section 5.No Conflicts or Consents .  The execution and delivery by Borrower of the Loan Documents to which it is a party, the performance by Borrower of its obligations under the Loan Documents, and the consummation of the transactions contemplated by the various Loan Documents, do not and will not  conflict with any provision of  any Law,  the organizational documents of Borrower, or  any agreement, judgment, license, order or permit applicable to or binding upon Borrower,  result in the acceleration of any Indebtedness owed by Borrower, or  result in or require the creation of any Lien upon any assets or properties of Borrower except as expressly contemplated or permitted in the Loan Documents.  Except as expressly contemplated in the Loan Documents, no consent, approval, authorization or order of, and no notice to or filing with, any Tribunal or third party is required in connection with the execution, delivery or performance by Borrower of any Loan Document or to consummate any transactions contemplated by the Loan Documents.

(b)

7.      Section 5.Enforceable Obligations .  This Agreement is, and the other Loan Documents when duly executed and delivered will be, legal, valid and binding obligations of Borrower, enforceable in accordance with their terms except as such enforcement may be limited by bankruptcy, insolvency or similar Laws of general application relating to the enforcement of creditors' rights.

8.

9.      Section 5.Intentionally Omitted .

10.

11.      Section 5.Other Obligations and Restrictions.   Borrower has no outstanding Liabilities of any kind (including Contingent Obligations, tax assessments, and unusual forward or long-term commitments).  Borrower is not subject to or restricted by any franchise, contract, deed, charter restriction, or other instrument or restriction which could cause a Material Adverse Change.

12.      Section 5.Full Disclosure .  No certificate, statement or other information delivered herewith or heretofore by Borrower to Lender in connection with the negotiation of this Agreement or in connection with any transaction contemplated hereby contains any untrue statement of a material fact or omits to state any material fact known to Borrower necessary to make the statements contained herein or therein not misleading as of the date made or deemed

ENB 00396

EM001-006876

made.  There is no fact known to Borrower that has not been disclosed to Lender in writing which could cause a Material Adverse Change.

13.

(a)        Section 5.<u>Litigation</u> .  There are no actions, suits or legal, equitable, arbitrative or administrative proceedings pending or threatened against Borrower before any Tribunal, and there are no outstanding judgments, injunctions, writs, rulings or orders by any such Tribunal against Borrower or Borrower's partners which could cause a Material Adverse Change.

(b)

14.        Section 5.<u>Intentionally Omitted</u> .

15.

16.        Section 5.<u>No Employees</u> .  Borrower has no employees.

17.

18.        Section 5.<u>Intentionally Omitted</u> .

19.

20.        Section 5.<u>No Prior Operations; Assets and Liabilities</u> .  Borrower conducted no operations prior to the date of its formation, and since the date of its formation has conducted no operations other than those contemplated by the Partnership Agreement.  Borrower has no assets other than the Butcher Revenue Interest and the accounts and contract rights and general intangibles under or pursuant to the Partnership Agreement and the proceeds of the foregoing.  Borrower is the sole legal and beneficial owner of the Butcher Revenue Interest.  Borrower has no liabilities (whether fixed or contingent) other than those under or pursuant to, and Borrower is not a party to any contract or other agreement other than the Partnership Agreement and the Loan Documents.

21.

22.        Section 5.<u>Subsidiaries</u> .  Borrower does not presently have any Subsidiary or own any stock in any other corporation or association and is not a partner in any partnership or member of any limited liability company.

23.

24.        Section 5.<u>Title to Properties; Licenses</u> .  Borrower has good and defensible title to all of the Collateral and to all of its material properties and assets, free and clear of all Liens, encumbrances, or adverse claims other than Permitted Liens and of all impediments to the use of the Collateral and such properties and assets in Borrower's business.

25.

26.        Section 5.<u>Government Regulation</u> .  Neither Borrower nor any other Restricted Person owing Obligations is subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, the Investment Company Act of 1940 (as any of the preceding acts have been amended) or any other Law which regulates the incurring by such Person of Indebtedness, including Laws relating to common contract carriers or the sale of electricity, gas, steam, water or other public utility services.

27.

28.        Section 5.<u>Insider</u> .  No Restricted Person, nor any Person having "control" (as that term is defined in 12 U.S.C. § 375b(9) or in regulations promulgated pursuant thereto) of Borrower, is a "director" or an "executive officer" or "principal shareholder" (as those terms are defined in 12 U.S.C. § 375b(8) or (9) or in regulations promulgated pursuant thereto) of Lender, of a bank holding company of which Lender is a Subsidiary or of any Subsidiary of a bank holding company of which Lender is a Subsidiary.

29.

ENB 00397

EM001-006877

30.    Section 5.Solvency .  Upon giving effect to the issuance of the Note, the execution of the Loan Documents by Borrower and the consummation of the transactions contemplated hereby, Borrower will be solvent (as such term is used in applicable bankruptcy, liquidation, receivership, insolvency or similar Laws).
31.
32.    Section 5.Year 2000 Compliance .  Borrower is Year 2000 Compliant.
33.

