All equipment of every nature and description whatsoever now owned or hereafter acquired by Debtor including all accessions, appurtenances and additions thereto and substitutions therefor, wheresoever located, including all tools, parts and accessories used in connection therewith;

GENERAL INTANGIBLES:

All personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money;

CHATTEL PAPER:

All of Debtor's interest under lease agreements and other instruments or documents, whether now existing or owned by Debtor or hereafter arising or acquired by Debtor, evidencing both a debt and security interest in or lease of specific goods;

INSTRUMENTS AND DOCUMENTS:

All of Debtor's now owned or existing as well as hereafter acquired or arising instruments, documents and money;

and accessions, additions and attachments thereto and the rentals, the proceeds and products thereof, including without limitation, all cash, general intangibles, accounts, inventory, equipment, fixtures, farm products, notes, drafts, acceptances, instruments and chattel paper or other property, benefits or rights arising therefrom, and in and to all returned or repossessed goods arising from or relating to any of the collateral described herein or other proceeds of any sale or other disposition of such collateral (all of the foregoing hereinafter sometimes called the "Collateral").

1.2  Obligations.  The security interest granted hereby is to secure the payment of (i) one certain demand promissory note of even date herewith in the original principal sum of $6,100,000.00, and any and all extensions, renewals and rearrangements thereof, executed by Debtor and payable to the order of Secured Party in the manner as therein provided, (ii) all indebtedness and liabilities of Debtor owing to Secured Party pursuant to that certain Credit Agreement of even date herewith between Debtor and Secured Party (as amended or supplemented from time to time, the "Credit Agreement"), and (iii) any and all other indebtedness and liabilities whatsoever of Debtor to Secured Party whether direct or indirect, absolute or contingent, due or to become due and whether now existing or hereafter arising and howsoever evidenced or acquired, whether joint or several (all of which are hereinafter sometimes called the "Obligations"). The Obligations shall be due and payable in full on demand made by Secured Party (whether or not an Event of Default has occurred or is continuing). Debtor hereby acknowledges that Secured Party, in its sole and absolute discretion, may make demand for payment on the Obligations at any time and without liability to Debtor for making such demand.

SECTION 2. REPRESENTATIONS, WARRANTIES AND COVENANTS OF DEBTOR.

F:\data\wp\06\11199\119900db.061 wpd.bd:11/9/99:11:18 AM

2

ENB 00415

EM001-006895

2.1    Ownership.   Except for the security interest granted hereby and any security interests approved by Secured Party, the Debtor is, and as to the Collateral acquired after the date hereof which is included within the security interest specified in Section 1 hereof, Debtor will be, the owner of all such Collateral free from all adverse claims, security interests and encumbrances.

2.2.    Liens.   Except for liens in favor of Secured Party, there is no financing statement now on file in any public office covering any part of the Collateral, and so long as any amount remains unpaid on any Obligations of the Debtor to Secured Party, Debtor will not execute and there will not be on file in any public office any such enforceable financing statement or statements except the financing statement filed or to be filed in respect to the security interest hereby granted and in respect of other security interests in favor of Secured Party.

2.3    Financial Information.   Subject to any limitation stated therein or in connection therewith, all information furnished to Secured Party concerning the Collateral and proceeds thereof, or otherwise for the purpose of obtaining credit or an extension of credit, is or will be at the time the same is furnished, accurate and correct in all material respects.

2.4    Business Use.   The Collateral will be used by the Debtor primarily for business use.

2.5    Removal.   Except as herein provided, Debtor will not remove the Collateral from the county or counties designated at the beginning of this Agreement without the written consent of Secured Party.   The address of Debtor designated at the beginning of this Agreement is Debtor's place of business if Debtor has no place of business.   Debtor agrees to notify Secured Party promptly of any change in such address.

## SECTION 3. PROVISIONS REGARDING ACCOUNTS.

The following provisions shall apply to all accounts included within the Collateral:

3.1    Eligible Accounts.   The term "account", as used in this Agreement shall have the same meaning as set forth in the Uniform Commercial Code of Texas (the "UCC") in effect as of the date of execution hereof, and as set forth in any amendment to the UCC to become effective after the date of execution hereof, and also shall include all present and future notes, instruments, documents, general intangibles, drafts, acceptances and chattel paper of Debtor, and the proceeds thereof.   As of the time any account becomes subject to such security interest, Debtor shall be deemed to have warranted as to each and all of such accounts (i) that each account and all papers and documents relating thereto are genuine and in all material respects what they purport to be, (ii) that each account is valid and subsisting and arises out of a bona fide sale of goods sold and delivered to, or out of and for services therefore actually rendered by Debtor to, the account debtor named in the account, and (iii) that the amount of the account represented as owing is the correct account actually and unconditionally owing except for normal cash discounts and is not subject to any set-offs, credits, deductions or countercharges.

F:\data\wp\061\1199\1199004b.061.wpd;bd;11/9/99;11:18 AM

ENB 00416

EM001-006896

3.2   Collection.   Prior to the occurrence of an Event of Default, Secured Party authorizes Debtor to collect its Accounts.   Secured Party shall have the right in its own name or in the name of Debtor after  demand is made for payment of the Obligations or an Event of Default by Debtor and upon five (5) days' advance notice to Debtor, to demand, collect, receive, receipt for, sue for, compound and give acquittal for, any and all amounts due or to become due on the accounts and to endorse the name of Debtor on all commercial paper given in payment or part payment thereof, and in its discretion to file any claim or take any other action or proceeding which Secured Party may deem necessary or appropriate to protect and preserve and realize upon the security interest of Secured Party in the Collateral.   In order to assure collection of accounts in which Secured Party has a security interest hereunder, Secured Party may notify the post office authorities to change the address for delivery of mail addressed to Debtor to such address as Secured Party may designate, and to open and dispose of such mail and receive the collections of accounts included herewith.

3.3   Further Action.   Debtor will from time to time execute such further instruments and do such further acts and things as Secured Party may reasonably require, by way of further assurance to Secured Party, including without limitation, an assignment or other form of identification in the form required by Secured Party of all accounts and/or chattel paper, together with such other evidence of the existence and identity of such accounts or chattel paper as Secured Party may reasonably require, and Debtor will mark its books and records and/or chattel paper, as the case may be, to reflect the assignment of any such accounts and/or chattel paper, or other accounts and/or chattel paper which are included within the security interest specified in Section 1 hereof.

## SECTION 4. PROVISIONS REGARDING INVENTORY.

The following provisions shall apply to all inventory included within the Collateral:

4.1   Location.   Debtor will promptly notify Secured Party in writing of any addition to, change in or discontinuance of its places of business, the places at which inventory is located as shown herein, the location of its chief executive office and the location of the office where it keeps its records as set forth herein.   All Collateral will be located at Debtor's places of business existing on the date hereof as modified by any notice(s) given pursuant hereto.

4.2   Use of Inventory.   Until an Event of Default, Debtor may use the inventory in any lawful manner not inconsistent with this Agreement or with the terms or conditions of any policy of insurance thereon and may also sell that part of the Collateral consisting of inventory provided that all of such sales are in the ordinary course of business.   A sale in the ordinary course of business does not include a transfer in partial or total satisfaction of a debt.   Until an Event of Default, Debtor may also use and consume any raw materials or supplies, the use and consumption of which are necessary in order to carry on Debtor's business.

4.3   Proceeds.   All accounts which are proceeds of the inventory collateral covered hereby shall be subject to all of the terms and provisions hereof pertaining to accounts.

## SECTION 5. GENERAL COVENANTS.

F:\data\wp\061\11199\11990045.061.wpd:bd:11/9/99:11:18 AM

ENB 00417

EM001-006897

5.1     Financing Statements.  Debtor agrees to execute and deliver such financing statement or statements, or amendments thereof or supplements thereto, or other instruments as Secured Party may from time to time require in order to comply with the UCC (or other applicable State law of the jurisdiction where any of the Collateral is located) and to preserve and protect the security interest hereby granted.

5.2     Performance by Secured Party.  Secured Party may, at its option, after demand is made for payment of the Obligations or whether before or after an Event of Default, but without obligation to Debtor, discharge taxes, liens or security interests or other encumbrances at any time levied or placed upon the Collateral, and may place and pay for insurance thereon, or pay for the repair, improvement, maintenance and preservation of the Collateral and pay any filing or recording fees necessary to preserve and protect the security interest hereby granted.  Debtor agrees to reimburse Secured Party on demand for any payment made or any expense incurred by Secured Party pursuant to the foregoing authorization, and such amount shall constitute additional obligations of Debtor which shall be secured by and entitled to the benefits of this Agreement.  Debtor agrees to pay interest on such amounts at a rate per annum at all times equal to the Default Rate (as defined in the Credit Agreement) applicable with respect to a Base Rate Loan (as defined in the Credit Agreement) until paid by Debtor.

5.3     Collection of Accounts and Chattel Paper.  Prior to the occurrence of after demand is made for payment of the Obligations or an Event of Default, Secured Party authorizes Debtor to collect its accounts.  Secured Party shall have the right at any time, in its own name or in the name of Debtor, after demand is made for payment of the Obligations or after an Event of Default by Debtor and upon five (5) days' notice to Debtor, to notify any and all account debtors or lessees under chattel paper to make payment thereof directly to Secured Party and to demand, collect, receive, receipt for, sue for, compound for and give acquittal for, any and all amounts due or to become due on the accounts and chattel paper, and to endorse the name of Debtor on all commercial paper or chattel paper, as the case may be, given in payment or part payment thereof, and in its discretion to file any claim or take any other action or proceeding which Secured Party may deem necessary or appropriate to protect and preserve and realize upon the security interest of Secured Party in the Collateral; but to the extent Secured Party does not so elect, Debtor shall continue to collect the accounts and rents under chattel paper.  Except as otherwise permitted by the provision to this sentence, all proceeds of collection of accounts and chattel paper received by Debtor shall forthwith be accounted for and transmitted to Secured Party in the form as re-ceived by Debtor and shall not be commingled with any funds of Debtor; provided, however, that prior to an Event of Default by Debtor in the payment of any Obligations to Secured Party or until the privilege given to Debtor by this provision shall be revoked by Secured Party in writing, Debtor need transmit to Secured Party only the proceeds of accounts included in the identification or assignment made pursuant to Section 3.3.

5.4     Inspection of Collateral.  Debtor shall at all reasonable times during normal business hours allow Secured Party by or through any of its officers, agents, attorneys or accountants, to examine or inspect the Collateral wherever located and to examine, inspect and make extracts from Debtor's books and records.  Debtor shall do, make execute and deliver all such additional and further acts, things, deeds, insurances, instruments as Secured Party may require, to more completely vest in and assure to Secured Party its rights hereunder and in or to the Collateral.

F:\data\wp\061\1199R11990043t.061.wpd.bd:11/9/99.11:18 AM

ENB 00418

5.5   Insurance. Debtor shall have and maintain insurance at all times with respect to all tangible Collateral covered hereby insuring against risks of fire (including so-called extended coverage), theft and other risks as Secured Party may reasonably require, containing such terms, in such form and amounts and written by such companies as may be reasonably satisfactory to Secured Party, all of such insurance to contain loss payable clauses in favor of Secured Party as its interest may appear. All policies of insurance shall provide for ten (10) days' written minimum cancellation notice to Secured Party and at request of Secured Party shall be delivered to and held by it. Secured Party is hereby authorized to act as attorney for Debtor in obtaining, adjusting, settling and canceling such insurance and endorsing any drafts or instruments. Secured Party shall be authorized to apply the proceeds from any insurance to the Obligations secured hereby whether or not such Obligations are then due and payable.

5.6   Additional Collateral. As additional security for payment of the Obligations, Debtor hereby grants to Secured Party a security interest, and a contractual pledge and assignment of, in and to any and all money, property, accounts, securities, documents, chattel paper, claims, demands, instruments, items or deposits of Debtor, or to which Debtor is a party, now held or hereafter coming within Secured Party's custody or control, including without limitation, all certificates of deposit and other depository accounts, whether such have matured or the exercise of Secured Party's rights results in loss of interest or other penalty on such deposits. Without prior notice to or demand upon Debtor, Secured Party may exercise its rights granted above, as well as other rights and remedies at law and equity (all of which are cumulative), at any time after demand is made for payment of the Obligations or when an Event of Default has occurred and is continuing.

## SECTION 6. DEFAULT.

6.1   Event of Default. The making of demand for payment of the Obligations by Secured Party or the occurrence of any Event of Default under the Credit Agreement shall constitute an event of default hereunder (herein called an "Event of Default").

6.2   Maturity of Obligation. Upon the occurrence of an Event of Default, and at any time thereafter, Secured Party, may, at its option, without demand, notice of intention to accelerate, notice of acceleration, notice of nonpayment, presentment, protest, notice of dishonor, or any other notice whatsoever, to the Debtor, declare all Obligations secured hereby immediately due and payable and Secured Party shall thereupon have the rights and remedies of a secured party under the UCC and as otherwise granted herein or under any applicable law or in any other agreement executed by Debtor (all of which rights and remedies shall be cumulative), including, without limitation, the right to sell, lease or otherwise dispose of any or all of the Collateral and to apply the proceeds thereof toward payment of any costs and expenses and attorney's fees and legal expenses thereby incurred by the Secured Party and toward payment of the Obligations in such order or manner as the Secured Party may elect. Secured Party shall have the right to take immediate possession of the Collateral, with or without process of law, and for that purpose Secured Party may enter upon any premises on which the Collateral or any part thereof may be situated and remove the same therefrom. Secured Party may require Debtor to assemble the Collateral and make it available to Secured Party at a place to be designated by the Secured Party which is reasonably convenient to both parties. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market,

ENB 00419

EM001-006899

Secured Party will send Debtor reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or other disposition thereof is to be made. The requirement of sending a reasonable notice shall be met if such notice is mailed, postage prepaid, to Debtor at the address designated at the beginning of this Agreement at least ten (10) days before the time of the sale or disposition. Expenses of sale, legal expenses, plus interest thereon at a rate per annum at all times equal to the highest lawful contract rate permitted by applicable usury laws, shall constitute additional Obligations of Debtor which shall be due on demand and which shall be secured by and entitled to the benefits of this Agreement. If the proceeds of any sale or other lawful disposition by Secured Party of the Collateral following its retaking are insufficient to pay the expenses of retaking, repairing, holding, preparing the Collateral for sale, selling it and the like, to satisfy the Obligations of Debtor to Secured Party, then Debtor agrees to pay any deficiency, but Debtor shall be entitled to any surplus if one results after lawful application of all such proceeds.

  6.3 <u>Remedy</u>.  Secured Party may remedy any Event of Default and may waive any default without waiving the Event of Default remedied or without waiving any other prior or subsequent Event of Default.

  6.4 <u>Cumulative Remedies</u>.  The remedies of Secured Party hereunder are cumulative, and the exercise of any one or more of the remedies provided herein shall not be construed as a waiver of any of the other remedies of Secured Party.

<u>SECTION 7. GENERAL</u>.

  7.1 <u>Partial Invalidity and Construction</u>.  Any provision hereof found to be invalid under the law of the State of Texas, or any other State having jurisdiction or other applicable law, shall be invalid only with respect to the offending provision. All words used herein shall be construed to be of such gender or number as the circumstances require. If this Agreement is executed by more than one Debtor, the obligations of all such Debtors shall be joint and several. This Agreement shall be binding upon the heirs, personal representatives, successors or assigns of the parties hereto, but shall inure to the benefit of successor or assigns of Secured Party only. The law of the State of Texas shall apply to this Agreement and its construction and interpretation.

  7.2 <u>Reproduction as Financing Statement</u>.  Any carbon, photographic or other reproduction of any financing statement signed by Debtor is sufficient as a financing statement for all purposes, including without limitation, filing in any state as may be permitted by the provisions of the Uniform Commercial Code of such state.

  7.3 <u>Intentionally Omitted</u>.

  7.4 <u>Continuing Effect</u>.  The security interest hereby granted and all the terms and provisions hereof shall be deemed a continuing security agreement and shall continue in full force and effect, and all the terms and provisions hereof shall remain effective as between the parties, until first to occur of the following: (i) the expiration of four (4) years from the date of payment of Debtor's last Obligations to Secured Party; or (ii) repayment by Debtor of all

F:\data\wp061\1199\11990046.061.wpd:bd:11/9/99:11:18 AM

ENB 00420

EM001-006900

Obligations secured hereby and the giving by Debtor of ten (10) days' written notice of revocation of the terms and provisions hereof.

7.5    Credit Agreement.   This Agreement is being executed in connection with the Credit Agreement, reference to which is here made for all purposes.

7.6    **NO ORAL AGREEMENTS.   THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

Remainder of Page Intentionally Left Blank.

F:\data\wp\061\1199\1199004b.061.wpd;bd:11/9/99;11:18 AM

ENB 00421

EM001-006901

IN WITNESS WHEREOF, this Agreement is executed this 8th day of November, 1999.

DEBTOR:

BUTCHER INTEREST PARTNERSHIP,
a Delaware partnership
Borrower

By:   K-PIPE GROUP, INC.,
      a Kansas corporation, general partner

      By:___

Name:_____

Title:_____

By:   MID LOUISIANA GAS COMPANY,
      a Delaware corporation, general partner

      By:___
            Richard A. Robert
            Treasurer

To Butcher Interest Partnership
Security Agreement

ENB 00422

EXHIBIT A

## DEMAND PROMISSORY NOTE

$6,100,000.00 Dallas, Texas  November 8, 1999

FOR VALUE RECEIVED, the undersigned, BUTCHER INTEREST PARTNERSHIP, a Delaware general partnership (herein called "Borrower"), whose sole general partners are K-PIPE GROUP, INC., a Kansas corporation, and MID LOUISIANA GAS COMPANY, a Delaware corporation, hereby promises to pay to the order of Bank of America, N.A., a national banking association (herein called "Lender"), the principal sum of Six Million One Hundred Thousand and No/100 Dollars ($6,100,000.00), or, if greater or less, the aggregate unpaid principal amount of the Loan made under this Note by Lender to Borrower pursuant to the terms of the Credit Agreement (as hereinafter defined), together with interest on the unpaid principal balance thereof as hereinafter set forth, both principal and interest payable as herein provided in lawful money of the United States at the offices of Lender under the Credit Agreement, 901 Main Street, Dallas, Texas 75202 or at such other place within Dallas County, Texas, as from time to time may be designated by the holder of this Note.

This Note (a) is issued and delivered under that certain Credit Agreement of even date herewith among Borrower and Lender referred to therein (herein, as from time to time supplemented, amended or restated, called the "Credit Agreement"), and is a "Note" as defined therein, (b) is subject to the terms and provisions of the Credit Agreement, which contains provisions for payments and prepayments hereunder and acceleration of the maturity hereof upon the happening of certain stated events, and (c) is secured by and entitled to the benefits of certain Security Documents (as identified and defined in the Credit Agreement). Payments on this Note shall be made and applied as provided herein and in the Credit Agreement. Reference is hereby made to the Credit Agreement for a description of certain rights, limitations of rights, obligations and duties of the parties hereto and for the meanings assigned to terms used and not defined herein and to the Security Documents for a description of the nature and extent of the security thereby provided and the rights of the parties thereto.

The principal amount of this Note, together with all interest accrued hereon, shall be due and payable in full on demand made by Lender (wether or not an Event of Default has occurred or is continuing), but if no such demand is made, on the Maturity Date. Borrower hereby acknowledges that Lender, in its sole and absolute discretion, may make demand for payment on the Note at any time and without liability to Borrower for making such demand. Borrower may not reborrow any amounts paid hereunder.

