22

ENB 00659

22

## ASSIGNMENT OF INTEREST IN BISHOP RINK HOLDINGS, LLC

This Assignment of Limited Liability Company Interest, is made and entered into as of the _5th_ day of _November_ 1999, by and between The Bishop Group, Ltd. (the "Original Member") and Dennis M. Langley (the "Additional Member").

WHEREAS, the Original Member owns a 99.9% limited liability company interest in ~~KP Operating Company, LLC~~, a Kansas limited liability company (the "Company") pursuant to that certain Operating Agreement (the "Operating Agreement") dated as of May 18, 1998; and _Bishop Rink Holdings, LLC y/k 11.8.99_

WHEREAS, the Original Member desires to transfer and the Additional Member desires to accept from the Original Member a non-cash transfer of the 99.9% limited liability company interest in the Company;

NOW, THEREFORE, in consideration of the promises and in conjunction with and in furtherance of making such transfer, the Original Member does by these presents, transfer, remise, release, assign and forever quit-claim to the Additional Member and its successors and assigns, the Original Member's respective right, title and interest as a Member in the 99.9% limited liability company interest of the Company, without warranty, express or implied. The Additional Member hereby accepts the Original Member's transfer and assignment of the Original Member's right, title and interest of the 99.9% limited liability company interest of the Original Member's interest in the Company and the Additional Member and the Original Member agree and acknowledge that all such rights, title and interest is subject to the Operating Agreement.

This instrument may be executed by two parties hereto at different times and in any number of originals of counterparts, and when taken together shall constitute only one instrument.

IN WITNESS WHEREOF, the Original Member and the Additional Member have executed these presents the day and year first above written.

ORIGINAL MEMBER                    ADDITIONAL MEMBER

The Bishop Group, Ltd.

By: _____        _____
Yvette C. Korb, Vice President      Dennis M. Langley

JC01DOCS/29046.01

ENB 00660

EM001-007140

NOV. 6. 1999   9:99AM

## ASSIGNMENT OF INTEREST IN BISHOP RINK HOLDINGS, LLC

This Assignment of Limited Liability Company Interest, is made and entered into as of the 5th day of November, 1999, by and between Dennis M. Langley (the "Original Member") and The Langley Group, Ltd. (the "Additional Member").

WHEREAS, the Original Member owns a .1% limited liability company interest in Bishop Rink Holdings, LLC, a Kansas limited liability company (the "Company") pursuant to that certain Operating Agreement (the "Operating Agreement") dated as of May 18, 1998; and

WHEREAS, the Original Member desires to transfer and the Additional Member desires to accept from the Original Member a non-cash transfer of the .1% limited liability company interest in the Company;

NOW, THEREFORE, in consideration of the promises and in conjunction with and in furtherance of making such transfer, the Original Member does by these presents, transfer, remise, release, assign and forever quit-claim to the Additional Member and its successors and assigns, the Original Member's respective right, title and interest as a Member in the .1% limited liability company interest of the Company, without warranty, express or implied. The Additional Member hereby accepts the Original Member's transfer and assignment of the Original Member's right, title and interest of the .1% limited liability company interest of the Original Member's interest in the Company and the Additional Member and the Original Member agree and acknowledge that all such rights, title and interest is subject to the Operating Agreement.

This instrument may be executed by two parties hereto at different times and in any number of originals of counterparts, and when taken together shall constitute only one instrument.

IN WITNESS WHEREOF, the Original Member and the Additional Member have executed these presents the day and year first above written.

ORIGINAL MEMBER

ADDITIONAL MEMBER

The Langley Group, Ltd.

By: _____
Yvette C. Korb, Vice President

_____
Dennis M. Langley

JC01DOCS/29046.01

Received Time Nov. 8.  4:40PM

ENB 00661

EM001-007141

23

ENB 00662

EM001-007142

23

# ASSIGNMENT

The Bishop Group, Ltd., a Kansas corporation, for good and valuable consideration, the receipt of which is hereby acknowledged, hereby assigns, transfers and delivers all of its right, title and interest in the Promissory Note from Dennis M. Langley to The Bishop Group, Ltd. dated March 10, 1999 in the principal amount of $265,000.00, a copy of which is attached hereto, to Dennis M. Langley and his heirs or assigns.

IN WITNESS WHEREOF, Yvette C. Korb, Vice President of The Bishop Group, Ltd. has executed this Assignment on the _5th_ day of _November_, 1999.

THE BISHOP GROUP, LTD.

By: _____
      Yvette C. Korb, Vice President

STATE OF KANSAS      )
                     ) ss.
COUNTY OF JOHNSON    )

The foregoing instrument was executed before me this 5th day of _November_, 1999 by Yvette C. Korb.

(SEAL)

My commission expires:
    Dianna L. Wood, Notary Public
        State of Kansas
    My Commission Expires  11-18-99

JC01DOCS/29047.01

ENB 00663

EM001-007143

# PROMISSORY NOTE

Principal Amount
$265,000.00

*Original*

Lenexa, KS
March 30, 1999

FOR VALUE RECEIVED, the undersigned ("Borrower") hereby promises to pay to the order of The Bishop Group, Ltd, 8325 Lenexa Drive, Suite 400, Lenexa, KS 66214 ("Lender"), the principal sum of $265,000.00, with interest on the principal from the date of this Note until paid in full, at Eight Percent (8%) per annum, plus accrued interest from January 1, 1998 through March 30, 1999 of $31,313.33.  Principal and interest shall be payable by Borrower to the named Lender, with thirty (30) days after receiving written demand for Lender which demand may not be made prior to March 30, 2003.

If Borrower is thirty (30) days delinquent in making any payment or is otherwise in default of this Note, or that certain Security Agreement and Partnership Interest Purchase Agreement between Borrower and Lender of even date herewith, then the entire principal amount outstanding and accrued interest thereon shall at once become due and payable at the option of the Lender. The Lender may exercise this option to accelerate during any default by Borrower regardless of any prior forbearance.

Borrower may prepay, without penalty, the principal amount outstanding in whole or in part at any time. Any partial payment shall be applied against the principal owing in reverse maturing order and shall not postpone the due date of any subsequent monthly installments, unless the Lender shall otherwise agree in writing.

Presentment, notice of dishonor, and protest are hereby waived by all makers, sureties, guarantors and endorsers hereof. This Note shall be the obligation of all makers, sureties, guarantors and endorsers, and shall be binding upon them and their successors and assigns. Any notice to Borrower provided for in this Note shall be given by mailing such notice by certified mail, addressed to Borrower at the address given below.

The indebtedness evidenced by this Note is secured by a Security Agreement of even date, and reference is made to said Security Agreements for rights as to acceleration of the indebtedness evidenced by this Note.

By: _____
Dennis M. Langley, Individually

jd\bishgr\promissory note1
03/09/99   12:37 PM

ENB 00664

EM001-007144

24

ENB 00665

EM001-007145

2-7

## TRANSFER AND CONVEYANCE AGREEMENT

Kansas Pipeline Company, a general partnership, for good and valuable consideration, the receipt of which is hereby acknowledged, hereby assigns, transfers and delivers all of its right, title and interest in and to the personal property described on the attached Exhibit A, to Dennis M. Langley, personally, but that Dennis M. Langley has designated that some of the property be assigned to Management Resources Group, LLC, a Kansas limited liability company.

IN WITNESS WHEREOF, Yvette C. Korb, Vice President of Kansas Pipeline Company has executed this Transfer and Conveyance Agreement on the 5th day of November, 1999.

KANSAS PIPELINE COMPANY

By:    Bishop Pipeline Company

By:    Syenergy Pipeline Company, L.P.

By: _Yvette C Korb_____
       Yvette C. Korb, Vice President

JC01DOCS/29049.01

ENB 00666

EM001-007146

## EXHIBIT A

| Asset | VIN | Fair Market Value |
|---|---|---|
| 1. Reno County, Kansas Real Estate | | $15,580 |
| 2. Johnson County, Kansas Real Estate | | $702,000 |
| 3. New Mexico ROW's | | $600,000 |
| 4. Common Stock of E&C Group, Inc. | | - |
| 5. Common Stock of The Bishop Corporation | | - |
| 6. Bishop Rink Holdings, LLC Interests | | $657,208 |
| 7. KP Operating Company, LLC Interests | | $1,023,397 |
| 8. BMA Whole Life Policy | | $14,000 |
| BMA Term Policy #40056777 | | $2,607 |
| BMA Whole Life Policy #40056776 (DML Owned) | | $14,000 |
| 9. DML Promissory Note to BGL | | $310,147 |
| 10. Available Cash of BGL et al | | $6,200,000 |
| 11. Cessna 421-BGL | | $188,768 |
| 12. MRG, Ltd. Project Development Agreement | | - |
| 13. Administrative Office Furniture & Fixtures | | |
| Furniture/Fixtures: | | |
| 8325 Lenexa Dr.-Furniture & Fixtures | | $150,000 |
| 5225 Renner-Furniture/Fixtures | | $126,403 |
| Computers/Office Equipment: | | |
| 8325 Lenexa Dr.-Furniture/Fixtures | | $80,000 |
| 5225 Renner-Furniture/Fixtures | | $40,000 |
| Vehicles: | | |
| 1997 Lexus LS400-Dennis | JT8BH28F0V0074224 | $29,245 |
| 1988 Jaguar XJ6 - Dennis | SAJHV164XJC524116 | $2,515 |
| 1999 F-150 Lariat - Eve | 1FTRX18L4XKB52918 | $14,530 |
| 1997 Ford F-150 Pickup | 1FMDU34E0VUB02133 | $10,540 |
| 1995 Olds. Aurora - Lyn | 1G3GR62CXS4134802 | $6,095 |
| 1995 F-250 - Diesel Tank | 1FXTHX26H85SKB0603 | $6,215 |
| 1991 Lexus ES 250-Pool Vehicle | JT8VVT1MO135776 | $3,840 |
| 2000 Lincoln LS - Yvette | 1LNHM8655YY755412 | $26,000 |
| 1997 Explorer XLT - JShaffer | 1FMDU340VUB02133 | $13,570 |
| 1995 Chevy Blazer - JBullimore | 1GNDT13W9SK179300 | $6,930 |
| 1995 Chevy Lumina - Vince | 2G1WL5M9S9283949 | $3,475 |
| 1990 Blair 20 ft 4GTNFB Nooseneck Trailer | 1B9GDFK54L1072016 | $400 |
| Power Equipment: | | |
| Bobcat - Excavator w/2 buckets | 512916677 | $30,000 |

KC01DOCS/456007.01

ENB 00667

| | | |
|---|---|---|
| Bobcat - Skid Steer | 514112585 | $15,500 |
| Case 580 Rubber Tired Backhoe | | $6,000 |
| Log Splitter | | $750 |
| All-Terrain Vehicle - 1998 Purchase | | $4,500 |
| All-Terrain Vehicle - 1999 Purchase | 478TE2244Y4105504 | $6,437 |
| Lincoln ArcWelder, Model SA200F163 | | $1,500 |
| Pacer Pump Model w/Briggs & Stratton | | $500 |
| Goodal Electric Parts Washer | | $500 |
| 14. Kansas City Chiefs/Royals season tickets | | $800 |
| 15. Legal Claims | | - |
| TOTAL | | $10,313,952 |

KC01DOCS/456007.01

ENB 00668

EM001-007148

ENB 00669

25

EM001-007149

2S

## Assignment of Contract

This Assignment Agreement is entered into this 24ᵗʰ day of _October_ , 1999, by and between Management Resources Group, Ltd., N/K/A Bishop Management, Inc. ("Assignor") and Management Resources Group, LLC ("Assignee").

WHEREAS, Assignor entered into a Project Development Agreement with KN Energy, Inc., dated November 27, 1996, ("PDA");

WHEREAS, Assignor desires to assign its rights, duties and obligations under the PDA to Assignee.

NOW, THEREFORE, in consideration of the promises and covenants contained herein and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1.      **Assignment of PDA.** Assignor does hereby assign, convey and transfer to Assignee all of its rights, duties and obligations under that PDA, effective the date first written above. Assignee agrees to indemnify and hold Assignor harmless from any and all liabilities arising out of the operation of the PDA after the date first written above, including attorneys' fees and costs. Assignor agrees to indemnify and hold Assignee harmless from any and all liabilities arising out of the operation of the PDA on or before the date first written above, including attorneys fees and costs.

2.      **Notices.**      All notices and other correspondence required or made necessary by the terms of this Agreement shall be delivered to the respective parties hereto by registered mail, return receipt requested at the following addresses:

> Management Resources Group, LLC
> 5225 Renner Road
> Shawnee, KS 66217
> Telephone: (913) 962-9999
> Fax: (913) 962-6517

> Management Resources Group, Ltd. N/K/A Bishop Management, Inc.
> 8325 Lenexa Drive, Suite 400
> Lenexa, KS 66214
> Telephone: (913) 888-7139
> Fax: (913) 599-5645

or to such other addresses as either party hereto may unilaterally designate in writing to the other. Duplicate notices may also be given by any of the following forms: telegram, telex, telecopy and/or personal delivery. A notice shall be deemed received when the first form of notice or duplicate notice is actually received by the party to whom it is addressed.

KC01DOCS/457092.01
assignment of contract

1

ENB 00670

EM001-007150

3.     _Waiver._ Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provision thereafter. Any party's failure or delay in protesting, or contending breach pursuant to Section 9 or taking legal and/or equitable action or demanding arbitration upon the other party's breach is no waiver of that cause of action, unless that party's delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations. Any party's failure or delay in protesting, or contending breach pursuant to Section 9 or taking legal and/or equitable action or demanding arbitration upon the other party's breach is not to be considered as being a waiver of that party's cause of action for any subsequent breach of the same or of a different nature.

4.     **Agreement Subject to Laws.**     If any provision of this Agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the latter shall control and this Agreement shall be deemed modified accordingly, but in other respects the Agreement shall continue in full force and effect, subject to the modifications necessary to preserve the intent and considerations due the parties as set forth in this Agreement.

5.     **Agreement Governed by the Laws of Kansas.**     This Agreement and the obligations of the parties hereunder, shall be interpreted, construed, and enforced in accordance with the laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

6.     **Recitals.**     The recitals of this Agreement are incorporated in the text of this Agreement as mutual and substantive terms hereof and may be relied upon by Consultant during any and all proceedings in law, equity and/or arbitration.

7.     **Modifications and Amendments.**     Any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and executed amendments. It is stipulated that oral modifications and amendments hereto shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or adjudication.

8.     **Titles of Articles, Sections and Subsections.** The title and subtitles of articles, paragraphs and subparagraphs of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of or in any way influence the interpretations of this Agreement.

9.     **Breach, Notice and Cure.**     In the event that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(s) describing such breach(s) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual

KC01DOCS/457092.01
assignment of contract

2

ENB 00671

EM001-007151

receipt of such notice to cure said breach(s) if it concurs that the acts or omissions described in the notice(s) constitute breach(s), or it may elect to provide a cure to the complaining party's contended breach(s) even if the purported breaching party is of the belief that the acts or omissions described in the notice(s) do not constitute a breach(s) hereof, and if so cured by the purported breaching party to the reasonable satisfaction of the complaining party, the breach(s) shall be deemed to have never occurred. In the event the parties cannot agree as to whether the complaint(s) constitute a breach(es) of the terms hereof, and the purported breaching party does not elect to undertake the expense of resolving the complaint(s), then the parties agree they may pursue any legal remedy they may have available.

10. **Invalidity of Part.**   The parties to this Agreement view this Agreement as legal and fair in all respects and have taken reasonable diligence to insure that this Agreement is legal and fair.

11. **Duplicate Originals.**   This contract may be executed in duplicate originals with each party receiving an original.

12. **Further Assurances.** The parties hereby agree to execute, acknowledge and deliver to each other any further writings, documents, transfers, acknowledgments, instruments, powers of attorney, authorizations, filings, applications, reports, etc. that may be reasonably required to give full force and effect to the provisions of this Agreement, and to take such further actions reasonably required in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

IN WITNESS WHEREOF, the parties have hereunto set their hands the day and year first written above, or consent to the terms hereof, as if executed on such date.

MANAGEMENT RESOURCES
GROUP, LLC

By: _____

Name:  Yvette Korb
Title:   Vice-President


MANAGEMENT RESOURCES
GROUP, LTD. K/N/A BISHOP
MANAGEMENT, INC.

By: _____

Name:  Dennis M. Langley
Title:   President

ENB 00672

EM001-007152

26

ENB 00673

26

## TERMINATION OF VOTING TRUST AGREEMENT

I, Dennis M. Langley the sole Voting Trust Stockholder of that certain Irrevocable Voting Trust Agreement dated December 2, 1986, as amended, do hereby agree and stipulate that the Voting Trust Agreement is hereby terminated and is of no force and effect as of the 5th day of November 1999.

_____
Dennis M. Langley, Individually

_____
Dennis M. Langley as voting trustee for Dennis M. Langley's 161,733.2625 Class A Common Shares

The termination of the above described Voting Trust Agreement is consented and approved the date first written above.

The Bishop Group, Ltd.

