Exhibit 6.4B to Project
Development Agreement

## GUARANTY
### (Parent—Assumption Agreement)

FOR VALUE RECEIVED, _____ (the "Guarantor")
unconditionally and irrevocably guaranties to Management Resources Group, L.L.C. and to
s individual or corporate members or owners (collectively, "MRG"), their successors,
r--s and assigns, the payment and performance by _____, a wholly-
ubsidiary of Guarantor (the "Buyer") and Kansas Pipeline Company ("KPC"), also a
y of Guarantor (collectively, the "Subsidiaries") to MRG of all liabilities, obligations,
nts and agreements of the Subsidiaries contained in the Assumption Agreement dated
_____ between Management Resources Group, L.L.C., KPC and MarGasCo
ip, and Buyer (specifically including the Development Agreement and the Consulting
nent as defined in the Assumption Agreement) and any guaranties by the Subsidiaries
s under the Development Agreement. Guarantor further agrees to pay any and all
i cket expenses (including attorneys' fees) which may be paid or incurred by MRG in
ng any rights under this Guaranty. This Guaranty is an absolute, unconditional and
r g guaranty of the full and punctual payment and performance by the Subsidiaries of the
i s and liabilities described herein and not of collectability only and is in no way
c ed upon any requirement that MRG first attempt to collect any amounts due and owing
r Subsidiaries or any other party primarily or secondarily liable with respect thereto or resort
y or other means of obtaining payment of any amounts due and owing to MRG or
r other contingency whatsoever.

The Guarantor hereby waives promptness, diligence and notice as to the obligations
: nants contained herein and acceptance of this Guaranty, and waives any other
stance which might otherwise constitute a legal or equitable discharge, release or defense of
c or or surety, or that might otherwise limit the obligations of the Guarantor hereunder. The
r hereby agrees that it shall not be entitled to consent to, or receive any notice of, any
nent or modification of, or waiver, release, consent or extension with respect to, or
nt of any agreement giving rise to any obligation guaranteed hereunder, and the Guarantor
knowledges that any such amendment, modification, waiver, release, consent, extension
g ment shall not affect the Guarantor's obligations hereunder. The Guarantor hereby agrees
i Guaranty shall automatically be reinstated if and to the extent that for any reason any
c of the Subsidiaries or on behalf of the Subsidiaries is rescinded or must otherwise be
c whether the result of any proceedings in bankruptcy or reorganization or otherwise.

The Guarantor also agrees as follows:

1.      Cy Pres. The doctrine of Cy Pres shall be applicable to this Agreement
i in interpreting the terms and conditions hereunder the intentions of the Guarantor and
iciaries hereof are to be carried out as near as may be, when it would otherwise be
;ible or illegal to give it literal effect. In any dispute arising out of this Agreement, the
of Cy Pres shall be applied.

2.      Agreement Governed by the Laws of Kansas. This Agreement and the
i is of the Guarantor hereunder, shall be interpreted, construed, and enforced in accordance
aws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

ENB 00734

**Exhibit 6.4C** to Project
Development Agreement

## GUARANTY
### (KPC)

FOR VALUE RECEIVED, Kansas Pipeline Company, a Kansas general partnership (the "Guarantor") hereby unconditionally and irrevocably guaranties to Management Resources Group, L.L.C. and Dennis Langley (collectively, "MRG"), their successors, transferees and assigns, the due and punctual performance and discharge by _____ ("Parent") of all of Parent's liabilities, obligations, covenants and agreements contained in Sections 8.10, 8.11 and 5.4 (and the Schedules and the Agreements referenced in Section 5.4) of the Stock Purchase Agreement, dated October 25, 1999 between MRG and Parent. Guarantor further agrees to pay any and all out-of-pocket expenses (including attorneys' fees) which may be paid or incurred by MRG in enforcing any rights under this Guaranty. This Guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment and performance by the Parent of the obligations and liabilities described herein and not of collectability only and is in no way conditioned upon any requirement that MRG first attempt to collect any amounts due and owing from the Parent or any other party primarily or secondarily liable with respect thereto or resort to any security or other means of obtaining payment of any amounts due and owing to MRG or upon any other contingency whatsoever.

The Guarantor hereby waives promptness, diligence and notice as to the obligations and covenants contained herein and acceptance of this Guaranty, and waives any other circumstance which might otherwise constitute a legal or equitable discharge, release or defense of a guarantor or surety, or that might otherwise limit the obligations of the Guarantor hereunder. The Guarantor hereby agrees that it shall not be entitled to consent to, or receive any notice of, any amendment or modification of, or waiver, release, consent or extension with respect to, or assignment of any agreement giving rise to any obligation guaranteed hereunder, and the Guarantor hereby acknowledges that any such amendment, modification, waiver, release, consent, extension or assignment shall not affect the Guarantor's obligations hereunder. The Guarantor hereby agrees that this Guaranty shall automatically be reinstated if and to the extent that for any reason any payment of the Parent or on behalf of the Parent is rescinded or must otherwise be restored, whether the result of any proceedings in bankruptcy or reorganization or otherwise.

The Guarantor also agrees as follows:

1.    <u>Cy Pres</u>. The doctrine of Cy Pres shall be applicable to this Agreement such that in interpreting the terms and conditions hereunder the intentions of the Guarantor and the beneficiaries hereof are to be carried out as near as may be, when it would otherwise be impossible or illegal to give it literal effect. In any dispute arising out of this Agreement, the doctrine of Cy Pres shall be applied.

2.    <u>Agreement Governed by the Laws of Kansas</u>. This Agreement and the obligations of the Guarantor hereunder, shall be interpreted, construed, and enforced in accordance with the laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

3.    <u>Agreement Subject to Laws</u>. If any provision of this Agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the latter shall control

455985.05                                1

ENB 00735

Exhibit 6.4C to Project
Development Agreement

and this Agreement shall be deemed modified accordingly, but in other respects this Agreement shall continue in full force and effect, subject to the modifications necessary to preserve the intent and considerations due the parties as set forth in this Agreement.

4.  Severability.  Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

5.  Jurisdiction and Venue.  Any suit, action or proceeding with respect to, arising under or in connection with this Agreement or the enforcement may be brought in any court in Kansas.  The Guarantor hereby submits to the jurisdiction and venue of any and all such courts for the purpose of any such suit, action or proceeding.

6.  Further Assurances.  The Guarantor hereby agrees to execute, acknowledge and deliver to each other any further writings, documents, transfers, acknowledgments, instruments, powers of attorney, authorizations, filings, applications, reports, etc. that may be reasonably required to give full force and effect to the provisions of this Agreement.

Dated: _____, ____

KANSAS PIPELINE COMPANY
By:
its General Partners

By:_____
Title:_____

455985.05                               2

ENB 00736

<u>EXHIBIT C</u>

<u>Employees:</u>

Dennis M. Langley
Steve Korb
Lynette K. Shaw
Yvette C. Korb
LaVonna Woods
Jim Bowman
Tracey LeBeau
Brandon Glenn
Betty Eichenlaub
Keith Teeple
Tiffany Beyer
Howard Lubow
Vicki Bryan
Teri Townley
Joan A.W. Schnepp
Any persons terminated or laid off
    by KPC after Closing of the
    Stock Purchase Agreement.

<u>Consultants:</u>

Nathan Beyer d/b/a Brown Dog Systems
Mary Holliday d/b/a CR Consulting
Judy D'Atley
Edward Lang
Butch Maki
Frank LaMere
Kerry Patrick d/b/a Patrick
    Development Corporation
Any lawyer which currently providing legal
services to The Bishop Group, Ltd.
and/or its Affiliated Entities prior to
October 15, 1999.

1

ENB 00737

28

ENB 00738

EM001-007218

20

# PROJECT DEVELOPMENT AGREEMENT

by and between

MarGasCo Partnership

and

Management Resources Group, LLC.

ENB 00739

TABLE OF CONTENTS

Page

ARTICLE I          DEFINITIONS, TERM and TERMINATION OPTIONS ..........................1
    Section 1.1      Specific Definitions ..........................................................1
    Section 1.2      Term..........................................................................1
    Section 1.3      Early MRG Exclusive Projects Termination Option .....................2
    Section 1.4      Early System/Electrical Projects Termination Option.....................2

ARTICLE II         MARGASCO'S PARTICIPATION IN MRG INIATED PROJECTS .......2
    Section 2.1      MRG Initiated Project...............................................................2
    Section 2.2      MRG Notice and Offer to MarGasCo..........................................3
    Section 2.3      MarGasCo's Election to Participate..........................................3
    Section 2.4      Contract Drafting .................................................................4
    Section 2.5      MarGasCo's Confirmation Period, Acceptance and Declination .............4
    Section 2.6      Effect of MarGasCo's Declination ..............................................4
    Section 2.7      New or Insufficient Data.........................................................5
    Section 2.8      Remedies of MarGasCo .........................................................5
    Section 2.9      Classification.......................................................................5
ARTICLE III
    Section 3.1      MarGasCo Initiated Projects.....................................................6
    Section 3.2      MarGasCo Notice and Offer to MRG.........................................6
    Section 3.3      MRG's Election to Participate ..................................................6
    Section 3.4      Contract Drafting .................................................................7
    Section 3.5      MRG's Confirmation Period, Acceptance and Declination........................7
    Section 3.6      Effect of MRG's Declination ..................................................8
    Section 3.7      New or Insufficient Data.........................................................8
    Section 3.8      Remedies of MRG ...............................................................8
    Section 3.9      Classification.......................................................................8

ARTICLE IV ...............................................................................................9
    Section 4.1      Project Financing ...............................................................9
    Section 4.2      Cash Flow Distributions .......................................................9
ARTICLE V
    Section 5.1      Put/Purchase Rights .............................................................9
    Section 5.2      Offer and Response................................................................10
    Section 5.3      Terms of Purchase................................................................10
ARTICLE VI
    Section 6.1      Legal Relationship ...............................................................10
    Section 6.2      MarGasCo Change of Control, Asset Sale, and/or Assignment .................11
    Section 6.3      Assignment by MRG ...........................................................11

ARTICLE VII  ARBITRATION...............................................................................11
    Section 7.1      Settling Disputes .................................................................11
    Section 7.2      Remedies and Enforcement ....................................................12

i

ENB 00740

| | | |
|---|---|---|
| Section 7.3 | Notice | 12 |
| Section 7.4 | Location of Hearing | 12 |
| Section 7.5 | Presentation of Arguments | 12 |
| Section 7.6 | Rendering of Decision | 12 |
| Section 7.7 | Choosing of Arbitrators | 13 |
| Section 7.8 | Attorney's Fees | 13 |
| ARTICLE VIII | | 13 |
| Section 8.1 | Geographic Coverage | 13 |
| Section 8.2 | Waiver | 13 |
| Section 8.3 | Notices | 14 |
| Section 8.4 | Reports and Information | 14 |
| Section 8.5 | Publicity | 14 |
| Section 8.6 | Use of Facilities | 15 |
| Section 8.7 | Governing Law | 15 |
| Section 8.8 | Complete Agreement | 15 |
| Section 8.9 | Counterparts | 15 |
| Section 8.10 | Titles of Articles, Sections and Sections | 15 |
| Section 8.11 | Severability | 15 |
| Section 8.12 | Jurisdiction and Venue | 15 |
| Section 8.13 | Further Assurances | 16 |
| Section 8.14 | Breach, Notice and Cure | 16 |
| Section 8.15 | Prohibited/MRG Activities | 16 |
| Section 8.16 | Warranty Against Circumvention/Confidentiality | 17 |

ENB 00741

EM001-007221

## PROJECT DEVELOPMENT AGREEMENT

This Project Development Agreement (Agreement), dated as of the 24th day of October, 1999, by and between Management Resources Group, LLC, a Kansas corporation ("MRG") and MarGasCo Partnership, an Oklahoma General Partnership ("MarGasCo").

WHEREAS, MarGasCo and MRG both desire to pursue possible projects for intrastate non-FERC regulated pipeline laterals off of the interstate FERC regulated pipeline of Kansas Pipeline Company, a Kansas General Partnership, (an affiliate of MarGasCo) which feed natural gas fired power plants outside of the K.C. Metro Area, as which hereinafter specified.

WHEREAS, MarGasCo and MRG desire to enter into an agreement whereby each may participate with the other in projects covered by this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, and other good and valuable consideration the receipt of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS, TERM and TERMINATION OPTIONS

**Section 1.1    Definitions.** As used in this Agreement, the terms set forth in the Glossary attached hereto as **Exhibit A,** are incorporated herein by reference thereto, shall have the meanings set forth or as referenced in Exhibit A. Terms not set forth in Exhibit A, but otherwise defined in the body of this Agreement, shall have the specific meanings attributed to them in the text. Terms used in this Agreement in the singular shall have the same meanings when used in the plural and vice versa, and any gender designation shall refer to all genders.

**Section 1.2    Term.** This Agreement shall commence on the date hereof and shall continue as to MRG Exclusive Projects for a term of seven (7) years thereafter unless the Early MRG Exclusive Projects Termination Option is exercised by MarGasCo pursuant to Section 1.3. Upon the expiration of the original seven (7) year term, this Agreement shall renew automatically for an infinite number of successive one year terms, unless either MarGasCo or MRG serves notice of termination to the other at least sixty days prior to the end of the then existing term, in which case such termination shall then become effective at twelve o'clock midnight CST, of the last day of the then existing term (original or successive). Termination at the end of the original term or any successive terms as provided for in the previous sentence shall not require the use of the Early MRG Exclusive Projects Termination Option or the payment of any fees associated therewith.   This Agreement shall commence on the date hereof and shall continue as to System/Electrical Projects and shall continue for twelve (12) years thereafter unless the Early System Electrical Project Termination Option is exercised by MarGasCo pursuant to Section 1.4 below. If the parties are in the process of determining their participation in any MRG Exclusive Project on System/Electrical Projects (which are the subject of a

ENB 00742

MarGasCo Project Notice and Offer or an MRG Project Notice and Offer) when the original terms or any extension thereof expires and/or is terminated in whole, or in part, the rights of the parties described in herein shall continue until the process described herein with respect to such pending Project has been concluded.

Section 1.3    Early MRG Exclusive Projects Termination Option. MarGasCo may elect to terminate this Agreement as to MRG Exclusive Projects (but not as to System/Electrical Projects) at any time prior to the expiration of the term of this Agreement as to MRG Exclusive Projects by tendering to MRG a one time payment in the amount of TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000) and by providing MRG with notice, pursuant to Section 8.3 hereof, of such termination of this Agreement as to MRG Exclusive Projects (herein the "Early MRG Exclusive Projects Termination Option"). Any MRG Exclusive Projects that have been confirmed by MarGasCo with a Confirmation Notice to MRG prior to the date of exercise of the Early MRG Exclusive Projects Termination Option shall remain subject to the terms of this Agreement.

Section 1.4    Early System/Electrical Projects Termination Option. MarGasCo may elect to terminate this Agreement as it relates to System/Electrical Projects any time after December 31, 2007, by tendering to MRG a one time payment in the amount of TEN MILLION DOLLARS ($10,000,000) and by providing MRG with notice, pursuant to Section 8.3, hereof, of such termination of this Agreement (herein the Early System/Electrical Projects Termination Option"). In the event of such termination, then MRG and its Affiliates for a period of 3 years from the date of the exercise of such Early System/Electrical Projects Termination Option shall be barred from the pursuit of any Systems/Electrical Project which could have been a System/Electrical Project (had the Agreement been continued without termination). Any System/Electrical Projects that have been confirmed by MRG by a Confirmation Notice to MarGasCo shall remain subject to the terms of this Agreement notwithstanding such Early System/Electrical Projects Termination.


# ARTICLE II

# MARGASCO'S PARTICIPATION IN MRG INIATED PROJECTS


Section 2.1    MRG Initiated Project. During the term of this Agreement and prior to any Early Electrical Termination, MRG shall submit to MarGasCo any System/Electrical Projects which it then desires to develop. MRG shall have no obligation to submit MRG Exclusive Projects to MarGasCo at any time during or after the term of this Agreement. Similarly, during the term of this Agreement as to System/Electrical Projects and prior to any Early System/Electrical Project Termination, MRG shall submit to MarGasCo all System/Electrical Projects which it then desires to develop to MarGasCo. MarGasCo shall have the right, but not the obligation, to elect to participate in any MRG Exclusive Project which MRG elects to submit to MarGasCo, and in any System/Electrical Projects which MRG submits

ENB 00743

EM001-007223

to MarGasCo ("MRG Initiated Project"). The minimum participation interest MarGasCo and its Affiliated Entities may take in any MRG Initiated Project which is also an MRG Exclusive Project is 10% of the interest of MRG and its Affiliated Entities therein, and the maximum participation interest MarGasCo and its Affiliated Entities may take in any such MRG Exclusive Project is 49% of the interest of MRG and its Affiliated Entities therein. The minimum and maximum participation interests of MarGasCo and/or its Affiliated Entities may take in any System/Electrical Project is 50% of 100% of the Project Investment Vehicle. MRG and its Affiliated Entities shall have the exclusive right to acquire, manage, operate, design and construct all MRG Exclusive Projects, subject to the terms of this Agreement.

