PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULE

SECTION 6.11

### Section 6.11
### Violations of any laws by Company or Subsidiaries

None, except for any laws which may be violated by virtue of any default in the Note, the Operative Agreements, MarGasCo Credit Agreement and/or Syenergy Credit Agreement, and/or the Partnership Agreements of Syenergy Pipeline, LP and its Affiliated Entities, which violations may arise out of this Purchase Agreement, the transactions related hereto, including all transactions disclosed in the Schedules & Exhibits hereto and related transactions.

ENB 00959

EM001-007439

PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULE

SECTION 6.12

### Section 6.12
### Title to Properties

1.     As referred to in Schedules 6.8, certain Easements and Rights of Way associated with the sale of certain contracts in September and November of 1996 ("Sales Contracts" and "Closing Agreement") to KN Energy, Inc. ("KN"), and KN Interstate Service Transmission Co. ("KNI") were retained by KPC's predecessors, KPP, Riverside and/or Bishop Pipeline Company as to the rights of way for natural gas lines in addition to the first line laid by KNI and/or KN.

2.     The Company is in the process of assigning these retained rights from Bishop Pipeline Company, Riverside and KPP to KPC.  The Company is in the process of complying with its obligations regarding said easements as set forth in those Sales Contracts and the Closing Agreement, as well as seeking the compliance of KN and KNI regarding the same.

3.     All liens, encumbrances, mortgages, deeds of trust, financing statements, UCC's and security interests securing the Note, the Syenergy Credit Agreement and the MarGasCo Credit Agreement, or otherwise described as the Security Documents or Operative Agreements in the Note.

17

ENB 00960

EM001-007440

PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULE

SECTION 6.13

### Section 6.13
### List of all Employee Benefit Plans

1. HMO and PPO Medical Insurance provided by Blue Cross and Blue Shield of Kansas City; Group Policy No. 146490000001.

2. Dental Insurance provided by Guarantee Life Insurance Company; Group Policy No. 01-D002316

3. Kansas Pipeline Company 401(k) Plan Contract I.D. number 91 652407 with Equitable Life Insurance, Momentum Select Administrative Services

4. Life and Accidental Death & Dismemberment Insurance provided by Business Men's Assurance Company of America, Group Policy No. BGGR090614.

5. Long Term Disability Insurance provided by UNUM Life Insurance Company of America; Group Policy No. 0511983

6. Vision Insurance provided by Vision Service Plan, Group Policy No. 12 119645 0001 0001

7. Section 125 Plan consisting of Flexible Spending Benefit and Dependent Care Spending provided by Benefit America Group Policy No. 261438

8. Voluntary Products in Section 125 Plan provided by Colonial Insurance Company Group BCN No. E7189749-0000.

ENB 00961

EM001-007441

PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULE

SECTION 6.17

### Section 6.17
### Year 2000 Compatibility

Company defines Year 2000 compliance as the following:

The capability of a system to provide all of the following functions:

(a)    handle date information before, during and after January 1, 2000, including but not limited to accepting date input, providing date output and performing calculations on dates or portions of dates;

(b)    function accurately and without interruption before, during and after January 1, 2000, without any change in operations associated with the advent of the new century;

(c)    respond to two-digit year-date input in a way that resolves the ambiguity as to century in a disclosed, defined and predetermined manner; and

(d)    store and provide output of date information in ways that are unambiguous as to century.

Company has accessed its internal systems and devices and feel confident that they meet the above definition, however, Company's systems and devices, like that of any other service company has potential for problems created by other systems outside of the company. Therefore, Company cannot represent, warrant or guarantee that Company will be unaffected by the Year 2000 problem. Company is currently accessing that impact on our services. In light of that, Company has developed contingency plans in the event there is such an occurrence.

®

ENB 00962

EM001-007442

PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULE

SECTION 6.18

## Section 6.18
### List of all material gas sales, purchase, and transportation contracts
### (the Gas Contracts)

Gas Purchase Agreement between Greeley Gas Company and Kansas Pipeline Company, L.P., dated July 20, 1989 and amendments and exhibits thereto, if any.

Gas Sales and Purchase Agreement between Kansas Pipeline Partnership and United Cities Gas Company dated December 17, 1992 and amendments and exhibits thereto, if any.

Natural Gas Sales Agreement between United Cities Gas Co. and MarGasCo Partnership dated April 20, 1993 and amendments and exhibits thereto, if any.

Rate Schedule SCT-NN Small Customer Transportation Contract No. 110199 – 103100-1 SCT-NN dated March 23, 1999 between Kansas Pipeline Company and Greeley Gas Company, and Amendments and Exhibits thereto, if any.

Riverside I Agreement dated between Missouri Gas Energy, a division of Southern Union Company and Riverside Pipeline Company, L.P. dated February 24, 1995 and amendments and exhibits thereto, if any.

Mid-Kansas II Firm Gas Purchase Contract between Missouri Gas Energy, a division of Southern Union Company and Mid-Kansas Partnership dated February 24, 1995 and amendments and exhibits thereto, if any.

Gas Purchase Agreement between The Kansas Power and Light Company and Kansas Natural Partnership dated October 3, 1991 and amendments and exhibits thereto, if any.

Gas Transportation Service Agreement between The Kansas Power and Light Company and Kansas Natural Partnership dated October 3, 1991 and amendments and exhibits thereto, if any.

Form of Service Agreement Rate Schedule FT Contract No. FT 91-10-01 between Riverside Pipeline Company, L.P. and The Kansas Power and Light Company dated October 3, 1991 and amendments and exhibits thereto, if any.

Gas Transportation Service Agreement between The Kansas Power and Light Company and KansOk Partnership dated October 3, 1991 and amendments and exhibits thereto, if any.

451747.21

20

ENB 00963

EM001-007443

Gas Transportation Service Agreement between The Kansas Power and Light Company and Kansas Pipeline Partnership dated October 3, 1991 and amendments and exhibits thereto, if any.

Gas Transportation Service Agreement between Kansas Power and Light Company and Kansas Natural Partnership dated October 3, 1991 and amendments and exhibits thereto, if any.

Form of Service Agreement Rate Schedule FT Contract No. FT-91-10-01 between Riverside Pipeline Company, L.P. and The Kansas Power and Light Company dated October 3, 1991 and amendments and exhibits thereto, if any.

Gas Transportation Service Agreement between Kansas Power and Light Company and KansOk Partnership dated October 3, 1991 and amendments and exhibits thereto, if any.

Gas Purchase Agreement between The Kansas Power and Light Company and Kansas Pipeline Company, L.P. dated August 8, 1988 and amendments and exhibits thereto, if any.

Firm Gas Purchase Contract (Paola and Osawatomie, Kansas) between Western Resources, Inc. and Kansas Pipeline Partnership dated February 28, 1995 and amendments and exhibits thereto, if any.

Firm Gas Purchase Contract (Ottawa, Kansas) between Western Resources, Inc. and Kansas Pipeline Partnership dated February 28, 1995.

Firm Gas Purchase Contract (Johnson and Wyandotte Counties, Kansas) between Western Resources, Inc. and Kansas Pipeline Partnership dated February 28, 1995.

Gas Transportation Service Agreement between Western Resources, Inc. and Kansas Pipeline Partnership dated February 28, 1995.

Amended and Restated Agreement of Lease and Amended and Restated Operating Agreement between TransOk, Inc., and KansOk Partnership dated April 24, 1992 and amendments and exhibits, thereto.

Settlement Agreement between Transok, LLC, KansOk Partnership, Kansas Pipeline Company, Bishop Pipeline Company, MarGasCo Partnership, Kansas Natural and KansOk, Inc. dated April 1, 1999, and amendments and exhibits thereto.

Rate Schedule IT Interruptible Transportation Service Form of Transportation Agreement Contract No. 060198-053100-2-IT between Kansas Pipeline Company, L.P. and Greeley Gas Company, a Division of Atmos Energy Corporation dated June 1, 1998, and amendments and exhibits thereto.

Rate Schedule IT Interruptible Transportation Service Form of Transportation Agreement Contract No. 060198-053100-3-IT between Kansas Pipeline Company, L.P. and United Cities Gas Company, a Division of Atmos Energy Corporation dated June 1, 1998, and amendments and exhibits thereto.

ENB 00964

EM001-007444

Rate Schedule IT Interruptible Transportation Service Form of Transportation Agreement Contract No. 060198-053100-1-IT between Kansas Pipeline Company, L.P. and MarGasCo Partnership dated June 1, 1998, and amendments and exhibits thereto.

Rate Schedule IT Interruptible Transportation Service Form of Transportation Agreement Contract No. 090198-083100-1-IT between Kansas Pipeline Company, L.P. and Oneok Gas Marketing Company dated September 1, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Allen Press dated November 23, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Alvamar Country Club dated September 7, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and American Camper dated October 21, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Aramark dated April 27, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Asphalt Plant Sales dated April 21, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Auto Plaza Car Wash dated January 12, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and B & G Plating dated July 9, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and BDP d/b/a Duds n Suds dated October 22, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Barbour Concrete dated April 4, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Beverly Health and Rehabilitation dated September 26, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Brandon Woods Retirement Community dated January 12, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Brannon Sand & Gravel dated May 22, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Brown Cargo Van dated December 31, 1996, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and CINTAS dated June 8, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Cargill dated September 24, 1999, and amendments and exhibits thereto.

ENB 00965

EM001-007445

Natural Gas Sales Contract between Petro Source Gas Ventures and Century Concrete dated January 16, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Chronicle Publishing (KAKE TV) dated December 8, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Claflin Farmers Coop dated February 17, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Coffey County Hospital dated November 3, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Coleman Company dated November 21, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Colgate Palmolive dated September 10, 1996, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Continental Cast Stone dated March 10, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Cooper, Inc. a/k/a Fabric Care Center dated June 16, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Cornejo & Sons, Inc. dated September 22, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Country Kitchen dated April 3, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Crown Automotive dated March 1, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Curtis Manufacturing dated January 21, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and DeLine Box dated April 14, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Decatur Good Samaritan Center dated May 14, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Desoto Schools dated July 1, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Douglas County dated October 14, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Earth Grains Company dated April 8, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and East Heights United Methodist dated July 16, 1997, and amendments and exhibits thereto.

ENB 00966

EM001-007446

Natural Gas Sales Contract between MarGasCo Partnership and Eaton Corporation dated September 24, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and El Dorado Correctional dated November 19, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Elkhart Schools dated June 8, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Ellsworth Correctional dated November 19, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and FCMP, Inc. dated June 27, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and FMC Corporation dated April 3, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Ferroloy Foundry dated May 8, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and First Methodist Lawrence dated February 12, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and First United Methodist ICT dated February 12, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Fowler Schools dated January 21, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Fowler Skilled Nursing dated June 25, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Free State Brewing dated February 26, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and GNB Battery dated November 19, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and GT Sales & Manufacturing dated March 16, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Garage Door Group dated May 18, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Garden City Community College dated December 12, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Tom Garner dated May 27, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Georgia Pacific dated (undated) , and amendments and exhibits thereto.

451747.21

24

ENB 00967

EM001-007447

Natural Gas Sales Contract between MarGasCo Partnership and Golf Course Superintendents dated September 2, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Good Shepherd Catholic Church dated June 30, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Green Thumb Gardens dated April 27, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Greensburg Schools dated May 23, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Gregory, Inc. dated December 11, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Hanston Schools dated June 18, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Hehr International dated March 24, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Hoechst Marion Roussel dated October 1, 1991, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Holliday Sand & Gravel dated July 1, 1993, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Huff's Gardens dated October 4, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Hugoton USD 210 dated June 8, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Idaho Timber Corporation dated March 9, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Immaculata High Schools dated August 9, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Industrial Chrome, Inc. dated May 14, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Inland Paperboard & Packaging, Inc. dated April 7, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and J & P Cattle dated May 1, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Jardine-Edison Junior Academy dated September 16, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and KC Container dated March 8, 1999, and amendments and exhibits thereto.

ENB 00968

EM001-007448

Natural Gas Sales Contract between MarGasCo Partnership and Kansas City, Kansas dated August 3, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Kreonite dated June 4, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and LMB Corporation a/k/a Mt. Oread dated August 11, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Kansas Dept. of Administration (Lansing Correctional) dated November 19, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Lawrence Housing Authority dated August 10, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Lawrence Presbyterian Manor dated January 20, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and City of Leavenworth dated October 30, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Lennox Industries dated October 10, 1996, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Liberal Good Samaritan Hospital dated June 20, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Liberty Hall dated February 12, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Liebherr Mining Equipment dated June 21, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Little Joes Car Wash dated May 26, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Lone Tree Retirement dated July 17, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Lyon County Health Dept., dated March 11, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Macon Municipal Utilities dated April 23, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Maize Schools dated May 3, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Corporation and Meade District Hospital dated September 9, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Meridian Laundry dated January 27, 1998, and amendments and exhibits thereto.

