# RELEASE

This Release (Agreement) is entered into 24th day of October, 1999, by and between Howard Lubow (Employee) and Kansas Pipeline Operating Company (KPOC) and Kansas Pipeline Company (KPC) (collectively KPOC and KPC shall be referred to as Employer)

Whereas Employee and Employer executed an employment agreement dated August 4, 1998, (Employment Agreement)

Whereas the parties desire to terminate said Employment Agreement;

Therefore, in consideration of ten ($10) dollars, the promises of covenants contained herein, and other good and valuable consideration, receipt of which is acknowledged hereby the undersigned agree as follows:

1. **Release.** Employee forever releases and waives Employer, its officers, directors and agents, as well as Employers' affiliates, successors and assigns from any and all claims, causes of actions, attorney's fees, damages or encumbrances of any kind whatsoever, now knowing, or hereafter acquired, arising out of, directly or indirectly, the Employment Agreements, including but not limited to, any compensation or severance claims described in Article III of the Employment Agreement.

2. **COBRA.** Employer shall not be relieved of any COBRA obligations it may have to Employee arising as a matter of law as of the date first written above, notwithstanding the termination of the Employment Agreement.

3. **Termination.** The Employment Agreement shall be terminated as of the date first written above and shall be of no force or effect, provided however, our obligations of Employee regarding confidentiality described in the Employment Agreement shall survive beyond the date first written above. As of the date first written above, there shall be no written or verbal agreement between Employer or Employee regarding Employee's terms and conditions of employment.

4. **Agreement Subject to Laws.** If any provision of this agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the later shall control and this Agreement shall be deemed modified accordingly, but the remainder of this Agreement and the application of such provisions to the other parties or circumstances shall not be effected thereby, and in all other respects the Agreement shall continue in full force and effect.

5. **Agreement Governed by the Laws of Kansas.** This Agreement shall be governed by and construed in accordance with the internal laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

Release_lubow.doc

ENB 01034

6.  **Notices.** All notices and other correspondence required or made necessary by the terms of this Agreement shall be delivered, postage prepaid, return receipt requested to the respective parties hereto at the following addresses:

> EMPLOYEE:      Howard E. Lubow
> 14068 Mastin
> Overland Park, KS 66221
>
> EMPLOYER:      Kansas Pipeline Company
> c/o Personnel Department
> 8325 Lenexa Drive, Suite 400
> Lenexa, KS 66214

or to such other addresses as either party hereto may designate in writing to the other party. Notices also may be given by telegram, telex, or telecopy. A notice shall be deemed received when actually received by the party to whom it is addressed.

7.  **Waiver.** Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provisions hereafter. Either party's failure or delay in protesting, or contending breach pursuant to Section 15, or taking legal action or demanding arbitration upon the other party's breach is no waiver of that cause of action, unless that party's delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations. Any party's failure or delay in protesting, or contending breach pursuant to Section 15 or taking legal and/or equitable action or demanding arbitration upon the other party's breach is not to be considered as being a waiver of that party's cause of action for any subsequent breach of the same or of a different nature.

8.  **Assignment Prohibited.** This Agreement shall not be assigned by either party hereto, without the prior written consent of the other party, provided that Employee can assign this Agreement to an affiliated entity of Employer without the consent of Employee.

9.  **Recitals.** The recitals of this Agreement are incorporated in the text of this Agreement as mutual and substantive terms hereof and may be relied upon by employee during any and all proceedings in law, equity and/or arbitration.

10. **Modifications and Amendments.** Any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and executed amendments. It is stipulated that oral modifications and amendments

ENB 01035

EM001-007515

hereto shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or adjudication.

11. **Titles of Articles, Section and Subsections.**  The titles and subtitles of Articles, Sections and Subsections of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of this Agreement or in any way influence the interpretation of this Agreement.

12. **Invalidity of Part.**  The parties to this Agreement view this Agreement as legal and fair in all respects and have taken reasonable diligence to insure that this Agreement is legal and fair.

13. **Duplicate Originals.**  This contract may be executed in duplicate originals, with Employer and Employee each receiving an original.

14. **Further Assurances.**  The parties hereby agree to execute any and all documents, transfers, notes, affidavits, minutes, resolutions, instruments or the like in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

15. **Breach, Notice and Cure.**  In the event, that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(es) describing such breach(es) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual receipt of such notice to cure said breach(es) if it concurs that the complaint(s) constitute breach(es), or it may elect to provide a cure to the complaining party's contended breach(es) even if the purported breaching party is of the belief that the complaint(s) do not constitute a breach(es) hereof, and if so cured by the purported breaching party the breach(es) shall be deemed to have never occurred. In the event the parties cannot agree as to whether the complaint(s) constitute a breach(es) of the terms hereof, and the purported breaching party does not elect to undertake the expense of resolving the complaint(s), then the parties agree they may pursue any legal remedy they may have available.

16. **Independent Legal Counsel.**  The law firm of Tino M. Monaldo, Chartered has represented the Company exclusively in the negotiation, drafting and execution of this Agreement. The Employee has been represented by his own independent legal counsel or has waived by opportunity to such counsel.

ENB 01036

EM001-007516

IN WITNESS WHEREOF, the parties have hereunto set their hands the day and year first written above, or consent to the terms hereof, as if executed on such date.

EMPLOYER:

Kansas Pipeline Company, a Kansas general partnership on its own behalf and on behalf of Kansas Pipeline Operating Company

By:    Syenergy Pipeline Company. L.P., its general partner

By:    Bishop Pipeline Company, its general partner

By:    _____

Name:  Dennis M. Langley
Title:  President

EMPLOYEE:

By:    _____

Howard E. Lubow

4

ENB 01037

EM001-007517

# RELEASE

This **Release** (Agreement) is entered into 24th day of October, 1999, by and between Wallace McKinney (Employee) and Kansas Pipeline Company (KPC) (referred to as Employer)

**Whereas** Employee and Employer executed an employment agreement dated March 1, 1999, (Employment Agreement)

**Whereas** the parties desire to terminate said Employment Agreement;

**Therefore,** in consideration of ten ($10) dollars, the promises of covenants contained herein, and other good and valuable consideration, receipt of which is acknowledged hereby the undersigned agree as follows:

1.   **Release.**  Employee forever releases and waives Employer, its officers, directors and agents, as well as Employers' affiliates, successors and assigns from any and all claims, causes of actions, attorney's fees, damages or encumbrances of any kind whatsoever, now knowing, or hereafter acquired, arising out of, directly or indirectly, the Employment Agreements, including but not limited to, any compensation or severance claims described in Article III of the Employment Agreement.

2.   **COBRA.**  Employer shall not be relieved of any COBRA obligations it may have to Employee arising as a matter of law as of the date first written above, notwithstanding the termination of the Employment Agreement.

3.   **Termination.**  The Employment Agreement shall be terminated as of the date first written above and shall be of no force or effect, provided however, our obligations of Employee regarding confidentiality described in the Employment Agreement shall survive beyond the date first written above. As of the date first written above, there shall be no written or verbal agreement between Employer or Employee regarding Employee's terms and conditions of employment.

4.   **Agreement Subject to Laws.**  If any provision of this agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the later shall control and this Agreement shall be deemed modified accordingly, but the remainder of this Agreement and the application of such provisions to the other parties or circumstances shall not be effected thereby, and in all other respects the Agreement shall continue in full force and effect.

5.   **Agreement Governed by the Laws of Kansas.**  This Agreement shall be governed by and construed in accordance with the internal laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

Release_McKinney

ENB 01038

6. **Notices.** All notices and other correspondence required or made necessary by the terms of this Agreement shall be delivered, postage prepaid, return receipt requested to the respective parties hereto at the following addresses:

EMPLOYEE:   Wallace G. McKinney
        600 Adair Circle
        Hutchinson, KS  67502

EMPLOYER:   Kansas Pipeline Company
        c/o Personnel Department
        8325 Lenexa Drive, Suite 400
        Lenexa, KS 66214

or to such other addresses as either party hereto may designate in writing to the other party. Notices also may be given by telegram, telex, or telecopy. A notice shall be deemed received when actually received by the party to whom it is addressed.

7. **Waiver.** Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provisions hereafter. Either party's failure or delay in protesting, or contending breach pursuant to Section 15, or taking legal action, or demanding arbitration upon the other party's breach is no waiver of that cause of action, unless that party's delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations. Any party's failure or delay in protesting, or contending breach pursuant to Section 15 or taking legal and/or equitable action or demanding arbitration upon the other party's breach is not to be considered as being a waiver of that party's cause of action for any subsequent breach of the same or of a different nature.

8. **Assignment Prohibited.** This Agreement shall not be assigned by either party hereto, without the prior written consent of the other party, provided that Employee can assign this Agreement to an affiliated entity of Employer without the consent of Employee.

9. **Recitals.** The recitals of this Agreement are incorporated in the text of this Agreement as mutual and substantive terms hereof and may be relied upon by employee during any and all proceedings in law, equity and/or arbitration.

10. **Modifications and Amendments.** Any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and executed amendments. It is stipulated that oral modifications and amendments

2

ENB 01039

hereto shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or adjudication.

11. **Titles of Articles, Section and Subsections.** The titles and subtitles of Articles, Sections and Subsections of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of this Agreement or in any way influence the interpretation of this Agreement.

12. **Invalidity of Part.** The parties to this Agreement view this Agreement as legal and fair in all respects and have taken reasonable diligence to insure that this Agreement is legal and fair.

13. **Duplicate Originals.** This contract may be executed in duplicate originals, with Employer and Employee each receiving an original.

14. **Further Assurances.** The parties hereby agree to execute any and all documents, transfers, notes, affidavits, minutes, resolutions, instruments or the like in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

15. **Breach, Notice and Cure.** In the event, that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(es) describing such breach(es) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual receipt of such notice to cure said breach(es) if it concurs that the complaint(s) constitute breach(es), or it may elect to provide a cure to the complaining party's contended breach(es) even if the purported breaching party is of the belief that the complaint(s) do not constitute a breach(es) hereof, and if so cured by the purported breaching party the breach(es) shall be deemed to have never occurred. In the event the parties cannot agree as to whether the complaint(s) constitute a breach(es) of the terms hereof, and the purported breaching party does not elect to undertake the expense of resolving the complaint(s), then the parties agree they may pursue any legal remedy they may have available.

16. **Independent Legal Counsel.** The law firm of Tino M. Monaldo, Chartered has represented the Company exclusively in the negotiation, drafting and execution of this Agreement. The Employee has been represented by his own independent legal counsel or has waived by opportunity to such counsel.

3

ENB 01040

EM001-007520

IN WITNESS WHEREOF, the parties have hereunto set their hands the day and year first written above, or consent to the terms hereof, as if executed on such date.

EMPLOYER:

Kansas Pipeline Company, a Kansas general partnership

By:   Syenergy Pipeline Company. L.P., its general partner

By:   Bishop Pipeline Company, its general partner

By:   _____

Name:  Dennis M. Langley
Title:  President

EMPLOYEE:

By:   _____
Wallace G. McKinney

4

ENB 01041

EM001-007521

## RELEASE

This Release (Agreement) is entered into _24th_ day of October, 1999, by and between Lynette K.Shaw (Employee) and Kansas Pipeline Operating Company (KPOC) and Kansas Pipeline Company (KPC) (collectively KPOC and KPC shall be referred to as Employer)

Whereas Employee and Employer executed an employment agreement dated April 1, 1998, (Employment Agreement)

Whereas the parties desire to terminate said Employment Agreement;

Therefore, in consideration of ten ($10) dollars, the promises of covenants contained herein, and other good and valuable consideration, receipt of which is acknowledged hereby the undersigned agree as follows:

1.  **Release.** Employee forever releases and waives Employer, its officers, directors and agents, as well as Employers' affiliates, successors and assigns from any and all claims, causes of actions, attorney's fees, damages or encumbrances of any kind whatsoever, now knowing, or hereafter acquired, arising out of, directly or indirectly, the Employment Agreements, including but not limited to, any compensation or severance claims described in Article III of the Employment Agreement.

2.  **COBRA.** Employer shall not be relieved of any COBRA obligations it may have to Employee arising as a matter of law as of the date first written above, notwithstanding the termination of the Employment Agreement.

3.  **Termination.** The Employment Agreement shall be terminated as of the date first written above and shall be of no force or effect, provided however, our obligations of Employee regarding confidentiality described in the Employment Agreement shall survive beyond the date first written above. As of the date first written above, there shall be no written or verbal agreement between Employer or Employee regarding Employee's terms and conditions of employment.

4.  **Agreement Subject to Laws.** If any provision of this agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the later shall control and this Agreement shall be deemed modified accordingly, but the remainder of this Agreement and the application of such provisions to the other parties or circumstances shall not be effected thereby, and in all other respects the Agreement shall continue in full force and effect.

5.  **Agreement Governed by the Laws of Kansas.** This Agreement shall be governed by and construed in accordance with the internal laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

Release_Shaw.doc

ENB 01042

6.   **Notices.** All notices and other correspondence required or made necessary by the terms of this Agreement shall be delivered, postage prepaid, return receipt requested to the respective parties hereto at the following addresses:

> EMPLOYEE:   Lynette K. Shaw
> 7123 Eby Drive, #204
> Merriam, KS  60204

> EMPLOYER:   Kansas Pipeline Company
> c/o Personnel Department
> 8325 Lenexa Drive, Suite 400
> Lenexa, KS 66214

or to such other addresses as either party hereto may designate in writing to the other party. Notices also may be given by telegram, telex, or telecopy. A notice shall be deemed received when actually received by the party to whom it is addressed.

