

PricewaterhouseCoopers LLP
1100 Louisiana Street
Suite 4100
Houston TX 77002
Telephone (713) 757 5200
Facsimile (713) 757 5249

April 8, 1999

Mr. Richard A. Robert
Midcoast Energy Resources, Inc.
1100 Louisiana, Suite 2950
Houston, Texas 77002

Dear Richard:

We appreciate the opportunity to provide tax compliance services to Midcoast Energy Resources, Inc. Enclosed are the terms of our engagement, which summarize the scope of the services to be performed and outline the responsibilities of PricewaterhouseCoopers LLP and Midcoast Energy Resources, Inc. necessary to perform the project.

We value our relationship with Midcoast Energy Resources, Inc. and believe our terms of engagement will assure the successful completion of our work.

We look forward to working with you and your staff during the completion of this important tax compliance project. If the attached terms are in accordance with your understanding of our engagement, please sign the enclosed copy and return it in the enclosed self-addressed, stamped envelope. Please retain the original for your files. If you have any questions or comments after reviewing the terms of engagement, please do not hesitate to contact Robert H. Whitten, Jr. at (713) 757-5237 or me at (713) 657-8264.

Yours very truly,

Thomas J Palmisano

Enclosures: Terms of Engagement to Prepare Tax Returns
Exhibit I: General Terms and Conditions

GOVERNMENT EXHIBIT 5

PENGAD-Bayonne, N. J.

MID 2.3-5

ENB-DOJ-016905

## Terms of Engagement to Prepare Tax Return

**Scope of Services**

PricewaterhouseCoopers LLP ("PricewaterhouseCoopers", "we" or "us") will perform the following services:

- Prepare and sign the 1998 Form 1120, Consolidated U.S. Corporation Income Tax Return, for Midcoast Energy Resources, Inc. and Subsidiaries.

- Prepare and sign the 1998 state corporate income/franchise tax returns for Midcoast Energy Resources, Inc. and Subsidiaries.

- Prepare and sign 1998 federal and state extensions

- Prepare 1999 federal and state estimated tax payment vouchers

- Prepare quarterly and annual tax provision for the 1999 financial statements.

We understand that the following information will be provided by Midcoast:

- Detail trial balance in a spreadsheet format on diskette for each legal entity,

- Reconciliation and roll-forward of retained earnings from 1997 to 1998 for each entity

- Computation of depreciation expense for regular and alternative minimum tax purposes,

- Preparation of state income tax apportionment schedules of property, payroll, and sales by state for each entity,

- Other detail schedules as need to support and comply with federal and state reporting requirements.

Should any unanticipated issues arise during the engagement wherein additional professional time may have to be expended and/or if you are unable to provide the required information and assistance listed above, we will mutually review the estimated fee to reflect additional services, if any, required of us to meet our deadline.

Our fee estimate does not include time for accounting support, tax planning, consultation or special projects. Specific projects and consultations will be detailed in a separate engagement letter should the need arise at 65% of our standard hourly rates.

**Access to Workpapers**

Any requests for access to our workpapers will be discussed with you prior to making them available to requesting parties.

**Fees and Billing Procedures**

The fee for our preparation of the tax returns described in the "Scope of Services" section is $46,000. Any out-of-pocket expenses will be billed separately. Such expenses will include computer usage, postage, photoreproduction and similar expenses. Additional state returns will be charged at $650 per return.

You will be billed for these services as work progresses will a final billing upon completion of the engagement.

The amount of our fee described above is based on the assumption that we will receive the information requested on a timely basis as well as any required assistance from company personnel. In the event we believe an additional fee is required as the result of the failure of Midcoast Energy Resources, Inc. to meet any of these requests or for any other reason, we will inform management immediately.

**Other Matters**

Exhibit I contains the General Terms and Conditions which will apply to this engagement letter.

* * * * *

PricewaterhouseCoopers LLP

By: [signature] Date: 4/8/99

Accepted:

By: ______________________ Date: __________

Exhibit I

# GENERAL TERMS AND CONDITIONS

1 **Entire Agreement**

These General Terms and Conditions and the engagement letter to which these General Terms and Conditions are attached (collectively, the "Agreement") constitute the entire agreement between the client to whom such engagement letter is addressed and **PricewaterhouseCoopers LLP**, a registered limited liability partnership formed under an agreement governed by the laws of the State of Delaware ("PricewaterhouseCoopers", "we" or "us"), regarding the project described in the engagement letter

2 **Responsibilities of Client**

Most of the tax returns that we will prepare require signatures, under the penalties of perjury, of an officer of Client affirming that the tax returns and the accompanying schedules and statements are true, correct and complete to the best of his or her knowledge. Accordingly, it is very important that management understand and agree with the various amounts, computations and statements made in the tax returns before they are filed with the Internal Revenue Service and state taxing authorities

Client agrees to file, unaltered, the tax returns as prepared by PricewaterhouseCoopers on or before the due dates for the returns as contemplated in the "Timing of Engagement" section of the engagement letter In the event changes must be made by Client personnel to the tax returns before filing, such changes may only be made with our written consent. Client also agrees to inform us in writing of any failure to timely file the tax returns.

Client will be responsible for providing us with accurate and timely information relative to the tax return preparation process. A fundamental term of the engagement is that Client will provide us with all information relevant to completion of tax returns and assist us as required throughout the compliance project. In addition, Client agrees to bring to our attention any matters that may require further consideration to determine the proper tax treatment. Client also agrees to bring to our attention any changes in the information as originally presented, as soon as such information becomes available.

Treasury regulations require that permanent books of account or records, including inventories, sufficient to establish the amount of gross income, deductions, credits or other matters shown on the tax return be maintained so long as the contents of these documents may be material in the administration of any internal revenue law Accordingly, Client agrees to maintain and retain adequate documentation to support the tax returns as filed in accordance with the Internal Revenue Code and associated regulations As Client is aware, penalties can be imposed for the failure to produce adequate documentation supporting the items included in a tax return

Unless otherwise agreed with PricewaterhouseCoopers, Client will be responsible for preparation and filing of all other tax or information returns required to be filed with the authorities including, for example, city and county income or gross receipts filings, payroll tax filings, sales and use tax filings, information reporting filings, etc

3. **Responsibilities of PricewaterhouseCoopers**

We will prepare the tax returns on the basis of the information provided to us and in accordance with the Internal Revenue Code of 1986, as amended, and any applicable regulations and associated interpretations existing at the time the returns are completed. In addition, state income tax returns will be prepared in accordance with applicable state tax laws, regulations and associated interpretations as of the date the tax returns are completed. Federal and state tax laws and regulations are subject to change at any time, and such changes may be retroactive in effect. Thus, it may be possible that changes in laws or regulations may effect the nature and amount of items reported on the returns prepared under this agreement, after our completion of these returns. We do not assume responsibility for tax changes occurring after the date we have completed preparation of the tax returns.

The Internal Revenue Code imposes penalties for the substantial understatement of tax liability as well as tax return preparer penalties for certain failures to prepare proper tax returns

Taxpayer penalties The Code and related regulations provide that a penalty will be imposed for any position resulting in a substantial understatement of the tax liability for which "substantial authority" does not exist and disclosure has not been made We are not responsible for any penalties imposed for positions which have been discussed with management that do not have, or are ultimately determined by the Internal Revenue Service not to have, substantial authority where we have recommended disclosure and Client has elected not to disclose.

Preparer penalties In addition, a preparer penalty can be imposed against PricewaterhouseCoopers if we prepare a tax return that includes a position which does not have a realistic possibility of success (a one-in-three chance of being sustained), and is not disclosed Should Client decide to take a position for which we do not believe a realistic possibility of success exists, and Client chooses not to disclose such a position, we will be prohibited from being associated with the tax returns and may resign from the engagement

We will discuss with management, and will document, any tax positions of which we are aware for which substantial authority or a realistic possibility of success may not exist and could subject Client or PricewaterhouseCoopers to penalties We will also discuss with management the related need for disclosure when we believe that it is required to avoid the imposition of any penalty. PricewaterhouseCoopers will use judgment in resolving questions where the tax law may be unclear, or where there are conflicts between taxing authorities' interpretations of the law and other supportable positions, and discuss them with Client.

It is PricewaterhouseCoopers' policy that all positions taken in the tax returns must have a realistic possibility of being sustained on their own merits, as prescribed by the Internal Revenue Code, regulations and associated interpretations, or must be non-frivolous and adequately disclosed on the tax returns as filed If the Client decides to take a position on its return and chooses not to follow our recommendation to disclose, and the IRS subsequently determines that a realistic possibility of success did not exist, then the Client agrees to reimburse PricewaterhouseCoopers for any penalties imposed on PricewaterhouseCoopers, its partners or staff

PricewaterhouseCoopers is not responsible for any penalties assessed against Client as the result of Client's failure to provide us with all the relevant information relative to the issue in question Client agrees to reimburse us for any penalties imposed on PricewaterhouseCoopers, its partners or staff, as the result of such a failure to provide such information

We are responsible only for the tax returns disclosed in the "Scope of Services" section of the engagement letter Accordingly, we are not responsible for the personal tax implications to directors, employees or other persons as the result of positions taken in the corporate income tax returns unless we are specifically instructed, and agree in writing, to address these issues

4. **Engagement Limitations**

The tax returns will be prepared solely for filing with the appropriate taxing authorities and may not be used for any other purpose without the written consent of PricewaterhouseCoopers

We will rely on information supplied by Client in preparing the tax returns and will not independently verify the accuracy of such information However, in certain instances, we may need to ask for additional clarification of some of the information.

As Client is aware, income tax returns are subject to examination by both the Internal Revenue Service and state taxing authorities. We will be available to assist Client in the event of an audit of the tax returns subject to this agreement. However, our fees for these additional services are not included in the fee for the preparation of the tax returns

5 **Disassociation or Termination of Engagement**

In the event we discover activities or practices that we deem inappropriate and that would prevent us from preparing complete and accurate tax returns, or should Client fail to provide us with adequate and accurate information or the requisite assistance to allow for the proper preparation of complete and accurate tax returns, PricewaterhouseCoopers reserves the right to resign from the engagement prior to the completion of our work. In such an event, Client agrees to be responsible for all professional fees and expenses incurred by PricewaterhouseCoopers prior to our resignation

In addition, we may suspend or terminate any work in progress in the event timely payment of our fees is not made in accordance with the billing schedule detailed in the "Fees and Billing Procedures" section of the engagement letter Moreover if during the course of our work, billing disputes arise which remain unresolved, we might withdraw from further services

Client may terminate the services covered by this agreement at any time by providing PricewaterhouseCoopers with written notice of such intentions The effective date of such a termination will be the date we receive the termination notice. In such event, Client will be responsible for all professional fees and expenses incurred by PricewaterhouseCoopers prior to the date of termination.

6 **Liability Limiting Clause**

All services will be rendered by and under the supervision of qualified staff in accordance with the terms and conditions set forth in this agreement and its attachments PricewaterhouseCoopers makes no other representation or warranty regarding either the services to be provided or any deliverables, in particular, and without limitation of the foregoing, any express or implied warranties of fitness for a particular purpose, merchantability, warranties arising by custom or usage in the profession, and warranties arising by operation of law are expressly disclaimed.

In no event, unless it has been finally determined that PricewaterhouseCoopers was grossly negligent or acted willfully or fraudulently, shall PricewaterhouseCoopers be liable to Client or any of its officers, directors, employees or shareholders or to any other third party, whether a claim be in tort, contract or otherwise. (a) for any amount in excess of the total professional fee paid by Client to PricewaterhouseCoopers under this agreement, or (b) for any special, consequential, indirect, exemplary, punitive, lost profit or similar damages, even if we have been apprised of the possibility thereof

7. **Indemnification Clause**

Client agrees to indemnify, defend and hold harmless PricewaterhouseCoopers and its partners, principals and employees (PricewaterhouseCoopers and each such person being an "indemnified party") from and against any and all liabilities, losses, demands, costs and expenses, joint or several, to which such indemnified parties may be subject under any applicable federal or state law arising solely out of the performance of services contemplated by this agreement, including claims by any third parties Client agrees to reimburse any indemnified party for all reasonable expenses (including reasonable counsel fees and expenses) as they are incurred in connection with the investigation of, preparation for, or defense of, any pending or threatened claim or action or proceeding arising therefrom, whether or not such indemnified party is a party. The provisions of this indemnification clause will not apply if it is finally determined that PricewaterhouseCoopers was grossly negligent or acted willfully or fraudulently

8. **Resolution of Differences**

In the unlikely event that differences concerning PricewaterhouseCoopers' services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, PricewaterhouseCoopers and Client agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to PricewaterhouseCoopers' services and fees for this engagement.

June 16, 1999

Mr. Bill Bray
Midcoast Energy
Attention: 32nd Floor
1100 Louisiana, Suite 2900
Houston, TX 77002

Dear Bill

Pursuant to our conversation, please find the enclosed presentation that provides a brief description of Project Ruby

We look forward to contacting you in the next few days to answer any questions and discuss your interest in proceeding to the next step of the process as outlined on page 9. We intend to begin distributing confidentiality agreements by the end of this week. In the meantime, please feel free to contact us as listed on the last page of the attachment

Sincerely yours,

Vean J Gregg III

cc
Rick Betz
Jim Bold
Bill Manias

enclosure

PENGAD-Bayonne, N. J.
GOVERNMENT
EXHIBIT
6

| | SCENARIO | SELLER CONSIDERATIONS | BUYER CONSIDERATIONS |
|---|---|---|---|
| (1) | Cash for stock in Bishop | ▪ Bishop realizes a gain on the sale that will be taxed at the full corporate tax rate of 35% | |
| (2) | Stock-for –stock | ▪ Entirely tax free<br>▪ Most efficient tax structure to Bishop<br>▪ Tax is deferred until stock is sold at which point taxed at the capital gains rate of 20% | ▪ Tax free to buyer |
| (3) | Mix of cash and stock | ▪ May be tax free to Bishop if stock portion is > 50%<br>▪ Cash portion is taxable<br>▪ Taxed at 20% capital gains tax rate | |
| (4) | MLP units for stock | ▪ Tax-free only if buyer issues new units<br>▪ Could use alternative tax structure to monetize stock without selling it – e g stock swaps, get a loan by using the stock as a collateral | ▪ Tax-free under Section 7 21<br>▪ Tax-inefficient since will have to pay taxes on the corporation earnings which will effectively be rolled under the MLP structure |
| (5) | MLP units for Syenergy units | ▪ Tax-free only if buyer issues new units<br>▪ Could use additional cashflow from the quarterly MLP distributions and reinvest into development of new projects at the Bishop Corporation level | ▪ Tax-free under Section 7 21<br>▪ Tax-inefficient since will have to pay taxes on the partnership earnings which will effectively be rolled under the MLP |
| (6) | Asset purchase at the KPC level for cash | ▪ Very tax inefficient, double taxation – once at the corporate tax rate for the gain on the sale, and for a second time at the Bishop level when the cash is taken out of the corporation | |

ENB-DOJ-036514

June 21, 1999

Mr. Bill Bray
Director, Business Development
Midcoast Energy
Attention 32nd Floor
1100 Louisiana, Suite 2900
Houston, TX 77002

Dear Bill

Thank you for your interest in Kansas Pipeline Company Attached is a Confidentiality Agreement ("CA") for your signature. Upon receiving a signed CA via fax or courier as indicated below, we will distribute the Confidential Offering Memorandum In the meantime, please feel free to contact Vean Gregg at 713-216-8848 or myself at 713-216-6386 with any questions or comments

Address
Chase Securities Inc.
Global Oil and Gas Group
600 Travis Street, 20th Floor
Houston, TX 77002-8086
Fax 713-216-8882

We look forward to working with you.

Sincerely yours,

Bill Manias
Vice President

cc: Chris Kaitson, General Counsel, Midcoast Energy

enclosure

PENGAD-Bayonne, N. J.
GOVERNMENT
EXHIBIT
7

ENB-DOJ-035982

July 21, 1999

Bill Manias
Chase Security, Inc.
600 Travis St. 20th Fl.
Houston, TX. 77002

**Delivered Via Fax: (713) 216-8882**

Re: Possible Sale of Stock in The Bishop Group Ltd. the 100% Owner of Kansas Pipeline Company

Dear Mr. Manias:

After receiving and reviewing your confidential offering memorandum dated June, 1999 Midcoast Energy Resources, Inc. (MERI) or one of its wholly owned subsidiaries respectfully submits for your review and evaluation, this preliminary non-binding indication of interest regarding the potential purchase of the above referenced entity, subject to further due diligence, and the negotiation of an acceptable purchase and sale agreement containing the following parameters:

(1) Midcoast would be prepared to pay one hundred fifty seven million dollars ($157,000,000) in cash, payable at closing for 100% of the stock in The Bishop Group Ltd.

