its business in every other jurisdiction in which its business is conducted, except where failure to be so qualified or licensed would not have a Material Adverse Effect on Parent. Each of Parent and its Subsidiaries has the corporate power to own or lease its respective properties and to carry on its business as now being conducted, wherever located. Neither Parent nor Merger Sub owns any material interest in any corporation, partnership, proprietorship or any other business entity.

7.3    Authorization of Agreement and Merger.  Each of Parent and Merger Sub has the requisite corporate power and authority to approve, authorize, execute and deliver this Agreement and to consummate the Transactions.  This Agreement, and the consummation by Parent and Merger Sub of the Merger and the other Transactions have been duly and validly authorized by the respective Boards of Directors of Parent and Merger Sub and the sole stockholder of Merger Sub and no other corporate proceedings on the part of Parent and Merger Sub are necessary to authorize this Agreement or to consummate the Transactions.

7.4    Enforceable Agreement.  This Agreement has been duly and validly executed and delivered by Parent and Merger Sub and, assuming it constitutes the valid and binding agreement of the Company, constitutes a valid and binding obligation of each of Parent and Merger Sub, enforceable against each of them according to its terms, subject to bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting the enforceability of contractual obligations and creditor's rights generally and by the application of equitable principles by courts of competent jurisdiction, sitting at law or in equity.

7.5    No Conflicts, Violations, Breaches or Defaults.  The execution and delivery of this Agreement by each of Parent and Merger Sub and its performance of the obligations hereunder, including its execution, delivery and performance of any Additional Agreements to which it is a party and the consummation of the Transactions, do not (a) conflict with or result in any breach of any provision of the respective Articles of Incorporation, Certificate of Incorporation or Bylaws of Parent or Merger Sub; (b) require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority, except (i) in connection with the applicable requirements, if any, of the HSR Act; (ii) pursuant to the applicable requirements of the Securities Act and the Exchange Act, and the rules and regulations promulgated thereunder; (iii) the filing of the Certificate of Merger pursuant to the DGCL and appropriate documents with the relevant authorities of other states in which Parent or any of its Subsidiaries is authorized to do business; (iv) such filing or consent as may be required by applicable state securities, or "blue sky" Laws; (v) approvals, if any, required of state Governmental Authorities having jurisdiction over Parent or any of its Subsidiaries; (vi) filings with, and approval of the Exchange; or (vii) where the failure to obtain such consent, approval, authorization or permit, or to make such filing or notification, would not have a Material Adverse Effect on Parent or its Subsidiaries or materially adversely affect the ability of Parent to consummate the Transactions; (c) except as would not, individually or in the aggregate, have a Material Adverse Effect on Parent, conflict with or result in a breach or violation of, or constitute a default under, or result in (or create in any party the right to cause) the acceleration of any performance of the Parent or its Subsidiaries under, (i) any Judgment or Law to which they are subject or bound (subject to any consents, approvals, authorizations, permits, filings or notifications required under (b) above), or (ii) any mortgage, bond, indenture, agreement, contract, license or other instrument or obligations to which Parent and/or its Subsidiaries are

18

subject or bound; or (d) result in the creation of any Lien on any of the assets of Parent or its Subsidiaries which would have a Material Adverse Effect on Parent or Merger Sub.

    7.6  <u>Parent SEC Reports</u>. Since _____, Parent has filed all forms, reports and documents with the SEC required to be filed by it pursuant to the federal securities Laws, all of which complied in all material respects with all applicable requirements of the Securities Act and the Exchange Act and the rules and regulations promulgated thereunder. None of the Parent SEC Reports, at the time filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

    7.7  <u>Financial Statements; Accounting Matters</u>

      (a)  The consolidated balance sheets and the related consolidated statements of income, stockholders' equity and cash flows (including the related notes thereto) of Parent included in the Parent SEC Reports complied as to form in all material respects with the published rules and regulations of the SEC with respect thereto, have been prepared in accordance with generally accepted accounting principles applied on a basis consistent with prior periods (except as otherwise noted therein), and present fairly the financial position of Parent and its Subsidiaries as of their respective dates, and the consolidated results of its operations and its cash flows for the periods presented therein (subject, in the case of the unaudited interim financial statements, to normal year-end adjustments and except that the unaudited interim financial statements do not contain all of the footnote disclosure required by generally accepted accounting principles).

      (b)  Neither Parent, Merger Sub nor, to the actual knowledge of Parent's officers, any of their affiliates, have taken or agreed to take any action that would jeopardize the qualification of the Merger as a reorganization within the meaning of Section 368(a) of the Code.

    ~~7.8  S___ Registration Statement. None of the information supplied or to be supplied by Parent or Merger Sub for inclusion or incorporation by reference in the S___ Registration Statement required to be filed in connection with the Transactions (or any amendment or supplement thereto) will, at the time it becomes effective and at the Effective Time, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. If at any time prior to the Effective Time any event occurs with respect to Parent, its officers and directors, or any of its Subsidiaries, which is required to be described in an amendment of, or a supplement to, the S___ Registration Statement, Parent will promptly file such with the SEC and disseminate it as required by Law to the stockholders of Parent and to the Stockholder.~~

    ~~7.9~~  7.8 <u>Litigation</u>. Except as disclosed in or appropriately reserved for in the financial statements included within the Parent SEC Reports, there is no action, suit, claim, governmental investigation, arbitration or other proceeding pending, or, to the actual knowledge

19

of Parent's officers, threatened in writing, against Parent which, if adversely determined would have a Material Adverse Effect

7.10   7.9 Taxes. Each of Parent and its Subsidiaries has (a) filed all material Tax Returns that they are required to file through the date hereof and shall prepare and file all material Tax Returns required to be filed after the date hereof and on or before the Effective Time and (b) paid or provided for the payment of all Taxes due and owing for the periods covered by such Tax Returns and all Taxes, if any, required to be paid for which no return is required, except in either case where the failure to file such returns or to pay or provide for such Taxes would not have a Material Adverse Effect.

7.11 7.10   Environmental Laws and Regulations.   Except as set forth on Parent's Disclosure Schedule or for non-compliance that will not have a Material Adverse Effect, Parent and each of its Subsidiaries (a) are in compliance with Environmental Laws except for non-compliance that would not have a Material Adverse Effect on Parent, and (b) have not received written notice of, or, to the actual knowledge of Parent's officers, is the subject of an Environmental Claim which would have a Material Adverse Effect on Parent.

7.12 7.11   Compliance with Applicable Laws.   Except as set forth on Parent Disclosure Schedule, or for violations that will not have a Material Adverse Effect, t The businesses of Parent and its Subsidiaries are not being conducted in accordance with all violation of any Laws, except for violations which would not have a Material Adverse Effect.

7.13   7.12 Broker's Fees.   Parent has not employed any investment bank, broker, finder, consultant or other intermediary, which would be entitled to any fee or commission from Parent in connection with the Transactions.

7.14 7.13   Interim Operations of Merger Sub.   Merger Sub was formed solely for the purpose of engaging in the Transactions and has not engaged in any business activities or conducted any operations other than in connection with the Transactions.   Merger Sub has no Subsidiaries.

7.15 7.14   Authorization for Parent Common Stock. Prior to the Effective Time, Parent will have taken all necessary action to permit it to issue the number of shares of Parent Common Stock required to be issued pursuant to Article V.   Parent Common Stock issued pursuant to Article V will, when issued, be validly issued, fully paid and nonassessable and no Person will have any preemptive right of subscription or purchase in respect thereof.   Such Parent Common Stock will, when issued, be registered under the Securities Act and the Exchange Act and registered or exempt from registration under any applicable state securities laws and will, when issued, be listed on the Exchange

**ARTICLE VIII**
**CONDUCT PENDING THE CLOSING AND COVENANTS**

8.1   Conduct of Business by Company and Parent Each of the Stockholder and Parent covenants and agrees that prior to the Effective Time, unless the other party agrees in writing or as otherwise contemplated by this Agreement, it will (and Stockholder will cause the

20

ENB-DOJ-036045

Company to) conduct its business and day to day operations (including those of any Subsidiary) in the ordinary and usual course of business, consistent with its past custom and practice, and will seek to preserve intact its business organization and goodwill, keep in full force and effect all material rights, licenses, permits and franchises relating to such business, and maintain satisfactory relationships with suppliers, customers and others having business relationships with it. Each of the Stockholder and Parent specifically agrees that, prior to the Effective Time, unless the other party otherwise agrees in writing or as otherwise contemplated by this Agreement, neither the Company nor Parent, nor any of the Company's Subsidiaries or Parent's Subsidiaries, will:

> (a)    issue, deliver, sell or dispose of, pledge or otherwise encumber (i) any additional shares of capital stock of any class, or any securities or rights convertible into, exchangeable for or creating the right to subscribe for any share of capital stock, or any rights, warrants, options, calls, or any other agreement of any kind to purchase or acquire any share of capital stock or such securities, or (ii) any securities exchangeable for, in respect of, or in substitution for Company Stock or Parent Common Stock currently outstanding;

> (b)    except pursuant to existing employee benefit plans, redeem, purchase or otherwise acquire any of its outstanding capital stock;

> (c)    split, combine, subdivide or reclassify any share of its capital stock, or declare, set aside or pay any dividend, or make any distribution, on its capital stock, except the declaration and payment of regular quarterly, semi-annual or annual cash dividends in accordance with past dividend policy (or dividends by a wholly owned Subsidiary);

> (d)    amend its respective Certificate/Articles of Incorporation or Bylaws;

> (e)    except as contemplated by this Agreement, take any action which would render, or which reasonably may be expected to render, any representation or warranty made by it in this Agreement untrue in any material respect at the Effective Time,

> (f)    take any action that would, or that could reasonably be expected to, cause any condition to Closing, as set forth in Article X hereof, to not be satisfied; or

> (g)    authorize, propose or announce an intention to do any of the foregoing, or enter into any contract or agreement to do any of the foregoing.

  8.2    <u>Conduct of Business of Merger Sub</u>.  During the period of time from the date of this Agreement to the Effective Time, Merger Sub shall not engage in any activities of any nature except as provided in or contemplated by this Agreement.

  8.3    <u>Additional Covenants of the Company</u>.  The Stock-holder agrees, in addition to the covenants set forth in Section 8.1, that prior to the Effective Time, without the

21

ENB-DOJ-036046

express written consent of Parent, neither the Company nor any of the Company's Subsidiaries will:

> (a)     adopt a plan of liquidation dissolution, merger (other than the Merger), consolidation, restructuring, or other reorganization of the Company or any Subsidiary, except as set forth on the Company Disclosure Schedule; or

> (b)     merge or consolidate with any other third party, except as set forth on the Company Disclosure Schedule.

8.4     <u>All Reasonable Efforts</u>.

> (a)     Subject to the terms and conditions herein, each of the parties hereto shall use reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the Transactions <u>(but shall not be required to file or prosecute any lawsuits or administrative proceedings, or otherwise expend any sums in excess of $___ in connection with its reasonable efforts)</u>, including using reasonable efforts to obtain all necessary or appropriate waivers, consents and approvals, to effect all necessary registrations, filings and submissions, including, but not limited to, (i) filings under the HSR Act and any other submissions required by any Governmental Authority, including FERC, and (ii) required approvals under the applicable state Laws and to lift any injunction or other legal bar to the Merger (and, in such case, to proceed with the Merger as expeditiously as possible).

> (b)     Each party agrees to make their initial filing pursuant to the HSR Act within five (5) business days after this Agreement has been executed and delivered and use reasonable commercial efforts to promptly respond to all requests from Governmental Authorities in connection therewith.

8.5     <u>Access to/Confidentiality of Information</u>  Upon reasonable notice, each of the Company and Parent shall (and shall cause its Subsidiaries to) afford to each other's Representatives, so that they may evaluate the Transactions, reasonable access during normal business hours throughout the period prior to the Effective Time, to its properties, personnel, books and records and other information as reasonably requested under the circumstances, and, during such period, furnish promptly to such Representatives the specific information concerning its business, properties and personnel as listed on the Parent Disclosure Schedule.  Each of the Company and Parent agrees that it will not, and will cause its Representatives not to, use any information obtained pursuant to this Section 8.6 for any purpose unrelated to the consummation of the Transactions.

8 6     <u>Publicity</u>. The parties will consult with each other and will mutually agree upon any press releases or public announcement pertaining to the Merger and the other Transactions and shall not issue any such press releases or make any such public announcements prior to such consultation and agreement, except as may be required by applicable Law or by obligations pursuant to any listing agreement with the Exchange, in which case the party

ENB-DOJ-036047

proposing to issue such press release or make such public announcement shall use all reasonable efforts to consult in good faith with the other party before any such issuance or announcement.

~~8.7    Registration Statement. Parent will, as promptly as possible, prepare and file with the SEC the S___ Registration Statement in connection with the registration under the Securities Act of Parent Common Stock issuable upon conversion of the Company Shares. Parent will use all reasonable efforts to have or cause the S___ Registration Statement declared effective as promptly as possible, including, without limitation, causing its accountants to deliver necessary or required instruments such as opinions and certificates, and will take any other action required or necessary to be taken under federal or state securities Laws or otherwise in connection with the registration process.~~

~~8.8    Exchange Listing. Parent shall cause the Parent Common Stock constituting the Merger Consideration to be listed on the Exchange.~~

~~8.9~~ 8.8 Employee Matters.  The Parent shall cause the Surviving Company to maintain and continue to pay the healthcare insurance, dental insurance, life insurance, disability insurance premiums, car purchase and/or lease payments and/or car allowances and auto insurance currently in effect as of the date of this Agreement for all employees of the Company and its Subsidiaries as of the date of Closing for a period of six (6) months after Closing.  After said six (6) month period, upon termination of any such employees, the Surviving Company shall provide all such employees all of the Federal COBRA benefits mandated relating to any of the above described employee benefits.  In addition, Parent shall cause the Surviving Company and its Subsidiaries to maintain and honor the existing contractual obligations as described in the employment contracts ~~ad~~ and consulting agreements listed in <u>Schedule 8.8</u>.

~~8.10~~    8.9 Reorganization. Neither the Parent nor its Subsidiaries will take any action that would jeopardize the qualification of the Merger as a reorganization within the meaning of Section 368(a) of the Code.

~~8.11~~ 8.10    <u>Parent's Diligence</u>. Parent acknowledges that it has conducted an extensive investigation of the financial condition and the properties and operations of the Company and that during the course of such investigation, Company and Stockholder have caused the facilities, books, records and personnel of Company to be made available to Parent and have caused to be provided to Parent such other information with respect to the Company as Parent has requested.  Parent has received from the Company and Stockholder all information which Parent has requested to its satisfaction, and Parent has been given the opportunity to discuss Company and its business and prospects with representatives of Company and to have such representatives answer any questions regarding the business of the Company, all of which questions have been answered to Parent's full satisfaction, and to obtain any additional information which Company or Stockholder possess that is necessary to verify the accuracy of the information supplied during the course of such investigation.  Parent has had access to the facilities and properties of Company and has inspected them to Parent's satisfaction.  Further, Parent acknowledges that (i) Parent has been advised that the Company and its Subsidiaries have certain Pending Claims, including without limitation a rate case by the Company's Subsidiary, Kansas Pipeline Company, pursuant to Section 4 of the Natural Gas Act, (ii) the outcomes of Pending Claims, including the rate case, are impossible to predict, (iii) neither the Company nor

23

Stockholder are making any representations or warranties of any kind or nature with respect to the Pending Claims (including the rate case) including without limitation with respect to the outcome thereof, (iv) the outcome of the Pending Claims, including the rate case, could have a Material Adverse Effect and (v) the Merger Consideration and the consummation of the Merger by Parent and Merger Sub are based on Parent's independent evaluation of the Pending Claims, including the rate case. As a result of the foregoing, as of the Closing, and without any further action required, Parent, Merge Sub and the Surviving Company, on behalf of themselves and all of their affiliates, shall be deemed to release and discharge as of the Closing the Stockholder and the Company and its Subsidiaries and each of their officers, directors, stockholders, employees, agents and representatives from and against all Agreement-Related Litigation and all claims which could be made in any Agreement-Related Litigation, including without limitation any claims pursuant to Rule 10(b)-5 of the Exchange Act or common law fraud.

## ARTICLE IX
## INDEMNIFICATION; REMEDIES

9.1    Survival of Representations and Warranties. The representations, warranties and agreements of the Parties made herein shall ~~not~~ survive Closing, any investigation by the Parties, and the execution and delivery of the documents contemplated by this Agreement, and shall continue in force and effect until terminated, as hereinafter provided in Sections 9.2 and 9.3. ~~expire, terminate and be of no further force or effect or actionable as of the earlier of the Closing or the termination of this Agreement pursuant to Article XI; provided, however, that Parent's representations in Sections 7.6 and 7.8 shall survive Closing.~~

9.2 General Indemnity by Stockholder. Stockholder agrees to protect, defend, indemnify and hold Parent and the Merger Sub, and their respective subsidiaries and affiliates, harmless from and against and shall reimburse Parent, Merger Sub, and their respective subsidiaries and affiliates for, all Adverse Consequences which arise from any of the following:

(a) the breach of any of Stockholder's representations and warranties contained in this Agreement; and

(b) all actions, suits, proceedings, demands, assessments, costs and expenses (including reasonable attorneys' fees and expenses of investigation and defense) incident to any such breach

The indemnity obligations and the representations and warranties of Stockholder to Parent and the Merger Sub under this Section 9.2 shall terminate and be of no further force and effect upon the expiration of one (1) year following the Closing Date, except as to matters which are the subject of a written claim made to the Stockholder by Parent and/or the Merger Sub by Stockholder prior thereto.

9.3 General Indemnity by Parent and Merger Sub. Merger Sub agree to protect, defend, indemnify and hold Stockholder harmless from and against, and shall reimburse Stockholder for, all Adverse Consequences which arise from any of the following:

24

ENB-DOJ-036049

(a) the breach of any of Parent and Merger Sub's representations and warranties contained in this Agreement; and

(b) all actions, suits, proceedings, demands, assessments, costs and expenses (including reasonable attorneys' fees and expenses of investigation and defense) incident to any such breach.

The indemnity obligations and the representations and warranties of Parent and the Merger Sub to Stockholder under this Section 9.3 shall terminate and be of no further force and effect upon the expiration of one (1) year following the Closing Date, except as to matters which are the subject of a written claim made to Parent and the Merger Sub by Stockholder prior thereto.

9 4 Matters Involving Third Parties.

(a) If any third party shall notify any Party (the "Indemnified Party") with respect to any claim ("Third Party Claim") that may give rise to a claim for indemnification against any other Party (the "Indemnifying Party") under this Article 9, then the Indemnified Party shall promptly (and in any event within five (5) business days after receiving notice of the Third Party Claim) notify the Indemnifying Party thereof in writing.

(b) The Indemnifying Party will have the right to assume and thereafter conduct the defense of the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party; provided, however, that the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably) unless the judgment or proposed settlement involves only the payment of money damages and does not impose an injunction or other equitable relief upon the Indemnified Party.

(c) Unless and until the Indemnifying Party assumes the defense of the Third Party Claim as provided in subsection 9 4(b) above, however, the Indemnified Party may defend against the Third Party Claim in any manner it reasonably may deem appropriate.

(d) In no event will the Indemnified Party consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party which consent shall not be withheld unreasonably

9 5 Limitations on Stockholder's Indemnification. Notwithstanding anything herein to the contrary, in no event and under no circumstances shall Stockholder be required to pay any amounts to Parent or Merger Sub under or in connection with Stockholder's warranties, representations and indemnities under this Agreement to the extent such amounts aggregate less than one million dollars ($1,000,000) or exceed ten million dollars ($10,000,000).

9 6 Limitations on Parent and Merger Sub's Indemnifi-cation Notwithstanding anything herein to the contrary, in no event and under no circumstances shall Parent or the

ENB-DOJ-036050

Merger Sub be required to pay any collective amounts to Stockholder, under or in connection with Parent and/or Merger Sub's warranties, representations and indemnities under this Agreement to the extent such amounts aggregate less than one million dollars ($1,000,000) or exceed ten million dollars ($10,000,000).

## ARTICLE X
## CONDITIONS

10.1  <u>Conditions to Each Party's Obligation to Close</u>.  The obligations of each of the parties to consummate the Transactions are subject to satisfaction, or mutual waiver, on or prior to the Effective Time of each of the following conditions:

(a)  <u>Injunction</u>.  There shall not be in effect any Law or any Judgment directing that the Transactions not be consummated; provided, however, that prior to invoking this condition each party shall use all reasonable efforts to have any such Judgment vacated; and there shall have been no Law enacted or promulgated which would make consummation of the Transactions illegal.

(b)  <u>Stockholder Approval</u>.  ~~This Agreement and the Merger shall have been duly approved by the stockholders of the Company in accordance with applicable Law and the Articles of Incorporation, as amended, of the Company.~~  <u>Stockholder approves the Merger</u>  Parent represents that the issuance of Parent Common Stock in connection with the Merger does not require Stockholder approval under applicable law.

(c)  <u>HSR Act</u>.  Any waiting period (and any extension thereof) applicable to the consummation of the Merger under the HSR Act shall have expired or shall have been earlier terminated.

10.2  <u>Additional Conditions to the Obligations of Parent and Merger Sub to Close</u>.  The obligations of Parent and Merger Sub to consummate the Transactions are subject to satisfaction, or waiver on or prior to the Effective Time of each of the following conditions:

(a)  <u>Performance</u>.  The Company shall have performed, in all material respects, all the obligations required to be performed by it under this Agreement at or prior to the Effective Time.

(b)  <u>Representations and Warranties</u>.  The representations and warranties ~~regarding the Company~~ <u>of Stockholder under this Agreement</u> shall be true and correct, in each such case as of the date of this Agreement and as of the Effective Time as though made on the Effective Time (except that representations and warranties that speak as of a specific date shall be true and correct as of such date), provided that for purposes of determining the satisfaction of the foregoing, such representations and warranties shall be deemed true and correct if the failure or failures of such representations and warranties to be so true and correct have not ~~had~~ <u>caused</u> and could not reasonably be expected to ~~have a Material Adverse Effect~~ <u>cause Adverse Consequences to the Company, Merger Sub and/or Parent, individually or collectively, in excess of one million dollars ($1,000,000)</u>.

ENB-DOJ-036051

(c)    <u>Deliveries</u>.  Parent shall have received at the Effective Time a certificate dated the Effective Time and executed by the Stockholder certifying to the fulfillment of the conditions specified in Sections 10.2(a) and (b).

(d) <u>Consents and Approvals</u>. All consents, approvals and authorizations legally required to be obtained to consummate the Merger shall have been obtained from all Governmental Authorities and third persons, except for such consents, approvals and authorizations the failure of which to obtain would not have a Material Adverse Effect on Parent (assuming for purposes of this Section 10.2(d) that the Merger shall have been effected)

(e) <u>Special Stockholder Authorization  Stockholder shall have authorized in writing the continued representation of the Company and its Subsidiaries and the Affiliates in all litigation and other pending proceedings by their current attorneys, notwithstanding any conflict or potential of such attorneys by reason of their present or future representation of the Stockholder with respect to this Agreement, the Transactions or any other matter.</u>

10.3    <u>Additional Conditions to the Company and Stockholder's Obligation to Close</u>.  The obligation of the Company and the Stockholder to consummate the Transactions is subject to satisfaction, or, to the extent permitted by Law, waiver on or prior to the Effective Time of each of the following conditions:

(a)    <u>Performance</u>. Parent and Merger Sub shall have performed in all material respects, all the obligations required to be performed by them under this Agreement at or prior to the Effective Time.

(b)    <u>Representations and Warranties</u>.  The represen-tations and warranties of Parent and Merger Sub shall be true and correct, in each such case as of the date of this Agreement and as of the Effective Time as though made on the Effective Time (except that representations and warranties that speak as of a specific date shall be true and correct as of such date), provided that for purposes of determining the satisfaction of the foregoing, such representations and warranties shall be deemed true and correct if the failure or failures of such representations and warranties to be so true and correct have not ~~had~~ <u>caused</u> and could not reasonably be expected ~~to have a Material Adverse Effect~~ <u>cause Adverse Consequences to Stockholder in excess of one million dollars ($1,000,000).</u>

(c)    <u>Deliveries</u>. The Company shall have received at the Effective Time a certificate dated the Effective Time and executed by the Chief Executive Officer or President of Parent certifying to the fulfillment of the conditions specified in Sections 10.3(a) and (b);

(d) <u>Consents and Approvals</u>. All consents, approvals and authorizations legally required to be obtained to consummate the Merger shall have been obtained from all Governmental Authorities and third persons (including those listed in Section 6.6), except for such consents, approvals and authorizations the failure of which to obtain

27

would not have a Material Adverse Effect (assuming for purposes of this Section 10.3(d) that the Merger shall have been effected).

(e) ~~S   Registration Statement; "Blue Sky" Approvals.   The S Registration Statement shall have become effective and no stop order suspending its effectiveness shall have been issued and no proceedings for such purpose shall have been initiated and be continuing by the SEC  Parent shall have received all state securities Law or "blue sky" permits and authorizations necessary to issue Parent Common Stock in exchange for the Company Shares in the Merger and allowing the Stockholder to sell all of the Parent Common Stock received by him as a part of the Merger Consideration immediately.~~

(f) ~~Listing of Parent Common Stock.   The shares of Parent Common Stock constituting a portion of the Merger Consideration and the other such shares required to be reserved for issuance in connection with the Merger shall have been authorized for listing on the Exchange.~~

(g) ~~Reorganization.   The Company and the Stockholder shall have received an opinion, based on appropriate representations contained in certificates of the Company, Parent, Merger Sub, their respective officers and others, of Bryan Cave LLP to the effect that the Merger will be treated for federal income taxes as a reorganization within the meaning of Section 368(a) of the Code~~

10.4   <u>Frustration of Closing Conditions</u>.   Neither Parent nor the Company may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3, as the case may be, to be satisfied if such failure was caused by such party's failure to use reasonable efforts to consummate the Merger and the other transactions contemplated by this Agreement, or otherwise occurred because of a breach of this Agreement by such party.

