IN WITNESS WHEREOF, Enbridge and KPC execute this Termination Agreement as of January 1, 2001.


ENBRIDGE PIPELINES (MIDLA) INC.

ENBRIDGE PIPELINES (KPC)
By:  MIDCOAST KANSAS
GENERAL PARTNER, INC., its
General Partner


By:_____

      E. Chris Kaitson
      Vice President & Secretary

By: _____

      E. Chris Kaitson
      Vice President & Secretary

SCHEDULE A

to

BUTCHER INTEREST PARTNERSHIP
GENERAL PARTNERSHIP AGREEMENT

*Butcher Interest* means one and one-half percent (1.5%) of the *Adjusted Gross Pipeline Proceeds*, as defined below. *Butcher Interests* shall burden the assets of the *Pipeline*, the *New KansMo Partnerships*, the *KansOk Partnerships*, the *KansMo Assets* and the *KN Assets* and run with the land (the easements and rights-of-way) as well as run with the personal and/or mixed property; i.e., the *Butcher Interests* shall burden and run with all of the above assets, and as such shall survive and be superior to any transfer, hypothecation, pledging, encumbrances, merger, reorganization, sale, consolidation, etc. Of the *Pipeline*, the *New KansMo Partnerships*, the *KansOk Partnerships*, the *KansMo Assets* and the *KN Assets* and/or any of the *Entities* which now or hereafter own any of the same. For purposes of this Schedule A, *Adjusted Gross Pipeline Proceeds* shall mean: (i) the total proceeds received from transportation of all natural gas transported through all or any portion of the *Pipelines* free and clear of, and without deduction for, all costs and expenses (except as provided below) incurred in transporting such natural gas and any and all taxes, and (ii) the gross spread between total proceeds received through the sale by the *Entities* owning the *Pipelines* of natural gas that is transported through all or any portion of the *Pipelines* and *Pipelines'*, and/or *Entities* owning the *Pipelines*, cost of acquiring such natural gas, free and clear of, and without deduction for, all costs and expenses incurred in connection therewith and any and all taxes; provided, however, that *Adjusted Gross Pipeline Proceeds* in either of the above cases shall not include actual conservation taxes, *KCC, OCC* and/or *MCC* fees and/or assessments, *FERC* Administrative Cost Assessments and Gas Research Institute fees, third party and/or *Affiliated Entity* marketing and/or brokerage fees, local distribution company and/or pipeline transportation fees, and/or other similar costs, fees, taxes, assessments, and/or expenses which are approved in writing by *TCW* in its reasonable discretion (collectively, the *Passthrough Expenses*), all of which *Passthrough Expenses* must be collected by the *Entities* owning the *Pipelines*. Notwithstanding the foregoing, in no event shall *Passthrough Expenses* include costs, fees, taxes, assessments and/or expenses listed in the *Pipeline Budgets*, as defined in the *TCW Loan Documents*, or any other costs, fees, assessments and/or expenses not specifically provided for in this Exhibit. *Adjusted Gross Pipeline Proceeds* shall include, without limitation, any prepayments received under transportation or sales contracts for natural gas to be delivered in the future or any other payments received relating to the transportation or sale of natural gas, including without limitation payments for capacity, standby-capacity, or other payments respecting such transportation or sales contracts, however characterized. For purposes of the Financing Statement, the definitions, meanings and explanations attributable to the italicized words herein shall be those attributed to them in a Restated and Amended Butcher Agreement dated April 15, 1990 by and between Butcher Resources, Inc., The K-Pipe Group, Ltd. and Kansas Transmission, Inc. and in the *General Agreement* dated June 22, 1990 by and between OKM Gas Pipeline Company, L.P., OKM Gas partners, L.P., The K-Pipe Group, Ltd., Management Resources Group, Ltd., The K-Pipe Corporation, K-Pipe Engineering, Inc.,

Kansas Gas Marketing, Inc., K-Pipe Pipeline Company, Kansas Natural, Inc., KansOk, Inc., Riverside Pipeline Company, Kansas Pipeline Company, Mid-Kansas Gas, inc. and Energy Resource Management, Inc., both of which agreements are incorporated herein by reference thereto.

**END.**

## DISSOLUTION OF BUTCHER INTEREST PARTNERSHIP
### AND
## CONVEYANCE OF BUTCHER INTEREST PARTNERSHIP PROPERTY
### TO
## MID LOUISIANA GAS COMPANY

WHEREAS, K-Pipe Group, Inc., a Kansas corporation, and Mid Louisiana Gas Company, a Delaware corporation, collectively owned all the partnership interest of Butcher Interest Partnership, a Delaware general partnership (hereinafter referred to as the "Company"); and

WHEREAS, by conveyance dated and effective November 9, 2000, K-Pipe Group, Inc. sold and conveyed to Mid Louisiana Gas Company all of the said K-Pipe Group, Inc.'s partnership interest of the Company, including the capital accounts, distribution rights, voting rights and all other rights and interests attributable to all of K-Pipe Group, Inc.'s partnership ownership of the Company;

NOW, THEREFORE, in consideration of the recitals hereinbefore, Mid Louisiana Gas Company hereby declares the Butcher Interest Partnership dissolved, and hereby distributes and assigns to itself, as the sole remaining owner and holder of all of the partnership interests of the Company prior to dissolution of the Company all property and rights owned by Butcher Interest Partnership, including, without limitation, all that certain property and rights described in Schedule A to the General Partnership Agreement of the Company (which Schedule A is attached to and made a part hereof).

DATED effective as of November 9, 2000.

MID LOUISIANA GAS COMPANY

By: _____

Name: Richard Robert

Title: CFO & Treasurer

# MIDCOAST ENERGY RESOURCES, INC.

## BOARD OF DIRECTORS MEETING

### October 7, 1999

---

ATTENDANCE:
| | |
|---|---|
| I. J. Berthelot II (*) | Bruce Withers (*) |
| Richard N. Richards (*) | Ted Collins (*) |
| Dan C. Tutcher (*) | Richard Robert |
| Curtis Dufour (*) | Duane S. Herbst |
| (*) Members | |

I.   **CALL TO ORDER**

The meeting was called to order at 3:40 p.m. with all members of the Board present telephonically.  Also present were Duane S. Herbst, Vice President of Corporate Affairs and Secretary, and Richard Robert, Chief Financial Officer and Treasurer.

II.   **KANSAS PIPELINE**

Mr. Berthelot reviewed for the Board the physical assets of Kansas Pipeline which primarily consist of an interstate pipeline that runs from the Oklahoma panhandle to the metropolitan Kansas City market. The principal customers on the system are the LDC's for the Kansas City and Wichita markets, which KPC can supply 128 and 32 MMcf/day respectively. Virtually all contracts are long-term (10+ years) which provides a stable cash flow. Environmentally the system is very clean and the facilities are in excellent shape. He noted the condition of the system was due to the fact it was only somewhat recently converted from crude oil to gas as discussed in an earlier Board meeting.

Mr. Tutcher reviewed the biggest risk in the project is the pending rate case.  The current rate base is $30.7 million, while KPC has requested an increase to $34.6 million. Management believes in its discussions that a worst cast scenario would be $29.5 million.

Mr. Berthelot noted the rationale for the purchase were that only KPC and Williams can serve the entire Kansas City market, the long-term nature of the contracts provides stable cash flow, Kansas City and Wichita are growing at 4% per year, there is potential for conversion to gas powered electric generation in the area and synergies exist with current Midcoast systems.

Mr. Robert noted that the project will require a $20 million equity infusion. Also as part of the purchase, Mr. Langley will get 50% of any rate settlement above $29.5 million and the right to participate on a heads-up basis for 50% of any expansion. A Project Development Agreement also gives Mr. Langley certain exclusive rights with regard to Indian land, alternative energy or electricity generation projects for seven years.  There is a provision such that we can buy-out his upside sharing agreement for the greater of $30 million or the fair market value. If he is bought out prior to three years the price is $50 million.

GOVERNMENT EXHIBIT

70

PENGAD-Bayonne, N.J.

MID 1.1-1

Finally, Mr. Tutcher explained the company will also acquire a fractional interest in a corporate jet leasing program as part of the acquisition.

Mr. Berthelot next reviewed the economic evaluations which he believed were very conservative and include no upside. The real immediate benefit is the cash flow generated by KPC. Much discussion followed on the relatively low rate of return and whether Midcoast has the infrastructure to assume an operation of this size. Mr. Tutcher noted he was comfortable with Midcoast handling the asset in light of the fact there are only three major customers, so there are very few contractual issues, and the assets are in excellent shape.

Finally, Mr. Berthelot explained in more detail the issues regarding the rate case and how he had handicapped the ultimate results of the case.

It was finally moved, seconded and unanimously approved to proceed with the purchase.

The meeting was then adjourned at 4:35 p.m.

Respectfully Submitted,

Duane S. Herbst, Secretary

2

**MID 1.1-2**

ENB-DOJ-015673

*08019.0011.2A*

# RONALD L. CHACHERE
### ATTORNEY AT LAW
FACSIMILE: (512) 883-2357
SUITE 970 • MERCANTILE TOWER • MT115
CORPUS CHRISTI, TEXAS 78477 • (512) 883-2356

## FAX TRANSMITTAL

**CONFIDENTIALITY NOTICE:** The documents accompanying this facsimile transmission contain confidential information which is legally privileged. The information is intended only for the use of the recipient named below. If you have received this telecopy in error, please immediately notify us by telephone, at our expense, and destroy the enclosed material. Your cooperation is appreciated.

**Date:** 10/7/99

**Time:** _____

**Route to:** Tino Monaldo, Esq.

**Firm/Company:** The Bishop Group, Ltd.

**Recipient's Fax Number:** (913) 962-6517

**From:** Ronald L. Chachere, Attorney-at-Law

**Re:** Stock Purchase Agreement + Schedules thereto

**Message:** Please note comments, inquiries+ requested changes to the referenced documents

**Number of Pages Transmitted: (including this cover page)** 20

    If there is a problem with transmission, please call (512) 883-2356.

CC: Jim Pryde, Esq. (816)374-3300
CC: Chris Karlson, Esq. (713) 650-3232

**002679**
KP1657

GOVERNMENT
EXHIBIT
11

FNB-DOJ-000946

*Taxes*: All Federal, state, local, foreign and other taxes of any kind, including without limitation, those on or measured by or referred to as income, gross receipts, sales, use, ad valorem, franchise, profits, withholding, payroll, employment, excise, severance, stamp, occupation, value added, windfall profits taxes, customs duties or similar fees and assessments of any kind, including interest, penalties and additions to tax or additional amounts imposed by any governmental authority with respect thereto.

*Tax Returns*: All returns, declarations, reports, information returns and statements with respect to Taxes of whatsoever kind.

*Transaction*: The transactions contemplated by this Agreement and those contemplated by the Additional Agreements.

*Working Cash*: Working Cash shall have the meaning set forth on Schedule 5.1(b) hereto.

1.2    Additional Terms.  Terms not set forth in Section 1.1, but otherwise defined in the body of this Agreement, shall have the specific meanings attributed to them in the text.  Terms in the singular shall have the same meanings when used in the plural and vice versa.

## ARTICLE II.
### PURCHASE AND SALE

*at the Closing, but*

2.1    Purchase and Sale.  Upon the terms and subject to the terms and conditions of this Agreement, {at the Closing} [effective as of the Effective Time], Buyer will purchase from Stockholder, and Stockholder will sell to Buyer, the Common Stock for the Purchase Price.{ The Preliminary Cash Consideration shall be paid at Closing.}

2.2    Closing.  On October 22, 1999, the Preliminary Cash Consideration and all documents required by {Section 10.1, 10.2} [Sections 3.1] and {10.3} [3.2] will be deposited by the Parties with the Escrow Agent pursuant to the Escrow Agreement attached hereto as Schedule 2.2.  The Closing of the Transaction shall occur at the offices of Bryan Cave LLP, 1200 Main, Suite 3500, Kansas City, MO 64105, commencing at 10:00 A.M., local time, on the earlier of {October 30} [November 4], 1999 or the date otherwise mutually agreed to by the Parties.

## ARTICLE III
### [DELIVERIES AT CLOSING

3.1    Deliveries by Seller.  At the Closing, Seller shall deliver, or cause to be delivered, to Buyer (and shall execute and/or notarize where applicable), the various instruments, documents and certificates listed on Schedule 3.1 hereto.

3.2    Deliveries by Buyer.  At the Closing, Buyer shall deliver, or cause to be delivered, to Seller (and shall execute and/or notarize, where applicable), the various

002680

KP1658

ENB-DOJ-000947

5.2   Make Whole Premium.   Certain secured debt of the Company to the noteholders described in the **Company Disclosure Schedule** may be called for prepayment as a result of the Transaction and transactions by Stockholder prior to Closing contemplated hereby, and as a result a "Make Whole Premium" or similar amount may be due in addition to any principal and accrued interest. The Parties agree that Buyer shall be obligated to pay any and all principal, interest, Make Whole Premium, and any and all other premiums, costs, fees (including assumption fees), penalties, due or which may be due, now or at date hereafter, pursuant to the terms of the Company Debt Instruments. The Company Debt Instruments are identified in the **Company Disclosure Schedule.** In the event the Company Debt Instruments are requested to be paid in full by the holders of the Company Debt Instruments within forty-five (45) days after Closing, the Stockholder shall pay to Buyer the total fees, costs, premiums and expenditures associated with the early call of the Company Debt Instruments up to one million, one hundred thousand dollars ($1,100,000), payable with the Revised Adjustment Amount.

5.3   Contingent Future Cash Consideration for Common Stock.   Buyer shall pay Stockholder additional contingent future cash consideration for the Common Stock as set forth on Schedule 5.3 hereto.

5.4   Purchase of Assets.   Prior to or simultaneous with the Closing, the assets of the Company and/or its Subsidiaries and/or Affiliates set forth on **Schedule 5.4A** hereto (including without limitation, the stock of The Bishop Corporation and E&C Group, Inc., and the limited liability interests in Bishop Rink Holdings, LLC and KP Operating Company, LLC) (the "Excluded Assets") will be sold to Stockholder for a purchase price of $_____ pursuant to Asset Purchase Agreements substantially in the form of Schedule 5.4B attached hereto. The parties will cause all appropriate documents to be executed and delivered at Closing to transfer the Excluded Assets to Stockholder. In addition, Stockholder and not the Company or the Buyer shall own and have the rights to use the name "The Bishop Group Ltd." and all derivatives thereof. In addition, the assets listed on Schedule 5.4C will be distributed to Stockholder in redemption of shares of _____ shares of Class A Common Stock pursuant to the Redemption Agreement substantially in the form of Schedule 5.4C. Buyer and its Affiliates shall execute all documents which may be necessary, after Closing, for any of the assets to be assigned, distributed and transferred to Stockholder, pursuant to this Section 5.4.

