**From:**     <thomas.j palmisano@us pwcglobal.com>
**To:**       Richard Robert <rrobert@midcoastenergy com>
**Date:**     10/30/99 8.17AM
**Subject:**  Re. KPC Documents

Gary and I have an idea to get Langley captial gain on the 13.75 mm
involving a distribution of a note receivable from KPC to Langley  followed
by a payment of the note upon the exercise of the PDA option. I've drafted
a brief memo descnbing the transaction which Gary is currently reviewing
After his review, we will distribute the memo.

Call me at home 281-752-7107 to discuss.

tjp
To     Chns Kaitson <ckaitson@midcoastenergy.com>, Chns Kaitson
       <ckaitson@midcoastenergy.com>, "'ctmorell@llgm com'"
       <ctmorell@llgm com>, Gary B. Wilcox/TAX/Washington
       DC/C&L/US@Amencas-US, "'gtaylor@llgm.com'" <gtaylor@llgm.com>,
       "'richachere@aol.com'" <richachere@aol.com>, Thomas J
       Palmisano/TAX/Houston TX/C&L/US@Amencas-US
cc:    Chip Berthelot <cberthelot@midcoastenergy com>
From:  Richard Robert <rrobert@midcoastenergy.com>
Date:  10/30/99 01:55:59 PM GMT
Subject: Re: KPC Documents


There has been a change to the deal based on PWC's objection to
characterizing the supplemental payment of $13.75 as capital gain. Dennis
has agreed to report the amount as ordinary income. He suggested that he
would like to minimize the hit as much as possible by reducing the
supplemental payment and possibly taking receivables at closing. He will be
calling me this afternoon with ideas, please give me some feedback as to
ideas.  We should look to Gary as to how to structure the wording and what
agreements the wording should be done. The sole reason Dennis has agreed to
this is to expedite getting these agreements to a standstill so that the
bank can sign off on them, we can execute them, and then we can close...in
that order! I very much appreciate everyone's patience and committment to
getting this deal done ..success is just around the corner! Please
acknowledge your receipt of this email by emailing me back. Please forward
this email to Craig Hoffman, I don't have his email

---

The information transmitted is intended only for the person or entity to
which it is addressed and may contain confidential and/or privileged
material. Any review, retransmission, dissemination or other use of, or
taking of any action in reliance upon, this information by persons or
entities other than the intended recipient is prohibited.  If you received
this in error, please contact the sender and delete the material from any
computer.

**KPLB-2116**



GOVERNMENT
EXHIBIT
101

ENB-DOJ-013153

CC:         Chris Kaitson <ckaitson@midcoastenergy.com>, "'ctmorell@llgm com'"
<ctmorell@llgm com>, "'gtaylor@llgm com'" <gtaylor@llgm.com>, "'rlchachere@aol com'"
<rlchachere@aol com>, Chip Berthelot <cberthelot@midcoastenergy com>

**KPLB-2117**

ENB-DOJ-013154

**From:**     Chris Kaitson <ckaitson@midcoastenergy com>
**To:**      "'James Pryde'" <jppryde@bryancavellp.com>, Chris Kaitson <ckaitson@midcoastenergy com>, "Cynthia Morelli (E-mail)" <ctmorell@llgm.com>, "Gary Wilcox (E-mail)" <gary.b.wilcox@us.pwcglobal.com>, "Graham Taylor (E-mail)" <gtaylor@llgm.com>, Richard Robert <rrobert@midcoastenergy.com>, "Ron Chachere (E-mail)" <richachere@aol.com>, "Tom Palmisano (E-mail)" <thomas.j.palmisano@us pwcglobal.com>
**Date:**     10/30/99 4.54PM
**Subject:**    KPC; Document Modifications

K-Pipe has requested the following changes:

1  SPA. 5.2, Make Whole.  First line change "Substantially simultaneous with the Closing" to "Within one (1) succeeding Business Day of Closing"

2. SPA: 11.2 Termination. Last line the phrase "second business day after receipt of the Closing Approvals" should be changed to reflect closing on Nov  5 and payment on Nov. 8.

3. Closing.  Move closing to LeBoeuf, Lamb in NY.  125 W. 55th Street, NY, NY 10019 (phone: 212-424-8000).  Celebration to follow closing.

4. SPA:  In the opening paragraph and the signature block the reference to voting trust trustee should be deleted.

5. Guaranties/Assumptions:  There are 6, are they all drafted?
     ForeTrend Guaranty of all K-Pipe obligations.
     KPC Guaranty of some of K-Pipe obligations under SPA
     Midcoast Guaranty of KPC obligations under SPA.
     Midcoast Guaranty of KPC obligations under PDA #1
     Midcoast Assumption of KPC obligations under PDA #1
     Midcoast Guaranty of MarGasco obligations under PDA #2.

I will be in the office on Sunday afternoon (and evening if needed)
Chris Kaitson
General Counsel
Midcoast Energy Resources, Inc.
1100 Louisiana Street, Suite 2950
Houston, Texas 77002
Phone: 713-650-8900 X2028
Fax: 713-650-3232
e-mail  ckaitson@midcoastenergy.com

GOVERNMENT EXHIBIT
103
PENGAD-Bayonne, N. J.

KPLB-3548

To:     'James Pryde' <jppryde@bryancavellp com>, lawyertm@southwind net,
        Chris Kaitson <ckaitson@midcoastenergy.com>, "Cynthia Morelli
        (E-mail)" <ctmorell@llgm.com>, Gary B. Wilcox/TAX/Washington
        DC/C&L/US@Americas-US, "Graham Taylor (E-mail)"
        <gtaylor@llgm.com>, Richard Robert <rrobert@midcoastenergy com>,
        "Ron Chachere (E-mail)" <rlchachere@aol com>, Thomas J
        Palmisano/TAX/Houston TX/C&L/US@Americas-US
cc:
From:   Chris Kaitson <ckaitson@midcoastenergy com>
Date:   10/30/99 11:41:11 PM GMT
Subject:  KPC; Document Modifications

**KPLB-3545**

ENB-DOJ-001111

**From:**      Chris Kaitson <ckaitson@midcoastenergy.com>
**To:**      Chris Kaitson <ckaitson@midcoastenergy.com>, "Cynthia Morelli (E-mail)" <ctmorell@llgm com>, "Gary Wilcox (E-mail)" <gary b wilcox@us.pwcglobal com>, "Graham Taylor (E-mail)" <gtaylor@llgm com>, Richard Robert <rrobert@midcoastenergy.com>, "Ron Chachere (E-mail)" <richachere@aol com>, "Tom Palmisano (E-mail)" <thomas.j palmisano@us.pwcglobal com>
**Date:**      10/31/99 7:57AM
**Subject:**      FW: KPC, Document Modifications

Assumption Agreement is back in   See Gary's other comments below.

-----Original Message-----
From: gary b.wilcox@us pwcglobal.com
[mailto:gary b.wilcox@us.pwcglobal com]
Sent. Sunday, October 31, 1999 12:00 AM
To: Chris Kaitson
Cc: rrobert@midcoastenergy com; thomas.j.palmisano@us pwcglobal com
Subject: Re: KPC; Document Modifications


You refer below to a Midcoast guaranty of KPC's obligations under the SPA.
Last weekend we ended up with three different guarantee/assumption
documents. First, there was KPC's guarantee of certain K-Pipe obligations
under the SPA (i e., primarily the tax indemnity). I was fairly OK with
this because it does not seem unusual to have K-Pipe's obligations
guaranteed by the target company It just purchased. I assumed that the KPC
guarantee would be signed contemporaneous with the SPA. Second, there was
an assumption agreement between the Newco GP entity and MRG. I understood
that this Assumption Agreement was required upon the change of control of
KPC, which meant that this Agreement would be signed when the Asset
Purchase Agreement is signed   Third, there was Midcoast's guarantee of
Newco's and KPC's obligations   Again, this guarantee was required because
of the change of control and would be signed upon the signing of the Asset
Purchase Agreement.

The third guarantee gave me the most heartburn.  Obviously, I do not want
to see Midcoast, the asset buyer, providing a guarantee of certain
obligations under the Stock Purchase Agreement. However, it became very
clear that Langley would not do the deal without it. So I got Tino to
soften some of the language in the guarantee by not referring to Langley
personally (instead, the guarantee ran to MRG and its individual members,
which helped me to associate the guarantee with a change of control under
the PDA , rather than with the SPA). We also referred to Newco GP and KPC
collectively as the "Subsidiaries," so we would not repeatedly refer to
Midcoast's guarantee of KPC's obligations.

I'm now concerned that the Midcoast guarantee may have changed, perhaps in
light of the PDA changes. For example, I noticed that the Assumption
Agreement may have been dropped as "unnecessary," according to the list of
closing documents. What I don't want to see is just a "naked" guarantee by
Midcoast of KPC's guarantee of the tax indemnity   It helps to have
Midcoast one step removed from KPC by having the Assumption Agreement in
between. It also helps to have the Midcoast guarantee arise as part of the
change of control provisions of the SPA.

PENGAD-Bayonne, N.J.

**GOVERNMENT
EXHIBIT**

105

KPLB-3543

ENB-DOJ-001112

**From:**      Chris Kaitson <ckaitson@midcoastenergy com>
**To:**        Chris Kaitson <ckaitson@midcoastenergy.com>, "Cynthia Morelli (E-mail)"
<ctmorell@llgm.com>, "Gary Wilcox (E-mail)" <gary b.wilcox@us pwcglobal.com>, "Graham Taylor
(E-mail)" <gtaylor@llgm.com>, Richard Robert <rrobert@midcoastenergy.com>, "Ron Chachere (E-mail)"
<richachere@aol com>, "Tom Palmisano (E-mail)" <thomas.j palmisano@us.pwcglobal.com>
**Date:**      10/31/99 9:35AM
**Subject:**   KPC Changes per Sunday 10:30 Phone Conference

As a result of the phone conference on Sunday at 10 30 Jim/Tino are making
the following changes

1  The changes proposed by K-pipe to the SPA, including changes to 5 2,
11.2, & moving closing to NY, are acceptable all to all parties.  SPA
reference to voting trust remains because the voting trust is still
effective as of signing, but will be terminated before closing.

2. the purchase price is being increased by $3million and the PDA
termination option fee reduced by $3million.  All references to the option
termination fee (supplemental payment) are being removed from the SPA.  the
termination fee will be in the option agreement

3. We are not meeting in KC on Monday to sign.  Efforts can be best served
by completing the documents  Sunday or Monday as early as possible so the
Bank can review them and we can sign on Tuesday.  I doubt moving the signing
date back a day will be objectionable to anyone.

See everyone in NY on Friday.


Chris Kaitson
General Counsel
Midcoast Energy Resources, Inc.
1100 Louisiana Street, Suite 2950
Houston, Texas  77002
Phone: 713-650-8900 X2028
Fax. 713-650-3232
e-mail: ckaitson@midcoastenergy.com

GOVERNMENT
EXHIBIT
1 0 6
PENGAD-Bayonne, N.J.

**KPLB-3542**

ENB-DOJ-001113

**From:** Gary B. Wilcox/TAX/Washington DC/C&L/US
**Date:** 11/02/99 12:14:31 PM
**Subject:** RE: KPC Option Agreement Changes

The latest version of the Option Agreement still does not have the language that I requested regarding MRG's obligation to report the payment as ordinary income. Paragraph 3 should be revised to add the following before the last sentence

The payment to MRG shall be treated by the parties for federal and state income tax purposes as a payment made in cancellation of PDA II. Accordingly, the payment to MRG will be reported by MRG as ordinary income, and KPC will issue a Form 1099 to MRG reflecting such payment.

**To:** Gary B. Wilcox/TAX/Washington DC/C&L/US@Americas-US
**cc:**
**From:** Richard Robert <rrobert@midcoastenergy com>
**Date:** 11/01/99 10:17 56 PM GMT
**Subject:** RE: KPC Option Agreement Changes

---

The agreement is supposed to contain language to include that he will
receive a 1099 for the payment I have not read the agreement. have you?
Is it worded appropriately?

----Original Message----
From gary.b wilcox@us pwcglobal com
[mailto gary b wilcox@us pwcglobal com]
Sent Sunday, October 31, 1999 10 42 PM
To Chris Kattson
Cc rrobert@midcoastenergy com; thomas j palmisano@us pwcglobal com
Subject Re KPC Option Agreement Changes

Did you discuss with Dennis the changes I recommended on my Saturday e-mail
to you, specifically a provision requiring MRG to report the cancellation
fee as ordinary income?
------------------------------------------------
The information transmitted is intended only for the person or entity to
which it is addressed and may contain confidential and/or privileged
material Any review, retransmission, dissemination or other use of, or
taking of any action in reliance upon, this information by persons or
entities other than the intended recipient is prohibited If you received
this in error, please contact the sender and delete the material from any
computer

------------------ Forwarded by Gary B Wilcox/US/TLS/PwC on 07/27/2001 09 55 AM ------------------

Gary B Wilcox
11/02/99 04 20 PM



GOVERNMENT
EXHIBIT
107

PWC P1061
ENB-DOJ-028247

To·     richachere@aol.com
cc     ckartson@midcoastenergy.com, rrobert@midcoastenergy.com, cberthelot@midcoastenergy.com, Thomas
      J Palmisano/TAX/Houston TX/C&L/US
Subject.  Remaining Items

Tom and I discussed with you the following items that remain to be done in the documents as far as we are concerned:

1.     **Clarify Tax Treatment of Payments.** We need Langley's agreement that the payment made to him under the Option Agreement or, alternatively, the payments made to him under the KPC PDA, will be reported by him (or MRG) as ordinary income. We do not want to leave him with the opportunity to later claim that the either the Option Agreement payment or the payments of contingent revenues represent capital gain from the sale of his stock. If it is not possible to change the Option Agreement or the KPC PDA at this point, then I agree with your suggestion to do a side letter as an amendment to these agreements. The side letter (or the agreements if they are changed) could say the following

a     With respect to the Option Agreement, the parties agree that any payment made by KPC to MRG upon exercise of the Option Rights will be treated by the parties for federal and state income tax purposes as a payment made in cancellation of the KPC PDA. Accordingly, such payment will be reported by MRG for federal and state income tax purposes as ordinary income, and KPC will issue a Form 1099 to MRG to reflect such payment.

b     With respect to the KPC PDA, the parties agree that to the extent that MRG receives distributions of KPC's cash flow pursuant to the KPC PDA, MRG will be allocated an equal amount of KPC's net income as determined for federal and state income tax purposes, and will be issued a Form K-1 by KPC reflecting such net income. MRG and its partners will be required to report such income consistently on their federal and state income tax returns. The parties agree that MRG will be treated as a partner only for federal and state income tax purposes, and nothing herein is intended to suggest or imply that MRG is a partner of KPC for any other purpose.

