PRICEWATERHOUSE(COPERS 🔲

### (b) Back-to-Back Loan/Royalty Arrangements

In Aiken Industries, Inc. v. Commissioner, 56 T.C. 925 (1971) ("Aiken"), the taxpayer was a domestic corporation ("DC"), wholly-owned by a foreign parent ("FP") organized in a country with whom the U.S. did not have an income tax treaty. DC had borrowed from FP such that FP held a note from DC on which it paid interest. Interest payments made to FP were subject to the statutory withholding tax rate of 30 percent. FP assigned the note to its Honduran subsidiary ("HC") At this time, the U.S. and Honduras had an income tax treaty providing for the elimination of withholding tax.

In holding for the Commissioner, the Tax Court disregarded HC's existence, stating that HC did not "exercise dominion and control" over the interest payments received from DC, as it: 1) derived no economic benefit or profit from the arrangements, and 2) HC and DC were controlled by FP. Thus, HC was a mere conduit. In reaching this conclusion, the Tax Court noted that HC merely obtained "physical possession on a temporary basis of funds representing interest payments" and that the transaction was little "more than a mere exchange of paper between related corporations".[23]

In SDI Netherlands B.V. v Commissioner ("SDI Netherlands"), 107 T C. 161 (1996), a Bermudan company ("BC") licensed certain intangibles to its Netherlands subsidiary ("SDI"), who sublicensed the intangibles to a US subsidiary ("USCo") in the BC group, in addition to other BC subsidiaries located in other jurisdictions. In holding that the "back to back" payments should be recognized, and noting that the facts of SDI Netherlands were more aligned with Northern Indiana (see discussion directly below) than with Aiken, the Tax Court stated that while "there was an identity both in terms and timing between the back to back loans, as well as a close relationship between the parties involved"[24], the control element was not "controlling", as it did not appear to have been exercised, the "two license agreements had separate and distinct terms", and SDI "had an independent role as the licensee from SDI Bermuda and the licensor of the other entities, including but not limited to SDI...."[25] In reaching its decision, the Tax Court noted that the terms provided for a spread, "which compensated petitioner for its efforts", concluding that "

> these arrangements should be accorded separate status with the result that, although the royalties paid by petitioner to SDI Bermuda were derived

---

items FS maintained separate books and records The Tax Court held that the FS was not Dc's agent, as Fs sustained a risk of loss
[23] Aiken Industries v Commissioner, 56 T C 925, 932
[24] SDI Netherlands v Commissioner, 107 T.C 161, at 174
[25] Id.

26

()

PWC P1137

ENB-DOJ-028323

PRICEWATERHOUSE(COOPERS 🏢

from the royalties received by petitioner from SDI USA, they were separate payments.[26]

As was the case in SDI Netherlands, K-Pipe must use the proceeds from the Asset Purchase to fund its Stock Purchase. Also like SDI Netherlands, the Stock Purchase Agreement and the Asset Purchase Agreement had separate and distinct terms, as K-Pipe assumed certain liabilities in the Stock Purchase Agreement not assumed by the Purchaser pursuant to the Asset Purchase Agreement. Finally, K-Pipe had an independent role as the Stock Purchaser and the Asset seller, as evidenced from the significant differences in rights and obligations set forth in the agreements. As such, the Stock Purchase should not be disregarded on the basis that K-Pipe used the Asset Purchase proceeds to fund its acquisition of Bishop Group's stock, or because the transactions were 'back-to-back". Lastly, K-Pipe's case should be stronger than that presented in SDI Netherlands, where the Tax Court recognized payments between related parties as "separate and distinct", as K-Pipe and Midcoast are wholly unrelated.

This analysis was confirmed in Northern Indiana Public Service Company v. Commissioner ("Northern Indiana"),115 F.3d 506 (1997), a U.S. corporation ("USCo") established a Netherlands Antilles company ("NA") to raise capital on foreign markets, which at the time was cheaper than available domestic capital NA issued Eurobonds to the public who paid interest at 17.25 percent, loaning the proceeds of the offering to USCo at an 18.25 percent interest rate. NA invested the spread on the investments (1 percent) without the assistance of USCo Had USCo issued the notes directly, withholding tax of at least 15% would have been due on interest paid. The Seventh Circuit held for the taxpayer, noting that the transactions should not be disregarded, despite the fact that the transactions was at least in part motivated by tax avoidance . The Seventh Circuit distinguished the case from Aiken on the grounds that 1) NA earned a profit (here, $700,000), 2) the transaction had economic substance to both USCo and NA, as USCo's resources were depleted with the payment of interest, and NA's were enhanced, 3) NA invested its profits independent of any input from USCo., and 3) NA, unlike HC, borrowed funds from unrelated third parties, the holders of the Eurobonds.

In reaching its conclusion, the Seventh Circuit noted that

> From Gregory and Aiken Industries, we glean the following: Transactions involving a foreign corporation are to be disregarded for lack of meaningful economic activity if the corporation is merely transitory, engaging in absolutely no business activity for profit - in other words, it is a mere

---

[26] Id

27

()

PWC P1138

ENB-DOJ-028324

# PRICEWATERHOUSE COOPERS 🅰

skeleton.... Transactions will also be disregarded if the foreign corporation lacks dominion and control over the interest payments it collects.[27]

In applying the case to K-Pipe and Midcoast, Northern Indiana should support recognition of the Stock Purchase. Firstly, K-Pipe and Midcoast are not related. Also, like NA, K-Pipe profited substantially from the transaction, earning approximately [$6,000,000]. The transaction had economic substance to K-Pipe, as K-Pipe acquired certain Bishop Group assets and liabilities which were not assumed by Midcoast (e.g. post-Stock Purchase Closing tax liabilities, liabilities associated with a delay in or a failure to close under the Stock Purchase Delay Letter), as well as for Midcoast, who acquired assets for use in its business in exchange for a substantial cash payment. Also like NA, K-Pipe will invest its profits without the control of Midcoast.

As noted in Section I(B), above, K-Pipe has certain tax attributes that it will use to reduce the tax cost associated with its gain on the Asset Purchase. Per Northern Indiana, however, the structure used by K-Pipe and Midcoast should not necessarily be recharacterized as a result of this tax benefit. In Northern Indiana, the Seventh Circuit felt

> "it was unnecessary, and we think it inappropriate, for us to sever a corporation from its transactions in analyzing a case, such as this one, where the corporation was formed with the intent of structuring its economic transactions to take advantage of laws that afford tax savings",[28]

distinguishing Northern Indiana from

> "[t]hose cases [which] allow the Commissioner to disregard transactions which are designed to manipulate the Tax Code so as to create artificial deductions. They do not allow the Commissioner to disregard economic transactions, such as the transactions in this case, which result in actual, non-tax-related changes in economic position."[29]

As such, the Stock Purchase should not be disregarded

(c) **Analysis**

---

[27] Northern Indiana Public Service Company v. Commissioner, 115 F 3d 506 (1997), at 514
[28] Id. at 514
[29] Id. at 512

()

PWC P1139

ENB-DOJ-028325

# PRICEWATERHOUSE(COOPERS ⓚ

In light of the above, K-Pipe should be regarded as the owner of the Assets in substance and in form. Pursuant to the Stock Purchase, K-Pipe took title to Bishop Group share and is thus subject to the various federal, state, and local regulatory and environmental requirements inherent in stock ownership. Unlike the taxpayer in <u>Gypsum</u>, K-Pipe sustained a true risk of loss between the time of the Stock Purchase and the Asset Purchase with respect to the Assets sold to Midcoast. K-Pipe sustained and continues to sustain full risk of loss with respect to the excluded assets and liabilities. K-Pipe also sustained a risk of loss that the Stock Purchase would not close of $15,000,000. While Midcoast were liable to K-Pipe for an equal amount in the event that the Asset Purchase failed to close, Midcoast's $15,000,000 obligation was not effective for another 24 hours. Wile the First Escrow Agreement provided K-Pipe with $14,000,000 to cover this potential obligation, the First Escrow terminated the next day, still several days before to closing. In any event, had Midcoast gone bankrupt, K-Pipe would have remained liable to Langley for the Stock Purchase proceeds, and, had Langley failed to deliver the Assets to K-Pipe in the working condition represented in the Stock Purchase Agreement, K-Pipe, and not Langley, would have been liable for breach of contract with respect to the representations made to Midcoast in the Asset Purchase Agreement. K-Pipe could not, and still cannot, extricate itself from the risks inherent in Bishop Group stock and the Assets as an agent could, and remains liable under the representations and warranties and indemnification provisions of the Agreements.

Further, K-Pipe's relationship with Langley and Midcoast is very similar to those presented in <u>Bramblett</u>, as K-Pipe, like C, realized a profit from the Asset Purchase that was larger than a typical agency fee  K-Pipe's income was not attributable to Langley or Midcoast, and K-Pipe retained all of the profit from the development.

While the acquisitions occurred only one day apart, a day is distinguishable from the mere moments during which Export held the rock in <u>Gypsum.</u> However, as noted in <u>Durliat</u>, the time between the transactions is not necessarily indicative of the transaction's tax treatment, but the substance of the control, that matters.

K-Pipe exercised control over the assets in substance and in form. Unlike the taxpayer in <u>Gypsum</u>, <u>Aiken</u>, and Revenue Ruling 70-424, but like C in <u>Durliat</u>, K-Pipe is not related to Langley or Midcoast  Thus, K-Pipe could act independent of Langley and Midcoast, who did not, in the end, have the power to exercise shareholder/corporation control over K-Pipe  Like C, K-Pipe had rights to refrain from selling the Assets to Midcoast, more than a theoretical right to refrain from selling. It was only compelled to sell the assets by the prospect of making a profit  Unlike the taxpayers in <u>Aiken</u>, K-Pipe made a sizeable profit on the transaction, and showed its control over the assets through the separate negotiation of the Assets to third parties, Midcoast  Further, the Stock Purchase and the Asset Purchase are distinguishable from all negative precedent, as they are not the equivalent of the back-to-back relationships addressed above. K-Pipe assumes certain liabilities and acquires certain assets not transferred

29

()

PWC P1140

ENB-DOJ-028326

# PRICEWATERHOUSECOOPERS 🏢

to Midcoast. Thus, K-Pipe should be regarded as having title to Bishop Group shares and the Assets sold to Midcoast in substance as well as in form.

### (d) Court Holding Doctrine

The IRS could argue that Langley, and not K-Pipe, was the true asset seller, based on the preliminary negotiations between Langley and Midcoast, citing Commissioner v. Court Holding Co ("Court Holding"), 65 S Ct. 707 (1945). While this line of cases generally results in the recharacterization of the sale for Langley, they are helpful in fully considering the true nature of the transactions.

#### (i) Applicable Law

In Court Holding, a corporation wholly-owned by taxpayers held an apartment building as its sole asset. The corporation entered into negotiations with potential purchasers of the building, eventually reaching an oral agreement with the purchasers as to the terms and conditions of the sale   When the parties met to reduce the agreement to writing, the corporation informed the purchasers that the sale would not occur as it would generate a substantial tax liability for the corporation. The next day, the corporation declared a liquidating dividend to the taxpayers, distributing the apartment building. The corporation itself did not legally liquidate The taxpayers then drew up a sales contract and sold the building to the purchasers three days later on substantially the same terms as those previously agreed between the corporation and the purchasers.

In reaching its conclusion, the Court noted that the "incidence of taxation depends upon the substance of the transaction" and that the 'tax consequences which arise from gains from a sale of property are not finally determined solely by the means employed to transfer legal title."[30] Further, "to permit the true nature of the a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."[31]

However, in United States v. Cumberland Public Service Co ("Cumberland"), 70 S.Ct. 280 (1950), a case similar to Midcoast's, seller of the assets was not disregarded  In Cumberland, the shareholders ("S") of a closely-held corporation ("C"), offered to sell the shares of C to a purchaser as a result of a change in market conditions. The purchaser refused to buy the stock, instead offering to buy the assets. C rejected the offer in light of the substantial tax costs involved in an asset sale. Simultaneously, S, wishing to avoid the negative impact on earnings

---

[30] Commissioner v  Court Holding Co , 65 S.Ct  707 (1945), at 707-708
[31] Id  at 708

30

()

PWC P1141

ENB-DOJ-028327

# PRICEWATERHOUSE COOPERS 🏢

associated with the tax liability C would sustain on an asset sale, offered to acquire the assets and resell them to the purchasers, an offer which the purchasers accepted. Pursuant to this verbal agreement, C distributed the desired assets to S in liquidation and S sold the assets to the purchasers. C sold its remaining assets to third parties and dissolved.

In concluding that the intermediate distribution to S should be respected, the Court distinguished Cumberland from Court Holdings, noting that in Cumberland at no time did the corporation plan to make the sale itself"[32], while in Court Holding the "corporation had negotiated for sale of its assets and had reached an oral agreement of sale."[33] Further, in Court Holding, the "terms of the purchase were substantially those of the previous oral agreement" while in Cumberland, as the parties had not reached an agreement, few terms had been established, and thus the terms on which S sold the property could not have been comparable. In clarifying its ruling in Court Holding, the Court noted that it "did not mean that a corporation can be taxed even when the sale has been made by a different party who obtained the assets through a genuine [transaction]"[34], such as the liquidation of the corporation. "While the distinction between sales by a corporation as compared with a distribution in kind followed by shareholder sales may be particularly shadowy and artificial when the corporation is closely held" and "[w]hatever the motive and however relevant it may be in determining whether the transaction was real or a sham, sales of physical properties by shareholders following a genuine liquidation distribution cannot be attributed to the corporation for tax purposes."

### (ii) Analysis

Unlike the taxpayers in Court Holding, Langley and Midcoast had not reached an agreement with respect to the terms of the sale. In fact, negotiations had reached an impasse and the deal was unlikely to conclude until K-Pipe became involved, as Langley wished to sell shares and Midcoast was interested in assets, positions seemingly irreconcilable. As such, no terms were agreed during the initial negotiations against which to compare those ultimately incorporated into the Agreements. Rather, each of the original parties – Langley and Midcoast – obtained the terms they desired – Langley sold shares and Midcoast bought assets, terms that by their very nature could not have been agreed during the initial discussions, and which distinguish K-Pipe and Midcoast's case from Court Holding. Further, unlike the shareholders in Court Holding, K-Pipe did not control the seller, Langley. As such, the terms of the sale required re-negotiation with an entirely new purchaser, K-Pipe. Also, unlike Court Holding, the Asset Purchase was not effectively final and then reconstructed to reduce taxes. Rather, the sale

---

[32] United States v. Cumberland, 70 S Ct 280 (1950), at 280
[33] Id
[34] Id at 281

31

()

# PRICEWATERHOUSECOOPERS 🏢

would not have occurred but for the revision in terms, albeit with a reduction in taxes. Thus, while it is true that, as was the case in Court Holding, the form of the transaction resulted in an overall reduction in tax liability, the facts presented in Court Holding are distinguishable from those presented by K-Pipe and Midcoast.

The Stock Purchase and Asset Purchase are analogous to the facts set forth in Cumberland. Langley and the Midcoast were unable to reach agreement with respect to the acquisition of the Assets. While the assets were not distributed to shareholders, K-Pipe acquired the assets in an independently-negotiated Stock Purchase. Surely such a stock purchase is among the "genuine" transactions contemplated by the Court in Cumberland, possibly presenting an even stronger position for Midcoast than was presented for the taxpayers therein, given that the Stock Purchase was not "particularly shadowy" as Bishop Group was not "closely-held" by K-Pipe during negotiations.

### (e) Installment Sale Cases

A line of installment sale cases also support the recognition of K-Pipe. In Roberts v. Commissioner ("Roberts"), 643 F.2d 654 (9th Cir. 1981), a taxpayer created a trust ("T") for the benefit of his children. The taxpayer sold $1 million of low-basis stock to T pursuant to an installment sale. T then sold the shares on the open market. While there were no economics to T's holding the shares vs the proceeds of the sale, as T had no real risk of loss, and while the taxpayer derived a benefit in that he was permitted to obtain the benefits of an installment sale, the Ninth Circuit held that T was an independent entity of substance, and upheld the taxpayer's sale. In reaching this conclusion, the Ninth Circuit noted that the taxpayer had never had the benefits of or control over the proceeds of the open market sale

In Rushing v Commissioner ("Rushing"), 441 F.2d 593 (5th Cir. 1971), the taxpayers adopted a plan of liquidation with respect to a wholly-owned corporation ("C"), and had C sell its assets. Just prior to the actual liquidation of C, the taxpayers sold their shares pursuant to an installment sale to an irrevocable trust established for the benefit of their children, and the trust collected the liquidation proceeds, rather than the taxpayers. The Fifth Circuit respected the form of the transaction, noting that the taxpayers did not receive the benefit of or control over the proceeds of liquidation, rather, "an autonomous entity controlled the proceeds .. the trustee was independent of the taxpayer's control  Thus, the intervening third party, the trustee, was neither a puppet nor an economic serf."[35]

These cases involve independent intermediaries who effectively blocked the taxpayer's control over events subsequent to the transfer of shares to the intermediary  Like K-Pipe, the trusts

---

[35] Rushing v Commissioner, 441 F 2d 593 (5th Cir 1971), at 598

32

()

PWC P1143

ENB-DOJ-028329

PRICEWATERHOUSECOOPERS 🅘

involved in these cases were not controlled by the sellers, but were independent. Further, as was the case with Langley, the sellers relinquished control over the shares transferred at the point of transfer. As such, these cases strongly support the recognition of K-Pipe as an independent intermediary and run counter to an IRS argument that K-Pipe should be disregarded.

Taken together, K-Pipe and the Stock and Asset Purchases are more similar to the facts presented in Cumberland, Roberts, and Rushing than they are to Court Holding. Thus, the Stock Purchase and Asset Purchase should be analyzed under the rationale of these cases as opposed to that of Court Holding, and K-Pipe's independent role should not be disregarded.

