- into Bishop
- K-Pipe Partners — owns 100% of 8th of
  Holding
  K Pipe Merger —

- 917-822-8802
- Home  -212-832-1058 —

Richard Robert -  H-713-973-7674
                  O 713-821-2043

- Not feel comfort putting up $14M
- Langley would do injunction
- Out for Fortr — re figure
- if Mid try far, allow them to
  have fordaw — but if wrong,

Richard Robert

① Sec Agmt
② Fortr will sign today —
   - Midcoast — will sign Wed —
   - if full agmt on Thursday — don't
                     want try on $14M —
Dennis coming  - Concern — Fortr sign doc — Mid
to Houston —          put up $14M —
               - Can't fund until Friday —

$14 M — was   - Fortr. sign today
Dan's call    - Mid. sign Wed —
              - if see no rules, may pull up
                 escrow + sign agr on Thursday —
              - Antention — all this done
                         today
              - Langley — has to consent to Assmp Agr.

PWC P1355

ENB-DOJ-028524

10/26 Richard Robert

- Overall oppressiveness
  Can't have regress to him
  Too many potents for litig
- want a clean litig
- Get rid of DA
- Have a noncompete —
- No continuing rel. —
- No closing until HSR
- Raised price by $14 Million —

10/28 Richard Robert

- 13.6M wore
- Develop Agr — only parties in gas-fired power plants —
- Still a KPC △ of control —
- Common to give parent guarantee —
- Stuck w/ guar a parent level
- Credit facility — signed a prev purch price
- Contempl. — going back to a more complic. Proj Agr — w/ Exhibits —
  —elim all rights except power plants —
- Start w/ Vers 1, pay stk $ or 14M to change —
Q — is # too that to stk fine differential?

PWC P1356

ENB-DOJ-028525

10/29 Tom P.

- Separate closings?
- Separate contracts?
- Need 14M w/ 1 mo difference
- Back to Proj Dev Agmt

10/29 Richard Robert –

- HSR in
  Midcast – Buch not ready until next
  ~~Tuesday~~ Monday then sign
  - Med. puts in 14M
  Med – signs Tues – gets 14M back
- Contig only on timing –

- Chris Watson – re escrow – send
  draft –
- ~~Option~~ – to go to diff. PDA –
  - can't operate bldr PDA
    for period of time –
  - pay in cash / or value in
    yr 2000

10/29 Ian Schachter

- To release buyer from guar, req's
  someone of equal credit –
- Lawsuit – 18M th –
  plus 2% over $150,000
- ~~Stella~~ more likely than not –
- Law is stupid –

PWC P1357

ENB-DOJ-028526

Q - where's [illegible] documented?
Q - Assets Escrow
K delay
Escrow delay
when is KPC Guar signed? Better if signa
at time of safe K
other quis - I won't sign until assets K
Where is option prov[illegible]? Change of Control?

10/29 Conf call - Craig, Cynthia, Graham,

① Craig re'd confirm that have $

② Revised PDA rec'd
Sale Pump Agr - vers. 27 -
Version 26?

Rec'd FTC Notif this AM -

②

Rivard -
   - Can[illegible] defer $ for pd of time
   - Option Agreement -
      - Complicated Agr - until Feb 1
      - Good one in place -
Option - down at KPC level - part
   of consid -
- Kpipe has option to nullify
   agr if [illegible] into that [illegible]
   - entered into -
- what would quantity of $ be to
   Cagley -

   -

**PWC P1358**

ENB-DOJ-028527

— Is an additional liab that is
   assumed?

— Is a company level payment —

Talk to Vitro — 816-374-3200
   Jim Pryde

Phone
Cellphone
316-646
  - 2152

— Capitalize as part of assets?

In reality → know as consid for
   stock?

— Refund — · Rev did not worth $13M
      Nuisance factor —

19.6% issue to him —

— If increased consid for stk is also
   increased consid for assets

— Events that triggers is beyond
   Fortis's control —

— Cynth needs
② — Stk — vers 2S
   — PDA revised
   — Asset Sale Agr — need comments —
   — Option Agr —
   Other Agr —
      — Consult Agr
      — Release of Employ K

③ — Escrow Agr —

PWC P1359

ENB-DOJ-028528

— Amend LOI —
  — Clearing P'ship name probl.
  — $300,000 asset —
  — Agree — whole out of LOI —

— [ Send comments to Chris K — ]
        on Asset
        Sale Agr.

— 13 M'' spread    — 7 M fee

— M & C get $

— Essentially — pulled a dividend out of
        company —

Signed — but not broke in until
    Feb 2000
      — when broke in, get $
        buy out —

_____

— Fix — put into Sale Redemp Agr —
— Club have payment from KPC
        to Langley —

Time

  — KPC — Dev Agr
  — Norgasco — No add pay's at all
      — Effect when sign
  — M & C — go in effect on Feb 1 — unless
        KPC elect to term —
      — Sale Purch Agr — 1887#

**PWC P1360**

- Supple pay - if KPC exer's option
- 2nd Amyded Agr
    - KPC - Option to term

- Supple pay - refer in CA to Punt
    - Opt Agr - not a schedule to
        80k Punt Agr -

H - 316 - 663 - 5220 -

- Payable if don't follow
    agr -

- Elect out of installment treatment

Don H - 281 - 752 - 7107

No Midcoast guarantee -
    [of $73.6 million]

- Byron   248 - 0975

10/30  Richard Robert
        Spoke to Jenny re ord inc w/up gr
        Begins to ord inc
        Try to reduce by assn some of A/R's
        Assume an adj to work cap

H - 713 - 973 - 7674
O - 713 - 821 - 2043

Cellphone
713 - 819 -
8281

PWC P1361

ENB-DOJ-028530

<u>Tom Palmis</u>                    Cell – 713-859-0243

- $1.2 million   A/R's → assigned no value
  b/c 90 days old
  WC Adj   AR
           Cash        )  2.5M
           Prog Cap's )

Could leave cash in there –
            $300-400,000 –

- Contract buyout provision?
- Buyout value – each possess a lot more
  than revenue interest –
- Not pay 800,000 – 200,000 for fee
- $50M – early term
- both of 35 + 50 – now 13 –
- View as K cancell cost?
  – Langley – agree to ord income
  – Opt Agr – upon payment, a
    1099 issued –
Tom – Is like make-whole provision –

- Eg – still pay $100m –
  Tartt – not thinking about
- of cap. as part of purch price,
  increases ? to Tartt –
  – non – Ee – not subj to EE –

- Langley – reduce hits by stripping
           out A/R's –

PWC P1362

ENB-DOJ-028531

- Give $400,000 cost to Fostr.
- Fostr. - financing issue —
- If reduce (price) they have to find financing —
- Thinks Dennis is keeping A/R's —
    — Dennis thinks collectible —

WC different? {
  - We - pay 2.6M for WC
    — they pay 2.4 for WC
  - Accr. int on the debt —
  - Accr. int on the escrow cash —
  - Accr. taxes, prop exp's —
}

→ $200,000 of inven value
    — If fostr. gets 20-30% of value —

- Dennis always understd. that he keeps A/R over pays —

- If Langley pulls out good A/R's, prob't help him
    — 612 cap gain either way —
- If resume, 3.75 — by value of A/R's he takes —

② - Ripe has oblig to turn over A/R proceeds
    - How does Midwood assume first oblig?
    It shdn't - shd carve out of pumbered assets

ENB-DOJ-028532

EBK. Purch Agr —
- Prelim Cash — reduced by all "Debt"
- Q = does this include Debt down a
     KPL level? presumably ~ b/c GAAP
     on unaudited basis
When buy assets — c'ld pay same Cash — purch
     price also includes liabs assumed
     Here — Debt of "companies" not
          literally include debt of Synergy

10/31  Tom Palmisano
          coming off of 13M #b —
     ③ — 3 possib's to get value to (Longley)
     ① Arome for one week after ) raise
work cap                                 } purch
adj      NO      transition — work'g cap adj } price
                                          } reduce
                                          } 13M by
     ② Pay for airplane                    } 1M
          for 5yrs — He owns
          - voice payments — 5 years —

     - Every $ that distrib — pay Ford
          5%

     ③ Pay all of the taxes on Bishop
          Group —
          — .inconsis. w/ assets —

          - will add to $9 anyway —

PWC P1364

ENB-DOJ-028533

11/2 —

Outs I's

① Side letter —
— cover both items
— Opt Agr
+ PDA

② Parent Guar
— delete ref
to opt Agr

③ Assump Agr

④ SPA — cov not
to signed

⑤ Escrow Agmt

⑥ P+S Agmt —
exclude A/R's

Send Email
to Ron

① Option Agr — refer to ordinary income reporting
by NRG

② Parent Guarantee —
— Delete refer to Opt Agr
— When are PDA's dated?

③ KPC Guar
— ∆'s sugg. by 10/30 E-mail

④ Assump Agr by Newco back in?
if so, then revise Parent Guar to guarantee
Newco's obligs under Assump Agr. —

⑤ Revise PDA's to clarify that NRG's share
of cash will be reported as ordinary
income as a ∫ for top guys only?
+ K-1 will be issued

⑥ SPA — reps that Kpipe will not
liquidate for at least 2 years

⑦ Escrow Agmt — re PSA + Closing —
delete references to Contract's note

___

11/2  Tom P —

1 business day — release of Escrow
be delay — one day after date Escrow
Agr is executed —
Leave in A/R's — bc Langley gets
them

PWC P1365

ENB-DOJ-028534

11/2  Ron Chouchère

- Extend to Nov. 8 –
- $180,000 – 1 wk extension
- 15m fee if not there –
- Need 2 separate letters
- Concern – that Bank not ready by Nov 8,
     or RA's don't assm doz's
     – concern – glitch – ard

11/2  Bob & T

Our clients will direct us to pay a value
added –
On such event, the fee is expec
     to be approx $ ___
Can't say contin on Deal Closing
     or how derived
Mtc. is our client –
     Not engaged by them – they paying as agent

[PDA]

11/2  Ron Chouchère

- Bank not give letter that they will
     fund – no commitment letter
- Start Closing process w/ Langley
     Monday AM –
     - Forest Bank to put $ in escrow
     - Not want $14 M at risk
- 1st - K pipe signs & closes
     - But can't start up LOI and $
→ Not put $ to M.d until get assn's

PWC P1366

ENB-DOJ-028535

from creditors

- They don't sign agr until $ in escrow
- No contractual risk at all?

Bank will cosign letter —

- Don't want 14M at risk w/ Langley
- If lose bank in syndicate, bank would pull out
- Richard — not think there is any risk —
    - Chip is ~~more~~ more uncomfortable than Richard —

- If value subj to financing —
    - Day 1 — KPipe signs
    - Day 2 — KPipe closes, Asset escrow funds
    - Day 3 — Escrow releases to KPipe

[Get copy from Ron] — KPipe did get Commit letter
    — has term loan of up to 215 M
    — Langley would have to agree that 715M is subj to financing —

(Jim Pryde — 816-374-3205)

— Ron Chachere — 361-883-235(0)

PWC P1367

ENB-DOJ-028536

Craig Hoff

① A typical is not involved in deal early
 — Typically, gets for the parties to understand
   how deal works.
② Deal itself has never gotten settled —
   — Bankers calculated $53 M exposure —

---

4/5 Craig Hoffman —

   — Delivered Stk Purch Agr signs yest.
   — $14M in Escrow yesterday
   — Been at risk for $14M for 24 hours
   — Doc's going forward —
      — Waiver Ltr — says only $14M — shd say
         $15 M —
   — Asset Purch Agr + waiver Ltr —

   Thurs — Fobr
            Signed
Doc re $14M     SPA
— Waiver letter —    Waiver letter
    —               Fortr quar

      Recd Amended LOI from Md
         14M Escrow signed by all
                    parties —
      Langley — delivered Stk Purch Agr
         — signed waiver letter

PWC P1368

ENB-DOJ-028537

11/5   – Chris & Ron

– Suggest → they really want to keep cash instead of close today

– Don't want to be bury out – w/o $14M
  – until put in rest of escrow –

---

– Lebery, Lamb
  125 West 55th St.
  Phone – 424-8000

– Tom – Cellphone – 713-859-0243
  Tom Palmisano

Enter value  169,700,000
  3.1 addition –

Richard – let's be clear on who's paying the fee –

– 169,700,000
– 3,112,800
  2,000,000
  (1,987,974)

  1,72,824,826
– 50,588,005
  1,222,3

128,507,821

5%  6,425,141.05
   – 33,573
   6,391,568.05 × 15% =
   $958,735

ENB-DOJ-028538

11/9 · Review of Asset Purch Agmt

~~Asset "Pshg Ints" — not Refinal~~

11/13

① Geo signed  Fortr. letter of Nov 9
② "         " Fortr. repres letter
③ Repres letter for midcoast
④ Check on Rostream Guarantees
⑤ Get copy of Forstreal guaranty to SPA

15/19 [Tom Palm]

— ~~Don~~ Whittington —
— — FERC guy for Midcoast
Hired firm & Whill — to present rate case
— Need exp. testi — filed by FERC related
to step-up on acquis. —
— currently — 89h.7 def tax liab for FERC
books — hampers ability to △ rates
— Nth.if to incl. taxes
— cleaned away 71.0 of step-up — now
Good & tax

Rate wase is
with KPC
only

— Then asked about internal —
— PWC — expect texts — no need to have
def tax liab —
— worth 85 in revenue — ( 1.5/year )
Probably — Book a portion of def tax liab
— Rule not book if more likely
than not —
[ Time — through 10/31 — 87,000 @ 40%
217,500

PWC P1370

ENB-DOJ-028539

12/6   -Bob W

Seller bid def tax/int
Buyer - b/c bought assets, def tax
      had had go away

12/6   Woody (Sharpe)

- Say - our client bought assets from
  seller -
- Will be filing in FERC
- Seller wanted to sell stk, Buyer
  wanted to buy assets - Third
  party came in + facilitated -

- Diana Steele - NY - PWC

12/10   Tom P
      - Will call Kosk to confirm election
      - or Bruce Snyder -

Betsy
- Purch. becomes partner in Old Partnership -
- New Rule + regs -
- If Old Pship rules else - covers them
- New Regs - Old Pship contribs to New Pship,
  who distrib's New Pship to partner
Old Pship  - Distrib is event only allows else against
step-up                - So New Pship can value -
of only in  - 761(e) - distrib of Pship int = exch for 754
New Pship,  - if true in 168 don't need in second
step-up      - recommend in Old Pship - most struk in future
occurs
again. instead

PWC P1371

ENB-DOJ-028540

<u>Bob Whitten</u>

**REDACTED**

<u>Midco - Considerations</u>
— if already, intro I as other buyer
1. Avoid advance disc: btt S and B; b/l LOI;
2. Avoid signed K btt I and B, under I Ks
   w/ S
3. I retain signf assets + liabs
4. I not liquidate corp
5. Report to govt, third parties consistently
6. Pricing — Midco take stock price + invoice for
   prem; prem = 5% of step-up
   *usually store risk*  7. Avoid indems or other connec btt, S and B
8. I must be actively involved in negos
9. Separate K signings — backup fee not
   separate closings — disaster risk,
   backup risk, etc.
10. Describe in press release as simply part of
    business
11. HSR — not when I buys the parent (too
    small), but HSR when I'll assets
12. I repres. by sepn counsel — at meetings,
    etc.
    — I indep pursued the stk purch

**PWC P1271**

ENB-DOJ-028442

[Midcoast]
Closing — Nov. 8

19th floor — Bishop/Fort
16th floor — Fort/Midcoast

→ Fortrend name new officers of corp. GP's of Synergy + KPC to effect sale of assets

→ Use LLC's as GP's so that Kpipe is part of midcoast consolid group, ie, check box on LLC's?

