# INPUT WORKSHEET

KANSAS PIPELINE OPERATING COMPANY - 0490

08/23/1999
PAGE 1

CHECK DATE 09/03/1999   WEEK 36   NEXT PAY:NP 08/30/1999 12:00
PERIOD BEGIN 08/23/1999   PERIOD END 09/05/1999
(913) 888-7139   PAM MUVRIN
NEXT EMPLOYEE ID #:   160

| EMPLOYEE NAME | | | | | |
| EMP ID   S S NO.   STATUS | RATE | | | | Fed & State Tax Overrides |
|---|---|---|---|---|---|
| **ABPLANALP, TERRY E** | 11/16/1998 | | | | |
| 308555  308555  TANKEE LUMPR | 1100  HOURLY | | | | |
| **ANDERSON, MARK E** | SALARY | N | | | |
| 107175  107175 OPERATIONS A | 06/17/1999 | | | | |
| **ANDREWS, CODY R** | 09/26/1990 | | | | |
| 226560  226560 PIPELINE MAI | | | | | |
| **ARMSTRONG, JAMES R** | SALARY | Y  N | | | |
| 107195  107195 REGULATORY A | 06/21/1999 | | | | |
| **BEFORT, MAUREEN A** | SALARY | Y  N | | | |
| 107165  107165 ADMINISTRATI | 11/02/1998 | | | | |
| **BEYER, EVE** | 02/16/1999 | | | | |
| 107200  107200 EXECUTIVE AD | 10.4400 HOURLY | | | | KPI1416 |
| **BEYER, TIFFANY J** | SALARY | Y  N | | | |
| 107200  107200 EXECUTIVE AD | 08/05/1993 | | | | |
| **TOTALS** | HOURS | | | | |
| | DOLLARS | | | | PAGE EMP TOTAL:   7 |

INITIALS :

| E | 1 | REGULAR EARNIN | E | D | DEPENDANT CARE | E | J | JURY DUTY | E | Q | ACC/SICK PRETA | E | 1S | SALARY | E | KM | 401K MATCH | D | A | ADVANCE |
| E | 2 | OVERTIME EARNI | E | E | BONUS | E | K | 401K | E | R | RETRO PAY | E | 99 | T/OFF TEST | E | LB | LABOR | D | B | BANKRUPTCY |
| E | 3 | PREMIUM EARNIN | E | F | SEVERANCE PAY | E | L | LOANS/ADVANCES | E | S | SICK | E | CA | CAR ALLOWANCE | E | MI | HEDINS PRETAX | D | F | ADMIN FEES |
| E | B | BEREAVEMENT | E | G | GTL | E | O | DISABILITY | E | T | TFB | E | CP | CANCER PRETAX | E | MR | MEDREIMB PRETA | D | G | GTL |
| E | C | COMMISSION | E | H | HOLIDAY | E | P | PERSONAL | E | V | VACATION | E | K2 | OTHER MATCH | | | | D | H | DISABILITY |

ENB-DOJ-021211

**INPUT WORKSHEET**
KANSAS PIPELINE OPERATING COMPANY - 0490

CHECK DATE 09/03/1999   WEEK 36   NEXT PAY: NP 08/30/1999 12:00   08/23/1999
PERIOD BEGIN 08/23/1999 PERIOD END 09/06/1999   PAGE  2
PAM MUVRIN
(913) 888-7139   NEXT EMPLOYEE ID #:  160

| EMPLOYEE NAME | RATE | | Fed & State Tax Overrides |
| EMP ID   S S NO.   STATUS | | | |

BODY, FELICIA
107165  107165 ADMINISTRATI   SALARY  Y  N   04/15/1998

BOYDBTON, BRUCE A
406560  406560 PIPELINE MAI   09/23/1985

BROWN, BLAINE J
106580  106580 SYSTEM CONTR   08/27/1997

BRYAN, VICKI L
107200  107200 EXECUTIVE AD   SALARY  Y  N   11/16/1998

BULLIMORE, JOSEPH W
106110  106110 PIPELINE OPE   SALARY  Y  N   11/02/1992

BUTLER, KAREN A
107175  107175 OPERATIONS A   SALARY  Y  N   01/24/1994

CASTLE, SCOTT L
226560  226560 PIPELINE MAI   11/01/1984  17.3080 HOURLY

TOTALS   HOURS   DOLLARS

INITIALS :

| E | 1 | REGULAR EARNIN | E | D | DEPENDANT CARE | E | J | JURY DUTY | E | Q | ACC/SICK PRETA | E | 1S | SALARY | E | KH | 401K MATCH | D | A | ADVANCE |
| E | 2 | OVERTIME EARNI | E | E | BONUS | E | K | 401K | E | R | RETRO PAY | E | 99 | T/OFF TEST | E | LB | LABOR | D | B | BANKRUPTCY |
| E | 3 | PREMIUM EARNIN | E | F | SEVERANCE PAY | E | L | LOANS/ADVANCES | E | S | SICK | E | CA | CAR ALLOWANCE | E | MI | MEDINS PRETAX | D | F | ADMIN FEES |
| E | B | BEREAVMENT | E | G | GTL | E | O | DISABILITY | E | T | TF8 | E | CP | CANCER PRETAX | E | MR | MEDREIMB PRETA | D | G | GTL |
| E | C | COMMISSION | E | H | HOLIDAY | E | P | PERSONAL | E | V | VACATION | E | K2 | OTHER MATCH | | | | D | H | DISABILITY |

KPI1417

PAGE EMP TOTAL:  7

ENB-DOJ-02121

INPUT WORKSHEET
KANSAS PIPELINE OPERATING COMPANY - 0490

CHECK DATE 09/03/1999   WEEK 36   NEXT PAY: NP 08/30/1999 12:00
PERIOD BEGIN 08/23/1999 PERIOD END 09/05/1999
(913) 888-7139   PAM MUVRIN

NEXT EMPLOYEE ID # : 160

08/23/1999
PAGE   3

| EMPLOYEE NAME | | RATE | | | | | | | | | Fed & State Tax Overrides |
|---|---|---|---|---|---|---|---|---|---|---|---|
| EMP ID   S S NO.   STATUS | | | | | | | | | | | |

CHAPMAN, DONALD L
406560  406560 PIPELINE MAI   07/23/1989   18.3800 HOURLY

CLOVER, ROBERT EARL
406555  406560 OITAWA COMPR   07/01/1992   23.5765 HOURLY

CLOVER, ROBERT EDWARD
406560  406560 PIPELINE MAI   02/13/1995   14.0660 HOURLY

CRISMA6, RANDY L
206555  206555 BEAUMONT COM   09/25/1995   13.8640 HOURLY

DAVIS, JAMIE L
107200  107200 EXECUTIVE AD   08/10/1998   8.5000 HOURLY   (temporary)

DEVEREAUX, DAVID J   SALARY   Y   N
145  145 MO/MO FI,   03/01/1998
150  107120 POLICY

DRAKE, JOE A
206555  206555 BEAUMONT COM   12/10/1993   56.8173 HOURLY

TOTALS   HOURS

   DOLLARS

INITIALS :

KPI1418

PAGE EMP TOTAL:   7

| E 1 REGULAR EARNIN | E D DEPENDANT CARE | E J JURY DUTY | E Q ACC/SICK PRETA | E 1S SALARY | E KH 401K MATCH | D A ADVANCE |
|---|---|---|---|---|---|---|
| E 2 OVERTIME EARNI | E E BONUS | E K 401K | E R RETRO PAY | E 99 T/OFF TEST | E LB LABOR | D B BANKRUPTCY |
| E 3 PREMIUM EARNIN | E F SEVERANCE PAY | E L LOANS/ADVANCES | E S SICK | E CA CAR ALLOWANCE | E MI MEDINS PRETAX | D F ADMIN FEES |
| E B BEREAVMENT | E G GTL | E O DISABILITY | E T TFB | E CP CANCER PRETAX | E MR MEDREIMB PRETA | D G GTL |
| E C COMMISSION | E H HOLIDAY | E P PERSONAL | E V VACATION | E K2 OTHER MATCH | | D H DISABILITY |

ENB-DOJ-012121

# INPUT WORKSHEET
KANSAS PIPELINE OPERATING COMPANY - 0490

CHECK DATE 09/03/1999   WEEK 36   NEXT PAY: NP 08/30/1999 12:00   08/23/1999
PERIOD BEGIN 08/23/1999 PERIOD END 09/05/1999   PAGE 4
PAM MUVRIN
(913) 888-7139                NEXT EMPLOYEE ID #:  160

| EMPLOYEE NAME | RATE | | | | Fed & State Tax Overrides |
|---|---|---|---|---|---|
| EMP ID   S S NO.   STATUS | | | | | |
| EHRET, WAYNE L | 08/03/1992 | | | | |
| 106580  106580 SYSTEM CONTR | 16.2200 HOURLY | | | | |
| EICHENLAUB, BETTY B | 02/08/1999 | | | | |
| 106110  106110 PIPELINE OPE | 12.2900 HOURLY | | | | |
| ENGLE, WILLIAM H | 12/16/1997 | | | | |
| 106580  106580 SYSTEM CONTR | 13.3500 HOURLY | | | | |
| FUENTEZ, VICENTE | 07/02/1999 | | | | |
| 107200  107200 EXECUTIVE AD | 15.0000 HOURLY | | | | |
| GERKEN, JOHN W | 07/16/1990 | | | | : : : : : |
| 406560  406560 PIPELINE MAI | 19.9600 HOURLY | | | | |
| GLENN, BRANDON L | SALARY  Y  N | | | | |
| 407175  107175 OPERATIONS A | 07/22/1998 | | | | KPI/1419 |
| GRANDON, STEVEN L | SALARY  Y  N | | | | |
| 106110  106110 PIPELINE OPE | 06/30/1997 | | | | |
| TOTALS | HOURS | | | | PAGE EMP TOTAL:    7 |
| INITIALS : | DOLLARS | | | | |

| E 1 REGULAR EARNIN | E D DEPENDANT CARE | E J JURY DUTY | E Q ACC/SICK PRETA | E 1S SALARY | E KH 401K MATCH | D A ADVANCE |
| E 3 OVERTIME EARNI | E E BONUS | E K 401K | E R RETRO PAY | E 99 T/OFF TEST | E LB LABOR | D B BANKRUPTCY |
| E 2 PREMIUM EARNIN | E F SEVERANCE PAY | E L LOANS/ADVANCES | E S SICK | E CA CAR ALLOWANCE | E MI MEDINS PRETAX | D F ADMIN FEES |
| E B BEREAVMENT | E G GTL | E O DISABILITY | E T TFB | E CP CANCER PRETAX | E MR MEDREIMB PRETA | D G GTL |
| E C COMMISSION | E H HOLIDAY | E P PERSONAL | E V VACATION | E K2 OTHER MATCH | | D H DISABILITY |

# INPUT WORKSHEET
KANSAS PIPELINE OPERATING COMPANY - 0490

08/23/1999
PAGE 6

CHECK DATE 09/03/1999   WEEK 36   NEXT PAY: NP 08/30/1999  12:00
PERIOD BEGIN 08/23/1999  PERIOD END 09/05/1999
PAM MUVRIN
(913) 888-7139
NEXT EMPLOYEE ID #: 160

| EMPLOYEE NAME | | | | |
| EMP ID   S S NO. | STATUS | RATE | | Fed & State Tax Overrides |
|---|---|---|---|---|
| GREMMINGER, ROBERT | Y  N | SALARY  10/05/1998 | | |
| 107190  107190 MARKETING | | | | |
| HADEN, KEVIN E | | 02/09/1998 | | |
| 106580  106580 SYSTEM CONTR | | | | |
| HARRIS, RODNEY | | 04/10/1995  HOURLY | | |
| 406570  406570 MEASURMT & R | | | | |
| HEARN, SCOTT A | | 09/09/1996  $15.5900 HOURLY | | |
| 206570  206570 MEASUREMT & | | | | |
| HINES, WALLACE L | | 11/07/1989  $17.6310 HOURLY | | |
| 406555  406555 OTTAWA COMPR | | | | |
| HOLLIS, GARY D | | 02/11/1991  24.5190 HOURLY | | |
| 106110  106110 PIPELINE OPE | | | | |
| HOLMES, CRAIG W | | 03/08/1992  16.8850 HOURLY | KPI1420 | |
| 226560  226560 PIPELINE MAI | | | | |
| TOTALS | | HOURS | | |
| | | DOLLARS | | PAGE EMP TOTAL:  7 |

INITIALS:

| | | | | | | |
|---|---|---|---|---|---|---|
| E 1 REGULAR EARNIN | E D DEPENDANT CARE | E J JURY DUTY | E Q ACC/SICK PRETA | E 1S SALARY | E KH 401K MATCH | D A ADVANCE |
| E 2 OVERTIME EARNI | E E BONUS | E K 401K | E R RETRO PAY | E 99 T/OFF TEST | E LB LABOR | D B BANKRUPTCY |
| E 3 PREMIUM EARNIN | E F SEVERANCE PAY | E L LOANS/ADVANCES | E S SICK | E CA CAR ALOMANCE | E MI MEDINS PRETAX | D F ADMN FEES |
| E B BEREAVEMENT | E G GTL | E O DISABILITY | E T TB | E CP CANCER PRETAX | E MR MEDREIMB PRETA | D G GTL |
| E C COMMISSION | E H HOLIDAY | E P PERSONAL | E V VACATION | E K2 OTHER MATCH | | D H DISABILITY |

ENB-DOJ-021215

# INPUT WORKSHEET

KANSAS PIPELINE OPERATING COMPANY - 0490

CHECK DATE 09/03/1999   WEEK 36   NEXT PAY: NP 08/30/1999 12:00   08/23/1999   PAGE 6
PERIOD BEGIN 08/23/1999 PERIOD END 09/05/1999   PAM MUVRIN
(913) 888-7139   NEXT EMPLOYEE ID # :   160

| EMPLOYEE NAME | RATE | STATUS | | Fed & State Tax Overrides |
| EMP ID   S S NO. | | | | |
| --- | --- | --- | --- | --- |
| HOUSE, BYRON W | 09/10/1990 | | | |
| · 84 | 15.9800 HOURLY | | | |
| 106580 106580 SYSTEM CONTR | | | | |
| KORB, STEPHEN P | SALARY | Y   N | | |
| 107200 107200 EXECUTIVE AD | 06/03/1996 | | | |
| KORB, YVETTE C | SALARY | Y   N | | |
| 107200 107200 EXECUTIVE AD | 01/01/1985 | | | |
| LANDWEHR, HERBERT M | SALARY | Y   N | | |
| 226560 226560 PIPELINE MAI | 01/15/1987 | | | |
| LANGLEY, DENNIS M | SALARY | Y   N | | |
| 107200 107200 EXECUTIVE AD | 01/01/1994 | | | |
| LANGLEY, SEAN | 06/14/1999 | | Summer temporary | |
| 107200 107200 EXECUTIVE AD | 3.0000 HOURLY | | | KPI1421 |
| LEBEAU, TRACEY A | SALARY | Y   N | | |
| 107200 107200 EXECUTIVE AD | 01/29/1999 | | | |

| TOTALS | HOURS | | | PAGE EMP TOTAL:   7 |
| --- | --- | --- | --- | --- |
| | DOLLARS | | | |

INITIALS:

| E 1 REGULAR EARNIN | E D DEPENDANT CARE | E J JURY DUTY | E Q ACC/SICK PRETA | E 1S SALARY | E KN 401K MATCH | D A ADVANCE |
| E 2 OVERTIME EARNI | E E BONUS | E K 401K | E R RETRO PAY | E 99 T/OFF TEST | E LB LABOR | D B BANKRUPTCY |
| E 3 PREMIUM EARNIN | E F SEVERANCE PAY | E L LOANS/ADVANCES | E S SICK | E CA CAR ALLOWANCE | E MI MEDINS PRETAX | D F ADMIN FEES |
| E B BEREAVEMENT | E G GTL | E O DISABILITY | E T TFB | E CP CANCER PRETAX | E MR MEDREIMB PRETA | D G GTL |
| E C COMMISSION | E H HOLIDAY | E P PERSONAL | E V VACATION | E K2 OTHER MATCH | | D H DISABILITY |

ENB-DOJ-021216

**INPUT WORKSHEET**
KANSAS PIPELINE OPERATING COMPANY - 0490

08/23/1999
PAGE   7

CHECK DATE 09/03/1999   WEEK  36   NEXT PAY: NP 08/30/1999  12:00
PERIOD BEGIN 08/23/1999 PERIOD END 09/05/1999
(913) 888-7139          PAM MUVRIN          NEXT EMPLOYEE ID #:  160

| EMPLOYEE NAME | RATE | STATUS | | Fed & State Tax Overrides |
|---|---|---|---|---|
| EMP ID   S S NO. | | | | |

LEDBETTER, TARA J
107200  107200 EXECUTIVE AD          $.0600 HOURLY          08/12/1999          *temporary*

LESTER, BARRY A          SALARY          09/01/1990          Y      N
306555  306555 PAWNEE COMPR

LEWIS, JAMES R          SALARY          11/08/1990          Y      N
406560  406560 PIPELINE MAI

LUBOW, HOWARD E          SALARY          01/01/1991          Y      N
107200  107200 EXECUTIVE AD

MCGLOTHLIN, CHARLENE R          13.0000 HOURLY          11/24/1997
107115  107115 ACCOUNTING

MCKINNEY, WALLACE G          SALARY          06/01/1995          Y      N
107190  107190 MARKETING

MCMILLEN, GLEN L          22.1475 HOURLY          10/15/1990
206555  206555 BEAUMONT COM

TOTALS          HOURS

INITIALS :          DOLLARS

| | | | |
|---|---|---|---|
| E  1  REGULAR EARNIN | E  D  DEPENDANT CARE | E  J  JURY DUTY | E  Q  ACC/SICK PRETA | E  1S  SALARY | E  KM  401K MATCH | E  A  ADVANCE |
| E  2  OVERTIME EARNI | E  E  BONUS | E  K  401K | E  R  RETRO PAY | E  99  T/OFF TEST | E  LB  LABOR | D  B  BANKRUPTCY |
| E  3  PREMIUM EARNIN | E  F  SEVERANCE PAY | E  L  LOANS/ADVANCES | E  S  SICK | E  CA  CAR ALLOWANCE | E  MI  MEDINS PREFAX | D  F  ADMIN FEES |
| E  B  BEREAVEMENT | E  G  GTL | E  O  DISABILITY | E  T  TFB | E  CP  CANCER PRETAX | E  MR  MEDREINB PRETA | D  G  GTL |
| E  C  COMMISSION | E  H  HOLIDAY | E  P  PERSONAL | E  V  VACATION | E  K2  OTHER MATCH | | D  H  DISABILITY |

KPI1422

PAGE EMP TOTAL:      7

PHONE (913) 262-9494          FAX (913) 262-3889

ENB-DOJ-021217

**INPUT WORKSHEET**
KANSAS PIPELINE OPERATING COMPANY - 0490

CHECK DATE 09/03/1999   WEEK 36   NEXT PAY:NP 08/30/1999 12.00

08/23/1999
PAGE   8

PERIOD BEGIN 08/23/1999 PERIOD END 09/05/1999

(913) 888-7139   PAM MUVRIN

NEXT EMPLOYEE ID #:   160

| EMPLOYEE NAME EMP ID   S S NO.   STATUS | RATE | | | | | | | | | | Fed & State Tax Overrides |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MILLAN, JUAN 406560 406560 PIPELINE MAI | 10/12/1998 14.4200 HOURLY | | | | | | | | | | |
| MULLEN-BROWN, CAROLINE 107115 107115 ACCOUNTING | SALARY  Y  N 02/02/1998 | | | | | | | | | | |
| MUVRIN, PAM 107115 107115 ACCOUNTING | 01/04/1999 11.7400 HOURLY | | | | | | | | | | ... |
| OETTING, GREGORY S 107150 107150 FINANCE ADMI | SALARY  Y  N 08/04/1995 | | | | | | | | | | |
| PECKENPAUGH, LORIS L 306555 306555 PANEE COMPR | 11/01/1990 17.3822 HOURLY | | | | | | | | | | |
| PEMBERTON, RICHARD D 107190 107190 MARKETING | SALARY  Y  N 08/17/1998 | | | | | | | | | | |
| PEREZ, MARIA A 107200 107200 EXECUTIVE AD | 05/24/1999 10.0000 HOURLY  temporary | | | | | | | | | | KPI1423 |
| TOTALS | HOURS | | | | | | | | | | |
|  | DOLLARS | | | | | | | | | | PAGE EMP TOTAL:   7 |

