Witness:  Emmanuel (Chris) Kaitson

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


ENBRIDGE ENERGY COMPANY,      )
INC. AND ENBRIDGE MIDCOAST    )
ENERGY, L.P. f/k/a            )
ENBRIDGE MIDCOAST ENERGY,     )
INC. f/k/a MIDCOAST ENERGY    )
RESOURCES, INC.,              )
        Plaintiffs,           )
                              )
vs.                           )          CASE NO. H-06-0657
                              )
UNITED STATES OF AMERICA,     )
        Defendant.            )



ORAL DEPOSITION

EMMANUEL (CHRIS) KAITSON

January 31, 2007



    ORAL DEPOSITION OF EMMANUEL (CHRIS) KAITSON,

produced as a witness at the instance of the Defendant

and duly sworn, was taken in the above-styled and

numbered cause on the 31st day of January, 2007, from

9:37 a.m. to 4:53 p.m., before Laraine L. Toliver,

Certified Shorthand Reporter in and for the State of

Texas, reported by computerized stenotype machine at the

offices of Vinson & Elkins, LLP, 1001 Fannin Street,

Conference Suite 2500B, Houston, Texas 77010, pursuant

to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.


HUNDT REPORTING
214-220-1122

Witness:   Emmanuel (Chris) Kaitson

## Page 2

APPEARANCES

FOR PLAINTIFF:

Karl S. Stern, Esq.
Emily W. Pipkin, Esq.
Vinson & Elkins, LLP
1001 Fannin Street, Suite 2300
Houston, Texas 77002-6760
Telephone: 713.758.3828
Fax:  713.615.5603
E-mail: kstern@velaw.com; epipkin@velaw.com

FOR DEFENDANT:

David B. Coffin, Esq.
United States Department of Justice
Tax Division, Southwestern Civil Trial Section
717 North Harwood, Suite 400
Dallas, Texas 75201
Telephone: 214.880.9749
Fax:  214.880.9741

FOR DEFENDANT:

Kevin G. Croke, Esq.
Internal Revenue Service
160 Spear Street, 9th Floor
San Francisco, California 94105
Telephone: 415.227.5125
Fax:  415.227.5159
E-mail: Kevin.G.Croke@IRSCOUNSEL.TREAS.GOV

ALSO PRESENT:

Jana Jordan, Director, US Tax Services
Enbridge Energy Company, Inc.

## Page 3

INDEX

| | PAGE |
|---|---|
| EMMANUEL (CHRIS) KAITSON | |
| Examination by Mr. Coffin | 12 |
| Signature Page | 222 |
| Court Reporter's Certificate | 223 |

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Black binder entitled "Sale of the Partnership Interests in Kansas Pipeline Company. K-Pipe (Seller) and Midcoast Energy Resources, Inc. (Buyer) November 9, 1999 | 48 |
| 2 | Black binder entitled "Sale of Stock of The Bishop Group, Ltd., Volume 1 and Volume 2" | 108 |
| 10 | Kansas Pipeline Company management discussion, 8/99 | 109 |
| 11 | Data Room Index | 112 |
| 12 | Document Request Lists | 113 |
| 13 | Copy of Midcoast personnel business cards | 115 |
| 14 | 8/10/99 letter, Dianna Wood of Bryan Cave, LLP to R. N. Lanningham, Re: Kansas Pipeline Company | 116 |
| 15 | 8/10/99 letter, Dianna Wood of Bryan Cave, LLP to Bill Bray, Re:  Kansas Pipeline Company | 116 |

## Page 4

EXHIBITS (cont.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 20 | Midcoast Energy Resources, Inc. Board of Directors Meeting, 8/11/99 | 116 |
| 21 | Group of due diligence correspondence | 122 |
| 22 | 8/18/99 letter, Bill Mamas, Chase Securities, to Chip Berthelot | 123 |
| 23 | 8/25/99 letter, W. Keith Buchanan, Bank of America Securities, to Richard A. Robert | 124 |
| 24 | 8/30/99 Redline Redraft of Agreement and Plan of Merger between Midcoast Energy Resources, Inc. and The Bishop Group, Ltd. and Dennis M. Langley | 127 |
| 25 | 8/30/99 letter, Dan C. Tutcher, Midcoast, to Vean Gregg, Chase Securities, Re:  Proposed Purchase of the Stock of the Bishop Group, Ltd. | 129 |
| 26 | 8/30/99 fax, Craig Hoffman, to Fortrend, to Bruce Snyder, Re: E&Y and info on Fortrend | 132 |
| 27 | Handwritten notes form 9/6/99 conversation | 143 |
| 28 | Deal Point Sheet, M.C. Ruby, Attorney/Client Privilege Confidential | 145 |

## Page 5

EXHIBITS (cont.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 30 | Draft - Attorney/Client Privilege, Summary of Essential Modifications to Merger Agreement Presented by Midcoast | 146 |
| 35 | 9/10/99 fax, James P. Pryde, Bryan Cave, LLP, to Tom Palmisano and Craig Hoffman, with attached Mutual Confidentiality Agreement | 147 |
| 37 | 9/12/99 e-mail, Becky Davis, Bryan Cave, LLP, to Thomas J. Palmisano, Subject: Stock Purchase Agreement, with attached redefined draft agreement | 153 |
| 38 | 9/16/99 letter, Bill Mamas, Chase Securities, to Craig Hoffman, Fortrend International | 155 |
| 40 | Midcoast Break-even Alternatives | 155 |
| 41 | 9/20/99 fax, Craig Hoffman to Chris Kaitson, with attached Confidentiality Agreement | 156 |
| 42 | 9/20/99 letter, Craig Hoffman to Richard Robert | 158 |
| 43 | Break-Even Alternatives dated 9/12/99 | 160 |
| 44 | Project Evaluation Data | 162 |
| 50 | Calculations of Make Whole Cost Sharing | 163 |

2 (Pages 2 to 5)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:  Emmanuel (Chris) Kaitson

## Page 6

EXHIBITS (cont.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 51 | Kansas Pipeline Company Disclosure Statement Depreciation Difference, Carryover Basis vs. Purchased Basis | 163 |
| 60 | 9/29/99 letter, Vean J. Gregg III to Chris Kaitson, Re: Confidential Offering Memorandum | 165 |
| 66 | 9/30/99 letter of intent, Jeff Furman of K-Pipe to Dan Tutcher of Midcoast | 167 |
| 70 | Midcoast Energy Resources, Inc. Board of Directors Meeting Minutes, 10/7/99 | 168 |
| 71 | 10/7/99 fax, Ronald Chachere to Tino Monaldo, Re: Stock Purchase Agreement and Schedules thereto | 168 |
| 72 | 10/8/99 e-mail, James Pryde to Ron Chachere, Chris Kaitson, Y. Korb, Tino Monaldo, Subject: Stock Purchase Agreement | 171 |
| 73 | 10/11/99 e-mail, James Pryde to Lori Brewer, Ron Chachere, Chris Kaitson, Internet lwoods@kansaspipeline.com, Therecia Johnson, Tino Monaldo; Subject: Revised Security Agreement | 172 |
| 76 | 10/14/99 fax, Ronald Chachere to Jim Pride, Esq., Subject: Revised sections of Stock Purchase Agreement and note with respect to the Tax Sharing Agreement | 178 |

## Page 7

EXHIBITS (cont.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 78 | 10/21/99 letter, Dennis M. Langley to Jeff Furman | 182 |
| 79 | K-Piper Merger Corporation and Dennis Langley letter agreement | 196 |
| 89 | 10/25/99 e-mail, James Pryde to Ron Chachere, Chip Berthelot, Chris Kaitson, Tino Monaldo, Y. Korb, Subject: Attached "clean copies" of final documents | 183 |
| 95 | 10/28/99 fax, Chris Kaitson to Jim Pryde, with attached Guaranty (Parent-Assumption Agreement); Guaranty (KPC); and Project Participation Agreement | 187 |
| 97 | 10/29/99 e-mail, Chris Kaitson to Chris Kaitson, Cynthia Morelli, et al, Subject: KPC documents | 188 |
| 100 | 7/27/01 e-mail string, Gary B. Wilcox to Thomas Palmisano, and 10/30/99 e-mail, Richard Robert to Chris Kaitson, Cynthia Morelli, Gary B. Wilcox, Graham Taylor, Ron Chachere, Thomas Palmisano, Chip Berthelot, Re: KPC Documents | 189 |
| 101 | 10/30/99 e-mail string, Re: KPC Documents | 193 |
| 103 | 10/30/99 e-mail, Chris Kaitson to James Pride, et al, Subject: KPC; document modifications | 194 |

## Page 8

EXHIBITS (cont.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 105 | 10/31/99 e-mail, Chris Kaitson to Chris Kaitson, Cynthia Morelli, Gary Wilcox, Graham Taylor, Richard Robert, Ron Chachere, Tom Palmisano, Subject: KPC, Document Modifications; and 10/31/99 e-mail, Gary B. Wilcox to Chris Kaitson | 198 |
| 106 | 10/31/99 e-mail, Chris Kaitson to Chris Kaitson, Cynthia Morelli, Gary Wilcox, Graham Taylor, Richard Robert, Ron Chachere, Tom Palmisano, Subject: KPC changes per Sunday 10:30 phone conference | 200 |
| 107 | E-mail string, 10/31/99, Gary B. Wilcox to Chris Kaitson, Subject: KPC Option Agreement changes | 201 |
| 108 | 11/2/99 e-mail, James Pryde to Joyce Essig, Gary Wilcox, Subject:  Comments to documents | 203 |
| 109 | E-mail string, 11/3/99, Chris Kaitson to Chris Kaitson, et al, Subject: PWC issues | 203 |
| 111 | 11/4/99 fax, Chris Kaitson to Jim Pryde, with attached partially executed side letter | 205 |
| 115 | 11/5/99 letter, Price Waterhouse Coopers to Richard Robert, Re: Summary of Services | 206 |
| 121 | E-mail String, 11/5/99, Duane Herbst to Chip Berthelot, Pam Jones, Chris Kaitson, Richard RObert, and craig Hoffman to Graham Taylor, Subject:  Kansas Pipeline Release | 207 |

## Page 9

EXHIBITS (cont.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 150 | 11/19/99 invoice of Ronald L. Chachere | 125 |
| 160 | 12/14/99 draft memorandum of PWC, Subject: Midcoast/K-Pipe Transaction - Tax Analysis | 134 |
| 169 | 4/5/00 fax, Chris Kaitson to Cynthia Morelli, with attached data request | 210 |
| 170 | 4/12/00 e-mail string between Cynthia Morelli and Chris Kaitson, Subject: Who is K-Pipe? | 209 |
| 183 | 11/7/00 e-mail, Richard Robert to James Lee, Janice Warren, Subject:  Butcher Partnership | 217 |
| 184 | E-mail string, Chris Kaitson to Richard Robert, Jeff Weiner, Thomas Palmisano, Subject: Butcher Partnership | 218 |
| 186 | 1/18/01 e-mails, Gary Wilcox to Robert H. Whitten, Thomas Palmisano, PWC, Subject: IRS warning on "Midco" transaction | 214 |

3 (Pages 6 to 9)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:  Emmanuel (Chris) Kaitson

Page 10

1    MR. COFFIN: Usual stipulations,
2  Mr. Stern? Everything -- objections reserved except as
3  to form of the question?
4    MR. STERN: Sounds good.
5    MR. COFFIN: Okay. Just a little
6  housekeeping. Emily, I promised you a disk of our
7  documents, with our generated Bates stamp numbers, and
8  here's the disk; it's a DVD.  And it should contain
9  everything that we've produced to you in the past. The
10  only difference is we Bates stamped them after the fact
11  with our Bates numbers. They already had your existing
12  Bates numbers on them, or whoever else may have produced
13  them; and so I just wanted to give that to you on the
14  record so I don't have to do a transmittal letter to
15  you.
16    MS. PIPKIN: Thank you.
17    MR. STERN: Also, we learned yesterday --
18  we learned when we met with Richard Robert a week or so
19  ago, two weeks ago, that he had a computer that had
20  crashed in his personal possession that he had used at
21  Midcoast and Enbridge, and we've had it restored and we
22  learned yesterday that it was -- we were able to restore
23  it. We have not been able to review anything on it.
24  And I guess the question is: do you want to defer --
25  it's going to take us a week or so to actually

Page 11

1  produce -- if there's anything on there that's relevant
2  and called for in your request, it's going to take us a
3  week.  And we've got Richard scheduled for tomorrow.
4  So, the question is whether you want to defer Richard
5  until you get the documents or you want to go forward
6  with Richard?
7    MR. COFFIN: I'd rather not, Mr. Stern, if
8  you don't mind, since we're here.  You know, we've kind
9  of got these schedules set out.  We don't have any of
10  the documents you're talking about?
11    MR. STERN: If any.
12    MR. COFFIN: If any, okay.
13    MR. STERN: Yeah.
14    MR. COFFIN: If we get them later, I don't
15  suppose you would be open to a supplemental deposition
16  if we needed to? I mean, I'm not crazy about the idea,
17  but if we needed to do a -- you know, depending on the
18  number of documents there are that are new, if we could
19  do a little supplemental deposition after the fact,
20  that's one option. Another option would be perhaps if
21  you would maybe stipulate that they are business records
22  and then I wouldn't have to take the deposition.
23    MR. STERN: You know, to the extent we can
24  short circuit anything by stipulating regarding the
25  admissibility of documents, I'm willing to do that.

Page 12

1    MR. COFFIN: Okay. All right. Well,
2  let's just play it by ear then. I want to go ahead and
3  take the deposition tomorrow since Kevin is here from
4  San Francisco and I'm down here. Let's do that and then
5  we'll just play it by ear after the fact, if that's all
6  right.
7    MR. STERN: Okay. That's fine.
8    MS. PIPKIN: And I did want to note for
9  the record, Mr. Coffin and I did have a conversation
10  about this last week as well, to let him know that --
11    MR. COFFIN: Yes. Yeah, I'm not surprised
12  by this at all.
13    Okay. Are we ready?
14    EMMANUEL (CHRIS) KAITSON,
15  having been first duly sworn, testified as follows:
16    EXAMINATION
17  Q. (BY MR. COFFIN) Please state your name for the
18  record.
19  A. Emmanuel Kaitson. I go by Chris.
20  Q. Okay. And your current address?
21  A. Business or home?
22  Q. Home.
23  A. Home. 5121 Jessamine, J-E-S-S-A-M-I-N-E,
24  Bellaire, Texas 77401.
25  Q. Mr. Kaitson, I'm David Coffin with the

Page 13

1  Department of Justice Tax Division representing the
2  United States in this matter.
3    Have you ever -- you're an attorney; is
4  that correct?
5  A. Yes, sir.
6  Q. Okay. And you're the inhouse general associate
7  counsel, is that fair, associate counsel for Enbridge?
8  A. Correct.
9  Q. Inhouse -- associate general counsel is your
10  current title?
11  A. That's my current title, yes, for Enbridge.
12  Q. All right. And being a lawyer, have you ever
13  given a deposition before or taken --
14  A. One time.
15  Q. You've given a deposition; you've testified in
16  a deposition?
17  A. One time.
18  Q. All right. You understand the rules then, just
19  the ground rules is what I call them?  These are not set
20  in stone, but if you'll try not to interrupt me, I'll
21  try not to interrupt you.
22  A. Okay.
23  Q. If you don't understand a question, just ask me
24  to restate it and I'll try to restate it as best I can.
25  If you need any breaks, just let me know.  We'll take

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel  (Chris) Kaitson

Page 14

1  plenty of breaks.  Mr. Stern may raise some objections,
2  but I'd ask you to respond to my question unless he asks
3  you not to do so.
4          Do you understand those rules?
5      A.  Yes.
6      Q.  Okay.  Are you on any medical or medication
7  right now that may inhibit your ability to understand
8  these questions that I'm going to ask you today?
9      A.  No.
10     Q.  Okay.  No medical conditions or anything like
11 that?
12     A.  No.
13     Q.  Okay.  And you're currently employed with
14 Enbridge; is that right?
15     A.  That's correct.
16     Q.  And the official name of the company that you
17 are employed by is Enbridge (U.S.) Inc.?
18     A.  That's one of the subsidiaries.  The actual
19 employer is Enbridge Employee Services, Inc.  That's who
20 our paycheck comes from.
21     Q.  Okay.  And that's --
22     A.  It's a subsidiary or affiliated company with
23 the companies on my business card.
24     Q.  Who is the parent of those companies?
25     A.  The parent company would be Enbridge, Inc.

Page 15

1      Q.  Okay.  And your business card also shows that
2  Enbridge Energy Company, Inc.  Is that another
3  subsidiary of Enbridge, Inc.?
4      A.  Correct.
5      Q.  Okay.  How long have you been employed by this
6  company?
7      A.  Enbridge acquired Midcoast in 1999 and I have
8  been employed with -- I'm sorry, in 2001, excuse me, and
9  I have been employed with them since then.
10     Q.  Okay.  And your previous employer was
11 Midcoast -- what's the full name?
12     A.  Midcoast Energy Resources, Inc.
13     Q.  So you were with Midcoast Energy Resources,
14 Inc. in 2001 and prior thereto?
15     A.  Correct.
16     Q.  Okay.  When did you begin your employment with
17 Midcoast Energy Resources, Inc.?
18     A.  1997.  Halloween, 1997.
19     Q.  What are your current responsibilities at
20 Enbridge?
21     A.  Oh, as associate general counsel, I report -- I
22 have dual reporting requirements.  I report to the
23 general counsel up in Canada, which is the general
24 counsel of Enbridge, Inc., and I also report to the
25 president and general manager, both here in Houston, and

Page 16

1  their responsibilities include all the U.S. assets.  So,
2  basically, I am the attorney that -- with my staff that
3  are responsible for the U.S. assets.
4      Q.  Okay.  Who is the president and GM here in
5  Houston?
6      A.  The president is -- of the partnership Enbridge
7  Energy Partners, that company's general partner is Terry
8  McGill.  The general manager of the U.S. assets is Steve
9  Letwin.
10     Q.  Steve?
11     A.  Letwin, L-E-T-W-I-N.
12     Q.  Is there a -- can you go over the corporate
13 umbrella of Enbridge, Inc.?  Is that something you do
14 quickly without looking at a chart or anything?
15     A.  I can try.
16     Q.  Okay.
17     A.  There are four publicly-traded companies that
18 are part of what I would say is the Enbridge family.
19 Enbridge, Inc. and another company up in Canada, and
20 then there are two publicly-traded companies here in the
21 United States: Enbridge Energy Partners, LP, and
22 Enbridge Energy Management, LLC.  And those are the two
23 entities that I do the majority of my work for.
24     Q.  The latter two?
25     A.  Correct.  Those are both publicly-traded

Page 17

1  companies.
2      Q.  Okay.
3      A.  So with those companies, then I also have
4  responsibility for the various different filings
5  associated with them.
6      Q.  Okay.  And at the -- now, who is the parent or
7  who owns Enbridge Energy Partners, LP?
8      A.  It's a publicly-traded company.
9      Q.  Publicly-traded, okay.
10     A.  Right.
11     Q.  Is it -- is a large number of its stock owned
12 by -- shares owned by Enbridge, Inc.?
13     A.  I believe it's about 17 percent.
14     Q.  Okay.  And then the Enbridge Energy Management,
15 did you say LLC?
16     A.  Correct, yes.
17     Q.  That's publicly-traded as well?
18     A.  Correct.
19     Q.  And the general counsel, you mentioned earlier,
20 he actually works for --
21     A.  He's with Enbridge, Inc. up in Canada and his
22 responsibilities are for all of Enbridge assets
23 worldwide.
24     Q.  Okay.  So you report to him under Enbridge,
25 Inc. by virtue of their stock ownership that they own?

5  (Pages 14 to 17)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 18

1  Enbridge, Inc. owns the Energy Partners and Energy
2  Management?
3     A.  Correct.
4     Q.  Okay.
5     A.  And, actually, the employer, Enbridge Employees
6  Services, Inc., the one that issues our paycheck, that
7  is a subsidiary of Enbridge, Inc. --
8     Q.  Okay.
9     A.  -- indirectly, a couple layers down.
10    Q.  Boy, talk about a stop down.
11         Okay.  So, when you say you -- did you say
12  you handled the assets; is that what you said?
13    A.  I'm responsible for the legal compliance --
14    Q.  Okay.
15    A.  -- and providing legal services for the U.S.
16  assets.
17    Q.  Okay.  Give me your educational history,
18  beginning with where you graduated from high school.
19    A.  High school, Crawfordsville High School in
20  Crawfordsville, Indiana; college, Indiana University,
21  Bloomington, Indiana; law school, South Texas College of
22  Law here in Houston, Texas.
23    Q.  What did you major in in your undergrad
24  studies?
25    A.  Forensics.

Page 19

1     Q.  Did you work in between the time you graduated
2  from Indiana University --
3     A.  Yes.
4     Q.  -- and before you went to law school?
5     A.  Yes.
6     Q.  Okay.  Tell me where you have been employed
7  then since graduating from college, undergrad.
8     A.  I was a prison guard in Indiana.  After that, I
9  moved to Houston and worked for Brown & Root.
10    Q.  What is that?
11    A.  Brown & Root is a construction company
12  headquartered here in Houston.  They do work all over
13  the world.  And following that, I went to work for
14  Bechtel, which is also a construction company that does
15  international construction work.
16    Q.  What kind of duties did you have with those
17  construction companies?
18    A.  I was in the contract administration department
19  or procurement department, I believe it's actually
20  called, procurement department responsible for working
21  on specific projects with contracts and purchasing and
22  some scheduling, construction related.
23    Q.  All right.  And then after Bechtel?
24    A.  After Bechtel, I went to work at a law firm
25  here in Houston, Texas, Moncure, Harris & Eidman.

Page 20

1     Q.  Can you spell that for me, please?
2     A.  M-O-N-C-U-R-E; Harris, H-A-R-R-I-S, and Eidman,
3  E-I-D-M-A-N.
4     Q.  And I suppose when you were working with
5  Bechtel you were going to law school; is that right?
6     A.  Correct, yes.
7     Q.  At South Texas, you said?
8     A.  Yes.
9     Q.  What year did you graduate from law school?
10    A.  '81.  1981.
11    Q.  Okay.  And did you go to work for Moncure
12  Harris in 1981?
13    A.  Correct, yes, I did.
14    Q.  All right.  And how long were you there?
15    A.  I was there about three years.
16    Q.  Okay.  What kind of -- what areas of law did
17  you practice in?
18    A.  I was primarily doing entry level associate
19  work, whatever one of the partners required,
20  researching, writing memos, reviewing documents, taking
21  notes at meetings.
22    Q.  Was that a litigation firm or a -- or an
23  employment firm?
24    A.  It was a general firm that each of the partners
25  had a different area of specialization.  Moncure's

Page 21

1  specialization was real estate; Harris was a litigator;
2  and Eidman was trust, wills, that type of work.
3     Q.  Did you do -- did your work -- strike that.
4         Did you primarily do work for all three of
5  them or one in particular?
6     A.  I primarily worked for all three of them.
7     Q.  So you worked for them for three years or
8  approximately three years and then where did you go?
9     A.  I went into business for myself, opened my own
10  practice, and did a general practice, primarily real
11  estate construction, but did general work as well.  And
12  in about 1988 I joined Enron.
13    Q.  How long did you work for Enron?
14    A.  Till 1995.
15    Q.  And were you inhouse counsel for Enron?
16    A.  Correct.  I was what they called an operations
17  attorney, which was -- my responsibilities included
18  operations of the pipeline, the right-of-ways associated
19  with it, and incidents, construction, injuries on the
20  pipeline, lawsuits related to the pipeline construction.
21    Q.  Okay.  And then in 1995 where did you go?
22    A.  I left at that time to go to work for Republic
23  Gas Partners, which was a new start-up company that
24  owned Mid Louisiana Gas Company and a couple other small
25  subsidiary companies.

6 (Pages 18 to 21)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:  Emmanuel (Chris) Kaitson

Page 22

1    Q.  Here in Houston as well?
2    A.  Correct.
3    Q.  Okay.  How long were you with Republic Gas?
4    A.  I was with them until 1997, when Midcoast
5  purchased that entity.  And that's when I became
6  employed by Midcoast Energy.
7    Q.  Okay.  What position did you take with Midcoast
8  in 1997?
9    A.  I was the only attorney.  My title was general
10  counsel.
11    Q.  Midcoast did not have one on staff at the time?
12    A.  Correct.
13    Q.  And, so, your duties ranged in what?
14    A.  It wasn't the traditional general counsel role
15  that I identify with today.  At that time, the company
16  had gone through many years of not having an inhouse
17  attorney.  They had been accustomed to in many cases
18  handling matters at different department levels.  The
19  COO, for example, would handle some contracts.  The CFO
20  would handle all work related to that department.  My
21  main responsibilities were really still operating the
22  pipelines themselves, and I was starting to learn some
23  of the corporate responsibilities, part of a publicly-
24  traded company.
25    Q.  Midcoast was publicly-traded at the time?

Page 23

1    A.  That's correct.
2    Q.  Who did you report to?
3    A.  I reported -- at Midcoast Energy, I reported to
4  the chief operating officer, Chip Berthelot,
5  B-E-R-T-H-E-L-O-T.
6    Q.  And did you report to Mr. Berthelot up until
7  1991 -- or, I'm sorry, 2001?
8    A.  Correct.
9    Q.  And that's when your responsibilities to report
10  to the GM and the president were invoked or --
11    A.  At that time when Enbridge acquired Midcoast,
12  the reporting responsibilities were to the president
13  here locally and to the general counsel in Canada.  Only
14  recently has Enbridge reorganized somewhat and changed a
15  few titles, so that the top position here in the United
16  States is called general manager.
17    Q.  Okay.
18    A.  But, at that time, the top position here in the
19  United States was the president of the partnership
20  Enbridge Energy Partners, LP.
21    Q.  So who was it you were reporting to after
22  Enbridge took over in 2001?
23    A.  I reported to Chip Berthelot, who was then part
24  of Enbridge, and I also reported to Darby Wade in
25  Canada, who was the general counsel of Enbridge, Inc.

Page 24

1    Q.  Is Mr. Berthelot still employed by Enbridge?
2    A.  No, he's not.
3    Q.  When did he leave?
4    A.  A year or two later.  I don't know exactly.
5    Q.  So you have your law license that you obtained
6  in 1981; is that right?
7    A.  Yes.
8    Q.  Do you have any other certifications or
9  licenses or accreditations?
10    A.  Not law related.
11    Q.  Do you have some other in construction or --
12    A.  No.  I mean, I scuba dive, I'm a pilot.  I
13  mean, other non-legally-related-type certifications.
14        MR. CROKE:  More fun.
15    A.  Fun stuff.
16    Q.  (BY MR. COFFIN) Mr. Kaitson, have you reviewed
17  anything to prepare for this deposition?
18    A.  Yes, I have.
19    Q.  What did you look at?
20    A.  I looked through my file, met with counsel,
21  reviewed some documents at that time.
22    Q.  How much time did you spend reviewing
23  documents?
24    A.  Four or five hours.
25    Q.  Are you going to appear at trial of this matter

Page 25

1  to testify on behalf of Enbridge?
2    A.  I don't know the answer to that.  I'm sorry.
3    Q.  So you were employed by Midcoast in 19 --
4  during 1999, correct?
5    A.  Correct.
6    Q.  And what were your responsibilities at that
7  time?
8    A.  My title was general counsel, so I -- I had
9  some general counsel responsibilities, which included
10  operations of the pipeline.  Some of the filings the
11  company made I was involved in reviewing.  We relied on
12  outside counsel to a significant degree for securities
13  matters and some corporate matters, because I didn't
14  have significant experience in those two areas.
15        Our employee benefits during the time
16  period were provided by a third party, so I was not
17  involved in employee benefit-type services.
18    Q.  Did you manage the litigation?
19    A.  Correct, yes, I did.
20    Q.  Okay.  I assume you had some responsibilities
21  related to acquisitions?
22    A.  Yes.  I was involved in I, believe, every one
23  of the acquisitions, to some degree or the other; but
24  being the only attorney, I also had primary
25  responsibilities for asset operations.

7 (Pages 22 to 25)

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

---

Page 26

1    Q.  In 1999, you were the only attorney still?
2    A.  Correct.
3    Q.  Can you give me a general description of what
4  Midcoast did back in 1999 so far as the business?
5    A.  Midcoast is a pipeline company.  Their primary
6  area of concentration was construction and operation of
7  pipelines, to a very small degree purchase and sale
8  of -- of natural gas, but it was only a gas -- only gas
9  pipelines.  We had plants that processed the gas and did
10  some treating of the gas, but it was a transportation
11  and transportation services type company.
12    Q.  Who were Midcoast's competitors during that
13  time period, do you recall?
14    A.  Oh, we were a small company, so I -- I would
15  say our competitors would have been a small company.
16  The only one that comes to mind immediately is, oh, a
17  company called AlaTenn, which was another interstate
18  pipeline company of about the same size as Midcoast.
19    Q.  Spell that for me, please.
20    A.  A-L-A-T-E-N-N.  Actually, it's AlaTenn Pipeline
21  Company I believe at the time.
22         Let me back up.  I'm sorry, you asked
23  Midcoast, didn't you?
24    Q.  Yes, I did.
25    A.  Okay.  AlaTenn was acquired by Midcoast.

---

Page 27

1    Q.  Uh-huh.
2    A.  Who would be considered Midcoast's competition
3  or Midcoast's -- I wouldn't know.  I'm sorry.
4    Q.  Okay.  So your response to the -- AlaTenn was a
5  company that was acquired by Midcoast?
6    A.  Correct.
7    Q.  Okay.
8    A.  We viewed that as a competitor until the
9  acquisition.
10    Q.  I see.
11    A.  Same as Midcoast was viewed -- was a competitor
12  with Mid Louisiana Gas Company until it acquired that
13  company.  So the three companies were somewhat all the
14  same size; then Midcoast acquired both of them.  So, as
15  I said, at one time they were competitors, but then they
16  were consolidated.
17    Q.  When were those companies acquired?
18    A.  In 1997.
19    Q.  Were those -- do you recall if those were asset
20  purchases or stock purchases?
21    A.  AlaTenn I do not recall.  Mid -- Mid-La was a
22  merger, so it would be more of a stock acquisition.
23    Q.  Now, was the -- has Midcoast been -- or let me
24  back up.
25         Was the company in an acquisition-type

---

Page 28

1  mode back in '99 or prior to that?
2    A.  Yes.
3    Q.  Okay.  And what were the goals of the company?
4  What did they seek to -- to accomplish with
5  acquisitions?
6    A.  The plan was to grow the company either to
7  become a significant self-staining entity or to grow the
8  company and then the principals to sell the company to
9  their benefit.
10    Q.  Okay.  Who were the principals at the time?
11    A.  Three individuals: Dan Tutcher; Steve Herbst,
12  H-E-R-B-S-T; and Kenneth Holmes.
13    Q.  Mr. Tutcher was the CEO at the time?
14    A.  Correct.
15    Q.  Okay.
16    A.  It was a publicly-traded company, but those
17  three were the founders and the principals of the
18  company.
19    Q.  They had the -- the significant share of stock
20  in the company, I would assume?
21    A.  Yes.
22    Q.  Okay.  And Mr. Herbst, was he employed by the
23  company?  Steve.
24    A.  I don't believe he was an -- I'm not sure.
25    Q.  Okay.

