Witness:   Richard Robert

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENBRIDGE ENERGY COMPANY,        )
INC. AND ENBRIDGE MIDCOAST      )
ENERGY, L.P. f/k/a              )
ENBRIDGE MIDCOAST ENERGY,       )
INC. f/k/a MIDCOAST ENERGY      )
RESOURCES, INC.,                )
     Plaintiffs,                )
                                )
vs.                             )        CASE NO. H-06-0657
                                )
UNITED STATES OF AMERICA,       )
     Defendant.                 )


ORAL DEPOSITION

RICHARD ROBERT

February 1, 2007


     ORAL DEPOSITION OF RICHARD ROBERT, produced as a

witness at the instance of the Defendant and duly sworn,

was taken in the above-styled and numbered cause on the

1st day of February, 2007, from 9:50 a.m. to 3:03 p.m.,

before Laraine L. Toliver, Certified Shorthand Reporter

in and for the State of Texas, reported by computerized

stenotype machine at the offices of Vinson & Elkins,

LLP, 1001 Fannin Street, Conference Room 2500B, Houston,

Texas 77010, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:  Richard Robert

## Page 2

```
 1            APPEARANCES
 2
 3  FOR PLAINTIFF:
 4     Karl S. Stern, Esq.
       Emily W. Pipkin, Esq.
 5  Vinson & Elkins, LLP
       1001 Fannin Street, Suite 2300
 6     Houston, Texas 77002-6760
       Telephone: 713.758.3828
 7     Fax:  713.615.5603
       E-mail: kstern@velaw.com; epipkin@velaw.com
 8
    FOR DEFENDANT:
 9
       David B. Coffin, Esq.
10  United States Department of Justice
       Tax Division, Southwestern Civil Trial Section
11     717 North Harwood, Suite 400
       Dallas, Texas 75201
12     Telephone: 214.880.9749
       Fax:  214.880.9741
13
    FOR DEFENDANT:
14
       Kevin G. Croke, Esq.
15  Internal Revenue Service
       160 Spear Street, 9th Floor
16     San Francisco, California 94105
       Telephone: 415.227.5125
17     Fax:  415.227.5159
       E-mail: Kevin.G.Croke@IRSCOUNSEL.TREAS.GOV
18
    ALSO PRESENT:
19
       Jana Jordan, Director, US Tax Services
20  Enbridge Energy Company, Inc.
21
22
23
24
25
```

## Page 3

```
 1
 2            INDEX
 3                      PAGE
 4  RICHARD ROBERT
 5  Examination by Mr. Coffin ..................   8
    Signature Page  ..............................  153
 6  Court Reporter's Certificate .................  154
 7
 8            EXHIBITS
 9
10  EXHIBIT       DESCRIPTION         PAGE
11  1      Black binder labeled "Sale of   28
           the Partnership Interests in
12         Kansas Pipeline Company, K-Pipe
           (Seller) and Midcoast Energy
13         Resources (Buyer), November 9,
           1999
14
    5      4/8/99 letter, Thomas J.    46
15         Palmisano to Richard Robert
16  6      6/16/99 letter, Vean J. Gregg   51
           III to Bill Bray, with attached
17         description of Project Ruby
18  7      6/21/99 letter, Bill Mamas to   52
           Bill Bray
19
    9.1    7/21/99 letter, Dan Tutcher to   52
20         Bill Manias, Chase Securities
21  10     Kansas Pipeline Company    53
           Management Discussion, August
22         1999
23  20     8/11/99 Midcoast Energy    54
           Resources, Inc. Board of
24         DIrectors Meeting Minutes
25
```

## Page 4

```
 1            EXHIBITS (cont.)
 2  EXHIBIT       DESCRIPTION         PAGE
 3  23     8/25/99 letter, W. Keith    57
           Buchanan, Bank of America, to
 4         Richard Robert
 5  24     8/30/99 redline redraft of    58
           Agreement and Plan of Merger
 6         between Midcoast Energy
           Resources, Inc. and The Bishop
 7         Group, Ltd. and Dennis
           M.Langley
 8
    25     8/30/99 offer letter, Dan    59
 9         Tutcher to Vean Gregg, Chase
           Securities
10
    26     8/30/99 fax, Craig Hoffman to   62
11         Bruce Snyder, Tom Palmisano,
           with attached information about
12         Fortrend
13  160    12/14/99 draft memorandum, Gary   69
           Wilcox, Catherine Coffey, PWC,
14         to Midcoast File
15  27     Handwritten notes from 9/6/99   75
           conversation
16
    28     Deal Point Sheet, M.C. Ruby,    76
17         Attorney/Client Privilege
           Confidential
18
    30     Draft, Attorney/Client    79
19         Privilege, Summary of Essential
           Modifications to Merger
20         Agreement Presented by Midcoast
21  35     9/10/99 fax, James P. Pryde,   81
           Bryan Cave, LLP, to Tom
22         Palmisano and Craig Hoffman,
           with attached Mutual
23         Confidentiality Agreement
24
25
```

## Page 5

```
 1            EXHIBITS (cont.)
 2  EXHIBIT       DESCRIPTION         PAGE
 3  37     9/12/99 e-mail, Becky David of   82
           Bryan Cave, LLP, to Thoma J.
 4         Palmisano, with attached
           redlined Stock Purchase
 5         Agreement
 6  40     "Break-Even Alternatives"    83
           spreadsheet
 7
    41     9/20/99 fax, Craig Hoffman to   84
 8         Chris Kaitson, with attached
           confidentiality agreement,
 9         draft LOI, and Summary of Major
           Corporate transactions since
10         1990
11  42     9/20/99 letter, Craig Hoffman   85
           to Richard Robert, Re:
12         Confidentiality
13  43     "Break-Even Alternatives"    88
           spreadsheet
14
    44     "Project Evaluation Data -    89
15         Capitalize All Input Data"
           spreadsheets
16
    50     "Calculation of Make Whole Cost   90
17         Sharing" document
18  51     Kansas Pipeline COmpany    94
           Disclosure Statement,
19         Depreciation Difference,
           Carryover Basis vs. Purchased
20         Basis spreadsheet
21  66     9/30/99 letter, K-Pipe Holdings   99
           Partners, LP, to Dan Tutcher,
22         Midcoast
23  70     10/7/99 Midcoast Energy    99
           Resources, Inc. Board of
24         Directors Meeting Minutes
25
```

2 (Pages 2 to 5)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:  Richard Robert

## Page 6

EXHIBITS (cont.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 76 | 10/14/99 fax, Ronald L. Chachere to Jim Pryde, Esq., with attached Stock Purchase Agreement | 101 |
| 77 | 10/19/99 e-mail, Richard Robert to Barry Davis, Stephanie Pendleton, Thomas Palmisano, Patrick Delaney, Subject:  New Events Memo | 105 |
| 78 | 10/21/99 letter, Dennis M. Langley to Jeff Furman | 106 |
| 96 | Appendix 8, Meeting Rabobank International Credit Committee dated 10/29/99 | 135 |
| 100 | E-mail string, 10/30/99, Re:  KPC Documents | 107 |
| 105 | 10/31/99 e-mail, Gary B. Wilcox to Chris Kaitson, et al, Subject:  KPC; Document Modifications | 112 |
| 107 | E-mail string between Gary Wilcox and Richard Robert and Chris Kaitson, Subject: KPC Option Agreement Changes | 113 |
| 109 | 11/3/99 e-mail string between Chris Kaitson, Cynthia Morelli, Thoma Palmisano, Graham Taylor, Richard Robert, Ron Chachere, Subject: PWC issues | 114 |
| 115 | 11/5/99 engagement letter, PWC to Richard Robert, Midcoast Energy Resources, Inc. | 114 |
| 130 | 11/8/99 Midcoast Energy Resources, Inc. Board of Directors Meeting Minutes | 121 |

## Page 7

EXHIBITS (cont.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 145 | 11/8/99 letter, Larry J. Austin, K-Pipe Group, Inc., to Rabobank, Chris Kortlandt | 123 |
| 150 | 11/19/99 invoice of Ronald L. Chachere | 95 |
| 160 | 12/14/99 draft memorandum, Gary Wilcox, Catherine Coffey, PWC, to Midcoast File | 69 |
| 186 | 1/18/01 e-mail, Stephanie B. O'Neil and Robert H. Whitten, PWC, to WNTS, Subject:  IRS warning on "intermediary transactions" Notice 2001-16 | 139 |
| 187 | E-mail string between PWC internally and Richard Robert, Subject:  Midcoast Energy - DIsclosure Requirement for Midco Transaction | 142 |
| 189 | 2/20/01 memo, Gary Wilcox and Bob Whitten, PWC, to Midcoast Tax Files, Subject:  Tax Statement Disclosure Statement | 145 |
| 195 | 8/10/01 fax, Tom Palmisano to Gary Wilcox, with attached representation letter, Midcoast to PWC | 148 |
| 196 | PWC to Midcoast Energy Resources, Inc. opinion letter effective 12/31/99 | 147 |
| 198 | 9/24/01 letter, Gary B. Wilcox, PWC, to Richard Robert | 146 |
| 201 | Handwritten PWC notes | 127 |

## Page 8

MR. COFFIN:  Mr. Stern, the same stipulations as yesterday?

MR. STERN:  Yes.

RICHARD ROBERT, having been first duly sworn, testified as follows:

EXAMINATION

Q.  (BY MR. COFFIN) Okay.  Please state your name for the record.

A.  Richard Robert.

Q.  And that's R-E-B --

A.  R-O-B-E-R-T.

Q.  Okay.  And what is your current address?

A.  11639 Versailles Lakes Lane, Houston, Texas 77082.

Q.  Okay.  My name is David Coffin and I represent the United States in this matter.

Have you ever given a deposition before?

A.  No.

Q.  Okay.  Just to go over some of the ground rules, I'll ask the questions and ask you to answer them as truthfully and honestly as you can.  I'll try not to interrupt you if you'll do the same for me.  If you don't understand a question, just ask me to restate it and I'll be happy to.  If you need a break at any time, let me know.

## Page 9

A.  Okay.

Q.  Mr. Stern may make some objections, but unless he instructs you not to answer the question, I'd ask that you go ahead and answer the question, please.

MR. STERN:  And I do, as well.

Q.  (BY MR. COFFIN) Do you have any medical condition or are you on any medication that would prohibit you from understanding the questions that I am going to ask today?

A.  No.

Q.  Are you currently employed?

A.  I am.

Q.  Where are you employed?

A.  A company called NAMI Holdings Company.

Q.  Spell that for me.

A.  N-A-M-I Holdings Company, LLC.

Q.  Where is that company located?

A.  Houston.

Q.  What do you do for NAMI Holdings Company?

A.  I'm their executive vice president and chief financial officer.

Q.  What kind of business is NAMI Holdings in?

A.  Oil and gas production.

Q.  And how long have you been employed by NAMI?

A.  One month as of today.

3  (Pages 6 to 9)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:   Richard Robert

Page 10

1    Q.  Prior to that, where were you employed?
2    A.  I owned an interest in a few businesses that I
3  started.
4    Q.  You may need to speak up just a little bit so
5  she can hear you.
6    A.  All right.
7    Q.  You own an interest in a few businesses that
8  you started?
9    A.  Yes, sir.
10    Q.  Okay.  What kind of businesses are those?
11    A.  One is Vintage Ventures, which is a retail wine
12  store, wine bar/restaurant.  We have two locations in
13  Houston.
14    Q.  Are those still open?
15    A.  Yes.
16        Another is Custom Living Properties.
17    Q.  Custom --
18    A.  Custom Living Properties --
19    Q.  Uh-huh.
20    A.  -- which is a residential home construction
21  business.  And the third is Lifewear Products, which is
22  a distributor of disposable products, principally
23  medical gloves.
24    Q.  Okay.  And are those thriving businesses?
25    A.  Depends how you define thriving, but yes.

Page 11

1    Q.  Are they still -- are they still interests that
2  you currently are operating?
3    A.  Yes.
4    Q.  Okay.  I assume you're operating them.  You
5  said they're your ventures or your interests?
6    A.  Yeah, I have partners in each.
7    Q.  And -- and you were employed by Midcoast,
8  Enbridge Midcoast at some point in time; is that
9  correct?
10    A.  That's correct.
11    Q.  Okay.  And so I'm just trying to fill in the
12  gaps quickly.  When did you cease being employed with
13  Enbridge Midcoast?  And I assume what you did after that
14  was open these businesses; is that correct?
15    A.  As well as have some fun, yes.
16    Q.  Okay.
17    A.  I believe it was June of 2002 that I stopped
18  being employed.
19    Q.  Okay.
20    A.  Or July, end of June.
21    Q.  Okay.
22    A.  And -- and then I had -- I did some consulting,
23  little bit of consulting, and then I started my
24  businesses.
25    Q.  Consulting for Midcoast or other businesses?

Page 12

1    A.  A little bit for Midcoast, but principally
2  my -- my principal consulting job was for Massey Energy,
3  which is a coal company in Richmond, Virginia.  I helped
4  them with financing, about five months.
5    Q.  And under what circumstances did you leave
6  Enbridge Midcoast in June 2002?
7    A.  What do you mean by circumstances?
8    Q.  Did you leave willingly?
9    A.  Yes.
10    Q.  Okay.  And why did you leave?
11    A.  A variety of reasons, principally wanting a
12  break.
13    Q.  Did you leave under good terms with the
14  company?
15    A.  I believe so.
16    Q.  Do you currently have any kind of a contractual
17  severance or pension plan or any kind of payment that
18  Midcoast may be paying to you or will pay to you in the
19  future?
20    A.  I did receive a severance payment when I --
21  when I left.
22    Q.  In a lump sum?
23    A.  In a lump sum.
24    Q.  But nothing -- there's no current right to
25  receive anything?

Page 13

1    A.  No.  I received health benefits.  That expired
2  about a year or more ago, or -- yeah, about a year.
3    Q.  What are your current responsibilities with
4  NAMI Holdings?
5    A.  We are in the process of -- of doing an S-1
6  filing.  A portion of the company is going public.
7    Q.  Where did you -- were you brought in
8  specifically to assist with that?
9    A.  Uh-huh, yes.
10    Q.  Okay.  And in addition, you're going to remain
11  on as CFO after the company goes public?
12    A.  I have a three-year employment agreement.
13    Q.  Three-year.  Give me your educational history,
14  beginning with where you graduated from high school.
15    A.  I graduated from high school from George S.
16  Henry in Toronto, Canada.
17    Q.  What year was that?
18    A.  '84.
19    Q.  Okay.
20    A.  Then I attended Southwest Texas State
21  University in San Marcos, Texas, also in '84.
22    Q.  What brought you to Texas from Toronto?
23    A.  Tennis scholarship.
24    Q.  Tennis?
25    A.  Uh-huh.

4 (Pages 10 to 13)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:  Richard Robert

Page 14

1    Q.  Okay.  And you graduated there in what year?
2    A.  1988.
3    Q.  With an accounting degree?
4    A.  Yes.
5    Q.  Any formal education after that?
6    A.  No.
7    Q.  And I assume you went to work in 1988?
8    A.  Yes.
9    Q.  For whom did you work?
10   A.  Arthur Andersen.
11   Q.  Which office?
12   A.  Houston.
13   Q.  Were you in audit or tax?
14   A.  Audit.
15   Q.  How long were you with Arthur Andersen?
16   A.  A little over three years.
17   Q.  Did you do any tax work at that time?
18   A.  No.
19   Q.  So you were primarily assisting with financial
20   statement audits of other companies?
21   A.  That's correct.
22   Q.  Okay.  Who were some of your clients, if you
23   recall?
24   A.  American Exploration Company, Texaco.  I did
25   some work with Enron.

Page 15

1    Q.  And when you left in -- was that '91 you would
2    have left Arthur Andersen?
3    A.  '92.
4    Q.  '92, okay.  Where did you go to work then?
5    A.  Midcoast.
6    Q.  What lured you to Midcoast from Arthur
7    Andersen?
8    A.  A partner at Arthur Andersen approached me with
9    the potential of working for Midcoast.  They were in
10   need of a CFO-type person, controller-type person,
11   and --
12   Q.  What was your title at Andersen when you left
13   in 1992?
14   A.  I was a senior.
15   Q.  Was Midcoast a small company at the time?
16   A.  Very small.
17   Q.  I think I read in your interview that you were
18   the only accounting person at the time; is that right?
19   A.  I was essentially the first employee.
20   Q.  First employee?
21   A.  (Witness nods).
22   Q.  And then tell me how -- I assume you were --
23   you were the CFO.  You were the accounting department,
24   basically?
25   A.  I was the controller.

Page 16

1    Q.  Okay.  Controller?
2    A.  My title was controller when I started.
3    Q.  Okay.  Did you eventually reach the title of
4    CFO?
5    A.  Yes.
6    Q.  When did that happen?
7    A.  When we went public or -- well, when we did a
8    filing in 1996.
9    Q.  Did the company go public in 1996?
10   A.  Well, it was -- we were pink sheeted, so we
11   were technically public, but...
12   Q.  What does pink sheeted mean?
13   A.  Just over the -- over-the-counter trading.  But
14   we raised our first batch of capital in 1996.
15   Q.  And then did -- when does it -- was there a
16   progression eventually that Midcoast was traded over
17   the -- over the --
18   A.  Yeah, we listed on American -- the American
19   Exchange.
20   Q.  When did that happen?
21   A.  '96.
22   Q.  Okay.  So, in 1996, you became CFO.  And how --
23   tell me the progression of the accounting department
24   from 1992 to 1996 of Midcoast.
25   A.  Initially, I did virtually everything.

Page 17

1    Q.  You did the -- all the --
2    A.  I did all the --
3    Q.  You booked all the transactions?
4    A.  -- the bookkeeping, all the payroll.  I did --
5    you know, just anything that needed to be done, I did
6    it.
7    Q.  Did you prepare tax returns at the time for
8    Midcoast?
9    A.  I -- I did, yes.  I believe I did.
10   Q.  From at least 1992 to 1996?
11   A.  No, I didn't do it for that long.
12   Q.  Okay.
13   A.  I don't believe.  I mean, at some point we had
14   our auditors step in and do it.
15   Q.  That would have been Price Waterhouse Coopers?
16   A.  No, it was Hein & Associates initially.
17   Q.  Hein?
18   A.  Hein, H-E-I-N.
19   Q.  Just a small local CPA firm?
20   A.  Regional.
21   Q.  Regional?
22   A.  Yeah.
23   Q.  Okay.  And they were doing the financial
24   statement audits --
25   A.  Uh-huh.

5 (Pages 14 to 17)

HUNDT REPORTING
214-220-1122

**Witness:   Richard Robert**

Page 18

1    Q.   -- at the time?
2    A.   Yes.
3    Q.   Okay.  Was that sufficient to -- were they a
4  large enough firm to allow you to attempt the public
5  or -- strike that.
6           Were they a large enough firm that the FCC
7  allowed to audit the company?
8    A.   Yes.
9    Q.   Okay.  And then eventually that firm was
10 replaced by Price Waterhouse?
11   A.   Correct.
12   Q.   Or Coopers & Lybrand?
13   A.   It was --
14   Q.   PWC?  Was it PWC by then?
15   A.   Yeah, I think at the -- I think by the time
16 that we engaged them, they were PWC.
17   Q.   All right.  And what year would that have been?
18   A.   I can't recall specifically.  It was '97, '98
19 time frame.
20   Q.   Okay.  Were you involved in the decision to
21 bring -- to replace Hein & Associates with PWC?
22   A.   Yes.
23   Q.   Do you recall why you made that decision?
24   A.   We had just gotten to a point where we had kind
25 of outgrown Hein's -- I don't know if you would call it

Page 19

1  expertise, but, you know, I think there came a time when
2  everyone became more comfortable going to a larger firm,
3  whether it be our bankers or, you know --
4    Q.   Management?
5    A.   -- management, board of directors, yes, sir.
6    Q.   Who was management beginning in '92?
7    A.   Dan Tutcher.
8    Q.   He was the president?
9    A.   Yes.  Chip Berthelot.
10   Q.   What was his title?
11   A.   Ultimately, it was chief operating officer.
12   Q.   Okay.
13   A.   And myself and --
14   Q.   Who actually hired you?
15   A.   Dan.  The three -- there were three principals.
16 Dan owned 50 percent and then another entity comprised
17 of Steve, Stevens Herbst and Kenneth Holmes were the
18 other two 25 percent owners.  So I met with the three of
19 them on a few occasions.
20   Q.   And did you -- who did you report to beginning
21 in '92?
22   A.   Dan Tutcher.
23   Q.   I see in some of the minutes to the meetings
24 that you were on the board?
25   A.   I was not.

