Witness:  Bruce Snyder

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


ENBRIDGE ENERGY COMPANY,
INC., and ENBRIDGE MIDCOAST
ENERGY, L.P., f/k/a ENBRIDGE
MIDCOAST ENERGY, INC., f/k/a
MIDCOAST ENERGY RESOURCES, INC.,

          Plaintiffs,

vs.                    Case No. H-06-0657


UNITED STATES OF AMERICA,

          Defendant.



          DEPOSITION OF BRUCE SNYDER, a witness,
taken on behalf of the Defendant, pursuant to
Subpoena, on the 6th day of February, 2007, at the
Charles E. Whittaker Courthouse, 400 East 9th
Street, Kansas City, Missouri, before

             GAIL L. RIEDE,

of AAA Court Reporting Company, a Certified Court
Reporter of the State of Missouri.


                APPEARANCES

     For the Plaintiffs:
     MR. KARL S. STERN
     MS. EMILY W. PIPKIN
     VINSON & ELKINS, LLP
     1001 Fannin Street, Suite 2300
     Houston, Texas  77002-6760

     For the Defendant:
     MR. DAVID B. COFFIN
     MR. HERB LINDER
     UNITED STATES DEPARTMENT OF JUSTICE
     717 North Harwood, Suite 400
     Dallas, Texas  75201

919f3d3d-1a58-49d0-8589-5c63369a7ddd

Witness:  Bruce Snyder

---

Page 2

```
 1            APPEARANCES
              (Continued)
 2
      For the Internal Revenue Service:
 3    MR. KEVIN G. CROKE
      SPECIAL TRIAL ATTORNEY
 4    160 Spear Street, Suite 9000
      San Francisco, California  94105
 5
      MS. YVONNE M. PETERS
 6    OFFICE OF CHIEF COUNSEL
      915 Second Avenue, Room 2710
 7    Seattle, Washington  98174
      For Ernst & Young:
 8    MS. SUSAN E. SEABROOK
      LATHAM & WATKINS, LLP
 9    555 Eleventh Street, N.W., Suite 1000
10    Washington, D.C., 20004-1304
11
12
13
14
15            STIPULATIONS
16        It was stipulated by and between
17    counsel and the witness that the presentment of
18    this deposition to the witness by the officer
19    is expressly waived.
20
21
22
23
24
25
```

---

Page 3

```
 1                INDEX
 2    WITNESS:  BRUCE SNYDER          PAGE:
 3    Examination by Mr. Coffin           7
      Examination by Mr. Stern          129
 4    Re-examination by Mr. Coffin      153
      Re-examination by Mr. Stern       158
 5    Further examination by Mr. Coffin  159
 6    EXHIBITS:            IDENTIFIED:
 7    1 - DOJ2450-52 9/7/00 Fax to Fox from Teig  159
 8    PREVIOUSLY MARKED EXHIBITS:
 9    26 - DOJ10815-17 Fax to Witness fr Hoffman   24
      100 - PWC048-050 1/27/03 E-ml Kaitson fr Wilcox 38
10    105 - DOJ112 E-mail between Midcoast & PWC   41
      159 - PWC363-388                 125
11    201 - DOJ28442-8455 PWC Employees' notes   122
      227 - E&Y Timekeeping system printouts   42
12    226 - DOJ4165 Final financial statement    99
      237 - DOJ4390 10/31/99 Billing stmt to Langley 72
13    228 - DOJ4527 3/21/00 E-mail to Wit fr Hoffman  73
      229 - DOJ04528-29 Series of e-mails       74
14    230 - DOJ3965-3969 1999 Engagement letter   76
      231 - DOJ10741-43 E-mails Fox & Palmisano    80
15    232 - DOJ4172-74 9/7/00 E-mail EY & Teig   102
      233 - DOJ4146-49 8/22/00 Memo to Lacy      83
16    234 - DOJ4156-57 8/28/00 Letter to Teig fr Wit  91
      235 - DOJ4158-60 E-mail and Memo           95
17    236 - DOJ4161-64 9/1/00 E-mail to Teig fr Lacy  96
      237 - DOJ4166-67 E-mail to Teig from Lacy   100
18    238 - DOJ4168-71 9/7/00 E-mail to Fox fr Lacy 105
      240 - DOJ4175 9/8/00 E-mail to Lacy from Fox 107
19    241 - DOJ 4336 9/8/00 Invoice to K-Pipe    107
      242 - DOJ3970 9/8/00 Letter to Lacy fr Austin 108
20    244 - DOJ4152-55 9/13/00 Memo to Lacy fr Teig 109
      246 - DOJ4146 9/14/00 E-mail to Lacy fr Fox 110
21    247 - DOJ3972-74 9/15/00 Ltr to Austin fr Wit 113
      249 - DOJ7895-7898 Ltr to Manatt fr K-Pipe 115
22    250 - DOJ15265-271 11/21/00 Ltr to K-P fr Man 116
      257 - DOJ7894 E-mails                    116
23    253 - DOJ3971 10/10/00 Ltr to Wit from Austin 117
      254 - DOJ7602-7667 1999 K-Pipe tax return 118
24
25
```

---

Page 4

```
 1        (The deposition commenced at 10:39
 2    a.m.)
 3            BRUCE SNYDER,
 4    a witness, being first duly sworn, testified
 5    under oath as follows:
 6        MR. COFFIN:  As a house cleaning
 7    matter, or housekeeping matter, we have
 8    stipulated, haven't we, Mr. Stern, that we can
 9    use Mr. Snyder's interview transcripts just as
10    if they were taken as a deposition in this
11    case?
12        MR. STERN:  And he was unavailable to
13    testify at trial, yes.
14        MR. COFFIN:  The government does not
15    say that it will not cover areas that were not
16    covered in the interview transcripts, but that
17    we have agreed that we could use the
18    transcripts in this case.
19        Is that correct?
20        MR. STERN:  That's correct.
21        MR. COFFIN:  Ms. Seabrook, do you have
22    any housekeeping matters?
23        MS. SEABROOK:  I guess I would just
24    point that there has been an order entered by
25    The Court with respect to Bruce being able to
```

---

Page 5

```
 1    testify in connection with information that
 2    would otherwise be covered by 7219, and also
 3    that there has been an assertion of a section
 4    7525 privilege by Ernst & Young's former client
 5    in this matter.  So there are certain areas of
 6    inquiry that Mr. Snyder may be precluded from
 7    talking about in this deposition.
 8        MR. STERN:  Who is the former client
 9    that has asserted the privilege?
10        MS. SEABROOK:  Dennis Langley of the
11    Bishop Group, I believe.
12        Is that right?
13        THE WITNESS:  Yes.
14        MR. COFFIN:  I believe you have
15    referred section 7216 instead of 7219?
16        MS. SEABROOK:  I'm sorry, yes, thank
17    you.
18        MR. STERN:  Dennis Langley was the
19    client, is that what you're saying?
20        MS. SEABROOK:  That's the individual.
21    I believe the client was the Bishop Group.
22        MR. STERN:  The Bishop Group, which,
23    as I understand it, is no longer represented or
24    owned by Mr. Langley, asserted this privilege?
25        MS. SEABROOK:  I believe so.
```

2 (Pages 2 to 5)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

Witness:  Bruce Snyder

Page 6

1      THE WITNESS:  Yes.
2      MS. SEABROOK:  This is several years
3  old.
4      MR. STERN:  Okay.
5      MR. COFFIN:  I think the government's
6  position would be that the privilege doesn't
7  apply in tax shelter transactions and that
8  would be our current position.  And I
9  understand you may go ahead and assert the
10  privilege.  And certainly I am not going to
11  twist anybody's arm to testify.  But if we have
12  to take that up with The Court later, we can do
13  that.
14      MS. SEABROOK:  Sure.  No, I think that
15  makes sense.  And we will just be clear to be
16  very definite about what we're talking about,
17  because I think some of the information -- this
18  is a client that had been a client for years,
19  so there is advice provided that's not directly
20  connected to this particular transaction that
21  would be -- certainly not be the type of
22  information that you are talking about.
23      MR. COFFIN:  I understand.  So I will
24  count on you -- if I ask a question that you
25  think that -- I will count on you to raise the

Page 7

1  privilege, but I'm going to ask away.
2  EXAMINATION BY MR. COFFIN:
3  Q.  Are you ready, Mr. Snyder?
4  A.  Sure.
5  Q.  Would you please state your name for the
6     record.
7  A.  Bruce Snyder.
8  Q.  Mr. Snyder, my name is David Coffin.  I'm with
9     the Department of Justice, Tax Division, and I
10     represent the United States in this matter.
11      Have you ever given a deposition
12     before?
13  A.  Yes.
14  Q.  How many instances?
15  A.  I believe two.
16  Q.  I would think that you would understand the
17     ground rules.  Basically, I ask the questions,
18     you answer.  I would ask you not to interrupt
19     me and I'll try to do the same.
20      If you don't understand a question,
21     just ask me to restate it --
22  A.  Okay.
23  Q.  -- I would be happy to.
24      If you need a break, we'll try to take
25     a break, if we can get a personal escort out to

Page 8

1     the rest room.
2      Your attorney may raise some
3     objections, but I would ask that unless she
4     asks you not to answer, that you go ahead and
5     answer.  Okay?  Do you understand those rules?
6  A.  Yes.
7  Q.  Mr. Snyder, do you have any medical condition
8     or any medication that would prohibit you from
9     understanding the questions that I'm going to
10     ask today?
11  A.  No.
12  Q.  Where are you currently employed?
13  A.  I am employed at -- actually, I'm a partner at
14     Ernst & Young LLP.  My office is here in Kansas
15     City, Missouri.
16  Q.  I think you distinguished -- you are not an
17     employee of Ernst & Young anymore; is that
18     correct?
19  A.  I am a partner.
20  Q.  I guess that would mean you are an equity owner
21     in the firm?
22  A.  Yes.
23  Q.  How long have you been with Ernst & Young?
24  A.  Nineteen years.
25  Q.  What are your current responsibilities?

Page 9

1  A.  I am the tax leader here in Kansas City.
2  Q.  How long have you been the tax leader?
3  A.  2-1/2 years.
4  Q.  What are your current responsibilities as the
5     tax leader?
6  A.  I oversee the tax function of the Kansas City
7     office.
8  Q.  Now, can you describe the tax function?  Is
9     there a compliance area and a consulting area?
10  A.  We have a compliance area and we have a tax
11     advisory area.
12  Q.  Are both of those areas under your control or
13     command?
14  A.  Yes.
15  Q.  Prior to becoming the tax leader, what position
16     did you hold with Ernst & Young?
17  A.  Prior to that, I was a tax partner of Ernst &
18     Young.  Specifically, my role was as a tax
19     service coordinator.
20  Q.  How were your duties as the tax service
21     coordinator, how were those duties different
22     than your duties as a tax leader?
23  A.  I'm still a tax service coordinator, but I've
24     also taken on the additional leadership role of
25     the Kansas City office for tax.

3 (Pages 6 to 9)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 10

1  Q. Did somebody step down for you to take that?
2  A. Actually, he was promoted to an area role.
3  Q. Give me your educational history, beginning
4     with where you graduated from high school.
5  A. Lyons High School in Lyons, Kansas.  The
6     University of Kansas, with a Bachelor of
7     Science in accounting and business
8     administration.
9  Q. In what year?
10 A. 1986.
11        An MBA from the University of Kansas,
12     December of 1987.
13 Q. Have you been employed by Ernst & Young since
14     then?
15 A. I have.
16 Q. Would that begin after you got your master's or
17     when you got your undergraduate degree?
18 A. After I received my master's degree.
19 Q. You have progressed through the positions or
20     designations of staff, senior, manager --
21 A. Yes.
22 Q. -- partner.
23        What year did you become partner?
24 A. October 1st of 2000.
25 Q. You are a certified public accountant, correct?

Page 11

1  A. Yes.
2  Q. What year did you get that designation?
3  A. 1990.
4  Q. Any other professional licenses or
5     accreditations?
6  A. No.  I'm licensed to practice in Kansas and
7     Missouri.
8  Q. Have you reviewed anything to prepare for this
9     deposition?
10 A. I reviewed my prior deposition.
11 Q. Are you talking about your interview with the
12     IRS?
13 A. Yes.
14 Q. Did that just encompass reviewing the
15     transcript or did you look at the exhibits that
16     came along or were used during that interview?
17 A. I primarily looked at the transcript.  I looked
18     at the exhibits which were follow-ups to the
19     interview with the IRS.
20 Q. How much time did you spend reviewing your
21     transcript, in hours?
22 A. It was probably two to three hours.
23 Q. Total, in everything?
24 A. Yes.
25 Q. In 1999, you were familiar with Dennis Langley,

Page 12

1     correct?
2  A. Yes.
3  Q. And your firm did tax work for the Bishop
4     Group, Limited; is that right?
5  A. That's right.
6  Q. How long had Ernst & Young done the tax work
7     for the Bishop Group as of 1999?
8  A. I would say probably 12 to 14 years.
9  Q. Prior to 1999?
10 A. Yes.  I think it was a client of our Wichita
11     office, and then at some point they moved to
12     Kansas City, I'm not sure when.
13 Q. When did you begin working on the tax --
14     performing tax work for the Bishop Group?
15 A. It would have been in late 1994.
16 Q. Had the firm only done tax work for Bishop or
17     was there audit work done as well?
18 A. There was also financial statement and
19     regulatory audits performed.
20 Q. On a regular basis?
21 A. Yes.
22 Q. Annually?
23 A. Yes.
24 Q. He didn't have any SEC filings that he --
25 A. No, it was a private company.  But there were a

Page 13

1     lot of regulatory filings that were done.
2  Q. Who was the regulating body?
3  A. I believe both FERC and the KCC.
4  Q. What is that?
5  A. Kansas Corporation Commission.
6  Q. And they required annually that Mr. Langley
7     obtain financial statement certification of the
8     Bishop Group's financial statements?
9  A. I think so.  That's not my area of expertise.
10 Q. Do you recall, when you began working on the
11     Bishop Group, was Ernst & Young performing
12     financial statement audits at that time
13     already?
14 A. Yes.
15 Q. When did that end?  When did Ernst & Young
16     cease doing financial statement audits of the
17     Bishop Group?
18 A. I believe the last audit was performed with
19     respect to the calendar year ended December
20     31st of 1998.
21 Q. I take it there wasn't an audit in '99 because
22     he sold the companies?
23 A. That's correct.
24 Q. Were the auditors in communication with
25     Mr. Langley throughout the year related to the

4 (Pages 10 to 13)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

Witness:   Bruce Snyder

Page 14

1    audit work that they did, or was this one where
2    they would come in at the end of the year and
3    do the audit in the first part of the --
4  A. I think they would generally do interim work in
5    the October time frame, and then would finalize
6    the audit sometime during -- after the end of
7    the year.
8  Q. Did you ever have any occasion to review the
9    audit work papers?
10 A. Yes.  We would do -- we would use a lot of the
11   audit work papers for preparation of the tax
12   returns and we would also assist with the
13   income tax provision that was part of the
14   audit.
15 Q. What about the tax work, was that something
16   that Ernst & Young would communicate with
17   Mr. Langley throughout the year or something
18   only done around tax preparation time?
19 A. Generally, we did not communicate with
20   Mr. Langley.  Most of the communication was
21   with the chief financial officer.
22 Q. Steve Korb?
23 A. Steve, I don't believe, was the chief financial
24   officer.  It was a gentleman by the name of
25   Terry Phipps.  And then at some point, I can't

Page 15

1    remember when, Terry left the company and it
2    became Howard Lubow.
3  Q. L-u-b-o-w?
4  A. L-u-b-o-w I believe is correct.
5        And he hired an internal tax person
6    named Jeff Weiner.
7  Q. W-e-i-n-e-r?
8  A. I think so.
9        There was another accountant who we
10   also worked with to get a lot of the
11   information, her name was Pam, and I can't
12   recall the last name.  But I believe she left
13   at some point in time, I can't remember when.
14 Q. So going back to -- you said I think earlier
15   that you normally -- let me ask you again,
16   when, again, did Ernst & Young typically deal
17   with Mr. Langley or his employees regarding the
18   preparation of income tax returns, would it be
19   during the tax year or following the tax year
20   whenever the filings were due?
21 A. It would primarily be after the tax year,
22   usually after the financial statement audit was
23   done.
24 Q. When were his returns due to be filed -- or
25   when were the Bishop Group's --

Page 16

1  A. The company's returns due to be filed?
2  Q. Yes.
3  A. Generally, by September 15 for the federal
4    return, and then the state returns generally by
5    October 15 of the subsequent year, on
6    extension.
7  Q. Did he have a calendar year-end or did the
8    Bishop companies have a calendar year-end?
9  A. Yes.
10       I believe there were partnership
11   returns also that were required to be filed.
12   Actually, they would have been October 15th on
13   final extension.
14 Q. That generally covers most of the filings, what
15   you just described?
16 A. Yes.
17 Q. Was Ernst & Young preparing any other returns
18   other than the income tax returns?
19 A. No.
20 Q. I want to focus your attention to the year
21   1999.
22       When did you -- I assume you heard
23   sometime in 1999 that Mr. Langley wanted to
24   sell his companies?
25 A. Correct.

Page 17

1  Q. Or his company?
2  A. Correct.
3  Q. When would that have been during the calendar
4    year, do you know?
5  A. I think he had been -- I think this was in my
6    prior deposition, that he had been trying to
7    sell the company for the last several years or
8    looking at potential buyers for the company.
9  Q. So you would have learned that before 1999?
10 A. Right.
11 Q. You just heard that Mr. Langley wanted to sell
12   his stock in the Bishop Group, Limited,
13   sometime during your work prior to 1999?
14 A. Yes.
15 Q. Was Ernst & Young engaged to perform services
16   in conjunction with the sale of his company
17   prior to 1999?  Was there any work that Ernst &
18   Young did?
19 A. We were generally engaged to provide tax
20   advisory services as part of the tax return
21   engagement and as part of being the overall tax
22   provider to the company.  We were not
23   specifically and contractually engaged by
24   Mr. Langley personally to sell his company.
25 Q. So the engagement letter that Ernst & Young had

5 (Pages 14 to 17)

HUNDT REPORTING
214-220-1122

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

---

Page 18

1    with the Bishop Group -- I assume there was an
2    engagement letter?
3    A.  Yes.
4    Q.  And did that cover also the tax advisory
5    services that anything -- that you might
6    perform or Ernst & Young might perform for the
7    Bishop Group?
8    A.  Correct.  I believe there was a general
9    statement in the letters that talked about any
10   services outside of the general tax return
11   preparation would be billed at some hourly rate
12   or some percent of our standard rate.  I don't
13   recall exactly what it said.
14   Q.  Okay.
15   A.  That was standard language in most engagement
16   letters.
17   Q.  So was there ever an engagement letter between
18   Ernst & Young and any -- either Langley or
19   Bishop Group where Ernst & Young had agreed to
20   provide tax advisory services related to the
21   sale of Mr. Langley's stock?
22   A.  No, I don't believe so.
23   Q.  Ernst & Young eventually did some work related
24   to that though, right?
25   A.  Yes.

---

Page 19

1    Q.  So how was that engagement -- was it ever
2    documented or what the agreement was between
3    the two, Mr. Langley and Ernst & Young?
4    A.  No, it would have just been under that general
5    tax advisory engagement letter.
6    Q.  So Ernst & Young or somebody at Ernst & Young
7    determined that you would go ahead and do the
8    work and it would just fall under the other
9    engagement letter between Ernst & Young and
10   Bishop Group?
11   A.  Right.
12   Q.  Do you remember when Ernst & Young was first
13   engaged to perform any services in that regard,
14   as far as month or year?  I mean, you mentioned
15   you knew that Langley wanted to sell his stock
16   prior to 1999.  So my question goes more into
17   did Ernst & Young perform any services related
18   to Langley's attempted sale prior to 1999?
19   A.  It seems to me we would answer a lot of, you
20   know, one-off questions with respect to tax
21   treatment on various items.
22   Q.  What-if type questions?
23   A.  Right.
24   Q.  When did you first hear that Langley had a
25   buyer for his stock?

