Witness:   Thomas J. Palmisano

```
                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF TEXAS
                              HOUSTON DIVISION

ENBRIDGE ENERGY COMPANY,        )
INC. AND ENBRIDGE MIDCOAST      )
ENERGY, L.P. f/k/a ENBRIDGE     )
MIDCOAST ENERGY, INC. f/k/a     )
MIDCOAST ENERGY RESOURCES,      )
INC.,                           )
            Plaintiffs          )
                                )
vs.                             ) CASE NO. H-06-0657
                                )
UNITED STATES OF AMERICA,       )
            Defendant.          )
```

ORAL DEPOSITION

THOMAS J. PALMISANO

February 22, 2007


ORAL DEPOSITION OF THOMAS J. PALMISANO, produced as

a witness at the instance of the Defendant and duly

sworn, was taken in the above-styled and numbered cause

on the 22nd day of February, 2007, from 10:00 a.m. to

2:32 p.m., before Kelly Hanna, Certified Shorthand

Reporter in and for the State of Texas, reported by

computerized stenotype machine at the offices of Vinson

& Elkins LLP, First City Tower, 1001 Fannin Street,

Suite 2300, Houston, Texas, pursuant to the Federal

Rules of Civil Procedure and the provisions stated on

the record or attached hereto.

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

Witness:  Thomas J. Palmisano

---

## Page 2

```
 1              APPEARANCES
 2
 3  FOR ENBRIDGE ENERGY COMPANY, INC. AND
    ENBRIDGE MIDCOAST ENERGY, L.P.:
 4
       Mr. Karl Stern
 5     Ms. Emily W. Pipkin
       Vinson & Elkins LLP
 6     1001 Fannin Street, Suite 2300
       Houston, Texas 77002-6760
 7     Telephone: 713.758.4780
       Fax:  713.615.5258
 8     E-mail: epipkin@velaw.com
 9  FOR DEFENDANT:
10     Mr. David B. Coffin
       Mr. Herb Linder
11     United States Department of Justice
       Tax Division
12     717 N. Harwood, Suite 400
       Dallas, Texas 75201
13     Telephone: 214.880.9749
       Fax:  214.880.9721
14
    FOR THE WITNESS:
15
       Mr. Albert H. Turkus
16     Mr. Brian M. Duncan
       Skadden, Arps, Slate, Meagher & Flom, LLP
17     1440 New York Avenue, N.W.
       Washington, DC 20005-2111
18     Telephone: 202.371.7000
       Fax:  202.393.5760
19     E-mail: aturkus@skadden.com
20  ALSO PRESENT:
21     Kelly Hanna, CSR, RPR, CRR, CMRS
       Kevin G. Croke, Internal Revenue Service
22     Ms. Jana Jordan, Enbridge Energy Company, Inc.
23
24
25
```

## Page 3

```
 1              INDEX
 2                              PAGE
 3  THOMAS J. PALMISANO
 4  Examination by Mr. Coffin ...................   5
    Signature Page  .............................  112
 5  Court Reporter's Certificate ................  114
 6
 7              EXHIBITS
 8
 9  EXHIBIT     DESCRIPTION          PAGE
10  No. 5    Letter dated 4/8/99 (Palmisano   13
             to Robert) (Mid 2.3-5 - 2.3-8)
11
    No. 26   Facsimile Transmission Sheet     16
12           dated 8/30/99 (PWC 117-119)
13  No. 35   Facsimile dated 9/10/99 (PWC     22
             110-116)
14
    No. 37   E-mail dated                     23
15           9/12/1999(PWC001-042)
16  No. 42   Letter dated 9/30/1999 (Hoffman  24
             to Robert) (MID 2.1-439-442)
17
    No. 50   Miscellaneous spreadsheets       24
18           (MID2.1-1700-1703)
19  No. 87   Memo dated 10/24/99 (Palmisano   27
             to File)(PWC 1026-1027)
20
    No. 115  Letter dated 11/5/99 (PWC        30
21           144-149)
22  No. 159  A/R Client Receipts (PWC         37
             363-388)
23
    No. 160  Memorandum - Draft of 12/14/99   56
24           (Wilcox/Coffey to Midcoast
             File) (PWC P1112-1156)
25
```

## Page 4

```
 1           EXHIBITS (cont.)
 2  EXHIBIT     DESCRIPTION          PAGE
 3
    No. 161  String of e-mails (PWC P1056)    54
 4
    No. 163  Draft letter (PWC P1092-1105)    57
 5
    No. 164  Draft letter (PWC P1217-1230)    61
 6
    No. 172  String of e-mails (001925-1927)  64
 7
    No. 186  String of e-mails (PWC           66
 8           P1008-1009)
 9  No. 187  String of e-mails (PWC           69
             P1011-1013)
10
    No. 188  String of e-mails (PWC P1016,    71
11           1015, 1013, 1020, 1057)
12  No. 189  Memo dated 2/20/01               73
             (Wilcox/Whitten to Midcoast Tax
13           Files) (PWC 398-399)
14  No. 190  Memo dated 7/23/01               80
             (Chesser/Campbell to Midcoast
15           File)(PWC P1033-1034)
16  No. 201  Handwritten notes (PWC P1271,    82
             1274-1371)
17
    No. 244  Memorandum dated 9/13/00 (Teig   107
18           to Lacy/Fox)  (001601-1604)
19
20
21
22
23
24
25
```

## Page 5

```
 1           THOMAS J. PALMISANO,
 2  having been first duly sworn, testified as follows:
 3               EXAMINATION
 4     Q.  (BY MR. COFFIN) Please state your name for the
 5  record.
 6     A.  Thomas Palmisano.
 7     Q.  What is your current address, Mr. Palmisano?
 8     A.  17618 Glory Rose, Cypress, Texas 77429.
 9     Q.  Have you ever given a deposition before?
10     A.  No, sir.
11     Q.  Okay.  Let me just try to go over the ground
12  rules a little bit.  I'll ask the questions.  I would
13  appreciate if you would answer truthfully and honestly.
14  If you try not to interrupt me, I'll try not to
15  interrupt you.
16          If you don't understand a question, I
17  would ask that you ask me to restate it; and I'll try to
18  do so.  If you need a break at any time, just let me
19  know.  There might be some objections posed by your
20  lawyer and Mr. Stern, and unless you're -- but unless
21  your counsel instructs you not to answer it, I would ask
22  that you answer the question, okay?
23     A.  Okay.
24     Q.  Okay?  You've got to answer audibly, too.
25     A.  Sure.
```

HUNDT REPORTING
214-220-1122

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

---

Page 6

1    Q.  Do you have any medical condition that would
2  prohibit you from understanding my questions today?
3    A.  No.
4    Q.  Are you taking any kind of medication that
5  would prohibit you from understanding my questions
6  today?
7    A.  No.
8    Q.  Give me your educational history beginning with
9  where you graduated from high school, please.
10    A.  Stratford High School in Houston, Texas and
11  University of Texas at Austin with BBAs and PPAs in
12  accounting.
13    Q.  What's the PPA?
14    A.  It's a Master's in accounting.
15    Q.  And what year did you graduate from University
16  of Texas?
17    A.  1993.
18    Q.  Was that for your Master's degree?
19    A.  Yes.
20    Q.  Are you currently a certified public
21  accountant?
22    A.  Yes.
23    Q.  When did you pass the -- or when did you become
24  licensed as a certified public accountant?
25    A.  1994.

---

Page 7

1    Q.  Any other licenses, professional licenses or
2  accreditations?
3    A.  No, sir.
4    Q.  How about your educational history beginning
5  with when you graduated from the University of Texas?
6        MR. TURKUS:  Excuse me.  You said
7  educational history.
8    Q.  (BY MR. COFFIN) I'm sorry.  How about your work
9  history?
10    A.  I've been employed with PriceWaterhouseCoopers
11  since I graduated from the University of Texas.
12    Q.  Beginning in 1993?
13    A.  Correct.
14    Q.  Initially with PriceWaterhouseCoopers or PWC,
15  what were your duties there when you started in 1993?
16    A.  Tax associate.
17    Q.  And what were your responsibilities at that
18  time?
19    A.  Perform tax consulting and tax compliance
20  services for clients of PriceWaterhouseCoopers.
21    Q.  Okay.  Are you currently a manager?
22    A.  A partner.
23    Q.  Partner.  When did you reach partner status
24  with PWC?
25    A.  June of 2005.

---

Page 8

1    Q.  Can you tell me what your titles were in
2  between tax associate and partner?
3    A.  Senior associate, manager, senior manager,
4  director, and then partner.
5    Q.  Mr. Palmisano, have you reviewed anything to
6  prepare for this deposition?
7    A.  Yes.
8    Q.  What did you review?
9    A.  Various documents related to the transaction
10  and copies of the representation letter, opinion letters
11  and various e-mails.
12        MR. TURKUS:  Just for the record,
13  Mr. Coffin, we provided Mr. Palmisano last week after
14  you provided us with documents similar to the ones that
15  are in the binder that you provided to us.
16        MR. COFFIN:  Thank you.
17    Q.  (BY MR. COFFIN) How much time did you spend
18  reviewing those materials, if you recall?
19    A.  A few hours.
20    Q.  Are you familiar with this action between
21  Enbridge Midcoast and the United States?
22    A.  Yes.
23    Q.  Have you been requested by Midcoast to appear
24  at the trial of this matter?
25    A.  Not that I'm aware of.

---

Page 9

1    Q.  During 1999 when you were working for PWC, who
2  did you report to within PWC?
3    A.  I guess the way we're structured at PWC we
4  don't necessarily report to one individual.  We report
5  to the assigned partners at -- for the various clients
6  you're responsible for.  So, it would be a multiple
7  amount of partners.
8    Q.  And what was your title in 1999?
9    A.  Senior manager.
10    Q.  You're familiar with one of PWC's clients known
11  as Midcoast Energy Resources, Inc.?
12    A.  Yes.
13    Q.  With regard to that client, were you providing
14  services for Midcoast?
15    A.  Yes.
16    Q.  And who were you reporting to, if there was a
17  particular partner that was in charge of that
18  engagement?
19    A.  Bob Whitten.
20    Q.  Is Mr. Whitten a tax partner?
21    A.  Tax partner.
22    Q.  Were you familiar with Gary Wilcox on that
23  particular engagement?
24    A.  Yes.
25    Q.  Were you reporting to Mr. Wilcox as well?

3 (Pages 6 to 9)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness: Thomas J. Palmisano**

---

Page 10

1    A.  Yes, during the project.
2    Q.  Do you know when PWC began its relationship
3  with Midcoast?
4    A.  Mid-'90s we started doing tax work for
5  Midcoast.
6    Q.  Were you doing tax work during the mid-'90s for
7  Midcoast?
8    A.  Yes.  We started providing tax services in the
9  mid-'90s.  I don't recall the exact year.
10    Q.  Okay.  And were you on that engagement?
11    A.  Yes.
12    Q.  What kind of service -- tax services were you
13  providing?
14    A.  Tax compliance and general tax advice on
15  various matters.
16    Q.  And was PWC performing any other services for,
17  if you recall, for Midcoast at the time other than tax?
18    A.  Initially we were purely their tax advisor.
19  Later, few years later we started doing their external
20  audit.
21    Q.  Doing their?
22    A.  External audit of their financial statements.
23    Q.  Do you recall who else was performing tax
24  services -- who else from PWC was performing tax
25  services for Midcoast other than yourself?

---

Page 11

1    A.  Myself, Bob Whitten, the engagement partner.  I
2  don't recall the -- the staff we had on the job.
3    Q.  Was there a Dennis McErlean with PWC at the
4  time?
5    A.  Yes.
6    Q.  What was his title?
7    A.  He was a tax partner.
8    Q.  Was he engaged on the Midcoast -- for the
9  Midcoast work?
10    A.  No.  He was -- he was not involved in the
11  day-to-day.
12    Q.  Since the mid-'90s, do you recall if Midcoast
13  had acquired any companies or businesses in between the
14  mid-'90s and 1999?
15    A.  Yes, they -- I don't recall every acquisition,
16  but there were acquisitions of Alatenn, which was, I
17  believe, in 1998.
18    Q.  Could you spell that for me, please?
19    A.  A-L-A-T-E-N-N.  I'm not exactly -- I'm not
20  positive that was the name of the company, and then
21  Midla Gas was acquired, I think within a two-year period
22  afterwards.
23    Q.  So, Alatenn 1998?
24    A.  Approximately.  I'm not certain.
25    Q.  And then Midla Gas, M-I-D-L-A, Midla Gas?

---

Page 12

1    A.  Actually Midla may have come before that; but,
2  yeah, around '97, '98 those two acquisitions occurred.
3    Q.  Do you recall if PWC performed any services for
4  Midcoast related to the Alatenn acquisition?
5    A.  We did.
6    Q.  What kind of services?
7    A.  Assistance with the acquisition.
8    Q.  What kind of assistance?
9    A.  Just general tax, due diligence on the
10  acquisition.
11    Q.  How would you define "due diligence"?
12    A.  Analysis of the basis.
13    Q.  Basis of?
14    A.  Tax basis of the target, understanding any --
15  the location of the assets, the impact of those assets
16  on Midco's current tax structure, additional compliance
17  considerations from a federal and state perspective.
18    Q.  And that was with regard to the Alatenn
19  acquisition?
20    A.  Both Alatenn and Midla.
21    Q.  Do you recall if those were asset purchases or
22  stock purchases?
23    A.  I believe Alatenn was a 338H10 qualified stock
24  purchase.  Midla was a -- a 368 tax-free merger.
25    Q.  Do you recall if PriceWaterhouseCoopers issued

---

Page 13

1  any kind of a tax opinion for each of those
2  acquisitions?
3    A.  I don't recall ever issuing an opinion on
4  those.
5    Q.  And I assume you performed work with regard to
6  both of those acquisitions?
7    A.  Yes, sir.
8        MR. TURKUS:  Objection to the form of the
9  question.
10    Q.  (BY MR. COFFIN) Okay.  There's a binder in
11  front of you with documents.  We are going to go through
12  some of those today.  If you would look at Government
13  Exhibit No. 5, what is that document, Mr. Palmisano?
14    A.  It appears to be the engagement letter to
15  provide tax-compliant services for the 1998 federal and
16  state tax filings.
17    Q.  Is that your signature at the bottom of the
18  first page?
19    A.  It appears to be so.
20    Q.  Turn to the second page of the document.  The
21  last paragraph, do you see that about the "Specific
22  projects and consultations will be detailed in a
23  separate engagement letter should the need arise at
24  65 percent of our standard hourly rates"?
25    A.  Uh-huh.

