Witness:   Stephen Korb

Page 1

```
     THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF TEXAS
              HOUSTON DIVISION
```

ENBRIDGE ENERGY COMPANY,
INC., and ENBRIDGE MIDCOAST
ENERGY, L.P., f/k/a ENBRIDGE
MIDCOAST ENERGY, INC., f/k/a
MIDCOAST ENERGY RESOURCES, INC.,

    Plaintiffs,

vs.                    Case No. H-06-0657

UNITED STATES OF AMERICA,

    Defendant.

    DEPOSITION OF STEPHEN KORB, a witness, taken on behalf of the Defendant, pursuant to Subpoena, on the 24th day of April, 2007, at the Charles E. Whittaker Courthouse, 400 East 9th Street, Kansas City, Missouri, before

        GAIL L. RIEDE,

of AAA Court Reporting Company, a Certified Court Reporter of the State of Missouri.

        APPEARANCES

    For the Plaintiffs:
    MR. KARL S. STERN
    MS. EMILY W. PIPKIN
    VINSON & ELKINS, LLP
    1001 Fannin Street, Suite 2300
    Houston, Texas  77002-6760

    For the Defendant:
    MR. DAVID B. COFFIN
    MR. HERB LINDER
    UNITED STATES DEPARTMENT OF JUSTICE
    717 North Harwood, Suite 400

Witness:  Stephen Korb

```
                                                    Page 2
 1            APPEARANCES
              (Continued)
 2
    For the Witness:
 3  MR MATTHEW T. GEIGER
    GADDY GEIGER & BROWN PC
 4  2345 Grand Boulevard, Suite 675
    Kansas City, Missouri  64108
 5
    Also Present:
 6  MS. JANA JORDAN
 7
 8
 9
10
11           STIPULATIONS
12      It was stipulated by and between
13  counsel that if this deposition is not signed
14  by the witness 30 days prior to the
15  commencement of the trial, it may be used as
16  though signed.
17
18
19
20
21
22
23
24
25
```

```
                                                    Page 3
 1              INDEX
 2
 3  WITNESS: STEPHEN KORB                PAGE:
 4  Examination by Mr. Coffin             4
    Examination by Mr. Stern             59
 5  Re-examination by Mr. Coffin         69
    Re-examination by Mr. Stern          70
 6
 7  PREVIOUSLY MARKED EXHIBITS:       IDENTIFIED:
 8   26 - Fax to Snyder from Fortrend       38
    165 - Draft representation letter       42
 9  225 - (Not identified.)                 50
    300 - (Not identified.)                 20
10  301 - Prospective buyers list           21
    302 - Documents re: Williams            27
11  303 - Documents re: Enron               31
    304 - (Not identified.)                 34
12  305 - (Not identified.)                 34
    306 - Business cards from Kaneb         37
13  308 - Letter to BGL from Hoffman        49
    310 - 1/25/00 Memo to Hoffman from Witness  51
14  312 - Memo from Meara                   54
    313 - Documents re: Butcher Interest    56
15  315 - (Not identified.)                 65
    316 - 8/23/99 Letter to Roberts from KPC  41
16
17
18
19
20
21
22
23
24
25
```

```
                                                    Page 4
 1           (The deposition commenced at 11:36
 2      a.m.)
 3           STEPHEN KORB,
 4      a witness, being first duly sworn, testified
 5      under oath as follows:
 6  EXAMINATION BY MR. COFFIN:
 7  Q. Please state your name for the record.
 8  A. Stephen Korb.
 9  Q. What is your current address, Mr. Korb?
10  A. 21100 Whispering Drive, Lenexa, Kansas, 66220.
11  Q. Have you ever given your deposition before,
12      Mr. Korb?
13  A. Multiple times.
14  Q. So you understand generally what the rules are.
15      I'll try to ask questions that are
16      understandable, and I hope you can understand
17      them and answer them for me truthfully and
18      honestly.
19           I'll try not to interrupt you if you
20      will try to do the same for me.  If you ever
21      need a break, let me know.
22           There might be objections posed during
23      this deposition, but unless your lawyer
24      instructs you to not answer it, I would ask
25      that you answer truthfully.  Okay?
```

```
                                                    Page 5
 1  A. Okay.
 2  Q. And you will need to answer verbally.
 3  A. Right.
 4  Q. Do you have any medical condition or are you on
 5      any medication that would prohibit you from
 6      understanding the questions I'm going to ask
 7      today?
 8  A. No.
 9  Q. What have you done to prepare for this
10      deposition?
11  A. I have read the exhibits that were forwarded,
12      my understanding, from your office through my
13      counsel.
14  Q. Have you discussed your testimony with anybody
15      today other than Mr. Geiger?
16  A. No.
17  Q. Give me your educational background beginning
18      with where you graduated from high school.
19  A. I graduated from high school from Westerville
20      South High School, Westerville, Ohio.  Bachelor
21      of Science accounting degree from Ohio State.
22           (Discussion off the record.)
23  A. An MBA from University of Missouri-Kansas City.
24  Q. (By Mr. Coffin) What year did you graduate out
25      of Ohio State?
```

2 (Pages 2 to 5)

Witness:  Stephen Korb

Page 6

1  A. Ohio State was '82.
2  Q. And then your MBA you completed in what year?
3  A. '93.
4  Q. Are you a certified public accountant?
5  A. I have a CPA certificate in Kansas.
6  Q. When did you receive that certificate?
7  A. '86.
8  Q. 1986.
9       And then give me your work history
10    since graduating with your accounting degree at
11    Ohio State.
12 A. I started working with the Ohio Consumer's
13    Council, which was a state agency, in the
14    public utility regulation.  It was a consumer
15    advocate in Ohio.
16 Q. What year was that?
17 A. From '82 to '85.
18       In 1986, I moved to Kansas City to
19    work for a public utility regulatory consulting
20    firm, Overland Consulting.  I worked for
21    Overland Consulting from '86 through '94, 1994,
22    I believe, with -- with a year stretch within
23    that, from '90 to '93, at Kansas Power & Light.
24    Then I went back to -- in '93, I went back to
25    Overland Consulting and worked there for

Page 7

1     another year or so.  Left Overland Consulting
2     and worked for Kansas Pipeline Operating
3     Company from '93 -- '94 till we sold, 1999.
4  Q. You said it was named Kansas Pipeline Operating
5     Company?
6  A. Operating Company.
7  Q. At that time, how was that entity owned; by
8     stockholders or --
9  A. My recollection was it was privately held
10    stock.
11 Q. By whom?
12 A. Dennis Langley.  I believe Mark Bolding had
13    some stock.
14 Q. Was Mr. Langley the primary shareholder?
15 A. Yes.
16 Q. Was that a relatively new company at the time
17    you joined them in 1994?
18 A. No, it was -- relatively new, I mean, can you
19    define that for me?
20 Q. Two, three years old?
21 A. Oh, it was older than that.
22 Q. What was your first position with Kansas
23    Pipeline Operating Company?
24 A. I'm going to say financial analyst, which --
25    and that was the title.

Page 8

1  Q. That was in '94?
2  A. '94.
3  Q. Did you ever receive a promotion where you were
4     given a different title?
5  A. No, not really.
6  Q. Did your duties ever change from what you did
7     in '94 through the date it was sold in --
8  A. When I started, I was more regulatory.
9  Q. Explain what you did as far as regulatory.
10 A. All aspects of public utility regulation in
11    front of mostly the Kansas Corporation
12    Commission; preparing proceedings, assisting in
13    the preparing of proceedings for the Kansas
14    Corporation Commission, the Missouri Public
15    Service Commission and Federal Energy
16    Regulatory Commission.
17 Q. Was that an accounting type function?
18 A. Yes.
19 Q. You did that in '94, then did your duties ever
20    progress into more?
21 A. Then I also, as the -- we started the process
22    of looking at options to sell the company, I
23    became the person responsible for cash flow
24    analysis, projections for the sale of pipeline.
25 Q. When did the company begin the process to --

Page 9

1     started the process to start selling the
2     company?
3  A. I -- you know, I don't remember exactly, 1999,
4     spring, somewhere in that range.
5  Q. So what did you do as far as the cash flow work
6     analysis in assisting in attempting to sell the
7     company?
8  A. Just basically prepared electronic spreadsheets
9     projecting revenues, expenses, you know,
10    balance sheet items, everything to do with
11    preparing a financial projection.
12 Q. Now, at this time, there were several entities
13    that Langley owned or were owned under the
14    corporate umbrella, the Bishop Group?
15 A. Correct.
16 Q. Could you go over those for me, what you
17    recall, the entities that led down to at least
18    the Kansas Pipeline Company?
19 A. Bishop Group owned -- my recollection was 100
20    percent of Synergy Pipeline Company.
21 Q. That's S-y-n-e-r-g-y?
22 A. Correct.
23       My understanding was Synergy owned the
24    operating pipelines, which consisted of Kansas
25    Pipeline Company, Kansas Natural Partnership,

