Witness:  Gary Wilcox

UNITED STATES DISTRICT COURT FOR THE SOUTHERN

DISTRICT OF TEXAS

HOUSTON DIVISION

```
--------------------------------:
ENBRIDGE ENERGY COMPANY, INC. AND :
ENBRIDGE MIDCOAST ENERGY, LP, F/K/A:
ENBRIDGE MIDCOAST ENERGY, INC.,       :
F/K/A MIDCOAST ENERGY RESOURCES,  :
INC.,                                        :
              Plaintiffs      : Civil No.
        v.                    : H-06-0657
UNITED STATES OF AMERICA       :
              Defendant       :
--------------------------------:
```

Washington, D.C.

Monday, February 19, 2007

Deposition of:

GARY WILCOX,

called for oral examination by counsel for

Defendant, pursuant to notice, at the law Office

of Skadden Arps, Slate, Meagher & Flom, LLP,

1440 New York Avenue, N.W., Washington, D.C.,

before Sheri C. Stewart, Registered Professional

Reporter and Notary Public in and for the

District of Columbia, beginning at 10:03 a.m.,

when were present on behalf of the respective

parties:

2bce65f8-760c-46ed-9083-54d369e7a9aa

Witness:  Gary Wilcox

| | |
|---|---|
| Page 2 | Page 4 |

Page 2

1   APPEARANCES:
2
3   ON BEHALF OF PLAINTIFFS:
4
5       KARL S. STERN, ESQUIRE
6       VINSON & ELKINS, LLP
7       First City Tower
8       1001 Fannin Street, Suite 2300
9       Houston, TX  77002-6760
10      (713)758-3828
11
12
13  ON BEHALF OF DEFENDANT:
14
15      DAVID B. COFFIN, ESQUIRE
16      U.S. DEPARTMENT OF JUSTICE - TAX DIVISION
17      Maxus Energy Tower
18      717 N. Harwood, Suite 400
19      Dallas, TX  75201
20      (214)880-9749
21
22

Page 4

1
2                    I N D E X
3   WITNESS                       PAGE
4   GARY WILCOX
5       EXAMINATION BY MR. COFFIN          5
6       EXAMINATION BY MR. STERN         200
7       EXAMINATION BY MR. COFFIN        233
8
9   GOVERNMENT EXHIBITS
10  NO.   DESCRIPTION                  PAGE
11  1    OPINION FROM PwC TO MIDCOAST     205
12
13
14
15  (*EXHIBITS ATTACHED TO TRANSCRIPT)
16
17
18
19
20
21
22

Page 3

1       A P P E A R A N C E S (Continued)
2
3   ON BEHALF OF WITNESS GARY WILCOX:
4
5       ALBERT H. TURKUS, ESQUIRE
6       SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
7       1440 New York Avenue, N.W.
8       Washington, D.C.  20005
9       (202)371-7000
10
11
12  ALSO PRESENT:  JANA JORDAN W/ENBRIDGE, BRIAN M.
13  DUNCAN W/SKADDEN ARPS, KEVIN G. CROKE W/IRS,
14  YVONNE M. PETERS W/IRS
15
16
17
18          * * * * *
19
20
21
22

Page 5

1
2                P R O C E E D I N G S
3   Whereupon,
4               GARY WILCOX,
5   called as a witness, and having been first duly
6   sworn, was examined and testified as follows
7       EXAMINATION BY COUNSEL FOR THE GOVERNMENT
8   BY MR. COFFIN:
9       Q    Please state your name for the record.
10      A    Gary Wilcox.
11      Q    Mr. Wilcox, what's your current
12  address?
13      A    4635 North 35th Street, Arlington,
14  Virginia 22207.
15      Q    Mr. Wilcox, have you ever given your
16  deposition before?
17      A    Yes.
18      Q    On how many occasions?
19      A    I believe in this case, once.
20      Q    That was actually an IRS interview,
21  correct, rather than a deposition?
22      A    Right.

2 (Pages 2 to 5)

**Witness:  Gary Wilcox**

Page 6

```
1      Q    But you've given a deposition before,
2   you understand the rules in a deposition or what I
3   call the ground rules?  I'll just briefly go over
4   them with you if that's all right.
5           I'll ask the questions.  I'll ask that
6   you answer truthfully and honestly.  Don't
7   interrupt me and I'll try not to interrupt you.
8   Inevitably it will happen; we'll just try to do
9   our best to keep a clean record.
10          If you don't understand a question,
11  please ask me to restate it.  Otherwise, if you
12  answer, I will assume that you understood the
13  question.  Okay?
14          If you need a break at any time, just
15  let me know.
16          Mr. Turkus may be objecting to some of
17  my questions, but I'll ask that you answer unless
18  he instructs you not to answer.
19          You understand those rules?
20     A    Yes.
21     Q    Okay.  Do you have any medical
22  condition, or are you on any medication that would
```

Page 7

```
1   prohibit you from understanding the questions
2   today?
3      A    No.
4      Q    Where are you currently employed?
5      A    Morgan, Lewis & Bockius.
6      Q    Spell that out, please.
7      A    Morgan, M-O-R-G-A-N, Lewis, L-E-W-I-S,
8   and Bockius, B-O-C-K-I-U-S.
9      Q    Is your office here in Washington,
10  D.C.?
11     A    I have an office in D.C. and in
12  Philadelphia.
13     Q    All right.  How long have you been
14  employed by Morgan, Lewis?
15     A    Almost three years.  Since leaving
16  government.
17     Q    You left the government in 2004; is
18  that correct?
19     A    Yes.
20     Q    Okay.  And what are your current
21  responsibilities with Morgan, Lewis?
22     A    I manage the firm's tax practice, and I
```

Page 8

```
1   maintain a tax practice of my own.
2      Q    We talked about your educational
3   history briefly before the deposition began.
4           Could you tell me where you graduated
5   high school, and then from there state for the
6   record your educational history?
7      A    Graduated from L.D. Bell High School in
8   Hurst, Texas.  Undergrad, I graduated from Texas
9   Tech in 1981.  For law school, I graduated from
10  University of Oklahoma in 1984, and then I
11  received an LLM in tax from NYU in 1986.
12     Q    You're a licensed attorney currently,
13  correct?
14     A    Yes.
15     Q    In what jurisdictions?
16     A    D.C., Pennsylvania, as well as Oklahoma
17  and North Carolina.
18     Q    And you passed the certified public
19  accountant's exam; is that correct?
20     A    Yes.
21     Q    You maintain your permit to practice?
22     A    No.
```

Page 9

```
1      Q    In what state did you take the exam?
2      A    Oklahoma.
3      Q    And when did you get your CPA
4   certificate, what year?
5      A    Would have been 1984.
6      Q    That's the same year you graduated from
7   law school?
8      A    Yes.
9      Q    Have you any other professional
10  licenses or any kind of accreditations?
11     A    No, I don't believe so, other than
12  various bar associations.
13     Q    And give me your employment history
14  beginning with when you graduated from law school.
15     A    First:  Doerner, Stuart in Tulsa,
16  Oklahoma.
17     Q    That's a law firm?
18     A    D-O-E-R-N-E-R.  Stuart is S-T-U-A-R-T.
19     Q    That's a law firm in Tulsa?
20     A    Yes, law firm.
21     Q    And you were there, you said, for a
22  year?
```

3 (Pages 6 to 9)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 10

1    A    I was there three years but, during
2    that period, I went to NYU.
3          MR. STERN:  Can I interrupt, David?
4    Can we have the same stipulations for Gary's
5    deposition -- Mr. Wilcox's deposition as we
6    had for Snyder's?  We can use the interview
7    transcript at the trial and it may speed
8    things up as far as some of this background
9    information.
10          MR. COFFIN:  Sure, sure.
11          MR. STERN:  Okay.
12          MR. COFFIN:  Um-hum.
13    A    Should I keep going?
14    BY MR. COFFIN:
15    Q    Yes, please.
16    A    Okay.  Second:  Skadden, Arps in
17    Washington, D.C., for four years.
18          You want a complete history?
19    Q    Well --
20    A    Or just highlights?
21    Q    Just keep going and I'll stop you.
22    A    Okay.  Third:  Morgan, Lewis & Bockius

Page 11

1    for five years.
2          And then IRS deputy chief counsel for
3    two years.
4    Q    That's an appointed position; is that
5    correct?
6    A    No.
7    Q    No?  Okay.  Who did you serve under?
8    A    B. John Williams.
9    Q    Did you know Mr. Williams prior to
10    getting that job?
11    A    Yes.
12    Q    How did you know him?
13    A    We were partners at Morgan, Lewis.
14    Q    Okay.  And you left the IRS?
15    A    February 2004.
16    Q    And went back to Morgan, Lewis?
17    A    Yes.
18    Q    Why did you leave IRS deputy chief
19    counsel?
20    A    I believe that I had accomplished my
21    goals in taking that position and had a desire to
22    return to private practice.

Page 12

1    Q    Have you reviewed anything to prepare
2    for this deposition today?
3    A    Yes.
4    Q    And I know I sent late last week or --
5    late last week a disk of documents to your
6    counsel.  Was he able to get those to you?
7    A    Yes.
8    Q    That would have been Friday or so.
9    Friday you received them?
10    A    Yes, Friday.
11    Q    I apologize for getting those to you
12    late.
13          You reviewed those documents, I assume?
14    A    I have.
15    Q    Okay.
16    A    Looked at them.
17    Q    Okay.  Did you review anything else?
18    A    I reviewed the transcript of my prior
19    deposition.
20    Q    Your interview with the IRS?
21    A    Interview.
22    Q    How much time did you spend reviewing

Page 13

1    those documents that I sent over?  Just roughly.
2    An hour, two hours?
3    A    An hour to two hours.
4    Q    Okay.  Have you been advised or
5    requested to appear in the trial of this matter
6    and to testify on behalf of the plaintiff,
7    Enbridge Midcoast?
8    A    I have.
9    Q    Have you been advised or requested to
10    appear at the trial of this matter, this lawsuit?
11    A    Not that I'm aware of.  I believe I've
12    only been requested to give this deposition.
13    Q    When were you employed with
14    PricewaterhouseCoopers?
15    A    I forgot to mention that.  Sorry.
16    Q    That's okay.
17    A    I joined, I left Morgan, Lewis in
18    March 1997 and was with PwC from April '97 until
19    February 2002.
20    Q    In February 2002 is when you went to
21    the IRS?
22    A    Yes.

4 (Pages 10 to 13)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 14

1    Q   And what were your responsibilities
2  when you worked at PwC?
3    A   I advised clients and practice offices
4  on the tax aspects of various transactions.
5    Q   And you worked in the national office
6  for PwC; is that correct?
7    A   Well, I joined Coopers, and Coopers
8  merged with Price Waterhouse which became PwC
9  about a year or two after I had joined Coopers.
10  And officially, I was co-leader of the WNTS
11  mergers and acquisitions practice.
12    Q   What does WNTS stand for?
13    A   Washington National Tax Services.
14    Q   Were you a partner with PwC since
15  joining with them in March or April '97?
16    A   Yes.
17    MR. TURKUS:  Just for the record, he
18    said he joined Coopers and then he came to
19    PwC.
20    MR. COFFIN:  Okay.
21  BY MR. COFFIN:
22    Q   Did your duties change when PwC merged

Page 15

1  with Coopers?
2    A   The size of our group doubled and so my
3  responsibilities were greater.  And I had been
4  before, immediately before the merger, leader of
5  Coopers national mergers and acquisitions practice
6  and, after the merger, I became a co-leader of
7  PwC's mergers and acquisitions practice.
8    Q   And you mentioned your duties were
9  advising clients and practice offices of the tax
10  aspects of various transactions.
11    What kind of transactions could those
12  be?
13    A   Mergers, acquisitions, spinoffs, joint
14  ventures.  Really any kind of business
15  transaction.
16    Q   At what point would a practice office
17  call you to enlist your services?  What kind of
18  transaction?
19    MR. TURKUS:  Just for clarity, do you
20    want him to talk about the kind of
21    transactions?
22    MR. COFFIN:  Well, I mean --

Page 16

1    MR. TURKUS:  You asked two different
2    questions.
3  BY MR. COFFIN:
4    Q   Okay.  A practice office typically had
5  some tax expertise there; is that correct?
6    A   (Nods yes.)
7    Q   So at what point would they deem it
8  necessary to contact you in the national office?
9    A   I think --
10    MR. TURKUS:  Objection to the form of
11    the question.
12    A   I don't know that I'm in a position to
13  say as a general rule when tax people in the
14  practice offices called the national office.  I
15  believe, for the most part, it was left up to
16  their judgment and knowledge of, you know, the
17  kind of expertise that the national office could
18  bring to them.
19  BY MR. COFFIN:
20    Q   Did you become familiar with Midcoast
21  Energy Resources, Inc., in 1999?
22    A   I recall having done previous work for

Page 17

1  Midcoast Energy.  I don't recall whether it was in
2  1999 or earlier.
3    Q   Do you recall if you worked on more
4  than one engagement with Midcoast Energy
5  Resources, Inc.?
6    MR. TURKUS:  Objection to the form of
7    the question.
8    Do you mean more than one project or
9    more than one engagement?  Because I don't
10    think he's testified about how many
11    engagements there were.
12    MR. COFFIN:  Okay.
13  BY MR. COFFIN:
14    Q   More than one project, then?
15    A   I only recall one other project.  I
16  don't recall exactly what it was, but it was a
17  different project than the one involved here.
18    Q   You recall if it was before or after
19  the project involved here?
20    A   It was before.
21    Q   So you had some familiarity with
22  Midcoast before the project involved here which

5  (Pages 14 to 17)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:   Gary Wilcox**

---

Page 18

1  occurred in 1999; is that right?
2      A    Well, I had given tax advice to the
3  practice office in connection with Midcoast,
4  but -- I don't know how else to answer that
5  question in terms of my familiarity with the
6  company.
7      Q    Okay.  Do you recall if you'd spoken to
8  anybody at Midcoast before 1999?
9      A    I don't recall.  I believe that I had
10  dealt only with the PwC practice office people who
11  in turn dealt with the company.
12      Q    I don't know if you mentioned or you
13  testified, do you recall the subject matter of
14  what that earlier project was?
15      A    No, I don't.
16      Q    But you do recall the project at issue
17  here.  Do you recall it occurred in 1999?
18      A    Yes.
19      Q    Okay.  And Midcoast was bidding on the
20  purchase of the stock of The Bishop Group
21  initially in the transaction; is that correct?
22      A    That's what I remember.

---

Page 19

1      Q    Okay.  How did you get involved with
2  that particular project?
3      A    Do you mean when was I first contacted?
4      Q    Yes.
5      A    I believe it was in early September,
6  and I don't know the exact date.  It was during, I
7  believe, the first or perhaps second week of
8  September.
9      Q    Who contacted you?
10      A    I believe it was Dennis McErlean and
11  Tom Palmisano.
12      Q    Now, Tom Palmisano was a tax man, is
13  that correct, at the time?
14      A    Yes.
15      Q    With the local practice in Houston?
16      A    Yes.
17      Q    Of PwC, right?
18          And who was Dennis McErlean?
19      A    Dennis was a tax partner also in the
20  Houston office.
21      Q    You recall why they requested your
22  services at that time?

---

Page 20

1          MR. TURKUS:  Objection to the form of
2  the question.
3      A    They called me about a potential
4  acquisition by Midcoast.
5  BY MR. COFFIN:
6      Q    And did they request that you perform
7  some kind of services at that time?
8      A    I don't recall exactly what was
9  requested.  As I just said, they called me to
10  discuss a potential acquisition by Midcoast.  That
11  call was similar to many calls that I would
12  receive from practice offices who would ask me
13  about my views on issues or transactions.
14      Q    And then what happened, do you recall,
15  after that initial call as far as how you got
16  further involved in the transaction?
17      A    I don't recall the exact sequence of
18  what happened when.  I'm happy to answer questions
19  if you want to give me something more specific.
20      Q    Sure.
21      A    I do recall traveling to Kansas City.
22  I don't remember the exact date of the meeting,

---

Page 21

1  but I remember traveling to Kansas City shortly
2  after Dennis and Tom called me.
3      Q    Looking back, can you summarize what
4  your responsibilities were with regard to that
5  project?
6          MR. TURKUS:  You mean overall or over
7  the entire time he was involved?
8          MR. COFFIN:  Yeah, just generally.
9      A    Generally, it was to provide tax advice
10  to Midcoast in connection with the acquisition.
11  BY MR. COFFIN:
12      Q    And the acquisition of the pipeline
13  assets?
14      A    Correct.
15      Q    Did you have any expertise at the time
16  in the energy field or pipeline industry?
17      A    No, but it was quite common to give tax
18  advice in transactions even where the advisor does
19  not have specific expertise of that industry
20  because the issues are quite common.
21      Q    Let's turn to Government Exhibit, in
22  the binder there, 26.  This is a facsimile from

---

6  (Pages 18 to 21)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:   Gary Wilcox**

Page 22

1  Fortrend International, LLC, to Mr. Bruce
2  Schneider of E&Y and cc to Tom Palmisano; is that
3  correct?
4       MR. TURKUS:  Well, Mr. Coffin, that's
5    what it purports to be.  I'm not sure the
6    witness can authenticate it for you.
7       MR. COFFIN:  Okay.  I don't want him to
8    authenticate it.
9       MR. TURKUS:  Well, you asked him, "Is
10   it correct?"
11  BY MR. COFFIN:
12   Q    Is that what it appears to be?
13   A    It appears to be a fax from Fortrend to
14  Bruce Snyder, Tom Palmisano.  Have you ever seen
15  this fax?
16       MR. TURKUS:  Prior to my providing a
17    copy to him last week?
18       MR. COFFIN:  Yes.
19  BY MR. COFFIN:
20   Q    Back in 1999, did you see this
21  facsimile?
22   A    I do not recall seeing this fax prior

Page 23

1  to Friday of last week.
2   Q    Okay.  How about the pages following?
3   A    I do recall seeing the next two pages
4  which describe Fortrend and several of the
5  principals.
6   Q    Okay.  And the date of this fax is
7  August 30, 1999.  Had you heard of Fortrend in
8  1999, prior to this transaction?
9   A    I do not recall having heard of
10  Fortrend prior to this transaction.
11   Q    How about you eventually became
12  familiar with some of the principals of Fortrend,
13  didn't you, during 1999?
14   A    Yes.
15   Q    On the third page of this exhibit, it
16  lists Frederick Forrester and Jeffrey Furman.
17  Were you familiar with those two individuals
18  before being involved with the project at issue?
19   A    No.  And I don't believe I ever spoke
20  with Frederick Forrester.
21   Q    Did you speak with Mr. Furman?
22   A    I did.  I don't recall exactly when but

Page 24

1  I did.
2   Q    Okay.  Did you ever meet with anybody
3  from Fortrend personally subsequent to August of
4  1999?
5   A    Yes.
6   Q    Who did you meet with?
7   A    Craig Hoffman.
8   Q    Okay.  Who introduced you to Fortrend?
9       MR. TURKUS:  Objection to the form of
10    the question.
11  BY THE WITNESS:
12   Q    I'll back up.
13       How did you become familiar with
14  Fortrend?
15   A    From my initial conversation with
16  Dennis McErlean and Tom Palmisano.
17   Q    And do you recall what they mentioned
18  to you about Fortrend?
19   A    Not specifically.
20   Q    Okay.  How about generally?
21   A    That Fortrend was an entity that could
22  possibly enter the bidding process as a purchaser

Page 25

1  of the stock of Bishop Group.
2   Q    Did you do any due diligence with
3  regard to Fortrend?
4       MR. TURKUS:  Objection to the form of
5    the question.
6   A    I'm going to have to ask you what you
7  mean by "due diligence."
8  BY MR. COFFIN:
9   Q    Okay.  In your practice, isn't due
10  diligence a term of art as far as doing background
11  information or research on potential parties to
12  transactions?
13   A    I believe that when you represent a
14  company that is making an acquisition, it's common
15  for the buyer to do the financial and tax due
16  diligence of the target company.
17       In this case, Midcoast was buying
18  partnership interests that were owned, as I
19  recall, by Bishop Group Corporation.  I have no
20  doubt that due diligence was done on the assets
21  that were being purchased, but it was not part of
22  what I was asked to do.

7  (Pages 22 to 25)

2bce65f8-760c-46ed-9083-54d369e7a9aa

Witness:   Gary Wilcox

Page 26

1    Q    So you didn't do any of the due
2  diligence on Fortrend then?
3         MR. TURKUS:  Objection to the form of
4    the question.
5         He's talking about due diligence of the
6    assets.
7    A    I was talking about due diligence in
8  general.
9         In terms of due diligence on Fortrend,
10 I recall that I made some general inquiries as to
11 Fortrend's experience in acquiring the stock of
12 companies, but I don't recall anything specific.
13   Q    I'm going to ask you to fast forward to
14 Government Exhibit 160, and the only reason I'm
15 doing this is I'm trying to do things in
16 chronological order.  You might pull that out.
17        Now, Mr. Wilcox, this is a memorandum
18 on PricewaterhouseCoopers letterhead; is that
19 correct?  Or memohead; is that right?
20   A    Yes.
21   Q    And it's a draft, memorandum draft,
22 December 14, 1999, and it's to the Midcoast file

Page 27

1  from Gary Wilcox and Catherine Coffey; is that
2  correct?
3    A    Correct.
4    Q    Who is Catherine Coffey?
5    A    She was a manager or a senior
6  manager -- I don't recall which -- in PwC's New
7  York office.
8    Q    What was her role in the preparation of
9  this memorandum?
10   A    It was to assist me in the research and
11 analysis of the tax issues.
12   Q    Was she working under your direction?
13   A    Yes.  And under the direction of Ian
14 Schacter.
15   Q    Who's Mr. Schacter?
16   A    Mr. Schacter was, and I believe still
17 is, the leader of the -- PwC's New York mergers
18 and acquisitions practice.
19   Q    Why would you or PwC choose Ms. Coffey
20 to assist you rather than having somebody in the
21 Washington, D.C., national office assist you in
22 this?

Page 28

1         MR. TURKUS:  Objection to the form of
2    the question.
3    A    I really do not recall.  The Washington
4  and the New York offices frequently worked
5  together.  But, beyond that, I don't recall.
6  BY MR. COFFIN:
7    Q    Would Ms. Coffey have been familiar
8  with the facts as they occurred in this draft
9  memorandum, or is that something you would supply
10 to her?
11        MR. TURKUS:  Objection to the form of
12   the question.
13   A    Ms. Coffey would have been familiar
14 with the facts as they were supplied to her by me
15 and possibly Tom Palmisano.
16   Q    And how did you gain an understanding
17 of the facts of this memorandum?
18        MR. TURKUS:  Objection to the form of
19   the question.
20        Are there specific facts that you're
21   referring to, Mr. Coffin?  Because it seems
22   to me that it's impossible to answer that

Page 29

1  question as to all of the many facts.
2         MR. COFFIN:  Just in general.  We can
3    go through the facts, but just in general.
4  BY MR. COFFIN:
5    Q    I mean, you were in Washington, D.C.,
6  and the transaction was occurring in Houston and
7  Kansas City; is that right?
8    A    This was a several hundred million
9  dollar transaction.  PwC was engaged to advise on
10 the tax aspects of the transaction.  So I was very
11 involved throughout the course of the transaction
12 with the progress of the transaction and the
13 various details.
14   Q    Okay.  Just generally speaking, why do
15 you prepare a draft like this or a memorandum like
16 this?
17        MR. TURKUS:  Is the question why this
18   document was prepared, or why documents like
19   this are generally prepared?
20        MR. COFFIN:  Documents like this.
21   A    Documents like this are prepared to
22 document and support the tax advice given to the

8  (Pages 26 to 29)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 30

1  client and, ultimately, the client's tax position.
2  BY MR. COFFIN:
3     Q    Turn to the second page of the
4  memorandum, the first paragraph at the top.  The
5  last sentence, it says, "While Midcoast was aware
6  of Langley's stated preference throughout the
7  negotiations, it had hoped an asset deal could be
8  negotiated."
9           Do you know why that was?
10          MR. TURKUS:  Excuse me.  Why what was?
11          MR. COFFIN:  Why Midcoast hoped an
12  asset deal could be negotiated.
13          MR. TURKUS:  Objection.  Lack of
14  foundation.
15     A    I don't recall specifically other than
16  the obvious tax benefit to an acquirer of assets
17  as opposed to an acquirer of stock.  And Midcoast
18  was in a competitive bidding process and I don't
19  recall specifically but as I'm, you know, I'm
20  speculating now, the benefit of a tax -- of an
21  asset purchase would be greater to them than a
22  stock purchase.  That's typical of all

Page 31

1  transactions.
2  BY MR. COFFIN:
3     Q    The third paragraph says, Midcoast
4  independently pursued the so-called Midco
5  transaction as a structural alternative."
6           What's the Midco transaction?
7     A    That is a reference to a transaction in
8  which stock is sold to a company and that company,
9  in turn, sells the assets to a different company.
10     Q    Is it structured that way for tax
11  purposes?
12          MR. STERN:  Objection, form.
13          MR. TURKUS:  Are you talking again,
14  Mr. Coffin, generally or with regard to a
15  specific transaction?
16          MR. COFFIN:  Generally.
17     A    Yes, sometimes that structure is used
18  to gain a tax advantage.
19  BY MR. COFFIN:
20     Q    Can you comment on how the tax
21  advantage is gained?
22     A    From the buyer's standpoint, the buyer

Page 32

1  desires to buy assets so that the buyer can
2  depreciate the cost of the assets.
3     Q    The next sentence on Paragraph 3 of
4  that page says, "On August 27, 1999, Midcoast and
5  PricewaterhouseCoopers contacted Fortrend
6  International."
7           Is that a correct statement?
8          MR. TURKUS:  Is what a correct
9  statement?  Is that what the document says or
10  is that a fact?
11          MR. COFFIN:  Is that a fact.  I'm
12  sorry.
13          MR. TURKUS:  I don't think you've shown
14  that the witness has a foundation to answer
15  that question.
16          MR. COFFIN:  He said earlier he was
17  heavily involved in negotiations and in these
18  transactions.
19          MR. TURKUS:  But he also said earlier,
20  Mr. Coffin, the first time he became involved
21  was in September.  So if you're asking him
22  did someone tell him that, that's one thing.