## ARTICLE VI - Affirmative Covenants of Borrower

To conform with the terms and conditions under which Lender is willing to have credit outstanding to Borrower, and to induce Lender to enter into this Agreement and extend credit hereunder, Borrower warrants, covenants and agrees that until the full and final payment of the Obligations and the termination of this Agreement, unless Lender has previously agreed otherwise:

1.    Section 6.Payment and Performance .  Borrower will pay all amounts due under the Loan Documents in accordance with the terms thereof and will observe, perform and comply with every covenant, term and condition expressed or implied in the Loan Documents.  Borrower will cause each other Restricted Person to observe, perform and comply with every such term, covenant and condition in any Loan Document.
2.
3.    Section 6.Books, Financial Statements and Reports .  Borrower will at all times maintain full and accurate books of account and records.  Borrower will maintain a standard system of accounting, will maintain its Fiscal Year, and will furnish financial statements of Borrower together with all notes thereto, prepared in reasonable detail in accordance with GAAP, upon Lender's request.
4.
5.    Section 6.Other Information and Inspections .  Borrower will furnish to Lender any information which Lender may from time to time reasonably request concerning any covenant, provision, representation or condition of the Loan Documents or any matter in connection with Borrower's business, properties, financial condition and operations and statements and schedules identifying and describing the Collateral and all other reports and information requested in connection with the Collateral, all in reasonable detail.  Borrower will permit representatives appointed by Lender (including independent accountants, auditors, agents, attorneys, appraisers and any other Persons) upon reasonable notice to visit and inspect during normal business hours any of Borrower's property, including its books of account, other books and records, and any facilities or other business assets, and to make extra copies therefrom and photocopies and photographs thereof, and to write down and record any information such representatives obtain, and Borrower shall permit Lender or its representatives to investigate and verify the accuracy of the information furnished to Lender in connection with the Loan Documents and to discuss all such matters with its officers, employees and representatives. Borrower will keep adequate records concerning the Collateral.
6.
7.    Section 6.Notice of Material Events and Change of Address .  Borrower will promptly notify Lender in writing, stating that such notice is being given pursuant to this Agreement, of:
8.

F:\data\wp\11\61099\1099250d.114.wpd.bd:11/9/99:11:17 AM

ENB 00398

EM001-006878

(a)      the occurrence of any Material Adverse Change;

(b)

(c)      the occurrence of any Default; and

(d)

(e)      any suit or proceeding involving Borrower as a defendant or in which any property of Borrower is subject to a claim and which is not covered by insurance or in which injunctive or similar relief is sought.

(f)

(g)Upon the occurrence of any of the foregoing, Borrower will take all necessary or appropriate steps to remedy promptly any such Material Adverse Change or Default, to protect against any such adverse claim, to defend any such suit or proceeding, and to resolve all controversies on account of any of the foregoing.  Borrower will also notify Lender and Lender's counsel in writing at least twenty (20) Business Days prior to the date that Borrower changes its name or the location of its chief executive office or principal place of business or the place where it keeps its books and records concerning the Collateral, furnishing with such notice any necessary financing statement amendments or requesting Lender and its counsel to prepare the same.

(h)

9.      Section 6.Maintenance of Properties .  Borrower will maintain, preserve, protect, and keep all Collateral and all other property used or useful in the conduct of its business in good condition and in compliance with all applicable Laws, and will from time to time make all repairs, renewals and replacements needed to enable the business and operations carried on in connection therewith to be promptly and advantageously conducted at all times.

10.

11.      Section 6.Maintenance of Existence and Qualifications .  Borrower will maintain and preserve its existence and its rights and franchises in full force and effect.

12.

(a)      Section 6.Payment of Trade Liabilities, Taxes, etc.  Borrower will  timely file all required tax returns,  timely pay all taxes, assessments, and other governmental charges or levies imposed upon it or upon its income, profits or property,  timely pay all Liabilities owed by it on ordinary trade terms to vendors, suppliers and other Persons providing goods and services used by it in the ordinary course of its business,  pay and discharge when due all other Liabilities now or hereafter owed by it, and  maintain appropriate accruals and reserves for all of the foregoing in accordance with GAAP.  Borrower may, however, delay paying or discharging any of the foregoing so long as it is in good faith contesting the validity thereof by appropriate proceedings and has set aside on its books adequate reserves therefor.

(b)

13.      Section 6.Insurance .  Borrower shall at all times maintain (at its own expense) adequate and customary  insurance against such risks, in such form and which such financially sound and reputable insurers as shall be satisfactory to Lender from time to time.

14.

15.      Section 6.Performance on Borrower's Behalf .  If any Restricted Person fails to pay any taxes, insurance premiums, expenses, attorneys' fees or other amounts it is required to pay under any Loan Document, Lender may pay the same.  Borrower shall immediately reimburse Lender for any such payments and each amount paid by Lender shall constitute an Obligation owed hereunder which is due and payable on the date such amount is paid by Lender.

16.