So long as no Event of Default has occurred and is continuing, all Base Rate Loans (exclusive of any past due principal or interest) from time to time outstanding shall bear interest on each day outstanding at the Adjusted Base Rate in effect on such day. If an Event of Default has occurred and is continuing, all Base Rate Loans (exclusive of any past due principal or interest) from time to time outstanding shall bear interest on each day outstanding at the Default

To Butcher Interest Partnership
Credit Agreement

**ENB 00423**

EM001-006903

Rate in effect on such day.  On each Interest Payment Date Borrower shall pay to the holder hereof all unpaid interest which has accrued on the Base Rate Loans to but not including such Interest Payment Date.  So long as no Event of Default has occurred and is continuing, each Eurodollar Loan (exclusive of any past due principal or interest) shall bear interest on each day during the related Interest Period at the related Adjusted Eurodollar Rate in effect on such day. If an Event of Default has occurred and is continuing,  all Eurodollar Loans (exclusive of any past due principal or interest) from time to time outstanding shall bear interest on each day outstanding at the Default Rate in effect on such day.  On each Interest Payment Date relating to such Eurodollar Loan, Borrower shall pay to the holder hereof all unpaid interest which has accrued on such Eurodollar Loan to but not including such Interest Payment Date.  All past due principal of and past due interest on the Loans shall bear interest on each day outstanding at the Default Rate in effect on such day, and such interest shall be due and payable daily as it accrues. Notwithstanding the foregoing provisions of this paragraph (a) this Note shall never bear interest in excess of the Highest Lawful Rate, and (b) if at any time the rate at which interest is payable on this Note is limited by the Highest Lawful Rate (by the foregoing subsection (a) or by reference to the Highest Lawful Rate in the definitions of Base Rate, Eurodollar Rate and Default Rate), this Note shall bear interest at the Highest Lawful Rate and shall continue to bear interest at the Highest Lawful Rate until such time as the total amount of interest accrued hereon equals (but does not exceed) the total amount of interest which would have accrued hereon had there been no Highest Lawful Rate applicable hereto.

Notwithstanding the foregoing paragraph and all other provisions of this Note, in no event shall the interest payable hereon, whether before or after maturity, exceed the maximum amount of interest which, under applicable Law, may be contracted for, charged, or received on this Note, and this Note is expressly made subject to the provisions of the Credit Agreement which more fully set out the limitations on how interest accrues hereon.  In the event applicable Law provides for an interest ceiling under Chapter 303 of the Texas Finance Code (the "Texas Finance Code") as amended, for that day, the ceiling shall be the "weekly ceiling" as defined in the Texas Finance Code and shall be used in this Note for calculating the Highest Lawful Rate and for all other purposes.  The term "applicable law" as used in this Note means the laws of the State of Texas or the laws of the United States, whichever laws allow the greater interest, as such laws now exist or may be changed or amended or come into effect in the future.

If this Note is placed in the hands of an attorney for collection after default, or if all or any part of the indebtedness represented hereby is proved, established or collected in any court or in any bankruptcy, receivership, debtor relief, probate or other court proceedings, Borrower and all endorsers, sureties and guarantors of this Note jointly and severally agree to pay reasonable attorneys' fees and collection costs to the holder hereof in addition to the principal and interest payable hereunder.

Borrower and all endorsers, sureties and guarantors of this Note hereby severally waive demand, presentment, notice of demand and of dishonor and nonpayment of this Note, protest, notice of protest, notice of intention to accelerate the maturity of this Note, declaration or notice of acceleration of the maturity of this Note, diligence in collecting, the bringing of any suit against any party and any notice of or defense on account of any extensions, renewals, partial payments or changes in any manner of or in this Note or in any of its terms, provisions and

To Butcher Interest Partnership<br>Credit Agreement

2

ENB 00424

covenants, or any releases or substitutions of any security, or any delay, indulgence or other act of any trustee or any holder hereof, whether before or after maturity.

This Note and the rights and duties of the parties hereto shall be governed by the Laws of the State of Texas (without regard to principles of conflicts of law), except to the extent the same are governed by applicable federal Law.

BUTCHER INTEREST PARTNERSHIP,
a Delaware partnership

By:     K-PIPE GROUP, INC.,
        a Kansas corporation, general partner

        By:___
        Name:_____
        Title:_____

By:     MID LOUISIANA GAS COMPANY,
        a Delaware corporation, general partner

        By:___
              Richard A. Robert
              Treasurer

To Butcher Interest Partnership
Credit Agreement

3

ENB 00425

EM001-006905

From: Craig J. Hoffman  To: Larry Austin                    Date: 11/7/99  Time: 6:38:00 PM

had there been no Highest Lawful Rate applicable hereto.

Notwithstanding the foregoing paragraph and all other provisions of this Note, in no event shall the interest payable hereon, whether before or after maturity, exceed the maximum amount of interest which, under applicable Law, may be contracted for, charged, or received on this Note, and this Note is expressly made subject to the provisions of the Credit Agreement which more fully set out the limitations on how interest accrues hereon. In the event applicable Law provides for an interest ceiling under Chapter 303 of the Texas Finance Code (the "Texas Finance Code") as amended, for that day, the ceiling shall be the "weekly ceiling" as defined in the Texas Finance Code and shall be used in this Note for calculating the Highest Lawful Rate and for all other purposes. The term "applicable law" as used in this Note means the laws of the State of Texas or the laws of the United States, whichever laws allow the greater interest, as such laws now exist or may be changed or amended or come into effect in the future.

If this Note is placed in the hands of an attorney for collection after default, or if all or any part of the indebtedness represented hereby is proved, established or collected in any court or in any bankruptcy, receivership, debtor relief, probate or other court proceedings, Borrower and all endorsers, sureties and guarantors of this Note jointly and severally agree to pay reasonable attorneys' fees and collection costs to the holder hereof in addition to the principal and interest payable hereunder.

Borrower and all endorsers, sureties and guarantors of this Note hereby severally waive demand, presentment, notice of demand and of dishonor and nonpayment of this Note, protest, notice of protest, notice of intention to accelerate the maturity of this Note, declaration or notice of acceleration of the maturity of this Note, diligence in collecting, the bringing of any suit against any party and any notice of or defense on account of any extensions, renewals, partial payments or changes in any manner of or in this Note or in any of its terms, provisions and covenants, or any releases or substitutions of any security, or any delay, indulgence or other act of any trustee or any holder hereof, whether before or after maturity.

This Note and the rights and duties of the parties hereto shall be governed by the Laws of the State of Texas (without regard to principles of conflicts of law), except to the extent the same are governed by applicable federal Law.

BUTCHER INTEREST PARTNERSHIP,
a Delaware partnership

By:    K-PIPE GROUP, INC.,
a Kansas corporation, general partner

By: _Larry J. Austin_
Name: _Larry J. Austin_
Title: _President_

By:    MID LOUISIANA GAS COMPANY,
a Delaware corporation, general partner

By: _____
Richard A. Robert
Treasurer

F:\data\wp\11411 1991\199909.wp4\wd:11/7/99 6:36 PM

ENB 00426

From: Craig J. Hoffman  To: Larry Austin                    Date: 11/7/99  Time: 6:36:00 PM

1

<u>BORROWING NOTICE</u>

Reference is made to that certain Credit Agreement dated as of November 8, 1999 (as from time to time amended, the "Agreement"), by and among BUTCHER INTEREST PARTNERSHIP ("Borrower") and Bank of America, N.A., as Lender ("Lender"). Terms which are defined in the Agreement are used herein with the meanings given them in the Agreement. Pursuant to the terms of the Agreement Borrower hereby requests a Borrowing of new Loans to be advanced pursuant to Section 2.2(a) of the Agreement as follows:

Aggregate amount of Base Rate Borrowing:   $6,100,000.00

Date on which Loan is to
be advanced:        November 8, 1999

The officer of Borrower signing this instrument hereby certifies that, to the best of his knowledge after due inquiry, the representations and warranties of Borrower in the Agreement are true, correct and complete.

IN WITNESS WHEREOF, this instrument is executed as of November 8, 1999.

BUTCHER INTEREST PARTNERSHIP,
a Delaware partnership

By:     K-PIPE GROUP, INC.,
        a Kansas corporation, general partner

        By: _____
        Name: Larry J. Austin
        Title: President

By:     MID LOUISIANA GAS COMPANY,
        a Delaware corporation, general partner

        By: _____
            Richard A. Robert
            Treasurer

F:\data\wp\11411 1999\119909.wpd;bd:11/7/99;6:36 PM

**ENB 00427**

EM001-006907

From: Craig J. Hoffman  To: Larry Austin                Date: 11/7/99  Time: 7:09:36 PM                Page 2 of 3

## CONTINUATION/CONVERSION NOTICE

Reference is made to that certain Credit Agreement dated as of November __, 1999 (as from time to time amended, the "Agreement"), by and among BUTCHER INTEREST PARTNERSHIP ("Borrower") and Bank of America, N.A., as Lender ("Lender"). Terms which are defined in the Agreement are used herein with the meanings given them in the Agreement.

Borrower hereby requests a Conversion or Continuation of existing Loans into a new Borrowing pursuant to Section 2.3 of the Agreement as follows:

Existing Borrowing(s) to be continued or converted:

    $_____ of Eurodollar Loans with Interest Period ending _____

    $_____ of Base Rate Loans

Date of Continuation or Conversion:          _____

Length of Interest Period for Eurodollar Loans
(1, 2, or 3 months):          _____ months

To meet the conditions set out in the Agreement for such conversion/continuation, Borrower hereby represents, warrants, acknowledges, and agrees to and with Lender that:

a.        The officer of Borrower signing this instrument is the duly elected, qualified and acting officer of Borrower as indicated below such officer's signature hereto having all necessary authority to act for Borrower in making the request herein contained.

a.        There does not exist on the date hereof any condition or event which constitutes a Default which has not been waived in writing as provided in Section 9.1(a) of the Agreement.

a.        The Loan Documents have not been modified, amended or supplemented by any unwritten representations or promises, by any course of dealing, or by any other means not provided for in Section 9.1(a) of the Agreement.  The Agreement and the other Loan Documents are hereby ratified, approved, and confirmed in all respects.

The officer of Borrower signing this instrument hereby certifies that, to the best of his knowledge after due inquiry, the above representations, warranties, acknowledgments, and agreements of Borrower are true, correct and complete.

IN WITNESS WHEREOF this instrument is executed as of _____.

BUTCHER INTEREST PARTNERSHIP,
a Delaware partnership

By:        K-PIPE GROUP, INC.,
    a Kansas corporation, general partner

    By: _Larry J. Austin_____
    Name: _Larry Ete Austin_____
    Title: _President_____

F:\data\wp\1141\1199\1199010.wpd\bd:11/7/99:6:34 PM

**ENB 00428**

EM001-006908

By:     MID LOUISIANA GAS COMPANY,
        a Delaware corporation, general partner

        By: _____
        Richard A. Robert
              Treasurer

EM001-006909

# TABLE OF CONTENTS

Page

CREDIT AGREEMENT    1

ARTICLE I - Definitions and References    1
    Section 1.1    Defined Terms    1
    Section 1.2.    Exhibits and Schedules; Additional Definitions    9
    Section 1.3.    Amendment of Defined Instruments    9
    Section 1.4.    References and Titles    10
    Section 1.5.    Calculations and Determinations    10
    Section 1.6.    Joint Preparation; Construction of Indemnities and Releases 10

ARTICLE II - The Term Loan    10
    Section 2.1.    Commitment to Lend; Note    10
    Section 2.2.    Request for Term Loan    11
    Section 2.3.    Continuations and Conversions of Existing Loans    11
    Section 2.4.    Use of Proceeds    12
    Section 2.5.    Interest Rates    12
    Section 2.6.    Optional Prepayments and Payment of Breakage Costs    12

ARTICLE III - Payments to Lender    13
    Section 3.1.    General Procedures    13
    Section 3.2.    Intentionally Omitted    14
    Section 3.3.    Intentionally Omitted    14
    Section 3.4.    Intentionally Omitted    14
    Section 3.5.    Increased Cost and Reduced Return    14
    Section 3.6.    Limitation on Types of Loans 15
    Section 3.7.    Illegality    15
    Section 3.8.    Treatment of Affected Loans 15
    Section 3.9.    Compensation 16
    Section 3.10.    Taxes  16

ARTICLE IV - Conditions Precedent to Lending    17
    Section 4.1.    Documents to be Delivered    17
    Section 4.2.    Additional Conditions Precedent    18

ARTICLE V - Representations and Warranties    19
    Section 5.1.    No Default    19
    Section 5.2.    Organization and Good Standing    19
    Section 5.3.    Authorization 19
    Section 5.4.    No Conflicts or Consents    19
    Section 5.5.    Enforceable Obligations    19
    Section 5.6.    Intentionally Omitted    19
    Section 5.7.    Other Obligations and Restrictions.    19

To Butcher Interest Partnership
Credit Agreement

ENB 00430

Section 5.8.    Full Disclosure          19
Section 5.9.    Litigation      20
Section 5.10.   Intentionally Omitted 20
Section 5.11.   No Employees 20
Section 5.12.   Intentionally Omitted 20
Section 5.13.   No Prior Operations; Assets and Liabilities   20
Section 5.14.   Subsidiaries    20
Section 5.15.   Title to Properties; Licenses    20
Section 5.16.   Government Regulation       20
Section 5.17.   Insider 20
Section 5.18.   Solvency        21
Section 5.19.   Year 2000 Compliance         21

ARTICLE VI - Affirmative Covenants of Borrower 21
Section 6.1.     Payment and Performance       21
Section 6.2.     Books, Financial Statements and Reports    21
Section 6.3.     Other Information and Inspections     21
Section 6.4.     Notice of Material Events and Change of Address    22
Section 6.5.     Maintenance of Properties       22
Section 6.6.     Maintenance of Existence and Qualifications 22
Section 6.7.     Payment of Trade Liabilities, Taxes, etc.     22
Section 6.8.     Insurance       22
Section 6.9.     Performance on Borrower's Behalf     22
Section 6.10.    Interest 23
Section 6.11.    Compliance with Agreements and Law        23
Section 6.12.    Intentionally Omitted 23
Section 6.13.    Evidence of Compliance     23
Section 6.14.    Agreements Regarding Collateral and Security Documents 23
Section 6.15.    Perfection and Protection of Security Interests and Liens    23
Section 6.16.    Bank Accounts; Offset.     23
Section 6.17     Year 2000 Compliance       24

ARTICLE VII - Negative Covenants of Borrower    24
Section 7.1.     Indebtedness 24
Section 7.2.     No Amendment     24
Section 7.3.     Liens  24
Section 7.4.     Sales of Assets       24
Section 7.5.     Leasebacks     24
Section 7.6.     Loans or Advances     24
Section 7.7.     Investments    24
Section 7.8.     Distributions 25
Section 7.9.     Business Activities  25
Section 7.10.    Transactions with Affiliates 25
Section 7.11.    Change of Control    25
Section 7.12.    Limitation on Mergers      25
Section 7.13.    Subsidiaries   25

To Butcher Interest Partnership
Credit Agreement

**ENB 00431**

EM001-006911

ARTICLE VIII – Events of Default and Remedies     25
    Section 8.1.     Events of Default     25
    Section 8.2.     Remedies     28

ARTICLE IX – Miscellaneous     28
    Section 9.1.     Waivers and Amendments; Acknowledgments     28
    Section 9.2.     Survival of Agreements; Cumulative Nature 29
    Section 9.3.     Notices     29
    Section 9.4.     Payment of Expenses; Indemnity     30
    Section 9.5.     Joint and Several Liability; Parties in Interest     31
    Section 9.6.     Intentionally Omitted 31
    Section 9.7.     Confidentiality     31
    Section 9.8.     Governing Law; Submission to Process     32
    Section 9.9.     Limitation on Interest 32
    Section 9.10.     Termination; Limited Survival     33
    Section 9.11.     Severability     33
    Section 9.12.     Counterparts; Fax     33
    Section 9.13.     Waiver of Jury Trial, Punitive Damages, etc. 33

Exhibits

Exhibit A - Form of Note
Exhibit B - Form of Borrowing Notice
Exhibit C - Form of Continuation/Conversion Notice
Exhibit D - Form of Opinion of Counsel for Restricted Persons

To Butcher Interest Partnership
Credit Agreement

**ENB 00432**

EM001-006912

## FINANCING STATEMENT

This instrument is presented to a Filing Officer in the Office of the Secretary of State for filing pursuant to the Uniform Commercial Code.

1. The name and address of the <u>Debtor</u> is:

> BUTCHER INTEREST PARTNERSHIP
> c/o Midcoast Energy Resources, Inc.
> 1100 Louisiana, Suite 2950
> Houston, Texas 77002

> BUTCHER INTEREST PARTNERSHIP
> 8325 Lenexa Drive, Suite 400
> Lenexa, Kansas 66214

2. The name and address of the <u>Secured Party</u> is:

> BANK OF AMERICA, N.A.
> 700 Louisiana Street
> Energy Finance Division, 8th Floor
> Houston, Texas 77002

3. The Debtor's Tax Payer Identification No. is _____:

4. This Financing Statement covers the following types or items of collateral:

(a)  all accounts now owned or existing as well as any and all that may hereafter arise or be acquired by Debtor, and all the proceeds and products thereof, including without limitation, all notes, drafts, acceptances, instruments and chattel paper arising therefrom, and all returned or repossessed goods arising from or relating to any such accounts, or other proceeds of any sale or other disposition of inventory;

(b)  all of Debtor's inventory, including all goods, merchandise, raw materials, goods in process, finished goods and other tangible personal property now owned or hereafter acquired and held for sale or lease or furnished or to be furnished under contracts for service or used or consumed in Debtor's business and all additions and accessions thereto and contracts with respect thereto and all documents of title evidencing or representing any part thereof, and all products and proceeds thereof;

(c)  all of Debtor's fixtures and appurtenances thereto, and such other goods, chattels, fixtures, equipment and personal property, including all additions and accessions thereto and replacements thereof and articles in substitution therefor, howsoever attached or affixed;

(d)  all equipment of every nature and description whatsoever now owned or hereafter acquired by Debtor including all accessions, appurtenances and additions thereto and substitutions therefor, wheresoever located, including all tools, parts and accessories used in connection therewith;

**ENB 00433**

EM001-006913

(e)   all personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money;

(f)   all of Debtor's interest under lease agreements and other instruments or documents, whether now existing or owned by Debtor or hereafter arising or acquired by Debtor, evidencing both a debt and security interest in or lease of specific goods;

(g)   all of Debtor's now owned or existing as well as hereafter acquired or arising instruments, documents and money; and

and accessions, additions and attachments thereto and the rentals, the proceeds and products thereof, including without limitation, all cash, general intangibles, accounts, inventory, equipment, fixtures, farm products, notes, drafts, acceptances, instruments and chattel paper or other property, benefits or rights arising therefrom, and in and to all returned or repossessed goods arising from or relating to any of the collateral described herein or other proceeds of any sale or other disposition of such collateral.

DEBTOR:

BUTCHER INTEREST PARTNERSHIP,
a Delaware partnership

By:   K-PIPE GROUP, INC.,
      a Kansas corporation, general partner

By:_____

Name:_____

Title:_____

By:   MID LOUISIANA GAS COMPANY,
      a Delaware corporation, general partner

By:_____

Richard A. Robert
Treasurer

2

ENB 00434

EM001-006914

17

ENB 00435

EM001-006915

## K-PIPE GROUP, INC.

### CERTIFICATE

On behalf of K-PIPE GROUP, INC., a Kansas corporation (the "Company"), the undersigned President and Secretary of the Company hereby certify that:

     1.    Attached hereto as Exhibit A is a true, complete, and correct copy of resolutions duly and unanimously adopted by the general partner of the Company in writing, which resolutions have not been revoked, modified, amended, or rescinded and remain in full force and effect; said resolutions have been recorded in the minute book of the Company and do not contravene any provision of the Company's certificate of incorporation or bylaws.

     2.    Attached hereto as Exhibit B is a true, complete, and correct copy of the Butcher Interest Partnership General Partnership Agreement (the "Agreement"), and no amendment to the Agreement has been authorized or become effective since the date of such document, no amendment or other document relating to or affecting such document has been filed in the office of the Secretary of State of the State of Delaware since such date, and no action has been taken by the Company, its stockholders, directors or officers in contemplation of the filing of any such amendment or other document or in contemplation of the liquidation or dissolution of the Butcher Interest Partnership.

     3.    Attached hereto as Exhibit C is a list of certain officers of the Company, each of whom is and has been at all times since a duly qualified and acting officer of the Company, duly elected or appointed to the office set forth opposite his name, and the specimen signature set forth opposite the name of each of said persons is the genuine signature of such person.

Dated: November __, 1999.