By: _____
Dennis M. Langley, President

JC01DOCS/29052.01

ENB 00674

EM001-007154

27

ENB 00675

# PROJECT DEVELOPMENT
## AND
## MRG INTERESTS AGREEMENT

### by and between

### Kansas Pipeline Company

### and

### Management Resources Group, LLC.

9t2#011.doc

ENB 00676

# TABLE OF CONTENTS

                                                                                      Page

ARTICLE I          DEFINITIONS AND TERM................................................................1
    Section 1.1    Specific Definitions ...........................................................................1
    Section 1.2    Term.................................................................................................2
    Section 1.3    KPC's Early Termination Options...................................................2

ARTICLE II         TYPES OF PROJECTS ....................................................................4
    Section 2.1    Project Categories ............................................................................4
    Section 2.2    Relative Rights.................................................................................4

ARTICLE III        PROJECT PARTICIPATION ...........................................................5
    Section 3.1    KPC Participation in MRG Initiated Projects.................................5
    Section 3.2    MRG Participation in KPC Initiated Projects.................................9
    Section 3.3    Classification..................................................................................13
    Section 3.4    Engineering and Construction.......................................................13
    Section 3.5    Incremental Operating Costs.........................................................14
    Section 3.6    Use of System by MRG .................................................................14
    Section 3.7    Effect of Declinations to Participate .............................................15

ARTICLE IV         PROJECT FINANCING AND DISTRIBUTIONS...........................15
    Section 4.1    Project Financing ...........................................................................15
    Section 4.2    Cash Flow Distributions ................................................................16
    Section 4.3    MRG Interests ...............................................................................16

ARTICLE V .............................................................................................................19
    Section 5.1    Put/Purchase Rights ......................................................................19
    Section 5.2    Offer and Response........................................................................19
    Section 5.3    Terms of Purchase.........................................................................19

ARTICLE VI         TRANSFERS AND AFFILIATED TRANSACTIONS...........................19
    Section 6.1    Uniqueness of Parties....................................................................19
    Section 6.2    Contractual Relationship...............................................................20
    Section 6.3    Affiliated Transactions...................................................................20
    Section 6.4    KPC Change of Control, Asset Sale, and/or Assignment............................20
    Section 6.5    MRG Change of Control or Assignment by MRG .....................................22

ARTICLE VII        ARBITRATION ..............................................................................22
    Section 7.1    Settling Disputes.............................................................................22
    Section 7.2    Remedies and Enforcement ...........................................................22
    Section 7.3    Notice..............................................................................................23
    Section 7.4    Location of Hearing .......................................................................23
    Section 7.5    Presentation of Arguments.............................................................23
    Section 7.6    Rendering of Decision ...................................................................23
    Section 7.7    Choosing of Arbitrators .................................................................23

i

ENB 00677

Section 7.8    Attorney's Fees ................................................................23
Section 7.9    Cy Pres ...............................................................................24

ARTICLE VIII    GENERAL TERMS AND CONDITIONS ..................................24
Section 8.1    Geographic Coverage.........................................................24
Section 8.2    Waiver ................................................................................24
Section 8.3    Notices................................................................................24
Section 8.4    Reports and Information ...................................................25
Section 8.5    Publicity ............................................................................25
Section 8.6    Use of Facilities ................................................................25
Section 8.7    Governing Law ..................................................................25
Section 8.8    Complete Agreement ........................................................25
Section 8.9    Counterparts......................................................................26
Section 8.10   Titles of Articles, Sections and Subsections....................26
Section 8.11   Severability .......................................................................26
Section 8.12   Jurisdiction and Venue.....................................................26
Section 8.13   Further Assurances............................................................26
Section 8.14   Breach, Notice and Cure ..................................................26
Section 8.15   Prohibited/MRG Activities ..............................................27
Section 8.16   Warranty Against Circumvention/Confidentiality............28
Section 8.17   Restricted Information ......................................................28

ii

ENB 00678

EM001-007158

# PROJECT DEVELOPMENT
## AND
## MRG INTERESTS AGREEMENT

This Project Development and MRG Interests Agreement (Agreement), dated as of the 24th day of October, 1999, by and between Management Resources Group, LLC, a Kansas corporation ("MRG"), and Kansas Pipeline Company, a Kansas General Partnership ("KPC").

WHEREAS, KPC and its Affiliated Entities, including MarGasCo Partnership ("MGC"), market and/or transport Natural Gas;

WHEREAS, MRG and/or its personnel have and/or may operate(d), manage(d) and/or evaluate(d) projects relating to the Natural Gas, alternative energy, water processing, environmental management and/or waste management industries;

WHEREAS, KPC believes that the scope of its operations affords MRG continuous opportunities to expand upon its project development capabilities, while at the same time expanding KPC's project development activities;

WHEREAS, MRG believes that its experience in the area of project development related to the Natural Gas industry may allow MRG to assist KPC and/or its Affiliated Entities in taking advantage of opportunities available to KPC to expand KPC's project development activities while at the same time expanding MRG's project management and development business; and

WHEREAS, KPC and MRG desire to establish a business relationship whereby they may pursue a variety of development projects all in accordance with the terms, conditions, rights and obligations set forth herein; and

WHEREAS, KPC is desirous of having MRG indemnify KPC from the Management Contract; and

WHEREAS, the payment of certain revenues is contingent, performance based and additional contingent consideration to MRG for its agreement to submit to the terms hereof which place restrictions and procedures on MRG's ability to compete with KPC.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, and other good and valuable consideration the receipt of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS AND TERM

Section 1.1   Definitions.  As used in this Agreement, the terms set forth in the Glossary attached hereto as **Exhibit 1.1.A**, are incorporated herein by reference thereto, shall

ENB 00679

have the meanings set forth or as referenced in Exhibit 1.1.A. Aside from definitions, various Sections and Subsections of the Glossary shall contain material and substantive contractual terms and expressions of intent. Terms not set forth in Exhibit 1.1.A, but otherwise defined in the body of this Agreement, shall have the specific meanings attributed to them in the text. Terms used in this Agreement in the singular shall have the same meanings when used in the plural and vice versa, and any gender designation shall refer to all genders.

Section 1.2   Term. This Agreement shall commence on the date hereof and shall continue as follows:  i) as to all matters governing KPC Expansion Projects and MRG Interests Payments the Agreement shall be in effect in perpetuity, unless the Early Complete Termination Option is exercised by KPC pursuant to Section 1.3 and its subsections; and ii) as to all matters governing MRG Exclusive Projects, this Agreement's original terms shall terminate seven (7) years after the date first written above, unless the Early Partial Termination Option is exercised by KPC pursuant to Section 1.3 and its subsections hereof. Upon the expiration of the original seven (7) year term, the MRG Exclusive Projects portion of this Agreement shall renew automatically for an infinite number of successive one year terms, unless either KPC or MRG serves notice of termination to the other at least sixty days prior to the end of the then existing term, in which case such termination shall then become effective at twelve o'clock midnight CST, of the last day of the term (original or successive) which the MRG Exclusive Projects portion is completing as of the date of the termination notice. Termination at the end of the original term or any successive terms of the MRG Exclusive Projects portion as provided for in the previous sentence, shall not require the use of the Early Partial Termination Option or the payment of any fees associated therewith. If the parties are in the process of determining their participation in Projects described in this Agreement when the original terms or any extension thereof expires and/or is terminated in whole, or in part; then the rights of the parties described in herein shall continue until the process described herein with respect to such pending Projects has been concluded.

Section 1.3   KPC's Early Termination Options. KPC has the right to terminate this Agreement in whole or in part as provided for in the Subsections (1.3.1, 1.3.2 and 1.3.3) of this Section.

1.3.1 Early Partial Termination Option. KPC may elect to terminate only the portions of this Agreement which relate to MRG Exclusive Projects, by tendering to MRG a one time payment in the amount of $2,500,000 and by providing MRG with notice, pursuant to Section 8.3, of such partial termination of the MRG Exclusive Projects portion of this Agreement (herein the "Early Partial Termination Option"). In the event of such partial termination, then KPC and its Affiliates for a period of 3 years from the date of the exercise of such Early Partial Termination Option shall be barred from the pursuit of any project which could have been an MRG Exclusive Project (had the Agreement have been continued without partial termination), which MRG or KPC and/or its Affiliates have previously reviewed and/or pursued (even if such review or pursuit had not yet resulted in the project becoming an MRG Exclusive Project) unless KPC and/or its Affiliates elect to pursue any one or more of such Projects with MRG, pursuant to the terms of this Agreement. Likewise, if the parties are in the process of determining their participation in any MRG Exclusive Projects described in this

2

ENB 00680

EM001-007160

Agreement when KPC exercises its Early Partial Termination Option; then the rights of the parties and their Affiliated Entities described herein shall continue until the process described herein with respect to such pending MRG Exclusive Projects has been concluded. Any MRG Exclusive Projects that have gone through the process described in Article III (or elsewhere herein) and/or which have been or are being developed thereafter, shall remain subject to the terms of the Agreement; i.e., notwithstanding anything herein to the contrary, KPC's exercising its Early Partial Termination Option shall not terminate the parties' and their Affiliated Entities' obligations to one another for Projects which have been or are being developed prior to such termination.

1.3.2   **Early Complete Termination Option.**   KPC may elect to completely terminate this Agreement by i) tendering to MRG the Early Complete Termination Payment, ii) by providing MRG with notice (pursuant to Section 8.3) of such complete termination of this Agreement, and iii) by fulfilling the condition precedent described in Subsection 1.3.3 below (herein the "Early Complete Termination Option"). In the event of such complete termination, then KPC and its Affiliated Entities for a period of 3 years from the Early Complete Termination Date shall be barred from the pursuit of any project which could have been an MRG Exclusive Project (had the Agreement have been continued without complete termination), which MRG and KPC (and/or its Affiliated Entities) have previously reviewed and/or pursued (even if such review or pursuit had not yet resulted in the project becoming an MRG Exclusive Project). If the parties are in the process of determining their participation in Projects described in this Agreement when KPC exercises its Early Complete Termination Option; then the rights of the parties described herein shall continue until the process described herein with respect to such pending Projects has been concluded. Any Projects that have gone through the Process described in Article III (or elsewhere herein) and/or which have been or are being developed thereafter, shall remain subject to the terms of the Agreement; i.e., notwithstanding anything herein to the contrary, KPC's exercising its Early Complete Termination Option shall not terminate the parties' and their Affiliated Entities' obligations to one another for Projects which have been or are being developed prior to such termination.

1.3.3   **Exercise of Early Complete Termination.**   KPC may exercise its Early Complete Termination Option by tendering to MRG the Early Complete Termination Payment in certified funds, which payment shall be in addition to any monies received by or accrued to MRG pursuant to the MRG Interests Payments up to the Early Complete Termination Date. To exercise its Early Complete Termination Option, KPC shall notify MRG in writing of its intent to tender and pay such amounts, stating the date on which KPC shall make such payments ("Early Complete Termination Date").

In the event KPC pays or proposes to pay MRG the amount which KPC has determined to be the Early Complete Termination Payment, and MRG disputes such amount, MRG shall give written notice to KPC within thirty (30) days of MRG's actual receipt of same; otherwise the amount paid shall be

ENB 00681

EM001-007161

conclusively and irrebutably be deemed to be correct. In the event of such timely notice of dispute by MRG to KPC, MRG and KPC shall attempt to resolve the Dispute to their mutual satisfaction within twenty (20) days, but if they fail to so resolve the Dispute, it shall be submitted to arbitration as described in Article VII hereof.

After i) the actual receipt by MRG from KPC of the Early Complete Termination Payment, and ii) the actual receipt by MRG from KPC of all MRG Interests Payments accrued and due MRG through the Early Complete Termination Date, iii) the final resolution of any dispute relating to monies which may be owed hereunder to MRG; then MRG shall release any and all security interests as may have been previously granted to secure payment of the MRG Interests Payments and shall execute any and all UCC-3 Termination Statements releasing any UCC-1 Financing Statements which may have been filed and are still in effect perfecting such security interests. In the event KPC exercises and fully completes the Early Complete Termination Option, as provided above, then MRG and its Affiliated Entities shall be prohibited for a term of three (3) years from the Early Complete Termination Date from pursuing a Project which would have been a KPC Expansion Project had this Agreement not been terminated pursuant to the Early Complete Termination Option.

## ARTICLE II

## TYPES OF PROJECTS

**Section 2.1    Project Categories.** There shall be two (2) categories of projects governed by this Agreement: KPC Expansion Projects and MRG Exclusive Projects. All KPC Expansion Projects shall be sub-categorized as either "Chartered" or "Unchartered". If a project does not fall within the scope of any of the above-described categories, then it shall be deemed to be an Unclassified Project. KPC Expansion Projects and MRG Exclusive Projects may collectively be referred to herein as "Projects"; i.e., Projects as the term is used herein shall not refer to Unclassified Projects. MRG and KPC (and/or their Affiliated Entities) shall have no obligations whatsoever to the other with respect to Unclassified Projects.

**Section 2.2    Relative Rights.** With respect to Projects, MRG (and its Affiliated Entities) and KPC (and its Affiliated Entities) shall have the following obligations, duties and options regarding Projects, to-wit:

i)      MRG (and its Affiliated Entities) and KPC (and its Affiliated Entities) shall offer each other the first right of participation in any KPC Expansion Project according to the procedures set forth in Article III below, and if either party fails to do so, then it shall be responsible to the other party for all damages and remedies described herein.

ii)     MRG and its Affiliated Entities shall have the exclusive right to acquire, manage, operate, design and construct all MRG Exclusive

4

ENB 00682

Projects. MRG may, but is not obligated to, offer KPC and its Affiliated Entities participation rights in a MRG Exclusive Project. If MRG, at its sole option, offers KPC and its Affiliated Entities the opportunity to participate in a MRG Exclusive Project, it shall do so according to the procedures set forth in Article III below. KPC and its Affiliated Entities shall not acquire, manage, operate, design or construct a MRG Exclusive Project without first offering MRG the opportunity to participate according to the procedures set forth in Article III below; but if it (they) does (do) so, then KPC and its Affiliated Entities shall be responsible to MRG for all damages and remedies described herein.

## ARTICLE III

## PROJECT PARTICIPATION

**Section 3.1   KPC's Participation in MRG Initiated Projects.**

**3.1.1   MRG Initiated Project.** KPC shall have the right, but not the obligation, to elect to participate in any KPC Expansion Project which MRG initiates and in any MRG Exclusive Project which MRG elects to submit to KPC ("MRG Initiated Project"). The minimum participation interest KPC and its Affiliated Entities may take in any MRG Initiated Project which is also an MRG Exclusive Project is 10% of the interest of MRG and its Affiliated Entities therein; and the maximum participation interest KPC and its Affiliated Entities may take any such MRG Exclusive Project is 49% of the interest of MRG and its Affiliated Entities therein. The minimum participation interest KPC and its Affiliated Entities may take in any MRG Initiated Project which is also an Unchartered KPC Expansion Project is 10% of the interest of MRG and its Affiliated Entities therein, and the maximum participation interest KPC and its Affiliated Entities may take in any such Unchartered KPC Expansion Project is 50% of the interest of MRG and its Affiliated Entities therein. Both the minimum and the maximum participation interest KPC and its Affiliated Entities may take in any MRG Initiated Project which is also a Chartered KPC Expansion Project is 50% .

**3.1.2   MRG   Exclusive   Projects   Which   MRG   Initiates.** Notwithstanding anything herein to the contrary the following is agreed regarding MRG Exclusive Projects:

(i)     MRG is not required to offer any MRG Exclusive Project to KPC and/or its Affiliated Entities or to treat any MRG Exclusive Project which MRG initiates as an MRG Initiated Project.

(ii)    If MRG, in its unilateral discretion, elects to offer any MRG Exclusive Project (which MRG discovers or initiates) to KPC and/or its Affiliated Entities; then MRG may elect, in its sole discretion (with or without

5

ENB 00683

cause), to withdraw any such MRG Exclusive Project from KPC and/or its Affiliated Entities consideration, at any time until KPC and/or its Affiliated Entities and MRG and/or its Affiliated Entities have executed a definitive and binding independent agreement regarding KPC's and/or its Affiliated Entities' participation in the MRG Exclusive Project; i.e., MRG may elect to terminate the procedure set forth in this Section 3.1 and its subsections, vis-à-vis a MRG Exclusive Project which has become a MRG Initiated Project, and MRG may do so in its sole discretion, without any penalties, damages or rights inuring to KPC and/or its Affiliated Entities, up to the time that KPC and/or its Affiliated Entities and MRG and/or its Affiliated Entities have executed a definitive, independent and binding contract regarding the MRG Exclusive Project in question.

3.1.3   **MRG Notice and Offer to KPC.**  MRG shall provide KPC with a written notice (an "MRG Initiated Project Notice and Offer") of the formation or impending commencement of any MRG Initiated Project.  Each MRG Initiated Project Notice and Offer shall include with respect to the applicable MRG Initiated Project, to the extent such information is normally compiled for a Project of substantially similar breadth and scope or is necessary for KPC to make an informed decision as to whether KPC desires to participate in such MRG Initiated Project:  i) a detailed description of such MRG Initiated Project, ii) a feasibility study,  iii) proposed economic parameters, including financing plans,  iv) identification of perceived necessary third party and governmental consents,  v) other facts or information necessary material and reasonably available assessing the economic viability of such MRG Initiated Project, and vi) if the Project is a KPC Expansion Project, then the structure and/or ownership of the Project must be presented in order to show how the same could be accomplished as both a Chartered Project and as an Unchartered Project, unless it is materially less profitable for the Project to be structured as an Unchartered Project (in which case MRG shall explain why it is materially less profitable to structure the Project as an Unchartered Project and shall submit it only as a Chartered Project).  All KPC Expansion Projects must be structured such that each is an Unchartered KPC Expansion Project; unless i) it is materially less profitable to do so, or ii) the parties mutually agree to allow the Project to be a Chartered Project, or iii) structuring the Project as an Unchartered Project would jeopardize KPC's FERC charter as an interstate Gas pipeline; or iv) it is required by law or FERC for the Project to be a Chartered Project.  KPC has the right to prohibit MRG from pursuing a Chartered Project in which KPC has declined (overtly or by omission) to participate, and if it does so, then i) KPC nor its Affiliated Entities may not thereafter pursue such Chartered Project and/or Substantially Similar Project for a period of three (3) years thereafter,(unless resubmitted pursuant to this Agreement) and ii) KPC may, if possible, restructure the Project as an Unchartered Project and pursue the same.