Section 2.2    MRG Notice and Offer to MarGasCo.    MRG shall provide MarGasCo with a written notice (an "MRG Initiated Project Notice and Offer") of the formation or impending commencement of any MRG Initiated Project. Each MRG Initiated Project Notice and Offer shall include with respect to the applicable MRG Initiated Project, to the extent such information is normally compiled for a project of substantially similar breadth and scope or is necessary for MarGasCo to make an informed decision as to whether MarGasCo desires to participate in such MRG Initiated Project:  i) a detailed description of such MRG Initiated Project, ii) a feasibility study, iii) proposed economic parameters, including financing plans, iv) identification of perceived necessary third party and governmental consents, and v) other facts or information necessary material and reasonably available assessing the economic viability of such MRG Initiated Project.

Section 2.3    MarGasCo's Election to Participate. .    MarGasCo shall have 21 Business Days (the "Project Inquiry Period") from the receipt of an MRG Initiated Project Notice and Offer to make any additional inquiries regarding information it deems necessary to make an informed decision regarding participation in the applicable MRG Initiated Project. MRG shall use reasonable efforts, in good faith, to be responsive to any such additional inquiries made by MarGasCo. If MarGasCo desires to participate in a MRG Initiated Project, it must provide MRG with written notice prior to the lapse of the applicable Project Inquiry Period that MarGasCo is willing to participate (a "MarGasCo Participation Notice") in such MRG Initiated Project upon the terms and conditions set forth by MRG in the related MRG Initiated Project Notice and Offer, provided, however, that if MarGasCo and MRG are maintaining a dialogue in good faith concerning additional information regarding the applicable MRG Initiated Project necessary for MarGasCo to make an informed decision as to participation in such MRG Initiated Project, the Project Inquiry Period shall be extended until the earlier of ten (10) Business Days following the date after which either i) such additional information is furnished, or ii) MRG indicates in writing that no further information is available; or alternatively, until any date as MarGasCo and MRG shall mutually agree to in writing.

Section 2.4    Contract Drafting. .    In the event MarGasCo elects to participate in a MRG Initiated Project pursuant to Section 2.3, then MRG shall within thirty (30) days thereafter send to MarGasCo a complete and binding legal offer setting forth in complete detail the contractual terms, which terms must include:  the price to be paid; operating terms and conditions; construction, design and engineering budgets; finance terms; contractual rights, duties and obligations of the parties; representations and warranties of MarGasCo in the Project;

ENB 00744

EM001-007224

the business Entity or Person which shall own the Project; funding, cash distribution and capital call provisions; Project Development Fees, if any, and any other materially relevant contractual terms (hereafter referred to "MRG Proposed Terms"). Within thirty (30) days after receiving the MRG Proposed Terms, MarGasCo shall indicate in writing its intention to accept or reject said MRG Proposed Terms ("MarGasCo Acceptance Notice").

Section 2.5   MarGasCo's   Confirmation   Period,   Acceptance   and Declination. . In the event MarGasCo elects to participate in a MRG Initiated Project pursuant to Section 2.4, MarGasCo shall have 30 Days following the submission of an MarGasCo Acceptance Notice (the "Confirmation Period") to arrange for and secure all necessary internal corporate approvals, and approvals and consents of or any Entity or Person necessary for MarGasCo or an Affiliate of MarGasCo to participate in the applicable MRG Initiated Project upon terms and conditions proposed in the MRG Proposed Terms and accepted pursuant to such MarGasCo Acceptance Notice [including, but not limited to, any necessary approvals of KPC (egs. of partners, of Board of Directors, of shareholders, etc.) and/or the syndicate banks for any credit or other loan agreement to be used for financing such MRG Initiated Project].

Prior to the lapse of the Confirmation Period, MarGasCo shall provide written notice to MRG (a "Confirmation Notice") whereby MarGasCo confirms that MarGasCo or an Affiliate of MarGasCo is prepared to proceed with the MRG Initiated Project upon the terms and conditions set forth in the MRG Proposed Terms and accepted by MarGasCo, in which case such terms and conditions shall be binding upon the parties. In the event that MarGasCo does not provide a Confirmation Notice to MRG prior to the lapse of the applicable Confirmation Period or MarGasCo provides written notice to MRG prior to the lapse of the applicable Confirmation Period informing MRG that MarGasCo and/or its Affiliates are unable to secure the necessary consents or approvals to proceed with the applicable MRG Initiated Project, MarGasCo shall conclusively be deemed to have elected not to participate in such MRG Initiated Project in accordance with and subject to the terms and provisions of Section 2.6.

Section 2.6   Effect of MarGasCo's Declination. . If MarGasCo elects not to participate in a MRG Initiated Project either by written notice to MRG, or by failure to provide a MarGasCo Participation Notice in accordance with Section 2.5, or a MarGasCo Acceptance Notice pursuant to Section 2.4, or a Confirmation Notice pursuant to Section 2.3; then MarGasCo shall have no rights to ownership, operation, management, participation or development of such MRG Initiated Project, provided that MRG actually initiates Construction Commencement of such Project within 18 months of the date of such declination (overtly or by omission) by MarGasCo. Thereafter, MarGasCo and its affiliates shall also be prohibited, without the written consent of MRG (which consent may be withheld for any or no reason) from participation in that particular MRG Initiated Project and in any Substantially Similar Project of MarGasCo's accord or with or through any Entity or Person for a period of three years from the lapse of the applicable Project Inquiry Period; provided that MRG actually initiates Construction Commencement of such Project within 18 months of the date of such declination, overtly or by omission, by MarGasCo. In the event MRG does not initiate Construction Commencement of such Project within 18 months of the date of such declination, overtly or by omission, by

ENB 00745

MarGasCo; then MRG shall be required to resubmit the Project, *ab initio* for MarGasCo's consideration, as if no such Project had never been considered by MarGasCo.

        **Section 2.7   New or Insufficient Data.** .  Notwithstanding the provisions of Section 2.6, if MarGasCo elects not to participate in a MRG Initiated Project by written notice to MRG in which MarGasCo states that the information provided by MRG is insufficient for MarGasCo and/or its Affiliates to make an informed decision regarding participation in such MRG Initiated Project, MRG may not proceed with such MRG Initiated Project with any Person not an Affiliate of MarGasCo to which it provides material information not previously provided to MarGasCo ("New Information") without first giving MarGasCo an opportunity to review such New Information and assess whether, as a result of such New Information, MarGasCo desires to participate in such MRG Initiated Project; unless the Project is an Exclusive Project, in which case MRG may elect to withdraw the Project from MarGasCo's consideration. For purposes of this Agreement, New Information shall include, but not be limited to any change in proposed (i) economic terms (including financing terms) of a MRG Initiated Project from those set forth in the applicable MRG Proposed Terms. MarGasCo shall have 10 Business Days from the receipt of any New Information to submit a Participation Acceptance Notice to MRG if MarGasCo desires to participate in the applicable MRG Initiated Project.

        **Section 2.8   Remedies of MarGasCo.** .  MRG may not allow the participation in an MRG Initiated Project of any Person and/or Entity not an Affiliate of MRG other than MarGasCo or a MarGasCo Affiliate until such time as MarGasCo's rights under this Article II and its Sections are exhausted.

        **Section 2.9   Classification.** .  If after receiving a MRG Project Notice and Offer, MarGasCo disputes the classification of such Project; or if MarGasCo believes MRG is proceeding with a Project without having followed the procedures set forth in Article II, then in either or both such events MarGasCo shall have five (5) business days from its receipt of such MRG Project Notice and Offer to send written notice to MRG setting forth an objection in detail with supporting evidence. If within ten (10) business days after receipt of the objection, MarGasCo and MRG cannot mutually agree in writing to a resolution of any such dispute, then the parties must use the Arbitration procedures set forth in Article VII herein to resolve the dispute over procedure and/or classification. If the Arbitrator determines that the classification was wrong and/or that the procedures set forth in Article II were not followed, then in five (5) business days after receipt of the final decision of the Arbitrator resolving the dispute, MRG shall resubmit the MRG Project Notice and Offer required in Article II.

# ARTICLE III

## MRG'S PARTICIPATION IN A MARGASCO INITIATED PROJECT

        **Section 3.1   MarGasCo Initiated Projects.** During the term of this Agreement as to MRG Exclusive Projects and prior to any Early MRG Exclusive Project Termination, MarGasCo shall submit all MRG Exclusive Projects which it then desires to develop to MRG. Similarly, during the term of this Agreement and prior to any Early Electrical Project

ENB 00746

EM001-007226

Termination, MarGasCo shall submit all System/Electrical Projects which it desires to then desires develop to MRG. MRG shall have the right, but not the obligation, to elect to participate in any MRG Exclusive Project and in any Electrical Project which MarGasCo submits to MRG as a proposed Project as described below in this Article III, ("MarGasCo Initiated Project"). The minimum participation interest MRG and/or its Affiliates may take in any MarGasCo Initiated Project which is also an MRG Exclusive Project is 10% of the interest of MarGasCo therein, and the maximum participation interest MRG and/or its Affiliates may take in any such project is 50% of the interest of MarGasCo and its Affiliates therein, except that if the project is a System/Electrical Project MarGasCo may take 50% of the 100% Project interest.

Section 3.2    MarGasCo Notice and Offer to MRG. .    MarGasCo shall provide MRG with a written notice (a "MarGasCo Initiated Project Notice and Offer") of the formation or impending commencement of any MarGasCo Initiated Project. Each MarGasCo Initiated Project Notice and Offer shall include with respect to the applicable MarGasCo Initiated Project, to the extent such information is normally compiled for a project of substantially similar breadth and scope or is necessary for MRG to make an informed decision as to whether MRG and/or its Affiliates desire to participate in such MarGasCo Initiated Project:  i) a detailed description of such MarGasCo Initiated Project, ii) a feasibility study, iii) proposed economic parameters, including financing plans, iv) identification of perceived necessary third party and governmental consents, and v) other facts or information necessary, material and reasonably available to assessing the economic viability of such MarGasCo Initiated Project.

Section 3.3    MRG's Election to Participate.  MRG shall have 21 Business Days (the "Project Inquiry Period") from the receipt of a MarGasCo Initiated Project Notice and Offer to make any additional inquiries regarding information it deems necessary to make an informed decision regarding participation in the applicable MarGasCo Initiated Project. MarGasCo shall use reasonable efforts, in good faith, to be responsive to any such additional inquiries made by MRG and/or its Affiliated Entities.  If MRG and/or its Affiliates desire to participate in a MarGasCo Initiated Project, it (they) must provide MarGasCo with written notice prior to the lapse of the applicable Project Inquiry Period that MRG and/or its Affiliates are willing to participate (a "MRG Participation Notice") in such MarGasCo Initiated Project upon the terms and conditions set forth by MarGasCo in the related MarGasCo Initiated Project Notice and Offer, provided, however, that if MRG and MarGasCo are maintaining a dialogue in good faith concerning additional information regarding the applicable MarGasCo Initiated Project necessary for MRG to make an informed decision as to participation in such MarGasCo Initiated Project, the Project Inquiry Period shall be extended until the earlier of i) ten (10) Business Days following the date after which such additional information is furnished, or ii) MarGasCo indicates in writing that no further information is available; or alternatively until any such date as MRG and MarGasCo shall mutually agree to in writing.

Section 3.4    Contract Drafting. .In the event MRG and/or its Affiliates elect to participate in a MarGasCo Initiated Project pursuant to Section 3.3, then MarGasCo shall within thirty (30) days thereafter send to MRG a complete and binding legal offer setting forth in complete detail the contractual terms, which terms must include:  the price to be paid; operating terms and conditions; construction, design and engineering budgets; finance terms; contractual

6

ENB 00747

rights, duties and obligations of the parties; representations and warranties of participants in the Project; the business Entity or Person which shall own the Project; funding cash distribution and capital call provisions; Project Development Fees, if any; and any other material relevant contractual terms (hereafter referred to "MarGasCo Proposed Terms"). Within thirty (30) days after receiving the MarGasCo Proposed Terms, MRG shall indicate in writing its (and/or its Affiliates) intention to accept or reject said MarGasCo Proposed Terms ("MRG Acceptance Notice").

Section 3.5    MRG's Confirmation Period, Acceptance and Declination. . In the event MRG elects to participate in a MarGasCo Initiated Project pursuant to Section 3.4, MRG shall have 30 Days following the submission of an MRG Acceptance Notice (the "Confirmation Period") to arrange for and secure all necessary internal corporate approvals, and approvals and consents of any Person or Entity necessary for MRG or an Affiliate of MRG to participate in the applicable MarGasCo Initiated Project upon terms and conditions proposed in the MarGasCo Proposed Terms and accepted pursuant to such MRG Acceptance Notice (including, but not limited to, any necessary approval of the Board of Directors of MRG or the syndicate banks for any credit or other loan agreement to be used for financing such MarGasCo Initiated Project).

Prior to the lapse of the Confirmation Period, MRG shall provide written notice to MarGasCo (a "Confirmation Notice") whereby MRG confirms that MRG, or an Affiliate(s) of MRG, is prepared to proceed with the MarGasCo Initiated Project upon the terms and conditions set forth in the MarGasCo Proposed Terms and accepted by MRG, in which case such terms and conditions shall be binding upon the parties. In the event that MRG or an Affiliate(s) of MRG does not provide a Confirmation Notice to MarGasCo prior to the lapse of the applicable Confirmation Period or MRG provides written notice to MarGasCo prior to the lapse of the applicable Confirmation Period informing MarGasCo that MRG or an Affiliate(s) of MRG is unable to secure the necessary consents or approvals to proceed with the applicable MarGasCo Initiated Project, MRG shall conclusively be deemed to have elected not to participate in such MarGasCo Initiated Project in accordance with and subject to the terms and provisions of Section 3.6.

Section 3.6    Effect of MRG's Declination. . If MRG elects not to participate in an MarGasCo Initiated Project either by written notice to MarGasCo, or by failure to provide a MRG Participation Notice in accordance with Section 3.4 or a MRG Acceptance Notice pursuant to Section 3.3, or a Confirmation Notice pursuant to Section 3.5; then MRG shall have no rights to ownership, operation, management, participation or development of such MarGasCo Initiated Project, provided that MarGasCo actually initiates Construction Commencement of such Project within 18 months of the date of such declination (overtly or by omission) by MRG. Thereafter, MRG shall also be prohibited, without the written consent of MarGasCo (which consent may be withheld for any or no reason), from participation in that particular MarGasCo Initiated Project or any Substantially Similar Project of MRG's accord or with or through any Entity or Person for a period of three years from the lapse of the applicable Project Inquiry Period; provided that MarGasCo actually initiates Construction Commencement of such Project within 18 months of the date of such declination, overtly or by omission, by MRG. In the event MarGasCo does not

ENB 00748

EM001-007228

initiate Construction Commencement of such Project within 18 months of the date of such declination, overtly or by omission, by MRG; then MarGasCo shall be required to resubmit the Project, *ab initio*, for MRG's consideration, as if no such Project had ever been considered by MRG.

Section 3.7    New or Insufficient Data.   Notwithstanding the provisions of Section 3.6, if MRG elects not to participate in a MarGasCo Initiated Project by providing written notice to MarGasCo in which MRG states that the information provided by MarGasCo is insufficient for MRG and/or its Affiliates to make an informed decision regarding participation in such MarGasCo Initiated Project, neither MarGasCo nor its Affiliates may proceed with such MarGasCo Initiated Project with any Person not an Affiliate of MRG to which it provides material information not previously provided to MRG ("New Information") without first giving MRG an opportunity to review such New Information and assess whether, as a result of such New Information, MRG desires to participate in such MarGasCo Initiated Project.  For purposes of this Agreement, New Information shall include, but not be limited to any change in proposed economic terms (including financing terms) of a MarGasCo Initiated Project from those set forth in the applicable MarGasCo Proposed Terms.  MRG shall have 10 Business Days from the receipt of any New Information to submit a Participation Acceptance Notice to MarGasCo if MRG and/or its Affiliate(s) desire(s) to participate in such MarGasCo Initiated Project.