ENB 00969

EM001-007449

Natural Gas Sales Contract between Petro Source Gas Ventures and Metropolitan Baptist Church dated May 1, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Miami County Medical Center dated July 1, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Montezuma USD #371 dated June 8, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Morrow Foundry dated May 27, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and College Church of Nazarene dated February 1, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Corporation and Omega Concrete dated April 16, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and PERG Building (Block Asset) dated March 5, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Packer Ware dated October 26, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Pawhuska Public Schools dated April 7, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Penny's Concrete dated August 9, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Petroleum Building dated December 1, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Phillips Pipeline dated September 25, 1996, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Phillips Pipeline dated September 12, 1991, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Phillips Pipeline dated August 1, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Phillips Pipeline dated October 10, 1996, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Phillips Pipeline dated May 6, 1994, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Players Sport Bar dated September 13, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Plaza West Care Center dated December 19, 1996, and amendments and exhibits thereto.

ENB 00970

EM001-007450

Natural Gas Sales Contract between MarGasCo Partnership and Purina Mills dated February 2, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and RACO Car Wash dated March 6, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and RSA Microtech (Ruffin) dated July 28, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Rainbow Mental Health Facility dated May 20, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Rawlins County Health dated August 6, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Reuter Organ dated February 16, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Riverview Condominium dated May 12, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Ron Wright dated June 1, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Roto-Mix dated May 23, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Corporation and Satanta District Hospital dated July 1, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Satanta USD 507 dated June 8, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Seiling Public Works dated December 10, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Sisters of St. Joseph dated August 6, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Standard Motor Products dated September 11, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Star Lumber and Supply dated January 13, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Sterling Farmers Coop dated February 17, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Corporation and Stevens County Hospital dated June 25, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Sublette Schools dated June 23, 1998, and amendments and exhibits thereto.

ENB 00971

EM001-007451

Natural Gas Sales Contract between MarGasCo Partnership and Sunrise Garden Center dated January 25, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Superior Automotive dated November 12, 1996, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Superior Linens dated November 13, 1995, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Town of Taloga dated December 29, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Tamko, Inc. dated December 22, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Overland Pizza Company dated January 26, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Kansas Dept. of Admn. (Topeka Correctional) dated November 19, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Corporation and Trinity Association dated July 3, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Udall Schools dated September 2, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Village Inns of Wichita dated July 31, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Vivi Public Works dated December 10, 1998, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and W.W. Manufacturing dated January 15, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Wallace Energy dated July 9, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Watkins Steel dated June 30, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Gas Ventures and Wellington Farmers Coop dated October 28, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between Petro Source Corporation and Wichita County Health Center dated August 11, 1997, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Williamette Industries dated August 23, 1999, and amendments and exhibits thereto.

Natural Gas Sales Contract between MarGasCo Partnership and Williams Foods dated February 4, 1999, and amendments and exhibits thereto.

451747.21

ENB 00972

EM001-007452

Natural Gas Sales Contract between Petro Source Gas Ventures and Youthville United Methodist dated May 18, 1998, and amendments and exhibits thereto.

Petro Source Gas Ventures Agreements and Petro Source Corporation Agreements were acquired by MarGasCo Partnership pursuant to an Agreement with Petro Source Corporation dated September 22, 1998, and amendments and exhibits thereto.

**Miscellaneous Agreements:**

Settlement Agreement between Western Resources, Inc., The Bishop Group, Ltd., Bishop Pipeline Company, Kansas Pipeline Operating Company, Kansas Pipeline Partnership, Riverside Pipeline Partnership, Mid-Kansas Partnership, Syenergy Pipeline Company, L.P., Riverside Pipeline Company, L.P., Citizens' Utility Ratepayer Board and the Staff of the Kansas Corporation Commission dated July 9, 1997.

Settlement, Release, Indemnity and Assignment Agreement effective February 24, 1995 between Southern Union Company, a division of which is Missouri Gas Energy and each of the following entities, jointly and severally:  The Bishop Group, Ltd., Bishop Pipeline Company, Kansas Natural Partnership, Kansas Pipeline Partnership, KansOk Partnership, Mid-Kansas Partnership, Riverside Pipeline Partnership, Riverside Pipeline Company, L.P., Syenergy Pipeline Company, L.P., Kansas Pipeline Operating Company and MarGasCo Partnership.

Settlement Agreement and Release – Linchpin and Wraparound Issues made on the 28th day of February, 1995 by and between Western Resources, Inc., The Bishop Group, Ltd., Bishop Pipeline Company, Kansas Pipeline Operating Company, Kansas Natural Partnership, KansOk Partnership, Kansas Pipeline Partnership, Riverside Pipeline Partnership Mid-Kansas Partnership, Syenergy Pipeline Company, L.P., Riverside Pipeline Company, L.P.

Settlement Agreement and Release – Regulatory Issues made on the 28th day of February, 1995 by and between Western Resources, Inc. The Bishop Group, Ltd., Bishop Pipeline Company, Kansas Pipeline Operating Company, Kansas Natural Partnership, KansOk Partnership, Kansas Pipeline Partnership, Riverside Pipeline Partnership Mid-Kansas Partnership, Syenergy Pipeline Company, L.P., Riverside Pipeline Company, L.P.

Limited Release of Western Resources to Southern Union Company (1995).

ENB 00973

EM001-007453

PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULE

SECTION 6.19

Section 6.19
Breaches of any Gas Contracts or written notices from any
party indicating an intent to rescind or dishonor any Gas Contract

1.　　Section 6.8 "Pending Claims" describing KGS filed lawsuit, which alleges KPC's breach of the KCC Settlement Agreement and other agreements and requests a monetary judgment and setting aside all of KGS's contracts with KPC as a remedy.

2.　　See Section 6.8 "Pending Claims", describing that MGE has indicated to KPC its belief that the 2% escalator clause under the Mid-Kansas II Agreement and/or the Riverside I Agreement is no longer applicable.

451747.21

31

ENB 00974

EM001-007454

PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULE

SECTION 6.21

### Section 6.21
### Noncompliance with any tariff

None, except for those tariff provisions set forth in CP96-152-000 and/or RP99-485-000 and related dockets which have not yet been adopted by FERC in its current form.

451747.21

32

ENB 00975

EM001-007455

PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULE

SECTION 6.22

**Section 6.22**
**Gas Imbalances**

KPC - <$97,282>

MarGasCo - <$12,168.60>

33

ENB 00976

EM001-007456

PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULE

SECTION 8.1

Section 8.1
Exceptions to Ordinary Course Covenants

1.      Prior to the Closing, the Excluded Assets including certain cash payments and other obligations will be distributed to Stockholder as part of a Partial Redemption of Stockholder's Shares in The Bishop Group, Ltd.

2.      Prior to Closing, Management Resources Group, Ltd. will change its name to Bishop Management, Inc. and assign all rights to the name "Management Resources Group," to Stockholder or his designees.

3.      Prior to Closing, KPC and/or Syenergy will forgive on its books the Butcher Interest payment, due to the Holders thereof.

4.      Prior to or at Closing, (i) KPC and MRG will have executed and delivered a Project Development and MRG Interests Agreement, (ii) MarGasCo and MRG will have executed and delivered a Project Development Agreement (guaranteed by KPC) and (iii) KPC, MarGasCo and MRG will have executed and delivered an Option Agreement relating to the agreements described in (i) and (ii).

5.      Prior to or substantially simultaneous with Closing, Buyer is providing funds to pay off or cause to be paid off and/or purchase or cause to be purchased the Notes, Security Documents and/or the Operative Agreements and the Make Whole Premium applicable thereto and related costs.

6.      Prior to or at Closing, BGL is partially redeeming certain shares of Stockholder in BGL in exchange for the distribution of the Excluded Assets to Stockholder.

7.      Prior to or at Closing, The Bishop Group, Ltd. will change its name to "K-Pipe Group, Inc." and assign all rights and the name "The Bishop Group, Ltd." to Stockholder or his designees.

8.      Prior to or at Closing, KPC will may have executed and/or delivered a Purchase Agreement, Management Agreements, Master Interchange Agreements and Owners Agreements to purchase an interest in a Beechjet 400 airplane not to exceed 25% and a 6.25% interest in a Hawker 800 airplane.

ENB 00977

EM001-007457

9.      Any and all terminations of employment contracts and/or consulting agreements, or other documents, necessary to carry out the provisions of Schedule 9.2 hereto.

10.      All other transactions necessary or required to consummate or carryout the transactions contemplated by or set forth in the Purchase Agreement and it Schedules and/or Exhibits.

ENB 00978

EM001-007458

PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULE

SECTION 10.2(d)

Section 10.2(d)
Consents from Secured Lenders

Consents, waivers and/or releases, required as a result of the transactions contemplated by the Purchase Agreement, its Schedules and exhibits , and related documents, as well as those described in Section 8.1 of this Company Disclosure Schedule, are needed from the Noteholders, Chase Manhattan Bank, N.A., the State Street Bank and Trust Company and the partners of KPC, MGC, Syenergy, KPP, KOP, Mid-Kansas and Riverside Pipeline Company, L.P.

ENB 00979

EM001-007459

## STOCK PURCHASE AGREEMENT
## SCHEDULE PREAMBLE

### Buyer Disclosure Schedule

This preamble is attached to and made a part of the attached Buyer Disclosure Schedule, which has been delivered by the Buyer to Dennis M. Langley pursuant to the terms of the Stock Purchase Agreement dated as of October 25, 1999, by and among such parties (the "Agreement"). Capitalized terms used but not defined in this Preamble shall have the meaning given them in the Agreement. .

Any information set forth in the Buyer Disclosure Schedule that is not required to be disclosed pursuant to the Section of the Agreement to which such Section of the Buyer Disclosure Schedule relates is provided for informational purposes only and shall not be construed as expanding or modifying the Buyer's representation or warranty contained therein.

The disclosure of a particular item or matter in a Section of the Buyer Disclosure Schedule shall not be construed as an admission by the Buyer that such item or matter falls within the scope of any materiality threshold or other qualifications or limitations set forth in the representation or warranty to which section of the Buyer's Disclosure Schedule relates.

ENB 00980

KC01DOCS/456208.01

1

PURCHASE AGREEMENT
BUYER DISCLOSURE SCHEDULE

SECTION 7.8

Section 7.8
Environmental Laws and Regulations

None

ENB 00981

EM001-007461

PURCHASE AGREEMENT
BUYER DISCLOSURE SCHEDULE

SECTION 7.9

Section 7.9
Compliance with Applicable laws

None

ENB 00982

EM001-007462

PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULE

SECTION 1.1(A)

### Schedule 1.1(A)
### List of Affiliates

Ownership of 100% of all of the Shares of Common Stock of The Bishop Group, Ltd.

Ownership of 2,000 Shares Common Stock of E & C Group, Inc. (100% wholly owned)

Ownership of 260 Shares Common Stock of The Bishop Corporation by E & C Group, Inc. being 100% wholly owned.

Ownership of 76 Shares Common Stock of Bishop Management, Inc., f/k/a Management Resources Group, Ltd. (100% wholly owned) Note: prior to Closing name was changed to Bishop Management, Inc. and the right to use "Management Resources Group," shall be assigned to Stockholder.

Ownership of 1,000 Shares Common Stock of Bishop Pipeline Company (100% wholly owned)

Ownership of 165,000 Shares Common Stock of Bishop Gas Transmission Company by virtue of Bishop Pipeline Company being 100% wholly owned

Ownership of 1000 Shares Common Stock of Kansas Pipeline Operating Company by Kansas Pipeline Company. (Corporation was dissolved on October 18, 1999)

Syenergy Pipeline Company, L.P., a limited partnership consisting of Bishop Pipeline Company owning a 55.6% general partnership interest and a 33.5% limited partnership interest and by Bishop Gas Transmission Company owning a 10.9% limited partnership interest.

Kansas Pipeline Company, formerly known as Riverside Pipeline Partnership, a general partnership consisting of Syenergy Pipeline Company, L.P. owning a 99.9% general partnership interest and Bishop Pipeline Company owning a .1% general partnership interest.