7.   **Waiver.** Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provisions hereafter. Either party's failure or delay in protesting, or contending breach pursuant to Section 15, or taking legal action or demanding arbitration upon the other party's breach is no waiver of that cause of action, unless that party's delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations. Any party's failure or delay in protesting, or contending breach pursuant to Section 15 or taking legal and/or equitable action or demanding arbitration upon the other party's breach is not to be considered as being a waiver of that party's cause of action for any subsequent breach of the same or of a different nature.

8.   **Assignment Prohibited.** This Agreement shall not be assigned by either party hereto, without the prior written consent of the other party, provided that Employee can assign this Agreement to an affiliated entity of Employer without the consent of Employee.

9.   **Recitals.** The recitals of this Agreement are incorporated in the text of this Agreement as mutual and substantive terms hereof and may be relied upon by employee during any and all proceedings in law, equity and/or arbitration.

10.  **Modifications and Amendments.** Any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and executed amendments. It is stipulated that oral modifications and amendments

ENB 01043

EM001-007523

hereto shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or adjudication.

11. **Titles of Articles, Section and Subsections.** The titles and subtitles of Articles, Sections and Subsections of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of this Agreement or in any way influence the interpretation of this Agreement.

12. **Invalidity of Part.** The parties to this Agreement view this Agreement as legal and fair in all respects and have taken reasonable diligence to insure that this Agreement is legal and fair.

13. **Duplicate Originals.** This contract may be executed in duplicate originals, with Employer and Employee each receiving an original.

14. **Further Assurances.** The parties hereby agree to execute any and all documents, transfers, notes, affidavits, minutes, resolutions, instruments or the like in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

15. **Breach, Notice and Cure.** In the event, that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(es) describing such breach(es) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual receipt of such notice to cure said breach(es) if it concurs that the complaint(s) constitute breach(es), or it may elect to provide a cure to the complaining party's contended breach(es) even if the purported breaching party is of the belief that the complaint(s) do not constitute a breach(es) hereof, and if so cured by the purported breaching party the breach(es) shall be deemed to have never occurred. In the event the parties cannot agree as to whether the complaint(s) constitute a breach(es) of the terms hereof, and the purported breaching party does not elect to undertake the expense of resolving the complaint(s), then the parties agree they may pursue any legal remedy they may have available.

16. **Independent Legal Counsel.** The law firm of Tino M. Monaldo, Chartered has represented the Company exclusively in the negotiation, drafting and execution of this Agreement. The Employee has been represented by his own independent legal counsel or has waived by opportunity to such counsel.

3

ENB 01044

IN WITNESS WHEREOF, the parties have hereunto set their hands the day and year first written above, or consent to the terms hereof, as if executed on such date.

EMPLOYER:

**Kansas Pipeline Company, a Kansas general partnership on its own behalf and on behalf of Kansas Pipeline Operating Company**

By:    **Syenergy Pipeline Company. L.P., its general partner**

By:    **Bishop Pipeline Company, its general partner**

By:    _____

Name:  Dennis M. Langley
Title:  President

EMPLOYEE:

By:    _____
Lynette K. Shaw

4

ENB 01045

EM001-007525

## RELEASE

This Release (Agreement) is entered into 27th day of October, 1999, by and between Stephen P. Korb (Employee) and Kansas Pipeline Operating Company (KPOC) and Kansas Pipeline Company (KPC) (collectively KPOC and KPC shall be referred to as Employer)

Whereas Employee and Employer executed an employment agreement dated September 1, 1998, (Employment Agreement)

Whereas the parties desire to terminate said Employment Agreement;

Therefore, in consideration of ten ($10) dollars, the promises of covenants contained herein, and other good and valuable consideration, receipt of which is acknowledged hereby the undersigned agree as follows:

1.  **Release.** Employee forever releases and waives Employer, its officers, directors and agents, as well as Employers' affiliates, successors and assigns from any and all claims, causes of actions, attorney's fees, damages or encumbrances of any kind whatsoever, now knowing, or hereafter acquired, arising out of, directly or indirectly, the Employment Agreements, including but not limited to, any compensation or severance claims described in Article III of the Employment Agreement.

2.  **COBRA.** Employer shall not be relieved of any COBRA obligations it may have to Employee arising as a matter of law as of the date first written above, notwithstanding the termination of the Employment Agreement.

3.  **Termination.** The Employment Agreement shall be terminated as of the date first written above and shall be of no force or effect, provided however, our obligations of Employee regarding confidentiality described in the Employment Agreement shall survive beyond the date first written above. As of the date first written above, there shall be no written or verbal agreement between Employer or Employee regarding Employee's terms and conditions of employment.

4.  **Agreement Subject to Laws.** If any provision of this agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the later shall control and this Agreement shall be deemed modified accordingly, but the remainder of this Agreement and the application of such provisions to the other parties or circumstances shall not be effected thereby, and in all other respects the Agreement shall continue in full force and effect.

5.  **Agreement Governed by the Laws of Kansas.** This Agreement shall be governed by and construed in accordance with the internal laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

Release_Korb.doc

ENB 01046

6.   **Notices.** All notices and other correspondence required or made necessary by the terms of this Agreement shall be delivered, postage prepaid, return receipt requested to the respective parties hereto at the following addresses:

> EMPLOYEE:          Stephen P. Korb
>                    21100 Whispering Drive
>                    Lenexa, KS 66220
>
> EMPLOYER:          Kansas Pipeline Company
>                    c/o Personnel Department
>                    8325 Lenexa Drive, Suite 400
>                    Lenexa, KS 66214

or to such other addresses as either party hereto may designate in writing to the other party. Notices also may be given by telegram, telex, or telecopy. A notice shall be deemed received when actually received by the party to whom it is addressed.

7.   **Waiver.** Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provisions hereafter. Either party's failure or delay in protesting, or contending breach pursuant to Section 15, or taking legal action or demanding arbitration upon the other party's breach is no waiver of that cause of action, unless that party's delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations. Any party's failure or delay in protesting, or contending breach pursuant to Section 15 or taking legal and/or equitable action or demanding arbitration upon the other party's breach is not to be considered as being a waiver of that party's cause of action for any subsequent breach of the same or of a different nature.

8.   **Assignment Prohibited.** This Agreement shall not be assigned by either party hereto, without the prior written consent of the other party, provided that Employee can assign this Agreement to an affiliated entity of Employer without the consent of Employee.

9.   **Recitals.** The recitals of this Agreement are incorporated in the text of this Agreement as mutual and substantive terms hereof and may be relied upon by employee during any and all proceedings in law, equity and/or arbitration.

10.  **Modifications and Amendments.** Any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and executed amendments. It is stipulated that oral modifications and amendments

ENB 01047

EM001-007527

hereto shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or adjudication.

11.  **Titles of Articles, Section and Subsections.**  The titles and subtitles of Articles, Sections and Subsections of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of this Agreement or in any way influence the interpretation of this Agreement.

12.  **Invalidity of Part.**  The parties to this Agreement view this Agreement as legal and fair in all respects and have taken reasonable diligence to insure that this Agreement is legal and fair.

13.  **Duplicate Originals.**  This contract may be executed in duplicate originals, with Employer and Employee each receiving an original.

14.  **Further Assurances.**  The parties hereby agree to execute any and all documents, transfers, notes, affidavits, minutes, resolutions, instruments or the like in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

15.  **Breach, Notice and Cure.**  In the event that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(es) describing such breach(es) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual receipt of such notice to cure said breach(es) if it concurs that the complaint(s) constitute breach(es), or it may elect to provide a cure to the complaining party's contended breach(es) even if the purported breaching party is of the belief that the complaint(s) do not constitute a breach(es) hereof, and if so cured by the purported breaching party the breach(es) shall be deemed to have never occurred. In the event the parties cannot agree as to whether the complaint(s) constitute a breach(es) of the terms hereof, and the purported breaching party does not elect to undertake the expense of resolving the complaint(s), then the parties agree they may pursue any legal remedy they may have available.

16.  **Independent Legal Counsel.**  The law firm of Tino M. Monaldo, Chartered has represented the Company exclusively in the negotiation, drafting and execution of this Agreement. The Employee has been represented by his own independent legal counsel or has waived by opportunity to such counsel.

3

ENB 01048

EM001-007528

IN WITNESS WHEREOF, the parties have hereunto set their hands the day and year first written above, or consent to the terms hereof, as if executed on such date.

EMPLOYER:

Kansas Pipeline Company, a Kansas general partnership on its own behalf and on behalf of Kansas Pipeline Operating Company

By:   Syenergy Pipeline Company. L.P., its general partner

By:   Bishop Pipeline Company, its general partner

By:   _____
      Name:  Dennis M. Langley
      Title:  President

EMPLOYEE:

By:   _____
      Stephen P. Korb

4

ENB 01049

## RELEASE

This Release (Agreement) is entered into 24th day of October, 1999, by and between Yvette C. Korb (Employee) and Kansas Pipeline Operating Company (KPOC) and Kansas Pipeline Company (KPC) (collectively KPOC and KPC shall be referred to as Employer).

Whereas Employee and Employer executed an employment agreement dated October 1, 1997, (Employment Agreement)

Whereas the parties desire to terminate said Employment Agreement;

Therefore, in consideration of ten ($10) dollars, the promises of covenants contained herein, and other good and valuable consideration, receipt of which is acknowledged hereby the undersigned agree as follows:

1.  **Release.** Employee forever releases and waives Employer, its officers, directors and agents, as well as Employers' affiliates, successors and assigns from any and all claims, causes of actions, attorney's fees, damages or encumbrances of any kind whatsoever, now knowing, or hereafter acquired, arising out of, directly or indirectly, the Employment Agreements, including but not limited to, any compensation or severance claims described in Article III of the Employment Agreement.

2.  **COBRA.** Employer shall not be relieved of any COBRA obligations it may have to Employee arising as a matter of law as of the date first written above, notwithstanding the termination of the Employment Agreement.

3.  **Termination.** The Employment Agreement shall be terminated as of the date first written above and shall be of no force or effect, provided however, our obligations of Employee regarding confidentiality described in the Employment Agreement shall survive beyond the date first written above. As of the date first written above, there shall be no written or verbal agreement between Employer or Employee regarding Employee's terms and conditions of employment.

4.  **Agreement Subject to Laws.** If any provision of this agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the later shall control and this Agreement shall be deemed modified accordingly, but the remainder of this Agreement and the application of such provisions to the other parties or circumstances shall not be effected thereby, and in all other respects the Agreement shall continue in full force and effect.

Release_Korby.doc

ENB 01050

5. **Agreement Governed by the Laws of Kansas.** This Agreement shall be governed by and construed in accordance with the internal laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

6. **Notices.** All notices and other correspondence required or made necessary by the terms of this Agreement shall be delivered, postage prepaid, return receipt requested to the respective parties hereto at the following addresses:

> EMPLOYEE:          Yvette C. Korb
> 21100 Whispering Drive
> Lenexa, KS 66220
>
> EMPLOYER:          Kansas Pipeline Company
> c/o Personnel Department
> 8325 Lenexa Drive, Suite 400
> Lenexa, KS 66214

or to such other addresses as either party hereto may designate in writing to the other party. Notices also may be given by telegram, telex, or telecopy. A notice shall be deemed received when actually received by the party to whom it is addressed.

7. **Waiver.** Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provisions hereafter. Either party's failure or delay in protesting, or contending breach pursuant to Section 15, or taking legal action or demanding arbitration upon the other party's breach is no waiver of that cause of action, unless that party's delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations. Any party's failure or delay in protesting, or contending breach pursuant to Section 15 or taking legal and/or equitable action or demanding arbitration upon the other party's breach is not to be considered as being a waiver of that party's cause of action for any subsequent breach of the same or of a different nature.

8. **Assignment Prohibited.** This Agreement shall not be assigned by either party hereto, without the prior written consent of the other party, provided that Employee can assign this Agreement to an affiliated entity of Employer without the consent of Employee.

9. **Recitals.** The recitals of this Agreement are incorporated in the text of this Agreement as mutual and substantive terms hereof and may be relied upon by employee during any and all proceedings in law, equity and/or arbitration.

ENB 01051

EM001-007531

10.   **Modifications and Amendments.**   Any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and executed amendments. It is stipulated that oral modifications and amendments hereto shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or adjudication.

11.   **Titles of Articles, Section and Subsections.**  The titles and subtitles of Articles, Sections and Subsections of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of this Agreement or in any way influence the interpretation of this Agreement.

12.   **Invalidity of Part.**  The parties to this Agreement view this Agreement as legal and fair in all respects and have taken reasonable diligence to insure that this Agreement is legal and fair.

13.   **Duplicate Originals.**  This contract may be executed in duplicate originals, with Employer and Employee each receiving an original.

14.   **Further Assurances.**   The parties hereby agree to execute any and all documents, transfers, notes, affidavits, minutes, resolutions, instruments or the like in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

15.   **Breach, Notice and Cure.**  In the event, that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(es) describing such breach(es) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual receipt of such notice to cure said breach(es) if it concurs that the complaint(s) constitute breach(es), or it may elect to provide a cure to the complaining party's contended breach(es) even if the purported breaching party is of the belief that the complaint(s) do not constitute a breach(es) hereof, and if so cured by the purported breaching party the breach(es) shall be deemed to have never occurred. In the event the parties cannot agree as to whether the complaint(s) constitute a breach(es) of the terms hereof, and the purported breaching party does not elect to undertake the expense of resolving the complaint(s), then the parties agree they may pursue any legal remedy they may have available.