(2) Midcoast Energy Resources, Inc. or one of its wholly owned subsidiaries is the perspective purchaser; other participants who may be involved in the process could include outside parties hired to provide legal, engineering, accounting, environmental and other due diligence assistance as well as our bankers.

(3) The source of the funds would be provided through our banking relationship with First Chicago Bank and the availability of the funds can be verified by contacting:

Ken Fatur
First Chicago Capital Markets Inc.
One First National Plaza, Site 362
Chicago, IL 60670-0362
Phone No. (312) 732-3117.

MID 2.1-1017

GOVERNMENT EXHIBIT 9.1

(4) An outline of additional information required by Midcoast in order to complete due diligence activities and to enter into a definitive agreement to acquire Kansas Pipeline is attached as Exhibit A.

(5) The approvals that we would expect are from the Department of Trust under the under the HSR Act, and MERI's Board of Directors. Board of Director's approval would occur prior to the execution of a formal purchase and sale agreement and could be obtained within ten working days. The approval process for the HSR Act typically begins immediately after the execution of the formal purchase and sale agreement and takes 30 - 45 days. The other conditions to closing would include completion of due diligence activities which should be substantially completed during the negotiation of a final purchase and sale agreement and financing which can be accomplished within a matter of weeks.

To the extent that you have questions regarding this indication of interest, we encourage you to call either myself or Chip Berthelot at (713) 650-8900. We sincerely appreciate the opportunity to be involved in this process and look forward to the successful consummation of this deal and a continuing positive relationship with the management of Kansas Pipeline for many years to come.

Sincerely,

**MIDCOAST ENERGY RESOURCES, INC.**

Dan C. Tutcher
President

DCT/prj



**Chase Securities Inc.**
600 Travis, 20th Floor
Houston, TX 77002

July 1, 1999

**PRIVATE AND CONFIDENTIAL**

Mr Bill Bray
Director, Business Development
Midcoast Energy
Attention: 32nd Floor
1100 Louisiana, Suite 2900
Houston, TX 77002

Dear Bill

Chase Securities Inc. ("Chase") has been retained by The Bishop Group, Ltd. ("Bishop" or the "Company") as its financial advisor in connection with a possible sale of stock in Bishop, the 100% owner of Kansas Pipeline Company ("KPC") On behalf of Bishop, Chase is soliciting preliminary non-binding indications of interest in order to identify a limited number of parties to be invited to proceed with further due diligence activities The timing and procedures for submitting an indication of interest are set forth below

I. The Confidential Offering Memorandum Pursuant to the confidentiality agreement that you have executed and returned to Chase, you are being provided with a Confidential Offering Memorandum that contains certain business and financial information regarding KPC Chase will be available to discuss the information contained in the Confidential Offering Memorandum and should be contacted if you have any questions or requests for additional information. Neither Bishop, Kansas Pipeline Company, nor any of their employees should be contacted directly by you, your staff, or your advisors.

II. Structure of Sale. The transaction will be structured as a sale of the stock of Bishop

III Form of Indication of Interest Subsequent to reviewing the Confidential Offering Memorandum, parties interested in acquiring KPC must so advise Chase in a written non-binding letter of interest addressed to either

Bill Manias
Chase Securities Inc.
600 Travis Street, 20th Floor
Houston, Texas 77002
Facsimile: (713) 216-8882
Telephone: (713) 216-6386

Vean Gregg
Chase Securities Inc.
600 Travis Street, 20th Floor
Houston, Texas 77002
Facsimile: (713) 216-8882
Telephone (713) 216-8848

Please submit your written indication of interest by Wednesday, July 21, 1999, no later than 5:00 P.M. Central Standard Time.

The indication of interest should include the following

(i) a preliminary non-binding indication of the stock and/or cash consideration that the prospective purchaser, based on the information reviewed to date, would be prepared to pay,

(ii) the identity of the prospective purchaser, including other participants in the proposed transaction, if any,

(iii) an indication of the source and availability of the funds that would be utilized to consummate the proposed acquisition.

(iv) an outline of additional information required by the prospective purchaser in order to make a definitive acquisition proposal,

(v) an estimate of the time and a summary of the approvals and any other conditions (including financing) required to make a definitive proposal and to complete the proposed transaction, and

(vi) the name and telephone number of the person Chase should contact in responding to or clarifying the indication of interest

IV. Selection of Qualified Prospective Purchasers. After receipt of the indications of interest, Chase will notify all parties who have submitted indications of interest whether or not Bishop will invite them to proceed with a further review Bishop, with the assistance of Chase, will provide a limited number of parties access to additional confidential information and the opportunity to conduct a further evaluation of the operations, assets and liabilities of Bishop and KPC Due diligence meetings and management presentations for qualifying parties will be scheduled by Chase and will begin July 28, 1999 Bishop expects to receive firm proposals and enter into negotiations with qualified parties as soon as practicable thereafter Qualifying parties will be provided with a form of an acquisition agreement specifying the terms upon which Bishop is prepared to enter into a transaction and the detailed procedures for the submission of definitive acquisition proposals at a later date.

Bishop reserves the right, in its sole discretion, to evaluate the terms and conditions of any proposal submitted and to accept or reject any such proposal for further consideration without specifying reasons therefor and to alter or terminate the process at any time

The existence and content of this letter are subject to the confidentiality agreement which was previously executed by you and Bishop

On behalf of Bishop, we would like to thank you for your interest in KPC Please do not hesitate to call Vean Gregg (713-216-8848) or me (713-216-6386) with any questions regarding these procedures or any other matter Bishop and Chase appreciate your interest in this opportunity and look forward to hearing from you

Sincerely,

Bill Manias
Vice President

Confidential
MidCoast

# KANSAS PIPELINE COMPANY
## Management Discussion

August 1999

KPI2685

KANSAS PIPELINE COMPANY

PENGAD-Bayonne, N J
GOVERNMENT
EXHIBIT
10

CHASE

*Confidential*

# Introductions

Dennis M. Langley - CEO, President, and Chairman of the Board

Howard Lubow - COO, CFO, and Treasurer

Joan Schnepp - VP Operations

Steve Korb - Financial Analyst

Yvette Korb - VP Administration

Tino Monaldo - Company Counsel

*Available for Consultation:*

Heller, Ehrman, White & McAuliff - FERC Counsel

Ernst & Young - Independent Auditors

KPI2686

CHASE

ENB-DOJ-022807

Confidential

# Opportunity Highlights

- Strong base cash flow generated by long-term contracts
- Significant and growing share of Kansas City gas market
- Current rates recently confirmed by FERC
- Possibility for significant operating and marketing synergies
- Opportunity to expand volumes in both LDC and industrial markets

KPI2687

Confidential

# Overview

- Company Overview - Dennis Langley
- System Overview - Joan Schnepp
- Market Overview - Dennis Langley
- Legal / Regulatory - Tino Monaldo / Howard Lubow
- Financial and Organizational Overview - Howard Lubow

KPI2688

KANSAS PIPELINE COMPANY

CHASE

ENB-DOJ-022808

Confidential

# Company Overview

KPI2689

**_KANSAS PIPELINE COMPANY_**

CHASE

Confidential

# Company Overview

*Original Development Strategy*

- **Create system capable of moving significant volumes of natural gas from fields in Oklahoma and Kansas to the greater Kansas City area**
- **Utilize existing disjointed infrastructure of LDCs to KPC's advantage**
- **Provide effective means of competing with Williams**

KPI2690

CHASE

ENB-DOJ-022810

Confidential

# Company Overview

## *History of the Company and System*

| | |
|---|---|
| Prior to 1975 | Phillips builds crude gathering pipeline between 1933 and 1975 |
| 1984 | Kansas Pipeline Co., L.P. purchases eastern portion of the system and begins conversion to natural gas service |
| 1985 | KPC's predecessors receive certificates from the KCC |
| 1986 | Natural gas deliveries commence |
| 1988 | Bishop successful in negotiating first baseload contracts with KPL |
| 1989 | Bishop acquires the western segment of the pipeline, combines with eastern segment to form integrated system |
| 1990 | OKM purchases 50% interest in system, provides incremental capital for expansion |
| 1990 | System expanded to interconnect with Transok; compression added to increase capacity |
| 1990 | New baseload contracts signed increasing maximum daily quantity (MDQ) under contract to 81 MMcf/d |
| 1991 | WRI executed new firm contracts increasing daily volumes under contract to 130 MMcf/d |
| 1991 | OKM interest consolidated with Bishop interest to form Syenergy; GP interest of OKM repurchased |
| 1992 | North Wichita metering station completed - marking entry into local distribution system outside metro Kansas City |
| 1997 | $4.5MM of new pipeline facilities constructed. New contracts increase MDQ to 159 MMcf/d |
| 1998 | FERC orders KPC to become a FERC regulated entity |

KPI2691

CHASE

ENB-DOJ-022811

Confidential

# Company Overview

- Regulatory Framework
- Market Overview
- Future Opportunities
- Rationale for Sale

KPI2692

KANSAS PIPELINE COMPANY

CHASE

*Confidential*

# System Overview

KPI2693

**KANSAS PIPELINE COMPANY**

CHASE

ENB-DOJ-022813

ENB-DOJ-022814

Confidential
Detailed System Map
Kansas Pipeline Company (the system)
Transok, Inc (leased line)
Interconnects (Delivery)
Interconnects (Receipt)
Underground Storage Field
KPI2694
KANSAS PIPELINE COMPANY
CHASE

ENB-DOJ-022815



ENB-DOJ-022816

*Confidential*

# Detailed Discussion of Segments

## KPC Zone 1

- **East Leg**
  - pipeline - one 12" diameter pipeline extending 28 miles northward and two parallel pipelines (8" and 10" diameter) extending northward for 15 miles
  - capacity - 90 MMcf/d
  - interconnects with long-term leasehold on the Transok system
  - compression - four compressor units rated at 1,478 Bhp each, constructed in 1990-91
- **West Leg**
  - pipeline - a single 8" diameter pipeline extending 57 miles northeast
  - capacity - 21 MMcf/d (without compression)
  - interconnects - ANR
  - compression - no compressor stations along route

KPI2696

ENB-DOJ-022817

*Confidential*

# Detailed Discussion of Segments

## KPC Zone 2

### East Leg

- pipeline - two parallel pipelines (an 8" diameter pipeline, another pipeline with a 6 mile, 12" diameter section, and a 66 mile, 10" diameter section), connecting with three parallel pipelines (two 8" diameter pipelines and one 12" diameter pipeline)
- capacity - 95MMcf/d (additional compression could be added)
- interconnects - Panhandle
- compression - one compressor station with three compressor units, each rated at 1,215 Bhp, constructed in 1990-91

### West Leg

- pipeline - one pipeline (8" diameter) extending northeasterly for 218 miles and two parallel pipelines (6" diameter) extending eastward for 105 miles
- capacity - 21 MMcf/d (without compression or commissioning of existing lines)
- interconnects - Panhandle, Williams Natural Gas, Atmos Energy, Mid-Continent Market Center and Kansas Gas Service
- compression - no compressor stations along route

KPI2697

KANSAS PIPELINE COMPANY

CHASE

ENB-DOJ-022818

*Confidential*

# Detailed Discussion of Segments

## KPC Zone 3

- **East Leg**
  - pipeline - a single 8" diameter pipeline extending 36 miles northeasterly connecting to a single 6" diameter pipeline extending northward for approximately 50 miles
  - capacity - 12 MMcf/d (6" without compression); capacity - 21 MMcf/d (8" without compression)
  - interconnects - Panhandle, Atmos Energy, and Kansas Gas Service
  - compression - no compressor stations along route

KPI2698

- **West Leg**
  - pipeline - two parallel pipelines that extend northeasterly for 78 miles (one 8" diameter pipeline and another pipeline with a 27 mile, 12" diameter section, and a 51 mile, 10" section)
  - capacity - 116 MMcf/d
  - interconnects - Kansas Gas Service, Atmos Energy, Panhandle, and Missouri Gas Energy
  - compression - three compressor units, each rated at 1,215 Bhp, and a fourth compressor unit rated at 1,478 Bhp; all constructed in 1990-91

***KANSAS PIPELINE COMPANY***

CHASE

ENB-DOJ-022819

Confidential

# General System Characteristics

- System cathodically protected from date of original installation
- SCADA - system remotely operated from centralized control facility
- System has undergone multiple environmental audits with consistent satisfactory results
- Transportation service has never been interrupted

KPI2699

ENB-DOJ-022820

*Confidential*

# Contract Summary

| Customer | Delivery Location | Expiration Date | Max. Daily Volume (MMBtu) | Annual Volume (MMBtu) | Current Rates (in cents) Reservation ($/MMBtu/Month) | Commodity (Cents/MMBtu) | Annual Revenue [1] |
|---|---|---|---|---|---|---|---|
| Missouri Gas Energy[4] | Kansas City, Missouri | 2009 | 46,332 | 3,200,000 | 20.2944 | 0.0625 | $11,483,378 |
| Kansas Gas Service[3,4] | Kansas City, Kansas | 2014 | 35,000 | 3,333,302 | 15.2864 | 0.0078 | $6,446,288 |
| Kansas Gas Service[3,4] | Kansas City, Kansas | 2014 | 27,568 | 2,388,926 | 19.9649 | 0.0625 | $6,754,016 |
| Kansas Gas Service[4] | Wichita, Kansas | 2009 | 21,100 | 1,540,000 | 11.4561 | 0.0588 | $2,991,237 |
| Kansas Gas Service | Kansas City, Kansas | 2007 | 5,700 | 503,700 | 15.2864 | 0.0078 | $1,049,519 |
| Kansas Gas Service | Ottawa, Kansas | 2017 | 6,900 | 579,255 | 6.1639 | 0.0286 | $526,938 |
| Kansas Gas Service | Osawat. / Paola, KS | 2017 | 6,857 | 513,075 | 10.7126 | 0.0348 | $899,331 |
| Atmos Energy | Heritage Park, Kansas | 2003 | 4,000 | 1,460,000 | n/a | 0.3078 | $449,388 |
| Atmos Energy | New Strawn, Kansas | 2003 | 500 | 6,704 | n/a | 1.4300 | $9,587 |
| Atmos Energy | Cedar Creek, Kansas | 1999 | 5,000 | 42,694 | n/a | 1.5000 | $64,041 |
| | Total [2] | | 158,957 | 13,567,656 | | | $30,673,721 |

[1] *Annual revenue = maximum daily volume x 12 months x current reservation rate + annual volume x current commodity rate, except for revenues from the Atmos Energy contracts which are equal to annual volume x current commodity rate*

[2] *Transportation net revenue excludes approximately $400,000 of estimated net revenue for MarGasCo marketing activities*

[3] *Initial contract term expires in 2009 and has been extended to 2014 under amended terms*

[4] *Base Load Contracts*

KPI2700

***KANSAS PIPELINE COMPANY***

CHASE

ENB-DOJ-022821



ENB-DOJ-022822

Confidential

# Transok Lease Overview

- Transok interconnect with Zone 1 East Leg
- Lease through 2011
- Priority access to 90 MMcf/d
- Monthly lease fee and additional usage fee
- Access subject only to prior right of PSO which is less than one third of capacity of system

KPI2702

ENB-DOJ-022823

*Confidential*

# Market Overview

KPI2703

**KANSAS PIPELINE COMPANY**

CHASE

ENB-DOJ-022824

Confidential

# Kansas City Market

- Demographics
- Industrial and residential load in Kansas City
- Demand growth

KPI2704

KANSAS PIPELINE COMPANY

CHASE

ENB-DOJ-022825

Confidential

# Growth Opportunities

- Downtown Kansas City capacity expansion opportunities
  - Multi-use, multi-pipe and strategic ROW
  - Only Williams and KPC can economically access this market
- Ability to create additional base-load demand
  - Gas-fired power plants
- Expand system to serve LDC demand in mid-size and smaller markets
  - Wichita, El Dorado, Emporia, Lawrence, Topeka, etc.
- Opportunities to by-pass local distribution companies
  - One of only two pipelines with right-of-way within the utility corridor that serves the Kansas City industrial area
  - Non-KC bypasses (Wichita, McPherson, Emporia, El Dorado, etc.)