**ARTICLE XI**
**TERMINATION AND REMEDIES**

11.1   <u>Termination</u>.   This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time, ~~before or after the approval by stockholders of either or both of the Company and Parent,~~:

(a)   by the mutual written consent of Parent and the Stockholder;

(b)   by either Parent or the Stockholder, if:

(i)   any court of competent jurisdiction in the United States, or some other Governmental Authority, shall have issued an order, decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the Merger and such order, decree, ruling or other action shall have become final and nonappealable; provided, however, that the party seeking to terminate this Agreement under this Section 11.1(b)(i) shall have used ~~its best~~ <u>reasonable commercial</u> efforts to remove such injunction, order or decree; or

28

(ii)      the Merger shall not have been consummated by ___ _____, 1999; provided, that the right to terminate this Agreement pursuant to this Section 11.1(b)(ii) shall not be available to any ~~p~~Party whose failure to fulfill any of its obligations under this Agreement results in the failure of the Merger to occur on or before such date; provided further ~~Parent~~ no Party shall not have the right to terminate this Agreement under this Section 11.1(b)(ii) until _____, 1999, if the Merger shall not have been consummated as a result of (A) all required regulatory approvals or consents necessary to satisfy the conditions set forth in Section 10.2(d) shall not have been received by _____, 1999; (B) the entering of an order or any pending action commenced by any applicable federal governmental antitrust authority seeking an order which would have the effect of making the Merger illegal or otherwise materially and adversely affecting the value of the Company or prohibiting consummation of the Merger, or (C) the failure of the conditions set forth ~~Stockholder, in each case of which the Company has been given notice in writing by Parent and which has not been cured by the Company within thirty (30) days of such notice and which misrepresentation, breach or failure to perform would, in the aggregate with all other misrepresentations, breaches or failures to perform, have a Material Adverse Effect~~ in Section 10.1(c) to be satisfied.

(c)      by Parent in the event that, as a result of Parent's diligence investigation regarding the Company conducted after the date of this Agreement, Parent shall have learned of facts not previously disclosed to or otherwise known by Parent which establish that Stockholder's representations and warranties set forth in this Agreement are not true and correct, or there has been a failure to perform a covenant on the part of the Company or Stockholder, or there has been a failure to perform a covenant on the part of the Company or the Stockholder, in each case of which the Company ~~has~~ and the Stockholder have been given notice in writing by Parent and which has not been cured by the Company or the Stockholder within thirty (30) days of such notice and which misrepresentation, breach or failure to perform would, in the aggregate with all other misrepresentations, breaches or failures to perform, ~~have a Material Adverse Effect~~ cause Adverse Consequences to Parent, Merger Sub and/or the Company in excess of one million dollars ($1,000,000).

(d)      by the Stockholder if ~~(i)~~ there has been a misrepresentation or breach of warranty or failure to perform a covenant on the part of the Parent or Merger Sub with respect to its or their representations, warranties and covenants set forth in this Agreement of which the Parent and/or Merger Sub, as the case may be, has been given notice in writing by the Company and which has not been cured by Parent or Merger Sub, as the case may be, within thirty (30) days of such notice and which misrepresentation, breach or failure to perform would, in the aggregate with all other misrepresentations, breaches or failures to perform, cause Adverse Consequences to Stockholder in excess of one million dollars ($1,000,000) ~~have a Material Adverse Effect; or~~

~~(ii)      the Parent Share Price is less than $_____.~~

29

ENB-DOJ-036054

11.2    Effect of Termination.

(a)    In the event of the termination and abandonment of this Agreement pursuant to Section 11.1, this Agreement shall become void and have no effect, without any liability on the part of any party hereto or its affiliates, directors, officers or stockholders, provided, however, that any such termination shall not affect any p Party's ability to seek damages, specific performance and any other legal or equitable remedies for breach of this Agreement. or Parent's right of specific performance under Section 11.3; provided further, however, that Stockholder shall not be liable for any damages if Parent terminates this Agreement pursuant to Section 11.1(c); provided further, that if the Stockholder terminates this Agreement pursuant to Section 11.1(d), Parent will pay to Stockholder (within 3 days after termination by Stockholder) an amount equal to $_____ [10% of the aggregate Merger Consideration] in cash.

## ARTICLE XIV XII

## PROHIBITED ACTIVITIES

12.1 In order to protect the goodwill and business interests of the Company and its Subsidiaries following the Closing, Stockholder covenants and agrees that he and his affiliates, now or hereafter existing, will not:

(a) directly or indirectly, request or advise any party to any gas sales, purchase, treating, processing or transportation contract, now or hereafter existing, with any of the Company and its Affiliates, to withdraw, curtail or cancel any service to or from such Party under the terms of any such contract;

(b) aid, abet or otherwise assist any person, firm or corporation seeking to interfere with the Company and its Affiliates' relationship with the parties to, or the terms, of any gas sales, purchase, treating, processing or transporation contract, now or hereafter existing, with any of the Company or its Affiliates; or

(c) without the approval of the Chief Executive Officer of the Buyer, directly or indirectly, induce or attempt to influence any employee of the Company and its Affiliates to leave or terminate his or her employment.

## ARTICLE XII XIII.
## GENERAL PROVISIONS

13.1    Expenses. Whether or not the Merger is consummated, all costs and expenses, incurred in connection with this Agreement and the Merger and the other transactions contemplated by this Agreement shall be paid by the party incurring such expense, except that the filing fee under the HSR Act shall be paid by Parent and the fees and expenses of the Stockholder shall be paid by the Company.

ENB-DOJ-036055

13.2 <u>Modification or Amendment</u>. This Agreement may be amended by an instrument in writing executed and delivered on behalf of each of the parties hereto, at any time prior to the Effective Time, subject to the provisions of the DGCL.

13.3 <u>Waiver</u>. The conditions to each of the parties' obligations to consummate the Merger are for the sole benefit of such party and may be waived, at any time prior to the Effective Time, by such party in whole or in part to the extent permitted by Law.  Any agreement on the part of a party hereto to any extension or waiver shall be valid only if set forth in writing signed on behalf of such party, and shall not be inferred by the failure of any such party to assert any of its rights hereunder.  Waiver of any provision of this Agreement or of any breach hereof shall be a waiver of only said specific provision or breach and shall not be deemed a waiver of any other provision or any future breach hereof.

13.4 <u>Notices</u>. All notices, documents, or other communications to be given hereunder shall be in writing and shall be deemed validly given if delivered by messenger, facsimile transmission (with a confirming copy sent by overnight courier), or express overnight delivery, or sent by certified mail, return receipt requested, as follows:

(a) If to the Company, to

Dennis M. Langley
c/o Tino Monaldo, Chtd
335 North Washington, Suite 130
Hutchinson, Kansas 67501
Telephone:        (316) 669-9338
Telecopier:       (316) 665-5961

with a copy to:

Thomas W. Van Dyke, Esq.
Bryan Cave LLP
7500 College Boulevard, Suite 1100
Overland Park, Kansas 66210
Telephone:        (913) 338-7700
Telecopier:       (913) 338-7777

(b) If to Parent or Merger Sub, to

<u>Midcoast Energy Resources, Inc.</u>
<u>1100 Louisiana, Suite 2950</u>
<u>Houston, TX  77002</u>
Telephone: <u>(713) 650-8900</u>
Telecopier: <u>(713) 650-3232</u>

31

ENB-DOJ-036056

with a copy to·

Ronald L. Chachere, Esq.
615 N. Upper Broadway, Suite 970
Corpus Christi, Texas 78401
Telephone: (361) 883-2356
Telecopier: (361) 883-2357

or such other Persons or addresses as may be designated in writing by the party to receive such notice  Any notice delivered by messenger shall be deemed received when such delivery is tendered; notices sent by facsimile transmission shall be deemed received upon faxed confirmation of receipt; notices mailed in the manner provided above, shall be deemed received on the third day after such are postmarked; and notices delivered by other methods shall be deemed received when actually received by the addressee or its authorized agent.

13.5   Governing Law, Jurisdiction; Venue. This Agreement shall be governed by, and construed and enforced in accordance with, the Laws of the State of Kansas, without giving effect to the principles of the conflicts of law thereof.  The parties hereto agree that the Federal Court of the District of Kansas shall have exclusive jurisdiction and venue to hear and determine any claims or disputes between the parties hereto, pertaining directly or indirectly to this Agreement, the Merger, any additional agreements or to any matter arising out of, in connection with or related to any thereof (collectively, "Agreement-Related Litigation").  Each party expressly submits and consents in advance to such jurisdiction in any action or proceeding commenced in such courts, hereby waiving personal service of the summons and complaint or other process or papers issued therein and agreeing that service of such summons and complaint or other process or papers may be made by registered or certified mail addressed to the relevant party at the address set forth in Section 12.4 13.4, which service shall be deemed made upon receipt thereof.  The exclusive choice of forum set forth in this Section shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action under this Agreement to enforce the same in any appropriate jurisdiction.

13 6   Entire Agreement.  This Agreement, including the Additional Agreements, constitute the entire agreement and understanding of the parties with respect to the Transactions and supersedes any and all prior agreements, representations and understandings relating to the subject matter hereof, including without limitations any representations, statements or facts set forth in the Confidential Offering Memorandum of June, 1999 and/or the Management Presentation Memorandum of August, 1999.  There are no representations or warranties except as specially set forth in this Agreement.

13.7   Construction.   The section and article headings contained in this Agreement are inserted for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  The preamble hereof, the recitals hereto, and all schedules attached hereto are hereby incorporated herein by reference and made a part hereof.

13.8   Binding Effect. This Agreement shall be binding upon and inure solely to the benefit of the parties, and their respective successors and assigns, to the extent allowed hereby.  Nothing in this Agreement, express or implied, is intended to or shall confer upon any

32

ENB-DOJ-036057

other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement

     13.9   Assignment.  None of the parties hereto may assign any rights or delegate any obligations provided for in this Agreement without the prior written consent of all the other parties, which consent shall be within the sole discretion of the non-assigning party.  Any assignment in violation of the preceding sentence shall be void.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns.

     13.10 Counterparts. This Agreement may be executed in any number of separate counterparts, each of which shall be deemed to be an original, but which together shall constitute one and the same instrument.

     13.11 Obligations of Subsidiaries. Whenever this Agreement requires Merger Sub to take any action, such requirement shall be deemed to include an undertaking on the part of Parent to cause Merger Sub to take such action and a guarantee of the performance thereof. Whenever this Agreement requires a Subsidiary of the Company to take any action, such requirement shall be deemed to include an undertaking on the part of the Company to cause such Subsidiary to take such action.

     13 12 Severability. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability or the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable or equitable provision shall be substituted therefor in order to carry out, so far as may be valid or enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

     13.13 Costs. If any Agreement-Related Litigation or other proceeding is brought including, without limitation for the enforcement or interpretation of any of the rights or provisions of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and all other costs and expenses incurred in that action or proceeding, in addition to any other relief to which it may be entitled.  ~~Notwithstanding anything to the contrary herein, if such Agreement-Related Litigation or other proceeding is initiated by Parent, Merger Sub or the Surviving Company, then Parent shall advance to Stockholder, on the day such Agreement-Related Litigation or other proceeding is commenced and on the same day of each calendar month thereafter until such litigation or proceeding is concluded, the sum of $50,000 (the "Advances").  If the Stockholder is the successful or prevailing party the Advances will be offset against amounts otherwise due and owing to the Stockholder hereunder.  If the Stockholder is the losing party, then the Stockholder will refund the Advances to the Parent without interest.~~

ENB-DOJ-036058

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

THE BISHOP GROUP, LTD.

By:_____

Name:_____

Title: President

~~Dennis M. Langley~~

_____

DENNIS M. LANGLEY

MIDCOAST ENERGY RESOURCES, INC.

By: _____

Name:_____

Title:_____

MIDCOAST ACQUISITION COMPANY

By: _____

Name:_____

Title:_____

34

ENB-DOJ-036059

Kansas

ENB-DOJ-036060



**ENERGY RESOURCES INC**

August 30, 1999

Vean Gregg
Chase Securities Inc.
Global Oil and Gas
600 Travis, 20th Floor - CTH 86
Houston, TX 77002

**DELIVERED VIA FAX (713) 216-8882**

Re:     Proposed Purchase of the Stock of the Bishop Group, Ltd ("Bishop"), the 100% Owner
        of Kansas Pipeline Company ("KPC").

Gentlemen:

This letter represents Midcoast Energy Resources, Inc.'s ("MRS") offer to acquire one hundred
percent (100%) of the stock of Bishop. Such offer contemplates the negotiation of a mutually
acceptable Agreement and Plan of Merger ("Agreement"), which among other things contains the
following terms and conditions:

    (i)      <u>Proposed Purchaser</u> - "MRS" or one of its wholly owned subsidiaries will be the
             sole participant in the transaction.

    (ii)    <u>Primary Offer Value</u> - the total value MRS is prepared to pay for 100% of the
             Bishop stock is one hundred eighty four million two hundred thousand dollars
             ($184,200,000) which includes the assumption of the balance sheet as outlined in
             your letter dated August 18, 1999 except the "Restricted Pipeline Royalties",
             which is attached hereto as Appendix I.

    (iii)   <u>Supplemental Offers</u> - In addition to the primary Offer , MRS will
             A.    Pay Dennis M. Langley ("DML") fifty percent (50%) of any increase in the
                   "KPC" Annual Cost of Service over thirty million seven hundred thousand
                   dollars ($30,700,000) that results from the upcoming FERC Rate Case or a
                   settlement of the KGS/Rate Dispute.
             B     Allow "DML" the opportunity to participate on a "Heads up" basis in up
                   to fifty percent (50%) of expansion project(s) to be specifically identified
                   in the Project Development Agreement involving the existing "KPC"
                   assets or Right-of-ways.        **MID 2.1-243**

GOVERNMENT
EXHIBIT
25
PENGAD-Bayonne, N. J.

ENB-DOJ-000886

      C.     Negotiate and enter into a "Project Development Agreement" with "DML".

(iv)    Consideration - the total consideration for this transaction in addition to the items mentioned above shall be one hundred fifteen million eight hundred ten thousand dollars ($115,810,000) in cash and/or a mutually agreed upon combination of cash and "MRS" Common Stock (which will be controlled by a mutually acceptable Voting Rights Agreement) deliverable at closing.  Again, this consideration will be adjusted in order to reconcile the actual September 30, 1999 balance sheet with the balance sheet that was attached to your August 18, 1999 letter.

(v)    Value for MarGasCo - the implicit value that "MRS" has allocated to MarGasCo is one million two hundred seventy five thousand dollars ($1,275,000)

(vi)    Approvals and Conditions to Close - a summary of the approvals and any other conditions to closing for this transaction are attached hereto as Appendix 2.

(vii)    Financing - the financing for this transaction will be provided through our syndicate banking relationship with Bank of America.  A copy of the Commitment Letter is attached hereto as Appendix 3.

(viii)    The Agreement - the terms upon which MRS is prepared to consummate this transaction are pursuant to the Agreement and Plan of Merger which is a redlined revision of the agreement that you transmitted to us on August 18, 1999, which is attached hereto as Appendix 4.

(ix)    Timing - it is estimated that MRS can close this transaction the later of September 30, 1999 or the receipt of HSR approval. The additional due diligence items which MRS wishes to conduct prior to executing the agreement and closing the transaction are listed in Appendix 5.

(x)    Other Contingencies - The additional contingencies and issues that need to be addressed prior to executing the agreement and closing the transaction are listed on the attached Appendix 6.

(xi)    Contacts - In the event that either DML, Bishop, or Chase has questions or comments regarding this offer, they should contact the undersigned

Sincerely,

MIDCOAST ENERGY RESOURCES, INC.

Dan C. Tutcher
President

DCT/prj

MID 2.1-244

ENB-DOJ-000887

**Appendix 1**

**Pro Forma Balance Sheet projected for September 30, 1999**

| Assets | ($ in Millions) |
|---|---|
| Utility Plant, Net | $61.64 |
| Other Assets, Net | 12.51 |
| Current Assets | |
| Cash Reserve for LTD | 10.00 |
| Accounts Receivable | 4.96 |
| Other Prepaid Expenses | 0.79 |
| Total Current Assets | 15.76 |
| **Total assets** | **89.90** |

**Capitalization and Liabilities**

| | |
|---|---|
| Partners capital | 13.37 |
| Long-Term Debt | 62.39 |
| Revolving Credit Facilities | 6 00 |
| Restricted Pipeline Royalties | 3.09 |
| Current Liabilities | |
| Accounts Payable | 2.20 |
| Accrued Interest | 1.50 |
| Accrued Property taxes | 0.42 |
| Other Accrued Liabilities | 0.94 |
| Total Current Liabilities | 5.06 |
| **Total Capitalization and Liabilities** | **89.90** |
| Unencumbered Working Capital at 9/30/99 | $ 0.70 |

**MID 2.1-245**

ENB-DOJ-000888

**Appendix 2**

Summary of Approvals and Conditions to Close                     Timing

I.      Midcoast Energy Resources, Inc. Board of Directors        3 days

II.     Hart Scott Rodino Act                                     30 days

III.    Financing                                                 30 days *from Verbal = Oct 1-15 ck*

IV.     Other Approvals? Contractual, Administrative and/or Regulatory    30 days

*Note holder Approval*
*Chg in control approval*

**MID 2.1-246**

ENB-DOJ-000889

**Appendix 3**

**Financing Commitment Letters**

MID 2.1-247

PAGE.02          713 657 8299                                                      SEP 17 '99 11:00

08/30/99  13:39 FAX 212 826 0010        FORTREND INTL. LLC                        ☒001

## FORTREND
### INTERNATIONAL LLC

## FACSIMILE TRANSMISSION SHEET

Please deliver the following pages to:

| NAME: | OF: | FACSIMILE NUMBER: | VOICE NUMBER: |
|---|---|---|---|
| Mr. Bruce Snyder | E&Y | 816-480-5555 | 816-480-5325 |
| CC-Tom Fernandz | | 713 657 8299 | |
| | | | |
| | | | |

FROM:   Craig J. Hoffman          VOICE NUMBER:   212-378-8880
DATE:    August 30, 1999          REGARDING·       Other E&Y and Info on
                                                   Fortrend

Total number of pages:   __3__   (Includes this page)

☒ Original Will Not Follow    Original Will Follow VIA:
                              ☐ Regular Mail    ☐ Overnight Delivery
                                                ☐ Messenger

### Comments:

Bruce, I enjoyed our conversation last week. Sorry this is a little late, I wanted to make sure I could get comments from others in my firm that are out of the country right now.

Al Fernandez with the Hawaii office.; Mike Evans in San Francisco; Jay Zuckerman and Harvey Bareneson in New York are all E&Y people that know us and have worked with us in the past.

I have also attached some info about Fortrend and I look forward to speaking with you again

Very truly yours,

Craig J. Hoffman

IF THIS TRANSMISSION IS NOT COMPLETE OR LEGIBLE, PLEASE CALL THE SENDER AT (212) 378-8880.

This message and the accompanying pages are intended only for the use of the party to whom it is addressed It may contain information which is privileged, confidential and exempt from disclosure under applicable law If the person receiving this communication is not the intended recipient, or an employee or agent responsible for delivery to the intended recipient, you are hereby notified that you may not read, copy, distribute, or in any manner desseminate the contents of this communication.

750 Lexington Avenue, 30th floor
New York, NY 10022
Telephone·  212.826.0770    Facsimile·  212.826 0077
New York  ·  Atlanta  ·  San Francisco  ·  Melbourne

**PWC 117**



GOVERNMENT
EXHIBIT
26

ENB-DOJ-010815

PAGE.03                713 657 8299                                      SEP 17 '99 11:09

09/30/99  13:40 FAX 212 828 0010        FORTREND INTL. LLC                    @002

## FIRM HISTORY:

Founded in 1986, Fortrend International is an investment bank that specializes in structuring and managing economic transactions that accomplish specific tax or accounting objectives. Fortrend has acted as principal or assisted as investment banker in mergers and acquisitions that have ranged in size from $5 million to in excess of $1 billion.

Fortrend has become a leading provider of unique planning techniques and has leveraged its knowledge of tax and GAAP matters to take advantage of many overlooked opportunities. Our creativity and innovation have added significant value to our client's transactions. In many cases our structures have permitted the completion of complex transactions which, without our involvement, were not economically feasible. These qualities have lead to the development of a solid reputation with our clients and their professional advisors.

## TRANSACTION MANAGEMENT

Fortrend was built on the philosophy that attention to details, creativity and ingenuity provide the ability to take advantage of hidden opportunities. Fortrend and its principals have been involved with several billion dollars of leading edge transactions and this experience has shaped our techniques and our transaction management skills. Fortrend's professionals have diverse professional expertise that provides the depth of knowledge and flexibility necessary to work seamlessly with our clients, bankers, attorneys and accountants.

Strong relationships with the some of the most creative and talented members of major law and accounting firms have been an integral part of our success. We feel that our network of outside counsel and advisors is among the best in providing solid, well-founded advice. Fortrend encourages the development of relationships with forward-thinking professionals to help maintain our success.

## TRANSACTIONS:

Working closely with its outside counsel, Fortrend has expertise with several strategies that are on the forefront of federal income tax and U.S. GAAP planning. Fortrend structures economic transactions to provide clients with optimal financial and accounting results. Mergers and acquisitions is a very complex area of law and GAAP reporting in which Fortrend has a proven track record for realizing value otherwise overlooked.

Fortrend has significant experience in many diverse situations and our techniques are applicable in most merger and acquisition scenarios. We are always interested in opportunities to meet with corporations or individuals involved with this discipline.

**PWC 118**

ENB-DOJ-010816

08/30/99  13:40 FAX 212 820 0010      FORTREND INTL. LLC                              ☒003

## FORTREND'S PRINCIPALS:

Fortrend's principals have over 30 years of combined experience managing leading edge transaction structuring. They combine unique skills into a cohesive but flexible management style that allows for creativity and innovation in transaction management. Their extensive network of professionals is a major asset to Fortrend and helps keep Fortrend abreast of the latest changes and news in the mergers and acquisitions arena.

### FREDERICK FORSTER

Principal – Co-Chairman

Since 1977, Mr. Forster has had responsibility for mergers and acquisition, disposition of assets and structuring of transactions for corporations and individuals. He has also managed investment programs for corporations and individuals in the equipment leasing, petroleum and real estate industries.   Prior to 1977, Mr. Forster, as a registered professional engineer, was responsible for the economic evaluation of major engineering and construction projects throughout the world.

### JEFFREY FURMAN

Principal – Co-Chairman

From 1985 to 1994, Mr. Furman was a Director of ICA International, an investment banking firm. Mr. Furman was President of Galin & Furman, a real estate company that specialized in developing residential properties. Mr. Furman currently serves as an officer of an equipment leasing company and is also president of a firm that raises equity and debt for start-up companies and real estate transactions.

**PWC 119**

ENB-DOJ-010817

ties have requested that such a conference not be scheduled before mid-September, 2001.

## [¶ 63,013]

### Summit Power NW LLC (Complainant) v. Portland General Electric Company (Respondent), Docket No. RP01-433-000

**Errata**

#### (Issued July 31, 2001)

**H. Peter Young, Settlement Judge.**

[Caution: Report of Settlement Judge to the Commission, issued July 30, 2001, appears at 96 FERC ¶ 63,016.]

*To the Commission:*

The undersigned settlement judge's July 30, 2001 Report to the Commission stated, *inter alia*, that the parties had filed nothing in the above-referenced docket as of July 30, 2001 at 10:00 a.m. That statement was based on information obtained through specific confirming queries to the Office of the Secretary and to Dockets, as well as from the Commission's CIPS and RIMS electronic posting systems.[1] The information was incorrect. The parties filed a Motion for Extension of Time at 4:55 p.m. on July 27, 2001.

## [¶ 63,014]

### Kansas Pipeline Company, Docket No. RP99-485-000

**Initial Decision**

#### (Issued July 31, 2001)

**Judith A. Dowd, Presiding Administrative Law Judge.**

*Appearances*

*Stanley A. Berman, Esq., Michael A. Stosser, Esq., Jane E. Stelck, Esq., Tino Monaldo, Esq., Mireys A.R. Llaurado, Esq.,* on behalf of Kansas Pipeline Company

*Elisabeth R. Myers-Kerbal, Esq., Curtis D. Blanc, Esq., Robert J. Woody, Esq., Richard G. Morgan, Esq., John McNish, Esq., W. Thomas Stratton, Esq.,* on behalf of Kansas Corporation Commission

*James F. Moriarty, Esq., Dennis K. Morgan, Esq.,* on behalf of Missouri Gas Energy

*Kelly A. Daly, Esq., David D'Alessandro, Esq., Thomas R. Schwarz, Jr., Esq.,* on behalf of Missouri Public Service Commission

*Gary W. Boyle, Esq.,* on behalf of Williams Gas Pipeline Central

*Carolyn Y. Thompson, Esq.,* on behalf of Transok, LLC

*Herbert J. Martin, Esq., Dana C. Contratto, Esq., John P. De Coursey, Esq.,* on behalf of Kansas Gas Service Company

*Lorna J. Hadlock, Esq., Marcia C. Hooks, Esq.,* on behalf of the Federal Energy Regulatory Commission

---

[1] As of 5:30 p.m. on July 30, 2001, CIPS and RIMS still failed to reflect any recent activity in this docket apart from my July 2001 Report to the Commission.



GOVERNMENT
EXHIBIT

**G-32**

**ENB 008942**

generally are in agreement with a 5-year period.

I. *What is the Appropriate Level for Butcher Interest Expenses?*

### KPC

KPC contends that it has a continuing obligation to pay the owners of the Restated and Amended Butcher Agreement a royalty payment equal to 1.5% of its gross receipts, less the cost of gas. According to KPC, the Butcher interest obligation amounts to $482,743 annually.[727] KPC explains that the Butcher Agreement was a financial arrangement that was entered into between Kansas Gas Transmission Company and Butcher Industries, Inc., which provided financing that enabled KPC's former owner, Dennis Langley, to secure the funds necessary to acquire a 25% interest in KPC. KPC acknowledges that no payments were made to the Butcher Interest holder during the 10-year period of time in which the Synergy loan was in place. KPC states that as a condition of the loan, the payments were accumulated on the books, but not disbursed.[728] KPC argues that notwithstanding the interest hiatus, the Butcher payment is a binding obligation on KPC. KPC states that the obligation has now been transferred to the new owners and it continues to be a legally binding obligation that must be paid.[729]

### MoPSC

MoPSC contends that the Butcher Interest expense should be rejected because: (1) the loan was paid off long ago; (2) the loan has been and is held by KPC equity holders; and (3) the loan arrangement provides no current benefit to customers.[730]

MoPSC gave the following account of the history of the Butcher Interest: MoPSC states that the Butcher Interest originated in August 1988, when Butcher Resources, Inc., an investment banking firm, gave a 1-year loan in the amount of $1.25 million to Bishop, which used the money to purchase Kansas Pipeline Company, L.P. MoPSC further states that in addition to its obligation to repay the loan, Bishop provided Butcher with a "royalty payment" (known as the original Butcher Interest) con-

sisting of 1.5% of the pipeline's adjusted gross pipeline proceeds.[731] According to MoPSC, Section 1.5 of the Butcher Loan Agreement obligates the owner of KPC to pay 1.5% of the Company's adjusted gross pipeline proceeds every year, in perpetuity. MoPSC states that in 1989, the original Butcher Loan was paid off, the Butcher Interest entitlement, (now called the Old Butcher Carried Interest) was carried forward and "created" a new contract. In April 1990, Bishop purchased that Butcher Interest for 4,209 shares of common stock of the Bishop Group, Ltd. At the same time, a "Restated and Amended Butcher Agreement" was created, converting the Old Butcher Carried Interest into the New Butcher Interest. Because KPC has no gas costs, 1.5% of its gross receipts is roughly equal to 1.5% of its cost-of-service.[732] In connection with Midcoast's purchase of KPC, the Butcher Interest changed hands again.[733] The Butcher Interest was acquired by Mid Louisiana Gas Company, a Midcoast affiliate and another unaffiliated company, for a total purchase price of $6,500,000.[734]

Based on the foregoing statement of facts, MoPSC argues that the loan with which the Butcher Interest was originally associated, was paid off in 1989. MoPSC further argues that even if the Butcher Interest were viewed as consideration in exchange for debt capital, an annual payment of $482,743 represents a 39% annual return on the $1.25 million original loan amount, and is usurious. In addition, MoPSC argues that since 1990, the Butcher Interest has been held, in whole or in part, by equity owners of KPC. MoPSC concludes that the mere fact that KPC has bound itself to make a payment does not mean that the Company may recover the cost from customers, absent some showing of how customers benefit. MoPSC asserts the KPC has not offered any explanation as to how these costs benefit current ratepayers, and the Butcher Interest should be excluded.