### ARTICLE VI
### REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY

Except as provided in this Agreement and except as set forth in the Company Disclosure Schedule (each section of which qualifies ~~all of the relevant~~ representations and warranties), the Stockholder hereby represents and warrants to Buyer and as follows:

6.1   Company Shares.   The Company Shares, at the ~~[Effective Time]~~ [Closing], will constitute all of the issued and outstanding capital stock of the Company and all such shares of Company Shares will have been duly authorized, validly issued and shall be fully paid and non-assessable.

Transaction Agreement
KC01 440994.15 (REDLINE 14 v 15)
10/6/99 4:49 PM

002681
KP1659

ENB-DOI-000948

such representatives answer any questions regarding the business of the Company, all of which questions have been answered to Buyer's full satisfaction, and to obtain any additional information which Company or Stockholder possess that is necessary to verify the accuracy of the information supplied during the course of such investigation. Buyer has had access to the facilities and properties of Company and has inspected them to Buyer's satisfaction. Further, Buyer acknowledges that (i) Buyer has been advised that the Company and its Subsidiaries have certain Pending Claims, including without limitation a rate case by the Company's Subsidiary, Kansas Pipeline Company, pursuant to Section 4 of the Natural Gas Act, (ii) the outcomes of Pending Claims, including the rate case, are impossible to predict, (iii) neither the Company nor Stockholder are making any representations or warranties of any kind or nature with respect to the Pending Claims (including the rate case) including without limitation with respect to the outcome thereof, (iv) the outcome of the Pending Claims, including the rate case, could have a Material Adverse Effect and the Transaction Consideration and the consummation of the Transaction by Buyer and are based on Buyer's independent evaluation of the Pending Claims, including the rate case. As a result of the foregoing, as of the Closing, and without any further action required, Buyer, on behalf of itself and all of its Affiliates, shall be deemed to release and discharge as of the Closing the Stockholder and the Company and its Subsidiaries and each of their officers, directors, stockholders, employees, agents and representatives from and against all Agreement-Related Litigation and all claims which could be made in any Agreement-Related Litigation, including without limitation any claims pursuant to Rule 10(b)-5 of the Exchange Act or common law fraud.

8.8    Representations Cut-Off. Within 15 business days (the "Cut-off Date") after execution and delivery of this Agreement by Buyer, Buyer must submit to Stockholder a statement (the "Representations Statement") describing in detail any breaches of representations or warranties by Stockholder then known to Buyer. Stockholder will then have 30 days to cure said breaches of representations or warranties. Buyer will be barred from seeking any indemnities or other remedies hereunder or from refusing to Close pursuant to Section 10.2(b) for any breaches of representations or warranties by Stockholder known to Buyer prior to the Cut-off Date and not set forth in the Representations Statement.

8.9    [Intentionally Omitted].

8.10    Tax Treatment. Neither Buyer nor any of its affiliates will take any action or omit any action which would cause Stockholder to receive other than long term capital gain treatment for Federal and State income taxes of any gain recognized as a result of the sale of Stockholder's BGL shares to Buyer. Buyer agrees to indemnify Stockholder from all liability, damages, costs and expenses (including without limitation legal and accounting fees and expenses, penalties and interest (collectively, "Damages")) from a breach of this provision. Buyer hereby pledges to Stockholder all of the stock of the Company and the Company hereby grants to Stockholder a security interest in all of the assets, stock and partnership interests of the Company and its Subsidiaries and the Affiliates, in each case to secure the payment of any Damages. Buyer will cause the Company and its Subsidiaries and the Affiliates to take all actions reasonably requested by the Stockholder to perfect these security interests.

ENB-DOJ-000949

**8.11   Employee Benefits.** Buyer agrees that after the Closing it will not allow the Company (or any successor or assign thereof) to take any action or omit to take any action which would, directly or indirectly, reduce any COBRA benefits being made available or which may be due to employees of the Company after the Closing for any employees terminated prior to Closing or within 6 months after Closing.

**8.12   Update Representations.** Buyer, on one hand, and Stockholder, on the other hand, each shall promptly notify the other party in writing if they become aware after the date hereof and before the Closing of any fact, information or condition that causes or constitutes a breach of any representation or any warranty made by them in this Agreement, whether such fact, information or condition (i) existed (whether or not known by the representing/warranting party for representations or warranties not predicated on such party's Knowledge) before the date hereof (a "Breach Event") or (ii) came into existence after the date hereof (a "Subsequent Development"). Such fact, information or condition shall be set forth in a supplemental schedule specifying the applicable section of this Agreement to which such information relates (a "Supplemental Schedule"). The Supplemental Schedule shall be delivered to the other party, and if not objected to in writing within ~~five (5)~~ business days of delivery, shall amend and, if applicable, replace the section of the original Company Disclosure Schedule or Buyer Disclosure Schedule to which it relates. *If objected to in writing within five (5) business days of delivery, the supplemental Schedule*

**8.13   Other Agreements.** Buyer shall execute and deliver to Stockholder the Aircraft Lease and Maintenance Agreement substantially in the same form as is set forth in Schedule 8.13 attached hereto.

**8.14   Change of Control.** Should ~~[the ultimate owner of Bishop Pipeline Company, Bishop Gas Transmission Company, Synergy Pipeline Company, L.P., and/or KPC be a party other than Buyer (New Party), then such event will be deemed to be a Change of Control. For purposes herein should Buyer own less than 51% of either Bishop Pipeline Company and/or Bishop Gas Transmission Company and/or should Bishop Pipeline Company and Bishop Gas Transmission Company own less than 51% of Synergy Pipeline Company, L.P. or less than 51% of KPC and/or should KPC sell more than 25% of its assets in the aggregate over time, then upon the occurrence of any such event]~~ [Buyer sell or assign more than fifty percent (50%) of either (a) Buyer's interest in Kansas Pipeline Company ("KPC") or (b) KPC's pipeline assets to a non-Affiliated Entity, then], a Change of Control shall be deemed to have occurred. ~~[In the event of]~~ [Upon] a Change of Control, [unless Buyer and the person to whom Buyer has sold either the interest in KPC or KPC's pipeline assets ("New Party") shall execute and deliver to Stockholder the Assumption Agreement substantially in the form of Schedule 8.14 hereto,] Buyer and New Party shall be obligated to pay ~~[Stockholder an amount of cash equal to the Prepayment Fee or Prepayment Fee II (as set forth in Schedule 5.3), unless simultaneous with said Change of Control, Buyer and New Party deliver to Stockholder the Assumption Agreement, executed by Buyer and New Party,]~~ [to Stockholder the amounts described in the Revenue Interest Agreement as the First Option Purchase Amount, if the Change of Control occurs less than three (3) years after the Closing, or the Second Option Purchase Amount, if the Change of Control occurs on or after three (3) years after the Closing.

ENB-DOI-000950

8.15 License Agreement/Subordination: At or prior to the Closing, the Company and its Affiliates will have executed and delivered the License Agreement] substantially in the form attached hereto as Schedule [8.14 to this Agreement.] [8.15A with respect to multiple pipe easements and right-of-way. On or prior to December 31, 1999, Buyer will cause all lenders who now have or may in the future have a mortgage or security interest in said easements or rights-of-way, the Revenue Interest Agreement and the Excluded Assets to subordinate or release such lender's interest in said assets pursuant to the Subordination and Release Agreement attached hereto as Schedule 8.15B. Buyer will also cause all future lenders to Buyer to similarly subordinate and release liens to any lien of such future lenders attaching to any of said assets. In the event Buyer or any successor or assign of Buyer breaches this covenant, Buyer or its successor or assign shall immediately pay to Stockholder the amounts described in the Revenue Interest Agreement as the First Option Purchase Amount, if the breach occurs less than three (3) years after the Closing, or the Second Option Purchase Amount, if the breach occurs on or after three (3) years after the Closing.]

## ARTICLE IX
## INDEMNIFICATION; REMEDIES

9.1 Survival of Representations and Warranties. The representations, warranties and agreements of the Parties made herein shall survive Closing, any investigation by the Parties, and the execution and delivery of the documents contemplated by this Agreement, and shall continue in force and effect until terminated, as hereinafter provided in Sections 9.2 and 9.3.

9.2 General Indemnity by Stockholder. Stockholder agrees to protect, defend, indemnify and hold Buyer, Buyer's successors and assigns as to the Company and its subsidiaries and affiliates, and Buyer's successors and assigns as to all or part of the assets of the Company, its subsidiaries and affiliates (collectively, the "Buyer Indemnified Parties" and individually a "Buyer Indemnified Party") harmless from and against and shall reimburse the Buyer Indemnified Parties for, all Adverse Consequences to the Buyer Indemnified Parties and the Company, its subsidiaries and affiliates, or any of them which arise from any of the following:

(a) the breach of any of Stockholder's representations and warranties contained in this Agreement;

(b) any severance obligation (excluding Federal COBRA benefits) to any employees or consultants listed on Schedule 9.2; and

(c) all actions, suits, proceedings, demands, assessments, costs and expenses (including reasonable attorneys' fees and expenses of investigation and defense) incident to any such breach.

Stockholder may reasonably require to prosecute or defend any claim, litigation or investigation by any Governmental Authority or third party or pursuant to Article IX hereof (including without limitation tax audits); provided that Stockholder shall reimburse Buyer for all reasonable out-of-pocket expenses and costs incurred in connection therewith.

## ARTICLE X
## CONDITIONS

10.1  Conditions to Each Party's Obligation to Close. The obligations of each of the parties to consummate the Transaction are subject to satisfaction, or mutual waiver, on or prior to the {Effective Time} [Closing] of each of the following conditions:

(a)  Injunction. There shall not be in effect any Law or any Judgment directing that the Transaction not be consummated; provided, however, that prior to invoking this condition each party shall use all reasonable efforts to have any such Judgment vacated; and there shall have been no Law enacted or promulgated which would make consummation of the Transaction illegal.

(b)  HSR Act. Any waiting period (and any extension thereof) applicable to the consummation of the Transaction under the HSR Act shall have expired or shall have been earlier terminated.

10.2  Additional Conditions to the Obligations of Buyer to Close. The obligations of Buyer {and} to consummate the Transaction are subject to satisfaction, or waiver on or prior to the {Effective Time} [Closing] of each of the following conditions:

(a)  Performance. The Company shall have performed, in all material respects, all the obligations required to be performed by it under this Agreement at or prior to the {Effective Time} [Closing].

(b)  Representations and Warranties. The representations and warranties of Stockholder under this Agreement shall be true and correct, in each such case as of the date of this Agreement and as of the {Effective Time} [Closing] as though made on the {Effective Time} [Closing] (except that representations and warranties that speak as of a specific date shall be true and correct as of such date), provided that for purposes of determining the satisfaction of the foregoing, such representations and warranties shall be deemed true and correct if the failure or failures of such representations and warranties to be so true and correct have not caused and could not reasonably be expected to cause a Material Adverse Effect.

(c)  Deliveries. Buyer shall have received at the {Effective Time} [Closing] a certificate dated the {Effective Time} [Closing] and executed by the Stockholder certifying to the fulfillment of the conditions specified in Sections 10.2(a) {and}[,] (b) [and (d)].

002685

KP1663

ENB-DOJ-000952

(d).   Consents and Approvals.  Except for the consent of the secured lenders of the Company, its Subsidiaries and the Affiliates set forth in the **Company Disclosure Schedule** (which consents are not a condition to Closing), all other consents, approvals and authorizations legally required to be obtained to consummate the Transaction shall have been obtained from all Governmental Authorities and third persons, except for such consents, approvals and authorizations the failure of which to obtain would not have a Material Adverse Effect on Buyer (assuming for purposes of this Section 10.2(d) that the Transaction shall have been effected).

10.3   Additional Conditions to the Stockholder's Obligation to Close.  The obligation of the Stockholder to consummate the Transaction is subject to satisfaction, or, to the extent permitted by Law, waiver on or prior to the {Effective Time} [Closing] of each of the following conditions:

(a)   Performance.  Buyer shall have performed in all material respects, all the obligations required to be performed by it under this Agreement at or prior to the {Effective Time} [Closing].

(b)   Representations and Warranties.  The representations and warranties of Buyer under this Agreement shall be true and correct, in each such case as of the date of this Agreement and as of the {Effective Time} [Closing] as though made on the {Effective Time} [Closing Date] (except that representations and warranties that speak as of a specific date shall be true and correct as of such date), provided that for purposes of determining the satisfaction of the foregoing, such representations and warranties shall be deemed true and correct if the failure or failures of such representations and warranties to be so true and correct have not caused and could not reasonably be expected to cause a Material Adverse Effect.

(c)   Deliveries.  The Stockholder shall have received at the {Effective Time} [Closing] a certificate dated the {Effective Time} [Closing Date] and executed by the Chief Executive Officer or President of Buyer certifying to the fulfillment of the conditions specified in Sections 10.3(a) {and}[,] (b) [and (d)];

(d)   Consents and Approvals.  All consents, approvals and authorizations legally required to be obtained to consummate the Transaction shall have been obtained from all Governmental Authorities and third persons (including those listed in Section 6.6), except for such consents, approvals and authorizations the failure of which to obtain would not have a Material Adverse Effect.

(e)   Tax Treatment.  The Stockholder shall have received an opinion, based on appropriate representations contained in certificates of the Company and Buyer, their respective officers and others, of ~~Drift & Young~~ the effect that the Stockholder will receive capital asset treatment with respect to his receipt of the Purchase Price.

002686

KP1664

ENB-DOJ-000953

10.4  Frustration of Closing Conditions. Neither Buyer nor the Company may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3, as the case may be, to be satisfied if such failure was caused by such Party's failure to use reasonable efforts to consummate the Transaction and the other transactions contemplated by this Agreement, or otherwise occurred because of a breach of this Agreement by such Party.