2.     **Guaranty by Parent.** Delete the reference to the Option Agreement. We do not want this agreement guaranteed by Midcoast. As stated previously, there is just no need for a Midcoast guarantee. Either the KPC PDA goes into effect, which is already guaranteed by Midcoast, or the payment is made under the Option Agreement

In addition, if the Assumption Agreement is brought back (as stated by Chris), then the Parent Guaranty needs to read like it did earlier last week (i e , Midcoast guaranteed the obligations of Newco under the Assumption Agreement, and there is no direct guaranty of KPC's obligations under the PDA)

3.     **Stock Purchase Agreement.** Add a representation/covenant in the SPA to the effect that K-Pipe has no plan or intention to liquidate The Bishop Group, Ltd and in any event will not liquidate such corporation for at least two years

4.     **Second Escrow Agreement** Revise to delete references to K-Pipe's financing of its stock purchase, and just say that the Midcoast escrow monies will be released at the end of the business day following the date that the Second Escrow Agreement is executed, first to a bank designated by K-Pipe to the extent of the Preliminary Cash Consideration, then to pay the debt that Midcoast has agreed to pay, and then any excess to Midcoast

Please call me if you have any questions

PWC P1062
ENB-DOJ-028248

08014.0011.2A

| | |
|---|---|
| **From:** | James Pryde |
| **To:** | Essig, Joyce; Gary Wilcox |
| **Date:** | 11/2/99 7:24PM |
| **Subject:** | Comments to documents |

Gary—Ron sent us your comments on the various documents. Our responses are as follows (Letters correspond to the letters in Ron's e-mail to us, which I assume is based on an e-mail from you).

a  Re:Option Agreement, we will put the language in a modification leter.
b.  RE: KPC PDA, we will recognize in a modification lettter that the cash flow distributions are ordinary income.  We will not make specific reference re: partnership for tax purposes.
c.  Requested change will be made to the Guaranty,
d.  If the old PDA remains in effect, then the old guaranty will be the one used.
e.  Re: covenant of K-Pipe not to liquidate Bishop—isn't that better suited in the APA between K-Pipe and MC as we do not care if they liquidate.
f.  Re:Escrow Agreements changes—we do not know what you are referring to.



GOVERNMENT EXHIBIT
108
PENGAD-Bayonne, N. J.

**002480**
KP1458

From:       "patnck.m delaney" <patrick.m.delaney@bankofamerica com>
To:         rrobert <rrobert@midcoastenergy com>
Date:       11/4/99 12.28PM
Subject:    RE: Loan for Butcher Interest Partnership

Pls. show covenant compliance calculation including Butcher debt in Total
Funded Debt for cash flow cover and debt/cap tests

> ——Onginal Message——
> From:      rrobert [SMTP rrobert@midcoastenergy com]
> Sent.      Thursday, November 04, 1999 11:55 AM
> To·        Delaney, Patnck M., Buchanan, Keith; bdavis, rlchachere; ckaitson
> Cc         thomas j palmisano, cjhoffmn
> Subject.   Loan for Butcher Interest Partnership
>
> It appears that the loan to be provided the Butcher Partnership will need
> to
> be $6 1 million.  Unless anyone objects, please proceed on that basis

CC:         "keith.buchanan" <keith.buchanan@bankofamerica com>, bdavis <bdavis@bpl.com>,
rlchachere <rlchachere@aol.com>, ckaitson <ckaitson@midcoastenergy com>

GOVERNMENT
EXHIBIT
1 10
PNG&D-Beyonc, N. J

TK 003950

ENB-DOJ-035646

**From:**      Chris Kaitson <ckaitson@midcoastenergy.com>
**To:**        'Robert Shearer' <Rshearer@BPL com>
**Date:**      11/4/99 1 16PM
**Subject:**   Butcher Interest

The ratios is 45% Midcoast.  Chns K

TK 003949

ENB-DOJ-035645

| | |
|---|---|
| **From:** | Richard Robert <rrobert@midcoastenergy com> |
| **To:** | 'Barry Davis' <bdavis@BPL.com>, "Keith Buchanan (E-mail)" |

<keith buchanan@bankofamerica com>, "Patrick Delaney (E-mail)"
<patrick m.delaney@bankofamerica com>, "Stephanie Pendleton (E-mail)"
<stephanie pendleton@bankofamerica com>

| | |
|---|---|
| **Date:** | 11/4/99 7 13PM |
| **Subject:** | RE. Butcher Interest Loan |

No I am not agreeable to the inclusion of this language  This agreement and
all previous agreements have been subject to GAAP standards.  If we make
exceptions in this case how many other exceptions will have to be dealt with
in the future.  The bank was unwilling to change definitions and diverge
from GAAP as it related to equity and the make whole  I don't see how this
is any different.  I feel that I have already made two significant
concessions on deal points on this agreement that increases the cost to me,
please don't ask me to make a third  Let PWC do their job and tell me
whether or not it has to be consolidated.

——Original Message——
From: Barry Davis [mailto bdavis@BPL com]
Sent  Thursday, November 04, 1999 7 05 PM
To  rrobert@midcoastenergy com
Cc  ckartson@midcoastenergy.com, fwbistline@porterhedges com
Subject  Butcher Interest Loan


Richard:

Attached is our proposed changes to the Credit Agreement regarding how to
handle the Butcher Interest loan and the calculation of the covenants
Please review

Barry Davis
Thompson Knight Brown Parker & Leahy, L L P
(713) 951-5863  (Phone)
(713) 654-1871  (Fax)
bdavis@bpl com

CONFIDENTIALITY NOTICE  The information contained in this
ELECTRONIC MAIL transmission is confidential  It may also be
subject to the attorney-client privilege or be privileged work
product or proprietary information  This information is intended
for the exclusive use of the addressee(s)  If you are not the
intended recipient, you are hereby notified that any use,
disclosure, dissemination, distribution (other than to the
addressee(s)) or copying of this information or the taking of
any action because of this information is strictly prohibited

TK 003953

ENB-DOJ-035649

**From:**       Richard Robert <rrobert@midcoastenergy.com>
**To:**         "Mary Lou Allen (E-mail)" <mary l allen@bankofamerica com>, "W Keith Buchanan
(E-mail)" <keith buchanan@bankofamerica com>, "Barry Davis (E-mail)" <bdavis@bpl.com>, "Patrick
Delaney (E-mail)" <patrick m delaney@bankofamerica com>, "Craig J Hoffman (E-mail)"
<cjhoffmn@ix.netcom com>, "CYNTHIA MORELLI (E-mail)" <CTMORELL@LLGM COM>, "Thomas. J
Palmisano (E-mail)" <thomas j palmisano@us pwcglobal com>, "Ronald C Chachere (E-mail)"
<rlchachere@aol com>, Chip Berthelot <cberthelot@midcoastenergy com>, Chris Kaitson
<ckaitson@midcoastenergy com>
**Date:**       11/4/99 10 03PM
**Subject:**    Closing Schedule

The closing schedule is as follows

Thursday 11/4
1 Midcoast funds $14 million in RABO escrow
2 K-Pipe executes stock purchase and related agreements

Friday 11/5
1 Midcoast executes asset acquisition agreement
2 Midcoast receives $14 million back from RABO escrow
3 Midcoast executes Credit Agreement.
4 Midcoast and K-Pipe execute the Butcher Partnership Credit Agreement.
5 Bank of America, RABO bank and attorneys will agree on Asset Escrow
Agreement

Monday 11/8
3 By 10 30 am Eastern, the RABO asset escrow is funded by Midcoast bank
syndicate
2 At 10 am Eastern, K-Pipe initiates closing procedures in New York with
the seller.
4 By noon Eastern, funds are wired to the seller
1. At 10 am Eastern, calculate the amount due under the Make Whole Provision
and finalize amount to be escrowed

Tuesday 11/9
1 At 10 am Eastern, Midcoast and K-Pipe initiate closing procedures.
2 Bank of America replaces Margasco Letter of Credit or Midcoast must fund
$1 3 million with Chase so that Chase collateral can be released  As soon
as practical, the replacement LC is issued and Midcoast gets $1 3 million
returned
3 By noon eastern, the escrow funds are disbursed to all parties including
K-Pipe, the noteholders (including principal amount, make whole and accrued
interest to closing), Chase Bank (including principal and interest to
closing), fees to Bank of America and other banks in syndicate
4. Attorney representing Bank of America awaits confirmation of noteholders
receipt of funds at which time the attorney can leave with assigned
collateral documents

The items that I know I am missing are
1 The timing and method of Bank of America funding the Butcher Partnership

Would everyone please take the time to add to this schedule by mid morning
All the pertinent items I have forgotten will be added and distributed
again  Thanks for your help

TK 003958

ENB-DOJ-035654

**From:**      Bonnie Ducharme
**To:**        Craig Hoffman
**Date:**      11/4/99 9:48PM
**Subject:**   Credit Facility by and between Bank of America and Butcher Interest

Attached is a memorandum and blacklined versions of draft loan documents in connection with the captioned transaction.

Please review and call either Barry Davis (713) 951-5863 or Bob Shearer at (713) 951-5896 with your comments

**CC:**        Barry Davis,  Robert Shearer

TK 003957

ENB-DOJ-035653

From:       Richard Robert <rrobert@midcoastenergy com>
To:         'Robert Shearer' <Rshearer@BPL.com>, "Barry Davis (E-mail)" <bdavis@bpl com>
Date:       11/4/99 10 24PM
Subject:    RE. Bishop Interest  Credit Agreement

I have not finished my review of this agreement, however, it seems as though
the agreement is referring to the wrong revenue interest.  The Butcher
Revenue Interest is a 1.5% royalty to be paid on all revenue on Kansas
Pipeline. This is not to be confused with the Contingent Revenue Interest as
referred to in the Project Development Agreement which provided for 50% of
all revenues in excess of $29.5 MM   The Butcher Revenue Interest is
included in the assets of Bishop Group which K-Pipe is buying.  The
partnership is simply going to purchase the Butcher Revenue Interest from
Bishop Group for $6.5 MM ($6.1 to be funded from this Credit Agreement and
the remainder from the capital contributions of the partners). We can
discuss further in the morning if more clarification is necessary

-----Original Message-----
From  Robert Shearer [mailto.Rshearer@BPL.com]
Sent: Thursday, November 04, 1999 5:19 PM
To. rrobert@midcoastenergy com
Subject· Bishop Interest Credit Agreement


Attached in Word and WordPerfect format is the current draft of the Butcher
Interest Partnership Credit Agreement with Bank of America.


CC:         "Patrick Delaney (E-mail)" <patrick.m.delaney@bankofamerica com>, "Craig J. Hoffman
(E-mail)" <cjhoffmn@ix.netcom.com>

**From:**      "Walter Bistline" <fwbistline@porterhedges com>
**To:**        <Bdavis@bpl com>, <rshearer@bpl com>, <ckaitson@midcoastenergy.com>,
<Rrobert@midcoastenergy com>
**Date:**      11/4/99 4·34PM
**Subject:**   Midcoast Energy Credit Agreement

I have only two minor corrections on the new draft of the Credit Agreement circulated today

In the definition of "Butcher Interest Partnership," please delete the words. "and an indirect 45% owned
Subsidiary of Borrower " Instead, say: "of which Borrower indirectly owns 45%." [With less than 50%
ownership, the partnership will NOT be a "Subsidiary" as defined in the Credit Agreement.]

In clause (i) of the definition of "Permitted Liens," please delete the reference to "$6,500,000" in the
description of the Butcher Interest Partnership Credit Agreement.

Anyone want to suggest a time tomorrow to rendezvous at TKBPL to iron out closing details and watch
Richard, Chris and Patrick sign mounds of paper?  walt


**CC:**        "Kristin Rutigliano" <kkrutigliano@porterhedges.com>, "Neal Kaminsky"
<nmkaminsky@porterhedges.com>

TK 003952

ENB-DOJ-035648

From:       <Andrew.Sherman@nyc.rabobank.com>
To:         SAN FRANCISCO OFFICE.SF1(CTMORELL)
Date:       11/5/99 7:35AM
Subject:    RE: FW: UCC-1

We will not be filing a UCC in this transaction.

-----Original Message-----
From. CYNTHIA MORELLI [mailto:CTMORELL@LLGM COM]
Sent: Friday, November 05, 1999 10:32 AM
To  cjhoffmn@ix.netcom.com
Cc: MCASILLA@LLGM COM; a.sherman@nyc.rabobank.com
Subject. Re: FW: UCC-1


Craig and Andrew:

The person drafting the borrower's opinion letter said he needed the UCC-1
forms because the current draft of his opinion says that the $195 million
loan is "evidenced by" the Promissory Note and "secured by" a) the Security
and Assignment Agreement, b) UCC-1 financing statement executed by borrower
in favor of lender to be filed with the Secretary of State of New York, and
c) UCC-1 financing statement executed by borrower in favor of lender to be
filed with the Office of the Clerk of New York County.

If for whatever reason he does not receive the UCC-1 Financing Statements by
this afternoon, he will simply delete this language from the opinion.

Cynthia

cc:  Mark Casillas


Cynthia McArthur Morelli
LeBoeuf, Lamb, Greene & MacRae LLP
One Embarcadero Center, Suite 400
San Francisco, CA  94111
P:  415-951-1158
F:  415-951-1179
ctmorell@llgm.com

>>> "Craig J. Hoffman" <cjhoffmn@ix.netcom.com> 11/05/99 06:46AM >>>
Cynthia,
        I'm not sure what it is I need or how to go about getting this, and
Andrew
seems a little unclear as to why we would need this.  Can I get further
explanation?
-Craig

Craig J. Hoffman

Fortrend International
cjhoffmn@ix.netcom.com
212-826-0770 Voice

**KPLB-3497**

GOVERNMENT
EXHIBIT
112
PENGAD-Bayonne, N.J.