### C. The Step Transaction Doctrine Should Not Result in Recharacterization of the Transactions

#### (1) General

The step transaction doctrine[36] is a judicially created tax doctrine intended to elevate substance over form by disregarding the tax significance of ostensibly separate transactions when the transactions are integrated steps in a single plan. However, as evidenced by cases previously discussed and illustrated further below, each of a series of steps generally will be respected, and the step transaction doctrine will not apply, if each step has independent economic significance. If the Asset Purchase is disregarded, Midcoast will not obtain its step-up in stock basis, and other undesirable tax consequences present in a stock acquisition could arise

#### (2) Potential Recasts of the Stock and Asset Purchases

Generally, the IRS may apply the step transaction to disregard meaningless steps.[37] It cannot create new steps. Nor can it modify the beginning or ending positions of the parties. As such,

---

[36] Step transaction cases often refer to the three "tests" imposed under the step transaction doctrine the binding commitment test, the mutual interdependence test, and the end result test. While the tests are defined distinctly, there is little meaningful differentiation between them. In fact, courts often refer to the tests interchangeably. See, e g , Penrod v. Commissioner, 88 T C 1415 (1987), at 1428 As such, we do not categorize our comments with reference to the tests herein, but rather, analyze the Stock Purchase and the Asset Purchase based on the specific challenges the IRS could raise under the doctrine.
[37] Esmark, Inc v Commissioner, 90 T C 171 (1988), discussed further infra Note that the step transaction doctrine generally is not imposed where a statutory framework is provided. Thus, in Supreme Investment Corporation v United States ("Supreme"), 468 F 2d 370 (5th Cir. 1972), the Fifth Circuit declined to apply the doctrine where an acquiring corporation made an election under Code Sec, 334(b)(2), pursuant to which it obtained a tax-free step-up in a target's installment notes, stating that "the web of statutory provisions governing this particular transaction prevents the Commissioner from using Section 269 to make an exception to the cost basis under Sec 334(b)(2)" Id at 377 While no specific statutory framework exists in this transaction, had K-Pipe made a Code Sec 338 election to step-up K-Pipe's inside basis in its assets, arguably Midcoast would be further insulated from the application of the step transaction doctrine

33

()

PWC P1144

ENB-DOJ-028330

# PRICEWATERHOUSE COOPERS 🅘

it is difficult to determine how the IRS could apply the doctrine to the Stock and Asset Purchases, taking into account the beginning and ending positions of the parties

The IRS could recast the transactions as follows

1) Bishop Group distributed the Assets to Langley, who then sold the Assets to Midcoast;  or
2) Langley sold shares to Midcoast; Bishop Group distributed the Assets to Midcoast

To be successful, the IRS would have to prove that 1) K-Pipe acted as Langley's agent, or performed some other function for Langley pursuant to which it was entitled to a significant amount of income, 2) the income K-Pipe earned was commensurate with its purportedly nominal role in negotiating the transactions on Langley's behalf, 3) the Midcoast payment to K-Pipe was merely a payment by Midcoast of purchase price that Langley assigned to K-Pipe as their "fee". Note that the IRS could not argue that any part of the "fee" paid to K-Pipe was associated with its tax attributes as, pursuant to the recharacterization, K-Pipe would not have been able to use the attributes to obtain Midcoast's step-up, as it acted as a mere agent.

The IRS should be unsuccessful in arguing the first recast as the true series of events, as the facts should not support a finding that K-Pipe acted as Langley's agent, or account for K-Pipe's substantial profits  Further, to prove its case, the IRS would have to add at least two steps to the transaction, which generally is not permitted

The second recast also poses difficult challenges for the IRS  Under this recast, the IRS would have to account for the cash payment, and here, the transfer of Bishop Group, to K-Pipe, and presumably would thus have to prove that these transfers represented payment by Midcoast for K-Pipe's services as an agent. Alternatively, the IRS would have to argue that the transfers represented the payment of purchase price by Midcoast to Langley, who then assigned the shares and cash to K-Pipe as payment for agency services rendered by K-Pipe to Langley. Again, the IRS should not be successful in arguing that this convoluted recast is the true characterization of the facts as it requires the IRS to add steps and prove K-Pipe's agency

### (a)  Applicable Law

The foregoing conclusions are supported by the Tax Court's reasoning in Esmark, Inc v. Commissioner ("Esmark"), 90 T C. 171 (1988). In Esmark, the taxpayer, "E", a publicly-traded corporation, believed its stock was undervalued, and had concerns that it may be a take-over target  As such, E wished to self-tender for a significant portion of its shares  However, E was experiencing liquidity problems as a result of recent acquisitions and the poor operating results of one of its lines of business  To adjust its cash position and redeem its shares, E decided to sell its energy line of business, held by one of its subsidiaries ("V")  To reduce the tax associated with the sale of V and to achieve the other objectives listed above, E requested

34

()

# PRICEWATERHOUSE(COPERS @

that bidders for V agree to tender for E shares on the market and acquire shares sufficient to permit E to distribute V shares in redemption of the tendered E shares  E eventually reached agreement with one of the bidders, Mobil ("M"), and M executed the transaction.  According to Esmark, M would not have tendered for the shares of E if E had not agreed to redeem the E shares with shares of V, and E would not have agreed to sell V to M if did not agree to tender for the shares.[38]  The tender and redemption occurred on the same day, resulting in a significant reduction in E's outstanding shares and the realization of E's objectives

The Commissioner attacked the transaction, contending that it should be recharacterized as E's sale of V shares to M for cash, followed by E's self-tender for shares in exchange for cash, arguing that the step transaction doctrine required that M's ownership be disregarded, and noting that the transaction was tax-motivated.

The Tax Court declined to accept the Commissioner's recharacterization of the transaction as the Commissioner had "pointed to no meaningless or unnecessary steps that should be ignored"[39]; rather, the Commissioner's characterization "does not simply combine steps, it invents new ones."[40]  Thus, the step transaction doctrine could not be applied, despite the "existence of an overall plan" and the fact that E was, in part, motivated by tax avoidance, as each of the Commissioner's recharacterizations "left petitioner, petitioner's shareholders, and the purchaser in the same relative positions", and the taxpayer merely "chose the path expected to result in the least tax."[41]

The Tax Court distinguished Esmark from Gregory noting that each of the steps - the purchase of petitioner's stock by Mobil and the redemption of that stock by petitioner - had permanent economic consequences.  "Mobil's tender offer was not a 'mere device' having no business purpose; the tender offer was an essential element of petitioner's plan to redeem over 50% of its stock "[42]

In Gray v. Commissioner ("Gray"), 561 F.2d 753 (9th Cir. 1977), the Ninth Circuit held that a taxpayer's sale of stock of a corporation ("C") which held only cash and preferred redeemable stock, to an unrelated third party ("TP") subject to a condition subsequent that the preferred shares be redeemed within six days at a price in excess of its fair market value, was effectively a redemption of the shares of C followed by a sale by the taxpayer of C to TP.  In reaching this conclusion, the Ninth Circuit stressed the fact the sale could not occur until the condition was satisfied  As such, the sale occurred after the shares were redeemed.  In reaching this

---

[38] Esmark, Inc. v  Commissioner, 90 T C  171 (1988), at 175
[39] Id
[40] Id  at 196.
[41] Id
[42] Id  at 198

35

()

# PRICEWATERHOUSECOOPERS ⬚

conclusion, the Ninth Circuit rejected the Tax Court's treatment of the transaction as a liquidation of C rather than a sale of its shares, with the purported buyer receiving a fee, even though the corporation's assets ultimately funded the purchase price.

Note that Gray has been distinguished by Owens v  Commissioner ("Owens"), 64 T.C. 1 (1975), subsequently affirmed 568 F.2d 1233 (6th Cir. 1977), and Estate of Weiskopf v Commissioner ("Weiskopf"), 64 T.C. 78 (1975), affirmed per curium 76-1 U.S.T.C. Sec. 9387.  In Owens, the stock of an S corporation the sole asset of which was cash was sold mid-way through the year to individuals with net operating losses.  The individuals intended to absorb their losses with the pre-acquisition income earned by the S corporation, and liquidated the S corporation immediately after the acquisition.  The Tax Court recharacterized the transaction as the liquidation of the S corporation.

In Weiskopf, US taxpayers held an investment in a US company ("USCO") which owned a controlling interest in a foreign corporation ("FC").  The taxpayers attempted to avoid dividend treatment arising on the sale of FC by selling the shares of USCO.  The Tax Court recast the funds received by the taxpayers as a dividend to the extent of FC's earnings, noting that no viable business had been sold, as FC's assets consisted of little more than accounts receivable.

   (b) Analysis

As was the case with the selling shareholders in Esmark, K-Pipe was not controlled by Midcoast and Midcoast could not bind K-Pipe  K-Pipe held title (and continues to hold title) to the Bishop Group shares acquired and was (and continues to be) entitled to income on and subject to liabilities associated with the shares. Like the relationship between the selling shareholders and M, an actual obligation ran between K-Pipe and Langley (the Stock Purchase Agreement)  None of the recharacterizations set forth above adequately account for the facts present in the Stock and Asset Purchases.  Rather, the recharacterizations require the addition of steps, as well as the IRS' success in proving that K-Pipe acted as an agent.  As such, K-Pipe and the Stock Purchase should not be disregarded under the step transaction doctrine

While the IRS has been successful in recharacterizing transactions structured to take advantage of the fact that the purchaser has tax attributes or is otherwise a disinterested party, with the exception of Esmark and Gray, these cases all involve the sale of corporations devoid of any business, holding solely cash or cash equivalents, and all involve recharacterization of the sale as a liquidation of the corporation into its parent, followed by the sale of assets by the Parent  As noted previously, this recharacterization does not account for all of the facts inherent in the Stock and Asset Purchase, such as K-Pipe's retention of cash and certain assets and liabilities  Further, the cases are distinguishable as the transferred assets consisted almost

36

()

# PRICEWATERHOUSECOOPERS 🅰

entirely of cash.  Here, Bishop Group holds gas transportation assets and partnership interests.
Thus, Owens and Weiskopf are distinguishable from the Stock and Asset Purchases.

### (3) Recasts Not Supported by Stock-for-Debt Exchange Rulings

#### (a) Applicable Law

Prior to their repeal in 1984, solvent corporations with debt outstanding could repay the debt
with shares of the corporation.  Pursuant to these rules, investment banking firms would
acquire a corporation's debt at a discount, exchange the debt for the corporation's stock, and
underwrite the stock offering to the public.  In so doing, the investment bankers would seek to
minimize their risk by acquiring the debt only after the corporation's Board of Directors had
approved the debt-for-shares exchange, paid for the debt only after the exchange agreement
was executed, and priced the corporation's stock slightly below market on the same day it
began selling the shares to ensure that it was able to sell the shares.

Field agents attempted to recharacterize the transaction as the purchase of shares by the
bankers for cash followed by the corporation's repurchase of its debt at a discount, arguing that
the bankers were merely agents for the corporation, and that the doctrine of substance over
form dictated the recharacterization. However, the transactions were upheld in a number of
Private Letter Rulings. [43]  In PLR 8738003, the IRS rejected the field agent arguments set
forth above, noting that

    (i)    No written agency agreement existed;

    (ii)   The corporation (the purported principal) had no control over the bankers (the
           purported agents), and

    (iii)   Third parties could not look to the corporation for specific performance or
           damages on contracts between third parties and the bankers,

and thus, the bankers were not agents of the corporation.

The IRS rejected application of the step transaction doctrine, noting that the proposed
recharacterization was "problematic because it requires a reversal of the order of the
transactions, which the Courts and Service have generally been reluctant to do ...".[44]

---

[43] PLR 8738003 (May 22, 1987), PLR 8735007 (May 18, 1987), and PLR 8735006 (May 18, 1987)  Note that
PLRs by their very nature cannot be relied upon as precedent as they are authoritative only with respect to the
taxpayer to whom they are issued  Thus, the above discussion is merely an indication of how the IRS might
approach the Stock and Asset Purchases
[44] PLR 8738003

37

()

PWC P1148

ENB-DOJ-028334

# PRICEWATERHOUSE COOPERS ⬚

The fact that the bankers had attempted to minimize their risk "through pre-arranged agreements with third-party stock purchasers and [the corporation] prior to its acquisition of the bonds"[45] did not change the economic reality of the transactions. Rather, "[s]uch pre-arrangements merely reflect good business judgment]."[46]

### (b) Analysis

As noted above, application of the step transaction doctrine to the Stock and Asset Purchases requires more than the reversal of steps in PLR 8738003. Like the bankers, K-Pipe attempted to minimize its risk by closing the Asset Purchase only 1 day after the Stock Purchase closed In fact, K-Pipe was more at risk than the investment bankers, as K-Pipe had not closed on the Asset Purchase at the time the Stock Purchase closed, unlike the bankers who did not acquire debt until the exchange agreement was in place. Like the bankers, K-Pipe was exercising good judgement in locking in an interested purchaser for the Assets. Here also, K-Pipe was more at risk, as the bankers received publicly-traded shares, whereas K-Pipe received shares of a private company, making resale more difficult, and retention of Midcoast's interests more important.

As discussed in Section II(A), above, no written agency agreement exists between K-Pipe and Langley or K-Pipe and Midcoast, and no party has control over the other. No third party will be able to look to Langley or Midcoast for specific performance of K-Pipe's obligations

Thus, the IRS' position with respect to the stock for debt exchange rulings is helpful to Midcoast, especially in light of the similarity of issues between the rulings and the Stock and Asset Purchases

### D.  The Three-Party Like-Kind Exchange Cases Respect Participation of Intermediaries

### (1)  Applicable Law

Support for the form of the Stock and Asset Purchases can be found under Code Sec 1031. Prior to its amendment in 1984 ("pre-'84 rules"), Sec 1031 provided that no gain or loss would be recognized if property held for productive use in a trade or business, or as an investment, was exchanged for property of a like kind to be held for use either in a business or as an investment  While current law contains additional law permitting certain three-party transactions, the literal terms of the pre-'84 rules do not

---

[45] Id
[46] Id

38

()

PWC P1149

ENB-DOJ-028335

# PRICEWATERHOUSECOOPERS 🏛

In Mercantile Trust Company v. Commissioner ("Mercantile"), 32 B.T.A. 82 (1935), taxpayers exchanged property ("original property") for other property ("replacement property") held by a title company ("INT") and cash. Just prior to the exchange, INT had acquired the replacement property from a third party ("TP") in exchange for cash, and just after the exchange, INT sold the original property to a fourth party. The Commissioner attempted to recharacterize the transaction as the taxpayer's sale of the original property to the fourth party for cash, arguing that the transactions were, in substance, a sham, and pointed to the significant tax savings the taxpayers obtained by arranging the transaction as a like-kind exchange. The Board of Tax Appeals rejected this argument. Rather, the "agreements and deeds executed, and the cash payments made by the four interested parties were not simulated transactions..... The agreements created fixed liabilities. The deeds transferred legal title. The cash payments were real."[47] As such, the Board of Tax Appeals upheld the transactions.

In Everett v. Commissioner ("Everett"), 37 T.C.M. 274 (1978), the taxpayers owned certain property (the "original property"), but wished to acquire land ("replacement property") owned by another ("INT"). At the time, INT was in negotiations to sell the replacement property for cash. To raise sufficient funds to acquire the replacement property, the taxpayers entered into negotiations with a third party ("TP") to sell the original property on an installment basis. After these negotiations proved unsuccessful, the taxpayers entered into a Code Sec. 1031 like-kind exchange with INT, pursuant to which the taxpayers exchanged the original property with the replacement property. INT agreed to the transaction knowing that it could immediately resell the original property to TP on terms agreeable to TP.

The IRS argued that, in substance, the taxpayer sold the original property to TP for cash, purchasing the replacement property with the proceeds, on the basis that 1) INT acted as an agent for the taxpayers and TP, and 2) that the taxpayers and TP had essentially negotiated their sale. The Tax Court rejected this argument, upholding the tax-free treatment of the transaction, on the basis that 1) INT was not involved in the agreement between petitioner and TP, and was thus not the agent of either party, and 2) the taxpayers and TP had never reached agreement on the terms of the sale of the original property. The Tax Court noted the critical nature of the financing terms between the taxpayer and TP. As no agreement had been reached on this issue, no sale occurred between the taxpayers and TP in substance.

In Alderson v. Commissioner ("Alderson"), 318 F 2d 790 (9th Cir. 1963), the taxpayer entered into an asset purchase agreement pursuant to which the taxpayer would sell property (the "original property") to INT, a purchaser, in exchange for cash, in May, 1957. Pursuant to the agreement, INT deposited the cash in an escrow account in preparation for the closing, scheduled to occur on September 11, 1957. Some time after the funds were deposited, the

---

[47] Mercantile Trust Company v. Commissioner, 32 B.T.A. 82 (1935)

39

PWC P1150

ENB-DOJ-028336

PRICEWATERHOUSE(COOPERS 🅑

taxpayer located land it wished to obtain ("replacement property"). Shortly thereafter, the taxpayer and INT amended their purchase agreement such that the taxpayer would exchange the original property for the replacement property, rather than cash. Deeds transferring the title to the replacement property to INT, the replacement property from INT to the taxpayer, and the original property to INT, were recorded on the same day - September 4, 1957. To pay for the replacement property, INT redirected the funds in escrow for the original property to an escrow account for the replacement property. The taxpayers paid costs associated with documentary stamps on the transfer of the replacement property to INT.

The Commissioner argued, citing Commissioner v. Court Holding, 324 U.S. 331, 65 S Ct. 707, that the ultimate structure of the transactions was modified "to make it appear other than what it was 'in order to avoid a tax liability solely to obtain a tax benefit'"[48], and that the true substance of the transaction was the sale by the taxpayer of the original property for cash followed by the purchase by the taxpayers of the replacement property.

The Ninth Circuit rejected this characterization, finding that 1) it was the intent of the parties from the outset to enter into a Code Sec. 1031 transaction if suitable property could be located, 2) the original asset purchase agreement had not matured, and 3) funds that the taxpayers had requested be transferred to the replacement property escrow account were not, in fact, transferred, and thus, the taxpayer's funds had not been used to acquire the replacement property, and that therefore the substance of the transaction followed its form.

In reaching this conclusion, the Ninth Circuit noted that Mercantile "appears to hold that one need not assume the benefits and burdens of ownership in property before exchanging it but may properly acquire title solely for the purpose of exchange and accept title and transfer it in exchange for other like property" under Code Sec. 1031.[49]

In Rutland v Commissioner ("Rutland"), 36 T C. Memo 40 (1977), involved a taxpayer who, like the taxpayer in Everett, had originally agreed to sell its property ("the original property") to an unrelated party ("INT") for cash (although preliminary negotiations had included provisions pursuant to which the taxpayer could request an exchange of property rather than cash), but later located suitable replacement property (the "replacement property"), owned by a third party ("TP"). Unlike the taxpayer in Everett, the taxpayer in Rutland was actively involved in the negotiations between INT and TP  The taxpayers negotiated with respect to the purchase price, the terms of the transactions, the manner in which title was conveyed, and the closing mechanics of the exchange and sale  In addition, the taxpayers paid closing costs

---

[48] Alderson v Commissioner, 317 F 2d 790 (1963), at 793, citing Commissioner v Court Holding, 324 U S  331, at 333, 65 S Ct  707, at 708, discussed in more detail above.
[49] Alderson, 317 F.2d 790, at 794  Although see Carlton v United States, 385 F.2d 238 (5th Cir. 1967), wherein the Fifth Circuit held that the mere intent to effect a Code Sec  1031 exchange is not dispositive

40

()

ENB-DOJ-028337

# PRICEWATERHOUSE COOPERS ⯁

associated with INT's acquisition of the replacement property and undertook the title search. INT took a passive role in the negotiations, and did not actually receive title to the original property as it was conveyed immediately to a bank as trustee. The deed transfers occurred almost simultaneously.

The Commissioner contended that, in substance, the taxpayer had sold the original property to INT for cash, and used the cash to acquire the replacement property, as 1) the negotiations for the acquisition of the replacement property were, in actuality, conducted by the taxpayers, 2) there was no contractual interdependency between INT's acquisition of the replacement property and its purchase of the original property, and 3) that INT did not assume any of the benefits and burdens of ownership with respect to the replacement property; thus INT never owned the property.

While acknowledging that the transactions "were constructed for tax purposes",[50] the Court found that 1) the documents and agreements were not fictitious, but created legal obligations among the parties, 2) INT provided consideration for the purchase and assumed the risks of ownership, albeit for a brief period, despite the fact that title was held by a bank as trustee for INT, and held for the taxpayers.