Larry Austin — Fortrend employee — at least equiv. of Craig Hoffman

→ Date of SPA — Oct. 25 or Nov. 4?
- MB&G letter re Ord ins — signed by KPC on Oct 25?
- KPC Guar's of Kpipe and PDA — separate?

call Barry Davis

→ Press release — get copy —
- Closing expected on Nov 9

→ Rabobank not fund cap contrib and loan until Nov. 9 —
- Need to fund $6.1 M today in escrow & keep $225,000 cap contrib out —
→ Need Bishop Group LtD guaranty —

→ Purch/Sale Agr — delete 3.7

| Prior | Thursday | Friday | Monday | Tues |
|---|---|---|---|---|
| KPC Develop K | Stk Purch Agr | Asset Purch Agr | Asset Escrow signed + funded | Close Asset Purch |
| Inerguarlo Dev K | KPipe waiver Ltr | Midcoast waiver Ltr | Stk purch. is closed | Sign all instruments of conveyance |
| Stk Redemp K | Fortr. guaranty | | Kpipe name new corp officers | Midcoast loan |
| Consult K | Amended Midc. LOI | | | (?) |
| KPC Guar | $14 M Escrow | | | |
| KPC Letter re Ord Ins Mat | | | | |
| Option Agr | | | | |

PWC P1274

ENB-DOJ-028443

Butcher and Cod. Agr - signed on Sunday by both
parties -

Work Cap - measured on two diff days -
Nov 8 + Nov 9 (?)
- two diff ends involved - b/c of the
liabs they're assuming, etc

Midcoast Escrow - $198,100,000 -
K Pipe funding - $22 M -

[ Point - Mdc guar not a clos dotn for the sale -
the only thing requiring Parents guar is the
Dev Agr]

Q - Possible to chain that Mdc. guar. not
required to unless KPC Dev Agr put into
effect?

→ Has BGL's name been changed to Kpipe
Group, Inc.?
If name changed, then shd it Kpipe Group,
Inc. be used on any docs signed by
Kpipe on Mon. & Tues.?

1:30 pm - only holdup is Butcher acct set up +
getting wire instr's for it.

ENB-DOJ-028444

Favorable Facts

Contractual risk – 24 hours, $1M
Escrow/ownership risk – 24 hours
Retained liabilities – SPA liab's, Tax Sharing Agr., pursue lawsuits
Retained assets – $10M escrow, 6.5M Bitstar debt ($275,000
          of equity)
Sellers put out for bids as a stk. sale; continued to
     entertain bids from other potential stock buyers
     during Fortr. negotiation
Fortr. came on scene while bids still being entertained –
     Fortr. reid package others investors rec'd; was given
     presentation by Bishop
Fortr. signed LOI ~ no Langley use review by Midcoast
No agency rel. btw Midc. & Fortr. written or oral
Fortr. never held itself out as agent of either party
Stk. purch. agr. not conditioned on asset agr.,
     or vice versa
Reporting of Fortr. sale of assets to Midc. for H.S.R
Midcoast's approval of trspn. when arises only bec. of D of
     control in Dev. Agr.
Substantial involv. by Fortr. in neg'n of Stk. Purch. Agr.
Press release only for purch. of KPC – not mention
     Dennis Langley
If POA not continued, KPC is paying MRG additional
     amounts (akin to payment of noted dividends out of KPC)
$21,500 event if closing delay from Nov 8 to
     Nov 9

PWC P1276

ENB-DOJ-028445

Unfavorable Facts

- Tax Indemnity to Langley
- Midcoast guar of KPC's guar of Tax indemnity
- Forbidden inability to borrow n/o escrowed funds from Midcoast
- Continuing rel 8th Langley & Midcoast through Develop K, Consulting K, etc.
    - but Develop Agr may be cut off by Option

PWC P1277

ENB-DOJ-028446

Review of Stk Sale Closing Documents

*s 1-11 are the Minutes

(12) Stk Redemp Agr - Oct 24

Pship Agr - already signed

Bid will not agree today to commit to b.2 payment

Robo - needs wire instr. today that $6.225 will be released tomorrow. NO

Only agr to give instr today re basic purchase price - so that no risk to

Bank BofA

Cash 100   Robo on basic
Intere 6,500,000   price

Debt   6,100,000
Pub Cap   500,000

March 6.1

[Escrow] 6.1 MM Loan

Tues 6.1

Tues 6.1
.225
6.325
<6.225>
100 K

[Partnership Bidder Acct]

Tues Midcourt
225,000.

2nd Kipe

2.25
275

[Kipe Interest Consideration]

6.5
275
6.225

3:00 - Escrow D'd to reflect one more day of accrued int. on Notes - $43,000
M.c → down to only $29,000 of work cap
Foster → offer (possibly) to take $3Min stock -

_Review of 8K Closing Documents_

Cathy - 596-5163
Dave - 597-3657
Michelle - 520-2913

① #27 - [KPC PDA] - as of 10/24

- Sec 6.4 - If KPC Δ of Control, purchaser or Ult.
  Controll. Entity must be a Qual Purchaser
  and - ⓐ Purchaser must sign Assump Agr
  and ⓑ Ult Contr Entity must sign Parent Guar

- Exhibit 6.4A - Assump Agr - assume oblig of
  KPC under PBA and KPC Guar (6.4C)
- Ex 6.4C is identical to KPC Guar signed as of 10/24
- But 6.4B Par Guar in KPC PDA is diff from
  current Par Guar, only refers to PDA,
  Cons. Agr. and KPC Guar. —

4:50 pm - Monday - Ron did not review any of the
  OTC Sale documents

To do:
- ① Check M. devonst waiver letter - Nov 9, P/SM
  ② Check Asset Purch Agmt
  ③ Check dusdr's of Conveyance

PWC P1279

ENB-DOJ-028448

Fact Background

(1st Duesfee - September - Sellis visit (EY), PW + Fortran)
had discussion (on Aug 26)
9/12 - PW mtg w/ Mde - Seller present) - spoke w/ Fort.
reflec - very limited disc's w/ Seller - test.
dgr to go forward w/ Mdco
Bid process - started in July - fresh bids due 8/30
- bid deadline extended
9/14 - Fortr rev'd materials -

**PWC P1280**

ENB-DOJ-028449

1/9 | Asset Closing

- Chris Kortland - will hold payment until told to
      release it —

- Closing on Monday ~approx 5:30 pm

Tuesday - money released out approx 11:30.

→ Checks on given by 2 BP's
     of Sutcliffe —

- 6th copy of Certif per Sutcliffe
                     S.D.

PWC P1281

ENB-DOJ-028450



ENB-DOJ-028451

01/27/04  13:01 FAX 7138212160          ENBRIDGE                    ☒019

Tax issues

① I cannot be agent of S2B.
  - No written agcy K?
  - I not held self out as agal
  - I acts for own benefit
  [Easy to avoid Bollinger]

  - fact that I pay w/ $ from B will mean
    a guaranty of price

                    Cononidate by wp/gstost
② Not treat as stk purch or otrt
   over form grounds

  - Parent sub cases
  - 1031 cases

③ Not treat seller's corp as selling
   Not a CD Hold o/t

ENB-DOJ-028452

Tom Palmisano          213-356-8264

- $150,000 work cap adj
- Net of $42,000 that Rick felt owed

PWC P1284

9/25 Jeff Furman

- Will cut rest of $ —
- will settle in Midwest — the dealing
  the side
- 40,000 ranges
- Never had deal - claims from both
  side
- Howard - will let know

PWC P1285

ENB-DOJ-028454

Midwest — Richard Robert

- Has been a request to supply w/ copies of opinion
- If don't provide one ($?)
- Close — week after rept

[Copy Blacklined version]

- Penalty — only for no substantial author —

- Conservative
- Avg          Prudently aggressive —
- Aggressive

- $140,000 — Fortress — actually paid
  Don't know if Fortress got $ from Langley —

ENB-DOJ-028455



# LEASE STRIPS AND VIRAL STOCK: ARE THEY DEAD YET?

**March 2005**

Reproduced with permission from Tax Management Memorandum, Vol. 45, No. 26, 12/27/2004. Copyright © 2005 by The Bureau of National Affairs, Inc. (800-372-1033), http://www.bna.com.

**www.morganlewis.com**

Philadelphia ■ Washington ■ New York ■ Los Angeles ■ San Francisco ■ Miami ■ Pittsburgh ■
Princeton ■ Chicago ■ Palo Alto ■ Dallas ■ Harrisburg ■ Irvine ■ Boston ■ London ■
Tokyo ■ Brussels ■ Frankfurt ■ Paris

GOVERNMENT EXHIBIT

205

## Lease Strips and Viral Stock: Are They Dead Yet?

## March 2005

by Gary B. Wilcox[1]
Morgan, Lewis & Bockius LLP
Philadelphia, PA and Washington, D.C.

Major References:
*Black & Decker Corp. v. U.S.*, 340 F. Supp. 2d 621 (D. Md. 2004); *Long Term Capital Holdings v. U.S.*, 330 F. Supp. 2d 122 (D. Conn. 2004).

**Introduction**

For comedians, timing is everything. The IRS, however, probably was not amused when the decision in *Black & Decker Corp. v. U.S.*[2] was announced on the same day that the IRS announced its settlement guidelines for lease strips[3] in the wake of the *Long Term Capital Holdings*[4] decision. The image of the IRS trying to mop up lease strips as a significant taxpayer victory occurs in a contingent liability shelter invokes a similar image from *Monty Python's Holy Grail*, where a person arises from a pile of bodies to claim "I'm not dead yet!" This memorandum explores some of the implications of the *Long Term Capital Holdings* decision for the analysis of not only lease strips and their progeny, known as "viral stock," but also other shelters that similarly involve a transfer of high-basis assets to an entity in a purported tax-free transaction followed by a sale of an interest in the entity.

---

[1]   Mr. Wilcox is a partner at Morgan, Lewis & Bockius LLP, resident in both the Philadelphia and Washington, D.C. offices, where he focuses on domestic and international corporate and partnership transactions. He is a former Deputy Chief Counsel for the IRS. The author would like to thank Steven S. Poulathas for his valuable assistance.

[2]   340 F. Supp. 2d 621 (D. Md. 2004). The *Black & Decker* decision was closely followed by two additional government losses involving the government's challenge of alleged tax avoidance transactions on economic substance grounds. *Coltec Indus. Inc. v. U.S.*, 62 Fed. Cl. 716 (2004); *TIFD III-E Inc. v. U.S.*, 94 A.F.T.R.2d 2004-6635 (D. Conn. 2004). Only the *Black & Decker* decision is discussed herein.

[3]   IRS News Release IR-2004-128 (10/20/04). Under these guidelines, the IRS will not settle unless taxpayers concede 100% of the claimed losses or deductions, reduced by transaction costs of up to 10% of the amount of such losses or deductions, and 50% of the accuracy-related penalty at issue.

[4]   330 F. Supp. 2d 122 (D. Conn. 2004).

This White Paper is published to inform clients and friends of Morgan Lewis and should not be construed as providing legal advice on any particular matter.

©2005 Morgan, Lewis & Bockius LLP

**THE *LONG TERM CAPITAL HOLDINGS* DECISION**

**The Long Term Capital Holdings Transactions**

At the core of the *Long Term Capital Holdings* case is the lease strip, from which all the subsequent tax benefits emanate. A foreign corporation, Onslow Trading and Commercial LLC (OTC), presumably owned by non-U.S. persons but no one in particular, acquired rights to lease computer equipment or trucks as a lessee. OTC then immediately subleased its rights as lessee to another party, with the sublessee prepaying 92.5% of the rent due under the sublease. As a foreign corporation, OTC paid no U.S. taxes on the prepayment, nor did it pay taxes in any other country. OTC deposited the prepayment in the bank, and then pledged the bank account as security for its own lease obligation.

At that point the lease strip was perfected. OTC received approximately $100 million in prepayments, on which no U.S. tax was paid. The $100 million was pledged to pay OTC's own lease obligations. OTC claimed it had a basis of $100 million in the pledged account. The net value of OTC's rights in the pledged account, the sublease and its own lease obligations was approximately $1 million. Hence, OTC claimed it owned an asset with a $99 million built-in loss.

The stage was then set to begin distributing the $99 million loss to multiple taxpayers, multiple times. This phenomenon results from tax rules that permit basis to be duplicated when property is transferred tax-free to a corporation or partnership. That is, the transferee corporation or partnership carries over the transferor's basis as inside basis in the asset and the transferor converts the asset basis into outside basis in the corporate stock or partnership interest.

The first transactions to duplicate basis occurred in 1995 when OTC transferred its positions in the lease and sublease and its rights in the bank deposit to U.S. subsidiaries of two large U.S. corporations in exchange for preferred stock, in transactions designed to qualify as tax-free under § 351.[5] These transactions occurred shortly after the lease strip. Presumably the U.S. parent companies contributed sufficient assets to their subsidiaries so that they, together with OTC, could be treated as transferor groups that met the control requirement of § 351. While the U.S. subsidiaries assumed OTC's obligations to pay rent under its own lease, OTC apparently claimed that such assumption did not reduce its basis in the preferred stock under § 358(d) because the payment of such liability would give rise to a deduction and, therefore, the liability is not taken into account pursuant to § 357(c).[6] Thus, OTC claimed a $100 million basis in the preferred

---

[5]   Unless otherwise noted, all section references are to the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

[6]   Literally, § 358(d) says to ignore an assumed liability for purposes of reducing outside basis only where the liability is ''excluded under § 357(c)(3),'' and § 357(c)(3), by its terms,

stock. The U.S. subsidiaries claimed a $100 million basis in the lease positions and bank deposits, and then claimed deductions as the monies in the deposit account were used to make rental payments. In effect, the income from the rent prepayments, which was never taxed in the U.S., had been stripped away from the corresponding deductions.