INITIALS :

| E | 1 REGULAR EARNIN | E | D DEPENDANT CARE | E | J JURY DUTY | E | Q ACC/SICK PRETA | E | 1S SALARY | E | KM 401K MATCH | D | A ADVANCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E | 2 OVERTIME EARNI | E | E BONUS | E | K 401K | E | R RETRO PAY | E | 99 T/OFF TEST | E | LB LABOR | D | B BANKRUPTCY |
| E | 3 PREMIUM EARNIN | E | F SEVERANCE PAY | E | L LOANS/ADVANCES | E | S SICK | E | CA CAR ALLOWANCE | E | HI MEDINS PRETAX | D | F ADMIN FEES |
| E | B BEREAVEMENT | E | G GTL | E | O DISABILITY | E | T TFB | E | CP CANCER PRETAX | E | MR MEDREIMB PRETA | D | G GTL |
| E | C COMMISSION | E | H HOLIDAY | E | P PERSONAL | E | V VACATION | E | K2 OTHER MATCH | | | D | H DISABILITY |

ENB-DOJ-021218

# INPUT WORKSHEET
KANSAS PIPELINE OPERATING COMPANY - 0490

CHECK DATE 09/03/1999   WEEK 36   NEXT PAY:NP 08/30/1999  12:00
PERIOD BEGIN 08/23/1999 PERIOD END 09/05/1999
(913) 888-7139   PAM MUVRIN
NEXT EMPLOYEE ID #: 160

08/23/1999
PAGE 9

| EMPLOYEE NAME | | | |
| --- | --- | --- | --- |
| EMP ID    S S NO.    STATUS | RATE | | Fed & State Tax Overrides |

PUTMAN, WENDELL C
SALARY    Y    N
04/01/1993
107200 107200 EXECUTIVE AD

ROBERTSON, TODD M
11/25/1998
15.5800 HOURLY
106115 106115 GAS CONTROL

SAMBURSKY, RANDALL K
02/21/1991
20.6500 HOURLY
106570 106570 MEASUREMENT

SCHNEPP, JOAN A
SALARY    Y    N
04/12/1993
107200 107200 EXECUTIVE AD

SCHROPP, INDIA M.
05/24/1999
12.5000 HOURLY
107175 107175 OPERATIONS A

SHAW, LYNETTE K
SALARY    Y    N
10/02/1995
107200 107200 EXECUTIVE AD

SHERMAN, MARILYN'S
09/30/1998
13.3200 HOURLY
107118  107735 107165 ADMINISTRATI

Jammed

KPI1424

TOTALS        HOURS

INITIALS :        DOLLARS

PAGE EMP TOTAL:        7

| E | 1 | REGULAR EARNIN | E | D | DEPENDANT CARE | E | J | JURY DUTY | E | Q | ACC/SICK PRETA | E | 1S | SALARY | E | KH | 401K MATCH | D | A | ADVANCE |
| E | 2 | OVERTIME EARNI | E | E | BONUS | E | K | 401K | E | R | RETRO PAY | E | 99 | T/OFF TEST | E | LB | LABOR | D | B | BANKRUPTCY |
| E | 3 | PREMIUM EARNIN | E | F | SEVERANCE PAY | E | L | LOANS/ADVANCES | E | S | SICK | E | CA | CAR ALLOWANCE | E | MI | MEDINS PRETAX | D | F | ADMIN FEES |
| E | B | BEREAVEMENT | E | G | GTL | E | O | DISABILITY | E | T | TFB | E | CP | CANCER PRETAX | E | MR | MEDREIMB PRETA | D | G | GTL |
| E | C | COMMISSION | E | H | HOLIDAY | E | P | PERSONAL | E | V | VACATION | E | K2 | OTHER MATCH | | | | D | H | DISABILITY |

ENB-DOJ-021219

# INPUT WORKSHEET
KANSAS PIPELINE OPERATING COMPANY - 0490

08/23/1999
PAGE 10

CHECK DATE 09/03/1999   WEEK 36   NEXT PAY: NP 08/30/1999 12:00
PERIOD BEGIN 08/23/1999 PERIOD END 09/05/1999
PAM MUVRIN
(913) 888-7139
NEXT EMPLOYEE ID # : 160

| EMPLOYEE NAME EMP ID   S S NO.   STATUS | RATE | | | | | | Fed & State Tax Overrides |
|---|---|---|---|---|---|---|---|
| SLOT, EDWARD A | SALARY   Y   N 03/08/1994 | | | | | | |
| 107175   107175 OPERATIONS A | | | | | | | |
| BEVERLY S. ~122   510-10 ~~ 050 FT | 10/06/1996   HOURLY | | | | | | |
| 107200   107200 EXECUTIVE AD | | | | | | | |
| STARK, WENDI M | 09/13/1995 10.5770 HOURLY | | | | | | |
| 107200   107200 EXECUTIVE AD | | | | | | | |
| SULLIVAN, GARRY D | SALARY   Y   N 10/28/1991 | | | | | | |
| 107140   107140 INFORMATION | | | | | | | |
| TEEPLE, KEITH A | 07/19/1999   22.0000 HOURLY | | | Summer-temporary ○ | | | |
| 106110   106110 PIPELINE OPE | | | | | | | |
| TILLEY, SEAN DAVID, P | 05/17/1999   9.0000 HOURLY | | | | | | |
| 107165   107165 ADMINISTRATI | | | | | | | |
| TOWNLEY, TERI D | SALARY   Y   N 01/01/1991 | | | | | | KPI1425 |
| 107140   107140 INFORMATION | | | | | | | |
| TOTALS | HOURS | | | | | | PAGE EMP TOTAL:   7 |
| | DOLLARS | | | | | | |

INITIALS :

| | | | | | | |
|---|---|---|---|---|---|---|
| E  1  REGULAR EARNIN | E  D  DEPENDANT CARE | E  J  JURY DUTY | E  Q  ACC/SICK PRETA | E  1S  SALARY | E  KH  401K MATCH | D  A  ADVANCE |
| E  2  OVERTIME EARNI | E  E  BONUS | E  K  401K | E  R  RETRO PAY | E  99  T/OFF TEST | E  L9  LABOR | D  B  BANKRUPTCY |
| E  3  PREMIUM EARNIN | E  F  SEVERANCE PAY | E  L  LOANS/ADVANCES | E  S  SICK | E  CA  CAR ALLOWANCE | E  MI  MEDINS PRETAX | D  F  ADMIN FEES |
| E  B  BEREAVMENT | E  G  GTL | E  O  DISABILITY | E  T  TFB | E  CP  CANCER PRETAX | E  MR  MEDREIMB PRETA | D  G  GTL |
| E  C  COMMISSION | E  H  HOLIDAY | E  P  PERSONAL | E  V  VACATION | E  K2  OTHER MATCH | | D  H  DISABILITY |

PHONE (913) 262-9494   FAX (913) 262-3899

ENB-DOJ-021220

# INPUT WORKSHEET

KANSAS PIPELINE OPERATING COMPANY - 0490

CHECK DATE 09/03/1999   WEEK 36   NEXT PAY: NP 08/30/1999 12:00   08/23/1999
PERIOD BEGIN 08/23/1999 PERIOD END 09/05/1999   PAGE   11
(913) 888-7139   PAM MUVRIN   NEXT EMPLOYEE ID # : 160

| EMPLOYEE NAME | | | | | | Fed & State Tax Overrides |
| EMP ID   S S NO.   STATUS | RATE | | | | | |

VAN CAMP, DEBBIE
106580  106580 SYSTEM CONTR   04/10/1995   14.9400 HOURLY

WARD, GARY D
406570  406570 MEASURMT & R   12/06/1993   17.8700 HOURLY

WEINER, JEFFREY M   Y   N   SALARY
107115  107115 ACCOUNTING   09/04/1991

WOODS, LAVONNA E   Y   N   SALARY
107200  107200 EXECUTIVE AD   07/06/1999

KPI1426

PAGE EMP TOTAL:   4

COMP EMP TOTAL:   74

## TOTALS

HOURS

DOLLARS

INITIALS:

| E 1 REGULAR EARNIN | E D DEPENDANT CARE | E J JURY DUTY | E Q ACC/SICK PRETA | E 1S SALARY | E KM 401K MATCH | D A ADVANCE |
| E 2 OVERTIME EARNI | E E BONUS | E K 401K | E R RETRO PAY | E 99 T/OFF TEST | E LB LABOR | D B BANKRUPTCY |
| E 3 PREMIUM EARNIN | E F SEVERANCE PAY | E L LOANS/ADVANCES | E S SICK | E CA CAR ALLOWANCE | E MI MEDINS PRETAX | D F ADMIN FEES |
| E B BEREAVEMENT | E G GTL | E O DISABILITY | E T TFB | E CP CANCER PRETAX | E MR MEDREIMB PRETA | D G GTL |
| E C COMMISSION | E H HOLIDAY | E P PERSONAL | E V VACATION | E K2 OTHER MATCH | | D H DISABILITY |

PHONE (913) 262-8484   FAX (913) 262-3899

ENB-DOJ-021221

StockMaster News for: BUCKEYE PINKS L P (BPL)                    ....  .. .....

|  Title of each class  |  which registe  |
|  ------------------  |  ------------  |

LP Units representing limited partnership interests .........     New York Stock Ex

Securities registered pursuant to Section 12(g) of the Act:

None
(Title of class)

        Indicate by check mark if disclosure of delinquent filers pursuant to Item
405 of Regulation S-K is not contained herein, and will not be contained, to
the best of registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K or any
amendment to this Form 10-K.  /X/

        Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
Registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days. Yes /X/ No / /

        At March 15, 1999, the aggregate market value of the registrant's LP Units
held by non-affiliates was $667 million. The calculation of such market value
should not be construed as an admission or conclusion by the registrant that
any person is in fact an affiliate of the registrant.

        LP Units outstanding as of March 15, 1999: 26,757,206

TABLE OF CONTENTS

PART I
Item 1.      Business .............................................................
Item 2.      Properties ...........................................................
Item 3.      Legal Proceedings ....................................................
Item 4.      Submission of Matters to a Vote of Security Holders ..................

PART II
Item 5.      Market for the Registrant's LP Units and Related Unitholder Matters...
Item 6.      Selected Financial Data ..............................................
Item 7.      Management's Discussion and Analysis of Financial Condition and
             Results of Operations ...............................................
Item 8.      Financial Statements and Supplementary Data ..........................
Item 9.      Changes in and Disagreements with Accountants on Accounting and
             Financial Disclosure ................................................
PART III
Item 10.     Directors and Executive Officers of the Registrant ...................
Item 11.     Executive Compensation ...............................................
Item 12.     Security Ownership of Certain Beneficial Owners and Management .......
Item 13.     Certain Relationships and Related Transactions .......................
PART IV
Item 14.     Exhibits, Financial Statement Schedules, and Reports on Form 8-K .....

1

KPI1395

ENB-DOJ-021190

PART I

Item 1. Business

Introduction

Buckeye Partners, L.P. (the "Partnership"), the Registrant, is a limited partnership organized in 1986 under the laws of the State of Delaware.

The Partnership conducts all its operations through subsidiary entities. These operating subsidiaries are Buckeye Pipe Line Company, L.P. ("Buckeye"), Laurel Pipe Line Company, L.P. ("Laurel"), Everglades Pipe Line Company, L.P. ("Everglades") and Buckeye Tank Terminals Company, L.P. ("BTT"). (Each of Buckeye, Laurel, Everglades and BTT is referred to as an "Operating Partnership" and collectively as the "Operating Partnerships"). The Partnership owns approximately a 99 percent interest in each of the Operating Partnerships.

Buckeye is one of the largest independent pipeline common carriers of refined petroleum products in the United States, with 3,105 miles of pipeline serving 9 states. Laurel owns a 345-mile common carrier refined products pipeline located principally in Pennsylvania. Everglades owns 37 miles of refined petroleum products pipeline in Florida. Buckeye, Laurel and Everglades conduct the Partnership's refined products pipeline business. BTT provides bulk storage service through leased facilities with an aggregate capacity of 257,000 barrels of refined petroleum products.

The Partnership acquired its interests in the Operating Partnerships from The Penn Central Corporation, now American Financial Group, Inc. ("American Financial"), on December 23, 1986 (the "1986 Acquisition"). The Operating Partnerships (other than Laurel) had been organized by American Financial in November 1986 and succeeded to the operations of predecessor companies owned by American Financial, including Buckeye Pipe Line Company, an Ohio corporation, and its subsidiaries ("Pipe Line"). Laurel was formed in October 1992 and succeeded to the operations of Laurel Pipe Line Company, an Ohio corporation, which was a majority owned corporate subsidiary of the Partnership until the minority interest was acquired in December 1991.

During March 1996, BMC Acquisition Company ("BAC"), a Delaware corporation organized in 1996, acquired all of the common stock of BMC for $63 million in cash from a subsidiary of American Financial (the "Acquisition"). BAC, which subsequently changed its name to Glenmoor, Ltd. ("Glenmoor"), is owned by certain directors and officers of BMC and trusts for the benefit of their families and members of senior management of Buckeye Pipe Line Services Company, a Pennsylvania corporation ("Services Company"). Glenmoor currently provides management services to BMC, the General Partner and Services Company. See "Certain Relationships and Related Transactions."

On August 12, 1997, as part of a restructuring (the "ESOP Restructuring") of the BMC Acquisition Company Employee Stock Ownership Plan (the "ESOP"), all of the General Partner's employees were transferred to Services Company, which is wholly owned by the ESOP. See "Management's Discussion and Analysis of Financial Condition and Results of Operations-- Employee Stock Ownership Plan." Services Company also entered into a Services Agreement with BMC and the General Partner to provide services to the Partnership and the Operating Partnerships for a 13.5 year term. Services Company is reimbursed by BMC or the General Partner for its direct and indirect expenses. BMC and the General Partner are in turn reimbursed by the Partnership and the Operating Partnerships for such expenses other than certain executive compensation and fringe benefit costs. See "Certain Relationships and Related Transactions."

In connection with an internal restructuring, effective December 31, 1998, Buckeye Management Company ("BMC"), transferred its general partnership interest in the Partnership, as well as certain other assets and liabilities, to its wholly-owned subsidiary, Buckeye Pipe Line

KPI1396

RECEIVED TIMEAUG. 17.  3:37PM          PRINT TIMEAUG. 17.  3:49PM

ENB-DOJ-021191

2

Company (the "General Partner"). Buckeye Pipe Line Company will serve as sole general partner of the Partnership and will continue to serve as sole general partner of each Operating Partnership. As of December 31, 1998, the General Partner owned approximately a 1 percent general partnership interest in the Partnership and approximately a 1 percent general partner interest in each Operating Partnership.

Refined Products Business

The Partnership receives petroleum products from refineries, connecting pipelines and marine terminals, and transports those products to other locations. In 1998, refined petroleum products transportation accounted for substantially all of the Partnership's consolidated revenues and consolidated operating income.

Effective for the December 31, 1998 financial statements, the Partnership adopted Financial Accounting Standards Board Statement No. 131, "Disclosures about Segments of an Enterprise and Related Information." The Partnership has one segment, transportation of refined petroleum products.

The Partnership transported an average of approximately 1,031,200 barrels per day of refined products in 1998. The following table shows the volume and percentage of refined petroleum products transported over the last three years.

Volume and Percentage of Refined Petroleum Products Transported (1)

(Volume in thousands of barrels per day)

|  | Year ended December 31, | | | |
|  | 1998 | | 1997 | |
|  | Volume | Percent | Volume | Percent |
| Gasoline ...................... | 516.8 | 50% | 507.8 | 50% |
| Jet Fuels ..................... | 257.2 | 25 | 255.4 | 25 |
| Middle Distillates (2) ........ | 230.3 | 23 | 238.8 | 23 |
| Other Products ................ | 24.9 | 2 | 22.0 | 2 |
| | ------- | -- | ------- | -- |
| Total ........................ | 1,031.2 | 100% | 1,024.0 | 100% |

- ----------
(1) Excludes local product transfers.
(2) Includes diesel fuel, heating oil, kerosene and other middle distillates.

The Partnership provides service in the following states: Pennsylvania, New York, New Jersey, Indiana, Ohio, Michigan, Illinois, Connecticut, Massachusetts and Florida.

KPI1397

Pennsylvania--New York--New Jersey

Buckeye serves major population centers in the states of Pennsylvania, New York and New Jersey through 1,004 miles of pipeline. Refined petroleum products are received at Linden, New Jersey. Products are then transported through two lines from Linden, New Jersey to Allentown, Pennsylvania. From Allentown, the pipeline continues west, through a connection with Laurel, to Pittsburgh, Pennsylvania (serving Reading, Harrisburg, Altoona/Johnstown and Pittsburgh)

ENB-DOJ-021192

StockMaster News for: BUCKEYE PINKS LP (BPL)

and north through eastern Pennsylvania into New York (serving
Scranton/Wilkes-Barre, Binghamton, Syracuse, Utica and Rochester and, via a
connecting carrier, Buffalo). Products received at Linden, New Jersey are also
transported through one line to Newark International Airport and through two
additional lines to J. F. Kennedy International and LaGuardia airports and to
commercial bulk terminals at Long Island City and Inwood, New York. These
pipelines presently supply J. F. Kennedy, LaGuardia and Newark airports with
substantially all of each airport's turbine fuel requirements.

3

Laurel transports refined petroleum products through a 345-mile pipeline
extending westward from five refineries in the Philadelphia area to Pittsburgh,
Pennsylvania.

Indiana--Ohio--Michigan--Illinois

Buckeye transports refined petroleum products through 1,989 miles of
pipeline (of which 246 miles are jointly owned with other pipeline companies)
in southern Illinois, central Indiana, eastern Michigan, western and northern
Ohio and western Pennsylvania. A number of receiving lines and delivery lines
connect to a central corridor which runs from Lima, Ohio, through Toledo, Ohio
to Detroit, Michigan. Products are received at East Chicago, Indiana; Robinson,
Illinois and at the refinery and other pipeline connection points near Detroit,
Toledo and Lima. Major market areas served include Huntington/Fort Wayne,
Indiana; Bay City, Detroit and Flint, Michigan; Cleveland, Columbus, Lima and
Toledo, Ohio; and Pittsburgh, Pennsylvania.

Other Refined Products Pipelines

Buckeye serves Connecticut and Massachusetts through 112 miles of pipeline
that carry refined products from New Haven, Connecticut to Hartford,
Connecticut and Springfield, Massachusetts.

Everglades carries primarily turbine fuel on a 37-mile pipeline from Port
Everglades, Florida to Hollywood-Ft. Lauderdale International Airport and Miami
International Airport.

Other Business Activities

BTT provides bulk storage services through leased facilities located in
Pittsburgh, Pennsylvania which have the capacity to store up to an aggregate of
approximately 257,000 barrels of refined petroleum products. This facility,
which is served by Buckeye and Laurel, provides bulk storage and loading
facilities for shippers and other customers.