---

Page 29

1    A.  I recall that he was an officer of the company,
2  which makes me think that he was an employee, but I
3  don't know that he in fact was an employee.
4    Q.  Okay.
5    A.  He was independently wealthy and I'm not sure
6  he needed the employee status as much as just involved
7  in the company.
8    Q.  Okay.  How about Mr. Holmes?
9    A.  Mr. Holmes was an employee at one time.  He had
10  already retired when I joined company in '97, but he
11  still owned significant stock and was one of the
12  founders.
13    Q.  So you began working with Midcoast in 1997; is
14  that correct?
15    A.  Correct.
16    Q.  Okay.  On these acquisitions of -- you said
17  Mid-La and that's short for --
18    A.  Mid Louisiana Gas Company.
19    Q.  Okay.  And AlaTenn?
20    A.  AlaTenn.
21    Q.  In those accusations, what were your --
22  what did you do for the company?
23    A.  Well, the first acquisition was prior to my
24  joining the company.  The AlaTenn acquisition was in
25  early 1997 --

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel  (Chris)  Kaitson

Page 30

1      Q.  Okay.
2      A.  -- and I was not part of the company then.  The
3  Mid-La acquisition, I was the acquired company; so I
4  actually joined Midcoast as part of that acquisition in
5  late 1997.
6      Q.  Okay.  Did Midcoast acquire any other companies
7  from 1997 to 1999, that you recall?
8      A.  Yes, there were -- I don't recall exactly how
9  many, but there were other acquisitions during that time
10  period.
11      Q.  Okay.  And, generally, were your duties the
12  same with regard to each acquisition that occurred?
13      A.  No, they would vary, depending on the size of
14  the transaction would somewhat impact what my
15  responsibilities were.  On the smaller transactions, I
16  would be more involved in perhaps all stages of the
17  process; whereas, larger transactions that would take
18  longer time, I knew I still had my day-to-day
19  operational responsibilities, so relied more on outside
20  counsel.
21      Q.  And when you engaged outside counsel, can you
22  tell me briefly what you would engage them to do?
23      A.  Brought them in to really lead the acquisition,
24  reporting to me, obviously, and to the rest of the
25  management team, but relied on them heavily.  I mean, it

Page 31

1  would be a longer transaction.
2      Q.  Okay.  On the smaller acquisitions you
3  mentioned -- do you recall how many acquisitions
4  occurred in between 1997 and 1999?
5      A.  I don't.
6      Q.  Okay.  Was it five or more?
7      A.  I would say half a dozen, perhaps more.
8      Q.  Okay.  And on the smaller ones that you were
9  more involved, could you -- could you tell me, not being
10  an inhouse, never having any inhouse experience or any
11  transactional attorney, what generally were your duties
12  on a more specific basis?
13      A.  Most of those were small transactions.  We
14  would be buying a few miles of pipe as opposed to
15  hundreds of miles of pipe.  Part of the due diligence
16  requirement would be actually going to the seller's
17  office and reviewing the documents.  On asset purchases,
18  we would have to go through and confirm that the assets
19  we were acquiring were in fact assets that they owned
20  and acquired.  We'd have to identify what lawsuits or
21  threats or deficiencies existed with the assets,
22  letters, notifications from state agencies, anything
23  that was problematic as far as our acquisition would be
24  concerned.
25      Q.  Now, let me stop you right there.  Now, if it's

Page 32

1  an asset purchase, are you still concerned with lawsuits
2  that might be -- that could possibly be out there?
3      A.  We would be.  Some of those acquisitions we
4  would inherit the lawsuit; some of those acquisitions we
5  would not inherit the lawsuit.  It really depended on
6  the type of lawsuit that was involved.  For example, if
7  the lawsuit involved the pipelines at the wrong level.
8  The pipeline was required to be, you know, pursuant to
9  the contract, 36 inches or lower, and the pipeline is at
10  32 inches, well, obviously the outcome of that lawsuit
11  would affect the assets we were buying.  So, therefore,
12  we would want that lawsuit -- would predict what the
13  risk is or probability and we would want to manage that
14  lawsuit, knowing that the final outcome of that lawsuit
15  could affect our assets.
16          Other lawsuits, there were, I don't know,
17  employee discrimination case or slip-and-fall case or
18  some type of damage case where you damaged someone's
19  pole or their fence line.  We would not be concerned
20  about those types of lawsuits because they did not
21  impact the assets or the operation of the assets going
22  forward.
23      Q.  Okay.  Now, with those type, the second area of
24  suits you described, employee discrimination, slip and
25  fall, I guess general tort cases, damage cases, did

Page 33

1  those necessarily follow the assets by operation of law
2  or how does that work?
3      A.  No, they do not.  In an asset transaction, they
4  do not follow the assets.
5      Q.  So that's why you didn't -- you wouldn't have
6  to calculate the risks of those being out there and work
7  those into the purchase price, I would assume?
8      A.  Correct.
9      Q.  And we're talking about acquisitions versus
10  stock, stock purchases, right?
11      A.  Correct.
12      Q.  All right.  And then -- okay.  You were
13  continuing on with the due diligence.  You reviewed
14  documents, looked at the possibility of litigation,
15  lawsuits and threats and things like that.  What else
16  would you do?
17      A.  I'd actually be involved in the acquisition
18  document, the purchase sale agreement, whether it was an
19  asset purchase sale agreement or whatever title it may
20  have.  The actual conveyance documents themselves, which
21  would be assignments and bill of sales and those types
22  of documents, and the schedules attached to them to make
23  sure they correctly identify exactly what we're
24  purchasing, identify what liability we're accepting as
25  part of that.  They're really -- we call them disclosure

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 34

1  schedules, so we know exactly what we're buying.
2      Q.   And when you say you were involved in those
3  smaller deals, you were actually drafting those
4  personally yourself?
5      A.   We would be drafting them or in many cases the
6  seller is the one that typically drafts those.  When
7  someone is selling assets, typically they put together a
8  data room and a pro forma or a proposed conveyance
9  document, an asset sale agreement, and we would go in
10 and actually have to review those and comment on those.
11     Q.   Okay.
12     A.   Usually the sellers set the ground rules.
13     Q.   Okay.  And forgive me if -- if -- because I
14 don't remember.  You said on the smaller transactions
15 you were more involved and the larger transactions you
16 would hire outside counsel to assist you or take the
17 lead in these larger deals?
18     A.   Correct, yes.
19     Q.   And so tell me, what would outside counsel do
20 in these larger deals?
21     A.   Outside counsel would take the lead on the
22 purchase sale agreement and the conveyance documents,
23 and I would be more involved in the due diligence
24 portion of it, which would be reviewing the documents,
25 the contracts we were acquiring, reviewing the

Page 35

1  right-of-way records, reviewing the litigation.  I would
2  take a more active role in the -- in the review process
3  to help us analyze the acquisition and outside counsel
4  would take a much more active role, leadership role in
5  the more complicated documents.
6      Q.   Now, you mentioned the data room, and I've seen
7  documents in this case showing that, with regard to the
8  sale of the Kansas Pipeline assets, that they had a data
9  room, at least an index that I saw.  And periodically
10 you or somebody else would make a request for documents
11 from there and then the seller would transmit them to
12 you?
13     A.   Correct.
14     Q.   Is it typical to have a document -- a document
15 room and have an index like that, that the seller or the
16 buyer, the buyer will look at and evaluate what
17 documents it wants?
18     A.   Depends on the size of the transaction.
19 Smaller transactions you walk into a room and there
20 might be two folders, you know, six inches each, and
21 that's everything that was involved with it.  Larger
22 transactions that involve more documents, indexes would
23 be prepared of those documents so you knew what
24 categories and what specific documents were included in
25 that transaction.

Page 36

1      Q.   Okay.  How many of the larger acquisitions were
2  you involved in from '97 to '99?
3      A.   I don't recall the number, I'm sorry.  I did
4  not look at that in preparation, so...
5      Q.   Is that what we said earlier, it was half a
6  dozen or so or was that total?
7      A.   Half a dozen total, I would say.
8      Q.   And of those half a dozen, do you recall -- and
9  I'm sorry if I've already asked this question -- how
10 many were asset purchase and how many would have been
11 stock purchases?  Was there a --
12     A.   The majority of those, if not all of them,
13 would have been asset purchases.  I was much more
14 inclined to promote asset acquisitions and not stock
15 acquisitions.
16     Q.   And why is that?
17     A.   Unknown liability that goes with the stock
18 purchase.  Any time you purchase the stock of a company,
19 you don't know what they did in the past and didn't do
20 and you don't know what acquisitions they had or if they
21 drilled a well somewhere that was leaking or any number
22 of unknown liabilities that come back to haunt you
23 later.
24     Q.   Any other reasons why you prefer an asset
25 purchase over a stock purchase?

Page 37

1      A.   I know exactly what I'm getting on an asset
2  purchase, because if it's not on the schedule and it's
3  not in the disclosure list and it's not an attachment to
4  a document, I'm not getting it.
5      Q.   Now, was there any discussion within Midcoast
6  at the time that there is a or was there a perception at
7  all that it was better, more tax benefits with an asset
8  purchase versus a stock purchase?
9      A.   I kept totally away from tax.
10     Q.   Okay.
11     A.   I didn't have any tax background, so...
12     Q.   Who was primarily making tax decisions from '97
13 to '99?
14     A.   Richard Robert was our chief financial officer,
15 in connection with whatever consultants he would use.  I
16 know Price Waterhouse was our auditor at the time.
17     Q.   So, when you were beginning working for
18 Midcoast, was Price Waterhouse already on board as a
19 consultant or an auditor at the time?
20     A.   Yes.
21     Q.   Okay.
22     A.   They were the auditors for Midcoast at the
23 time.
24     Q.   Were they doing -- so you said they were
25 doing -- when you say auditor, you mean financial

10  (Pages 34 to 37)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 38

1  statement preparation type things?
2      A.  Correct, in connection with publicly-filed
3  documents and all the annual reviews and things,
4  whatever other consulting services they provided.
5      Q.  Were they doing the tax work as well?
6      A.  I don't know.  I -- I think so, but I don't
7  know.
8      Q.  Did you deal with any of the PWC people?  I'll
9  say PWC for short, if that's all right.
10     A.  Very rarely.  On occasions I would -- I would
11 speak with an individual with some specific matter.
12 Typically, it would involve corporate structure and who
13 owned what, or if we were acquiring an asset, which one
14 of our subsidiary companies would be the most
15 appropriate fit for that acquisition.
16         When you acquire assets, if you have 15
17 different companies, you still have to decide if you're
18 going to form a new company to acquire those assets or
19 if you're going to put those assets into one of your
20 existing companies.
21     Q.  Okay.  So was PWC consulted then on a -- when
22 you were looking at acquisitions?
23     A.  Once again, Richard Robert would have been the
24 one that made the decision if he would consult them or
25 not.

Page 39

1      Q.  Okay.  Do you recall if they were ever
2  consulted?  It sounded like you were describing them
3  just a minute ago when you said trying to determine,
4  what you did you say, corporate form?
5      A.  Yeah, I know that I had at least two
6  transactions that I had interaction with the Price
7  Waterhouse folks on where the assets should go, as far
8  as which one of our entities should -- should own those.
9  The other transactions, I don't recall discussing
10 anything with them, and any discussions along those
11 lines would have been, you know, between Richard Robert
12 and them.
13     Q.  Now, when you were conducting due diligence on
14 some of the larger deals, who else would be involved in
15 the -- in the company?
16     A.  Oh, my.  We would have operations folks there
17 to look at the pipelines themselves, the integrity
18 records of the pipeline, inspection reports dealing with
19 the pipelines, the various filings that the pipelines
20 would make.  We would have regulatory folks there,
21 either state regulatory folks or FERC regulatory folks,
22 depending on who regulated the pipeline.  We would have
23 contract administration people present to review the
24 contracts and summarize them.  We would have accounting
25 and finance people to reconcile that the contract rate

Page 40

1  or the rates quoted in the contract matched with the
2  income so that we knew we were getting contracts that --
3  that supported the income projections.
4      Q.  And this was -- this was -- those things were
5  typical of these larger deals that Midcoast was involved
6  in?
7      A.  Well, they were typical of smaller ones as
8  well.  Yes, all transactions require those group of
9  folks to some degree or another.
10     Q.  Yes.
11     A.  Smaller transactions, many times they would
12 provide us with a folder that we could actually have the
13 documents and disperse them among the company and not
14 have to go to their offices.  Larger transactions, they
15 didn't want to copy that large a quantity, so we were at
16 their offices reviewing information.
17     Q.  I would assume you would categorize the
18 purchase of the Kansas Pipeline assets as a large
19 acquisition?
20     A.  Yes.
21     Q.  As far as the assets that Midcoast was
22 acquiring in any of these large acquisitions, what --
23 how would you typically verify a certain asset existed,
24 a certain pipeline existed?  Was there -- were there
25 documents or --

Page 41

1      A.  The existence of a pipeline, you would identify
2  it through the gas flow.  You would have statements that
3  show gas coming into a pipeline at what we call receipt
4  points; you would show the gas that goes out the
5  pipeline at what we call delivery points.  Our
6  operations folks would actually go out and visibly drive
7  the route of the pipelines or we might fly the pipelines
8  to confirm that you don't see dead grass over a
9  pipeline, which indicates there's a leak, those types of
10 matters, to see the condition of the ground, if you
11 will, at these various assets.  If you go to a station,
12 a compressor station or a treating plant and the dirt is
13 all black, there's probably some problem with that.
14     Q.  Uh-huh.
15     A.  So, those types of matters we would actually
16 confirm with paper, as well as the field review.  And
17 then my responsibility would be to confirm that the
18 actual title was owned by the seller.  A common
19 discussion point was the seller would not want to
20 represent they owned the assets.  They just -- I'll
21 convey you the assets, period.  We always wanted a
22 statement saying that you will convey us all of the
23 assets and that you have title to them.
24         So, that's part of the due diligence, to
25 confirm that the -- they acquired the assets, so I would

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 42

1  need to look at the documents.  On an acquisition, we
2  would typically have someone review the courthouse
3  records to make sure those documents were filed at the
4  courthouse, to show that they in fact were the owners
5  and that they had not sold them to someone else prior to
6  us acquiring them.
7      Q.  Okay.  And then you mentioned earlier inherited
8  liabilities.  How would you perform due diligence on
9  inherited liabilities?  You know, how would you assess,
10  I guess, the risk of liabilities that might be inherited
11  from an asset purchase?
12      A.  Well, asset purchase we didn't worry about the
13  liabilities because they were all on a schedule.
14      Q.  Okay.
15      A.  We knew exactly what liability we were taking,
16  what lawsuits existed.  And you -- like I said, I
17  believe I said earlier, if it's not on the schedule, we
18  are not acquiring it, and that would limit the
19  liabilities as well.
20         Now, the only exception might be a
21  contract, for example.  If we had a contracted assigned
22  to us, sometimes we would have the liabilities
23  associated with that contract, sometimes we would not.
24  That would all be part of the negotiations.  We
25  obviously would prefer that we pick the transaction

Page 43

1  closing date and all liability associated with the
2  contract prior to that belonged to the seller and any
3  liability subsequent to that went with the buyer.  That
4  was our preference, but it was always a negotiating
5  point as to what the actual timeline was.  Sellers
6  prefer you take all liability and they walk away
7  scot-free; we preferred they kept the liability up until
8  the closing date.
9      Q.  In a stock purchase, where you did inherit
10  liabilities, how did you go out and assess the risks
11  associated with those?
12      A.  We would -- we would look through the minute
13  books to identify what acquisitions were listed in the
14  minute books, ask for supporting documents for those
15  transactions.  We would try to identify any other
16  documents, any companies that were merged into any
17  entities that we were acquiring, any assets that they
18  acquired, anything that was assigned to them.  It's
19  virtually impossible to get it all done on stock
20  transactions.
21      Q.  And then income projections, what kind of
22  things did you do as far as due diligence to verify
23  those?
24      A.  I did zero.  That was all up to the financial
25  folks to do the income projections and what the contract

Page 44

1  income was, match it up with the balance sheets or the
2  financial statements.
3      Q.  That was Mr. Robert?
4      A.  Correct, and his folks.
5      Q.  Okay.  And the same thing with expense
6  projections, then, I assume, did you have any --
7      A.  Correct.  I would do a small degree of expense
8  projections related to the legal matters.  If we were
9  inheriting a lawsuit or acquiring assets with a lawsuit,
10  I would give a projection on what I assumed, estimated
11  would be the costs going forward of that.
12      Q.  Uh-huh.
13      A.  If there were other liabilities out there, I
14  might put a number on it or a risk factor, probably of
15  success of a lawsuit, to try and give us an idea of how
16  much we might pay out if we lost this lawsuit.
17      Q.  Was there any other due diligence that may have
18  occurred that we haven't covered?
19      A.  Nothing comes to mind.  There may be, but
20  nothing comes to mind right now.
21      Q.  Just whatever, whatever the transaction posed,
22  I guess you would analyze it?
23      A.  Yeah.  Our job, our job was to find out what
24  we're buying, what we're going to own at the end of the
25  day, what liability goes with those, with those

Page 45

1  acquisitions.
2      Q.  Was there ever any -- any reason you needed to
3  look into who was selling the company or the assets to
4  you, the management of the company?
5      A.  Not that I recall.
6      Q.  Okay.  So, just generally speaking -- okay.
7  Well, how about -- how about owners of the company, was
8  there any reason to look into the owners of the company?
9      A.  We would typically have companies that we would
10  prefer to do business with, companies that we would keep
11  away from.  From that standpoint, some companies were
12  very forthcoming with information, they would freely and
13  openly give you all documents.  There were no ghosts in
14  the closet or nothing to be concerned about.  And there
15  were other folks that had reputations of holding back.
16  If you don't ask for it, I'm not going to give it to
17  you.
18         So, we had folks that we preferred to do
19  business with and others that we were more cautious of.
20  So I guess we did have an opinion or maybe some concerns
21  at different times with different companies we
22  interacted with.
23      Q.  Okay.  So, once the due diligence step was
24  completed, what was generally the next step in these
25  acquisitions?

12 (Pages 42 to 45)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:  Emmanuel  (Chris)  Kaitson

Page 46

1    A.  You're usually going down two paths at once.
2  You're going down a due diligence path and you're also
3  going down a path of negotiating the transaction
4  documents, the acquisition documents.  Typically you go
5  down both those processes at the same time.
6         At some stage during the process, the
7  seller typically wants an offer.  They want to know what
8  we're willing to pay, and they typically would want a
9  marked-up document, so that they knew what types of
10  terms and conditions would be contained in the
11  documents.  Are we willing to accept liability, yes or
12  no.  Is the closing date the date where seller keeps
13  previous liability, we take liability.  That's the
14  purpose of the -- marking up the documents, so that
15  we knew and the seller knew and they could analyze the
16  different bids they received.
17    Q.  Okay.  And then a letter of intent, can you
18  just generally describe what that is?
19    A.  Letter of intent is not a whole lot different
20  than simply submitting a bid to someone.  A letter of
21  intent can be binding, where you're going to -- you
22  know, it is a summary of what the actual final deal will
23  look like and all the terms and conditions in it you're
24  bound by.  It may be a bid subject to certain things you
25  still have to complete.

Page 47

1         In transactions, it's -- it's not uncommon
2  for us to submit a bid and to continue to do due
3  diligence.  Timing, the number of documents involved,
4  how many resources we're able to -- to contribute to
5  towards that due diligence, we would -- we would at
6  times submit a bid, but indicate in the bid letter that
7  we had not completed due diligence.  We were continuing
8  to do due diligence or work on it, subject to
9  satisfactory review of some information or completion.
10    Q.  And the letter of intent, is it typically -- I
11  it drafted?  It could be drafted in the middle of due
12  diligence or before due diligence or does it just depend
13  on the transaction?
14    A.  It depends on the seller.  Some sellers provide
15  you with a form up front and say here's the conveyance
16  documents, here's the form of the letter of intent.
17  Smaller transactions, maybe they would not have a form,
18  just say give us a bid.  We would write it up and put
19  whatever contingencies we wanted in there.  There were
20  no hard and fast rules.
21    Q.  Okay.  Now, a break-up fee, is that a term of
22  art in corporate acquisitions?
23    A.  Yeah, it's somewhat self-descriptive, I would
24  say.
25    Q.  And just generally describe what that is.

Page 48

1    A.  Sellers obviously would take the assets off the
2  market if you submitted a bid to them and they liked
3  your price.  So it -- sellers would then say we will
4  take the assets off the market, we'll negotiate
5  exclusively with you, and here's the price.  And if at
6  the end of the day, you decide you just don't want to
7  do, then here's the penalty, if you will, here's how
8  much money you lose, or I would -- I guess the seller
9  would lose by taking the assets off the market having to
10  go back and redo all the due diligence negotiations and
11  everything, so...
12    Q.  Okay.  If you'll take Binder No. 1 there --
13    A.  Okay.
14    Q.  -- right there.  That entire binder is going to
15  be Exhibit No. 1.  They're all Bates stamped and we'll
16  go through them, some of them.  I'll refer to the Bates
17  stamps on them.
18    A.  Okay.
19    Q.  Yours is not tabbed and I apologize, but we can
20  get through -- to the document quickly, I think, with
21  the Bates stamp numbers.
22         The first --
23         MR. COFFIN:  I'm sorry, the Exhibit No. 1,
24  Karl, is the sale of the partnership interests in Kansas
25  Pipeline Company.

Page 49

1         MR. STERN:  Okay.
2    Q.  (BY MR. COFFIN) Mr. Kaitson, I'll represent to
3  you that this document, this entire Exhibit 1, was
4  produced by your counsel in this litigation.  Are you
5  familiar with this binder?
6    A.  Not this binder, but this page does look like
7  something I've seen before, yes.
8    Q.  Okay.  Now, is this what would be called a
9  closing binder in a transaction?
10    A.  Let me look through it.  I --
11    Q.  Okay.  Let me give you mine, which probably
12  more resembles what your counsel gave us.  It has tabs
13  and things like that.  And then hand it back to me, if
14  you would.
15    A.  Okay.  I didn't look at all the documents, but,
16  yes, that's traditionally a closing binder --
17    Q.  Okay.
18    A.  -- or a closing book.
19    Q.  Closing book is what it's called, okay.
20         And, generally, when is this book
21  assembled, as far as related to the -- the timing of the
22  transactions?  Is it after, right after the transaction,
23  or the documents come trickling in later and you
24  assemble the book?
25    A.  I've never assembled one of these books.

13  (Pages 46 to 49)

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

---

Page 50

1    Q.  Okay.  Who is responsible for assembling these
2  books?
3    A.  Typically, outside counsel would be responsible
4  for those.
5    Q.  Okay.
6    A.  Small transactions, there would only be two or
7  three tabs.
8    Q.  I see.  So --
9    A.  But, yeah, the books cannot be assembled until
10  after all the documents are signed and after the closing
11  has occurred.
12    Q.  Okay.  And, so, Mr. Chachere --
13    A.  Chachere.
14    Q.  -- Chachere, he was the outside one on this
15  particular transaction; is that correct?
16    A.  Yes, he was one of the outside counsel.
17    Q.  Who would be the other?
18    A.  Bernie Foster would be another counsel we used
19  for FERC matters.  I think those are the only two.
20    Q.  Okay.  So, would Mr. Chachere's office assemble
21  this binder and transmit it to you?
22    A.  Perhaps.  Either the seller or the buyer's
23  counsel prepared these, the binders.  So I don't know if
24  Mr. Chachere prepared this or if the seller's counsel
25  prepared this; but one of the two typically takes the

---

Page 51

1  responsibility of we'll prepare the closing book for
2  everyone.
3    Q.  And does the legal department within Midcoast
4  have the responsibility of maintaining these binders?
5    A.  Yes, we do.
6    Q.  Okay.  If you'll turn to -- there are two Bates
7  numbers.  We're going to use the ENB Bates numbers;
8  okay?
9    A.  Uh-huh.
10    Q.  218, ENB 218.
11    A.  Okay.
12    Q.  And this appears to be a letter to Midcoast
13  Energy Resources from K-Pipe Holdings; is that correct?
14    A.  Correct.
15    Q.  And it's signed on behalf of Midcoast by Dan
16  Tutcher?
17    A.  Tutcher, yes.
18    Q.  And is there an initial there, C-K?
19    A.  Yes, there are.
20    Q.  And that's your initials?
21    A.  That's correct.
22    Q.  So I assume you would have reviewed this
23  document?
24    A.  Yes.
25    Q.  Okay.  Paragraph No. 2 in this document on ENB

---

Page 52

1  220 -- let me back up.  Would this be considered a
2  letter of intent dated September 30, 1999?
3    A.  Yes.
4    Q.  Okay.  And back to paragraph 2 on ENB 220, I
5  guess closing was shown to occur within about 30 days,
6  is that right, October 30 of '99?
7    A.  Yes, that's what it says, yes.
8    Q.  Okay.  Is that typical in acquisitions this
9  large, 30-day closing?
10    A.  Yes, if you've completed all the due diligence
11  and various things have been negotiated, yeah.  That's
12  not uncommon, yes.
13    Q.  What is a -- again, in paragraph 2, what is a
14  post closing true-up?
15    A.  When you close on a specific date, obviously
16  there are still some matters outstanding.  On contracts,
17  for example, how much the actual gas flow might have
18  been, how much money is actually collected; so you're
19  somewhat estimating what it's going to be at that date,
20  and then over the next 30, 60, 90 days we know what the
21  real numbers were and, therefore, adjustments are made
22  to make the real numbers as opposed to estimates or
23  based on previous -- previous information.
24    Q.  Is that -- is a post-closing true-up typical in
25  these types of acquisitions, large acquisitions?

---

Page 53

1    A.  It's typical in every transaction that I have
2  been involved in.
3    Q.  Okay.  Paragraph 3 on the same page talks about
4  the option for the Butcher interests?
5    A.  Correct.
6    Q.  What were the Butcher interests?
7    A.  The Butcher interest was a right to a certain
8  amount of income or certain percentage of income.
9  That's it.  It applied specifically to Kansas Pipeline
10  Company, at least as I recall, revenue.
11    Q.  Okay.  The paragraph says, "The option for the
12  Butcher interest shall be exercisable by buyer at any
13  time on or before the expiration of three years from the
14  closing by payment of the sum of $6,500,000 cash to
15  seller," and the seller was the K-Pipe; is that right?
16    A.  Correct.
17    Q.  What -- how was the $6.5 million determined?
18    A.  Just a negotiated price and value placed on it.
19    Q.  Okay.  Are you aware -- well, tell me, I mean,
20  how would you value this interest?
21    A.  I do not know.  Richard Robert and the finance
22  folks would be the ones that put values on specific
23  assets or --
24    Q.  Okay.
25    A.  -- come up with the price for the asset.

14 (Pages 50 to 53)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel  (Chris) Kaitson

Page 54

1    Q.  All right.  So this was -- was this an income
2  projection that we talked about earlier, that you said
3  Mr. Robert would be responsible for?
4    A.  Actually, this was an expense item and we
5  wanted to acquire it.  Kansas Pipeline Company had to
6  pay a percentage of its income to this Butcher interest
7  owners; so, therefore, it was an expense for Kansas
8  Pipeline Company and we wanted to be sure that we
9  acquired this expense item so that any income Kansas
10  Pipeline paid actually ended up being paid to Enbridge.
11    Q.  Okay.  Well, who was the owner at the time of
12  the Butcher interest?
13    A.  At which time?  I'm sorry.
14    Q.  At the time this letter was drafted.  Because
15  I --
16    A.  September 30th, I'm not sure if it's Bishop
17  Pipeline Company or Bishop or Dennis Langley.  Someone
18  of that category would have been the owner at that time
19  period.
20    Q.  Not Kansas or not K-Pipe?
21    A.  Correct.
22    Q.  Okay.  Then why is a representation in this
23  letter or why is this option mentioned in this letter of
24  intent between Midcoast and K-Pipe?  It would seem it
25  would appear in the letter between Midcoast or Bishop or

Page 55

1  Langley or another entity.
2    A.  Well, this letter, we were not buying anything
3  from Bishop or Langley.  This letter was simply our
4  offer or letter of intent to buy things from K-Pipe.
5    Q.  Uh-huh.
6    A.  So, K-Pipe would have to acquire this interest
7  in order to be able to sell it to us.
8    Q.  Oh, okay.  So you're saying K-Pipe was going to
9  acquire it and then you were going to buy it from them?
10    A.  Yes.  We could only acquire it if they owned
11  it.
12    Q.  Okay.  But you said it's an expense item, not
13  an income item.  So my question is: why would you be
14  paying money for something that's an obligation to pay
15  an expense?
16    A.  Well, it was an expense for Kansas Pipeline
17  Company because it was money going out of the company.
18    Q.  Uh-huh.
19    A.  So we wanted to buy out that, purchase, acquire
20  that revenue stream.  I mean, it has value.
21    Q.  Okay.
22    A.  Someone is receiving money from Kansas Pipeline
23  Company.
24    Q.  So it is -- it's a -- it's an expense, but, on
25  the other hand, it's a revenue stream coming back; is

Page 56

1  that right?
2    A.  Well, it's an expense to Kansas Pipeline
3  Company, because it's money leaving that company.
4    Q.  Uh-huh.
5    A.  And someone is specifically that money, and
6  that's where the revenue stream would be coming in.
7  And, as Enbridge, we wanted to be the one receiving that
8  money.
9    Q.  Okay.  But you were anticipating that K-Pipe
10  would own that revenue interest; is that right?
11    A.  Yes, or acquire it before we acquired it from
12  them, yes.
13    Q.  Okay.  So, as far as you knew, or as far as
14  Midcoast knew, there was an expense going out of the
15  Butcher interest royalty or obligation paid out, and
16  then a revenue interest coming back; is that right?
17    A.  Well, they're two different -- the expense goes
18  out of Kansas Pipeline Company.  It was an expense to
19  Kansas Pipeline Company going to the Butcher interest.
20    Q.  Uh-huh.
21    A.  And then whoever owned the Butcher interest
22  received that income.
23    Q.  Okay.  Maybe I'm confused then.  Kansas
24  Pipeline Company was the asset that Midcoast was going
25  to acquire, right?