Page 20

1    Q.   At least in '99?
2    A.   I wasn't a board member.
3    Q.   Oh, you weren't a board member, but you
4  attended the board meetings?
5    A.   Yes, I did.
6    Q.   Are you a -- you are a CPA, correct?
7    A.   Yes.
8    Q.   And you still maintain your license?
9    A.   I do.
10   Q.   When did you pass the CPA exam?
11   A.   In 1993, I believe.
12   Q.   In one sitting?
13   A.   Two.
14   Q.   Do you have any other licenses or professional
15 accreditations?
16   A.   No.
17   Q.   Okay.  Have you reviewed anything to prepare
18 for this deposition?
19   A.   Yes.
20   Q.   What did you review?
21   A.   A variety of documents.  It was my -- that's
22 right, it was my interview from last time that I
23 reviewed.
24   Q.   With the IRS?
25   A.   Yes.

Page 21

1    Q.   And you -- you reviewed that?
2    A.   I did.
3    Q.   And only that?
4    A.   I've seen a few documents as well.
5    Q.   Did -- Mr. Stern does not --
6         MR. COFFIN:  You don't represent
7  Mr. Robert, do you, individually?
8         MR. STERN:  I represent him as a former
9  employee of the company.
10        MR. COFFIN:  Okay.
11        MR. STERN:  In his capacity as former
12 employee of the company.
13        MR. COFFIN:  Okay.
14   Q.   (BY MR. COFFIN) Did you review any documents
15 provided by Mr. Stern?
16   A.   Yes.
17   Q.   Okay.  How many hours did you spend looking at
18 documents and getting ready for the deposition?
19   A.   Two hours.
20   Q.   Have you always reported to Mr. Tutcher -- or
21 Tutcher?
22   A.   Yes.
23   Q.   And let's see.  You became CFO in '96; is that
24 correct?
25   A.   Correct.

6  (Pages 18 to 21)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:   Richard Robert**

Page 22

1    Q.  And then did you -- did your title ever change
2  after that?
3    A.  No.
4    Q.  You remained as such until June of '02?
5    A.  Well, no.  When Enbridge acquired Midcoast, my
6  title changed to vice president of finance, I believe.
7    Q.  Did somebody take over the role that you had
8  had as CFO?
9    A.  Well, Enbridge had a CFO in Calgary --
10   Q.  Okay.
11   A.   -- and so they didn't -- they didn't have --
12  they didn't need two CFOs.
13   Q.  You didn't maintain becoming a CFO or maintain
14  your role as CFO of Midcoast?
15   A.  My responsibilities didn't change, but my title
16  did, for the most part.
17   Q.  From your -- from the beginning of your
18  employment in 1992 through 1999, do you recall how many
19  acquisitions Midcoast would have been involved in, as
20  far as purchasing companies or assets?
21   A.  Companies or assets?
22   Q.  Right, uh-huh.
23   A.  I'd venture to guess between 20 and 30.
24   Q.  Do you know if -- or could you break down how
25  many would be asset purchases and how many would be

Page 23

1  stock purchases?
2    A.  No.  I mean, I really --
3    Q.  Was there a preference either way?
4    A.  Oh, yeah.  We always preferred to purchase
5  assets.
6    Q.  Okay.  Can you say whether a majority would
7  have been asset purchases or stock purchases?
8    A.  I mean, without refreshing my memory on all the
9  different transactions we did, I mean, I really couldn't
10  say.
11   Q.  Why was the asset purchase preferred?
12   A.  A variety of reasons.  Liability issues when
13  you're buying stock, you know, unknown liabilities in
14  particular, you know, as well as tax consequences,
15  step-up in basis.
16   Q.  Were the 20 or so acquisitions that you
17  mentioned, would they have been large acquisitions or
18  was -- I understand that your acquisition of the Kansas
19  Pipeline Company's assets was the largest at that time
20  you had done?
21   A.  That's correct.
22   Q.  And that was, a gross amount, around
23  188 million, whatever it was.  Dollar-wise, did you ever
24  have any half that large before then?
25   A.  I don't believe so.

Page 24

1    Q.  Okay.  Do you recall dollar-wise how -- what
2  would the largest have been before that, the largest
3  acquisition?
4    A.  I believe the AlaTenn acquisition was probably
5  the only other -- the second largest, at about
6  40 million.
7    Q.  Ala --
8    A.  AlaTenn.
9    Q.  Spell that.
10   A.  Alabama Tennessee.
11   Q.  Spell that one again for me.
12   A.  A-L-A-T-E-N-N.
13   Q.  Okay.
14   A.  Which stood for Alabama Tennessee Natural Gas
15  Company.
16   Q.  When did that acquisition occur?
17   A.  I can't --
18   Q.  Would it have been before or after the intent
19  to go public?
20   A.  It was after.
21   Q.  After '96?
22   A.  Yeah.
23   Q.  Okay.
24   A.  It was probably '97, I believe.
25   Q.  Was that an asset purchase or a stock purchase?

Page 25

1    A.  Asset.  I think there was an (h)10 election
2  involved.
3    Q.  That's 330 --
4    A.  338(h)10.
5    Q.  338(h)10 Code Section.
6        Do you recall the type of due diligence
7  that was performed then, before the AlaTenn purchase?
8    A.  (Witness nods)
9    Q.  What kind of things were you responsible for as
10  far as due diligence goes?
11   A.  Financial matters.
12   Q.  Did you go out --
13   A.  Projections.
14   Q.  Sorry for interrupting.
15   A.  Yeah, just financial matters in general.
16   Q.  Did you go out and verify assets somehow?
17   A.  We went to the location.
18   Q.  Did you go inspect?
19   A.  Well, we -- I didn't look at the pipelines, per
20  se, but, you know, I was at their offices and reviewed
21  various documents.
22   Q.  And then you'd look at the liabilities?
23   A.  Uh-huh.
24   Q.  I assume -- how would you become comfortable
25  with the outstanding liabilities?

7 (Pages 22 to 25)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:   Richard Robert

Page 26

1    A.  Well, recorded ones were easy to get a grip on;
2  and it was just a matter of, you know, discussions with
3  personnel and, you know, just trying to get a sense as
4  to whether or not there could be other liabilities out
5  there, environmental and otherwise.
6    Q.  And income projections I assume you would look
7  at; is that correct?
8    A.  That's correct.
9    Q.  How would you test those?  As an auditor, isn't
10  it a term of art to test the veracity of something?
11    A.  Yeah, it was.  You know, you would look at
12  contracts principally.  And that's certainly what we
13  liked to see, is, you know, an income stream related to
14  a contract that was -- you know, you could see the term
15  and then you could -- you would have to assess the
16  likelihood of -- of the contract renewing and just the
17  general market conditions in that area.
18    Q.  And how would you verify expense type
19  projections?
20    A.  We would -- we would have to estimate the
21  incremental -- the incremental expenses that would be
22  either added to or taken off what they were -- what they
23  were -- what they had at that time.  Typically, we tried
24  to save money.
25    Q.  Was there any due diligence that occurred with

Page 27

1  regard to the management of the company?
2    A.  Can you -- I'm not sure I understand your
3  question.
4    Q.  Would you ever have to, for any reason,
5  investigate, you know, how the management is either
6  perceived or --
7    A.  Generally not.
8    Q.  If you were bringing them along, certainly you
9  would want to know something about them; is that right?
10    A.  Yes, that is true.
11    Q.  The AlaTenn purchase, did you bring any of the
12  management along?
13    A.  No, I don't believe so.  I mean, management,
14  no.
15    Q.  Who else -- did you bring somebody along?
16    A.  Yeah, we -- we brought over --
17    Q.  Employees?
18    A.  -- all the operations folks.
19    Q.  And then who owned AlaTenn at the time?
20    A.  Atrion.
21    Q.  Is that a private entity or a public entity?
22    A.  I think it was a public entity.  I think
23  they're a medical products company.
24    Q.  They're in medical products?
25    A.  Uh-huh.

Page 28

1    Q.  And the assets, were they pipelines as well,
2  AlaTenn?
3    A.  Uh-huh, they were.
4    Q.  Okay.  I've got various binders here.  I would
5  like for you to look at this binder first, please.
6  That's Government Exhibit No. 1.
7        Yesterday Mr. Kaitson was in and he
8  confirmed that this was the closing binder held by
9  Midcoast.  They have been Bates stamped if you look at
10  the bottom right-hand corner.  I'll try to refer to
11  those Bates stamp when we want to look at various
12  documents.
13        I assume you are familiar with this
14  binder; is that correct?
15    A.  Familiar with this agreement?
16    Q.  Well, this -- this entire binder I think has
17  not only the agreement but ancillary documents.
18    A.  I can't --
19    Q.  I know you haven't had a chance to really go
20  through it.
21    A.  Yeah, I can't say I am familiar with it until I
22  actually look at it.
23    Q.  Okay.  That's all right.  We'll start with an
24  individual document.  We'll go there.
25        If you'll turn to ENB 235, which is the

Page 29

1  asset purchase agreement, are you familiar with this
2  document, sir?
3    A.  As familiar as I can be after five or six
4  years, whatever it's been.
5    Q.  Okay.  Look at 263, and let me know if that's
6  your signature.
7    A.  263?
8    Q.  Uh-huh.
9    A.  Yes, it is.
10    Q.  Okay.  Did you -- did you look at this
11  document, the asset purchase agreement, in conjunction
12  with your preparation for this deposition?
13    A.  No.
14    Q.  Okay.  Do you recall the time period, just
15  generally speaking, around the time this agreement was
16  executed back in November of '99?
17    A.  Do I recall the time period?
18    Q.  Yeah.  Well, do you recall the events
19  surrounding that time period?
20    A.  Generally.
21    Q.  Ask you the question and we'll find out, right?
22    A.  Yeah.
23    Q.  Do you recall why -- why Midcoast was
24  interested in buying these assets --
25    A.  Yes.

8  (Pages 26 to 29)

HUNDT REPORTING
214-220-1122

**Witness:  Richard Robert**

Page 30

1    Q.  -- of this company?
2        Okay.  Why is that?
3    A.  It -- we felt that it gained us critical mass
4  that we needed in the public markets.  It basically
5  doubled the size of the company.  And we thought -- you
6  know, we thought ultimately there was some upside, you
7  know, to those assets.
8    Q.  Okay.  Look at ENB 240 -- I'm sorry, 242.  Can
9  you tell me -- that has to do with excluded assets.  If
10 you'll review that provision for a minute.
11       Do you recall what the Butcher interests
12 were?
13   A.  Yes.
14   Q.  What were the Butcher interests?
15   A.  It was an obligation to pay basically a
16 royalty.  I don't remember whether it was 1-1/2 or
17 2 percent of revenue.
18   Q.  An obligation of?
19   A.  The company.
20   Q.  Kansas Pipeline?
21   A.  I believe so.
22   Q.  Okay.  Now, an obligation is not necessarily an
23 asset, is it?
24   A.  From whose perspective?  The person who owns
25 it, it is an asset; the person who -- who has to pay it,

Page 31

1  it would be a liability.
2    Q.  Okay.  So, I mean, if it's an excluded asset,
3  would it necessarily be on the exclude -- or if it's an
4  obligation, would it be on the excluded assets list?
5    A.  It depends on, again, whose perspective.
6    Q.  Okay.  Whose perspective was this agreement
7  written?
8    A.  I guess the person who owned all these
9  interests.  It was an asset of K-Pipe at that time,
10 because they were the recipient of that revenue stream.
11   Q.  So they were the obligor and the recipient; is
12 that correct?
13   A.  No.
14   Q.  Okay.  So, when you mention the Butcher
15 interests was an obligation, is it -- as far as K-Pipe
16 went then, is it -- was it an obligation?  Was it a
17 liability or an asset?
18   A.  From whose perspective?
19   Q.  From K-Pipe.  That's who you said this
20 agreement was written for.
21       Either way, K-Pipe is transferring assets
22 to Midcoast?
23   A.  Right.
24   Q.  My question --
25   A.  They wanted to retain that interest.

Page 32

1    Q.  They wanted to retain the interest or the
2  obligation?
3    A.  The interest.
4    Q.  Okay.  When you described what the Butcher
5  interest was a minute ago, you said it was an
6  obligation, so that's why I'm trying --
7    A.  It was an obligation of Kansas Pipeline; and if
8  we purchased Kansas Pipeline, we would -- we would have
9  that obligation.  We would continue to have that
10 obligation and K-Pipe would retain the benefit of
11 that -- of that 2 percent royalty.
12   Q.  Okay.  And who have the obligation?
13   A.  Whoever owned Kansas Pipeline, which in this
14 case was us, Midcoast.
15   Q.  So is the -- the Butcher interest is
16 listed on the excluded assets listing.  I'm still
17 confused.  Is it an obligation or is it --
18   A.  It's an obligation of Kansas Pipeline.  And if
19 we were buying Kansas Pipeline, Kansas Pipeline would
20 have to continue to pay that royalty interest to the
21 owner of the Butcher interest, which in this case was
22 K-Pipe.
23   Q.  Uh-huh.
24   A.  So that obligation continued, essentially.
25   Q.  Okay.

Page 33

1    A.  They're saying they want to retain that, and we
2  would have -- we bought that asset with that encumbrance
3  on it.
4    Q.  Okay.  Midcoast bought the asset with the
5  encumbrance on it?
6    A.  Yes.  Kansas Line -- Kansas Pipeline came with
7  that obligation to pay that 2 percent revenue interest.
8    Q.  Okay.  So, the Butcher interest as listed here
9  is --
10   A.  Is an asset of K-Pipe's.
11   Q.  -- is an asset of K-Pipe's that they're going
12 to retain?
13   A.  That they wanted to retain.
14   Q.  Okay.  And as it being an asset, it's not
15 their -- it's not an obligation, is it?  It's receiving
16 something?
17   A.  From K-Pipe's perspective, it's an asset; from
18 Kansas Pipeline's perspective, it's an obligation.
19   Q.  Okay.  Why -- was it Midcoast that didn't want
20 to buy the Butcher interest or was it K-Pipe who wanted
21 to retain the Butcher interest?
22   A.  K-Pipe wanted to retain it --
23   Q.  And why is that?
24   A.  -- and we wanted to buy it, but we had to
25 negotiate separately for it.

9  (Pages 30 to 33)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:   Richard Robert**

Page 34

1    Q.  Okay.  And why is that?
2    A.  Like I said, it's a nice asset.
3    Q.  Well, why did they want to not sell it to you?
4    A.  Well, they did ultimately.  I mean, we
5  became -- I mean, they sold a portion of it to us.
6    Q.  I understand that.  But during the -- when this
7  agreement was executed, why wasn't it just transferred
8  along with all the other assets to Midcoast?
9    A.  It -- it was principally a FERC issue.  We --
10  we wanted to retain -- you know, we were in the process
11  of a rate case.
12    Q.  Uh-huh.
13    A.  And so we wanted to show that that -- that
14  obligation was an obligation to an outside party, and so
15  we wanted to handle it separately so that -- in hopes
16  that it could be included as part of the costs of Kansas
17  Pipeline that could be recovered from the rate payers.
18    Q.  And the outside party would have been K-Pipe;
19  is that right?
20    A.  Yes.
21    Q.  Were -- was Midcoast ultimately successful in
22  the rate case in asserting that position?  Did it go
23  into the computation --
24    A.  I --
25    Q.  -- by the FERC?

Page 35

1    A.  I wasn't there by the time that rate case was
2  resolved, so I'm not sure.
3    Q.  Okay.  Tell me what Item B under 2.5 is.  What
4  kind of asset was that and why was it held out or
5  excluded?
6    A.  As I recall, that was a cash reserve that was
7  required by lenders.  I can't remember if it was Trust
8  Company of the West or some -- someone had put in or had
9  lent money to I can't remember which entity, one of --
10  one of the entities; and as a requirement they were
11  required to have $10 million set aside, a sinking fund,
12  per se.
13    Q.  One of the Langley entities?
14    A.  Yeah.
15    Q.  So, was there a requirement, then, that that --
16  explain to me why that reason required that the asset be
17  excluded from the conveyance.
18    A.  I -- I assume they wanted to keep the
19  $10 million.
20    Q.  "They" being?
21    A.  K-Pipe.  Or that -- you know, maybe their
22  agreement with Langley.  Maybe Langley wanted to keep
23  the $10 million.  I don't know.  Because, I mean, it
24  would -- it would just be a wash.  I mean, you would pay
25  him $10 million to get $10 million.  I mean, there's no

Page 36

1  point in having it part of the transaction.
2    Q.  Okay.  And on the item No. C, do you recall why
3  those certain causes of action were withheld or
4  excluded?
5    A.  I'm a little fuzzy on that, but, I mean, just
6  by reading it, I assume it was litigation --
7    Q.  Okay.
8    A.  -- that we didn't want a part -- we didn't want
9  to be a party to.
10    Q.  Is -- who negotiated these provisions, do you
11  know, on behalf of Midcoast under 2.5?
12    A.  Under 2.5?
13    Q.  Yeah, that's the provisions under 2.5.
14    A.  I mean, it would have been a variety of people,
15  included in -- in negotiating provisions in this
16  agreement.
17    Q.  Would you -- how much was your involvement as
18  far as negotiating provisions such as 2.5?
19    A.  Oh, I would have been certainly very involved.
20    Q.  Was it -- was Mr. Tutcher making most of -- I
21  assume whenever the agreements are drafted that there is
22  some back and forth negotiation in that regard with
23  regard to the provisions.  Was Mr. Tutcher the lead
24  person responsible for looking and -- and making
25  suggestions or would that have been you?

Page 37

1    A.  No, that would have been myself and attorneys,
2  depending on -- and tax advisors, et cetera, depending
3  on what provisions we were talking about.  And -- and,
4  you know, Chip Berthelot had a hand in some of it as
5  well.
6    Q.  Generally, was it you would -- you would review
7  what was going on at the time and report to Mr. Tutcher,
8  if he asked you how are things going on the acquisition
9  type thing?
10    A.  Yeah, we would report to Mr. Tutcher and the
11  board.
12    Q.  Was he -- was Mr. Tutcher actively involved?
13  Was he notified on a daily basis what was going on
14  during this period of time?
15    A.  I mean, I wouldn't characterize it as actively
16  involved.
17    Q.  He depended on you and others to do the
18  negotiations?
19    A.  Correct.  There was -- yeah, essentially.
20    Q.  Turn to ENB 367.  Do you recognize this
21  partnership agreement?
22    A.  Yes, generally.
23    Q.  Tell me again the purpose of the Butcher
24  Interest Partnership.
25    A.  We wanted to own part of that interest, so we

10  (Pages 34 to 37)

**HUNDT REPORTING**
**214-220-1122**

**Witness:   Richard Robert**

Page 38

1    entered into a partnership with K-Pipe.
2        Q.   And you said earlier that the reason it wasn't
3    just purchased initially or in conjunction with the
4    asset purchase agreement is because you wanted to keep
5    the obligation in place to assist you in your rate case?
6        A.   Well, that was, you know, certainly -- K-Pipe
7    liked the asset and -- and, yeah, I mean, from our
8    perspective, you know, we didn't want to buy it outright
9    because we wanted to retain that -- that position in
10   front of the FERC.
11       Q.   And why did -- what makes you think that K-Pipe
12   wanted the asset or the interest?  Did anybody from
13   K-Pipe ever express to you why they wanted to keep that
14   interest?
15       A.   Well, why anyone would want to keep an asset,
16   because it's, you know, cash flows.
17       Q.   Did -- do you know if K-Pipe ever received any
18   cash flows from the Butcher interest?
19       A.   I can't -- I don't know.  I don't remember
20   specifically.  I remember we ultimately bought it from
21   them, so...
22       Q.   In the FERC proceeding, did Midcoast have to
23   disclose the history of the Butcher interest to the
24   FERC?
25       A.   I wasn't part of the proceedings.