---

Page 20

1    A.  I know he had hired Chase Manhattan, I believe
2    it was, as an investment banker to look for a
3    buyer.
4    Q.  That would have been sometime in '99?
5    A.  Right.
6    Q.  Do you recall any of the other entities who
7    were bidding on the company or were looking at
8    the company?
9    A.  There was Enron, I recall them looking at the
10   company; there was -- Midcoast was another one;
11   and then this Fortrend was another party
12   that -- of interest.
13   Q.  You didn't recall any other attempted or other
14   potential bidders or buyers?
15   A.  Not off the top of my head, no.  I'm sure there
16   were.
17        MS. SEABROOK:  Are you asking him were
18   there or to identify them?
19        MR. COFFIN:  I'm asking him if he
20   heard of any, was he aware of any.
21   A.  I'm sure there were from time to time, but I
22   don't recall the names.
23   Q.  (By Mr. Coffin) Do you know whether Langley
24   preferred a stock sale or an asset sale?
25   A.  No, not really.  I would assume a stock sale.

---

Page 21

1    Q.  But you never heard somebody come out and say,
2    We're absolutely going to do a stock sale,
3    we're not going to entertain any other offers
4    for an asset sale?
5    A.  No.
6    Q.  You said you were aware that Midcoast was a
7    buyer, was a potential buyer, of the stock of
8    Langley; is that correct?
9    A.  Yes.
10   Q.  What was your perception of Midcoast during the
11   bidding process?
12   A.  What do you mean?
13   Q.  Did you have a perception -- were they
14   aggressive or did you have any kind of
15   perception like that?
16   A.  No, I don't believe so.
17   Q.  When was the first time you recall Midcoast
18   being involved as a buyer or a potential buyer?
19   A.  It probably would have been sometime during the
20   fall of 1999, maybe late summer or fall, August
21   or September probably.
22   Q.  When you learned that Midcoast was a potential
23   buyer, was it your perception that they had
24   just bid or had they been in the bidding
25   process for some time?

---

6 (Pages 18 to 21)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:   Bruce Snyder**

Page 22

1   A.  There was a lot of due diligence going on.
2   Q.  On their part?
3   A.  On their part.
4         Like I said, there were several other
5   bidders.  They had a data room set up at a law
6   firm and a lot of our work was supporting
7   information for the data room that was pulled
8   from the tax return files.
9         I believe they also looked at a lot of
10   our audit work papers, but I wasn't directly
11   involved in pulling those.
12   Q.  Were there any requests made, during Midcoast's
13   due diligence, to you to provide information?
14   A.  There may have been.  We provided a lot of the
15   information in the data room.
16   Q.  What kind of information?
17   A.  Prior tax returns filed, tax basis work papers,
18   depreciation work papers.
19   Q.  I assume the audit side provided audited
20   financial statements?
21   A.  And the audit work papers, I assume.
22   Q.  Do you know if the audit work papers still
23   exist for as far back as 1999?
24   A.  I really don't.
25   Q.  During the due diligence process, did you talk

Page 23

1   to anybody from Midcoast?
2   A.  I believe I may have spoken to their CFO.  I
3   can't remember his name at the time.
4   Q.  Was it Richard Robert?
5   A.  That sounds familiar.
6   Q.  At what level were you; were you a manager, a
7   senior manager, at that time?
8   A.  I was a senior manager in 1999.
9   Q.  Who did you report to?
10   A.  I reported to Michael D. Carr, C-a-r-r.  He was
11   the partner at the time.
12   Q.  As far as managers go, did you have a
13   significant amount of responsibility in 1999?
14   A.  Yes.
15   Q.  Were you aware that you were going to make
16   partner the following year?
17   A.  I was not aware.
18   Q.  But they put quite a bit of responsibility on
19   senior managers?
20   A.  Yes.
21   Q.  Do you recall your conversation with
22   Mr. Robert?
23   A.  No, I do not.
24   Q.  Did you meet with him face-to-face?
25   A.  I don't believe so.

Page 24

1   Q.  Just over the telephone?
2   A.  Perhaps.
3   Q.  Generally, do you recall what the conversation
4   may have been surrounding?
5   A.  No, I sure don't.
6   Q.  Were you aware that Midcoast was pursuing the
7   stock of the Bishop Group?
8   A.  I was aware that they were pursuing the
9   company.
10   Q.  You weren't aware that they were attempting to
11   purchase the stock of the Bishop Group?
12         MR. STERN:  Objection, form.
13   A.  No, I was aware -- I was aware that they were
14   trying to acquire the business, whether it be
15   stock or assets.
16   Q.  (By Mr. Coffin) Were you aware of any due
17   diligence conducted by the Bishop Group on
18   Midcoast?
19   A.  I was not.
20   Q.  Do you recall the first time you heard of
21   Fortrend?
22   A.  I believe it was in August of 1999.
23   Q.  We'll just go with that first exhibit.  I'll
24   refer you to Government Exhibit 26.  This is a
25   facsimile from Fortrend to you, Mr. Snyder,

Page 25

1   with a cc to Tom Palmisano; is that correct?
2   A.  Yes.
3   Q.  Do you recall receiving this, Mr. Snyder?
4   A.  Yes, I do.
5   Q.  Mr. Hoffman under the Comments section says,
6   "Bruce, I enjoyed our conversation last week.
7   Sorry this is a little late.  I wanted to make
8   sure I could get comments from others in my
9   firm that are out of the country right now."
10   So I assume you talked to Mr. Hoffman prior to
11   receiving this facsimile?
12   A.  Yes, I believe so.
13   Q.  Would that have been over the telephone or
14   face-to-face?
15   A.  That would have been over the telephone.  I've
16   never met Mr. Hoffman face-to-face.
17   Q.  Did you ever form an impression of him at all?
18   A.  Not really.
19   Q.  How many times did you talk to him on the
20   telephone?
21   A.  Probably just once or twice.
22   Q.  What was discussed in those conversations?
23   A.  I think there was an interest in acquiring the
24   Bishop Group.
25   Q.  On whose part?

7 (Pages 22 to 25)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

Witness:   Bruce Snyder

Page 26

1   A.  On Fortrend's or Hoffman's.
2   Q.  Who else was on the telephone call along with
3       you and Mr. Hoffman?  Was Mr. Palmisano on it?
4   A.  I believe so.
5   Q.  Did you form an impression as to who
6       Mr. Palmisano represented?
7   A.  Price Waterhouse Coopers.  I don't believe he
8       was a partner, I believe he was either a
9       manager or senior manager.
10  Q.  Do you know, was he on the phone for the
11      benefit of a client, Mr. Palmisano?
12  A.  I don't recall.  I don't recall if he was on
13      the phone on behalf of Fortrend or some other
14      client, I really don't.
15  Q.  Do you know if Mr. Hoffman and Mr. Palmisano
16      were in the same office when they called you or
17      was it a conference call type thing?
18  A.  It was a conference call.
19  Q.  Do you know who instigated the conference call,
20      or initiated?
21  A.  I don't recall who initiated it.  I know that
22      Steve Korb was also on the phone and I don't
23      recall who else was on the phone.
24  Q.  You picked up the phone and all three of them
25      were on, is that how it worked?

Page 27

1   A.  I don't recall if it was a prearranged phone
2       call or it was a -- I just happened to pick up
3       the phone, I really don't.
4   Q.  Did you know at that time that Fortrend was
5       interested in buying the stock of the Bishop
6       Group so they could turn around and sell the
7       assets to Midcoast?
8   A.  I didn't know at that time.
9   Q.  What did you know at that time?
10  A.  I just knew that -- it seemed like to me that
11      they were trying to get credibility with
12      respect to transactions --
13  Q.  I don't --
14  A.  -- as I recall the discussion, because the
15      discussion centered around other people in our
16      firm that they had worked with.
17  Q.  What kind of credibility were they looking for?
18  A.  I think just trying to qualify them as a buyer.
19  Q.  Whether they had the financial resources to
20      complete a transaction?
21  A.  Exactly.
22  Q.  Why would you have specifically been brought in
23      on this phone conversation?
24  A.  Probably because I was the tax advisor to
25      Bishop.

Page 28

1   Q.  But that doesn't necessarily have anything to
2       do with Fortrend's ability to finance the
3       transaction.  Would you agree with me?
4   A.  I would agree with that.
5   Q.  So again, why would you be involved in the
6       phone conversation?
7   A.  I don't know, other than I was a person from
8       Ernst & Young, and the representation, I
9       believe, that they had made to the Bishop Group
10      was that they had worked with Ernst & Young in
11      the past.
12  Q.  In what way had they worked with Ernst & Young?
13  A.  Presumably buying other companies.
14  Q.  Were they describing to you intermediary type
15      transactions during the conversation?
16  A.  I don't recall.
17  Q.  Did you become comfortable with Fortrend, as
18      Bishop Group's tax advisor, because of that
19      phone call?
20  A.  No, I don't believe so.
21  Q.  They also faxed some firm history type
22      documentation that came with that, with
23      Government Exhibit 26, correct?  If you turn
24      the page.
25  A.  I believe that's correct.

Page 29

1   Q.  Did you review this -- these documents attached
2       to Government Exhibit 26?
3   A.  Just the second page of the fax.  Is this what
4       you're referring to?
5   Q.  Yes, the second page and the third page.
6   A.  Yes, I reviewed that.
7   Q.  Did you become comfortable with Fortrend after
8       reviewing this firm history and text regarding
9       Fortrend?
10  A.  No, I believe I called several people mentioned
11      in this fax regarding the company.
12  Q.  There is Al -- is it Hernandez, with the Hawaii
13      office?  What does that say?
14  A.  It looks like Fernandez.
15  Q.  Did you call Mr. Fernandez?
16  A.  I did not.
17  Q.  There's a Mike Evans in San Francisco.  Did you
18      call Mr. Evans?
19  A.  No.
20          The only one I called on here was -- I
21      guess on this fax was Harvey Berenson in New
22      York --
23  Q.  Did you know --
24  A.  -- because I knew Harvey.
25  Q.  Go ahead.

8 (Pages 26 to 29)

HUNDT REPORTING
214-220-1122

919f3d3d-1a58-49d0-8589-5c63369a7ddd

Witness:  Bruce Snyder

Page 30

1   A.  I knew Harvey.
2   Q.  How did you know Mr. Berenson?
3   A.  I believe I had worked with him on several
4       transactions or projects not related to Bishop
5       in the past.
6   Q.  Did Mr. Berenson, in New York, did he advise
7       you that he was aware or knew of Fortrend?
8   A.  I don't believe he had specific knowledge of
9       Fortrend as they had stated here.
10  Q.  So I assume you performed additional due
11      diligence on Fortrend?
12  A.  I did not.
13  Q.  So Mr. Berenson knew nothing about Fortrend,
14      had no knowledge of Fortrend at that time?
15  A.  I don't recall if he had never heard of them or
16      he had just never worked with them.  I don't
17      recall what the discussion was.  But I know
18      that he had not been specifically involved in a
19      transaction that they had done work on.
20  Q.  At this point then, after you made the phone
21      call to Mr. Berenson, were you comfortable with
22      Fortrend at that time or comfortable with your
23      knowledge of Fortrend at the time?
24  A.  From the standpoint of?
25  Q.  Being a potential buyer of the stock.

Page 31

1   A.  No, I wasn't.  And I didn't necessarily -- now,
2       I was doing this as really kind of one-off
3       advice to the client and I was not engaged to
4       perform due diligence on Fortrend.  So I wasn't
5       required to express an opinion level on how
6       comfortable I was with them.  I assumed that
7       perhaps the company did their own due
8       diligence, but I wasn't involved specifically
9       in that.
10  Q.  Well, you were brought into the phone
11      conversation, then you were sent the fax, so I
12      assume you reported back to Mr. Korb or
13      somebody at Bishop that you were either
14      comfortable with Fortrend or you hadn't heard
15      of Fortrend.  Is that right?
16  A.  I likely reported back what Harvey Berenson had
17      told me, that he had not actually worked with
18      Fortrend.
19  Q.  Did you make any kind of recommendation as to
20      whether the Bishop Group should go forward in
21      negotiations with Fortrend?
22  A.  No, I wouldn't have made a recommendation.
23  Q.  Now, was there any discussion with Mr. Berenson
24      or Mr. Hoffman or Mr. Palmisano at the time
25      regarding intermediary transactions or mid-co

Page 32

1       transactions?
2   A.  There could have been.  I don't recall exactly
3       what was said.
4   Q.  What do you know about intermediary and midco
5       transactions?
6           MS. SEABROOK:  As of today?
7   Q.  (By Mr. Coffin)  As of today?
8   A.  As a technical matter?
9   Q.  Yes.
10  A.  Are you referring to the listed transaction or
11      the notice that was issued?
12  Q.  Yes.
13  A.  In which notice?
14  Q.  2001-16.
15  A.  It's generally a transaction I think where a
16      seller goes out and sells his stock to a third
17      party.  At some point in time, the third party
18      turns around and sells the assets of the
19      company to an ultimate buyer of those assets.
20  Q.  Generally, what is the purpose of the
21      transaction?
22  A.  Generally, the purpose of the transaction is to
23      provide the seller a stock sale which provides
24      favorable capital gains rate on that stock
25      sale, and to provide the buyer of the assets a

Page 33

1       step-up in the basis of those assets.
2   Q.  The notice came out in 2001, is that correct,
3       2001-16, somewhere around that time?
4   A.  Approximately.
5   Q.  After this transaction, the stock sale took
6       place in 1999, correct?
7   A.  I think that's right.
8   Q.  But back in 1999, were you aware of those types
9       of transactions being marketed or sold?
10  A.  I was not specifically aware of those
11      transactions being sold.  Our firm was not
12      engaged or promoting those types of
13      transactions.
14  Q.  You said you were not specifically.  How about
15      generally were you aware, was there talk in
16      accounting circles and things like that about
17      these types of transactions at that time?
18  A.  I believe our national office had heard of the
19      transactions.  I think they were still in the
20      process of maybe perhaps reviewing those
21      transactions and were not -- hadn't formed any
22      sort of opinion on those types of transactions.
23  Q.  Now, did you have any conversation with
24      Mr. Berenson at that time about the fact that
25      Ernst & Young was looking at these transactions

9  (Pages 30 to 33)

HUNDT REPORTING
214-220-1122

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 34

1    and they hadn't yet formed an opinion?
2  A.  Perhaps.
3  Q.  Now, did you ever have any other occasion to
4    talk to Mr. Hoffman after this facsimile was
5    sent?
6  A.  I believe we talked to him perhaps one or two
7    other times with respect to some administrative
8    matters, such as return preparation and things
9    like that.  He left the company at some point,
10    I'm not sure when.  But at some point, we were
11    dealing with another gentleman in getting the
12    returns prepared.
13  Q.  But as far as Mr. -- your conversations with
14    Mr. Hoffman, and prior to November 8th of 1999,
15    did you have any further conversation with
16    Mr. Hoffman subsequent to that, subsequent to
17    August -- subsequent to receiving this
18    facsimile?
19  A.  I don't recall that I did.
20  Q.  Did Mr. Hoffman, in your phone conversation
21    with him, or your telephone conference with
22    him, did he set out how Fortrend could benefit
23    Mr. Langley or Bishop?
24  A.  He could have.  I don't recall exactly what was
25    said.

Page 35

1  Q.  Do you recall generally what was discussed?
2  A.  Generally, it had to do with the sale of the
3    company or the --
4  Q.  Was an intermediary or midco transaction
5    discussed in that conversation?
6  A.  I don't recall specifically what was discussed.
7    It's possible.
8  Q.  Generally, do you recall that it was discussed?
9    You said "specifically," I'm just saying
10    generally.
11  A.  It's possible it was discussed, but I don't
12    specifically recall that it was discussed.
13  Q.  Mr. Palmisano, you said he was on that
14    conversation as well?
15  A.  Yes.
16  Q.  Do you recall what Mr. Palmisano was -- what
17    was his role in the telephone conference?
18  A.  I don't recall what his specific role was.  He
19    had presumably worked with Fortrend in the
20    past.
21  Q.  Was he kind of helping to sell the deal or
22    trying to convince you, was he trying to -- did
23    he appear to be an advocate on behalf of
24    Fortrend?
25        MR. STERN:  Objection, form.

Page 36

1  A.  I believe he appeared to be an advocate.
2  Q.  (By Mr. Coffin) So as far as you knew,
3    Mr. Palmisano was not there really to evaluate
4    whether to use Fortrend or not, but rather he
5    was there to try to convince you that Fortrend
6    would be a good buyer of the stock?
7        MR. STERN:  Objection, form.
8  A.  That could have been.
9  Q.  (By Mr. Coffin) And you mentioned earlier that
10    E&Y was not asked to do any due diligence into
11    Fortrend, correct?
12  A.  Other than just checking these references, I
13    believe.
14  Q.  Would that have been Mr. Korb that would have
15    asked you to do that?
16  A.  Yes.
17  Q.  Was Mr. Lubow the CFO in 1999?
18  A.  He was.
19  Q.  Are you aware of any due diligence conducted by
20    Langley or his representatives on Fortrend?
21  A.  Not specifically, no.
22  Q.  How about generally?
23  A.  I would assume that there was some done, but I
24    don't know what it was.
25  Q.  Then so after your conversation with

Page 37

1    Mr. Hoffman and you may have reported to
2    Mr. Korb that you didn't -- you hadn't heard of
3    Fortrend or nobody in E&Y had heard of
4    Fortrend, then when was the next time that you
5    would have heard that Fortrend was in the
6    transaction?
7        MR. STERN:  Objection, form.
8  A.  I think my comment was nobody in the firm had
9    worked with Fortrend on a transaction.  I don't
10    recall whether anyone had heard of Fortrend or
11    not.
12  Q.  (By Mr. Coffin) So what would have been the
13    next step after advising Mr. Korb that nobody
14    had worked with Fortrend from Ernst & Young?
15  A.  On our part, I don't recall if there was a next
16    step.
17  Q.  When did you hear, subsequent to that, that
18    Fortrend was a bidder in the stock of the
19    Bishop Group?
20  A.  I don't recall exactly when that was.  It would
21    have been sometime thereafter I presume.
22  Q.  We'll go through the billings, the timekeeping
23    records, and maybe we'll nail that down.
24        Was Ernst & Young involved in any
25    negotiations of the stock purchase agreement

10  (Pages 34 to 37)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 38

1     between Langley and Fortrend?
2   A. I know that we reviewed some stock purchase
3     agreements.  As far as purchase price, is that
4     what you're asking?
5   Q. No, not necessarily purchase price.  Any of the
6     provisions in the stock purchase agreement.
7     You said you did review --
8   A. We reviewed several agreements.  I don't recall
9     specifically whether we reviewed that
10    agreement, we may have.  It would have been
11    more for tax issues.
12        MS. SEABROOK:  The question was
13    negotiate, though, right?
14        MR. COFFIN:  Yes.  Involved in any of
15    the negotiation of any of the provisions.
16  A. We were not involved in the negotiation, no.
17  Q. (By Mr. Coffin) But you would have reviewed
18    provisions to the stock purchase agreement, or
19    any agreement for that matter, and given your
20    comments?
21  A. We could have provided some comments.
22  Q. Go ahead and turn to the next exhibit, please,
23    which is Government Exhibit 100.
24  A. (Witness complies.)
25  Q. Now, Mr. Snyder, I know you probably haven't

Page 39

1     seen this e-mail, but it's from -- it's between
2     PWC and Richard Robert.  And the text of the
3     e-mail says, "There has been a change to the
4     deal based on PWC's objection to characterizing
5     the supplemental payment of $13.75 as capital
6     gain.  Dennis has agreed to report the amount
7     as ordinary income."
8         Do you recall that issue arising
9     during your work with --
10  A. I don't recall what that is.
11  Q. You don't remember anything about a 13.75
12    supplemental payment?
13  A. Not off the top of my head, no.
14  Q. Do you remember anything about a $10 million
15    supplemental payment, $10.75 million
16    supplemental payment?
17  A. Not off the top of my head, I don't.
18  Q. Turn the page of Exhibit 100 to -- do you see
19    some Bates numbers in the bottom right?  There
20    are several of them.  We will use the PWC bates
21    numbers, 049.
22  A. I'm sorry, where are you looking?  Oh, 049,
23    okay.
24  Q. If you will look at -- underneath No. 1 it
25    says, "Stock Purchase Agreement."  Go all the

Page 40

1     way down past the 2, past the A and B, and it
2     says, "Note" -- and again, this is an e-mail
3     from -- I think it's from Gary Wilcox to Chris
4     Kaitson of Midcoast.  It says, "Note that the
5     option agreement must not be guaranteed by
6     Midcoast pursuant to the parent guarantee.
7     There is no need for that anyway.  If KPC
8     doesn't exercise the option, there will be a
9     parent guarantee of KPC's obligation under the
10    KPC PDA.  If the option is exercised, KPC must
11    produce 13.75 million in cash."
12        Now, my question to you is simply, do
13    you remember any kind of tax advice you would
14    have given with regard to these issues
15    discussed?
16  A. I don't remember that, no.
17  Q. Turn the page to PWC 50.
18  A. (Witness complies.)
19  Q. I believe this is the same e-mail.  Item No. 3,
20    Stock Purchase Agreement, it says, "It is
21    critical Midcoast's tax position that the
22    Bishop Group, Limited, is not liquidated by
23    Fortrend for at least two years."  Do you
24    remember discussing tax issues related to that
25    statement with Langley?