---

4 (Pages 10 to 13)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

Page 14

1        MR. TURKUS: You have to say "yes" for the
2    record.
3        A.   Yes.
4        Q.   (BY MR. COFFIN) Can you tell me why or how the
5    65 percent was determined?
6        MR. TURKUS:  Objection to the form of the
7    question.  Objection, lack of foundation.
8        A.   65 percent is -- is a general practice of the
9    rates that we were charging clients at that time for
10   that type of work.
11       Q.   (BY MR. COFFIN) Mr. Palmisano, during 1999 did
12   you become aware that Midcoast was bidding on the
13   purchase of the stock in the Bishop Group Limited?
14       A.   Yes.
15       Q.   Do you recall how you became aware of that?
16       A.   I don't recall the specific time, but I believe
17   I would have been informed of the proposed acquisition
18   by Richard Robert.
19       Q.   Was he the CFO of Midcoast?
20       A.   Yes.
21       Q.   And do you recall if Mr. Robert would have
22   requested PWC services at that time?
23       A.   Yes, yes.
24       Q.   What kind of services was he requesting?
25       A.   Midcoast did not have an internal tax

Page 15

1    department.  So, the majority, if not all the tax
2    matters generally were handled by
3    PriceWaterhouseCoopers.
4        Q.   So, again, what kind of services was he
5    requesting that PWC perform?
6        A.   With respect to the acquisition?
7        Q.   Yes, sir.
8        A.   General due diligence on the acquisition.
9        Q.   And does the general due diligence have the
10   same meaning you gave me earlier?
11       A.   Yes, sir.
12       Q.   Did Mr. Robert contact you or would he have
13   contacted Mr. Whitten?
14       MR. TURKUS:  Objection to the form of the
15   question.
16       A.   I don't recall who he contacted initially.
17       Q.   (BY MR. COFFIN) Okay.  Initially, what would
18   have been your role in the engagement?
19       MR. TURKUS:  Objection to the form of the
20   question.  Do you want to know what his role was or what
21   his role would have been?
22       MR. COFFIN:  What his role was in the
23   engagement initially.
24       A.   Assist -- assist with the analysis of tax --
25   tax attributes of the target, tax basis of the target,

Page 16

1    implications to Midcoast's existing structure, state
2    liability, et cetera.
3        Q.   (BY MR. COFFIN) And did you perform those
4    services?
5        A.   Yes.
6        Q.   In performing your services did you become
7    familiar with the tax basis and the assets of the Bishop
8    Group Limited?
9        A.   Yes.
10       Q.   Turn to Government Exhibit 26, please.
11       Mr. Palmisano, have you seen this document
12   before?
13       A.   Yes, I have.
14       MR. TURKUS:  Again, do you mean prior to
15   last week?
16       Q.   (BY MR. COFFIN) Yes.  I'm sorry.  Prior to last
17   week when you were provided the documents by counsel.
18       A.   Yes, yes, I've seen this prior to last week.
19       Q.   Who is Craig Hoffman?
20       A.   He was an associate for Fortrend.  I'm not sure
21   of his specific title.
22       Q.   And who was Fortrend?
23       A.   Fortrend is an investment banking organization.
24       Q.   Were you familiar with Fortrend back in August
25   of 1999?

Page 17

1        A.   Yes.
2        Q.   Do you recall receiving this facsimile around
3    August 30 of 1999?
4        A.   Yes, I do.
5        Q.   Were you familiar with Fortrend prior to
6    August 30, 1999?
7        A.   I don't recall the exact date, but prior to
8    this.
9        Q.   And do you recall who told you about Fortrend?
10       MR. TURKUS:  Objection to the form of the
11   question.  Do you mean who first told him about
12   Fortrend?
13       MR. COFFIN:  Yes.
14       A.   I don't recall who first introduced us to
15   Fortrend.
16       Q.   (BY MR. COFFIN) When you say "us," do you mean
17   PWC?
18       A.   PWC.
19       Q.   Who was Bruce Snyder?
20       A.   Bruce was a tax advisor for the Bishop Group
21   with Ernst & Young.
22       Q.   Did you know if Mr. Snyder had heard of
23   Fortrend prior to this facsimile date?
24       A.   No, I don't recall whether they were aware or
25   knew of Fortrend.

5 (Pages 14 to 17)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

Witness:  Thomas J. Palmisano

Page 18

1    Q.  The facsimile references a conversation that
2   Mr. Hoffman had with Bruce.  Do you see that in the
3   first sentence under "Comments"?
4    A.  Yes.
5    Q.  Were you involved in that conversation?
6        MR. TURKUS:  Objection to the form of the
7   question.  Objection, lack of foundation.
8    A.  I don't recall whether I was a part of that or
9   not.
10   Q.  (BY MR. COFFIN) Did you participate or do you
11  recall participating in any conversations with
12  Mr. Hoffman or Mr. Snyder --
13       MR. TURKUS:  At any time?
14   Q.  (BY MR. COFFIN) -- on the telephone?  At any
15  time.
16   A.  I don't recall specific conversations, but --
17  but I -- I believe I was on some -- some calls with
18  them, yes, that's correct.
19   Q.  Do you recall the subject matter of those
20  calls?
21   A.  Not specifically, but it would have certainly
22  had to do with the acquisition.
23   Q.  What was Mr. Hoffman's involvement in those
24  calls?
25   A.  Well, Mr. Hoffman was the key person for

Page 19

1   Fortrend with respect to Fortrend's acquisition of
2   Bishop.  He was our primary contact with Fortrend.
3    Q.  What was Fortrend's involvement then in the
4   acquisition?
5    A.  Midcoast acquired the KPC partnership interest
6   from Fortrend.
7    Q.  Do you know if PWC had worked with Fortrend on
8   any other transactions prior to August of 1999?
9    A.  I'm not aware of any transactions that PWC was
10  involved with with Fortrend.
11   Q.  Did you ever meet with anybody from Fortrend
12  personally?
13   A.  Yes, Craig Hoffman.
14   Q.  Did you form any impressions of Mr. Hoffman?
15       MR. TURKUS:  Objection to the form of the
16  question.  What do you mean by "impressions"?
17   Q.  (BY MR. COFFIN) Professional.
18   A.  I don't --
19       MR. TURKUS:  Objection to the form of the
20  question.
21   A.  I don't understand the question.
22   Q.  (BY MR. COFFIN) Did you believe him to be a
23  truthful and upstanding individual?
24       MR. TURKUS:  Objection to the form of the
25  question.

Page 20

1    A.  I -- he didn't give me any other impression.
2    Q.  (BY MR. COFFIN) Do you recall back in August of
3   1999 what all you knew about Fortrend?
4        MR. TURKUS:  Objection to the form of the
5   question.
6    A.  Could you be a little more specific?
7    Q.  (BY MR. COFFIN) Sure.  Had you ever heard that
8   Fortrend was a promoter of tax shelter transactions back
9   in August of 1999?
10       MR. STERN:  Objection, form.
11       MR. TURKUS:  Objection to the form of the
12  question.
13   A.  I knew them as an investment banker
14  specializing in structuring and managing transactions.
15   Q.  (BY MR. COFFIN) You said you met with
16  Mr. Hoffman personally, and I didn't catch -- did you
17  tell me how many times you met with him personally?
18   A.  I don't recall how many times.
19   Q.  Was it more than once?
20   A.  It would have been more than once.
21   Q.  Do you recall if anybody from Midcoast was with
22  you during your meetings with -- personal meetings with
23  Mr. Hoffman?
24   A.  I believe so, but I don't recall who might have
25  been there.

Page 21

1    Q.  On Government Exhibit 26 there are a couple of
2   pages attached there.  Do you recall seeing these two
3   pages, PWC118 and PWC119 back in 1999?
4    A.  Yes.
5    Q.  Do you recall if Fortrend ever provided any
6   other documents to PWC which would have described what
7   Fortrend did?
8    A.  Could you be clear on exactly what you mean by
9   what they did?
10   Q.  Okay.  There are a couple of documents here
11  that kind of gives their -- Fortrend's background.
12       MR. TURKUS:  Couple of pages you mean?
13   Q.  (BY MR. COFFIN) Couple of pages, yes.  Did they
14  ever provide any other documents that described the
15  things that Fortrend did, their investment banking work?
16   A.  I don't -- I don't recall any other documents
17  provided.
18   Q.  Did Fortrend ever provide any kind of
19  prospectus or anything like that to PWC?
20       MR. TURKUS:  Objection to the form of the
21  question.
22   A.  Prospectus regarding?
23   Q.  (BY MR. COFFIN) Regarding how they could
24  facilitate the purchase of assets from Bishop Group
25  Limited?

6 (Pages 18 to 21)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

---

Page 22

1     MR. STERN:  Objection, form.
2     A.  I don't recall seeing anything like that.
3     Q.  (BY MR. COFFIN) Turn to Government Exhibit 35,
4  please.  Mr. Palmisano, have you seen this document
5  before -- before Friday of last week or whenever it was
6  it was provided to you by counsel?
7     A.  Thirty-five?
8     Q.  Yes, sir.
9        MR. TURKUS:  Just for the record, I think
10 we got it on Friday from you and sent it to
11 Mr. Palmisano.  So, he received it on Monday of this
12 week.
13       MR. COFFIN:  Okay.
14    A.  Yes, I recall receiving this.
15    Q.  (BY MR. COFFIN) Okay.  And it's a facsimile
16 from Bryan Cave; is that correct?
17    A.  Appears to be a fax from Bryan Cave.
18    Q.  And it's from James P. Pryde; is that right?
19       MR. TURKUS:  Document speaks for itself.
20 Objection.
21    Q.  (BY MR. COFFIN) Who did Mr. Pryde represent?
22    A.  I believe he represented Bishop Group.
23    Q.  Okay.  And the document that's attached appears
24 to be a draft Mutual Confidentiality Agreement between
25 Fortrend and The Bishop Group Limited.

---

Page 23

1        My question is:  Why would Bryan Cave and
2  Mr. Pryde be faxing this document to you, Mr. Palmisano?
3        MR. TURKUS:  Objection to the form of the
4  question.  Objection, lack of foundation.
5     A.  I don't recall.
6     Q.  (BY MR. COFFIN) Okay.  Did PWC represent Craig
7  Hoffman and the Fortrend group?
8     A.  No.
9     Q.  Turn the page to Government Exhibit 37, please.
10 Turn to the next Exhibit 37.
11    A.  Thirty-six or 37?
12    Q.  Thirty-seven.  Just flip on over to 37.
13    A.  (Witness complies.)
14    Q.  This appears to be an e-mail from Becky Davis
15 to you, Mr. Palmisano, dated September 12, 1999.
16 Attached to it is -- appears to be a draft Stock
17 Purchase Agreement by and between Fortrend
18 International, LLC and Mr. Langley.
19       Do you recall receiving this document,
20 Mr. Palmisano, by -- by e-mail?
21    A.  I don't recall specifically receiving it, but
22 it appears that it went to me via e-mail based on this
23 document.
24    Q.  Okay.  My question, again, is:  Why were you
25 receiving a Stock Purchase Agreement or a draft Stock

---

Page 24

1  Purchase Agreement between Mr. Langley and Fortrend
2  International?
3        MR. TURKUS:  Objection, lack of
4  foundation.
5     A.  I don't recall why they would have sent this to
6  me.
7     Q.  (BY MR. COFFIN) Turn to Government Exhibit 42,
8  please.
9     A.  (Witness complies.)
10    Q.  Could you look at that document, Mr. Palmisano,
11 and tell me if you've ever seen this document before,
12 please?
13    A.  Forty-two?
14    Q.  Yes, sir.
15    A.  Could you repeat your question again?
16    Q.  Do you recall ever seeing this document before?
17    A.  Before it was provided by counsel?
18    Q.  Yes.
19    A.  I don't recall seeing this.
20    Q.  Turn to Government Exhibit 50, please.
21    A.  (Witness complies.)
22    Q.  If you would turn to the last page of this
23 exhibit, Mr. Palmisano, the last page of this exhibit?
24    A.  Fifty?
25    Q.  Uh-huh.  There is a spreadsheet at the top

---

Page 25

1  titled "Break-Even Alternatives."  Do you see that?
2  Have you ever seen this document before?
3     A.  I believe this was provided by counsel on
4  Monday.
5     Q.  Just recently?
6     A.  Recently.
7     Q.  Prior to that, do you recall seeing it?  I'll
8  ask you to focus on the last page.  I'll give you the
9  DOJ Bates No. 18090.
10    A.  I don't recall seeing this.
11    Q.  Okay.  In the bottom right-hand corner there's
12 a calculation there that says "Fortrend Cost"?
13    A.  Uh-huh, yes.
14    Q.  Do you have any idea what that calculation is?
15       MR. TURKUS:  Are you asking him to
16 speculate as to what it is?
17       MR. COFFIN:  Sure.
18    A.  It appears to be calculating the tax step-up on
19 the calculation.
20    Q.  (BY MR. COFFIN) Tax step-up of?
21    A.  In the purchase price of the assets in excess
22 of the historical tax basis.
23    Q.  And then the "Agreed Rate," what was that, if
24 you recall?
25       MR. TURKUS:  Objection to the form of the

---

7 (Pages 22 to 25)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:   Thomas J. Palmisano**

Page 26

1    question.  Objection, lack of foundation.  He said he
2    doesn't recall ever seeing it before.  Are you asking
3    him again to speculate as to what it might be?
4              MR. COFFIN:  Sure.
5              MR. TURKUS:  Then please ask the question
6    that way.
7        Q.  (BY MR. COFFIN) The 5 percent --
8        A.  Speculate what the --
9        Q.  Sure.  Any idea what the 5 percent is?
10       A.  Well, the $6 million appears to be
11   approximately the -- profit on the sale from
12   Fortrend.
13       Q.  What do you mean "the profit"?
14       A.  Well, it's the -- the excess of the purchase
15   price of assets sold to Midcoast over -- over their
16   purchase price of the stock.
17       Q.  And then what was -- how was the 5 percent
18   determined, if you recall?
19             MR. TURKUS:  Are you asking him how this
20   number was put on this -- why this number was put on
21   this piece of paper?  Or are you asking more generally
22   what he knows about a 5 percent number?
23             MR. COFFIN:  I'll ask him more generally.
24       Q.  (BY MR. COFFIN) What do you know about the
25   5 percent?

Page 27

1              MR. STERN:  Objection, form.
2        A.  Generally the 5 percent, or generally --
3        Q.  (BY MR. COFFIN) The 5 percent.
4        A.  I -- I believe that is the customary profit
5    that Fortrend looks to get on the purchase and sale of
6    assets.  Customary practice, I believe, was 5 to
7    7 percent, based on conversations with Craig Hoffman.
8        Q.  Okay.  Do you know how it was determined
9    whether 5 percent would be used or 7 percent or anything
10   in between?
11       A.  I don't recall.
12             MR. TURKUS:  Objection, form.
13             MR. STERN:  Objection, lack of foundation.
14       Q.  (BY MR. COFFIN) Turn to Government 87, please.
15       A.  (Witness complies.)
16             MR. STERN:  Eighty-seven?
17             MR. COFFIN:  Eighty-seven.
18       Q.  (BY MR. COFFIN) Have you seen this document
19   before, Mr. Palmisano?
20       A.  Yes, I have.
21       Q.  Did you draft the memorandum?
22       A.  It appears from the document that I drafted it.
23       Q.  Do you recall who requested that you draft that
24   memorandum?
25             MR. TURKUS:  Objection to the form of the

Page 28

1    question.
2        A.  I don't recall specifically who would have
3    asked me to draft it.
4        Q.  (BY MR. COFFIN) Do you recall why you drafted
5    the memo?
6        A.  I believe it was to lay out the -- steps to
7    the formation of the Butcher Interest Partnership.
8        Q.  What was the Butcher Interest Partnership?
9        A.  I don't recall specifically, but I believe it
10   was an overriding royalty interest in one of the
11   pipelines, the pipeline assets of KPC or related
12   entities.
13       Q.  Well, that's the interest, right?
14       A.  Correct.  The Butcher Interest.
15       Q.  Okay.  What was the partnership component of
16   that?
17             MR. TURKUS:  Objection to the form of the
18   question.
19       Q.  (BY MR. COFFIN) My question was:  What was the
20   Butcher Interest Partnership?
21             MR. TURKUS:  Objection to the form of the
22   question.
23       A.  I apologize.  I thought you asked me what the
24   Butcher Interest was.  The Butcher Interest Partnership
25   was a partnership formed by a Midcoast entity and

Page 29

1    Butcher Group Limited to hold the Butcher Interests.
2        Q.  (BY MR. COFFIN) The second bullet point in your
3    memo shows -- does it show the fair market value
4    $6.5 million, does that reference the fair market value
5    of the Butcher Interest?
6              MR. TURKUS:  Are you asking him what the
7    document says?
8        Q.  (BY MR. COFFIN) Yeah, I'm just wondering if
9    that's what the FMV $6.5 million refer to the fair
10   market value that Butcher has.
11       A.  Yes, I believe that is what the document is
12   referring to.
13       Q.  Do you recall how the fair market value of the
14   Butcher Interest was determined?
15       A.  Not specifically, other than just an
16   agreed-upon value by the two parties.
17       Q.  The two parties being?
18       A.  Bishop Group and the -- the Midcoast affiliate
19   that was the other partner to the partnership.
20       Q.  And the partnership you said was between -- the
21   two partners of the partnership were Bishop Group and
22   Midcoast?
23             MR. TURKUS:  Objection to the form of the
24   question.  Asked and answered.  That's not what the
25   witness said.