3 (Pages 6 to 9)

Witness:  Stephen Korb

Page 10

1  Riverside Pipeline Company.  Synergy also owned
2  a marketing affiliate, MarGasCo.
3       And there was what we call the
4  operating company, Kansas Pipeline Operating
5  Company, which, as the name implies, was an
6  operating company.  All the employees worked
7  for Kansas Pipeline Operating Company, in
8  general, and then were -- to avoid having
9  intercompany personnel issues, you know,
10  allocating personnel, we just did it at the
11  Kansas Pipeline Operating Company level.
12       There was other entities that Synergy
13  owned -- had that I don't remember.
14  Q. So the projections that you were working on
15     related mainly to which entities?
16  A. All of the operating company entities.
17  Q. Are you currently employed?
18  A. Yes.
19  Q. Where are you employed?
20  A. I am president of YSK Business Solutions,
21     Limited.
22  Q. What kind of company is it?
23  A. It is a consulting company.  We do financial
24     valuations, small business organizational work
25     in terms of labor filings, you know, your

Page 11

1     941's, your 940's, unemployment, that type of
2     stuff.
3  Q. It's a limited partnership?
4  A. It's an S-corp.
5  Q. Who are the principal shareholders of that
6     S-corp?
7  A. Myself and Yvette Korb, Y-v-e-t-t-e.
8  Q. She's a former employee of the Bishop Group as
9     well?
10  A. Correct.
11  Q. Did you begin this company after leaving the
12     employment of Bishop Group?
13  A. The Bishop Group was sold, and then I worked
14     for a new organization after that, created by
15     Mr. Langley, Management Resources Group, which
16     was a project development company.
17  Q. What were the periods of employment you worked
18     for MRG?
19  A. From the sale, I immediately was transferred to
20     MRG from the sale of the Bishop Group, to I
21     think 2003.
22  Q. Then when did you start your company?
23  A. Same time.  Actually, the end of 2002, I
24     believe, I started.  So there was a small, two,
25     three month period where the company was

Page 12

1     started and I was still working for MRG.
2  Q. Do you have any business relationship with
3     Mr. Langley now?
4  A. They are a client of YSK.
5  Q. What kind of work do you do for Mr. Langley
6     right now or does YSK do for Mr. Langley?
7  A. Financial valuation, cash flow analysis.
8  Q. I assume you do personal services related to
9     the consulting of the company or that the
10     company does, you consult personally yourself?
11  A. Yes.
12  Q. Do you sell any financial products with your
13     company?
14  A. No.
15  Q. How much of the business do you do for
16     Mr. Langley in relation to the other clients
17     you have?
18  A. In terms of time or in terms of revenues?
19  Q. Of fees, revenues.
20  A. Revenues?
21  Q. Yes.
22  A. Probably 90 percent.
23  Q. Now, I mean, I said earlier that you were
24     employed by the Bishop Group when you told me I
25     think it was actually Kansas Pipeline Operating

Page 13

1     Company.  Are you still using them one and the
2     same?
3  A. Yes, yes, they are one and the same.  Kansas
4     Pipeline Operating Company really just housed
5     the employees.  Some of the office leasing may
6     have been through -- but I don't even think
7     that, I think it was really just an entity
8     created to house employees.
9  Q. Was there a controller or a comptroller within
10     Kansas Pipeline Operating Company?
11  A. There was a couple different.
12  Q. Who were those people?
13  A. Pam Swanson was the first comptroller when I
14     started.  I'm not sure how long she was there.
15     Then eventually Greg Oetting.
16  Q. Spell that last name, please.
17  A. O-e-t-t-i-n-g.
18  Q. So who at the company was responsible for the
19     financial reporting component or the financial
20     reporting of the company, like preparing
21     financial statements and things like that?
22  A. Preparing financial statements, it would have
23     been Pam Swanson during the period she was
24     there and Greg Oetting when they transitioned
25     from one to the other.

4 (Pages 10 to 13)

Witness:   Stephen Korb

### Page 14

1   Q. I understand that Ernst & Young performed
2      services for the Bishop Group?
3   A. Yes, Ernst & Young --
4   Q. Who was the primary contact with Ernst & Young?
5   A. You know, I really didn't delve into that much,
6      so I can't -- I don't -- I mean, we had two
7      people, we had audit people and we had tax
8      people.
9   Q. When you say "people," are you talking about --
10  A. Ernst & Young, we worked with both their tax
11     group and their audit group.
12  Q. Did you deal on any occasion with the Ernst &
13     Young people on the tax side or the audit side?
14  A. I dealt -- I don't remember ever dealing with
15     the audit side. I did deal with the tax side.
16  Q. That would be Mr. Snyder?
17  A. Yeah, Bruce Snyder.
18  Q. Who were you reporting to while you were
19     employed by the Bishop Group?
20  A. It's a hard question to answer. I floated
21     between multiple areas. I reported to
22     Mr. Langley for --
23  Q. In what areas?
24  A. The cash flow -- all cash flow projection work
25     that I did was for Mr. Langley.

### Page 15

1   Q. Was that projection work when Mr. Langley was
2      trying to sell the company or even before that?
3   A. Yes, and even some before that.
4   Q. Who else did you report to?
5   A. And then on the regulatory -- when I was doing
6      regulatory work, it was a gentleman by the name
7      of Howard Lubow, L-u-b-o-w.
8   Q. What was his position?
9   A. He was chief financial officer.
10  Q. Help me understand what the -- when you say on
11     the regulatory things, what kind of things were
12     you reporting -- or doing and then reporting to
13     him?
14  A. It was all aspect of revenue requirement
15     analysis for proceedings in front of the Kansas
16     Corporation Commission, and then toward the end
17     we were doing a lot of work at Federal Energy
18     Regulatory Commission.
19        It's not necessarily separate and
20     distinct, the cash flow, I mean, it's a lot of
21     revenue, expenses, you know, financial
22     statement -- you know, looking at financial
23     statements, that type of stuff, in regulation,
24     too, so it was all accounting related.
25  Q. Was the revenue analysis you did for the

### Page 16

1      regulatory agencies a year-round duty that you
2      had or was it --
3   A. We had -- there are reporting requirements,
4      standard reporting requirements, even if you're
5      not in a rate case proceeding or in, you know,
6      a jurisdiction, but there are some standard
7      reporting requirements that I worked on that.
8      And then it ramped up a lot if we had a rate
9      case or some case that was started in front of
10     one of those agencies.
11  Q. So you reported to Mr. Langley, Mr. Lubow. Was
12     there anyone else?
13  A. Not really. The company was small enough, I
14     mean, it was more if a project was there,
15     people were assigned to it and...
16  Q. How often do you speak with Mr. Langley now;
17     once a week or once a month?
18  A. It can be intense, you know, where it's daily,
19     and then I may not speak with him for a month.
20  Q. I believe your wife Evette (ph.) Or Yvette?
21  A. Yvette.
22  Q. She worked at Bishop as well; is that right?
23  A. Correct.
24  Q. What was her duties?
25  A. She was vice-president of administration.

### Page 17

1   Q. What did her duties entail?
2   A. Corporate secretary, human resources, risk
3      management insurance, office administration.
4   Q. Who did she report to?
5   A. Mr. Langley.
6   Q. Is she currently employed with the YSK company?
7   A. She is a stockholder, yes, and --
8   Q. Does she do any work?
9   A. -- and does work for --
10  Q. Does she work for anyone else right now?
11  A. Yes.
12  Q. What is her --
13  A. She is a legal assistant at Bryan Cave.
14  Q. Had you known Mr. Langley prior to going to
15     work for him?
16  A. There was -- I met Mr. Langley through Overland
17     Consulting. Overland Consulting was retained
18     by the Bishop Companies to do regulatory work
19     for the Bishop Companies. So when I first met
20     Mr. Langley, I was still working for Overland
21     Consulting and had been hired -- the firm had
22     been hired to do regulatory -- a regulatory
23     case -- cases.
24  Q. Did he convince you to come to work for him?
25  A. I had decided to leave the company and it was

5 (Pages 14 to 17)

Witness:  Stephen Korb

Page 18

1  very important to Mr. Langley that I sever the
2  consulting business before.
3  Q. And that would have been in what year again,
4     '94, '95?
5  A. Yes.
6  Q. Working from '94 through '99 with Mr. Langley,
7     did you form an impression as to how
8     Mr. Langley was as a business man?
9         MR. STERN:  Objection, form.
10 A. Yeah, I'm not -- yes.
11 Q. (By Mr. Coffin) What is your impression?
12 A. Very smart man.
13 Q. Any other observations?
14 A. No.
15 Q. Would you define him as shrewd?
16         MR. GEIGER:  Objection, vague and
17    ambiguous.
18         MR. STERN:  Objection, form.
19         MR. GEIGER:  You can answer.  They're
20    just for record.
21 A. Can you -- I don't understand your definition
22    of shrewd.
23 Q. (By Mr. Coffin) Was he somebody who studied
24    matters closely before he entered into a
25    transaction?