Page 33

1  But in terms of foundation, you haven't
2  established a foundation for him to answer
3  that question.
4          MR. COFFIN:  Well, this is his memo.
5          MR. TURKUS:  That's correct, but you're
6  asking him is this a fact and he already said
7  that his first involvement in this
8  transaction was September.
9          MR. COFFIN:  Well, how did he know to
10  write this memo?
11          MR. TURKUS:  That's right.  That's
12  what's called laying a foundation.  You have
13  to ask the foundation question.
14          MR. COFFIN:  Okay.
15  BY MR. COFFIN:
16     Q    Where did you get these facts that you
17  put into this memo?
18          MR. TURKUS:  Which facts?
19          MR. COFFIN:  All of them.
20          MR. TURKUS:  He's already answered that
21  question.  But you're asking now about a
22  specific question.  You're asking is it a

HUNDT REPORTING
214-220-1122

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 34

1    fact; then you have to ask him how he learned
2    about that fact, or that statement.
3    BY MR. COFFIN:
4        Q    Well, how did you learn about that fact
5    on August 27, 1999, Midcoast and
6    PricewaterhouseCoopers contacted Fortrend
7    International, LLC?
8        MR. TURKUS:  If you recall.
9        A    I recall that I was told by Tom
10   Palmisano and/or Dennis McErlean that they had
11   contacted Fortrend.
12   BY MR. COFFIN:
13       Q    In the next sentence, it says, "Over
14   the next several weeks, several conversations took
15   place among Fortrend, Midcoast, PwC and Ernst &
16   Young regarding the viability of the Midco
17   alternative."
18       Why is it characterized as a Midco
19   alternative there?
20       MR. TURKUS:  Objection to the form of
21   the question.
22       A    I really don't know what you're asking.

Page 35

1    I explained earlier what the reference to a Midco
2    transaction was. I've made reference to it again
3    here, but I'm not sure exactly what you're asking.
4    BY MR. COFFIN:
5        Q    As an alternative you made reference to
6    it here. So it's an alternative to what?
7        A    You asked me earlier was Midcoast --
8    had Midcoast been involved in the bidding process,
9    and I answered yes. So the alternative would have
10   been for Midcoast to acquire the stock of Bishop
11   Group directly from Langley.
12       Q    In the fifth paragraph, it says, "On
13   September 13, 1999, PwC met with Midcoast and
14   Kansas City to determine whether Fortrend should
15   be invited to enter the bidding process."
16       Did you attend that meeting?
17       A    Yes.
18       Q    Who else was at the meeting, if you
19   recall?
20       A    From PwC, Tom Palmisano. I don't
21   recall if Dennis McErlean was there. In fact, I
22   believe he was. From Midcoast, I believe Richard

Page 36

1    Robert and one or two other Midcoast
2    representatives. I'm not recalling their names
3    now. There was Dennis Langley and several of his
4    representatives, as well as legal counsel were
5    there also. This meeting is in the offices of
6    Bryan Cave, Langley's counsel.
7        Q    Who from Fortrend was there?
8        MR. TURKUS:  Objection to the form of
9    the question.
10       I don't think he said yesterday that
11   anyone was present from Fortrend.
12   BY MR. COFFIN:
13       Q    Oh, I'm sorry. I misread the fax.
14       Was anybody from Fortrend there?
15       A    No.
16       Q    Do you recall what Langley's -- or what
17   was discussed at the meeting?
18       A    At which meeting?
19       Q    Your meeting with -- on September 13,
20   1999.
21       A    Are you asking me to confirm what was
22   written in this memo or -- because I believe the

Page 37

1    memo describes some of the discussions.
2        Q    Well, let me ask you this: Was this
3    memo, was it ever finalized? Because it shows to
4    be a draft of December 14, 1999.
5        A    Not that I recall.
6        Q    The last sentence of that Paragraph 5,
7    "PwC did not witness any direct discussions
8    between Midcoast, Langley, or its representative
9    at this meeting."
10       Can you tell what the relevance of that
11   statement is?
12       MR. TURKUS:  Objection to the form of
13   the question.
14       A    I'm sorry. Can you repeat the
15   question?
16   BY MR. COFFIN:
17       Q    What's the relevance of that statement?
18       MR. STERN:  Objection to form.
19       A    Relevance? Relevant to what?
20   BY MR. COFFIN:
21       Q    Well, I assume you put it in the
22   memorandum because it had some relevance.

10  (Pages 34 to 37)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 38

1      MR. TURKUS:  Objection to the statement
2   of counsel.
3      Is that a question?
4      MR. COFFIN:  Um-hum.
5      MR. TURKUS:  What's the question?
6      MR. COFFIN:  What's the relevance of
7   the last statement in Paragraph 5?
8      MR. TURKUS:  He's asked you to clarify
9   the question.
10  BY MR. COFFIN:
11     Q    Why would it be relevant to this
12  memorandum?
13     A    This section of the memorandum was
14  intended to describe the course of this
15  transaction in detail.  This facts section
16  describes in detail the negotiations that took
17  place between Midcoast and Fortrend, it describes
18  negotiations that took place between Fortrend and
19  Langley.  This was a statement that was made in
20  order to illustrate that, during that meeting on
21  September 13, '99, it did not appear that there
22  were negotiations taking place directly between

Page 39

1   Midcoast and Langley.
2      Q    Was that important at the time?
3      MR. TURKUS:  Objection to the form of
4   the question.
5      Important to whom?
6      MR. COFFIN:  To PwC.
7      MR. TURKUS:  At what time?  The time of
8   September 13, '99?
9      MR. COFFIN:  Yes.
10     MR. TURKUS:  Or at the time the
11  document was written?  At what time?
12     MR. COFFIN:  September 13, 1999.
13     MR. TURKUS:  Objection to the form of
14  the question.
15     A    I would say that it was advisable, if
16  this so-called Midco alternative was to be
17  pursued, that Midcoast begin to limit the extent
18  of direct negotiations with Langley.
19  BY MR. COFFIN:
20     Q    Okay.  During that meeting, was
21  Fortrend present?
22     MR. TURKUS:  Objection.  Asked and

Page 40

1   answered.
2   BY MR. COFFIN:
3      Q    In Kansas City?
4      MR. TURKUS:  That's already been
5   answered.
6      MR. COFFIN:  I don't think it has been.
7      MR. TURKUS:  Yes, it has.  He can
8   answer it again, but he did answer.
9      MR. COFFIN:  Okay.
10     A    No one from Fortrend was present in
11  Kansas City.
12  BY MR. COFFIN:
13     Q    Okay.  About the third line in
14  Paragraph 5 it says, "PwC discussed with
15  Fortrend."
16     Do you see that sentence?
17     A    Yes.
18     Q    Did that discussion take place on
19  September 13, 1999, or some other time?
20     A    I believe it took place on
21  September 13th.  I don't recall whether that
22  meeting was one day or two days.  It might have

Page 41

1   been the 14th, but I believe it was the 13th.
2      Q    Do you recall how -- I assume you're
3   aware you became involved in the transaction at
4   least by September 13th of 1999, correct?
5      MR. TURKUS:  I'm sorry.  I'm just
6   confused about the question.  Is it does he
7   recall, or you assume, or --
8      MR. COFFIN:  I assume, because this
9   memorandum says they had a meeting on
10  September 13th of '99.
11     MR. TURKUS:  He already said he was at
12  the meeting.  What's the question?
13     MR. COFFIN:  I assume he was aware then
14  of the Midcoast transaction at that meeting,
15  correct?
16     MR. TURKUS:  The Midcoast transaction?
17     MR. COFFIN:  This transaction.
18     A    I'm going to have to ask you to clarify
19  what you mean by "the Midcoast transaction."
20  BY MR. COFFIN:
21     Q    Well, how about the Midcoast project as
22  you were describing earlier.  You're aware -- my

11  (Pages 38 to 41)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 42

1   question is more how much earlier, when you went
2   to Kansas City on this meeting -- I'm sorry,
3   September 17, 1999.
4        MR. TURKUS:  September 17th?
5        MR. COFFIN:  Yeah.
6        MR. TURKUS:  13th?
7        MR. COFFIN:  Let me -- give me a second
8   here.
9        MR. TURKUS:  I'm confused.
10       MR. COFFIN:  I'm confused, too.
11  BY MR. COFFIN:
12       Q   Yes, on September 13, 1999, Paragraph 5
13  on page 2.  PwC met with Midcoast in Kansas City,
14  and you said you were there.
15       Do you recall how much earlier you
16  would have become aware of the transaction?
17       MR. TURKUS:  Objection.  Asked and
18       answered.
19       He said earlier he thought he became
20       aware of it in the first or second week of
21       September.  That was his testimony.
22

Page 43

1   BY MR. COFFIN:
2        Q   Okay.  That's your best recollection?
3        A   My best recollection is that, as I
4   said, I was called by Tom Palmisano and/or Dennis
5   McErlean during the first or second week of
6   September.  That was the first time I was aware of
7   any aspect of this transaction.
8        Q   Turn the page to page 3 of Exhibit 160.
9   The first paragraph there discusses that Fortrend
10  had received a private placement memorandum and
11  other opportunities.
12       Do you recall how you would have been
13  aware or advised of that fact?
14       A   No, I do not recall whether I learned
15  that directly from Fortrend or from some other
16  person.
17       Q   Okay.  The last sentence in that
18  paragraph says, "Presentation was made by
19  telephone to Fortrend on September 16, 1999."
20       Were you involved in that presentation
21  at all?
22       A   No, I was not involved in that at all.

Page 44

1        Q   Do you know if anybody from PwC would
2   have been involved in that presentation?
3        A   I do not believe so.
4        Q   And the second paragraph says, "From
5   that point forward, Fortrend began having direct
6   and frequent discussions directly with Langley's
7   representative, Steve Korb, and Langley's outside
8   counsel, Jim Pryde of Bryan Cave of Kansas City."
9        Did PwC have any involvement with --
10  anybody from PwC have any involvement with -- in
11  those direct and frequent discussions?
12       MR. TURKUS:  Objection to the form of
13       the question.
14       A   There may have been an occasion where
15  PwC was either included on an e-mail
16  communication, but I do not recall phone
17  conversations in which PwC, Fortrend, and
18  Langley's counsel participated together.  It may
19  have happened -- and I'm willing to have my
20  recollection refreshed with documents -- but I
21  don't recall right now.
22       I should state for the record that PwC

Page 45

1   was a tax advisor in this transaction; we were not
2   providing legal advice.  There were many
3   discussions that had to take place among the
4   lawyers which did not require the presence of PwC.
5   BY MR. COFFIN:
6        Q   Turn over to Government Exhibit 37 on
7   the bottom.  Just keep that 160 out, please.
8        MR. STERN:  What number?
9        MR. COFFIN:  37.
10  BY MR. COFFIN:
11       Q   This appears to be an e-mail along with
12  an attachment sent from Becky Davis of, I believe,
13  Bryan Cave to Mr. Palmisano.  The attachment is --
14  looks like the red line stock purchase agreement
15  between -- by and between Fortrend and
16  Mr. Langley.
17       You see that?
18       A   Yes .
19       Q   And the e-mail was dated September 12
20  of '99.
21       Do you know why Mr. Palmisano would
22  have been receiving a copy of this e-mail and its

HUNDT REPORTING
214-220-1122

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 46

1  attachment, or why he would have received this
2  e-mail and the attachment?
3       MR. TURKUS:  Are you asking him to
4  speculate as to why Ms. Davis sent this to
5  Mr. Palmisano, or to generally describe his
6  understanding if he knows?
7       MR. COFFIN:  If he knows.
8    A    I don't know, although you have already
9  asked me to testify about a fax from Fortrend that
10 indicated PwC, Tom Palmisano, and Ernst & Young
11 had already had a discussion in late August about
12 this transaction.  E&Y represented Dennis Langley
13 as well as Bryan Cave.
14 BY MR. COFFIN:
15   Q    Bryan Cave represented Langley?
16   A    Yes.
17   Q    Okay.  Did PwC represent Fortrend at
18 all in this transaction?
19   A    No.
20   Q    Look at Government Exhibit 42, please.
21       Have you ever seen this document
22 before, Mr. Wilcox?

Page 47

1       MR. TURKUS:  Before last Friday?
2       MR. COFFIN:  Before last Friday, yes.
3    A    I believe I would have seen it, but I
4  don't recall exactly when I did see it.
5  BY MR. COFFIN:
6    Q    What makes you believe that you did see
7  it?
8    A    This appears to be a confidentiality
9  agreement between Fortrend and Midcoast relating
10 to Midcoast's purchase of assets.  And as tax
11 advisor to Midcoast, I believe this is the kind of
12 document that would have been shared with me.
13   Q    Okay.  The first paragraph refers to
14 evaluation material.  Would you read that
15 paragraph to yourself, please?
16       MR. TURKUS:  You mean the first bullet?
17       MR. COFFIN:  First bullet, yes.
18   A    Okay.
19 BY MR. COFFIN:
20   Q    My question is, it references
21 information in documents that -- in terms of
22 evaluation material.  Do you recall ever seeing

Page 48

1  anything that that is referring to?
2       MR. STERN:  Objection, form.
3       MR. TURKUS:  Yeah.  Are you asking him
4  whether he saw any information that could be
5  such material or that was specifically what
6  the author of the document was referring to
7  by the term "evaluation material"?
8       MR. COFFIN:  What the author of the
9  document was referring to.
10      MR. TURKUS:  How can he know?
11 BY MR. COFFIN:
12   Q    How about generally then?
13   A    I do not know what would have comprised
14 the quote, evaluation material, quote.
15   Q    Do you recall ever seeing any documents
16 from Fortrend that would set forth the nature of
17 the Midco transaction?
18      MR. TURKUS:  Objection to the form of
19 the question.
20      Is it your interpretation, Mr. Coffin,
21 that that's what evaluation material is, or
22 whether it's material relating to the assets?

Page 49

1       MR. COFFIN:  No, my question is -- just
2  stands by itself.
3       MR. STERN:  I object to the form as
4  well.
5       MR. TURKUS:  So you want to know
6  whether he saw any information that would be
7  from Fortrend regarding the Midco
8  transaction?
9       MR. COFFIN:  Right.
10      MR. TURKUS:  And what do you mean by
11 the phrase "Midco transaction" in that
12 context?
13      MR. COFFIN:  The way he described it
14 earlier.
15   A    As I sit here today, I can say that
16 without having recalled exactly what comprised the
17 evaluation material, that this appears to be a
18 standard confidentiality letter that would be
19 signed between a seller of assets and a buyer of
20 assets.  And I believe the reference to evaluation
21 material was intended to relate to various
22 information and documents relating to the assets

13  (Pages 46 to 49)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:   Gary Wilcox**

Page 50

1  that were being sold in this transaction, and I'm
2  not aware that any other information would have
3  been shared by Fortrend other than information
4  relating to the assets which are being sold.
5  BY MR. COFFIN:
6      Q    In a standard confidentiality agreement
7  referring with regard to an asset purchase just
8  described, would that necessarily use the words
9  "purpose of evaluating the possible use of the
10  transaction by you and your clients"?
11          MR. TURKUS:  Objection to the form of
12  the question.
13          That question just doesn't make sense
14  whatsoever, Mr. Coffin.
15          MR. COFFIN:  Why don't you let him --
16          MR. TURKUS:  How can he answer a
17  question about what people would write?
18          MR. COFFIN:  He just described what was
19  in a standard --
20          MR. TURKUS:  Right.
21          MR. COFFIN:  -- confidentiality
22  agreement.

Page 51

1          MR. TURKUS:  And you just --
2          MR. COFFIN:  So I'm asking him has he
3  ever --
4          MR. TURKUS:  Can you let me finish my
5  objection?
6          MR. COFFIN:  No.  Can you just let him
7  answer the question?
8          MR. TURKUS:  No.  I'm going to state an
9  objection for the record.
10          MR. COFFIN:  Well, just state it and
11  that's it.  Let him answer the question.
12          MR. TURKUS:  All right.  Well, I'm
13  saying to you that it makes no sense to ask a
14  witness in a standard confidentiality
15  agreement what author -- whether authors
16  would use five words.  That makes no sense.
17  That's a nonsensical question.
18          MR. COFFIN:  Well, he just described
19  what's in the standard.
20          MR. TURKUS:  But your question is not a
21  reasonable follow-up question.  It makes no
22  sense.

Page 52

1          MR. COFFIN:  Well, let him answer the
2  question.
3          MR. TURKUS:  Well, it makes no sense.
4  Objection to the form of the question.
5          MR. COFFIN:  Coaching the witness.
6          MR. TURKUS:  I'm not coaching the
7  witness.
8          MR. COFFIN:  Yes, you are.
9          MR. TURKUS:  I'm making an objection.
10  That question makes no --
11          MR. COFFIN:  Well, just object to the
12  form and that's it.
13          MR. TURKUS:  Excuse me, sir.  The court
14  reporter can only take one person at a time.
15          I'm stating an objection for the record
16  because the form of that question makes no
17  sense.
18          MR. STERN:  Objection to form.
19          MR. COFFIN:  Thank you, Karl.
20      A    I'm going to try to answer what I
21  believe was the question.  I said that this, I
22  believe, appeared to be a standard confidentiality

Page 53

1  letter.  But, for the record, I am not an expert
2  on confidentiality letters and, at the time, was
3  acting as a tax advisor, not as a legal advisor.
4  So, I really can't comment on particular words
5  being used here, but I note that the transaction
6  is defined in this letter as a transaction
7  relating to the purchase of the assets.
8          I described for you earlier what I
9  believed a Midco transaction was, and I do not see
10  any reference to a Midco transaction in this
11  letter.  I see only a reference to a purchase of
12  assets which is defined as the transaction.
13          So in answer to your question, which
14  refers to the language, quote, possible use of the
15  transaction by you and your clients, quote, I
16  don't know how to comment on that other than it
17  simply refers to the purchase of assets.
18          MR. CROKE:  Could I have just a
19  five-minute break?
20          MR. COFFIN:  Sure.
21          MR. CROKE:  That would be helpful.
22          (Whereupon, there was a break from

14  (Pages 50 to 53)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 54

1  11:15 a.m. until 11:25 a.m.)
2  BY MR. COFFIN:
3      Q    Mr. Wilcox, when you were first
4  contacted by Mr. Palmisano, Mr. McErlean regarding
5  Midcoast, did they discuss with you using a Midco
6  transaction at that time?
7      A    Yes.
8      Q    Do you recall if -- who suggested that
9  a Midco transaction be used?
10         MR. TURKUS:  Objection to the form of
11     the question.
12         MR. STERN:  Objection to form.
13     A    All I recall is that Tom and/or Dennis
14  had had conversations as already indicated with
15  Fortrend, with E&Y, and they called me to see if I
16  could help them advise the client on this
17  transaction.
18  BY MR. COFFIN:
19     Q    So at that point in time, was it your
20  impression that they had already decided to --
21  Midcoast had already decided to engage in a Midco
22  transaction?

Page 55

1         MR. TURKUS:  Objection to the form of
2     the question.
3         MR. STERN:  Join in that.
4     A    I don't believe any decisions had been
5  made -- any decision had been made by Midcoast to
6  pursue what we'll call the Midco alternative at
7  the time I was first contacted by Tom and Dennis.
8  It had been discussed, but I do not believe a
9  decision had been made.
10  BY MR. COFFIN:
11     Q    Did you participate in any discussions
12  with Midcoast regarding the Midco alternative?
13         MR. TURKUS:  At any time?
14         MR. COFFIN:  At any time.
15     A    Yes.  You know, as indicated by the
16  draft memo you referred to, I and -- Tom and I met
17  with Midcoast representatives on September 13th to
18  discuss the Midco alternative with Midcoast.
19  BY MR. COFFIN:
20     Q    And did you explain to Midcoast at the
21  time how the Midco alternative would work for them
22  or how it would benefit them?

Page 56

1         MR. TURKUS:  Objection to the form of
2     the question.
3         You say "at the time."  You mean
4     September 13?
5         MR. COFFIN:  Yes.
6     A    I don't remember specific conversations
7  but, as I sit here today, it makes sense that I
8  would have described this alternative to them.
9  BY MR. COFFIN:
10     Q    Go back to Government Exhibit 160 which
11  is the draft memorandum.  Page 4, the first full
12  paragraph up at the top there.  Could you read
13  that to yourself, please?
14     A    Okay.
15     Q    There's a sentence, second to the last
16  sentence of that paragraph, discusses interest,
17  Midcoast did not want to purchase the butcher
18  interest currently because of rate base concerns.
19  See that?
20     A    Yes.
21     Q    Tell me how the rate base concerns
22  affected, if you recall, affected Midcoast's

Page 57

1  decision to not purchase the -- it did not want to
2  purchase the butcher interest.
3     A    I recall being told -- I don't remember
4  by who -- that Midcoast preferred not to acquire
5  the butcher interest because of FERC-related
6  issues.
7         MR. TURKUS:  That's F-E-R-C.
8         THE WITNESS:  F-E-R-C, Federal Energy
9     Regulatory Commission issues.
10     A    That I -- I don't recall determining
11  exactly what those issues were other than I was
12  told they preferred not to acquire it as part of
13  their assets.  At least initially.
14  BY MR. COFFIN:
15     Q    Did you learn later of another reason
16  why they preferred not to purchase the butcher
17  interest?
18     A    I think that Midcoast's preference not
19  to acquire the butcher interest from a FERC
20  standpoint was also helpful to Midcoast for their
21  tax position.
22     Q    Okay.  How would it be helpful?

15  (Pages 54 to 57)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 58

1    A    Because The Bishop Group Corporation
2  which was acquired by Fortrend would continue to
3  hold a significant asset after its sale of assets
4  to Midcoast.
5    Q    And how did that affect the tax --
6  Midcoast's tax position?
7    A    I don't think I'm prepared this morning
8  to explain in detail all of the points that
9  supported Midcoast's tax position but I can just
10  say in general, there was a perception that if the
11  government were to challenge this transaction, it
12  would argue that the participation of Fortrend in
13  buying stock and then selling assets would be
14  ignored for tax purposes.  And the presence of
15  Bishop Group Corporation continuing to hold a
16  significant asset after the transaction, I
17  believe, creates difficulty for the government in
18  making that argument.
19    Q    Turn to Government Exhibit 77, please.
20  Keep 160 out.
21    A    Sorry, 77?
22    Q    77, yeah.