F:\data\wp\114\0993\0992304.114.wpd.txt 11/9/99 11:17 AM

**ENB 00399**

EM001-006879

17.     Section 6.Interest . Borrower hereby promises to Lender to pay interest at the Default Rate on all Obligations (including Obligations to pay fees or to reimburse or indemnify Lender) which Borrower has in this Agreement promised to pay to Lender and which are not paid when due. Such interest shall accrue from the date such Obligations become due until they are paid.
18.
19.     Section 6.Compliance with Agreements and Law . Borrower will perform all material obligations it is required to perform under the terms of each indenture, mortgage, deed of trust, security agreement, lease, franchise, agreement, contract or other instrument or obligation to which it is a party or by which it or any of its properties is bound. Borrower will conduct its business and affairs in compliance with all Laws applicable thereto.
20.
21.     Section 6.Intentionally Omitted .
22.
23.     Section 6.Evidence of Compliance . Borrower will furnish to Lender at Borrower's or Borrower's expense all evidence which Lender from time to time reasonably requests in writing as to the accuracy and validity of or compliance with all representations, warranties and covenants made by Borrower in the Loan Documents, the satisfaction of all conditions contained therein, and all other matters pertaining thereto..
24.
25.     Section 6.Agreements Regarding Collateral and Security Documents .
26.
27.     Borrower agrees to deliver and to cause each other Restricted Person to deliver, to further secure the Obligations whenever requested by Lender, in its sole and absolute discretion, deeds of trust, mortgages, chattel mortgages, security agreements, financing statements and other Security Documents in form and substance satisfactory to Lender for the purpose of granting, confirming, and perfecting first and prior liens or security interests in any real or personal property now owned or hereafter acquired by Borrower.
28.
29.     Section 6.Perfection and Protection of Security Interests and Liens . Borrower will from time to time deliver, and will cause each other Restricted Person from time to time to deliver, to Lender any financing statements, continuation statements, extension agreements and other documents, properly completed and executed (and acknowledged when required) by Restricted Persons in form and substance satisfactory to Lender, which Lender requests for the purpose of perfecting, confirming, or protecting any Liens or other rights in Collateral securing any Obligations.
30.
(a)     Section 6.Bank Accounts; Offset.  To secure the repayment of the Obligations Borrower hereby grants to Lender a security interest, a lien, and a right of offset, each of which shall be in addition to all other interests, liens, and rights of Lender at common Law, under the Loan Documents, or otherwise, and each of which shall be upon and against  any and all monies, securities or other property (and the proceeds therefrom) of Borrower now or hereafter held or received by or in transit to Lender from or for the account of Borrower, whether for safekeeping, custody, pledge, transmission, collection or otherwise,  any and all deposits (general or special, time or demand, provisional or final) of Borrower with Lender, and  any other credits and claims of Borrower at any time existing against Lender, including claims under certificates of deposit. At any time and from time to time after the occurrence of any Default, Lender is hereby authorized to foreclose upon, or to offset against the Obligations then due and payable (in either

ENB 00400

EM001-006880

case without notice to Borrower), any and all items hereinabove referred to.  The remedies of foreclosure and offset are separate and cumulative, and either may be exercised independently of the other without regard to procedures or restrictions applicable to the other.

(b)

(c)    Section 6.17  Year 2000 Compliance . Borrower shall perform all acts reasonably necessary  to ensure that Borrower and its Subsidiaries and any business in which Borrower or its Subsidiaries holds a substantial interest continue to be Year 2000 Compliant.  Borrower shall, immediately upon request, provide to the Lender such certifications or other evidence of Borrower's compliance with the terms of this section as the Lender may from time to time require.

(d)

### ARTICLE VII - Negative Covenants of Borrower

To conform with the terms and conditions under which Lender is willing to have credit outstanding to Borrower, and to induce Lender to enter into this Agreement and make the Loans, Borrower warrants, covenants and agrees that until the full and final payment of the Obligations and the termination of this Agreement, unless Lender has previously agreed otherwise, Borrower shall not:

1.    Section 7.Indebtedness .  In any manner owe or be liable for Indebtedness except the Obligations.

2.

3.    Section 7.No Amendment . The Partnership Agreement shall not be amended in any manner without the express prior written consent of Lender.

4.

5.    Section 7.Liens . Create, incur, assume, or suffer to exist any Lien on any of its properties or assets, whether now owned or hereafter acquired except for Permitted Liens.

6.

7.    Section 7.Sales of Assets . Sell, transfer, or otherwise dispose of its properties or assets, whether now owned or hereafter acquired.

8.

9.    Section 7.Leasebacks . Enter into any agreement to sell or transfer any property and thereafter rent or lease as lessee such property or other property intended for the same use or purpose as the property sold or transferred.

10.

11.    Section 7.Loans or Advances . Make or agree to make or allow to remain outstanding any loans or advances to any Person.

12.

13.    Section 7.Investments . Except for Permitted Investments, acquire Investments in, or purchase or otherwise acquire all or substantially all of the assets of any Person.

14.

15.    Section 7.Distributions . Except as provided in Section 2.4 above, declare, pay, or make, whether in cash or property, any Distribution on, or purchase, redeem, or otherwise acquire for value, any share of any class of it's capital stock or any partnership or other interest at any time.

16.

17.    Section 7.Business Activities . Engage in business activities or operations of any kind except directly related to the acquiring, holding and selling of the Butcher Revenue Interest.

F:\data\wp\114\10991\10991504.114.wpd:bd:11/9/99:11:17 AM

ENB 00401

18.

19.    Section 7. <u>Transactions with Affiliates</u> . Directly or indirectly, enter into any transaction (including the sale, lease, or exchange of property or the rendering of service) with any of its Affiliates, other than upon fair and reasonable terms no less favorable than could be obtained in an arm's length transaction with a Person which was not an Affiliate, and if such transactions are on less than an arm's length basis, Borrower will provide Lender with a detailed explanation of the business purpose therefore; *provided, however,* the foregoing shall not apply to transactions between Borrower and Midcoast or any Affiliate of Midcoast; and *provided further, however,* the foregoing shall not apply to any transaction related to Borrower's acquisition of the Butcher Revenue Interest.

20.

21.    Section 7. <u>Change of Control</u> . There shall be no event or circumstance resulting in (i) a change of more than five percent (5%) in the percentage partnership interest of the Partners (i.e. 55% for K-Pipe and 45% for MLGC) from that set forth in the Partnership Agreement ; (ii) any Partner ceasing to be a partner in Borrower; (iii) the admission of any Person as a partner in Borrower other than the Partners: and (iv) a dissolution of Borrower or termination of the Partnership Agreement.

22.

23.    Section 7. <u>Limitation on Mergers</u> . Borrower will not merge or consolidate with or into any other Person.

24.

25.    Section 7. <u>Subsidiaries</u> . Borrower will not create or acquire any Subsidiaries.

26.

27.

28.