By _____
Name:  Larry J. Austin
Title:  President

By _____
Name:  Linda Austin
Title:  Secretary

SF 124411.1 05211 00482

ENB 00436

EM001-006916

EXHIBIT A TO CERTIFICATE

RESOLUTIONS

SF 128811.1 05211 00482

ENB 00437

EM001-006917

BUTCHER INTEREST PARTNERSHIP

WRITTEN CONSENT
OF
GENERAL PARTNER
as of
November 8, 1999

The undersigned, being a general partner of BUTCHER INTEREST PARTNERSHIP, a general partnership (the "Company"), hereby consents to the adoption of the following resolutions:

1.   **Loan Agreement and Security.**

WHEREAS, the general partners have determined that it is advisable and in the best interest of the Company for the Company to accept a loan of up to $6,100,000 (the "Loan") from Bank of America, N.A. (the "Lender"), and to provide certain collateral to the Lender as security for the Loan.

NOW, THEREFORE, BE IT RESOLVED, that the following are hereby adopted, approved and ratified: (i) the Credit Agreement dated as of November __, 1999 in the principal amount of $6,100,000 between the Company and the Lender relating to the Loan (the "Loan Agreement"), (ii) the Security Agreement dated as of November __, 1999 between the Company and the Lender (the "Security Agreement"), and (iii) the other agreements, instruments, financing statements, and documents that may be executed and delivered in connection with the Loan (together with the Loan Agreement and the Security Agreement, the "Loan Documents");

RESOLVED, that any officer or general partner of the Company (an "Authorized Officer") is hereby authorized to prepare, execute and enter into, deliver and perform for and on behalf of the Company the Loan Documents, and to negotiate, cause to be prepared, execute and enter into, deliver and perform any other agreement, instrument or undertaking to which the Company is a party in order to effectuate the purposes of the Loan and the Loan Documents, with such revisions, changes, amendments or modifications thereto as such Authorized Officer shall, as conclusively evidenced by such Authorized Officer's execution and delivery thereof, deem appropriate;

RESOLVED, that the authority given under these resolutions shall be retroactive and any and all acts authorized under these resolutions performed prior to their adoption are hereby ratified.  In the event two or more resolutions or unanimous

SF 126793.1 05211 00482

-1-

ENB 00438

EM001-006918

written consents of the Company regarding the furnishing by the
Company of promissory notes, security agreements, guaranties,
hypothecations, or other agreements referred to herein are
concurrently in effect, the provisions of each shall be
cumulative.  The authority provided for in these resolutions
shall remain in full force and effect, and the Lender is
authorized and requested to rely and act thereon until the Lender
shall have received a certified copy of a further resolution of
the Company amending or revoking these resolutions.

    2.   <u>General</u>

    RESOLVED, that any Authorized Officer is authorized and
empowered to certify and furnish copies as may be necessary of
this and the foregoing resolutions and statements as to the
incumbents of the corporate offices of the Company and under the
corporate seal, if requested, and any person receiving such a
certified copy or statement shall be authorized to rely upon the
contents thereof;

    RESOLVED, that the Authorized Officers be, and each of them
individually hereby is, authorized and empowered, for and on
behalf of the Company, to take or cause to be taken any and all
such further actions and to execute and deliver or cause to be
executed and delivered all such further agreements, documents,
instruments and certificates as any officer, in such officer's
sole discretion, may determine to be necessary or appropriate to
effect the purpose and intent of the foregoing resolutions and to
perform the obligations of the Company under the agreements,
instruments and documents authorized by these resolutions, and
the execution by any such officer of any such agreement,
document, instrument or certificate or the doing by any such
officer of any act in connection with the foregoing matters shall
conclusively establish such officer's authority therefor and the
approval of the agreements, documents, instruments or
certificates so executed and the actions so taken; and

SF 128793.1 05211 00482

-2-

ENB 00439

EM001-006919

RESOLVED, that all lawful acts of any of the Authorized Officers in connection with any of the foregoing resolutions and such other documents herein described be, and hereby are, approved, adopted and ratified.

This consent may be executed in any number of counterparts, which, taken together, shall constitute one document.

GENERAL PARTNER:

K-PIPE GROUP, INC.

By: _____
Name: Larry J. Austin
Title: President

SF 128793.1 05211 00482                              -3-

ENB 00440

EM001-006920

EXHIBIT B TO CERTIFICATE

PARTNERSHIP AGREEMENT

SF 128811.1 05211 00482

ENB 00441

EM001-006921

BUTCHER INTEREST PARTNERSHIP

GENERAL PARTNERSHIP AGREEMENT

This General Partnership Agreement (the "Agreement") is entered into by and between Mid Louisiana Gas Company, a Delaware corporation ("MIDLA") and K-Pipe Group, Inc., a Kansas corporation ("K-Pipe"), as of the 8th day of November, 1999.

WHEREAS, K-Pipe owns that certain property and rights described in Schedule A attached hereto (the "Butcher Interest");

WHEREAS, K-Pipe desires to form a partnership in order to enhance its ability to transfer interests in the Butcher Interest and for the purpose of refinancing the Butcher Interest debt; and

WHEREAS, MIDLA desires to enter into a partnership with K-Pipe to accomplish the aforesaid purposes;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I

Name and Formation of Partnership

The name of the Partnership is Butcher Interest Partnership (the "Partnership"). Subject to the provisions hereof, the Partners designate the Partnership as a Delaware general partnership.

ARTICLE II

Purpose and Business of the Partnership

The sole purpose and business of the Partnership is to own and finance, and to provide for the operation and maintenance of, the Butcher Interest. The Partnership shall not acquire any assets other than the Butcher Interest, obtain any loans other than for the financing or refinancing of the transaction provided for in Article VIII hereof, hire any employees, or otherwise conduct any business other than that necessary to or for the ownership, financing, operation and maintenance of the Butcher Interest.

ARTICLE III

Partnership Interests

ENB 00442

EM001-006922

K-Pipe and MIDLA each hold a General Partner interest, and shall be known collectively as the "General Partners" or the "Partners."

## ARTICLE IV

### Place of Business of the Partnership

The location of the principal place of business of the Partnership and where the Partnership's records are kept is 8325 Lenexa Drive, Suite 400, Lenexa, Kansas 66214. The Partners may, from time-to-time, change the principal place of business of the Partnership.

## ARTICLE V

### Term of the Partnership

The Partnership commenced on the date hereof and shall continue until December 31, 2010, unless earlier terminated as a result of: (i) the cessation of any Partner to exist as a legal entity; (ii) the determination by all the Partners that the Partnership should be dissolved; or (iii) the sale of substantially all of the Partnership's property.

## ARTICLE VI

### Capital Contributions; Capital Account

6.01. As soon as all of the necessary consents and approvals have been secured in order to make the transfer effective, K-Pipe shall assign or otherwise transfer to the Partnership all contracts, rights, permits and entitlements relating to the Butcher Interest, and shall convey to the Partnership all right, title and interest of K-Pipe in and to all other assets comprising the personal property of the Butcher Interest.  In consideration for the assignment to the Partnership of these contracts, rights, permits and entitlements and the conveyance of all person property, K-Pipe shall be credited with a capital contribution in an amount equal to six million five hundred thousand dollars ($6,500,000) and its capital account shall be credited accordingly simultaneously with the transfer.

6.02. MIDLA shall contribute an aggregate amount of two hundred twenty-five thousand dollars ($225,000) to the Partnership and its capital account shall be credited accordingly.

6.03    Each Partner's capital account shall be re-determined as appropriate to reflect profits, losses, or distributions allocated or made to such Partner, and shall be

ENB 00443

EM001-006923

maintained in accordance with federal income tax accounting principles and Treasury Regulations Section 1.704-1(b).

## ARTICLE VII
### Refinancing Transaction

Contemporaneously with the formation of the Partnership, the Partnership shall enter into a credit agreement with Bank of America (the "Butcher Interest Partnership Credit Agreement") pursuant to which the Partnership shall obtain loans in the amount of six million one hundred thousand dollars ($6,100,000), which loans are secured by Partnership property and guaranteed by each of the Partners. Upon receipt of the loan proceeds, the Partnership shall distribute six million two hundred twenty-five dollars ($6,225,000) to K-Pipe, and K-Pipe's capital account shall be reduced accordingly.

## ARTICLE VIII
### Additional Contributions

No Partner shall be required to make additional capital contributions. However, in the event that additional capital contributions are necessary for the continuance of the business of the Partnership, each Partner may elect to make all or part of any such additional capital contributions, in which event such Partner's capital account shall be credited accordingly, and the sharing percentages described in Article X shall be adjusted to reflect the relative capital accounts of the Partners.

## ARTICLE IX
### Return of Contributions

The capital contributions of each Partner shall be returned to it, if at all, upon the termination of the Partnership or earlier at the discretion of the Partners. A Partner shall not have the right to demand and receive property other than cash in return of its capital contribution.

## ARTICLE X
### Distribution of Cash, Allocation of Profits and Losses

All profits, losses, and credits shall be allocated and distributions shall be made 55% to K-Pipe and 45% to MIDLA. Distributions of funds shall be made by the Partners

ENB 00444

EM001-006924

at such times and in such amounts as the Partners deem appropriate.

## ARTICLE XI

### Power, Rights and Duties of the Partners

Subject to the provisions of this Agreement, the Partners shall have exclusive management and control of the business of the Partnership and all decisions regarding the management and affairs of the Partnership shall be made jointly and unanimously by the Partners. The Partners shall have all the rights and powers of a partner as provided by the Uniform Partnership Laws of Delaware and as otherwise provided by law, and any action taken by the Partners shall constitute the act of and serve to bind the Partnership.

## ARTICLE XII

### Transfers

A Partner may not transfer its interest as a partner, in whole or in part, or voluntarily withdraw from the Partnership, without the consent of all the other Partners.

## ARTICLE XIII

### Options to Purchase and Sell

13.01  Midcoast shall have the option, at any time on or after May 9, 2000, to purchase the Partnership interest of K-Pipe at a purchase price as determined herein. Such option to purchase shall be exercisable by written notice from Midcoast to K-Pipe of its intent to purchase such interest given at least thirty (30) days in advance of the date upon which Midcoast intends to exercise its option.

13.02  MIDLA's option price shall be equal to (i) 100% of K-Pipe's initial capital account (as determined after the distribution made pursuant to Article VII hereof), if the notice is provided to K-Pipe by November 9, 2000; (ii) 111% of the amount determined in clause (i) if the notice is provided after November 9, 2000, but before November 9, 2001; and (iii) 121% of the amount determined in clause (i) if the notice is provided after November 9, 2001.

13.03  The closing of any purchase of K-Pipe's interest pursuant to Section 13.01 hereof shall be held at the principal offices of Midcoast or at such other place as MIDLA may designate in the option notice on the date specified by Midcoast in the option notice. At the closing of any purchase of K-Pipe's interest, K-Pipe will deliver its interest free and

ENB 00445

EM001-006925

clear of all liens, security interests and other encumbrances other than any liens and security interests created under or pursuant to the Butcher Interest Partnership Credit Agreement, and shall deliver such other instruments and documents as may be necessary for the effective transfer hereof. At the closing of the purchase of K-Pipe's interest, MIDLA shall deliver to K-Pipe cash or certified or official bank check in the amount of the total purchase price.

13.04   K-Pipe shall have the option, at any time on or after November 9, 2000, to sell its Partnership interest to MIDLA at a purchase price as determined herein. Such option to sell shall be exercisable by written notice from K-Pipe to MIDLA of its intent to sell such interest given at least thirty (30) days in advance of the date upon which K-Pipe intends to exercise its option.

13.05   K-Pipe's option price shall be equal to (i) 89% of K-Pipe's initial capital Account (as determined after the distribution made pursuant to Article VII hereof), if the notice is provided to MIDLA by November 9, 2001; and (ii)   99% of K-Pipe's initial capital account (as determined after the distribution made pursuant to Article VII hereof) if the notice is provided after November 9, 2001.

13.06   The closing of any sale of K-Pipe's interest pursuant to Section 13.04 hereof shall be held at the principal offices of K-Pipe or at such other place as K-Pipe may designate in the option notice on the date specified by K-Pipe in the option notice. At the closing of any purchase of K-Pipe's interest, K-Pipe will deliver its interest free and clear of all liens, security interests and other encumbrances other than any liens and security interests created under or pursuant to the Butcher Interest Partnership Credit Agreement, and shall deliver such other instruments and documents as may be necessary for the effective transfer hereof. At the closing of the purchase of K-Pipe's interest, Midcoast shall deliver to K-Pipe cash or certified or official bank check in the amount of the total purchase price.

## ARTICLE XIV

### Dissolution

The Partnership shall be dissolved and terminated upon (i) the expiration of the term of the Partnership as provided in Article V of this Agreement; or (ii) upon a Partner's

ENB 00446

EM001-006926

bankruptcy or cessation to exist as a legal entity, unless a successor partner has been admitted pursuant to Article XII and a new or amended Agreement is executed by the successor Partner within one hundred twenty (120) days after the removal of said last remaining Partner.  Upon dissolution and termination of the Partnership, the Partners shall pay all debts and liabilities of the Partnership and shall distribute the remaining assets in accordance with the Partner's respective positive Capital Accounts.

ARTICLE XV

Notices

All notices and other communications required or permitted by this Agreement or by law to be served upon or given to a party hereto shall be deemed duly served and given when received after being delivered by hand or sent by registered or certified mail, return receipt requests, postage prepaid, addressed as follows:

| | |
|---|---|
| if to K-Pipe, to: | K-Pipe Group, Inc.<br>c/o SCALP<br>750 Lexington Avenue, 30th Floor<br>New York, New York  10022 |
| if to MIDLA, to: | Mid Louisiana Gas Company<br>1100 Louisiana, Suite 2900<br>Houston, Texas 77002<br>Attn: General Counsel |

Any Partner may change its address for the purpose of this Article XV by giving written notice of such change to the other Partners in the manner provided in this Article XV.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

K-PIPE GROUP, INC.

By: _Larry J. Austin_

Name: _Larry J. Austin_

Title: _President_

MID LOUISIANA GAS COMPANY

11/7/99 5:16 PM                                6

ENB 00447

EM001-006927

By: _____
Name: _Richard Robert_____
Title: _Chief Financial Officer and Treasurer_

ENB 00448

EM001-006928

SCHEDULE A
to
BUTCHER INTEREST PARTNERSHIP
GENERAL PARTNERSHIP AGREEMENT

*Butcher Interest* means one and one-half percent (1.5%) of the *Adjusted Gross Pipeline Proceeds*, as defined below. *Butcher Interests* shall burden the assets of the *Pipeline*, the *New KansMo Partnerships*, the *KansOk Partnerships*, the *KansMo Assets* and the *KN Assets* and run with the land (the easements and rights-of-way) as well as run with the personal and/or mixed property; i.e., the *Butcher Interests* shall burden and run with all of the above assets, and as such shall survive and be superior to any transfer, hypothecation, pledging, encumbrances, merger, reorganization, sale, consolidation, etc. Of the *Pipeline*, the *New KansMo Partnerships*, the *KansOk Partnerships*, the *KansMo Assets* and the *KN Assets* and/or any of the *Entities* which now or hereafter own any of the same. For purposes of this Schedule A, *Adjusted Gross Pipeline Proceeds* shall mean: (i) the total proceeds received from transportation of all natural gas transported through all or any portion of the *Pipelines* free and clear of, and without deduction for, all costs and expenses (except as provided below) incurred in transporting such natural gas and any and all taxes, and (ii) the gross spread between total proceeds received through the sale by the *Entities* owning the *Pipelines* of natural gas that is transported through all or any portion of the *Pipelines* and *Pipelines'*, and/or *Entities* owning the *Pipelines*, cost of acquiring such natural gas, free and clear of, and without deduction for, all costs and expenses incurred in connection therewith and any and all taxes; provided, however, that *Adjusted Gross Pipeline Proceeds* in either of the above cases shall not include actual conservation taxes, *KCC, OCC* and/or *MCC* fees and/or assessments, *FERC* Administrative Cost Assessments and Gas Research Institute fees, third party and/or *Affiliated Entity* marketing and/or brokerage fees, local distribution company and/or pipeline transportation fees, and/or other similar costs, fees, taxes, assessments, and/or expenses which are approved in writing by *TCW* in its reasonable discretion (collectively, the *Passthrough Expenses*), all of which *Passthrough Expenses* must be collected by the *Entities* owning the *Pipelines*. Notwithstanding the foregoing, in no event shall *Passthrough Expenses* include costs, fees, taxes, assessments and/or expenses listed in the *Pipeline Budgets*, as defined in the *TCW Loan Documents*, or any other costs, fees, assessments and/or expenses not specifically provided for in this Exhibit. *Adjusted Gross Pipeline Proceeds* shall include, without limitation, any prepayments received under transportation or sales contracts for natural gas to be delivered in the future or any other payments received relating to the transportation or sale of natural gas, including without limitation payments for capacity, standby-capacity, or other payments respecting such transportation or sales contracts, however characterized. For purposes of the Financing Statement, the definitions, meanings and explanations attributable to the italicized words herein shall be those attributed to them in a Restated and Amended Butcher Agreement dated April 15, 1990 by and between Butcher Resources, Inc., The K-Pipe Group, Ltd. and Kansas Transmission, Inc. and in the *General Agreement* dated June 22, 1990 by and between OKM Gas Pipeline Company, L.P., OKM Gas partners, L.P., The K-Pipe Group, Ltd., Management Resources Group, Ltd., The K-Pipe Corporation, K-Pipe Engineering, Inc.,

ENB 00449

EM001-006929

Kansas Gas Marketing, Inc., K-Pipe Pipeline Company, Kansas Natural, Inc., KansOk, Inc., Riverside Pipeline Company, Kansas Pipeline Company, Mid-Kansas Gas, inc. and Energy Resource Management, Inc., both of which agreements are incorporated herein by reference thereto.

**END.**

ENB 00450

EM001-006930

Received Time:Nov. 8.  2:11PM

## EXHIBIT C TO CERTIFICATE

### INCUMBENCY AND SIGNATURE SPECIMENS

| OFFICER | NAME | SIGNATURE |
|---|---|---|
| President & Treasurer | Larry J. Austin | |
| Secretary | Linda Austin | |

SF 128011.1 05211 00482

ENB 00451

EM001-006931

18

ENB 00452

EM001-006932

# MID LOUISIANA GAS COMPANY

## COMPLIANCE CERTFICIATE

I, Richard Robert, Chief Financial Officer of Mid Louisiana Gas Company hereby certify the following:

1. All representations and warranties made by any Restricted Person in any Loan Documents are true on and as of the date of such Loan (except to the extent that the facts upon which such representations are based have been changed by the extension of credit hereunder) as if such representations and warranties had been made as of the date of such Loan

2. No Default exists at the date of such Loan.

3. No Material Adverse Change has occurred.

4. Each Restricted Person has performed and complied with all agreements and conditions required in the Loan Documents to be performed or complied with by it on or prior to the date of such Loan.

Capitalized terms used herein shall have the meaning ascribed to them in that certain Credit Agreement by and between Butcher Interest Partnership and Bank of America dated as of November 8, 1999.

This certificate is executed and delivered in connection with funding pursuant to the aforementioned Credit Agreement.

Dated as of November 8, 1999

MID LOUISIANA GAS COMPANY

By_____

Name:  Richard Robert

Title:   Chief Financial Officer

ENB 00453

EM001-006933

# K-PIPE GROUP, INC.

## COMPLIANCE CERTFICIATE

I, Larry J. Austin, President of K-Pipe Group, Inc. hereby certify the following:

1. All representations and warranties made by any Restricted Person in any Loan Documents are true on and as of the date of such Loan (except to the extent that the facts upon which such representations are based have been changed by the extension of credit hereunder) as if such representations and warranties had been made as of the date of such Loan

2. No Default exists at the date of such Loan.

3. No Material Adverse Change has occurred.

4. Each Restricted Person has performed and complied with all agreements and conditions required in the Loan Documents to be performed or complied with by it on or prior to the date of such Loan.

Capitalized terms used herein shall have the meaning ascribed to them in that certain Credit Agreement by and between Butcher Interest Partnership and Bank of America dated as of November 8, 1999.

This certificate is executed and delivered in connection with funding pursuant to the aforementioned Credit Agreement.

Dated as of November 8, 1999

K-PIPE GROUP, INC.