3.1.4   **KPC's Election to Participate.**  KPC shall have 21 Business Days (the "Project Inquiry Period") from the receipt of an MRG Initiated Project Notice and Offer to make any additional inquiries regarding information it deems

ENB 00684

EM001-007164

necessary to make an informed decision regarding participation in the applicable MRG Initiated Project. MRG shall use reasonable efforts, in good faith, to be responsive to any such additional inquiries made by KPC. If KPC desires to participate in a MRG Initiated Project, it must provide MRG with written notice prior to the lapse of the applicable Project Inquiry Period that KPC is willing to participate (a "KPC Participation Notice") in such MRG Initiated Project upon the terms and conditions set forth by MRG in the related MRG Initiated Project Notice and Offer, provided, however, that if KPC and MRG are maintaining a dialogue in good faith concerning additional information regarding the applicable MRG Initiated Project necessary for KPC to make an informed decision as to participation in such MRG Initiated Project, the Project Inquiry Period shall be extended until the earlier of ten (10) Business Days following the date after which either i) such additional information is furnished, or ii) MRG indicates in writing that no further information is available; or alternatively, until any date as KPC and MRG shall mutually agree to in writing.

　　3.1.5　**Contract Drafting.**　In the event KPC elects to participate in a MRG Initiated Project pursuant to Subsection 3.1.4, then MRG shall within thirty (30) days thereafter send to KPC a complete and binding legal offer setting forth in complete detail the contractual terms, which terms must include: the price to be paid; operating terms and conditions; construction, design and engineering budgets; finance terms; contractual rights, duties and obligations of the parties; representations and warranties of KPC in the Project; the business Entity or Person which shall own the Project; funding, cash distribution and capital call provisions; Project Development Fees, if any, and any other materially relevant contractual terms (hereafter referred to "MRG Proposed Terms"). Within thirty (30) days after receiving the MRG Proposed Terms, KPC shall indicate in writing its intention to accept or reject said MRG Proposed Terms ("KPC Acceptance Notice").

　　3.1.6　**KPC's Confirmation Period, Acceptance and Declination.**　In the event KPC elects to participate in a MRG Initiated Project pursuant to Subsection 3.1.5, KPC shall have 30 Days following the submission of a KPC Acceptance Notice (the "Confirmation Period") to arrange for and secure all necessary internal corporate approvals, and approvals and consents of or any Entity or Person necessary for KPC or an Affiliate of KPC to participate in the applicable MRG Initiated Project upon terms and conditions proposed in the MRG Proposed Terms and accepted pursuant to such KPC Acceptance Notice [including, but not limited to, any necessary approvals of KPC (egs. of partners, of Board of Directors, of shareholders, etc.) and/or the syndicate banks for any credit or other loan agreement to be used for financing such MRG Initiated Project].

　　If KPC elects to participate, KPC and its Affiliates shall use their reasonable commercial efforts, within the time frame description in this Subsection 3.1.6, to provide MRG Project Financing. Should KPC and its Affiliated Entities on more than one (1) occasion during the term of this

ENB 00685

EM001-007165

Agreement or renewals thereof fail to obtain MRG Project Financing for a project in which both KPC and its Affiliated Entities and MRG and/or its Affiliated Entities have elected to participate, MRG may, in its sole discretion, elect (for a period of ninety days from the earlier of MRG's notice to KPC or KPC's notice to MRG that MRG Project Financing has not been obtained) elect to terminate this Agreement only as it applies to KPC Expansion Projects. While the parties have a reasonable commercial expectation that KPC and/or its Affiliates will be able to obtain MRG Project Financing, it is expressly understood that KPC and its Affiliates are not required to provide MRG Project Financing if it is not commercially reasonable to do so. Moreover, if KPC and its Affiliates fail to provide MRG Project Financing or fail to meet the "reasonable commercial" test above, then the only remedy available to MRG shall be MRG's limited right of termination of the portions of this Agreement relating to KPC Expansion Projects (however if such limited termination is exercised prior to November 1, 2001, then MRG and/or its Affiliated Entities shall not compete with KPC regarding KPC Expansion Projects until November 1, 2001).

Prior to the lapse of the Confirmation Period, KPC shall provide written notice to MRG (a "Confirmation Notice") whereby KPC confirms that KPC or an Affiliate of KPC is prepared to proceed with the MRG Initiated Project upon the terms and conditions set forth in the MRG Proposed Terms and accepted by KPC, in which case such terms and conditions shall be binding upon the parties. In the event that KPC does not provide a Confirmation Notice to MRG prior to the lapse of the applicable Confirmation Period or KPC provides written notice to MRG prior to the lapse of the applicable Confirmation Period informing MRG that KPC and/or its Affiliates are unable to secure the necessary consents or approvals to proceed with the applicable MRG Initiated Project, KPC shall conclusively be deemed to have elected not to participate in such MRG Initiated Project in accordance with and subject to the terms and provisions of Subsection 3.1.7.

3.1.7   **Effect of KPC's Declination.** If KPC elects not to participate in a MRG Initiated Project either by written notice to MRG, or by failure to provide a KPC Participation Notice in accordance with Section 3.1.6, or a KPC Acceptance Notice pursuant to Subsection 3.1.4, or a Confirmation Notice pursuant to Subsection 3.1.6; then KPC shall have no rights to ownership, operation, management, participation or development of such MRG Initiated Project, provided that MRG actually initiates Construction Commencement of such Project within 18 months of the date of such declination (overtly or by omission) by KPC (which MRG shall have the right to do unless it is a Chartered Project which KPC has prohibited MRG from pursuing pursuant to Section 3.1.3). Thereafter, KPC and its affiliates shall also be prohibited, without the written consent of MRG (which consent may be withheld for any or no reason) from participation in that particular MRG Initiated Project and in any Substantially Similar Project of KPC's accord or with or through any Entity or Person for a period of three years from the lapse of the applicable Project Inquiry Period; provided that MRG actually initiates Construction Commencement of such Project within 18 months of the date of such declination, overtly or by omission,

8

ENB 00686

by KPC. In the event MRG does not initiate Construction Commencement of such Project within 18 months of the date of such declination, overtly or by omission, by KPC; then MRG shall be required to resubmit the Project, *ab initio* for KPC's consideration, as if no such Project had never been considered by KPC.

3.1.8   **New or Insufficient Data.**   Notwithstanding the provisions of Subsection 3.1.7, if KPC elects not to participate in a MRG Initiated Project by written notice to MRG in which KPC states that the information provided by MRG is insufficient for KPC and/or its Affiliates to make an informed decision regarding participation in such MRG Initiated Project, MRG may not proceed with such MRG Initiated Project with any Person not an Affiliate of KPC to which it provides material information not previously provided to KPC ("New Information") without first giving KPC an opportunity to review such New Information and assess whether, as a result of such New Information, KPC desires to participate in such MRG Initiated Project; unless the Project is an Exclusive Project, in which case MRG may elect to withdraw the Project from KPC's consideration. For purposes of this Agreement, New Information shall include, but not be limited to any change in proposed (i) economic terms (including financing terms) of a MRG Initiated Project from those set forth in the applicable MRG Proposed Terms. KPC shall have 10 Business Days from the receipt of any New Information to submit a Participation Acceptance Notice to MRG if KPC desires to participate in the applicable MRG Initiated Project.

3.1.9   **Remedies of KPC.**   MRG may not allow the participation in an MRG Initiated Project (which is also a KPC Expansion Project) of any Person and/or Entity not an Affiliate of MRG other than KPC or a KPC Affiliate until such time as KPC's rights under this Section 3.1 and its Subsections are exhausted. Provided, however, should MRG acquire, manage or close a KPC Expansion Project, without giving KPC a right to participate therein in accordance with Section 3.1 and its Subsections; then in such event KPC shall be entitled to both damages and specific performance (but not in an economically duplicative manner) such that it will receive all of the rights and benefits (economic or otherwise) of any such KPC Expansion Project developed by MRG as if KPC had owned 50% of the interest which MRG owns therein.

**Section 3.2   MRG Participation in KPC Initiated Projects.**

3.2.1   **KPC Initiated Projects.**   MRG shall have the right, but not the obligation, to elect to participate in any KPC Project in which KPC submits to MRG as a proposed Project as described below in this Section 3.2 and its Subsections, ("KPC Initiated Project"). The minimum participation interest MRG and/or its Affiliates may take in any KPC Initiated Project which is also an MRG Exclusive Project is 10% of the interest of KPC therein, and the maximum participation interest MRG and/or its Affiliates may take in any such Project is 50% of the interest of KPC and its Affiliates therein. The minimum participation interest MRG and/or its Affiliates may take in any KPC Initiated Project which is also an Unchartered KPC Expansion Project is 10% of the interest of KPC and its

9

ENB 00687

Affiliates therein, and the maximum participation interest MRG and/or its Affiliates may take in any such Unchartered KPC Expansion Project is 50% of the interest of KPC and its Affiliates therein. Both the minimum and the maximum participation interest which MRG and/or its Affiliates may take in any KPC Initiated Project which is also a Chartered KPC Expansion Project is 50%.

3.2.2  **KPC Notice and Offer to MRG.** KPC shall provide MRG with a written notice (a "KPC Initiated Project Notice and Offer") of the formation or impending commencement of any KPC Initiated Project. Each KPC Initiated Project Notice and Offer shall include with respect to the applicable KPC Initiated Project, to the extent such information is normally compiled for a Project of substantially similar breadth and scope or is necessary for MRG to make an informed decision as to whether MRG and/or its Affiliates desire to participate in such KPC Initiated Project:  i) a detailed description of such KPC Initiated Project, ii) a feasibility study, iii) proposed economic parameters, including financing plans, iv) identification of perceived necessary third party and governmental consents, v) other facts or information necessary, material and reasonably available to assessing the economic viability of such KPC Initiated Project, and vi) if the Project is a KPC Expansion Project, then the structure and/or ownership of the Project must be presented in order to show how the same could be accomplished as both a Chartered Project and as an Unchartered Project, unless it is materially less profitable for the Project to be structured as an Unchartered Project (in which case KPC shall explain why it is materially less profitable to structure the Project as an Unchartered Project, and shall submit it only as a Chartered Project). All KPC Expansion Projects must be structured such that each is an Unchartered KPC Expansion Project, unless either i) it is materially less profitable to do so, or ii) the parties mutually agree to allow the Project to be a Chartered Project, or iii) structuring the Project as an Unchartered Project would jeopardize KPC's FERC charter as an interstate Natural Gas pipeline; or iv) it is required by law or FERC for the Project to be a Chartered Project. KPC has the right to veto and prohibited MRG and/or its Affiliates from pursuing a Chartered Project in which KPC has declined (overtly or by omission) to participate, and if KPC does so, then :  i) KPC and/or its Affiliates may not thereafter pursue or participate in any Substantially Similar Project for a period of three years thereafter (unless resubmitted pursuant to this Agreement), and ii) MRG may if possible, restructure the project as an Unchartered Project and thereby pursue the same.

3.2.3  **MRG's Election to Participate.** MRG shall have 21 Business Days (the "Project Inquiry Period") from the receipt of a KPC Initiated Project Notice and Offer to make any additional inquiries regarding information it deems necessary to make an informed decision regarding participation in the applicable KPC Initiated Project. KPC shall use reasonable efforts, in good faith, to be responsive to any such additional inquiries made by MRG and/or its Affiliated Entities. If MRG and/or its Affiliates desire to participate in a KPC Initiated Project, it (they) must provide KPC with written notice prior to the lapse of the applicable Project Inquiry Period that MRG and/or its Affiliates are willing to

10

ENB 00688

participate (a "MRG Participation Notice") in such KPC Initiated Project upon the terms and conditions set forth by KPC in the related KPC Initiated Project Notice and Offer, provided, however, that if MRG and KPC are maintaining a dialogue in good faith concerning additional information regarding the applicable KPC Initiated Project necessary for MRG to make an informed decision as to participation in such KPC Initiated Project, the Project Inquiry Period shall be extended until the earlier of i) ten (10) Business Days following the date after which such additional information is furnished, or ii) KPC indicates in writing that no further information is available; or alternatively until any such date as MRG and KPC shall mutually agree to in writing.

   3.2.4   Contract Drafting.  In the event MRG and/or its Affiliates elect to participate in a KPC Initiated Project pursuant to Subsection 3.2.3, then KPC shall within thirty (30) days thereafter send to MRG a complete and binding legal offer setting forth in complete detail the contractual terms, which terms must include: the price to be paid; operating terms and conditions; construction, design and engineering budgets; finance terms; contractual rights, duties and obligations of the parties; representations and warranties of participants in the Project; the business Entity or Person which shall own the Project; funding cash distribution and capital call provisions; Project Development Fees, if any; and any other material relevant contractual terms (hereafter referred to "KPC Proposed Terms"). Within thirty (30) days after receiving the KPC Proposed Terms, MRG shall indicate in writing its (and/or its Affiliates) intention to accept or reject said KPC Proposed Terms ("MRG Acceptance Notice").

   3.2.5   MRG's Confirmation Period, Acceptance and Declination.  In the event MRG elects to participate in an KPC Initiated Project pursuant to Subsection 3.2.4, MRG shall have 30 Days following the submission of a MRG Acceptance Notice (the "Confirmation Period") to arrange for and secure all necessary internal corporate approvals, and approvals and consents of any Person or Entity necessary for MRG or an Affiliate of MRG to participate in the applicable KPC Initiated Project upon terms and conditions proposed in the KPC Proposed Terms and accepted pursuant to such MRG Acceptance Notice (including, but not limited to, any necessary approval of the Board of Directors of MRG or the syndicate banks for any credit or other loan agreement to be used for financing such KPC Initiated Project).

   If MRG elects to participate, KPC and its Affiliates shall use their commercially reasonable efforts, within the time frame description in this Subsection 3.2.5, to provide MRG Project Financing.  Should KPC (and/or its Affiliates) on more than one (1) occasion during the term of this Agreement or renewals thereof, fail to obtain MRG Project Financing for a Project in which both KPC (and/or its Affiliates) and MRG (and/or its Affiliates) have elected to participate, MRG may, in its sole discretion (for a period of 90 days from the earlier of MRG's notice to KPC or KPC's notice to MRG that MRG Project Financing has not been obtained), elect to terminate this Agreement only as it applies to KPC Expansion Projects.   While the parties have a reasonable

11

ENB 00689

EM001-007169

commercial expectation that KPC and/or its Affiliates will be able to obtain MRG Project Financing, it is expressly understood that KPC and its Affiliates are not required to provide MRG Project Financing if it is not commercially reasonable to do so. Moreover, if KPC and its Affiliates fail to provide MRG Project Financing or fail to meet the "reasonable commercial" test above, then the only remedy available to MRG shall be MRG's limited right of termination of the portions of this Agreement relating to KPC Expansion Projects (however if such limited termination is exercised prior to November 1, 2001, then MRG and/or its Affiliated Entities shall not compete with KPC regarding KPC Expansion Projects until November 1, 2001).

Prior to the lapse of the Confirmation Period, MRG shall provide written notice to KPC (a "Confirmation Notice") whereby MRG confirms that MRG, or an Affiliate(s) of MRG, is prepared to proceed with the KPC Initiated Project upon the terms and conditions set forth in the KPC Proposed Terms and accepted by MRG, in which case such terms and conditions shall be binding upon the parties. In the event that MRG or an Affiliate(s) of MRG does not provide a Confirmation Notice to KPC prior to the lapse of the applicable Confirmation Period or MRG provides written notice to KPC prior to the lapse of the applicable Confirmation Period informing KPC that MRG or an Affiliate(s) of MRG is unable to secure the necessary consents or approvals to proceed with the applicable KPC Initiated Project, MRG shall conclusively be deemed to have elected not to participate in such KPC Initiated Project in accordance with and subject to the terms and provisions of Subsection 3.2.6.

3.2.6 **Effect of MRG's Declination.** If MRG elects not to participate in an KPC Initiated Project either by written notice to KPC, or by failure to provide a MRG Participation Notice in accordance with Subsection 3.2.3, or a MRG Acceptance Notice pursuant to Subsection 3.2.3, or a Confirmation Notice pursuant to Subsection 3.2.4; then MRG shall have no rights to ownership, operation, management, participation or development of such KPC Initiated Project, provided that KPC actually initiates Construction Commencement of such Project within 18 months of the date of such declination (overtly or by omission) by MRG. Thereafter, MRG shall also be prohibited, without the written consent of KPC (which consent may be withheld for any or no reason), from participation in that particular KPC Initiated Project or any Substantially Similar Project of MRG's accord or with or through any Entity or Person for a period of three years from the lapse of the applicable Project Inquiry Period; provided that KPC actually initiates Construction Commencement of such Project within 18 months of the date of such declination, overtly or by omission, by MRG. In the event KPC does not initiate Construction Commencement of such Project within 18 months of the date of such declination, overtly or by omission, by MRG; then KPC shall be required to resubmit the Project, *ab initio*, for MRG's consideration, as if no such Project had ever been considered by MRG.