Section 3.8    Remedies of MRG..  MarGasCo may not allow the participation in a MarGasCo Initiated Project of any Person and/or Entity other than MRG until such time as MRG's rights under this Article III are exhausted.

Section 3.9    Classification.  If after receiving a MarGasCo Project Notice and Offer, MRG disputes the classification of such Project; or if MRG believes MarGasCo is proceeding with a Project without having followed the procedures set forth in Article III, then in either or both such events MRG shall have five (5) business days from its receipt of such MarGasCo Project Notice and Offer to send written notice to MarGasCo setting forth an objection in detail with supporting evidence.  If within ten (10) business days after receipt of the objection, MRG and MarGasCo cannot mutually agree in writing to a resolution of any such dispute, then the parties must use the Arbitration procedures set forth in Article VII herein to resolve the dispute over procedure and/or classification.  If the Arbitrator determines that the classification was wrong and/or that the procedures set forth in Article III were not followed, then in five (5) business days after receipt of the final decision of the Arbitrator resolving the dispute, MarGasCo shall resubmit the MarGasCo Project Notice and Offer required in Article III and the procedures set forth in Article III shall resume accordingly.

## ARTICLE IV

### PROJECT FINANCING AND DISTRIBUTIONS

Section 4.1    Project Financing.  Each party shall be required to secure their own financing and contribute their own equity regarding all Projects.  Neither party is required to

8

ENB 00749

obtain funding of any kind for any Project for the other party. Notwithstanding any other provisions of this Agreement to the contrary, if at any time a party is unable to obtain or for whatever reason does not obtain the financing and/or equity contribution required for a Project, then such party shall have no rights to ownership, operation, management, participation or development of such Project provided that Commencement Construction is commenced within 18 months after such failure or default to obtain financing and/or equity contributions.

Section 4.2    Cash Flow Distributions.   Except as otherwise mutually agreed to by MRG and MarGasCo, all positive cash flow from any MRG Exclusive Project in which both MRG and MarGasCo (and/or their Affiliates) participate, shall be distributed quarterly with MRG (and/or its Affiliates) and MarGasCo (and/or its Affiliates) receiving net proceeds (after debt service, operation costs, Project Development Fees, if applicable) in proportion to their respective ownership therein.

## ARTICLE V

## PUT/PURCHASE RIGHTS REGARDING COMPLETED PROJECTS

Section 5.1    Put/Purchase Rights.   With respect to each completed MRG Exclusive Project and each completed System/Electrical Project (a "Put Eligible Project") in which both MRG (and/or its Affiliates) and MarGasCo (and/or its Affiliates) participated pursuant to the terms of this Agreement, i) MRG shall have the right to put or purchase (a "Put/Purchase Right") its ownership interest in a Put Eligible Project to or from MarGasCo at any time following the third anniversary of completion of such Put Eligible Project, and ii) MarGasCo shall have a Put/Purchase Right with respect to its ownership interest in a Put Eligible Project to or from MRG at any time following the third anniversary of completion of such Put Eligible Project.

Section 5.2    Offer and Response.   For purposes of this Article V, a Put/Purchase Right shall mean the right of a party hereto (the "Exercising Party") to submit in writing to the other party (the "Recipient Party") a price certain for which the Exercising Party will sell its ownership interest in the applicable Put Eligible Project. Within 60 Days of receipt of the Exercising Party's proposed sale price for such Exercising Party's ownership interest in the applicable Put Eligible Project, the Recipient Party shall indicate in writing (the "Put Response") whether it wishes to (i) acquire such ownership interest from the Exercising Party at the stated price, or (ii) sell its ownership interest in the applicable Put Eligible Project to the Exercising Party for a proportionately equivalent price. The Exercising Party or the Receiving Party shall purchase the other party's ownership interest in the applicable Put Eligible Project in accordance with the Put Response within sixty (60) days of the receipt of the Put Response by the Exercising Party.

Section 5.3    Terms of Purchase.   In any acquisition of an interest (beneficial or otherwise) in an MRG Exclusive Project, the definitive documentation evidencing such transaction shall include (a) on behalf of each of the selling party and the acquiring party,

ENB 00750

EM001-007230

traditional representations, warranties and covenants by such party as a Person similarly situated would be expected to provide in a transaction of similar nature under like circumstances, and (b) provisions whereby the selling party shall fully indemnify the acquiring party for all actions taken by (or omissions of) such selling party with respect to the interest to be so acquired or, if such interest represents a controlling interest in a Project, all actions taken by (or omissions of) any Person in the course of establishing, developing, promoting, consummation or operating such Project for any period prior to consummation of such acquisition.

## ARTICLE VI

## TRANSFERS AND AFFILIATED TRANSACTIONS

Section 6.1    Legal Relationship.  The obligations of the parties to one another under this Agreement are purely contractual in nature. MarGasCo (and its Affiliates) and MRG (and its Affiliates) do not have fiduciary duties to each other by reason of their current affiliation or common ownership at this time; it being expressly intended that MarGasCo and MRG may act (or refrain from acting) in their own economic self-interests subject only to the terms of this Agreement.   MRG and MarGasCo and/or their Affiliated Entities have no obligations whatsoever to the other with respect to any Projects other than those expressly provided for in this Agreement.

Section 6.2    Asset Sale, and/or Assignment. This Agreement may not be assigned by MarGasCo to any Entity, except an Entity which shall thereafter own KPC and the System and which purchaser (assignee or beneficiary) and/or its ultimate controlling Entity executes a guaranty agreement in form and content reasonaby acceptable to MRG, guaranteeing the obligations of MarGasCo under this Agreement.  In the event there is a complete assignment of this Agreement by MarGasCo which has complied with the terms hereof, then MRG shall grant a release and novation of only the assigning party and its ultimate controlling Entity from the terms hereof and the assignee and/or its (their) ultimate controlling Entity (Entities) shall be substituted in full for all obligations hereof.  This Agreement shall inure to the benefit of and be binding upon any permitted Assignee.

Section 6.3    Assignment by MRG.  MRG may assign this Agreement to any Entity which Langley wholly owns or controls (a "Permitted Assignee"), but in such event MRG shall provide MarGasCo written notice thereof pursuant to Section 8.3 hereof. Neither MRG, nor subsequent Permitted Assignee may assign this Agreement to any Entity unless the express, prior written consent of MarGasCo is obtained, which consent can be withheld for any or no reasons. In the event there is an assignment of this Agreement by MRG to an Entity which is consented to in writing by MarGasCo, then the new Entity shall execute an assumption agreement and/or a restated Agreement which substitutes the new Entity for MRG (or a subsequent Permitted Assignee), and upon the receipt thereof, MarGasCo shall grant MRG (or subsequent Permitted

10

ENB 00751

EM001-007231

Assignee) a release and novation from the terms of this Agreement.

## ARTICLE VII

## ARBITRATION

Section 7.1    Settling Disputes.    Pursuant to the following Sections of this Section 7.1, all claims, disputes and other matters in question arising out of, or relating to this Agreement or the breach hereof, herein "Disputes" (including those Disputes not resolved pursuant to Section 8.16) shall be decided by arbitration under the rules and procedures of the American Arbitration Association, unless the parties mutually agree in writing otherwise. The parties expressly stipulate such claims to be submitted to arbitration hereunder relating to any and all legal, statutory, administrative, equitable and regulatory claims relating to this Agreement, the negotiations between the parties concerning this Agreement, the claims, securities claims, tort claims, fraud claims, and any and all other legal and/or equitable claims, etc. It is the expressed intent of the parties hereto that any and all conflicts which would arise between the parties and their assigns be submitted to and determined by Arbitration.

Section 7.2    Remedies and Enforcement.   It is stipulated that the agreement to arbitrate shall be enforceable via specific performance and/or injunctive relief. The award and judgment rendered by the Arbitrator shall be final and conclusive, and the parties stipulate that legal and/or equitable judgment may be entered upon it in any court having jurisdiction.   It is also stipulated and agreed and the specific intent of the Parties hereto that termination of this Agreement shall not be a remedy available to either party.   The Arbitrator (nor any Court) specifically may not order termination of this Agreement in rendering its decision.   It is stipulated that this agreement to arbitrate shall be enforceable via specific performance and/or injunctive relief. It is also stipulated and agreed that the Arbitrator in rendering its decision shall be authorized to order the future specific performance of the terms of this Agreement, and in the same decision award a Party hereto monetary damages as to the failure of the other party to perform its previous obligations to the other Party hereto. The award and judgment rendered by the Arbitrator shall be final and conclusive, and the parties stipulate that legal and/or equitable judgment may be entered upon it in any court having jurisdiction.

Section 7.3    Notice.   Notice of the demand for arbitration  shall be filed in writing with the other parties to the Agreement and with the American Arbitration Association. The demand for arbitration shall be made within a reasonable time (not less than five (5) days and not more than thirty (30) days) after the notice is received. In no event shall notice be given after the date when the institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations or statute of repose. Notice to each party shall either be hand delivered in any fashion and to the Persons (or their successors) as prescribed in Section 8.3 hereof.

11

ENB 00752

EM001-007232

Section 7.4   Location of Hearing.  Actual arbitration hearings shall take place in Johnson County, Kansas, unless otherwise mutually agreed, in writing.

Section 7.5   Presentation of Arguments.  All arguments must be presented in no more than fifteen (15) days after the start of the arbitration hearings.  Failure to present arguments within the time allotted shall be considered a default only on the matter presented for arbitration.  If any party so defaults, it hereby agrees to forfeit all other remedies available to it in law, equity or otherwise for the matter being arbitrated only.

Section 7.6   Rendering of Decision.  After each side rests in the arbitration hearing, the decision of the Arbitrators must be rendered in writing within ten (10) days, however, a decision rendered extrinsic of such time frame shall be valid and binding on the parties.  If either party believes the decision to be ambiguous or unclear in any manner it shall submit its questions in writing to the Arbitrator and to the other party which may elect to submit comments on the questions in writing to the Arbitrator and to the questioning party within ten (10) days, and the Arbitrators shall respond thereto in writing within ten (10) days of their receipt of the later of the questions or the comments on the questions.

Section 7.7   Choosing of Arbitrator.  The American Arbitration Association shall select one (1) Arbitrator to preside over the arbitration proceedings and render judgment thereon. The Arbitrator shall be an attorney with experience in interstate Natural Gas pipelines. The selection of the American Arbitration Association shall be final, conclusive and irrebutable.

Section 7.8   Costs and Fees.  In the event of any legal or arbitration proceedings (or legal action to enforce the same) arising out of or relating to the arrangements contemplated by this Agreement (regardless of whether such action alleges breach of contract, tort, violation of a statute or any other cause of action), the prevailing party will be entitled to recover its reasonable costs of all such proceedings, including its reasonable attorneys' fees and expert witness fees.  If a party prevails on some aspects of such action but not on others, the Arbitrator shall apportion any award of costs or attorneys' fees in such manner as it deems equitable, including court costs, legal expenses of both parties during the course of and in preparation for the proceedings; travel and out-of-pocket expenditures of either party in preparation for the proceedings; accounting, professional and/or expert witness fees actually expended by either party in preparation for or during the proceedings, etc.

# ARTICLE VIII

## GENERAL TERMS AND CONDITIONS

Section 8.1   Geographic Coverage.  The terms and provisions of this Agreement as to MRG Exclusive Projects, including the rights and obligations of the parties granted hereunder with respect to MRG Exclusive Projects, shall apply to the parties and the operations of their respective businesses throughout the world.

ENB 00753

EM001-007233

Section 8.2    Waiver.  Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provision thereafter.  Any party's failure or delay in protesting, or contending breach pursuant to Article VII or taking legal and/or equitable action or demanding arbitration upon the other party's breach is no waiver of that cause of action, unless that party's delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations.  Any party's failure or delay in protesting, or contending breach pursuant to Article VII or taking legal and/or equitable action or demanding arbitration upon the other party's breach is not to be considered as being a waiver of that party's cause of action for any subsequent breach of the same or of a different nature.  Except as set forth in Section 1.3.2 and 1.3.3 regarding the Early Complete Termination Option procedure, failure of any party hereto to contest the accuracy of any payments due and/or previously made hereunder, shall not constitute a waiver or release of any rights or remedies pursuant to the provisions of this Section 8.2, "Waiver", Section 8.14, "Breach, Notice and Cure", or Article VII, "Arbitration".

Section 8.3    Notices.  All notices and other correspondence required or made necessary by the terms of this Agreement shall be delivered to the respective parties hereto by registered mail, return receipt requested at the following addresses:

MRG:    Management Resources Group, LLC.
        Dennis M. Langley, President
        13137 Thunderhead Falls Lane
        Rapid City, SD  57702
        Telephone No:  (605) 355-9746

MarGasCo    MarGasCo Partnership
            8325 Lenexa Drive
            Lenexa, KS  66214
            Telephone No: (913) 599-4302
            Fax No.:  (913) 599-4823
            Attn:  Howard E. Lubow, Executive Vice President

or to such other addresses or Persons as either party hereto may unilaterally designate in writing to the other.  Duplicate notices may also be given by any of the following forms:  telegram, telex, telecopy and/or personal delivery.  A notice shall be deemed received when the first form of notice or duplicate notice is actually received by the party to whom it is addressed.

Section 8.4    Reports and Information.  From time to time during the life of this Agreement, both parties shall consult and meet with as well as provide reports and information to each other and in other appropriate ways keep each other timely informed about the status of all ongoing Projects.  The parties hereby agree to execute, acknowledge and deliver to each other any further transfers, acknowledgments, powers of attorney, authorizations, filings, applications, reports or other documents or instruments that may be reasonably required to give

13

ENB 00754

EM001-007234

full force and effect to the provisions of this Agreement, and to take such further actions reasonably required in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

Section 8.5    Publicity. So long as this Agreement is in effect, without the prior consent of the other party, which may be withheld for any reason or no reason at the sole discretion of either party, neither MRG nor KPC shall, nor shall either of them permit their respective Affiliates to, issue or cause the publication of any press release or other public statement or announcement of any nature with respect to this Agreement or the transactions contemplated hereby except as may be required by law or by obligations pursuant to any listing agreement with a national securities exchange. If either KPC or MRG is required by law or obligation pursuant to any applicable listing agreement to disclose any information with respect to this Agreement or the transactions contemplated hereby, such party shall provide the other party with prompt notice of such required disclosure.

Section 8.6    Use of Facilities. During the term of this Agreement, KPC shall make available to MRG and its representatives, free of charge, the use of office space at KPC's headquarters located in Johnson County, Kansas, for work related to Projects, until September 30, 2000, and MRG shall permit its personal property located at such offices to be used by KPC until such date.

Section 8.7    Governing Law. This Agreement and the obligations of the parties hereunder, shall be interpreted, construed, and enforced in accordance with the laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

Section 8.8    Complete Agreement.    This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

Section 8.9    Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be in an original, but all of which shall be deemed to constitute one instrument. This Agreement or any document executed in connection herewith shall be binding upon such signatory party, if said signature is delivered by telecopier or other like transmission.

Section 8.10    Grammatical Construction and Titles of Sections . The title and subtitles of articles, sections and Sections of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of or in any way influence the interpretations of this Agreement.

Section 8.11    Severability. Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

14

ENB 00755

EM001-007235

**Section 8.12   Jurisdiction and Venue.** Any suit, action or proceeding with respect to the enforcement of any decision or judgment of Arbitrators pursuant to Article VII (and only in such circumstances) may be brought in any court in Kansas. KPC and MRG respectively hereby submit to the jurisdiction of any and all such courts for the purpose of any such suit, action or proceeding. The parties stipulate that the provisions of this paragraph shall not be construed to grant any party the right to file an action arising out of or relating to this Agreement in any court in the state of Kansas except for the purpose of enforcing a judgment or decision rendered under this Agreement pursuant to Article VII.

**Section 8.13   Further Assurances.** The parties hereby agree to execute, acknowledge and deliver to each other any further writings, documents, transfers, acknowledgments, instruments, powers of attorney, authorizations, filings, applications, reports, etc. that may be reasonably required to give full force and effect to the provisions of this Agreement, and to take such further actions reasonably required in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

**Section 8.14   Breach, Notice and Cure.** In the event that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(s) describing such breach(s) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual receipt of such notice to cure said breach(s) if it concurs that the acts or omissions described in the notice(s) constitute breach(s), or it may elect to provide a cure to the complaining party's contended breach(s) even if the purported breaching party is of the belief that the acts or omissions described in the notice(s) do not constitute a breach(s) hereof; and if so cured by the purported breaching party to the reasonable satisfaction of the complaining party, the breach(s) shall be deemed to have never occurred. In the event the parties cannot agree as to whether the acts or omissions described in the notice(s) constitute a breach(s) of the terms hereof, and the purported breaching party does not elect to cure the alleged breaches to the reasonable satisfaction of the complaining party, then the parties shall resolve said Dispute(s) by Arbitration according to Article VII.