Riverside Pipeline Company, L.P., a general partnership consisting of Kansas Pipeline Company, formerly known as Riverside Pipeline Partnership owning a 50% general partnership interest and Syenergy Pipeline Company, L.P. owning a 50% general partnership interest

Kansas Pipeline Partnership, a general partnership consisting of Syenergy Pipeline Company, L.P. owning a 99.9% general partnership interest and Bishop Pipeline Company owning a .1% general partnership interest.

ENB 00983

EM001-007463

KansOk Partnership, a general partnership consisting of Syenergy Pipeline Company, L.P. owning a 99.9% general partnership interest and Bishop Pipeline Company owning a .1% general partnership interest.

Mid-Kansas Partnership, a general partnership consisting of Syenergy Pipeline Company, L.P. owning a 99.9% general partnership interest and Bishop Pipeline Company owning a .1% general partnership interest.

MarGasCo Partnership, a general partnership consisting of Syenergy Pipeline Company, L.P. owning a 99.9% general partnership interest and Bishop Pipeline Company owning a .1% general partnership interest.

Ownership of 99.9% of the limited liability company interests in Bishop Rink Holdings, LLC

Ownership of 99.9% of the limited liability company interests in KP Operating Company, LLC

ENB 00984

EM001-007464

SCHEDULE 1.1B

## TAX SHARING AGREEMENT

THIS TAX SHARING AGREEMENT (this "Agreement") is made as of November __, 1999 by and among K-Pipe Merger Corporation, a Delaware corporation ("Buyer") and DENNIS M. LANGLEY ("Stockholder") (Buyer and Stockholder are hereinafter sometimes collectively referred to as the "Parties" and individually as a "Party").

### PREMISES

WHEREAS, Buyer and Stockholder have entered into a Stock Purchase Agreement dated as of October 25, 1999 (the "Stock Purchase Agreement"), whereby the Stockholder will sell and transfer 100% of the Common Stock of The Bishop Group, Ltd., a Kansas corporation (the "Company") to the Buyer on the terms stated therein; and

WHEREAS, Section 1.1 of the Stock Purchase Agreement requires the execution and delivery of this Agreement at the Closing provided for in the Stock Purchase Agreement; and

WHEREAS, Buyer and the Stockholder intend that this Agreement shall govern the Tax matters relevant and necessary for the Stock Purchase Agreement.

### AGREEMENTS

NOW, THEREFORE, in consideration of the Premises and mutual agreements herein contained, the parties agree as follows:

Section 1.     Definitions

As used in this Agreement, the following terms have the meanings set forth in this Agreement. Any capitalized terms not defined herein shall have the meanings ascribed to such terms in the Stock Purchase Agreement. All Article and Section numbers used in this Agreement refer to Articles and Sections of this Agreement, unless otherwise specifically indicated.

"Adverse Consequences" means all debts, obligations, losses, costs of investigation and defense, damages, liabilities, claims, judgments, awards, settlements, taxes, penalties, fines, assessments and other costs and expenses (including any prejudgment interest in any litigated or arbitrated matter) which may be incurred, made or levied; provided, however, that such term shall not include any punitive or exemplary damages.

"Breach" of a representation, warranty, covenant, obligation or other provision of this Agreement, the Stock Purchase Agreement or any instrument delivered pursuant to either such agreement will be deemed to have occurred if there is or has been (i) any inaccuracy in or breach of, or any failure to perform or comply with, such representation, warranty, covenant, obligation or other provision, or (ii) any other occurrence or circumstance that is or was inconsistent with such representation, warranty, covenant, obligation or other provision, and the term "Breach" means any such inaccuracy, breach, failure, occurrence or circumstance.

ENB:00985

"Closing Date" shall be the date specified in Article 2.2 of the Stock Purchase Agreement for the Closing of the Transaction.

"Income Taxes" means any Tax imposed on or measured by income.

"Ordinary Course Tax Liabilities" means the amount as of the Closing Date, of Tax liabilities that are reflected or reserved against in the books and records of the Company and its Affiliates.

"Other Taxes" means any Taxes other than an Income Taxes.

"Post-Closing Tax Period" means any Tax period beginning after the Closing Date.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date.

"Pre-Closing Income Tax Liability" means any liability arising or resulting from Income Taxes imposed on the Company for any Pre-Closing Tax Period.

"Seller Group" means, collectively, the Stockholder and, at any time before the Closing, the Transferred Entities.

"Stock Purchase Agreement" means the Stock Purchase Agreement described in the Premises.

"Stub Period" means the period from January 1, 1999 through and including the Closing Date.

"Straddle Period" means any Tax period that begins on or prior to and ends after the Closing Date.

"Tax" or "Taxes" means any federal, state, local, or foreign income tax (including any alternative or add-on minimum tax) or franchise tax, any sales, use, excise, gross receipts or value added tax, any intangibles tax, any tax resulting from membership in a Tax Group or departure from a Tax Group, any tax on real or personal property, any profits, capital, premium occupational, production, severance, ad valorem, occupancy, stamp, transfer, unemployment insurance, social security, disability, workers' compensation, customs, withholding, or other tax, duty or similar governmental charge or any deposit required to be made with respect thereto, including all interest and penalties thereon and additions thereto.

"Tax Arbitrator" means a mutually agreeable so-called "Big 5" accounting firm.

"Tax Group" means any group of entities that pays, or is required to pay, Tax on a consolidated, combined, unitary or similar basis.

ENB 00986

EM001-007466

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Tax Sharing Agreement" means any written agreement or arrangement for the allocation or payment of Tax liabilities or payment for Tax benefits, including any agreement with respect to a consolidated, combined or unitary Tax Return which Tax Return includes the Company.

"Taxing Authority" means any governmental entity responsible for the imposition of Taxes.

"Transferred Entities" means the Company and its direct and indirect Affiliates and Subsidiaries.

Terms not set forth in this Section 1.1, but otherwise defined in the body of this Agreement shall have the specific meanings attributed to them in the text hereof. Terms in the singular shall have the same meanings when used in the plural and vice versa.

Section 2.    Over-Accrual Refunds for Pre-Closing Tax Periods.

(a)    Stub Period. To the extent the accruals of Ordinary Course Tax Liabilities (which amounts will be provided to Buyer pursuant to Article V of the Stock Purchase Agreement) exceed the amount of Taxes owed for the Stub Period, Buyer will refund such amounts within fifteen (15) days after filing its Federal Income Tax Return or other relevant return for calendar year 1999. To the extent Buyer directly or indirectly receives a refund of Income Taxes or other Taxes for any Pre-Closing Tax Period, Buyer will pay such amount to Stockholder within five (5) business days of the receipt of such amount by Buyer. Buyer will make all relevant books and records available to Stockholder and his agents to review the accuracy of any payment (or non-payment) to be made hereunder to the extent the audit by Stockholder reveals there was an underpayment of amounts owed hereunder by Buyer, Buyer will pay interest on such underpayment at 18% per annum.

Section 3.    Buyer Tax Liability

(a)    Income Tax Liability. Buyer agrees to indemnify the Stockholder against and holds him harmless from, any liability resulting from (i) Income Taxes imposed on any of the Transferred Entities for any Post-Closing Tax Period and (ii) all liability for fees, costs and expenses including reasonable attorneys' fees arising out of or incident to any proceeding before any Taxing Authority or any judicial authority with respect to any amount indemnifiable under this Section 3(a).

(b)    Other Taxes. Buyer agrees to indemnify Stockholder against and hold him harmless from (i) all Other Taxes of the Transferred Entities attributable to any Post-Closing Tax Period, and (ii) all liability for fees, costs and expenses including reasonable attorneys' fees

ENB 00987

EM001-007467

arising out of or incident to any proceeding before any Taxing Authority or any judicial authority with respect to any amount indemnifiable under this Section 3(b).

(c)     Return Preparation. The Buyer shall at its expense retain Ernst & Young (or other accounting firm acceptable to Stockholder) to prepare and Buyer shall file, or cause to be filed, on a timely basis all Tax Returns with respect to the Buyer and any Transferred Entities for any Post-Closing Tax Period and any Straddle Period. In the case of any Tax Return which includes a Straddle Period, Buyer shall provide Stockholder with a copy of such pro forma Tax Return ending on the Closing Date and the basis for the calculation of any such Tax due thereon with respect to the portion of such Straddle Period ending on the Closing Date at least thirty (30) days before such Tax Return is due. If Stockholder objects to Buyer's calculation of the portion of such Tax with respect to the portion of such Straddle Period ending on the Closing Date, Stockholder shall within fifteen (15) days of receipt of such Tax Return notify Buyer of such objection. The parties shall attempt to resolve such dispute prior to the due date of such Tax Return and if unable to resolve such dispute prior to the due date of such Tax Return, the dispute shall be referred to the Tax Arbitrator, who shall resolve the dispute. If necessary, Buyer shall seek any available extensions to delay filing the Tax Return to resolve such disputes. Notwithstanding the foregoing, if the dispute is not resolved, the Tax Return shall be filed by such Tax Return's due date (including extensions) as proposed by Stockholder, unless the Tax Arbitrator determines that it is more likely than not that penalties would be proposed by the relevant taxing authority if the Tax Return is filed as requested or Stockholder,.

Section 4.     Buyer's Covenants

(a)     With respect to any Pre-Closing Tax Period, Straddle Period, Stub Period or Post-Closing Tax Period, Buyer covenants that it will not, nor will it permit any of the Transferred Entities that it then controls to, make or change any Tax election, amend any Tax Return, take any Tax position on any Tax Return or take any new action (including a change in the pricing of related party sales, services, royalties or other payments or allocations subject to Section 482 of the Code) that results in an increased Tax liability (including any increase resulting from a reduction of any Tax credits) in respect of any Pre-Closing Tax Period, Straddle Period or Stub Period, except with the express written consent of the Stockholder.

(b)     Buyer agrees that Stockholder shall not be liable for any Adverse Consequences resulting from any action referred to in Section 4(a), and the Buyer agrees to indemnify and hold the Stockholder harmless against any such Adverse Consequences. Notwithstanding anything contained herein to the contrary, the Parties agree that the monetary remedy provided by this Section 4(b) shall be the exclusive remedy of the Stockholder in the event of any Breach by the Buyer of Section 4(a).

Section 5.     Seller's Covenants

(a)     With respect to any Post-Closing Period or Straddle Period, the Stockholder covenants that he will not, nor will he cause any Transferred Entity then within his control to, make or change any Tax election, amend any Tax Return, take any Tax position on any Tax Return or take any new action (including a change in the pricing of related party sales,

ENB 00988

EM001-007468

services, royalties, or other payments or allocations subject to Section 482 of the Code) that results in an increased Tax liability (including any increase resulting from a reduction of any Tax credits) in respect of any Post-Closing Tax Period or Straddle Period, except with the express written consent of Buyer.

(b)     The Stockholder agrees that Buyer shall not be liable for any Adverse Consequences resulting from any action referred to in Section 5(a) and the Stockholder agrees to indemnify and hold the Buyer harmless against any such Adverse Consequences. Notwithstanding anything contained herein to the contrary, the Stockholder and Buyer hereby agree that the monetary remedy provided by this Section 5(b) shall be the exclusive remedy of the Buyer in the event of any Breach by the Stockholder of Section 5(a).

Section 6.     Cooperation on Tax Matters

(a)     Stockholder and Buyer shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information (including access to books and records) and assistance relating to the Transferred Entities as is reasonably necessary for the filing of any Tax Return, the preparation for any Tax audit, the prosecution or defense of any claim, suit or proceeding relating to any proposed Tax adjustment for which Stockholder or Buyer may have liability under this Agreement and for the performance by Stockholder and Buyer of their respective obligations under this Agreement. Stockholder and Buyer shall keep all such information and documents received by them confidential unless otherwise required by law.

(b)     Buyer agrees to retain or cause to be retained all books and records pertinent to the Transferred Entities that are in its control until the applicable period for assessment of Taxes under applicable law (giving effect to any and all extensions or waivers) had expired, and to abide by and cause the Transferred Entities to abide by, all record retention agreements entered into with any Taxing Authority. Buyer agrees to give the Stockholder reasonable notice prior to transferring, discarding or destroying any such books and records relating to Tax matters and, if so requested, Buyer shall allow the Stockholder to take possession of such books and records.

(c)     Buyer and Stockholder shall cooperate with each other in the conduct of any audit or other proceedings for any Tax purposes and each of Buyer and Stockholder shall execute and deliver such powers of attorney and other documents as are necessary to carry out the intent of this Agreement.