16.   **Independent Legal Counsel.**  The law firm of Tino M. Monaldo, Chartered has represented the Company exclusively in the negotiation, drafting and execution of this Agreement. The Employee has been represented by his own independent legal counsel or has waived by opportunity to such counsel.

3

ENB 01052

EM001-007532

IN WITNESS WHEREOF, the parties have hereunto set their hands the day and year first written above, or consent to the terms hereof, as if executed on such date.

EMPLOYER:

Kansas Pipeline Company, a Kansas general partnership on its own behalf and on behalf of Kansas Pipeline Operating Company

By: Syenergy Pipeline Company. L.P., its general partner

By: Bishop Pipeline Company, its general partner

By: _____

Name: Dennis M. Langley
Title: President

EMPLOYEE:

By: _____

Yvette C. Korb

4

ENB 01053

EM001-007533

## RELEASE

This Release (Agreement) is entered into 24ᵗʰday of October, 1999, by and between Tracey Lebeau (Employee) and Kansas Pipeline Company (KPC) (referred to as Employer)

Whereas Employee and Employer executed an employment agreement dated March 1, 1999, (Employment Agreement)

Whereas the parties desire to terminate said Employment Agreement;

Therefore, in consideration of ten ($10) dollars, the promises of covenants contained herein, and other good and valuable consideration, receipt of which is acknowledged hereby the undersigned agree as follows:

1.     Release.  Employee forever releases and waives Employer, its officers, directors and agents, as well as Employers' affiliates, successors and assigns from any and all claims, causes of actions, attorney's fees, damages or encumbrances of any kind whatsoever, now knowing, or hereafter acquired, arising out of, directly or indirectly, the Employment Agreements, including but not limited to, any compensation or severance claims described in Article III of the Employment Agreement.

2.     COBRA.  Employer shall not be relieved of any COBRA obligations it may have to Employee arising as a matter of law as of the date first written above, notwithstanding the termination of the Employment Agreement.

3.     Termination.  The Employment Agreement shall be terminated as of the date first written above and shall be of no force or effect, provided however, our obligations of Employee regarding confidentiality described in the Employment Agreement shall survive beyond the date first written above.  As of the date first written above, there shall be no written or verbal agreement between Employer or Employee regarding Employee's terms and conditions of employment.

4.     Agreement Subject to Laws.  If any provision of this agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the later shall control and this Agreement shall be deemed modified accordingly, but the remainder of this Agreement and the application of such provisions to the other parties or circumstances shall not be effected thereby, and in all other respects the Agreement shall continue in full force and effect.

5.     Agreement Governed by the Laws of Kansas.  This Agreement shall be governed by and construed in accordance with the internal laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

Release_Lebeau.doc

ENB 01054

EM001-007534

6. **Notices.** All notices and other correspondence required or made necessary by the terms of this Agreement shall be delivered, postage prepaid, return receipt requested to the respective parties hereto at the following addresses:

| | |
|---|---|
| EMPLOYEE: | Tracey LeBeau<br>5303 Foxridge Drive, #303<br>Mission, KS 66202 |
| EMPLOYER: | Kansas Pipeline Company<br>c/o Personnel Department<br>8325 Lenexa Drive, Suite 400<br>Lenexa, KS 66214 |

or to such other addresses as either party hereto may designate in writing to the other party. Notices also may be given by telegram, telex, or telecopy. A notice shall be deemed received when actually received by the party to whom it is addressed.

7. **Waiver.** Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provisions hereafter. Either party's failure or delay in protesting, or contending breach pursuant to Section 15, or taking legal action or demanding arbitration upon the other party's breach is no waiver of that cause of action, unless that party's delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations. Any party's failure or delay in protesting, or contending breach pursuant to Section 15 or taking legal and/or equitable action or demanding arbitration upon the other party's breach is not to be considered as being a waiver of that party's cause of action for any subsequent breach of the same or of a different nature.

8. **Assignment Prohibited.** This Agreement shall not be assigned by either party hereto, without the prior written consent of the other party, provided that Employee can assign this Agreement to an affiliated entity of Employer without the consent of Employee.

9. **Recitals.** The recitals of this Agreement are incorporated in the text of this Agreement as mutual and substantive terms hereof and may be relied upon by employee during any and all proceedings in law, equity and/or arbitration.

10. **Modifications and Amendments.** Any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and executed amendments. It is stipulated that oral modifications and amendments

2

ENB 01055

EM001-007535

hereto shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or adjudication.

11. **Titles of Articles, Section and Subsections.** The titles and subtitles of Articles, Sections and Subsections of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of this Agreement or in any way influence the interpretation of this Agreement.

12. **Invalidity of Part.** The parties to this Agreement view this Agreement as legal and fair in all respects and have taken reasonable diligence to insure that this Agreement is legal and fair.

13. **Duplicate Originals.** This contract may be executed in duplicate originals, with Employer and Employee each receiving an original.

14. **Further Assurances.** The parties hereby agree to execute any and all documents, transfers, notes, affidavits, minutes, resolutions, instruments or the like in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

15. **Breach, Notice and Cure.** In the event, that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(es) describing such breach(es) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual receipt of such notice to cure said breach(es) if it concurs that the complaint(s) constitute breach(es), or it may elect to provide a cure to the complaining party's contended breach(es) even if the purported breaching party is of the belief that the complaint(s) do not constitute a breach(es) hereof, and if so cured by the purported breaching party the breach(es) shall be deemed to have never occurred. In the event the parties cannot agree as to whether the complaint(s) constitute a breach(es) of the terms hereof, and the purported breaching party does not elect to undertake the expense of resolving the complaint(s), then the parties agree they may pursue any legal remedy they may have available.

16. **Independent Legal Counsel.** The law firm of Tino M. Monaldo, Chartered has represented the Company exclusively in the negotiation, drafting and execution of this Agreement. The Employee has been represented by his own independent legal counsel or has waived by opportunity to such counsel.

3

ENB 01056

EM001-007536

IN WITNESS WHEREOF, the parties have hereunto set their hands the day and year first written above, or consent to the terms hereof, as if executed on such date.

EMPLOYER:

Kansas Pipeline Company, a Kansas general partnership

By:    Syenergy Pipeline Company. L.P., its general partner

By:    Bishop Pipeline Company, its general partner

By:    _Dennis M. Langley_
       Name:  Dennis M. Langley
       Title:  President

EMPLOYEE:

By:    _Tracey LeBeau_
       Tracey LeBeau

4

ENB 01057

EM001-007537

41

ENB 01058

41

## RELEASE

This Release (Agreement) is entered into 24th day of October, 1999, by and between Frank Lamere (Consultant) and Kansas Pipeline Operating Company (KPOC) and Kansas Pipeline Company (KPC) (collectively KPOC and KPC shall be referred to as Company)

Whereas Consultant and Company executed an Consulting Agreement dated December 1, 1998, (Consulting Agreement)

Whereas the parties desire to terminate said Consulting Agreement;

Therefore, in consideration of ten ($10) dollars, the promises of covenants contained herein, and other good and valuable consideration, receipt of which is acknowledged hereby the undersigned agree as follows:

1.  **Release.** Employee forever releases and waives Employer, its officers, directors and agents, as well as Employers' affiliates, successors and assigns from any and all claims, causes of actions, attorney's fees, damages or encumbrances of any kind whatsoever, now knowing, or hereafter acquired, arising out of, directly or indirectly, the Employment Agreements, including but not limited to, any compensation or severance claims described in Article III of the Employment Agreement.

2.  **COBRA.** Employer shall not be relieved of any COBRA obligations it may have to Employee arising as a matter of law as of the date first written above, notwithstanding the termination of the Employment Agreement.

3.  **Termination.** The Employment Agreement shall be terminated as of the date first written above and shall be of no force or effect, provided however, our obligations of Employee regarding confidentiality described in the Employment Agreement shall survive beyond the date first written above. As of the date first written above, there shall be no written or verbal agreement between Employer or Employee regarding Employee's terms and conditions of employment.

4.  **Agreement Subject to Laws.** If any provision of this agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the later shall control and this Agreement shall be deemed modified accordingly, but the remainder of this Agreement and the application of such provisions to the other parties or circumstances shall not be effected thereby, and in all other respects the Agreement shall continue in full force and effect.

10/20/99 ReleaseconTlao                                           5:17 PM

ENB 01059

EM001-007539

3.   **Agreement Governed by the Laws of Kansas.**  This Agreement shall be governed by and construed in accordance with the internal laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

6.   **Notices.**  All notices and other correspondence required or made necessary by the terms of this Agreement shall be delivered, postage prepaid, return receipt requested to the respective parties hereto at the following addresses:

          CONSULTANT          Frank LaMere
                                    600 Pioneer Place
                                    South Sioux City, NE  68776

          COMPANY:          Kansas Pipeline Company
                                    c/o Personnel Department
                                    8325 Lenexa Drive, Suite 400
                                    Lenexa, KS 66214

or to such other addresses as either party hereto may designate in writing to the other party. Notices also may be given by telegram, telex, or telecopy. A notice shall be deemed received when actually received by the party to whom it is addressed.

7.   **Waiver.**  Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provisions hereafter. Either party's failure or delay in protesting, or contending breach pursuant to Section 15, or taking legal action or demanding arbitration upon the other party's breach is no waiver of that cause of action, unless that party's delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations. Any party's failure or delay in protesting, or contending breach pursuant to Section 15 or taking legal and/or equitable action or demanding arbitration upon the other party's breach is not to be considered as being a waiver of that party's cause of action for any subsequent breach of the same or of a different nature.

8.   **Assignment Prohibited.**  This Agreement shall not be assigned by either party hereto, without the prior written consent of the other party, provided that Employee can assign this Agreement to an affiliated entity of Employer without the consent of Employee.

9.   **Recitals.**  The recitals of this Agreement are incorporated in the text of this Agreement as mutual and substantive terms hereof and may be relied upon by employee during any and all proceedings in law, equity and/or arbitration.

10/20/99 ReleasesconTime                                      5:17 PM

ENB 01060

EM001-007540

10. **Modifications and Amendments.** Any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and executed amendments. It is stipulated that oral modifications and amendments hereto shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or adjudication.

11. **Titles of Articles, Section and Subsections.** The titles and subtitles of Articles, Sections and Subsections of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of this Agreement or in any way influence the interpretation of this Agreement.

12. **Invalidity of Part.** The parties to this Agreement view this Agreement as legal and fair in all respects and have taken reasonable diligence to insure that this Agreement is legal and fair.

13. **Duplicate Originals.** This contract may be executed in duplicate originals, with Employer and Employee each receiving an original.

14. **Further Assurances.** The parties hereby agree to execute any and all documents, transfers, notes, affidavits, minutes, resolutions, instruments or the like in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

15. **Breach, Notice and Cure.** In the event that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(es) describing such breach(es) with particularity (in fact and in legal impact) and the purported breaching party shall be granted thirty (30) days from its actual receipt of such notice to cure said breach(es) if it concurs that the complaint(s) constitute breach(es), or it may elect to provide a cure to the complaining party's contended breach(es) even if the purported breaching party is of the belief that the complaint(s) do not constitute a breach(es) hereof, and if so cured by the purported breaching party the breach(es) shall be deemed to have never occurred. In the event the parties cannot agree as to whether the complaint(s) constitute a breach(es) of the terms hereof, and the purported breaching party does not elect to undertake the expense of resolving the complaint(s), then the parties agree they may pursue any legal remedy they may have available.

16. **Independent Legal Counsel.** The law firm of Tino M. Monaldo, Chartered has represented the Company exclusively in the negotiation, drafting and execution of this Agreement. The Employee has been represented by his own independent legal counsel or has waived by opportunity to such counsel.

ENB 01061

EM001-007541

IN WITNESS WHEREOF, the parties have hereunto set their hands the day and year first written above, or consent to the terms hereof, as if executed on such date.

COMPANY:

**Kansas Pipeline Company, a Kansas general partnership on its own behalf and on behalf of Kansas Pipeline Operating Company, the predecessor to Kansas Pipeline Company**

By: **Synergy Pipeline Company, L.P., its general partner**

By: **Bishop Pipeline Company, its general partner**

By:

Name: Dennis M. Langley
Title: President

CONSULTANT:

By:

Frank LaMere

10/20/99 ReleaseconTino                                                      5:17 PM

ENB 01062

EM001-007542

42

ENB 01063

EM001-007543

# STATEMENT OF RESIGNATION

I hereby resign as an officer and director in the following companies effective as of the consummation of the Closing as defined in the Stock Purchase Agreement dated as of _October 25_ , 1999:

The Bishop Group, Ltd.
Bishop Pipeline Company
Bishop Gas Transmission Company
Kansas Pipeline Company f/k/a Riverside Pipeline Partnership
Syenergy Pipeline Company, L.P.
MarGasCo Partnership
Mid-Kansas Partnership
Bishop Management Group, Inc. f/k/a Management Resources Group, Ltd.
Riverside Pipeline Company
Kansas Pipeline Partnership
KansOk Partnership
Riverside Pipeline Company, L.P.