KPI2705

FNB-DOJ-022826

*Confidential*

# Legal / Regulatory Overview

KPI2706

**KANSAS PIPELINE COMPANY**

CHASE

ENB-DOJ-022827

*Confidential*

# Legal / Regulatory Overview

KPI2706

**KANSAS PIPELINE COMPANY**

CHASE

*Confidential*

# Legal Proceedings

- Missouri Public Service Commission
- KGS Lawsuit

KPI2707

**KANSAS PIPELINE COMPANY**

CHASE

ENB-DOJ-022828

Confidential

# Regulatory Overview

## History

- Prior to May 11, 1998, the assets were held in three partnerships subject to various state and federal regulation:

| Partnership | Regulatory Authority |
|---|---|
| Kansok | Oklahoma |
| Kansas Pipeline | Kansas |
| Riverside | FERC |

KPI2708

KANSAS PIPELINE COMPANY

CHASE

ENB-DOJ-022829

Confidential

# Regulatory Overview

## FERC Regulation

- Effective May 11, 1998, assets held in a single FERC regulated entity, KPC
- FERC issued certificate of public convenience and necessity in recently completed Section 7 proceeding
- Current rates affirmed as initial rates in extensive revenue requirement analysis
- Section 4 Rate Case to be filed by September 10, 1999
- A FERC order from April 2, 1999 accepted KPC's existing contracts with MGE and KGS as non-conforming service agreements
- MGE contract at fixed rates for remaining term subject to inflation escalator

KPI2709

**_KANSAS PIPELINE COMPANY_**

CHASE

*Confidential*

# Financial / Organizational Overview

KPI2710

**KANSAS PIPELINE COMPANY**

CHASE

ENB-DOJ-022831

Confidential

# Corporate Organization Chart

KPI2711

(1) FERC regulated pipeline

(2) BPC is the General Partner ("GP") with 0.1% ownership and Syenergy is a General Partner ("GP") with 99 9% ownership Kansas Pipeline Partnership, KansOk Partnership, and Riverside Pipeline Company, L P., which are all direct or indirect subsidiaries of KPC, became inactive after the consolidation of all pipeline assets into KPC in 1998

(3) Non-regulated marketing entity

Inactive subsidiaries not shown include E&C Group Inc , Management Resources Group Ltd, The Bishop Corporation, Kansas Pipeline Partnership, KansOk Partnership, and Riverside Pipeline Company, L.P

**KANSAS PIPELINE COMPANY**

ENB-DOJ-022832

ENB-DOJ-022833

Confidential

# Pro Forma Balance Sheet -9/30/1999

| *($ in Millions)* | |
|---|---|
| **Assets** | |
| Utility Plant, Net | $61.64 |
| Other Assets, Net | 12.51 |
| Current Assets | |
| Cash Reserve for LTD | 10.00 |
| Accounts Receivable | 4.96 |
| Other Prepaid Expenses | 0.79 |
| Total Current Assets | 15.76 |
| **Total Assets** | **89.90** |
| **Capitalization and Liabilities** | |
| Partners Capital | $13.37 |
| Long-Term Debt | 62.39 |
| Revolving Credit Facilities | 6.00 |
| Restricted Pipeline Royalties | 3.09 |
| Current Liabilities | |
| Accounts Payable | 2.20 |
| Accrued Interest | 1.50 |
| Accrued Property Taxes | 0.42 |
| Other Accrued Liabilities | 0.94 |
| Total Current Liabilities | 5.06 |
| **Total Capitalization and Liabilities** | **89.90** |
| **Unencumbered Working Capital at 9/30/99** | **$0.70** |

KPI2712

**KANSAS PIPELINE COMPANY**

CHASE

Confidential

# Summary Financial Overview (1)

## Condensed Income Statement

| ($ millions) | 1997 | 1998 | 1999 E |
|---|---|---|---|
| Net Operating Revenues [2] | 30.3 | 32.0 | 31.1 |
| Operating Expenses [2] | 15.2 | 12.3 | 11.7 [3] |
| **EBITDA** | 15.1 | 19.7 | 19.4 |
| Depreciation & Amortization | 4.9 | 4.2 | 4.2 |
| **EBIT** | **10.3** | **15.4** | **15.2** |

**PRIOR TO EFFECT OF ANY MERGER SYNERGIES**

KPI2713

(1) *Effective May 11, 1998, KPC became a FERC regulated entity providing only transportation of natural gas.*

(2) *Prior to becoming a FERC regulated entity KPC was selling as well as transporting natural gas, therefore net operating revenues in 1997 and 1998 are derived by netting $61.8MM and $22.2MM of natural gas purchases expense against $80.4MM and $26.9MM of natural gas sales in 1997 and 1998, respectively.*

(3) *Operating expenses in 1999 include a normalized level of professional fees due to higher expenses associated with the FERC Section 4 filing in September 1999*

***KANSAS PIPELINE COMPANY***

CHASE

ENB-DOJ-022834

ENB-DOJ-022835

Confidential

# Operating Expense Breakdown

| Total 1999 Projected Operating Expenses ($ in thousands) | |
|---|---|
| Transok transportation charges | $1,368 |
| Compensation and benefits | 4,072 |
| Travel and entertainment | 404 |
| Insurance | 201 |
| Other general and administrative [1] | 3,172 |
| Operating and maintenance (field expenses) | 791 |
| Property taxes, including new construction | 1,677 |
| **Total Cash Expenses** | **$11,685** |

**PRIOR TO EFFECT OF ANY MERGER SYNERGIES**

*[1] Other G&A and professional fees shown at a normalized level due to higher anticipated costs associated with the FERC Section 4 Case to be filed by September 1999*

KPI2714

CHASE

Confidential

# Personnel Overview

- **Field Operations Personnel - 20**
  - Pipeline and Compressor Station Personnel - 20
- **General and Administrative Personnel - 30**
  - Office of the CEO, Government Affairs, Support Staff - 8
  - COO/CFO, Accounting, Regulatory Affairs, Policy Information Systems, Office Support Staff - 22
- **Non-Field Operations Personnel - 14**
  - Management - 4
  - Support Staff - 5
  - System Controllers - 5

KPI2715

ENB-DOJ-022836

Confidential

# Opportunity Highlights

- Strong base cash flow generated by long-term contracts
- Significant and growing share of Kansas City gas market
- Current rates recently confirmed by FERC
- Possibility for significant operating and marketing synergies
- Opportunity to expand volumes in both LDC and industrial markets

KPI2716

**KANSAS PIPELINE COMPANY**

CHASE



DATA ROOM COPY
Mudcoast
copies 8/9/9
COPY

DATA ROOM INDEX

| DOCUMENT | | | COPIES |
|---|---|---|---|
| 1. Corporate Records | | | |
| 1.1. | Current Articles of Incorporation/Partnership Agreements | | |
| | a) | The Bishop Group, Ltd | |
| | b) | Bishop Pipeline Company | |
| | c) | Bishop Gas Transmission Company | |
| | d) | Syenergy Pipeline Company, L.P Limited Partnership Certificate and Amended and Restated Limited Partnership Agreement and Amendment No 1 | |
| | e) | Kansas Pipeline Company Partnership Agreement f/k/a Riverside Pipeline Partnership | |
| | f) | Riverside Pipeline Partnership Agreement | |
| | g) | First Amendment to Riverside Pipeline Partnership Agreement | |
| | h) | Kansas Pipeline Partnership Agreement | |
| | i) | First Amendment to Kansas Pipeline Partnership Agreement | |
| | j) | KansOk Partnership Agreement | |
| | k) | First Amendment to KansOk Partnership Agreement | |
| | l) | Riverside Pipeline Company, L.P. Certificate and Amended and Restated Agreement of Limited Partnership of Riverside Pipeline Company, L.P | |
| | m) | MarGasCo. Partnership Agreement | |
| | n) | First Amendment to MarGasCo Partnership Agreement | |
| | o) | Mid-Kansas Partnership Agreement | |
| | p) | First Amendment to Mid-Kansas Partnership Agreement | |
| | q) | Kansas Natural Partnership Agreement | |
| | r) | First Amendment to Kansas Natural Partnership Agreement | |
| 1.2. | Current By-laws | | |
| | a) | The Bishop Group, Ltd. | |
| | b) | Bishop Pipeline Company | |

KPI2665

KC01DOCS/440984 01
8/8/1999 4 01 PM

GOVERNMENT EXHIBIT
11
PENGAD-Bayonne, NJ

ENB-DOJ-022785

| DOCUMENT | | COPIES |
|---|---|---|
| 1.8. | Capitalization/Stock Ledgers and/or Stock Certificates | |
| | a) The Bishop Group, Ltd. | |
| | b) Bishop Pipeline Company | |
| | c) Bishop Gas Transmission Company | |
| 1.9. | Purchase of Partnership Interests on August 8, 1997 | |
| | a) Purchase of Chase Manhattan Capital Corporation (CMCC) Partnership Interests on August 8, 1997 (SEE BINDER) | |
| | b) Purchase of EON-Syenergy DR II Partnership Interests on August 8, 1997 and Purchase of TCW's interest in Stock of BGL and Release of TCW debt against Bishop Gas Transmission Company (SEE BINDER) | |
| 1.10. | KN Energy, Inc. Sale Documents (sale of two (2) expansion contracts and retention of certain easements) (SEE BINDER) | ✓ tab 90 |
| 1.11. | MarGasCo Partnership purchase of gas purchase and sale contracts from Petro Source Corporation on September 22, 1998 (SEE BINDER) | |
| 2. | Financial Information | |
| 2.1 | Audited Financial Statements (Fiscal 1996-1998) | |
| | a) The Bishop Group, Ltd. (calendar years 1996-1998) | |
| | b) Syenergy Pipeline Company, L.P. (calendar years 1995, 1996 and 1997) | |
| | c) MarGasCo Partnership (calendar years 1996, 1997 and 1998) | |
| 2.2. | Unaudited Financial Statements | |
| | a) The Bishop Group, Ltd. – First Quarter Ended 3/31/99 | |
| | b) Syenergy Company Limited Partnership – First Quarter Ended 3/31/99 and 3/31/98 | |
| | c) MarGasCo Partnership – First Quarter Ended 3/31/99 | |
| 2.3 | Federal and State Income Tax Returns for Fiscal Years 1995, 1996 and 1997 | |
| | a) The Bishop Group, Ltd. | |
| 2.4. | Summary Financial Data | |
| | a) Accounts Receivable Detail for the periods ending 12/31/98 and 3/31/99 for Kansas Pipeline Operating Company, | |



| | | | |
|---|---|---|---|
| | | Kansas Pipeline Partnership, Mid-Kansas Partnership, Kansas Pipeline Company, MarGasCo Partnership and The Bishop Group, Ltd. | |
| | b) | Summary of Syenergy Pipeline Company, L.P. - bad debt experience ending 12/31/98 | |
| | c) | Summary of Kansas Pipeline Operating Company - prepaid expenses 12/31/98 and 3/31/99 | |
| | d) | Accounts Payable Detail for the periods ending 12/31/98 and 3/31/99 for SPC Companies and The Bishop Group, Ltd | |
| 2.5. | Regulatory Annual Reports | | |
| | a) | Kansas Corporation Commission Reports for Kansas Pipeline Partnership for the years 1996 and 1997 | |
| | b) | Federal Energy Regulating Commission Form 2, 1998 | |
| 2.6. | 1995, 1996, 1997 Corporate Annual Reports for The Bishop Group, Ltd in Kansas; Bishop Pipeline Company in Kansas, Oklahoma and Missouri; and Bishop Gas Transmission for Kansas | | |
| 2.7. | Syenergy Pipeline Company, L.P. Long-Term Note and Amendment | | |
| 2.8 | Credit Agreement between Chase Manhattan Bank and Syenergy Pipeline Company with amendments | | |
| 2.9 | Amended and Restated Credit Agreement between Chase Manhattan Bank and MarGasCo Partnership with amendments | | |
| 2.10 | Tax DDA Forecast 1998 through 2017 | | ✓ |
| 3. | Asset Lists | | |
| 3.1. | Assets owned by The Bishop Group, Ltd. and/or its subsidiaries | | |
| 3.2. | Assets excluded from transaction | | ✓ |
| 3 3. | Miscellaneous Equipment and Telephone Leases/Agreements | | |
| 3.4 | Master Equity Lease Agreement and copies of vehicle leases and titles | | |
| 3.5 | Registration of 1973 Cessna Golden Eagle 421B and Promissory Note | | |
| 4. | Operations and Administration | | |
| 4.1. | Rebuild Estimate from Panco Stewart and Stevenson – dated 1/23/96 for Kansas Pipeline | | |

KPI2667

| | | |
|---|---|---|
| 4.15 | Kansas Pipeline Company Emergency Response Manual | |
| 4 16 | Internal Memo dated 7/17/94 re: KCC Information Request concerning compressor inspections | |
| 4.17 | Federal Energy Regulatory Commission Tariff for Kansas Pipeline Company | |
| 4.18. | Copy of The Bishop Group, Ltd Employee Policies and Procedures | |
| 4 19 | System Map | |
| | a) Detailed system map setting forth interconnects, delivery and receipt points, MAOP | |
| | b) Bishop System Schematic | |
| 4.20. | Assignment of all Assets to Kansas Pipeline Company | |
| 4.21 | Utter & Associates, Inc. Pipeline Summaries Estimated Replacement Costs and Remaining Life Assessment of KansOk Partnership and Riverside Pipeline Company, L.P dated March 29, 1995 | |
| 4.22 | Utter & Associates, Inc Pipeline Summaries Estimated Replacement Costs and Remaining Life Assessment of Kansas Natural Partnership and Kansas Pipeline Partnership dated March 29, 1995 | |
| 4.23 | Year 2000 Statements Issued and Received regarding Kansas Pipeline Company | |
| 4 24. | KPC Annual Report FERC Format #567 for 12 mo. Period ending 12/31/98 | |
| 5. | Office Leases | |
| 5.1. | Existing Corporate Office Leases | ✓ |
| 5 2. | Lease Agreement between Kansas Pipeline Company and Jack Bennett, dated 11/30/90 (Ottawa Shop Lease) | |
| 5.3 | Lease Agreement between Bryan and Kansas Pipeline Company, dated 11/1/95 (Medicine Lodge Shop Lease) and a Lease between Landwehr and Kansas Pipeline Company dated November 1, 1995 | |
| 6. | Private Placement Memorandum for the placement of $91,000,000 Long-Term Notes and Collateral Documents with Institutional Investors | |
| 6.1(a) | **Debt/Financing Agreements** -- Syenergy Pipeline Company, L.P. Long-Term Note and Amendment [See Attachment A for complete index to the Syenergy Pipeline Company, L.P. Long-Term Note and | |