### MGE

MGE agrees that the Butcher expense is not now (and has not been for ten years) a current cost to KPC of providing service.[735] MGE states that the original $1.25 million Butcher

---

[727] KPC Initial Br. at p. 80; Ex. KPC-68 at Schedule H-2(2XI); Ex. KPC-32 at 27.

[728] KPC Initial Br. at pp. 80-81; Ex. KPC-32 at 28.

[729] KPC Initial Br. at p. 81; Ex. KPC-32 at 29.

[730] MoPSC Initial Br. at p. 88.

[731] MoPSC Initial Br. at p. 89; Ex. PSC-37 at 24-25; Ex. PSC-53 Ex. MGE-1 at 35-39; Ex. S-30 at 13-14.

[732] MoPSC Initial Br. at p. 89; Tr. 619.

[733] MoPSC Initial Br. at p. 89; Ex. KPC-32 at 28-29; Ex. PSC-99; Tr. 628-630.

[734] MoPSC Initial Br. at pp. 89-90; Ex. PSC-99; Tr. 628-630.

[735] MGE Initial Br. at p. 7; Ex. MGE-1 at 35.

**¶ 63,014**    Federal Energy Guidelines

ENB 008943

loan was paid off in 1989.[736] MGE argues that the Butcher payments have been made to current or prior equity owners of the regulated pipeline entities that are now KPC. MGE asserts that KPC acknowledged at the hearing that a portion of the payment KPC makes, goes back to a subsidiary of Midcoast.[737]

### KGS

KGS states that for the reasons set forth in the testimony of Staff Witness Bailey and MGE Witness Doering, it agrees the Butcher Interest payments should be excluded entirely from KPC's cost of service.[738]

### KCC

KCC strongly opposes the inclusion of the Butcher Interest payment expenses. KCC states that the payments provide no benefit to ratepayers and are merely an inter-corporate transfer of funds which KPC seeks to recover from ratepayers.[739] KCC argues that KPC witness Whittington could not testify the Butcher Interest payments provide any benefit to ratepayers now.[740] KCC alleges that although the Butcher Interest payment costs were fixed at the time the Butcher Interest was acquired, the Butcher Interest payments go on for eternity.[741] KPC points out that the revenues from the payments continue to come in and the cost to the Company has not increased, and the debt should have been more than recovered. KCC also cites KPC witness Whittington's testimony that "at the end of the day, a portion of the payments KPC makes pursuant to the Butcher Interest goes back to a subsidiary of Midcoast."[742]

### Staff

Staff emphasizes that in addition to requiring repayment of the original loan, the Butcher loan agreement requires the annual payment of 1.5% of the adjusted gross proceeds of KPC to the owner of the Butcher Agreement, in perpetuity. Staff states that the original loan was paid off in 1989 and subsequently, Mr. Langley, the then sole owner of KPC, acquired ownership of the Butcher Agreement. Staff makes the point that KPC Witness Whittington testified no payments have been made under the Butcher Agreement for the past ten years "because of certain restrictions with respect to the Syenergy loan agreement."[743] Staff's position is that the question of pay-

ments is irrelevant because Mr. Langley was the sole owner of the rights to the income stream generated by the Butcher Agreement. Staff asserts that although there may have been various corporate entities involved in the transaction, the fact remains that Mr. Langley was, in effect, paying himself.

Staff argues that the original loan relating to the Butcher Agreement was retired over 10 years ago, long before KPC was regulated by FERC, and that payment of the expense provides absolutely no benefit to the ratepayer. Staff maintains that allowing the Butcher Interest payments to be included in rates would encourage other pipelines to enter into similar agreements, which benefit pipeline affiliates, but provide no benefit to the ratepayers. According to Staff, KPC is in effect, seeking to pay itself a portion of the Butcher Interest and then recover the payments from its ratepayers. In Staff's view, transactions such as this are highly inappropriate and should not be permitted as a matter of public policy.

### Decision

I agree with Staff and the Intervenors that none of the so-called Butcher Interest payments can be included in KPC's rates. The continuing payments of $482,743 per year that KPC seeks to recover in rates are owed in perpetuity to the holders of the Butcher Interest, one of whom is a Midcoast affiliate. As Staff and Intervenors vigorously argue, current ratepayers derive no benefit from these payments. Moreover, KPC failed to offer any substantial evidence to disprove Staff's and the Intervenors' assertion that the original loan amount was paid off in 1989.

The continuing Butcher Interest payments are clearly not a result of arms-length negotiations because the payments are owed in perpetuity, which amounts to flagrant usury. KPC's only justification for including the Butcher Interest payments is that it owes the money, even though KPC acknowledges that no payments have been made under the Butcher Agreement for the past ten years. KPC has failed to justify including the Butcher Interest payments in rates and I find that the entire amount of these payments should be excluded.

J. *What is the Appropriate level for Account Nos. 930.1 and 930.2 and 931?*

---

[736] MGE-1 at 38; MGE-10.

[737] Tr. 652.

[738] KGS Initial Br. at p. 69; Ex. S-30 at 13-17; Ex. S-32; MGE-1 at 34-42; MGE-4, MGE-8, and MGE-10.

[739] KCC Initial Br. at p. 26.

[740] KCC Initial Br. at p. 27; Tr. 651-652.

[741] KCC Initial Br.at p. 27; Tr. 653, lines 7-11.

[742] KCC Initial Br at p. 27; Tr. 652, lines 21-24.

[743] Staff Initial Br. at p. 86, quoting from Ex. KPC-32 at 28, lines 18-22.

¶ **63,014**

ENB 008944

Sep. 10 1999  5:22PM   BRYAN CAVE                    No. 4236   P. 1/7

# BRYAN CAVE LLP

ST. LOUIS, MISSOURI
WASHINGTON, D.C.
NEW YORK, NEW YORK
JEFFERSON CITY, MISSOURI
OVERLAND PARK, KANSAS
PHOENIX, ARIZONA
SANTA MONICA, CALIFORNIA
IRVINE, CALIFORNIA

3500 One Kansas City Place
1200 Main Street
Kansas City, Missouri 64105-2100
(816) 374-3200
Facsimile: (816) 374-3300

LONDON, ENGLAND
RIYADH, SAUDI ARABIA
KUWAIT CITY, KUWAIT
ABU DHABI, UNITED ARAB EMIRATES
DUBAI, UNITED ARAB EMIRATES
HONG KONG
ASSOCIATED OFFICE IN SHANGHAI

## Facsimile Delivery Instructions

This facsimile contains information which (a) may be LEGALLY PRIVILEGED, PROPRIETARY IN
NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE and (b) is intended only for the
use of the Addressee(s) named below. If you are not the Addressee, or the person responsible for
delivering this to the Addressee(s), you are hereby notified that reading, copying or distributing this
facsimile is prohibited. If you have received this facsimile in error, please telephone us immediately and
mail the facsimile back to us at the above address. Thank You.

FROM:  James P. Pryde, Esq.                     DATE:   9/10/1999
MATTER NO:  10 9 9 5 4                DIRECT DIAL:  (816) 374-3205

**MESSAGE FROM SENDER**   TOTAL NO. OF PAGES:  (including this page) 3

See attached.

PLEASE DELIVER TO THE FOLLOWING.

TO:   Tom Palmisano                 FAX NO:   (713) 657-8299
COMPANY:                             PHONE NO:

TO:   Craig Hoffman                 FAX NO:   (212) 208-4697
COMPANY:                             PHONE NO:

**TO SENDER:**
Do you wish to have your copy returned?                    ☒ Yes   ☐ No
Do you wish to be contacted when Fax is Sent?              ☐ Yes   ☒ No
Do you wish to have the confirmation sheet sent to you?    ☐ Yes   ☒ No
Do you wish to be contacted at your home/office if fax CANNOT be
sent within one hour?         Phone No:                    ☒ Yes   ☐ No

---

If you do not receive all material, please call (816) 374-3344, or (816) 374-3205



PWC 110

ENB-DOJ-010808

## MUTUAL CONFIDENTIALITY AGREEMENT

AGREEMENT made as of the ___th day of _____, 1999 between The Bishop Group, Ltd. ("Company") and **Fortrend International, L.L.C.** ("**Fortrend**").

WHEREAS, **Fortrend** is in the business of developing, owning and operating interstate and/or intrastate natural gas transmission lines, the sale and/or transportation of natural gas and other energy related projects;

WHEREAS, Company is in the business of developing, owning and operating interstate and/or intrastate natural gas transmission lines, the sale and/or transportation of natural gas and other energy related projects;

WHEREAS, Company is the ultimate corporate owner of 100% of the general partnership interests in Kansas Pipeline Company, a Kansas general partnership (the "Pipeline");

WHEREAS, **Fortrend** and Company may have provided and may in the future provide each other with certain information for the purpose of discussing the possible merger and/or consolidation of the Company and **Fortrend** and/or the sale and/or acquisition of certain assets or stock of the Company by **Fortrend** (hereafter collectively referred to as the "Purpose"); and

WHEREAS, Company and **Fortrend** desire to establish certain conditions with respect to information disclosed to each other;

NOW THEREFORE, the parties, intending to be legally bound hereby, do agree as follows:

1.    **Restricted Information.**    The term "Restricted Information" shall include all information that is not known by or available to the public and that concerns the business or affairs of Company or **Fortrend**, including existing Company or **Fortrend** projects and those in development; the identity of Company's and **Fortend's** business partners or prospective business partners; the terms, conditions, and prices or the proposed terms, conditions and prices of any contract between **Fortrend** and Company, the financial records of **Fortrend** and/or the Company; and any other information identified by **Fortrend** or Company as confidential. Company and **Fortrend** each acknowledge and agree that in the course of, or incident to, the Purpose, **Fortrend** and Company may provide to each other or Company and **Fortrend** each may otherwise become exposed to the Restricted Information and that Company's and **Fortrend's** access to the Restricted Information is necessary to enable Company and **Fortrend** to perform the Purpose. Company and **Fortrend** each agree that any Restricted Information disclosed to it by the other party in 1999, but prior to the execution date of this Agreement shall be subject to this Agreement  The party disclosing Restricted Information hereunder makes no warranty, express or implied, regarding the accuracy, completeness or usefulness of the Restricted Information furnished hereunder and the receiving party shall use the Restricted

**PWC 111**

ENB-DOJ-010809

Information at its own risk and discretion. At the request of Company, **Fortrend** will promptly deliver to Company all such Restricted Information (including all copies thereof made by **Fortrend**) and **Fortrend** will certify, in writing, to Company that **Fortrend** has so complied. At all times while **Fortrend** holds any such Restricted Information, **Fortrend** will do so in a fiduciary relationship with Company.

2.    **Non-Disclosure.**    Company and **Fortrend** each agree that at all times: (a) it will protect the Restricted Information from disclosure to persons not authorized herein by exercising at least the same care with respect thereto as it exercises with respect to its own confidential information of like kind, except if disclosure is required pursuant to a subpoena or court order (in which event the party receiving such subpoena or order shall promptly give the other party written notice), however, the party subject to such subpoena or court order will provide all the other parties a reasonable opportunity to seek a protective order or other remedy to prohibit or limit disclosure of Restricted Information and shall offer all reasonable cooperation for any such efforts to prohibit or limit the disclosure of any such Restricted Information; (b) it will restrict dissemination of the Restricted Information within its organization and the organizations of its subsidiaries and affiliates to those persons who have a need to know such information in performing the Purpose; and (c) it will not employ the Restricted Information for any purpose other than the Purpose. The foregoing shall not prohibit or limit Company's or **Fortend's** use of information (including, but not limited to, ideas, concepts, know-how, techniques and methodologies) which. (a) was previously known to it; (b) was independently developed by it; (c) was rightfully acquired by it from a third party without continuing restriction on use of which it is aware; or (d) is or becomes part of the public domain through no breach by Company or **Fortrend** of this Agreement.    **Fortrend** recognizes that certain Restricted Information of the Company that will be disclosed pursuant to this Agreement is highly competitively-sensitive, and **Fortrend** agrees, therefore, that any use of such information by **Fortrend** to interfere with or participate in current or potential business relationships of the Company is strictly prohibited.

3.    **No Transaction Obligated.** This Agreement shall in no way be deemed to require the disclosure by either party of any Restricted Information, which shall solely be at the discretion of the disclosing party, or to require either party to proceed with any proposed transaction which is disclosed herein

4.    **Restricted Dissemination.**    The parties agree to restrict the dissemination of Restricted Information within its organization and/or that of their respective affiliates and those persons having a need to know such information in the performance of duties related to this Agreement. Company and **Fortrend** each agree to take such actions as are necessary, including appropriate agreements with or instructions to its subsidiaries, affiliates, officers, directors and employees, to enable it to perform its obligations hereunder  At the other party's request, **Fortrend** or Company will cause any of its or its subsidiaries' or affiliates' officers, directors or employees participating in a project to acknowledge in writing their obligations hereunder; however, failure of either party to so request shall not affect the other party's obligations hereunder. In the event either party shall have the knowledge of any breach of the confidentiality of or misrepresentation

449206 01                                                      2

**PWC 112**

ENB-DOJ-010810

of any Restricted Information, the party with said knowledge will promptly notify the other.

5.   **No Intervention.**     The parties recognize that, in any matter before the Federal Energy Regulatory Commission, there is a high risk of unauthorized use of certain Restricted Information disclosed to **Fortrend** pursuant to this Agreement.   As additional material consideration, **Fortrend** represents and warrants that it shall not ever, at any time, intervene for any reason in any matter, which was either pending as of the date first written above or was filed by the Company or the Pipeline before the Federal Energy Regulatory Commission from and after the date first written above through the three-year period thereafter, including, but not limited to, any rate cases of Company and/or Pipeline.

6.   **Assignment.**   This Agreement may not be assigned by either party hereto without the prior written consent of the other party, which consent may be withheld for any reason or no reason at all. Any assignment or delegation of any portion of this Agreement consented to in writing by the non-assigning party, shall only become effective upon Notice of such assignment to the other party being consented to by the non-assigning party.

7.   **No Other Changes.**   Other than the changes, modifications or amendments described herein, there are no other changes to the Agreements, which remain in effect according to the terms thereunder.

8.   **Notices.**  All notices and other correspondence required or made necessary by the terms of this Agreement shall be delivered to the respective parties hereto by registered mail, return receipt requested at the following addresses:

|  |  |
|---|---|
| COMPANY: | The Bishop Group, Ltd.<br>8325 Lenexa Drive, Suite 400<br>Lenexa, KS 66214<br>Telephone: 913-888-7139<br>Fax  913-599-5645 |
| FORTREND: | Fortrend International, L.L.C.<br><br><br>Telephone<br>Fax: |

or to such other addresses as either party hereto may unilaterally designate in writing to the other. Duplicate notices may also be given by any of the following forms:  telegram, telex, telecopy and/or personal delivery.  A notice shall be deemed received when the first form of notice or duplicate notice is actually received by the party to whom it is addressed.

449206 01                                3

**PWC 113**

ENB-DOI-010811

9.   **Waiver.** Each party reserves the right to waive, in whole or in part, any provision hereof which is for the benefit of that party, and such waiver shall not be construed as creating a course of conduct which prevents it from refusing to waive other provisions and/or the same provision thereafter. Any party's failure or delay in protesting, or contending breach pursuant to Section 10 or taking legal and/or equitable action is no waiver of that cause of action, unless that party's delay to take action exceeds a reasonable time under the circumstances, exceeds a time frame limitation set forth elsewhere herein or exceeds the statute of limitations. Any party's failure or delay in protesting, or contending breach pursuant to Section 10 or taking legal and/or equitable action upon the other party's breach is not to be considered as being a waiver of that party's cause of action for any subsequent breach of the same or of a different nature.

10.   **Breach, Notice and Cure.** In the event that either party believes the other party is in breach of the terms hereof for any reason(s), it shall provide written notice of such purported breach(s) describing such breach(s) with particularity (in fact and in legal impact) and the purported breaching party shall be granted ten (10) days from its actual receipt of such notice to cure said breach(s) if it concurs that the acts or omissions described in the notice(s) constitute breach(s), or it may elect to provide a cure to the complaining party's contended breach(s) even if the purported breaching party is of the belief that the acts or omissions described in the notice(s) do not constitute a breach(s) hereof, and if so cured by the purported breaching party to the reasonable satisfaction of the complaining party, the breach(s) shall be deemed to have never occurred  In the event the parties cannot agree as to whether the acts or omissions described in the notice(s) constitute a breach(s) of the terms hereof, and the purported breaching party does not elect to cure the alleged breaches to the reasonable satisfaction of the complaining party, then the parties may elect to resolve the same by any legal remedies available. All reasonable costs of court proceedings shall be borne by the losing party in litigation. The losing party shall be the party designated as such by the Court. In the event both parties prevail on certain issues and lose on others, the costs shall be apportioned between the parties in any manner the Court orders. Such costs shall include, but are not limited to, the following:

Court costs;

Legal expenses of both parties during the course of and in preparation for the court proceedings;

Travel and out-of-pocket expenditures of either party in preparation for the court proceedings;

Accounting, professional and/or expert witness fees actually expended by either party in preparation for or during the course of court proceedings, etc.

In the event there is any dispute regarding what constitutes such an expense or cost or the reasonableness of a particular item of expense submitted, the Court shall resolve the same

11.   **Termination of Agreement** Either party to this Agreement may terminate the

449206 01                                                4

**PWC 114**

ENB-DOJ-010812

Agreement upon thirty (30) days written notice to the other at the addresses provided below or at such other address as may be substituted in writing. The provisions of this Agreement shall survive the termination of this Agreement with regard to any Restricted Information disclosed prior to the date of termination.

12.  **Miscellaneous.**    It is understood that the covenants of this Agreement and the Restricted Information disclosed hereunder are special, unique and of an extraordinary character, and that disclosure of any such Restricted Information will cause irreparable harm to the party whose Restricted Information has been disclosed; and the use of the Restricted Information for the business purposes of any party other than the owner of the Restricted Information would enable such party to compete unfairly with said other party. The parties agree that monetary damages are an insufficient remedy for any actual or anticipatory breach of this Agreement, and that injunctive relief is an appropriate remedy to prevent the unwarranted disclosure of any Restricted Information. In addition, a party hereunder shall be entitled to any remedy to which it may be entitled by law, including, but not limited to, injunctive relief, specific performance and damages. The parties hereto agree to indemnify and hold the other harmless from any breach of this Agreement, including the non-breaching party's reasonable attorney's fees and costs incurred in enforcing the agreement.

13.  **Agreement Governed by the Laws of Kansas.** This Agreement and the obligations of the parties hereunder, shall be interpreted, construed, and enforced in accordance with the laws, and not the laws pertaining to choice or conflict of laws, of the state of Kansas.

14   **Amendments.** Except as otherwise provided for herein, any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and mutually executed amendments. It is stipulated that oral modifications and amendments hereto or other parole evidence shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or other adjudication.

15.  **Agreement Subject to Laws.** If any provision of this Agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any law, rule, regulation or order, the latter shall control and this Agreement shall be deemed modified accordingly, but in other respects the Agreement shall continue in full force and effect, subject to the modifications necessary to preserve the intent and considerations due the parties as set forth in this Agreement.

16.  **Titles of Articles, Sections and Subsections.** The title and subtitles of articles, paragraphs and subparagraphs of this Agreement are for convenience only, are not part of the terms of this Agreement, are without legal or contractual significance, and as such shall not govern the terms of or in any way influence the interpretations of this Agreement.

17.  **Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be in an original, but all of which shall be deemed to constitute one instrument. This

445206 01                                        5

**PWC 115**

ENB-DOJ-010813

Agreement or any document executed in connection herewith shall be binding upon such signator party, if said signature is delivered by telecopier or other like transmission.

18.   **Further Assurances.**   The parties hereby agree to execute, acknowledge and deliver to each other any further writings, documents, transfers, acknowledgments, instruments, powers of attorney, authorizations, filings, applications, reports, etc. that may be reasonably required to give full force and effect to the provisions of this Agreement, and to take such further actions reasonably required in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

19.   **Independent Legal Counsel.**   The law firm of Tino M. Monaldo, Chartered has represented Company exclusively in the negotiation, drafting and execution of this Agreement. FORTREND has been represented by its own independent legal counsel or has had the opportunity for said independent counsel and has waived that opportunity.

IN WITNESS WHEREOF, the undersigned, with full authority of their respective parties to bind them, have executed this Agreement as of the date first above written.

Executed on behalf of **COMPANY**           Executed on behalf of **FORTREND INTERNATIONAL, L.L.C.**

**The Bishop Group, Ltd.**
8325 Lenexa Drive, Suite 400              _____
Lenexa, KS 66214
                                          _____


By: _____              By: _____
    Dennis M. Langley,                        Name:
    President                                 Title:

449206.01                                   6

**PWC 116**

ENB-DOJ-010814

September ___, 1999

**DRAFT**

Mr. Dennis Langley
335 North Washington, Suite 130
Hutchinson, KS 67501

Re:    Letter of Intent

Dear Sir:

This letter sets forth the intentions of the parties concerning a proposed transaction whereby Fortrend International, LLC ("Buyer") would purchase (the "Transaction") all of the stock (the "Stock") of The Bishop Group, Ltd., a Kansas corporation (the "Company") from Dennis Langley ("Seller"), all as may be mutually agreed upon by the parties under a definitive agreement covering the Transaction

By executing this letter, Buyer and Seller confirm their intentions specified herein with respect to the Transaction, but, except for the provisions of paragraph 4 hereof which is intended to be legally binding and enforceable and which shall survive the termination of this letter of intent, this letter is not intended to constitute a contract nor an offer to enter into a contract, nor to be binding upon either of the parties or create any legal obligations or rights.

This letter of intent supersedes and replaces all prior offers and negotiations between the Buyer and Seller. It is the intention of Buyer and Seller to proceed with the proposed Transaction as follows:

1.      Seller shall sell the Stock to Buyer for a purchase price (cash and/or stock) equal to approximately $175 Million, less certain debt of the Company and its Subsidiaries to remain in place. Prior to the consummation of the Transaction, certain assets of the Company and Company's subsidiaries and affiliates (which assets are not necessary to Company's core pipeline business) shall be distributed to Seller in a partial redemption of Seller's shares in the Company. In addition, certain consulting agreement(s) may be negotiated and executed, if mutually agreed upon, between the Seller and/or his affiliates and the Company and/or Company's affiliates.

2.      The purchase price will be paid at Closing, with a post-Closing true up of certain items of debt, payables and receivables as of Closing.

3.      The consummation of the Transaction shall be contingent, among other things, on the negotiation, execution and delivery of the definitive agreements and on the completion by Buyer and Seller of a satisfactory review of the financial and legal aspects of the business, properties, assets and liabilities of the Company (in the case of Buyer) and Buyer (in the case of Seller) and of this Transaction (the "Businessman's Audits"). In connection with the Businessman's Audits, Seller and Buyer each agree to provide the other full access and

**PWC 108**



GOVERNMENT
EXHIBIT
36
PENGAD-Bayonne, N.J.

ENB-DOJ-000891

opportunity to examine the books, records, contracts, and other documentation relating to the assets and properties of the Company and Buyer, as appropriate.

4.      Neither party will make any public disclosure or publicity release pertaining to the existence of this letter of intent or of the subject matter contained herein without having first obtained the written consent of the other party.

5.      As soon as possible hereafter, Buyer and Seller shall commence in good faith the preparation and negotiation of the definitive agreements governing the Transaction described in this letter which will contain the detailed terms and conditions of the Transaction as well as such representations and warranties, covenants, conditions precedent, indemnities and other provisions as may be mutually agreed upon by the parties. Seller and Buyer shall promptly file the necessary documentation and applications for approval under the federal Hart Scott Rodino Act, with Buyer paying all such filing fees.

        If the above correctly sets forth your understanding of our intentions with respect to the Transaction, please so indicate by executing the enclosed copy of this letter in the space provided below and returning it to the undersigned not later than 5:00 p.m. on September __, 1999. After this time, this letter, if not executed and returned, shall cease to be of any force or effect. Either party may terminate this agreement at any time prior to the execution of the definitive agreements without liability.

                                        Very truly yours,

                                        FORTREND INTERNATIONAL, LLC


                                By:     _____

                                        Title: _____


ACCEPTED AND APPROVED this
__ day of September, 1999



_____
Dennis M. Langley



449063 01                                2

**PWC 109**

ENB-DOJ-000892

 **Thomas J Palmisano**
01/27/2003 08:50 PM

To: Lita Kyle/US/TLS/PwC@Americas-US
cc:
Subject: Print out this email and all attachements.