## ARTICLE XI
### TERMINATION AND REMEDIES

11.1  Termination. This Agreement may be terminated and the Transaction may be abandoned at any time prior to the [Effective Time] [Closing]:

(a)  by the mutual written consent of Buyer and the Stockholder;

(b)  by either Buyer or the Stockholder, if:

(i)  any court of competent jurisdiction in the United States, or some other Governmental Authority, shall have issued an order, decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the Transaction and such order, decree, ruling or other action shall have become final and nonappealable; provided, however, that the party seeking to terminate this Agreement under this Section 11.1(b)(i) shall have used its reasonable commercial efforts to remove such injunction, order or decree; or

(ii)  the Transaction shall not have been consummated by [[October 30,] [November 4,] 1999[]]; provided, that the right to terminate this Agreement pursuant to this Section 11.1(b)(ii) shall not be available to any Party whose failure to fulfill any of its obligations under this Agreement results in the failure of the Transaction to occur on or before such date; provided further no Party shall have the right to terminate this Agreement under this Section 11.1(b)(ii) until [[October 30,] [November 4,] 1999[]], if the Transaction shall not have been consummated as a result of (A) all required regulatory approvals or consents necessary to satisfy the conditions set forth in Section 10.2(d) shall not have been received by [October 25] [November 1], 1999; (B) the entering of an order or any pending action commenced by any applicable federal governmental antitrust authority seeking an order which would have the effect of making the Transaction illegal or otherwise materially and adversely affecting the value of the Company or prohibiting consummation of the Transaction, or (C) the failure of the conditions set forth in Section 10.1(c) to be satisfied.

(c)  by Buyer [in the event that, as a result of Buyer's diligence investigation regarding the Company not known to Buyer on or before ten (10) business days after the execution of this Agreement, Buyer shall have learned of facts not previously disclosed to or otherwise known by Buyer which establish that Stockholder's

KP1665
002687

ENB-DOJ-000954

(4)     Life Insurance Policies:

BMA Whole Life Policy #40056779
BMA Term Policy #40056777
BMA Whole Life Policy #40056776 (owned by Dennis Langley)

(5)     Promissory Note owned by The Bishop Group, Ltd. from Dennis M. Langley dated March 30, 1999 in the principal amount of $265,000, with accrued interest.

(6)     All available cash contained in accounts owned by The Bishop Group, Ltd., E & C Group, Inc., The Bishop Corporation, Syenergy Pipeline Company, L.P., Bishop Pipeline Company, Kansas Pipeline Company, Kansas Pipeline Partnership, Mid-Kansas Partnership, MarGasCo Partnership, KansOk Partnership, Riverside Pipeline Company, L.P., Bishop Rink Holdings, LLC., and KP Operating Company, LLC. other than that cash necessary to leave $700,000 in working capital as set forth in the Purchase Agreement as of the Closing of this transaction.

(7)     A Cessna 421 plane, serial no. _____ owned by The Bishop Group, Ltd.

8325 Lenexa Drive, Lenexa, KS

All office furniture, fixtures, equipment, computers (software and hardware) and all other personal property located at 8325 Lenexa Drive, Lenexa, Kansas, Suite 400, except for the SCADA equipment and related computer hardware and software, including but not limited to those items listed in Exhibit A to this Schedule 5.4.

**Miscellaneous:**

(1)    All office furniture, fixtures, equipment, computers (hardware and software) and all other personal property of Kansas Pipeline Company now located at 5225 Renner Road, Shawnee, Kansas.

(2)    All rights to the Kansas City Chiefs and Kansas City Royals season tickets.

(3)    A perpetual exclusive easement for all lawful purposes set forth in all Kansas Pipeline Easements, except for ~~the rights to utilize Kansas Pipeline Company's easements for~~ the purpose of installing, maintaining or using ~~natural gas~~ pipelines. *for the transportation of natural gas or other hydrocarbons*

(4)    ~~An irrevocably~~ license to use the easements of Kansas Pipeline Company for Kansas Pipeline Company Expansion Projects, as set forth in and subject to the terms and conditions of any written agreement between Kansas Pipeline Company and the Stockholder or his assigns.

ENB-DOJ-000956

Natural Gas Sales Contract between Petro Source Gas Ventures and Youthville United Methodist dated May 18, 1998, and amendments and exhibits thereto.

Petro Source Gas Ventures Agreements and Petro Source Corporation Agreements were acquired by MarGasCo Partnership pursuant to an Agreement with Petro Source Corporation dated September 22, 1998, and amendments and exhibits thereto.

**Miscellaneous Agreements:**

Settlement Agreement between Western Resources, Inc., The Bishop Group, Ltd., Bishop Pipeline Company, Kansas Pipeline Operating Company, Kansas Pipeline Partnership, Riverside Pipeline Partnership, Mid-Kansas Partnership, Syenergy Pipeline Company, L.P., Riverside Pipeline Company, L.P., Citizens' Utility Ratepayer Board and the Staff of the Kansas Corporation Commission dated July 9, 1997.

Settlement, Release, Indemnity and Assignment Agreement effective February 24, 1995 between Southern Union Company, a division of which is Missouri Gas Energy and each of the following entities, jointly and severally:   The Bishop Group, Ltd., Bishop Pipeline Company, Kansas Natural Partnership, Kansas Pipeline Partnership, KansOk Partnership, Mid-Kansas Partnership, Riverside Pipeline Partnership, Riverside Pipeline Company, L.P., Syenergy Pipeline Company, L.P., Kansas Pipeline Operating Company and MarGasCo Partnership.

Settlement Agreement and Release – Linchpin and Wraparound Issues made on the 28th day of February, 1995 by and between Western Resources, Inc., The Bishop Group, Ltd., Bishop Pipeline Company, Kansas Pipeline Operating Company, Kansas Natural Partnership, KansOk Partnership, Kansas Pipeline Partnership, Riverside Pipeline Partnership Mid-Kansas Partnership, Syenergy Pipeline Company, L.P., Riverside Pipeline Company, L.P.

Settlement Agreement and Release – Regulatory Issues made on the 28th day of February, 1995 by and between Western Resources, Inc. The Bishop Group, Ltd., Bishop Pipeline Company, Kansas Pipeline Operating Company, Kansas Natural Partnership, KansOk Partnership, Kansas Pipeline Partnership, Riverside Pipeline Partnership Mid-Kansas Partnership, Syenergy Pipeline Company, L.P., Riverside Pipeline Company, L.P.

Limited Release of Western Resources to Southern Union Company (1995).

**002690**
KP1668

**PURCHASE AGREEMENT**
**COMPANY DISCLOSURE SCHEDULE**

**SECTION 6**
**October 4, 1999**

Section 6
~~Any Exception~~ to ~~any~~ representations
*Specific*

j:h\forms\schedule stock purchase agreement v4 clean
10/04/99   5:18 PM

002691
KP1669

ENB-DOJ-000958

PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULE

SECTION 6.8
October 4, 1999

Section 6.8
List of any pending claims

1.  FERC Docket Nos. CP96-152-000, RP95-212, RP95-395 and PR94-3000. (Complaint and Riverside's Application for Interstate Rates as a Consolidated Entity and KansOk Rate Case). A FERC Order issued on April 30, 1998, Order which: (i) granted the Clients' Motion for Rehearing in part; (ii) granted the Clients' rates that approximately equaled the Clients' then existing rates; and (iii) directed the Clients to consolidate assets into one interstate entity effective May 11, 1998. The Clients were ordered to file a Rate Case on or before September 11, 1999. Said assets of KPP, KOP, RPCLP, were consolidated into Riverside Pipeline Partnership n/k/a Kansas Pipeline Company, also a Kansas Partnership, as of May 11, 1998. Third parties have petitioned for rehearing which is still pending. Existing transportation contracts with MGE and Kansas Gas Service are filed with FERC awaiting ruling from FERC as to acceptance of any material deviations from the form of service agreements. In an Order dated April 2, 1999, (see attached copy) which may still be subject to rehearing, the FERC approved KPC's contract with Missouri Gas Energy, a division of Southern Union Company ("MGE") as a non-conforming form of service agreement. In that same Order, FERC approved KPC's pre-existing contracts with Kansas Gas Service (KGS) (Western Resources, Inc.'s successor) as non-conforming form of service agreements, but did not approve KPC's KCC Settlement of July, 1997, as it pertains to FERC jurisdictional matters. As you know, the FERC Order of April 30, 1998, approved rates to be charged by KPC to its existing customers substantially equal to those rates being charged by KOP, KPP and RPCLP prior to said Order. The April 2, 1999, FERC Order allows KPC to continue to bill MGE and KGS, its major customers, as it has been, subject to KPC's obligations to file a Section 4 Rate Case before FERC by September 11, 1999. In an Order dated June 18, 1999, FERC denied KGS's Application for Rehearing as to the April 2, 1999, Order. Certain parties have appealed certain issues to the Federal Court in the District of Columbia, Case No. _____.

2.  FERC Docket, Kansas Pipeline Company, RP99-485-000. represents the Section 4 Rate Case of Kansas Pipeline Company, filed on or about September 1, 1999. In a draft order made available September 29, 1999, the Commission ordered KPC's tariff sheets, accepted and suspended, to be effective March 1, 2000, subject to refund and the outcome of a hearing and ordered a prehearing conference within twenty (20) days of the issuance of their Order.

002692
KP1670

ENB-DOJ-000959

3.      FERC Docket Transok, LLC, RP97-738-008 represents reopened docket in which Transok had previously received a limited Section ___ Certificate to operate the Transok Lease. On or about September 28, 1999, FERC _____ this docket to review the Amendment to the Transok Lease dated _____. Interventions are due by October 8, 1999 and KPC intends to intervene.

4.      Below is a list of other FERC proceedings in which we have intervened.

**Insert**

5.      Missouri Public Service Commission Docket No. GR-98-167.  This proceeding is an annual ACA proceeding by the MPSC of charges paid by MGE to its suppliers.  In September of 1999, MPSC Staff recommended a disallowance of about $4,500,000 of charges paid by MGE to Mid-Kansas during the July 1, 1997, through June 30, 1998 time period and said they were reducing their recommended disallowance in the GR96-450 case from about $4,500,000 to about $3,500,000.  The MPSC Staff also recommended the case not proceed until a decision in GR96-450 is issued.

6.      Missouri Public Service Commission Docket No. GR-96-450.   This proceeding is an annual ACA review by the MPSC of charges paid by MGE to its suppliers.  While the MPSC Staff in June of 1998 recommended a disallowance of about $4,500,000 of charges paid by MGE to Mid-Kansas/Riverside ("Mid-Kansas") during the July 1, 1996 through June 30, 1997, time period, Mid-Kansas and MGE have vigorously opposed this recommendation.  Both MGE and Mid-Kansas have argued that the MPSC is precluded from disallowing Mid-Kansas's charges to MGE, because of a prior settlement executed by the parties and approved by the MPSC in Docket No. GR-94-101 and GR-94-228.  Mid-Kansas filed a Writ of Prohibition in Cole County, Missouri Circuit Court, Case No. CV198-1505CC and received a temporary restraining order, which was later quashed.  However, Mid-Kansas has appealed two separate Motions to Dismiss, which were denied by the MPSC.  One Motion dealt with the MPSC's lack of jurisdiction because of the aforementioned settlement.  The other Motion to Dismiss is based upon the Staff's failure to file sufficient evidence.  Both issues are on appeal in Case No. CV-199-53-CC in the Circuit Court of Cole County, Missouri.  In the interim, the Court in Case No. CV-199-53-CC has ruled the MPSC may take no further action until further order of the Court.  Oral arguments are scheduled in the appeal on July 1, 1999 in the Cole County Circuit Court, Cole County, Missouri. In an Order dated _____, the Circuit Court of Cole County denied Mid-Kansas's Motion to Dismiss for Insufficiency of Evidence, but agreed with Mid-Kansas that the MPSC should not have issued a finding as the Settlement of 1995 without first holding a hearing and taking evidence and therefore remanded the matter to the MPSC.

Mid-Kansas has appealed and has filed an appeal of the decision by the Circuit Court to the Court of Appeals in Case No. _____, Mid-Kansas is seeking to have the Court of Appeals _rule that: (i) the 1995 Settlement precludes the prudency review

**002693**

KP1671

FNB-DOJ-000960

obligations. As of December 31, 1996, MGE disputes approximately Two Hundred Sixty Nine Thousand Three Hundred Seventy Four and 25/100 Dollars ($269,374.25) billed by MKP to MGE for the period covering October, 1995, through December 31, 1996, but has not paid only One Hundred Twenty Thousand Three Hundred Forty Two and 72/100 Dollars ($120,342.72) of that amount. MGE alleges that certain reservation charges since after October 1, 1995, improperly include: (i) the difference between 51.8¢ and 57.32¢ of Riverside's FERC approved rates from October 1, 1995, to 1996; and the difference between 51.8¢ and 58.64¢ from October 1, 1996 to date; and (ii) KPP's surcharge for increased property taxes from and after January, 1996. Since the implementation of the KPP rates in August, 1997, after the KCC Settlement in Docket No. 190,362-U, et.al., KPP's charges include any property tax component. MGE has paid these KPC rates since the implementation of these KCC Settlement Rates.  Since implementation of the transportation-only contract with MGE on June 1, 1998, MGE has not paid the two-percent (2%) increase contained in the Riverside I Agreement, alleging it no longer has to pay that 2% increase. That increase will equal between $200,000 – $300,000 per year. FERC has agreed to review the two percent (2%) escalator in KPC's Section 4 rate case now pending. Kansas Pipeline Company does not agree with MGE's interpretation. Also, since May 11, 1998, MGE has been paying $20,000 to $30,000 per month less than what KPC believes was approved by FERC related to fuel costs and the full MDQ in all three (3) zones. KPC does not agree with these underpayments being made by MGE and continues to bill these amounts to MGE.

11.  <u>Billing Dispute with Kansas Gas Service</u>.  Kansas Gas Service (KGS), the successor owner of the Kansas LDC, has asserted in communications with Kansas Pipeline Company  that it believes under the existing contracts and the Settlement reached in KCC Docket No. 97-WSRG-312-PGA, et.al., the rates of Kansas Pipeline Company  will decrease by August of 2001, to the then-existing Williams' rates and continue thereafter for a three-year period, then reverting back to KPC's then authorized FERC rates. but not to exceed a cost of service as to KGS of greater than approximately $27.3 million. Kansas Pipeline Company disagrees with KGS' interpretation. Also, KGS has underpaid Kansas Pipeline Company's invoices to date by approximately $617,000.00 since May of 1998, reflecting KGS' differing interpretation of what the FERC's April 30, 1998 Order meant when it granted the Clients a rate as one interstate pipeline, equal to the then existing rates of KOP, KPP and Riverside. 