ENB-DOJ-014619

# PRICEWATERHOUSE COOPERS 

PricewaterhouseCoopers LLP
1100 Louisiana Street
Suite 4100
Houston TX 77002
Telephone (713) 757 5200
Facsimile  (713) 757 5249

November 5, 1999

Mr. Richard Robert
Midcoast Energy Resources, Inc.
1100 Louisiana, Suite 2950
Houston, Texas 77002

Dear Richard:

We appreciate the opportunity to provide tax consulting services to Midcoast Energy Resources, Inc. ("Midcoast") in connection with its acquisition of certain assets of Bishop Pipeline Company and Syenergy Pipeline Company.  This engagement letter and the attached Terms of Engagement to Provide Tax Consulting Services set forth an understanding of the nature and scope of the services to be performed, the fees we will charge for the services, and outline the responsibilities of PricewaterhouseCoopers LLP ("PricewaterhouseCoopers") necessary to ensure that PricewaterhouseCoopers professional services are performed to achieve mutually agreed upon objectives.

**Summary of Services**

You have requested that PricewaterhouseCoopers perform the following services:

## REDACTED

Midcoast Assistance

In order to provide our opinion, we will be requesting representations from Midcoast and the sellers of the assets as to the correct facts associated with the background and negotiation of the above-described transaction.  To further facilitate PricewaterhouseCoopers advice and opinion, you also will need to provide us with all relevant term sheets, letters of intent and other documents relating to the proposed acquisition and updates of these documents as they become available, as well as updates of any other significant changes or developments.  We anticipate, in addition, having a number of factual and other questions which can be handled by phone, e-mail and/or fax  We would appreciate your assistance in seeing that any information that we determine is necessary for the prompt completion of our work is made available to us in a timely manner.

**PWC 144**

GOVERNMENT
EXHIBIT
115
PENGAD-Bayonne, N J.

ENB-DOJ-010842

# PRICEWATERHOUSECOOPERS 🌐

PricewaterhouseCoopers LLP
1100 Louisiana Street
Suite 4100
Houston TX 77002
Telephone (713) 757 5200
Facsimile (713) 757 5249

November 5, 1999

Mr. Richard Robert
Midcoast Energy Resources, Inc.
1100 Louisiana, Suite 2950
Houston, Texas 77002



Dear Richard:

We appreciate the opportunity to provide tax consulting services to Midcoast Energy Resources, Inc ("Midcoast") in connection with its acquisition of certain assets of Bishop Pipeline Company and Syenergy Pipeline Company. This engagement letter and the attached Terms of Engagement to Provide Tax Consulting Services set forth an understanding of the nature and scope of the services to be performed, the fees we will charge for the services, and outline the responsibilities of PricewaterhouseCoopers LLP ("PricewaterhouseCoopers") necessary to ensure that PricewaterhouseCoopers professional services are performed to achieve mutually agreed upon objectives

## Summary of Services

You have requested that PricewaterhouseCoopers perform the following services·

To provide advice in connection with the structuring of the above-described transaction and to provide an opinion to Midcoast that it is more likely than not that, immediately after the consummation of its purchase of the assets of Bishop Pipeline Company and Syenergy Pipeline Company, the acquired assets, in the aggregate, will have, for U S federal income tax purposes, a tax basis in the hands of the buyers equal to the cost to the buyers of such acquired assets as determined in accordance with Section 1012 of the Internal Revenue Code of 1986, as amended

**Previously Redacted**

## Midcoast Assistance

In order to provide our opinion, we will be requesting representations from Midcoast and the sellers of the assets as to the correct facts associated with the background and negotiation of the above-described transaction. To further facilitate PricewaterhouseCoopers advice and opinion, you also will need to provide us with all relevant term sheets, letters of intent and other documents relating to the proposed acquisition and updates of these documents as they become available, as well as updates of any other significant changes or developments  We anticipate, in addition, having a number of factual and other questions which can be handled by phone, e-mail and/or fax  We would appreciate your assistance in seeing that any information that we determine is necessary for the prompt completion of our work is made available to us in a timely manner

**PWC 144**

ENB-DOJ-028158

**Fees and Billing Procedures**

Our fees for professional services are based on a number of factors including the time spent, the nature of and the value of the work performed, the experience level of the staff required to bring the appropriate level of expertise to the project, and the circumstances under which the work is performed. The fees will include fees for services already rendered in the past month or so in the structuring of this transaction.

In the event, through our efforts, we have brought extraordinary value to the transaction and you agree that this is the case, our total fees for the services described herein will be commensurate with that value. In such case, the fees may be paid out of the sales proceeds received by the sellers from Midcoast in the above-described transaction in accordance with usual and customary practices. If you do not agree that we have brought extraordinary value to the transaction, our fees will be based on the hours we spent in connection with this matter and billed at our standard hourly billing rates. In such case, an invoice for our fees and expenses will be sent to Midcoast, which will be due and payable upon receipt.

\* \* \* \* \*

We look forward to working with you and your staff during the completion of this important tax consulting project. If the above and the attached terms are in accordance with your understanding of our engagement, please sign the enclosed copy and return it in the enclosed self-addressed, stamped envelope. Please retain the original for your files. If you have any questions or comments regarding the terms of this engagement letter, please do not hesitate to contact Gary Wilcox at (202) 414-4422, Tom Palmisano at (713) 657-8264 or Bob Whitten at (713) 757-5237.

Very truly yours,

PricewaterhouseCoopers LLP

Enclosure:     Terms of Engagement to Perform Special Tax Consulting Project

PricewaterhouseCoopers LLP

By: _Pricewaterhousecoopers LLP_     Date: _11-5-99_

Accepted: Midcoast Energy Resources, Inc

By _____     Date: _11-5-99_

**PWC 145**

ENB-DOJ-010843

Terms of Engagement to Provide Tax Consulting Services

Responsibilities of the Client

The Client agrees to identify those individuals within the Company authorized to request services from PricewaterhouseCoopers under the terms of this agreement. Individuals authorized to request services agree to identify the purpose of the consulting services, and identify for whom the services are to be performed (e.g., the corporation, an employee, a director) at the time the services are requested.

A fundamental term of our engagement is that the Client will provide us with all information relevant to the consulting services to be performed and to provide us with any assistance as may be required to properly perform the engagement. In addition, the Client agrees to bring to our attention any matters that may require further consideration to determine the proper tax treatment of any relevant item. The Client also agrees to bring to our attention any changes in the information as originally presented, as soon as such information becomes available.

Responsibilities of PricewaterhouseCoopers

We will perform our services on the basis of the information you have provided and in accordance with the Internal Revenue Code of 1986 ("the Code"), as amended, and any applicable regulations and associated interpretations existing at the time the consulting services are performed. In addition, consultations regarding state tax matters will be performed in accordance with applicable state tax laws, regulations and associated interpretations as of the date the services are provided. Federal and state tax laws and regulations are subject to change at any time, and such changes may be retroactive in effect and may be applicable to advice given or other services rendered before their effective dates

We do not assume responsibility for tax changes occurring after the date we have completed our services.

Some of the matters on which we may be asked to advise the company (e.g., stock option plans, profit related compensation arrangements, etc.) may have personal tax implications to directors, employees or other persons. However, we have no responsibility to these individuals unless we have been specifically instructed to address these issues, and we agree to do so in writing

We also agree to discuss those requests for consulting services that we believe qualify as special projects, as defined by the parameters discussed in the "Special Projects" section in the letter transmitting these terms, prior to beginning any such work. However, in the event a request for services is not identified as a special project on the basis of these parameters when we initially commence work pursuant to such request, we agree to notify management at the time professional fees and expenses exceed an amount stipulated in the letter transmitting these terms on any particular service that is subject to the terms of this agreement.

We agree to provide documentation (letters, memoranda, etc.) that will summarize the facts as we understand them, the applicable rule(s) of law, and our analysis and conclusion for each service resulting in a fee in exceeding an amount stipulated by agreement or as requested by management. However, such requirement may be waived upon mutual agreement of the parties to this agreement. However, we will not ordinarily provide this documentation in response to very routine questions.

The Internal Revenue Code imposes penalties for the substantial understatement of tax liability for certain failures to file proper tax returns  The Code and related regulations provide that a penalty will be imposed for any position resulting in a substantial

**PWC 146**

FNB-DOJ-010844

understatement of the tax liability for which "substantial authority" does not exist and disclosure has not been made. Relative to the services provided under the terms of this agreement, we will discuss with management any tax positions for which substantial authority does not exist, and could therefore subject the Client to penalties. We will also discuss with management the related need for disclosure in the Company's tax return to avoid the imposition of any penalty. We will use our judgment in resolving questions where the tax law may be unclear, or where there are conflicts between taxing authorities' interpretations of the law and other supportable positions, and discuss them with you. We are not responsible for any penalties imposed for positions that have been discussed with management that do not have, or are ultimately determined by the Internal Revenue Service ("IRS") not to have, substantial authority where we recommended disclosure and the Client elected not to disclose on its tax return.

In the event a position on an issue for which we provide services under the terms of this agreement is determined to represent the preparation of a "substantial portion" of the Company's tax return when included in that return, we may be considered a tax return preparer for purposes of the tax return preparer penalty statutes Accordingly, in such an event, a preparer penalty could be imposed against us if the position included in the Company's tax return does not have a "realistic possibility" of success (in general, a one in three chance of being sustained) and is not disclosed. We will discuss with management, and will document, any tax positions of which we are aware for which a realistic possibility of success may not exist and could therefore subject PricewaterhouseCoopers to penalties. We will also discuss with management the need for disclosure when we believe that it is required in the Company's tax return to avoid the imposition of any penalty. If the Client decides to take a position on its return and chooses not to follow our recommendation to disclose, and the IRS subsequently determines that a realistic

possibility of success did not exist, then the Client agrees to reimburse PricewaterhouseCoopers for any penalties imposed on PricewaterhouseCoopers, its partners or staff.

PricewaterhouseCoopers is not responsible for any penalties assessed against the Client as the result of the Client's failure to provide us with all the relevant information relative to the issue under consultation. Furthermore, the Client agrees to reimburse PricewaterhouseCoopers for any penalties imposed on PricewaterhouseCoopers, its partners or staff, as the result of such a failure to provide such information.

Engagement Limitations

We will rely on information supplied by you in performing our services under this agreement and will not independently verify the accuracy of such information.

As you are aware, income tax returns are subject to examination by both the Internal Revenue Service and state taxing authorities. We will be available to assist the Client in the event of an audit of any issue on which we have provided tax advice under the terms of this agreement. However, our fees for these additional services are not included in our fee for providing ongoing tax consulting services.

Disassociation or Termination of Engagement

In the event we discover activities or practices that we deem inappropriate and that would prevent us from completing this project, or should the Client fail to provide us with adequate and accurate information or the requisite assistance to allow for the proper completion of this project, PricewaterhouseCoopers reserves the right to resign from the engagement prior to the completion of our work. In such an event, the Client agrees to be responsible for all

**PWC 147**

ENB-DOJ-010845

professional fees and expenses incurred by us prior to our resignation. Of course, we will return to the Client any payments received in excess of the professional fees and expenses incurred to the date of resignation.

In addition, we also reserve the right to suspend or terminate any work in progress in the event timely payment of our fees is not made in accordance with any agreed upon billing schedule. Moreover, if during the course of our work, billing disputes arise and remain unresolved, we reserve the right to withdraw from further services.

The Client reserves the right to terminate the services covered by this agreement at any time by providing PricewaterhouseCoopers with written notice of such intentions. The effective date of such termination will be the date we receive the termination notice. In such event, the Client will be responsible for all professional fees and expenses incurred by us prior to the date of termination

Liability Limiting Clause

All services will be rendered by and under the supervision of qualified staff in accordance with the terms and conditions set forth in this agreement and its attachments. PricewaterhouseCoopers makes no other representation or warranty regarding either the services to be provided or any deliverables; in particular, and without limitation of the foregoing, any express or implied warranties of fitness for a particular purpose, merchantability, warranties arising by custom or usage in the profession, and warranties arising by operation of law are expressly disclaimed

In no event, unless it has been finally determined that PricewaterhouseCoopers was grossly negligent or acted willfully or fraudulently, shall PricewaterhouseCoopers be liable to the Client or any of its officers, directors, employees or shareholders or to any

other third party, whether a claim be in tort, contract or otherwise: (a) for any amount in excess of the total professional fee paid by you to us under this agreement; or (b) for any special, consequential, indirect, exemplary, punitive, lost or similar damages, even if we have been apprised of the possibility thereof.

Indemnification and Consequential Damages Clause

The Client agrees to indemnify, defend and hold harmless PricewaterhouseCoopers and its partners or staff (PricewaterhouseCoopers and each such person being an "indemnified party") from and against any and all liabilities, losses, demands, costs and expenses, joint or several, to which such indemnified parties may be subject under any applicable federal or state law arising solely out of the performance of services contemplated by this agreement, including claims by any third parties. The Client agrees to reimburse any indemnified party for all reasonable expenses (including reasonable counsel fees and expenses) as they are incurred in connection with the investigation of, preparation for, or defense of, any pending or threatened claim or action or proceeding arising therefrom, whether or not such indemnified party is a party. The provisions of this indemnification clause will not apply if it has been finally determined that PricewaterhouseCoopers was grossly negligent or acted willfully or fraudulently

Resolution of Differences

In the unlikely event that differences concerning PricewaterhouseCoopers' services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, PricewaterhouseCoopers and you agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to PricewaterhouseCoopers' services and fees for this engagement.

**PWC 148**

ENB-DOJ-010846

Timing of Engagement

The expected completion date of each service
provided under this agreement will be mutually
agreed upon at the time of requesting the
services. In the event the agreed timetable
requires that the Company provide us with
needed information within a specified period of
time, the failure to timely provide this
information may require adjustment to our
completion date. In addition, in the event
unforeseen circumstances occur that impact our
ability to meet the final completion date of a
particular service, we will contact management
immediately to discuss an acceptable revised
completion date.

* * * * *

The clauses regarding liability limitations,
indemnification, and resolution of differences
shall survive any termination of this agreement
This agreement will be governed by the laws of
the State of New York.