In Biggs v. Commissioner ("Biggs"), 632 F.2d 1171 (5fth Cir. 1980), Biggs had two parcels of land ("original property") that he wishes to sell. Biggs met with a potential purchaser ("INT") to discuss the sale of the original property, and noted during the meeting that he would not agree to a deal unless he received property qualifying under the like-kind exchange rules as part of the consideration. INT issued a letter of intent ("LOI") setting further certain terms of the purchase but omitting the contemplated exchange of properties. Biggs informed INT that the LOI did not reflect the exchange, and INT verbally reiterated its agreement to cooperate with respect to replacement property. Shortly thereafter, Biggs located property suitable for an exchange (the "replacement property"). As initially drafted, the contract to purchase the replacement property was drawn up with Biggs, rather than INT, as the purchaser. The contract was amended to describe the purchaser as "Biggs (acting as agent for syndicate").[51] At signing, Biggs paid the sellers $13,900 in partial payment for the property. Because INT was unable to take title to the replacement property, Biggs transferred title to a title company ("S") controlled by his attorney. At this time, Biggs and S entered into an agreement pursuant to which either party could request at any time that the replacement property be transferred to Biggs for a purchase price equal to the costs advanced to acquire the property plus S' costs. The contract also provided that Biggs would release or cause S to be released "from any and all obligations which the latter has created, assumed or become bound, upon in its acquisition

---

[50] Rutland v. Commissioner ("Rutland"), 36 T.C. Memo 40 (1977)
[51] Biggs v. Commissioner, 632 F.2d 1171 (5th Cir. 1980), at 1172

41

()

PWC P1152

ENB-DOJ-028338

# PRICEWATERHOUSECOOPERS 🅐

and holding of title to said property."[52] The sale closed and S received title to the replacement property. To finance the purchase, Biggs loaned S sufficient funds in return for a note from S secured by the replacement property. S also assumed liabilities totaling $142,545 Biggs paid all of the closing costs.

Subsequently, S and INT signed an agreement pursuant to which S sold the replacement property to INT, and INT agreed to make certain payments to S and Biggs. The next day, Biggs and INT entered into a contract pursuant to which INT sold Biggs the replacement property in exchange for cash and an option to acquire the original property INT subsequently assigned the right to acquire the original property

S then transferred the replacement property to Biggs, who assumed certain liabilities pursuant to the transfer, including the note to himself. Two days later, INT's assignees exercised their right to acquire the original property, and Biggs sold the property to them. Both the transfer of the original and the replacement property closed on the same day.

While noting Biggs' intention to exchange property, the Commissioner argued that the transactions did not qualify as like-kind exchanges because 1) the purchaser of the original property, INT, never held title to the replacement property, 2) the transactions were, in substance, the sale by Biggs of the original property for cash, and 3) S acted as Biggs' agent, as Biggs would have received title to the property directly and not from INT

The Fifth Circuit held for Biggs, noting that 1) to qualify for like-kind exchange treatment, it is not an absolute prerequisite that an intermediary hold title to the replacement property,[53] 2) INT agreed to pay certain promissory notes secured by deeds of trust on the replacement property, 3) the documents imposed legal obligations and risks, 4) Biggs did not receive any cash payments until the transactions closed, 5) Biggs at all times expressed an intention to

---

[52] Id. at 1173

[53] Note that the Ninth Circuit addresses a similar, but not identical, issue with respect to title, in Starker v United States ("Starker"), 602 F.2d 1341 (1979) There, the taxpayers entered into an agreement pursuant to which they agreed to exchange nine parcels of land (the "original property") for property ("replacement property") a corporation ("INT") agreed to provide within 5 years of the agreement. With respect to several parcels, the taxpayer requested that the corporation convey title to the replacement property to his daughter, once the property was identified. The Ninth Circuit held that the taxpayer's request was tantamount to his never holding title to the property, effectively eliminating the taxpayer from the transaction. Noting that "the key to receiving nonrecognition treatment is maintaining continuity of title", and the lack of simultaneity of the transfers, the Ninth Circuit denied non-recognition treatment

As K-Pipe did not assign its rights to acquire the assets prior to the closing of the Stock Purchase Agreement, and as K-Pipe itself assumed certain liabilities associated with the sale, this case arguably is distinguishable from the Stock and Asset Purchase In any event, the vast weight of available precedent suggests that the Stock and Asset Purchases are factually similar to the other discussed above

42

0

PWC P1153

ENB-DOJ-028339

# PRICEWATERHOUSE COOPERS 🏢

exchange property, which INT acknowledged, and 6) Biggs did not contract to sell the original property until INT held the replacement property. Further, S was not an agent of Biggs, as S took title to the property as a principal.

The cases require:

1  that the taxpayer have originally intended to enter into a like-kind exchange;[54]
2. failure of the originally-negotiated property-for-cash transaction to close;
3. the existence of proper documentation supporting the transactions;
4. a lack of contractual interdependency between the sale and purchase contracts;
5. that cash flows follow the form of the transactions, such that the seller of the original property does not receive cash prior to consummating the acquisition of the replacement property; and
6. that the intermediate entity be at-risk, even if for a brief time.

However, they provide significant support for the taxpayer in three-party like-kind exchange transactions, offering considerable latitude, as:

1. the intermediate entities ("INTs") are not absolutely required to hold title of either the original or the replacement property,
2  the INTs may limit the exercise of their rights with respect to the properties to their disposition, rather than exercising other benefits and burdens of ownership;
3  the INTs may economically "cover" their transactions by negotiating a contract to sell the original property acquired while negotiating for its purchase,
4. the taxpayer and the third party ("TP") may join in the negotiation of meaningful terms of the contracts and attend the closing of transactions between the INTs and the TPs,
5. the negotiation and near-closing of transactions for different consideration but involving the same parties is not determinative; and
6  the payment by the taxpayers of certain costs associated with the purchase by INT of the replacement property from the TPs is not determinative.

### (2)  Analysis

It is difficult to ignore the similarities between the above cases and the Stock and Asset Purchases  However, it should be noted that the IRS may attempt to distinguish the cases from the Stock and Asset Purchases on the ground that they relate to a specific Code provision,

---

[54] Although *see* Carlton v  United States, 385 F 2d 238 (5th Cir  1967), wherein the Fifth Circuit held that the mere intent to effect a Code Sec. 1031 exchange is not dispositive

43

()

PWC P1154

ENB-DOJ-028340

# PRICEWATERHOUSECOOPERS ⓘ

enacted by Congress to carve-out a tax benefit for like-kind exchanges. Further, the cases could also be distinguished on the ground that they involve intermediate entities that acquire and resell similar property, rather than involving the purchase of stock and the sale of assets, a transaction which generally would not have qualified for like-kind exchange treatment. Nonetheless, if the IRS does not successfully distinguish the cases, they could provide substantial support for the parties to the Stock and Asset Agreements, who seek to have the substance of the transactions be recognized as following their form.

As compared to the like-kind exchange cases above,

1. With respect to intention, while Midcoast wished to acquire the Assets, and not the shares, of Bishop Group, it did not insist upon an asset purchase;
2. Like the cases, Midcoast's original negotiations with Langley did not result in a contract that closed (in fact, the negotiations did not even reach the contract-drafting stage),
3. Like the cases, the documentation of the Stock and Asset Purchases supports Midcoat's desired characterization of the transaction (Stock and Asset Purchase Agreements were executed),
4. The Stock and Asset Purchase Agreements do not contain interdependent terms  The Stock Purchase was not contingent upon the Asset Purchase, but would have closed regardless of the ultimate closure of the Asset Purchase. Had either purchase failed to close, the other purchase would have been adversely affecte *;[55]
5. Like the cases, Midcoast paid K-Pipe for the Assets and K-Pipe paid Langley for the shares. As was the case above, the cash flows were essentially simultaneous; and
6. Like the cases, K-Pipe was, and continues to be, at risk with respect to the shares it acquired and representations, warranties, and indemnifications it made to Langley and Midcoast.

As per the cases above,

1. K-Pipe held title to the Assets, but not for more than a day prior to their sale to Midcoast;
2. K-Pipe exercised its right as an owner to sell the Assets. However, the Stock and Asset Purchases present stronger factual arguments than do the cases as K-Pipe retained certain property, and continues to enjoy the benefits and burdens associated with ownership of this property;

---

[55] For a more detailed discussion of the interdependency prohibition inherent in like-kind exchanges, *see* Allen v Commissioner, T C Memo. 1982-188, in which the Tax Court held that two transactions ultimately resulting in taxpayers holding qualifying replacement property did not qualify for like-kind exchange treatment as the" failure of either transaction would have left the rights and obligations of the parties to the other transaction unaffected "

44

()

PWC P1155

ENB-DOJ-028341

# PRICEWATERHOUSECOOPERS 🏢

3. K-Pipe economically covered substantially all of its purchase of Bishop Group by selling the Assets to Midcoast almost immediately after their acquisition, although, unlike the cases, K-Pipe did not fully cover its risk as it retained certain liabilities.

4. While Midcoast attended several meeting at which K-Pipe negotiated the terms of the Stock Purchase, they did not negotiate these terms themselves - K-Pipe did, and thus the Stock and Asset Purchases present stronger factual arguments than the like-kind cases (here, Rutland); and

5. Midcoast did not pay any of K-Pipe's costs associated with the Stock Purchase. As such, the Stock and Assets Purchases present stronger facts than the cases above.

Thus, if the like-kind exchange cases are not distinguished, they should provide compelling support for the conclusion that the substance of the Stock and Asset Purchases should mirror their form. The cases provide some of the only "on point" guidance for multi-party transactions where the parties are not subject to common control, and reflect the commercial realities associated with such circumstances. Indeed, the cases should not be distinguished as the fundamental factors on which the conclusions were reached are not unique to, or based on, the theories underlying the like-kind exchange rules. Rather, few of the cases involved the fundamental issue raised in such cases: if the replacement property is sufficiently similar to the original property to be treated as "like-kind". As such, it is more likely than not that the cases are not distinguishable and can be relied upon as support for Midcoast's desired characterization of the Stock and Asset Purchases.

45

0

**MIDCOAST ENERGY RESOURCES, INC.**

**BOARD OF DIRECTORS MEETING**

**February 24, 2000**

---

ATTENDANCE:      I. J. Berthelot II (*)              Bruce Withers (*)
                 Richard N. Richards (*)           Ted Collins (*)
                 Dan C. Tutcher (*)                Richard Robert
                 Curtis Dufour (*)                 Duane S. Herbst
                 (*) Members

I.    CALL TO ORDER

      The meeting was called to order at 11:45 p.m. by Chairman Dan C. Tutcher. All members of the Board were present. Also present were Duane S. Herbst, Vice President of Corporate Affairs and Secretary, and Richard Robert, Chief Financial Officer and Treasurer.

II.   MINUTES

      The reading of the prior meetings' minutes was waived and it was moved and seconded that, subject to the amendment proposed by Mr. Richards, the minutes from the Board meetings on August 11, November 8, November 17 and December 1, 1999 be accepted, which was unanimously approved. Mr. Withers noted that minutes from the October 7 meeting were omitted. Mr. Herbst apologized and will include these for approval at the next meeting.

III.  CORPORATE MATTERS

      A.    Stock Offering

      Mr. Herbst informed the Board that while the pricing of the December stock offering was disappointing, there was a very positive response from both old institutional shareholders as well as several new institutions. Among the new institutions was Wedge Capital, which is based in North Carolina, and who was the largest buyer, purchasing 250,000 shares. Another new buyer was J. W. Seligman which bought a large block of stock, and has since added to their position.

      B.    Restructure Costs

      A schedule reflecting the salary cost savings as compared to the cost of the restructuring were reviewed. Discussion followed on the positive and negative results since the restructuring.



GOVERNMENT EXHIBIT

168

PENGAD-Bayonne, N. J.

MID 1.1-12

ENB-DOJ-001114

Mr. Withers asked about the status of the budget and it was reported that this will not be ready for review for another 3-4 months since we were having to start from scratch in the budget process.

C.    Credit Facility

Mr. Robert advised that we are in the process of increasing our credit facility. Availability under the facility is currently $265 million and $250 million is currently borrowed. This leaves very little flexibility for financing future transactions. Due to the December equity offering we have the ability to increase the facility to the $300 million range.

He also reviewed for the Board that there are $65 million of interest rate swaps in place which gives us a 7.45% blended interest rate.

D.    Insurance Coverage

Mr. Robert informs the Board that as discussed at the earlier Board meeting, the Umbrella Liability Coverage has been increased from $65MM to $100MM at a cost of $60,000 for two years.

E.    Miscellaneous

Mr. Tutcher noted that a focus of his was to review our acquisition thought process and financing alternatives. At Midcoast's current equity prices it can not be competitive because the acquisition targets are selling for higher multiples than our stock. Evaluations of high yield debt, master limited partnerships, convertible equity and non-recourse project financing have been explored, but strong alternatives have not been identified.

Mr. Richards noted that Boeing has moved to utilizing EVA for project evaluations and will provide templates for management to review. Discussion followed on the pros and cons of EVA.

IV.  ANNUAL MEETING

Mr. Herbst advised that the Proxy Statement will need to be mailed out by the middle of April and he proposed a March 31 record date for the Annual Meeting. A date of May 16th was set for the next Board of Directors meeting in Houston, which was also set for the Annual Meeting of Stockholders.

The Board approved the nominations of Messrs. Tutcher, Berthelot, Dufour, Collins, Richards and Withers for re-election to the Board and approved an

2

**MID 1.1-13**

ENB-DOJ-001115

amendment in the 1996 Incentive Stock Plan to increase the shares authorized for issuance under the plan to 1,000,000 shares. Both items will be placed for vote by the shareholders at the meeting.

Discussion followed on increasing the size of the Board, but no action was taken. It was also noted that the increase in shares for the incentive plan still left the company within the generally accepted range for incentive shares as compared to outstanding shares.

IV.    NEW BUSINESS

A.    Corporate Focus (Big 5)

Mr. Tutcher informed the Board that he has developed five key issues which are the immediate focus for himself and the Company.  These are:

1.    Mr. Tutcher and Mr. Robert will find a reasonable, functional, and logical way to finance the Company in the future, some of which was discussed earlier in the meeting.

2.    Follow through with the restructuring program to make sure the savings are realized and there is sufficient follow-through.

3.    Mr. Tutcher will personally be negotiating the Kansas Pipeline rate case settlement.

4.    The Company will continue to aggressively pursue the new co-generation facilities along the MIT system.

5.    Seek to fully rationalize the value of the Anadarko system through expansion, joint venture or sales. Mr. Tutcher noted that Anadarko is throwing off a lot of money and it is an asset that the Company can do without given the right situation.

B.    WFF Acquisition (Canada)

The Western Facilities Fund includes the Nevis gas plant and a crude oil pipeline, both located in Canada.  The pipeline is fully regulated and has a $6-7 million cash flow. Nevis is the only sour gas plant in 3,600 miles and is the largest in British Columbia.  The two assets have a $17-18 million cash flow. The market capitalization on the Canadian market for the outstanding WFF units is about $65 million with $25 million in debt (Canadian).  Mr. Tutcher advised this acquisition is only under consideration at this time and wanted to keep the Board members updated.

3

MID 1.1-14

ENB-DOJ-001116

C.     <u>Delta Terminals</u>

PriceWaterhouse brought this prospect to the Company. The company is private and should sell for approximately $100 million. It is owned 80% by Citicorp and 20% by individuals.

Its primary assets are terminals in New Orleans and Cincinnati and the biggest positive in the deal is that Citicorp would be willing to take stock, thus helping Midcoast from a balance sheet and financing standpoint. The big question is whether terminaling is a business Midcoast wants to pursue. Discussions are very preliminary and the Board will be kept informed.

IV    <u>OLD BUSINESS</u>

A.     <u>Seacrest</u>

Mr. Berthelot noted that the SeaCrest assets were performing as projected. He is currently negotiating an arrangement with the SeaCrest principals such that new deals will be on a "heads-up" basis. The two principals will become Midcoast employees. We are, however, far apart on the price to buy them out of the joint venture.

B.     <u>Canada</u>

It was reported that the Probe acquisition continues to perform below projections. Probe remains in severe financial trouble and due to this, the field has still not been developed as projected.

Mr. Collins left the meeting at this point.

Mr. Berthelot reviewed the Provost purchase which, due to several last minute changes, closed with a projected 9% rate of return. He noted this was below what was originally projected, however, we felt we were committed to proceed and close the deal because TransCanada had jumped through hoops to get everything we demanded and it was not worth jeopardizing the relationship. Also we remain excited about the prospects for the area.

He further noted Manyberries should close in late March and currently we are evaluating 14 plants being divested from TransCanada which we will have a chance to look at on a negotiated basis.

<div align="center">4</div>

<div align="right">**MID 1.1-15**</div>

ENB-DOJ-001117

C.    <u>MIT Cogen Update</u>

     Mr. Berthelot reported that Calpine has reached agreement with Solutia for their cogeneration project. We are negotiating to lay a 52 mile pipeline at a cost of about $22 million. The 20 year firm commitment would be 100 MMCF/day with a swing load up to 138 MMCF/day. He is currently negotiating for a $.09 per mcf rate. Mr. Berthelot reviewed his evaluations which reflected an 11% rate of return. He noted that after 20 years the rate goes to $.04, or we can force them to buy the pipeline at the depreciated book value. He noted we will save money utilizing existing right of way which should amount to $800M to $2MM in savings off the estimate. Other upside includes loads over the 138 MMCF/day swing volumes and marketing potential. This protects our territory and the main competition is Calpine laying the line themselves, but they cannot match our cost.

     He also reviewed the fact that Calpine would likely get the Amoco cogeneration project which would require Midcoast to lay a larger pipe. He reviewed his Case #2 that evaluated this option. After discussion the project was unanimously approved.

D.    <u>Kansas Pipeline</u>

     Mr. Robert reported that in January we terminated the project development agreement with Mr. Langley. Mr. Tutcher reviewed for the Board that we had elected to eliminate this agreement at the last minute prior to closing the KPC purchase. We negotiated a $13.75 million increase in the purchase price with $3 million paid at closing and the other $10.75 million to be paid anytime before January 31. This could be paid in stock and/or cash or a combination. We presented him with several options as far as stock was concerned but he wanted a bigger discount than we were willing to give. We eventually paid in all cash.

     Mr. Tutcher advised that the rate case is still pending. There have been many delays, but all data that has been requested by the F.E.R.C. has been supplied in a timely fashion. We have also agreed not to implement the new rates for the current time. He still feels that the rate case can be settled in the very near future.

E.    <u>Midla-Exxon Processing Expansion Update</u>

     Mr. Berthelot advised right of way is being bought and he expects to be finished this summer.

MJD 1.1-16

ENB-DOJ-001118

F.    Guanajuato

Mr. Tutcher advised that we are still negotiating with General Motors. He noted that TransCanada has announced it is pulling out of Mexico. Tejas & Kinder Morgan are also apparently selling out. This means the only active company in Mexico is El Paso. Due to this, our position to capture not only General Motors, but also the LDC is much better.