The second transactions to duplicate basis occurred in 1996 when OTC transferred the preferred stock to Long-Term Capital Partnership, which in turn contributed the preferred stock to a lower-tier partnership called Portfolio. These transactions occurred more than a year after OTC received the preferred stock. Both Long-Term Capital Partnership and Portfolio claimed that OTC's $100 million basis in the preferred stock carried over to them in tax-free § 721 transactions. Approximately one year later, in 1997, OTC sold its partnership interest in Long-Term Capital Partnership to Long-Term Capital Management, a partnership that itself was a partner in Long-Term Capital Partnership, pursuant to put options that OTC acquired from Long-Term Capital Management at the time it contributed the preferred stock in the § 721 transactions. The purchase price was substantially less than $100 million. Then, two months later, at the end of 1997, Portfolio sold the preferred stock in the two U.S. corporations to an investment bank.

Portfolio allocated the capital loss from the sale of the preferred stock to Long-Term Capital Partnership, as it was required to do under § 704(c).[7] Long-Term Capital Partnership then allocated the capital loss it received from Portfolio to Long-Term Capital Management, again as required under § 704(c). That is, when OTC contributed the preferred stock to Long-Term Capital Partnership, § 704(c) principles required that any capital loss from the sale of the preferred stock be allocated to OTC. However, when OTC sold its interest to Long-Term Capital Management, the purchaser stepped into the shoes of OTC with respect to the § 704(c) loss. If a § 754 election had been in place for Long-Term Capital Partnership, then the capital loss that shot out to Long-Term Capital Management would have been offset by the purchaser's negative

---

excludes certain liabilities from the application of the ''liabilities over basis'' rule in § 357(c)(1). Where, as in *Long Term Capital Holdings*, the liabilities assumed did not exceed the alleged basis, it would seem that the transferor should not get the benefit of the special rule in § 358(d) that excludes certain liabilities from being taken into account for outside basis. However, the IRS ruled in Rev. Rul. 95-74, 1995-2 C.B. 36, that deductible liabilities are not taken into account whether or not they exceed the basis of the transferred property. Taxpayers also have relied on that position to support high outside basis in other tax shelter contexts, such as the contingent liability transaction described in Notice 2001-17, 2001-9 I.R.B. 730. It is not clear if § 358(h), effective after October 18, 1999, would require that OTC's basis in the preferred stock be reduced by the assumed liability. An exception applies if substantially all the assets with which the liability is associated are transferred to the corporation. Note, however, applicable for transactions entered into after Oct. 22, 2004, the American Jobs Creation Act of 2004 (2004 AJCA), P.L. 108-357, § 836, amends § 362 to limit the U.S. subsidiary's carryover basis in the built-in loss assets to their fair market value. *See* § 362(e), as amended by the 2004 AJCA, P.L. 108-357, § 836.

[7]   Note that § 704(c)(1)(C), as added by the 2004 AJCA, P.L. 108-357, § 833(a), would prohibit OTC's § 704(c) gain from being transferred to Long-Term Capital Management. *See* § 704(c)(1)(C), as added by the 2004 AJCA, P.L. 108-357, § 833(a), applicable to contributions made after Oct. 22, 2004.

§ 743 adjustment, and effectively denied.[8] Not surprisingly, there was no § 754 election in effect for Long-Term Capital Management.

**The U.S. District Court's Opinion**

This case was only about the capital loss claimed by Long-Term Capital Management from Portfolio's sale of the preferred stock. Effectively, for purposes of deciding the case, the court assumed that the various assets contributed by OTC to the U.S. subsidiaries had an aggregate basis of $100 million at the time, and that OTC converted that basis into basis in preferred stock in a tax-free § 351 transaction. The ability of the U.S. subsidiaries to claim $100 million of deductions without recognizing income was not before the court. The real analysis for the court began at OTC's contribution of the preferred stock to Long-Term Capital Partnership.

The U.S. District Court for the District of Connecticut held that OTC's contribution of the preferred stock to Long-Term Capital Partnership, OTC's sale of its partnership interest to Long-Term Capital Management, and Portfolio's subsequent sale of the preferred stock to an investment bank lacked economic substance and must be disregarded for federal income tax purposes. The court held in the alternative that the transactions must be recast under the step transaction doctrine as a taxable sale by OTC directly to Long-Term Capital Management. The court also upheld a 40% penalty for gross valuation misstatement and, in the alternative, 20% substantial understatement penalties.[9]

The district court, citing *Gilman v. Comm'r*,[10] suggested it would use a "flexible" conjunctive test for applying the economic substance doctrine, that is, that "a finding of either a lack of a business purpose other than tax avoidance or an absence of economic substance beyond the creation of tax benefits can be but is not necessarily sufficient to conclude the transaction is a sham." Nevertheless, since it found that both were lacking, it did not decide whether the test is conjunctive or disjunctive in the Second Circuit. Long Term Capital argued that the transactions should be recognized as having economic substance if the transactions caused a change in their economic positions. The court, however, believed that the law of the Second Circuit required that the court determine whether there was a "reasonable opportunity for economic profit, that is, profit exclusive of tax benefits."

In applying the economic substance requirement, the *Long Term Capital Holdings* court concluded that it was not reasonable for the taxpayer to expect a non-tax-based profit from the

---

[8]    Section 743(b), as amended by the 2004 AJCA, P.L. 108-357, § 833(b), would mandate a § 743(b) adjustment in these circumstances. See § 743(b), as amended by the 2004 AJCA, P.L. 108-357, § 833(b), applicable to transfers after Oct. 22, 2004.

[9]    The implications of the *Long Term Capital Holdings* decision on penalties and reliance on opinions of professional advisors are discussed in detail in the companion White Paper by Miriam L. Fisher, "*Long Term Capital Holdings v. United States*, The End of Penalty Protection?".

[10]   933 F.2d 143 (2d Cir. 1991).

4

transactions considering the hefty transactional costs intended to be incurred. For instance, Long Term Capital decision to close the fund to new investors and forgo additional fees would not follow business logic without an expectation of simultaneous tax benefits. The court compared the potential profit to the sizeable amounts paid as attorney fees, consultant fees, partnership distributions, bonuses, and related-party loans. While the court took notice and generously assumed that the above-market returns would continue for potential profits, it also aggressively excluded certain management fees and chose to ignore the economic value of partner relationships. The court's analysis of such profits and costs led to its conclusion that the transaction lacked economic substance simply because no prudent investor would knowingly and intentionally incur costs above a reasonable gain.

The court in *Long Term Capital Holdings* reinforced its implosion of the tax shelter by also relying on the "end result" version of the step transaction doctrine. OTC's transfer of the preferred shares to Long-Term Care followed by OTC's put of the Long-Term Capital Partnership interest to Long-Term Capital Management was considered a prearranged series of transactions by all the parties who had complete control over all of the steps. Distinguishing *Grove v. Comm'r.*[11] and *Esmark v. Comm'r.*,[12] the court characterized the transaction as simply a premeditated sale of preferred shares by OTC to Long-Term Capital Management followed by a transfer of those shares to Long-Term Capital Partnership.

Much already has been (and still more will be) written about the impact of the particular facts on the court's application of the economic substance and step transaction doctrines. Empowered by the sheer force of the *Long Term Capital Holdings* decision, the IRS's recent "no mas" settlement policy on lease strips closely follows the approach it took with the "Son of BOSS" shelter. However, the Son of BOSS shelters done on or after October 18, 1999[13] are subject to statutory and regulatory limitations that, barring a successful challenge to the validity of the regulations, effectively eliminate the taxpayer's hope for a favorable decision.[14]

The government does not have the same silver bullet in cases involving lease strips and the successive multiplication of basis through so-called "viral stock" transfers.[15] Instead, it has to

---

[11]   490 F.2d 241 (2d Cir. 1973).

[12]   *Esmark, Inc. v. Comm'r.*, 90 T.C. 171 (1988), *aff'd in unpub. opin.*, 886 F.2d 1318 (7th Cir. 1989).

[13]   That is, those described in the second fact pattern of Notice 2000-44, 2000-36 I.R.B. 255.

[14]   § 358(h); Regs. § 1.752-6T; Chief Counsel's Notice CC-2003-020.

[15]   Notice 2003-55, 2003-34 I.R.B. 395 (the IRS will attack lease strips by applying "various judicial doctrines, such as the doctrines of assignment-of-income, business purpose, substance-over-form, step transaction, or sham"); Rev. Rul. 2003-96, 2003-34 I.R.B. 386 (application of § 482 to lease strips is limited). On Nov. 10, 2003, proposed regulations under § 7701(l), issued in 1995, which recharacterized lease strips to prevent tax avoidance, were withdrawn because "the complexity presented by these proposed regulations is not necessary to prevent tax avoidance in these transactions," in light of government's victories in *Anadantech* and *Nicole Rose*. The IRS Coordinated Issue Paper on Lease-Stripping Transactions, issued on July 21, 2000, does not reflect the IRS's current positions.

Morgan, Lewis & Bockius LLP

wade through the thicket of the economic substance and other judicial doctrines in order to successfully challenge these transactions. Occasionally the government is presented with facts so egregious that the particular legal theory at play is almost irrelevant. It becomes obvious that the court is looking for a way to hold in favor of the government. Practitioners saw that in another lease stripping case, *Andantech L.L.C. v. Comm'r.*,[16] from which it is almost impossible to draw cohesive legal principles for application in other contexts, even though the decision represents a resounding victory for the government.

The *Long Term Capital Holdings* case is similarly driven by bad facts rather than a cohesive application of the law. As we know, bad facts often make bad law. A key question going forward is what does this case really mean for the application of the economic substance and step transaction doctrines under other fact patterns and other shelters? For example, does it mean that every tax-driven § 351 contribution or § 721 contribution will be subject to an economic substance analysis? Surely not. Sometimes a court will conclude that a particular transaction has economic substance even though it seems obvious that the decision is more conclusory than analytical. The recent *Black & Decker* decision is a good example. The challenge going forward for both the government and private practitioners is to determine up front whether a transaction lends itself to an economic analysis before wading into the thicket. More often than not, there is a far more sensible and appropriate means than economic substance to judge the transaction's validity.

## ECONOMIC SUBSTANCE DOCTRINE IN OTHER CONTEXTS

The economic substance doctrine historically has been used by courts in cases involving individual tax shelters such as leases and straddles. These courts have adopted a two-pronged test for analyzing whether a tax shelter transaction is a "sham." The first factor focuses on the taxpayer's subjective motive for choosing to enter the transaction and is thus an intent test. The second factor is whether the transaction has economic substance. This factor is an objective determination of whether there existed any possibility of an economic profit other than tax benefits. A transaction motivated solely by tax avoidance is not characterized as a sham unless the court also finds that the transaction lacks economic substance.[17]

This two-pronged analysis for tax shelters generally has been applied only to tax shelters and other closed investments where the taxpayer is not already engaged in the particular subject of the investment and stands to profit, if at all, only from the particular investment. Most of the recent corporate tax shelter cases involve isolated transactions outside the taxpayer's trade or business that are specifically identified to generate a tax loss or deduction item.[18]

---

[16]   331 F.3d 972 (D.C. Cir. 2003), *aff'g in part & remanding for consideration of other issues* T.C. Memo 2002-97.

[17]   *Frank Lyon Co. v. U.S.*, 435 U.S. 561 (1978); *Rice's Toyota World, Inc. v. Comm'r.*, 752 F.2d 89, 91 (4th Cir. 1985).

[18]   *See, e.g.*, *ACM P'ship v. Comm'r.*, 157 F.3d 231 (3d Cir. 1998).

Morgan, Lewis & Bockius LLP

For example, the courts have rejected the IRS's repeated attempts to argue sham transaction theory or *Tax Management Memorandum* the economic substance doctrine in the context of inter company financing transactions. The seminal case on this topic, *Kraft Food Co. v. Comm'r.*,[19] was decided nearly 50 years ago. In that case, a parent corporation operating at a loss owned a highly profitable subsidiary. At that time, the consolidated return provisions had been abolished. Faced with the prospect of not being able to offset the subsidiary's income with the parent's losses, the parent caused the subsidiary to distribute a $30 million interest-bearing note to the parent as a dividend. The interest deduction on the note reduced the subsidiary's taxable income, while the interest income to the parent was offset by the parent's losses. Both the Tax Court and the Second Circuit found that the transaction was driven primarily by tax savings. The Tax Court disallowed the subsidiary's interest deduction because the only purpose of issuing the notes was to obtain the interest deduction, the parent's economic interests were unaffected by the issuance of the note, and the transaction was not arm's length because the parties involved were related.

The Second Circuit in *Kraft* reversed in favor of the taxpayer, holding that the notes could not be disregarded since they created legal rights and duties with genuine commercial law effects, including the effects on priority of rights in bankruptcy. It did not matter to the Second Circuit that the notes were distributed primarily to achieve a tax benefit: "The inquiry is not what the purpose of the taxpayer is, but whether what is claimed to be, is in fact . . . .  We think that the occurrence of these acts affected their legal relations."

Another area in which the economic substance doctrine has been considered inappropriate is the tax treatment of back-to-back loans involving a Netherlands Antilles subsidiary. The back-to-back loan authorities primarily involve financing transactions designed to take advantage of a U.S. income tax treaty. Before the enactment of the portfolio interest provisions of the Code in 1984, U.S. companies formed Netherlands Antilles subsidiaries which borrowed money from a foreign person and then on-lent the proceeds to their U.S. parent on back-to-back terms. This was done solely to qualify the payment of interest by the U.S. parent under the U.S./Netherlands Antilles treaty and avoid the U.S. withholding tax that would otherwise be imposed on interest paid directly to the foreign investors. When the portfolio interest provisions, which exempt most borrowings from foreign investors from U.S. withholding tax, were enacted in 1984, Congress grandfathered all prior back-to-back arrangements where the Netherlands Antilles subsidiary maintained no more than a five-to-one debt-to-equity ratio.

The IRS has since challenged several pre-1984 Netherlands Antilles financing arrangements that did not qualify for grandfather relief because of a higher than five-to-one debt-to-equity ratio. In *Northern Indiana Public Serv. Co. v. Comm'r.*,[20] the IRS first argued in the Tax Court that the arrangement failed under the early back-to-back loan case, *Aiken Indus., Inc. v. Comm'r.*,[21] in which a back-to-back loan was collapsed and treated as a "conduit" where the intermediary had no equity, made no profit, and otherwise had no dominion and control over the interest income it

---

[19]   232 F.2d 118 (2d Cir. 1955), *rev'g* 21 T.C. 513 (1954).

[20]   115 F.3d 506 (7th Cir. 1997).

[21]   56 T.C. 925 (1971).

7

received. The Tax Court rejected that argument because the Netherlands Antilles subsidiary did have equity capital apart from its loan receivable and loan payable, and it also earned a 1% profit (borrowing at 17.5% and on-lending at 18.5%).