Competition and Other Business Considerations

The Operating Partnerships do business without the benefit of exclusive
franchises from government entities. In addition, the Operating Partnerships
generally operate as common carriers, providing transportation services at
posted tariffs and without long-term contracts. The Operating Partnerships do
not own the products they transport. Demand for the service provided by the
Operating Partnerships derives from demand for petroleum products in the
regions served and the ability and willingness of refiners, marketers and
end-users to supply such demand by deliveries through the Operating
Partnerships' pipelines. Demand for refined petroleum products is primarily a
function of price, prevailing general economic conditions and weather. The
Operating Partnerships' businesses are, therefore, subject to a variety of
factors partially or entirely beyond their control. Multiple sources of
pipeline entry and multiple points of delivery, however, have historically
helped maintain stable total volumes even when volumes at particular source or
destination points have changed.

KPI1398

RECEIVED TIME AUG. 17.   3:37PM                PRINT TIME AUG. 17.   3:48PM

ENB-DOJ-021193

The Partnership's business may in the future be affected by changing oil prices or other factors affecting demand for oil and other fuels. The Partnership's business may also be affected by energy conservation, changing sources of supply, structural changes in the oil industry and new energy technologies. The General Partner is unable to predict the effect of such factors.

A substantial portion of the refined petroleum products transported by the Partnership's pipelines are ultimately used as fuel for motor vehicles and aircraft. Changes in transportation and travel patterns in the areas served by the Partnership's pipelines could adversely affect the Partnership's results of operations and financial condition.

In 1998, the Operating Partnerships had approximately 97 customers, most of which were either major integrated oil companies or large refined product marketing companies. The largest two customers accounted for 8.1 percent and 6.8 percent, respectively, of consolidated revenues, while the 20 largest customers accounted for 76.2 percent of consolidated revenues.

Generally, pipelines are the lowest cost method for long-haul overland movement of refined petroleum products. Therefore, the Operating Partnerships' most significant competitors for large volume shipments are other pipelines, many of which are owned and operated by major integrated oil companies. Although it is unlikely that a pipeline system comparable in size and scope to the Operating Partnerships' pipeline system will be built in the foreseeable future, new pipelines (including pipeline segments that connect with existing pipeline systems) could be built to effectively compete with the Operating Partnerships in particular locations.

The Operating Partnerships compete with marine transportation in some areas. Tankers and barges on the Great Lakes account for some of the volume to certain Michigan, Ohio and upstate New York locations during the approximately eight non-winter months of the year. Barges are presently a competitive factor for deliveries to the New York City area, the Pittsburgh area, Connecticut and Ohio.

Trucks competitively deliver product in a number of areas served by the Operating Partnerships. While their costs may not be competitive for longer hauls or large volume shipments, trucks compete effectively for incremental and marginal volumes in many areas served by the Operating Partnerships. The availability of truck transportation places a significant competitive constraint on the ability of the Operating Partnerships to increase their tariff rates.

Privately arranged exchanges of product between marketers in different locations are an increasing but unquantified form of competition. Generally, such exchanges reduce both parties' costs by eliminating or reducing transportation charges. In addition, consolidation among refiners and marketers that has accelerated in recent years has altered distribution patterns, reducing demand for transportation services in some markets and increasing them in other markets.

Distribution of refined petroleum products depends to a large extent upon the location and capacity of refineries. In recent years, domestic refining capacity has both increased and decreased as a result of refinery expansions and shutdowns. Because the Partnership's business is largely driven by the consumption of fuel in its delivery areas and the Operating Partnerships' pipelines have numerous source points, the General Partner does not believe that the expansion or shutdown of any particular refinery would have a material effect on the business of the Partnership. However, the General Partner is unable to determine whether additional expansions or shutdowns will occur or what their specific effect would be. See "Management's Discussion and Analysis

KPI1399

ENB-DOJ-021194

of Financial Condition and Results of Operations--Results of
Operations--Competition and Other Business Conditions."

The Operating Partnerships' mix of products transported tends to vary
seasonally. Declines in demand for heating oil during the summer months are, to
a certain extent, offset by increased demand for gasoline and jet fuel.
Overall, operations have been only moderately seasonal, with somewhat lower
than average volume being transported during March, April and May as compared
to the rest of the year.

Neither the Partnership nor any of the Operating Partnerships have any
employees. All of the operations of the Operating Partnerships are managed and
operated by employees of Services Company. In addition, Glenmoor provides
certain management services to BMC, the General Partner and Services Company.
At December 31, 1998, Services Company had a total of 517 full-time employees,
150 of whom were represented by two labor unions. The Operating Partnerships
(and their predecessors) have never experienced any significant work stoppages
or other significant labor problems.

5

Capital Expenditures

The General Partner anticipates that the Partnership will continue to make
ongoing capital expenditures to maintain and enhance its assets and properties,
including improvements to meet customers' needs and those required to satisfy
new environmental and safety standards. In 1998, total capital expenditures
were $22.8 million. Projected capital expenditures for 1999 amount to
approximately $22.3 million and are expected to be funded from cash generated
by operations and Buckeye's bank line of credit. Planned capital expenditures
in 1999 include, among other things, installation of transmix tanks, renewal
and replacement of several tank roofs and seals, upgrades to field
instrumentation and cathodic protection systems, installation and replacement
of mainline pipe and valves, facility automation and various improvements that
facilitate increased pipeline volumes. Capital expenditures are expected to
remain approximately at this level for the next few years as a result of the
General Partner's plan to automate certain facilities in order to more
effectively control operating costs. See "Management's Discussion and Analysis
of Financial Condition and Results of Operations--Liquidity and Capital
Resources-Capital Expenditures."

Regulation

General

Buckeye is an interstate common carrier subject to the regulatory
jurisdiction of the Federal Energy Regulatory Commission ("FERC") under the
Interstate Commerce Act and the Department of Energy Organization Act. FERC
regulation requires that interstate oil pipeline rates be posted publicly and
that these rates be "just and reasonable" and non-discriminatory. FERC
regulation also enforces common carrier obligations and specifies a uniform
system of accounts. In addition, Buckeye, and the other Operating Partnerships,
are subject to the jurisdiction of certain other federal agencies with respect
to environmental and pipeline safety matters.

The Operating Partnerships are also subject to the jurisdiction of various
state and local agencies, including, in some states, public utility commissions
which have jurisdiction over, among other things, intrastate tariffs, the
issuance of debt and equity securities, transfers of assets and pipeline
safety.

FERC Rate Regulation                                        KPI1400

ENB-DOJ-021195

Buckeye's rates are governed by a market-based rate regulation program initially approved by FERC in March 1991 for three years and subsequently extended. Under this program, in markets where Buckeye does not have significant market power, individual rate increases: (a) will not exceed a real (i.e., exclusive of inflation) increase of 15 percent over any two-year period (the "rate cap"), and (b) will be allowed to become effective without suspension or investigation if they do not exceed a "trigger" equal to the change in the Gross Domestic Product implicit price deflator since the date on which the individual rate was last increased, plus 2 percent. Individual rate decreases will be presumptively valid upon a showing that the proposed rate exceeds marginal costs. In markets where Buckeye was found to have significant market power and in certain markets where no market power finding was made: (i) individual rate increases cannot exceed the volume weighted average rate increase in markets where Buckeye does not have significant market power since the date on which the individual rate was last increased, and (ii) any volume weighted average rate decrease in markets where Buckeye does not have significant market power must be accompanied by a corresponding decrease in all of Buckeye's rates in markets where it does have significant market power. Shippers retain the right to file complaints or protests following notice of a rate increase, but are required to show that the proposed rates violate or have not been adequately justified under the market-based rate regulation program, that the proposed rates are unduly discriminatory, or that Buckeye has acquired significant market power in markets previously found to be competitive.

6

The Buckeye program is an exception to the generic oil pipeline regulations issued under the Energy Policy Act of 1992. The generic rules rely primarily on an index methodology, whereby a pipeline is allowed to change its rates in accordance with an index that FERC believes reflects cost changes appropriate for application to pipeline rates. In the alternative, a pipeline is allowed to charge market-based rates if the pipeline establishes that it does not possess significant market power in a particular market. In addition, the rules provide for the rights of both pipelines and shippers to demonstrate that the index should not apply to an individual pipeline's rates in light of the pipeline's costs. The final rules became effective on January 1, 1995.

The Buckeye program will be subject to reevaluation at the same time FERC reviews the index selected in the generic oil pipeline regulations, which is anticipated to occur by July 2000. At this time, the General Partner cannot predict the impact, if any, that a change to Buckeye's rate program would have on Buckeye's operations. Independent of regulatory considerations, it is expected that tariff rates will continue to be constrained by competition and other market factors.

Environmental Matters                                          KPI1401

The Operating Partnerships are subject to federal, state and local laws and regulations relating to the protection of the environment. Although the General Partner believes that the operations of the Operating Partnerships comply in all material respects with applicable environmental laws and regulations, risks of substantial liabilities are inherent in pipeline operations, and there can be no assurance that material environmental liabilities will not be incurred. Moreover, it is possible that other developments, such as increasingly rigorous environmental laws, regulations and enforcement policies thereunder, and claims for damages to property or persons resulting from the operations of the Operating Partnerships, could result in substantial costs and liabilities to the Partnership. See "Legal Proceedings" and "Management's Discussion and Analysis of Financial Condition and Results of Operations--Liquidity and Capital Resources--Environmental Matters."

The Oil Pollution Act of 1990 ("OPA") amended certain provisions of the federal Water Pollution Control Act of 1972, commonly referred to as the Clean Water Act ("CWA"), and other statutes as they pertain to the prevention of and

ENB-DOJ-021196

response to oil spills into navigable waters. The OPA subjects owners of facilities to strict joint and several liability for all containment and clean-up costs and certain other damages arising from a spill. The CWA provides penalties for any discharges of petroleum products in reportable quantities and imposes substantial liability for the costs of removing a spill. State laws for the control of water pollution also provide varying civil and criminal penalties and liabilities in the case of releases of petroleum or its derivatives into surface waters or into the ground. Regulations are currently being developed under OPA and state laws which may impose additional regulatory burdens on the Partnership.

Contamination resulting from spills or releases of refined petroleum products are not unusual in the petroleum pipeline industry. The Partnership's pipelines cross numerous navigable rivers and streams. Although the General Partner believes that the Operating Partnerships comply in all material respects with the spill prevention, control and countermeasure requirements of federal laws, any spill or other release of petroleum products into navigable waters may result in material costs and liabilities to the Partnership.

The Resource Conservation and Recovery Act ("RCRA"), as amended, establishes a comprehensive program of regulation of "hazardous wastes." Hazardous waste generators, transporters, and owners or operators of treatment, storage and disposal facilities must comply with regulations designed to ensure detailed tracking, handling and monitoring of these wastes. RCRA also regulates the disposal of certain non-hazardous wastes. As a result of these regulations, certain wastes previously generated by pipeline operations are considered "hazardous wastes" which are subject to rigorous disposal requirements.

The Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), also known as "Superfund," governs the release or threat of release of a "hazardous

7

KPI1402

substance." Disposal of a hazardous substance, whether on or off-site, may subject the generator of that substance to liability under CERCLA for the costs of clean-up and other remedial action. Pipeline maintenance and other activities in the ordinary course of business generate "hazardous substances". As a result, to the extent a hazardous substance generated by the Operating Partnerships or their predecessors may have been released or disposed of in the past, the Operating Partnerships may in the future be required to remedy contaminated property. Governmental authorities such as the Environmental Protection Agency, and in some instances third parties, are authorized under CERCLA to seek to recover remediation and other costs from responsible persons, without regard to fault or the legality of the original disposal. In addition to its potential liability as a generator of a "hazardous substance," the property or right-of-way of the Operating Partnerships may be adjacent to or in the immediate vicinity of Superfund and other hazardous waste sites. Accordingly, the Operating Partnerships may be responsible under CERCLA for all or part of the costs required to cleanup such sites, which costs could be material.

The Clean Air Act, amended by the Clean Air Act Amendments of 1990 (the "Amendments"), imposes controls on the emission of pollutants into the air. The Amendments required states to develop facility-wide permitting programs over the past several years to comply with new federal programs. Existing operating and air-emission requirements like those currently imposed on the Operating Partnerships are being reviewed by appropriate state agencies in connection with the new facility-wide permitting program. It is possible that new or more stringent controls will be imposed upon the Operating Partnerships through this permit review process.

The Operating Partnerships are also subject to environmental laws and regulations adopted by the various states in which they operate. In certain

ENB-DOJ-021197

instances, the regulatory standards adopted by the states are more stringent than applicable federal laws.

In connection with the 1986 Acquisition, Pipe Line entered into an Administrative Consent Order ("ACO") with the New Jersey Department of Environmental Protection and Energy under the New Jersey Environmental Cleanup Responsibility Act of 1983 ("ECRA") relating to all six of Pipe Line's facilities in New Jersey. The ACO permitted the 1986 Acquisition to be completed prior to full compliance with ECRA, but required Pipe Line to conduct in a timely manner a sampling plan for environmental conditions at the New Jersey facilities and to implement any required clean-up plan. Sampling continues in an effort to identify areas of contamination at the New Jersey facilities, while clean-up operations have begun and have been completed at certain of the sites. The obligations of Pipe Line were not assumed by the Partnership or by BAC in the Acquisition, and the costs of compliance have been and will continue to be paid by American Financial. Through December 1998, Buckeye's costs of approximately $2,546,000 have been paid by American Financial.

Safety Matters

The Operating Partnerships are subject to regulation by the United States Department of Transportation ("DOT") under the Hazardous Liquid Pipeline Safety Act of 1979 ("HLPSA") relating to the design, installation, testing, construction, operation, replacement and management of their pipeline facilities. HLPSA covers petroleum and petroleum products and requires any entity which owns or operates pipeline facilities to comply with applicable safety standards, to establish and maintain a plan of inspection and maintenance and to comply with such plans.

The Pipeline Safety Reauthorization Act of 1988 requires coordination of safety regulation between federal and state agencies, testing and certification of pipeline personnel, and authorization of safety-related feasibility studies. The General Partner has initiated drug and alcohol testing programs to comply with the regulations promulgated by the Office of Pipeline Safety and DOT.

HLPSA requires, among other things, that the Secretary of Transportation consider the need for the protection of the environment in issuing federal safety standards for the transportation of hazardous liquids by pipeline. The legislation also requires the Secretary of Transportation to issue regulations concerning, among other things, the identification by pipeline operators of

6

environmentally sensitive areas; the circumstances under which emergency flow restricting devices should be required on pipelines; training and qualification standards for personnel involved in maintenance and operation of pipelines; and the periodic integrity testing of pipelines in environmentally sensitive and high-density population areas by internal inspection devices or by hydrostatic testing. Significant expenses would be incurred if, for instance, additional valves were required, if leak detection standards were amended to exceed the current control system capabilities of the Operating Partnerships or additional integrity testing of pipeline facilities were to be required. The General Partner believes that the Operating Partnerships' operations comply in all material respects with HLPSA. However, the industry, including the Partnership, could be required to incur substantial additional capital expenditures and increased operating costs depending upon the requirements of final regulations issued by DOT pursuant to HLPSA, as amended.

The Operating Partnerships are also subject to the requirements of the Federal Occupational Safety and Health Act ("OSHA") and comparable state statutes. The General Partner believes that the Operating Partnerships' operations comply in all material respects with OSHA requirements, including general industry standards, recordkeeping, hazard communication requirements

KPI1403

ENB-DOJ-021198

and monitoring of occupational exposure to benzene and other regulated substances.

The General Partner cannot predict whether or in what form any new legislation or regulatory requirements might be enacted or adopted or the costs of compliance. In general, any such new regulations would increase operating costs and impose additional capital expenditure requirements on the Partnership, but the General Partner does not presently expect that such costs or capital expenditure requirements would have a material adverse effect on the Partnership.

Tax Treatment of Publicly Traded Partnerships under the Internal Revenue Code

The Internal Revenue Code of 1986, as amended (the "Code"), imposes certain limitations on the current deductibility of losses attributable to investments in publicly traded partnerships and treats certain publicly traded partnerships as corporations for federal income tax purposes. The following discussion briefly describes certain aspects of the Code that apply to individuals who are citizens or residents of the United States without commenting on all of the federal income tax matters affecting the Partnership or the holders of LP units ("Unitholders"), and is qualified in its entirety by reference to the Code. UNITHOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISOR ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES TO THEM OF AN INVESTMENT IN THE PARTNERSHIP.

Characterization of the Partnership for Tax Purposes

The Code treats a publicly traded partnership that existed on December 17, 1987, such as the Partnership, as a corporation for federal income tax purposes, unless, for each taxable year of the Partnership, under Section 7704(d) of the Code, 90 percent or more of its gross income consists of "qualifying income." Qualifying income includes interest, dividends, real property rents, gains from the sale or disposition of real property, income and gains derived from the exploration, development, mining or production, processing, refining, transportation (including pipelines transporting gas, oil or products thereof), or the marketing of any mineral or natural resource (including fertilizer, geothermal energy and timber), and gain from the sale or disposition of capital assets that produce such income. Because the Partnership is engaged primarily in the refined products pipeline transportation business, the General Partner believes that 90 percent or more of the Partnership's gross income has been qualifying income. If this continues to be true and no subsequent legislation amends that provision, the Partnership will continue to be classified as a partnership and not as a corporation for federal income tax purposes.

9

KPI1404

Passive Activity Loss Rules

The Code provides that an individual, estate, trust or personal service corporation generally may not deduct losses from passive business activities, to the extent they exceed income from all such passive activities, against other (active) income. Income which may not be offset by passive activity losses includes not only salary and active business income, but also portfolio income such as interest, dividends or royalties or gain from the sale of property that produces portfolio income. Credits from passive activities are also limited to the tax attributable to any income from passive activities. The passive activity loss rules are applied after other applicable limitations on deductions, such as the at-risk rules and basis limitations. Certain closely held corporations are subject to slightly different rules which can also limit their ability to offset passive losses against certain types of income.

ENB-DOJ-021199

Under the Code, net income from publicly traded partnerships is not treated as passive income for purposes of the passive loss rule, but is treated as non-passive income. Net losses and credits attributable to an interest in a publicly traded partnership are not allowed to offset a partner's other income. Thus, a Unitholder's proportionate share of the Partnership's net losses may be used to offset only Partnership net income from its trade or business in succeeding taxable years or, upon a complete disposition of a Unitholder's interest in the Partnership to an unrelated person in a fully taxable transaction, may be used to (i) offset gain recognized upon the disposition, and (ii) then against all other income of the Unitholder. In effect, net losses are suspended and carried forward indefinitely until utilized to offset net income of the Partnership from its trade or business or allowed upon the complete disposition to an unrelated person in a fully taxable transaction of the Unitholder's interest in the Partnership. A Unitholder's share of Partnership net income may not be offset by passive activity losses generated by other passive activities. In addition, a Unitholder's proportionate share of the Partnership's portfolio income, including portfolio income arising from the investment of the Partnership's working capital, is not treated as income from a passive activity and may not be offset by such Unitholder's share of net losses of the Partnership.

Deductibility of Interest Expense

The Code generally provides that investment interest expense is deductible only to the extent of a non-corporate taxpayer's net investment income. In general, net investment income for purposes of this limitation includes gross income from property held for investment, gain attributable to the disposition of property held for investment (except for net capital gains for which the taxpayer has elected to be taxed at special capital gains rates) and portfolio income (determined pursuant to the passive loss rules) reduced by certain expenses (other than interest) which are directly connected with the production of such income. Property subject to the passive loss rules is not treated as property held for investment. However, the IRS has issued a Notice which provides that net income from a publicly traded partnership (not otherwise treated as a corporation) may be included in net investment income for purposes of the limitation on the deductibility of investment interest. A Unitholder's investment income attributable to its interest in the Partnership will include both its allocable share of the Partnership's portfolio income and trade or business income. A Unitholder's investment interest expense will include its allocable share of the Partnership's interest expense attributable to portfolio investments.