Page 57

1    A.  Okay.  Correct.
2    Q.  Okay.  So there's an expense that Kansas
3  Pipeline Company would have or an obligation to pay?
4    A.  Yes.
5    Q.  By somebody else, which you anticipated K-Pipe
6  would own in the end, a revenue interest coming back in,
7  is that right, of the same amount?
8    A.  To the owner of Butcher interest, yes.
9    Q.  Okay.  So it seems to me like it's a wash?
10    A.  Well, it's only a wash if the same company owns
11  both sides of it.  If the same company owns the expense
12  going out and the same company owns the income coming
13  in, then this would be a wash, yes.
14    Q.  Okay.
15    A.  But if a different company is receiving the
16  income, then it's not a wash; it's an expense.
17    Q.  Okay.
18    A.  I'm not sure if that's the right accounting
19  term, but...
20    Q.  So, at the time, did K-Pipe own -- at the time
21  K-Pipe would be selling you the assets, did it have both
22  the obligation to pay and the revenue interest coming
23  back?
24    A.  Well, this paragraph anticipates that K-Pipe
25  would own the Butcher interest.

15  (Pages 54 to 57)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:  Emmanuel (Chris) Kaitson

Page 58

1    Q.  That's the revenue stream?
2    A.  Correct.
3    Q.  Okay.
4    A.  So they would have the revenue coming in.  And
5  then in the first paragraph, it lists Kansas Pipeline
6  Company as one of the assets that Midcoast would be
7  acquiring from K-Pipe, and that's where the expense
8  would have been.
9    Q.  So -- so it's true then that K-Pipe, at the
10  time this was executed, you knew that K-Pipe would both
11  have the obligation to pay and the revenue interest
12  coming back?
13    A.  Yes.
14    Q.  Okay.  On paragraph 4, it says, "The
15  consummation of this tran -- of the transaction shall be
16  contingent, among other things, on the negotiation,
17  execution and delivery of the definitive agreement and
18  upon the completion by buyer of a satisfactory review of
19  the financial and legal aspects of the business,
20  properties, assets and liabilities pertaining to the
21  transaction, and buyer's acceptance of the final terms
22  and provisions of the assumed obligations, which are
23  currently being negotiated between seller and Dennis M.
24  Langley."
25        And it says, "Seller agrees to provide

Page 59

1  buyer and its representatives full access and
2  opportunity to examine the books, records, contracts and
3  other documentation related to the assets."  Is that
4  right?
5    A.  Correct, that's what it says.
6    Q.  Okay.  Why was the transaction contingent on
7  the buyer's acceptance of the final terms and provisions
8  of the assumed obligations?
9    A.  When you buy something, you want to know
10  exactly what you're buying --
11    Q.  Uh-huh.
12    A.  -- and you want to know exactly what liability
13  goes with what you're buying.  In a typical due
14  diligence, when we would go out and acquire the assets,
15  we would go look at all the backup documents, make sure
16  that they owned the assets.  We would look at the
17  documents where they acquired the assets, so we knew
18  exactly what they acquired and knew that in fact that it
19  was coming -- that we were -- that they had the right to
20  transfer it to us and that they were the owners and that
21  they were transferring it to us.
22    Q.  Okay.  And as soon as the obligations go, that
23  was a defined term which meant -- which were being
24  negotiated between seller, which was K-Pipe and Dennis
25  Langley at the time; is that right?

Page 60

1    A.  Yes.  That's what it says, yes.
2    Q.  So was it important to Midcoast to find out
3  what liabilities were being assumed by K-Pipe in their
4  stock purchase transaction?
5    A.  Well, it was important for us to know what
6  liabilities we were assuming.  And, typically, as part
7  of the due diligence, you know what kind of liabilities
8  the seller assumed when they acquired the assets.
9    Q.  Okay.  And then the last sentence in that
10  paragraph which I already read, "Seller agrees to
11  provide buyer and its representative full access and
12  opportunity to examine the books, records, contracts and
13  other documentation relating to the assets."  So, whose
14  books and records, contracts, et cetera, were -- was
15  the -- that provision referencing, was it Langley's or
16  was it K-Pipe's?
17    A.  Well, at the time of this document, the assets
18  were still owned by Langley.  K-Pipe had not acquired
19  them yet.  But we were -- we wanted to look at all the
20  of the documents associated with the assets.
21    Q.  Is that what that --
22    A.  Regarding -- yeah, sorry.
23    Q.  So that would have been Langley's books and
24  records, contracts, and other documentation?
25    A.  Correct.

Page 61

1    Q.  Paragraph 5 relates to confidentiality.  Why is
2  it important to keep -- why was it important to keep
3  this matter confidential?
4    A.  That's -- that's common in -- in all letters of
5  intent or bids.  Neither side wants other parties to
6  know what the price is.  From a seller's standpoint, the
7  seller wants to be able to negotiate with multiple
8  parties.  They don't want one party's bid to be
9  disclosed, because it will affect how they negotiate.
10  From a buyer's standpoint, you don't want to bid against
11  yourself, so you want your price to be kept confidential
12  so you are in a fair bidding process.
13    Q.  Okay.
14    A.  That's a common provision.
15    Q.  Do you recall if there was a confidentiality
16  letter executed?
17    A.  With whom?
18    Q.  With K-Pipe.
19    A.  I believe there was.
20    Q.  Okay.  Paragraph 6, the last sentence in that
21  paragraph on page ENB 220 of Exhibit 1, it says, "Seller
22  and buyer shall promptly file the necessary
23  documentation, the applications for approval under the
24  Federal Hart-Scott-Rodino Act" -- Rodyno?
25    A.  Correct.

16 (Pages 58 to 61)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

---

Page 62

1     Q.   Is it Rodyno or Rodino?
2     A.   Rodino.
3     Q.   -- "Rodino, with buyer paying all such filing
4  fees."  What is the Hart-Scott-Rodino Act?
5     A.   It is a request for the government for approval
6  to acquire assets.  It's the government's ability to
7  prevent monopolies.
8     Q.   Uh-huh.
9     A.   If someone is too large of an owner of assets
10  in a certain area, so that there is free trade and
11  enterprise and competition the government then has the
12  right to approve an acquisition or transfer of one party
13  to another.  If it's over a certain dollar amount, it
14  requires government approval.
15     Q.   Okay.  And why -- now, it's my understanding
16  from reading the documents in this case, there's no such
17  requirement for a stock purchase; is that right?
18     A.   That's not correct.
19     Q.   Okay.
20     A.   There is the same requirement.
21     Q.   Oh, I'm sorry.
22     A.   It's a dollar amount threshold requirement and
23  it's also a value of the buyer and seller.  There's
24  multiple requirements or threshold amounts that are met.
25     Q.   Okay.  Is -- now, do they -- when they talk

---

Page 63

1  about the value, are they talking about the gross value,
2  for example, with regard to this Midcoast transaction
3  with K-Pipe?  Then they bought -- bought assets, paid
4  cash, and then paid off some liabilities as well.  So,
5  would you take the gross amount or the net amount that's
6  considered in whether you need to file a Hart-Scott-
7  Rodino filing?
8     A.   My understanding, it's the gross amount.
9     Q.   Okay.  Now, I take it that the purchase
10  acquisition in this, in this case, required a
11  Hart-Scott-Rodino filing; is that correct?
12     A.   Yes.
13     Q.   Okay.  Do you know if K-Pipe's purchase of
14  stock from Langley required a filing as well?
15     A.   I don't know.
16     Q.   Paragraph 7, next page, ENB 221, it says, "Each
17  party will be solely responsible for its own costs in
18  connection with the transaction, including without
19  limitation legal and accounting costs, provided,
20  however, that in the event that buyer fails to execute a
21  definitive agreement, buyer shall pay seller a break-up
22  fee of $25,000 at buyer's sole obligation to the
23  seller."
24           MR. CROKE:  20 million.
25     Q.   (BY MR. COFFIN) 20 million.  Is that 20 million

---

Page 64

1  or 20,000?  That's 20,000, isn't it?
2     A.   20,000.
3     Q.   So, how was that amount determined?
4     A.   It's a negotiated amount.
5     Q.   Okay.  And, generally, what does it encompass?
6  If you're negotiating a break-up fee, what are you
7  thinking about?
8     A.   Do I have other bidders waiting in line, how
9  difficult will it be for me to find another buyer, how
10  much time and effort have I put into this transaction,
11  how long have the assets been off the market.
12     Q.   Okay.  Do you know if those -- who negotiated
13  the break-up fee in this case, in this particular
14  letter, do you know?
15     A.   That would have been Richard Robert.
16     Q.   So paragraph 8 relates to the assignment of
17  rights?
18     A.   Yes.
19     Q.   So Midcoast, at least within this letter of
20  intent, wanted to be sure that it was getting all of
21  K-Pipe's rights as far as the representatives --
22  representations, warranties, covenants, et cetera, that
23  K-Pipe got in its transaction with Bishop Group, Ltd.,
24  right?
25     A.   Yes.

---

Page 65

1     Q.   Okay.  Now, the last paragraph before the
2  signature block, it says, "Either party may terminate
3  this agreement at any time prior to the execution of the
4  definitive agreements without liability."  Now, when I
5  read that, I thought that conflicted with paragraph 7.
6     A.   Well, that's a general statement, whereas
7  paragraph 7 is a specific statement, and specific will
8  control over general.
9     Q.   That's why I'm not a contracts lawyer.
10     A.   I just noticed paragraph 9 also.  I had
11  forgotten that was in here --
12     Q.   Uh-huh.
13     A.   -- where it says that seller covenants not to
14  negotiate or communicate with any other potential
15  purchaser of the assets for a period of 45 days, so that
16  means they're taking the assets off the market for 45
17  days, and that's one of the factors that would be
18  considered in negotiating the break-up fee.
19     Q.   Okay.  Now, at this time, though, K-Pipe, as of
20  September 30, K-Pipe did not own any assets, did it,
21  September 30 of '99?
22     A.   I believe they did not own the Kansas Pipeline
23  assets at that time.
24     Q.   Okay.  Go to ENB 223.  It's a letter dated
25  November 4 of 1999, from K-Pipe Holding Partners, LP, to

---

17 (Pages 62 to 65)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:  Emmanuel (Chris) Kaitson

Page 66

1   Mr. Dan Tutcher of Midcoast, correct?
2       A.  Yes, that's correct.
3       Q.  It looks like the signatures are on 225, signed
4   by Alice Dill, attorney-in-fact for Jeffrey Furman, and
5   Richard Robert signed it on behalf of Midcoast; is that
6   right?
7       A.  That's correct.
8       Q.  What precipitated the amendment to the original
9   letter of intent, do you recall?
10      A.  I don't, I'm sorry to say.  I don't see my
11  initials on there, so I just can't recall.
12      Q.  Do you know if you reviewed the document?
13      A.  I do not know if I reviewed it.
14      Q.  If you reviewed something, would you typically
15  see your initials on it, or would you review something
16  and sometimes not initial it?
17      A.  Occasionally, I reviewed something and not
18  initial it; but that's the exception.
19      Q.  Okay.  Do you know who Alice Dill was?
20      A.  I do not.
21      Q.  Do you know if Midcoast had a power of attorney
22  on file from Alice Dill on behalf of Jeffrey Furman?
23      A.  I do not know.
24      Q.  Now, paragraph 1 talks about a $14 million
25  escrow that calls for buyers, which is Midcoast, to

Page 67

1   deposit $14 million to an escrow account.  Do you see
2   that?
3       A.  I do see that, yes.
4       Q.  Okay.  Do you recall why that was required?
5       A.  I recall the seller having some concern that
6   the $20,000 wasn't a significant enough fee to hold
7   Midcoast's feet to the fire, that they could still walk
8   away and pay $20,000 and not have any liability and not
9   do the deal, and I think that they wanted more assurance
10  that Midcoast was committed to this transaction.
11      Q.  The seller being K-Pipe, right?
12      A.  Yes.
13      Q.  Okay.  Turn to 227, ENB 227, please.
14      A.  Okay.
15      Q.  Did you review this?  Oh, this is an escrow
16  agreement, correct?
17      A.  Yes, it is.
18      Q.  Between K-Pipe and Midcoast Merger Corporation,
19  entered into on the 5th day of November, '99, correct?
20      A.  Yes, it is.
21      Q.  Did you review this document before it was
22  signed?
23      A.  Yes.
24      Q.  And as a general matter, did you review
25  primarily or most of the documents that were involved in

Page 68

1   acquisitions?  Did you have that responsibility?
2       A.  Yes, I did, with outside counsel.  I tried to
3   review all them.  Sometimes it's wasn't always possible.
4   There were times I would not be at a meeting or a
5   session.  But I did try to review all of them, yes.
6       Q.  Okay.  And this is, I think, the -- this is the
7   escrow agreement discussed in that amended letter of
8   intent you just talked about; is that right?
9       A.  Well, I see the 14 million in here, so, yeah, I
10  believe it is.
11      Q.  Now, how was the $14 million determined?
12      A.  I don't know.  I would not have been involved
13  in coming up with the dollar amount.
14      Q.  Would Robert have negotiated that?
15      A.  I assume he would have or unless it went to
16  higher level, which would have been Dan Tutcher.  I
17  would expect that a matter of that level would require
18  Dan Tutcher's approval, maybe even the board of
19  directors.
20      Q.  Was there a -- a threshold, dollar threshold
21  that required approval or transactions over a dollar
22  threshold that required approval by the board of
23  directors within Midcoast?
24      A.  I don't recall.  It's common to have that
25  scenario, but I don't remember specifically at Midcoast.

Page 69

1       Q.  Who would generally make the decision of
2   determining whether they need to seek board approval for
3   transactions?
4       A.  Dan Tutcher, the president.
5       Q.  Okay.  I assume you're aware that Midcoast or,
6   I'm sorry, K-Pipe Merger or one of its affiliates had
7   negotiated a same -- similar type of escrow agreement
8   with Mr. Langley, that was a break-up fee as well, that
9   was $15 million; do you recall that?
10      A.  After the fact, I learned that, yes.
11      Q.  You mean after --
12      A.  After the closing of our acquisition, I learned
13  that.
14      Q.  Okay.
15          MR. STERN:  David, we have been going
16  almost an hour and a half.
17          MR. COFFIN:  Sure.
18          MR. STERN:  Whenever is a convenient
19  break.
20          MR. COFFIN:  Well, let me just -- give me
21  a couple seconds here to look at this document.
22          MR. STERN:  Sure.
23          MR. COFFIN:  I think I'm finished with it.
24  Yeah, let's go ahead and take a break.
25          (Recess from 10:55 a.m. to 11:06 a.m.)

18 (Pages 66 to 69)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 70

1          MR. COFFIN:  All right.  Back on the
2  record.
3      Q.  (BY MR. COFFIN) Now, with regard to -- did we
4  talk about 227, which is the escrow agreement?
5      A.  Yes, we started that.
6      Q.  Okay.  Now, this mentions the $14 million that
7  Midcoast was to put into escrow; is that correct?
8      A.  Yes, it does.
9      Q.  Which represented the new break-up fee between
10  K-Pipe and Midcoast, correct?
11      A.  Yeah, I don't recall if that's the break-up fee
12  or if we get that back at the end or -- I don't recall.
13      Q.  Is --
14      A.  Depositing into escrow is like a down payment.
15      Q.  Okay.
16      A.  Things possibly could go wrong where we would
17  get that back.  We don't automatically lose that if we
18  walk away, typically.
19      Q.  Now, does it differ from the break-up fee then?
20      A.  It can.  It can also be considered a break-up
21  fee, but it typically has other conditions in here
22  which, for example, if something goes wrong on the
23  seller's side where the seller can't sell it to you, we
24  should not lose the money under that situation.
25      Q.  I see.  All right.

Page 71

1      A.  So it's just a down payment on a house.
2      Q.  Okay.  So, Midcoast was on the hook then, I'd
3  say, for $14 million if it was unable to close the
4  transaction for reasons that are set out in the escrow
5  agreement; is that right?
6      A.  Yes, I'd agree with that.
7      Q.  Okay.  And we discussed the fact that K-Pipe
8  had a similar type agreement with Langley, which was --
9  that was $15 million, that you said you became aware of
10  after the transaction closed?
11      A.  That's correct.
12      Q.  Okay.  Any idea why that would put K-Pipe
13  essentially at risk for a million dollars; is that
14  right?  If -- because if Midcoast was unable to complete
15  the transaction, then K-Pipe would be unable to complete
16  the transaction with Langley; is that correct?
17      A.  Yes.
18      Q.  Okay.  So, K-Pipe would have been on the jook
19  for a million bucks, and my question is: why wouldn't
20  have K-Pipe, if you know, negotiated a full 15 million
21  instead of just the 14 million with Midcoast?
22      A.  I don't know.
23      Q.  Okay.
24      A.  I could guess.  Maybe that's all the money we
25  had available at the time, but I don't know.

Page 72

1      Q.  Okay.  Turn to 235.  This is the asset purchase
2  agreement between K-Pipe Merger Corporation and
3  Midcoast; is that right?
4      A.  Yes.
5      Q.  And I believe it goes back to ENB 304; is that
6  right?
7      A.  I'm sorry.  ENB what?
8      Q.  304?
9      A.  304.
10      Q.  And then there's an amendment after that?
11      A.  That's correct.
12      Q.  Okay.  I assume you reviewed this document
13  before it was executed by Midcoast?
14      A.  I believe I would have.  It's possible that I
15  would not have reviewed the actual final document, that
16  our outside counsel may have been the one that reviewed
17  the actual final document.  But I reviewed this document
18  many times in different forms, yes.
19      Q.  And who would have -- so, Mr. Chachere would
20  have had primary responsibility in drafting or reviewing
21  the agreement; is that right?
22      A.  Yes.  Yes, he would have.
23      Q.  Now, is this a case again where the seller was
24  providing the document or is Mr. Chachere providing the
25  document?

Page 73

1      A.  I believe the seller provided this document.
2      Q.  Okay.  I want to turn to paragraph 2.5 or
3  Section 2.5.  Let me see if I can -- that's on 242.
4      A.  Okay.
5      Q.  And this relates to the excluded assets, is
6  that right, or references the excluded assets?
7      A.  Correct.
8      Q.  Okay.  And, generally, these assets are
9  essentially excluded from the transaction as
10  contemplated by this agreement; is that right?
11      A.  Yes.
12      Q.  Okay.  And the first one is the Butcher
13  interest?
14      A.  Correct.
15      Q.  And I thought the -- well, let me back up.  Who
16  would have negotiated the excluded assets on behalf of
17  Midcoast?
18      A.  I assume Richard Robert would have been the
19  lead negotiator on that, with -- with Ron Chachere and
20  myself.
21      Q.  Okay.  Now, the Butcher interests are excluded
22  here; is that right?
23      A.  That's correct.
24      Q.  And -- and what was the reason for excluding
25  the Butcher interests from this asset purchase

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel  (Chris) Kaitson

Page 74

1    agreement?
2        A.  I remember that specifically.  We didn't have
3    the money.
4        Q.  How much money was it going to be?
5        A.  6, 6-1/2 million dollars.
6        Q.  And you didn't have that money in cash or you
7    didn't have the ability to go borrow the money?
8        A.  We didn't have the ability to go borrow that
9    amount of money or didn't have it in cash.  I just
10   remember we couldn't acquire it at this time.  I
11   remember that discussion.
12       Q.  Now, is this -- so this is discussing the
13   exclusion of the revenue interests; is that right?
14       A.  Yes.
15       Q.  Okay.  Now, was the obligation to pay the
16   Butcher interests, was that obligation assumed within
17   this agreement?
18       A.  Yes.  The ob -- well, the obligation existed.
19   Whoever owned Kansas Pipeline Company had the obligation
20   to pay out that Butcher interest, yes.
21       Q.  Okay.  So, within this document that Midcoast
22   was purchasing the Kansas Pipeline Company assets; is
23   that right?
24       A.  Correct.
25       Q.  So with it came the obligation to pay the

Page 75

1    Butcher interests; is that right?
2        A.  Yes.
3        Q.  But you were specifically within this
4    document -- the revenue was specifically excluded; is
5    that right?
6        A.  Yes.
7        Q.  Okay.  And I thought we talked about earlier
8    how that was a wash, because the same company is paying
9    it who is getting it?
10       A.  Yeah, that's correct.
11       Q.  So how could you put a value of 6-1/2 or how
12   did Midcoast put a value of 6-1/2 on the Butcher
13   interest?
14       A.  I don't know.  Like I said, Richard Robert
15   would have been the person who determined what values go
16   with what.
17       Q.  What was the $10 million principal balance in
18   the cash reserve account, Item No. B under 2.5?
19       A.  Just generally speaking, I remember there was
20   an account that had $10 million in it that was not part
21   of the transaction, but I don't remember what it was or
22   how it got there or -- it had something to do with an
23   existing loan, but I don't remember any of those
24   specific details.
25       Q.  Okay.  Is -- and the cash reserve account it

Page 76

1    says is held in the name of -- is it Synergy, is that
2    how you pronounce that, or is it just Synergy Pipeline
3    Company?
4        A.  I say it Synergy.
5        Q.  Synergy, S-Y-N-E-R-G-Y.  And you don't recall
6    why those assets were specifically excluded?
7        A.  I do not.
8        Q.  And then there are certain contract rights or
9    litigation rights that are excluded under Item No. C; is
10   that right?
11       A.  Right, except there's a lawsuit that's excluded
12   as well.
13       Q.  And why was the decision made to exclude that
14   lawsuit?
15       A.  I don't recall why.
16       Q.  Because that's a -- it's not necessarily a
17   liability or a contingent liability at this point, is
18   it?  It's a right to sue in tort -- in an action for
19   tort or breach of contract, right, because it's an
20   asset?
21       A.  I believe that's correct.
22       Q.  Okay.  Do you recall any -- any -- you don't
23   recall any business reason why you would not want the
24   ability to sue these companies?
25       A.  I don't recall that, no.

Page 77

1        Q.  Do you recall if K-Pipe specifically wanted to
2    keep those rights?
3        A.  I don't remember.  I'm sorry.
4        Q.  Okay.  And the Butcher interests again, do you
5    recall if K-Pipe specifically wanted to keep that right?
6        A.  No, I recall that we wanted to acquire it, but
7    we didn't have the money to acquire it.
8        Q.  Okay.  And the $10 million, do you -- do you
9    recall whether K-Pipe wanted to keep that amount?
10       A.  No, I -- once again, I just remember there was
11   a discussion on it, but I don't recall the specifics
12   around it.
13       Q.  And then turn to ENB 306, which is the first
14   amendment to the asset purchase agreement under Exhibit
15   No. 1.
16       A.  Okay.
17       Q.  Have you seen this document?
18       A.  Yes.
19       Q.  And, in fact, I think if you go to 309, ENB
20   309, it shows that -- looks like the signature page was
21   faxed to you --
22       A.  That's correct.
23       Q.  -- by Cynthia Morelli; is that right?
24       A.  Yes.  Yes.
25       Q.  Do you remember what precipitated the amendment

20  (Pages 74 to 77)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 78

1  to the asset purchase agreement?
2      A.  I don't at this time.
3      Q.  Okay.  And the document was actually
4  executed -- well, let's see.  Morelli's fax to you was
5  dated January 24 of 2000 on ENB 309; is that right?
6      A.  That's what it says, yes.
7      Q.  So would it necessarily have been executed on
8  or around that time?
9      A.  No, I -- I wouldn't think so.  I think this is
10  a document that we were perhaps missing and it was faxed
11  to us at a later time.
12      Q.  Okay.  If you look at the top of ENB 308, it
13  looks like both of those dates showing, you know, fax
14  transmission dates, both of them are in 2000?
15      A.  I see that, uh-huh.
16      Q.  Okay.  And you still believe it was drafted and
17  signed before January of 2000?
18          If you also look at Mr. Robert's signature
19  page on 307 --
20      A.  Uh-huh.
21      Q.  -- and at the bottom left, R-E-V, revised, I
22  would assume, 1, 2000; is that right?
23      A.  That's what it says, uh-huh.
24      Q.  And CK, is that your initials?
25      A.  That is my initial, yes.

Page 79

1      Q.  So you would have prepared the document?
2      A.  Apparently so.
3      Q.  Okay.  You don't recall why a couple months
4  later this thing was executed?
5      A.  I do not.  I --
6      Q.  What was the -- and it amends.  On 306, the
7  first amendment relates to paragraph 2.3(c)(i) of the
8  original agreement, which was amended to read, "The
9  seller shall submit to buyers not later than January 24,
10  2000, its good faith estimate adjusted values revised
11  based on any information then available to the seller."
12          Do you recall why an adjustment needed to
13  be made?  And it looks like relatively quickly since
14  the -- the last date that you could make a proposed
15  adjustment was January 24, 2000.
16      A.  It appears that we changed the -- the date on
17  when the adjusted values could be submitted.
18      Q.  What was the previous date?
19      A.  That's what I'm looking back right now.
20  (c)(i), not more than 30 days after the true-up date.
21  So it appears they extended the time period within which
22  or we extended the time period within which that could
23  occur.
24      Q.  Was it one of those situations maybe where you
25  missed the deadline and wanted to extend it and they

Page 80

1  agreed?
2      A.  Or the parties just couldn't agree on some
3  numbers and, therefore, we agreed to extend it while we
4  obtained better information or might have been some
5  adjustment to some contracts that -- that weren't
6  finalized as of yet.
7      Q.  Uh-huh.
8      A.  I don't recall why, but it appears we just
9  extended the date to use what we call the real numbers.
10      Q.  Okay.
11      A.  I had forgotten about that.
12      Q.  All right.  Turn to ENB 313.  That is a letter
13  from K-Pipe Merger Corporation to Midcoast; is that
14  correct?
15      A.  Yes.
16      Q.  Signed by Larry Austin as president.  Did you
17  ever meet Larry Austin?
18      A.  I did not.
19      Q.  Did you know who he was?
20      A.  No.
21      Q.  Okay.  And it looks like it was agreed and
22  accepted to on the -- on 3-14 by Mr. Robert, correct?
23      A.  Yes.
24      Q.  Okay.  And this -- you might review that for a
25  minute.

Page 81

1          Now, is that -- it references $15 million
2  that would be paid to K-Pipe as K-Pipe's sole remedy for
3  Midcoast's failure to close?
4      A.  It does, correct.
5      Q.  Okay.  Is that the same $15 million or the same
6  I guess what I call a break-up fee as we saw in the
7  escrow agreement on 227?  I mean, they're --
8      A.  They're the same numbers.  It appears they
9  would be.
10      Q.  Well, actually, they -- the escrow agreement on
11  227 was 14 million and this one references 15 million in
12  the --
13      A.  You're correct.
14      Q.  Okay.
15      A.  Yeah.
16      Q.  So, turning -- if you'll turn back to ENB 227,
17  and while you're doing that, I'll just talk, it looks
18  like they were executed -- this one was executed
19  November 5 of '99 and the escrow agreement was executed
20  11-4 of '99?
21      A.  When you say they were executed on those
22  dates --
23      Q.  You're having a hard time with that?  Well, I
24  say -- I said they were executed; that may be incorrect.
25  The fax dates at the top, you know, show November 5 of

21  (Pages 78 to 81)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 82

1   '99 for ENB 313, which is the document you're looking
2   at, and then the escrow agreement appears to be faxed on
3   11-4 of '99, so right around the same time?
4       A.   Around the same time, yes, okay.
5       Q.   I'm just wondering why the discrepancies?
6       A.   I don't recall.  I don't remember seeing this
7   before, but it doesn't mean I didn't, but I don't
8   remember seeing the document 313.
9       Q.   Okay.  I note, though, that in 315 that there
10  is -- appears to be a signature page to an escrow
11  agreement, but we don't have the escrow agreement there?
12      A.   You're correct.
13      Q.   So perhaps the escrow agreement was eventually
14  amended, revised to incorporate the 15 million?
15      A.   I don't remember that happening.
16      Q.   Okay.  Now, if you'll look at -- on 313 again,
17  which is the letter from K-Pipe Merger Corporation to
18  Midcoast, the last -- second to the last sentence says,
19  "Midcoast acknowledges that K-Pipe is relying on this
20  letter of understanding or undertaking other financial
21  obligations to third parties, which third parties are
22  acknowledged by Midcoast to be donee or creditor
23  beneficiaries.  Midcoast agrees that such third parties
24  may pursue claims they may have against Midcoast."
25      A.   That's what it says, yes.

Page 83

1       Q.   So, who would be the -- who are the third-party
2   donees or creditor beneficiaries?
3       A.   Well, the creditors would be the banks,
4   obviously, that would lend money.
5       Q.   And in this case it should have been Rabobank?
6       A.   They were involved somehow in the transaction.
7   I don't recall if they were a lender or not.
8       Q.   Okay.
9       A.   I don't -- they were not a lender to Midcoast.
10      Q.   Okay.  And then donee, a third-party that would
11  be a donee, would that be Langley?
12      A.   I don't -- I don't know.
13      Q.   So, essentially, this puts Midcoast on the hook
14  to others if it failed to close the deal with K-Pipe, is
15  that right, with third-party donees or creditor
16  beneficiaries?
17      A.   That's what the sentence says, yes.
18      Q.   Would you have reviewed this before it was
19  signed?
20      A.   I don't recall seeing this before, no.
21      Q.   If you'll turn to ENB 322 --
22      A.   Okay.
23      Q.   -- now, this is the escrow agreement between
24  K-Pipe Merger, Midcoast, Rabobank and Bank of America;
25  is that right?