Page 39

1        Q.   Did Midcoast have the financial ability to
2    acquire the Butcher interest at the time the asset
3    purchase agreement was entered into?
4        A.   As I recall, no.
5        Q.   Why not?
6        A.   We didn't have any availability on a credit
7    line to do it.
8        Q.   How much was the credit line?
9        A.   I believe it was 265 million.
10       Q.   And then the transaction itself was -- the
11   asset purchase was 200 million or so?
12       A.   Round-about.
13       Q.   Okay.
14       A.   But we had some existing debt already.
15       Q.   Some existing.  So you -- there was no way to
16   get another $6-1/2 million?
17       A.   Not at that point in time.
18       Q.   And was that amount of money requested from the
19   line of credit?
20       A.   I mean, you're testing my memory.  I can't -- I
21   mean, I just knew that we didn't have that availability
22   at the time to do it.
23       Q.   You don't recall a request to Bank of
24   America to --
25       A.   I mean, ultimately, yeah.  Ultimately, it was

Page 40

1    requested when we negotiated a deal with K-Pipe.
2        Q.   And how was that request made?
3        A.   I just talked to our -- the bank officer and
4    told him the transaction that we were attempting to do
5    and -- and if they could provide financing, which they
6    ultimately did.
7        Q.   Was that after the fact or was that in
8    November, you know, pursuant to this transaction?
9        A.   It was -- I know it -- I know that the
10   acquisition of our interest in this occurred after the
11   fact.
12       Q.   I'm just trying to gauge whenever your
13   discussion with -- when you went to the bank to ask for
14   the money.  Was it after the fact or was it in
15   conjunction with the purchase, asset purchase?
16       A.   I don't recall specifically.
17       Q.   And at that time you were able to get -- were
18   you able to get the lending you needed?
19       A.   Yeah, I believe we acquired -- I think was it
20   $6.1 million loan or something like that.
21       Q.   Well, turn to 16.  I mean, I think that's what
22   we're talking about then.
23       A.   16?
24       Q.   I'm sorry, 377, ENB 377.
25       A.   Uh-huh.

Page 41

1        Q.   Is this what you were talking about?
2        A.   Yes.
3        Q.   The credit agreement between Butcher Interest
4    Partnership as borrower and Bank of America N.A. as
5    lender?
6        A.   Yes.
7        Q.   And so the $6.1 million was able to be
8    borrowed?
9        A.   Yes.
10       Q.   Did you negotiate this credit agreement with
11   Bank of America?
12       A.   I was involved, yes.
13       Q.   How did the addition of K-Pipe as a partner --
14   I assume that that's -- your position is that that gave
15   Bank of America more comfort in lending the money to you
16   or Midcoast and K-Pipe?
17       A.   I don't understand the question.
18       Q.   Yeah, terrible question.
19            Why was it that Bank of America would not
20   loan Midcoast the money, but then when K-Pipe was
21   brought in it would?
22       A.   Well, again, I don't think it was an issue of
23   whether or not they would lend Midcoast the money.  It
24   was an issue of Midcoast at that time wanted, you know,
25   from the FERC perspective, to not own it, wholly own it.

11  (Pages 38 to 41)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:  Richard Robert

Page 42

1   Q.  Uh-huh.
2   A.  And so we went into a partnership arrangement
3  with K-Pipe.
4   Q.  Okay.  But I thought you said also that, at the
5  time, that Midcoast couldn't af -- there was no more
6  room in the credit line?
7   A.  Well, there wasn't, as -- as it was
8  contemplated --
9   Q.  Uh-huh.
10   A.  -- because this was an excluded asset.  And,
11  so, had we included it, could we have gotten funding for
12  it?  Possibly.
13   Q.  Okay.  Do you recall if Midcoast guaranteed
14  this Butcher Interest Partnership credit agreement?
15   A.  I expect we did.
16   Q.  Do you recall if K-Pipe, anybody from K-Pipe
17  guaranteed the obligation?
18   A.  I expect they did as well.
19   Q.  Was the income from the Butcher interest enough
20  to pay the principal and interest on the Butcher
21  Interest Partnership credit agreement, on that loan?
22   A.  I believe so.  I don't recall the specific
23  numbers.
24   Q.  Was Midcoast making the payment on the note?
25   A.  I don't think it was Midcoast that was a party

Page 43

1  to this.  No, I mean, I assume it was the -- this was
2  the partnership.
3   Q.  Would it surprise you if Midcoast was making
4  payments on that note?
5   A.  Yeah, because I would think that the
6  partnership would make the payments on the note.
7   Q.  Who would authorize the payment of the note
8  payment each -- was it a monthly payment?
9   A.  I don't recall.
10   Q.  Would that have been under your responsibility,
11  to authorize payment of such?
12   A.  Yeah, it's likely, yeah.  I mean --
13   Q.  Who had control over the Butcher Interest
14  Partnership bank account?
15   A.  Again, you're testing my memory, but I would
16  assume both parties would have control over the account.
17   Q.  Turn back to ENB 369, please.
18   A.  Okay.
19   Q.  Article VII in the Butcher Interest Partnership
20  agreement, do you see that?
21   A.  Uh-huh.
22   Q.  What was the reason that this cash -- cash was
23  borrowed of 6.1 million; is that right?
24   A.  Uh-huh.
25   Q.  And then it was to be distributed to K-Pipe,

Page 44

1  6.225 million?
2   A.  225, uh-huh.
3   Q.  What was the purpose of that distribution?
4   A.  The partnership was paying K-Pipe for the
5  interest.  They basically sold that interest to this
6  partnership.
7   Q.  And do you know why K-Pipe would -- would have
8  wanted to do that if -- I thought you said earlier they
9  wanted to retain that interest?
10   A.  Well, we offered them a price that they were
11  willing to take.
12   Q.  How much -- how was that price determined, the
13  six-point -- was it 6.5 million or --
14   A.  Yeah, I think that's right.
15   Q.  How was that price determined?
16   A.  It was just modeled like anything else, I
17  imagine.
18   Q.  Do you recall --
19   A.  I believe I would have modeled it.
20   Q.  There would have been some kind of projections?
21   A.  Uh-huh.
22   Q.  And you're talking about modeling an Excel
23  spreadsheet?
24   A.  Exactly.
25   Q.  Okay.  Was that something that you were

Page 45

1  responsible for in Midcoast --
2   A.  Uh-huh.
3   Q.  -- the projections and modeling them?
4   A.  Generally, yes.
5   Q.  Turning on to Article XIII on page ENB 370, do
6  you recall that K-Pipe had an option to purchase -- oh,
7  I'm sorry -- Midcoast had an option to purchase K-Pipe's
8  interests?
9   A.  Uh-huh, yeah.
10   Q.  And what was the purpose of that provision?
11   A.  I expect that, as I recall, if we -- I guess if
12  we felt like we weren't going to be successful at FERC,
13  we wanted the option to -- to buy it.
14   Q.  Okay.  And then the next page on Section 13.04,
15  K-Pipe is given a right to purchase the interest, that
16  partnership interest from Midcoast; is that right?
17   A.  No, I think they were given the -- well, I
18  think they were -- K-Pipe shall have the option to sell,
19  it says.  It was a -- they could put it to us,
20  essentially.
21   Q.  Okay.  And why -- what was the purpose of that
22  provision, if you recall?
23   A.  I guess it gave them, you know, gave them
24  ultimate flexibility in what they wanted to do.  I mean,
25  we wanted the right to buy it and they wanted other --

12  (Pages 42 to 45)

HUNDT REPORTING
214-220-1122

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:  Richard Robert**

Page 46

1  they wanted rights as well, based on what they wanted to
2  do.
3  Q.  Okay.  You can close that binder and then go to
4  binder -- let me see.
5  A.  Could I take a break?
6  Q.  Sure.  Sure.  Just a quick break.
7       (Recess from 10:46 a.m. to 10:55 a.m.)
8  Q.  (BY MR. COFFIN) Mr. Robert, you ready?
9  A.  Yes, I am.
10  Q.  Okay.  Turn to Government Exhibit 5, which
11  would be in here.
12  A.  Okay.
13  Q.  You could put those two on the floor behind
14  you, if you would like.
15  A.  Okay.
16  Q.  This is a -- appears to be an engagement letter
17  between Price Waterhouse Coopers and Midcoast Energy
18  Resources; is that correct?
19  A.  Yes.
20  Q.  And it's addressed to you, dated April 8, 1999;
21  is that right?
22  A.  That's correct.
23  Q.  Is this something that you obtained -- did you
24  obtain the engagement letter from Price Waterhouse
25  Coopers every year prior to their work?

Page 47

1  A.  I can't recall if I got it every year.  I
2  recall --
3  Q.  Periodically?
4  A.  I recall acquiring them at some point.  I don't
5  know if I got it the first year and --
6  Q.  All right.  The third paragraph, it says, "We
7  look forward to working with you and your staff during
8  the completion of this important tax compliance
9  project."  Now, tax compliance is generally the
10  preparation of income tax returns; is that right?
11  A.  Correct.
12  Q.  Was Price Waterhouse Coopers doing the audit of
13  Midcoast at this time as well?
14  A.  Yes, they were.
15  Q.  Who was -- do you recall in '99, who was the
16  audit partner?
17  A.  In '99?
18  Q.  Uh-huh.
19  A.  Steven.  His last name eludes me.  Steven
20  Parker.
21  Q.  Steven Parker?
22  A.  Parker, I believe.
23  Q.  And did you work with Mr. Parker in assisting
24  with the financial statement audit of the company?
25  A.  Did -- could you repeat the question?

Page 48

1  Q.  Did you work with Mr. Parker in conjunction
2  with the -- their financial statement audit of the
3  company?
4  A.  Yes.
5  Q.  Okay.  And his staff people, I assume?
6  A.  Yes.
7  Q.  And how long did PWC continue doing the
8  financial statement audits after 1999?
9  A.  To my knowledge --
10  Q.  Was it up until you left?
11  A.  To my knowledge, they haven't stopped.
12  Q.  Oh, okay.  And in conjunction with the
13  financial statement audits of the company, was it
14  typical to have the staff people come and ask you
15  questions about various issues on the financial
16  statements?
17  A.  Typically, I only dealt with issues, if there
18  were any issues.
19  Q.  All right.
20  A.  So, no, they typically didn't deal with me.
21  Q.  Typically, they dealt with your staff; is that
22  right?
23  A.  Correct.
24  Q.  How many did you have in your accounting
25  department back in 1999?  More than five?

Page 49

1  A.  Oh, yeah, yeah.  I would have to guess
2  somewhere in the neighborhood of 20.
3  Q.  And you said that Price Waterhouse Coopers'
4  audit team only came to you if there were certain
5  issues; is that right?
6  A.  Uh-huh.
7  Q.  Did Price Waterhouse Coopers, in conjunction
8  with their audits, ever come and ask you about this
9  transaction with K-Pipe?
10  A.  I mean, not as an issue.
11  Q.  Not as an issue?
12  A.  No.
13  Q.  They did discuss it with you?
14  A.  Yeah.  We would -- I would have discussions
15  with our auditors about things we were doing all the
16  time.
17  Q.  Okay.  But I thought you said they only came to
18  you if there were certain issues?
19  A.  The staff people who were doing an audit, I
20  would sit and talk.  But, you know, I would go and have
21  lunch with Steven Parker and we would talk about things
22  that were going on.
23  Q.  On, let's see.  On the second page of the
24  engagement letter, it says, "Terms of engagement to
25  prepare tax return"?

13  (Pages 46 to 49)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:   Richard Robert

Page 50

1    A.  Uh-huh.
2    Q.  At the bottom, it says, "Our fee estimate does
3  not include time for accounting support, tax planning,
4  consultation or special projects. Special projects and
5  consultations will be detailed in a separate engagement
6  letter should the need arise at 65 percent of our
7  standard hourly rates."
8    A.  Uh-huh.
9    Q.  Was that pretty typical?
10    A.  Was what typical?
11    Q.  That they would bill their -- for special
12  projects and consultations at 65 percent of standard
13  hourly rates?
14    A.  That's what I required.
15    Q.  Pardon me?
16    A.  I required that.
17    Q.  You required that?
18    A.  That was a negotiated number.
19    Q.  Okay.  And why -- and they were willing to do
20  it at 65 percent of rates?
21    A.  Uh-huh.
22    Q.  Okay.  Did they -- did you use them, PWC, for
23  special projects and consultations periodically?
24    A.  Periodically.
25    Q.  And those billings were at 65 percent of the

Page 51

1  rate?
2    A.  I -- I expect so.
3    Q.  Do you recall how you justified to them that
4  they should only get 65 percent of their rates for --
5    A.  Because their rates were ridiculous and they
6  kept going up and up.  I think that's why I required
7  this, actually, because I got tired of the rates keep
8  going up.  So, that -- that -- I recall that I was
9  getting tired of that, so I said let's put it on paper
10  and let's agree.
11    Q.  Do you have Exhibit 6 in your binder?  I pulled
12  it out yesterday, I think.
13    A.  This one here?
14    Q.  Oh, you do have it.
15      MR. COFFIN:  These must be yours.
16      MS. PIPKIN:  Yes, they are.
17      MR. COFFIN:  Those are yours as well.
18    Q.  (BY MR. COFFIN) This is an unsigned letter from
19  Chase, I think, to Mr. Bill Bray, dated June 16th of
20  '99, and the first line says:  Pursuant to our
21  conversation, please find the enclosed presentation that
22  provides a brief description of Project Ruby."  My only
23  question is, June 16th of '99, is it about that time
24  that you began receiving things from Chase, Midcoast
25  began receiving things from Chase with regard to the

Page 52

1  purchase of Kansas Pipeline Company?
2    A.  Yeah.  I mean, this would indicate that would
3  be -- that was the case.
4    Q.  Did -- I mean, is there anything in your
5  recollection that would say, no, it was later or before
6  that?
7    A.  No.
8    Q.  And the next exhibit, Government Exhibit 7,
9  same type of question.  It's an unsigned copy.  We got
10  it from Chase.  It's dated June 21, '99, another letter
11  to Bill Bray where they were transmitting the
12  confidentiality agreement for signature?
13    A.  Uh-huh.
14    Q.  June 21, 1999, is that about the time when
15  Midcoast would have received something like that from
16  Chase?
17    A.  Yeah, that's what it indicates.  I imagine
18  that's correct.
19    Q.  Any reason to dispute?
20    A.  Nope.
21    Q.  The same question with 9.1, if you would turn
22  over there, please.  You don't have one?
23    A.  No, I don't think so.  I see 10.
24    Q.  Here you go.  Take a look at this one.  This is
25  a letter on July 21 of '99.  It's unsigned but it's from

Page 53

1  Midcoast energy to Mr. Bill Manias at Chase Securities.
2  I'm just wondering the same question, about the same --
3  the time frame involved.  Would that have been about the
4  time the letter, if any, would have been transmitted to
5  Chase?
6    A.  No reason to think it would be any other time.
7    Q.  Okay.  Insert that in yours, please.
8    A.  Should these be --
9    Q.  They shouldn't be stapled?
10    A.  Well, this says 10, this says 10.
11    Q.  Go ahead and take it off.
12    A.  This is -- so just unstaple them.  Here's 9, so
13  maybe it's back here.  9.1.
14    Q.  Okay.
15    A.  I guess 10 is just out of place.
16      MR. COFFIN:  Go off the record for a
17  second.
18    A.  Oh, you've got another 10 here.
19    Q.  Oh, you've got a 10 there.  That's my crackpot
20  staff.
21      Okay.  Deposition Exhibit 10, this is
22  the -- this is a copy of the Kansas Pipeline offering
23  memo.  I assume you would have reviewed something like
24  this around that time period?
25    A.  Yes.

14  (Pages 50 to 53)

HUNDT REPORTING
214-220-1122

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:   Richard Robert**

Page 54

1    Q.  And it's dated -- shows August of '99?
2    A.  Uh-huh.
3    Q.  What was attractive -- I think we already
4  covered this.  What was attractive to Midcoast about
5  Kansas Pipeline Company?
6    A.  It was -- it was an acquisition that was going
7  to give us critical mass in the market, which we felt
8  was important.  It was an asset that we were familiar
9  with, being a pipeline and being regulated.
10    Q.  Was Midcoast pursuing a pipeline company at the
11  time or did Bishop or Langley or his representatives
12  call Midcoast first?
13    A.  I don't know.
14    Q.  Okay.  How did you first hear of the potential
15  acquisition?
16    A.  Through -- through our business development
17  people.
18    Q.  Okay.  Was that Mr. Bray?
19    A.  Uh-huh.
20    Q.  Go to 20, Government Exhibit 20.  Okay.  This
21  is a draft copy of the board of directors meeting of
22  Midcoast Energy Resources dated August 11th of '99, and
23  it's unsigned.  I understand there should be a signed
24  copy somewhere, but I did want to talk to you about page
25  2 of the minutes, the New Business matters.

Page 55

1         You attended all the board meetings; is
2  that correct?
3    A.  Yes.
4    Q.  And did you have an opportunity to review the
5  minutes afterwards for any reason?
6    A.  Generally.
7    Q.  Is that in draft form you reviewed them or did
8  you review them after they were finalized?
9    A.  Generally, I reviewed them in draft form.
10    Q.  And why was that?
11    A.  Just for clarity.
12    Q.  And then who was preparing minutes?
13  Mr. Herbst?
14    A.  Herbst.
15    Q.  Duane S. Herbst?
16    A.  Uh-huh.
17    Q.  And then would you make suggestions to him?
18    A.  Yeah, if there was something I disagreed with.
19    Q.  Okay.
20    A.  But, generally, he got it right.
21    Q.  Is it true -- you might read over that New
22  Business on page 2, couple paragraphs there, two
23  paragraphs.
24    A.  Uh-huh.  Okay.
25    Q.  Okay.  My first question is: the initial bid of

Page 56

1  Midcoast was 157 million; is that correct?  Do you
2  recall that?
3    A.  I wasn't involved with that, but that's what it
4  says.
5    Q.  Generally, is this -- is this, this text under
6  New Business, is this consistent with management's
7  perception of Kansas Pipeline at the time?
8    A.  At that time.
9    Q.  Okay.  And the last -- the last sentence in
10  that, under that New Business says, "No recommendation
11  or approvals were being sought at this time, but
12  Mr. Tutcher wanted the board to be advised of this
13  pending transaction."  Was that something that was
14  customary, for Mr. Tutcher to advise the board of what
15  was going on basically?
16    A.  Something of this magnitude, yes.
17    Q.  The due diligence that you personally conducted
18  on the Kansas Pipeline, whether it be the -- the stock
19  purchase, the attempted stock purchase or the asset
20  purchase, how much time or how much due diligence in
21  hours would you say you conducted?
22    A.  I mean, it was significant after a letter of
23  intent was signed.
24    Q.  How many trips to Kansas City occurred?
25    A.  I can recall two, at least.

Page 57

1    Q.  Where you personally went?
2    A.  Yeah.
3    Q.  Were there other times when other members of
4  management or the due diligence team traveled up there
5  otherwise?
6    A.  Yeah, I believe so.
7    Q.  Government Exhibit 23, this is a letter from
8  Bank of America Securities to Midcoast Energy Resources,
9  to your attention; is that right?
10    A.  That's correct.
11    Q.  Dated August 25 of '99?
12    A.  Uh-huh.
13    Q.  All right.
14    A.  Yes.
15    Q.  And what is this?  What is this type of letter
16  called?  Is it a -- is there a term of art that
17  describes this type of letter in the -- in your industry
18  or in banking?
19    A.  A financing letter, I guess.
20    Q.  Okay.  And on the second page, it says, "Having
21  conducted the review cited above and taking into account
22  the assumptions cited above, we believe a transaction
23  providing for all costs and expenses associated with the
24  acquisition transaction is financeable through and up to
25  $250 million senior secured bank debt facility.

**HUNDT REPORTING**
**214-220-1122**

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:   Richard Robert

Page 58

1    A.  Uh-huh.
2    Q.  So, is that -- is the 250 million they were
3    willing to loan only related to the transaction, the
4    purchase of Kansas Pipeline?
5    A.  No.
6    Q.  Okay.  What else did that encompass?
7    A.  That encompassed all of our debt.
8    Q.  Okay.  And did they ever back off of the
9    $250 million?
10   A.  No.  They had to -- they had to increase it to
11   265.
12   Q.  Oh, they did?  Okay.
13   A.  In order to get all of our debt under the
14   umbrella.
15   Q.  Okay.  Government Exhibit 24, if you'll just
16   flip over one, please, this is a draft, redline draft
17   Agreement and Plan of Merger between Midcoast and Dennis
18   Langley; is that right?
19   A.  That's correct.
20   Q.  And it says the date of it is 8-30-99,
21   4:30 p.m.; is that right?
22   A.  Correct.
23   Q.  And it looks like it is a redline version.  My
24   question is: who -- do you know who proposed the changes
25   to this agreement that would result in the redline

Page 59

1    changes?
2    A.  I couldn't be certain.
3    Q.  Okay.  I believe Mr. Kaitson testified
4    yesterday that Langley and his representatives provided
5    the agreement and changes were proposed by Midcoast to
6    Langley's representatives; is that right?
7    A.  I -- that -- yeah, I don't dispute that.
8    Q.  The next exhibit, Government Exhibit 25, this
9    is a letter from Midcoast to Chase Securities, dated
10   August 30 of '99, correct?
11   A.  That's correct.
12   Q.  Signed by Mr. Tutcher?
13   A.  Uh-huh, yes.
14   Q.  Would you have reviewed something like this
15   before it went to Chase?
16   A.  Yes.
17   Q.  On the second page, under (v) or next to (v),
18   it says "Value for MarGasCo."  What was -- what was
19   MarGasCo?
20   A.  MarGasCo was their gas trading, gas marketing
21   entity.
22   Q.  And it says, "The implicit value that Midcoast
23   has allocated to MarGasCo is $1,275,000"?
24   A.  Uh-huh.
25   Q.  How was that amount determined?