Page 41

1   A. No, I do not.
2   Q. Underneath that, item No. 4, under Purchase and
3     Sale Agreement, it says, "I will be sending
4     comments on this agreement shortly, but I would
5     like K-Pipe to think about retaining some of
6     the receivables that are currently in KPC."  Do
7     you ever remember any discussion regarding
8     that?
9   A. No, I sure don't.
10  Q. Turn the page to Government Exhibit 105,
11    please.
12  A. (Witness complies.)
13  Q. This is an e-mail from -- between various
14    parties, it looks like an e-mail string,
15    involving Midcoast and PWC.
16        The second paragraph says, "The third
17    guarantee gave me the most heartburn.
18    Obviously, I do not want to see Midcoast, the
19    asset buyer, providing a guarantee of certain
20    obligations under the stock purchase agreement.
21    However, it became very clear that Langley
22    would not do the deal without it."
23        Do you recall any advisory services
24    you gave with regard to those issues?
25  A. No, I don't.

11  (Pages 38 to 41)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 42

1  Q.  Turn on to Government Exhibit 225, please.
2  A.  (Witness complies.)
3  Q.  Could you thumb through that and just tell me,
4      give me a description of what that is, please.
5      I believe it's an Ernst & Young document; is
6      that correct?
7  A.  Yes, it looks like an output from our
8      timekeeping and reporting system.
9  Q.  It's not necessarily an invoice or billing
10     statement; is that right?
11 A.  No, it is not an invoice or a billing
12     statement, that's correct.
13 Q.  Is this something that is used to manage the
14     costs and fees associated with an engagement?
15 A.  It's used to manage the costs and fees, and
16     it's also used to actually provide description
17     and to bill the client.
18 Q.  Turn to the second page of this statement.
19 A.  Page 2?
20 Q.  Yes, page 2, please.
21 A.  Okay.
22 Q.  I believe this is -- from looking at the first
23     page it looks like entries that you would have
24     made from June of '99 through August of '99.
25 A.  Yes.

Page 43

1  Q.  What did you call this thing again, this
2      document?  The timekeeping system?
3  A.  Timekeeping and reporting system, yes.
4  Q.  I want you to look --
5              MR. STERN:  Do you want to stipulate
6      it's a business record?
7              MR. COFFIN:  Sure.
8  Q.  (By Mr. Coffin) The entry on August 27th of
9      '99, it says, "Follow-up on tax strategy on
10     intermediary transaction discussed with EY
11     national and follow-up on tax issues related to
12     potential disposition."
13          Now, this entry, I assume, was
14     pursuant or subsequent to your conversation
15     with Mr. Hoffman; is that correct?
16 A.  That could have been, correct.
17          When was the Hoffman fax?
18 Q.  August 30.
19 A.  That was subsequent to our conversation, so
20     it's possible that that was pursuant to that
21     discussion.
22 Q.  You spent three hours on it, is that right --
23 A.  Yes.
24 Q.  -- on that particular date.
25          So I assume this is consistent with

Page 44

1      your testimony earlier, you were aware of what
2      intermediary transactions were at the time?
3  A.  Yes.
4  Q.  And you were discussing with EY national and --
5      who all at EY national were you discussing
6      these with?
7  A.  Let's see, there was Harvey Berenson, I know,
8      was on the phone.  And then I believe there was
9      a partner by the name of Elio Casinelli, who I
10     had discussed with.  I don't recall if it was
11     this certain point in time, but I know at some
12     point I did have discussions Elio.  And then
13     perhaps others.
14 Q.  On the Government Exhibit 26 there was a Jay
15     Zuckerman mentioned there?
16 A.  Jay Zuckerman.
17 Q.  Did Mr. Berenson indicate that Mr. Zuckerman
18     had worked with Fortrend at all?
19 A.  He did not.
20 Q.  Did he mention Mr. Zuckerman in your
21     conversation at all during that time?
22 A.  I don't recall.
23 Q.  Then the rest of your entry there, it says,
24     "Follow-up on tax issues related to a potential
25     disposition."  Do you recall what tax issues

Page 45

1      those would have been?
2  A.  No, not specifically.
3  Q.  Then your August 30 of '99 entry, "Tax issue on
4      intermediary," more of the same?  Discussion of
5      the intermediary transaction with Mr. Korb
6      would it have been, or what would -- what are
7      you describing in that entry?
8  A.  Which line item are you looking at?
9  Q.  August 30 of '99.
10 A.  There's two entries.
11 Q.  I'm sorry, the second one.
12 A.  "Tax issue on intermediary"?
13 Q.  Yes.
14 A.  I don't know which -- who I would have been
15     talking to or dealing with on that.
16 Q.  Then 8/31/99, "Steve on proposal."  I assume
17     that's Steve Korb?
18 A.  Yes, I would assume that's the case.
19 Q.  What was the proposal?
20 A.  I don't know which proposal I'm referring to
21     there.
22 Q.  And then "tax issues with proposed transaction
23     and discuss issues with PWC."  I assume you
24     would have been talking about the proposed
25     intermediary transaction at that point?

12  (Pages 42 to 45)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 46

1        MR. STERN:  Objection, form.
2   A.  I don't know specifically what the discussion
3        was.
4   Q.  (By Mr. Coffin) If you are talking with PWC?
5   A.  Yes.
6   Q.  Wouldn't that necessarily be who you were
7        talking about, the proposed intermediaries
8        transaction?
9        MR. STERN:  Objection, form.
10  A.  It might have been, but I can't say for sure.
11  Q.  (By Mr. Coffin)  Were you working with PWC with
12       regard to any other proposed transaction at
13       that time?
14  A.  I don't recall that I was.
15  Q.  Turn to the third page, please.
16  A.  (Witness complies.)
17  Q.  Now, these are entries that Shari A. Fox made.
18       Was she an employee of Ernst & Young?
19  A.  She was at the time.
20  Q.  It looks like the next two pages or so and the
21       top of the third page is filled with her
22       entries into the timekeeping system; is that
23       correct?
24  A.  That's correct.
25  Q.  As the senior -- you were senior manager at the

Page 47

1        time and Ms. Fox was a senior?
2   A.  Right.
3   Q.  You would have been reviewing her work; is that
4        correct?
5   A.  That's correct.
6   Q.  Would you have necessarily reviewed her time
7        entries into the timekeeping system?
8   A.  Not prior to perhaps reviewing this report.
9   Q.  Okay, but once the report was generated, you
10       would review it?
11  A.  Right.
12  Q.  Go back, make sure everything -- there was --
13       the entries were reasonable; is that right?
14  A.  Perhaps.
15  Q.  On the entry for -- there's two entries for
16       August 4.  I direct you to the second entry,
17       "Research on potential Section 355 spinoff of
18       unwanted assets prior to proposed sale
19       transaction."  Could you elaborate on what that
20       issue was at the time?
21  A.  I can tell you what a 355 spinoff is.  355
22       spinoff deals with the disposition of -- the
23       disposition of stock of a subsidiary generally
24       in a tax-free transaction.
25  Q.  Do you recall the issue or was there an issue

Page 48

1        related to a Section 355 spinoff at the time?
2   A.  It could have been that we -- that we were
3        asked to look at whether or not -- I know there
4        were several subsidiaries of the Bishop Group,
5        and there could have been discussion regarding
6        trying to spin off one of those subsidiaries in
7        a 355 type of transaction.
8   Q.  Was it because the buyer wouldn't have
9        wanted -- why would that have been, why would
10       Langley want to spin off subsidiaries in a
11       tax-free transaction?
12  A.  I would assume that the buyer wouldn't want the
13       assets of that subsidiary or that subsidiary.
14  Q.  At this point, we don't know who the buyer is,
15       so it would be any potential buyer; is that
16       right?
17  A.  Correct.
18       Or perhaps the other way around,
19       perhaps those were assets that Langley wanted
20       to retain, I don't know.  One of the two.
21  Q.  On the bottom right-hand corner there's a DOJ
22       number.  DOJ 4401 is what I would like you to
23       turn to, please.
24  A.  (Witness complies.)
25  Q.  It says "page 16" in the middle; is that

Page 49

1        correct?
2   A.  That's correct.
3   Q.  Now, is this a different document or the same
4        document or same type of document?
5   A.  Are you asking is that part of our time
6        reporting system?
7   Q.  Correct.
8   A.  If looks like it comes from our time reporting
9        system, correct.
10  Q.  At the top it looks like it says for the days
11       October 1, '99, through 10/31/99; is that
12       right?
13  A.  Correct.
14  Q.  In middle under Principal it says, "John
15       Edwards Swails."  And do you recall what
16       Mr. Swails was doing on the Bishop Group or
17       what was Mr. Swails doing for the Bishop Group?
18  A.  Ed is part of our tax quality and standards
19       group.
20  Q.  He goes by Ed, John Edward Swails goes by --
21  A.  Yes.
22  Q.  What was he doing?  Why was he conferred with
23       during the --
24  A.  It would have been a procedural matter.  He
25       deals with policy and procedure, not

13  (Pages 46 to 49)

**HUNDT REPORTING**
**214-220-1122**

**Witness:  Bruce Snyder**

---

Page 50

1   necessarily technical issues.  In fact, never
2   technical issues, really.
3   Q.  Is he in New York or Washington, D.C.?
4   A.  Ed, I believe, is in Washington.
5   Q.  If you look at the entries above that,
6   beginning October 11, '99, under Mr. Swails, it
7   says "Off" -- I assume "Office conference with
8   Elio" -- and that's the partner you mentioned
9   earlier?
10  A.  Elio Casinelli.
11  Q.  -- "re: Tax opinion."  Was Ernst & Young
12  approached about issuing a tax opinion in this
13  transaction?
14  A.  Yes, we were.
15  Q.  Specifically, what was it that they were asked
16  to issue a tax opinion on?
17  A.  I believe that we were asked to provide a tax
18  opinion to Langley with respect to receiving
19  capital gain treatment on the sale of stock.
20  Q.  Did it specifically have to do with a capital
21  gain treatment related to or subsequent to an
22  intermediary transaction?
23      MR. STERN:  Objection, form.
24      MS. SEABROOK:  I think also the
25  Langley -- the Bishop Group has asserted a 7525

---

Page 51

1   privilege in connection with any advice
2   provided to them in connection with the sale of
3   this entity.  So I think we would have to get
4   them to waive that before Bruce could talk
5   about the details of what type of opinion they
6   requested or what type of advice was given to
7   them.
8       MR. COFFIN:  Okay.  Like we mentioned
9   earlier, that this is a listed transaction that
10  the government would assert is a tax shelter
11  transaction, therefore the privilege wouldn't
12  apply.  If you are going to continue to assert
13  the privilege, that's fine.
14      MS. SEABROOK:  I'm not asserting the
15  privilege.  This client has asserted the
16  privilege.  So the client is the one that needs
17  to prove up the privilege or not.
18      MR. COFFIN:  So who am I going to
19  summon to the court to argue this privilege?
20      MS. SEABROOK:  I believe the client's
21  attorney was Tina Minaldo, and that they
22  provided a document or documents that have
23  already been provided to the IRS asserting the
24  privilege with respect to the advice.
25      MR. COFFIN:  Do we know, has he

---

Page 52

1   been -- has Mr. Minaldo been consulted recently
2   in conjunction with this deposition?
3       MS. SEABROOK:  I have no idea.  There
4   was a taxpayer representative at Bruce's
5   interview, and an attorney.
6       THE WITNESS:  John Edgar, I believe,
7   was his name.
8       MS. SEABROOK:  John Edgar, yes, that
9   asked to be present in order to assert the
10  privilege at that interview, but he was not
11  permitted to attend.  I don't know whether he
12  still represents them or not.
13      MR. COFFIN:  I just need to know who
14  to bring to court and who is going to -- if
15  we're successful, who is going to pay the costs
16  of us coming back up here.
17      MS. SEABROOK:  Can we go off the
18  record a second?
19      MR. COFFIN:  Sure.
20      (Discussion off the record.)
21  Q.  (By Mr. Coffin) Mr. Snyder, did you contact
22  Mr. Minaldo or anybody who formerly worked for
23  or represented the Bishop Group about this
24  deposition?
25  A.  No, I did not.

---

Page 53

1   Q.  Did you feel like you had an obligation to do
2   that?
3   A.  No, I did not.
4   Q.  Why is that?
5   A.  Basically, I wasn't instructed to by counsel.
6       MR. COFFIN:  If you are going to -- I
7   mean, are you advising the witness to not
8   answer the question?
9       MS. SEABROOK:  No.  I'm advising him
10  to answer the questions as they deal with
11  factual matters.  And going over the time
12  reports is fine, but as far as the subject
13  matter of advice given, we were careful not to
14  go into that at the interview and we would not
15  go into the subject matter or the specific
16  advice that may or may not have been given
17  because there has been a privilege asserted.
18  And that's our concern.  And that's what the
19  e-mail from Michael Frank, the general counsel,
20  to you, states, that we cannot -- that the
21  client has asserted 7525 privilege and that
22  there may be areas that we cannot go into.
23      MR. STERN:  You've made a distinction
24  between -- are we on the record?
25      MS. SEABROOK:  Yes.

14  (Pages 50 to 53)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

Witness:   Bruce Snyder

Page 54

1      MR. STERN:  Subject matter or
2  substance, are you distinguishing between
3  those?
4      MS. SEABROOK:  Subject matter, are you
5  meaning whether advice was given on an
6  intermediary transaction?
7      MR. STERN:  Yes.  That may shorten
8  this up.
9      MS. SEABROOK:  That's correct, you are
10 right, it may.
11     Bruce, did Ernst & Young give tax
12 advice to the Bishop Group on the subject
13 matter of an intermediary transaction?
14     THE WITNESS:  No.
15     MR. COFFIN:  Your question again was
16 did Langley or did Bishop Group ask?
17     MS. SEABROOK:  I believe he's told you
18 that they asked for an opinion on the issue of
19 capital gains treatment.
20     MR. COFFIN:  I'm going to ask
21 questions.  If you want to assert your
22 privilege --
23     MS. SEABROOK:  It's not my privilege
24 to assert.
25     MR. COFFIN:  If the witness does not

Page 55

1  want to answer, then we'll address that.
2      MS. SEABROOK:  I'm not sure what we
3  had on the record and what we didn't have on
4  the record because we went off the record.
5      I'm not trying to be difficult.  This
6  witness is in a difficult position because the
7  former client has asserted a 7525 privilege.
8  And this is not recent, this is two years ago.
9  So we have to be careful not to talk about
10 advice that Bruce, in his capacity as an Ernst
11 & Young partner, may have given to this
12 particular client that's not in connection with
13 the filing of the return but is in connection
14 with other types of tax advice.
15     Bruce has clarified that they did not
16 provide tax advice on an intermediary
17 transaction, which is what I think what you are
18 driving for, what you are looking for.  And if
19 you're going to ask him about other tax advice
20 provided to the client, I think until we get
21 the client waiver on that, he cannot testify.
22     MR. COFFIN:  Okay.
23 Q. (By Mr. Coffin) Back on page 16 again.  There
24    was no tax opinion ever issued; is that right?
25 A. That's correct.

Page 56

1  Q. Next entry, 10/18 of '99, "Review Bruce," it
2     says "Schneider" -- that is supposed to be
3     Snyder?
4  A. Correct.
5  Q. -- "rep memo."  Do you recall what that was?
6  A. I believe that we received a representation
7     memo from Fortrend.
8  Q. What did that memo --
9  A. I don't recall what all the representations
10    were.
11 Q. Was that a document -- are you aware if that
12    document was provided to the government or not?
13 A. I don't recall.
14 Q. Who sent you the memo?  It says, "Bruce
15    Schneider rep memo."  Did you author the memo?
16 A. No, I did not.
17 Q. It was sent from Fortrend?
18 A. I believe so.  Probably Craig Hoffman.
19 Q. What kind of memorandum was it, do you recall?
20 A. I think they were making certain
21    representations with respect to us being able
22    to provide a tax opinion with respect to them
23    as the buyer.  And it was a sample
24    representation document.
25 Q. So you used that to -- did you look at that

Page 57

1     document and make any kind of assessment of it?
2  A. I probably did.  And it appears that I also
3     provided that to at least Harvey Berenson.
4  Q. So at least somebody had asked Ernst & Young at
5     the time to provide a tax opinion with regard
6     to the intermediary transaction?
7  A. That's correct.
8  Q. And it was not issued?
9  A. Well, again, it was a tax opinion.  Let me
10    clarify, it was a tax opinion with respect to
11    capital gains treatment on the sale of stock,
12    that I do remember.
13 Q. Was the representation memo from Fortrend
14    retained by Ernest & Young?
15 A. I don't believe so.
16 Q. So the next entry, for Mr. Berenson, on 10/18
17    of '99, "Review purchase agreement and proposed
18    reps for midco transaction."  So you think
19    Mr. Berenson would have been looking at the
20    same proposed rep letter; is that right?
21 A. Probably.
22 Q. And the midco transaction, was that known in
23    the accounting circles as the same thing as an
24    intermediary transaction?
25     MR. STERN:  Objection, form.

15  (Pages 54 to 57)

**Witness:  Bruce Snyder**

Page 58

1  A.  It could have been.
2  Q.  (By Mr. Coffin) Could it have been anything
3      else?
4  A.  Midco could have referred to Midcoast, I
5      assume, but I don't know that for sure.
6  Q.  Why wasn't a tax opinion letter issued by Ernst
7      & Young?
8  A.  I don't believe we were comfortable with all
9      the representations.
10 Q.  Whose representations?
11 A.  Well, it would have been Fortrend.
12 Q.  Can you elaborate why you weren't comfortable?
13 A.  I don't recall specifically.
14 Q.  How about generally?
15 A.  I know there was a time element involved, too.
16 Q.  What do you mean by that?
17 A.  Well, with respect to the time frame that the
18     opinion needed to be issued.
19 Q.  It needed to be issued, as far as you knew,
20     before the transaction closed with Fortrend?
21 A.  I think that was also an issue.
22 Q.  Again, you said you didn't recall specifically
23     why Ernst & Young wasn't comfortable with
24     Fortrend.  Do you remember generally why they
25     may not have been comfortable with Fortrend,

Page 59

1      why the firm wasn't comfortable with Fortrend?
2          MR. STERN:  Objection, form.
3  A.  I don't recall.  Typically, we don't issue
4      opinions on transactions that have not closed.
5  Q.  (By Mr. Coffin) So the time element was that
6      you didn't want to -- Ernst & Young didn't want
7      to issue a tax opinion for a transaction that
8      was going to close in the future?
9  A.  Right.
10 Q.  Who requested the tax opinion?
11 A.  I believe that it was Steve Korb on behalf of
12     the company, or Dennis for that matter.
13 Q.  Turn to page 17, which is DOJ 4402.
14 A.  (Witness complies.)
15 Q.  There's an entry for October 22 of '99.  It
16     says, "Get info together for review by PWC and
17     meet with PWC on basis calculations."  I
18     believe we if look back to page 16, these are
19     entries for your time; is that right?
20 A.  Yes, I believe you're right.
21 Q.  What information was gathered for review by
22     PWC?
23 A.  I'm sorry, which line item are you looking at?
24 Q.  October 22 entry.
25 A.  It looks like tax basis calculations.