8  (Pages 26 to 29)

HUNDT REPORTING
214-220-1122

**Witness:   Thomas J. Palmisano**

---

Page 30

1      MR. COFFIN:  I'm just asking.
2      MR. TURKUS:  He already testified.  He
3  answered that question very clearly the first time you
4  asked it.
5      MR. COFFIN:  Well, I can ask him again.
6      MR. TURKUS:  You have to listen to the
7  answers, so you don't have to ask him again.
8      MR. COFFIN:  I'm trying to.  All right.
9    Q.  (BY MR. COFFIN) Who did you say the partners
10  were to the partnership?
11      MR. TURKUS:  Objection, asked and
12  answered.
13    A.  According to the document it was Bishop Group
14  Limited and Midcoast Holding.
15    Q.  (BY MR. COFFIN) Do you have an independent
16  recollection of who the partnership partners were?
17    A.  I don't recall the specific partners.
18    Q.  Turn to Government Exhibit 115, please.  115.
19    A.  115?
20    Q.  Uh-huh.  Mr. Palmisano, have you seen this
21  document before, Government Exhibit 115?
22      MR. TURKUS:  Prior to last Monday?
23    Q.  (BY MR. COFFIN) Prior to last Monday.
24    A.  Government 115?
25    Q.  Yes, sir.

---

Page 31

1    A.  Yes, I have.
2    Q.  Do you recall who signed the document on behalf
3  of PriceWaterhouseCoopers?
4    A.  No, I don't.
5    Q.  Could it have been you at the time?
6    A.  No.
7    Q.  You were a senior manager at the time?
8    A.  Correct.
9    Q.  Do you recall who drafted the agreement?
10    A.  The document 144 -- or Exhibit 115?
11    Q.  Yes, sir.
12    A.  No, I don't recall the specific drafters of the
13  agreement.
14    Q.  Would you have assisted on the preparation of
15  this agreement at all?
16    A.  Yes, I would have.
17    Q.  On PWC145, which is the signature page, in the
18  second paragraph, first line references "extraordinary
19  value."  Do you recall what that term was meant to be
20  back in November of '99?
21      MR. TURKUS:  Objection to the form of the
22  question.  Objection, lack of foundation.
23    A.  I don't recall why we worded this paragraph the
24  way it's worded in the document.
25    Q.  (BY MR. COFFIN) Do you recall having any

---

Page 32

1  discussions about that particular phrase?
2    A.  That phrase?
3    Q.  Yeah, that phrase back in 1999?
4    A.  Yes, I recall having some discussions about
5  generally that.
6    Q.  What do you recall about your discussions?
7    A.  Could you be a little more specific?
8    Q.  Who were your discussions with?
9    A.  In terms of -- I -- I recall general
10  discussions about the way to structure the fees with the
11  partners involved, Gary and Bob.  But I don't recall how
12  and why we sort of landed where we did in terms of
13  what's on the document.
14    Q.  The second sentence says "In such case, the
15  fees may be paid out of the sales proceeds received by
16  the sellers from Midcoast in the above-described
17  transaction in accordance with usual and customary
18  practices."  Do you remember having discussions with
19  regard to who would pay the fees back in November of
20  '99?
21      MR. TURKUS:  Objection.  Discussions with
22  whom?
23      MR. COFFIN:  Anyone.
24    A.  Yes.  I think it was discussed -- two
25  alternatives were discussed, either that payment of

---

Page 33

1  PriceWaterhouseCoopers fees would come out of
2  consideration paid by Midcoast or -- or directly to
3  Midcoast outside of consideration.
4    Q.  (BY MR. COFFIN) Directly from Midcoast?
5    A.  From Midcoast, yes.
6    Q.  Do you recall -- did somebody make a
7  determination of how those fees would be paid based on
8  those two alternatives?
9      MR. TURKUS:  Objection to the form of the
10  question.  At what point in time?
11      MR. COFFIN:  Any time.
12    A.  Well, according to the document, it was at
13  Midcoast's discretion.
14    Q.  (BY MR. COFFIN) According to the document,
15  Midcoast would have to agree that there was
16  extraordinary value brought by PWC before payment would
17  be made?
18    A.  Correct.
19    Q.  Do you recall if Midcoast ever made that
20  determination?
21    A.  I believe the fees were paid out of Midcoast
22  consideration for the acquisition in which case there
23  was determined to be extraordinary value by Midcoast.
24    Q.  Do you recall who from Midcoast made that
25  determination?

---

**HUNDT REPORTING**
**214-220-1122**

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

Page 34

1       MR. TURKUS: Objection, lack of
2  foundation.
3       A.  Specifically, no, I don't know who specifically
4  made the call; but it would have been -- assuming
5  Richard Robert, who is the CFO and our primary contact
6  in charge of taxes would have been involved in that
7  decision.
8       Q.  (BY MR. COFFIN) Do you recall receiving
9  anything in writing from Mr. Robert or from Midcoast
10  that would indicate or authorize payment for this
11  extraordinary value?
12      A.  I don't recall the form of the communication to
13  the seller, Fortrend.
14      Q.  Do you know how PWC's fees were calculated?
15      A.  The customary practice of Fortrend was to --
16  the actual -- I apologize.  The actual fees we received?
17      Q.  Uh-huh.
18      A.  The customary practice of Fortrend as a seller
19  would be to pay the fee as a percentage of the -- the
20  step-up involved.  So, I believe that was a component of
21  the fee that Midcoast paid to -- to PWC at closing.
22      Q.  Do you recall if PWC sent an invoice to
23  Midcoast for the fees?
24      A.  I don't recall the invoice, but I would assume
25  an invoice was sent so that we could be paid.

Page 35

1       Q.  If you recall back on Government Exhibit 5 when
2  we looked at the provision on the last paragraph of the
3  second page where it said "Specific projects and
4  consultations will be detailed in a separate engagement
5  letter should the need arise at 65 percent of our
6  standard hourly rates" --
7       A.  Uh-huh.
8       Q.  -- and you said, I think, that was customary at
9  the time?
10      A.  Correct.
11      Q.  So my question is:  Why wouldn't PWC just bill
12  Midcoast for 65 percent of it standard hourly rates?
13      MR. TURKUS:  Object to the form of the
14  question.  You earlier said these were the '98 tax
15  returns they were preparing.  That's what he identified
16  Exhibit 5 as.
17      MR. COFFIN:  Okay.  Well, he can tell me
18  that, if that's what it was.
19      MR. TURKUS:  He's already told you that.
20      A.  Correct.  This engagement letter is for the
21  1998 tax period.  So, the KPC acquisition was in '99.
22  So, it's -- and it's customary that we issue new
23  engagement letters every year.  So, this wouldn't be
24  applicable to the transaction for '99.
25      Q.  (BY MR. COFFIN) When would the '99 engagement

Page 36

1  letter be drafted?
2       A.  There's no set time we would have drafted a '99
3  engagement letter.  So, we drafted a specific engagement
4  letter for this transaction, which is the -- what
5  exhibit was that?  155?
6       Q.  115.
7       A.  115?
8       Q.  Yes.  Government 115 also represents that PWC
9  would provide a tax opinion.  Do you recall who from
10  Midcoast requested the tax opinion letter?
11      MR. TURKUS:  Objection to the form of the
12  question.  Objection, lack of foundation.
13      A.  Richard Robert.
14      Q.  (BY MR. COFFIN) Do you recall when Mr. --
15      A.  I don't recall.
16      Q.  Let me finish the question.  Do you recall when
17  Mr. Robert would have requested the tax opinion letter?
18      A.  No, I don't recall.
19      Q.  Who from PWC dealt with Mr. Robert on a
20  day-to-day basis or more frequently than the others at
21  PWC?
22      MR. TURKUS:  Objection to the form of the
23  question.
24      A.  I would have interacted with him on a
25  day-to-day basis as the senior manager on the

Page 37

1  engagement.
2       Q.  (BY MR. COFFIN) Go to Government Exhibit 159,
3  please.
4       MR. TURKUS:  159?
5       MR. COFFIN:  Yes, 159.
6       MR. TURKUS:  We don't have it in our
7  binder.  Maybe we do.  Ours are in the wrong order.
8       No, we don't.  It's not in your binder, is
9  it?
10      THE WITNESS:  No.
11      MR. TURKUS:  It's not in the witness'
12  binder either.
13      MR. LINDER:  You can have my copy.
14      MR. TURKUS:  We need two copies.  Do you
15  have another copy?
16      MR. STERN:  I don't have a copy.
17      MR. TURKUS:  The witness has got to look
18  at it.  I need to be looking at it, too.
19      MR. STERN:  Why don't we take a break, and
20  we'll make a copy for you.
21      (Recess taken from 11:08 to 11:17.)
22      Q.  (BY MR. COFFIN) Turn back to -- or turn to
23  Government Exhibit 159, please, Mr. Palmisano.  Do you
24  recognize this document?
25      MR. TURKUS:  Do you mean does he recognize

10  (Pages 34 to 37)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

---

Page 38

1  this specific document or does he know what this
2  document is, kind of a type?
3      Q.  (BY MR. COFFIN) Can you tell me what the
4  document is, please?
5      A.  Appears to be our accounting,
6  PriceWaterhouseCoopers' accounting printout from their
7  accounting system.
8      Q.  Is this a document that you would look at in
9  your normal course of duties at PriceWaterhouseCoopers?
10     A.  Yes.
11     Q.  And why would you look at it?
12          MR. TURKUS:  Do you mean this specific
13  document or time records like this generally?
14          MR. COFFIN:  In general.  Sorry.
15     Q.  (BY MR. COFFIN) In general.
16     A.  Yes, in general.
17     Q.  Do you recall if you've looked at this document
18  before, this specific one?
19     A.  Yes.  This -- well, the top page of Exhibit 159
20  is familiar.
21     Q.  Have you looked at -- I'm just trying to figure
22  out -- there are some notations there.  Do you know
23  whose those notations are?
24     A.  On which specific page?
25     Q.  Any of the pages.  There's numbers to the right

Page 39

1  of the hours.
2      A.  The notations?
3      Q.  Yes, the handwritten --
4      A.  What's the specific question?
5      Q.  Do you know whose handwriting that is?
6      A.  I -- it doesn't look familiar to me.
7      Q.  And do you know what the purpose of this
8  document is?
9      A.  This is a printout of the time with respect to
10  the engagement code in the top left-hand corner.
11     Q.  Okay.  What do you mean?  Let me ask you:  Do
12  you make -- do you personally make entries into this
13  document?
14     A.  Yes.  This is a -- well, not into the document
15  itself, but this is a printout from our
16  PriceWaterhouseCoopers' time management system.
17     Q.  Okay.  It summarizes the entries that are made
18  by the PriceWaterhouseCoopers employees?
19     A.  It collects the entries.
20     Q.  All right.  Turn to PWC 369, please.
21     A.  369?
22     Q.  Yeah.  PWC 369, bottom left-hand corner.  I'm
23  sorry.
24          MR. TURKUS:  Let me take it out for you.
25  It might be a little easier.  He means the page number.

Page 40

1      A.  Oh, I see.
2      Q.  (BY MR. COFFIN) Okay.  There are some entries
3  that are made there, it appears by -- or for
4  Mr. Palmisano, which would be you; is that correct?
5      A.  Either -- either myself or my executive
6  assistant would have input this data.
7      Q.  Did she input that data at your instruction?
8      A.  I don't recall.
9      Q.  Was it typical for her to input data at your
10  instruction?
11     A.  It would vary.  It's not -- either I would
12  input my time or my executive assistant.
13     Q.  Okay.  But my question is:  If she would have
14  done it, would it have been at your instruction?
15     A.  Yes.
16     Q.  Okay.
17     A.  That's correct.
18     Q.  Thank you.  There are some entries there for
19  August 26 of '99.  Do you see that?
20     A.  Yes.
21     Q.  With your name.  And I want to look at the
22  second entry dated August 26 of '99 where it says
23  Palmisano, description:  Midcoast Bishop, looks like the
24  number of hours, four.  Below that is a comment section.
25     A.  Uh-huh.  Yes.

Page 41

1      Q.  Who keys in or inputs the comment section to
2  those entries?
3      A.  Either myself or my executive assistant at the
4  time.
5      Q.  Can you read what the comment is under that
6  second entry August 26 of 1999?
7          MR. TURKUS:  To himself or out loud?
8      Q.  (BY MR. COFFIN) Out loud, please.
9          MR. TURKUS:  Objection.  Document speaks
10  for itself.
11     A.  The second line?
12     Q.  (BY MR. COFFIN) The "Comments" section.
13     A.  The entire section or just the second line?
14     Q.  The --
15     A.  The "cc with Dennis" --
16     Q.  Right.  Just read from there, please.
17     A.  -- "M, David Miller, Craig Hoffman, Bruce
18  Snyder, Steve Corbs, re:  Proposed acqu and midco."
19     Q.  Okay.  Do you recall who Dennis M. would be or
20  who was Dennis M.?
21     A.  Would likely to have been Dennis McErlean.
22     Q.  Okay.  Who would David Miller be?
23     A.  David Miller was a tax partner from our -- I
24  believe our Dallas office.
25     Q.  And then Craig Hoffman you mentioned was from

11  (Pages 38 to 41)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:   Thomas J. Palmisano**

Page 42

1  Fortrend; is that right?
2      A.  Correct.
3      Q.  Bruce Snyder was with Ernst & Young?
4      A.  Correct.
5      Q.  Who is Steve Corbs?
6      A.  I believe he was with KPC.
7      Q.  Kansas Pipeline Company?
8      A.  Correct.
9      Q.  Okay.  And you reference there a proposed -- is
10  that acquisition?  Would that be acquisition?
11      A.  It's "acqu."  I would assume it's probably
12  acquisition, but I don't recall specifically.
13      Q.  Okay.  And "Midco," what's -- what is "Midco"?
14      A.  What is Midco?  I don't recall if I was
15  referring to Midcoast abbreviated or -- or maybe Midco
16  transaction potentially.
17      Q.  Okay.  What's your understanding of what a
18  Midco transaction is?
19          MR. TURKUS:  Sitting here today or what it
20  meant back then?
21      Q.  (BY MR. COFFIN)  Sitting here today.
22      A.  Well, my understanding of a Midco is a
23  situation that where a -- it's a three-party transaction
24  where the first seller sells stock to a buyer, and the
25  buyer then sells assets to a second seller.