Page 19

1         MR. STERN:  Objection, form.
2  A. Surprising, I really can't answer that.  I
3     don't know how much he studied.
4  Q. (By Mr. Coffin) Do you recall the period of
5     time that Mr. Langley started discussing that
6     he wanted to sell his businesses -- or his
7     business, the Bishop Group?
8  A. Subject to however many years, nine years, of
9     memory loss, yes, I remember that time period.
10 Q. Do you recall why he wanted to sell the Bishop
11    Group?
12 A. No, I don't have a specific as to why --
13 Q. Do you --
14 A. -- what his decision was.
15 Q. Can you speculate as to why he wanted to sell
16    at the time?
17 A. My speculation is, I mean, the company had
18    grown to a level that was all he could make out
19    of it and he was ready to do other things.
20 Q. Do you recall when you first learned that he
21    wanted to sell?
22 A. Not specifically.
23 Q. Do you recall whether he wanted to sell stock,
24    stock he owned in the Bishop Group or he wanted
25    to sell the assets of the company?

Page 20

1  A. My impression always was he was -- he was
2     willing to go either way, recognizing that
3     there were tax -- significant tax consequences
4     of one versus the other.
5  Q. During the period of time in 1999 that he was
6     wanting to sell his company, did you meet with
7     him on a regular basis?
8  A. Not formally.
9  Q. How about informally?
10 A. I mean, yes, I mean, it was very ad hoc.  I
11    didn't have regularly scheduled weekly
12    meetings.  There would be periods of intense,
13    16-hour days, and then I may not see him for a
14    week.
15 Q. Do you recall that Chase Bank was hired to act
16    as Mr. Langley's advisor in the sale of Bishop?
17 A. Yes.
18 Q. What exactly was Chase's role?
19 A. Chase's role was basically to organize the --
20    to locate potential buyers and formalize and
21    organize process for bringing them in,
22    presenting the information about the Bishop
23    Group, and a liaison between buyers and
24    sellers.
25 Q. Did Mr. Langley have meetings that you recall

Page 21

1     with the people from Chase?
2  A. Yes.
3  Q. Did you participate in any of those meetings?
4  A. Some.
5  Q. Turn to Government Exhibit 300 in your binder,
6     please.
7  A. (Witness complies.)
8  Q. Mr. Korb, I believe I sent Mr. Geiger some
9     documents, and this would have been in that set
10    of documents.  But my question to you is, had
11    you seen this document prior to me sending it
12    to Mr. Geiger?
13 A. I may have, I don't remember.  I don't
14    specifically remember this document until
15    yesterday.
16 Q. Do you recall sitting in on any meetings with
17    Mr. Langley or discussing the matters that are
18    within this document with Mr. Langley at any
19    time?
20 A. I sat in on meetings when some of these issues
21    were discussed.
22 Q. It lists the various scenarios on the left-hand
23    side.  Do you recall Mr. Langley preferred any
24    of the scenarios in selling his companies?
25 A. I mean, he was interested in -- the only thing

HUNDT REPORTING
214-220-1122

Witness:  Stephen Korb

Page 22

1    I ever really remember working with was a
2    cash-for-stock transaction.  You know, I
3    recollect a brief period where we looked at
4    stock-for-stock.  A lot of it depended on the
5    entities.  You know, different entities that
6    came in made us look at it different ways based
7    on their tax situation, our tax -- we were open
8    to a lot of different opportunities.
9  Q. Do you recall what entities came in that you
10   may have discussed a stock-for-stock
11   transaction?
12 A. I believe we -- not specifically.
13 Q. Enron?
14 A. We could have.  I remember meeting with Enron.
15   We could have.
16 Q. Turn to the next exhibit, Government Exhibit,
17   please.
18 A. (Witness complies.)
19 Q. Do you recall seeing this document, Mr. Korb,
20   prior to me sending it to your lawyer,
21   Mr. Geiger?
22 A. I do not remember this document either.  And
23   I'm sure it was in the documents you sent, but
24   I don't remember looking at this even
25   yesterday.  But I'm -- you know, I'm sure it

Page 23

1    was there.  I must have missed it.
2  Q. Do you know if you would have necessarily
3    reviewed something like this back in 1999?
4  A. It's possible I reviewed this in 1999.
5  Q. In looking at it today, does it refresh your
6    recollection at all as to any of these
7    potential buyers?
8  A. Oh, I mean, I certainly remember -- I remember
9    some of these names, you know, from the
10   process, you know, coming in and doing more.  I
11   remember some of these names as coming in and
12   going through the data room process and the
13   presentation process.  And I remember I think
14   some of these never did come in.
15 Q. Explain generally what the data room is.
16 A. Well, and I'm calling the data room the whole
17   process.
18         Chase prepared an offering memorandum
19   that they sent to a list of potential -- who
20   they considered to be potential buyers.  Based
21   on their level of interest from that offering
22   memorandum, confidentiality agreements were
23   signed.  Once that was done, they were provided
24   an opportunity to come to Kansas City,
25   participate in a presentation that was prepared

Page 24

1    to tell a little bit more about the process.
2    There was a data room with all sorts of
3    documents.
4  Q. Where was that located?
5  A. Bryan Cave's offices.
6  Q. On this document, Government Exhibit 301, it
7    lists Contact in the first column, Name of
8    Company and Address.  And I notice that below
9    some of those names and addresses they show
10   either Data Room Visit or Declined?
11 A. Oh, yes, I see that now.  Correct.
12 Q. Do you recall if Enron actually made a data
13   room visit?
14 A. Yes, I remember Enron coming in.  I mean, I
15   remember that they came in.
16 Q. On the next page, The Williams Companies, it
17   says "Separate process."  Do you know what that
18   meant?
19 A. As I remember the Williams situation,
20   Williams -- the Williams Pipeline was the
21   primary competitor of the Bishop Pipelines.
22   And we were very sensitive to having -- to
23   whether Williams was actually a legitimate
24   player or they just wanted to come in and see
25   everything they could on us.  I don't remember

Page 25

1    them ever coming into the data room.  I believe
2    they received an offering memorandum.
3  Q. Now, how did you know when these potential
4    buyers were coming into the data room?
5  A. Most of the time I was there for the
6    presentations.
7  Q. What occurred within the data room?
8  A. Well, within the data room it was just a whole
9    series of documents that, you know, they just
10   asked for.  They were signed out, you know,
11   signed back.  If they wanted copies and were
12   allowed to have copies, I don't remember that
13   procedure, you know, copies were provided.
14 Q. I think you mentioned you were involved in the
15   process, is that what you said?
16 A. Well, there was the presentation process where
17   we provided a presentation.  Then they had
18   access to the data room.  And then we had what
19   we called breakout sessions, where they could
20   ask specific questions of different areas of
21   the company.
22 Q. And you participated in all three of those
23   aspects?
24 A. I did some presentations.  I did some of the
25   breakout sessions.

HUNDT REPORTING
214-220-1122

aa2e7673-a3f0-49a4-9872-10172169b172

Witness: Stephen Korb

Page 26

1  Q. With regard to these potential buyers that are
2     listed on this sheet, did you do any due
3     diligence work? Well, let me back up.
4         Did you do any research into these
5     companies to find out more about them?
6  A. No, I don't think so.
7  Q. Do you know if somebody in the office did that
8     kind of work for you or did Chase do that?
9  A. I think we relied on Chase, my recollection was
10    we relied on Chase to -- I mean, obviously,
11    some of these -- I mean, Enron, at the time we
12    were very familiar with Williams, we were very
13    familiar with Reliant has a long history in the
14    business, Utilicorp.
15 Q. So when we talk about the Williams Company, and
16    where it says "Separate process," do you just
17    think that that was something that was done
18    differently because of Williams Company's
19    potential -- because of their competitive
20    nature or their status?
21 A. Yes.
22 Q. With regard to the data room, was it visited by
23    people at the same time or during the same
24    period of time that the presentation would be
25    made and the breakout sessions occurred, or did

Page 27

1     you ever have them come back?
2  A. It happened based on their schedules, always.
3     Some of them, you know, would do some of the
4     process before the presentation. It just
5     depended on their schedules, who was available.
6  Q. I envision that when this potential buyer came
7     in, you did the presentation, you did the data
8     room visit, and they had the breakout session
9     does. So my question is, did they ever have an
10    occasion where the buyer would come back to the
11    data room and request more information to come
12    back and look?
13 A. Some buyers, yes, did come back and look.
14 Q. Generally speaking, how much time would
15    somebody spend in the data room making requests
16    and looking through documents?
17        MR. STERN: Objection, form.
18 A. It varied significantly.
19 Q. (By Mr. Coffin) Did you find that the more
20    serious the prospective buyer, the more time
21    they would spend in the data room?
22        MR. STERN: Objection, form.
23 A. My perception of the seriousness, I would agree
24    with your statement based on my recollection of
25    who I thought was serious and who wasn't.