Page 59

1    A    Okay.  Yes, I have it.
2    Q    Okay.  Now, Mr. Wilcox, this is an
3  e-mail with your name nowhere on it between Barry
4  Davis and Richard Robert dated October 19, 1999,
5  and the subject of it is "New Events Memo," and
6  then there's a memo attached to it.
7         There's a paragraph that begins with
8  "However."  Could you review that paragraph for
9  me, please?
10         MR. TURKUS:  Just for the record,
11    Mr. Coffin, the e-mail from Mr. Robert was
12    addressed to a number of people.
13         MR. COFFIN:  Okay.
14    A    I've read it, although I will say that
15  I don't know who Barry Davis is or several other
16  people on this e-mail.
17  BY MR. COFFIN:
18    Q    Okay.  You did read it?
19    A    I did read that paragraph, yes.
20    Q    Okay.  And, I'm sorry, there's, at the
21  end, I see about five lines up, it says, "This is
22  a major deal point with the buyer"?  If you

Page 60

1  haven't read that paragraph, would you continue?
2    A    Okay.  Okay.
3    Q    Do you recall the tax indemnification
4  provision that was being negotiated during --
5  before this transaction closed, before the asset
6  purchase closed?
7         MR. TURKUS:  Objection to the form of
8    the question.
9    A    I recall a tax indemnification
10  provision in the stock purchase agreement between
11  Langley and Fortrend.
12  BY MR. COFFIN:
13    Q    Okay.  Do you recall why Langley
14  requested -- or did Langley request that
15  provision?
16         MR. STERN:  Objection, form.
17         MR. TURKUS:  Objection, lack of
18    foundation.
19    A    I recall that this particular
20  provision -- and I could certainly refer to it if
21  I had a document to refresh my recollection -- but
22  I recall that this provision had been in early

Page 61

1  drafts of stock purchase agreements between
2  Langley and Midcoast and those drafts existed
3  before Fortrend ever became involved.
4         I also recall that, therefore, I do not
5  believe that this tax indemnification provision
6  was brought into the documents as a result of
7  Fortrend's involvement.  I recall it was a
8  standard provision that Langley had put into the
9  various stock purchase agreements it was
10  negotiating not only with Midcoast but other
11  potential bidders.  And I recall that the reason
12  for it was that Langley was concerned that certain
13  assets that were being distributed out of Bishop
14  Group would qualify for capital gain treatment,
15  that is, Langley was causing certain assets that
16  were contained within the partnerships that Bishop
17  Group Corporation owned to be distributed out to
18  him prior to the sale of stock, and I believe he
19  wanted to ensure that that distribution would be
20  viewed as part of the overall capital gain
21  transaction on the sale of the stock.
22    Q    On Government Exhibit 1, page 6, first

16  (Pages 58 to 61)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 62

1  paragraph at the top, would you read that to
2  yourself?
3        And my question is:  How would you have
4  become aware of these facts in this first
5  paragraph?
6    A    You are referring to a meeting on
7  October 23rd in Kansas City.  I was present at
8  Kansas City.  I was not part of the meeting which
9  is referred to in that first paragraph, but I
10  would have learned what happened in that meeting
11  from the attorneys for Fortrend and, well, from
12  Craig Hoffman and Cynthia Fortrend's attorney.
13    Q    Did you deem that those facts were
14  necessary to be included in this memorandum for
15  some reason?
16        MR. TURKUS:  Objection to the form of
17    the question.
18    A    As I said earlier, this statement of
19  facts was intended to be a detailed account of the
20  course of the transaction, including negotiations
21  between Fortrend and Langley and negotiations
22  between Fortrend and Midcoast.  And I believe that

Page 63

1  the description of this meeting was consistent
2  with the overall goal of providing that kind of
3  detail.
4  BY MR. COFFIN:
5    Q    Go to page 8 of that same document,
6  please.
7        MR. TURKUS:  Exhibit 160?
8        MR. COFFIN:  Exhibit 160.
9        MR. TURKUS:  Thank you.
10  BY MR. COFFIN:
11    Q    First full paragraph at the top.  If
12  you would read that, where it begins, "At this
13  time."
14        MR. TURKUS:  The prior paragraph that
15    refers to November 2nd, 1999; is that
16    correct?
17        MR. COFFIN:  Sure.
18        MR. TURKUS:  Okay.
19  BY MR. COFFIN:
20    Q    It says there that Midcoast's lender
21  stated verbally that it would fund the loan at the
22  appropriate time assuming everything was in order

Page 64

1  at that time but that it would not make such a
2  commitment in writing.
3        Do you recall where you learned that
4  fact from?
5    A    No, but very likely I would have
6  learned that from Richard Robert.  I was not
7  involved in Midcoast's discussions with its
8  lender.
9    Q    Did Mr. Robert tell you why the bank
10  would not make a commitment in writing?
11    A    No, I don't recall why other than I
12  believe this paragraph was just intended to convey
13  the notion that there was some risk to Midcoast at
14  that time that the transaction might not happen.
15    Q    Turn to page 11, please, Government
16  Exhibit 160.  That paragraph above Roman numeral
17  II where it says "Several Differences."
18        Could you read that, please, to
19  yourself?
20    A    Okay.
21    Q    You're basically listing the
22  differences between the purchase price for the

Page 65

1  stock purchase and the purchase price for the
2  asset purchase.  Why is that important in this
3  memorandum?
4        MR. TURKUS:  Objection to the form of
5    the question.
6        MR. STERN:  Objection to form.
7    A    As I said earlier, we anticipated that
8  if this transaction were challenged by the
9  government, the government would argue that the
10  participation of Fortrend as a stock purchaser and
11  then as an asset purchaser should be ignored --
12  I'm sorry -- as stock purchaser and then as an
13  asset seller should be ignored and these are
14  additional facts intended to illustrate that the
15  stock purchase agreement between Fortrend and
16  Langley operated independently from the asset
17  purchase agreement between Fortrend and Midcoast.
18  BY MR. COFFIN:
19    Q    The last fact you list there, Fortrend
20  earned a spread of approximately 6.4 million on
21  its sale of assets to Midcoast, do you recall, did
22  you calculate that amount?

17 (Pages 62 to 65)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:   Gary Wilcox**

---

Page 66

1       MR. TURKUS:  Objection to the form of
2    the question.
3    A    I don't remember personally calculating
4    that amount.  I must have learned this from Tom
5    Palmisano or from Richard Robert.  I don't recall.
6    BY MR. COFFIN:
7    Q    Could you have also learned that from
8    anybody from Fortrend?
9    A    It's possible, but I believe it's more
10   possible that I would have learned it from Tom
11   Palmisano or Richard Robert.
12   Q    Turn over to Government Exhibit 100,
13   please.  This appears to be an e-mail string
14   between Midcoast representatives and employees and
15   PwC.  It looks like you, Mr. Wilcox, were involved
16   or was a recipient to some of these.
17       The e-mail on the front, Government
18   Exhibit 100, looks like it's from Richard Robert
19   to Mr. Kaitson and you among other people.  And it
20   starts out, "There has been a changed to the deal
21   based on PwC's objection to characterizing the
22   supplemental payment of 13.75 as capital gain."

---

Page 67

1       Do you recall what that issue was?
2       MR. TURKUS:  Just for the record, at
3    least one of the cc's there is, I think, is
4    from outside counsel to --
5       MR. COFFIN:  Midcoast?
6       MR. TURKUS:  I think so.  I don't know
7    all the players but on the next page there
8    are other people.  Just for the record.
9       MR. COFFIN:  Sure.
10   A    And I also -- you said that this is a
11   chain of e-mails, and I don't know whether these
12   e-mails are actually a chain or have otherwise
13   been put together.
14   BY MR. COFFIN:
15   Q    Okay.  Let's just talk about in this
16   subject matter of the e-mails.
17   A    All right.  I believe that the
18   reference to a payment of 13.75 refers to a
19   payment that might be made under the option
20   agreement which I recall was an agreement between
21   MRG, an entity in which Dennis Langley was a
22   member, and KPC or perhaps other partnerships that

---

Page 68

1    were owned by Bishop Group Corporation.
2       As I recall, it was an agreement that
3    MRG entered into with those partnerships prior to
4    Langley sale of stock of The Bishop Corporation,
5    and it related to whether the partnerships could
6    terminate Langley's economic interest in those
7    partnerships that he had retained prior to the
8    sale of the stock.  And in order to terminate --
9    in order for the partnership to exercise an option
10   to terminate Langley's participation, the
11   partnership had to make a payment to Langley, and
12   I believe it was originally 13.75 million.
13   Q    Okay.  That sentence refers to PwC's
14   objection to characterizing the payment as capital
15   gain.  Do you recall what PwC's objection was?
16   A    Yes.  In our view, that option payment,
17   if it were made, would not be considered part of
18   the transaction in which Langley sold stock of
19   Bishop Group Corporation to Fortrend, nor would it
20   be part of the transaction in which Fortrend sold
21   assets to Midcoast.  I believe that Langley would
22   have treated the sale of his stock in Bishop Group

---

Page 69

1    as a capital gain, but we believed that this
2    payment option should not have been viewed as
3    additional consideration paid to Langley in
4    connection with his sale of stock.  It was an
5    independent payment that would be made by this
6    partnership in the event the partnership decided
7    to buy him out.  Therefore, it had to be analyzed
8    as a payment made by a partnership to cancel an
9    option.  And I don't recall what the appropriate
10   tax treatment of that would be, but I knew that
11   that payment should not have been considered part
12   of Langley's sale of stock.
13   Q    Turn to the next page, PwC049.  I think
14   this is a -- appears to be an e-mail from you,
15   Mr. Wilcox, to various people, including
16   Mr. Kaitson and people at Midcoast; is that
17   correct?
18   A    Yes, it appears to be.
19   Q    Under No. 2 at the bottom where it says
20   "Guaranteed by KPC," and it appears, at least on
21   my copy, to be bold, it says, "Note that the
22   option agreement must not be guaranteed by

---

18  (Pages 66 to 69)

**Witness:  Gary Wilcox**

---

Page 70

1   Midcoast pursuant to the parent guarantee."
2        Do you remember that issue arising?
3     A    I don't remember specifically how it
4   arose but as I read these words now, I believe I
5   was simply responding to a request from somewhere
6   that the parent guarantee be expanded to include a
7   guarantee of KPC's obligation under the option
8   agreement and I was stating that there it didn't
9   appear to be any need or value in doing that.
10    Q    Was that a tax issue?
11       MR. TURKUS:  Excuse me.  I'm not sure
12   he was finished answering the question.
13       MR. COFFIN:  I'm sorry.
14    A    I think I finished that last one.
15   BY MR. COFFIN:
16    Q    Okay.  Was that a tax issue then?
17    A    Well, everything that I commented on
18   here, particularly in writing, was advice given
19   from a tax standpoint.  So, yes, I believe it was
20   a fact that -- so it went into the overall mix of
21   facts that could be relevant to the tax position.
22    Q    How was then this fact relevant to

---

Page 71

1   Midcoast's tax position?
2     A    I don't know what the government's
3   argument is here, legal argument for why the
4   taxpayers should be entitled to the tax benefit
5   they're claiming.  As I said earlier, we
6   anticipated that if there were ever a government
7   challenge, the government would try to ignore the
8   participation of Fortrend as a purchaser of stock
9   and then a seller of assets.  And as I've seen so
10   far in my prior interview and now today, it's
11   clear that any guarantee that Midcoast is
12   perceived as giving is a fact that the government
13   will focus on.
14       So I think the advice here was why put
15   a guarantee in place that will cause the
16   government to focus even further on something
17   that, in the end, economically, was not important.
18    Q    Turn to the next page, please.  Look at
19   the Bates number on the bottom, PwC050.
20       Item No. 3 under "Stock Purchase
21   Agreement," this is still continuing on with your
22   e-mail; is that right?

---

Page 72

1     A    It appears to all be part of the same
2   e-mail.
3       MR. TURKUS:  It's the e-mail that
4   begins on the bottom of page PwC048?
5       MR. COFFIN:  Yes, sir.
6   BY MR. COFFIN:
7     Q    Item No. 3, could you read that
8   paragraph to yourself, please?
9     A    Okay.
10    Q    Tell me how the tax -- Midcoast's tax
11   position would be affected by that in the first
12   sentence where it says, "It is critical Midcoast's
13   tax position that The Bishop Group, Limited, is
14   not liquidated by Fortrend for at least two
15   years."
16       How would the nonliquidation of
17   Fortrend affect Midcoast's tax position?
18    A    Again, in anticipation that the
19   government would attempt to ignore the
20   participation of Fortrend as a stock purchaser and
21   an asset seller.  I believed it would be helpful
22   to Midcoast's tax position that the corporation,

---

Page 73

1   Bishop Group, Limited, remain in existence as a
2   corporation for two years.  It just so happened
3   that there was an independent need for, as I
4   remember, for the corporation to remain in
5   existence because of a requirement that Bishop
6   Group, Limited, continued to pursue a lawsuit.  I
7   can't recall exactly what that lawsuit was, but I
8   believe that it may be referenced in the stock
9   purchase agreement.
10    Q    In that lawsuit with Bishop Group,
11   would it have been a plaintiff or a defendant; do
12   you recall?
13    A    I don't recall.  I believe it was as a
14   plaintiff, as I recall.  Therefore, if there were
15   any recovery, it would inure to the benefit of The
16   Bishop Group, Limited, which was a corporation
17   owned by Fortrend.
18    Q    And which party would have requested
19   that Fortrend not liquidate or Bishop Group not
20   liquidate for two years?
21       MR. TURKUS:  Objection to the form of
22   the question.

---

19 (Pages 70 to 73)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 74

1       When you say "would have requested,"
2   are you asking --
3   BY MR. COFFIN:
4       Q    Which party did request that The Bishop
5   Group not be liquidated?
6           MR. TURKUS:  Objection to the form of
7       the question.
8       A    I don't know that it was requested by
9   either party.
10  BY MR. COFFIN:
11      Q    "Either party" being?
12      A    I don't believe it was requested by
13  Langley in the stock purchase agreement or that it
14  was requested by Midcoast in the asset purchase
15  agreement.  However, my advice is that -- was that
16  it would be a helpful fact for Midcoast if the
17  company were to remain in existence.  That,
18  combined with this independent need for Bishop
19  Group to continue maintaining its position in a
20  lawsuit, you know, allowed this requirement to
21  remain in existence to be, you know, agreeable to,
22  you know, the parties involved.

Page 75

1       Q    Where -- did you suggest two years; is
2   that right?
3       A    It does appear he suggested two years.
4       Q    Why two years?
5       A    Tax advisors commonly think of two
6   years as a safe harbor under the tax law for
7   avoiding a step transaction challenge.  Although
8   it's by no means necessary, that it be at least
9   two years.  It's just viewed as a comfortable
10  period of time.
11      Q    And in the next item, No. 4, if you
12  would look at that.  On the second page, PwC050.
13      A    Okay.
14      Q    You comment that you would like K-Pipe
15  to think about retaining some of the receivables
16  that are currently in KPC.
17          Why were you making that suggestion?
18      A    Again, because of a concern that the
19  government might argue that the participation of
20  Fortrend might be ignored.  The more activities
21  that remain after the transaction, the stronger
22  the tax position.

Page 76

1       Q    And the next sentence, you say, "I
2   understand that some of these receivables are due
3   from governmental agencies with little, if any,
4   collection risk involved."
5           How was that relevant to the tax issue?
6           MR. STERN:  Objection to form.
7           MR. TURKUS:  Objection to the form of
8       the question.
9       A    If K-Pipe -- to the extent K-Pipe
10  retained an asset, that would mean that K-Pipe
11  would not be selling the asset and, therefore,
12  K-Pipe's sales price for those assets would be
13  less.  So K-Pipe would be presumably taking on
14  some risk to the extent it retained assets, and my
15  point here is that these are assets that had
16  relatively little --
17      Q    I'm sorry to interject.  How would that
18  affect the sales price?  Is that what you said?
19      A    Well, if the receivables go with the
20  assets that are purchased by Midcoast and Midcoast
21  will pay for those receivables.  If they are
22  retained by K-Pipe, Midcoast won't pay for those

Page 77

1   receivables and K-Pipe would have received less up
2   front from Midcoast.  Now, why would K-Pipe do
3   that unless it believed that it was going to
4   collect on those receivables.
5           (Whereupon, there were discussions off
6       the record.)
7   BY MR. COFFIN:
8       Q    Back on the same exhibit, Exhibit No.
9   100, back to PwC050 under "Stock Purchase
10  Agreement" again.  Talking about that liquidation
11  provision, and you comment that, "Such a provision
12  would look unusual in the asset purchase
13  agreement."
14          Do you recall why you believed it would
15  look unusual in the asset purchase agreement?
16      A    Midcoast was merely purchasing assets
17  from the Bishop Group, Limited.  At the time, it
18  seemed unusual to me for a buyer of assets to
19  require that the seller remain in existence as a
20  legal entity for any period of time, whereas in
21  the stock purchase agreement, by virtue of the
22  obligation of Fortrend to maintain these lawsuits

20  (Pages 74 to 77)

2bce65f8-760c-46ed-9083-54d369e7a9aa

Witness:  Gary Wilcox

Page 78

1  in the name of Bishop Group, Limited, it made more
2  sense to me for that provision to be in that
3  agreement.
4     Q   Okay.  Turn back to Government
5  Exhibit 79.
6     A   79?
7     Q   79.
8        MR. COFFIN:  You don't have 79?
9        MR. TURKUS:  No.  We go from 77 to 87.
10       MR. COFFIN:  Okay.
11       MR. TURKUS:  Do you want me to make
12    some copies of it?
13       MR. COFFIN:  It's a three-page
14    document.  I'll show it to him and then ask
15    him a question.  If you guys want to look at
16    it --
17  BY MR. COFFIN:
18    Q   Take a look at that document.
19       MR. COFFIN:  If I may look over his
20    shoulder, Mr. Turkus.
21  BY MR. COFFIN:
22    Q   That is a letter from K-Pipe Merger

Page 79

1  Corporation to Mr. Langley; is that correct?
2       MR. TURKUS:  The document speaks for
3    itself.  Objection to the form of the
4    question.
5     A   Yes, appears to be a letter from K-Pipe
6  Merger to Dennis Langley.
7  BY MR. COFFIN:
8     Q   Okay.  And Item No. 2 -- let me back
9  up.
10       The preamble to the letter makes
11  reference to the stock purchase agreement between
12  Langley and K-Pipe Merger.  And Item No. 2
13  contains a representation warranty that says,
14  "K-Pipe represents and warrants to Langley that
15  K-Pipe has no plan or intention to liquidate the
16  company and agrees it will not liquidate the
17  company for at least two years after the closing
18  date."
19       Mr. Wilcox, is that the provision you
20  were suggesting in your e-mail that we just looked
21  at?
22       MR. TURKUS:  Objection to the form of

Page 80

1     the question.
2     A   Yes.
3  BY MR. COFFIN:
4     Q   Any idea why it was not included in the
5  stock purchase agreement itself?
6        MR. TURKUS:  Objection to the form of
7     the question.  Objection, lack of foundation.
8     A   I don't recall other than, as I sit
9  here now, one explanation is that the stock
10  purchase agreement had already been signed at the
11  time this -- these particular matters were agreed
12  to, and so it was done by side letter rather than
13  amend the agreement.
14       Well, let me clarify.  I believe the
15  intention was that this letter agreement is, from
16  a legal standpoint, an amendment of the stock
17  purchase agreement.  It's just done by letter
18  rather than by formal amendment.
19    Q   If you'll keep that over there.  Turn
20  to Government Exhibit 102, please.
21       You recall seeing this document,
22  Mr. Wilcox, prior to Friday?

Page 81

1        MR. STERN:  101?
2        MR. COFFIN:  102.
3     A   I have a faint memory of receiving this
4  from Cathy Coffey, although I can't recall when.
5  BY MR. COFFIN:
6     Q   You have a faint memory, you said?
7     A   Well --
8     Q   The cover page is -- looks like a plain
9  piece of paper, to Gary Wilcox from Cathy and --
10  is that Ian Schacter?
11    A   Yes.
12    Q   It says, "As promised."  Whose
13  signature is that?
14    A   I don't know.
15    Q   Okay.  And it says "Section 1031
16  Analysis" on that.  Do you see that?
17    A   Yes.
18    Q   Do you recognize that handwriting?
19    A   No, but it's not mine.
20    Q   Okay.  And in the corner, it says "Copy
21  to Brian"; is that right?
22    A   Looks like Byron.

21 (Pages 78 to 81)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:   Gary Wilcox**

1    Q    Byron?  Do you know Byron?
2    A    Byron Shoji, S-H-O-J-I.
3    Q    Who is he?
4    A    He was a manager in the PwC Washington
5  office.
6    Q    Okay.
7    A    He must have been helping as well.
8    Q    And the text that is attached relates
9  to multiparty like-kind exchange transaction.
10   A    Okay.
11   Q    Do you recall what relevance multiparty
12  like-kind exchange transactions had with regard to
13  your work on the Midcoast project?
14        MR. TURKUS:  Objection to the form of
15   the question.
16        MR. STERN:  Objection to form.
17   A    This related to the legal support for
18  the taxpayer's position that Fortrend's purchase
19  of stock and then Fortrend's sale of assets were
20  two separate transactions for tax purposes.  And
21  the like-kind exchange area is analogous because,
22  in that area, it's commonly known that so-called

1  intermediaries are used to purchase real estate
2  and then sell real estate in back-to-back
3  transactions, and the courts have upheld those
4  transactions as separate transactions.
5        So I believe this was sent in
6  anticipation of preparing the draft backup
7  memorandum.
8  BY MR. COFFIN:
9    Q    Government Exhibit 160?
10   A    Yes.
11   Q    Turn to Government Exhibit 105, please.
12        This appears to be a string of e-mails
13  again between Midcoast, including you, Mr. Wilcox,
14  and several other people.  And you provided
15  comments in the e-mail below that you sent Sunday,
16  October 31st, 1999.  Can you read through the --
17  that page there, the first page of Government
18  Exhibit 105?
19        MR. TURKUS:  We only have one page.
20        MR. COFFIN:  I'm sorry.  The bottom of
21   that.
22   A    Okay.

1  BY MR. COFFIN:
2    Q    And the second paragraph of that
3  e-mail, your e-mail, you say, "The third guarantee
4  gave me the most heartburn.  Obviously I do not
5  want to see Midcoast, the asset buyer, providing a
6  guarantee of certain obligations under the stock
7  purchase agreement."
8        Why did that give you heartburn, that
9  statement?
10        MR. TURKUS:  Objection to the form of
11   the question.
12   A    I'll repeat again.  My concern is that
13  if the government were to challenge this
14  transaction, it would argue that the participation
15  of Fortrend as stock purchaser and asset seller
16  would be ignored.  And while I do not recall any
17  legal authority on point, that would suggest that
18  a guarantee from Midcoast, the asset buyer, to
19  Langley, the stock seller, would present a problem
20  for Midcoast.
21        The ultimate legal question is one that
22  depends on all the facts and circumstances, and

1  there were many facts and circumstances that had
2  to be weighed throughout the course of this
3  transaction.  And this was a fact, this reference
4  to the third guarantee, was a fact that I
5  anticipated would be considered an adverse fact by
6  the government if the government were to challenge
7  the transaction.  That's why I refer to it that
8  way.
9    Q    How did you know that Langley would not
10  do the deal without that guarantee?
11        MR. STERN:  Objection, form.
12   A    I testified earlier that this so-called
13  tax indemnification provision that was in the
14  stock purchase agreement had been in early drafts
15  of Langley stock purchase agreement, including
16  drafts that were made at a time before Fortrend
17  was ever involved.  It was important to Langley
18  that he receive capital gain treatment on the sale
19  of his stock, including capital gain treatment on
20  the distributions of assets prior to the sale of
21  the stock, and he had it in his mind that
22  particular provision was very important to him.

22  (Pages 82 to 85)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 86

1         And in terms of how I learned that he
2  would not do the deal without it, I don't know how
3  I learned that.
4  BY MR. COFFIN:
5     Q    So Langley was requiring Midcoast to
6  make the guarantee; is that right?
7         MR. STERN:  Objection, form.
8         MR. TURKUS:  Objection, form of the
9     question.
10    A    No, not necessarily.  I think Langley
11  was requiring that he -- that there be some source
12  of assets other than Fortrend International to
13  support this tax indemnification provision which,
14  as I have testified, is a provision that was
15  really limited to ensuring that Langley had
16  capital gain treatment on the sale of a stock.
17  BY MR. COFFIN:
18    Q    I don't understand why he couldn't have
19  just gotten that guarantee from Fortrend.
20        MR. TURKUS:  Is that a question?
21        MR. COFFIN:  Um-hum.
22

Page 87

1  BY MR. COFFIN:
2     Q    Do you know why?
3         MR. TURKUS:  Objection to the form of
4     the question.  Objection, lack of foundation.
5  BY MR. COFFIN:
6     Q    Why he needed --
7     A    I think I just said that I recall that
8  Langley wanted to be able to look to the source of
9  assets other than the assets of Fortrend
10  International to support that tax indemnification.
11    Q    The last paragraph of that e-mail,
12  Exhibit 105, you make a statement in there, "What
13  I don't want to see is just a naked guarantee by
14  Midcoast and KPC's guarantee of the tax indemnity.
15  It helps to have Midcoast one step removed from
16  KPC by having the assumption agreement in between.
17  It also helps to have Midcoast's guarantee arise
18  as part of the change of control provisions of the
19  SPA."
20        Do you recall why you made those
21  comments?
22    A    As I've said, I anticipated that if the

Page 88

1  government were to challenge this, they would
2  focus on the various facts and circumstances and
3  any guarantees running directly from Midcoast to
4  Langley would perhaps cause the government to be
5  more concerned than if those guarantees were not
6  directly running between those parties.
7         Again, just to clarify, this particular
8  provision being guaranteed was not viewed by
9  Midcoast as really having presenting any exposure
10  to Midcoast.  Therefore, Midcoast, I believe, was
11  willing to accommodate Langley's request and to
12  provide a source of assets that would ultimately
13  back that indemnification provision.  At the same
14  time, knowing that the provision did not really
15  expose Midcoast to any real risk because the
16  provision was really limited to ensuring that
17  Langley receives capital gain treatment and
18  regardless of what the government's theory is on
19  this transaction as to how it should be
20  characterized, Langley will get capital gain
21  treatment one way or the other.  So, frankly,
22  that's why the provision was not viewed as

Page 89

1  exposing Midcoast.
2     Q    You talk about exposing Midcoast.  Are
3  you talking just about financial risk or tax risk?
4     A    Well, I believe the provision says that
5  if Langley doesn't get capital gain treatment,
6  then there will be an indemnity to Langley.  And
7  in the first instance, Fortrend, as the party to
8  the stock purchase agreement, has agreed to
9  indemnify Langley.  I believe that Fortrend's
10  obligation under the stock purchase agreement is
11  guaranteed by KPC, which is the partnership owned
12  by Bishop Group, that that obligation of KPC, in
13  turn, I believe, was guaranteed by Midcoast.
14        You asked me about the last paragraph.
15  I believe that refers to how the Midcoast
16  guarantee of KPC's obligation would come into
17  existence.  And, as I recall, when Langley
18  withdrew certain rights and assets out of the
19  partnerships prior to his sale of the stock of
20  Bishop Group, he also entered into this project
21  development agreement -- or, rather, MRG, an
22  entity in which Langley was a member entered into

23  (Pages 86 to 89)

2bce65f8-760c-46ed-9083-54d369e7a9aa

Witness:  Gary Wilcox

Page 90

1    the project development agreement which, as I
2    recall, entitled MRG to certain rights and sharing
3    of revenues and the like from the partnerships
4    even after there was a change in control of KPC.
5           And the project development agreement
6    said that if there were a change in control of
7    KPC -- that is, a change in control after Fortrend
8    bought the stock of Bishop Group -- that the new
9    controlling party would have to guarantee the
10   obligations of KPC in order for Langley to consent
11   to the change of control event.  And I was
12   referring to the possibility of this guarantee by
13   Midcoast of KPC's obligations coming into
14   existence as a result of the change in control of
15   KPC which was governed by ultimately by the
16   project development agreement.
17   Q    Are you finished?
18   A    Yes.
19   Q    Would you look at your exhibits after
20   Government Exhibit 109?  Is it by chance you have
21   Government Exhibit 79 there?  After 109.  I'm just
22   wondering if maybe my admin person put it after

Page 91

1    109.
2           MR. STERN:  It's not after 109 in mine.
3           MR. COFFIN:  Never mind.
4           MR. TURKUS:  110 is after 109.  I'll
5    make more copies of it for you.
6           MR. COFFIN:  At lunch?
7           MR. TURKUS:  Whenever you want to take
8    a break.
9    BY MR. COFFIN:
10   Q    Turn to 110, please.  Once again,
11   another e-mail, Mr. Wilcox.  Your name is not on
12   it anywhere, but my question for you has to do
13   with the butcher interest partnership.
14          Do you recall the circumstances
15   surrounding the formation of that partnership?
16   A    As I testified earlier, I recall
17   hearing that Midcoast had a preference for not
18   acquiring the butcher interest because of
19   FERC-related reasons.  And it may have been -- and
20   this is speculation at this point -- that what
21   they didn't want to do is acquire control of the
22   butcher interest.