## ARTICLE VIII - <u>Events of Default and Remedies</u>

1.    Section 8. <u>Events of Default</u> . Whether Lender has made demand for payment of the Obligations or not, each of the following events constitutes an Event of Default under this Agreement:

2.

(a)    any Restricted Person fails to pay any principal component of any Obligation when due and payable, whether at a date for the payment of a fixed installment or as a contingent or other payment becomes due and payable or as a result of acceleration or otherwise;

(b)

(c)    any Restricted Person fails to pay any Obligation (other than the Obligations in subsection (a) above) when due and payable, whether at a date for the payment of a fixed installment or as a Butcher or other payment becomes due and payable or as a result of acceleration or otherwise, within three (3) Business Days after the same becomes due;

(d)

(e)    any "default" or "event of default" occurs under any Loan Document which defines either such term, and the same is not remedied within the applicable period of grace (if any) provided in such Loan Document;

(f)

(g)    Borrower fails to duly observe, perform or comply with any covenant, agreement or provision of <u>Section 6.4</u> or <u>Article VII</u>;

(h)

ENB 00402

(i)      Borrower fails (other than as referred to in subsections (a), (b), (c) or (d) above) to duly observe, perform or comply with any covenant, agreement, condition or provision of any Loan Document, and such failure remains unremedied for a period of thirty (30) days after notice of such failure is given by Lender to Borrower or Borrower first obtains knowledge thereof;

(j)

(k)      any representation or warranty previously, presently or hereafter made in writing by or on behalf of Borrower in connection with any Loan Document shall prove to have been false or incorrect in any material respect on any date on or as of which made, or any Loan Document at any time ceases to be valid, binding and enforceable as warranted in Section 5.5 for any reason other than its release or subordination by Lender;

(l)

(m)      Borrower fails to duly observe, perform or comply with any agreement with any Person or any term or condition of any instrument, if such agreement or instrument is materially significant to Borrower or materially significant to any Guarantor, and such failure is not remedied within the applicable period of grace (if any) provided in such agreement or instrument;

(n)

(o)      intentionally omitted;

(p)

(q)      intentionally omitted;

(r)

(s)      Borrower:

(t)

(i)      suffers the entry against it of a judgment, decree or order for relief by a Tribunal of competent jurisdiction in an involuntary proceeding commenced under any applicable bankruptcy, insolvency or other similar Law of any jurisdiction now or hereafter in effect, including the Bankruptcy Code or has any such proceeding commenced against it which remains undismissed for a period of sixty (60) days; or

(i)      commences a voluntary case under any applicable bankruptcy, insolvency or similar Law now or hereafter in effect, including the Bankruptcy Code; or applies for or consents to the entry of an order for relief in an involuntary case under any such Law; or makes a general assignment for the benefit of creditors; or fails generally to pay (or admits in writing its inability to pay) its debts as such debts become due; or takes corporate or other action to authorize any of the foregoing; or

(i)      suffers the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of all or a substantial part of its assets or of any part of the Collateral in a proceeding brought against or initiated by it, and such appointment or taking possession is neither made ineffective nor discharged within sixty (60) days after the making thereof, or such appointment or taking possession is at any time consented to, requested by, or acquiesced to by it; or

(i)      suffers the entry against it of a final judgment for the payment of money in excess of $100,000 (not covered by insurance satisfactory to Lender in its discretion), unless the same is discharged within thirty (30) days after the date of entry thereof or an appeal or

ENB 00403

EM001-006883

appropriate proceeding for review thereof is taken within such period and a stay of execution pending such appeal is obtained; or

(i)      suffers a writ or warrant of attachment or any similar process to be issued by any Tribunal against all or any substantial part of its assets or any part of the Collateral, and such writ or warrant of attachment or any similar process is not stayed or released within thirty (30) days after the entry or levy thereof or after any stay is vacated or set aside;

(i)      conceals, removes, or diverts, or permits to be concealed, removed, or diverted, any part of its property, with intent to hinder, delay, or defraud its creditors or any of them;

(ii)     makes or suffers a transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance, or similar Law;

(i)      makes any transfer of its property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid; or

(i)      shall have suffered or permitted, while insolvent, any creditor to obtain a Lien upon any of its property through legal proceedings or distraint which is not vacated within thirty (30) days from the date thereof;

(a)      any Material Adverse Change occurs and continues for a period of thirty (30) days; or

(b)

(c)      any Security Document shall for any reason not, or cease to, create valid and perfected first-priority Liens against the Collateral purportedly covered thereby and the failure to create or maintain such first-priority Lien shall materially and adversely affect the value of the Collateral taken as a whole.

(d)

(1)Upon the occurrence of an Event of Default described in subsection (j)(i), (j)(ii) or (j)(iii) of this section with respect to Borrower, all of the Obligations shall thereupon be immediately due and payable, without demand, presentment, notice of demand or of dishonor and nonpayment, protest, notice of protest, notice of intention to accelerate, declaration or notice of acceleration, or any other notice or declaration of any kind, all of which are hereby expressly waived by Borrower and each Restricted Person who at any time ratifies or approves this Agreement.  Upon any such acceleration, any obligation of Lender to make any further Loans shall be permanently terminated.  During the continuance of any other Event of Default, Lender at any time and from time to time may, without notice to Borrower or any other Restricted Person, do either or both of the following:  terminate any obligation of Lender to make Loans hereunder; and  declare any or all of the Obligations immediately due and payable, and all such Obligations shall thereupon be immediately due and payable, without demand, presentment, notice of demand or of dishonor and nonpayment, protest, notice of protest, notice of intention to accelerate, declaration or notice of acceleration, or any other notice or declaration of any kind, all of which are hereby expressly waived by Borrower and each Restricted Person who at any time ratifies or approves this Agreement.