By

Name: Larry J. Austin

Title:  President

ENB 00454

EM001-006934

Sonnenschein

Mark G. Flaherty
(816) 460-2481
mgf@sonnenschein.com

4520 Main Street
Suite 1100
Kansas City, MO 64111
816.460.2400
816.531.7545 fax
www.sonnenschein.com

Chicago
Kansas City
Los Angeles
New York
San Francisco
St. Louis
Washington, D.C.

May 30, 2000

Mr. Chris Kaitson
Vice President & General Counsel
Kansas Pipeline Operating Company
1100 Louisiana, Suite 2950
Houston, Texas  77002

    RE:  *Howard E.  Lubow*

Dear Chris:

    Per our conversation, here are two originals of the revised documents signed by Howard.
Please sign both originals and retain a set for your files and return a set to me for my files.

    Thank you for your cooperation in the matter.

                    Very truly yours,

                    SONNENSCHEIN NATH & ROSENTHAL

                    Mark G. Flaherty

MGF:cml
Enclosures

cc(w/enc.):     Howard E. Lubow

21047345\V.1

ENB 00455

EM001-006935

## MID LOUISIANA GAS COMPANY

### COMPLIANCE CERTFICIATE

I, Richard Robert, Chief Financial Officer of Mid Louisiana Gas Company hereby certify the following:

1.  All representations and warranties made by any Restricted Person in any Loan Documents are true on and as of the date of such Loan (except to the extent that the facts upon which such representations are based have been changed by the extension of credit hereunder) as if such representations and warranties had been made as of the date of such Loan

2.  No Default exists at the date of such Loan.

3.  No Material Adverse Change has occurred.

4.  Each Restricted Person has performed and complied with all agreements and conditions required in the Loan Documents to be performed or complied with by it on or prior to the date of such Loan.

Capitalized terms used herein shall have the meaning ascribed to them in that certain Credit Agreement by and between Butcher Interest Partnership and Bank of America dated as of November 8, 1999.

This certificate is executed and delivered in connection with funding pursuant to the aforementioned Credit Agreement.

Dated as of November 8, 1999

MID LOUISIANA GAS COMPANY

By_____
Name: Richard Robert
Title:   Chief Financial Officer

ENB 00456

EM001-006936

**K-PIPE GROUP, INC.**

**COMPLIANCE CERTFICIATE**

I, Larry J. Austin, President of K-Pipe Group, Inc. hereby certify the following:

1. All representations and warranties made by any Restricted Person in any Loan Documents are true on and as of the date of such Loan (except to the extent that the facts upon which such representations are based have been changed by the extension of credit hereunder) as if such representations and warranties had been made as of the date of such Loan

2. No Default exists at the date of such Loan.

3. No Material Adverse Change has occurred.

4. Each Restricted Person has performed and complied with all agreements and conditions required in the Loan Documents to be performed or complied with by it on or prior to the date of such Loan.

Capitalized terms used herein shall have the meaning ascribed to them in that certain Credit Agreement by and between Butcher Interest Partnership and Bank of America dated as of November 8, 1999.

This certificate is executed and delivered in connection with funding pursuant to the aforementioned Credit Agreement.

Dated as of November 8, 1999

K-PIPE GROUP, INC.

By
Name: Larry J. Austin
Title: President

ENB 00457

EM001-006937

Sonnenschein

4520 Main Street
Suite 1100
Kansas City, MO 64111
816.460.2400
816.531.7545 fax
www.sonnenschein.com

Chicago
Kansas City
Los Angeles
New York
San Francisco
St. Louis
Washington, D.C.

**Mark G. Flaherty**
(816) 460-2481
mgf@sonnenschein.com

May 30, 2000

*File*
*MERI*
*KPC*
*acquisition*
*File*

Mr. Chris Kaitson
Vice President & General Counsel
Kansas Pipeline Operating Company
1100 Louisiana, Suite 2950
Houston, Texas  77002

RE:   *Howard E. Lubow*

Dear Chris:

Per our conversation, here are two originals of the revised documents signed by Howard. Please sign both originals and retain a set for your files and return a set to me for my files.

Thank you for your cooperation in the matter.

Very truly yours,

SONNENSCHEIN NATH & ROSENTHAL

Mark G. Flaherty

MGF:cml
Enclosures

cc(w/enc.):   Howard E. Lubow

31047348\V-1

ENB 00458

EM001-006938

## AGREEMENT

RECITALS

Whereas Kansas Pipeline Operating Company (KPOC) and Howard E. Lubow (HEL) were parties to a certain Agreement dated August 5, 1997, a copy of which is attached hereto as Exhibit A; and

Whereas KPOC and HEL were parties to a certain Agreement dated August 4, 1998, a copy of which is attached hereto as Exhibit B; and

Whereas KPOC and HEL were parties to a certain Release Agreement dated October 24, 1999, a copy of which is attached hereto as Exhibit C; and

Whereas KPOC and HEL were parties to a certain Bonus Plan and Split-Dollar Agreements, both dated August 3, 1999, copies of which are attached hereto as Exhibit D; and

Whereas KPOC and HEL are parties to certain other oral and written agreements, pursuant to which HEL, through Overland Consulting, Inc. and/or OCI Resources, Inc., provides certain consulting services to KPOC; and

Whereas the parties hereto desire to confirm certain understandings between them through this Agreement;

Now, therefore, the parties have reached the following:

AGREEMENTS

1.      As consideration for the agreements of KPOC as set forth herein, HEL does, hereby, waive any and all claims for vacation benefits due from KPOC or any KPOC affiliate; and

2.      As further consideration for KPOC's agreements as set forth herein, HEL agrees to cause former KPOC employee Vicki Bryan to waive any and all claims for unpaid vacation benefits that she may have against KPOC and, further, agrees to indemnify and hold KPOC (or any KPOC affiliate) harmless in the event that Vicki Bryan, or any one claiming through or on her behalf, makes any claim against KPOC (or any KPOC affiliate) related to vacation benefits due from KPOC (or any KPOC affiliate);

3.      In exchange for the consideration set forth in numbered paragraphs 1 and 2 above, KPOC agrees that it has not and shall not, at any time, or under any circumstances, sell, transfer, convey, or in any other way hypothecate, any suit, claim, or cause of action arising out of or in any way related to any of its rights (or those of any of its affiliates) under the Agreements attached hereto as Exhibits A, B, C and D, to any other person or entity, whatsoever.

Agreed this _____ day of June, 2000.

KANSAS PIPELINE OPERATING COMPANY

By:_____
Its:_____

_____
Howard E. Lubow

210468931\V-3

ENB 00459

EM001-006939

## HEL Employment Agreement

This *Agreement* entered into this 5th day of August, 1997, and revised and restated on this 30th day of April, 1998.

*HEL* shall mean Howard E. Lubow.

*KPOC* shall mean Kansas Pipeline Operating Company, its successors and/or assigns or any other *Langley Affiliated Entity(s)* nominated by *Langley* to fulfill the terms of this *Agreement*. Kansas Pipeline Operating Company, may be merged, consolidated and/or reorganized with another *Entity(s)* to form a new *Langley Entity*.

*Langley* shall mean Dennis M. Langley.

*Langley Affiliate* or *Langley Affiliated Entity* shall mean any legal *Entity* (corporation, limited or general partnership, joint venture, proprietorship, project, trust, estate and/or any entity or person) in which *Langley* has a five percent (5%) or greater interest, direct or indirect ownership or an equitable interest. An indirect interest shall be any equitable or legal interest owned by or inuring to any *Entity(s)* or any sequence of *Entities* related or commonly owned *Entity(s)* in which *Langley* has a five percent (5%) or greater ownership or equitable interest.

*Langley PD Interest* is defined as a net revenue, after tax, after debt service, which shall be restricted to whatever restrictions (debt, cash flow distributions, sinking fund, subordination, encumbrance, etc.).

*Langley Nominee* shall have the meaning ascribed thereto in Section 6 of this *Agreement*, and may be any third party, *Langley Affiliate* and/or *Langley*.

*OCI* shall mean Overland Consulting, Inc.

*OCI Payment* shall have the meaning ascribed thereto in Section 6 of this *Agreement*.

*PD* shall mean project development.

*Pipeline Entity(s)* shall mean Kansas Pipeline Partnership, KansOk Partnership, Riverside Pipeline Company, L.P., the Syenergy Partnership, Bishop Pipeline Company, *KPOC* and/or Riverside Pipeline Partnership.

# EXHIBIT A

Confidential
HEL Employment Agreement v.doc

ENB 00460

EM001-006940

1. <u>Full Time Employee.</u>  100% of *HEL's* time shall be spent as an employee of *KPOC*. *HEL's* job description, tasks, duties and responsibilities shall be whatever *Langley* reasonably desires, wants or delegates, whether orally or in writing.  This includes any redefinition of job functions, title, duties, etc.  Any such change shall be consistent with *HEL's* expertise and experience.  *HEL's* initial title shall be Executive Vice President, and he shall perform those services that are practical, given *HEL's* other duties and responsibilities, that were previously provided to *KPOC* by *OCI*, as part of his tasks and duties.

2. <u>Base Salary.</u>  *HEL's KPOC* base salary shall be $210,000/year which shall be paid in twenty-four equal payments throughout the year and shall be paid pro-rata through the date of termination in the event of a voluntary or involuntary termination of this *Agreement*. *HEL* shall receive cost of living adjustments, consistent with adjustments made for other senior officers of *KPOC*.

3. <u>Benefits.</u>  *HEL* shall receive health insurance, car allowance, travel, meals, entertainment expenses, etc. consistent with benefits provided by *KPOC* to senior officers, excluding the CEO.  For purposes of determining vacation, eligibility in the profit sharing plan, etc., *HEL* shall be entitled to 4 weeks vacation or the maximum allowed by *KPOC* and *HEL* shall be eligible with allowable vesting in the profit sharing plan, giving recognition for *OCI* years of service.

4. <u>KPOC Internal Bonus.</u>  Commencing with the calendar year 1998, *HEL* may receive a *KPOC Internal Bonus* which shall be based on the economic performance of the *Pipeline Entities* and shall be linear from $0 to a $216,000/annum cap.  Such bonus, among other things, will be based on *KPOC* operating results relative to economic performance and return to *Shareholders*.  *HEL's* internal bonus will be based both on total *KPOC* operating results in his capacity of *EVP*, and on the departmental results under his direct control.  The bonus will be based on criteria established by *Langley* annually, but *Langley*, in his sole discretion, may or may not award a bonus based on criteria which are outside the following criteria:

   A.  The DSCR must equal or exceed 1.20, after distributions to BGL, *Langley*, or his assigns.

   B.  The Debt Service Reserve must be fully funded.

   C.  There must be no events of default, material adverse effect and/or potential default regarding any debt instrument or loan(s) currently outstanding, and all Bishop affiliates must be in full compliance with all terms and conditions of any and all material agreements (including debt or loan agreements) which are outstanding.

   D.  There must be no material adverse event, no default or potential default under the Syenergy Note.

   E.  *Langley* shall receive as salary from *KPOC* equal to or greater than $435,000, and Butcher Interest distributions shall be equal to or greater than $400,000.

ENB 00461

EM001-006941

F.  BGL shall have achieved equal or greater than the following economic performances:
   i)    $3,500,000 of dividends distributed from Syenergy; and
   ii)   $1,000,000 cash on hand after its distributions to shareholders.

G.  Syenergy and/or KPC shall have achieved equal or greater than the following economic performances:
   i)    $3,500,000 of ordinary pre-tax income, excluding depreciation; and
   ii)   $1,000,000 cash on hand.

H.  Equal to or greater than $750,000 of project development expenditures shall be generated out of Syenergy cash flow independent of, and in addition to the above criteria.

Once the above minimum requirements or thresholds have been achieved as determined by *Langley* via the use of reasonable discretion, then *HEL* shall be entitled to a *KPOC Internal Bonus* of at least $108,000, plus an additional *KPOC Internal Bonus* of up to, but not greater than, another $108,000 (i.e., or maximum total per annum *KPOC Internal Bonus* of $216,000; $108,000 + $108,000) on a linear basis starting at the threshold of $3,500,000 of ordinary pre-tax Syenergy and/or *KPOC* income and culminating with any amount equal to or greater than $6,000,000 of ordinary, pre-tax Syenergy and/or *KPOC* income.  For purpose of Section 4, "ordinary" income or cash flow shall mean income determined by *Langley* in his exclusive, but reasonable, discretion to be *Pipeline Entity* ordinary, day to day income derived from rates, and shall exclude the following:  *PD Income*, income from the sale of assets, marketing income post federal regulation, interest income, non-pipeline investment income, all income not derived by the *Pipeline Entities* from State or Federally approved rates, like or similar income, etc.  The extent to which these items may affect *HEL's* compensation, will be considered separately, and at *Langley's* sole discretion.

For each year subsequent to 1998 (no later than March 31 of the year in question and no earlier than September 30 of the year immediately preceding the year in question), *Langley* shall develop the criteria to apply to the following year.

5.  **HEL PD Bonus**.  In addition to the *KPOC Internal Bonus*, *HEL* may from time to time in *Langley's* total and exclusive discretion receive an *HEL PD Bonus*.  It is the desire of *Langley* and *HEL*, that *HEL* bring material and substantive *PD* expertise, experience and performance to *Langley*, *Langley Affiliated Entity(s)* and *KPOC*, and *HEL* is being employed hereunder and being compensated as provided for above in paragraphs 2, 3 and 4 for the same.  However, if and when *Langley*, in his exclusive and complete discretion, is of the belief that *HEL's* performance regarding the discovery or closing of a particular *PD Entity* warrants the reward of a supplemental bonus beyond that set for the in paragraph 4 above, then *Langley* may grant an *HEL PD Bonus*.  *HEL* shall not receive any *HEL PD Bonus*, unless and until, the terms of the same (to be determined in the exclusive discretion of *Langley*) have been set forth in writing and executed by *Langley*, it being clearly and unambiguously understood that *Langley* in his sole and exclusive judgement (which may be arbitrary, capricious, inconsistent with prior judgements, etc.) exercised on a case by case basis may decide whether or not *HEL* is to receive an *HEL PD Bonus*, and if so, what the terms thereof shall be.  In exercising his exclusive discretion as to when, whether and/or what

ENB 00462

EM001-006942

*HEL* is to receive as an *HEL PD Bonus*, *Langley* is in no way whatsoever to be limited or restricted by any guidelines and/or course of conduct which he may hereafter develop; i.e., to the extent such guidelines and/or course of conduct are developed they shall exist solely for the convenience of *Langley* to either use or ignore, in whole, or in part, and nothing therein may be relied upon by *HEL* or any *Entity* as restricting or limiting *Langley's* discretion regarding any *HEL PD Bonus*.

6. **OCI.** *Langley's Nominee* shall acquire 80% of *OCI*, subject to *HEL's* receipt of the *"OCI Payments"*, (such payments shall be restricted to the following and *HEL's* recourse shall be limited to the following), to-wit:

    A.  *HEL* shall receive $300,000 upon the Execution of the *Agreement* in 1997 and/or 1998.

    B.  *HEL* shall receive an additional $200,000 in 1998, but shall not be entitled to a 1997 *KPOC Internal Bonus* in 1998.

    C.  Except, as specified in Section 6, D and E hereof, *HEL* (and/or *OCI's* existing shareholders) shall receive all of *OCI's* after tax income and available cash flow for the years 1997 and 1998, in excess of $100,000 as further defined in Item 7.

    D.  Absent 1998 rent, and absent written consent from *Langley* to the contrary, any monies, facilities and/or the fair market value of in kind contributions which *OCI* receives from BGL and/or any *Langley Affiliated Entity* shall be separately accounted for and shall remain in *OCI* (egs., office space, fees, materials, etc.), in addition to the $100,000 referred to in Section 6, C and Section 7 hereof.

    E.  Absent written consent of *Langley* to the contrary, although *HEL* shall provide certain services to *KPOC* internally which were previously performed by *OCI*, in the event that *KPOC* or any *Langley Affiliate* pays fees to *OCI* (which are not paid by *OCI* to third party non-*OCI* employees), then all such fees after January 1, 1998, shall remain in *OCI* (in addition to the $100,000 referred to in Section 6, C and Section 7 hereof) and may not be removed therefrom by *HEL*.

*HEL* shall structure all of the above *OCI Payments* such that the *Pipeline Entities* shall capitalize the same and place them in their rate base, and shall structure his distribution from *KPOC* and/or *OCI* such that his receipt thereof is not inconsistent from a tax perspective or from a regulatory perspective with the *Pipeline Entities* treatment of the *OCI Payment* as capitalized. *Langley's Nominee* shall receive 80% of all the issued and outstanding stock in *OCI* for consulting and project development services in which such *Nominee* shall have a zero or low basis although the fair market value thereof shall be substantial. From the date of this *Agreement*, *OCI* shall not provide any services to *KPOC*, the *Pipeline Entities* and/or any *Langley Affiliates* (it being understood that *HEL* shall generally hereafter replace those services internally); unless, and only unless, *Langley* expressly approves of such additional *OCI* services in writing to be attached hereto. *Langley's Nominee* shall bear no risk of loss for *OCI's* underperformance or loss; i.e., the *Nominee* shall bear only the customary risk of a corporate shareholder which does not include any liability for the lack of economic performance of the corporation, except to the

extent and only to the extent of the price in goods, services or money paid by such shareholder for its stock in the corporation.

7. <u>Transfer of *OCI* Stock Interest.</u>   As of January 1, 1999, given the above condition precedent and/or subsequent that *OCI Payments* have been made to *HEL* pursuant to Section 6, *Langley's Nominee* shall automatically own 80% of the *OCI* stock then outstanding, including the tangible assets and accounts receivable of *OCI*. The tangible assets of *OCI*, including furniture, fixtures and equipment, working capital, prepayments, or other assets will be deemed to have been paid for via the *OCI Payments* and $180,000, i) such payments shall be the formal consideration for the stock purchased/transferred to *Langley's Nominee*, and all tangible and intangible assets of *OCI*; or ii) such amount as mutually agreed upon on a detailed inventory. *HEL* may elect to exclude certain items from such inventory, and will provide a detail of such items. It is understood and agreed that *HEL* shall retain and receive the proceeds of all cash and accounts receivables in excess of $100,000 plus *KPOC* and/or *Langley Affiliate* payments to *OCI* as described in Sections 6, D and E hereof, regardless of whether distributed to *HEL* by January 1, 1999 or not, provided accrual billings are for services actually performed by *OCI* on or before December 31, 1998.

8. <u>Assignment of *OCI* Lease.</u>   Upon execution of this *Agreement*, or as soon thereafter as practical, *KPOC* agrees to accept assignment and/or responsibility for the office space lease dated September 19, 1996 at 7007 College Blvd., Suite 705. Such lease ends October 31, 2001, but *OCI* will pay for such office space from its cash flow, and *KPOC* shall only be contingently liable in the event of an *OCI* default.

9. <u>Internal and/or Independent Audits.</u>   Internal and/or independent audits may, at *Langley's* discretion, be conducted at any time regarding any financial or performance activity of *OCI*, *HEL*, *KPOC*, any *Project* being developed or any *Entity*, project or task in which *Langley* and/or *Langley Affiliated Entities* have any pecuniary or equitable interest. Such audits shall be paid for by *KPOC* and shall be cooperated with fully and completely by *HEL*, *OCI*, *KPOC*, any of *Langley's Affiliated Entities* and by third party entities to the extent the *Affiliated Entities* and/or *Langley* and/or *HEL* can control or assist in such cooperation. Some other firm or individual that is mutually acceptable shall review *OCI* and audit any aspect thereof periodically. Failure to use auditing or review rights shall not constitute a relinquishment or reduction of those rights which vest exclusively in both *KPOC* and *Langley* and are plenary.