3.2.7 **New or Insufficient Data.** Notwithstanding the provisions of Subsection 3.2.6, if MRG elects not to participate in an KPC Initiated Project by

12

ENB 00690

providing written notice to KPC in which MRG states that the information provided by KPC is insufficient for MRG and/or its Affiliates to make an informed decision regarding participation in such KPC Initiated Project, neither KPC nor its Affiliates may proceed with such KPC Initiated Project with any Person not an Affiliate of MRG to which it provides material information not previously provided to MRG ("New Information") without first giving MRG an opportunity to review such New Information and assess whether, as a result of such New Information, MRG desires to participate in such KPC Initiated Project. For purposes of this Agreement, New Information shall include, but not be limited to any change in proposed economic terms (including financing terms) of a KPC Initiated Project from those set forth in the applicable KPC Proposed Terms. MRG shall have 10 Business Days from the receipt of any New Information to submit a Participation Acceptance Notice to KPC if MRG and/or its Affiliate(s) desire(s) to participate in such KPC Initiated Project.

3.2.8   **Remedies of MRG.**   KPC may not allow the participation in a KPC Initiated Project of any Person and/or Entity other than MRG until such time as MRG's rights under this Section 3.2 and its Subsections are exhausted. Provided however, should KPC and/or its Affiliate(s) acquire, operate, manage or close any Project without giving MRG a right to participate therein in accordance with Section 3.2 and its Subsections; then in such event, MRG shall be entitled to both damages and specific performance (but not in an economically duplicative manner) such that it will be entitled to receive all of the rights and benefits (economic or otherwise) of any Project developed by KPC and/or its Affiliates as if MRG had i) owned 49% of KPC's and/or its Affiliates' interest therein if the Project is an MRG Exclusive Project (50% if the Project is a KPC Expansion Project), and ii) MRG and/or its Affiliated Entities would have performed the engineering and construction of such Project receiving a 12% gross, pre-tax profit therefrom (which profit shall for purposes of damages be irrebuttably presumed to be the case).

**Section 3.3   Classification.**   If i) after receiving a MRG Project Notice and Offer or a KPC Project Notice and Offer, the receiving party disputes the classification of a Project; or ii) if one party believes the other party is proceeding with a Project without having followed the procedures set forth in Article III; then said disputing party shall have five (5) business days from its receipt of such (MRG or KPC) Project Notice and Offer to send written notice to the other party setting forth an objection in detail with supporting evidence. If within ten (10) business days after receipt of the objection, MRG and KPC cannot mutually agree in writing to a resolution of any such dispute, then the parties must use the Arbitration procedures set forth in Article VII herein to resolve the dispute over procedure and/or classification. Within five (5) business days after receipt of the final decision of the Arbitrator resolving the dispute, the non-prevailing party shall resubmit the Project Notice and Offer required in Subsections 3.1.3 or 3.2.2, respectively, and the procedures set forth in Article III shall resume accordingly.

**Section 3.4   Engineering and Construction.**   As additional independent consideration for MRG entering into this Agreement (but for the granting of which MRG would not have entered into this Agreement), during the term of this Agreement and any renewals

13

ENB 00691

thereof, MRG and/or its Affiliates, shall be on the bid list for and be permitted to submit a bid to do work for KPC and its Affiliates on all engineering, design, construction, project management, materials acquisition and/or installation (E&C) to the extent that KPC and/or its Affiliates are using Unaffiliated Entities to do such work related to any and all projects that KPC and/or its Affiliates have anywhere. With respect to a KPC Expansion Project which MRG is participating in, KPC shall grant MRG, and/or its Affiliates, a first right of refusal to provide E&C as to said KPC Expansion Projects so long as MRG, and/or its Affiliates, at the time it matches any bid on such E&C by a third party qualified to perform such E&C or submits evidence to KPC to reasonably satisfy KPC that MRG will be qualified to perform such E&C when required.

For any E&C bids sent out by KPC in a KPC Expansion Project, KPC and MRG agree to attempt in good faith to agree as to which Entities said bids will be submitted; it being the intent of the parties that the bids be sent only to qualified contractors capable of being bonded for the cost of the E&C involved in such a KPC Expansion Project. KPC agrees that when it selects a successful third party contractor to do E&C on a KPC Expansion Project it shall send MRG a copy of the successful bid and give MRG, and or its Affiliates, five (5) business days from its actual receipt of the same to match said third party bid. If MRG, and/or its Affiliates, fails to match said bid in writing within the time frame specified, MRG shall have no further rights to the E&C on said particular KPC Expansion Project.

Section 3.5   Incremental Operating Costs. For purposes of this Article III, as to any and all Projects described herein, which KPC and/or its Affiliates may operate, KPC may only assess only its reasonable incremental operating costs, if any, to said such Project(s). Similarly, in the event MRG elects to pursue a KPC Expansion Project, and KPC and its Affiliates decline to participate therein; and MRG elects to operate the same; then if thereafter there is a different MRG Initiated Project which is also a different KPC Expansion Project, which KPC and/or its Affiliates elect to participate in, and of which MRG is the operator, then MRG may assess only its reasonable incremental operating costs, if any, to such subsequent KPC Expansion Project. In the event the parties can not mutually agree on whether any assessment is incremental and/or the amount thereof, the issue shall be submitted to Arbitration pursuant to Article VII hereof and the decision of the Arbitrator shall be binding on the parties.

Section 3.6   Use of System by MRG. If KPC does not participate in a KPC Expansion Project undertaken by MRG, KPC shall take all actions, at MRG's sole expense, reasonably necessary and feasible to facilitate MRG's tying-in of laterals, adding of compression and other physical equipment and fixtures to KPC's pipeline, and KPC shall contract with MRG for Gas transmission through KPC's pipeline and KPC's solely owned KPC Expansion Projects at KPC's most favorable tariffs or rates charged to similarly situated parties from time-to-time (subject to FERC regulation where applicable). MRG shall be entitled to all of the revenues from any KPC Expansion Project in which KPC does not participate subject to and burdened by the aforementioned minimum tariff or rate and incremental operating fees (if any) payable to KPC pursuant to Section 3.5 of this Agreement. KPC shall not bear any cost attributable to any KPC Expansion Project in which it does not participate. In the event that MRG and/or its Affiliates elect to proceed with a KPC Expansion Project which is an Unchartered Project in conformity with the terms herein; then regardless of whether KPC and/or any of its Affiliates participate therein or not, KPC shall in accordance with and subject to the limitations and restrictions set forth in the license agreement referred to in Section 8.13, partially assign to the

14

ENB 00692

Project Investment Vehicle for such Project such portion of or rights under the Easements as is reasonably necessary to such Project for the limited purpose of fulfilling the purpose of the Project and conducting the business contemplated thereby. Notwithstanding the above, KPC reserves the right to prohibit MRG and/or its Affiliates from proceeding with a Chartered Project as more particularly set forth in Subsections 3.1.3 and 3.2.2 hereof.

Section 3.7    Effect of Declinations to Participate.  If KPC declines to participate in a KPC Expansion Project proposed by MRG or should KPC and/or its Affiliates elect to participate therein but be unable to obtain the required financing for such a KPC Expansion Project, then MRG may pursue said KPC Expansion Project without resubmitting it to KPC (and/or its Affiliates) and without its pursuit of said KPC Expansion Project being deemed a violation of this Agreement by MRG.  If MRG declines to participate in a KPC Expansion Project, then KPC may pursue said KPC Expansion Project without resubmitting it to MRG and without its pursuit of said KPC Expansion Project being deemed a violation of this Agreement by KPC.  Notwithstanding the above, KPC reserves the right to prohibit MRG and/or its Affiliates from proceeding with a Chartered Project as more particularly set forth in Subsections 3.1.3 and 3.2.2 hereof.

## ARTICLE IV

## PROJECT FINANCING AND DISTRIBUTIONS

Section 4.1    Project Financing.  With respect to each MRG Initiated Project in which KPC elects to participate, or any KPC Initiated Project in which MRG elects to participate, KPC and its Affiliates shall use their commercially reasonable efforts to provide MRG Project Financing to finance a) the purchase of MRG's (and/or its Affiliates') equity interest in such Project(s) and b) MRG's (and/or its Affiliates') non-equity (debt) obligations related to such Project(s).  MRG and KPC may mutually agree to the financing of such Project(s) on terms other than as provided for herein.  While the parties have a reasonable commercial expectation that KPC and/or its Affiliates will be able to obtain MRG Project Financing, it is expressly understood that KPC and its Affiliates are not required to obtain MRG Project Financing if it is not commercially reasonable to do so.  Moreover, if KPC and its Affiliates fail to provide MRG Project Financing, or fail to meet the "reasonable commercial" test above, then the only remedy available to MRG shall be MRG's limited right of termination of the portions of this Agreement relating to KPC Expansion Projects (however if such limited termination is exercised prior to November 1, 2001, then MRG and/or its Affiliated Entities shall not compete with KPC regarding KPC Expansion Projects until November 1, 2001).  Notwithstanding any provisions of this Agreement to the contrary, KPC shall have the right to construct any KPC Expansion Project (whether initiated by MRG or KPC) for its own account and sole ownership if KPC cannot or does not obtain MRG Project Financing for MRG thereon, and MRG cannot or does not obtain its own financing with respect thereto.

15

ENB 00693

**Section 4.2    Cash Flow Distributions.** Except as otherwise mutually agreed to by MRG and KPC, all positive cash flow from any KPC Expansion Project or MRG Exclusive Project (if offered by MRG) in which both MRG and KPC (and/or their Affiliates) participate, shall be distributed quarterly with MRG (and/or its Affiliates) and KPC (and/or its Affiliates) receiving net proceeds (after debt service, operation costs, Project Development Fees, if applicable) in proportion to their respective ownership therein. It is agreed that 80% of any cash flow distributions due MRG shall be used to retire the interest and principal of the MRG Equity Financing until paid in full.

**Section 4.3    MRG Interests.** In consideration for i) MRG's agreement to abide by the terms hereof regarding KPC Expansion Projects, which terms restrict MRG's ability to compete with the System and for ii) fulfilling the obligations regarding the Management Contract as set forth in Section 6.4 hereof, and for iii) other good and valuable consideration the receipt of which is hereby acknowledged; KPC agrees to hereby create and transfer complete and unencumbered ownership of the MRG Interests to MRG and to tender to MRG the MRG Interests Payments. In the event, MRG is determined to be in breach of the terms of this Agreement (including any term relating to KPC Expansion Projects and/or restricted competition), MRG Interests shall not terminate and MRG Payments may not be terminated, because they are owned by MRG, and because pre-judgment attachment thereof is expressly forbidden as a remedy. KPC warrants that all Gas which it or any of its Affiliates buys, sells, contracts for, transports, etc. in the States of Kansas,Oklahoma and/or Missouri within ten (10) miles of the System (excluding the Transok leasehold interest) shall, to the extent physically possible, be transported over the System and KPC at the firm transportation rates or the interruptible transportation rates specified or imputed as Affiliated Marketing Transactions Imputed Revenue. The only exceptions to the preceding sentence shall be: i) Gas which is not capable of being moved through the System (eg. firm transportation when there is no existing capacity, no interconnections, etc.); ii) Gas whose destination is not in Kansas, Oklahoma or Missouri; iii) Gas which does not move on an inter or intrastate pipeline system, iv) Gas controlled by a Project or Project Investment Vehicle; v) Gas which is under contract (for the duration of the contract) as of the Effective Date and vi) Gas which for any reason whatsoever KPC and/or its Affiliates elect not to move on and/or over the System and/or via KPC, in which case the Affiliated Marketing Imputed Revenue which would have been added to Revenue had such Gas moved on and/or over the System and/or via KPC, shall be imputed and added to Revenue as if such Gas had been moved on and/or over the System and/or via KPC.

**4.3.1    Commencement of MRG Payments.** KPC shall pay to MRG the MRG Payments on a monthly basis. MRG's ownership of MRG Interests and MRG's right to receive MRG Payments shall be effective as of the day and year first above written (herein the "Effective Date"). KPC shall tender MRG Payments to MRG beginning on the twenty-fifth (25th) day following the 1st complete calendar month after the Effective Date and continuing monthly thereafter on the 25th day of each successive month (with each such payment relating to the immediately prior and completed month) in perpetuity, unless KPC exercises its Early Complete Termination Option and tenders MRG the Termination Payment.

16

ENB 00694

4.3.2   MRG Monthly Payments. If the Revenues for any given month do not exceed the Monthly Base Amount there shall be no MRG Payment due such month.   For each month when the Revenues exceed the Monthly Base Amount, KPC and KPC shall pay MRG, on a monthly basis, a cash sum equal to fifty percent (50%) of the difference between the Monthly Base Amount and the Revenues accrued for each such month (herein the "MRG Monthly Payments"). Any MRG Payment not paid within five (5) days of its due date shall accrue interest at the higher of i) the one percentage point (1%) above the prime rate as published in the Wall Street Journal for the month in question, or ii) 12% per annum compounded daily, until paid in full.

4.3.3   Annual True-Up of MRG Payments.  On an annual basis, the parties shall true-up the MRG Payments.  On or before March 31st immediately following the end of each calendar year, KPC shall at its cost prepare and send MRG a calculation prepared by, opined to and signed by the national accounting firm that prepared KPC's audited financial statement for the period in question, which calculation sets forth the Annual True-Up of MRG Payments due MRG by virtue of its ownership of the MRG Interests based on the final actual Revenues for such calendar year (herein the "Annual True-Up").

If the Annual True-Up is greater than the MRG Payments that were paid to MRG for the immediately preceding calendar year, then KPC shall pay MRG the difference without interest accruing thereon, provided that such amount due MRG is paid in full on or before April 5th of the year immediately following the end of each calendar year to which the Annual True-Up relates.   Should the Annual True-Up be less than the MRG Payments that were paid to MRG for the immediately preceding calendar year, then MRG shall conditionally owe the difference to the KPC without interest accruing thereon, and MRG shall have such deficiency offset its future MRG Payments, if any, as provided for in this Subsection below.

Should KPC and MRG Dispute the calculation of any MRG Monthly Payment or of the Annual True-Up amount (calculated by the national accounting firm), then the disputing party(ies) shall pay (in the case of the KPC  or start having future MRG Payments offset (in the case of MRG) whatever amounts are not in dispute, and notify the other party what amount it does dispute within thirty (30) days after receiving the MRG Monthly Payment or the Annual True-Up calculation by the national accounting firm.  However, failure to assert one's claim or Dispute within such timeframe shall not prevent either party from asserting such claim or Dispute thereafter, provided the same is done within the timeframe of the appropriate Statute of Limitations.  If after receiving notice of a Dispute, KPC and MRG cannot mutually agree to a resolution the same may be submitted to Arbitration and the decision of the Arbitrator as to the amount of the proper MRG Monthly Payment, MRG Annual Payment and/or of the Annual True-Up shall be final, conclusive and irrebutable.

17

ENB 00695

For any calendar year in which the Annual True-Up does not exceed the Base Amount on an annual basis, the amount of such difference shall constitute the "Shortfall". The Shortfall shall carry forward as an offset to future MRG Payments due MRG in the immediately following calendar year(s). Shortfall(s) shall only be carried forward to succeeding calendar years (and not backward to preceding calendar years). Such Shortfall(s) shall, if necessary, be carried forward for more than one succeeding year, until such Shortfall(s) is/are fully offset by future MRG Payments otherwise payable to MRG in such succeeding years but for the Shortfall(s).

4.3.4   **Ownership Interest.** The parties agree that at all times MRG shall be the exclusive owner of the MRG Interests and that KPC shall collect MRG's share of Revenue, on MRG's behalf and hold the same in trust for MRG until delivered to MRG as set forth herein; provided however to the extent any Arbitrator or judicial body determines the MRG Interests and/or the MRG Payments to be a contract right, then the same shall be deemed to be Collateral secured by a first perfected security interest as described herein and in Exhibit 4.3.4. The MRG Interests and MRG Payments shall be secured by a first perfected security interest against an undivided 50% of the Revenues in excess of the Base Amount (the "Collateral"), renewed by KPC as required to maintain MRG's secured status at all times until the Termination Date of this Agreement, as described in Section 8.13. The security interests in the Collateral are in and to the same proceeds as the MRG Interests (which MRG owns out right) and MRG Payments and do not encumber KPC's proceeds (the remaining 50% of the Revenue in excess of the Base Amount). KPC agrees to execute any and all new or additional security agreements, financing statements, and UCC forms requested by MRG which are necessary to secure or perfect the security interest in the Collateral. The parties recognize that MRG Interests and MRG Payments are currently encumbered by KPC's lenders. KPC hereby warrants that it shall i) indemnify and hold MRG harmless from any and all claims against MRG Interests and/or MRG Payments by such Lenders; and ii) have any and all such liens, mortgages, claims, security interests, etc. released as to MRG Interests and/or MRG Payments no later than December 31, 1999.

4.3.5   **Audit Rights.** MRG shall have the right to audit the books of KPC, MGC and/or their Affiliated Entities, for purposes of verifying any of KPC's payments hereunder (egs. the Annual True-up, MRG Payments, Early Complete Termination Payments and any and all other matters or payments which could be related thereto or have any effect thereon). MRG or its agents shall pay its own costs for such audit, and conduct it during normal business hours. If after the audit, it is determined that additional amounts are due MRG for the periods audited, then KPC shall pay the additional amounts due, plus interest thereon from their original due date. If the understatement exceeds 5% of the amount paid during the periods covered by the audit, KPC shall pay MRG's reasonably incurred audit expenses.