**Section 8.15   Prohibited Activities.** In order to protect the good will and business interests of MarGasCo and its affiliate, KPC, MRG and MarGasCo agree that at any time during the term of the Agreement, or any renewals thereof:

i)   MRG, its stockholders, Affiliates, officers, employees, directors or agents thereof will not directly or indirectly request or advise any KPC customers, to withdraw, curtail or cancel any service to, from or on KPC and/or the System. Provided however, nothing in this Section 8.15 shall prevent MRG, its stockholders, officers, employees, directors or agents from pursuing any MRG Exclusive Project or Unclassified Project with any KPC customer. nor will MRG aid or abet or otherwise assist any Entity to do what MRG is otherwise not permitted to do under this Section 8.15.

ENB 00756

EM001-007236

ii)   Neither MRG or its Affiliates, nor MarGasCo or its Affiliates, nor their respective officers, directors, employees or agents will without the prior written consent of the other party's Chief Executive Officer, directly or indirectly induce or attempt to influence any employee of the other party to leave or terminate his or her employment; provided however, MRG,and MarGasCo agree and understand that any of the employees, agents and/or consultants listed in Exhibit C hereto may be employed by MRG or its Affiliated Entities or consult with or provide legal and/or professional services thereto, then such departure is deemed to be consented to by MarGasCo and their Chief Executive Officers, and deemed not to be a violation of this Section 8.15.

iii)   MRG and MRG Affiliates will not solicit, interfere with or compete for the firm transportation volumes (at existing levels) of Western Resources and/or Missouri Gas Energy, nor interfere, solicit or compete for such volumes when the existing firm transportation contracts expire and/or are up for renewal.

iv)   Notwithstanding anything herein to the contrary, MRG and its Affiliated Entities are prohibited for so long as this Agreement remains in effect as to MRG Exclusive Projects from pursuing K.C. Metro Projects for a period of three (3) years after the date of exercise the Early MRG Exclusive Projects Termination Option.

Section 8.16   Warranty Against Circumvention/Confidentiality.   The parties hereto warrant that neither they nor any of their Affiliated Entities shall attempt to circumvent the terms of this Agreement or its underlying intent either directly or indirectly via the use or creation of an Affiliated Entity. The parties further warrant that they shall indemnify one another and keep each other whole from any actions of an Affiliate which if done by a party would be a breach of the terms hereof. To the extent either party alleges that such circumvention has been attempted and/or such a breach has occurred, any Arbitrator reviewing such action is expressly requested by the parties to look harshly upon such an action or such an attempt of circumvention. Any circumvention of this Agreement by a party hereto through the direct use or indirect use (with or without knowledge) of an Affiliated Entity which owns, participates in or operates a Project, or Project Investment Vehicle, shall be deemed to be circumvention of this Agreement by the party hereto which is affiliated to such Affiliated Entity.

MarGasCo and MRG are currently Affiliates of one another; however, if they cease to be Affiliated by virtue of the issued and outstanding stock of The Bishop Group, Ltd. being sold to an Unaffiliated Entity, the duties imposed on Affiliated Entities and/or liabilities and/or indemnities of the parties with respect to activities of their Affiliated Entities, which may be circular, and even meaningless, (while MarGasCo and MRG are Affiliated Entities) are intended to be created and shall survive assignment of this Agreement. However, circular liabilities (liabilities of a party and/or its Affiliates to the same party and/or its Affiliates and not

16

ENB 00757

to the other party and/or its Affiliates) to the extent they exist, and for the duration of their existence shall be eliminated, ignored and limitedly released.

      IN WITNESS WHEREOF, each of MarGasCo and MRG have caused this Agreement to be executed by their duly authorized officers as of the day and year first above written.


Management Resources Group, LLC


By _____
    Dennis M. Langley, President


MarGasCo Partnership
By: Syenergy Pipeline Company, L.P., its
    General Partner
By: Bishop Pipeline Company, its
    General Partner

By: _____
    Howard E. Lubow
    Executive Vice President and Chief
    Operating Officer


17

ENB 00758

EM001-007238

EXHIBIT A

TO

PROJECT DEVELOPMENT AGREEMENT

GLOSSARY

Terms in the singular shall have the same meanings when used in the plural and vice versa, and any gender designation shall refer to all genders. The following terms shall be used throughout the Project Development Agreement in accordance with the definitions ascribed to them in this Glossary, to-wit:

**Affiliated Entity or Affiliate** shall be deemed affiliated as to each other to the extent: a) one of the Entities directly or indirectly controls, or is controlled by, the operations of the other, or the direct or indirect control of one of the Entities is exercised by the officers, directors, stockholders, or partners of the other Entity (whether or not such persons exercise such control in their capacities as officers, directors, stockholders, or partners); and b) one of the Entities directly or indirectly owns, and/or its officers, directors, stockholders or partners (limited or general) directly or indirectly own, a fifteen percent (15%) or greater interest in the capital and/or profits of the other Entity. By way of illustration, if Corporation A owns 51% of the stock of Corporation B, which owns 51% of the stock of Corporation C, which owns fifty-one 51% of Corporation D; then each of A, B, C and D would be an Affiliate of each and every one of the other three corporations.

**Agreement** shall mean that particular "Project Development Agreement" to which this Glossary is attached as Exhibit A.

**Arbitration** shall have the meaning set forth in Article VII.

**Business Day** shall mean any day except a Saturday, Sunday or a day on which banking institutions in Johnson County, Kansas, are obligated by law, regulation or governmental order to close.

**CDT** shall mean Central Daylight Time

**CST** shall mean Central Standard Time

**CT** shall mean either CST or CDT whichever is applicable at the time to which it is being referred.

1

ENB 00759

MarGasCo Project Notice and Offer shall have the meaning set forth in Section 3.5

MarGasCo Proposed Terms shall have the meaning set forth in Section 3.4.

MRG shall mean Management Resources Group, LLC, a Kansas corporation. It is expressly acknowledged, accepted and understood by KPC that MRG is not the same Entity as the former Management Resources Group, Ltd. The former Management Resources Group, Ltd.'s name was changed to Bishop Management, Inc., and that Entity was and is a wholly owned subsidiary of The Bishop Group, Ltd.

MRG Exclusive Project shall mean any and all of the following Projects:

i)   Any and all projects for the sale (wholesale or retail), transmission, storage, gathering, generation, distribution production and/or reproduction of electricity.

ii)  Any and all Projects that involve material participation by or in assets and/or property owned, and/or developed, in part or in whole, by any Native American Tribe; and/or any and all Projects in which a material portion of the assets of such Project are located on land owned by a Native American Tribe.

iii) Any and all projects involving the acquisition, development, expansion and/or operation of alternate energy, including: solar, wind generation, geothermal, ocean thermal gradients, magneto hydrodynamics, hydrogen, water (hydro) power, hydrothermal fusion, photovoltaic power, fuel cells, bio-energy, bio-mass, refuse derived fuel, atmospheric thermal gradients, refrigerant created thermal gradients, tidal energy projects.

iv)  Any and all recycling or environmental reclamation projects; and/or any and all water processing, purification or treatment, processing, distribution, transportation, production, storage and/or sewage projects.

MRG Initiated Project shall have the meaning set forth in Section 2.1.

MRG Participation Notice shall have the meaning set forth in Section 2.3.

MRG Project Notice and Offer shall have the meaning set forth in Section 2.3.

MRG Proposed Terms shall have the meaning set forth in Section 2.6.

MarGasCo shall mean MarGasCo Partnership, an Oklahoma partnership ( an Affiliated Entity of KPC), and its successors and/or assigns.

Native American Tribe shall mean any Indian Tribe, band, group, Nation or Entity, including Alaska Indians, Aleuts, or Eskimos, or any Alaskan Native Village of the United States, which is considered an eligible recipient under the Indian Self Determination and Education Assistance Act (Public Law 93-638) or was considered an eligible recipient under

3

ENB 00760

EM001-007240

chapter 67 of title 31, United States Code, prior to the repeal of such chapter. It should be noted that P.L. 93-638 incorporates Department of Interior List of Federally Recognized Tribes. Additionally, Native American Tribe shall mean any Entity recognized by their respective Governments as being aboriginal, Indian, and/or having ancestry in Canada or Mexico prior to 1492.

Natural Gas or Gas shall mean hydrogen, methane, ethane, propane, butane, iso-butane, pentanes or heavier hydrocarbons or any combination thereof, as well as all non-hydrocarbon elements which are concomitant, entrained or imbedded therein or therewith. Natural Gas may be in a liquid, vapor or solid form and inherently includes CNG, LP and LNG Products.

New Information shall have the meaning set forth in Sections 2.7 and 3.7.

Permitted Assignee shall have the meaning set forth in Section 6.3.

Person or Entity shall mean any corporation, proprietorship, partnership (general or limited), natural person, trust, estate, foundation, association or any other entity or group.

Project shall mean any MRG Exclusive Project or System/Electrical Project, as the term are used herein.

Project Costs shall mean, with respect to any Project, the total "turn-key" costs expended or accrued on such Project until it is completely finished, started-up and placed in service, whether capitalized or expensed, whether internal or external, including but not limited to project development fees and costs, professional fees, engineering costs, accounting costs, construction costs, equipment costs, pre-start-up operating expenses, inspection expenses, regulatory fees and assessments, taxes, labor costs and legal expenses.

Project Development Fees shall mean any project development fees or costs incurred by the party in developing a Project, including professional fees, consulting fees, labor costs, travel and lodging expenses and other general and administrative charges of said developing party, not to exceed three percent (3%) of Project Costs.

Project Inquiry Period shall have the meaning set forth in Sections 2.3 and 3.3.

Project Investment Vehicle shall mean any Person which has a direct or indirect ownership (equity or legal) in, or the right to control the operation and receive income from any Project.

Put Eligible Project shall have the meaning set forth in Section 5.1.

Put/Purchase Right shall have the meaning set forth in Section 5.2.

Put Response shall have the meaning set forth in Section 5.2.

Recipient Party shall have the meaning set forth in Section 5.2.

4

ENB 00761

EM001-007241

EXHIBIT C

Employees:

Dennis M. Langley
Steve Korb
Lynette K. Shaw
Yvette C. Korb
LaVonna Woods
Jim Bowman
Tracey LeBeau
Brandon Glenn
Betty Eichenlaub
Keith Teeple
Tiffany Beyer
Howard Lubow
Vicki Bryan
Teri Townley
Joan A.W. Schnepp
Any persons terminated or laid off
    by KPC after Closing of the
    Stock Purchase Agreement.

Consultants:

Nathan Beyer d/b/a Brown Dog Systems
Mary Holliday d/b/a CR Consulting
Judy D'Atley
Edward Lang
Butch Maki
Frank LaMere
Kerry Patrick d/b/a Patrick
    Development Corporation
Any lawyer which currently providing legal
services to The Bishop Group, Ltd.
and/or its Affiliated Entities prior to
October 15, 1999.

ENB 00762

EM001-007242

*CC: Chip*
*Joan*
*Alex*

*KPC acquisition put in closing book before*

## INTER-OFFICE MEMORANDUM

### Midcoast Legal

TO: Bill Bray, Jones Gow, Mark Fuqua

FROM: Sherri Tanner

DATE: November 21, 2000

SUBJECT: Summary of Project Development Agreement ("Agreement") between MarGasCo Partnership ("MarGasCo") and Management Resources Group, LLC. ("MRG") Dated October 24, 1999

The following is a summary of this Project Development Agreement. Please refer to the Agreement and the Glossary of the Agreement (Exhibit A) for a more detailed description of the terms.

1.  Terms:
    The term for MRG Exclusive Projects is 7 years and then successive 1 year terms, unless early termination options are exercised.
    If MarGasCo wants to terminate the Agreement early for a MRG Exclusive Project – MarGasCo must pay MRG $2.5 Million.
    The definition of MRG Exclusive Projects includes projects involving: electricity; Native American Tribes or their land; alternative energy; and/or recycling and water processing.

    The term for System/Electrical Projects is 12 years, unless early termination options are exercised.
    If MarGasCo wants to terminate the Agreement early for a System/Electrical Project after 12/31/2007 – MarGasCo must pay MRG $10 Million.
    The definition of System/Electrical Projects includes projects involving Natural Gas laterals off of the KPC System to electrical generation facilities within 35 miles.

ENB 00763

EM001-007243

2.  MarGasCo's Participation in MRG Initiated Projects:
    MRG Initiated Project is any System/Electrical Project MRG desires to
    develop and any MRG Exclusive Projects which MRG elects to submit to
    MarGasCo.

    MarGasCo's participation in MRG Exclusive Project may be between
    10% - 49% of MRG's interest.
    MarGasCo's  maximum participation in System/Electrical Project is 50%
    of 100% of the Project Investment Vehicle.

    MarGasCo initially has 21 days to decide on participation in MRG
    Initiated Project, then MRG has 30 days to send MarGasCo a detailed
    contract.  MarGasCo then has 30 days to accept or reject the proposed
    terms.

3.  MRG's Participation in MarGasCo Initiated Projects:
    MarGasCo Initiated Projects include any MRG Exclusive Project and any
    System/Electrical Project which MarGasCo submits to MRG.

    MRG's participation in a MarGasCo Initiated Project which is also a
    MRG Exclusive Project may be between 10%-50% of MarGasCo's
    interest.
    Maximum interest in System/Electrical Project is 50% of 100% of the
    Project interest.

    MRG initially has 21 days to decide on participation in Project, then
    MarGasCo has 30 days to send MRG a detailed contract. MRG has 30
    days to accept or reject the proposed terms.

4.  Project Financing and Distributions:

    Each party shall secure their own financing and contribute their own
    equity.  All positive cash flow from any MRG Exclusive Project will be
    distributed quarterly.

5.  Put/Purchase Rights Regarding Completed Projects:

    Each party shall have put/purchase rights 3 years after completion of
    Project.  Each party has 60 days to respond to offer, and 60 days to
    purchase.

6.  Assignments:

    MarGasCo may assign Agreement only if a guaranty agreement is
    executed and acceptable to MRG.

ENB 00764

MRG may assign Agreement to an entity owned or controlled by Dennis Langley with notice being given to MarGasCo.  It may not be further assigned without MarGasCo's consent.

7.  Arbitration:

All conflicts will be resolved by Arbitration in Johnson County, Kansas. Prevailing party may recover reasonable costs.

8.  General Terms and Conditions

Kansas law will govern Agreement.
Parties will routinely provide reports and consult with each other.
Other party's consent is necessary before any press releases or public statements are made about the Agreement.
Neither party shall attempt to influence any employee of the other to terminate their employment.
MRG will not compete for firm transportation volumes of Western Resources and/or Missouri Gas Energy.

If you have any questions, please feel free to contact me.

ENB 00765

29

ENB 00766

EM001-007246

# KPC GUARANTY
## Of the Project Development Agreement

FOR VALUE RECEIVED, Kansas Pipeline Company, a Kansas general partnership (the "Guarantor") hereby unconditionally and irrevocably guaranties to Management Resources Group, L.L.C., ("MRG"), its successors, transferees and assigns, the due and punctual performance and discharge of all of MarGasCo Partnership's ("MarGasCo") liabilities, obligations, covenants and agreements contained in the Project Development Agreement, and dated October 24, 1999 between MRG and MarGasCo. Guarantor further agrees to pay any and all out-of-pocket expenses (including attorneys' fees) which may be paid or incurred by MRG in enforcing any rights under this Guaranty. This Guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment and performance by the MarGasCo of the obligations and liabilities described herein and not of collectability only and is in no way conditioned upon any requirement that MRG first attempt to collect any amounts due and owing from the MarGasCo or any other party primarily or secondarily liable with respect thereto or resort to any security or other means of obtaining payment of any amounts due and owing or performance due to MRG or upon any other contingency whatsoever.