(d)     To the extent as a result of an audit or otherwise additional amounts becoming owing for Income Taxes or Other Taxes for any Pre-Closing Tax Period, any calculation of Adverse Consequences shall take into account the timing of any future allowed deductions which may be disallowed during the Pre-Closing Tax Period.

Section 7.     Indemnification Procedures

(a)     All amounts paid under this Agreement shall be characterized for Tax purposes as an adjustment to the purchase price.

ENB 00989

EM001-007469

(b)     Any claim by either Party for indemnification for Adverse Consequences under this Agreement shall be made by notifying the other Party and following the procedures set forth in this Agreement. No Party hereto shall have any liability for the payment of any Adverse Consequences to the extent attributable to or resulting from any action taken by the other Party, its Subsidiaries or Affiliates, in contravention of such Party's covenants hereunder.

(c)     (i)     Notice of Claims.  If any Taxing Authority or other third party shall notify any Party (the "Indemnified Party") with respect to any matter which may give rise to a claim for indemnification (a "Third Party Claim") against the other Party (the "Indemnifying Party") under Sections 2 and 3 of this Agreement, then the Indemnified Party shall promptly provide written notice to the Indemnifying Party setting forth reasonable detail as to such Third Party Claim (a "Notice of Claim").  It shall be a condition to indemnification hereunder that the Notice of Claim be delivered promptly and be received by the Indemnifying Party prior to the time the Indemnifying Party's ability to contest the Third Party Claim would be materially impaired by such lack of notice or delay.  If the Indemnified Party fails to meet the foregoing condition then it shall have waived all rights to indemnification with respect to such Third Party Claim.

(ii)     Defense of Third Party Claims.

(A)     The Indemnifying Party may and shall be deemed to undertake the defense of a Third Party Claim unless the Indemnifying Party delivers notice to the contrary to the Indemnified Party not later than the earlier of (i) sixty (60) calendar days after receipt by the Indemnifying Party of the Notice of Claim or (ii) fifteen (15) calendar days prior to the first required date of response to a Third Party Claim.

(B)     If the Indemnifying Party undertakes the defense of any Third Party Claim, it shall control the investigation and defense thereof, except that the Indemnifying Party shall not require the Indemnified Party without the Indemnified Party's prior written consent (such consent not to be unreasonably withheld or delayed), to take or refrain from taking any action in connection with such Third Party Claim, or make any public statement that it reasonably considers to be against its interest, nor shall the Indemnifying Party, without the prior written consent of the Indemnified Party (such consent not to be unreasonably withheld or delayed), consent to any settlement that requires the Indemnified Party to make any payment that is not fully indemnified under this Agreement; and subject to the Indemnifying Party's control rights, the Indemnified Party may participate in such investigation and defense, at its own expense, including, but not limited to, the right to attend (with counsel) all proceedings connected with such Third Party Claim and receive copies of any correspondence received or sent in connection with such Third Party Claim.

ENB 00990

EM001-007470

(C)     If the Indemnifying Party does not undertake the defense of a Third Party Claim the Indemnified Party shall control such investigation and defense and may consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim in any manner it may deem reasonably appropriate (and the Indemnified Party need not consult with, or obtain any consent from, the Indemnifying Party in connection therewith), except that the Indemnified Party shall not require the Indemnifying Party without the Indemnifying Party's prior written consent, to take or refrain from taking any action in connection with such Third Party Claim, or make any public statement that it reasonably considers to be against its interest, nor shall the Indemnified Party, without the prior written consent of the Indemnifying Party (such consent not to be unreasonably withheld or delayed), consent to any settlement that requires the Indemnifying Party to make any payment under this Agreement and subject to the Indemnified Party's control rights, the Indemnifying Party may participate in such investigation and defense, at its own expense, including, but not limited to, the right to attend (with counsel) all proceedings connected with such Third Party Claim and receive copies of any correspondence received or sent in connection with such Third Party Claim.

(D)     In the event that a Third Party Claim as to which Sellers are the Indemnifying Party is part of a larger proceeding also involving a Third Party Claim as to which Buyer is the Indemnifying Party, Buyer and Sellers shall use their reasonable best efforts to segregate such Third Party Claims so that the control provisions of Sections 7(d)(ii)(A), (B) and (C) may be applied separately as to each such Third Party Claim.

(E)     Buyer and Stockholder shall make available to each other, their counsel and other representatives, all information and documents reasonably available to them which relate to any Third Party Claim, and otherwise cooperate as may reasonably be required in connection with the investigation and defense thereof.

Section 8.     Refunds

(a)     Stockholder.  To the extent requested by Stockholder and at the sole expense of Stockholder, Buyer shall as promptly as practicable claim any refunds relating to Taxes for which the Stockholder is responsible.  If, after the Closing Date, Buyer receives any refund relating to Taxes for which the Stockholder is responsible, Buyer shall promptly transfer, or cause to be transferred, the amount of such refund (net of any reasonable expenses incurred by the Buyer in obtaining such refund, including Income Tax liability directly arising from the receipt of such refund, if any) to Stockholder.

(b)     Buyer.  Buyer shall be entitled to receive and retain any refunds of Tax relating to the Transferred Entities with respect to any Post-Closing Tax Period.

Section 9.     Survival; Tax Sharing Agreements.

(a)     Survival.  Notwithstanding anything to the contrary in this Agreement, and notwithstanding anything to the contrary in the Stock Purchase Agreement, the representations,

ENB 00991

EM001-007471

covenants and obligations of the Parties set forth in this Agreement shall be unconditional and absolute and shall remain in effect until the expiration of the applicable statute of limitations.

(b)   <u>Termination of Tax Sharing Agreements</u>.   Neither Buyer nor any Transferred Entity shall have any liability with respect to any agreement or arrangement with respect to the allocation or sharing of Taxes that may have been entered into by the Transferred Entities on or before the Closing Date. Stockholder shall indemnify and hold Buyer harmless with respect to any obligation under any such agreements.

Section 10.   <u>General</u>

(a)   <u>Amendment</u>. This Agreement may be amended, modified, superseded or canceled, and any of the terms hereof may be waived, only by a written instrument specifically referring to this Agreement and specifically stating that it amends, modifies, supersedes or cancels this Agreement or waives any of its terms, executed by all parties (or, in the cause of a waiver, by the party waiving compliance). Except to the extent set forth herein, the failure of any party at any time or times to require performance of any provision of this Agreement shall in no manner affect such parties' right at a later time to enforce the same. No waiver by any party of any Breach of any term contained in this Agreement in any one or more instances shall be deemed to be or construed as a further or continuing waiver of such Breach, or a waiver of any Breach of any other term.

(b)   <u>Interpretation</u>. The Section headings contained in this Agreement are for convenient reference only, and shall not in any way affect the meaning or interpretation of this Agreement.

(c)   <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Kansas, excluding the conflict of laws provisions thereof that would otherwise require the application of the law of any other jurisdiction.

(d)   <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall be an original, but all of which shall constitute but one agreement.

(e)   <u>Assignment</u>. This Agreement shall not be assignable by any party hereto without the consent of both Buyer (or its designated agent) and Stockholder, except as set forth in this Subsection (e). This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, but no assignment or delegation by any party of any of its obligations under this Agreement shall operate to discharge that party from its obligations.

(f)   <u>Merger</u>. This Agreement shall be construed as if all provisions of the Stock Purchase Agreement not explicitly excluded are included in the Agreement, and the Stock Purchase Agreement shall be construed as if all provisions of the Agreement are included in the Stock Purchase Agreement. Consistent with the foregoing, the provisions of the Agreement and the Stock Purchase Agreement shall be interpreted to constitute a single integrated agreement without duplicative provisions, and, in the event that any provision of the Stock Purchase

ENB 00992

Agreement conflicts with any provision of this Agreement with respect to Taxes, this Agreement shall be controlling.

       (g)    Notices.   All notices, requests, demands and other communications required or permitted to be given hereunder shall be deemed to have been duly given if in writing and sent, delivered, or telecopied to:

                  Stockholder:

                  Dennis M. Langley
                  13137 Thunderhead Falls Lane
                  Rapid City, SD  57702
                  Telephone: (605)355-9746
                       And to:
                  Tino Monaldo, Chtd.
                  335 North Washington, Suite 130
                  Hutchinson, Kansas 67501
                  Telephone:   (316) 669-9338
                  Telecopier:   (316) 665-5961

                  with a copy to:

                  Thomas W. Van Dyke, Esq.
                  Bryan Cave LLP
                  7500 College Boulevard, Suite 1100
                  Overland Park, Kansas 66210
                  Telephone:   (913) 338-7700
                  Telecopier:   (913) 338-7777

                  Buyer:
                  K-Pipe Merger Corporation
                  c/o SCALP
                  750 Lexington Ave., 30th Floor
                  New York, New York
                  Telephone:   (212) 826-0770
                  Telecopier:   (212) 826-0077

                  with a copy to:
                  Howard Teig, CPA
                  510 Jericho Turnpike, Suite 320
                  Jericho, New York  11753
                  Telephone:   (516) 931-5506
                  Telecopier:   (516) 931-5327

ENB 00993

EM001-007473

All such notices, requests, demands or communications shall be sufficient and effective upon personal delivery, or upon confirmation of the receipt of the applicable telecopy or one Business Day after delivery to a reputable overnight carrier for next Business Day delivery, or three (3) days after the date on which the notice is deposited in the United States mail, registered or certified with return receipt requested and proper postage prepaid.

IN WITNESS WHEREOF, Stockholder and Buyer have executed or caused this Agreement to be duly executed as of the date first above written.

Dennis M. Langley

K-Pipeline Merger Corporation

By:_____
Title:_____

ENB 00994

EM001-007474

## Schedule 3.1

### Stockholder's Closing Deliveries

1.  Tax Sharing Agreement
2.  Stock Certificate(s) with stock powers attached
3.  Certificate of Fulfillment of Conditions Precedent by Stockholder
4.  FIRPTA Certificate that Stockholder is not a foreign person

KC01DOCS/453324.05

ENB 00995

## Schedule 3.2

### Buyer's Closing Deliveries

1. Tax Sharing Agreement
2. Certificate of Fulfillment of Conditions Precedent by CEO or President of Buyer
3. Preliminary Cash Consideration
4. Certified Resolutions of Buyer Approving the Transaction
5. Opinion Letter of LeBoeuf, Lamb, Greene & MacRae

KC01DOCS/453324.05

ENB 00996

EM001-007476

PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULE

SCHEDULE 5.1(b)

Schedule 5.1(b)
Calculation of Adjustment Value

Definitions:

**Adjustment Amount** = Adjustment Value minus $25,000.

**Adjustment Value** = the sum of the positive working capital accounts of the company on the True-up Date minus the sum of the negative working capital accounts. The balances of positive and negative working capital accounts to be determined in accordance with generally accepted accounting principals.

**True-up Date** = The Closing Date defined herein.

**Positive Working Capital Accounts**

**Cash**: All cash, currency on hand, money market funds, cash held as margin requirement and excess equity in the MarGasCo gas futures account, commercial paper and other cash or cash equivalents of the Company; except, for purposes of the calculation of the Adjustment Amount, the $10,000,000 (ten million dollar) principal balance in the Cash Reserve Account held in the name of Syenergy Pipeline Company, L.P. shall not be considered part of the Cash accounts nor any other component of working capital of the Company.

**Accounts Receivable**: All accounts receivable of the Company and all Affiliates accrued as of the True-up Date less the sum of those accounts receivable more than 90 days from the True-up Date and Allowance for Doubtful Accounts less than 90 days from the True-up Date. Buyer will compensate Seller for any Accounts Receivable accrued as of the True-up Date and ultimately collected from any source that were originally excluded from the calculation of Adjustment Value.

**Accrued Interest Earned**: Accrued interest earned as of the True-up Date for all cash accounts of the Company and all Affiliates including all interest credited to the Cash Reserve Account held in the name of Syenergy Pipeline Company, L.P. representing any balance in the account in excess of the $10,000,000 principal balance.

**Gas Marketing Contracts and Futures Account**: The net unrealized gain/(loss) on the True-up Date of all natural gas contracts held in the MarGasCo's Gas Futures account and MarGasCo gas sales contracts. If account has a net unrealized loss, account represents a negative working capital account.

**Prepaid Expenses**: The sum of all working capital accounts representing the payment for goods and/or services that will be provided subsequent to the True-up Date. Prepaid Expenses will specifically include the $100,000.00 paid by Kansas Pipeline Company to Flight Options, Inc. pursuant to the Flight Options Binder Agreement dated October 1999.