Dennis M. Langley

JC01/29071.01

ENB 01064

EM001-007544

## STATEMENT OF RESIGNATION

I hereby resign as an officer and director in the following companies effective as of the consummation of the Closing as defined in the Stock Purchase Agreement dated as of _October 25_ , 1999:

The Bishop Group, Ltd.
Bishop Pipeline Company
Bishop Gas Transmission Company
Kansas Pipeline Company f/k/a Riverside Pipeline Partnership
Syenergy Pipeline Company, L.P.
MarGasCo Partnership
Mid-Kansas Partnership
Bishop Management Group, Inc. f/k/a Management Resources Group, Ltd.
Riverside Pipeline Company
Kansas Pipeline Partnership
KansOk Partnership
Riverside Pipeline Company, L.P.

Lynette K. Shaw

JC01/29071.01

ENB 01065

EM001-007545

# STATEMENT OF RESIGNATION

I hereby resign as an officer and director in the following companies effective as of the consummation of the Closing as defined in the Stock Purchase Agreement dated as of October 25 , 1999:

The Bishop Group, Ltd.
Bishop Pipeline Company
Bishop Gas Transmission Company
Kansas Pipeline Company f/k/a Riverside Pipeline Partnership
Syenergy Pipeline Company, L.P.
MarGasCo Partnership
Mid-Kansas Partnership
Bishop Management Group, Inc. f/k/a Management Resources Group, Ltd.
Riverside Pipeline Company
Kansas Pipeline Partnership
KansOk Partnership
Riverside Pipeline Company, L.P.

Wallace G. McKinney

JC01/29071.01

ENB 01066

## STATEMENT OF RESIGNATION

I hereby resign as an officer and director in the following companies effective as of the consummation of the Closing as defined in the Stock Purchase Agreement dated as of October 25 , 1999:

The Bishop Group, Ltd.
Bishop Pipeline Company
Bishop Gas Transmission Company
Kansas Pipeline Company f/k/a Riverside Pipeline Partnership
Syenergy Pipeline Company, L.P.
MarGasCo Partnership
Mid-Kansas Partnership
Bishop Management Group, Inc. f/k/a Management Resources Group, Ltd.
Riverside Pipeline Company
Kansas Pipeline Partnership
KansOk Partnership
Riverside Pipeline Company, L.P.

Howard E. Lubow

JC01/29071.01

ENB 01067

EM001-007547

# STATEMENT OF RESIGNATION

I hereby resign as an officer and director in the following companies effective as of the consummation of the Closing as defined in the Stock Purchase Agreement dated as of October 25 , 1999:

The Bishop Group, Ltd.
Bishop Pipeline Company
Bishop Gas Transmission Company
Kansas Pipeline Company f/k/a Riverside Pipeline Partnership
Syenergy Pipeline Company, L.P.
MarGasCo Partnership
Mid-Kansas Partnership
Bishop Management Group, Inc. f/k/a Management Resources Group, Ltd.
Riverside Pipeline Company
Kansas Pipeline Partnership
KansOk Partnership
Riverside Pipeline Company, L.P.

Yvette C. Korb

JC01/29071.01

ENB 01068

EM001-007548

43

ENB 01069

EM001-007549



INCORPORATED UNDER THE LAWS OF THE STATE OF KANSAS

# BISHOP GAS TRANSMISSION COMPANY

The Corporation is authorized to issue 100,000,000 Common Shares—No Par Value

**This Certifies that**  Bishop Pipeline Company

Fifteen Thousand (15,000)

is the owner of fully paid and non-assessable Shares of the above Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and to be sealed with the Seal of the Corporation.

Dated  November 15, 1991

ENB 01070

EM001-007550

44

ENB 01071

EM001-007551

44



INCORPORATED UNDER THE LAWS OF THE STATE OF KANSAS

# BISHOP PIPELINE COMPANY

The Corporation is authorized to issue 10,000 Shares — Without Par Value

**This Certifies that** The Bishop Group, Ltd.

is the owner of

One Thousand - - - - - - - - - - - - - - - - - - - - - - - - - - - - fully paid and

non-assessable Shares of the above Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and to be sealed with the Seal of the Corporation.

Dated   June 12, 1989

ENB 01072

EXCELSIOR-LEGAL, INC. BOX 5683, ARLINGTON, TX 76011

45

ENB 01073



INCORPORATED UNDER THE LAWS OF THE STATE OF KANSAS

**MANAGEMENT RESOURCES GROUP LTD.**

The Corporation is Authorized to issue 10,000 Shares Without Par Value.

This Certifies that THE BISHOP GROUP, LTD.

SEVENTY SIX (76)

non-assessable Shares of the above Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and to be sealed with the Seal of the Corporation.

Dated December 2, 1986.

ENB 01074

EM001-007554

46

ENB 01075

46

## MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT is made and entered into this _____5_____ day of _____November_____, 1999 by and between FLIGHT OPTIONS, INC., a Delaware corporation having its principal offices at 26180 Curtiss-Wright Parkway, Cleveland, Ohio 44143 ("Manager"), and KANSAS PIPELINE COMPANY, a Kansas general partnership having its principal address at 8325 LENEXA DRIVE, #400, LENEXA, KS 66214 ("Owner").

WHEREAS, Owner has purchased under a Purchase Agreement with Manager the percentage property interest set forth in Schedule A (the "Interest") in the aircraft described in said Schedule (the "Aircraft") and wishes to retain Manager to manage the Interest;

WHEREAS, the other parties who own the remaining undivided interests in the Aircraft (the "Additional Interest Owners") have also retained Manager to manage their interests in the Aircraft under management agreements substantially similar to this Management Agreement;

WHEREAS, Owner and the Additional Interest Owners (collectively the "Owners") and Manager are also parties to an Owners Agreement and a Master Interchange Agreement which relate to management of the Aircraft;

WHEREAS, in the case of interests in the Aircraft subject to lease, the parties to the management agreements and the Master Interchange Agreement are the lessees of the interests and in such context Owners, as used in this Management Agreement, refers to such lessees;

WHEREAS, the Purchase Agreement, this Management Agreement, the Owners Agreement and the Master Interchange Agreement form a coordinated group of agreements involving the parties hereto (said group of agreements is herein referred to as the "Operative Agreements");

NOW, THEREFORE, the parties hereto agree as follows:

1.     PROVISION OF MANAGEMENT SERVICES.

1.1     Owner hereby engages Manager, and Manager hereby agrees, to manage the Interest for the benefit of the Owner under the terms of the Operative Agreements. Manager hereby accepts possession of the Aircraft from the Owners and acknowledges that, as represented and warranted by Manager to Owner in Section 2.1 of the Purchase Agreement, the Aircraft is in good working order and repair and has been maintained within the prior 12-month period (or the period of its existence if the Aircraft is less than 12 months old) in accordance with the provisions of FAR Part 91.409(f)(3) and all applicable requirements for maintenance and inspection thereunder.

1.2     Each Owner shall maintain operational control of the Aircraft when using it. Manager hereby agrees that, in a manner consistent with such operational control by the Owners, it shall use, manage, maintain and operate the Aircraft for the benefit and at the direction of the Owners with all due reasonable care and in accordance with applicable insurance coverage and within the standards and guidelines established by the Federal Aviation Administration (the "FAA"). Manager shall permit the Aircraft to be used only as contemplated by the manufacturer thereof as specified in the owner's manual and other technical materials regarding the Aircraft provided by the manufacturer. Manager shall comply with all laws, ordinances or regulations relating to the use, operation and maintenance of the Aircraft. Owner shall have the right with reasonable advance notice to examine at Owner's expense the log books and records of the Aircraft.

1.3     The following defined terms shall for purposes hereof have the meanings set forth for them at the specified locations within this Management Agreement:

Defined Term                                          Location of Definition

MA - 1

ENB 01076

EM001-007556

| | |
|---|---|
| Aircraft | First Whereas clause |
| Allocated Hours | Section 5.1, Schedule A |
| Available Hours | Section 5.1 |
| Base Fuel Price | Section 4.4, Schedule A |
| Comparable Aircraft | Section 5.1, Schedule A |
| Consumer Price Index | Section 4.4 |
| Discontinuous Flights | Section 5.8, Schedule A |
| Event of Default | Section 9 |
| Excess Hours | Section 5.3, Schedule A |
| FAR | Section 4.7 |
| Fuel Adjustment Factor | Section 4.4, Schedule A |
| Interchange Program | Section 5.4(d) |
| Interest | First Whereas clause |
| Manager | Introductory paragraph |
| Master Interchange Agreement | Third Whereas clause |
| Minimum Telephonic Notice | Section 5.2, Schedule A |
| Monthly Management Fee | Section 4.1, Schedule A |
| Occupied Hourly Deposit | Section 4.2 |
| Occupied Hourly Rate | Section 4.1, Schedule A |
| Operative Agreements | Fifth Whereas clause |
| Owner | Introductory paragraph |
| Owner Occupied Hour | Section 5.4(a) |
| Owners | Third and Fourth Whereas clauses |
| Peak Travel Day | Section 5.2 |
| Primary Service Area | Section 5.2 |
| Purchase Agreement | First Whereas clause |
| Simultaneous Use | Section 5.8, Schedule A |
| Supplemental Hourly Rate | Section 5.3, Schedule A |
| Usage Charge | Section 4.1 |
| Year | Section 5.1 |

2.    **TERM.**

The term of this Management Agreement shall commence on the Closing (as defined in Section 1.4 of the Purchase Agreement) and shall terminate on the date Manager repurchases the Interest from Owner or the Interest is otherwise transferred from Owner in accordance with the terms of the Purchase Agreement, unless earlier terminated by Owner due to Manager's default.

3.    **SERVICES PROVIDED BY MANAGER.**

3.1    Manager shall arrange for the Aircraft to be inspected, maintained, serviced, repaired, overhauled and tested by competent personnel, in accordance with FAA, Manufacturer's Maintenance Manual Chapter 5 and repaired under the balance of the Manual (as defined by standards set forth by the Airline Transportation Association) or other approved maintenance and preventive repair programs therefor, and shall keep and maintain in good standing the airworthiness certification of the Aircraft. These services and all others to be rendered by Manager under this Management Agreement shall be carried out on behalf of Owner and the other Owners.   Payment for services shall be made as set forth in Section 3.9.

3.2    Manager shall cause to be maintained all records, logs and other materials required by the FAA to be maintained in respect of the Aircraft. Any other manuals provided or used by Manager in connection with the services provided hereunder will be and remain the exclusive property of Manager and, if provided to Owner, shall be returned to Manager upon termination of this Management Agreement.

ENB 01077

EM001-007557

3.3     Manager shall not permit or allow the Aircraft to be operated or located in any area excluded from coverage by any insurance required by the terms of this Management Agreement.

3.4     Manager shall, with the consent of the Owner, provide professionally trained and qualified pilots who shall be familiar with and licensed to operate the Aircraft, recurrent pilot training, pilot medical examinations and uniforms, a computerized maintenance program, hangar space, general storage space for Aircraft items, tie-down as required, normal in-flight catering (as available), flight planning and weather services, administrative communications and aeronautical radio services (or equivalent).

3.5     Manager shall make on Owner's behalf all necessary take-off, flight and landing arrangements involved in Owner's use of the Aircraft.  At Owner's request and expense, Manager shall also coordinate related ground transportation.  Reasonable and customary landing fees incurred during normal working hours of an airport shall be paid by Manager as provided in Section 3.9, but any excess charge, whether for take-off or landing, ground handling or other items, for after-hours departure or arrival requested by Owner shall be at Owner's expense.

3.6     Manager shall arrange for and obtain with respect to the Aircraft (i) zero-deductible all-risk hull insurance against any loss, theft or damage to the Aircraft (including any engines or parts while removed from the Aircraft) for an amount not less than the greater of the fair market value of the Aircraft (as reasonably determined by Manager) or the aggregate purchase price paid for all the interests in the Aircraft by the Owners naming the Owners, Manager and such other parties as Manager shall reasonably designate as insured parties (or, as may be appropriate for lenders, loss payees) with losses payable as their respective interests may appear and in accordance with Section 6 hereof; and (ii) liability insurance for bodily injury and property damage related to the Aircraft and its operation in an amount not less than $200,000,000 combined single limit liability coverage, naming Owners, Manager and such other parties as Manager may reasonably designate as insured parties.  Such insurance shall permit the waiver of subrogation set forth in the Owners Agreement and the Master Interchange Agreement.  All such insurance shall contain an "additional interest endorsement" assuring that loss payee coverage for the holders of authorized liens on interests in the Aircraft shall not be invalidated by acts or neglect of the named insureds. All such insurance shall also contain a policy condition customary for fractionally owned or managed aircraft which shall designate Manager as the "first named insured" and shall assure that named insured coverage for Owner and other Owners or lessees of interests in the Aircraft shall not be invalidated by acts or neglect of the first named insured.  The insurance required hereunder shall be maintained by Manager in full force and effect throughout the term hereof and Manager shall upon execution of this Management Agreement and thereafter upon request provide Owner a certificate in evidence thereof.-  The policy for such insurance shall provide that there shall be no cancellation thereof by the insurer without 30 days' prior written notice to the named insureds (10 days' notice in the event of nonpayment of premium).  Upon Owner's request, Manager shall provide Owner with a copy of the policy and shall undertake to notify Owner promptly of any subsequent material updates or changes.  Manager shall maintain comparable hull and liability insurance on all other aircraft in the Interchange Program under the Master Interchange Agreement and Owner shall be covered under the policy(ies) for such liability insurance when using such aircraft.  The liability insurance provided hereunder shall also cover any usage of non-Interchange-Program aircraft made available to Owner by Manager hereunder.  OWNER AGREES THAT IN ALL CASES THE PROCEEDS OF SUCH INSURANCE TO WHICH IT IS ENTITLED SHALL BE OWNER'S SOLE RECOURSE AGAINST MANAGER FOR ANY LOSS OR DAMAGE TO OWNER OR TO THE AIRCRAFT, EXCEPT TO THE EXTENT CAUSED BY OR DUE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF MANAGER. AS TO ANY LOSS OR DAMAGE CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF MANAGER, THE RIGHT OF OWNER TO RECOVER FROM MANAGER ANY PORTION OF SUCH LOSS WHICH IS NOT COVERED BY THE INSURANCE PROVIDED HEREUNDER SHALL NOT BE LIMITED BY ANY WAIVER OF SUBROGATION SET FORTH IN THE OWNERS AGREEMENT OR THE MASTER INTERCHANGE AGREEMENT.