KPI2668



| | |
|---|---|
| dated November 1, 1994; Letter dated March 17, 1995 suspending Seasonal Exchange for the period; Letter dated October 10, 1995 re: period adjustments; Gas Purchase Contract dated September 1, 1997, Amendment III to the Amended and Restated Agreement of Lease and Amended and Restated Operating Agreement dated April 1, 1999 | |
| (i) Settlement Agreement | |
| j) Missouri Gas Energy Contracts | |
| (i) Riverside I Agreement - 46,332 MMB&U (effective 5/11/98) | |
| (ii) Mid-Kansas II Agreement - 46,332 MMB&U (effective 6/1/95- 5/10/98) | |
| k) Kansas Pipeline Company's Index of Customers and Transportation Contract Summary | ✓ |
| l) Interconnect Agreements with Kansas Pipeline Company | |
| i.) Interconnect Facility Operating Agreement Kansas Power and Light Company n/k/a MGE dated December 4, 1989 | |
| ii.) Interconnect Facility Operating Agreement with United Cities Gas Company dated June 22, 1990 | |
| iii.) Operating Agreement with United Cities Company dated May 1, 1995 | |
| iv.) Delivery Facility Construction, Ownership and Operating Agreement with Getty Gas Gathering, Inc dated September 13, 1996 | |
| v.) Interconnect Facility Operating Agreement with Kansas Power and Light Company dated July 17, 1986 and Supplemental Agreement dated November 10, 1987 | |
| vi.) Interconnection Agreement between ANR Pipeline Company and KansOK Partnership dated October 14, 1994 | |
| vii ) Reimbursement, Construction, Ownership and Operation Agreement between Panhandle Eastern Pipeline Company and Riverside Pipeline Company, L.P., Miami County, KS dated July 25, 1996 | |
| viii ) Facilities Interconnection and Reimbursment Agreement between Panhandle Eastern Pipeline Company and Kansas Pipeline Company dated February 15, 1991 | |
| ix ) Operation and Maintenance Agreement between Panhandle | |

| | |
|---|---|
| Eastern Pipe Line Company and Kansas Pipeline Company dated February 1, 1991 | |
| m) Interruptible Transportation Agreements of Kansas Pipeline Company | |
| i.) Atmos Greeley Gas Company dated June 1, 1998 | |
| ii.) Atmos United Cities Gas Company dated June 1, 1998 | |
| iii.) MarGasCo Partnership dated June 1, 1998 | |
| iv ) Oneok Gas Marketing Company dated September 1, 1998 | |
| n) Operational Balancing Agreements | |
| i) Panhandle Eastern Pipe Line Company at Phenix and Kansas Pipeline Meters | |
| ii) Panhandle Eastern Pipe Line Company at Mastergas | |
| iii) ANR Pipeline Company at Lovedale Kansok Interconnect | |
| iv) Mid Continent Market Center | |
| v) Getty Gas Gathering | |
| o) Summary list of MarGasCo Contracts | |
| i ) January, 1999 report summarizing Gas Futures Account Activity, New Customers Added and Estimate of Gross Profits for following month | ✓ |
| ii.) February, 1999 report summarizing Gas Futures Account Activity, New Customers Added and Estimate of Gross Profits for following month. | ✓ |
| iii.) March, 1999 report summarizing Gas Futures Account Activity, New Customers Added and Estimate of Gross Profits for following month. | ✓ |
| iv.) April, 1999 report summarizing Gas Futures Account Activity; New Customers Added and Estimate of Gross Profits for following month | ✓ |
| v.) May, 1999 report summarizing Gas Futures Account Activity, New Customers Added and Estimate of Gross Profits for following month | ✓ |
| vi.) June, 1999 report summarizing Gas Futures Account Activity; New Customers Added and Estimate of | ✓ |

| | |
|---|---|
| Gross Profits for following month. | |
| p) Shared Repeater Subscription Agreement | |
| q) Mobile Phone/Pager Agreements | |
| r) Radio Station License | |
| 8. Environmental Letters/Permits | |
| 8 1 Environmental Letters | |
| a) Letter from State of Missouri, Department of natural Resources dated 6/24/94 regarding ID numbers for Hazardous Waste Activity | |
| b) Letter from State of Kansas, Department of Health and Environment dated 6/9/94 regarding Notification of Hazardous Waste Activity | |
| c) Letter from State of Kansas Department of Health and Environment regarding Petroleum Storage Tank Plan for Beaumont Compressor Station dated 9/11/90 | |
| d) Letter from Franklin County Health Department County Sanitarian dated July 31, 1990 regarding septic tank | |
| e) Letter from Kansas Department of Health & Environment dated 7/20/90 regarding petroleum storage tank plan | |
| f) Compressor Stations Noise Study prepared for KPC by Burns and McDonnell in March, 1997 with Letter from Heller, Ehrman to FERC on May 17, 1999 setting forth compliance on noise levels, List of alternatives for noise reduction measures. | |
| g) Environmental Assessments | |
| i.) Environmental Assessment of the Phenix Transmission Company for Bishop Pipeline Company by Environmental and Safety Services, Inc. dated September 27, 1989 | ✓ |
| ii.) Supplement to the Environmental Assessment of the Phenix Transmission Company for Bishop Pipeline Company by Environmental and Safety Services, Inc dated October 16, 1989 | ✓ |
| iii.) Preliminary Environmental Review for KansOk Pipeline by Environmental and Safety Services, Inc. dated April 18, 1990 | ✓ |
| iv.) Environmental Risk Assessment of Kansas Pipeline Company and Kansas Natural, Inc prepared for | ✓ |

KPI2671

| | | |
|---|---|---|
| | Vinson and Elkins dated May, 1990 | |
| v.) | Internal Memorandum dated June 24, 1991 addressing Pilko Report recommendations | ✓ |
| vi.) | Environmental Assessment of Syenergy Pipeline Company, L.P prepared by Pilko & Associates, Inc dated May 22, 1992 | ✓ |
| vii ) | Addendum to Environmental Assessment of Syenergy Pipeline Company, L.P. prepared by Pilko & Associates, Inc dated May 22, 1992 dated 5/29/92 | ✓ |

| | | |
|---|---|---|
| 8.2 | Applications/Permits/Approvals | |
| a) | Part 70 Permit Application for the KansOK Partnership, Pawnee Compressor Station, Pawnee County, OK, September 1996 and Authorization to Operate effective 9/11/98 | |
| b) | 40 CFR Part 70 General Operating Permit Application for the Kansas Pipeline Partnership, Beaumont Compressor Station, Greenwood County, Kansas, October 1996 | |
| c) | 40 CFR Part 70 General Operating Permit Application for the Kansas Pipeline Partnership, L.P., Ottawa Compressor Station, Franklin County, Kansas, October 1996 | |
| d) | Class I Operating Permit for Beaumont Compressor Station issued 7/31/97 | |
| e) | Class I Operating Permit for Ottawa Compressor Station issued 7/31/97 | |
| f) | Pawnee Compressor Station Semi Annual Report for Authorization No 96-404-TV for Air Quality Division | |
| g) | Air Emissions Inventory Forms submitted to Kansas Department of Health and Environment, Bureau of Air and Radiation on May 25, 1999 (2 reports for Ottawa Compressor Station) | |
| h) | Annual Emission Inventory forms for Pawnee Compressor Station submitted to Emissions Inventory and Fee Development Unit, Air Quality Division, Oklahoma Dept. of Environmental Quality on March 29, 1999 | |
| i) | Annual reports (Summary of total operating hours per location per Title V permit requirements for Ottawa Station, Beaumont Station) submitted on May 25, 1999 to Kansas Department of Health and | |

KPI2672

| | |
|---|---|
| Environment, Bureau of Air and Radiation | |
| j) Annual Compliance Forms for Ottawa Station and Beaumont Station submitted on May 25, 1999 to Kansas Department of Health and Environment, Bureau of Air and Radiation | |
| k) Johnson County Industrial Solid Waste disposal Authorization dated 1/19/96 | |
| l) Butler-Greenwood Bi-County Health Department sewage facility construction approval | |
| m) Letter dated 5/20/96 from Kansas Department of Health and Environment regarding Permit No. I-WA23-N001 | |
| n) Letter from Office of Zoning Administration dated 6/20/90 regarding Septic System/Building permit 276 | |
| o) Letter from Kansas Department of Health & Environment dated 9/1/95 regarding Kansas Water Pollution Control Permit No | |

| | |
|---|---|
| 9. Human Resources | |
| 9 1 Organization Charts (Job Titles for all Employees) | ✓ |
| 9 2 Employee List with Compensation | ✓ ✓ |
| 9.3. Benefits | |
| a) Medical/Dental | |
| i) Medical Plan Summary | |
| ii) Group Dental Plan Summary | |
| b) 401(k) Plan Description and Contracts | |
| c) Life/Accidental Death and Dismemberment Summary | |
| d) Long-Term Disability Insurance Summary | |
| 9.4 Employee Manual | |
| 9.5 DML Employment Agreements | ✓ |
| a) The Bishop Group, Ltd. | ✓ |
| b) Management Resources Group, Ltd | ✓ |
| c) Consolidation and Amendment of Management Agreement and Employment Contracts with The Bishop Group, Ltd. and its subsidiaries | ✓ |
| d) Syenergy Pipeline Company, L P | ✓ |



| | |
|---|---|
| 10.5. List of regulatory proceedings in which Kansas Pipeline Company is an intervenor or party | |
| 10.6 Key Orders and Pleadings granted in Kansas Corporation Commission (KCC) and Federal Energy Regulatory Commission Dockets | |
| a) Trial Brief of Kansas Pipeline Partnership and Kansas Natural Partnership dated December 19, 1994 with Appendix | |
| b) March 17, 1995 KCC Order Regarding Application of KPP/KNP | |
| c) June 16, 1995 KCC Order | |
| d) November 6, 1995 KCC Order Regarding Petitions for Reconsideration | |
| e) December 30, 1996 KCC Order on Remand | |
| f) March 5, 1997 Initial Comments of RPCLP in FERC Docket | |
| g) March 25, 1997 Reply Comments of RPCLP in FERC Docket | |
| h) October 3, 1997 FERC Order Granting and Denying Rehearings, Issuing Certificates and Establishing Refunds | |
| i) November 3, 1997 Request for Rehearing of KPC, KPP, KP, RPCLP and KPOC | |
| j) April 29, 1998 FERC Order on Rehearing | |
| k) April 2, 1999 FERC Order | |
| l) June 18, 1999 FERC Order | |
| m) Accounting Order of Kansas Pipeline Partnership issued October 30, 1991 | |
| n) Accounting Order of Kansas Natual Partnership issued October 30, 1991 | |
| 11. Insurance/Risk Management | |
| a) Summary of Insurance Coverage for Combined Property, Business Interruption and Boiler Coverage; Commercial General Liability, Business Automobile, Workers' Compensation, Excess Liability and Binders for Coverages | ✓ |
| b) Loss Reports for Workers Compensation and Automobile for policy periods 7/1/96 to 7/1/97 and 7/1/97 to 7/1/98 | ✓ |

KP12674

Name: Don Withington

Name of Company: ________

# DOCUMENT REQUEST LIST

| Document | Index # | Out | In | Copy |
|---|---|---|---|---|
| 1 | 12.2a | ✓ | ✓ | |
| 2 | 12.2b | ✓ | ✓ | |
| 3. | 12.2d | ✓ | ✓ | |
| 4. | 12.2e | ✓ | ✓ | |
| 5 | | | | |
| 6. | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12. | | | | |
| 13 | | | | |
| 14. | | | | |
| 15. | | | | |
| 16. | | | | |
| 17. | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |

KPI2677

KC01DOCS/401837 01

GOVERNMENT EXHIBIT 12

PENGAD-Bayonne, N.J.

Name: Jan Tutcher

Name of Company: ____________

## DOCUMENT REQUEST LIST

| Document | Index # | Out | In | Copy |
|---|---|---|---|---|
| 1 | 1.10 | ✓ | ✓ | |
| 2. | | | | |
| 3 | | | | |
| 4 | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17. | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |

KP12678

KC01DOCS/401837 01

Name: Chris Karlson

Name of Company: Midcoast

**DOCUMENT REQUEST LIST**

| | Document | Index # | Out | In | Copy |
|---|---|---|---|---|---|
| 1 | 1.1 | | | ✓ | |
| 2. | 1.2 | | | ✓ | |
| 3. | 1.3 | | | ✓ | |
| 4 | 1.4 | | | ✓ | |
| 5 | 1.5 | | | ✓ | |
| 6. | 1.6 | | | ✓ | |
| 7. | 1.7 | | | ✓ | |
| 8 | 1.8 | | | ✓ | |
| 9. | 1.9 | | | ✓ | |
| 10. | 1.10 | | | ✓ | |
| 11 | 1.11 | | | ✓ | |
| 12. | | | | | |
| 13. | | | | | |
| 14 | | | | | |
| 15. | | | | | |
| 16. | | | | | |
| 17 | | | | | |
| 18. | | | | | |
| 19. | | | | | |
| 20. | | | | | |

KP12679

KC01DOCS/401837 01

Name: ~~[illegible]~~ R. N. CANNINGHAM

Name of Company: MIDCOAST

## DOCUMENT REQUEST LIST

| Document | Index # | Out | In | Copy |
|---|---|---|---|---|
| 1. | 4.1 | ✓ | ✓ | |
| 2. | 4.2 | ✓ | ✓ | |
| 3 | 4.4 | ✓ | ✓ | |
| 4 | 7(a) | ✓ | ✓ | |
| 5. | (b) | ✓ | ✓ | |
| 6. | (c) | ✓ | ✓ | |
| 7 | (d) | ✓ | ✓ | |
| 8. | (e) | ✓ | ✓ | |
| 9. | (f) | ✓ | ✓ | |
| 10. | 8.1 ALL | ✓ | | |
| 11. | 8.2 ALL | ✓ | ✓ | |
| 12. | 4.5 | ✓ | ✓ | |
| 13 | ~~5.1~~ | | | |
| 14. | ~~5.2~~ | | | |
| 15. | ~~5.3~~ | | | |
| 16 | | | | |
| 17. | | | | |
| 18. | | | | |
| 19 | | | | |
| 20. | | | | |

KPI2680

Name: Chip Berthelot
Name of Company:

**DOCUMENT REQUEST LIST**

| Document | Index # | Out | In | Copy |
|---|---|---|---|---|
| 1 | 4.7 | ✓ | ✓ | |
| 2. | 4.13 | ✓ | ✓ | |
| 3. | 4.16 | ✓ | ✓ | |
| 4. | 4.18 | ✓ | ✓ | |
| 5. | 7(k) | ✓ | ✓ | |
| 6. | 7(l) i-ix | ✓ | ✓ | |
| 7. | 9.2 | ✓ | | ✓ |
| 8. | 9.4 | ✓ | ✓ | |
| 9. | 9.5 All | ✓ | | ✓ |
| 10. | | | | |
| 11. | | | | |
| 12. | | | | |
| 13. | | | | |
| 14. | | | | |
| 15 | | | | |
| 16 | | | | |
| 17. | | | | |
| 18. | | | | |
| 19. | | | | |
| 20 | | | | |

KP12681

Name: Richard Robert
Name of Company: Midcoast Energy Resources, Inc.

## DOCUMENT REQUEST LIST

| Document | Index # | Out | In | Copy |
|---|---|---|---|---|
| 1 All Section 2 | | ✓ | ✓ | 2.10 ✗ Please copy |
| 2 All Section 3 | | -3.5 ✓ | ✓ | |
| 3. All Section 5 | | ✓ | ✓ | |
| 4. All Section 6 | | | ✓ | |
| 5. Org Charts | 9.1 | | ✓ | ✗ |
| 6. Employee list w/ Comp. | 9.2 | | | ✓ |
| 7. Benefits (a, b, c, d) | 9.3 | ✓ | ✓ | |
| 8 All Section 11 | | ✓ | | 11(a)(4) please copy |
| 9. | | | | |
| 10 | | | | |
| 11 | | | | |
| 12. | | | | |
| 13. binders | | | | |
| 14 | | | | |
| 15 | | | | |
| 16. | | | | |
| 17 | | | | |
| 18 | | | | |
| 19. | | | | |
| 20 | | | | |

KPI2682

KC01DOCS/401837 01

Name: Bill Bray

Name of Company:

# DOCUMENT REQUEST LIST

| Document | Index # | Out | In | Copy |
|---|---|---|---|---|
| 1 | 7(o)i – vi | ✓ | | |
| 2. | #190 & | | | ✓ 2 |
| 3 | 110 | | ✓ | |
| 4 | | | | |
| 5 | 7(K) | - already out | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10 | | | | |
| 11 | | | | |
| 12. | | | | |
| 13. | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |

KPI2683

KC01DOCS/401837 01



R.N. Lanningham
Vice President-Operations

1100 Louisiana, Suite 2950 Tel. (713) 650-8900
Houston, Texas 77002 Fax (713) 650-3232
E-mail mlanningham@midcoastenergy com

Bill G. Bray
Director of Business Develop

1100 Louisiana, Suite 2950 • Houston, Texas 77002
Tel (713) 650-8900 Fax (713) 650-3232

Dan C. Tutcher
Chief Executive Officer

1100 Louisiana, Suite 2950 • Houston, Texas 77002
Tel (713) 650-8900 Fax (713) 653-6710

I.J. "Chip" Berthelot, II
Executive Vice President &
Chief Operating Officer

1100 Louisiana, Suite 2900 (713) 650-8900
Houston, Texas 77002 Fax (713) 653-6711
e-mail: chipb@midcoastenergy com

Richard A. Robert
Chief Financial Officer
and Treasurer

1100 Louisiana, Suite 2950 • Houston, Texas 77002
Tel (713) 650-8900 Fax (713) 650-3232
e-mail rcnardr@midcoastenergy com

Donald R Whittington
Vice President
Regulatory Affairs

1100 Louisiana Suite 2950 Tel (713) 650-8900
Houston Texas 77002 Fax (713) 650-3232
email donw@midcoastenergy com

E. Chris Kaitson
General Counsel

1100 Louisiana, Suite 2950 • Houston Texas 77002
Tel (713) 650-8900 Ext. 2271 Fax (713) 650-3232
e-mail kaitson@midcoastenergy com

PENGAD-Bayonne, N J
GOVERNMENT
EXHIBIT
13

KPI2684

ST LOUIS MISSOURI
WASHINGTON D C
NEW YORK, NEW YORK
JEFFERSON CITY, MISSOURI
OVERLAND PARK, KANSAS
PHOENIX ARIZONA
SANTA MONICA, CALIFORNIA
IRVINE CALIFORNIA

BRYAN CAVE LLP
3500 ONE KANSAS CITY PLACE
1200 MAIN STREET
KANSAS CITY, MISSOURI 64105-2100
(816) 374-3200
FACSIMILE (816) 374-3300