—— Forwarded by Thomas J Palmisano/US/TLS/PwC on 01/27/2003 08:50 PM ——

 **Becky Davis**
<bdavis@bryancavellp.com>
09/12/1999 04:45 PM

To: Thomas J Palmisano/TAX/Houston TX/C&L/US@Americas-US
cc:
Subject: Stock Purchase Agreement

- 9g9%RED.DOC

**GOVERNMENT EXHIBIT**
31

PERGAD-Bayonne, N. J

PWC 001

ENB-DOJ-010699

This redlined draft, generated by CompareRite (TM) - The Instant Redliner, shows the differences between -
original document   : C:\DMS\JPP\AGT\9G9%09!.DOC
and revised document: C:\DMS\JPP\AGT\9G9%10! DOC

CompareRite found  392 change(s) in the text

Deletions appear as Overstrike text surrounded by {}
Additions appear as Bold text surrounded by []

## {AGREEMENT AND PLAN OF MERGER }[STOCK PURCHASE AGREEMENT]

### {By and Among} [By and Between]

{Midcoast Energy Resources, Inc.,

Midcoast Acquisition Company,

The Bishop Group, Ltd.} [FORTREND INTERNATIONAL, LLC]

and

Dennis M. Langley

[September ___], 1999

**PWC 002**

ENB-DOJ-010700

DRAFT SEPTEMBER 10, 1999

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ................................................................................................1
    1 1  Defined Terms.. .........................................................................................1
    1 2  Additional Terms.  ......................................................................................6

ARTICLE II  ~~[TERMS OF THE MERGER 6~~
        ~~2.1 The Merger 6~~
        ~~2.2 Effective Time 7~~
        ~~2.3 Closing 7~~
        ~~ARTICLE III CERTIFICATE OF INCORPORATION AND BYLAWS OF THE SURVIVING COMPANY 7~~
        ~~3.1 Certificate of Incorporation 7~~
        ~~3.2 The Bylaws 7~~
        ~~ARTICLE IV DIRECTORS AND OFFICERS OF THE SURVIVING COMPANY 7~~
        ~~4.1 Directors 7~~
        ~~4.2 Officers 7~~
        ~~ARTICLE V MERGER CONSIDERATION; CONVERSION OR CANCELLATION OF COMPANY SHARES IN THE MERGER 8~~
        ~~5.1 Merger Consideration 8~~
        ~~5.2 Cancellation of Company Shares 10~~
        ~~5.3 Payment for Company Shares in the Merger 11~~
        ~~5.4]~~ [PURCHASE AND SALE ...........................................................................6
    2.1  Purchase and Sale................................................................................6
    2.2  Closing ................................................................................................6

ARTICLE III [Intentionally Deleted] .........................................................................6

ARTICLE IV [Intentionally Deleted] .........................................................................6

ARTICLE V ADJUSTMENT TO PURCHASE PRICE................................................7
    5.1  Adjustments ........................................................................................7
    5.2  Make Whole Amounts .........................................................................9
    5.3]  Distribution of Assets .......................................................~~[11]~~ [9]

**PWC 003**

ENB-DOJ-010701

**DRAFT SEPTEMBER 10, 1999**

ARTICLE VI REPRESENTATIONS AND WARRANTIES REGARDING THE
    COMPANY ........................................................................................... ~~[11]~~ [9]
6.1   Company Shares.................................................................................. ~~[11]~~ [9]
6.2   Capitalization...................................................................................... ~~[11]~~ [10]
6.3   Corporate Organization, Qualification and Power ............................. ~~[12]~~ [10]
6.4   Authorization of Agreement and ~~[Merger 12]~~ [Transaction ................... 10]
6.5   Enforceable Agreement....................................................................... ~~[12]~~ [10]
6.6   No Conflicts, Violations, Breaches or Defaults . ............................... ~~[12]~~ [11]
6.7   Financial Statements ........................................................................... ~~[13]~~ [11]
6.8   Litigation ............................................................................................ ~~[13]~~ [12]
6.9   Taxes ................................................................................................... ~~[14]~~ [12]
6.10  Environmental Laws and Regulations ................................................ ~~[14]~~ [12]
6.11  Compliance with Applicable Laws...................................................... ~~[14]~~ [12]
6.12  Title to Properties ............................................................................... ~~[14]~~ [12]
6.13  Employee Benefit Matters................................................................... ~~[15]~~ [13]
6.14  Broker's Fees ...................................................................................... ~~[15]~~ [13]
6.15  Absence of Certain Changes or Events................................................ ~~[15]~~ [13]
6.16  Labor Matters ..................................................................................... ~~[16]~~ [14]
6.17  Year 2000 Compatibility...................................................................... ~~[16]~~ [14]
6.18  Gas Contracts ...................................................................................... ~~[16]~~ [14]
6.19  No Defaults........................................................................................... ~~[16]~~ [14]
6.20  Insurance ............................................................................................. ~~[16]~~ [15]
6.21  Tariffs ................................................................................................. ~~[17]~~ [15]

ARTICLE VII REPRESENTATIONS AND WARRANTIES OF ~~[PARENT AND MERGER SUB 17]~~ [BUYER................................................................. 15]
7.1   Capitalization........................................................................................ ~~[17]~~ [15]
7.2   Corporate Organization, Qualification and Power ............................. ~~[17]~~ [16]
7.3   Authorization of Agreement and ~~[Merger 18]~~ [Transaction ................... 16]
7.4   Enforceable Agreement........................................................................ ~~[18]~~ [16]
7.5   No Conflicts, Violations, Breaches or Defaults. ................................. ~~[18]~~ [16]
7.6   ~~[Parent]~~ [Buyer] SEC Reports. ......................................................... ~~[19]~~ [17]
7.7   Financial Statements; Accounting Matters. ....................................... ~~[19]~~ [17]
7.8   S-__ Registration Statement ............................................................... ~~[19]~~ [17]
7.9   Litigation .............................................................................................. ~~[20]~~ [18]
7.10  Taxes.................................................................................................... ~~[20]~~ [18]
7.11  Environmental Laws and Regulations ................................................ ~~[20]~~ [18]
7.12  Compliance with Applicable Laws ...................................................... ~~[20]~~ [18]
7.13  Broker's Fees ...................................................................................... ~~[20]~~ [18]
~~[7.14 Interim Operations of Merger Sub 20]~~
    ~~7.15]~~ [7.14 ]Authorization for ~~[Parent]~~ [Buyer] Common Stock........... ~~[20]~~ [18]

ARTICLE VIII CONDUCT PENDING THE CLOSING AND COVENANTS .............. ~~[21]~~ [19]
8.1   Conduct of Business by Company and ~~[Parent 21]~~ [Buyer............................. 19]
~~[8.2 Conduct of Business of Merger Sub 22]~~
    ~~8.3]~~ [8.2]  Additional Covenants of the Company ..................................... ~~[22]~~ [20]
~~[8.4]~~ [8.3]  All Reasonable Efforts.......................................................... ~~[22]~~ [20]
~~[8.5]~~ [8.4]  Access to/Confidentiality of Information ............................. ~~[22]~~ [20]
~~[8.6]~~ [8.5]  Publicity ............................................................................... ~~[23]~~ [21]
~~[8.7]~~ [8.6]  Registration Statement. ....................................................... ~~[23]~~
    ~~8.8 Exchange Listing 23~~

**PWC 004**

ENB-DOJ-010702

DRAFT SEPTEMBER 10, 1999

~~8.10 Employee Matters 23~~
~~8 10 Reorganization 23~~
~~8.11 Parent's Diligence 24]~~ [21]
8.7    Exchange Listing ..... ............ ... ... .............. ........... ...... .. ... ...... ..........21
8 8    Employee Matters..... ........ .. ... .. ... ..... ...... .. . ... ...... ...........21
8.9    Buyer's Diligence ... ... ...... ... ... ...... ..... .... . . ...... ............21
8.10   Representations Cut-Off.... .. .. ........... ...... .. ... . .... .. ...... .. .22
8 11   Assumption Fees . ... ................ ...... ......... . ...... .. .........22
8.12   Tax Treatment ...... ........... ...... ... ...... ....... ... ...... .....22
8.13   Employee Benefits .... . .. ......... .. ... . . .. ....... ... .. ...... . 23
8.14   Waiver of Conflicts ... ......... ........ ...... ....... ... . . ...... .... 23
8.15   Update Representations ...... .. .. ....... ... ...... .. ... ... .. ........23]

ARTICLE IX INDEMNIFICATION; REMEDIES . .   ...... ... .. ... .. ... .. ... .. ... ~~{25}~~ [23]

9 1    Survival of Representations and Warranties. ... ... ........... ..... .. ... ...... ~~{25~~
       }[23
9.2    General Indemnity by Stockholder ... ... ...... .... . . .. ... ...... ...23
9.3    General Indemnity by Buyer .. .............. ...... . ...... . . .. .. ...... ....24
9.4    Matters Involving Third Parties  ...... ............... ....... ... .. .. ..... ... .. ... .. 24
9.5    Limitations on Stockholder's Indemnification ... .. .. . . ...... . . ...... ... .. 25]

ARTICLE X CONDITIONS  ...... .. ...... . .. ...... .. . .. .. ...... .. .. ... 25

10 1   Conditions to Each Party's Obligation to Close... . . .......... .. ... ...... ... .. ...25
10.2   Additional Conditions to the Obligations of ~~{Parent}~~ [Buyer] and  ~~{Merger Sub}~~
       to Close. .. .  ...... ..... ...... ...... .. .... ... .. .. .... . . ...... .. ~~{26}~~ [25]
10.3   Additional Conditions to the ~~{Company's}~~ [Stockholder's] Obligation to Close... ... ...26
10.4   Frustration of Closing Conditions  ... ..... ...... ...... . ...... .. .... ... ~~{28}~~ [27]

ARTICLE XI TERMINATION AND REMEDIES ... ...... . ... .. ...... .. ... ...... ...  ..~~{28}~~ [27]

11.1   Termination . . .. ...... .. ...... ...... ...... . ...... ...... . ... .. . ..~~{28}~~ [27]
11.2   Effect of Termination .  ... .. ... .... ... .. ...... . .... . .. ... ... .. ...... .....29

ARTICLE XII GENERAL PROVISIONS . ... ...... ...... . .. ...... .. ... ...... . .29

12 1   Expenses. .. .. ..... ...... ...... ... ...... ...... ...... ...... . ...... ..29
12 2   Modification or Amendment     ...... ... ...... ... . .. ...... ... ...... .. .29
12.3   Waiver . ... .... ...... .. ...... ...... ...... .. ....... ... ...... .. ~~{30}~~ [29]
12 4   Notices.. ...... ...... ... ... ...... ...... . .. ...... ... ...... ... ...... ~~{30}~~ [29]
12.5   Governing Law; Jurisdiction; Venue ... ... ...... .. ...... ...... ...... ~~{31}~~ [30]
12.6   Entire Agreement ... .. ..... ...... ...... ...... . . ...... ...... . . ...31
12 7   Construction  ...... ....... ...... ...... . .. ...... . ...... ....... .. . .31
12 8   Binding Effect .. ...... .... ... ... ...... . ...... ...... ... ...... ... .. ~~{32}~~ [31]
12.9   Assignment ... ...... ...... . .. ... ...... ... . . ...... .. ~~{32}~~ [31]
12 10  Counterparts . ... .... ...... . .. ...... .. ...... ..... . ...... ... ~~{32}~~ [31]
12.11  Obligations of Subsidiaries  ...  .... ...... .... .. ... ...... . . .. .. 32
12.12  Severability. ...... ...... ...... ...... ... ...... . ...... ...... .. .32
12.13  Costs . . .. ...... ...... .. ..... ...... .. ...... .. ...... ...... ... .. .32

**PWC 005**

ENB-DOJ-010703

DRAFT SEPTEMBER 10, 1999

[12.14  Prohibited Activities  32]

<u>LIST OF SCHEDULES</u>

Company Disclosure Schedule
~~[Parent]~~ [Buyer] Disclosure Schedule
Working Cash - 1.1B
Affiliates - 1.1A
Adjustment Value - 5 1(b)
List of Employees - 8.10(a)
Contracts to be honored - 8.10(b)
Unwanted Assets - 5.4

<u>LIST OF EXHIBITS</u>

Escrow Agreement - A

**PWC 006**

ENB-DOJ-010704

DRAFT SEPTEMBER 10, 1999

# [STOCK PURCHASE] AGREEMENT

## ~~[AND PLAN OF MERGER~~

~~THIS ]~~[THIS STOCK PURCHASE] AGREEMENT ~~[AND PLAN OF MERGER]~~ is made and entered into as of _____, 1999, by and ~~[among MIDCOAST ENERGY RESOURCES, INC., a Nevada corporation ("Parent"), MIDCOAST ACQUISITION COMPANY, a Delaware corporation, which is a wholly owned direct subsidiary of Parent ("Merger Sub"), THE BISHOP GROUP, LTD., a Kansas corporation (the "Company") and DENNIS M. LANGLEY ("Stockholder"). (Parent, Merger Sub, the Company]~~ [between **FORTREND INTERNATIONAL, LLC,** a _____ limited liability company **("Buyer")** and **("Stockholder").** (Buyer)] and Stockholder are hereinafter sometimes collectively referred to as the "Parties" and individually as a "Party")

## RECITALS

A.    ~~[The respective Boards of Directors of Parent, Merger Sub and the Company each have determined that it is in the best interests of their respective stockholders that the Company be merged with and into the Merger Sub, and, to that end, have approved the merger of the Company with and into the Merger Sub in accordance with the laws of the State of Delaware and the provisions of this Agreement and Plan of Merger.]~~ [Stockholder owns 100% of the common stock (the "Stock") of The Bishop Group, Ltd., a Kansas corporation (the "Company").]

B.    ~~[Approval of the stockholders of Parent is unnecessary and Stockholder is the sole stockholder of the Company.~~

~~Parent, Merger Sub, Stockholder and the Company desire to make certain representations, warranties and agreements in connection with, and establish certain conditions precedent to, the Merger.]~~ [Buyer desires to buy from Seller, and Seller desire to sell to Buyer Stock on the terms and conditions set forth herein.]

## AGREEMENT

In consideration of the mutual agreements, promises and covenants set forth herein and the recitals set forth above, and other good and valuable consideration, the receipt and adequacy of which are acknowledged, the ~~[parties]~~ [Parties] hereto, intending to be legally bound, agree as follows:

**PWC 007**

FNB-DOJ-010705

DRAFT SEPTEMBER 10, 1999

## ARTICLE I
## DEFINITIONS

1 1    Defined Terms.  As used herein the following terms shall have the following meanings:

*Acquisition Proposal*:  Any proposal or offer from any Person relating to the direct or indirect acquisition of a business that constitutes 51% or more of the net revenues, income or assets of the Company or 51% or more of the Company Stock or any proposal or offer for a ~~{merger}~~ [**Transaction**] or other business combination with the Company, other than the Transactions.

*Additional Agreements*:  Those agreements listed in this Agreement and attached hereto, either as of the date hereof or, subject to the mutual agreement of the parties, prior to Closing, as exhibits and incorporated herein by reference, including but not limited to a **mutually agreeable tax sharing agreement** as well as all assignments and ancillary agreements necessary to effectuate the ~~{Merger}~~ [**Transaction**].

*Adjustment Amount*.  Adjustment Amount shall have the meaning set forth in Section 5.1(b).

*Adjustment Value*:  Adjustment Value shall have the meaning set forth in Section 5.1(b).

*[Adverse Consequences*:  **All debts, obligations, losses, costs of investigation and defense, damages, liabilities, claims, judgments, awards, settlements, taxes, penalties, fines, assessments and other costs and expenses (including any prejudgment *interest in any litigated or arbitrated matter*) which may be incurred, made or levied; provided, however, that such term shall not include any punitive or exemplary damages.]**

*Affiliates*    Affiliates shall mean the companies set forth on **Schedule 1.1A** hereto.

*Agreement*·  This [**Stock Purchase**] Agreement ~~{and Plan of Merger}~~, including the preamble, recitals, and schedules hereto, all of which are hereby incorporated herein by reference and made a part hereof

*Agreement-Related Litigation*    Agreement-Related Litigation shall have the meaning set forth in Section 12.5.

*[FORTREND Revised Adjusted Value*:  **FORTREND Value shall have the meaning set forth in Section 5.1(c).**

*Buyer*:  Fortrend International, LLC, a _____ limited        liability company.

**PWC 008**

ENB-DOJ-010706

DRAFT SEPTEMBER 10, 1999

*Buyer Common Stock*:   Duly authorized shares of common stock, _____ par value per share, of Buyer.

*Buyer Common Stock Consideration*:   Buyer Common Stock Consideration shall have the meaning set forth in the definition of Transaction Consideration.

*Buyer Disclosure Schedule*:   That schedule from Buyer to the Company to be delivered upon the execution of this Agreement, and updated, subject to the approval of the Company, and redelivered at Closing, which sets forth certain disclosures concerning Buyer and their businesses.

*Buyer Share Price*:   The average of the high and low sales prices of the Buyer Common Stock for the twenty (20) trading days prior to three (3) days before the Closing.

*Buyer SEC Reports*:   The forms, reports and documents filed by Buyer with the SEC since January 1, 1997.]

*Certificates*:   The certificates representing Company Shares to be surrendered in exchange for the [Purchase Price.] {Merger Consideration.

~~Certificate of Merger: The document to be prepared by the parties hereto in compliance in all respects with the requirements of the DGCL and the Laws of the State of Kansas and the provisions of this Agreement.}~~

*Closing.*  A meeting for the purpose of concluding the Transactions to be held at the place and on the date fixed in accordance with Section 2.3

*Code*  The Internal Revenue Code of 1986, as amended.

*Company*  The Bishop Group, Ltd., a Kansas corporation~~{, which will merge into Merger Sub as set forth in Section 2.1}~~.

*Company Disclosure Schedule*·   That schedule from the ~~{Company}~~ [Stockholder] to ~~{Parent}~~ [Buyer] to be delivered upon the execution of this Agreement, and updated, subject to approval of ~~{Parent}~~ [Buyer], and redelivered at the Closing, which sets forth certain disclosures concerning the Company and its Affiliates and its and their businesses.

*Company Financial Statements*:   Company Financial Statements shall have the meaning set forth in Section 6.7.

*Company Shares or Common Stock*·  The shares of Class A Common Stock of the Company issued and outstanding immediately prior to the Effective Time

**PWC 009**

ENB-DOJ-010707

DRAFT SEPTEMBER 10, 1999

[_Debt_: means long term debt, current portion of long term debt, and short term notes payable, all as defined by generally accepted accounting principles [Being Reviewed].]

[~~DGCL: The General Corporation Law of the State of Delaware.~~

~~Effective Time:~~ [_Effective Time._] The date and time at which the ~~[Certificate of Merger has been duly filed with the Secretary of State of the State of Delaware or such other time as is agreed upon by the parties and specified in the Certificate of Merger.]~~ [Closing is consumamted.]

_Environmental Claim_.  Any action, cause of action, claim, investigation, demand or notice by any Person alleging liability under or non-compliance with any Environmental Law.

_ERISA_:  The Employee Retirement Income Security Act of 1974, as amended.

_Exchange_:  The Exchange on which the ~~[Parent]~~ [Buyer] Common Stock is listed.

_Exchange Act_:  The Securities Exchange Act of 1934, as amended (15 U.S.C. § 78a et seq.)

_Facilities_·  The real property, plant and equipment owned or leased by the Company and its Subsidiaries.

_Gas Contracts_   Gas Contracts shall have the meaning set forth in Section 6.18.

_Governmental Authority_.  The Federal government, any state, county, municipal, local or foreign government and any governmental agency, bureau, commission, authority or body.

_Governmental Authority_.  The Federal government, any state, county, municipal, local or foreign government and any governmental agency, bureau, commission, authority or body

_HSR Act_:  The Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended

_Indemnified Party_·  Indemnified Party shall have the meaning set forth in Section 9.4.

_Indemnifying Party_   Indemnifying Party shall have the meaning set forth in Section 9.4.

**PWC 010**

ENB-DOJ-010708

DRAFT SEPTEMBER 10, 1999

*Judgment*:  Any judgment, writ, injunction, order or decree of or by any court, judge, justice or magistrate, including any bankruptcy court or judge, having appropriate jurisdiction, and any adjudicative order of or by a Governmental Authority

*Law*:  The common law and any statute, ordinance, code or other law, rule, regulation, order, requirement or procedure enacted, adopted, promulgated, applied or followed by any Governmental Authority or court.

*Lien*:  Any mortgage, lien or encumbrance, which (i) creates or confers an interest in property to secure payment or performance of a liability, obligation or claim, or which retains or reserves such an interest for such purpose; (ii) grants to any Person the right to purchase or otherwise acquire, or obligates any Person to sell or otherwise dispose of, or otherwise results or may result in any Person acquiring, any property or interest in property; (iii) restricts the transfer of, or the exercise of any rights in or the enjoyment of any benefits arising by reason of ownership of, any property; or (iv) otherwise constitutes an interest in, or claim against, property, whether arising pursuant to any Law, Judgment or any binding contract.

*Material Adverse Effect*.  Any change, event, occurrence or state of facts which is or which would reasonably be expected to lead to an adverse change in the consolidated balance sheet or Facilities of the Company or any of the Company's Subsidiaries, or ~~{Parent}~~ [Buyer] or any of ~~{Parent's}~~ [Buyer's] Subsidiaries, as the case may be, which is material to the Company and its Subsidiaries, or ~~{Parent}~~ [Buyer] and its Subsidiaries, taken as a whole, as the case may be, other than any change or effect (i) arising out of general economic conditions, (ii) arising with respect to the industry in which the Company engages in business, but not specifically relating to the Company, (iii) arising out of or as a result of the public announcement of the Transactions, or (iv) arising out of events or facts set forth on the **Company Disclosure Schedule** or the ~~{Parent}~~ [Buyer] **Disclosure Schedule**  No change or event shall be material unless it is individually greater than ~~{$1,000,000.}~~ [$250,000.]

~~{Merger: The merger of Company into and with Merger Sub at Closing, as set forth in Section 2.1.~~

~~Merger  Consideration}~~ *[Purchase Price]*:  The Preliminary Cash Consideration, as adjusted at and following Closing, [and _____ worth shares of ~~{Parent}~~ [Buyer] Common Stock (based on the ~~{Parent}~~ [Buyer] Share Price) (the ~~{"Parent}~~["Buyer"] Common Stock Consideration") ]

£

~~Merger  Sub.  Midcoast  Acquisition  Company,  a  Delaware  corporation,  which  is  the wholly  owned  direct  subsidiary  of  Parent  and  which  will  be  merged  with  the  Company and continue as the Surviving Company pursuant to the Merger~~

~~Midcoast  Revised  Adjusted  Value:  Midcoast  Value  shall  have  the  meaning  set  forth  in~~

PWC 011

ENB-DOJ-010709

DRAFT SEPTEMBER 10, 1999

~~Section 5.1(c).~~

~~Parent. Mideast Energy Resources, Inc., a Nevada corporation.~~

~~Parent Common Stock. Duly authorized shares of common stock, ——— par value per share, of Parent.~~

~~Parent Common Stock Consideration. Parent Common Stock Consideration shall have the meaning set forth in the definition of Merger Consideration.~~

~~Parent Disclosure Schedule. That schedule from Parent to the Company to be delivered upon the execution of this Agreement, and updated, subject to the approval of the Company, and redelivered at Closing, which sets forth certain disclosures concerning Parent and Merger Sub and their businesses.~~

~~Parent Share Price. The average of the high and low sales prices of the Parent Common Stock for the twenty (20) trading days prior to three (3) days before the Closing.~~

~~Parent SEC Reports. The forms, reports and documents filed by Parent with the SEC since January 1, 1997.~~

[Pending Claims: Pending Claims shall have the meaning set forth in Section 6.8

Person: Any natural person, corporation, limited liability company, general or limited partnership, joint venture, trust, association, unincorporated entity of any kind or Governmental Authority.

Preliminary Cash Consideration. Preliminary Cash Consideration shall mean a sum of cash equal to $_____, plus or minus the Adjustment Amount as defined in Section 5(b) below.

Representatives. Officers, employees, legal counsel, financial advisors, accountants or other authorized representatives of any of the parties hereto, to be provided access to information

Revised Adjustment Value. Revised Adjustment Value shall have the meaning set forth in Section 5.1(c)

[S- Registration Statement. A registration statement on Form S-__, as amended or supplemented in connection with the registration under the Securities Act of {Parent} [Buyer] Common Stock issuable upon conversion of the Company Shares ]

SEC: The United States Securities and Exchange Commission.

Stockholder Revised Adjustment Value: Stockholder Revised Adjustment Value shall have the meaning set forth in Section 5.1(c) below

**PWC 012**

ENB-DOJ-010710

DRAFT SEPTEMBER 10, 1999

*Securities Act*:  The Securities Act of 1933, as amended (15 U.S.C. § 77a et seq).

*Subsidiary*:  In reference to any entity, any corporation, limited liability company, limited partnership or general partnership, a majority of the outstanding voting securities or voting control of which are owned directly or indirectly by such entity.

~~*{Surviving Company: Merger Sub, which shall be the survivor of the Merger, as set forth in Section 2.1.*~~

*{Taxes}*  All Federal, state, local, foreign and other taxes of any kind, including without limitation, those on or measured by or referred to as income, gross receipts, sales, use, ad valorem, franchise, profits, withholding, payroll, employment, excise, severance, stamp, occupation, value added, windfall profits taxes, customs duties or similar fees and assessments of any kind, including interest, penalties and additions to tax or additional amounts imposed by any governmental authority with respect thereto

*Tax Returns*:  All returns, declarations, reports, information returns and statements with respect to Taxes of whatsoever kind

*{Transactions} [Transaction]*:  The transactions contemplated by this Agreement{, including the Merger} and those contemplated by the Additional Agreements.

*Unwanted Assets*  Unwanted Assets shall have the meaning set forth in Section 5.4.  The term "Unwanted Assets" shall include all files and other records of Stockholder and employees or consultants of the Company or its Affiliates or Subsidiaries relating to other Unwanted Assets (whether such files are on the premises of the Company, in storage or otherwise).

*Working Cash*:  Working Cash shall have the meaning set forth on **Schedule 1.1B** hereto

1 2   Additional Terms   Terms not set forth in Section 1.1, but otherwise defined in the body of this Agreement, shall have the specific meanings attributed to them in the text.  Terms in the singular shall have the same meanings when used in the plural and vice versa

### ARTICLE II
### ~~{TERMS OF THE MERGER}~~ [PURCHASE AND SALE]

2 1   ~~{The Merger <*>}~~ **[Purchase and Sale].  Upon the terms and subject to the [terms and] conditions of this Agreement, at the [Closing  Buyer will purchase from Seller, and Seller will sell to Buyer the Stock for the Purchase Price.  The Preliminary Cash Consideration shall be paid at Closing.]** ~~{Effective Time, the Company and Merger Sub shall consummate the Merger in which (a) Company shall be merged into and with Merger Sub in accordance with the DGCL, (b) the separate existence of the Company shall thereupon cease, (c)~~

Transaction Agreement
KC01 440994 10
1/31/03 2 32 PM

7

**PWC 013**

ENB-DOJ-010711

DRAFT SEPTEMBER 10, 1999

~~the Merger Sub shall be the survivor to the Merger and, as the Surviving Company, shall continue its corporate existence under the DGCL as a wholly owned subsidiary of Parent, retaining its rights, privileges, immunities, powers and franchises, unaffected by the Merger, and shall assume all the rights and obligations (including without limitation employment contracts and subleases) of the Company. The Merger shall have the effects set forth in the DGCL.~~

~~Effective Time<*>. Subject to the terms and conditions of the Agreement, the parties hereto shall prepare and execute a mutually agreeable Certificate of Merger. The Certificate of Merger shall be filed on the date of Closing (or such other date as agreed by Parent and the Company) with the Secretary of State of the State of Delaware in the manner provided in the DGCL and the Merger shall be effective at the Effective Time.]~~

2.2     Closing.  The Closing of the {Merger} [Transaction] shall occur at the offices of Bryan Cave LLP, 1200 Main, Suite 3500, Kansas City, MO 64105, commencing at 10 00 A.M., local time, on or before the third business day following the date on which the condition set forth in Section 10.1(c) [HSR Act] shall have been fulfilled or waived, or at such other place, time and date as {Parent} [Buyer] and the Company may agree.