Recently KGS has filed a lawsuit in Johnson County, Kansas District Court, Case No. 99 C 06574. KPC has caused said case to be removed to the United States District Court for the District of Kansas (Kansas City Division) Case No. 99-2268 KHV. It appears KGS, not being satisfied with FERC's recent rulings of April and June, 1999, is seeking to have the Court interpret and possibly set aside KGS's existing contracts with KPC, because of KGS's (we believe) unfounded allegations that the KCC Settlement of July, 1997, between KPC, the KCC and KGS's predecessor, Western Resources, Inc., was not accepted by FERC. KPC believes it has met all of its obligations under the KCC Settlement. KPC sought to have the KCC Settlement and its KGS contracts approved by FERC. FERC, with its plenary jurisdiction over interstate pipelines, approved the

002694

KP1672

ENB-DOJ-000961

**Section 6.9**
**Exceptions to Tax Representations**

1. No representation is made with respect to the forgiveness by the Company of amounts owed by Kansas Pipeline Company to the Company (The Bishop Group, Ltd., Bishop Pipeline Company and Bishop Transmission Company) in connection with the so-called Butcher Interests.

2. No representation is made with respect to the effect of the difference between the Effective Time and the Closing.

3. No representation is made with respect to the effect (including pre-closing effect) of any transactions by the Company or its Affiliates or Subsidiaries after the Closing.

STOCK PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULE

SECTION 6.11
October 4, 1999

Section 6.11
Violations of any laws by Company or Subsidiaries

None, except for any laws violated by virtue of the transfer or distribution of cash and other assets described in Schedule 5.4 hereto by Syenergy Pipeline Company, L.P. and/or Kansas Pipeline Company

002696
KP1674

ENB-DOJ-000963

PURCHASE AGREEMENT
COMPANY DISCLOSURE SCHEDULE

SECTION 6.19
October 4, 1999

Section 6.19
Breaches of any Gas Contracts or written notices from any
party indicating an intent to rescind or dishonor any Gas Contract

1.    Section 6.8 "Pending Claims" describing KGS filed lawsuit, which alleges
KPC's breach of the KCC Settlement Agreement and requests a monetary judgment and setting
aside all of KGS contracts with KPC as a remedy.

2.    See Section 6.8 "Pending Claims", describing that MGE has indicated to
KPC its belief that the 2% escalator clause under the Riverside I Agreement is no longer
applicable.

002697
KP1675

ENB-DOJ-000964

**PURCHASE AGREEMENT**
**COMPANY DISCLOSURE SCHEDULE**

SECTION 8.1
October 4, 1999

Section 8.1
**Exceptions to Ordinary Course Covenants**

1.     Prior to the Closing. the Excluded Assets will either be sold to Stockholder and/or distributed to Stockholder as consideration for a Partial Redemption of Stockholder's Shares in The Bishop Group. Ltd.

2.    Prior to the Closing. the Company will redeem certain shares of Common Stock owned by the Stockholder for cash.

3.  Prior to the Closing. the Company or its Affiliates will transfer to the Stockholder ~~the non-natural gas~~ pipeline rights in and to all easements and rights-of-way owned or possessed by the Company and its Affiliates, *certain nonexclusive except as to the transporting of natural gas or other hydro...*

4.  Prior to the Closing. the Company or its Affiliates will License to the Stockholder certain rights to multiple natural pipeline casements and rights-of-way.

002698
KP1676

ENB-DOJ-000965

*0 8019. 0011. 24*

| | |
|---|---|
| **From:** | James Pryde |
| **To:** | Chachere, Ron, Chris Kaitson; Korb, Y.; Tino Monaldo |
| **Date:** | 10/8/99 4:12PM |
| **Subject:** | Stock Purchase Agreement |

   Attached is a revised, blackline Stock Purchase Agreement  The changes reflect Ron's comments and some additional clean-up.  We have made all of Ron's changes with the exception of his proposed changes to the lead-In to Paragraph 6.  Please note specifically as follows:
   1  Dates in Article 2 and 11 have not been approved by Dennis
   2  Section 6 Lead in.  Ron proposed to say that the disclosures in the Company Disclosure Schedule only qualify the specific section referenced in the Schedule.  The form of document on which the bid was based and each draft since then has always said a disclosure in the Compnay Disclosure Schedule is a disclosure for all representations  The Company's method avoids a foot fault or a technical default because a cross reference was missed, and as a result we believe the document should stay the way it is.
   3  Section 8 14 (Change of Control) has not yet been changed pending resolution of the PDA and CRIA; however, please note that a net worth requirement on transferees perhaps should be added to prevent subsequent assignments to shells.
   4. Section 8.15—Ron has proposed language that Buyer should not be liable for a failure by a subsequent lender to subordinate its interest in the easements and license agreements.  I have included the language, but Dennis and Tino have not yet approved the concept
   5  Section 11 2 (a)(i)- In the last draft, Ron added language that to collect the break-up fee, the non-defaulting party must be willing to waive all breaches other than failure to make the Article III deliveries.  I wanted to be sure people have focused and approved this provision.
          Please provide me with further comments or questions.  JPP

GOVERNMENT
EXHIBIT
72
PENGAD·Bayonne, N. J.

*002678*

*002678*

**From:**      James Pryde
**To:**         Brewer, Lori;  Chachere, Ron;  Chris Kaltson,  Internet."Lwoods@Kansaspipeline com",
Johnson, Therecia;  Tino Monaldo
**Date:**      10/11/99 7:19PM
**Subject:**   Revised Security Agreement

Per Tino's conversations with Dennis and Chris. I have not yet revised the signature blocks.


**CC:**         James P. Pryde

GOVERNMENT
EXHIBIT
13

PENGAD-Bayonne, N. J.

002399
KP1377

ENB-DOJ-000967

### SECURITY AGREEMENT
### (Project Development Agreement)

THIS SECURITY AGREEMENT is made and entered into this ____ day of October, 1999, between K-Pipe Holdings Partners, L.P., MarGasCo Partnership, an Oklahoma general partnership, Kansas Pipeline Company, a Kansas general partnership, Syenergy Pipeline Company, L.P., a Kansas limited partnership and Bishop Pipeline Company, a Kansas corporation (collectively referred to as the "Debtors"), and Dennis M. Langley and (_____( collectively, )[Management Resources Group, LLC, a Kansas limited liability company ("MRG")( collectively, Langley and MRG are referred to as] "Secured Party").

I.      **SECURITY INTEREST**

For valuable consideration, the receipt of which is hereby acknowledged, Debtors hereby grant to Secured Party a security interest in the Collateral (as defined below) to secure the [Obligations (as defined below). "Obligations" means] payment of the Revenue Interest Payments to be made by K-Pipe Holdings Partners, L.P., its successors and assigns ("K-Pipe")[,] to Secured Party under, pursuant to or in connection with that certain Project Development Agreement, dated as of October ___, 1999 between K-Pipe and (an affiliate of Secured) [Kansas Pipeline Company, on the one hand, and MRG on the other] Party (the "PDA").

The "Collateral" means an undivided 50% in all Revenues (as defined in the PDA)(including those realized from the ownership and operation of pipeline assets by Debtors) in excess of the Base Amount (as defined in the PDA), as adjusted on an annual basis, and all proceeds thereof. The parties hereto agree that the Secured Party owns the Collateral and this Agreement is being entered into for precautionary purposes. The Collateral does not cover or include the other undivided 50% interest in all such Revenues, which is owned by Debtor.

II.      **WARRANTIES AND COVENANTS OF DEBTORS**

Debtors warrant, covenant, and agree that:

1      The execution, delivery and performance of this Security Agreement are within Debtors' powers, have been duly authorized by the requisite corporate action and the same do not violate any law or the terms of Debtors' charters, bylaws or the terms of any indenture, agreement or undertaking to which either of the Debtors are a party or by which either is bound

2.      Except for the security interest granted hereby, Debtors have not placed any lien, security interest, or encumbrance, on the Collateral[,] and Debtors will defend the title to the Collateral against all claims and demands of all persons at any time claiming the same or any interest therein by, through or under Debtors [arising from actions of any Debtor after the date hereof].

**002400**

KP1378

3.        Debtors will join with Secured Party in executing ~~[in form satisfactory to Secured Party]~~ one or more financing statements pursuant to the Uniform Commercial Code and such other documents as Secured Party may from time to time reasonably request.

4.        Any financing statement (other than any which may be filed on behalf of Secured Party) or any other method which creates a security interest in the Collateral in the future, ~~[while any obligations are outstanding under the PDA,]~~ shall be subordinated to that of the Secured Party.

5.        Debtors shall from time to time promptly execute and deliver all further instruments and documents (including financing or continuation statements and amendments thereto) and take all further action that may be ~~[necessary or desirable or that Secured Party may request in order to perfect and protect any]~~ [reasonably necessary to perfect the] security interest granted or purported to be granted hereby or described herein ~~[or to enable Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral]~~.

6.        All obligations and covenants of Debtors hereunder shall be joint and several.

**III.        EVENTS OF DEFAULT**

Debtors shall be in default under this Security Agreement upon the happening of any one or more of the following events (each an "Event of Default")

7.        Breach of any obligation or liability of K-Pipe, arising under the PDA which default continues beyond any grace period provided therein.

8.        Breach of any obligation or liability of any Debtor hereunder or arising under that certain Contingent Revenue Sharing Agreement, dated October ___, 1999 by and between K-Pipe and Dennis Langley, in each case, which ~~[is not cured within ten days after written notice from Secured Party.]~~ [default continues beyond any grace period provided herein or therein.]

9.        Sale or encumbrance of any of the Collateral ~~[or the making by any person of any levy, seizure, or attachment thereof or thereon.]~~ [by the Debtors.]

10.        ~~[Dissolution, termination of existence,]~~ [Dissolution, ]insolvency, business failure, appointment of a receiver of any part of the property of, assignment for the benefit of creditors by, the commencement of any voluntary proceeding under any bankruptcy or insolvency laws by any Debtor or the involuntary commencement of any such proceeding against any Debtor which is not discharged within sixty (60) days

11.        ~~[Service of any warrant of attachment, garnishment, or the existence or making or issuance of any tax lien, levy, or similar levy on or with respect to Debtors that has a material adverse effect on any Debtor.]~~

12.        ]Any attempted sale or assignment of any of either (a) K-Pipe's or its successors'

**002401**

453256 02                              2                         **KP1379**

ENB-DOJ-000969

or assigns' interests in Kansas Pipeline Company, a Kansas general partnership ("KPC") or (b) KPC's pipeline assets, in each case not in compliance with the PDA and without the execution and delivery by the transferee of the Assumption Agreement specified under the PDA.

**UPON OCCURRENCE OF ANY OF THE FOREGOING EVENTS OF DEFAULT, DEBTORS SHALL IMMEDIATELY NOTIFY SECURED PARTY OF SUCH DEFAULT.**

## IV.　　SECURED PARTY'S RIGHTS AND REMEDIES

From and after the occurrence of an Event of Default:

14.　　Secured Party may declare any and all obligations secured hereby immediately due and payable and shall have the remedies of a secured party under the Uniform Commercial Code. [ Secured Party may, at its option, require Debtors to assemble the Collateral and make it available to Secured Party at a place to be designated by Secured Party which is reasonably convenient to both parties; or in the event of Debtors failing or refusing to so assemble the Collateral, Secured Party shall have the right, and Debtors does hereby authorize and empower Secured Party, to enter upon the premises wherever the Collateral may be in order to remove the same. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market,] Secured Party will give Debtors reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or other intended disposition thereof is to be made. The requirements of reasonable notice shall be met if such notice is mailed, postage prepaid, to Debtors at least [five (5)] [fifteen (15)] days prior to the date of the sale or disposition.

15.　　In the event of repossession of the Collateral, Secured Party shall have such rights as are provided and permitted by law, including the right to reasonable attorneys' fees and legal expenses incurred for the purpose of retaking, holding, and disposing of the Collateral.

16　　Secured Party shall have the right to notify account and contract debtors obligated on any or all of the Collateral to make payment thereof directly to Secured Party and Secured Party may take control of all proceeds of any of the Collateral, which rights Secured Party may exercise at any time any Debtor is in default hereunder. Until such time as Secured Party elects to exercise such rights, each Debtor is authorized, as agent of Secured Party, to collect and enforce all such contracts and accounts

## V.　　GENERAL

All rights and remedies of Secured Party whether or not granted hereunder shall be cumulative and may be exercised singularly or concurrently. All rights of Secured Party hereunder shall inure to the benefit of its successors and assigns, and all obligations of Debtors shall bind their successors or assigns. Any attempted sale or assignment of any of either (a) K-Pipe's or its successors or assign's interest in KPC or (b) KPC's pipeline assets, in each case not in compliance with the PDA and without the execution and delivery by the transferee of the Assumption Agreement specified under the PDA shall be void and shall constitute a breach pursuant to the PDA. Should the obligations set forth in

**002402**
KP1380

453256 02　　　　　　　　　3

this paragraph be breached, the Secured Party and the Debtors and the Debtors' successors and assigns agree that the Secured Party shall have a constructive trust on and {a security interest} in the proceeds of the transfer in violation of the PDA[, in the Collateral] and in all personal property and fixtures of the Debtors owned immediately prior to the violative transfer (the "Trust Assets"), and the transferee {agrees} [and transferor agree] that {it} [they] shall hold the Trust Assets in trust for the benefit of Secured Party to {secure the amounts secured hereby} [assure the Obligations are paid]. The Trust Assets shall include, without limiting the generality of the foregoing all inventory of Debtors, all Debtors' accounts and accounts receivable; all monies, claims for monies and contract rights of each Debtor that are due and to become due; all instruments, documents of title, policies and certificates of insurance, money, chattel paper, deposits, warehouse receipts and things in action; all goods, equipment and machinery of Debtors including, without limiting the generality of the foregoing, pipe, motor vehicles and aircraft; all general intangibles of Debtors, including, without limiting the generality of the foregoing, licenses, trademarks, corporate and trade names, copyrights, goodwill, patents and patent applications, all right, title and interest in and to the partnership interests of KPC and MarGasCo Partnership, an Oklahoma general partnership; and any and all additions, accessions, replacements and substitutions to or for the foregoing and any and all proceeds and products thereof. Notwithstanding the foregoing, the parties agree that the Secured Party's {interest} [constructive trust] in the Trust Assets is expressly subordinate to the interest of {the Debtors'}[(i) any present] lender which loaned [Debtor] the funds {to Debtors or Debtors' affiliates} to purchase the Trust Assets [and (ii) any future lender to any subsequent purchasers of the partnership interests in KPC or KPC's pipeline assets within 12 months of the date hereof, which lenders loaned the funds to such subsequent purchasers to purchase the Trust Assets.]