**PWC 149**

ENB-DOJ-010847

```
C/O FORTREND INTERNATIONAL          STATEMENT PERIOD
750 LEXINGTON AVE                   07/01/1999-12/31/1999
NEW YORK   NY 10021
                       ACCOUNT#
                       00018313        USD
                       K-PIPE MERGER CORP
                       Account Type/Description
                       000-Normal Account
```

| Entry Date | Text | Ref. Number | Value Date | Amount |
|---|---|---|---|---|
| | Opening Balance | | | 0.00DR |
| | Balance | | | 0.00DR |
| 11/08/1999 | COMMERCIAL LOANS | | 11/08/1999 | 123,345,000.00CR |
| 11/08/1999 | COMMERCIAL LOANS | | 11/08/1999 | 750,000.00DR |
| 11/08/1999 | PAYING & RECEIVING | | 11/08/1999 | 122,594,852.00DR |
| | Balance | | | 148.00CR |
| 11/09/1999 | COMMERCIAL LOANS | | 11/09/1999 | 112,695,895 00CR |
| 11/09/1999 | PAYING & RECEIVING | | 11/09/1999 | 10,039,536.01CR |
| 11/09/1999 | PAYING & RECEIVING | | 11/09/1999 | 6,225,000.00CR |
| 11/09/1999 | PAYING & RECEIVING | | 11/09/1999 | 525,000.00DR |
| 11/09/1999 | PAYING & RECEIVING | | 11/09/1999 | 950,000.00DR |
| 11/09/1999 | PAYING & RECEIVING | | 11/09/1999 | 75,000.00DR |
| 11/09/1999 | PAYING & RECEIVING | | 11/09/1999 | 299,750.00DR |
| 11/09/1999 | PAYING & RECEIVING | | 11/09/1999 | 312,260.00DR |
| 11/09/1999 | COMMERCIAL LOANS | | 11/09/1999 | 123,373,266.56DR |
| 11/09/1999 | MM - VALUE DATE SETTLEMT. | 00428452 | 11/09/1999 | 3,400,000.00DR |
| | Balance | | | 25,302.45CR |
| 11/10/1999 | MM - MATURITY SETTLEMENT | 00428452 | 11/10/1999 | 3,400,472.22CR |
| 11/10/1999 | MM - VALUE DATE SETTLEMT. | 00428497 | 11/10/1999 | 3,425,774.67DR |
| | Balance | | | 0 00DR |
| 11/12/1999 | MM - MATURITY SETTLEMENT | 00428497 | 11/12/1999 | 3,426,726 27CR |
| 11/12/1999 | PAYING & RECEIVING | | 11/12/1999 | 8,743.00DR |
| 11/12/1999 | PAYING & RECEIVING | | 11/12/1999 | 1,451,000.00DR |
| 11/12/1999 | PAYING & RECEIVING | | 11/12/1999 | 1,451,000.00DR |
| | Balance | | | 515,983.27CR |
| 11/18/1999 | MM - VALUE DATE SETTLEMT. | 00428764 | 11/15/1999 | 515,983.27DR |
| | Balance | | | 0.00DR |

GOVERNMENT EXHIBIT

G-116

0079

ENB-RB-000080

```
ESCROW ACCT                           STATEMENT PERIOD
MIDCOAST ENERGY RESOURCES INC         07/01/1999-12/31/1999
100 LOUISIANA 29TH FLOOR
                                          ACCOUNT#
HOUSTON TX                                00018359           USD
77002                                 MIDCOAST ENERGY RES - ESCROW ACCT
                                      Account Type/Description
                                      000-Normal Account
```

| Entry Date | Text | Ref. Number | Value Date | Amount |
|---|---|---|---|---|
| | Opening Balance | | | 0.00DR |
| | Balance | | | 0.00DR |
| 11/08/1999 | PAYING  & RECEIVING | | 11/08/1999 | 192,000,000.00CR |
| 11/08/1999 | PAYING  & RECEIVING | | 11/08/1999 | 6,100,000.00CR |
| 11/08/1999 | MM - VALUE DATE SETTLEMT. | 00428397 | 11/08/1999 | 198,100,000.00DR |
| | Balance | | | 0.00DR |
| 11/09/1999 | MM - MATURITY SETTLEMENT | 00428397 | 11/09/1999 | 198,127,513.89CR |
| 11/09/1999 | COMMERCIAL LOANS | | 11/09/1999 | 73,288,380.29DR |
| 11/09/1999 | COMMERCIAL LOANS | | 11/09/1999 | 6,012,164.38DR |
| 11/09/1999 | COMMERCIAL LOANS | | 11/09/1999 | 6,100,000.00DR |
| 11/09/1999 | COMMERCIAL LOANS | | 11/09/1999 | 31,074.22DR |
| 11/09/1999 | COMMERCIAL LOANS | | 11/09/1999 | 112,695,895.00DR |
| 11/09/1999 | PAYING  & RECEIVING | | 11/09/1999 | 6,100,000.00CR |
| | Balance | | | 6,100,000.00CR |
| 11/10/1999 | PAYING  & RECEIVING | | 11/09/1999 | 6,100,000.00DR |
| | Closing balance | | | 0.00DR |

**GOVERNMENT EXHIBIT**

**G-117**

001430

ENB-DOJ-001127

 **ENBRIDGE**          **Peter Mack on 03/06/2001 03:55 PM**

To:       James Lee <jlee@midcoastenergy.com>
cc:
Subject:  Re: Your Phone Call

Thanks for the additional information. Could I also prevail on you to ask your Tax Manager to give us a
brief description of how tax basis was bumped on the acquisition of the Kansas Pipeline. Richard referred
to this initiative in our session last week and implied that it was a bit out of the ordinary. Thanks again.

**GOVERNMENT
EXHIBIT**

**G-118**

**ENB  008427**

## Midcoast Meetings - April 17, 2001

On April 17, Mike Miller and Wanda Opheim met with Richard Robert and Jeff Wiener of Midcoast. We also spend approximately 2 hours with Tom Palmisano of PWC who represents Midcoast's primary tax person. The primary purpose of the meetings were as follows:

-a chance to meet Jeff Weiner (of Midcoast) and Tom Palmisano (of PWC)
-discuss tax issues particularly as it relates to any exposures we may want to record at the time of the acquisition as part of the purchase accounting.
-gain a better understanding of the tax function at Midcoast.

### Findings

-What was learned from the meetings was not too far from expectations based upon discussions with Richard Robert (Please see attached note on my observations from the discussion with Richard Robert) and from the due diligence work which had been completed by Peter Mack. However, as noted below under tax exposures, though we asked the questions at the time of the due diligence, Midcoast seems to be indicating a higher risk than during the due diligence process. Some of this feedback is because they think it makes sense to layer on as much of the liability at the time of purchase as possible to avoid future earnings hit. Both Mike and I felt that it seemed they were being particularly conservative. However, this is one area we will need to spend a great deal of more time on as it relates to the purchase equation for accounting purposes.

**REDACTED**

GOVERNMENT
EXHIBIT
**G-119**

**REDACTED**

REDACTED

ENB  008442

REDACTED

**Tax Exposures**

As noted above during our meetings we spend quite a bit of time discussing tax exposures. Noted below are the main items, which were discussed.

REDACTED

**REDACTED**

**REDACTED**

Kansas Pipeline Step Up in Tax Basis.

This was probably the most disconcerting item we discussed, but yet both Mike and I feel that they were now putting a higher risk on it than is necessary (subject to actually seeing the opinion.)  At the time they purchased Kansas Pipeline, the stock was first sold by the original owner to KPC Holdings (unrelated to Midcoast) and then the assets were sold to MidCoast.  These transactions occurred within 48 hours of each other. Midcoast has elected to step up the tax basis of the assets to the purchase price.  (PWC also did a cost allocation study, which assisted in getting more of the assets into faster write off classifications.)  Though they have an opinion from PWC that the more likely than not they will be successful, Midcoast has indicated there is a risk and therefore as part of the purchase equation we may want to reflect this liability.  (The amount of liability to be recorded would be U.S. $40 million.)  This seems to be very conservative, if the transactions was that risky PWC should have made Midcoast record this liability at the time of the purchase.  Again this would manage any potential future earnings hit for Enbridge, but it seems to conservative.  The Midcoast fact situation seems strong and though the IRS is interested in transactions involving an intermediary, this transaction has enough substance that it should not be what the IRS is going after.

**REDACTED**

Summary

**REDACTED**

6

ENB 008445

We also need to be able to review ourselves the opinions PWC has provided. I asked for the opinion particularly as it related to Kansas Pipeline and PWC was not comfortable with providing it as it could waive privilege. Once the deal closes we should be able to get a copy.

**REDACTED**

## Action Items

**REDACTED**

-Obtain additional information on the tax exposures. Quantify, access likelihood of adverse reassessment, once transaction closes get PWC opinions. Deal with these items as it relates to the purchase equation. (Needs to be discussed with Controllers group on how to manage this.)

**REDACTED**

7

**ENB  008446**

**REDACTED**

Prepared by:   Wanda Opheim
April 19, 2001

8

ENB  008447

## GUARANTY

THIS GUARANTY is made as of November 8, 1999, by MIDCOAST ENERGY RESOURCES, INC., a Texas corporation ("Guarantor"), in favor of BANK OF AMERICA, N.A., ("Lender").

### RECITALS:

1. Butcher Interest Partnership, a Delaware general partnership ("Borrower") whose sole general partners are K-Pipe Group, Inc., a Kansas corporation, and Mid Louisiana Gas Company, a Delaware corporation ("MLGC"), has executed in favor of Lender that certain demand promissory note of even date herewith, payable to the order of Lender in the principal amount of $6,100,000.00 (such demand promissory note, as from time to time amended, and all promissory notes given in substitution, renewal or extension therefor or thereof, in whole or in part, being herein collectively called the "Note").

2. The Note was executed pursuant to a Credit Agreement of even date herewith (herein, as from time to time amended, supplemented or restated, called the "Credit Agreement"), by and between Borrower and Lender, pursuant to which Lender has agreed to make a term loan to Borrower under the Note.

3. It is a condition precedent to Lender's obligations to advance funds pursuant to the Credit Agreement that Guarantor shall execute and deliver to Lender a satisfactory guaranty of Borrower's obligations under the Note and the Credit Agreement.

4. Guarantor owns directly one hundred percent (100%) of the outstanding shares of common stock of MLGC and MLGC owns a forty five percent (45%) general partnership interest in Borrower.

5. Borrower, Guarantor, and the other direct and indirect subsidiaries of Guarantor are mutually dependent on each other in the conduct of their respective businesses under a holding company structure, with the credit needed from time to time by each often being provided by another or by means of financing obtained by one such affiliate with the support of the others for their mutual benefit and the ability of each to obtain such financing being dependent on the successful operations of the others.

6. The board of directors of Guarantor has determined that Guarantor's execution, delivery and performance of this Guaranty may reasonably be expected to benefit Guarantor, directly or indirectly, and are in the best interests of Guarantor.

NOW, THEREFORE, in consideration of the premises, of the benefits which will inure to Guarantor from Lender's advances of funds to Borrower under the Credit Agreement, and of Ten Dollars and other good and valuable consideration, the receipt and sufficiency of all of which are

GOVERNMENT
EXHIBIT

G-122

TK 002492

ENB-DOJ-034158

hereby acknowledged, and in order to induce Lender to advance funds under the Credit Agreement, Guarantor hereby agrees with Lender as follows:

AGREEMENTS:

Section 1. <u>Definitions</u>. Reference is hereby made to the Credit Agreement for all purposes. All terms used in this Guaranty which are defined in the Credit Agreement and not otherwise defined herein shall have the same meanings when used herein. All references herein to any Obligation Document, Loan Document, or other document or instrument refer to the same as from time to time amended, supplemented or restated. As used herein, the following terms shall have the following meanings:

"<u>Lender</u>" means Bank of America, N.A. and all other Persons who at any time are "Lenders" under the Credit Agreement.

"<u>Obligations</u>" means collectively all of the indebtedness, obligations, and undertakings which are guaranteed by Guarantor and described in subsections (a) and (b) of Section 2.

"<u>Obligation Documents</u>" means this Guaranty, the Note, the Credit Agreement, the Loan Documents, all other documents and instruments under, by reason of which, or pursuant to which any or all of the Obligations are evidenced, governed, secured, or otherwise dealt with, and all other documents, instruments, agreements, certificates, legal opinions and other writings heretofore or hereafter delivered in connection herewith or therewith.

"<u>Obligors</u>" means Borrower, Guarantor and any other endorsers, guarantors or obligors, primary or secondary, of any or all of the Obligations.

"<u>Security</u>" means any rights, properties, or interests of Lender, under the Obligation Documents or otherwise, which provide recourse or other benefits to Lender in connection with the Obligations or the non-payment or non-performance thereof, including collateral (whether real or personal, tangible or intangible) in which Lender has rights under or pursuant to any Obligation Documents, guaranties of the payment or performance of any Obligation, bonds, surety agreements, keep-well agreements, letters of credit, rights of subrogation, rights of offset, and rights pursuant to which other claims are subordinated to the Obligations.

Section 2. <u>Guaranty</u>.

(a) Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to Lender the prompt, complete, and full payment when due, and no matter how the same shall become due, of:

(i) the Note, including all principal, all interest thereon and all other sums payable thereunder; and

(ii) All other sums payable under the other Obligation Documents, whether for principal, interest, fees or otherwise; and

F:\data\wp\892\1099\1099064c.892.wpd:bd:11/7/99:1:26 PM

TK 002493

ENB-DOJ-034159

(iii) Any and all other indebtedness or liabilities which Borrower may at any time owe to Lender, whether incurred heretofore or hereafter or concurrently herewith, voluntarily or involuntarily, whether owed alone or with others, whether fixed, contingent, absolute, inchoate, liquidated or unliquidated, whether such indebtedness or liability arises by notes, discounts, overdrafts, open account indebtedness or in any other manner whatsoever, and including interest, attorneys' fees and collection costs as may be provided by law or in any instrument evidencing any such indebtedness or liability.

Without limiting the generality of the foregoing, Guarantor's liability hereunder shall extend to and include all post-petition interest, expenses, and other duties and liabilities of Borrower described above in this subsection (a), or below in the following subsection (b), which would be owed by Borrower but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization, or similar proceeding involving Borrower.

(b) Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to Lender the prompt, complete and full performance, when due, and no matter how the same shall become due, of all obligations and undertakings of Borrower to Lender under, by reason of, or pursuant to any of the Obligation Documents.