G.    Anadarko Look-Back

Mr. Robert briefly reviewed the Anadarko look-back analysis distributed to the Board. He advised that there was a small error in the analysis, but revenue and expenses were fairly accurate. He noted volumes were lower than estimated, primarily because the anticipated drilling did not occur, but this had been offset by dramatically improved processing margins.

H.    Bazor Ridge

Mr. Berthelot informed the Board that we were never able to close this deal and the producer is building the plant on his own. We were never comfortable with the reserves and demanded a guarantee which we could never reach agreement on.

I.    East Tennessee/Sea Robin Wrap-Up

Mr. Tutcher advised we could not justify the final price which East Tennessee sold for and it was sold to Duke. We also backed out of the Sea Robin bid process.

VII.   FINANCIAL REVIEW

Mr. Robert reviewed the revised financial results for the past quarter and answered questions from the Board on the past quarter as well as the outlook for the beginning of 2000. He noted that the quarter was very strong. KPC had been earnings neutral, but $.10 accretive to cash flow. In looking ahead he warned we are very interest rate sensitive. He also reviewed the debt compliance ratios.

VIII.  ADJOURNMENT

There being no further business it was moved and seconded that the meeting be adjourned. Mr. Tutcher adjourned the meeting at 2:30.

Respectfully Submitted,

Duane S. Herbst, Secretary

6                                    **MID 1.1-17**

ENB-DOJ-001119

Fortrend International                    212 826 0077          07/10/00 12:02P   P.001

# FORTREND INTERNATIONAL

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Gary Wilcox | Jeffrey Furman |
| COMPANY: | DATE: |
| | JULY 10, 2000 |
| FAX NUMBER: | TOTAL NO. OF PAGES INCLUDING COVER: |
| 202-414-1301 | 4 |
| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
| RE: | YOUR REFERENCE NUMBER: |

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

NOTES/COMMENTS:

750 LEXINGTON AVENUE  NEW YORK, NY 10022  212.826.0770(P)  212.826.0077(F)

JUL 10 '00 12:50                              212 826 0077      PAGE.01

GOVERNMENT
EXHIBIT

176

**PWC 056**

ENB-DOJ-010754

F O R T R E N D

I N T E R N A T I O N A L

July 10, 2000

PricewaterhouseCoopers, LLP
1301 K Street NW
Suite 800W
Washington, DC 20005-3333

Ladies and Gentlemen:

We are providing you with the following representations with the knowledge and understanding that you will be relying on them in connection with your engagement by Midcoast Energy Resources, Inc.[1]

After due inquiry and investigation (including assurances from K-Pipe Holdings Partners, L.P., K-Pipe Merger Corporation, and their affiliates, collectively referred to hereafter as "K-Pipe"), we hereby certify and represent that the following statements are true with respect to the transactions described in (i) the Stock Purchase Agreement dated as of October 25, 1999, between K-Pipe Merger Corporation and Dennis Langley ("Langley") (the "Stock Purchase Agreement"), and (ii) the Asset Purchase Agreement, dated as of November 5, 1999, between K-Pipe Merger Corporation and Midcoast Energy Resources, Inc., Midcoast Kansas Pipeline, Inc., and Midcoast Kansas General Partner, Inc. (collectively, "Midcoast") (the "Asset Purchase Agreement"):

1. Founded in 1995, Fortrend International LLC ("Fortrend") is an investment bank that has acted as a consultant or assisted as investment banker in mergers and acquisitions that have ranged in size from $5 million to in excess of $1 billion.

2. Fortrend ordinarily consummates its transactions through special purpose vehicles. In this case, K-Pipe Holdings Partners, L.P. was formed, which in turn created K-Pipe Merger Corporation, to purchase the stock of Bishop Group.

3. Midcoast and its representatives did not at any time authorize Fortrend International LLC ("Fortrend") or any of its principals or representatives to act (or to cause K-Pipe or any other person to act) on Midcoast's behalf in any discussions with Langley.

---

[1] All references to a party include references to the authorized representatives of that party, unless indicated otherwise.

C:\My Documents\Fortrend Repr Ltr.doc1.doc

FORTREND INTERNATIONAL LLC

38TH FLOOR

NEW YORK, NY 10022

TEL · (212) 826-0770 · FAX · (212) 826-0077

NEW YORK · ATLANTA · SAN FRANCISCO · DELRAY BEACH · MELBOURNE

PWC 057

ENB-DOJ-010755

2. Fortrend ordinarily consummates its transactions through special purpose vehicles. In this case, K-Pipe Holdings Partners, L.P. was formed, which in turn created K-Pipe Merger Corporation, to purchase the stock of Bishop Group.

3. Midcoast and its representatives did not at any time authorize Fortrend International LLC ("Fortrend") or any of its principals or representatives to act (or to cause K-Pipe or any other person to act) on Midcoast's behalf in any discussions with Langley.

4. K-Pipe Holdings Partners, L.P. negotiated both the Stock Purchase Agreement and the Asset Purchase Agreement solely on behalf of K-Pipe as a principal, with due regard for K-Pipe's own rights, liabilities and obligations thereunder. In negotiating the purchase price for Langley's stock in the The Bishop Group, Ltd., K-Pipe Holding Partners, L.P. acted solely on behalf of K-Pipe.

5. K-Pipe was liable for the debt it incurred to purchase the stock of The Bishop Group, Ltd., and no other person was liable therefor.

6. The third party financing provided to K-Pipe in connection with its acquisition of the Bishop Group, Ltd. stock was not made in reliance on Midcoast's assets or solvency.

7. The stock of The Bishop Group, Ltd. purchased by K-Pipe was (and continues to be) subject to the claims of K-Pipe's creditors.

8. Neither Fortrend nor K-Pipe has ever been, nor will either of them be, held out as Midcoast's agent or representative in any dealings with third parties.

9. Neither Fortrend nor K-Pipe holds itself out as being engaged in the business of being an agent with respect to transactions between unrelated third parties, and is not regularly engaged in the business of being an agent with respect to transactions between unrelated third parties.

10. K-Pipe's business purpose in entering into the Stock Purchase Agreement and the Asset Purchase Agreement was to make a profit by buying the stock of The Bishop Group, Ltd. and maximizing the value of the company's assets, including the sale of certain assets, such as partnership interests held by Bishop Pipeline Company and Syenergy Pipeline Company, L.P.

11. K-Pipe has no plan or intention to liquidate The Bishop Group, Ltd. after the consummation of the transactions contemplated by the Asset Purchase Agreement.

C:\My Documents\Fortrend Repr. Ltr.doc1.doc

**PWC 058**

ENB-DOJ-010756

12. Midcoast agreed to pay certain entities owned by K-Pipe for certain assets, including partnership interests. Midcoast did not pay any other amounts or fees to Fortrend, K-Pipe, or any of their affiliates.

13. There are no agreements or understandings between Midcoast and either Fortrend or K-Pipe other than those set forth in the Asset Purchase Agreement and documents references therein.

The undersigned will promptly notify PricewaterhouseCoopers LLP if any of the above representations or covenants cease to be accurate and complete.

Very Truly Yours,

Fortrend International LLC

By: _____

Name: JEFFREY FURMAN

Title: Co-CHAIRMAN

C:\My Documents\Fortrend Repr, ltr doc1.doc

JUL 10 '00 12:51                                    212 826 0077      PAGE.04

**PWC 059**

ENB-DOJ-010757



**kasey.dunn@us.pwc** **global.com**

10/22/2002 08:44 PM

To: ken.lanik@enbridge-us.com, jana.jordon@enbridge-us.com
cc: niloufar.molavi@us.pwcglobal.com, robert.h.whitten@us.pwcglobal.com
Subject: Enbridge Conference Call, Wednesday, October 23

Ken:

As you have requested, we have scheduled a conference call for Wednesday, October 23rd, at 4:30pm regarding the Midcoast transaction.  The call in information is as follows:

U.S. Dial-in-Number :     1-877-214-5010
Participant Code:     806770

Please let me know if this time does not work for you or Jana.  If you have any questions, please call me at 713-356-4520.

Best regards,

Kasey

---

PWC involvement
   Gary Wilcox (M&A) ; Tom Palmisano involved
   Suggested structure ; introduced intermediary.

2/2001 met ; determined no disclosure was
   required in 2001 T/R.
Oct 2002 IRS required PWC to disclose advisor
   status for transactions ; tax payers ; dates ;
     name (MEPI)
     EIN   76 037 638
     11/9/99
   that relate to N 2001-16

*but why was this trans considered similar??*

Sent in Oct 17th ! (Thurs)
audit ptnr didn't call Mark until Oct 21 (Mon)

Niloufar to set up call w/ atty who made decision,
but contridiction by PWC remains.

GOVERNMENT
EXHIBIT
G-177

ENB 008466

# PRICEWATERHOUSECOOPERS 🏢

PricewaterhouseCoopers LLP
Suite 2900
1201 Louisiana Street
Houston  TX 77002-5678
Telephone   (713) 356 4700
Facsimile    (713) 356 4717

February 3, 2003

Ms. Jana Jordan
Enbridge Energy Company, Inc.
1100 Louisiana, Suite 3300
Houston, Texas 77002

Dear Jana:

I am writing you in response to your letter dated December 11, 2002 requesting certain
information relating to the 1999 acquisition by Midcoast Kansas Pipeline, Inc. and Midcoast
Kansas General Partner Inc. ("Midcoast") of certain assets from K-Pipe Merger Corporation
("K-Pipe"). Below I have included your request and PwC's response.

1.  Enbridge Request: "Copies of (a) the IRS summons served on
    PricewaterhouseCoopers LLP ("PwC") pursuant to which you furnished information
    about Midcoast and the Transaction and (b) PwC's response to the summons."

    PwC Response: The IRS summons and the redacted version of the PwC response to
    the summons was faxed to your attention on January 29, 2003. Please let me know if
    you have not received that information.

2.  Enbridge Request: "Any information PwC has regarding whether any party, including
    for example PwC or Fortrend International LLC ("Fortrend") (or affiliates of either),
    registered this Transaction as a tax shelter under section 6111."

    PwC Response: We are confirming that PwC has not registered this transaction as a
    tax shelter under section 6111. However we have no information as to whether any
    party, including Fortrend or any of its affiliates, have registered this Transaction as a
    tax shelter under section 6111.

3.  Enbridge Request: "All files and records possessed by PwC, including e-mails, work
    papers, correspondence memoranda, typed or handwritten notes, and computer-
    readable data compilations, relating in any way to the Transaction, whether or not
    prepared by PwC."

    PwC Response: In the above request you have asked for work papers that we may
    have in our possession related to both the asset purchase by Midcoast as well as the
    prior stock purchase of Bishop Group, Ltd. by K-Pipe. We are unable to provide you
    with any work papers that we may have related to the stock purchase of Bishop Group,

GOVERNMENT
EXHIBIT
G-178

ENB  008531

# PRICEWATERHOUSE(COOPERS 🅟

Ltd. by K-Pipe. Those work papers are confidential client records of Fortrend and unless we receive a waiver from them we cannot release that information to you.

With regard to Midcoast work papers, we are in the process of gathering all the records you have requested. Please note that we have limited our search to our tax work papers and information in possession of individuals in our tax practice who were involved in the transaction. We have not compiled any information that may be included in our audit work papers related to this transaction. In order to expedite getting you at least some of these work papers now, I am enclosing certain documents that we have compiled with this letter. In the next few weeks I will be sending you any other work papers that we have in our possession with regard to the Midcoast acquisition.

4. Enbridge Request: "Any information regarding Fortrend, including information about its current operations and status and current contact information for Craig Hoffman and Jeffrey Furman."

PwC Response: We have no current information on Fortrend or current contact information for Craig Hoffman and Jeffrey Furman.

5. Enbridge Request: "You also agreed to check with John Monaco to see if any PwC clients have been notified that the IRS intends to examine a transaction the IRS claims is described in, or substantially similar to one described in, Notice 2001-16. We of course are not asking for the name(s) of such clients, just whether there are any under audit, or about to be audited."

PwC Request: We have contacted John Monaco and he is in the process of gathering the latest information available. I will be contacting you to arrange for a conference call with John in the near future.

If you have any questions regarding the information provided, please do not hesitate to contact me at (713) 356-6002.

Sincerely,

*Niloufar Molavi*

Niloufar Molavi

Enclosures – As stated

cc:     Wanda Opheim – without enclosures

**ENB 008532**

(2)

To.     James Lee <jlee@midcoastenergy.com>, Janice Warren
        <jwarren@midcoastenergy.com>
cc:     Greg Montgomery <gmontgomery@midcoastenergy.com>, John Espiau
        <jespiau@midcoastenergy.com>, "Patrick Delaney (E-mail)"
        <patrick.m.delaney@bankofamerica.com>, Chris Kaitson
        <ckaitson@midcoastenergy.com>, Don Whittington
        <dwhittington@midcoastenergy.com>, Thomas J
        Palmisano/US/TLS/PwC@Americas-US, Jeff Weiner
        <jweiner@midcoastenergy.com>
From:   Richard Robert <rrobert@midcoastenergy.com>
Date:   11/07/2000 12:35:21 PM EST
Subject: Butcher Partnership


I just got off the phone with Jeff Furman at K-Pipe and he has requested
that we buy him out of the Butcher partnership.  MidLouisiana Gas Company
will buy him out at 89% of his original capital account which equals
$244,750 ($275,000 x 89%).  this should be done effective November 9, 2000
Concurrent with buying their 55% interest (which will give MIDLA 100%
ownership), we will payoff the $6.1 million Butcher Partnership debt.  MERI
will borrow the money and provide MIDLA an intercompany loan (Tom/Jeff -
should the loan be set up between an entity other than MERI?)
The Butcher debt needs to be paid off on the Nov. 9 (James please confirm in
Butcher loan agreement, it may be the 10th) and Jan can make the requisite
borrowing notices with B of A.

PWC 046

GOVERNMENT
EXHIBIT
183
PENGAD-Bayonne, N. J.

ENB-DOJ-010744

Chris Kaitson will draft the assignment today and get K-Pipe to sign. Any questions please let me know.

---

The information transmitted is intended only for the person or entity to which
it is addressed and may contain confidential and/or privileged material. Any
review, retransmission, dissemination or other use of, or taking of any action
in reliance upon, this information by persons or entities other than the
intended recipient is prohibited.   If you received this in error, please
contact the sender and delete the material from any computer.

**PWC 047**

ENB-DOJ-010745

—— Forwarded by Thomas J Palmisano/US/TLS/PwC on 12/08/2004 11:02 AM ——



**Chris Kaitson**
&lt;ckaitson@midcoastenergy
.com&gt;

11/07/2000 04:00 PM

To   Richard Robert &lt;rrobert@midcoastenergy.com&gt;, Jeff Weiner
     &lt;jweiner@midcoastenergy.com&gt;
cc   Thomas J Palmisano/US/TLS/PwC@Americas-US

Subject   RE: Butcher Partnership

---

I have talked with Tom Palmisano and based on his recommendation:

Midcoast Gas Marketing will loan to Midla an amount equal to
      (1) the purchase price of the K-pipe partnership interest, plus
      (2) payoff amount of Butcher Partnership loan to bank.
MERI should also make a capital contribution to MGM in the same amount as
the loan to Midla.
Effective date of all this to be 11-9-00, the date of acquisition of the
partnership interest.

If this is not correct, let me know.

Chris K.


——Original Message——
From: thomas.j.palmisano@us.pwcglobal.com
[mailto:thomas.j.palmisano@us.pwcglobal.com]
Sent: Tuesday, November 07, 2000 1:31 PM
To: Richard Robert
Cc: Jeff Weiner; Chris Kaitson
Subject: Re: Butcher Partnership


The note should go through our intercompany finance company, Midcoast Gas
Marketing, Inc.  MERI should capitalize MGM and MGM should create a note to
Midla Gas (11%).  This is consistent with our other notes. We will have to
file
a final return for the year ending Nov 9, 2000.

Call me if you have any questions.
tip.

To:   James Lee &lt;jlee@midcoastenergy.com&gt;, Janice Warren
      &lt;jwarren@midcoastenergy.com&gt;
cc:   Greg Montgomery &lt;gmontgomery@midcoastenergy.com&gt;, John Espiau
      &lt;jespiau@midcoastenergy.com&gt;, "Patrick Delaney (E-mail)"
      &lt;patrick.m.delaney@bankofamerica.com&gt;, Chris Kaitson
      &lt;ckaitson@midcoastenergy.com&gt;, Don Whittington
      &lt;dwhittington@midcoastenergy.com&gt;, Thomas J
      Palmisano/US/TLS/PwC@Americas-US, Jeff Weiner

GOVERNMENT
EXHIBIT
184

PENGAD-Bayonne, N.J.

Previously produced
as PWC 393

**PWC P1407**

ENB-DOJ-028196

| To: | Jennifer Sholes/US/TLS/PwC@Americas-US |
|---|---|
| cc: | |
| From: | Thomas J Palmisano/US/TLS/PwC |
| Date: | 02/14/2001 02:25:40 PM |
| Subject: | RE: Butcher Partnership |

Here's the info.
tjp

| To: | Thomas J Palmisano/US/TLS/PwC@Americas-US |
|---|---|
| cc: | |
| From: | Chris Kaitson <ckaitson@midcoastenergy.com> |
| Date: | 11/07/2000 03:06:25 PM EST |
| Subject: | RE: Butcher Partnership |

To be sure I understand: The purchase price is $244,750. One note from
MERI to MGM dated Nov. 9 in the amount of $244,750 @ 11% for ____ years, and
one note from MGM to Midla same date, for the same amount, same interest
rate and same years.

Chris Kaitson

——Original Message——
From: thomas.j.palmisano@us.pwcglobal.com
[mailto:thomas.j.palmisano@us.pwcglobal.com]
Sent: Tuesday, November 07, 2000 1:31 PM
To: Richard Robert
Cc: Jeff Weiner; Chris Kaitson
Subject: Re: Butcher Partnership


The note should go through our intercompany finance company, Midcoast Gas
Marketing, Inc. MERI should capitalize MGM and MGM should create a note to
Midla Gas (11%). This is consistent with our other notes. We will have to
file
a final return for the year ending Nov 9, 2000.