On appeal, the IRS argued that the arrangement should be ignored based on the economic substance doctrine. The Seventh Circuit held that the various cases applying the economic substance doctrine to tax shelters, such as *Goldstein*,[22] *Sheldon*,[23] and *Knetsch*,[24] were not applicable because those cases involved borrowing transactions unrelated to any economic activity, where the taxpayer's pre-tax interest outlay was greater than the pre-tax interest received. In the case of *Northern Indiana*, the borrowing transaction, while clearly using a tax-motivated structure designed to take advantage of treaty benefits, was otherwise effected pursuant to a bona fide business objective of obtaining capital. Moreover, the Seventh Circuit concluded that the arrangement *had* economic substance because the finance subsidiary earned a profit when it borrowed at 17.5% and on-lent at 18.5%. It did not matter to the court that the profit was earned inside a wholly owned subsidiary of the U.S. parent.

The IRS challenged a back-to-back loan arrangement a second time in *Del Commercial Properties, Inc. v. Comm'r.*,[25] and this time won in the Tax Court. The court's reasoning is not well articulated. It mentions not only the step transaction doctrine but also the "conduit" theory, the general sham transaction doctrine, and the substance over form doctrine, without indicating on which principle the decision rests. What is clear, however, is that the taxpayer had a particularly egregious fact pattern. There were direct links between the ultimate borrower and a third-party lender in the form of covenants, guaranties and mortgages. After several years, the ultimate borrower began to bypass the intermediary and make payments directly to the intermediary's lender. Also, after several years, the interest spread earned by the intermediary was reduced to zero. It is not at all surprising that the taxpayer lost on those facts, regardless of which legal theory supported the decision.

*United Parcel Serv. v. Comm'r.*,[26] recently confirmed that the economic substance doctrine traditionally used to analyze tax shelters is not applicable when analyzing a transaction entered into as part of a company's ongoing business activities. UPS had been receiving excess value charges (EVCs) from its customers for insuring parcels worth more than $100 (UPS is liable only for the first $100 of loss). UPS restructured its EVC program by insuring the risks with an unrelated insurer; as a result, UPS paid the entire premiums over to the insurer and deducted the payment as an expense. The unrelated insurer then reinsured the risk with a Bermuda company that had been formed by UPS and then distributed to the UPS shareholders. As a result, the EVC income that UPS previously reported in its income was now being reported by an offshore

---

22   364 F.2d 734 (2d Cir. 1966).

23   94 T.C. 738 (1990).

24   364 U.S. 361 (1960).

25   T.C. Memo 1999-411.

26   254 F.3d 1014 (11th Cir. 2001).

8

insurance company that was owned by the UPS shareholders. The Tax Court held for the IRS, relying on some murky combination of the sham and economic substance doctrines and factual findings that the restructuring of the EVC program had no defensible business purpose.

The Eleventh Circuit reversed in favor of the taxpayer, holding that the restructuring should be respected for tax purposes. The issue before the court was whether the EVC restructuring had the kind of economic substance that removes it from "sham-hood." Given how the issue was presented, the court proceeded with an analysis of the transaction under the economic substance doctrine to determine (1) whether it had "economic effects other than the creation of tax avoidance," and (2) whether it had "no business purpose and its motive is tax avoidance." The restructuring had the necessary "economic effects" because UPS was obligated to pay the unrelated insurer and the insurer could proceed against UPS if the insurer defaulted. The insurer also bore the risk of default by the Bermuda company on its obligations under the reinsurance treaty. The restructuring had the necessary business purpose because, "when we are talking about a going concern like UPS," the transaction has a business purpose "as long as it figures in a bona fide, profit-seeking business." The court compared the EVC restructuring to a corporation's choice between debt and equity; that is, a taxpayer does not lack a business purpose when it chooses between "different ways of financing a business." The court distinguished the business purpose analysis that is applied to individual tax shelters or those corporate tax shelters such as in *ACM P'ship*[27] where the transactions "would not have occurred, in any form, but for tax avoidance reasons."

The IRS in recent years also has discouraged use of the economic substance doctrine in cases where it is more appropriate to analyze the transaction under substance-over-form principles. For example, in Rev. Rul. 99-14,[28] the IRS ruled that a "lease-in/lease-out" or so-called LILO transaction should be disregarded on the grounds that it lacked economic substance. In a LILO transaction, a tax-exempt entity leases property to a U.S. taxpayer for a period of years and the U.S. taxpayer leases the property back to the tax-exempt entity for a lesser period of years. The obligations of the tax-exempt entity to pay rent as well as to exercise a purchase option at the end of the sublease term are economically defeased. The transaction is designed to provide the U.S. taxpayer an immediate and substantial rent deduction while deferring rent income. The IRS later acknowledged that the economic substance doctrine was inappropriate because the U.S. taxpayer actually earns a modest pre-tax profit from engaging in the transaction. As a result, the IRS issued Rev. Rul. 2002-69,[29] which relies on a more traditional substance-over-form analysis to challenge the transaction and supersedes Rev. Rul. 99-14.

## STEP TRANSACTION DOCTRINE IN OTHER CONTEXTS

---

[27] *ACM P'ship v. Comm'r.*, 157 F.3d 231 (3d Cir. 1998), *aff'g, rev'g, and rem'g* 73 T.C.M. 2189 (1997).

[28] 1999-13 I.R.B. 3, *superseded* by Rev. Rul. 2002-69, 2002-44 I.R.B. 760.

[29] 2002-44 I.R.B. 760.

Morgan, Lewis & Bockius LLP

The step transaction doctrine treats a series of formally separate steps as a single transaction if the steps are in substance integrated and focused toward a particular result. The courts have applied three alternative tests in deciding whether to invoke the step transaction doctrine in a particular transaction, namely the "end result" test, the "mutual interdependence" test, and the "binding commitment" test.[30] The cases need to be analyzed carefully to understand the particular circumstances in which this doctrine should be applied. It is not enough in a given case to simply cite the general principles and then claim that a particular step taken by the taxpayer should be ignored because it occurred closely in time to another step, or it does not have economic justification, or that the taxpayer could have structured the transaction a different way.

Unfortunately, the courts and the IRS have not delineated the particular circumstances in which the step transaction doctrine is applicable. Its application in simple cases is obvious. For example, if a corporation acquires stock of a target corporation in a purported tax-free "B" reorganization and then immediately liquidates the target pursuant to a prearranged plan, it is well accepted that the intermediate steps of acquiring target stock and then liquidating the target will be ignored and the transaction will be viewed as an acquisition of target's assets for purposes of determining whether the transaction qualifies as a tax-free reorganization.[31]

In other cases, the steps taken are respected as having occurred, but may not have the effect under the tax laws intended by the taxpayer if the step transaction doctrine is applied. For example, if B and C transfer property to Newco in exchange for all of Newco's stock in a purported § 351 transaction and then, pursuant to a binding contract, sell a portion of the Newco stock to a third party in a taxable sale that results in B and C owning less than 80% of Newco stock, B and C will still be treated as having transferred property to Newco for stock and then selling that stock in a taxable sale. However, the requirement under the Code that B and C acquire "control" of Newco will not be satisfied and, therefore, B's and C's transfer of property to Newco will be taxable.[32]

When faced with a more complex transaction such as the one in *Long Term Capital Holdings*, it is helpful to first understand when the application of the step transaction doctrine is inappropriate. The IRS generally is prohibited from substituting steps for the steps actually consummated or resequencing steps under the guise of the step transaction doctrine where the steps taken have enduring economic consequences. Where there are two ways to achieve a particular transaction, one being tax favorable and the other being tax adverse, the courts will not apply the step transaction doctrine to "generate events which never took place just so additional tax liability may be asserted."[33] Nor will the courts resequence steps in a way more burdensome

---

[30]   *See Penrod v. Comm'r.*, 88 T.C. 1415, 1428-30 (1987).

[31]   *E.g.*, Rev. Rul. 67-274, 1967-2 C.B. 141.

[32]   *E.g.*, Rev. Rul. 79-70, 1979-1 C.B. 144.

[33]   *See Grove v. Comm'r.*, 490 F.2d 241 (2d Cir. 1973).

Morgan, Lewis & Bockius LLP

from a tax perspective (e.g., IRS treating taxpayer's second step as occurring before the first step) unless the particular steps taken by the taxpayer are "meaningless or unnecessary."[34]

These principles are well illustrated by the transaction in *Comm'r. v. Gilmore Est.*[35] In that case, a holding company was merged into its 51%-owned subsidiary because the shareholders desired to eliminate the holding company. The shareholders claimed that the surrender of their holding company shares for subsidiary shares was a tax-free exchange pursuant to an "A" reorganization. The IRS argued that since the transaction had the same economic effect as a liquidation of the holding company, the transaction should be treated as if the holding company had distributed its subsidiary stock to its shareholders in a taxable liquidation, since the taxpayer did not have a business purpose for the method chosen. The court refused to recharacterize the transaction and it held for the taxpayers, stating:

> We think this gets down to the proposition that if there are two ways of accomplishing a legitimate business result, one of which clearly creates a taxable transaction, one is equally subject to liability if he chooses the other unless there is an adequate reason for the particular method used. We do not think this is the rule of the statute, the Regulations, nor, as we read them, the decisions.[36]

In *Esmark v. Comm'r.*, Mobil wanted to acquire Vickers, a subsidiary of Esmark. If Esmark just sold Vickers to Mobil for cash, Esmark would recognize taxable gain. However, Esmark would avoid recognizing taxable gain under the Code if Vickers were transferred to an Esmark shareholder pursuant to a redemption of the shareholder's stock. In order to permit Esmark to rely on the favorable Code provision, Mobil acquired 54% of Esmark's stock through a cash tender offer. Immediately thereafter, Esmark redeemed Mobil's Esmark shares by transferring Vickers to Mobil. The IRS argued that, under the step transaction doctrine, the transaction should be recharacterized as if Esmark sold Vickers to Esmark for cash and then used the cash to purchase the tendered shares from the shareholders. The Tax Court faulted the IRS for not respecting Mobil's purchase of Esmark stock from Esmark shareholders, and held for the taxpayer. That transaction was meaningfully different from a corporate and legal perspective than a tender offer made by Esmark. While the overall plan of Esmark and Mobil to achieve a favorable tax result was not in dispute, the IRS "pointed to no meaningless or unnecessary steps that should be ignored."[37]

It is relatively rare for a transfer of property to either a corporation or partnership followed by a prearranged transfer of the corporate stock or partnership interest to a third party to be

---

[34]   *Esmark, Inc. v. Comm'r.*, 90 T. C. 171 (1988), *aff'd in unpub. opin.*, 886 F.2d 1318 (7th Cir. 1989); *Turner Broad. Sys. Inc. v. Comm'r.*, 111 T.C. 315 (1998).

[35]   130 F.2d 791 (3d Cir. 1942), *acq.*, 1946-2 C.B. 2.

[36]   *Id.*

[37]   *Esmark, Inc. v. Comm'r.*, 90 T.C. 171, 195 (1988).

11

recharacterized as if the property had been sold directly to the third party followed by the third party's contribution of the property to the corporation or partnership, at least where the transferor retains a meaningful interest in the corporation or partnership. The IRS has prevailed in having such a recharacterization adopted in a few cases where the transferor retained no direct interest in the transferee entity (although the transferor received stock in the acquiring entity), such entity was subsequently liquidated by the entity acquiring the transferee entity, and there was no purpose other than tax avoidance for the transferee entity's formation.[38] Recently, the IRS effectively ruled that it would take that position only in a situation where the initial transfer of property to a transferee corporation is needed in order to ensure the tax-free treatment of the subsequent transfer of the transferee corporation stock to the acquiring corporation in exchange for stock of the acquiring corporation; otherwise, the initial transfer of property to the transferee corporation would be respected even if there is a binding contract to transfer stock in the transferee corporation for stock of the acquiring corporation.[39]

In addition, it is generally accepted that parties forming a partnership have a great deal of flexibility in structuring the transaction. Assume B desires to contribute property to a partnership in which B and C share 50/50, and receive cash for 50% of the property's value. If B contributed property to the partnership and C contributed cash equal to 50% of the property's value and the cash was immediately distributed to B, B would be treated as having sold 50% of the property to the partnership and contributed the other 50%. Alternatively, B could first sell 50% of the property to C for cash and then each could transfer a 50% interest in the property to the partnership, and that transaction would be respected as such.[40]

On the other hand, if a taxpayer transfers property to a corporation or partnership and then sells the stock or partnership interest to a third party for cash or other non-equity consideration, and retains no direct or indirect equity interest in the transferred property, the authorities that provide flexibility in choosing how to organize a corporation or partnership are not applicable on their face. In that case, the real question is whether the transferor ever acquired an ownership interest in the transferee entity. The court's recasting of the transaction in *Long Term Capital Holdings* as a taxable sale by the contributing partner directly to the other partner might have been more persuasive had the court engaged in a pure tax ownership analysis rather than an application of the step transaction doctrine.

## IMPACT OF THE *BLACK & DECKER* DECISION

The *Black & Decker* case involved a contingent liability transaction that is described in Notice 2001-17[41] as a listed transaction and was the subject of a settlement initiative in the fall of

---

[38]   *West Coast Mktg. Corp. v. Comm'r.*, 46 T.C. 32 (1966).

[39]   Rev. Rul. 2003-51, 2003-21 I.R.B. 938.

[40]   *Cf.* Regs. § 1.197-2(k), Exs. 17, 18, and 19.

[41]   2001-9 I.R.B. 730. See also Notice 2004-67, 2004-41 I.R.B. 600, which includes this transaction as a listed transaction on the updated list of listed transactions.

Morgan, Lewis & Bockius LLP

2002.[42] In 1998, Black & Decker (B&D) sold three of its businesses, realizing significant capital gains. That same year, B&D transferred $561 million in cash along with $560 million in contingent employee healthcare claims to a newly formed subsidiary in exchange for stock. B&D then sold the stock to an independent third party for $1 million and claimed a capital loss of $560 million. It was undisputed that the subsidiary became responsible for managing and servicing the healthcare claims of B&D employees through the efforts of its own salaried employees and that the claims were paid with the subsidiary's assets. The government argued that the transaction was a tax-avoidance vehicle that must be disregarded for tax purposes, and asserted $41 million in accuracy-related penalties.[43] Apparently, the government did not contend, as it did in *Long Term Capital Holdings*, that B&D's transfer of property and liabilities to the subsidiary followed by a sale of the subsidiary stock to a third party should be recharacterized under the step transaction doctrine as a sale of the property and liabilities directly to the third party followed by that party's contribution of the same to the subsidiary.