Unrelated Business Taxable Income

Certain entities otherwise exempt from federal income taxes (such as individual retirement accounts, pension plans and charitable organizations) are nevertheless subject to federal income tax on net unrelated business taxable income and each such entity must file a tax return for each year in which it has more than $1,000 of gross income from unrelated business activities. The General Partner believes that substantially all of the Partnership's gross income will be treated as derived from an unrelated trade or business and taxable to such entities. The tax-exempt entity's share of the Partnership's deductions directly connected with carrying on such unrelated trade or business

10

are allowed in computing the entity's taxable unrelated business income. ACCORDINGLY, INVESTMENT IN THE PARTNERSHIP BY TAX-EXEMPT ENTITIES SUCH AS INDIVIDUAL RETIREMENT ACCOUNTS, PENSION PLANS AND CHARITABLE TRUSTS MAY NOT BE ADVISABLE.

State Tax Treatment

KPI1405

RECEIVED TIMEAUG. 17.  3:37PM                    PRINT TIMEAUG. 17.  3:48PM

ENB-DOJ-021200

During 1998, the Partnership owned property or conducted business in the states of Pennsylvania, New York, New Jersey, Indiana, Ohio, Michigan, Illinois, Connecticut, Massachusetts and Florida. A Unitholder will likely be required to file state income tax returns and to pay applicable state income taxes in many of these states and may be subject to penalties for failure to comply with such requirements. Some of the states have proposed that the Partnership withhold a percentage of income attributable to Partnership operations within the state for Unitholders who are non-residents of the state. In the event that amounts are required to be withheld (which may be greater or less than a particular Unitholder's income tax liability to the state), such withholding would generally not relieve the non-resident Unitholder from the obligation to file a state income tax return.

Certain Tax Consequences to Unitholders

Upon formation of the Partnership in 1986, the General Partner elected twelve-year straight-line depreciation for tax purposes. For this reason, starting in 1999, the amount of depreciation available to the Partnership will be reduced significantly and taxable income will increase accordingly. Unitholders, however, will continue to offset Partnership income with individual LP Unit depreciation under their IRC section 754 election. Each Unitholder's tax situation will differ depending upon the price paid and when LP Units were purchased. Generally, those who purchased LP Units in the past few years will have adequate depreciation to offset a considerable portion of Partnership income, while those who purchased LP Units more than several years ago will experience the full increase in taxable income. Unitholders are reminded that, in spite of the additional taxable income beginning in 1999, the current level of cash distributions exceed expected tax payments. Furthermore, sale of LP Units will result in ordinary income tax recapture. UNITHOLDERS ARE ENCOURAGED TO CONSULT THEIR PROFESSIONAL TAX ADVISORS REGARDING THE TAX IMPLICATIONS TO THEIR INVESTMENT IN LP UNITS.

Certain Amendments to the Partnership Agreement

In July 1998, through a consent solicitation approved by more than two-thirds of the LP Unitholders, amendments to the Partnership Agreement were adopted to (i) remove the limitation on the number of LP Units that may be issued without the approval of the Unitholders; (ii) eliminate the restrictions on the amount of debt that can be incurred by the Partnership or its Operating Partnerships and (iii) remove the limitations on the amount of capital expenditures that can be made by the Partnership or the Operating Partnerships in any calendar year.

Item 2. Properties

As of December 31, 1998, the principal facilities of the Operating Partnerships included 3,487 miles of 6-inch to 24-inch diameter pipeline, 34 pumping stations, 84 delivery points and various sized tanks having an aggregate capacity of approximately 9.2 million barrels. The Operating Partnerships own substantially all of their facilities.

In general, the Operating Partnerships' pipelines are located on land owned by others pursuant to rights granted under easements, leases, licenses and permits from railroads, utilities, governmental entities and private parties. Like other pipelines, certain of the Operating Partnerships' rights are revocable at the election of the grantor or are subject to renewal at various intervals, and some require periodic payments. Certain portions of Buckeye's pipeline in Connecticut and

11                                          KPI1406

Massachusetts are subject to security interests in favor of the owners of the right-of-way to secure future lease payments. The Operating Partnerships have not experienced any revocations or lapses of such rights which were material to

...........y for past or future clean up costs at the site. Although the cost of the ultimate remediation cannot be determined at this time, Buckeye expects to

ENB-DOJ-021201

that its liability, if any, will not be material.

12

    Additional claims for the cost of cleaning up releases of hazardous
substances and for damage to the environment resulting from the activities of
the Operating Partnerships or their predecessors may be asserted in the future
under various federal and state laws, but the amount of such claims or the
potential liability, if any, cannot be estimated. See
"Business--Regulation--Environmental Matters."

    In February 1999, the General Partner entered into a stipulation and order
of settlement with the New York State Office of Real Property Services and the
City of New York settling various real property tax certiorari proceedings. The
Partnership had challenged its real property tax assessments for a number of
past tax years on that portion of its pipeline that is located in public
right-of-way in New York City. The settlement agreement is expected to result
in a gain of approximately $11.0 million for the Partnership in the second
quarter of 1999. In addition, based upon the settlement, the Partnership
expects that its real property tax expense will be reduced by approximately
$1.0 million in 1999, with continued tax savings realized in the years 2000
through 2003. The settlement is contingent upon various conditions set forth in
the stipulation and order of settlement.

    In June 1998, a putative class action complaint (Shakeredge v. Martinelli,
et al) was filed in the Delaware Court of Chancery against the Partnership,
BMC, Glenmoor and the directors of BMC alleging that the Consent Solicitation
Statement relating to various Partnership Agreement amendments was materially
false and misleading, because it failed to disclose that the incentive payments
made to the General Partner by the Partnership may be affected by an increase
in the number of LP Units outstanding; that the elimination of the restrictions
contained in the Partnership Agreement will remove the checks and balances
imposed on the Partnership and the General Partner; and whether the defendants
were planning or considering any specific transactions that would be affected
by the removal of the restrictions at the time of the Consent Solicitation
Statement. The complaint seeks, among other things, an injunction prohibiting
the consummation of the consent solicitation or giving effect to any other
proposed amendments to the Partnership Agreement. An answer was filed by the
General Partner and the other defendants in July 1998. No other filings or
proceedings have occurred in the case. BMC and the other defendants believe
that the Consent Solicitation Statement disclosed all material information to
the Unitholders and that the complaint is without merit.

Item 4. Submission of Matters to a Vote of Security Holders

    No matters were submitted to a vote of the holders of LP Units during the
fourth quarter of the fiscal year ended December 31, 1998.

13

PART II                                              KPI1407

Item 5. Market for the Registrant's LP Units and Related Unitholder Matters

    The LP Units of the Partnership are listed and traded principally on the
New York Stock Exchange. In January 1998, the General Partner approved a
two-for-one unit split that became effective February 13, 1998. All unit and
per unit information contained in this filing, unless otherwise noted, has been
adjusted for the two for one split. The high and low sales prices of the LP
Units in 1998 and 1997, as reported on the New York Stock Exchange Composite
Tape, were as follows:

ENB-DOJ-021202

StockMaster News for: BUCKEYE PTNRS L P (BPL)

| Quarter | 1998 | | 1997 | |
| --- | --- | --- | --- | --- |
| | High | Low | High | Low |
| First .......... | 30.0625 | 27.5000 | 24.9385 | 20.1250 |
| Second ......... | 29.8750 | 27.0000 | 22.6250 | 21.2500 |
| Third .......... | 30.2500 | 26.0000 | 26.7500 | 22.5625 |
| Fourth ......... | 31.1250 | 26.0625 | 30.0000 | 24.6875 |

During the months of December 1998 and January 1999, the Partnership gathered tax information from its known LP Unitholders and from brokers/nominees. Based on the information collected, the Partnership estimates its number of beneficial LP Unitholders to be approximately 18,000.

Cash distributions paid during 1997 and 1998 were as follows:

| Record Date | Payment Date | Amount Per Unit |
| --- | --- | --- |
| February 21, 1997 ......... | February 28, 1997 | $ 0.375 |
| May 6, 1997 ............... | May 30, 1997 | $ 0.375 |
| August 22,1997 ............ | August 29, 1997 | $ 0.440 |
| November 5, 1997 .......... | November 28, 1997 | $ 0.525 |
| February 23, 1998 ......... | February 27, 1998 | $ 0.525 |
| May 6, 1998 ............... | May 29, 1998 | $ 0.525 |
| August 5, 1998 ............ | August 31, 1998 | $ 0.525 |
| November 4, 1998 .......... | November 30, 1998 | $ 0.525 |

In general, the Partnership makes quarterly cash distributions of substantially all of its available cash less such retentions for working capital, anticipated expenditures and contingencies as the General Partner deems appropriate.

On February 4, 1999, the Partnership announced a quarterly distribution of $0.525 per LP Unit payable on February 26, 1999 to Unitholders of record on February 16, 1999.

Item 6. Selected Financial Data

The following tables set forth, for the period and at the dates indicated, the Partnership's income statement and balance sheet data for the years ended December 31, 1998, 1997, 1996, 1995 and 1994. The tables should be read in conjunction with the consolidated financial statements and notes thereto included elsewhere in this Report.

14

KPI1408

| | | Year Ended | |
| --- | --- | --- | --- |
| | 1998 | 1997 | |
| | | (In thousands, exc | |
| Income Statement Data: | | | |
| Revenue ................................... | $ 184,477 | $ 184,981 | $ 1 |

RECEIVED TIMEAUG. 17.   3:37PM        PRINT TIMEAUG. 17.   3:47PM

ENB-DOJ-021203

| | | |
|---|---|---|
| Depreciation and amortization (1) ......... | 16,432 | 13,177 |
| Operating income ......................... | 74,358 | 72,075 |
| Interest and debt expense (2) ............. | 15,886 | 21,187 |
| Income from continuing operations before | | |
| extraordinary loss ...................... | 52,007 | 48,807 |
| Net income ............................... | 52,007 | 6,383 |
| Income per unit from continuing opera- | | |
| tions before extraordinary loss .......... | 1.93 | 1.92 |
| Net income per unit ...................... | 1.93 | 0.25 |
| Distributions per unit ................... | 2.10 | 1.72 |

| | | | |
|---|---|---|---|
| | | | Dece |
| | 1998 | 1997 | ----- |
| | | | (In t |
| Balance Sheet Data: | | | |
| Total assets ............................. | $ 618,099 | $ 615,062 | $ 5 |
| Long-term debt ........................... | 240,000 | 240,000 | 2 |
| General Partner's capital ................ | 2,390 | 2,432 | |
| Limited Partners' capital ................ | 296,095 | 300,346 | 2 |

- ---------------

(1) Depreciation and amortization includes $4,698,000 in 1998 and $1,806,000 in
    1997 for amortization of a deferred charge related to the ESOP
    Restructuring.

(2) In December 1997 Buckeye issued $240,000,000 of Senior Notes bearing
    interest ranging from 6.39 percent to 6.98 percent. Concurrently with the
    issuance of the Senior Notes, Buckeye extinguished $202,100,000 of First
    Mortgage Notes bearing interest ranging from 7.11 percent to 11.18
    percent.

Item 7. Management's Discussion and Analysis of Financial Condition and Results
    of Operations

    The following is a discussion of the liquidity and capital resources and
the results of operations of the Partnership for the periods indicated below.
This discussion should be read in conjunction with the consolidated financial
statements and notes thereto, which are included elsewhere in this Report.

Results of Operations

    Through its Operating Partnerships, the Partnership is principally engaged
in the transportation of refined petroleum products including gasoline,
aviation turbine fuel, diesel fuel, heating oil and kerosene. The Partnership's
revenues are principally a function of the volumes of refined petroleum
products transported by the Partnership, which are in turn a function of the
demand for refined petroleum products in the regions served by the
Partnership's pipelines and the tariffs or transportation fees charged for such
transportation. Results of operations are affected by factors which include
general economic conditions, weather, competitive conditions, demand for
products transported, seasonality and regulation. See "Business--Competition
and Other Business Considerations."

15

1998 Compared With 1997                                          KPI1409

RECEIVED TIMEAUG 17  3:37PM          PRINT TIMEAUG. 17.  3:47PM

ENB-DOJ-021204

**Investor** — The benchmark for quality financial information

Market Guide

Home   Research   Markets   What's Hot   Screening   About   Help

**telebank**   Here's a rate hike you can live with...

SEARCH FOR

◉ Symb ○ Name

[ ] GO

**DATEK ONLINE**

*How Low Can We Go?*

Snapshot
Quotes
News
Price Charts
Highlights
Earnings Estimates
Performance
Comparison
Insider Trading
Instit. Ownership
Financials
DRIP

More Research

Broker Research

**PROFESSIONAL Stock Screening**

*Advertise with us.*

**Buckeye Partners, L.P.**
NYSE : BPL
Sector: Energy
Industry: Oil Well Services & Equipment

**Market Guide**
*The Benchmark for Quality Financial Information*

**Selected Financials**

SELECTED INCOME STATEMENT ITEMS

| | ANNUAL | | | YEAR TO DATE | |
|---|---|---|---|---|---|
| | 12 MONTHS ENDING 12/31/96 | 12 MONTHS ENDING 12/31/97 | 12 MONTHS ENDING 12/31/98 | 6 MONTHS ENDING 06/30/98 | 6 MONTH ENDING 06/30/99 |
| Revenue | 182,955 | 184,981 | 184,477 | 90,082 | 130,1 |
| Operating Expenses | 114,171 | 112,906 | 110,119 | 54,858 | 78,2 |
| **Operating Income** | **68,784** | **72,075** | **74,358** | **35,224** | **51,9** |
| Non-Operating Income | 2,407 | -2,081 | -6,465 | -3,044 | -3,8 |
| Non-Operating Expenses | -21,854 | -21,187 | -15,886 | -7,818 | -8,2 |
| **Income Before Taxes** | **49,337** | **48,807** | **52,007** | **24,362** | **39,8** |
| Income Taxes | 0 | 0 | 0 | 0 | |
| **Income After Taxes** | **49,337** | **48,807** | **52,007** | **24,362** | **39,8** |
| Adjustments to Income | -493 | -85 | -470 | -220 | -3 |
| **Inc. for Primary EPS** | **48,844** | **48,722** | **51,537** | **24,142** | **39,4** |
| Pri/Bas EPS Ex. XOrd | 2.006 | 1.919 | 1.910 | 0.895 | 1.4 |
| Disc Opns + Xord Items | 0 | -42,424 | 0 | 0 | |
| Pri/Bas EPS In. XOrd | 2.006 | 0.248 | 1.910 | 0.895 | 1.4 |
| Primary/Basic Avg Sh | 24,346.71 | 25,385.04 | 26,982.10 | 26,978.00 | 26,998. |
| Common Dividends/Shr | 1.500 | 1.720 | 2.100 | 1.050 | 1.0 |
| **Dilutd EPS Excl XOrd** | **2.001** | **1.911** | **1.903** | **0.892** | **1.4** |
| **Dilutd EPS** | **2.001** | **0.247** | **1.903** | **0.892** | **1.4** |

ENB-DOJ-021205

| Incl XOrd | 2.001 | 0.247 | 1.903 | 0.892 | 1.4 |

Note: Units in Thousands of U.S. Dollars except for per share item

## SELECTED BALANCE SHEET ITEMS

| | YEAR ENDING | | | QUARTER ENDING | |
|---|---|---|---|---|---|
| | 12/31/96 | 12/31/97 | 12/31/98 | 06/30/98 | 06/30/99 |
| Cash & ST Investments | 31,944 | 10,203 | 8,341 | 7,195 | 17,700 |
| Receivables | 12,536 | 10,195 | 7,578 | 9,756 | 10,602 |
| Other Current Assets | 9,447 | 14,082 | 8,308 | 10,454 | 20,861 |
| Total Current Assets | 53,927 | 34,480 | 24,227 | 27,405 | 49,163 |
| LT Investments | 0 | 0 | 0 | 0 | 0 |
| Fixed Assets | 511,646 | 520,941 | 532,696 | 527,466 | 546,963 |
| Other LT Assets | 2,264 | 59,641 | 61,176 | 62,778 | 61,461 |
| Total Assets | 567,837 | 615,062 | 618,099 | 617,649 | 657,587 |
| Accounts Payable | 4,279 | 3,664 | 4,369 | 3,950 | 10,260 |
| ST Debt & Curr LTD | 11,900 | 0 | 0 | 0 | 0 |
| Other Current Liab. | 24,088 | 21,073 | 26,124 | 25,672 | 20,365 |
| Total Current Liab. | 40,267 | 24,737 | 30,493 | 29,622 | 30,625 |
| LT Debt & Cap Leases | 202,100 | 240,000 | 240,000 | 240,000 | 266,000 |
| Other LT Liabilities | 49,491 | 47,547 | 49,121 | 48,858 | 51,136 |
| Total Liabilities | 291,858 | 312,284 | 319,614 | 318,480 | 347,761 |
| Preferred Stock | 2,760 | 2,432 | 2,390 | 2,396 | 2,488 |
| Common & Paid In Capital | 273,219 | 300,346 | 296,095 | 296,773 | 307,338 |
| Retained Earnings | 0 | 0 | 0 | 0 | 0 |
| Other Equity | 0 | 0 | 0 | 0 | 0 |
| Total Equity | 275,979 | 302,778 | 298,485 | 299,169 | 309,826 |
| Shares Outstanding | 24,120 | 26,722 | 26,757 | 26,742 | 26,772 |

Note: Units in Thousands of U.S. Dollars.

KPI1411

## SELECTED STATEMENT OF CASH FLOW ITEMS
### (INDIRECT Method)

ANNUAL                         YEAR TO DATE

ENB-DOJ-021206

| | 12 MONTHS ENDING 12/31/96 | 12 MONTHS ENDING 12/31/97 | 12 MONTHS ENDING 12/31/98 | 6 MONTHS ENDING 06/30/98 | 6 MONTH ENDING 06/30/99 |
|---|---|---|---|---|---|
| Net Income | 49,337 | 48,807 | 52,007 | 24,362 | 39,80 |
| Depreciation & Amort. | 11,333 | 13,177 | 16,432 | 8,184 | 9,24 |
| Non Cash Items | -2,519 | -42,813 | -229 | -228 | 15 |
| Other Operating CF | -11,021 | 9,201 | 12,376 | 7,663 | -8,41 |
| **Total Operating CF** | **47,130** | **28,372** | **80,586** | **39,981** | **40,79** |
| Capital Expenditures | -14,881 | -19,841 | -22,750 | -11,996 | -10,30 |
| Other Investing CF | 4,497 | -814 | -544 | -168 | -18,66 |
| **Total Investing CF** | **-10,384** | **-20,655** | **-23,294** | **-12,164** | **-28,96** |
| Dividends Paid | -36,527 | -44,305 | -56,666 | -28,330 | -29,02 |
| Sale (Purch.) of Stock | 974 | 516 | 366 | 359 | 55 |
| Net Borrowings | 0 | 26,000 | 0 | 0 | 26,00 |
| Other Financing CF | 10 | 5 | 0 | 0 | |
| **Total Financing CF** | **-35,543** | **-17,784** | **-56,300** | **-27,971** | **-2,46** |
| Exchange Rate Effect | 0 | 0 | 0 | 0 | |
| **Net Change In Cash** | **1,203** | **-10,067** | **992** | **-154** | **9,35** |

Note: Units in Thousands of U.S. Dollar

Glossary of financial terms.



[Home] [Research] [Markets] [What's Hot] [Screening] [About] [Help]

Copyright © 1996 - 1999 Market Guide Inc., 2001 Marcus Ave, Lake Success, NY 11042.
All rights reserved. Disclaimer.