Page 84

1       A.   Yes.
2       Q.   And it relates to the assets purchase
3   agreement; is that right?
4       A.   Correct.
5       Q.   And it's -- the amount of the -- let's see.  It
6   says Bank of America, down on point No. 1.  Bank of
7   America will deposit 198,100,000 for credit to Rabobank;
8   is that right?
9       A.   That's correct, that's what it says.
10      Q.   For further credit to Midcoast.  And then on 4,
11  it says, "The disbursement of escrowed property is
12  subject only to the fulfillment of the conditions
13  precedent, that buyer and Bank of America jointly give
14  written notice of escrow agent to deliver the escrowed
15  property.  Escrow agent is hereby authorized and
16  directed to remit and deliver the escrow property on
17  Tuesday, November 9, 1999, before 4:00 p.m. as follows."
18           So, the 198 million was -- was borrowed by
19  Midcoast from Bank of America and is a syndicate of
20  other lenders; is that right?
21      A.   Yes.
22      Q.   So -- and then that amount was to be disbursed
23  as listed in paragraph 4 on the next page; is that
24  right?
25      A.   That's what the document says, yes.

Page 85

1       Q.   Okay.  So, it was anticipated that 112,695,895
2   would be transferred to the seller, which at that point
3   was -- was K-Pipe Merger; is that right?
4       A.   Yes.
5       Q.   73 million to State Street Bank, and I assume
6   that's for outstanding debt; is that right?
7       A.   I -- that's a safe assumption.  I assume that's
8   correct.
9       Q.   Okay.  It says, Reference Synergy Pipeline
10  Company, LP.  The sum of $6 million and some change
11  shall be wired to Chase Manhattan, again for Synergy.  I
12  guess that's some more debt?
13      A.   Correct.
14      Q.   Okay.  And then the sum of $6.1 million to Bank
15  of America for the benefit of the Butcher interests; is
16  that right?
17      A.   That's what it says, yes.
18      Q.   Okay.  And the balance should be -- would be
19  sent back to Midcoast Energy; is that right?
20      A.   Correct.
21      Q.   Okay.  I thought you said earlier that Midcoast
22  did not have the financial wherewithal to buy the
23  Butcher interests?
24      A.   That was my recollection.
25      Q.   Because, in effect, Midcoast borrowed the money

22  (Pages 82 to 85)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:  Emmanuel (Chris) Kaitson

Page 86

1 to buy the Butcher interests, right?
2     A.  Yes.  That's what this says, yes.
3     Q.  Okay.  So that again raises the question why
4 exclude the Butcher interests as an asset on the asset
5 purchase agreement and then still pay for it in the same
6 loan transaction?
7     A.  Well, I note that it says the benefit of
8 Butcher interest partnership.  The Butcher interest was
9 actually acquired by Midcoast at a later date from a
10 partnership that was set up.  So the Butcher interests
11 went from K-Pipe into a partnership.
12     Q.  Uh-huh.
13     A.  And Midcoast was part -- was one of the
14 partners in that partnership.  And then Midcoast at a
15 later date actually purchased the entire Butcher
16 interests from that partnership.
17     Q.  Okay.
18     A.  I believe that's the case.
19     Q.  All right.  Do you know why then the Butcher
20 interest was transferred to a partnership, rather than
21 just buying it with -- among the other assets that were
22 purchased?
23     A.  I don't recall.
24     Q.  Do you have any recollection of why a loan was
25 taken out for the Butcher interest partnership?

Page 87

1     A.  Like I said earlier, my recollection was that
2 Midcoast did not have the cash to buy it at that time.
3 So the loan was made to the Butcher interest
4 partnership, those two entities that made up the
5 partnership, and Midcoast was one of those two entities.
6     Q.  So, are you saying that Midcoast could not
7 borrow the money on the -- on its financial strength?
8     A.  By itself, correct.
9     Q.  For the Butcher interest?
10     A.  That was my recollection, yes.
11     Q.  Do you know if Midcoast guaranteed that loan?
12     A.  I don't remember.  They could have.  I don't
13 remember.
14     Q.  Do you remember who the -- who the other
15 partner was of the Butcher interest?
16     A.  No.  I remember -- no, I don't.
17     Q.  Were you aware at all with the operations of
18 the Butcher interest after it was acquired or after
19 Midcoast became a partner in the Butcher interest
20 partnership?
21     A.  Would you restate the question?  I'm sorry.
22     Q.  Were you involved in the operations of -- well,
23 let's back up.  What were -- if you recall, what were
24 the Butcher interest partnership's -- what was its
25 business purposes?

Page 88

1     A.  The only thing it owned, from my recollection,
2 was the Butcher interest itself; so, therefore, it had
3 revenue coming in.
4     Q.  Okay.  And the obligation to pay it out was --
5 was imposed upon Midcoast by virtue of its purchase of
6 the Kansas Pipeline assets?
7     A.  Correct.
8     Q.  Okay.  So, the sole reason, the sole operations
9 of the Butcher interest partnership were to receive
10 those revenue interests?
11     A.  I don't -- my recollection was that's -- that
12 was the only purpose that it was set up for and that's
13 all that it did, yes.
14     Q.  Okay.  Is there -- was there any legal benefit
15 of having that interest in a partnership versus Midcoast
16 owning it outright?
17     A.  Not that I recall, no.
18     Q.  Was there any business advantage of having that
19 partnership interest owned by the Butcher interest
20 partnership versus Midcoast owning it outright?
21         MR. STERN:  Objection, form.
22     A.  Yeah, not that I'm aware of.
23     Q.  (BY MR. COFFIN) Do you recall who was making
24 the note payments on the -- on behalf of the Butcher
25 interest partnership?

Page 89

1     A.  No, I don't.
2     Q.  Did you know that shortly after the Butcher
3 Interest Partnership was formed that 6.225 million of
4 cash was distributed to the K-Pipe group?
5         MR. STERN:  Objection, form.
6     A.  No, I did not know that.
7     Q.  (BY MR. COFFIN) Do you know what happened to
8 the Butcher Interest Partnership?
9     A.  Eventually, a Midcoast entity or Midcoast
10 actually acquired all of -- 100 percent of it.
11     Q.  Why?  Why did it do that?
12     A.  Well, it was a revenue stream, so it -- it was
13 an opportunity for Midcoast to own 100 percent of that
14 revenue stream instead of the partnership receiving it.
15     Q.  Was there actually cash generated from the
16 revenue stream?
17     A.  I don't know the answer to that.  That would
18 have been the accounting/finance group.
19     Q.  Do you know what the partnership did with the
20 $6.1 million?
21     A.  I do not.
22     Q.  Turn to ENB 329.  This is an agreement consent
23 of sole stockholder of the Bishop Pipeline Company,
24 correct?
25     A.  Yes.

23 (Pages 86 to 89)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel  (Chris)  Kaitson

Page 90

1    Q.  Dated November 8, 1999?
2    A.  Yes.
3    Q.  And this is a resolution, I guess, to or a
4 consent resolving that the corporation, which is Bishop
5 Pipeline Company, dividend its entire interest in the
6 Butcher interest to the sole stockholder of the
7 corporation; is that correct?
8    A.  That's what it says, yes.
9    Q.  The sole stockholder is K-Pipe Group, Inc.?
10    A.  Yes.
11    Q.  Any idea why -- why the Butcher interest was
12 dividended out of that corporation?
13    A.  The Butcher interest had to end up in that
14 Butcher Interest Partnership, so somehow it went from
15 K-Pipe Group to the Bishop Interest Partnership.
16    Q.  Did you have any discussions with K-Pipe Group
17 or anybody on that side on this particular action?
18    A.  No.
19    Q.  So, when you give me that explanation, are
20 you -- are you making an assumption that that's why this
21 happened or do you actually know?
22    A.  Well, I know somehow the Butcher interest had
23 to get into the partnership.  I don't know how it got
24 there, but...
25    Q.  Okay.  It appears in looking at -- if you go to

Page 91

1 ENB 335 --
2    A.  Okay.
3    Q.  -- it looks like the same type of consent as
4 related to Bishop Gas Transmission Co.; is that right?
5    A.  That's what it looks, yes.
6    Q.  It looks like that entity may have owned an
7 interest in the Butcher interest as well?
8    A.  That's what it appears, yes.
9    Q.  Go to ENB 359, please.
10    A.  Okay.
11    Q.  This is an assumption agreement?
12    A.  59?
13    Q.  Yeah.  I'm sorry.  ENB 359.
14    A.  Got it.
15    Q.  Assumption agreement between Synergy Pipeline
16 Company and Kansas Pipeline Company; is that right?
17    A.  Correct.
18    Q.  Now, what -- do you have an understanding of
19 what is trying to be accomplished in this document?
20    A.  No.  I remember the title of the document, but
21 I don't remember the content of it at all.
22    Q.  Okay.
23    A.  No, I don't.  I don't know what was intended
24 happen here.
25    Q.  It says, "Whereas" -- this is the third

Page 92

1 paragraph, second whereas.  "Whereas, as a condition of
2 the closing of the asset purchase agreement, KPC is to
3 assume certain debt obligations of Synergy as described
4 on Exhibit A."  Do you remember why that was to occur?
5    A.  I do not.
6    Q.  Okay.  Turn to ENB 364.  This is a guaranty.
7 Underneath it says in parenthesis Parent.  And Midcoast
8 Energy Resources is the guarantor, correct?
9    A.  Correct.
10    Q.  And Midcoast is guaranteeing agreements between
11 certain entities, MarGasCo, M-A-R-G-A-S-C-O, and MRG,
12 Management Resources Group, LLC.  Essentially there
13 it's -- Midcoast is guaranteeing obligations --
14 liabilities, obligations, covenants and agreements
15 contained in the project development agreement dated
16 October 25, 1999; is that right?
17    A.  Yeah, I believe so, yes.
18    Q.  The consulting agreement dated October 25,
19 1999?
20    A.  Yes.
21    Q.  The guaranty by Kansas Pipeline Company to MRG,
22 et al, dated November 2 of '99?
23    A.  Correct.
24    Q.  There's one more, it looks like.  And the
25 project development and MRG interest agreement between

Page 93

1 MRG and KPC, which is Kansas Pipeline Company?
2    A.  Yes.
3    Q.  Okay.  But, essentially, isn't Midcoast
4 guaranteeing transactions between K-Pipe and Langley
5 under this guaranty?
6    A.  No.  Midcoast is actually guaranteeing the
7 obligations of one of its newly acquired subsidiary
8 companies.  Midcoast actually acquired MarGasCo.
9    Q.  Uh-huh.
10    A.  And so MarGasCo is a subsidiary company of M --
11 of Midcoast Energy Resources.  So, when Midcoast Energy
12 issues a guaranty, it's just guaranteeing that its
13 subsidiary company will perform.
14    Q.  Okay.  And who was MRG?
15    A.  My recollection was MRG was a marketing company
16 that was acquired as part of the Kansas Pipeline Company
17 acquisition.  I believe that's the case.
18    Q.  Okay.  So, essentially, it was a -- it was a
19 Langley, Langley or Bishop Group?
20        MR. STERN:  Objection, form.
21    A.  You mean was that company at one time owned by
22 Langley?
23    Q.  (BY MR. COFFIN) Yeah.
24    A.  I believe it was, yes.
25    Q.  And MarGasCo, same thing?

24  (Pages 90 to 93)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel  (Chris) Kaitson

Page 94

1      A.   Yes, at one time MarGasCo I believe was owned
2   by Langley or one of the Langley companies.
3      Q.   Okay.  And all the agreements that are
4   guaranteed took place prior to the closing of Midcoast's
5   purchase of assets from K-Pipe; is that right?
6      A.   Correct.
7      Q.   So, who was the -- who would be the beneficiary
8   of this guaranty?
9      A.   Management Resources Group, LLC, or MRG as it's
10   referred to in this document.
11      Q.   Uh-huh.  And MRG and all those entities listed
12   in there, are they owned by K-Pipe at the time or --
13           MR. STERN:  Objection, form.
14      Q.   (BY MR. COFFIN) Or Langley?
15           MR. STERN:  What time?
16           MR. COFFIN:  Pardon me?
17      Q.   (BY MR. COFFIN)  At the time this was executed.
18      A.   At the time this was executed.  Let's see
19   whenever it executed.  November 9th.  At the time this
20   was executed, Kansas Pipeline Company would have been
21   owned by Midcoast, MarGasCo would have been owned by
22   Midcoast, MRG would not have been owned by Midcoast.  It
23   would have been owned by Bishop or Langley or somebody
24   else.
25      Q.   How about Management Resources Group, LLC?

Page 95

1      A.   That's MRG, I believe.
2      Q.   Oh, it is?
3      A.   I believe it is.  I believe Management
4   Resources Group, LLC, is -- is used -- is identified as
5   MRG in this document.
6      Q.   Okay.  Next page, what's the doctrine of "cy
7   pres"?
8      A.   "Cy pres" goes to the intent of the parties.
9      Q.   Uh-huh.
10      A.   We -- we struggled with this just because the
11   intent of one party may not be the same as the intent of
12   the other party, but...
13      Q.   Okay.  Well --
14      A.   It was a Kansas term I was not familiar until
15   this transaction.
16      Q.   I see.  And you say a Kansas term.  Why was
17   the -- was it negotiated that the agreement would be
18   governed by the laws of Kansas versus of Texas or --
19      A.   You know, I don't recall what the law was in
20   the documents.  I see the next paragraph, though, says
21   this document is governed by the laws of Kansas.
22      Q.   And Langley and his companies were in Kansas;
23   is that right?
24      A.   His office was in Kansas, yes.
25      Q.   Okay.

Page 96

1      A.   I don't recall what state of incorporation or
2   organization the actual companies were, but his office
3   was in Kansas.  He also had an office in North Dakota or
4   some other state as well.
5      Q.   Okay.  Turn to ENB 367.
6      A.   The other partner in Bishop Interest
7   Partnership was K-Pipe Group, Inc., obviously as stated
8   in this document.
9      Q.   All right.  And this is the Butcher Interest
10   Partnership general partnership agreement, correct?
11      A.   Correct.
12      Q.   Who drafted this document?
13      A.   I don't recall who drafted it.  I don't recall
14   if it was drafted by K-Pipe or -- or Midcoast.
15      Q.   Okay.  Would you have reviewed it before it was
16   signed?
17      A.   I would have, yes.
18      Q.   Okay.  It looks like on the last page, ENB 373,
19   Richard Robert signed it, correct?
20      A.   Correct.
21      Q.   Okay.  On 6.01 on the second page, K-Pipe, it
22   talks about capital contributions, capital account.
23   K-Pipe to assign or transfer to the partnership all
24   rights it had in the Butcher interest; is that right?
25      A.   Yes, it is.

Page 97

1      Q.   And convey to the partnership the Butcher
2   interest, basically?
3      A.   Right.
4      Q.   And in consideration for the assignment, K-Pipe
5   would be credited with a capital contribution in the
6   amount of $6.5 million; is that right?
7      A.   That's what it says, yes.
8      Q.   Okay.  Again, do you recall why the transaction
9   was structured this way?
10      A.   My recollection was Midcoast did not have the
11   cash to buy the Butcher interest itself from K-Pipe and
12   it was structured this way so we could at least have an
13   option of purchasing it later.
14      Q.   What did K-Pipe bring to the table to allow --
15   well, let's back up.
16           We looked at the $6.5 million loan
17   earlier?
18      A.   Uh-huh.
19      Q.   Which was basically borrowed by Midcoast from
20   Bank of America and the consortium of lenders; is that
21   right?
22           MR. STERN:  Objection, form.
23      A.   I thought it was a different amount.
24           MR. CROKE:  6.1 million.
25      Q.   (BY MR. COFFIN) 6.1 million?

25  (Pages 94 to 97)

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel  (Chris) Kaitson

Page 98

1    A.  I believe that's correct, yes.
2    Q.  And is it still your testimony then that
3  Midcoast was unable by itself to borrow that money to
4  buy the Butcher interest?
5    A.  That's my recollection.
6    Q.  Do you know if K-Pipe brought anything to the
7  table that would give Midcoast additional -- Midcoast or
8  the Butcher Interest Partnership any additional
9  financial strength to borrow $6.1 million?
10    A.  I'm sorry.  Would you say it again?
11    Q.  I don't know if I can.  What did K-Pipe bring
12  to the table to allow, other than the Butcher Interest
13  Partner -- or other than the Butcher interest, that
14  would allow Midcoast or the Butcher Interest Partnership
15  to borrow the money, the $6.1 million, from Bank of
16  America and the lenders?
17    A.  They would have had the cash we just paid them
18  for the Kansas Pipeline assets.
19    Q.  Was that -- okay.  Was that cash, though, in
20  turn paid to Langley to buy his stock?
21    A.  I -- they had to pay it somewhere, so I don't
22  know if it was that cash or other cash.
23    Q.  Okay.  And Article 7 on the next page, it talks
24  about the partnership shall enter into a credit
25  agreement with Bank of America, pursuant to which the

Page 99

1  partnership shall obtain loans in the amount of
2  $6,100,000, which loans are secured by partnership
3  property and guaranteed by each of the partners?
4    A.  Correct.
5    Q.  Upon receipt of the loan proceeds, the
6  partnership shall distribute $6,225,000 to K-Pipe and
7  K-Pipe's capital account shall be reduced accordingly.
8  Do you recall why the money was distributed to K-Pipe?
9    A.  K-Pipe owned the Butcher interest, so the
10  partnership would have had to purchase the Butcher
11  interest from K-Pipe.
12    Q.  And, again, it's your testimony that this --
13  that the transaction with the Butcher interest had to be
14  structured in this way because of Midcoast's inability
15  to borrow that $6.1 million?
16    A.  That's my recollection.
17    MR. STERN:  What do you want to do about
18  lunch?  Whenever we get to that point.
19    MR. COFFIN:  Yeah, give me a minute.  Let
20  me get through this binder, which will be the next few
21  minutes, and then we'll do that.
22    MR. STERN:  Okay, that's fine.  I just
23  wanted to remind you, because I get hungry.
24    MR. COFFIN:  You get cranky when you get
25  hungry?

Page 100

1    MR. STERN:  Yeah.
2    Q.  (BY MR. COFFIN)  Go to ENB 370.
3    A.  Okay.
4    Q.  And Article 13.
5    A.  Yes.
6    Q.  This discusses Midcoast's option to purchase
7  K-Pipe's share of the partnership interest?
8    A.  Correct.
9    Q.  Tell me why there was an option -- why Midcoast
10  was granted an option or why they negotiated an option
11  to purchase the partnership interest.
12    A.  It's one of the negotiating items, negotiated
13  items in the asset purchase.  We negotiated to purchase
14  Kansas Pipeline Company.  We also negotiated to acquire
15  the Butcher interest in some manner.  This is the only
16  manner that we could economically afford to acquire it,
17  through a partnership, with the right that we had the
18  right -- with the option to acquire the asset from the
19  partnership at a later time.
20    Q.  Okay.  And there's a date up there, any time on
21  or after May 9 of 2000.  Do you know why -- how that
22  date was negotiated or determined?
23    A.  I do not know.
24    Q.  And then there's a notice date in 13.02 of
25  November 9 of 2000?

Page 101

1    A.  Correct.
2    Q.  Any -- it looks like there are -- based on
3  notices before that date and after the date, the
4  purchase price for that interest either -- is determined
5  based on, I guess, the closing?
6    I'm sorry.  The purchase price is based on
7  certain percentages of the K-Pipe's capital account?
8    A.  That's what it says.
9    Q.  Okay.  Do you know why that November 9, 2000
10  date was used?
11    A.  No, I do not.
12    Q.  And on 13.04, the next page, it says, "K-Pipe
13  shall have the option at any time on or after November 9
14  of 2000 to sell its partnership interest to Midcoast."
15    A.  So this is what I would call a put, where they
16  have the right to put it to us and force us to acquire
17  it.
18    Q.  Okay.  And why was that put granted to K-Pipe?
19    A.  It appears that K-Pipe wanted their money and
20  there was a date when they wanted to get the -- their
21  money from Midcoast and wanted out of this partnership.
22    MR. STERN:  I'm going to object to the
23  form of the question.
24    A.  This is not an uncommon provision in a
25  partnership agreement.  The one side wants the right to

26 (Pages 98 to 101)

Witness:  Emmanuel  (Chris)  Kaitson

Page 102

1  get out at a future date.  I may on such and such a date
2  or before or after such a date force you to buy me out,
3  so this is not an unusual provision.
4      Q.  Okay.
5          MR. STERN:  Just answer the questions.
6      Q.  (BY MR. COFFIN) Did -- go to ENB 377, please.
7  This is the credit agreement between Butcher Interest
8  Partnership as borrower and Bank of America N.A. as
9  lender, correct?
10     A.  Correct.
11     Q.  Okay.  Who negotiated with the bank on this?
12     A.  I know Richard Robert was negotiating with the
13  bank, our CFO.
14     Q.  On behalf of Midcoast?
15     A.  Midcoast or Midcoast as a partner in the
16  Butcher Interest Partnership.
17     Q.  Was -- who negotiated on the other side?
18     A.  I don't recall.
19     Q.  And when I say "other side," I mean K-Pipe.
20     A.  I don't recall who K-Pipe had involved in the
21  negotiations.
22     Q.  Do you remember if they negotiated any of the
23  terms at all?
24     A.  I do not.
25     Q.  Okay.  Do you know if Midcoast guaranteed this

Page 103

1  credit agreement?
2      A.  I don't recall specifically if we did or did
3  not.
4      Q.  Do you recall whether they were supposed to?
5      A.  Not offhand.  It's not uncommon that we would
6  issue guarantees to our bank, though, for loans, but I
7  don't remember this, specifically on this one if we did
8  or did not.
9      Q.  Do you know if K-Pipe guaranteed this note?
10     A.  I don't recall.
11     Q.  I think it mentioned that both parties were
12  supposed to in the partnership agreement.  Do you recall
13  that?
14     A.  Right, I recall that, yes.
15     Q.  Now, is this $6.1 million that was borrowed
16  different from the cash that was received from this
17  loan?  Is it different from the loan we saw where the
18  escrow proceeds would be distributed?
19          MR. STERN:  Objection, form.
20     A.  Is it a different 6.1 million?
21     Q.  (BY MR. COFFIN) Yeah.  I know that's a terrible
22  question.
23     A.  I don't know if it's the same or different.  I
24  know the amounts are the same, I understand that.
25     Q.  If you'll turn to ENB 323, that's the escrow

Page 104

1  agreement.
2      A.  Right.  Got it.
3      Q.  Okay.  So, was there money -- my question, I
4  guess, would be would the document, the credit agreement
5  between Butcher Interest Partnership as borrower and
6  Bank of America as lender, is that a refinancing of the
7  6.1 million that was to be distributed under the escrow
8  agreement on ENB 322?
9      A.  I don't remember this.
10     Q.  Okay.  Turn to 539, ENB 539, please.  This
11  appears to be some correspondence from you to Mr. Teig
12  and to K-Pipe Merger Corporation, in general?
13     A.  Correct.
14     Q.  Who is Mr. Teig, do you recall?
15     A.  Well, it says here he was the CPA for K-Pipe.
16  I had forgotten who he was until seeing this.
17     Q.  Okay.  Had you met with Mr. Teig at all?
18     A.  No, not that I remember.
19     Q.  Okay.  Looks like there's an issue between
20  Midcoast and K-Pipe regarding the true-up of the revised
21  adjustment value; is that right?
22     A.  Correct.  I remember there was, yes.
23     Q.  Was that -- do you recall what the issue was?
24     A.  No.  I just remember there was an issue.  I
25  don't remember what it was, but...

Page 105

1      Q.  Okay.  Was the issue ever resolved?
2      A.  It had to be, but I don't remember how.
3      Q.  After closing the transaction in November of
4  '99, did you have any occasions to deal with the K-Pipe
5  people, I mean, like Furman, Hoffman, Mr. Teig?
6      A.  No.  After the transaction, the only time I
7  recall talking to any of them was in connection with the
8  Butcher interest.
9      Q.  And obviously this matter here?
10     A.  Correct.
11     Q.  Did you physically -- or did you talk to
12  anybody over the phone or was it all correspondence
13  related to this matter?
14     A.  You know, I sent this letter, but this matter
15  would have been between our financial people.  So I know
16  the letter is signed by me and -- and I copied Richard
17  Robert, because I'm making the communication, but the
18  issues are his issues as far as resolving them.
19     Q.  Okay.  And if you go to 542, it looks like it's
20  an e-mail from -- or to you, Richard Robert from you,
21  Richard Robert from you?
22     A.  Yes.
23     Q.  And reading through the e-mail string there, it
24  looks like Ms. Morelli was having a hard time getting
25  ahold of K-Pipe people.  Do you recall that?

27 (Pages 102 to 105)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 106

1    A.   Yeah, I see that here, yes.
2    Q.   It says, "Please see message that K-Pipe
3   attorney cannot help us.  Their client is not
4   cooperating.  I will send them an official notice.
5   Chris."
6    A.   Uh-huh, I do see that.
7    Q.   Sent from your Blackberry wireless?
8    A.   Correct.
9    Q.   Did you find K-Pipe uncooperative after closing
10  the transaction in the matters that you dealt with them
11  in?
12   A.   I don't know if uncooperative.  It's just we
13  would -- it would be difficult to find a person to talk
14  to.
15   Q.   The next page looks like -- looks like e-mail
16  from you to Cynthia Morelli, correct?
17   A.   What page?  I'm sorry.
18   Q.   Oh, 543.  543 it says, "Richard Robert, our
19  CFO," you're writing this to Cynthia Morelli, "has been
20  working with Howard on the working capital adjustment
21  and we believe that both parties have agreed that
22  Midcoast is owed approximately" -- Midcoast is owned?
23  It should be owed, isn't it?
24   A.   Correct, yes, should be.
25   Q.   -- owed approximately $120,000.

Page 107

1   Unfortunately, Howard wants to wait to settle a tax
2   matter with Dennis Langley before paying us."  Do you
3   know what that tax matter was?
4    A.   No.  I knew that there were -- well, I'll just
5   say no.  I assumed that there were issues to be resolved
6   between K-Pipe's acquisition from Langley, just like we
7   had issues to resolve between K-Pipe and Midcoast.
8    Q.   Okay.  No. 554, please.
9    A.   Okay.
10   Q.   This appears to be some correspondence between
11  Heller, Ehrman, White and -- how do you pronounce that
12  last one?
13   A.   Tino Monaldo.
14   Q.   No, I'm sorry, I must have the wrong one.
15  540 -- 554.
16   A.   Oh, excuse me.  Okay.
17       MR. CROKE:  McAuliffe.
18       MR. COFFIN:  McAuliffe.
19   A.   I don't see that name on here.
20   Q.   (BY MR. COFFIN) On the letterhead, I'm sorry,
21  at the top.
22   A.   The letterhead, I'm sorry, okay, yes.
23   Q.   Uh-huh.  And this is a memo related to the
24  Section 4 rate case; is that right?
25   A.   Yes.

Page 108

1    Q.   And that's with the FERC; is that correct?
2    A.   Correct.  That's correct.
3    Q.   And my question is more why is this document in
4   the closing book or the closing binder?  What does it
5   have to do with the closing or with the transaction?
6    A.   I don't have a clue.  I mean, all I can assume
7   is it was inadvertently inserted in here --
8    Q.   Oh, okay.
9    A.   -- because it's not a typical closing document.
10   Q.   All right.  Exhibit 2, which is the other
11  binder, the only reason I'm going to talk about it is
12  because I'm going to be very brief on it.  Exhibit 2 is
13  the -- the sale of stock binder.
14   A.   Okay.
15   Q.   All right.  I'm going to represent to you that
16  I got this from your counsel as well.  And would you
17  necessarily have received a -- or it was -- it came from
18  you, your counsel, I assume from Midcoast, so I was just
19  wondering, why would Midcoast have a copy of that
20  binder?
21   A.   As part of our due diligence, we typically
22  would get the documents supporting our acquisition, and
23  these documents would show that, in fact, K-Pipe did
24  acquire the assets and show the chain of title of the
25  assets.

Page 109

1        MR. COFFIN:  All right.  How about a lunch
2   break?
3        MR. STERN:  Sounds good.
4        THE WITNESS:  Good.
5        (Lunch recess, 12:11 p.m. to 1:22 p.m.)
6        MR. COFFIN:  All right.  Let's go back on
7   the record.
8    Q.   (BY MR. COFFIN) Mr. Kaitson, are you ready?
9    A.   Yes, sir.
10   Q.   If you'll turn to Government Exhibit 10, which
11  is -- it's a Kansas Pipeline Company management
12  discussion, August of 1999.
13   A.   Okay.
14   Q.   That's Bates stamped number -- we use the DOJ
15  Bates stamp number on this one, ENB/DOJ 22805.
16   A.   Correct.
17   Q.   On the top, it says Confidential.  It has
18  Midcoast handwritten there.  Do you recognize the
19  handwriting on there?
20   A.   I do not.
21   Q.   Now, did you review something like this in part
22  of your due diligence work?
23   A.   I recall receiving a document similar to this
24  the first time we went to Kansas City to meet with
25  Dennis Langley and the Bishop folks.