Page 60

1    A.  Again, just based on the income stream that it
2    provided.
3    Q.  Do you think you would have done some modeling
4    for this entity?
5    A.  I don't recall doing any modeling on that
6    entity specifically.
7    Q.  Okay.
8    A.  But it was -- it was principally a function of,
9    you know, we wanted -- we wanted him to be aware that if
10   he didn't want to include it in the transaction, you
11   know, it was fine, because we didn't attribute much
12   value to it.
13   Q.  I see.  So you were getting the option of
14   excluding that from the transaction?
15   A.  Because I think he was -- yeah.  I mean, I
16   think we had a difference of opinion on what the value
17   of that entity was.
18   Q.  Okay.
19   A.  And so we wanted to just clarify what we
20   thought it was worth.
21   Q.  Now, at the time -- I assume this was -- this
22   was an offer to buy the stock of -- of Bishop; is that
23   right?
24   A.  That's correct.
25   Q.  Now, why did -- do you know why Mr. Langley did

Page 61

1    not accept this offer?
2    A.  He didn't -- he didn't think it was an adequate
3    offer.
4    Q.  Okay.  Was the Butcher interest something that
5    was contemplated at this time, the exclusion of the
6    Butcher interest from the agreement?
7    A.  "Except the Restricted Pipeline Royalties,"
8    which is the Butcher interest, so, yeah, it excluded
9    that.
10   Q.  Where is that?
11   A.  No. 2.
12   Q.  H-m-m.  Okay.
13          And that would be -- is that on the -- is
14   there an appendix to that?  I guess the balance sheet is
15   attached as Appendix 1?
16   A.  That's the appendix, yeah.
17   Q.  Okay.  Do you recall at what point in time --
18   or was PWC always involved in the negotiations, whether
19   it be stock purchase or asset purchase?
20   A.  Can you clarify your question?
21   Q.  When did PWC become involved with this
22   particular acquisition?
23   A.  This particular one.  I can't recall
24   specifically the date.
25   Q.  Okay.  Would they have been involved when

16  (Pages 58 to 61)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:   Richard Robert**

Page 62

1  Midcoast was contemplating a stock purchase?
2     A.  I would have ultimately gotten them involved in
3  that situation.
4     Q.  Okay.  But you would have ultimately --
5  somewhere down along the line, had the stock purchase
6  gone forward, you would have brought them in?
7     A.  Yes.
8     Q.  For what type of reasons?
9     A.  Just to help from a due diligence standpoint,
10  make sure that, you know, I wasn't missing something,
11  something of this magnitude.
12     Q.  Okay.  Turn to 26, please.
13     A.  26.
14     Q.  This is a facsimile transmission sheet, along
15  with some attachments, to -- from Craig Hoffman of
16  Fortrend International to Mr. Bruce Snyder of Ernst &
17  Young, "cc" Tom Palmisano, and it's dated August 30 of
18  '99, correct?
19     A.  Uh-huh, that's correct.
20     Q.  Have you seen this document before?
21     A.  Yes.
22     Q.  Including the cover page?
23     A.  That I can't confirm.
24     Q.  Okay.  When did -- tell me this, how you came
25  to know of Fortrend.

Page 63

1     A.  I believe it was Tom Palmisano, a conversation
2  that I was having -- I had with him.
3     Q.  And what did Mr. Palmisano tell you?
4     A.  He suggested that -- that they're -- Fortrend,
5  there was a company Fortrend that might help us in our
6  transaction.
7     Q.  How did he suggest that they might help?
8     A.  Well, because we were having, obviously, a
9  difficult time getting the stock transaction closed,
10  because there was a gap between what we were willing to
11  pay and what Mr. Langley was willing to accept.  Tom was
12  aware of that.
13     Q.  And how did Tom tell you that Fortrend could
14  assist in that?
15     A.  Well, he had suggested that, you know, Fortrend
16  was a potential buyer of the stock, and that if they
17  bought the stock we could buy the assets.
18     Q.  Did he describe to you the tax benefits that
19  result from Fortrend buying the stock?
20     A.  Well, I was, you know, certainly aware of the
21  benefits.  Some of the liability issues that we were
22  concerned with, you know, would go away, as well as a
23  step-up in basis was important to us.
24     Q.  What were the liability issues?
25     A.  Well, just, potential liability issues that

Page 64

1  were out there.
2     Q.  Were you aware that there might be some?
3     A.  Litigation, et cetera, that was ongoing, I
4  mean, certainly gave us cause for concern.
5     Q.  So you knew that Fortrend would help in the
6  transaction by giving you some comfort in the liability
7  issues, plus the tax benefits of an asset purchase?
8     A.  Yes.
9     Q.  Any other -- any other thoughts or reasons why
10  Fortrend would assist in the transaction?
11     A.  No.
12     Q.  Do you remember how much weight you placed on
13  those two items: the liability issues, tax benefits, as
14  far as --
15     A.  They were both very important.
16     Q.  Were you aware of any litigation out there that
17  might come back to bite you if there was a stock
18  purchase?
19     A.  Well, I mean, I recall on that other exhibit
20  there was mention of lawsuits with One Oak, et cetera.
21     Q.  That was a -- that was a right to sue One Oak,
22  wasn't it?
23     A.  Yeah, I can't -- I don't remember the issues,
24  but there was -- you know, certainly there were --
25  Langley's relations with customers was strained to

Page 65

1  say -- say the least.
2     Q.  Is that right?
3     A.  Yes.
4     Q.  What was the -- what did you know about that?
5     A.  He wasn't very well liked, clearly, by FERC and
6  others.
7     Q.  When you say "clearly," explain why it's clear.
8     A.  One of the customers wasn't paying as invoiced.
9  You know, I -- you know, I don't recall all the legal
10  issues that were going on at the time.
11     Q.  So -- so Mr. Palmisano approached you about
12  Fortrend.  Did he tell you who Fortrend was, who made
13  it -- who made that company up?
14     A.  That was certainly one of my questions, and I
15  think that's why I received -- I remember looking at
16  this history of the firm.
17     Q.  Other than reading this history of the firm
18  that's on Government Exhibit 26, was there anything else
19  you did to become comfortable with Fortrend
20  International?
21     A.  I did speak to a gentleman there.
22     Q.  Who did you speak with?
23     A.  I don't remember his name, but if you gave me
24  some names, I'd probably remember it.
25     Q.  Craig Hoffman?

17  (Pages 62 to 65)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:  Richard Robert**

Page 66

1    A.  It wasn't Craig that I spoke to.
2    Q.  Jeff Furman?
3    A.  I think it might have been Jeff Furman who I
4  spoke to initially.
5    Q.  And how long -- was that over the phone?
6    A.  Yes.
7    Q.  How long did you speak with him?
8    A.  I don't recall exactly, to be honest.
9    Q.  And what did you -- did you know what -- how
10  Fortrend would benefit from this transaction?
11    A.  As I recall it -- as I recall, they had net
12  operating losses.
13    Q.  And how would -- so tell me how they would
14  benefit from the transaction.
15    A.  That -- I don't recall the mechanics, but I
16  assumed that allowed them to not be concerned about
17  step-ups in basis, et cetera, et cetera.  I don't recall
18  mechanically how they benefitted, but that was the gist.
19  I assume the way they'd benefit is that we, as an asset
20  purchaser, are willing to pay more than they're going to
21  have to pay for the stock, so I assume that's how they
22  benefit.
23    Q.  Were they paid a fee in addition, additional to
24  the spread they would make on the purchase of the sale
25  of the assets?

Page 67

1    A.  No, there's no fee.
2    Q.  Did you ever personally meet with anybody at
3  Fortrend?
4    A.  Craig Hoffman.
5    Q.  And where did you meet with him?  Was it in
6  Kansas City?
7    A.  I believe I saw him in Kansas City and I
8  believe I saw him in Houston, and I -- did I see him in
9  New York?  I -- I can't remember.
10    Q.  Did you have any reservations about doing
11  business with Fortrend?
12    A.  No.
13    Q.  Was it customary or did you think it was
14  customary to get a company or engage a company that had
15  net operating losses to come in and buy the stock so
16  that it could sell the assets to Midcoast?
17      MR. STERN:  Objection, form.
18    Q.  (BY MR. COFFIN)  You can go ahead and answer.
19    A.  Oh, I can?
20    Q.  Yeah, unless he tells you not to.
21    A.  Oh, okay.  Can you repeat the question?
22    Q.  Did you find -- was it a customary thing in the
23  industry to find a buyer who would come in and buy stock
24  of a company so that your company could come and buy its
25  assets and not suffer the income tax consequences?

Page 68

1    A.  I don't know what -- I don't know if customary
2  is the right word.  I know that they participated in
3  numerous transactions and that gave me comfort.
4    Q.  You knew Fortrend participated?
5    A.  Yes.
6    Q.  Okay.
7    A.  I knew they -- and, frankly, I relied on PWC's
8  recommendation.  If they were recommending them, I felt
9  a certain level of comforts in that.
10    Q.  Was PWC aware of any other of those -- of these
11  types of transactions, using Fortrend?  Did they have
12  any clients that they said they had done this?
13    A.  Yeah, I believe so.  I mean, I saw a list -- I
14  recall seeing some transaction -- a list of
15  transactions, so...
16    Q.  So, once Mr. Palmisano suggested the use of
17  Fortrend, what was the next step?
18    A.  It was, you know, the little bit of due
19  diligence I did, reading this, talking to --
20    Q.  Jeff Furman?
21    A.  -- Jeff Furman.
22    Q.  Uh-huh.
23    A.  And then it was, you know, introducing the
24  idea, introducing Fortrend to Dennis, and, you know,
25  rethinking how this transaction -- how we were going to

Page 69

1  do the transaction.  You know, it was -- it was a matter
2  of closing the gap, and this was the only thing that we
3  felt could close it.
4      MR. COFFIN:  What's this?
5      MR. STERN:  That's my copy of the
6  exhibits.
7      MR. COFFIN:  Oh, I'm sorry.
8    A.  Can I put this away?
9    Q.  (BY MR. COFFIN)  Not yet.  Sorry.  Sorry, wish
10  you could.
11      MR. CROKE:  Is that empty?  I can get that
12  off the table for you.
13      THE WITNESS:  Thank you.
14      MR. CROKE:  Do you want another?
15      THE WITNESS:  Well, actually, I probably
16  could use a quick break.
17      MR. COFFIN:  Okay.  Let's take a quick
18  break.
19      (Recess from 11:32 a.m. to 11:39 a.m.)
20    Q.  (BY MR. COFFIN)  Okay.  Government Exhibit 160,
21  please, this is a draft memorandum dated December 14,
22  1999, from Price Waterhouse Coopers.  I know you
23  probably haven't seen this, but I wanted to go over some
24  of the assertions that are made, made in the memorandum,
25  to see if they are consistent with what you recall.

18 (Pages 66 to 69)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:  Richard Robert**

---

Page 70

1    A.  Okay.
2    Q.  Second paragraph of page 2, it says, "In
3  August 1999, Langley indicated to Midcoast that
4  Midcoast's bid was lower than several of the other bids
5  by approximately $20 million, but that he might be
6  interested in entertaining creative structural ideas
7  such as a revenue sharing arrangement."  Do you recall
8  that that was the case in August of '99?
9    A.  That makes sense, that timing.
10    Q.  Okay.  And do you recall if the bid was
11  $20 million short?
12    A.  That's what he indicated to us.
13    Q.  All right.  And then the third paragraph says,
14  "Midcoast independently pursued the so-called Midco
15  transaction" -- Midco is M-I-D-C-O -- "Midco transaction
16  as a structural alternative."  Is that accurate?
17    A.  That -- yeah.
18    Q.  Okay.  And "On August 27th of '99, Midcoast and
19  Price Waterhouse Coopers contacted Fortrend
20  International, LLC."  Is that about right?
21    A.  I don't dispute it.
22    Q.  Okay.  And were you a part of that contact?
23    A.  Yes.
24    Q.  Was that when you spoke with Mr. Furman?
25    A.  I believe so.

---

Page 71

1    Q.  Okay.  And then the fourth paragraph down, it
2  says, "On August 30, 1999, Fortrend provided some of its
3  background information to Langley's tax advisors, Ernst
4  & Young."  I think we saw that in a facsimile
5  transmission sheet we saw just a second ago, Exhibit 26.
6  "Over the next several weeks, several conversations took
7  place among Fortrend, Midcoast, PWC and Ernst & Young
8  regarding the viability of the Midco alternative."  Is
9  that -- is that accurate?
10    A.  I believe so.
11    Q.  Okay.  And then the last full paragraph, it
12  says, "On September 13, 1999, PWC met with Midcoast in
13  Kansas City to determine whether Fortrend should be
14  invited to enter the bidding process."  Is that
15  accurate?
16    A.  Sounds reasonable.
17    Q.  Okay.  And then it says next, "At the time,
18  Langley was actively discussing a transaction with at
19  least three or four potential purchasers."  Do you
20  recall that at the time?
21    A.  That's what we were told.
22    Q.  Do you recall who the purchasers were?
23    A.  We -- we hypothecated, but we weren't certain
24  who they might have been.
25    Q.  Did you -- were you aware that there were some

---

Page 72

1  other parties that Langley was negotiating with who
2  might be bidding on this acquisition?
3    A.  Yeah.  I mean, they had an auction process.  I
4  mean, typically they invite multiple people.
5    Q.  Did you know the parties?
6    A.  We didn't know who they were.
7    Q.  You didn't know?
8    A.  No.
9    Q.  You said you hypothecated.  Who did you think
10  it might be?
11    A.  Kinder Morgan, we thought; Enron, we thought.
12    Q.  Okay.  And then the next says, "PWC discussed
13  with Fortrend the price at which Fortrend might sell
14  assets of the Bishop Group to Midcoast if Fortrend were
15  to buy the stock of Bishop Group."  Is that about right?
16    A.  Can you -- I didn't read that.  PWC discussed
17  with Fortrend the price at which Fortrend would buy the
18  stock in Bishop Group.  I guess.  I mean, I can't talk
19  for PWC.
20    Q.  Okay.  And it says, "Once Midcoast decided to
21  urge Fortrend to submit a bid, PWC discussed briefly
22  with Langley the due diligence process and closing
23  schedule if a Midco alternative were pursued."  Did
24  Midcoast urge Fortrend to submit a bid?
25    A.  I don't know if "urge" is the right word, but

---

Page 73

1  we -- yeah, I mean, we were certainly happy to entertain
2  that.
3    Q.  Okay.  And then the -- did you know what -- was
4  the word "Midco" used in your discussions with Palmisano
5  and Fortrend, M-I-D-C-O, Midco?
6    A.  Like as a code name?  I don't recall.  I don't
7  recall.
8    Q.  You've never heard the phrase "Midco
9  alternative"?
10    A.  I don't remember it being referred to as that.
11  I remember "Project Ruby."  That was Langley's code
12  name.
13    Q.  Turn to the next page, page 3.  The third
14  paragraph follows two paragraphs that talk about how
15  Fortrend continued to pursue stock purchase.  The third
16  paragraph says, "Midcoast did not formally withdraw its
17  bid to purchase the stock of Bishop Group."  Is that
18  correct?
19    A.  I believe that's true.
20    Q.  Why did Midcoast find it was necessary to
21  continue to bid on the stock purchase of Bishop?
22    A.  There was no reason to withdraw it.  Our bid
23  was in there just like anyone else's.  If he was going
24  to accept that bid, we were still willing to proceed.
25    Q.  Okay.  And I should have read the next

---

**HUNDT REPORTING**
**214-220-1122**

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:  Richard Robert**

---

Page 74

1  sentence.  It says, "Midcoast was concerned that
2  withdrawing its bid would render it unable to go forward
3  with the stock purchase in the event that Fortrend was
4  unable to proceed with the stock purchase transaction."
5  Is that correct?
6     A.  Yeah.  I mean, that was the whole gap issue.
7     Q.  What do you mean, the whole gap issue?
8     A.  That -- that -- the gap between what we were
9  willing to buy and he was willing to sell.
10    Q.  Uh-huh.  The next paragraph says, "However, as
11 of September 13, 1999, Midcoast did not engage in any
12 further discussions with Langley or his representatives
13 regarding the purchase of the Bishop Group stock."  Do
14 you recall if that's correct?
15    A.  Yeah, with the caveat that he includes here.
16    Q.  What's that, that some direct discussions
17 between Midcoast and Langley's representatives
18 inevitably took place, but they were far more limited
19 than what they otherwise would have been if Fortrend
20 were not involved?  Is that the caveat?
21    A.  Yes, that's correct.
22    Q.  Okay.  When you couldn't close the gap between
23 Midcoast and what Langley wanted, Midcoast offered what
24 Langley wanted, did you ever consider -- did Midcoast
25 ever consider doing an asset purchase?

---

Page 75

1     A.  We wanted to do an asset purchase the entire
2  time.  Langley wouldn't entertain it.
3     Q.  Well, see, to the point where he wouldn't
4  entertain it whatsoever, regardless of what the price
5  was, or did you ever have discussions with his
6  representatives like that?
7     A.  Oh, sure.  Yeah, I imagine from the outset we
8  asked if we could buy the assets, because we always -- I
9  mean, that was always the preferred route.  And we were
10 told, no, it's a stock transaction.
11        THE WITNESS:  You writing love letters to
12 somebody?
13        MS. PIPKIN:  Oh, I was just finishing my
14 notes on that.
15        THE WITNESS:  You're very intense.
16    Q.  (BY MR. COFFIN) Turn to -- sorry to interrupt
17 you.
18    A.  No, that's all right.
19    Q.  -- Exhibit 27, which would be back in this
20 first binder, please.  Those are handwritten notes.  Do
21 you recognize those?
22    A.  Not specifically.  I recognize the handwriting.
23    Q.  Who is the handwriting?
24    A.  Chip Berthelot.
25    Q.  It says, "Notes from 9-6-99 conversation."

---

Page 76

1  Item No. 1 -- did you have a conversation with Chip on
2  that date, do you think, discussing these things?
3     A.  I may have.  I don't know.
4     Q.  Okay.  Do you know what he's talking about when
5  he -- on Item No. 3, it says, "Tax, use it or not.  If
6  yes, share 50 percent savings.  Plug back into gap.  Or
7  not," and there's an arrow pointing down, or "we adjust
8  one fourth of it now."  Any ideas what he's --
9     A.  No.
10    Q.  And it says on the left there, "Dennis to use
11 Price Waterhouse."  Was there ever any discussion that
12 Mr. Langley would use Price Waterhouse for any reason?
13    A.  I don't know for what.
14    Q.  Turn to 28, please.  Do you recognize this
15 document, Mr. Robert?
16    A.  Yeah.
17    Q.  What is this?
18    A.  It's -- it's what it suggests, a data point
19 sheet going over all the --
20    Q.  Who would have prepared it?
21    A.  I am not certain, but it might have been Chip
22 Berthelot.
23    Q.  Was this something that you reviewed?
24    A.  Yes.
25    Q.  Around -- it's dated at the bottom September 7

---

Page 77

1  of '99.  Is that something you would have reviewed
2  around that time?
3     A.  Yeah.  I mean, this is my handwriting on it,
4  so...
5     Q.  Oh, okay.
6     A.  I expect I did.
7     Q.  What's Item No. 3?  It says, "Gap to be
8  closed."  Is that what you were talking about earlier --
9     A.  Yes.
10    Q.  -- the gap?
11        Explain to me what A means, "Hard,
12 23 million, $1.00 for $1.00 up front."
13    A.  It would be conjecture.  I expect hard means
14 real dollars.
15    Q.  Uh-huh.
16    A.  Soft being dollars that may or may not occur.
17    Q.  Okay.  Give me an example of what a -- how
18 does -- how do those numbers relate to the gap to be
19 closed?
20    A.  I guess -- again, this is conjecture on my
21 part.
22    Q.  Uh-huh.
23    A.  I mean, hard is probably identify specific
24 dollars that, you know, that we couldn't --
25    Q.  Is that -- is that maybe the $20 million that

---

**HUNDT REPORTING**
**214-220-1122**

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:  Richard Robert**

Page 78

1   you were apart on this bid?
2       A.  That was probably it.
3       Q.  Okay.  And what's the soft?  How does the soft
4   relate to the gap?
5       A.  Maybe it -- I'd be guessing.
6       Q.  Okay.
7       A.  No, let me look at this.  "Stop gap closures."
8   Yeah, that's -- that's what I suspected.  I mean,
9   what -- what we were trying to do is come up with a way
10  to close the gap outside of just increasing our price,
11  you know, a revenue sharing arrangement that if the
12  pipeline produced more revenue than we had modeled, that
13  he could share in that.  That was a creative way of, you
14  know, allowing him to participate in the upside, if
15  there was any.
16          And I think he was giving a lot of value
17  to that.  He said he would.
18      Q.  And this document, Government Exhibit 28, is an
19  internal document, correct, that was not shared -- I
20  assume it was not shared with Mr. Langley?
21      A.  I -- I don't know.  I don't think it was.  Not
22  to my knowledge, anyway.
23      Q.  Okay.  On Item 4, "Hard gap closures," what's
24  B?  It says, "If PWC $5 million; indemnity from
25  Midcoast."  What's that referring to?