Page 60

1  Q.  Why was PWC getting a copy of those?
2  A.  I would presume that they were doing their own
3      due diligence with respect to the tax basis of
4      the assets.
5  Q.  Was that on behalf of Fortrend or Midcoast or
6      do you know?
7  A.  I don't recall.
8  Q.  Turn the page to page 18 of Government Exhibit
9      225.
10 A.  (Witness complies.)
11 Q.  There is an entry there by Christopher Nelson.
12     Who is that?
13 A.  Do you mind if I refer to the previous
14     document?
15 Q.  Sure.
16 A.  He would have been -- let's see, US 150.  He
17     would have been somebody in national tax.
18 Q.  In New York?
19 A.  Either New York or Washington, D.C. likely.
20     But we have national tax people throughout the
21     country that are part of that group, so...
22 Q.  Did you have a direct discussion with
23     Mr. Nelson?
24 A.  It appears that I did by this timekeeping.
25 Q.  Mr. McCormack was involved as well, Rob

Page 61

1      McCormack?
2  A.  Yes, it looks like it.
3  Q.  Do you know who Mr. McCormack was?
4  A.  I believe he was a partner in national tax as
5      well.
6  Q.  So in October 18 of '99, do you recall, would
7      this have been a telephone conference?
8  A.  Yes.
9  Q.  Do you recall what was discussed in that
10     telephone conference?
11 A.  No, not specifically.
12 Q.  Turn the page, please.
13 A.  (Witness complies.)
14 Q.  There are some entries there for Emily Burns.
15     Was that another individual working under you?
16 A.  Yes.
17 Q.  What was her level?
18 A.  She would have been a staff person.  She would
19     have been a staff person at the time.
20 Q.  So on October 8 of '99, it looks like she
21     "Searched for policies and procedures on tax
22     opinions"?
23 A.  Correct.
24 Q.  Her next entry is "Researched applicable
25     penalties and exposure to selling stock to an

16  (Pages 58 to 61)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 62

1    intermediary versus a sale of assets."
2         Was there a concern by the Bishop
3    Group that engaging in an intermediary
4    transaction would expose it to penalties?
5  A.  There may have been.
6  Q.  You don't recall specifically?
7  A.  I don't recall specifically if they
8    researched -- they asked us to research that
9    issue or if we did it on our own behalf.
10 Q.  Why would you have done it on your own behalf?
11 A.  Just to look into the issue.
12 Q.  Did you report anything like that to anybody at
13   the Bishop Group?
14 A.  I don't recall.  I could have.
15 Q.  Turn the page, please.
16 A.  (Witness complies.)
17 Q.  There is an entry there for a principal, Kyle
18   Klein.  Who is that?
19 A.  I'm sorry, which page are you looking at?
20 Q.  The Bates number should be 4364.  Did you find
21   that?
22 A.  Kyle Klein is in our national office.
23 Q.  Did you have a discussion with Kyle Klein --
24 A.  It appears that I did.
25 Q.  -- in June of 2000?

Page 63

1         Do you recall what the subject matter
2    of that conversation was?
3  A.  Let's see, Kyle deals in -- primarily in
4    taxation of financial instruments.  So it would
5    have had something to do with looks like maybe
6    some type of option type of arrangement or
7    something like that was being contemplated at
8    the time, some deferred payment.
9  Q.  Turn on to 4366, please.
10 A.  (Witness complies.)
11 Q.  Shari Fox -- entry for Shari Fox as a manager,
12   do you see that?
13 A.  Yes.
14 Q.  "Discussions with Howard Teig - intermediary
15   auditor regarding YE" -- that stands for
16   year-end; isn't that right?
17 A.  That would be correct.
18 Q.  -- "issues and return prep issues."  Was Mr.
19   Teig the gentleman from Fortrend that you
20   mentioned earlier?
21 A.  I believe he represented the buyer of the
22   stock.  And I believe it was a cash merger
23   transaction.  So I think he would have
24   represented K-Pipe or K-Pipe Holdings at the
25   time.

Page 64

1  Q.  Did you ever meet with Mr. Teig?
2  A.  Face-to-face?
3  Q.  Yes.
4  A.  No, I don't recall so.
5  Q.  Did you speak with him on the phone?
6  A.  Yes, on several occasions.
7  Q.  We'll go through that.
8  A.  I think our primary discussions were via
9    e-mail.
10 Q.  Had you talked to Mr. Teig prior to January of
11   2000 or was that the first time you dealt with
12   him?
13 A.  I don't recall talking to him prior to that
14   time, no.
15       MR. COFFIN:  Anybody need a break?
16       (A lunch recess was taken.)
17 Q.  (By Mr. Coffin)  Mr. Snyder, would you please
18   turn again to Government Exhibit 225.  And
19   specifically, if you will turn to Bates No.
20   4402.  It says "Page 17," bottom middle.
21 A.  Okay.
22 Q.  It's again, if you look at the prior page, this
23   looks like your entries; is that right?
24 A.  Yes.
25 Q.  Again, those entries are regarding engagement

Page 65

1    for tax opinion and tax issues.  And my
2    colleagues advised me at lunch that there was
3    some confusion as to what issue the tax opinion
4    was requested for, so I just want to clear it
5    up.
6         You were requested by the Bishop Group
7    to issue a tax opinion on the intermediary
8    transaction; is that correct?
9       MR. STERN:  Objection, form.
10 A.  I was asked to provide a tax opinion whether or
11   not capital gains would be received on a tax --
12   on a stock transaction.  That was the tax
13   opinion that I was asked to deliver.
14 Q.  (By Mr. Coffin)  Now, did that encompass the
15   sale to an intermediary, the sale of the stock
16   to an intermediary?
17 A.  I think it would have encompassed the sale of
18   the stock to Fortrend, however you would have
19   classified them.
20 Q.  Was it requested that -- some of the facts that
21   was proposed to you in issuing the tax opinion,
22   did that include a sale to a company who would
23   subsequently sell the assets to Midcoast?
24 A.  I don't recall specifically, but -- no, I don't
25   recall specifically.

17  (Pages 62 to 65)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

Witness:  Bruce Snyder

Page 66

1   Q. But?  What were you going to say?  Generally,
2      do you recall something like that?
3   A. Perhaps.  Again, we don't issue a tax opinion
4      with respect to a transaction that hasn't
5      closed.
6   Q. Why is that?
7   A. Because you don't have all the facts until the
8      transaction closes.
9   Q. But Fortrend would have been a buyer and the
10     facts were proposed to you in issuing the tax
11     opinion?
12  A. Yes, I believe so.
13  Q. And you said earlier I think that you were --
14     that E&Y also was not comfortable with
15     Fortrend; is that correct?
16  A. We were not -- we -- I guess we -- I think it
17     was somewhat misrepresented to us that they had
18     actually done deals with Ernst & Young.
19  Q. So how did that affect whether you would issue
20     an opinion or not, or whether Ernst & Young
21     would issue an opinion or not?
22  A. Well, I think the request, as I look through
23     these time records and recall, was whether we
24     would issue an opinion on -- given the
25     representations that were provided, and the

Page 67

1      answer was, no, we don't simply issue an
2      opinion generally based on representations.
3   Q. Okay.  And those representations again were
4      from Fortrend?
5   A. Yes, I believe so.
6   Q. Ernst & Young, or you specifically, Ernst &
7      Young were uncomfortable with those
8      representations made by Fortrend?
9   A. Perhaps -- I don't recall exactly why we were
10     uncomfortable with those representations.
11     Presumably, we didn't feel like it was enough
12     to be able to say, after the transaction
13     closed, that, yes, we would issue a should
14     opinion or whatever level of opinion we would
15     issue.
16  Q. When you say it was not enough, I still don't
17     understand.  What were you looking for?  What
18     additional information did you need in order to
19     issue the tax opinion?
20  A. I don't recall specifically.  My -- I would
21     think that we would want to make sure we
22     understood what the complete transaction is.
23  Q. And based upon the representations you had --
24  A. Presumably, we didn't have enough comfort with
25     that.

Page 68

1   Q. Did Ernst & Young ask any questions as to what
2      would happen to the gain from the sale of the
3      assets by the intermediary?
4   A. I don't recall that we got that far.
5   Q. Did you ever gain an understanding in this case
6      how Fortrend handled the gain on the
7      transaction?
8   A. With respect to this review of the transaction
9      during this time frame?
10  Q. During the time frame, yes.
11  A. No.
12  Q. You did subsequent to that; is that correct?
13  A. Just in connection with preparation of the
14     income tax returns, which would have been
15     almost a year subsequent to that.
16  Q. As far as your understanding of intermediary
17     transactions at the time, did you understand
18     generally how they worked?
19  A. I don't recall if I had a really good
20     understanding of the transactions.
21  Q. Did you know or did you understand that somehow
22     gain related to the sale of assets would be
23     offset in those types of transactions?
24  A. I don't recall.
25  Q. Did you ever form an opinion as to who PWC was

Page 69

1      representing as far as was it Fortrend or
2      Midcoast?
3   A. I think it was -- the assumption was it was a
4      buyer.  I was authorized by the Bishop Group to
5      talk to them, so not necessarily requiring that
6      I know exactly who they were representing.  I
7      think I gave in my previous testimony it was
8      either/or.
9   Q. You never really formed an opinion as to who
10     PWC was representing?
11  A. No, I don't think so.
12  Q. Turn to 4364 again, please.
13  A. Which way is that?
14  Q. Should be going backwards.  Should be page 1 at
15     the bottom.  It's back to the entry by
16     Kyle Klein.  Did you find it?
17  A. Yes.
18  Q. I think you testified earlier that you talked
19     to Mr. Klein; is that correct?
20  A. Ms. But, yes.
21  Q. It's a Ms. Klein?
22  A. Yes.
23  Q. Kyle is a Ms.?
24  A. Yes.
25  Q. She is in the national office?

18  (Pages 66 to 69)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:   Bruce Snyder**

Page 70

1    A.  National office, Washington, DC.
2    Q.  It says, "Review of plan for sale with options.
3        As currently constructed, this is simply a
4        deferred payment plan and lacks economic
5        substance as a true option."  Do you recall
6        that issue arising in your discussions with
7        Ms. Klein?
8    A.  That was on June 22 of 2000?
9    Q.  Yes.
10   A.  I don't specifically recall the issue.  I know
11       they were looking at potential contingent
12       payment options and things like that.
13   Q.  Did you form an opinion personally that, as
14       constructed, it was something that was simply a
15       deferred payment plan which lacked economic
16       substances as a true option?
17   A.  It looks like she must have provided some
18       analysis that's in case, what it was.  I
19       don't know if it was even the final transaction
20       that occurred.
21   Q.  Did you use that information in any way?
22   A.  I don't recall.
23   Q.  It says, "In addition, the B class interest
24       appears to be valued in excess of its real fair
25       market value."  Do you know what that is

Page 71

1        regarding?
2    A.  That may have been something that they had
3        proposed.  By they, I mean the Bishop Group.
4        And I don't know even know if they proposed it
5        to anyone.  They were just -- that was around
6        June time frame, so they were looking at
7        potential ways to sell the company, I believe.
8    Q.  Well, this happened actually in June of 2000.
9    A.  Oh, oh, okay.
10   Q.  With that in mind--
11   A.  Subsequent, okay.
12   Q.  Yes.
13           With that in mind, let's go back up to
14       the first question again.
15   A.  Okay, I thought it was June of '99.
16   Q.  So "sale with options," do you know what that
17       has to do with, "Review of plan for sale with
18       options"?
19   A.  That may have not even related to this
20       transaction.  It looks like -- is that coded 1?
21   Q.  What do you mean, coded 1?
22   A.  I see there's a note down here and it's not
23       very well copied, but it says, "Sum of 1's,"
24       and it says, "MRG related time."
25   Q.  MRG was -- wasn't that an entity within the

Page 72

1        Bishop Group?
2    A.  I believe it was -- I don't recall.  I believe
3        it was a -- it was an entity within Bishop
4        Group, but I believe it was also an entity that
5        was formed by Dennis Langley at some other
6        point in time, perhaps after that, to do -- I
7        don't think -- I guess what I'm telling you is,
8        in looking at this, I don't think this deal
9        related to the sale of the Bishop Group, I
10       think it was something subsequent that they
11       consulted with us on.
12   Q.  Do you recall a payment that was made
13       subsequent to the sale by Midcoast to the
14       Bishop Group or to Langley?
15   A.  No, I don't.
16   Q.  The $10 million payment doesn't ring a bell or
17       10.75 million?
18   A.  No, I don't believe so.
19   Q.  Turn to Exhibit 227, please.
20   A.  (Witness complies.)
21   Q.  I just wanted to confirm with you this is the
22       billing statement from Ernst & Young to
23       Mr. Langley for services, professional tax
24       services, rendered through October 31 of '99,
25       correct?

Page 73

1    A.  That's correct.
2    Q.  This would have been a bill that you, as the
3        senior tax manager, would have been responsible
4        for sending to Mr. Langley?
5    A.  Yes.
6    Q.  Turn to 228, please.
7    A.  (Witness complies.)
8    Q.  This is an e-mail, looks like a couple of
9        e-mails, but the original e-mail is from
10       Mr. Hoffman, Craig Hoffman, to you; is that
11       correct?
12   A.  Yes, it appears so.
13   Q.  Dated March 21 of 2000?
14   A.  Okay.
15   Q.  Mr. Hoffman makes a representation to you that
16       generally -- on behalf of K-Pipe, generally
17       saying there has been no revenue activities; is
18       that correct?
19   A.  That's right.
20   Q.  Do you recall why this representation was
21       necessary to get from Mr. Hoffman?
22   A.  Let's see, that would have been around March of
23       2000.  So we would have been probably looking
24       at filing extensions for the 12/31/99 tax year.
25       So that would have been to determine whether or

**HUNDT REPORTING**
**214-220-1122**

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:   Bruce Snyder**

---

Page 74

1    not we had all the items of income and
2    deductions during that time so we could see if
3    we had enough federal income tax paid in,
4    probably state income tax as well.
5    Q.  Did you review on this representation in
6    preparing the 1999 return for K-Pipe, for the
7    K-Pipe group?
8    A.  I'm sorry, I didn't understand the question.
9    Q.  Did you review on this representation at all in
10   preparing the tax return for the K-Pipe group
11   for 1999?
12   A.  I would have -- we probably would have taken
13   this into account in preparing the extensions.
14   Q.  Just the extensions?
15   A.  Yes.  I believe there was some further dialogue
16   with Howard Teig regarding all the activities
17   of the K-Pipe group in preparation of the tax
18   returns subsequent to this e-mail.
19   Q.  All right, turn the page to Government Exhibit
20   229, please.
21   A.  (Witness complies.)
22   Q.  This is a series of e-mails.  Looks like the
23   top one is from you to Mr. Palmisano of PWC?
24   A.  Uh-huh, yes.
25   Q.  With a cc to Shari Fox; is that right?

---

Page 75

1    A.  Yes.
2    Q.  Who is Gayla E. Jackson?  That's another
3    recipient.
4    A.  She was another staff person.
5    Q.  And the subject is KPC 754 election; isn't that
6    right?
7    A.  Correct.
8    Q.  And then below that it looks like there is an
9    e-mail from Jeff Weiner, is that right, to
10   Tom Palmisano, and you have been cc'd; is that
11   correct?
12   A.  Correct.
13   Q.  What is a 754 election?
14   A.  A 754 election is part of the partnership
15   rules, and it's basically to elect to step up
16   the basis with respect to a purchasing partner
17   of an interest in a partnership.
18   Q.  Why was Ernst & Young asking for it?
19   A.  I don't believe we were asking for it.  I
20   believe someone inquired as to whether or not
21   we had seen a signed copy of the election.
22   Q.  Had you at that point?
23   A.  I don't believe so.
24   Q.  Did you ever see one?
25   A.  I don't know if we did or not.  Apparently not,

---

Page 76

1    according to this.
2    Q.  What is a protective election?
3    A.  I believe, under 754, once a partnership makes
4    an election for 754 to apply, the election is
5    irrevocable.  But I think you can make an
6    election again upon a subsequent sale of a
7    partnership interest if you are not aware that
8    a 754 election has been made prior to.  And I
9    believe that's what we're referring to here
10   with respect to a protective election.
11   Q.  Did that have anything to do with the
12   preparation of the K-Pipe 1999 tax return?
13   A.  No, that would have been for the seller -- or
14   for the purchaser of the partnership interests.
15   Q.  Turn to Government Exhibit 230, please.
16   A.  (Witness complies.)
17   Q.  Describe this document for me, please.
18   A.  That is an engagement letter to -- for
19   preparation of the 1999 income tax returns.
20   Q.  For the various entities listed?
21   A.  Correct.
22   Q.  It's prepared -- it's dated June 5 of 2000?
23   A.  Right.
24   Q.  And signed by Larry Austin on behalf of K-Pipe
25   Group on June 28 of 2000?

---

Page 77

1    A.  Right.
2    Q.  Would you have sent this letter to Mr. Austin
3    for his signature?
4    A.  Yes.
5    Q.  How was Ernst & Young engaged to prepare these
6    returns?  Who requested that?
7    A.  I believe that we were requested by the old
8    Bishop Group -- or I believe there was
9    something in the stock purchase agreement with
10   respect to our preparing the final return that
11   included the Bishop Group.
12   Q.  Did somebody ask you, or anybody at Ernst &
13   Young, if you would agree to preparing the
14   return, the final return, of the Bishop Group
15   before the sale actually closed?  Did somebody
16   ask you that before the sale actually closed?
17   A.  I'm sure they did.
18   Q.  And it would have been you that would have made
19   the decision to agree to it?
20   A.  Yes.
21   Q.  Why was somebody at the Bishop Group asking
22   Ernst & Young to prepare the final return?
23   A.  If I recall, the reason being is that the
24   activity of the Bishop Group was included
25   through the date of close of the transaction,

---

20  (Pages 74 to 77)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:   Bruce Snyder**

Page 78

1    which would have included the old shareholder
2    group, which was most of the tax year.  And
3    since we had prepared all the prior years'
4    returns, they requested that we prepare this
5    final return for the Bishop Group.
6    Q.  Who requested that?
7    A.  It would have been somebody probably at the
8    Bishop Group, such as Steve Korb or perhaps
9    even Langley.
10   Q.  Who did you discuss this with?
11   A.  The engagement letter?
12   Q.  Well, the preparation of the returns would have
13   been Korb or Langley?
14   A.  By the time this engagement letter was
15   signed -- initially, it would have been
16   probably Korb or Langley.
17   Q.  Back prior to the close of the transaction?
18   A.  Back prior to the close of the transaction.
19   And there may have been some communication with
20   either Steve Korb -- probably Steve Korb, or
21   maybe even Minaldo, with respect to us getting
22   in contact with the buyer and getting the
23   information to prepare the returns.
24            And then I believe a lot of the books
25   and records for the year were still housed at

Page 79

1    the operating company, which would have been in
2    Kansas.  And I believe Jeff Weiner was still on
3    staff then as well, so we worked with him as
4    well to get these prepared.
5    Q.  Did Mr. Langley request -- do you recall if
6    Mr. Langley requested that E&Y prepare the
7    returns to insure he would get his capital
8    gains treatment on the sale of the stock?
9    A.  We would not have reflected his capital gain in
10   the tax return preparation.  That would have
11   been reflected on his individual return.  So,
12   no.  And I don't believe he called specifically
13   and requested us to prepare the returns, it was
14   probably either through Steve Korb or
15   Tina Minaldo.
16   Q.  Did Langley, Minaldo or Korb request that E&Y
17   prepare the returns to insure that the sale of
18   the assets by K-Pipe to Midcoast would be
19   properly reflected as a sale of assets in the
20   tax return?
21   A.  I don't know if that was their intention.
22   There was no sale of assets, it was a sale of
23   partnership interests that was reflected on the
24   tax returns.
25   Q.  What about that, did they ask you -- did they

Page 80

1    ask E&Y to prepare the returns specifically to
2    insure that the sale of assets was properly
3    reported on the tax return -- sale of
4    partnership interest, I'm sorry, was reported
5    on the tax return?
6    A.  I don't know.
7    Q.  Government Exhibit 230, is that a standard
8    engagement letter or was it modified at all?
9    A.  It looks to be fairly standard.  I don't recall
10   if there were any modifications or not.
11   Q.  231, Government Exhibit 231, please.  It looks
12   like a series of e-mails between Shari Fox and
13   Tom Palmisano; is that correct?  And it looks
14   like you were cc'd on one of them or two of
15   them; is that right?
16   A.  It appears to be correspondence between the
17   two, correct.
18   Q.  I want to focus on the one in the middle from
19   Mr. Palmisano to Shari Fox, cc-ing you on 6/26,
20   2000.
21   A.  Okay.
22   Q.  It says, "FYI, K-Pipe Group, Inc., formed a
23   partnership (Butcher Interest Partnership) with
24   Mid-Louisiana Gas Company (a Midcoast sub) as
25   of 11/8/99.  As part of the formation, K-Pipe

Page 81

1    contributed the Butcher Interest for a capital
2    account value of 6.5 million, then received a
3    cash distribution from the partnership of
4    6.225 million.  Therefore, the net contribution
5    is $275,000.  This transaction will be treated
6    as a Section 707 disguised sale.  Therefore,
7    K-Pipe will have sales proceeds of 6.225
8    million, which should be reflected on the 1999
9    form 1120.  The partnership will receive a
10   corresponding step-up in the asset."
11            What is a Section 707 disguised sale?
12   A.  It generally refers to -- that's an Internal
13   Revenue Code section, and it refers to a
14   transaction where a contribution is made of
15   assets to a partnership.  Generally those
16   assets have gain inherent.  And then a cash
17   distribution is received fairly soon after the
18   contribution.  It's considered to be a
19   disguised sale because I think under the rules,
20   in essence, what you are doing is you are
21   selling the assets for cash.
22   Q.  Then whose return did this affect, whose tax
23   return?
24   A.  It looks like it would have reflected the
25   K-Pipe consolidated return.