Page 43

1          MR. TURKUS:  Second --
2      A.  Second buyer.  Sorry.
3      Q.  (BY MR. COFFIN)  And is there a purpose for
4  conducting that transaction?
5          MR. TURKUS:  Objection to the form of the
6  question.
7      A.  There are -- specifically, you're asking?
8      Q.  (BY MR. COFFIN)  A tax purpose.
9          MR. TURKUS:  Objection to the form of the
10  question.
11      A.  Why -- why would -- what would be a tax
12  motivation for the transaction?
13      Q.  (BY MR. COFFIN)  Right.
14      A.  For the initial seller to receive capital gain
15  treatment on the sale, and the -- the second buyer to
16  receive a stepped up tax basis in the assets acquired.
17      Q.  And then what's the tax motivation for the
18  first buyer of the assets of the stock?
19          MR. TURKUS:  Objection to the form of the
20  question.
21      A.  The tax motivation?
22      Q.  (BY MR. COFFIN)  Yes.
23      A.  I don't know that there's a tax motivation
24  other than an economic motivation for the first buyer to
25  be able to receive a profit from the subsequent sale of

Page 44

1  the assets.
2      Q.  Isn't the purpose of the transaction to shelter
3  gain that the ultimate buyer would receive from
4  purchasing --
5      A.  Gain from the buyer?
6          MR. TURKUS:  Let him finish the question.
7          MR. COFFIN:  Let me strike that question.
8      Q.  (BY MR. COFFIN)  Is there a tax benefit to the
9  ultimate buyer of the assets?
10          MR. TURKUS:  Objection.  Asked and
11  answered.
12      A.  The ultimate buyer receives cost basis in the
13  assets purchased.
14      Q.  (BY MR. COFFIN)  And the first buyer of the
15  stock would have some gain resulting from its purchase
16  of the assets in which the assets came over on a
17  carryover basis, correct?
18          MR. STERN:  Objection, form.
19          MR. TURKUS:  Objection to the form of the
20  question.
21      A.  Can you repeat the question?
22      Q.  (BY MR. COFFIN)  Yes.  The first buyer of the
23  stock, when it buys the stock and the assets that are
24  acquired come over, it comes over on a carryover basis;
25  is that right?

Page 45

1      A.  Assuming there's not a qualified stock
2  purchase.
3      Q.  Okay.  Was there a qualified stock purchase in
4  the transaction at issue?
5      A.  I -- I don't know.
6      Q.  And then when that initial buyer of the stock
7  sells the assets to the ultimate buyer, isn't there a
8  gain that would be recognized based on the sale, the
9  asset purchase price?
10          MR. TURKUS:  Objection to the form of the
11  question.
12      Q.  (BY MR. COFFIN)  Over -- over the carryover
13  basis of the assets?
14          MR. TURKUS:  Objection to the form of the
15  question.
16          MR. STERN:  Same objection.
17      A.  Could you repeat that question, please?
18          MR. COFFIN:  Read that back for him,
19  please.
20          (The record was read as requested.)
21          MR. TURKUS:  Same objection.
22      A.  If -- if the -- if the assets sold by the first
23  buyer were sold for an amount in excess of the adjusted
24  tax basis of the assets, then that seller, in this case
25  the first buyer, would be subject to gain on those

12  (Pages 42 to 45)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

Page 46

1  assets.
2      Q.  (BY MR. COFFIN) Now, in a Midco transaction, is
3  that gain sheltered somehow?
4          MR. TURKUS:  Object to the form of the
5  question.
6          MR. STERN:  Same objection.
7      A.  I'm not familiar with how that gain is reported
8  or is treated for the first buyer, generally.
9      Q.  (BY MR. COFFIN) Do you recall when you first
10  learned of Midco transactions?
11          MR. TURKUS:  Objection to the form of the
12  question.
13      A.  I don't recall specifically.
14      Q.  (BY MR. COFFIN) What about generally?
15      A.  What year?  What --
16      Q.  Yes.
17      A.  I don't -- I don't recall.
18      Q.  Would it have been in 1999?
19      A.  I -- I don't recall if 1999 was the first time
20  I became aware of a Midco transaction.
21      Q.  Would it have been after 1999?
22      A.  It could have been before '99.
23      Q.  It would have been sometime at least by
24  August 26 of '99; is that right?
25      A.  Yeah.  At that time or before, that's correct.

Page 47

1      Q.  Do you recall if the firm, PWC, had circulated
2  any materials or information about Midco transactions?
3      A.  I don't recall.
4      Q.  Do you recall if Mr. McErlean would have
5  communicated to you a description of Midco transactions?
6      A.  It could have been Mr. McErlean or another one
7  of the partners in our mergers and acquisitions group.
8      Q.  Who else would that -- might that be?
9      A.  David Miller or Ian Shackter.
10      Q.  Do you know if Mr. Miller had worked with
11  Fortrend prior to August 26 of '99?
12      A.  I don't recall if he had or not.
13      Q.  Okay.  Do you know if Mr. Shackter had worked
14  with Fortrend prior to August 26 of 1999?
15      A.  I don't recall.
16      Q.  Do you recall if Fortrend represented to PWC
17  that it could facilitate a Midco transaction?
18          MR. TURKUS:  Objection to the form of the
19  question.  Objection, lack of foundation.  To anyone at
20  PWC?
21          MR. COFFIN:  Sure.
22          MR. TURKUS:  Same objection.
23      A.  Could you repeat the question again?
24          MR. COFFIN:  Read that back for me,
25  please.

Page 48

1          (The record was read as requested.)
2      A.  I don't recall if they specifically used the
3  term "Midco," no.  I don't -- I don't recall a specific
4  term being used.
5      Q.  (BY MR. COFFIN) How about -- did they -- did
6  Fortrend or Craig Hoffman ever advise PWC that they
7  could facilitate a intermediary transaction?
8          MR. TURKUS:  Objection to the form.
9  Objection, lack of foundation.
10      A.  How would they -- how would you define an
11  "intermediary transaction"?
12      Q.  (BY MR. COFFIN) An August 2 Midco transaction?
13          MR. TURKUS:  Same objection.
14      A.  The -- the representation -- I don't recall any
15  specific representation, but Fortrend represented that
16  they could facilitate an asset purchase by Midcoast of
17  the KPC assets.
18      Q.  (BY MR. COFFIN) In your discussions with Craig
19  Hoffman or anybody else from Fortrend, nobody ever
20  represented or used the phrase "Midco transaction"?
21      A.  They -- they -- I don't recall if they did or
22  not.  They -- I don't recall.
23      Q.  Okay.  How about -- same question for
24  "intermediary transaction"?
25      A.  I don't recall.

Page 49

1      Q.  On the next comment there to the 8/26/99 entry,
2  your second one, your second August 26 of '99 entry, it
3  says "cc with rr re: capital loss idea."
4          Is "cc" conference call?  Is that what
5  that means?
6      A.  I believe so.
7      Q.  And "rr," what would that be?
8      A.  Richard Robert.
9      Q.  And then do you recall what the "capital loss
10  idea" was?
11          MR. TURKUS:  Objection to the form of the
12  question.
13      A.  No, I don't recall.
14      Q.  (BY MR. COFFIN) Okay.  Down below September 2,
15  1999 entry, the second one, read the "Comments" for me,
16  please.
17      A.  The September 2, '99?
18      Q.  Yes.
19      A.  "Bishop deal, cc with drm, rhw, steve corbs,
20  bruce snyder re:  Cap loss generator."
21      Q.  Do you know what a "cap loss generator" is
22  today?
23          MR. TURKUS:  Objection to the form of the
24  question.
25      A.  What a cap loss generator -- what this -- what

13  (Pages 46 to 49)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:   Thomas J. Palmisano**

Page 50

1  this specifically means?
2     Q.  (BY MR. COFFIN) Does it have a definition
3  associated with that phrase today?
4           MR. TURKUS:  Objection to the form of the
5  question.
6     A.  Well, cap -- it certainly implies a transaction
7  that would generate a capital loss.
8     Q.  (BY MR. COFFIN) Okay.  But you're not aware of
9  any specific phrase or --
10    A.  I --
11          MR. TURKUS:  He hasn't finished his
12 question.
13    Q.  (BY MR. COFFIN) You're not aware of any
14 specific phrase or term that uses "cap loss generator"?
15          MR. TURKUS:  Objection to the form of the
16 question.
17    A.  I don't understand the question.
18    Q.  (BY MR. COFFIN) Okay.  Bad question.  You're
19 not aware of any transaction that can be described as a
20 cap loss generator?
21          MR. TURKUS:  Objection to the form of the
22 question.
23    A.  Any transaction?
24    Q.  (BY MR. COFFIN) Uh-huh.
25    A.  I'm -- I'm aware of transactions that could

Page 51

1  generate capital losses.
2     Q.  But you're not aware of the phrase "cap loss
3  generator"?
4           MR. TURKUS:  Objection to the form of the
5  question.
6     A.  I -- I don't understand the question.  Aware of
7  the phrase?
8     Q.  (BY MR. COFFIN) Yeah.  Have you ever -- you
9  wrote the words down here, so I'm wondering what the --
10          MR. TURKUS:  Objection.  That's not what
11 the witness said.  He said he might have input the data;
12 his executive assistant might have input the data.
13          MR. COFFIN:  At his instruction.
14          MR. TURKUS:  That's correct, but you
15 mischaracterized his prior testimony.
16    A.  I don't recall the details of this comment
17 associated with this deal.
18    Q.  (BY MR. COFFIN) Go to PWC 383, please, same
19 document, Government Exhibit --
20          MR. TURKUS:  159.
21    Q.  (BY MR. COFFIN) -- 159.  Thank you.  On
22 October 19, 1999 there's an entry by Mr. Whitten.  Do
23 you see that?
24    A.  What was the date?
25    Q.  October 19, 1999.

Page 52

1     A.  Nineteenth?
2     Q.  Do you see that entry, Mr. Palmisano?
3     A.  Yes.
4     Q.  Okay.  And on the comments I believe it says
5  "conference call with attorney for Bank of America, T
6  Hardie with Wilcox and Palmisano/tax issues of concern
7  to bank."  Do you recall being on a conference call with
8  Mr. Whitten, with T. Hardie and Mr. Wilcox on there as
9  well?
10    A.  Yes.
11    Q.  And who is T. Hardie?
12    A.  I believe he is a tax advisor for Bank of
13 America.
14    Q.  Okay.  Do you recall any tax issues or concerns
15 of tax issues by Mr. Hardie?
16    A.  I believe this was in association with
17 Midcoast's acquisition of KPC.
18    Q.  Do you recall a subject matter of that
19 conference call at all?
20    A.  The -- the discussions surrounded the
21 acquisition of KPC assets and the carryover or the tax
22 basis step-up on the acquisition of those assets.
23    Q.  Do you remember any specific concern of the
24 bank?
25          MR. TURKUS:  Objection to the form of the

Page 53

1  question.
2     A.  I believe the discussion was -- surrounding
3  Bank of America was the -- one of the lenders to
4  Midcoast financing the KPC acquisition, and it was to
5  better understand the acquisition of those assets and
6  the tax issues surrounding that.
7     Q.  (BY MR. COFFIN) What were the tax issues that
8  were identified in that conference call?
9     A.  The stepped-up basis and other tax issues
10 associated with an acquisition of assets.
11    Q.  Do you recall what Mr. Hardie's specific
12 concerns were?
13          MR. TURKUS:  Objection to the form of the
14 question.
15    A.  I don't recall his specific concerns.  I think
16 the primary purpose of the call was to talk about issues
17 associated with the acquisition.
18    Q.  (BY MR. COFFIN) Did Mr. Hardie have a concern
19 that Midcoast was getting any kind of extraordinary tax
20 benefit from the Midco transaction?
21          MR. TURKUS:  Objection to the form of the
22 question.
23          MR. STERN:  Object to the form.
24    A.  What do you mean by "extraordinary tax
25 benefit"?

14  (Pages 50 to 53)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

Page 54

1   Q.  (BY MR. COFFIN) You don't know what that means?
2         MR. TURKUS:  Is that a question?
3         MR. COFFIN:  Uh-huh.
4         MR. TURKUS:  Objection to the form of the
5   question.  He's asking you to explain your prior
6   question.  You used a term.  He's asking you to put it
7   in context so he can answer your question.
8   Q.  (BY MR. COFFIN) Isn't it true that Midcoast
9   sheltered some gain on the transaction?
10        MR. TURKUS:  Objection to the form of the
11  question.
12  Q.  (BY MR. COFFIN) Or got a tax benefit from the
13  Midco transaction in this case?
14        MR. TURKUS:  Objection to the form of the
15  question.
16        MR. STERN:  Object to the form.
17  A.  Midcoast received tax basis for their cost of
18  the acquisition.  I believe Mr. Hardie wanted to
19  understand, because of the complexity of the deal,
20  the -- the tax issues associated with the acquisition.
21  Q.  (BY MR. COFFIN) Okay.  Turn to Government
22  Exhibit 161, please.  This appears to be, Mr. Palmisano,
23  a string of e-mails between Mr. Wilcox, you, Ms. Coffey.
24  I think Mr. Whitten received some -- some of these
25  e-mails as well; and it looks like the one from you in

Page 55

1   the middle dated January 4 of 2000, do you see that, to
2   Mr. Wilcox and Ms. Coffey?
3   A.  Uh-huh.
4         MR. TURKUS:  You have to say "yes" or
5   "no."
6   A.  Oh, yes.  Sorry.
7   Q.  (BY MR. COFFIN) Subject Re:  Midcoast letter?
8   A.  Yes.
9   Q.  Okay.  Do you know if that was -- was that the
10  tax opinion letter that was attached to your e-mail?
11  A.  It's not attached to the Exhibit 161?
12  Q.  Yes.  I don't have it attached to the exhibit.
13  A.  It appears from the exhibit the title "99
14  Midcoast Opinion Letter."
15  Q.  Uh-huh.
16  A.  It appears that that was the opinion letter or
17  a draft of the opinion letter.
18  Q.  So, did you have any input in the drafting of
19  the tax opinion letter that was issued to Midcoast by
20  PWC?
21  A.  I was involved in the drafting, but the primary
22  writers were Catherine Coffey and Gary Wilcox, but I did
23  review the letter.
24  Q.  Okay.  And the above e-mail was from Gary
25  Wilcox to Ms. Coffey and to you with a cc to

Page 56

1   Mr. Whitten.  Do you see that dated January 3 of 2000?
2   A.  Yes.
3   Q.  Where Mr. Wilcox advises that he is attaching
4   the Midcoast representation letter; and he requests that
5   you, Ms. Coffey, review it, provide your comments?
6   A.  Yes.
7   Q.  Did you have input then in the Midcoast
8   representation letter, as far as the preparation of that
9   document?
10        MR. TURKUS:  When you say "then," do you
11  mean at that point in time or at any point in time?
12  Q.  (BY MR. COFFIN) Then.  In January of 2000.
13  A.  I don't -- I don't recall if I had input on
14  that date, but I was -- I had, generally, input on the
15  representation letter.
16  Q.  And what was your responsibility with regard to
17  providing input on the representation letter?
18  A.  Ensuring the facts were complete and accurate
19  based on my involvement in the transaction.
20  Q.  Go back to Government Exhibit 160, please.
21  Turn back one document.
22  A.  (Witness complies.)
23  Q.  Have you seen this document, Mr. Palmisano,
24  prior to Monday of this week?
25  A.  This specific document draft December 14?