Page 28

1  Q. (By Mr. Coffin) Go to 3O2, please.
2  A. (Witness complies.)
3  Q. Mr. Korb, these are some of the documents that
4     I sent to Mr. Geiger, and I included it all
5     generally as one exhibit. If you will look
6     through that, my question is, more generally,
7     this appears to be documents generated during
8     the period of time that Williams was interested
9     in purchasing the business of Bishop Group, and
10    I was just seeing if you would agree with me on
11    that.
12        MR. STERN: Objection, form.
13        MR. GEIGER: Take your time and read
14    it.
15        THE WITNESS: Okay.
16 A. Okay, I kind of glanced through this.
17        What was your question again?
18 Q. (By Mr. Coffin) My question is, to me, this
19    appears to be documents generated during the
20    period of time that Williams was interested in
21    purchasing the business of the Bishop Group,
22    and I was just wondering if you would agree
23    with me on that.
24        MR. STERN: Objection, form.
25 A. These were not prepared for -- I can tell from

Page 29

1     some of these, specifically for delivery to
2     Williams. Most of these look, to me, to be
3     prepared for other purposes. And, you know,
4     assuming that they were sent to Williams, you
5     know, that was just stuff that was already on
6     the table. I remember these maps.
7  Q. (By Mr. Coffin) Sure. If you will look at --
8     there are some Bates numbers, what we call
9     Bates numbers, at the bottom. And if you will
10    go back to -- I hope these are in order --
11    24892.
12 A. That looks to be a fax cover sheet.
13 Q. Yes. I was wondering if these documents that
14    follow necessarily would be an attachment to
15    that fax cover sheet.
16        MR. STERN: All of them or the seven
17    pages?
18        MR. COFFIN: The seven pages.
19 A. So the seven pages you refer to appear, to me,
20    to be just the confidentiality agreement?
21 Q. (By Mr. Coffin) Right.
22 A. I would have had nothing to do with the
23    preparation of this confidentiality agreement.
24    And my only involvement in it would have been
25    do they or do they not have a CA signed.

8 (Pages 26 to 29)

Witness: Stephen Korb

Page 30

1  Q. The CA is the confidentiality agreement?
2  A. Confidentiality agreement, yes.
3  Q. Do you recall if Williams had a confidentiality
4     agreement signed?
5  A. I mean, all I -- my only recollection would be
6     from going through here and seeing a signature
7     on 024897.
8  Q. Oh, there is one. Okay.
9         And then look at 24898 within that
10    same exhibit.
11 A. I have it.
12 Q. That's a letter from Yvette Korb, your wife, to
13    Mr. Compkins; is that right?
14 A. I don't even recognize that name.
15 Q. Is that your wife's signature?
16 A. Yeah, it appears to be.
17 Q. Do you know if that's her handwriting on the
18    bottom there where it says, "Mailed to them was
19    4.19"?
20 A. Yes.
21 Q. Okay, and then turn to 24917 within that same
22    document.
23 A. Looks like a fax cover sheet from Chase.
24 Q. And it's addressed to you and Mr. Langley; is
25    that right?

Page 31

1  A. Correct.
2  Q. Was it normal for you to receive these kind of
3     requests or these kind of faxes from Chase
4     during that period of time?
5  A. Let me glance and see what the --
6  Q. Sure.
7  A. -- to what they are requesting.
8         My -- I mean, I would have received --
9     I very well -- do you want me to go back and
10    look through what they were requesting to see
11    whether I would normally receive this?
12 Q. Well, no. My question is, I guess, there is no
13    reason for you to dispute that you didn't
14    receive requests such as this from Chase; is
15    that right?
16 A. No, I have no reason to dispute that I received
17    this.
18        Looking at the list behind it, I mean,
19    they're talking about permits, easements,
20    safety, I would have had nothing to do with any
21    of that.
22 Q. Is there a reason then why Chase would have
23    listed you and Mr. Langley? Were you somewhat
24    of a contact with Chase, between the Bishop
25    Group and Chase?

Page 32

1         MR. STERN: Objection, form.
2  A. I was not a contact with Chase for any of the
3     typewritten information on the subsequent page,
4     24918, I would not have been a contact for
5     that, for any of this information.
6  Q. (By Mr. Coffin) Generally speaking, were you
7     involved in responding to --
8  A. Can I -- I'm sorry.
9  Q. Go ahead.
10 A. No. 2 possibly would have been within my area,
11    some of that in item 2. Excuse me.
12 Q. In general, though, during that period of time,
13    were you involved in responding to inquiries
14    such as this from potential buyers?
15 A. Such as this inquiry, no. Subject to inquiries
16    relative to my areas, yes.
17 Q. Turn over to Government Exhibit 303.
18 A. (Witness complies.)
19 Q. This, Mr. Korb, once again, is a set of
20    documents that I sent to your lawyer. And I
21    generally categorized all the documents, these
22    are documents related to Enron's potential
23    purchase.
24        MR. STERN: Are you testifying to
25    that?

Page 33

1         MR. COFFIN: No, I'm just saying --
2         MR. STERN: I object to the form.
3         MR. COFFIN: This is what I
4     categorized it as.
5  Q. (By Mr. Coffin) Do you see the front page of
6     that exhibit where it has -- looks like copies
7     of business cards that were made?
8  A. Yes.
9  Q. Was that a practice that somebody at the Bishop
10    Company did related to potential purchasers?
11 A. Yes.
12 Q. Was it performed whenever the people or the
13    potential purchaser or their team would come
14    in?
15 A. Yes, yes. Typically, we would do these as part
16    of the presentation. It was the most likely
17    time we had the largest group of the potential
18    buyers in front of us was the presentation, and
19    we would gather business cards and make copies
20    of them like this.
21 Q. Turn to the third page of this exhibit, please,
22    which is that page right there.
23 A. To 870?
24 Q. Yes.
25        Looks like it says "Data Room Index."

**Witness: Stephen Korb**

Page 34

1  Could you generally explain what the purpose of
2  this document was?
3  A. It pretty -- I mean, it is what -- it was an
4  index of all of the documents that were within
5  the data room.
6  Q. And it was presented to potential buyers or the
7  team of people that --
8  A. Yes.
9      MR. STERN: Can I just interrupt,
10  David --
11      MR. COFFIN: Sure.
12      MR. STERN: -- and have him define,
13  what are the Bates ranges of what he's just
14  testified as the data room index?
15  Q. (By Mr. Coffin) Did you hear that request,
16  Mr. Korb?
17  A. No, I'm sorry.
18  Q. Give the Bates range for the data room index.
19  A. Oh, the -- are you saying -- 020870 through
20  020887.
21  Q. And then follow that, there are documents
22  entitled at the top Document Request List?
23  A. Correct.
24  Q. If you recall, what were the purposes -- what
25  was the purpose of a document such as this in

Page 35

1  relation to a data room visit?
2  A. My -- I mean, I really didn't have any
3  administrative oversight over the data room.
4  Q. Have you seen a document such as this before?
5  A. I don't -- I mean, it's -- I don't recollect
6  ever seeing it.
7      (A recess was taken.)
8  Q. (By Mr. Coffin) Turn to 304, please.
9  A. (Witness complies.)
10 Q. Mr. Korb, do you recall representatives of
11  Reliant Energy coming to or sitting in on a
12  presentation as a potential buyer?
13 A. I recall Reliant coming in for the
14  presentation.
15 Q. With regard to the larger entities -- and we
16  talked about some of this -- Reliant, Enron and
17  the Williams Companies, was there any -- we
18  talked a bit about this earlier -- was there
19  any research done to the financial capabilities
20  of these types of companies to carry out a
21  transaction with the Bishop Group?
22 A. I never -- I never participated in any
23  research, and I have no knowledge as to whether
24  anybody else did or not.
25 Q. Turn to Government Exhibit 305, please.