Page 92

1           This partnership was a partnership
2    between -- essentially between Midcoast and
3    Fortrend relating to the ownership of the butcher
4    interest after Fortrend sold assets to Midcoast.
5    As I recall, the butcher interest had been valued
6    at around six and a half million.
7    Q    Let me stop you right there.
8    A    Yeah.
9    Q    Do you recall who determined the value
10   of the butcher interest?
11   A    No.  I don't know it that was
12   Midcoast's view as to what it was worth or whether
13   there was an appraisal.  I have no idea.
14   Q    Okay.  Turn to Government Exhibit 115,
15   please.
16   A    Okay.
17   Q    This is a letter from
18   PricewaterhouseCoopers to Mr. Richard Robert dated
19   November 5 of '99.  And the first page of the
20   exhibit was previously redacted and it looks like
21   the second page, which contains the same Bates
22   number as the first page, has been unredacted.

Page 93

1           Do you recall seeing this document?
2    A    Yes.
3    Q    Was this something you drafted or
4    somebody in your office drafted?
5    A    I was in Washington.  This is on the
6    Houston office letterhead.  I did not sign this
7    document.  That is not my signature or
8    handwriting.  But I do believe I participated in
9    drafting this with the help of Tom Palmisano and
10   others.
11   Q    Did PwC request that this engagement
12   letter or this letter be entered into with
13   Midcoast?
14          MR. TURKUS:  Objection to the form of
15   the question.  Objection, lack of foundation.
16   A    I don't recall exactly how this letter
17   came about but, as I sit here today, it seems
18   reasonable to me that PwC would have requested
19   Midcoast to sign this letter.
20   BY MR. COFFIN:
21   Q    And why would have PwC requested that
22   the letter be signed by Midcoast?

24  (Pages 90 to 93)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:   Gary Wilcox**

Page 94

1        MR. STERN:  Objection to form.
2        MR. TURKUS:  Objection to the form of
3    the question.
4        A    As I recall, PwC already had a general
5    engagement letter with Midcoast.  However, PwC's
6    understanding with Midcoast for this transaction
7    was that PwC would issue advice and, most likely,
8    an opinion to the effect, you know, described in
9    this document.  And from that standpoint alone,
10   it's important to put in writing what the -- to
11   put in writing the scope of the engagement so that
12   there's no misunderstanding as to what PwC is to
13   deliver to the client.  In addition, it was
14   important to put in writing what the fee
15   arrangement was for these services.
16   BY MR. COFFIN:
17       Q    And what was the fee arrangement?
18       A    Do you want me to read to you what the
19   letter says?
20       Q    No.  That's a good point.  Look at the
21   second paragraph of PwC145.  Just read that
22   paragraph to yourself.

Page 95

1        A    Okay.
2        Q    What was meant by the phrase
3    "extraordinary value"?
4        A    As I remember that, that was a phrase
5    that was commonly used in engagement letters to
6    provide for the possibility that PwC would receive
7    a fee that might exceed a fee based solely on
8    rates and hours.  It was intended -- it's intended
9    to be a subjective standard, subjective from the
10   client's standpoint as to whether or not we have
11   brought extraordinary value.  It's intended to be
12   a standard where there's no binding agreement to
13   be paid; it's up to the client.
14       Q    And with regard to this particular
15   project, PwC was paid based on this extraordinary
16   value; is that correct?
17       MR. TURKUS:  Objection to the form of
18   the question.
19   BY MR. COFFIN:
20       Q    Rather than the hourly billings?
21       MR. TURKUS:  Objection to the form of
22   the question.

Page 96

1        A    PwC was paid pursuant to the terms of
2    this letter based on the extraordinary value
3    provision.
4    BY MR. COFFIN:
5        Q    And, in fact, did Midcoast have to
6    approve -- Midcoast had to agree that PwC had
7    provided extraordinary value in order for PwC to
8    be paid; is that correct?
9        MR. TURKUS:  Objection to the form of
10   the question.
11       You mean paid pursuant to the
12   extraordinary value provision?
13       MR. COFFIN:  Yes.
14       A    In order for PwC to be paid pursuant to
15   the extraordinary value provision, Midcoast would
16   have to conclude that PwC had brought
17   extraordinary value to the transaction.  If
18   Midcoast did not reach that conclusion, then PwC
19   would be paid based upon its rates and hours.
20   BY MR. COFFIN:
21       Q    And in this particular -- with regard
22   to this particular engagement, how did -- what did

Page 97

1    Midcoast conclude; do you know?
2        A    Midcoast concluded that PwC had brought
3    extraordinary value to the transaction.
4        Q    And I think, if I recall your
5    interview, transcript testimony, I think you
6    said -- was there a letter from Midcoast
7    approving -- formally approving payment based on
8    the extraordinary value provision?
9        MR. TURKUS:  Objection to the form of
10   the question.
11       Are you asking him whether there was a
12   letter, or are you asking him what he
13   testified to in the interview?
14   BY MR. COFFIN:
15       Q    Was there a letter?
16       A    I recall there being a letter, but my
17   memory is faint at this point.  But I recall there
18   being a letter from Midcoast to Fortrend whereby
19   Midcoast -- and I don't know what it indicated, I
20   don't know what that letter referred to -- its
21   decision that we had brought extraordinary value
22   to the transaction.  But I believe the purpose of

25  (Pages 94 to 97)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 98

1   that letter was to direct Fortrend to pay a
2   portion of the sales proceeds that Midcoast had
3   paid Fortrend to direct Fortrend to pay a portion
4   of those sales proceeds to PwC in accordance with
5   the arrangement that Midcoast had with PwC.  But I
6   don't have the letter here.  I don't recall
7   exactly what it said.
8       Q    Was it your belief then that Midcoast
9   was paying the fee or that Fortrend was paying the
10  fee?
11      A    Our belief was that Midcoast was paying
12  the fee.  Midcoast was our client.  If Midcoast
13  did not direct Fortrend to apply the monies to a
14  payment to PwC, PwC would not have received those
15  monies, and PwC would have then simply billed
16  Midcoast for the rates and hours which, frankly,
17  were substantial.
18      Q    Do you recall what they were?
19      A    I have no idea what the time records or
20  what the billings reflect, but I think, I don't --
21  I am guessing.  Can I guess?
22      Q    Sure.

Page 99

1       A    I am guessing that they were close to
2   500,000.
3       Q    All right.  The letter's dated
4   November 5 of '99, and the stock purchase and the
5   asset sale occurred on November 8th and 9th
6   respectively.  I was wondering why so late in the
7   engagement was an engagement letter signed by both
8   parties?
9           MR. TURKUS:  Objection to the form of
10      the question.
11      A    I don't remember why it was not until
12  November 1999 that this letter was signed.  I can
13  say that PwC knew that it needed to have this
14  letter in place with Midcoast.
15          This transaction was all-consuming from
16  the client's standpoint.  Richard Robert, in
17  particular, had many other pressing issues, and I
18  think it was simply there's no other reason other
19  than this ended up going to the back burner.
20  BY MR. COFFIN:
21      Q    Was the engagement letter, I mean
22  Exhibit 115, was it -- did it memorialize a prior

Page 100

1   verbal agreement?
2       A    Absolutely.
3       Q    And at what point -- the part of the
4   services PwC has represented that it would provide
5   was an opinion from PwC to Midcoast.  Do you
6   recall when PwC agreed to provide the tax opinion?
7           MR. TURKUS:  When it agreed to?  As
8       opposed to when it provided it?
9           MR. COFFIN:  Yes, when it agreed to.
10      A    I don't believe there was any agreement
11  between PwC and Midcoast, any specific agreement
12  as to when that opinion would be provided.  It was
13  certainly understood that the opinion would be
14  provided sometime after the transaction.
15          MR. TURKUS:  I don't think that was the
16      question.  I thought the question was when
17      was it agreed to.
18          THE WITNESS:  Okay.
19          MR. TURKUS:  That an opinion would be
20      provided.
21      A    There was no agreement as to
22  specifically as to when the opinion would be

Page 101

1   provided.
2           MR. TURKUS:  That's not the question.
3   The question he's asking, I think, is when
4   did PwC and the client agree that an opinion
5   would be provided, not as to the date that it
6   would ultimately be provided, but when was
7   that agreement reached, I think.
8           THE WITNESS:  It's a leading question.
9           MR. TURKUS:  He's asking you when did
10  the two parties agree that one of the
11  services to be provided by PwC would be an
12  opinion.
13          THE WITNESS:  Oh, okay.  I'm sorry.
14          MR. TURKUS:  I'm sorry.  I didn't do
15  that very well.
16      A    I don't recall exactly when, but I
17  believe it was understood between PwC and Midcoast
18  at the inception of this so-called Midco
19  alternative that PwC would ultimately provide an
20  opinion.  The description of the opinion, as I've
21  said in this engagement letter, is really just a
22  confirmation of a prior verbal agreement between

26 (Pages 98 to 101)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness: Gary Wilcox**

Page 102

1  PwC and Midcoast.
2  BY MR. COFFIN:
3     Q   Do you recall how the fee that was paid
4  to PwC was computed?
5     A   When PwC had its initial conversation
6  with Fortrend, which I believe was -- well, let me
7  clarify.  When PwC had a conversation with
8  Fortrend, I believe on September 13.
9     Q   That was by telephone?
10     A   By telephone.  Fortrend indicated to
11  PwC that it had a common practice of permitting a
12  portion of its proceeds from the sale of assets to
13  be used for payment of a fee to buyer's counsel or
14  tax advisors if the buyer so directed.  And its
15  practice had been to permit a fee that was a
16  percentage of the profit that Fortrend earned in
17  connection with the transaction.
18     Q   How was the profit determined?
19     A   All I recall is I was told by Fortrend
20  in general how it would price the sale of the
21  assets.  That price, of course, was a function of
22  what it had to pay to buy the stock.  And Fortrend

Page 103

1  said it would -- its practice was to sell the
2  assets for a price that allowed Fortrend to earn a
3  profit that approximated some percentage of the
4  step-up in asset basis as a result of the sale of
5  assets.
6     Q   And in that September 13, 1999
7  telephone conference with Fortrend, were the
8  parties aware, the parties to that conversation,
9  aware at the time of what the step-up in assets
10  would be?
11        MR. TURKUS:  Objection to the form of
12     the question.
13     A   I don't recall there being any
14  discussion of any specific amounts.  There might
15  have been; I just don't remember.  I don't
16  remember knowing what, at that time, what the
17  inside asset basis of Bishop Group's assets were.
18        MR. COFFIN:  Let's break for lunch.
19        (Whereupon, there was a break from
20  12:58 p.m. until 1:49 p.m.)
21  BY MR. COFFIN:
22     Q   Have you seen Government Exhibit 134

Page 104

1  prior to last Friday, Mr. Wilcox?
2     A   I'm familiar with the representation
3  letter by Fortrend, but this is a markup of one of
4  the drafts and I don't recall seeing this specific
5  draft.
6     Q   Do you recall who was responsible --
7  who at PwC was responsible for drafting a
8  representation letter between PwC and Fortrend?
9        MR. TURKUS:  Objection to the form of
10     the question.
11        MR. STERN:  I join that as well.
12     A   I believe that Cathy Coffey would have
13  produced an initial draft, and then she and I --
14  BY MR. COFFIN:
15     Q   Go to 135.  Maybe that will help.
16        MR. TURKUS:  Excuse me.  He hadn't
17     finished answering the question.
18        MR. COFFIN:  I'm sorry.
19     A   She and I worked together to produce
20  the letter.
21  BY MR. COFFIN:
22     Q   Okay.  And if you'll turn to 135.

Page 105

1        MR. STERN:  Yet another one I don't
2     have.
3        MR. COFFIN:  Do you have that now?
4        MR. STERN:  I'm disadvantaged.
5  BY MR. COFFIN:
6     Q   Have you seen this fax and attachment,
7  Mr. Wilcox?
8     A   Well, the handwriting -- I'll just cut
9  to the chase.  The handwriting is mine, so that
10  means I would have seen it, but I don't recall
11  when.
12     Q   Now, did PwC represent Fortrend?
13     A   No.
14     Q   What was the purpose of this?  I assume
15  these letters were eventually finalized, the
16  representation letter from Fortrend?
17     A   It was eventually finalized.
18     Q   I think I have a copy somewhere back
19  here but we'll get to that.
20        Why was a representation from Fortrend
21  necessary?
22        MR. TURKUS:  Objection to the form of

27 (Pages 102 to 105)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:   Gary Wilcox**

Page 106

1    the question.
2         MR. STERN:  I'll join in that.
3    A    I don't know that it was necessary.
4    It's always helpful to, when issuing an opinion,
5    to have a representation letter from the party in
6    the best position to provide, you know, these
7    particular facts.  It's not unusual in a
8    transaction like a tax-free reorganization to get
9    representations from both sides of the
10   transaction.
11   BY MR. COFFIN:
12   Q    Go to Government Exhibit 146.
13   A    If it's here, it's not in order.
14        (Whereupon, there were discussions off
15   the record.)
16   BY MR. COFFIN:
17   Q    Government Exhibit 146, Mr. Wilcox.  Is
18   that a facsimile from Jeffrey Furman to you dated
19   June 12, 2000?
20   A    Yes.
21   Q    And attached to it appears to be
22   another draft of the representation letter

Page 107

1    between -- from Fortrend International to PwC; is
2    that right?
3    A    Yes.
4    Q    Whose handwriting is on the document?
5         MR. TURKUS:  Objection, lack of
6    foundation.
7    A    It's not my handwriting.  And I'm
8    assuming that because this fax came from Jeff
9    Furman, it's Jeff Furman's handwriting.
10   BY MR. COFFIN:
11   Q    Do you remember receiving this fax?
12   A    Not specifically, but I don't deny
13   that I received it.
14   Q    Do you remember the changes that were
15   proposed by -- that appear to be proposed by
16   Mr. Furman in this facsimile?
17        MR. TURKUS:  Objection to the form of
18   the question.
19   A    I don't remember thinking about these
20   specific changes.
21   BY MR. COFFIN:
22   Q    You still have 134 handy there?

Page 108

1    A    Yes.
2    Q    134, Paragraph 11, references a $20,000
3    payment to K-Pipe?
4         MR. TURKUS:  Objection to the form of
5    the question.
6    A    What's your question?
7    BY MR. COFFIN:
8    Q    My question is:  Do you recall that
9    provision about a $20,000 payment to compensate
10   K-Pipe, or agreement to pay K-Pipe for transaction
11   costs up to $20,000.
12        MR. STERN:  Objection, form.
13   A    I do not recall what that is about.
14   BY MR. COFFIN:
15   Q    Okay.
16   A    I don't know if that is -- reflects the
17   final facts or not.
18   Q    Was there an engagement between
19   Fortrend and PwC?
20   A    No.
21   Q    Go to Government Exhibit 145, please.
22   And turn to DOJ28626, in the bottom right-hand

Page 109

1    corner.  These are not necessarily in order.
2         MR. TURKUS:  These all look like a
3    bunch of unrelated documents.  Is that
4    incorrect?  I know you have it as one
5    exhibit, but none of them -- the page numbers
6    don't match on any of them.  Or they're not
7    consecutive, I should say.
8         MR. COFFIN:  That's what I just said.
9         MR. TURKUS:  So are you representing
10   this is one document?
11        MR. COFFIN:  No.
12        MR. TURKUS:  Okay.  That's all I want
13   to know.
14        MR. COFFIN:  Okay.
15   BY MR. COFFIN:
16   Q    Did you get to 28626, Mr. Wilcox?
17   A    Yes.
18   Q    There is a reference in the middle of
19   the page, or the first wire there, "with credit to
20   Cronulla Corporation."  Do you see that?  For
21   $1,451,000?
22   A    Okay.  Yes, I see it.

28 (Pages 106 to 109)

2bce65f8-760c-46ed-9083-54d369e7a9aa

Witness:  Gary Wilcox

Page 110

1    Q    Were you familiar with Cronulla
2  Corporation back in '99?
3    A    No.  I don't believe I've ever heard of
4  it.
5    Q    Okay.  And how about below that,
6  similar wire -- identical wire to Ashville
7  International, Limited?
8    A    I don't believe I've ever heard of
9  Ashville International.
10    Q    If you'll turn the page.  Looks like a
11  wire to PricewaterhouseCoopers as represented
12  there in the amount of $8,743.
13       Do you recall if PricewaterhouseCoopers
14  ever received a wire in that amount on this
15  engagement?
16    A    I believe there was an additional
17  payment to PwC, but I don't -- of some amount in
18  this range, but I don't recall when it happened or
19  how.
20    Q    If you'll turn the page.  There's
21  another reference to a wire transfer to
22  PricewaterhouseCoopers in the amount of $950,000?

Page 111

1    A    Yes.
2    Q    Do you recall if PricewaterhouseCoopers
3  received that wire?
4    A    I believe they did.
5    Q    Related to the Midcoast engagement; is
6  that right?
7    A    Yes.
8    Q    Do you recall if -- you said there was
9  a separate wire?  I think you said that earlier,
10  or additional wire which may have been this $8,743
11  one?
12    A    Yes, I did say that.
13    Q    Okay.  Do you recall why there were two
14  separate wires to PricewaterhouseCoopers?
15    A    As I testified earlier, I believe that
16  Midcoast had instructed Fortrend to pay its tax
17  advisor, PwC, an amount out of the sales proceeds
18  for the asset sale consistent with the past
19  practice of Fortrend to pay tax advisors of the
20  buyer.  And I believe that after the closing, it
21  was determined that there was -- that Fortrend
22  determined it made an error in calculating the

Page 112

1  amount it intended to pay PwC consistent with its
2  past practice and there was a subsequent
3  adjustment.  But I do not recall why that
4  particular amount was determined.  I mean, I don't
5  remember the specifics.
6    Q    Were those two amounts together the
7  total of the payment that PwC received pursuant to
8  the extraordinary value provision that was in the
9  engagement letter?
10       MR. TURKUS:  Objection to the form of
11    the question.  The witness has said he
12    doesn't recall the amount of the smaller wire
13    transfer.  You're asking him is it his sense
14    that these two taken together are the --
15       MR. COFFIN:  His recollection.
16       MR. TURKUS:  Okay.
17    A    My recollection is that the two amounts
18  on 6/25 and 6/22 represent the total amount that
19  PwC received pursuant to the extraordinary value
20  provision in the engagement letter and that PwC
21  received no other fees based on rates and hours.
22

Page 113

1  BY MR. COFFIN:
2    Q    Did PwC receive any other fees related
3  to the preparation of the tax opinion that it
4  issued later to Midcoast?
5    A    No.  Well, not that I'm aware.  I don't
6  recall if the time was entered by PwC people and
7  then billed out separately.  I don't recall, but I
8  don't believe so.
9       MR. COFFIN:  Let's go off the record
10    for a second.
11       (Whereupon, there were discussions off
12    the record.)
13  BY MR. COFFIN:
14    Q    Go to 162, please.  This is a facsimile
15  from Cathy Coffey to you, Mr. Wilcox, dated
16  January 3rd, 2000; is that right?
17    A    Yes.
18    Q    Whose handwriting is on the pages that
19  follow?
20       MR. TURKUS:  Objection to the form of
21    the question.
22

29 (Pages 110 to 113)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 114

1  BY MR. COFFIN:
2     Q    Are they your -- is it your
3  handwriting?
4     A    Yes, it appears to be mine.
5     Q    And in the note portion of the
6  facsimile, Ms. Coffey advises that, "Attached
7  please find the Fortrend rep letter modifications
8  requested.  Note that the last attachment e-mail I
9  forwarded requested these adjustments."
10          Was Ms. Coffey making changes to the
11  Fortrend representation letter, or was she simply
12  transcribing in the changes that you made?
13          MR. STERN:  Objection to form.
14          MR. TURKUS:  Objection to the form of
15  the question.  Objection, lack of foundation.
16     A    I really don't know.  I cannot -- I
17  cannot reconcile the cover note with the fact that
18  I have marked up the rep letter.
19  BY MR. COFFIN:
20     Q    Do you know if Ms. Coffey would be
21  proposing changes to the rep letter?
22          MR. TURKUS:  Objection to the form of

Page 115

1     the question.  Objection, lack of foundation.
2          You mean other than the changes
3     reflected in the handwriting here?
4          MR. COFFIN:  Yeah, just in general.
5  BY MR. COFFIN:
6     Q    The Fortrend rep letter, was Ms. Coffey
7  proposing changes?  Do you know if Ms. Coffey was
8  proposing changes to the Fortrend rep letter for
9  any reason?
10     A    There were probably several
11  communications between me and Ms. Coffey where I
12  gave her comments and perhaps she gave me comments
13  on the letter, but I can't think of any specific
14  occasion on which she would have proposed changes.
15  I'm sure that she provided comments on the various
16  drafts.
17     Q    Would Ms. Coffey have an independent
18  knowledge of the facts of the project that you
19  were working on with Midcoast?
20          MR. TURKUS:  Objection, lack of
21  foundation.
22     A    I think I testified earlier that

Page 116

1  Ms. Coffey would have learned of the facts of this
2  transaction from either me or Tom Palmisano.
3          I should clarify that Ms. Coffey might
4  have had copies of various transaction documents,
5  but I can't say for certain.  Or she could have
6  independently learned some of this information.
7  BY MR. COFFIN:
8     Q    Turn to Government Exhibit 173, please.
9          You recall seeing this document,
10  Mr. Wilcox?
11          MR. TURKUS:  Again, prior to last
12  Friday?
13  BY MR. COFFIN:
14     Q    Yes.  I'm sorry, prior to last Friday.
15     A    I don't recall specifically seeing it,
16  but I note the document is a fax from me, so I
17  think I did see it at one time.
18     Q    Read the message portion of the fax
19  cover sheet to yourself, if you would.
20     A    Okay.
21     Q    The red lined version of the rep letter
22  that is attached, I assume contains changes that

Page 117

1  were requested by Mr. Furman; is that right?
2          MR. TURKUS:  Objection to the form of
3  the question.
4          Are you asking him his recollection, or
5  whether he advised that from reading the
6  cover letter?
7          MR. COFFIN:  His recollection.
8     A    I don't know without really going
9  through the complete sequence in order of these
10  faxes because it's just as possible that that's a
11  change that I was proposing to him.  I can't say
12  for certain.  It appears from the cover note that
13  I was explaining to Mr. Furman why those changes
14  were made which would suggest I made the change,
15  not him, but I can't say.
16  BY MR. COFFIN:
17     Q    If you turn to the PwC066.  Item No. 2
18  at the top.
19     A    Okay.
20     Q    Do you recall why the reference to
21  Signal Capital Associates, LP, was stricken out of
22  the letter?

30  (Pages 114 to 117)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 118

1        MR. TURKUS:  Objection, lack of
2    foundation.  Objection to the form of the
3    question.
4        A    No, I don't recall.  I do recall that
5    we were not necessarily knowledgeable about the,
6    you know, the ownership structure of K-Pipe
7    Holdings Partners, LP.  It may be that we put some
8    facts in that we thought were true and it turned
9    out they weren't true.  I really don't know.  But
10   I don't recall any specific reason for deleting
11   the reference to Signal Capital Associates other
12   than taking somebody's comment.
13       Q    Were you familiar with Signal Capital
14   Associates, LP, back in 1999; do you recall?
15       A    No.  Did not.  Had never heard of it.
16       Q    Okay.  176.  Government No. 176.  Do
17   you have it, Mr. Wilcox?
18       A    Yes.
19       Q    Does this represent a fax from
20   Mr. Furman to you?
21       A    That's what it purports to be.
22       Q    And do you recall receiving this -- I

Page 119

1    assume this is the final signed copy of the
2    Fortrend representation letter?
3        MR. TURKUS:  Is that a question?
4        MR. COFFIN:  Yes.
5    BY MR. COFFIN:
6        Q    Is that correct?
7        MR. TURKUS:  Do you want him to comment
8    on what it is?  Or your assumption?
9    BY MR. COFFIN:
10       Q    On what it is, please.
11       A    I think I can only say what it appears
12   to be.  It appears to be a final version of the
13   rep letter because it is signed by Mr. Furman.
14   BY MR. COFFIN:
15       Q    Okay.  It's dated July -- the fax cover
16   is dated July 10, 2000, as is the rep letter,
17   correct?
18       A    Yes.
19       MR. TURKUS:  The document speaks for
20   itself.  Objection.
21   BY MR. COFFIN:
22       Q    Why dated after the November '99

Page 120

1    transaction?  Why so late after the November of
2    '99 transaction?
3        MR. TURKUS:  Objection to the form of
4    the question.
5        A    Why so late?  I believe one of the
6    earlier documents that you had me testify about
7    indicated that a form of the representation letter
8    had been given to Craig Hoffman prior to the
9    closing.  And Mr. Hoffman reviewed the letter and
10   agreed that Fortrend would be in a position to
11   provide us -- provide PwC a signed representation
12   letter.
13       As I recall, Mr. Hoffman, at some point
14   after the closing, left Fortrend -- I have no idea
15   where he went -- and I was then forced to deal
16   directly with Mr. Furman who I really had not had
17   any direct dealings with other than I believe he
18   participated in a conversation with Mr. Hoffman
19   early in the process.  And I believe I had just
20   took time to get Mr. Furman's attention to provide
21   comments and review the rep letter.
22       That's my only -- that's all I can

Page 121

1    recall about why it would have taken this long.
2        Q    Okay.
3        MR. COFFIN:  Karl, do you have 181?
4        MR. STERN:  No.
5    BY MR. COFFIN:
6        Q    Turn to 181, Government 181, please.
7        Do you recognize this document,
8    Mr. Wilcox?
9        A    I recognize this as a draft
10   representation letter from Midcoast to PwC.
11       Q    And whose handwriting is on the
12   document?
13       MR. TURKUS:  Objection, lack of
14   foundation.
15       Are you asking him to just read what it
16   says on the first page, or are you asking him
17   if he recognizes the handwriting?
18       MR. COFFIN:  Yeah, just recognize the
19   handwriting.
20       A    I recognize the handwriting on the
21   first page as my handwriting.  But on subsequent
22   pages, some of the handwriting is not mine.