(2)

2.       Section 8.Remedies .  If any Default shall occur and be continuing, Lender may protect and enforce its rights under the Loan Documents by any appropriate proceedings, including

F:\data\wp\114\10991099250d.114.wpd:bd:11/9/99:11:17 AM

ENB 00404

EM001-006884

proceedings for specific performance of any covenant or agreement contained in any Loan Document, and Lender may enforce the payment of any Obligations due it or enforce any other legal or equitable right which it may have. All rights, remedies and powers conferred upon Lender under the Loan Documents shall be deemed cumulative and not exclusive of any other rights, remedies or powers available under the Loan Documents or at Law or in equity.
3.

### ARTICLE IX - Miscellaneous

1.     Section 9. Waivers and Amendments; Acknowledgments .

(i)      Waivers and Amendments.  No failure or delay (whether by course of conduct or otherwise) by Lender in exercising any right, power or remedy which Lender may have under any of the Loan Documents shall operate as a waiver thereof or of any other right, power or remedy, nor shall any single or partial exercise by Lender of any such right, power or remedy preclude any other or further exercise thereof or of any other right, power or remedy.  No waiver of any provision of any Loan Document and no consent to any departure therefrom shall ever be effective unless it is in writing and signed as provided below in this section, and then such waiver or consent shall be effective only in the specific instances and for the purposes for which given and to the extent specified in such writing.  No notice to or demand on Borrower shall in any case of itself entitle Borrower to any other or further notice or demand in similar or other circumstances.  This Agreement and the other Loan Documents set forth the entire understanding between the parties hereto with respect to the transactions contemplated herein and therein and supersede all prior discussions and understandings with respect to the subject matter hereof and thereof, and no waiver, consent, release, modification or amendment of or supplement to this Agreement or the other Loan Documents shall be valid or effective against any party hereto unless the same is in writing and signed by  if such party is Borrower, by Borrower,  if such party is Lender, by Lender.

(ii)

(iii)      Acknowledgments and Admissions.  Borrower hereby represents, warrants, acknowledges and admits that  it has been advised by counsel in the negotiation, execution and delivery of the Loan Documents to which it is a party,  it has made an independent decision to enter into this Agreement and the other Loan Documents to which it is a party, without reliance on any representation, warranty, covenant or undertaking by Lender, whether written, oral or implicit, other than as expressly set out in this Agreement or in another Loan Document delivered on or after the date hereof,  there are no representations, warranties, covenants, undertakings or agreements by Lender as to the Loan Documents except as expressly set out in this Agreement or in another Loan Document delivered on or after the date hereof,  Lender has no fiduciary obligation toward Borrower with respect to any Loan Document or the transactions contemplated thereby,  the relationship pursuant to the Loan Documents between Borrower and the other Restricted Persons, on one hand, and Lender, on the other hand, is and shall be solely that of debtor and creditor, respectively,  no partnership or joint venture exists with respect to the Loan Documents between Borrower and Lender,  should an Event of Default or Default occur or exist, Lender will determine in its sole discretion and for its own reasons what remedies and actions it will or will not exercise or take at that time,  without limiting any of the foregoing, Borrower is not relying upon any representation or covenant by Lender, or any representative thereof, and no such representation or covenant has been made, that Lender will, at the time of an Event of Default or Default, or at any other time, waive, negotiate, discuss, or take or refrain

F:\data\wp\U1-01099\10992304.114.wpd\bd:11/9/99:11:17 AM

**ENB 00405**

from taking any action permitted under the Loan Documents with respect to any such Event of Default or Default or any other provision of the Loan Documents, and Lender has relied upon the truthfulness of the acknowledgments in this section in deciding to execute and deliver this Agreement and to become obligated hereunder.

(iv)

(b)      Joint Acknowledgment. THIS WRITTEN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

(c)

(d)      THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

(e)

2.      Section 9.Survival of Agreements; Cumulative Nature . All of Borrower's various representations, warranties, covenants and agreements in the Loan Documents shall survive the execution and delivery of this Agreement and the other Loan Documents and the performance hereof and thereof, including the making or granting of the Loans and the delivery of the Note and the other Loan Documents, and shall further survive until all of the Obligations are paid in full to Lender and all of Lender's obligations to Borrower are terminated. All statements and agreements contained in any certificate or other instrument delivered by Borrower to Lender under any Loan Document shall be deemed representations and warranties by Borrower or agreements and covenants of Borrower under this Agreement. The representations, warranties, indemnities, and covenants made by Restricted Persons in the Loan Documents, and the rights, powers, and privileges granted to Lender in the Loan Documents, are cumulative, and, except for expressly specified waivers and consents, no Loan Document shall be construed in the context of another to diminish, nullify, or otherwise reduce the benefit to Lender of any such representation, warranty, indemnity, covenant, right, power or privilege. In particular and without limitation, no exception set out in this Agreement to any representation, warranty, indemnity, or covenant herein contained shall apply to any similar representation, warranty, indemnity, or covenant contained in any other Loan Document, and each such similar representation, warranty, indemnity, or covenant shall be subject only to those exceptions which are expressly made applicable to it by the terms of the various Loan Documents.

3.