10. <u>Termination.</u>   Termination, if for any cause other than misfeasance or malfeasance and if involuntary on *HEL's* part and prior to January 1, 1999, then: i) *Langley's Nominee* shall assign its *OCI* interest to *HEL*, ii) *HEL* shall be entitled to retain whatever portion of the *OCI Payments* he had received to such date, iii) *HEL* shall be entitled to six (6) months severance payment, iv) *HEL* shall not be entitled to any portion of the *KPOC Internal Bonus* for the year in which the involuntary termination occurred, v) *HEL* shall not be entitled to any *HEL PD Bonus* which has not already vested by virtue of his prior receipt thereof in a written conveyance executed by *Langley* pursuant to Section 5 hereof, but he shall not forfeit prior *HEL PD Bonuses* either except on the basis of the terms set forth in writing in such conveyance documents. Termination, if for any cause other than misfeasance or malfeasance

Confidential
HEL Employment Agreement

and if involuntary on *HEL's* after January 1, 1999, then: i) *HEL* shall receive one year's *KPOC Base Salary* without any bonus (i.e. $210,000), ii) *Langley's Nominee* shall retain or receive its *OCI* interests, iii) *HEL* shall be entitled to thirty (30) days severance payment, iv) *HEL* shall not be entitled to any portion of the *KPOC Internal Bonus* for the year in which the involuntary termination occurred, v) *HEL* shall not be entitled to any *HEL PD Bonus* which has not already vested by virtue of his prior receipt thereof in a written conveyance executed by *Langley* pursuant to Section 5 hereof, but he shall not forfeit prior *HEL PD Bonuses* either except on the basis of the terms set forth in writing in such conveyance documents. If *HEL* voluntarily terminates his employment hereunder, then he shall receive 90 days of his base salary as severance, and shall forfeit any and all right to any bonuses for the year in question (the year of the termination), but shall retain the prior vested *HEL PD Bonuses* which he has previously received by a written conveyance document.

## 11. Arbitration Provision.

    11.1   **Settling Disputes.** Pursuant to the following Subsections of this Section 11.1, all claims, disputes and other matters in question arising out of, or relating to this *Agreement* or the breach hereof shall be decided by arbitration under the rules and procedures of the American Arbitration Association, unless the parties mutually agree in writing otherwise. The parties expressly stipulate such claims to be submitted to arbitration hereunder relating to any and all legal, statutory, administrative, equitable and regulatory claims relating to this *Agreement,* the negotiations between the parties concerning this *Agreement,* the claims, securities claims, tort claims, fraud claims, and any and all other legal and/or equitable claims, etc. It is the expressed intent of the parties hereto that any and all conflicts which would arise between the parties and their assigns be submitted to and determined by Arbitration.

    11.2   **Enforceable at Law and in Equity.** It is stipulated that the agreement to arbitrate shall be enforceable via specific performance and/or injunctive relief. The award and judgment rendered by the Arbitrator shall be final and conclusive, and the parties stipulate that legal and/or equitable judgment may be entered upon it in any court having jurisdiction.

    11.3   **Notice.** Notice of the demand for arbitration shall be filed in writing with the other parties to the *Agreement* and with the American Arbitration Association. The demand for arbitration shall be made within a reasonable time (not less than five (5) days and not more than thirty (30) days) after the notice is received. In no event shall notice be given after the date when the institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations or statute of repose. Notice to each party shall either be hand delivered or sent via registered mail, return receipt requested, postage prepaid to the following agents at the following addresses, to-wit:

ENB 00465

EM001-006945

The Bishop Group, Ltd.
Kansas Pipeline Operating Company
8325 Lenexa Drive, Suite 400
Lenexa, Kansas 66214
Telecopier Number: (913) 599-5645

Howard E. Lubow
14068 Mastin
Overland Park, Kansas 66221

Each party hereto may unilaterally change its address described above by giving notice to the other party as described in this Section 11.

In Witness Whereof, the parties have hereunto set their hand the date first above written or consent to and/or ratify the terms hereof as if executed on such date.

Dennis M. Langley
on behalf of *Langley Affiliates* other than
Kansas Pipeline Operating Company

Howard E. Lubow

Overland Consulting, Inc.

by:

Howard E. Lubow, President

Kansas Pipeline Operating Company

by:

Dennis M. Langley, President

ENB 00466

EM001-006946



9.6(b)
8

## EMPLOYMENT CONTRACT

AGREEMENT (herein "Agreement") made effective this 4th day of August, 1998, between Kansas Pipeline Operating Company ("KPOC") and its successors and assigns (hereafter referred to as "Employer" or the "Corporation" or "the Pipelines") and Howard Lubow 14068 Mastin, Overland Park, KS (hereafter referred to as "Employee").

### RECITALS

WHEREAS, Employer desires to retain Employee as Executive Vice-President;

WHEREAS, Employee desires to be employed by Employer;

For the reasons set forth above and in consideration of the mutual covenants and promises of the parties hereto, Employer and Employee agree as follows:

### ARTICLE I
### SCOPE AND TERM OF EMPLOYMENT

1.1  Scope of Employment.   Employer shall employ Employee as Executive Vice-President to supervise and manage the overall day-to-day operation of the Company, supervise other senior management personnel, and all other duties contained in any Employee job description existing as of the date first written above.

### ARTICLE II
### TERM

2.1  Commencement.   This Agreement shall commence on the date first written above and shall terminate on the one (1) year anniversary of said date, provided however, if either party notifies the other in writing on or before thirty (30) days before the expiration of the initial term or any renewal thereof, then this Agreement shall automatically renew for an additional one (1) year term. Employee shall be employed "at will" by Employer, such that Employer may terminate this Agreement and Employee's employment hereunder for any reason or no reason at all.

If, and only if, there should be a Change of Control during the term hereof or any renewal term, and if Employer terminates Employee's employment with the Pipeline, then upon termination of Employee's employment, Employee shall return all personal property, data, equipment, lists or information or property of any kind of the Corporation to Employer. Should there be no Change of Control and Employer terminates this Agreement, for reasons other than for cause, then Employee shall be entitled to severance pay equal to three (3) months multiplied by the monthly salary then being paid to Employee, as well as being entitled to any lawfully required COBRA benefits.

# EXHIBIT B

ENB 00467

## ARTICLE III
## COMPENSATION

3.1      Compensation.

a.      Wages.      Employee shall be paid not less than the salary being paid to Employee as of the first day of the month immediately preceding the date first written above. Employee may receive a salary increase, but no salary decrease during the term hereunder.

b.      Benefits.      Employee shall receive the same health, dental, disability insurance and life insurance benefits, 401(k) matching contributions, cafeteria plan options, etc. as Employee was receiving prior to the date first written above, subject to modification in benefits implemented on a company wide basis.

c.      Car Allowance.      Employee shall receive the same car allowance and/or vehicle benefits during the term hereunder as Employee was receiving on the first day of the month immediately preceding the date first written above.

d.      Severance.      In the event that the ownership of The Bishop Group, Ltd. (BGL) and/or the Pipelines change during the term of this Agreement, such that Dennis M. Langley does not directly or indirectly own more than 51% of the common voting stock of BGL or Dennis M. Langley does not directly and effectively control the Pipelines (hereafter such event shall be called "Change of Control"), then Employee shall exercise only one of two options within sixty (60) days after the effective date of such Change of Control by sending written notice to Employer as to which option is selected. Should Employer receive no written notice as to the option chosen, then Option 2 shall be the option selected automatically under this Agreement.

Option 1.      Employee may elect to remain employed "at will" pursuant to the terms of the Agreement hereunder and be paid accordingly hereunder; or

Option 2.      Employee may elect to voluntarily cease employment under this Agreement upon which cessation of employment, Employee shall receive the following benefits:

A.      A lump sum cash payment equal to eighteen (18) multiplied by Employee's monthly salary as of the date of ownership change.

ENB 00468

2

EM001-006948

B.     Employer will pay for Employee's health care insurance and dental insurance under COBRA for the lawfully required period after Employee's last date of employment for which COBRA benefits must be made available.

C.     Employer shall fully cooperate and assist Employee's transfer and rollover of any and all 401(k) plan benefits vested to Employee as of the date of employment and shall pay any and all transfer fees and/or penalties associated with Employee withdrawing and transferring out of the Company's 401 (k) plan.

D.     Employer shall pay Employee a lump sum of cash for the same vehicle benefits and/or car allowance as described in 3.1(c) above, which Employee would have received for the period described in Option 2, Paragraph A above.

If Employee elects Option 2 the lump sum payment due shall be paid within fifteen (15) days after the Employer receives the written notice.

## ARTICLE IV
## MISCELLANEOUS

4.1     Agreement Subject to Laws.  If any provision of this Agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the later shall control and this Agreement shall be deemed modified accordingly, but the remainder of this Agreement and the application of such provisions to the other parties or circumstances shall not be effected thereby, and in all other respects the Agreement shall continue in full force and effect.

4.2     Agreement Governed by the Laws of Kansas.  This Agreement shall be governed by and construed in accordance with the internal laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

4.3     Notices.  All notices and other correspondence required or made necessary by the terms of this Agreement shall be delivered, postage prepaid, return receipt requested to the respective parties hereto at the following addresses:

EMPLOYEE:     Howard Lubow
              14068 Mastin
              Overland Park, KS 66221

EMPLOYER:     Kansas Pipeline Operating Company
              c/o Personnel Department
              8325 Lenexa Drive, Suite 400
              Lenexa, KS 66214

3

ENB 00469

EM001-006949

or to such other addresses as either party hereto may designate in writing to the other party. Notices also may be given by telegram, telex, or telecopy. A notice shall be deemed received when actually received by the party to whom it is addressed.

4.4 <u>Waiver.</u>      Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provisions hereafter. Either party's failure or delay in protesting, or contending breach pursuant to Section 5412, or taking legal action or demanding arbitration upon the other party's breach is no waiver of that cause of action, unless that party's delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations. Any party's failure or delay in protesting, or contending breach pursuant to Section 4.12 or taking legal and/or equitable action or demanding arbitration upon the other party's breach is not to be considered as being a waiver of that party's cause of action for any subsequent breach of the same or of a different nature.

4.5 <u>Assignment Prohibited.</u>      This Agreement shall not be assigned by either party hereto, without the prior written consent of the other party, provided that Employee can assign this Agreement to an affiliated entity of Employer without the consent of Employee.

4.6 <u>Recitals.</u>      The recitals of this Agreement are incorporated in the text of this Agreement as mutual and substantive terms hereof and may be relied upon by employee during any and all proceedings in law, equity and/or arbitration.

4.7 <u>Modifications and Amendments.</u>      Any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and executed amendments. It is stipulated that oral modifications and amendments hereto shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or adjudication.

4.8 <u>Titles of Articles, Section and Subsections.</u>      The titles and subtitles of Articles, Sections and Subsections of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of this Agreement or in any way influence the interpretation of this Agreement.

4.9 <u>Invalidity of Part.</u>      The parties to this Agreement view this Agreement as legal and fair in all respects and have taken reasonable diligence to insure that this Agreement is legal and fair.

ENB 00470

EM001-006950

4.10 <u>Duplicate Originals.</u> This contract may be executed in duplicate originals, with Employer and Employee each receiving an original.

4.11 <u>Further Assurances.</u> The parties hereby agree to execute any and all documents, transfers, notes, affidavits, minutes, resolutions, instruments or the like in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

4.12 <u>Breach, Notice and Cure.</u> In the event, that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(es) describing such breach(es) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual receipt of such notice to cure said breach(es) if it concurs that the complaint(s) constitute breach(es), or it may elect to provide a cure to the complaining party's contended breach(es) even if the purported breaching party is of the belief that the complaint(s) do not constitute a breach(es) hereof, and if so cured by the purported breaching party the breach(es) shall be deemed to have never occurred. In the event the parties cannot agree as to whether the complaint(s) constitute a breach(es) of the terms hereof, and the purported breaching party does not elect to undertake the expense of resolving the complaint(s), then the parties agree they may pursue any legal remedy they may have available.

4.13 <u>Independent Legal Counsel.</u> The law firm of Tino M. Monaldo, Chartered has represented the Company exclusively in the negotiation, drafting and execution of this Agreement. The Employee has been represented by his own independent legal counsel or has waived by opportunity to such counsel.

4.14. <u>Employee Will Not Disclose Confidential Information.</u> It is understood that in the course of his/her activities on behalf of Employer, Employee may acquire, be informed of or have access to trade secrets and certain other information deemed to be confidential or proprietary by Employer. Without the express and prior written consent of Employer, Employee shall never communicate or disclose, either during the term of his/her employment with Employer or at any time subsequent to the termination of such employment, any confidential information to any person or use any confidential information, either for the benefit of Employee or for the benefit of any person, firm partnership, corporation or other entity, other than Employer, for any reason or purpose.

As used in this Agreement, the phrase "confidential information" means all information pertaining to past, present or future business of Employer, price lists, methods or policies, formulas, processes, procedures or standards, know-how, manuals, handbooks, instructions, techniques, business strategies, technology, materials, customer lists, vendors' or suppliers' names and addresses, proprietary information, trade secrets, financial information and all other information, knowledge or data of any kind or character relating to Employer's business, whether or not reduced to writing, which Employer considers confidential and which is not

5

ENB 00471

generally available to the public. Specifically, Employer may from time-to time explore acquiring companies or the Employer or its affiliates may explore selling assets or stock of the Employer or such affiliates. The existence of any such explorations or any discussions, negotiations or agreements related thereto or any of the terms thereof shall specifically be included in the phrase "confidential information". Moreover, any such targets or potential acquirors may be public companies. As a result, the Employee may acquire and may not use any inside information that may be acquired by Employee (as defined in Federal or state securities laws), and the Employee agrees that any such "inside information" shall also be included in the phrase "confidential information.

Employee further agrees that Employee will use Employee's best efforts at all times to safeguard any confidential information made available to Employee from falling into the hands of any unauthorized person (including other employees of Employer), and in particular, will not permit any such information which has been reduced to writing to be read, duplicated or extracted by any person except upon the written authorization of Employer. In the event Employee is specifically instructed by Employer to divulge any confidential information Employee may have, Employee will do so in strict compliance with such instructions. Upon termination of employment with Employer, or whenever Employer shall request, Employee shall promptly deliver to Employer all drawings, blueprints, manuals, letters, notes, handbooks, reports, customer lists, price lists and all other written materials containing confidential, proprietary or secret information or data relating to Employer's or any affiliate's business which are now in the possession or under the control of Employee and will not retain any copies thereof.

Should Employee breach the provisions of this Paragraph at any time, in addition to any other remedies Employer may have, Employee shall irrevocably forfeit any compensation that would otherwise be due and owing to Employee pursuant to Paragraph 3.1(d) of this Agreement.

IN WITNESS WHEREOF, the parties have hereunto set their hands the day and year first written above, or consent to the terms hereof, as if executed on such date.

EMPLOYER:
Kansas Pipeline Operating Company,
a Kansas general partnership

By: _Dennis M. Langley_
Dennis Langley, President

ENB 00472

6

EM001-006952

EMPLOYEE:

By: _____

Howard Lubow, Individually

7

ENB 00473

EM001-006953

46

# RELEASE

This Release (Agreement) is entered into 29th day of October, 1999, by and between Howard Lubow (Employee) and Kansas Pipeline Operating Company (KPOC) and Kansas Pipeline Company (KPC) (collectively KPOC and KPC shall be referred to as Employer)

Whereas Employee and Employer executed an employment agreement dated August 4, 1998, (Employment Agreement)

Whereas the parties desire to terminate said Employment Agreement;

Therefore, in consideration of ten ($10) dollars, the promises of covenants contained herein, and other good and valuable consideration, receipt of which is acknowledged hereby the undersigned agree as follows:

1.   Release.  Employee forever releases and waives Employer, its officers, directors and agents, as well as Employers' affiliates, successors and assigns from any and all claims, causes of actions, attorney's fees, damages or encumbrances of any kind whatsoever, now knowing, or hereafter acquired, arising out of, directly or indirectly, the Employment Agreements, including but not limited to, any compensation or severance claims described in Article III of the Employment Agreement.

2.   COBRA.  Employer shall not be relieved of any COBRA obligations it may have to Employee arising as a matter of law as of the date first written above, notwithstanding the termination of the Employment Agreement.

3.   Termination.  The Employment Agreement shall be terminated as of the date first written above and shall be of no force or effect, provided however, our obligations of Employee regarding confidentiality described in the Employment Agreement shall survive beyond the date first written above. As of the date first written above, there shall be no written or verbal agreement between Employer or Employee regarding Employee's terms and conditions of employment.

4.   Agreement Subject to Laws.  If any provision of this agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the later shall control and this Agreement shall be deemed modified accordingly, but the remainder of this Agreement and the application of such provisions to the other parties or circumstances shall not be effected thereby, and in all other respects the Agreement shall continue in full force and effect.

5.   Agreement Governed by the Laws of Kansas.  This Agreement shall be governed by and construed in accordance with the internal laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

Release_lubow.doc

## EXHIBIT C

ENB 00474

EM001-006954

6.   **Notices.** All notices and other correspondence required or made necessary by the terms of this Agreement shall be delivered, postage prepaid, return receipt requested to the respective parties hereto at the following addresses:

   EMPLOYEE:        Howard E. Lubow
                    14068 Mastin
                    Overland Park, KS 66221

   EMPLOYER:        Kansas Pipeline Company
                    c/o Personnel Department
                    8325 Lenexa Drive, Suite 400
                    Lenexa, KS 66214

or to such other addresses as either party hereto may designate in writing to the other party. Notices also may be given by telegram, telex, or telecopy. A notice shall be deemed received when actually received by the party to whom it is addressed.

7.   **Waiver.** Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provisions hereafter. Either party's failure or delay in protesting, or contending breach pursuant to Section 15, or taking legal action or demanding arbitration upon the other party's breach is no waiver of that cause of action, unless that party's delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations. Any party's failure or delay in protesting, or contending breach pursuant to Section 15 or taking legal and/or equitable action or demanding arbitration upon the other party's breach is not to be considered as being a waiver of that party's cause of action for any subsequent breach of the same or of a different nature.

8.   **Assignment Prohibited.** This Agreement shall not be assigned by either party hereto, without the prior written consent of the other party, provided that Employee can assign this Agreement to an affiliated entity of Employer without the consent of Employee.

9.   **Recitals.** The recitals of this Agreement are incorporated in the text of this Agreement as mutual and substantive terms hereof and may be relied upon by employee during any and all proceedings in law, equity and/or arbitration.

10.  **Modifications and Amendments.** Any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and executed amendments. It is stipulated that oral modifications and amendments

2

**ENB 00475**

EM001-006955

hereto shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or adjudication.

11. **Titles of Articles, Section and Subsection.** The titles and subtitles of Articles, Sections and Subsections of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of this Agreement or in any way influence the interpretation of this Agreement.

12. **Invalidity of Part.** The parties to this Agreement view this Agreement as legal and fair in all respects and have taken reasonable diligence to insure that this Agreement is legal and fair.

13. **Duplicate Originals.** This contract may be executed in duplicate originals, with Employer and Employee each receiving an original.

14. **Further Assurances.** The parties hereby agree to execute any and all documents, transfers, notes, affidavits, minutes, resolutions, instruments or the like in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

15. **Breach, Notice and Cure.** In the event, that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(es) describing such breach(es) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual receipt of such notice to cure said breach(es) if it concurs that the complaint(s) constitute breach(es), or it may elect to provide a cure to the complaining party's contended breach(es) even if the purported breaching party is of the belief that the complaint(s) do not constitute a breach(es) hereof, and if so cured by the purported breaching party the breach(es) shall be deemed to have never occurred. In the event the parties cannot agree as to whether the complaint(s) constitute a breach(es) of the terms hereof, and the purported breaching party does not elect to undertake the expense of resolving the complaint(s), then the parties agree they may pursue any legal remedy they may have available.

16. **Independent Legal Counsel.** The law firm of Tino M. Monaldo, Chartered has represented the Company exclusively in the negotiation, drafting and execution of this Agreement. The Employee has been represented by his own independent legal counsel or has waived by opportunity to such counsel.

3

**ENB 00476**

EM001-006956

**IN WITNESS WHEREOF**, the parties have hereunto set their hands the day and year first written above, or consent to the terms hereof, as if executed on such date.