18

ENB 00696

EM001-007176

## ARTICLE V

### Put/Purchase Rights Regarding Completed Projects

**Section 5.1    Put/Purchase Rights.**  With respect to each completed Project (a "Put Eligible Project") in which both MRG (and/or its Affiliates) and KPC (and/or its Affiliates) participated pursuant to the terms of this Agreement, i) MRG shall have the right to put or purchase (a "Put/Purchase Right") its ownership interest in a Put Eligible Project to or from KPC at any time following the third anniversary of completion of such Put Eligible Project, and ii) KPC shall have a Put/Purchase Right with respect to its ownership interest in a Put Eligible Project to or from MRG at any time following the third anniversary of completion of such Put Eligible Project.

**Section 5.2    Offer and Response.**  For purposes of this Article V, a Put/Purchase Right shall mean the right of a party hereto (the "Exercising Party") to submit in writing to the other party (the "Recipient Party") a price certain for which the Exercising Party will sell its ownership interest in the applicable Put Eligible Project.  Within 60 Days of receipt of the Exercising Party's proposed sale price for such Exercising Party's ownership interest in the applicable Put Eligible Project, the Recipient Party shall indicate in writing (the "Put Response") whether it wishes to (i) acquire such ownership interest from the Exercising Party at the stated price, or (ii) sell its ownership interest in the applicable Put Eligible Project to the Exercising Party for a proportionately equivalent price.  The Exercising Party or the Receiving Party shall purchase the other party's ownership interest in the applicable Put Eligible Project in accordance with the Put Response within sixty (60) days of the receipt of the Put Response by the Exercising Party.

**Section 5.3    Terms of Purchase.**  In any acquisition of an interest (beneficial or otherwise) in a Project, the definitive documentation evidencing such transaction shall include (a) on behalf of each of the selling party and the acquiring party, traditional representations, warranties and covenants by such party as a Person similarly situated would be expected to provide in a transaction of similar nature under like circumstances, and (b) provisions whereby the selling party shall fully indemnify the acquiring party for all actions taken by (or omissions of) such selling party with respect to the interest to be so acquired or, if such interest represents a controlling interest in a Project, all actions taken by (or omissions of) any Person in the course of establishing, developing, promoting, consummation or operating such Project for any period prior to consummation of such acquisition.

## ARTICLE VI

## TRANSFERS AND AFFILIATED TRANSACTIONS

**Section 6.1    Uniqueness of Parties.**  Because this Agreement is pragmatically and materially affected by the personnel of KPC and MRG, and the assets owned by thereby, any assignment hereof or thereof is strictly restricted by the terms hereof. If there is a dispute regarding a breach of the assignment and/or change of control provisions set forth herein, which

19

ENB 00697

breach has not been cured in good faith pursuant to Section 8.14, the Arbitrators reviewing the dispute and any issues of assignment and/or change of control are instructed to strictly enforce the assignment and/or change of control provisions hereof including the firm, rapid and conclusive assessment of damages and/or remedies as provided for herein.  The parties agree that termination of this Agreement, except as provided for herein, is not a remedy which shall be available to either party and may not be invoked by the Arbitrator and/or Court.

Section 6.2    Legal Relationship.  The obligations of the parties to one another under this Agreement are contractual and property rights in nature.  While KPC and MRG each have the duty to act in good faith and deal fairly with each other in honoring the contractual obligations described herein and in recognizing the property interests of one another as herein provided, KPC and MRG do not have fiduciary duties to each other.  KPC and MRG may act (or refrain from acting)in their own economic self-interests, provided their actions and/or omissions are in conformity with the terms herein.

Section 6.3    Affiliated Transactions.  Certain Affiliated Transactions are expressly provided for (and on occasion encouraged) within the four corners of this Agreement and/or its Exhibits.  Affiliated Marketing Transactions are expressly permitted and encouraged, provided that the Affiliated Marketing Transaction Imputed Revenue calculations associated therewith are added to Revenues.  The Arbitrator is instructed that breach of this provision will require that the aggrieved party be made whole (to the extent possible) via whatever use of equitable and/or legal remedies (except termination of the Agreement) which best accomplish that result.

Section 6.4    KPC Change of Control, Asset Sale, and/or Assignment.  This Agreement may not be assigned by KPC to any Entity, except an Entity which shall thereafter own KPC and the System.  Except as provided for in this Section, KPC shall not transfer and/or sell any assets of KPC and/or the System.  If KPC desires to i) transfer and/or sell assets of KPC and/or the System which cumulatively result in a KPC Change of Control, and/or ii) create a KPC Change of Control; then KPC may do so, but only if it adheres to the following: a) KPC elects to exercise its Early Complete Termination Option hereunder, or b) MRG consents thereto (which consent may be withheld for any or no reason), or c) the purchaser (assignee or beneficiary) or its ultimate controlling Entity thereof is a Qualified Purchaser, which executes (together with the Qualified Purchaser's ultimately controlling Entity) an assignment and ratification of this Agreement in the form of the Assumption Agreement which is attached hereto as Exhibit 6.4A and incorporated herein by reference (and a restatement of this Agreement if MRG so requests), and the ultimate controlling Entity of the Qualified Purchaser executes a guaranty agreement in the form of the Guaranty Agreement which is attached hereto as Exhibit 6.4B and incorporated herein by reference, and KPC executes guaranty in the form of the Guaranty Agreement which is attached hereto as Exhibit 6.4 C and is incorporated herein by reference thereto.  In the event there is a complete assignment of this Agreement by KPC which has complied with the terms hereof, then MRG shall grant a release and novation of only the assigning party and its ultimate controlling Entity from the terms hereof and of such guaranties, but the assignee and/or its (their) ultimate controlling Entities shall be substituted in full for all obligations hereof and of such guarantee.

In addition to the above, KPC may sell a portion of the assets of the System or of KPC, so long as the totality of all such assets sold, as determined cumulatively, over an unlimited

20

ENB 00698

period of time, shall not exceed 10% of the total assets of the System or of KPC as determined by the audited book value (excluding good will, cash and intangibles) in accordance with GAAP, verified via audited financial statements and opined to by an accounting firm of national recognition, reputation and authority; provided that KPC strictly adheres to the following: i) the transaction shall not be an Affiliated Transaction, and ii) the transaction shall not reduce Revenue (determined on the basis of whether such assets created Revenue in the past 24 months), and iii) provided that KPC extends to MRG (and strictly adhere to) the following first right of refusal procedure:

a)   KPC shall notify MRG in writing of its intention to proceed with such a limited sale of assets (identifying the assets with particularity) and shall negotiate in good faith, with MRG for a period of 20 Business Days from the date of MRG's actual receipt of such notice to arrive at a mutually agreeable price by which MRG is willing to pay and KPC is willing to accept for its sale of such assets.

b)   If at the end of such twenty (20) Business Days, KPC and MRG have not reached a mutual agreement, then KPC shall make a formal written offer to MRG for which KPC will sell assets to MRG.

c)   MRG shall have five (5) Business Days from its actual receipt of such formal offer to accept the offer exactly as presented.   Such acceptance by MRG must be firm, unconditional and in writing delivered to KPC pursuant to Section 8.3 hereof.  If MRG fails to accept such formal offer within the five (5) Business Days allocated, then MRG shall conclusively and irrebutably be deemed to have rejected such formal offer.

d)   In the event MRG accepts the formal offer, then closing and payment shall take place pursuant to the terms of the formal offer.

e)   In the event MRG rejects the formal offer (either overtly or by omission or by failure to accept within the specified time frame), then KPC shall be free to sell such assets provided that the price term of such sale is equal to or higher than the price term of the formal offer from KPC to MRG.

f)   Thereafter if KPC desires to sell such assets at a price which is less than the price in the formal offer from KPC to MRG, then KPC must resubmit a new formal offer to MRG containing the lesser price, and MRG shall have five (5) Business days from its actual receipt of such new formal offer to accept or reject the same. In the event MRG fails to accept such new formal offer within the five (5) Business Days allocated, then MRG shall conclusively and irrebutably be deemed to have rejected such new formal offer, and KPC shall be free to sell such assets.

21

ENB 00699

The above shall not be construed as limiting KPC's ability to refurbish and/or replace portions of the System so long as the total assets of the System or of KPC are not reduced beyond 10%, as described above, and the above shall not be construed to prevent KPC from salvaging all or portions of the System. In the event of a KPC Change of Control, MRG warrants that it shall either secure the release of KPC from its obligations under the terms of the Management Contract or it shall indemnify KPC therefrom.

Section 6.5    Assignment by MRG.  MRG may assign this Agreement to any Affiliated Entity of MRG and/or Langley, and MRG may assign its MRG Interests and rights to the MRG Payment to any Entity (including an Unaffiliated Entity), but in such event MRG shall provide KPC written notice thereof pursuant to Section 8.3.  MRG may not assign the Project development aspects of this Agreement, or E & C rights under Section 3.4 hereof, to an Unaffiliated Entity unless MRG obtains the written consent of KPC thereto, which consent can be withheld for any or no reasons.  In the event MRG breaches this provision and does not cure such breach pursuant to Section 8.14, the sole remedy available to KPC shall be the right to declare such assignment (but not this Agreement) void and of no force or effect.  In the event, there is an assignment of this Agreement by MRG to an Unaffiliated Entity which is consented to in writing by KPC, then the new Entity shall execute an assumption agreement and/or a restated Agreement which substitutes the new Entity for MRG, and upon the receipt thereof, KPC shall grant MRG a release and novation from the terms of this Agreement.

## ARTICLE VII

## ARBITRATION

Section 7.1    Settling Disputes.  Pursuant to the following Subsections of this Section 7.1, all claims, disputes and other matters in question arising out of, or relating to this Agreement or the breach hereof, herein "Disputes" (including those Disputes not resolved pursuant to Section 8.16) shall be decided by arbitration under the rules and procedures of the American Arbitration Association, unless the parties mutually agree in writing otherwise.  The parties expressly stipulate such claims to be submitted to arbitration hereunder relating to any and all legal, statutory, administrative, equitable and regulatory claims relating to this Agreement, the negotiations between the parties concerning this Agreement, the claims, securities claims, tort claims, fraud claims, and any and all other legal and/or equitable claims, etc.  It is the expressed intent of the parties hereto that any and all conflicts which would arise between the parties and their assigns be submitted to and determined by Arbitration.

Section 7.2    Remedies and Enforcement.  It is stipulated that the agreement to arbitrate shall be enforceable via specific performance and/or injunctive relief.  The award and judgment rendered by the Arbitrator shall be final and conclusive, and the parties stipulate that legal and/or equitable judgment may be entered upon it in any court having jurisdiction.  It is also stipulated and agreed and the specific intent of the Parties hereto that termination of this Agreement shall not be a remedy available to either party.  The Arbitrator (nor any Court) specifically may not order termination of this Agreement in rendering its decision.  It is

22

ENB 00700

stipulated that this agreement to arbitrate shall be enforceable via specific performance and/or injunctive relief. It is also stipulated and agreed that the Arbitrator in rendering its decision shall be authorized to order the future specific performance of the terms of this Agreement, and in the same decision award a Party hereto monetary damages as to the failure of the other party to perform its previous obligations to the other Party hereto. The award and judgment rendered by the Arbitrator shall be final and conclusive, and the parties stipulate that legal and/or equitable judgment may be entered upon it in any court having jurisdiction.

      **Section 7.3   Notice.**  Notice of the demand for arbitration  shall be filed in writing with the other parties to the Agreement and with the American Arbitration Association. The demand for arbitration shall be made within a reasonable time (not less than five (5) days and not more than thirty (30) days) after the notice is received. In no event shall notice be given after the date when the institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations or statute of repose. Notice to each party shall either be hand delivered in any fashion and to the Persons (or their successors) as prescribed in Section 8.3 hereof.

      **Section 7.4   Location of Hearing.**  Actual arbitration hearings shall take place in Johnson County, Kansas, unless otherwise mutually agreed, in writing.

      **Section 7.5   Presentation of Arguments.**  All arguments must be presented in no more than fifteen (15) days after the start of the arbitration hearings. Failure to present arguments within the time allotted shall be considered a default only on the matter presented for arbitration. If any party so defaults, it hereby agrees to forfeit all other remedies available to it in law, equity or otherwise for the matter being arbitrated only.

      **Section 7.6   Rendering of Decision.**  After each side rests in the arbitration hearing, the decision of the Arbitrators must be rendered in writing within ten (10) days, however, a decision rendered extrinsic of such time frame shall be valid and binding on the parties. If either party believes the decision to be ambiguous or unclear in any manner it shall submit its questions in writing to the Arbitrator and to the other party which may elect to submit comments on the questions in writing to the Arbitrator and to the questioning party within ten (10) days, and the Arbitrators shall respond thereto in writing within ten (10) days of their receipt of the later of the questions or the comments on the questions.

      **Section 7.7   Choosing of Arbitrator.**  The American Arbitration Association shall select one (1) Arbitrator to preside over the arbitration proceedings and render judgment thereon. The Arbitrator shall be an attorney with experience in interstate Natural Gas pipelines. The selection of the American Arbitration Association shall be final, conclusive and irrebuttable.

      **Section 7.8   Costs and Fees.**  In the event of any legal or arbitration proceedings (or legal action to enforce the same) arising out of or relating to the arrangements contemplated by this Agreement (regardless of whether such action alleges breach of contract, tort, violation of a statute or any other cause of action), the prevailing party will be entitled to recover its reasonable costs of all such proceedings, including its reasonable attorneys' fees and expert witness fees. If a party prevails on some aspects of such action but not on others, the Arbitrator shall apportion any award of costs or attorneys' fees in such manner as it deems equitable, including court costs, legal expenses of both parties during the course of and in

ENB 00701

EM001-007181

preparation for the proceedings; travel and out-of-pocket expenditures of either party in preparation for the proceedings; accounting, professional and/or expert witness fees actually expended by either party in preparation for or during the proceedings, etc.

Section 7.9 Cy Pres. The doctrine of *Cy Pres* shall be applicable to the Agreement such that in interpreting the terms and conditions hereunder the intentions of the parties are to be carried out as near as may be, when it would otherwise be impossible or illegal to give it literal effect. In any dispute arising out of this Agreement, the doctrine of *Cy Pres* shall be applied by the Arbitrator.

## ARTICLE VIII

## GENERAL TERMS AND CONDITIONS

Section 8.1 Geographic Coverage. The terms and provisions of this Agreement, including the rights and obligations of the parties granted hereunder, shall apply to the parties and the operations of their respective businesses throughout the world.

Section 8.2 Waiver. Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provision thereafter. Any party's failure or delay in protesting, or contending breach pursuant to Article VII or taking legal and/or equitable action or demanding arbitration upon the other party's breach is no waiver of that cause of action, unless that party's delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations. Any party's failure or delay in protesting, or contending breach pursuant to Article VII or taking legal and/or equitable action or demanding arbitration upon the other party's breach is not to be considered as being a waiver of that party's cause of action for any subsequent breach of the same or of a different nature. Except as set forth in Section 1.3.2 and 1.3.3 regarding the Early Complete Termination Option procedure, failure of any party hereto to contest the accuracy of any payments due and/or previously made hereunder, shall not constitute a waiver or release of any rights or remedies pursuant to the provisions of this Section 8.2, "Waiver", Section 8.14, "Breach, Notice and Cure", or Article VII, "Arbitration".

Section 8.3 Notices. All notices and other correspondence required or made necessary by the terms of this Agreement shall be delivered to the respective parties hereto by registered mail, return receipt requested at the following addresses:

MRG:     Management Resources Group, LLC.
Dennis M. Langley, President
13137 Thunderhead Falls Lane
Rapid City, SD 57702
Telephone No: (605) 355-9746

24

ENB 00702

EM001-007182

KPC        Kansas Pipeline Company
8325 Lenexa Drive, Suite 400
Lenexa, KS 66214
Telephone No: (913) 888-7139
Fax No.: (913) 599-2573
Attn: Howard E. Lubow, Executive Vice President

or to such other addresses or Persons as either party hereto may unilaterally designate in writing to the other. Duplicate notices may also be given by any of the following forms: telegram, telex, telecopy and/or personal delivery. A notice shall be deemed received when the first form of notice or duplicate notice is actually received by the party to whom it is addressed.

       **Section 8.4    Reports and Information.** From time to time during the life of this Agreement, both parties shall consult and meet with as well as provide reports and information to each other and in other appropriate ways keep each other timely informed about the status of all ongoing Projects. The parties hereby agree to execute, acknowledge and deliver to each other any further transfers, acknowledgments, powers of attorney, authorizations, filings, applications, reports or other documents or instruments that may be reasonably required to give full force and effect to the provisions of this Agreement, and to take such further actions reasonably required in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

       **Section 8.5    Publicity.** So long as this Agreement is in effect, without the prior consent of the other party, which may be withheld for any reason or no reason at the sole discretion of either party, neither MRG nor KPC shall, nor shall either of them permit their respective Affiliates to, issue or cause the publication of any press release or other public statement or announcement of any nature with respect to this Agreement or the transactions contemplated hereby except as may be required by law or by obligations pursuant to any listing agreement with a national securities exchange. If either KPC or MRG is required by law or obligation pursuant to any applicable listing agreement to disclose any information with respect to this Agreement or the transactions contemplated hereby, such party shall provide the other party with prompt notice of such required disclosure.

       **Section 8.6    Use of Facilities.** During the term of this Agreement, KPC shall make available to MRG and its representatives, free of charge, the use of office space at KPC's headquarters located in Johnson County, Kansas, for work related to Projects, until September 30, 2000, and MRG shall permit its personal property located at such offices to be used by KPC until such date.

       **Section 8.7    Governing Law.** This Agreement and the obligations of the parties hereunder, shall be interpreted, construed, and enforced in accordance with the laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

       **Section 8.8    Complete Agreement.** This Agreement and the other documents and writings referred to herein or delivered pursuant hereto, contain the entire understanding of the parties with respect to the subject matter hereof and thereof and supersede all prior

ENB 00703

EM001-007183

agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof and thereof.