The Guarantor hereby waives promptness, diligence and notice as to the obligations and covenants contained herein and acceptance of this Guaranty, and waives any other circumstance which might otherwise constitute a legal or equitable discharge, release or defense of a guarantor or surety, or that might otherwise limit the obligations of the Guarantor hereunder. The Guarantor hereby agrees that it shall not be entitled to consent to, or receive any notice of, any amendment or modification of, or waiver, release, consent or extension with respect to, or assignment of any agreement giving rise to any obligation guaranteed hereunder, and the Guarantor hereby acknowledges that any such amendment, modification, waiver, release, consent, extension or assignment shall not affect the Guarantor's obligations hereunder. The Guarantor hereby agrees that this Guaranty shall automatically be reinstated if and to the extent that for any reason any payment or performance of the MarGasCo or on behalf of the MarGasCo is rescinded or must otherwise be restored, whether the result of any proceedings in bankruptcy or reorganization or otherwise.

The Guarantor also agrees as follows:

1.     Cy Pres. The doctrine of Cy Pres shall be applicable to this Agreement such that in interpreting the terms and conditions hereunder the intentions of the Guarantor and the beneficiaries hereof are to be carried out as near as may be, when it would otherwise be impossible or illegal to give it literal effect. In any dispute arising out of this Agreement, the doctrine of Cy Pres shall be applied.

2.     Agreement Governed by the Laws of Kansas. This Agreement and the obligations of the Guarantor hereunder, shall be interpreted, construed, and enforced in accordance with the laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

3.     Agreement Subject to Laws. If any provision of this Agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the latter shall control

Guaranty_PDA.doc                                              1

ENB 00767

and this Agreement shall be deemed modified accordingly, but in other respects this Agreement shall continue in full force and effect, subject to the modifications necessary to preserve the intent and considerations due the parties as set forth in this Agreement.

     4.    Severability. Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

     5.    Jurisdiction and Venue. Any suit, action or proceeding with respect to, arising under or in connection with this Agreement or the enforcement may be brought in any court in Kansas. The Guarantor hereby submits to the jurisdiction and venue of any and all such courts for the purpose of any such suit, action or proceeding.

     6.    Further Assurances. The Guarantor hereby agrees to execute, acknowledge and deliver to each other any further writings, documents, transfers, acknowledgments, instruments, powers of attorney, authorizations, filings, applications, reports, etc. that may be reasonably required to give full force and effect to the provisions of this Agreement.

Dated: October 24, 1999

Kansas Pipeline Company
By: Syenergy Pipeline Company, L.P., its
     General Partner
By: Bishop Pipeline Company, its
     General Partner

By:     _____
     Howard E. Lubow
     Executive Vice President and Chief
     Operating Officer

ENB 00768

EM001-007248

30

ENB 00769

## CONSULTING AGREEMENT

This Consulting Agreement (Agreement) made this _24th_ day of _October_, 1999, by and between Kansas Pipeline Company, a Kansas general partnership company, and its successors and assigns (hereafter the "Company"), and Management Resources Group, LLC, a Kansas limited liability company, (hereafter the "Consultant").

WHEREAS, the Consultant's employees or contractors have been previously employed by (but as of the data hereof are not currently employed by contractors to) the Company, its subsidiaries and/or affiliates at various high level management positions and have obtained a thorough knowledge of the Company's operations, policies and procedures;

WHEREAS, the Consultant as of the date hereof is not a consultant of the Company, its subsidiaries and/or affiliates;

WHEREAS, the Company desires to continue to benefit from and utilize the Consultant's, employees' or contractors' knowledge about the Company's business;

WHEREAS, the Company desires to contract with the Consultant for certain consulting services;

WHEREAS, the Consultant has certain expertise in matters relating to the operation of the Company's assets and business;

WHEREAS, the Company and the Consultant desire to enter into a formal written agreement setting forth the entire agreement between the Company and Consultant;

WHEREAS, the Company and the Consultant intend for this Agreement to supersede and replace all other consulting and/or employment agreements, verbal or written, express or implied, involving the Company and/or its Affiliates on the one hand, and Consultant's employees and/or contractors on the other hand;

NOW THEREFORE, in consideration of the covenants and promises contained herein, the Company and the Consultant agree as follows:

1.    **CONSULTING SERVICES.**  The Consultant shall, when requested by the Company, provide consulting services to the Company regarding the management of the Company's assets and business relating to its interstate pipeline and natural gas transmission business, including but not limited to, the pending Section 4 rate case pending before the Federal Energy Regulatory Commission, and matters which may be pending before the Kansas Corporation Commission, the Missouri Public Services Commission, or all other legal or regulatory proceedings, which may arise hereafter during the term of this Agreement  The Company anticipates requesting the Consultant's expertise and time regarding testimony,

ENB 00770

rebuttal testimony and surrebuttal testimony and the answering of certain data requests arising out of said rate case, as well as assistance in legal and other regulatory matters, and any other matters relating to the operation of the business of the Company. The hours, compensation and persons to be made available to the Company by the Consultant shall be as set forth in Exhibit A attached hereto and incorporated herein by reference. In performing requested services for the Company, the Consultant will not exceed the monthly hourly limitation described in Exhibit A (during the first term) or Exhibit B (during the renew term) without the consent of the Company. If the Company's failure or refusal to grant such consent causes the Consultant to not be able to complete the work requested, Consultant shall be under no obligation to perform additional services unless and until consented to by the Company. If the Company desires to obtain consulting services from the Consultant, the Company shall submit a written request to the Consultant setting forth the services requested, the time frame for such services, the identity of any particular employee or contractor of the Consultant which the Company desires to perform said services, the estimated time the Company expects the Consultant to spend providing such services. The Consultant shall perform said additional services as requested unless the Consultant sends notice to the Company declining to provide part or all of such services. The Consultant and the Company shall attempt in good faith to reasonably agree on the additional services requested and the time necessary therefore.

2.    **PAYMENT**. During the Primary Term of this Agreement, the Company shall pay the Consultant the consideration set forth in Exhibit A hereto and during the Secondary Term, if any, as set forth in Exhibit B hereto. There shall be no minimum payment, such that should no services be requested or costs authorized by the Company, then no payment shall be due hereunder.

3.    **RELATIONSHIP OF PARTIES**. The Company and Contractor agree that for all purposes, the relationship between them shall be one of an independent contractor and not employee/employer, including, but not limited to, the workers' compensation laws, sales tax, unemployment laws, the withholding tax requirements and the social security contribution requirements of the federal government and the state of Kansas or any other state, and with respect to tort liability extending from the conduct of the Consultant's obligations under this Agreement.    During the term hereunder, neither the Consultant, nor its employees or consultants should discuss the services requested by the Company of the Consultant with any existing firm transportation customer of the Company or its affiliates (as said affiliates exist immediately prior to the date first written above), without the prior written consent of the Company, except as may be provided in any other agreement between the Company or its affiliates and the Consultant.    Any Sales Taxes or similar taxes, if any, due on any compensation paid the Consultant shall be the sole responsibility of the Consultant. Nothing in this document shall serve to negate, diminish or waive the Consultant's or the Consultant's employees' or consultant's legal rights as a former employee or consultant of the Company to fully avail himself or herself of any rights under the federal COBRA laws.

The Consultant is not to be considered an employee of the Company for any purpose, and any employees and consultants of the Consultant are not entitled to any benefits that the Company provides its own employees. The Consultant will be solely and entirely responsible

ENB 00771

EM001-007251

for its acts or and for the acts of its agents, consultants, employees, servants, contractors and subcontractors during the performance of this Agreement.

Furthermore, the following are expressly recognized by both the Company and the Consultant:

A.   That the services provided by the Consultant, as contemplated herein, are highly specialized in nature.

B.   The Consultant is not authorized to take any binding actions on behalf of the Company with respect to work or relations with third parties and may only represent itself to be a Consultant to the Company.

C.   The Consultant warrants and represents it shall be responsible for all federal, state and local taxes associated with any monies paid to it by the Company, including, but not limited to, federal and state income taxes, social security and unemployment payments or contributions, and shall indemnify and hold the Company harmless from the same.

D.   The Consultant warrants and represents it shall be responsible for providing its own workers' compensation insurance for itself and any of its employees in any state in which the Consultant conducts business and shall provide proof of insurance, if requested by the Company.

E.   Neither the Consultant, nor Consultant's employees or contractors, are guaranteeing any results with respect to any services which the Company requests of the Consultant or the Consultant's employees, contractors or subcontractors, nor is the Consultant guaranteeing it will employ or contract with the persons set forth in Exhibit A and B.

F.   Consultant and/or its employees and/or contractors shall not be required to provide services hereunder, if a conflict of interest arises between Consultant and the Company, or between Consultant's employees or contractors and the Company.

4.   **DURATION**.  The duration of the Agreement shall be from the date first written above until September 30, 2000 ("Primary Term").   The term of this Agreement shall automatically extend for one (1) additional twelve (12) month period ("Secondary Term") unless the Company provides the Consultant with a written notice of termination at least sixty (60) days prior to the expiration of the Primary Term.  During the Secondary Term, if any, the Company shall pay the Consultant for services rendered, as set forth in Exhibit B attached hereto and incorporated herein by reference. In the event the Company and the Consultant hereto desire to extend the term of this Agreement beyond said date, the Company and the Consultant must mutually agree in writing as to any such extension for such to be binding thereon.

ENB 00772

EM001-007252

5.    LIABILITY.   The services to be provided under this Agreement by the Consultant shall be provided entirely at the risk of the Consultant. The Consultant agrees to be fully liable and responsible for any and all liability caused, in whole or in part, by its actions or those of any of its agents, employees, consultants, servants, contractors and subcontractors, arising out of or in consequence of the performance of this Agreement, except that in no instance shall the Consultant be held responsible for any liability claim, demand or cause of action proximately attributable to the negligence of the Company.

6.    INDEMNITY AND HOLD HARMLESS.   The Company and the Consultant each agree to protect, defend, indemnify and hold harmless the other, its contractors and employees, against all actual claims, losses, damages and expenses, including reasonable attorney's fees by reasons of any suits, claims, demands, causes of action or judgments caused in whole or in part by the actions or omissions of the Consultant, its employees, contractors, or any subcontractors, arising out of or in consequence of the performance of this Agreement, along with the representations and warranties made in Paragraph 3 above, except that in no instance shall either the Company or the Consultant be held responsible for any liability, claim demand or cause of action attributable to the negligence of the other or for any consequential damages.

7.    CONFIDENTIALITY.   The Consultant agrees to keep and maintain all records and information received from the Company in strictest confidence and shall be prohibited from disclosing said information to any other party without the consent of the Company, unless required by law to disclose such information.

8.    DEDICATION OF TIME AND FACILITIES.   The Company acknowledges that the Consultant, the Consultant's employees and contractors have other business interests and will not be devoting all of its time and attention to the performance of the services contemplated hereunder; however, to assist the Consultant in the performance of its duties hereunder in an expeditious and efficient manner, the Company agrees during the term of this Agreement to provide the Consultant at the Company's sole cost with professional office space, customary office supplies, accessories and receptionist services for up to sixteen (16) persons. Any phones, copiers, fax machines, computers and other equipment which is owned by or leased by the Consultant may be used by the Consultant at the Company's office and may also be utilized by the Company at no cost, other than maintenance for normal wear and tear. Any office equipment owned or leased by the Company may be used by the Consultant.

9.    INDEPENDENT CONTRACTOR(S) TO CONSULTANT.   In the event the Consultant, with the written consent of the Company, desires to retain an employee, contractor, representative or consultant on matters relating to the Consultant's services hereunder to *the* Company, the Consultant shall require said third party to execute a written agreement with *the* Consultant on substantially the same terms and conditions as this Agreement.

10.    BREACH, NOTICE AND CURE.   In the event that either the Company or the Consultant hereto believes the other hereto is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(s) describing such breach(s) with particularity (in fact and in legal impact) and the purported breaching party shall be granted

ENB 00773

EM001-007253

thirty (30) days from its actual receipt of such notice to cure said breach(s) if it concurs that the acts or omissions described in the notice(s) constitute breach(s), or it may elect to provide a cure to the complaining party's contended breach(s) even if the purported breaching party is of the belief that the acts or omissions described in the notice(s) do not constitute a breach(s) hereof, and if so cured by the purported breaching party to the reasonable satisfaction of the complaining party, the breach(s) shall be deemed to have never occurred. In the event the Company and the Consultant hereto cannot agree as to whether the acts or omissions described in the notice(s) constitute a breach(s) of the terms hereof, and the purported breaching party does not elect to cure the alleged breaches to the reasonable satisfaction of the complaining party, then the Company and the Consultant shall resolve said Dispute(s) by Arbitrator according to Section 11.

## 11. ARBITRATION.

11.1    Settling Disputes.  Pursuant to the following Subsections of this Section 11.1, all claims, disputes and other matters in question arising out of, or relating to this Agreement or the breach hereof (including those Disputes not resolved pursuant to Section 10 above) shall be decided by arbitration under the rules and procedures of the American Arbitration Association, unless the Company and the Consultant mutually agree in writing otherwise.  The Company and the Consultant expressly stipulate such claims to be submitted to arbitration hereunder relating to any and all legal, statutory, administrative, equitable and regulatory claims relating to this Agreement, the negotiations between the Company and the Consultant concerning this Agreement, the claims, securities claims, tort claims, fraud claims, and any and all other legal and/or equitable claims, etc. It is the expressed intent of the Company and the Consultant hereto that any and all conflicts which would arise between the Company and the Consultant and their assigns be submitted to and determined by Arbitration.

11.2    Enforceable at Law and in Equity.  It is stipulated that the agreement to arbitrate shall be enforceable via specific performance and/or injunctive relief.  The award and judgment rendered by the Arbitrators shall be final and conclusive, and the Company and the Consultant stipulate that legal and/or equitable judgment may be entered upon it in any court having jurisdiction.

11.3    Notice.  Notice of the demand for arbitration shall be filed in writing with the Company and the Consultant to the Agreement and with the American Arbitration Association.  The demand for arbitration shall be made within a reasonable time (not less than five (5) days and not more than thirty (30) days) after the notice is received.  In no event shall notice be given after the date when the institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations or statute of repose.  Notice to each of the Company and the Consultant hereto shall either be hand delivered or sent via registered mail, return receipt requested, postage prepaid to the following contractors at the following addresses, to-wit:

5

ENB 00774

EM001-007254

Consultant
Management Resources Group, LLC
c/o Dennis M. Langley
13137 Thunderhead Falls Lane
Rapid City, SD  57702

and

Management Resources Group, LLC
c/o Dennis M. Langley
5225 Renner Road
Shawnee, KS  66219

Company
Kansas Pipeline Company
8325 Lenexa Drive, Suite 400
Lenexa, KS  66214
(913) 599-5645 (fax)


        The Company and the Consultant hereto may unilaterally change its address described above by giving notice to the other as described in this Section 11.3.

        Such contractors and/or addresses may be unilaterally altered by the Company or the Consultant upon its providing written notice to the other.

        11.4    Location of Hearing.    Actual arbitration hearings shall take place in Johnson County, Kansas, unless otherwise mutually agreed, in writing by the Company and the Consultant hereto.

        11.5    Presentation of Arguments.    All arguments must be presented in no more than fifteen (15) days after the start of the arbitration hearings.  Failure to present arguments within the time allotted shall be considered a default only on the matter presented for arbitration.  If the Company or the Consultant so defaults, it hereby agrees to forfeit all other remedies available to it in law, equity or otherwise for the matter being arbitrated only.

        11.6    Rendering of Decision.    After each side rests in the arbitration hearing, the decision of the Arbitrators must be rendered in writing within ten (10) days, however, a decision rendered extrinsic of such time frame shall be valid and binding on the Company and the Consultant.  If the Company or the Consultant believes the decision to be ambiguous or unclear in any manner it shall submit its questions in writing to the Arbitrator and to the other which may elect to submit comments on the questions in writing to the Arbitrator and to the questioning party within ten (10) days, and the

ENB 00775

EM001-007255

Arbitrator shall respond thereto in writing within ten (10) days of their receipt of the later of the questions or the comments on the questions.

11.7   Choosing of Arbitrators.   The American Arbitration Association shall select one (1) Arbitrator to preside over the arbitration proceedings and render judgment thereon.   The Arbitrator shall be an attorney with experience in interstate natural gas pipelines.   The selection of the American Arbitration Association shall be final, conclusive and irrebutable.

11.8   Costs and Fees.   In the event of any legal or arbitration proceedings (or legal action to enforce the same) arising out of or relating to the arrangements contemplated by this Agreement (regardless of whether such action alleges breach of contract, tort, violation of a statute or any other cause of action), the prevailing party will be entitled to recover from the non-prevailing party its reasonable costs of all such proceedings, including its reasonable attorneys' fees and expert witness fees.  If a party prevails on some aspects of such action but not on others, the Arbitrator shall apportion any award of costs or attorneys' fees in such manner as it deems equitable, including court costs, legal expenses of both the Company and the Consultant during the course of and in preparation for the proceedings; travel and out-of-pocket expenditures of either party in preparation for the proceedings; accounting, professional and/or expert witness fees actually expended by either the Company or the  Consultant in preparation for or during the proceedings, etc.