39

ENB 00997

EM001-007477

**Negative Working Capital Accounts**

<u>Accounts Payable</u>:  all accounts payable of the Company and all Affiliates accrued as of the True-up Date representing payments owed for goods and/or services received prior to the True-up date but not yet paid.  In no event shall any commission or any other payments due Chase Securities for their participation in this stock sale be considered as part of the Adjustment Value Calculation.

<u>Accrued Interest Payable</u>:  accrued interest payable as of the Closing Date on all Company and all Affiliates debt including but not limited to the Revolving Credit Agreement with Chase Manhattan Bank and the MarGasCo revolving Credit Agreement with Chase Manhattan Bank.  Accrued Interest Payable will not include  any Make Whole Premium on the Syenergy Pipeline Company's $91 million Senior Secured Debt.  Accrued Interest through October 29, 1999 on the Syenergy Pipeline Company's $91 million Senior Secured Note in the amount of $1,987,973.53 has been included as a reduction to the Preliminary Cash Consideration and will not be a reduction to the Adjustment Value.  Accrued Interest Payable will be increased $16,705.66 for each day Closing is after October 29, 1999.  Accrued Interest Payable will be decreased $16,705.66 for each day Closing is before October 29, 1999.

<u>Natural Gas Purchases</u>:  Accrued natural gas purchases as of the True-up Date for the Company and all Affiliates.

<u>Over/Under Retained Compressor Fuel and Lost and Unaccounted for Gas</u>:  The net balance of accrued fuel retainage subject to FERC Fuel Adjustment less actual compressor fuel and lost and accounted for gas subject to FERC Fuel Adjustment.

<u>Accrued Income Taxes</u>:   Accrued federal and state income taxes of the Company and all Affiliates as of the True-up Date less all estimated income taxes paid.  Accrued Income taxes shall be estimated as of the True-up Date for purposes of calculating the Adjustment Value such estimates to be revised in preparation of the Revised Adjustment Value..

<u>Accrued Property Taxes</u>:  accrued property taxes payable for the Company and all Affiliates as of the True-up Date based on the 1999 property tax assessments.

<u>Other Accrued Liabilities</u>:  the sum of all other working capital accounts representing payments owed for goods and services received prior to the True-up Date not yet paid including, but not limited to, accrued payroll and benefits payable, trade accounts payable and accrued legal/professional fees.

ENB 00998

EM001-007478

**Positive Working Capital Accounts**

| | | |
|---|---|---|
| Cash | | 200,000.00 |
| **Accounts Receivable** | | |
| Total Accounts Receivable | 5,324,247.21 | |
| Less: Accounts Receivable in excess of 90 day from True-up Date | (1,694,317.92) | |
| Less: Total Allowance for Doubtful Account | (794,532.96) | |
| Plus: Allowance for Doubtful Accounts in excess of 90 days from True-up Date | | 694,000.00 |
| Net Accounts Receivable: | 3,529,396.33 | 3,529,396.33 |
| Accrued Interest Earned | | 45,000.00 |
| Net Unrealized Gain/(Loss) in Gas Futures Account | | 489,500.00 |
| Other Prepaid Expenses | | 394,000.00 |
| **Total Positive Working Capital Adjustment** | | 4,657,896.33 |

**Negative Working Capital Accounts**

| | | |
|---|---|---|
| Accounts Payable | | (2,190,168.00) |
| Accrued Interest Expense | | (18,000.00) |
| Natural Gas Purchases (800,000.00) | | |
| Over Retainage of Compressor Fuel subject to refund | | (212,000.00) |
| **Accrued Income Taxes** | | |
| Accrued Income Tax Expense | (1,640,000) | |
| Estimated Income Taxes Paid | 1,650,000 | |
| Net Accrued Income Taxes | 10,000 | 10,000 |
| Accrued Property Taxes | | (480,000.00) |
| Other Accrued Liabilities | | (240,000.00) |
| Total Negative Working Capital Adjustment | | (3,930,168.00) |
| **Adjustment Value** | | 727,728.00 |
| Working Capital Allowance in Purchase Price (25,000) | | |
| Adjustment Amount | | 702,728.33 |

ENB 00999

EM001-007479

PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULES

SECTION 5.4A

Schedule 5.4A

Excluded Assets

The below described property constitutes the Excluded Assets:

**Real Estate**

(1)     Real estate located in Reno County, Kansas more fully described as follows:

A tract in the Northwest Quarter (NW/4) of Section 13, Township 23 South, Range 6 West of the 6th P.M., described as follows: Commencing at the intersection of the north line of Section 13, Township 23 South, Range 6 West of the 6th P.M., and the West line of Washington Street; thence West 260 feet for a place of beginning; thence south 104 feet; thence West parallel with the north line of Section 234.8 feet to a point on the east line of Adams Street that is 139 feet south of the south line of Fourth Avenue West; thence north 29 feet to a point 110 feet south of south line of Fourth Avenue West; thence east parallel with Fourth Avenue 65 feet; thence north 10 feet thence east parallel with Fourth Avenue 50 feet; thence north 100 feet to a point on the south line of Fourth Avenue that is 115 feet east of Adams Street; thence east on the south line of Fourth Avenue 120 feet; thence south 31.2 feet to the place of beginning the same being a part of the Northwest Quarter (NW/4) of Section 13, Township 23 South, Range 6 West of the 6th P.M., and part of Reserve #5 of Miller and Smith's Addition to the City of Hutchinson.

(2)     Tracts of real estate located in Johnson County, Kansas more fully described as follows:

Tract II described as follows:

The South 50 feet of the East 203.29 feet of the South ½ of the West ¾ of the Northwest ¼ of the Southwest 1/4 of Section 5, Township 12 South, Range 24 East, Johnson County, Kansas

Tract III described as follows:

All of the South ½ of the West ¾ of the Northwest ¼ of the Southwest ¼ of Section 5, Township 12, South, Range 24 East, Johnson County, Kansas, being more particularly described as follows: Beginning at the Southwest corner of the

ENB 01000

EM001-007480

Northwest ¼ of the Southwest ¼; thence North 00 degrees 15 minutes 56 seconds West along the West line of the Northwest ¼ of the Southwest ¼ of said Section 5, 661.55 feet to the Northwest corner of the South ½ of the Northwest ¼ of the Southwest ¼ of said Section 5; thence North 89 degrees 22 minutes 32 seconds East along the North line of said South ½, 989.95 feet to the Northeast corner of the South ½ of the West ¾ of the Northwest ¼ of the Southwest ¼ of said Section 5; thence South 00 degrees 35 minutes 57 seconds East along the East line of the South ½ of the West ¾ of the Northwest ¼ of the Southwest ¼ of said Section 5; 662.22 feet to the Southeast corner of the South ½ of the West ¾ of the Northwest ¼ of Southwest ¼ of said Section 5, thence South 89 degrees 24 minutes 54 seconds West along the South line of the Northwest ¼ of the Southwest ¼, said line  also being the North line of QUIVIRA ESTATES, a subdivision of land in Johnson County, Kansas, 993.80 feet to the point of beginning, subject to that part in Renner Road, EXCEPT Beginning 230 feet West of the Southeast corner of the North ½ of the West ¾ of the Northwest ¼ of the Southwest ¼ of Section 5, Township 12 South, Range 24 East; thence Southerly parallel to the East line of the South ¼ of said West ¾, 512.0 feet; thence Westerly, parallel to the South line of said South ½, 300.00 feet; thence Northerly, parallel to the East line of said South ½, 511.86 feet to the North line of said South ½; thence East along said North line to the point of beginning AND the West 155 feet of the North 110 feet of the South ½ of the West ¾ of the Northwest ¼ of the Southwest ¼ of said Section 5, Township 12, Range 24. ALSO EXCEPT:

The South 50 feet of the East 203.29 feet of the South ½ of the West ¾ of the Northwest ¼ of the Southwest ¼ of Section 5, Township 12 South, Range 24 East.

ENB 01001

EM001-007481

(3)     The Easement Agreement dated July 30, 1998 between the Pueblo of Isleta and The Bishop Group, Ltd. and any and all related exhibits thereto and all attendant rights and interests related thereto, as amended, including, but not limited to, all legal and equitable rights in and to New Mexico rights of ways and interests as set forth in Easement and Right of Way executed with the Pueblo of Isleta and any and all rights to any potential project arising out of or relating thereto (New Mexico Easement), including, but not be limited to the following:

> An eighty (80) foot wide parcel of land located on trust lands of the Pueblo in Bernalillo and/or Torrance and/or Valencia County, New Mexico, to be used as right of way, as more particularly identified in the New Mexico Easement; and

> An eighty (80) foot wide parcel of land belonging to the Pueblo of Isleta in the state of New Mexico known as Comanche Ranch, as more particularly described in the New Mexico Easement.

**Companies:**

(4)     2,000 Shares of Common Stock of E & C Group, Inc. (100% wholly owned by The Bishop Group, Ltd.).

(5)     260 Shares of Common Stock of The Bishop Corporation owned by E & C Group, Inc.

(6)     99.9% of the limited liability interests in Bishop Rink Holdings, LLC

(7)     99.9% of the limited liability interests in KP Operating Company, LLC

(8)     Life Insurance Policies:

BMA Whole Life Policy #40056779
BMA Term Policy #40056777
BMA Whole Life Policy #40056776 (owned by Dennis Langley)

(9)     Promissory Note owned by The Bishop Group, Ltd. from Dennis M. Langley dated March 30, 1999 in the principal amount of $265,000, with accrued interest.

(10)    All available cash contained in accounts owned by The Bishop Group, Ltd., E & C Group, Inc., The Bishop Corporation, Management Resources Group, Ltd. n/k/a Bishop Management, Inc., Syenergy Pipeline Company, L.P., Bishop Pipeline Company, Kansas Pipeline Company, Kansas Pipeline Partnership, Mid-Kansas Partnership, MarGasCo Partnership, KansOk Partnership, Riverside Pipeline Company, L.P., Bishop Rink Holdings, LLC., and KP Operating Company, LLC other than that cash necessary to leave $25,000 in working capital as set forth in the Purchase Agreement as of the Closing

451747.21

44

ENB 01002

of this transaction; provided however, The Debt Service Cash Reserve Account will remain in place.

(11)   A Cessna 421 plane, Serial No. 421B0385, owned by The Bishop Group, Ltd.

(12)   The Project Development Agreement dated November 27, 1996, between Management Resources Group, Ltd. (n/k/a Bishop Management, Inc.) and KN Energy, Inc.

(13)   All office furniture, fixtures, copiers, faxes, equipment, computers (software and hardware) vehicles used by any personnel who work at the Administrative Offices (i.e. 8325 Lenexa Drive, Lenexa, Kansas and 5225 Renner Road, Shawnee, Kansas) and all other personal property located at the Administrative Offices except for the items listed below:

   (i)   Computer hardware and software necessary to update the SCADA System, System Control and the Electronic Bulletin Board, including personal computers, disk drives, monitors and license agreements located at 8325 Lenexa Drive as well as the following lease agreements:

      (A)   Canon Copier Lease for NP4050;

      (B)   Canon Copier Lease for NP6070; and

      (C)   Postage Meter Scale.