MA - 3

ENB 01078

3.7     Manager shall provide assistance to and consult with Owner on matters regarding the Aircraft, including but not limited to:

(a) Acceptance of the delivery of the Aircraft;
(b) FAA and manufacturer's correspondence;
(c) Administration, enforcement and settlement of warranty claims and insurance matters;
(d) Parts replacement services and maintenance arrangements; and
(e) Preparation and filing of FAA and Federal Communications Commission mandatory reports and registrations.

3.8     Manager shall provide all administrative services necessary to enable Owner to participate in the Interchange Program contemplated by the Master Interchange Agreement.

3.9     Except as set forth in Sections 4.7 and 4.8 or other provisions of this Management Agreement, the services explicitly described in this Section 3, whether delivered by Manager or by others with whom Manager makes arrangements on Owner's behalf, shall be provided at Manager's sole cost and expense.

4.      COMPENSATION AND REIMBURSEMENT.

4.1     As compensation for the services to be performed by Manager hereunder, Owner hereby agrees to pay to Manager (i) a Monthly Management Fee in the amount set forth in Schedule A, payable in advance on the date of this Management Agreement and on the same calendar day of each subsequent month (or the next business day if said payment date is a non-business day or the last business day of the month if said payment date would be a non-existent day of a month) throughout the term of this Management Agreement, and (ii) a Usage Charge equal to the Occupied Hourly Rate set forth in Schedule A multiplied by the number of Owner Occupied Hours (as defined in Section 5) flown by Owner, payable within 30 days after date of the invoice thereof. The Usage Charge shall be calculated and invoiced for each calendar month. Payment of all Monthly Management Fees after the first such fee shall be accomplished through an electronic funds transfer from Owner's bank to Manager's bank; such transfer shall be initiated by Manager each month and shall be authorized through Owner's execution and delivery to Manager of an "Authorization Agreement for Electronic Funds Transfer" in the form of Attachment A hereto, or an equivalent document. Said Authorization Agreement shall provide that it may be canceled by Owner in writing at any time. If at the end of the term hereof Owner Occupied Hours exceed the prorated number of Allocated Hours for said term, then Owner shall pay to Manager the additional Monthly Management Fees that would have been earned if said Owner Occupied Hours had been logged over a longer period such that the number of Owner Occupied Hours would have been equal to the prorated number of Allocated Hours for said longer period.

4.2     Upon execution of this Management Agreement, Owner will advance to Manager the Occupied Hourly Deposit, which shall be a sum equal to one month's estimated Usage Charge (i.e., Occupied Hourly Rate multiplied by Allocated Hours (as defined in Section 5) for each Year divided by 12) to be used by Manager to defray the cost of maintenance, fuel and other expenses incurred by Manager pending receipt of Usage Charges, which are billed in arrears. Such amount, which shall bear no interest, shall be returned to Owner at the termination of this Management Agreement after payment by Owner of all sums due Manager.

4.3     In the event the Monthly Management Fee, Usage Charge or other amounts due to Manager hereunder shall not be promptly paid when due, Owner shall pay interest from the date the fees were due at the rate of 15 percent per annum (but not in excess of the maximum rate permitted by law).

MA - 4

ENB 01079

EM001-007559

4.4     The Monthly Management Fee and the Occupied Hourly Rate may, in Manager's sole discretion, each be adjusted on January 1 of each calendar year during the term hereof beginning January 1, 2001 by an amount not to exceed the percentage change in the Consumer Price Index for Urban Consumers (U.S. City Average, All Items (1982-84=100)) ("Consumer Price Index") during the 12-month period ending October 31 of the immediately preceding calendar year.  In addition thereto the Occupied Hourly Rate shall increase or decrease at the beginning of each month whenever the U.S. Average Jet-A Fuel Price per gallon (excluding any fuel tax as to which Manager is exempt), as then published in Business and Commercial Aviation or a comparable source, is greater or less than the Base Fuel Price set forth on Schedule A.  For each $.01 that the published price is greater than the Base Fuel Price, the Occupied Hourly Rate for the month shall be increased by the amount of the Fuel Adjustment Factor set forth in Schedule A.  For each $.01 that the published price is less than the Base Fuel Price, the Occupied Hourly Rate for the month shall be decreased by the amount of the Fuel Adjustment Factor.  Manager reserves the right to make an adjustment to the Occupied Hourly Rate at the end of the 24th month following the Closing based on Manager's sole discretion, but such adjustment shall not exceed 5% of the Occupied Hourly Rate then in effect.

4.5     Owner shall be responsible for its proportionate share (based on Owner's percentage ownership of the Aircraft) of any and all federal, state, local and foreign taxes, charges, imposts, duties and excise taxes, and other similar assessments, including associated interest and penalties, (except net income or any other similar taxes imposed upon the net income of Manager) relating generally to the ownership, operation, maintenance or use of the Aircraft.  Owner shall pay the full amount, however, of charges incurred on its flights for use of flight phones on board the Aircraft, all special landing permits and fees, head taxes, departure taxes, immigration, customs, handling, overflight, navigation and airspace fees and similar charges.  Manager may as a practical necessity in the course of managing the Aircraft pay fuel taxes as to which it is later able to assert an exemption and receive a refund;  Owner shall not be charged for such taxes and Manager shall retain the refund.

4.6     Owner hereby agrees that Manager shall have the right during such periods of time that the Aircraft is not being used by one of the Owners or under the Master Interchange Agreement to use the Aircraft for recurrent flight training for Manager's pilots and for demonstration flights operated under FAR Part 135 solely for the purpose of promoting Manager's fractional ownership program.  Manager shall be entitled to retain for its own account any reimbursement or compensation received by Manager for such use of the Aircraft.

4.7     Owner shall pay its proportionate share of the cost of complying with any airworthiness directives, manufacturer's alert/mandatory service bulletins, new FAA requirements of the Federal Aviation Regulations ("FAR") Part under which fractional ownership programs are then operated (currently FAR Part 91) or manufacturer's recommended service bulletins applicable to the Aircraft.  Manager shall use all reasonable efforts to pursue any reimbursement from the manufacturer or other appropriate party for such costs.

4.8     Owner shall reimburse Manager for Aircraft costs and expenses incurred by Manager resulting from extraordinary wear, tear or damage caused by Owner and not covered by insurance carried pursuant to Section 3.

5.     AVAILABILITY AND OPERATION OF AIRCRAFT.

5.1     For purposes of services rendered under this Management Agreement a "Year" shall mean the 12-month period beginning on the month and day of the date hereof (for February 29 use February 28) and ending at 12:00 midnight on the day before the same month and day of the following year. Owner and Manager hereby agree that Owner shall be entitled to the use of the Aircraft, and Manager agrees to make the Aircraft available, each Year for (i) the number of

ENB 01080

Owner Occupied Hours (as defined in Section 5.4) set forth in Schedule A as the "Allocated Hours" for that Year plus (ii) all unused Allocated Hours carried over from previous Years (the total of (i) and (ii) is referred to as "Available Hours"), subject to the notice and other requirements of Section 5.2 and the limitations of Section 5.3. Owner agrees and acknowledges that, due to its participation in the Master Interchange Agreement, Owner may be provided the use of another aircraft in place of the Aircraft. Manager shall use reasonable efforts to obtain the Aircraft for Owner before providing Owner with any other aircraft available under the Master Interchange Agreement. Manager shall not be liable in the event that the Aircraft or any other aircraft under the Master Interchange Agreement is unavailable at any given time, and in the event no aircraft is available under the Master Interchange Agreement at any given time, Manager will provide Owner with use of a Comparable Aircraft, as defined in Schedule A, subject to the notice and other requirements of Section 5.2 and other applicable provisions of this Management Agreement. Any aircraft so provided by Manager and used by Owner shall be treated as if it were the Aircraft for purposes of this Management Agreement and the determination of Owner's use of Allocated Hours.

5.2    The "Primary Service Area" is (i) the 48 contiguous states constituting the continental United States and any point within 200 statute miles thereof and (ii) the Bahama Islands. Owner agrees that it shall provide Manager with Owner's requested flight schedule as far in advance as practical and in any case Owner shall give Manager the minimum number of hours telephonic notice ("Minimum Telephonic Notice") set forth in Schedule A prior to an anticipated flight; provided, however, if the proposed destination or departure point is outside the Primary Service Area or Owner desires to schedule such flight on a "Peak Travel Day", Owner shall give Manager a minimum of 48 hours telephonic notice, and Manager shall be entitled to delay or accelerate requested departure times on Peak Travel Days by up to 3 hours. For scheduled departures on Peak Travel Days, Owner may optionally use a 10 hour telephonic notice (12 hours west of Denver) and/or set a specific departure time by treating each hour of the requested flight as if it were 1.5 hours for purposes of Usage Charges and use of Allocated Hours. Peak Travel Days shall be published from time to time by Manager and shall not exceed 10 days in any calendar year. In addition, in order to insure the availability of the Aircraft and pilots to the Owners, all requests for flights originating or terminating more than 1,000 statute miles outside of the contiguous United States shall be subject to availability. Owner agrees that it shall provide Manager with the following information for each proposed flight:

(a)    proposed departure point;
(b)    destination;
(c)    date and time of flight;
(d)    the number of anticipated passengers;
(e)    the nature and extent of luggage to be carried;
(f)    the date and time of a return flight, if any; and
        any other information concerning the proposed flight that may be pertinent or is reasonably required by Manager.

5.3    In addition to the foregoing, in the event Owner shall desire to use the Aircraft in any Year for a number of hours in excess of the Available Hours for such Year, Owner shall be permitted to use the Aircraft for an additional number of hours in such Year (the "Excess Hours") up to the limit set forth in Schedule A, and such Excess Hours shall be charged against Owner's Allocated Hours for the following Year during the term hereof, thereby reducing accordingly the Allocated Hours to which Owner is entitled in such subsequent Year. Similarly, in the event Owner fails to use the Aircraft in any given Year for the full Allocated Hours to which it is entitled, Owner shall be entitled to use the Aircraft in any subsequent Year during the term hereof for the amount of such unused hours in addition to the Allocated Hours attributable to such subsequent Year. If Owner desires to use the Aircraft for a number of hours in excess of the Available Hours plus the Excess Hours in any given Year, any such usage shall be on an as-available basis and Owner shall pay for each such hour a Usage Charge calculated using the Supplemental Hourly Rate set forth in Schedule A rather than the Occupied Hourly Rate. The

MA - 6

ENB 01081

Supplemental Hourly Rate may, in Manager's sole discretion, be adjusted in the manner set forth in Section 4.4 on January 1 of each calendar year during the term hereof by reference to changes in the Consumer Price Index.

5.4     (a)     Manager and Owner agree that the use of the Aircraft shall be deemed to commence at the time Owner takes off on the Aircraft and shall terminate when the Aircraft lands. Flight time shall be measured and accounted for in increments of one tenth of one hour. In addition, one tenth of an hour shall be added to each take-off and each landing to allow for taxi time. The flight time and taxi time together shall constitute the hourly use of the Aircraft. Each such hour of use by an Owner shall be defined herein as an "Owner Occupied Hour" and shall reduce Owner's available Allocated Hours.

    (b)     Notwithstanding the foregoing, Owner agrees that all flight segments (a flight segment is the period from a take-off to the next landing) shall be deemed to be a minimum of one hour's duration; except that this one hour minimum flight segment duration shall not apply to (i) three minimum leg flight segments per Year for each one-sixteenth ownership interest of Owner in the Aircraft, (ii) any flight segment caused solely as a result of government regulation such as a customs stop or a fuel stop necessitated by the airport of departure for a specific leg, in which event Owner shall be charged for actual Owner Occupied Hours plus $200 (subject to increase by Manager for inflation after 1999, with the proportion of such increase not to exceed the proportionate increase in the Consumer Price Index from January 1, 2000 to the date of the increase), or (iii) any flight segment during a calendar day during which Owner's use of the Aircraft equals at least four Owner Occupied Hours.