LONDON ENGLAND
RIYADH SAUDI ARABIA
KUWAIT CITY, KUWAIT
ABU DHABI UNITED ARAB EMIRATES
DUBAI, UNITED ARAB EMIRATES
HONG KONG
ASSOCIATED OFFICE IN SHANGHAI

DIANNA L WOOD
LEGAL ASSISTANT

(816) 374-3200

August 10, 1999

**Via FedEx**

R N Lanningham
Midcoast Energy Resources, Inc
1100 Louisiana
Suite 2950
Houston, TX 77002

Re Kansas Pipeline Company

Dear Mr Lanningham

We enclose copies of the following documents which you requested from the data room

1 8 1(g)(i)-(vii)

The following copies are for Richard Robert

1 2 10
2 3 2
3 2 5 1
2 9 1
3 9 2
4 11(a)
5 11(b)

If you need additional documents, do not hesitate to call me or Wesley Fields

Very truly yours,

Dianna L Wood
Legal Assistant

Enc

KPI2675

ENB-DOJ-022795

ST LOUIS MISSOURI
WASHINGTON D C
NEW YORK NEW YORK
JEFFERSON CITY MISSOURI
OVERLAND PARK KANSAS
PHOENIX ARIZONA
SANTA MONICA CALIFORNIA
IRVINE CALIFORNIA

DIANNA L WOOD
LEGAL ASSISTANT

BRYAN CAVE LLP
3500 ONE KANSAS CITY PLACE
1200 MAIN STREET
KANSAS CITY, MISSOURI 64105-2100
(816) 374-3200
FACSIMILE: (816) 374-3300

LONDON, ENGLAND
RIYADH SAUDI ARABIA
KUWAIT CITY KUWAIT
ABU DHABI UNITED ARAB EMIRATES
DUBAI UNITED ARAB EMIRATES
HONG KONG
ASSOCIATED OFFICE IN SHANGHAI

(816) 374-3200

August 10, 1999

**Via FedEx**

Bill G Bray
Midcoast Energy Resources, Inc
1100 Louisiana
Suite 2950
Houston, TX 77002

Re Kansas Pipeline Company

Dear Mr Bray

We enclose copies of the following documents which you requested from the data room

1 7(o)(i) - 7(o)(vi)
2 7(k)

The following copies are for Chip Berthelot

1 9 2
2 9 5(a)-(d)

If you need additional documents, do not hesitate to call me or Wesley Fields

Very truly yours,

Dianna L Wood
Legal Assistant

Enc

KPI2676

ENB-DOJ-022796

**DRAFT**

**MIDCOAST ENERGY RESOURCES, INC.**

**BOARD OF DIRECTORS MEETING**

**August 11, 1999**

---

ATTENDANCE:

| | |
|---|---|
| I. J. Berthelot II (*) | Bruce Withers (*) |
| Richard N. Richards (*) | Ted Collins (*) |
| Dan C. Tutcher (*) | Richard Robert |
| Curtis Dufour (*) | Duane S. Herbst |
| (*) Members | |

I. CALL TO ORDER

The meeting was called to order at 11:45 p.m. by Chairman Dan C. Tutcher. All members of the Board were present. Also present were Duane S. Herbst, Vice President of Corporate Affairs and Secretary, and Richard Robert, Chief Financial Officer and Treasurer.

II. MINUTES

The reading of the prior meeting's minutes was waived and it was moved and seconded that the minutes from the Board meeting on May 17, 1999, be accepted, which was unanimously approved.

III. CORPORATE MATTERS

A. Stock Offering

Mr. Herbst informed the Board that Capital Guardian now owns 1.1 million shares of the Company stock and are the single largest shareholder at this point. Currently, 62% of Midcoast stock is held by institutions and the rest is retail. He noted the Company has had some strong support from its institutional shareholders since the offering.

B. Management Changes

Mr. Tutcher announced to the Board that Lou Marinos who was the President of Midcoast Interstate Transmission in Alabama has been moved to the Houston office. MIT is now running smoothly and the transition to Houston has been made for the marketing, gas control, engineering, etc. departments that were in Alabama. It was decided that Lou Marinos would be transferred into the Houston office and recommended that he be made Vice President of Administration, with his primary job to take some burdens away from Richard Robert, Chip Berthelot and Dan Tutcher in terms of trying to pull together and assimilating the employees from our various acquired companies.

PH 001029

GOVERNMENT
EXHIBIT
20
PENGAD-Bayonne, N.J.

ENB-DOJ-027373

Bill Bray was also recommended to be made Vice President of Business Development. Mr. Bray is very analytical, conservative and has with Midcoast for nine years and knows the company extremely well.

Mr. Tutcher requested a motion creating these two posts and assigning Mr. Marinos and Mr. Bray those assigned positions. It was moved, seconded and was unanimously approved.

C. Review Insurance Coverage

Mr. Robert reviewed the insurance coverage for the Company. He advised the Board that the market is tightening and it would benefit the Company to lock in a three year term. For the most part, the Company is currently self insured for property. The Board recommended Mr. Robert pursue insurance for the Calmar Plant, the Harmony Plant and any other plant that would take over 90 days to get back online with a business interruption policy. Mr. Robert noted the umbrella policy is now at $35MM, but the Company has grown substantially since that policy was put in place. Mr. Richards advised that he had researched the current average coverage and felt $50-$100MM would be more appropriate. It will cost $50-$60M for an additional $65MM in coverage and it was recommended that $100MM in coverage be pursued.

IV New Business

A. Kansas Pipeline

Mr. Tutcher reviewed the background of Kansas Pipeline. This pipeline was formerly three separate systems. Two Phillips crude oil lines were converted to natural gas service, one of which runs from the western part of Oklahoma (Anadarko) and one of which runs from north central Oklahoma to a point around McPherson, Kansas and then on to serve the city of Kansas City and a number of smaller municipalities along the way. These two crude oil systems were converted by different groups and the lower part, or gathering part of the system, was originally put together by John Connolly and a group in Houston. Once in service, this system was competing heavily with Williams, so Williams forced them to certify with FERC as an interstate pipeline and file a rate case which is now pending. The line is fully subscribed to today.

This line is owned by Dennis Langley who was the Chairman of the Democratic Party in Kansas and is very active politically. He has $60MM in debentures outstanding with the balance being equity. There are four others bidding for this system, Consolidated Michigan, ONEOK/Western Resources, Oxbow (David Koch), and Kinder Morgan. Mr. Tutcher believed that one bid was approximately $225MM, with two other bids of about $196 million and $175MM.

Our initial bid was $157MM, but we now understand the rate case better and have identified additional synergies. A group representing Midcoast also attended a presentation by Mr. Langley to promote the upside of the Kansas market. Mr. Langley prefers doing business with our Company because we would continue to work with him on his other projects. Mr. Langley prefers a cash deal and the debentures can be assumed making a cash offer of $110-115MM.

Mr. Berthelot describes the line as being 900 to 1,000 miles long and runs from the Texas/Oklahoma supply areas close to Anadarko. It has 158MM/day of firm capacity sold and it delivers the gas to the Kansas City market place. In the summertime it moves 20-30MM/day. There are three major customers and the system has three compressor stations. The pipelines were built between 1930 and 1950 and they were refurbished, retested and upgraded in late 1980's. The major customers are the Cities of Kansas City and Wichita and certain synergies exist with regard to the Owens Corning and BPU Quindaro systems as well as with the Anadarko system on the supply side.

No recommendation or approvals were being sought at this time, but Mr. Tutcher wanted the Board to be advised of this pending transaction.

B. East Tennessee

Mr. Tutcher advised the Board that this system is probably going to be spun off through the El Paso/Sonat merger. The order of magnitude is probably between $350-$400 million. This system is going to be very competitive and be a fast paced transaction once they are ready to get the sale done. We have been a good partner for El Paso and have bought a number of systems from them. They trust Midcoast because we can finance and close it. Also, the other buyers for the pipeline will likely be competition for El Paso whereas we would still use them as a major supplier upstream.

C. Bazor Ridge

Mr. Berthelot advised that we are in the final stages of contract negotiations, subject to Board approval, on a 20 MMCF/day gathering system and central treating and processing plant near the Harmony Plant. The system and plant serve a major new gas find in the area and under the current structure the producer would guarantee Midcoast certain volumes backed by a guarantee from the Hillman family, which management is comfortable can back the guarantee.

Discussion followed on the economics and Mr. Berthelot reviewed the analysis he prepared. After more discussion concerning the guarantee, and reserves, it was moved, seconded and was unanimously approved.

D. Southern Industrial Gas Acquisition

Mr. Berthelot advised this is a small company which has about 14 end-user type pipelines. We have pursued them for a couple of years, and it overlays the Midla system in different places of Mississippi and Louisiana. The deal was within management authority and has already been closed, but he wanted to inform the Board of it.

E. Bags, Giggs & Brazos Offshore Acquisition (SeaCrest)

Mr. Berthelot advised that between the time an initial offer was made and accepted there has been some new production on this proposed system. He reviewed this was a $2MM acquisition which falls within management's approval threshold. It is a 35-40% rate of return project with the new development well. If for some reason this development well, which is scheduled to come on at 10MM/day, does not produce, it is an 18% rate of return project.

After more discussion, this acquisition was approved, seconded and was unanimously approved.

V. Old Business

A. Guanajuato, Mexico

Mr. Tutcher explained that if the Company can reach agreements with American Axle, General Motors and Maseco, this would amount to a ten year 8.5 mmcf/day commitment with those three customers, even without the new LDC which has committed to TransCanada. TransCanada has fired their chairman and are in turmoil. They are about to sell off most of their Canadian plants, and have sold off some of their U. S. assets. Mr. Tutcher believes that they are probably going to back completely out of Mexico. This would mean that our competition on this project is probably going to go away and we would end up with the LDC. With the LDC this is an 18-20% rate of return project. The current economics, presented to the Board, only include the 8.5 mmcf/day.

(Ted Collins left)

Mr. Tutcher noted we have the only public right of way and will be closing on that in the next two or three weeks because the phone company is also looking at that right of way. Otherwise, he would keep the Board informed.

B. Canada

Mr. Berthelot advised the Calmar system is going as scheduled, but Probe is in financial trouble and they are for sale. Our legal counsel has advised that we are in good shape with our guarantees and other contractual arrangements.

Jimmy Wright is working on other deals in Canada and some discussion came up as to whether we should be considering taking on a financial partner in Canada.

C. Anadarko

Mr. Berthelot advises that all of the compression upgrades have been done, but there are some accounting and measurement problems to get resolved. Two joint ventures are in the works, one with Williams and one with Dynegy, both of which involve rolling together processing assets.

D. Chevron

Mr. Berthelot advised that the B.P. Alliance refinery is adjacent to the Gloria System we purchased from Koch. It looks like a deal has been made with B.P. to them 15MM/day gas with about an $.08 or $.09 spread.

VI. Financial Review

Mr. Robert briefly reviewed the financial results for the past quarter and answered questions from the Board on the past quarter as well as the outlook for the balance of 1999.

VII. Adjournment

There being no further business it was moved and seconded that the meeting be adjourned.

Respectfully Submitted,

____________________________

Duane S. Herbst, Secretary

PH 001033

THE BISHOP GROUP, LTD

8325 Lenexa Drive - Suite 400
Lenexa, Kansas 66214
(913) 888 7139 / Fax (913) 599 5645

August 17, 1999

VIA OVERNIGHT MAIL

Richard A. Robert
Chief Financial Officer and Treasurer
Midcoast Energy Resources, Inc
1100 Louisiana, Suite 2950
Houston, TX 77002

Dear Richard,

Enclosed are copies of the Partnership (IRS Form 1065) and Missouri income tax returns for 1995, 1996 and 1997. These returns support The Bishop Group, Ltd income tax returns provided as part of the pre-copied material during your August 9 visit to Kansas City and were unintentionally omitted from Data Room document 2.3(a). I hope these documents make the consolidated Bishop Group returns previously provided more understandable

According to my notes, this completes the information/documents you requested from Howard and me Please let me know if you have any additional questions

Sincerely,

Stephen Korb
Project Analyst
The Bishop Group, Ltd.

PENGAD-Bayonne, N.J.
GOVERNMENT EXHIBIT
21

KPI2664



ST. LOUIS MISSOURI
WASHINGTON D C
NEW YORK NEW YORK
JEFFERSON CITY, MISSOURI
OVERLAND PARK KANSAS
PHOENIX ARIZONA
SANTA MONICA, CALIFORNIA
IRVINE CALIFORNIA

DIANNA L WOOD
LEGAL ASSISTANT

BRYAN CAVE LLP
3500 ONE KANSAS CITY PLACE
1200 MAIN STREET
KANSAS CITY, MISSOURI 64105-2100
(816) 374-3200
FACSIMILE (816) 374-3300

LONDON ENGLAND
RIYADH SAUDI ARABIA
KUWAIT CITY, KUWAIT
ABU DHABI UNITED ARAB EMIRATES
DUBAI UNITED ARAB EMIRATES
HONG KONG
ASSOCIATED OFFICE IN SHANGHAI

(816) 374-7705

August 19, 1999

**Via FedEx**

Don Wittington
Midcoast Energy Resources, Inc
1100 Louisiana, Suite 2950
Houston, TX 77002

Re Kansas Pipeline Company

Dear Mr Wittington

Pursuant to Tino Monaldo's instructions, enclosed please find a copy of the Index of UCC Filings Relating to the Butcher Interests for your review

If you need additional information, do not hesitate to call me

Very truly yours,

Dianna L. Wood
Legal Assistant

Enc

KPI2661

ST LOUIS MISSOURI
WASHINGTON D.C.
NEW YORK NEW YORK
JEFFERSON CITY, MISSOURI
OVERLAND PARK, KANSAS
PHOENIX ARIZONA
SANTA MONICA, CALIFORNIA
IRVINE, CALIFORNIA

DIANNA L WOOD
LEGAL ASSISTANT

BRYAN CAVE LLP
3500 ONE KANSAS CITY PLACE
1200 MAIN STREET
KANSAS CITY, MISSOURI 64105-2100
(816) 374-3200
FACSIMILE: (816) 374-3300

LONDON, ENGLAND
RIYADH, SAUDI ARABIA
KUWAIT CITY KUWAIT
ABU DHABI UNITED ARAB EMIRATES
DUBAI UNITED ARAB EMIRATES
HONG KONG
ASSOCIATED OFFICE IN SHANGHAI

(816) 374-7705

August 20, 1999

**Via FedEx**

Bill G Bray
Midcoast Energy Resources, Inc
1100 Louisiana, Suite 2950
Houston, TX 77002

Re Kansas Pipeline Company

Dear Mr Bray

Pursuant to your request to Vean Gregg, we enclose copies of the following documents from the data room. The document numbers correspond with the Data Room Index

1 4 5
2 4 8
3 4 13
4 7(n)(i)-(v)

If you have any additional requests, do not hesitate to call me

Very truly yours,

Dianna L Wood
Legal Assistant

Enc

KP12662



KANSAS PIPELINE COMPANY
8325 LENEXA DRIVE • SUITE 400
LENEXA KANSAS 66214
913 888 7139 • FAX 913 599 2571

August 21, 1999

Mr Richard A Robert
Chief Financial Officer and Treasurer
Midcoast Energy Resources, Inc.
1100 Louisiana, Suite 2950
Houston, TX 77002

Dear Richard,

Please find the attached responses to the two data requests you asked in the August 20 voice mail message. Based on the information available, I have prepared a brief summary of property taxes for 1998 and 1999 Shown is the actual property taxes paid in 1998 by state Also enclosed are the property tax assessments for 1998 and 1999 Please note that in 1998, KPC still paid tax on the individual partnerships As such, Riverside paid tax in Oklahoma, Kansas and Missouri Kansas Pipeline paid tax in Kansas and KansOk paid tax in Oklahoma Therefore, to calculate the total assessment in Oklahoma and Kansas shown in the spreadsheet, Riverside has to be added to Kansas Pipeline for Kansas and KansOk for Oklahoma Effective in 1999, KPC began submitting consolidated assessment returns for the entire system in each state Also note that that to date KPC has not received the 1999 assessment for Kansas

In response to your second request, I have provided the actual and budgeted Operations Division capital expenditures for 1995 - 1998 For 1998, the remaining $3 4 million of capital expenditures consist entirely of FERC Section 7 costs, Project Development and other assets included on the retained asset schedule previously provided Routine Operations capital expenditures in 1997 totaled $206,885 Construction of the small town facilities totaled $3,657173 (see P700 Project Expenditure Summary) The combined total equates to 1997 additions to utility plant Operations capital expenditures totaled $356,186 in 1996 Operations capital expenditures totaled $617,996 in 1995,

Let me know if you have additional questions

Sincerely,

Stephen Korb
Financial Analyst
Kansas Pipeline Company

KPI2717

ENB-DOJ-022838



KANSAS PIPELINE COMPANY
8175 LENEXA DRIVE • SUITE
LENEXA KANSAS
913 888 7110 • FAX

August 23, 1999

VIA FED EX

Mr. Richard A. Robert
Chief Financial Officer and Treasurer
Midcoast Energy Resources, Inc.
1100 Louisiana, Suite 2950
Houston, TX 77002

Dear Richard,

Pursuant to an e-mail request from Bill Bray to Vean Gregg that was forwarded to me, please find enclosed Syenergy financial statements (unaudited) for the six months ended June 30, 1999.