## ARTICLE III
~~[CERTIFICATE OF INCORPORATION AND BYLAWS OF THE SURVIVING COMPANY]~~[[Intentionally Deleted]]

## ARTICLE IV
~~[Certificate of Incorporation<*>. At the Effective Time and in accordance with the DGCL, the Certificate of Incorporation of Merger Sub shall be the Certificate of Incorporation of the Surviving Company.]~~[[Intentionally Deleted]]

## ARTICLE V
~~[The Bylaws<*>. At the Effective Time and without any further action on the part of the Surviving Company, Parent, or the Merger Sub, the Bylaws of the Merger Sub shall be the Bylaws of the Surviving Company and thereafter may be amended or repealed in accordance with their terms, the Certificate of Incorporation of the Surviving Company and as provided by law.]~~ [ADJUSTMENT TO PURCHASE PRICE]

5.1     ~~[DIRECTORS AND OFFICERS OF THE SURVIVING COMPANY~~

~~Directors<*>. The directors of Merger Sub at the Effective Time shall, from and after the Effective Time, be the directors of the Surviving Company until their successors have been duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the Surviving Company's Certificate of Incorporation and Bylaws.~~

~~Officers<*>. The officers of the Merger Sub at the Effective Time shall, from and after the Effective Time, be the officers of the Surviving Company until their successors have been duly elected or appointed and qualified or until their earlier death, resignation or removal in~~

**PWC 014**

ENB-DOJ-010712

DRAFT SEPTEMBER 10, 1999

accordance with the Surviving Company's Certificate of Incorporation and Bylaws

MERGER CONSIDERATION; CONVERSION OR CANCELLATION OF COMPANY SHARES IN THE MERGER

Merger Consideration<*>

Subject to the provisions of this Agreement, at the Effective Time, Company Shares, by virtue of the Merger and without any action on the part of the holder thereof, shall be converted into the right to receive the Merger Consideration} [Adjustments].

(a)    ]The Preliminary Cash Consideration and {Parent} [Buyer] Common Stock Consideration shall be paid to the Stockholder at Closing.

(b)    The Preliminary Cash Consideration at Closing shall be increased or decreased (as the case may be) (with such difference being paid in cash as hereinafter provided by either {Parent of} [Buyer or] Stockholder, as the case may be) to the extent the Adjustment Value (based on Stockholders estimate as provided below) is greater or less than Seven Hundred Thousand Dollars ($700,000 00) (such difference is referred to as the "Adjustment Amount"). "Adjustment Value" shall be calculated on a consolidated basis as of {September 30, 1999} [the end of the month immediately prior to Closing (the "True-Up Date")], in accordance with GAAP, for the Company and the Affiliates of the Company as set forth on **Schedule 5.1(b)**. Stockholder shall submit to {Parent} [Buyer] at least three (3) days prior to Closing his good faith estimate of the Adjustment Value as of {September 30, 1999} [the True-Up Date].

(c)    After the Closing, Stockholder and {Parent} [Buyer] shall true up Stockholder's estimate of the Adjustment Value made at Closing. The Revised Adjustment Value shall be determined based on **Schedule 5.1(b)** as follows

(i)    Stockholder shall submit to {Parent} [Buyer], not more than thirty (30) days after Closing, his good faith estimate of the Adjustment Value as revised based on any information then available to the Stockholder (the "Revised Adjustment Value") Stockholder shall also provide {Parent} [Buyer] with the work papers and back-up materials used in preparing his estimated Revised Adjusted Value

(ii)    Within thirty (30) days after receiving the Revised Adjustment Value from Stockholder after the Closing Date, {Parent} [Buyer] shall prepare and deliver to Stockholder a detailed statement as to its calculation of the Adjustment Value (the {"Mideoast}["Fortrend] Revised Adjusted Value")

(iii)    If Stockholder has any objections to the {Mideoast} [Fortrend] Revised Adjusted Value calculation, he shall deliver a detailed statement describing his objections to {Parent} [Buyer] and setting his calculation

**PWC 015**

ENB-DOJ-010713

DRAFT SEPTEMBER 10, 1999

of the Revised Adjustment Value (the "Stockholder Revised Adjustment Value") within thirty (30) days after receiving the ~~[Mideoast]~~ **[Fortrend]** Revised Adjusted Value calculation.   Stockholder and ~~[Parent]~~ **[Buyer]** shall use reasonable efforts to resolve any such objections themselves.   If they do not resolve such objection within thirty (30) days after Stockholder has delivered his statement of objections, ~~[Parent]~~ **[Buyer]** and Stockholder shall select an accounting firm mutually acceptable to them which shall resolve any remaining objections.   If they are unable to agree on the choice of accounting firm, they shall select a nationally-recognized accounting firm by lot (after excluding their respective regular outside accounting firms), which such selection occur no later than ten (10) days following the expiration of the foregoing thirty (30) day time period.   The determinations made by the accounting firm so selected shall be set forth in writing and shall be conclusive and binding upon all parties hereto.   The determinations made by the accounting firm shall be delivered to ~~[Parent]~~ **[Buyer]** and Stockholder no later than thirty (30) days following selection of such accounting firm.   ~~[Parent]~~ **[Buyer]** and Stockholder shall revise the statement of the Revised Adjusted Value as appropriate to reflect the resolution of any objections thereto pursuant to this Section 5.1(c) and such revised statement shall be the Revised Adjustment Value.   The difference between Revised Adjustment Value and the Adjustment Value shall be paid by Stockholder or ~~[Parent]~~ **[Buyer]**, as appropriate, within three (3) business days after the final determination of the Revised Adjustment Value.

(iv)   In the event ~~[Parent]~~ **[Buyer]** and Stockholder submit any unresolved objections to an accounting firm for resolution as provided in (b) above, they shall share responsibility for the fees and expenses of the accounting firm as follows

(A)   if the accounting firm resolves all of the unresolved objections in favor of ~~[Parent]~~ **[Buyer]**, Stockholder shall be responsible for all of the fees and expenses of the accounting firm,

(B)   if the accounting firm resolves all of the unresolved objections in favor the Stockholder, ~~[Parent]~~ **[Buyer]** shall be responsible for all of the fees and expenses of the accounting firm;

(C)   if the accounting firm resolves some of the unresolved objections in favor of ~~[Parent]~~ **[Buyer]** and the rest of the unresolved objections in favor of the Stockholder, ~~[Parent]~~ **[Buyer]** shall be responsible for the fraction of the fees and expenses of the accounting firm equal to (x) the different between the Revised Adjustment Value and the ~~[Mideoast]~~ **[Fortrend]** Revised Adjustment Value, divided by (y) the difference between the Stockholder Revised Adjustment Value and the ~~[Mideoast]~~ **[Fortrend]** Revised Adjustment Value

PWC 016

ENB-DOJ-010714

DRAFT SEPTEMBER 10, 1999

Example #1:

     If the ~~[Mideoast]~~ **[Fortrend]** Revised Adjustment Value is 100, the Revised Adjustment Value is 125, and the Stockholder Revised Adjustment Value is 175, then ~~[Parent]~~ **[Buyer]** shall pay 25/75 or 1/3 of the fees and expenses of the accounting firm, and Stockholder shall pay the remaining 2/3.

$$\frac{125-100}{175-100} \quad = \quad \frac{25}{75} \quad or \quad 1/3$$

Example #2:

     If the ~~[Mideoast]~~ **[Fortrend]** Revised Adjustment Value is 50, the Revised Adjustment Value is 150, and the Stockholder Revised Adjustment Value is 200, then ~~[Parent]~~ **[Buyer]** shall pay 100/150 or 2/3 of the fees and expenses of the accounting firm, and Stockholder shall pay the remaining 1/3.

$$\frac{150-50}{200-50} \quad = \quad \frac{100}{150} \quad or \quad 2/3$$

     (v)    ~~[Parent]~~ **[Buyer]** shall make the books and records of the Company and its Affiliates available for inspection, review and copying to Stockholder and his accountants and other representatives ~~[Parent]~~ **[Buyer]** shall cooperate with Stockholder and will make the work papers and backup materials used in preparing the statement of the ~~[Mideoast]~~ **[Fortrend]** Revised Adjustment Value available to Stockholder and his accountants and other representatives in each case at reasonable times and upon reasonable notice at any time during (A) the preparation by ~~[Parent]~~ **[Buyer]** of the statement of ~~[Mideoast]~~ **[Fortrend]** Revised Adjustment Value, (B) the review by Stockholder of the Statement of ~~[Mideoast]~~ **[Fortrend]** Revised Adjustment Value, and (C) the resolution by the ~~[Parent]~~ **[Buyer]** and Stockholder of any objections thereto.

     5 2    ~~[Cancellation of Company Shares<*>]~~ **[Make Whole Amounts. Certain debt of the Company to the noteholders described in the Company Disclosure Schedule may be called for prepayment as a result of the Transaction and transactions by Stockholder prior to Closing contemplated hereby, and as a result a "Make Whole" Amount or similar amount may be due. The parties agree to address the Make Whole Amount as set forth on Schedule 5.2 hereto.]**

     5 3    ~~[All Company Shares to be converted into Parent Common Stock pursuant to Section 5.1 shall, by virtue of the Merger and without any action on the part of the holders thereof, cease to be outstanding, be canceled and cease to exist, and each holder of a Certificate shall thereafter cease to have any rights with respect to such Company Shares, except the right to~~

DRAFT SEPTEMBER 10, 1999

~~receive for each of the Company Shares, upon the surrender of such Certificate in accordance with Section 5.3, a pro rata share of the Merger Consideration.~~

~~At the Effective Time, each share of common stock of Merger Sub issued and outstanding immediately prior to the Effective Time shall, by virtue of the Merger and without any action on the part of Merger Sub or the holder thereof, be converted into shares of common stock of the Surviving Company pursuant to the Certificate of Merger.~~

~~Payment for Company Shares in the Merger<*>. The manner of making payment for Company Shares in the Merger shall be as follows:~~

~~At the Effective Time, Parent shall pay by wire transfer the cash portion of the Merger Consideration and shall make available to the Stockholder, the aggregate number of shares of Parent Common Stock constituting the Merger Consideration payable pursuant to Section 5.1.~~

~~The Stockholder shall surrender to the Parent the Certificate evidencing the Company Shares. Until so surrendered, such Certificates shall represent solely the right to receive the Merger Consideration with respect to each of the Company Shares represented thereby.~~

~~The Revised Adjustment Value shall be paid in cash by the appropriate party in the amount and at the times set forth in Section 5.1(c).~~ ] [Contingent Future Cash Consideration. Buyer shall pay Stockholder additional contingent future cash consideration as set forth on Schedule 5.3 hereto.]

    5.4   Distribution of Assets. Prior to the Closing, the assets of the Company and/or its Subsidiaries and/or Affiliates set forth on Schedule 5.4 hereto (including without limitation, the stock of The Bishop Corporation, E&C Group, Inc., and Management Resources Group, Ltd., and the limited liability interests in Bishop Rink Holdings, LLC and KP Operating Company, LLC) (the "Unwanted Assets") will be distributed to ~~{Stockholders}~~ [Stockholder] in redemption of _____ shares of the stock of the Company. In addition, Stockholder and not the ~~{Surviving}~~ Company [or the Buyer] shall own and have the rights to use the name "The Bishop Group Ltd." and all derivatives thereof.

**ARTICLE VI**
**REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY**

    Except as provided in this Agreement and except as set forth in the **Company Disclosure Schedule** (each section of which qualifies all of the relevant representations or warranties), the Stockholder hereby represents and warrants to ~~{Parent}~~ [Buyer] and ~~{Merger Sub}~~ as follows

    6.1   Company Shares. The Company Shares, at the Effective Time, will constitute all of the issued and outstanding capital stock of the Company and all such shares of Company Shares will have been duly authorized, validly issued and shall be fully paid and non-assessable.

**PWC 018**

ENB-DOJ-010716

6.2     Capitalization.   The entire authorized capital stock of the Company consists of _____ shares of Class A Common Stock and _____ shares of non-voting Common Stock   As of the date hereof, _____ shares of Class A Common Stock are issued and outstanding and owned by Dennis M. Langley and zero (0) shares of such non-voting Common Stock are issued and outstanding.  As of the date of this Agreement, all the outstanding shares of capital stock of each Subsidiary of the Company are owned by the Company, or by another wholly-owned subsidiary of the Company, free and clear of all Liens, and are duly authorized, validly issued, fully paid and non-assessable.  There are not as of the date hereof, and there will not be at the Effective Time, any stockholder agreements, voting trusts or other agreements or understandings to which the Company is a party or to which it is bound relating to the voting of any shares of the capital stock of the Company, or the capital stock of any of its Subsidiaries.  There are no outstanding or authorized options, warrants, subscriptions, calls, demands or rights of any character relating to the Company's capital stock, or the capital stock of its Subsidiaries, whether or not issued, which the Company, or any of its Subsidiaries, is a party to, including without limitation, securities convertible into or evidencing the right to purchase any capital stock or other securities of the Company or any of its Subsidiaries

6 3     Corporate Organization, Qualification and Power.  Each of the Company and its Subsidiaries is a corporation or partnership duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and is duly qualified to conduct its business and is in good standing in every other jurisdiction in which its business is conducted, except where failure to be so qualified, licensed or to be in good standing would not have a Material Adverse Effect.  Each of the Company and its Subsidiaries has the corporate or partnership power to own or lease its respective properties and to carry on its business as now being conducted, wherever located.  The Company's Subsidiaries are listed on the **Company Disclosure Schedule** and the Company owns no other material interest in any corporation, partnership, limited liability company, proprietorship or any other business entity other than the stock in those Subsidiaries which will be distributed to the Stockholder as provided in Section 5 4

6 4     Authorization of Agreement and {Merger<*>}[Transaction]   The Company has the requisite corporate power and authority to approve, authorize, execute and deliver this Agreement and to consummate the Transactions.   This Agreement, and the consummation by the Company of the Transactions have been duly and validly authorized by the Board of Directors of the Company and no other corporate proceedings on the part of the Company are necessary to authorize this Agreement or to consummate the Transactions.  The Stockholder agrees to vote his Company Shares in favor of the {Merger} [Transaction].

6.5     Enforceable Agreement.  This Agreement has been duly and validly executed and delivered by the Company and, assuming it constitutes the valid and binding agreement of {Parent} [Buyer] and {Merger Sub}, constitutes a valid and binding obligation of the Company, enforceable against the Company according to its terms, subject to bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting the enforceability of contractual obligations and creditor's rights generally and by the application of equitable principles by courts of competent jurisdiction, sitting at law or in equity.

**PWC 019**

ENB-DOJ-010717

DRAFT SEPTEMBER 10, 1999

6 6     No Conflicts, Violations, Breaches or Defaults.  Except as set forth on the **Company Disclosure Schedule**, the execution and delivery of this Agreement by the Company and its performance of the obligations hereunder, including its execution, delivery and performance of any Additional Agreements to which it is a party and the consummation of the Transactions, do not (a) conflict with or result in any breach of any provision of the Articles of Incorporation, as amended, or Bylaws, as amended, of the Company or the comparable charter or organizational documents of any of its Subsidiaries, (b) require any consent, approval, authorization or permit of, or filing with, or notification to, any Governmental Authority, except (i) in connection with the applicable requirements, if any, of the HSR Act, (ii) the filing of the Certificate of {Merger} [Transaction] pursuant to the DGCL and appropriate documents with the relevant authorities of other states in which the Company is authorized to do business; (iii) approvals, if any, required of the Federal Energy Regulatory Commission ("FERC") and any state Governmental Authorities having jurisdiction over the Company; or (iv) approvals of the lenders to the Company and its Subsidiaries, including without limitation, Chase Manhattan Bank and the holders of long term notes of the Company's Subsidiary, Synergy Pipeline Company, L.P., initially issued in or about 1992; or (v) where the failure to obtain such consent, approval, authorization or permit, or to make such filing or notification, would not have a Material Adverse Effect or materially adversely affect the ability of the Company to consummate the Transactions; (c) except as would not have a Material Adverse Effect, conflict with or result in a breach or violation of, or constitute a default under, or result in (or create in any party the right to cause) the acceleration of any performance required by the Company or its Subsidiaries under, (i) any Judgment or Law to which they are subject or bound (subject to any consents, approvals, authorizations, permits, filings or notifications required under (b) above), or (ii) any mortgage, bond, indenture, agreement, contract, license or other instrument or obligation to which the Company and/or its Subsidiaries are subject or bound, or (d) result in the creation of any Lien on any of the assets of the Company or its Subsidiaries which would have a Material Adverse Effect.

6 7     Financial Statements   The consolidated balance sheets and the related consolidated statements of earnings, stockholders' equity and cash flows (including the related notes thereto) of the Company for and as of December 31, 1997 and 1998 and for and as of _____ _____, 1999 (collectively, the "Company Financial Statements"), have been prepared in accordance with generally accepted accounting principles applied on a basis consistent with prior periods (except as otherwise noted therein), and present fairly the financial position of the Company and its Subsidiaries as of their respective dates, and the consolidated results of their operations and their cash flows for the periods presented therein (subject, in the case of the unaudited interim financial statements, to normal year-end adjustments and except that the unaudited interim financial statements do not contain all of the footnote disclosure required by generally accepted accounting principles).

6.8     Litigation   Except as set forth in the **Company Disclosure Schedule** (the "Pending Claims"), there is no action, suit, claim, governmental investigation, arbitration or other proceeding pending, or, to the actual knowledge of the Stockholder, threatened in writing, against the Company or any of its Subsidiaries which, if adversely determined would have a Material Adverse Effect.

**PWC 020**

ENB-DOJ-010718

DRAFT SEPTEMBER 10, 1999

6.9    Taxes. The Company and each of its Subsidiaries and the Affiliates has timely filed (or, as to its Subsidiaries, the Company has timely filed on their behalf) all material Tax Returns required to be filed by it (taking into account extensions approved by Governmental Authorities), has paid (or, as to its Subsidiaries, the Company has paid on their behalf) all Taxes shown thereon to be due and has provided (or, as to its Subsidiaries, the Company has made provision on their behalf) reserves in accordance with generally accepted accounting principles in its financial statements for any Taxes that have not been paid, whether or not shown as being due on any Tax Returns, except where the failure to pay or provide for such Taxes would not have a Material Adverse Effect, and (i) no material claim for unpaid Taxes has been asserted against the Company or any of its Subsidiaries in writing by a tax authority or has become a Lien (except for Liens for Taxes not yet due and payable or for Taxes that are being disputed in good faith by appropriate proceedings and that have been reserved against in accordance with generally accepted accounting principles) against the property of the Company or any of its Subsidiaries, except as to such matters as would not have a Material Adverse Effect, (ii) as of the date of this Agreement, no audit of any material Tax Return of the Company or any of its Subsidiaries is being conducted by a tax authority, and (iii) as of the date of this Agreement, no extension of the statute of limitations on the assessment of any Taxes has been granted by Company or any of its Subsidiaries and is currently in effect.

6.10    Environmental Laws and Regulations.    Except as set forth on the **Company Disclosure Schedule** or for noncompliance that will not have a Material Adverse Effect, the Company and each of its Subsidiaries and the Affiliates (a) are in compliance with Environmental Laws (as defined below), and (b) have not received written notice of, or to the Stockholder's actual knowledge, is the subject of an Environmental Claim which would have a Material Adverse Effect  The term "Environmental Laws" shall mean any state or federal, environmental statute or regulation, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (collectively, "Environmental Laws").

6 11    Compliance with Applicable Laws  Except as set forth on the **Company Disclosure Schedule** or for violations that will not have a Material Adverse Effect, the businesses of the Company and its Subsidiaries and the Affiliates are not being conducted in violation of any Laws.

6.12    Title to Properties. The Company and each of its Subsidiaries and the Affiliates has good and marketable title to, or valid leasehold interests in, all their respective material properties and assets except for such as are no longer used or useful in the conduct of their respective businesses or as have been disposed of in the ordinary course of business and except for defects in title, easements, encroachments, restrictive covenants and similar encumbrances or impediments that would not have a Material Adverse Effect. All such assets and properties, other than assets and properties in which the Company or any of its Subsidiaries has leasehold interests, are free and clear of all Liens except for Liens that would not have a Material Adverse Effect.

**PWC 021**

ENB-DOI-010719

DRAFT SEPTEMBER 10, 1999

6.13    Employee Benefit Matters.

(a)    The Company has furnished to {Parent} [Buyer] true and complete copies of all material employee benefit plans within the meaning of Section 3(3) of ERISA that covers employees, directors, former employees or former directors of the Company and its Subsidiaries, all as listed in the **Company Disclosure Schedule**. In addition, the Company has furnished any trust agreements or insurance contracts forming a part of any such employee benefit plans maintained by the Company, a copy of the most recent determination letter for any such employee benefit plan which is an employee pension benefit plan within the meaning of Section 3(2) of ERISA and is intended to comply with Section 401(a) of the Code, and a copy of the most recent Form 5500, if applicable.

(b)    Each of the employee benefit plans maintained by the Company and its Subsidiaries is in substantial compliance with all applicable Laws including ERISA and the Code, except for any noncompliance that would not have a Material Adverse Effect

(c)    No employee benefit plan is a "multiemployer plan" as such term is defined in Section 4001(a)(3) of ERISA or Section 414(f) of the Code or a multiemployer plan described in clauses (i) or (ii) of Section 3(37)(A) of ERISA; or is a part of a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(d)    There are no pending, threatened, or anticipated claims (other than routine claims for benefits or immaterial claims) by, on behalf of or against any of the employee benefit plans or any trusts related thereto that would have a Material Adverse Effect.

6 14    Broker's Fees    Except for the fees and expenses payable to Chase Securities, Inc and/or Friedman, Billings, Ramsey Group, Inc., neither the Company nor the Stockholder has employed any investment bank, broker, finder, consultant or other intermediary, which would be entitled to any fee or commission from the Company in connection with this {Merger} [Transaction] Agreement or the Transactions

6.15    Absence of Certain Changes or Events    Since December 31, 1998, the Company and each of the Subsidiaries and the Affiliates has conducted its business in all material respects in the ordinary course consistent with past practice, and there is not and has not been: (i) any change which has had a Material Adverse Effect, or (ii) any condition, event or occurrence which is reasonably likely to have a Material Adverse Effect

6 16    Labor Matters. As of the date of this Agreement, neither the Company nor any of its Subsidiaries or the Affiliates is a party to or bound by, and none of their employees is subject to, any collective bargaining agreement relating to the term and conditions of employment for any group of employees (any such agreement, memorandum or document, a "Collective Bargaining Agreement"), and as of the date of this Agreement there are no labor

**PWC 022**

ENB-DOJ-010720

DRAFT SEPTEMBER 10, 1999

unions or other organizations representing or, to the knowledge of the Company, purporting to represent, any employees employed by any of the Company and its Subsidiaries. As of the date of this Agreement, no labor union is currently engaged in or, to the knowledge of the Company, threatening, organizational efforts with respect to any employees of the Company or any of its Subsidiaries

6.17    Year 2000 Compatibility.  The Company and each of its Subsidiaries and the Affiliates has developed and is executing a plan (the "Y2K Plan") to address significant year 2000 compatibility issues.  In the case of certain equipment with imbedded chips where testing for year 2000 compliance is impossible or impractical, the Y2K Plan may include plans and strategies for replacing such capability with redundant capacity within the Company or with alternative third party sourcing with comparable quality and pricing, excluding any provider of basic services and utilities.

6.18    Gas Contracts    All material gas sales, purchase and transportation contracts (the "Gas Contracts") to which any of the Company and its Subsidiaries is a party or is otherwise bound are listed in the **Company Disclosure Schedule**.  Copies of all such Gas Contracts, together with all amendments, modifications, revocations and notices pertaining thereto have been delivered or made available to {Parent} **[Buyer]** and the {Merger Sub}.  Except as set forth in the **Company Disclosure Schedule**, none of the Company and its Subsidiaries is party to any arrangement under which it will be obligated, by virtue of a prepayment arrangement, a "take-or-pay" arrangement or any other arrangement, to transport or deliver hydrocarbons at some future time without then or thereafter receiving full payment therefor, or to pay for hydrocarbons for their transportation without then receiving such hydrocarbons.

6 19    No Defaults    {To} **[Except as set forth on the Company Disclosure Schedule to]** the actual knowledge of the Stockholder, (i) none of the Company and its Subsidiaries and the Affiliates is in breach or default under any term or provision of any of the Gas Contracts except where such breaches or defaults would not, either individually or in the aggregate, have a Material Adverse Effect, (ii) all of the Gas Contracts are in full force and effect, and constitute legal, valid and binding obligations of the Company and its Affiliates and to the Stockholder's knowledge, the other Parties thereto except where the failure to be in full force and effect and legal, valid and binding would not have a Material Adverse Effect, (iii) none of the Company and its Subsidiaries and the Affiliates has received any written notice from any other party indicating any intent to rescind or dishonor any material provision contained in any of the Contracts.  Except as set forth in the **Company Disclosure Schedule** or in **Schedule 5.4**, none of the Company and its Subsidiaries and the Affiliates is a party to any contract to sell any portion of its assets other than in the ordinary course of business.

6 20    Insurance    To the Stockholder's actual knowledge, the Company, its Subsidiaries and the Affiliates maintain in effect insurance on their respective assets and such insurance policies are in full force and effect on the date hereof and will remain in effect through the Closing  To the Stockholder's actual knowledge, none of the Company and its Subsidiaries is in default with respect to any provision contained in any insurance policy covering any portion of their assets, except where such default would not have a Material Adverse Effect.