        **IN WITNESS WHEREOF,** the parties hereto have executed this Security Agreement on the day and year first above written.

                        Dennis M. Langley


                        MarGasCo Partnership

                        By:
                        Name:
                        Title:


                        _____
                        Name:_____
                        Title:_____

453256 02                          4                    002403
                                                        KP1381

ENB-DOJ-000971

Kansas Pipeline Company

By:
Name:
Title:


K-Pipe Holdings Partners, L P

By·
Name.
Title.


Syenergy Pipeline Company, L.P.

By:
Name.
Title:


Bishop Pipeline Company

By:
Name.
Title:

[Management Resources Group, LLC

**By:**_____
**Name:**_____
**Title:**_____]

002404
KP1382

ENB-DOJ-000972

# Midcoast Energy Resources, Inc.

## Board Presentation
## October 7, 1999

### Telephone Conference

GOVERNMENT
EXHIBIT

74

ENB 008795

# *Table of Contents*

*I.*     *Kansas Pipeline Financials*

*II.*    *Executive Summary*

*III.*   *Company Description*

*IV.*    *Presentation*

*V.*     *Note Section*

**ENB 008796**

Kansas Pipeline
Financials

ENB 008797

Value: Miles  
PI/E: Miles  693.6 Miles  
Diameter  10  

EQUITY: $0  
Share Price: $18.000  
Tax EQUITY  
Escalate Exp.: 0.00%

## PROFORMA CASH FLOW WITHOUT FINANCING COSTS

| DESCRIPTION | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 | YEAR 9 | YEAR 10 | YEAR 11 | YEAR 12 | YEAR 13 | YEAR 14 | YEAR 15 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | | | | | | |
| MCF/Day | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | |
| Spread | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | |
| MCF/Day Additional | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Spread | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | |
| Other Income | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Gross Revenue | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $460,383,180 |
| Total Revenue | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $460,383,180 |
| **EXPENSES** | | | | | | | | | | | | | | | | |
| Property Tax | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 6,905,748 |
| Trans. Royalties | 7,236,834 | 7,236,834 | 7,236,834 | 7,236,834 | 7,236,834 | 7,236,834 | 7,236,834 | 7,236,834 | 7,236,834 | 7,236,834 | 7,236,834 | 7,236,834 | 7,236,834 | 7,236,834 | 7,236,834 | 108,552,510 |
| O& Overhead | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 42,937,410 |
| Operations | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 22,860,000 |
| Other Expense | | | | | | | | | | | | | | | | |
| Total Expenses | $12,083,711 | $12,083,711 | $12,083,711 | $12,083,711 | $12,083,711 | $12,083,711 | $12,083,711 | $12,083,711 | $12,083,711 | $12,083,711 | $12,083,711 | $12,083,711 | $12,083,711 | $12,083,711 | $12,083,711 | $181,255,668 |
| **NET CASH FLOW** | $13,991,307 | $16,638,250 | $16,638,250 | $16,034,301 | $15,487,082 | $14,989,435 | $14,762,187 | $14,776,821 | $14,806,122 | $14,828,115 | $14,835,422 | $14,857,415 | $14,864,723 | $14,864,723 | $103,820,716 | $318,804,095 |
| **PAYOUT**  11.6 Yrs. | | | | | | | | | | | | | | | | |
| CUM. CASH FLOW | (163,876,692) | (146,563,302) | (129,925,053) | (113,890,752) | (98,403,670) | (83,414,334) | (68,652,051) | (53,875,230) | (39,076,417) | (24,270,295) | (9,442,180) | 5,399,242 | 20,250,657 | 35,115,379 | 138,936,095 | 138,936,095 |

## RATE OF RETURN CALCULATIONS

| | |
|---|---|
| IRR (W/Residual): | 6.54% |
| IRR (WO/Residual): | 3.32% |

| | | | |
|---|---|---|---|
| PV @ 10% | 138,006,992 | PV @ 20% | 78,048,016 |
| PV @ 15% | 101,026,924 | PV @ 25% | 62,931,925 |

### PROFORMA CASH FLOW MODEL

| DESCRIPTION | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 | YEAR 9 | YEAR 10 | YEAR 11 | YEAR 12 | YEAR 13 | YEAR 14 | YEAR 15 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EBITDA | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 279,127,512 |
| Depreciation | (8,893,400) | (16,927,460) | (15,294,714) | (13,834,136) | (12,510,752) | (11,307,256) | (10,793,072) | (10,846,259) | (10,863,932) | (10,917,119) | (10,934,792) | (10,987,199) | (11,005,652) | (11,088,339) | (11,088,339) | (176,933,034) |
| TAXABLE INCOME | 9,715,101 | 1,681,041 | 3,313,787 | 4,774,365 | 6,097,748 | 7,301,244 | 7,815,429 | 7,762,242 | 7,744,569 | 7,691,382 | 7,673,709 | 7,620,522 | 7,602,869 | 7,520,162 | 7,520,162 | 102,194,478 |
| Income Tax | (4,017,194) | (695,110) | (1,370,251) | (1,974,000) | (2,521,419) | (3,018,065) | (3,231,680) | (3,209,418) | (3,202,379) | (3,173,070) | (3,180,386) | (3,151,085) | (3,143,178) | (3,112,785) | (3,112,785) | (42,257,417) |
| NET INCOME | $5,697,907 | $985,931 | $1,943,536 | $2,800,165 | $3,576,329 | $4,282,179 | $4,583,749 | $4,552,555 | $4,542,190 | $4,500,630 | $4,500,630 | $4,459,071 | $4,459,435 | $4,427,877 | $4,427,877 | $59,937,061 |
| Depreciation | 8,893,400 | 15,294,714 | 13,834,136 | 12,510,752 | 11,307,256 | 10,793,072 | 10,846,259 | 10,863,932 | 10,917,119 | 10,934,792 | 10,934,792 | 10,987,199 | 10,987,999 | 11,055,652 | 10,987,999 | 176,933,034 |
| Capital Expenditure | (600,000) | (600,000) | (600,000) | (600,000) | (600,000) | (600,000) | (600,000) | (600,000) | (600,000) | (600,000) | (600,000) | (600,000) | (600,000) | (600,000) | (600,000) | (9,000,000) |
| Residual | | | | | | | | | | | | | | | 88,934,000 | 88,934,000 |
| NET CASH FLOW | $13,991,307 | $16,638,250 | $16,034,300 | $16,034,301 | $15,487,082 | $14,989,435 | $14,776,821 | $14,776,821 | $14,806,122 | $14,828,115 | $14,835,422 | $14,857,415 | $14,864,723 | $14,864,723 | $103,820,716 | $318,804,095 |

### ACCRETION MODEL

| DESCRIPTION | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 | YEAR 9 | YEAR 10 | YEAR 11 | YEAR 12 | YEAR 13 | YEAR 14 | YEAR 15 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EBITDA | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 18,608,501 | 279,127,512 |
| Depreciation | (5,081,943) | (15,099,086) | (13,116,229) | (11,655,679) | (10,332,065) | (9,128,569) | (8,614,385) | (5,201,943) | (5,236,202) | (5,253,371) | (5,287,657) | (5,287,657) | (5,287,657) | (78,029,143) | (78,029,143) | (78,029,143) |
| Interest Expense | (14,381,651) | (14,075,098) | (13,292,664) | (12,559,669) | (11,741,487) | (11,485,387) | (11,188,648) | (10,793,648) | (10,360,862) | (9,902,119) | (9,406,751) | (8,766,110) | (8,088,495) | (8,088,495) | (6,971,301) | (136,971,301) |
| TAXABLE INCOME | (855,093) | (565,683) | (2,800,392) | (5,606,847) | (3,465,051) | (2,005,455) | (1,205,468) | 2,613,150 | 3,011,437 | 3,452,906 | 3,984,110 | 4,440,306 | 4,917,483 | 5,416,484 | 5,416,484 | 38,029,143 |
| Income Tax | | | | | | | | | | | | | | | | |
| NET INCOME | ($618,524) | ($331,773) | ($113,308) | $560,260 | $1,067,669 | $1,916,800 | $2,396,440 | $2,908,904 | $3,502,232 | $3,984,110 | $4,440,306 | $4,917,483 | $5,416,484 | $5,997,034 | $5,997,034 | $37,610,526 |
| EPS ACCRETION | ($0.06) | ($0.03) | $0.01 | $0.05 | $0.09 | $0.14 | $0.18 | $0.22 | $0.27 | $0.33 | $0.37 | $0.41 | $0.46 | $0.51 | $0.55 | |
| # Shares Outstanding | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | |
| Incremental Shares | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | |
| TOTAL # SHARES | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 10,720,000 | 166,536,428 |
| CASH FLOW | $6,039,457 | $6,039,346 | $9,440,357 | $9,291,398 | $9,200,641 | $9,164,178 | $9,405,982 | $9,910,315 | $10,454,825 | $11,065,516 | $11,579,432 | $12,053,599 | $13,078,586 | $13,631,184 | $13,631,184 | $155,536,428 |
| CASH FLOW ACCR | $0.56 | $0.90 | $0.88 | $0.87 | $0.86 | $0.85 | $0.88 | $0.92 | $0.98 | $1.03 | $1.08 | $1.12 | $1.17 | $1.22 | $1.27 | |
| PRINCIPAL REDUC | $6,039,457 | $6,039,346 | $9,440,357 | $9,291,398 | $9,200,641 | $9,164,178 | $9,405,982 | $9,910,315 | $10,454,825 | $11,065,516 | $11,579,432 | $12,053,599 | $13,078,586 | $13,631,184 | $13,631,184 | $156,536,428 |

ENB 008791

PROJECT :   Kansas Pipeline                                                           DATE: 9/9/99                          CASE: #1

**ASSUMPTIONS :**

| | |
|---|---|
| INITIAL COST | $177,668,000 |
| | |
| Residual Value | $89,934,000 |
| PIPE Miles | 693.8 Miles |
| Diameter | 10 " |

| | | | |
|---|---|---|---|
| LOAN : | $187,868,000 | State | Kansas |
| Interest : | 7.25% | Depreciation : | Accelerated |
| EQUITY : | | Tax Life | |
| Share Price : | $18,000 | Escalate Exp. | 0.00% |

**PROFORMA CASH FLOW WITHOUT FINANCING COSTS**

| DESCRIPTION | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 | YEAR 9 | YEAR 10 | YEAR 11 | YEAR 12 | YEAR 13 | YEAR 14 | YEAR 15 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | | | | | | |
| MCF/Day | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | 158,957 | |
| Spread | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | $0.529 | |
| MCF/Day Additional | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Spread | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Other Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Gross Revenue | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $30,692,212 | $460,382,180 |
| **EXPENSES** | | | | | | | | | | | | | | | | |
| Property Tax | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 460,383 | 6,905,748 |
| Trans. Royalties | 7,216,834 | 7,216,834 | 7,216,834 | 7,216,834 | 7,216,834 | 7,216,834 | 7,216,834 | 7,216,834 | 7,216,834 | 7,216,834 | 7,216,834 | 7,216,834 | 7,216,834 | 7,216,834 | 7,216,834 | 108,252,510 |
| Op Overhead | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 2,862,494 | 42,937,410 |
| Operations | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 1,524,000 | 22,860,000 |
| Other Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Total Expense | $12,063,711 | $12,063,711 | $12,063,711 | $12,063,711 | $12,063,711 | $12,063,711 | $12,063,711 | $12,063,711 | $12,063,711 | $12,063,711 | $12,063,711 | $12,063,711 | $12,063,711 | $12,063,711 | $12,063,711 | $180,955,668 |
| **EBITDA** | $18,608,501 | $18,608,501 | $18,608,501 | $18,608,501 | $18,608,501 | $18,608,501 | $18,608,501 | $18,608,501 | $18,608,501 | $18,608,501 | $18,608,501 | $18,608,501 | $18,608,501 | $18,608,501 | $18,608,501 | $279,127,512 |

**RATE OF RETURN CALCULATIONS**

| | | |
|---|---|---|
| IRR (W/Residual) | 6.54% | PV @ 10% |
| IRR (W/OResidual) | 3.22% | PV @ 20% |

**ACCRETION MODEL**

| | | |
|---|---|---|
| EPS ACCRETION | | |
| # Shares Outstanding | 10,720,000 | |
| TOTAL # SHARES | 10,720,000 | |

ENB 008798

Executive
Summary

ENB 008799

# Midcoast Energy Resources, Inc.

## DESCRIPTION OF SENIOR CREDIT FACILITY

On behalf of Midcoast Energy Resources, Inc., Banc of America Securities LLC, as Lead Arranger and Book Manager is arranging a $265 million Senior Revolving Credit Facility, which will provide for multicurrency borrowings in Canadian dollars, pesos, and any other currencies available under the Company's existing credit facility. The Facility will include a $25 million sublimit for the issuance of standby letters of credit. Bank of America will serve as the Administrative Agent of the Facility.

The Facility will contain an increase option which will allow for increases up to a maximum amount of $400 million post Closing. The increase option will allow for the aggregate commitment amount to increase at the request of the Borrower, provided that no Lender's individual commitment under the Facility will be increased without such Lender's approval. At the discretion of the Borrower, and subject the acceptance of the Administrative Agent (not to be unreasonably withheld), new Lenders may be added to the Facility to accommodate such an increase.

Borrowings under the $265 million of Senior Credit Facility will be available to: (i) renew and extend indebtedness under the Existing Facility; (ii) finance acquisition of KPC; (iii) working capital, capital expenditures, and other lawful corporate purpose. The Senior Credit Facility will be structured as follows:

| Facility | Amount | Maturity | Initial LIBOR Margin | Unused Fee |
|---|---|---|---|---|
| Revolver | $265,000,000 | 5 years | 200.0 bps | 45.0 bps |

Pricing will be governed by a performance pricing grid based upon the Borrower's ratio of Total Debt/Total Capitalization. Initial pricing will be set at L+200 basis points reflecting the Borrower's projected pro forma ratio of Total Funded Debt to Capitalization as of December 31, 1999 of 65.34%. Please see Section IV, Summary Terms and Conditions for more details.