(c) If Borrower shall for any reason fail to pay any Obligation, as and when such Obligation shall become due and payable, whether at its stated maturity, as a result of the exercise of any power to accelerate, or otherwise, Guarantor will, forthwith upon demand by Lender, pay such Obligation in full to Lender to whom such Obligation is owed. If Borrower shall for any reason fail to perform promptly any Obligation, Guarantor will, forthwith upon demand by Lender, cause such Obligation to be performed or, if specified by Lender, provide sufficient funds, in such amount and manner as Lender shall in good faith determine, for the prompt, full and faithful performance of such Obligation by Lender or such other Person as Lender shall designate.

(d) If either Borrower or Guarantor fails to pay or perform any Obligation as described in the immediately preceding subsections (a), (b), or (c) Guarantor will incur the additional obligation to pay to Lender, and Guarantor will forthwith upon demand by Lender pay to Lender, the amount of any and all expenses, including fees and disbursements of Lender's counsel and of any experts or agents retained by Lender, which Lender may incur as a result of such failure.

(e) As between Guarantor and Lender, this Guaranty shall be considered a primary and liquidated liability of Guarantor.

(f) The liability of Guarantor hereunder shall be limited to the maximum amount of liability that can be incurred without rendering this Guaranty, as it relates to Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount.

Section 3. Unconditional Guaranty.

(a) No action which Lender may take or omit to take in connection with any of the Obligation Documents, any of the Obligations or any Security, and no course of dealing of Lender

TK 002494

ENB-DOJ-034160

with any Obligor or any other Person, shall release or diminish Guarantor's obligations, liabilities, agreements or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against Lender, regardless of whether any such action or inaction may increase any risks to or liabilities of Lender or any Obligor or increase any risk to or diminish any safeguard of any Security. Without limiting the foregoing, Guarantor hereby expressly agrees that Lender may, from time to time, without notice to or the consent of Guarantor, do any or all of the following:

(i) Amend, change or modify, in whole or in part, any one or more of the Obligation Documents and give or refuse to give any waivers or other indulgences with respect thereto.

(ii) Neglect, delay, fail, or refuse to take or prosecute any action for the collection or enforcement of any of the Obligations, to foreclose or take or prosecute any action in connection with any Security or Obligation Document, to bring suit against any Obligor or any other Person, or to take any other action concerning the Obligations or the Obligation Documents.

(iii) Accelerate, change, rearrange, extend, or renew the time, rate, terms, or manner for payment or performance of any one or more of the Obligations (whether for principal, interest, fees, expenses, indemnifications, affirmative or negative covenants, or otherwise).

(iv) Compromise or settle any unpaid or unperformed Obligation or any other obligation or amount due or owing, or claimed to be due or owing, under any one or more of the Obligation Documents.

(v) Take, exchange, amend, eliminate, surrender, release, or subordinate any or all Security for any or all of the Obligations, accept additional or substituted Security therefor, and perfect or fail to perfect Lender's rights in any or all Security.

(vi) Discharge, release, substitute or add Obligors.

(vii) Apply all monies received from Obligors or others, or from any Security for any of the Obligations, as Lender may determine to be in their best interest, without in any way being required to marshall Security or assets or to apply all or any part of such monies upon any particular Obligations.

(b) No action or inaction of any Obligor or any other Person, and no change of law or circumstances, shall release or diminish Guarantor's obligations, liabilities, agreements, or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against Lender. Without limiting the foregoing, the obligations, liabilities, agreements, and duties of Guarantor under this Guaranty shall not be released, diminished, impaired, reduced, or affected by the occurrence of any or all of the following from time to time, even if occurring without notice to or without the consent of Guarantor:

(i) Any voluntary or involuntary liquidation, dissolution, sale of all or substantially all assets, marshalling of assets or liabilities, receivership, conservatorship, assignment for the benefit of creditors, insolvency, bankruptcy, reorganization, arrangement, or composition

TK 002495

ENB-DOJ-034161

of any Obligor or any other proceedings involving any Obligor or any of the assets of any Obligor under laws for the protection of debtors, or any discharge, impairment, modification, release, or limitation of the liability of, or stay of actions or lien enforcement proceedings against, any Obligor, any properties of any Obligor, or the estate in bankruptcy of any Obligor in the course of or resulting from any such proceedings.

(ii) The failure by Lender to file or enforce a claim in any proceeding described in the immediately preceding subsection (i) or to take any other action in any proceeding to which any Obligor is a party.

(iii) The release by operation of law of any Obligor from any of the Obligations or any other obligations to Lender.

(iv) The invalidity, deficiency, illegality, or unenforceability of any of the Obligations or the Obligation Documents, in whole or in part, any bar by any statute of limitations or other law of recovery on any of the Obligations, or any defense or excuse for failure to perform on account of force majeure, act of God, casualty, impossibility, impracticability, or other defense or excuse whatsoever.

(v) The failure of any Obligor or any other Person to sign any guaranty or other instrument or agreement within the contemplation of any Obligor or any Lender.

(vi) The fact that Guarantor may have incurred directly part of the Obligations or is otherwise primarily liable therefor.

(vii) Without limiting any of the foregoing, any fact or event (whether or not similar to any of the foregoing) which in the absence of this provision would or might constitute or afford a legal or equitable discharge or release of or defense to a guarantor or surety other than the actual payment and performance by Guarantor under this Guaranty.

(c) Lender may invoke the benefits of this Guaranty before pursuing any remedies against any Obligor or any other Person and before proceeding against any Security now or hereafter existing for the payment or performance of any of the Obligations. Lender may maintain an action against Guarantor on this Guaranty without joining any other Obligor therein and without bringing a separate action against any other Obligor.

(d) If any payment to Lender by any Obligor is held to constitute a preference or a voidable transfer under applicable state or federal laws, or if for any other reason Lender is required to refund such payment to the payor thereof or to pay the amount thereof to any other Person, such payment to Lender shall not constitute a release of Guarantor from any liability hereunder, and Guarantor agrees to pay such amount to Lender on demand and agrees and acknowledges that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such payment or payments. Any transfer by subrogation which is made as contemplated in Section 6 prior to any such payment or payments shall (regardless of the terms of such transfer) be automatically voided upon the making of any such payment or payments, and all rights so transferred shall thereupon revert to and be vested in Lender.

TK 002496

ENB-DOJ-034162

(e) This is a continuing guaranty and shall apply to and cover all Obligations and renewals and extensions thereof and substitutions therefor from time to time.

Section 4. <u>Waiver</u>. Guarantor hereby waives, with respect to the Obligations, this Guaranty, and the other Obligation Documents:

(a) notice of the incurrence of any Obligation by Borrower, and notice of any kind concerning the assets, liabilities, financial condition, creditworthiness, businesses, prospects, or other affairs of Borrower (it being understood and agreed that: (i) Guarantor shall take full responsibility for informing itself of such matters, (ii) Lender shall not have any responsibility of any kind to inform Guarantor of such matters, and (iii) Lender is hereby authorized to assume that Guarantor, by virtue of its relationships with Borrower which are independent of this Guaranty, has full and complete knowledge of such matters whenever Lender extends credit to Borrower or takes any other action which may change or increase Guarantor's liabilities or losses hereunder).

(b) notice that any Lender, any Obligor, or any other Person has taken or omitted to take any action under any Obligation Document or any other agreement or instrument relating thereto or relating to any Obligation.

(c) notice of acceptance of this Guaranty and all rights of Guarantor under §34.02 of the Texas Business and Commerce Code, as amended.

(d) default, demand, presentment for payment, and notice of default, demand, dishonor, nonpayment, or nonperformance.

(e) notice of intention to accelerate, notice of acceleration, protest, notice of protest, notice of any exercise of remedies (as described in the following Section 5 or otherwise), and all other notices of any kind whatsoever.

Section 5. <u>Exercise of Remedies</u>. Lender shall have the right to enforce, from time to time, in any order and at Lender's sole discretion, any rights, powers and remedies which Lender may have under the Obligation Documents or otherwise, including judicial foreclosure, the exercise of rights of power of sale, the taking of a deed or assignment in lieu of foreclosure, the appointment of a receiver to collect rents, issues and profits, the exercise of remedies against personal property, or the enforcement of any assignment of leases, rentals, oil or gas production, or other properties or rights, whether real or personal, tangible or intangible; and Guarantor shall be liable to Lender hereunder for any deficiency resulting from the exercise by Lender of any such right or remedy even though any rights which Guarantor may have against Borrower or others may be destroyed or diminished by exercise of any such right or remedy. No failure on the part of Lender to exercise, and no delay in exercising, any right hereunder or under any other Obligation Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right preclude any other or further exercise thereof or the exercise of any other right. The rights, powers and remedies of Lender provided herein and in the other Obligation Documents are cumulative and are in addition to, and not exclusive of, any other rights, powers or remedies provided by law or in equity. The rights of Lender hereunder are not conditional or contingent on any attempt by Lender to exercise any of its rights under any other Obligation Document against any Obligor or any other Person.

TK 002497

ENB-DOJ-034163

Section 6.  Limited Subrogation.

(a)     Until all of the Obligations have been paid and performed in full Guarantor shall have no right to exercise any right of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which it may now or hereafter have against or to any Obligor or any Security in connection with this Guaranty (including any right of subrogation under §34.04 of the Texas Business and Commerce Code, as amended), and Guarantor hereby waives any rights to enforce any remedy which Guarantor may have against Borrower and any right to participate in any Security until such time.  If any amount shall be paid to Guarantor on account of any such subrogation or other rights, any such other remedy, or any Security at any time when all of the Obligations and all other expenses guaranteed pursuant hereto shall not have been paid in full, such amount shall be held in trust for the benefit of Lender, shall be segregated from the other funds of Guarantor and shall forthwith be paid over to Lender to be held by Lender as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portion of the Obligations, whether matured or unmatured, in such order as Lender shall elect.

(b)     If Guarantor shall make payment to Lender of all or any portion of the Obligations and if all of the Obligations shall be finally paid in full, Lender will, at Guarantor's request and expense, execute and deliver to Guarantor (without recourse, representation or warranty) appropriate documents necessary to evidence the transfer by subrogation to Guarantor of an interest in the Obligations resulting from such payment by Guarantor; provided that such transfer shall be subject to Section 3(d) above and that without the consent of Lender (which Lender may withhold in its discretion) Guarantor shall not have the right to be subrogated to any claim or right against any Obligor which has become owned by Lender, whose ownership has otherwise changed in the course of enforcement of the Obligation Documents, or which Lender otherwise has released or wishes to release from its Obligations.

Section 7.  Successors and Assigns.  Guarantor's rights or obligations hereunder may not be assigned or delegated, but this Guaranty and such obligations shall pass to and be fully binding upon the successors of Guarantor, as well as Guarantor.  This Guaranty shall apply to and inure to the benefit of Lender and its successors or assigns.  Without limiting the generality of the immediately preceding sentence, Lender may assign, grant a participation in, or otherwise transfer any Obligation held by it or any portion thereof, and Lender may assign or otherwise transfer its rights or any portion thereof under any Obligation Document, to any other Person, and such other Person shall thereupon become vested with all of the benefits in respect thereof granted to Lender hereunder unless otherwise expressly provided by Lender in connection with such assignment or transfer.

Section 8.  Subordination and Offset.  Guarantor hereby subordinates and makes inferior to the Obligations any and all indebtedness now or at any time hereafter owed by Borrower to Guarantor.  Guarantor agrees that after the occurrence of any Default or Event of Default it will neither permit Borrower to repay such indebtedness or any part thereof nor accept payment from Borrower of such indebtedness or any part thereof without the prior written consent of Lender.  If Guarantor receives any such payment without the prior written consent of Lender, the amount so paid shall be held in trust for the benefit of Lender, shall be segregated from the other funds of Guarantor, and shall forthwith be paid over to Lender to be held by Lender as collateral for, or then

TK 002498

ENB-DOJ-034164

or at any time thereafter applied in whole or in part by Lender against, all or any portions of the Obligations, whether matured or unmatured, in such order as Lender shall elect.

Guarantor hereby grants to Lender a right of offset to secure the payment of the Obligations and Guarantor's obligations and liabilities hereunder, which right of offset shall be upon any and all monies, securities and other property (and the proceeds therefrom) of Guarantor now or hereafter held or received by or in transit to Lender from or for the account of Guarantor, whether for safekeeping, custody, pledge, transmission, collection or otherwise, and also upon any and all deposits (general or special), credits and claims of Guarantor at any time existing against Lender. Upon the occurrence of any Default or Event of Default, Lender is hereby authorized at any time and from time to time, without notice to Guarantor, to offset, appropriate and apply any and all items hereinabove referred to against the Obligations and Guarantor's obligations and liabilities hereunder irrespective of whether or not Lender shall have made any demand under this Guaranty and although such obligations and liabilities may be contingent or unmatured.  Lender agrees promptly to notify Guarantor after any such offset and application made by Lender, provided that the failure to give such notice shall not affect the validity of such offset and application. The rights of Lender under this section are in addition to, and shall not be limited by, any other rights and remedies (including other rights of offset) which Lender may have.

Section 9.  <u>Representations and Warranties</u>.  Guarantor hereby represents and warrants to Lender as follows:

(a)  The Recitals at the beginning of this Guaranty are true and correct in all respects.

(b)  Guarantor is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation as set forth in the Recitals to this Guaranty; and Guarantor has all requisite power and authority to execute, deliver and perform this Guaranty.

(c)  The execution, delivery and performance by Guarantor of this Guaranty have been duly authorized by all necessary corporate action and do not and will not contravene its certificate or articles of incorporation or bylaws.

(d)  The execution, delivery and performance by Guarantor of this Guaranty do not and will not contravene any law or governmental regulation or any contractual restriction binding on or affecting Guarantor or any of its Affiliates or properties, and do not and will not result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties.

(e)  No authorization or approval or other action by, and no notice to or filing with, any governmental authority or other regulatory body or third party is required for the due execution, delivery and performance by Guarantor of this Guaranty.

(f)  This Guaranty is a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms except as limited by bankruptcy, insolvency or similar laws of general application relating to the enforcement of creditors' rights.