Call me if you have any questions.
tjp

| To: | James Lee <jlee@midcoastenergy.com>, Janice Warren <jwarren@midcoastenergy.com> |
|---|---|
| cc: | Greg Montgomery <gmontgomery@midcoastenergy.com>, John Espiau <jespiau@midcoastenergy.com>, "Patrick Delaney (E-mail)" <patrick.m.delaney@bankofamerica.com>, Chris Kaitson <ckaitson@midcoastenergy.com>, Don Whittington <dwhittington@midcoastenergy.com>, Thomas J Palmisano/US/TLS/PwC@Americas-US, Jeff Weiner <jweiner@midcoastenergy.com> |
| From: | Richard Robert <rrobert@midcoastenergy.com> |

Previously produced
as PWC 396

**PWC P1408**

ENB-DOJ-028197

—— Forwarded by Thomas J Palmisano/US/TLS/PwC on 01/27/2003 08:50 PM ——



**Gary B. Wilcox**          To: Robert H. Whitten/US/TLS/PwC@Americas-US, Thomas J
01/18/2001 06:06 PM              Palmisano/US/TLS/PwC@Americas-US
cc:
Subject: IRS warning on "Midco" transactions

Do we really have to issue that opinion? Just kidding. I have Ian's signoff and can send an unsigned version to Richard along with the Midcoast representation letter for his signature. The opinion and representation letter will have to be dated as of the closing date. Any thoughts?
———————— Forwarded by Gary B. Wilcox/US/TLS/PwC on 01/18/2001 06:44 PM ————————

Dick Ruge
01/18/2001 05:00 PM

To:       WNTS IP
cc:       Stephanie B. O'Neill/US/TLS/PwC
Subject:  IRS warning on "intermediary transactions" (Notice 2001-16)

——————— Forwarded by Dick Ruge/US/TLS/PwC on 01/18/2001 05:02 PM ———————

| | **IRS warning on "intermediary transactions" (Notice 2001-16)** |
|---|---|
| **PRICEWATERHOUSECOOPERS** 🅰 WNTS Tax Developments WNTS Alert **"For Internal Use Only"** | Dick Ruge, 01/18/2001 |



Call the following WNTS professionals for more information : Mark Boyer at 202 414.1629 or other members of the WNTS M&A Group



GOVERNMENT EXHIBIT
186

*Overview*

The IRS has warned **(Notice 2001-16)** that it may challenge the purported tax benefits of certain "intermediary transactions" that are being marketed to taxpayers "for the avoidance of federal income taxes." The Notice also alerts taxpayers and taxpayer representatives of responsibilities relating to their participation in such transactions.

A transaction that is the same or substantially similar to the transactions described in Notice 2001-16 is considered a "listed transaction" for purposes of Temp. Regs. Sec. 1.6011-4T(b)(2) and also may be subject to the tax shelter registration and list maintenance requirements under the Section 6111 and 6112 regulations.

*Intermediary transactions*

The IRS states that these transactions generally involve four parties: seller (X) who desires to sell stock of a corporation (T), an intermediary corporation (M), and buyer (Y) who desires to purchase the assets (and not the stock) of T. Pursuant to a plan, the parties undertake the following steps. X purports to sell the stock of T to M. T then purports to sell some or all of its assets to Y. Y claims a basis in the T assets equal to Y's purchase price. Under one version of this transaction, T is included as a member of the affiliated group that includes M, which files a consolidated return, and the group reports losses (or credits) to offset the gain (or tax) resulting from T's sale of assets. In another form of the transaction, M may be an entity that is not subject to tax, and M liquidates T (in a transaction that is not covered by Section 337(b)(2) or Treas. Regs. Sec. 1.337(d)-4), resulting in no reported gain on M's sale of T's assets.

The IRS may challenge these transactions on the grounds that (1) M is an agent for X, and consequently for tax purposes T has sold assets while T is still owned by X; (2) M is an agent for Y, and consequently for tax purposes Y has purchased the stock of T from X; or (3) the transaction otherwise is properly recharacterized (e.g., to treat X as having sold assets or to treat T as having sold assets while T is still owned by X). Alternatively, the IRS may examine M's consolidated group to determine whether it properly may offset losses (or credits) against the gain (or tax) from the sale of assets.

*Penalties*

The IRS states that participants and promoters of such transactions may be subject to the accuracy-related penalty under Section 6662, the return preparer penalty under Section 6694, the promoter penalty under Section 6700, and the aiding and abetting penalty under Section 6701.

© 2000 PricewaterhouseCoopers LLP All Rights Reserved.

Last update by: Dick Ruge    Date: 01/18/2001



cc:
From:       Richard Robert <rrobert@midcoastenergy com>
Date:       01/26/2001 09:13:41 AM EST
Subject:    Re: Marlin

---

That being the case we should discuss any further work before it is done.

---

Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

----- Forwarded by Thomas J Palmisano/US/TLS/PwC on 01/27/2003 08:50 PM —

  **Dennis R. McErlean**          To:  Robert H. Whitten/US/TLS/PwC@Americas-US
01/26/2001 12.32 PM          cc:  Gary B. Wilcox/US/TLS/PwC@Americas-US, Thomas J
                                  Palmisano/US/TLS/PwC@Americas-US
                            Subject:  Re: Midcoast Energy -- Disclosure Requirement for Midco Transaction

Gary,

I got your phone message and understand the issue.  My thought is that, although the Notice may require a disclosure of the 1999 transaction on 2000 filings even through the return is already filed, that makes little sense  Since the transaction is facts and circumstances sensitive (as Bob touches on below), perhaps we can take a more liberal view here.  I agree with Bob's recommendation for further internal discussion.  Although I haven't been close to Richard in quite some time, I would guess that he'll ask if we've considered every conceivable way to prevent these disclosures.

Dennis

Robert H. Whitten

       Robert H. Whitten
                           01/25/2001 06 59 PM

To        Gary B  Wilcox/US/TLS/PwC
cc:       Thomas J Palmisano/US/TLS/PwC@Amencas-US, Dennis R. McErlean/US/TLS/PwC@Americas-US
Subject.  Re: Midcoast Energy -- Disclosure Requirement for Midco Transaction

Gary, I think we need to be very sure of our answer here before we talk to Richard.  Could there a basis for distinguishing based on  substance of MERI's transaction?   My recommendation that we do an internal conf call first.  Nature and extent of disclosure under  reg below would also need to be understood.   Rhw

To:         Robert H. Whitten/US/TLS/PwC@Americas-US, Thomas J
            Palmisano/US/TLS/PwC@Americas-US, Dennis R.
            McErlean/US/TLS/PwC@Americas-US
cc:
From:       Gary B. Wilcox/US/TLS/PwC
Date:       01/25/2001 06 16.49 PM EST
Subject:    Midcoast Energy -- Disclosure Requirement for Midco Transaction

I understand that the disclosure requirement for "listed transactions" applies retroactively to transactions



GOVERNMENT
EXHIBIT
137
PENGAD-Bayonne, N.J.

PWC P1011

ENB-DOJ-028205

that become listed after the tax shelter regulations were issued on February 28, 2000.  Specifically, if a transaction becomes a listed transaction after the taxpayer has filed its return for the first taxable year for which the transaction affected the taxpayer's liability, a disclosure statement must be filed with the taxpayer's return that is next filed after the date the transaction becomes a reportable transaction.  Treas. Reg. section 1.6011-4T(d)(2).

Midcoast's transaction closed in November, 1999, before the tax shelter regs were issued.  Presumably, Midcoast already has filed its 1999 return.  I understand that because of the recent Notice 2001-16, Midcoast is required to disclose the 1999 transaction on its 2000 return whenever it is filed, as well as file the National Office disclosure.

I will get the opinion done so that it is ready to send in unexecuted form, along with the Midcoast letter, no later than Monday, and I would like to alert Richard at that time as to the disclosure requirement.  Would you prefer to talk to Richard first?  In the meantime, I will confirm with our risk management group that my interpretation of these rules is correct.

----- Forwarded by Thomas J Palmisano/US/TLS/PwC on 01/27/2003 08:50 PM -----



| | | |
|---|---|---|
| **Richard Robert** <rrobert@midcoastener gy.com> 07/16/2001 12:04 PM | To: | Thomas J Palmisano/US/TLS/PwC@Americas-US, Gary B Wilcox/US/TLS/PwC@Americas-US |
| | cc: | |
| | Subject: | RE: Midcoast Representation Letter and PwC Opinion |

Gentlemen,
Better late than never.  I have reviewed the opinion and rep letter and have one concern  On page 7 of the rep letter it suggests that the payment of the $10.75 million for extinguishment of the Project Development Agreement would not result in additional purchase price for the Assets.  Tom needs to

PWC P1012

ENB-DOJ-028206

confirm the treatment for tax purposes, but for book purposes the $10.75 million payment WAS classified as additional PP&E. Expensing it was not an option for book purposes as it would have killed our earnings.
Also, while it was not a forgone conclusion that we were going to buy Fortrends 55% interest in the Butcher Partnership, we did buy it approximately one year after the transaction close at a reduced price.
These are my only comments. Let me know how you wish to proceed.
Regards
Richard
-----Original Message-----
From: thomas.j.palmisano@us.pwcglobal.com
[mailto:thomas.j.palmisano@us.pwcglobal.com]
Sent: Thursday, February 22, 2001 4:31 PM
To: Richard Robert
Subject: Midcoast Representation Letter and PwC Opinion

richard, please find the attached rep letter and draft opinion letter. Please review the rep letter and, if satisfied, please prepare the letter on Meri letterhead, sign a copy & send it to my attention.

tjp
To:      Robert H. Whitten/US/TLS/PwC@Americas-US, Thomas J
         Palmisano/US/TLS/PwC@Americas-US

cc:
From:    Gary B. Wilcox/US/TLS/PwC
Date:    02/20/2001 09.46:01 AM EST
Subject: Midcoast Representation Letter and PwC Opinion

Please find attached final versions of the repr. ltr and opinion. Once Richard signs the repr. letter, I will sign the opinion.

(See attached file: Midcoast rep letter.doc)

(See attached file: midcoastopnltr.doc)

_____

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.
--- Forwarded by Thomas J Palmisano/US/TLS/PwC on 01/27/2003 08:50 PM -----


**Thomas J Palmisano**          To: Richard Robert <rrobert@midcoastenergy.com> @ INTL
07/16/2001 12:55 PM             cc:
                                Subject RE. Midcoast Representation Letter and PwC Opinion

WE LOSE 225K OF NOLS(77K TAX VALUE) IF WE EXPENSE, BUT WE'D ALSO GET A REFUND OF 660K I'LL CHECK WITH GARY ON HIS THOUGHTS.

TJP

tjp
To:     Robert H. Whitten/US/TLS/PwC@Americas-US, Thomas J
        Palmisano/US/TLS/PwC@Americas-US

cc:
From:   Gary B. Wilcox/US/TLS/PwC
Date:   02/20/2001 09:46:01 AM EST
Subject: Midcoast Representation Letter and PwC Opinion

Please find attached final versions of the repr llr and opinion. Once
Richard signs the repr. letter, I will sign the opinion.

(See attached file: Midcoast rep letter doc)


(See attached file: midcoastopnltr.doc)



──────────────────────────────

The information transmitted is intended only for the person or entity to
which it is addressed and may contain confidential and/or privileged
material. Any review, retransmission, dissemination or other use of, or
taking of any action in reliance upon, this information by persons or
entities other than the intended recipient is prohibited.  If you received
this in error, please contact the sender and delete the material from any
computer.


─── Forwarded by Thomas J Palmisano/US/TLS/PwC on 01/27/2003 08.50 PM ───

    Thomas J Palmisano      To: Richard Robert <rrobert@midcoastenergy.com> @ INTL
                        07/18/2001 06:26 PM      cc:
                                                Subject: RE Midcoast Representation Letter and PwC Opinion

Not to waffle on the issue, but the position we are shooting for is expensing this on the return. Based on
preliminary research, we have determined that authority exists to expense fees paid in cancellation of a
contract since no future benefit is derived from such expenditure (no asset to capitalize).   However, if we
capitalize the expenditure, it will be a contract right to be amortized over the agreement or replacement
document. The cost will not be treated as additional purchase price/pp&E for tax purposes    I'm waiting
on Gary's comments on the issue.

Either way, we will be consistent with the below representation

I'll be out until next Thursday, but you can reach me at 330-467-1195 if something comes up

tjp

To:     Richard Robert <rrobert@midcoastenergy.com> @ INTL
cc:     Gary B. Wilcox/US/TLS/PwC@Americas-US
From:   Thomas J Palmisano/US/TLS/PwC
Date:   07/18/2001 04:40 24 PM
Subject: 🖹    RE Midcoast Representation Letter and PwC Opinion

The rep states: "Fortrend and Midcoast understood that such cancellation fee, if paid, would not
be treated for *tax purposes* as a liability that was assumed as part of the purchase price for the

GOVERNMENT
EXHIBIT
188
PENGAD-Bayonne, N.J.

PWC P1016

ENB-DOJ-028210

material. Any review, retransmission, dissemination or other use of, or
taking of any action in reliance upon, this information by persons or
entities other than the intended recipient is prohibited.   If you received
this in error, please contact the sender and delete the material from any
computer.

—— Forwarded by Thomas J Palmisano/US/TLS/PwC on 01/27/2003 08.50 PM ——



| | |
|---|---|
| **Thomas J Palmisano** 07/18/2001 04:40 PM | To: Richard Robert <rrobert@midcoastenergy.com> @ INTL<br>cc: Gary B. Wilcox/US/TLS/PwC@Americas-US<br>Subject: RE: Midcoast Representation Letter and PwC Opinion |

The rep states. "Fortrend and Midcoast understood that such cancellation fee, if paid, would not
be treated for *tax purposes* as a liability that was assumed as part of the purchase price for the
Assets, in light of the contingent and discretionary nature of the option right.  Accordingly, any
cancellation payments made by KPC would not result in additional amount realized by Fortrend
or additional purchase price for the Assets paid by Midcoast."

We are expensing the cancellation fee on the return.   Therefore, the representation is correct
tjp

| | |
|---|---|
| To: | Thomas J Palmisano/US/TLS/PwC@Americas-US, Gary B<br>Wilcox/US/TLS/PwC@Americas-US |
| cc: | |
| From: | Richard Robert <rrobert@midcoastenergy.com> |
| Date: | 07/16/2001 12·04:43 PM EST |
| Subject: | RE: Midcoast Representation Letter and PwC Opinion |

Gentlemen,
Better late than never. I have reviewed the opinion and rep letter and have
one concern   On page 7 of the rep letter it suggests that the payment of
the $10 75 million for extinguishment of the Project Development Agreement
would not result in additional purchase price for the Assets  Tom needs to
confirm the treatment for tax purposes, but for book purposes the $10.75
million payment WAS classified as additional PP&E.  Expensing it was not an
option for book purposes as it would have killed our earnings.
Also, while it was not a forgone conclusion that we were going to buy
Fortrends 55% interest in the Butcher Partnership, we did buy it
approximately one year after the transaction close at a reduced price.
These are my only comments.  Let me know how you wish to proceed.
Regards
Richard
-----Original Message-----
From· thomas j.palmisano@us.pwcglobal.com
[mailto thomas j.palmisano@us pwcglobal.com]
Sent Thursday, February 22, 2001 4:31 PM
To· Richard Robert
Subject  Midcoast Representation Letter and PwC Opinion

richard, please find the attached rep letter and draft opinion letter
Please review the rep letter and, if satisfied, please prepare the letter
on Meri letterhead, sign a copy & send it to my attention.

**GOVERNMENT
EXHIBIT
188.1**

PWC P1015

ENB-DOJ-028209

confirm the treatment for tax purposes, but for book purposes the $10.75
million payment WAS classified as additional PP&E.  Expensing it was not an
option for book purposes as it would have killed our earnings.
Also, while it was not a forgone conclusion that we were going to buy
Fortrends 55% interest in the Butcher Partnership, we did buy it
approximately one year after the transaction close at a reduced price.
These are my only comments   Let me know how you wish to proceed.
Regards
Richard
-----Original Message-----
From: thomas.j.palmisano@us.pwcglobal.com
[mailto:thomas.j.palmisano@us.pwcglobal.com]
Sent: Thursday, February 22, 2001 4:31 PM
To: Richard Robert
Subject: Midcoast Representation Letter and PwC Opinion


richard, please find the attached rep letter and draft opinion letter.
Please review the rep letter and, if satisfied, please prepare the letter
on Meri letterhead, sign a copy & send it to my attention.

tjp
To:      Robert H  Whitten/US/TLS/PwC@Americas-US, Thomas J
         Palmisano/US/TLS/PwC@Americas-US

cc·
From:    Gary B. Wilcox/US/TLS/PwC
Date:    02/20/2001 09:46:01 AM EST
Subject:  Midcoast Representation Letter and PwC Opinion

Please find attached final versions of the repr. ltr and opinion.  Once
Richard signs the repr. letter, I will sign the opinion.

(See attached file: Midcoast  rep letter.doc)


(See attached file: midcoastopnltr.doc)



-------------------------------------------------------
The information transmitted is intended only for the person or entity to
which it is addressed and may contain confidential and/or privileged
material.  Any review, retransmission, dissemination or other use of, or
taking of any action in reliance upon, this information by persons or
entities other than the intended recipient is prohibited.   If you received
this in error, please contact the sender and delete the material from any
computer.
---- Forwarded by Thomas J Palmisano/US/TLS/PwC on 01/27/2003 08:50 PM -----



         Thomas J Palmisano        To: Richard Robert <rrobert@midcoastenergy.com> @ INTL
         07/16/2001 12:55 PM       cc:
                                   Subject  RE: Midcoast Representation Letter and PwC Opinion


WE LOSE 225K OF NOLS(77K TAX VALUE) IF WE EXPENSE, BUT WE'D ALSO GET A REFUND OF
660K   I'LL CHECK WITH GARY ON HIS THOUGHTS.

TJP

GOVERNMENT
EXHIBIT

188.2

PWC P1013

ENB-DOJ-028207

01/27/04   12:30     PRICEWATERHOUSECOOPERS → 7138212150                    NO.155   P002/014

---- Forwarded by Thomas J Palmisano/US/TLS/PwC on 01/27/2003 08:50 PM ----



**Thomas J Palmisano**          To: Richard Robert <rrobert@midcoastenergy.com>
07/31/2001 02:19 PM             cc:
                                Subject:  PDA cancellation fee

We've researched the issue on the deductibility of this fee.  No authority exists to expense a contract cancellation fee if the canceled contract is replaced by another agreement.  Accordingly, since the payment restored the Margasco agreement, the fee should be capitalized and amortized over the life of the Margasco agreement.  The agreement states  a 7 and 12 year life depending on the type of project.  We will use the 7 year life for the amortization period.

We should still receive a refund of the tax paid on the 2000 return since we will write off the costs incurred in connection with the FERC rate case (approx 2.5mm).

let me know if you have any questions.  I've attached our file memo documenting our research for your information.

tjp



01 - PDA Contract Cancellation 31-July-01.
---- Forwarded by Thomas J Palmisano/US/TLS/PwC on 01/27/2003 08:50 PM ----



**Thomas J Palmisano**          To: Richard Robert <rrobert@midcoastenergy.com>
08/09/2001 01:52 PM             cc:
                                Subject: RE: Midcoast Representation Letter and PwC Opinion

Please forward the letter when you get a chance.

Hope all is well with the family.  We received the picture of Darcie in the mail.  She is cute.  There is really nothing like a fresh baby.

thanks,
tjp

To:        Richard Robert <rrobert@midcoastenergy.com> @ INTL
cc:
From:      Thomas J Palmisano/US/TLS/PwC
Date:      07/27/2001 08:46:57 AM
Subject:   RE: Midcoast Representation Letter and PwC Opinion

Gary and I agree that the reps are correct as originally stated.  Therefore, please sign the rep letter and return it to my attention.  after we receive the letter, we will finalize the opinion and send you a copy

tjp
To:        Thomas J Palmisano/US/TLS/PwC@Americas-US

**GOVERNMENT
EXHIBIT

188.3**

PWC P1020

ENB-DOJ-028214

It might be helpful to include more in the document on the obligations retained by Fortrend/K-Pipe and to emphasize Fortrend's exposure on the $14m more. It also seems like we switch tenses intermittently in the document. Please let me know what you think when you get a chance - I can be reached at 212-596-5563. I'll review the other two documents and get back to you soon

Best wishes,

Cathy

----- Forwarded by Thomas J Palmisano/US/TLS/PwC on 01/27/2003 08:52 PM ---

 **Thomas J Palmisano**          To: Gary B. Wilcox/US/PwC@Amencas-US
07/27/2001 08:43 AM           cc:
                              Subject: RE: Midcoast Representation Letter and PwC Opinion

Thanks Gary. I think we are better off capitalizing the costs with the contract assuming the PDA has a reasonably short life. Expensing currently flags the item in the case of an audit and creates an nol that we would rather not carry back to 98 and 99 for obvious reasons.