The U.S. District Court for the District of Maryland ruled for the taxpayer on its motion for summary judgment. For this purpose, B&D conceded that "tax evasion" was its sole motivation. (The record was later corrected to reflect that B&D meant "tax avoidance.")  In applying the two-pronged test in *Rice's Toyota World v. Comm'r*.[44] to determine whether the transaction should be treated as a sham, the court acknowledged that the "business purpose" prong was not met in light of the taxpayer's concession. The second prong was described as an examination of the transaction's "objective reasonableness," which looks to whether "the corporations engages in bona fide economically-based business transactions," without a citation to the *Northern Indiana* case. The court held that on the basis of the undisputed evidence, the transaction "had very real economic implications for every beneficiary of B&D's employee benefits program, as well as for the parties to the transaction," and, therefore, could not be disregarded as a sham.


The contrast between the three-page decision in *Black & Decker* and the exhaustive, nearly 100-page decision in *Long-Term Capital Holdings* is indeed striking. The *Black & Decker* court engaged in no analysis of the pre-tax profit potential relative to the tax benefits. It concluded, as a matter of law, that the transaction engaged in by B&D and its subsidiary had real economic consequences. This approach resembles the approach taken in other cases where the transaction

---

[42]   Rev. Proc. 2002-67, 2002-43 I.R.B. 733.

[43]   On Aug. 3, 2004, the government's motion for summary judgment on statutory grounds was denied. The government argued that the assumed liabilities may not be excluded under § § 357(c)(3)(A) and 358(d)(2) on the grounds that the related expenses are the transferor's business expenses and should not be deductible by the transferee. The court found no support in the legislative history to § 357(c) for such interpretation, and concluded that the IRS's own revenue ruling, Rev. Rul. 95-74, 1995-2 C.B. 36, focused on the *transferor's* deductibility when applying § 357(c)(3)(A). See also Chief Counsel's Notice CC-2001-033a, which describes the government's position.

[44]   752 F.2d 89 (4th Cir. 1985).

Morgan, Lewis & Bockius LLP

engaged in by the taxpayer was closely connected with the taxpayer's ongoing business operations, such as *United Parcel Serv.*, *Northern Indiana*, and *Kraft*. In fact, the court's citation to *Northern Indiana* is a fairly clear indication that the court put this transaction in the category of a transaction that carries out the business of the taxpayer.

## CONCLUSION

The most difficult question for any court when analyzing a particular tax shelter is the first one: Will the transaction be tested under the rigorous version of the economic substance test as illustrated by *Long Term Capital Holdings* or the more lenient version of the economic substance test as illustrated by *Black & Decker* and *United Parcel Serv.*[45] Once that decision is made, it seems as though the court ends up being driven to a particular result, with the more rigorous approach resulting in a government victory and the more lenient approach resulting in a taxpayer victory. As long as there is no clearly established jurisprudence for placing a particular transaction in one category or the other, it may be wishful thinking on the government's part to conclude that any particular shelter with some connection to the taxpayer's business is in the bag.

For more information on these developments, contact your primary Morgan Lewis attorney or one of the following:

**Philadelphia**

Gary B. Wilcox          215.963.5043          gwilcox@morganlewis.com

**Washington, D.C.**

Miriam L. Fisher          202.739.5489          miriam.fisher@morganlewis.com

James N. Mastracchio          202.739.5488          jmastracchio@morganlewis.com

---

[45]   In footnote 89 of the *Long Term Capital Holding* decision, the court distinguished the OTC investment from the transactions in *United Parcel Serv*. The OTC investment "was a one-time purchase of a tax product by Long Term and different in almost every way from Long Term's core investment business."

14

Morgan, Lewis & Bockius LLP

## Current Charges by Engagement/Engagement
### (By Client, Engagement, Rank, Individual, Date)
#### For the days 06/25/1999 to 08/31/1999

(Detail)

Bishop Group, The, LTD (60024092)

BGL CONSULTING (US025 - 10240752)

**Senior Manager**

Snyder, Bruce E (US025/1355618)

| Date | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 6/28/99 | bob welchin on items for FERC filing | 0.5 | 193 | | | |
| 7/6/99 | tino on tax issues | 0.5 | 193 | | | |
| 7/7/99 | followup with Tino and review deal structure | 2.0 | 770 | | | |
| 7/7/99 | welchin on tax issues related to FERC filing | 1.0 | 385 | | | |
| 7/9/99 | review tax info and transaction | 1.0 | 385 | | | |
| 7/10/99 | review restruct agreement | 2.0 | 770 | | | |
| 7/12/99 | conference call regarding proposed merger agreement | 2.0 | 770 | | | |
| 7/12/99 | meet at clients to discuss tax balances for FERC filing | 4.0 | 1,540 | | | |
| 7/12/99 | | | | | 11 | RT to Bishop for meeting regarding FERC issues |
| 7/15/99 | knob on transaction | 0.5 | 193 | | | |
| 7/16/99 | transaction - issues on the engagement | 1.0 | 385 | | | |
| 7/19/99 | review on trans. | 1.0 | 385 | | | |
| 7/20/99 | tino on transaction | 0.5 | 193 | | | |
| 7/21/99 | discuss transaction with tino | 1.0 | 385 | | | |
| 7/21/99 | review agreement | 1.0 | 385 | | | |
| 7/21/99 | review depr differences for ferc filings | 0.5 | 193 | | | |
| 7/26/99 | compliance issues with wiener | 0.5 | 193 | | | |
| 7/26/99 | meet with Chase on trans. | 2.5 | 963 | | | |
| 7/27/99 | howard on invoices and compliance issues structuring | 0.5 | 193 | | | |

001873

Suspended transactions are not included.  Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge.  Refer to the instructions from EMS-2 and EMS-3 for explanations of surcharges   Expense Amounts include the applicable admin  surcharge.

TRAX/Reporter Version 5.1

Page    1

Run: 09/20/99 10:56 AM

GOVERNMENT EXHIBIT
225
PENGAD-Bayonne, N. J

ENB-DOJ-004426

(Detail)

## Current Charges by Client/Engagement
(By Client, Engagement, Bank, Individual, Date)
For the days 06/25/1999 to 08/31/1999

Bishop Group, The, LTD (60024092)

BGL CONSULTING (US025 - 10240752)

| Date | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 7/29/99 | fu on transaction and update aarons | 0.5 | 193 | | | |
| 8/4/99 | deal regarding tax structuring and due diligence | 1.0 | 385 | | | |
| 8/10/99 | issues on tax returns | 2.0 | 770 | | | |
| 8/10/99 | steve korb on deal | 1.0 | 385 | | | |
| 8/11/99 | brief shari and meeting at attorneys to answer DD questions | 3.0 | 1,155 | | | |
| 8/13/99 | korb on state tax issues and other deal points | 1.0 | 385 | | | |
| 8/16/99 | bob welchlin - followup on bishop tax basis issues with respect to ferc audit | 1.0 | 385 | | | |
| 8/17/99 | followup on dennis SD issue | 1.0 | 385 | | | |
| 8/18/99 | landers on tax return issues | 1.0 | 385 | | | |
| 8/19/99 | bishop on tax issues and shari on other issues | 1.0 | 385 | | | |
| 8/20/99 | steve korb on S.D. issues | 0.5 | 193 | | | |
| 8/20/99 | tax return issues with shari | 0.5 | 193 | | | |
| 8/24/99 | followup on transaction issues | 1.0 | 385 | | | |
| 8/27/99 | followup on tax strategy on intermediary transaction, discuss with EY national and followup on tax issues related to potential disposition | 3.0 | 1,155 | | | |
| 8/27/99 | status update from greg on tax returns | 0.5 | 193 | | | |
| 8/30/99 | followup woith steve on bid process and tax issues | 0.5 | 193 | | | |
| 8/30/99 | tax issue on intermediary | 2.0 | 770 | | | |
| 8/31/99 | steve on proposal, tax issues with proposed transaction and discuss issues with pvc | 4.0 | 1,540 | | | |

Page   2

Suspended transactions are not included.  Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge  Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges   Expense Amounts include the applicable admin  surcharge.

TRAX/Reporter Version 5.1

Run: 09/20/99 10:56 AM

001874

ENB-DOJ-004427

## Current Charges by Client/Engagement

(By Client, Engagement, Rank, Individual, Date)

For the days 06/25/1999 to 08/31/1999

(Detail)

Bishop Group, The, LTD (60024092)

BGL CONSULTING (US025 - 10240752)

| | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|
| Individual Total | 46.5 | $17,903 | | $11 | |
| Rank Total | 46.5 | $17,903 | $385 | $11 | |

Senior 3

Fox, Shari A (US025/1359208)

| | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 8/2/99 | FERC book/tax fixed asset basis differences | 2.0 | 364 | | | |
| 8/4/99 | FER Book/tax basis differences | 3.0 | 546 | | | |
| 8/4/99 | Research on potential Section 355 spinoff of unwanted assets prior to proposed sale transaction | 1.5 | 273 | | | |
| 8/5/99 | Reconciliation of info for FERC book/tax fixed asset differences. Meeting with Ron Klote of OCI to discuss issues | 6.0 | 1,092 | | | |
| 8/5/99 | Research on Section 355 issue and potential Section 311(b) gain in a transaction involving MLPs | 2.0 | 364 | | | |
| 8/6/99 | Discussions with OCI auditor, Ron Klote, regarding FERC fixed asset issues. | 1.0 | 182 | | | |
| 8/10/99 | A reorg and review of ENron tax request  Discussions with Jeff regarding tax return preparation issues | 2.0 | 364 | | | |
| 8/11/99 | Tax return discussions with David, Jeff and Bruce | 1.0 | 182 | | | |
| 8/11/99 | Various research and meetings regarding potential sale transaction.  (Meeting with Enron rep) | 5.0 | 910 | | | |

Suspended transactions are not included.  Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge.  Refer to the instructions for forms EMS-2 and FMS-3 for explanations of surcharges.  Expense Amounts include the applicable admin  surcharge

TRAX/Reporter Version 5.1

Page    3

Run: 09/20/99  10:56 AM

ENB-DOJ-004428

001875

(Detail)

# Current Charges by Client/Engagement

(By Client, Engagement, Rank, Individual, Date)

For the days 06/25/1999 to 08/31/1999

Bishop Group, The, LTD (60024092)

## BGL CONSULTING (LS025 - I0240752)

| Hours | Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 8/12/99 | Work on various issues and transaction relating to potential sale | 3.0 | 546 | | | |
| 8/16/99 | PY KPP Gas Plant Acq adjustment (error on PY return), conf call with J. Weiner re 1990 transx and other FERC issues | 2.5 | 455 | | | |
| 8/16/99 | Research on issues on relating to potential management fee/employment agreement to Dennis and distribution of Butcher Royalty | 1.0 | 182 | | | |
| 8/16/99 | Work on FERC fixed asset issues | 1.0 | 182 | | | |
| 8/17/99 | Conf call with Tino and Steve Korb regarding Section 311(b) issue and compensation expenses. Research on these issues prior to call | 2.0 | 364 | | | |
| 8/18/99 | E-mail to S Korb regarding DGL relocation to South Dakota | 0.5 | 91 | | | |
| 8/18/99 | Review research on Margas Co Hedging transactions and convey conclusions to client | 2.0 | 364 | | | |
| 8/18/99 | Review research on amortization of Petro contract and related non compete agreement | 0.5 | 91 | | | |
| 8/20/99 | Deferred compensation on KPOC | 0.5 | 91 | | | |
| 8/23/99 | Discuss ELA analysis with Jeff Rogers | 1.0 | 182 | | | |
| 8/23/99 | Other tax return issues | 1.0 | 182 | | | |
| 8/23/99 | Tax return issues - KPOC dept/M&E/KJPC Ferc $ | 1.0 | 182 | | | |
| 8/25/99 | Review KOP return | 1.5 | 273 | | | |
| 8/25/99 | Review MKP return | 2.0 | 364 | | | |

001876

Suspended transactions are not included  Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge. Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges   Expense Amounts include the applicable admin surcharge.

ENB-DOJ-004429

(Detail)

## Current Charges by Client/Engagement
(By Client, Engagement, Rank, Individual, Date)
For the days 06/25/1999 to 08/31/1999

Bishop Group, The, LTD (60024092)

### BGL CONSULTING (US025 - 10240752)

| | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 8/25/99 | Review RI/CLP return | 1.5 | 273 | | | |
| 8/26/99 | Additional MKP review | 1.0 | 182 | | | |
| 8/26/99 | MGP review | 3.0 | 546 | | | |
| 8/31/99 | Begin review of KPCGP return | 5.0 | 910 | | | |
| **Individual Total** | | **53.5** | **$9,737** | | **$0** | |
| **Rank Total** | | **53.5** | **$9,737** | **$182** | **$0** | |

### Senior 1&2/Senior Consultant

Moen, Heather D (US025/1356640)

| | | | | | | |
|---|---|---|---|---|---|---|
| 6/25/99 | Investigate the book/tax difference in the FA rollforward schedule  Pull files - request files from basement. | 3.0 | 546 | | | |
| 6/28/99 | FA Roll-forward schedule, received pre-94 files from the basement. Call with Bob Welchin to have him e-mail the schedule. | 2.0 | 364 | | | |
| 6/29/99 | FA Roll-forward review - call to Bob Welchin - he wants to know the basis for the adjustment and when the adjustment occurred. | 1.0 | 182 | | | |
| 6/30/99 | FA Roll-forward - update schedule to include the year in which the adjustment was made | 1.0 | 182 | | | |
| 7/7/99 | FA Rollforward schedule sent to Welchin. | 0.3 | 55 | | | |
| 7/8/99 | Pooling research for Tino Minaldo - information from audit pooling toolkit was too detailed, pull information from TDR | 2.0 | 364 | | | |
| 7/12/99 | Deferred tax issues - try to resolve issues from morning meeting w/ Bob Welchin | 6.0 | 1,092 | | | |

001877

Suspended transactions are not included.  Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge.  Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges  Expense Amounts include the applicable admin. surcharge.