KPI1412

ENB-DOJ-021207



# When Not in Las Vegas!



Name or symbol: BPL_____ for  SEC Filings  ▼  Go

News | Profile | Competitors | Key Financials | Mgmt Discussion | SEC Filings|

```
SECURITIES AND EXCHANGE COMMISSION
          Washington, D.C. 20549


                    FORM 10-K
     (Mark One)

     /X/   Annual Report Pursuant to Section 13 or 15(d) of
           the Securities Exchange Act of 1934

           For the fiscal year ended December 31, 1998

                         OR

     / /   Transition Report Pursuant to Section 13 or 15(d) of
           the Securities Exchange Act of 1934

     For the transition period from          to

     Commission file number 1-9356


                 Buckeye Partners, L.P.
      (Exact name of registrant as specified in its charter)


          Delaware                       23-2432497
 (State or other jurisdiction of         (IRS Employer
  incorporation or organization)     Identification number)


     5 Radnor Corporate Center
        100 Matsonford Road
      Radnor, Pennsylvania                  19087
(Address of principal executive offies)   (Zip Code)


     Registrant's telephone number, including area code: (610) 770-4000

 Securities registered pursuant to Section 12(b) of the Act:
```

**KPI1414**

```
                                      Name of each exch
```

ENB-DOJ-021209



## BUCKEYE PIPE LINE COMPANY

STEPHEN C. MUTHER
Senior Vice President, Administration,
General Counsel and Secretary
(610) 254-4640

August 12, 1999

5 Radnor Corporate Center
Suite 500
100 Matsonford Road
Radnor, Pennsylvania 19087
Tel (610) 254-4600
Fax (610) 254-4625

VIA FACSIMILE AND U.S. MAIL

Mr. Vean Gregg
Associate
Chase Securities Inc.
600 Travis Street
Houston, TX 77002

Re:   Kansas Pipeline Company

Dear Vean:

The following individuals will constitute the Buckeye team that will be traveling to Kansas City next week to meet with management of Kansas Pipeline Company and review documents.

1.   Robert A. Malecky
     Director, Marketing
     Buckeye Pipe Line Company
     5 Radnor Corporate Center, Suite 500
     Radnor, PA  19087
     Phone: (610) 254-4638
     Fax:    (610) 254-4625

2.   David J. Martinelli
     Senior Vice President and Treasurer
     Buckeye Pipe Line Company
     5 Radnor Corporate Center, Suite 500
     Radnor, PA  19087
     Phone: (610) 254-4630
     Fax:    (610) 254-4626

3.   Stephen C. Muther
     Senior Vice President, Administration, General Counsel and Secretary
     Buckeye Pipe Line Company
     5 Radnor Corporate Center, Suite 500
     Radnor, PA  19087
     Phone: (610) 254-4640
     Fax:    (610) 254-4625

KPI1392

ENB-DOJ-021187

4.    Christopher J. Barr, Esq.
      Morgan, Lewis and Bockius LLP
      1800 M Street, N.W.
      Washington, DC 20036-5869
      Phone: (202) 467-7142
      Fax:   (202) 467-7176

5.    Curt W. Koman
      Energy Consultant
      Strategic Energy Ltd.
      2 Gateway Center
      Pittsburgh, PA 15222-1458
      Phone: (412) 394-5673
      Fax:   (412) 394-6576

Best regards.

Sincerely,

Stephen C. Muther

SCM:rlc

KPI1393

ENB-DOJ-021188




# When Not in Las Vegas!

Name or symbol: BPL _____ for SEC Filings

News | Profile | Competitors | Key Financials | Mgmt Discussion | SEC Filings

---

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-K

(Mark One)

/X/   Annual Report Pursuant to Section 13 or 15(d) of
      the Securities Exchange Act of 1934

      For the fiscal year ended December 31, 1998

                        OR

/ /   Transition Report Pursuant to Section 13 or 15(d) of
      the Securities Exchange Act of 1934

For the transition period from            to

Commission file number 1-9356

Buckeye Partners, L.P.
(Exact name of registrant as specified in its charter)

Delaware                                   23-2432497
(State or other jurisdiction of            (IRS Employer
incorporation or organization)          Identification number)

5 Radnor Corporate Center
100 Matsonford Road
Radnor, Pennsylvania                          19087
(Address of principal executive offies)    (Zip Code)

Registrant's telephone number, including area code: (610) 770-4000

Securities registered pursuant to Section 12(b) of the Act:        KPI1394

Name of each exch

ENB-DOJ-021189



**LEON E. HUTCHENS**
*President*

KANEB
PIPE LINE
COMPANY
A KANEB COMPANY

7340 West 21st St. N., Suite 200
Wichita, Kansas 67205
phone 316.773.9600
fax 316.773.9001
mobile 316.655.9900
lhutchens@kanebpipeline.com



**EDWARD D. DOHERT**
*Chairman an*
*Chief Executive Office*

KANEB
PIPE LINE
COMPANY
A KANEB COMPANY

P.O. Box 65205
Dallas, Texas 75265-025
2435 N. Central Expwy, Suite 70
Richardson, Texas 75080-273
phone 972.699.40
fax 972.699.189

---

**RON SCOGGINS**
*Senior Vice President*

KANEB
PIPE LINE
COMPANY
A KANEB COMPANY

P.O. Box 650283
Dallas, Texas 75265-0283
2435 N. Central Expwy, Suite 700
Richardson, Texas 75080-2731
phone 972.699.4047
fax 972.699.1894

**J. MARK JONES,** MSF(N), CPA
*Acquisitions & Planning Manage*

KANEB
PIPE LINE
COMPANY
A KANEB COMPANY

P.O. Box 65028
Dallas, Texas 75265-028
2435 N. Central Expwy, Suite 700
Richardson, Texas 75080-273
phone 972.699.405
fax 972.699.1894
mjones@kaneb.com

---

**L. LEROY ANDERSON**
*Vice President*

KANEB
PIPE LINE
COMPANY
A KANEB COMPANY

7340 West 21st St. N., Suite 200
Wichita, Kansas 67205
phone 316.773.9000
fax 316.773.9001
landerson@kanebpipeline.com



**RON WAHL**
*Vice President - Transportation*

KANEB
PIPE LINE
COMPANY
A KANEB COMPANY

7340 West 21st St. N., Suite 200
Wichita, Kansas 67205
phone 316.773.9000
fax 316.773.9001
mobile 316.655.8666
rwahl@kanebpipeline.com

---



**JIMMY L. HARRISON**
*Vice President and Controller*

KANEB
PIPE LINE
COMPANY
A KANEB COMPANY

7340 West 21st St. N., Suite 200
Wichita, Kansas 67205
phone 316.773.9000
fax 316.773.9001
jharrison@kanebpipeline.com

**JAMES D. REITER**
*Vice President - Operations*

KANEB
PIPE LINE
COMPANY
A KANEB COMPANY

7340 West 21st St. N., Suite 200
Wichita, Kansas 67205
phone 316.773.9000
fax 316.773.9001
mobile 316.655.4415
jreiter@kanebpipeline.com

---

Feldman
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION
1050 Thomas Jefferson Street NW
Washington, D.C. 20007-3877
(202) 298-1800 Fax (202) 338-2416

Pamela Marwan

18 CFR 28

KPI1259

GOVERNMENT
EXHIBIT
306
PENGAD-Bayonne, N.J.

ENB-DOJ-022427



**Chase Securities Inc.**
600 Travis, 20th Floor
Houston, TX 77002

August 18, 1999

**PRIVATE AND CONFIDENTIAL**

Mr. Edward Doherty
Chairman & CEO
Kaneb Pipeline Company
2435 North Central Expressway, Suite 700
Richardson, TX 75080

Dear Ed:

On behalf of Dennis Langley (the "Seller") and The Bishop Group Ltd. ("Bishop"), a company which is wholly-owned by the Seller, thank you for your continuing interest in Kansas Pipeline Company, a wholly-owned subsidiary of Bishop. As you know, Chase Securities Inc. ("Chase") has been retained as financial advisor in connection with a sale of Bishop.

This letter sets forth the procedures for the submission of a definitive, fully financed, binding offer (the "Offer") for the acquisition of Bishop (the "Transaction"). Enclosed please find the proposed form of the Agreement and Plan of Merger (the "Agreement") which reflects the terms upon which the Seller is prepared to consummate the Transaction with the prospective purchaser ("Purchaser").

I.   Timing.  The Offer must be received by Chase no later than 5:00 P.M. (Noon, Central Time) on Monday, August 30, 1999.

II.  Contents of the Offer.  The Offer should include the following (please submit the Offer in the same numbered format as outlined below):

(i)   **Proposed Purchaser** - the identity of the Purchaser submitting the Offer, including other participants in the Transaction, if any.

(ii)  **Primary Offer Value** - the total value Purchaser is prepared to pay for 100% of the Bishop common stock that is wholly owned by the Seller. The Offer should consist of the Stock Purchase Price, including assumption of the balance sheet, including all debt and working capital, as outlined in Appendix 1 – Pro Forma Balance Sheet projected for September 30, 1999 ("Appendix 1").

KPI1260

ENB-DOJ-022428

August 18, 1999
Page 2

(iii) **Supplemental Offers** – In addition to the primary Offer outlined in II (ii) above, Purchaser may submit additional alternative bids or structures to purchase the pipeline system held by Bishop, which will be reviewed and considered by the Seller.

(iv) **Consideration** - a detailed description of the form of consideration that the Purchaser is prepared to pay for the stock of Bishop. As discussed, this consideration will be adjusted at closing in order to reconcile with the balance sheet in Appendix 1.

(v) **Value for MarGasCo** – please indicate the implicit value from within the total bid that is attributed to MarGasCo. While MarGasCo is intended to be part of the sale, the Seller may consider retaining MarGasCo if this entity does not have meaningful value to the Purchaser.

(vi) **Approvals and Conditions to Close** - a summary of the approvals and any other conditions required in connection with the Offer and consummation of the Transaction. Purchaser should note that the Seller expects that all required corporate approvals for the Transaction, including the authorization of Purchaser's Board of Directors, will be obtained prior to the submission of the Offer. Any conditions to closing, in addition to those set forth in the Agreement, must be clearly identified and detailed in the Offer, including any required consents and government approvals and the timing for obtaining such approvals.

(vii) **Financing** - details regarding the proposed financing of the Transaction, including, as appropriate, the proposed amount of senior debt, subordinated debt and equity, and the type of financing (e.g. bridge, bank, private and/or public capital markets), as well as the identity of all institutions involved and copies of any commitment letters or financing agreements. Please note that the Seller will look favorably on an Offer that does not contain a financing contingency.

(viii) **The Agreement** - the terms upon which the Purchaser is prepared to consummate the Transaction should be provided with the Offer in the form of the attached Agreement. Please indicate in the Offer that Purchaser is prepared to execute promptly the Agreement in the form submitted (including any redlined revisions). Any proposed revisions to the Agreement should be presented in the form of redlined changes to this version.

(ix) **Timing** - an estimate of the time needed to close the Transaction taking into account all necessary regulatory approvals. This estimate should include a list any additional due diligence items which the Purchaser wishes to conduct prior to executing the Agreement and closing the Transaction.

(x) **Other** - any additional information that may assist the Seller in its evaluation of the Offer; and

KPI1261

August 18, 1999
Page 3

(xi) **Contacts** - the name(s) and telephone number(s) of the person(s) the Seller and Chase should contact in clarifying and responding to the Offer.

III. Transmittal of the Offer and Agreement. The Offer and Agreement should be transmitted as follows:

(i) if these items are transmitted by fax, the Offer and Agreement should be faxed (including any redlined revisions of the Agreement) to:

> Vean Gregg
> Chase Securities Inc.
> Global Oil and Gas
> 600 Travis, 20th Floor-CTH 86
> Houston, TX 77002
> Facsimile: (713) 216-8882

(ii) if these documents are transmitted by fax, an original version of the Offer should be received by the above (by hand or overnight mail) no later than 10:30 a.m. the following morning.

(iii) absent a transmittal by fax, an original version of the Offer and Agreement should be received by the above no later than 5:00 P.M. (Noon, Central Time) on Monday, August 30, 1999.

(iv) Please also submit the Agreement by e-mail in electronic form (including any redlined revisions) to the attention of Vean Gregg as follows:
> vean.gregg@chase.com

IV. Selection of the Purchaser. After receipt of the Offer, the Seller and Chase will contact each prospective purchaser, as necessary, to clarify the terms of such Offer or proposed revisions to the Agreement. The Seller, with the assistance of Chase, intends to evaluate such Offers as expeditiously as practicable. Although the foregoing reflects the Seller's present intentions concerning the process, the Seller reserves the right, in its sole discretion, to evaluate the terms and conditions of any Offer and to accept or reject any such Offer for further consideration without specifying reasons therefor and to alter the procedures set forth herein or terminate the process at any time without prior notice.

The existence and contents of this letter are subject to the terms of the confidentiality agreement that was previously executed by you and Bishop.

Chase continues to be available to respond to your questions and requests for supplementary information and to coordinate questions with respect to the Offer or Agreement. Should you have any questions regarding the procedures detailed in this letter, please feel free to call Vean

KPI1262

August 18, 1999
Page 4


Gregg (713) 216-8848 or me (713) 216-6386. **In no event should either the Seller or Bishop be contacted directly.**

The Seller and Chase appreciate your interest in Bishop and look forward to hearing from you.

CHASE SECURITIES INC.
on behalf of The Bishop Group Ltd.


Bill Manias
Vice President
/encl.

KPI1263

ENB-DOJ-022431

August 18, 1999
Page 5

### Appendix 1. Pro Forma Balance Sheet projected for September 30, 1999

| Assets | ($ in Millions |
|---|---|
| Utility Plant, Net | $61.64 |
| Other Assets, Net | 12.51 |
| **Current Assets** | |
| Cash Reserve for LTD | 10.00 |
| Accounts Receivable | 4.96 |
| Other Prepaid Expenses | 0.79 |
| Total Current Assets | 15.76 |
| **Total Assets** | **89.90** |

**Capitalization and Liabilities**

| | |
|---|---|
| Partners Capital | $13.37 |
| Long-Term Debt | 62.39 |
| Revolving Credit Facilities | 6.00 |
| Restricted Pipeline Royalties | 3.09 |
| **Current Liabilities** | |
| Accounts Payable | 2.20 |
| Accrued Interest | 1.50 |
| Accrued Property Taxes | 0.42 |
| Other Accrued Liabilities | 0.94 |
| Total Current Liabilities | 5.06 |
| **Total Capitalization and Liabilities** | **89.90** |
| **Unencumbered Working Capital at 9/30/99** | **$0.70** |

KPI1264

ENB-DOJ-022432

Company Overview

## COMPANY OVERVIEW

### Kaneb Pipe Line Partners, L.P.

Kaneb Pipe Line Partners transports refined petroleum products -- gasoline, diesel and propane -- in Colorado, Iowa, Kansas, Nebraska, North Dakota, South Dakota, and Wyoming. Its 2,075-mile East Pipeline has 15 product terminals and 23 product tanks with a combined capacity of more than four million barrels. The 550-mile West Pipeline has four product terminals and total storage of more than 1.7 million barrels. The partnership also owns diesel fuel pipelines in Oregon, Wyoming, and Washington. Kaneb Pipe Line Partners' liquid-related terminal operations include about 30 facilities in 15 states with a total capacity of about 17.2 million barrels. The company also owns six terminals in the UK .

| | |
|---|---|
| Address: | 2435 N. Central Expwy<br>Richardson, TX 75080 |
| Phone: | 972-699-4000 |
| Fax: | 972-699-4025 |
| Web Site: | http://www.kanebpipeline.com |
| CEO: | Edward D. Doherty |
| CFO: | Howard C. Wadsworth |
| HR: | William Kettler |
| Fiscal year end: | December 31 |
| Sales Year: | 1998 |
| Sales ($ millions): | 125.8 (latest quarterly financials) |
| 1-Yr. Sales Change: | 0.04% |
| | |
| Employees: | 540 |
| Ticker Symbol: | KPP (Quote) |
| Exchange: | NYSE |

Hoover's Company Information
Copyright © 1998, Hoover's, Inc.
Austin, Texas.

back to top

KPI1255

RECEIVED TIMEAUG. 5.  8:51AM          PRINT TIMEAUG. 5.  9:54AM

ENB-DOJ-022423

SI: Kaneb(KAB) (#34/77)

SI   Inbox | Folders     Bookmarks | People     Hot | New Subjects     Options | Profile
Computers&Peripherals · Software · Communications · Semiconductors          sponsored by Datex



electronic trading solutions
WWW.THEAGROUP.NET

Talk : $5 and Under : Kaneb(KAB)

| Previous | Next | Respond | Become a Member of Silicon Investor!

|                                                    | Wednesday, Jul 23 1997 7:43PM ET |
| To: Bob Davis (33)                                 | Reply # 34   of 77 |
| From: Bob Davis                                    |                    |

THE NAPEAGUE LETTER
July 23, 1997
http://www.napeague.com

Kaneb Services (NYSE:KAB) Earnings Announcement

Exciting announcements from Kaneb Services over the last few days...

- Today KAB announced second quarter results which once again
exceeded "street expectations". Per share earnings reached $.08, a 60%
increase over the $.05 in the prior year quarter and well ahead of the $.07
that analysts were expecting. Revenues for the quarter also rose, to $58.4
million from $57.2 million in the prior year quarter. The press release
can be found at
http://biz.yahoo.com/prnews/97/07/23/kab_kpp_y_1.html.

- On Monday, Kaneb Pipeline Partners announced that "its independent
terminaling group has signed a definitive agreement to acquire the
Chicago area terminal assets of Stolthaven Chicago, Inc. The terminal to
be acquired is the only deep water facility in Chicago with 90 tanks and a
total capacity of 794,000 barrels." The Company expects to close this
transaction in September, so its first impact should be felt on 4th quarter
results. The press release can be found at
http://biz.yahoo.com/prnews/97/07/21/kpp_knu_y_1.html.

To quote the press release itself, "Our operating results continue to be in
line with our expectations in all areas of the Company. We had a very
strong quarter in our industrial field services unit. Improvements in
terminaling operations, which have been very strong all year, offset a soft
quarter of pipeline operations. Also during this quarter, we bought in
443,400 shares of our common stock bringing the total number of shares
purchased since October of last year to 1,191,200 shares."

I am anticipating obtaining additional information over the next few days,
and I will e-mail it to subscribers and place it on the Napeague Web Site at
http://www.napeague.com. I will also update the KAB in-depth Analysis
when I receive the 10-Q Report for the Quarter.

| Previous | Next | Respond |

KPI1256

Quotes · 100-Day Chart · News · Discussion · $5 and Under
View SubjectMarks                              Bookmark this Subject

### KANEB SERVICES (NYSE: KAB)                         Date: Aug 04

| Last Trade | | Change | | Bid | Ask | Volume |
| --- | --- | --- | --- | --- | --- | --- |
| 4 7/16 | | unch   ( 0.00%) | | 0.000 | 0.000 | 0₀0 |
| Prev.Close | Open | Day Range | | Last Tick | | Avg.Volume |
| 4 7/16 | 0.000 | 0.000 - 0.000 | | 0.0 | | 0₄3,100₀ |

52-week range: 3 1/2 - 5 5/16

ENB-DOJ-022424



| Home | Research | What's Hot | StockQuest | Sector | Industry | Subscribe |

Copyright 1996 - 1999 Market Guide Inc., 2001 Marcus Avenue Suite S200, Lake Success, NY 11042. All rights reserved

# Kaneb Pipe Line Partners

2435 North Central Expressway
Richardson, TX 75080
(972) 699-4000

Ticker: KPP
Exchange: NYSE
Sector: Energy
Industry: Oil Well Services & Equipment

| Complete Financials: Mar 1999 | Earnings Announcement: Jun 1999 |
|---|---|

**Business Summary**
KPP, a master limited partnership, owns and operates a refined petroleum products pipeline business & a petroleum products and specialty liquids storage and terminaling business. For the 3 months ended 3/31/99, revenues rose 31% to $36.8M. Net income applic. to Limited Partners rose 24% to $11M. Results reflect increased volumes on the East Pipeline, terminal acquisitions & greater tank utilization, partially offset by lower margins and increased debt levels.