28 (Pages 106 to 109)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 110

1      Q.  Okay.
2          MR. COFFIN:  Let's go off the record for
3  just a second.
4          (Recess from 1:23 p.m. to 1:24 p.m.)
5          MR. COFFIN:  Okay.  Back on the record.
6      Q.  (BY MR. COFFIN) Mr. Kaitson, you would have
7  reviewed something like this, you think, during your due
8  diligence work?
9      A.  Yes.
10     Q.  And that would have been due diligence related
11  to the -- the Midcoast review of the Bishop Pipeline
12  Group's assets or stock; is that correct?
13     A.  Correct, when we were negotiating with Bishop
14  to acquire the stock.
15     Q.  On the stock purchase?
16     A.  Correct.
17     Q.  And it's dated August of '99.  Would that have
18  been around the time you would have received something
19  like this?
20     A.  Yes, it would have been.
21     Q.  What was attractive about -- attractive to
22  Midcoast about Kansas Pipeline Company?
23     A.  It was a large interstate pipeline.  We already
24  owned two FERC-regulated interstate pipelines, so we
25  were familiar with the business.  This was of the size

Page 111

1  that we could attempt to acquire larger acquisitions and
2  bid on the market around this time period.  We couldn't
3  afford to acquire them, they were too large.  So,
4  between those two items and the third being that our
5  president was from Kansas and this was a Kansas
6  acquisition, that -- was another factor that we
7  considered.
8      Q.  That was Mr. Tutcher --
9      A.  Correct.
10     Q.  -- that was from Kansas?
11     A.  Correct, yes.
12     Q.  Did he know Mr. Langley?
13     A.  I don't know if he did or not.
14     Q.  Okay.  So, was Midcoast pursuing a pipeline
15  company or did Bishop or its representatives,
16  representatives call Midcoast first?
17     A.  I don't know the answer to that.
18     Q.  Okay.  Any part of the offering memorandum that
19  you considered particularly attractive as far as Kansas
20  Pipeline Company went?
21     A.  I liked the idea of acquiring an asset that we
22  already knew how to operate that type of business.  I
23  mean FERC interstate.  So we had folks that were
24  familiar with that, familiar with the regulations.  That
25  was the -- that was probably the one issue I was most

Page 112

1  comfortable with.
2      Q.  Did you have some input in -- input in the
3  decision making on whether to go after Kansas Pipeline
4  Company?
5      A.  No.  I was on vacation and got a phone call
6  that we're going to go on a due diligence, come home.
7      Q.  Who was the call from, Mr. Tutcher or --
8      A.  No, Mr. Berthelot.
9      Q.  Okay.  Turn on to Government Exhibit 11, which
10  is -- begins with ENB/DOJ 22785.
11     A.  Right.
12     Q.  Now, this is a data room index; is that right?
13     A.  I believe so.
14     Q.  Okay.  And the reason I have it in the binder
15  as an exhibit is it has "Midcoast copies, August 9 of
16  '99" at the top.
17     A.  I see that, yes.
18     Q.  Now, is that your handwriting or anybody's
19  handwriting that you know of?
20     A.  It's not mine.  I don't recognize that.
21     Q.  Okay.  It looks like it was provided by KPI,
22  which may be Kansas Pipeline, Inc., pursuant to a
23  summons from the IRS.  Like I said, it has "Midcoast
24  copies" at the top, so I assume that you reviewed in
25  your group, due diligence group, reviewed something

Page 113

1  similar to this?
2      A.  Yeah, this appears to be the document or
3  something similar to a document that we received of what
4  was in the data room on a trip to Kansas City.
5      Q.  Okay.  And I think the data room index you
6  talked about earlier is pretty typical in larger deals?
7      A.  Correct.
8      Q.  Okay.  Turn to Exhibit 12.  This is -- appears
9  to be a series of document requests made by a gentleman
10  from Midcoast; is that correct?
11     A.  Yes.
12     Q.  Are those -- let's see.  Kaitson, I think,
13  yours, is the third one, third page?
14     A.  That's correct.
15     Q.  And is that your handwriting on that document?
16     A.  Yes, it is.
17     Q.  Okay.  I would assume that the other
18  individuals there, that's their handwriting as well?
19     A.  Yeah.
20     Q.  Can you tell?
21     A.  Couple of them I recognize.  Dan Tutcher, I
22  recognize his.
23     Q.  Yeah, uh-huh.
24         Okay.  Let me ask you generally, how does
25  it work?  Do you go visit -- did you go and visit

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel  (Chris) Kaitson

Page 114

1  Mr. Langley's offices and then provide -- or did they
2  provide these forms to you that you filled out?
3     A.  The process first started, we were given a data
4  room index of this type and we were not allowed to go
5  into the room.  They had a clerk or a person that was in
6  the room.  We would identify which items on this list we
7  wanted to look at.  We were given a piece of paper with
8  the cross-reference from the index sheet.  They would
9  pull the file and give it to us.  When we were done, we
10 would give it back to them.
11    Q.  Okay.  So, once you got it -- once it was given
12 to you, somebody would check "out" and then when it came
13 back somebody would check "in"?
14    A.  Yes.
15    Q.  And this was upon an initial trip to -- to
16 Langley's offices; is that right?
17    A.  I can't say for sure that this -- these
18 documents were from our first trip, but these are the
19 documents we used I know for sure the first couple times
20 we went to the data room.
21    Q.  Okay.  On the first trip you went, which you
22 were required to come back from vacation to go on --
23    A.  Right.
24    Q.  -- was that -- did you do any due diligence at
25 that time?

Page 115

1     A.  Yes, extensive due diligence at that time.
2  That was I believe in August, maybe late July.
3     Q.  And using the same procedure, the data room
4  index and the data request lists?
5     A.  Yes.
6     Q.  And then do you recall another time that you
7  may have come up and done the same thing, as far as
8  requesting documents on the data index?
9     A.  Yes.
10    Q.  Okay.  So maybe twice that happened in this
11 acquisition?
12    A.  Twice using this process with these types of
13 requests.
14    Q.  Okay.
15    A.  And after perhaps the third time we went up, we
16 were then allowed to go into the data room and review
17 whatever documents we desired.
18    Q.  I see.
19        All right.  And then Government Exhibit
20 13, I believe the IRS obtained this document.  Were
21 those the people that were involved in the due
22 diligence?
23    A.  Yes, those and others.
24    Q.  On behalf of Midcoast?
25    A.  Yes.

Page 116

1     Q.  How many would be on teams of the due diligence
2  teams that you would take up there?
3     A.  As small as three or four, as many as a dozen.
4     Q.  And you said there were at least three
5  instances where you, Midcoast, took teams up there to
6  perform due diligence?
7     A.  More than three.  First two I know for sure we
8  followed the process of making requests to review
9  documents.  I know I'm not supposed to guess, but I
10 would say perhaps six times we went to Kansas City.
11    Q.  Okay.  Exhibits 14 and 15 are unsigned copies
12 of letters from Bryan Cave, LLP, to Midcoast,
13 specifically Mr. Lanningham on Exhibit 14 and Mr. Bray
14 on Exhibit 15.  Are these other -- do those letters
15 represent other incidences of due diligence or other due
16 diligence?
17    A.  I have never seen these before.
18    Q.  Okay.  Was it -- was there a procedure ever
19 where, with regard to this specific transaction or
20 attempted transaction -- and that's the stock
21 purchase -- where you guys, Midcoast, would request
22 documents from Langley or his law firm and they would
23 send them to you?
24    A.  Yes.
25    Q.  Okay.  Exhibit 20 is a draft document, board of

Page 117

1  directors meeting for Midcoast Energy Resources, Inc.,
2  dated August 11th of 1999.
3         MR. COFFIN:  I assume, Ms. Pipkin, there
4  are signed copies of all the minutes that -- in the
5  documents that you provided us on the production?
6         MS. PIPKIN:  We've provided you with
7  everything we have.
8         MR. COFFIN:  Okay.
9         MS. PIPKIN:  So --
10        MR. COFFIN:  Well, I'll substitute this
11 with a signed copy later.
12    Q.  (BY MR. COFFIN) But, generally speaking,
13 Mr. Kaitson, did you ever have an opportunity or
14 occasion to review minutes to board meetings for the
15 company?
16    A.  No.
17    Q.  Okay.  Did you attend board meetings ever?
18    A.  No.
19    Q.  Okay.  If you'll look on paragraph B on the
20 first page of Exhibit 20 --
21    A.  Yes, sir.
22    Q.  -- where it says Management Changes, the last
23 sentence refers to various acquired companies, and I was
24 wondering, we talked about the acquisitions that
25 Midcoast had engaged in prior to the Kansas Pipeline.

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 118

1    A.  I'm sorry, I'm not following where you are in
2  this document.  First page?
3    Q.  Okay.  First page --
4    A.  Okay.
5    Q.  -- paragraph B at the bottom.
6    A.  Oh, okay.
7    Q.  There's a discussion there about "pull together
8  and assimilating the employees from our various acquired
9  companies."  And I'm -- the reason -- the only reason
10  I'm asking the question is: what companies were acquired
11  that he may have been talking about at that point, if
12  you know?
13    A.  August of '99 was prior to my joining Midcoast.
14    Q.  August of '99?
15    A.  I didn't join until Halloween of '99.
16    Q.  I thought it was '97.
17        MR. STERN:  '97.
18    A.  '97, I'm sorry.  It was '97.
19    Q.  (BY MR. COFFIN) I think we talked about a
20  couple of them, but I just wondered if there were more,
21  if you recall?
22    A.  There were transactions during that time
23  period.  I don't recall the names of the transactions.
24    Q.  All right.
25    A.  Okay.

Page 119

1    Q.  And on the second page of the minutes --
2    A.  Okay.
3    Q.  -- under New Business, Kansas Pipeline, would
4  you read over all the way to B and I'll ask you a
5  question in a second.
6    A.  Okay.
7    Q.  Okay.  And do you know if that section under
8  the New Business, Section A, was consistent with
9  management's perception of Kansas Pipeline at the time?
10    A.  Some parts of that I'm familiar with; other
11  parts of this language I'm not familiar with.  The
12  dollars that are mentioned in here, I don't recall ever
13  having any discussions or any knowledge of what prices
14  or what bids were submitted by other folks.  The portion
15  dealing with the history of the pipeline, first
16  paragraph, if you will, under A, I do recall that
17  information and I believe I also became aware of that as
18  part of the due diligence process.
19        The second paragraph dealing with
20  Mr. Langley's involvement with the Democratic Party, I
21  remember that information being discussed among the
22  management team.
23    Q.  Are you aware of the -- the bids that Langley
24  received, as stated by Mr. Tutcher?
25    A.  No, I had never heard other company names as

Page 120

1  far as the bids were concerned.
2    Q.  At the top of page 3, it says, "Our initial bid
3  was 157 million, but we now understand the rate case
4  better and have identified additional synergies."  What
5  was the rate case?
6    A.  The rate case, Kansas Pipeline Company started
7  out as a state regulated pipeline and not regulated by
8  the Federal Energy Regulatory Commission.  There was a
9  complaint filed by some shippers or by some parties
10  saying that it really is an interstate pipeline; they're
11  just operating it at different pieces.  And, as a result
12  of that, Kansas Pipeline Company agreed they would be
13  regulated by the Federal Energy Regulatory Commission.
14        That required them then to file initial
15  rates, substantiate those rates, to file a tariff, and
16  then to actually file a rate case to prove what the long
17  term rates should be for the pipeline.  So that's the
18  rate case explanation.
19    Q.  Okay.
20    A.  The additional synergies portion of that simply
21  refers to we already have two interstate pipelines, we
22  have folks that are familiar with operating interstate
23  pipelines, so we would not require all of the current
24  Kansas Pipeline Company management team to take over the
25  same service.  We would save some money by doing with

Page 121

1  our existing folks.
2    Q.  Okay.  And the last sentence of that paragraph
3  says, "Mr. Langley prefers a cash deal and the
4  debentures can be assumed making a cash offer of $110 or
5  $115 million."  Do you know why Mr. Langley preferred a
6  cash deal?
7    A.  No idea.  Never heard that before.
8    Q.  And the sentence above that refers to Midcoast
9  continuing to work with Mr. Langley on other projects.
10  Was that -- do you remember that issue at the time?
11    A.  I recall Mr. Langley making many speeches to --
12  to us as a bidder, and one of those being that he liked
13  us and he felt comfortable doing business with Midcoast
14  in the future and -- and looked forward to attempting to
15  work -- to work with us.
16    Q.  What was your impression of Mr. Langley?
17        MR. STERN:  Note for the record that
18  counsel is smiling.
19    A.  Mr. Langley ran his company.  He had final
20  say-so, final control over everything that was done.  He
21  would be very creative at the times when the rest of us
22  were sleeping.  His typical workday started at 2:00 or
23  3:00 or 4:00 in the afternoon and went until 2:00 or
24  3:00 or 4:00 in the morning.  We would leave 6:00, 7:00
25  in the evening, go to dinner.  Dennis Langley would

31 (Pages 118 to 121)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 122

1  still be working.  We would come in the next morning and
2  we would be surprised at the documents or the changes
3  that were being proposed to documents.  He wanted it his
4  way.
5      Q.  Do you have an Exhibit 21 in your book?
6      A.  Yes, sir.
7      Q.  Tell me what Exhibit 21 is.
8      A.  It's a group of letters from different
9  entities, one from Bishop Group, one from Bryan Cave.
10  They appear to be addressed to different individuals.
11     Q.  Okay.  Could we -- could I just say that this
12  is more due diligence type work that Midcoast was
13  engaged in?  Is that too general to describe these
14  documents?
15     A.  Let me just -- give me a moment to look at the
16  content.
17     Q.  Sure.
18     A.  Yes, these appear to be due diligence type
19  communications.
20     Q.  Okay.  Do you recall how much time or can you
21  estimate how much time was spent conducting due
22  diligence on this stock purchase?
23     A.  Hundreds of hours.
24     Q.  Is that pretty typical in deals this size or --
25     A.  This was the first deal we had done of this

Page 123

1  size.  We were somewhat nervous of a deal of this size,
2  so we spent more time perhaps than we would have spent
3  on a deal subsequent to it of the same size.
4      Q.  Okay.
5      A.  So this is -- we probably spent more time on
6  this than we did other transactions of a similar size,
7  but this transaction was far more complicated than --
8  than 90 percent of the deals.
9      Q.  Yeah.
10         MR. COFFIN:  Okay.  Let's go off the
11  record for a minute.
12         (Recess from 1:45 p.m. to 1:47 p.m.)
13     Q.  (BY MR. COFFIN) Pull Exhibit 150 from your
14  binder.  Just pull it out.  We'll refer to it
15  periodically.
16     A.  Okay.
17     Q.  All right.  So we were on Exhibit 22; is that
18  right?
19     A.  Yes, sir.
20     Q.  22.  And we -- and we said that that was more
21  due diligence, basically?
22     A.  No, the ones prior to that.
23     Q.  Oh, okay.
24     A.  Let me look at 22.
25     Q.  21, I'm sorry.  21 was more due diligence?

Page 124

1      A.  Correct.
2      Q.  Okay.  22 is a copy of a letter from Chase to
3  Mr. Chip Berthelot; is that right?
4      A.  Yes, it is.
5      Q.  Dated August 18 of 1999.  Once again, this
6  document is not signed, but I think it's the only
7  document we have of its kind.  Do you recall reviewing a
8  letter similar to this one --
9      A.  No.
10     Q.  -- mr. Kaitson?
11         Okay.  So this would be categorized -- how
12  would you categorize this letter, on a general basis,
13  from Chase?  It sets forth the procedures for submission
14  of a bid?
15     A.  Yeah, it appears that -- that typically this --
16  a letter of this type would be sent when a party has
17  been invited to participate in the due diligence or
18  bidding process.
19     Q.  Okay.  It's dated August 18 of 1999.  Do you
20  know if that's about the time you would have received a
21  letter like this from -- from Chase?
22     A.  I -- no, I don't know what dates it would have
23  been.
24     Q.  Okay.  All right.  Go to Exhibit 23, please.
25     A.  Okay.

Page 125

1      Q.  That's a letter from Bank of America to
2  Midcoast, correct?
3      A.  Yes.
4      Q.  Attention, Richard Robert; is that correct?
5      A.  Yes.
6      Q.  Did you get a copy or get an opportunity to
7  review this letter?
8      A.  Nope.
9      Q.  Okay.  On the second page, it says, "Having
10  conducted the review cited above and taking into account
11  the assumptions cited above, we believe that a
12  transaction providing for all costs and expenses
13  associated with the acquisition transaction is
14  financeable through and up to $250 million senior
15  secured bank debt facility."
16     A.  I see that.
17     Q.  Okay.  And this is dated August 25 of '99, so
18  that would have been before K-Pipe would have entered
19  the picture; is that correct?
20     A.  I assume so.  I know the first time I met
21  K-Pipe.  I don't know when they officially entered the
22  picture.
23     Q.  Okay.  And I asked you to pull Exhibit 150.  Do
24  you have that one handy?
25     A.  Yes.

32 (Pages 122 to 125)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 126

1    Q.  And this is Richard Robert's -- I mean, I'm
2  sorry, Ronald Chachere's invoice to Midcoast, correct?
3    A.  Yes.
4    Q.  Dated November 19, 1999; is that right?
5    A.  Yes.
6    Q.  And what was Mr. Chachere's relationship with
7  Midcoast in August of '99?
8    A.  He was outside counsel for Midcoast and had
9  been outside counsel for Midcoast since their inception.
10 He had been the attorney that had conducted every
11 acquisition for them during this time.
12   Q.  He was already being used before you came into
13 the picture at Midcoast?
14   A.  That's correct.
15   Q.  Okay.  The first entry on his invoice shows
16 that on August 16 of '99 he received a call from you and
17 discussed some basic aspects of the acquisition of the
18 Kansas Pipeline; is that correct?
19   A.  Correct.
20   Q.  Okay.  Would that have been the first time he
21 would have been -- I guess is that when Midcoast was
22 serious about the deal --
23   A.  Yes.
24   Q.  -- would have been August 16th?
25       You would have made that call?

Page 127

1    A.  Yes, at the time that I decided that the
2  transaction was of such size that I needed outside
3  counsel to assist.
4    Q.  As general counsel, are you responsible for
5  reviewing the legal bills?
6    A.  Currently, I am, but at this time I was not.
7    Q.  Okay.  Who was doing that at the time?
8    A.  Richard Robert.
9    Q.  And Mr. Robert, I assume, or --
10   A.  I say that.  I'm -- I probably ought to --
11   Q.  Qualify?
12   A.  I don't know if Richard Robert was.  I was not.
13   Q.  All right.  You were -- you were -- part of
14 your duties did not include reviewing this particular
15 invoice?
16   A.  Not at this stage of my career with Midcoast
17 Energy.
18   Q.  Okay.
19   A.  After the Kansas Pipeline acquisition, I
20 undertook that responsibility.
21   Q.  Okay.  Exhibit 24, please.
22   A.  Yes.
23   Q.  This is a redline draft of the agreement and
24 plan of merger between -- by and among Midcoast Energy
25 Resources, Inc. and the Bishop Group, right?

Page 128

1    A.  Correct.
2    Q.  Okay.  Who would have drafted this document?
3    A.  I seem to recall this being a seller document.
4  The seller proposed this document.
5    Q.  Okay.  And then the redline changes, who
6  necessarily made those changes, do you know?
7    A.  They would have been Midcoast, a combination
8  of -- of the management team that had been involved in
9  the initial review and the initial due diligence.
10       MR. STERN:  Is this a complete document?
11 I've just got to page 4.
12       THE WITNESS:  Mine goes to page 34.
13       MR. COFFIN:  You got a bad copy, I'm
14 sorry.  Exhibit 24, let me give you the Bates numbers on
15 it.  The Bates number of Exhibit 24, ENB/DOJ 36026
16 through 36060.  And since it doesn't have a Bates stamp
17 number on it, I believe it was produced by Chase.
18   A.  Mine does have a number at the bottom.
19   Q.  (BY MR. COFFIN) Well, I'm sorry, it doesn't
20 have a number other than the government Bates stamp
21 number.
22   A.  Oh, correct.
23   Q.  So, as of August 30 of '99, there was already a
24 redline draft of the agreement between the two entities?
25   A.  Correct.

Page 129

1    Q.  Okay.  And go to Exhibit 25, please.  Is this
2  the initial letter of intent between or that Midcoast
3  sent to Chase on behalf of Langley?
4    A.  Yes.
5    Q.  So, the primary offer value was $184,200,000;
6  is that right?
7    A.  That's what the document says, yes.
8    Q.  Were you involved at all in determining the
9  primary offer value?
10   A.  No.
11   Q.  Would that be Mr. Tutcher and Mr. Robert?
12   A.  And with Mr. Berthelot's involvement, possibly
13 Mr. Herbst.
14   Q.  And do you know why the supplemental offers
15 were made under (iii)?
16   A.  I recall Dennis Langley telling us at one of
17 our due diligence sessions that his expectations were
18 items A and B would be part of the transaction.
19   Q.  Okay.  What about C on the next page?
20   A.  I didn't think the project development
21 agreement was August 3rd.  Seems to me it started in
22 early September, but I'm not confident of the date.  So,
23 yeah, that could have been part of it at this time as
24 well.
25   Q.  Okay.  Do you know why Langley did not accept

33 (Pages 126 to 129)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:  Emmanuel  (Chris)  Kaitson

Page 130

1   this offer?
2       A.  No.
3       Q.  And why didn't Midcoast make an offer to
4   purchase the assets only?
5       A.  My understanding was Langley would not
6   entertain an offer for assets only.
7       Q.  So, on the second page of this letter, where it
8   talks about timing, "It is estimated that MRS can close
9   this traction the later of September 30, 1999 or the
10  receipt of HSR approval." So Hart-Scott-Rodino approval
11  would have been required on this transaction?
12      A.  Yes, I believe so.
13      Q.  And was it the purchase price that invoked
14  that -- that requirement or can you elaborate?
15      A.  Well --
16          MR. STERN:  There's a -- there's a size of
17  person test and there's a size of transaction test and
18  you have to meet both.
19          MR. COFFIN:  Okay.
20          MR. STERN:  And so this apparently was
21  triggered both by the size of person and size of
22  transaction.  I think what he was saying earlier about
23  K-Pipe, although the transaction met the size of
24  transaction test, K-Pipe didn't meet the size of person
25  test.

Page 131

1           MR. COFFIN:  I see.
2           MR. CROKE:  And is that because K-Pipe
3   didn't have any gas pipeline assets?
4           MR. STERN:  No, it's just the -- you look
5   at the entire corporate family and what's the -- what's
6   the size of that.
7           MR. CROKE:  In dollar terms?
8           MR. STERN:  Yeah.
9           MR. CROKE:  Value?
10          MR. STERN:  Value.
11          MR. CROKE:  I see.
12          MR. COFFIN:  Thank you.
13      Q.  (BY MR. COFFIN) On subparagraph (v), Value for
14  MarGasCo, M-A-R-G-A-S-C-O, "The implicit value that MRS
15  has allocated to MarGasCo is $1,275,000," do you know
16  how that was determined by Midcoast?
17      A.  No, I do not.
18      Q.  At what point was Price Waterhouse Coopers
19  brought in to review the transaction?
20      A.  First recollection I have of Price Waterhouse's
21  involvement was about mid September.
22      Q.  Okay.
23      A.  They could have been involved before that.
24  That's the first recollection I have of them.
25      Q.  Now, with regard to this letter of intent,

Page 132

1   Exhibit 25 -- I said letter of intent.  Is it
2   necessarily a letter of intent or is it just a proposed
3   offer letter?
4       A.  Not a lot of difference between the two.
5       Q.  Okay.  Was there any discussion at this time
6   about the Butcher interest?
7       A.  I don't recall.  I don't recall when the
8   Butcher interest was actually discussed and a major part
9   of the negotiations.
10      Q.  Okay.  Turn to Government Exhibit 26, please.
11  This is a facsimile from Craig Hoffman of Fortrend
12  International, LLC, to Bruce Snyder, "cc" Tom Palmisano?
13      A.  I see that, yes.
14      Q.  Okay.  Do you ever have occasion to review this
15  particular document?
16      A.  No, I don't recall ever seeing this.
17      Q.  I know the first page probably not.  How about
18  the second and third page?
19      A.  Don't recall seeing those pages either.
20      Q.  When did you first become aware or hear
21  of the company named Fortrend?
22      A.  Mid September, about the same time I recall
23  Price Waterhouse communications or talking with them.
24      Q.  Okay.  Did Price Waterhouse mention Fortrend to
25  you?

Page 133

1       A.  Not to me, no.  I first heard the name from
2   Richard Robert.
3       Q.  Did you ever meet with anyone from Fortrend
4   personally?
5       A.  I met with their lawyers.
6       Q.  Who would that have been?
7       A.  Cynthia Morelli and --
8       Q.  Graham Taylor?
9       A.  Graham Taylor.  I started to say Grant but
10  Graham Taylor.
11      Q.  But you never had occasion to meet with Craig
12  Hoffman or Jeff Furman?
13      A.  One of those individuals was in Kansas City at
14  the same time I was there and we went to dinner two
15  evenings together.  I don't recall which one of the two.
16  And that was the extent of it.
17          So, other than that, no.
18      Q.  What did you know about Fortrend?
19      A.  Personally, I didn't know anything.  What was
20  communicated to me from -- from Richard Robert, that's
21  the extent of what I knew.
22      Q.  Did you have any reservations about Midcoast
23  doing business with Fortrend?
24      A.  No.
25      Q.  Do you know if anyone else did?

34 (Pages 130 to 133)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel  (Chris)  Kaitson

Page 134

1    A.  I do not know.
2    Q.  Did you personally do any -- perform any due
3  diligence with regard to Fortrend?
4    A.  I recall doing an Internet search, just a name
5  search, to see if I could find anything on the
6  companies; and that's the extent of what I recall
7  personally doing.
8    Q.  Did you find anything?
9    A.  I remember finding the name and some articles
10 and -- in the New York papers, and that's -- that was
11 it.  They -- they had been involved in acquisitions.
12   Q.  Okay.  Get in the other binder document
13 Government Exhibit 160, please.
14   A.  Okay.
15   Q.  This is a draft memorandum dated December 14 of
16 1999 on Price Waterhouse Coopers letterhead, correct?
17   A.  Yes.
18   Q.  And it says To/Location, Midcoast file;
19 From/Location, Gary Wilcox, Catharine Coffey?
20   A.  Correct.
21   Q.  Subject, Midcoast/K-Pipe Transaction, Tax
22 Analysis?
23   A.  Yes.
24   Q.  Have you ever seen this document?
25   A.  I don't think so, no.

Page 135

1    Q.  Okay.
2    A.  No, I have not.
3    Q.  Okay.  Turn to page 2.  And I know you haven't
4  seen the document, but there are representations made in
5  here that I want to ask you about, if you'll -- about
6  the accuracy of them.
7    A.  Okay.
8    Q.  The top of the page 2, it says, "While Midcoast
9  was aware of Langley's stated preference throughout the
10 negotiation, it had hoped an asset deal could be
11 negotiated."  Was that correct at the time?
12   A.  That we hoped that, yes.  We hoped all the
13 other bidders would drop out and we were the only game
14 in town and they would go by our rules.
15   Q.  Second paragraph it says, "In August 1999,
16 Langley indicated to Midcoast that Midcoast's bid was
17 lower than several of the other bidders -- other bids by
18 approximately 20 million, but that he might be
19 interested in entertaining creative structural ideas
20 such as a revenue sharing arrangement."  Is that an
21 accurate statement?
22   A.  Yes.
23   Q.  And the next sentence says, "Midcoast began to
24 consider how its bid could be made more attractive
25 without significantly increasing the purchase price."

Page 136

1  Is that correct?
2    A.  Yes.
3    Q.  How about the rest of that paragraph, starting
4  with "one option discussed"?
5    A.  Those are accurate, yes.
6    Q.  Okay.  And this third paragraph begins,
7  "Midcoast independently pursued the so-called 'Midco
8  transaction' as a structural alternative"?
9    A.  I don't know that to be fact, factually
10 correct.
11   Q.  Okay.  Do you know what the phrase "structural
12 alternative" means?
13   A.  I'd be guessing if I -- if I said yes, so...
14   Q.  All right.  "On August 27, 1999, Midcoast and
15 Price Waterhouse Coopers contacted Fortrend
16 International, LLC."  Is that true?
17   A.  I did not know that occurred then, no.  Well, I
18 can't say it's true or not true.  I don't know.
19   Q.  Okay.  But did Midcoast and Price Waterhouse
20 contact Fortrend eventually, make the first initial
21 contact?
22   A.  That's not my understanding.
23   Q.  What was your --
24   A.  My understanding is that Price Waterhouse
25 introduced Fortrend to Midcoast.

Page 137

1    Q.  Did you ever participate in a phone conference
2  with Fortrend where it was the first initial contact
3  with them?
4    A.  No.
5    Q.  Do you know if Mr. Robert did?
6    A.  I do not know.
7    Q.  Okay.  "On August 30," the fourth paragraph,
8  "1999, Fortrend provided some of its background
9  information to Langley's tax advisors, Ernst & Young."
10 Do you know if that's true or not?
11   A.  I do not know.
12   Q.  It goes on, "Over the next several weeks,
13 several conversations took place among Fortrend,
14 Midcoast, PWC and Ernst & Young regarding the viability
15 of the Midco alternative."  Do you recall if there were
16 any meetings between the four of those?
17   A.  I never participated in any meetings where
18 Ernst & Young was present or participated, so I -- not
19 that I'm aware of.
20   Q.  Did you participate in any meetings with
21 Fortrend --
22   A.  Yes.
23   Q.  -- where Midcoast and PWC were involved?
24   A.  Yes.
25   Q.  Where were those meetings?