Page 79

1       A.  I assume, again -- I mean, it's -- again, it's
2   conjecture on my part, but I would assume he is
3   anticipating what Fortrend could offer above and beyond
4   what we could.
5       Q.  What's -- what's -- if PWC was --
6       A.  Meaning -- that's, again, conjecture, so...
7       Q.  Okay.
8       A.  I can't think of what else it would be.
9       Q.  I see.  And then it says if -- what's Ruby
10  Diablo?  Did you ever hear that phrase during your --
11  the negotiation or your due diligence?
12      A.  No idea.
13      Q.  That's a real code name?
14      A.  Yeah.
15      Q.  Go to Government Exhibit 30, which would be the
16  next document.  Do you recognize this document?
17      A.  Yeah.
18      Q.  Whose handwriting is that on the left?
19      A.  It's mine.
20      Q.  Okay.  And it looks like it's dated around 9-9
21  of '99; is that right?
22      A.  That's correct.
23      Q.  So I assume you would have reviewed it around
24  that time?
25      A.  I assume.

Page 80

1       Q.  Okay.  And who would have prepared the
2   document?
3       A.  I don't recall.
4       Q.  But -- and the only way you know that you
5   reviewed it is that's your handwriting on it?
6       A.  Yeah.
7       Q.  Okay.  Item No. 6 -- well, let's look at the
8   top.  It says Summary of Essential Modifications to
9   Merger Agreement Presented by Midcoast.  So, would that
10  be a modification to the agreement between Langley and
11  Midcoast at this time or the agreement between Fortrend
12  and Langley?
13      A.  I'd have the review this if you want me to try
14  to answer that.
15      Q.  Okay.  Just take a minute and look at it.
16          Let me -- Item No. 2 seems to indicate it
17  would be -- "Any Midcoast stock, if any, must be
18  registered and freely tradable" would seem that would
19  be -- indicate stock that may be issued to Bishop -- I
20  mean to Langley, wouldn't it?
21      A.  Well, that's what I remember offering, some
22  stock, but I'm -- what I'm trying to remember is if we
23  offered stock to K-Pipe as well.
24      Q.  Okay.
25      A.  We may have.  I can't remember.

Page 81

1       Q.  How about provision 7, which says, "There may
2   be an issue as to whether stockholder receiving an
3   adequate tax letter is a condition to stockholder
4   closing and whether Midcoast representation and warranty
5   as to non-interference with stockholder's tax-free
6   reorganization and capital gains/loss treatment is
7   secured by an unperfected lien against Bishop stock." is
8   that a provision that Langley asked for after Fortrend
9   came into the picture or was that something that they
10  asked for, Midcoast?
11      A.  I remember the issue.  I just don't remember if
12  it was before or after.
13      Q.  Okay.  Go to 35, please, Government Exhibit 35.
14  This is a facsimile from Bryan Cave, specifically James
15  Pryde, to Tom Palmisano and Craig Hoffman, correct?
16      A.  Uh-huh.
17      Q.  And it looks like what's transmitted is a
18  mutual confidentiality agreement between Bishop and
19  Fortrend?
20      A.  Uh-huh.
21      Q.  Do you know why Palmisano would be getting a
22  copy of this from James Pryde?
23      A.  (Witness shakes head)
24      Q.  PWC didn't represent Fortrend, did it, in its
25  dealings?

21  (Pages 78 to 81)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:  Richard Robert**

---

Page 82

1    A.  I know they got paid by Fortrend, so I don't
2   know if that indicates they represented them.
3    Q.  Are you talking about PWC got paid by Fortrend?
4    A.  I believe so.
5    Q.  In conjunction with this transaction?
6    A.  I believe so.
7    Q.  And that was not a -- that was not a fee of
8   Midcoast's?
9    A.  No.
10    Q.  It was a fee of Fortrend?
11    A.  I know Fortrend paid PWC.
12    Q.  Okay.  Let's go to 37, please.  This is an
13   e-mail from -- I'm going to focus on the -- the e-mail
14   dated September 12, '99, from Becky Davis to Tom
15   Palmisano, Subject: Stock Purchase Agreement, and
16   following that is a draft stock purchase agreement
17   between Fortrend and Dennis Langley.  Do you see that?
18    A.  Yes.
19    Q.  I didn't -- do you know why Palmisano was
20   receiving a stock purchase agreement between Langley and
21   Fortrend?
22    A.  No.  Again -- I mean, again, I know he was
23   being paid by Fortrend, so I guess it doesn't surprise
24   me that he received it.
25    Q.  Okay.  Did he relay these draft -- a draft of

---

Page 83

1   the agreements, the stock purchase agreements to you at
2   Midcoast?
3    A.  Tom specifically wouldn't, but, I mean, the
4   only time that we would get involved in the stock
5   purchase agreement was when there was something that was
6   going to pass through to us, from an asset purchase type
7   point, and if points needed to be negotiated.
8    Q.  Government Exhibit 40, please.  Do you
9   recognize this document?
10    A.  I do.
11    Q.  And is this something you would you have
12   prepared?
13    A.  No.
14    Q.  Who would have prepared it?
15    A.  I believe it was Langley.
16    Q.  Whose handwriting is on it?
17    A.  That's Chip's.
18    Q.  This is something that Langley prepared and
19   then forwarded to Midcoast?
20    A.  I believe so.
21    Q.  At the top, it shows -- it says "Alternate
22   Bogie."  Do you know what that is?
23    A.  That's the other offers that supposedly he was
24   receiving.  He was basically just indicating it to us,
25   that our offer was not sufficient.  That's gap to be

---

Page 84

1   closed.  That's the $23 million you saw on that other
2   page, the hard, the hard $23 million.
3    Q.  Uh-huh.
4    A.  That's where that number came from.
5    Q.  I see.  Under Midcoast's offer of 9/3?
6    A.  Correct.
7    Q.  Okay.  And then columns A and B over there,
8   what -- what are those, do you know?  What do those
9   columns contemplate?
10    A.  You know, possibly adjustments to certain
11   things.
12    Q.  Have you had occasion to review this, this
13   document, or a document of this sort?
14    A.  Yeah.  I mean, I recall seeing it.
15    Q.  Okay.  Turn to Government Exhibit 41.  That is
16   a fax from Fortrend to Chris Kaitson, correct?
17    A.  That's correct.
18    Q.  Dated September 20 of '99, and it looks like
19   it's transmitting the confidentiality agreement draft,
20   letter of intent, and other information.  Would you have
21   reviewed this?  Well, following is a -- the draft letter
22   of intent, it looks like, with your name at the top
23   there.  Would you have reviewed this document?
24    A.  I expect so.
25    Q.  And then on the last page of the document there

---

Page 85

1   is some Fortrend information.  It says Summary of Major
2   Corporate Transactions since 1990.
3    A.  Yeah, I see.  That's the list I was referring
4   to.
5    Q.  Okay.  What -- shows the year, type of
6   transaction, industry, size, and built-in gain.  What's
7   the built-in gain component on the end?  Do you
8   understand what that was?
9    A.  No.
10    Q.  You didn't understand what it was at the time?
11    A.  I assumed -- well, no.  I would be -- it would
12   be conjecture.
13    Q.  Did you ask any questions about it to
14   Mr. Furman or Mr. Hoffman?
15    A.  I don't recall asking.  I don't know.
16    Q.  Did reviewing this help you make your decision
17   on whether to go forward with Fortrend in the
18   transaction?
19    A.  I expect so.  As I stated earlier, the fact
20   that they had done multiple transactions and PWC was
21   referring them gave me sufficient comfort to -- to agree
22   to it.
23    Q.  Okay.  And then turn to 42, which I think we
24   determined or Mr. Stern determined yesterday that this
25   item was -- this document was transmitted along with the

---

22  (Pages 82 to 85)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:  Richard Robert

Page 86

1  facsimile Government Exhibit 41, but there are changes
2  made thereto and your signature on the second page.  Is
3  that right?
4     A.  Yes.
5     Q.  Okay.  Do you recall seeing this document and
6  signing it?
7     A.  Clearly, I did.
8     Q.  Okay.  And you and Mr. Kaitson, I believe, made
9  changes to the document before you signed it; is that
10 right?
11    A.  I believe those are Kaitson's.
12    Q.  He testified to that yesterday.  In the first
13 bullet point, it says, "Written information provided to
14 you as well as any additional information disclosed to
15 you or any of your representatives which contains or
16 otherwise reflects or is generated from such information
17 or documents," he calls it the evaluation material,
18 "will be used solely for the purpose of evaluating the
19 possible use of the transaction by you."  What does he
20 mean by -- what's the letter mean by "use of the
21 transaction"?
22    A.  I don't know why he used those words.
23    Q.  You don't know what -- what he means by that?
24    A.  I don't know.  I couldn't -- you'd have to ask
25 him.

Page 87

1     Q.  Okay.  And the evaluation material it
2  references, what would -- what would that have been?
3     A.  The evaluation material?
4     Q.  Uh-huh.
5     A.  I don't know specifically what he would be
6  referring to, other than information we had already seen
7  about Kansas Pipeline.
8     Q.  Okay.  Was there ever any kind of document or
9  prospectus that you received from Fortrend that would
10 have described exactly how it would buy stock of Bishop,
11 sell the assets, how the net operating losses would
12 minimize any or eliminate any taxable gain to them?
13    A.  No.
14    Q.  Okay.
15    A.  Never saw anything like that.
16    Q.  On the second page, the second to the last
17 bullet point in the letter, again, he uses the phrases
18 "using the transaction."
19        "If you do not enter into a transaction
20 with us using the transaction described in the
21 evaluation material, you will promptly return to us all
22 copies of the evaluation material."
23    A.  I really don't know what he's referring to.
24    Q.  Okay.  There's nothing -- you didn't get any
25 documents describing the "use of the transaction"?

Page 88

1     A.  I mean, this, this list is the only thing that
2  we looked at before.  This is the only thing that I saw
3  from Fortrend.
4     Q.  Okay.  Along with the two other pages?  Weren't
5  there two other pages?
6     A.  Yeah, the --
7     Q.  Oh, okay.
8     A.  Yeah, who the --
9     Q.  The three pages here on Exhibit --
10    A.  -- the people were and their history, that's
11 the only information I ever saw on that.
12    Q.  Government Exhibit 43, please, is this -- this
13 is similar to the other spreadsheet we saw; is that
14 right?
15    A.  That's correct.
16    Q.  And it looks like the bottom right, it says
17 9-21-99, 4:43 p.m.  And, again, was this something
18 prepared by Langley?
19    A.  I don't know for certain.
20    Q.  Would this have been -- did you ever
21 have anything like this, spreadsheets on your computer,
22 your system like this?
23    A.  Not that I recall, but -- not that I recall.
24    Q.  Okay.
25    A.  But, you know, again, it's a long time ago.

Page 89

1     Q.  Sure.  Government Exhibit 44, tiny print.
2     A.  Uh-huh.
3     Q.  Do you recognize this document?
4     A.  I do.
5     Q.  Okay.  Is this something that you would have
6  prepared?
7     A.  Yes.
8     Q.  Generally, tell me what is trying to be
9  accomplished here.
10    A.  I mean, we're basically -- this is the input
11 sheet.
12    Q.  Uh-huh.
13    A.  And your assumptions basically were inputted on
14 this page.
15    Q.  Okay.
16    A.  And then whatever you -- whatever assumptions
17 you used would flow into the model on the second page.
18    Q.  All right.  This -- I assume this was the model
19 that was used to help you and Midcoast assess the price
20 and the cost of the transaction; is that right?
21    A.  Correct.
22    Q.  Does that relate to the stock purchase or the
23 asset purchase?
24    A.  As you can see, I modeled where you can -- you
25 can toggle whether it was stock versus asset.  This is

23  (Pages 86 to 89)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:   Richard Robert**

Page 90

1   stock purchase right down there on that and there is a
2   no or yes.
3       Q.   Okay.  So this was --
4       A.   No.
5       Q.   This was not -- this was the asset purchase?
6       A.   This was an asset purchase, right.
7       Q.   Okay.  Turn to Exhibit 50, please.  Can you
8   tell me what the make whole premium was in this
9   transaction?
10          MR. STERN:  The what?
11      Q.   (BY MR. COFFIN) Well, it doesn't say "make
12  whole premium," but I thought the phrase is "make whole
13  premium," isn't it, that was an issue in this
14  transaction?  I still don't understand.
15      A.   Yeah, I'm trying to remember myself.
16      Q.   If you recall.  If not, that's fine.
17      A.   Make whole.
18      Q.   Let me ask you this.  What -- this schedule, do
19  you know what this schedule is trying to accomplish?
20      A.   I don't recall any more.  I mean, at the time,
21  I probably would have been able to help you.
22      Q.   Okay.
23      A.   But I don't -- this is tax stuff that I'm not
24  as proficient in.
25      Q.   Okay.

Page 91

1       A.   Make whole I assume is --
2       Q.   Then turn the page, same exhibit.  Is that a --
3   something that you're familiar with?
4       A.   Make whole, make whole.  This is -- okay,
5   sorry.  Make whole, this was on the -- the debt that was
6   outstanding.
7       Q.   Uh-huh.
8       A.   There was a pre-penalty payment essentially and
9   it was called a "make whole payment."
10      Q.   All right.
11      A.   That's what it was.  Yeah, that's right.
12      Q.   Okay.
13      A.   That's right.  And what I was trying to --
14  yeah, what this was is that I had -- I insisted that
15  they share that liability for having to break those,
16  prepay those notes.
17      Q.   And you're saying "they."  Are you talking
18  about Langley?
19      A.   Yeah, Langley at the time.  It's --
20      Q.   Did they --
21      A.   This was early on in the transaction we're
22  talking about there.
23      Q.   Did they end up sharing payment of that?
24          MR. STERN:  Objection, form.
25      Q.   (BY MR. COFFIN) If you can't remember, the

Page 92

1   document will let us know.
2       A.   I don't remember if they did or not.
3       Q.   Okay.  Well, turn the page.  Is that anything
4   that looks familiar to you, DOJ 18088?
5       A.   Yeah, I remember seeing this.
6       Q.   Is that something prepared by you or your staff
7   or somebody else?
8       A.   As I recall, I think it might have been
9   prepared by someone on Langley's staff.
10      Q.   Okay.  And then skipping to the last page of
11  that document, there's another Break-Even Alternatives
12  spreadsheet?
13      A.   But then I think I -- I probably had this on my
14  computer at some point as well.
15      Q.   Okay.  Going to the last page, do you see that
16  Break-Even Alternatives spreadsheet again?
17      A.   Uh-huh.
18      Q.   Is that something that came from Langley or
19  from your office, from Midcoast?
20      A.   I don't recall where it would have come from.
21      Q.   Look at the HDrive\Midcoast\Break-even-
22  Alternative.  Does that look familiar to you?
23      A.   Break-even Alternative.  I would guess, based
24  on that H\Midcoast\Break-EvenAlternative5, that came
25  from Langley's group, only because I don't know why I

Page 93

1   would have a Midcoast folder.
2       Q.   Who was -- who was preparing these kind of
3   things for Midcoast or for Langley, do you know?
4       A.   He had one accountant-type guy that I dealt
5   with.
6       Q.   Steve Korb?
7       A.   Yes.  Yes.
8       Q.   Do you think that he may have prepared
9   something like this for Langley?
10      A.   Wouldn't surprise me.
11      Q.   Okay.  In the bottom right corner, it says --
12  there's calculations there headed up Fortrend Cost.  Do
13  you know what -- what that is about?
14      A.   Where?
15      Q.   Not all the way to the bottom right, but just
16  move up a little bit, on the bottom right-hand side of
17  the spreadsheet.
18      A.   Oh, the right-hand side?
19      Q.   Yeah.  It says Fortrend Cost.
20      A.   Fortrend Cost.
21      Q.   Uh-huh.  It comes down to a calculation under
22  two alternatives of 6,055,640 and 6,255,640.
23      A.   Uh-huh.
24      Q.   Do you know what those figures relate to?
25      A.   I'd be hypothecating.  I assume that --

**HUNDT REPORTING**
**214-220-1122**

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:   Richard Robert**

---

Page 94

1    Q.  Did you -- were you aware that Fortrend would
2  get a fee of 5 percent of the step-up in basis?
3    A.  No.  I think I recall questioning, you know,
4  what they could expect to make.
5    Q.  Uh-huh.
6    A.  And I think I recall being told that it was
7  generally in that area, which they anticipated making
8  the difference between buying and selling.
9    Q.  The -- so you heard from somebody that they --
10 their spread would be six, around $6 million or so?
11   A.  Well, that's -- I think I recall asking Tom --
12   Q.  Uh-huh.
13   A.  -- what they expected, and I think Tom said
14 generally they'd get somewhere between 5 and 7 percent.
15   Q.  Did you know how that was calculated?
16   A.  Well, I assume this is how it's calculated.
17   Q.  Okay.  This 5 percent of the step-up in basis?
18   A.  I think that's -- I think that's right.  That's
19 what I have been told.
20   Q.  Exhibit 51, it says Kansas Pipeline Company,
21 Disclosure Statement, Depreciation Difference, Carryover
22 Basis Versus Purchase Basis.  Are you familiar with this
23 document?
24   A.  I don't recall.  I don't recall it.
25   Q.  Do you think it would have come out of Midcoast

---

Page 95

1  or out of your -- your office or your staff?
2    A.  No, I don't think so.
3    Q.  Okay.  Do you recall seeing it?
4    A.  I don't recall it right now.  No, I don't
5  recall seeing it.
6    Q.  Hold your spot in that binder, but in the other
7  binder, go to Government Exhibit 150, please.
8    A.  150.
9        THE WITNESS:  Could I take another quick
10 break, please?
11       MR. COFFIN:  Sure.  You guys want to break
12 for lunch real quick?
13       MR. STERN:  Do you want to break for
14 lunch?
15       MS. PIPKIN:  Yes.
16       (Lunch recess, 12:26 p.m. to 1:05 p.m.)
17   Q.  (BY MR. COFFIN) Exhibit 150, which is in front
18 of you --
19   A.  Yes.
20   Q.  -- this is invoice from Ron Chachere; is that
21 right?
22   A.  Yes, it is.
23   Q.  Dated November 19, 1999?
24   A.  Uh-huh.
25   Q.  And it looks like this is his invoice or

---

Page 96

1  billing for the -- his work on the acquisition of the
2  Kansas Pipeline; is that correct?
3    A.  Uh-huh, it does.
4    Q.  And on the last page it looks like he billed
5  Midcoast $127,062.50, page 884?
6    A.  That's what it says.
7    Q.  With the instruction "Please do not remit
8  payment until after January 1, 2000, so that 1099 will
9  be issued in 2000."  Did you approve payment of this
10 invoice?
11   A.  I don't believe so.
12   Q.  Okay.  Who would have normally done that?
13   A.  Chris Kaitson, probably.
14   Q.  I actually think he said you did that.
15   A.  No, I would -- the attorney specifically asked
16 that I not approve their invoices any more, so...
17   Q.  Were you scrutinizing them --
18   A.  Yes.
19   Q.  -- too heavily?
20   A.  Yes.
21   Q.  Did you have occasion to review the invoice?
22   A.  No, I don't recall looking at this.
23   Q.  Would Kaitson have been in charge of that, too?
24   A.  I would have thought that Kaitson would.  I
25 mean, potentially Chip would have.  I wouldn't think at

---

Page 97

1  this point Dan would have, but he may have.  I just know
2  that I didn't specifically review this.
3    Q.  Okay.  Look at page 5, at the exhibit, please.
4    A.  Okay.
5    Q.  There are various entries that Mr. Chachere
6  is -- looks like he put incredible detail into his
7  billings?
8    A.  Uh-huh.
9    Q.  Maybe that was the result of your scrutiny on
10 his -- on the lawyer's billings.  But October 8, for
11 example, he says, "Receipt and review of revised
12 schedules to stock purchase agreement," and at this
13 point, I thought we talked earlier, based on review of
14 the PWC memo, that -- that Midcoast as of September 13
15 of '99, Midcoast did not engage in any further
16 discussions with Langley or his representatives
17 regarding the purchase of the Bishop Group stock?
18   A.  Except as it related to items that would have
19 affected us as an asset purchaser.
20   Q.  So that's why the entries that follow that
21 date --
22   A.  Uh-huh.  And there were, as I recall.
23   Q.  Uh-huh.
24   A.  -- several areas that affected us, and so there
25 shortly was continuing discussion on those particular

---

**HUNDT REPORTING**
**214-220-1122**

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:   Richard Robert**

---

Page 98

1   areas.
2      Q.  And why wouldn't Mr. Chachere or anybody at
3   Midcoast have made those -- would they have made those
4   changes and proposed them to --
5      A.  Fortrend.
6      Q.  -- Fortrend and then Fortrend would propose
7   them to --
8      A.  Uh-huh, yeah.
9      Q.  Or did it go both ways?
10     A.  Yeah.  I mean, certainly, it would go both
11  ways.  As -- as Dennis would want something, you know,
12  it would go through Fortrend and Fortrend would go
13  through us.  And if there was something that
14  specifically dealt with us, we would -- we would deal
15  with it.
16     Q.  Okay.  Go to page 7, October 27, '99 entry.
17  So, for example, Chachere is continuing work on the
18  project development work with Langley, work on revising
19  guaranty agreements and stock purchase agreement with
20  Attorney Pryde.  So there are instances where Chachere
21  is going directly to Attorney Pryde or to Langley on
22  these agreements?
23     A.  If I recall, I mean, there are some things that
24  dealt with us specifically.  You know, these
25  participation agreements specifically, I mean, we were

---

Page 99

1   basically going after to assume those and agree to
2   everything that was in there.  So, yeah, we had a lot.
3      Q.  When you say participation agreements, were
4   those the project development agreements?
5      A.  Yes.  So we had a lot of input on the drafting
6   of those.
7      Q.  Okay.  You can put that one aside for a minute.
8          The -- go to Exhibit 66, please.  This is
9   a letter of intent between Midcoast and K-Pipe; is that
10  right?
11     A.  Yes, it is.
12     Q.  Did you review this document before Mr. Tutcher
13  signed it?
14     A.  I believe I would have.
15     Q.  Do you recall who drafted the agreement or the
16  letter?
17     A.  I don't recall who did it.
18     Q.  Okay.  Government Exhibit 70, these are minutes
19  to the board of directors meeting of Midcoast Energy
20  dated October 7, '99, correct?
21     A.  Correct.
22     Q.  And I understand you were at this meeting; is
23  that right?
24     A.  That's correct.
25     Q.  And you spoke to the board, apparently?