21  (Pages 78 to 81)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

Witness:  Bruce Snyder

Page 82

1  Q. The return that E&Y was preparing?
2  A. That we would have filed, yes.
3  Q. I guess back in 6/26 of 2000 you would have
4     been working on that?
5  A. Correct.
6  Q. Do you know if it was treated as such on the
7     return?
8  A. I don't recall for sure.
9  Q. Then why was Mr. Palmisano telling you how to
10    treat it, telling Ernst & Young how to treat a
11    transaction on the return?
12         MR. STERN:  Objection, form.
13 A. I would assume that he must have been involved
14    in advising -- perhaps advising K-Pipe or
15    Midcoast on the transaction.
16 Q. (By Mr. Coffin)  Do you know if Ernst & Young
17    did anything to verify the assertions made by
18    Mr. Palmisano here?
19 A. I don't believe we did, no.
20 Q. Was there any correspondence with PWC as far
21    as getting information to prepare the K-Pipe
22    1999 return?
23 A. No, most of the discussion was with Howard Teig
24    or Teig.
25 Q. Mr. Teig, again, represented K-Pipe?

Page 83

1  A. He was a -- it was our understanding that he
2     was a CPA that represented K-Pipe.
3  Q. Go to Government Exhibit 233, please.
4  A. (Witness complies.)
5  Q. This is a memorandum from Mr. Teig to Bill Lacy
6     and Shari Fox, correct?
7  A. Correct.
8  Q. Dated August 22, 2000; is that right?
9  A. Correct.
10 Q. Who is Mr. Lacy?
11 A. He was a compliance person, I believe either a
12    senior or a manager.  I think he was a manager
13    at the time.
14 Q. He was reporting directly to you?
15 A. He was reporting to me.  And he was responsible
16    for preparation of the returns.
17 Q. This is a memo regarding K-Pipe activity; is
18    that right?
19 A. I believe that's right.
20 Q. Did you look at this document in preparation of
21    your deposition today?
22 A. No, I haven't looked at this document in some
23    time.
24 Q. Do you recall seeing this document before?
25 A. Yes.

Page 84

1  Q. Was this information requested from Mr. Teig?
2  A. I guess it would be.  First line is "In
3     response to your request for information."
4  A. Right, we requested information regarding the
5     activities of K-Pipe for I guess the period
6     from the time of the transaction through
7     December '99, so that we could understand and
8     properly reflect the information on the tax
9     return.
10 Q. Did you rely on the information?
11 A. We would have relied on that information.
12 Q. In preparing the tax return?
13 A. In preparing the tax return, correct.  And any
14    subsequent information we received.
15 Q. At the bottom of the first page of that
16    memorandum it shows that "SCALP's aggregated
17    tax basis in the assets was 145,411,651,
18    consisting of" -- and it shows three items
19    there, Petro, Universal and Canadian dollars.
20    Do you see that?
21 A. Yes.
22 Q. Do you recall how these assets had such high
23    tax basis?
24 A. I believe that we requested representation
25    regarding the tax basis, not from Mr. Teig, but

Page 85

1     from Mr. Austin.
2         I believe that we also checked into
3     the Canadian dollar transaction specifically as
4     to why it had such high tax basis.
5  Q. What about the Petro and the Universal?
6  A. I don't believe we -- I believe we specifically
7     asked for representation from the president of
8     the company with respect to the tax basis of
9     those two interests, but not -- it's not our
10    responsibility necessarily to perform due
11    diligence and audit those numbers as tax
12    preparers.
13 Q. Did you check -- look into the reasonableness
14    of those numbers?  Do you have an obligation,
15    as a tax return preparer, to look into the
16    reasonableness of numbers on the tax return?
17 A. We do, but these are -- these, I believe, were
18    business interests, and so the tax basis has to
19    be representation from the client.
20        I know when I looked at it, I was
21    concerned about the Canadian dollars and that
22    basis.  But it was described to me that that
23    was a result of a technical termination of a
24    partnership back in 1996, I believe, at which
25    time that made sense, because that was a

HUNDT REPORTING
214-220-1122

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 86

1    transaction that could create a large basis in
2    property.
3  Q. Turn the page.
4  A. (Witness complies.)
5  Q. At the top of the next page it describes the
6    journal entry to report this transaction.  It
7    shows the journal entry made.  It says, "The
8    above entry was based upon the fair market
9    value of the contributed assets."  So the fair
10   market value would have necessarily been
11   772,861 as asserted by Mr. Teig in this memo,
12   correct?
13 A. Yes.
14 Q. So you have a fair market value of 772,000 and
15   a corresponding tax basis of 145 million and
16   some change.  Did that make sense to you at the
17   time, was that reasonable?
18 A. Again, my responsibility is to get
19   representation.  I mean, there's many
20   circumstances that created the tax basis
21   substantially in excess of the fair market
22   value of assets.  And that could be a very
23   valid tax basis.
24       Again, we did ask about the Canadian
25   dollars, because that seemed fairly odd to us,

Page 87

1    but that was described as a partnership
2    termination transaction.
3  Q. So the tax basis in this case was essentially
4    187 times the fair market value.  And did that
5    not necessarily seem odd to you at all?
6  A. Again, I asked about the Canadian dollars
7    transaction.
8  Q. So it wasn't odd to you at all?
9  A. Not necessarily.
10 Q. Have you seen transactions like that before?
11 Q. Where the basis was substantially in excess of
12   the value?
13 Q. Yeah, by 187 times.
14 A. Certainly, you see investments that -- you see
15   investments that are worthless where the tax
16   basis is fairly high, it's fairly standard.
17 Q. In the hundreds of millions?
18 A. Sure.
19 Q. What kind of transactions are those?
20 A. Foreign subsidiary transactions where the
21   subsidiary is worthless and worthless stock
22   production situations.
23 Q. Back on previous page, the paragraph that
24   starts "On November 8, 1999, SCALP contributed
25   pursuant to a plan which would qualify under

Page 88

1    Section 351 under the Internal Revenue Code,"
2    do you see that?
3  A. Yes.
4  Q. Did anybody tell you what the business purpose
5    of the Section 351 transaction was?
6  A. I don't believe so.
7        Is a business purpose required under
8    Section 351?
9  Q. I think so.  But I'm just asking, did anybody
10   tell you the business purpose --
11 A. I don't recall documenting a business purpose.
12 Q. Then on the second page it talks about
13   Disposition of Assets.  It says, "During 1999,
14   K-Pipe sold the assets that it had received in
15   the contribution from SCALP.  The information
16   on the assets sold is as follows," it gives
17   some information there.
18       Did you rely on those representations
19   in preparing the K-Pipe tax return for 1999?
20 A. Yes.
21 Q. Did anybody at K-Pipe tell you what the
22   business purpose of those dispositions were?
23 A. I don't believe so.  I think we -- we asked for
24   representation as to whether or not those
25   transactions were with a related party.

Page 89

1  Q. Which transactions?
2  A. The sale transactions.
3  Q. Did you --
4  A. The response was, no, they were not with a
5    related party.
6  Q. That's to JRCR Corp?
7  A. Right.
8  Q. And Riversea Corp?
9  A. I believe so.
10 Q. Why was that important to you that they would
11   not be related party transactions?
12 A. Because losses -- loss transactions to related
13   parties are disallowed under the code.
14 Q. Were you aware at the time that basis in assets
15   could be inflated by using abusive tax
16   shelters?
17 A. I knew there was a strategy to inflate the
18   basis of assets vis-a-vis a partnership
19   structure.  I don't know at that time whether
20   or not it had been designated or not.
21 Q. Did you look into whether the basis of these
22   assets were inflated by using those types of
23   strategies?
24 A. Not specifically, no.
25 Q. Did you feel an obligation to look into that?

23 (Pages 86 to 89)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 90

1   A.  No, I don't think so.  Like I said, I was
2       filing a tax return and just needed to use a
3       reasonable and standard and get representations
4       from the client.
5   Q.  On the third page of that document, it lists
6       the cash activities.  I assume that's the cash
7       activities of K-Pipe.  Is that right?
8   A.  Where are you looking?
9   Q.  The third page of that document.
10  A.  This one, 3 of 7?
11  Q.  Next page.  Bates No. DOJ 4148.
12  A.  Okay.
13  Q.  I assume that's the cash activities of K-Pipe
14      and K-Pipe Merger; is that right?
15  A.  It looks like that, correct.
16  Q.  Once again, these entries were used to assist
17      you in preparing the -- to assist E&Y in
18      preparing the 1999 return?
19  A.  Right.
20  Q.  Do you know what the entry at the bottom of
21      that page reflects?  It just says, "to record
22      sundry cash."
23  A.  It looks like it was a distribution and some
24      fees.
25  Q.  Did you look into who the recipients of those

Page 91

1       fees were for any reason?
2   A.  No, I did not.  We may have asked the question
3       as to whether or not they believed those fees
4       to be deductible.
5   Q.  Did you inquire what the finder's fee was?
6   A.  No.
7   Q.  Did you have any idea what the finder's fee
8       would have been, who that was paid to?
9   A.  No, I don't.
10  Q.  Did you ever hear what PWC, what their fee was
11      in this intermediary transaction?
12          MR. STERN:  Objection, form.
13  A.  I don't know what PWC was paid or who paid
14      them.
15  Q.  (By Mr. Coffin)  Did E&Y prepare any 1099's for
16      any recipients of these fees?
17  A.  No.
18  Q.  Go to 234, please.  Government Exhibit 234.
19  A.  (Witness complies.)
20  Q.  Look over the letter and just tell me generally
21      why this letter was mailed to Mr. Teig.
22          I'll back up I guess.  Let me ask you
23      if this letter was mailed to Mr. Teig on August
24      28 of 2000.
25  A.  I believe it was faxed to Mr. Teig.

Page 92

1   Q.  It's not signed, but it has your signature
2       block there; is that right?
3   A.  Correct.
4   Q.  Eventually, you signed it and faxed it to
5       Mr. Teig, do you think?
6   A.  The intent was to sign it.  I don't know if it
7       got signed or not.
8   Q.  Was a request made to Mr. Teig on August 28,
9       2000, for additional information?
10  A.  Yeah, I think that's what you're looking at
11      here.
12  Q.  Why was this letter mailed -- I'm sorry,
13      faxed?
14  A.  Faxed?
15  Q.  Yes.
16  A.  I believe we were looking for additional
17      clarification on certain questions that we had.
18  Q.  Did you feel that K-Pipe and Mr. Teig were
19      being forthcoming with the information that
20      they were giving you?
21  A.  I think you'll see in the correspondence that
22      there was a lot of back-and-forth between us
23      and Mr. Teig, and we quite honestly were pushed
24      right to the deadline of trying to get these
25      returns filed.

Page 93

1   Q.  So are you saying that they were not providing
2       information -- were not timely providing
3       information to you?
4   A.  I think that's correct.
5   Q.  What about the subject matter of their
6       information, were you comfortable with what you
7       were getting from Mr. Teig and K-Pipe?
8   A.  I think we were comfortable enough at the -- in
9       the end to file a tax return.
10  Q.  Item No. 5 requested in that letter, why was it
11      important to determine the holding period?
12  A.  Well, I think for reporting purposes you need
13      to determine whether or not the gain is
14      long-term or short-term.
15  Q.  Item No. -- go ahead.  Were you finished?
16  A.  Yes.
17  Q.  Item No. 7, is that where you requested a
18      representation that neither JRCR Corp. nor
19      Riversea Corp. were related parties?
20  A.  Yes.
21  Q.  I don't remember if I asked you, but did you do
22      any further due diligence into whether those
23      entries were related parties or not?
24  A.  No, other than the representation, which I did
25      receive I believe.

24  (Pages 90 to 93)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 94

1  Q. On the bottom of this letter, it says, "Copy to
2     Mr. Steve Korb and Ms. Tina Minaldo."  Why were
3     they being cc'd on this request?
4  A. I believe under the agreement with K-Pipe they
5     had a right to receive correspondence and
6     information with respect to the final tax
7     return.
8  Q. Do you know why that representation was -- why
9     that agreement was made with them?
10 A. I would assume because there was a straddle
11    period involved with respect to preparation of
12    the income tax return.
13 Q. What was the straddle period?
14 A. Well, the straddle period is one with old
15    ownership versus new ownership of the company.
16 Q. Was the Bishop Group, Limited, was that a
17    corporation or limited partnership?
18 A. Yes, corporation.
19 Q. It was a C corp I guess?
20 A. That's correct.
21 Q. So Mr. Langley owned all the stock of the
22    Bishop Group?
23 A. That's correct.
24 Q. So how would the straddle period or whatever
25    occurred within the corporation affect what was

Page 95

1     going on with Mr. Langley, who had just sold
2     the stock in the corporation?
3  A. There may have been -- I don't recall whether
4     there was any sort of tax sharing arrangement
5     with respect to the purchase price of the stock
6     or anything of that matter.  Typically, you'll
7     see a sharing arrangement pre and post
8     transaction that has provisions that if it's
9     not within a certain amount, there may be an
10    adjustment to purchase price of the stock.
11 Q. Turn to 235, please.
12 A. (Witness complies.)
13 Q. This is an e-mail from Mr. Teig to Mr. Lacy and
14    Ms. Fox, correct?
15 A. Correct.
16 Q. In the first line he says, "Please copy Bruce
17    Snyder on the e-mail."  It looks like this is
18    his response, Mr. Teig's response, to that
19    previous exhibit of August 28, 2000.  Is that
20    right?
21 A. Yes, I believe so, but I'm wondering about the
22    date.
23 Q. I think the date may have been more when
24    this -- this document was printed out after the
25    fact.

Page 96

1  A. That doesn't make sense to me.
2  Q. But I would guess -- it says, "Following is in
3     response to your letter of August 28, 2000."
4     So he didn't respond as late as December 5,
5     2003, did he, to your request?
6  A. No, I believe he responded probably sometime
7     just prior to filing of the tax returns.
8  Q. So I assume it would have been August 30 of
9     2000, which is consistent with the date of the
10    e-mail?
11 A. Or later perhaps.
12 Q. Did you rely on Mr. Teig's responses to your
13    requests in preparing the 1999 tax return for
14    K-Pipe?
15 A. I did rely on those responses, or we did, and
16    also the representations provided by
17    Mr. Austin.
18 Q. Then it looks like Government Exhibit 236 is
19    another follow-up request for information in
20    the form of an e-mail from Mr. Lacy to
21    Mr. Teig, dated September 1 of 2000; is that
22    correct?
23 A. Yes.
24 Q. Mr. Lacy says in his e-mail, in the second
25    paragraph it says, "Also attached is an Excel

Page 97

1     file with financial statements we have
2     constructed from the information in your memos.
3     Please review these financial statements and
4     confirm to us they are accurate."
5           Why -- if you are preparing the tax
6     return, why do you prepare financial
7     statements?
8  A. I think in the previous correspondence all he
9     provided us was journal entries.  So we would
10    have to take the balances as of presumably the
11    transaction date and then roll those forward
12    with respect to the journal entries so that we
13    could develop financial statements, because the
14    tax return has really an income statement and a
15    balance sheet.  And so you have to present a
16    balance sheet and income statement on the tax
17    return.
18 Q. It looks like, along with the e-mail, there's
19    an attachment there, another memorandum to
20    Mr. Teig from Bruce Snyder, Shari Fox, Bill
21    Lacy, dated September 1 of 2000; is that right?
22 A. Correct.
23 Q. In the first request you are looking for a
24    signed form 8594.  What is that form?
25 A. I believe that is a form that reports an asset

25  (Pages 94 to 97)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

Witness:  Bruce Snyder

Page 98

1    sale.
2  Q.  Did Ernst & Young ever receive that completed
3      form 8594?
4  A.  I don't recall if we did or not.
5  Q.  For what purpose would Ernst & Young use it in
6      the preparation of K-Pipe's 1999 tax return?
7  A.  I believe that it's required to be attached to
8      the tax return by both the buyer and seller of
9      assets.  I think we later determined that it
10     was actually a sale of partnership interests
11     and not a sale of assets.  So perhaps we
12     determined that that form isn't actually
13     required, I just can't recall.
14 Q.  Had it been required, would you have prepared
15     it and attached it with the tax return?
16 A.  We would have requested a copy of it, either
17     prepared, or we would have prepared the form
18     ourselves.
19 Q.  Then item No. 2 in that memo says, "With regard
20     to item 11 of your memo of August 30 of 2000,
21     we still have some confusion about how SCALP
22     could have a tax basis of $40,288,712 in the
23     Canadian currency."  So that's what you
24     expressed earlier, your continuing concern
25     regarding the tax basis in the currency?

Page 99

1  A.  Correct.
2  Q.  I assume you obtained information later to --
3  A.  We did obtain information.  As I recall, on the
4      original documentation there was a subsequent
5      e-mail from Howard Teig.
6  Q.  We may get to it here.
7  A.  Okay.
8  Q.  Then attached to that are the financial
9      statements that Mr. Lacy prepared, is that
10     correct, would have prepared?  It looks like
11     there's a Changes in Cash schedule, then a
12     Balance Sheet?
13 A.  Yes, that could have been.
14 Q.  Then a Balance Sheet.
15         And then I have mistakenly tagged up
16     Government Exhibit 226, looks like the final
17     financial statement that should go along with
18     the other two; is that right?
19 A.  226?
20 Q.  You don't have it?
21 A.  I went to 237.
22 Q.  If you go back to 226, I think it's probably
23     out of order.  It says "5 of 5" on the bottom
24     right and I don't know who wrote that, but --
25 A.  That's probably my writing.  I think that was

Page 100

1      in connection with the summons, not the
2      original tax return work papers.  So that looks
3      like an income statement that we developed from
4      his journal entries from 11/9 -- 11/8 of '99
5      through 12/31 of '99.
6  Q.  Is that a tax loss there or a book loss that's
7      shown?
8  A.  That looks like a book loss.
9  Q.  Prepared -- so book would be prepared under
10     Generally Accepted Accounting Principles?
11 A.  Likely.  It looks like they recorded the assets
12     that they contributed at fair market value as
13     opposed to tax basis.  So the loss would not be
14     reflected in the book net income.  I don't know
15     if that's proper GAAP treatment or not.
16 Q.  But anyway, it's a book basis?
17 A.  Right.
18 Q.  "Gain/loss on the sale of assets" on Government
19     Exhibit 226, it shows $2.9 million, then it
20     says "plug."  What does that mean?
21 A.  I think that was -- that's derived to get to
22     the correct net income or loss number, I
23     believe, based on the cash that was received.
24 Q.  Just to clarify, would you agree with me then
25     that 226 belongs on the back end of 236 as far

Page 101

1      as the order of the exhibits?
2  A.  I believe that's correct.
3  Q.  Then turn to 237.
4  A.  (Witness complies.)
5  Q.  It looks like another e-mail from Mr. Teig to
6      Mr. Lacy, Ms. Fox and to you, correct?
7  A.  Correct.
8  Q.  Dated December 1 of 2000.  He says he's never
9      seen the 8594 and was thinking that you had it
10     or could inquire about such.  I think we
11     discussed that a minute ago.
12         Regarding SCALP's basis in the
13     currency, Mr. Teig says, "The transactions that
14     caused SCALP to have the basis are quite
15     complex and would therefore be quite difficult
16     to convey."  Do you see that there?
17 A.  Yes.
18 Q.  How did perceive Mr. Teig's response in that
19     regard?
20 A.  I don't believe we considered that to be
21     sufficient.  I think we inquired with respect
22     to more information.
23         I thought there was a subsequent
24     e-mail to that.  Maybe we're coming to it or
25     maybe there was a discussion.