Page 57

1   Q.  Yes.
2   A.  I -- I don't recall seeing this prior to
3   Monday.
4   Q.  Turn to Government Exhibit 163, please.
5   A.  (Witness complies.)
6   Q.  Do you recognize this document, Mr. Palmisano?
7   A.  163?
8   Q.  Yes.
9   A.  Yes.  This appears to be a draft representation
10  letter.
11        MR. TURKUS:  Just to be clear, Mr. Coffin,
12  are you asking whether he saw this particular draft or
13  one of the drafts?
14  Q.  (BY MR. COFFIN) Yes.  Did you see this
15  particular draft, first of all?  And if not, did you see
16  any of the drafts of Midcoast's representation letter?
17  A.  I don't recall if I saw this particular draft,
18  but I did review drafts of their representation letter.
19  Q.  Turn to the second page of Government
20  Exhibit 163.  The second or the first full paragraph
21  from the bottom, would you read that out loud, please?
22  A.  The entire paragraph?
23  Q.  Yes.
24  A.  "Midcoast independently pursued the so-called
25  'Midco transaction' as a structural alternative.  On

15  (Pages 54 to 57)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

Page 58

1  August 27, 1999, Midcoast and PriceWaterhouseCoopers,
2  ('PWC') contacted Fortrend International, LLC. Founded
3  in 1986, Fortrend is an investment bank that has acted
4  as a principal in mergers and acquisitions that have
5  ranged in size from $5 million to in excess of
6  $1 billion." And there's a parenthesis "Gary-do we need
7  to define 'Midco transaction'? It'd be best to avoid
8  this, but the way we present the phrase above suggests
9  that a definition is necessary."
10  Q.  That comment in the last sentence there, do you
11  know who made that comment?
12  A.  I don't recall who made that comment.
13  Q.  Was it your comment?
14  A.  I don't recall whether it was my comment or
15  not.
16  Q.  And was it your understanding at the time that
17  Midco transaction was the type of transaction that you
18  described earlier today?
19  A.  Could you repeat the question?
20  Q.  Was it your understanding at the time that the
21  Midco transaction was the type of transaction you
22  described earlier today?
23  A.  Yes.
24  Q.  And it says "Midcoast independently pursued the
25  so-called 'Midco transaction' as a structural

Page 59

1  alternative." What was it an alternative to?
2  A.  Well, in the context of this letter there's a
3  discussion about Midcoast purchasing stock in the prior
4  paragraph. So, I would assume this is an alternative to
5  a stock purchase based on this document.
6  Q.  And the sentence beginning with "On August 27,
7  1999, Midcoast and PriceWaterhouseCoopers contacted
8  Fortrend International, LLC," do you recall that being a
9  true statement?
10  A.  I don't recall whether the date -- that exact
11  date, but -- but PriceWaterhouseCoopers and Midcoast did
12  contact Fortrend.
13  Q.  And then the paragraph beginning at the bottom,
14  would you read that paragraph and on to the next page
15  until the end?
16  MR. TURKUS:  To himself or out loud?
17  MR. COFFIN:  Out loud, please.
18  MR. TURKUS:  Objection to the form of the
19  question. The document speaks for itself. He doesn't
20  have to spend time reading it into the record. We can
21  all read it. It's an exhibit.
22  MR. COFFIN:  Well, I want him to read it.
23  MR. TURKUS:  Well, he can read it to
24  himself. He doesn't have to read it out loud. What
25  kind of waste of time is this?

Page 60

1  MR. COFFIN:  I like to hear it from his
2  voice.
3  MR. TURKUS:  Objection to the form of the
4  question. It's completely inappropriate.
5  A.  "On August 30, 1999, Fortrend provided some of
6  its background information to Langley's tax advisors,
7  Ernst & Young ('E&Y'). Over the next several weeks,
8  several conversations took place among Fortrend,
9  Midcoast, PWC and E&Y regarding the viability of the
10  Midco alternative. On September 10, 1999, Langley's
11  representatives faxed to Fortrend a draft letter of
12  intent reflecting a purchase price of $175 million and a
13  mutual confidentiality agreement."
14  Q.  (BY MR. COFFIN) Were you involved in the
15  conversations taking place among Fortrend, Midcoast, PWC
16  and E&Y?
17  MR. TURKUS:  Objection to the form of the
18  question.
19  Q.  (BY MR. COFFIN) As stated in that paragraph?
20  MR. TURKUS:  Objection to the form of the
21  question.
22  A.  I was involved in some of the discussions.
23  Q.  (BY MR. COFFIN) What was discussed regarding
24  the viability of the Midco alternative?
25  A.  I don't recall the specific discussions.

Page 61

1  Q.  Generally, do you recall?
2  A.  Generally, the ability of Midcoast to purchase
3  assets from Fortrend after a previous acquisition was
4  stopped by Fortrend.
5  Q.  Turn to Government Exhibit 164, please.
6  A.  (Witness complies.)
7  MR. TURKUS:  It doesn't appear to be in
8  the witness' binder.
9  THE WITNESS:  164?
10  MR. TURKUS:  I'm sorry. It's right in
11  front of the witness. How is that for being helpful?
12  Sorry.
13  Q.  (BY MR. COFFIN) Have you seen this document,
14  Government Exhibit 164, prior to Monday, Mr. Palmisano?
15  MR. TURKUS:  Again, you mean this specific
16  document?
17  MR. COFFIN:  Yes.
18  A.  Yeah, I don't recall seeing this specific
19  document.
20  Q.  (BY MR. COFFIN) Okay. Do you recall seeing --
21  do you recognize the handwriting on the document?
22  A.  I don't recognize the handwriting.
23  Q.  Back in '99, what did PWC tell Midcoast about a
24  Midco transaction?
25  MR. TURKUS:  Objection to the form of the

16 (Pages 58 to 61)

Witness:  Thomas J. Palmisano

Page 62

1  question.  Objection, lack of foundation.  Do you mean
2  anybody at PWC?
3       MR. COFFIN:  Sure.
4       MR. TURKUS:  How could the witness know?
5       MR. COFFIN:  Well, let's see what he
6  recalls.  Can't he just tell me that?
7       MR. TURKUS:  He can't say what anyone at
8  PWC -- I mean, the question is just not worded
9  intelligently.
10      MR. COFFIN:  Okay, Al.  Let him answer the
11  question, please.
12      MR. TURKUS:  If you would ask it properly,
13  I wouldn't raise an objection.
14      A.  I don't recall specific advice provided by PWC
15  to Midcoast; but generally, we would have discussed
16  how -- how a three-party transaction would work and a
17  company such as Fortrend would independently buy the
18  stock of a company and Midcoast would then buy the
19  assets from Fortrend or an affiliate to ensure that
20  Midcoast would receive cost basis in their acquisition.
21      Q.  (BY MR. COFFIN) Was there any discussion -- did
22  you have any discussion with anybody from Midcoast about
23  how Fortrend would offset the gain on the sale of the
24  assets?
25      A.  No.

Page 63

1      Q.  Did anybody from Midcoast ever ask the question
2  of how Fortrend would offset the gain from the sale of
3  the assets?
4       MR. TURKUS:  Ask Mr. Palmisano?
5       MR. COFFIN:  Yes.
6      A.  I don't recall if they specifically asked, but
7  PriceWaterhouseCoopers or any of the
8  PriceWaterhouseCoopers involved in the deal were not
9  aware of how Fortrend would treat the gain on their tax
10  returns since we weren't their advisors.
11      Q.  (BY MR. COFFIN) You weren't whose advisors?
12      A.  Fortrend's advisors.
13      Q.  Were you involved in any discussions between
14  PWC and Midcoast where you discussed how the IRS might
15  view Fortrend's involvement in the transaction?
16      A.  We -- I don't recall specific conversation.
17  However, we did communicate to Midcoast that the
18  transaction had a level of uncertainty, which is why we
19  prepared an opinion letter for the document, the
20  transaction.
21      Q.  And what was that uncertainty?  Do you recall?
22      A.  Because the law is unclear on how to treat
23  these transactions.
24      Q.  And that information would have been
25  communicated to who at -- or whom at Midcoast?

Page 64

1      A.  I don't recall specifically who; but likely
2  Richard Robert, Midcoast counsel, both external and
3  internal and other Midcoast executives.
4      Q.  What other executives do you recall would have
5  been involved in those discussions?
6      A.  Dan Toucher, who was CEO at the time and Chip
7  Burkowatt, who was chief operating officer and involved
8  in the -- the purchase.
9      Q.  Do you have Exhibit 172 in your binder?
10      MR. TURKUS:  I don't think so.  He has it.
11      MR. COFFIN:  Okay.  I've got yours.
12      Q.  (BY MR. COFFIN) Take a look at 172, please.
13      A.  (Witness complies.)
14      Q.  I want you to focus on the bottom of the first
15  page of 172 and carryover to the next page, please.  It
16  appears to be an e-mail from you to Mr. Robert dated
17  June 9 of 2000.  The subject is "KPC 1/1/99-11/8/99 tax
18  returns."  And then on the next page, you comment that
19  "Al Lovinger called me yesterday requesting these
20  returns."  Who is Al -- is it "Lovinger" or "Lovinger"?
21      A.  Lovinger.  I believe he was an independent
22  advisor to Midcoast with respect to their FERC case.
23      Q.  Do you recall having a telephone conversation
24  with Mr. Lovinger?
25      A.  I had several conversations with Mr. Lovinger,

Page 65

1  as I provided him tax information for purposes of his
2  dealings with the FERC.
3      Q.  It says "Al would like a return showing the
4  gain on the sale of the ptsp" -- I assume that's
5  partnership -- "interest to MERI" -- is that Midcoast
6  Energy Resources, Inc., MERI?
7      A.  Yes.
8      Q.  -- "by June 12th to show the FERC."  Do you
9  recall why Mr. Lovinger was requesting that partnership
10  return -- I mean, sorry.  Is that a tax return he was
11  asking for?
12      A.  Yes.
13      Q.  Okay.  Let me ask you again.  Do you recall why
14  Mr. Lovinger was asking for that tax return?
15      MR. TURKUS:  Objection, lack of
16  foundation.
17      A.  Yes.  I believe in terms of -- the step-up in
18  basis affected the -- the rate case and Mr. Lovinger was
19  trying to provide documentation to indicate that
20  Midcoast had received a step-up in basis for the
21  purchase of the assets.
22      Q.  (BY MR. COFFIN) How would the information
23  showing the gain on the sale of the partnership interest
24  to MERI establish what Mr. Lovinger was trying to show?
25      MR. TURKUS:  Objection to the form of the

17 (Pages 62 to 65)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

Witness:  Thomas J. Palmisano

Page 66

1  question.  Objection, lack of foundation.
2      A.  The -- the gain on the sale of the partnership
3  interest was sold by the Fortrend affiliate and that
4  would have -- that would have indicated the gain on the
5  sale, which would have substantiated the step-up in
6  basis for his rate case.  And I believe the -- there was
7  no prior FERC history of a purchase of a regulated
8  pipeline through -- a purchase of partnership interest.
9  The only guidance that he had, historical guidance was a
10  338H10.
11     Q.  (BY MR. COFFIN) What's an approximate 338H10?
12     A.  Qualified stock purchase resulting in a stepped
13  up basis.  So, the -- I believe Mr. Lovinger described
14  the transaction in general terms; and since there was no
15  prior history of such a transaction before the FERC,
16  they wanted more detail on the transaction to show why
17  there was a step-up.
18     Q.  Okay.  Go to Government Exhibit 186, please.
19     A.  (Witness complies.)
20     Q.  Do you recall receiving this e-mail,
21  Mr. Palmisano?
22     A.  Yes, I do.
23     Q.  Do you recall if you were concerned when you
24  received this e-mail?
25         MR. TURKUS:  Objection to the form of the

Page 67

1  question.
2      A.  Concerned specifically about -- can you be more
3  specific about --
4      Q.  (BY MR. COFFIN) Well, the IRS had just issued
5  this notice on intermediary transactions, and that's
6  essentially what Fortrend's involvement was, wasn't it,
7  an intermediary transaction?
8          MR. TURKUS:  Objection to the form of the
9  question.
10         MR. STERN:  Objection to the form.
11         MR. TURKUS:  Are you asking whether this
12  transaction was the kind of transaction addressed in the
13  notice?  Is that what you're asking?
14         MR. COFFIN:  Sure.
15     A.  Can you rephrase the question?
16         MR. COFFIN:  Ask your counsel to rephrase
17  it.
18         MR. TURKUS:  Apparently the question is:
19  Were you concerned because, in your judgment, the
20  Midcoast transaction with Fortrend was effectively or
21  the same as the transaction or substantially similar to
22  the transaction discussed in IRS Notice 2001-16, did you
23  have such a concern?
24     A.  My -- my reaction to this e-mail indicated that
25  the Service was not -- did not approve of a -- of a

Page 68

1  transaction as defined in the notice.
2      Q.  (BY MR. COFFIN) That was your opinion?
3          MR. TURKUS:  Objection to the form of the
4  question.
5      A.  My opinion?
6      Q.  (BY MR. COFFIN) Uh-huh.
7      A.  My concern -- well, I don't know that I
8  necessarily had concerns because of the e-mail; but my
9  reaction to the e-mail is that the Service did not
10  approve of what they define as intermediary transaction
11  in the notice.
12     Q.  Did that give you some concern?
13         MR. TURKUS:  Objection to the form of the
14  question.
15         MR. STERN:  Objection, form.
16         MR. TURKUS:  Concern of what?
17     A.  Concern about what?
18     Q.  (BY MR. COFFIN) Whether PWC had advised
19  Midcoast on an improper transaction?
20         MR. TURKUS:  Objection to the form of the
21  question.
22     A.  I believe there was some concern about the
23  transaction we were involved with would be considered a
24  Midco transaction in which case we had formal notice
25  that the IRS didn't approve of similar transactions.

Page 69

1          MR. STERN:  Lunch is ready whenever y'all
2  want to take a break.
3          MR. COFFIN:  This is a good time for
4  lunch.
5          (Recess taken from 12:14 to 12:54.)
6      Q.  (BY MR. COFFIN) Turn to Exhibit 187, please.
7  Are you there?
8      A.  Yes, sir.
9      Q.  Apparently appears to be some e-mail strings
10  between Mr. McErlean, Mr. Whitten.  Looks like you were
11  a recipient as well.  It appears to -- these e-mails
12  appear to be discussing whether the transaction entered
13  between Midcoast and KPG should be disclosed as a listed
14  transaction.  Do you recall having discussions with
15  Robert Robert about that subject?
16         MR. STERN:  Objection, form.
17     A.  With Richard Robert?
18     Q.  (BY MR. COFFIN) Yes, sir.
19     A.  I recall having discussions with Richard about
20  the disclosure topic.  Not specifically, though.
21     Q.  Okay.  Do you recall what you said to
22  Mr. Robert about the disclosure topic?
23     A.  I believe we concluded that we would not
24  disclose the transaction.
25     Q.  Who is "we"?

18  (Pages 66 to 69)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

Page 70

1      A.  Midcoast or advise them not to disclose.
2      Q.  Do you remember what Mr. Robert's comments were
3   in that regard?
4      A.  No, I don't recall.
5      Q.  Would it have been -- did you speak to him or
6   did somebody else in your firm speak to Mr. Robert about
7   this?
8      A.  I don't recall how it was communicated.
9      Q.  The e-mail from Mr. McErlean at the top of the
10  first -- top third of Government Exhibit 187, first page
11  from Mr. McErlean to Mr. Whitten, the last sentence
12  Mr. McErlean writes is "Although I haven't been close to
13  Richard in quite some time, I would guess he'll ask if
14  we've considered every conceivable way to prevent these
15  disclosures."  Were you aware of the relationship
16  between Mr. McErlean and Richard Robert?
17     A.  I -- I know they -- they had met a few times,
18  and Dennis participated in one of the first rounds of
19  meetings regarding this transaction with Richard.
20     Q.  And Mr. McErlean comments that "I would guess
21  that he'll ask if we've considered every conceivable way
22  to prevent these disclosures."  Do you remember a
23  response like that from Mr. Robert?
24           MR. TURKUS:  Objection to the form of the
25  question.