Page 36

1  A. (Witness complies.)
2  Q. Do you recall representatives of the Buckeye
3  Pipeline Company coming in as a potential
4  buyer?
5  A. Yes.
6  Q. Did you know, at the time, were you aware of
7  who Buckeye Pipeline Company was, as far as the
8  size of the company?
9      MR. STERN: Objection, form.
10 A. Buckeye was a company that I had not heard of
11  until they came in. I mean, I did not prepare
12  any research on Buckeye. My recollection was
13  Chase did do a little, you know, these guys are
14  this size and here's their revenue, you know,
15  just very, very big picture.
16 Q. If you turn to 21189, which I don't know if
17  these are necessarily in consecutive order, but
18  same exhibit, it would be about halfway into it
19  probably.
20      MR. STERN: Is this your compilation
21  or is this how these documents were produced?
22      MR. COFFIN: This is my compilation.
23 A. This one is 21190.
24 Q. (By Mr. Coffin) Okay, I think these got out of
25  order, but go to the end of that document and

Page 37

1  they should be in there.
2      MR. STERN: What are we looking for?
3      MR. COFFIN: 21189. At the top it
4  says, "When not in Las Vegas."
5  A. Here it is.
6  Q. (By Mr. Coffin) Is this something that you
7  think Chase would have researched and brought
8  in?
9      MR. STERN: Objection, form.
10 A. They could have. It's possible they did. It's
11  possible I did -- you know, I would have
12  looked -- gone on the Internet and looked for a
13  10-K.
14 Q. (By Mr. Coffin) Do you recall why -- was there
15  a concern as to the companies, like Buckeye, as
16  to their financial capabilities?
17      MR. STERN: Objection, form.
18 A. I don't know what you mean by concern. I mean,
19  of the -- if I didn't know -- if I had never
20  heard of the company when they came in, I would
21  have probably had a verbal conversation with
22  Chase where they may have provided me
23  something, or I may have just gone on the
24  Internet and looked at a public -- you know,
25  just never spending more than 10 or 15 minutes

10 (Pages 34 to 37)

Witness:  Stephen Korb

Page 38

1  doing that.
2      My assumption was somebody else -- if
3  they -- if they were in the data room, they
4  were supposed to be there, was my assumption,
5  or if they were in the presentation/data room.
6  Q. When you say they were supposed to be there,
7  what do you mean by that?
8  A. That somebody higher than my pay grade had done
9  the research that I believe you are referring
10 to.
11 Q. And on to Government Exhibit 306. It looks
12 like business cards of representatives from the
13 Kaneb -- is it Kaneb Pipeline Company?
14 A. That's my recollection.
15 Q. Do you recall representatives of Kaneb coming
16 in as a potential buyer?
17 A. Not specifically. I remember -- I don't
18 remember specifically. I remember one -- they
19 are one of the entities that did come in.
20 Q. Mr. Korb, are you familiar with the name of an
21 entity known as Fortrend?
22 A. Yes.
23 Q. When did you become familiar with the name of
24 that entity?
25 A. I don't remember specifically.

Page 39

1  Q. Would it have been in 1999?
2  A. Yes.
3  Q. Turn to Government Exhibit 26, please.
4  A. (Witness complies.)
5  Q. This is a facsimile from Fortrend
6  International, LLC, to Mr. Bruce Snyder, E&Y,
7  and Tom Palmisano from -- specifically from
8  Craig J. Hoffman at Fortrend International.
9      Did you know Mr. Hoffman?
10 A. Yes, I met Mr. Hoffman.
11 Q. Do you recall when you first met him?
12 A. It would have been in that same 1999 time
13 period.
14 Q. Do you recall where he was when you met him?
15 A. No, not...
16 Q. Did you know Mr. Snyder?
17 A. Yes.
18 Q. How did you know Mr. Snyder?
19 A. Mr. Snyder was a principal at Ernst & Young and
20 worked on the tax side, and I had had several
21 dealings with him through the years.
22 Q. Attached to the cover page of this facsimile,
23 Mr. Korb, it says "Firm History" at the top
24 there. Do you see that?
25 A. Yes.

Page 40

1  Q. It describes Fortrend International. Do you
2  recall ever seeing these two pages, PWC118 and
3  PWC119?
4  A. No, I do not recall that.
5  Q. On the front page of the document, under the
6  Comments section, Mr. Hoffman says, "Bruce, I
7  enjoyed our conversation last week. Sorry this
8  is a little late. I wanted to make sure I
9  could get comments from others in my firm that
10 are out of the country right now."
11     Did you ever participate in a
12 conversation between Mr. Snyder, or where
13 Mr. Snyder and Mr. Hoffman were involved?
14 A. I don't recall.
15 Q. Did you ever participate in any telephone
16 conferences where Mr. Hoffman was on the phone?
17 A. I don't recall.
18 Q. What do you know about Fortrend International,
19 LLC?
20     MR. GEIGER: I'm sorry, what does he
21 know now or what did he know at the time of
22 December 26th?
23 Q. (By Mr. Coffin) What do you know now?
24 A. What do I know now? I mean, I haven't read --
25 I can read this whole exhibit, this --

Page 41

1  Q. Well, I want to know what you know now based on
2  your knowledge.
3  A. Just -- very little. They bought the pipeline,
4  that's about it.
5  Q. Did you ever have any discussions with
6  Mr. Snyder about Fortrend International?
7  A. I don't recall.
8  Q. Do you recall when the first time you heard of
9  Fortrend International was?
10 A. It was part of this sale process and it was --
11 it was somewhere in the process they came in as
12 an alternate potential buyer.
13 Q. What did you know about Fortrend
14 International's finances at the time, do you
15 recall?
16 A. Zero.
17 Q. Do you recall doing anything specifically to
18 learn about Fortrend's financial capabilities?
19 A. No.
20 Q. Do you recall if anybody ever discussed whether
21 Fortrend had the financial capability to enter
22 into a transaction with the Bishop Group?
23 A. No.
24 Q. Tell me again, how did you know Craig Hoffman?
25 A. Just as part of this process.

aa2e7673-a3f0-49a4-9872-10172169b172

Page 42

1  Q. What did you know about Mr. Hoffman?
2  A. That he worked for Fortrend.
3  Q. Do you recall what his title was?
4  A. No, I don't.  I mean, I know he was -- he
5     was -- no, I don't recollect his title.
6  Q. Turn to Government Exhibit 316, please.
7  A. Witness complies.
8  Q. This is a letter, Mr. Korb, on the KPC
9     letterhead, dated August 23rd of 1999, sent by
10    FedEx to Mr. Richard Robert; is that right?
11 A. Correct.
12 Q. Is that your signature at the bottom?
13 A. Yes.
14 Q. It looks like you are responding to an e-mail
15    request made from Bill Bray, who was also
16    employed at Midcoast; is that right?
17 A. Correct.
18 Q. And it lists three requests at the bottom?
19 A. Correct.
20 Q. One, 3 and 4.  On the fourth one it says "Tax
21    Structure.  I will attempt --
22 A. Correct.
23 Q. "I will attempt to contact our EY person
24    tomorrow and arrange a conference call ASAP.  I
25    will contact you today, 8/24, to confirm

Page 43

1     status."
2         Do you recall what the tax structure
3     request was made by the representatives of
4     Midcoast?
5         MR. STERN:  Objection to form.
6  A. No.
7  Q. (By Mr. Coffin) Do you recall arranging a
8     conference call regarding the tax structure?
9  A. Not specifically.
10 Q. How about generally?
11 A. We had -- we had multiple calls with multiple
12    potential buyers between Ernst & Young,
13    primarily Bruce Snyder, and buyers.  We would
14    arrange conference calls between Bruce and
15    potential buyers multiple times.  And that's
16    what I mean by specifically.  I don't remember
17    specifically, in answer to this question,
18    having arranged that call, but it's possible
19    that I would have.  And I would have been the
20    person probably responsible for coordinating
21    that call happening.
22 Q. But you don't recall participating in such a
23    call though; is that right?
24 A. No, not specifically.
25 Q. Mr. Korb, I have Government Exhibit 165, which

Page 44

1     you don't have a copy of.  This is, I'll
2     represent to you, a draft of a letter, it's
3     called a Representation Letter, I believe, to
4     Price Waterhouse Coopers, written for
5     Midcoast's signature.  There's a recitation of
6     facts within the document.
7         And it reads on the second page of the
8     document, "Midcoast independently pursued the
9     so-called midco transaction as a structural
10    alternative.
11        "On August 24, 1999, PWC discussed the
12    midco with Midcoast and Fortrend separately.
13        "On August 25, 1999, PWC, Fortrend and
14    Midcoast discussed the midco.
15        "On August 26, 1999, PWC, Bishop,
16    (Steve Korb), EY, (Bruce Snyder) and Fortrend,
17    (Craig Hoffman) discussed the midco."
18        Do you recall participating in any
19    discussion described here?
20 A. Not specifically.
21 Q. Do you recall the terms midco or intermediary
22    transaction raised in any of the discussions
23    with either Ernst & Young or Craig Hoffman or
24    representatives of Midcoast?
25 A. Can you repeat that question?