31 (Pages 118 to 121)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:   Gary Wilcox**

Page 122

1  BY MR. COFFIN:
2      Q    Do you know whose handwriting it might
3  be?
4      A    I believe it is Ian Schacter's
5  handwriting, because the first page of the fax
6  indicates that this draft reflected Ian Schacter's
7  revisions.
8      Q    Did you discuss making changes to this
9  letter with Ian Schacter?
10     A    I don't recall specifically discussing
11 making changes with Ian Schacter, but it would
12 seem reasonable that we did discuss this by phone
13 as well as by fax, exchanges of faxes.
14     Q    Why is it -- why do you think it's
15 reasonable?
16         MR. TURKUS:  Objection to the form of
17 the question.
18     A    I'm doing my best to try to provide an
19 explanation, a fax that, frankly, I don't remember
20 specifically.  And I'll stop doing that if you
21 don't want those kinds of answers.
22

Page 123

1  BY MR. COFFIN:
2      Q    No.
3      A    I don't remember the conversation with
4  Ian Schacter.
5      Q    Okay.  I was just asking why it would
6  have been reasonable.  Is it something you
7  normally did, was send these rep letters up to Ian
8  Schacter?
9      A    Because he was a colleague of mine and
10 we talked frequently, so it would be common as a
11 courtesy for us to have spoken personally in
12 addition to exchanging faxes because it was pretty
13 simple just to call him up and talk to him about
14 it.
15     Q    Okay.  Would Mr. Schacter have
16 independently had any knowledge of the facts
17 surrounding the Midcoast project?
18         MR. TURKUS:  Objection to the form of
19 the question.
20         MR. STERN:  Objection to the form.
21         MR. TURKUS:  What do you mean by
22 "independently"?

Page 124

1          MR. COFFIN:  What?
2          MR. TURKUS:  I'm asking you what you
3  mean by the word "independently," and how
4  this witness could have that knowledge.
5          MR. COFFIN:  I'm asking him was
6  Mr. Schacter involved, I guess, in the
7  day-to-day negotiations and involvement of
8  the transaction.
9          MR. TURKUS:  No objection to that
10 question.
11     A    Well, first of all, I've never said
12 that I was involved in day-to-day negotiations.
13         We were involved in providing tax
14 advice, and Tom Palmisano and I were the ones from
15 PwC primarily involved in providing tax advice
16 through the transaction, but we conferred on a
17 regular basis with Ian Schacter and Cathy Coffey
18 and they were knowledgeable about the transaction
19 based on our conversations with them.  I don't
20 recall that Ian or Cathy ever attended a meeting
21 with Midcoast or joined a phone conversation with
22 Midcoast.

Page 125

1  BY MR. COFFIN:
2      Q    Do you know if Mr. Schacter was
3  familiar with Fortrend prior to PwC engaging in
4  these -- PwC working for Midcoast in this
5  engagement?
6      A    I believe that Mr. Schacter had heard
7  of Fortrend.  That's all I remember.
8      Q    You don't recall why, how you know that
9  Mr. Schacter had heard of Fortrend?
10         MR. TURKUS:  Objection, asked and
11 answered.
12     A    No, I don't.  I don't know whether it's
13 because of his own experience with Fortrend or
14 whether he heard something about them from someone
15 else.  I don't know.  I do recall that he was
16 familiar with them at some level.
17 BY MR. COFFIN:
18     Q    Government Exhibit 186, please.
19         MR. COFFIN:  Do you have that?
20         MR. TURKUS:  Yes.
21 BY MR. COFFIN:
22     Q    This is an e-mail from you, Mr. Wilcox,

32 (Pages 122 to 125)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 126

1  to Mr. Whitten and Mr. Palmisano dated January 18,
2  2001, correct?
3      A    Yes.
4      Q    Subject?
5          MR. TURKUS:  You mean the first part of
6      it?
7          MR. COFFIN:  Yes.  Yes, I'm sorry.
8  BY MR. COFFIN:
9      Q    Looks like there's an attachment to it.
10  The subject matter of the e-mail shows to be "IRS
11  warning on Midco transactions."  And your comment,
12  first comment, is, "Do you really have to issue
13  that opinion?  Just kidding."
14          Do you recall drafting this e-mail?
15      A    I don't recall drafting this e-mail,
16  but I'm not denying that I did.
17      Q    Do you recall receiving the IRS notice,
18  the first time you may have seen the IRS Notice
19  2001-16?
20          MR. TURKUS:  Are you asking him if
21      recalls receiving it, or does he recall the
22      first time he saw it?

Page 127

1          MR. COFFIN:  The first time he saw it.
2      A    No, I don't recall, but it does appear
3  that my e-mail is on January 18th, and the notice
4  came out from the IRS on January 18th.
5  BY MR. COFFIN:
6      Q    Do you recall ever talking to anybody
7  at Midcoast about this notice?
8          MR. TURKUS:  At any time?
9          MR. COFFIN:  At any time.
10      A    I can't say when, but I am fairly
11  confident that we had a conversation with Richard
12  Robert about this notice.  I just don't know how
13  soon after January 18th that conversation took
14  place, but I'm fairly confident it did.
15  BY MR. COFFIN:
16      Q    Do you recall the details of the
17  conversation you had with Mr. Robert, or you just
18  know it happened?
19          MR. TURKUS:  The conversation he would
20      have had or the conversation he had?
21          MR. COFFIN:  I thought he said he had
22      had one.

Page 128

1          MR. TURKUS:  But you didn't ask him
2  about the conversation he had; you asked him
3  about the conversation he would have had.
4          MR. COFFIN:  Oh, I'm sorry.
5          MR. STERN:  That's an expression.
6          MR. TURKUS:  Well, objection to the
7  expression and the form of the question.
8  BY MR. COFFIN:
9      Q    Well, I'll just put it this way:  Were
10  you fixing to have a conversation?
11          MR. TURKUS:  No objection.
12      A    I understand that.  I'm from Texas.
13          My memory is very faint on this.  I
14  don't know whether it's based on actual memory at
15  this point or a belief that this conversation
16  seems like something that should have taken place
17  soon after this notice, but I, like I say, I don't
18  know how to answer other than I'm fairly confident
19  there was a conversation.  I do not remember what
20  was said.  I can certainly guess as to what was
21  said, and I'm sure it was informing the client
22  that this notice was released.  Beyond that, I

Page 129

1  don't remember.
2  BY MR. COFFIN:
3      Q    Government Exhibit 189.  Are you
4  familiar with this memorandum, Mr. Wilcox?
5      A    Yes, I remember this memo.
6      Q    Why did you -- or did you prepare this
7  memorandum?
8      A    I'm sure because my name is on it that
9  I participated in preparing it.  I don't know that
10  I was the only one who prepared it.
11      Q    Do you know why it was prepared?
12      A    Well, I don't remember the
13  circumstances that --
14          MR. TURKUS:  Could we take a break for
15      just a minute?
16          MR. COFFIN:  Sure.
17          (Whereupon, there was a break from
18  2:34 p.m. until 2:39 p.m.)
19          (Whereupon, the last question was
20  read.)
21      A    I believe that under the law at the
22  time in early 2001, if the IRS listed a

33 (Pages 126 to 129)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 130

1  transaction and a taxpayer had previously did a
2  transaction that was substantially similar, the
3  taxpayer was required to file a disclosure
4  statement even if the tax return for that
5  transaction had already been filed.
6        So my recollection is that this advice
7  was given in the context of determining or
8  advising Midcoast on whether it was required to
9  file a disclosure statement in connection with the
10  transaction that closed in 1999.
11  BY MR. COFFIN:
12      Q    In the second paragraph, it says, "Our
13  client, Midcoast Energy Resources, purchased
14  assets on November 9, 1999, from an entity
15  commonly known as an intermediary."
16        Do you recall what you meant by "an
17  entity commonly known as an intermediary"?
18      A    No, but I can tell you what I believe
19  it means to me sitting here today.
20      Q    Okay.
21      A    I believe it means entity that, you
22  know, buys the stock of corporations and later

Page 131

1  causes those corporations to sell assets.
2      Q    In the memorandum, I believe, PwC
3  concluded that the disclosure statement need not
4  be attached to Midcoast's tax return; is that
5  right?
6      A    It concluded that it could advise
7  Midcoast that there -- I'm reading the language --
8  is an appropriate basis for not attaching a
9  disclosure statement.
10      Q    Did PwC advise Midcoast of its
11  conclusion?
12      A    I assume it did, but I don't recall
13  specifically delivering that advice.  It may have
14  been Bob Whitten who gave that advice to the
15  client because he was the local office engagement
16  partner.
17      Q    Do you know if Midcoast has made a
18  claim against PwC resulting from the IRS
19  examination of Midcoast's 1999 tax return?
20      A    What kind of claim?
21      Q    A claim that would be seeking damages
22  from PwC?

Page 132

1      A    No, I'm not aware of any such claim.
2      Q    Okay.  Let's go to 201, Government 201.
3        Mr. Wilcox, do you recognize Government
4  Exhibit 201 as your notes?
5      A    For the most part, it's my notes, but
6  it does appear there are several diagrams in here
7  that do not appear to be my handwriting.
8      Q    Do you recognize the handwriting on
9  these pages?
10      A    For the most part, I recognize that the
11  handwriting is mine.  I just said there -- but it
12  does appear -- and I can identify pages if you
13  want.
14      Q    Yeah, that would be great.
15      A    On page 1278, the handwriting appears
16  to be mine, but that diagram in the middle is not
17  my handwriting.  I don't know where that came
18  from.
19        On page 1282, the handwriting at the
20  bottom appears to be mine, but that is not my
21  diagram.
22      Q    Is that all, Mr. Wilcox?

Page 133

1      A    Yes.  That appears to be the only
2  portions that are not my handwriting.
3      Q    Back in 1999, was it your habit of
4  taking notes?
5        MR. TURKUS:  Objection to the form of
6  the question.
7      A    I wouldn't call it a habit; I would
8  call it a practice.
9  BY MR. COFFIN:
10      Q    Is that something you still do today,
11  take notes of discussions, meetings?
12        MR. TURKUS:  Objection to the form of
13  the question.
14      A    Can you explain to me why that's
15  relevant, what I do today?
16  BY MR. COFFIN:
17      Q    Well, I just want to know if this is
18  your practice.  You said it's your practice.
19      A    I'm not going to answer that question
20  unless you can explain to me why it's relevant to
21  why we're here today.
22        MR. COFFIN:  Do you agree with him that

34 (Pages 130 to 133)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 134

1    he doesn't need to answer the question?
2         MR. TURKUS:  I didn't instruct him not
3    to answer, but I don't think it has any
4    relevance whatsoever.  You asked him was it
5    his practice at the time; he said it was.
6    You asked him was it his habit; he said no,
7    it was his practice.  So what difference does
8    it make what he does today?
9         MR. COFFIN:  I just want to know if
10   that's what he does.
11        MR. TURKUS:  Well, you might want to
12   know a lot of things, but it has nothing to
13   do with your case.  I understand why he's
14   objecting.  He now works for a different
15   entity.  He's now serving as a lawyer.  He
16   wasn't a lawyer then; he was working for an
17   accounting firm.
18        I just don't think it really has any
19   relevance.  If you want to go to a judge on
20   it, go right ahead.  I didn't instruct him
21   not to answer, but I certainly understand why
22   he's reluctant to provide information about

Page 135

1    how he represents clients today in a
2    different firm.
3    BY MR. COFFIN:
4         Q   I'll move on.
5             With regard to Exhibit No. 201, were
6    your notes written down when fresh in your memory?
7         MR. TURKUS:  Objection to the form of
8    the question.
9         You mean all of these notes, these
10   hundreds of pages of notes?
11        MR. COFFIN:  Yeah.
12        MR. TURKUS:  You want him to make a
13   general statement that all of these notes
14   were prepared when things were fresh in his
15   mind?
16        MR. COFFIN:  Well, it was his practice.
17        MR. TURKUS:  That's not the same
18   question.
19        MR. COFFIN:  Well, I'm asking.  He can
20   tell me.
21        MR. TURKUS:  What is the question?
22        MR. COFFIN:  Were the notes made while

Page 136

1    they were fresh in his mind?
2         MR. TURKUS:  Objection to the form of
3    the question.
4         A   I'm not sure how to answer that
5    question because if I write something down, it's
6    obviously something that I'm thinking.  So,
7    therefore, it must be fresh in my mind.  I don't
8    know how else to answer that.
9         Do I write all notes contemporaneous
10   with the thought process?  I don't know.
11        I think it's fair to say that some of
12   these notes are thoughts that I would write down
13   at a quiet moment.  It's not necessarily during
14   the course of a conversation.  Some of the notes
15   might be during the course of a conversation I'm
16   having.
17        There was a lot to think about in this
18   transaction, a lot of facts, and I think that is
19   part of the reason why there are many notes.
20   There were a lot of facts to be in command of
21   throughout this transaction.
22

Page 137

1    BY MR. COFFIN:
2         Q   Okay.  On the first page, 1271, would
3    you read the first line there, please?
4         A   The first line appears to say,
5    "No. 1" -- well, looks like something's been
6    interposed, but No. 1 is, "Avoid advance
7    discussions between S and B before LOI."
8         Q   What's the -- well, the title above
9    that, what does that say?  Is that "Midco
10   Considerations"?
11        A   Yes.
12        Q   And then Item 2?
13        A   "Avoid signed" -- now, do you want me
14   to read it as it appears on the page?  Some of
15   these words are symbols and shorthand.  What are
16   you asking me to do?
17        Q   Read it not as it appears but what you
18   perceive that appears to say.
19        A   "Avoid signed contract between
20   intermediary and buyer when intermediary contracts
21   with seller."
22        Q   Okay.  Go on.

HUNDT REPORTING
214-220-1122

2bce65f8-760c-46ed-9083-54d369e7a9aa

Witness:  Gary Wilcox

Page 138

1    A    No. 3, "Intermediary retains
2 significant assets and liabilities."
3          Keep going?
4    Q    Yes, please.
5    A    "Intermediary not liquidate
6 corporation."
7          No. 5, "Report to government and third
8 parties consistently."
9          No. 6, "Pricing.  Midco take stock
10 price and increase for premium.  Premium is equal
11 to 5 percent of step-up."
12          No. 7, "Avoid indemnities or other
13 connections between seller and buyer."
14          No. 8, "Intermediary must be actively
15 involved in negotiations."
16          No. 9, "Separate contract signings,
17 breakup fee, risk, separate closings, disaster
18 risk, bankruptcy risk, et cetera."
19          No. 10, "Describe the press release as
20 simply purchase of business."
21          No. 11, "Hart Scott Rodino."  I think
22 this says "which does not apply when intermediary

Page 139

1 buys because it's exempt, but it does apply -- but
2 HSR does apply when intermediary sells assets."
3          No. 12, "Intermediary represented by
4 separate counsel at meetings, et cetera.
5 Intermediary independently financed the stock
6 purchase."
7    Q    Are the terms "Midco" and
8 "intermediary" synonymous, in your view?
9    A    Could I ask for --
10   Q    You need a break?
11        THE WITNESS:  Well, can I ask you a
12 question?
13        MR. TURKUS:  Sure.
14        (Whereupon, there was a break from
15 2:54 p.m. until 2:56 p.m.)
16        (Whereupon, the last question was
17 read.)
18   A    So this question is not in reference to
19 a document; it's just a general question?
20 BY MR. COFFIN:
21   Q    In relation to Government Exhibit 201.
22        MR. TURKUS:  Page 1271?

Page 140

1        MR. COFFIN:  Yes, sir.
2    A    No.  I think the -- I have referred to
3 Midco as a convenient way of explaining the role
4 of an intermediary.  But I don't believe that
5 not -- that either term has a single meaning
6 associated with it, and I believe that the
7 difficulty with this area is that distinguishing
8 from, you know, an entity that is truly buying
9 stock and then selling the assets from one that is
10 just a conduit, and where do you draw the line
11 because we all know that, you know, there are
12 companies out there, and they've been out there
13 since the '80s, that buy companies and then sell
14 off the assets.  Anybody who's seen Gordon Gekko
15 knows that that happens.
16        And so I think that those companies,
17 what they do is very similar to what happened in
18 this case.
19        And so calling a company a Midco or an
20 intermediary, in my view, is not the same as
21 concluding that the entity should be disregarded
22 for tax purposes.  It simply describes the fact

Page 141

1 that they may acquire the stock of an entity and
2 then subsequently sell off the parts.
3    Q    Okay.  Are you finished?
4    A    Yes.
5    Q    Okay.  Go back to Government Exhibit
6 189 real quick.  I'm sorry.  Backwards.  This is
7 the memorandum on the tax statement disclosure.
8 Turn to the second page of that memorandum.
9        Second paragraph, would you read that
10 paragraph to yourself, please?
11   A    Okay.
12   Q    The sentence -- the second to the last
13 sentence says, "Neither the seller nor Midcoast
14 has any knowledge of whether or how the
15 intermediary would be able to offset gain from the
16 sale of assets."
17        Do you know if that's a true statement?
18   A    As far as I know, that's a true
19 statement or I wouldn't have signed a memo with
20 this statement in here.
21   Q    Did PwC have any knowledge at the time
22 of whether or how the intermediary would be able

HUNDT REPORTING
214-220-1122

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 142

1  to offset gain from the sale of assets?
2     A    No idea.  PwC had no idea.
3     Q    Do you recall ever inquiring to anyone
4  how the intermediary would be able to offset the
5  gain from the sale of assets in this transaction?
6     A    I believe I might have asked Craig
7  Hoffman when I met him in person at the
8  October 23rd meeting.  But I don't remember
9  hearing anything specific from him.  I sense that
10  it probably wasn't, you know, an area that I
11  needed to know in order to do my job and what they
12  did was not -- it wasn't part of my business.  So
13  I don't believe that the conversation went very
14  far.
15     Q    Okay.  Back to Government Exhibit 201,
16  first page.
17        Do you know why you would have -- do
18  you recall why you would have written these down?
19     A    Where are we?
20     Q    Government 201, your handwritten notes?
21     A    Which page?
22     Q    The first page.

Page 143

1     A    I am not confident that these notes
2  were written down in connection with the Midcoast
3  transaction.  They may well had been written down
4  as my own personal list of issues to think about,
5  and my notes simply were put into the Midcoast
6  file, because I don't recall writing any of this
7  in connection with the Midcoast transaction.
8        It was not uncommon as an M&A person in
9  the PwC office to get questions all the time about
10  how to structure transactions, and it was common
11  for us to keep our notes and thoughts collected so
12  that we were in a position to give advice.
13     Q    Go to 1276, please.
14     A    Okay.
15        MR. COFFIN:  Let's go off the record.
16        (Whereupon, there was a break from
17  3:05 p.m. until 3:11 p.m.)
18  BY MR. COFFIN:
19     Q    Mr. Wilcox, sorry to keep going
20  backwards.  Back to 1271 on 201, the Midco
21  considerations.  Do you recall discussing these
22  considerations with Midcoast at all?

Page 144

1        MR. TURKUS:  You're asking whether he
2  recalls discussing any of these
3  considerations or all of them?
4        MR. COFFIN:  Any of them.
5     A    Like I said, I don't think this list
6  was prepared in connection with the Midcoast
7  transaction.  It -- I think it was prepared either
8  before or after that transaction -- I don't know
9  which -- and just reflected my general thoughts on
10  Midco transactions.  But I did, from time to time,
11  discuss with the client what was important in
12  order to maintain their tax position.
13  BY MR. COFFIN:
14     Q    Okay.  Item No. 6 on that page,
15  pricing, "Midco takes stock price and increase for
16  premium.  Premium equals 5 percent of step-up."
17        Do you recall talking to Midcoast about
18  that type of pricing on the transaction that it
19  engaged in with Fortrend?
20     A    Yes.  I remember having -- it probably
21  would have been a conversation between PwC and
22  Midcoast on September 13 or there abouts in Kansas

Page 145

1  City after we learned from Fortrend how they would
2  price an asset sale.
3     Q    Okay.  Do you recall -- do you recall
4  specifics of that conversation, or are you just
5  assuming that it occurred during that meeting?
6  I'm looking for -- do you recall what Midcoast's
7  representatives, what their reaction was to that
8  pricing structure?
9     A    I don't.  I, again, am fairly confident
10  that we would have discussed what we learned from
11  Fortrend with, at a minimum, Richard Robert, but I
12  don't remember the specific conversation or what
13  his reaction would have been.  Obviously because
14  the so-called Midco alternative was pursued,
15  Richard Robert decided to pursue it, but I don't
16  remember anything other than that.
17     Q    Okay.  Turn over to PwC1276, please.
18  At the top of that page, it says "Favorable
19  Facts," correct?
20     A    Yes.
21     Q    Do you recall if you wrote these notes
22  in relation to the Midcoast transaction?

37 (Pages 142 to 145)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 146

1    A    Yes, these notes relate to the Midcoast
2  transaction.
3    Q    In the first sentence, first line of
4  notes underneath the heading "Favorable Facts," it
5  says, "Contractual risk, 24 hours, 1 million."  Is
6  that $1 million?
7    A    Yes.
8    Q    Okay.  Tell me -- I assume that's a
9  favorable fact; is that correct?  Do you determine
10  it to be?
11    A    Everything in this list, presumably, is
12  a favorable fact.
13    Q    And why is that a favorable fact?
14    A    I don't remember the details of this,
15  but there was a -- it had something to do with the
16  way in which the escrow -- escrows were funded.
17  And there was a 24-hour period where, if the deal
18  fell through, Fortrend would be exposed to a
19  million dollar contractual risk to Langley.  As I
20  recall, it was a difference between a $15 million
21  amount and a $14 million amount, but I don't
22  remember the context.

Page 147

1    Q    Okay.  And why would that contractual
2  risk be a favorable fact?
3    A    Again, believing that if the government
4  were to look at this, they would argue that --
5  they may argue several things, but one of the
6  possible arguments, we believe, was that the
7  government would contend that Fortrend should be
8  ignored.  And, as I've said earlier, the more
9  activity that Fortrend has as a participant in the
10  transaction, the more activity that it has after
11  the transaction as well as, in this case, risks
12  that it incurred in connection with its role.  All
13  of those are favorable facts supporting the
14  position that they should not be ignored.
15    Q    So this listing is a listing of facts
16  that you felt were favorable in the event that the
17  government challenged the transaction; is that
18  correct?
19    A    Well, let me state it differently
20  because I -- these are -- yes, that is true that
21  they are favorable facts to support the taxpayer's
22  position in the event the government were to

Page 148

1  challenge the position.  But even apart from
2  whether the government ever challenged the
3  position, they are favorable facts to support
4  PwC's opinion and to support the taxpayer's
5  position on its tax return.
6    Q    Okay.  Turn the page, please.  At the
7  top, the heading is "Unfavorable Facts"; is that
8  correct?
9    A    Yes.
10    Q    So I would assume that this is a --
11  these are unfavorable facts to the taxpayer's
12  position; is that correct?
13    A    They could be.  But, again, it all
14  depends on all facts and circumstances.
15    Q    Okay.  Can you describe what the tax
16  indemnity to Langley was?  Is that something we've
17  already talked about?
18    A    I think I was referring there to the
19  simple fact that the stock purchase agreement
20  contains a tax indemnity which, on its face, is
21  going to attract someone's attention, but which
22  I've already explained doesn't have a lot of teeth

Page 149

1  in it because I don't think it resulted in any
2  exposure to Midcoast.
3    Q    Okay.  How about the next item?
4    A    The next item refers to a Midcoast
5  guarantee of KPC's guarantee of the tax indemnity.
6  Again, I don't -- I would put that in the
7  unfavorable category, not because I believe
8  Midcoast had any exposure to risk as a result of
9  that guarantee, but the mere fact that it can be
10  linked in some contractual way, albeit directly,
11  but, nevertheless, linked in some contractual way
12  to Langley would be perceived by the government as
13  an -- as a favorable fact for them.
14    Q    Okay.  The next item, "Fortrend
15  inability to borrow without escrowed funds from
16  Midcoast"?
17    A    I will say that these are not
18  necessarily conclusions on my part because,
19  frankly, I don't know what Fortrend's ability or
20  inability to borrow was in connection with this
21  transaction.  I wasn't privy to any of those
22  facts.