(a)      Section 9.Notices . All notices, requests, consents, demands and other communications required or permitted under any Loan Document shall be in writing, unless otherwise specifically provided in such Loan Document, and shall be deemed sufficiently given or furnished if delivered by personal delivery, by facsimile or other electronic transmission, by delivery service with proof of delivery, or by registered or certified United States mail, postage prepaid, to Borrower and Restricted Persons at the address of Borrower specified on the signature pages hereto and to Lender at its address specified on the signature pages hereto (unless changed by similar notice in writing given by the particular Person whose address is to be changed). Any such notice or communication shall be deemed to have been given in the case of personal delivery or delivery service, as of the date of first attempted delivery during normal business hours at the address provided herein, in the case of facsimile or other electronic transmission, upon receipt, or in the case of registered or certified United States mail, three days after deposit

F:\data\wp\1114\1099\1099250d.114.wpd\bd:11/9/99:11:17 AM

ENB 00406

EM001-006886

in the mail; *provided, however,* that no Borrowing Notice shall become effective until actually received by Lender.

(b)

4.       Section 9.Payment of Expenses; Indemnity .

5.

(i)        Payment of Expenses. Whether or not the transactions contemplated by this Agreement are consummated, Borrower will promptly (and in any event, within thirty (30) days after any invoice or other statement or notice) pay:  all transfer, stamp, mortgage, documentary or other similar taxes, assessments or charges levied by any governmental or revenue authority in respect of this Agreement or any of the other Loan Documents or any other document referred to herein or therein;  all reasonable costs and expenses incurred by or on behalf of Lender (including without limitation attorneys' fees, consultants' fees and engineering fees, travel costs and miscellaneous expenses) in connection with  the negotiation, preparation, due diligence, syndication, execution and delivery and administration of the Loan Documents, and any and all consents, waivers or other documents or instruments relating thereto,  the filing, recording, refiling and re-recording of any Loan Documents and any other documents or instruments or further assurances required to be filed or recorded or refiled or re-recorded by the terms of any Loan Document,  the borrowings hereunder and other action reasonably required in the course of administration hereof,  monitoring or confirming (or preparation or negotiation of any document related to) Borrower's compliance with any covenants or conditions contained in this Agreement or in any Loan Document; and  all reasonable costs and expenses incurred by or on behalf of Lender (including without limitation attorneys' fees, consultants' fees and accounting fees) in connection with the defense or enforcement of any of the Loan Documents (including this section) or the defense of Lender's exercise of its rights thereunder.  In addition to the foregoing, until all Obligations have been paid in full, Borrower will also pay or reimburse Lender for all reasonable out-of-pocket costs and expenses of Lender or its agents or employees in connection with the continuing administration of the Loans and the related due diligence of Lender, including travel and miscellaneous expenses and fees and expenses of Lender's outside counsel, reserve engineers and consultants engaged in connection with the Loan Documents.

(a)        Indemnity.  Borrower agrees to indemnify Lender and their Affiliates, upon demand, from and against any and all liabilities, obligations, claims, losses, damages, penalties, fines, actions, judgments, suits, settlements, costs, expenses or disbursements (including reasonable fees of attorneys, accountants, experts and advisors) of any kind or nature whatsoever (in this section collectively called "liabilities and costs") which to any extent (in whole or in part) may be imposed on, incurred by, or asserted against Lender or its Affiliates growing out of, resulting from or in any other way associated with any of the Collateral, the Loan Documents and the transactions and events (including the enforcement or defense thereof) at any time associated therewith or contemplated therein (whether arising in contract or in tort or otherwise and including any violation or noncompliance with any Environmental Laws by Lender or its Affiliates or any other Person or any liabilities or duties of Lender or its Affiliates or any other Person with respect to Hazardous Materials found in or released into the environment).

(b)

(c)THE FOREGOING INDEMNIFICATION SHALL APPLY AT ALL TIMES AFTER BORROWER'S ACCEPTANCE OF THE LENDER'S COMMITMENTS

F:\data\wp\116\1099\1099250d.114.wpd:bd:11/9/99:11:17 AM

ENB 00407

**NOTWITHSTANDING ANY FAILURE TO CLOSE AND WHETHER OR NOT SUCH LIABILITIES AND COSTS ARE IN ANY WAY OR TO ANY EXTENT OWED, IN WHOLE OR IN PART, UNDER ANY CLAIM OR THEORY OF STRICT LIABILITY OR CAUSED, IN WHOLE OR IN PART BY ANY NEGLIGENT ACT OR OMISSION OF ANY KIND BY LENDER OR ITS AFFILIATES,**

(d)

(e)*provided only* that Lender shall not be entitled under this section to receive indemnification for that portion, if any, of any liabilities and costs which is proximately caused by its own individual gross negligence or willful misconduct, as determined in a final judgment.  If any Person (including Borrower or any of its Affiliates) ever alleges such gross negligence or willful misconduct by Lender, the indemnification provided for in this section shall nonetheless be paid upon demand, subject to later adjustment or reimbursement, until such time as a court of competent jurisdiction enters a final judgment as to the extent and effect of the alleged gross negligence or willful misconduct.  As used in this section the term "Lender" shall refer not only to each Person designated as such in Section 1.1 but also to each director, officer, agent, attorney, employee, representative and Affiliate of such Person.

1.	Section 9.Joint and Several Liability; Parties in Interest .  All Obligations which are incurred by two or more Restricted Persons shall be their joint and several obligations and liabilities.  All grants, covenants and agreements contained in the Loan Documents shall bind and inure to the benefit of the parties thereto and their respective successors and assigns; *provided, however,* that no Restricted Person may assign or transfer any of its rights or delegate any of its duties or obligations under any Loan Document without the prior consent of Lender.

1.	Section 9.Intentionally Omitted .

2.