**EMPLOYER:**

Kansas Pipeline Company, a Kansas general partnership on its own behalf and on behalf of Kansas Pipeline Operating Company

By:   Syenergy Pipeline Company. L.P., its general partner

By:   Bishop Pipeline Company, its general partner

By: _____

Name:  Dennis M. Langley
Title:  President

**EMPLOYEE:**

By: _____

Howard E. Lubow

**ENB 00477**

**EM001-006957**

## AGREEMENT

### RECITALS

Whereas Kansas Pipeline Operating Company (KPOC) and Howard E. Lubow (HEL) were parties to a certain Agreement dated August 5, 1997, a copy of which is attached hereto as Exhibit A; and

Whereas KPOC and HEL were parties to a certain Agreement dated August 4, 1998, a copy of which is attached hereto as Exhibit B; and

Whereas KPOC and HEL were parties to a certain Release Agreement dated October 24, 1999, a copy of which is attached hereto as Exhibit C; and

Whereas KPOC and HEL were parties to a certain Bonus Plan and Split-Dollar Agreements, both dated August 3, 1999, copies of which are attached hereto as Exhibit D; and

Whereas KPOC and HEL are parties to certain other oral and written agreements, pursuant to which HEL, through Overland Consulting, Inc. and/or OCI Resources, Inc., provides certain consulting services to KPOC; and

Whereas the parties hereto desire to confirm certain understandings between them through this Agreement;

Now, therefore, the parties have reached the following:

### AGREEMENTS

1.      As consideration for the agreements of KPOC as set forth herein, HEL does, hereby, waive any and all claims for vacation benefits due from KPOC or any KPOC affiliate; and

2.      As further consideration for KPOC's agreements as set forth herein, HEL agrees to cause former KPOC employee Vicki Bryan to waive any and all claims for unpaid vacation benefits that she may have against KPOC and, further, agrees to indemnify and hold KPOC (or any KPOC affiliate) harmless in the event that Vicki Bryan, or any one claiming through or on her behalf, makes any claim against KPOC (or any KPOC affiliate) related to vacation benefits due from KPOC (or any KPOC affiliate);

3.      In exchange for the consideration set forth in numbered paragraphs 1 and 2 above, KPOC agrees that it has not and shall not, at any time, or under any circumstances, sell, transfer, convey, or in any other way hypothecate, any suit, claim, or cause of action arising out of or in any way related to any of its rights (or those of any of its affiliates) under the Agreements attached hereto as Exhibits A, B, C and D, to any other person or entity, whatsoever.

Agreed this _____ day of June, 2000.

KANSAS PIPELINE OPERATING COMPANY

By:_____

Its:_____

_____
Howard E. Lubow

21046893\V-3

ENB 00478

## HEL Employment Agreement

This *Agreement* entered into this 5th day of August, 1997, and revised and restated on this 30th day of April, 1998.

*HEL* shall mean Howard E. Lubow.

*KPOC* shall mean Kansas Pipeline Operating Company, its successors and/or assigns or any other *Langley Affiliated Entity(s)* nominated by *Langley* to fulfill the terms of this *Agreement*. Kansas Pipeline Operating Company, may be merged, consolidated and/or reorganized with another *Entity(s)* to form a new *Langley Entity*.

*Langley* shall mean Dennis M. Langley.

*Langley Affiliate* or *Langley Affiliated Entity* shall mean any legal *Entity* (corporation, limited or general partnership, joint venture, proprietorship, project, trust, estate and/or any entity or person) in which *Langley* has a five percent (5%) or greater interest, direct or indirect ownership or an equitable interest. An indirect interest shall be any equitable or legal interest owned by or inuring to any *Entity(s)* or any sequence of *Entities* related or commonly owned *Entity(s)* in which *Langley* has a five percent (5%) or greater ownership or equitable interest.

*Langley PD Interest* is defined as a net revenue, after tax, after debt service, which shall be restricted to whatever restrictions (debt, cash flow distributions, sinking fund, subordination, encumbrance, etc.).

*Langley Nominee* shall have the meaning ascribed thereto in Section 6 of this *Agreement*, and may be any third party, *Langley Affiliate* and/or *Langley*.

*OCI* shall mean Overland Consulting, Inc.

*OCI Payment* shall have the meaning ascribed thereto in Section 6 of this *Agreement*.

*PD* shall mean project development.

*Pipeline Entity(s)* shall mean Kansas Pipeline Partnership, KansOk Partnership, Riverside Pipeline Company, L.P., the Syenergy Partnership, Bishop Pipeline Company, *KPOC* and/or Riverside Pipeline Partnership.

# EXHIBIT A

ENB 00479

EM001-006959

1. **Full Time Employee.** 100% of *HEL's* time shall be spent as an employee of *KPOC*. *HEL's* job description, tasks, duties and responsibilities shall be whatever *Langley* reasonably desires, wants or delegates, whether orally or in writing. This includes any redefinition of job functions, title, duties, etc. Any such change shall be consistent with *HEL's* expertise and experience. *HEL's* initial title shall be Executive Vice President, and he shall perform those services that are practical, given *HEL's* other duties and responsibilities, that were previously provided to *KPOC* by *OCI*, as part of his tasks and duties.

2. **Base Salary.** *HEL's KPOC* base salary shall be $210,000/year which shall be paid in twenty-four equal payments throughout the year and shall be paid pro-rata through the date of termination in the event of a voluntary or involuntary termination of this *Agreement. HEL* shall receive cost of living adjustments, consistent with adjustments made for other senior officers of *KPOC*.

3. **Benefits.** *HEL* shall receive health insurance, car allowance, travel, meals, entertainment expenses, etc. consistent with benefits provided by *KPOC* to senior officers, excluding the CEO. For purposes of determining vacation, eligibility in the profit sharing plan, etc., *HEL* shall be entitled to 4 weeks vacation or the maximum allowed by *KPOC* and *HEL* shall be eligible with allowable vesting in the profit sharing plan, giving recognition for *OCI* years of service.

4. **KPOC Internal Bonus.** Commencing with the calendar year 1998, *HEL* may receive a *KPOC Internal Bonus* which shall be based on the economic performance of the *Pipeline Entities* and shall be linear from $0 to a $216,000/annum cap. Such bonus, among other things, will be based on *KPOC* operating results relative to economic performance and return to *Shareholders. HEL's* internal bonus will be based both on total *KPOC* operating results in his capacity of *EVP*, and on the departmental results under his direct control. The bonus will be based on criteria established by *Langley* annually, but *Langley*, in his sole discretion, may or may not award a bonus based on criteria which are outside the following criteria:

   A. The DSCR must equal or exceed 1.20, after distributions to BGL, *Langley*, or his assigns.

   B. The Debt Service Reserve must be fully funded.

   C. There must be no events of default, material adverse effect and/or potential default regarding any debt instrument or loan(s) currently outstanding, and all Bishop affiliates must be in full compliance with all terms and conditions of any and all material agreements (including debt or loan agreements) which are outstanding.

   D. There must be no material adverse event, no default or potential default under the Syenergy Note.

   E. *Langley* shall receive as salary from *KPOC* equal to or greater than $435,000, and Butcher Interest distributions shall be equal to or greater than $400,000.

ENB 00480

EM001-006960

F.  BGL shall have achieved equal or greater than the following economic performances:
   i)    $3,500,000 of dividends distributed from Syenergy; and
   ii)   $1,000,000 cash on hand after its distributions to shareholders.

G.  Syenergy and/or KPC shall have achieved equal or greater than the following economic performances:
   i)    $3,500,000 of ordinary pre-tax income, excluding depreciation; and
   ii)   $1,000,000 cash on hand.

H.  Equal to or greater than $750,000 of project development expenditures shall be generated out of Syenergy cash flow independent of, and in addition to the above criteria.

Once the above minimum requirements or thresholds have been achieved as determined by *Langley* via the use of reasonable discretion, then *HEL* shall be entitled to a *KPOC Internal Bonus* of at least $108,000, plus an additional *KPOC Internal Bonus* of up to, but not greater than, another $108,000 (i.e., or maximum total per annum *KPOC Internal Bonus* of $216,000; $108,000 + $108,000) on a linear basis starting at the threshold of $3,500,000 of ordinary pre-tax Syenergy and/or *KPOC* income and culminating with any amount equal to or greater than $6,000,000 of ordinary, pre-tax Syenergy and/or *KPOC* income. For purpose of Section 4, "ordinary" income or cash flow shall mean income determined by *Langley* in his exclusive, but reasonable, discretion to be *Pipeline Entity* ordinary, day to day income derived from rates, and shall exclude the following: *PD Income*, income from the sale of assets, marketing income post federal regulation, interest income, non-pipeline investment income, all income not derived by the *Pipeline Entities* from State or Federally approved rates, like or similar income, etc. The extent to which these items may affect *HEL's* compensation, will be considered separately, and at *Langley's* sole discretion.

For each year subsequent to 1998 (no later than March 31 of the year in question and no earlier than September 30 of the year immediately preceding the year in question), *Langley* shall develop the criteria to apply to the following year.

5.  **HEL PD Bonus**.  In addition to the *KPOC Internal Bonus*, *HEL* may from time to time in *Langley's* total and exclusive discretion receive an *HEL PD Bonus*. It is the desire of *Langley* and *HEL*, that *HEL* bring material and substantive *PD* expertise, experience and performance to *Langley*, *Langley Affiliated Entity(s)* and *KPOC*, and *HEL* is being employed hereunder and being compensated as provided for above in paragraphs 2, 3 and 4 for the same. However, if and when *Langley*, in his exclusive and complete discretion, is of the belief that *HEL's* performance regarding the discovery or closing of a particular *PD Entity* warrants the reward of a supplemental bonus beyond that set for the in paragraph 4 above, then *Langley* may grant an *HEL PD Bonus*. *HEL* shall not receive any *HEL PD Bonus*, unless and until, the terms of the same (to be determined in the exclusive discretion of *Langley*) have been set forth in writing and executed by *Langley*, it being clearly and unambiguously understood that *Langley* in his sole and exclusive judgement (which may be arbitrary, capricious, inconsistent with prior judgements, etc.) exercised on a case by case basis may decide whether or not *HEL* is to receive an *HEL PD Bonus*, and if so, what the terms thereof shall be. In exercising his exclusive discretion as to when, whether and/or what

ENB 00481

EM001-006961

*HEL* is to receive as an *HEL PD Bonus*, *Langley* is in no way whatsoever to be limited or restricted by any guidelines and/or course of conduct which he may hereafter develop; i.e., to the extent such guidelines and/or course of conduct are developed they shall exist solely for the convenience of *Langley* to either use or ignore, in whole, or in part, and nothing therein may be relied upon by *HEL* or any *Entity* as restricting or limiting *Langley's* discretion regarding any *HEL PD Bonus*.

6.  **OCI.**  *Langley's Nominee* shall acquire 80% of *OCI*, subject to *HEL's* receipt of the *"OCI Payments"*, (such payments shall be restricted to the following and *HEL's* recourse shall be limited to the following), to-wit:

A.  *HEL* shall receive $300,000 upon the Execution of the *Agreement* in 1997 and/or 1998.

B.  *HEL* shall receive an additional $200,000 in 1998, but shall not be entitled to a 1997 *KPOC Internal Bonus* in 1998.

C.  Except, as specified in Section 6, D and E hereof, *HEL* (and/or *OCI's* existing shareholders) shall receive all of *OCI's* after tax income and available cash flow for the years 1997 and 1998, in excess of $100,000 as further defined in Item 7.

D.  Absent 1998 rent, and absent written consent from *Langley* to the contrary, any monies, facilities and/or the fair market value of in kind contributions which *OCI* receives from BGL and/or any *Langley Affiliated Entity* shall be separately accounted for and shall remain in *OCI* (egs., office space, fees, materials, etc.), in addition to the $100,000 referred to in Section 6, C and Section 7 hereof.

E.  Absent written consent of *Langley* to the contrary, although *HEL* shall provide certain services to *KPOC* internally which were previously performed by *OCI*, in the event that *KPOC* or any *Langley Affiliate* pays fees to *OCI* (which are not paid by *OCI* to third party non-*OCI* employees), then all such fees after January 1, 1998, shall remain in *OCI* (in addition to the $100,000 referred to in Section 6, C and Section 7 hereof) and may not be removed therefrom by *HEL*.

*HEL* shall structure all of the above *OCI Payments* such that the *Pipeline Entities* shall capitalize the same and place them in their rate base, and shall structure his distribution from *KPOC* and/or *OCI* such that his receipt thereof is not inconsistent from a tax perspective or from a regulatory perspective with the *Pipeline Entities* treatment of the *OCI Payment* as capitalized. *Langley's Nominee* shall receive 80% of all the issued and outstanding stock in *OCI* for consulting and project development services in which such *Nominee* shall have a zero or low basis although the fair market value thereof shall be substantial. From the date of this *Agreement*, *OCI* shall not provide any services to *KPOC*, the *Pipeline Entities* and/or any *Langley Affiliates* (it being understood that *HEL* shall generally hereafter replace those services internally); unless, and only unless, *Langley* expressly approves of such additional *OCI* services in writing to be attached hereto. *Langley's Nominee* shall bear no risk of loss for *OCI's* underperformance or loss; i.e., the *Nominee* shall bear only the customary risk of a corporate shareholder which does not include any liability for the lack of economic performance of the corporation, except to the

extent and only to the extent of the price in goods, services or money paid by such shareholder for its stock in the corporation.

7. <u>Transfer of *OCI* Stock Interest.</u>  As of January 1, 1999, given the above condition precedent and/or subsequent that *OCI Payments* have been made to *HEL* pursuant to Section 6, *Langley's Nominee* shall automatically own 80% of the *OCI* stock then outstanding, including the tangible assets and accounts receivable of *OCI*. The tangible assets of *OCI*, including furniture, fixtures and equipment, working capital, prepayments, or other assets will be deemed to have been paid for via the *OCI Payments* and $180,000, i) such payments shall be the formal consideration for the stock purchased/transferred to *Langley's Nominee*, and all tangible and intangible assets of *OCI*; or ii) such amount as mutually agreed upon on a detailed inventory. *HEL* may elect to exclude certain items from such inventory, and will provide a detail of such items. It is understood and agreed that *HEL* shall retain and receive the proceeds of all cash and accounts receivables in excess of $100,000 plus *KPOC* and/or *Langley Affiliate* payments to *OCI* as described in Sections 6, D and E hereof, regardless of whether distributed to *HEL* by January 1, 1999 or not, provided accrual billings are for services actually performed by *OCI* on or before December 31, 1998.

8. <u>Assignment of *OCI* Lease.</u>  Upon execution of this *Agreement*, or as soon thereafter as practical, *KPOC* agrees to accept assignment and/or responsibility for the office space lease dated September 19, 1996 at 7007 College Blvd., Suite 705. Such lease ends October 31, 2001, but *OCI* will pay for such office space from its cash flow, and *KPOC* shall only be contingently liable in the event of an *OCI* default.

9. <u>Internal and/or Independent Audits.</u>  Internal and/or independent audits may, at *Langley's* discretion, be conducted at any time regarding any financial or performance activity of *OCI*, *HEL*, *KPOC*, any *Project* being developed or any *Entity*, project or task in which *Langley* and/or *Langley Affiliated Entities* have any pecuniary or equitable interest. Such audits shall be paid for by *KPOC* and shall be cooperated with fully and completely by *HEL*, *OCI*, *KPOC*, any of *Langley's Affiliated Entities* and by third party entities to the extent the *Affiliated Entities* and/or *Langley* and/or *HEL* can control or assist in such cooperation. Some other firm or individual that is mutually acceptable shall review *OCI* and audit any aspect thereof periodically. Failure to use auditing or review rights shall not constitute a relinquishment or reduction of those rights which vest exclusively in both *KPOC* and *Langley* and are plenary.

10. <u>Termination.</u>  Termination, if for any cause other than misfeasance or malfeasance and if involuntary on *HEL's* part and prior to January 1, 1999, then:  i) *Langley's Nominee* shall assign its *OCI* interest to *HEL*, ii) *HEL* shall be entitled to retain whatever portion of the *OCI Payments* he had received to such date, iii) *HEL* shall be entitled to six (6) months severance payment, iv) *HEL* shall not be entitled to any portion of the *KPOC Internal Bonus* for the year in which the involuntary termination occurred, v) *HEL* shall not be entitled to any *HEL PD Bonus* which has not already vested by virtue of his prior receipt thereof in a written conveyance executed by *Langley* pursuant to Section 5 hereof, but he shall not forfeit prior *HEL PD Bonuses* either except on the basis of the terms set forth in writing in such conveyance documents. Termination, if for any cause other than misfeasance or malfeasance

ENB 00483

EM001-006963

and if involuntary on *HEL's* after January 1, 1999, then:  i) *HEL* shall receive one year's *KPOC Base Salary* without any bonus (i.e. $210,000), ii) *Langley's Nominee* shall retain or receive its *OCI* interests, iii) *HEL* shall be entitled to thirty (30) days severance payment, iv) *HEL* shall not be entitled to any portion of the *KPOC Internal Bonus* for the year in which the involuntary termination occurred, v) *HEL* shall not be entitled to any *HEL PD Bonus* which has not already vested by virtue of his prior receipt thereof in a written conveyance executed by *Langley* pursuant to Section 5 hereof, but he shall not forfeit prior *HEL PD Bonuses* either except on the basis of the terms set forth in writing in such conveyance documents.  If *HEL* voluntarily terminates his employment hereunder, then he shall receive 90 days of his base salary as severance, and shall forfeit any and all right to any bonuses for the year in question (the year of the termination), but shall retain the prior vested *HEL PD Bonuses* which he has previously received by a written conveyance document.

## 11. Arbitration Provision.

11.1   **Settling Disputes.**  Pursuant to the following Subsections of this Section 11.1, all claims, disputes and other matters in question arising out of, or relating to this *Agreement* or the breach hereof shall be decided by arbitration under the rules and procedures of the American Arbitration Association, unless the parties mutually agree in writing otherwise.  The parties expressly stipulate such claims to be submitted to arbitration hereunder relating to any and all legal, statutory, administrative, equitable and regulatory claims relating to this *Agreement*, the negotiations between the parties concerning this *Agreement*, the claims, securities claims, tort claims, fraud claims, and any and all other legal and/or equitable claims, etc.  It is the expressed intent of the parties hereto that any and all conflicts which would arise between the parties and their assigns be submitted to and determined by Arbitration.

11.2   **Enforceable at Law and in Equity.**  It is stipulated that the agreement to arbitrate shall be enforceable via specific performance and/or injunctive relief.  The award and judgment rendered by the Arbitrator shall be final and conclusive, and the parties stipulate that legal and/or equitable judgment may be entered upon it in any court having jurisdiction.

11.3   **Notice.**  Notice of the demand for arbitration shall be filed in writing with the other parties to the *Agreement* and with the American Arbitration Association.  The demand for arbitration shall be made within a reasonable time (not less than five (5) days and not more than thirty (30) days) after the notice is received.  In no event shall notice be given after the date when the institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations or statute of repose.  Notice to each party shall either be hand delivered or sent via registered mail, return receipt requested, postage prepaid to the following agents at the following addresses, to-wit:

ENB 00484

EM001-006964

The Bishop Group, Ltd.
Kansas Pipeline Operating Company
8325 Lenexa Drive, Suite 400
Lenexa, Kansas 66214
Telecopier Number: (913) 599-5645

Howard E. Lubow
14068 Mastin
Overland Park, Kansas 66221

Each party hereto may unilaterally change its address described above by giving notice to the other party as described in this Section 11.

In Witness Whereof, the parties have hereunto set their hand the date first above written or consent to and/or ratify the terms hereof as if executed on such date.

Dennis M. Langley
on behalf of *Langley Affiliates* other than
Kansas Pipeline Operating Company

Howard E. Lubow

Overland Consulting, Inc.

by:

Howard E. Lubow, President

Kansas Pipeline Operating Company

by:

Dennis M. Langley, President

ENB 00485

EM001-006965

9.6(b)
8 

## EMPLOYMENT CONTRACT

AGREEMENT (herein "Agreement") made effective this 4th day of August, 1998, between Kansas Pipeline Operating Company ("KPOC") and its successors and assigns (hereafter referred to as "Employer" or the "Corporation" or "the Pipelines") and Howard Lubow 14068 Mastin, Overland Park, KS (hereafter referred to as "Employee").

### RECITALS

WHEREAS, Employer desires to retain Employee as Executive Vice-President;

WHEREAS, Employee desires to be employed by Employer;

For the reasons set forth above and in consideration of the mutual covenants and promises of the parties hereto, Employer and Employee agree as follows:

### ARTICLE I
### SCOPE AND TERM OF EMPLOYMENT

1.1     Scope of Employment.     Employer shall employ Employee as Executive Vice-President to supervise and manage the overall day-to-day operation of the Company, supervise other senior management personnel, and all other duties contained in any Employee job description existing as of the date first written above.