Section 8.9    Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be in an original, but all of which shall be deemed to constitute one instrument. This Agreement or any document executed in connection herewith shall be binding upon such signatory party, if said signature is delivered by telecopier or other like transmission.

Section 8.10    Grammatical Construction and Titles of Sections . The title and subtitles of articles, sections and subsections of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of or in any way influence the interpretations of this Agreement.

Section 8.11    Severability.  Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

Section 8.12    Jurisdiction and Venue.  Any suit, action or proceeding with respect to the enforcement of any decision or judgment of Arbitrators pursuant to Article VII (and only in such circumstances) may be brought in any court in Kansas.  KPC and MRG respectively hereby submit to the jurisdiction of any and all such courts for the purpose of any such suit, action or proceeding.  The parties stipulate that the provisions of this paragraph shall not be construed to grant any party the right to file an action arising out of or relating to this Agreement in any court in the state of Kansas except for the purpose of enforcing a judgment or decision rendered under this Agreement pursuant to Article VII.

Section 8.13    Further Assurances.   The parties hereby agree to execute, acknowledge and deliver to each other any further writings, documents, transfers, acknowledgments, instruments, powers of attorney, authorizations, filings, applications, reports, etc. that may be reasonably required to give full force and effect to the provisions of this Agreement, and to take such further actions reasonably required in fulfillment of obligations set forth herein or in furtherance of the intent hereof, including, but not limited to:  i) a license agreement sufficient to permit MRG to proceed with any duly authorized Project hereunder and a partial assignment of easement sufficient for that purpose; ii) a first perfected security agreement in favor of MRG securing the payment of the MRG Interests; and iii) a partial assignment of easements along all of the System granting MRG an easement to own, operate and conduct business, for any permitted use other than Natural Gas uses; all of such items (i, ii, and iii, will be in a form reasonably agreeable to the parties hereto.

Section 8.14    Breach, Notice and Cure. In the event that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(s) describing such breach(s) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual receipt of such notice to cure said breach(s) if it concurs that the acts or omissions described in the notice(s) constitute breach(s), or it may elect to provide a cure to the complaining party's contended breach(s) even if the purported breaching party is of the belief that the  acts or omissions

26

ENB 00704

described in the notice(s) do not constitute a breach(s) hereof; and if so cured by the purported breaching party to the reasonable satisfaction of the complaining party, the breach(s) shall be deemed to have never occurred. In the event the parties cannot agree as to whether the acts or omissions described in the notice(s) constitute a breach(s) of the terms hereof, and the purported breaching party does not elect to cure the alleged breaches to the reasonable satisfaction of the complaining party, then the parties shall resolve said Dispute(s) by Arbitration according to Article VII.

Section 8.15 Prohibited Activities. In order to protect the good will and business interests of KPC and MRG following the Closing of the Stock Purchase Agreement, MRG and KPC agree that at any time during the term of the Agreement, or any renewals thereof:

i) MRG, KPC, their stockholders, Affiliates, officers, employees, directors or agents thereof will not directly or indirectly request or advise any KPC customers, to withdraw, curtail or cancel any service to, from or on KPC and/or the System. Provided however, nothing in this Section 8.15 shall prevent MRG, its stockholders, officers, employees, directors or agents from pursuing any Project or Unclassified Project with any KPC Customer. Moreover, KPC acknowledges and agrees that it expects, anticipates and encourages MRG to speak with KPC Customers regarding said Projects, and agrees when MRG does so its only obligation is to not, indirectly or directly, request or advise such KPC Customer to not honor its obligations under any then existing contracts, nor will MRG or KPC aid or abet or otherwise assist any Entity to do what MRG or KPC is otherwise not permitted to do under this Section 8.15.

ii) Neither MRG, nor KPC, nor their officers, directors, employees or agents will without the prior written consent of the other party's Chief Executive Officer directly or indirectly induce or attempt to influence any employee of the other party to leave or terminate his or her employment; provided however, both MRG and KPC agree and understand that prior to or after the Closing of the Stock Purchase Agreement should any of the employees, agents and/or consultants listed in Exhibit C hereto may be employed by MRG or its Affiliated Entities or consult with or provide legal and/or professional services thereto, then such departure is deemed to be consented to by KPC and its Chief Executive Officer, and deemed not to be a violation of this Section 8.15.

iii) Neither MRG, nor its stockholders, directors nor officers may discuss the terms of any KPC Expansion Project with Kansas Gas Service or Missouri Gas Energy, or their respective successors, without the prior consent of KPC unless KPC has declined to participate (or is otherwise precluded from participating) in a particular KPC Expansion Project pursuant to Section 3.1 and its subsections, in which case discussion will be permitted without KPC's consent as to said particular KPC Expansion Project.

ENB 00705

EM001-007185

iv)            MRG, MRG Affiliates and KPC Affiliates will not solicit, interfere with or compete for the firm transportation volumes (at existing levels) of Western Resources and/or Missouri Gas Energy, nor interfere, solicit or compete for such volumes when the existing firm transportation contracts expire and/or are up for renewal.

Section 8.16   Warranty Against Circumvention/Confidentiality.   The parties hereto warrant that neither they nor any of their Affiliated Entities shall attempt to circumvent the terms of this Agreement or its underlying intent either directly or indirectly via the use or creation of an Affiliated Entity. The parties further warrant that they shall indemnify one another and keep each other whole from any actions of an Affiliate which if done by a party would be a breach of the terms hereof. To the extent either party alleges that such circumvention has been attempted and/or such a breach has occurred, any Arbitrator reviewing such action is expressly requested by the parties to look harshly upon such an action or such an attempt of circumvention. Any circumvention of this Agreement by a party hereto through the direct use or indirect use (with or without knowledge) of an Affiliated Entity which owns, participates in or operates a Project, or Project Investment Vehicle, shall be deemed to be circumvention of this Agreement by the party hereto which is affiliated to such Affiliated Entity.

KPC and MRG are currently Affiliates of one another; however, if they cease to be Affiliated by virtue of the issued and outstanding stock of The Bishop Group, Ltd. being sold to an Unaffiliated Entity, the duties imposed on Affiliated Entities and/or liabilities and/or indemnities of the parties with respect to activities of their Affiliated Entities, which may be circular, and even meaningless, (while KPC and MRG are Affiliated Entities) are intended to be created and shall survive assignment of this Agreement. However, circular liabilities (liabilities of a party and/or its Affiliates to the same party and/or its Affiliates and not to the other party and/or its Affiliates) to the extent they exist, and for the duration of their existence shall be eliminated, ignored and limitedly released.

Section 8.17.   Restricted Information.   All information, documents, data and information disclosed by either party to the other shall be held in strict confidentiality ("Restricted Information"). MRG and KPC each agree that at all times: a) it will protect the Restricted Information from disclosure to persons not authorized herein by exercising at least the same care with respect thereto as it exercises with respect to its own confidential information of like kind, except if disclosure is required pursuant to a subpoena or court order (in written notice), however, the party subject to such subpoena or court order will provide all the other parties a reasonable opportunity to seek a protective order or other remedy to prohibit or limit disclosure of Restricted Information and shall offer all reasonable cooperation for any such dissemination of the Restricted Information within its organization and the organizations of its subsidiaries and affiliates to those persons who have a need to know such information in

ENB 00706

EM001-007186

performing the purpose; and b) it will not employ the Restricted Information for any purpose other than the purpose. The foregoing shall not prohibit or limit MRG's or KPC's use of Restricted Information which: a) was previously known to it; b) was independently developed by it; c) was rightfully acquired by it from a third party without continuing restriction on use for which it is aware; or d) is or becomes part of the public domain through no breach by MRG or KPC of this Agreement.

IN WITNESS WHEREOF, each of KPC and MRG have caused this Agreement to be executed by their duly authorized officers as of the day and year first above written.

Management Resources Group, LLC

By: _____

Dennis M. Langley, President

Kansas Pipeline Company
By:  Syenergy Pipeline Company, L.P., its
     General Partner
By:  Bishop Pipeline Company, its
     General Partner

By: _____

Howard E. Lubow
Executive Vice President and Chief
Operating Officer

ENB 00707

EM001-007187

EXHIBIT 1.1.A

TO

PROJECT DEVELOPMENT AND MRG INTERESTS AGREEMENT

GLOSSARY

Aside from definitions, various Sections and Subsections of this Glossary (Exhibit 1.1.A of the Project Development Agreement) may and shall contain material and substantive contractual terms and expressions of intent. Terms in the singular shall have the same meanings when used in the plural and vice versa, and any gender designation shall refer to all genders. The following terms shall be used throughout the Project Development Agreement in accordance with the definitions ascribed to them in this Glossary, to-wit:

**Affiliated Entity or Affiliate** shall be deemed affiliated as to each other to the extent: a) one of the Entities directly or indirectly controls, or is controlled by, the operations of the other, or the direct or indirect control of one of the Entities is exercised by the officers, directors, stockholders, or partners of the other Entity (whether or not such persons exercise such control in their capacities as officers, directors, stockholders, or partners); and b) one of the Entities directly or indirectly owns, and/or its officers, directors, stockholders or partners (limited or general) directly or indirectly own, a fifteen percent (15%) or greater interest in the capital and/or profits of the other Entity. By way of illustration, if Corporation A owns 51% of the stock of Corporation B, which owns 51% of the stock of Corporation C, which owns fifty-one 51% of Corporation D; then each of A, B, C and D would be an Affiliate of each and every one of the other three corporations.

**Affiliated Transaction(s)** shall mean any transaction by KPC (and/or which uses the System) with an Affiliated Entity of KPC (including any agent, representative and/or operative thereof) so long as such Affiliated Entity of KPC is not also an Affiliated Entity of MRG.

**Affiliated Marketing Transaction(s)** shall mean an Affiliated Transaction which: i) takes Gas onto the System, ii) moves Gas off the System, iii) transports Gas over the System, iv) results in transportation rates being assessed by KPC for use of the System, and/or v) acquires and/or uses Gas transportation services of the System.

**Affiliated Marketing Transactions Imputed Revenue** shall have the following meanings:

i)      As regards interruptible transportation and firm released capacity, Affiliated

1

ENB 00708

EM001-007188

Marketing Transactions Imputed Revenue shall mean the greater of twice (two times) the minimum allowable interruptible transportation rate which FERC permits KPC to charge for interruptible transportation on any portion of the System, or 6.5¢ per dekatherm whichever is the greater, multiplied by the interruptible volumes actually transported over any such portion of the System pursuant to an Affiliated Marketing Transaction.

ii)     As regards firm transportation, Affiliated Marketing Transactions Imputed Revenue shall mean the maximum allowable firm transportation rate  (and Revenue resulting therefrom) which FERC permits KPC to charge for firm transportation on the System, calculated as follows:

a)     The reservation component of such firm transportation Revenue shall be the product of the maximum daily contract quantity pursuant to an Affiliated Marketing Transaction times the maximum applicable reservation rate per dekatherm as set forth in KPC's tariff sheets as revised.

b)     The commodity component of such firm transportation Revenue shall be the product of the actual quantity of Gas pursuant to an Affiliated Marketing Transaction delivered during the month times the maximum applicable commodity rate as set forth in KPC's tariff sheets as revised.

c)     If the receipt and delivery points for a given firm transportation contract are located within the same Zone as defined in KPC's tariff as revised, the applicable rate for the reservation and commodity components in a) and b) above shall be for that Zone only.  If receipt and delivery points are located in different zones, the applicable rates shall be derived by adding the effective rates for service in the multiple Zones.

As an exception to the above, if all of the following criteria are independently met, then at KPC's discretion, KPC and MRG shall share all gross revenue (less Unaffiliated Entity cost of Gas, transportation and/or fuel) inuring to KPC and all of its Affiliated Entities from an expressly specified and particular Affiliated Marketing Transaction on a 50%/50% basis, even if MRG's 50% share is less than the above stated levels, to-wit:

i)     Revenue for the month and year in question is greater than the Base Amount ($2,460,000/month and $29,500,000/yr) and the Annual True Up does not reduce the Annual Revenues to a level less than the Base Amount ($29,500,000); and

ii)     the Affiliated Transaction is a reasonable, competitive response to the marketplace; and

2

ENB 00709

iii)     KPC fully discloses all revenue generated by the transaction, warrants such disclosure and grants MRG audit rights to its and Affiliate's books vis-à-vis the transaction.

Affiliated Marketing Transactions Imputed Revenues are conclusively presumed and imputed by agreement of the parties for the sole purpose of calculating Revenue, and have no bearing on or relationship to the actual prices charged by KPC to Affiliates for use of the System, and have no relationship to the actual earnings of Affiliates (including MarGasCo); i.e., an Affiliate of KPC could actually earn more or less than the Affiliated Marketing Transactions Imputed Revenues, and that would not alter the Affiliated Marketing Transaction Imputed Revenues; and KPC could actually earn more or less than the Affiliated Marketing Transaction Imputed Revenues from transacting to transport such Gas, and it would not alter the Affiliated Transaction Imputed Revenues.

If FERC regulations and/or terminology should change such that the terms and concepts set forth in this definition become meaningless and/or are altered to such a fashion that the economic import of those terms or regulations as they impact the above definition or the economic result thereof (e.gs. "interruptible transportation", "interruptible transportation rates", "firm transportation", "firm transportation rates", "firm released capacity", etc.); then the parties shall work in good faith to modify the above definition in accordance with the equitable concept of *Cy Pres*, in order to preserve their original intent. However, if they fail to achieve a mutually acceptable reformation, the Dispute shall be submitted to Arbitration hereunder with the Arbitrator being instructed to invoke the concept of *Cy Pres*, and being expressly empowered with contract reformation capabilities. It being the original, general intent of the parties that MRG and KPC share in all Revenue of KPC and MarGasCo as well as all Revenue in excess of the Base Amount inuring to any Affiliated Entity involved in an Affiliated Marketing Transaction on a 50%/50% basis less the cost of gas, recognizing that income garnered by Projects is not Revenue. KPC warrants that all Gas which it or any of its Affiliates buys, sells, contracts for, transports, etc. in the States of Kansas, Oklahoma and/or Missouri within ten (10) miles of the System (excluding the Transok leasehold interest) shall, to the extent physically possible, be transported over the System and KPC at the firm transportation rates or the interruptible transportation rates specified or imputed as Affiliated Marketing Transactions Imputed Revenue. The only exceptions to the preceding sentence shall be: i) Gas which is not capable of being moved through the System (eg. firm transportation when there is no existing capacity, no interconnections, etc.); ii) Gas whose destination is not in Kansas, Oklahoma or Missouri; iii) Gas which does not move on a pipeline, iv) Gas controlled by a Project or Project Investment Vehicle; and v) Gas which is under contract (for the duration of the contract) as of the Effective Date and vi) Gas which for any reason whatsoever KPC and/or its Affiliates elect not to move on and/or over the System and/or via KPC, in which case the Affiliated Marketing Imputed Revenue which would have been added to Revenue had such Gas moved on and/or over the System and/or via KPC, shall be imputed and added to Revenue as if such Gas had been moved on and/or over the System and/or via KPC.

**Agreement** shall mean that particular "Project Development and MRG Interests Agreement" to which this Glossary is attached as Exhibit 1.1.A.

3

ENB 00710

**Annual True-Up** shall have the meaning set forth in Subsection 4.3.3.

**Arbitration** shall have the meaning set forth in Article VII.

**Base Amount** shall mean $2,460,000 of Revenues per calendar month (also the **Monthly Base Amount**) after the date first written above for each and every such calendar month during the term of this Agreement, except as may otherwise be agreed to in writing by KPC and Langley.  Should the Effective Date be other than the first day of the month in which the Effective Date is calendered; or the Termination Date be other than the last day of the month in which the termination Date is calendered; then only for the 1st and last month, if applicable, the monthly payment of Revenue, which shall constitute the Base Amount shall be $2,460,000 multiplied by x divided by y with:

$x$ = the date of the month upon which the Effective Date or Termination Date falls, and

$y$ = the total number of days in the month in which the Effective Date or Termination Date falls.

Base Amount shall also mean $29,500,000 of Revenues per calendar year (also the *Annual Base Amount*) after the date first written above for each and every such calendar year during the term of this Agreement, except as may otherwise be agreed to in writing by KPC and Langley.  Should the Termination Date be other than the last day of the year in which the Termination Date is calendered; then only for the last year the annual Base Amount shall be $29,500,000 multiplied by x divided by y with:

$x$ = the number of the day of the year (out of 365 days) upon which the Termination Date falls, and

$y = 365$.

**Business Day** shall mean any day except a Saturday, Sunday or a day on which banking institutions in Johnson County, Kansas, are obligated by law, regulation or governmental order to close.

**CDT** shall mean Central Daylight Time

**CST** shall mean Central Standard Time

**CT** shall mean either CST or CDT whichever is applicable at the time to which it is being referred.

**Chartered Project** shall have the meaning set forth in the definition of KPC Expansion Project herein.

**Collateral** shall have that meaning set forth in Subsection 4.3.4 of this Agreement and Exhibit 4.3.4 thereto.

**Confirmation Notice** shall have the meaning set forth in Subsections 3.1.5 and 3.2.4.

ENB 00711

EM001-007191

Confirmation Period shall have the meaning set forth in Subsections 3.1.5 and 3.2.4.

Construction Commencement shall mean any and all construction and/or engineering services of any type whatsoever necessary to engineer and/or design a facility; to create construction blueprints and/or drawings; to build; to install and/or construct facilities and any modifications, improvements, and/or expansions of the facilities; and/or to order materials supplies and/or equipment to be consumed during Construction or to become part of the facilities.