11.9   Cy Pres.   The doctrine of *Cy Pres* shall be applicable to the Agreement such that in interpreting the terms and conditions hereunder the intentions of the Company and the Consultant are to be carried out as near as may be, when it would otherwise be impossible or illegal to give it literal effect.  In any dispute arising out of this Agreement, the doctrine of *Cy Pres* shall be applied by the Arbitrator.

## 12.   GENERAL TERMS AND CONDITIONS.

12.1   Waiver.   The Company and the Consultant reserve the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provision thereafter.   The Company or the Consultant's failure or delay in protesting, or contending breach pursuant to Section 10 or taking legal and/or equitable action or demanding arbitration upon the other breach is no waiver of that cause of action, unless the Company or the Consultant delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations.   The Company or the Consultant's failure or delay in protesting, or contending breach pursuant to Section 10 or taking legal and/or equitable action or demanding arbitration upon the other breach is not to be considered as being a waiver of the Company or the Consultant cause of action for any subsequent breach of the same or of a different nature.

ENB 00776

EM001-007256

12.2   All notices, payments due hereunder  and other correspondence required or made necessary by the terms of this Agreement shall be delivered to the Company and the Consultant hereto by registered mail, return receipt requested at the following addresses:

> Consultant
> Management Resources Group, LLC
> c/o Dennis M. Langley
> 13137 Thunderhead Falls Lane
> Rapid City, SD  57702
>
> and
>
> Management Resources Group, LLC
> c/o Dennis M. Langley
> 5225 Renner Road
> Shawnee, KS  _____
>
> Company
> Kansas Pipeline Company
> 8325 Lenexa Drive, Suite 400
> Lenexa, KS  66214
> (913) 599-5645 (fax)

or to such other addresses as the Company and the Consultant hereto may unilaterally designate in writing to the other.  Duplicate notices may also be given by any of the following forms:  telegram, telex, telecopy and/or personal delivery.  A notice shall be deemed received when the first form of notice or duplicate notice is actually received by the Company or the Consultant to whom it is addressed.

12.3   Assignment.  This Agreement may not be assigned by either the Company or the Consultant hereto without the prior written consent of the Company or the Consultant hereto, which consent may be withheld for any reason or no reason at all.

12.4   Governing Law.  This Agreement and the obligations of the Company and the Consultant hereto hereunder, shall be interpreted, construed, and enforced in accordance with the laws of the state of Kansas, and not the laws pertaining to choice or conflict of laws.

12.5   Complete Agreement.  This Agreement and the other documents and writings referred to herein or delivered pursuant hereto, contain the entire understanding of the Company and the Consultant with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both written and oral, between the Company and the Consultant hereto with respect to the subject matter hereof and thereof.

12.6   Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be in an original, but all of which shall be deemed to constitute one

ENB 00777

EM001-007257

instrument. This Agreement or any document executed in connection herewith shall be binding upon such signatory, if said signature is delivered by telecopier or other like transmission.

12.7 Titles of Articles, Sections and Subsections. The title and subtitles of articles, paragraphs and subparagraphs of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of or in any way influence the interpretations of this Agreement.

12.8 Severability. Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

12.9 Jurisdiction and Venue. Any suit, action or proceeding with respect to the enforcement of any decision or judgment of an arbitrator pursuant to Section 11 (and only in such circumstances) may be brought in any court in Kansas. The Company and the Consultant respectively hereby submit to the jurisdiction of any and all such courts for the purpose of any such suit, action or proceeding. The Company and the Consultant stipulate that the provisions of this paragraph shall not be construed to grant the Company or the Consultant the right to file an action arising out of or relating to this Agreement in any court in the state of Kansas except for the purpose of enforcing a judgment or decision rendered under this Agreement or the obligation to arbitrate pursuant to Section 11.

12.10 Further Assurances. The Company and the Consultant hereto hereby agree to execute, acknowledge and deliver to each other any further writings, documents, transfers, acknowledgments, instruments, powers of attorney, authorizations, filings, applications, reports, etc. that may be reasonably required to give full force and effect to the provisions of this Agreement, and to take such further actions reasonably required in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

13. **INDEPENDENT LEGAL COUNSEL.** The law firm of Tino M. Monaldo, chartered has represented the Consultant exclusively in the negotiation, drafting and execution of this Agreement. The Company has been represented by its own independent legal counsel throughout the negotiation, drafting and execution of this Agreement. Any services requested by the Company of the Consultant involving the services of Tino M. Monaldo, Chartered, shall be provided by Tino M. Monaldo, Chartered to Consultant on behalf of the Consultant and not the Company, such that Tino M. Monaldo, Chartered's client shall be the Consultant exclusively, not withstanding the Company shall pay the Consultant for said services according to Exhibit A and/or B hereto.

14. **SUPERSEDED.** This Agreement supersedes and replaces all other employment and/or consulting agreements, verbal or written, express or implied, involving the

ENB 00778

EM001-007258

Company on the one hand and the Consultant and/or Consultant's employees or consultants on the other hand, including, but not limited to, any (i) Employment Contract between Kansas Pipeline Operating Company, Kansas Pipeline Company (KPC), The Bishop Group. Ltd., or its Affiliates, Synergy Pipeline Company, L.P., or its Affiliates on the one hand, and Dennis M. Langley on the other; (ii) Employment Agreements between KPC and the individuals named in Exhibits A and B; and (iii) Contract for Legal Services, dated February 1, 1999 between Tino M. Monaldo and KPC.

IN WITNESS WHEREOF, the Company and the Consultant hereto have set their hands the day and year first written above, or consent to the terms hereof as if executed on such date.

KANSAS PIPELINE COMPANY, a Kansas general partnership

By:     Synergy Pipeline Company, L.P., its general partner

By:     Bishop Pipeline Company, its general partner

By:
Name:   HOWARD E. LUBOW
Title:  EXEC. V. P.

MANAGEMENT RESOURCES GROUP, LLC, a Kansas limited liability company

By:
Name:
Title:

KC01 451412.07                                    10

ENB 00779

EM001-007259

Exhibit A

| Name | Normal Hourly Rate | Hourly Rate For Months In Which Monthly Limit Or Annual Limit On Hours Has Been Exceeded | Annual Hourly Limitation | Monthly Hourly Limitation |
|---|---|---|---|---|
| Dennis M. Langley | $250.00 | $350.00 | 1000 | 115 |
| Yvette Korb | $60.00 | $80.00 | 1000 | 115 |
| Steve Korb | $60.00 | $80.00 | 1000 | 115 |
| Lynette K. Shaw | $60.00 | $80.00 | 1000 | 115 |
| Joan A. W. Schnepp | $60.00 | $80.00 | 1000 | 115 |
| Clerical and Administrative Support Staff | $30.00 | $40.00 | 1000 | 115 |
| **Third Party Services** | | | | |
| Tino M. Monaldo, Chtd. | $125.00 | $150.00 | 800 | 120 |

**Charges.** Our statements to our clients are normally rendered on a monthly basis, and ordinarily include certain charges other than fees for consulting services. These charges may include third-party expenses (such as lodging and travel) with no mark-up. The Company may be asked to pay larger third-party invoices directly. Other third-party expenses will be added to our bills with no markup. We have elected to charge for certain support activities on the basis of each client's individual use instead of covering them in its rates for fee earners. Internal charges will be billed in the below described manner.

**Air Travel.** Dennis M. Langley and Tino M. Monaldo shall have the option of traveling by first class commercial air service, while all others shall be coach class commercial air services.

**Facsimile.** The Company will provide all paper, supplies, operation and maintenance plus the telephone expenses for outgoing faxes.

**Mail.** The Company will be charged the actual cost of postage, express mail and bulk mailings, as well as air express couriers. However, there is no charge for invoices sent to the client by regular mail.

**Messengers.** The Company will be charged the actual costs of outside messenger service. In some instances, the Consultant personnel may be used in lieu of an outside messenger services to reduce delivery time. In those cases, delivery charges are competitive with those of the outside messenger.

ENB 00780

EM001-007260

<u>Overtime</u>.  Staff overtime is charged only when required by the time constraints of the specific project. Any staff used but not listed above will be at competitive rates.

<u>Photocopying</u>.   The Company will provide paper, supplies, operation and maintenance. Copying by outside vendors when required by size or time constraints of the specific project is charged at actual cost.

<u>Computerized Support Services Including Word Processing</u>.  The Company will be billed for computerized support services, including word processing services for composing and editing at the clerical and administrative rates in Exhibits A and B.

<u>Computer Research</u>.   The Consultant uses Lexis/Nexis and Westlaw computer assisted research. The Consultant contracts for these services in bulk and for several years in advance. The Consultant bills clients at the vendor's regular rates to third parties without discount.

<u>Long Distance Telephone Calls</u>.  To ensure availability and quality of transmission of voice and data, the Consultant contracts with long distance carriers for these services in bulk and for several years in advance. Long distance calls will be billed at the direct dial rates to third parties without discount.

ENB 00781

EM001-007261

Exhibit B

| Name | Normal Hourly Rate | Hourly Rate For Months In Which Monthly Limit Or Annual Limit On Hours Has Been Exceeded | Annual Hourly Limitation | Monthly Hourly Limitation |
|---|---|---|---|---|
| Dennis M. Langley | $350.00 | $400.00 | 1000 | 115 |
| Yvette Korb | $80.00 | $100.00 | 1000 | 115 |
| Steve Korb | $80.00 | $100.00 | 1000 | 115 |
| Lynette K. Shaw | $80.00 | $100.00 | 1000 | 115 |
| Joan A.W. Schnepp | $80.00 | $100.00 | 1000 | 115 |
| Clerical and Administrative Support Staff | $30.00 | $40.00 | 1000 | 115 |
| **Third Party Services** | | | | |
| Tino M. Monaldo, Chtd. | $150.00 | $175.00 | 800 | 120 |

**Charges.**  Our statements to our clients are normally rendered on a monthly basis, and ordinarily include certain charges other than fees for consulting services. These charges may include third-party expenses (such as lodging and travel) with no mark-up.  The Company may be asked to pay larger third-party invoices directly. Other third-party expenses will be added to our bills with no markup.  We have elected to charge for certain support activities on the basis of each client's individual use instead of covering them in its rates for fee earners.  Internal charges will be billed in the below described manner.

**Air Travel.**  Dennis M. Langley and Tino M. Monaldo shall have the option of traveling by first class commercial air service, while all others shall be by coach class commercial air service..

**Facsimile.**  The Company will provide all paper, supplies, operation and maintenance plus the telephone expenses for outgoing faxes.

**Mail.**  The Company will be charged the actual cost of postage, express mail and bulk mailings, as well as air express couriers.  However, there is no charge for invoices sent to the client by regular mail.

**Messengers.**  The Company will be charged the actual costs of outside messenger service. In some instances, the Consultant personnel may be used in lieu of an outside messenger services to reduce delivery time. In those cases, delivery charges are competitive with those of the outside messenger.

ENB 00782

EM001-007262

<u>Overtime</u>.  Staff overtime is charged only when required by the time constraints of the specific project. Any staff used but not listed above will be at competitive rates.

<u>Photocopying</u>.   The Company will provide paper, supplies, operation and maintenance. Copying by outside vendors when required by size or time constraints of the specific project is charged at actual cost.

<u>Computerized Support Services Including Word Processing</u>.  The Company will be billed for computerized support services, including word processing services for composing and editing at the clerical and administrative rates in Exhibits A and B.

<u>Computer Research</u>.    The Consultant uses Lexis/Nexis and Westlaw computer assisted research. The Consultant contracts for these services in bulk and for several years in advance. The Consultant bills clients at the vendor's regular rates to third parties without discount.

<u>Long Distance Telephone Calls</u>.  To ensure availability and quality of transmission of voice and data, the Consultant contracts with long distance carriers for these services in bulk and for several years in advance. Long distance calls will be billed at the direct dial rates to third parties without discount.

ENB 00783

EM001-007263

31

ENB 00784

EM001-007264

51

## MANAGEMENT RESOURCES GROUP, LLC

October 24, 1999

Kansas Pipeline Company
8325 Lenexa Drive, Suite 400
Lenexa, KS 66214

Gentlemen:

You have requested clarification of certain matters regarding that certain Option Agreement (Option Agreement) between MarGasCo Partnership, Kansas Pipeline Company (KPC) and Management Resources Group, LLC, (MRG) as well as with respect to that certain Project Development Agreement and MRG Interest Agreement between KPC and MRG (Development Agreement).

MRG agrees that with respect to the Option Agreement any payments made by KPC to MRG upon the exercise of the Option Rights defined in the Option Agreement will be treated for federal and state income tax purposes as a payment made in cancellation of the Development Agreement, and such payments actually received by MRG will be reported as ordinary income and KPC will record such payments on its records similarly.

With respect to the Development Agreement, the parties agree that for federal and state income tax purposes any payments made under the Development Agreement by KPC to MRG shall be reported by MRG as ordinary income and will be reported similarly by KPC.

If you should have any questions, please do not hesitate to contact me.

Sincerely,

Dennis M. Langley, President
of Management Resources Group, LLC

jd\trs\kansas pipeline

ENB 00785

EM001-007265

Agreed to and Accepted as of the date first written above:

Kansas Pipeline Company

By:    Syenergy Pipeline Company, L.P.
        its general partner

By:    Bishop Pipeline Company,
        its general partner

By:    _____
        Howard E. Lubow
        Executive Vice President

MarGasCo Partnership

By:    Syenergy Pipeline Company, L.P.
        its general partner

By:    Bishop Pipeline Company,
        its general partner

By:    _____
        Lynette K. Shaw
        Vice President

jd\ltrs\kansas pipeline

ENB 00786

EM001-007266

32

ENB 00787

# K-PIPE MERGER CORPORATION

Dennis Langley
13137 Thunderhead Falls Lane
Rapid City, SD  57702

Dear Mr. Langley:

We make reference to the Stock Purchase Agreement (the "Purchase Agreement") dated as of October 25, 1999 between Dennis Langley ("Langley") and K-Pipe Merger Corporation ("K-Pipe"). This letter agreement is being executed and delivered contemporaneously with the execution of the Purchase Agreement and as an amendment thereto. (Capitalized terms used herein without definition shall have the meaning ascribed thereto in the Purchase Agreement). The parties agree as follows:

1.     A Closing has been set under the Purchase Agreement for November 5, 1999. K-Pipe, at its sole option, can cause the Closing to be extended to no later than November 8, 1999 upon notice to Langley. Further, K-Pipe, at its sole option, can cause the Closing to be extended to no later than November 15, 1999 by notice to Langley, but, as a condition to the extension, at the Closing K-Pipe will pay to Langley $21,500 for each day the Close is delayed beyond November 8, 1999, in addition to the Preliminary Cash Consideration. In addition, and superceding the last sentence of Section 11.2 of the Purchase Agreement, if K-Pipe has not timely submitted a Representation Statement or if all matters listed on the Representation Statement have been cured, then if the Close under the Purchase Agreement does not occur on or prior to November 15, 1999 for any reason (other than a failure by Langley to make the deliveries required by Article III of the Purchase Agreement) then K-Pipe will pay to Langley $15,000,000 on November 16, 1999 as Langley's sole remedy for K-Pipe's failure to Close unless Langley has specifically agreed in writing to further delay the Close.

2.     K-Pipe represents and warrants to Langley that K-Pipe has no plan or intention to liquidate the Company and agrees it will not liquidate the Company for at least two years after the Closing Date.

3.     The term "Cut-Off Date" is amended to mean 5:00 p.m. central time on November 5, 1999.

KC01DOCS/457241.04                        1

ENB 00788

EM001-007268

This agreement is binding on and shall inure to the benefit of the parties hereto and all beneficiaries hereof.

Very truly yours,

K-PIPE MERGER CORPORATION

By_____
Authorized Officer

Accepted and Agreed to

Dennis M. Langley

KC01DOCS/457241.04                                    2

ENB 00789

EM001-007269

This agreement is binding on and shall inure to the benefit of the parties hereto and all beneficiaries hereof.