   (ii)   All field office equipment, computers, faxes, phones, copiers, furniture and supplies located at any and all KPC field offices, such as Pawnee, OK; Ottawa, KS; Medicine Lodge, KS; Beaumont, KS; and Wichita, KS (and not the Administrative Offices); all pipe and equipment inventory, mobile phones for field employees and the following vehicles owned or leased by KPC for field employee use:

| Make/Model | Vehicle I.D. Number |
|---|---|
| 1997 Ford F150 Pickup | 1FTDX18WXVKD06162 |
| 1998 Ford F150 XL | 1FTZX18W6WKB93396 |
| 1999 Ford 250 XLT SuperCab | 1FTNX21S5XED10879 |
| 1997 Ford Explorer XLT | 1FMDU34E8VUB32867 |
| 1998 Ford F150 | 1FTZX18W1WKB56029 |
| 1995 Ford Chassis Cab | 1FDKF38G2SEA74063 |
| 1998 Chevy K1500 Ext. Cab | 1GCEK19M4WE220166 |
| 1999 Ford F150 pickup | 1FTRX18W9XNC32045 |
| 1991 Ford F250 Pickup | 1FTHF26HOMLA21431 |
| 1997 Ford 150 Pickup | 1FTDX18W1VKD06163 |

ENB 01003

EM001-007483

| | |
|---|---|
| 1995 Ford Chassis Cab | 1FDKF38G1SEA74068 |
| 1999 Ford F150 Pickup | 1FTRX18WXXKB54764 |
| 1999 Ford F150 | 1FTRX18W3XKB02098 |
| 1998 Ford F150 | 1FTZX18WXWKB72230 |
| 1999 Ford Explorer | 1FMZ434E8XZB30354 |
| 1999 Ford F350 w/crane | 1FDWF37S1XEC32729 |
| 1998 Ford F150 | 1FZX18W1WKB56028 |
| 1999 Ford F250 | 1FTNX21L4XED84285 |
| 1999 Ford F250 Pickup | 1FTNX21L6XEB96707 |
| 1999 Dodge Ram | 1B7HF13Y2XJ649134 |
| 1999 Ford F150 | 1FTRX18W0XKB40727 |
| 1999 Ford F350 w/crane | 1FDWF37SXXEC32728 |
| 1980 Ford F600 2 ton pickup | F60HVJD1451 |
| 1999 Ford F250 Ottawa Spare | 1FTNF21L8XEB65686 |
| 1999 F350 w/crane | 1FDWF37S8KEC32727 |
| 1998 Ford F150 Pickup | 1FTZX18W4WKB93395 |
| 1998 Ford Explorer | 1FMZU34XXWZA77754 |
| 1998 Chevy K1500 Pickup | 1GCEK19M4WE220166 |
| 1998 Chevy K1500 Pickup | 1GCEK19R1WE224588 |
| 1996 Wells Fargo EW2355 Trailer | 1WC200E20T2029278 |
| 1990 Croft Standard Trailer | GC12981 |
| 1989 Air Comp./Trailer Combo | 180519U89330 |
| 1989 SUN Trailer - Style HT | 154CH1629KT003166 |
| 1994 Trailer (Utility) | KS 114867 |
| 1997 Blair Trailer | 1B9GDFU58V1072178 |
| 1999 Load Trailer | 4ZEGF2522X1125391 |

(iii)   License Agreement and software for JD Edwards Accounting Package.

(14)   The following vehicles being distributed to Stockholder:

| Make/Model | Vehicle I.D. Number |
|---|---|
| 1997 Ford F150 Pickup | 1FTDX1865VKA12863 |
| 1997 Ford Explorer XLT | 1FMDU34E0VUB02133 |
| 1999 Ford F150 Lariat | 1FTRX18L4XKB52918 |
| 1995 Chevrolet Lumina | 2G1WL5M9S9283949 |
| 1988 Jaguar | SAJHV164XJC524116 |
| 1997 Lexus 400 | JT8BH28F0V0074224 |

451747.21

46

ENB 01004

EM001-007484

| | |
|---|---|
| 1991 Lexus 250 | JT8VV22T1MO135776 |
| 2000 Lincoln | 1LNHM8655YY755412 |
| 1995 Chevy Blazer | 1GNDT13W9SK179300 |
| 1995 Oldsmobile | 1G3GR62CXS4134802 |
| 1995 Ford 250 Pickup | 1FTHX26H85SKB80603 |
| 1990 Blair 20 ft. 4GNFB | 1B9GDF54L1072016 |

Two Four wheelers

One Bobcat

Excavator--Model Melroe
16677 with 2 buckets

Backhoe Case Model 580
Super E

Lincoln ArcWelder
Model No. SA200F163

Pacer Pump Model
w/Briggs Stratton Engine

Goodal Electric Parts
Washer

(15)   All rights to the Kansas City Chiefs and Kansas City Royals season tickets.

(16)   Causes of Action:

A.   Any and all causes of action, tort or breach of contract, or otherwise, held by Company
and/or its Affiliated Entities against Western Resources, Inc. and/or OneoK, Inc. or their
Affiliated Entities arising out of or related to the failure of Western Resources, Inc. to sell
Company and/or its Affiliated Entities the gas local distribution company assets and
business which is now KGS, a division of OneoK, Inc. (hereafter "Causes of Action").

Buyer agrees, if requested by Stockholder, to pursue these Causes of Action (on behalf of
Stockholder, BGL, KPC, Mid-Kansas, MarGasCo, BPC, BGT, Syenergy, KPP, KOP
and/or Riverside (collectively "Petitioners"), by filing a lawsuit, making witnesses and
records available, going to trial and appeal, if necessary, all as may be determined within
the sole discretion of Stockholder, even after the Closing of this Agreement.

451747.21

ENB 01005

EM001-007485

Stockholder or his designees shall make all decisions regarding the drafting of any lawsuit(s), pleadings, selection of legal counsel and experts, the jurisdiction and venue of filing, witnesses, discovery, trial, appeal, and/or settlement and all other aspects of prosecuting the Causes of Action. Buyer shall take no action, nor cause others to take any action regarding the Causes of Action without the written consent of Stockholder.

Stockholder shall pay and/or reimburse Buyer for all of its actual costs and fees to prosecute these Causes of Actions ("Costs") at the time such costs are incurred by Buyer. Any judgment or settlement monies collected by Buyer on behalf of the Petitioners shall first go to reimburse Buyer for such Costs, and then the remaining proceeds shall be paid to Stockholder within fifteen (15) days after its receipt by Buyer. The monies received, if any, by Stockholder shall be deemed additional payment to Stockholder for the partial redemption of his BGL shares prior to Closing.

If at any time, before or after Closing, it is determined within Stockholder's sole discretion, that part or all of these Causes of Action can be assigned by the Petitioners to Stockholder and pursued by Stockholder directly, and Stockholder requests such an assignment from Buyer and/or Petitioners, then Buyer and/or Petitioners shall assign, without warranty, any and all such assignable Causes of Action to Stockholder, and will cooperate fully with Stockholder as described above, at Stockholder's sole cost if Stockholder prosecutes said assigned Causes of Action, as well as non-assigned Causes of Actions.

B.     An additional cause of action relating to the Reimbursement by KNI described in Schedule 6.8 of this Company Disclosure Schedule ("Reimbursement by KNI"). If this receivable is not collected or converted to cash prior to Closing, the Company or Buyer shall, if requested by Stockholder, cause Petitioners to pursue this Reimbursement by KNI on behalf of Stockholder and Petitioners by filing a lawsuit, making witnesses and records available, going to trial and appeal, if necessary, all as may be determined within the sole discretion of Stockholder, even after the Closing of this Agreement.

Stockholder or his designees shall make all decisions regarding the drafting of any lawsuit(s), pleadings, selection of legal counsel and experts, the jurisdiction and venue of filing, witnesses, discovery, trial, appeal, and/or settlement and all other aspects of prosecuting the Reimbursement by KNI. Buyer shall take no action, nor cause others to take any action regarding the Reimbursement by KNI without the written consent of Stockholder.

Stockholder shall pay and/or reimburse Buyer for all of its actual costs to prosecute these Reimbursement by KNI at the time such costs are incurred by Buyer. Any judgment or settlement monies collected by Buyer on behalf of the Petitioners shall first go to reimburse Buyer for such Costs, and then the remaining proceeds shall be paid to Stockholder within fifteen (15) days after its recipient by Buyer. The monies received, if any, by Stockholder shall be deemed additional payment to Stockholder for the partial redemption of his BGL shares prior to Closing.

ENB 01006

EM001-007486

If at any time, before or after Closing, it is determined within Stockholder's sole discretion, that part or all of these Reimbursements by KNI can be assigned by the Petitioners to Stockholder and pursued by Stockholder directly, and Stockholder requests such an assignment from Buyer and/or Petitioners, then Buyer and/or Petitioners shall assign, without warranty, any and all such assignable Reimbursements by KNI to Stockholder, and will cooperate fully with Stockholder as described above, at Stockholder's sole cost if Stockholder prosecutes said non-assigned Reimbursements by KNI, as well as non-assigned Reimbursements to KNI.

451747.21

49

ENB 01007

EM001-007487

Schedule 5.4B

## STOCK REDEMPTION AGREEMENT

THIS AGREEMENT (herein "Agreement") made this _____ day of _____, 1999, by and between The Bishop Group, Ltd., a Kansas corporation (hereafter the "Company") and Dennis M. Langley on behalf of himself and as Voting Trustee of all of said shares pursuant to that Voting Trust Agreement dated June 2, 1986, as amended (hereafter the "Stockholder").

WHEREAS, Stockholder owns 161,733.2625 shares of the issued and outstanding common stock of the Company; and

WHEREAS, the Company desires to redeem certain shares of the common stock of Company owned by the Stockholder, all in accordance with the terms and conditions of this Agreement; and

WHEREAS, the transaction is one in a series of transactions that ultimately will result in the Stockholder ultimately disposing of 100% of his stock of the Company and this Agreement would not be entered into but for the Stock Purchase Agreement whereby Stockholder will dispose of all the remainder of his stock of the Company.

NOW, THEREFORE, the undersigned for the mutual promises and covenants expressly contained herein, agree as follows:

1.    **SALE OF STOCK.**  Stockholder shall assign, sell and transfer to Company 13,005.2625 shares of common stock of the Company (the "Shares").

2.    **PURCHASE PRICE.**  In consideration for the Shares, Company agrees to transfer all of Company's right, title and interest in and to the assets set forth on Exhibit A hereto to the Stockholder (the "Assets").  The agreed upon values for the Assets are set forth on Exhibit A.

3.    **REPRESENTATIONS.**

A.    **Representations of Company.** Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Kansas. Company has the power to execute and deliver this Agreement and to carry out the transactions hereunder contemplated.

B.    **Stockholder's Representations.**  Stockholder represents that he is the owner, beneficially and of record, and that he is transferring the Shares hereunder and clear of any liens, claims or encumbrances.

4.    **COVENANTS.** Company agrees to deliver to Stockholder all books, records, surveys, data, documents, files and all other information relating to the Assets of

ENB 01008

Company's business or its properties or assets stored on any electronic media, including computers.

5. **CLOSING.** The transfer and exchange provided for in this Agreement (the "Closing") shall take place at the offices of Bryan Cave, 3500 One Kansas City Place, 1200 Main Street, Kansas City, Missouri, commencing at 10:00 a.m. on _____, 1999, or on such other date or such other place as the parties may mutually agree (such date is called the "Closing Date"). At the Closing:

    A.    Company shall transfer to Stockholder the Assets.

    B.    Stockholder shall transfer to Company the Shares duly endorsed for transfer.

6. **SUCCESSORS AND ASSIGNS.** Neither party shall assign its rights under this Agreement or the attachments hereto without the prior written consent of the other.

7. **MODIFICATIONS AND AMENDMENTS.** Any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and executed amendments. It is stipulated that oral modifications and amendments hereto shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or adjudication.

8. **AGREEMENT SUBJECT TO LAWS.** If any provision of this Agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the latter shall control and this Agreement shall be deemed modified accordingly, but the remainder of this Agreement and the application of such provisions to the other parties or circumstances shall not be affected thereby, and in all other respects this Agreement shall continue in full force and effect.

9. **COSTS.** If any legal action or other proceeding is brought for the enforcement or interpretation of any of the rights or provisions of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and all other costs and expenses incurred in that action or proceeding, in addition to any other relief to which it may be entitled.

10. **AGREEMENT GOVERNED BY THE LAWS OF KANSAS.** This Agreement shall be governed by and construed in accordance with the internal laws, and not the laws pertaining to choice or conflict of laws, of the State of Kansas.

448123.10

2

ENB 01009

11.    <u>ADDITIONAL DOCUMENTS</u>. At Closing, Company shall execute, acknowledge and deliver or cause to be delivered to Stockholder a bill of sale and such other assignments and other instruments of transfer and conveyance, in form and substance reasonably satisfactory to Stockholder, and take such other action as Stockholder shall reasonably deem to be necessary or desirable to vest in Stockholder all right, title and interest in and to the Assets.

12.    <u>WAIVER.</u>    Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provisions thereafter.

13.    <u>ENTIRE AGREEMENT</u>.    This Agreement cancels, merges and supersedes all prior and contemporaneous understandings and agreements relating to the subject matter of this Agreement, written or oral, between the parties hereto and contains the entire agreement of the parties hereto, and the parties hereto have no agreements, representations or warranties relating to the subject matter of this Agreement which are not set forth herein. This Agreement shall not be amended, modified or supplemented in any manner whatsoever except as otherwise provided herein or in writing signed by each of the parties hereto.