    (c)     In addition, Owner acknowledges and agrees that on all flight segments originating or terminating outside the Primary Service Area, in addition to actual Owner Occupied Hours, Owner shall incur a Usage Charge for all flight hours required to ferry the Aircraft to or from such origination or termination point outside the Primary Service Area, to or from, as the case may be, the nearest suitable international airport within the contiguous United States regardless of whether or not Manager shall actually ferry the Aircraft to or from the contiguous United States, but such ferry hours shall not be charged against Owner's Allocated Hours. The Usage Charge for such ferry hours shall be incurred at the Occupied Hourly Rate, except that when the Aircraft is a Hawker 800 or Challenger 600 (or an aircraft designated by Manager as a successor or equivalent thereto), the Usage Charge for such hours shall be incurred at 70% of the Occupied Hourly Rate. As an alternative to the Owner's paying the Usage Charge for such ferry flights to or from the contiguous United States, Owner shall be entitled to keep the Aircraft outside the Primary Service Area for a maximum of five days (including, if applicable, any day or portion thereof used for ferry flights). In the event Owner so elects to keep the Aircraft outside the Primary Service Area, Owner shall be deemed to have used the Aircraft for the greater of three Owner Occupied Hours per day or the actual number of Owner Occupied Hours used per day, and Owner shall be surcharged $400 (subject to increase by Manager for inflation after 1999, with the proportion of such increase not to exceed the proportionate increase in the Consumer Price Index from January 1, 2000 to the date of the increase) for each night the flight crew remains outside the Primary Service Area.

    (d)     The Master Interchange Agreement describes the Interchange Program in which the Aircraft participates. Under that Program, Owner may use the Aircraft or one or more Interchange Aircraft as defined in that Agreement. Section 2.2 of that Agreement describes the charges incurred for use of Interchange Aircraft. For use of an Interchange Aircraft of the same make and model as the Aircraft, Owner shall incur no additional charge beyond the Occupied Hourly Rate payable hereunder. If Owner, pursuant to its specific request, uses an Interchange Aircraft of a make and/or model different from the

ENB 01082

EM001-007562

Aircraft, the number of Owner Occupied Hours for which Owner shall be charged at its Occupied Hourly Rate and the number of hours which shall be deducted from Owner's Allocated Hours shall be equal to the number of hours which it would have been charged if it had been using the Aircraft multiplied by a factor which expresses the differential cost of owning, operating and maintaining the Interchange Aircraft actually used by comparison with the Aircraft. Those differential cost factors are set forth in Schedule B to the Master Interchange Agreement.

5.5     Owner shall have the option to make one request to delay a scheduled departure but such request shall be made not more then 90 minutes beyond the scheduled departure time.   Such request by Owner for a new departure time shall be honored by Manager provided the newly requested departure time is consistent with crew duty time restrictions and/or FAA ATC requirements. Manager shall keep the aircraft in place until at least 90 minutes beyond the newly scheduled departure.  At that time if Owner still is delayed Owner shall be required to reschedule using the Minimum Telephonic Notice.  However, there shall be no charge to Owner in the event Owner is late or cancels a scheduled flight, except that (i) the Aircraft shall be permitted to leave in the event Owner is more than ninety minutes late for the flight and has not notified Manager that Owner will be late and (ii) if Manager has pre-positioned the Aircraft specifically for such flight, Owner shall reimburse Manager for all crew and aircraft repositioning expenses (not to exceed the estimated cost of the canceled trip) unless, for departures inside the Primary Service Area only, Owner has given manager notice of such cancellation four hours prior to scheduled departure.  For cancellations outside the Primary Service Area, all such repositioning expenses will be charged (not to exceed the estimated cost of the canceled trip).

5.6     The Aircraft may be used at any time during any day of the week and shall be available at any airport suitable for landing in accordance with the FAA Regulations under which the Aircraft is then being operated and for which Manager can obtain a landing slot, provided that landing at such airport does not violate the terms of applicable insurance coverage or any U.S. laws, regulations or applicable policies.  In addition, any operations outside the contiguous United States shall be subject to all applicable laws, regulations and policies.

5.7     In the event Manager is more than 60 minutes late furnishing the Aircraft at any time due to any reason other than Force Majeure or safety considerations as set forth in Section 8, Owner shall be granted at no additional cost in the month of Owner's choice during the term hereof additional Allocated Hours equal to the length of the delay, up to a maximum of two hours per occurrence.  The foregoing shall be Owner's sole remedy for delay or failure to furnish the Aircraft by Manager, unless the recurrence of delays leads to an Event of Default by Manager under Section 11.

5.8     During a calendar day Owner may use the Aircraft for any number of flight segments so long as there is point-to-point continuity in the itinerary.  "Simultaneous Use" is defined as Owner's use of the Aircraft (or the Aircraft and one or more additional aircraft) during a day for two or more flight segments which do not have point-to-point continuity ("Discontinuous Flights").  As set forth in the Simultaneous Use chart in Schedule A, Owner's permitted number of Discontinuous Flights in a day is determined by the percentage size of the Interest and the model of the Aircraft.  If Owner, an affiliate of Owner, or a party materially related to Owner (a "Related Party") also owns an interest in another aircraft of the same model as the Aircraft which is also subject to the Master Interchange Agreement (the "Other Aircraft"), Owner shall not be entitled to use the Aircraft on the same day that the Related Party uses the Other Aircraft but may use it only on an as-available basis, unless Manager's regulations governing simultaneous aircraft use specifically state that Owner shall be entitled to use of the Aircraft under such circumstances. Manager shall make available to Owner upon request a current copy of its simultaneous aircraft use regulations.

6.     LOSS OR DAMAGE TO THE AIRCRAFT

MA - 8

ENB 01083

6.1     In the event of any damage to or loss, theft or destruction of the Aircraft due to any cause whatsoever ("Loss or Damage") not involving a total loss, all aircraft hull insurance proceeds in respect thereof shall be paid to Manager in trust for the repair and restoration of the Aircraft to good condition and working order.

6.2     In the event of Loss or Damage to the Aircraft under Section 6.1 above, Manager shall use its best efforts to arrange for Owner an alternate aircraft in accordance with the terms of Section 5.1 hereof while the Aircraft is being repaired.

6.3     In the event of a total loss of the Aircraft as determined by the insurer or insurers that have issued the all-risk hull insurance with respect to the Aircraft ("Total Loss"), Manager shall have the option, but not the obligation, to substitute for the Aircraft an aircraft of the same make and model (the "Replacement Aircraft") having a fair market value at least equal to the fair market value of the Aircraft immediately preceding such Total Loss. Such option may be exercised by notice to Owner within 30 days after a final determination is made by the insurance company that the Aircraft has suffered a Total Loss. In the event such substitution option is exercised, Owner shall be entitled to enjoy all the benefits of this Management Agreement during the period from loss to replacement without interruption and Manager shall be entitled to use the proceeds of insurance to purchase the Replacement Aircraft and retain any excess proceeds for its own account. If the insurance proceeds are insufficient to purchase such Replacement Aircraft on exercise of said option, Manager shall fund the difference. If the option to provide a Replacement Aircraft is not exercised, Owner shall be entitled to receive its proportionate share of the aircraft hull insurance proceeds in accordance with Section 3.6 hereof, the Interest shall then cease to exist and this Management Agreement and the other Operative Agreements will terminate. Owner and Manager agree to execute all documents necessary to accomplish the foregoing.

7.     NO LIENS, CLAIMS, CHARGES OR ENCUMBRANCES.

Manager and Owner agree that, throughout the term of this Management Agreement, neither party shall cause or permit, through its own acts or failure to act, any liens, claims, charges or encumbrances attributable to it to attach to the Aircraft or the Interest, other than (i) mechanic's lien to be discharged in the ordinary course of business, (ii) the rights of Owners pursuant to the terms of the Owners Agreement and (iii) in the case of Owner, a Lien as permitted pursuant to Section 7 of the Owners Agreement.

8.     FORCE MAJEURE.

Manager shall have no liability for delay or failure to furnish the services contemplated by this Management Agreement when such delay or failure is caused by Force Majeure as defined below. Owner and Manager agree that when, in the reasonable view of Owner, Manager or the pilots of the Aircraft, safety may be compromised, Owner, Manager or the pilots of the Aircraft may terminate a flight, refuse to commence a flight, or take other action necessitated by such safety considerations without liability for loss, injury, damage or delay. For purposes of this Management Agreement, "Force Majeure" shall mean an act of God, strike or lockout or other labor dispute, act of the public enemy, war (declared or undeclared), blockade, revolution, civil commotion, lightning, fire, storm, flood, earthquake, explosion, governmental restraint, embargo, sudden or unexpected aircraft mechanical failure, inability to obtain or delay in obtaining governmental approvals, permits, licenses or allocations and any other cause whether of the kind specifically enumerated above or otherwise, provided that in order for any of the foregoing to constitute Force Majeure, it must not be reasonably within the control of the Manager.

9.     EVENTS OF DEFAULT BY OWNER.

The occurrence and continuation of any of the following shall constitute an "Event of Default" by Owner under this Management Agreement:

(a)     The failure of Owner to pay when due any amount required to be paid by Owner

MA - 9

ENB 01084

EM001-007564

hereunder; provided, however, the Owner may cure such Event of Default by paying such overdue amount within ten (10) days after receipt of notice thereof from Manager.

(b)      Any lien, claim, charge or encumbrance, other than a Lien permitted pursuant to Section 7 of the Owners Agreement, shall attach to the Aircraft or the Interest as a result of Owner's acts or failure to act.

(c)      The breach by Owner of any other material provision of this Management Agreement or any other Operative Document, which breach continues for 30 days after notice to Owner by Manager describing the breach; provided that there shall be no Event of Default if within such 30 days Owner diligently commences cure of such breach and completes same within 60 days of Manager's notice or such longer period as may be acceptable to the parties.

(d)      Owner shall:

(1) make an assignment for the benefit of its creditors;
(2) consent to or fail for thirty days to stay the appointment of a custodian for itself or for the whole or substantially all of its property;
(3) upon a petition in bankruptcy or other law relating to the relief of debtors being filed against it, be adjudicated bankrupt or have an order for relief granted; or
(4) file a petition or answer seeking liquidation, reorganization or other substantial relief under any bankruptcy or other law for the relief of debtors or file an answer admitting, or failing to deny, the material allegations of a petition filed against it for any such relief.

## 10.      REMEDIES FOR DEFAULT BY OWNER.

Upon the occurrence of an Event of Default by Owner and, as to Events of Default specified in paragraphs (a), (b) and (c) of Section 9, the failure of Owner to cure such Event of Default diligently after notice from Manager describing the default, Owner shall not be entitled to management services or Aircraft use hereunder or under the Master Interchange Agreement while the Event of Default continues and Owner's Allocated Hours shall be reduced, as liquidated damages and not as a penalty, by an amount equal to one twelfth of the Year's Allocated Hours for each thirty-day period (or part thereof) that Owner is in default until such default is cured. Any such reduction of Owner's Allocated Hours shall be in addition to and not in lieu of Manager's right to bring an action or claim against Owner for all sums which may be due and owing hereunder and to pursue all other remedies available to it at law or in equity, including repurchase of the Interest under the Purchase Agreement and termination of all Operative Agreements.

## 11.   . EVENTS OF DEFAULT BY MANAGER.

The occurrence and continuation of any of the following shall constitute an Event of Default by Manager under this Management Agreement:

(a)      The failure by Manager to maintain in full force and effect during the term of this Management Agreement the insurance required by Section 3.6 hereof.

(b)      The furnishing by the Manager of an aircraft to the Owner more than 60 minutes late on five or more separate occasions during any Year under circumstances which entitle the Owner to free additional flight time pursuant to Section 5.7 hereof.

(c)      The breach by Manager of any other material provision of this Management Agreement or any other Operative Document, which breach continues for 30 days after notice to Manager by Owner describing the breach; provided that there shall be no Event of Default if within such thirty days Manager diligently commences cure of such breach and completes same within 60 days of Owner's notice or such longer period as may be acceptable to the parties.

ENB 01085

EM001-007565

(d)     Manager shall:

    (1)  make an assignment for the benefit of its creditors;

    (2)  consent to or fail for thirty days to stay the appointment of a custodian for itself or for the whole or substantially all of its property;

    (3)  upon a petition in bankruptcy or other law relating to the relief of debtors being filed against it, be adjudicated bankrupt or have an order for relief granted; or

    (4)  file a petition or answer seeking liquidation, reorganization or other substantial relief under any bankruptcy or other law for the relief of debtors or file an answer admitting, or failing to deny, the material allegations of a petition filed against it for any such relief.

## 12.     REMEDIES FOR DEFAULT BY MANAGER.

In addition to any other remedies provided for herein or otherwise available to Owner at law or in equity, upon the occurrence of an Event of Default by Manager, Owner may by notice to Manager terminate this Management Agreement and require Manager to repurchase the Interest pursuant to Section 4 of the Purchase Agreement; provided, however, that Manager shall be entitled to receive from the proceeds of sale of the Interest any and all amounts then owed to Manager by Owner.

## 13.     INDEMNIFICATION.

Each party hereto will indemnify and hold harmless the other party, its directors, officers, agents and employees, from and against any and all loss, cost, damage, injury or expense that may be incurred by reason of any breach by the indemnifying party of any of its representations or obligations set forth in this Management Agreement. A party indemnified hereunder shall promptly give notice to the indemnifying party of the initiation by any third party of an action expected to be covered hereby, and the indemnifying party shall be entitled to participate in the defense of any such action by counsel of its own choosing. Each party will also indemnify and hold harmless the other against any loss sustained or reasonable expense incurred by the indemnified party as the direct result of or arising out of the imposition on the Aircraft, or the Interest, of any Federal or other tax lien or the foreclosure thereof by virtue of the failure to pay or underpayment by the indemnifying party of Federal or other taxes payable by the indemnifying party, including without limitation any portion of property taxes on the Aircraft which are the responsibility of the Owner. It is specifically agreed, however, that no party shall be liable for, or indemnify the other party against, indirect, special or consequential damages suffered by such other party.