Regarding the other three requests:

1. Detailed trial balances (6/30/99), I should be able to pull them together tomorrow for overnight delivery Wednesday.

3 1999 Kansas ad valorem rendition As mentioned in my August 21 letter, we have still not received the Kansas 1999 rendition Data on Oklahoma, Missouri and 1998 actual has been provided

4 Tax Structure. I will attempt to contact our E&Y person tomorrow and arrange a conference call ASAP I will contact you today (Tuesday 8/24) to confirm status

Sincerely,

Stephen Korb
Financial Analyst
Kansas Pipeline Company

cc Bill Bray VIA FAX

KP12731

ENB-DOJ-022852



KANSAS PIPELINE COMPANY
8325 LENEXA DRIVE • SUITE 400
LENEXA KANSAS 66214
913 888 7139 • FAX 913 599 2573

August 26, 1999

VIA OVERNIGHT MAIL

Mr Chris Kaitson
Midcoast Energy Resources, Inc.
1100 Louisiana, Suite 2950
Houston, TX 77002

Dear Mr. Kaitson:

Mr. Bill Bray requested that you be provided with copies of items 9.5 (a) through (d) and 9.6 (a) and (b) from the dataroom located at the law offices of Bryan Cave. If you should have any questions, please advise.

Sincerely,

Kansas Pipeline Company

Yvette C. Korb
Vice President, Administration

KPI2762

Please provide the agreements listed in the Data Room Index 9 5 a) through d) and 9 6 a) and b) Please send to our Houston office to the attention of Chris Kaitson and copy me with the transmittal letter

Thanks again for you assistance

KPI2763

Received from gateway kansaspipeline com
([192 168 1 2])
by KPC_COMM, Thu, 26 Aug 1999 15 02 50 -0500
Received. from tnthaw.chase com ([204 149.85 6]) by gateway.kansaspipeline com
via smtpd (for [192 168 1 70]) with SMTP; 26 Aug 1999 20 10 51 UT
Received by tnthaw chase.com, id QAA07699, Thu, 26 Aug 1999 16.08 05 -0400 (EDT)
From <VEAN GREGG@chase com>
Received from msw02 chase.com(170 31 23 17) by tnthaw chase com via smap (4 1)
id xma007582, Thu, 26 Aug 99 16·07 57 -0400
Received from 3cmc04smtp chase com (unverified) by mimesweeper2 chase com
(Content Technologies SMTPRS 2 0 15) with SMTP id <B0010027580@mimesweeper2 chase com>,
Thu, 26 Aug 1999 16 02 51 -0400
Received by 3cmc04smtp chase com(Lotus SMTP MTA v4 6 4 (830.2 3-23-1999)) id
852567D9 006DFCAD , Thu, 26 Aug 1999 16 01 21 -0400
X-Lotus-FromDomain. CHASE
To· ykorb@kansaspipeline com, skorb@kansaspipeline.com, lawyertm@southwind net
Message-Id <852567D9 006DF8E1 00@3cmc04smtp chase com>
Date Thu, 26 Aug 1999 14.54 41 -0500
Subject Kansas Pipeline Company
MIME-Version 1 0
Content-Type: text/plain, charset=us-ascii
Content-Disposition: inline

Please see the attached request from Bill Bray at Midcoast
---------------------- Forwarded by Vean Gregg/CHASE on 08/26/99 02·54 PM
---------------------------

Bill Bray <bbray@midcoastenergy.com> on 08/26/99 02 23 33 PM

To Vean Gregg/CHASE@CHASE

cc. Chris Kaitson <ckaitson@midcoastenergy.com>, Chip Berthelot <cberthelot@midcoastenergy com>

Subject Kansas Pipeline Company

Vean

KPI2764



**Chase Securities Inc.**
600 Travis, 20th Floor
Houston, TX 77002

August 18, 1999

**PRIVATE AND CONFIDENTIAL**

Mr. Chip Berthelot
Executive Vice President & Chief Operating Officer
Midcoast Energy
1100 Louisiana, Suite 2900
Houston, TX 77002

Dear Chip

On behalf of Dennis Langley (the "Seller") and The Bishop Group Ltd. ("Bishop"), a company which is wholly-owned by the Seller, thank you for your continuing interest in Kansas Pipeline Company, a wholly-owned subsidiary of Bishop. As you know, Chase Securities Inc ("Chase") has been retained as financial advisor in connection with a sale of Bishop.

This letter sets forth the procedures for the submission of a definitive, fully financed, binding offer (the "Offer") for the acquisition of Bishop (the "Transaction"). Enclosed please find the proposed form of the Agreement and Plan of Merger (the "Agreement") which reflects the terms upon which the Seller is prepared to consummate the Transaction with the prospective purchaser ("Purchaser").

I. Timing. The Offer must be received by Chase no later than 5:00 P M. (Noon, Central Time) on Monday, August 30, 1999.

II Contents of the Offer The Offer should include the following (please submit the Offer in the same numbered format as outlined below):

(i) **Proposed Purchaser** - the identity of the Purchaser submitting the Offer, including other participants in the Transaction, if any

(ii) **Primary Offer Value** - the total value Purchaser is prepared to pay for 100% of the Bishop common stock that is wholly owned by the Seller The Offer should consist of the Stock Purchase Price, including assumption of the balance sheet, including all debt and working capital, as outlined in Appendix 1 – Pro Forma Balance Sheet projected for September 30, 1999 ("Appendix 1")

GOVERNMENT EXHIBIT 22

ENB-DOJ-035915

(iii) **Supplemental Offers** – In addition to the primary Offer outlined in II (ii) above, Purchaser may submit additional alternative bids or structures to purchase the pipeline system held by Bishop, which will be reviewed and considered by the Seller.

(iv) **Consideration** - a detailed description of the form of consideration that the Purchaser is prepared to pay for the stock of Bishop. As discussed, this consideration will be adjusted at closing in order to reconcile with the balance sheet in Appendix 1.

(v) **Value for MarGasCo** – please indicate the implicit value from within the total bid that is attributed to MarGasCo While MarGasCo is intended to be part of the sale, the Seller may consider retaining MarGasCo if this entity does not have meaningful value to the Purchaser.

(vi) **Approvals and Conditions to Close** - a summary of the approvals and any other conditions required in connection with the Offer and consummation of the Transaction. Purchaser should note that the Seller expects that all required corporate approvals for the Transaction, including the authorization of Purchaser's Board of Directors, will be obtained prior to the submission of the Offer. Any conditions to closing, in addition to those set forth in the Agreement, must be clearly identified and detailed in the Offer, including any required consents and government approvals and the timing for obtaining such approvals.

(vii) **Financing** - details regarding the proposed financing of the Transaction, including, as appropriate, the proposed amount of senior debt, subordinated debt and equity, and the type of financing (e.g. bridge, bank, private and/or public capital markets), as well as the identity of all institutions involved and copies of any commitment letters or financing agreements Please note that the Seller will look favorably on an Offer that does not contain a financing contingency.

(viii) **The Agreement** - the terms upon which the Purchaser is prepared to consummate the Transaction should be provided with the Offer in the form of the attached Agreement. Please indicate in the Offer that Purchaser is prepared to execute promptly the Agreement in the form submitted (including any redlined revisions). Any proposed revisions to the Agreement should be presented in the form of redlined changes to this version.

(ix) **Timing** - an estimate of the time needed to close the Transaction taking into account all necessary regulatory approvals. This estimate should include a list any additional due diligence items which the Purchaser wishes to conduct prior to executing the Agreement and closing the Transaction

(x) **Other** - any additional information that may assist the Seller in its evaluation of the Offer, and

(xi) **Contacts** - the name(s) and telephone number(s) of the person(s) the Seller and Chase should contact in clarifying and responding to the Offer.

III <u>Transmittal of the Offer and Agreement</u>. The Offer and Agreement should be transmitted as follows:

(i) if these items are transmitted by fax, the Offer and Agreement should be faxed (including any redlined revisions of the Agreement) to

Vean Gregg
Chase Securities Inc
Global Oil and Gas
600 Travis, 20th Floor-CTH 86
Houston, TX 77002
Facsimile (713) 216-8882

(ii) if these documents are transmitted by fax, an original version of the Offer should be received by the above (by hand or overnight mail) no later than 10:30 a m. the following morning

(iii) absent a transmittal by fax, an original version of the Offer and Agreement should be received by the above no later than 5 00 P.M. (Noon, Central Time) on Monday, August 30, 1999.

(iv) Please also submit the Agreement by e-mail in electronic form (including any redlined revisions) to the attention of Vean Gregg as follows:
vean gregg@chase.com

IV. <u>Selection of the Purchaser</u>. After receipt of the Offer, the Seller and Chase will contact each prospective purchaser, as necessary, to clarify the terms of such Offer or proposed revisions to the Agreement. The Seller, with the assistance of Chase, intends to evaluate such Offers as expeditiously as practicable Although the foregoing reflects the Seller's present intentions concerning the process, the Seller reserves the right, in its sole discretion, to evaluate the terms and conditions of any Offer and to accept or reject any such Offer for further consideration without specifying reasons therefor and to alter the procedures set forth herein or terminate the process at any time without prior notice

The existence and contents of this letter are subject to the terms of the confidentiality agreement that was previously executed by you and Bishop

Chase continues to be available to respond to your questions and requests for supplementary information and to coordinate questions with respect to the Offer or Agreement Should you have any questions regarding the procedures detailed in this letter, please feel free to call Vean Gregg (713) 216-8848 or me (713) 216-6386. **In no event should either the Seller or Bishop be contacted directly.**

The Seller and Chase appreciate your interest in Bishop and look forward to hearing from you.

CHASE SECURITIES INC.
on behalf of The Bishop Group Ltd.

Bill Manias
Vice President
/encl.

**Appendix 1. Pro Forma Balance Sheet projected for September 30, 1999**

| **Assets** | *($ in Millions)* |
|---|---|
| Utility Plant, Net | $61 64 |
| Other Assets, Net | 12 51 |
| Current Assets | |
| Cash Reserve for LTD | 10 00 |
| Accounts Receivable | 4 96 |
| Other Prepaid Expenses | 0 79 |
| Total Current Assets | 15 76 |
| **Total Assets** | **89.90** |
| **Capitalization and Liabilities** | |
| Partners Capital | $13 37 |
| Long-Term Debt | 62 39 |
| Revolving Credit Facilities | 6 00 |
| Restricted Pipeline Royalties | 3 09 |
| Current Liabilities | |
| Accounts Payable | 2 20 |
| Accrued Interest | 1 50 |
| Accrued Property Taxes | 0 42 |
| Other Accrued Liabilities | 0 94 |
| Total Current Liabilities | 5 06 |
| **Total Capitalization and Liabilities** | **89.90** |
| **Unencumbered Working Capital at 9/30/99** | **$0.70** |

("Redline" Redraft)
8/30/99 - 4:30 p.m.

**AGREEMENT AND PLAN OF MERGER**

THIS AGREEMENT AND PLAN OF MERGER is made and entered into as of ______________, 1999, by and among MIDCOAST ENERGY RESOURCES, INC., a Nevada corporation ("Parent"), MIDCOAST ACQUISITION COMPANY, a Delaware corporation, which is a wholly owned direct subsidiary of Parent ("Merger Sub"), THE BISHOP GROUP, LTD., a Kansas corporation (the "Company") and DENNIS M. LANGLEY ("Stockholder"). (Parent, Merger Sub, the Company and Stockholder are hereinafter sometimes collectively referred to as the "Parties" and individually as a "Party".)

**RECITALS**

A. The respective Boards of Directors of Parent, Merger Sub and the Company each have determined that it is in the best interests of their respective stockholders that the Company be merged with and into the Merger Sub, and, to that end, have approved the merger of the Company with and into the Merger Sub in accordance with the laws of the State of Delaware and the provisions of this Agreement and Plan of Merger.

B. Approval of the stockholders of Parent is unnecessary and Stockholder is the sole stockholder of the Company.

~~B~~ C. Parent, Merger Sub, Stockholder and the Company desire to make certain representations, warranties and agreements in connection with, and establish certain conditions precedent to, the Merger.

**AGREEMENT**

In consideration of the mutual agreements, promises and covenants set forth herein and the recitals set forth above, and other good and valuable consideration, the receipt and adequacy of which are acknowledged, the parties hereto, intending to be legally bound, agree as follows.

**ARTICLE I**
**DEFINITIONS**

1.1 Defined Terms. As used herein the following terms shall have the following meanings:

Acquisition Proposal: Any proposal or offer from any Person relating to the direct or indirect acquisition of a business that constitutes 51% or more of the net revenues, income or assets of the Company or 51% or more of the Company Stock or any proposal or offer for a merger or other business combination with the Company, other than the Transactions

Additional Agreements: Those agreements listed in this Agreement and attached hereto, either as of the date hereof or, subject to the mutual agreement of the parties, prior to Closing, as

PENGAD-Bayonne, N.J.
GOVERNMENT EXHIBIT
24

exhibits and incorporated herein by reference, including but not limited to a mutually agreeable tax sharing agreement as well as all assignments and ancillary agreements necessary to effectuate the Merger.

Adjustment Amount: Adjustment Amount shall have the meaning set forth in Section 5.1(b).

Adjustment Value: Adjustment Value shall have the meaning set forth in Section 5.1(b).

Adverse Consequences: all debts, obligations, losses, costs of investigation and defense, damages, liabilities, claims, judgments, awards, settlements, taxes, penalties, fines, assessments and other costs and expenses (including any prejudgment interest in any litigated or arbitrated matter) which may be incurred, made or levied; provided, however, that such term shall not include any punitive or exemplary damages.

Affiliates: Affiliates shall have the meaning set forth in Section 5.1(b).

Agreement: This Agreement and Plan of Merger, including the preamble, recitals, and schedules hereto, all of which are hereby incorporated herein by reference and made a part hereof.

Agreement-Related Litigation: Agreement-Related Litigation shall have the meaning set forth in Section ~~12.5~~ 13.5.

~~Base Shares: Base Shares shall have the meaning set forth in the definition of Merger Consideration.~~

Certificates: The certificates representing Company Shares to be surrendered in exchange for the Merger Consideration.

Certificate of Merger: The document to be prepared by the parties hereto in compliance in all respects with the requirements of the DGCL and the Laws of the State of Kansas and the provisions of this Agreement.

Closing: A meeting for the purpose of concluding the Transactions to be held at the place and on the date fixed in accordance with Section 2.3.

Code: The Internal Revenue Code of 1986, as amended.

Company: The Bishop Group, Ltd., a Kansas corporation, which will merge into Merger Sub as set forth in Section 2.1.

Company Disclosure Schedule: That schedule from the Company to Parent to be delivered upon the execution of this Agreement, and updated, subject to approval of Parent, and redelivered at the Closing, which sets forth certain disclosures concerning the Company and its Affiliates and its and their businesses

Company Financial Statements: Company Financial Statements shall have the meaning set forth in Section 6.7.

Company Shares or Common Stock: The shares of Class A Common Stock of the Company issued and outstanding immediately prior to the Effective Time.

Debt: means long term debt, current portion of long term debt, and short term notes payable, all as defined by generally accepted accounting principles

DGCL: The General Corporation Law of the State of Delaware.

Effective Time: The date and time at which the Certificate of Merger has been duly filed with the Secretary of State of the State of Delaware or such other time as is agreed upon by the parties and specified in the Certificate of Merger.

Environmental Claim: Any action, cause of action, claim, investigation, demand or notice by any Person alleging liability under or non-compliance with any Environmental Law.

ERISA: The Employee Retirement Income Security Act of 1974, as amended.

Exchange: The Exchange on which the Parent Common Stock is listed.

Exchange Act: The Securities Exchange Act of 1934, as amended (15 U.S.C. § 78a et seq.).