PWC 023

ENB-DOJ-010721

DRAFT SEPTEMBER 10, 1999

6.21    Tariffs.  To the Stockholder's actual knowledge, except as set forth in the **Company Disclosure Schedule** or for noncompliance that will not have a Material Adverse Effect, all operations of any of the Company and its Subsidiaries and the Affiliates which are subject to a tariff approved by FERC are in compliance with each such tariff.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF {PARENT-AND-MERGER-SUB} [BUYER]

Except as set forth in the {Parent} [Buyer] **Disclosure Schedule** (each section of which qualifies the correspondingly numbered representation or warranty), {Parent-and-Merger Sub hereby jointly and severally represent and warrant to the Company} [Buyer hereby **represents and warrants to the Stockholder**] as follows:

7 1    Capitalization.   The entire authorized capital stock of the {Parent} [Buyer] consists of _____ shares of {Parent} [Buyer] Common Stock, _____ par value per share.  As of the date hereof, _____ shares of {Parent} [Buyer] Common Stock are issued and outstanding and no shares of {Parent} [Buyer] Common Stock or {Parent} [Buyer] Preferred Stock are held in treasury.  As of the date hereof, such shares constitute all of the issued and outstanding capital stock of the {Parent} [Buyer], all of which have been duly authorized, validly issued and are fully paid and non-assessable.  All outstanding shares of capital stock of {Parent's} [Buyer's] Subsidiaries are owned by {Parent} [Buyer] or a direct or indirect wholly owned subsidiary of {Parent} [Buyer], free and clear of all Liens, and are duly authorized, validly issued, fully paid and non-assessable  There are not as of the date hereof, and there will not be at the Effective Time, any stockholder agreements, voting trusts or other agreements or understandings to which {Parent} [Buyer] is a party or to which it is bound relating to the voting of any shares of the capital stock of {Parent} [Buyer].  As of the date hereof, _____ shares of {Parent} [Buyer] Common Stock were reserved for issuance upon exercise of outstanding options under the {Parent} [Buyer] Option Plans.  Except pursuant to the {Parent} [Buyer] Option Plans, and as set forth in the {Parent} [Buyer] **Disclosure Schedule**, there are no outstanding or authorized options, warrants, agreements, subscriptions, calls, demands or rights of any character relating to the {Parent's, or Parent's} [Buyer's, or Buyer's] Subsidiaries' capital stock, whether or not issued, including without limitation, securities convertible into or evidencing the right to purchase any capital stock or other securities of {Parent} [Buyer] or any of its Subsidiaries   {Parent} [Buyer] does not own, directly or indirectly, any capital stock of the Company.

7.2    Corporate Organization, Qualification and Power    Each of {Parent,} [Buyer and] its Subsidiaries {and Merger Sub} is a corporation duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and is duly qualified to conduct its business in every other jurisdiction in which its business is conducted, except where failure to be so qualified or licensed would not have a Material Adverse Effect on {Parent} [Buyer.]  Each of {Parent} [Buyer] and its Subsidiaries has the corporate power to own or lease its respective properties and to carry on its business as now being conducted,

PWC 024

ENB-DOJ-010722

DRAFT SEPTEMBER 10, 1999

wherever located.  Neither {Parent} [Buyer] nor {Merger Sub} owns any material interest in any corporation, partnership, proprietorship or any other business entity.

7 3     Authorization of Agreement and {Merger<*> Each of Parent and Merger Sub} [Transaction.  Buyer] has the requisite corporate power and authority to approve, authorize, execute and deliver this Agreement and to consummate the Transactions.  This Agreement, and the consummation by {Parent} [Buyer] and {Merger Sub} of the {Merger} [Transaction] and the other Transactions have been duly and validly authorized by the respective Boards of Directors of {Parent and Merger Sub} [Buyer] and the sole stockholder of {Merger Sub} and no other corporate proceedings on the part of {Parent and Merger Sub} [Buyer] are necessary to authorize this Agreement or to consummate the Transactions.

7.4     Enforceable Agreement.  This Agreement has been duly and validly executed and delivered by {Parent and Merger Sub} [Buyer] and, assuming it constitutes the valid and binding agreement of the {Company} [Stockholder], constitutes a valid and binding obligation of each of {Parent and Merger Sub,} [Buyer,] enforceable against {each of them} [it] according to its terms, subject to bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting the enforceability of contractual obligations and creditor's rights generally and by the application of equitable principles by courts of competent jurisdiction, sitting at law or in equity.

7.5     No Conflicts, Violations, Breaches or Defaults.  The execution and delivery of this Agreement by {each of Parent and Merger Sub} [Buyer] and its performance of the obligations hereunder, including its execution, delivery and performance of any Additional Agreements to which it is a party and the consummation of the Transactions, do not (a) conflict with or result in any breach of any provision of the respective Articles of Incorporation, Certificate of Incorporation or Bylaws of {Parent or Merger Sub} [Buyer], (b) require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority, except (i) in connection with the applicable requirements, if any, of the HSR Act; (ii) pursuant to the applicable requirements of the Securities Act and the Exchange Act, and the rules and regulations promulgated thereunder, (iii) the filing of the Certificate of {Merger} [Transaction] pursuant to the DGCL and appropriate documents with the relevant authorities of other states in which {Parent} [Buyer] or any of its Subsidiaries is authorized to do business; (iv) such filing or consent as may be required by applicable state securities, or "blue sky" Laws; (v) approvals, if any, required of state Governmental Authorities having jurisdiction over {Parent} [Buyer] or any of its Subsidiaries, (vi) filings with, and approval of the Exchange; or (vii) where the failure to obtain such consent, approval, authorization or permit, or to make such filing or notification, would not have a Material Adverse Effect on {Parent} [Buyer] or its Subsidiaries or materially adversely affect the ability of {Parent} [Buyer] to consummate the Transactions, (c) except as would not, individually or in the aggregate, have a Material Adverse Effect on {Parent} [Buyer], conflict with or result in a breach or violation of, or constitute a default under, or result in (or create in any party the right to cause) the acceleration of any performance of the {Parent} [Buyer] or its Subsidiaries under, (i) any Judgment or Law to which they are subject or bound (subject to any consents, approvals, authorizations, permits, filings or notifications required under (b) above), or (ii) any mortgage, bond, indenture, agreement,

Transaction Agreement
KC01 440994 10
1/31/03 2.32 PM

19

PWC 025

ENB-DOI-010723

DRAFT SEPTEMBER 10, 1999

contract, license or other instrument or obligations to which {Parent} [Buyer] and/or its Subsidiaries are subject or bound; or (d) result in the creation of any Lien on any of the assets of {Parent} [Buyer] or its Subsidiaries which would have a Material Adverse Effect on {Parent or Merger Sub.} [Buyer or .]

7.6     {Parent} [Buyer] SEC Reports.  Since _____, {Parent} [Buyer] has filed all forms, reports and documents with the SEC required to be filed by it pursuant to the federal securities Laws, all of which complied in all material respects with all applicable requirements of the Securities Act and the Exchange Act and the rules and regulations promulgated thereunder.  None of the {Parent} [Buyer] SEC Reports, at the time filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

7.7     Financial Statements, Accounting Matters.

(a)     The consolidated balance sheets and the related consolidated statements of income, stockholders' equity and cash flows (including the related notes thereto) of {Parent} [Buyer] included in the {Parent} [Buyer] SEC Reports complied as to form in all material respects with the published rules and regulations of the SEC with respect thereto, have been prepared in accordance with generally accepted accounting principles applied on a basis consistent with prior periods (except as otherwise noted therein), and present fairly the financial position of {Parent} [Buyer] and its Subsidiaries as of their respective dates, and the consolidated results of its operations and its cash flows for the periods presented therein (subject, in the case of the unaudited interim financial statements, to normal year-end adjustments and except that the unaudited interim financial statements do not contain all of the footnote disclosure required by generally accepted accounting principles).

(b)     Neither {Parent, Merger Sub} [Buyer,]   nor, to the actual knowledge of {Parent's} [Buyer's] officers, any of their affiliates, have taken or agreed to take any action that would jeopardize the qualification of the {Merger} [Transaction] as a reorganization within the meaning of Section 368(a) of the Code.

7.8     S-___ Registration Statement.  None of the information supplied or to be supplied by {Parent} [Buyer] or {Merger Sub} for inclusion or incorporation by reference in the S-___ Registration Statement required to be filed in connection with the Transactions (or any amendment or supplement thereto) will, at the time it becomes effective and at the Effective Time, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading  If at any time prior to the Effective Time any event occurs with respect to {Parent} [Buyer], its officers and directors, or any of its Subsidiaries, which is required to be described in an amendment of, or a supplement to, the S-___ Registration Statement, {Parent} [Buyer] will promptly file such with the SEC and disseminate it as required by Law to the stockholders of {Parent} [Buyer] and to the Stockholder

PWC 026

ENB-DOJ-010724

DRAFT SEPTEMBER 10, 1999

7.9    Litigation. Except as disclosed in or appropriately reserved for in the financial statements included within the {Parent} [Buyer] SEC Reports, there is no action, suit, claim, governmental investigation, arbitration or other proceeding pending, or, to the actual knowledge of {Parent's} [Buyer's] officers, threatened in writing, against {Parent} [Buyer] which, if adversely determined would have a Material Adverse Effect

7.10   Taxes. Each of {Parent} [Buyer] and its Subsidiaries has (a) filed all material Tax Returns that they are required to file through the date hereof and shall prepare and file all material Tax Returns required to be filed after the date hereof and on or before the Effective Time and (b) paid or provided for the payment of all Taxes due and owing for the periods covered by such Tax Returns and all Taxes, if any, required to be paid for which no return is required, except in either case where the failure to file such returns or to pay or provide for such Taxes would not have a Material Adverse Effect.

7.11   Environmental Laws and Regulations. Except as set forth on {Parent's} [Buyer's] Disclosure Schedule or for non-compliance that will not have a Material Adverse Effect, {Parent} [Buyer] and each of its Subsidiaries (a) are in compliance with Environmental Laws, and (b) have not received written notice of, or, to the actual knowledge of {Parent's} [Buyer's] officers, is the subject of an Environmental Claim.

7.12   Compliance with Applicable Laws. Except as set forth on {Parent} [Buyer] Disclosure Schedule or for violations that will not have a Material Adverse Effect, the businesses of {Parent} [Buyer] and its Subsidiaries are not being conducted in violation of any Laws

7.13   Broker's Fees   {Parent} [Buyer] has not employed any investment bank, broker, finder, consultant or other intermediary, which would be entitled to any fee or commission from {Parent} [Buyer] in connection with the Transactions

7 14   {Interim Operations of Merger Sub<™> Merger Sub was formed solely for the purpose of engaging in the Transactions and has not engaged in any business activities or conducted any operations other than in connection with the Transactions Merger Sub has no Subsidiaries Authorization for Parent} [Authorization for Buyer] Common Stock. Prior to the Effective Time, {Parent} [Buyer] will have taken all necessary action to permit it to issue the number of shares of {Parent} [Buyer] Common Stock required to be issued pursuant to Article V. {Parent} [Buyer] Common Stock issued pursuant to Article V will, when issued, be validly issued, fully paid and nonassessable and no Person will have any preemptive right of subscription or purchase in respect thereof. [Such {Parent} [Buyer] Common Stock will, when issued, be registered under the Securities Act and the Exchange Act and registered or exempt from registration under any applicable state securities laws and will, when issued, be listed on the Exchange ]

**PWC 027**

ENB-DOJ-010725

DRAFT SEPTEMBER 10, 1999

## ARTICLE VIII
## CONDUCT PENDING THE CLOSING AND COVENANTS

8.1     Conduct of Business by Company and ~~[Parent<*>]~~[Buyer]  Each of the Stockholder and ~~[Parent]~~ [Buyer] covenants and agrees that prior to the Effective Time, unless the other party agrees in writing or as otherwise contemplated by this Agreement, it will (and Stockholder will cause the Company to) conduct its business and day to day operations (including those of any Subsidiary) in the ordinary and usual course of business, consistent with its past custom and practice, and will seek to preserve intact its business organization and goodwill, keep in full force and effect all material rights, licenses, permits and franchises relating to such business, and maintain satisfactory relationships with suppliers, customers and others having business relationships with it. Each of the Stockholder and ~~[Parent]~~ [Buyer] specifically agrees that, prior to the Effective Time, unless the other party otherwise agrees in writing or as otherwise contemplated by this Agreement, neither the Company nor ~~[Parent]~~ [Buyer], nor any of the Company's Subsidiaries or ~~[Parent's]~~ [Buyer's] Subsidiaries, will.

(a)     issue, deliver, sell or dispose of, pledge or otherwise encumber (i) any additional shares of capital stock of any class, or any securities or rights convertible into, exchangeable for or creating the right to subscribe for any share of capital stock, or any rights, warrants, options, calls, or any other agreement of any kind to purchase or acquire any share of capital stock or such securities, or (ii) any securities exchangeable for, in respect of, or in substitution for Company Stock or ~~[Parent]~~ [Buyer] Common Stock currently outstanding;

(b)     except pursuant to existing employee benefit plans, redeem, purchase or otherwise acquire any of its outstanding capital stock,

(c)     split, combine, subdivide or reclassify any share of its capital stock, or declare, set aside or pay any dividend, or make any distribution, on its capital stock, except the declaration and payment of regular quarterly, semi-annual or annual cash dividends in accordance with past dividend policy (or dividends by a wholly owned Subsidiary);

(d)     amend its respective Certificate/Articles of Incorporation or Bylaws;

(e)     except as contemplated by this Agreement, take any action which would render, or which reasonably may be expected to render, any representation or warranty made by it in this Agreement untrue in any material respect at the Effective Time;

(f)     take any action that would, or that could reasonably be expected to, cause any condition to Closing, as set forth in Article X hereof, to not be satisfied, or

(g)     authorize, propose or announce an intention to do any of the foregoing, or enter into any contract or agreement to do any of the foregoing.

Transaction Agreement
KC01 440994 10                                    22
1/31/03 2 32 PM

**PWC 028**

ENB-DOJ-010726

DRAFT SEPTEMBER 10, 1999

8.2    ~~{Conduct of Business of Merger Sub<*>. During the period of time from the date of this Agreement to the Effective Time, Merger Sub shall not engage in any activities of any nature except as provided in or contemplated by this Agreement.~~

~~}~~Additional Covenants of the Company.  The Stockholder agrees, in addition to the covenants set forth in Section 8.1, that prior to the Effective Time, without the express written consent of ~~{Parent}~~ [Buyer], neither the Company nor any of the Company's Subsidiaries will

(a)    adopt a plan of liquidation dissolution, ~~{merger}~~ [Transaction] (other than the ~~{Merger}~~ [Transaction]), consolidation, restructuring, or other reorganization of the Company or any Subsidiary, except as set forth on the **Company Disclosure Schedule**; or

(b)    merge or consolidate with any other third party, except as set forth on the **Company Disclosure Schedule**.

8.3    All Reasonable Efforts

(a)    Subject to the terms and conditions herein, each of the parties hereto shall use reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the Transactions (but shall not be required to file or prosecute any lawsuits or administrative proceedings, or otherwise expend any sums in excess of $1,000,000 in connection with its reasonable efforts) including using reasonable efforts to obtain all necessary or appropriate waivers, consents and approvals, to effect all necessary registrations, filings and submissions, including, but not limited to, (i) filings under the HSR Act and any other submissions required by any Governmental Authority, including FERC, and (ii) required approvals under the applicable state Laws and to lift any injunction or other legal bar to the ~~{Merger}~~ [Transaction] (and, in such case, to proceed with the ~~{Merger}~~ [Transaction] as expeditiously as possible)

(b)    Each party agrees to make their initial filing pursuant to the HSR Act within five (5) business days after this Agreement has been executed and delivered and use reasonable commercial efforts to promptly respond to all requests from Governmental Authorities in connection therewith.

8.4    Access to/Confidentiality of Information.  Upon reasonable notice, each of the Company and ~~{Parent}~~ [Buyer] shall (and shall cause its Subsidiaries to) afford to each other's Representatives, so that they may evaluate the Transactions, reasonable access during normal business hours throughout the period prior to the Effective Time, to its properties, personnel, books and records and other information as reasonably requested under the circumstances, and, during such period, furnish promptly to such Representatives the specific information concerning its business, properties and personnel as listed on the ~~{Parent}~~ [Buyer] Disclosure Schedule. Each of the Company and ~~{Parent}~~ [Buyer] agrees that it will not, and will cause its Representatives not to, use any information obtained pursuant to this Section 8.6 for any purpose unrelated to the consummation of the Transactions

**PWC 029**

ENB-DOJ-010727

8.5     Publicity.  [N.B. Stockholder has strong desire not to have disclosure prior to Closing.  This will need to be addressed.]  The parties will consult with each other and will mutually agree upon any press releases or public announcement pertaining to the ~~[Merger]~~ [Transaction] and the other Transactions and shall not issue any such press releases or make any such public announcements prior to such consultation and agreement, [except as may be required by applicable Law [What is the applicable Law?] or by obligations pursuant to any listing agreement with the Exchange] in which case the party proposing to issue such press release or make such public announcement shall use all reasonable efforts to consult in good faith with the other party before any such issuance or announcement.

8 6     Registration Statement.  ~~[Parent]~~ [Buyer] will, as promptly as possible, prepare and file with the SEC the S-__ Registration Statement in connection with the registration under the Securities Act of ~~[Parent]~~ [Buyer] Common Stock issuable upon conversion of the Company Shares.  ~~[Parent]~~ [Buyer] will use all reasonable efforts to have or cause the S-__ Registration Statement declared effective as promptly as possible, including, without limitation, causing its accountants to deliver necessary or required instruments such as opinions and certificates, and will take any other action required or necessary to be taken under federal or state securities Laws or otherwise in connection with the registration process.

8 7     Exchange Listing.  ~~[Parent]~~ [Buyer] shall cause the ~~[Parent]~~ [Buyer] Common Stock constituting the ~~[Merger]~~ [Transaction] Consideration to be listed on the Exchange.

8 8     Employee Matters  The ~~[Parent]~~ [Buyer] shall cause the ~~[Surviving]~~ Company [after the Closing] to maintain and continue to pay the healthcare insurance, dental insurance, life insurance, disability insurance premiums, car purchase and/or lease payments and/or car allowances and auto insurance currently in effect as of the date of this Agreement for all employees of the Company and its Subsidiaries as of the date of Closing for a period of six (6) months after Closing.  After said six (6) month period, upon termination of any such employees, the Surviving Company shall provide all such employees all of the Federal COBRA benefits mandated relating to any of the above described employee benefits  In addition, ~~[Parent]~~ [Buyer] shall cause the Surviving Company and its Subsidiaries to maintain and honor the existing contractual obligations as described in the employment contracts and consulting agreements listed in **Schedule 8.10(b)**.

8.9     ~~[Reorganization<*>.  Neither the Parent nor its Subsidiaries will take any action that would jeopardize the qualification of the Merger as a reorganization within the meaning of Section 368(a) of the Code.~~

~~Parent's Diligence<*>.  Parent]~~ [Buyer's Diligence.  Buyer] acknowledges that it has conducted an extensive investigation of the financial condition and the properties and operations of the Company and that during the course of such investigation, Company and Stockholder have caused the facilities, books, records and personnel of Company to be made available to ~~[Parent]~~ [Buyer] and have caused to be provided to ~~[Parent]~~ [Buyer] such other information with respect to the Company as ~~[Parent]~~ [Buyer] has requested   ~~[Parent]~~ [Buyer] has received from the Company and Stockholder all information which ~~[Parent]~~ [Buyer] has requested to its

**PWC 030**

FNB-DOJ-010728

**DRAFT SEPTEMBER 10, 1999**

satisfaction, and {Parent} [Buyer] has been given the opportunity to discuss Company and its business and prospects with representatives of Company and to have such representatives answer any questions regarding the business of the Company, all of which questions have been answered to {Parent's} [Buyer's] full satisfaction, and to obtain any additional information which Company or Stockholder possess that is necessary to verify the accuracy of the information supplied during the course of such investigation. {Parent} [Buyer] has had access to the facilities and properties of Company and has inspected them to {Parent's} [Buyer's] satisfaction. Further, {Parent} [Buyer] acknowledges that (i) {Parent} [Buyer] has been advised that the Company and its Subsidiaries have certain Pending Claims, including without limitation a rate case by the Company's Subsidiary, Kansas Pipeline Company, pursuant to Section 4 of the Natural Gas Act, (ii) the outcomes of Pending Claims, including the rate case, are impossible to predict, (iii) neither the Company nor Stockholder are making any representations or warranties of any kind or nature with respect to the Pending Claims (including the rate case) including without limitation with respect to the outcome thereof, (iv) the outcome of the Pending Claims, including the rate case, could have a Material Adverse Effect and (v) the {Merger} [Transaction] Consideration and the consummation of the {Merger} [Transaction] by {Parent} [Buyer] and {Merger Sub} are based on {Parent's} [Buyer's] independent evaluation of the Pending Claims, including the rate case  As a result of the foregoing, as of the Closing, and without any further action required, {Parent} [Buyer], Merge Sub and the Surviving Company, on behalf of themselves and all of their affiliates, shall be deemed to release and discharge as of the Closing the Stockholder and the Company and its Subsidiaries and each of their officers, directors, stockholders, employees, agents and representatives from and against all Agreement-Related Litigation and all claims which could be made in any Agreement-Related Litigation, including without limitation any claims pursuant to Rule 10(b)-5 of the Exchange Act or common law fraud.

8 10    Representations Cut-Off]]    Within 10 business days (the "Cut-off Date") after execution and delivery of this Agreement by {Parent, Parent} [Buyer, Buyer] must submit to Stockholder a statement (the "Representations Statement") describing in detail any breaches of representations or warranties by Stockholder then known to {Parent} [Buyer]. Stockholder will then have 30 days to cure said breaches of representations or warranties  {Parent} [Buyer] and {Merger Sub} will be barred from seeking any indemnities or other remedies hereunder or from refusing to Close pursuant to Section 10 2(b) for any breaches of representations or warranties by Stockholder known to {Parent} [Buyer] prior to the Cut-off Date and not set forth in the Representations Statement.

8.11    Assumption Fees{ Parent}[.  Buyer] will pay for any assumption fees, prepayment penalties or other fees, costs, expenses or other amounts payable in connection with the {Merger} [Transaction] (e.g. change of control provisions), the transactions contemplated by this Agreement (including without limitation Section 5 4 hereof) or the assumption by the Surviving Company, in each case, of, under or pursuant to any contracts or agreements of the Company or any of its Subsidiaries or Affiliates including without limitation any credit, loan or other obligation to the lenders referenced in the **Company Disclosure Schedule [[Is this separate from the treatment of the Make-whole amount?]**

**PWC 031**

ENB-DOJ-010729

DRAFT SEPTEMBER 10, 1999

8.12    Tax Treatment. Neither Buyer nor any of its] {Tax Treatment. Neither Parent nor Merger Sub nor any of their} affiliates will take any action or omit any action which would cause Stockholder to receive other than long term capital asset treatment for Federal and State income taxes of any gain recognized as a result of the {Merger. Parent} [Transaction. Buyer] agrees to indemnify Stockholder from all liability, damages, costs and expenses (including without limitation legal and accounting fees and expenses, penalties and interest (collectively, "Damages")) from a breach of this provision. {Parent} [Buyer] hereby pledges to Stockholder all of the stock of the {Surviving} Company and the {Merger Sub (on behalf of the Surviving Company)} [Company] hereby grants to Stockholder a security interest in all of the assets of the {Surviving Company} [Company and its Subsidiaries and the Affiliates], in each case to secure the payment of any Damages. [Buyer will cause the Company and its Subsidiaries and the Affiliates to take all actions reasonably requested by the Stockholder to perfect these security interests.

8.13    Employee Benefits. Buyer] {Employee Benefits. Parent} agrees that after the Closing it will not allow the {Surviving} Company (or any successor or assign thereof) to take any action or omit to take any action which would, directly or indirectly, reduce any COBRA benefits being made available or which may be due to employees of the Company after the Closing for any employees terminated prior to Closing or within 1 year after Closing.

8.14    [Update Representations. Buyer, on one hand, and Seller, on the other hand, each shall promptly notify the other party in writing if they become aware after the date hereof and before the Closing of any fact, information or condition that causes or constitutes a breach of any representation or any warranty made by them in this Agreement, whether such fact, information or condition (i) existed (whether or not known by the representing/warranting party for representations or warranties not predicated on such party's Knowledge) before the date hereof (a "Breach Event") or (ii) came into existence after the date hereof (a "Subsequent Development"). Such fact, information or condition shall be set forth in a supplemental schedule specifying the applicable section of this Agreement to which such information relates (a "Supplemental Schedule"). The Supplemental Schedule shall be delivered to the other party, and if not objected to in writing within three (3) business days of delivery, shall amend and, if applicable, replace the section of the original Company Disclosure Schedule or Buyer Disclosure Schedule to which it relates.]

## ARTICLE IX
## INDEMNIFICATION; REMEDIES

9.1    Survival of Representations and Warranties. The representations, warranties and agreements of the Parties made herein shall {not} survive Closing[, any investigation by the Parties,] and the execution and delivery of the documents contemplated by this Agreement[, and shall continue in force and effect until terminated, as hereinafter provided in Sections 9.2 and 9.3.

PWC 032

ENB-DOJ-010730

DRAFT SEPTEMBER 10, 1999

9.2     General Indemnity by Stockholder. Stockholder agrees to protect, defend, indemnify and hold Parent and the Merger Sub, and their respective subsidiaries and affiliates, harmless from and against and shall reimburse Buyer and its respective subsidiaries and affiliates for, all Adverse Consequences which arise from any of the following:

(a)     the breach of any of Stockholder's representations and warranties contained in this Agreement; and

(b)     all actions, suits, proceedings, demands, assessments, costs and expenses (including reasonable attorneys' fees and expenses of investigation and defense) incident to any such breach.

The indemnity obligations and the representations and warranties of Stockholder to Buyer under this Section 9.2 shall terminate and be of no further force and effect upon the expiration of one (1) year following the Closing Date, except as to matters which are the subject of a written claim made to the Stockholder by Buyer prior thereto.

9.3     General Indemnity by Buyer. Buyer agrees to protect, defend, indemnify and hold Stockholder harmless from and against, and shall reimburse Stockholder for, all Adverse Consequences which arise from any of the following:

(a)     the breach of any of Buyer's representations and warranties contained in this Agreement; and

(b)     all actions, suits, proceedings, demands, assessments, costs and expenses (including reasonable attorneys' fees and expenses of investigation and defense) incident to any such breach.

The indemnity obligations and the representations and warranties of Buyer to Stockholder under this Section 9.3 shall terminate and be of no further force and effect upon the expiration of one (1) year following the Closing Date, except as to matters which are the subject of a written claim made to Buyer by Stockholder prior thereto.

9.4     Matters Involving Third Parties.

(a)     If any third party shall notify any Party (the "Indemnified Party") with respect to any claim ("Third Party Claim") that may give rise to a claim for indemnification against any other Party (the "Indemnifying Party") under this Article 9, then the Indemnified Party shall promptly (and in any event within five (5) business days after receiving notice of the Third Party Claim) notify the Indemnifying Party thereof in writing.

(b)     The Indemnifying Party will have the right to assume and thereafter conduct the defense of the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party; provided, however, that the Indemnifying Party will not consent to the entry of any judgment or enter into any

**PWC 033**

ENB-DOJ-010731

**DRAFT SEPTEMBER 10, 1999**

settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably) unless the judgment or proposed settlement involves only the payment of money damages and does not impose an injunction or other equitable relief upon the Indemnified Party.

(c)     Unless and until the Indemnifying Party assumes the defense of the Third Party Claim as provided in subsection 9.4(b) above, however, the Indemnified Party may defend against the Third Party Claim in any manner it reasonably may deem appropriate.

(d)     In no event will the Indemnified Party consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party which consent shall not be withheld unreasonably.