## Security

The Facility shall be secured by the pledges of the stock of each Guarantor. Additionally, the Borrower and each Guarantor shall agree to a negative pledge on all of their assets. The liens securing the Existing Facility (including the pledged stock of each Guarantor) shall be assigned to the Administrative Agent for the benefit of Lenders.

Upon prepayment of the KPC Notes, the liens securing the KPC Notes shall be assigned to Administrative Agent for the benefit of Lenders. All such liens shall continue to secure the Facility through June 30, 2000. Prior to June 30, 2000, the Borrower may request a release of such liens (other than the liens on the stock of Guarantors which will continue to secure the Facility at all times) (a "Release Request") if Borrower is and remains in compliance with the 65% Test and the 1.25 Test described below under Financial Covenants. The Administrative Agent will not record assignment documentation prior to June 30, 2000,

**ENB 008800**



## Midcoast Energy Resources, Inc.

except upon the occurrence of an event of default or as may be required by law to maintain the validity and/or priority of such assigned liens.  Notwithstanding the forgoing, if the KPC Notes are not prepaid and the liens securing the KPC Notes remain on the assets of KPC, the liens securing the Existing Facility shall remain in place and the Borrower shall not be entitled to a Release Request.

## Financial Covenants

The Facility will be governed by a comprehensive set of financial covenants to include the following:

- Minimum Tangible Net Worth equal to 90% of Tangible Net Worth as of September 30, 1999, with step-ups equal to 50% of net income (with no deduction for net losses) and 75% of the proceeds of any equity issuances.

- Maximum Debt to Capitalization Ratio (total funded debt/ (net worth + total funded debt) not to exceed (A) 70% prior to June 30, 2000, and (B) 65% on and after June 30, 2000 (the "65% Test").

- Minimum Cash Flow Coverage Ratio (EBITDA/ (interest expense + 1/10th of total funded debt)) not less than (A) 1.1 to 1 prior to June 30, 2000 and (B) 1.25 to 1 on and after June 30, 2000 (the "1.25 Test").  EBITDA shall be calculated on a rolling four quarter basis pro forma for acquisitions.  Additionally, for purposes of the cash flow coverage ratio, total funded debt shall exclude indebtedness incurred to acquire the $10 million sinking fund for the KPC notes.

- From and after June 30, 2000, Borrower and each Guarantor shall grant first priority liens in favor of Administrative Agent, for the benefit of Lenders, on all of their assets, unless Borrower is in compliance with the (i) 65% Test (as described above) and (ii) the 1.25 Test (as described above).

Please refer to Section IV for definitions of the financial covenants as well as the complete Summary Terms and Conditions.

## ACQUISITION RATIONALE

The following is Midcoast's key strategic reasons for the acquisition of Kansas Pipeline Company ("KPC").

- Kansas City Market Share:  KPC and Williams Gas Pipeline Central, Inc., an affiliate of The Williams Companies, Inc., are the only two natural gas pipelines providing complete access into the metropolitan Kansas City market (including downtown) with multiple connections to the principal local distribution companies servicing the market and access to the major centers of industrial demand for natural gas.  KN Energy, Inc. also provides access to the south side of the Kansas City metro area.

ENB 008801



# Midcoast Energy Resources, Inc.

- **Firm Revenue Stream:**  More than 95% of the current net revenues are derived from long-term firm transportation contracts with Kansas Gas Service ("KGS") and Missouri Gas Energy ("MGE"), the local distribution companies in Kansas City and Witchita, through at least 2009.

- **Current Rates Recently confirmed by FERC:**  KPC recently completed a Section 7 proceeding including review of the rate base and operating expenses.  KPC expects to confirm or exceed current rates in a Section 4 filing which was filed in August 1999.  The filing contained a request to increase the revenue rate base to $34.7 million, approximately $4 million in excess of the current rate base.  An outcome of this filing is not expected to be known for approximately two years.  Despite the high degree of upside in this rate petition, the Company's current financial projections include only $29.5 million of estimated revenue, which is below the current rate base.

- **Growth Opportunities:**  Market share growth opportunities exist:

  - ➢ Growing markets in Kansas City and Wichita
  - ➢ By-pass opportunities with industrial and utility customers in the Kansas City area
  - ➢ Upgrades to the western portion of the system
  - ➢ Right-of-way corridor for additional installations along the route

- **Synergies:**  Operating efficiencies are expected for suppliers or marketers with pipeline operations, as are synergies from the elimination of numerous duplicative functions, such as management, accounting, and gas control.  The presentation of the Company's pro forma December 31, 1999 EBITDA includes hard cost savings of $1.2 million, primarily management reduction, as well as anticipated synergies in years two and three.

- **Trading Optimality:**

  - ➢ Ability to diversify supply sources within Mid-Continent and Rocky Mountain regions to take advantage of basis differentials
  - ➢ Utilization of the system's swing capacity to maximize synergies with marketing operations

**Midcoast Energy Resources, Inc.**

CONFIDENTIAL

## COMPANY OVERVIEW – KANSAS PIPELINE COMPANY

KPC is a Kansas general partnership headquartered in Lenexa, Kansas, which owns and operates a regulated natural gas pipeline system (the "System"). The System extends into two major segments from northwestern and northeastern Oklahoma into Kansas City, Kansas, and via a river crossing, into Kansas City, Missouri. The System interconnects with the local gas distribution facilities of the Company's two principal customers: KGS, a division of Oneok Inc., the successor to Western Resources, Inc. ("WRI"), in Wichita and Kansas City, Kansas; and MGE, a division of Southern Union Company ("SU"), the successor to WRI, in Kansas City, Missouri. As currently configured, the System is capable of delivering approximately 120 million cubic feet per day ("MMcf/d") and 21 MMcf/d of natural gas into the Kansas City and Wichita marketplaces, respectively. New pipeline facilities were put in place in 1997 to transport gas under new 20-year contracts to KGS in Paola, Osawatomie and Ottawa, Kansas ("Small Town Contracts").



The pipeline assets of KPC were held in three partnerships prior to May 11, 1998. KansOk Partnership ("KOP"), a Kansas general partnership, owned intrastate pipelines whose rates were determined by the Federal Energy Regulatory Commission ("FERC"). Kansas Pipeline Partnership ("KPP") owned an intrastate pipeline in Kansas whose rates were regulated by the Kansas Corporation Commission ("KCC"). Riverside Pipeline Company ("RPC"), L.P., a Kansas limited partnership owned interstate pipeline assets in Kansas, Oklahoma and Missouri, which connected KOP to KPP assets at the state line of Kansas and Oklahoma and which connected KPP assets to Missouri.

**Midcoast Energy Resources, Inc.**   CONFIDENTIAL

The following charts illustrate Syenergy's historical gross margin and EBITDA for the past two years and for the first six months of the two most recent fiscal years.



Syenergy recorded 1998 gross margin and EBITDA of $31.9 million and $19.7 million, respectively.

Effective May 11, 1998, after more than two years of jurisdictional procedures before FERC, the assets of KPP, KOP and RPC were consolidated into one single FERC regulated entity: KPC. KPC's initial rates, by order of FERC, were approximately equal to its then existing rates. FERC has ordered KPC to file a Section 4 Rate Case by September 10, 1999, which KPC filed early in late August 1999.

KPC derives approximately 95% of its net revenues from a series of long-term firm transportation contracts (the "Base Load Contracts") with KGS and MGE. These contracts provide a steady and predictable cash flow stream. Pricing under the KGS and MGE contracts has been recently approved by FERC as permitted non-conforming contracts. These contracts have a primary term through October 31, 2009. Another recent contract with KGS runs from 2009 to October 2014, while one other recent contract expires in 2007. The recent Small Town Contracts with KGS will remain effective through October 1, 2017.

Syenergy is the managing general partner and 99.9% owner of MarGasCo Partnership ("MarGasCo"), an Oklahoma general partnership established to conduct the independent non-regulated marketing functions of the system. The other general partner of MarGasCo is Bishop Pipeline Company ("BPC") (0.1%). The ultimate owner of KPC is Bishop, a Kansas corporation, which is owned 100% by Dennis M. Langley.

MarGasCo is owned by Synergy and BOC. It is a non-regulated marketing company that buys and sells natural gas to industrial users generally located in the Wichita and Kansas City metropolitan areas. MarGasCo employs two persons who handle the marketing activities. MarGasCo anticipates net revenue in 1999 of approximately $400,000.

KPC is not subject to the provisions of the Public Utility Holding Company Act of 1935 because it does not engage in direct retail sales of natural gas.

ENB 008804

## Midcoast Energy Resources, Inc.



(1)  FERC regulated pipeline.
(2)  BPC is a General Partner ("GP") with 0.1% ownership and Syenergy is a General Partner ("GP") with 99.9% ownership. Kansas Pipeline Partnership, KansOk Partnership, and Riverside Pipeline Company, L.P., which are all direct or indirect subsidiaries of Syenergy, became inactive after the consolidation of all pipeline assets into KPC in 1998.
(3)  Non-regulated marketing entity.

Inactive subsidiaries not shown include E&C Group Inc., Management Resources Group Ltd., the Bishop Corporation, Kansas Pipeline Partnership, KansOk Partnership, and Riverside Pipeline Company, L.P.

## BUSINESS GROWTH OPPORTUNTIES

### LDC By-Pass

KPC has identified several opportunities to by-pass the local distribution companies ("LDC") and directly serve large customers within the KPC service territory.  The most significant opportunities exist along the highly industrialized areas in Fairfax and Kansas City, Kansas. KPC is one of only two pipelines with right-of-way ("ROW") within the utility corridor that serves this industrial area.   Auto manufacturing, food processing, agribusiness and ammonia processing are some of the businesses operating within the area.  Since these industries are generally contiguous with the utility corridor, by-pass laterals typically would not be more than 1.5 miles from existing KPC facilities.  The vast majority of the KPC ROW to and within the corridor has multiple line/use rights.  Since this existing corridor is effectively fully developed, most projects for additional utility access, which do not utilize the Company's existing ROW, would be significantly more expensive.

KPC estimates that approximately 75,000 MMBtu/d of by-pass opportunities exist within an economically feasible distance of existing ROW in the Fairfax/Kansas City, Kansas area. Several of the target industries have approached KPC predecessor entities about by-passing existing LDC service in the past.  Prior to becoming a FERC regulated entity, KPC

**ENB 008805**

**Midcoast Energy Resources, Inc.**                                    CONFIDENTIAL

could not grant these customer requests because the state certificate under which KPC operated precluded LDC by-pass.  These restrictions no longer exist under KPC's FERC certificate.  KPC believes that approximately 10,000 MMBtu/day of additional Kansas by-pass opportunities exist outside the Fairfax/Kansas City, Kansas area.

## Capacity Expansion

The KPC system as currently configured is effectively fully subscribed. KPC has identified certain system enhancements designed to increase available peak throughput and allow for additional firm transportation contracts.  These enhancements include adding compression facilities and refurbishing existing pipeline assets on the western portion of the system, but do not involve installing significant amounts of new pipe.

KPC estimates that approximately 73,000 MMBtu/d of firm capacity can be made available with a capital investment of approximately $14.0 million and an increase in annual cash operating expenses of $1.3 million per year.  Of this 73,000 MMBtu/d additional capacity, approximately 35,000 MMBtu/d can be delivered to market zones in the eastern portion of the KPC system, while the remaining 38,000 MMBtu/d can be made available to delivery points on the western portion of the KPC system.

## CONTRACT AND REVENUE SUMMARY

Much of the System capacity is dedicated to the Base Load Contracts with KGS and MGE. Collectively these contracts call for the System to provide KGS and MGE approximately 11.3 Bcf per annum with a maximum daily quantity of 130,000 MMBtu/d through their primary term of October 31, 2009.  An additional contract with KGS runs from 2009 to 2014, and provides for transportation of 62,568 MMBtu/d into Kansas City, Kansas.  The Small Town Contracts have a primary term through 2017. KGS and MGE then sell the natural gas delivered by the System to the utilities' residential and small commercial base load customers in Kansas City and Wichita, Kansas and Kansas City, Missouri.

**ENB 008806**



## Midcoast Energy Resources, Inc.

CONFIDENTIAL

| Customer | Delivery Location | Expiration Date | Max. Daily Volume (MMBtu) | Annual Volume (MMBtu) | Current Rates (in cents) | | Annual Revenue [1] |
|---|---|---|---|---|---|---|---|
| | | | | | Reservation ($/MMBtu/Month) | Commodity (Cents/MMBtu) | |
| Missouri Gas Energy [4] | Kansas City, Missouri | 2009 | 46,332 | 3,200,000 | 20.2944 | 0.0625 | $11,483,378 |
| Kansas Gas Service [3,4] | Kansas City, Kansas | 2009 | 35,000 | 3,333,302 | 15 2864 | 0.0078 | $6,446,288 |
| Kansas Gas Service [3,4] | Kansas City, Kansas | 2009 | 13,784 | 1,194,463 | 19.9649 | 0.0625 | $3,377,008 |
| Kansas Gas Service [3,4] | Kansas City, Kansas | 2009 | 13,784 | 1,194,463 | 19.9649 | 0.0625 | $3,377,008 |
| Kansas Gas Service [4] | Wichita, Kansas | 2009 | 10,550 | 770,000 | 11.4561 | 0.0588 | $1,495,618 |
| Kansas Gas Service [4] | Wichita, Kansas | 2009 | 10,550 | 770,000 | 11.4561 | 0.0588 | $1,495,618 |
| Kansas Gas Service | Kansas City, Kansas | 2007 | 5,700 | 503,700 | 15.2864 | 0.0078 | $1,049,519 |
| Kansas Gas Service | Ottawa, Kansas | 2017 | 6,900 | 579,255 | 6.1639 | 0 0286 | $526,938 |
| Kansas Gas Service | Paola/Osawatomie, KS | 2017 | 6,857 | 513,075 | 10.7126 | 0.0348 | $899,331 |
| Atmos Energy | Heritage Park, Kansas | 2003 | 4,000 | 1,460,000 | n/a | 0.3078 | $449,388 |
| Atmos Energy | New Strawn, Kansas | 2003 | 500 | 6,704 | n/a | 1.4300 | $9,587 |
| Atmos Energy | Cedar Creek, Kansas | 1999 | 5,000 | 42,694 | n/a | 1.5000 | $64,041 |

| | | |
|---|---|---|
| Total Transportation Net Revenue [2] | | $30,673,721 |

1) Annual revenue = maximum daily volume x 12 months x current reservation rate + annual volume x current commodity rate, except for revenues from the Atmos Energy contracts which are equal to annual volume x current commodity rate

2) Transportation net revenue excludes approximately $400,000 of estimated net revenue for MarGasCo marketing activities

3) Volumes transported under these contracts have been extended under a new contract from 2009 to 2014

4) Base Load Contracts

ENB 008807

Company
Description

ENB 008808

**Midcoast Energy Resources, Inc.**                    CONFIDENTIAL

## COMPANY OVERVIEW – KANSAS PIPELINE COMPANY



### Kansas Pipeline East and West Legs

KPP was a Kansas general partnership formed on June 22, 1990 to own those portions of the System located in Kansas that were formerly owned by KPCLP. Those assets are now owned and operated by KPC. System sections owned by KPP include two segments referred to individually as "Kansas Pipeline East Leg" and "Kansas Pipeline West Leg".