TK 002499

ENB-DOJ-034165

(g)  There is no action, suit or proceeding pending or, to the knowledge of Guarantor, threatened against or otherwise affecting Guarantor before any court, arbitrator or governmental department, commission, board, bureau, agency or instrumentality which may materially and adversely affect Guarantor's financial condition or its ability to perform its obligations hereunder.

(h)  The direct or indirect value of the consideration received and to be received by Guarantor in connection herewith is reasonably worth at least as much as the liability and obligations of Guarantor hereunder, and the incurrence of such liability and obligations in return for such consideration may reasonably be expected to benefit Guarantor, directly or indirectly.

(i)  Guarantor is not "insolvent" on the date hereof (that is, the sum of Guarantor's absolute and contingent liabilities, including the Obligations, does not exceed the fair market value of Guarantor's assets). Guarantor's capital is adequate for the businesses in which Guarantor is engaged and intends to be engaged. Guarantor has not incurred (whether hereby or otherwise), nor does Guarantor intend to incur or believe that it will incur, debts which will be beyond its ability to pay as such debts mature.

(j)  All balance sheets, earning statements, financial data and other information concerning Guarantor which have been furnished to Lender to induce it to accept this Guaranty (or otherwise furnished to Lender in connection with the transactions contemplated hereby or associated herewith) fairly represent the financial condition of Guarantor as of the dates and the results of Guarantor's operations for the periods for which the same are furnished. None of such balance sheets, earnings and cash flow statements, financial data and other information contains any untrue statement of a material fact or omits to state any material fact which is necessary to make any statements contained therein not misleading.

Section 10.  No Oral Change.  No amendment of any provision of this Guaranty shall be effective unless it is in writing and signed by Guarantor and Lender, and no waiver of any provision of this Guaranty, and no consent to any departure by Guarantor therefrom, shall be effective unless it is in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 11.  Invalidity of Particular Provisions.  If any term or provision of this Guaranty shall be determined to be illegal or unenforceable all other terms and provisions hereof shall nevertheless remain effective and shall be enforced to the fullest extent permitted by applicable law.

Section 12.  Headings and References.  The headings used herein are for purposes of convenience only and shall not be used in construing the provisions hereof. The words "this Guaranty," "this instrument," "herein," "hereof," "hereby" and words of similar import refer to this Guaranty as a whole and not to any particular subdivision unless expressly so limited. The phrases "this section" and "this subsection" and similar phrases refer only to the subdivisions hereof in which such phrases occur. The word "or" is not exclusive, and the word "including" (in its various forms) means "including without limitation". Pronouns in masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

TK 002500

ENB-DOJ-034166

Section 13. <u>Term</u>. This Guaranty shall be irrevocable until all of the Obligations have been completely and finally paid and performed, no Lender has any obligation to make any loans or other advances to Borrower, and all obligations and undertakings of Borrower under, by reason of, or pursuant to the Obligation Documents have been completely performed, and this Guaranty is thereafter subject to reinstatement as provided in Section 3(d). All extensions of credit and financial accommodations heretofore or hereafter made by Lender to Borrower shall be conclusively presumed to have been made in acceptance hereof and in reliance hereon.

Section 14. <u>Notices</u>. Any notice or communication required or permitted hereunder shall be given as provided in the Credit Agreement.

Section 15. <u>Limitation on Interest</u>. Lender and Guarantor intend to contract in strict compliance with applicable usury law from time to time in effect, and the provisions of the Credit Agreement limiting the interest for which Guarantor is obligated are expressly incorporated herein by reference.

Section 16. <u>Loan Document</u>. This Guaranty is a Loan Document, as defined in the Credit Agreement, and is subject to the provisions of the Credit Agreement governing Loan Documents.

Guarantor hereby ratifies, confirms and approves the Credit Agreement and the other Loan Documents and, in particular, any provisions thereof which relate to Guarantor.

Section 17. <u>Counterparts</u>. This Guaranty may be executed in any number of counterparts, each of which when so executed shall be deemed to constitute one and the same Guaranty. This Agreement may be validly executed and delivered by facsimile or other electronic transmission.

SECTION 18. <u>GOVERNING LAW</u>. THIS GUARANTY IS TO BE PERFORMED IN THE STATE OF TEXAS AND SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF SUCH STATE WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. GUARANTOR HEREBY IRREVOCABLY SUBMITS ITSELF TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF SUCH STATE OF AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON IT IN ANY LEGAL PROCEEDING RELATING HERETO BY SERVING THE SECRETARY OF STATE OF THE STATE OF TEXAS (OR BY OTHER SERVICE) IN ACCORDANCE WITH ANY APPLICABLE PROVISIONS OF THE TEXAS REVISED CIVIL STATUTES, AS AMENDED, GOVERNING SERVICE OF PROCESS UPON FOREIGN CORPORATIONS.

SECTION 19. <u>FINAL AGREEMENT</u>. THIS WRITTEN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES HERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES

F:\data\wp\892\1099\1099064c 892.wpd:bd:11/7/99:1:26 PM

10

TK 002501

ENB-DOJ-034167

HERETO.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE
PARTIES HERETO.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

F:\data\wp\8921\099\1099064c.892.wpd.bd:11/7/99 1:26 PM

TK 002502

ENB-DOJ-034168

IN WITNESS WHEREOF, Guarantor has executed and delivered this Guaranty as of the date first written above.

GUARANTOR:

MIDCOAST ENERGY RESOURCES, INC.

By: _____

Richard A. Robert
Chief Financial Officer and Treasurer

TK 002503

ENB-DOJ-034169

## RESOLUTION OF SOLE SHAREHOLDER

## OF K-PIPE MERGER CORPORATION

WE, the sole shareholder of K-PIPE MERGER CORPORATION, pursuant to the By Laws of the Corporation do hereby consent to the number of directors of the Corporation being one (1) in number and being Larry J. Austin, pursuant to By Laws Article III section A.

Consented to this 22nd day of October, 1999.

K-PIPE HOLDINGS PARTNERS L.P.

By: _____
SIGNAL CAPITAL ASSOCIATES, L.P.
Jeffrey Furman,
Sole General Partner

GOVERNMENT
EXHIBIT
G-123

0205

*State of Delaware*

## *Office of the Secretary of State*  PAGE  1

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "K-PIPE MERGER CORPORATION", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF OCTOBER, A.D. 1999, AT 2 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE KENT COUNTY RECORDER OF DEEDS.



*Edward J. Freel, Secretary of State*

3115236   8100

991448469

AUTHENTICATION:   0041146

DATE:   10-22-99   0206

11/04/99  THU 20:31  [TX/RX NO 9171]

ENB-RB-000207

## CERTIFICATE OF INCORPORATION

OF

### K - PIPE MERGER CORPORATION

---

The undersigned, for the purposes of forming a corporation under the laws of the State of Delaware, do make, file and record this Certificate, and do certify that:

**FIRST:**    The name of this corporation is K - PIPE MERGER CORPORATION.

**SECOND:**    Its Registered Office in the State of Delaware is to be located at 9 East Loockerman Street, in the City of Dover, County of Kent, 19901. The Registered Agent in charge thereof is National Registered Agents, Inc.

**THIRD:**    The purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of Delaware.

**FOURTH:**    The amount of the total authorized capital stock of the corporation is 100,000, all of which are without par value and classified as Common stock.

**FIFTH:**    Shareholders shall be entitled as a matter of right to a preemptive right, for a period of thirty days, to subscribe for, purchase or receive any shares of the corporation which it may issue or sell, whether out of the number of shares authorized by the Certificate of Incorporation or by amendment thereof, or out of the shares of the corporation acquired by it after the issuance thereof, any shareholder shall be entitled as a matter of right to purchase or subscribe for or receive any bonds, debentures, or other obligations which the corporation may issue or sell that shall be convertible into or exchangeable for shares, or to which shall be attached or shall appertain to any warrant or warrants or other instrument or instruments that shall confer upon the holder or owner of such obligation the right to subscribe for or purchase from the corporation any shares of any class or classes; and after the expiration of said thirty days, any and all of such shares, rights, bonds, debentures or other obligations which the corporation may have issued, reissued, transferred, or granted by the Board of Directors, as the case may be, to such persons, firms, corporations, and associations, and for such lawful consideration, and on such terms, as the Board of Directors in its discretion may determine.

*Delaware Certificate of Incorporation 7/95 -1*

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 02:00 PM 10/22/1999
991448469 - 3115236

0207

ENB-RB-000208

**SIXTH:**    The name and mailing address of the incorporator are as follows:

**NAME**                              **MAILING ADDRESS**
Sandi Hancock                         1425 River Park Drive, Ste. 110
                                      Sacramento, California 95815

**SEVENTH:**   The duration of the corporation shall be perpetual.

**EIGHTH:**    When a compromise or arrangement is proposed between the corporation and its creditors or any class of them or between the corporation and its shareholders or any class of them, a court of equity jurisdiction within the state, on application of the corporation or of a creditor or shareholder thereof, or on application of a receiver appointed for the corporation pursuant to the provisions of Section 291 of Title 8 of the Delaware Code or on application of trustees in dissolution or of any receiver or receivers appointed for the corporation pursuant to provisions of Section 279 of Title 8 of the Delaware Code may order a meeting of the creditors or class of creditors or of the shareholders or class of shareholders to be affected by the proposed compromise or arrangement or reorganization, to be summoned in such manner as the court directs. If a majority in number representing 3/4 in value of the creditors or class of creditors, or of the shareholders or class of shareholders to be affected by the proposed compromise or arrangement or a reorganization, agree to a compromise or arrangement or a reorganization of the corporation as a consequence of the compromise or arrangement, the compromise or arrangement and the reorganization, if sanctioned by the court to which the application has been made, shall be binding on all the creditors or class of creditors, or on all the shareholders or class of shareholders and also on the corporation.

**NINTH:**    The personal liability of all of the directors of the corporation is hereby eliminated to the fullest extent allowed as provided by the Delaware General Corporation Law, as the same may be supplemented and amended.

**TENTH:**    The corporation shall, to the fullest extent legally permissible under the provisions of the Delaware General Corporation Law, as the same may be amended and supplemented, indemnify and hold harmless any and all persons whom it shall have power to indemnify under said provisions from and against any and all liabilities (including expenses) imposed upon or reasonably incurred by him in connection with any action, suit or other proceeding in which he may be involved or with which he may be threatened, or other matters referred to in or covered by said provisions both as to action in his official capacity and as to

Delaware Certificate of Incorporation 7/95 -2

0208

ENB-RB-000209

action in another capacity while holding such office, and shall continue as to a person who has ceased to be a director or officer of the corporation. Such indemnification provided shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any Bylaw, Agreement or Resolution adopted by the shareholders entitled to vote thereon after notice.

Dated on this 22nd day of October, 1999.

*Sandi Hancock*

Sandi Hancock, Incorporator

Delaware Certificate of Incorporation 7/95 -3

## K-PIPE MERGER CORPORATION

### WRITTEN CONSENT
### OF
### SOLE STOCKHOLDER
as of
November __, 1999

The undersigned, being the sole stockholder of K-Pipe Merger Corporation, a Delaware corporation (the **"Corporation"**), hereby consents, pursuant to the provisions of Section 228 of the General Corporation Law of the State of Delaware, to the adoption of the following resolutions, which are to be filed with the minutes of the Corporation:

### 1. Agreement for Merger.

WHEREAS, the Corporation's Board of Directors (the **"Board"**) has determined that it is advisable and in the best interest of the Corporation for the Corporation (the **"Parent"**) to merge with and into K-Pipe Group, Inc., a Kansas corporation and a wholly owned subsidiary of the Corporation (the **"Subsidiary"**), effective at the **"Effective Time"** (as defined below);

NOW, THEREFORE, BE IT RESOLVED, that the Parent merge into the Subsidiary (the **"Merger"**);

RESOLVED, that the Merger shall become effective (the **"Effective Time"**) at the time of the filing of a Certificate of Merger with the Secretary of State of the State of Delaware in accordance with the provisions of the General Corporation Law of the State of Delaware and with the Secretary of State of the State of Kansas in accordance with the provisions of the Corporation Law of the State of Kansas;

RESOLVED, that at the Effective Time the separate existence of the Parent shall cease, the Parent shall be merged with and into the Subsidiary, and the Subsidiary shall be the surviving corporation (the **"Surviving Corporation"**); the Surviving Corporation, without further action, shall possess all the rights, privileges, powers and franchises, public and private, of both the Parent and the Subsidiary and shall be subject to all the debts, liabilities, obligations, restrictions, disabilities and duties of both the Parent and the Subsidiary;

RESOLVED, that the certificate of incorporation of the Subsidiary, as in effect immediately prior to the Effective Time, shall be the certificate of incorporation of the Surviving

SF2 128482.1 05211.00482                    -1-

GOVERNMENT
EXHIBIT
G-124

0161

Corporation until thereafter amended as provided by law or such certificate of incorporation; and the bylaws of the Subsidiary, as in effect immediately prior to the Effective Time, shall be the bylaws of the Surviving Corporation until thereafter amended as provided by law or such bylaws;

RESOLVED, that (i) at the Effective Time each share of the Common Stock of the Parent which is issued and outstanding immediately prior to the Effective Time shall be deemed canceled, and (ii) each share of the Common Stock of the Subsidiary which is issued and outstanding in the name of the Parent immediately prior to the Effective Time shall at the Effective Time be deemed to be issued and outstanding in the name of the sole stockholder of the Parent;

RESOLVED, that the directors of the Subsidiary as of the Effective Time shall be the directors of the Surviving Corporation until their successors are duly elected or appointed and the officers of the Subsidiary as of the Effective Time shall be the officers of the Surviving Corporation until their successors are duly elected or appointed;

RESOLVED, that the Agreement and Plan of Merger dated as of November __, 1999 between the Parent and the Subsidiary (the **"Merger Agreement"**) is hereby adopted, approved, and ratified; and

RESOLVED, that the General Partner of the sole stockholder (the **"General Partner"**) is hereby authorized to prepare, execute and enter into, deliver and perform for and on behalf of the sole stockholder any agreement, instrument or undertaking to which the sole stockholder is a party, including, without limitation, the exhibits to the Merger Agreement to which the sole stockholder is a party, in order to effectuate the purposes of the Merger Agreement and the Merger, with such revisions, changes, amendments or modifications thereto as the General Partner shall, as conclusively evidenced by the General Partner's execution and delivery thereof, deem appropriate.