Thanks again for your reply and hopefully this puts this to bed.

tjp
To:          Thomas J Palmisano/US/TLS/PwC@Americas-US
cc:
From:        Gary B  Wilcox/US/TLS/PwC
Date:        07/27/2001 09.35:29 AM EDT
Subject: RE: Midcoast Representation Letter and PwC Opinion

Tom,

I agree that the repres. letter is correct as written. First, the statement about how the parties agreed to treat the cancellation fee is consistent with what happened. There was a side letter, dated October 24, 1999, signed by Langley, in which he agreed that  any payments made by KPC to MRG upon exercise of the option "will be treated for federal and state income tax purposes as a payment made in cancellation of the Development Agreement, and such payments actually received by MRG will be reported as ordinary income and KPC will record such payments on its records similarly." I am forwarding several e-mails discussing this issue, including one in which I said that "KPC will likely capitalize the payment and amortize the payment over the life of the MarGasCo Project Development Agreement." I continue to believe that is the better answer, as opposed to claiming a current deduction  But that is capitalization of a contract cancellation fee, and **not** a capitalization of any part of the purchase price for the assets

Second, the other concern of Richard relates to the statement in the repres. letter that  there was "no substantial certainty" that the Midcoast would exercise its option to purchase the Butcher Interest." Richard says below it was not a foregone conclusion  Thus, this repres. is correct as written.

Gary

Thomas J Palmisano

          Thomas J Palmisano
                             07/25/2001 09 01 PM

**GOVERNMENT
EXHIBIT

188.4**

PWC P1057

ENB-DOJ-028243

To·       Gary B. Wilcox/US/TLS/PwC
cc:
Subject.  RE  Midcoast Representation Letter and PwC Opinion

I believe the reps are correct as is.  Do you have any comments?

tjp

| | |
|---|---|
| To: | Thomas J Palmisano/US/TLS/PwC@Americas-US, Gary B. Wilcox/US/TLS/PwC@Americas-US |
| cc: | |
| From: | Richard Robert <rrobert@midcoastenergy.com> |
| Date: | 07/16/2001 12:04:43 PM EST |
| Subject: | RE: Midcoast Representation Letter and PwC Opinion |

I agree
Gentlemen,
Better late than never.  I have reviewed the opinion and rep letter and have
one concern.  On page 7 of the rep letter it suggests that the payment of
the $10.75 million for extinguishment of the Project Development Agreement
would not result in additional purchase price for the Assets.  Tom needs to
confirm the treatment for tax purposes, but for book purposes the $10.75
million payment WAS classified as additional PP&E.  Expensing it was not an
option for book purposes as it would have killed our earnings.
Also, while it was not a forgone conclusion that we were going to buy
Fortrends 55% interest in the Butcher Partnership, we did buy it
approximately one year after the transaction close at a reduced price.
These are my only comments.  Let me know how you wish to proceed.
Regards
Richard
-----Original Message-----
From· thomas.j.palmisano@us.pwcglobal.com
[mailto:thomas.j.palmisano@us.pwcglobal.com]
Sent: Thursday, February 22, 2001 4·31 PM
To. Richard Robert
Subject· Midcoast Representation Letter and PwC Opinion

richard, please find the attached rep letter and draft opinion letter.
Please review the rep letter and, if satisfied, please prepare the letter
on Meri letterhead, sign a copy & send it to my attention.

tjp

| | |
|---|---|
| To: | Robert H Whitten/US/TLS/PwC@Americas-US, Thomas J Palmisano/US/TLS/PwC@Americas-US |
| cc: | |
| From | Gary B. Wilcox/US/TLS/PwC |
| Date: | 02/20/2001 09:46:01 AM EST |
| Subject | Midcoast Representation Letter and PwC Opinion |

Please find attached final versions of the repr. ltr and opinion.  Once
Richard signs the repr. letter, I will sign the opinion

(See attached file: Midcoast  rep letter doc)

(See attached file: midcoastopnltr.doc)

GOVERNMENT
EXHIBIT

188.5

PWC P1058

ENB-DOJ-028244

*P*RICE*W*ATERHOUSE*C*OOPERS 🅘

# Memo

| | |
|---|---|
| To. / Location. | Midcoast Tax Files |
| From: / Location· | Gary Wilcox and Bob Whitten |
| Date: | February 20, 2001 |
| Subject. | Tax Statement Disclosure Statement |

In Notice 2001-16, issued on January 18, 2001, the IRS described a certain "intermediary transaction" as a "listed transaction" for purposes of the tax shelter disclosure requirements in Treas. Reg. section 1.6011-4T. According to Treas. Reg. section 1.6011-4T(b)(2), any transaction that is the same or substantially similar to a transaction described in an IRS notice is also a "listed transaction."

Our client, Midcoast Energy Resources, Inc. ("Midcoast"), purchased assets on November 9, 1999, from an entity commonly known as an intermediary. PwC has issued an opinion to Midcoast that it is more likely than not that, immediately after the closing of such purchase transaction, the acquired assets will have, for federal income tax purposes, a tax basis in the hands of Midcoast equal to the cost basis of those assets under section 1012 of the Internal Revenue Code. Midcoast is an audit client of PwC, and PwC signs the Midcoast federal tax return.

For the reasons explained below, there is a good argument that the Midcoast transaction is not the same or substantially similar to the transaction described in Notice 2001-16.

First, the Notice states that "pursuant to a plan," the seller "purports" to sell the stock of a target corporation to an intermediary corporation, and then the target "purports" to sell some or all of its assets to the buyer. By using the term "purport," the IRS has described a transaction that, in substance, is not what it appears to be. That is, if the seller merely "purports" to sell the target stock to an intermediary, then apparently the seller has, in reality, either sold the target stock to the ultimate buyer instead of to the intermediary, or not sold the target stock at all. If the target merely "purports" to sell its assets to the ultimate buyer after the target stock has been "purportedly" purchased by the intermediary, then apparently the target has, in reality, either sold its assets to the buyer while it was still owned by seller, or not sold its assets at all.



GOVERNMENT
EXHIBIT
189
PHIGJA-Bayonne, N. J.

**PWC 398**

# PRICEWATERHOUSE COOPERS 🏢

In the Midcoast transaction, PwC is opining, on a "more likely than not" basis, that Midcoast did in fact purchase assets. The two corollaries of this opinion are that the seller, on a more likely than not basis, did in fact sell the target stock to the intermediary, and that the intermediary, on a more likely than not basis, did in fact cause the target corporation to sell its assets to Midcoast. It is difficult to put the Midcoast transaction in a category of transactions in which those steps were only "purported" to have taken place.

Second, the Notice describes two versions of the transaction, one in which the target corporation is included in the intermediary's consolidated return and the intermediary's group reports losses to offset the gain from target's sale of the assets. The second version is where the intermediary is an exempt organization which liquidates the target and then sells the target's assets. In the Midcoast transaction, the buyer of the target stock was actually a limited partnership, and therefore neither a consolidated group nor an exempt organization. Neither the seller nor Midcoast had any knowledge of whether or how the intermediary would be able to offset the gain from the sale of assets. Clearly, the means by which the intermediary attempted to offset the gain by somehow generating current losses was of no concern to either the seller or Midcoast, and certainly could not be said to be any part of a "plan" involving all of the parties.

On the basis of the foregoing, PwC is prepared to advise Midcoast that there is an appropriate basis for deciding neither to attach a disclosure statement to Midcoast's return for its taxable year ended December 31, 2000 (Midcoast's 1999 return was filed in September, 2000), nor to file a copy of a disclosure statement with the IRS in Washington, D.C. PwC will advise Midcoast that the decision not to attach the disclosure statement could result in increased exposure to a substantial understatement penalty under section 6662. Specifically, in the event that Midcoast is treated by a court as having purchased stock rather than assets, and the IRS asserts a substantial understatement penalty, Midcoast may have more difficulty avoiding the penalty on the grounds that it acted in "good faith" within the meaning of section 6664(c)(1).

We have discussed this matter with Dan Mendelson of Risk Management in Washington, D.C. Dan has confirmed that our decision not to attach a disclosure statement on the basis of the foregoing is an appropriate course of action. Dan also has confirmed that our decision not to attach a disclosure statement to Midcoast's return on the basis of the foregoing would not cause the return to be considered an incomplete return or otherwise subject Midcoast or PwC to any material penalties other than the possible enhanced exposure to the section 6662 penalty as discussed above.

cc: Ian Schachter
    Dan Mendelson
    Dennis McErlean

(2)

**PWC 399**

ENB-DOJ-028160

# PRICEWATERHOUSE COOPERS 🅡



PricewaterhouseCoopers LLP
Suite 2900
1201 Louisiana St.
Houston TX 77002-5678
Telephone (713) 356 4000
Facsimile (713) 356 4717
Direct phone 713-356-8160
Direct fax 713-356-8299

## Fax

| | |
|---|---|
| To: | Gary Wilcox |
| Company: | PwC-WNTS |
| Addressee fax No.: | 202-414-1336 |
| | |
| From: | Tom Palmisano |
| Return fax number: | 713-356-8299 |
| | |
| Date: | August 10, 2001 |
| No. of pages: | (incl. this page) |

**If this fax is illegible please contact:  713-356-4000**

Notice  If the reader is not the specified recipient of this confidential fax transmission, you are hereby notified that any distribution or copying of this communication is strictly prohibited.  If you are not the specified recipient, please notify us immediately by telephone.  Thank you

GOVERNMENT
EXHIBIT
195
PENGAD-Bayonne, N. J.

PWC P1255

ENB-DOJ-028427



Effective as of December 31, 1999

PricewaterhouseCoopers LLP
1301 K Street NW
Washington, DC 20005

Ladies and Gentlemen:

You have been requested to render an opinion (the "Opinion") regarding certain federal income tax consequences to Midcoast Energy Resources, Inc., a publicly-traded Texas corporation ("Midcoast") of the acquisition by Midcoast Kansas Pipeline, Inc., a Delaware corporation ("Midcoast Pipeline") and Midcoast Kansas General Partner, Inc., a Delaware corporation ("Midcoast General Partner") (collectively referred to herein as "Midcoast" unless otherwise stated) of certain assets previously owned by Bishop Pipeline Company, a Kansas corporation ("BPC"), Syenergy Pipeline Company, L.P., a Kansas limited partnership ("Syenergy"), and Kansas Pipeline Company, a Kansas general partnership ("KPC") (BPC, Syenergy and KPC collectively referred to as the "Sellers"), which consist primarily of partnership interests in Kansas Pipeline Company, MarGasCo Partnership , Mid-Kansas Partnership, and Riverside Pipeline Company L.P. (the "Partnership Interests"), pursuant to the Asset Purchase Agreement dated November 5, 1999, between K-Pipe Merger Corporation, a Delaware corporation and Midcoast (the "Asset Purchase Agreement").

*Statement of Facts*

Midcoast is engaged in the business of transporting, gathering, processing and marketing natural gas and other petroleum products through its pipelines to both end users and other transporters. In connection with these activities, Midcoast often acquires and constructs pipelines.

Dennis Langley ("Langley"), the sole shareholder of The Bishop Group, Ltd. ("Bishop Group"), commenced efforts to sell the stock of Bishop Group in the summer of 1999  Langley used Chase Securities as his investment banker. Letters were sent to potential purchasers asking for an expression of interest   Those responding received a

PWC P1256

ENB-DOJ-028428

PricewaterhouseCoopers LLP
Effective as of December 31, 1999
Page 2

private placement memorandum after signing a confidentiality agreement, and were asked to submit a bid. Final bids were due August 30, 1999.

Bishop Group, though its affiliates BPC, Bishop Gas, and Syenergy, owned 100% of the partnership interests of four partnerships engaged in the pipeline business, Kansas Pipeline Company ("KPC"), MarGasCo Partnership, Mid-Kansas Partnership, and Riverside Pipeline Company L.P. (the "Partnership Interests"). Bishop Group's other assets included several other partnerships and a certain royalty interest known as the "Butcher Interest."

Midcoast, like several of the other interested parties, submitted a bid to purchase the stock of Bishop Group. Midcoast's initial bid was for $115 million, reflecting a gross value of $184 million and liabilities of $69 million. Based on due diligence results, Midcoast's bid was lowered to approximately $100 million. Throughout the course of the bidding process, Langley expressed a strong preference that the acquiror of Bishop Group purchase the shares of Bishop Group, rather than its assets. While Midcoast was aware of Langley's stated preference throughout the negotiations, it had hoped an asset deal could be negotiated.

In August, 1999, Langley indicated to Midcoast that Midcoast's bid was lower than several of the other bids by approximately $20 million, but that he might be interested in entertaining creative structural ideas such as a revenue sharing arrangement. To make its bid more attractive without significantly increasing the purchase price, after some deliberation, Midcoast proposed a revenue sharing arrangement, pursuant to which Langley would (i) share in gross revenues earned by KPC in excess of $29.5 million and (ii) be entitled to participate in special projects of KPC and Midcoast in the proximity of KPC on a 50/50 basis.

In addition, on August 24, 1999, Midcoast (through its advisors) contacted Fortrend International LLC ("Fortrend"). Beginning on August 26, 1999 and continuing over the next several weeks, several conversations took place among Fortrend and PricewaterhouseCoopers LLP ("PwC") regarding the viability of a Fortrend acquisition (to be followed by a sale of substantially all the assets to Midcoast). On August 30, 1999, Fortrend provided some of its background information to Ernst & Young, Langley's tax advisors. On September 10, 1999, Langley's representatives faxed to Fortrend a draft letter of intent reflecting a purchase price of $190 million less outstanding debt, and a mutual confidentiality agreement.

On September 13, 1999, Langley, PwC and Midcoast met in Kansas City. Langley notified Midcoast that Fortrend was being invited to enter the bidding process. At the time, Langley was actively discussing a transaction with at least 3 or 4 potential purchasers. Midcoast already had discussed with Langley the possible purchase price if a revenue sharing arrangement was implemented.

As of the close of September 13, 1999, Fortrend had received the Private Placement Memorandum and other offering materials that were provided to other bidders, and had returned a signed confidentiality agreement to Langley. Langley effectively extended the due date for

PWC P1257

ENB-DOJ-028429

PricewaterhouseCoopers LLP
Effective as of December 31, 1999
Page 3

bids by inviting Fortrend to submit a bid. Fortrend contacted Chase Securities to schedule a presentation, as had been provided to the other bidders. The presentation was made by telephone to Fortrend on September 16, 1999.

From that point forward, Fortrend began having direct and frequent discussions directly with Langley's representative, Steve Korb, and Langley's outside counsel, Jim Pryde of Bryan Cave in Kansas City. Fortrend engaged its regular outside counsel, Graham Taylor and Cynthia Morelli of Lebouf, Lamb, Green & MacRae ("Lebouf, Lamb") in San Francisco, to negotiate with Korb and Pryde. Shortly thereafter, one of Fortrend's general partners, Jeff Furman, through Signal Capital Associates, L.P. ("SCALP"), along with several others, created K-Pipe Holdings Partners, L.P. ("K-Pipe Holdings") which in turn created K-Pipe Merger Corporation, a special purpose vehicle ("K-Pipe"), to actually purchase the stock of Bishop Group (for ease of reference, references to "Fortrend" will include K-Pipe Holdings and K-Pipe unless otherwise stated).

Midcoast did not formally withdraw its bid to purchase the stock of Bishop Group. Langley continued to have discussions with several other potential buyers. Midcoast was concerned that withdrawing its bid would render it unable to go forward with a stock purchase in the event that Fortrend was unable to proceed with its own stock purchase transaction. Accordingly, Midcoast did not cease its due diligence review of the Bishop Group, which was already in progress. The other potential purchasers also continued their due diligence efforts.

However, as of September 13, 1999, Midcoast did not engage in any further discussions with Langley or his representatives regarding a purchase of Bishop Group stock. Midcoast relayed to Fortrend its comments and concerns relating to a potential purchase of the assets, and Fortrend in turn communicated to Langley's representatives its comments and concerns, to the extent relevant to Fortrend in its capacity as a potential purchaser of the stock.

As of September 17, 1999, Fortrend had received a draft stock purchase agreement and a form bid letter from Langley. As of September 20, 1999, Fortrend indicated to PwC that it had gone through "several rounds of discussions" with Langley's representatives on the bid letter. As of September 23, 1999, Fortrend had received Langley's revised draft of the letter of intent for the stock sale, including the Stock Purchase Agreement, and Project Development and Consulting Agreements. It was understood at this time that Langley was still talking to other bidders. Negotiations between Fortrend and Langley continued until September 28, 1999, when the letter of intent for the stock sale was signed, which reflected a purchase price equal to either (i)

$187,974,600 (including the sinking fund reserve), less all assumed debt, or (ii) $181,964,600 (excluding the sinking fund reserve), less all assumed debt. A schedule

PWC P1258

ENB-DOJ-028430

PricewaterhouseCoopers LLP
Effective as of December 31, 1999
Page 4

developed that was driven in part by the need for Fortrend to conduct its own due diligence and file for Hart Scott Rodino ("HSR") approval once a letter of intent between Fortrend and Langley was signed.

On October 1, 1999, Midcoast signed a letter of intent dated September 30, 1999, to purchase the Partnership Interests and certain other assets from K-Pipe Holdings, an affiliate of Fortrend.  The letter of intent provides that the parties intend that Fortrend will sell the Partnership Interests, related records, licenses and permits, and option rights to purchase the Butcher Interest, an investment in natural gas pipelines in the Midwest (the "Assets"), for a purchase price equal to either (i) $187,868,000 (including the sinking fund reserve), less all assumed debt, or (ii) $182,068,000 (excluding the sinking fund reserve), less all assumed debt (the "Asset Purchase").  Following the signing of the letter of intent, Fortrend proceeded with filing for HSR approval for its contemplated sale of the Assets to Midcoast.

The price differential in the Fortrend/Midcoast letter of intent reflected a combination of the sinking fund reserve and the make whole premium.  If Fortrend paid down the third party debt, it would be obligated to pay a make whole premium of $8 million. Fortrend and Midcoast agreed to share the cost of this premium.  Thus, the $182,068,000 price reflected the initial price of $187,868,000, less the $10,000,000 sinking fund reserve, plus $4,200,000 representing approximately 50% of the premium.