ENB-DOJ-004430

**Current Charges by ●●●●●●nt/Engagement**
(By Client, Engagement, ●●●, Individual, Date)
For the days 06/25/1999 to 08/31/1999

(Detail)

Bishop Group, The, LTD (60024092)

BGL CONSULTING (US025 - 10240752)

| | Hours Description | ChargeHle Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 7/12/99 | Meeting w/ Bob Welchlin of OP consulting to discuss book/tax differences and effect on FERC exam | 3 0 | 546 | | | |
| 7/13/99 | Identification of each T/R workpaper giving rise to the book/tax difference calculation, identify net plant per audited FS and per tax return   Create spreadsheet to compare the book to tax for purposes of proving the book/tax differences | 6 5 | 1,183 | | | |
| 7/14/99 | Organization of all materials in support of the book/tax differences, tie FA rollforward to photocopied TR workpapers, compare audited financial statement figures w/ those provided by Bob Welchlin, review of audit perm files for information related to the 6/90 transaction. | 7.5 | 1,365 | | | |
| 7/19/99 | KNP reconciliation of Form 4562 for 12/31/91 YE. | 0 5 | 91 | | | |
| 8/2/99 | Analysis for FERC of M1 | 2 5 | 455 | | | |
| 8/18/99 | Adjustments - meet w/ Shari. Research on amortization of short-term contract. | 2 0 | 364 | | | |
| Individual Total | | 37.3 | $6,789 | | $0 | |
| Rank Total | | 37.3 | $6,789 | $182 | $0 | |

Staff 2/Consultant
Switzer,Jennifer A  (US025/1464758)

001878

Suspended transactions are not included   Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge   Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges.   Expense Amounts include the applicable admin surcharge

TRAX/Reporter Version 5.1                    Page    6                              Run: 09/20/99 10:56 AM

ENB-DOJ-004431

## Current Charges by Client/Engagement

(By Client, Engagement, Rank, Individual, Date)
For the days 06/25/1999 to 08/31/1999

(Detail)

Bishop Group, The, LTD (60024092)

BGL CONSULTING (US025 - 102240752)

| | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 7/13/99 | Time spent photocopying files for audit. | 0.5 | 75 | | | |
| 7/14/99 | time spent photocopying files for audit. | 0.5 | 75 | | | |
| Individual Total | | 1.0 | $150 | | $0 | |
| Rank Total | | 1.0 | $150 | $150 | $0 | |

Staff 1

Rogers, Jeff W (US025/1564255)

| | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 8/23/99 | Researching and analysis excess loss accounts. | 4.0 | 600 | | | |
| 8/24/99 | Finishing excess loss account work, | 3.0 | 450 | | | |
| Individual Total | | 7.0 | $1,050 | | $0 | |
| Rank Total | | 7.0 | $1,050 | $150 | $0 | |
| Engagement Total | | 145.3 | $35,628 | $245 | $11 | (incl $0 admin surcharge) |
| Client Total | | 145.3 | $35,628 | $245 | $11 | (incl $0 admin surcharge) |
| Report Total | | 145.3 | $35,628 | $245 | $11 | (incl $0 admin surcharge) |

Suspended transactions are not included   Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge. Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges   Expense Amounts include the applicable admin surcharge

TRAX/Reporter Version 5.1

Page      7

Run: 09/20/99  10:56 AM

001979

ENB-DOJ-004432

(Detail)

ENB-DOJ-004396

Bishop Group, The, LTD (60024092)

(By Client, Engagement... k, Individual, Date)
For the days 09/15/1999 to 09/30/1999

BGL CONSULTING (US025 - 10240752)

| Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|
| **Principal** | | | | | |
| Broadbent,John (US150/1176064) | | | | | |
| 9/22/99 Telephone w/Bruce Snyder re. -13(g)/ELA issue | 1.0 | 650 | | | |
| Individual Total | 1.0 | $650 | $650 | $0 | |
| Rank Total | 1.0 | $650 | $650 | $0 | |
| **Senior Manager** | | | | | |
| Snyder,Bruce E (US025/1355618) | | | | | |
| 9/15/99 review agreement | 2.0 | 770 | | | |
| 9/16/99 conf. call with tuno and steve regarding agreement | 2.5 | 963 | | | |
| 9/17/99 conference call re agreement | 1.0 | 385 | | | |
| 9/22/99 followup on excess loss accounts and deferred intercompany gain | 3.0 | 1,155 | | | |
| 9/27/99 korb, etc on issues related to transaction | 1.0 | 385 | | | |
| Individual Total | 9.5 | 3,658 | | | |
| Rank Total | 9.5 | $3,658 | $385 | $0 | |
| | | | | $0 | |
| **Senior 3** | | | | | |
| Fox,Shari A (US025/1359208) | | | | | |
| 9/15/99 Tax return issues | 1.0 | 182 | | | |
| 9/18/99 Discussions with Bruce for billing | 0.5 | 91 | | | |
| 9/19/99 Review ELA information on BGL subs prepared by Jeff Rogers | 2.0 | 364 | | | |
| 9/20/99 Discussions with Steve Korb on current transaction status; Provide Steve with copies of the 1998 tax returns. | 0.5 | 91 | | | |

*Handwritten annotations: 9.5 - 2 = 7.5   $3,658 - 770 = 2,888   710 = 2,888*

001843

Suspended transactions are not included. Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge. Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges. Expense Amounts include the applicable admin. surcharge.

TRAX/Reporter Version 5.1                    Page     1                    Run: 10/20/99 05:31 PM

(By Client, Engagement, Rank, Individual, Date)
For the days 09/15/1999 to 09/30/1999

Bishop Group, The, LTD (6024092)

BGL CONSULTING (US025 - 10240752)

| | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 9/20/99 | ELA's for TBS, E&C, and MRG | 2.0 | 364 | | | |
| 9/22/99 | Excess loss accounts | 1.5 | 273 | | | |
| 9/23/99 | ELA and information regarding new potential structured transaction. Respond to inquiries from Bill Woods in CA | 6.0 | 1,092 | | | |
| 9/24/99 | Meetings and gather information for new potential structured transaction | 3.0 | 546 | | | |
| Individual Total | | 16.5 | $3,003 | | $0 | |
| Rank Total | | 16.5 | $3,003 | $182 | $0 | |

*(handwritten: -1 = 15.5; $3,003 - 182 = 2821)*

Senior 1&2/Senior Consultant

Moen, Heather D (US025/1356640)

| | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 9/15/99 | Review of research materials related to prepayment penalties, documents from TDR, information to Stephens to incorporate into memo format. | 2.5 | 455 | | | |
| 9/16/99 | Review of memos and research on senior notes prepared by Paul Stephens | 2.0 | 364 | | | |
| Individual Total | | 4.5 | $819 | | $0 | |
| Rank Total | | 4.5 | $819 | $182 | $0 | |

*(handwritten: -2.5 = 2; $819 - 455 = 364)*

Staff 1

Stephens, Paul B (US025/1502982)

| | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 9/15/99 | | 3.0 | 420 | | | |
| 9/16/99 | | 2.0 | 280 | | | |
| 9/17/99 | | 6.0 | 840 | | | |
| 9/27/99 | Pulled contracts related to the Butcher Pipeline Interests. | 1.5 | 210 | | | |

001844

Suspended transactions are not included.  Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge.  Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges.  Expense Amounts include the applicable admin. surcharge.

TRAX/Reporter Version 5.1     Page     2     Run: 10/20/99  05:31 PM

ENB-DOJ-004397

Current Charges by Client Engagement
(By Client, Engagement, Rank, Individual, Date)
For the days 09/15/1999 to 09/30/1999

(Detail)

Bishop Group, The, LTD (60024092)
BGL CONSULTING (US025 - 10240752)

| | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 9/28/99 | Pulled information together regarding the formation of KNP and the tax treatment of the assets acquired through the related party transaction. | 3.0 | 420 | | | |
| 9/29/99 | Wrapped up the work started on Tuesday | 1.0 | 140 | | | |
| Individual Total | | 16.5 | $2,310 | | | |
| Rank Total | | 16.5 | $2,310 | $140 | | |

handwritten: $16.5 - 3 = 13.5$   $2,310 - 140 = (90)$

Administrative Support Personnel
Akhlaghi, Julia (US186/1340560)

| | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 9/30/99 | | | | | 2 | pick up cash receipts from client at office |
| Individual Total | | 0.0 | $0 | | $2 | |
| Rank Total | | 0.0 | $0 | $0 | $2 | (incl $0 admin surcharge) |
| Engagement Total | | 48.0 | $10,440 | $217 | $2 | (incl $0 admin surcharge) |
| Client Total | | 48.0 | $10,440 | $217 | $2 | (incl $0 admin surcharge) |
| Report Total | | 48.0 | $10,440 | $217 | $2 | (incl $0 admin surcharge) |

Suspended transactions are not included. Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge. Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges. Expense Amounts include the applicable admin. surcharge.

TRAX/Reporter Version 5.1     Page     3     Run: 10/20/99 05:31 PM

ENB-DOJ-004398

001845

**(By Client, Engageme...nk, Individual, Date)**
For the days 10/01/1999 to 10/31/1999

Bishop Group, The, LTD (60024092)
BGL CONSULTING (US025 - 10240752)

| | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| **Non Employee Level 5** | | | | | | |
| Eyre,Qn (US150/1525663) | | | | | | |
| 10/5/99 | | 0.0 | $0 | | $0 | |
| Individual Total | | 0.0 | $0 | | $0 | |
| Rank Total | | | | $0 | | |
| **Partner** | | | | | | |
| Friedman,Ronald E (US150/959546) | | | | | | |
| 10/21/99 | | 1.5 | 975 | | $0 | |
| Individual Total | | 1.5 | $975(T) | | $0 | |
| Rank Total | | 1.5 | $975 | $650 | | |
| **Principal** | | | | | | |
| Swails,John Edward (US150/132600) | | | | | | |
| 10/1/99 | off conf elio casinelli re tax opinion | 1.0 | 550 | | | |
| 10/18/99 | review B Schneider rep memo | 0.5 | 275 | | | |
| 10/18/99 | t/c harvey berenson | 0.3 | 165 | | | |
| 10/19/99 | off conf. RTM | 0.5 | 275 | | | |
| Individual Total | | 2.3(T) | $1,265(T) | | $0 | |
| Berenson,Harvey (US150/1466217) | | | | | | |
| 10/18/99 | rev purchase agreement and proposed reps for mdco transaction | 2.0 | 1,100 | | | |
| 10/20/99 | conf call re mdco transaction w/myecies, rfriedman, eswails, bsyndcr,rmccormack | 1.5 | 825 | | | |
| Individual Total | | 3.5(T) | $1,925(T) | | $0 | |
| Rank Total | | 5.8 | $3,190 | $550 | $0 | |
| **Senior Manager** | | | | | | |
| Snyder,Druce E (US025/1355618) | | | | | | |
| 10/1/99 | work on structure | 2.0 | 810 | | | |

001948

Suspended transactions are not included. Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge. Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges  Expense Amounts include the applicable admin surcharge.

ENB-DOJ-004401

Bishop Group, The, LTD (60024092)

(By Client, Engagement ... lk, Individual, Date)
For the days 10/01/1999 to 10/31/1999

BGL CONSULTING (US025 - 10240752)

| Date | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 10/4/99 | steve on transaction issues | 1.5 | 608 | | | |
| 10/5/99 | meet with dennis, tuno, and Steve on contract issues and econ | 2.5 | 1,013 | | | |
| 10/5/99 | research issues and review all agreements | 6.0 | 2,430 | | | |
| 10/6/99 | conf call with Swails and Elio regarding engagement for tax opinion and tax issues | 1.0 | 405 | | | |
| 10/7/99 | discuss opinion issues with Elio | 1.0 | 405 | | | |
| 10/8/99 | F/U on tax opinion | 1.0 | 405 | | | |
| 10/11/99 | FU conference call on tax opinon | 1.0 | 405 | | | |
| 10/13/99 | Steve on outstanding issues | 2.0 | 810 | | | |
| 10/14/99 | FU on tax opinion | 2.0 | 810 | | | |
| 10/15/99 | tax opinion | 2.0 | 810 | | | |
| 10/18/99 | transaction | 1.0 | 405 | | | |
| 10/19/99 | conf call regarding tax opinon letter | 1.0 | 405 | | | |
| 10/20/99 | review contingent payment issues and tax sharing agreement, etc | 2.0 | 810 | | | |
| 10/21/99 | FU with steve on agreements | 1.0 | 405 | | | |
| 10/21/99 | korb on project dev. and conting agreements | 1.0 | 405 | | | |
| 10/22/99 | get info together for review by PWC and meet with PWC on basis calculations | 4.0 | 1,620 | | | |
| 10/25/99 | steve on butcher interest, etc. and tax basis balance sheets | 2.0 | 810 | | | |
| 10/26/99 | FU on filing requirements and tax sharing agreement | 1.0 | 405 | | | |
| 10/27/99 | review agreements | 1.0 | 405 | | | |

Suspended transactions are not included   Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge.  Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges   Expense Amounts include the applicable admin surcharge

TRAX/Reporter Version 5.1

Page    17

Run: 11/02/99  05:40 PM

001849

ENB-DOJ-004402

(By Client, Engagement... Individual, Date)
For the days 10/01/1999 to 10/31/1999

Bishop Group, The, LTD (60024092)

BGL CONSULTING (US025 - 10240752)

| | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 10/27/99 | steve on butcher interest and agreements - call while in Houston | 1.0 | 405 | | | |
| | **Individual Total** | 37.0(T) | $14,985(T) | | $0 | |
| | **Rank Total** | 37.0 | $14,985 | $405 | $0 | |
| **Manager** | | | | | | |
| **Fox,Shari A (US025/1359208)** | | | | | | |
| 10/14/99 | Review and sign KS return for BGL | 1.0 | 255 | | | |
| 10/18/99 | Butcher interest research | 2.0 | 510 | | | |
| 10/25/99 | Research by Paul and discussions regarding tax basis in Butcher interest. | 1.5 | 383 | | | |
| 10/25/99 | | 1.0 | 255 | | | |
| 10/27/99 | Discuss and update butcher interest research | 2.0 | 510 | | | |
| | **Individual Total** | 7.5(T) | $1,913(T) | | $0 | |
| **Nelson,Christopher J (US150/15870)** | | | | | | |
| 10/18/99 | Intermediary Transaction Deal discussions with Bruce Snyder (Kansas City), Harvey Berenson (New York) and Rob McCormack. | 2.0 | 720 | | | |
| | **Individual Total** | 2.0(T) | $720(T) | | $0 | |
| | **Rank Total** | 9.5 | $2,633 | $277 | $0 | |
| **Staff 1** | | | | | | |
| **Stephens,Paul B (US025/1502982)** | | | | | | |
| 10/5/99 | CRAT Analysis for Langley | 5.0 | 750 | | | |
| 10/6/99 | Discussion on the calculation and implications of a possible CRAT for Bishop. | 1.0 | 150 | | | |

Suspended transactions are not included. Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge. Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges. Expense Amounts include the applicable admin surcharge

TRAX/Reporter Version 5.1          Page   18          Run: 11/02/99  05:40 PM

001850

ENB-DOJ-004403

(By Client, Engagement...h, Individual, Date)
For the days 10/01/1999 to 10/31/1999

Bishop Group, The, LTD (60024092)

BGL CONSULTING (US025 - 10240752)

| | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 10/25/99 | Researched contracts related to the sale of Butcher interest | 2.5 | 375 | | | |
| Individual Total | | 8.5① | $1,275① | | $0 | |
| **Burns,Emily K (US025/1543811)** | | | | | | |
| 10/8/99 | Searched for Policy and Procedures on Tax Opinions | 0.7 | 105 | | | |
| 10/20/99 | Researched applicable penalties and exposure to selling stock to an intermediary versus a sale of assets. | 1.5 | 225 | | | |
| 10/20/99 | Researched how and when gain is recognized on a sale of stock for contingent payments. | 2.5 | 375 | | | |
| 10/21/99 | Researched applicable penalties and interest associated with selling stock to an intermediary versus the sale of assets. | 2.5 | 375 | | | |
| 10/22/99 | Met with Bruce Snyder | 0.5 | 75 | | | |
| 10/22/99 | Met with Steve from Bishop to discuss interest and penalties spreadsheet comparing asset sale v. stock sale | 0.5 | 75 | | | |
| 10/22/99 | Researched applicable state penalties for underpayment and state interest rate  Prepared spreadsheet documenting the total tax liability, interest and penalties of asset sale v  stock sale. | 3.0 | 450 | | | |
| 10/26/99 | Met with Bruce Snyder to go over requirements for filing a separate return for the stub period. | 0.3 | 45 | | | |

Suspended transactions are not included. Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge.  Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges    Expense Amounts include the applicable admin. surcharge.