* Earnings Announcement. For the 3 months ended 06/30/1999, revenues were 39,171, after tax earnings were 11,413. (Thousands)

## RATIOS AND STATISTICS AT A GLANCE
(As of 07/30/99)

| Price $ | 30.00 | EPS (TTM) $ | 4.93* |
|---|---|---|---|
| 52 Week High $ | 34.50 | P/E Ratio (TTM) | 6.08* |
| 52 Week Low $ | 29.38 | Book Value (MRQ) $ | 0.00 |
| 3 Month Avg Daily Vol (Mil) | 0.03 | Price/Book (MRQ) | NM |
| Beta | 0.35 | Sales Per Share (TTM) $ | 13.08* |
| Market Cap (Mil) $ | 481.80 | Return on Assets (TTM) % | 15.77* |
| Shares Outstanding (Mil) | 16.06 | Return on Equity (TTM) % | NM* |
| Float (Mil) | 15.70 | Cash Per Share (MRQ) $ | 0.36 |
| Indicated Annual Dividend $ | 2.80 | Current Ratio (MRQ) | 0.73 |
| Dividend Yield % | 9.33 | Total Debt/Equity (MRQ) | 1.40 |

Note:
Mil = Millions
MRQ = Most Recent Quarter
TTM = Trailing Twelve Months

KPI1257

| Additional Research Available for Kaneb Pipe Line Partners | | | | | |
|---|---|---|---|---|---|
| Quotes | Snapshot | Quick Facts | Company Profile | Ratio Comparison | More |
| Price Charts | News | Earnings Est. | DetailedFinancial | Provestor | SEC - Filings |

## Click here for FREE Real Time Quotes

| Company Snapshot (FRE | Ticker Symb | | GET |

Ameritrade   TRADING DIRECT   DATEK ONLINE   FAST TRADES   Wall Street Access

http://schwab3.marketguide.com/MGI/SNAP/4997N-CS.ohtml                                8/5/99

RECEIVED TIMEAUG. 5. 8:51AM        PRINT TIMEAUG. 5. 8:54AM

ENB-DOJ-022425

# The Napeague Letter

Monday, November 2, 1998

## UPDATES OF PREVIOUSLY ANALYZED COMPANIES

Of the stocks followed by TNL, six currently appear to be "strong and immediate investment opportunities":

### ABATIX ENVIRONMENTAL - (NASDAQ:ABIX):

The Company's greatly improved web site can be found at <http://www.abatix.com>. They now have a beta-test order form on the site and they are clearly about to add more of their catalog pages to the site.

The Company has informed me that the next earnings report should be out tomorrow afternoon.

### GO VIDEO, INC. - (AMEX:VCR):

Yesterday, the HDTV era "officially" began with the transmission of digital broadcast signals by about 46 TV stations. A recently published Reuters article on HDTV cites VCR as an entry into this arena.

I've just received this week's copy of Newsweek and I found a full page ad for the Go Video DDVCR in a section on "Today's Home Theater".

### KANEB SERVICES - (NYSE:KAB):

Kaneb Pipeline Partners today announced that they were part of a joint venture to run a terminal in the New York harbor area.

Although KAB has been moving upward strongly since the beginning of October, technical indicators do not seem to agree as to whether this trend will continue. I have just obtained some information which I needed to complete the KAB "Flash Report", and I expect to publish this either later tonight or early tomorrow, and I will comment again on the stock's technical situation in that "Report".

### MARLTON TECHNOLOGIES - (AMEX:MTY):

In a brief discussion with the Company's management earlier today, I learned that third quarter earnings would probably be released early next week. Although I did not learn anything definitive, I did not come away from this phone call with the sense that there would be any major surprises.

The stock has been methodically moving upwards over the last two months in a series of "waves". I expect that the next move upward will occur after it releases its earnings in about a week.

There has recently been a significant amount of "insider buying". A member of the Company's Board of Directors purchased 13,000 shares on September 10th on the open market, investing just under $50,000.

### TOUCHSTONE APPLIED SCIENCES - (NASDAQ:TASA):

A short phone call with the Company's management left me with the feeling that the acquisition of Mildred Elley Schools would be completed within the next few days.

In addition, a major concern about Elley has been resolved. The Department of Education has released the most recent student loan default rates, which shows that Elley's rate for the most recent year is only 15.9%, and thus is again eligible for complete participation in the Guaranteed Student Loan Program.

On October 30th, The Motley Fool ran an article on "post-secondary education". This article cites the predictability of the revenue flows, the operating leverage, and the value of degree-granting status.

To return to the Home Page of The Napeague Letter

KPI1258

RECEIVED TIMEAUG. 5. 8:51AM          PRINT TIMEAUG. 5. 8:54AM

ENB-DOJ-022426

| | |
|---|---|
| **From:** | GRAHAM TAYLOR |
| **To:** | Cjhoffmn@ix.netcom.com |
| **Date:** | Fri; Oct 15, 1999 1:29 PM |
| **Subject:** | K-Pipe |

Did you see the "Data Room Index," for this deal? We should discuss the 'due diligence' scope and execution on our side.

Regards,

Graham R. Taylor

**GOVERNMENT
EXHIBIT**

**320**

**KPLB-3048**

# K-PIPE HOLDINGS PARTNERS, L.P.

## LIMITED PARTNERSHIP AGREEMENT

### Dated as of October 20, 1999

The parties to this Limited Partnership Agreement are **SIGNAL CAPITAL ASSOCIATES, L.P.,** a Delaware limited partnership with an address at 750 Lexington Avenue, 30th Floor, New York, New York (the "General Partner") and the Persons whose signatures appear herein as Limited Partners (a "Limited Partner" or collectively the "Limited Partners").

### Background

The General Partner and the Limited Partners have formed or are continuing a limited partnership under the laws of the State of Delaware (the "Partnership") in order to acquire, own, operate, and deal in, interests of any nature related to oil and gas transmission facilities (the "Property") and to carry out any of the activities related to the Property.

1.     **Additional Definitions**.

1.1     "**Advances**" means interest free loans from the Partners to the Partnership.

1.2     "**Cash Receipts**" means all revenues, other than the proceeds of contributions, loans or advances by Partners to the Partnership, received by the Partnership in cash during any year.

1.3     "**Limited Partner**" is defined as set forth in the first paragraph above.

1.4     "**Limited Partners**" means all of the Limited Partners.

1.5     "**Losses**" means the net taxable losses of the Partnership, as finally determined for federal income tax purposes, decreased by items of income which are tax exempt and increased by expenditures which are not deductible other than those which are not deductible because they are Capital in nature.

1.6     "**Partner**" means any one of the Limited Partners or the General Partner.

1.7     "**Partners**" means all of the Limited Partners and the General Partner.

1.8     "**Partnership Act**" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. 1953, Sec. 1701, et sec., as such act must be amended from time to time.

GOVERNMENT
EXHIBIT

G-321

0225

1.9     "Profits" means the net taxable income of the Partnership, as finally determined for federal income tax purposes, increased by items of income which are tax exempt and decreased by expenditures which are not deductible other than those which are not deductible because they are capital in nature.

2.     Establishment of Partnership.

2.1     Formation of Partnership.  The Parties hereby form a limited partnership pursuant to the Partnership Act.  The General Partner, on behalf of the Partnership, shall execute or cause to be executed all such other certificates and documents conforming thereto and shall do all such filing and other acts as may be necessary or appropriate from time to time to comply with all requirements for the operation of a limited partnership in the State of Delaware and the qualification of the Partnership from time to time in all other jurisdictions where the Partnership shall conduct its business.

2.2     Partnership Name.  The name of the Partnership shall be K-Pipe Holdings Partners; provided however, that, subject to all applicable laws, the business of the Partnership may be conducted under any other name or names deemed necessary or advisable by the General Partner.

2.3     Purposes, Powers and Business of the Partnership.  The Partnership shall have the purpose of acquiring and dealing in ownership interests in oil and gas transmission facilities, and in furtherance of the foregoing purpose to do all things as may be lawful for partnerships organized under the Partnership Act and exercising and enjoying all powers, rights and privileges conferred upon partnerships organized under the Partnership Act as regards such purposes.

2.4     Principal Office and Address.  The principal office of the Partnership shall be c/o the General Partner at its address set forth above, or such other address or addresses as the General Partner may designate by notice to the Limited Partners.  The Partnership may maintain offices and other facilities from time to time at such other locations, within or without the State of Delaware as may be deemed necessary or advisable by the General Partner.

2.5     Term.  The existence of the Partnership shall commence on the date hereof, and, unless sooner terminated or dissolved under the provisions of this Agreement, the Partnership shall dissolve on December 31, 2034.

2.6     Agent for Service and Registered Office.  The agent for service of process upon the Partnership shall be National Registered Agents, Inc., 9 East Loockerman Street, Dover, Delaware 19901, or such other agent as may be designated from time to time by the General Partner.  The registered office of the Partnership in the State of Delaware shall be c/o such agent for service of process or such other address as may be designated from time to time by the General Partner.  The General Partner shall promptly notify the Limited Partners of any designation of a new agent for service of process or a new registered office.

0226

11/04/99  THU 20:31  [TX/RX NO 9171]

ENB-RB-000227

3.      Capital Contributions.

3.1      Contributions by the General partner.  The General Partner has contributed the sum of $2,000 to the capital of the Partnership in exchange for a 2% partnership interest.

3.2      Contribution of the Limited Partners.  Concurrently with the execution hereof the Limited Partners have contributed the amounts to the capital of the Partnership set forth and will receive the percentage interest in the manner herein provided, as follows:

| Limited Partners | Capital Contribution | Percentage Interest |
|---|---|---|
| Ashfield Investments Ltd. | $48,000 | 48% |
| Cronulla Corporation | $48,000 | 48% |

3.3      Additional Contributions.

(a)      The General Partner may in its discretion determine at any time that the capital of the Partnership should be increased.  It shall determine the aggregate amounts and timing of such additional capital contributions.  Within ten (10) days after receipt of notice from the General Partner (a "Capital Call"), each Partner shall be responsible for contributing additional capital required by the Partnership pro rata, in the proportion its percentage interest bears to all Limited Partner interest (each such contribution is an "Additional Capital Contribution") provided, however, that such Capital Calls shall not exceed in the aggregate more than one hundred thousand dollars in excess of the Partners Capital Contributions set forth above.

(b)      Partners shall receive no interest on their Capital Contributions to the Partnership.  The Partners shall make no withdrawals from the capital of the Partnership, except as otherwise agreed to by the General Partner, which agreement may not be unreasonably withheld.

3.4      Capital Accounts.  A capital account (a "Capital Account") shall be established for each Partner on the books of the Partnership.  Each Capital Account shall reflect such Partner's Capital Contribution to the Partnership as set forth herein, increased by any Additional Capital Contributions made by such Partner to the Partnership, decreased by the amount of any distributions from the Partnership to such Partner, and adjusted to reflect all

0227

items of gain, profit and loss allocated to such Partner pursuant to this Agreement. Each Capital Amount shall be maintained in accordance with the Code and the Treasury Regulations promulgated thereunder.

      3.5     <u>Default in Making Additional Capital Contributions When Due</u>. Except as expressly provided to the contrary herein, upon the failure of any Partner (the "Defaulting Partner") to pay or provide in full when due any installment or any portion of its Additional Capital Contribution upon a Capital Call of any Additional Capital contribution (the "Defaulted Payment"), and continuation of such failure for more than 48 hours (48 hours) after the time upon which such Additional Capital Contribution was due, the General Partner, in its sole discretion, will have the right on behalf of the Partnership to reduce the Percentage Interest of the Defaulting Partner in the proportion that the Defaulted Payment bears to the aggregate of all Additional Capital Contributions called by the General Partner pursuant to that Capital Call, and to permit any Partners not then in default to pay such Defaulted Payment proportionately, based on their Percentage Interests or the General Partner may advance the amount of the Defaulted Payment of the Defaulted Partner to the Partnership and be entitled, to preferred distribution as provided herein of an amount equal to two (2) times the amount of such Defaulted Payment payable from distributions which would have been made to such Defaulting Partner as to such amount as if the General Partner were such Defaulting Partner (but disregarding the Default for distribution purposes) before any distributions whatsoever are made to such Defaulting Partner.

      3.6     <u>Withdrawal of Capital</u>. No Partner will be entitled to withdraw any part of its capital contribution, to receive any distribution from the Partnership or to cause the dissolution of the Partnership, except as specifically provided for herein. Distributions to the Partners may, in the sole discretion of the General Partner, be made in cash, property or any combination thereof.

      3.7     <u>Limitations on Liability of the Partners and Capacity of Limited Partners</u>. Except for the obligation to make the capital contribution referred to in Section 3.2, the Limited Partners shall not have any personal liability or obligation to the Partnership or to any of the other Partners for any liability or obligation of the Partnership, and the Limited Partners shall not be obligated to lend funds to the Partnership for any purpose. In addition, no officer, director, agent, employee, shareholder or other affiliate of the General Partner shall have any liability or obligation to third parties for the payment and performance by the Partnership or the General Partner of Partnership liabilities or obligations to third parties. The Limited Partners shall not take part in the management of the business of the Partnership or transact any business for or in the name of the Partnership, and shall not have power to sign for or to bind the Partnership. No salary shall be paid to the Limited Partners. The Limited Partners shall have no Partnership drawing account. The Limited Partners shall not be entitled to any distribution from the Partnership or to withdraw or demand the return of any part of its capital contributions except as specifically provided for herein.

ENB-RB-000229

3.8     Capital Accounts. A capital account for each Partner shall be established on the books of the Partnership and shall be credited with the capital contributions of such Partner and with the amount of profits allocable to such Partner, and shall be charged with the amount of all distributions made to such Partner, and by the amount of all losses allocable to such Partner.

4.     Use and Distributions of Cash Receipts.

4.1     Allocation of Cash Receipts. Cash Receipts shall be applied by the General Partner in the following order of priority:

   (a)     To pay principal of, and interest on, any outstanding indebtedness of the Partnership to non-Partners; to pay expenses or obligations arising in connection with the operation of the Partnership and the conduct of its business;

   (b)     To repay to the Partners any loans or advances made by any of the Partners to the Partnership (it being understood that no Partner shall have any obligation to make any such loan or advance; and

   (c)     At all times to the extent that Cash Receipts available are in excess of amounts paid, committed or reserved for payment as provided for herein, immediately to pay:  (i) 2% thereof to the General Partner, and (ii) 98% thereof to the Limited Partners.

4.2     Reserves. Anything herein to the contrary notwithstanding, the General Partner may, in its sole discretion create reasonable reserves for the payment of debts, liabilities, taxes and expenses anticipated by the General Partner in good faith to be payable, before making any distribution of Cash Receipts to the Partners as provided for in Section 4.1(c).

5.     Allocation of Profits and Losses.

5.1     Allocation of Profits. 2% of all Profits of the Partnership shall be credited to the capital account of the General Partner, 98% thereof shall be credited to the capital accounts of the Limited Partners.

5.2     Allocation of Losses. 2% of all Losses of the Partnership shall be charged to the capital account of the General Partner, 98% thereof shall be charged to the capital account of the Limited Partners.

0229

11/04/99  THU 20:31  [TX/RX NO 9171]

ENB-RB-000230

6.        The General Partner.

6.1        Powers of the General Partner.  The management and control of the business and affairs of the Partnership (including, without limitation, the determination of which transactions to engage in and all other terms thereof) shall be vested solely and exclusively in the General Partner, who shall do all things as it may in its sole and absolute, discretion determine to be necessary or useful in order to accomplish the purposes of the Partnership and to conduct its business, all in accordance with the provisions hereof; and, in furtherance thereof, it shall possess and may exercise all of the powers, rights and privileges of a general partner in a limited partnership under the Partnership Act as enacted in the State of Delaware, including, without limitation, the power, exercisable in good faith in its sole and absolute discretion to sell, transfer, assign or dispose of, and pledge, hypothecate or otherwise encumber, all or any portion of the assets of the Partnership without the consent of the Limited Partners.

6.2        Services of General Partner.  The General Partner shall render to the Partnership such services as are reasonably necessary for the management and conduct of the business of the Partnership.

6.3        Indemnification of General Partner.  The General shall not be liable to the Partnership or to the Limited Partners for any act of omission in good faith within the scope of the authority conferred by this Agreement and without gross negligence on its part.  The Partnership shall indemnify and save harmless the General Partner from and against any and all liability, loss, cost, expense or damage incurred or sustained by reason of any act or omission in the conduct of the business of the Partnership in good faith, within the scope of the authority conferred by and without limitation of the foregoing, the General Partner shall be entitled to indemnification by the Partnership against the reasonable expenses, including attorneys' fees, actually and necessarily incurred by the General Partner in connection with the defense of any action to which the General Partner may be made a party in the right of the Partnership to procure a judgment in favor of the Partnership, to the fullest extent permitted under the provisions of the Partnership Act or any other applicable statute.

6.4        Other Activities of the General Partner and the Limited Partners.  The General Partner is authorized to manage the business of the Partnership in conjunction, with its other business interests, activities and investments and will not be obligated to devote all or any particular part of its time and effort to the Partnership and its affairs.  Neither this Agreement nor any activity undertaken on behalf of the Partnership shall prevent the General Partner, the Limited Partners or any of their respective affiliates from engaging in other activities or businesses or from making investments, whether or not such activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Partnership, whether individually or jointly with others, without any obligation to account to the Partnership or the other Partners for any profits or other benefits derived therefrom, and without having to offer an interest in such activities, businesses or investments to the Partnership or the, other Partners.  Neither the General Partner nor any of its affiliates shall be obligated to present to the Partnership any particular investment opportunity, regardless of whether such opportunity is of such character that the Partnership could take it if such

SP 127041.1 05211 00307
10/25/99 4:42 PM

-6-

0230

ENB-RB-000231

opportunity were presented to the Partnership, and the General Partner and its affiliates shall have the right to take for its own account (individually or otherwise) or to recommend to others any such investment opportunity.

6.5     Failure to Take Action.  The General Partner will not be liable to the Limited Partner for its failure to take any action (including, without limitation, any action which may prevent the foreclosure of all or any portion of the property of the Partnership) on behalf of the Partnership, due to the Partnership's not having sufficient funds to take such action.  In such event, the General Partner shall, in its good faith determination as to the best interests of the Partnership, (a) sell all or any portion of the property of the Partnership in order to raise such funds, or (b) cause the dissolution of the Partnership or the abandonment of all or any portion of its property or both; provided, however, that the General Partner shall have no obligation whatsoever to take any action referred to in this sentence if the General Partner believes, in the good faith exercise of its sole and absolute discretion, that such action might result in any further liability to the Partnership or the General Partner.

7.     Records, Reports and Taxes.

7.1     Fiscal Year, Accounting and Records.  The fiscal year of the Partnership for both accounting and federal income tax purposes shall end on December 31 of each year, and, for accounting and federal income tax purposes, the partnership shall report its operations and Profits and Losses in accordance with such method as the General Partner shall determine.  At all times during the continuance of the partnership, the General Partner shall keep or cause to be kept full and faithful books of account in which shall be entered fully and accurately each transaction of the Partnership.  All of the books of account shall be open to the inspection and examination by the Limited Partners or their representatives, by appointment, during normal business hours.  The General Partner shall cause the Partnership to prepare and to send to each Limited Partner (a) within 45 days after the end of each fiscal quarter an unaudited report as to the transactions entered into and the amounts paid and received by the Partnership during the preceding fiscal quarter, and (b) within 75 days after the end of each fiscal year such tax information as shall be necessary for the preparation of such Limited partner's federal tax return.

7.2     Bank Account.  The General partner, on behalf of the Partnership, may open and maintain a bank account or accounts, in which may be deposited all of the capital Cash Receipts and other funds of the Partnership.  All withdrawals from the Partnership's account shall be made only upon checks or instruments signed by such person or persons and in such manner as the General Partner shall from time to time designate in writing.  The General Partner shall not commingle Partnership funds with the General Partner's other funds.