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 138

1    A.  We met in Kansas City and we also had
2  telephonic meetings.
3    Q.  And what kind of things were discussed with
4  them at that time?  Did you ever hear of the term "Midco
5  alternative" or "Midco"?
6    A.  This is the first time in reading it right now
7  today.
8    Q.  Did you ever hear of the phrase "intermediary"
9  or anything like that?
10    A.  I've heard that intermediary before, yes.
11    Q.  In conjunction with this transaction?
12    A.  Yes.
13    Q.  Okay.  And what did you hear about -- how was
14  it described to you?
15    A.  Just -- how was it described to me?  I don't
16  believe it was described.  Just that Fortrend could be
17  an intermediary, what I recall.  And I formed my own
18  conclusion to what that may or may not mean.  I don't
19  recall ever discussing that with anyone.
20    Q.  So did you hear the -- you heard the phrase
21  "intermediary"?
22    A.  Correct.
23    Q.  Okay.  And you said that you thought Fortrend
24  might be an intermediary?
25    A.  Yeah, I seem to recall discussion somewhere

Page 139

1  with someone, I don't know who it was --
2    Q.  Uh-huh.
3    A.  -- where Fortrend and intermediary were in the
4  same sentence.
5    Q.  Okay.  And then you said you reached some
6  conclusion on your own.  What was that conclusion?
7    A.  That Fortrend, from my understanding of what
8  their past practices were, they would buy a large
9  company and sell off pieces of the company, and that we
10  could then pursue acquiring the pieces we wanted from
11  them.
12    Q.  Okay.  The fifth paragraph says, "On
13  September 13, 1999, PWC met with Midcoast in Kansas City
14  to determine whether -- to determine whether Fortrend
15  should be invited to enter the bidding process."  Do you
16  recall that meeting or a meeting like that?
17    A.  Yes.  That's about the right date.  I don't
18  know if that's the exact date, but there was a meeting
19  with them in Kansas City, yes.
20    Q.  It says, "At the time, Langley was actively
21  discussing a transaction with at least three or four
22  potential purchasers."  Is that correct?
23    A.  That's what he told us.
24    Q.  Do you know who they were?
25    A.  I don't -- no.  Matter of fact, I doubted that

Page 140

1  was in fact correct, but that's what Langley told us.
2    Q.  Okay.  And then skip a sentence, it says, "PWC
3  discussed with Fortrend the price at which Fortrend
4  might sell assets of the Bishop Group to Midcoast if
5  Fortrend were to buy the stock of Bishop Group."  Do you
6  recall that discussion?
7    A.  No.
8    Q.  Do you recall a similar discussion?
9    A.  Not involving PWC.
10    Q.  Do you --
11    A.  I remember talk --
12    Q.  Go ahead.
13    A.  I remember talking, participating in a
14  discussion with Fortrend or Fortrend's lawyer, I should
15  say.  When I say "Fortrend," do you interpret that to
16  mean their lawyer also or just the principals?
17    Q.  Either, yeah.
18    A.  Okay.  Because when I say "Fortrend" --
19    Q.  Okay.
20    A.  -- my only interaction with them was with their
21  lawyers and maybe very limited with their business
22  folks.
23    Q.  And then the next sentence says, "Once Midcoast
24  decided to urge Fortrend to submit a bid, PWC discussed
25  briefly with Langley the due diligence process and

Page 141

1  closing schedule if a Midco alternative were pursued."
2  Did Midcoast urge Fortrend to submit a bid?
3    A.  Did we urge them to?  I don't know if we urged
4  them to.  We hoped that someone would -- would buy
5  everything Langley had for sale so we could buy the
6  pieces we wanted.  So, if that's urging them to, then
7  yes.
8    Q.  It says -- the next sentence says, "The
9  specific timetable included and anticipated date of
10  September 22 for execution of letters of intent, and
11  anticipated closing dates of October 22.  This schedule
12  was driven in part by the need for Fortrend to file for
13  HSR approval once a letter of intent between Fortrend
14  and Langley was signed."
15        As we discussed earlier, there was no HSR
16  approval required for that transaction; is that right?
17    A.  I believe that's correct.
18    Q.  "During September 13, PWC and Midcoast were
19  located in a separate conference room from Langley and
20  his representatives."  Is that correct?
21    A.  Yes.
22    Q.  And why?  Why was that?  Why were you located
23  separately?
24    A.  There were different bidders now in the
25  process.  We were continuing to talk with Langley about

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:  Emmanuel (Chris) Kaitson

Page 142

1  a stock transaction, if anything could be worked out at
2  the price we could -- we could justify, and at the same
3  time we were also talking with the K-Pipe/Fortrend
4  people about if you're going to buy everything, we'd
5  like to buy some pieces from you.
6      Q.  Now, is that something that's -- that's normal
7  in the business or is that something that you were --
8  that was new to you, working with two potential sellers
9  at the same time?
10     A.  No, there was another transaction we worked on
11 that -- it was after this time period, though.  I don't
12 recall the year -- where the entity we were acquiring
13 the assets from had to in fact acquire the remainder of
14 the interest.  They only owned a percentage.  I don't
15 know if it was 50 percent, some percentage of the
16 assets.  And before they could sell the assets,
17 100 percent of the assets to us, they had to acquire the
18 other 50 percent, and we were involved in reviewing
19 those documents, confirming that they in fact did
20 acquire the 50 -- remaining 50 percent interest so that
21 they owned 100 percent.  So...
22     Q.  But were you making a bid to that other
23 50 percent owner?
24     A.  No, we were just buying from the one company,
25 with the expectation that they would acquire the other

Page 143

1  50 percent and then sell us 100 percent.
2      Q.  Okay.  In this situation, though, this says you
3  were still actively pursuing the stocks or the asset
4  from Langley or the stock from K-Pipe?
5      A.  Correct.  We wanted to buy this asset.  And we
6  hoped to do it, hoped to get it done, so we were
7  pursuing every avenue we could.
8      Q.  Okay.  Turn to Exhibit 27, please.
9      A.  Okay.
10     Q.  Do you know whose handwriting that might be?
11     A.  I do not.
12     Q.  It's not yours?
13     A.  No, it is not mine.
14     Q.  Are you familiar with any of the items listed
15 thereon?  Item No. 1 discusses a plane?
16     A.  I do recall a plane discussion and that
17 Langley's companies owned a plane.  I do recall that,
18 yes.
19     Q.  Item No. 2 says, "75/25.  75/25 upside, until
20 2X hicky"?
21     A.  No idea what that means.
22     Q.  No. 3 says, "Tax, use it or not.  If yes, share
23 50 percent savings, plug back into GAP, or we adjust one
24 fourth of it now."
25     A.  No idea.

Page 144

1      Q.  Okay.  It says on the left, "Dennis to use
2  Price Waterhouse."  Any idea?
3      A.  No.  Sorry.
4      Q.  Okay.  And then the top corner of Item 3 says,
5  "Roughly 20 -- is that 20 million -- "to 100 percent"?
6      A.  20M squared, is that --
7      Q.  Yeah.  Does that mean 20 million?
8      A.  I'm not sure.
9      Q.  Okay.  The next line item shows, "Our tax step
10 up if Dennis can get comfy."  Do you know what that is?
11     A.  No.
12     Q.  Turn to page -- middle of that next page is
13 handwritten.  Do you recognize that handwriting?
14     A.  No, do not.
15     Q.  There is a star.  It says, "He wants us to take
16 the private placement risk."  Do you know what that's
17 about?
18     A.  I recall Langley telling us we could go raise
19 money if we'd sell some more stock.  "Why don't you go
20 sell some more stock to raise some more money."
21     Q.  Was that an alternative?
22     A.  That was not a decision that I would have been
23 able to make or been involved in.  That would have been
24 Richard and Dan and Chip, whether that's an alternative
25 or not.  I just recall Langley saying that, and

Page 145

1  typically that goes with private placement possibilities
2  of --
3      Q.  Okay.  And turn to Government Exhibit 28.  It
4  says Deal Point Sheet, M.C. Ruby, Attorney/Client
5  Privilege Confidential.  Are you familiar with this
6  document?
7      A.  No.
8      Q.  Item No. 3 says, "Gap to be closed.  A., Hard
9  23 million, $1.00 for $1.00 up front, no risk of
10 performance is taken; or, B., Soft, 46 million, $1.00
11 down to $1.00 up, risk of performance is taken."  Do you
12 know what that means or what that is addressing?
13     A.  I'd be guessing if I did, if I answered that.
14 I -- I don't know in fact what's -- Langley wanted more
15 money.  Those were a couple options of perhaps getting
16 more money.
17     Q.  What's the hard and soft?
18     A.  Typically, hard -- I mean, I don't know what --
19 exactly what it means here, but my understanding when I
20 am accustomed to using the word "hard," it's real
21 dollars, I want hard money, give me real money; whereas,
22 soft money, there's an opportunity to make 46 million or
23 an opportunity to make zero, and so it's soft money.  If
24 the person is willing to take the upside risk, then
25 they'll make a whole lot more, understanding they may

37 (Pages 142 to 145)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel  (Chris)  Kaitson

Page 146

1  get zero out of it.
2      Q.  What's item C?  Have you ever heard the term
3  "Ruby Diablo"?
4      A.  Never.
5      Q.  B, it says, "If PWC $5 million; indemnity from
6  M.C."  Do you know what that is?
7      A.  No.
8      Q.  It says "step up," handwritten?
9      A.  Yeah, I see that, but, no, I don't know what
10  that is.
11      Q.  And "capital loss generates"?
12      A.  I see that writing on there.  I don't recognize
13  it.
14      Q.  Okay.  Item number -- Government Exhibit 30.
15      A.  Okay.
16      Q.  It says Summary of Essential Modifications to
17  Merger Agreement Presented by Midcoast.  Do you
18  recognize this handwriting?
19      A.  I do not recognize the handwriting.
20      Q.  Have you seen the document before?
21      A.  No.
22      Q.  Item No. 7 says, "There may be an issue as to
23  whether stockholder receiving an adequate tax letter is
24  a condition to stockholder closing and whether Midcoast
25  representation and warranty as to non-interference with

Page 147

1  stockholder's tax-free reorganization and capital gains/
2  loss treatment is secured by an unperfected lien against
3  BPC/BGT stock, SPCLP partnership interests and KPC
4  assets."  Do you know what that paragraph is discussing?
5      A.  I do not.
6      Q.  Paragraph -- I'm sorry, Government Exhibit
7  35 --
8      A.  Ask me about 31.  I've seen it before.
9      Q.  All right.  Tell me about Government
10  Exhibit 31.
11      A.  No, just I've seen it before.  I haven't seen
12  the other ones.  Here's one I recognize.  I have seen
13  this page before.
14      Q.  All right.  Well, I'm not going to ask you any
15  questions about it.
16          Government Exhibit 35, a facsimile from
17  Bryan Cave, LLP, from James P. Pryde, Esquire, to Tom
18  Palmisano.  And he's with PWC; is that right?
19      A.  Yes.
20      Q.  Did you work with Palmisano quite a bit on this
21  transaction?
22      A.  I didn't.  I had a couple conversations with
23  him perhaps.
24      Q.  And Craig Hoffman, the fax is also to Craig
25  Hoffman.  Have you seen this document before?

Page 148

1      A.  I have not.
2      Q.  Okay.  Do you know -- so it appears to be a
3  mutual confidentiality agreement being sent to Fortrend,
4  right?
5      A.  Correct.
6      Q.  By the Bishop Group, Bishop Group's attorney.
7  So my question is: do you know why Tom Palmisano would
8  be getting a copy of this?
9      A.  I do not.
10      Q.  Now, back on Government Exhibit 160, which is
11  the -- yeah, the reason we're going back and forth is
12  we're trying to follow the chronology of events here.
13      A.  Okay.
14      Q.  On the third paragraph of page 3 of Government
15  Exhibit 160 --
16      A.  Yes.
17      Q.  -- third paragraph, it says, "Midcoast did not
18  formally withdraw its bid to purchase the stock of
19  Bishop Group.  Langley continued to have discussions
20  with several other potential buyers.  Midcoast was
21  concerned that withdrawing its bid would render it
22  unable to go forward with the stock purchase in the
23  event that Fortrend was unable to proceed with the stock
24  purchase transaction."  Is that an accurate statement?
25      A.  Yes.  Well -- yes, it's accurate.  Do I know it

Page 149

1  to be -- just a moment.
2          The second sentence, "Langley continued to
3  have discussions with several other potential bidders,"
4  I -- I don't know that to be accurate.  All I know is
5  that Langley told us that was happening.
6      Q.  Okay.  "Accordingly, Midcoast did not cease its
7  due diligence review of the Bishop Group, which was
8  already in progress.  The other potential purchasers
9  also continued their due diligence events."  Who were
10  the other potential purchasers?
11      A.  We don't know.  I did not know.
12      Q.  Okay.
13      A.  Earlier we read some minutes where there was
14  something in some meeting minutes about some names.  I
15  had not heard those names before.
16      Q.  Okay.  And this is probably as of the middle of
17  September, so you weren't aware at that time either?
18      A.  No.  Matter of fact, every time we went back to
19  the data room, we looked for papers and cards, trying to
20  identify if someone left a card, and the only thing we
21  found was a card from someone at Enron, which we -- Ron
22  Chachere and I speculated someone from Enron had been
23  there.
24      Q.  And then it says, "However, as of September 13,
25  1999, Midcoast did not engage in any further discussions

HUNDT REPORTING
214-220-1122

Witness:   Emmanuel  (Chris)  Kaitson

Page 150

1  with Langley or his representatives regarding a purchase
2  of Bishop Group stock." Is that a correct statement?
3      A. I don't believe so, no.
4      Q. Okay. Tell me why it's not correct.
5      A. That's -- that date, September 13th, is about
6  the time I believe Fortrend entered the transaction,
7  from -- based on my knowledge.
8      Q. Uh-huh.
9      A. I recall going to Kansas City to continue due
10 diligence and walking into the data room and meeting
11 Cynthia Morelli for the first time. And I asked her who
12 she is and what she's doing there. And that -- that --
13 she was outside counsel for Fortrend and had been there
14 doing due diligence work.
15         We continued even after that process
16 negotiating with Langley a stock deal, in the event
17 K-Pipe decided not to pursue or we were the only bidder
18 left in the world that wanted the assets, any number of
19 possibilities. So I believe we continued negotiating
20 the stock purchase deal for perhaps a week after that,
21 maybe longer.
22     Q. Okay. And how is it that you're able to gauge
23 the dates?
24     A. The timing of -- closing was November -- going
25 backwards from there to when we first started, to the

Page 151

1  different meetings, so I'm guessing it was about the
2  middle of September.
3      Q. But do you have anything you can tie it to to
4  identify if September 13th, you did or didn't? I mean,
5  there had to become a point in time where you guys quit
6  negotiating the stock purchase, right?
7      A. Oh, we did, yes.
8      Q. When would that have been?
9      A. When Dennis Langley told us he wasn't going to
10 negotiate with us any more.
11     Q. Okay. And when did that occur?
12     A. That's what I was trying to get. It was two or
13 three weeks before closing of the tran -- of our
14 acquisition. So that would have been what, early
15 October perhaps.
16     Q. Was it a verbal statement or written?
17     A. It was a verbal statement.
18     Q. And it happened while you guys, the Midcoast
19 group, was performing due diligence in Kansas City?
20     A. Correct.
21     Q. So, did you just pack your things up and leave
22 at that point?
23     A. No. Then we turned our attention strictly to
24 the acquisition from K-Pipe.
25     Q. Okay. So what did you do differently due

Page 152

1  diligence-wise?
2      A. What did we do differently? We eliminated some
3  of the risk factors that we had earlier considered.
4      Q. Well, you were at Kansas City when this
5  conversation took place with Langley, right?
6      A. Yes.
7      Q. And I asked if you packed your stuff up and
8  left and you said no. So I'm wondering, you know, how
9  did your focus change from a stock purchase to an asset
10 purchase at that time and what -- how did you change,
11 shift gears at that time? Was it any different?
12     A. We did not pursue due diligence on some assets
13 that we were not interested in buying now. Dennis
14 Langley's corporate structure, he had many, many other
15 interests, other companies that he had owned at
16 different stages of his career, that had merged
17 companies in. There was an ice skating rink, there were
18 wind power, all -- multiple different things. He had a
19 construction company. He had lots of business ventures.
20 And these different business ventures had been merged
21 into some of the companies that he was trying to sell.
22         We were continually trying to find out
23 more information on these companies, and he was very, I
24 don't know, standoff-ish. "The documents will be here
25 tomorrow." They'd never show up. "Oh, they're coming.

Page 153

1  They're in storage. They're in warehouses." Excuse
2  after excuse. We would not see the due diligence
3  documents that we were -- were interested in.
4          When we were no longer involved in the
5  stock transaction portion of this, at that stage I
6  didn't care about his construction company, I didn't
7  care about his skating rink, because I wasn't going to
8  buy those anymore. So that -- it changed from that
9  standpoint, that I was not as insistent on getting
10 litigation files on some matters that were unrelated to
11 the assets.
12     Q. Okay. Do you remember again the date that that
13 may have happened to occur?
14     A. No, I do not exactly.
15     Q. Sometime after September 13th of '99?
16     A. Yes.
17     Q. Go to Exhibit 37.
18     A. Okay.
19     Q. This is -- it begins with an e-mail from Becky
20 Davis at Bryan Cave. Do you recognize that name?
21     A. I do not.
22     Q. Okay. To Tom Palmisano of PWC; is that right?
23     A. Yes.
24     Q. It's dated -- if you look at the top, I think
25 there's a -- that's a later transaction?

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:  Emmanuel (Chris) Kaitson

Page 154

1    A.  Yeah, I think --
2    Q.  Looks like a later transmission of this e-mail
3  I think that PWC made to have these documents copied,
4  but the one I want to focus on is the e-mail between
5  Becky Davis and Tom Palmisano dated September 12, '99.
6    A.  Correct, I see that.
7    Q.  And the subject says Stock Purchase Agreement,
8  and I'll represent to you that this was provided by PWC.
9  Following it is a -- is the stock purchase agreement
10  between -- it was previously the Midcoast stock
11  agreement between Bishop and -- I'm sorry, between
12  Langley and Bishop Group and Midcoast, but now it's been
13  redlined and inserted in place of Midcoast is Fortrend
14  International, LLC, correct?
15    A.  I see that, yes.
16    Q.  And this was transmitted to Tom Palmisano on
17  September 12 of '99.  Any idea why Tom Palmisano is
18  getting a copy of this?
19    A.  I have no idea.
20    Q.  Was Palmisano representing or PWC representing
21  Fortrend at the time?
22    A.  Not as far as I knew.
23    Q.  Do you know if Palmisano gave Midcoast a copy
24  of this at that time?
25    A.  I do not know.  I have not seen this document

Page 155

1  before.
2    Q.  Okay.  Government Exhibit 38 is a letter from
3  Chase to Craig Hoffman of Fortrend International, dated
4  September 16 of '99, correct?
5    A.  Yes.
6    Q.  And it looks like the same letter that was sent
7  to Midcoast regarding the procedures for the submission
8  and the bid or an offer; is that right?
9    A.  It looks similar.
10    Q.  Okay.  Did you ever have occasion to review
11  this document?
12    A.  No, sir.
13    Q.  Turn to Government Exhibit 40.
14    A.  Okay.
15    Q.  This looks like a spreadsheet and it has a
16  Mid 2.1-1692 Bates number on the bottom right, if you --
17    A.  I see it, yes.
18    Q.  Okay.  So that was provided by Midcoast.  Have
19  you ever seen this document or a similar document?
20    A.  No, sir.
21    Q.  This appears to be a spreadsheet entitled
22  Break-Even Alternatives, correct?
23    A.  Yes.
24    Q.  And you've never reviewed anything like this?
25    A.  No, sir.

Page 156

1    Q.  Have you ever seen a similar type document in
2  conjunction with any other acquisitions by Midcoast?
3    A.  Yes, I'm sure I have.
4    Q.  Did you see a document, any other similar type
5  documents with regard to the acquisition of or the
6  attempted acquisition of either the stock of Langley or
7  stock owned by Langley or the assets of K-Pipe?
8    A.  I don't believe so.  When these type of
9  negotiations would occur, I would excuse myself and go
10  do the rest of the due diligence that I needed to do.
11    Q.  This was along the lines of Mr. Robert's?
12    A.  Right.  I was not a number cruncher at all.
13    Q.  Do you know what "Alternate Bogie" means?
14    A.  No.
15    Q.  Okay.  Take a look at Government Exhibit 41.
16    A.  Okay.
17    Q.  This is a facsimile transmission sheet from
18  Fortrend International to you; is that right?
19    A.  Yes, it is.
20    Q.  And it looks like it's from Craig Hoffman; is
21  that right?
22    A.  Yes.
23    Q.  And he's transmitting to you the drafts, draft
24  confidentiality agreements, and it looks like some
25  information on the company, on Fortrend; is that

Page 157

1  correct?
2    A.  That's what the cover page says.
3    Q.  I think we're missing a few pages, if you look
4  at the fax numbers or the fax page number at the top.
5    A.  Correct.  Appears pages 2 and 3 are missing.
6    Q.  Right.  And maybe the -- the confidentiality
7  agreement, right?
8    A.  Right.
9    Q.  And this document, I think, was prepared by or
10  was submitted by Midcoast, because it has Midcoast's
11  Bates number at the bottom right.
12        MR. COFFIN:  Emily, do you know if -- what
13  happened to pages 2 and 3?
14        MS. PIPKIN:  I can tell you that I was
15  looking at this document recently and the same two pages
16  are missing from ours.
17        MR. COFFIN:  Okay.
18        MS. PIPKIN:  Which is why this has the
19  Midcoast Bates numbers.
20        MR. COFFIN:  So you haven't found it
21  anywhere in your records, is that right, pages 2 and 3?
22        MR. STERN:  Look at your Exhibit 42.
23        MS. PIPKIN:  But the Midcoast numbers
24  don't fit into this document.
25        MR. STERN:  I understand.  I understand.

40 (Pages 154 to 157)

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:  Emmanuel (Chris) Kaitson

Page 158

1         MR. COFFIN:  Looks like they were pulled
2  out maybe and just put in behind.  Okay.
3     Q.  (BY MR. COFFIN) So, Mr. Kaitson, did you have
4  an opportunity to review these documents associated with
5  Government Exhibit 41?
6     A.  Yes, I remember receiving these.
7     Q.  Okay.  So you did do a review of the background
8  information on Fortrend?
9     A.  I see it attached to the back here.  I don't
10 remember reading that document before, but it could have
11 been attached to the fax.  I just don't recall it.
12    Q.  Okay.
13    A.  Obviously, it was attached, but I don't recall
14 seeing it before.
15    Q.  Okay.  And there's a page that says Summary of
16 Major Corporate Transactions since 1990?
17    A.  I do see that, yes.
18    Q.  Okay.  And it lists the year on the left, the
19 type of transaction, industry, size, built-in gain.
20 What's the built-in gain portion, do you know?
21    A.  No, I don't.
22    Q.  Okay.  Government Exhibit 42, as Mr. Stern has
23 pointed out, appears to be the confidentiality agreement
24 that was signed and sent back to Fortrend?
25    A.  Yes, it is.

Page 159

1     Q.  Whose handwriting is on this document?
2     A.  Most of it is mine.
3     Q.  Doing your job, right?
4     A.  Yes.
5     Q.  So you reviewed and approved this document?
6     A.  Correct.  And it actually looks like I made
7  some insertions into the document.
8     Q.  Okay.  In the first bullet point paragraph on
9  the front page it talks about "Written information
10 provided to you, as well as any additional information
11 disclosed to you or any of your representatives which
12 contains or otherwise reflects or is generated from such
13 information or documents," and it has in parenthesis
14 (the evaluation material), "will be used solely for the
15 purpose of evaluating the possible use of the
16 transaction by you and your clients and all the
17 evaluation material will be kept confidential by you and
18 your representatives," et cetera?
19    A.  Correct.
20    Q.  What was the evaluation material?
21    A.  Due diligence material.  Evaluation material
22 would be everything that we review as part of any
23 transaction.  So this transaction, it would not only be
24 what K-Pipe or Fortrend provides to us directly, but any
25 documents that they are going to acquire or enter into

Page 160

1  as part of their acquisition of whatever they're selling
2  to us.
3     Q.  Okay.  Was it not something separately that
4  they provided to you, do you recall?
5     A.  Not that I recall.  This -- it's -- that's a
6  common paragraph for confidentiality agreements.
7     Q.  Okay.  And it says "will be used solely for the
8  purpose of evaluating the possible use of the
9  transaction."  What's -- what does it mean by "use of
10 the transaction"?
11    A.  The word "use" seems a little out of place
12 there.  It's just evaluating the transaction.
13    Q.  The third bullet point says, "You recognize and
14 acknowledge the competitive value and confidential
15 nature of the evaluation material and the irreparable
16 damage that could result if information contained
17 therein is disclosed to any third-party in violation of
18 this agreement."  It just seems to me in reviewing this
19 letter that the evaluation material referred to may be
20 some more documents that they actually provided to you
21 which described how the transaction would be used.  Do
22 you not recall that?
23    A.  I do not recall receiving any of that, anything
24 like that.
25    Q.  Okay.  43, Government Exhibit 43, same type of

Page 161

1  spreadsheet we saw earlier.  Are you familiar with
2  anything on this page?
3     A.  No, I have not seen this page before.
4     Q.  Okay.  Still no answer to what the "Alternate
5  Bogie" is?
6     A.  Nope, no idea.
7     Q.  And any idea what was redacted there?  Looks
8  like something was marked out in the last column at the
9  top.
10    A.  No, I don't know.
11        MR. STERN:  I think that was the original
12 document.  It's not a redaction.
13        MR. COFFIN:  Say that again.
14        MR. STERN:  It's not a redaction in
15 connection with the production.
16        MR. COFFIN:  Oh, okay.  It's not a
17 redaction by you guys?
18        MR. STERN:  It's just somebody marked it
19 out.
20        MR. COFFIN:  Okay.
21    Q.  (BY MR. COFFIN) Can you look at the bottom of
22 that analysis?
23    A.  Yes.
24    Q.  Do you know what a gap closer is or what's the
25 gap to be closed?  What does that represent?

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 162

1           MR. STERN:  Objection, form.
2       A.  I'd be guessing because I really don't know.
3       Q.  (BY MR. COFFIN) Okay.
4           Okay.  Government Exhibit 44.
5           MR. STERN:  This is the key to the case.
6           MR. CROKE:  Everybody is going to get out
7   their glasses for this one.
8           MR. STERN:  It is.
9       Q.  (BY MR. COFFIN) What's the -- have you seen
10  this document before?
11      A.  Give me a moment.  The first page does not look
12  familiar at all.
13      Q.  Okay.
14      A.  I saw documents of this style or type --
15      Q.  Uh-huh.
16      A.  -- that Richard Robert had prepared.  I don't
17  know if this is one of his or not.
18      Q.  Okay.
19      A.  But this looks like a type of a document that
20  Richard prepared.
21      Q.  Any -- did you place any reliance on these type
22  of spreadsheets in conducting your due diligence?
23      A.  I never looked at them.
24      Q.  Okay.
25      A.  I gave him input on whatever areas I was

Page 163

1   responsible for and he put the numbers in the formula.
2       Q.  Okay.  Government Exhibit 50, are you familiar
3   with this document?  And I don't know if the four pages
4   in that exhibit go together, but they appear to, so I
5   stapled them.  Are you familiar with any of these
6   documents?
7       A.  No, I don't -- I don't recognize these either,
8   no, sir.
9       Q.  What's the -- on Government Exhibit 50, on the
10  first page, the Make Whole Cost Sharing, there's a lot
11  of discussion about a "make whole premium."  Are you
12  familiar with that phrase?
13      A.  I'm familiar with the phrase "make whole."
14      Q.  As it related to this case, do you recall what
15  it was?
16      A.  I don't relate it to this case, no.
17      Q.  You don't recall?
18      A.  No, I don't recall.
19      Q.  Okay.  Government Exhibit 51, please.  Are you
20  familiar with this document?  It says Kansas Pipeline
21  Company, Disclosure Statement, Depreciation Difference,
22  Carryover Basis versus Purchased Basis.
23      A.  I do not recognize this, no.
24      Q.  Okay.  Go to Government Exhibit 150.  That's
25  Mr. Chachere's invoice.

Page 164

1       A.  Okay.
2       Q.  Can you -- if you look on this document, does
3   it -- on these dates, Mr. Chachere gives you a pretty
4   good chronology of events.  Can you tell me when it was
5   exactly that you quit negotiating the stock purchase
6   with Langley?  Does this document help you?
7           MR. STERN:  It's a lengthy document.  Why
8   don't we take a break, go off the record, let him look
9   at it.
10          MR. COFFIN:  Okay.
11          (Recess from 2:52 p.m. to 3:01 p.m.)
12          MR. COFFIN:  Back on the record.
13      Q.  (BY MR. COFFIN) Mr. Kaitson, have you had an
14  opportunity to review Government Exhibit 150?
15      A.  Yes.
16      Q.  And have you had any -- did anything in there
17  refresh your recollection as to when exactly it was
18  Midcoast quit negotiating or ceased negotiating the
19  stock purchase from Langley?
20      A.  Relying strictly on the document, it appears
21  that about the middle of October we stopped negotiating
22  the purchase, the stock deal.  And that's, I think, in
23  line with what I had said earlier, about two or
24  three weeks before the actual closing.  So I think this
25  kind of confirms what I think I earlier said.

Page 165

1       Q.  Okay.  Government Exhibit 60?
2       A.  Yes, sir.
3       Q.  This is from Chase Bank, a letter dated
4   September 29, 1999, to Chris Kaitson.  "Per your
5   request, please find attached three additional copies of
6   the Confidential Offering Memorandum."  Do you recall
7   making that request to Chase?
8       A.  Yes, I do.
9       Q.  And why did you make a request for three
10  additional copies?
11      A.  We were going to use those copies as part of
12  our Hart-Scott-Rodino filing.
13      Q.  And the Hart-Scott-Rodino filing with regard to
14  the stock purchase or the asset purchase?
15      A.  No, the asset purchase.
16      Q.  Okay.  Was there -- so, by that time, had the
17  filing been prepared?
18      A.  I think it was being prepared.  Seems like it
19  was filed early October.  I don't remember exact dates,
20  but sometime early October I think the filing was
21  completed.
22      Q.  Okay.  And why -- or how long did it typically
23  take to get HSR approval?
24      A.  Three to four weeks.  Thirty days is the
25  default time period.  If you receive no response within

42 (Pages 162 to 165)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel  (Chris)  Kaitson

Page 166

1  the 30-day period, then at the end of 30 days the
2  transaction is automatically approved.  In virtually all
3  cases, we asked for early determination, asking them to
4  decide in two or three weeks.  It's common to get an
5  approval done in three weeks.
6      Q.   Okay.  Now, was it important to begin that
7  process as of the end of September, early October?
8      A.   No, we could have started at any time.  It's
9  just -- it takes a good week or ten days to prepare the
10 documents and then gather all the information you need
11 to make the filings.
12     Q.   Who actually did that work?
13     A.   Ron Chachere did.
14     Q.   Okay.
15     A.   Generally speaking, I would gather the
16 documents to provide to him and he would actually fill
17 out the forms; but I would gather a significant portion
18 of the documents internally for him to provide.
19     Q.   Was that an easy process or onerous process?
20     A.   Gathering documents is very challenging.
21 Getting documents from different individuals,
22 identifying everybody involved with the transaction, it
23 just took time.
24     Q.   Okay.  Was that -- would the filing have been
25 any different if it was a stock purchase versus an asset

Page 167

1  purchase?
2      A.   No.
3      Q.   It would have been the same type of filing
4  or --
5      A.   Correct.
6      Q.   Okay.  It's just, I guess, on the application,
7  would there be some type of description of the
8  transaction or --
9      A.   Yes, there is a description of the transaction
10 that goes on there, so it would be stated slightly
11 different.  So...
12     Q.   Okay.  Government Exhibit 66, that's a letter
13 of intent to -- between Midcoast and K-Pipe Holdings
14 Partners; is that correct?
15     A.   Yes.
16     Q.   Dated September 30 of '99, but it looks like it
17 was signed by Mr. Tutcher on October 1 of '99?
18     A.   Correct.
19     Q.   Did you review this --
20     A.   Yes.
21     Q.   -- document?
22          The CK next to Mr. Tutcher's name is your
23 initials?
24     A.   That's correct.
25     Q.   So, at this point, I mean, with the letter of

Page 168

1  intent dated September 30 of '99, it would seem that at
2  this point Midcoast was pretty serious about buying the
3  assets of -- of K-Pipe, is that correct, or buying the
4  assets from K-Pipe Holdings Partners?
5      A.   Correct.
6      Q.   Was there a condition in here saying that they
7  would only buy them if K-Pipe went through with its
8  purchase of the stock?
9      A.   It's not really conditioned, but when they --
10 when we say that we are going to buy Kansas Pipeline
11 Company, they can only sell it to us if they own it.  So
12 it's implied that they would have to acquire it before
13 they could sell it to us.
14     Q.   So even after Midcoast executed this letter of
15 intent, it still continued to negotiate the stock
16 purchase from Langley at the same time?
17     A.   Yes, that was required by Mr. Langley.
18     Q.   And then Government Exhibit 70, these are the
19 board of directors meeting minutes of Midcoast Energy
20 Resources, Inc. dated October 7th of '99, correct?
21     A.   Correct.
22     Q.   And you have not had occasion to review this;
23 is that correct?
24     A.   That's correct.
25     Q.   Okay.  Go to Government Exhibit 71.