---

Page 100

1      A.  Yes.
2      Q.  Under the Kansas Pipeline heading, it looks
3   like Mr. Berthelot spoke to the board about the
4   acquisition, Mr. Tutcher did as well, and you too; is
5   that right?
6      A.  That's correct.
7      Q.  Now, at this point, Fortrend and K-Pipe are
8   involved, isn't that right, involved in the transaction?
9   This is October 7th of '99.
10     A.  Yes.
11     Q.  My question is: why wouldn't there be any
12  discussion about Fortrend or K-Pipe -- or was there any
13  discussion about Fortrend or K-Pipe in the meeting?
14     A.  I don't recall specifically if they were
15  discussed.
16     Q.  Okay.  Would the -- would either Mr. Berthelot
17  or Mr. Tutcher or you have advised the board that Midco
18  was now pursuing an asset purchase from -- or Midcoast
19  was purchasing an asset purchase from Fortrend or one of
20  its affiliates?
21     A.  I expect they would have been advised.
22     Q.  Do you recall whether they were specifically
23  advised?
24     A.  I don't recall the conversation, but...
25     Q.  You don't recall sitting in a board meeting

---

Page 101

1   advising the board that we were going to change the
2   structure of the strat -- transaction to an asset
3   purchase going through Fortrend?
4      A.  I don't recall the conversation, but I expect
5   it occurred.
6      Q.  Okay.  And why do you expect that it would have
7   occurred?
8      A.  Because it was a relevant part of the
9   transaction.
10     Q.  Would you necessarily have told the board that
11  Fortrend or one of its affiliates would be using net
12  operating losses to offset any gain, income tax gain?
13     A.  I don't know if I would have got into that
14  detail.
15     Q.  I'm going to refer you back to Government
16  Exhibit 150, which is the Chachere invoice.  It's in the
17  other binder.  The reason I'm going back and forth is
18  I'm trying to follow this chronology.
19     A.  150, okay.
20     Q.  Uh-huh.  His October 9th and 10th of '99
21  entries, it says, "Receipt and review of e-mail message
22  from Attorney Pryde concerning constructive trust
23  issues."  What were the constructive trust issues?
24     A.  I have no clue.
25     Q.  What's a -- go to Exhibit 76, please.  This is

---

26 (Pages 98 to 101)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:   Richard Robert**

Page 102

1  a fax from Ron Chachere to Jim Pryde?
2      A.  Uh-huh.
3      Q.  Dated 10-14-99, correct?
4      A.  Correct.
5      Q.  It looks like he's submitting some changes to
6  the stock purchase agreement, and this third page of
7  this exhibit refers to an intercreditor agreement.  Do
8  you know what that is?
9      A.  I assume this is the notes that were
10  outstanding.
11      Q.  Okay.
12      A.  And there was a question of whether they were
13  going to get paid off or not.  These are the notes from
14  the make whole agreement.
15      Q.  Okay.  At the bottom, "Tax Sharing Agreement.
16  Note: Richard Robert is having the tax sharing agreement
17  reviewed by Midcoast's tax advisors," do you recall what
18  that was about?
19      A.  I don't even recall the tax sharing agreement,
20  to be honest.
21      Q.  Okay.  And then back on the second page,
22  provision -- go back one page.
23      A.  All right.
24      Q.  Yeah.  Provision 8.10, which is proposed --
25      A.  Tax treatment, yeah.

Page 103

1      Q.  Do you recall this issue with Langley?
2      A.  He wanted capital gains treatment.
3      Q.  Right.
4      A.  Uh-huh.
5      Q.  What was his -- do you know what his -- what
6  was his concern?
7      A.  His concern was that somehow it would be
8  characterized as ordinary income, and he was adamant
9  that it be part of the agreement -- that it stipulate
10  that his gain was going to be capital gain.
11      Q.  Do you know why he had that concern?  Because
12  if it's a tax sale or, I mean, a stock sale, it gets
13  capital gains treatment.
14      A.  Well, exactly.  That's what we didn't
15  understand, and our -- and our advisors advised us,
16  yeah, go ahead and agree to it, because there's no other
17  way to interpret it.
18      Q.  Okay.  Did Langley ever express any concern to
19  Midcoast that bringing Fortrend in and doing the
20  transaction through K-Pipe could expose him to any
21  challenges by the IRS?
22          MR. STERN:  Objection, form.
23      A.  Could you repeat the question?
24          MR. COFFIN:  Read that one back for me,
25  please.

Page 104

1          (The record was read as follows:
2          "QUESTION: Did Langley ever express any
3          concern to Midcoast that bringing Fortrend
4          in and doing the transaction through
5          K-Pipe could expose him to any challenges
6          by the IRS?")
7      A.  Did Langley express a concern that -- that
8  Fortrend buying the stock was going to cause him a
9  problem, is that -- am I repeating the question?
10      Q.  (BY MR. COFFIN) Uh-huh.
11      A.  I expect -- as I recall, he had some initial
12  concerns, which is, you know, why does -- why is this
13  going to happen and how does it affect me.  But I
14  believe he, you know, got over his concerns after having
15  talked to his advisors.
16      Q.  Okay.  Did you ever, specifically you
17  personally, ever have any discussions with him or any of
18  his representatives about the issue?
19      A.  Well, I remember -- yeah, I remember discussing
20  Fortrend with him.
21      Q.  I'm talking about his concerns about the IRS
22  coming in and challenging his tax treatment.
23      A.  No, I never had discussions with him about
24  that.
25      Q.  Who communicated his concerns to you?

Page 105

1      A.  I expect it was Tom.
2      Q.  Turn to Government Exhibit 77, please.  This is
3  an e-mail from you to Barry Davis; is that right, 77?
4      A.  That's correct.
5      Q.  And it says New Events Memo.  That's the
6  subject in the subject line.  The date is October 19th
7  of '99, and you're requesting, "Please comment on the
8  attached memo ASAP."
9      A.  Uh-huh.
10      Q.  And attached to that is a memo from you to
11  Stephanie Pendleton; is that right?
12      A.  That's correct.
13      Q.  Who is Stephanie Pendleton?
14      A.  She was, I believe, in the credit department at
15  Bank of America.
16      Q.  Okay.  And who was Barry Davis?
17      A.  He is an attorney at Thompson & Knight,
18  representing the bank.
19      Q.  Do you recall sending this memo to
20  Ms. Pendleton and Mr. Davis?
21      A.  I recall the memo, yes.
22      Q.  And in the -- where it says, "However," I guess
23  that's the second paragraph, "the seller is requiring
24  that Midcoast provide a tax indemnification to the
25  seller which states," and it goes on to talk about how

27 (Pages 102 to 105)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:   Richard Robert**

Page 106

1   Langley wanted the provision indemnifying him in the
2   event his capital gains treatment was challenged --
3       A.   Yes.
4       Q.   -- I guess Langley wanted a security interest
5   in the KPC assets, is that right, to protect him?
6       A.   Uh-huh, yep.
7       Q.   Was that ever -- was that granted to him?
8       A.   It was.
9       Q.   And the bank signed off on that?
10      A.   Because they agreed.
11      Q.   And the second or third to the last sentence
12   says, "We are receiving an opinion from PWC and the
13   seller is receiving an opinion from Ernst & Young which
14   provides us a lot of comfort that the seller will
15   receive capital gains treatment."  Did you ever receive
16   that opinion from PWC?
17      A.   I know we received an opinion from PWC and I --
18   I don't remember if it specifically addressed the
19   seller's tax treatment or not, but it may have.
20      Q.   Okay.  78, letter from Dennis Langley to K-Pipe
21   Holdings Partners, dated October 21 of '99.  Do you
22   recall receiving this letter or seeing this letter?
23   There is a -- if you'll look, there is a fax cover sheet
24   that shows he sent it to you as well.  Langley sent the
25   letter to you on 10-21-99.

Page 107

1       A.   I don't recall seeing it.
2       Q.   Uh-huh.
3       A.   But...
4       Q.   You don't dispute it was passed to you?
5       A.   No, I don't dispute it.  I kind of -- I do
6   recall things dragging -- you know, things dragging on
7   longer than Langley liked and he started putting
8   ultimatums on us.
9       Q.   Okay.  And, specifically, why would he,
10   Langley, mail you at Midcoast or fax to you a copy of
11   this letter?
12      A.   Because he knew -- I assume because he knew
13   that we were doing a transaction with K-Pipe.
14      Q.   I know there is a silent yes that's going on in
15   your brains as I turn each page quickly.
16      A.   Does that mean you can't go back to them after
17   you have turned them?
18      Q.   I will not make that promise.
19          MR. STERN:  It's the rule, we shouldn't
20   let you.
21          MR. CROKE:  It's one of those ground rules
22   you made earlier.
23          MR. COFFIN:  Start making those in the
24   next few depositions.
25      Q.   (BY MR. COFFIN) 100, please.  That would be in

Page 108

1   the next binder, I believe.
2       A.   Okay.
3       Q.   Okay.  This is an e-mail, looks like a series
4   of e-mails, but it looks like you wrote one or you sent
5   an e-mail on October 30 of '99 to Chris Kaitson.  Do you
6   see that on the front page of Government Exhibit 100?
7       A.   Exhibit 100, Gary Wilcox to Tom Palmisano?
8   Okay.
9       Q.   Okay.  And the first sentence says, "There has
10   been a change to the deal based on PWC's objection to
11   characterizing the supplemental payment of $13.75 as
12   capital gain.  Dennis has agreed to report the amount as
13   ordinary income."  Do you see that?
14      A.   Yes.
15      Q.   Why did PWC object to characterizing the
16   supplemental payment as capital gain?
17      A.   I suppose because of -- because we wanted --
18   because of how we wanted to characterize it on our
19   taxes.
20      Q.   Do you recall what the $13.75 payment was for?
21   That's 13.75 million, isn't it?
22      A.   Yes.  Yeah.  I believe that number turned into
23   13 million and it was the -- the payments to terminate
24   the project development agreement.
25      Q.   Uh-huh.

Page 109

1       A.   And, as I recall, 3 million was simply added.
2   We agreed to pay K-Pipe 3 million more.  And 10 million
3   was paid in January of the following year, I believe, to
4   terminate the project development agreement.
5       Q.   Paid to K-Pipe or paid to Langley?
6       A.   It was paid to Langley.  The project
7   development agreement was between Kansas Pipeline and
8   Langley.
9       Q.   By the time you closed the deal with -- the
10   transaction with K-Pipe, was it already known that you
11   would not or that you would exercise the option on the
12   project development agreement?
13      A.   No, principally because we didn't have the
14   money to exercise it.  We actually had to go do an
15   equity offering to get the money to pay it.
16      Q.   The additional 10 million it would have been?
17      A.   Correct.
18      Q.   The next page of that document looks like -- I
19   think it begins on the first page.  It's an e-mail from
20   Gary Wilcox to several people, and I don't know if your
21   name is on that distribution.
22      A.   Yeah, it is.
23      Q.   Okay.  And, like I said, it's from Gary Wilcox,
24   and he's making changes to the stock or proposing
25   changes to the stock purchase agreement, right?

28 (Pages 106 to 109)

**Witness:  Richard Robert**

Page 110

1      A.  The option agreement.
2      Q.  Do you see where he says, "To reflect the
3  foregoing, the following changes should be made," and he
4  has No. 1, Stock Purchase Agreement?
5      A.  True, yes.
6      Q.  Okay.  Under No. 2, Guaranty by KPC.  After the
7  a. and the b., he has, "Note that the option agreement
8  must not be guaranteed by Midcoast pursuant to the
9  parent guarantee."  Do you know why that was the case?
10      A.  I don't even remember what the option agreement
11  was, to be honest.
12      Q.  Okay.  Turn the page, please.
13      A.  The option -- well, the option agreement may
14  have been to -- to terminate.  Is that the option
15  agreement, to terminate the project development
16  agreement?
17      Q.  I think so, uh-huh.
18          MR. STERN:  I think that's right.
19      Q.  (BY MR. COFFIN) And on the next page, under
20  Stock Purchase Agreement, Item No. 3, it says, "It is
21  critical to Midcoast's tax position that The Bishop
22  Group, Ltd. is not liquidated by Fortrend for at least
23  two years."  Do you recall that issue?
24      A.  Peripherally, I remember.  Yeah, I remember
25  reading this, so...

Page 111

1      Q.  Do you recall why it was critical to Midcoast's
2  tax position, what their reasoning was behind that?
3      A.  I don't remember the tax reasoning.  I don't
4  remember the tax reasoning.
5      Q.  Okay.  And under Item No. 4, under Purchase and
6  Sale Agreement, it says, "I will be sending comments on
7  the agreement shortly, but I would like K-Pipe to think
8  about retaining some of the receivables that are
9  currently in KPC."  Do you know why he was making that
10  suggestion?
11      A.  I'm not sure why he's making the suggestion,
12  but clearly they did.  I mean, as the stock purchaser,
13  they -- as I recall, there was a receivable, a tax
14  receivable that they retained.
15      Q.  What kind of tax?  State?
16      A.  Might have been, yeah.  I can't --
17      Q.  State tax?
18      A.  Might have been a state tax or --
19      Q.  Why would he suggest that they retain those?
20      A.  I don't know, because they were going to
21  anyways.  I guess he hadn't worked through the working
22  capital adjustment or something.
23      Q.  How would that be?
24      A.  Maybe he wasn't -- I mean, maybe he didn't
25  consider that there was going to be a working capital

Page 112

1  adjustment and through that they would retain those
2  anyways.
3      Q.  105, e-mail from Kaitson to various people,
4  including you, and it looks like he was forwarding an
5  e-mail from Gary to Chris and to yourself.  Looks like
6  you were cc'd.  In the second paragraph, it says, "The
7  third guarantee gave me the most heartburn.  Obviously,
8  I do not want to see Midcoast, the asset buyer,
9  providing a guarantee of certain obligations under the
10  stock purchase agreement."  Why is that?  Do you know
11  why?
12      A.  Why he wouldn't want us, the asset buyer, to
13  provide a guarantee of obligations under the stock
14  purchase agreement?
15      Q.  Right.
16      A.  Principally because we weren't a party to the
17  stock purchase agreement, I assume.
18      Q.  Did Midcoast guarantee other obligations in the
19  project development agreements, other obligations of
20  K-Pipe?
21      Q.  Did Midcoast guarantee obligations of K-Pipe?
22      Q.  Uh-huh.
23      A.  Under the project development agreements?
24      Q.  Yeah.
25      A.  That we may have, because they were going to be

Page 113

1  transferred to us.
2      Q.  Okay.  Was it -- was there a provision in those
3  guarantees that somehow guaranteed the provisions of the
4  stock purchase agreement with Langley?
5      A.  Not that I'm aware of.
6      Q.  The next paragraph, he says, "What I don't want
7  to see is just a naked guarantee by Midcoast of KPC's
8  guarantee of the tax indemnity.  It helps to have
9  Midcoast one step removed from KPC by having the
10  assumption agreement in between.  It also helps to have
11  the Midcoast guarantee arise as part of the change of
12  control provisions of the SPA."  Do you know what he was
13  talking about there?
14      A.  Yeah, I think it's just that, that he wants our
15  guarantees to arise out of a change of control, not
16  beforehand.
17      Q.  Why was Langley asking for them beforehand?
18      A.  Because Langley would ask for everything under
19  the sun.
20      Q.  107, please.  This is an e-mail from Gary
21  Wilcox to -- I think it was cut off.  I don't see who
22  it's too, actually, but within that is another e-mail
23  from you to Gary Wilcox dated 11-1 of '99.  It says,
24  "The agreement is supposed to contain language to
25  include that he will receive a 1099 for the payment.  I

**HUNDT REPORTING**
**214-220-1122**

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:  Richard Robert

Page 114

1  have not read the agreement.  Have you?  Is it worded
2  appropriately?"  What does that have to do with?
3      A.  That's the $10 million --
4      Q.  Termination.
5      A.  -- termination.
6      Q.  109, please.  This is an e-mail from
7  Mr. Palmisano to Kaitson and others, including you.
8  Within it it looks like forwarded is another e-mail from
9  Kaitson to several others, and down below, Item No. 3,
10  it says, "Stock Purchase Agreement.  Add a
11  representation/covenant in the SPA to the effect that
12  K-Pipe has no plan or intention to liquidate The Bishop
13  Group, Ltd. and in any event will not liquidate such
14  corporation for at least two years."
15          And then next to that, handwritten, it
16  says, "Jim, this needs to be done.  Ron."
17      A.  Uh-huh.
18      Q.  Why was that provision so important?
19      A.  Again, it comes from that other e-mail that
20  Wilcox had drafted.
21      Q.  Wilcox never explained to you why the provision
22  needed to be inserted?
23      A.  I don't recall why it was important.  I don't
24  know if it was a legal or a tax issue.
25      Q.  Okay.  Go to 115, Exhibit 115, please.  This is

Page 115

1  a letter from Price Waterhouse Coopers to Midcoast
2  Energy, specifically you, Mr. Robert, dated November 5
3  of 1999, correct?
4      A.  Correct.
5      Q.  And the first page you'll notice is redacted in
6  the middle, the second page is an unredacted version of
7  the first, and then signed on the third page by Price
8  Waterhouse Coopers and you, correct?
9      A.  Correct.
10      Q.  Dated 11-5 of '99.  Do you recall signing this
11  letter?
12      A.  Clearly, I did.
13      Q.  Do you recall why another -- why this
14  engagement letter was received from PWC on that date?
15      A.  Why was it was received on that date as opposed
16  to another date?
17      Q.  Wasn't there an engagement letter already in
18  place for PWC to do consulting and special project type
19  work?
20      A.  I think it suggested that there would be an
21  additional letter to the extent there was additional
22  services.
23      Q.  Oh, I thought you had negotiated a $65 rate or
24  a 65 percent rate in that initial letter for special
25  projects and additional consulting services?