26 (Pages 98 to 101)

HUNDT REPORTING
214-220-1122

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 102

1  Q. Go to 232.
2  A. (Witness complies.)
3  Q. This is a series of e-mails between --
4  A. I'm sorry, 232?
5  Q. Yes.
6  A. I go from 237, which I think the one we were
7     just on --
8  Q. Then go back to 232, I think.  They're probably
9     in order.  Like I said, I tried to put these in
10    chronological order, but I might have missed
11    some of them.  Go backwards.
12 A. Okay.
13 Q. This appears to be another series of e-mails
14    from -- or between Ernst & Young and Mr. Teig,
15    is that correct, it looks like sent around
16    September of 2000?
17 A. Okay.
18 Q. Did Ernst & Young rely on these responses by
19    Mr. Teig to these requests in preparing the
20    1999 tax return for K-Pipe?
21 A. Without reviewing all the responses, I couldn't
22    say whether we specifically relied on
23    everything in here, but I'm sure that we did in
24    connection with other responses.
25 Q. Item No. 5 on 3 of 3 talks about an unpaid

Page 103

1     invoice.  Did K-Pipe pay all of E&Y's fees in
2     connection with the preparation of the '99
3     return?
4  A. Yes.
5  Q. They eventually did pay up?
6  A. Yes.
7  Q. If you look at 2 of 3 in the requests from
8     Ms. Fox to Mr. Teig -- or actually to
9     Mr. Austin, I guess, and Mr. Teig, item No. 1
10    talks about "With respect to the asset purchase
11    price allocation issues, Section 2.9 of the
12    asset purchase agreement addresses this issue.
13    It states that 'within 60 days from closing the
14    buyers will provide to the seller a schedule of
15    the buyer's estimated allocation of the
16    purchase price among the assets required.'  We
17    do not have access to that information and it
18    appears that the buyer should have provided
19    this to K-Pipe the first part of the year."
20         Why was the asset purchase price
21    allocation needed to prepare the return?
22 A. I believe it's just a reported -- a reporting
23    matter.
24 Q. Did E&Y eventually get that information?
25 A. Again, I don't know for sure.

Page 104

1  Q. Then item No. 2, SCALP Basis Issues, it says,
2     "At this time we have yet to receive a
3     sufficient amount of information regarding this
4     transaction."
5         Did E&Y have any concerns at that time
6     about the transaction, about the --
7  A. I think we had concerns that we weren't getting
8     the necessary explanation and that's why we
9     asked for additional information.  And I think
10    Shari's e-mail here is well-articulated.
11 Q. Expressing a little bit of frustration maybe?
12 A. Correct.
13 Q. "It is our responsibility as the paid tax
14    preparer to insure that this transaction will
15    meet the substantial authority test if
16    questioned in the future by the Internal
17    Revenue Service."  What is the substantial
18    authority test?
19 A. Well, I think she's -- I don't know if the --
20    if the standard is substantial authority with
21    respect to tax return preparation.  I think
22    it's -- I think it probably is substantial
23    authority.
24         But basically, we have to have return
25    filing positions with respect to transactions,

Page 105

1     so that's what we were requesting here.
2  Q. Say that again, you had to have what?
3  A. Return filing positions that were acceptable
4     under the substantial authority standard with
5     respect to any items reflected on the income
6     tax return.
7  Q. Did you feel like you had?
8  A. By the end, I know that we did, based on the
9     representations and the final description of
10    the -- I believe it was the foreign currency
11    transaction.  Again, the standard for tax
12    return preparation isn't extremely high, it's
13    less than 50 percent likelihood of success.
14 Q. Government Exhibit 239, please.  This is an
15    e-mail from Mr. Lacy to Mr. Teig, correct,
16    dated 9/7, 2000; is that right?
17 A. Yes.
18 Q. Subject K-Pipe issues.  Mr. Lacy says that "The
19    financial statements we put together are
20    constructed on a book rather than a tax basis.
21    Based on your comment about the loan fee, I
22    have revised these financial statements to
23    reflect the $750,000 loan fee as having first
24    been capitalized and then written off against
25    income in the same year, when the loan was

27 (Pages 102 to 105)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 106

1    repaid.  Thus, there is an additional charge of
2    $750,000 on the income statement."
3        So if you turn to the expense
4    statement -- which is 4 of 4; is that right?
5    A. (No response.)
6    Q. So from the period of November 8th of '99
7    through December 31 of '99, K-Pipe Group had a
8    net -- book net income -- or net loss of $3.6
9    million; is that correct?
10   A. No, I believe that is an income number.
11   Q. Oh, it is an income number?
12   A. Right.  I think interest income is stated as a
13   credit balance.
14   Q. Oh, and the gain is a credit balance as well?
15   A. Foreign exchange loss is a debit balance and
16   the write-off of the loan fee would also be a
17   debit balance, which is an expense.  Then you
18   have interest expense, which is a debit
19   balance, and professional fees, which are a
20   debit balance.
21   Q. So it would have reported, for book purposes, a
22   $3.6 million gain?
23   A. I believe that's right.
24   Q. Or net income?
25   A. Or $3.6 million of net income, almost 3.7

Page 107

1    million.
2    Q. Back on the front page of Government Exhibit
3    239, Lacy had requested that Teig review the
4    revised financial statement, is that right; his
5    last request on that page on the e-mail where
6    he says, "I have attached the revised financial
7    statements"?
8    A. Yes.
9    Q. Then the next Government Exhibit 240 is the
10   next piece of correspondence.  And Mr. Teig
11   says at the top, "It does seem correct.  I
12   cannot figure out why it would not be."  Is
13   that right?  Is he talking about the financial
14   statement there?
15   A. I think that's right.
16   Q. That's an e-mail from Teig to Lacy dated 9/8 of
17   2000?
18   A. And that is subsequent to -- what was his
19   e-mail dated?
20   Q. The previous e-mail is --
21   A. 9/1?
22   Q. 9/7 of 2000.
23   A. Or 9/7.  Okay, so that would make sense.
24   Q. Then Government Exhibit 241 is the invoice from
25   E&Y to K-Pipe Group, correct?

Page 108

1    A. Correct.
2    Q. You were responsible for sending this bill out;
3    is that correct?
4    A. Yes.
5    Q. And you said they eventually paid the entire
6    balance due?
7    A. Yes.
8    Q. When was it that they paid -- it looks like
9    they made a progress billing of 7/20 of 2000
10   for $40,000; is that right?
11   A. Yes.
12   Q. Then when would have K-Pipe made the additional
13   balance of 55,600?
14   A. I'm not sure.  I don't believe it was too
15   terribly long after we got the returns filed.
16   I don't think it was outstanding for that much
17   time.
18   Q. Government Exhibit 242 is a letter from K-Pipe
19   Merger Corporation to Mr. Lacy; is that right?
20   A. Correct.
21   Q. Who prepared this letter?
22   A. I believe that -- well, it was signed by
23   Mr. Austin.  I believe that the contents of the
24   letter were prepared by us, requesting that he
25   provide the representations that we requested.

Page 109

1    Q. So did Mr. Austin or Mr. Teig ever request any
2    changes to the representation letter?
3    A. No.
4    Q. They signed it and faxed it back to you?
5    A. Well, we did not -- they -- we explained to
6    them either through -- probably through an
7    e-mail exactly what we requested they
8    represent, and then they drafted a letter with
9    those representations on them.  But there was
10   no discussion regarding the representations
11   that we were requesting.
12   Q. On their part?
13   A. On their part, correct.
14   Q. Then I assume that E&Y relied on these
15   representations in preparing the 1999 tax
16   return for K-Pipe?
17   A. We did.
18   Q. 244, please, Government Exhibit 244.  This
19   appears to be the same memorandum we saw
20   earlier, I think.  It may not be.  But in any
21   event, it has some handwriting on it.  Whose
22   handwriting is on this document?
23   A. That was likely whoever prepared the returns.
24   Could have been Bill Lacy's handwriting.
25   Q. I assume with all the notations and things that

28  (Pages 106 to 109)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 110

1    it eventually was put into the tax work papers
2    of Ernst & Young?
3  A. Correct.
4  Q. Then it has "PBC" on the top.  Does that mean
5    prepared by client?
6  A. Yes.
7  Q. "Summary of tax loss, 144,640,020, was that the
8    loss resulting from the sale of the investments
9    in Petro, Universal and in Canadian dollars?
10  A. I think that's what's detailed out there.  That
11    looks like a Schedule D analysis.
12  Q. The tax loss would roll over to Schedule D of
13    the tax return?
14  A. Correct.
15  Q. Go to 246, please.
16  A. (Witness complies.)
17  Q. Looks like an e-mail from -- there's a couple
18    of e-mails, but one was from Teig to you, and
19    then it was forwarded to Mr. Lacy and Ms. Fox.
20    But your instructions "Please copy to the
21    file."
22       Mr. Teig, in the initial e-mail to
23    you, says, "Spoke to Fred Forster."  Who is
24    Fred Forster?
25  A. I don't recall.

Page 111

1  Q. Then it says, "His thought is not to make the
2    election to forego the carry-back.  There is no
3    intention to use the carry-back either forward
4    or back, and Fortrend recognizes the audit
5    risks associated with a carry-back.  However,
6    he sees no benefit in making the election now."
7    What was that all about?
8  A. I think there was a -- well, there was a
9    capital loss.  And it's a standard question, do
10    you wish to carry the loss back, or there is
11    election you can make simply to carry the loss
12    forward, but you have to make it in the
13    originally filed tax return to forego the
14    carry-back.
15  Q. And --
16  A. So we were just asking, as part of the tax
17    return preparation process, if they desired to
18    make that election.  It's a standard question
19    whenever there is an NOL or capital loss.
20  Q. Do NOL's and capital losses have some value to
21    taxpayers?
22  A. Depends on the circumstances.  If there's an
23    expectation of future taxable income, if it's a
24    net operating loss or if there's taxable income
25    in prior years that you can carry that loss

Page 112

1    back to, obviously it would have substantial
2    value.
3       The same thing with a capital loss,
4    which can only be offset by capital gains.  So
5    to the extent a company had capital gains in
6    the future or in the past that they could carry
7    back or carry forward to, it may have some
8    value.
9  Q. Teig says, "There is no intention to use the
10    carry-back either forward or back."  Was that
11    unusual for a company to not use their
12    carry-back either forward or back?
13  A. Well, I think a capital loss is -- it generally
14    has a very short life.  I think it's only
15    carried back two years and it has a life of
16    five years carried forward.  So if there is no
17    other anticipated capital transactions either
18    backward or forward, then the intention of
19    using the loss may not be there.
20  Q. Now, was there any chance that K-Pipe could
21    have used the carry-back with regard to income
22    recognized by Langley in the past two years --
23    the Bishop Group, I'm sorry, by income
24    recognized by the Bishop Group in the past two
25    years?

Page 113

1  A. I don't recall if -- I don't believe the Bishop
2    Group had any capital gains in the previous two
3    years, but I would have to go back and look at
4    the returns to see.  But I guess the potential
5    did exist that they could utilize those if they
6    did, but they would have had to have capital
7    gains.
8  Q. So Fortrend still had no intention to use that
9    carry-back though; is that right?
10  A. Apparently, that's what he's saying.
11  Q. They say they recognize an audit risk
12    associated with the carry-back.  What was the
13    audit risk?
14  A. I don't believe we explored what their audit
15    risk is.
16  Q. Was it the risk that the intermediary
17    transaction would be discovered by the IRS?
18       MR. STERN:  Objection, form.
19  A. I have no idea.  Again, we were just asking the
20    question as to whether they wanted to make the
21    election.  That was our intent there.
22  Q. (By Mr. Coffin) 247 is a letter from Ernst &
23    Young to Larry Austin, is that correct, and
24    signed by you?
25  A. That's correct.

29  (Pages 110 to 113)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

Witness:  Bruce Snyder

Page 114

1  Q. It's a transmittal letter; is that right?
2  A. That is correct.
3  Q. And you are delivering or transmitting the
4     returns that E&Y prepared for K-Pipe Group,
5     Inc., and subsidiaries?
6  A. Right.
7  Q. On the last page of the letter there is a
8     paragraph that says, "Please note that we do
9     not have any" -- "we do not have specific
10    knowledge of the events that gave rise to the
11    amount of the adjusted basis in Petro Holdings,
12    LP, Inc., Universal Merit Securities, Inc., and
13    the investment in Canadian dollars that were
14    contributed to K-Pipe Group, Inc., on November
15    8, 1999."
16       At that point, did you still have some
17    concerns about those transactions?
18 A. Really, that's basically to protect
19    Ernst & Young, you know, in case penalties were
20    ever asserted, in the fact that we advised the
21    client that if they felt that these
22    transactions rose to the level of tax shelter
23    type transactions, that they needed to make
24    adequate disclosure on the tax returns.
25 Q. Is that language --

Page 115

1  A. And ultimately, it's their responsibility if we
2     inform them.
3  Q. Then there is some language or another
4     paragraph below that that talks about the IRS
5     may impose penalties for an understatement of
6     income tax.
7  A. That's fairly standard on all of our
8     transmittal letters.
9  Q. The first paragraph, though, that wasn't
10    necessarily standard, was it, on engagement
11    letters?
12 A. No, that would have been specific to this
13    client.
14 Q. 249, please. This is a letter to Manatt,
15    Phelps & Phillips, LLP, dated November 21 of
16    2000, signed by Jeffrey Furman of Signal
17    Capital Associates, LP. It's regarding
18    representations for tax opinion. It looks like
19    it addresses the federal income tax
20    consequences where SCALP contributed its
21    interest in Petro Holdings, Universal Merit
22    Securities and the Canadian currency to a
23    subsidiary.
24       My question, Mr. Snyder, is, have you
25    ever seen this document before?

Page 116

1  A. No, I have not.
2  Q. Turn to 250, please.
3  A. (Witness complies.)
4  Q. This is a letter from Manatt, Phelps &
5     Phillips, LLP, to Signal Capital Associates,
6     LP, and K-Pipe Merger Corporation, dated
7     November 21 of 2000, regarding "Certain federal
8     income tax consequences of the transfer of
9     assets by Signal Capital Associates, LP, to
10    K-Pipe Merger Corporation."
11       Mr. Snyder, have you ever seen this
12    document?
13 A. No, I have not.
14 Q. Did you ever request from Mr. Teig or anybody
15    at K-Pipe representations or tax opinion
16    letters like this?
17 A. We probably would have. I don't know if we
18    requested those in writing.
19 Q. Did you ever see any drafts of these documents?
20 A. No, I did not.
21 Q. Do you know if anybody at E&Y has seen anything
22    like this?
23 A. I'm not aware that anybody has, no.
24 Q. Look at Government Exhibit 252, please.
25 A. (Witness complies.)

Page 117

1  Q. This is a series of e-mails from Ms. Fox to
2     Mr. Teig, dated January 8, 2001, and it looks
3     like a forwarding of that e-mail to Larry
4     Austin on January 8, 2001. Ms. Fox says to
5     Mr. Teig, "Attached is your draft letter. I
6     have made a few red-line suggestions." Was
7     that the representation letter we saw earlier?
8  A. I'm sorry, you're looking at 252?
9  Q. 252. If you look in the middle of the page,
10    Ms. Fox says, "Attached is your draft letter.
11    I have made a few red-line suggestions."
12       If you look at the top, Mr. Teig is
13    describing to Mr. Austin what the attached
14    letter was. So I think it relates to the --
15 A. No, this relates to -- we had a -- in the haste
16    of getting the returns filed, I think there was
17    a double counting of some of the basis of one
18    of the partnership interests related to the
19    debt, and it overstated -- substantially
20    overstated the capital loss that occurred.
21 Q. Turn to the next page.
22 A. (Witness complies.)
23 Q. 253 would have been the letter I think that has
24    been requested?
25 A. Right.

30 (Pages 114 to 117)

HUNDT REPORTING
214-220-1122

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 118

1  Q.  So there was an overstatement of the capital
2      loss on Schedule D of 69 million?
3  A.  Right.
4          And basically, what we requested
5      was -- really, when you knowingly have an
6      overstatement or a change in your capital loss,
7      you're not necessarily required to go back and
8      file an amended return for that loss if it
9      wasn't -- if it did not impact the income tax
10     on the return.  You're allowed to simply adjust
11     any carry-forward item or carry-back item that
12     you would have on a subsequent or previous
13     return.
14         So we were just getting confirmation
15     from them that they recognized that there was
16     an overstatement in the haste to get the
17     returns completed, and that if there were any
18     use of that capital loss, that it would be
19     adjusted appropriately.
20 Q.  Government Exhibit 254, please.  Mr. Snyder, is
21     this the 1999 K-Pipe Group, Inc., and
22     subsidiaries, tax return prepared by your
23     office?
24 A.  That's correct.
25 Q.  That's your signature at the bottom, correct?