Page 71

1      A.  I don't recall him responding that way.
2           MR. TURKUS:  Just for the record, I would
3   note that this exhibit seems to have a bunch of e-mails
4   which are not clearly related to each other.
5           MR. COFFIN:  Yeah, I agree.  They may or
6   may not be.
7           MR. TURKUS:  I just wanted to -- so you
8   know.
9      Q.  (BY MR. COFFIN) PWC 1012, which is the second
10  page of 187, at the bottom there's an e-mail there from
11  Mr. Robert to you, Mr. Palmisano, regarding the Midcoast
12  representation letter and PWC opinion.  And it looks
13  like Mr. Robert is making comments to the rep letter.
14  Do you see that?
15     A.  Yes.
16     Q.  Okay.  My question is:  At that time, July 16
17  of 2001, had -- at that time do you know if PWC, anyone
18  at PWC had advised Mr. Robert of the issuance of Notice
19  2001-16?
20     A.  I don't recall we discussed it with them.
21     Q.  Take a look at Government Exhibit 188, please.
22     A.  (Witness complies.)
23     Q.  There is an e-mail in the middle of the page
24  from you, Mr. Palmisano, to Richard Robert.  Would you
25  read that e-mail to yourself, please?

Page 72

1      A.  (Witness complies.)
2      Q.  Do you recall the subject matter of that
3   e-mail?
4      A.  Yes.
5      Q.  Okay.  Tell me what the issues were there.
6      A.  Midcoast was obligated to pay a project
7   development fee that was an obligation of KPC or one of
8   the affiliates at the time they acquired them.  And the
9   question was how to treat that expenditure for tax
10  purposes to capitalize that expenditure or expense it
11  currently.
12     Q.  And did you perform research on that issue?
13     A.  Yes.
14     Q.  And do you recall what you concluded?
15     A.  I believe we concluded it needed to be
16  capitalized over the life of the contract replacing the
17  contract terminated.
18     Q.  Turn in the same exhibit, turn to PWC 1020 at
19  the bottom right-hand corner.  I'm sorry 1057.
20           MR. TURKUS:  Yeah, this is a similar
21  exhibit of apparently disconnected e-mails, for the
22  record.
23     Q.  (BY MR. COFFIN) The e-mail on the top --
24  beginning at the top third of the page from you to
25  Mr. Wilcox, do you see that?  From you to Mr. Wilcox?

Page 73

1      A.  Yes.
2      Q.  Dated July 27, 2001, could you read that e-mail
3   for us, please, just the subject matter?
4      A.  To myself or out loud?
5      Q.  Read it out loud, please.
6      A.  "Thanks, Gary.  I think we are better off
7   capitalizing the costs with the contract assuming the
8   PDA has a reasonably short line.  Expensing currently
9   flags the item in the case of an audit and creates a nol
10  that we would rather not carry back to '98 or '99 for
11  obvious reasons.
12           "Thanks for your reply and hopefully this
13  puts to bed."
14     Q.  Okay.  Do you recall what those obvious reasons
15  were?
16     A.  Well, in 1999 we have the KPC acquisition,
17  which, as we have discussed, has some uncertainty as to
18  where -- how the IRS would treat the transaction.
19     Q.  And, then, the -- was there anything in '98
20  that created any concern?
21     A.  Not that I'm aware of.
22     Q.  Turn to 189, please.
23     A.  199?
24           MR. TURKUS:  Eighty-nine.
25     Q.  (BY MR. COFFIN) Eighty-nine.  Have you seen

19  (Pages 70 to 73)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

Page 74

1 this document, Mr. Palmisano, prior to last Monday?
2     A. Yes, I have.
3     Q. Did you review it sometime February of 2001, do
4 you think?
5     A. I don't recall reviewing it in 2001.
6     Q. When do you recall reviewing it or when is it
7 that you recalled that you reviewed it?
8     A. I would assume from the documents, since it's
9 dated February 20, that I would have read it around that
10 time.
11    Q. February 20, 2001?
12    A. Correct.
13    Q. Okay. The second page of the document, did you
14 agree with the conclusion reached there that PWC is
15 prepared to advise Midcoast that there is an appropriate
16 basis for deciding neither to attach a disclosure
17 statement to Midcoast's return for its taxable year
18 ended December 31, 2001 nor to file a copy of the
19 disclosure statement with the IRS in Washington, D.C.?
20         MR. TURKUS: Objection to the form of the
21 question.
22    A. That was the conclusion that our firm reached
23 with respect to this issue.
24    Q. (BY MR. COFFIN) Did you reach the same
25 conclusion yourself?

Page 75

1         MR. TURKUS: Objection to the form of the
2 question.
3     A. Did I agree with the conclusion?
4     Q. (BY MR. COFFIN) Yeah.
5     A. That was -- I agreed with the conclusion at the
6 time.
7     Q. Do you still agree with the conclusion?
8         MR. TURKUS: Objection to the form of the
9 question.
10    A. I believe since this memo has been written that
11 there is further clarity on the disclosure rules that
12 may or may not change my opinion on whether this was the
13 right answer.
14    Q. (BY MR. COFFIN) During the break co-counsel
15 advised me that it's still not clear how Fortrend came
16 into the picture. Whose idea was it to bring Fortrend
17 in to -- to help with this transaction?
18         MR. TURKUS: Objection to the form of the
19 question.
20    A. PriceWaterhouseCoopers initially contacted
21 Fortrend about the transaction and introduced Fortrend
22 to Midcoast.
23    Q. (BY MR. COFFIN) Do you recall who it was that
24 contacted Fortrend?
25         MR. TURKUS: Objection to -- withdraw

Page 76

1 that.
2     A. I don't recall the initial contact, but Dennis
3 McErlean and I were involved in initial or -- or early
4 discussions, but I don't recall who had the specific
5 contact with -- with Fortrend within our firm.
6     Q. (BY MR. COFFIN) And, then, why -- or how was it
7 determined that Fortrend needed to be contacted?
8         MR. TURKUS: Objection to the form of the
9 question.
10        MR. STERN: Objection, form.
11    A. How was it determined?
12    Q. (BY MR. COFFIN) Yeah. Why did you -- why did
13 PWC decide to go out and talk to -- to make an initial
14 contact with Fortrend?
15    A. There was a desire by Midcoast to receive a
16 stepped-up basis in the assets. And by doing so, it
17 gave them an ability to increase the amount of
18 consideration for the assets.
19    Q. Who is "they"?
20    A. Midcoast.
21    Q. So --
22    A. Because -- because of the step-up, there was
23 more economic benefit to Midcoast as a buyer. So, they
24 were -- it enabled them to -- to pay more for the
25 assets.

Page 77

1     Q. Okay. So, once you and Mr. McErlean made the
2 initial contact with Fortrend, what was the next step?
3         MR. TURKUS: Objection to the form of the
4 question. That's not what he said.
5         MR. COFFIN: Oh, I'm sorry.
6         MR. TURKUS: He said he didn't know who
7 made the initial contact. He said they had early
8 discussions.
9     Q. (BY MR. COFFIN) I'm sorry. Well, once you had
10 and Mr. McErlean had early discussions with Fortrend,
11 what was the next step?
12    A. There was a conference call with Fortrend and
13 representatives from Midcoast shortly after we contacted
14 Fortrend. We made an introduction to Midcoast via
15 conference call.
16    Q. Who was on the conference call?
17    A. I don't -- I don't recall the specific
18 individuals involved; but I believe it was myself,
19 Dennis McErlean, Richard Robert and either Craig Hoffman
20 or Jeff Furman from Fortrend. But I'm not -- I'm not
21 positive who represented Fortrend and whether there were
22 additional PWC folks on the call as well as Midcoast's
23 folks.
24    Q. And were there any discussions on that
25 conference call as to how Fortrend would be able to

20  (Pages 74 to 77)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

| Page 78 |
|---|

1  absorb the gain from the purchasing of the stock and
2  sale of the assets to Midcoast Energy?
3          MR. STERN:  Objection to form.
4          MR. TURKUS:  Objection, asked and
5  answered.
6      A.  There were not -- I don't recall any
7  discussions about how -- how the gain would be treated
8  by Fortrend on their tax returns.
9      Q.  (BY MR. COFFIN) Did you personally wonder how
10  the gain would be treated on their tax returns?
11          MR. TURKUS:  Objection to the form of the
12  question.
13      Q.  (BY MR. COFFIN) On Fortrend's tax returns?
14          MR. TURKUS:  Same objection.
15      A.  Was I -- was I curious how the gain would be
16  treated?
17      Q.  (BY MR. COFFIN) Uh-huh.
18      A.  I would say, yes, I was curious.
19      Q.  Did you ever seek out -- did you talk to
20  anybody about your curiosity, ask anybody in PWC how the
21  gain would be treated?
22          MR. TURKUS:  Anybody at PWC or anybody at
23  Fortrend?
24      Q.  (BY MR. COFFIN) Anybody at PWC.
25      A.  I don't recall specific discussions about that,

| Page 79 |
|---|

1  but --
2      Q.  Did you have some general discussions?
3      A.  -- I'm sure there were some discussions about
4  how the gain would be treated at Fortrend; but we
5  weren't -- were not aware of how it was going to be
6  treated at Fortrend because it was irrelevant to our
7  purchase of the assets, Midcoast's purchase of the
8  assets.
9      Q.  So, after that conference call, what would have
10  happened next, as far as pushing the transaction
11  forward?
12          MR. TURKUS:  Do you mean the conference
13  call that he described some time ago between people at
14  Fortrend, people at Midcoast and people at PWC?
15          MR. COFFIN:  Yes.
16          MR. TURKUS:  Objection to the form of the
17  question.
18      A.  The -- actually the representation letter
19  actually has very good documentation of the sequence of
20  events.
21      Q.  (BY MR. COFFIN) Okay.
22          MR. TURKUS:  You need to clarify for
23  Mr. Coffin which representation letter you're talking
24  about.
25      A.  The Midcoast representation letter to

| Page 80 |
|---|

1  PriceWaterhouseCoopers.
2      Q.  (BY MR. COFFIN) Did anybody at Midcoast ever
3  express curiosity to you as to how the gain would be
4  treated by Fortrend?
5      A.  I -- I don't recall specific questions about
6  it, but I believe such discussions could have occurred.
7      Q.  And why do you think that such discussions
8  could have occurred?
9          MR. STERN:  Objection to the form.
10          MR. TURKUS:  Objection to the form of the
11  question.
12      A.  I think --
13      Q.  (BY MR. COFFIN) Was Mr. Robert inquisitive in
14  that regard?
15          MR. TURKUS:  Objection to the form of the
16  question.
17      A.  He may have asked that question.  We may have
18  had a discussion.  I just don't recall any specific
19  discussions on that specific topic.
20      Q.  (BY MR. COFFIN) Take a look at Government
21  Exhibit 190, please.
22      A.  (Witness complies.)
23      Q.  Have you seen that document before,
24  Mr. Palmisano?
25      A.  Yes, I have.

| Page 81 |
|---|

1      Q.  Who are John Chesser and Amy Campbell?
2      A.  They were associates -- tax associates at
3  PriceWaterhouseCoopers at the time this was written.
4      Q.  In the Houston office?
5      A.  Yes.
6      Q.  Do you know why this memo was prepared?
7      A.  I had asked John and Amy to prepare this memo
8  to document our conclusion with regard to the tax
9  treatment of the contract cancellation fee.
10      Q.  And this is consistent with your -- the
11  position you told me about a few minutes ago, right?
12      A.  Yes, sir.
13      Q.  Do you know if PWC's position ever changed in
14  that regard with regard to this issue?
15      A.  I believe our treatment on the tax return was
16  consistent with this file memo.
17      Q.  One thing I didn't see in the representation
18  letter is when exactly did PWC agree to provide a tax
19  opinion letter to Midcoast on this transaction?  Do you
20  recall when that was?
21          MR. TURKUS:  Objection to the form of the
22  question.
23      A.  No, I don't recall specifically when that
24  occurred.
25      Q.  (BY MR. COFFIN) Was it at the time that the

21  (Pages 78 to 81)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

Page 82

1  engagement letter was entered into, which was Government
2  Exhibit 115, I believe?
3      A.  I don't recall when we made the agreement to
4  write the opinion letter.
5      Q.  Do you recall discussing the opinion letter in
6  one of your conversations with Mr. Robert?
7          MR. TURKUS:  At what time?  At any time?
8          MR. COFFIN:  At any time.
9      A.  It was -- I do recall it was Mr. Robert's
10  desire that we provide a tax opinion with respect to the
11  acquisition.
12      Q.  (BY MR. COFFIN)  Was that something he requested
13  early on in your discussions of Fortrend?
14          MR. TURKUS:  Objection to the form of the
15  question.
16      A.  I don't recall at what time.  I think it was --
17  it was likely during the -- during the transaction.
18      Q.  (BY MR. COFFIN)  What do you mean "during the
19  transaction"?
20      A.  Well, at some point between the time they
21  pursued the asset purchase and the time it was closed,
22  but I don't recall specifically when.
23      Q.  Turn to Government Exhibit 201, please.
24      A.  (Witness complies.)
25      Q.  For the most part, Mr. Palmisano, Mr. Wilcox

Page 83

1  testified last Monday that these are his notes, but I
2  wanted to go over a few of the topics that he writes
3  about in his notes.
4          MR. STERN:  I'm missing my copy.  If you
5  will just bear with me.  Okay.  Sorry.
6      Q.  (BY MR. COFFIN)  Mr. Palmisano, did you keep
7  notes yourself when working on engagements such as this?
8      A.  I may have kept notes or I may have taken
9  notes, but I -- I don't believe I kept those notes or
10  put them in our files.
11      Q.  Have you done a search of all your files?
12      A.  Yes.
13      Q.  Look on the first page of 201.  It says
14  "Midco-Considerations."  Can you just look over those
15  for a minute?
16      A.  (Witness complies.)
17      Q.  My question will be, when you're finished:  Are
18  any of those matters listed written there familiar to
19  you with regard to this transaction?
20          MR. TURKUS:  Objection to the form of the
21  question.  The person who made the notes said they were
22  not necessarily prepared in connection with this
23  transaction.  That was his sworn testimony.
24          MR. COFFIN:  He didn't say that it wasn't,
25  though.

Page 84

1          MR. TURKUS:  He said that he wasn't sure
2  whether they were or not.  The way you've asked this
3  question, you're suggesting to this witness that these
4  notes were prepared in connection with the transaction.
5          MR. COFFIN:  I asked him if they were
6  familiar with regard to this transaction.
7          MR. TURKUS:  My objection is on the
8  record.
9          MR. COFFIN:  Along with a lot of other
10  comments.
11          MR. TURKUS:  That's right.  It's a
12  question of how you ask the questions.
13      A.  Okay.  Could you repeat the question again?
14          MR. COFFIN:  Would you read that back,
15  please?
16          (The record was read as requested.)
17          MR. TURKUS:  I note an additional
18  objection to the prior objection, which is that there
19  are a lot of abbreviations here, and I'm not sure you've
20  explained to the witness what the notes say.
21      A.  There -- there's nothing specific to the
22  transaction listed here, but there are some -- some
23  general themes here that -- that are consistent with
24  issues -- tax issues associated with the transaction.
25      Q.  (BY MR. COFFIN)  Do you recall talking to

Page 85

1  Mr. Wilcox about any of these matters?
2          MR. TURKUS:  In connection with this
3  transaction?
4      Q.  (BY MR. COFFIN)  At any time.
5      A.  Yes.  These are some -- some of these are broad
6  issues associated with the tax treatment of the
7  transaction.
8      Q.  I don't understand your answer.
9          MR. TURKUS:  Then ask him a question.
10      Q.  (BY MR. COFFIN)  I asked him:  Do you recall
11  talking to Mr. --
12          MR. COFFIN:  Read that back for me.
13          MR. TURKUS:  The question or the answer?
14          MR. COFFIN:  The question.
15          (The record was read as requested.)
16      Q.  (BY MR. COFFIN)  Okay.  So, you did talk to him?
17      A.  So, yeah, these are -- I don't -- I don't know
18  if he wrote these specifically for this transaction,
19  but --
20      Q.  Turn to PWC 1287, please.
21      A.  (Witness complies.)
22      Q.  At the bottom of 1287 it appears it says
23  "Seller asking for incremental consid-equal to one half
24  the step-up."  Do you recall what that may have been?
25  What that was in regard to?