Page 45

1         MR. COFFIN:  Read it back, please.
2         (The pending question was read by the
3     reporter.)
4  A. Not specifically.
5  Q. (By Mr. Coffin) Generally, do you recall?
6  A. We had so many conversations with so many
7     different potential buyers that --
8  Q. I'm limiting it to the discussion of the terms
9     midco and intermediary transaction, though.  Do
10    you recall those two terms being used?
11 A. No.
12 Q. Not at all?
13 A. No.
14 Q. Do you recall how Fortrend came in as a
15    potential buyer of the stock of the Bishop
16    Company?
17 A. No.
18 Q. Do you recall having any discussions with
19    Mr. Langley or anybody from PWC wherein the
20    phrases "intermediary transaction" or "midco
21    transaction" were ever discussed?
22 A. No.
23 Q. With regard to Fortrend's involvement or
24    acquisition of stock of Bishop, can you just
25    give me your recollection in your own words as

12 (Pages 42 to 45)

**Witness:  Stephen Korb**

Page 46

1  to how you recall Fortrend coming into the mix
2  and what eventually occurred?
3  A. Fortrend was not one of the initial prospective
4     buyers that were brought to us by Chase. They
5     came in later in the process. My recollection,
6     by the time Fortrend came in, we were all in --
7     or I was heavily involved with, as I remember,
8     Enron, Buckeye, providing a lot -- and
9     Midcoast, providing a lot of data to them. My
10    biggest recollection is I don't want to have to
11    deal with somebody else right now, but
12    providing them financial projections and stuff
13    with somebody else right now.
14         How they came in, that was just --
15    that's my basic recollection. They came in
16    late and I was at a point where research on
17    like Buckeye, who had come in earlier, who I
18    didn't know, where I would have done, by the
19    time Fortrend came in, later in the process, I
20    was too busy to do any research.
21 Q. What kind of research are you talking about?
22 A. Just maybe going on the Internet and looking
23    for a 10-K, you know, which I may have asked
24    Chase -- I would have -- you know, when Buckeye
25    came in, earlier in the process, I do recollect

Page 47

1  somehow getting something from Buckeye. I
2  don't know who these people are.
3       By the time Fortrend came in, we were
4  further along in the process and I was too busy
5  and I don't remember doing anything or looking
6  at anything on who they were.
7 Q. You didn't know who they were?
8 A. I don't remember looking or hearing or doing
9  any research on who they were.
10 Q. Do you remember if anybody did any research on
11    who Fortrend was?
12 A. No.
13 Q. So at that period of time, through getting
14    requests from Midcoast, Enron, Buckeye, for
15    documents and things?
16 A. I mean, I know Buckeye was in the process late.
17    I believe Enron was -- stayed through pretty
18    much the whole process. I don't know when
19    specifically the other ones dropped in and/or
20    out of the process. But there were multiple
21    entities that we were -- that were still in the
22    process by the time Fortrend came in.
23 Q. So you said "Fortrend came in." Then what do
24    you recall transpired after that with regard to
25    the transaction, stock transaction?

Page 48

1 A. I mean, I know -- recall -- I don't
2    specifically -- I mean, they weren't really any
3    different than anybody else, providing -- from
4    my standpoint, I provided cash flow analysis,
5    answered --
6 Q. Did you --
7         MR. STERN: Can you let him finish his
8    answer, please?
9 Q. (By Mr. Coffin) I'm sorry.
10 A. I mean, I know that I sent Craig Hoffman -- I
11    recollect, you know, sending him electronic
12    copies of cash flow projections and that's it.
13 Q. What else would you have sent him?
14 A. I mean, if -- would I have sent him?
15 Q. Uh-huh. What else do you recall sending him?
16 A. I don't recall specifically sending him
17    anything other than sending him a file, an
18    electronic spreadsheet file.
19 Q. What was on that file?
20 A. Just the same cash flow projection information
21    that we were sending to everybody else.
22 Q. Do you recall any other requests that he made
23    for information?
24 A. Not specifically.
25 Q. Were you aware at the time that Fortrend, or

Page 49

1  one of its affiliated entities, once it would
2  buy the stock of the Bishop Group, that it
3  would turn around and sell the assets to
4  Midcoast?
5 A. No.
6 Q. Did you ever become aware of that fact?
7 A. I eventually knew that Midcoast acquired the
8    assets.
9 Q. When did you discover that?
10 A. I don't remember specifically. After -- I
11    mean, it was after we had closed, it was after
12    we had closed.
13 Q. Were you involved in any of the negotiations
14    that took place between Mr. Langley and the
15    various potential buyers?
16 A. In some cases.
17 Q. Do you recall which potential buyers those
18    were?
19 A. Not specifically.
20 Q. Do you recall any negotiations between
21    Mr. Langley and K-Pipe or Fortrend?
22 A. I have no specific recollection of sitting in
23    on meetings between K-Pipe, Mr. Langley and
24    myself.
25 Q. Do you have any general recollections of that

13 (Pages 46 to 49)

Witness:  Stephen Korb

Page 50

1    occurring?
2  A. No.
3  Q. Turn to Government Exhibit 308, please.
4  A. I have it.
5  Q. Is that your signature at the bottom, Mr. Korb?
6  A. Yes.
7  Q. This is a letter from Bishop Group, Limited, to
8     Mr. Hoffman?
9  A. Correct.
10 Q. Do you recall this request from Mr. Hoffman for
11    federal income tax returns?
12 A. I mean, I don't specifically, but this is --
13    this is what I would have done.
14 Q. Same thing on the third page of that document.
15    There is a letter from Bishop Group, dated
16    October 22nd of '99, to Mr. Hoffman.
17        MR. STERN:  Third page of the exhibit
18    or the document?
19        MR. COFFIN:  The exhibit.
20 A. DOJ 021346?
21 Q. (By Mr. Coffin) Yes, yes.
22        Do you recall this request from
23    Mr. Hoffman?
24 A. Not specifically.  But again, this is something
25    I would have done.

Page 51

1  Q. Turn to the next page, which is DOJ 21345 of
2     Government Exhibit 308.
3  A. (Witness complies.)
4  Q. This is a memo from Mr. Teno Minaldo to
5     Mr. Hoffman, dated November of '99 sometime.
6     Who is Mr. Minaldo?
7  A. Mr. Minaldo was general counsel for Bishop
8     Group.
9  Q. Do you have any knowledge of what the Butcher
10    Interest were?
11 A. Just vague recollection that they were out
12    there and -- I mean, it's -- at one point I may
13    have known, you know, generally how it worked,
14    but I certainly have forgotten that by now.
15 Q. Turn back to Government Exhibit 225.
16 A. (Witness complies.)
17 Q. Flip to DOJ 4404.
18 A. (Witness complies.)
19 Q. This is, Mr. Korb, a log of hours and estimated
20    fees for Ernst & Young, Mr. Snyder testified to
21    previously.  The page I asked you to look at,
22    4404, there is an entry there dated October
23    21st of '99.  Do you see that?
24 A. October 21st of 99?
25 Q. Yes.

Page 52

1  A. I see one entry on this page.
2  Q. And above that, Emily K. Burns I think is the
3     employee who logged the time and estimated
4     fees.  She writes that she "Researched
5     applicable penalties and interests associated
6     with selling stock to an intermediary versus
7     the sale of assets."  On 10/22 she met with
8     Bruce Snyder.  On 10/22, she also met with
9     Steve from Bishop to discuss interest and
10    penalties spreadsheet comparing asset sale
11    versus stock sale.
12        Do you recall meeting with Emily Burns
13    of Ernst & Young around that period of time?
14 A. I don't have any specific recollection of that
15    meeting.
16 Q. Did you ever discuss an interest and penalties
17    spreadsheet with anyone from Ernst & Young?
18 A. I don't have any recollection of specifically
19    that being done.
20 Q. Do you remember a request being made to Ernst &
21    Young to prepare a spreadsheet discussing
22    interest and penalties?
23 A. No, I can't remember doing that.
24 Q. Go to Government Exhibit 310, please.
25 A. (Witness complies.)

Page 53

1  Q. This is a memorandum from you to Mr. Hoffman;
2     is that right?
3  A. Correct.
4  Q. Dated January 25 of 2000.  And the memo head is
5     from Management Resources Group, LLC; is that
6     right?
7  A. Correct.
8  Q. It says -- the memo describes the calculation
9     of the revised adjustment amount of 2,249,689.
10    Do you recall preparing this memo?
11 A. I don't specifically recall preparing this
12    memo, but this is what I would have done.
13 Q. Tell me what the subject matter of the contents
14    of this memo was.
15 A. The contracts -- the stock purchase agreement,
16    as I recall, or one of the agreements, had a
17    provision for a working capital adjustment,
18    which was designed to match receivables,
19    payables.  There was an estimate of the
20    position of the company at the time of the
21    sale, the stock sale, recognizing that there
22    would be invoices that would come in after the
23    fact, and invoices that would be paid before
24    the fact, that would need to be adjusted to
25    make everybody whole.

Witness: Stephen Korb

Page 54

1  Q. It looks like, at the end of the document, your
2     calculation resulted in an additional amount
3     seller of 593,383; is that right?
4  A. Yeah, that's what it says.
5  Q. I assume you transmitted this to Mr. Hoffman so
6     that he or somebody from Fortrend or K-Pipe
7     would pay that amount; is that right?
8  A. I mean, that's -- that is what I would have
9     done.
10 Q. Do you recall if the amount was ever paid or
11    not?
12 A. I don't -- don't recall whether that was ever
13    paid, not specifically.
14 Q. Do you remember if there was ever any issue
15    of -- did you ever wonder if Craig Hoffman or
16    his entities, Fortrend or K-Pipe, had the
17    ability to pay that amount --
18        MR. STERN: Objection, form.
19 Q. (By Mr. Coffin) -- the 593,000?
20 A. At the time of this -- that this memo was
21    written?
22 Q. Yes, sir.
23 A. At the time that this memo was written, of
24    January 25th, I didn't care.
25 Q. Why was that?