38  (Pages 146 to 149)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 150

1    I think what I was referring to here
2  was the perception that the government might
3  reach -- the conclusion that the government would
4  reach that Fortrend was unable to borrow without
5  getting money from Midcoast through the escrow.
6    Q   Okay.  The next item.  Does that say
7  "Continuing Relationship"?
8    A   I think, again, maybe that's more of an
9  optical kind of fact in that if Langley and
10  Midcoast are connected in some way contractually
11  or economically on a going forward basis, that
12  might suggest that they were dealing with each
13  other again.
14    Q   Okay.  Go ahead.
15    A   We're just coming up with a list of
16  what could possibly cut against the taxpayer's
17  position, and I was weighing that against the
18  facts that I viewed as favorable.
19    Q   Okay.  Were those favorable facts and
20  unfavorable facts communicated to Midcoast?
21    A   I think we've already -- I've already
22  testified about certain communications, such as

Page 151

1  the tax indemnity which you asked me about.  I
2  can't say that every one of these points were
3  communicated but many of them definitely were.
4    Q   Okay.  Turn to PwCP1280, please.  The
5  top it says "Fact Background."
6    Do you see that?
7    A   Yes.
8    Q   There's an entry there, 9/12.  Could
9  you read that note for me, please?
10    A   The 9/12 line appears to say "PW
11  meeting with Midcoast.  Seller present.  Spoke
12  with Fortrend, re fee.  Very limited discussions
13  with seller.  Tentative" -- I think that means
14  "Tentative agreement to go forward with Midco."
15    Q   Were you involved in that meeting with
16  Midcoast on that day, or was there a meeting with
17  Midcoast on that day?
18    A   9/12 I believe refers to the meeting in
19  Kansas City where I was present.
20    Q   Okay.  And "seller present," does that
21  mean Langley was there?
22    A   Yes, sir, as I've said.

Page 152

1    Q   Okay.  And did Langley participate?
2  Says, "Spoke with Fortrend, re fee."
3    Did Langley participate in that
4  conversation?
5    A   No.
6    Q   And it says, "Tentative agreement to go
7  forward with Midco."
8    Who reached the agreement at that
9  point?
10    A   I think decisions were made by both
11  Langley and Midcoast.  Midcoast had been a bidder
12  along with other bidders to buy the stock.
13  Midcoast, I don't believe agreement is
14  necessarily -- reflects what happened legally.
15  There was no agreement, per se, but Midcoast
16  decided that it would delay pursuing its bid to
17  buy stock and instead pursue a purchase of assets
18  from Fortrend.  Langley decided that it would
19  entertain a bid from Fortrend to buy stock, and I
20  think there were decisions made by both Langley
21  and Midcoast but not an agreement between anyone.
22    Q   All right.  1283, please.  At the top

Page 153

1  it says "Tax Issues," correct?
2    A   Yes.
3    Q   And on this page, does "I" translate to
4  intermediary?
5    A   Yes.  Again, I don't know if that --
6  these notes were prepared in connection with the
7  Midcoast transaction.  They may have been, they
8  may not have been.  I don't know.  But, yes, "I"
9  refers to intermediary.
10    Q   And "S" refers to seller and "B,"
11  buyer, I take it?
12    A   Yes, yes.
13    Q   "Easy to avoid Bollinger."
14    Do you see that note?
15    A   Yes.
16    Q   What is Bollinger?
17    A   It's a U.S. Supreme Court case on the
18  law of agency.
19    Q   Okay.  Turn to 1285, please.  There's
20  an entry there, says "9/25, Jeff Furman"; is that
21  correct?
22    A   Yes.

39 (Pages 150 to 153)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:   Gary Wilcox**

Page 154

1    Q    You had a conversation with Mr. Furman
2  on that date?
3    A    I don't recall specifically, but it
4  would appear that I may have.  It's also not clear
5  whether he was the only one on the phone -- if
6  there was a phone conversation, that he was the
7  only one.
8    Q    Would that have been a conversation on
9  September 25 of 1999 or on a later date?
10       MR. TURKUS:  As opposed to a third
11   possibility, an earlier date?
12       MR. COFFIN:  Yes.  I thought he
13   testified he didn't know of Fortrend before
14   September of '99.
15       MR. TURKUS:  This is September 25th.
16   Could have been -- I'm thinking could have
17   been on that date, before that date, or after
18   that date.
19       MR. COFFIN:  Okay.
20       MR. TURKUS:  You only asked two of the
21   three possibilities, which is fine.  I just
22   want to make clear what you were asking.

Page 155

1    A    This would have been 1999.
2  BY MR. COFFIN:
3    Q    Why do you believe that?
4    A    Because having seen the faxes that you
5  asked me about earlier where I was obtaining a rep
6  letter from Mr. Furman in July of 2000, I don't
7  believe I would have had a conversation with him
8  after July of 2000.
9    Q    Okay.
10   A    And I can't explain the context of this
11  discussion on September 25th, but it strikes me as
12  one that would have occurred in that time frame in
13  1999.
14   Q    Okay.  Well, the last entry on that
15  page, is that "Howard"?  "Howard will let know"?
16   A    That's not ringing a bell.
17   Q    You don't recall a Howard being
18  involved in the transaction?
19   A    I don't.
20   Q    Okay.  Turning the page to 1286,
21  please.
22   A    Okay.

Page 156

1    Q    Could you explain what these notes are
2  in relation to?
3    A    I can't say exactly whether this was in
4  2000 or 2001, but I believe that this is a
5  conversation I had with Richard Robert in
6  February -- on February 23rd, because that seems
7  to be indicated by the date.
8        The first line, "Has been a request to
9  supply with copies of opinion."  I believe this
10  was a request by Enbridge in connection with its
11  acquisition of Midcoast because I can't think of
12  any other request that would have been made for
13  our opinion.
14   Q    So that's what -- where it says, "Close
15  week after next," that would have been Enbridge's
16  acquisition of Midcoast?
17       MR. TURKUS:  Objection to the form of
18   the question.
19   A    I don't know for sure, but that seems
20  to make sense to me as I'm sitting here.
21  BY MR. COFFIN:
22   Q    And next line says, "Penalty only with

Page 157

1  no substantial authority"; is that right?
2    A    That appears to be what it says, yes.
3        MR. STERN:  "With" or "it?"
4        THE WITNESS:  It appears to say,
5    "Penalty only if no substantial authority."
6  BY MR. COFFIN:
7    Q    "If no substantial authority."
8        And then you list "Conservative,
9  average, or aggressive," and then to the side it
10  says "Prudently aggressive."
11       Do you recall what those notes were
12  regarding?
13   A    No.  I don't know whether that refers
14  to Midcoast or Enbridge or something else.  I
15  don't know.
16   Q    Is the discussion of the penalty in
17  relation to the chance that the government would
18  challenge the transaction?
19   A    I think -- I don't know that that's
20  what I had in mind when I jotted that down, but
21  obviously penalties arise only when you are
22  challenged by the government, so.

40 (Pages 154 to 157)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:   Gary Wilcox**

Page 158

1      Q    And then below that it says "140,000";
2  is that right?  "$140,000 Fortrend actually paid,"
3  and then what does it say below that?
4      A    "I don't know if Fortrend got money
5  from Langley."
6      Q    Do you know what that -- those two
7  notes were regarding?
8      A    I am not for certain, but I believe
9  that might refer to a working capital adjustment
10 Fortrend had to pay.  But I -- I don't think it's
11 referring to Fortrend's -- the payment that
12 Fortrend received in connection with the butcher
13 interest.  I believe this is something else.
14     Q    And at the top there where it says,
15 "Has been request to supply with copies of
16 opinion," was that a request made by Midcoast or
17 by somebody else?
18         MR. TURKUS:  Objection to the form of
19     the question.
20     A    I testified earlier that I believe this
21 was a request made by Enbridge in connection with
22 its acquisition of Midcoast.

Page 159

1  BY MR. COFFIN:
2      Q    All right.
3      A    As part of their due diligence.
4      Q    1287, which is the next page.  On the
5  entry in the middle of the page beginning with
6  9/10, "Dennis M."  Is that Dennis --
7      A    McErlean.
8      Q    -- McErlean?
9           And then read the next entry there,
10 beginning "Tom Palmisano."
11     A    "Tom Palmisano, seller conferred with
12 E&Y, risk to seller, seller/buyer call, on
13 structure, plugged in Fortrend."
14     Q    Do you know what that was in regards
15 to?
16         MR. TURKUS:  Are you asking him what he
17     had in mind when he wrote that?
18         MR. COFFIN:  Yeah.
19         MR. TURKUS:  Or are you asking him to
20     speculate about what he thinks it might mean?
21 BY MR. COFFIN:
22     Q    What did you have in mind when you

Page 160

1  wrote that?
2      A    Again, it's very difficult to testify
3  as to what was in my mind on September 10, 1999,
4  but I believe having been informed that there was
5  a phone call between E&Y, PwC, and Fortrend made
6  in late August, that these notes were referring to
7  that phone call.
8      Q    Okay.  The bottom of the page and on to
9  the next page, could you read the beginning at the
10 bottom where it says "Seller"?
11     A    Looks like, "Seller asking for
12 incremental consideration equal to one-half a
13 step-up."
14     Q    Is that referring to Langley, if you
15 recall?
16     A    I don't recall, but I think it's fair
17 to say if I write the word "seller," I'm referring
18 to the seller and that would be Langley.
19     Q    Do you recall if Langley eventually got
20 the incremental consideration equal to half its
21 step-up?
22     A    I don't believe he -- I don't believe

Page 161

1  he did.  I really have no idea what -- I mean --
2      Q    Okay.
3      A    -- if you want me to testify more -- in
4  more detail about the purchase price for the stock
5  versus the purchase price for the assets, I can
6  try to, but, beyond that, I don't know.
7      Q    All right.  Do you recall if Langley
8  was concerned at all about engaging in a Midco
9  transaction?
10         MR. STERN:  Objection, form.
11         MR. TURKUS:  Objection, lack of
12     foundation.  Objection to the form of the
13     question.
14         What time are you asking this question?
15         MR. COFFIN:  Prior to entering into the
16     transaction.
17         MR. TURKUS:  Same objections.
18     A    I don't recall specific concerns of
19 Langley.
20 BY MR. COFFIN:
21     Q    Okay.  Do you recall general concern?
22     A    I don't recall general concerns.  I

**HUNDT REPORTING**
**214-220-1122**

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:   Gary Wilcox**

Page 162

1  recall that his accountants gained knowledge of
2  Fortrend's role as a purchaser of the stock.  But
3  I don't -- I don't remember them expressing a
4  concern.
5       Q    Okay.  Look at the top, 1288.  It says
6  "$120 million"; is that correct?
7       A    Yes.
8       Q    And then the next entry, I assume it's
9  "Intermediary, 7 percent"; is that right?
10      A    I believe that's what that refers to.
11      Q    Okay.  And says, "We get 15 percent."
12           Did that refer to PwC?
13      A    I believe that does.
14      Q    And then, "15-year pipeline"?
15      A    I think that refers to the fact that
16  the pipeline is a 15-year depreciable asset.
17      Q    Okay.  Do you recall how that was
18  relevant to the figures above it?
19           MR. TURKUS:  Objection to the form of
20      the question.
21      A    First of all, I am not certain that
22  page 1288 is a continuation of the notes on page

Page 163

1  1287.
2  BY MR. COFFIN:
3       Q    Okay.
4       A    But I don't believe that there is a
5  connection between those, the bottom of 1287 and
6  the top of 1288.
7       Q    Okay.  And below that, some more notes.
8  Is that "Bill" -- "Bill G."?
9       A    Yes.
10      Q    Who is Bill G.?
11      A    Bill Galanis [phonetic], partner at
12  PwC.
13      Q    Which office?
14      A    Washington.
15      Q    And the notes that follow, were
16  those -- down to where it says "Ian"?
17      A    Yes.
18      Q    Were those notes taken in conjunction
19  with the Midcoast transaction, or are they related
20  to what you know about Midcoast in general?
21           MR. TURKUS:  Objection to the form of
22      the question.

Page 164

1       A    I believe that these were notes taken
2  in preparation of my initial trip to Kansas City
3  in early September.
4  BY MR. COFFIN:
5       Q    Okay.  Where it says on Item No. 3,
6  "Midco injects loss assets into corp, corp sells,
7  Midco takes risk," what is meant by "loss assets"?
8       A    I'm only guessing as I'm sitting here
9  today and not saying what was in my head at the
10  time, but I think that refers to Midco
11  transferring high-basis assets into the
12  corporation that it purchased.  Corporation sells
13  the assets and if those losses are not available,
14  that is Midco's risk, tax risk.
15      Q    Do you know if that's what happened in
16  this transaction?
17      A    I don't.  As I said earlier, I don't
18  know what they did, if anything.  I really don't.
19      Q    Okay.  Again, who is Bill G.?
20      A    Bill Galanis.
21      Q    And why was he consulted?
22      A    Because I conferred with him all the

Page 165

1  time.  We were partners in the Washington M&A
2  group.
3       Q    I assume above -- you see the first
4  bracket on the left there where the star is?
5       A    Yes.
6       Q    Does that say, "Ian not troubled by
7  indemnity," or is that "Dan"?
8       A    I think that's, "Ian not troubled by
9  indemnities."
10      Q    And down below, below the section
11  dealing with Ian where there's a straight line,
12  what's that word?  Is it "patterns"?
13      A    "Alternatives."
14      Q    "Alternatives."  And one, does that say
15  "sandwich"?
16      A    Yes.
17      Q    What is that referring to?
18      A    That refers to a -- it's hard for me to
19  say at this point without really thinking through
20  what these words say, but sandwich referred to, in
21  common terms, referred to a transaction in which
22  the stock of a target corporation would be

42 (Pages 162 to 165)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 166

1  exchanged in a tax-free transaction and the
2  acquiring corporation would put cash into an LLC
3  in which the target shareholder was the managing
4  member. I don't know how that transaction would
5  have applied here, but I was obviously thinking
6  about various transaction structures.
7       Q    And then the next page at the top, Item
8  No. 2, is that "partnership basis strip"?
9       A    Yes.
10      Q    Is that a tax structure?  Does that
11 describe a tax structure?
12           MR. TURKUS:  Objection to the form of
13      the question.
14      A    In general terms, it describes a
15 transaction in which a seller of assets drops the
16 assets into a partnership, the buyer acquires an
17 interest in the partnership, the partnership
18 borrows against the assets, distributes the cash
19 up to the seller and the seller defers the gain.
20 BY MR. COFFIN:
21      Q    Were those two alternatives described,
22 the sandwich and the partnership basis strip, were

Page 167

1  those alternatives communicated to Midcoast?
2           MR. TURKUS:  Objection to the form of
3      the question.
4      A    I really don't recall if they were or
5  not.
6  BY MR. COFFIN:
7      Q    Okay.  Turn to 1291, please. PwCP1291?
8      A    Okay.
9      Q    Was this one of the drawings you said
10 that was not yours?
11     A    No.  This looks like mine.
12     Q    Okay.  Below the drawing it says,
13 "step-up."  Is it 105 million?
14     A    That's what it looks like.
15     Q    They want percentage of step-up, inside
16 basis, 50 million?
17     A    Yes.
18     Q    Do you recall how the 105 million was
19 calculated?
20     A    No.  I mean, obviously a step-up is the
21 difference between the purchase price for the
22 assets and the current tax basis of those assets.

Page 168

1      Q    Okay.
2      A    But I did not do the calculation.
3      Q    It says, "They want percentage of
4  step-up."
5           Do you recall who "they" was or were?
6      A    I believe that would have referred
7  to -- "they" being -- "they" would refer to
8  Fortrend.
9      Q    Okay.  Then "An inside basis,
10 50 million."  Is that basis of the --
11     A    I don't know.  I wrote it down but I
12 can't say that it was.
13     Q    Do you recall how much Fortrend was
14 eventually paid as far as percentage of step-up?
15          MR. STERN:  Objection, form.
16          MR. TURKUS:  Objection to the form of
17     the question.  Objection, lack of foundation.
18     A    First of all, the reference to
19 percentage of step-up refers to the price
20 differential between what Fortrend paid for the
21 stock and what it sold the assets for.  My best
22 recollection is that Fortrend priced the asset

Page 169

1  sale based on a differential approximately equal
2  to 5 percent of the step-up.
3  BY MR. COFFIN:
4      Q    Do you know if Midcoast was aware of
5  that pricing structure?
6           MR. STERN:  Objection to form.
7           MR. TURKUS:  Objection to the form of
8      the question.  Objection, lack of foundation.
9      A    Like I said earlier, I believe that I
10 had a conversation with Midcoast on September 13
11 after I spoke with Fortrend and I'm fairly
12 confident that I would have communicated the
13 5 percent price differential to Midcoast at that
14 time.
15 BY MR. COFFIN:
16     Q    I apologize for asking you again.  Turn
17 to 1292, please.  Was this -- did you take these
18 notes pursuant to a conversation you had with
19 Mr. Schacter on September 12?
20          MR. TURKUS:  Objection to the form of
21     the question.
22     A    These are my notes, and it appears

43 (Pages 166 to 169)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:   Gary Wilcox**

Page 170

1   that I took them as part of a conversation with
2   Ian Schacter.
3   BY MR. COFFIN:
4       Q    You think that would have occurred
5   September 12 of 1999?
6       A    Yes.
7       Q    Do you see the first bracket there on
8   the left side?
9       A    Yes.
10      Q    Could you read those four lines for me,
11  please?
12      A    And again, I'm putting abbreviated
13  words into my own words at this point.
14          "We've had meeting of minds already,
15  risk is increased.  If close to meeting, need to
16  introduce Midco as other buyer."
17          Keep going.
18      Q    Please?
19      A    "Continuing relationship equals more of
20  whisper than direct communication.  Fortrend won't
21  accept any risks."
22      Q    Okay.  That's good.

Page 171

1       A    Okay.
2       Q    You recall discussing these matters
3   with Mr. Schacter?
4           MR. TURKUS:  On this date, this
5       conversation?
6           MR. COFFIN:  Yes, sir.
7           MR. TURKUS:  As opposed to what the
8       note showed?  Does he have an independent
9       recollection on that?  I think that was a
10      yes.
11      A    I have an independent recollection of
12  talking with Ian, but I don't have an independent
13  recollection of every point in these notes.
14  BY MR. COFFIN:
15      Q    Do you recall discussing with
16  Mr. Schacter the "Fortrend won't accept any
17  risks"?
18      A    I do not remember that.
19      Q    Do you have any recollection of
20  discussing Fortrend, that they wouldn't accept any
21  risks?
22      A    I believe that when I spoke with

Page 172

1   Fortrend on September 13, I told them that this
2   transaction would have to be structured in a
3   certain way for us to be comfortable.  I don't
4   recall what I said to them about taking on risks,
5   but I believe I've already testified that they did
6   take on certain risks such as the million dollar
7   risk over a 24-hour period as well as, I believe,
8   they had certain risks associated with their
9   status as a party to the stock purchase agreement
10  that were independent of Midcoast's obligations
11  under the asset agreement, and they were informed
12  that the transaction would have to be structured
13  in a certain way.  But, beyond that, I don't
14  remember the details.
15      Q    Okay.  Farther down, about four entries
16  after the one we just talked about, where it says,
17  "If do RT"; is that right?  "If do right," you see
18  that?
19      A    Yes.
20      Q    Okay.  Read that for me as you would
21  interpret it today.
22      A    I think that says, "If you do it right,

Page 173

1   more likely than not."
2       Q    Okay.  Turn to 1293, please.  The
3   line -- the top third where it says "Ian."
4       A    Yes.
5       Q    Read those two lines, three lines.
6       A    I think it says, "Ian should get to
7   5/6 percent, 5 then 1 PwC.  PwC should act as
8   representative in negotiating price for buyer."
9       Q    Is that what Mr. Schacter told you in
10  the last sentence?
11          MR. TURKUS:  Objection to the form of
12      the question.
13          Are you asking him does he recall
14      having a conversation to that effect with
15      Mr. Schacter, or are you asking him to
16      speculate what he meant when he wrote these
17      notes?
18          MR. COFFIN:  Does he recall.
19      A    I don't recall Ian specifically telling
20  me that, but I believe in looking at these notes
21  as I sit here today that the reason why I wrote
22  down "Ian" before I said "Should get to 5 or

44 (Pages 170 to 173)

2bce65f8-760c-46ed-9083-54d369e7a9aa

Witness:   Gary Wilcox

Page 174

1  6 percent," is because Ian said that.
2  BY MR. COFFIN:
3      Q    Say that again.
4      A    I don't recall Ian specifically saying
5  that, but I'm just trying to be helpful here.  As
6  I sit here today, it would appear that Ian did
7  say, "Should get to 5 or 6 percent," because I
8  wrote that next to Ian's name.
9      Q    And what did the 5 to 6 percent refer
10  to?
11      A    I'm speculating at this point because
12  the only thing that makes sense to me is for that
13  to refer to the price differential that would be
14  charged by Fortrend.
15      Q    Turn to 1295, please.  Down at the
16  bottom.  It says -- underneath the line that goes
17  across the page.  See that?
18      A    Yes.
19      Q    Could you read that for me, please?
20      A    Looks like it says, "First time they
21  talked with Fortrend attorney to attorney."
22           Then says, "Ian is not comfortable

Page 175

1  taking fee without disclosure to client and
2  directing Fortrend to pay us a portion."
3      Q    Was it understood from the beginning
4  that Fortrend would pay the fee, Midcoast's fee to
5  PwC?
6           MR. TURKUS:  Objection to the form of
7  the question.
8           What do you mean by "at the beginning"?
9           MR. COFFIN:  When the details of the
10  transaction were being worked out.
11           MR. TURKUS:  Objection to the form of
12  the question.  Same objection.
13           MR. STERN:  Could you restate that
14  question?
15           MR. COFFIN:  Sure.
16  BY MR. COFFIN:
17      Q    I guess I'll ask it this way:  When was
18  it determined that Fortrend would pay PwC's fee?
19           MR. TURKUS:  Objection to the form of
20  the question.
21           MR. STERN:  Objection, form.
22           MR. TURKUS:  It's inconsistent with the

Page 176

1      witness's testimony.
2  BY MR. COFFIN:
3      Q    And I know you said they paid it on
4  behalf of Midcoast; is that correct?
5      A    Let me restate what I said earlier.
6           We were advised by Fortrend that their
7  practice in other transactions was to permit a
8  portion of the sales proceeds from the sale of
9  assets to be applied toward the payment of the
10  buyer's counsel's fees.  And their practice in
11  other transactions was to permit a portion of
12  those fees equal to approximately 15 percent of
13  the price differential to be applied toward the
14  buyer's counsel's fees.
15           Our client was only Midcoast.  Our fees
16  were to be paid by Midcoast, and these notes at
17  the bottom refer to the fact -- actually, are
18  consistent with what we've already gone through in
19  the engagement letter; that we would receive that
20  15 percent of the price differential only if
21  Midcoast, our client, directed Fortrend to
22  essentially, by wire transfer, I assume, send PwC

Page 177

1  a payment at Midcoast's direction.
2      Q    Turn to 1297, please.  Top says
3  "August 26th"; is that right?
4      A    Yes.
5      Q    And next to it, it says, "Steve Snyder
6  of Fortrend called."
7           Were you involved in that call?
8      A    I said earlier that I believe there was
9  a call involving E&Y for Fortrend and PwC in late
10  August.  I was not a part of that call.  I believe
11  that this is simply my jotting down the fact that
12  that call took place.
13      Q    All right.  The first entry is that
14  note "tombstones"; is that what that says?
15      A    I believe that's what that says.
16      Q    What is meant by tombstones?
17      A    "Tombstone" is a term commonly used for
18  an announcement, a public announcement of a
19  transaction.  I don't remember why I wrote that
20  down.
21      Q    Okay.  The next entry, it says,
22  "Agree" -- is that "new standard dog and pony

45 (Pages 174 to 177)

2bce65f8-760c-46ed-9083-54d369e7a9aa

Witness:  Gary Wilcox

Page 178

1  show"?
2      A    I believe so.
3      Q    Okay.  Do you recall why you wrote that
4  note?
5      A    I believe this was some notes I jotted
6  down when I met with Langley's counsel on
7  September 13 to discuss what would happen if
8  Fortrend entered the bidding process as a
9  potential stock purchaser.
10     Q    So you're saying that these notes were
11 written prior to your meeting with Langley on
12 December 13?
13     A    I believe it was written --
14         MR. TURKUS:  Objection to form of the
15 question.
16     A    I believe it was a meeting with
17 Langley's counsel.  I don't recall if Langley was
18 present.
19 BY MR. COFFIN:
20     Q    Okay.  Go to 1299, please.  Is this a
21 continuation of notes taken on the prior page,
22 1299?

Page 179

1      A    It appears to be.
2      Q    It appears the second note on that page
3  says -- is that "now" or "knew"?  Read that for
4  me, would you, please?
5      A    That appears to say, "Now" -- I don't
6  understand why, but it appears to say, "Now, a
7  condition to closing, buyer get opinion, whether
8  PwC or Ernst."
9      Q    Do you recall -- I assume buyer -- I'm
10 sorry.  The buyer in that regard would be Midcoast
11 or Fortrend, or do you recall?
12     A    I don't recall.
13     Q    Okay.
14         MR. TURKUS:  Objection to the form of
15 the question.
16 BY MR. COFFIN:
17     Q    Down at the bottom of that page, it
18 says "boss"; is that correct?
19     A    Yes.
20     Q    What is that in reference to?
21         MR. TURKUS:  Objection to the form of
22 the question.