(a)	Section 9.Confidentiality .  Lender agrees to keep confidential any information furnished or made available to it by Borrower pursuant to this Agreement that is marked confidential; *provided* that nothing herein shall prevent Lender from disclosing such information  to any other Lender or any Affiliate of Lender, or any officer, director, employee, agent, or advisor of Lender or Affiliate of Lender,  to any other Person if reasonably incidental to the administration of the credit facility provided herein,  as required by any Law,  upon the order of any Tribunal,  upon the request or demand of any Tribunal,  that is or becomes available to the public or that is or becomes available to Lender other than as a result of a disclosure by Lender prohibited by this Agreement,  in connection with any litigation to which Lender or any of its Affiliates may be a party,  to the extent necessary in connection with the exercise of any remedy under this Agreement or any other Loan Document, and  subject to provisions substantially similar to those contained in this section, to any actual or proposed participant or assignee.

(b)

3.	Section 9.Governing Law; Submission to Process .  **Except to the extent that the law of another jurisdiction is expressly elected in a Loan Document, the Loan Documents shall be deemed contracts and instruments made under the Laws of the State of Texas and shall be construed and enforced in accordance with and governed by the Laws of the State of Texas and the Laws of the United States, without regard to principles of conflicts of law.  Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving tri-party accounts) does not apply to this Agreement or to the Note.  Borrower**

F:\data\wp\114\099\1099250\114.wpd;bd;11/9/99;11:17 AM

ENB 00408

EM001-006888

hereby irrevocably submits itself and each other Restricted Person to the jurisdiction of the state and federal courts sitting in the State of Texas and agrees and consents that service of process may be made upon it or Borrower in any legal proceeding relating to the Loan Documents or the Obligations by any means allowed under Texas or federal law. Any legal proceeding arising out of or in any way related to any of the Loan Documents shall be brought and litigated exclusively in the United States District Court for the Southern District of Texas, to the extent it has subject matter jurisdiction, and otherwise in the Texas District Courts sitting in Harris County, Texas. The parties hereto hereby waive and agree not to assert, by way of motion, as a defense or otherwise, that any such proceeding is brought in an inconvenient forum or that the venue thereof is improper, and further agree to a transfer of any such proceeding to a federal court sitting in the State of Texas to the extent that it has subject matter jurisdiction, and otherwise to a state court in Houston, Texas. In furtherance thereof, Borrower and Lender each hereby acknowledge and agree that it was not inconvenient for them to negotiate and receive funding of the transactions contemplated by this Agreement in such county and that it will be neither inconvenient nor unfair to litigate or otherwise resolve any disputes or claims in a court sitting in such county.

4.

(a)     Section 9.Limitation on Interest . Lender, Restricted Persons and any other parties to the Loan Documents intend to contract in strict compliance with applicable usury Law from time to time in effect. In furtherance thereof such Persons stipulate and agree that none of the terms and provisions contained in the Loan Documents shall ever be construed to create a contract to pay for the use, forbearance or detention of money, interest in excess of the maximum amount of interest permitted to be charged by applicable Law from time to time in effect. Neither Borrower nor any present or future guarantors, endorsers, or other Persons hereafter becoming liable for payment of any Obligation shall ever be liable for unearned interest thereon or shall ever be required to pay interest thereon in excess of the maximum amount that may be lawfully contracted for, charged, or received under applicable Law from time to time in effect, and the provisions of this section shall control over all other provisions of the Loan Documents which may be in conflict or apparent conflict herewith. Lender expressly disavows any intention to contract for, charge, or collect excessive unearned interest or finance charges in the event the maturity of any Obligation is accelerated. If the maturity of any Obligation is accelerated for any reason,  any Obligation is prepaid and as a result any amounts held to constitute interest are determined to be in excess of the legal maximum, or  Lender or any other holder of any or all of the Obligations shall otherwise collect moneys which are determined to constitute interest which would otherwise increase the interest on any or all of the Obligations to an amount in excess of that permitted to be charged by applicable Law then in effect, then all sums determined to constitute interest in excess of such legal limit shall, without penalty, be promptly applied to reduce the then outstanding principal of the related Obligations or, at Lender's or holder's option, promptly returned to Borrower or the other payor thereof upon such determination. In determining whether or not the interest paid or payable, under any specific circumstance, exceeds the maximum amount permitted under applicable Law, Lender and Restricted Persons (and any other payors thereof) shall to the greatest extent permitted under applicable Law, characterize any non-principal payment as an expense, fee or premium rather than as interest, exclude voluntary prepayments and the effects thereof, and  amortize, prorate, allocate, and spread the total amount of interest throughout the entire contemplated term of the instruments evidencing the Obligations in accordance with the amounts outstanding from time to time

F:\data\wp\116\1099\1099230d.114.wpd:bd; 11/9/99.11:17 AM

ENB 00409

EM001-006889

thereunder and the maximum legal rate of interest from time to time in effect under applicable Law in order to lawfully contract for, charge, or receive the maximum amount of interest permitted under applicable Law.  In the event applicable Law provides for an interest ceiling under Chapter 303 of the Texas Finance Code (the "Texas Finance Code") as amended, for that day, the ceiling shall be the "weekly ceiling" as defined in the Texas Finance Code; *provided* that if any applicable Law permits greater interest, the Law permitting the greatest interest shall apply. As used in this section the term "applicable Law" means the Laws of the State of Texas or the Laws of the United States, whichever Laws allow the greater interest, as such Laws now exist or may be changed or amended or come into effect in the future.

(b)

5.      Section 9.Termination; Limited Survival .  In its sole and absolute discretion Borrower may at any time that no Obligations are owing elect in a written notice delivered to Lender to terminate this Agreement.  Upon receipt by Lender of such a notice, if no Obligations are then owing this Agreement and all other Loan Documents shall thereupon be terminated and the parties thereto released from all prospective obligations thereunder.  Notwithstanding the foregoing or anything herein to the contrary, any waivers or admissions made by Borrower in any Loan Document, any Obligations under Sections 3.2 through 3.6, and any obligations which any Person may have to indemnify or compensate Lender shall survive any termination of this Agreement or any other Loan Document.  At the request and expense of Borrower, Lender shall prepare and execute all necessary instruments to reflect and effect such termination of the Loan Documents.