### ARTICLE II
### TERM

2.1     Commencement.     This Agreement shall commence on the date first written above and shall terminate on the one (1) year anniversary of said date, provided however, if either party notifies the other in writing on or before thirty (30) days before the expiration of the initial term or any renewal thereof, then this Agreement shall automatically renew for an additional one (1) year term. Employee shall be employed "at will" by Employer, such that Employer may terminate this Agreement and Employee's employment hereunder for any reason or no reason at all.

If, and only if, there should be a Change of Control during the term hereof or any renewal term, and if Employer terminates Employee's employment with the Pipeline, then upon termination of Employee's employment, Employee shall return all personal property, data, equipment, lists or information or property of any kind of the Corporation to Employer. Should there be no Change of Control and Employer terminates this Agreement, for reasons other than for cause, then Employee shall be entitled to severance pay equal to three (3) months multiplied by the monthly salary then being paid to Employee, as well as being entitled to any lawfully required COBRA benefits.

# EXHIBIT B     1

ENB 00486

EM001-006966

## ARTICLE III
## COMPENSATION

3.1     Compensation.

a.     Wages.     Employee shall be paid not less than the salary being paid to Employee as of the first day of the month immediately preceding the date first written above. Employee may receive a salary increase, but no salary decrease during the term hereunder.

b.     Benefits.     Employee shall receive the same health, dental, disability insurance and life insurance benefits, 401(k) matching contributions, cafeteria plan options, etc. as Employee was receiving prior to the date first written above, subject to modification in benefits implemented on a company wide basis.

c.     Car Allowance.     Employee shall receive the same car allowance and/or vehicle benefits during the term hereunder as Employee was receiving on the first day of the month immediately preceding the date first written above.

d.     Severance.     In the event that the ownership of The Bishop Group, Ltd. (BGL) and/or the Pipelines change during the term of this Agreement, such that Dennis M. Langley does not directly or indirectly own more than 51% of the common voting stock of BGL or Dennis M. Langley does not directly and effectively control the Pipelines (hereafter such event shall be called "Change of Control"), then Employee shall exercise only one of two options within sixty (60) days after the effective date of such Change of Control by sending written notice to Employer as to which option is selected. Should Employer receive no written notice as to the option chosen, then Option 2 shall be the option selected automatically under this Agreement.

Option 1.     Employee may elect to remain employed "at will" pursuant to the terms of the Agreement hereunder and be paid accordingly hereunder; or

Option 2.     Employee may elect to voluntarily cease employment under this Agreement upon which cessation of employment, Employee shall receive the following benefits:

A.     A lump sum cash payment equal to eighteen (18) multiplied by Employee's monthly salary as of the date of ownership change.

2

ENB 00487

EM001-006967

B.    Employer will pay for Employee's health care insurance and dental insurance under COBRA for the lawfully required period after Employee's last date of employment for which COBRA benefits must be made available.

C.    Employer shall fully cooperate and assist Employee's transfer and rollover of any and all 401(k) plan benefits vested to Employee as of the date of employment and shall pay any and all transfer fees and/or penalties associated with Employee withdrawing and transferring out of the Company's 401 (k) plan.

D.    Employer shall pay Employee a lump sum of cash for the same vehicle benefits and/or car allowance as described in 3.1(c) above, which Employee would have received for the period described in Option 2, Paragraph A above.

If Employee elects Option 2 the lump sum payment due shall be paid within fifteen (15) days after the Employer receives the written notice.

## ARTICLE IV
## MISCELLANEOUS

4.1    Agreement Subject to Laws.  If any provision of this Agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the later shall control and this Agreement shall be deemed modified accordingly, but the remainder of this Agreement and the application of such provisions to the other parties or circumstances shall not be effected thereby, and in all other respects the Agreement shall continue in full force and effect.

4.2    Agreement Governed by the Laws of Kansas.    This Agreement shall be governed by and construed in accordance with the internal laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

4.3    Notices.    All notices and other correspondence required or made necessary by the terms of this Agreement shall be delivered, postage prepaid, return receipt requested to the respective parties hereto at the following addresses:

EMPLOYEE:        Howard Lubow
                 14068 Mastin
                 Overland Park, KS 66221

EMPLOYER:        Kansas Pipeline Operating Company
                 c/o Personnel Department
                 8325 Lenexa Drive, Suite 400
                 Lenexa, KS 66214

ENB 00488

3

EM001-006968

or to such other addresses as either party hereto may designate in writing to the other party. Notices also may be given by telegram, telex, or telecopy. A notice shall be deemed received when actually received by the party to whom it is addressed.

4.4   Waiver.   Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provisions hereafter. Either party's failure or delay in protesting, or contending breach pursuant to Section 5412, or taking legal action or demanding arbitration upon the other party's breach is no waiver of that cause of action, unless that party's delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations. Any party's failure or delay in protesting, or contending breach pursuant to Section 4.12 or taking legal and/or equitable action or demanding arbitration upon the other party's breach is not to be considered as being a waiver of that party's cause of action for any subsequent breach of the same or of a different nature.

4.5   Assignment Prohibited.   This Agreement shall not be assigned by either party hereto, without the prior written consent of the other party, provided that Employee can assign this Agreement to an affiliated entity of Employer without the consent of Employee.

4.6   Recitals.   The recitals of this Agreement are incorporated in the text of this Agreement as mutual and substantive terms hereof and may be relied upon by employee during any and all proceedings in law, equity and/or arbitration.

4.7   Modifications and Amendments.   Any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and executed amendments. It is stipulated that oral modifications and amendments hereto shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or adjudication.

4.8   Titles of Articles, Section and Subsections.   The titles and subtitles of Articles, Sections and Subsections of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of this Agreement or in any way influence the interpretation of this Agreement.

4.9   Invalidity of Part.   The parties to this Agreement view this Agreement as legal and fair in all respects and have taken reasonable diligence to insure that this Agreement is legal and fair.

ENB 00489

4

EM001-006969

4.10   Duplicate Originals.   This contract may be executed in duplicate originals, with Employer and Employee each receiving an original.

4.11   Further Assurances.   The parties hereby agree to execute any and all documents, transfers, notes, affidavits, minutes, resolutions, instruments or the like in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

4.12   Breach, Notice and Cure.   In the event, that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(es) describing such breach(es) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual receipt of such notice to cure said breach(es) if it concurs that the complaint(s) constitute breach(es), or it may elect to provide a cure to the complaining party's contended breach(es) even if the purported breaching party is of the belief that the complaint(s) do not constitute a breach(es) hereof, and if so cured by the purported breaching party the breach(es) shall be deemed to have never occurred. In the event the parties cannot agree as to whether the complaint(s) constitute a breach(es) of the terms hereof, and the purported breaching party does not elect to undertake the expense of resolving the complaint(s), then the parties agree they may pursue any legal remedy they may have available.

4.13   Independent Legal Counsel.   The law firm of Tino M. Monaldo, Chartered has represented the Company exclusively in the negotiation, drafting and execution of this Agreement. The Employee has been represented by his own independent legal counsel or has waived by opportunity to such counsel.

4.14.   Employee Will Not Disclose Confidential Information.   It is understood that in the course of his/her activities on behalf of Employer, Employee may acquire, be informed of or have access to trade secrets and certain other information deemed to be confidential or proprietary by Employer. Without the express and prior written consent of Employer, Employee shall never communicate or disclose, either during the term of his/her employment with Employer or at any time subsequent to the termination of such employment, any confidential information to any person or use any confidential information, either for the benefit of Employee or for the benefit of any person, firm partnership, corporation or other entity, other than Employer, for any reason or purpose.

As used in this Agreement, the phrase "confidential information" means all information pertaining to past, present or future business of Employer, price lists, methods or policies, formulas, processes, procedures or standards, know-how, manuals, handbooks, instructions, techniques, business strategies, technology, materials, customer lists, vendors' or suppliers' names and addresses, proprietary information, trade secrets, financial information and all other information, knowledge or data of any kind or character relating to Employer's business, whether or not reduced to writing, which Employer considers confidential and which is not

ENB 00490

5

EM001-006970

generally available to the public. Specifically, Employer may from time-to time explore acquiring companies or the Employer or its affiliates may explore selling assets or stock of the Employer or such affiliates. The existence of any such explorations or any discussions, negotiations or agreements related thereto or any of the terms thereof shall specifically be included in the phrase "confidential information". Moreover, any such targets or potential acquirors may be public companies. As a result, the Employee may acquire and may not use any inside information that may be acquired by Employee (as defined in Federal or state securities laws), and the Employee agrees that any such "inside information" shall also be included in the phrase "confidential information.

Employee further agrees that Employee will use Employee's best efforts at all times to safeguard any confidential information made available to Employee from falling into the hands of any unauthorized person (including other employees of Employer), and in particular, will not permit any such information which has been reduced to writing to be read, duplicated or extracted by any person except upon the written authorization of Employer. In the event Employee is specifically instructed by Employer to divulge any confidential information Employee may have, Employee will do so in strict compliance with such instructions. Upon termination of employment with Employer, or whenever Employer shall request, Employee shall promptly deliver to Employer all drawings, blueprints, manuals, letters, notes, handbooks, reports, customer lists, price lists and all other written materials containing confidential, proprietary or secret information or data relating to Employer's or any affiliate's business which are now in the possession or under the control of Employee and will not retain any copies thereof.

Should Employee breach the provisions of this Paragraph at any time, in addition to any other remedies Employer may have, Employee shall irrevocably forfeit any compensation that would otherwise be due and owing to Employee pursuant to Paragraph 3.1(d) of this Agreement.

IN WITNESS WHEREOF, the parties have hereunto set their hands the day and year first written above, or consent to the terms hereof, as if executed on such date.

EMPLOYER:
Kansas Pipeline Operating Company,
a Kansas general partnership

By: _Dennis M. Langley_
Dennis Langley, President

ENB 00491

6

EM001-006971

EMPLOYEE:

By: _____

Howard Lubow, Individually

7

ENB 00492

EM001-006972

46

## RELEASE

This Release (Agreement) is entered into 29ᵗᴴ day of October, 1999, by and between Howard Lubow (Employee) and Kansas Pipeline Operating Company (KPOC) and Kansas Pipeline Company (KPC) (collectively KPOC and KPC shall be referred to as Employer)

Whereas Employee and Employer executed an employment agreement dated August 4, 1998, (Employment Agreement)

Whereas the parties desire to terminate said Employment Agreement;

Therefore, in consideration of ten ($10) dollars, the promises of covenants contained herein, and other good and valuable consideration, receipt of which is acknowledged hereby the undersigned agree as follows:

1.  Release. Employee forever releases and waives Employer, its officers, directors and agents, as well as Employers' affiliates, successors and assigns from any and all claims, causes of actions, attorney's fees, damages or encumbrances of any kind whatsoever, now knowing, or hereafter acquired, arising out of, directly or indirectly, the Employment Agreements, including but not limited to, any compensation or severance claims described in Article III of the Employment Agreement.

2.  COBRA. Employer shall not be relieved of any COBRA obligations it may have to Employee arising as a matter of law as of the date first written above, notwithstanding the termination of the Employment Agreement.

3.  Termination. The Employment Agreement shall be terminated as of the date first written above and shall be of no force or effect, provided however, our obligations of Employee regarding confidentiality described in the Employment Agreement shall survive beyond the date first written above. As of the date first written above, there shall be no written or verbal agreement between Employer or Employee regarding Employee's terms and conditions of employment.

4.  Agreement Subject to Laws. If any provision of this agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the later shall control and this Agreement shall be deemed modified accordingly, but the remainder of this Agreement and the application of such provisions to the other parties or circumstances shall not be effected thereby, and in all other respects the Agreement shall continue in full force and effect.

5.  Agreement Governed by the Laws of Kansas. This Agreement shall be governed by and construed in accordance with the internal laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

Release_lubow.doc

# EXHIBIT C

ENB 00493

EM001-006973

6.   **Notices.**  All notices and other correspondence required or made necessary by the terms of this Agreement shall be delivered, postage prepaid, return receipt requested to the respective parties hereto at the following addresses:

EMPLOYEE:         Howard E. Lubow
                  14068 Mastin
                  Overland Park, KS 66221

EMPLOYER:         Kansas Pipeline Company
                  c/o Personnel Department
                  8325 Lenexa Drive, Suite 400
                  Lenexa, KS 66214

or to such other addresses as either party hereto may designate in writing to the other party. Notices also may be given by telegram, telex, or telecopy. A notice shall be deemed received when actually received by the party to whom it is addressed.

7.   **Waiver.**  Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provisions hereafter. Either party's failure or delay in protesting, or contending breach pursuant to Section 15, or taking legal action or demanding arbitration upon the other party's breach is no waiver of that cause of action, unless that party's delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations. Any party's failure or delay in protesting, or contending breach pursuant to Section 15 or taking legal and/or equitable action or demanding arbitration upon the other party's breach is not to be considered as being a waiver of that party's cause of action for any subsequent breach of the same or of a different nature.

8.   **Assignment Prohibited.**  This Agreement shall not be assigned by either party hereto, without the prior written consent of the other party, provided that Employee can assign this Agreement to an affiliated entity of Employer without the consent of Employee.

9.   **Recitals.**  The recitals of this Agreement are incorporated in the text of this Agreement as mutual and substantive terms hereof and may be relied upon by employee during any and all proceedings in law, equity and/or arbitration.

10.  **Modifications and Amendments.**  Any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and executed amendments. It is stipulated that oral modifications and amendments

2

ENB 00494

EM001-006974

hereto shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or adjudication.

11. **Titles of Articles, Section and Subsections.** The titles and subtitles of Articles, Sections and Subsections of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of this Agreement or in any way influence the interpretation of this Agreement.

12. **Invalidity of Part.** The parties to this Agreement view this Agreement as legal and fair in all respects and have taken reasonable diligence to insure that this Agreement is legal and fair.

13. **Duplicate Originals.** This contract may be executed in duplicate originals, with Employer and Employee each receiving an original.

14. **Further Assurances.** The parties hereby agree to execute any and all documents, transfers, notes, affidavits, minutes, resolutions, instruments or the like in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

15. **Breach, Notice and Cure.** In the event, that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(es) describing such breach(es) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual receipt of such notice to cure said breach(es) if it concurs that the complaint(s) constitute breach(es), or it may elect to provide a cure to the complaining party's contended breach(es) even if the purported breaching party is of the belief that the complaint(s) do not constitute a breach(es) hereof, and if so cured by the purported breaching party the breach(es) shall be deemed to have never occurred. In the event the parties cannot agree as to whether the complaint(s) constitute a breach(es) of the terms hereof, and the purported breaching party does not elect to undertake the expense of resolving the complaint(s), then the parties agree they may pursue any legal remedy they may have available.

16. **Independent Legal Counsel.** The law firm of Tino M. Monaldo, Chartered has represented the Company exclusively in the negotiation, drafting and execution of this Agreement. The Employee has been represented by his own independent legal counsel or has waived by opportunity to such counsel.

3

ENB 00495

IN WITNESS WHEREOF, the parties have hereunto set their hands the day and year first written above, or consent to the terms hereof, as if executed on such date.

EMPLOYER:

Kansas Pipeline Company, a Kansas general partnership on its own behalf and on behalf of Kansas Pipeline Operating Company

By:   Syenergy Pipeline Company. L.P., its general partner

By:   Bishop Pipeline Company, its general partner

By:

Name:  Dennis M. Langley
Title:  President

EMPLOYEE:

By:

Howard E. Lubow

ENB 00496

EM001-006976

## HOWARD E. LUBOW\KANSAS PIPELINE COMPANY

## BONUS PLAN AGREEMENT

THIS AGREEMENT, made and entered into this 3ʳᵈ day of August, 1999, by and between Kansas Pipeline Company, a Kansas corporation, with principal offices and place of business in the State of Kansas (hereinafter referred to as the "Corporation"), and Howard E. Lubow, an individual residing in the State of Kansas (hereinafter referred to as the "Employee"),

WITNESSETH THAT:

WHEREAS, the Employee is employed by the Corporation; and

WHEREAS, the Corporation recognizes the value of the services performed by the Employee and wishes to encourage his continued employment; and

WHEREAS, the Employee wishes to be assured that under certain circumstances, he will be entitled to a certain bonus if he is living when such bonus is to be paid; and

WHEREAS, the parties hereto wish to provide the terms and conditions upon which the Corporation shall pay such bonus to the Employee; and

WHEREAS, the parties hereto intend that this Agreement be considered an unfunded arrangement, maintained primarily to provide deferred compensation benefits for the Employee, a member of a select group of management or highly compensated employees of the Corporation, for purposes of the Employee Retirement Security Act of 1974, as amended;

NOW, THEREFORE, in consideration of the premises and of the mutual promises herein contained, the parties hereto agree as follows:

SL01DOCS/511584.01                                1

# EXHIBIT D

ENB 00497

EM001-006977

1.    **Deferred Compensation Bonus**.

    a.    **Eligibility for Benefit**. On the ____ day of _____, 1999, the Corporation and the Employee entered into a Split-Dollar Agreement (the "Split-Dollar Agreement"). The Employee shall be entitled to receive the Deferred Compensation Bonus provided hereunder from the Corporation in the event of the termination of the Split-Dollar Agreement, for any reason other than the Employee's death or the Employee's failure to timely pay his portion of the premiums, if any, due under the Split-Dollar Agreement, as provided in the Split-Dollar Agreement (an "Eligible Termination").

    b.    **Amount of Deferred Compensation Bonus**. The amount of the Deferred Compensation Bonus to be provided by the Corporation to the Employee under this Section 1 shall be determined as follows:

    i.    **Eligible Termination With Respect to Both Policies**. If there is an Eligible Termination of the Split-Dollar Agreement with respect to both of the life insurance policies subject to the terms of the Split-Dollar Agreement, the amount of the Deferred Compensation Bonus to be provided by the Corporation to the Employee under this Section 1 shall be an amount equal to the greater of (1) $568,712 or (2) the total amount of the premium payments made by the Corporation under the terms of the Split-Dollar Agreement.

    ii.    **Eligible Termination With Respect to Only Northwestern Policy**. If there is an Eligible Termination of the Split-Dollar Agreement with respect to only the policy issued by Northwestern Mutual Life Insurance Company which is subject to the terms of the Split-Dollar Agreement, the amount of the Deferred Compensation Bonus to be provided by the Corporation to the Employee under this Section 1 shall be an amount equal to the greater of (1) $288,712 or (2) the total amount of the premium payments

SL01DOCS/511584.01

2

ENB 00498

EM001-006978

made by the Corporation under the terms of the Split-Dollar Agreement with respect to such life insurance policy.

      iii.    <u>Eligible Termination With Respect to Only Pacific Life Policy</u>. If there is an Eligible Termination of the Split-Dollar Agreement with respect to only the policy issued by Pacific Life Insurance Company which is subject to the terms of the Split-Dollar Agreement, the amount of the Deferred Compensation Bonus to be provided by the Corporation to the Employee under this Section 1 shall be an amount equal to the greater of (1) $280,000 or (2) the total amount of the premium payments made by the Corporation under the terms of the Split-Dollar Agreement with respect to such life insurance policy.

    c.    <u>Payment of Deferred Compensation Bonus</u>. Within 60 days of the date upon which the Employee becomes entitled to the Deferred Compensation Bonus, as provided above, the Corporation shall pay to the Employee an amount equal to the Deferred Compensation Bonus.

    d.    <u>No Trust Created</u>. Notwithstanding anything in this Section 1, no action taken pursuant to its provisions by either the Corporation or the Employee shall create, or be construed to create, a trust of any kind, or a fiduciary relationship between the Corporation and the Employee, his beneficiary or beneficiaries, or any other person.

    e.    <u>Deferred Compensation Bonus Unfunded</u>. Until the occurrence of any event which entitles the Employee to receive the Deferred Compensation Bonus provided under this Section 1, such benefit shall remain an asset of the Corporation which, in the event of the Corporation's insolvency, will be subject to the claims of general creditors of the Corporation. The parties intend this Deferred Compensation Bonus to be considered

SL01DOCS/511584.01            3

ENB 00499

EM001-006979

unfunded for federal income tax purposes, so as not to have the benefit provided hereunder be included in the Employee's income for such tax purposes prior to actual receipt thereof.

      e.    <u>Benefit Not Transferable</u>.  Neither the Employee nor any other person with a beneficial interest in this Agreement shall have any power or right to transfer, assign, anticipate, hypothecate or otherwise encumber any part or all of this Deferred Compensation Bonus.  No such amounts shall be subject to seizure by any creditor or any such beneficiary, by a proceeding at law or in equity, nor shall such amounts be transferable by operation of law in the event of bankruptcy, insolvency or death of the Employee, his beneficiary or beneficiaries, or any other person with a beneficial interest in this Agreement.  Any such attempt at assignment or transfer shall be void.