Dispute shall have the meaning set forth in Article VII.

E & C shall have the meaning set forth in Section 3.4

Early Complete Termination Date shall have the meaning set forth in Subsection 1.3.3.

Early Complete Termination Payment shall mean the amount to be paid (in addition to other separately specified true-ups, payments and considerations) by KPC to MRG in the event that KPC exercises its Early Complete Termination Option. If KPC exercises its Early Complete Termination Option pursuant to Subsections 1.3.2 and 1.3.3 of the Agreement at any time up to and including Midnight, CST, December 31, 2002, the Early Complete Termination Payment due MRG shall be $50,000,000. If KPC exercises its Early Completion Termination Option any time after Midnight CST, December 31, 2002, then the Early Complete Termination Payment due MRG by KPC shall be the greater of ii) $35,000,000 or the ii) the FMV of the MRG Interests and the MRG Payments due therefrom.

Early Partial Termination Option shall mean KPC's right to terminate only the portions of this Agreement which relate to MRG Exclusive Projects for a fee of $2,500,000, as explained more particularly in subsection 1.3.1 of the Agreement.

Early Total Termination Option shall mean KPC's right to terminate this Agreement and all obligations hereunder including, but not limited to any and all obligations to MRG regarding KPC Expansion Projects and/or MRG Exclusive Projects, and the requirement to make MRG Interests Payments to MRG, all as more particularly set forth in Subsections 1.3.2 and 1.3.3 of the Agreement.

Effective Date shall mean the day and year first written in the Agreement.

Entity see Person.

Exercising Party shall have the meaning set forth in Section [5.1(b).]

FERC shall mean Federal Energy Regulatory Commission.

FMV shall have the meaning of fair market value of the MRG Interests and the MRG Payments at any given point in time, which shall be the amount at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. By fair market value

5

ENB 00712

EM001-007192

is meant the price in cash, or its equivalent, that the property would have brought at the time of taking, considering its highest and most profitable use, if then offered for sale in the open market, in competition with other similar properties, with a reasonable time allowed to find a purchaser.

GAAP shall mean generally accepted accounting principles consistently applied.

KPC shall mean Kansas Pipeline Company, a Kansas general partnership, and its successors and assigns.

KPC Change of Control shall mean any one or all of the following events, to-wit:

    i)          should K-Pipe, KPC and/or any Entity sell and/or transfer more than 10% of KPC's or the System's assets cumulatively over any period of time and/or file abandonment proceedings with the FERC which, when taken together with all other sales and/or transfers exceed the 10% threshold; and/or

    ii)          should The Bishop Group or Langley cease to own directly and/or indirectly less than 50.1% of KPC or MGC; and/or

    iii)         should KPC cease to be an Affiliated Entity of Langley; and/or

    iv)         any other event of sale and/or transfer of more than 10% of KPC.

KPC Expansion Project shall mean any and all of the following Projects (provided that such project exceeds the minimal throughput and capital threshold set forth in this definition below), to-wit:

    i)          Increased volumetric throughput of the System, including projects that consist of increased compression on or into the System.

    ii)          Any and all construction and/or acquisition of Natural Gas gathering or pipelines within ten (10) miles of the System.

    iii)         The acquisition and/or construction of Natural Gas pipelines that feed to Natural Gas fired power plants provided the pipelines so constructed and/or acquired are within ten (10) miles of the System.

    iv)         Pipeline connections to commercial and/or industrial users within 10 miles of the System.

Notwithstanding the above, there are two additional, minimal thresholds which are necessary for a project to become a KPC Expansion Project. In the event a given project meets the above i) – iv) criteria, but does not meet either of the minimal thresholds set forth below; then such project shall not become a KPC Expansion Project. The minimum thresholds which a project must meet before it can become a KPC Expansion Project are as follows:

6

ENB 00713

a)        The volumetric throughput of the maximum actual operating capacity (MAOP) of the System must be increased by equal to or greater than 5 MMCFD at 60°F and standard atmospheric pressure, and certified as such by a third party engineering firm mutually acceptable to MRG and KPC.

AND

b)        The actual capital expenditures associated with the project, when added to the aggregate of all other capital expenditures of KPC for the applicable calendar year must be greater than $1,250,000, and certified as such by KPC's auditors and Ernst & Young (EY).

All KPC Expansion Projects must be structured as either i) Chartered or ii) Unchartered. A Chartered Project is any Project in which more than 90% (by fair market value) of the facilities of the Project become a part of the plant in service of KPC and/or its successor and/or assigns as reported to and recognized by FERC. An Unchartered Project is any Project in which more than 90% (by fair market value) of the facilities of the Project are neither reported to nor recognized by the FERC as part of the plant in service of KPC and/or its successors and/or assigns.

**KPC Initiated Project Notice and Offer** shall have the meaning set forth in Section 3.2.1.

**KPC Participation Notice** shall have the meaning set forth in Section 3.1.4.

**KPC Project Notice and Offer** shall have the meaning set forth in Section 3.2.2.

**KPC Proposed Terms** shall have the meaning set forth in Section 3.2.5.

**LDC** shall mean a local distribution company.

**Langley** shall mean Dennis M. Langley, his heirs, legatees, successors, assigns and grantees.

**MRG** shall mean Management Resources Group, LLC, a Kansas corporation, its successors and assigns. It is expressly acknowledged, accepted and understood by KPC that MRG is not the same Entity as the former Management Resources Group, Ltd. The former Management Resources Group, Ltd.'s name was changed to Bishop Management, Inc., and that Entity was and is a wholly owned subsidiary of The Bishop Group, Ltd.

**MRG Change of Control of** shall mean any event which results in Langley (plus his Affiliated Entities) owning less than 50.1% of MRG.

**MRG Debt Financing** shall mean any and all debt and/or equity contributions and/or liabilities which MRG shall be obligated to pay or be liable for in order to participate in a specific Project. MRG Debt Financing shall be provided exclusively by or via KPC (and/or its lending institutions). MRG Debt Financing shall have recourse only to the assets of the specific

ENB 00714

EM001-007194

Project in question and shall not require the guarantee of MRG and/or any personal guarantees. MRG Debt Financing is submerged in the definition, MRG Project Financing, but is defined separately for the purpose of being able to distinguish between "debt" and "equity" (eg. To distinguish the interest rates and/or rates of return to be applied thereto); hence, MRG Project Financing shall mean MRG Debt Financing and/or MRG Equity Financing, if any. MRG Debt Financing shall be on financial terms (including interest rates, Project debt-equity ratios, Project cash flow requirements, etc.) equal to the financial terms available to KPC.

**MRG Equity Financing** shall mean any and all debt and/or equity contributions and/or liabilities which MRG shall be obligated to pay or be liable for in order to participate in a specific Project. MRG Equity Financing shall be provided exclusively by or via KPC (and/or its lending institutions). MRG Equity Financing shall have recourse only to the assets of the specific Project in question and shall not require the guarantee of MRG and/or any personal guarantees. MRG Equity Financing is submerged in the definition, MRG Project Financing, but is defined separately for the purpose of being able to distinguish between "debt" and "equity" (eg. to distinguish the interest rates, rates of return and repayment obligation to be applied thereto); hence, MRG Project Financing shall mean MRG Debt Financing and/or MRG Equity Financing, if any. Any and all monies provided to MRG from KPC for MRG Equity Financing shall be structured as debentures or debt instruments with recourse only to assets of a given Project as provided above, on the same terms as MRG Debt Financing except that the interest rate or rate of return thereon shall be three hundred - basis points (3.0%) above the MRG Debt Financing interest rate for the same Project. It is agreed that 80% of any cash flow distributions due MRG shall be used to retire the interest and principal of the MRG Equity Financing until paid in full.

**MRG Exclusive Project** shall mean any and all of the following Projects:

i)   The acquisition or construction of Natural Gas pipelines, LDCs, gathering systems and/or Gas storage facilities:  a) between and including the San Juan Basin to Los Alamos, Santa Fe, Taos, Albuquerque, and the metro areas within a 30-mile radius of said cities in New Mexico; b) on the Western Slope of Colorado; c) in the northeast quadrant of Arizona; and d) in Mexico.

ii)  Any and all projects for the sale (wholesale or retail), transmission, storage, gathering, generation, distribution production and/or reproduction of electricity.

iii) Any and all projects that involve material participation by or in assets and/or property owned, and/or developed, in part or in whole, by any Native American Tribe; and/or any and all Projects in which a material portion of the assets of such Project are located on land owned by a Native American Tribe.

iv)  Any and all projects involving the acquisition, development, expansion and/or operation of alternate energy, including:  solar, wind generation, geothermal, ocean thermal gradients, magneto hydrodynamics, hydrogen, water (hydro) power, hydrothermal fusion, photovoltaic power, fuel cells, bio-energy, bio-mass,

ENB 00715

EM001-007195

refuse derived fuel, atmospheric thermal gradients, refrigerant created thermal gradients, tidal energy projects.

v)                        Any and all recycling or environmental reclamation projects; and/or any and all water processing, purification or treatment, processing, distribution, transportation, production, storage and/or sewage projects; and/or any and all telecommunications projects.

**MRG Initiated Project** shall have the meaning set forth in Section 3.1.1.

**MRG Interests** shall mean MRG's interest in and ownership of 50% of the Revenue above the Base Amount, which KPC and/or KPC shall collect on MRG's behalf and transmit to MRG as MRG Interest Payments, all as more particularly described in Section 4.3 hereof and the Subsections thereof.

**MRG Interest Payments (or MRG Payments) and MRG Monthly Interest Payments (or MRG Monthly Payments) and MRG Annual Interest Payments (or MRG Annual Payments)** shall mean MRG's right to receive 50% of the Revenue above the Base Amount as of January 1, 2009, and thereafter, subject to an Annual True-Up and the KPC Early Complete Termination Option all as more particularly described in Section 4.3 hereof and the Subsections thereof. All MRG Interest Payments constitute the tendering to MRG by KPC and KPC of monies due MRG by virtue of MRG's ownership of MRG Interests.

**MRG Participation Notice** shall have the meaning set forth in Section 3.2.3.

**MRG Project Financing** shall mean any and all debt and/or equity contributions and/or liabilities which MRG shall be obligated to pay or be liable for in order to participate in a specific Project. MRG Project Financing shall be provided exclusively by or via KPC (and/or its lending institutions). MRG Project Financing shall have recourse only to the assets of the specific Project in question and shall not require the guarantee of MRG and/or any personal guarantees. MRG Debt Financing and/or MRG Equity Financing are submerged in the definition of MRG Project Financing, but are defined separately for the purpose of being able to distinguish between "debt" and "equity" (e.g. to distinguish the interest rates, rates of return and repayment obligation to be applied thereto); hence, MRG Project Financing shall mean MRG Debt Financing and/or MRG Equity Financing, if any.

**MRG Debt Financing** shall be on financial terms (including interest rates, Project debt/equity ratios, Project cash flow requirements, etc.) equal to the financial terms obtained by KPC for KPC's debt financing. Any and all monies provided to MRG from KPC for MRG Equity Financing shall be structured as debentures or debt instruments with recourse only to assets and revenues of a given Project as provided above, on the same terms as MRG Debt Financing; except that the interest rate or rate of return thereon shall be three hundred - basis points (3.0%) above the MRG Debt Financing interest rate for the same Project.

9

ENB 00716

MRG Project Notice and Offer shall have the meaning set forth in Section 3.1.3.

MRG Proposed Terms shall have the meaning set forth in Section 3.1.6.

Management Contract shall mean that particular Management and Employment Contract dated October 30, 1991, between Langley and Syenergy Pipeline Company, L.P., the performance of which is guaranteed by KPC.

MarGasCo or MGC shall mean MarGasCo Partnership, an Oklahoma partnership and an Affiliated Entity of KPC.

Marketing Revenue Base Amount shall have the meaning of $33,333 per month and $400,000 per year. The Marketing Revenue Base Amount shall be added to and therefore become a part of Revenue. The Marketing Revenue Base Amount shall be the same regardless of what MarGasCo and/or any marketing Affiliate of KPC actually earns, and regardless of whether MarGasCo is hereafter terminated, sold, consolidated and/or merged into another Affiliate of KPC.

Native American Tribe shall mean any Indian Tribe, band, group, Nation or Entity, including Alaska Indians, Aleuts, or Eskimos, or any Alaskan Native Village of the United States, which is considered an eligible recipient under the Indian Self Determination and Education Assistance Act (Public Law 93-638) or was considered an eligible recipient under chapter 67 of title 31, United States Code, prior to the repeal of such chapter. It should be noted that P.L. 93-638 incorporates Department of Interior List of Federally Recognized Tribes. Additionally, Native American Tribe shall mean any Entity recognized by their respective Governments as being aboriginal, Indian, and/or having ancestry in Canada or Mexico prior to 1492.

Natural Gas or Gas shall mean hydrogen, methane, ethane, propane, butane, iso-butane, pentanes or heavier hydrocarbons or any combination thereof, as well as all non-hydrocarbon elements which are concomitant, entrained or imbedded therein or therewith. Natural Gas may be in a liquid, vapor or solid form and inherently includes CNG, LP and LNG Products.

New Information shall have the meaning set forth in Sections 3.1.7 and 3.2.6.

Person or Entity shall mean any corporation, proprietorship, partnership (general or limited), natural person, trust, estate, foundation, association or any other entity or group.

Project shall mean any KPC Expansion Project or MRG Exclusive Project, as the term is used herein; an Unclassified Project is not a Project.

Project Costs shall mean, with respect to any Project, the total "turn-key" costs expended or accrued on such Project until it is completely finished, started-up and placed in service, whether capitalized or expensed, whether internal or external, including but not limited to project development fees and costs, professional fees, engineering costs, accounting costs, construction

10

ENB 00717

EM001-007197

costs, equipment costs, pre-start-up operating expenses, inspection expenses, regulatory fees and assessments, taxes, labor costs and legal expenses.

**Project Development Fees** shall mean any project development fees or costs incurred by the party in developing a Project, including professional fees, consulting fees, labor costs, travel and lodging expenses and other general and administrative charges of said developing party. Project Development Fees may not exceed three percent (3%) of Project Costs.

**Project Inquiry Period** shall have the meaning set forth in Sections 3.1.4 and 3.2.3.

**Project Investment Vehicle** shall mean any Person which has a direct or indirect ownership (equity or legal) in, or the right to control the operation and receive income from any Project.

**Put Eligible Project** shall have the meaning set forth in Section 5.1.1.

**Put/Purchase Right** shall have the meaning set forth in Section 5.1.2.

**Put Response** shall have the meaning set forth in Section 5.1.2.

**Qualified Purchaser** shall mean any Entity which is affirmatively accepted by MRG as such or which meets the following economic criteria:

    i)        GAAP equity of at least $100,000,000;

    ii)       a GAAP debt/equity ratio of no more than 65% debt nor less than 35% equity;

    iii)     positive income in excess of $10,000,000 per year (excluding extraordinary and non-recurring items) for each of the three most recent of its fiscal years.

**Recipient Party** shall have the meaning set forth in Section 5.1.2.

**Revenues** shall mean i) the Marketing Base Revenue Amount, plus ii) Affiliated Marketing Transaction Imputed Revenue, plus iii) all gross revenues and income (not duplicative of i or ii above) calculated on an accrual basis according to GAAP (and not on a cash basis) which are recognized or realized on a consolidated basis from the ownership, operation and business activities of the System and KPC from any and all sources, including but not limited to the regulated and unregulated sale, marketing, gathering and transmission of Natural Gas and all activities related thereto, except as otherwise agreed to in writing by KPC and MRG. Income which is generated and earned by a KPC Expansion Project is not Revenue and KPC's receipt of incremental operating expenses from a KPC Expansion Project pursuant to the terms hereof shall not be Revenue. In the event the Revenue is accrued which is later "written-off" as a bad debt or as rate refunds, then the later "write-off" shall be a deduction from Revenue at the time of the write-off or write-down, but only to the extent it was previously accrued as Revenue.

11

ENB 00718

EM001-007198

Securities Act shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

Shortfall shall have the meaning set forth in Subsection 4.3.3 of this Agreement.

Stock Purchase Agreement shall mean that certain Stock Purchase Agreement of even date herewith between Langley as Seller and KPC as Buyer.

Substantially Similar Project shall mean, with respect to any Project (or a material portion thereof), another project (or a material portion thereof) so similar in primary objective, geographic scope, location and intended customer base to the original Project (or a material portion thereof) as to cause a disinterested, objective, third party to conclude that both (Projects) projects (or a material portion thereof) are substantially similar.

Sufficient Detail shall mean, with respect to a Project or any combination of the following which are sufficient for a disinterested, objective, third party to identify such Project: a) the primary objective of such Project, b) the geographic scope and location of such Project, c) the intended primary customers to be served by such Project, d) the intended participants in such Project, and/or e) any other material information with respect to such Project.

System shall mean that particular, Natural Gas pipeline, and any and all appurtenances thereto and/or assets associated therewith, whether now owned or hereafter owned by KPC and/or its successors and/or assigns including, but not limited to the following:

i)      Any and all future expansions, additions, accretions and/or appurtenances thereto, provided the same are the result of either a KPC Expansion Project or normal capital expenditures of KPC which do not reach the thresholds to become a KPC Expansions Project; and/or

ii)     The Transok leasehold interest owned by KPC, as the same may be, expanded, renewed, amended and/or modified; and/or

iii)    Any and all facilities now owned or hereafter acquired by KPC which are recognized by the FERC as part of KPC's plant in service either now or at any point in the future; and/or

iv)     Any and all other assets, property, (of any nature whatsoever whether intangible or tangible, real, personal, and/or mixed, etc.), contract rights, licenses, goods, etc. to the extent the same are either (now or hereafter owned by KPC and/or its successors and/or assigns), or used by KPC and/or its successors and/or assigns, in order to transport Natural Gas, fulfill any of its contractual obligations, and/or fulfill the legal or certification requirements of any Governmental Agency (particularly the FERC).