Very truly yours,

K-PIPE MERGER CORPORATION

By _Larry J. Austin_
Authorized Officer

Accepted and Agreed to

_____

Dennis M. Langley

ENB 00790

EM001-007270

33

ENB 00791



KANSAS PIPELINE COMPANY
8325 LENEXA DRIVE • SUITE 400
LENEXA, KANSAS 66214
913-888-7139 • FAX 913-599-2573

October 24, 1999

Mr. Dennis M. Langley
Management Resources Group, LLC
13137 Thunderhead Falls Lane
Rapid City, SD 57702

Ms. Lynette K. Shaw
MarGasCo Partnership
8325 Lenexa Drive
Lenexa, KS  66214

Dear Mr. Langley and Ms. Shaw:

In the event, that Kansas Pipeline Company (KPC) exercises its Option Rights as defined in the attached Option Agreement, (attached hereto as Exhibit A) then KPC warrants and guarantees to both Management Resources Group, LLC and/or its Permitted Assignees (as defined in either of the Project Development Agreements attached hereto as Exhibits B & C) (herein MRG), and to MarGasCo, (MarGasCo) and its assignees, the following unless hereafter expressly prohibited by FERC rules and/or regulations, to-wit:

1.  Absent emergency or force majeure, MRG and/or MarGasCo may tie into the System on any Business Day after at least thirty (30) days written notice (herein "Tie-In"), for any purpose, at any place, except in the K.C. Metro Area.  For purposes hereof a Tie-In shall also include the setting, construction and/or installation of any associated facilities required by FERC and/or KPC's FERC tariff, or mutually agreed to by the parties herein, including but not limited to:  hot taps, tees, saddles, meters, de-hy units, filters, scrubbers, odorant facilities, measuring devices (volume, Btu content, chromatographic, water content, pressure, compression, etc.), pipe, valves, fittings, etc.

2.  The Tie-In may be accomplished by MRG, MarGasCo and/or their qualified agents, in whole or part, if KPC for any reason will or does not make its personnel available on such date.

3.  The Tie-In may be stubbed out to a blind or valve until the particular project or Project on which MRG, MarGasCo and/or a Project Investment Vehicle are (is) working has been completed.

4.  In the event, KPC sets any facilities, performs any services and/or purchases any materials or equipment associated with any such Tie-In, then MRG or MarGasCo shall reimburse KPC for the same at KPC's hard cost with no mark-up for profits, administration or overhead.

5.  The rates which KPC shall charge the Project Investment Vehicle, MarGasCo and/or MRG for transportation over the System from and/or to any such Tie-In shall be the lowest rate available to similarly situated shippers.

ENB 00792

6.  Transportation Service will be granted if there is available capacity held by KPC and/or our Affiliates (including MarGasCo) at the time. Interruptible transportation is always available. If transportation service is required, then you will need to complete a request for service form, which form will be honored by KPC pursuant to the terms hereof so long as the same continues to be permitted by the FERC.

7.  If the FERC should hereafter prohibit KPC from any of the above, then KPC agrees to revise the terms hereof KPC in such a manner as best fulfills the intentions and needs of the parties under the circumstances consistent with the principle of Cy Pres.

KPC understands that MRG is expressly relying on this letter warranty and guarantee in executing the Option Agreement and Project Development Agreements attached hereto; i.e., but for this letter and warranty which is being received, contemporaneously with the execution of that Stock Purchase Agreement, between Dennis M. Langley and K-Pipe Merger Corporation, the Development Agreements, and the Option Agreement, MRG would not have granted the Option Rights to KPC. The terms used herein have been ascribed the meanings given to them in the Project Development Agreements (and their Glossaries) and the Option Agreement all attached hereto.

Sincerely,

**Kansas Pipeline Company**
By: Syenergy Pipeline Company;
          its general partner
By: Bishop Pipeline Company,
          its general partner

Howard E. Lubow
Executive Vice President

**Acknowledged and Accepted by:**

**MarGasCo Partnership**
By: Syenergy Pipeline Company;
          its general partner
By: Bishop Pipeline Company,
          its general partner

By: Lynette K. Shaw, Vice President

**Management Resources Group, LLC**

By: Dennis M. Langley, President

ENB 00793

Exhibit A

## OPTION AGREEMENT

THIS OPTION AGREEMENT ("Agreement") is entered into as of the 24th day of October, 1999, by and between Management Resources Group, LLC ("MRG"), Kansas Pipeline Company, a Kansas general partnership ("KPC"), and MarGasCo Partnership, an Oklahoma general partnership ("MGC").

WHEREAS, on the date first written above, MGC and MRG executed a Project Development Agreement (the "PDA I")

WHEREAS, on the date first written above, KPC and MRG executed a Project Development Agreement and MRG Interest Agreement (the "PDA II");

WHEREAS, the parties desire to enter into an agreement to define their rights, duties and obligations under the PDA I and PDA II;

NOW, THEREFORE, in consideration of the promises and covenants contained herein, the parties agree as follows:

1.     <u>PDA I</u>. The PDA I shall be deemed effective as of the date first written above, unless KPC does not exercise its Option Rights during the Option Period described below, in which event the PDA I shall then be deemed automatically terminated ab initio, as if it never existed.

2.     <u>PDA II</u>. The PDA II shall be deemed effective as of the date first written above if KPC does not exercise its Option Rights during the Option Period described below. If KPC exercises its Option Rights during the Option Period, then the PDA II shall be deemed automatically terminated ab initio as if it never existed. If KPC does not exercise its Option Rights during the Option Period, then the PDA II shall become effective, retroactively, as of date first written above, including all payments and obligations due thereunder, as if the PDA II has been in effect from the date first written above (i.e any payment which would have been due under the PDA II during the Option Period or specific performances due during the Option Period, shall become immediately due upon the expiration of this Option Period if the Option Rights are not exercised).

3.     <u>Option Rights of KPC</u>.   KPC shall have the option, but not the obligation, to elect to cancel and terminate the PDA II ("Option Rights") for a period of time ("Option Period") from the date first written above, until 5:00 central time, January 31, 2000. To exercise its Option Rights, KPC shall notify: (i) MRG in writing pursuant to the notice provisions set forth in Section 4(c) below at any time during the Option Period; and (ii) make payment to MRG of $10,750,000.00 in certified funds, or other liquid assets including, but not limited to, publicly tradable securities or stocks, which KPC and MRG may mutually agree to in writing with said payment being made contemporaneously with KPC's notification described in subsection (i) above. Should KPC fail to exercise its Option Rights during the Option Period, the Option Rights shall automatically terminate immediately upon the expiration of the Option Period without any further action necessary by any party hereto.

ENB 00794

Telephone: (913) 888-7139
Telecopier: (913) 599-5645

or such other persons or addresses as may be designated in writing by the party to receive such notice. Any notice delivered by messenger shall be deemed received when such delivery is tendered; notices sent by facsimile transmission shall be deemed received upon faxed confirmation of receipt; notices mailed in the manner provided above, shall be deemed received on the third day after such are postmarked; and notices delivered by other methods shall be deemed received when actually received by the addressee or its authorized agent.

(d)     Governing Law; Jurisdiction; Venue.  This Agreement shall be governed by, and construed and enforced in accordance with, the Laws of the State of Kansas, without giving effect to the principles of the conflicts of law thereof. The parties agree that the Federal Court of the District of Kansas shall have exclusive jurisdiction and venue to hear and determine any claims or disputes between the parties, pertaining directly or indirectly to this Agreement, any additional agreements or in connection with this Agreement.     Each party expressly submits and consents in advance to such jurisdiction in any action or proceeding commenced in such courts, hereby waiving personal service of the summons and complaint or other process or papers issued therein and agreeing that service of such summons and complaint or other process or papers may be made by registered or certified mail addressed to the relevant party at the address set forth in Section 4(c), which service shall be deemed made upon receipt thereof. The exclusive choice of forum set forth in this Section shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action under this Agreement to enforce the same in any appropriate jurisdiction.

(e)     Entire Agreement.     This Agreement constitutes the entire agreement and understanding of the parties with respect to the matters covered hereby and supersedes any and all prior agreements, representations and understandings relating to the subject matter hereof.

(f)     Construction.  The section headings contained in this Agreement are inserted for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  The preamble hereof, the recitals hereto, and all schedules attached hereto are hereby incorporated herein by reference and made a part hereof.

(g)     Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties, and their respective successors and assigns, to the extent allowed hereby.  Nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.

(h)     Assignment. None of the parties may assign any rights or delegate any obligations provided for in this Agreement without the prior written consent of all the

3

ENB 00795

EM001-007275

other parties, which consent shall not be unreasonably withheld. Any assignment in violation of the preceding sentence shall be void. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns. The assignment of the PDA I or the PDA II shall be governed by the PDA I and/ or PDA II, respectively.

(i)     Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be in an original, but all of which shall be deemed to constitute one instrument. This Agreement or any document executed in connection herewith shall be binding upon such signator party, if said signature is delivered by telecopier or other like transmission.

(j)     Obligations of Subsidiaries. Whenever this Agreement requires a Subsidiary of the Company to take any action, such requirement shall be deemed to include an undertaking on the part of the Company to cause such Subsidiary to take such action.

(k)     Severability. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability or the other provisions hereof. If any provision of this Agreement, or the application thereof to any person or any circumstance, is invalid or unenforceable, (a) a suitable or equitable provision shall be substituted therefor in order to carry out, so far as may be valid or enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction. The doctrine of *Cy Pres* shall be applicable to the Agreement such that in interpreting the terms and conditions hereunder the intentions of the parties are to be carried out as near as may be, when it would otherwise be impossible or illegal to give it literal effect. In any dispute arising out of this Agreement, the doctrine of *Cy Pres* shall be applied by the Court.

(l)     Costs and Fees. In connection with litigation related to this Agreement (regardless of whether the action alleges breach of contract, tort, violation of a statute, or any other cause of action), the prevailing party will be entitled to recover from the nonprevailing party its reasonable costs in bringing or defending such claims, including its reasonable attorneys' fees, accounting fees, professional and/or expert witness fees, court costs, and travel and out-of-pocket expenditures incurred in preparation for and during such proceedings. If a party prevails on some aspects of its claims but not on others, the court shall apportion any award of costs in bringing or defending such claims in such manner as it deems equitable.

(m)     Breach, Notice and Cure. In the event that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written

4

ENB 00796

notice of such purported breach(s) describing such breach(s) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual receipt of such notice to cure said breach(s) if it concurs that the acts or omissions described in the notice(s) constitute breach(s), or it may elect to provide a cure to the complaining party's contended breach(s) even if the purported breaching party is of the belief that the  acts or omissions described in the notice(s) do not constitute a breach(s) hereof; and if so cured by the purported breaching party to the reasonable satisfaction of the complaining party, the breach(s) shall be deemed to have never occurred.  In the event the parties cannot agree as to whether the acts or omissions described in the notice(s) constitute a breach(s) of the terms hereof, and the purported breaching party does not elect to cure the alleged breaches to the reasonable satisfaction of the complaining party, then the parties may pursue any legal remedies they may have.

(n)     <u>Definitions</u>.    Any capitalized words shall have the meaning attributed to said words given it in the Company Agreements, unless otherwise defined herein specifically.

(o)     <u>Further Assurances</u>.    The parties hereby agree to execute, acknowledge and deliver to each other any further writings, documents, transfers, acknowledgments, instruments, powers of attorney, authorizations, filings, applications, reports, etc. that may be reasonably required to give full force and effect to the provisions of this Agreement, and to take such further actions reasonably required in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

5

ENB 00797

EM001-007277

IN WITNESS WHEREOF, the parties affix their signature effective the date first written above.

MRG:   Management Resources Group, LLC

By:_____
Name:
Title:

KPC:   Kansas Pipeline Company

By:   Syenergy Pipeline Company, L.P.,
its general partner

By:   Bishop Pipeline Company, L.P., its
general partner

By:   _____
Name:
Title:

MGC:   MarGasCo Partnership

By:   Syenergy Pipeline Company, L.P.,
its general partner

By:   Bishop Pipeline Company, L.P., its
general partner

By:   _____
Name:
Title:

6

ENB 00798

EM001-007278

Exhibit B

# PROJECT DEVELOPMENT
# AND
# MRG INTERESTS AGREEMENT

by and between

## Kansas Pipeline Company

and

## Management Resources Group, LLC.

9t2#01!.doc

ENB 00799

EM001-007279

# TABLE OF CONTENTS

**Page**

ARTICLE I    DEFINITIONS AND TERM................................................1
   Section 1.1    Specific Definitions .................................................1
   Section 1.2    Term........................................................................2
   Section 1.3    KPC's Early Termination Options.........................2

ARTICLE II    TYPES OF PROJECTS .....................................................4
   Section 2.1    Project Categories .................................................4
   Section 2.2    Relative Rights ......................................................4

ARTICLE III    PROJECT PARTICIPATION ...........................................5
   Section 3.1    KPC Participation in MRG Initiated Projects..............5
   Section 3.2    MRG Participation in KPC Initiated Projects..............9
   Section 3.3    Classification..........................................................13
   Section 3.4    Engineering and Construction................................13
   Section 3.5    Incremental Operating Costs .................................14
   Section 3.6    Use of System by MRG .........................................14
   Section 3.7    Effect of Declarations to Participate .....................15

ARTICLE IV    PROJECT FINANCING AND DISTRIBUTIONS.................15
   Section 4.1    Project Financing ..................................................15
   Section 4.2    Cash Flow Distributions ........................................16
   Section 4.3    MRG Interests.......................................................16

ARTICLE V.........................................................................................19
   Section 5.1    Put/Purchase Rights .............................................19
   Section 5.2    Offer and Response ..............................................19
   Section 5.3    Terms of Purchase ...............................................19

ARTICLE VI    TRANSFERS AND AFFILIATED TRANSACTIONS............19
   Section 6.1    Uniqueness of Parties...........................................19
   Section 6.2    Contractual Relationship.......................................20
   Section 6.3    Affiliated Transactions..........................................20
   Section 6.4    KPC Change of Control, Asset Sale, and/or Assignment..........20
   Section 6.5    MRG Change of Control or Assignment by MRG ......22

ARTICLE VII    ARBITRATION ............................................................22
   Section 7.1    Settling Disputes ..................................................22
   Section 7.2    Remedies and Enforcement ..................................22
   Section 7.3    Notice....................................................................23
   Section 7.4    Location of Hearing ..............................................23
   Section 7.5    Presentation of Arguments....................................23
   Section 7.6    Rendering of Decision ...........................................23
   Section 7.7    Choosing of Arbitrators ........................................23

i

ENB 00800

Section 7.8     Attorney's Fees ....................................................................................23
Section 7.9     Cy Pres ................................................................................................24

ARTICLE VIII     GENERAL TERMS AND CONDITIONS ............................................24
Section 8.1     Geographic Coverage ............................................................................24
Section 8.2     Waiver ..................................................................................................24
Section 8.3     Notices ..................................................................................................24
Section 8.4     Reports and Information .......................................................................25
Section 8.5     Publicity ................................................................................................25
Section 8.6     Use of Facilities ...................................................................................25
Section 8.7     Governing Law .....................................................................................25
Section 8.8     Complete Agreement ............................................................................25
Section 8.9     Counterparts .........................................................................................26
Section 8.10    Titles of Articles, Sections and Subsections .......................................26
Section 8.11    Severability ..........................................................................................26
Section 8.12    Jurisdiction and Venue .........................................................................26
Section 8.13    Further Assurances ...............................................................................26
Section 8.14    Breach, Notice and Cure ......................................................................26
Section 8.15    Prohibited/MRG Activities ..................................................................27
Section 8.16    Warranty Against Circumvention/Confidentiality ...............................28
Section 8.17    Restricted Information ..........................................................................28

ii

ENB 00801

EM001-007281

## PROJECT DEVELOPMENT
## AND
## MRG INTERESTS AGREEMENT

This Project Development and MRG Interests Agreement (Agreement), dated as of the 24th day of October, 1999, by and between Management Resources Group, LLC, a Kansas corporation ("MRG"), and Kansas Pipeline Company, a Kansas General Partnership ("KPC").