14.    <u>USE OF ASSETS</u>. To the extent any of the Assets being transferred hereunder are office furniture, equipment or the like and located at property leased by Company, Company shall maintain use and possession of such assets and shall fully insure them at their current level of insurance. Company shall redeliver possession of such Assets to Stockholder at their present location or at such other location as to which the Stockholder and the Company may mutually agree upon no later than September 30, 2000. During Company's possession and use of such Assets, Company shall cause such Assets not to waste and shall maintain them in reasonable working condition, normal wear and tear accepted. Company shall not remove any such Assets from their current location without the express prior written consent of Stockholder. Company will pay all personal property taxes related to such Assets while such Assets are in the possession of Company.

15.    <u>FURTHER ASSURANCES</u>. The parties hereby acknowledge that the transfer of the Assets will likely not be complete as of the date hereof and as a result, Company hereby agrees to execute, acknowledge and deliver, and cause each of Bishop Gas Transmission Company, a Kansas corporation, Syenergy Pipeline Company, L.P., a Kansas limited partnership, Kansas Pipeline Company, a Kansas general partnership, and MarGasCo Partnership, an Oklahoma general partnership (collectively, the "Affiliates"), to execute, acknowledge and deliver, at Stockholder's sole expense, any further writings, documents, transfers, acknowledgments, instruments, powers of attorney, authorizations, filings, applications, reports, etc. that Stockholder shall reasonably deem to be necessary to vest in Stockholder all right, title and interest in and to the Assets and to take such further actions that Stockholder shall reasonably deem to be necessary to fulfill

ENB 01010

EM001-007490

Company's obligations set forth herein. Should the Company or any of the Affiliates fail to take any action required by this Section, the parties hereto recognize that Stockholder will be entitled to cause a court to order specific performance and require the Company or such Affiliate to take this required action and the Company and the Affiliates agree not to oppose a specific performance order (once the court determines that a requested action is required by this Agreement).

16.     COUNTERPARTS.    This Agreement may be executed in multiple counterparts, each of which shall be in an original, but all of which shall be deemed to constitute one instrument. This Agreement or any document executed in connection herewith shall be binding upon such signator party, if said signature is delivered by telecopier or other like transmission.

17. SEVERABILITY. Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

ENB 01011

EM001-007491

IN WITNESS WHEREOF, the parties have hereunto set their hands the day and year first written above, or consent to the terms hereof, as if executed on such date.

COMPANY:

The Bishop Group, Ltd.

By: _____

Title:  Vice President

STOCKHOLDER:

_____

Dennis M. Langley on behalf of himself and as Voting Trustee of all of said shares pursuant to that Voting Trust Agreement dated June 2, 1986, as amended

448123.10                                    5

ENB 01012

EM001-007492

EXHIBIT A

| Asset | VIN | Fair Market Value |
|---|---|---|
| 1. Reno County, Kansas Real Estate | | $15,580 |
| 2. Johnson County, Kansas Real Estate | | $702,000 |
| 3. New Mexico ROW's | | $600,000 |
| 4. Common Stock of E&C Group, Inc. | | - |
| 5. Common Stock of The Bishop Corporation | | - |
| 6. Bishop Rink Holdings, LLC Interests | | $657,208 |
| 7. KP Operating Company, LLC Interests | | $1,023,397 |
| 8. BMA Whole Life Policy | | $14,000 |
| BMA Term Policy #40056777 | | $2,607 |
| BMA Whole Life Policy #40056776 (DML Owned) | | $14,000 |
| 9. DML Promissory Note to BGL | | $310,147 |
| 10. Available Cash of BGL et al | | $6,200,000 |
| 11. Cessna 421-BGL | | $188,768 |
| 12. MRG, Ltd. Project Development Agreement | | - |
| 13. Administrative Office Furniture & Fixtures | | |
| Furniture/Fixtures: | | |
| 8325 Lenexa Dr.-Furniture & Fixtures | | $150,000 |
| 5225 Renner-Furniture/Fixtures | | $126,403 |
| | | |
| Computers/Office Equipment: | | |
| 8325 Lenexa Dr.-Furniture/Fixtures | | $80,000 |
| 5225 Renner-Furniture/Fixtures | | $40,000 |
| Vehicles: | | |
| 1997 Lexus LS400-Dennis | JT8BH28F0V0074224 | $29,245 |
| 1988 Jaguar XJ6 - Dennis | SAJHV164XJC524116 | $2,515 |
| 1999 F-150 Lariat - Eve | 1FTRX18L4XKB52918 | $14,530 |
| 1997 Ford F-150 Pickup | 1FMDU34E0VUB02133 | $10,540 |
| 1995 Olds. Aurora - Lyn | 1G3GR62CXS4134802 | $6,095 |
| 1995 F-250 - Diesel Tank | 1FXTHX26H85SKB0603 | $6,215 |
| 1991 Lexus ES 250-Pool Vehicle | JT8VVT1MO135776 | $3,840 |
| 2000 Lincoln LS - Yvette | 1LNHM8655YY755412 | $26,000 |
| 1997 Explorer XLT - JShaffer | 1FMDU340VUB02133 | $13,570 |
| 1995 Chevy Blazer - JBullimore | 1GNDT13W9SK179300 | $6,930 |
| 1995 Chevy Lumina - Vince | 2G1WL5M9S9283949 | $3,475 |
| 1990 Blair 20 ft 4GTNFB Nooseneck Trailer | 1B9GDFK54L1072016 | $400 |
| Power Equipment: | | |
| Bobcat - Excavator w/2 buckets | 512916677 | $30,000 |

KC01DOCS/456007.01

ENB 01013

| | | |
|---|---|---|
| Bobcat - Skid Steer | 514112585 | $15,500 |
| Case 580 Rubber Tired Backhoe | | $6,000 |
| Log Splitter | | $750 |
| All-Terrain Vehicle - 1998 Purchase | | $4,500 |
| All-Terrain Vehicle - 1999 Purchase | 478TE2244Y4105504 | $6,437 |
| Lincoln ArcWelder, Model SA200F163 | | $1,500 |
| Pacer Pump Model w/Briggs & Stratton | | $500 |
| Goodal Electric Parts Washer | | $500 |
| 14. Kansas City Chiefs/Royals season tickets | | $800 |
| 15. Legal Claims | | - |
| TOTAL | | $10,313,952 |

KC01DOCS/456007.01

ENB 01014

EM001-007494

PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULE

SECTION 9.2

### Section 9.2
**Employees or Non-Employees which Stockholder Indemnifies Buyer against as to Severance Obligations**

1. Dennis M. Langley
2. Steve Korb
3. Lynette Shaw
4. Brandon Glenn
5. Tracey Lebeau
6. Frank LaMere (Non-Employee)
7. Howard Lubow
8. Yvette Korb
9. Nate Beyer d/b/a Brown Dog (Non-Employee)
10. Wallace McKinney
11. Tino Monaldo, Chtd. (Non-Employee)
12. With respect to Overland Consulting, Inc. ("OCI"), at or before Closing OCI shall have forever released and waived all of its rights described in the last two sentences of paragraph 4 of its Consulting Agreement with KPC and its Affiliated Entities, dated April 1, 1997, regarding its option to terminate said Consulting Agreement in the event of a "change of control" as defined therein.

ENB 01015

EM001-007495

35

ENB:01016

EM001-007496

## GUARANTY
### (KPC)

FOR VALUE RECEIVED, Kansas Pipeline Company, a Kansas general partnership (the "Guarantor") hereby unconditionally and irrevocably guaranties to Dennis Langley ("Langley"), his heirs, transferees and assigns, the due and punctual performance and discharge by K-Pipe Merger Corporation ("Parent") of all of Parent's liabilities, obligations, covenants and agreements contained in Sections 8.10, 8.11 and 5.4 (and the Schedules and the Agreements referenced in Section 5.4) of the Stock Purchase Agreement, dated October 25, 1999 between Langley and Parent, subject to all time, monetary and other limitations set forth in said Stock Purchase Agreement. The foregoing Guaranty shall not create any greater liability of Guarantor to Langley than Parent has to Langley pursuant to said Stock Purchase Agreement. Guarantor further agrees to pay any and all out-of-pocket expenses (including attorneys' fees) which may be paid or incurred by Langley in enforcing any rights under this Guaranty. This Guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment and performance by the Parent of the obligations and liabilities described herein and not of collectability only and is in no way conditioned upon any requirement that Langley first attempt to collect any amounts due and owing from the Parent or any other party primarily or secondarily liable with respect thereto or resort to any security or other means of obtaining payment of any amounts due and owing to Langley or upon any other contingency whatsoever.

The Guarantor hereby waives promptness, diligence and notice as to the obligations and covenants contained herein and acceptance of this Guaranty, and waives any other circumstance which might otherwise constitute a legal or equitable discharge, release or defense of a guarantor or surety, or that might otherwise limit the obligations of the Guarantor hereunder. The Guarantor hereby agrees that it shall not be entitled to consent to, or receive any notice of, any amendment or modification of, or waiver, release, consent or extension with respect to, or assignment of any agreement giving rise to any obligation guaranteed hereunder, and the Guarantor hereby acknowledges that any such amendment, modification, waiver, release, consent, extension or assignment shall not affect the Guarantor's obligations hereunder. The Guarantor hereby agrees that this Guaranty shall automatically be reinstated if and to the extent that for any reason any payment of the Parent or on behalf of the Parent is rescinded or must otherwise be restored, whether the result of any proceedings in bankruptcy or reorganization or otherwise.

The Guarantor also agrees as follows:

1.      <u>Cy Pres</u>. The doctrine of Cy Pres shall be applicable to this Agreement such that in interpreting the terms and conditions hereunder the intentions of the Guarantor and the beneficiaries hereof are to be carried out as near as may be, when it would otherwise be impossible or illegal to give it literal effect. In any dispute arising out of this Agreement, the doctrine of Cy Pres shall be applied.

2.      <u>Agreement Governed by the Laws of Kansas</u>. This Agreement and the obligations of the Guarantor hereunder, shall be interpreted, construed, and enforced in accordance with the laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

3.      <u>Agreement Subject to Laws</u>. If any provision of this Agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the latter shall control

457026.3

1

ENB 01017



and this Agreement shall be deemed modified accordingly, but in other respects this Agreement shall continue in full force and effect, subject to the modifications necessary to preserve the intent and considerations due the parties as set forth in this Agreement.

4.     <u>Severability</u>.  Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

5.     <u>Jurisdiction and Venue</u>.  Any suit, action or proceeding with respect to, arising under or in connection with this Agreement or the enforcement may be brought in any court in Kansas.  The Guarantor hereby submits to the jurisdiction and venue of any and all such courts for the purpose of any such suit, action or proceeding.

6.     <u>Further Assurances</u>.  The Guarantor hereby agrees to execute, acknowledge and deliver to each other any further writings, documents, transfers, acknowledgments, instruments, powers of attorney, authorizations, filings, applications, reports, etc. that may be reasonably required to give full force and effect to the provisions of this Agreement.

Dated: November 2, 1999.

KANSAS PIPELINE COMPANY

By:     Syenergy Pipeline Company, L.P.,
        its General Partner

By:     Bishop Pipeline Company,
        its General Partner

By: _____
    Name:  Howard E. Lubow
    Title:   Executive Vice President

457026.3

2

ENB 01018

EM001-007498

36

ENB 01019

EM001-007499

### OPTION AGREEMENT

THIS OPTION AGREEMENT ("Agreement") is entered into as of the 24th day of October, 1999, by and between Management Resources Group, LLC ("MRG"), Kansas Pipeline Company, a Kansas general partnership ("KPC"), and MarGasCo Partnership, an Oklahoma general partnership ("MGC").

WHEREAS, on the date first written above, MGC and MRG executed a Project Development Agreement (the "PDA I")

WHEREAS, on the date first written above, KPC and MRG executed a Project Development Agreement and MRG Interest Agreement (the "PDA II");

WHEREAS, the parties desire to enter into an agreement to define their rights, duties and obligations under the PDA I and PDA II;

NOW, THEREFORE, in consideration of the promises and covenants contained herein, the parties agree as follows:

1.     <u>PDA I</u>.  The PDA I shall be deemed effective as of the date first written above, unless KPC does not exercise its Option Rights during the Option Period described below, in which event the PDA I shall then be deemed automatically terminated ab initio, as if it never existed.

2.     <u>PDA II</u>.  The PDA II shall be deemed effective as of the date first written above if KPC does not exercise its Option Rights during the Option Period described below.  If KPC exercises its Option Rights during the Option Period, then the PDA II shall be deemed automatically terminated ab initio as if it never existed.  If KPC does not exercise its Option Rights during the Option Period, then the PDA II shall become effective, retroactively, as of date first written above, including all payments and obligations due thereunder, as if the PDA II has been in effect from the date first written above (i.e any payment which would have been due under the PDA II during the Option Period or specific performances due during the Option Period, shall become immediately due upon the expiration of this Option Period if the Option Rights are not exercised).