## 14.     THIRD PARTY BENEFICIARIES.

Owner acknowledges that, in consideration of the mutual covenants set forth in this Management Agreement and the other Operative Agreements, the other Owners are third party beneficiaries of this Management Agreement.

## 15.     INDEPENDENT CONTRACTOR.

The relationship of Manager to Owner hereunder is that of an independent contractor. In no event shall this Management Agreement be construed as creating a joint venture, partnership or other form of association or cooperative arrangement between the parties.

## 16.     ASSIGNMENT.

Owner shall not assign its rights under this Management Agreement except in conjunction with an assignment of the Interest permitted under the Purchase Agreement. Manager shall not assign its rights under this Management Agreement except to an entity qualified to fulfill Manager's responsibilities hereunder. This Management Agreement shall be binding upon and inure to the benefit of the parties hereto and their personal representatives, successors and permitted assigns.

ENB 01086

EM001-007566

17. **ENTIRE AGREEMENT.**

This Management Agreement and the other Operative Agreements constitute the entire understanding among the parties on the subject matter of said documents, and there are no representations, warranties, rights, obligations, liabilities, conditions, covenants or agreements other than as set forth in the Operative Agreements.

18. **GOVERNING LAW.**

This Management Agreement shall be governed by the laws of the State of Ohio without giving effect to Ohio's principles of conflict of laws.

19. **NOTICES.**

Notice hereunder shall be in writing and sufficiently given if personally delivered or sent by registered or certified mail, commercial courier or facsimile to the recipient at its address set forth in this Management Agreement or at such other address as the recipient shall have specified by notice. Notice shall be effective on the earlier of three business days following its sending or the time of actual receipt. Business days include all weekdays except national holidays.

20. **COUNTERPARTS.**

This Management Agreement may be executed by ink or facsimile signature in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one agreement.

21. **SEVERABILITY.**

In the event that any one or more of the provisions of this Management Agreement shall for any reason be held invalid, illegal or unenforceable, the remaining provisions hereof shall be unimpaired and the invalid, illegal or unenforceable provision shall be replaced by a mutually acceptable provision which (i) is valid, legal and enforceable and (ii) comes closest to the intention of the parties underlying the provision being replaced.

22. **LIMITATION OF LIABILITY.**

NEITHER PARTY SHALL, IN ANY EVENT, BE LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES AND/OR PUNITIVE DAMAGES OF ANY KIND OR NATURE UNDER ANY CIRCUMSTANCES OR FOR ANY REASON. IN PARTICULAR AND WITHOUT LIMITATION, MANAGER SHALL NOT BE LIABLE TO OWNER FOR ANY SUCH DAMAGES FOR ANY LOSS DUE TO ANY DELAY BY MANAGER IN FURNISHING OR FAILURE BY MANAGER TO FURNISH THE AIRCRAFT OR CAUSED OR OCCASIONED BY THE PERFORMANCE OR NON-PERFORMANCE OF ANY MANAGEMENT SERVICES COVERED BY THIS MANAGEMENT AGREEMENT.

IN WITNESS WHEREOF, the parties hereto have executed this Management Agreement on the day and year first written above.

OWNER:

KANSAS PIPELINE COMPANY, KANSAS
GENERAL PARTNERSHIP

By: Syenergy Pipeline Company, L.P. its general partner

MA - 12

ENB 01087

By: Bishop Pipeline Company, its general partner

By: _____

Name: _HOWARD E. LUBOW_

Title: _VICE PRESIDENT_

**MANAGER:**

**FLIGHT OPTIONS, INC.**

By:_____
                    [Signature of Officer]

Its:_____
                    [Title of Officer]

ENB 01088

MA - 13

EM001-007568

## SCHEDULE A

| | Aircraft Model:<br>Serial Number:<br>FAA Registration: | Beechjet 400A<br>RK-4<br>N494CW |
|---|---|---|
| Interest Percentage | 18.75% | |
| Monthly Management Fee | $10,425.00 | (subject to Annual Escalation)° |
| Occupied Hourly Rate | $1,250.00 | per Owner Occupied Hour (see Section 5.4) (subject to Annual Escalation)° |
| Base Fuel Price | $1.80 | per gallon |
| Fuel Adjustment Factor | $2.82 | added to or subtracted from the Occupied Hourly Rate on a monthly basis for each $.01 by which the published fuel price per gallon (see Section 4.4) exceeds or is less than the Base Fuel Price set forth above |
| Minimum Telephonic Notice | 4 Hours | (add two hours for trips originating west of Denver, Colorado) (see Section 5.2 for further provisions regarding telephonic notice) |
| Minimum Leg Allocation | 9 | minimum leg flight segments per year |
| Allocated Hours | 150 | hours per year |
| Excess Hours | 37.5 | hours per year |
| Supplemental Hourly Charge | $3,750.00 | per Owner Occupied Hour flown each year in excess of Available Hours (see Section 5.1) plus Excess Hours (subject to Annual Escalation)° |

°Annual Escalation - The Monthly Management Fee, the Occupied Hourly Rate and the Supplemental Hourly Charge shall be adjusted (on a cumulative basis) on January 1 of each year during the term January 1, 2001 hereof by the percentage change in the Consumer Price Index (see Section 4.4) during the 12-month period ending October 31 of the year preceding the January 1 adjustment date.

For purposes of this Management Agreement (see Section 5.1), "Comparable Aircraft" includes, but is not limited to: Citation V/Ultra, Lear 35/45 Beechjet 400 Series, Diamond 1 Series.

ENB 01089

EM001-007569

**SCHEDULE A**
**Continued**

Simultaneous Use

The number of Discontinuous Flights (see Section 5.8) permitted in one calendar day is set forth in the chart below.

| Interest | Citation, Beechjet, Hawker | Challenger, G IV |
|---|---|---|
| Under 25% | None | None |
| 25% to 49% | 2 | None |
| 50% and up | 4 | 2 |

MA - 15

ENB 01090

EM001-007570

ADDENDUM DATED November 19, 1998
TO FLIGHT OPTIONS, INC.
MANAGEMENT AGREEMENT

PEAK TRAVEL DAYS

The following are the current listing of "Peak Travel Days". Any changes or additions to the following list will be published and distributed by Flight Options, Inc. with substantial notice to all Owners.

**1998**

| | | |
|---|---|---|
| Tuesday | November 24 | Two Days Before Thanksgiving |
| Wednesday | November 25 | One Day Before Thanksgiving |
| Sunday | November 29 | Sunday After Thanksgiving |
| Wednesday | December 23 | Two Days Before Christmas |
| Thursday | December 24 | One Day Before Christmas |

**1999**

| | | |
|---|---|---|
| Sunday | January 3 | Sunday After New Year's |
| Sunday | January 31 | Super Bowl Sunday |
| Sunday | April 11 | Final Round-Masters Golf |
| Friday | July 2 | Friday Before 4th of July |
| Monday | July 5 | Day of Celebrating 4th of July |
| Tuesday | November 23 | Two Days Before Thanksgiving |
| Wednesday | November 24 | One Day Before Thanksgiving |
| Sunday | November 28 | Sunday After Thanksgiving |
| Thursday | December 23 | Two Days Before Christmas |
| Friday | December 24 | One Day Before Christmas |

**2000**

| | | |
|---|---|---|
| Sunday | January 2 | Sunday After New Year's |

ENB 01091

EM001-007571

# AUTHORIZATION AGREEMENT
## FOR ELECTRONIC FUNDS TRANSFER

| Contract Name: KANSAS PIPELINE COMPANY | Aircraft Registration: N494CW |
|---|---|

I HEREBY AUTHORIZE FLIGHT OPTIONS, INC., HEREINAFTER CALLED FLIGHT OPTIONS, TO INITIATE DEBIT ENTRIES TO MY: (SELECT ONE)

_____ CHECKING ACCOUNT     OR     _____ SAVINGS ACCOUNT

INDICATED BELOW AT THE DEPOSITORY FINANCIAL INSTITUTION NAMED BELOW, HEREINAFTER CALLED DEPOSITORY, AND TO DEBIT THE SAME TO SUCH ACCOUNT. I ACKNOWLEDGE THAT THE ORIGINATION OF EFT TRANSACTIONS TO MY ACCOUNT MUST COMPLY WITH THE PROVISIONS OF U.S. LAW.

DEPOSITORY
NAME _____     BRANCH _____

CITY _____     STATE _____ ZIP _____

ROUTING                                ACCOUNT
NUMBER _____     NUMBER _____

DATE OF MONTHLY DEDUCTION _____

AMOUNT OF MONTHLY DEDUCTION  $ _____

THIS AUTHORIZATION IS TO REMAIN IN FULL FORCE AND EFFECT UNTIL FLIGHT OPTIONS HAS RECEIVED WRITTEN NOTIFICATION FROM ME OF ITS TERMINATION IN SUCH TIME AND IN SUCH MANNER AS TO AFFORD FLIGHT OPTIONS AND DEPOSITORY A REASONABLE OPPORTUNITY TO ACT ON IT.

ACCOUNT NAME _____

ID NUMBER _____

SIGNATURE: _____     DATE: _____

PRINT NAME: _____

NOTE:   ALL WRITTEN DEBIT AUTHORIZATIONS <u>MUST</u> PROVIDE THAT THE RECEIVER MAY REVOKE THE AUTHORIZATION ONLY BY NOTIFYING THE ORIGINATOR IN THE MANNER SPECIFIED IN THE AUTHORIZATION.

> **Return Completed Form to:**
> Contracting
> Flight Options, Inc.
> 26180 Curtiss-Wright Parkway
> Richmond Hts., OH  44143

ENB 01092

MAR 19

## MASTER INTERCHANGE AGREEMENT

THIS MASTER INTERCHANGE AGREEMENT is dated July 1, 1999 and is made by and among FLIGHT OPTIONS, INC., a Delaware corporation ("Manager") having its principal offices at 26180 Curtiss-Wright Parkway, Cleveland, Ohio 44143, and each of the parties identified in Schedule A (collectively referred to as the "Participants" and individually as a "Participant").

WHEREAS, each Participant owns or leases an undivided percentage interest (the "Interest") in an aircraft as set forth next to Participant's name in Schedule A (the individual aircraft in which a Participant has an Interest is referred to herein as the "Aircraft" and the aircraft in which a Participant does not have an Interest is/are referred to, in the singular or the plural as the context may determine, as "Interchange Aircraft");

WHEREAS, Manager shall be a Participant as to aircraft specified in Schedule A (i) in which Manager owns an Interest or (ii) which are leased to or otherwise under the operational control of Manager and which Manager has placed in the Interchange Program described herein;

WHEREAS, each Participant who is an Owner is a party to an "Owners Agreement" with the other owners of interests in the Participant's Aircraft, and each Participant (other than Manager) (i) either owns its Interest and is a party to a "Purchase Agreement" with Manager or leases its Interest and is a party to a "Lease Agreement" with the owner and (ii) has retained Manager to manage its Interest under the terms of a "Management Agreement" between Participant and Manager;

WHEREAS, when Manager is a Participant as to an Aircraft, Manager shall perform or see to the performance for that Aircraft of all support services, including maintenance, insurance, provision of qualified pilots, regulatory compliance, etc., which are required under the Management Agreements with other Participants;

WHEREAS, as to each Participant there is a set of "Operative Agreements";

WHEREAS, the Operative Agreements for Manager as a Participant are the respective Owners Agreements and this Master Interchange Agreement;

WHEREAS, the Operative Agreements for other Participants who are owners ("Owners") are the Participant's Management Agreement, Purchase Agreement and Owners Agreement together with this Master Interchange Agreement;

WHEREAS, the Operative Agreements for other Participants who are lessees ("Lessees") are the Participant's Management Agreement and Lease Agreement together with this Master Interchange Agreement;

WHEREAS, the Participants desire to participate as contemplated in the Operative Agreements in an interchange arrangement (the "Interchange Program") as provided for in Section 91.501(c)(2) of the Federal Aviation Regulations ("FARs"), both by making the Aircraft in which they own or lease interests available to other Participants and by using Interchange Aircraft provided by other Participants in the Interchange Program; and

WHEREAS, under the terms of the Management Agreements Manager is to provide administrative services to facilitate the Participant's participation in the Interchange Program;

NOW, THEREFORE, the Parties hereto agree as follows:

1. **TERM OF AGREEMENT.**

This Master Interchange Agreement shall as to any Participant take effect on the date the Participant first acquires an Interest in one or more Aircraft and shall continue in effect until (i), in the case of Owners other than Manager, Manager repurchases the Interest from said Participant or the Interest is otherwise transferred from the Participant in accordance with the terms of said Participant's Purchase Agreement or (ii), in the case of Lessees, the Participant's Lease Agreement terminates.   When an Interest is transferred, a Lease Agreement terminates or

MIA-1

ENB 01093

additional Participants become parties hereto to add their Aircraft to the Interchange Program, Manager shall amend Schedule A to designate the new party or parties and to specify as to each party the effective date of such designation. Manager may by appropriate entries in Schedule A add to the Interchange Program or remove from it any Aircraft which is wholly-owned by Manager or which is leased to or otherwise under the operational control of Manager. Manager shall maintain Schedule A and make a current copy thereof available to a Participant at any time upon request.