Facilities: The real property, plant and equipment owned or leased by the Company and its Subsidiaries.

Gas Contracts: Gas Contracts shall have the meaning set forth in Section 6.18.

Governmental Authority: The Federal government, any state, county, municipal, local or foreign government and any governmental agency, bureau, commission, authority or body.

HSR Act: The Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

Indemnified Party: Indemnified Party shall have the meaning set forth in Section 9.4.

Indemnifying Party: Indemnifying Party shall have the meaning set forth in Section 9.4

Judgment: Any judgment, writ, injunction, order or decree of or by any court, judge, justice or magistrate, including any bankruptcy court or judge, having appropriate jurisdiction, and any adjudicative order of or by a Governmental Authority.

Law: The common law and any statute, ordinance, code or other law, rule, regulation, order, requirement or procedure enacted, adopted, promulgated, applied or followed by any Governmental Authority or court.

Lien: Any mortgage, lien or encumbrance, which (i) creates or confers an interest in property to secure payment or performance of a liability, obligation or claim, or which retains or reserves such an interest for such purpose; (ii) grants to any Person the right to purchase or otherwise acquire, or obligates any Person to sell or otherwise dispose of, or otherwise results or may result in any Person acquiring, any property or interest in property; (iii) restricts the transfer of, or the exercise of any rights in or the enjoyment of any benefits arising by reason of ownership of, any property; or (iv) otherwise constitutes an interest in, or claim against, property, whether arising pursuant to any Law, Judgment or any binding contract.

Material Adverse Effect: Any change, event, occurrence or state of facts which is or which would reasonably be expected to lead to an adverse change in the aggregate amount of twenty-five thousand dollars ($25,000) or more to the business, operations, consolidated balance sheet and/or Facilities of the Company or any of the Company's Subsidiaries, or Parent or any of Parent's Subsidiaries, as the case may be, ~~which is Material to the Company and its Subsidiaries, or Parent and its Subsidiaries, taken as a whole, as the case may be,~~ other than any change or effect (i) arising out of general economic conditions, (ii) arising with respect to the industry in which the Company engages in business, but not specifically relating to the Company, (iii) arising out of or as a result of the public announcement of the Transactions, or (iv) arising out of events or facts set forth on the Company Disclosure Schedule or the Parent Disclosure Schedule.

Merger: The merger of Company into and with Merger Sub at Closing, as set forth in Section 2.1.

Merger Consideration: ~~$__________ cash~~ The Preliminary Cash Consideration, as adjusted following Closing, and $_________ worth shares of Parent Common Stock (based on the Parent Share Price) (the "Parent Common Stock Consideration") ~~(the "Base Shares") registered with the SEC for immediate sale by the Stockholder and listed on the Exchange.~~

Merger Sub: Midcoast Acquisition Company, a Delaware corporation, which is the wholly owned direct subsidiary of Parent and which will be merged with the Company and continue as the Surviving Company pursuant to the Merger.

Midcoast Value: Midcoast Value shall have the meaning set forth in Section 5.1(c)(i)ii)

Parent: Midcoast Energy Resources, Inc., a Nevada corporation.

Parent Common Stock: Duly authorized shares of common stock, _____ par value per share, of Parent.

Parent Common Stock Consideration: Parent Common Stock Consideration shall have the meaning set forth in the definition of Merger Consideration.

Parent Disclosure Schedule: That schedule from Parent to the Company to be delivered upon the execution of this Agreement, and updated, subject to the approval of the Company, and redelivered at Closing, which sets forth certain disclosures concerning Parent and Merger Sub and their businesses.

Parent Share Price: The average of the high and low sales prices of the Parent Common Stock for the twenty (20) trading days prior to three (3) days before the Closing.

Parent SEC Reports: The forms, reports and documents filed by Parent with the SEC since January 1, 1997.

Pending Claims: Pending Claims shall have the meaning set forth in Section 6 8

Person: Any natural person, corporation, limited liability company, general or limited partnership, joint venture, trust, association, unincorporated entity of any kind or Governmental Authority.

Preliminary Cash Consideration: a cash sum equal to the difference between $________ and the aggregate of (i) the value of the Parent Common Stock (based on the Parent Share Price) to be received by the Stockholder as part of ther Merger Consideration and (ii) the Debt of the Company and its Subsidiaries on a consolidated basis as of the Effective Date.

Representatives: Officers, employees, legal counsel, financial advisors, accountants or other authorized representatives of any of the parties hereto, to be provided access to information.

~~Revised Adjustment Value. Revised Adjustment Value shall have the meaning set forth in Section 5.1(b).~~

~~S-__ Registration Statement: A registration statement on Form S-__, as amended or supplemented in connection with the registration under the Securities Act of Parent Common Stock issuable upon conversion of the Company Shares.~~

SEC: The United States Securities and Exchange Commission.

Stockholder Value: Stockholder Value shall have the meaning set forth in Section 5 1(c)(iii).

Securities Act: The Securities Act of 1933, as amended (15 U S.C. § 77a et seq.).

Subsidiary: In reference to any entity, any corporation, limited liability company, limited partnership or general partnership, a majority of the outstanding voting securities or voting control of which are owned directly or indirectly by such entity.

Surviving Company: Merger Sub, which shall be the survivor of the Merger, as set forth in Section 2.1.

Taxes: All Federal, state, local, foreign and other taxes of any kind, including without limitation, those on or measured by or referred to as income, gross receipts, sales, use, ad valorem, franchise, profits, withholding, payroll, employment, excise, severance, stamp, occupation, value added, windfall profits taxes, customs duties or similar fees and assessments of any kind, including interest, penalties and additions to tax or additional amounts imposed by any governmental authority with respect thereto.

Tax Returns. All returns, declarations, reports, information returns and statements with respect to Taxes of whatsoever kind.

Third Party Claim: Third Party Claim shall have the meaning set forth in Section 9.3.

Transactions: The transactions contemplated by this Agreement, including the Merger and those contemplated by the Additional Agreements.

Working Capital: Current assets, less current debts, determined in accordance with generally accepted accounting principles.

Unwanted Assets: Unwanted Assets shall have the meaning set forth in Section 5.4.

1.2 Additional Terms. Terms not set forth in Section 1.1, but otherwise defined in the body of this Agreement, shall have the specific meanings attributed to them in the text. Terms in the singular shall have the same meanings when used in the plural and vice versa.

## ARTICLE II
## TERMS OF THE MERGER

2.1 The Merger Upon the terms and subject to the conditions of this Agreement, at the Effective Time, the Company and Merger Sub shall consummate the Merger in which (a) Company shall be merged into and with Merger Sub in accordance with the DGCL, (b) the separate existence of the Company shall thereupon cease, (c) the Merger Sub shall be the survivor to the Merger and, as the Surviving Company, shall continue its corporate existence under the DGCL as a wholly owned subsidiary of Parent, retaining its rights, privileges, immunities, powers and franchises, unaffected by the Merger, and shall assume all the rights and obligations (including without limitation employment contracts and subleases) of the Company. The Merger shall have the effects set forth in the DGCL.

2.2 Effective Time. Subject to the terms and conditions of the Agreement, the parties hereto shall prepare and execute a mutually agreeable Certificate of Merger. The Certificate of Merger shall be filed on the date of Closing (or such other date as agreed by Parent and the Company) with the Secretary of State of the State of Delaware in the manner provided in the DGCL and the Merger shall be effective at the Effective Time.

2.3 Closing. The Closing of the Merger shall occur at the offices of Bryan Cave LLP, 1200 Main, Suite 3500, Kansas City, MO 64105, commencing at 10:00 A.M., local time, on or before the third business day following the date on which the condition set forth in Section 10.1(c) [HSR Act] shall have been fulfilled or waived, or at such other place, time and date as Parent and the Company may agree.

## ARTICLE III
## CERTIFICATE OF INCORPORATION AND BYLAWS OF THE SURVIVING COMPANY

3.1 Certificate of Incorporation. At the Effective Time and in accordance with the DGCL, the Certificate of Incorporation of Merger Sub shall be the Certificate of Incorporation of the Surviving Company.

3.2 The Bylaws. At the Effective Time and without any further action on the part of the Surviving Company, Parent, or the Merger Sub, the Bylaws of the Merger Sub shall be the Bylaws of the Surviving Company and thereafter may be amended or repealed in accordance with their terms, the Certificate of Incorporation of the Surviving Company and as provided by law.

## ARTICLE IV
## DIRECTORS AND OFFICERS OF THE SURVIVING COMPANY

4.1 Directors. The directors of Merger Sub at the Effective Time shall, from and after the Effective Time, be the directors of the Surviving Company until their successors have been duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the Surviving Company's Certificate of Incorporation and Bylaws.

4.2 Officers. The officers of the Merger Sub at the Effective Time shall, from and after the Effective Time, be the officers of the Surviving Company until their successors have been duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the Surviving Company's Certificate of Incorporation and Bylaws.

## ARTICLE V
## MERGER CONSIDERATION; CONVERSION OR CANCELLATION OF COMPANY SHARES IN THE MERGER

5.1 Merger Consideration.

(a) Subject to the provisions of this Agreement, at the Effective Time, ~~each~~ the Company Shares, by virtue of the Merger and without any action on the part of the holder thereof, shall be converted into the right to receive the Merger Consideration. The ~~cash~~ Preliminary Cash Consideration and the Parent Common Stock Consideration ~~Base Shares constituting a portion of the Merger Consideration~~ shall be paid to the Stockholder at Closing.

(b) ~~In addition to the Base Shares to be delivered to Stockholder at Closing, the aggregate Merger Consideration~~ The Preliminary Cash Consideration shall be increased or decreased (as the case may be) (with such difference being paid in cash ~~at Closing~~ as hereinafter provided by either Parent or Stockholder, as the case may be) to the extent the Adjustment Value is greater or less than seven hundred thousand dollars ($700,000) (such difference is referred to as the "Adjustment Amount").

"Adjustment Value" shall be calculated on a consolidated basis as of ~~Closing~~ the Effective Time in accordance with GAAP, for the Company and the Affiliates of the Company set forth on Schedule 5.1(b) hereto (the "Affiliates") and shall be the Working Capital of the Company and the Affiliates on the Effective Date, with the following adjustments thereto: ~~as follows:~~ (i) decreased by the amount of restricted cash; (ii) increased by the amount of short term notes payable and current portion of long term debt payable; (iii) to the extent there are any employee bonus plans or severance plans which are triggered as a result of the execution of this Agreement or the closing of the Transactions, decreased by the liabilities attributable to such plans; (iv) decreased by the amount of all fees and costs payable by the Company and the Stockholder to attorneys, accountants and other professionals in connection with the Merger and the Transactions; (v) decreased by the amount of all brokerage fees payable by the Company to Chase Securities, Inc. and/or Friedman, Billings, Ramsey Group, Inc. in connection with the

Merger and the Transaction; and (vi) decreased or increased, as the case may be, by the fair market value of any natural gas futures contracts as of the Effective Date.

~~(i) All cash, currency on hand, money market funds, commercial paper and other cash or cash equivalents including, but not limited to, the Cash Reserve Account held in the name of Synergy Pipeline Company, L.P., plus~~

~~(ii) All accounts receivable, less all accounts payable (excluding any amounts due under any employee retention programs or any amounts under any employment contracts which may be accelerated upon a change of control), plus~~

~~(iii) All costs associated with this Agreement paid or accrued by Company and/or its Affiliates as of the date of Closing, including all attorneys' fees and costs (and those of its lenders relating to this Agreement and/or its review), accounting fees and costs, and all other professional fees and any costs incurred or accrued by Stockholder, Company and its Affiliates as of the date of Closing; plus~~

~~(iv) All amounts expended by the Company and the Affiliate since December 31, 1998 for tenant improvements and capital assets or improvements.~~

~~Stockholder shall submit to Parent at least three (3) days prior to Closing an itemized calculation (including reasonable estimates) of the Adjustment Value as of the Closing.~~

(c) The Adjustment Amount shall be paid in cash within three (3) business days after such determination has been made of the Adjustment Value. The Adjustment Value shall be determined as follows:

(i) Stockholder shall submit to Parent, not less than five (5) days prior to Closing, his good faith estimate of the Adjustment Value. Stockholder shall also provide Parent with the work papers and back-up materials used in preparing his estimated Adjusted Value.

(ii) Within sixty (60) days after the Closing Date, Parent shall prepare and deliver to Stockholder a statement as to its calculation of the Adjustment Value (the "Midcoast Value").

(iii) If Stockholder has any objections to the Midcoast Value calculation, he shall deliver a detailed statement describing his objections to Parent and setting his calculation of the Adjustment Value (the "Stockholder Value") within fifteen (15) days after receiving the Midcoast Value calculation. Stockholder and Parent shall use reasonable efforts to resolve any such objections themselves. If they do not resolve such objection within thirty (30) days after Stockholder has delivered his statement of objections, Parent and Stockholder shall select an accounting firm mutually acceptable to them which shall resolve any remaining objections. If they are unable to agree on the choice of an accounting firm, they

shall select a nationally-recognized accounting firm by lot (after excluding their respective regular outside accounting firms), which such selection shall occur no later than ten (10) days following the expiration of the foregoing thirty (30) day time period. The determinations made by the accounting firm so selected shall be set forth in writing and shall be conclusive and binding upon the Parent and Stockholder. The determinations made by the accounting firm shall be delivered to Parent and Stockholder no later than thirty (30) days following selection of such accounting firm. Parent shall revise the statement of the Midcoast Value as appropriate to reflect the resolution of any objections thereto pursuant to this Section 5 1(c) and such revised statement shall be the Adjustment Value.

(iv) In the event Parent and Stockholder submit any unresolved objections to an accounting firm for resolution as provided in (b) above, they shall share responsibility for the fees and expenses of the accounting firm as follows:

(A) if the accounting firm resolves all of the unresolved objections in favor of Parent, Stockholder shall be responsible for all of the fees and expenses of the accounting firm;

(B) if the accounting firm resolves all of the unresolved objections in favor of the Stockholder, Parent shall be responsible for all of the fees and expenses of the accounting firm;

(C) if the accounting firm resolves some of the unresolved objections in favor of Parent and the rest of the unresolved objections in favor of the Stockholder, Parent shall be responsible for the fraction of the fees and expenses of the accounting firm equal to (x) the difference between the Adjustment Value and the Midcoast Value, divided by (y) the difference between the Stockholder Value and the Midcoast Value.

Example #1:

If the Midcoast Value is 100, the Adjustment Value is 125, and the Stockholder Value is 175, then Parent shall pay 25/75 or 1/3 of the fees and expenses of the accounting firm, and Stockholder shall pay the remaining 2/3.

$$\frac{125-100}{175-100} = \frac{25}{75} \text{ or } 1/3$$

Example #2:

If the Midcoast Value is 50, the Adjustment Value is 150, and the Stockholder Value is 200, then Parent shall pay 100/150 or 2/3 of the fees and expenses of the accounting firm, and Stockholder shall pay the remaining 1/3.

$$\frac{150-50}{200-50} = \frac{100}{150} \text{ or } 2/3$$

(iv) Parent shall make the books and records of the Company and its Affiliates available for inspection, review and copying to Stockholder and his accountants and other representatives. Parent shall cooperate with Stockholder and will make the work papers and backup materials used in preparing the statement of the Midcoast Value available to Stockholder and his accountants and other representa-tives, in each case at reasonable times and upon reasonable notice at any time during (A) the preparation by Parent of the statement of the Midcoast Value, (B) the review by Stockholder of the Statement of the Midcoast Value, and (C) the resolution by the Parent and Stockholder of any objections thereto.

5.2 Cancellation of Company Shares.

(a) All Company Shares to be converted into Parent Common Stock pursuant to Section 5.1 shall, by virtue of the Merger and without any action on the part of the holders thereof, cease to be outstanding, be canceled and cease to exist, and each holder of a Certificate shall thereafter cease to have any rights with respect to such Company Shares, except the right to receive for each of the Company Shares, upon the surrender of such Certificate in accordance with Section 5 3, a prorata share of the Merger Consideration.

(b) At the Effective Time, each share of common stock of Merger Sub issued and outstanding immediately prior to the Effective Time shall, by virtue of the Merger and without any action on the part of Merger Sub or the holder thereof, be converted into shares of common stock of the Surviving Company pursuant to the Certificate of Merger.

5.3 Payment for Company Shares in the Merger. The manner of making payment for Company Shares in the Merger shall be as follows:

(a) At the Effective Time, Parent shall pay by wire transfer the Preliminary Cash Consideration portion of the Merger Consideration and shall make available to the Stockholder, the aggregate number of shares of Parent Common Stock constituting the Merger Consideration payable pursuant to Section 5.1.