9.5     Limitations on Stockholder's Indemnification. Notwithstanding anything herein to the contrary, in no event and under no circumstances shall Stockholder be required to pay any amounts to Buyer under or in connection with Stockholder's warranties, representations and indemnities under this Agreement to the extent such amounts for any single claim are less than Two Hundred Fifty Thousand Dollars ($250,000) or exceed Five Million Dollars ($5,000,000) in the aggregate]

**ARTICLE X**
**CONDITIONS**

10.1     Conditions to Each Party's Obligation to Close   The obligations of each of the parties to consummate the Transactions are subject to satisfaction, or mutual waiver, on or prior to the Effective Time of each of the following conditions.

(a)     Injunction   There shall not be in effect any Law or any Judgment directing that the Transactions not be consummated; provided, however, that prior to invoking this condition each party shall use all reasonable efforts to have any such Judgment vacated; and there shall have been no Law enacted or promulgated which would make consummation of the Transactions illegal.

(b)     [Stockholder Approval Stockholder hereby approves the Merger. Parent represents that the issuance of Parent Common Stock in connection with the Merger does not require Stockholder approval under applicable law.

]HSR Act   Any waiting period (and any extension thereof) applicable to the consummation of the {Merger} [Transaction] under the HSR Act shall have expired or shall have been earlier terminated

10 2     Additional Conditions to the Obligations of {Parent} [Buyer] and {Merger Sub} to Close. The obligations of {Parent} [Buyer] and {Merger Sub} to consummate

**PWC 034**

ENB-DOJ-010732

DRAFT SEPTEMBER 10, 1999

the Transactions are subject to satisfaction, or waiver on or prior to the Effective Time of each of the following conditions:

       (a)    <u>Performance</u>.  The Company shall have performed, in all material respects, all the obligations required to be performed by it under this Agreement at or prior to the Effective Time.

       (b)    <u>Representations and Warranties</u>.   The representations and warranties of Stockholder under this Agreement shall be true and correct, in each such case as of the date of this Agreement and as of the Effective Time as though made on the Effective Time (except that representations and warranties that speak as of a specific date shall be true and correct as of such date), provided that for purposes of determining the satisfaction of the foregoing, such representations and warranties shall be deemed true and correct if the failure or failures of such representations and warranties to be so true and correct have not caused and could not reasonably be expected to cause a Material Adverse Effect.

       (c)    <u>Deliveries</u>.  {Parent} **[Buyer]** shall have received at the Effective Time a certificate dated the Effective Time and executed by the Stockholder certifying to the fulfillment of the conditions specified in Sections 10.2(a) and (b).

       (d)    <u>Consents and Approvals</u>.  Except for the consent of the secured lenders of the Company, its Subsidiaries and the Affiliates set forth in the **Company Disclosure Schedule** (which consents are not a condition to Closing), all other consents, approvals and authorizations legally required to be obtained to consummate the {Merger} **[Transaction]** shall have been obtained from all Governmental Authorities and third persons, except for such consents, approvals and authorizations the failure of which to obtain would not have a Material Adverse Effect on {Parent} **[Buyer]** (assuming for purposes of this Section 10.2(d) that the {Merger} **[Transaction]** shall have been effected).

10.3   ~~{{Company is not willing to make continued use of legal counsel as a condition to Closing, but is willing to work with Parent regarding use of counsel where possible and if agreed to by counsel.  In the event of a conflict, Company expects current Company counsel to represent Stockholder exclusively.}~~

~~}~~<u>Additional Conditions to the ~~{Company and}~~ Stockholder's Obligation to Close</u>.  The obligation of ~~{the Company and}~~ the Stockholder to consummate the Transactions is subject to satisfaction, or, to the extent permitted by Law, waiver on or prior to the Effective Time of each of the following conditions:

       (a)    <u>Performance</u>.  ~~{Parent and Merger Sub}~~ **[Buyer]** shall have performed in all material respects, all the obligations required to be performed by ~~{them}~~ **[it]** under this Agreement at or prior to the Effective Time

PWC 035

ENB-DOJ-010733

DRAFT SEPTEMBER 10, 1999

(b) <u>Representations and Warranties</u>. The representations and warranties of ~~[Parent and Merger Sub]~~ [Buyer] under this Agreement shall be true and correct, in each such case as of the date of this Agreement and as of the Effective Time as though made on the Effective Time (except that representations and warranties that speak as of a specific date shall be true and correct as of such date), provided that for purposes of determining the satisfaction of the foregoing, such representations and warranties shall be deemed true and correct if the failure or failures of such representations and warranties to be so true and correct have not caused and could not reasonably be expected to cause a Material Adverse Effect

(c) <u>Deliveries</u>. The ~~[Company]~~ [Stockholder] shall have received at the Effective Time a certificate dated the Effective Time and executed by the Chief Executive Officer or President of ~~[Parent]~~ [Buyer] certifying to the fulfillment of the conditions specified in Sections 10 3(a) and (b);

(d) <u>Consents and Approvals</u>. All consents, approvals and authorizations legally required to be obtained to consummate the ~~[Merger]~~ [Transaction] shall have been obtained from all Governmental Authorities and third persons (including those listed in Section 6.6), except for such consents, approvals and authorizations the failure of which to obtain would not have a Material Adverse Effect~~[(assuming for purposes of this Section 10.3(d) that the Merger shall have been effected)]~~.

(e) <u>S- Registration Statement, "Blue Sky" Approvals</u> The S-__ Registration Statement shall have become effective and no stop order suspending its effectiveness shall have been issued and no proceedings for such purpose shall have been initiated and be continuing by the SEC. ~~[Parent]~~ [Buyer] shall have received all state securities Law or "blue sky" permits and authorizations necessary to issue ~~[Parent]~~ [Buyer] Common Stock in exchange for the Company Shares in the ~~[Merger]~~ [Transaction] and allowing the Stockholder to sell all of the ~~[Parent]~~ [Buyer] Common Stock received by him as a part of the ~~[Merger]~~ [Transaction] Consideration immediately

(f) <u>Listing of ~~[Parent]~~ [Buyer] Common Stock</u>. The shares of ~~[Parent]~~ [Buyer] Common Stock constituting a portion of the ~~[Merger]~~ [Transaction] Consideration and the other such shares required to be reserved for issuance in connection with the ~~[Merger]~~ [Transaction] shall have been authorized for listing on the Exchange

(g) ~~[Reorganization. The Company and the]~~ [Tax Treatment. The ]Stockholder shall have received an opinion, based on appropriate representations contained in certificates of the Company~~[, Parent, Merger Sub]~~ [and Buyer], their respective officers and others, of ~~[Bryan Cave LLP]~~[_____] to the effect that the ~~[Merger will be treated for federal income taxes as a reorganization within the meaning of Section 368(a) of the Code [Subject to change depending on Final Structure]]~~ [Stockholder will receive capital asset treatment with respect to his receipt of the Purchase Price.]

**PWC 036**

ENB-DOJ-010734

DRAFT SEPTEMBER 10, 1999

10.4   Frustration of Closing Conditions.   Neither {Parent} [Buyer] nor the Company may rely on the failure on any condition set forth in Section 10.1, 10.2 or 10.3, as the case may be, to be satisfied if such failure was caused by such party's failure to use reasonable efforts to consummate the {Merger} [Transaction] and the other transactions contemplated by this Agreement, or otherwise occurred because of a breach of this Agreement by such party.

## ARTICLE XI
## TERMINATION AND REMEDIES

11 1   Termination.   This Agreement may be terminated and the {Merger} [Transaction] may be abandoned at any time prior to the Effective Time:

(a)   by the mutual written consent of {Parent} [Buyer] and the Stockholder;

(b)   by either {Parent} [Buyer] or the Stockholder, if:

(i)   any court of competent jurisdiction in the United States, or some other Governmental Authority, shall have issued an order, decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the {Merger} [Transaction] and such order, decree, ruling or other action shall have become final and nonappealable; provided, however, that the party seeking to terminate this Agreement under this Section 11.1(b)(i) shall have used its reasonable commercial efforts to remove such injunction, order or decree; or

(ii)   the {Merger} [Transaction] shall not have been consummated by _____, 1999, provided, that the right to terminate this Agreement pursuant to this Section 11.1(b)(ii) shall not be available to any Party whose failure to fulfill any of its obligations under this Agreement results in the failure of the {Merger} [Transaction] to occur on or before such date, provided further no Party shall have the right to terminate this Agreement under this Section 11 (b)(ii) until _____, 1999, if the {Merger} [Transaction] shall not have been consummated as a result of (A) all required regulatory approvals or consents necessary to satisfy the conditions set forth in Section 10 2(d) shall not have been received by _____, 1999; (B) the entering of an order or any pending action commenced by any applicable federal governmental antitrust authority seeking an order which would have the effect of making the {Merger} [Transaction] illegal or otherwise materially and adversely affecting the value of the Company or prohibiting consummation of the {Merger} [Transaction], or (C) the failure of the conditions set forth in Section 10 1(c) to be satisfied.

(c)   by {Parent} [Buyer] in the event that, as a result of {Parent's} [Buyer's] diligence investigation regarding the Company conducted after the date of this Agreement, {Parent} [Buyer] shall have learned of facts not previously disclosed to or

PWC 037

ENB-DOJ-010735

otherwise known by {Parent} [Buyer] which establish that Stockholder's representations and warranties set forth in this Agreement are not true and correct or there has been a failure to perform a covenant on the part of the Company or the Stockholder, in each case of which the Company and the Stockholder have been given notice in writing by {Parent} [Buyer] and which has not been cured by the Company or the Stockholder within thirty (30) days of such notice and which misrepresentation, breach or failure to perform would, in the aggregate with all other misrepresentations, breaches or failures to perform, caused a Material Adverse Effect

        (d)    by the Stockholder if:

        (i)    there has been a misrepresentation or breach of warranty or failure to perform a covenant on the part of the {Parent} [Buyer] or {Merger Sub} with respect to its or their representations, warranties and covenants set forth in this Agreement of which the {Parent} [Buyer] and/or {Merger Sub}, as the case may be, has been given notice in writing by the Company and which has not been cured by {Parent} [Buyer] or {Merger Sub}, as the case may be, within thirty (30) days of such notice and which misrepresentation, breach or failure to perform would cause a Material Adverse Effect, or

        (ii)    the {Parent} [Buyer] Share Price is less than $_____.

11.2   Effect of Termination

        (a)    In the event of the termination and abandonment of this Agreement pursuant to Section 11.1, this Agreement shall become void and have no effect, without any liability on the part of any party hereto or its affiliates, directors, officers or stockholders, provided, however, that any such termination shall not affect any party's ability to seek damages for breach of this Agreement; provided further, however, that Stockholder shall not be liable for any damages if {Parent} [Buyer] terminates this Agreement pursuant to Section 11.1(c), [[]provided further, that if the Stockholder terminates this Agreement pursuant to Section 11.1(d), {Parent} [Buyer] will pay to Stockholder (within 3 days after termination by Stockholder) an amount equal to $15,000,000 (the "Breakup Fee") in cash. {At the signing of this Agreement, the Breakup Fee will be deposited by Buyer with _____ as escrow agent pursuant to the Escrow Agreement in the form attached hereto as Exhibit A.} [Being Negotiated.]]

### ARTICLE XII
### GENERAL PROVISIONS

12.1   Expenses.  Whether or not the {Merger} [Transaction] is consummated, all costs and expenses, incurred in connection with this Agreement and the {Merger} [Transaction] and the other transactions contemplated by this Agreement shall be paid by the

PWC 038

ENB-DOJ-010736

*DRAFT SEPTEMBER 10, 1999*

party incurring such expense, except that the filing fee under the HSR Act shall be paid by ~~[Parent]~~ **[Buyer]** and the fees and expenses of the Stockholder shall be paid by the Company.

12.2   <u>Modification or Amendment</u>.   This Agreement may be amended by an instrument in writing executed and delivered on behalf of each of the parties hereto, at any time prior to the Effective Time, subject to the provisions of the DGCL.

12.3   <u>Waiver</u>.   The conditions to each of the parties' obligations to consummate the ~~[Merger]~~ **[Transaction]** are for the sole benefit of such party and may be waived, at any time prior to the Effective Time, by such party in whole or in part to the extent permitted by Law. Any agreement on the part of a party hereto to any extension or waiver shall be valid only if set forth in writing signed on behalf of such party, and shall not be inferred by the failure of any such party to assert any of its rights hereunder.   Waiver of any provision of this Agreement or of any breach hereof shall be a waiver of only said specific provision or breach and shall not be deemed a waiver of any other provision or any future breach hereof.

12.4   <u>Notices</u>.   All notices, documents, or other communications to be given hereunder shall be in writing and shall be deemed validly given if delivered by messenger, facsimile transmission (with a confirming copy sent by overnight courier), or express overnight delivery, or sent by certified mail, return receipt requested, as follows:

(a)   If to the ~~[Company]~~ **[Stockholder]**, to

Dennis M. Langley
c/o Tino Monaldo, Chtd
335 North Washington, Suite 130
Hutchinson, Kansas 67501
Telephone:  (316) 669-9338
Telecopier:  (316) 665-5961

with a copy to:

Thomas W. Van Dyke, Esq.
Bryan Cave LLP
7500 College Boulevard, Suite 1100
Overland Park, Kansas 66210
Telephone:  (913) 338-7700
Telecopier:  (913) 338-7777

(b)   If to ~~[Parent or Merger Sub, to~~

~~Midcoast Energy Resources, Inc~~

~~1100 Lousiana, Suite 2950~~

~~Houston, TX 77002~~

Transaction Agreement
KC01 440994 10
1/31/03 2 32 PM

33

**PWC 039**

ENB-DOJ-010737

DRAFT SEPTEMBER 10, 1999

~~Telephone: (713) 650-8900~~

~~Telecopier: (713) 650-3232~~

~~with a copy to:~~

~~Ronald L. Chachere, Esq.~~

~~615 N. Upper Broadway, Suite 970~~

~~Corpus Christi, Texas 78401~~

~~Telephone. (361) 883-2356~~

~~Telecopier: (361) 883-2357]~~ **[Buyer, to**

> _____
> _____
> _____

**Telephone:** _____
**Telecopier:** _____

**with a copy to:**

> _____
> _____
> _____

**Telephone:** _____
**Telecopier:** _____**]**

or such other Persons or addresses as may be designated in writing by the party to receive such notice  Any notice delivered by messenger shall be deemed received when such delivery is tendered; notices sent by facsimile transmission shall be deemed received upon faxed confirmation of receipt, notices mailed in the manner provided above, shall be deemed received on the third day after such are postmarked; and notices delivered by other methods shall be deemed received when actually received by the addressee or its authorized agent.

12 5    Governing Law; Jurisdiction; Venue  This Agreement shall be governed by, and construed and enforced in accordance with, the Laws of the State of Kansas, without giving effect to the principles of the conflicts of law thereof.  The parties hereto agree that the Federal Court of the District of Kansas shall have exclusive jurisdiction and venue to hear and determine any claims or disputes between the parties hereto, pertaining directly or indirectly to this Agreement, the {Merger} [Transaction], any additional agreements or to any matter arising out of, in connection with or related to any thereof (collectively, "Agreement-Related

**PWC 040**

ENB-DOJ-010738

12 12   Severability.  The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability or the other provisions hereof   If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable or equitable provision shall be substituted therefor in order to carry out, so far as may be valid or enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

12.13   Costs.  If any Agreement-Related Litigation or other proceeding is brought including, without limitation for the enforcement or interpretation of any of the rights or provisions of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and all other costs and expenses incurred in that action or proceeding, in addition to any other relief to which it may be entitled; provided, however, if Stockholder prevails on at least a portion of any substantive issue in any Agreement-Related Litigation, Stockholder shall not be responsible for any of ~~[Parent or Merger Sub's]~~ [Buyer] attorneys' fees, costs or expenses related to any Agreement-Related Litigation.

**PWC 041**

ENB-DOJ-010739

· DRAFT SEPTEMBER 10, 1999

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

~~[THE BISHOP GROUP, LTD.~~
~~By:~~
~~Name:~~
~~Title: President]~~

_____

Dennis M. Langley


~~[MIDCOAST ENERGY RESOURCES, INC.]~~
[FORTREND INTERNATIONAL, LLC]


By: _____
Name: _____
Title: _____


~~[MIDCOAST ACQUISITION COMPANY~~


~~By:~~
~~Name:~~
~~Title ]~~

**PWC 042**

ENB-DOJ-010740



**Chase Securities Inc.**
600 Travis, 20th Floor
Houston, TX 77002

September 16, 1999

**PRIVATE AND CONFIDENTIAL**

Mr. Craig Hoffman
Fortrend International
750 Lexington Avenue, 30th Floor
New York, NY 10022

Dear Craig:

On behalf of Dennis Langley (the "Seller") and The Bishop Group Ltd ("Bishop"), a company which is wholly-owned by the Seller, thank you for your continuing interest in Kansas Pipeline Company, a wholly-owned subsidiary of Bishop. As you know, Chase Securities Inc. ("Chase") has been retained as financial advisor in connection with a sale of Bishop

This letter sets forth the procedures for the submission of a definitive, fully financed, binding offer (the "Offer") for the acquisition of Bishop (the "Transaction")   Enclosed please find the proposed form of the Agreement and Plan of Merger (the "Agreement") which reflects the terms upon which the Seller is prepared to consummate the Transaction with the prospective purchaser ("Purchaser").

I.   <u>Timing</u>   The Offer must be received by Chase no later than 4:00 P M. (Central Time) on Monday, September 20, 1999.

II   <u>Contents of the Offer</u>.  The Offer should include the following (please submit the Offer in the same numbered format as outlined below).

   (i)   **Proposed Purchaser** - the identity of the Purchaser submitting the Offer, including other participants in the Transaction, if any

   (ii)   **Primary Offer Value** - the total value Purchaser is prepared to pay for 100% of the Bishop common stock that is wholly owned by the Seller   The Offer should consist of the Stock Purchase Price, including assumption of the balance sheet, including all debt and working capital, as outlined in Appendix 1 – Pro Forma Balance Sheet projected for September 30, 1999 ("Appendix 1")

   (iii)   **Supplemental Offers** – In addition to the primary Offer outlined in II (ii) above, Purchaser may submit additional alternative bids or structures to purchase the pipeline system held by Bishop, which will be reviewed and considered by the Seller.

GOVERNMENT
EXHIBIT
38
PENGAD-Bayonne, N. J.

ENB-DOJ-035910

September 16, 1999
Page 2

(iv) **Consideration** - a detailed description of the form of consideration that the Purchaser is prepared to pay for the stock of Bishop  As discussed, this consideration will be adjusted at closing in order to reconcile with the balance sheet in Appendix 1.

(v) **Value for MarGasCo** – please indicate the implicit value from within the total bid that is attributed to MarGasCo  While MarGasCo is intended to be part of the sale, the Seller may consider retaining MarGasCo if this entity does not have meaningful value to the Purchaser.

(vi) **Approvals and Conditions to Close** - a summary of the approvals and any other conditions required in connection with the Offer and consummation of the Transaction  Purchaser should note that the Seller expects that all required corporate approvals for the Transaction, including the authorization of Purchaser's Board of Directors, will be obtained prior to the submission of the Offer  Any conditions to closing, in addition to those set forth in the Agreement, must be clearly identified and detailed in the Offer, including any required consents and government approvals and the timing for obtaining such approvals.

(vii) **Financing** - details regarding the proposed financing of the Transaction, including, as appropriate, the proposed amount of senior debt, subordinated debt and equity, and the type of financing (e.g  bridge, bank, private and/or public capital markets), as well as the identity of all institutions involved and copies of any commitment letters or financing agreements.  Please note that the Seller will look favorably on an Offer that does not contain a financing contingency.

(viii) **The Agreement** - the terms upon which the Purchaser is prepared to consummate the Transaction should be provided with the Offer in the form of the attached Agreement. Please indicate in the Offer that Purchaser is prepared to execute promptly the Agreement in the form submitted (including any redlined revisions).  Any proposed revisions to the Agreement should be presented in the form of redlined changes to this version

(ix) **Timing** - an estimate of the time needed to close the Transaction taking into account all necessary regulatory approvals  This estimate should include a list any additional due diligence items which the Purchaser wishes to conduct prior to executing the Agreement and closing the Transaction

(x) **Other** - any additional information that may assist the Seller in its evaluation of the Offer, and

(xi) **Contacts** - the name(s) and telephone number(s) of the person(s) the Seller and Chase should contact in clarifying and responding to the Offer.

III   Transmittal of the Offer and Agreement.  The Offer and Agreement should be transmitted as follows

ENB-DOJ-035911

September 16, 1999
Page 3

(i)  if these items are transmitted by fax, the Offer and Agreement should be faxed (including any redlined revisions of the Agreement) to:

> Vean Gregg
> Chase Securities Inc.
> Global Oil and Gas
> 600 Travis, 20th Floor-CTH 86
> Houston, TX 77002
> Facsimile:  (713) 216-8882

(ii)  if these documents are transmitted by fax, an original version of the Offer should be received by the above (by hand or overnight mail) no later than 10 30 a.m. the following morning.

(iii)  absent a transmittal by fax, an original version of the Offer and Agreement should be received by the above no later than 4 00 P M. (Central Time) on Monday, September 20, 1999

(iv)  Please also submit the Agreement by e-mail in electronic form (including any redlined revisions) to the attention of Vean Gregg as follows·
> vean.gregg@chase com

IV.  <u>Selection of the Purchaser</u>  After receipt of the Offer, the Seller and Chase will contact each prospective purchaser, as necessary, to clarify the terms of such Offer or proposed revisions to the Agreement.  The Seller, with the assistance of Chase, intends to evaluate such Offers as expeditiously as practicable.  Although the foregoing reflects the Seller's present intentions concerning the process, the Seller reserves the right, in its sole discretion, to evaluate the terms and conditions of any Offer and to accept or reject any such Offer for further consideration without specifying reasons therefor and to alter the procedures set forth herein or terminate the process at any time without prior notice.

The existence and contents of this letter are subject to the terms of the confidentiality agreement that was previously executed by you and Bishop.

Chase continues to be available to respond to your questions and requests for supplementary information and to coordinate questions with respect to the Offer or Agreement.  Should you have any questions regarding the procedures detailed in this letter, please feel free to call Vean Gregg (713) 216-8848 or me (713) 216-6386  **In no event should either the Seller or Bishop be contacted directly.**

The Seller and Chase appreciate your interest in Bishop and look forward to hearing from you.

CHASE SECURITIES INC
on behalf of The Bishop Group Ltd.

Bill Manias

ENB-DOJ-035912

September 16, 1999
Page 4

Vice President
/encl.

ENB-DOJ-035913

September 16, 1999
Page 5

## Appendix 1. Pro Forma Balance Sheet projected for September 30, 1999

| Assets | ($ in Millions) |
|---|---|
| Utility Plant, Net | $61.64 |
| Other Assets, Net | 12 51 |
| **Current Assets** | |
| Cash Reserve for LTD | 10 00 |
| Accounts Receivable | 4 96 |
| Other Prepaid Expenses | 0 79 |
| Total Current Assets | 15 76 |
| **Total Assets** | **89.90** |

| Capitalization and Liabilities | |
|---|---|
| Partners Capital | $13 37 |
| Long-Term Debt | 62 39 |
| Revolving Credit Facilities | 6 00 |
| Restricted Pipeline Royalties | 3 09 |
| **Current Liabilities** | |
| Accounts Payable | 2 20 |
| Accrued Interest | 1 50 |
| Accrued Property Taxes | 0 42 |
| Other Accrued Liabilities | 0 94 |
| Total Current Liabilities | 5 06 |
| **Total Capitalization and Liabilities** | **89.90** |

| **Unencumbered Working Capital at 9/30/99** | **$0.70** |
|---|---|

FORTREND
INTERNATIONAL LLC

## FACSIMILE TRANSMISSION SHEET

**Please deliver the following pages to:**

| NAME: | OF: | | FACSIMILE NUMBER: | VOICE NUMBER: |
|---|---|---|---|---|
| Mr. Chris Kaitson | Midcoast | | 713-650-3232 | |
| | | | | |
| | | | | |
| | | | | |

FROM:   Craig J. Hoffman          VOICE NUMBER:   212-378-8880
DATE:   September 20, 1999        REGARDING:      Information we
                                                  discussed

Total number of pages:   __9__   (Includes this page)

☒ Original Will Not Follow   Original Will Follow VIA:
                             ☐ Regular Mail        ☐ Overnight Delivery
                                                   ☐ Messenger

**Comments:**
Chris,

        Please see the attached Confidentiality agreement, Draft LOI and other information you
requested.  I look forward to working with you on this matter.  If you have any questions or I
can be of any further assistance, please call.

Very truly yours,
Craig J. Hoffman

IF THIS TRANSMISSION IS NOT COMPLETE OR LEGIBLE, PLEASE CALL THE SENDER AT (212) 378-8880.

This message and the accompanying pages are intended only for the use of the party to whom it is addressed.
It may contain information which is privileged, confidential and exempt from disclosure under applicable law.
If the person receiving this communication is not the intended recipient, or an employee or agent responsible
for delivery to the intended recipient, you are hereby notified that you may not read, copy, distribute, or in any
manner desseminate the contents of this communication.

GOVERNMENT
EXHIBIT
41
PENGAD-Bayonne, N.J.

750 Lexington Avenue, 30th floor
New York, NY 10022
Telephone: 212.826.0770   Facsimile: 212.826.0077

MID 2.1-303

ENB-DOJ-019231

September 22, 1999

[Mr. Richard Robert]
Midcoast Energy
1100 Louisiana
Suite 2900
Houston, TX 77002

**DRAFT**

Re: Intent to Sell Assets

Dear Richard:

This Letter of Intent sets forth the basic terms and conditions under which Pipeline Holdings
Partners ("PHP") intends to enter into a definitive sale agreement (the "Sale Agreement") with
[Midcoast Energy] ("Midcoast") for the sale to Midcoast of the assets and certain liabilities (the
"Assets") of Bishop Pipeline Company ("BPC"). It is anticipated that the consummation of the
Sale Agreement will occur on or before [October 22, 1999], or on such other date to which the
parties to this agreement may agree.

| | |
|---|---|
| Purchase Price: | $108,700,000 payable in cash.<br>$68,300,000 of assumption of debt<br>An earn-out the provisions of which are [Provisions] |
| Asset Sale Agreement: | Subject to the prior satisfaction of the conditions precedent set forth below, PHP and Midcoast will use best efforts to enter into the Sale Agreement, and to complete the sale of the Assets on or about [October 22, 1999.] |
| | The Sale Agreement shall contain customary representations, warranties, covenants and indemnities in form and substance satisfactory to Midcoast and PHP. |
| Due Diligence: | The Seller agrees to permit Midcoast to conduct a full due diligence review of BPC. This will include review of corporate, financial and accounting records of BPC, documentation relating to any properties owned by BPC, materials relating to pending and threatening litigation, materials relating to title to the BPC's properties, environmental matters, and such other items as Midcoast considers material. Midcoast agrees to begin such review promptly after the execution of this Agreement. In the event that Midcoast determines that there exist any conditions |

**MID 2.1-304**

CNB-DOJ-019232

with respect to the documentation or records of BPC, or any other matter relating to the transactions described herein that would permit Midcoast not to consummate the transactions contemplated hereby, Midcoast will promptly advise PHP in writing of the details of such conditions and afford PHP a reasonable opportunity to correct the same.