Kansas Pipeline West Leg consists of two parallel pipelines and associated common ROW that originate downstream of the Master Gas interconnect with Kansas Natural East Leg in southwestern Franklin County, Kansas. It extends northeasterly for approximately 78 miles to an interconnect point with MGE's local distribution facilities in Platte County, Missouri. These pipelines consist of one 8" diameter pipeline and another pipeline with a 27 mile, 12 diameter section (originating downstream of Master Gas) and a 51mile, 10 section. There is one compressor station on the Kansas Pipeline West Leg, the "Ottawa Station", which is located in central Franklin County, Kansas. The Ottawa Station contains three compressors, which were installed in 1990 each rated at 1,215 Bhp, and a fourth compressor rated at 1,478 Bhp, which was added in 1992. Interconnects on the Kansas Pipeline West Leg pipelines (other than those mentioned above) include: five interconnects with KGS's Kansas City, Kansas local distribution facilities at points in Franklin and Wyandotte Counties, Kansas, an interconnect with Atmos Energy Corporation in Johnson County, Kansas, an interconnect with Kansas Pipeline East Leg (described below) and an interconnect with MGE. Kansas Pipeline West Leg is used to support the System's Kansas City related gas sales and transportation activities. Given the System's current hydraulic

ENB 008809

**Midcoast Energy Resources, Inc.**                              CONFIDENTIAL

configuration, Kansas Pipeline West Leg is capable of delivering approximately 116 MMcf/d of gas into Kansas City.  The Kansas Pipeline West Leg pipelines were part of the original Phillips crude oil and products pipeline purchased by KPCLP in 1984.  The pipelines were converted for use as natural gas pipelines in 1985.  The Ottawa Station was constructed in 1990.

Kansas Pipeline East Leg consists of a single 6" diameter pipeline and associated ROW originating at a point in central Miami County, Kansas (the Phillips Paola terminal), and extending northward for approximately 50 miles to an interconnect with Kansas Pipeline West Leg's facilities in northern Wyandotte County, Kansas (near the Fairfax industrial district of Kansas City, Kansas). Kansas Pipeline East Leg has no compressor stations along its route.  In addition to the interconnects mentioned above, Kansas Pipeline East Leg is also interconnected with Panhandle's system in central Miami County, Kansas; Atmos Energy at Heritage Park in Johnson County, Kansas; KGS in Paola and Osawatomie in Miami County, Kansas; and KGS's Mission District local distribution facilities at three points in northern Johnson County, Kansas.  Kansas Pipeline East Leg is used to support the System's Kansas City related gas sales and transportation activities.  Given the System's current hydraulic configuration, Kansas Pipeline East Leg is capable of delivering approximately 12 MMcf/d of gas into Kansas City.  The Kansas Pipeline East Leg pipeline was part of the original Phillips crude oil and products pipeline purchased by KPCLP in 1984.  The pipeline was converted for use as a natural gas pipeline in 1985.

### Kansas Natural East and West Legs

KNP was a Kansas general partnership formed on June 22, 1990, to own those portions of the System located in Kansas that were formerly owned by Phenix.  In 1995, KNP's assets were merged with those of KPP under approval by the KCC. System sections formerly owned by KNP include two segments referred to individually as "Kansas Natural West Leg" and "Kansas Natural East Leg".

Kansas Natural East Leg consists of: (a) two parallel pipelines and associated common ROW that originate at an interconnect with KansOk East Leg in southern Cowley County, Kansas and extend northward for approximately 72 miles into northern Greenwood County, Kansas, where they interconnect with (b) three parallel pipelines sharing a common ROW that extends northeasterly from that point for approximately 53 miles to an interconnect with Kansas Pipeline's facilities in southwestern Franklin County, Kansas.  The two parallel pipelines are comprised of one 8" diameter pipeline (the "P-40 Line"), another pipeline with a 6 mile, 12" diameter section (the "P-110 Line," originating at the KansOk East Leg interconnect and extending northward for 6 miles), and a 66 mile, 10" diameter section (the "P-30 Line").  The pipelines referred to under (b) above consist of two 8" diameter pipelines (the "P-SO and P-70 Lines") and one 12" diameter pipeline (the "P-60 Line").  There is one compressor station on the Kansas Natural East Leg, the "Beaumont Station", which is located on the P-30 and P-40 Lines in southern Greenwood County, Kansas.  The Beaumont Station houses three compressors; each rated at 1,215 Bhp.   Additional interconnects on Kansas Natural East Leg include:  an interconnect with Panhandle in Coffey County, KS, Kansas Natural West Leg in northern Greenwood County, Kansas and central Coffey County, Kansas.  Kansas Natural East Leg is used to support the Systems' Kansas City related gas sales and transportation activities.  Given the System's current

## Midcoast Energy Resources, Inc.

hydraulic configuration, Kansas Natural East Leg is capable of delivering approximately 95 MMcf/d of gas as to the interconnect with Kansas Pipeline's facilities. These lines were part of the original Phillips crude oil and products pipeline purchased by Phenix Transmission Company in 1983. Those lines were converted for use as natural gas pipelines in 1985. The P-110 Line and the Beaumont Station were constructed in 1990.

Kansas Natural West Leg consists of: (a) one 8" diameter pipeline and associated ROW (the "P-80 Line") originating at an interconnect with KansOk's West Leg in southern Comanche County, Kansas and extending northeasterly for approximately 220 miles to an interconnect with Kansas Natural East Leg at the Coffey/Andersen County Lines, Kansas, and (b) two parallel 6" diameter pipelines and associated common ROW (the "P-10 and P-20 Lines") originating in central Rice County, Kansas and extending eastward for approximately 105 miles to an interconnect with Kansas Natural East Leg in northern Greenwood County, Kansas. There are no compressor stations on the Kansas Natural West Leg system. Interconnects on the Kansas Natural West Leg pipelines (other than those mentioned above) include: an interconnect with Panhandle's system on the P-80 Line in northern Harper County; an interconnect with WNG on the P80 Line in northern Butler County, Kansas, an interconnect with Atmos Energy Corporation at New Strawn in Coffey County, Kansas, and an interconnect with Mid-Continent Market Center ("MCMC") on the P-10 and P-20 Lines in central McPherson County, Kansas. Interconnects are also maintained with the industrial customers served along this portion of the System. Construction was completed to provide interconnects between the local distribution facilities of KGS in Wichita, Kansas (located in northeastern Sedgwick County) and the P-80 Line. Kansas Natural West Leg is used to provide gas sales and transportation services to industrial customers along its portion of the System. Beginning in 1993 (as per the terms of the Base Load Contracts), Kansas Natural West Leg began delivering 1.54 Bcf per annum with a MDQ of 21,100 MMcf/d to KGS in Wichita, Kansas. Given the System's current hydraulic configuration, the P-80 Line is capable of delivering approximately 22 MMcf/d of gas along its route and the P-10 and P-20 Lines are capable of delivering approximately 10 MMcf/d of gas along their route. The Kansas Natural West Leg pipelines and associated facilities are part of the original Phillips crude oil and products pipeline purchased by Phenix in 1983. The pipelines were converted for use as natural gas pipelines in 1984.

### KansOk East and West Legs

KPC's assets were formerly held by KOP, a Kansas general partnership formed on June 22, 1990 to own those portions of the System located entirely in Oklahoma. This section includes two distinct segments referred to individually as "KansOk East Leg" and "KansOk West Leg."

KansOk East Leg consists of: (a) one 12" diameter pipeline and associated rights-of-way (the "P-100 Line") originating at an interconnect with Transok system in Pawnee County, Oklahoma and extending approximately 41 miles northward through Pawnee and Osage Counties, Oklahoma to an interconnect with Kansas Natural East Leg, and (b) one 8" diameter pipeline (the "P.40 Line") originating at an interconnect with the P-100 Line in central Osage County, Oklahoma and extending approximately 15 miles northward (running parallel to the P-100 Line) to an interconnect with Kansas Natural East Leg. There is one compressor station on the KansOk East Leg, the "Pawnee Station," which is located on the

**Midcoast Energy Resources, Inc.**

P-100 Line at the Transok interconnect point. The Pawnee Station contains four compressor units, each rated at 1,478 Bhp. The interconnects discussed above are the only ones on this segment of the System. KansOk East Leg is used to support the System's Kansas City related gas sales and transportation activities. Given the System's current hydraulic configuration, KansOk East Leg is capable of delivering approximately 95 MMcf/d of gas to Kansas Natural's West Leg. The P-40 Line was part of the original Phillips crude oil and products pipeline purchased by Phenix Transmission Company in 1983. The P-40 Line was converted for use as a natural gas pipeline in 1984. The P-100 Line and the Pawnee Station were constructed in 1990.

KansOk West Leg consists of a single 8" diameter pipeline and associated right of way (the "P-80 Line") originating at an interconnect with the Inland Gathering Company (an affiliate of Slawson Exploration Company) in the southwest corner of Harper County, Oklahoma and extending for approximately 57 miles northeast through Harper and Woods Counties, Oklahoma to an interconnect with Kansas Natural West Leg in southern

Comanche County, Kansas. KansOk West Leg has no compressor stations along its route. KansOk West Leg has one interconnect with ANR (American Natural Resources), a wholly owned subsidiary of The Coastal Corporation, in northeastern Harper County, Oklahoma. KansOk West Leg is used to supply gas into the southwest Kansas portion of KPC's facilities for sale to industrial customers along that section of the System. Given the System's current hydraulic configuration, KansOk West Leg is capable of delivering approximately 22 MMcf/d of gas into southwestern Kansas. The KansOk West Leg pipeline was a part of the original Phillips crude oil and products pipeline purchased by Phenix in 1983. The pipeline was converted for use as a natural gas pipeline in 1984.

## Riverside East and West Legs

RPC is a Kansas limited partnership formed on March 2, 1989 to own those portions of the system that cross state lines. Those assets are now owned and operated by KPC. These sections include three distinct segments referred to individually as "Riverside," "Riverside West Leg" and "Riverside East Leg."

Riverside consists of a single 12" diameter pipeline and associated ROWs originating at an interconnect with KPP's facilities in Wyandotte County, Kansas (Kansas City, Kansas) and extending approximately 1.6 miles (including a river crossing over the Missouri River) to an interconnect with MGE's local distribution facilities in Platte County, Missouri (Kansas City, Missouri). Riverside has no compressor stations along its route and no interconnects other than those mentioned above. Riverside supports the System's Kansas City, Missouri related gas sales and transportation activities. Given the System's current hydraulic configuration, Riverside is capable of delivering approximately 70 MMcf/d to the MGE interconnect. The Riverside pipeline was constructed in 1990.

Riverside West Leg consists of a single 8" diameter pipeline and associated ROWs (the "P-80 Line") originating at an interconnect with KOP West Leg's facilities in northern Woods County, Oklahoma and extending less than 1 mile (across the Oklahoma/Kansas border) to an interconnect with KPP West Leg's facilities in southern Comanche County, Kansas. Riverside West Leg has no compressor stations along its route and no interconnects other

**ENB 008812**

## Midcoast Energy Resources, Inc.

than those mentioned above. Riverside West Leg supports the System's western Kansas related gas sales and transportation activities. Given the System's current hydraulic configuration, Riverside West Leg is capable of delivering approximately 22 MMcf/d of gas to the Kansas Natural West Leg interconnect. The Riverside West Leg pipeline was part of the original Phillips crude oil and products pipeline purchased by Phenix Transmission Company in 1983. The pipeline was converted for use as a natural gas pipeline in 1984.

Riverside East Leg consists of: (a) one 12" diameter pipeline and associated ROW (the "P-100 Line"); and (b) one 8" diameter pipeline (the "P-40 Line"), which runs parallel to and within the same ROWs as the P-100 Line. These lines originate at interconnects with KOP East Leg's facilities in northern Osage County, Oklahoma and extend less than 1 mile (across the Oklahoma/Kansas border) to interconnects with Kansas East Leg's facilities in southern Cowley County, Kansas. Riverside East Leg has no compressor stations along its route and no interconnections other than those mentioned above. Riverside East Leg is used to support the System's Kansas City, related gas sales and transportation activities. Given the System's current hydraulic configuration, Riverside East Leg is capable of delivering approximately 95 MMcf/d of gas to the KNP interconnect. The P40 Line was part of the original Phillips crude oil and products pipeline purchased by Phenix Transmission Company in 1983. The P-40 Line was converted for use as a natural gas pipeline in 1984. The P-100 Line was constructed in 1990.

## Transok System

As the System is currently configured, the two methods of sourcing supply involve utilizing Transok's Oklahoma intrastate pipeline system and accessing gas supplies through the Kansas Natural West Leg.

The Transok arrangement provides KPC with firm leased space on the Transok system. This effectively allows KPC to utilize Transok, up to leased space capacity, as an extension of the System into major producing fields. KPC's customers can therefore purchase gas from any field or any producer, which accesses the Transok pipeline and ship that gas through the Transok pipeline to the System. In short, the Transok system greatly expands KPC's access to substantial gas reserves in Oklahoma and Texas.

Transok is an Oklahoma-based intrastate natural gas gathering and transmission company strategically positioned to supply natural gas for electricity generation to the Public Service of Oklahoma ("PSO"). In May 1999, Transok was acquired from Tejas Corp, an affiliate of Shell Oil, by Enogex Inc., an affiliate of Oklahoma Gas & Electric.