### 2. General

RESOLVED, that the General Partner is authorized and empowered to certify and furnish copies as may be necessary of this and the foregoing resolutions and statements as to the authority of the sole stockholder and any person receiving such a certified copy or statement shall be authorized to rely upon the contents thereof;

RESOLVED, that the General Partner be authorized and empowered, for and on behalf of the sole stockholder, to take or cause to be taken any and all such further actions and to execute

SF2 128482.1 05211.00482                -2-

and deliver or cause to be executed and delivered all such further agreements, documents, instruments and certificates as it, in its sole discretion, may determine to be necessary or appropriate to effect the purpose and intent of the foregoing resolutions, and the execution by the General Partner of any act in connection with the foregoing matters shall conclusively establish the General Partner's authority therefor and the approval of the agreements, documents, instruments or certificates so executed and the actions so taken; and

RESOLVED, that all lawful acts of the General Partner in connection with any of the foregoing resolutions and such other documents herein described be, and hereby are, approved, adopted and ratified.

IN WITNESS WHEREOF, the undersigned sole stockholder has caused this consent to be executed as of the date first written above.

                          K-PIPE HOLDINGS PARTNERS, L.P.

                          By:  Its General Partner

                               SIGNAL CAPITAL ASSOCIATES L.P.

                               By: _____
                               Alice Dill, Attorney-in-Fact
                               for Jeffrey Furman, General Partner

SF2 128482.1 05211.00482            -3-

0163

ENB-RB-000164

**From:**       Richard Robert <rrobert@midcoastenergy.com>
**To:**          'Barry Davis' <bdavis@BPL com>, <keith buchanan@bankofamenca com>,
<mary l.allen@bankofamerica.com>, <patrick m delaney@bankofamerica com>,
<cjhoffmn@ix netcom com>, <CTMORELL@LLGM COM>, Chris Kaitson
<ckaitson@midcoastenergy com>, <patrickdelaney@msn com>, <fwbistline@porterhedges com>
**Date:**       11/6/99 2 01PM
**Subject:**    RE  Revised Credit Agreement

My comments on the Credit Agreement are as follows.

1 Section 6.4 Notice of Material Events· there is a provision that allows
for the transfer of the Butcher Interest to Midcoast. It would seem strange
to an outsider that there is a provision allowing for transfer to one
partner and not the other.  This loan is supposed to be a loan to the
partnership based on the financial strength of the Partnership  References
in the agreement that favor Midcoast would lead an outsider to believe the
loan was made to Midcoast and not the Partnership. I would suggest striking
the language or revise the provision that notice is required if it is K-Pipe
or Midcoast
2  Section 6 5 Maintenance of Properties  providing for transfer to
Midcoast  Same issue as above
3  Section 7 11 Change of Control  does not allow partnership ownership
percentages to change  This would prohibit Midcoast from making any further
capital contributions which it may have to do in the future depending on
interest charges and the amount of income from the Butcher Interest  I don't
think the bank wants to limit our ability to make future capital
contributions  What is the bank trying to prevent with this provision?

——Original Message——
From: Barry Davis [mailto bdavis@BPL com]
Sent  Saturday, November 06, 1999 12.56 PM
To. keith buchanan@bankofamerica.com; mary l allen@bankofamerica com,
patrick m delaney@bankofamerica com, cjhoffmn@ix netcom.com;
CTMORELL@LLGM COM; ckaitson@midcoastenergy com,
rrobert@midcoastenergy com, patrickdelaney@msn com;
fwbistline@porterhedges com
Subject. Revised Credit Agreement

Attached for your review is a marked copy of the Butcher Interest
Partnership Credit Agreement. Please note that we have asked that the
partnership be formed under Delaware law. The current draft of the
partnership agreement still indicates Kansas law  If this is to be the case,
who will be opining on matters of due formation etc  for Borrower? Please
advise.

Barry Davis
Thompson Knight Brown Parker & Leahy, L L P
(713) 951-5863  (Phone)
(713) 654-1871  (Fax)
bdavis@bpl com

GOVERNMENT
EXHIBIT
125
PENGAD-Bayonne, N.J

TK 003937

Larry Davis - RE Revised Credit Agreement                                                    Page 2

CONFIDENTIALITY NOTICE  The information contained in this
ELECTRONIC MAIL transmission is confidential   It may also be
subject to the attorney-client privilege or be privileged work
product or proprietary information  This information is intended
for the exclusive use of the addressee(s).  If you are not the
intended recipient, you are hereby notified that any use,
disclosure, dissemination, distribution (other than to the
addressee(s)) or copying of this information or the taking of
any action because of this information is strictly prohibited.

TK 003938

ENB-DOJ-035634

# MIDCOAST ENERGY RESOURCES, INC.
## BOARD OF DIRECTORS MEETING
### November 8, 1999

| ATTENDANCE. | I. J. Berthelot II (*) | Bruce Withers (*) |
|---|---|---|
| | Richard N. Richards (*) | Ted Collins (*) |
| | Dan C. Tutcher (*) | Richard Robert |
| | Curtis Dufour (*) | Duane S. Herbst |
| | (*) Members | |

I.   CALL TO ORDER

The meeting was called to order by Chairman Dan C Tutcher at 1·45 p.m. with all members of the Board present.  Also present were Duane S. Herbst, Vice President of Corporate Affairs and Secretary, who acted as secretary for this meeting and Richard Robert, Chief Financial Officer. All members appeared telephonically.

II   Kansas Pipeline Acquisition

Mr. Berthelot opened the meeting by noting that management believed it was necessary for the Board to re-approve the Kansas Pipeline acquisition because it had changed sufficiently since the Board originally approved the deal.  He noted that the primary difference concerned the continuing "up-side" sharing and business development agreements which had been substantially eliminated.  As consideration the purchase price had been increased $13 6 million.  The only on-going obligation under the new arrangement would be the opportunity for Mr. Langley to participate in laterals for new power plants in Kansas.  As currently planned the Company would still enter into the original agreements, but with a new buy-out provision for a short period of time following closing

Mr  Robert reviewed the revised financial projections and the interest rate assumptions included therein   He stressed that following this transaction Midcoast would be extremely interest rate sensitive. He also noted that an equity offering of about $20MM would be needed in the near future to give the Company some flexibility and to meet certain covenant and interest rate step down levels, contained in the new credit facility

After a great deal of discussion on the revisions, break-up commitments and the equity offering, it was unanimously approved that the Company proceed ahead with the acquisition as presented.

1

GOVERNMENT
EXHIBIT
130

PENGAD-Bayonne, N. J.

MID 1.1-3

ENB-DOJ-015674

III.   Adjournment

There being no further business it was moved and seconded that the meeting be adjourned.

Respectfully Submitted,

Duane S  Herbst, Secretary

2

**MID 1.1-4**

ENB-DOI-015675

# CONSENT TO ACTION TAKEN OR TO BE TAKEN
## OF THE BOARD OF DIRECTORS OF
### MIDCOAST ENERGY RESOURCES, INC.

We, the undersigned, being all of the members of the Board of Directors of Midcoast Energy Resources, Inc., a Texas corporation (hereinafter referred to as the "Corporation"), do hereby consent to the Adoption of the Following resolutions:

RESOLVED, that the Corporation pay a cash dividend of $ 07 per share of common stock to stockholders of record on November 19, 1999 with a payment date of December 1, 1999;

DATED at Houston, Texas, November 8, 1999.

I. J. Berthelot II                    Director          Richard Richards          Director

Ted Collins                           Director          Dan C. Tutcher            Director

Curtis Dufour                         Director          Bruce Withers             Director

**MID 1.1-5**

ENB-DOJ-015676

FROM                         (MON)11. 8'99 14:24/ST. 14:23/NO. 4860240303 P  2

K-Pipe Group, Inc. (survivor of merger with K-Pipe Merger Corp)

November 8, 1999

Rabobank Nederland, New York Branch
245 Park Avenue
37th Floor
New York, NY 10167
Attn: Chris Kortlandt

Dear Chris:

This letter is to inform you that K-Pipe Merger Corp has merged into K-Pipe Group, Inc., effective November 8, 1999.  Please see the attached Merger documents and resolutions.  This company should succeed to the account # 18313 at your bank.

We appreciate your attention.

Very truly yours,

K-Pipe Group, Inc. (Survivor of merger with K-Pipe Merger Corp)

By:
Name:      Larry J. Austin
Title:       President

GOVERNMENT
EXHIBIT
145

001217

ENB-DOJ-028698

11/08/99 TUE 10:22 FAX 212 808 2584    RABO CORP FIN NY                    ☑001

# K-Pipe Merger Corp

November 8, 1999

Rabobank Nederland, New York Branch
245 Park Avenue
37th Floor
New York, NY 10167

L/# 591699

Attn  Chris Kortlandt

UAFC

Dear Sir

We hereby request a drawdown of $123,345,000 under the Promissory Note dated as of November 8, 1999 and ask you to credit the proceeds of the loan to our account (#18313) at your Bank. In addition, you are hereby authorized to debit our account for an up-front fee of $750,000   Any amount remaining in the account at the end of the day should be used to reduce our outstanding loan balance.

We appreciate your attention

Very truly yours,

K-Pipe Merger Corp

By:
Name:      Larry J. Austin
Title·     President

Non Onto

001160

11/08/99  MON 16.31  [TX/RX NO 7116]

ENB-DOJ-028641

11/09/99   TUE 13:25 FAX 212 808 2584      RABO CORP FIN NY                      ☑002

## K-Pipe Group, Inc. (Survivor or merger with K-Pipe Merger Corp)

November 9, 1999

Utrecht-America Finance Co.
c/o Rabobank Nederland, New York Branch
245 Park Avenue
37th Floor
New York, NY 10167

Attn. Chris Kortlandt

*C/#59169 9*

*UAFC*

Dear Sir:

You are hereby irrevocably instructed and authorized to debit our account, reference pre-payment K-Pipe Merger Corp loan in full  Our account number at your bank is #18313.

We appreciate your attention.

Very truly yours,

K-Pipe Group, Inc. (survivor of
merger with K-Pipe Merger Corp)

By: *Larry J. Austin*
Name:    Larry J. Austin
Title:    President

*From Alexandra*

*Batch #*

*Dr. 18313      $123,373,266.56*

*Cr. 13679       123,345.000*

*13679         28,266.56*

*P.d. 11/9/99*

**001162**

ENB-DOJ-028643

K-Pipe Group, Inc. (survivor of merger with K-Pipe Merger Corp)

November 9, 1999

Rabobank Nederland, New York Branch
245 Park Avenue
37th Floor
New York, NY 10167
Attn: Chris Kortlandt

Dear Chris:
We hereby ask you to execute the following wire transfers for value November 9, 1999:

| | |
|---|---|
| Amount: | $299,750 |
| To: | Citibank |
| ABA#: | 321-1711-84 |
| Credit to: | Lebouef, Lamb, Greene & MacRae L.L.P. |
| Account #: | 200001899 |
| Reference: | Fortrend International/K-Pipe #05211-482/Graham R. Taylor/contact Linh Tran |

| | |
|---|---|
| Amount: | $312,260 |
| To: | Citibank, F.S.B.; 1000 Connecticut Avenue; Washington, D.C. 20036 (800) 926-1067 |
| ABA#: | 254-070-116 |
| Credit to: | Larry J. Austin |
| Account #: | 5017-2840 |
| Reference: | Contact Larry Austin 703-799-2122 when received |

Please debit our account at your Bank (#18313).

We appreciate your attention.

Very truly yours,

K-Pipe Group, Inc. (Survivor of merger with K-Pipe Merger Corp)

By:
Name:     Larry J. Austin
Title:     President

DR BY _____ 18313
CR BY _____ 151
INPUT BY _____
RELEASE BY _____

001143

11/09/99  TUE 15:22  [TX/RX NO 9251]

ENB-DOJ-028624

11/09/99   TUE 15:15 FAX 212 808 2584       RABO CORP FIN NY                                  ☐005
11/09/99   15:25 FAX 212 826 0010       FORTREND INTL. LLC                              ☒005

### K-Pipe Group, Inc. (survivor of merger with K-Pipe Merger Corp)

November 9, 1999

Rabobank Nederland, New York Branch
245 Park Avenue
37th Floor
New York, NY 10167
Attn: Chris Kortlandt

Dear Chris:
We hereby ask you to execute the following wire transfers for value November 9, 1999:

Amount:        $525,000
To:            Chase Manhattan Bank
ABA#:          021-0000-21
Credit to:     Craig J. Hoffman Savings Acct.#: 123 612 568 701
Reference:     Fortrend K-Pipe. Contact Craig at 212-826-0770 when received.

Please debit our account at your Bank (#18313).

We appreciate your attention.

Very truly yours,

K-Pipe Group, Inc. (Survivor of merger with K-Pipe Merger Corp)

By:
Name:        Larry J. Austin
Title:        President

DR BY ____18313____
CR BY _____
INPUT BY _____
RELEASE BY _____

11/09/99   TUE 15:22   [TX/RX NO 9251]   001140

ENB-DOJ-028621

### K-Pipe Group, Inc. (survivor of merger with K-Pipe Merger Corp)

November 9, 1999

Rabobank Nederland, New York Branch
245 Park Avenue
37th Floor
New York, NY 10167
Attn: Chris Kortlandt

Dear Chris:

We hereby ask you to execute the following wire transfers for value November 9, 1999:

Amount:       $299,750
To:           Citibank
ABA#:         321-1711-84
Credit to:    Lebouef, Lamb, Greene & MacRae L.L.P.
Account #:    200001899
Reference:    Fortrend International/K-Pipe #05211-482/Graham R. Taylor/contact Linh
              Tran

Amount:       $312,260
To:           Citibank, F.S.B.; 1000 Connecticut Avenue; Washington, D.C. 20036
              (800) 926-1067
ABA#:         254-070-116
Credit to:    Larry J. Austin
Account #:    5017-2840
Reference:    Contact Larry Austin 703-799-2122 when received

Please debit our account at your Bank (#18313).

We appreciate your attention.