Over the next several weeks Langley's representatives negotiated the terms of a Stock Purchase Agreement with Fortrend and Fortrend, in turn, negotiated the terms of an Asset Purchase Agreement with Midcoast.  Fortrend and Midcoast also were actively involved in arranging for financing with their respective lenders.  During the negotiation process between Langley and Fortrend, Fortrend maintained regular contact with Midcoast, primarily to confirm Midcoast's continuing interest in acquiring some or all of the Assets and to negotiate the purchase terms.  Midcoast was advised by Fortrend of certain terms of Fortrend's transaction with Langley to ensure that the terms on which K-Pipe acquired Bishop Group stock, and in particular the various contractual arrangements between Langley and KPC to be put in place prior to the stock sale (e.g., the Project Development Agreement), would not adversely affect Midcoast's interests in the event that Midcoast and Fortrend reached agreement with respect to the sale of the Assets.  At no time during the calls or meetings did Fortrend or its representatives and attorneys, represent Midcoast.  Rather, Midcoast represented itself or was represented by its outside attorney, Ronald Chachere.

On or about October 21, 1999, Fortrend was informed by Langley that he would cancel the stock sale unless a definitive Stock Purchase Agreement was signed by

Saturday, October 23, 1999.  At this time, it was clear that closing on the asset sale could not take place before November 8, 1999, due to an HSR waiting period.  Fortrend responded that the earliest it could obtain financing would be two weeks from Friday, October 22.

PWC P1259

ENB-DOJ-028431

PricewaterhouseCoopers LLP
Effective as of December 31, 1999
Page 5

Due to the urgent need for Fortrend to negotiate a definitive Stock Purchase Agreement (whether or not Fortrend would have financing in place), Craig Hoffman of Fortrend decided to meet with Langley and his representatives in Kansas City on Friday, October 22. Hoffman was accompanied by his counsel, Cynthia Morelli of Lebouf, Lamb. Midcoast also believed it was necessary to be present in order to simultaneously negotiate the terms of its Asset Purchase Agreement with Fortrend. Midcoast representatives present in Kansas City on Friday morning included Richard Robert, Chris Kaitson, Chip Berthelot, and Ron Chachere, as well as Gary Wilcox and Tom Palmisano from PwC. Fortrend and Midcoast were each provided separate conference rooms at the offices of Bryan Cave, in order to meet separately from each other, as well from Langley.

During the first half of Friday, October 22, Fortrend and Midcoast representatives separately reviewed the various draft documents prepared by Langley. Fortrend needed to carefully review all draft stock sale documents in order to understand the risks it was undertaking (including the liabilities and obligations it was assuming and retaining as stock purchaser), and to be in a better position to finalize the draft of its Asset Purchase Agreement with Midcoast. Midcoast needed to review those documents that would continue to affect the Assets after Midcoast's purchase of the Assets from Fortrend.

At approximately 2:00 p.m. on Friday, October 22, a meeting was held among Hoffman, Morelli, Taylor (by conference call), Chachere, Kaitson and Wilcox, to discuss certain provisions of the Stock Purchase Agreement, Tax Sharing Agreement and Project Development Agreement that would impact Midcoast as purchaser of the Assets.

Beginning at approximately 4:30 p.m. and continuing until at least 7:00 p.m., Fortrend (i.e., Hoffman, Morelli and, by conference call, Taylor) met separately with Jim Pryde of Bryan Cave and Tino Monaldo, Langley's attorneys, to negotiate the Stock Purchase Agreement and discuss timing issues for the closing. No Midcoast representatives were present. Hoffman reported to Midcoast that evening on the tentative schedule that Fortrend had agreed to with Langley, which contemplated that (i) Langley would sign various agreements between himself or his affiliates and KPC and MarGasCo on October 23, and (ii) Fortrend would sign the Stock Purchase Agreement on October 26, prior to its expected loan approval on October 27, while recognizing that Fortrend could not close on the Asset Purchase Agreement prior to November 8, and (iii) Fortrend would close the Stock Purchase Agreement on October 29, using proceeds that it received from an escrow agreement executed with Midcoast on that date.

On Saturday morning, October 23, Hoffman and Morelli met with Monaldo and Pryde, after Fortrend provided Langley a markup of the Stock Purchase Agreement and

Tax Sharing Agreement. The items discussed included (i) a guarantee by Fortrend of K-Pipe's obligations, (ii) treatment of airplane debt as a prepaid expense, (iii) the particular provisions of the Stock Purchase Agreement that KPC would guarantee, (iv) Fortrend's payment of the outstanding debt, (v) representations regarding a section 754 election, and (vi) Fortrend's obligation to pursue certain lawsuits in the name of Bishop Group. Issues remaining after this

PWC P1260

ENB-DOJ-028432

PricewaterhouseCoopers LLP
Effective as of December 31, 1999
Page 6

discussion included (i) timing of closing on the stock sale, and (ii) particular Fortrend obligations guaranteed by KPC.

Craig Hoffman and Cynthia Morelli then met separately with Chris Kaitson, Ron Chachere and Gary Wilcox. The items discussed and agreed to included (i) KPC would not guarantee Tax Sharing Agreement or Article 9 responsibilities of Fortrend, and (ii) Midcoast would not likely be able to fund an escrow for the asset sale by Friday, October 29.

Fortrend then considered the risks it was undertaking if it signed a Stock Purchase Agreement containing a $15,000,000 breakup fee before it closed on the escrow for the asset sale with Midcoast. The parties agreed that Midcoast would fund a $14,000,000 advance escrow at least 24 hours after Fortrend became potentially liable for the $15,000,000 breakup fee. When the second escrow for the full Asset Purchase was funded, the $14,000,000 advance second escrow would be terminated. Thus, Fortrend would be exposed to a $1,000,000 contractual risk for at least 24 hours.

Fortrend negotiated with Midcoast regarding the ownership, operation and refinancing of the Butcher Interest following the sale of the Assets to Midcoast. Specifically, Fortrend would contribute the Butcher Interest to a general partnership. Midcoast would contribute cash. Fortrend would receive a 55% interest in profits and cash flow, and Midcoast would receive a 45% interest. The partnership would refinance a substantial portion of the Butcher Interest and distribute the proceeds to Fortrend, leaving Fortrend with an equity interest of approximately $275,000. Midcoast would have the right to purchase Fortrend's interest at 100% of Fortrend's initial capital account amount, but only after six months. Fortrend would have the right to put its interest to Midcoast at 89% of its initial capital account amount, but only after one year.

Hoffman then reconvened with Monaldo to discuss the timing for signing and closing the Stock Purchase Agreement and the penalties for delays. Fortrend and Langley agreed that (i) Fortrend would sign the Stock Purchase Agreement on Monday, October 25, (ii) Fortrend would become obligated for the $15 million breakup fee as of 4:00 p.m. on Wednesday, October 27, (iii) the ability to terminate because of a breach would expire on Thursday, October 28, (iv) escrow would be funded on Friday, October 29, with interest payable to Langley and (v) closing would occur on earlier of November 8 and HSR approval. Extension of closing beyond those dates would be subject to daily penalty. If closing did not occur by December 10 for any reason other than failure of government approval, the breakup fee would be owed to Langley.

Midcoast and Fortrend also renegotiated on October 23 how the outstanding debt would be repaid. It was agreed that Midcoast would repay the outstanding debt after it purchased the assets, and that Midcoast would be responsible for the entire make whole premium.

The relevant parties continued to negotiate their documents on October 24, 1999. Fortrend met separately with Langley to discuss the revised draft of the Stock Purchase

PWC P1261

ENB-DOJ-028433

PricewaterhouseCoopers LLP
Effective as of December 31, 1999
Page 7

Agreement. Fortrend also met separately with Midcoast to discuss the major provisions of the
Asset Purchase Agreement.

A series of conference calls occurred on October 25 between Fortrend and Midcoast
representatives to discuss, among other things, (i) the concern of Fortrend's lender, the New
York branch of Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. ("Rabobank"), with
financing Fortrend's purchase of the $10,000,000 reserve, which would not be part of the Assets
sold to Midcoast, and (ii) sharing of responsibility for interest on outstanding debt if Fortrend
extends closing on stock sale due to failure of HSR approval.

On October 26, Midcoast determined that it was unwilling to buy the Assets subject to
the Project Development Agreement in its then-current form. Midcoast was concerned about
having an ongoing relationship with Langley pursuant to the Project Development Agreement,
and wanted the option to cancel that agreement at some future date.  Negotiations among
Langley, Fortrend and Midcoast resulted in an Option Agreement executed by KPC, MarGasCo
and Langley's affiliate, Management Resources Group, LLC ("MRG"), pursuant to which the
owner of KPC and MarGasCo could decide, prior to February 1, 2000, to cancel the KPC
Project Development Agreement by paying a cancellation fee of $10.75 million to MRG, in
which case the less onerous MarGasCo Project Development Agreement would become effective
retroactively in its place.  Langley separately agreed that such fee, if received, would be treated
as ordinary income for tax purposes; in addition, any payments made to MRG on an ongoing
basis under the KPC Project Development Agreement (if it survived February 1) would be
reported as ordinary income.  Fortrend and Midcoast understood that such cancellation fee, if
paid, would not be treated for tax purposes as a liability that was assumed as part of the purchase
price for the Assets, in light of the contingent and discretionary nature of the option right.
Accordingly, any cancellation payments made by KPC would not result in additional amount
realized by Fortrend or additional purchase price for the Assets paid by Midcoast.

On October 29, Fortrend received confirmation that Rabobank would fund its purchase of
the stock of Bishop Group. It also was notified by the Federal Trade Commission that the HSR
waiting period expired.

As of November 2, 1999, the outstanding issues discussed between Fortrend and
Midcoast included (i) ensuring that appropriate side letters between Langley and Fortrend

confirmed how the cancellation fee (if payable) and ongoing Project Development Agreements
would be treated for tax purposes; (ii) ensuring that Fortrend would be obligated not to liquidate
Bishop Group for at least two years, and (iii) confirming that certain receivables were excluded
from the Assets purchased by Midcoast.

At this time, Midcoast had not received confirmation of its lender's approval of the
financing for the Asset Purchase, and in fact was informed that a confirmation letter would not
be given.  Instead, Midcoast's lender stated verbally that it would fund the loan at the appropriate
time assuming everything was in order at that time, but that it would not make such a

PWC P1262

ENB-DOJ-028434

PricewaterhouseCoopers LLP
Effective as of December 31, 1999
Page 8

commitment in writing.  Conceivably, the financing could fall through if one of the banks in the lender's syndicate pulled out, or if one or more of the outstanding KPC creditors did not agree to the sale of KPC to a new owner.  Accordingly, Midcoast was exposed to the risk of losing $14 million under the advance escrow, since it was possible that Midcoast's financing could subsequently fall through.

Prior to November 5, 1999, Langley caused the following agreements to be executed between himself or MRG and either Bishop Group or one or more of the Partnerships· (i) KPC Project Development Agreement, (ii) MarGasCo Project Development Agreement, (iii) Stock Redemption Agreement, (iv) Consulting Agreement, (v) KPC Guaranty of the Project Development Agreement, (vi) KPC Letter Agreement regarding ordinary income treatment, (vii) Option Agreement, (viii) various assignments of assets from Bishop Group and its affiliates to Langley, pursuant to the Stock Redemption Agreement, and (ix) various corporate resolutions of the Bishop Group and its affiliates relating to the sale of stock of Bishop Group, the termination of the Voting Trust Agreement, the transfer of assets to Langley pursuant to the Stock Redemption Agreement, and the execution of certain documents.  These agreements and resolutions are dated October 24, 1999.  In addition, effective October 18, 1999, Bishop Group amended its Articles of Incorporation to change its name to K-Pipe Group, Inc. (for continuity of reference, herein, we will continue to refer to it as "Bishop Group"), in preparation for Langley's sale of the Bishop Group stock to K-Pipe.

On November 2, 1999, Howard Lubow, then executive vice president of BPC (the general partner of KPC), signed a Guaranty on behalf of KPC, pursuant to which KPC guaranteed K-Pipe's obligations contained in Sections 8 10, 8.11 and 5.4 of the Stock Purchase Agreement.

On November 5, the following documents relating to the sale of Bishop Group stock were executed: (i) Stock Purchase Agreement, (ii) side letter agreement between Fortrend and Langley ("K-Pipe Side Letter"), and (iii) Fortrend Guaranty.  The K-Pipe Side Letter provided that the Stock Purchase would close on November 5, 1999.  However, K-Pipe, at its sole option, could extend the closing to no later than November 15, 1999 by paying Langley $21,500 for each day the closing was delayed beyond November 8, 1999, in addition to the Stock Purchase . proceeds.  If the closing did not occur on or prior to November 15, 1999, then, under certain circumstances, K-Pipe would

be obligated to pay Langley $15 million on November 16, 1999 as Langley's sole remedy for K-Pipe's failure to close.  Further, pursuant to the K-Pipe Side Letter, K-Pipe represented to Langley that it had no plan or intention to liquidate Bishop Group for at least two years after the closing date.

Also on November 5, Fortrend and Midcoast executed the following documents relating to the sale of the Assets:  (i) amended letter of intent dated as of November 4, (ii) side letter between Fortrend and Midcoast ("Midcoast Side Letter"), (iii) an escrow agreement pursuant to

PWC P1263

ENB-DOJ-028435

PricewaterhouseCoopers LLP
Effective as of December 31, 1999
Page 9

which Midcoast agreed to place $14 million in escrow ("First Escrow Agreement"), and (iv) Asset Purchase Agreement.

The amended letter of intent revised the terms of the Asset Purchase and described the parties' intent to enter into two escrow agreements. It also sets forth the parties' intention to form a partnership to hold their joint rights in the Butcher Interest.

The Midcoast Side Letter provided that the Asset Purchase is expected to close on November 9, 1999. However, Midcoast, at its sole option, could extend the closing to no later than November 15, 1999 by paying K-Pipe $21,500 for each day the closing was delayed beyond November 9, 1999, in addition to the Asset Purchase proceeds. If the closing did not occur on or prior to November 15, 1999, then, under certain circumstances, Midcoast would be obligated to pay K-Pipe $15 million on November 16, 1999 as K-Pipe's sole remedy for Midcoast's failure to close. Thus, K-Pipe sustained full economic risk for $21,500 if the Stock Purchase did not close on November 8. However, for each day after November 9, Midcoast had an obligation to pay K-Pipe the same amount K-Pipe is obligated to pay Langley. These obligations were not protected by escrow accounts.

The First Escrow Agreement provides that Midcoast will deposit $14,000,000 into an escrow account with Rabobank as escrow agent, to be held in conservative investments selected by Midcoast. Midcoast was to receive all income and incur all losses associated with the investments. The funds were to be returned to Midcoast, with interest, on November 8th, 1999, upon delivery of written confirmation by Midcoast and K-Pipe jointly that Midcoast had executed and delivered the Asset Purchase Agreement to K-Pipe on November 5. If the Asset Purchase Agreement was not signed by Midcoast and delivered to K-Pipe on November 5, the $14 million held in the First Escrow Account would be distributed to K-Pipe as payment for damages.

The Stock Purchase closed on November 8, 1999. The following persons were present at the New York offices of Lebouf, Lamb on that date: Hoffman and Larry Austin of Fortrend, Morelli and Taylor of Lebouf, Lamb as counsel for Fortrend, Monaldo as counsel for Langley, Robert of Midcoast, Chachere as counsel for Midcoast, and Wilcox of PwC. Fortrend and Lebouf Lamb met with Langley's representatives in a separate conference room from the room used by Midcoast and its representatives on November 8.

Austin is an attorney who is employed by Fortrend and generally is appointed to serve as president of the entities that Fortrend sets up to purchase stock.

On November 8, 1999, K-Pipe drew down $123,345,000 under a promissory note with Rabobank. K-Pipe then authorized the transfer of the stock purchase price of $122,595,000 to Langley, and the payment of $750,000 in fees to Rabobank. The payment of $122,595,000 constituted payment of the Preliminary Cash Consideration of $189,324,826 reduced for debt assumed by K-Pipe of $66,729,826. K-Pipe also delivered (i) an executed Tax Sharing

PWC P1264

ENB-DOJ-028436

PricewaterhouseCoopers LLP
Effective as of December 31, 1999
Page 10

Agreement, (ii) a certificate of fulfilment of conditions precedent by K-Pipe, (iii) certified resolutions of K-Pipe approving the Stock Purchase, and (iv) an opinion letter of Lebouf, Lamb. On this date, K-Pipe merged with and into Bishop Group, with Bishop Group surviving. As a result, K-Pipe Holdings Partners, L.P., sole shareholder of K-Pipe, became the sole shareholder of Bishop Group.

On November 8, 1999, Langley delivered to K-Pipe a Stock Certificate representing his 148,728 shares of Bishop Group, duly endorsed and a Stock Certificate representing 148,728 Bishop Group shares issued to K-Pipe. Langley also delivered to K-Pipe (i) an executed Tax Sharing Agreement, (ii) a certificate of fulfilment of conditions precedent by Langley, (iii) a FIRPTA certificate, and (iv) resignations of officers and directors of Bishop Group and its affiliates, effective as of the closing of the Stock Purchase.

As the new owner of Bishop Group and its affiliates, K-Pipe Holdings, an affiliate of Fortrend, then caused each of BPC and Bishop Gas to appoint Larry Austin as sole director, to elect Larry Austin as President and Treasurer and Linda Austin as secretary, and to dividend the Butcher Interest to Bishop Group (now K-Pipe Group, Inc.).

After the foregoing matters were accomplished on November 8, 1999, Midcoast and Fortrend executed a second escrow agreement ("Second Escrow Agreement"), pursuant to which Midcoast's lender, Bank of America, deposited $198,100,000 with Rabobank as escrow agent, to be held in conservative investments selected by Midcoast. Midcoast received all income and incurred all losses associated with the investments. The funds were held for later transfer to K-Pipe and certain holders of debt issued by Syenergy, upon closing of the Asset Purchase, as well for transfer to the Butcher Interest Partnership after closing of the Asset Purchase. Specifically, $112,695,895 would be transferred to K-Pipe, separate wires of $73,288,380 (which included the Make Whole Premium) and $6,012,164 would be transferred to creditors of Syenergy and $6,100,000 would be transferred to the Butcher Interest Partnership.

The Asset Purchase closed on November 9, 1999. On that date, only Fortrend and Midcoast representatives were present at the offices of Lebouf, Lamb. Fortrend and Midcoast gave joint notice to Rabobank to deliver the escrowed funds in accordance with the Second Escrow Agreement. Austin then caused BPC, Syenergy, and Bishop Gas to

convey the Partnership Interests to the Midcoast purchasing entities. Then, pursuant to the change of control provisions of the MarGasCo Project Development Agreement,

Midcoast executed a Guaranty, pursuant to which Midcoast guaranteed (i) the obligations of MarGasCo under the MarGasCo Project Development Agreement, (ii) the obligations of KPC under the Consulting Agreement, (iii) the KPC Guaranty dated November 2, 1999, and (iv) the obligations of KPC under the KPC Project Development Agreement.

PWC P1265

ENB-DOJ-028437

PricewaterhouseCoopers LLP
Effective as of December 31, 1999
Page 11

Finally, on November 9, 1999, K-Pipe Group, Inc. (formerly Bishop Group) and Mid Louisiana Gas Company, a Delaware corporation and subsidiary of Midcoast ("MIDLA") established the Butcher Interest Partnership, pursuant to which K-Pipe Group, Inc. contributed the Butcher Interest in exchange for an initial capital account of $6,500,000, and Midcoast contributed $225,000. Butcher Interest Partnership borrowed funds of $6,100,000 from Bank of America. Butcher Interest Partnership distributed $6,225,000 to K-Pipe Group, Inc. shortly after the Partnership's formation, leaving K-Pipe Group, Inc. with an adjusted capital account of $275,000.