001851

ENB-DOJ-004404

(By Client, Engagement, ... k, Individual, Date)
For the days 10/01/1999 to 10/31/1999

Bishop Group, The, LTD (6U024092)

BGL CONSULTING (US025 - 10240752)

| | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 10/26/99 | Read escrow agreement, stock redemption agreement and stock purchase agreement regarding the purchase of Dennis Langley's shares. | 1.0 | 150 | | | |
| 10/26/99 | Researched if a separate return will be required for the short taxable year as a result of Dennis Langley selling his stock. | 1.2 | 180 | | | |
| 10/27/99 | Familiarized myself with the Tax Sharing agreement | 0.9 | 135 | | | |
| 10/27/99 | Met with Bruce Snyder to discuss if Bishop will need to file a stub period tax return. Also, discussed the merger transaction of Bishop. | 1.0 | 150 | | | |
| 10/27/99 | Researched whether or not Bishop will have to file a separate tax return upon Langley's sale of stock. Prepared a memo on the issue. | 1.5 | 225 | | | |
| 10/28/99 | Read over legal docs to determine if buyer's liability carries over to subsequent purchasers. | 1.0 | 150 | | | |
| | Individual Total | 18.1 | $2,715 | | $0 | |
| | Rank Total | 26.6 | $3,990 | $150 | $0 | |
| | Engagement Total | 80.4 | $25,773 | $321 | $0 | (incl $0 admin surcharge) |
| | Client Total | 80.4 | $25,773 | $321 | $0 | (incl $0 admin surcharge) |
| | Report Total | 278.1 | $91,203 | $328 | $4,968 | (incl $0 admin surcharge) |

Suspended transactions are not included   Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge. Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges   Expense Amounts include the applicable admin. surcharge.

Run: 11/02/99 05:40 PM

ENB-DOJ-004405

001852

## Current Charges by Client/Engagement

(By Client, Engagement, Rank, Individual, Date)
For the days 01/01/2000 to 06/30/2000

Bishop Group, The, LTD (60024092)

Consulting (US025 - 10240752)

| Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|
| **Partner** | | | | | |
| Cody,Kevin J (US025/1344011) | | | | | |
| 6/19/2000 | 2.0 | 968 | | | |
| 6/21/2000 | 2.0 | 968 | | | |
| **Individual Total** | 4.0 | $1,936 | | $0 | |
| Casnell,Elio J (US150/1552448) | | | | | |
| 5/30/2000 | 1.0 | 715 | | | |
| **Individual Total** | 1.0 | $715 | | $0 | |
| **Rank Total** | 5.0 | $2,651 | $530 | $0 | |
| **Principal** | | | | | |
| Kleun,Kyle H (US150/1280859) | | | | | |
| 6/22/2000 | 1.0 | 561 | | | |
| Bruce Snyder in Kansas City - review of plan for sale with options - as currently constructed this is simply a deferred payment plan and lacks economic substance as a true option. In addition the B class interest appears to be valued in excess of its real fair market value | | | | | |
| **Individual Total** | 1.0 | $561 | | $0 | |
| **Rank Total** | 1.0 | $561 | $561 | $0 | |
| **Senior Manager** | | | | | |
| Hambrick,Kathryn W (US150/1058) | | | | | |
| 5/26/2000 | 0.5 | 201 | | | |
| Management Resource Group conf call re: new JV | | | | | |

001811

Suspended transactions are not included  Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge. Refer to the
instructions for forms EMS-2 and EMS-3 for explanations of surcharges  Expense Amounts include the applicable admin. surcharge.

TRAX/Reporter Version 5.13                    Page     1                                               Run: 07/05/2000 10:39 AM

ENB-DOJ-004364

# Current Charges by Client/Engagement
### (By Client, Engagement, Rank, Individual, Date)
### For the days 01/01/2000 to 06/30/2000

(Detail)

Bishop Group, The, LTD (60024092)

Consulting (US025 - 10240752)

| Date | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 6/14/2000 | Management Resource Group - disc w/ Bruce Snyder re LP formation and liquidation options | 0.5 | 201 | | | |
| 6/20/2000 | Review of MRG structure | 1.0 | 402 | | | |
| Individual Total | | 2.0 | $803 | | $0 | |

Snyder, Bruce E (US025/1355618)

| Date | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 1/27/2000 | followup on issues related to tax prep for 1999 | 2.0 | 926 | | | |
| 2/3/2000 | FU on tax returns | 1.0 | 463 | | | |
| 2/22/2000 | FU with steve korb on compliance issues | 0.5 | 232 | | | |
| 3/6/2000 | tax return prep issues | 2.0 | 926 | | | |
| 3/7/2000 | fu on tax prep and extension calculations | 1.0 | 463 | | | |
| 3/10/2000 | work on tax est for extension and followup on needed information | 2.5 | 1,158 | | | |
| 3/13/2000 | review and followup on infomation for extension calc | 2.5 | 1,158 | | | |
| 3/14/2000 | review and discuss with sham and set up payments and info, etc. | 2.0 | 926 | | | |
| 3/15/2000 | finalize estimates | 2.0 | 926 | | | |
| 4/10/2000 | followup on t/r prep | 1.0 | 463 | | | |
| 5/24/2000 | steve on mg acquisition and discuss 338h10 | 1.0 | 446 | | | |
| 5/26/2000 | prep for meeting and meeting at clients | 3.0 | 1,337 | | | |
| 5/30/2000 | work on pship allocations and review deal | 4.0 | 1,782 | | | |
| 6/12/2000 | followup on utilcorp on transaction | 1.0 | 446 | | | |

Suspended transactions are not included. Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge. Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges. Expense Amounts include the applicable admin. surcharge

TRAX/Reporter Version 5.13    Page 2    Run: 07/05/2000 10:39 AM

ENB-DOJ-004365

C01812

# Current Charges by Client/Engagement

(By Client, Engagement, Rank, Individual, Date)
For the days 01/01/2000 to 06/30/2000

Client/Engagement (Detail)

Bishop Group, The, LTD (60024092)

Consulting (US025 - 10240752)

| Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|
| 6/12/2000 tax return issues | 0.5 | 223 | | | |
| 6/13/2000 conference call on gateway transaction | 1.5 | 668 | | | |
| 6/15/2000 conf. call on utilcorp transaction | 1.0 | 446 | | | |
| 6/15/2000 work on utilcorp deal | 2.0 | 891 | | | |
| 6/19/2000 followup on accounting issues related to structure | 2.0 | 946 | | | |
| 6/20/2000 followup on issues related to joint venture | 1.0 | 473 | | | |
| 6/21/2000 cases on options | 1.0 | 473 | | | |
| 6/21/2000 conference call on accounting rules related to put and call options | 1.0 | 473 | | | |
| 6/22/2000 review cases for options and followup with two | 2.0 | 946 | | | |
| 6/26/2000 two on status of acquisition | 0.5 | 237 | | | |
| Individual Total | 38.0 | $17,426 | | $0 | |
| Rank Total | 40.0 | $18,229 | $456 | $0 | |

Manager

Fox, Shari A (US025/1359208)

| | | | | | |
|---|---|---|---|---|---|
| 1/12/2000 Discussions with Howard Tieg - intermediary auditor regarding YE issues and return prep issues | 1.0 | 292 | | | |
| 1/13/2000 Copy of returns for intermediary and discuss with Bruce, phone calls to Steve Korb regarding final document agreements | 0.5 | 146 | | | |
| 1/20/2000 | 1.0 | 292 | | | |
| 1/24/2000 | 1.0 | 292 | | | |
| 1/26/2000 Review final transaction documents forwarded by Steve Korb | 2.0 | 583 | | | |

Suspended transactions are not included. Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge. Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges    Expense Amounts include the applicable admin surcharge.

TRAX/Reporter Version 5.13                     Page      3                                    Run: 07/05/2000 10:39 AM

001013

ENB-DOJ-004366

**Current Charges by Client/Engagement**

(By Client, Engagement, Rank, Individual, Date)
For the days 01/01/2000 to 06/30/2000

Client/Engag (Detail)

Bishop Group, The, LTD (60024092)

Consulting (US025 - 10240752)

| Date | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 1/27/2000 | Conference call with Steve Korb and Craig Hoffman regarding tax compliance for 1999  Discuss staffing with Alan | 2.0 | 583 | | | |
| 1/31/2000 | Phone call with Craig Hoffman, e-mail to set-up call, discuss PFC planning with Ronda | 0.5 | 146 | | | |
| 2/12/2000 | Return issues | 0.5 | 146 | | | |
| 2/21/2000 | Return issues | 0.5 | 146 | | | |
| 2/24/2000 | | 0.5 | 146 | | | |
| 3/6/2000 | | 1.0 | 292 | | | |
| 3/9/2000 | | 7.0 | 2,041 | | | |
| 3/13/2000 | Review info and methodlogy for extension calculation with Gayla; Determine SPCLP temporary differences | 4.0 | 1,166 | | | |
| 3/14/2000 | Preparation of estimate of federal taxable income for 1999 extensions | 5.0 | 1,458 | | | |
| 3/14/2000 | | | | | 8 | RT mileage |
| 3/15/2000 | Finalize, execute and corodinate 3/15 extensions | 4.0 | 1,166 | | | |
| 4/10/2000 | State extensions | 2.0 | 583 | | | |
| 5/4/2000 | | 1.0 | 281 | | | |
| 5/30/2000 | MRGConsulting with Bruce regarding Unlicorp acquistion | 1.0 | 281 | | | |
| 5/31/2000 | Update acquistion model and discuss with Paul and Steve | 1.0 | 281 | | | |
| 6/1/2000 | Tom Palmisano, engagement letter issues, etc | 1.0 | 303 | | | |
| 6/7/2000 | MRG | 1.0 | 303 | | | |
| 6/12/2000 | conf calls re engagement letter, PBC info, etc | 1.0 | 303 | | | |
| 6/19/2000 | MRG- | 1.0 | 303 | | | |

Suspended transactions are not included.  Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge.  Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges.  Expense Amounts include the applicable admin  surcharge.

TRAX/Reporter Version 5.13

Page   4

Run: 07/05/2000 10:39 AM

ENB-DOJ-004367

001214

Client/Engag
(Detail)

## Current Charges by Client/Engagement
(By Client, Engagement, Rank, Individual, Date)
For the days 01/01/2000 to 06/30/2000

Bishop Group, The, LTD (60024092)

| | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| **Consulting (US025 - 10240752)** | | | | | | |
| 6/26/2000 | Review status of returns and various issues with Bill Lacy. Discussions with PWC on Butcher interest partnership and tax basis in butcher interest. | 2.0 | 605 | | $8 | |
| **Individual Total** | | 41.5 | $12,130 | | $8 | |
| **Rank Total** | | 41.5 | $12,130 | $292 | | |
| **Senior 1&2/Senior Consultant** | | | | | | |
| **Carlstedt, Jason L (US025/1457991)** | | | | | | |
| 1/26/2000 | Research on whether short period return needs to be filed after company purchased. Also spoke with Elto and Shan. Researched when short period return is due. | 2.0 | 416 | | | |
| **Individual Total** | | 2.0 | $416 | | $0 | |
| **Jackson, Gayla Estelle (US025/1502** | | | | | | |
| 5/30/2000 | Research whether use of a transitory subsidiary followed by liquidation of the subsidiary into an LLC invalidates a section 338(h)(10) election | 6.5 | 1,301 | | | |
| **Individual Total** | | 6.5 | $1,301 | | $0 | |
| **Rank Total** | | 8.5 | $1,717 | $202 | $0 | |
| **Staff 2/Consultant** | | | | | | |
| **Schneider, Linda S (US025/1544376)** | | | | | | |
| 1/13/2000 | Getting taxpayer copy and letters ready to send to Howard Tieg of Bishop, Pipeline and Synergy. | 2.0 | 343 | | | |

**001815**

Suspended transactions are not included   Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge.  Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges   Expense Amounts include the applicable admin. surcharge

TRAX/Reporter Version 5.13                Page        5                                     Run: 07/05/2000 10:39 AM

ENB-DOJ-004368

## Current Charges by Client/Engagement

(By Client, Engagement, Rank, Individual, Date)
For the days 01/01/2000 to 06/30/2000

Client/Engag
(Detail)

Bishop Group, The, LTD (60024092)

Consulting (US025 - 10240752)

| | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 5/24/2000 | Review of pipeline acquisition documents and sample engagement letters | 3.0 | 495 | | | |
| 5/25/2000 | Discussion of pipeline acquisition with Bruce Snyder. | 2.0 | 330 | | | |
| 5/26/2000 | Meeting with Steve Korb and research on 338(h)(10) election followed by immediate liquidation of C corporation. | 8.0 | 1,320 | | | |
| 6/20/2000 | Bishop group (specifically MRG) research and analysis of possible transaction structure. (Bruce) | 6.0 | 1,056 | | | |
| 6/21/2000 | Bishop group (specifically MRG) research and analysis of possible transaction structure. (Bruce) | 8.0 | 1,408 | | | |
| 6/23/2000 | Bishop group (specifically MRG) research on the capitalization of interest. (Bruce) | 4.0 | 704 | | | |
| 6/26/2000 | Bishop group (specifically MRG) research on the capitalization of interest. (Bruce) | 4.0 | 704 | | | |
| 6/27/2000 | Bishop group (specifically MRG) research on the capitalization of interest. (Bruce) | 2.0 | 352 | | | |
| **Individual Total** | | **39.0** | **$6,712** | | **$0** | |
| **Rank Total** | | **39.0** | **$6,712** | **$172** | **$0** | |

Staff 1

Stephens,Paul B (US025/1502982)

| | | | | | | |
|---|---|---|---|---|---|---|
| 3/10/2000 | Picked up materials for Bruce Snyder from Bishop's location at 75th and I-35 | 1.0 | 172 | | | |

001816

Suspended transactions are not included. Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge. Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges. Expense Amounts include the applicable admin. surcharge

TRAX/Reporter Version 5.13

Page 6

Run: 07/05/2000 10:39 AM

ENB-DOJ-004369

Client/Engag
(Detail)

## Current Charges by Client/Engagement
(By Client, Engagement, Rank, Individual, Date)
For the days 01/01/2000 to 06/30/2000

Bishop Group, The, LTD (60024092)

Consulting (US025 - 10240752)

| | Hours Description | Chargeable Hours | Estimated Fees | Average Rate Per Hour | Expense Amount | Expense Description |
|---|---|---|---|---|---|---|
| 3/10/2000 | | | | | 11 | Travel required to pick up materials from Kansas Pipeline. |
| 3/13/2000 | Completed spreadsheet for Gayla Jackson related to additions to several of Bishop subs | 12 | 206 | | | |
| 4/5/2000 | Research whether Bishop or any of its subsidiaries had had a private letter ruling issued | 16 | 275 | | | |
| 5/30/2000 | | 0.5 | 83 | | | |
| 5/31/2000 | | 0.8 | 132 | | | |
| Individual Total | | 5.1 | $867 | | $11 | |
| Rank Total | | 5.1 | $867 | $170 | $11 | |
| Engagement Total | | 140.1 | $42,867 | $306 | $3,682 | (incl $3,663 admin surcharge). |
| Client Total | | 140.1 | $42,867 | $306 | $3,682 | (incl $3,663 admin surcharge) |
| Report Total | | 140.1 | $42,867 | $306 | $3,682 | (incl $3,663 admin surcharge) |

Suspended transactions are not included   Estimated fees are calculated using the Standard Billing Rate adjusted, when applicable, by the 8% or 10% surcharge   Refer to the instructions for forms EMS-2 and EMS-3 for explanations of surcharges   Expense Amounts include the applicable admin. surcharge.