7.3     Allocation in Event of Transfer of Partnership Interest During Year.  In the event of the transfer of all or any part of a Partnership interest (in accordance with the provisions of this Agreement or by operation of law) at any time other than at the end of the Partnership year, the distributive share, in respect of the Partnership interest assigned, of Partnership income, gains, losses, deductions and credits, as computed both for partnership

0231

accounting purposes and for federal income tax purposes, shall be allocated between the transferor and the transferee, in the same ratio as the number of days in such year before and after the date of such transfer. The foregoing provisions of this Section shall not be applicable to the distributive share, in respect of the Partnership interest assigned, of Partnership income, gains, losses, deductions and credits arising out of (a) the sale or other disposition of all or substantially all of the property of the Partnership, or (b) other extraordinary nonrecurring items, all of which will be allocated to the holder of such Partnership interest on the date such income, gains, losses, deductions and credits are earned or incurred.

     7.4     <u>Tax Elections</u>. All elections required or permitted to be made by the Partnership under the Internal Revenue Code of 1954, as amended, may, but shall not be required to, be made by the General partner in its sole and absolute discretion.

     8.     <u>Withdrawal and Transfer of Interests</u>.

     8.1     <u>Dissolution or Withdrawal of or Sale of its Interest by, a Limited Partner</u>.

     (a)     No Limited Partner may withdraw or retire as a Limited Partner or, directly or indirectly, sell its interest as a Limited Partner without the prior consent of the General Partner.

     (b)     The bankruptcy, insolvency, dissolution or other cessation to exist as a legal entity of a Limited Partner which is not an individual, shall not cause termination of the Partnership, but the authorized representative of such Limited Partner shall have all the rights (for the purpose of effecting the orderly winding up and disposition of the business of such Limited Partner) and powers as such Limited Partner possessed to make an assignment of its interest in the Partnership in accordance with terms hereof.

     (c)     The death, insanity, legal incapacity, bankruptcy or insolvency of an individual Limited Partner shall not cause a termination of the Partnership, but its legally authorized representative shall have all of the rights (for the purpose of settling or managing its estate) and such powers as the decedent, incompetent, bankrupt or insolvent Limited Partner possessed to make an assignment of his interest in the Partnership in accordance with the terms hereof.

     (d)     In the event that the authorized representative of a Limited Partner has not made an assignment of such Limited Partner's interest in the Partnership in accordance with the terms hereof within ninety (90) days of the death, incompetency insanity, legal incapacity, bankruptcy, insolvency, dissolution or other cessation to exist of such Limited Partner, the General Partner may, as attorney-in-fact for such Limited Partner pursuant to Section 10.9 hereof, sell, assign, transfer such Limited Partner's interest.

     9.     <u>Dissolution, Liquidation and Termination</u>.

0232

11/04/99  THU 20:31  [TX/RX NO 9171]

ENB-RB-000233

9.1     Dissolution.  Except as herein otherwise expressly provided, the Partnership shall be dissolved upon the occurrence of any of the following events:

(a)     The bankruptcy, insolvency, withdrawal, dissolution or cessation to exist of the General Partner;

(b)     The death or dissolution of any Partner;

(c)     The agreement of all of the Partners; or

(d)     The expiration of the term provided in Section 2.5 hereof.

9.2     Effective Date of Dissolution.  Dissolution shall be effective on the date of the event giving rise to the dissolution, but the Partnership shall not terminate until the assets thereof have been distributed in accordance with the provisions of Section 9.4 hereof. and the balance distributed to all Partners in accordance with their respective capital accounts.

9.3     Liquidating Trustee.  Upon dissolution of the Partnership, the liquidating trustee (which shall be the General Partner or its successors and assigns unless such dissolution shall occur as a result of the Section 9.1(a) hereof, in which event a majority in interest of the Limited Partners shall have the right to appoint the liquidating trustee) shall proceed diligently to wind up the affairs of the Partnership and distribute its assets in accordance with the provisions of Section 9.4 hereof. During the interim, the liquidating trustee shall continue to exploit the rights and properties of the Partnership consistent with the liquidating thereof, exercising in connection therewith all of the power and authority of the General Partner as herein set forth.

9.4     Liquidation and Termination.  As expeditiously as possible the liquidating trustee shall distribute the assets of the Partnership in the following order of priority:

(a)     To pay, or provide for, all liabilities and obligations of the Partnership, except those to Partners arising under this Agreement;

(b)     To pay, or provide for, all other liabilities and obligations of the Partnership, including, and loans or advances; and

(c)     To distribute the cash or other property remaining to the Partners: (i) until their capital accounts have been reduced to zero, in accordance with the percentages obtained by multiplying 100 by fractions the respective numerators of which are the balances in their respective capital accounts after allocation of all Partnership gain or loss and the denominators of which are, in each case, the aggregate capital account balances of all Partners after such allocation; and (ii) thereafter, (x) 2% to the General Partner, (y) 98% to the Limited Partners.

SF 127041.1 05211 00307
10/25/99 4:42 PM

-9-

0233

11/04/99  THU 20:31  [TX/RX NO 9171]

ENB-RB-000234

The liquidating trustee shall have power to establish reserves for the payment of liabilities and obligations of the Partnership in such amounts as the liquidating trustee shall deem appropriate. Distribution of Partnership assets hereunder may be made in cash, or in kind or any combination thereof All salable assets of the Partnership may be sold, in the sole and absolute discretion of the liquidating trustee, in connection with any liquidation at public or private sale and at such price and upon such terms as the liquidating trustee in its sole discretion may deem advisable. Any Partner and any partnership, corporation or other firm in which any Partner is in any way interest may purchase assets at such Sale.

10.    _Miscellaneous_.

10.1    _Representations and Warranties_.  Each Partner represents and warrants to, and agrees with, the other Partners that: (a) if it is a corporation, it is duly incorporated and validly existing in good standing under the laws of the jurisdiction in which it was incorporated and has full right, power and authority to execute and deliver this Agreement and to perform each of its obligations hereunder; (b) it has duly and validly executed and delivered this Agreement; (c) this Agreement constitutes its valid and binding obligation, enforceable against it in accordance with its terms; (d) it is not subject to any restriction or any agreement which prohibits, or would be violated by, the execution or delivery hereof or the consummation of the transactions contemplated herein or pursuant to which the consent of any third person, firm or corporation is required in order to give effect to the transactions contemplated herein; (e) it will at all times maintain its existence, rights and franchises and take all such other action as will enable it to remain a Partner, perform its obligations hereunder and enable the Partnership to continue, and the Partnership to conduct business in the manner and, for the purposes for which the Partnership was formed; and (f) it has not dealt with any broker, finder or other person to whom any fee is or may be payable in connection with the execution or delivery of this Agreement or the formation or continuation of the Partnership.

10.2    _Notices_.  Any notice, consent or other communication required or permitted to be given by and provisions of this Agreement shall be in writing and shall be deemed to have been given on the date the same is: (a) delivered personally with receipt acknowledged; or (b) sent by registered or certified mail, return receipt requested, postage charges prepaid, and addressed as follows:

    (i)    _if to the Partnership_, to its principal place of business referred to herein, with a copy to each of the Partners at their respective addresses set forth in this Agreement; and

    (ii)    _if to a Partner_, to its address set forth in this Agreement.

The Partners may change their addresses for purposes of this Section 10.2 by notice to the Partnership at its principal office in the manner herein provided for.

SF 127041.1 05211 00307
10/25/99 4:42 PM

-10-

0234

10.3     Further Assurances. Each of the Partners agrees to execute, acknowledge, deliver, file record and publish such further certificates, instruments, agreements and other documents, and to take all such Rather action as may be required by law or deemed by the General Partner in the exercise of its sole discretion in good faith to be necessary in furtherance of the Partnership's purposes and the objectives and intentions underlying this Agreement and not inconsistent with the terms hereof

10.4     Arbitration. Any dispute arising under, out of or in relation to this Agreement or its interpretation, the making or validity hereof or any breach hereof shall be determined and settled by binding arbitration pursuant to the Commercial Rules then existing of the American Arbitration Association. Any award rendered by the arbitrators shall be final and conclusive and binding upon the parties, and a judgment thereon may be entered in any court, state or Federal, having jurisdiction.

10.5     Amendments. This Agreement may be amended at any time, and from time to time, only upon the written concurrence of all of the Partners.

10.6     Gender and Number. Unless the context otherwise requires, when used herein, the singular includes the plural and vice versa, and the masculine includes the feminine and neuter and vice versa. A person is deemed to include a person, firm, corporation or other entity.

10.7     Benefit. This Agreement is binding upon and inures to the benefit of the parties hereto, their heirs, legal representatives, successors and assigns.

10.8     Captions. Captions are inserted for convenience only and shall not be given any legal effect.

10.9     Powers of Attorney. Each of the parties hereto, including persons who become parties to this Agreement or become entitled to the benefits of its provisions after the date hereof, hereby irrevocably constitutes and appoints the General Partner, with full power of substitution, as its true and lawful representative and attorney-in-fact, with full power and authority in its name, place and stead, to make execute, sign, acknowledge, swear, deliver, record or file:

(a)     Any and all instruments or documents (i) referred to in Section 2.1 hereof, or (ii) that may be appropriate to record or otherwise reflect the following transactions approved in the manner provided in this Agreement: (A) a change in the name or the location of the principal place of business of the Partnership, (B) the disposition by a Partner of its interest in the Partnership or any part thereof, (C) the substitution or addition of a person becoming a Partner of the Partnership, (D) a distribution in reduction of the capital contribution of a Partner, and (E) a change in the capital of the Partnership;

0235

(b)    Any assignment of the interest of a Partner;

(c)    Any and all amendments or modifications of the instruments described in subsection 10.9 (a) hereof,

(d)    All documents and instruments which may be required to effect the dissolution and termination of the Partnership in accordance with this Agreement; and

(e)    All such other documents or instruments, including, but not limited to, instruments of conveyance of any Partnership property or interest therein, which, subject to the provisions of this Agreement. the General Partner deems necessary or appropriate in the conduct of the Partnership's business.

The foregoing power of attorney shall be deemed to be coupled with an interest and shall survive the death, insanity, incompetency, legal incapacity, bankruptcy, insolvency or dissolution of any party hereto, including, without limitation, any Partner or the assignment of its interest in the Partnership.

In addition, the parties hereby agree to execute and deliver to the General Partner, within five (5) days after receipt of the General Partner's request therefor, such other and further powers of attorney, and other instruments which the General Partner deems necessary to comply with any laws, rules or regulations relating to the formation of the Partnership or the conduct of business by the Partnership.

Notwithstanding the foregoing provisions of this Section 10.9, when acting a representative capacity, the General Partner shall not have any right, power or authority to amend or modify this Agreement.

10.10    Severability.  The invalidity or illegality of any portion of this Agreement shall not affect the validity or legality of any other provision.

10.11    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

10.12    Governing Law.  This Agreement shall be construed in accordance with the laws and decisions of the State of Delaware.

0236

ENB-RB-000237

10.13 <u>Tax Matters Partner</u>. The partners have designated the General Partner to be the Partnership's tax matters ("Tax Matters Partner"). The Tax Matters Partner shall have all power and responsibilities provide in code Section 6221, et seq. The Tax Matters Partner shall keep all Partners informed all notices from governmental taxing authorities which may come to the attention of the Tax Matters Partner. The Partnership shall be responsible for all reasonable third-party costs and expenses incurred by the Tax Matters Partner in performing those duties. A Partner shall be responsible for any costs incurred by the Partner with respect to any tax audit or tax-related administrative or judicial proceeding against any Partner, even though it relates to the Partnership. The Tax Matters Partner shall not compromise any dispute with the Internal Revenue Service without the approval of the Partner.

[SIGNATURE PAGE IMMEDIATELY FOLLOWS]

8F 127041.1 05211 00307
10/25/99 4:42 PM

0237

ENB-RB-000238

IN WITNESS WHEREOF, the parties have executed this Agreement as of October 20, 1999.

GENERAL PARTNER:

SIGNAL CAPITAL ASSOCIATES L.P.

By: _____
Name:    Jeffrey Furman
Title:   General Partner

LIMITED PARTNERS:

ASHFIELD INVESTMENTS LTD.

By: _____
Name:
Title:

CRONULLA CORPORATION

By: _____
Name:
Title:

8F 127041.1 05211 00307
10/25/99 4:42 PM

-14-

0238

ENB-RB-000239

IN WITNESS WHEREOF, the parties have executed this Agreement as of October 20, 1999.

GENERAL PARTNER:

SIGNAL CAPITAL ASSOCIATES L.P.

By: _____

Name:        Jeffrey Furman

Title:   General Partner

LIMITED PARTNERS:

ASHFIELD INTERNATIONAL LTD.

By: _____ for Director Services Ltd.

Name: Michael L. Alberga

Title:  Director

CRONULLA CORPORATION

By: _____

Name:

Title:

SP 127041.1 05211 00307
10/26/99 4:33 PM

-14-

0239

ENB-RB-000240

Case 4:06-cv-00657   Document 23-27   Filed on 07/31/07 in TXSD   Page 60 of 75

IN WITNESS WHEREOF, the parties have executed this Agreement as of October 20, 1999.

GENERAL PARTNER:

SIGNAL CAPITAL ASSOCIATES L.P.

By: _____
Name: Jeffrey Furman
Title:   General Partner

LIMITED PARTNERS:

ASHFIELD INVESTMENTS LTD.

By: _____
Name:
Title:

CRONULLA CORPORATION

By: _____
Name:
Title:

-13-

0240

SF 127041.1 00311 00307
10/25/99 9:44 AM

ENB-RB-000241

10/29/99  15:44 FAX 212 826 0010          FORTREND INTL. LLC                    ⌀001

# FORTREND
## INTERNATIONAL LLC

### FACSIMILE TRANSMISSION SHEET

Please deliver the following pages to:

| NAME: | OF: | FACSIMILE NUMBER: | VOICE NUMBER: |
|---|---|---|---|
| Graham R. Taylor, Esq | LLGM | 415-951-1180 | 415-951-1121 |
| Cynthia Morelli, Esq. | LLGM | 415-951-1180 | 415-951-1158 |
| | | | |
| | | | |
| | | | |

FROM:  Craig J. Hoffman        VOICE NUMBER:  212-378-8880
DATE:  October 29, 1999        REGARDING:  Credit Commitment

Total number of pages:    4    (Includes this page)

☒ Original Will Not Follow   Original Will Follow VIA:
                            ☐ Regular Mail    ☐ Overnight Delivery
                                              ☐ Messenger

**Comments:**
Graham, Cynthia,

    I received the commitment letter from Rabo. All is good in Rabo's mind now except what I call "collateral mechanics," which I am currently working out. As per earlier discussion with Cynhtia, I'd like to be able to use this commitment to 1.) tantalize them a little... I have the cash.. 2.) Give them comfort that I can do this deal now. Please give me your thoughts.

-Craig

IF THIS TRANSMISSION IS NOT COMPLETE OR LEGIBLE, PLEASE CALL THE SENDER AT (212) 378-8880.

This message and the accompanying pages are intended only for the use of the party to whom it is addressed. It may contain information which is privileged, confidential and exempt from disclosure under applicable law. If the person receiving this communication is not the intended recipient, or an employee or agent responsible for delivery to the intended recipient, you are hereby notified that you may not read, copy, distribute, or in any manner desseminate the contents of this communication.

**GOVERNMENT
EXHIBIT
322**

750 Lexington Avenue, 30th floor
New York, NY 10022
Telephone: 212.826.0770   Facsimile: 212.826.0077

**KPLB-3557**

ENB-DOJ-014702



ENB-DOJ-014703

10/29/99  15:44 FAX 212 826 0010     FORTREND INTL. LLC                          ☑002
10/29/99  FRI 15:22 FAX 212 808 2584     RABO CORP FIN NY                      ☑002



**Utrecht-America Finance Co.**
245 Park Avenue
New York, NY 10167-0062 U.S.A.
212-916-7800

October 29, 1999

K-Pipe Merger Corporation
c/o Fortrend International
805 Third Avenue, Suite 2300
New York, NY 10021

Gentlemen:

We are pleased to inform you that we are prepared to make a term loan available to you substantially according to the following terms and conditions:

| | |
|---|---|
| **Borrowers:** | K-Pipe Merger Corporation ("K-Pipe") a company organized under the laws of Delaware. |
| **Lender:** | Utrecht-America Finance Company. |
| **Amount and Type of Facility:** | Up to $215,000,000 Term Loan. |
| **Purpose:** | Acquisition of the stock of Bishop Group, Ltd and subsidiaries. |
| **Collateral:** | As security for the Borrower's obligations under the term loan facility, Rabobank shall be granted a first priority lien on the common stock of K-Pipe Merger Corporation and the property in which the Borrower now has or hereafter shall have any interest. In addition, UAFC shall be granted a pledge in K-Pipe Merger Corporation's and/or other accounts at Rabobank, as agreed among the various parties. |
| **Fee:** | As agreed in a separate fee letter. |
| **Interest:** | Rabobank's Base Rate as in effect from time to time, |
| **Maturity:** | Within thirty (30) days from closing, which shall take place no later than November 15, 1999. |
| **Applicable Laws/** | |

**KPLB-3558**

*An Affiliate of Rabobank*

ENB-DOJ-014704



**Utrecht-America Finance Co.**
245 Park Avenue
New York, NY 10167-0062, U.S.A.
212-916-7800

K-Pipe Merger Corporation

, 1999

**Jurisdiction:**    Laws of the State of New York and submission to federal courts located in New York, NY.

**Legal Fees:**    All Fees and expenses of legal counsel to the Bank are for the account of the Borrower.

The documentation shall contain representations, warranties, covenants, events of default and other terms which are customary for a transaction of this type.

The terms and conditions of this commitment are not limited to the above terms and conditions. Those matters which are not covered by or made clear in the above outline are subject to mutual agreement of the parties.

This commitment is conditional upon the preparation, execution and delivery of legal documentation and opinions in form and substance satisfactory to Rabobank and our counsel incorporating substantially the terms and conditions outlined or referred to above.

Please evidence your acceptance of the foregoing by signing and returning to us the enclosed copy of this letter on or before November 2, 1999, the date this commitment (if not accepted prior thereto) shall expire.

Very truly yours,

UTRECHT-AMERICA FINANCE COMPANY

By: _____

By: _____

Accepted on _____ ___, 1999

K-PIPE MERGER CORPORATION

By: _____
Title:

**KPLB-3559**

2

*An Affiliate of Rabobank*



**Utrecht-America Finance Co.**
245 Park Avenue
New York, NY 10167-0062 U.S.A.
212-916-7800

October 29, 1999

K-Pipe Merger Corporation
c/o Fortrend International,
805 Third Avenue, Suite 2300
New York, NY 10021

Gentlemen:

<u>Fee Letter</u>

This letter confirms that the fee payable for the up to $215,000,000 loan K-Pipe Merger Corporation for acquisition financing described in the Commitment Letter dated the date hereof (the "Commitment Letter") will total $750,000.—, payable to Utrecht-America Finance Company at closing.

The terms and conditions of the loan facility are outlined in our commitment letter to you dated October 29, 1999.

Very truly yours,



UTRECHT-AMERICA FINANCE COMPANY

By:
Name:
Title:

By:
Name:   Joseph A. Insinga
Title:   Vice President

Accepted on _____, 1999

By:  K-PIPE MERGER CORPORATION

Name: _____

**KPLB-3560**

An Affiliate of Rabobank

ENB-DOJ-014706

Signal Capital Associates, L.P.
c/o Jeffrey Furman, General Partner
750 Lexington Avenue 30th Floor
New York, New York 10022

December 20, 1999

Via Facsimile (345) 949-6589

Mrs. Kerry Ramoon
MeesPierson (Cayman) Limited
Grand Pavilion Commercial Centre
Bougainvillea Way
802 West Bay Road
Grand Cayman, Cayman Islands, B.W.I.

    Re: Transfer of Beneficial Interest in funds

Dear Mrs. Ramoon,

Please irrevocably transfer 158,620 Canadian dollars to K-Pipe Group, Inc.., a wholly owned subsidiary of Signal Capital Associates, L.P. without conversion into any different other currency.  Presently, the currency is held in the name of Signal Capital Associates, L.P.