Page 169

1      A.   Okay.
2      Q.   This is a facsimile from Chachere --
3      A.   Yes.
4      Q.   -- to Tino Monaldo, Esquire.  Who was Tino
5  Monaldo?
6      A.   Tino Monaldo was outside for Langley.  I
7  believe Langley was his only client.  But he was not an
8  employee; he was in private practice for himself.
9      Q.   He was also the -- he was negotiating on behalf
10 of Langley on the sale of the Bishop Group stock,
11 though, correct?
12     A.   Correct.  We considered him Langley's --
13 Langley's attorney.
14     Q.   Okay.
15     A.   Along with the Bryan Cave folks.
16     Q.   And this is transmitting certain changes to the
17 stock purchase agreement and schedules thereto, correct?
18     A.   Yes.
19     Q.   Now, is this the stock purchase agreement
20 between Langley and K-Pipe or the stock purchase
21 agreement between Langley and Midcoast?
22     A.   From the document here, I don't think I can
23 tell.
24     Q.   Well, it would have to be -- would it have to
25 be between Bishop and Midcoast?

43 (Pages 166 to 169)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 170

1     A.  I believe it's the doc -- I believe it's the
2   document between Midcoast and Bishop.  But with the
3   first page missing and the signature page missing, I
4   don't see the names of any companies on the document.
5   I'm not supposed to guess, but that's my guess.
6     Q.  Look at the DOJ Bates No. 950, that page.
7     A.  Yes, uh-huh.
8     Q.  There's some -- and 8.14 is the section, Change
9   of Control.
10    A.  I see that.
11    Q.  There's been quite a bit of redlining there,
12  but it now reads to say, "Should buyer sell or assign
13  more than 50 percent of either, (a), buyer's interest in
14  Kansas Pipeline Company or, (b), KPC's pipeline assets
15  to a non-affiliated entity, then a change of control
16  shall be deemed to have occurred.  Upon a change of
17  control, unless buyer and the person to whom buyer has
18  sold either the interest in KPC or KPC's pipeline
19  assets," defined as New Party, "shall execute and
20  deliver to stockholder the assumption agreement
21  substantially in the form of Schedule 8.14 hereto."
22        So, it looks like it contemplates the sale
23  of the assets after the stock purchase; would you agree?
24        MR. STERN:  Objection, form.
25    A.  No, I would not agree.

Page 171

1     Q.  (BY MR. COFFIN) Okay.  Why would you not agree?
2     A.  My recollection of this, this timing, was
3   Dennis Langley wanted some comfort that he had all the
4   guarantees and whatever successor owners -- that all
5   successor owners would honor the project development
6   agreement and provide guarantees of performances.  So I
7   don't believe that had anything to do with the K-Pipe
8   transaction --
9     Q.  Okay.
10    A.  -- as I see the word "change" out to the side.
11    Q.  Huh?
12    A.  I think that's what the word "change" is next
13  to that.  This was a common problem we had with the
14  Bryan Cave folks.  We would submit changes to a document
15  and they would decide if they wanted to make changes or
16  not.  They would not return the mark-up document, but
17  just give us a new redline, and we had no idea if they
18  had honored all our changes or not.
19    Q.  Okay.  And then Government Exhibit 72, it looks
20  like an e-mail from Mr. Pryde to Chachere, you, Tino
21  Monaldo and Y. Korb.  Is that Yvette?
22    A.  I believe it would be Yvette Korb, yes.
23    Q.  Who was Yvette Korb?
24    A.  Yvette was an employee or a vice president of
25  the Bishop Group.

Page 172

1     Q.  Okay.  So prior to sending a revised blacklined
2   stock purchase agreement to your party, to Midcoast,
3   through Chachere and you; is that correct?
4     A.  Correct.
5     Q.  Once again, is that stock purchase agreement --
6   do you know if the stock purchase agreement was the
7   stock purchase agreement between Midcoast and Langley or
8   was that the one between K-Pipe and Langley?
9     A.  I believe this would be between Midcoast and
10  Langley, because if it involved K-Pipe in any way, the
11  K-Pipe attorney would be on there.
12    Q.  Okay.  Look at Government Exhibit 73.  This is
13  an e-mail from Pryde to you, Ron Chachere.  Who is Lori
14  Brewer?
15    A.  No idea.
16    Q.  Okay.  And lwoods@kansaspipeline.com, any idea?
17    A.  No idea.
18    Q.  Therecia, T-H-E-R-E-C-I-A, Johnson?
19    A.  Once again, no idea.
20    Q.  Tino Monaldo?
21    A.  I recognize Tino's name.
22    Q.  It says, "Per Tino's conversations with Dennis
23  and Chris, I have not yet revised the signature blocks."
24  So they were sending you a revised signature agreement.
25  If you turn the page, it looks like the parties that

Page 173

1   executed it were K-Pipe Holding Partners and with
2   Langley, Management Resources Group?
3     A.  Correct.
4     Q.  Okay.  And why -- why are you guys getting a
5   revised security agreement that related to K-Pipe?
6     A.  This would have been part of our continued due
7   diligence.  If the assets we're acquiring from
8   K-Pipe have a lien on them, security interest granted,
9   then we would need to know that we're buying assets with
10  a lien on them.
11    Q.  Wouldn't you get that information from K-Pipe
12  instead of from.Pryde?
13    A.  Well, if Pryde is the one drafting the
14  agreement between Langley and K-Pipe, and we're doing
15  due diligence, then Pryde can either give the document
16  to Cynthia Morelli and she can forward it to us or Pryde
17  can forward it to us directly as part of our due
18  diligence, either one of the two.
19    Q.  And that e-mail is dated October 11 of '99,
20  correct?
21    A.  Correct.
22    Q.  If you go to Exhibit 150, which is Chachere's
23  invoice, the October 11 entry --
24    A.  Yes.
25    Q.  -- about two-thirds of the way down it says,

44 (Pages 170 to 173)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel  (Chris)  Kaitson

Page 174

1   "Receipt and review of e-mail of 9-30-99 draft of stock
2   purchase agreement from Attorney Morelli; various
3   further telephone conversations with Attorney Monaldo
4   and Attorney Kaitson; called to and discussion with Don
5   Whittington as to settlement agreement."  Again, why is
6   Chachere receiving and reviewing the 9-30 draft of the
7   stock purchase agreement from Morelli?
8       A.   It goes back to what -- same reason for the
9   security agreement.  That would be part of the due
10  diligence, that we would need to know what K-Pipe is in
11  fact purchasing.
12      Q.   So, did you have input on the -- the -- did
13  Midcoast have input in terms of the stock purchase
14  agreement between Langley and K-Pipe?
15      A.   We were able to make suggestions to K-Pipe on
16  what would be acceptable to us and what would not be
17  acceptable to us.
18      Q.   And those changes were communicated to Morelli
19  and her firm or to James Pryde and his firm?
20      A.   Could have been to either.  In some cases,
21  both.  If we were to make a suggestion to Morelli and
22  she was fine with the suggestion, it could have gone
23  directly back to -- to Pryde.
24      Q.   Was there an open line of communication between
25  Pryde, Morelli, and Midcoast's attorneys?

Page 175

1       A.   Open line of -- no.  We would -- we would
2   not -- Midcoast would not talk to Bishop without
3   K-Pipe's approval or concurrence or knowledge.
4       Q.   Well, then, how would you generally seek that
5   approval or concurrence or knowledge?
6       A.   We would talk to Cynthia Morelli about a change
7   or comment.  If she said, "Oh, I'm fine with that, just
8   go ahead and send it to Pryde," we would.
9       Q.   Now, was there any occasion that Morelli said
10  no to any of the requested changes that Midcoast made?
11      A.   Oh, definitely, or she'd say give it to her and
12  she'd discuss it with her client or consider it, yes.
13      Q.   What kind of issues were those, do you recall?
14      A.   Not offhand.  I just recall there were some,
15  but I don't know what they were specifically.
16      Q.   Okay.  Back on -- do you have this one handy,
17  Government Exhibit 160?
18      A.   160?  Yes.
19      Q.   Okay.  Turn to page 4.  The first full
20  paragraph, it says, "On September 30, 1999, Midcoast
21  signed a letter of intent to purchase the partnership
22  interests and certain other assets from K-Pipe Holdings,
23  an affiliate of Fortrend."  And I think we saw that
24  earlier; is that right?
25      A.   Correct, I agree.

Page 176

1       Q.   Okay.  The last sentence of that paragraph
2   says, "Midcoast did not want to purchase the Butcher
3   interest currently because of rate base concerns."  What
4   were those rate base concerns?
5       A.   I --
6       Q.   Let me back up.  Is that a correct statement,
7   first of all?
8       A.   That was a discussion.  I -- was it a concern?
9   Yes, it was a discussion and concern, the concern being
10  that because the Butcher interest was an expense to
11  Kansas Pipeline Company and, therefore, was an expense
12  that was part of the FERC rate case filing of Kansas
13  Pipeline Company, we wanted to try and be able to
14  recover that expense.  We believed that if Kansas
15  Pipeline Company owned that expense, that it may not be
16  recoverable.
17      Q.   Okay.  I don't understand.  I thought we
18  determined earlier it was kind of a wash because it was
19  an obligation by Kansas Pipeline, but yet Kansas
20  Pipeline owned the right to receive the revenue interest
21  as well?
22          MR. STERN:  Objection, form.
23      A.   Yeah, it would have been a wash if the -- if
24  the parent companies were the same.  If the parent
25  companies were not the same, then it would not be a

Page 177

1   wash.
2       Q.   (BY MR. COFFIN) Okay.  Because it would have
3   been two affiliated entities versus just the parent
4   company?
5       A.   Or a third-party entity.
6       Q.   Okay.  What was it in this situation?
7       A.   This situation was a concern we had that if
8   Midcoast individually owned the Butcher interest, that
9   perhaps Kansas Pipeline would not be able to recover
10  that in their rate case as part of whatever expenses
11  because it was owned by their parent company.
12      Q.   Are you talking about the expense portion or
13  the revenue interest portion?
14          MR. STERN:  Objection, form.
15      A.   Well, yeah, two different ones.  The Kansas
16  Pipe -- thinking of Kansas Pipeline Company, Kansas
17  Pipeline Company is filing a rate case and they're
18  telling the FERC, here are our expenses.
19      Q.   (BY MR. COFFIN) Uh-huh.
20      A.   We would like for you to approve our expenses
21  and allow us to recover in our cost of service all of
22  these expenses.
23      Q.   Okay.  And one of the expenses is purportedly
24  the Butcher interest expense?
25      A.   Correct.

45  (Pages 174 to 177)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 178

1    Q.  Okay.
2    A.  And if the FERC says, "Time out.  That Butcher
3   interest is actually owned by your parent company.
4   We're not going to let you do that."
5    Q.  You're talking about the revenue interest
6   portion?
7    A.  Yes.
8    Q.  Okay.
9    A.  We saw that as a risk.  So, being aware of that
10  risk, was there a way to -- to structure that to
11  minimize the risk.  And the partnership was one way of
12  minimizing the risk and also it helped us with our --
13  what I believe was our inability to pay cash for it at
14  that time.
15   Q.  Okay.  Government Exhibit 76.
16   A.  Yes.  Yes.
17   Q.  I'm sorry.  This is a fax from Mr. Chachere to
18  Jim Pryde, correct?
19   A.  Correct.
20   Q.  And it looks like there's a little dissension
21  involved in the message, where Chachere says, "Jim, this
22  morning you informed me that you will not include any of
23  my requested revisions to the Stock Purchase Agreement
24  or any of other document which are considered business
25  points."

Page 179

1    A.  I think his -- this is when we realized that
2   they were reviewing our changes and making their own
3   independent determination of which changes they would
4   make to a redline document.  Prior to this, we thought
5   that their typing pool was missing some of the changes,
6   and I think it was around this time we realized that it
7   was -- they were intentionally not making some of our
8   requested changes.
9    Q.  Okay.  And Mr. Chachere is still negotiating on
10  the stock purchase agreement.  Paragraph 8.10, is a
11  tax -- paragraph regarding tax treatment.
12        Let's see.  Did you have an opportunity to
13  review this particular provision before it was sent or
14  after it was sent to Mr. Pryde, I guess?
15   A.  I don't recall reviewing it, but I may have.
16   Q.  Uh-huh.  Now, is this the provision that
17  relates to the stock purchase agreement between Langley
18  and K-Pipe or the stock purchase agreement between
19  Midcoast and Langley?
20   A.  I believe this is between Midcoast and Langley,
21  because I do not see any K-Pipe lawyers' names included
22  on the copy.
23   Q.  The last item on this particular fax says Tax
24  Sharing Agreement.  It says, "Richard Robert is having
25  the tax sharing agreement reviewed by Midcoast's tax

Page 180

1   advisors."
2    A.  I see that.
3    Q.  Do you know what the tax sharing agreement was?
4    A.  No.  I just recall that there was one.
5    Q.  Okay.  And up above that, under 10.2,
6   Additional Conditions to the Obligations of Buyer to
7   Close, what's an intercreditor agreement?  Are you
8   familiar with that phrase?
9    A.  I'm not.  I don't -- I don't know.  I don't
10  recall.  I mean, I can read the paragraph and say what
11  I -- it appears it's requiring.
12   Q.  Uh-huh.
13   A.  It speaks for itself.  It says, "Buyer shall
14  cause an intercreditor agreement to be executed and
15  delivered by the company's lenders unless buyer shall
16  have elected to pay off the debt at closing."
17   Q.  Back on Government Exhibit 150, going
18  chronologically --
19   A.  Yes, okay.
20   Q.  -- entries 10-13, 10-14, it says the stock
21  purchase agreement -- or Chachere notes in his billing
22  that he reviewed, revised several documents.  In both
23  entries he refers to the stock purchase agreement?
24   A.  Correct.
25   Q.  Okay.  Is that, again, same question, the stock

Page 181

1   purchase agreement between Langley and Midcoast or stock
2   purchase agreement between Langley and K-Pipe?
3    A.  I believe it's the stock purchase agreement
4   between Midcoast and Langley.
5    Q.  Okay.  And what makes you -- are you certain
6   about that?
7    A.  No, I'm not certain about it.
8    Q.  Okay.
9    A.  As we looked at the other documents, there were
10  no K-Pipe lawyer's names included in that, which leads
11  me to believe that it -- they were not -- that was not
12  their document.
13   Q.  Okay.  The 10-15 entries related to revisions
14  to comments and questions as to the project development
15  agreement and the contingent revenue interest agreement,
16  review of draft stock purchase agreement as to remaining
17  issues and sections to be completed or drafted.  Was
18  there a project development agreement being negotiated
19  in conjunction with the stock purchase agreement?
20   A.  Yes.
21   Q.  Between Langley and Midcoast?
22   A.  Yes.
23   Q.  Okay.  And a contingent revenue interest
24  agreement, same thing, same question?
25   A.  Yes.

46 (Pages 178 to 181)

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel  (Chris) Kaitson

Page 182

1     Q.  Okay.  Exhibit 78 is a letter, along with some
2  fax cover pages and a fax transmission document.  This
3  is transmitting a letter from Dennis Langley to Jeff
4  Furman of K-Pipe Holdings Partners, LP, dated
5  October 21, '99, right?
6     A.  Yes.
7     Q.  Okay.  Are you familiar with the -- this
8  document?
9     A.  The letter itself, no, I'm not.
10    Q.  It looks like Mr. Langley sent a copy of this
11 letter to Richard Robert; is that correct?
12    A.  Yes.
13    Q.  And why would he have done that, do you think?
14    A.  To -- one of two things; either let Richard
15 know that the stock purchase agreement may be back on if
16 they're walking out --
17    Q.  Uh-huh.
18    A.  -- or to simply advise him the possibility that
19 Midcoast would not be able to buy the assets from K-Pipe
20 because Langley is not going to sell them to K-Pipe.
21    Q.  Okay.  And do you remember the event or the --
22 do you remember any discussion about Langley making this
23 known?
24    A.  I recall a discussion with Robert only on the
25 fact that Langley was upset with the timing, how slow

Page 183

1  things were going, and threatened to pull the deal.
2     Q.  How did Midcoast react?
3     A.  At this stage, we had become numb to the
4  threats.
5     Q.  What do you mean?
6     A.  Mr. Langley had made many, many threats during
7  the course of our negotiations, and not that we didn't
8  take them serious, but we perhaps didn't jump at each
9  one of them as we did the first month of the
10 negotiations.  There was one meeting in the -- early on
11 where we were ready to go home on a Friday, go back to
12 Houston, and he walked in and -- and in so many words,
13 "If you walk out, you'll never do business in the energy
14 business world again," and numerous other things, so we
15 ended up staying and working through the weekend.
16    Q.  Okay.  By this time, the threat had been posed
17 by Mr. Langley, October 21 of '99.  Do you know if by
18 then had you guys, Midcoast, quit negotiating the stock
19 purchase agreement?
20    A.  I believe we had.
21    Q.  By that time?
22    A.  Yes.
23    Q.  Okay.  89, Government Exhibit 89, please.  This
24 is an e-mail from Mr. Pryde to Ron Chachere, Chip
25 Berthelot, Chris Kaitson, Tino Monaldo, and Yvette Korb.

Page 184

1  It says, "Attached are the clean copies of what we
2  believe are the final documents.  Dennis plans on
3  executing the SPA this evening and we have requested
4  signatures by K-Pipe and Fortrend also.  JPP."  Why was
5  Mr. Pryde transmitting clean copies of the SPA, stock
6  purchase agreement, between -- I assume that would be
7  between Langley and K-Pipe at this point, right?
8     A.  That's correct.
9     Q.  Okay.  Why would you be or Midcoast be
10 receiving copies of those documents?
11    A.  This would have told us that we are at the end
12 of our due dilligence, that there are no changes to the
13 documents between those parties, which ultimately then
14 allows us to finalize our transaction with K-Pipe.
15    Q.  Could that be done -- I'm curious as to why you
16 would get the entire stock purchase agreement when
17 that -- Midcoast could have been notified verbally,
18 couldn't they?
19    A.  We could have been notified, but as a common
20 part of a due diligence, we review the entire
21 acquisition document or acquisition notebook or closing
22 book.
23    Q.  Okay.  Before the fact?
24    A.  It's usually done before somebody sells the
25 assets.  This was a little unique situation, that they

Page 185

1  were buying and selling, you know, in a short period of
2  time.  That document is usually completed before we
3  start a due diligence.
4     Q.  Back on Exhibit 150, which is the billing from
5  Chachere --
6     A.  Yes, okay.
7     Q.  -- entry for October 26 of '99, Chachere says
8  he goes to Houston, "To Houston re: meeting with clients
9  and Dennis Langley," or Dennie Langley it says there.
10    A.  Uh-huh.
11    Q.  "Attorney Pryde, et al, going over issues."
12 Did Mr. Langley come to Houston on October 26th of '99?
13    A.  He was in Houston on a couple times.  I don't
14 remember that date specifically.
15    Q.  Why would he have -- why would you be
16 talking -- I assume he still -- was he negotiating or
17 why was Mr. Langley in Houston?
18        MR. STERN:  Objection, form.
19    A.  I don't remember.  I don't recall a meeting
20 with Langley in Houston involving Ron Chachere.
21    Q.  (BY MR. COFFIN)  Did he -- you said he did come
22 to Houston though?
23    A.  He came to Houston on a regular basis.
24    Q.  Uh-huh.  To meet with Midcoast?
25    A.  Yes.

47  (Pages 182 to 185)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 186

1    Q.  On this transaction?
2    A.  Yeah.  He was doing -- he was doing work for us
3  other than just this transaction.
4    Q.  Oh, I'm sorry.  I meant Mr. Langley.
5    A.  Okay.
6    Q.  Did he come to Houston?
7    A.  I recall him being in Houston two times.  He
8  may have been there more, but I only recall two times
9  that he came to Houston.
10   Q.  Okay.  You have no idea why he would have been
11 in Houston after the stock purchase agreement between
12 Langley and K-Pipe was finalized and ready to go?
13   A.  No idea.
14   Q.  And then the following entry, 10-27, '99,
15 "Continued work on revising project and development
16 agreement with Dennis Langley; work on revising guaranty
17 agreements and the stock purchase agreement with
18 Attorney Pryde."  Does the timing of that make sense?
19   A.  No.
20   Q.  And 10-28-99, looks like Mr. Chachere is still
21 talking to Dennis Langley?
22   A.  I see that on this bill.  I don't understand
23 that.
24   Q.  Okay.  In those meetings where Langley came to
25 your office, was Fortrend around?

Page 187

1    A.  No.
2    Q.  Were they there?
3    A.  Never that I was aware of.
4    Q.  Turn to Government Exhibit 95, please.
5    A.  Okay.
6    Q.  This is a facsimile from you to Jim Pryde,
7  correct?
8    A.  That's what it says, yes.
9    Q.  Dated October 28, October 28 of '99; is that
10 right?
11   A.  Correct, yes.
12   Q.  And 26 pages in length; is that correct?
13   A.  Yes.
14   Q.  And it says, "Attached are the following
15 documents:  Guaranty (Parent Assumption Agreement) -- I
16 assume there's a closed paren there -- Guaranty (KPC);
17 and Project Participation Agreement.  Is that right?
18   A.  Yes.
19   Q.  Is that your handwriting?
20   A.  No.
21   Q.  Okay.  Whose handwriting is that?
22   A.  I don't have any idea.  That's not my
23 traditional fax cover page.
24   Q.  Okay.  And then the next page, do these
25 documents -- let me ask you, do these documents relate

Page 188

1  to the stock purchase transaction between Langley and
2  K-Pipe or to the transaction between K-Pipe and
3  Midcoast?
4         MR. STERN:  Objection, form.
5    A.  I'm not sure.
6    Q.  (BY MR. COFFIN) Is that your handwriting on the
7  second page?
8    A.  No, it's not.
9    Q.  Any idea whose handwriting that might be?
10   A.  No.
11   Q.  Okay.  Turn to Government Exhibit 97, please.
12   A.  Okay.
13   Q.  There is an e-mail from you to you.  I guess
14 that would be -- is that a distribution list type thing?
15   A.  Apparently it is, yes.
16   Q.  And Morelli got it, Gary Wilcox, Graham Taylor,
17 Richard Robert, Ron Chachere, Tom Palmisano.  It's KPC
18 documents.  "Attached are the stock purchase agreement
19 and the following related documents," and it lists
20 several documents there.  And it says missing are buyer
21 K-Pipe's disclosure schedule, project development
22 agreement, and the project participation agreement.
23         Now, why are you transmitting the stock
24 purchase agreement to those individuals?
25   A.  I'm confirming these are the final documents so

Page 189

1  that I can wrap up my due diligence, so I know that I
2  have final documents that I'm reviewing.
3    Q.  Okay.  Now, this -- so the final document would
4  be between Langley and K-Pipe, correct?
5    A.  Between langley and K-Pipe?  I believe so, yes.
6    Q.  Okay.  Because this is October 29, '99?
7    A.  I believe so, yes.
8    Q.  Had you revised -- reviewed and revised those
9  documents or was that -- were you just transmitting
10 them?
11   A.  No, I think I was just transmitting them,
12 trying to get everybody's buyoff that we all had the
13 final documents.
14   Q.  Okay.
15        Okay.  Turn to Government Exhibit 100.
16   A.  Different book?
17   Q.  Yeah.  We get to graduate to the next binder.
18   A.  Okay.
19        MR. COFFIN:  Does anybody need a break?
20 Okay.
21   Which one is next?  100 to 201, okay.  Exhibit
22 100.
23   Q.  (BY MR. COFFIN) Yes.  This is an e-mail from --
24 the one I want to focus on was the one from Richard
25 Robert to you and to Cynthia Morelli, Gary Wilcox,

48 (Pages 186 to 189)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:  Emmanuel (Chris) Kaitson

Page 190

1  Graham Taylor, Ron Chachere, Tom Palmisano, and Chip
2  Berthelot, dated 10-30 of '99.  Do you see that?
3      A.  Yes.
4      Q.  Okay.  It says, "There has been a change to the
5  deal based on PWC's objection to characterizing the
6  supplemental payment of $13.75 as capital gain."  Were
7  you aware of that issue at the time?
8      A.  No, I don't recall that.
9      Q.  Okay.  You did -- but you did get a copy of the
10  e-mail, didn't you?
11     A.  Yeah.  I am on there, so I assume I did, yes.
12     Q.  You weren't involved in any of the negotiation
13  of those -- of this particular issue at all?
14     A.  No.
15     Q.  Okay.
16     A.  Not that I remember.
17     Q.  Okay.  And turn the page.
18         Let me back up.  It looks like at the
19  bottom of the first page of Government Exhibit 100 is
20  another -- the beginning of another e-mail from
21  Mr. Wilcox dated 10-30-99 at 4:2500 p.m., to the same
22  distributees, including you, Robert, et cetera.  Do you
23  see that?
24     A.  Yes.
25     Q.  It says revisions to the documents -- revisions

Page 191

1  to documents, and he discusses several changes that need
2  to be made, so -- so then it says, "To reflect the
3  foregoing, the following changes should be made."  So
4  stock purchase agreement, there are changes made to the
5  stock purchase agreement.  I assume that's the stock
6  purchase agreement between Langley and K-Pipe, correct?
7      A.  I would assume that, yes.
8      Q.  Okay.  And then the same with regard to
9  document or the item listed in No. 2 and 3; would you
10  agree?
11     A.  I would agree.
12     Q.  Okay.  So there was still -- Wilcox still had
13  an opportunity to negotiate provisions or terms in the
14  stock purchase agreement; is that right?
15     A.  Apparently so.
16     Q.  And Wilcox represented Midcoast and not K-Pipe,
17  correct?
18     A.  Correct.
19     Q.  He says under Item No. 2, "Note that the option
20  agreement must not be guaranteed by Midcoast pursuant to
21  the parent guarantee.  There is no need for that
22  anyway."  So, why -- do you know why he said the option
23  agreement must not be guaranteed by Midcoast?  What was
24  his reason for that statement?
25         MR. STERN:  Where are you?

Page 192

1          MR. COFFIN:  I'm sorry.  Under -- I'm on
2  DOJ 1108, which is the second page of that exhibit, and
3  about two-thirds of the way down there is an Item 2,
4  Guaranty by KPC.
5          MR. STERN:  Okay.
6          MR. COFFIN:  And then down below that,
7  under A and B, there's some bold.
8          MR. STERN:  Oh.
9      A.  No, I don't remember why he did that or why he
10  suggested that.
11     Q.  (BY MR. COFFIN) If you turn the page -- turn
12  the page and there's some more discussion there on the
13  stock purchase agreement by Wilcox.  Item No. 3 says,
14  "It is critical to Midcoast's tax position that the
15  Bishop Group, Ltd. is not liquidated by Fortrend for at
16  least two years.  Somewhere K-Pipe needs to represent a
17  covenant that it has no plan or intention to liquidate
18  The Bishop Group, Ltd., and in any event will not
19  liquidate such corporation for at least two years.  Such
20  a provision would look unusual in the asset purchase
21  agreement.  However, in light of K-Pipe's obligation to
22  pursue certain lawsuits in the name of The Bishop Group,
23  Ltd., it would seem necessary for K-Pipe to represent
24  and covenant to Langley in the stock purchase agreement
25  that it will not liquidate the purchased corporation for

Page 193

1  as long as the lawsuits are alive.  But we could add
2  that in no event will such liquidation occur before two
3  years."
4          Do you know why that provision or those --
5  that language is critical to Midcoast's tax position?
6      A.  He was the tax expert, so, no, I don't know why
7  that was critical.
8      Q.  Under Item No. 4, Purchase and Sale Agreement,
9  it says Wilcox is negotiating some of the purchase or --
10  suggesting terms for the purchase and sale agreement, I
11  take it.  He says, "I would like K-Pipe to think about
12  retaining some of the receivables that are currently in
13  KPC.  I understand that some of those receivables are
14  due from governmental agencies, with little, if any,
15  collection risk involved."
16         Any idea why he's suggesting that K-Pipe
17  think about retaining receivables?
18     A.  No, no idea.
19     Q.  Next, Government Exhibit 101, at the top e-mail
20  from Tom Palmisano to Richard Robert, 10-30 of '99, it
21  talks about a memo that Mr. -- Mr. Palmisano talks about
22  a memo that he's preparing.  Did you ever have an
23  opportunity to review that memo regarding a capital gain
24  of $13.75 million?
25     A.  No.

49 (Pages 190 to 193)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 194

1    Q.  103, e-mail from you, Mr. Kaitson, to James
2  Pryde and various other people, dated 10-30 of '99,
3  4:54 p.m., and you're requesting changes to the stock
4  purchase agreement.  And you say K-Pipe has requested
5  the following changes; is that right?
6    A.  Yes.
7    Q.  Now, why are you asking or why are you telling
8  James Pryde to make changes requested by K-Pipe?  You
9  didn't represent K-Pipe, did you?
10    A.  I did not.  I did not.  Obviously, I would have
11  had a discussion with Cynthia Morelli about some issues;
12  and she would have said, fine, go ahead and convey that
13  information directly to Pryde.
14    Q.  Okay.
15    A.  And I would have copied her on that to let her
16  know that I did it.
17    Q.  Would there have been any correspondence
18  between you and Morelli that -- where you're asking for
19  permission to make these changes and asking if you could
20  forward those changes on to James Pryde?
21    A.  There may have been, but I -- I don't know.
22  There may have been, but I don't recall.
23    Q.  Okay.  I haven't seen any.
24    A.  Okay.
25    Q.  That's why I was asking.