Page 116

1      A.  Yeah, that's right.
2      Q.  Do you recall --
3      A.  Yes.
4      Q.  -- you said you had required that?
5      A.  That's right.
6      Q.  So why would another engagement letter be
7  required for this particular transaction?
8      A.  As I recall -- I'm not sure why they felt it
9  necessary to send another letter.
10      Q.  Did you have a discussion with them about it,
11  with Mr. Wilcox, Mr. Palmisano?
12      A.  Well, the only thing I recall is that --
13  that -- that PWC's fees were to be paid by Fortrend and
14  that's really all that I cared about.
15      Q.  And the second paragraph of the signature page
16  says, "In the event, through our efforts, we have
17  brought extraordinary value to the transaction and you
18  agree that this is the case, our total fees for the
19  services described herein will be commensurate with that
20  value."  Did you think that they brought extraordinary
21  value to the transaction?
22      A.  Extraordinary value?  Yeah, I thought they
23  brought a lot of value to the transaction.  You know,
24  I'm not a tax person, so...
25      Q.  And you were -- and this letter says that their

Page 117

1  fees would be commensurate with that value.  How was it
2  determined what their fee would be?
3      A.  I have no idea.  And I didn't care, because I
4  wasn't paying them.
5      Q.  Did you have to approve a specific amount that
6  would be distributed to them?
7      A.  No.
8      Q.  Who would approve that amount?
9      A.  That was between the seller and PWC.
10      Q.  So you're saying K-Pipe --
11      A.  Uh-huh.
12      Q.  -- would have authorized that payment?
13      A.  Yep.
14      Q.  Was PWC representing K-Pipe or Midcoast?
15      A.  They represented Midcoast.
16      Q.  How do you think K-Pipe got the funds to pay
17  PWC?
18      A.  Proceeds received from the seller.
19      Q.  So, was the sales price increased to pay for
20  PWC's fees?
21      A.  No, it was not.
22      Q.  Was it worked into the calculation of how much
23  you would pay K-Pipe for the assets?
24      A.  No, it was not.
25      Q.  But you were aware that they would be paid from

30 (Pages 114 to 117)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:   Richard Robert

Page 118

1  the sales proceeds?
2      A.  That's correct.
3      Q.  Okay.  What is extraordinary value?
4      A.  Very subjective, obviously.
5      Q.  Did you consider what it was when you signed
6  the -- the agreement?
7      A.  You know, as I mentioned to you, this simply
8  said that someone else was going the pay the fees and I
9  was happy to sign.
10     Q.  If somebody else was going to pay the fees,
11 then why would you need to sign the agreement?
12     A.  Because they would be working for me and yet
13 someone else would be paying.  I guess they wanted that
14 arrangement understood.  That's conjecture.
15     Q.  It says, "If you do not agree that we have
16 brought extraordinary value to the transactions, our
17 fees will be based on the hours we spent in connection
18 with this matter and billed at our standard hourly
19 billing rates."  Did you ever discuss with them whether
20 they should get the extraordinary value fee or the
21 standard customary hourly fee?
22     A.  No, because, clearly, I would -- it's pretty
23 clear which one I'd say they brought to the table.
24     Q.  Did you ever have a conversation prior to
25 closing the K-Pipe transaction with PWC about how the

Page 119

1  role of Fortrend in the transaction might be viewed by
2  the IRS?
3      A.  How the role of Fortrend would be viewed in the
4  eyes of the IRS?  Not specifically, but that's certainly
5  why I wanted an opinion on the transaction, I mean,
6  so...
7      Q.  You were --
8      A.  Yeah, it was discussed via that opinion, I
9  suppose.
10     Q.  You were aware that the IRS could challenge the
11 transaction?
12     A.  Yeah, the IRS can challenge anything.
13     Q.  Was that a concern of yours?
14     A.  Not really, no.  I mean, you know, with the
15 opinion in hand and having seen all these other
16 transactions take place, I wasn't really too concerned.
17     Q.  Well, when you say "opinion in hand," what do
18 you mean by that?
19     A.  The more likely than not opinion that I got
20 from PWC.
21     Q.  Did you get it -- you didn't get that opinion
22 prior to closing the K-Pipe transaction, did you?
23     A.  Not prior, no.
24     Q.  How long did it take them to provide that?
25     A.  It took a while, as I recall.

Page 120

1      Q.  So there was no concern in between the time you
2  closed the transaction and the time you got the --
3      A.  No, because I knew I was going to get it.  It
4  was just a matter of documenting the evidence.
5      Q.  Did you get an invoice from PWC for their fees
6  that they were paid in this transaction?
7      A.  Did I receive an invoice?
8      Q.  Uh-huh.  Or did Midcoast?
9      A.  No.
10     Q.  Was there an additional fee for the tax opinion
11 that you got?
12     A.  No.
13     Q.  Did anybody at Midcoast internally research the
14 issues addressed in the tax opinion from PWC?
15     A.  No.
16     Q.  So that was either a -- even before receiving
17 the issues or the tax opinion, nobody at Midcoast did
18 any research on the propriety or impropriety of this
19 transaction with K-Pipe?
20     A.  I don't -- we didn't have a tax person, per se,
21 on staff to do so.
22         THE WITNESS:  I don't know, when did you
23 come on board, Jana, if you remember?
24         MS. JORDAN:  Late '01.
25     A.  Okay.  So, yeah, obviously, it was late after

Page 121

1  that.
2      Q.  (BY MR. COFFIN) Okay.  Did you sign tax returns
3  on behalf of Midcoast?
4      A.  Yes.
5      Q.  And you would have signed a '99 return as well?
6      A.  Yes.
7      Q.  Did Midcoast seek out an opinion on the
8  transaction from somebody other than PWC?
9      A.  No.
10     Q.  Anybody else that was not involved in the
11 transaction?
12     A.  No.
13     Q.  Go to 130.  Government Exhibit 130, these are
14 the board of directors meeting minutes from Midcoast
15 dated November 8th of '99, correct?
16     A.  Correct.
17     Q.  And did you attend that meeting?
18     A.  I did.
19     Q.  There's more discussion about the Kansas
20 Pipeline acquisition; is that right?
21     A.  There is.
22     Q.  And Mr. Berthelot opened the meeting by noting
23 that management believed it was necessary from the board
24 to re-approve the Kansas Pipeline acquisition because it
25 had changed sufficiently since the board originally

31 (Pages 118 to 121)

HUNDT REPORTING
214-220-1122

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:   Richard Robert**

Page 122

1  approved the deal, saying that the primary difference
2  concerned the continuing upside sharing and business
3  development agreements which had been substantially
4  eliminated.  It says, "Consideration of purchase price
5  had been increased by 13.6 million."  Was that a correct
6  statement?
7       A.  If he's referring to the option agreements,
8  that would be -- we agreed to -- to have the option to
9  terminate those if it would cost us that much money.
10      Q.  It says, "The purchase price had been increased
11  by $13.6 million."
12      A.  Well, that's not accurate.
13      Q.  Did you -- I think you said earlier you had an
14  opportunity to review these minutes in draft form?
15      A.  Uh-huh.
16      Q.  And then make suggestions to Mr. Herbst?
17      A.  Uh-huh.
18      Q.  I assume you had the opportunity to do that
19  with this document?
20      A.  Possibly.
21      Q.  There's still no mention of K-Pipe in the board
22  of director meeting minutes.  Is there any reason that
23  you can think of?
24      A.  No.
25      Q.  No mention of Fortrend either; is that right?

Page 123

1       A.  There is not.
2       Q.  Go to Exhibit 145, please.  I'll represent to
3  you these are various wire transfer requests and
4  authorizations related to K-Pipe and Midcoast's purchase
5  of assets from K-Pipe.  Go to the bottom right-hand
6  corner, there are some DOJ Bates stamp numbers.  Go to
7  626, please.
8       A.  There it is, okay.
9       Q.  This was dated November 10 of '99 to Rabobank.
10  Looks like it's from Larry Austin; is that right?
11      A.  That's correct.
12      Q.  Did you know who Larry Austin was?
13      A.  I heard -- I had heard of him as a principal in
14  Fortrend, I think.
15      Q.  Did you ever meet him?
16      A.  I think at the closing I met him.
17      Q.  In New York?
18      A.  Yeah.
19      Q.  Okay.  There are a couple wire instructions
20  there to -- of a million-four, approximately?
21      A.  Uh-huh.
22      Q.  And one is to Cronulla Corporation, the other
23  one is to Ashfield International, Ltd.?
24      A.  Uh-huh.
25      Q.  Cronulla is C-R-O-N-U-L-L-A.

Page 124

1            Were you aware or had you heard of these
2  entities at that time?
3       A.  No, I had not.
4       Q.  Okay.  Turn the page.  There is an instruction
5  to wire Price Waterhouse Coopers $8,743.  Do you see
6  that?
7       A.  I do.
8       Q.  Are you aware of that wire transfer?
9       A.  Nope.
10      Q.  Turn the page.  There is another wire
11  instruction to NationsBank on behalf of or for credit to
12  Price Waterhouse Coopers of $950,000.  Were you aware of
13  that amount?
14      A.  I was aware of that amount.
15      Q.  You knew that Price Waterhouse Coopers was
16  going to make $950,000 from this transaction?
17      A.  Gary Wilcox showed that to me at closing.
18      Q.  Okay.  And what was your reaction?
19      A.  Good for you.
20      Q.  You don't know why the separate wire of $8,743?
21      A.  No idea.
22      Q.  Did you ever wonder if Fortrend's payment of
23  PWC's fees would compromise the relationship that K --
24  Price Waterhouse Coopers had with Midcoast?
25      A.  From a legal perspective?

Page 125

1       Q.  No, not from a legal perspective; just from a
2  whose best interest were they working for.
3       A.  No, I never -- I never questioned that.
4            Would this be a good time for a short
5  break?
6       Q.  It would be a great time.
7       A.  All right.
8            (Recess from 2:00 p.m. to 2:05 p.m.)
9            MR. COFFIN:  All right.  Let's get back
10  on.
11      Q.  (BY MR. COFFIN) Mr. Robert, regarding the
12  project development agreements in these transactions --
13      A.  Yes.
14      Q.  -- how did those come about, do you recall?
15      A.  They were -- as I recall, they were Dennis
16  Langley's creations.
17      Q.  Okay.  And those were -- were those actually
18  executed by Midcoast or were they executed by K-Pipe?
19      A.  K-Pipe.  I believe they were executed by
20  K-Pipe.
21      Q.  But at that time you knew that Midcoast would
22  inherit those; is that right?
23      A.  Yes.
24      Q.  So, Midcoast was actively involved in
25  negotiations of the -- of the PDAs; is that right?

32 (Pages 122 to 125)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:   Richard Robert

Page 126

1    A.   Correct.
2    Q.   And when -- what was the status of the -- of
3  the finalization of the PDAs at the time Midcoast
4  decided that it no longer wanted to engage in these
5  agreements with Langley?
6    A.   Towards the end.
7    Q.   Okay.  Before -- before closing, I assume?
8    A.   Yes.
9    Q.   Okay.  And it was determined that there be a
10  13.75 million payment to buy Langley out of those
11  agreements, basically?
12    A.   Essentially, but I think the number was reduced
13  to 13.
14    Q.   So, 3 million was added to the stock purchase
15  price?
16    A.   I -- yeah, we agreed to pay K-Pipe 3 million
17  more, which -- and I assume that then went to Langley.
18    Q.   That they passed through to Langley?
19    A.   Yes.
20    Q.   And then 10 million, 10.75 million or whatever
21  the number was, was paid later?
22    A.   Yeah, maybe it was.
23    Q.   Okay.  How was the -- how were those two
24  amounts determined?  How was it determined that
25  3 million would go to the purchase price and 10 million

Page 127

1  would be paid later?
2    A.   It was what we could afford at the time, I
3  believe.
4    Q.   So it was simply a matter of not having the
5  finances to pay the entire 13 million?
6    A.   I believe so.  That was the principal factor,
7  as I recall.
8    Q.   I'm going to test your eyes with Government
9  Exhibit 201.
10    A.   201.
11    Q.   Uh-huh.
12    A.   Oh, 201, there you go.
13         MR. STERN:  That's another way to look at
14  it.
15    Q.   (BY MR. COFFIN)  It's not clipped, but it's
16  going to be all those handwritten notes; okay?
17    A.   All these handwritten notes?
18    Q.   And what I'll do is tell you where to go.  I'm
19  looking at the PWC numbers at the bottom right.
20         Okay.  Go to PWC 1288.  And these are
21  notes from Price Waterhouse Coopers, by the way.  In the
22  middle of the page, there's a -- there's two brackets.
23  The second bracket, do you see that?
24    A.   Yes.
25    Q.   The handwritten notes appear to say, "Now, 1,

Page 128

1  Sell assets by corp. for cash; 2, Then sell stock to
2  Midco; 3, Midco injects loss assets into corp.  Corp.
3  sells.  Midco takes risk."  Do you see that?
4    A.   I do.
5    Q.   Did you ever have any discussions with anybody
6  at PWC about injecting loss assets into the corporation?
7    A.   No.
8    Q.   Did Fortrend ever discuss with you or anyone at
9  Midcoast, as far as you know, about the IRS views of
10  incorporating them into the transaction?
11    A.   No.
12    Q.   Go back one page to 1289.
13    A.   1289?
14    Q.   Uh-huh.
15    A.   Oh, back, okay.
16    Q.   There's a heading there that says Critical
17  Factors in Avoiding Agency I?
18    A.   Uh-huh.
19    Q.   It says, "No written agreement with S or B
20  evidencing agency rel."  I assume that's relationship.
21  "No agreement or even LOI between S or B when I gets
22  involved."  And there's several other items down there
23  listed.  Was there ever any discussion with anybody at
24  PWC or Fortrend about critical factors in avoiding
25  agency relationship with Fortrend?

Page 129

1    A.   No, there wasn't so much -- I mean, it wasn't
2  specifically characterized as "avoiding agency
3  relationship," but it was certainly very clear that
4  there had to be an arm's length transaction between both
5  parties.
6    Q.   Okay.  And the middle or in the middle of that
7  list, it says, "Better if I retains some signif --
8  significant, I assume -- "assets such as A/Rs --"
9    A.   A/R.
10    Q.   -- which are account receivable, "to interfere
11  with step trans doctrine."
12         And we saw that e-mail earlier where
13  Wilcox was suggesting that receivables be retained by
14  K-Pipe.  Do you remember having any discussion with
15  Wilcox or Fortrend or anybody else at PWC about
16  retaining significant assets to make this transaction --
17  avoid -- to allow this transaction to avoid the step
18  transaction doctrine?
19    A.   I don't recall a specific conversation.
20    Q.   Are you familiar with the phrase "step
21  transaction doctrine"?
22    A.   Now that you have mentioned it, I do -- I do
23  recall having seen it.
24    Q.   Having seen it?
25    A.   Yeah.  I don't readily --

HUNDT REPORTING
214-220-1122

Witness:  Richard Robert

Page 130

1    Q.  Oh, seen the phrase?
2    A.  Seen the phrase, heard of the phrase.
3    Q.  Any discussion with Wilcox about the step
4  transaction doctrine?
5    A.  Probably I heard it, you know, after this all
6  came about and the IRS getting involved.
7    Q.  Did you have any discussions with either
8  Fortrend or PWC concerning Fortrend's fee for providing
9  or their involvement in this transaction?
10   A.  No.
11   Q.  We talked about the 5 percent we saw earlier on
12  the schedule?
13   A.  Right.  I mean, I certainly wouldn't
14  characterize it as a fee.
15   Q.  Uh-huh.
16   A.  It was what they expected to make as a -- you
17  know, the difference between what we would pay versus
18  what they would have to pay.
19   Q.  Was there any -- ever any discussion about
20  paying the 5 percent that Fortrend was expecting through
21  the Butcher Interest Partnership?
22   A.  No.
23   Q.  Go to 1306, PWC 1306, at the bottom.  On the
24  top, the top of that page it has Richard underlined,
25  correct?

Page 131

1    A.  Uh-huh.
2    Q.  Certain notes below that?
3        MR. STERN:  What page?  Oh, I'm sorry.
4        MR. COFFIN:  1306.
5        MR. STERN:  I was looking at 1305.
6    Q.  (BY MR. COFFIN) There is a dash there, and it
7  says "better with us."  It's about one, two, three,
8  four, five -- eight lines down or so.  Do you see that?
9    A.  Uh-huh, I do.
10   Q.  "Better with us," and it says, "Agreed that
11  Fortr's," F-O-R-T-R-apostrophe-S, "bid has to be greater
12  than 5M."  Do you know what that meant?
13       MR. STERN:  Objection, form.  It's hardly
14  obvious that's what it says.
15       MR. COFFIN:  It's clear to me.
16   A.  "Better with us.  Agreed that Fortrend's" -- it
17  would be conjecture on my part, but it could be meaning
18  that -- that their bid has to be greater than 5 million
19  more than ours.
20   Q.  (BY MR. COFFIN) Okay.  Do you remember having
21  any discussions with anybody at PWC about -- look at the
22  matters listed there on this page and see if you had any
23  discussions with PWC about these items.
24   A.  It's a little hard to read.
25       MR. CROKE:  Uh-huh.

Page 132

1    A.  Okay.  I've read as best I can.
2    Q.  (BY MR. COFFIN) Anything refresh your
3  recollection as to any discussions you may have had with
4  anybody at PWC?
5    A.  Yeah, we -- I mean, we certainly talked to them
6  about the issues that we were having.  I mean, it says
7  that -- you know, it talks about our initial bid, though
8  I think that's the 184 --
9    Q.  Uh-huh.
10   A.  -- that we have in our initial offer.  And
11  since then, based on our due diligence, we lowered it
12  12 million and then another 5 million, and that's what
13  created such a large gap to begin with.  And we -- it
14  says we would be willing to pay that reduced amount for
15  the stock.
16       And then, you know, reason -- I guess the
17  reason is it was uneconomical to do it for any more than
18  that.  And the rates, the rate case they were in and the
19  legal issues gave us concern about things going forward.
20  It talks about Dennis's idea the ability to do future
21  projects, about bridging the gap.
22   Q.  Let me stop you.  Was Midcoast involved then in
23  determining how much Fortrend needed to pay for
24  Langley's stock?
25   A.  No.  We knew -- we knew what Dennis wanted.  It

Page 133

1  just talks about other bidders still in the picture.
2    Q.  How did Midcoast determine how much to pay for
3  the assets of Kansas Pipeline?
4    A.  It was negotiated with K-Pipe.
5    Q.  Was there first done some kind of modeling that
6  you said --
7    A.  Sure.
8    Q.  -- to determine what amount it should be?
9    A.  Sure.  I mean, we modeled.  We modeled the
10  transaction different ways.
11   Q.  Did you place any good will on the, you know --
12  you didn't pay just the net asset value, did you, or
13  market value?
14   A.  No.  I mean we looked at IRR principally when
15  we were doing our modeling and the effect on EPS and
16  things like that.
17   Q.  Okay.  IRR is --
18   A.  Internal rate of return.
19   Q.  Okay.  EPS?
20   A.  Earnings per share.
21   Q.  So, essentially, is it a discounted cash flow
22  type method that you use?
23   A.  We looked at discounted cash flow, PV-10
24  values, like that.
25   Q.  PV?

34  (Pages 130 to 133)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:   Richard Robert

Page 134

1    A.  Present value, discounted at 10 percent.
2    Q.  10 percent?
3    A.  Yes.
4    Q.  Why 10 percent?
5    A.  It's just a standard.
6    Q.  Okay.  Did you discuss the -- I assume you
7  discussed the involvement of Fortrend in the transaction
8  with Bank of America?
9    A.  Yes.
10   Q.  Was it -- did anybody at Bank of America have
11  any concerns about using Fortrend in this transaction?
12       MR. STERN:  Objection, form.
13   A.  The bank was not concerned, to my knowledge,
14  about Fortrend's participation.
15   Q.  (BY MR. COFFIN) Okay.  Was there a gentleman by
16  the name of T. Hardy or Ty Hardy at the bank that you
17  were dealing with?
18   A.  No, not that I recall.
19   Q.  Okay.  Was -- K-Pipe was -- financed its -- the
20  purchase of the stock from Langley with a loan from
21  Rabobank; is that correct?
22   A.  To my knowledge.
23   Q.  And isn't it true that before Rabobank would
24  fund that loan that it required Midcoast put up $200
25  million in escrow with Rabobank?