Page 119

1  A.  It is.
2  Q.  Turn to statement 27, I believe.  It's DOJ
3      7649, is the Bates number of that document.
4      Are you there?
5  A.  Yes.
6  Q.  In the middle of the page, Schedule M-1, line
7      8, "Deductions on Return Not Charged Against
8      Book," what does that mean?  Deductions, are
9      they income tax deductions that are taken but
10     not charged against book income or loss?
11 A.  That's book-to-tax reconciliation, Schedule
12     M-1.
13 Q.  That 144,662,975, is that a deduction or a loss
14     or neither?
15 A.  That's a reconciliation of the book income to
16     the taxable income or loss, and so that would
17     be a reconciling item.
18 Q.  Go back to Government Exhibit 244, keep your
19     finger there.  Government 244 was the
20     memorandum that was PBC.
21 A.  Okay.
22 Q.  On the top right where it says "Summary of Tax
23     Loss" --
24 A.  Right.
25 Q.  -- how does that roll, the tax loss, that

Page 120

1      144,000,000, how does that roll into the return
2      or how is that presented on the return?
3  A.  Let me see.  It looks like you have -- -- well,
4      that wouldn't be -- that would be the
5      book-to-tax reconciliation, so that wouldn't
6      tie out to the gain number.
7  Q.  So 7649 is not where it would be displayed, is
8      that what you're saying?
9  A.  Right.
10 Q.  The tax loss is displayed somewhere else in the
11     return?
12 A.  I think that's right.
13 Q.  Is this something you can tie down in the next
14     few minutes or should we take a break?
15 A.  I should be able to tie it down in the next few
16     minutes here.  If I can't, we'll take a break.
17     How does that sound?
18 Q.  Sounds good.
19 A.  I think if you look at -- it would be your
20     7608.
21 Q.  DOJ 7608?
22 A.  Right.
23         It looks like Schedule D refers back
24     to statement 30 and statement 31.
25 Q.  So that statement 30 is DOJ 7652; is that

Page 121

1      right?
2  A.  Statement 30 and statement 31.  It looks like
3      the numbers tied out are a little bit different
4      than what's reported on that schedule.  I don't
5      know if that was the final statement or not.  I
6      mean, I couldn't sit here probably in 15
7      minutes and tell you what the difference is.
8  Q.  So that's where the sale of the shares in Petro
9      Holdings and shares in Universal Merit
10     Securities are reflected, which would roll up
11     to Schedule D of the return?
12 A.  That's right.
13 Q.  Then where does the foreign currency tax loss
14     show up?  That's another 40 million or so?
15 A.  I believe that's on statement 4.
16 Q.  What is the Bates number?
17 A.  7626.
18 Q.  The foreign exchange loss shows up on line 10
19     on front of the return; is that right?
20 A.  Well, it would be the sum, it would be the sum
21     of all those.  So you would have a negative
22     39,986, and then that's -- it's a consolidated
23     return, so K-Pipe Group, Inc., is one member of
24     the consolidated group, and then you have
25     Bishop Pipeline Company, Bishop Gas

31 (Pages 118 to 121)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 122

1    Transmission, Management Resources Group, LTD,
2    that all have other items of income that all go
3    on line 10 as well as part of the consolidated
4    filing.  So that would tie -- the 5,931,000
5    would tie to the front of the return, line 10.
6         MR. COFFIN:  Let's take a quick break.
7         (A recess was taken.)
8    Q. (By Mr. Coffin)  Let me hand you Government
9    Exhibit 201.  I know it's thick.  We're not
10   going through all of it.  Mr. Snyder, these are
11   notes taken by PWC employees.
12   A. Okay.
13   Q. I know you haven't seen them, but I just wanted
14      to ask you about some things in here.
15         Turn to -- bottom right-hand corner
16      there are some PWC Bates stamps.  Turn to PWC
17      1287 please.
18   A. Okay.
19   Q. There are some notes there, it says "9/10."  Do
20      you see that?  "Dennis M. Tom Palmisano," says
21      "Seller conferred with EY.  Risk to seller.
22      Seller-buyer call on structure plugged in
23      Fortrend."  Do you recall having a conversation
24      about risks to Langley with regard to Fortrend?
25   A. I don't specifically recall having discussions

Page 123

1      regarding risks to Langley, no.
2    Q. Generally, do you recall anything?
3    A. Not specifically.
4    Q. How about generally?
5    A. No, not generally.
6    Q. On the bottom of that page it says, "Seller
7      asking for incremental consid" -- I assume that
8      means consideration -- "equal to half the
9      step-up."
10        Were you aware that Langley was
11      requesting an incremental consideration equal
12      to half the step-up in basis in assets?
13   A. No, I wasn't privy to the price negotiations.
14   Q. Go to 1297, please.
15   A. (Witness complies.)
16   Q. At the top it says, "August 26.  Steve, Snyder
17      and Fortrend call."  Then it says, "No
18      tombstones."  Do you see that?  Or does it say,
19      "No tomatoes"?
20   A. I don't know what it says.
21   Q. Do you recall having the conversation with
22      Steve and Fortrend on August 26, phone call or
23      anything?
24   A. I think that was probably that call that was
25      referred to in that fax that I received, I

Page 124

1    would imagine.
2    Q. Was there some discussion -- everybody agreed
3      to do the standard dog and pony show, do you
4      recall any of that discussion?
5    A. I'm not sure what you are referring to.
6    Q. Well, No. 1 item, do you recall, "Agree to
7      std dog and pony show."  Do you recall those
8      words being used?
9         MS. SEABROOK:  That may be "dog and
10        pony shoes."
11   A. I'm not sure what that is referring to.
12   Q. (By Mr. Coffin)  But do you recall having a
13      discussion about a dog and pony show in that
14      conversation on August 26?
15   A. Not specifically.
16   Q. How about generally?
17   A. No, not generally either.
18        MS. SEABROOK:  Do we know whose notes
19      these are?
20        MR. COFFIN:  I think Gary Wilcox.
21   Q. (By Mr. Coffin)  Were you aware of any fee
22      that Fortrend was to receive in conjunction
23      with the intermediary transaction that it
24      entered into?
25   A. No, I didn't have privy to that information, I

Page 125

1    was not privy to that information.
2    Q. Did you ever become aware that Fortrend
3      received a fee that was a percentage of the
4      step-up in basis in the Bishop Group assets?
5         MR. STERN:  Objection, form.
6    A. No.
7    Q. (By Mr. Coffin)  Did you ever meet
8      Larry Austin?
9    A. No.
10   Q. Did you ever talk to Mr. Austin?
11   A. I don't believe so.
12   Q. Did anybody on your staff?
13   A. No, I don't believe so.
14   Q. Do you know who owned K-Pipe Group?
15   A. I believe it was this SCALP, LP, Limited
16      Partnership, Inc., but I don't recall
17      specifically.
18   Q. Did you look at who the principals of SCALP
19      were?
20   A. No, I did not.
21   Q. Just one more exhibit.  Let me hand you what
22      has been marked as Government Exhibit 159.
23      Once again, this is not something produced from
24      your office, it's produced by PWC.
25         Turn to 369, PWC 369, please.

**HUNDT REPORTING**
**214-220-1122**

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 126

1  A. (Witness complies.)
2  Q. Do you see those Bates stamps on there?
3  A. Yes.
4  Q. Do you see the comments?  About three comments
5     up from the bottom it looks like Mr. Palmisano
6     had an entry on 9/2/99.  It says, "Bishop deal
7     cc with drm, rhw, steve corbs, bruce snider re:
8     Cap loss generator."  Any idea what a cap loss
9     generator is?
10 A. I think that was something that PWC was
11    pitching to Dennis Langley, as I recall.  But I
12    don't believe that there was ever a transaction
13    with respect to a capital loss generator.
14 Q. How did the capital loss generator transaction
15    work?
16 A. I don't recall.
17 Q. You said PWC was pitching that to Langley?
18 A. I think so.
19 Q. Similarly, did PWC pitch the intermediary
20    transaction to Langley?
21 A. I'm not aware that they did specifically.
22 Q. Turn to -- or generally?
23 A. Or generally.
24 Q. Turn to 370, please, PWC 370.
25 A. (Witness complies.)

Page 127

1  Q. There's an entry by Mr. Palmisano, it's the
2     last entry on that page, on 9/24/99, under
3     Comments.  If you look, you'll see beginning
4     with the third line from the bottom it says,
5     "cc with rr/ck re: Alternative structure
6     proposed by EY."  Was there a structure being
7     proposed by Ernst & Young around that date?
8  A. I don't recall what that would have been.
9  Q. So the answer is no or yes?
10 A. The answer is I don't remember.
11       That could have been on the
12    disposition of unwanted assets, but I'm not
13    sure.  He mentions 311 b issue up here.
14 Q. Who does, Mr. Palmisano does in his Comments?
15 A. Right.
16 Q. Mr. Snyder, when we look at those exhibits that
17    showed the high tax basis and the Petro
18    Holdings and the other interests, do you recall
19    those?
20 A. Yes.
21 Q. Did you ever inquire as to how those
22    contributed assets had such high tax basis?
23 A. I may have asked some questions on the matter.
24    I don't know if I ever got finality of an
25    answer.

Page 128

1  Q. Did that concern you or was that a concern of
2     yours at the time?
3  A. I mean, again, the tax return is not an audited
4     document, it's representations taken by the
5     taxpayer.
6  Q. But there had to be a reason why you may have
7     asked for additional information.
8  A. Well, I think you have to use some type of
9     reasonableness and you have to ask the
10    appropriate questions, if you receive
11    information that may not be correct or may not
12    be intended.
13 Q. Did you come to the conclusion then that they
14    were correct or did you just accept the
15    representations provided by Mr. Teig and
16    Mr. Austin?
17 A. I accepted the representations made by the
18    taxpayer.
19 Q. Did you have any concern at all in signing the
20    tax return because of those high basis assets?
21 A. No, because, again, I felt like the -- like we
22    had done our diligence to the extent it needed
23    to be done with respect to making inquiries.
24       MR. COFFIN: I'll pass the witness.
25 EXAMINATION BY MR. STERN:

Page 129

1  Q. While we're on the subject of the basis, the
2     high basis in those assets, what was the
3     significance of that basis to the K-Pipe tax
4     returns that you prepared?
5  A. The significance of the basis?
6  Q. Kind of a general concept.
7  A. Well, the significance of the basis is that the
8     basis is used for determining the gain or loss
9     in the subsequent sale of those assets, which
10    needs to be reflected on the tax return.
11 Q. As I understand it, in the tax return there was
12    a substantial loss associated with the sale of
13    those assets?
14 A. Correct.
15 Q. What gain did those losses offset?  General
16    concepts.
17 A. They would have offset the sale of the
18    partnership interests.
19 Q. When you say "sale of the partnership
20    interests," you're talking about the sale of
21    the Bishop Group partnership interests to
22    Midcoast?
23 A. Correct.
24 Q. And you attempted to gather whatever
25    information you could regarding that basis and

33 (Pages 126 to 129)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 130

1   the legitimacy of those losses?
2   A.  Yes.
3   Q.  And in the end, you relied on the
4   representations of the taxpayer?
5   A.  Correct.
6   Q.  And if the basis was subject to challenge and
7   was not, in fact, legitimate, what would happen
8   to the tax liability of the taxpayer, K-Pipe?
9   A.  If the losses were disallowed?
10  Q.  Yes.  That's a better way of saying it.
11  A.  If the losses were disallowed, I think there
12  would be a tax liability associated on that
13  return.
14  Q.  And the tax liability would have been
15  associated with the sale of the partnership
16  interests to Midcoast?
17  A.  Correct.
18  Q.  Now, in reading -- we can go back and look at
19  it, but in reading your engagement letter, it
20  appeared that there were provisions in the
21  engagement letter, looked like standard stuff,
22  but to the extent there was any challenge by
23  the Internal Revenue Service to the tax
24  returns, that your firm was available to
25  provide certain services?

Page 131

1   A.  Right.
2   Q.  Were you ever called upon by K-Pipe to provide
3   services in connection with any audit or
4   challenge by the IRS to those returns?
5   A.  Yes.
6   Q.  When?
7   A.  It would have been probably in sometime during
8   2004.
9   Q.  I've seen --
10  A.  I believe there was a gentleman by the name
11  of -- it was an attorney that was representing
12  K-Pipe pursuant to an IRS examination.  I
13  believe his name was -- Randall Dick was his
14  name.  And he requested certain information
15  pursuant to a document request that the service
16  had received.
17  Q.  We've seen some notations on some of these
18  documents, 3 of 4, 4 of 4, and I think you made
19  reference to requests from the IRS.  Were those
20  documents that you generated in connection with
21  those requests?
22  A.  Either pursuant to that request or I did
23  receive a separate summons from the Internal
24  Revenue Service for our work papers.
25  Q.  Let me make sure I understand exactly how that

Page 132

1   played out.  At some point in 2004, Mr. Dick
2   called you and requested certain information
3   from you so that K-Pipe could respond to an IRS
4   summons?
5   A.  Yeah.  And 2004 may not be the right date.  It
6   seemed like to me it was -- there was a lot of
7   information gathering first on his behalf, and
8   then also I was the subject or our firm was the
9   subject of an IRS summons with respect to the
10  Bishop Group and the tax return work papers, et
11  cetera.
12  Q.  And it was in connection with that second
13  information gathering effort by the IRS that
14  you gave your interview that was transcribed?
15  A.  I was subpoenaed.
16  Q.  You were subpoenaed?
17  A.  Right.
18  Q.  But it was about the same time as the summons
19  directed to Ernst & Young?
20  A.  It was subsequent to the summons.
21  Q.  So as far as post-return activity by Ernst &
22  Young, there was responding to Mr. Dick's
23  requests for information?
24  A.  Yes.
25  Q.  There was responding to the IRS's summons to

Page 133

1   Ernst & Young directly?
2   A.  Yes.
3   Q.  And preparation for and participation in your
4   interview?
5   A.  Yes.
6   Q.  Anything else?
7   A.  With respect to K-Pipe?
8   Q.  Yes.
9   A.  No.
10  Q.  In connection with the information gathering,
11  were you, and others at Ernst & Young that you
12  are aware of, gathering factual information
13  such as documents and providing data as opposed
14  to doing some sort of independent analysis and
15  providing advice?
16  A.  We were generally gathering information in
17  response to the document request and also the
18  summons.  We were not providing technical tax
19  advice, no.
20  Q.  With respect to either the stock sale from
21  Mr. Langley to K-Pipe or the separate asset
22  partnership interest sale from K-Pipe to
23  Midcoast, have you been involved in any other
24  activity generated by the IRS?
25  A.  I'm sorry, I don't understand the question.

34 (Pages 130 to 133)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 134

1  Q.  Well, I thought you qualified one of your
2      earlier answers that suggested to me that maybe
3      there was -- I don't know whether there was
4      some activity surrounding Mr. Langley or --
5  A.  No, I did -- I think it was referred to here in
6      the Kyle Klein entry.  We did some work for one
7      of Mr. Langley's other companies.  I think he
8      was looking at another acquisition, that was
9      completely unrelated to this -- this
10     transaction and this tax return filing, that
11     was completely separate, and that was in that
12     next year.
13 Q.  Do you currently have or does Ernst & Young
14     currently have any relationship with K-Pipe?
15 A.  No, other than an outstanding invoice for the
16     data collection and these services.
17 Q.  What about Midcoast?
18 A.  No.
19 Q.  Have you ever had any client-accountant client
20     relationship with Midcoast?
21 A.  Not that I'm aware of.  I don't know if there
22     is any relationship in our Houston office, and
23     I haven't run that check, but there's no
24     relationship with the Kansas City office.
25 Q.  So as far as you sitting here today, you're not

Page 135

1      aware of any relationship?
2  A.  No.
3  Q.  What about with Enbridge Energy or any of its
4      affiliated companies?
5  A.  Not that I'm aware of.
6  Q.  During questioning from Mr. Coffin and your
7      initial interview with -- I think it was
8      Ms. Creswell (ph.)?
9  A.  Yes.
10 Q.  There has been some discussion about who PWC --
11     who was PWC's client.
12 A.  Correct.
13 Q.  I think the bottom line is, you are not sure
14     who their client was?
15 A.  I think my representation is it was either/or.
16 Q.  It was either K-Pipe?
17 A.  Either K-Pipe or Fortrend or perhaps both, I
18     don't know.
19 Q.  K-Pipe or Midcoast?
20 A.  I'm sorry, Midcoast or Fortrend, which I also
21     understand to be K-Pipe.
22 Q.  Fortrend you also understand to be K-Pipe?
23 A.  Correct.
24 Q.  Did Mr. Palmisano or anyone else from PWC ever
25     tell you, make any statements to the effect,

Page 136

1      that Fortrend or K-Pipe was a PWC client?
2  A.  No, I don't recall that.
3  Q.  Do you recall whether anyone made any
4      statements or representations to you that
5      Fortrend or K-Pipe had some affiliation with
6      Midcoast?
7  A.  I don't recall that either.
8  Q.  Did anyone ever suggest to you that Fortrend or
9      K-Pipe were a Midcoast agent?
10         MR. COFFIN:  Objection, form.
11 A.  I don't recall that either.
12 Q.  (By Mr. Stern)  Throughout the Ernst & Young
13     time entries there are instances where there
14     are references to an intermediary transaction
15     or a midco.  Do you recall we saw those?
16 A.  Yes.
17 Q.  I'm not a tax lawyer, so I may not say this
18     right, so you can just correct me if I'm wrong.
19     But as I understand it, there was an IRS notice
20     that related to intermediary transactions in
21     2001?
22 A.  Yes, I believe that's right.
23 Q.  And to the extent there was a notice issued by
24     the IRS, it defined what was meant in that
25     notice by intermediary transactions?

Page 137

1  A.  I think that's right.
2  Q.  And to the extent, in 1999 and 2000, there were
3      entries in Ernst & Young time records regarding
4      "intermediary transactions," do you know
5      whether you or anyone else at Ernst & Young had
6      in their mind the specific definition adopted
7      by the Internal Revenue Service in 2001?
8  A.  Well, I think the Internal Revenue Service
9      notice refers to transactions or substantially
10     similar transactions.  So my -- I believe that
11     our -- at least our national merger and
12     acquisitions group had knowledge that these
13     types of transactions existed, or substantially
14     similar transactions existed, prior to the
15     notice.  I would be very surprised if that
16     weren't the case.
17 Q.  During some questioning from Mr. Coffin there
18     was some back-and-forth about whether or not
19     Ernst & Young was going to issue an opinion, a
20     tax opinion, in connection with the
21     Langley-Fortrend transaction.
22 A.  Correct.
23 Q.  I may just have misunderstood.  There were some
24     instances where I thought you were saying that
25     EY just doesn't issue an opinion about a

35  (Pages 134 to 137)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:   Bruce Snyder**

---

Page 138

1    transaction that's not finalized; and then
2    there were other instances where I thought you
3    were saying that you may have had concerns
4    about Fortrend specifically.  And let me just
5    put in context my question.
6            I couldn't understand, if you just
7    have a rule that you don't issue those types of
8    opinions, why concerns about Fortrend would
9    even be relevant.  So if you could maybe
10   explain.  Did I miss something?
11   A.  I think what you're asking is the specific
12   concern regarding Fortrend was that they
13   represented to us that they had worked on other
14   deals with Ernst & Young, and in checking with
15   the people named on that fax there was no such
16   relationship.  So that caused a concern.
17           And then with respect to opinions,
18   which I think is the other part of your
19   question, we will agree to issue an opinion on
20   a transaction.  We will not formally issue that
21   opinion until after the transaction has closed.
22   Q.  So you may negotiate and work with your client
23   on the form of the opinion and have it in a
24   draft form?
25   A.  Potentially.

---

Page 139

1    Q.  And that frequently happens?
2    A.  Yes.
3    Q.  Then when the transaction closes, you'll
4    actually issue the opinion?
5    A.  Right.
6            And now there's -- under circular 230
7    there are specific requirements and due
8    diligence processes in place with respect to an
9    opinion that have to be taken into account.
10   Q.  Mr. Coffin also asked you some questions about
11   why the parties might have wanted Ernst & Young
12   to prepare the K-Pipe tax return for '99.  And
13   I thought he was suggesting that that
14   motivation was that the parties wanted the tax
15   return to properly reflect the partnership sale
16   to Midcoast, the sale of the partnership
17   interest to Midcoast.  Do you recall those
18   questions?
19   A.  Yes.
20   Q.  Isn't that what you tried to do?
21   A.  The intent is to reflect, appropriately
22   reflect, the sale -- all transactions within
23   the tax return that we have knowledge of and
24   were provided information for.
25   Q.  That's your job, right?

---

Page 140

1    A.  Correct.
2    Q.  That's what you do every time you prepare tax
3    returns?
4    A.  Correct.
5    Q.  That's why people hire you, right?
6    A.  I hope so.
7    Q.  And to your knowledge, the tax returns did
8    properly reflect the sale of the partnership
9    interests from K-Pipe to Midcoast?
10   A.  To the best of my knowledge, correct.
11   Q.  And to your knowledge, there was no stock sale
12   by K-Pipe to Midcoast?
13           MR. COFFIN:  Objection, form.
14   A.  No, it was our understanding there was an asset
15   sale.
16   Q.  (By Mr. Stern) And to the extent you had
17   knowledge of the transaction between
18   Mr. Langley and K-Pipe, was that a stock sale
19   or an asset sale?
20   A.  It was essentially a stock sale.
21   Q.  I thought you testified to this, and I may be
22   wrong, but did you say that you understood that
23   Mr. Langley was intent on selling the Bishop
24   Group pursuant to an asset sale as opposed to an
25   asset sale?

---

Page 141

1    A.  I think he had been reviewing a lot of
2    alternatives over the last couple of years that
3    I knew of to dispose of the Bishop Group
4    business in some liquidating transaction.
5    Q.  And by the summer of 1999, you understood that
6    he was pursuing a stock sale?
7    A.  I couldn't say specifically that he was
8    pursuing a stock sale.  I think he was pursuing
9    a transaction.
10   Q.  Why would a seller pursue a stock sale as
11   opposed to an asset sale?
12   A.  In the context of a C corporation?
13   Q.  Yes.
14   A.  Because generally, on a stock sale, you would
15   avoid the double taxation which would be caused
16   by the subsequent liquidation of the C
17   corporation proceeds back to the shareholder.
18   Q.  Why would a buyer -- what are the reasons that
19   a buyer would prefer an asset sale?
20   A.  If there were a -- well, again, in the context
21   of a C corporation, if the assets to be
22   acquired have substantial increase in fair
23   market value over basis, then the buyer would
24   want the assets in order to be able to
25   depreciate or amortize those assets and receive

---

HUNDT REPORTING
214-220-1122

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:   Bruce Snyder**

Page 142

1    the tax benefit of the purchase price.
2  Q. Are there any other reasons why a purchaser
3    would prefer an asset purchase over a stock
4    purchase?
5        MR. COFFIN:  Objection, form.
6  A. I think there would be a lot of legal reasons.
7  Q. (By Mr. Stern) Like potential liabilities?
8  A. You would know better than I.
9  Q. You have been involved in a number of
10   transactions?
11 A. Sure.
12 Q. You understand that -- you've observed what
13   parties consider to be important as they enter
14   into transactions like this?
15 A. Right.
16 Q. Are those types of liabilities the sort of
17   things that buyers typically are concerned
18   about or at least want to consider in either
19   doing an asset or a stock deal?
20       MR. COFFIN:  Objection, form.
21 A. Yes.
22 Q. (By Mr. Stern) Have you been involved in
23   transactions where someone other than your
24   client pays your fees?
25 A. I don't recall that I have.