22  (Pages 82 to 85)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

---

Page 86

1      MR. TURKUS: Objection, lack of
2  foundation.
3      A.  1278?
4      Q.  (BY MR. COFFIN) 1287.
5      A.  1287.  Okay.  What was the phrasing?
6      Q.  The very bottom.  That note on the very bottom.
7      MR. TURKUS:  Same objection.
8      A.  No, I --
9      Q.  (BY MR. COFFIN) Okay.  Turn the page.
10     A.  I don't recall what that refers to.
11     Q.  Turn the page.  At the top of 1288 there's a
12  few notes there.  Do you recall what those numbers mean?
13     MR. TURKUS:  Are you asking if he knows
14  what Mr. Wilcox meant when he wrote these numbers?  Is
15  that what you're asking?
16     MR. COFFIN:  No.  Let me restate the
17  question.
18     MR. TURKUS:  Can you restate the question,
19  please?
20     Q.  (BY MR. COFFIN) Do those numbers look familiar
21  to you?
22     MR. TURKUS:  Objection to the form of the
23  question.
24     A.  It appears that's the -- the profit that K
25  Pipe, their customary and practice to receive a profit

---

Page 87

1  of 7 percent on -- on these transactions.  So, that's --
2      Q.  (BY MR. COFFIN) And do you know what the 15
3  percent is?
4      A.  Fifteen percent is a percentage of -- of fee
5  paid by the buyer to the tax advisor.
6      Q.  That would have been PWC?
7      A.  Yes.
8      Q.  Look -- I'm sorry.  Same page.  There's a
9  couple of brackets there.  If you look on the second
10  bracket, Item No. 3, it says "Midco injects loss assets
11  to corp.  Corp sells -- Midco takes risk."  Are you
12  familiar with the phrase "loss assets"?
13     MR. TURKUS:  In connection with this
14  transaction?
15     MR. COFFIN:  In any transaction.
16     Q.  (BY MR. COFFIN) Let's start with this
17  transaction.
18     MR. TURKUS:  Objection to the form of the
19  question.  Objection, lack of foundation.
20     A.  The question is:  What does this note mean in
21  connection with the transaction?
22     Q.  (BY MR. COFFIN) Right.  Are you familiar with
23  the phrase, term "loss assets" in conjunction with this
24  transaction?
25     A.  I'm not aware of what the loss assets were, if

---

Page 88

1  any, in connection with this transaction.
2      Q.  Did you have any discussions with Mr. Robert or
3  anyone at Midcoast regarding Fortrend's fee structure?
4      A.  Yes.
5      Q.  And were they aware of Fortrend's fee
6  structure?
7      MR. TURKUS:  Objection to the form of the
8  question.
9      MR. STERN:  Objection to form.
10     MR. TURKUS:  What do you mean by "fee
11  structure"?
12     A.  Yeah.  Do you mean by the profit on their sale?
13     Q.  (BY MR. COFFIN) Yes.
14     A.  Yes, we talked about what type of profit they
15  usually shoot for when they sell these assets.
16     Q.  Did you ever have a conversation with
17  Mr. Wilcox wherein he used the phrase "loss assets"?
18     MR. TURKUS:  In any transaction?
19     Q.  (BY MR. COFFIN) In this transaction.
20     A.  I don't recall a specific discussion.
21     Q.  Can you speculate on what he was referring to
22  in talking about loss assets or writing about loss
23  assets?
24     MR. TURKUS:  Objection to the form of the
25  question.  Objection, lack of foundation.

---

Page 89

1      MR. STERN:  Anybody can speculate.
2      MR. TURKUS:  How does that help?
3      MR. STERN:  That's a different question.
4      A.  I -- I would speculate that he was curious how
5  Fortrend would treat the gain on the asset sale.
6      Q.  (BY MR. COFFIN) PWC 1293, please.  At the
7  bottom of the page there is a reference there.  It says
8  "15-17M."  Do you see that about the fourth line up?
9      A.  Yes.
10     Q.  Okay.  Dash PV of tax benefits.  Do you know or
11  do those numbers and terms look familiar to you in
12  regard to this transaction?
13     MR. TURKUS:  Objection to the form of the
14  question.
15     A.  I believe the tax step-up, the difference
16  between the asset purchase price and the adjusted basis
17  of the assets was approximately 120 to $130 million
18  gross.  So, that approximate looks like present value of
19  that increased tax basis through depreciation deductions
20  over the life of the respected properties.
21     Q.  (BY MR. COFFIN) Do you recall discussions with
22  Mr. Wilcox or Mr. Robert about the present value of the
23  tax benefits that they would be getting on the
24  depreciation?
25     MR. TURKUS:  "That they would be getting"

---

**HUNDT REPORTING**
**214-220-1122**

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

---

Page 90

1  meaning Mr. Wilcox?
2  Q.  (BY MR. COFFIN) That Midcoast would be getting?
3  A.  Yes.
4  Q.  And do you recall -- was there an amount that
5  you guys determined that would be the present value?
6  MR. TURKUS: Objection to the form of the
7  question.  "You guys"?
8  Q.  (BY MR. COFFIN) Well, the tax advisors and
9  Midcoast determined was the present value of the tax
10 benefits?
11 A.  I don't recall who ran the present value model,
12 but I recall a model being run to determine what the
13 benefit would be.
14 Q.  Once that amount was determined, do you recall
15 how that amount was used in conjunction with this
16 transaction?
17 MR. TURKUS: Objection to the form of the
18 question.
19 MR. STERN: Objection, form.
20 A.  Could you specify what you mean by how it was
21 used?
22 Q.  (BY MR. COFFIN) Sure.  Was that number used to
23 assist Midcoast in planning or in determining whether to
24 enter into the transaction with Fortrend or not?
25 MR. TURKUS: Objection to form of the

---

Page 91

1  question.  Objection, lack of foundation.
2  MR. STERN: Same objection.
3  A.  The benefit of the step-up enabled Midcoast to
4  increase the amount of consideration for the assets.
5  Q.  (BY MR. COFFIN) And what did the present value
6  of the tax benefit, how did that help in that equation,
7  if at all?
8  MR. TURKUS: Objection to the form of the
9  question.
10 A.  The increased tax basis would give Midcoast
11 additional corporate and state income tax deductions
12 after the transaction in excess of a carryover basis.
13 Q.  (BY MR. COFFIN) I'm still a little confused.
14 It might be my questioning.  I'm sure Mr. Turkus would
15 say yes, it is.
16 Why would -- I understand you're
17 calculating the tax benefit into the future, then you
18 bring it back to present value.  So, the present value,
19 how was that number used, if you know, by Midcoast in
20 its planning for this transaction?
21 A.  In terms of --
22 Q.  Was it compared against something else or was
23 it -- was that the figure that was used to add to the
24 purchase price that could -- the increased purchase
25 price you mentioned earlier?

---

Page 92

1  MR. TURKUS: Objection.  Lack of
2  foundation.
3  A.  I'm not -- I don't recall specifically how
4  Midcoast determined their purchase price or ascertained
5  additional consideration because of the purchase.  Since
6  we were their tax advisors, we would advise them on what
7  the benefit of the step-up was in terms of how it was
8  allocated to the respective assets.  But the financial
9  Midcoast employees, Richard Robert and his group, would
10 have determined what that meant in terms of deal
11 economics.
12 Q.  (BY MR. COFFIN) Go to the bottom of 1295,
13 please.
14 A.  (Witness complies.)
15 Q.  Now, at the bottom I think it says "Ian not
16 comfort talking fee without disclosure to client.
17 directing Fortrend to pay us a portion."  Do you recall
18 any of those matters in relation to the transaction?
19 MR. TURKUS: Objection to the form of the
20 question.  Objection, lack of foundation.
21 A.  Well, the final agreement engagement letter
22 included that Midcoast would direct Fortrend to pay out
23 of Midcoast's consideration on the asset purchase.  That
24 would seem that relates to these notes in some fashion.
25 Q.  (BY MR. COFFIN) Go to PWC P1299, please.  At

---

Page 93

1  the bottom where it says "BOSS," does that word have any
2  meaning to you today?
3  A.  BOSS?
4  Q.  With regard to a tax transaction?
5  MR. TURKUS: In connection with this
6  transaction?
7  Q.  (BY MR. COFFIN) No.  Just any tax.  A tax
8  transaction.
9  A.  I believe it is -- it's a reference to a tax
10 shelter transaction.
11 Q.  Was there -- do you recall any discussions with
12 PWC or Midcoast about a BOSS transaction back in '99?
13 A.  A BOSS transaction.  I don't -- I don't recall
14 specific discussions, but it was discussed as a -- it
15 was discussed at some point with Richard as a tax
16 planning strategy.
17 Q.  Was Fortrend -- do you know if Fortrend, were
18 they involved in BOSS transactions?
19 MR. TURKUS: Objection, lack of
20 foundation.
21 A.  I'm not aware of their involvement in BOSS
22 transactions.
23 Q.  (BY MR. COFFIN) Was there much discussion with
24 Mr. Robert about a BOSS transaction?
25 A.  There -- there were discussions with Mr. Robert

---

24  (Pages 90 to 93)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

---

Page 94

1  about BOSS transactions.
2     Q.  Do you recall what was discussed?
3     A.  Not -- not specifically.
4     Q.  What about just generally?
5     A.  I do recall conversations that I -- that
6  PriceWaterhouseCoopers had with Richard about BOSS as a
7  general strategy.
8     Q.  Who was involved from PriceWaterhouseCoopers?
9     A.  Myself and Dennis McErlean, possibly Bob
10  Whitten.
11    Q.  Was a BOSS transaction entered into by
12  Midcoast?
13    A.  Not that I'm aware of.
14        MR. COFFIN:  All right.  I've got to have
15  a break.  I'm sorry.
16        MR. TURKUS:  That's okay.
17        (Recess taken from 1:45 to 1:52.)
18    Q.  (BY MR. COFFIN) Go to 1304, please, PWC 1304.
19  There's an entry there, I think "9/15 Tom P" next to it,
20  which I think would be you, and it says "Dennis said
21  Fortrend pays us."  Did you discuss with Mr. Wilcox or
22  Mr. McErlean about who should pay the fee --
23        MR. STERN:  Objection, form.
24    Q.  (BY MR. COFFIN) -- to PWC?
25    A.  There were discussions about how to -- how to

---

Page 95

1  arrange the fee, PWC's fee for Midcoast.
2     Q.  Okay.
3     A.  And whether or not it should be paid by
4  Midcoast or paid at closing.
5     Q.  Was it determined that it would be paid at
6  closing from the seller's proceeds?
7     A.  Paid at closing from the consideration by the
8  buyer, yeah.
9     Q.  Do you know why it was instructed that Midcoast
10  would pay the fee directly to PWC?
11    A.  I don't recall why we arranged the way we did.
12  I believe it was an issue of convenience.
13    Q.  Go to 1306.  If you will just read the bottom
14  there where it says "9/17 Bob Whitten," go to the next
15  page, about the top third, to the next entry.
16    A.  (Witness complies.)
17    Q.  There seems to be some reference there to
18  Circular 230.  Are you familiar with Circular 230?
19        MR. TURKUS:  Is he familiar today with it
20  or was he familiar in 1999?
21        MR. COFFIN:  Today.
22    A.  I know generally what Circular 230 is, yes.
23    Q.  (BY MR. COFFIN) Okay.  Were there discussions
24  about Circular 230 in 1999 in relation to this
25  transaction?

---

Page 96

1        MR. TURKUS:  Object to the form of the
2  question.  Discussions involving this witness?
3        MR. COFFIN:  Sure.
4     A.  I don't recall specific discussions about
5  Circular 230.
6     Q.  (BY MR. COFFIN) Okay.  Any general discussions
7  about Circular 230?
8     A.  I don't recall any general discussions that I
9  was involved with.
10    Q.  Okay.  Back on 1306 at the bottom.  You read
11  part of that.  Down at the bottom it says "separate
12  letter with Fortrend."
13        Do you know what that is in regard to?
14        MR. TURKUS:  Objection, lack of
15  foundation.
16    A.  No, I don't recall.
17    Q.  (BY MR. COFFIN) Go to 1308.  There is a note
18  there with "Dennis M" with the triangle around it.  Do
19  you see that?  Below that where it says "Nature of
20  concern," would you read that to yourself, please?
21    A.  The triangle?
22    Q.  Well, I think it's a rectangle, isn't it?  Four
23  sides?  1308.
24    A.  Oh.
25        MR. TURKUS:  You said triangle at first.

---

Page 97

1        MR. COFFIN:  Oh, I'm sorry.
2        MR. TURKUS:  It was a trick question.
3        MR. COFFIN:  I'm sorry.  I'm surprised you
4  didn't object.
5        MR. TURKUS:  I knew what you meant.  I
6  figured Tom would, too; but I was wrong.
7     Q.  (BY MR. COFFIN) Have you read those five lines
8  there?
9     A.  They're not very legible.
10    Q.  No, they're not.  Have you looked at that?
11    A.  Yes.
12    Q.  Okay.  Under the rectangle it says "Nature of
13  concern," and I think it says "Richard not tell BD,"
14  which I think is board, "that they'll pay us 900K."
15        Do you remember if there was an issue as
16  to whether Mr. Robert was or was not going to tell the
17  board about PriceWaterhouseCoopers' fees on the
18  transaction?
19    A.  I don't recall any issue along those lines.
20    Q.  Below that "Tom" with a square around it,
21  appears to say "Richard reconsid how to pull out."  Do
22  you remember if you had any discussions with Mr. Robert
23  or Mr. Wilcox about pulling out?
24    A.  Not specific discussions; but with any
25  acquisition, there was a potential that could have died

---

25  (Pages 94 to 97)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

Page 98

1  at several points in time during the negotiations.
2      Q.  Go to 1312, please.
3      A.  (Witness complies.)
4      Q.  There is an entry at the top that says 9/22
5  appears to say "Jeff Furman, Craig H., Tom P. and Dennis
6  M."  On the left of those entries, and there's a bracket
7  there, it looks like it says charge for ord, what I
8  would consider to be ordinary -- "charge 7 percent for
9  ord and 5 percent for capital."  Do you see that?
10     A.  Yes.
11     Q.  Do you recall if Fortrend had two different
12  fees for -- depending on what type of gains occurred on
13  the transaction?
14         MR. TURKUS:  Objection to the form of the
15  question.  Objection, lack of foundation.
16         MR. STERN:  Objection to the form.
17     A.  Can you repeat the question again?  Sorry.  I
18  was reading while you were asking it.  I apologize.
19         MR. COFFIN:  That's all right.  Read that
20  back, please.
21         (The record was read as requested.)
22         MR. TURKUS:  Same objection.
23     A.  The -- the selling price was, I believe, a flat
24  fee.  So, it didn't factor into whether it would be
25  ordinary gain or capital gain to portray on the sale.