Page 55

1  A. Because -- because the eagle had landed, Dennis
2     was -- Mr. Langley was a very wealthy man at
3     that point. It was a lot -- it was and still
4     is a lot of money to me. But at this point, I
5     might have still been in a little bit of a
6     celebratory mode, so I really didn't -- yes, I
7     would have, you know, been interested, and I'm
8     not saying I would have ignored it, but -- at
9     all, but, you know, I can't specifically
10    recollect getting that money and...
11 Q. Do you recall pursuing the collection of that
12    amount?
13 A. No, I don't.
14 Q. Go to Government Exhibit 312, please.
15 A. (Witness complies.)
16 Q. This is a letter and attached memo, I believe,
17    from Meara, King & Co., certified public
18    accountants. Do you see that?
19 A. Yes.
20 Q. Dated November 5 of '99?
21 A. Correct.
22 Q. Do you recall what kind of services Meara, King
23    & Co., provided to Mr. Langley?
24 A. Meara, King was Dennis' personal tax
25    advisor/preparer.

Page 56

1  Q. As opposed to being the company's tax advisor?
2  A. Correct.
3  Q. Did you have discussions with anybody at Meara,
4     King & Co., around November 5 of '99?
5  A. Yes, I would have.
6  Q. What was the subject matter of those
7     conversations?
8  A. I don't specifically remember, you know, what
9     the -- I mean, I know I would have discussed
10    the tax treatment of the sale of Dennis' stock
11    with Julie Welch.
12 Q. Now, it seems to me that it's outside the scope
13    of your duties that you had with the Bishop
14    Group, so I was just wondering how you
15    reconciled that.
16 A. I had -- I had a limited involvement in just
17    coordinating, getting Dennis' personal
18    information to his tax accountants. I had no
19    involvement in preparing it. I was gathering
20    information and providing it to his tax
21    counsel/preparer/advisor.
22 Q. Would you have been aware of the basis of the
23    assets owned by the Bishop Group, more
24    specifically, Kansas Pipeline Company, the tax
25    basis?

Page 57

1         MR. STERN: When?
2  Q. (By Mr. Coffin) Back during this period of
3     time, November 5 of '99.
4  A. Would I have been aware of the -- of...
5  Q. The tax basis of the assets opened by the
6     Bishop Group, Limited.
7  A. I might have been -- I would not have been
8     involved in preparing it, evaluating it. I may
9     have been involved -- I may have been aware as
10    to what the number was.
11 Q. Turn to 313, please.
12 A. (Witness complies.)
13 Q. Mr. Korb, this is a document that discusses the
14    Butcher Interest?
15 A. Correct.
16 Q. It talks about, in No. 1 -- let me back up.
17    Have you seen this document before?
18 A. Not before yesterday, seeing it in the list of
19    the documents you provided.
20 Q. No. 1 talks about the fair market value of the
21    Butcher Interest back in May 4 of 1990. My
22    question to you more is, with regard to the
23    Butcher Interest, did you ever have occasion to
24    calculate the fair market value of that?
25 A. No.

Witness: Stephen Korb

### Page 58

1  Q. Did you ever have occasion to work with the
2     fair market value of that -- or to discover the
3     fair market value through any of your dealings
4     during that period of time, in '99, of the fair
5     market value of the Butcher Interest?
6  A. I think -- can you just --
7  Q. It was a terrible question.
8         Did you ever discover, during 1999,
9     what the fair market value of Butcher Interest
10    was?
11 A. I would have -- I would have done a cash flow
12    projection of what the Butcher Interest's cash
13    flow would have been or projected what Butcher
14    Interest's cash flow would have been, which
15    would have been a primary input into
16    determining what the fair market value would
17    be.
18 Q. Do you recall if anybody ever made that
19    determination?
20 A. I don't specifically recall whether that
21    determination of what the Butcher Interest was
22    in 1999, what the fair market value, what the
23    cash flow projections. If it was done, I
24    probably was the one to have done it.
25        MR. COFFIN: Let's take a five-minute

### Page 59

1     break.
2         (A recess was taken.)
3  Q. (By Mr. Coffin) Earlier, you mentioned, we
4     were talking about doing the background check
5     on potential companies, to determine their
6     financial capabilities, and you said that there
7     was somebody with a higher pay grade that would
8     be responsible for determining whether a
9     potential buyer was supposed to be in the data
10    room or not. Do you recall that line of
11    testimony? Who might those people be?
12 A. That would have been Chase and Dennis Langley.
13 Q. I may have asked the second question before,
14    but did I ask you specifically who brought
15    Fortrend into the transaction?
16 A. If you -- if you did, I don't -- I mean, if you
17    did, I would have answered, and still will,
18    that I don't recall how they came to the
19    transaction.
20        MR. COFFIN: Pass the witness.
21 EXAMINATION BY MR. STERN:
22 Q. Mr. Korb, I want to follow up on a couple of
23    questions Mr. Coffin asked you and maybe a
24    variation on what he just asked you.
25        Earlier, he asked you a series of

### Page 60

1     questions about whether or not you had made any
2     inquiries about Fortrend's financial
3     wherewithal to do various things. Do you
4     recall that?
5  A. Yes.
6  Q. To the extent you testified that you did not,
7     does that mean that someone else did not on the
8     Langley side of this transaction?
9         MR. COFFIN: Objection, foundation.
10 A. I'm sorry, one more time.
11 Q. (By Mr. Stern) Well, I just want to understand
12    whether, when you say "you" didn't do
13    something, specifically with respect to looking
14    into Fortrend's background, does that mean that
15    no one else did?
16 A. No, no, it doesn't mean that at all, no.
17 Q. Because I think, as you just testified to,
18    there were others with higher pay grades that
19    were looking at that information?
20 A. Oh, absolutely, absolutely.
21 Q. I want to go back to Exhibit 301. This was the
22    Williams compilation that Mr. Coffin had put
23    together. There's something before that.
24        MR. COFFIN: 3O2 is the Williams
25    compilation.

### Page 61

1         MR. STERN: Yes, 301.
2  Q. (By Mr. Stern) 301 was the list of prospective
3     buyers, and there's a date up in the top
4     left-hand corner. Do you see that?
5  A. Yes.
6  Q. That's 7/19/99, right?
7  A. Correct.
8  Q. And there's a reference there to "Project Ruby
9     contact sheet." Does Project Ruby mean
10    anything to you?
11 A. Yeah, that was the title that Chase had given
12    this whole process of selling.
13 Q. Is that unusual to give sort of a code name or
14    title to a project like this?
15 A. This -- I have no knowledge as to whether
16    that's usual or unusual for Chase to have done
17    that.
18 Q. What I would like to do is go through this
19    list. Do you recall that Enron Corp. actually
20    visited the data room?
21 A. Yes, I recall that they visited the data room.
22 Q. Did they ultimately make an indicative offer?
23 A. I can't recall.
24 Q. We talked about Williams. We know about
25    Midcoast.

16 (Pages 58 to 61)

Witness:  Stephen Korb

### Page 62

1   Haddington Venture, do you see
2   that --
3 A. Yes.
4 Q. -- on the second page.
5   Do you know whether they actually
6   visited the data room?
7 A. Yeah, I know they came in.
8 Q. Do you know whether they made an indicative
9   offer?
10 A. I don't remember.
11 Q. Do you know Haddington Venture was at the time?
12 A. No.
13 Q. Did you make any investigation into their
14   financial wherewithal to do a deal?
15 A. I don't recall.
16 Q. On the next page Reliant Energy is reflected as
17   visiting the data room.  Do you recall that
18   they did that?
19 A. Yes.
20 Q. Do you recall whether they made an indicative
21   offer?
22 A. I don't recall.
23 Q. And then the next page we have Buckeye
24   Partners.  It indicates that they visited the
25   data room.  Is that what you recall?