Page 180

1      A    Again, I don't know what I was thinking
2  at the time, but I think we all know now what
3  "boss" refers to.  It was a transaction that the
4  IRS has listed.
5  BY MR. COFFIN:
6      Q    You don't recall how that -- if that
7  relates to the Midcoast transaction at all?
8      A    I don't think it related at all to the
9  Midcoast transaction.  I don't know why I jotted
10 that down.
11         MR. TURKUS:  Can I ask if we can go off
12 the record for a moment?
13         MR. COFFIN:  Sure.
14         (Whereupon, there were discussions off
15 the record.)
16 BY MR. COFFIN:
17     Q    Go to 1303, please.  At the bottom of
18 the page, there's a note that says, "When go to
19 LOI" -- I assume that's the letter of intent --
20 "need" -- what's the rest of that statement?
21     A    I don't know what that means.  It looks
22 like -- I don't know if it's "ask" or "advance."

Page 181

1      Q    -- "of $50,000."
2      Do you recall if there was some kind of
3  a request for a $50,000 advance?
4      A    I believe this was referring to whether
5  Midcoast would have to pay Fortrend 50,000 up
6  front to sign the letter of intent to the purchase
7  of assets.  But, as I recall, it wasn't required.
8  This was just a discussion of whether it might be
9  required.
10     Q    1306, please.  About five or six lines
11 down, it says, "Better" -- is that, "Better with
12 us"?
13     A    That appears to be what it says, but I
14 can't explain it.
15     Q    "Better with us.  Agreed that
16 Fortrend's bid has to be greater than 5 million."
17 Is that what it says?
18     A    That's what it says.
19     Q    Any recollection of what that meant?
20     A    No.  I will speculate today that it
21 refers to the bid that Fortrend makes on the
22 purchase of stock as being more than 5 million

46 (Pages 178 to 181)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 182

1 relative to something else.
2     Q    All right.  Turn to 1307, please.
3 There's an entry there in the middle, "Craig
4 Hoffman, 9/17"?
5     A    Yes.
6     Q    And below that, there's a note that
7 begins with, "Two ways."  Could you read 1 and 2
8 for me, please?
9     A    Appears to say, "Two ways: 1, Fortrend
10 sets up, engages accounting firm later and pays
11 premium.  Second" -- I don't know what this says.
12 "Second" -- looks like "RD, pay as finder's fee."
13     Q    Then below that?
14     A    That appears to say, "No engagement
15 letter with firm based on verbal understanding."
16     Q    Back on 1307 where it says, "No
17 engagement letter with firm based on verbal
18 understanding," was that -- is it your
19 understanding, your recollection that that meant
20 between PwC and Fortrend?
21     MR. TURKUS:  You're asking him what he
22 had in mind when he wrote it down, or are you

Page 183

1     asking him what he thinks it might mean
2 today?
3     MR. COFFIN:  What he had in mind when
4 he wrote it down.
5     A    I think what I had in mind when I wrote
6 that down is that there is no engagement letter
7 between PwC and Fortrend.
8 BY MR. COFFIN:
9     Q    Did that have something to do with the
10 payment of the fee?
11     MR. TURKUS:  Objection to the form of
12 the question.
13     A    As I've said, Fortrend told us they had
14 a practice of permitting a portion of their sales
15 proceeds to be paid to buyer's counsel.  This is
16 referring to that understanding; that if that
17 happened, it would not be pursuant to any
18 engagement letter between PwC and Fortrend and it
19 would, while it's not written there, it would be
20 at the buyer's direction.
21 BY MR. COFFIN:
22     Q    Turn to 1308, PwC1308 at the bottom.

Page 184

1 I'm going to ask you:  Do these notes on the
2 bottom with -- looks like you had law conversation
3 with Bob Whitten; is that correct?
4     A    I believe that's correct.
5     MR. TURKUS:  Objection to the form of
6 the question.
7     A    I believe that Bob W. refers to Bob
8 Whitten.
9 BY MR. COFFIN:
10     Q    Okay.
11     MR. TURKUS:  The question was:  Was
12 this relating to a conversation with
13 Mr. Whitten?  If you can recall.
14     A    I believe, based on the way that I have
15 written Bob Whitten's name in my notes, that this
16 was a conversation with him.
17 BY MR. COFFIN:
18     Q    And there's a reference there to
19 Circular 230; is that correct?
20     A    I see the words, yes.
21     Q    Okay.  You recall Circular 230 being at
22 issue back in September of '99?

Page 185

1     MR. TURKUS:  Objection to the form of
2 the question.
3     At issue for whom about what?  What are
4 you asking?
5     MR. COFFIN:  Well, I'm asking why is he
6 discussing -- why is he writing down
7 "Circular 230" here.
8     MR. TURKUS:  Objection to the form of
9 the question.
10     A    I can't explain why I wrote it down
11 other than it's pretty obvious that it was
12 discussed in some way.
13     Do you have a more specific question
14 for me about that?
15 BY MR. COFFIN:
16     Q    Was there a concern that -- what does
17 Circular 230 say?
18     A    You've got to be kidding me.  Is that
19 really your question?
20     Q    Yeah.
21     MR. TURKUS:  Today you want to know
22 what Circular 230 means?  Just let me --

47 (Pages 182 to 185)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:   Gary Wilcox**

Page 186

1        MR. COFFIN:  Just in general, what does
2    it say?
3        MR. TURKUS:  What does it say today or
4    what did it say in 1999?  And how can the
5    witness really be expected to recall in
6    detail that?
7        MR. COFFIN:  I didn't ask in detail; I
8    said in general.
9        MR. TURKUS:  Do you want to know what
10    it says today or what it said in 1999?
11        MR. COFFIN:  In '99 in general.
12        MR. TURKUS:  Objection to the form of
13    the question.
14    A    I need to understand why the government
15    is asking me personally about Circular 230 in a
16    case about a corporate taxpayer.  I just need to
17    understand.
18    BY MR. COFFIN:
19    Q    Well, you wrote it down in the notes,
20    that's why I'm asking you.
21    A    I need to understand why it's relevant
22    to your --

Page 187

1    Q    It's in the notes.
2    A    -- to this particular case.
3    Q    It's in the notes; that's why it's
4    relevant.
5    A    I agree it's in the notes.
6    Q    Okay.
7    A    I wrote it down.
8    Q    So tell me about that.
9    A    What more do you need to know?
10    Q    I need to know how it applied to this
11    case, the facts of this case.
12        MR. STERN:  Objection to form.
13        MR. TURKUS:  Objection to the form of
14    the question.  If you can recall.
15    A    It appears from these notes that
16    Circular 230 is being discussed because Bob
17    Whitten and I are determining whether there are
18    any issues based on a proposal to Midcoast that we
19    be paid based on extraordinary value.
20    BY MR. COFFIN:
21    Q    Go to 1310, please, where it says
22    "Dennis M. and Bob W." in the top third of the

Page 188

1    page.  Do you see that?
2    A    Yes.
3    Q    What does that say below that?
4    A    "Probably do cap loss generator."
5    Q    What is a cap loss generator?
6        MR. TURKUS:  Do you mean generally what
7    is a cap loss generator, or do you mean what
8    do the words mean in these notes?
9        MR. COFFIN:  What do the words mean in
10    these notes?
11        MR. TURKUS:  If you recall.
12    A    I don't recall why that statement is in
13    these notes.
14    BY MR. COFFIN:
15    Q    Go to 1320, please.  The bottom of the
16    page, 9/30, Tom P.; is that correct?
17    A    Yes.
18    Q    Read those lines there, after that.
19    A    "Agree with GBW, not made clear.  On
20    Fortrend side only makes sense re percentage of
21    gain shelter.  Step-up equals purchase price over
22    basis.  Dan T. happy re lower rate."

Page 189

1    Q    What are you referring to when you talk
2    about gain shelter; do you recall?
3    A    Well, because I'm referring to
4    Fortrend, I assume that it refers to the gain
5    Fortrend will recognize on the sale of the assets.
6    Q    Okay.
7    A    As I've said, I have no idea how or
8    whether they sheltered that gain.
9        Dan T., I don't -- I believe that is
10    someone at -- was someone at Midcoast.
11    Q    And the 1322, please.  The top, there's
12    an entry there, 10/4, Tom P.  Read that first line
13    for me, please.
14    A    "Richard Robert.  Why not beat down
15    fee?"
16    Q    Do you recall -- let me back up.
17        Would this note have been taken
18    pursuant to a conversation with Mr. Palmisano?
19    A    I believe so.
20    Q    Do you recall if Mr. Palmisano was
21    communicating to you a request by Mr. Robert?
22        MR. TURKUS:  Objection to the form of

48  (Pages 186 to 189)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 190

1  the question.
2      Is the question whether he's, sitting
3  here today he recalls that, or whether that's
4  what he interprets this note to mean?
5      MR. COFFIN:  His interpretation.
6      MR. TURKUS:  So you're not asking him
7  whether he recalls it; is that right?
8      MR. COFFIN:  Right.
9      A    My interpretation of this, because I
10  wrote down "Richard Robert" before this statement,
11  that it refers to a comment that Richard Robert
12  made to Tom Palmisano.
13  BY MR. COFFIN:
14      Q    Do you recall discussing with
15  Mr. Palmisano a comment regarding this statement
16  that would be made by Mr. Robert?
17      MR. TURKUS:  Do you mean independent of
18  these notes does he have such a recollection?
19      MR. COFFIN:  Yes.
20      A    Well, I think we just agreed that I was
21  going to answer the question based on what it
22  appears to me.  How it appears to me today, I

Page 191

1  don't recall having this specific conversation
2  with Tom Palmisano.
3  BY MR. COFFIN:
4      Q    Okay.  Go to 1326, please.  There's an
5  entry at the top, 10/16, T. Hardy [phonetic].  It
6  says, "Represent lender to Midcoast"?
7      A    Yes.
8      Q    Did you have a conversation with
9  somebody who represented the lender to Midcoast?
10      MR. TURKUS:  Objection to the form of
11  the question.
12      Are you referring to these notes or are
13  you asking him whether he has an independent
14  recollection of a conversation with a lender
15  to Midcoast?
16      MR. COFFIN:  Independent recollection.
17      A    I do have an independent recollection
18  of a conversation with T. Hardy who I believe was
19  counsel to a potential lender.
20  BY MR. COFFIN:
21      Q    Do you remember who the potential
22  lender was?

Page 192

1      A    No.
2      Q    Do you recall who the lender may have
3  been?
4      A    No.  I said no.
5      Q    Oh, I'm sorry.
6      MR. STERN:  Are you about to wrap up
7  so I can ask my questions?
8      MR. COFFIN:  Yeah.  Give me ten more
9  minutes.
10      MR. STERN:  Okay.
11  BY MR. COFFIN:
12      Q    Do you recall Mr. Hardy having
13  concern -- where it says "concern of lender out of
14  ordinary tax advantage," do you recall Mr. Hardy
15  expressing that concern to you?
16      MR. TURKUS:  Objection to the form of
17  the question.
18      Independent of the notes; is that what
19  you're asking?
20      MR. COFFIN:  Yes.
21      A    I don't remember a concern for
22  Mr. Hardy independent of my notes.  I do see in my

Page 193

1  notes that I wrote down concern that must have
2  been reflecting my conversation with him, but I
3  don't know what else to make of it.
4  BY MR. COFFIN:
5      Q    Page 1324.  10/5 entry, Tom P. next to
6  that.  Does it say, "New push to get" -- could you
7  read the rest of that for me, please?
8      A    "New push to get engagement letter with
9  Fortrend.  Need format."
10      Q    Okay.  Independent of these notes, do
11  you recall that there was a push to get an
12  engagement letter with Fortrend?
13      A    I believe that refers to an engagement
14  letter between Fortrend and Midcoast relating to
15  the purchase of assets.  I don't know why I wrote
16  down "engagement letter," but I believe it
17  referred to this -- these notes refer to a letter
18  of intent between Fortrend and Midcoast.
19      Q    If you can go to 1339, please.  At the
20  top, it says "4:15 p.m."
21      A    Okay.
22      Q    Read those notes for me, please.

49 (Pages 190 to 193)

2bce65f8-760c-46ed-9083-54d369e7a9aa

Witness:  Gary Wilcox

Page 194

1    A    Okay.
2         MR. TURKUS:  That line?
3         MR. COFFIN:  Yes, just that segment.
4    A    Again, I am reading the words in full
5  even though they appear abbreviated.  "S" --
6  "Steve Korb suggested that instead of indemnity,
7  Fortrend indemnify Dennis if Bishop treated as
8  selling assets and then liquidating.  Told him
9  that if recast as sale of assets by Bishop in
10 hands of Dennis, Fortrend wouldn't be able to use
11 its losses to offset gain."
12 BY MR. COFFIN:
13   Q    You were aware at the time that
14 Fortrend would have losses to offset gain?
15   A    No.  As I've said, I'm not aware how or
16 whether Fortrend was able to offset its gain.  I
17 think this was purely based on an assumption or a
18 speculation that they might have losses.
19   Q    I hand you what's been marked as
20 Government Exhibit 205.  Is this an article that
21 you authored?
22   A    Yes.

Page 195

1         (Whereupon, there were discussions off
2  the record.)
3  BY MR. COFFIN:
4    Q    You refer in your article to viral
5  stock; is that correct?
6    A    Yes.
7    Q    And you also refer to shelters that,
8  similarly, involve the transfer of high-basis
9  assets to an entity in a purported tax-free
10 transaction followed by a sale of the interest in
11 the entity.
12        Do you know if viral stock was used in
13 the -- used by Fortrend in this transaction?
14        MR. STERN:  Objection to form.
15        MR. TURKUS:  Objection to the form of
16 the question.  Asked and answered over and
17 over and over.
18   A    No, I do not know how or whether
19 Fortrend offset the gain in this transaction.
20 And, in particular, I'm not aware that they used
21 viral stock.
22

Page 196

1  BY MR. COFFIN:
2    Q    How are you sure about that?
3         MR. TURKUS:  Objection to the form of
4  the question.
5         That's not what he said.
6         MR. COFFIN:  Okay.  Well, let me clear
7  that up.
8         MR. TURKUS:  Don't misstate what the
9  witness says.
10        MR. COFFIN:  I'm sorry.
11        MR. TURKUS:  He said, "In particular,
12 I'm not sure."
13        MR. COFFIN:  Okay.  All right.  You
14 okay?
15        MR. TURKUS:  Yeah.
16        MR. COFFIN:  Good.
17        MR. TURKUS:  And if you don't
18 mischaracterize the witness's answers, I'll
19 be much better.
20        MR. COFFIN:  Thank you.
21 BY MR. COFFIN:
22   Q    Does this article set forth an analysis

Page 197

1  of how viral stock is used in tax shelter
2  transactions?
3         MR. TURKUS:  Objection to the form of
4  the question.
5         MR. STERN:  I agree.  Objection.
6    A    No.  This -- well, this article
7  explains how viral stock was used in the long-term
8  capital transaction and then compares the
9  long-term capital decision and the Black & Decker
10 decision in a broader context of similar kinds of
11 transactions, in particular, the -- well,
12 that's -- I'll leave it at that.
13 BY MR. COFFIN:
14   Q    Were you aware of lease strip and viral
15 stock concepts back in 1999?
16        MR. TURKUS:  Objection to the form of
17 the question.
18   A    No, I don't believe I was.
19 BY MR. COFFIN:
20   Q    When did you become familiar with those
21 concepts?
22        MR. TURKUS:  Objection to the form of

50  (Pages 194 to 197)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 198

1      the question.
2      A    When I worked for the government.
3  BY MR. COFFIN:
4      Q    When you worked for the IRS, do you
5  recall having a meeting with the IRS chief
6  counsel's office regarding intermediary
7  transactions?
8          MR. TURKUS:  Objection to the form of
9  the question.
10     A    In what context?
11 BY MR. COFFIN:
12     Q    You recall having a meeting with other
13 chief counsel lawyers wherein this specific
14 transaction was discussed?
15         MR. TURKUS:  What specific transaction?
16         MR. COFFIN:  The Midcoast transaction.
17         MR. TURKUS:  The Midcoast transaction?
18         MR. COFFIN:  Um-hum.
19     A    I don't believe.  Can you give me some
20 specifics and I'll try to remember?
21 BY MR. COFFIN:
22     Q    Do you recall having a meeting where

Page 199

1  Ms. Yvonne Peters was present at the meeting
2  discussing this Midco transaction?
3          MR. TURKUS:  You keep flipping back and
4  forth, Mr. Coffin.  Do you mean this
5  transaction or Midco transactions generally?
6          MR. COFFIN:  I said Midcoast.
7          MR. TURKUS:  No, you said Midco.
8          MR. COFFIN:  No, I didn't.
9          MR. TURKUS:  Yes, you did.  Look at the
10 record.
11         MR. COFFIN:  I said the Midcoast
12 transaction.
13         MR. TURKUS:  No, that's not what you
14 said.  So please rephrase the question.
15 BY MR. COFFIN:
16     Q    Do you recall having a meeting with
17 Mrs. Yvonne Peters present?
18         MR. TURKUS:  Want to take a break?
19         MR. COFFIN:  Yes, sir.
20         MR. TURKUS:  You want a break?
21         MR. COFFIN:  Yeah.  Just a two-minute
22 break.

Page 200

1          MR. TURKUS:  That's okay.
2          (Whereupon, there was a break from
3  4:43 p.m. until 4:48 p.m.)
4  BY MR. COFFIN:
5      Q    Just one more question.
6          Go to 1347, please, of Government
7  Exhibit 201.  And that diagram there, Mr. Wilcox,
8  is that your handwriting?
9      A    Yes.
10         MR. COFFIN:  Okay.  Pass the witness.
11 EXAMINATION BY COUNSEL FOR THE ENBRIDGE PLAINTIFFS
12 BY MR. STERN:
13     Q    Mr. Wilcox, you understand I'm
14 representing the Enbridge plaintiffs in this
15 proceeding?
16     A    Yes.
17     Q    All right.  I've got a few questions to
18 ask you and I may cover some ground that
19 Mr. Coffin's already covered.  I'll ask you to be
20 patient with me, but I'm trying to flesh some
21 things out.
22         First of all, could you just give us

Page 201

1  a -- at the time, you know, in September of 1999
2  when you became involved with the Midcoast
3  transactions, can you describe for us in a general
4  sense your experience in advising parties to
5  mergers and acquisition transactions regarding tax
6  issues?  Just give me a general description of
7  your experience.  If you were trying -- if you
8  were trying to -- if you were trying to explain to
9  somebody like Midcoast why they should retain you
10 in a transaction of this type, give me the
11 highlights of your experience.
12     A    That I specialize in advising taxpayers
13 on tax aspects of mergers and acquisitions, in
14 particular, how to structure various taxable and
15 nontaxable transactions.  And, you know, I don't
16 know what I'd say other than I had many years of
17 experience, including years of experience at a
18 national office level where I've seen a number of
19 different kinds of transactions.  And I'm not sure
20 what more I would add.  I generally am not
21 comfortable trying to gloat about my own
22 experience, so I'm pretty -- I find that difficult

                                    51 (Pages 198 to 201)

Witness:  Gary Wilcox

Page 202

1  to go on and on about that.
2      Q    Okay.  Fair enough.
3          At some point you did join the IRS in
4  some capacity, right?
5      A    Yes.
6      Q    And what was that?
7      A    It was a deputy chief counsel
8  technical.  So I was in charge of -- my direct
9  responsibility was to be in charge of the
10  technical positions and the service, in
11  particular, the technical positions that are set
12  forth in published guidance, regulations,
13  readings, and the like.
14          Officially, I was the principal deputy
15  of the chief counsel, so I was second in charge of
16  the chief counsel's office.
17      Q    And what is the chief counsel's office?
18      A    Chief counsel's office is an office of
19  approximately 1,500 attorneys made up of both
20  national office attorneys at 1111 Constitution
21  who --
22      Q    What is 1111 Constitution?

Page 203

1      A    1111 Constitution is the headquarters
2  of the IRS.  That's where the commissioner's
3  office is, that's where the chief counsel's office
4  is.  About half of the 1,500 chief counsel
5  attorneys work out of that building.  The other
6  half work in various offices throughout the
7  country.  And many of the attorneys who -- well,
8  in fact, most of the chief counsel attorneys who
9  work at the national headquarters building
10  reported to me because they were within the
11  associate offices, and the associate offices are
12  divided by technical specialties such as
13  corporate, international, pass-throughs.  And they
14  are the attorneys primarily in charge of
15  developing technical positions in service.
16          The other attorneys, like several of
17  the attorneys in this room, are assigned to
18  operating -- they're assigned to advise the
19  operating divisions of the Service, whether it's
20  LMSB or SPD and, for the most part, they are
21  located in various IRS offices throughout the
22  country.

Page 204

1      Q    That are essentially implementing those
2  technical positions?
3      A    Well, they are.  They represent the IRS
4  in the tax court.  They advise revenue agents in
5  connection with audits.  They advise appeals.
6  They work with the attorneys in the national
7  office that help develop technical positions and
8  guidance.  And, for the most part, the attorneys
9  in the field who are associated with the operating
10  division reported to the other deputy who, at the
11  time, was Emily Parker.
12      Q    So the chief counsel and below the
13  chief counsel there are two deputies?
14      A    Two deputies.  I was the technical
15  deputy.  Emily was the deputy chief counsel in
16  charge of operations.  But there was one principal
17  deputy, and that was me.
18      Q    Okay.  And when you talk about
19  technical positions, those are policy positions
20  that are issued by the IRS?
21      A    Well, it could be a legal position of
22  the IRS in a case, or it could be a legal position

Page 205

1  of the IRS that was to be implemented in published
2  guidance.  So I attended many briefings of actual
3  cases because I was concerned about the technical
4  position of the Service.
5      Q    Jumping back to the Midcoast
6  transaction.  As I understand it, you became
7  involved in mid September of 1999, and you
8  provided advice to Midcoast regarding tax aspects
9  of the transaction; is that right?
10          MR. TURKUS:  Objection to the form of
11      the question.
12  BY MR. STERN:
13      Q    Is that right?
14      A    Yes.
15      Q    And ultimately your firm issued an
16  opinion to Midcoast in connection with that
17  transaction?
18      A    That is correct.
19          MR. STERN:  Let me mark this Wilcox
20      Exhibit 1.
21          (Whereupon, Wilcox Exhibit No. 1 was
22  marked for identification.)

52 (Pages 202 to 205)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:   Gary Wilcox**

1   BY MR. STERN:
2       Q    Can you identify Wilcox Exhibit 1?
3       A    This is an opinion from PwC to
4   Midcoast.
5       Q    Is that the opinion that we just were
6   talking about, the opinion that PwC issued in
7   connection with the Midcoast transaction?
8       A    Yes.
9           MR. TURKUS:  Just for the record, I
10      think he's talking about pages PwCP1246
11      through 1248 and not page 1245.
12          MR. STERN:  Fair enough.
13  BY MR. STERN:
14      Q    Mr. Wilcox, the first page of Exhibit 1
15  to your deposition is a cover letter from you to
16  Mr. Robert transmitting to Mr. Robert the actual
17  opinion which is the second through fourth page of
18  the exhibit; is that right?
19      A    Correct.
20      Q    Now, the actual opinion is in the third
21  to last paragraph on the last page of Exhibit 1 to
22  your deposition; is that right?

1       A    That is correct.  The actual opinion
2   language is on page 3.
3       Q    And that actual opinion language is
4   that, "Based upon and subject to the foregoing as
5   well as limitations set forth below, we are of the
6   opinion that it is more likely than not that
7   immediately after the consummation of the
8   purchase, the acquired assets in the aggregate
9   will have for federal income tax purposes a tax
10  basis in the hands of Midcoast equal to the cost
11  to Midcoast of such acquired assets as determined
12  in accordance with Section 1012 of the Internal
13  Revenue Code of 1986 as amended."
14          Is that right?
15      A    That is right.
16      Q    And that was the opinion that PwC was
17  willing to provide after your participation in the
18  transaction as the tax advisor and your review of
19  the various materials that are described in the
20  opinion letter?
21          MR. COFFIN:  Objection.
22          MR. TURKUS:  Objection to the form of

1       the question.
2   BY MR. STERN:
3       Q    What's the basis of your opinion?
4           MR. COFFIN:  I said leading.
5       A    This is an opinion that PwC was willing
6   to issue based on --
7   BY MR. STERN:
8       Q    Let me ask you the question --
9       A    Okay.
10      Q    -- in a different way.
11          On what is that opinion based?
12      A    It is based on the transaction
13  documents, the representation letters provided
14  from Midcoast and Fortrend, whatever additional
15  information that we obtained in connection with
16  our role in this transaction, and our analysis of
17  the applicable law.
18      Q    And Mr. Coffin took you through and
19  showed you various e-mails and notes that were
20  generated during the course of the, I guess, the
21  negotiations of the transaction, e-mails that you
22  participated in either as an author or recipient.

1   You recall that?
2       A    Yes.
3       Q    So you had knowledge of the subject
4   matter of those e-mails at the time that you
5   forwarded this opinion to Midcoast?
6       A    Yes.
7       Q    And if we could look on the third page
8   of the exhibit, second page of the actual opinion
9   letter -- it's Bates stamped PwCP1247 -- there's a
10  reference under the numbered paragraphs to
11  representation letters from Midcoast and Fortrend.
12          You see that?
13      A    Yes.
14      Q    And if we could pull them out of
15  your -- if we could pull them out of your
16  notebooks, 189, Government Exhibit -- no, excuse
17  me.  176 and 195.
18          What is Government Exhibit 176?
19      A    This appears to be a final
20  representation letter from Fortrend to PwC.
21      Q    And do you understand that that's the
22  representation letter that's referenced on the

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:   Gary Wilcox**

Page 210

1  second page of the PwC opinion letter?
2      A    Yes, I believe it is.
3      Q    And did PwC rely on the representations
4  by Fortrend in this letter in issuing its opinion?
5      A    Yes.
6      Q    Now, Mr. Coffin looked at some --
7  various drafts that appeared to have been
8  exchanged between PwC and Fortrend, first drafts
9  of this letter.  Do you recall that?
10     A    Yes.
11     Q    Were there certain factual matters that
12 PwC was specifically requesting that Fortrend make
13 representations regarding?
14     A    I'm sorry, can you repeat that?
15     Q    Fortrend wasn't making representations
16 to you guys in a vacuum.  Did you tell them the
17 types of things that you needed from them?
18     A    I think I testified that prior to the
19 closing of the transaction in November '99, I
20 presented Craig Hoffman with a draft of a
21 representation letter, asked him to look at it,
22 comment on it, make additions, make deletions.