6.

7.      Section 9.Severability .  If any term or provision of any Loan Document shall be determined to be illegal or unenforceable all other terms and provisions of the Loan Documents shall nevertheless remain effective and shall be enforced to the fullest extent permitted by applicable Law.

8.

9.      Section 9.Counterparts; Fax .  This Agreement may be separately executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to constitute one and the same Agreement.  This Agreement and the Loan Documents may be validly executed and delivered by facsimile or other electronic transmission.

10.

(a)      Section 9.Waiver of Jury Trial, Punitive Damages, etc.  **Borrower and Lender each hereby knowingly, voluntarily, intentionally, and irrevocably  waives, to the maximum extent not prohibited by Law, any right it may have to a trial by jury in respect of any litigation based hereon, or directly or indirectly at any time arising out of, under or in connection with the Loan Documents or any transaction contemplated thereby or associated therewith, before or after maturity;  waives, to the maximum extent not prohibited by Law, any right it may have to claim or recover in any such litigation any "Special Damages", as defined below,  certifies that no party hereto nor any representative or agent or counsel for any party hereto has represented, expressly or otherwise, or implied that such party would not, in the event of litigation, seek to enforce the foregoing waivers, and  acknowledges that it has been induced to enter into this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby by, among other things, the mutual waivers and certifications contained in this section. As used in this section, "Special Damages" includes all special, consequential, exemplary, or punitive damages**

F:\data\wp\114\1099\1099\230d.114.wpd:bd:11/9/99:11:17 AM

ENB 00410

(regardless of how named), but does not include any payments or funds which any party hereto has expressly promised to pay or deliver to any other party hereto.

(b)

(c)

Remainder of Page Intentionally Left Blank.

F:\data\wp314\1099\1099250d.114.wpd.bd:11/9/99:11:17 AM

ENB 00411

EM001-006891

From: Craig J. Hoffman  To: Larry Austin                    Date: 11/7/99  Time: 6:4a:3o PM

IN WITNESS WHEREOF, this Agreement is executed as of the date first written above.

BUTCHER INTEREST PARTNERSHIP,
a Delaware partnership
Borrower

By:     K-PIPE GROUP, INC.,
        a Kansas corporation, general partner

        By: _Larry J. Austin_
        Name: _Larry J. Austin_
        Title: _President_

By:     MID LOUISIANA GAS COMPANY,
        a Delaware corporation, general partner

        By: ____
            Richard A. Robert
            Treasurer

        Address:

        Butcher Interest Partnership
        c/o Midcoast Energy Resources, Inc.
        1100 Louisiana, Suite 2950
        Houston, Texas 77002
        Attention: Richard A. Robert

        Telephone: (713) 650-8900
        Fax: (713) 650-3232

To Butcher Interest Partnership
Credit Agreement

ENB 00412

EM001-006892

BANK OF AMERICA, N.A.,
Lender


By:___
    Patrick M. Delaney
    Managing Director


**Address for Eurodollar Lending Office and
Domestic Lending Office:**

Bank of America, N.A.
Houston Main Banking Center
700 Louisiana Street
Energy Finance Division, 8th Floor
Houston, Texas  77002
Attention:  Patrick M. Delaney

Telephone:  (713) 247-7373
Fax:  (713) 247-6568

## SECURITY AGREEMENT

BUTCHER INTEREST PARTNERSHIP, a Delaware partnership (herein called "Debtor"), whose sole general partners are K-PIPE GROUP, INC., a Kansas corporation, and MID LOUISIANA GAS COMPANY, a Delaware corporation and (herein called "Lender") with its office and its address for notice being c/o Midcoast Energy Resources, Inc., 1100 Louisiana Street, Suite 2950, Houston, Texas 77002 (hereinafter called "Debtor"), for value received, the receipt and sufficiency of which are hereby acknowledged, hereby grants to BANK OF AMERICA, N.A, a national banking association (hereinafter called "Secured Party"), the security interest hereinafter set forth and agrees with Secured Party as follows:

## SECTION 1. SECURITY INTEREST.

   1.1   <u>Collateral</u>. Debtor hereby grants to Secured Party a security interest in and agrees that Secured Party has and shall continue to have a security interest in the following property, including without limitation the items described on Exhibits, if any, attached hereto and made a part hereof, to-wit:

ACCOUNTS:

      All accounts now owned or existing as well as any and all that may hereafter arise or be acquired by Debtor, and all the proceeds and products thereof, including without limitation, all notes, drafts, acceptances, instruments and chattel paper arising therefrom, and all returned or repossessed goods arising from or relating to any such accounts, or other proceeds of any sale or other disposition of inventory;

INVENTORY:

      All of Debtor's inventory, including all goods, merchandise, raw materials, goods in process, finished goods and other tangible personal property now owned or hereafter acquired and held for sale or lease or furnished or to be furnished under contracts for service or used or consumed in Debtor's business and all additions and accessions thereto and contracts with respect thereto and all documents of title evidencing or representing any part thereof, and all products and proceeds thereof;

FIXTURES:

      All of Debtor's fixtures and appurtenances thereto, and such other goods, chattels, fixtures, equipment and personal property affixed or in any manner attached to the real estate and or building(s) or structure(s) described in Exhibit "A" attached hereto, including all additions and accessions thereto and replacements thereof and articles in substitution therefor, howsoever attached or affixed;

EQUIPMENT:

ENB 00414

EM001-006894