      2.    <u>Named Fiduciary, Determination of Benefits, Claims Procedure and Administration</u>.

      a.    The Company is hereby designated as the named fiduciary under this Agreement.  The named fiduciary shall have authority to control and manage the operation and administration of this Agreement through an Administrator designated by it, and it shall be responsible for establishing and carrying out a funding policy and method consistent with the objectives of this Agreement.  The Company shall also have the power to establish, adopt or revise such rules and regulations as it may deem advisable for the administration of the Agreement.  The interpretation and construction of the Agreement by the Company and any action taken thereunder, shall be binding and conclusive upon all parties in interest.  No officer, employee or agent of the Company shall, in any event, be liable to any person for any action taken or omitted to be taken in connection with the interpretation, construction or

SL01DOCS/511584.01          4

ENB 00500

EM001-006980

administration of the Agreement, so long as such action or omission to act is made in good faith.

        b.     (1)    <u>Claim</u>.

        A person who believes that he is being denied a benefit to which he is entitled under the Agreement (hereinafter referred to as a "Claimant") may file a written request for such benefit with the Company, setting forth his claim. The request must be addressed to the President of the Company at its then principal place of business.

        (2)    <u>Claim Decision</u>.

        Upon receipt of a claim, the President shall advise the Claimant that a reply will be forthcoming within ninety (90) days and shall, in fact, deliver such reply within such period. The President may, however, extend the reply period for an additional ninety (90) days for reasonable cause.

        If the claim is denied in whole or in part, the President shall adopt a written opinion, using language calculated to be understood by the Claimant, setting forth:  (i) the specific reason or reasons for such denial; (ii) the specific reference to pertinent provisions of this Agreement on which such denial is based; (iii) a description of any additional material or information necessary for the Claimant to perfect his or her claim and an explanation why such material or such information is necessary; (iv) appropriate information as to the steps to be taken if the Claimant wishes to submit the claim for review; and (v) the time limits for requesting a review under Section 6.01(b)(3) and for review under Section 6.01(b)(4) hereof.

SL01DOCS/511584.01            5

ENB 00501

EM001-006981

(3)    <u>Request for Review</u>.

Within sixty (60) days after the receipt by the Claimant of the written opinion described above, the Claimant may request in writing that the Secretary of the Company review the determination of the President.  Such request must be addressed to the Secretary of the Company, at its then principal place of business.  The Claimant or his or her duly authorized representative may, but need not, review the pertinent documents and submit issues and comments in writing for consideration by the Secretary.  If the Claimant does not request a review of the President's determination by the Secretary within such sixty (60) day period, he or she shall be barred and estopped from challenging the President's determination.

(4)    <u>Review of Decision</u>.

Within sixty (60) days after the Secretary's receipt of a request for review, he will review the President's determination.  After considering all materials presented by the Claimant, the Secretary will render a written opinion, written in a manner calculated to be understood by the Claimant, setting forth the specific reasons for the decision  and containing specific references to the pertinent provisions of this Agreement on which the decision is based.  If special circumstances require that the sixty (60) day time period be extended, the Secretary will so notify the Claimant and will render the decision as soon as possible, but no later than one hundred twenty (120) days after receipt of the request for review.

SL01DOCS/511584.01                     6

ENB 00502

EM001-006982

2.  <u>Miscellaneous</u>

   a.   <u>No Contract of Employment</u>.  Nothing contained herein shall be construed to be a contract of employment for any term of years, nor as conferring upon the Employee the right to continue in the employ of the Corporation in any capacity.

   b.   <u>Amendment of Agreement</u>.  This Agreement may not be amended, altered or modified, except by a written instrument signed by the parties hereto, or their respective successors or assigns, and may not be otherwise terminated except as provided herein.

   c.   <u>Notice</u>.  Any notice, consent, or demand required or permitted to be given under the provision of this Agreement shall be in writing, and shall be signed by the party giving or making the same.  If such notice, consent, or demand is mailed to a party hereto, it shall be sent by United States certified mail, postage prepaid, addressed to such party's last known address as shown on the records of the Company.  The date of such mailing shall be deemed the date of notice, consent, or demand.  Either party may change the address to which notice is to be sent by giving notice of the change of address in the manner aforesaid.

   d.   <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Kansas and any applicable federal laws.

   e.   <u>Gender, Singular and Plural</u>.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, or neuter, as the identity of the person or persons may require.  As the context may require, the singular may be read as the plural and the plural as the singular.

SL01DOCS/511584.01                                   7

ENB 00503

EM001-006983

f.     Inurement.  This Agreement shall be binding upon and inure to the benefit of the Corporation and its successors and assigns, and the Employee, his successors, heirs, executors, administrators and beneficiaries.

g.     Captions.  The captions of the sections and paragraphs of this Agreement are for convenience only and shall not control or affect the meaning or construction of any of its provisions.

h.     Validity.  In the event any provision of this Agreement is held invalid, void, or unenforceable, the same shall not affect, in any respect whatsoever, the validity of any other provision of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, in duplicate, as of the day and year first above written.

Kansas Pipeline Company
By: General Pipeline Company), L.P., its general partner
By: Bishop Pipeline Company

By _____
        President

ATTEST:

_____
Secretary

"Corporation"

_____
Howard E. Lubow,
        "Employee"

ENB 00504

EM001-006984

Date

Office of Employee Benefits Security
Labor Management Service Administration
U.S. Department of Labor
Washington, D.C. 20216

       Re:     Notice of Plan(s) of Deferred Compensation

Dear Sir or Madam:

       Pursuant to DOL Reg. Sec. 2520.104-23, the undersigned Employer hereby files the following information with respect to its plan(s) of deferred compensation.

1.     Name and Address of Employer:
       Kansas Pipeline Company
       8325 Lenexa Drive, Ste. 400
       Lenexa, KS  66214

2.     Federal Employer Identification No. (EIN):

       _____

3.     The Employer maintains ___ plan(s) of deferred compensation primarily for the purpose of providing deferred compensation to a select group of management or highly-compensated employees.

4.     ____ employee(s) is/are covered by such plan(s).

       Very truly yours,

       KANSAS PIPELINE COMPANY

       By:_____
           Title:_____

ENB 00505

EM001-006985

## SPLIT-DOLLAR AGREEMENT

THIS AGREEMENT made and entered into this 3ʳᵈ day of AUGUST, 1999, by and between Kansas Pipeline Company, a Kansas corporation, with principal offices and place of business in the State of Kansas (the "Corporation"), and Howard E. Lubow, an individual residing in the State of Kansas (the "Employee"),

WITNESSETH THAT:

WHEREAS, the Employee is employed by the Corporation; and

WHEREAS, the Employee wishes to provide life insurance protection for his family in the event of his death, under policies of life insurance insuring his life (individually, a "Policy" and collectively, the "Policies"), which are described in Exhibit A.  One of the Policies is being issued by Northwestern Mutual Life Insurance Company and the other is being issued by Pacific Life Insurance Company (individually, an "Insurer" and collectively, the "Insurers"); and

WHEREAS, the Corporation is willing to pay a portion of the premiums due on the Policies as an additional employment benefit for the Employee, on the terms and conditions hereinafter set forth; and

WHEREAS, the Employee is the owner of the Policies and, as such, possesses all incidents of ownership in and to the Policies; and

WHEREAS, the Corporation wishes to have the Policies collaterally assigned to it by the Employee, in order to secure the repayment of the amounts which it will pay toward the premiums on the Policies;

NOW, THEREFORE, in consideration of the premises and of the mutual promises contained herein, the parties hereto agree as follows:

# EXHIBIT D

ENB 00506

EM001-006986

1.    **Purchase of Policies.**  The Employee will contemporaneously purchase the Policies from the Insurers which have an aggregate face amount of $1,685,372.  The Policy issued by Pacific Life Insurance Company has an Increasing Death Benefit (as defined in that Policy).  The parties hereto have taken all necessary action to cause the Insurers to issue the Policies, and shall take any further action which may be necessary to cause the Policies to conform to the provisions of this Agreement.  The parties hereto agree that the Policies shall be subject to the terms and conditions of this Agreement and of the collateral assignments filed with the Insurers relating to the Policies.

2.    **Ownership of Policies.**  The Employee shall be the sole and absolute owner of the Policies, and may exercise all ownership rights granted to the owner thereof by the terms of the Policy, including, but not limited to, the right to elect and to change the death benefit and, with respect to the Policy issued by Pacific Life Insurance Company, the Death Benefit Option and the investment options of the Policy, except as may otherwise be provided herein.

3.    **Policy Dividends.**  Any dividend declared on the Policy issued by Northwestern Mutual Life Insurance Company shall be applied to purchase paid-up additional insurance on the life of the Employee.  The parties hereto agree that the dividend election provisions of such Policy shall conform to the provisions hereof.

4.    **Payment of Premiums.**

a.    Thirty (30) days prior to the due date of each Policy premium, the Corporation shall notify the Employee of the exact amount due from the Employee hereunder, which shall be an amount equal to the annual cost of current life insurance protection on the life of the Employee, measured by the lower of the PS 58 rate, set forth in Revenue Ruling 55-747 (or the corresponding applicable provision of any future Revenue Ruling), or the current

ENB 00507

EM001-006987

published premium rate for annually renewable term insurance for standard risks of the Insurer which issued such Policy. The Employee shall pay such required contribution to the Corporation prior to the premium due date. If the Employee fails to make such timely payment, the Corporation, in its sole discretion, may elect to make the Employee's portion of the premium payment, which payment shall be recovered by the Corporation as provided herein.

      b.     On or before the due date of each Policy premium, or within the grace period provided therein, the Corporation shall pay the full amount of the premium to the Insurer which issued the Policy, and shall, upon request, promptly furnish the Employee evidence of timely payment of such premium. Except with the consent of the Employee, the Corporation shall not pay less than $70,000 per year in premiums with respect to the Policy issued by Pacific Life Insurance Company during the first four Policy years or less than $36,390 per year in premiums with respect to the Policy issued by Northwestern Mutual Life Insurance Company during the first eight Policy years (taking into consideration the Employee's contributions toward premium payments), but it may, in its discretion, at any time and from time to time, subject to acceptance of such amount by the Insurer which issued a Policy, pay more than such amount or make other premium payments on such Policy. The Corporation shall annually furnish the Employee a statement of the amount of income reportable by the Employee for federal and state income tax purposes as a result of the insurance protection provided the beneficiary or beneficiaries of the Policies.

     5.    **Collateral Assignment**.  To secure the repayment to the Corporation of the amount of the premiums on the Policies paid by it hereunder, the Employee has, contemporaneously herewith, assigned the Policies to the Corporation as collateral, under the forms used by the Insurers for such assignments. The collateral assignments of the Policies to

ENB 00508

EM001-006988

the Corporation hereunder shall not be terminated, altered or amended by the Employee, without the express written consent of the Corporation.  The parties hereto agree to take all action necessary to cause such collateral assignments to conform to the provisions of this Agreement.

      6.    **Limitations on Employee's Rights in Policies**.  The Employee shall not sell, assign, transfer, borrow against or withdraw from the cash surrender value of a Policy, surrender or cancel the Policy, change the beneficiary designation provision thereof, or, with respect to the Policy issued by Pacific Life Insurance Company, decrease the death benefit or change the Death Benefit Option provisions without, in any such case, the express written consent of the Corporation.

      7.    **Collection of Death Proceeds**.

      a.    Upon the death of the Employee, the Corporation shall cooperate with the beneficiary or beneficiaries designated by the Employee to take whatever action is necessary to collect the death benefits provided under the Policies; when such benefits have been collected and paid as provided herein, this Agreement shall terminate.

      b.    Upon the death of the Employee, the Corporation shall have the unqualified right to receive a portion of the insurance benefits provided under each Policy equal to the total amount of the premiums paid by it hereunder with respect to such Policy, reduced by any outstanding indebtedness which was incurred by the Corporation and secured by such Policy, including any interest due on such indebtedness.  The balance of the insurance benefits provided under such Policy, if any, shall be paid directly to the beneficiary or beneficiaries designated by the Employee, in the manner and in the amount or amounts provided in the beneficiary designation provision of such Policy.  In no event shall the amount payable to the Corporation hereunder with respect to a Policy exceed the insurance benefits payable under such Policy at the

SL01DOCS/511582.01             4

ENB 00509

EM001-006989

death of the Employee.  No amount shall be paid from the insurance benefits payable under a Policy to the beneficiary or beneficiaries designated by the Employee until the full amount due the Corporation hereunder with respect to such Policy has been paid.  The parties hereto agree that the beneficiary designation provisions of the Policies shall conform to the provisions hereof.

      c.      In the event that, for any reason whatsoever, no death benefit is payable under a Policy upon the death of the Employee and in lieu thereof the Insurer which issued such Policy refunds all or any part of the premiums paid for such Policy, the Corporation and the Employee's beneficiary or beneficiaries shall have the unqualified right to share such premiums based on their respective cumulative contributions thereto.

      8.      **Termination of the Agreement During the Employee's Lifetime**.

      a.      This Agreement shall terminate, during the Employee's lifetime, without notice, upon the occurrence of any of the following events:  (a) total cessation of the Corporation's business; (b) bankruptcy, receivership or dissolution of the Corporation; (c) termination of Employee's employment by the Corporation (other than by reason of his death); or (d) failure of the Employee to timely pay the Employee's portion of the premiums, if any, due under this Split-Dollar Agreement, unless the Company elects to make such payment on behalf of the Executive as provided herein.

      b.      In addition, the Corporation and the Employee may terminate this Agreement, with respect to either or both Policies, by mutual written agreement, which termination shall be effective as of the date specified in such agreement.

      c.      Unless this Agreement has been terminated in accordance with Section 8.a or 8.b above, then in the event of a Change in Control, the Employee, in his discretion, may terminate this Agreement by providing written notice of such termination to the

SL01DOCS/511582.01

5

ENB 00510

EM001-006990

Corporation. The Employee's right to terminate this Agreement may be exercised by the Employee at any time after a Change in Control occurs, but must be exercised, if at all, within 60 days of a Change in Control. For purposes of this Agreement, a Change in Control shall be deemed to have occurred if Dennis M. Langley ceases to hold more than fifty percent (50%) of the voting power of the Company, or would cease to hold more than fifty percent (50%) of the voting power of the Company if all outstanding rights, options, warrants or other rights to obtain voting power of the Company, whether or not presently exercisable, were exercised.

> 9.     **Disposition of the Policy on Termination of the Agreement During the Employee's Lifetime**.

> a.     For sixty (60) days after the date of the termination of this Agreement during the Employee's lifetime, the Employee shall have the option of obtaining the release of the collateral assignment of either or both of the Policies to the Corporation, or, if the Agreement has terminated with respect to only one of the Policies, the Employee shall have the option of obtaining the release of the collateral assignment of such Policy to the Corporation. To obtain such release with respect to a Policy, the Employee shall repay to the Corporation the lesser of the total amount of the premium payments made by the Corporation hereunder or the then cash surrender value of such Policy, less any indebtedness secured by such Policy which was incurred by the Corporation and remains outstanding as of the date of such termination, including any interest due on such indebtedness. Upon receipt of such amount, the Corporation shall release the collateral assignment of such Policy, by the execution and delivery of an appropriate instrument of release.

> b.     If the Employee fails to exercise such option with respect to any Policy within such sixty (60) day period, then, at the request of the Corporation, the Employee shall

SL01DOCS/511582.01                                    6

ENB 00511

EM001-006991

execute any document or documents required by the Insurer which issued such Policy to transfer the interest of the Employee in such Policy to the Corporation. Alternatively, the Corporation may enforce its right to be repaid the amount of the premiums on such Policy paid by it from the cash surrender value of such Policy under the collateral assignment of such Policy; provided that in the event the cash surrender value of such Policy exceeds the amount due the Corporation, such excess shall be paid to the Employee. Thereafter, neither the Employee nor his respective heirs, assigns or beneficiaries shall have any further interest in and to such Policy, either under the terms thereof or under this Agreement.

10. **Insurers Not Parties.** Each Insurer shall be fully discharged from its obligations under the Policy it issued by payment of the insurance benefits to the beneficiary or beneficiaries named in such Policy, subject to the terms and conditions of such Policy. In no event shall either Insurer be considered a party to this Agreement, or any modification or amendment hereof. No provision of this Agreement, nor of any modification or amendment hereof, shall in any way be construed as enlarging, changing, varying, or in any other way affecting the obligations of an Insurer as expressly provided in the Policy it issued, except insofar as the provisions hereof are made a part of such Policy by the collateral assignment executed by the Employee and filed with such Insurer in connection herewith.

11. **Named Fiduciary, Determination of Benefits, Claims Procedure and Administration.**

a. The Corporation is hereby designated as the named fiduciary under this Agreement. The named fiduciary shall have authority to control and manage the operation and administration of this Agreement, and it shall be responsible for establishing and carrying out a funding policy and method consistent with the objectives of this Agreement.

SL01DOCS/511582.01                                    7

ENB 00512

EM001-006992

b.    (1)    <u>Claim</u>.

A person who believes that he or she is being denied a benefit to which he or she is entitled under this Agreement (hereinafter referred to as a "Claimant") may file a written request for such benefit with the Corporation, setting forth his or her claim.  The request must be addressed to the President of the Corporation at its then principal place of business.

(2)    <u>Claim Decision</u>.

Upon receipt of a claim, the Corporation shall advise the Claimant that a reply will be forthcoming within ninety (90) days and shall, in fact, deliver such reply within such period.  The Corporation may, however, extend the reply period for an additional ninety (90) days for reasonable cause.

If the claim is denied in whole or in part, the Corporation shall adopt a written opinion, using language calculated to be understood by the Claimant, setting forth:  (a) the specific reason or reasons for such denial; (b) the specific reference to pertinent provisions of this Agreement on which such denial is based; (c) a description of any additional material or information necessary for the Claimant to perfect his or her claim and an explanation why such material or such information is necessary; (d) appropriate information as to the steps to be taken if the Claimant wishes to submit the claim for review; and (e) the time limits for requesting a review under subsection (3) and for review under subsection (4) hereof.

(3)    <u>Request for Review</u>.

With sixty (60) days after the receipt by the Claimant of the written opinion described above, the Claimant may request in writing that the Secretary of the Corporation review the determination of the Corporation.  Such request must be addressed to the

ENB 00513

EM001-006993

Secretary of the Corporation, at its then principal place of business. The Claimant or his or her duly authorized representative may, but need not, review the pertinent documents and submit issues and comments in writing for consideration by the Corporation. If the Claimant does not request a review of the Corporation's determination by the Secretary of the Corporation within such sixty (60) day period, he or she shall be barred and estopped from challenging the Corporation's determination.

(4) **Review of Decision**.

Within sixty (60) days after the Secretary's receipt of a request for review, he or she will review the Corporation's determination. After considering all materials presented by the Claimant, the Secretary will render a written opinion, written in a manner calculated to be understood by the Claimant, setting forth the specific reasons for the decision and containing specific references to the pertinent provisions of this Agreement on which the decision is based. If special circumstances require that the sixty (60) day time period be extended, the Secretary will so notify the Claimant and will render the decision as soon as possible, but no later than one hundred twenty (120) days after receipt of the request for review.

12. **Amendment**. This Agreement may not be amended, altered or modified, except by a written instrument signed by the parties hereto, or their respective successors or assigns, and may not be otherwise terminated except as provided herein.

13. **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the Corporation and its successors and assigns, and the Employee, his successors, assigns, heirs, executors, administrators and beneficiaries.

14. **Notice**. Any notice, consent or demand required or permitted to be given under the provisions of this Agreement shall be in writing, and shall be signed by the party giving or

SL01DOCS/511582.01

9

ENB 00514

EM001-006994