A map of the System as it currently exists is attached to the Project Development Agreement as Exhibit 1.1.B

12

ENB 00719

**Unaffiliated Entity** or **Non-Affiliate** shall mean any Entity which is not an Affiliated Entity.

**Unchartered Project** shall have the meaning set forth in the definition of KPC Expansion Project herein.

13

ENB 00720

EM001-007200

## EXHIBIT 6.4 A

## ASSUMPTION AGREEMENT

1

ENB 00721

EM001-007201

<u>Exhibit 6.4A</u> to Project<br>
Development Agreement

### <u>ASSUMPTION AGREEMENT</u>

This Assumption Agreement ("Assumption Agreement") is made this ___ day of _____ between Management Resources Group, LLC ("MRG") and

_____ ("Newco"); and Kansas Pipeline Company, ("KPC") and MarGasCo Partnership ("MGC")-("KPC" and MGC shall collectively be referred to as "Company").

WHEREAS, MRG entered into a Project Development Agreement and MRG Interests Agreement with KPC, dated _____, 1999 ("Development Agreement");

WHEREAS, MRG entered into a Consulting Agreement with KPC, dated _____, 1999 ("Consulting Agreement");

WHEREAS, the Development Agreement and Consulting Agreement shall collectively be referred to as "Company Agreements");

WHEREAS, under the provision of the Company Agreements an event has occurred that constitutes a KPC Change of Control;

WHEREAS, Newco desires to assume the obligations of Company under the Company Agreements;

WHEREAS, Newco, Company and MRG shall collectively be referred to as "Parties";

NOW, THEREFORE, in consideration of One Dollar ($1.00), the mutual covenants and promises contained herein and other good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1.    <u>Assumption of Liabilities and Obligations.</u>    In compliance with each of the Company Agreements, Newco hereby fully and unconditionally assumes any and all obligations of Company arising out of or under the Company Agreements, as well as all obligations and liabilities of KPC under any and all guaranties made by KPC pursuant to the Development Agreement in the form attached as Exhibit 6.4C to the Development Agreement, all of which are incorporated herein fully by reference thereto.

2.    <u>Consent.</u>    In reliance upon the execution of this Agreement by Newco, MRG hereby releases Newco from any obligations to pay MRG any monies that would otherwise become due by reason of the following specified KPC Change of Control transaction under the Company Agreements. MRG's release is only with respect to the transaction whereby Newco acquired sufficient ownership of Company to have

ENB 00722

EM001-007202

obligation to which Newco is subject or bound; or result in the creation of any lien on any of the assets of the Newco which would have a material effect on the Newco.

4.6   **Qualified Purchaser.**   Newco or its ultimate controlling entity is a Qualified Purchaser as defined in the Company Agreements.

4.7   **General Partners of Company.**   The general partners of KPC and MGC and their interests therein, after giving effect to the transaction whereby Newco acquired sufficient interest in KPC and/or MGC for a KPC Change of Control to have occurred pursuant to the Company Agreements, are as follows:

_____

_____

_____

# ARTICLE V
## ARBITRATION

**Section 5.1 Settling Disputes.** Pursuant to the following Sections of this Article V, all claims, disputes and other matters in question arising out of, or relating to this Agreement or the breach hereof shall be decided by arbitration under the rules and procedures of the American Arbitration Association, unless the parties mutually agree in writing otherwise. The parties expressly stipulate such claims to be submitted to arbitration hereunder relating to any and all legal, statutory, administrative, equitable and regulatory claims relating to this Agreement only the negotiations between the parties concerning this Agreement only, the claims, securities claims, tort claims, fraud claims, and any and all other legal and/or equitable claims, etc. It is the expressed intent of the parties hereto that any and all conflicts which would arise between the parties and their assigns regarding this Agreement, be submitted to and determined by Arbitration.

**Section 5.2 Remedies and Enforcement.** It is stipulated that this agreement to arbitrate shall be enforceable via specific performance and/or injunctive relief. The award and judgment rendered by the Arbitrator shall be final and conclusive, and the parties stipulate that legal and/or equitable judgment may be entered upon it in any court having jurisdiction. It is also stipulated and agreed and the specific intent of the Parties hereto that termination of this Agreement shall not be a remedy available to either party. The Arbitrator (nor any Court) specifically may not order termination of this Agreement in rendering its decision. It is also stipulated that this agreement to arbitrate shall be enforceable via specific performance and/or injunctive relief. It is also stipulated and agreed that the Arbitrator in rendering its decision shall be authorized to order the future specific performance of the terms of this Agreement, and in the same decision award a Party hereto monetary damages as to the failure of the other party to perform its previous obligations to the other Party hereto. The award and judgment rendered by the Arbitrator shall be final and conclusive, and the parties stipulate that legal and/or equitable judgment may be entered upon it in any court having jurisdiction. It is stipulated

ENB 00723

EM001-007203

and agreed that if an Arbitrator determines that Newco is for any reason in default of this Agreement, then such default shall also constitute a default by Newco of its obligations under the Company Agreements.

**Section 5.3  Notice.**  Notice of the demand for arbitration shall be filed in writing with the other parties to the Agreement and with the American Arbitration Association.  The demand for arbitration shall be made within a reasonable time (not less than five (5) days and not more than thirty (30) days) after the notice is received.  In no event shall notice be given after the date when the institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations or statute of repose.  Notice to each party shall either be hand delivered in any fashion and to the Persons (or their successors) as prescribed in Section 5.1 hereof.

**Section 5.4  Location of Hearing.**  Actual arbitration hearings shall take place in Johnson County, Kansas, unless otherwise mutually agreed, in writing.

**Section 5.5  Presentation of Arguments.**  All arguments must be presented in no more than fifteen (15) days after the start of the arbitration hearings.  Failure to present arguments within the time allotted shall be considered a default only on the matter presented for arbitration.  If any party so defaults, it hereby agrees to forfeit all other remedies available to it in law, equity or otherwise for the matter being arbitrated only.

**Section 5.6  Rendering of Decision.**  After each side rests in the arbitration hearing, the decision of the Arbitrators must be rendered in writing within ten (10) days, however, a decision rendered extrinsic of such time frame shall be valid and binding on the parties.  If either party believes the decision to be ambiguous or unclear in any manner it shall submit its questions in writing to the Arbitrator and to the other party which may elect to submit comments on the questions in writing to the Arbitrator and to the questioning party within ten (10) days, and the Arbitrators shall respond thereto in writing within ten (10) days of their receipt of the later of the questions or the comments on the questions.

**Section 5.7  Choosing of Arbitrator.**  The American Arbitration Association shall select one (1) Arbitrator to preside over the arbitration proceedings and render judgment thereon. The Arbitrator shall be an attorney with experience in interstate natural gas pipelines.  The selection of the American Arbitration Association shall be final, conclusive and irrebutable.

**Section 5.8  Costs and Fees.**  In the event of any legal or arbitration proceedings (or legal action to enforce the same) arising out of or relating to the arrangements contemplated by this Agreement (regardless of whether such action alleges breach of contract, tort, violation of a statute or any other cause of action), the prevailing party will be entitled to recover its reasonable costs of all such proceedings, including its

KC01 451211.8                                    4

ENB 00724

EM001-007204

reasonable attorneys' fees and expert witness fees. If a party prevails on some aspects of such action but not on others, the Arbitrator shall apportion any award of costs or attorneys' fees in such manner as it deems equitable, including court costs, legal expenses of both parties during the course of and in preparation for the proceedings; travel and out-of-pocket expenditures of either party in preparation for the proceedings; accounting, professional and/or expert witness fees actually expended by either party in preparation for or during the proceedings, etc.

Section 5.9  Cy Pres.  The doctrine of Cy Pres shall be applicable to the Agreement such that in interpreting the terms and conditions hereunder the intentions of the parties are to be carried out as near as may be, when it would otherwise be impossible or illegal to give it literal effect.  In any dispute arising out of this Agreement, the doctrine of Cy Pres shall be applied by the Arbitrator.

ARTICLE VI
MISCELLANEOUS

Section 6.1  Notices.  All notices, payments due and other correspondence required or made necessary by the terms of this Agreement or payments due hereunder shall be delivered to the respective parties hereto by registered mail, return receipt requested at the following addresses:

NEWCO:   _____
         _____
         _____

         _____
         _____
         _____

         _____
         _____
         _____

KC01 451211.8                              5

ENB 00725

EM001-007205

COMPANY: Kansas Pipeline Company
8325 Lenexa Drive, Suite 400
Lenexa, Kansas 66214

MarGasCo Partnership
8325 Lenexa Drive, Suite 400
Lenexa, Kansas 66214

MRG:   Management Resources Group, LLC
13137 Thunderhead Falls Lane
Rapid City, SD 55702
Telephone: 605-355-9746

with a copy to:

Tino Monaldo, Chtd.
P.O. Box 728
335 North Washington, Suite 130
Hutchinson, Kansas 67504-0728
Fax: (316) 665-5961

or to such other addresses as either party hereto may unilaterally designate in writing to the other. Duplicate notices may also be given by any of the following forms: telegram, telex, telecopy and/or personal delivery. A notice shall be deemed received when the first form of notice or duplicate notice is actually received by the party to whom it is addressed.

     Section 6.2  Waiver. Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provision thereafter. Any party's failure or delay in protesting, or contending breach pursuant to Section 6.3 or taking legal and/or equitable action or demanding arbitration upon the other party's breach is no waiver of that cause of action, unless that party's delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations. Any party's failure or delay in protesting, or contending breach pursuant to Section 6.3 or taking legal and/or equitable action or demanding arbitration upon the other party's breach is not to be considered as being a waiver of that party's cause of action for any subsequent breach of the same or of a different nature.

     Section 6.3  Breach, Notice and Cure. In the event that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(s) describing such breach(s) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual receipt of such notice to cure said breach(s) if it concurs that the acts or

KC01 451211.8

6

ENB 00726

omissions described in the notice(s) constitute breach(s), or it may elect to provide a cure to the complaining party's contended breach(s) even if the purported breaching party is of the belief that the acts or omissions described in the notice(s) do not constitute a breach(s) hereof, and if so cured by the purported breaching party to the reasonable satisfaction of the complaining party, the breach(s) shall be deemed to have never occurred.   In the event the parties cannot agree as to whether the acts or omissions described in the notice(s) constitute a breach(s) of the terms hereof, and the purported breaching party does not elect to cure the alleged breaches to the reasonable satisfaction of the complaining party, then the parties shall be resolved by use of the Arbitration Provisions of Article V above.   All reasonable costs of legal proceedings shall be borne by the losing party in arbitration.   The losing party shall be the party designated as such by the Arbitrators.   In the event both parties prevail on certain issues and lose on others, the costs shall be apportioned between the parties in any manner the Arbitrators order.   Such costs shall include, but are not limited to, the following: (a) court costs; (b) legal expenses of both parties during the course of and in preparation for the legal proceedings; (c) travel and out-of-pocket expenditures of either party in preparation for the legal proceedings; and (d) accounting, professional and/or expert witness fees actually expended by either party in preparation for or during the course of legal proceedings, etc.

In the event there is any dispute regarding what constitutes such an expense or cost or the reasonableness of a particular item of expense submitted, the Arbitrators shall resolve the same.

**Section 6.4  Agreement Governed by the Laws of Kansas.**  This Agreement and the obligations of the parties hereunder, shall be interpreted, construed, and enforced in accordance with the laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

**Section 6.5  Amendments.**  Except as otherwise provided for herein, any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and mutually executed amendments. It is stipulated that oral modifications and amendments hereto or other parole evidence shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or other adjudication.

**Section 6.6  Warranty Against Circumvention/Confidentiality.**  The parties hereto warrant that neither they nor any of their Affiliated Entities shall attempt to circumvent the terms of this Agreement or its underlying intent either directly or indirectly via the use or creation of an Affiliated Entity, and to the extent either party alleges that such circumvention has been attempted, any Arbitrator reviewing such action is expressly requested by the parties to look harshly upon such an action or such an attempt of circumvention.  Any circumvention of this Agreement by a party hereto through the direct use or indirect use (with or without knowledge) or by an Affiliated Entity shall be deemed to be circumvention of this Agreement by the party hereto which is affiliated to such Affiliated Entity.

KC01 451211.8

7

ENB 00727

EM001-007207

**Section 6.7  Agreement Subject to Laws.**  If any provision of this Agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the latter shall control and this Agreement shall be deemed modified accordingly, but in other respects the Agreement shall continue in full force and effect, subject to the modifications necessary to preserve the intent and considerations due the parties as set forth in this Agreement.

**Section 6.8  Severability.**  Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

**Section 6.9  Jurisdiction and Venue.**  Any suit, action or proceeding with respect to the enforcement of any decision or judgment of an arbitrator pursuant to Article V (and only in such circumstances) may be brought in any court in Kansas. The parties respectively hereby submit to the jurisdiction of any and all such courts for the purpose of any such suit, action or proceeding.  The parties stipulate that the provisions of this paragraph shall not be construed to grant any party the right to file an action arising out of or relating to this Agreement in any court in the state of Kansas except for the purpose of enforcing a judgment or decision rendered under this Agreement or the obligation to arbitrate pursuant to Article V.

**Section 6.10  Titles of Articles, Sections and Subsections.**  The title and subtitles of articles, paragraphs and subparagraphs of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of or in any way influence the interpretations of this Agreement.

**Section 6.11  Counterparts.**  This Agreement may be executed in multiple counterparts, each of which shall be an original, but all of which shall be deemed to constitute one instrument. This Agreement or any document executed in connection herewith shall be binding upon such signator party, if said signature is delivered by telecopier or other like transmission.

**Section 6.12  Definitions.**  Any capitalized words shall have the meaning attributed to said words given it in the Company Agreements, unless otherwise defined herein specifically.

**Section 6.13  Further Assurances.**  The parties hereby agree to execute, acknowledge and deliver to each other any further writings, documents, transfers, acknowledgments, instruments, powers of attorney, authorizations, filings, applications,

ENB 00728

EM001-007208

reports, etc. that may be reasonably required to give full force and effect to the provisions of this Agreement, and to take such further actions reasonably required in fulfillment of obligations set forth herein or in furtherance of the intent hereof, including but not limited to the execution of a Restatement of each of the Company Agreements, if requested by MRG.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

COMPANY: Kansas Pipeline Company,
a Kansas general partnership

By:_____
    Name:_____
    Title:_____

MarGasCo Partnership
an Oklahoma Partnership

By:_____
    Name:_____
    Title:_____

NEWCO: _____
_____
_____

[Signature Block for all general partners of KPC and MGC]

KC01 451211.8

9

ENB 00729

EM001-007209

MRG:    Management Resources Group, LLC

By:_____
       Dennis M. Langley, President

10

ENB 00730

EM001-007210

**Section 6.7  Agreement Subject to Laws.**  If any provision of this Agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the latter shall control and this Agreement shall be deemed modified accordingly, but in other respects the Agreement shall continue in full force and effect, subject to the modifications necessary to preserve the intent and considerations due the parties as set forth in this Agreement.

**Section 6.8  Severability.**  Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

**Section 6.9  Jurisdiction and Venue.**  Any suit, action or proceeding with respect to the enforcement of any decision or judgment of an arbitrator pursuant to Article V (and only in such circumstances) may be brought in any court in Kansas. The parties respectively hereby submit to the jurisdiction of any and all such courts for the purpose of any such suit, action or proceeding.  The parties stipulate that the provisions of this paragraph shall not be construed to grant any party the right to file an action arising out of or relating to this Agreement in any court in the state of Kansas except for the purpose of enforcing a judgment or decision rendered under this Agreement or the obligation to arbitrate pursuant to Article V.

**Section 6.10  Titles of Articles, Sections and Subsections.**  The title and subtitles of articles, paragraphs and subparagraphs of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of or in any way influence the interpretations of this Agreement.

**Section 6.11  Counterparts.**  This Agreement may be executed in multiple counterparts, each of which shall be in an original, but all of which shall be deemed to constitute one instrument. This Agreement or any document executed in connection herewith shall be binding upon such signator party, if said signature is delivered by telecopier or other like transmission.

**Section 6.12  Definitions.**  Any capitalized words shall have the meaning attributed to said words given it in the Company Agreements, unless otherwise defined herein specifically.

**Section 6.13  Further Assurances.**  The parties hereby agree to execute, acknowledge and deliver to each other any further writings, documents, transfers, acknowledgments, instruments, powers of attorney, authorizations, filings, applications,

8

ENB 00731

reports, etc. that may be reasonably required to give full force and effect to the provisions of this Agreement, and to take such further actions reasonably required in fulfillment of obligations set forth herein or in furtherance of the intent hereof, including but not limited to the execution of a Restatement of each of the Company Agreements, if requested by MRG.

　　　　IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

COMPANY:　Kansas Pipeline Company,
　　　　　　a Kansas general partnership

By:_____
　　Name:_____
　　Title:_____

MarGasCo Partnership
an Oklahoma Partnership

By:_____
　　Name:_____
　　Title:_____

NEWCO:　_____
　　　　　_____
　　　　　_____

[Signature Block for all general partners of KPC and MGC]

ENB 00732

EM001-007212

MRG:     Management Resources Group, LLC

By:_____
         Dennis M. Langley, President

ENB 00733

EM001-007213