WHEREAS, KPC and its Affiliated Entities, including MarGasCo Partnership ("MGC"), market and/or transport Natural Gas;

WHEREAS, MRG and/or its personnel have and/or may operate(d), manage(d) and/or evaluate(d) projects relating to the Natural Gas, alternative energy, water processing, environmental management and/or waste management industries;

WHEREAS, KPC believes that the scope of its operations affords MRG continuous opportunities to expand upon its project development capabilities, while at the same time expanding KPC's project development activities;

WHEREAS, MRG believes that its experience in the area of project development related to the Natural Gas industry may allow MRG to assist KPC and/or its Affiliated Entities in taking advantage of opportunities available to KPC to expand KPC's project development activities while at the same time expanding MRG's project management and development business; and

WHEREAS, KPC and MRG desire to establish a business relationship whereby they may pursue a variety of development projects all in accordance with the terms, conditions, rights and obligations set forth herein; and

WHEREAS, KPC is desirous of having MRG indemnify KPC from the Management Contract; and

WHEREAS, the payment of certain revenues is contingent, performance based and additional contingent consideration to MRG for its agreement to submit to the terms hereof which place restrictions and procedures on MRG's ability to compete with KPC.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, and other good and valuable consideration the receipt of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS AND TERM

Section 1.1    Definitions.  As used in this Agreement, the terms set forth in the Glossary attached hereto as Exhibit 1.1.A, are incorporated herein by reference thereto, shall

ENB 00802

have the meanings set forth or as referenced in Exhibit 1.1.A. Aside from definitions, various Sections and Subsections of the Glossary shall contain material and substantive contractual terms and expressions of intent. Terms not set forth in Exhibit 1.1.A, but otherwise defined in the body of this Agreement, shall have the specific meanings attributed to them in the text. Terms used in this Agreement in the singular shall have the same meanings when used in the plural and vice versa, and any gender designation shall refer to all genders.

      **Section 1.2   Term.** This Agreement shall commence on the date hereof and shall continue as follows:  i) as to all matters governing KPC Expansion Projects and MRG Interests Payments the Agreement shall be in effect in perpetuity, unless the Early Complete Termination Option is exercised by KPC pursuant to Section 1.3 and its subsections; and ii) as to all matters governing MRG Exclusive Projects, this Agreement's original terms shall terminate seven (7) years after the date first written above, unless the Early Partial Termination Option is exercised by KPC pursuant to Section 1.3 and its subsections hereof. Upon the expiration of the original seven (7) year term, the MRG Exclusive Projects portion of this Agreement shall renew automatically for an infinite number of successive one year terms, unless either KPC or MRG serves notice of termination to the other at least sixty days prior to the end of the then existing term, in which case such termination shall then become effective at twelve o'clock midnight CST, of the last day of the term (original or successive) which the MRG Exclusive Projects portion is completing as of the date of the termination notice. Termination at the end of the original term or any successive terms of the MRG Exclusive Projects portion as provided for in the previous sentence, shall not require the use of the Early Partial Termination Option or the payment of any fees associated therewith. If the parties are in the process of determining their participation in Projects described in this Agreement when the original terms or any extension thereof expires and/or is terminated in whole, or in part; then the rights of the parties described in herein shall continue until the process described herein with respect to such pending Projects has been concluded.

      **Section 1.3   KPC's Early Termination Options.** KPC has the right to terminate this Agreement in whole or in part as provided for in the Subsections (1.3.1, 1.3.2 and 1.3.3) of this Section.

      **1.3.1 Early Partial Termination Option.** KPC may elect to terminate only the portions of this Agreement which relate to MRG Exclusive Projects, by tendering to MRG a one time payment in the amount of $2,500,000 and by providing MRG with notice, pursuant to Section 8.3, of such partial termination of the MRG Exclusive Projects portion of this Agreement (herein the "Early Partial Termination Option"). In the event of such partial termination, then KPC and its Affiliates for a period of 3 years from the date of the exercise of such Early Partial Termination Option shall be barred from the pursuit of any project which could have been an MRG Exclusive Project (had the Agreement have been continued without partial termination), which MRG or KPC and/or its Affiliates have previously reviewed and/or pursued (even if such review or pursuit had not yet resulted in the project becoming an MRG Exclusive Project) unless KPC and/or its Affiliates elect to pursue any one or more of such Projects with MRG, pursuant to the terms of this Agreement. Likewise, if the parties are in the process of determining their participation in any MRG Exclusive Projects described in this

2

ENB 00803

Agreement when KPC exercises its Early Partial Termination Option; then the rights of the parties and their Affiliated Entities described herein shall continue until the process described herein with respect to such pending MRG Exclusive Projects has been concluded. Any MRG Exclusive Projects that have gone through the process described in Article III (or elsewhere herein) and/or which have been or are being developed thereafter, shall remain subject to the terms of the Agreement; i.e., notwithstanding anything herein to the contrary, KPC's exercising its Early Partial Termination Option shall not terminate the parties' and their Affiliated Entities' obligations to one another for Projects which have been or are being developed prior to such termination.

1.3.2   **Early Complete Termination Option.**   KPC may elect to completely terminate this Agreement by i) tendering to MRG the Early Complete Termination Payment, ii) by providing MRG with notice (pursuant to Section 8.3) of such complete termination of this Agreement, and iii) by fulfilling the condition precedent described in Subsection 1.3.3 below (herein the "Early Complete Termination Option"). In the event of such complete termination, then KPC and its Affiliated Entities for a period of 3 years from the Early Complete Termination Date shall be barred from the pursuit of any project which could have been an MRG Exclusive Project (had the Agreement have been continued without complete termination), which MRG and KPC (and/or its Affiliated Entities) have previously reviewed and/or pursued (even if such review or pursuit had not yet resulted in the project becoming an MRG Exclusive Project). If the parties are in the process of determining their participation in Projects described in this Agreement when KPC exercises its Early Complete Termination Option; then the rights of the parties described herein shall continue until the process described herein with respect to such pending Projects has been concluded. Any Projects that have gone through the Process described in Article III (or elsewhere herein) and/or which have been or are being developed thereafter, shall remain subject to the terms of the Agreement; i.e., notwithstanding anything herein to the contrary, KPC's exercising its Early Complete Termination Option shall not terminate the parties' and their Affiliated Entities' obligations to one another for Projects which have been or are being developed prior to such termination.

1.3.3   **Exercise of Early Complete Termination.**   KPC may exercise its Early Complete Termination Option by tendering to MRG the Early Complete Termination Payment in certified funds, which payment shall be in addition to any monies received by or accrued to MRG pursuant to the MRG Interests Payments up to the Early Complete Termination Date. To exercise its Early Complete Termination Option, KPC shall notify MRG in writing of its intent to tender and pay such amounts, stating the date on which KPC shall make such payments ("Early Complete Termination Date").

In the event KPC pays or proposes to pay MRG the amount which KPC has determined to be the Early Complete Termination Payment, and MRG disputes such amount, MRG shall give written notice to KPC within thirty (30) days of MRG's actual receipt of same; otherwise the amount paid shall be

3

ENB 00804

conclusively and irrebutably be deemed to be correct. In the event of such timely notice of dispute by MRG to KPC, MRG and KPC shall attempt to resolve the Dispute to their mutual satisfaction within twenty (20) days, but if they fail to so resolve the Dispute, it shall be submitted to arbitration as described in Article VII hereof.

After i) the actual receipt by MRG from KPC of the Early Complete Termination Payment, and ii) the actual receipt by MRG from KPC of all MRG Interests Payments accrued and due MRG through the Early Complete Termination Date, iii) the final resolution of any dispute relating to monies which may be owed hereunder to MRG; then MRG shall release any and all security interests as may have been previously granted to secure payment of the MRG Interests Payments and shall execute any and all UCC-3 Termination Statements releasing any UCC-1 Financing Statements which may have been filed and are still in effect perfecting such security interests. In the event KPC exercises and fully completes the Early Complete Termination Option, as provided above, then MRG and its Affiliated Entities shall be prohibited for a term of three (3) years from the Early Complete Termination Date from pursuing a Project which would have been a KPC Expansion Project had this Agreement not been terminated pursuant to the Early Complete Termination Option.

## ARTICLE II

### TYPES OF PROJECTS

**Section 2.1    Project Categories.** There shall be two (2) categories of projects governed by this Agreement: KPC Expansion Projects and MRG Exclusive Projects. All KPC Expansion Projects shall be sub-categorized as either "Chartered" or "Unchartered". If a project does not fall within the scope of any of the above-described categories, then it shall be deemed to be an Unclassified Project. KPC Expansion Projects and MRG Exclusive Projects may collectively be referred to herein as "Projects"; i.e., Projects as the term is used herein shall not refer to Unclassified Projects. MRG and KPC (and/or their Affiliated Entities) shall have no obligations whatsoever to the other with respect to Unclassified Projects.

**Section 2.2    Relative Rights.** With respect to Projects, MRG (and its Affiliated Entities) and KPC (and its Affiliated Entities) shall have the following obligations, duties and options regarding Projects, to-wit:

i)    MRG (and its Affiliated Entities) and KPC (and its Affiliated Entities) shall offer each other the first right of participation in any KPC Expansion Project according to the procedures set forth in Article III below, and if either party fails to do so, then it shall be responsible to the other party for all damages and remedies described herein.

ii)    MRG and its Affiliated Entities shall have the exclusive right to acquire, manage, operate, design and construct all MRG Exclusive

4

ENB 00805

Projects. MRG may, but is not obligated to, offer KPC and its Affiliated Entities participation rights in a MRG Exclusive Project. If MRG, at its sole option, offers KPC and its Affiliated Entities the opportunity to participate in a MRG Exclusive Project, it shall do so according to the procedures set forth in Article III below. KPC and its Affiliated Entities shall not acquire, manage, operate, design or construct a MRG Exclusive Project without first offering MRG the opportunity to participate according to the procedures set forth in Article III below; but if it (they) does (do) so, then KPC and its Affiliated Entities shall be responsible to MRG for all damages and remedies described herein.

## ARTICLE III

## PROJECT PARTICIPATION

**Section 3.1     KPC's Participation in MRG Initiated Projects.**

3.1.1   MRG Initiated Project.   KPC shall have the right, but not the obligation, to elect to participate in any KPC Expansion Project which MRG initiates and in any MRG Exclusive Project which MRG elects to submit to KPC ("MRG Initiated Project"). The minimum participation interest KPC and its Affiliated Entities may take in any MRG Initiated Project which is also an MRG Exclusive Project is 10% of the interest of MRG and its Affiliated Entities therein; and the maximum participation interest KPC and its Affiliated Entities may take any such MRG Exclusive Project is 49% of the interest of MRG and its Affiliated Entities therein. The minimum participation interest KPC and its Affiliated Entities may take in any MRG Initiated Project which is also an Unchartered KPC Expansion Project is 10% of the interest of MRG and its Affiliated Entities therein, and the maximum participation interest KPC and its Affiliated Entities may take in any such Unchartered KPC Expansion Project is 50% of the interest of MRG and its Affiliated Entities therein. Both the minimum and the maximum participation interest KPC and its Affiliated Entities may take in any MRG Initiated Project which is also a Chartered KPC Expansion Project is 50% .

3.1.2   MRG     Exclusive     Projects     Which     MRG     Initiates. Notwithstanding anything herein to the contrary the following is agreed regarding MRG Exclusive Projects:

(i)      MRG is not required to offer any MRG Exclusive Project to KPC and/or its Affiliated Entities or to treat any MRG Exclusive Project which MRG initiates as an MRG Initiated Project.

(ii)     If MRG, in its unilateral discretion, elects to offer any MRG Exclusive Project (which MRG discovers or initiates) to KPC and/or its Affiliated Entities; then MRG may elect, in its sole discretion (with or without

5

ENB 00806

cause), to withdraw any such MRG Exclusive Project from KPC and/or its Affiliated Entities consideration, at any time until KPC and/or its Affiliated Entities and MRG and/or its Affiliated Entities have executed a definitive and binding independent agreement regarding KPC's and/or its Affiliated Entities' participation in the MRG Exclusive Project; i.e., MRG may elect to terminate the procedure set forth in this Section 3.1 and its subsections, vis-à-vis a MRG Exclusive Project which has become a MRG Initiated Project, and MRG may do so in its sole discretion, without any penalties, damages or rights inuring to KPC and/or its Affiliated Entities, up to the time that KPC and/or its Affiliated Entities and MRG and/or its Affiliated Entities have executed a definitive, independent and binding contract regarding the MRG Exclusive Project in question.

3.1.3   MRG Notice and Offer to KPC.  MRG shall provide KPC with a written notice (an "MRG Initiated Project Notice and Offer") of the formation or impending commencement of any MRG Initiated Project.  Each MRG Initiated Project Notice and Offer shall include with respect to the applicable MRG Initiated Project, to the extent such information is normally compiled for a Project of substantially similar breadth and scope or is necessary for KPC to make an informed decision as to whether KPC desires to participate in such MRG Initiated Project:  i) a detailed description of such MRG Initiated Project, ii) a feasibility study,  iii) proposed economic parameters, including financing plans, iv) identification of perceived necessary third party and governmental consents, v) other facts or information necessary material and reasonably available assessing the economic viability of such MRG Initiated Project, and vi) if the Project is a KPC Expansion Project, then the structure and/or ownership of the Project must be presented in order to show how the same could be accomplished as both a Chartered Project and as an Unchartered Project, unless it is materially less profitable for the Project to be structured as an Unchartered Project (in which case MRG shall explain why it is materially less profitable to structure the Project as an Unchartered Project and shall submit it only as a Chartered Project).  All KPC Expansion Projects must be structured such that each is an Unchartered KPC Expansion Project; unless i) it is materially less profitable to do so, or ii) the parties mutually agree to allow the Project to be a Chartered Project, or iii) structuring the Project as an Unchartered Project would jeopardize KPC's FERC charter as an interstate Gas pipeline; or iv) it is required by law or FERC for the Project to be a Chartered Project.  KPC has the right to prohibit MRG from pursuing a Chartered Project in which KPC has declined (overtly or by omission) to participate, and if it does so, then i) KPC nor its Affiliated Entities may not thereafter pursue such Chartered Project and/or Substantially Similar Project for a period of three (3) years thereafter,(unless resubmitted pursuant to this Agreement) and ii) KPC may, if possible, restructure the Project as an Unchartered Project and pursue the same.

3.1.4   KPC's Election to Participate.  KPC shall have 21 Business Days (the "Project Inquiry Period") from the receipt of an MRG Initiated Project Notice and Offer to make any additional inquiries regarding information it deems

6

ENB 00807

necessary to make an informed decision regarding participation in the applicable MRG Initiated Project. MRG shall use reasonable efforts, in good faith, to be responsive to any such additional inquiries made by KPC. If KPC desires to participate in a MRG Initiated Project, it must provide MRG with written notice prior to the lapse of the applicable Project Inquiry Period that KPC is willing to participate (a "KPC Participation Notice") in such MRG Initiated Project upon the terms and conditions set forth by MRG in the related MRG Initiated Project Notice and Offer, provided, however, that if KPC and MRG are maintaining a dialogue in good faith concerning additional information regarding the applicable MRG Initiated Project necessary for KPC to make an informed decision as to participation in such MRG Initiated Project, the Project Inquiry Period shall be extended until the earlier of ten (10) Business Days following the date after which either i) such additional information is furnished, or ii) MRG indicates in writing that no further information is available; or alternatively, until any date as KPC and MRG shall mutually agree to in writing.

3.1.5   Contract Drafting.   In the event KPC elects to participate in a MRG Initiated Project pursuant to Subsection 3.1.4, then MRG shall within thirty (30) days thereafter send to KPC a complete and binding legal offer setting forth in complete detail the contractual terms, which terms must include: the price to be paid; operating terms and conditions; construction, design and engineering budgets; finance terms; contractual rights, duties and obligations of the parties; representations and warranties of KPC in the Project; the business Entity or Person which shall own the Project; funding, cash distribution and capital call provisions; Project Development Fees, if any, and any other materially relevant contractual terms (hereafter referred to "MRG Proposed Terms"). Within thirty (30) days after receiving the MRG Proposed Terms, KPC shall indicate in writing its intention to accept or reject said MRG Proposed Terms ("KPC Acceptance Notice").

3.1.6   KPC's Confirmation Period, Acceptance and Declination.   In the event KPC elects to participate in a MRG Initiated Project pursuant to Subsection 3.1.5, KPC shall have 30 Days following the submission of a KPC Acceptance Notice (the "Confirmation Period") to arrange for and secure all necessary internal corporate approvals, and approvals and consents of or any Entity or Person necessary for KPC or an Affiliate of KPC to participate in the applicable MRG Initiated Project upon terms and conditions proposed in the MRG Proposed Terms and accepted pursuant to such KPC Acceptance Notice [including, but not limited to, any necessary approvals of KPC (egs. of partners, of Board of Directors, of shareholders, etc.) and/or the syndicate banks for any credit or other loan agreement to be used for financing such MRG Initiated Project].

If KPC elects to participate, KPC and its Affiliates shall use their reasonable commercial efforts, within the time frame description in this Subsection 3.1.6, to provide MRG Project Financing. Should KPC and its Affiliated Entities on more than one (1) occasion during the term of this

7

ENB 00808