3.     <u>**Option Rights of KPC**</u>.  KPC shall have the option, but not the obligation, to elect to cancel and terminate the PDA II ("Option Rights") for a period of time ("Option Period") from the date first written above, until 5:00 central time, January 31, 2000.  To exercise its Option Rights, KPC shall notify: (i) MRG in writing pursuant to the notice provisions set forth in Section 4(c) below at any time during the Option Period; and (ii) make payment to MRG of $10,750,000.00 in certified funds, or other liquid assets including, but not limited to, publicly tradable securities or stocks, which KPC and MRG may mutually agree to in writing with said payment being made contemporaneously with KPC's notification described in subsection (i) above. Should KPC fail to exercise its Option Rights during the Option Period, the Option Rights shall automatically terminate immediately upon the expiration of the Option Period without any further action necessary by any party hereto.

ENB 01020

4.    Moratorium.  Prior to January 31, 2000, the Parties agree that no Projects (as defined in both PDA I and PDA II) shall be proposed or initiated by any Party unless otherwise mutually agreed to in writing by the Parties.

5.    General Provisions.

(a)    Amendments. Except as otherwise provided for herein, any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and mutually executed amendments. It is stipulated that oral modifications and amendments hereto or other parole evidence shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or other adjudication.

(b)    Waiver.  Waiver of any provision of this Agreement or of any breach hereof shall be a waiver of only said specific provision or breach and shall not be deemed a waiver of any other provision or any future breach hereof.

(c)    Notices.  All notices, documents, or other communications to be given hereunder shall be in writing and shall be deemed validly given if delivered by messenger, facsimile transmission (with a confirming copy sent by overnight courier), or express overnight delivery, or sent by certified mail, return receipt requested, as follows:

If to the MRG, to

Dennis M. Langley
13137 Thunderhead Falls Lane
Rapid City, SD  57702
Telephone No: (605) 355-9746
Telecopier:  (316) 665-5961

and to:

Tino Monaldo, Chtd.
335 North Washington, Suite 130
Hutchinson, Kansas 67501
Telephone:     (316) 669-9338
Telecopier:(316) 665-5961

and:

If to KPC or MGC, to

MarGasCo Partnership
Kansas Pipeline Company
8325 Lenexa Drive, Suite 400
Lenexa, KS 66214

2

ENB 01021

EM001-007501

Telephone: (913) 888-7139
Telecopier: (913) 599-5645

or such other persons or addresses as may be designated in writing by the party to receive such notice. Any notice delivered by messenger shall be deemed received when such delivery is tendered; notices sent by facsimile transmission shall be deemed received upon faxed confirmation of receipt; notices mailed in the manner provided above, shall be deemed received on the third day after such are postmarked; and notices delivered by other methods shall be deemed received when actually received by the addressee or its authorized agent.

(d)     Governing Law; Jurisdiction; Venue.  This Agreement shall be governed by, and construed and enforced in accordance with, the Laws of the State of Kansas, without giving effect to the principles of the conflicts of law thereof. The parties agree that the Federal Court of the District of Kansas shall have exclusive jurisdiction and venue to hear and determine any claims or disputes between the parties, pertaining directly or indirectly to this Agreement, any additional agreements or in connection with this Agreement.  Each party expressly submits and consents in advance to such jurisdiction in any action or proceeding commenced in such courts, hereby waiving personal service of the summons and complaint or other process or papers issued therein and agreeing that service of such summons and complaint or other process or papers may be made by registered or certified mail addressed to the relevant party at the address set forth in Section 4(c), which service shall be deemed made upon receipt thereof.  The exclusive choice of forum set forth in this Section shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action under this Agreement to enforce the same in any appropriate jurisdiction.

(e)     Entire Agreement.   This Agreement constitutes the entire agreement and understanding of the parties with respect to the matters covered hereby and supersedes any and all prior agreements, representations and understandings relating to the subject matter hereof.

(f)     Construction.  The section headings contained in this Agreement are inserted for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  The preamble hereof, the recitals hereto, and all schedules attached hereto are hereby incorporated herein by reference and made a part hereof.

(g)     Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties, and their respective successors and assigns, to the extent allowed hereby.  Nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.

(h)     Assignment.  None of the parties may assign any rights or delegate any obligations provided for in this Agreement without the prior written consent of all the

3

ENB 01022

other parties, which consent shall not be unreasonably withheld. Any assignment in violation of the preceding sentence shall be void. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns. The assignment of the PDA I or the PDA II shall be governed by the PDA I and/ or PDA II, respectively.

(i)     Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be in an original, but all of which shall be deemed to constitute one instrument. This Agreement or any document executed in connection herewith shall be binding upon such signator party, if said signature is delivered by telecopier or other like transmission.

(j)     Obligations of Subsidiaries. Whenever this Agreement requires a Subsidiary of the Company to take any action, such requirement shall be deemed to include an undertaking on the part of the Company to cause such Subsidiary to take such action.

(k)     Severability. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability or the other provisions hereof.  If any provision of this Agreement, or the application thereof to any person or any circumstance, is invalid or unenforceable, (a) a suitable or equitable provision shall be substituted therefor in order to carry out, so far as may be valid or enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction. The doctrine of *Cy Pres* shall be applicable to the Agreement such that in interpreting the terms and conditions hereunder the intentions of the parties are to be carried out as near as may be, when it would otherwise be impossible or illegal to give it literal effect.  In any dispute arising out of this Agreement, the doctrine of *Cy Pres* shall be applied by the Court.

(l)     Costs and Fees. In connection with litigation related to this Agreement (regardless of whether the action alleges breach of contract, tort, violation of a statute, or any other cause of action), the prevailing party will be entitled to recover from the nonprevailing party its reasonable costs in bringing or defending such claims, including its reasonable attorneys' fees, accounting fees, professional and/or expert witness fees, court costs,  and travel and out-of-pocket expenditures incurred in preparation for and during such proceedings.  If a party prevails on some aspects of its claims but not on others, the court shall apportion any award of costs in bringing or defending such claims in such manner as it deems equitable.

(m)     Breach, Notice and Cure. In the event that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written

4

ENB 01023

notice of such purported breach(s) describing such breach(s) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual receipt of such notice to cure said breach(s) if it concurs that the acts or omissions described in the notice(s) constitute breach(s), or it may elect to provide a cure to the complaining party's contended breach(s) even if the purported breaching party is of the belief that the acts or omissions described in the notice(s) do not constitute a breach(s) hereof; and if so cured by the purported breaching party to the reasonable satisfaction of the complaining party, the breach(s) shall be deemed to have never occurred. In the event the parties cannot agree as to whether the acts or omissions described in the notice(s) constitute a breach(s) of the terms hereof, and the purported breaching party does not elect to cure the alleged breaches to the reasonable satisfaction of the complaining party, then the parties may pursue any legal remedies they may have.

(n)   <u>Definitions</u>.   Any capitalized words shall have the meaning attributed to said words given it in the Company Agreements, unless otherwise defined herein specifically.

(o)   <u>Further Assurances</u>.   The parties hereby agree to execute, acknowledge and deliver to each other any further writings, documents, transfers, acknowledgments, instruments, powers of attorney, authorizations, filings, applications, reports, etc. that may be reasonably required to give full force and effect to the provisions of this Agreement, and to take such further actions reasonably required in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

5

ENB 01024

IN WITNESS WHEREOF, the parties affix their signature effective the date first written above.

MRG:        Management Resources Group, LLC

By: _Dennis M. Langley_
Name: Dennis M. Langley
Title: President

KPC:        Kansas Pipeline Company

By:    Syenergy Pipeline Company, L.P.,
       its general partner

By:    Bishop Pipeline Company, L.P., its
       general partner

By: _Yvette C. Korb_
Name: Yvette C. Korb
Title: Vice President

MGC:        MarGasCo Partnership

By:    Syenergy Pipeline Company, L.P.,
       its general partner

By:    Bishop Pipeline Company, L.P., its
       general partner

By: _____
Name: Howard E. Lubow
Title: Executive Vice President

457038.02                           6

ENB 01025

EM001-007505

37

ENB 01026

EM001-007506



**38**

ENB 01028

EM001-007508

### CERTIFICATE OF AMENDMENT OF ARTICLES OF INCORPORATION
### OF
### THE BISHOP GROUP, LTD.

The undersigned. The Bishop Group, Ltd.. a Kansas corporation (the "Corporation"), for the purpose of amending the Articles of Incorporation of the Corporation. in accordance with the General Corporation Code of Kansas. does hereby make and execute this Certificate of Amendment of Articles of Incorporation and does hereby certify that:

1.     The amendment of the Articles of Incorporation proposed by the directors and adopted by the stockholders of the Corporation is as follows:

### ARTICLE ONE

The name of the corporation is K-Pipe Group, Inc.

2.     The said amendment has been duly adopted by written consent of the stockholders in accordance with the provisions of Section 17-6518 of the Kansas Statutes Annotated.

IN WITNESS WHEREOF, this Certificate of Amendment has been executed by the Corporation by its President and attested by its Secretary on this 18th day of October, 1999.

The Bishop Group, Ltd.

[CORPORATE SEAL]

By _____
    Dennis M. Langley, President

ATTEST:

_____
Yvette C. Korb. Secretary

STATE OF Kansas      )
                     ) SS.
COUNTY OF Johnson    )

BE IT REMEMBERED. that on this 18th day of October, 1999, before me. the undersigned. a Notary Public in and for said County and State. personally appeared Dennis M. Langley and Yvette C. Korb, who declared that they are the President and Secretary, respectively, of the corporation named in the foregoing certificate. and acknowledged that they executed the foregoing certificate on behalf of the corporation.

[NOTARIAL SEAL]

_____
Notary Public

My Commission Expires:
    Dianna L. Wood, Notary Public
    State of Kansas
    My Commission Expires        11-18-99

JC01DOCS/28955.01

ENB 01029

EM001-007509

**39**

ENB 01030

EM001-007510

## AMENDMENT

This Amendment Agreement ("Amendment") is entered into effective this 24ᵗʰ day of October, 1999, by and between Kansas Pipeline Company ("KPC") and Overland Consulting, Inc., a Kansas corporation ("Consultant" or "OCI").

WHEREAS, OCI executed a Consulting Agreement dated April 1, 1997, with Kansas Pipeline Operating Company ("KPOC"), Kansas Pipeline Partnership ("KPP"), KansOk Partnership ("KOP") and Riverside Pipeline Company, L.P. ("Riverside") hereafter called the "Consulting Agreement"; and

WHEREAS, the parties desire to amend the Consulting Agreement.

NOW, THEREFORE in consideration of the promises and covenants contained herein and for other good and valuable consideration contained herein, the parties agree as follows:

1.    **Assumption.** KPC assumes all the rights, duties and obligations of KPOC, KPP, KOP and Riverside under the Consulting Agreement.

2.    **Consent.**   OCI hereby accepts and consents to the substitution of and assumption by KPC of all of the rights, duties and obligations of KPOC, KPP, KOP and Riverside under the Consulting Agreement.

3.    **Amendment.** Paragraph 4 of the Consulting Agreement is hereby deleted in its entirety and a new Paragraph 4 is substituted in its stead and shall read as follows:

"4.    TERM. This Agreement shall commence April 14, 1997, and shall terminate on April 13, 2001. This Agreement may be terminated at any time by OCI in which case OCI, shall be required to provide services hereunder to the Pipelines for a period of time equal to no less than ninety (90) days after OCI's notice of termination; if so requested by the Pipelines; provided however, if requested by the Pipelines, OCI will provides services requested for longer than ninety (90) days if it relates to any ongoing regulatory proceedings for which OCI is providing services.

4.    **Ratification.** Other than the specific changes described herein, there are no other changes, alterations or modifications to the proposed Consulting Agreement, which is ratified and confirmed, along with this Amendment by the parties hereto.

IN WITNESS WHEREOF, the parties affix their signatures hereto, effective the date first written above.

sh\forms\OCI Amendmentv2

ENB 01031

EM001-007511

KANSAS PIPELINE COMPANY

By:    Syenergy Pipeline Company, L.P.,
its general partner

By:    Bishop Pipeline Company,
its general partner

By:    _____
Name Dennis M. Langley
Title:  President

OVERLAND CONSULTING, INC.

By:    _____
Name:  Howard E. Lubow
Title:  President

sh\forms\OCI Amendmentv2

ENB 01032

**40**

ENB 01033