2.     PARTICIPATION IN INTERCHANGE PROGRAM.

    2.1     Each Participant hereby agrees (i) to participate in the Interchange Program, (ii) to be bound by the provisions of this Master Interchange Agreement and (iii) to share the Aircraft with all other Participants in good standing under this Master Interchange Agreement.

    2.2     In the event an Aircraft is for any reason unavailable for use by its Participant, the Participant shall be entitled, subject to the terms and conditions of its Management Agreement, to the use of an Interchange Aircraft on an equal-time, as-available, first-come, first-served basis. A Participant shall have operational control of an Interchange Aircraft which it is using. If Participant uses an Interchange Aircraft of the same make and model as the Aircraft, there shall be no additional charge to Participant beyond the Occupied Hourly Rate payable under its Management Agreement. If Participant, pursuant to its specific request, uses an Interchange Aircraft of a make and/or model different from its Aircraft, the number of Owner Occupied Hours for which the Participant shall be charged at its Occupied Hourly Rate (as those terms are defined in Participant's Management Agreement) shall be equal to the number of hours which it would have been charged if it had been using its Aircraft multiplied by a factor which expresses the differential cost of owning, operating and maintaining the Interchange Aircraft actually used by comparison with Participant's Aircraft.

    2.3     The factors expressing the differential costs of owning, operating and maintaining the various Interchange Aircraft shall be established by Manager in accordance with FAR 91.1.501(c)(2), which reads: "An *interchange agreement* means an arrangement whereby a Participant leases his airplane to another Participant in exchange for equal time, when needed, on the other Participant's airplane, and no charge, assessment, or fee is made, except that a charge may be made not to exceed the difference between the cost of owning, operating, and maintaining the two airplanes." The factors presently established for the Interchange Aircraft are set forth in Schedule B hereto. Manager shall make additions to Schedule B as new makes or models of aircraft are added to the Interchange Program and shall make a current copy of said schedule available to a Participant at any time upon request. Manager reserves the right in its sole discretion to amend the factors set forth on Schedule B on 30 days' prior notice to the Participants in the event there is a material change in the differential costs of operating, owning or maintaining the various Interchange Aircraft.

    2.4     In the case of upgrades specifically requested by Participant to Interchange Aircraft whose cost factors are higher than the cost factor for Participant's Aircraft, the number of Owner Occupied Hours which a Participant may use per year under its Management Agreement shall not exceed 15% of Participant's annual Allocated Hours (as defined in its Management Agreement). In the case of downgrades specifically requested by Participant to less costly Interchange Aircraft, there shall be no such limit.

    2.5     Subject to (i) availability, (ii) Section 5.8 or other relevant provisions of the Participant's Management Agreement and (iii) Manager's simultaneous-use rules as the same may be amended from time to time, each Participant shall be entitled to use on a given day an additional aircraft of the same make and model as its Aircraft for each 50 percent Interest in any Challenger, Gulfstream IV or equivalent aircraft owned by such Participant or for each 25 percent Interest in any other Aircraft owned by such Participant; provided, however, if one of the aircraft is to be used outside the Primary Service Area (as defined in the Participant's Management Agreement), Participant may use the additional aircraft only with the consent of Manager, which consent may be granted or withheld in Manager's discretion. Manager shall maintain simultaneous-use rules which are reasonably adapted to the array of aircraft in the Interchange Program and shall make a current copy of said rules available to a Participant at any time upon

ENB 01094

EM001-007574

request. In no event shall a Participant be entitled to use on the same day more than four aircraft regardless of the number of Interests owned by Participant.

3.     MAINTENANCE OF AIRCRAFT.

Participants shall be solely responsible for the securing of necessary inspections and maintenance, including preventive maintenance, of their respective Aircraft. No inspection or necessary periodic or preventive maintenance shall be delayed or postponed for the purpose of scheduling the Aircraft under the Interchange Program. Each Participant acknowledges that it has contracted with Manager under its Management Agreement to manage the Aircraft, and the management services to be rendered thereunder include but are not limited to securing all such necessary inspections and maintenance of the Aircraft.

4.     ADMINISTRATION OF INTERCHANGE PROGRAM.

Manager shall, at its sole cost and expense, administer the Interchange Program.

5.     OPERATION OF AIRCRAFT.

Participants hereby direct Manager and Manager hereby agrees to engage and provide to each Participant qualified pilots as described in each Participant's Management Agreement for each flight undertaken under this Master Interchange Agreement. Participants may also provide their own pilots. Pilots provided by Participant or at Participant's direction will be subject to approval by Manager and will exercise their duties and responsibilities in regard to the safety of each flight conducted hereunder in accordance with the applicable FARs. The Participants agree that when, in the view of the pilots of the Aircraft, safety may be compromised, the pilots may terminate a flight, refuse to commence a flight, or take other action necessitated by safety considerations without liability for loss or delay except for negligence or misconduct. A Participant shall not, in any case and for any reason, be liable to another Participant for delay in furnishing or failure to furnish the Aircraft or pilots pursuant to this Master Interchange Agreement.

6.     INSURANCE.

Participants shall obtain or cause Manager to obtain insurance in accordance with their respective Management Agreements such that all aircraft in the Interchange Program have casualty and liability insurance not less than that specified in Manager's customary form of Management Agreement.

7.     REPRESENTATIONS AND WARRANTIES.

Each Participant hereby represents and warrants to Manager and the other Participants that:

(a)     Participant will use the Interchange Aircraft only for and on account of Participant's own pleasure or business in the carriage of its officials, employees and guests and will not use such Interchange Aircraft for any illegal purpose or to provide transportation of passengers or cargo in air commerce for compensation or hire except in accordance with the provisions of Section 91.501 and 91.321 of the FARs;

(b)     Participant will abide by and conform to all laws and governmental or airport orders, rules and regulations, including any amendments thereto, controlling or in any manner affecting operations, use or occupancy of such Interchange Aircraft or use of airport premises by such Interchange Aircraft; and

(c)     Participant shall not, except as permitted by its Operative Agreements, (i) attempt to convey, mortgage, transfer, assign, lease or alienate the Interest, the Aircraft or any interest in the Interchange Aircraft or (ii) take any action to attach to the Interest, the Aircraft or any interest in the Interchange Aircraft any lien or security interest other than mechanic's liens to be discharged in the normal course of business and/or a Lien, if any, on the Interest as may be permitted pursuant to the applicable Owners Agreement.

8.     DEFAULTS.

ENB 01095

EM001-007575

Participant shall not be permitted to use any Interchange Aircraft hereunder for such period of time as Participant, due to its Event of Default under its Operative Agreements, is not permitted to use its Aircraft.

**9.      WAIVER OF SUBROGATION.**

Participants, jointly and severally, and Manager hereby waive all claims, rights or causes of action each or any of them may have against any other of them, or any of their respective employees, agents, officers, directors, successors, assigns, members, managers or lessees, or any guest, invitee or other permitted user of any aircraft in the Interchange Program, for claims, losses or damages covered by the insurance which Manager is required to maintain on the Aircraft pursuant to the Operative Agreements.   Such insurance shall permit this waiver of subrogation.

**10.      INDEMNIFICATION.**

Each party hereto will indemnify and hold harmless each other party, its directors, officers, agents and employees, from and against any and all loss, cost, damage, injury or expense that may be incurred by reason of any breach by such indemnifying party of any of its representations or obligations set forth in this Master Interchange Agreement. A party indemnified hereunder shall promptly give notice to the indemnifying party of the initiation by any third party of an action expected to be covered hereby, and the indemnifying party shall be entitled to participate in the defense of any such action by counsel of its own choosing. Each party will also indemnify and hold harmless each other party against any loss sustained or reasonable expense incurred by the indemnified party as the direct result of or arising out of the imposition on any Interchange Aircraft of any federal or other tax lien or the foreclosure thereof by virtue of the failure to pay or underpayment by the indemnifying party of federal or other taxes payable by the indemnifying party. It is specifically agreed, however, that no party shall be liable for, or indemnify any other party against, indirect, special or consequential damages suffered by such other party.

**11.      RELATIONSHIP OF PARTIES.**

Nothing contained herein shall be deemed to constitute a partnership or joint venture or any business organization of any kind among the parties hereto.

**12.      ASSIGNMENT.**

No Participant other than Manager shall assign its rights under this Master Interchange Agreement except in conjunction with an assignment of the Interest permitted under the Participant's Purchase Agreement or Lease Agreement.  Manager may assign its rights hereunder only to an entity qualified to fulfill Manager's responsibilities hereunder.   This Master Interchange Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their representatives, successors and permitted assigns.

**13.      ENTIRE AGREEMENT.**

This Master Interchange Agreement and the other Operative Agreements for the various Participants constitute the entire understanding among the parties on the subject matter of said documents, and there are no representations, warranties, rights, obligations, liabilities, conditions, covenants or agreements other than as set forth in said Operative Agreements.

**14.      GOVERNING LAW.**

This Master Interchange Agreement shall be governed by the laws of the State of Ohio without giving effect to Ohio's principles of conflict of laws.

**15.      NOTICE.**

ENB 01096

EM001-007576



Notice hereunder shall be in writing and sufficiently given if personally delivered or sent by registered or certified mail, commercial courier or facsimile to the recipient at its address set forth in this Master Interchange Agreement or at such other address as the recipient shall have specified by notice to the Manager for inclusion in Schedule A. Notice shall be effective on the earlier of three business days following its sending or the time of actual receipt.

16. COUNTERPARTS.

This Master Interchange Agreement may be executed by ink or facsimile signature in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one agreement.

17. SEVERABILITY.

In the event that any one or more of the provisions of this Master Interchange Agreement shall for any reason be held invalid, illegal or unenforceable, the remaining provisions hereof shall be unimpaired and the invalid, illegal or unenforceable provision shall be replaced by a provision acceptable to the parties which (i) is valid, legal and enforceable and (ii) comes closest to the intention of the parties underlying the provision being replaced.

18. AMENDMENT.

This Master Interchange Agreement may be amended by written action of all the parties hereto. In addition, Manager may by notice to the Participants submit for their approval any amendment hereto which serves the purposes of this Master Interchange Agreement and is not materially adverse to any Participant, other than a Participant who consents in writing to such amendment. Any such amendment shall take effect 60 days after such notice to the Participants, unless disapproved by notice to Manager by a majority of all the Participants. The Participants shall not unreasonably disapprove of such an amendment. Manager shall notify the Participants if any such amendment is disapproved. Manager shall make available to a Participant at any time upon request a current copy of this Master Interchange Agreement.

19. TRUTH-IN-LEASING.

In accordance with FAR Section 91.23, it is hereby stated as follows:

EACH PARTICIPANT HEREBY CERTIFIES THAT ITS AIRCRAFT HAS BEEN INSPECTED AND MAINTAINED WITHIN THE 12-MONTH PERIOD PRECEDING THE DATE OF THIS MASTER INTERCHANGE AGREEMENT (OR THE PERIOD OF ITS EXISTENCE IF THE AIRCRAFT IS LESS THAN 12 MONTHS OLD) IN ACCORDANCE WITH THE PROVISIONS OF FAR PARTS 91.409 AND ALL APPLICABLE REQUIREMENTS FOR MAINTENANCE AND INSPECTION THEREUNDER HAVE BEEN COMPLIED WITH.

EACH PARTICIPANT AGREES, CERTIFIES AND KNOWINGLY ACKNOWLEDGES THAT WHEN IT OPERATES ANY AIRCRAFT UNDER THIS MASTER INTERCHANGE AGREEMENT, IT SHALL BE KNOWN AS, CONSIDERED, AND IN FACT WILL BE THE OPERATOR OF THE AIRCRAFT AS PROVIDED HEREIN.

AN EXPLANATION OF FACTORS BEARING ON OPERATIONAL CONTROL AND PERTINENT FARs CAN BE OBTAINED FROM THE NEAREST FAA FLIGHT STANDARDS DISTRICT OFFICE, GENERAL AVIATION DISTRICT OFFICE, OR AIR CARRIER DISTRICT OFFICE. EACH PARTICIPANT AGREES TO UNDERSTAND AND ABIDE BY THESE REGULATIONS
THE PARTIES HERETO CERTIFY THAT A TRUE COPY OF THIS MASTER INTERCHANGE AGREEMENT SHALL BE CARRIED ON THE AIRCRAFT AT ALL TIMES, AND SHALL BE MADE AVAILABLE FOR INSPECTION UPON REQUEST BY AN APPROPRIATELY CONSTITUTED IDENTIFIED REPRESENTATIVE OF THE ADMINISTRATOR OF THE FAA.

ENB 01097

EM001-007577



**IN WITNESS WHEREOF,** the parties hereto have executed this Master Interchange Agreement, in the case of Manager, as of the date first set forth above and, as to each Participant, as of the effective date set forth for it in Schedule A.

PARTICIPANT:

KANSAS PIPELINE COMPANY, KANSAS
GENERAL PARTNERSHIP

By: Syenergy Pipeline Company, L.P. its general partner

By: Bishop Pipeline Company, its general partner

By: _____

Name: _HOWARD E. LUBOW_

Title: _VICE PRESIDENT_


MANAGER:

**FLIGHT OPTIONS, INC.**

By:_____
            [Signature of Officer]

Its:_____
            [Title of Officer]

ENB 01098

MIA-6

EM001-007578