(b) The Stockholder shall surrender to the Parent the Certificate evidencing the Company Shares. Until so surrendered, such Certificates shall represent solely the right to receive the Merger Consideration with respect to each of the Company Shares represented thereby.

5.4 Distribution of Assets. Prior to the Closing, the assets of the Company set forth on Schedule 5.4 hereto (including without limitation the stock of The Bishop Corporation, E&C Group, Inc., Management Resources Group, Ltd., Bishop Rink Holdings, LLC and KP Operating Company, LLC) (the "Unwanted Assets") will be distributed to Stockholders in

redemption of __________ shares of the stock of the Company. ~~[alternative tax structures may be used]~~. In addition, Stockholder and not the Surviving Company shall own and have the rights to use the name "The Bishop Group Ltd." and all derivatives thereof.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY

Except as provided in this Agreement and except as set forth in the Company Disclosure Schedule (each section of which qualifies all of the relevant representations or warranties), the Stockholder hereby represents and warrants to Parent and Merger Sub as follows:

6.1 Company Shares. The Company Shares, at the Effective Time, will constitute all of the issued and outstanding capital stock of the Company and all such shares of Company Shares will have been duly authorized, validly issued and shall be fully paid and non-assessable.

6.2 Capitalization. The entire authorized capital stock of the Company consists of ______________ shares of Class A Common Stock and ______________ shares of non-voting Common Stock. As of the date hereof, ______________ shares of Class A Common Stock are issued and outstanding and owned by Dennis M. Langley and zero (0) shares of such non-voting Common Stock are issued and outstanding. As of the date of this Agreement, all the outstanding shares of capital stock of each Subsidiary of the Company are owned by the Company, or by another wholly-owned subsidiary of the Company, free and clear of all Liens, and are duly authorized, validly issued, fully paid and non-assessable. There are not as of the date hereof, and there will not be at the Effective Time, any stockholder agreements, voting trusts or other agreements or understandings to which the Company is a party or to which it is bound relating to the voting of any shares of the capital stock of the Company, or the capital stock of any of its Subsidiaries. There are no outstanding or authorized options, warrants, subscriptions, calls, demands or rights of any character relating to the Company's capital stock, or the capital stock of its Subsidiaries, whether or not issued, which the Company, or any of its Subsidiaries, is a party to, including without limitation, securities convertible into or evidencing the right to purchase any capital stock or other securities of the Company or any of its Subsidiaries.

6.3 Corporate Organization, Qualification and Power. Each of the Company and its Subsidiaries is a corporation or partnership duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and is duly qualified to conduct its business and is in good standing in every other jurisdiction in which its business is conducted, except where failure to be so qualified, licensed or to be in good standing would not have a Material Adverse Effect. Each of the Company and its Subsidiaries has the corporate or partnership power to own or lease its respective properties and to carry on its business as now being conducted, wherever located. The Company's Subsidiaries are listed on the Company Disclosure Schedule and the Company owns no other material interest in any corporation, partnership, limited liability company, proprietorship or any other business entity other than the stock in those Subsidiaries which will be distributed to the Stockholder as provided in Section 5.4.

6.4 Authorization of Agreement and Merger. The Company has the requisite corporate power and authority to approve, authorize, execute and deliver this Agreement and to consummate the Transactions. This Agreement, and the consummation by the Company of the Transactions have been duly and validly authorized by the Board of Directors of the Company and no other corporate proceedings on the part of the Company are necessary to authorize this Agreement or to consummate the Transactions. The Stockholder agrees to vote his Company Shares in favor of the Merger.

6.5 Enforceable Agreement. This Agreement has been duly and validly executed and delivered by the Company and, assuming it constitutes the valid and binding agreement of Parent and Merger Sub, constitutes a valid and binding obligation of the Company, enforceable against the Company according to its terms, subject to bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting the enforceability of contractual obligations and creditor's rights generally and by the application of equitable principles by courts of competent jurisdiction, sitting at law or in equity.

6.6 No Conflicts, Violations, Breaches or Defaults. The execution and delivery of this Agreement by the Company and its performance of the obligations hereunder, including its execution, delivery and performance of any Additional Agreements to which it is a party and the consummation of the Transactions, do not (a) conflict with or result in any breach of any provision of the Articles of Incorporation, as amended, or Bylaws, as amended, of the Company or the comparable charter or organizational documents of any of its Subsidiaries; (b) require any consent, approval, authorization or permit of, or filing with, or notification to, any Governmental Authority, except (i) in connection with the applicable requirements, if any, of the HSR Act; (ii) the filing of the Certificate of Merger pursuant to the DGCL and appropriate documents with the relevant authorities of other states in which the Company is authorized to do business; (iii) approvals, if any, required of the Federal Energy Regulatory Commission ("FERC") and any state Governmental Authorities having jurisdiction over the Company; or (iv) approvals of the lenders to the Company and its Subsidiaries, including without limitation, Chase Manhattan Bank and the holders of long term notes of the Company's Subsidiary, Synergy Pipeline Company, L.P., initially issued in or about 1992; or (v) where the failure to obtain such consent, approval, authorization or permit, or to make such filing or notification, would not have a Material Adverse Effect or materially adversely affect the ability of the Company to consummate the Transactions; (c) except as would not have a Material Adverse Effect, conflict with or result in a breach or violation of, or constitute a default under, or result in (or create in any party the right to cause) the acceleration of any performance required by the Company or its Subsidiaries under, (i) any Judgment or Law to which they are subject or bound (subject to any consents, approvals, authorizations, permits, filings or notifications required under (b) above), or (ii) any mortgage, bond, indenture, agreement, contract, license or other instrument or obligation to which the Company and/or its Subsidiaries are subject or bound; or (d) result in the creation of any Lien on any of the assets of the Company or its Subsidiaries which would have a Material Adverse Effect.

6.7 Financial Statements. The consolidated balance sheets and the related consolidated statements of earnings, stockholders' equity and cash flows (including the related notes thereto) of the Company for and as of December 31, 1997 and 1998 and for and as of ____

______, 1999 (collectively, the "Company Financial Statements"), have been prepared in accordance with generally accepted accounting principles applied on a basis consistent with prior periods (except as otherwise noted therein), and present fairly the financial position of the Company and its Subsidiaries as of their respective dates, and the consolidated results of their ~~its~~ operations and their ~~its~~ cash flows for the periods presented therein (subject, in the case of the unaudited interim financial statements, to normal year-end adjustments and except that the unaudited interim financial statements do not contain all of the footnote disclosure required by generally accepted accounting principles).

6.8 Litigation. Except ~~as appropriately reserved for in the financial statements and except~~ as set forth in the Company Disclosure Schedule (the "Pending Claims"), there is no action, suit, claim, governmental investigation, arbitration or other proceeding pending, or, to the actual knowledge of the Stockholder or the Company's officers, threatened in writing, against the Company or any of its Subsidiaries or the Affiliates which, if adversely determined would have a Material Adverse Effect. All of the Pending Claims are appropriately reserved for in the Company Financial Statements.

6.9 Taxes. The Company and each of its Subsidiaries and the Affiliates has timely filed (or, as to its Subsidiaries, the Company has timely filed on their behalf) all material Tax Returns required to be filed by it (taking into account extensions approved by Governmental Authorities), has paid (or, as to its Subsidiaries, the Company has paid on their behalf) all Taxes shown thereon to be due and has provided (or, as to its Subsidiaries, the Company has made provision on their behalf) reserves in accordance with generally accepted accounting principles in its financial statements for any Taxes that have not been paid, whether or not shown as being due on any Tax Returns, except where the failure to pay or provide for such Taxes would not have a Material Adverse Effect, and (i) no material claim for unpaid Taxes has been asserted against the Company or any of its Subsidiaries in writing by a tax authority or has become a Lien (except for Liens for Taxes not yet due and payable or for Taxes that are being disputed in good faith by appropriate proceedings and that have been reserved against in accordance with generally accepted accounting principles) against the property of the Company or any of its Subsidiaries, except as to such matters as would not have a Material Adverse Effect, (ii) as of the date of this Agreement, no audit of any material Tax Return of the Company or any of its Subsidiaries is being conducted by a tax authority, and (iii) as of the date of this Agreement, no extension of the statute of limitations on the assessment of any Taxes has been granted by Company or any of its Subsidiaries and is currently in effect.

6.10 Environmental Laws and Regulations. Except as set forth on the Company Disclosure Schedule or for noncompliance that will not have a Material Adverse Effect, t ~~T~~he Company and each of its Subsidiaries and the Affiliates (a) are in compliance with Environmental Laws (as defined below), ~~except for non-compliance that would not have a Material Adverse Effect~~ and (b) have not received written notice of, or to the Stockholder's actual knowledge, is the subject of an Environmental Claim which would have a Material Adverse Effect. The term "Environmental Laws" shall mean any state or federal environmental statute or regulation, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (collectively, "Environmental Laws").

6.11 Compliance with Applicable Laws. Except as set forth on Company's Disclosure Schedule or for violations that will not have a Material Adverse Effect, the ~~The~~ businesses of the Company and its Subsidiaries and the Affiliates are not being conducted in violation of any Laws. ~~, except for violations which would not have a Material Adverse Effect.~~

6.12 Title to Properties. The Company and each of its Subsidiaries and the Affiliates has good and marketable title to, or valid leasehold interests in, all their respective material properties and assets except for such as are no longer used or useful in the conduct of their respective businesses or as have been disposed of in the ordinary course of business and except for defects in title, easements, encroachments, restrictive covenants and similar encumbrances or impediments that would not have a Material Adverse Effect All such assets and properties, other than assets and properties in which the Company or any of its Subsidiaries has leasehold interests, are free and clear of all Liens except for Liens that would not have a Material Adverse Effect.

6.13 Employee Benefit Matters

(a) The Company has furnished to Parent true and complete copies of all material employee benefit plans within the meaning of Section 3(3) of ERISA that covers employees, directors, former employees or former directors of the Company and its Subsidiaries, all as listed in the Company Disclosure Schedule. In addition, the Company has furnished any trust agreements or insurance contracts forming a part of any such employee benefit plans maintained by the Company, a copy of the most recent determination letter for any such employee benefit plan which is an employee pension benefit plan within the meaning of Section 3(2) of ERISA and is intended to comply with Section 401(a) of the Code, and a copy of the most recent Form 5500, if applicable.

(b) Each of the employee benefit plans maintained by the Company and its Subsidiaries is in substantial compliance with all applicable Laws including ERISA and the Code, except for any noncompliance that would not have a Material Adverse Effect

(c) No employee benefit plan is a "multiemployer plan" as such term is defined in Section 4001(a)(3) of ERISA or Section 414(f) of the Code or a multiemployer plan described in clauses (i) or (ii) of Section 3(37)(A) of ERISA; or is a part of a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(d) There are no pending, threatened, or anticipated claims (other than routine claims for benefits or immaterial claims) by, on behalf of or against any of the employee benefit plans or any trusts related thereto that would have a Material Adverse Effect.

6.14 Broker's Fees. Except for the fees and expenses payable to Chase Securities, Inc. and/or Friedman, Billings, Ramsey Group, Inc., neither the Company nor the Stockholder has employed any investment bank, broker, finder, consultant or other intermediary,

which would be entitled to any fee or commission from the Company in connection with this Merger Agreement or the Transactions.

6.15 Absence of Certain Changes or Events. Since December 31, 1998, the Company and each of the Subsidiaryies and the Affiliates has conducted its business in all material respects in the ordinary course consistent with past practice, and there is not and has not been: (i) any change which has had a Material Adverse Effect, or (ii) any condition, event or occurrence which is reasonably likely to have a Material Adverse Effect.

6.16 Labor Matters. As of the date of this Agreement, neither the Company nor any of its Subsidiaries or the Affiliates is a party to or bound by, and none of their employees is subject to, any collective bargaining agreement relating to the term and conditions of employment for any group of employees (any such agreement, memorandum or document, a "Collective Bargaining Agreement"), and as of the date of this Agreement there are no labor unions or other organizations representing or, to the knowledge of the Company, purporting to represent, any employees employed by any of the Company and its Subsidiaries. As of the date of this Agreement, no labor union is currently engaged in or, to the knowledge of the Company, threatening, organizational efforts with respect to any employees of the Company or any of its Subsidiaries

6.17 Year 2000 Compatibility. The Company and each of its Subsidiaries and the Affiliates has developed and is executing a plan (the "Y2K Plan") to address significant year 2000 compatibility issues. In the case of certain equipment with imbedded chips where testing for year 2000 compliance is impossible or impractical, the Y2K Plan may include plans and strategies for replacing such capability with redundant capacity within the Company or with alternative third party sourcing with comparable quality and pricing, excluding any provider of basic services and utilities.

6.18 Gas Contracts. All gas sales, purchase, treating, processing and transportation contracts (the "Gas Contracts") to which any of the Company and its Subsidiaries is a party or is otherwise bound are listed in the Company Disclosure Schedule. Copies of all the Gas Contracts, together with all amendments, modifications, revocations and notices pertaining thereto have been delivered or made available to Parent and the Merger Sub. Except as set forth in the Disclosure Schedule, none of the Company and its Subsidiaries is party to any arrangement under which it will be obligated, by virtue of a prepayment arrangement, a "take-or-pay" arrangement or any other arrangement, to transport or deliver hydrocarbons at some future time without then or thereafter receiving full payment therefor, or to pay for hydrocarbons or their transportation without then receiving such hydrocarbons.

6 19 No Defaults. None of the Company and its Subsidiaries and the Affiliates is in breach or default under any term or provision of any of the Gas Contracts except where such breaches or defaults would not, either individually or in the aggregate, have a Material Adverse Effect. All of the Gas Contracts are in full force and effect, and constitute legal, valid and binding obligations of the Parties thereto except where the failure to be in full force and effect and legal, valid and binding would not, either individually or in the aggregate, have a Material Adverse Effect. None of the Company and its Subsidiaries and the Affiliates has received any written notice from any other party indicating any intent to rescind or dishonor any material

provision contained in any of the Contracts. Except as set forth in the Disclosure Schedule, none of the Company and its Subsidiaries and the Affiliates is a party to any contract to sell any portion of its assets other than in the ordinary course of business.

6.20 Insurance. The Subsidiaries and the Affiliates maintain in effect insurance on their respective assets as described in the Disclosure Schedule. Such insurance policies are in full force and effect on the date hereof and will remain in effect through the Closing. None of the Company and its Subsidiaries is in default with respect to any provision contained in any insurance policy covering any portion of their assets, except where such default would not have a Material Adverse Effect.

6.21 Tariffs. Except as set forth in the Disclosure Schedule or for noncompliance that will not have a Material Adverse Effect, all operations of any of the Company and its Subsidiaries and the Affiliates which are subject to a tariff approved by FERC are in compliance with each such tariff.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB

Except as set forth in the Parent Disclosure Schedule (each section of which qualifies the correspondingly numbered representation or warranty), Parent and Merger Sub hereby jointly and severally represent and warrant to the Company as follows:

7.1 Capitalization. The entire authorized capital stock of the Parent consists of _______________ shares of Parent Common Stock, _____ par value per share. As of the date hereof, ______________ shares of Parent Common Stock are issued and outstanding and no shares of Parent Common Stock or Parent Preferred Stock are held in treasury. As of the date hereof, such shares constitute all of the issued and outstanding capital stock of the Parent, all of which have been duly authorized, validly issued and are fully paid and non-assessable. All outstanding shares of capital stock of Parent's Subsidiaries are owned by Parent or a direct or indirect wholly owned subsidiary of Parent, free and clear of all Liens, and are duly authorized, validly issued, fully paid and non-assessable. There are not as of the date hereof, and there will not be at the Effective Time, any stockholder agreements, voting trusts or other agreements or understandings to which Parent is a party or to which it is bound relating to the voting of any shares of the capital stock of Parent. As of the date hereof, ____________ shares of Parent Common Stock were reserved for issuance upon exercise of outstanding options under the Parent Option Plans. Except pursuant to the Parent Option Plans, and as set forth in the Parent Disclosure Schedule, there are no outstanding or authorized options, warrants, agreements, subscriptions, calls, demands or rights of any character relating to the Parent's, or Parent's Subsidiaries' capital stock, whether or not issued, including without limitation, securities convertible into or evidencing the right to purchase any capital stock or other securities of Parent or any of its Subsidiaries. Parent does not own, directly or indirectly, any capital stock of the Company.

7.2 Corporate Organization, Qualification and Power Each of Parent, its Subsidiaries and Merger Sub is a corporation duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and is duly qualified to conduct