**Financial Information:** The terms set forth in this Letter of Intent are based upon Midcoast's understanding of the financial position of BPC as of September 22, 1999.

**Other Negotiations:** PHP represents and warrants that it is not negotiating with any other party for the sale of the Assets, and has not entered into any understanding, whether binding or not, with respect to these Assets. PHP also agrees that it will not, for a period of 180 days negotiate for the sale of or offer to sell, the Assets to any other party without Midcoast's written consent. PHP, however, may be in negotiations to sell other assets of BPC that Acquirers have not expressed an interested in purchasing.

**Conditions Precedent:** The obligations of Midcoast to consummate the transactions contemplated hereby shall be subject to the following additional conditions precedent:

1. Satisfactory completion of due diligence.

2. As of the Closing Date, the description of the assets and liabilities of the company as shown in the stock purchase agreement will be accurate and complete in all material aspects.

3. On or prior to the Closing Date, all consents and waivers required in connection with the transactions contemplated hereby have been obtained.

4. All filing or consents required under applicable laws in connection with the transactions contemplated hereby will have been made.

**Good Faith Deposit:** Midcoast will pay with the execution of this Letter of Intent a deposit of [$XX,XXX] (the "Deposit"). This deposit will be applied against the purchase price when the Asset Sale Agreement is consummated. In the event that Midcoast does not perform under the intentions of this Letter of Intent, the deposit shall be refunded to the extent that PHP has not used the funds in connection with this transaction.



MID 2.1-305
AVERY®

ENB-DOJ-019233

**Transaction Costs:**      Each party is responsible for the fees or costs of its own counsel and advisors and other costs and fees applicable to this transaction.

**Confidentiality:**      The parties to this Letter of Intent shall disclose to the public or any other third party other than BPC's or PHP' legal and financial advisors the existence of this Letter of Intent or the proposed transactions described herein, other than with the express prior written consent of the other party, except as may be required by law.

**Effect**      This Letter of Intent sets forth the intent of the parties with respect to the sale of the Assets. Only the matters set forth in the paragraphs titled "Other Negotiations," "Good Faith Deposit" and "Transaction Costs" of this Letter of Intent shall be binding on the parties; otherwise this Letter of Intent creates no binding obligations of the parties.

**Additional Provisions:**



1. This agreement may be signed in counterpart and by facsimile.

2. This agreement shall be governed and construed in accordance with the laws of the state of New York. To the extent applicable, action concerning this agreement shall be taken in New York City, New York.

**MID 2.1-306**

ENB-DOI-019234

09/20/99  13.21 FAX 212 326 0010          FORTREND INTL. LLC                    ☑007

If this letter correctly sets out our intentions, please sign and return a copy to the undersigned.

Very truly yours,                           So Agreed,

PHP                                         Midcoast

By: _____                 By: _____
Name:                                       Name:
Title:                                      Title:

Copy(ies) to:

Blind Copy(ies) to:

**MID 2.1-307**

ENB-DOJ-019235

09 20/99 18:21 FAX 212 826 0010 FORTREND INTL. LLC @008

## FIRM HISTORY:

Founded in 1986, Fortrend International is an investment bank that specializes in structuring and managing economic transactions that accomplish specific tax or accounting objectives. Fortrend has acted as principal or assisted as investment banker in mergers and acquisitions that have ranged in size from $5 million to in excess of $1 billion.

Fortrend has become a leading provider of unique planning techniques and has leveraged its knowledge of tax and GAAP matters to take advantage of many overlooked opportunities. Our creativity and innovation have added significant value to our client's transactions. In many cases our structures have permitted the completion of complex transactions which, without our involvement, were not economically feasible. These qualities have lead to the development of a solid reputation with our clients and their professional advisors.

## TRANSACTION MANAGEMENT

Fortrend was built on the philosophy that attention to details, creativity and ingenuity provide the ability to take advantage of hidden opportunities. Fortrend and its principals have been involved with several billion dollars of leading edge transactions and this experience has shaped our techniques and our transaction management skills. Fortrend's professionals have diverse professional expertise that provides the depth of knowledge and flexibility necessary to work seamlessly with our clients, bankers, attorneys and accountants.

Strong relationships with the some of the most creative and talented members of major law and accounting firms have been an integral part of our success. We feel that our network of outside counsel and advisors is among the best in providing solid, well-founded advice. Fortrend encourages the development of relationships with forward-thinking professionals to help maintain our success.

## TRANSACTIONS:

Working closely with its outside counsel, Fortrend has expertise with several strategies that are on the forefront of federal income tax and U.S. GAAP planning. Fortrend structures economic transactions to provide clients with optimal financial and accounting results. Mergers and acquisitions is a very complex area of law and GAAP reporting in which Fortrend has a proven track record for realizing value otherwise overlooked.

Fortrend has significant experience in many diverse situations and our techniques are applicable in most merger and acquisition scenarios. We are always interested in opportunities to meet with corporations or individuals involved with this discipline.

MID 2.1-308 ...-™

ENB-DOJ-019236

## FORTREND'S PRINCIPALS:

Fortrend's principals have over 30 years of combined experience managing leading edge transaction structuring. They combine unique skills into a cohesive but flexible management style that allows for creativity and innovation in transaction management. Their extensive network of professionals is a major asset to Fortrend and helps keep Fortrend abreast of the latest changes and news in the mergers and acquisitions arena.

### FREDERICK FORSTER

Principal – Co-Chairman

Since 1977, Mr. Forster has had responsibility for mergers and acquisition, disposition of assets and structuring of transactions for corporations and individuals. He has also managed investment programs for corporations and individuals in the equipment leasing, petroleum and real estate industries. Prior to 1977, Mr. Forster, as a registered professional engineer, was responsible for the economic evaluation of major engineering and construction projects throughout the world.

### JEFFREY FURMAN

Principal – Co-Chairman

From 1985 to 1994, Mr. Furman was a Director of ICA International, an investment banking firm. Mr. Furman was President of Galin & Furman, a real estate company that specialized in developing residential properties. Mr. Furman currently serves as an officer of an equipment leasing company and is also president of a firm that raises equity and debt for start-up companies and real estate transactions.

**MID 2.1-309**

ENB-DOJ-019237

09/20/99  13:22 FAX 212 326 0010        FORTREND INTL. LLC                    ☑010

## Summary of Major Corporate Transactions since 1990

| Year | Type of Transaction | Industry | Size (Gross) (In Thousands) | Built-In Gain (In Thousands) |
|------|---------------------|----------|-----------------------------|------------------------------|
| 1998 | Corporate Breakup | Construction | 35,000 | 30,000 |
| 1998 | FIRPTA | Real Estate | 8,500 | 8,500 |
| 1998 | Corporate Breakup | Drilling | 15,000 | 9,500 |
| 1998 | Corporate Breakup | High Tech | 50,000 | 35,000 |
| 1998 | Corporate Breakup | Securities | 10,000 | 10,000 |
| 1997 | FIRPTA | Real Estate | 42,000 | 42,000 |
| 1997 | Corporate Breakup | Utilities | 1,200,000 | 800,000 |
| 1997 | Corporate Breakup | Securities | 75,000 | 210,000 |
| 1997 | FIRPTA | Real Estate | 30,000 | 15,500 |
| 1997 | Corporate Breakup | Securities | 120,000 | 70,000 |
| 1996 | Corporate Breakup | Broadcasting | 200,000 | 170,000 |
| 1996 | Corporate Breakup | TBT's | 26,000 | 26,000 |
| 1996 | Corporate Breakup | Insurance | 135,000 | 90,000 |
| 1996 | Corporate Breakup | Financial Services | 480,000 | 400,000 |
| 1996 | FIRPTA | Real Estate | 35,000 | 35,000 |
| 1995 | Corporate Breakup | Financial Services | 18,000 | 16,000 |
| 1994 | Capital Loss Transfer | Real Estate | 100,000 | |
| 1994 | Corporate Breakup | Transportation | 1,350,000 | 750,000 |
| 1994 | Corporate Breakup | TBT's | 140,000 | 140,000 |
| 1994 | FIRPTA | Real Estate | 12,000 | 12,000 |
| 1994 | Structured Lease | Transportation | 100,000 | |
| 1994 | Structured Lease | Manufacturing | 25,000 | |
| 1993 | Corporate Breakup | Defense | 22,000 | 19,000 |
| 1993 | Structured Lease | Manufacturing | 20,000 | |
| 1992 | Corporate Breakup | Financial Services | 6,000 | 6,000 |
| 1992 | Structured Lease | Manufacturing | 120,000 | |
| 1992 | Structured Lease | Entertainment | 27,000 | |
| 1991 | Cap Loss Conv | Misc | 10,000 | |
| 1991 | Corporate Breakup | Power Generation | 66,000 | 66,000 |
| 1991 | Corporate Breakup | Aircraft | 40,000 | 40,000 |
| 1991 | Corporate Breakup | Aircraft | 10,000 | 10,000 |
| 1991 | Corporate Breakup | TBT's | 40,000 | 40,000 |
| 1991 | Corporate Breakup | Misc | 8,000 | 8,000 |

**MID 2.1-310**

ENB-DOJ-019238

CC: *[handwritten]* Chris Keito

# F O R T R E N D
## I N T E R N A T I O N A L

September 20, 1999

**VIA FACSIMILE**

Mr. Richard Robert
Midcoast Energy
1100 Louisiana
Suite 2900
Houston, TX 77002

*[handwritten] make file (Kansas pipeline) Fortrend put on cover*

Re:  Confidentiality

Dear Richard:

*[handwritten] and MarGasCo.*

*[handwritten right margin] P/a*

We are providing you with information concerning a transaction relating to the purchase of the assets of *[handwritten: the entities owning]* Kansas City Pipeline Company (the "Transaction"). In consideration of being furnished with such information, we request your agreement to the following (it being understood that you are also agreeing to cause your directors, officers, employees, representatives, advisors and/or agents (collectively "Representatives") to comply with the provisions hereof:

*[handwritten left margin] K pe*

- Written information provided to you as well as any additional information disclosed to you or any of your Representatives which contains or otherwise reflects or is generated from such information or documents (the "Evaluation Material") will be used solely for the purpose of evaluating the possible use of the Transaction by you and your clients and all the Evaluation Material will be kept confidential by you and your Representatives and shall not be reproduced, disclosed, distributed or communicated, directly or indirectly, in whole or in part, by you or your Representatives to any other person, *[handwritten: except as may be required by law.]*

*[handwritten right margin] P/a*

- You will only disclose those portions of the Evaluation Material to those Representatives who need to know such information for evaluating the Transaction and you agree that you will inform each of such Representatives of the existence and content of this agreement and will take all reasonable action necessary to cause such Representatives to observe the terms and provisions of this agreement. In any event, you agree to be responsible for any breach of this agreement by any of the Representatives.

- You recognize and acknowledge the competitive value and confidential nature of the Evaluation Material and the irreparable damage that could result if information contained therein is disclosed to any third party in violation of this

FORTREND INTERNATIONAL LLC
750 LEXINGTON AVENUE
30TH FLOOR
NEW YORK, NY 10022
TEL - (212) 826-0770 • FAX - (212) 826-0077

**MID 2.1-439**

GOVERNMENT
EXHIBIT
42
PENGAD-Bayonne, N.J.

ENB-DOI-019368

agreement. Notwithstanding the other provisions hereof, you agree that the Evaluation Material will not be used by you or any of your Representatives in any way detrimental to us. You agree that money damages would not be a sufficient remedy for any breach of this agreement and, accordingly, that we shall be entitled to equitable relief, including injunction and specific performance, in the event of any breach or potential breach of the provisions of this agreement, in addition to all other remedies available to us at law or in equity.

- If you do not enter into a transaction with us using the Transaction described in the Evaluation Material, you will promptly return to us all copies of the Evaluation Material, and any copies, notes, extracts or other reproduction thereof, without retaining any copy thereof.

- None of the provisions in this agreement can be waived or amended except by written consent of Fortrend International LLC.

This agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

This agreement will be governed by and construed in accordance with the laws of the State of New York.

If you agree with the foregoing, please sign both copies of this agreement and return one to us. The other copy is for your records.

Sincerely,

Craig J. Hoffman

Confirmed and Agreed as
of the date written above:
MIDCOAST ENERGY RESOURCES, INC.

By: _____ CK
      Richard Robert

Title: CFO & Treasurer
        Midcoast Energy

Copy to:     Mr. Jeffrey Furman

**MID 2.1-440**

| | |
|---|---|
| **TO:** | **Craig J. Hoffman**<br>**Fortrend International** |
| **CC:** | **Jeffrey Furman** |
| **FAX NO.:** | **212/826-0077** |
| **FROM:** | **Richard A. Robert** |
| **DATE:** | **October 4, 1999** |
| **PAGES:** | **3** **(including cover)** |
| **SUBJECT:** | Confidentiality |

---

**CONFIDENTIALITY NOTICE**

The documents accompanying this facsimile transmission contain confidential information which is legally privileged. The information is intended only for the use of the recipient named below. If you have received this telecopy in error, please immediately notify us by telephone, at our expense, and destroy the enclosed material. Your cooperation is appreciated.

```
                                                OK        RESULT
                                                3         PGS. SENT
                                             00.58        USAGE T
                                          10/04 10:05     ST. TIME
                                                          CONNECTION ID
                                                          SUBADDRESS
                      8121282600TT                        CONNECTION TEL.
                           0763                           TX/RX NO
                                      TRANSMISSION OK

                  *********************
                  ***   TX REPORT   ***          MID 2.1-441
                  *********************
```

ENB-DOJ-019370

**MIDCOAST ENERGY RESOURCES, INC.**
1100 LOUISIANA, SUITE 2950
HOUSTON, TX 77002
Tel.: 713-650-8900
Fax: 713-653-6710

# FAX TRANSMISSION

| | |
|---|---|
| **TO:** | **Craig J. Hoffman**<br>**Fortrend International** |
| **CC:** | **Jeffrey Furman** |
| **FAX NO.:** | **212/826-0077** |
| **FROM:** | **Richard A. Robert** |
| **DATE:** | **October 4, 1999** |
| **PAGES:** | **3      (including cover)** |
| **SUBJECT:** | Confidentiality |

**CONFIDENTIALITY NOTICE**

The documents accompanying this facsimile transmission contain confidential information which is legally privileged. The information is intended only for the use of the recipient named below. If you have received this telecopy in error, please immediately notify us by telephone, at our expense, and destroy the enclosed material. Your cooperation is appreciated.

**MID 2.1-442**

ENB-DOJ-019371

Calculation of Make Whole Cost Sharing

Assumptions:

| | |
|---|---|
| Fortrend Effective Tax Rate: | 34% |
| Midcoast Effective Tax Rate: | 38% |
| Midcoast Libor Spread: | 1.75% |

| | |
|---|---|
| Total Make Whole before Accrued Interest | 8,213,813 |
| Fortrend Estimated Effective Tax Rate | 34% |
| Fortrend Savings due to Tax Write-Off | 2,792,696 |
| | |
| After Tax Cost of Make Whole | 5,421,117 |
| Midcoast After Tax Interest Savings | (1,714,911) |
| Net Remaining Liability | 3,706,206 |
| | |
| **50% to be Shared by DML and Midcoast** | **1,853,103** |



GOVERNMENT
EXHIBIT
50

MID 2.1-1700

ENB-DOJ-018087

Mid Coast Energy
9.64%  Senior Notes due 12/31/08

Interest Savings resulting from refinancing
3m LIBOR            6.80% Amortizing Fixed Rate Swap
Borrowing Spread    1.75%
Initial Int Rate    8.55%

Midcoast Tax Rat    38.00%

LIBOR Change        0.00% Do simple sensitivity analysis with floating rates.
(semiannual))

| Date | Period from 11/1/99 | Note Interest Rate | Interest Payment | Refinanced Interest Rate | Refinanced Interest Payment | Dollar Savings | After - Tax Savings | Present Value A-T Savings |
|---|---|---|---|---|---|---|---|---|
| 11/1/99 | | | | | | | | |
| Before Repurchase | | | $2,004,680 | | | | | |
| 12/31/1999 | 0.17 | 9.64% | 1,002,340 | 8.55% | 869,248 | 133,092 | 82,517 | 81,374 |
| 6/30/2000 | 0.67 | 9.64% | 2,906,779 | 8.55% | 2,578,108 | 328,671 | 203,776 | 192,714 |
| 12/31/2000 | 1.17 | 9.64% | 2,801,707 | 8.55% | 2,484,916 | 316,790 | 196,410 | 178,133 |
| 6/30/2001 | 1.67 | 9.64% | 2,691,570 | 8.55% | 2,387,232 | 304,337 | 188,689 | 164,114 |
| 12/31/2001 | 2.17 | 9.64% | 2,576,124 | 8.55% | 2,284,840 | 291,284 | 180,596 | 150,635 |
| 6/30/2002 | 2.67 | 9.64% | 2,455,114 | 8.55% | 2,177,513 | 277,601 | 172,113 | 137,674 |
| 12/31/2002 | 3.17 | 9.64% | 2,328,272 | 8.55% | 2,065,013 | 263,259 | 163,221 | 125,208 |
| 6/30/2003 | 3.67 | 9.64% | 2,195,316 | 8.55% | 1,947,090 | 248,226 | 153,900 | 113,218 |
| 12/31/2003 | 4.17 | 9.64% | 2,055,951 | 8.55% | 1,823,483 | 232,467 | 144,130 | 101,684 |
| 6/30/2004 | 4.67 | 9.64% | 1,909,869 | 8.55% | 1,693,919 | 215,950 | 133,889 | 90,586 |
| 12/31/2004 | 5.17 | 9.64% | 1,756,746 | 8.55% | 1,558,109 | 198,636 | 123,154 | 79,908 |
| 6/30/2005 | 5.67 | 9.64% | 1,596,242 | 8.55% | 1,415,754 | 180,488 | 111,903 | 69,630 |
| 12/31/2005 | 6.17 | 9.64% | 1,428,002 | 8.55% | 1,266,537 | 161,465 | 100,108 | 59,738 |
| 6/30/2006 | 6.67 | 9.64% | 1,251,652 | 8.55% | 1,110,127 | 141,525 | 87,746 | 50,214 |
| 12/31/2006 | 7.17 | 9.64% | 1,066,803 | 8.55% | 946,179 | 120,624 | 74,787 | 41,043 |
| 6/30/2007 | 7.67 | 9.64% | 873,044 | 8.55% | 774,329 | 98,716 | 61,204 | 32,212 |
| 12/31/2007 | 8.17 | 9.64% | 669,946 | 8.55% | 594,195 | 75,751 | 46,966 | 23,705 |
| 6/30/2008 | 8.67 | 9.64% | 457,058 | 8.55% | 405,379 | 51,680 | 32,041 | 15,509 |
| 12/31/2008 | 9.17 | 9.64% | 233,910 | 8.55% | 207,461 | 26,448 | 16,398 | 7,612 |
| | | | $32,256,443 | | $28,589,433 | $3,667,010 | $2,273,546 | $1,714,911 |

MID 2.1-1701

ENB-DOJ-018088

**Mid Coast Energy**
**9.64% Senior Notes due 12/31/08**
**Make-Whole Calculation as of October 14, 1999**

| Maturity | 12/28/2008 | |
|---|---|---|
| Prepayment Date | 11/1/1999 | |
| Average Life | 5.55 years | |
| Yield approximating Ave Life | 6.077% | Interpolated between 5 and 6 year. |
| Premium: | 0.50% | |
| Formula Yield: | 6.58% | |
| Coupon. | 9.64% | |
| Principal: | $62,386,300 | |

| Date: | Period from 11/1/99 | Interest Pmt | Principal | Principal Balance | Cash Flow | Discounted Cash Flow | | DAYS | YEARS | AVG LIFE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | $62,386,300 | | | | | | |
| 11/1/99 | Before Repurchase | $2,004,680 | | $62,386,300 | | | | | | |
| 12/31/1999 | 0.17 | 1,002,340 | 2,079,684 | 60,306,616 | 3,082,024 | 3,048,962 | | 60 | 0.2 | 0.006 |
| 6/30/2000 | 0.67 | 2,906,779 | 2,179,925 | 58,126,691 | 5,086,705 | 4,871,924 | | 240 | 0.7 | 0.024 |
| 12/31/2000 | 1.17 | 2,801,707 | 2,284,998 | 55,841,693 | 5,086,705 | 4,716,812 | | 420 | 1.2 | 0.044 |
| 6/30/2001 | 1.67 | 2,691,570 | 2,395,135 | 53,446,558 | 5,086,705 | 4,566,638 | | 600 | 1.7 | 0.066 |
| 12/31/2001 | 2.17 | 2,576,124 | 2,510,576 | 50,935,982 | 5,086,700 | 4,421,242 | | 780 | 2.2 | 0.090 |
| 6/30/2002 | 2.67 | 2,455,114 | 2,631,586 | 48,304,396 | 5,086,700 | 4,280,478 | | 960 | 2.7 | 0.116 |
| 12/31/2002 | 3.17 | 2,328,272 | 2,758,428 | 45,545,968 | 5,086,700 | 4,144,196 | | 1140 | 3.2 | 0.145 |
| 6/30/2003 | 3.67 | 2,195,316 | 2,891,384 | 42,654,584 | 5,086,700 | 4,012,253 | | 1320 | 3.7 | 0.176 |
| 12/31/2003 | 4.17 | 2,055,951 | 3,030,749 | 39,623,835 | 5,086,700 | 3,884,511 | | 1500 | 4.2 | 0.209 |
| 6/30/2004 | 4.67 | 1,909,869 | 3,176,831 | 36,447,004 | 5,086,700 | 3,760,836 | | 1680 | 4.7 | 0.246 |
| 12/31/2004 | 5.17 | 1,756,746 | 3,329,954 | 33,117,049 | 5,086,700 | 3,641,099 | | 1860 | 5.2 | 0.285 |
| 6/30/2005 | 5.67 | 1,596,242 | 3,490,458 | 29,626,591 | 5,086,700 | 3,525,173 | | 2040 | 5.7 | 0.328 |
| 12/31/2005 | 6.17 | 1,428,002 | 3,658,698 | 25,967,893 | 5,086,700 | 3,412,939 | | 2220 | 6.2 | 0.374 |
| 6/30/2006 | 6.67 | 1,251,652 | 3,835,048 | 22,132,845 | 5,086,700 | 3,304,278 | | 2400 | 6.7 | 0.424 |
| 12/31/2006 | 7.17 | 1,066,803 | 4,019,897 | 18,112,948 | 5,086,700 | 3,199,076 | | 2580 | 7.2 | 0.478 |
| 6/30/2007 | 7.67 | 873,044 | 4,213,656 | 13,899,293 | 5,086,700 | 3,097,224 | | 2760 | 7.7 | 0.536 |
| 12/31/2007 | 8.17 | 669,946 | 4,416,754 | 9,482,538 | 5,086,700 | 2,998,614 | | 2940 | 8.2 | 0.598 |
| 6/30/2008 | 8.67 | 457,058 | 4,629,642 | 4,852,897 | 5,086,700 | 2,903,144 | | 3120 | 8.7 | 0.665 |
| 12/31/2008 | 9.17 | 233,910 | 4,852,790 | 106 | 5,086,700 | 2,810,714 | | 3300 | 9.2 | 0.738 |
| | | $32,256,443 | $62,386,194 | | $94,642,637 | $70,600,113 | | Weighted Average Life | | 5.548 |
| | | | | | | | | | | 5 years and 6.5mo |

| Sum of Cash Flows | $70,600,113 |
|---|---|
| Principal | ($62,386,300) |
| Make Whole Amount: | $8,213,813 |

Bond Price     $113.17

| | 62,386.30 | | t = | | 6.08% |
|---|---|---|---|---|---|
| | 9.64% | | makewhole | | 0.50% |
| | i | p | | cf | |
| 6/30/1999 | | | 62,386.30 | | |
| 12/31/1999 | 3,007.0 | 2,079.68 | 60,306.62 | 5,086.7 | $4,923.77 |
| 6/30/2000 | 2,906.8 | 2,179.93 | 58,126.69 | 5,086.7 | $4,767.73 |
| 12/31/2000 | 2,801.7 | 2,285.00 | 55,841.69 | 5,086.7 | $4,615.01 |
| 6/30/2001 | 2,691.6 | 2,395.14 | 53,446.56 | 5,086.7 | $4,469.55 |
| 12/31/2001 | 2,576.1 | 2,510.58 | 50,935.98 | 5,086.7 | $4,326.38 |
| 6/30/2002 | 2,455.1 | 2,631.59 | 48,304.40 | 5,086.7 | $4,190.02 |
| 12/31/2002 | 2,328.2 | 2,758.43 | 45,545.97 | 5,086.7 | $4,055.80 |
| 6/30/2003 | 2,195.3 | 2,891.38 | 42,654.58 | 5,086.7 | $3,927.97 |
| 12/31/2003 | 2,056.0 | 3,030.75 | 39,623.83 | 5,086.7 | $3,802.15 |
| 6/30/2004 | 1,909.9 | 3,176.83 | 36,447.00 | 5,086.7 | $3,681.66 |
| 12/31/2004 | 1,756.7 | 3,329.95 | 33,117.05 | 5,086.7 | $3,563.73 |
| 6/30/2005 | 1,596.2 | 3,490.46 | 29,626.59 | 5,086.7 | $3,451.41 |
| 12/31/2005 | 1,428.0 | 3,658.70 | 25,967.89 | 5,086.7 | $3,340.85 |
| 6/30/2006 | 1,251.7 | 3,835.05 | 22,132.85 | 5,086.7 | $3,235.55 |
| 12/31/2006 | 1,066.8 | 4,019.90 | 18,112.95 | 5,086.7 | $3,131.91 |
| 6/30/2007 | 873.0 | 4,213.66 | 13,899.29 | 5,086.7 | $3,033.20 |
| 12/31/2007 | 669.9 | 4,416.75 | 9,482.54 | 5,086.7 | $2,936.04 |
| 6/30/2008 | 457.1 | 4,629.64 | 4,852.90 | 5,086.7 | $2,843.00 |
| 12/31/2008 | 233.9 | 4,852.79 | 0.11 | 5,086.7 | $2,751.93 |
| | 34,261.1 | 62,386.19 | | | $71,047.67 |
| | | | 71081.17891 | | |
| | Avg. Life | | 6.197 yrs | | 113.9% |
| | | | | | $8,661.37 |

**MID 2.1-1702**

ENB-DOJ-018089