The Transok system has an estimated transmission capacity of 1.4 Bcf/d with current transport volumes averaging 600 MMcf/d on an annual basis. Recently, the Transok system has been expanded by the purchases of the Tex-Con, Reliance, Cresent, WAGGS (West Anadarko Gas Gathering Systems) and NAGS (North Anadarko Gathering System) pipeline systems. PSO's usage of the Transok system is approximately 225 MMcf/d and all such gas is purchased under long-term contracts with producers. PSO also purchases some peak gas requirements directly from Transok during the summer months. Total utilization of Transok by PSO has never exceeded 450 MMcf/d, assuring adequate capacity on the Transok system for non-affiliated entities.

**ENB 008813**



**Midcoast Energy Resources, Inc.**

Transok currently is tied directly (via wellhead, plant residue or split connected) to approximately 1.8 Bcf of daily gas deliverability.  Approximately 1.2 Bcf of Transok's 1.8 Bcf daily deliverability is from the Anadarko Basin and about 0.15 Bcf/d comes from the Lower Hugoton Field.  The balance of the gas comes from the Arkoma Basin.  Anticipating increased supplies from the Arkoma Basin, one of the largest natural gas reservoirs in the United States, Transok recently constructed additional pipeline capacity in this area.  In addition to this supply, Transok has a 26 Bcf storage field with a working capacity of 13 Bcf and winter sustained daily deliverability of approximately 180 MMcf/d.

This Amended Lease Agreement between Transok and KPC, gives KPC priority access to 90 MMcf/d of capacity on the Transok system.  This Amended Lease expires in 2009 with KPC having the option to extend for two years.  This allows KPC's customers to purchase gas from independent producers connected to the Transok system and ship this gas to the Transok Interconnect with the Kansok East Leg.  Access to this capacity is subject only to the prior right of P50 and a third party. PSO is a summer peaking utility and has the greatest need for capacity in the summer while KGSIMGE are winter peaking utilities; therefore, P50 usually does not compete with KPC for capacity on the Transok system.  The demand requirements of the third party are less than one-third of that required by the system. KPC pays Transok a monthly lease fee and additional fees-based upon the specific Transok line segment used.

## ENVIRONMENTAL RISKS

Certain environmental risks are associated with the operation of natural gas pipelines. Historically, the most serious of these has been the presence of PCB's, which were once used as a fire retardant in equipment lubricants.  This practice was discontinued prior to the conversion of the System to natural gas service.

In conjunction with the 1990 restructuring and the 1992 private placement, Pilko and Associates, an environmental risk consulting firm based in Houston, was engaged to perform an extensive environmental review of the System's assets.  Pilko conducted interviews with Company management, reviewed historical information regarding the System's assets, and visited numerous sites.

The only major issue identified was in the 1990 report by Pilko concerning ground water contamination at the site of the old Phillips Petroleum refinery in Kansas City, a site adjacent to one of KPC's terminal facilities.  Phillips is cleaning up the site with no liability to KPC.  No other conditions identified in the Pilko report present any significant liability to KPC and KPC was found to be in compliance with all necessary environmental permits.

## REGULATORY AND LEGAL ENVIRONMENT

Regulation of KPC's tariff structure and other aspects of its pipeline business can result in distortions of revenues and expenses and swings in operating as well as net income from year to year.  Revenues and expenses are often recognized in years subsequent to the year

**ENB 008814**



## Midcoast Energy Resources, Inc.

than those mentioned above. Riverside West Leg supports the System's western Kansas related gas sales and transportation activities. Given the System's current hydraulic configuration, Riverside West Leg is capable of delivering approximately 22 MMcf/d of gas to the Kansas Natural West Leg interconnect. The Riverside West Leg pipeline was part of the original Phillips crude oil and products pipeline purchased by Phenix Transmission Company in 1983. The pipeline was converted for use as a natural gas pipeline in 1984.

Riverside East Leg consists of: (a) one 12" diameter pipeline and associated ROW (the "P-100 Line"); and (b) one 8" diameter pipeline (the "P-40 Line"), which runs parallel to and within the same ROWs as the P-100 Line. These lines originate at interconnects with KOP East Leg's facilities in northern Osage County, Oklahoma and extend less than 1 mile (across the Oklahoma/Kansas border) to interconnects with Kansas East Leg's facilities in southern Cowley County, Kansas. Riverside East Leg has no compressor stations along its route and no interconnects other than those mentioned above. Riverside East Leg is used to support the System's Kansas City, related gas sales and transportation activities. Given the System's current hydraulic configuration, Riverside East Leg is capable of delivering approximately 95 MMcf/d of gas to the KNP interconnect. The P40 Line was part of the original Phillips crude oil and products pipeline purchased by Phenix Transmission Company in 1983. The P-40 Line was converted for use as a natural gas pipeline in 1984. The P-100 Line was constructed in 1990.

### Transok System

As the System is currently configured, the two methods of sourcing supply involve utilizing Transok's Oklahoma intrastate pipeline system and accessing gas supplies through the Kansas Natural West Leg.

The Transok arrangement provides KPC with firm leased space on the Transok system. This effectively allows KPC to utilize Transok, up to leased space capacity, as an extension of the System into major producing fields. KPC's customers can therefore purchase gas from any field or any producer, which accesses the Transok pipeline and ship that gas through the Transok pipeline to the System. In short, the Transok system greatly expands KPC's access to substantial gas reserves in Oklahoma and Texas.

Transok is an Oklahoma-based intrastate natural gas gathering and transmission company strategically positioned to supply natural gas for electricity generation to the Public Service of Oklahoma ("PSO"). In May 1999, Transok was acquired from Tejas Corp, an affiliate of Shell Oil, by Enogex Inc., an affiliate of Oklahoma Gas & Electric.

The Transok system has an estimated transmission capacity of 1.4 Bcf/d with current transport volumes averaging 600 MMcf/d on an annual basis. Recently, the Transok system has been expanded by the purchases of the Tex-Con, Reliance, Cresent, WAGGS (West Anadarko Gas Gathering Systems) and NAGS (North Anadarko Gathering System) pipeline systems. PSO's usage of the Transok system is approximately 225 MMcf/d and all such gas is purchased under long-term contracts with producers. PSO also purchases some peak gas requirements directly from Transok during the summer months. Total utilization of Transok by PSO has never exceeded 450 MMcf/d, assuring adequate capacity on the Transok system for non-affiliated entities.

**ENB 008815**



Presentation

ENB 008816



Midcoast Energy Resources, Inc.

Kansas Pipeline Company (KPC)

ENB 008817

MIDCOAST ENERGY RESOURCES INC

# The Timing

| | |
|---|---|
| October 4 | Sign LOI & File HSR |
| October 7 | Board Meeting Requesting Approval |
| October 12 | Execute Final Documents & Announce |
| October 13 | Analyst Meeting - New York |
| October 14 | Customer & Employee Meetings - Kansas City |
| October 20 | Final Due Diligence Date |
| October 22 | Close Bank Facility |
| November 4 | HSR Termination & Close Transaction |

**MIDCOAST** ENERGY RESOURCES INC

ENB 008818

# Kansas Pipeline Overview

- FERC regulated 835-mile interstate pipeline which transports gas from Oklahoma and western Kansas to the metropolitan Wichita and Kansas City markets

- One of only three pipelines delivering gas into the Kansas City metropolitan market (with Williams and KN)

- Currently capable of delivering approximately 128 MMcf/day to Kansas City and 32 MMcf/day to the Wichita market

- Major interconnects with Transok and Panhandle Eastern

- 95% of net revenues are derived from long-term contracts (through 2009 and longer) with LDCs in Kansas City



MIDCOAST
ENERGY RESOURCES INC

ENB 008819

ENB 008820



# FERC Rate Case

- **Order Issued on September 29, 1999**

- **Annual Cost of Service Numbers**
  - Filed    $34,600,000
  - Current    $30,700,000

- **Timing**
  - 5 Month Suspension
  - Spring/Summer Settlement
  - Could be as Long 24 Months

MIDCOAST
ENERGY RESOURCES INC



# KPC Acquisition Rationale

- Only KPC and Williams provide complete access to Kansas City market

- 95% of the current revenues are derived from long-term (through 2009) contracts

- Growing markets in Kansas City & Wichita
  - 4% projected growth rate
  - Conversion to gas-fired electric generators

- Synergies with existing Midcoast operations

ENB 008821



# Business Synergies

- **Upstream - Raymond & Anadarko Gathering Systems**

- **Downstream - End-User pipeline Systems**
  - Owens Corning Fiberglass
  - Board of Public Utilities of Kansas City
  - City of Augusta Power Plant

- **Marketing**

- **Upside - Expansion/Acquisition/Full Utilization**

**MIDCOAST ENERGY RESOURCES INC.**

ENB 008822

ENB 008823



# Operational Synergies

- **Successfully completed 3 similar integrations in the last 3 years - MIT, Midla, & Anadarko**

- **Cost Savings**
  - **Phase I**
    - **$1,500,000 per year · Executive Staff & Office Leases**
  - **Phase II**
    - **$ 900,000 per year · Gas Control & Accounting**
  - **Phase III**
    - **$ 900,000 per year · Operations Management & Philosophy**



ENB 008824



Supply Sources

ENB 008825

ENB 008826

# KPC Contract Summary

**MIDCOAST ENERGY RESOURCES INC**

| CUSTOMER | TERM | RESERVATION REVENUE | PERCENT OF TOTAL |
|---|---|---|---|
| MGE | 2009 | $11,280,000 | 37 % |
| KGS | 2017 | $510,000 | 2 % |
| KGS | 2014 | $13,025,000 | 42 % |
| KGS | 2009 | $2,901,000 | 9 % |
| TOTAL | | $27,716,000 | 90 % |



Midcoast Energy Resources, Inc.

Financial Highlights

ENB 008827

# Historical Operating Performance - KPC

| ($ in millions) | ACTUAL | | SIX MONTHS ENDED | |
|---|---|---|---|---|
| December 31 | 1997 | 1998 | June 30 1998 | June 30 1999 |
| Revenue | $92.2 | $54.1 | $34.0 | $21.1 |
| Gross Margin | 30.4 | 21.9 | 14.2 | 15.7 |
| G&A | 13.2 | 10.8 | 5.4 | 6.3 |
| % of Gross Margin | 43.4% | 49.3% | 38.0% | 40.1% |
| EBITDA | 15.1 | 19.7 | 7.9 | 8.4 |
| Depreciation & Amortization | 4.9 | 4.2 | 2.1 | 2.1 |
| EBIT | 10.3 | 15.4 | 5.8 | 6.3 |
| Capital Expenditures | 0.0 | 0.7 | 0.0 | 0.9 |
| Interest Expense | 7.3 | 7.0 | 3.5 | 3.3 |

MIDCOAST ENERGY RESOURCES INC

ENB 008828

# Pro Forma Capitalization

## Pro Forma Capitalization
### December 31, 1999

| ($ in millions) | Book Capitalization | % Capitalization | EBITDA (1) |
|---|---|---|---|
| Current Maturities of LTD | $4.5 | 1.2% | 0.1x |
| Revolver ($265,000,000) | 189.4 | 49.6% | 3.9x |
| Private Placement | 55.8 | 14.6% | 1.2x |
| Total Funded Debt | 249.7 | 65.3% | 5.1x |
| Total Shareholders' Equity | $132.5 | 34.7% | 2.7x |
| Total Capitalization | $382.2 | 100.0% | 7.9x |

(1) Pro forma 12/31/99 EBITDA of $48.5 million.

ENB 008829

# Projected Operating Performance



($ in millions)

| December 31 | Pro Forma LTM 12/31/1999 | 2000 | 2001 | Projected 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| Revenue | $408.5 | $489.4 | $513.7 | $524.7 | $530.2 | $533.0 |
| Gross Margin | 63.5 | 71.4 | 74.8 | 75.0 | 75.0 | 75.0 |
| % Growth |  | 12.4% | 4.8% | 0.3% | 0.0% | 0.0% |
| G&A | 15.0 | 14.4 | 13.4 | 13.2 | 13.0 | 12.8 |
| % of Gross Margin | 23.6% | 20.1% | 18.0% | 17.5% | 17.4% | 17.1% |
| EBITDA | 48.5 | 57.1 | 61.3 | 61.8 | 62.0 | 62.1 |
| Depreciation & Amortization | 11.5 | 12.9 | 13.4 | 13.5 | 13.6 | 13.6 |
| EBIT | 37.0 | 44.2 | 47.9 | 48.3 | 48.5 | 48.6 |
| Capital Expenditures | 207.8 | 28.2 | 2.8 | 2.6 | 2.6 | 2.6 |
| Interest Expense | 19.1 | 19.1 | 16.4 | 13.6 | 10.7 | 7.4 |

ENB 008830

# Projected Operating Credit Statistics

**MIDCOAST ENERGY RESOURCES INC**

ENB 008831

| ($ in millions) December 31 | Pro Forma LTM 12/31/1999 | 2000 | Projected 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| EBITDA (After Synergies) | $48.5 | $57.1 | $61.3 | $61.8 | $62.0 | $62.1 |
| Funded Debt | 249.7 | 214.0 | 182.9 | 145.3 | 108.7 | 65.1 |
| Net Worth | 132.5 | 166.1 | 184.9 | 206.4 | 230.6 | 257.9 |
| | | | | | | |
| Funded Debt / EBITDA | 5.14x | 3.75x | 2.98x | 2.35x | 1.75x | 1.05x |
| Funded Debt / Total Capitalization | 65.3% | 56.3% | 49.7% | 41.3% | 32.0% | 20.2% |
| | | | | | | |
| EBITDA / Interest | 2.55x | 2.99x | 3.74x | 4.54x | 5.82x | 8.37x |
| EBITDA / (Interest+ > (CMLTD or 1/10 of (Total Funded Debt - Sinking Fund) | 1.13x | 1.45x | 1.82x | 2.28x | 3.02x | 4.26x |

ENB 008832

# Additional Issues



- **Revenue Interest Agreement**
  - 50 % over $29,500,000 per year
  - 50 % participation in expansion - heads up
- **Project Development Agreement**
  - Exclusive Projects
    - Indian Lands
    - Electricity
    - Alternative Energy
  - Term = 7 years
- **Transportation Issues**

ENB 008833

# KPC Acquisition Benefits



- Wall Street Issues
  - Significant Cash Flow Accretion (avg. = $0.89 per share)
  - Nearly Doubles Asset Base
- Long Term Contracts
- No Commodity Price Risk
- Operational Synergies - Been There, Done That
- Familiar Territory - Operational & Business Development

Note Section

ENB 008834

# Notes

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

ENB 008835