Very truly yours,

K-Pipe Group, Inc. (Survivor of merger with K-Pipe Merger Corp)

By:
Name:     Larry J. Austin
Title:    President

DR BY _____ 18313
CR BY _____ 151
INPUT BY _____
RELEASE BY _____

001143

ENB-DOJ-028624

Sent By: Starwalker LLC;                JetSuite;                Nov-11-99  4:08PM;                Page 2/2

## K-Pipe Group, Inc. (survivor of merger with K-Pipe Merger Corp)

November 10, 1999

Rabobank Nederland, New York Branch
245 Park Avenue
37th Floor
New York, NY 10167
Attn: Chris Kortlandt

Dear Chris:

We hereby ask you to execute the following wire transfers for value November 10, 1999:

| | |
|---|---|
| Amount: | $1,451,000 |
| To: | Golden Gate Bank 344 Pine Street San Francisco, CA 94104 |
| ABA#: | 121-0361-57 |
| Credit to: | Cronulla Corporation. |
| Acct.#: | 003-000150 |
| Reference: | Call Fred Forster 415-986-2940 |

| | |
|---|---|
| Amount: | $1,451,000 |
| To: | Chase Manhattan Bank, New York |
| ABA#: | 021-0000-21 |
| Credit to: | CIBC Bank And Trust Company (Cayman) Limited Account #:400802015 |
| Further Credit to: | Ashfield International, Ltd.  Account #: 12-26215 |
| Reference: | Call Fred Forster 415-986-2940 |

Please debit our account at your Bank (#18313).

We appreciate your attention.

Very truly yours,

K-Pipe Group, Inc. (Survivor of merger with K-Pipe Merger Corp)

By:
Name:   Larry J. Austin
Title:   President

SIGNATURE
iW
11-12-99
VERIFIED

DR BY _____ 18313 _____     **DR BY** _____ 18313 _____

CR BY _____ 151 _____     **CR BY** _____ 151 _____

INPUT BY _____     **INPUT BY** _____

RELEASE BY _____     **RELEASE BY** _____

001145

11/11/99  THU 16:07  [TX/RX NO 9290]

ENB-DOJ-028626

**K-Pipe Group, Inc. (survivor of merger with K-Pipe Merger Corp)**

November 10, 1999

Rabobank Nederland, New York Branch
245 Park Avenue
37th Floor
New York, NY 10167
Attn: Chris Kortlandt

Dear Chris:
We hereby ask you to execute the following wire transfers for value November 10, 1999:

| | |
|---|---|
| Amount: | $ 8,743 |
| To: | Nationsbank |
| ABA#: | 111-000-025 |
| Credit to: | PricewaterhouseCoopers |
| Account #: | 018 054 4924 |
| Reference: | Engagement #: 447980-0151-00 |

Please debit our account at your Bank (#18313).

We appreciate your attention.

Very truly yours,

K-Pipe Group, Inc. (Survivor of merger with K-Pipe Merger Corp)

By:
Name:      Larry J. Austin
Title:       President

DR BY ___18313___
CR BY ___151___
INPUT BY ___
RELEASE BY ___

001144

ENB-DOJ-028625

K-Pipe Group, Inc. (survivor of merger with K-Pipe Merger Corp)

November 9, 1999

Rabobank Nederland, New York Branch
245 Park Avenue
37th Floor
New York, NY 10167
Attn: Chris Kortlandt

Dear Chris:

We hereby ask you to execute the following wire transfers for value November 9, 1999:

| | |
|---|---|
| Amount: | $950,000 |
| To: | Nationsbank |
| ABA#: | 111-000-025 |
| Credit to: | PricewaterhouseCoopers |
| Account #: | 018 054 4924 |
| Reference: | Engagement #: 447980-0151-00 |

Please debit our account at your Bank (#18313).

We appreciate your attention.

Very truly yours,

K-Pipe Group, Inc. (Survivor of merger with K-Pipe Merger Corp)

By:
Name:    Larry J. Austin
Title:    President

RD BY _____ 18313
CR BY _____ 151
INPUT BY _____
RELEASE BY _____

PAID
NOV - 9 1999

001141

ENB-DOJ-028622

11/08/99   TUE 16:16 FAX 212 808 2884       RABO CORP FIN NY                    002
11/08/99   16:28 FAX 212 826 0010       FORTREND INTL. LLC                      002

K-Pipe Group, Inc. (survivor of merger with K-Pipe Merger Corp)

November 9, 1999

Rabobank Nederland, New York Branch
245 Park Avenue
37th Floor
New York, NY 10167
Attn: Chris Kortlandt

Dear Chris:

We hereby ask you to execute the following wire transfers for value November 9, 1999:

| | |
|---|---|
| Amount: | $75,000 |
| To: | Fleet Bank, NA, Jericho, NY |
| ABA#: | 021-200-339 |
| Credit to: | Howard B. Teig, CPA |
| Account #: | 2032-60-8487 |
| Reference: | K-Pipe Transaction |

Please debit our account at your Bank (#18313).

We appreciate your attention.

Very truly yours,

K-Pipe Group, Inc. (Survivor of merger with K-Pipe Merger Corp)

By:
Name:       Larry J. Austin
Title:       President



DR BY _____ 18313
CR BY _____ 151
INPUT BY _____
RELEASE BY _____

001142

11/09/99   TUE 15:22   [TX/RX NO 9251]

CNB-DOJ-028623

**Prepared By: Andrew Feinstein**
**Last Updated: 11/5/99**

## STRUCTURING SUMMARY
### Project/Company Name
**GIB Deal Team: R. Betz, W. Manias, V.Gregg, G. Manahilov     Client Executive, R. Betz Lender, S. Wood**
**Documentation:**
**Credit Executive: M. Woodford**

| | |
|---|---|
| **Maximum Exposure for Approval ($MM):** | **Industry Description:** |
| **Transaction for Approval ($MM):** | **Primary SIC Code:** |
| **Customer Name:** | |
| **Obligor/Facility Risk Grade:** | **Major Plant Locations:** |
| **Parent Name:** | **Major Overseas Ops:** |
| **Parent Risk Grade:** | **TREND:** <br> **Improving/Stable/Declining** |
| **Public Ratings (LT & ST):** <br> **Date Ratings Last Changed:** | **Outlook/Trend?** |
| **Stock Price (as   of __/__/96):** <br> **Market Capitalization:** <br> **Bond Spreads:** | **52 Wk High/Low:** <br> **Market Cap/Book Cap:** <br> **Bond Description:** |

### Executive Summary:

The transaction for the sale of Bishop Group Ltd, ("Bishop") the parent to Syenergy and Kansas Pipeline company,  to Midcoast Energy Resources, Inc. ("MRS"), a public company based in Houston with a equity market capitalization of approximately $187 million, is scheduled for Monday, November 5, 1999, at 10 a.m.  In the process, one outstanding, Chase-issued irrevocable standby financial letter of credit expiring 12/15/99 ("LOC") for a notional amount of $1.38 million between MarGasCo, a subsidiary of the Bishop, and Western Gas will become the obligation of MRS.  To facilitate the closing in an efficient and timely manner, Bank of America ("BOA"), MRS' lead bank and financial arranger for this transaction, has agreed to backstop this LOC with a separate LOC issued by BOA to Chase.

We are requesting credit approval to accept the BOA LOC as a backstop to the Chase LOC and to leave the existing Chase LOC in place until expiration on or around December 20, 1999 (45 days).  The actual expiration is on December 15, 1999, however, we are requesting a five day cushion.

Chase acted as financial advisor on the sale for Bishop and Chase private bank will also manage the proceeds for Dennis Langley post-transaction.  Chase also has possible equity derivative opportunities that may result from this transaction.

### Transaction Overview:

### Sources and Uses (N/A if Vanilla Rollover):

| | Sources | | Uses | |
|---|---|---|---|---|
| | | | | |
| | | _____ | | _____ |
| | | _____ | | _____ |
| | | _____ | | _____ |
| | | _____ | | _____ |
| | | _____ | | _____ |
| | Total   $ | | Total   $ | |

GOVERNMENT EXHIBIT

G-147

*Global Syndicated Finance - Confidential*

**Company's Business:**

**Industry Analysis:**

**Discussion of Risks and Mitigating Factors:**

**Year 2000 Issues:**

*The most current Y2K Risk Assessment may be found in the Bank's Credit Files located with Corporate Lending and Transaction Management.*

**Y2K Risk Assessment**    ☐ High        ☐ Medium        ☐ Low

**Management / Sponsor:**

**Corporate Structure:**

**Capital Structure and Credit Statistics:**

|  | 1996 | 1997 | 1998 | 1999(P) | 2000(P) |
|---|---|---|---|---|---|
|  | $ | $ | $ | $ | $ |
| Sales |  |  |  |  |  |
| EBITDA |  |  |  |  |  |
| Senior Bank Debt |  |  |  |  |  |
| Other Senior Debt |  |  |  |  |  |
| Subordinated Debt |  |  |  |  |  |
| Total Debt |  |  |  |  |  |
| Book Equity |  |  |  |  |  |
| Interest Expense |  |  |  |  |  |
| Depreciation & Amortization |  |  |  |  |  |
| Capex |  |  |  |  |  |



2

ENB-DOJ-036410

*Global Syndicated Finance - Confidential*

| Dividends | | | | | |
|---|---|---|---|---|---|
| EBITDA/Cash Interest | x | x | x | x | x |
| EBITDA-Capex/Cash Int. | X | x | x | x | x |
| Total Debt/Book Cap | % | % | % | % | % |
| Total Debt/Market Cap | % | % | % | % | % |
| Senior Debt/EBITDA | x | x | x | x | x |
| Total Debt/EBITDA | x | x | x | x | x |
|  | | | | | |
| If Acquisition:  Total Purchase Price/EBITDA = | | | | | |
|  | | | | | |

## Financial Analysis (Historical):

## Financial Forecast:

A. **Base Case Assumptions and Conclusions**
B. **Downside Case Assumptions and Conclusions** *(MANDATORY RR4 or worse)*

## Key Deal Terms:

|  | Current Deal (if any) | First Cut at Proposed Deal | Final Deal |
|---|---|---|---|
| Amount ($MM) | | | |
| Tenor (yr) | | | |
| Commitment Amount | | | |
| Hold Amount | | | |
| Average Life (if leveraged) (yrs) | | | |
| Undrawn Cost (bps) | | | |
| Drawn Cost (bps) | | | |
| Utilization Fee (bps) | | | |
| Grid ? (Y/N) | | | |
| Upfront Fees to Market (bps) | | | |
| Underwriting Fee (if U/W) (%) | | | |
| Funded ? (Y/N) | | | |
| Secured ? (Y/N) | | | |
| Guaranteed? (Y/N) | | | |
| Administrative Agent | | | |
| Syndication Agent | | | |

## Brief Discussion of Most Comparable Recent Transactions:

## Syndication Strategy:



3

ENB-DOJ-036411

*Global Syndicated Finance - Confidential*

**Cross Sell Opportunities and Strategy:**

**Please refer to "GSF Approval Sheet" for all signatures.**

**Attachments:**
- GSF Information and Approval Sheet
- GES Exposure (MEA of customer and family)
- Facility Risk Rating Worksheet
- Detailed financial analysis for Risk Grades worse than 3
- CompuStat Data for Risk Grade Credits 1-3
- Spreads for Management, Base, Sensitivity Cases for Risk Grades worse than 3.
- Proposed covenants for all risk grades and performance of these covenants under the projection scenarios for Risk Grades worse than 3.
- Report on Due Diligence Results
- Moody's and S&P write-ups (Required on Risk Grades 1-3)
- Existing Bank Group (including what other business banks have)
- Bank Universe
- Comps
- Supply Dynamics
- Relevant Analyst Opinions (attach entire report if requested)
- Company and Industry Sections from 10K
- Chart showing organizational structure of borrower by legal entities



4

# PROMISSORY NOTE

$195,000,000.00

Dated: As of November 8, 1999

FOR VALUE RECEIVED, the undersigned, K-PIPE MERGER CORPORATION, a corporation organized under the laws of Delaware (the "Borrower"), HEREBY PROMISES TO PAY to the order of UTRECHT-AMERICA FINANCE CO. ("UAFC") the principal amount of the Advance (as defined below) on November 28, 1999 (the "Maturity Date"), together with interest (computed on the basis of a year of 365 days for the actual number of days elapsed) on the principal amount of the advance made by UAFC to the Borrower on the date hereof (the "Advance"). Interest on the Advance shall be payable on the day when the principal amount of such Advance is due and, with respect to interest on any overdue principal amount, payable on demand, at a fluctuating interest rate per annum equal at all times to (but with respect to any interest on any overdue principal amount hereunder 2.00% per annum above) the rate of interest, announced by Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., "Rabobank Nederland", New York Branch ("Rabobank") in New York, New York, from time to time, as its base rate, each change in such fluctuating interest rate to take effect simultaneously with the corresponding change in such base rate, but in no event in excess of the maximum interest rate permitted by applicable law. The Borrower may prepay the principal amount of the Advance in whole or in part at any time without penalty.

The agreement of UAFC to make the Advance is subject to the satisfaction, immediately prior to or concurrently with the making of the Advance, of the following conditions precedent:

(a)    The Borrower has executed and delivered to UAFC the Security and Assignment Agreement, dated as of the date hereof, made by the Borrower in favor of UAFC (the "Security Agreement");

(b)    The Borrower, Dennis M. Langley (the "Seller"), Midcoast Kansas Pipeline, Inc., a Delaware corporation ("MKPI"), Midcoast Kansas General Partner, Inc., a Delaware corporation ("MKGPI"; together with MKPI, the "Purchasers") and Rabobank, as escrow agent (in such capacity, the "Escrow Agent"), shall have entered into that certain Escrow Agreement (the "Escrow Agreement") dated as of the date hereof, in form and substance satisfactory to UAFC;

(c)    Simultaneously with the making of the Advance hereunder the Escrow Agent shall have received the Escrow Amount (as defined in the Escrow Agreement) and the Escrow Amount shall no less than the sum of (i) the principal amount of the Advance *plus* (ii) all interest to be due on the Advance from the date hereof through the Maturity *plus* (iii) $1,000,000 (the "Required Amount");

(d)    Each of the representations and warranties made by the Borrower herein or pursuant hereto shall be true and correct in all material respects on and as of such date as if made on and as of such date;

M:\WPFILES\STRUCFIN\K-PIPE\PRO

GOVERNMENT
EXHIBIT

G-148

0319

11/08/99  MON 15:49  [TX/RX NO 7115]