Several differences between the purchase price for the Stock Purchase and the purchase price for the Asset Purchase should be noted. First, the working capital adjustment paid by Fortrend to Langley was $209,425 less than the working capital adjustment paid by Midcoast to Fortrend, due to adjustments that affected a purchase of stock but not a purchase of assets (e.g., accrued income taxes). Second, Fortrend's stock purchase price reflected the value of the $10,000,000 reserve fund and the $6,500,000 Butcher Interest, whereas Midcoast's purchase price did not.

### *Representations*

In connection with the Opinion, and recognizing that you will be relying on the accuracy and completeness of the factual statements and representations made herein, the undersigned, a duly authorized officer of Midcoast, after due inquiry and investigation, does hereby represent that the following statements and representations are true, correct and complete in all respects at the date hereof:

1. The Statement of Facts presented above accurately and completely sets forth the material facts associated with Midcoast's acquisition of the Assets from the Sellers;

2. At no point did Midcoast reach an agreement with Langley to purchase the stock of Bishop Group;

3. Midcoast did not at any time authorize Fortrend or K-Pipe, or any of their principals or representatives to act on Midcoast's behalf or to use Midcoast's


   name in any discussions regarding the purchase of the stock of Bishop Group by Fortrend or K-Pipe;

4. Except for those matters identified in the KPC Guaranty dated November 2, 1999, neither KPC nor Midcoast assumed any of the rights and obligations of K-Pipe under the Stock Purchase Agreement.

5. To the best of Midcoast's knowledge, all material elements of the Stock Purchase Agreement between the Langley and Fortrend (or K-Pipe) were negotiated solely by and

PWC P1266

ENB-DOJ-028438

PricewaterhouseCoopers LLP
Effective as of December 31, 1999
Page 12

between Langley and Fortrend (or K-Pipe);

6. Midcoast did not make any representations to any banks or other sources of funds ("funding sources") used by Fortrend or K-Pipe in K-Pipe's purchase of the stock of Bishop Group;

7. Midcoast is not a party to any loan agreement between Fortrend or K-Pipe and its funding sources for the purchase of stock of Bishop Group;

8. Except for those matters identified in the KPC Guaranty dated November 2, 1999, there is no legal basis on which KPC or Midcoast would be responsible to K-Pipe or Fortrend for specific damages or performance with respect to any contract entered into between Bishop Group or Langley and K-Pipe;

9. Midcoast is not bound, contractually or otherwise, by any transactions entered into by K-Pipe or Fortrend;

10. Any agreements between Midcoast and the Sellers are at arm's length, and Midcoast and the Sellers have no equity interests in each other and are otherwise unrelated;

11. There are no agreements or understandings between Midcoast and either Fortrend, K-Pipe or the Sellers (or their respective officers, directors, shareholders, principals, affiliates or agents), regarding the acquisition of the Partnership Interests other than those agreements and understandings set forth in the Asset Purchase Agreement;

12. Each of the transactions described in the Asset Purchase Agreement were consummated in accordance with the terms thereof;

13. Midcoast will not take any position contrary to the treatment of the acquisition of the Partnership Interests as other than an acquisition of assets;

14. Midcoast is not aware of any other party to either the Stock Purchase Agreement or the Asset Purchase Agreement who is taking, or plans or intends to take, any

position contrary to the treatment of the acquisition of the Partnership Interests as other than an acquisition of assets;

15 After the acquisition of the Partnership Interests, Midcoast does not plan or intend to acquire the stock of Bishop Group; and

16 K-Pipe Group, Inc. continues to hold its interest in the Butcher Interest Partnership, and there is no substantial certainty that Midcoast will exercise its option to purchase such interest.

PWC P1267

ENB-DOJ-028439

PricewaterhouseCoopers LLP
Effective as of December 31, 1999
Page 13

It is understood that (i) the Opinion of PricewaterhouseCoopers LLP will be based on the statements of fact and the representations set forth herein and on the terms of, and transactions described in, the Asset Purchase Agreement (including all schedules and exhibits thereto and all related documents), and the Stock Purchase Agreement (including all schedules and exhibits thereto and all related documents); and (ii) your Opinion will be subject to certain limitations and qualifications including that it may not be relied upon if such statements or representations are not accurate in all material respects.

PWC P1268

ENB-DOJ-028440

PricewaterhouseCoopers LLP
Effective as of December 31, 1999
Page 14

The undersigned will promptly notify PricewaterhouseCoopers LLP if any of the above statements or representations cease to be accurate and complete.

Very Truly Yours,

Midcoast Energy Resources, Inc.

By: _____

Name: _Richard Robert_

Title: _Chief Financial Officer and Treasurer_

PWC P1269

ENB-DOJ-028441

# PRICEWATERHOUSE COOPERS 🔲

PricewaterhouseCoopers LLP
Washington Tax Service
1301 K Street NW, 800W
Washington DC 20005-3333
Telephone (202) 414 1000
Facsimile (202) 414 1301

Effective as of December 31, 1999

Midcoast Energy Resources, Inc.
1100 Louisiana, 29th Floor
Houston, TX 77002

Ladies and Gentlemen:

You have requested our opinion regarding certain federal income tax consequences to Midcoast Energy Resources, Inc., a Texas corporation ("Midcoast") of the acquisition (hereafter, the "Purchase") by Midcoast Kansas Pipeline, Inc., a Delaware corporation ("Midcoast Pipeline") and Midcoast Kansas General Partner, Inc., a Delaware corporation ("Midcoast General Partner") (references herein to "Midcoast" shall include references to "Midcoast Pipeline" and "Midcoast General Partner" unless otherwise stated) of certain assets (the "Acquired Assets") previously owned by Bishop Pipeline Company, a Kansas corporation ("BPC"), Syenergy Pipeline Company, L.P., a Kansas limited partnership ("Syenergy"), and Kansas Pipeline Company, a Kansas general partnership ("KPC") (BPC, Syenergy and KPC collectively referred to as the "Sellers"), which consist primarily of partnership interests in Kansas Pipeline Company, MarGasCo Partnership , Mid-Kansas Partnership, and Riverside Pipeline Company L P. (the "Partnership Interests"), pursuant to the Asset Purchase Agreement dated November 5, 1999, between K-Pipe Merger Corporation, a Delaware corporation ("K-Pipe") and Midcoast (the "Asset Purchase Agreement").

In formulating our opinion, we reviewed such documents as we have deemed appropriate, including the following (collectively, the "Transaction Documents"):   .

    (i)    Letter of intent signed by Midcoast and K-Pipe Holdings Partners, L.P., dated September 30,1999;

    (ii)    Amendment to letter of intent signed by Midcoast and K-Pipe Holdings Partners, L P., dated November 4, 1999;

    (iii)    Escrow Agreement among Midcoast, K-Pipe and Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., New York Branch ("Rabobank"), dated November 5, 1999;

    (iv)    Asset Purchase Agreement and all schedules and exhibits attached thereto,

    (v)    Side letter between K-Pipe and Midcoast dated November 5, 1999;

    (vi)    Escrow Agreement among Midcoast, K-Pipe, Rabobank and Bank of America, N.A., dated November 8, 1999;

PRIVILEGED AND CONFIDENTIAL DOCUMENT
SUBJECT TO FEDERALLY AUTHORIZED PRACTITIONER - CLIENT PRIVILEGE



GOVERNMENT
EXHIBIT
196

PWC P1246

ENB-DOJ-028418

Midcoast Energy Resources, Inc
Effective as of December 31, 1999
Page 2

    (vii)   BPC's Stockholder's and Director's minutes approving dividend of
           Butcher Interest, dated November 8, 1999;

    (viii)  Bishop Gas Transmission Co. Stockholder's and Director's minutes
           approving dividend of Butcher Interest, dated November 8, 1999;

    (ix)   Conveyances of the Partnership Interests, dated November 9, 1999;

    (x)    Bill of Sale dated November 9, 1999;

    (xi)   Guaranty (pursuant to MarGasCo Project Development Agreement), dated
           November 9, 1999;

    (xii)   Butcher Interest Partnership General Partnership Agreement, dated
           November 8, 1999;

    (xiii)  Stock Redemption Agreement between The Bishop Group Ltd. and
           Dennis M. Langley ("Langley"), dated October 24, 1999;

    (xiv)  Project Development Agreement and MRG Interests Agreement between
           KPC and Management Resources Group, LLC ("MRG"), dated as of
           October 24, 1999;

    (xv)   Project Development Agreement between MarGasCo Partnership and
           MRG dated as of October 24, 1999;

    (xvi)  KPC Guaranty of the MarGasCo Partnership Project Development
           Agreement, dated October 24, 1999;

    (xvii)  MRG side letter dated October 24, 1999, regarding ordinary income
           treatment;

    (xviii) Side letter between Langley and K-Pipe, dated November 5, 1999;

    (xix)  Stock Purchase Agreement between K-Pipe and Langley, dated October
           25, 1999, and the schedules and exhibits attached thereto;

    (xx)   KPC Guaranty dated November 2, 1999; and

    (xxi)  Option Agreement among MRG, KPC and MarGasCo Partnership, dated
           as of October 24, 1999

In addition, we have relied upon representation letters to us from Midcoast and
Fortrend International LLC ("Fortrend") (the "Representation Letters"), including the
Statement of Facts included in Midcoast's Representation Letter, and have assumed that
such representations and statements will be true, correct, complete and not breached as of
the date hereof, and that no actions that are inconsistent with such representations and
statements will be taken. Finally, we have obtained such additional information as we
deemed relevant and necessary through consultation with officers and representatives of
Midcoast and Fortrend.

Our opinion set forth below assumes (a) the accuracy of the Representation
Letters and Statement of Facts, (b) that there are no facts or agreements relevant to the
Purchase or this opinion other than those set forth in the Transaction Documents, the
Representation Letters and the Statement of Facts, and (c) the consummation of the
transactions described in the Transaction Documents in the manner contemplated by and
in accordance with the terms thereof, without amendment or alteration

PRIVILEGED AND CONFIDENTIAL DOCUMENT
SUBJECT TO FEDERALLY AUTHORIZED PRACTITIONER – CLIENT PRIVILEGE

PWC P1247

Midcoast Energy Resources, Inc.
Effective as of December 31, 1999
Page 3

Our opinion is based on current provisions of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder, published pronouncements of the Internal Revenue Service and judicial precedent, any of which may be changed at any time, possibly with retroactive effect. Any change in applicable law or the facts and circumstances surrounding the Purchase, or any inaccuracy in the representations and statements on which we have relied, may affect the continuing validity of the opinion set forth herein. We do not undertake to advise you as to any changes after the date hereof that may affect our opinion unless we are specifically asked to do so. The opinion expressed herein is not binding on the Internal Revenue Service or any court, and there can be no assurance that the IRS or a court of competent jurisdiction will not disagree with such opinion.

Based upon and subject to the foregoing as well as the limitations set forth below, we are of the opinion that it is more likely than not that, immediately after the consummation of the Purchase, the Acquired Assets, in the aggregate, will have, for federal income tax purposes, a tax basis in the hands of Midcoast equal to the cost to Midcoast of such Acquired Assets as determined in accordance with Section 1012 of the Internal Revenue Code of 1986, as amended.

No opinion is expressed as to any matter not specifically addressed above. Also, no opinion is expressed as to the tax consequences of the Purchase under any state, local or non-U.S. tax law.

This opinion is issued solely for the benefit of Midcoast in connection with the Purchase of the Acquired Assets and may not be used or relied upon for any other purpose and may not be circulated, quoted or otherwise referred to for any other purpose without our express written consent.

Very truly yours,

*PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP

PRIVILEGED AND CONFIDENTIAL DOCUMENT
SUBJECT TO FEDERALLY AUTHORIZED PRACTITIONER – CLIENT PRIVILEGE

Bob Whitten

**REDACTED**

Mdco - Considerations
— if already, intro I as other buyer
① Avoid advance disc's b/t S and B, b/4 LOI
② Avoid signed K b/t I and B, unless I Ks
      w/ S
③ I retains signif assets & liabs
④ I not liquidate corp
⑤ Report to govt, third parties consistently

⑥ Pricing — Mdco take stock price & increase for
      prem; prem = 5% of step-up
usually
stone
risk     ⑦ Avoid indemns or other (connex's b/t S and B
         ⑧ I must be actively involved in negos
         ⑨ Separate K signings — backup fee w/
              separate closings — disaster risk,
                            backup risk, etc.
         ⑩ Describe in press release as simply purch of
              business
         ⑪ HSR — not when I buys the govt (too
              small), but HSR when I sell assets

         ⑫ I repres. by sepn counsel — at meetings,
              etc.
              — I indep. financed the 1th purch

GOVERNMENT
EXHIBIT
201
FINKAD-Bayonne, N.J.

PWC P1271

ENB-DOJ-028442

[Midcoast]
Closing - Nov. 8

19th floor - Bishop/KA
16th floor - Fortr/Midcoast

→ Fortrend some new officers of corp. GP's of Synenergy +
   KPC to effect sale of assets

→ Use LLC's as GP's so that Rship is part of
   midcoast consolid group, ie, ck box on LLC's?

Larry Austin - Fortrend employee - at least equiv of
Craig Hoffman

→ Date of SPA - Oct. 25 or Nov 4?
   - M&G letter reord in - signed by KPC on
     Oct 25?
   - KPC Guar's of Kpipe and PDA - separate?

Call        → Press release — get copy —
Barry          - Closing expected on Nov 9
Davis

→ Switcher will fund cap contrib and loan
   until Nov. 9 - $
     - Need to fund $ 6.1 M today in escrow
       & keep $ 225,000 cap contrib out —
     → Need Bishop Group LLC guaranty —

→ Purch Sale Agr - delete 3.7

| Prior | Thursday | Friday | Monday | Tues |
|---|---|---|---|---|
| KPC Develop K | Stk Purch Agr | Asset Purch Agr | Asset Escrow signed | Close Assets |
| Assgn to Dev K | KPipe waiver Ltr | midcoast waiver Ltr. | + funded | Purch |
| Stk Redemp K | Fortr. guaranty | | Stk purch. is closed | Sign all |
| Consult. K | Amended Midc. LoI | | Klpe name new corp | instruments |
| KPC Guar | $14 M Escrow | | officers | of conveyance |
| KPC letter re | | | | Midcoast loan |
| Ord Inc't b'ust. | | | | (?) |
| Option Agr | | | | |

PWC P1274

ENB-DOJ-028443

Butcher and Cod. Agr - signed on Sunday by both
parties -

· Work Cap - measured on ~~two~~ diff days -
Nov 8 + Nov 9 (?)
- two diff amts ~~involved~~ - bc of top
liabs they're assuming, etc.

Midcoast Escrow - $198,100,000 -
KPipe funding - 122 M -

[ Point - Midc. guar not a clos. doc for the sale -
the only thing requiring Parent guar is the
Dev Agr.]

Q - Possible to claim that Midc. guar. not
required ~~to~~ unless KPC Dev Agr. put into
effect?

→ Has BGL's name been changed to Kpipe
Group, Inc.?
If name changed, then shldn't Kpipe Group,
Inc. be used on any docs signed by
Kpipe on Mon. & Tues.?

1:30pm - only holding is Butcher acct set up +
getting wire instr's for it.

PWC P1275

ENB-DOJ-028444

<u>Favorable Facts</u>

Contractual risk – 24 hours, $1M

Escrow/ownership risk – 24 hours

Retained liabilities – SPA liab's, Tax Sharing Agr., pursuing lawsuits

Retained assets – $10M escrow, $6.5M Britton debt ($275,000 of equity)

Sellers put out for bids as a stk sale; continued to entertain bids from other potential stock buyers during Fortr. negotiation

Fortr. came on scene while bids still being entertained – Fortr. reid package other investors rec'd; was given presentation by Bishop

Fortr. signed LOI – ang Langley who review by Midcoast

No escrow rel. btw Midc. & Fortr. – written or oral

Fortr. never held itself out as agent of either party

Stk purch agr. not conditioned on asset agr., or vice versa

Reporting of Fortr. sale of assets to Midc. for H.S.R.

Midcoast guar. of terp. issue arises only bec. of DOJ control in Dev. Agr.

Substantial involv. by Fortr. in negs's of Stk Purch Agr.

Press release – only by purch. of KPC – not mention Dennis Langley

If POA not contrived, KPC is paying MRG additional amounts (akin to payment of note distrib out of KPC)

$21,500 penal if closing delays from Nov. 8 to Nov. 9

PWC P1276

ENB-DOJ-028445

<u>Unfavorable Facts</u>

- Tax Indemnity to Langley
- Midcoast guar of KPC's guar of tax indemnity
- Forbierd inability to borrow w/o escrowed funds from
  Midcoast
- Continuing rel B/t Langley & Midcoast through Develop
  K, Consulting K, etc.
  - but Develop Agr may be cut off by Option

**PWC P1277**

ENB-DOJ-028446

Review of Stk Sale Closing Documents

#'s 1-11 are the Minutes

12) Stk Redemp Agr - Oct 24

P'ship Agr - already signed

Robo - needs wire instr. today that $6.225 will be
        released tomorrow? NO

But will not agree today to commit to b 2 payment   Only agr to give note today re basic
                purchase price - so that no risk to

Bank BofA

Cash   100      Rabo on basic
Intco  6,500,000      pieces

[flowchart diagram]

Mark
6.1

Escrow  6.1 MM Loan

Debt      6,100,000
Pd Cap      500,000

Txs 6.1

Partnership
Buttw Acct   Txs Midcast
              225,000

Txs 6.1
  .225
 6.325
<6.225>
  100K

              225 Kipe

            225
            275

Kipe Intratt
Consideratn

  .6.5
  275
 6.225

            225
            275
 6.225

3:00 - Escrow SJd to reflect one more day of accrued
       int on Notes - $13,000
M dc → down to only $20,000 of work cap
For br → offer (possibly) to take $3M in stock --

PWC P1278

ENB-DOJ-028447

Review of SBK Closing Documents

Cathy - 596-5563
Dave - 597-3657
Michelle - 520-2913

① #27 - KPC PDA - as of 10/24

- Sec 6.4 - If KPL Δ of Control, purchaser or ULE
  Controll. Entity must be a Qual Purchaser
  and - ⓐ Purchaser must sign Assump Agr
  and - ⓑ ULE Contr. Entity must sign Parent Guar

- Exhibit 6.4A - Assump Agr - assume obly of
  KPC under PBA and KPC Guar (6.4C)
- Ex 6.4C is identical to KPL Guar signed as of 10/24
- Ext. 6.4B Par Guar in KPC PDA is diff from
  current Par Guar, only refers to PBA,
  Cons. Agr. and KPL Guar. -

4:50 pm - Monday - Ron did not review any of the
Stock Sale documents

To do:
- ① Check M. divorth waiver letter - Nov 9, FISM
  ② Check Asset Purch Agmt
  ③ Check Master of Conveyance

**PWC P1279**

ENB-DOJ-028448