Run: 07/05/2000 10:39 AM

ENB-DOJ-004370

001917

**Shari A. Fox**          09/07/2000 04:09 PM
Ernst & Young, LLP / Kansas City Tax Consulting
Phone Number: 816-480-5552
Fax Number: 816-480-5080
EYComm: 1377485

To:     William S. Lacy/MissouriKansas/TAX/EYLLP/US
cc:
Subject: RE: K Pipe Issues

------------------ Forwarded by Shari A. Fox/MissouriKansas/TAX/EYLLP/US on 09/07/2000 04:09 PM
--------------------

  hteig@ica-ipg.com on 09/07/2000 02:10:21 PM

To:     Shari A. Fox/MissouriKansas/TAX/EYLLP/US@EY-NAmerica, austinesq@aol.com@Internet
cc:     Bruce E Snyder/MissouriKansas/TAX/EYLLP/US@EY-Namerica, Brad
        Hart/MissouriKansas/TAX/EYLLP/US@EY-NAmerica,
        CN=William_S._Lacy#s#OU=MissouriKansas#s#O=TAX#s#O=EYLLP#s#C=US%EY-NAmerica@EYLLP
        WT001.ey.com@Internet, tmonaldo@mrg-llc.com@Internet, skorb@mrg-llc com@Internet
Subject: RE: K Pipe Issues

In response to below:

1. I have checked and do not have details.  I do have the true-up of working
capital and will fax such to you today.  I will try to follow up with
Midcoast re: overall allocation.

2. Following is a brief summary - SCALP was formed in 1994.  Several limited
partners contributed assets having high basis, in exchange for approx. 30%
of interest.  Remaining 70% interest was allocated to GP.  The limited
partners however received a priority of all distributions.  In 1996, the
general partner changed to Jeffrey Furman (he remains to this date as GP).
At the time of the change in GP, the only assets in SCALP were cash (small
amount) and an investment in Canadian dollars and British pound sterling.
Since the change of GP caused a technical termination of partnership under
IRC Section 708, the outside basis of the partners adhered to the assets
that were technically distributed by and recontributed to SCALP.  As a
result, since the basis of cash is its face amount, the remainder of the
basis attached to the investment in foreign currency.  Since 1996, SCALP has
maintained investments in each of these currencies without a change to
another currency or without conversion into US dollars.  It is a portion of
these assets which SCALP contributed into K-Pipe.

3. Sorry about not looking at the financial statement included in Bill's
message of 9/1.  I must have overlooked it. However, it for the most part
looks fine assuming that you have done this on a book basis and not tax
basis.  In addition, I am not sure what was done with $750,000 loan fee.
Perhaps you could explain this.  I am also not sure what the gain reflected
on the P&L is supposed to represent.

GOVERNMENT
EXHIBIT
232

001C20

1/3

ENB-DOJ-004172

4. I have looked at the spreadsheet and I must apologize, since I am not really sure what I am looking at or what purpose it serves. Perhaps you could explain this in more detail.

5. I am waiting for your invoice. I actually am not in charge of paying the bills. However, I did pass the bill on to the proper party very shortly after receipt. In addition, I today have VERY STRONGLY urged payment of that bill and one to come. I did not know whether it was paid or not. I will follow up on this though.

-----Original Message-----
From: Shari A. Fox [mailto:shari.fox@ey.com]
Sent: Thursday, September 07, 2000 10:55 AM
To: austinesq@aol.com; hteig@ica-ipg.com
Cc: Bruce E. Snyder; CN=William S.
Lacy/OU=MissouriKansas/OU=TAX/O=EYLLP/C=US%EY-NAmerica; Brad Hart;
tmonaldo@mrg-llc.com; skorb@mrg-llc.com
Subject: K Pipe Issues


Howard -

In response to your 9/1 e-mail:

1.   With respect to the asset purchase price allocation issues, Section 2.9 of the Asset Purchase agreement addresses this issue. It states that "within sixty days (60) from Closing, the Buyers will provide to the Seller a schedule of the Buyer's estimated allocation of the Purchase Price among the Assets acquired." We do not have access to that information and it appears that the buyer (MidCoast) should have provided this to K Pipe the first part of the year. We do not have any contacts at MidCoast and will rely entirely upon you or another K Pipe representative to obtain this information. Since Craig Hoffman's departure, we have no contact with K Pipe except through you and we will continue to rely on you to serve as their representative unless notified otherwise.

2.   SCALP Basis Issues - At this time, we have yet to receive a sufficient amount of information regarding this transaction. We do not feel that we are requesting information that would be beyond a request made by any prudent and responsible CPA who is charged with the responsibility of signing a federal income tax return. While your e-mail refers to this transaction as complex and difficult to convey, we are extremely confident upon our receipt of a detailed written explanation of the transaction we have the expertise to ascertain and concur with your assessment of the tax treatment of this transaction. It is our responsibility as the paid tax preparer to ensure that this transaction will meet the substantial authority test if questioned in the future by the Internal Revenue Service. It is also our responsibility to ensure that the appropriate (if any) disclosures are made regarding this transaction.

3    We are still waiting for your approval on the financial statements that Bill prepared and forwarded to you. Since we have not received financial statements in a prepared format from you or anyone at K Pipe, it is critical that you review and approve the information we have prepared.

001621    2/3

ENB-DOJ-004173

A couple of additional items...

4.     Bill has spent a great deal of time deciphering the asset purchase agreement and has done a thorough job of gleaning what information is available from this document.    We have one open item as it relates to the cash consideration.  Please review the attached spreadsheet and provide us with a reconciliation of the difference.


5.     Finally, as mentioned last week, our initial invoice for this project remains unpaid.  Therefore, we will be faxing out today the second invoice for this project and will expect payment prior to the delivery of the returns.  We will fax this invoice to you unless you provide us with a direct fax to Larry Austin or another K Pipe representative.

Howard,  we are now at a critical stage in the return preparation process. Our staff is working an enormous number of hours and as is common with all accounting firms we are trying to maintain and coordinate everyone's schedule.   We are now being forced to set firm deadlines for all our clients.  Therefore, we are informing you that if we do not receive all the information necessary to complete these returns by Monday morning at 9:00 am, we will be unable to guarantee that the K Pipe federal and state returns will be prepared in time for filing on September 15th.

If you have any questions or concerns, please do not hesitate to contact me at 816-480-5552 or Bruce Snyder at 816-480-5352.

Sincerely,

Shari Fox


**********************************************************************
***
Note:        The information contained in this message may be privileged and confidential and protected from disclosure.  If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.  Thank you.  Ernst & Young LLP
**********************************************************************
***

001822    3/3

08/22/00  15:24 FAX                                                           @002

# MEMORANDUM

To:     Bill Lacy
        Shari Fox

From:   Howard Teig

Date:   August 22, 2000

Re:     K-Pipe activity

---

In response to your request for information about the activities of K-Pipe for the period through December 31, 1999 from the closing date, the following is a summary thereof.

Contribution of Assets
The K-Pipe group was effectively wholly owned by a partnership, Signal Capital Associates, L.P. ("SCALP"), on the closing date. SCALP's address and EIN are:

        Signal Capital Associates, L.P.
        Jeffrey Furman, General Partner
        750 Lexington Avenue
        30th Floor
        New York, New York 10022
        EIN 13-4105282

SCALP effectively wholly owns K-Pipe by virtue of its being the only partner of K-Pipe Holdings Partners, L.P. ("K-Pipe LP") on the date of the closing of the stock purchase when K-Pipe LP's wholly owned subsidiary, K-Pipe Merger Corporation ("K-Pipe Merger") merged K-Pipe.

On November 8, 1999, SCALP contributed pursuant to a plan which would qualify under Section 351 of the Internal Revenue Code.

        45% of SCALP's holdings in Petro Holdings LP, Inc. ("Petro")
        36.75% of SCALP's holdings in Universal Merit Securities, Inc. ("Universal")
        158,620 Canadian dollars

Since SCALP already owned 100% of the shares of K-Pipe, it did not receive additional shares from the exchange. Instead these assets were contributed as additional capital to the company.

SCALP's aggregate tax basis in the assets was $145,411,651 consisting of:

        Petro –              $ 22,500,000
        Universal –          $ 82,622,939
        Canadian dollars -   $ 40,288,712

002595

GOVERNMENT
EXHIBIT
233
PENGAD-Bayonne, N.J.

ENB-DOJ-004146

08/22/00  15:25 FAX                                                                    ⓦ003

The journal entry to report this transaction is as follows:

|                                      | Debit       | Credit.     |
|--------------------------------------|-------------|-------------|
| Investment in Petro                  | $  75,000   |             |
| Investment in Universal              | $ 590,000   |             |
| Investment in Canadian dollars       | $ 107,861   |             |
| Paid in Capital                      |             | $ 772,861   |

The above entry was based upon the fair market value ("FMV") of the contributed assets
and not their respective tax basis. The FMV of the Petro and Universal assets has been
based upon the values realized later in the year (see below) since no appraisals of values
were obtained at the time of the contribution. The investment in Canadian dollars has
been based upon the exchange rate of Canadian dollars to US dollars (.68 to 1) as of the
date of contribution (November 8, 1999). For tax return reporting purposes, a disclosure
statement under Treasury Regulations 1.351-(3)(b) must be made of this transaction.

Disposition of Assets

During December 1999, K-Pipe sold the assets that it had received in the contribution
from SCALP. The information on the assets sold is as follows:

1. *December 15, 1999 – sale of* the Petro to JRCR Corp. for a $75,000 promissory note.
   Note bore interest at the rate of 6.0% per annum and is due on December 15, 2000.
   K-Pipe's tax loss from this transaction was a capital loss of $22,425,000.

2. December  22, 1999 – sale of Universal to Riversea Corp. for $590,000 in cash. K-
   Pipe's tax loss from this transaction was a capital loss of $82,032,939.

3. December 29, 1999 – conversion of Canadian dollars to US dollars. Conversion
   proceeds equaled $106,631.15. As a result, K-Pipe realized a tax loss of $40,182,081,
   which under Code Section 988 is reportable as an ordinary loss.

The journal entry to report these transactions for book purposes is as follows:

|                                      | Debit       | Credit.     |
|--------------------------------------|-------------|-------------|
| Cash                                 | $ 696,631   |             |
| Note Receivable                      | $  75,197   |             |
| Foreign Exchange Loss                | $   1,230   |             |
| Investment in Petro                  |             | $  75,000   |
| Investment in Universal              |             | $ 590,000   |
| Investment in Canadian dollars       |             | $ 107,861   |
| Interest Income (12/15-12/31/99)     |             | $     197   |

For tax reporting purposes, the difference between the book and tax results of these
transactions are reportable as Schedule M-1 adjustments.

C01£9S

3|↑

08/22/00  15:26 FAX

## Cash Activities

In addition to the transactions described above, below is a summary o1 f the cash activities at Rabobank Nederland NY (prepared in journal entry format) in K-Pipe and K-Pipe Merger which as a result of the merger have been combined.  All references to "cash" is to the account maintained at Rabobank.  All amounts have been rounded, where applicable, to the nearest dollar.

| | Debit | Credit |
|---|---|---|
| Cash | $ 148 | |
| Investment in K-Pipe | $122,594,852 | |
| Loan Fee to Bank | $ 750,000 | |
| Loan Payable to Bank | | $123,345,000 |
| To record loan payable from bank and use of proceeds. | | |
| | | |
| Cash | $112,695,895 | |
| Sales Proceeds – Assets | | $112,695,895 |
| To record cash received from sale of assets. | | |
| | | |
| Cash | $ 6,225,000 | |
| Investment – Butcher Interest | | $ 6,225,000 |
| To record distribution received from Butcher Interest. | | |
| | | |
| Cash | $ 10,039,536 | |
| Cash – State Street Bank | | $ 10,039,536 |
| To record the inter-bank transfer of cash. | | |
| | | |
| Loan Payable to Bank | $123,345,000 | |
| Interest Expense | $ 28,266 | |
| Cash | | $123,373,266 |
| To record repayment of loan. | | |
| | | |
| Cash | $ 3,282 | |
| Interest Income | | $ 3,282 |
| To record interest income earned on cash balance. | | |
| | | |
| Distribution to SCALP | $ 2,902,000 | |
| Consulting fee | $ 525,000 | |
| Accounting fee | $ 75,000 | |
| Finder's fee | $ 958,743 | |
| Administrative fee | $ 312,260 | |
| Legal fee | $ 299,750 | |
| Cash | | $ 5,072,753 |
| To record sundry cash payments. | | |

002597

4|7

Received  08-22-00  01.28pm  From-          To-ERNST AND YOUNG    Page  04

ENB-DOJ-004148

08/22/00  15:26 FAX

The above cash transactions result in a cash balance of $1,214,473, which is the rounded amount of the actual cash balance per the bank statements of $1,214,472.51.

Other Transaction

The only other known transaction is the investment in the Butcher Interest Partnership.  A copy of the K-1 will be faxed today.  The K-1 shows that K-Pipe Group, Inc. has an ordinary loss from trade or business activities of $38,756 and a distribution of $6,225,000.  The distribution amount agrees with the summary of cash above.

ENB-DOJ-004149