Thereafter, please convert all of the Canadian dollars and send the entire proceeds, prior to December 31, 1999,  to the account of K-Pipe Group, Ltd. by wire transfer.  The wiring instructions for K-Pipe Group, Ltd. are as follows:

| | |
|---|---|
| Bank of New York | |
| New York, New York | |
| ABA Routing Number | 021000018 |
| For Credit to | Rabobank Nederland NY |
| Account Number | 802-6002-533 |
| For Further Credit to | K-Pipe Group, Inc. |
| Account Number | 18313 |

Thank you for your assistance.

Yours truly,
Signal Capital Associates, L.P.

Jeffrey Furman, General Partner

H01016

001041

GOVERNMENT EXHIBIT 324

ENB-DOJ-031657

**From:** CYNTHIA MORELLI
**To:** "hteig@ica-ipg.com".SMTP.HEADQUARTERS NEW YORK
**Date:** 8/18/00 11:23AM
**Subject:** RE: K-Pipe

**FILE**

I don't have enough information to answer that question. All that I can tell you is that Schedule 5.1(b) of the SPA governs true-up on the stock side. Schedule 2.3(b) governs the asset true-up. If I read your e-mail correctly, the $44K issue relates to accrued interest income. With respect to accrued interest income as a positive working capital account, the two schedules read the same: "Accrued interest earned as of the True-Up Date for all cash accounts of the Company(ies) and all Affiliates including all interest credited to the Cash Reserve Account held in the name of Syenergy Pipeline Company, L.P., representing any balance in the account in excess of the $10,000,000 principal balance."

On the surface of it, accrued interest should be a complete pass-through. However, you should note that the defined terms have different meanings in the respective documents. On the Stock side, the True-Up Date is 11/8/99. Asset True-Up Date is 11/9/99. On the Stock side, "Company" means the Bishop Group (which K-Pipe purchased), which has a fair number of subsidiaries. On the Asset side, "Companies" means just MGC, Mid-Kansas, KPC and Riverside (and excludes those Bishop Group entities which K-Pipe retained).

So, unless the $44K issue relates to the time between the two True-Up dates (highly unlikely) or to one of the retained entities, I can't see from the documents why it's not a pass-through.

Hope this helps.

Cynthia

>>> "Howard Teig" <hteig@ica-ipg.com> 08/18/00 06:13AM >>>
I am not sure I totally understand your response about the $44k issue.
After reviewing the docs and the schedules thereto, do you agree with me or with Midcoast on this matter. I need to know (preferably today) whether we are discussing a $100k or $144k issue).

As for your detailed info on the Butcher Interest, thank you very much.

Howard

-----Original Message-----
From: CYNTHIA MORELLI [mailto:CTMORELL@LLGM.COM]
Sent: Thursday, August 17, 2000 6:03 PM
To: hteig@ica-ipg.com
Cc: GRAHAM TAYLOR
Subject: Re: K-Pipe

The Butcher Interest partnership, you may recall, was entered into at the insistence of PwC in order to add "substance" and "good facts" to this Midco transaction. On the question of how to monetize the partnership interest:

**KPLB-0575**

GOVERNMENT
EXHIBIT
326

ENB-DOJ-011573

Midcoast has an option to purchase K-Pipe's partnership interest on 30 days notice. If the notice is provided prior to 11/9/00, the option price is $275,000. If notice is provided thereafter, but before 11/9/01, the price is $305,250. The price is $332,750 if the notice is provided after 11/9/01.

K-Pipe has an option to put the partnership interest to Midcoast on 30 days notice, but it cannot be exercised until 11/9/00. If notice is given before 11/9/01, the sales price will be $244,750. If the notice is provided after 11/9/01, the price will be $272,250.

If you need to monetize the Butcher interest ASAP, you must wait until 11/9/00. There is the possibility that Midcoast will exercise its option before that point, yielding $275,000. If not, K-Pipe can deliver notice to Midcoast on 11/9/00, and close 30 days thereafter at a price of $244,750.

I expect Richard Robert, the Midcoast CFO, will be phoning me shortly. I will mention to him the $44K issue, apparently the only one outstanding on the asset side, but you will have to work out the details with him directly (i.e. pass along Craig's thoughts as to why Midcoast is not entitled to the interest income in dispute).

Cynthia


· · · · · · · · · · · · · · · ·

Cynthia M. Morelli
LeBoeuf, Lamb, Greene & MacRae LLP
One Embarcadero Center, Suite 400
San Francisco, California 94111
P: 415-951-1158
F: 415-951-1180
ctmorell@llgm.com

This e-mail, including attachments, contains information that is confidential, and it may be protected by the attorney/client or other privileges. This e-mail, including attachments, constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not an intended recipient, please delete this e-mail, including attachments, and notify me by return mail, e-mail or at (415) 951-1158. The unauthorized use, dissemination, distribution or reproduction of this e-mail, including attachments, is prohibited and may be unlawful.

· · · · · · · · · · · · · · · ·

>>> "Howard Teig" <hteig@ica-lpg.com> 08/17/00 01:16PM >>>

I have spoken to Craig Hoffman about this matter at some length today and do have more information as well as questions.

The difference between the two amounts of working capital ($1,885,733 versus $1,656,306) is that there were certain liabilities which supposedly we were going to try to manage and hopefully capitalize on. The major liability was the accrued income taxes for which approx. $200k was provided and

**KPLB-0576**

effectively pre-funded.  This liability we already know about and apparently, the ability to manage and capitalize on this amount has gone. We will know what this final number is when the tax returns are due.

In the schedules that I faxed to you today, Cynthia, there is an amount of approx. $44,000 representing accrued interest income flowing through to both parties.  In Craig's computations of the above amounts (file attached hereto) $50k was due from the Stock Purchaser or rather debtor to the company.  However, Midcoast was not entitled to any of this.  Therefore, I think that the asset buyers numbers are off by $44k (give or take).

There is one final matter that we need to focus on.  As it turns out K-Pipe still has an investment in Butcher Interest Partnership.  The capital account balance as of 12/99 was approx. $260k.  Craig's computations had valued this interest at approx. $275k. The question is what do we have to do to monetize this partnership interest.

Craig has indicated that we should not try to offset this partnership interest against liabilities, but rather to treat each item separately.

The bottom line is that we may owe via the true up $252k less possibly $44k. In addition, we are owed money back either from the government or the stock seller for taxes in the amount of approx. $423k.  And then finally we are entitled to approx.$250-275k for the Butcher Interest.

Howard

CC:        GRAHAM TAYLOR

**KPLB-0577**

ENB-DOJ-011575

*Provided by PWC 12/11/02*

October 7, 1999

Mr. Jeff Furman
Fortrend International LLC
750 Lexington Avenue, 30th Floor
New York, NY 10022

Dear Mr. Furman:

We appreciate the opportunity to provide tax consulting services to Fortrend International
LLC ("Fortrend") in connection with the sale of certain assets of the Bishop Pipeline
Company. This engagement letter and the attached **Terms of Engagement to Provide Tax
Consulting Services** set forth an understanding of the nature and scope of the services to be
performed, the fees we will charge for the services, and outline the responsibilities of
PricewaterhouseCoopers LLP ("PwC") necessary to ensure that PwC's professional services
are performed to achieve mutually agreed upon objectives.

**Summary of Services**

You have requested that PwC perform the following services:

To provide tax consultation in connection with the above-described transaction to facilitate the
consummation of the transaction.

**Fees and Billing Procedures**

Our fees for professional services are based on a number of factors including the time spent,
the nature of and the value of the work performed, the experience level of the staff required to
bring the appropriate level of expertise to the project, and the circumstances under which the
work is performed. We anticipate that our fee for this work will be $960,000. In the event,
through our efforts, we have brought extraordinary value to the transaction and you agree that
this is the case, we would expect to negotiate with you an additional fee commensurate with
that value.

Our total fees for the services described herein, plus out-of-pocket expenses, will be paid
entirely out of the sales proceeds received by Fortrend in the above-described transaction, in
accordance with the seller's customary practice. The above mentioned fees are due and
payable at the closing date of the transaction.

We look forward to working with you and your staff during the completion of this important
tax consulting project. If the above and the attached terms are in accordance with your
understanding of our engagement, please sign the enclosed copy and return it in the enclosed
self-addressed, stamped envelope. Please retain the original for your files. If you have any
questions or comments regarding the terms of this engagement letter, please do not hesitate to
call Gary Wilcox at 202-414-4422 or Dennis McErlean at 713-657-8277.

Yours very truly,

GOVERNMENT
EXHIBIT
328

**ENB  008342**

<ADDRESSEE>
Page 2
June 25, 1998

PricewaterhouseCoopers LLP

Enclosure:        Terms of Engagement to Perform Special Tax Consulting Project

PricewaterhouseCoopers LLP

By:  _____        Date:  _____

Accepted:  Fortrend International LLC

By:  _____        Date:  _____

**ENB  008343**

## Terms of Engagement to Provide Tax Consulting Services

### Responsibilities of the Fortrend

Fortrend agrees to identify those individuals within the Company authorized to request services from PricewaterhouseCoopers under the terms of this agreement. Individuals authorized to request services agree to identify the purpose of the consulting services, and identify for whom the services are to be performed (e.g., the corporation, an employee, a director) at the time the services are requested.

A fundamental term of our engagement is that Fortrend will provide us with all information relevant to the consulting services to be performed and to provide us with any assistance as may be required to properly perform the engagement. In addition, Fortrend agrees to bring to our attention any matters that may require further consideration to determine the proper tax treatment of any relevant item. Fortrend also agrees to bring to our attention any changes in the information as originally presented, as soon as such information becomes available.

### Responsibilities of PricewaterhouseCoopers

We will perform our services on the basis of the information you have provided and in accordance with the Internal Revenue Code of 1986 ("the Code"), as amended, and any applicable regulations and associated interpretations existing at the time the consulting services are performed. In addition, consultations regarding state tax matters will be performed in accordance with applicable state tax laws, regulations and associated interpretations as of the date the services are provided. Federal and state tax laws and regulations are subject to change at any time, and such changes may be retroactive in effect and may be applicable to advice given or other services rendered before their effective dates. We do not assume responsibility for tax changes occurring after the date we have completed our services.

Some of the matters on which we may be asked to advise the company (e.g., stock option plans, profit related compensation arrangements, etc.) may have personal tax implications to directors, employees or other persons. However, we have no responsibility to these individuals unless we have been specifically instructed to address these issues, and we agree to do so in writing.

We also agree to discuss those requests for consulting services that we believe qualify as special projects, as defined by the parameters discussed in the "Special Projects" section in the letter transmitting these terms, prior to beginning any such work. However, in the event a request for services is not identified as a special project on the basis of these parameters when we initially commence work pursuant to such request, we agree to notify management at the time professional fees and expenses exceed an amount stipulated in the letter transmitting these terms on any particular service that is subject to the terms of this agreement.

We agree to provide documentation (letters, memoranda, etc.) that will summarize the facts as we understand them, the applicable rule(s) of law, and our analysis and conclusion for each service resulting in a fee in exceeding an amount

stipulated by agreement or as requested by management. However, such requirement may be waived upon mutual agreement of the parties to this agreement. However, we will not ordinarily provide this documentation in response to very routine questions.

The Internal Revenue Code imposes penalties for the substantial understatement of tax liability for certain failures to file proper tax returns. The Code and related regulations provide that a penalty will be imposed for any position resulting in a substantial understatement of the tax liability for which "substantial authority" does not exist and disclosure has not been made. Relative to the services provided under the terms of this agreement, we will discuss with management any tax positions for which substantial authority does not exist, and could therefore subject Fortrend to penalties. We will also discuss with management the related need for disclosure in the Company's tax return to avoid the imposition of any penalty. We will use our judgment in resolving questions where the tax law may be unclear, or where there are conflicts between taxing authorities' interpretations of the law and other supportable positions, and discuss them with you. We are not responsible for any penalties imposed for positions that have been discussed with management that do not have, or are ultimately determined by the Internal Revenue Service ("IRS") not to have, substantial authority where we recommended disclosure and Fortrend elected not to disclose on its tax return.

In the event a position on an issue for which we provide services under the terms of this agreement is determined to represent the preparation of a "substantial portion" of the Company's tax return when included in that return, we may be considered a tax return preparer for purposes of the tax return preparer penalty statutes. Accordingly, in such an event, a preparer penalty could be imposed against us if the position included in the Company's tax return does not have a "realistic possibility" of success (in general, a one in three chance of being sustained) and is not disclosed. We will discuss with management, and will document, any tax positions of which we are aware for which a realistic possibility of success may not exist and could therefore subject PricewaterhouseCoopers to penalties. We will also discuss with management the need for disclosure when we believe that it is required in the Company's tax return to avoid the imposition of any penalty. If Fortrend decides to take a position on its return and chooses not to follow our recommendation to disclose, and the IRS subsequently determines that a realistic possibility of success did not exist, then Fortrend agrees to reimburse PricewaterhouseCoopers for any penalties imposed on PricewaterhouseCoopers, its partners or staff.

PricewaterhouseCoopers is not responsible for any penalties assessed against Fortrend as the result of Fortrend's failure to provide us with all the relevant information relative to the issue under consultation. Furthermore, Fortrend agrees to reimburse PricewaterhouseCoopers for any penalties imposed on PricewaterhouseCoopers, its partners or staff, as the result of such a failure to provide such information.

### Engagement Limitations

**ENB 008344**

We will rely on information supplied by you in performing our services under this agreement and will not independently verify the accuracy of such information.

As you are aware, income tax returns are subject to examination by both the Internal Revenue Service and state taxing authorities. We will be available to assist Fortrend in the event of an audit of any issue on which we have provided tax advice under the terms of this agreement. However, our fees for these additional services are not included in our fee for providing ongoing tax consulting services.

## Disassociation or Termination of Engagement

In the event we discover activities or practices that we deem inappropriate and that would prevent us from completing this project, or should Fortrend fail to provide us with adequate and accurate information or the requisite assistance to allow for the proper completion of this project, PricewaterhouseCoopers reserves the right to resign from the engagement prior to the completion of our work. In such an event, Fortrend agrees to be responsible for all professional fees and expenses incurred by us prior to our resignation. Of course, we will return to Fortrend any payments received in excess of the professional fees and expenses incurred to the date of resignation.

In addition, we also reserve the right to suspend or terminate any work in progress in the event timely payment of our fees is not made in accordance with any agreed upon billing schedule. Moreover, if during the course of our work, billing disputes arise and remain unresolved, we reserve the right to withdraw from further services.

Fortrend reserves the right to terminate the services covered by this agreement at any time by providing PricewaterhouseCoopers with written notice of such intentions. The effective date of such termination will be the date we receive the termination notice. In such event, Fortrend will be responsible for all professional fees and expenses incurred by us prior to the date of termination.

## Liability Limiting Clause

All services will be rendered by and under the supervision of qualified staff in accordance with the terms and conditions set forth in this agreement and its attachments. PricewaterhouseCoopers makes no other representation or warranty regarding either the services to be provided or any deliverables; in particular, and without limitation of the foregoing, any express or implied warranties of fitness for a particular purpose, merchantability, warranties arising by custom or usage in the profession, and warranties arising by operation of law are expressly disclaimed

In no event, unless it has been finally determined that PricewaterhouseCoopers was grossly negligent or acted willfully or fraudulently, shall PricewaterhouseCoopers be liable to Fortrend or any of its officers, directors, employees or shareholders or to any other third party, whether a claim be in tort, contract or otherwise: (a) for any amount in excess of the total professional fee paid by you to us under this agreement; or (b) for any special, consequential, indirect, exemplary, punitive, lost or similar damages, even if we have been apprised of the possibility thereof.

## Indemnification and Consequential Damages Clause

Fortrend agrees to indemnify, defend and hold harmless PricewaterhouseCoopers and its partners or staff (PricewaterhouseCoopers and each such person being an "indemnified party") from and against any and all liabilities, losses, demands, costs and expenses, joint or several, to which such indemnified parties may be subject under any applicable federal or state law arising solely out of the performance of services contemplated by this agreement, including claims by any third parties. Fortrend agrees to reimburse any indemnified party for all reasonable expenses (including reasonable counsel fees and expenses) as they are incurred in connection with the investigation of, preparation for, or defense of, any pending or threatened claim or action or proceeding arising therefrom, whether or not such indemnified party is a party. The provisions of this indemnification clause will not apply if it has been finally determined that PricewaterhouseCoopers was grossly negligent or acted willfully or fraudulently.

## Resolution of Differences

In the unlikely event that differences concerning PricewaterhouseCoopers' services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, PricewaterhouseCoopers and you agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to PricewaterhouseCoopers' services and fees for this engagement.

## Timing of Engagement

The expected completion date of each service provided under this agreement will be mutually agreed upon at the time of requesting the services. In the event the agreed timetable requires that the Company provide us with needed information within a specified period of time, the failure to timely provide this information may require adjustment to our completion date. In addition, in the event unforeseen circumstances occur that impact our ability to meet the final completion date of a particular service, we will contact management immediately to discuss an acceptable revised completion date.

\* \* \* \* \*

The clauses regarding liability limitations, indemnification, and resolution of differences shall survive any termination of this agreement. This agreement will be governed by the laws of the State of New York.

**ENB  008345**

# FORTREND INTERNATIONAL

**GOVERNMENT EXHIBIT**

**330.1**

FORTREND INTERNATIONAL LLC
805 THIRD AVENUE SUITE 2300
NEW YORK NY 10022
TEL · 212.376.8660 · FAX · 212.376.8877

5 BDO 00010747

# FORTREND
## INTERNATIONAL LLC

## FIRM AND TRANSACTIONS

### FIRM SUMMARY

Fortrend International LLC ("Fortrend") is an investment banking firm which structures economic transactions to solve specific corporate tax or accounting problems or to take advantage of related opportunities. Fortrend has acted as principal or assisted as investment banker in numerous transactions, ranging from $10 million to in excess of $500 million in assets, securities, or corporate net operating losses.

### FORTREND'S METHODS

Fortrend's principals have many years of management and financial experience in the implementation of financial and tax structures. Fortrend utilizes the talent of some of the most creative members of major law and accounting firms.

Fortrend addresses specific business or individual tax objectives, while providing for sound economic yields. Fortrend reviews each client's situation and designs an investment package for that client, obtaining tax opinions, accounting opinions, and expert asset appraisals where appropriate.

Fortrend can assist taxpayers to shelter operating income, preserve net operating losses, avoid "phantom income" in real property and equipment leasing situations, and manage the tax aspects of corporate mergers and acquisitions. Fortrend has also developed an investment structure for individuals which increases the after-tax profit of a sale of an asset, by indefinitely deferring the capital gains tax.

### SALE OF APPRECIATED BUSINESSES

The sale of appreciated businesses by corporations or individuals that hold the businesses directly, or in one or more subsidiaries, will often produce substantial tax liabilities due to the gain on the sale. This tax liability often results in conflicting desired transaction structures; the seller wants to sell shares to minimize current taxes while the buyer wants to buy assets to obtain 1) a step-up in tax basis in the assets and 2) the ability to recover the full purchase price (including goodwill) through depreciation or amortization deductions. Fortrend can often arrange for the sale of the business at a price which substantially increases the sellers after-tax profits. Similarly, when a client wishes to purchase assets held by a corporation, Fortrend can often negotiate a lower price.

### GOODWILL CONVERSIONS

Many parent companies have previously acquired shares of subsidiary companies with no step-up in the tax basis of the subsidiary's assets. Unlike an asset acquisition for tax purposes, this common acquisition structure does not allow the parent to recover its full purchase price through amortization or depreciation deductions. This can also produce undesired GAAP results. Fortrend can often arrange for a sale of the shares to a leasing company which would lease/license the assets to the parent company with an option to purchase the assets. This structure allows the parent to retain complete control of the operating business and to obtain significant marginal tax benefits.

### FOREIGN OWNED REAL ESTATE

Foreign corporations owning appreciated U.S. real estate are subject to full U.S. federal and applicable state income tax on gains realized upon sale of the property. However, a sale by the foreign owner of the stock

**S BDO 00010748**