Page 195

1    A.  No.  We usually just picked up the phone and
2  called each other.  As you can see, the changes are not
3  significant.  We're not changing paragraphs; we're
4  changing a word here or there.  And each party would pull
5  out the document.  We'd look and see what the change was
6  and --
7    Q.  And you reference certain guaranties and
8  assumptions in paragraph 5 or item No. 5 in the e-mail?
9    A.  Yes, I do.
10    Q.  And "There are six guaranties and assumptions.
11  Are they all drafted?"  And within that, "Midcoast
12  guaranty of KPC obligations under the stock purchase
13  agreement."  So, did -- did Midcoast guarantee KPC
14  obligations under the stock purchase agreement?
15    A.  There was some type of a guaranty.  I don't --
16  without looking at the guaranty, I don't recall --
17    Q.  Okay.
18    A.  -- how it tied.
19    Q.  Was there -- was that something Langley
20  requested?
21    A.  I'd have to refer to the document.  I seem to
22  recall there was an obligation of any purchaser of the
23  assets to issue a guaranty to Langley.
24    Q.  I hate to do this to you, but we've got to go
25  backwards for a minute to 79.

Page 196

1    A.  Okay.
2    Q.  This is the -- let's see.  This looks like a
3  side letter between K-Pipe Merger Corporation and Dennis
4  Langley dated -- doesn't have a date on it, but it
5  references the stock purchase agreement dated as of
6  October 25 of '99?
7    A.  Okay.
8    Q.  And it says, "This letter agreement is being
9  executed and delivered contemporaneously with the
10  execution of the purchase agreement"?
11    A.  Correct.
12    Q.  "And as an amendment thereto."  Looks like
13  there is where the $15 million fee is negotiated or the
14  break-up fee, what I call it, between Langley and K-Pipe
15  in paragraph 1.  That's where that fee is set out; is
16  that correct?
17    A.  Yes, at the end of paragraph 1.
18    Q.  Okay.  And then paragraph 2 says, "K-Pipe
19  represents and warrants to Langley that K-Pipe has no
20  plan or intention to liquidate the company and agrees it
21  will not liquidate the company for at least two years
22  after the closing date."  Is that the same provision
23  that was requested by Mr. Wilcox in those e-mails?
24    A.  This appears to be the same idea or the same
25  type of provision.

Page 197

1    Q.  Okay.  Why does -- do you know why K-Pipe made
2  this represent -- representation to Langley in this side
3  letter rather than in the stock purchase agreement?
4    A.  I do not.
5    Q.  And on Government 150, which is Chacere's
6  billing invoice, page 8, entry on October 29 of 1999 --
7  I'm sorry, entry October 31 of '99, he talks about
8  making revisions to the guaranty (parent) purchase
9  agreement, option agreement and side letter, and
10  e-mailing same to the parties.  So he's still working on
11  the purchase agreement as of October 31 of '99; is that
12  right?
13    A.  I'm not sure if that's it or if he's working on
14  the guaranty that goes with the stock purchase
15  agreement.
16    Q.  Oh, okay.  And the option agreement and side
17  letter?
18    A.  Right.  There's no comma between the guaranty
19  and stock purchase.  That makes me think that it might
20  be the guaranty associated with that stock purchase
21  agreement.
22    Q.  What was the --
23    A.  I don't know.
24    Q.  Okay.  What was the side letter he was to be
25  working on?

50  (Pages 194 to 197)

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel  (Chris) Kaitson

Page 198

1    A.  I don't know.
2    Q.  Exhibit 105?
3    A.  Yes, sir.
4    Q.  Then at the top it's an e-mail from you to
5  various people: Morelli, Wilcox, Taylor, Robert,
6  Chachere, Palmisano, and it says, "Assumption agreement
7  is back in.  See Gary's other comments below."  And
8  Mr. Wilcox -- below there is an e-mail from Wilcox to
9  you, Robert and Palmisano.  Do you see that?
10   A.  Yes, I do.
11   Q.  In the second paragraph of Mr. Wilcox's e-mail,
12  he says, "The third guarantee gave me the most
13  heartburn.  Obviously I do not want to see Midcoast, the
14  asset buyer, providing a guarantee of certain
15  obligations under the stock purchase agreement."
16   A.  That's what it says, yes.
17   Q.  Why would that give Mr. Wilcox heartburn, do
18  you know?
19       MR. STERN:  Objection, form.
20   A.  I don't know.
21   Q.  (BY MR. COFFIN) So it says, "However, it became
22  very clear that Langley would not do the deal without
23  it.  So I got Tino to soften some of the language in the
24  guarantee by not referring to Langley personally.
25  Instead, the guarantee ran to MRG and its individual

Page 199

1  members, which helped me to associate the guarantee with
2  a change of control under the PDA rather than the SPA.
3  We also referred to Newco GP and KPC collectively as the
4  subsidiaries so we would not repeatedly refer to
5  Midcoast's guarantee of KPC's obligations."
6    A.  That's what it says, yes.
7    Q.  Okay.  Do you remember what issues were
8  surrounding this particular e-mail at the time?
9    A.  I do not.
10   Q.  Do you know what the problem is with this naked
11  guarantee by Midcoast of KPC's guarantee of the tax
12  indemnity?
13       MR. STERN:  Objection, form.
14   Q.  (BY MR. COFFIN) That's the following paragraph.
15  I'm sorry, I jumped the gun.  He says, "What I don't
16  want to see is just a naked guarantee by Midcoast of
17  KPC's guarantee of tax indemnity."  Do you know what the
18  tax indemnity was?
19   A.  There was a tax sharing document.  There may
20  have been a tax indemnity, but I don't recall.
21   Q.  Okay.  Do you know why?
22   A.  I do not.
23   Q.  Okay.  You don't know anything about these
24  issues in this e-mail, even though you were the
25  recipient of the e-mail?

Page 200

1    A.  No.  I see that, but, no, I don't remember what
2  the issues surrounding them were.
3    Q.  Okay.  Okay.  106, 10-31-99 e-mail from you,
4  Mr. Kaitson, to various people, including Morelli,
5  Wilcox, Taylor, Robert, Chachere, Palmisano, dated
6  10-31-99, 9:35 a.m. in the morning.
7    A.  Yes.
8    Q.  It says, "As a result of the phone conference
9  on Sunday at 10:30, Jim and Tino are making the
10  following changes."  So you say K-Pipe is make --
11  proposing the following to the SPA; is that correct?
12   A.  Correct.
13   Q.  My question again is why isn't Morelli at her
14  office making these changes as opposed to you, who is
15  employed by Midcoast and representing Midcoast, making
16  these changes?
17   A.  Well, once again, we were on a conference call
18  and I was obviously in the office at the time and
19  perhaps other people were not, so I was able to transmit
20  the e-mail.
21   Q.  Okay.  Who was on the conference call?
22   A.  Specifically, I don't remember.  I mean, that
23  is what I would take from this, that there was a
24  discussion with folks.  And I don't remember who they
25  were with.  This was discussed and I sent out a

Page 201

1  confirming e-mail.
2    Q.  Okay.  In Item 2 it says the purchase price is
3  being increased by 3 million and the PDA termination
4  option fee reduced by 3 million.  So that's -- would you
5  consider that a -- a material provision?
6    A.  A $3 million change would be, yes.
7    Q.  Do you know why the purchase price was being
8  increased by $3 million and the term -- and the PDA
9  termination fee reduced by 3 million?
10   A.  I do not.
11   Q.  And why all references to the option
12  termination fee would be removed from the stock purchase
13  agreement?
14   A.  No, I don't recall why we did that.
15   Q.  Okay.  E-mail or Exhibit -- Government Exhibit
16  107.
17   A.  Okay.
18   Q.  This is an e-mail in the middle of the page or
19  the bottom half of the page from Wilcox to you,
20  Mr. Kaitson?
21   A.  Correct.
22   Q.  Dated October 31 of '99?
23   A.  Yes.
24   Q.  10:42 p.m., and it says, "Did you discuss with
25  Dennis the changes I recommended on my Saturday e-mail

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel  (Chris)  Kaitson

Page 202

1   to you, specifically a provision requiring MRG to report
2   the cancellation fee as ordinary income?"  Were you
3   talking to Mr. Langley at the time?
4       A.  I must have been, but I do not recall that.
5       Q.  And then at the bottom of that page there is an
6   e-mail from Mr. Wilcox dated 11-2-99 at 4:2000 p.m., to
7   Chachere, along with cc-ing you, Robert, Berthelot,
8   Palmisano.  "Remaining Items" is the subject.
9       A.  Yes.
10      Q.  Says, "Tom and I discussed with you the
11   following items that remain to be done in the documents
12   as far as we are concerned."  And these are all the
13   documents -- take a look at that, but are these all the
14   documents related to the stock purchase agreement
15   between Langley and K-Pipe?
16      A.  Some of the documents I can specifically
17   identify which transaction they're associated with.
18      Q.  Uh-huh.
19      A.  Others, it's not clear from reading what's said
20   in here.
21      Q.  Okay.  So, which ones can you identify?  Stock
22   purchase agreement, obviously?
23      A.  Correct, yeah that's the one that's obvious.
24   And the representations and the SPA to the effect that
25   K-Pipe has no plans or intentions to liquidate the

Page 203

1   Bishop Group, that clearly is between those two parties.
2   The other documents I know were documents that were part
3   of the Langley to K-Pipe transaction.
4       Q.  Okay.  And the next page, Government 108, is an
5   e-mail from Pryde to Joyce Essig, whoever that is, and
6   Gary Wilcox, dated 11-of '99, 7:24 p.m., Subject:
7   Comments to documents.  It says, "Gary, Ron sent us your
8   comments on the various documents.  Our responses are as
9   follows.  Letters correspond to the letters in Ron's
10   e-mail, which I assume is based on an e-mail from you."
11          It looks like Pryde is telling Gary Wilcox
12   what provisions or what -- what modifications will be
13   made to those various agreements; is that right, sir?
14      A.  That's the way it appears.
15      Q.  Government Exhibit 109, e-mail from -- there's
16   a couple of e-mails on this document.  The first one is
17   from Palmisano to Chris Kaitson, several others,
18   including Morelli, Wilcox, Graham Taylor, Richard
19   Robert.  It says, "This is a very important
20   representation which needs to be in either the SPA or a
21   side letter between K-Pipe and Langley.  This should
22   definitely not be in the asset purchase agreement as an
23   asset buyer would be indifferent.  Call me if you have
24   questions."
25          And down below, I think there is another

Page 204

1   e-mail from you to various people, some of the same
2   people, and it's says, "PWC's other comments are being
3   addressed, but Item 3, per Jim Pryde, does not belong in
4   the SPA.  They have no reason to be interested in such
5   two-year period.  What about putting it in the asset
6   agreement or a side letter?  Item 4 is K-Pipe/Midcoast
7   escrow agreement change."
8          What was so important about that
9   representation, do you recall?
10      A.  I don't.  It obviously was very important to,
11   you know, the tax folks --
12      Q.  Uh-huh.
13      A.  -- that two-year period, but I don't recall why
14   it was that important.
15      Q.  Okay.  I assume that's Chachere's handwriting
16   there, "Jim, this needs to be done.  Ron"?
17      A.  Yes.
18      Q.  And I guess we saw that -- didn't we see that
19   in the side letter earlier?
20      A.  We did see that in the side letter, yes.
21      Q.  Exhibit 79 --
22          Did you have drafts of the stock purchase
23   agreement between Langley and K-Pipe on your computer
24   system that you were making changes to?
25      A.  Did I have drafts?  If they were e-mailed to

Page 205

1   me, then, yes, I did.
2       Q.  Okay.  Would you physically go in and make the
3   changes yourself or direct somebody in your office to
4   make the changes?
5          MR. STERN:  Objection, form.
6          MR. COFFIN:  That's a good objection.
7       Q.  (BY MR. COFFIN) Did you make any changes to the
8   agreements that were on your computer, the stock
9   purchase agreement?
10      A.  I don't recall if I did or not.
11      Q.  Is it possible that you did?
12      A.  It's possible.
13      Q.  Okay.  Turn to Government Exhibit 111.
14      A.  Okay.
15      Q.  There is a facsimile from you to Jim Pryde; is
16   that correct?
17      A.  Correct.
18      Q.  Dated November 4 of '99; is that right?
19      A.  Yes.
20      Q.  And the message is, "Attached is a partially
21   executed side letter," correct?
22      A.  Yes.
23      Q.  And this side letter is between K-Pipe Merger
24   Corporation and Midcoast; is that correct?
25      A.  Yes.

52 (Pages 202 to 205)

HUNDT REPORTING
214-220-1122

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 206

1    Q.   And it's signed by Richard Robert on the third
2    page?
3    A.   Correct.
4    Q.   And unsigned by K-Pipe Merger.  Why would you
5    be transmitting this letter to James -- Jim Pryde?
6    A.   We're anticipating purchasing the assets from
7    K-Pipe.
8    Q.   So -- but Jim Pryde represents Langley,
9    correct?
10   A.   Correct.
11   Q.   Okay.  So, again, why -- why would you be
12   transmitting this to Jim Pryde, I mean, Langley's
13   attorney?  Did Langley want assurances that you were
14   going to buy the assets from K-Pipe?
15   A.   Let me finish reading it.  I --
16   Q.   Okay.
17   A.   See if it comes back to me.
18        I did fax it to him, obviously.  That's my
19   fax sheet.  I'll be darned if I remember why.
20   Q.   Okay.  Turn to Government Exhibit 115, please.
21   A.   Okay.
22   Q.   This is a -- these are documents provided by
23   Price Waterhouse Coopers, and really the first page is
24   redacted, but the second page is the same, same page but
25   it's unredacted, not redacted, and I'm just wondering if

Page 207

1    you -- did you ever have a chance to review this
2    engagement letter between Price Waterhouse Coopers and
3    Midcoast?
4    A.   No, I don't remember seeing this.
5    Q.   Okay.  Did you ever deal at all with the
6    payment of PWC, as far as overseeing, authorizing the
7    payment to Price Waterhouse Coopers?
8    A.   No.
9    Q.   That was all Robert, as far as you knew?
10   A.   Yes.
11   Q.   Turn to the Government Exhibit 121.
12        MR. STERN:  I wonder who KPLB is.
13        MR. COFFIN:  KPLB?  I do not know at this
14   time, but I could find out for you.  These are documents
15   provided by the IRS pursuant to a summons, I believe.
16        MR. CROKE:  KPLB?  Don't know.
17   Q.   (BY MR. COFFIN) Appears to be an e-mail, couple
18   of e-mails.  One, though, was from Duane Herbst.  Is
19   that the board member's son or --
20   A.   That's correct.
21   Q.   To Chip Berthelot, Pam Jones, Chris Kaitson,
22   Richard Robert.  Re: Subject: Kansas Pipeline Release.
23   "Please find attached the latest version of the
24   KPC/Midcoast Press release.  Let me have any comments as
25   soon as possible."  It looks like those were forwarded

Page 208

1    to Hoffman and then Hoffman forwarded them to Graham
2    Taylor.
3        Hoffman says, "This seems okay to me.
4    What do you think?"  And Taylor says, "Yes, but even
5    better if they mention K-Pipe, i.e, us."  Do you know
6    why K-Pipe was not mentioned?
7        Let me ask you this.  K-Pipe was not
8    mentioned in the press release, was it?
9    A.   I don't recall.
10   Q.   Okay.  Do you ever recall any discussion
11   whether or not to mention K-Pipe in the press release?
12   A.   No, I do not.
13        One correction, though.  Duane Herbst is
14   the corporate secretary.  He's the son of the founder,
15   not the son of the --
16   Q.   Board member?
17   A.   -- board member.
18   Q.   Okay.  Thank you.
19        MR. STERN:  How much more do you have?
20        MR. COFFIN:  I don't know, to tell you the
21   truth.  Do you want to take a quick break?
22        MR. STERN:  Yeah, if we can take a break.
23        MR. COFFIN:  Let's take a quick break and
24   then I'll --
25        (Recess from 4:22 p.m. to 4:34 p.m.)

Page 209

1        MR. COFFIN:  All right.  Let's go back on
2    the record.
3    Q.   (BY MR. COFFIN) Mr. Kaitson, as far as
4    communications with Price Waterhouse Coopers during this
5    time period of these transactions, were you the person
6    that communicated with PWC?
7    A.   I was not the main contact.  I rarely
8    communicated with them.
9    Q.   Okay.  Would Richard Robert be the main
10   contact?
11   A.   Yes.
12   Q.   So he would be a better source of answers to my
13   questions than you would be?
14   A.   Yes.
15   Q.   Okay.  I will reserve some of these questions
16   for him tomorrow.
17   A.   Thank you.
18   Q.   Turn to 170, please.  It looks like this is a
19   series of e-mails between you and Ms. Morelli.  I'll let
20   you get there.
21   A.   Okay.
22   Q.   A series of e-mails between you and Ms. Morelli
23   concerning FERC jurisdiction; is that correct?
24   A.   Yes.
25   Q.   Okay.  Let's go back.  I'm sorry, let's go back

53 (Pages 206 to 209)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel (Chris) Kaitson

Page 210

1    to 169.  I didn't see that one.
2           This is a fax from you to Ms. Morelli and
3    it's regarding K-Pipe data request?
4      A.  Correct.
5      Q.  Tell me what was going on that you needed to
6    make this request to send this facsimile to Ms. Morelli.
7      A.  Kansas Pipeline Company had filed a rate case,
8    and as part of the rate case the staff of the FERC is
9    allowed to do discovery.  They obviously sent us a data
10   request or request for discovery.
11     Q.  Uh-huh.
12     A.  And we needed assistance from K-Pipe to answer
13   some questions.
14     Q.  Okay.  On the third page of that exhibit,
15   there's a request on the left.  What are those items in
16   the first column, where it says MGE4-whatever?
17     A.  MGE would be the name of the company that is
18   providing these requests to the FERC to give to us.
19   MGE, Missouri Gas -- I don't know if it's Gas Energy or
20   Gas Electric.
21     Q.  Oh, so other parties were allowed to make
22   requests during the FERC hearing?
23     A.  Correct, yes, they are.
24     Q.  Okay.  And under the -- next to the request MGE
25   4-17, the request is made, "Did Midcoast ever negotiate

Page 211

1    directly with Dennis Langley to purchase the partnership
2    assets?  If yes, why was the sale structured to go
3    through a middleman entity?  Why did Midcoast not buy
4    the partnership assets directly from Bishop Group,
5    Ltd.?"
6           Was there a response made to this specific
7    request?
8      A.  I would expect there was, yes.
9      Q.  Okay.  Do you know what form would that
10   response have been in?
11     A.  That response would have been filed with the
12   FERC.
13     Q.  Okay.
14     A.  It would have been a written response.
15         MR. COFFIN:  Okay.  Did we get a copy of
16   these responses, do you know?
17         MS. PIPKIN:  I can't tell you off the top
18   of my head.
19         MR. COFFIN:  Okay.  If not --
20         MR. STERN:  We will.
21         MR. COFFIN:  -- can I get those?
22         MR. STERN:  Yeah.
23         MR. COFFIN:  What might be good is if we
24   could get -- I don't know that we got any of the
25   documents related to the FERC hearing.  Is there any way

Page 212

1    we could review those and determine whether we want to,
2    you know, make copies, rather than having you copy them
3    and send them down?
4          MR. STERN:  We can talk about that at a
5    break and let you know.
6          MR. COFFIN:  Sure.
7          MR. STERN:  I just don't know how they're
8    maintained.
9          MR. CROKE:  The volume?
10         MR. STERN:  The volume and where they are
11   and whether they're intermixed with privileged stuff.
12         MR. COFFIN:  Sure.
13         MR. STERN:  I mean --
14         MS. JORDAN:  I don't know.
15         MR. COFFIN:  Okay.  Well, I will -- I'll
16   write a letter to you; okay?
17         MR. STERN:  Yeah.  Just off the record.
18         (Recess from 4:40 p.m. to 4:41 p.m.)
19     Q.  (BY MR. COFFIN) All right.  With regard to the
20   responses to these requests shown on Government Exhibit
21   169, would Midcoast have drafted a response to this or
22   was that something that would have been done by outside
23   attorneys?
24     A.  Jointly.
25     Q.  Jointly.

Page 213

1      A.  But a written response would have been prepared
2    and provided.
3      Q.  Okay.  And then you don't -- but you don't --
4    Midcoast did not retain any of those documents; is that
5    what you're saying?
6      A.  If they're extremely voluminous, we usually do
7    not retain them, especially in a case of this type,
8    which is being -- which was appealed.  There were cases
9    of documents, in the hundreds.
10     Q.  Okay.
11         MR. STERN:  Cases being boxes?
12         THE WITNESS:  Yes.
13         MR. COFFIN:  Sounds like fun going through
14   them.
15         MR. STERN:  We'll put you in a warehouse.
16         MR. COFFIN:  Yeah, nice hot warehouse, I'm
17   sure.  I've been there, done that before.
18     Q.  (BY MR. COFFIN) Exhibit 170, please.
19     A.  Okay.
20     Q.  This is a series of e-mails between you and
21   Cynthia Morelli, correct?
22     A.  Yes.
23     Q.  Generally, tell me what was her concern
24   regarding the FERC case.
25     A.  I don't remember offhand.  Let me read it.

54 (Pages 210 to 213)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:   Emmanuel  (Chris) Kaitson

Page 214

1          There was a concern by someone at the FERC
2    that Dennis Langley still owned Kansas Pipeline Company
3    or had some type of an interest in finan -- in Kansas
4    Pipeline Company.  We received a letter from K-Pipe
5    indicating that Bishop was no longer a Dennis Langley
6    Company and that K-Pipe was not owned by Dennis Langley.
7    We were requesting to file that with the FERC, and she
8    expressed a concern that by filing a K-Pipe letter with
9    the FERC perhaps K-Pipe was exposing themselves to FERC
10   jurisdiction.
11        Q.  Okay.
12        A.  So we were simply trying to answer the
13   questions on Government Exhibit 169.
14        Q.  Was the letter entered into and made part of
15   the FERC, official FERC records?
16        A.  I don't recall.
17        Q.  186, please.
18        A.  Okay.
19        Q.  This is an e-mail from Wilcox to Bob Whitten.
20   Do you know who Bob Whitten or Robert H. Whitten is?
21        A.  I do not.
22        Q.  And Tom Palmisano.  It says, "Subject:  IRS
23   warning on Midco transactions," dated late January -- or
24   January 18, 2001, and it looks like there is an IRS
25   notice or a summary of the notice is followed -- follows

Page 215

1    there.
2          Were you aware back in January of 2001
3    that the IRS had issued a warning, a warning on
4    intermediary transactions?
5        A.  No.
6        Q.  When did you become aware that the IRS was
7    looking at the transaction that Midcoast had entered
8    into as an intermediary transaction?
9        A.  2002, I believe.  2001 is when Enbridge
10   acquired Midcoast.
11        Q.  Uh-huh.
12        A.  And I don't believe I knew about that during
13   that transaction.  2002 was another large transaction we
14   called the I-share Formation and I don't believe I knew
15   about it during that part of the -- during that
16   transaction either.
17        Q.  When you say knew about it, you mean the IRS
18   was reviewing the transaction, the Midcoast/K-Pipe
19   transaction?
20        A.  Correct, yes.
21        Q.  Okay.
22        A.  I don't know, is it Midcoast or Midco?  I'm
23   not --
24        Q.  Oh.
25        A.  You're interpreting that to mean that it's

Page 216

1    Midcoast they were --
2        Q.  No, no, no, no.
3        A.  I'm sorry.
4        Q.  That is -- this is a general notice, not
5    necessarily aimed at --
6        A.  Okay.
7        Q.  -- at the transaction that Midcoast entered
8    into.
9        A.  Okay.  I don't think Midco --
10        Q.  I know that was a bad question, but, yeah, I
11   was wondering if you were ever aware of this notice that
12   came out by the IRS?
13        A.  No, not at that time period.
14        Q.  Okay.
15        A.  It was late 2002, perhaps early 2003, that I
16   remember becoming aware of this.
17        Q.  And what you became aware of is not
18   necessarily the notice, but the fact that the IRS was
19   looking at the Midcoast/K-Pipe transaction?  Is that
20   what you became aware of?
21        A.  I became aware of that at some point, but at a
22   different point in time I became aware of Price
23   Waterhouse being required to turn over Midcoast's name
24   to the IRS.  And those are two different recollections,
25   but I don't remember what the time periods are in either

Page 217

1    one of those.
2        Q.  Did anybody at PWC ever discuss with you or
3    anybody at Midcoast whether the fact that bringing
4    Fortrend and K-Pipe into the transaction would result in
5    tax benefits to Midcoast?
6        A.  Did not discuss that with me.
7        Q.  So, as far as you knew, bringing or having
8    Fortrend being involved in the transaction and under the
9    name of K-Pipe or K-Pipe Merger Corporation, you were
10   not aware that that use, bringing them into the
11   transaction, resulted in tax benefits to Midcoast?
12        A.  Well, I'm aware that an asset transaction gives
13   you the step-up in your basis --
14        Q.  Okay.
15        A.  -- whereas, a stock transaction does not
16   automatically do that.
17        Q.  Right.
18        A.  So that's a yes and no to your question.
19        Q.  Okay.  183, please.
20        A.  Okay.
21        Q.  There is from Richard Robert to various people,
22   including you, correct?
23        A.  Yes.
24        Q.  An E-mail dated 11-7, 2000, and Mr. Robert says
25   he just got off the phone with Jeff Furman at K-Pipe and

55 (Pages 214 to 217)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:  Emmanuel (Chris) Kaitson

Page 218

1    "he has requested that we buy him out of the Butcher
2    Partnership."
3        A.  Yes.
4        Q.  Do you know why Mr. Furman requested that
5    Midcoast buy K-Pipe out of the partnership?
6        A.  No, I do not.
7        Q.  Did you have any involvement as far as buying
8    that partnership interest?
9        A.  I drafted the documents for that.
10       Q.  Okay.  184, that is an e-mail from you to
11   Robert; Weiner, Jeff.  Jeff Weiner, who is that?
12       A.  Jeff is in the accounting department, but I
13   don't recall what his responsibilities were.
14       Q.  Okay.  And Tom Palmisano, an e-mail dated 11-7,
15   2000, regarding the Butcher Partnership, and you say in
16   the e-mail, "I have talked with Tom Palmisano and based
17   on his recommendation," and certain events are listed
18   there.  Why would you necessarily talk to Mr. Palmisano
19   about this matter?
20       A.  Where -- where the funds should come from,
21   which party would be the ultimate owner of it, of the
22   asset.
23       Q.  Uh-huh.  I mean, why -- but why ask
24   Mr. Palmisano?  I mean -- yeah, Mr. Palmisano, isn't he
25   a tax guy?

Page 219

1        A.  He is a tax guy.  I would only go to him if
2    Richard Robert was not available.  So, for some reason,
3    perhaps I couldn't get ahold of Richard.  I would never
4    go directly to Tom if I knew that Richard was available.
5            MR. COFFIN:  Okay.  Did -- those exhibits
6    earlier that I was asking you about, unsigned documents,
7    did you come to a conclusion on those?
8            MS. PIPKIN:  Do you want to go off the
9    record for a second so I can just show you what we have
10   and then --
11           MR. COFFIN:  Sure.
12           (Recess from 4:53 p.m. to 4:54 p.m.)
13       Q.  (BY MR. COFFIN) Just a few more questions.
14       A.  Okay.
15       Q.  Do you have any tax law experience,
16   Mr. Kaitson?
17       A.  Definitely not.
18       Q.  Did you ever have occasion to research or
19   analyze the tax issues related to either the stock
20   purchase transaction between Langley and -- or the
21   proposed stock purchase transaction between Langley and
22   Midcoast or the asset purchase between Midcoast and
23   K-Pipe?
24       A.  No.
25       Q.  Do you know if anyone at Midcoast ever did any

Page 220

1    of that research or analyzed it?
2        A.  I do not know.
3            MR. COFFIN:  Okay.  I think I'm done.
4            MR. STERN:  All right, good.
5            MR. COFFIN:  Thank you, sir.
6            (Proceedings at 4:53 p.m.)

Page 221

1                CHANGES AND SIGNATURE
2    PAGE LINE CHANGE          REASON
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

56 (Pages 218 to 221)

19ae6c68-05b5-4551-8b57-86bf8d863079

Witness:  Emmanuel (Chris) Kaitson

Page 222

1
2
3
4
5
6
7
8      I declare under penalty of perjury that the
9  foregoing is true and correct.
10
11        _____
12        EMMANUEL (CHRIS) KAITSON
13
14
15      SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned
16  authority, by the witness, EMMANUEL (CHRIS) KAITSON, on
17  this the _____ day of _____, _____.
18
19        _____
20        NOTARY PUBLIC IN AND FOR
21        THE STATE OF _____
22
23  My Commission Expires: _____
24
25

Page 223

1  STATE OF TEXAS
2  COUNTY OF HARRIS
3
4        REPORTER'S CERTIFICATE
5     ORAL DEPOSITION OF EMMANUEL (CHRIS) KAITSON
6        January 31, 2007
7
8      I, the undersigned Certified Shorthand Reporter in
9  and for the State of Texas, certify that the facts
10  stated in the foregoing pages are true and correct.
11      I further certify that I am neither attorney nor
12  counsel for, related to, nor employed by any parties to
13  the action in which this testimony is taken and,
14  further, that I am not a relative or employee of any
15  counsel employed by the parties hereto or financially
16  interested in the action.
17      SUBSCRIBED AND SWORN TO under my hand and seal of
18  office on this the _____ day of _____,
19  _____.
20
21
22        _____
          Laraine L. Toliver, CSR 433
          Expiration: 12/31/2008
23        Hundt Reporting (Firm No. 347)
          703 McKinney Avenue, Suite 207
24        Dallas, Texas 75202
          214.220.1122; 214.220.1127 fax
25

57 (Pages 222 to 223)

19ae6c68-05b5-4551-8b57-86bf8d863079