Page 135

1    A.  I don't recall that.
2        MR. COFFIN:  I'm going to have to break
3  the rule and go backwards on exhibits.
4    Q.  (BY MR. COFFIN) Go to Exhibit 96.  It should be
5  in the first binder.  This is very hard to read, too, I
6  know.  This is from Rabobank.  It's a summary.  At the
7  top, it says Appendix 8, references a bunch of letters
8  and numbers, and it says Meeting Rabobank International
9  Credit Committee, dated October 29, 1999, Summary of
10  Credit Report dated October 22, 1999, and additional
11  memorandum dated October 27, '99, both by Mr. C.J.
12  Kortlandt, K-O-R-T-L-A-N-D-T, of New York branch.
13  Client is K-Pipe Holdings Partners.  Do you see that?
14   A.  Yes.
15   Q.  And it's the application.  It says, "An up to
16  30 days cash secured term loan of $215 million,"
17  correct?
18   A.  Yes.
19   Q.  And the purpose is to allow K-Pipe to complete
20  a stock purchase agreement between K-Pipe and the
21  shareholders of Bishop Group, Ltd., a Kansas
22  corporation.  Existing exposure, None.  Total exposure
23  in -- what's it say, included application?  Principal,
24  U.S. dollars 215 million.  Existing protection, none.
25  Proposed protection, Pledged escrow account, U.S. dollar

Page 136

1  220 million; held at Rabobank.  And then at the bottom,
2  it talks about the transaction is contemplated as
3  follows.  I know it's difficult to read.
4    A.  Yeah.
5    Q.  But I'm more focused on the next page.  At the
6  top, it says, "2.  Prior to Rabobank advancing the
7  money, Midcoast Energy, Inc. has placed an amount of
8  $200 million in an escrow account held at Rabobank.
9  This escrow account is pledged to Rabobank."  Is that
10  accurate?
11   A.  That's what it says.
12   Q.  Is that something you recall or don't recall?
13   A.  I don't recall forwarding $200 million to do an
14  escrow account.
15   Q.  Do you know if that did or didn't happen,
16  eventually?
17   A.  Again, I don't recall it happening.
18   Q.  Okay.
19   A.  I mean, it's fathomable that we -- when we paid
20  K-Pipe, we paid it into an account held at Rabo, but...
21   Q.  But you don't think that Midcoast --
22   A.  I mean, we didn't do it with the intention of
23  it being some sort of escrow and pledged against there
24  being able to borrow it.
25   Q.  Was there -- would it surprise you if that's

Page 137

1  the way it occurred?
2    A.  No.  I mean, as I said, it wouldn't surprise me
3  that when we paid K-Pipe, that we paid it into a
4  Rabobank account.  So, whether they characterized it as
5  an escrow account or not, I guess it wasn't relevant to
6  me.
7    Q.  Well, it had to be -- there had to be an escrow
8  agreement signed, didn't there --
9    A.  Yeah, I guess there may have been.
10   Q.  -- for that to happen?
11       Why wouldn't you -- why would you doubt
12  that that's the way it would be planned to occur?
13   A.  I just didn't remember it happening that way.
14   Q.  Okay.
15   A.  Might have been a last minute requirement.  I'm
16  not sure.
17   Q.  Did you believe that K-Pipe had the financial
18  strength to borrow the money to buy Langley's stock
19  without any commitment or escrowed money put up by
20  Midcoast?
21   A.  I remember that being a concern, but I remember
22  getting a financing letter from Rabobank saying they
23  were capable.  I know that they had the loan approved.
24   Q.  But as far as you knew, it wasn't conditioned
25  upon Mid --

35  (Pages 134 to 137)

HUNDT REPORTING
214-220-1122

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:   Richard Robert

**Page 138**

1    A.  I don't recall that.
2    Q.  -- Midcoast putting up $200 million in an
3  escrow account?
4    A.  No, I don't recall that being a condition.
5    Q.  When K-Pipe closed on its purchase of Langley
6  stock, was there a binding obligation on K-Pipe to sell
7  the assets to Midcoast?
8    A.  Again, it's a timing issue.  I'm not exactly
9  sure the dates, when it -- when each occurred, when they
10  signed versus when we signed.
11    Q.  But it was always planned that Midcoast was
12  going to buy the assets, whether -- I mean, if --
13    A.  That --
14    Q.  -- K-Pipe would have gone through with the
15  stock purchase?
16    A.  If they were capable.  I mean, there was an
17  agreement in place that was executed.
18          MR. COFFIN:  Okay.  Let's take a quick
19  break.
20          MR. STERN:  Then you're done?
21          MR. COFFIN:  No.  Hopefully, I'll wrap
22  things up.
23          (Recess from 2:31 p.m. to 2:35 p.m.)
24          MR. COFFIN:  Let's go back on.
25    Q.  (BY MR. COFFIN) Was your recollection refreshed

**Page 139**

1  during the break?
2    A.  It was.
3    Q.  Okay.  Do you want to comment on some of your
4  testimony?
5    A.  Well, clearly, our funds were put into an
6  escrow account.
7    Q.  Okay.  And counsel for Midcoast showed that to
8  you?
9          MR. COFFIN:  What exhibit number was that?
10          MR. STERN:  It's --
11          MS. PIPKIN:  It was in --
12          MR. COFFIN:  Oh, in Exhibit 1, okay.
13          MR. STERN:  Yes.  It's that escrow
14  agreement we looked at yesterday, with 6.1 million.
15          MS. PIPKIN:  Tab No. 6.
16          MR. STERN:  But it wasn't 250 million.
17          MR. COFFIN:  Wasn't 250?
18          THE WITNESS:  It was 198,100,000.
19          MR. COFFIN:  Okay.  Good enough.
20    Q.  (BY MR. COFFIN) Turn to 186, please.  That is
21  an e-mail from, looks like, Gary Wilcox to Robert
22  Whitten.  And I don't know, have we discussed Robert
23  Whitten, who he is?
24    A.  Bob Whitten?
25    Q.  Was he the tax partner for PWC?

**Page 140**

1    A.  Correct.
2    Q.  But did you deal with Mr. Whitten on this
3  transaction?
4    A.  No.
5    Q.  Mostly Mr. Palmisano?
6    A.  Yes.
7    Q.  Mr. Palmisano, was he a --
8    A.  Manager.
9    Q.  -- manager at the time?
10    A.  Yes.
11    Q.  And this is an internal e-mail within PWC, and
12  what's being transmitted is a notice of IRS warning on
13  intermediary transactions.  Do you recall hearing from
14  Mr. Wilcox or anybody at PWC about this IRS notice?
15    A.  Yes.
16    Q.  Okay.  What do you recall about that?
17    A.  I recall that -- I just recall they suggested
18  that the IRS had sent this notice out.
19    Q.  Okay.  And did that cause them any concern?
20  Who was it, Wilcox or Palmisano?
21    A.  I believe it was Bob and Tom.
22    Q.  Bob?
23    A.  Whitten.
24    Q.  And Tom?
25    A.  And Tom Palmisano.

**Page 141**

1    Q.  Did they speakerphone you or --
2    A.  No, I think they came over and talked about it.
3    Q.  Okay.  And what did they say?
4    A.  They just kind of informed me of -- of this
5  notice.
6    Q.  Did they express any concerns?
7    A.  Concerns?
8    Q.  Uh-huh.
9    A.  I guess they wouldn't have come talked to me
10  unless they had some concerns.
11    Q.  Did they advise you that Midcoast would need to
12  disclose the transaction to the IRS?
13    A.  They suggested that they were talking about it
14  internally.
15    Q.  And how did you feel about that?
16    A.  I thought that was kind of -- you know, I
17  didn't understand why.
18    Q.  What was your -- why did you have a problem
19  understanding that?
20    A.  Well, I -- because they -- you know, I had
21  gotten an opinion from them, et cetera, et cetera.  I
22  didn't know how -- why it would have affected us.
23    Q.  Were you angry?
24    A.  Was I angry?
25    Q.  Uh-huh?

36  (Pages 138 to 141)

HUNDT REPORTING
214-220-1122

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:   Richard Robert

Page 142

1    A.  Well, at the time, no, they were just talking
2   about it internally.  I think by the time -- you know,
3   after I'd left I think is when -- when I had heard that
4   it had, you know -- they had informed the IRS or what
5   have you.
6    Q.  When you -- when you heard from Bob and Tom,
7   did you report the matters to anybody else at Midcoast?
8    A.  I expect.  I don't recall specifically, but,
9   logically, I would have talked to at least Dan about it,
10  I suppose.
11   Q.  Dan Tutcher?
12   A.  Yeah.
13   Q.  Would you have discussed with the board these
14  issues at any time after your conversation with Bob and
15  Tom?
16   A.  I don't believe so.
17   Q.  You don't think so?
18   A.  I don't think so.
19   Q.  Turn to 187.
20   A.  Because --
21   Q.  187.
22   A.  Uh-huh.
23   Q.  This looks like at the top it's a partial
24  e-mail from you to somebody, Subject: Marlin.  What does
25  Marlin stand for?

Page 143

1    A.  Enbridge.
2    Q.  And what -- how do you come -- how do you get
3   Enbridge from Marlin?
4    A.  That was the code name.
5    Q.  Oh, there were code names?
6    A.  Well, we -- we took it -- after Project Ruby,
7   we decided to start code names.
8    Q.  So, was that at the time the potential -- that
9   was the potential acquisition by Enbridge, was code
10  named Marlin?
11   A.  Yes.
12   Q.  I see.  And, okay, below that --
13       MR. COFFIN:  What did you say?  That's the
14  big one?
15       MR. CROKE:  It's a big fish.
16   Q.  (BY MR. COFFIN)  Gary has e-mailed Dennis
17  McErlean.  Do you know who that is, of PWC?
18   A.  Dennis.
19   Q.  M-C-E-R-L-E-A-N?
20   A.  No.
21   Q.  Okay.  It says -- Dennis is writing to Gary.
22  "I got your phone message and understand the issue."
23  Oh, by the way, the subject line is Midcoast Energy
24  Disclosure Requirement for Midco Transaction.  Midco is
25  M-I-D-C-O.

Page 144

1       "I got your phone message and understand
2   the issue.  My thought is that, although the notice may
3   require a disclosure of the 1999 transaction on 2000
4   filings even through," but I think it should be even
5   though, "the return is already filed, that makes little
6   sense.  Since the transaction is facts and circumstances
7   sensitive, as Bob touches on below, perhaps we could
8   take a more liberal view here.  I agree with Bob's
9   recommendation for further internal discussion.
10  Although I haven't been close to Richard in quite some
11  time, I would suggest that he'll ask if we've considered
12  every conceivable way to prevent these disclosures."
13       Did you ask them to prevent disclosures?
14  PWC.
15   A.  I didn't ask them to prevent the disclosure.
16  I --
17   Q.  Did you ask them to find every conceivable way
18  to not disclose the transaction?
19   A.  I wanted to understand why it would have to be
20  disclosed if it was disclosed.
21   Q.  This says that -- Dennis indicates in the
22  e-mail that he hasn't been close to Richard in quite
23  some time.  It would seem to indicate he knew you at one
24  point?
25   A.  Granted, I'm not the best with names, but...

Page 145

1    Q.  Okay.  Could it be maybe he's worked at PWC and
2   worked on the audit or the tax --
3    A.  The name is just not familiar.
4    Q.  Okay.  And this was dated -- this was around,
5   let's see, January 26th of 2001, right?  That was the
6   e-mail from Dennis to Robert Whitten and Gary Wilcox.
7   And by that time --
8    A.  What I don't understand, it says here forwarded
9   by Tom Palmisano 1-27, 2003, 8:50 p.m.
10   Q.  I have a theory on that.  I don't know if it's
11  correct or not, but I think Mr. Palmisano was sending
12  that to somebody to print out for --
13   A.  This.
14   Q.  -- providing the documents to the government.
15   A.  I gotcha.  Okay.
16   Q.  189, please.
17   A.  189?
18   Q.  Yes.  It's a memorandum on Price Waterhouse
19  Coopers' letterhead or memohead to Midcoast Tax Files,
20  from Gary Wilcox and Bob Whitten, dated February 20,
21  2001, Subject: Tax Statement Disclosure Statement.  Do
22  you recall ever seeing this document?
23   A.  I don't recall.
24   Q.  Did you -- did anybody at Midcoast ever
25  internally research whether the transaction should be

37 (Pages 142 to 145)

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

**Witness:   Richard Robert**

Page 146

1  disclosed or did you rely on Price Waterhouse Coopers?
2      A.   We relied on Price Waterhouse.
3          THE WITNESS:  I see -- oh, Jana, were you
4  there at that point?
5          MS. JORDAN:  (Shakes head)
6          THE WITNESS:  Oh, okay.
7      Q.   (BY MR. COFFIN) 198, please.  It's a letter
8  from PWC to you, Mr. Robert, September 24, 2001,
9  correct?
10     A.   Yes, it is.
11     Q.   From Gary Wilcox, and he's transmitting a copy
12 of their -- of their opinion; is that correct?
13     A.   That's what it says, yes.
14     Q.   And he says, "We are in receipt of the original
15 signed representation letters from both Midcoast and
16 Fortrend, which we will keep in our files."  And this
17 was September 24, 2001, almost two years after the
18 transaction took place; is that right?
19     A.   That's right.
20     Q.   Why did it take PWC so long to get their tax
21 opinion out?
22     A.   You'd have to ask them.
23     Q.   Did you ask the question during the interim
24 period?
25     A.   Yeah, I'd ask, "Where is my opinion?"

Page 147

1      Q.   And what was their response?
2      A.   "Working on it."
3      Q.   And let's see.  Look at 196, Government
4  Exhibit 196.
5      A.   196.
6      Q.   Yeah, we're in 201, so go backwards.
7      A.   Sorry, yeah.
8      Q.   Is this a copy of the tax opinion you received
9  from PWC?
10     A.   Mine goes from 195 to 198.
11     Q.   You don't have a 196?
12     A.   Huh-uh, no.
13         MR. COFFIN:  Do you have a 196?
14         MR. STERN:  No, but let me see if it's a
15 stapling error.
16     Q.   (BY MR. COFFIN) Here, just take mine.
17     A.   I think it's part of this, isn't it?  Oh, this
18 is -- no, this is our management -- okay.
19     Q.   196, is that a copy of your -- the tax opinion
20 you received from PWC?
21     A.   Yeah, it is.
22     Q.   Did you do anything with that other than put it
23 in a file, away in a file?
24     A.   That's, I believe, all I did with it.
25     Q.   Did PWC ever express to you their desire to not

Page 148

1  provide a tax opinion?
2      A.   No.
3      Q.   What's a Section 338 election?  You mentioned
4  that earlier, didn't you?
5      A.   338(h)10.
6      Q.   (h)10, yeah, what is that?
7      A.   As I recall, it's when you have a parent
8  corporation and you can -- you can buy the -- you can
9  buy the -- you can buy the stock, and it's represented
10 as an asset transaction if the parent agrees to -- to
11 represent it that way.  I can't remember exactly.
12     Q.   Was such an election ever considered in this
13 transaction?
14     A.   Yeah, Langley would -- I don't -- I don't know
15 if it was possible because of the structure.
16     Q.   So it wasn't considered then or maybe it was
17 brought up, but --
18     A.   Well, yeah, anything to -- to do an asset
19 transaction was considered, but I think it may have been
20 the structure didn't allow that to occur or he just said
21 no.  I can't remember which.
22     Q.   Government Exhibit 195.
23     A.   Do you want this back?
24     Q.   Just leave it there.  195 is a fax, it looks
25 like, from Tom Palmisano to Gary Wilcox, dated August 10

Page 149

1  of 2001, and attached to it is a letter from Midcoast to
2  Price Waterhouse, with your signature; is that correct?
3      A.   That's correct.
4      Q.   Is this what is known as a client
5  representation letter?
6      A.   Yes.
7      Q.   I assume you read the -- you read the letter
8  before signing it?
9      A.   Correct.
10     Q.   Made sure that representations were accurate?
11     A.   Correct.
12     Q.   Did you recall suggesting any changes to the
13 letter, if it came in draft form?
14     A.   I recall a few minor changes.
15     Q.   All right.  I'm going to refer you back to
16 Government Exhibit 201, which is the handwritten notes.
17 If you'll turn to Bates No. 1286, handwritten notes,
18 once again, PWC.  At the top, it says Midcoast,
19 underlined, and Richard Robert, underlined.  It says,
20 "Has been a request to supply with copies of opinion."
21 Something, "Don't provide more Q?  Close, week after
22 next.  Penalty - only if no substan" -- I think it's
23 substantial authority.  And it has three choices there:
24 conservative, average or aggressive.
25         And then next to that, it says "prudently

**HUNDT REPORTING**
**214-220-1122**

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:  Richard Robert

Page 150

1  aggressive." Then there is a dollar amount there,
2  $140,000. Fortrend actually paid. Don't know if
3  Fortrend got dollars from Langley."
4       Do you remember having a discussion with
5  anybody at PWC about, I guess, assessing risk of
6  conservative, average or aggressive, and then concluding
7  that Midcoast -- or you wanted to proceed to be
8  prudently aggressive?
9     A.  I don't know what he would be referring to
10 there.
11    Q.  Okay. And do you recall any discussions with
12 PWC about penalties, only if there are no substantial
13 authority?
14    A.  Yeah, I think I -- I think I asked what, you
15 know, what does this opinion do for me.
16    Q.  Okay. And when would that conversation have
17 taken place? Before the closing of the transaction?
18    A.  Long time ago, yeah.
19    Q.  Before the closing, you think?
20    A.  Oh, yeah.
21    Q.  Okay. And I assume Mr. Wilcox assured you that
22 their tax opinion would -- would prevent penalties from
23 being assessed?
24    A.  I believe so.
25       MR. COFFIN:  One quick break just to wrap

Page 151

1  things up, I hope.
2       (Recess from 2:56 p.m. to 3:02 p.m.)
3       MR. COFFIN:  Go back on the record.  No
4  further questions.
5       Yeah, actually, let me reserve --
6       MR. STERN:  It's too late.
7       MR. COFFIN:  Too late. I understand there
8  are some more documents and in the event --
9       MR. STERN:  Yeah, we've already talked
10 about that.  We'll have to figure it out.
11       MR. COFFIN:  Yeah, we'll figure it out.
12 I'm not going to conclude the deposition. I mean, I'll
13 conclude the deposition with that caveat, if there are
14 additional documents I haven't seen, that are new, I'd
15 like the opportunity to depose Mr. Robert again.  And I
16 know that you may object to that.
17       MR. STERN:  Since I gave you the
18 opportunity to hold off and I don't want to impose on
19 Mr. Robert's time unduly.
20       THE WITNESS:  All right.
21       MR. STERN:  Did you have any questions?
22       MS. PIPKIN:  No questions.  I think we're
23 done.
24       (Proceedings at 3:03 p.m.)
25

Page 152

1          CHANGES AND SIGNATURE
2  PAGE LINE  CHANGE          REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 153

1
2
3
4
5
6
7
8     I declare under penalty of perjury that the
9  foregoing is true and correct.
10
11       _____
12          RICHARD ROBERT
13
14
15    SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned
16 authority, by the witness, RICHARD ROBERT, on the this the
17 _____ day of _____, _____.
18
19       _____
20          NOTARY PUBLIC IN AND FOR
21          THE STATE OF _____
22
23 My Commission Expires: _____
24
25

39 (Pages 150 to 153)

HUNDT REPORTING
214-220-1122

cbae4aff-c4d8-43ae-992b-70a87d1a41f2

Witness:   Richard Robert

```
                                    Page 154
 1  STATE OF TEXAS
 2  COUNTY OF HARRIS
 3
 4          REPORTER'S CERTIFICATE
 5        ORAL DEPOSITION OF RICHARD ROBERT
 6            February 1, 2007
 7
 8      I, the undersigned Certified Shorthand Reporter in
 9  and for the State of Texas, certify that the facts
10  stated in the foregoing pages are true and correct.
11      I further certify that I am neither attorney or
12  counsel for, related to, nor employed by any parties to
13  the action in which this testimony is taken and,
14  further, that I am not a relative or employee of any
15  counsel employed by the parties hereto or financially
16  interested in the action.
17      SUBSCRIBED AND SWORN TO under my hand and seal of
18  office on this the _____ day of _____,
19  _____.
20
21      _____
22      Laraine L. Toliver, CSR 433
        Expiration:  12/31/2008
23      Hundt Reporting (Firm No. 347)
        703 McKinney, Suite 207
24      Dallas, Texas 75202
        214.220.1122;214.220.1127 fax
25
```

40 (Page 154)

HUNDT REPORTING
214-220-1122

cbae4aff-c4d8-43ae-992b-70a87d1a41f2