Page 143

1  Q. To your knowledge, did Mr. Langley sell stock
2    to Midcoast?
3  A. I don't believe so.
4  Q. What are post-closing adjustments?
5  A. Post-closing adjustments?
6  Q. Yes.
7  A. They are generally adjustments to the purchase
8    price based upon an audit of financial
9    statements for working capital, whatever the
10   case may be, which can't be reconciled prior to
11   the deal closing.
12 Q. Were there post-closing adjustments that you're
13   aware of between K-Pipe and Langley?
14 A. There may have been.  I don't specifically
15   recall what those might have been.
16 Q. We'll look at some documents in a minute.
17       Do you remember whether there were
18   post-closing adjustments between K-Pipe and
19   Midcoast?
20 A. Again, I don't recall whether there were or
21   not.
22 Q. I'm going to bounce around a little bit.  Let's
23   go through these documents.
24       Let's look at Government Exhibit 228.
25   Mr. Coffin showed you this e-mail from

Page 144

1    Mr. Hoffman to Mr. Snyder -- or to you, dated
2    March 21, 2000, where there's a statement --
3  A. Still getting there.  I'm a little slow.  Okay.
4  Q. Do you see there in the middle there's a
5    statement by Mr. Hoffman, "There have been no
6    revenue activities and we do not expect that
7    there will be any taxable income for the period
8    between the closing date and the 12/31/99"; do
9    you see that?
10 A. Yes.
11 Q. When you were responding to questions from
12   Mr. Coffin, I thought you left open the
13   possibility that either in your conversations
14   with Mr. Teig or through other information that
15   you gathered after receiving this that you may
16   have learned whether this was incorrect or
17   correct.
18 A. Well, the context of this was just simply to
19   get an estimate of taxable income for the year
20   so that we could file extensions.  It wasn't to
21   nail down information to prepare the tax
22   returns.  So this was just for estimate
23   purposes only in order to get a good extension
24   number so we weren't underpaid.
25 Q. Do you know whether there was any revenue

Page 145

1    activity for the period between the closing
2    date and 12/31/99?
3  A. Well, I think we discussed earlier that
4    documented income statement and balance sheet
5    and all those entries.  There were some booked
6    gains and losses.  Obviously, there were a lot
7    of tax gains and losses on the -- that were
8    later reflected as a result of all those
9    transactions that we previously discussed.
10       So I think his statement there either
11   is incorrect or he was just referring to the
12   fact that there was no items that gave
13   significant rise to income that would have
14   created us -- that would have required us to
15   increase our expected extension payment.
16 Q. It you could look at Exhibit 233, which is the
17   August 22, 2000, memo from Howard Teig to Bill
18   Lacy and Shari Fox.
19 A. Okay.
20 Q. On the third page there is a reference to, at
21   the bottom, to the sundry cash payments?
22 A. I'm sorry, where are you at?
23 Q. The third page, bottom of the page, very
24   bottom.
25 A. Is that 3 of 7 or 4 of 7?

37 (Pages 142 to 145)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:   Bruce Snyder**

Page 146

1  Q. 4 of 7.
2  A. Okay.
3  Q. Sundry payments, $5,000,000, very bottom?
4  A. The 5,072,753?
5  Q. Right.
6  A. Right.
7  Q. "Distribution to SCALP, 2,902,000," do you know
8     what that is?
9  A. I assume that was some type of dividend
10    distribution.
11 Q. If you could look at Exhibit 250.  I may need
12    to take a break for this.  But this is the
13    Manatt Phelps opinion letter?
14 A. Exhibit 250?
15 Q. Yes, Government Exhibit 250.
16 A. Okay.
17 Q. Have you had an opportunity to read this
18    document?
19 A. No, I haven't.
20 Q. You may just have to look at the opinions,
21    which I think start at page marked DOJ 15270,
22    second to the last and last page, but you can
23    read whatever you want to read.
24       My question would be whether there is
25    anything in this document that's inconsistent

Page 147

1     with the positions that were taken in the
2     K-Pipe return that Ernst & Young prepared.
3        MR. COFFIN:  Objection, form.
4  A. Without reading -- without analyzing the
5     document -- I guess I don't care necessarily to
6     analyze this document to try to make that
7     determination.
8  Q. (By Mr. Stern) Well, what would you have to
9     analyze?
10 A. Well, I think you would have to -- I didn't
11    realize this opinion existed.
12 Q. No, I understand that.  And there is -- well, I
13    would like to avoid the suggestion that there
14    is anything nefarious about that.  If you
15    can -- there are specific opinions that are set
16    forth, there are factual assumptions that are
17    set forth in this document.  I'm not asking you to
18    endorse the opinion, but if you could look at
19    it and tell me whether anything jumps out at
20    you as being inconsistent with the positions
21    that you understand were taken in the K-Pipe
22    return.
23       MR. COFFIN:  Objection, form.
24 A. Well, I think it's the taxpayer's -- if he
25    didn't -- if the taxpayer didn't specifically

Page 148

1     request that I review their opinion and make
2     sure that it's consistent with the tax return,
3     then I don't have an obligation.  It's really
4     the taxpayer's obligation to decide whether or
5     not the information reflected in the tax return
6     is -- corresponds to the opinion that they
7     received, and the representations that they
8     provided to me correspond to the opinion that I
9     received.
10 Q. (By Mr. Stern)  We're not talking about whose
11    obligations -- who had what obligation to do
12    what.
13       I'm asking you to look at the letter
14    and let me know if there's anything that jumps
15    out at you as being inconsistent with the
16    positions that are taken in the K-Pipe return.
17    We're not holding you to the standard of an
18    opinion that you would issue, I just want to
19    know if there is anything that jumps out at you
20    as you look at this that is inconsistent with
21    your understanding of the K-Pipe return.
22       MR. COFFIN:  Objection, form.
23       THE WITNESS:  Am I required to do
24    that?
25       MS. SEABROOK:  He's asked you the

Page 149

1     question.  Why don't we take a few minutes off
2     the record.  Why don't we give Bruce a couple
3     of minutes to look through it.
4        (A recess was taken.)
5        MR. COFFIN:  I want to keep my
6     objection to form.
7        MR. STERN:  What is your objection to
8     form?
9        MR. COFFIN:  It is who -- you said
10    K-Pipe's -- or you said positions on the tax
11    return.  I don't know whose positions you are
12    referring to.
13       MR. STERN:  The positions on the tax
14    return.  I think the judge will understand
15    that.
16 Q. (By Mr. Stern) Have you had a chance to review
17    Exhibit 250, Government Exhibit 250?
18 A. Yes.
19 Q. I believe my question was whether anything
20    jumped out at you that was inconsistent with
21    the positions taken in the K-Pipe tax return
22    for 1999.
23       MR. COFFIN:  Same objection.
24 A. No, nothing jumps out at me, other than the
25    numbers being just a little bit different.

38  (Pages 146 to 149)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

**Witness:  Bruce Snyder**

Page 150

1  Q. (By Mr. Stern) Is it a material difference?
2  A. Couple of million here or there, I think.
3  Q. In the tax return itself, 254, there is
4     Schedule J -- Schedule K, which is on the same
5     page as Schedule J.  Are you there?
6  A. Yes.
7         MR. COFFIN:  What Bates number is
8     that?
9         MS. SEABROOK:  7606.
10 Q. (By Mr. Stern) Paragraph 3, "At the end of the
11    tax year did the corporation own, directly or
12    indirectly, 50 percent or more of the voting
13    stock of a domestic corporation?"  Then it
14    says, "Statement 10."  So we would have to look
15    at Statement 10 for the answer to that
16    question?
17 A. "At the end of the tax year did the corporation
18    own, directly or indirectly, 50 percent or more
19    of the voting stock of a domestic corporation?"
20    So the answer is yes.  And statement 10...
21 Q. Can you find statement 10?  It's 7632.
22 A. Okay.
23 Q. This statement 10 would be a list of the
24    entities that K-Pipe owned 50 percent or more
25    of at the end of the tax year -- corporations

Page 151

1     that K-Pipe owned 50 percent or more of the
2     voting stock of at the end of the tax year?
3  A. Correct.
4  Q. And there is either income or loss attributable
5     to each of these?
6  A. Yes.
7  Q. Do you know what the activities in each of
8     these entities was at the end of 1999?
9  A. I believe that most of these were simply
10    holding companies.  I believe -- if I recall
11    back, Bishop Pipeline Company and Bishop Gas
12    Transmission generally held the partnership
13    interests, and the gas pipeline operations were
14    through the partnerships.
15 Q. What about Management Resources Group, Limited?
16 A. I don't recall exactly what that one did.  It
17    did not -- I don't believe it had a lot of
18    activity.
19 Q. Do you recall, while we have got the return,
20    Mr. Coffin asked you some questions about the
21    Butcher Interest.  And I think there was a tax
22    code provision, which I can look up, but
23    dealing with something called a disguised sale.
24    Do you recall that?
25 A. Yes.

Page 152

1  Q. Do you know whether the Butcher Interest
2     transaction was treated as a disguised sale in
3     these tax returns?
4  A. Again, I don't recall.
5  Q. How would we figure that out?
6  A. It may be -- it may be in part of the income
7     from the partnerships, but I just don't recall
8     exactly where that would be.
9  Q. So sitting here today, you don't know how we
10    could specifically figure that out?
11 A. I don't know specifically.
12 Q. Generally?
13 A. Or generally, other than going back through
14    detailed work papers, how we could figure that
15    out, no.
16 Q. Do you know who did Dennis Langley's personal
17    tax returns?
18 A. I believe it was someone at Meara King.
19 Q. Did you interface with them at all in
20    connection with the stock sale to K-Pipe?
21 A. Very briefly.  I remember we provided some
22    information and I can't remember even what it
23    was about.  I think it was a person by the name
24    of Julie Welch.
25 Q. This is my last question, unless I think of

Page 153

1     something else.  But in response to one of
2     Mr. Coffin's questions about your early contact
3     with Fortrend where Mr. Palmisano was a
4     participant in the call --
5  A. Correct.
6  Q. -- I think you made some statement that you
7     either assumed or you may have stated that
8     Palmisano had worked for Fortrend in the past?
9  A. I believe that I made the statement that he
10    appeared to at least be an advocate of Fortrend
11    or worked with Fortrend in the past.
12 Q. Do you have any knowledge that he worked with
13    Fortrend in the past?
14 A. No, not specifically.
15 Q. Generally?
16 A. Generally, no.  I don't know if there is any
17    general knowledge in that instance.
18       MR. STERN:  I'll pass the witness.
19 RE-EXAMINATION BY MR. COFFIN:
20 Q. Just a couple of follow-up questions,
21    Mr. Snyder.
22    I am sorry to dwell on this, but
23    again, on the tax opinion that we talked about
24    earlier where E&Y was requested to provide a
25    tax opinion letter on the transaction -- and

**HUNDT REPORTING**
**214-220-1122**

**Witness:  Bruce Snyder**

Page 154

1    that would have been the stock sale, is that
2    right, to K-Pipe?
3  A.  Or to Fortrend at the time.
4  Q.  Or to Fortrend at the time, okay.
5         And you said earlier there were two
6    reasons it wasn't issued:  No. 1, you said
7    because Ernst & Young does not issue tax
8    opinions for transactions that haven't closed;
9    and the other reason I think you said is you
10   weren't comfortable with Fortrend's
11   representations.  Is that correct?
12  A.  (Witness nods head.)
13  Q.  In this case, had you been comfortable with
14   Fortrend's representations, would the firm have
15   gone ahead and agreed to provide the tax
16   opinion letter?
17  A.  I don't recall whether we would have or not.
18  Q.  But it certainly wasn't a limitation that the
19   transaction hadn't closed yet, because had you
20   been comfortable with all the circumstances,
21   you would have --
22  A.  We may have decided --
23         MR. STERN:  Let me object to the
24   question once he finishes, if I could.
25  A.  We may have decided to --

Page 155

1         MR. STERN:  Now, hold on.
2    Objection, leading.
3         I didn't think he finished his
4    question.  And I apologize for interrupting so
5    much.
6         MS. SEABROOK:  What was the question?
7  A.  Who is talking now?
8  Q.  (By Mr. Coffin)  Was it a true limitation that
9    the transaction hadn't closed yet that would
10   have prevented Ernst & Young from issuing the
11   tax opinion letter?
12  A.  As I said, it was a matter of we may have
13   agreed to issue an opinion, and I think that's
14   the question you're asking, but in this case we
15   agreed not to issue an opinion -- or not to
16   pursue trying to issue an opinion on the
17   transaction.
18  Q.  Was the reason based upon the fact that you
19   were not comfortable with Fortrend's
20   representations?
21  A.  I think that probably had something to do with
22   it.
23  Q.  Were there any other limitations you can think
24   of why --
25  A.  Well, I mentioned earlier I thought it was a

Page 156

1    timing matter, too --
2  Q.  Oh, you mean they needed one quickly?
3  A.  -- with how quickly they wanted the opinion.
4    And I don't know if it was a matter of they
5    wanted the opinion before the transaction
6    closed or not, which we would not issue a
7    formal opinion prior to that time.  We may
8    agree to issue one, but we wouldn't issue it
9    prior to the closing.
10  Q.  Back on the tax return, Government Exhibit 254,
11   back to schedule K, which is DOJ 7632,
12   statement 10, Mr. Stern was discussing those
13   entities listed on Schedule K.
14  A.  Let me get back there.
15  Q.  It's the 7632.
16  A.  Yes.
17  Q.  Those income and loss amounts that are listed
18   there, do you recall Mr. Stern asking you about
19   those?  Do you recall that questioning?
20  A.  Yes.
21  Q.  That was income or loss that would have been
22   recognized prior to the sale of stock -- or I'm
23   sorry, prior to the sale of assets to Midcoast,
24   correct?
25  A.  No, that should have been for the entire year.

Page 157

1  Q.  Through December 31?
2  A.  Right.
3  Q.  Now, if they sold the assets to those entities,
4    how could they still recognize income or loss?
5  A.  Well, this would have been income for the
6    entire year.  So it would have been income
7    pre-transaction and post-transaction as well.
8    So all the operations of the partnerships that
9    flowed up to these companies would have been in
10   those numbers.
11         And also, any ordinary income
12   recognized on the sale itself of the
13   partnership interest would be included in those
14   numbers.
15  Q.  I see.  So the operations, would they have
16   necessarily ceased on November 9th of 1999?
17  A.  They would have transferred to the buyer at
18   that point in time.
19  Q.  Which was Midcoast?
20  A.  Or the operations would not have ceased, no,
21   because I believe the partnership interests
22   were acquired, so they would have stayed
23   intact.
24  Q.  Who are you referring to as the buyer then?
25  A.  The buyer of the assets --

40  (Pages 154 to 157)

919f3d3d-1a58-49d0-8589-5c63369a7ddd

Witness:  Bruce Snyder

Page 158

1  Q. Yes.
2  A. -- or the buyer of the partnership interests?
3  Q. Yes.
4  A. It would have been Midcoast Energy.
5  Q. So if the partnership interests transferred to
6     Midcoast, then K-Pipe would not have recognized
7     income after that date from those operations?
8  A. Not from the operations, that's correct.
9  Q. But from the gain or loss from the sale of
10     those partnership interests?
11  A. Right.
12        MR. COFFIN:  Pass the witness.
13  RE-EXAMINATION BY MR. STERN:
14  Q. You don't specifically know what generated that
15     income and whether it was before or after the
16     disposition of the partnership interests to
17     Midcoast?
18  A. On this schedule?
19  Q. Yes.
20  A. Well, this income should all be reflected on
21     the consolidated return, because these are all
22     consolidated group members listed here.
23  Q. No, I understand that.  But to the extent there
24     were assets retained by K-Pipe that weren't
25     transferred to Midcoast, there may be income

Page 159

1     associated with that or loss associated with
2     that?
3  A. There could have been other things flowing
4     through.
5  Q. So to specifically say that this income was pre
6     or post closing of the partnership sale to
7     Midcoast, you really can't say specifically?
8  A. No, this would have reflected income for the
9     entire year.
10        (Snyder Deposition Exhibit No. 1 was
11     marked for identification.)
12  Q. (By Mr. Stern)  I have marked this as Snyder 1.
13     This is a fax from Howard Teig to Shari Fox and
14     it has some working capital account data.  Do
15     you see that?  Does this look familiar to you?
16  A. No, it really doesn't.  I don't recall -- I
17     don't recall this work paper.
18  Q. We'll ask Shari tomorrow.
19        MR. STERN:  Pass the witness.
20  FURTHER EXAMINATION BY MR. COFFIN:
21  Q. Mr. Snyder, just one quick question.
22        In your testimony you have been
23     distinguishing I think between a sale of assets
24     and a sale of partnership interests.
25  A. Right.

Page 160

1  Q. Is there a distinction for the Internal Revenue
2     Code for that or is there a reason why or are
3     you trying to be more specific than general?
4  A. I'm trying to be more specific, because the
5     transaction was structured as a sale of
6     partnership interests, and generally, I think
7     the tax treatment is relatively the same.
8        MR. COFFIN:  No further questions.
9        MR. STERN:  Nothing for now.
10        (The deposition concluded at 3:48
11  p.m.)

Page 161

1  RE: Enbridge Energy, vs. United States
2  PG/LN        Correction          Reason
3  _____|_____|_____
4  _____|_____|_____
5  _____|_____|_____
6  _____|_____|_____
7  _____|_____|_____
8  _____|_____|_____
9  _____|_____|_____
10  _____|_____|_____
11  _____|_____|_____
12  _____|_____|_____
13  _____|_____|_____
14  _____|_____|_____
15  _____|_____|_____
16  _____|_____|_____
17  _____|_____|_____
18  _____|_____|_____
19  _____|_____|_____
20  _____|_____|_____
21  _____|_____|_____
22
23        _____
24        BRUCE SNYDER
25  GLR

HUNDT REPORTING
214-220-1122

919f3d3d-1a58-49d0-8589-5c63369a7ddd

Witness:  Bruce Snyder

Page 162

```
 1    RE:  Enbridge Energy, vs. United States
 2
 3        ____ I certify that I have read my testimony
 4          and request that NO changes be made.
 5
 6        ____ I certify that I have read my testimony
 7          and request that the above changes be
 8          made.
 9
10
11          _____
12          BRUCE SNYDER
13
14
15        Subscribed and sworn to before me this ____
16    day of _____, 2007.
17
18
19          _____
20          Notary Public
21          State of _____
22          County of _____
23          My Commission Expires_____
24    GLR
25
```

Page 163

```
 1          C E R T I F I C A T E
 2
 3        I, Gail L. Riede, a Certified Court Reporter of
 4    the State of Missouri, do hereby certify:
 5        That prior to being examined, the witness was
 6     first duly sworn;
 7        That said testimony was taken down by me in
 8    shorthand at the time and place hereinbefore stated
 9    and was thereafter reduced to typewriting under my
10    direction;
11        That the foregoing transcript is a true record
12    of the testimony given by said witness;
13        That I am not a relative or employee or
14    attorney or counsel of any of the parties or a
15    relative or employee of such attorney or counsel or
16    financially interested in the action.
17        Witness my hand and seal this 13th day of
18    February, 2007.
19
20
21
22
23          Gail L. Riede
24          Missouri Supreme Court
25          Certified Court Reporter (G)
```

42 (Pages 162 to 163)

919f3d3d-1a58-49d0-8589-5c63369a7ddd