Page 99

1      Q.  (BY MR. COFFIN) Is that a "yes" or "no"?
2      A.  "Yes" or "no" to?
3      Q.  Wasn't my question do you recall?
4          MR. TURKUS:  Question was:  Do you recall
5  whether they had a different fee structure depending on
6  whether it was ordinary gains or capital gains.
7      A.  I don't recall the graduated structure that --
8      Q.  (BY MR. COFFIN) Go to P1320, please.
9      A.  (Witness complies.)
10     Q.  In the middle of the page there's an entry
11  "9/30 Tom P."  If you will read to yourself that to the
12  bottom of the page, please.
13     A.  (Witness complies.)
14     Q.  Have you finished?
15     A.  Yes.
16     Q.  Was there an issue with regard to how the fee
17  would be calculated that was discussed with -- that you
18  discussed with Mr. Wilcox on September 30?
19         MR. TURKUS:  Objection to the form of the
20  question.  Objection, lack of foundation.
21         MR. STERN:  Same objection.
22     A.  When -- when you refer to "fee," what
23  specifically are you talking about?
24  PriceWaterhouseCoopers' fee from Midcoast?
25     Q.  (BY MR. COFFIN) Yes, sir.

Page 100

1      A.  The -- I'm sorry.  Can you repeat the question
2  again?  I lost my train of thought.
3          MR. COFFIN:  Okay.  Read it back for me,
4  if you would.
5          (The record was read as requested.)
6      A.  I don't recall the specific discussion with
7  Gary about a fee increase.
8      Q.  (BY MR. COFFIN) Okay.
9      A.  On the 30th.
10     Q.  Okay.  Do your view of these notes, does
11  anything come to mind as to an issue with regard to the
12  computation of the fee?
13         MR. TURKUS:  Objection to the form of the
14  question.
15     A.  That -- the PriceWaterhouseCoopers' fee paid by
16  Midcoast?
17     Q.  (BY MR. COFFIN) Either that fee or the fee that
18  was paid to -- well, that's what it says.  You tell me
19  if you know what that fee relates to where it says at
20  the top "step-up and related fee include fee."
21         MR. TURKUS:  Objection, lack of
22  foundation.  He didn't write these notes.
23     A.  Yeah.
24         MR. STERN:  Same objection.
25     A.  The -- I believe generally -- and I don't

Page 101

1  recall the discussions on September 30, but with respect
2  to additional consideration in the deal would cause
3  additional purchase price in step-up which would impact
4  the amount of profit that Fortrend receives on the sale
5  of the assets.
6      Q.  (BY MR. COFFIN) Okay.  The $6 million -- is
7  that 6 million?  Is that what you take it in the notes?
8          MR. TURKUS:  Objection to the form of the
9  question.
10     A.  What I was referring to?
11     Q.  (BY MR. COFFIN) Yeah.  If 6 million -- the
12  second line says "If 6 million step-up additional five
13  percent for $6 million"?
14     A.  Yes.  That's what I'm referring to as the notes
15  here.
16     Q.  Does the 6 million relate to the Butcher
17  Interest?
18         MR. TURKUS:  Objection to the form of the
19  question.  Objection, lack of foundation.
20         MR. STERN:  Same objection.
21     A.  I don't recall what this 6 million refers to.
22     Q.  (BY MR. COFFIN) And the notes at the bottom
23  where, it says "9/30 Tom P.," very bottom of the page,
24  P1320, I believe it says "agree with GBW not made clear
25  on Fort," Fortrend's side.  "Only makes sense re

26  (Pages 98 to 101)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness: Thomas J. Palmisano**

Page 102

1  percentage of gains sheltered."
2  Do those words have any meaning to you as
3  related to the transaction in '99?
4  A. Well, the customary practice, I believe, of
5  Fortrend was to receive a profit on their sale of a
6  percentage of the step-up in the tax basis to the
7  ultimate asset buyer. So, with additional consideration
8  involved, that would mean additional step-up and
9  additional purchase price.
10  Q. But it says -- what about the words "percentage
11  of gain sheltered"? Does that mean anything to you?
12  MR. TURKUS: Are you asking him if he
13  knows what Mr. Wilcox meant when he wrote that or are
14  you asking him something different?
15  MR. COFFIN: No, I'm asking him something
16  different.
17  MR. TURKUS: Okay. Could you explain the
18  question then?
19  Q. (BY MR. COFFIN) Reading those words written in
20  the notes that appear to result from conversation with
21  you on 9/30 by Mr. Wilcox, do -- does the words or do
22  the words "gain sheltered" mean anything to you today as
23  related to that transaction in 1999?
24  MR. TURKUS: Objection to the form of the
25  question.

Page 103

1  A. I believe he is referring to the percentage of
2  the tax step-up, which was a basis for the profit on the
3  asset sale.
4  Q. (BY MR. COFFIN) 1322, please, P1322. At the
5  top "10/4 Tom P." It says "Richard Robert-why not beat
6  down fee?" And then it says "not outraged-just ask if
7  how normally done." Do you recall having any
8  conversations with Mr. Robert about -- about beating
9  down any fees?
10  MR. TURKUS: Objection to the form of the
11  question.
12  A. With respect to this transaction or all of the
13  work we perform?
14  Q. (BY MR. COFFIN) This one specifically.
15  A. Okay. I recall discussing the methodology used
16  by Fortrend to determine the amount of a purchase price
17  when they sell the assets.
18  Q. Was Mr. Robert proposing that you negotiate
19  with Fortrend to reduce their fee?
20  MR. TURKUS: Objection to the form of the
21  question.
22  A. I don't recall specific discussions about that.
23  Q. (BY MR. COFFIN) What about just generally?
24  MR. TURKUS: Same objection.
25  A. I don't recall the specific discussions about

Page 104

1  the fee or negotiating the fee or any -- any sort of
2  back and forth with Fortrend with respect to the amount
3  of the purchase price of the assets.
4  Q. (BY MR. COFFIN) Did Mr. Robert talk to you
5  about reducing PWC's fee on this transaction?
6  A. I don't recall any specific negotiations on the
7  fee with respect to PWC's fee or whether he asked us to
8  lower the fee.
9  Q. Now, you chuckled earlier about Mr. Robert and
10  wanting him -- about beating down fees in general. Can
11  you comment on that?
12  MR. TURKUS: Objection to the form of the
13  question.
14  A. I think it's a -- the responsibility of any
15  chief financial officer at a company to be mindful of
16  the amount of professional fees incurred. And he was
17  mindful of professional fees that were incurred on
18  behalf of his company.
19  Q. (BY MR. COFFIN) When I took his deposition
20  several weeks ago he commented on the initial engagement
21  letter, Exhibit No. 5, that the 65 percent -- 65 percent
22  of the hourly fees was something he negotiated
23  specifically. And he seemed to be proud of the fact
24  that he did that. Is that typical of something
25  Mr. Robert would try to do at PWC?

Page 105

1  MR. TURKUS: Objection to the form of the
2  question. Objection, lack of foundation.
3  MR. STERN: Same objection.
4  A. I -- I think it's typical for our liaisons with
5  clients to be prudent about the amount of fees they
6  incur and negotiate the best fee for their company, and
7  Richard was no exception.
8  Q. (BY MR. COFFIN) Go to 1326, please. There's an
9  entry there "10/16 T Hardie." Now, we talked about Tye
10  Hardie earlier as a representative of Bank of America, I
11  believe. Could you read through that list there or
12  those notes and tell me if you recall that those
13  issues -- those matters were concerns of T. Hardie?
14  MR. TURKUS: In connection with these
15  notes relating to apparently 10/16 or just general? I
16  point out Mr. Palmisano's name is not here.
17  MR. COFFIN: Yes.
18  MR. TURKUS: So you're asking just
19  generally?
20  MR. COFFIN: Just generally.
21  MR. STERN: Are you asking if the heart
22  relates to T. Hardie?
23  MR. TURKUS: Off the record.
24  (Discussion off the record)
25  A. Could you repeat the question again?

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

**Witness:  Thomas J. Palmisano**

---

Page 106

1      MR. COFFIN:  Read it back, please.
2          (The record was read as requested.)
3      Q.  (BY MR. COFFIN) Based on your discussions with
4  him.
5      A.  I don't recall the -- these specific issues
6  discussed with T. Hardie, but we did discuss the
7  transaction with T. Hardie with respect to his -- his
8  client, the lender on the transaction.
9      Q.  Who is "we"?
10     A.  PriceWaterhouseCoopers.
11     Q.  Go to 1369, please.  Do you see the calculation
12  there underneath that says "Tom's cell phone," I assume
13  that's your cell phone number or was at some time?
14     A.  Yes, it was.
15     Q.  Does this calculation mean anything to you?
16     A.  It looks like a calculation of the profit on
17  the sale of the assets that Fortrend received.
18     Q.  Where is that number?
19     A.  5 percent of $128 million.
20     Q.  Okay.  And, then, do you know what the -- the
21  15 percent there, is that what PWC was to be paid?
22     A.  I don't know if that's the exact number, but it
23  looks like a -- an estimate of what the number would be.
24     Q.  So, the $958,735 is what PWC would have been
25  paid?

---

Page 107

1      A.  It appears to be an estimate.
2      Q.  Okay.  Do you guys have 244 in your books,
3  which would be the last exhibit?
4      A.  244?
5      Q.  Yes.
6      A.  Yes, I have it.
7          MR. COFFIN:  Do you have that one, Al?
8          MR. TURKUS:  I don't think so.  The last
9  one we have is 204.
10         MR. STERN:  254?
11         MR. COFFIN:  244.  I have an extra one, if
12  you need it.  Here you go.
13         MR. STERN:  I've got it.
14     Q.  (BY MR. COFFIN) Mr. Palmisano, your name is
15  nowhere on this memorandum, but I wanted to ask you if
16  you'll look on -- in the body of that memorandum refers
17  to SCALP, S-C-A-L-P, Signal Capital Associates, LP.  Are
18  you familiar with that entity?
19     A.  I don't recall that entity in the transaction.
20     Q.  Okay.  Down below there's a reference there
21  45 percent of SCALP'S holdings in Petro Holdings LP,
22  Inc.  Do you see that?
23     A.  Yes.
24     Q.  Are you familiar with that entity?
25     A.  No, I'm not familiar with it.

---

Page 108

1      Q.  Okay.  What about below that, Universal Merit
2  Securities, Inc.?
3      A.  No.
4          MR. COFFIN:  Okay.  One last break,
5  hopefully.  Are you going to have any questions,
6  Mr. Stern?
7          MR. STERN:  (No response.)
8          (Recess taken from 2:22 to 2:27.)
9      Q.  (BY MR. COFFIN) Mr. Palmisano, I think you
10  testified earlier, and if I misstate your testimony,
11  please correct me, that you had initial discussions
12  regarding using Fortrend or bringing in Fortrend with
13  other people at PWC; is that right?  And then you
14  brought Midcoast into the mix as far as having those
15  discussions about Fortrend; is that correct?
16     A.  That's correct.
17     Q.  Okay.  At what point in time did PWC start
18  researching whether a Midcoast alternative was a
19  transaction that was viable?
20         MR. TURKUS:  Objection, lack of
21  foundation.
22     A.  Could you give an example of -- in terms of the
23  research?
24     Q.  (BY MR. COFFIN) Okay.  Researching the legal
25  authorities, when was that conducted by PWC, if at all?

---

Page 109

1          MR. TURKUS:  Objection, lack of
2  foundation.
3      A.  I don't recall specifically when we began the
4  research specifically on our transaction, but the -- I
5  don't recall specific research done before the
6  transaction with respect to the three-party sale that
7  was proposed at the time, but the -- I know some
8  technical research transpired October through December
9  with respect to this specific deal and the tax issues
10  associated with it as evidenced by the December 14 memo
11  prepared by Gary Wilcox.
12     Q.  (BY MR. COFFIN) Do you know when that research
13  then would have been done?  Sometime before December 14,
14  1999?
15     A.  I would assume that to be the case, but I
16  wasn't -- I wasn't heavily involved in the research
17  effort.  I was involved in the transaction.
18     Q.  Do you know who was doing most of the
19  researching of the legal authorities?
20     A.  I don't know specifically, but the individuals
21  that would have been heavily involved would have been
22  Gary Wilcox and Catherine Coffey.
23     Q.  So, do you know if anybody in the Houston
24  office of PWC would have done any of the research that
25  resulted in this memo draft of December 14, 1999,

---

28 (Pages 106 to 109)

Witness:  Thomas J. Palmisano

Page 110

1  Government Exhibit 160?
2      A.  I don't -- I don't recall anyone in the Houston
3  office working on that technical memo.
4      Q.  Okay.  Do you recall when the results of the
5  research would have been communicated -- or were the
6  results of the research communicated to Midcoast?
7      A.  I don't know necessarily the results of the
8  research, but the -- at the time of closing -- I don't
9  recall the specific communication, but I believe there
10 was an understanding with PriceWaterhouseCoopers and
11 Midcoast that PriceWaterhouseCoopers had enough comfort
12 with the transaction that they would issue a
13 more-likely-than-not opinion on the transaction.
14     Q.  Did you attend the closing of this transaction?
15     A.  No, I did not.
16     Q.  Who from PriceWaterhouseCoopers was there?
17     A.  Gary Wilcox, I believe, was there.  I don't
18 believe any other PriceWaterhouseCoopers individuals
19 were there.
20         MR. COFFIN:  Pass the witness.
21         MR. STERN:  I don't have anything at this
22 time.
23         MR. TURKUS:  Mr. Palmisano will read and
24 sign this deposition transcript.
25         MR. COFFIN:  Thanks for coming in.

Page 111

1          (Proceedings concluded at 2:32 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 112

1              CHANGES AND SIGNATURE
2  WITNESS NAME: Thomas J. Palmisano
3  DATE OF DEPOSITION: February 28, 2007
4  PAGE LINE CHANGE              REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 113

1      I, THOMAS J. PALMISANO, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5      _____
              THOMAS J. PALMISANO
6
7  THE STATE OF _____)
8  COUNTY OF _____)
9
10     Before me, _____, on this day
11 personally appeared THOMAS J. PALMISANO, known to me or
12 proved to me on the oath of _____ or through
13 _____ (description of identity card
14 or other document) to be the person whose name is
15 subscribed to the foregoing instrument and acknowledged
16 to me that he/she executed the same for the purpose and
17 consideration therein expressed.
18     Given under my hand and seal of office on this _____
19 day of _____, _____.
20
21     _____
              NOTARY PUBLIC IN AND FOR
22            THE STATE OF _____
23 My Commission Expires: _____
24
25

29 (Pages 110 to 113)

6459a3f3-1e9e-456c-a85a-2f23c5e1a8d8

Witness:   Thomas J. Palmisano

Page 114

```
 1   STATE OF TEXAS
 2   COUNTY OF HARRIS
 3
 4        REPORTER'S CERTIFICATE
 5        ORAL DEPOSITION OF THOMAS J. PALMISANO
 6             February 22, 2007
 7
 8      I, the undersigned Certified Shorthand Reporter in
 9   and for the State of Texas, certify that the facts
10   stated in the foregoing pages are true and correct.
11      I further certify that I am neither attorney or
12   counsel for, related to, nor employed by any parties to
13   the action in which this testimony is taken and,
14   further, that I am not a relative or employee of any
15   counsel employed by the parties hereto or financially
16   interested in the action.
17      SUBSCRIBED AND SWORN TO under my hand and seal of
18   office on this the _____ day of _____,
19   _____.
20      _____
        Kelly Hanna, CSR, RPR, CRR, CMRS
21      Texas CSR 1654
        Expiration: 12/31/2007
22      Firm Registration No.:  347
        703 McKinney Avenue
23      Suite 207
        Dallas, Texas 75202
24      214.220.1122 - 214.220.1127
25
```

30 (Page 114)

HUNDT REPORTING
214-220-1122