### Page 63

1 A. Yes.
2 Q. Do you recall whether Buckeye Partners made an
3   indicative offer?
4 A. Yes, they did.
5   Let me back up.  Can you define
6   indicative offer?
7 Q. Well, as I understand this bid process, an
8   initial offer was made by various prospects,
9   subject to further due diligence, negotiation
10   and other processes.  And I'm focusing on
11   whether that initial bid came in from any of
12   these entities.  That's what I'm call an
13   indicative offer.
14 A. No, I cannot recall.  Under that frame or under
15   that definition, I cannot recall whether
16   Buckeye Partners submitted an indicative offer
17   or not.
18 Q. When I asked you the question initially, you
19   had something in mind that caused you to answer
20   yes.  And what I would like for you to do is
21   tell me what you understood Buckeye Partners
22   submitted.
23 A. Buckeye -- we had continuing negotiations with
24   Buckeye for kind of a structure outside of
25   maybe what we were looking at with other

### Page 64

1   people, whether it was participating in some of
2   the things they were doing, I think there was
3   some consulting about rolling their assets in
4   Ohio.  So it wasn't consistent with the formal
5   process that Chase was requiring bidders to
6   comply with.  But there were negotiations with
7   Buckeye in terms of doing a deal where -- kind
8   of outside of the scope, whether it included
9   some of these assets, whether it didn't include
10   some of these assets.  There was just a lot of
11   preliminary to intermediate discussions as to
12   can we do something else with Buckeye.
13 Q. Okay.  Then Kaneb Pipeline Company is next.
14   And did they visit the data room?
15 A. Yes.
16 Q. And do you know whether they submitted any type
17   of offer?
18 A. I cannot recall.
19 Q. If we go to Exhibit 3O2 -- again, this is
20   the -- I'm looking for the index to the data
21   room.  I think that was 303.
22   MR. COFFIN:  It's 303.
23 Q. (By Mr. Stern)  Earlier, Mr. Coffin was
24   questioning you about Exhibit 303 and pages
25   Bates labeled 20870 through 20887, and I

### Page 65

1   believe you indicated that this was an index of
2   the documents and materials that were in the
3   data room?
4 A. Yes.
5 Q. And to the extent prospective bidders went into
6   the data room, they would have access to these
7   materials?
8 A. Yes.
9 Q. To the extent Fortrend went into the data room,
10   would it have had access to these materials?
11   MR. COFFIN:  Objection, form.
12   MR. STERN:  What is the objection?
13   MR. COFFIN:  There's no testimony they
14   went into the data room.
15   MR. STERN:  Well, we'll wait for
16   Cynthia Morelli (ph.) next week.
17 Q. (By Mr. Stern)  But to the extent that Fortrend
18   was in the -- well, first of all, do you know
19   whether Fortrend actually went to the data
20   room?
21 A. Fortrend went to the data room?  I can't recall
22   whether they ever went to the data room or not.
23 Q. To the extent there's testimony that they did
24   go to the data room, would they have had access
25   to these materials?

17 (Pages 62 to 65)

Witness:  Stephen Korb

Page 66

1  A. The procedure would have been if you had -- had
2     access to the data room, they would have had
3     access to these materials.
4  Q. Would you look at Exhibit 315.
5  A. (Witness complies.)
6  Q. Have you seen this document before?
7  A. I saw it as part of the documents Mr. Coffin
8     provided.
9  Q. Had you seen it prior to that?
10 A. I don't specifically recall seeing it.
11 Q. If you look at page 2, bottom paragraph that
12    carries over onto page 3, this memorandum
13    states, "As a result of the confidential
14    placement memorandum, taxpayer received
15    preliminary indications of interest from five
16    potential purchasers, including Enron
17    Corporation, Buckeye Partners, Haddington
18    Ventures, Midcoast Energy Resources and Kaneb
19    Pipeline Partners, LP."  Do you see that?
20 A. Yes.
21 Q. Is that consistent with your memory?
22 A. Yes.
23 Q. If you go to the next page it says, "The
24    proposed purchase prices range from a low of
25    135 million to a high of 195 million, all

Page 67

1     within the selling range estimated by Chase."
2     Do you see that?
3  A. Yes.
4  Q. Is that consistent with your memory?
5  A. Yes.
6  Q. After these initial indications of interest
7     came in from these five potential purchasers,
8     would you know whether there were further
9     negotiations between the Langley camp and the
10    prospective purchasers regarding a transaction?
11 A. Yes.
12 Q. Do you know how long those negotiations went on
13    with each of these prospective purchasers?
14 A. No, I don't, I don't recall specifically.
15 Q. Do you recall what happened with each of the
16    negotiations with these prospective purchasers,
17    what was the end result?  Obviously, none of
18    these purchasers actually did a stock
19    transaction with Mr. Langley, right?
20 A. Correct.
21 Q. Do you recall how their participation ended?
22 A. Not specifically, other than Buckeye, there was
23    some discussions about doing something else
24    with them after, I mean, beyond.  The pipelines
25    were gone,

Page 68

1     what-can-we-do-to-help-you-build-your-business
2     type discussion.
3  Q. Do you recall, as part of the process that
4     Chase was managing, Project Ruby, that a form
5     of agreement and plan of merger was supplied to
6     prospective bidders?
7  A. I don't specifically -- I don't recall that.
8  Q. There has been some discussion of the Butcher
9     Interest.
10 A. Yes.
11 Q. There has also been some discussion of the role
12    that you played in connection with submissions
13    to regulators?
14 A. Yes.
15 Q. To your recollection, did the Butcher Interest
16    have any significance or relevance to those
17    submissions?
18 A. I don't recall the Butcher Interest ever being
19    an issue in a regulatory setting, but it might
20    have.  I don't remember.
21 Q. Do you recall when the Butcher Interest was
22    established?
23 A. No.
24 Q. Was it part of this Project Ruby that the
25    Butcher Interest was established?

Page 69

1  A. It predated Project Ruby.
2  Q. Do you know by how much?
3  A. No, no, it was -- but by many years.
4  Q. By many years?
5  A. Yes.
6        MR. STERN:  Pass the witness.
7  RE-EXAMINATION BY MR. COFFIN:
8  Q. Mr. Korb, was there a log that was maintained
9     for visitors to the data room, that you recall?
10 A. Yes.
11 Q. Who would have maintained that log?
12 A. Representative Diane Wood at Bryan Cave, and
13    probably my wife, Yvette, both were working
14    that data room.
15 Q. Any idea if that particular log would exist
16    today?
17 A. No idea.
18 Q. If it did exist, do you know where it might be
19    located?
20 A. None.
21 Q. Do you know where any of the books and records
22    that were not transferred over to Midcoast
23    would have been maintained for the Bishop
24    Group's books and records?
25        MR. STERN:  Objection, form.

18 (Pages 66 to 69)

HUNDT REPORTING
214-220-1122

aa2e7673-a3f0-49a4-9872-10172169b172

Witness:  Stephen Korb

Page 70

1  A. No.
2     MR. COFFIN: I have got no further
3  questions.
4  RE-EXAMINATION BY MR. STERN:
5  Q. Where was the data room physically?
6  A. In Bryan Cave's offices.
7  Q. And Bryan Cave was Mr. Langley's or Bishop
8  Group's lawyers?
9  A. They were -- they were representing Bishop
10  Group's side of the table, yes.
11  Q. In Project Ruby?
12  A. In Project Ruby.
13     MR. STERN: Thank you. No further
14  questions.
15     (The deposition concluded at 1:46
16  p.m.)

Page 71

1  RE: Enbridge, vs. USA
2  PG/LN       Correction       Reason
3  _____
4  _____|_____|_____
5  _____|_____|_____
6  _____|_____|_____
7  _____|_____|_____
8  _____|_____|_____
9  _____|_____|_____
10 _____|_____|_____
11 _____|_____|_____
12 _____|_____|_____
13 _____|_____|_____
14 _____|_____|_____
15 _____|_____|_____
16 _____|_____|_____
17 _____|_____|_____
18 _____|_____|_____
19 _____|_____|_____
20 _____|_____|_____
21 _____|_____|_____
22
23         _____
24              STEPHEN KORB
25  GLR

Page 72

1  RE: Enbridge, vs. USA
2
3  ____ I certify that I have read my testimony
4     and request that NO changes be made.
5
6  ____ I certify that I have read my testimony
7     and request that the above changes be
8     made.
9
10
11       _____
12          STEPHEN KORB
13
14
15  Subscribed and sworn to before me this ____
16  day of _____, 2007.
17
18
19       _____
20          Notary Public
21          State of _____
22          County of _____
23       My Commission Expires_____
24  GLR
25

Page 73

1       C E R T I F I C A T E
2
3  I, Gail L. Riede, a Certified Court Reporter of
4  the State of Missouri, do hereby certify:
5  That prior to being examined, the witness was
6  first duly sworn;
7  That said testimony was taken down by me in
8  shorthand at the time and place hereinbefore stated
9  and was thereafter reduced to typewriting under my
10  direction;
11  That the foregoing transcript is a true record
12  of the testimony given by said witness;
13  That I am not a relative or employee or
14  attorney or counsel of any of the parties or a
15  relative or employee of such attorney or counsel or
16  financially interested in the action.
17  Witness my hand and seal this 5th day of May,
18  2007.
19
20
21
22
23          Gail L. Riede
24          Missouri Supreme Court
25          Certified Court Reporter (G)

19 (Pages 70 to 73)

HUNDT REPORTING
214-220-1122

aa2e7673-a3f0-49a4-9872-10172169b172