Page 211

1  And as we've seen through some of the faxes,
2  there were changes that were made by Fortrend.
3          So I think I'm answering your question,
4  yes, we did ask Fortrend to review what we
5  believed were the appropriate facts that we needed
6  them to confirm.
7      Q    All right.  And they actually came back
8  and provided you with some input on whether or not
9  they could provide the representation using the
10 same things that you submitted to them?
11     A    Yes, they did come back to us with
12 input and comments.
13     Q    And that process led to a document that
14 apparently you could live with and they could live
15 with, Exhibit 176, Government Exhibit 176?
16         MR. TURKUS:  Objection to the form of
17 the question.
18 BY MR. STERN:
19     Q    Let me put it this way:  Ultimately
20 that process led to a letter that they were
21 willing to sign and you were willing to accept as
22 a basis for your opinions?

Page 212

1      A    That is correct.
2      Q    And was it unusual in your experience
3  to have that kind of -- well, first of all, to
4  request a representation letter from a party to a
5  transaction that was not your client?
6      A    I've done many tax-free reorganizations
7  in my career.  In fact, I've co-authored the
8  treatise, the B&A treatise on tax-free reorg, so I
9  know that area well.  It's quite common in that
10 area to get representation letters from both
11 parties to the transaction.  There's always an
12 acquiring company and there's always a target
13 company.  You get representations letters from
14 each.  Frankly, I had not done a so-called Midco
15 transaction.
16     Q    Okay.  Well, that wasn't my question.
17 My question was:  In the transactions that you've
18 been involved in, is it unusual for you to request
19 representation letters from a party that is not
20 your client?
21     A    It is not unusual and it is quite
22 common in the context of transactions to ask

Page 213

1  representation -- ask for a representation letter
2  from a nonclient.
3      Q    And in those instances in your
4  experience where you so asked for representation
5  letters from a nonclient, is it unusual to have
6  some give and take on the wording of the letter?
7      A    No, it's actually quite common because
8  any time any party is asked to certify as to a
9  statement of facts, they generally take it
10 seriously and that there is almost always some
11 give and take on the actual language that's used.
12     Q    Based on your interactions with
13 Fortrend, was there anything that suggested to you
14 that they were not taking their representation
15 letters seriously?
16     A    No.  The answer is no.
17     Q    We can look at Exhibit 195.  Can you
18 tell us what Exhibit 195 is, Government
19 Exhibit 195?
20     A    This is a final representation letter
21 from Midcoast to PwC.
22     Q    All right.  And to be specific, there's

54 (Pages 210 to 213)

2bce65f8-760c-46ed-9083-54d369e7a9aa

Witness:  Gary Wilcox

Page 214

1  a cover fax from Mr. Palmisano to you and then
2  attached is the actual rep letter beginning on the
3  second page, PwCP1256 through 1269, correct?
4      A    Correct.
5      Q    All right.  And is this letter from
6  Midcoast the Midcoast representation letter that's
7  referred to in the second page of the PwC opinion
8  letter marked as Wilcox Exhibit --
9      A    Yes.
10     Q    -- 1?
11     A    Yes.
12     Q    Can you describe for us how the rep
13 letter from Midcoast was prepared?  I mean, who
14 actually put together the wording in the
15 description of the statement of facts and then the
16 specific representations that were made by
17 Midcoast?
18     A    The process was similar to the process
19 we went through with Fortrend.  I mean, we, PwC,
20 prepared a draft of this letter and presented it
21 to Midcoast, asked Midcoast to review it
22 carefully, make comments.  As I recall, there were

Page 215

1  comments.  But that, to me, that was quite common
2  because, in fact, in every other transaction I'd
3  ever been involved with where there were
4  representation letters, the attorneys prepared the
5  initial draft.
6      Q    Okay.  Who prepared the initial draft
7  here?
8      A    Well, I said the attorneys.  I believe
9  that PwC prepared the initial draft of the
10 Midcoast representation letter.
11     Q    We saw earlier Mr. Coffin took you
12 through Exhibit 160 which is the draft memorandum
13 which had a statement of background facts.
14        Do you recall that?
15     A    Yes.
16     Q    And I'm not going to ask you to compare
17 it, but the documents speak for themselves, and it
18 appears to me that the background facts in the
19 memorandum marked Government Exhibit 160 is very
20 similar, in many respects identical, to the
21 statement of facts in the Midcoast rep letter.
22        Have you any reason to disagree with

Page 216

1  that?  Is that consistent with your memory?
2      A    I don't have any reason to disagree
3  with that.  I do note that the memorandum was
4  dated mid December and it's possible that it
5  reflects only the version of the statement of
6  facts that existed at that time.  There might have
7  been subsequent changes before the opinion was
8  finalized, but I don't know without comparing the
9  two.
10     Q    Okay.  To the extent you participated
11 in the Midcoast transaction as an advisor, a tax
12 advisor to Midcoast, you and others at PwC, did
13 you become aware -- I assume you became aware of
14 transaction documents and events surrounding --
15 some events surrounding the negotiation of the
16 transaction?
17        MR. TURKUS:  Objection to the form of
18     the question.
19 BY MR. STERN:
20     Q    Go ahead.
21     A    As tax advisors to Midcoast in a
22 several hundred million dollar transaction that

Page 217

1  was extraordinarily complicated, we were very
2  involved throughout the process advising them on
3  structural and tax issues in connection with the
4  transaction.
5      Q    If there was anything in this
6  representation letter that was inconsistent with
7  your understanding of either the transaction or
8  the events surrounding the negotiation of the
9  transaction, would you have raised either
10 objections or comments with Midcoast as you worked
11 with Midcoast to develop this representation
12 letter?
13     A    Absolutely.  I mean, the statement of
14 the facts obviously was intended to reflect an
15 accurate picture of what happened.  Our opinion,
16 frankly, is only as good as the facts and the law
17 it relies on and absolutely it was my objective
18 for the statement of facts to be accurate and to
19 disclose all the relevant facts, whether they
20 could be construed as favorable or unfavorable.
21     Q    And if we look at your notes marked
22 Government Exhibit 201, and on page 1276 there was

55 (Pages 214 to 217)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 218

1  a list of favorable facts and on page 1277 there
2  was a list of unfavorable facts.  You recall that?
3      A    Yes.
4      Q    And you were aware of both the
5  favorable list and the unfavorable list at the
6  time PwC issued its opinion?
7      A    Yes.
8          MR. TURKUS:  I was just asking if that
9      was a question.
10     A    Well, I was aware that I had written in
11 my notes favorable facts and unfavorable facts.  I
12 think it's also fair to say I was just aware as a
13 substantive matter when this opinion was issued
14 what the favorable facts and what the unfavorable
15 facts were and --
16 BY MR. STERN:
17     Q    Let me ask it a different way.  I think
18 that's a good qualification.
19         To the extent we had this list on page
20 1276 and 1277, Government Exhibit 201, you were
21 aware of all those items that were listed on those
22 two pages at the time you issued your opinion?

Page 219

1      A    Absolutely.  I think -- well, yes,
2  absolutely.
3      Q    As you participated in the transaction
4  as a tax advisor, did you interact with Midcoast
5  and Fortrend and their respective advisors, did
6  anyone ever suggest to you that Fortrend, or any
7  Fortrend affiliate, was acting as an agent for
8  Midcoast?
9      A    No, no one ever suggested anything like
10 that, and I'm not aware of any facts that would
11 suggest that they were an agent of Midcoast.
12     Q    Did anyone ever suggest to you, or did
13 you ever observe anything that suggested to you
14 that Fortrend or its affiliates were in some other
15 capacity acting on behalf of Midcoast in
16 connection with this transaction?
17     A    No.  No authority was given by Midcoast
18 to anyone at Fortrend to act on their behalf,
19 verbally or in writing.
20     Q    And just so we're clear, did PwC, what
21 was its relationship with Midcoast at the time you
22 became involved in September of 1999?

Page 220

1      A    Midcoast was already a client of PwC,
2  the Houston office.  Tom Palmisano and Bob Whitten
3  were already involved in providing tax advice to
4  Midcoast.
5      Q    To your knowledge, had Fortrend or any
6  of its affiliates ever been a client of PwC's?
7      A    No.  I'm not aware that they -- they
8  certainly were not a client at the time I was
9  involved in this transaction, and I'm not aware
10 that they were ever a client.
11     Q    Did you or anyone else at PwC, to your
12 knowledge, act on behalf of Fortrend or its
13 affiliates in connection with the Midcoast
14 transaction?
15     A    No, not in any way.  I mean, Fortrend
16 acted through its principals, it acted through its
17 attorneys, and other than a few conversations with
18 Fortrend, I really did not have that much -- not
19 much involvement with them directly.  Frankly, I
20 dealt mostly with their attorneys once the
21 transaction got under way.
22     Q    Let me shift gears and talk about

Page 221

1  Government Exhibit 189.  And Exhibit 189, I
2  believe you identified earlier as a memorandum
3  from you and Bob Whitten to the Midcoast tax
4  files; is that right?
5      A    Yes.
6      Q    And this memo relates to -- well, what
7  does -- hold on.  In the third paragraph, you and
8  Mr. Whitten wrote, "For the reasons explained
9  below, there is a good argument that the Midcoast
10 transaction is not the same or substantially
11 similar to the transaction described in Notice
12 2001-16."
13         What was Notice 2001-16?
14     A    It was the notice whereby the IRS
15 listed intermediary transactions or described
16 intermediary transactions as a listed transaction.
17 And I'm using the phrase "intermediary
18 transactions" in the same manner that the IRS
19 referred to that term.
20     Q    It's term defined by the IRS?
21     A    Well, can you point me to the notice?
22 I believe that was in the --

HUNDT REPORTING
214-220-1122

2bce65f8-760c-46ed-9083-54d369e7a9aa

Witness:   Gary Wilcox

Page 222

1    Q    186.
2    A    I believe that was in the title.  That
3  is a term used by the IRS in its listing notice,
4  intermediary transactions.
5    Q    All right.  Going back to that
6  paragraph that I just read about the Midcoast
7  transaction not being the same or substantially --
8  I'm sorry.
9    A    Got it.
10    Q    189?
11    A    Yes.
12    Q    Back to that sentence that I read about
13  the Midcoast transaction not being the same or
14  substantially similar to the transactions
15  described in Notice 2001-16.  Can you explain what
16  the significance of that conclusion by you and
17  Mr. Whitten was to Midcoast at that time?  If it
18  had been the same or substantially similar, would
19  there have been some action required of Midcoast?
20    A    Yes.  I believe the action, if it were
21  the same or substantially similar, I believe that
22  Midcoast would have had an obligation to attach a

Page 223

1  disclosure statement to its next file tax return.
2    Q    Was it PwC's opinion as of February 20,
3  2001, that Midcoast would not have to do that?
4    A    It was PwC's view that -- and I'm using
5  the words in this memo -- that there was a good
6  argument that it wasn't required to do that or
7  there was an appropriate basis for not filing that
8  disclosure statement.
9    Q    And do you know whether that conclusion
10  was communicated to Midcoast?
11        MR. TURKUS:  Objection.  Asked and
12    answered.
13    A    I don't recall being part of that
14  communication.  I believe that the communication
15  was made by Bob Whitten.
16  BY MR. STERN:
17    Q    Well, if we look at the last paragraph
18  of Exhibit 189, it says, "We have discussed this
19  matter with Dan Mendelson of Risk Management in
20  Washington, D.C.  Dan has confirmed that our
21  decision not to attach a disclosure statement on
22  the basis of the foregoing is an appropriate

Page 224

1  course of action."
2        What decision is he referring to -- are
3  you referring to when you refer to "our decision"?
4    A    I don't recall exactly what I was
5  thinking at the time that language was used in
6  this memo.  I do not that -- well, that I believe
7  PwC signed the tax returns for Midcoast.
8        So I think this was a situation where
9  there was both advice given to Midcoast as the
10  taxpayer as to what its obligations were and what
11  the risks to Midcoast were if it did not attach
12  this disclosure statement, as well as a decision
13  by PwC as return preparer to be comfortable with
14  this course of action.
15    Q    And the course of action was not
16  attaching the disclosure statement, disclosing the
17  Fortrend transaction?
18    A    Correct.
19    Q    So that was a decision that PwC made as
20  tax preparer, is that right, in its capacity as
21  tax preparer?
22    A    Well, you know, I don't know that I'm

Page 225

1  in the best position to comment on that.  I was
2  not involved with the preparation of the tax
3  return.
4    Q    Was that Mr. Palmisano?
5    A    Well, Palmisano and Whitten.
6    Q    We're going talk to Mr. Palmisano.
7    A    So I don't know, frankly, I should
8  clarify, what thinking they went through as return
9  preparers.  I was just trying to respond to your
10  question about the reference to "our decision."  I
11  was just trying to clarify that more was involved
12  here than simply giving advice to a client as to
13  the client's course of action because PwC was also
14  the return preparer.  That's all I was saying.
15    Q    So PwC as return preparer had to make
16  decisions about what it could and could not do or
17  should and should not do as return preparer?
18    A    Presumably, yes.
19    Q    All right.  I'm going to look through
20  my notes.  I may have some cats and dogs to ask
21  you about.
22        (Whereupon, there were discussions off

57 (Pages 222 to 225)

2bce65f8-760c-46ed-9083-54d369e7a9aa

Witness:  Gary Wilcox

Page 226

1  the record.)
2  BY MR. STERN:
3      Q    Let me jump back to Exhibit 160,
4  Government Exhibit 160.  I'm looking at page 1 --
5  excuse me, page 29 which is PwCP1140.  And
6  specifically at the paragraph at the top of the
7  page.  And I'm interested in from about two-thirds
8  of the way down, the sentence begins, "In any
9  event, had Midcoast gone bankrupt," on down to the
10 end of that paragraph.  If you could read it and
11 let me know when you finish.
12         MR. COFFIN:  What page is that, Karl?
13         MR. STERN:  29.
14         MR. TURKUS:  1140.
15         MR. COFFIN:  Where on the page?
16         MR. TURKUS:  The top paragraph.
17     A    Okay.
18 BY MR. STERN:
19     Q    You independently recall the risk to
20 K-Pipe as described in those sentences?
21     A    I guess I independently remember
22 thinking about this risk in connection with all

Page 227

1  the other favorable factors as well as perhaps
2  some of the unfavorable factors.
3      Q    Could you just describe for the Court
4  your understanding of this risk?
5          MR. TURKUS:  The Court?  You said
6  describe "for the Court."
7          MR. STERN:  The Court is going to be
8  hearing this.
9          MR. TURKUS:  But you guys have to agree
10 on whether this transcript is admissible.
11         Okay.  Never mind.  I withdraw my
12 objection.
13         MR. STERN:  Well, if we agree.
14         MR. TURKUS:  Nobody else objects.
15         Go right ahead.  Answer the question.
16     A    Companies worry about overnight risk of
17 terrorist incidents, acts of God, anything that
18 can happen that could expose them to risk and
19 prevent a transaction from happening.  And
20 Fortrend's purchase of the stock occurred on one
21 day, Fortrend's sale of the assets occurred the
22 next day.  If something happened to Midcoast that

Page 228

1  affected its ability to borrow money the next day,
2  then Fortrend could conceivably be left, you know,
3  owning the entire business that it just purchased
4  and potentially not being able to pay back the
5  loan that it had just incurred to buy the stock.
6          As far as I remember, you know, the
7  closing of the stock deal was not conditioned on
8  the asset deal closing.  There were no conditions
9  like that, as I remember.  There was no absolute
10 assurance that the asset sale would occur the next
11 day.  Parties might have expected it to occur, but
12 there was no absolute assurance that it would.
13 And if didn't, Fortrend could conceivably be at
14 risk for the company that it had just bought.  And
15 in the real world, companies worry about that
16 risk, the overnight risk.  And obviously we're
17 just making the point in the memo that that risk
18 was present here.
19     Q    Was it a real risk?
20     A    Well, who's to say it's real?  I mean,
21 it's a theoretical real.  It could be real, you
22 never know.  But it's something that companies in

Page 229

1  the real world worry about.
2          I think there's another point in here
3  that it's not just the overnight risk; it's the
4  risk under the contract with Langley.  I mean,
5  there were a number of covenants between Fortrend
6  and Langley associated with the purchase of the
7  stock that were not indemnified against or
8  guaranteed in any way, directly or indirectly, by
9  Midcoast or any affiliate of Midcoast.  And, you
10 know, it's not as if Fortrend was able to walk
11 away completely from this transaction.  It had
12 continuing obligations to Langley, it continued to
13 own assets, frankly, after the transaction.
14     Q    And that brings up another point that I
15 wanted to ask you about.
16         If we jump to Government Exhibit 195,
17 which was the Midcoast representation letter, on
18 page 11 of that letter, which is PwCP1266 -- you
19 there with me?
20         MR. TURKUS:  He is now.
21 BY MR. STERN:
22     Q    Okay.  The paragraph above the

58 (Pages 226 to 229)

HUNDT REPORTING
214-220-1122

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:   Gary Wilcox**

---

Page 230

1  "Representation" heading --
2      A    Yes.
3      Q    -- says, "Several differences between
4  the purchase price for the stock purchase and the
5  purchase price for the asset purchase should be
6  noted.  First, the working capital adjustment paid
7  by Fortrend to Langley was $239,425 less than the
8  working capital adjustment paid by Midcoast to
9  Fortrend due to adjustments that affected a
10  purchase of stock but not a purchase of assets,
11  e.g., accrued income taxes."
12          Could you explain that?
13          MR. COFFIN:  Objection, form.
14      A    I'm not sure I can explain this in
15  detail.  I think this statement was included in
16  the statement of facts to illustrate the point
17  that the purchase price paid under the stock
18  purchase agreement by Fortrend was not just a, you
19  know, a mirror image of the purchase price paid by
20  Midcoast under the asset purchase agreement with
21  only the difference being the so-called price
22  differential; that they're inherent in the

---

Page 231

1  differences between the purchase of stock and the
2  purchase of assets are differences in how purchase
3  price is calculated.
4          When you buy stock, you step in to all
5  of the contingent liabilities associated with the
6  business that are inside the corporation.  When
7  you buy assets, you get to pick and choose which
8  liabilities to assume.  And that right there
9  created differences between adjustments to the
10  purchase price.
11          Like any transaction, these
12  transactions had postclosing adjustments to the
13  purchase price based on audits of the working
14  capital and the like.  And, you know, here we had
15  a business that was purchased by Fortrend that
16  Fortrend sold to Midcoast less the butcher
17  interest and contingent claim, as I mentioned, but
18  yet the adjustments to the purchase price was
19  altered in different amounts being owed by the
20  parties.
21      Q    Different amounts owed by Fortrend to
22  Langley versus amounts owed between Fortrend and

---

Page 232

1  Midcoast?
2      A    Correct.  And it turns out, I guess, in
3  this case as I read the language now, this
4  operated to the benefit of Fortrend, but I don't
5  know that that was assured.  I think it just -- I
6  don't recall the reasons why, you know, the amount
7  Fortrend had to pay was less than the amount it
8  received from Midcoast.  I don't remember why.
9  But the point was to illustrate there were
10  differences.
11      Q    All right.  And based on your work in
12  this, in connection with this transaction, did
13  Midcoast transact a stock purchase?  Did Midcoast
14  purchase stock from Langley?
15          MR. COFFIN:  Objection to form.
16      A    No, Midcoast certainly did not purchase
17  stock from Langley.
18  BY MR. STERN:
19      Q    What did Midcoast acquire in this
20  transaction?
21          MR. COFFIN:  Objection to form.
22      A    Midcoast acquired various interests in

---

Page 233

1  partnerships that were owned by The Bishop Group
2  Corporation.
3  BY MR. STERN:
4      Q    Which was owned by --
5      A    The Bishop Group Corporation was
6  purchased by Fortrend from Langley.
7      Q    And at the time of the --
8          MR. STERN:  Well, pass the witness.
9          MR. COFFIN:  Just one area to follow up
10  on.
11  EXAMINATION BY COUNSEL FOR THE GOVERNMENT
12  BY MR. COFFIN:
13      Q    Mr. Wilcox, the tax opinion which was
14  labeled Wilcox Exhibit No. 1, the transmittal
15  letter from to you Mr. Robert is dated
16  September 24, 2001, correct?
17      A    Correct.
18      Q    Let me back up.
19          Was it customary for PwC to issue tax
20  opinions in transactions, various corporate merger
21  transactions?
22          MR. TURKUS:  Objection to the form of

---

59 (Pages 230 to 233)

2bce65f8-760c-46ed-9083-54d369e7a9aa

**Witness:  Gary Wilcox**

Page 234

1     the question.
2   BY MR. COFFIN:
3     Q    Let me ask it this way:  Was it an
4   unusual event to issue a tax opinion on a
5   particular transaction?
6          MR. TURKUS:  Objection to the form of
7      the question.
8     A    No, it was not unusual to issue
9   opinions to clients in connection with business
10  transactions.  As I said, I was heavily involved
11  in issuing tax opinions in various tax-free
12  reorganizations.
13  BY MR. COFFIN:
14    Q    This opinion was issued September 24,
15  2001, almost two years after the transaction
16  occurred.  Was it customary to issue tax opinions
17  so far in the future?
18         MR. STERN:  Objection to form.
19         MR. TURKUS:  Objection to the form of
20     the question, "so far in the future."
21         MR. COFFIN:  Yeah, almost two years
22     after the transaction occurred.

Page 235

1          MR. TURKUS:  I wouldn't call that "in
2      the future."  Objection to the form of the
3      question.
4     A    I'm not sure I can comment on that only
5   because most of my experience prior to this
6   transaction was issuing opinions in transactions where the opinion was a
7   opinions in transactions where the opinion was a
8   condition to closing.  Most tax-free reorgs, for
9   example, the opinion is required to be issued at
10  closing.  Here there was no requirement that the
11  opinion be issued at closing.  The taxpayer, you
12  know, had asked that PwC issue an opinion to it
13  but there was no particular, you know, deadline
14  imposed for issuing that opinion.  Midcoast, you
15  know, understood all along that if the transaction
16  were properly structured, PwC would issue it, a
17  more likely than not opinion that the transaction
18  would be characterized as an asset purchase.
19  BY MR. COFFIN:
20    Q    Why did it take almost two years to
21  issue the tax opinion; do you recall?
22         MR. TURKUS:  Objection to the form of

Page 236

1     the question.
2     A    I don't recall specifically.  I mean,
3   my memory is refreshed as to the efforts that we
4   went to to secure a final representation letter
5   from Fortrend, and I think it was in part, as I
6   said, because Craig Hoffman left the company and I
7   was having to deal with somebody else, Jeff
8   Furman, and it just took a while to get him to
9   focus and return comments.  But it finally
10  happened in July of 2000.
11         I don't remember specifically other
12  than I believe that we would have been waiting for
13  Richard Robert to carefully review the
14  representation letter we had provided him, and we
15  were not going to issue the opinion until we were
16  assured that he did review the representation
17  letter and signed it.  And I don't know.  For
18  whatever reason, we must not have received it from
19  him.
20         MR. COFFIN:  No further questions.
21         MR. STERN:  I don't have anything else.
22         MR. TURKUS:  Thank you.  Mr. Wilcox

Page 237

1   will read an sign.
2          (Signature having not been waived, the
3   deposition of Gary Wilcox was concluded at
4   5:44 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

60 (Pages 234 to 237)

2bce65f8-760c-46ed-9083-54d369e7a9aa

Witness:  Gary Wilcox

ACKNOWLEDGMENT OF DEPONENT

1
2   I, Gary Wilcox, do hereby acknowledge
3   that I have read and examined the foregoing
4   testimony, and the same is a true, correct
5   and complete transcription of the testimony
6   given by me and any corrections appear on the
7   attached Errata sheet signed by me.
8
9   _____    _____
10      (DATE)              (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22

1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2       I, Sheri C. Stewart, the officer before
3   whom the foregoing proceedings were taken, do
4   hereby certify that the foregoing transcript is a
5   true and correct record of the proceedings; that
6   said proceedings were taken by me stenographically
7   and thereafter reduced to typewriting under my
8   supervision; and that I am neither counsel for,
9   related to, nor employed by any of the parties to
10  this case and have no interest, financial or
11  otherwise, in its outcome.
12      IN WITNESS WHEREOF, I have hereunto set
13  my hand and affixed my notarial seal this 1st day
14  of March, 2007 .
15   My commission expires:
16   October 14, 2009
17
18
19  _____
20  NOTARY PUBLIC IN AND FOR
21  THE DISTRICT OF COLUMBIA
22

1       E R R A T A   S H E E T
2       IN RE:  Enbridge Energy Company, Inc., et al
3   v. United States of America
4   RETURN BY:
5   _____
6   PAGE    LINE    CORRECTION AND REASON
7   _____   _____   _____
8   _____   _____   _____
9   _____   _____   _____
10  _____   _____   _____
11  _____   _____   _____
12  _____   _____   _____
13  _____   _____   _____
14  _____   _____   _____
15  _____   _____   _____
16  _____   _____   _____
17  _____   _____   _____
18  _____   _____   _____
19  _____   _____   _____
20  _____   _____   _____
21  _____   _____   _____
22  _____   _____   _____

61 (Pages 238 to 240)