Witness:  Craig Hoffman

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

```
ENBRIDGE ENERGY COMPANY, et   )
al.,                          )
              Plaintiffs,     )
                              )   Case No.:  H-06-0657
vs.                           )      VOLUME I
                              )   Pages 1 to 172
UNITED STATES OF AMERICA,     )
              Defendant.      )
_____)
```

DEPOSITION OF CRAIG HOFFMAN

Thursday, May 10, 2007

Reported by:

HEIDI BELTON, CSR #12885, RPR

_____

JAN BROWN & ASSOCIATES

CERTIFIED SHORTHAND REPORTERS

701 Battery Street, 3rd Floor, San Francisco, CA 94111

(415) 981-3498

9230bd6f-ed11-442a-994b-826142d0b85f

Witness:  Craig Hoffman

---

Page 2

1
2                 I N D E X
3
4    EXAMINATION:                      PAGE
5    BY MR. COFFIN                    6, 169
6    BY MR. STERN                      127
7
8
9
10
11
12
13              INDEX OF
14              EXHIBITS
15                           PAGE
16   1   Document entitled "MID 2.1-1205"      166
17
18
19              --oOo--
20
21
22
23
24
25

---

Page 3

1        BE IT REMEMBERED that, pursuant to Subpoena, and
2    on Thursday, May 10, 2007, commencing at the hour of 11:00
3    a.m., thereof, at UNITED STATES ATTORNEYS' OFFICE, 450
4    Golden Gate Avenue, 11th Floor, San Francisco, California,
5    before me, Heidi Belton, CSR No. 12885, State of
6    California, there personally appeared
7              CRAIG HOFFMAN,
8    who was provided as a witness under the provisions of the
9    United States District Court Southern District of Texas.
10
11              ---oOo---
12
13        A P P E A R A N C E S
14
15        KARL S. STERN and EMILY PIPKIN, Attorneys at
16   Law, of VINSON & ELKINS, First City Tower, 1001 Fannin
17   Street, Suite 2300, Houston, Texas 77002, appeared as
18   counsel on behalf of the plaintiffs.  Phone: (713)
19   758-3828  Fax: (713) 615-5603  E-mail: kstern@velaw.com
20
21        DAVID B. COFFIN, Attorney at Law, of UNITED
22   STATES DEPARTMENT OF JUSTICE TAX DIVISION, SOUTHWESTERN
23   CIVIL TRIAL SECTION, Maxus Energy Tower, 717 N. Harwood,
24   Suite 400, Dallas, Texas 75201, appeared as counsel on
25   behalf of the defendant.  Phone: (214) 880-9749  Fax:

---

Page 4

1    (214) 880-9742.  E-mail: David.coffin@usdoj.gov.
2
3        RICHARD J. IDELL, Attorney at Law, of IDELL &
4    SEITEL, LLP, 465 California Street, Suite 300, San
5    Francisco, California 94104, appeared as counsel on behalf
6    of the witness.  Phone: (415) 986-2400  Fax: (415)
7    392-9259  E-mail: richard.idell@idellseitel.com
8
9        Also present:  Kevin G. Croke, Internal Revenue
10   Service, Special Trial Attorney; Jana Jordan, Director US
11   Tax Services, Enbridge Energy Company, Inc.; Marty
12   Majdoub, videographer.
13
14
15
16
17
18
19              ---oOo---
20
21
22
23
24
25

---

Page 5

1    May 10, 2007 - Thursday        10:59 a.m.
2          V O L U M E  I
3          P R O C E E D I N G S
4              --oOo--
5
6        THE VIDEOGRAPHER:  Good morning.  Here begins
7    videotape number 1 in the deposition of Craig Hoffman in
8    the matter of Enbridge Energy versus United States of
9    America in the Southern District of Texas, Houston
10   Division.  Case number H-06-0657.  Today's date is May 10,
11   2007.  The time is 11:00 a.m.  This deposition is being
12   taken at 450 Golden Gate Avenue, San Francisco,
13   California.  The videographer is Marty Majdoub, on behalf
14   of Esquire Deposition Services, 505 Sansome, Suite 502,
15   San Francisco, California.
16        Would all counsel please identify yourselves and
17   state whom you represent.
18        MR. COFFIN:  David Coffin, with the Department
19   of Justice Tax Division for the United States.
20        MR. CROKE:  Kevin Croke, with the IRS.
21        MR. STERN:  Karl Stern, with Vinson & Elkins,
22   representing Enbridge Energy.
23        MS. PIPKIN:  Emily Pipkin, with Vinson & Elkins
24   representing Enbridge Energy.
25        MR. IDELL:  Richard Idell, representing the

HUNDT REPORTING
214-220-1122

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:  Craig Hoffman**

Page 6

1  witness.
2       THE VIDEOGRAPHER:  Could the court reporter
3  please swear in the witness.
4       (Whereupon, the witness, CRAIG HOFFMAN,
5       having been duly sworn, testified as follows:)
6            EXAMINATION
7  BY MR. COFFIN:
8       Q.  Please state your full name for the record.
9       A.  Craig Hoffman.
10      Q.  Mr. Hoffman, my name is David Coffin, as I
11  indicated, I'm from the Department of Justice, Tax
12  Division representing the United States in this matter.
13           Have you ever given a deposition before?
14      A.  No.
15      Q.  Let me go over some of the ground rules here.
16  I'll ask the questions.  And I'd like you to answer
17  truthfully and honestly.  If you don't understand a
18  question, please ask me to restate it.  I'd be happy to.
19  I'll try not to interrupt you; if you'll do the same with
20  me.
21           If you need a break at any time, just let me
22  know; we can take one.  Your counsel or Mr. Stern may
23  object to some of the questions.  But unless they --
24  unless your counsel, Mr. Idell, tells you not to answer
25  the question, I'd ask that you please answer the question.

Page 7

1       A.  (Witness nods head.)
2       Q.  Do you understand those rules?
3       A.  Yes.  What if he objects?  And then I have to
4  look at you and wait for you to object or not object; is
5  that correct?
6            MR. IDELL:  Yes.
7            THE WITNESS:  Okay.
8  BY MR. COFFIN:
9       Q.  Are you under any medication or are you
10  currently or do you have any medical condition that would
11  prohibit you from understanding the questions I ask today?
12      A.  No.
13      Q.  Have you reviewed anything to prepare for this
14  deposition?
15      A.  Yes.
16      Q.  What have you reviewed?
17      A.  Black binder with Mr. Idell last night.  I
18  believe we got it from you.
19      Q.  Have you -- other than Mr. Idell, have you
20  spoken to anybody about this deposition?
21      A.  My wife.
22      Q.  Have you talked to Mr. Stern or anybody from his
23  law firm in the last two or three years?
24      A.  Yes.
25      Q.  When did you talk to Mr. Stern or anybody from

Page 8

1  his firm?
2       A.  Summer of 2006.
3       Q.  And what was the subject matter of your
4  discussions?
5       A.  This transaction.
6       Q.  How long was the conversation?
7       A.  Two hours.
8       Q.  Was it over the phone or face to face?
9       A.  Face to face.
10      Q.  Where did it take place?
11      A.  A law office in New York.
12      Q.  Give me your educational background beginning
13  with high school.
14      A.  Cardinal Newman High School in West Palm Beach,
15  Florida.  Then I went to Furman University in Greenville,
16  South Carolina.  Graduated with a BA of accountancy.  And
17  2005 I went to Columbia where I completed an MBA degree.
18      Q.  Did you complete your MBA degree in 2005?
19      A.  Sorry.  I completed it in 2005, yes.
20      Q.  Do you have any professional licenses or
21  accreditations?
22      A.  I don't believe so anymore.  I believe my
23  securities license may have lapsed at this point.
24      Q.  When did you have a securities license?
25      A.  From 2001 until 2006, I believe.

Page 9

1       Q.  And you're not currently -- you're not a CPA,
2  are you?
3       A.  Not currently.
4       Q.  Were you at one time?
5       A.  Yes, I was.
6       Q.  Okay.  When was that?
7       A.  I would have been licensed in 1993 until 1999.
8  Until 1998.  My licensed would have lapsed.
9       Q.  In 1998?
10      A.  '98, if I remember correctly.
11      Q.  Why did it lapse?
12      A.  Because I left the profession and I didn't keep
13  up with the continuing professional education.
14      Q.  Give me your work history since graduating with
15  your undergraduate degree at Furman.
16      A.  Okay.  I joined Arthur Andersen & Company in the
17  Atlanta office.
18      Q.  What year was that?
19      A.  1991.
20      Q.  Were you in their audit division or --
21      A.  I was in the tax division.
22      Q.  Tax division.
23           How long were you with Arthur Andersen?
24      A.  Just under five years.  I left in 1996.
25      Q.  Were you a manager when you left?

3  (Pages 6 to 9)

9230bd6f-ed11-442a-994b-826142d0b85f

# Witness:  Craig Hoffman

Page 10

1    A.  No.  I was a senior tax accountant.
2    Q.  What were your responsibilities at Arthur
3 Andersen?
4    A.  Preparation of tax returns, working on tax
5 matters.  I was a -- I dedicated an awful lot of time to
6 Section 382.
7    Q.  What is that section?
8    A.  The section related to net operating losses.  I
9 had a large client that was -- had a big issue with its
10 NOL.  I spent a lot of time in Section 382.
11    Q.  After you left Andersen in 1996 where did you
12 go?
13    A.  I became self-employed and I moved to New York
14 City.  And I was a deal consultant that became connected
15 to Fortrend International.
16    Q.  When you say "deal consultant," what do you mean
17 by that?
18    A.  I was an independent contractor that would get
19 hired -- well, I worked there in their office but worked
20 on transactions but wasn't paid by them until transactions
21 closed.  So nobody paid me a salary to work there.  I
22 simply had an office and a phone.  And I worked on deals
23 as they became live.
24    Q.  I'm curious why you left -- you left Arthur
25 Andersen while you were still in Georgia; is that correct?

Page 11

1    A.  That's correct.  I was with Arthur Andersen in
2 Atlanta, and then I moved to New York.  And I moved to
3 New York more or less for personal reasons.  My family is
4 originally from New York.
5    Q.  And why did you leave Arthur Andersen?
6    A.  Because I wanted to move to New York, and they
7 wouldn't move me to the New York office.
8    Q.  And how did you become familiar with Fortrend
9 International?
10    A.  We had done some work at Arthur Andersen on
11 transactions for our clients where Fortrend was involved.
12    Q.  Do you recall what kind of transactions those
13 were?
14    A.  I -- yes.  They were advisory transactions where
15 a stock seller sold stock to Fortrend.
16    Q.  Okay.  When you say "advisory transactions" --
17    A.  We were the advisors to a client that was
18 selling itself to Fortrend.
19       MR. IDELL:  Let him finish the question before
20 you answer.  That way you won't be talking over him.
21       THE WITNESS:  Okay.
22       MR. IDELL:  Even though you think you know where
23 he's going, you may not.  But the worst thing is that the
24 reporter won't be able to take down the two of you at
25 once.  So just take your time.

Page 12

1       THE WITNESS:  Thank you, Mr. Idell.
2 BY MR. COFFIN:
3    Q.  Were those transactions similar to the
4 transactions involved in this case.  Or the transaction
5 involved in this case?
6    A.  Yes.
7    Q.  And who did you first meet with at Fortrend
8 International to -- that would result in you becoming a
9 deal consultant with Fortrend?
10    A.  Jeff Furman.
11    Q.  Were you familiar with Mr. Furman from your work
12 at Arthur Andersen?
13    A.  No.
14    Q.  Do you recall who from Fortrend you were working
15 with or knew of while you were working at Arthur Andersen?
16    A.  Yes.
17    Q.  Who was that?
18    A.  Mark Klopfenstein.
19    Q.  Spell that for me.
20    A.  K-L-O-P-F-E-N-S-T-E-I-N, Klopfenstein.
21    Q.  So you went to work for Fortrend in 1996 --
22    A.  Correct.
23    Q.  -- as a deal consultant; is that right?
24    A.  Correct.
25    Q.  And you were only paid once a particular deal

Page 13

1 closed; is that right?
2    A.  Correct.
3    Q.  Was there a variation of the pay structure?
4    A.  There was.
5    Q.  What was the other way?
6    A.  In the beginning I had a draw against my first
7 transaction.
8    Q.  Was there a specific type of transaction you
9 were working on when you were with Fortrend as far as the
10 structure went?
11    A.  Yes.
12    Q.  Were those transactions -- was that transaction
13 similar to the ones that you referenced with regard to
14 your work at Arthur Andersen?
15    A.  Yes.
16    Q.  Was there a name for that structure or
17 transaction?
18    A.  Yes.
19    Q.  What was the name of that structure?
20    A.  Midco.
21    Q.  M-I-D- --
22    A.  -C-O.
23    Q.  How long did you work with Fortrend
24 International as a deal consultant?
25    A.  I left in 1999.  So just over three years, I

4  (Pages 10 to 13)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:   Craig Hoffman**

Page 14

1  suppose.
2      Q.   Are you sure it was '99 when you left?  I see
3  correspondence in 2000 between you and Fortrend and you or
4  Midcoast.
5          MR. STERN:  Objection.  Form.
6  BY MR. COFFIN:
7      Q.   If that's what you understand, that's fine.
8  We'll get to those exhibits and we can talk about whether
9  you were still working for Fortrend or not at the time.
10     A.   No, I left in '99.
11     Q.   What part of '99?
12     A.   Late.  Late '99.
13     Q.   Do you remember what month?
14     A.   I think -- I don't remember.  But -- I don't
15  remember.
16     Q.   Would it have been after the transaction at
17  issue in this --
18     A.   Yes.
19     Q.   -- case?
20          So sometime after November 8 or 9 of 1999?
21     A.   Yes.
22     Q.   And when you left Fortrend, what did you do for
23  a living after that?
24     A.   I joined a merchant bank called Terra Nova
25  Capital Partners.

Page 15

1      Q.   What's a merchant bank?
2      A.   It was a firm that had a private equity fund as
3  well as a broker dealer and we invested in opportunities
4  and then raised capital for them in our broker dealer.  Or
5  raised capital for them and then invested in the
6  opportunity.
7      Q.   I'm sorry.  What was the name of that merchant
8  bank again?
9      A.   Terra Nova.
10     Q.   Spell that for me.
11     A.   T-E-R-R-A, N-O-V-A, Capital Partners.
12          And the broker dealer entity was named TN
13  Capital Equities.
14     Q.   Just TN?
15     A.   Yes, as in Terra Nova.  Capital Equities.
16     Q.   And what were your responsibilities there?
17     A.   Finding opportunities to invest in, structuring
18  those investments, managing our portfolio, valuing our
19  portfolio, and running the books and records on the back
20  side.  I was a partner in the firm.
21     Q.   And that was in '99.  Are you currently employed
22  by -- let me ask you, are you an independent contractor
23  still or were you --
24     A.   No.  I was a partner in that firm.
25     Q.   Oh, I'm sorry.  Partner?

Page 16

1          MR. IDELL:  Slow down.
2          THE WITNESS:  Same thing.
3          MR. IDELL:  Just let him finish the question.
4          THE WITNESS:  Yup.  Sorry.
5          MR. STERN:  It's a New York thing.
6  BY MR. COFFIN:
7      Q.   And are you currently a partner with Terra Nova?
8      A.   Not with Capital Partners but I am still a
9  partner in the private equity firm, in the private equity
10  partnership.  So I still own my equity interest in our
11  investment vehicle.
12     Q.   Is that your primary source of income currently?
13     A.   No.
14     Q.   Are you doing something else?
15     A.   Yes.
16     Q.   What else are you doing?
17     A.   Now?
18     Q.   Mm-hmm.
19     A.   Now I work for a company called Nexcen Brands.
20     Q.   Spell that for me.
21     A.   N-E-X-C-E-N.
22     Q.   Brands?
23     A.   Company.
24     Q.   And I'm sorry.  I may have jumped.  From once
25  you went with Terra Nova, were you employed by somebody

Page 17

1  else prior to going to work for Nexcen Brands?
2      A.   Yes.
3      Q.   Who was that?
4      A.   I left Terra Nova to found my own firm.  So I
5  founded my own merchant bank called Hoffman & Company.
6      Q.   And I assume you were doing the same things
7  there that you were doing at --
8      A.   Very similar.
9      Q.   -- Terra Nova?
10     A.   Sorry.
11     Q.   Is Hoffman & Company still in existence?
12     A.   Yes.
13     Q.   How many employees does it have?
14     A.   Zero.
15     Q.   Is it still active?
16     A.   No.
17     Q.   When did it cease its activity?
18     A.   2005.
19     Q.   Is that when you went to Nexcen Brands?
20     A.   I went to a company that was -- yes.
21     Q.   You say a company that was acquired?
22     A.   That would be a little complicated.
23     Q.   What do you do at Nexcen Brands right now?
24     A.   I'm the managing director in our mergers and
25  acquisitions group.

5 (Pages 14 to 17)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness: Craig Hoffman**

---

Page 18

1    Q.  Why did you leave Fortrend in 1999?
2    A.  A few reasons.  One being the -- we were full
3  swing with the internet boom at the time.  And I ran
4  across opportunities like Terra Nova to invest in,
5  technology opportunities.
6    Q.  When you say "we were full swing in the internet
7  boom," are you --
8    A.  I meant we, the general economy.
9    Q.  The next reason?
10    A.  The next reason, I had my differences with Jeff
11  and Fred inside Fortrend.
12    Q.  Jeff...?
13    A.  Jeff Furman.
14    Q.  And Fred would be Fred Forster?
15    A.  Yes.
16    Q.  F-O-R-S-T-E-R?
17    A.  I believe so.
18    Q.  Can you tell me the nature of those differences.
19    A.  Didn't feel I was compensated fairly by
20  comparison to others in the firm.  Didn't agree with the
21  way they managed the company.  And it wasn't, for me, a
22  nice place to work anymore.
23    Q.  A little more specific, on the differences
24  regarding the way they managed the company.  What were
25  they doing that you didn't agree with?

---

Page 19

1    A.  They often put me in a position to negotiate
2  with others -- for example, service providers -- to -- if
3  I can just use colloquialism -- to beat them down on their
4  fees.  That jeopardized relationships that I was otherwise
5  developing with people and put me in positions I didn't
6  like to be in.
7    Q.  What kind of service providers were there?
8    A.  Accountants or lawyers or anyone else involved
9  with our transactions.  Finders as well.
10    Q.  Any other reasons?  You said there were several
11  reasons you left Fortrend.
12    A.  Just personally I had reached a point where I
13  wanted more control on what was going on.  And I wasn't
14  going to be given that control inside the organization and
15  just reached a natural ending for my run there.
16    Q.  And reference you back to 1999.  Do you recall
17  the transaction at issue here involving Midcoast and the
18  Bishop Group?
19    A.  Yes.
20    Q.  How did you first find out about that particular
21  transaction?
22    A.  Jeff Furman brought me on to a conference call
23  with lawyers and accountants related to the transaction.
24    Q.  Can you tell me who the lawyers and accountants
25  were?

---

Page 20

1    A.  Not anymore.  I don't remember who everybody
2  was.
3    Q.  Do you remember particular firms or -- was
4  PriceWaterhouse one of those?
5    A.  I believe -- yes, they were.
6    Q.  PriceWaterhouseCoopers, at the time.
7    A.  Correct.
8    Q.  Was -- do the names Tom Palmisano ring a bell
9  for PriceWaterhouseCoopers?
10    A.  Yes.
11    Q.  Would he have been on that conference call?
12    A.  I don't know.
13    Q.  Someone from PWC was on the call, though?
14    A.  Yes.
15    Q.  At the time was it just lawyers and accountants?
16    A.  I don't remember.
17    Q.  Do you recall approximately how many were
18  involved on the call?
19    A.  No more than five.  No fewer than three.
20    Q.  And what was being discussed on the call?
21    A.  Our opportunity to become involved in the bid
22  process to buy the company.
23    Q.  And the company would be the Bishop Group?
24    A.  Correct.
25    Q.  And do you recall what your understanding of

---

Page 21

1  what your -- Fortrend's opportunity was at the time?
2    A.  Yes.
3    Q.  What was that?
4    A.  To buy the company.  To buy the stock.
5    Q.  And do you recall why these accountants and
6  lawyers wanted to involve Fortrend or wanted Fortrend to
7  buy the stock?
8      MR. STERN:  Objection.  Form.
9      MR. IDELL:  Do you understand the question?
10      THE WITNESS:  I think I do.  Actually, restate
11  it for me, though, please.
12      MR. COFFIN:  Could you read it back, please.
13      (Record read.)
14      THE WITNESS:  Yes.
15  BY MR. COFFIN:
16    Q.  What was the reason?
17    A.  Because we had an opportunity to profit if we
18  bought the company.
19    Q.  And what would -- how would Fortrend have
20  profited from that transaction?
21    A.  By selling the company after we bought it.
22    Q.  You described a Midco transaction earlier.  Was
23  a Midco transaction being discussed at that time on the
24  call?
25    A.  Yes.

**HUNDT REPORTING**
**214-220-1122**

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:  Craig Hoffman**

Page 22

1    Q.  Was there a representative from Ernst & Young on
2  that phone call at the time?
3    A.  I don't remember.
4    Q.  You're familiar with a gentleman Richard Robert
5  that worked at Midcoast at the time?
6    A.  Yes.
7    Q.  That's Midcoast versus Midco.
8       Was he on the call?
9    A.  I don't remember.
10    Q.  Did Fortrend have a previous relationship with
11  anybody else on that phone call?
12       MR. STERN:  Say that again.
13  BY MR. COFFIN:
14    Q.  Did Fortrend have a previous relationship with
15  any of the lawyers or accountants on that phone call?
16    A.  I don't remember.  I don't remember who was on
17  the first call.
18    Q.  Did Fortrend have a previous relationship with
19  PriceWaterhouseCoopers prior to that call?
20    A.  Yes.
21    Q.  And what kind of relationship was that?
22    A.  Advisory and introductory.
23    Q.  What do you mean by "advisory"?
24    A.  They would provide us advice on structuring or
25  on tax issues as we looked at transactions.

Page 23

1    Q.  Do you recall who at PriceWaterhouseCoopers was
2  the primary contact?
3    A.  Ian Schacter.
4    Q.  Which office was he from, do you recall?
5    A.  No.
6    Q.  As far as geographically.
7    A.  Right.
8    Q.  Was Mr. Schacter involved in the advisory side
9  of it or the introductory side or both?
10    A.  Both.
11    Q.  And when you mean introductory, I assume you're
12  saying introduced to new clients?
13    A.  Correct.
14    Q.  How long did this telephone conversation last,
15  do you recall?
16    A.  No.
17    Q.  Do you recall how the transaction progressed
18  after that phone call?
19    A.  Yes.
20    Q.  What happened next?
21    A.  At least a few more conference calls.  Then we
22  shared information with them about who we were and we got
23  into the bid process.
24    Q.  When you say you "shared information with them,"
25  who would be "them"?

Page 24

1    A.  Chase, who was representing the Bishop Group;
2  and the lawyers and accountants that represented the
3  Bishop Group.
4    Q.  Do you recall who first contacted Mr. Furman
5  about Fortrend becoming involved in this transaction?
6    A.  No.
7    Q.  So prior to the phone call that we referenced,
8  is it safe to say that PWC was a client -- I'm sorry --
9  Fortrend was a client of PWC?
10    A.  Explain what you mean with regard to them being
11  a client.
12    Q.  Was there ever an engagement letter signed to
13  perform services between Fortrend and PWC?
14    A.  Not that I know of.
15    Q.  But they were providing -- PWC was providing
16  advisory services on certain transactions with Fortrend?
17    A.  Correct.
18    Q.  And as far as the introductory function of PWC,
19  do you recall how many clients PWC introduced to Fortrend
20  prior to that phone call in 1999?
21       MR. STERN:  Objection, form, as far as the use
22  of the word "client."
23       MR. IDELL:  Can I get it read back.
24         (Record read.)
25  BY MR. COFFIN:

Page 25

1    Q.  And your answer was you didn't recall?
2    A.  I don't recall.
3    Q.  Was it -- can you give a ballpark; more than
4  five?
5    A.  I don't know.  I didn't -- I never knew what the
6  real relationship was with PWC.
7    Q.  How did you know that they were providing
8  advisory services to Fortrend?
9    A.  I overheard conference calls with Ian discussing
10  matters.
11    Q.  And how did you know that they were providing
12  introductory services to Fortrend prior to that conference
13  call?
14    A.  I was involved with conversations with Ian about
15  potential opportunities for us.
16    Q.  Did any of those potential opportunities come to
17  fruition?
18    A.  I don't know.  I didn't work on every deal in
19  our shop.
20    Q.  Did you work on any deals where you were talking
21  with Mr. Schacter about opportunities and that opportunity
22  subsequently came to fruition was actually closed?
23       THE WITNESS:  I'm sorry.  Would you read that
24  one more time.
25         (Record read.)

HUNDT REPORTING
214-220-1122

9230bd6f-ed11-442a-994b-826142d0b85f

# Witness:  Craig Hoffman

Page 26

1    THE WITNESS: No.
2 BY MR. COFFIN:
3    Q.  Do you recall the first time you talked to
4 either on the phone or in person with somebody from
5 Midcoast?
6    A.  Recall the first time I spoke to them on the
7 phone?  No.  I don't recall a separate phone call with
8 them at any given point.
9    Q.  I'm sorry.  I probably need to ask more clearer
10 questions.  But were you involved in any phone calls not
11 just with Midcoast but with other parties involved at any
12 time?
13    MR. STERN: Objection. Form.
14 BY MR. COFFIN:
15    Q.  And let me give you a date parameter.  Prior to
16 November 8 or 9 of 1999.
17    MR. STERN: Doesn't help.
18    THE WITNESS: I'm sorry.  Restate that.  I
19 apologize.
20 BY MR. COFFIN:
21    Q.  Were you involved in any telephone calls where
22 Midcoast was on the call, whether it was Midcoast only or
23 with other people prior to November of 1999?
24    A.  Yes.
25    Q.  And do you recall who from Midcoast you were

Page 27

1 talking to?
2    A.  I do recall speaking to Rich Robert.
3    Q.  Do you recall what kind of things you were
4 talking to Mr. Robert about?
5    A.  Selling the assets of the Bishop Group to him.
6 I apologize.  Not to him, but to Midcoast.
7    Q.  Was -- did you ever discuss with Mr. Robert the
8 tax benefit you could provide to Midcoast?
9    MR. STERN: Objection. Form.
10 BY MR. COFFIN:
11    Q.  I'm sorry.  Did you ever discuss with Mr. Robert
12 the tax benefit that Fortrend could provide to Midcoast?
13    MR. STERN: Objection. Form.
14    THE WITNESS: We -- no.
15 BY MR. COFFIN:
16    Q.  You were going to say something.
17    A.  I was.
18    Q.  Go ahead.
19    A.  We didn't provide a tax benefit to them.  We
20 sold the assets to them.
21    Q.  You were aware -- were you aware that the --
22 within the Bishop Group that the tax basis of the assets
23 was such that if the Bishop Group sold its assets to
24 Midcoast, that there would be a significant tax gain on
25 that transaction?

Page 28

1    MR. IDELL:  Vague and ambiguous.
2    MR. STERN: Objection. Form.
3 BY MR. COFFIN:
4    Q.  Were you aware of that?
5    MR. IDELL:  If you understand it, go ahead and
6 answer it.
7    MR. STERN:  Which part?
8    THE WITNESS: Yes.
9 BY MR. COFFIN:
10    Q.  And you were aware that if Fortrend or any
11 entity controlled by Fortrend bought that stock and sold
12 that stock or sold the assets to Midcoast, that there
13 would be a similar taxable gain on that transaction?
14    A.  Yes.
15    Q.  Did -- are you aware if Fortrend or the entity
16 that bought the stock which is K-Pipe Group; is that
17 correct?  K-Pipe Group Inc.?
18    A.  K-Pipe -- I don't remember the entity name but
19 there was an entity named K-Pipe that bought the Bishop
20 Group, yes.
21    Q.  Are you aware if it recognized taxable income on
22 the sale of the assets to Midcoast?
23    A.  No, I'm not.
24    Q.  Was there a strategy or a method that you're
25 aware of that would cause K-Pipe Group, Inc. to not pay

Page 29

1 tax on the taxable gain that would result from selling the
2 assets to Midcoast?
3    A.  Right.  Clarify what you mean by strategy.
4    Q.  Was there a method?  Was there a method that
5 would allow K-Pipe Group to effectively not pay tax on the
6 gain?
7    MR. STERN: Objection. Form.
8    THE WITNESS:  There was an expectation that
9 there was a method.  It becomes difficult for me to answer
10 because I was no longer there.
11 BY MR. COFFIN:
12    Q.  And what was the expectation or how would --
13 what was the expectation?
14    A.  That a reorganization could be structured
15 wherein assets that had a built in loss could be brought
16 into the entity somehow and, therefore, sold at the same
17 time to offset the gain that would be -- that would occur
18 inside the C corporation.
19    Q.  Was Mr. Robert aware of that expectation?
20    MR. STERN: Objection. Form.
21 BY MR. COFFIN:
22    Q.  As far as you know.
23    A.  I don't know.
24    Q.  Do you know if anybody at Midcoast was aware of
25 that expectation?

8 (Pages 26 to 29)

9230bd6f-ed11-442a-994b-826142d0b85f

Witness:  Craig Hoffman

| Page 30 |
| --- |

1      A.  I don't know.
2      Q.  Would you -- can you speculate whether they
3  would know or not?
4          MR. STERN:  Objection.  Form.
5          THE WITNESS:  I could.
6  BY MR. COFFIN:
7      Q.  Okay.  Go ahead and speculate.
8      A.  Yes, they would have known that we were going to
9  do something to offset the gain while we owned the
10  company.
11      Q.  And why do you think that?
12          MR. STERN:  Objection.  Form.  You're asking him
13  to speculate now.
14          MR. IDELL:  I don't want you to guess or
15  speculate.
16          THE WITNESS:  Okay.
17  BY MR. COFFIN:
18      Q.  Well, based on -- you've already testified that
19  you would expect that they would know.
20      A.  Mm-hmm.
21      Q.  So I'm just asking you what makes you think that
22  they would have known?
23          MR. IDELL:  If you have knowledge of this, then
24  you can testify, but you are not required to give your
25  speculations or your assumptions.

| Page 31 |
| --- |

1          THE WITNESS:  Okay.  Let me just make sure I do
2  or don't have knowledge.  Give me just a second to think
3  about it.
4          Yes, they would have known that we had an
5  expectation of that.  Because this was a common problem
6  that a C corporation couldn't sell without the gain.  And
7  we would have told them that we can arrange a transaction
8  for ourselves that would offset that gain but we would not
9  have told them how nor would we have told them what the --
10  what our internal expectation was for that tax matter.
11  BY MR. COFFIN:
12      Q.  And why wouldn't you have told them of your
13  internal expectation?
14      A.  None of their business.
15      Q.  Was that a proprietary thing?
16      A.  Clarify.
17      Q.  Well, was it something that you didn't normally
18  tell your --
19      A.  Targets.
20      Q.  Your targets?
21      A.  Correct.
22      Q.  And just explain to me why that was the policy.
23      A.  First --
24          MR. STERN:  Objection.  Form.
25          THE WITNESS:  Because there were many

| Page 32 |
| --- |

1  accountants and lawyers trying to convince people at the
2  time that they could step in and buy the stock and turn
3  around and sell the assets.  And we wanted to protect what
4  we had so that we didn't get ripped off in the
5  marketplace.
6  BY MR. COFFIN:
7      Q.  Did Fortrend provide Midcoast with any
8  materials, documents describing the structure of the
9  transaction?
10          MR. STERN:  Objection.  Form.
11          MR. COFFIN:  Did I say that right?
12          THE WITNESS:  Clarify what you mean.
13          MR. STERN:  What transaction.
14  BY MR. COFFIN:
15      Q.  Did Fortrend provide Midcoast with any materials
16  describing the structure of the transaction?
17      A.  Describe it more.
18          MR. IDELL:  Vague as to time.  It's vague and
19  ambiguous.
20  BY MR. COFFIN:
21      Q.  Well, the stock sale followed by the asset
22  purchase.
23      A.  No.
24      Q.  Was it typical that Fortrend provided those
25  types of materials to either the stock seller or the asset

| Page 33 |
| --- |

1  purchaser?  In a Midco transaction.
2      A.  No.  We didn't provide information about the
3  stock sale whatever we did and then the asset sale.  We
4  provided information about a stock sale to one group of
5  parties.  And we provided the information about an asset
6  sale to another group of parties.
7      Q.  How did Fortrend make a profit on a Midco
8  transaction?
9      A.  Buying the company for less than we sold it for.
10      Q.  Was there a fee that was calculated based upon
11  the step-up in basis?
12      A.  No.  There was no fee.
13      Q.  There was a profit percentage or formula used to
14  determine how much Fortrend would make on a particular
15  transaction based upon a step-up in fee or step-up in
16  basis?
17      A.  As much as we possibly could was the formula.
18  And there were market forces that drove us to certain
19  realizations.
20      Q.  Explain that for me.
21      A.  We could buy the stock, we could sell the
22  assets.  There were other options available to people.
23  They could go do their own transaction as it was.  And we
24  could only charge what we could -- we could only build in
25  what we could build in, in terms of our spread.

HUNDT REPORTING
214-220-1122

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:  Craig Hoffman**

Page 34

1    Q.  And what was the spread?
2    A.  The difference between what we bought the stock
3  for and what we sold the assets for.  It ranged in every
4  transaction.
5    Q.  Well, this was -- these transactions were not
6  simply where you would buy the stock and then sell the
7  assets at fair market value and make more money than what
8  you paid for the stock sale, are they --
9        MR. STERN:  Objection.
10 BY MR. COFFIN:
11   Q.  -- I mean the stock purchase.
12       MR. IDELL:  Can I get read back, please.
13       MR. STERN:  Objection.  Form.
14          (Record read.)
15       MR. COFFIN:  Stock purchase is what I meant.
16       MR. IDELL:  I'm not sure I understand the
17 question.
18       Do you understand the question?
19       THE WITNESS:  I think I understand where you're
20 going with the question.
21       I would actually want you to clarify a little
22 bit with regard to what you mean by it wasn't simply, and
23 then fair market value.
24       MR. IDELL:  The question's somewhat
25 argumentative.

Page 35

1  BY MR. COFFIN:
2    Q.  Okay.  Well, let's move on and then maybe some
3  of the exhibits will help us work through there.
4    A.  David?
5    Q.  Yes?
6    A.  Can I talk to Richard for just a second?
7    Q.  Do you want to take a break?
8    A.  I don't need a long break.  It will literally be
9  just 30 seconds.
10       MR. COFFIN:  I could use a break.
11       THE VIDEOGRAPHER:  We are going off the record.
12 The time is 11:44 a.m.
13       (Recess taken from 11:44 a.m. to 11:51 a.m.)
14       THE VIDEOGRAPHER:  We are now back on the
15 record.  The time is 11:51 a.m.
16 BY MR. COFFIN:
17   Q.  You've had a chance to talk to your lawyer.  Was
18 there anything that you wanted to clarify or --
19   A.  No.
20   Q.  -- talk about?  Okay.
21       With regard to Fortrend's involvement in the
22 transaction at issue, did Fortrend have a relationship --
23 a business relationship with PriceWaterhouseCoopers?
24       MR. STERN:  Objection.  Form.
25       THE WITNESS:  I don't know.

Page 36

1  BY MR. COFFIN:
2    Q.  Do you know what PriceWaterhouseCoopers'
3  relationship or what its role in the transaction was?
4    A.  Yes.
5    Q.  What was its role?
6    A.  They provided advice.
7    Q.  To?
8    A.  Forgive me for a moment.  My head's swimming for
9  a second.  Give me just a second to sort it out.
10   Q.  Sure.
11   A.  I'm actually blanking on it at the moment.  I
12 apologize.  I know that I worked with PriceWaterhouse a
13 great deal on the transaction but I'm blanking at the
14 moment and the entities are swimming in my head.  Can we
15 come back to the question, is that possible?
16   Q.  Were they providing advice to Fortrend?
17   A.  No.  They provided the introduction to Fortrend.
18   Q.  And was PWC compensated for providing the
19 introduction?
20   A.  I believe so.
21       Yes.  I know the answer.
22   Q.  You recall how there -- was it a fee that was
23 paid to them, a finder's fee?
24   A.  Yes.
25   Q.  How was that finder's fee computed?

Page 37

1    A.  I don't know.
2    Q.  Were you familiar with how other entities who
3  were paid finders' fee -- fees were you familiar with how
4  their fees were computed?
5    A.  Yes.
6    Q.  And generally speaking, can you say how their
7  fees were computed?
8    A.  Yes.  Percentage of the gross transaction size.
9    Q.  Percentage of?
10   A.  Gross transaction size.
11   Q.  What's the gross transaction?
12   A.  The size?  The gross transaction size?
13   Q.  Okay.  Gross transaction size.  Yes.
14   A.  Was the amount of money paid for the stock of
15 the target.
16   Q.  And was there a percentage, a general percentage
17 that was paid?
18   A.  Yes.
19   Q.  What was that?
20   A.  Roughly 1 percent.
21   Q.  Was there anything in writing concerning
22 Fortrend's obligation to pay this finder's fee to either
23 PWC in this case or other finders in general?
24       MR. STERN:  Objection.  Form.
25       THE WITNESS:  Seems very broad.

**HUNDT REPORTING**
**214-220-1122**

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:   Craig Hoffman**

Page 38

1  BY MR. COFFIN:
2      Q.  Was there an agreement that you would pay --
3  that Fortrend would pay this finder's fee of 1 percent?
4          MR. STERN:  Objection.  Form.
5          THE WITNESS:  This, in this transaction?
6          MR. STERN:  Yes.
7          THE WITNESS:  No, not that I'm aware of.
8  BY MR. COFFIN:
9      Q.  In other similar transactions was there an
10  agreement that was reached and reduced to writing?
11      A.  Not that I know of.
12      Q.  Was there a reason why an agreement wouldn't be
13  reduced to writing to pay a finder's fee?
14      A.  Yes.
15      Q.  Why is that?
16      A.  It's easier to beat them down later.
17      Q.  When you say "beat them down," what do you mean
18  by that?
19      A.  Go back to the finder and explain to them that
20  we won't pay them exactly the percentage that was
21  discussed with them originally; that it had to be less.
22      Q.  Did you have any discussions with PWC on this
23  particular transaction wherein the transaction doctrine
24  was discussed?
25      A.  I don't remember.

Page 39

1      Q.  Do you recall that the stock seller's name
2  was -- last name was Langley?
3      A.  Yes.
4      Q.  Dennis Langley?
5      A.  Yes.
6      Q.  Did you ever have any occasion to meet with him?
7      A.  Yes.
8      Q.  When did you meet with him, do you recall?
9      A.  During negotiations to buy the company.
10      Q.  Where did your meeting with Mr. Langley occur?
11      A.  In his office.
12      Q.  Kansas City?
13      A.  Yes.
14      Q.  How many times did you go to Mr. Langley's
15  office?
16      A.  Twice.
17      Q.  And you were located in New York at the time; is
18  that right?
19      A.  Correct.
20      Q.  Is that where Fortrend's offices are?
21      A.  They were.
22      Q.  They were at the time?
23      A.  Yes.
24      Q.  And so when you went to Mr. Langley's office,
25  did you -- was that on consecutive days or different trips

Page 40

1  from New York?
2      A.  Different trips from New York.
3      Q.  So you said you had two different trips to
4  Mr. Langley's office.
5      A.  (Witness nods.)
6      Q.  Did you have any other trips to his lawyer's
7  offices?
8      A.  I don't remember.
9      Q.  His lawyer, you may recall, was Bryan Cave or
10  that's the law firm that represented him in the
11  transaction?
12      A.  Yes.
13      Q.  What happened in the first meeting that you had
14  in Mr. Langley's office?
15      A.  I don't remember individually anymore.
16      Q.  What do you mean "individually"?
17      A.  I remember the transaction; I don't recall the
18  first time I went versus the second time I went.
19      Q.  Do you recall what kind of matters were
20  negotiated in either meeting?
21      A.  Yes.
22      Q.  What kind of matters were negotiated?
23      A.  Price, timing, reps and warranties, risks, other
24  assets.
25      Q.  In your line of work there's a term of art "due

Page 41

1  diligence."  Are you familiar with that?
2      A.  Yes.
3      Q.  Generally describe for the court what due
4  diligence is, in your mind.
5      A.  It's your opportunity to review information
6  related to the target company to assess the risks of
7  ownership to you and to assess the rewards of ownership to
8  you.  It's your opportunity to verify the accuracy of what
9  you've been told by the seller.
10      Q.  Did you perform any due diligence on behalf of
11  Fortrend on your two trips to Kansas City to Mr. Langley's
12  office?
13      A.  Yes.
14      Q.  And what kind of things did you do in that
15  regard?
16      A.  Reviewed organizational documents, reviewed
17  existence of other assets, reviewed contingent
18  liabilities, reviewed liabilities we'd have to assume, and
19  reviewed tax returns.
20      Q.  And where did that review take place?
21      A.  I don't remember.
22      Q.  Would it have been in Mr. Langley's office?
23      A.  I don't remember anymore.  I know some of the
24  review would have happened back in New York because I
25  carried information back to New York with me, copies of

11  (Pages 38 to 41)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:  Craig Hoffman**

---

Page 42

1  information.  Standard in the due diligence process.  But
2  I no longer remember where I was reviewing information
3  while I was there.
4      Q.  It's my understanding there was a, they call it,
5  a data room.  Are you familiar with that term?
6      A.  I am.
7      Q.  Did you go into a data room and conduct your due
8  diligence?
9      A.  I don't remember.  I've been in hundreds of
10  them.
11     Q.  Who drafted the stock purchase agreement between
12  Langley and K-Pipe Group, Inc.?
13     A.  I don't remember.
14     Q.  Do you remember specifically negotiating any
15  part of the stock purchase agreement in this case or in
16  this transaction?
17     A.  Yes.
18     Q.  What specifically do you recall?
19     A.  I recall intense struggle over reps and
20  warranties.
21     Q.  Do you recall which reps and warranties were the
22  parties struggling with?
23     A.  No.  I recall -- I recall negotiating to keep
24  assets inside the company.
25     Q.  And that was with -- that was with regard to

---

Page 43

1  negotiations between Langley and K-Pipe Group?
2      A.  No.  No.
3          And I recall great struggles over timing in the
4  transaction.  Langley was very difficult to deal with.
5      Q.  Back to the negotiations on -- to keep assets
6  inside the company.  What specifically were the
7  negotiations in that regard?
8      A.  We knew there were assets we were going to break
9  up and sell out.  We knew there were assets that we wanted
10  to keep.  We had to make sure that we understood clearly
11  what the assets were inside the company so that we knew
12  what we could sell out, what we wanted to sell out, and
13  what we wanted to keep.
14     Q.  How did that result in negotiations between you
15  on behalf of Fortrend or K-Pipe and the other party?
16     A.  Well --
17         MR. STERN:  I'm confused.  You started out
18  talking about stock purchase agreement.  Are you still
19  talking about the stock purchase agreement?
20         MR. COFFIN:  No.  He said the negotiations were
21  not related to the asset -- keeping the assets out were
22  not with Langley in the stock purchase agreement.
23         MR. STERN:  Okay.  I just wanted to make sure.
24  I'm sorry I interrupted.
25         MR. COFFIN:  Sure.

---

Page 44

1          THE WITNESS:  The asset structure of the
2  transaction was not clean.  There wasn't 1 box with 10
3  assets in it with the company in it.  There were
4  partnerships.  There were other subsidiaries.  There was a
5  great structure down below the company.  And there were
6  projects that he was involved with that I don't think it
7  was clear whether or not they actually belonged to the
8  company or whether or not they belonged to him personally.
9  BY MR. COFFIN:
10     Q.  And you're talking about Langley?
11     A.  Correct.
12         And there was an awful lot of time spent trying
13  to make sure we actually understood what was in the box
14  that we were buying, what were those assets, what did he
15  own, what were the assets of the combined entity when you
16  put it all together.  Because the business itself, the
17  Bishop Group business, wasn't all nice and neatly
18  contained in that box.  Because it was all wrapped up with
19  him personally as well.
20     Q.  Okay.  Maybe I'm too simple-minded but that
21  doesn't sound like negotiations, more than due diligence.
22         MR. IDELL:  There's no question pending.
23         THE WITNESS:  I understand.
24  BY MR. COFFIN:
25     Q.  So is it due diligence you're talking about

---

Page 45

1  there or was there actual negotiations involved?
2      A.  It's both.  As you review the information
3  they've told you during due diligence, you discover
4  things.  As you discover them, you negotiate them in or
5  out of the transaction based on what you've discovered.
6      Q.  Now were these negotiations with Langley -- back
7  on the stock purchase agreement -- were those conducted
8  face to face or by e-mail or letter?
9      A.  Not face to face.  Not e-mail or letter.
10     Q.  Phone call?
11     A.  Yes.
12     Q.  And this was while you were in New York, I
13  presume?
14     A.  Yes.
15     Q.  Did you maintain notes or any writings with
16  regard to these negotiations?
17     A.  I don't remember.
18     Q.  Did you -- when you left Fortrend did you take
19  your paperwork with you with regard to the transactions
20  you'd worked on, or did that stay with Fortrend?
21     A.  That all stayed with Fortrend.
22     Q.  So you wouldn't have anything at home or in your
23  current office that would relate to this transaction, any
24  documents?
25     A.  No.

12  (Pages 42 to 45)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:  Craig Hoffman**

Page 46

1    Q.  Now, in order to engage in the stock purchase,
2  Fortrend had to go out and borrow money from Rabobank; is
3  that correct?
4    A.  Correct.
5    Q.  Who at Fortrend dealt with Rabobank?
6    A.  I did and Jeff Furman did.
7       MR. IDELL:  Were you done?
8       THE WITNESS:  I was going to answer one more
9  name.
10      MR. IDELL:  Go ahead.
11      THE WITNESS:  And Fred Forster.
12  BY MR. COFFIN:
13   Q.  I've been informed that I haven't asked you yet
14  what exactly your responsibilities were with regard to
15  your involvement in the transactions at issue in this
16  case.  Could you please tell me those.
17   A.  Yes.  I was a deal mechanic.  I was responsible
18  for making sure all of the steps to complete the
19  acquisition were taken.  So I worked with the lawyers to
20  make sure all the documents got prepared.  I worked with
21  the target to make sure that I understood what their
22  business was performing due diligence.  I worked with the
23  target to ensure that we didn't have any liabilities that
24  we'd be assuming that we didn't know about.  And I was
25  responsible for keeping the project on time and on task.

Page 47

1    Q.  Was anybody else at Fortrend working on this
2  transaction with you?
3    A.  Yes.
4    Q.  Who else?
5    A.  Jeff.
6    Q.  What were his responsibilities?
7    A.  Negotiating the transaction.
8    Q.  Which transaction are you talking about?
9    A.  The purchase of the company.
10   Q.  The stock purchase?
11   A.  Correct.
12   Q.  And who did he negotiate with?
13   A.  Tino Monaldo.
14   Q.  And Mr. Monaldo was -- what was his role in the
15  transaction, if you recall?
16   A.  He was a counselor representing Langley.
17   Q.  Did Mr. Furman ever go to Kansas City and meet
18  Mr. Langley?
19   A.  I don't know.
20   Q.  You were responsible for doing the negotiations
21  as well right?  In between?
22   A.  Yes.
23   Q.  And why would Mr. Furman be involved in the
24  negotiations?
25   A.  I spent time understanding relevant positions to

Page 48

1  understand what somebody thought about an issue to which I
2  would then bring it back to Jeff and say, "Here's what
3  they think.  Here's what they think it's worth.  What
4  should we do in the transaction?"  Jeff would give me the
5  approval or not approval to do that.  I didn't have direct
6  responsibility to do the transaction or negotiate and
7  agree on points.
8    Q.  So did you ever witness Mr. Furman picking up
9  the phone and calling Mr. Monaldo or anybody else from the
10  stock seller?
11   A.  Yes.
12   Q.  Who did you talk to?  You said Monaldo --
13   A.  Yes.
14   Q.  -- Mr. Monaldo.  Anybody else?
15   A.  I don't remember.
16   Q.  Prior to this transaction, the stock purchase,
17  had you or Fortrend dealt with Rabobank in the past?
18   A.  Yes.
19   Q.  Was Rabobank used to finance similar -- other
20  similar-type transactions?
21      MR. IDELL:  Vague and ambiguous.
22  BY MR. COFFIN:
23   Q.  Midco transactions which you described earlier.
24   A.  Yes.
25   Q.  And do you recall in this case that Midcoast had

Page 49

1  to put $200 million into escrow -- around $200 million
2  into escrow in order to -- in order for Fortrend or K-Pipe
3  to borrow the money for the stock purchase?
4    A.  No.
5       MR. STERN:  Objection.  Form.
6  BY MR. COFFIN:
7    Q.  What's your recollection of the financing, as
8  far as how Rabobank would be secured on the transaction?
9    A.  That they had a lien on -- I don't remember
10  specifics anymore.
11   Q.  Do you recall the interest known as the Butcher
12  Interest in this transaction?
13   A.  Yes.
14   Q.  Do you recall that it was valued at 6 and a half
15  million dollars by the parties in this transaction?
16   A.  Yes.
17   Q.  Do you recall how that value was derived?
18   A.  No.
19   Q.  Tell me what you recall about the Butcher
20  Interest.
21   A.  That there was the existence of a Butcher
22  Interest.  That we evaluated that gas prices were on the
23  rise.  Sorry.  I don't remember if it was gas or oil.  I
24  believe it was gas.  And that there was an opportunity to
25  profit if we bought that Butcher Interest.

13  (Pages 46 to 49)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:   Craig Hoffman**

Page 50

1    Q.  And how would the profit be derived?
2    A.  The value of the Butcher Interest would go up if
3 the underlying gas or oil prices went up and if the
4 underlying volume running through the pipe went up.  And
5 we then, therefore, would be able to sell the Butcher
6 Interest for more than we paid for it.
7    Q.  Did those events actually happen?
8    A.  I don't know.
9    Q.  Do you recall there was a partnership formed
10 wherein the Butcher Interest was contributed and the
11 partners were K-Pipe and Midcoast?
12       MR. STERN:  Objection.  Form.
13       THE WITNESS:  No.
14 BY MR. COFFIN:
15    Q.  Do you recall that there was a loan of
16 $6.1 million borrowed from Bank of America by the Butcher
17 Interest partnership?
18    A.  No.
19    Q.  Okay.  Let's go on the books, please.  And these
20 exhibits are tabbed on the right-hand side.  And we won't
21 necessarily be going through them in order.
22    A.  Okay.
23    Q.  So that's why they're tabbed for you.
24 Government Exhibit 26.  Is that your signature in the
25 middle of the page there?

Page 51

1    A.  It is.
2    Q.  Do you recall seeing this document before?
3    A.  Yes.
4    Q.  And prior to last night -- you reviewed these
5 documents last night; is that correct?
6    A.  Correct.
7    Q.  Do you recall seeing this document prior to last
8 night?
9    A.  No.
10    Q.  Do you have any doubts that was, in fact, a fax
11 that you sent to Mr. Bruce Snyder or Mr. Palmisano?
12    A.  No.
13    Q.  And I think from your answer earlier you
14 wouldn't recall sending -- that you sent this fax to
15 Mr. Snyder or Palmisano; is that --
16    A.  No.
17    Q.  -- right?
18    A.  Give me one second.
19       Sorry.
20    Q.  Could you read under the "Comments" section for
21 me up until your signature.
22    A.  Sure.
23       Okay.
24    Q.  Do you recall why you sent this facsimile to
25 Mr. Snyder?

Page 52

1    A.  No.
2    Q.  Can you speculate as to why you sent it to
3 Mr. Snyder?
4       MR. IDELL:  I don't want you to guess or
5 speculate.  If you have knowledge, tell him.
6       THE WITNESS:  I don't recall doing it.
7 BY MR. COFFIN:
8    Q.  Is it something you normally sent out to
9 potential targets or parties that you might be dealing
10 with?
11    A.  Yes.
12    Q.  And it mentions in the second paragraph
13 underneath your comments that Fortrend had worked with
14 those people at E&Y.  Do you see that?
15    A.  Yes.
16    Q.  Do you recall working with those people
17 specifically?
18    A.  No.
19    Q.  Are you familiar with any of those names on
20 that -- that you've listed there:  Al Hernandez, Mike
21 Evans, Jay Zuckerson, Harvey Bareneson?
22    A.  No.
23    Q.  Do you know why you would have cc'd
24 Mr. Palmisano on this?
25    A.  No.

Page 53

1    Q.  And then if you'll turn the page Bates numbers
2 on the bottom PWC118 --
3    A.  Yes.
4    Q.  -- and 119.
5       Is this text the description of Fortrend
6 something you're familiar with?
7    A.  Yes.
8    Q.  Did you have any input into the drafting of this
9 text?
10    A.  Yes.
11    Q.  What would have been your input?
12    A.  I know I edited it -- I know I edited the
13 document.  I know that I worked to make sure it was in
14 proper English and made sense.
15    Q.  And would that have been in relation, if you
16 know, to sending this fax or just in general you did that
17 for Fortrend?
18    A.  In general.
19    Q.  Turn the page to Government Exhibit 35, please.
20 This is a fax from James P. Pryde, Esquire, to Tom
21 Palmisano, who was with PWC --
22    A.  Mm-hmm.
23    Q.  -- and to you; is that correct?
24    A.  Looks like it.
25    Q.  Looks like attached to it is a mutual

HUNDT REPORTING
214-220-1122

**Witness:  Craig Hoffman**

Page 54

1  confidentiality agreement draft between the Bishop Group
2  Limited and Fortrend International; is that right?
3      A.  Yes.
4      Q.  Do you recall seeing this document?
5      A.  No.
6      Q.  Not prior to last night?
7      A.  Correct.
8      Q.  Do you know why Mr. Pryde -- Mr. Pryde
9  represented Dennis Langley; is that right?
10     A.  Mm-hmm.
11     Q.  Do you know why Mr. Pryde would have sent this
12  fax to you; any ideas?
13     A.  Because I was involved with the beginning of the
14  transaction to get involved with the potential purchase.
15     Q.  And then any idea why he would have been faxing
16  the same document to Mr. Palmisano, who was with
17  PriceWaterhouseCoopers?
18     A.  No.
19     Q.  Okay.  Turn to Government Exhibit 41, please.
20  This is a facsimile from you to Mr. Chris Kaitson of
21  Midcoast --
22     A.  Mm-hmm.
23     Q.  -- is that correct?
24     A.  Yes.
25     Q.  Are you familiar with Mr. Kaitson?

Page 55

1      A.  I remember his name.  I think I remember him.
2      Q.  I believe the evidence shows that he's the
3  general counsel -- he was the general counsel of Midcoast
4  at the time.  Does that sound right?
5      A.  Yes.
6      Q.  And do you recall sending this facsimile to
7  Mr. Kaitson?
8      A.  No.
9      Q.  The draft -- is that a draft letter of intent
10  that follows that fax cover sheet?
11     A.  Yes.
12     Q.  It references a -- it's a draft, as I said.  It
13  says it "sets forth the basic terms and conditions under
14  which Pipeline Holding Partners intends to enter into a
15  definitive sale agreement with Midcoast."
16     A.  Mm-hmm.
17     Q.  Who was Pipeline Holding Partners?
18     A.  I don't know.
19     Q.  On the second page of the draft it mentions a
20  "good faith deposit."  Do you see that at the bottom?
21     A.  I do.
22     Q.  It says, "Midcoast will pay with the execution
23  of the letter of intent a deposit of" X amount.
24         Do you recall if Midcoast ever paid a deposit?
25     A.  I don't recall.

Page 56

1      Q.  Give me just a second here.
2      A.  Surely.
3      Q.  Turn to the last page, please, of the facsimile
4  where there's a summary of major corporate transactions
5  since 1990 --
6      A.  Yes.
7      Q.  -- do you see that?
8         What does the -- the first column would be the
9  date those transactions were entered into; is that right?
10     A.  Yes.
11     Q.  First of all, do you remember this particular
12  schedule?
13     A.  Yes.
14     Q.  Did you help draft this schedule?
15     A.  Yes.
16     Q.  And type of transaction, it lists there several
17  different types.
18     A.  Mm-hmm.
19     Q.  Corporate break up.  What's the F-I-R-P-T-A?
20     A.  Foreign Interest in Real Property Tax Act, I
21  believe.
22     Q.  And what -- can you give a general description
23  of what kind of transaction that is.
24     A.  Was where we bought -- sorry.  Where we were
25  involved with the purchase of a transaction of a company

Page 57

1  that owned property in the United States but its owners
2  were not US citizens.
3      Q.  So how would bringing Fortrend help facilitate
4  that transaction?
5         MR. STERN:  Objection.  Form.
6         THE WITNESS:  Can you restate that?
7         MR. COFFIN:  Yeah.  Read that back, please.
8            (Record read.)
9         THE WITNESS:  I don't think it was as much about
10  facilitation as it was an opportunity for us to profit
11  again.
12  BY MR. COFFIN:
13     Q.  How did Fortrend make a profit on those types of
14  transactions?
15     A.  Because sellers -- because foreign owners of US
16  property were willing to sell us the C corporation rather
17  than try to make the money out of the corporation
18  themselves.
19     Q.  Why was that?
20     A.  Because of the Foreign Interest Real Property
21  Tax Act somehow -- I think there was a withholding due if
22  they tried to sell the company or if they tried to sell
23  the asset and then pull the money out.
24     Q.  "They," being the foreign --
25     A.  The foreign owner, yeah.

15  (Pages 54 to 57)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:  Craig Hoffman**

Page 58

1     Q.   So you said there was a withholding.
2  Withholding tax due?
3     A.   Yes.
4     Q.   And then the next column shows "Industry" and
5  then "Size" in thousands.  That's the size of the gross
6  transaction?
7     A.   Yes.
8     Q.   And then the "built-in gain" in the far right
9  column.  What is it meant by built-in gain there?
10     A.   The difference between the fair market value of
11  the assets and their tax basis.
12     Q.   Government Exhibit 42 is a confidentiality
13  agreement it looks like from Fortrend to Mr. Richard
14  Robert.  Do you see that?
15     A.   Mm-hmm.
16     Q.   Is that your signature on the second page?
17     A.   Yes, it is.
18     Q.   It looks like the fax transmission documents are
19  attached thereto.  Do you see that?
20     A.   I do.
21     Q.   What's the -- what was the purpose of this
22  document?
23     A.   To bind Midcoast to treat our -- the information
24  that we were going to send to them confidentially.
25     Q.   Okay.  And did you -- you signed on behalf of

Page 59

1  Fortrend; is that correct?
2     A.   Correct.
3     Q.   Did you have the authority to sign on behalf of
4  Fortrend?
5     A.   For letters of intent -- I'm sorry.  For
6  confidentiality agreements, yes.
7     Q.   And who conferred upon you that authority?
8  Mr. Furman, I presume?
9     A.   Jeff, yes.
10     Q.   There is -- in the first bullet paragraph
11  there's a reference there to "Evaluation Material."
12     A.   Mm-hmm.
13     Q.   What was the evaluation material?
14     A.   Would have been materials regarding the assets
15  of the company we were going to acquire that we wanted to
16  sell to Midcoast.
17     Q.   And, generally, what would that consist of?
18     A.   The assets with regard to good title -- I'm
19  sorry.  The documents relating to good title, the
20  documents related to the performance of those assets, the
21  documents related to contingent -- liabilities associated
22  with those assets.
23     Q.   And, again, the first bullet point says,
24  "Written information provided to you as well as any
25  additional information disclosed to you or any of your

Page 60

1  representatives which contains or otherwise reflects or is
2  generated from such information or documents (the
3  evaluation material) will be used solely for the purpose
4  of evaluating the possible use of the transaction by you."
5     A.   Mm-hmm.
6     Q.   What was meant by "use of the transaction"?
7     A.   I'm sorry.  I don't know.  I would have expected
8  that sentence to read "of the possible transaction."  That
9  looks -- I don't know.  See, it doesn't make sense; the
10  transaction is defined in the document.  And the
11  transaction's the purchase of the assets.  So that
12  sentence to me does not make sense.
13     Q.   Would you have drafted this document?
14     A.   Yes.
15     Q.   And the second bullet point says, "You will only
16  discuss those portions of the evaluation material to those
17  representatives who need to know such information for
18  evaluating the transaction."  Is that --
19     A.   Mm-hmm.
20     Q.   -- still you're talking about a listing of the
21  assets and good title and so forth?
22     A.   Yes.  The information related to their due
23  diligence on whether or not they wanted to purchase the
24  assets.
25     Q.   So was any evaluation material actually provided

Page 61

1  to Midcoast by Fortrend?
2     A.   Yes.
3     Q.   Were there specific documents?
4     A.   Yes.
5     Q.   And how would that have been transmitted; by
6  mail or...?
7     A.   I don't remember.
8     Q.   And the third bullet point says, "You recognize
9  and acknowledge the competitive value and confidential
10  nature of the evaluation material and the irreparable
11  damage that could result if information contained therein
12  is disclosed to any third party."
13         What's the competitive value of the -- the
14  evaluation material as you've described it to be?
15     A.   I don't know.  This is boilerplate
16  confidentiality agreement language that I would have just
17  copied from the lawyer's document.
18     Q.   And the next page of the document, the
19  second-to-the-last bullet point again it says, "If you do
20  not enter into a transaction with us using the transaction
21  described in the evaluation material," again, what do you
22  mean by "using the transaction"?
23     A.   I'm sorry.  I don't know.  It looks like poor
24  drafting on my part again.
25     Q.   And using the term "transaction," was that

16  (Pages 58 to 61)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:  Craig Hoffman**

Page 62

1  referring to a Midco transaction as you described earlier?
2      A.  In this document it would be referring to the
3  sale of the assets.
4      Q.  How does that differ from the phrase Midco, as
5  you used earlier?
6      A.  The Midco would describe the transaction that --
7  that our organization did wherein we bought it, we
8  reorganized it, and we sold it.  It would be no different
9  than using the term break-up transaction.
10     Q.  Turn all the way over to Government Exhibit 308,
11 please.  The first page of this document appears to be a
12 letter from Mr. Stephen Korb to you, Mr. Hoffman.
13     A.  Yes.  To me, yes.
14     Q.  Do you remember who Stephen Korb was?
15     A.  Yes.
16     Q.  What's your recollection?
17     A.  He was a controller for Dennis's company.
18     Q.  For the Bishop Group?
19     A.  For the Bishop Group, yes, sorry.
20     Q.  And is this part of the due diligence, this
21 first page -- this is a letter dated September 20, 1999 --
22 part of the due diligence that you were doing --
23     A.  Yes.
24     Q.  -- in relation to the stock purchase?
25     A.  Yes.

Page 63

1      MR. STERN:  Are you referring to the first page
2  or all of them?
3      MR. COFFIN:  I've been referring to the first
4  page.  I've been trying to be clear about that.
5      Q.  Tell me why it's important in doing due
6  diligence to get the federal income tax returns of your
7  target company.
8      A.  Because we were acquiring the company, any and
9  all future tax liabilities or current tax liabilities
10 would come along with the company that we bought.
11     Q.  The third page of this particular Government
12 Exhibit 308, the third page is another letter from
13 Mr. Korb to you.
14     A.  Just to make sure I understand, what document
15 number is it found on?
16     Q.  It's KPI1543.
17     A.  Yes, sir.
18     Q.  It's a letter dated October 22 of 1999.
19     A.  Yes.
20     Q.  And it's -- it looks like Mr. Korb was
21 delivering copies of the federal 1998 corporate income tax
22 return as stated therein.  And he hand-delivered the
23 document.  So I assume you were in Kansas City at the time
24 or somewhere in Mr. Langley's office; would that be
25 correct?

Page 64

1      MR. IDELL:  Well, the document says it was
2  hand-delivered to New York.
3      MR. COFFIN:  I'm sorry.  I'm sorry.
4      THE WITNESS:  Right.
5  BY MR. COFFIN:
6      Q.  Is that --
7      A.  I don't remember.
8      Q.  Okay.  The next page of this exhibit with the
9  Bates number KPI1542 --
10     A.  Yes.
11     Q.  -- is a memorandum from Tino Monaldo to you --
12     A.  Mm-hmm.
13     Q.  -- would that be correct?
14     A.  Mm-hmm.  Yes.
15     Q.  Do you recall receiving this information
16 regarding the Butcher Interest?
17     A.  No.
18     Q.  Any doubts that you did get it?
19     A.  No.
20     Q.  And the following page is a -- just seems to
21 be -- it's a fax cover page we received in our discovery
22 of this case from Mr. Korb again to you, Mr. Hoffman --
23     A.  Mm-hmm.
24     Q.  -- dated 11/4 of '99.
25     A.  Mm-hmm.

Page 65

1      Q.  And there are -- should be 8 pages to follow but
2  we don't have those.  But anyway the "Notes" section says,
3  "Craig hard copy of adjustment amount calcu- --" --
4  something -- "I e-mailed last night."
5      Do you remember what the adjustment amount that
6  would be referring to?
7      A.  No, I don't.
8      Q.  Turn back to Government Exhibit 65, please.
9      A.  Yes.
10     Q.  This is a letter of intent dated September 30 of
11 1999 with K-Pipe Holding Partners LP at the top.
12 Addressed to Mr. Dennis Langley.
13     A.  Mm-hmm.
14     Q.  And there's a signature on the last page of the
15 document it looks like Mr. Furman signed it, as well as
16 Mr. Langley.  Do you see that?
17     A.  Yes.
18     Q.  Do you recognize that as Mr. Furman's signature?
19     A.  Yes.
20     Q.  Would this have been -- this is a letter of
21 intent between K-Pipe Holding Partners and Dennis Langley;
22 is that right?
23     A.  Yes.
24     Q.  And would this have been something that you
25 would have seen in conjunction with working on the

17  (Pages 62 to 65)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:  Craig Hoffman**

Page 66

1  transaction?
2     A.  Yes.
3     Q.  It's dated September 30 of '99.
4     A.  Mm-hmm.
5     Q.  Do you know what -- what all did Fortrend know
6  about Bishop -- the Bishop Group at this time?
7     A.  Knew the information provided in the pitch
8  materials --
9     Q.  What's the pitch materials?
10     A.  -- that were prepared by Chase.
11        We would have known some basic information about
12  the operation and the assets of the company.
13        Sorry.  We knew one other thing.  We knew what
14  the competitive bids were from other players who were
15  bidding for the company.  We knew what level they were.
16  Sorry.  We didn't know the bids.  Sorry.
17     Q.  Were you --
18     A.  Chase was conducting an auction.
19     Q.  So what do you mean, "what level they were"?
20     A.  What price levels they were at.
21     Q.  And how would you have known that?
22     A.  Because Chase provided that information to us.
23     Q.  Explain briefly to the court, I mean, how
24  somebody in Chase's shoes would have approached you to say
25  this is -- is it a range of --

Page 67

1     A.  Yes.
2     Q.  It's a range dollars?
3     A.  Chase would have given us an indication that
4  says that "If your bid isn't in this range, don't bother
5  bringing a bid."
6     Q.  So in the first paragraph where it says, "Seller
7  shall sell the stock to buyer for a purchase price equal
8  to approximately $188,312,800."
9        How would have Fortrend or K-Pipe Holding
10  Partners at the time established that amount?
11        MR. IDELL:  Compound.
12        Go ahead and answer, if you know.
13        THE WITNESS:  We would have negotiated the best
14  that we could to get him to sell us the company for the
15  lowest possible price.
16  BY MR. COFFIN:
17     Q.  At the time this letter was entered into,
18  though, how was the $188 million determined?
19     A.  Again, we knew what price range we had to fall
20  within.  I don't remember specifics.
21     Q.  Would there have been any due diligence
22  conducted prior to entering this letter of intent?
23     A.  Yes.
24     Q.  How much?
25     A.  Limited.

Page 68

1     Q.  And that consisted of looking at the pitch
2  materials, as you've described earlier?
3     A.  Yes.
4     Q.  Anything else?
5     A.  Some basic performance materials -- some basic
6  materials that would have told us about the performance of
7  the company and what those assets were.
8     Q.  Is that just like financial statements, things
9  like that?
10     A.  Yes.
11     Q.  And with regard to the pitch materials you
12  described, did Chase put on a presentation for Fortrend?
13     A.  I don't remember.
14     Q.  You don't remember attending any presentations?
15     A.  I don't remember.
16     Q.  And I think we may have discussed this earlier,
17  but Mr. Furman signed a letter of intent.  Was that
18  something you didn't have authority to do?
19     A.  Yes.
20     Q.  Would you have drafted this agreement or this
21  letter of intent?
22     A.  I don't know.
23     Q.  Was that something that was typically within
24  your duties when you were working on a transaction?
25     A.  Yes.

Page 69

1     Q.  Is there any kind of identifying numbers or
2  anything that would help you determine whether you drafted
3  the agreement or the letter of intent?
4     A.  No.  But to be fair, it doesn't look like my
5  format, which is why I say I don't know.
6     Q.  How is your format different?
7     A.  The "re" wouldn't have been indented.  Just
8  little silly things like that.
9     Q.  On the second page of the letter of intent --
10     A.  Yes.
11     Q.  -- it references "Businessman's audits."  Do you
12  see that?
13     A.  I'm sorry.  No.  Where?
14     Q.  Paragraph 4 at the bottom.
15     A.  Yes.
16     Q.  What's a "businessman's audit"?
17     A.  I don't know.
18     Q.  I take it it's not a phrase you used?
19     A.  No, it is not.
20     Q.  Turn to Government Exhibit 66, please.  This is
21  a letter dated September 30 of '99 --
22     A.  Mm-hmm.
23     Q.  -- is that correct?
24     A.  Yes.
25     Q.  And it's addressed to Midcoast Energy Resources,

**HUNDT REPORTING**
**214-220-1122**

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:   Craig Hoffman**

---

Page 70

1  Inc. --
2      A.  Mm-hmm.
3      Q.  -- is that right?
4      A.  Yes.
5      Q.  And attention Mr. Dan Tutcher, T-U-T-C-H-E-R --
6      A.  Yes.
7      Q.  -- is that right?
8      A.  Yes.
9      Q.  Did you ever have any occasion to meet
10 Mr. Tutcher?
11     A.  I don't remember.
12     Q.  It says here under his name president and CEO.
13     A.  Yes.
14     Q.  Do you recall him being the president and CEO
15 of --
16     A.  Yes.
17     Q.  -- Midcast?
18     A.  Sorry.
19     Q.  The third page -- sorry.  The fourth page of the
20 document is a signature page.  Do you recognize that as
21 Mr. Furman's signature at the bottom?
22     A.  I do.
23     Q.  Now, is this -- did you draft this letter of
24 intent?
25     A.  I -- I don't remember.

---

Page 71

1      Q.  Does it look more like the format that you would
2  have used?
3      A.  It does look more like it, yes.
4      Q.  There is -- let's see.  Turn to Government
5  Exhibit 72, please.  Mr. Hoffman, your name doesn't appear
6  anywhere on this e-mail but I still have a question for
7  you.  It's a facsimile from James Pryde to Ron Chachere --
8  C-H-A-C-H-E-R-E -- and Chris Kaitson, Y. Corb, and Tino
9  Monaldo.  Are you familiar with Mr. Chachere?
10     A.  Yes.  Chachere.
11     Q.  Chachere.  I'm sorry.
12         What was his role in the transaction, as you
13 recall?
14     A.  He was a lawyer.
15     Q.  Representing?
16     A.  Midcast.
17     Q.  And it looks like Mr. Pryde is transmitting to
18 those individuals on October 8 of '99 a revised blackline
19 stock purchase agreement.
20     A.  Mm-hmm.
21     Q.  Do you see that?  And by this time I think
22 K-Pipe Holding Partners had already entered into a letter
23 of intent with Dennis Langley.
24     A.  Yes.
25     Q.  We saw that --

---

Page 72

1      A.  Yes.
2      Q.  -- dated September 30, '99.
3          So my question is do you know why Pryde would be
4  transmitting a read revised blackline stock purchase
5  agreement to Mr. Chachere -- did you say Chachere?
6      A.  Chachere.
7      Q.  Chachere.
8          -- and Mr. Kaitson who were both working for
9  Midcast?
10     A.  No.
11     Q.  And turn to the next exhibit, Government
12 Exhibit 73.  This is an e-mail from Mr. Pryde again to
13 Lori Brewer.  Do you see that?
14     A.  Yes.
15     Q.  Do you know who Lori Brewer is?
16     A.  No.
17     Q.  Ron Chachere --
18         MR. STERN:  Chachere.
19         MR. COFFIN:  Chachere.
20     Q.  -- Chris Kaitson and an "Lwoods," along with
21 some other people, dated October 11 of '99.  And the
22 subject is "Revised security agreement."
23         And if you'll look at the next page which
24 includes the security agreement between K-Pipe Holding
25 Partners, MarGasCo Partnership, Kansas Pipeline Company

---

Page 73

1  and Syenergy Pipeline Company and some other entities
2  related to Mr. Langley, I guess.
3          So my question, again is, why would Mr. Pryde be
4  sending Mr. Chachere and Mr. Kaitson a security agreement
5  that's related to -- or that's between K-Pipe Holding
6  Partners and Langley and his entities?
7      A.  I don't know.
8      Q.  Again, this is dated October 11 of '99, which is
9  subsequent to the date the letter of intent was entered
10 into between Mr. Langley and K-Pipe Holding Partners; is
11 that right?
12     A.  Yes.
13     Q.  Government Exhibit 320, please.  This is an
14 e-mail from Graham Taylor to "Cjhoffman."  I assume that's
15 you; is that right?
16     A.  Right.
17     Q.  And who is Graham Taylor?
18     A.  Our lawyer from the Lebouef firm.
19     Q.  Was he a lawyer that Fortrend used more than
20 once?
21     A.  Yes.
22     Q.  How many times, if you recall?
23     A.  Don't recall.
24     Q.  Was it -- was it more than 10 times or less than
25 10?

---

19  (Pages 70 to 73)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:  Craig Hoffman**

Page 74

1    A.  It was many.
2    Q.  And the subject is K-Pipe.  It's an e-mail dated
3  Friday, October 15 of 1999.  Do you recall receiving this
4  e-mail?
5    A.  No.
6    Q.  Any doubts that you would not have received this
7  e-mail?
8    A.  No.
9    Q.  It says, "Did you see the data room index for
10  this deal?  We should discuss the due diligence scope and
11  execution on our side" --
12    A.  Mm-hmm.
13    Q.  -- written by Graham Taylor.
14    A.  Mm-hmm.
15    Q.  Do you recall seeing the data room index in this
16  deal?
17    A.  No.  Again, I apologize.  I've done a lot of
18  deals.
19        MR. COFFIN:  Okay.  Take a break?
20        THE VIDEOGRAPHER:  You have eight minutes.  Up
21  to you.
22        MR. IDELL:  For the record, I don't have any
23  idea where this document came from.  But just to make sure
24  nothing's waived to the extent Mr. Taylor was a lawyer
25  that was working for Mr. Hoffman's company, there's no

Page 75

1  waiver of privilege here.  I don't know where the document
2  came from or any of that.  But I just want to make clear
3  that there's no waiver.
4        MR. COFFIN:  Okay.  I just want to make clear.
5  Do you represent Fortrend or Mr. Hoffman or both?
6        MR. IDELL:  I represent Mr. Hoffman.
7        MR. COFFIN:  Okay.  But not Fortrend.
8        MR. IDELL:  But it was a letter from a lawyer to
9  Mr. Hoffman who was a lawyer in the deal.
10  BY MR. COFFIN:
11    Q.  Did Mr. Taylor represent you or Fortrend?
12    A.  Fortrend.
13    Q.  Okay.
14        MR. STERN:  And your point would be that he's
15  not authorized to waive privilege?
16        MR. IDELL:  He's not authorized to waive
17  privilege.  I'm --
18        MR. STERN:  Nor are you.
19        MR. IDELL:  -- not authorized to waive
20  privilege.
21        MR. STERN:  [Sotto voce]  I'm being peanut
22  gallery.  Throwing peanuts.
23  BY MR. COFFIN:
24    Q.  The next exhibit, Government Exhibit 321,
25  please.

Page 76

1    A.  Yes.
2    Q.  This is a limited partnership agreement between
3  K-Pipe Holding Partners -- I'm sorry -- for K-Pipe Holding
4  Partners LP; is that right?
5    A.  Yes.
6    Q.  Dated as of October 20, '99.
7    A.  Yes.
8    Q.  And do you recognize on the last page that to be
9  Mr. Furman's signature?
10    A.  Yes.
11    Q.  Did you have any -- did you draft this document?
12    A.  No.
13    Q.  Do you know who might have?
14    A.  No.
15    Q.  It says the parties to the limited partnership
16  agreement are Signal Capital Associates LP and other
17  persons listed there.  Are you familiar with Signal
18  Capital Associates LP?
19    A.  I know the name.
20    Q.  What do you know about the entity?
21    A.  It was a partnership that Fred and Jeff talked
22  about a lot.
23    Q.  And what did they talk about?  If you recall,
24  what did they say about it?
25    A.  I don't know.  I don't remember.  I do remember

Page 77

1  it was involved in a lot of transactions.
2    Q.  On the third page of the limited partnership
3  agreement it lists the limited partners as Ashfield
4  Investments Limited.
5    A.  Mm-hmm.
6    Q.  Are you familiar with that entity?
7    A.  I know the names.
8    Q.  And you know -- you're familiar with Cronulla?
9    A.  Again, I know the name.
10    Q.  And what do you know about them?
11    A.  I just know that their name appeared in a lot of
12  our documents like this.  I don't know anything about the
13  entities themselves.
14    Q.  Do you know what kind of business those two
15  entities were in, Ashfield or Cronulla?
16    A.  No.
17    Q.  Who were the -- do you know who the principals
18  of those entities were?
19    A.  No.
20    Q.  Government Exhibit 311, please.  This is a
21  letter from Mr. Langley to K-Pipe Holding Partners LP
22  dated October 21, 1999.  And attention Mr. Jeff Furman.
23  And you were cc'd at the bottom there.
24    A.  Mm-hmm.
25    Q.  Do you recall receiving this letter from

20  (Pages 74 to 77)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:   Craig Hoffman**

Page 78

1  Mr. Langley?
2      A.  No.
3      Q.  Do you recall -- you talked about timing issues
4  earlier.
5      A.  Mm-hmm.
6      Q.  Is this a letter that's evidencing Mr. Langley's
7  concern about the timing of the transaction?
8      A.  Yes.
9      Q.  Can you elaborate on that a little bit more.
10     A.  He pushed us around a lot to close on certain
11  dates demanding that we close by certain times.
12         MR. COFFIN:  All right.  Let's go ahead and take
13  a break.
14         THE VIDEOGRAPHER:  This is the end of videotape
15  number 1.  We are now going off the video record.  The
16  time is 1:05 p.m.
17         (Recess taken from 1:05 p.m. to 2:00 p.m.)
18         THE VIDEOGRAPHER:  This is the beginning of
19  videotape number 2.  We are now back on the video record.
20  The time is 2:00.
21  BY MR. COFFIN:
22     Q.  Mr. Hoffman, would you turn to government
23  Exhibit 322, please.  This is a facsimile from Fortrend
24  International LLC specifically you to Graham R. Taylor and
25  Cynthia Morelli; is that right?

Page 79

1      A.  Yes.
2      Q.  Dated October 29, 99.  Regarding credit
3  commitment.
4      A.  Mm-hmm.
5      Q.  Do you see that?
6      A.  Yes.
7      Q.  Who was Cynthia Morelli?
8      A.  Another lawyer with LeBoeuf, Lamb.  She worked
9  for Graham.
10     Q.  Under the "Comments" section you say -- let me
11  back up.  Is that your signature right there next to your
12  name?
13     A.  Yes, it is.
14     Q.  And do you recall sending this facsimile?
15     A.  No.
16     Q.  And you reference there "collateral mechanics."
17     A.  Yeah.
18     Q.  Do you know what that is?
19     A.  Probably -- probably is not the right word.  Not
20  directly, no.
21     Q.  Probably, what would it mean?
22     A.  The mechanics for making sure that the bank had
23  its collateral interest in the stock.
24     Q.  And you say, "As per earlier discussion with
25  Cynthia, I'd like to be able to use this commitment to

Page 80

1  tantalize them a little.  I have the cash."
2      A.  Yes.
3      Q.  Who is "them"; do you know?
4      A.  The Bishop Group.
5      Q.  "And then give them comfort that I can do this
6  deal now."
7      A.  Yes.
8      Q.  Again, "them" would be the Bishop Group?
9      A.  Yes.
10     Q.  Was there some question at that time, if you
11  recall, whether Fortrend could do the deal at that time?
12     A.  Not from our side but the Bishop Group was
13  concerned that we weren't going to be able to do the deal,
14  yes.
15     Q.  Who from Bishop reflected that concern to you?
16     A.  Tino Monaldo.
17     Q.  Do you know why they had a concern?
18     A.  They hadn't seen our commitment letter for
19  financing.
20     Q.  Turn to Government Exhibit 79, please.
21     A.  Mm-hmm.
22     Q.  This is a letter, appears to be undated, from
23  K-Pipe Merger Corporation and specifically Larry J.
24  Austin --
25     A.  Yes.

Page 81

1      Q.  -- to Mr. Langley; is that right?
2      A.  So it appears, yes.
3      Q.  Have you seen this letter before?  Before last
4  night.
5      A.  Not that I remember.
6      Q.  Could you briefly take a look at it and I'll ask
7  you questions about it in a second.
8      A.  Sure.
9          Okay.
10     Q.  Do you recall the matters surrounding the things
11  discussed in this letter?
12         MR. STERN:  Objection.  Form.
13  BY MR. COFFIN:
14     Q.  Specifically paragraph 1.
15     A.  Yes.  What about it?
16     Q.  It looks like Langley's demanding 21,500 for
17  each day that the close is delayed beyond November 8 of
18  '99.
19     A.  Yes.
20         MR. STERN:  Objection.  Form.
21  BY MR. COFFIN:
22     Q.  Do you recall why -- let me back up.
23         Who is Mr. Austin?
24     A.  Larry was an officer of companies that were
25  purchased by the Fortrend entities.

HUNDT REPORTING
214-220-1122

Witness:   Craig Hoffman

Page 82

1    Q.  And did he have -- did you know much about
2  Mr. Austin?  Did you deal with him very much?
3    A.  Only in the sense that I prepared the documents
4  for him to be signed and usually had him sign the
5  documents.
6    Q.  Where was Mr. Austin located?
7    A.  In Virginia.
8    Q.  I'm curious if you know why Mr. Austin would be
9  signing these documents instead of Mr. Furman or
10  Mr. Forster.
11    A.  It was a business arrangement between them, and
12  I don't know how that came about.
13    Q.  You don't know the specifics of the business
14  arrangement?
15    A.  No, I don't.
16    Q.  Do you have any recollection of the events
17  surrounding the matters described in this letter?
18    A.  No.
19        MR. STERN:  Objection.  Form.
20        THE WITNESS:  I remember that there was concern
21  that we weren't going to be able to close on time.  And I
22  remember that Langley got very onerous about it and
23  basically told us if we didn't close on a certain time it
24  was going to cost us twenty-one five a day.
25  BY MR. COFFIN:

Page 83

1    Q.  Was this something that Langley negotiated with
2  you or --
3    A.  No.
4    Q.  Who would he have negotiated with on that?
5    A.  I don't remember.
6    Q.  And item number 2 it says, "K-Pipe represents
7  and warrants to Langley that K-Pipe has no plan or
8  intention to liquidate the company and agrees it will not
9  liquidate the company for at least two years after the
10  closing date."
11    A.  Mm-hmm.
12    Q.  Do you recall what that statement is regarding?
13    A.  It was regarding liquidating and dissolving the
14  entities so that it could -- sorry.  Not liquidating and
15  dissolving the entities so that it could stand behind the
16  contracts that we had in front of us.
17    Q.  And what were the contracts?
18    A.  The documents for the transaction.
19    Q.  And why would Langley -- if he's getting his
20  money up front, why would he be concerned with the --
21  K-Pipe's ongoing obligations?
22    A.  Because there were obligations in the agreements
23  even between us and the stock seller that he didn't want
24  the entity not to be there if he had to go back against
25  the entity for those obligations and those agreements.

Page 84

1    Q.  Would you have drafted this letter?
2    A.  No.
3    Q.  Go to Government Exhibit 85, please.  This is a
4  Rabobank document, Mr. Hoffman.  It's a memo from the
5  executive board, I believe dated October 22 of '99.  Do
6  you see that?
7    A.  I do see the date.
8    Q.  And I think if you look at it you'll agree with
9  me this is the -- this memo describes the financing that
10  Fortrend International used to buy the stock of Langley.
11  Have you had a chance to review it?
12    A.  Yes.
13    Q.  Do you have any doubts that this represents the
14  financing that Fortrend engaged in order to buy the stock
15  of Langley?
16    A.  Not of Langley.  Of Bishop Group.
17    Q.  I'm sorry.  Owned by Langley.
18    A.  Yes.
19    Q.  And on the second page of the document under --
20  you see where it says "Protection"?
21    A.  Yes.
22    Q.  Next to it shows that there would be a pledge of
23  the partnership interests --
24    A.  Yes.
25    Q.  -- of K-Pipe Holding Partners to Rabobank,

Page 85

1  correct?
2    A.  Uh-huh.
3    Q.  And also, the next item shows they made pledge
4  of an escrow account in the name of the seller; is that
5  right?
6    A.  I see.
7    Q.  And the escrow account would be held by
8  Rabobank; is that right?
9    A.  As escrow agent I see, yes.
10    Q.  And then next item -- next paragraph shows a
11  pledge of an escrow account held at Rabobank with account
12  balance in excess of $200 million.
13    A.  Okay.
14    Q.  A few sentences over it says, "Midcoast Energy
15  will transfer $200 million drawn down under their credit
16  facility with Bank of America into the escrow account
17  prior to Rabobank advancing the loan."
18        Do you see that?
19    A.  Yes.
20    Q.  Does that help you refresh your recollection as
21  to the $200 million escrow that was put up for Fortrend's
22  financing of the stock purchase?
23    A.  No.  Honestly I'm still confused by that.  I
24  clearly see it here in the document.  It says that.  But I
25  do not remember there being an escrow for the deal.

22  (Pages 82 to 85)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:  Craig Hoffman**

Page 86

1    Q.  Are you familiar with what -- at that time in
2  1999 what assets Fortrend actually owned?  What did its
3  financial statement look like at the time, its balance
4  sheet?
5    A.  I -- I would not have known.
6    Q.  Do you know why Rabobank required an escrow
7  account of $200 million to be funded by Midcoast?
8    MR. STERN:  Objection.  Form.
9    THE WITNESS:  I do not know.
10 BY MR. COFFIN:
11   Q.  Go to Government Exhibit 121, please.  This is
12 an e-mail or string of e-mails but the first one at the
13 top it looks like one from Graham Taylor to you again.
14   A.  Mm-hmm.
15   Q.  And it follows the e-mail from below which was
16 from Duane Herbst, H-E-R-B-S-T, to individuals at Midcoast
17 and as well as to you; is that right?
18   A.  Yes.
19   Q.  And it looks like it says, "Attached please find
20 the latest version of the KPC/Midcoast press release.  Let
21 me have any comments as soon as possible."  Do you recall
22 receiving that press release?
23   A.  No.
24   Q.  Do you recall seeing the press release?
25   A.  Yes.

Page 87

1    Q.  When did you see it?
2    A.  That I don't remember.
3    Q.  Sometime around the closing of the transaction?
4    A.  Yes.
5    Q.  And so you forwarded it on to Mr. Taylor.  It
6  says, "This seems okay to me.  What do you think?"  And
7  Mr. Taylor says, "Yes.  But even better if they mentioned
8  K-Pipe, us."
9        Do you know why it would have been better to
10 have mentioned K-Pipe in the press release?
11   A.  I don't remember.
12   Q.  Do you know why K-Pipe was not mentioned in the
13 press release?
14   A.  No.
15   Q.  Government Exhibit 323, please.  This is a
16 letter of understanding dated November 8 of 1999, correct?
17   A.  I see, yes.
18   Q.  And it's signed by both you and Tino Monaldo?
19   A.  Yes.
20   Q.  Do you recall the purpose of this letter of
21 understanding?
22   A.  Just that we were to exchange some documents to
23 each other to Tino -- between Tino and myself.
24   Q.  Is this something where the documents were not
25 exchanged at closing?  Is this why a letter of

Page 88

1  understanding like this would be drafted and signed?
2    A.  Yes.  Yes.
3    Q.  Go to Government Exhibit 145, please.
4  Government Exhibit 145, Mr. Hoffman, I believe represents
5  various instructions from Larry Austin on behalf of K-Pipe
6  Group to Rabobank.
7    A.  Yes.
8    Q.  Would you have been involved in drafting these?
9    A.  Yes.
10   Q.  Who would have determined the amounts on the
11 wire instructions?
12   A.  Which amounts?
13   Q.  On 1143 I know -- well, let's go back to the DOJ
14 numbers.  That might be better.
15       Go to 228624 at the bottom in the small print.
16   A.  Okay.
17   Q.  The 299,750 that would -- that there was
18 instruction to wire to LeBoeuf Lamb -- L-E-B-O-U- -- is
19 that -E-F?
20   A.  Yeah, I believe so, yes.
21   Q.  Is that something that you would have
22 determined?
23   A.  Determined?  No.
24   Q.  Or would have been -- something that you got,
25 maybe a statement from the firm or -- I'm just curious as

Page 89

1  to how do you know how much to put in that particular
2  amount?
3    A.  Get an invoice from the law firm.
4    Q.  And how about the amount below that that would
5  be wired to Larry Austin?
6    A.  I don't know how that number would have been
7  calculated.
8    Q.  312,260?
9    A.  Um --
10   Q.  And you don't know the specifics of how that
11 amount was calculated?
12   A.  No, I don't.
13   Q.  And the next page it looks like there's an
14 instruction there to wire you $525,000?
15   A.  Yes.  Actually, I'm sorry.  It's the page before
16 in my book, if that helps.
17   Q.  I'm sorry.
18       How was that -- how was that -- what was your
19 compensation arrangement for K-Pipe or Fortrend?
20   A.  When I closed the transaction I would be told
21 how much I was expected to make off the closing of the
22 transaction.  Unfortunately there was no set formula.
23   Q.  So you would only know whenever you would close
24 the transaction how much you would get?
25   A.  Yes.

23 (Pages 86 to 89)

**Witness:   Craig Hoffman**

---

Page 90

1    Q.  And who would tell you that?
2    A.  Fred and Jeff.
3    Q.  So you had no employment agreement or consulting
4  agreement that set out the fee that you would earn in
5  specifics?
6    A.  No.
7    Q.  Was there a written consulting agreement between
8  you and Fortrend?
9    A.  There was an agreement regarding -- I'm sorry.
10  Yes is the answer to the question.
11    Q.  And did it deal with all the transactions that
12  you brought in and closed or just a particular
13  transaction?
14    A.  Neither.  It -- it did not -- it didn't deal
15  with -- I'm sorry.  Restate the question.
16             (Record read.)
17        THE WITNESS:  (No response.)
18  BY MR. COFFIN:
19    Q.  What I'm trying to find out is if there was an
20  independent consulting agreement for each deal that you
21  were working on.
22    A.  No, there was not.
23    Q.  There was one that covered all your
24  responsibilities with --
25    A.  Yes --

---

Page 91

1    Q.  -- Fortrend?
2    A.  -- there was.
3    Q.  Go to DOJ28626.
4    A.  28626.  Okay.
5    Q.  And here are wire instructions advising to wire
6  $1,451,000 to Golden Gate Bank on behalf of Cronulla
7  Corporation?
8    A.  Mm-hmm.
9    Q.  And the same amount of money below that to Chase
10  Manhattan Bank on behalf of Ashfield International?
11    A.  Mm-hmm.
12    Q.  How would you have gotten those numbers as far
13  as how much to wire those entities?
14    A.  Somebody would have given those to me.
15    Q.  Do you know why those entities were getting the
16  cash from the closing?
17    A.  Aside -- no.
18    Q.  Aside from -- you were going to say being the
19  limited partners of --
20    A.  Correct.
21    Q.  -- of K Pipe Holding?
22        The next two pages are instructions to wire
23  moneys to PriceWaterhouseCoopers.  One for eighty-seven
24  forty-three.  Do you see that?
25    A.  Yes.

---

Page 92

1    Q.  The next one for 950,000.
2    A.  Yes.
3    Q.  How would you have determined those amounts?
4    A.  I don't remember.
5    Q.  Do you know why there are two separate
6  transfers?
7    A.  No, I don't.
8    Q.  The gross value of this transaction was how
9  much?  Was it 188 million or 200 million?
10    A.  It was big like that, yeah.  It sounds right.
11    Q.  And so you mentioned earlier that generally you
12  paid 1 percent to a finder which in this case would have
13  been more than a million dollars.
14    A.  Okay.
15    Q.  So I'm just wondering can you reconcile the
16  amount that PriceWaterhouseCoopers got versus what you
17  testified to earlier?
18    A.  No.  Because I didn't -- I wasn't involved with
19  calculating the number.  I don't know.  But 1 percent is
20  also a general rule of thumb and it was negotiated
21  separately in transactions.
22    Q.  Turn to the page DOJ28623.
23    A.  Yes.
24    Q.  There's an instruction there to wire $5,000 to
25  Fleet Bank on behalf of Howard Teig?

---

Page 93

1    A.  Teig.
2    Q.  T-E-I-G.  CPA.
3        Who is Mr. Teig?
4    A.  The CPA who handled the income statements --
5  financial statements and tax returns for all the entities
6  that were owned by Fortrend -- sorry -- involved with
7  Fortrend entities.
8    Q.  Did you deal with Mr. Teig on a regular basis?
9    A.  Yes.
10    Q.  On several -- on all the transactions that you
11  were working on?  That you closed?
12    A.  Yes.
13    Q.  Do you know what his arrangement was with
14  Fortrend as to the amounts?
15    A.  No.
16    Q.  Who told you -- who would have told you then to
17  wire or to prepare this instruction to the bank to wire
18  $75,000 to Mr. Teig?
19    A.  Howard would have given me the number; Jeff
20  would have authorized it, of course.
21    Q.  And when those authorizations like that came in,
22  was it written or was it verbal?
23    A.  Verbal.
24    Q.  324.  Government Exhibit 324, please.  This is a
25  letter from Signal Capital Associates LP care of Jeffrey

---

24  (Pages 90 to 93)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:   Craig Hoffman**

Page 94

1 Furman, general partner, to Mrs. Ramoon in Grand Cayman.
2     A.  I see the letter.
3     Q.  Are you familiar with Ramoon or MeesPierson
4 Limited in the Grand Cayman?
5     A.  No.
6     Q.  And the letter -- text of the letter states,
7 "Dear Mrs. Ramoon, Please irrevocably transfer 158,620
8 Canadian dollars to K-Pipe Group, Inc., a wholly owned
9 subsidiary of Signal Capital Associates, LP without
10 conversion into any different other currency."
11     A.  I see.
12     Q.  Do you know what the purpose of this instruction
13 was?
14     A.  I'm sorry.  Yes.  It was to put the Canadian
15 dollars into that entity.
16     Q.  Do you know why Mr. Furman was wanting to move
17 that -- those Canadian dollars into the entity, Signal
18 Capital Associates LP?
19         MR. STERN:  Do you have a signed copy of this?
20 Do you know if this was sent?
21         MR. COFFIN:  I don't have a copy of a signed
22 copy, no.
23         MR. STERN:  I'll object to form.
24         THE WITNESS:  Hang on one second.
25         I'm sorry.  Could you read the question one more

Page 95

1 time.
2         MR. COFFIN:  Let me just restate it --
3         THE WITNESS:  Sure.
4         MR. COFFIN:  -- is that all right?
5     Q.  Do you know why Mr. Furman would have requested
6 that Ms. Ramoon irrevocably transfer 158,620 Canadian
7 dollars to K-Pipe Inc.?
8         MR. STERN:  Objection.  Form.
9         THE WITNESS:  Because he believed they had high
10 basis and low value.
11 BY MR. COFFIN:
12     Q.  And what was going to be -- do you know what was
13 going to be used with that high basis/low value -- or low
14 fair market value Canadian dollars?
15     A.  To offset the gain on the sale of the assets.
16     Q.  And that would be the gain that K-Pipe Group
17 Limited would incur upon the sale of the assets?
18     A.  Yes.
19     Q.  And the sale of the assets would have been --
20 was the sale of the assets to Midcoast?
21     A.  Correct.
22     Q.  Go to 228, please, Government Exhibit 228.  This
23 is a string of e-mails.  It looks like the top one is
24 between Bruce E. Snyder and Sherry A. Fox.  Do you see
25 that?

Page 96

1     A.  I do.
2     Q.  Do you recall Mr. Snyder being -- I can't
3 remember if we talked about this earlier -- a tax
4 accountant for Ernst & Young?
5     A.  No.
6     Q.  You don't recall?
7     A.  No.
8     Q.  Do you recall Mr. Snyder at all?
9     A.  I remember his name.  I don't remember who he
10 was.
11     Q.  And the e-mail below is one from you dated
12 3/21/2000 to Mr. Snyder.  Do you see that?
13     A.  Yes.
14     Q.  And do you have any doubts that this in fact --
15 or this was not an e-mail from you to Mr. Snyder?
16     A.  No.  It's clear it's my e-mail.
17     Q.  And in the text of this e-mail dated 3/21/2000,
18 you say, "Bruce, this note is to confirm that after the
19 acquisition of K-Pipe Group, Inc., there have been no
20 revenue activities and we do not expect there would be any
21 taxable income for the period between the closing date and
22 12/31/99.  I look forward to wrapping up this matter with
23 you soon." Correct?
24     A.  Yes.
25     Q.  I think you talked earlier that you left

Page 97

1 Fortrend end of '99.  And this e-mail's dated 3/21 of
2 2000.
3     A.  Yes.
4     Q.  Did you still do some work for Fortrend after
5 you left?
6     A.  I did.
7     Q.  Some wrap-up type work?
8     A.  Absolutely.
9     Q.  Why -- do you know what the purpose of this
10 letter was or why you would have e-mailed this note to
11 Mr. Snyder?
12     A.  Because he was involved with -- no, I'm sorry.
13 I don't remember why.  I -- I remember being asked by Fred
14 and Jeff to get involved with a couple of things after I
15 was already at my new firm.  I believe I started with
16 Terra Nova in February of 2000, if I'm not mistaken.  And
17 I was asked to be involved with a few matters after that.
18 But I don't remember what they were for.
19     Q.  You recall that Mr. Snyder or Ernst & Young was
20 going to prepare the tax return for K-Pipe Group?
21     A.  Not directly, no.
22     Q.  And do you know -- strike that.
23         Was this a true statement that you made in the
24 e-mail?
25     A.  As far as I know.

25  (Pages 94 to 97)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:   Craig Hoffman**

Page 98

1     Q.   Government Exhibit 233, please, 2-3-3.  This is
2   a memorandum from Howard Teig to Bill Lacey and Sherry
3   Fox.
4     A.   Okay.
5     Q.   Dated August 22 of 2000 regarding K-Pipe
6   activity.
7     A.   Mm-hmm.
8     Q.   And I'll represent to you that the testimony in
9   this case has been that Ms. Fox and Mr. Lacey worked for
10  Ernst & Young who was preparing the K-Pipe Group, Inc. tax
11  return --
12    A.   Okay.
13    Q.   -- for the period ended December 31 of 1999.
14    A.   Okay.
15    Q.   And the first topic there in the memo where it
16  says "Contribution of Assets" --
17    A.   Mm-hmm.
18    Q.   -- below that it says, "On November 8, 1999,
19  SCALP contributed percent to a plan which would qualify
20  under Section 351 of the Internal Revenue Code."  And it
21  lists three different assets, one of which is the 158,620
22  Canadian dollars --
23    A.   Mm-hmm.
24    Q.   -- you see that?
25         The other two are -- one is 45 percent of

Page 99

1   SCALP's holdings in Petro Holdings LP, Inc.; the other one
2   is 36.76 percent of SCALP's Holdings in Universal Merit
3   Securities, Inc.
4     A.   I see.
5     Q.   Do you know what the purpose of those -- of the
6   contribution would have been?
7     A.   No.  I was long gone by then.
8     Q.   Did you know why those contributions would have
9   been made?
10    A.   I mean, again, I can speculate, but I don't
11  think it's the right thing for me to do.
12    Q.   I'd like you to speculate.
13         And can we -- if it's not admissible then we can
14  fight about that later.
15         MR. IDELL:  I don't want you to guess or
16  speculate.
17         THE WITNESS:  Okay.  I was long gone from the
18  company and not involved with it by this point.
19  BY MR. COFFIN:
20    Q.   I have in front of me a transcript of an
21  interview conducted by the IRS of Howard Teig --
22    A.   Okay.
23    Q.   -- dated September 10 of 2003 wherein this memo
24  was being discussed.  The top of that page (indicating).
25         MR. STERN:  Do you have another copy?

Page 100

1         MR. COFFIN:  I only have one -- wait.  No, I
2   don't.  Hold on a second.
3         MR. IDELL:  What page and line number did you
4   want him to read?
5         MR. COFFIN:  50 is the top of the page.  He
6   doesn't have to read it -- he can read it to himself.
7         MR. IDELL:  50 is at the bottom of the page.
8         MR. COFFIN:  I'm sorry.  Look at the top there.
9         MR. IDELL:  Okay.  Where it says, "What was the
10  purpose of the transfer?"
11        MR. COFFIN:  Yeah, "What was the purpose of the
12  transfer."
13    Q.   Read down to line 24.
14    A.   (Witness complies.)
15         I see.
16    Q.   Mr. Teig --
17        MR. STERN:  Mr. Hoffman.
18  BY MR. COFFIN:
19    Q.   Yeah.  Mr. Hoffman, do you see that Mr. Teig
20  believed that you had told him the amounts that he needed
21  to transfer?
22    A.   I do see that.
23    Q.   And do you have a response to Mr. Teig's
24  testimony?
25    A.   Certainly.  It would have been on my schedule

Page 101

1   that the numbers would have come that went to him.  But
2   the development of those numbers would not have been due
3   to me.  It would have been due to working with Jeff and
4   everyone else in order to get to the right numbers.  I
5   certainly would have been the guy that put together the
6   schedule and said, "Here's all the numbers."  Again, I
7   would have drafted that and handed it to Howard.
8     Q.   And what would those numbers have been based on?
9     A.   I mean, the parameters in the transaction.  So
10  whatever invoices we got for people that needed to be
11  paid, that would have ended up on there.
12    Q.   What is -- did it also have to do with the
13  amount of the gain that needed to be absorbed by K-Pipe?
14    A.   Yes.
15    Q.   Turn to -- to make this easier for you,
16  Mr. Idell, page 71 of 179 at the top.
17        MR. IDELL:  71 of 179?
18        MR. COFFIN:  Right.
19    Q.   Starting with line 14.  The question that was
20  asked of Mr. Teig, "Mr. Teig, did you do the gain
21  computation or assist in doing the gain computation for
22  the sale of the assets to K-Pipe?
23        "ANSWER:  No.
24        "QUESTION:  Did you know who did that?
25        "ANSWER:  Mr. Hoffman."

26 (Pages 98 to 101)

9230bd6f-ed11-442a-994b-826142d0b85f

## Witness:  Craig Hoffman

Page 102

1    Is that a true statement?
2    A.  Yes.
3    Q.  And down at the bottom of Government Exhibit 233
4  there's a statement there that says, "SCALP's aggregate
5  tax basis in the assets was 145,411,651 consisting of --"
6  and it breaks down between Petro, Universal, and Canadian
7  dollars.
8    A.  Mm-hmm.
9    Q.  Do you know how those assets got those high tax
10 bases?
11   A.  No, I do not.  I remember -- I'm sorry.  I need
12 to point out.  I do remember Petro.  Petro was a company
13 that was bought at one point.  And there was cash paid by
14 the company.
15   Q.  By...?
16   A.  By an entity very similar to K-Pipe.  I guess --
17 I don't know.  It looks like it was owned by SCALP.
18   Q.  Who bought Petro?
19   A.  Some -- some entity very similar to K-Pipe.
20   Q.  I see.  Turn the page, please.  Under the
21 heading "Disposition of Assets" --
22   A.  Mm-hmm.
23   Q.  -- do you see that?
24   A.  Mm-hmm.
25   Q.  It says, "During December of 1999 K-Pipe sold

Page 103

1  the assets that it had received in the contribution from
2  SCALP."  And it lists a sale of the Petro to JRCR Corp for
3  $75,000.
4    A.  Okay.
5    Q.  Are you familiar with that transaction?
6    A.  No, I'm not.
7    Q.  Do you know -- are you familiar with the entity
8  JRCR Corp?
9    A.  I remember the name, but I don't know anything
10 about the entity.
11   Q.  Do you recall who the principals may have been
12 of that entity?
13   A.  No.
14   Q.  Then it shows on December 22 of '99 a sale of
15 Universal to River Sea Corp, R-I-V-E-R, S-E-A, Corp.  Are
16 you familiar with that transaction?
17   A.  No, I'm not.
18   Q.  How about with the entity River Sea Corp?
19   A.  Neither.
20   Q.  Okay.  And then item 3, that's the conversion of
21 the Canadian dollars that we talked about earlier; is that
22 right?
23   A.  I'm sorry.  I remember talking about a
24 contribution of Canadian dollars.
25   Q.  Oh, okay.  And are you familiar with the

Page 104

1  transaction there, December 29 of 1999, the conversion of
2  the Canadian dollars to US dollars?
3    A.  No, I'm not.
4    Q.  Do you have any idea of what the business
5  purpose of items 1, 2, and 3 were?
6    A.  I can read it.  It says they were getting
7  capital losses in the entity.  I guess also an ordinary
8  loss.
9    Q.  Government Exhibit 254, please.  Mr. Hoffman,
10 did you ever have any occasion to review the -- this tax
11 return of K-Pipe Group for the year ended 1999?
12   A.  No.  Sorry.  I saw it last night.
13   Q.  Last night.  Thank you.Government Exhibit 326,
14 please.  This is a string of e-mails between Ms. Morelli
15 and Mr. Teig.  And on the second page of the e-mail
16 Mr. Teig references talking to you about working capital
17 adjustments; is that right?  You see the bottom of the
18 second page?
19   A.  Mm-hmm.
20   Q.  And this e-mail's dated August 17 of 2000.
21   A.  Okay.
22   Q.  Was Mr. Teig consulting with you regarding
23 K-Pipe well after or well into the year 2000?
24   A.  He -- yes, he was.
25   Q.  Do you remember talking to him about the

Page 105

1  differences in working capital?
2    A.  Yes, I remember having a conversation about it.
3    Q.  Can you generally describe what the substance of
4  the conversation was.
5    A.  I remember that the working capital schedules
6  didn't match up in our stock deal and in our subsequent
7  asset deal.  And I remember that there was some confusion
8  as to how the amount should have been calculated.  And I
9  was helping sort of sort out how those amounts were to be
10 calculated.
11   Q.  Turn back to the first page of Exhibit 326.
12   A.  Yes.
13   Q.  At the bottom where Ms. Morelli is -- e-mails
14 Mr. Teig.  She said,"The Butcher Interest partnership you
15 may recall was entered into at the insistence of PWC in
16 order to add substance and good facts to this Midco
17 transaction."
18      Is that your recollection, as far as PWC
19 insisted that the Butcher Interest partnership be entered
20 into?
21   A.  No.
22   Q.  Government Exhibit 249, please.  This is a
23 letter from Manatt, Phelps & Phillips, LLP.  I'm sorry.
24 To Manatt, Phelps & Phillips dated November 21, 2000
25 signed by Mr. Furman on behalf of Signal Capital

27 (Pages 102 to 105)

9230bd6f-ed11-442a-994b-826142d0b85f

Witness:   Craig Hoffman

Page 106

1  Associates LP.  Do you recognize that as his signature?
2      A.  I do.
3      Q.  And it's regarding a representation for tax
4  opinion.
5      A.  Okay.
6      Q.  Have you ever seen this letter?
7      A.  No, I've not.  Last night.
8      Q.  Last night.  Okay.
9          Were you familiar with the law firm of Manatt,
10  Phelps?
11      A.  I know the name but I don't know the firm.
12      Q.  Did you ever deal with any lawyers there?
13      A.  Not that I remember.
14      Q.  Government Exhibit 250, please.  This appears to
15  be the tax opinion letter referenced by earlier exhibit by
16  Manatt, Phelps dated November 21, 2000.  You see that?
17      A.  Yes.
18      Q.  Did you have any occasion to review this letter?
19      A.  Not until last night.
20      Q.  Had you seen similar type letters for deals that
21  Fortrend did prior to the K-Pipe deal?
22      A.  Yes.
23      Q.  And who would generally request those?
24      A.  I don't know.
25      Q.  And why would you have occasion to review those

Page 107

1  tax opinion letters?
2      A.  They were documents related to the transactions
3  that I would have been shepherding and making sure were
4  all together with the rest of the documents related to the
5  deals.
6      Q.  Government Exhibit 251, please.
7      A.  Yes.
8      Q.  This is a letter from Chamberlain --
9      A.  Hrdlicka.
10      Q.  -- Hrdlicka dated December 24, 2002, well --
11  after the time that you left Fortrend -- to K-Pipe Merger
12  Corp and Manatt, Phelps.  Did you ever have occasion to
13  review this letter, sir?
14      A.  Not until last night.
15      Q.  Had you seen similar-type letters from
16  Chamberlain Hrdlicka in relation to other deals?
17      A.  No.  Not that I remember.
18      Q.  It references -- the letter references an
19  opinion letter dated January 28, 1997 to Frederick
20  Forster.
21      A.  Okay.
22      Q.  Have you ever seen that letter?
23      A.  Not that I recall.
24      Q.  Was Mr. Forster -- what were Mr. Forster's
25  duties in relation to Fortrend International?

Page 108

1      A.  He did a lot of yelling.
2      Q.  At?  At you?
3      A.  He -- I mean, what were his duties?  He was one
4  of the owners as far as I knew.
5      Q.  Was he an officer or did he have a title?
6      A.  I don't know.  He was Fred.
7      Q.  I'm -- I don't think I've asked this.  I'm
8  curious how many employees did Fortrend have back in 1999?
9      A.  Actual employees?
10      Q.  Mm-hmm.
11      A.  I don't believe it had many.  It had -- I just
12  think just the people in the office.  I'm sorry.  I don't
13  know the actual answer to the question.
14      Q.  How many people were in the office?
15      A.  About 10.
16      Q.  And was it your understanding that most of the
17  people were consultants?
18      A.  Yes.
19      Q.  Were there any staff-type -- secretarial staff
20  type people?
21      A.  Yes.
22      Q.  Whether they were employees or not, you don't
23  know?
24      A.  Correct.
25      Q.  And you worked there from 1996 to 1999; is that

Page 109

1  right?
2      A.  To 1999, yes.
3      Q.  Did -- and did that number fluctuate, the number
4  of people in the office, 10?
5      A.  Yes.
6      Q.  The letter Government Exhibit 251 references
7  bases that Michael C. Hall, Kanawha Enterprises LP,
8  Autochthon Associates LP had in limited partnership
9  interest that they collectively owned in SCALP,
10  immediately before the SCHC exchange, was $793 million.
11  Do you see that?
12      A.  I see it.
13      Q.  Are you familiar with either Michael C. Hall,
14  Kanawha Enterprises LP, or Autochthon Associates LP?
15      A.  I know Michael's name, but I don't know the
16  other two names.
17      Q.  Any idea how those -- how the limited partner --
18  partnership interest basis of $793 million was obtained?
19      A.  No.  Aside from what it says here, it was in
20  some opinion letter.
21          MR. COFFIN:  I need to take a break.  About 5 or
22  10 minutes.
23          THE VIDEOGRAPHER:  We are now going off the
24  video record.  The time is 2:51 p.m.
25          (Recess taken from 2:51 p.m. to 3:02 p.m.)

HUNDT REPORTING
214-220-1122

9230bd6f-ed11-442a-994b-826142d0b85f

Witness:  Craig Hoffman

Page 110

1     THE VIDEOGRAPHER: We are now back on the video
2   record. The time is 3:02 p.m.
3   BY MR. COFFIN:
4     Q. Mr. Hoffman, please turn to Government
5   Exhibit 201. I'll represent to you, Mr. Hoffman, that
6   there's been testimony in this case that these are the
7   notes of Gary Wilcox from PriceWaterhouseCoopers. I can't
8   recall, did you work with -- you recall working with Gary
9   Wilcox on this case?
10    A. I do.
11    Q. Turn to -- there's Bates numbers from PWC in the
12  bottom right-hand corner. Turn to Bates number PWC P1295,
13  please.
14    A. Okay.
15    Q. At the top there Mr. Wilcox referenced a 9/12
16  conversation with Jeff Furman, Craig Hoffman. Do you
17  recall talking to Mr. Wilcox with Mr. Furman maybe on the
18  phone?
19    A. Not directly. I mean not specifically.
20    Q. Specifically. Generally you recall having those
21  types of conversations?
22    A. Certainly spoke to the man.
23    Q. At the -- on the -- at the bottom third of the
24  page there's some notes there. And I know they're
25  difficult to read but I think it says, "Minimum of 120M

Page 111

1   step-up. Normally 15 percent of gross fee." Then
2   "Normally 7 to 8 percent step." And then it says "If at
3   5 percent and 5 and a half percent," question mark. And
4   to the right it says, "Just say 5 million them; 1 million
5   us." Do you see that?
6     A. I see that.
7     Q. My question, was the fee that you guys earned
8   related to the step-up in the transaction or the built-in
9   gain in the transaction?
10    MR. STERN: Objection. Form.
11    THE WITNESS: The spread between the buy and the
12  sell would have been related to the size of the step-up,
13  yes.
14  BY MR. COFFIN:
15    Q. And tell me exactly how it would have been
16  related.
17    A. It would have been related because there was a
18  market going on for us to buy and sell these assets. And
19  as a general rule we negotiated the best we could on both
20  sides of the deal. But it came out to a range.
21    Q. So if you had -- if this deal was a $200 million
22  deal, for example, and the basis in the assets was $50
23  million, would that mean that there would be $150 million
24  step-up in basis and from that number you would calculate
25  the fee that would -- the profit that Fortrend would earn

Page 112

1   on the transaction?
2     MR. STERN: Objection. Form.
3     MR. IDELL: Compound. Vague and ambiguous.
4   BY MR. COFFIN:
5     Q. That's just an example.
6     MR. IDELL: Calls for speculation.
7     Do you understand the question?
8     THE WITNESS: I do understand the question.
9     That would have -- so I guess answering the
10  first part of your question, yes, the step-up would have
11  been the difference between the deal size and the basis
12  and the assets.
13    And the -- and now I will have to actually get
14  you to reread the question.
15    MR. COFFIN: Okay.
16    (Record read.)
17    THE WITNESS: Yeah, that's how we would have
18  tried to calculate the spread in the transaction. It
19  would have been roughly based on that -- on that deal
20  size.
21  BY MR. COFFIN:
22    Q. Define for me what you're calling the spread.
23  What is that?
24    A. The spread is the difference between what we
25  bought the stock for and sold the assets for.

Page 113

1     Q. So I'm a little unclear then how -- and that's
2   all based on fair market value then, right; what you
3   bought the stock for and what you sold the assets for?
4     A. Correct.
5     Q. So how does the tax basis work into the
6   calculation, if at all?
7     A. Because there was a gain inside the corporation
8   when we were buying it that everybody knew about.
9     Q. And once again, was there a percentage that was
10  multiplied against that built-in gain to determine how
11  much Fortrend would earn on the transaction?
12    A. We knew where it generally worked out. We tried
13  to get as much as we possibly could. But we knew normally
14  what the range was. And that range was around 7 percent
15  or so.
16    And so we could and we would occasionally say
17  when you're thinking of the deal, what you do is you look
18  at it and say what's the step-up? Here's about the
19  spread. Let's do it at -- you know, say call it
20  7 percent. And that's what we would mark up the assets in
21  the transaction.
22    Q. Okay.
23    A. But then of course we'd try to negotiate the
24  best we could and we would try to sell them for as high as
25  we could and buy them for as low as we could. It was a

HUNDT REPORTING
214-220-1122

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:   Craig Hoffman**

Page 114

1   range.  We got higher numbers; we got lower numbers.
2       Q.  But generally you were shooting for the spread
3   to be 7 to 8 percent of a step-up in basis; is that --
4       MR. STERN:  Objection.  Form.
5   BY MR. COFFIN:
6       Q.  Is that correct?
7       A.  In general, we were trying to get the deals done
8   so that we could get them done.  And that's where it
9   worked out.
10      Q.  Were these -- was that 7 percent negotiated by
11  any of the parties?
12      A.  The -- I mean, the answer to -- was it
13  7 percent?  Yes.
14      Q.  And who specifically negotiated it in this
15  transaction?
16      A.  I don't know.
17      Q.  Were you negotiating it on behalf of Fortrend?
18      A.  Yes.
19      Q.  And who would have been negotiating it on behalf
20  of --
21      A.  Sorry.  Was I negotiating it on behalf of
22  Fortrend?  Yes.  Was I negotiating the spread in the
23  transaction?  No, not that I remember.  I mean, I
24  obviously was involved with some of these conversations,
25  but this would have been Jeff talking.

Page 115

1       Q.  He is the person at Fortrend who had the
2   authority to determine how much the spread would be?
3       A.  Well -- no.  I mean, we negotiated on one side
4   to buy the stock.  We would try to get the stock for as
5   low as we could.  We would then negotiate to try to sell
6   the assets.  We'd try to get -- sell the assets for as
7   much as we could.  There were competitive issues where
8   there were other buyers in the marketplace.  There were
9   other people.  There were other things people could do
10  that sort of limited where our bounds were.  We tried to
11  get as much money as we could.
12      Q.  When you say "other people" in the market, are
13  you talking about direct competitors of Fortrend?
14      A.  Yes.
15      Q.  Who were some of those competitors?
16      A.  There were groups that I never really knew but I
17  knew we were -- there were always other groups doing
18  deals.
19      Q.  So you knew that Fortrend had to fall in line
20  with what -- what the other firms, competitors were
21  earning?
22      MR. STERN:  Objection.  Form.  Leading.
23      THE WITNESS:  And I don't think I would say it
24  quite that way.  If I can --
25      MR. COFFIN:  Sure.

Page 116

1       THE WITNESS:  -- can answer the heart of your
2   question.
3       There were bids we could put on the table that
4   would be accepted and bids that we could put on the table
5   that wouldn't be accepted.  We knew where they generally
6   worked out.  And we tried our best to get them worked out.
7   Because the more deal flow we did, the more money.
8   BY MR. COFFIN:
9       Q.  And who all was involved -- what other parties
10  were involved in the negotiation of the spread?
11      A.  I don't recall.  I mean, I know Jeff was
12  involved.  I mean, I know I was there.
13      Q.  Who from Midcoast?
14      A.  I don't recall.
15      Q.  Would it have been Richard Robert?
16      A.  Richard was involved in negotiating the
17  transaction.  I'm sure he was involved in the pricing.
18      Q.  Okay.  Turn to PWC1287, please.
19      A.  Okay.
20      Q.  These are notes from, it looks like,
21  September 10 discussion with Dennis M., which I believe is
22  Dennis McErlean.  Are you familiar with him?  Do you
23  remember that name?
24      A.  I remember the name.
25      Q.  Did you ever deal with him?

Page 117

1       A.  I can't picture who he was.  I'm not sure.  I
2   don't recall.
3       Q.  Down at the bottom of the page there's a note
4   that says, "Seller asking for "incremental consid" --
5   which consider to be consideration -- "equal to one-half
6   the step-up."
7       A.  Okay.
8       Q.  Do you recall any discussions about Mr. Langley
9   asking for incremental consideration equal to one-half of
10  the step-up in basis?
11      A.  Not specifically.  He asked for incremental
12  consideration at every step along the way.
13      Q.  Turn the page to 1288.  At the top it shows
14  "120M."  120 million, I believe.  And then "interest" dash
15  "7 percent, we get 15 percent."  And then "15-year
16  pipeline" underneath that.  PWC -- do you recall if PWC's
17  fee was 15 percent of --
18      A.  I don't -- Sorry.
19      Q.  -- of 7 percent?
20      A.  Thought you were done.
21          I don't recall their number.
22      Q.  Was that a negotiated fee on their part?
23      A.  I don't know.
24      Q.  Government Exhibit 330.
25      MR. STERN:  Where did this come from?

**HUNDT REPORTING**
**214-220-1122**

9230bd6f-ed11-442a-994b-826142d0b85f

# Witness:  Craig Hoffman

Page 118

1        MR. COFFIN:  IRS just gave it to me.
2        MR. STERN:  Has it been produced yet?
3        MR. COFFIN:  No.  I'm using it for impeachment
4   purposes.
5        MR. STERN:  He's using it for -- what does that
6   have to do with whether or not you produced it to us?
7        MR. COFFIN:  Well, I just got it.
8        MR. STERN:  Your client didn't just get it.  Are
9   there other things that we're going to be --
10       MR. COFFIN:  It depends.  I mean -- it depends
11  on what I can get out from the parties of this
12  transaction.
13       MR. STERN:  What can you get out of parties --
14       MR. COFFIN:  What I can -- the testimony that I
15  can get.  If I have to impeach them with other
16  documents --
17       MR. STERN:  Well, I'm entitled to relevant
18  documents.  Is this a relevant document?  What are you
19  impeaching him at a deposition?
20       MR. COFFIN:  Well, we're videotaping it for
21  trial.
22       MR. STERN:  I don't understand what rule you're
23  following that you don't have to produce a document that
24  you're using in discovery to me.
25       MR. COFFIN:  I just got it.

Page 119

1        MR. STERN:  When?
2        MR. COFFIN:  A week ago, maybe.
3        MR. STERN:  Why didn't you give to me?
4        MR. COFFIN:  Because I didn't know if I was
5   going to have to use it or not.
6        MR. STERN:  Is it relevant?
7        MR. CROKE:  Shouldn't we go off the record?
8        MR. STERN:  No.
9        MR. COFFIN:  It is now.
10       MR. STERN:  It is now.  Well, isn't the rule
11  that we're entitled to the discovery of relevant evidence
12  and evidence that may make the discovery relevant?
13       MR. COFFIN:  I can't turn over everything under
14  6103 until it becomes relevant.
15       MR. STERN:  I think you ought to review 6103.
16       MR. COFFIN:  Well, we can talk about it later.
17  I understand your complaint.
18       MR. CROKE:  I can explain it to you if we go off
19  the record.
20       MR. STERN:  I want you to explain it on the
21  record.
22       MR. CROKE:  Should I explain?
23       MR. COFFIN:  Sure.
24       MR. CROKE:  This did not come from this case.
25  This was not provided to the IRS related to the K-Pipe

Page 120

1   case, the Midcoast case at all.  It came from Fortrend in
2   an audit of a different taxpayer.  Okay?
3        What I believe is going to happen is, the
4   question's going to be put to the witness as to whether
5   he's familiar with this and was this type of information
6   provided to Midcoast.  So this is not connected to this
7   case, this particular document.
8        MR. STERN:  Well, it's obviously connected to
9   the case.
10       MR. CROKE:  No.  What is going on is that this
11  is a Fortrend document, right?  Fortrend provided it to
12  the IRS with respect to a completely different
13  transaction.
14       MR. STERN:  And it's in the IRS's possession and
15  it's relevant --
16       MR. CROKE:  But it may not have anything to do
17  with this particular case at all.
18       MR. STERN:  Or it may lead to the discovery of
19  admissible evidence, which is the definition under the
20  federal rules.  So anyway, go ahead.
21  BY MR. COFFIN:
22  Q.  Okay.  Are you familiar with this document?
23  A.  I see it, yes.
24  Q.  Have you seen it before?
25  A.  I believe -- yes.

Page 121

1   Q.  Was this something you had been involved in
2   drafting?
3   A.  Yes.
4   Q.  Okay.  Specifically on the second page there is
5   a heading "Sale of Appreciated Businesses."
6   A.  Mm-hmm.
7   Q.  Read that real quick.
8   A.  (Witness complies.)
9        Okay.
10  Q.  Is this the type of structure that was used in
11  the transaction at issue in this case?
12  A.  It's a description of a Midco, yes.
13  Q.  It says, "Fortrend can often arrange for the
14  sale of a business at a price which substantially
15  increases the seller's after-tax profits."
16  A.  Yes.
17  Q.  And how was that accomplished?
18  A.  If the seller were to sell to us and we're
19  buying stock, his after-tax profit is going to be higher
20  than if we bought some -- even if we bought the assets
21  from him.
22  Q.  There's a description on BDO 10750.  I'm sorry,
23  10751.
24  A.  Yes.
25  Q.  Of you, Mr. Hoffman.

31 (Pages 118 to 121)

**Witness:   Craig Hoffman**

Page 122

1    A.  Yes.
2    Q.  Is that a -- did you draft that description?
3    A.  Yes.
4    Q.  Was it accurate?
5    A.  Yes.
6    Q.  And turn to BDO 10763, please.
7    A.  Yes.
8    Q.  It says, "Buy stock/sell assets transaction
9  executive summary."
10    A.  Mm-hmm.
11         MR. STERN:  Can I ask what documents have been
12  eliminated from this, what pages?
13         MR. COFFIN:  I don't know.
14         MR. CROKE:  I don't know either.
15         MR. STERN:  So you have an incomplete document
16  here that you're using?
17         MR. CROKE:  Is it incomplete?  Again, I don't
18  know.
19         MR. STERN:  Well, it goes from BDO 00010754 to
20  10763.  It shows page 8 at the bottom of the fax line and
21  it goes to page 18.  I request production of a complete
22  document.  I don't think it's fair if you use partial
23  documents.
24         MR. COFFIN:  Okay.  We'll address that.
25    Q.  Back to the page that I requested you to look

Page 123

1  at.
2    A.  Yes.
3    Q.  Is that something -- this page is something you
4  drafted?
5    A.  Not that I recall.
6    Q.  Do you recall drafting any portion of this
7  document?
8    A.  I remember being involved with the firm and
9  transaction section.  This was -- I remember the beginning
10  of this document for certain.  This was the firm brochure
11  shortly after I joined the firm.  I was involved with
12  editing and probably rewriting sections of this document,
13  yes.
14    Q.  Would the -- do you know if the second page of
15  the document would that have been transmitted to Midcoast
16  in conjunction with the transaction that Fortrend engaged
17  in with them?
18    A.  Of this document?
19    Q.  Yeah.
20    A.  I don't think so.
21    Q.  Why wouldn't you think so?
22    A.  Because I believe this is an older document than
23  that.
24    Q.  So at some point in time this page was taken
25  out?

Page 124

1    A.  No.  I think it's -- sorry.
2    Q.  I'm sorry.  This page was taken out of materials
3  you gave to potential targets or --
4    A.  No, the brochure was rewritten.
5    Q.  So the paragraph "Sale of Appreciated
6  Businesses," would that have been taken out when it was
7  rewritten?
8    A.  When it was rewritten it looked like a lot more
9  like the one you saw in the evidence that for -- you got
10  in the binder that I saw last night.
11    Q.  So it appears that -- I mean, if this one is not
12  in the other one, my question is why would it be taken out
13  of the materials?
14    A.  As the firm grew our brochure changed.
15    Q.  You wouldn't want to provide more information
16  versus less to your --
17         MR. IDELL:  Argumentative.
18  BY MR. COFFIN:
19    Q.  -- to your potential customers?
20         MR. STERN:  Calls for impeachment.  Also
21  impeaching.
22         THE WITNESS:  I mean --
23         MR. IDELL:  It --
24         MR. COFFIN:  I'll withdraw the question.
25    Q.  On 10763 again --

Page 125

1    A.  Yes.
2    Q.  -- the third full paragraph where it says, "We
3  are working with various clients --"
4    A.  Yes.
5    Q.  "-- who may be willing to buy the stock from the
6  seller and then cause the target corporation to sell its
7  net assets to the ultimate buyer.  These clients have
8  certain tax attributes that enable them to absorb the tax
9  gain inherent in the assets."
10    A.  Yes.
11    Q.  Who were the various clients, if you recall?
12    A.  I don't know.  Those would be the entities that
13  Fortrend was involved with that were involved in the
14  deal -- with each deal.
15    Q.  And then what -- do you know what the tax
16  attributes of those entities would have been?
17    A.  In some cases.
18    Q.  Who would they have been?
19    A.  They would have been, for example, the Canadian
20  dollars that you saw earlier, which I believe those assets
21  were held by an entity because they believed they had
22  higher basis than they had value.
23    Q.  Are you aware of any current lawsuits against
24  Fortrend International?
25    A.  I've heard people talk about them.

**HUNDT REPORTING**
**214-220-1122**

9230bd6f-ed11-442a-994b-826142d0b85f

# Witness:  Craig Hoffman

Page 126

1    Q.  What did you hear?
2    A.  I've heard people say that there are lawsuits.
3    Q.  Do you know what the substance of those suits
4  are?
5    A.  No.
6       (Counsel confers with witness.)
7       THE WITNESS:  I need to say that.  Sorry.
8       Also -- I apologize.  Fortrend is also a
9  defendant in a lawsuit that was started by Dennis Langley
10 against both Fortrend.  And I'm also named as a defendant
11 in that case.
12 BY MR. COFFIN:
13   Q.  Were you aware that Mr. Taylor has been
14 indicted?
15   A.  I read a news article about that.
16   Q.  Was it a Wall Street Journal article --
17   A.  Yes.
18   Q.  -- House of Cards?
19      Have you had any contact with Mr. Taylor since
20 you left?
21   A.  I spoke to him briefly after that article.
22   Q.  My colleague here tells me that I haven't asked
23 how you became involved in the K-Pipe transaction.
24      MR. IDELL:  I think you did.  But you can say it
25 again.

Page 127

1       THE WITNESS:  I think you did, but I'll say it
2  again.  Jeff came into my office and told me there was a
3  conference call coming on that I had to get involved in.
4       MR. COFFIN:  That's right.  Sorry.
5       MR. IDELL:  Can I ask a housekeeping question?
6       MR. COFFIN:  Sure.
7       MR. IDELL:  So this exhibit binder will be the
8  exhibits to this deposition; is that how that works?
9       MR. COFFIN:  Well, the ones that we talked
10 about.  There were some that we didn't talk about.
11      MR. IDELL:  And -- all right.
12      MR. STERN:  We have sequentially numbered
13 exhibits for all the depositions.
14      MR. IDELL:  I see.  I see.  Okay.
15      MR. STERN:  We've got the government deposition
16 exhibits for all the depositions.
17      MR. IDELL:  I see.
18      MR. COFFIN:  Pass the witness.
19      THE VIDEOGRAPHER:  We are now going off the
20 video record.  The time is 3:28 p.m.
21      (Recess taken from 3:28 p.m. to 3:37 p.m.)
22      THE VIDEOGRAPHER:  We are now back on the video
23 record.  The time is 3:37 p.m.
24             EXAMINATION
25 BY MR. STERN:

Page 128

1    Q.  Mr. Hoffman, I want to follow up on a question
2  that Mr. Coffin just asked you about, negotiating the
3  spread.
4    A.  Mm-hmm.
5    Q.  Do you remember him asking you those questions?
6    A.  Mm-hmm.
7    Q.  Did you in these transactions negotiate a spread
8  or did you negotiate a purchase price for the sale of --
9  or purchase of stock and a sale price for the sale of the
10 assets?
11      MR. COFFIN:  Objection.  Leading.
12 BY MR. STERN:
13   Q.  Was it accurate to say that you negotiated a
14 spread, the spread?
15      MR. COFFIN:  Same objection.
16      THE WITNESS:  It is --
17 BY MR. STERN:
18   Q.  What I'm trying to get at --
19   A.  Yes.
20   Q.  I mean the spread, as I understand it, is the
21 difference between what you buy the stock at and sell the
22 assets.
23   A.  Correct.
24   Q.  Did you negotiate with one party a spread or do
25 you negotiate pricing or do you negotiate something else?

Page 129

1    A.  The answer is there's no one clear answer to the
2  question.  Yes, there were people that knew that there
3  were -- there was a spread which was in the marketplace
4  and the question was if we do this transaction, what's the
5  spread going to be.  There were people that we simply
6  bought at a price.
7    Q.  And sold at a price?
8    A.  And sold at a price.
9    Q.  And do you recall what the circumstance was in
10 the transaction with Midcoast?
11   A.  No, I do not.
12      I'm sorry.  As a procedural matter I'm not sure
13 what I'm supposed to do when you object to something.
14      MR. IDELL:  Ignore it.  Unless I instruct you
15 not to answer, you have to answer.
16      THE WITNESS:  Thank you.
17 BY MR. STERN:
18   Q.  Just as you should have ignored me.
19      In connection with this -- these two
20 transactions, the purchase of stock from Langley and the
21 sale of assets to Midcoast, I want to go back and focus on
22 some of the players involved.
23   A.  Okay.
24   Q.  You described your involvement did -- first of
25 all, what was Fortrend's role in the transaction as

33  (Pages 126 to 129)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:   Craig Hoffman**

Page 130

1  opposed to K-Pipe's role in the transaction?
2      A.  Fortrend was the advisor to K-Pipe that handled
3  the matters of the transaction, is the way to think of it.
4  So I was the deal mechanic on behalf of Fortrend working
5  on behalf K-Pipe to get the transaction closed.
6      Q.  And did Fortrend -- how is Fortrend compensated
7  for its participation in the transaction?
8      A.  I don't know.
9      Q.  And then you mentioned Graham Taylor and Cynthia
10  Morelli.  Who were they?
11      A.  Graham Taylor was counsel.  And Cynthia was a
12  younger lawyer who worked for him.  So Graham was a parter
13  and I think Cynthia was an associate.
14      Q.  And who did they represent?
15      A.  They represented K-Pipe.  But they also
16  represented Fortrend.
17      Q.  And we saw that at closing they were paid some
18  $299,000.
19      A.  Correct.
20      Q.  Their firm was.
21      A.  The -- yes.
22      Q.  And that firm was -- what was the name?
23      A.  LeBoeuf, Lamb, Greene & MacRae, I believe.
24      Q.  And was the Midcoast transaction the first
25  transaction that LeBeouf, Lamb represented for Fortrend?

Page 131

1      A.  I don't recall.
2      Q.  Did Dennis Langley have anything to do with
3  LeBoeuf, Lamb representing Fortrend in that -- in the
4  stock purchase side of that transaction?
5      A.  Not that I --
6          MR. COFFIN:  Objection.  Leading.
7          THE WITNESS:  Not that I know of.
8  BY MR. STERN:
9      Q.  Did Midcoast have anything to do with LeBoeuf,
10  Lamb representing Fortrend in the asset sale -- asset side
11  of the transaction?
12      A.  No.
13      Q.  To your knowledge, did Midcoast introduce
14  Leboeuf, Lam to Fortrend?
15      A.  Not to my knowledge.
16      Q.  Do you know whether Fortrend had any prior
17  relationship with Lebeouf, Lam?
18      A.  Not that I know of.
19      Q.  What did Lebeouf do in connection with
20  representing Fortrend and K-Pipe in the transaction?
21      A.  They conducted due diligence, they drafted legal
22  documents, and they assisted in negotiations.
23      Q.  Do you know specifically what they did in
24  connection with the due diligence?
25      A.  Generally supported me in my review of documents

Page 132

1  and reviewed legal matters.  They handled the review of
2  issues for which I was not prepared to handle because I
3  wasn't a lawyer.  So they handled it.
4      Q.  And were they involved in drafting the documents
5  for the stock purchase?
6      A.  Yes.
7      Q.  What was their involvement in drafting the
8  documents for the stock purchase?  What did they do?
9      A.  I believe -- oops.  We certainly -- they --
10  Lebeouf certainly negotiated and negotiated the reps and
11  warranties and covenants and crafted language and argued
12  with the sellers with regard to points in the documents
13  themselves.  I don't remember who controlled the document.
14      Q.  Who are our choices as far as who controlled the
15  document for the stock purchase?
16      A.  Lebeouf, Lam and Bryan Cave.
17      Q.  And who is Bryan Cave?
18      A.  The --
19      Q.  That's not a person, is it?
20      A.  No, no, no.  Bryan Cave is a law firm.
21      Q.  And they represented who?
22      A.  Dennis Langley.
23      Q.  All right.  So as far as controlling the stock
24  purchase agreement it was -- development and drafting of
25  the stock purchase agreement it was either Lebeouf, Lam or

Page 133

1  Bryan Cave?
2      A.  In terms of controlling the document.  But those
3  two negotiated directly together on the document itself,
4  yes.
5      Q.  All right.  Who was involved in negotiating the
6  asset purchase agreement?
7      A.  (No response.)
8      Q.  As far as the document itself.
9      A.  Right.  I believe Lebeouf, Lam on our behalf.
10      I'm a little unclear if there was a law firm
11  representing Midcoast or if Midcoast was doing it
12  themselves.
13      Q.  Do you remember a gentleman by the name of Ron
14  Chachere.
15      A.  I do remember.
16      Q.  Do you remember what his role in the transaction
17  was?
18      A.  He was involved in drafting the documents and
19  negotiating the legal points for the deal with Midcoast.
20      Q.  On the asset purchase side?
21      A.  That's correct.
22      Q.  Mr. Kaufman asked you about specific meetings.
23  And it may be a little repetitive but I'd like for you to
24  chronologically go through what you remember about how --
25  you talked about how you first got involved in this

HUNDT REPORTING
214-220-1122

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:   Craig Hoffman**

Page 134

1  transaction. I'd like you to take me step-by-step the
2  sequence of what happened --
3      A.  Okay.
4      Q.  -- as the transaction was negotiated to an LOI
5  and then to a definitive agreement and then closed.
6      A.  Okay.
7      Q.  So let's start up to the LOI or the letter of
8  intent.
9      A.  Okay.
10         MR. IDELL:  For which transaction?
11         MR. STERN:  The letters of intent.
12         THE WITNESS:  Fair.  There was a conference call
13  that I was brought into with Jeff Furman where the
14  transaction was first brought up and proposed.
15  BY MR. STERN:
16      Q.  And I hate to do this but do you remember who
17  all was involved in that phone call.
18      A.  I do not.
19      Q.  Do you remember anybody who was involved in that
20  phone call?
21      A.  I know -- obviously Jeff was there.  I remember
22  a loud voice which I think is Tino Monaldo.
23      Q.  Good guess.
24      A.  But I don't recall who was on that call, no.
25      Q.  And do you remember which parties were

Page 135

1  represented on that call?
2      A.  It was Langley.  Langley's side.
3      Q.  What happened after that call?
4      A.  Either that call -- that call I believe led to
5  another call a few days later, which was the call that was
6  the I have to get there and go visit the company because
7  there's a process in place.  There's a deadline for a bid.
8  You have to pick up and go right now.
9      Q.  Okay.  Why don't you describe what happened on
10  that call because I don't think you testified to that.
11      A.  Right.  There was another call that I was
12  brought into by Jeff --
13      Q.  Okay.
14      A.  -- where the call was centered around process.
15  You have to get here.  There's --
16      Q.  Wait.  Who -- which parties were represented on
17  that call?
18      A.  Langley.
19      Q.  And do you recall who representing Langley was
20  on that call?
21      A.  No.
22      Q.  So what happened in the call?
23      A.  On that call it was outlined that there was a
24  process.  The company was being sold.  If we wanted to be
25  involved, we had to move immediately and move fast.  And I

Page 136

1  had to go run from the office that afternoon, catch a
2  flight to Kansas, and go.
3      Q.  And did you do that?
4      A.  Yes, I did.
5      Q.  So you went that night to Kansas City?
6      A.  Yes.
7      Q.  All right.  What did you do when you were in
8  Kansas City?  First of all, do you remember how long that
9  trip was?
10      A.  Two days, maybe three.
11      Q.  All right.  What did you do during the two to
12  three days?
13      A.  And I'm sorry.  I'm afraid the two trips get
14  confused in my head as if it's one and I don't remember
15  specifically what happened on either trip.
16      Q.  Let me ask you this before you get into what
17  happened.  You had this first two- to three-day trip and
18  you had a subsequent trip.
19      A.  Yes.
20      Q.  How did the second trip come about?
21      A.  Okay.  The second trip was we were there to
22  actually finalize more of the negotiations and we were
23  actually deep in document issues at that point and
24  economic issues.
25      Q.  And was that before signing the letter of intent

Page 137

1  or the definitive agreements?
2      A.  It would have been before the definitive
3  agreements, after the letter of intent.
4      Q.  Well, let's just -- if you can generally --
5      A.  No.
6      Q.  -- before the first meeting and the second
7  meeting were there conference calls or other
8  communications between the Fortrend team and the Langley
9  team?
10      A.  Yes, there were.
11      Q.  Do you know how many?
12      A.  No.
13      Q.  Was it a lot?
14      A.  A fair bit.
15      Q.  And were there also communications between the
16  Fortrend team and the Midcoast team?
17      A.  Yes, there were.
18      Q.  And would that have been a lot or a little bit,
19  do you know how much?
20      A.  I don't know how much.
21      Q.  Could you characterize it?
22      A.  A fair bit.
23      Q.  Okay.  All right.  And during that -- well,
24  first of all do you remember anything that happened
25  distinctly at that first two- to three-day visit to Kansas

HUNDT REPORTING
214-220-1122

9230bd6f-ed11-442a-994b-826142db85f

**Witness:   Craig Hoffman**

---

Page 138

1  City?
2      A.  I remember sitting in a conference room seeing a
3  presentation and I remember getting basic financial
4  information about the company.
5      Q.  And was that a presentation by Chase?
6      A.  I don't remember.
7      Q.  Do you remember anything about the presentation?
8      A.  Just that it was dark and I saw a PowerPoint
9  presentation.
10     Q.  And you've seen a lot of PowerPoint
11 presentations?
12     A.  I have.
13     Q.  And you remember getting basic financial
14 information.
15         Do you remember anything else distinctly about
16 that meeting or that visit to Kansas City?
17     A.  Not specifically that visit, no.
18     Q.  All right.  And then after that meeting there
19 were letters of intent that were negotiated?
20     A.  Correct.
21     Q.  Was there -- were you aware of any -- at the
22 time the letter of intent was negotiated with Langley,
23 there was actually a letter of intent that was signed,
24 right?
25     A.  Mm-hmm.

---

Page 139

1      Q.  Is that yes?
2      A.  Yes.
3      Q.  And I think we looked at that earlier in the
4  binder.  And it was Exhibit 61 --
5      A.  Okay.
6      Q.  -- is that right?
7          And that's dated September 30, 1999.
8      A.  I'm sorry.  You say Exhibit 61?
9      Q.  65.  I'm sorry.  Thank you.
10     A.  September 30, 1999.  Yes.
11     Q.  And then if you look at the next exhibit,
12 Exhibit 66, there's a September 30, 1999 letter of intent
13 with Midcoast.
14     A.  Yes.
15     Q.  Now, in your business have you entered into more
16 than these letters of intent?  Are you familiar with --
17         MR. COFFIN:  Objection to form.
18 BY MR. STERN:
19     Q.  -- with letter of intents?
20     A.  I am familiar with letters of intent.
21     Q.  Are you familiar with binding letters of intent
22 versus nonbinding letters of intent?
23     A.  I am.
24     Q.  What's the difference?
25     A.  The difference is one constitutes a legal

---

Page 140

1  obligation to perform the acts that you're saying in the
2  letter of intent.  The other says that it's not a legal
3  obligation on your behalf.  It's just something you intend
4  to do at some point in the future.
5      Q.  Did you understand that the letter of intent
6  with Langley that's marked Exhibit 65, Government
7  Exhibit 65, was a binding or nonbinding letter of intent?
8      A.  I don't recall.  I'm sure I could tell if I
9  looked at it.
10     Q.  Could you look at it.  Look at the second
11 paragraph.
12     A.  So this was a nonbinding letter of intent with
13 the exception of paragraph 5 which was the confidentiality
14 or nondisclosure paragraph.
15     Q.  All right.  And if you look at Government
16 Exhibit 66, is that a binding or nonbinding letter of
17 intent?
18     A.  This is a nonbinding letter of intent again with
19 the exception of paragraph 4.
20     Q.  All right.  Based on your experience in entering
21 into transactions of these types, what's the purpose of
22 entering into a nonbinding letter of intent?
23     A.  To set forth the schedule by with -- by which
24 the parties were going enter into the transaction and try
25 to get things done.

---

Page 141

1      Q.  Now the -- and you may not know the answer to
2  this, but if you look at paragraph 1 on the Langley letter
3  of intent --
4      A.  Yes.
5      Q.  -- it refers to a purchase price of
6  approximately $188 million.
7      A.  Yes.
8      Q.  And then in the Midcoast letter of intent it
9  refers to a purchase price of $187,868,000.  Do you see
10 that?
11     A.  Yes.
12     Q.  Where is the spread?
13     A.  Well, it's not in the two purchase prices
14 because I'm paying more for the stock than I'm getting for
15 the sale of the assets.  It would have to be in the other
16 assets.  Frankly, I don't know.  I would have to actually
17 sit down and figure out what these other paragraphs say
18 here.
19     Q.  We can do that later.
20     A.  Okay.
21     Q.  Were you aware at the time that this letter of
22 intent marked as Exhibit 65 --
23     A.  Yup.
24     Q.  -- the K-Pipe Langley letter of intent --
25     A.  Yup.

---

HUNDT REPORTING
214-220-1122

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:   Craig Hoffman**

---

Page 142

1    Q.  -- was signed, were you aware of any agreement,
2  binding or otherwise, between Midcoast and Langley
3  relating to the purchase of stock from Langley?
4    A.  No, I was not.
5    Q.  At the time you got involved in this
6  transaction, did you have any prior relationship with
7  Midcoast?
8    A.  No.
9    Q.  Do you know -- have any reason to believe that
10  Fortrend had any prior relationship with Midcoast?
11    A.  No.
12    Q.  You mentioned that PWC played an -- I think, an
13  introductory role in this transaction?
14    A.  Mm-hmm.
15    Q.  Do you remember that?
16    A.  Yes.
17    Q.  Did PWC play an advisory role for Fortrend or
18  K-Pipe in this transaction?
19    A.  No, they did not.
20    Q.  Let's go back to our chronology.  The letters of
21  intent are signed.  What happens next?
22    A.  Then full due diligence would begin.
23    Q.  And for Fortrend and K-Pipe what did that full
24  due diligence mean?
25    A.  That would mean requesting as much information

---

Page 143

1  as possible from the seller regarding the entities.  So it
2  would be financial statements; it would be corporate
3  formation documents; it would be debt documents; it would
4  be documents representing the assets; representing
5  liability attached to those assets; representing the
6  performance of those assets; and, I should say, adding tax
7  returns, obviously.
8    Q.  And who for the Fortrend/K-Pipe team was
9  involved in the actual due diligence?
10    A.  I was and LeBoeuf, Lamb was.
11    Q.  Was anyone from Midcoast involved in
12  Fortrend/K-Pipe's due diligence?
13    A.  In our due diligence?
14    Q.  In your due diligence.
15    A.  Not in our due diligence.
16    Q.  Did Midcoast do its own due diligence as it was
17  moving forward with the asset acquisition transaction from
18  K-Pipe?
19    A.  Yes.
20    Q.  What did they do?
21    A.  They analyzed the assets of the company and they
22  analyzed what the performance was of those assets.
23    Q.  Do you recall -- you mentioned in response to
24  Mr. Coffin's questions an analysis of liabilities --
25    A.  Mm-hmm, yes.

---

Page 144

1    Q.  -- that K-Pipe would be assuming --
2    A.  Yes.
3    Q.  -- through the acquisition of stock.  Do you
4  recall that?
5    A.  Yes.
6    Q.  What types of liabilities were you looking at?
7  Do you remember specifically?
8    A.  I don't.
9    Q.  Generically?
10    A.  Generically any and all liabilities associated
11  with the company.  Some contingent liabilities.  You know,
12  if there were liabilities related to the operations of the
13  assets, that we would end up being on the hook for
14  afterwards that were not on a balance sheet.
15    Q.  All right.  We talked about due diligence.
16    A.  Yes.
17    Q.  What else -- what else did K-Pipe -- excuse
18  me -- yeah, Fortrend and the K-Pipe team do as you moved
19  towards definitive agreements?
20    A.  Documents started being drafted and negotiations
21  were held with regard to both the price that we were going
22  to pay on the stock deal and the price that we were going
23  to receive on the asset deal.
24    Q.  Okay.  Now I was asking you about the stock --
25  negotiating the stock on the stock deal.

---

Page 145

1    A.  Yes.
2    Q.  It was a stock purchase --
3    A.  Yes.
4    Q.  -- from the K-Pipe perspective.
5        How did it work where you had negotiations with
6  Langley over the stock purchase and negotiations with
7  Midcoast over the asset sale?
8    A.  It was -- can be best described as an iterative
9  process.  Where we would present information and describe
10  it to an asset buyer, soliciting how much they'd be
11  willing to pay us for those assets.  We would then be
12  turning around and negotiating with Langley to find out
13  how much he would be willing to accept for the sale of his
14  stock.  And there would be much negotiation back and forth
15  with the asset buyers telling us the condition of the
16  assets wasn't sufficient for a higher price; they wanted
17  to get a lower price.  And the stock seller telling us of
18  course that condition is great and you should just buy my
19  stock and walk away.
20    Q.  I think that in this case the IRS is
21  contending -- the government is contending that in
22  anticipating that iterative process and dealing on the one
23  hand with Midcoast as an asset buyer and then dealing with
24  Langley as a stock seller that you were representing
25  Midcoast directly in dealing with Langley.

---

37 (Pages 142 to 145)

9230bd6f-ed11-442a-994b-826142d0b85f

Witness:  Craig Hoffman

Page 146

1    A.  Okay.
2    Q.  Was the Fortrend/K-Pipe team representing
3  Midcoast in dealing with Langley?
4    A.  No.
5    Q.  How would you characterize what you were doing?
6    A.  We were inserting ourselves to try to buy the
7  stock in order to turn around and sell the assets; because
8  we had a willing buyer and a willing seller.
9    Q.  To the extent Midcoast may have had concerns
10  about the assets themselves or obligations that may have
11  followed the assets, what would you have expected them to
12  do?
13      MR. COFFIN:  Objection.  Form.
14      MR. STERN:  What's the objection?
15      MR. COFFIN:  Speculation.
16  BY MR. STERN:
17    Q.  Based on your experience in dealing with parties
18  in these types of transactions, what would you have
19  expected them to do?
20    A.  To adjust your price or try to make us retain
21  liabilities that they didn't want to own.
22    Q.  And if they didn't want them and you didn't want
23  them, what would you do?
24    A.  I would either adjust my price with Langley or
25  try to get him to hold them.

Page 147

1    Q.  All right.  We have the due diligence and the
2  negotiations and you had the second meeting?
3    A.  Correct.
4    Q.  What do you remember specifically about that
5  second meeting in Kansas City?
6    A.  I remember that we were in Dennis's office.
7    Q.  Go ahead.
8    A.  I remember that we were in Dennis's office quite
9  a bit.  I remember a great deal of tension -- there was a
10  great deal of tension surrounding the transaction.  I
11  remember --
12    Q.  Do you remember what the source of the tension
13  was?
14    A.  Well, the deal itself was put in a very short
15  time frame.  So there was an awful lot of tension with
16  regard to everybody to try to get everything finished in
17  time.  But also Dennis was a tough negotiator that made
18  what we viewed as extraordinary demands throughout the
19  transaction.
20    Q.  So you're in this meeting in -- these meetings
21  in Kansas City.
22    A.  Yes.
23    Q.  There's tension.
24    A.  Yes.
25    Q.  What else do you remember?

Page 148

1    A.  I remember specifically negotiating documents
2  with Cynthia.  Cynthia Morelli was there.  I also remember
3  that the Midcoast team was there as well.  I remember
4  that, you know, we were -- I remember tense negotiations
5  with an intense deadline to try to get a transaction done
6  for a guy who was, you know, incredibly demanding on us to
7  try to get the transaction done.  He wanted to sell us his
8  stock.
9    Q.  That's Langley?
10    A.  Correct.
11    Q.  Okay.  And you all were able to do it.  You all
12  were able to finalize the definitive agreements?
13    A.  I don't think it got finalized then.  In fact,
14  at one point -- it was -- it was very tense.  In fact at
15  one point I do remember that we effectively decided we
16  couldn't do the deal and we were going to walk out and
17  leave.  And I was in the elevator lobby at that point and
18  Tino Monaldo came out and said, "Wait.  Before you go."
19  And negotiations started up again.
20    Q.  Who made the decision to get up to leave?
21    A.  I mean, I don't recall, but it would have been
22  me and Cynthia who were there and I would have been on the
23  phone with Jeff an awful lot as well.
24    Q.  So the actual negotiations between
25  Fortrend/K-Pipe and Mr. Langley, how would you

Page 149

1  characterize those?
2    A.  Very tense.
3    Q.  You ultimately get to definitive agreements.
4    A.  Yes.
5    Q.  Do you remember the escrows?
6    A.  I don't.  I'm sorry.  Clarify which escrows?
7    Q.  Well, there was an escrow of $14 million.
8    A.  I -- I do remember seeing that in the
9  documentation I reviewed last night, yes.
10    Q.  We'll look at it in a minute but I want to --
11  there was a letter agreement relating to a $15 million
12  break-up fee that Fortrend/K-Pipe would pay Langley --
13    A.  Mm-hmm.
14    Q.  -- if the stock purchase didn't go through.
15    A.  I reviewed that again last night, yes.
16    Q.  And you recall there was also a letter agreement
17  with Midcoast where Midcoast would pay a certain amount if
18  the stock purchase agreement was not signed?
19    A.  Yes.
20    Q.  Excuse me.  An assess purchase agreement was not
21  signed.
22    A.  Yes.
23    Q.  What do you remember about those?
24    A.  Well, I remember that they didn't match.  That
25  there was a $15 million cost to us but only $14 million

38 (Pages 146 to 149)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:  Craig Hoffman**

Page 150

1  coming in from the Midcoast deal if that fell through.
2    Q.  And do you know how that came about that there
3  was that $1 million difference?
4    A.  I don't recall.
5    Q.  Would you look at 79 in the notebook.
6    A.  Yes.
7    Q.  Can you tell us what Exhibit 79 is.
8      MR. IDELL:  000477.  It's a letter agreement.
9      MR. STERN:  Was this the letter agreement
10  between --
11      MR. IDELL:  Larry Austin between and behalf
12  of --
13      MR. STERN:  I need the witness to tell me.
14      MR. IDELL:  I'm sorry.  I thought you were
15  asking me what it was.
16      MR. STERN:  No.  I was asking --
17      MR. IDELL:  I'm sorry.
18      MR. STERN:  It's getting late.
19      THE WITNESS:  This was a letter agreement
20  between K-Pipe and Dennis Langley for the extension of the
21  transaction.
22  BY MR. STERN:
23    Q.  Okay.  Was there an initial closing date that
24  had been targeted by the parties that was being extended
25  by this agreement?

Page 151

1    A.  Yes.
2    Q.  And do you know when this was signed?
3    A.  No, I don't.  Because the document's not dated
4  and I don't see...
5    Q.  I'm going to show you Government Exhibit -- I'm
6  going to show you Government Exhibit 2, tab 32 which
7  appears to be a copy of the same letter.
8    A.  Yes, it does.
9    Q.  And it has a signature page from Larry Austin
10  with a fax --
11    A.  Time stamp on it.
12    Q.  -- time stamp.  Can you tell what that says?
13    A.  It says November 4.
14    Q.  Okay.  All right.  And then there was the...
15      (Discussion held off the record.)
16  BY MR. STERN:
17    Q.  We'll call it, Exhibit 1 which is the asset --
18  Government Exhibit 1 which is the asset purchase agreement
19  closing binder.  And under tab 5 there's a November 5,
20  1999 fax sheet --
21    A.  Okay.
22    Q.  -- fax line.  And it's a letter from Larry
23  Austin to Midcoast, right?
24    A.  Yes.
25    Q.  And it's signed by Richard Robert.  Can you tell

Page 152

1  us what this is.
2    A.  It's a letter of agreement to extend the asset
3  purchase agreement.
4    Q.  The signing of the asset purchase agreement?
5    A.  Yes.
6    Q.  And what happens if it's not signed by a certain
7  date?
8    A.  If it's not signed by a certain date, then
9  there's a penalty built in for every day afterwards.
10    Q.  Okay.
11    A.  And then if it's not closed by November 15 --
12    Q.  That's not the one I was looking for.
13      (Discussion held off the record.)
14  BY MR. STERN:
15    Q.  I'm showing you Government Exhibit 1, the asset
16  closing binder under tab 2.  There's a document that's
17  entitled "Amended Letter of Intent."  It's dated
18  November 4, 1999.
19    A.  Yes.
20    Q.  And it's signed by K-Pipe and by Midcoast --
21    A.  Mm-hmm.
22    Q.  -- right?
23    A.  Yes.
24    Q.  And paragraph 1, "Contemporaneously with the
25  execution of this letter agreement, buyers and seller" --

Page 153

1  "buyer and seller will enter into the escrow agreement
2  attached hereto as Exhibit A and made part hereof whereby
3  buyer will cause the sum of $14 million to be deposited
4  into escrow."  Do you see that?
5    A.  Yes, I do.
6    Q.  And you mentioned the -- bear with me a second.
7      All right.  And then if you look at the next
8  page it talks about the escrow being released if the asset
9  purchase agreement is not signed by November 5.
10    A.  Yes.
11    Q.  Do you see that?
12    A.  I do.
13    Q.  All right.  Is this what you were referring to
14  earlier when you talked about a $14 million payment versus
15  a $15 million payment and the $1 million gap?
16    A.  Yes.
17    Q.  All right.  And you don't recall why that gap
18  existed?
19    A.  No, I don't.
20    Q.  Did you have any views as to whether or not that
21  put Fortrend or K-Pipe at any risk --
22      MR. COFFIN:  Objection.  Leading.
23  BY MR. STERN:
24    Q.  -- in connection with --
25      MR. COFFIN:  Sorry.  I thought you were done.

39 (Pages 150 to 153)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:   Craig Hoffman**

Page 154

1  Go ahead.
2      MR. STERN:  You were just jumping all over me.
3      Q.  Did you have any views about whether or not this
4  put K-Pipe at risk?
5      MR. COFFIN:  Objection.  Leading.
6      THE WITNESS:  Yes.
7  BY MR. STERN:
8      Q.  What were your views as to whether or not this
9  put K-Pipe at risk?
10     A.  Well, it seemed if we didn't close on time we
11  could end up taking a $1 million risk.
12     Q.  Ultimately the asset purchase agreement was
13  signed, correct?
14     A.  Yes.
15     Q.  And the stock purchase agreement was signed?
16     A.  Yes.
17     Q.  And the deal -- stock purchase closed and the
18  asset purchase closed?
19     A.  Yes.
20     Q.  Could you catalog for me any risks that you
21  perceived at the time that K-Pipe or Fortrend were taking
22  in connection with this transaction.  And in light of his
23  objection, if you could also address this.
24     A.  Understood.  I remember there were liabilities
25  inside the company that weren't fully covered that we were

Page 155

1  effectively going to manage on a going-forward basis.
2  I --
3      Q.  Do you remember any specifics?
4      A.  I'm afraid I don't.
5      Q.  Okay.  Go on.
6      A.  I remember that there was a difference in the
7  working capital schedules and the working capital
8  calculations where I could end up owing Langley money but
9  Midcoast wouldn't owe us money on the asset side.
10     Q.  Do you remember what accounted for that
11  discrepancy?
12     A.  No, I don't.
13     Q.  Okay.  What else?
14     A.  We did retain assets inside the company that
15  were not ultimately sold on to Midcoast and the value of
16  those assets could have gone down.
17     Q.  Do you specifically recall what assets?
18     A.  I remember we retained the Butcher Interest for
19  certain.  There were also agreements related to the
20  project development agreements, but I don't remember
21  exactly how those assets ultimately worked out.
22     Q.  Any other risks?
23     A.  I guess there's the transactional risk that we
24  didn't close on time.
25     Q.  Close with Langley or close with Midcoast?

Page 156

1      A.  Well, close with Langley.
2      Q.  Were there any issues surrounding -- that you
3  were aware of or concerned about Midcoast's ability to
4  close?
5      A.  Yes.
6      Q.  What?
7      A.  We were -- we were concerned they wouldn't be
8  able to pull together their financing.
9      Q.  Did you have some -- was there something
10  specific that triggered that concern?
11     A.  Yes.
12     Q.  What?
13     A.  Near the closing there was a great deal of
14  discussion with them about whether or not they would have
15  their money ready.  And, in fact, if I remember -- sorry.
16  And in fact I remember a conversation related to them
17  conducting a private placement, you know, just prior to
18  the transaction to raise additional cash in order to make
19  the transaction happen.
20     Q.  What do you remember about that?  Do you
21  remember who you talked to about that?
22     A.  I remember Larry Austin telling me about that
23  and having a quick conversation with Rich Robert about
24  that.
25     Q.  What was the significance to Fortrend or K-Pipe

Page 157

1  of -- as to whether or not it could get its financing?
2      A.  Well, we would then have to close on this
3  transaction and find a replacement buyer.
4      Q.  Had that before happened to you in any other
5  transactions?
6      A.  We had transactions close where we bought the
7  stock and the buyer did not close when expected, yes.
8      Q.  Is that a risk that Fortrend assumes in these
9  types of transactions?
10     A.  Yes.
11     Q.  Did Fortrend and K-Pipe assume that risk in this
12  transaction?
13     A.  Yes.
14     Q.  How many transactions had you worked on for
15  Fortrend before this transaction?
16     A.  Approximately 16.
17     Q.  And could you give me a range of sizes.
18     A.  Ranging from $5 million transactions on the
19  small side to the largest part of this transaction was
20  $100 million, I believe.  I'm sorry.  I'm sorry.
21  $132 million.
22     Q.  Was this among the largest that you'd worked on?
23     A.  Yes.
24     Q.  And was this the last one that you worked on?
25     A.  It was the last substantial one I worked on.  I

HUNDT REPORTING
214-220-1122

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:   Craig Hoffman**

| | |
|---|---|
| Page 158 | Page 160 |

Page 158

1  worked on one minor transaction shortly after this.
2  Sorry. In fact, it's smaller than the range I suggested.
3  It was only $2 million.
4      THE VIDEOGRAPHER: Counsel, three minutes.
5      MR. STERN: Let's go and change tape.
6      THE VIDEOGRAPHER: This is the end of videotape
7  no. 2. We are now going off the record. The time is
8  4:17 p.m.
9      (Recess taken from 4:17 p.m. to 4:24 p.m.)
10      THE VIDEOGRAPHER:   This is the beginning of
11  videotape no. 3. We are now back on the video record.
12  The time is 4:24 p.m.
13  BY MR. STERN:
14      Q.  Mr. Hoffman, what do you remember about the
15  Butcher Interest?
16      A.  I remember that we did not sell it to Midcoast.
17  I remember that we had calculated that there was a profit
18  opportunity on it. I remember that it was valued at
19  roughly 6 and a half million dollars. And that there was
20  the possibility for it to run up in value because we
21  thought gas was moving that way.
22      Q.  Do you recall that Midcoast had the option to
23  acquire that at a later date?
24      A.  Yes.
25      Q.  Were you involved at all at the time that that

Page 159

1  option was exercised?
2      A.  Yes.
3      Q.  What was your involvement?
4      A.  Howard Teig called me to ask me about what the
5  arrangement was on it and how it worked and what was
6  supposed to be done.
7      Q.  And what did you tell him?
8      A.  If I remember correctly, I think I told him to
9  put it back to Dennis because it had gone up in value.
10  But I don't -- I believe that's what I told him.
11      Q.  Put it back to Dennis or sell it to Midcoast; do
12  you recall which way it went?
13      A.  I don't recall which way it went.
14      Q.  All right. At the time -- were you there at the
15  closing of the stock purchase?
16      A.  Yes.
17      Q.  Were you present at closing of the asset sale?
18      A.  I don't remember.
19      Q.  Who do you recall was listed as and signed as
20  the buyer of the Bishop Group stock in the stock purchase
21  agreement?
22      A.  Without looking at it, I would say it would be
23  K-Pipe.
24      Q.  It would be the K-Pipe entity?
25      A.  That's right.

Page 160

1      Q.  Who received and held title to the Bishop Group
2  stock as a result of the transaction?
3      A.  The K-Pipe entity.
4      Q.  Did Midcoast ever receive and hold title to the
5  Bishop Group stock, to your knowledge?
6      A.  Not to my knowledge.
7      Q.  After these two transactions closed, who had the
8  right to vote the shares of the Bishop Group stock?
9      A.  The K-Pipe group.
10      Q.  After these two transactions closed, who had the
11  right to pay dividends --
12      A.  The --
13      Q.  -- with respect to the Bishop Group stock?
14      A.  The K-Pipe group.
15      Q.  And to the extent that K-Pipe retained any
16  assets in the Bishop Group, who had the right to control
17  those assets?
18      A.  The K-Pipe group.
19      Q.  To your knowledge, did Fortrend? Excuse me.
20  Did Midcoast have any right to control those assets?
21      A.  Not to my knowledge.
22      Q.  I want to focus briefly on Rabobank.
23      A.  Okay.
24      Q.  Did Midcoast introduce Rabobank to Fortrend or
25  K-Pipe?

Page 161

1      A.  No.
2      Q.  Did -- did Fortrend or K-Pipe -- the
3  Fortrend/K-Pipe group have any relationship with Rabobank
4  before these transactions -- before Fortrend and K-Pipe
5  got involved in these transactions?
6      A.  Yes, they did.
7      Q.  How would you describe that relationship, that
8  preexisting relationship?
9      A.  Entities involved in transactions that Fortrend
10  was involved with borrowed money from Rabobank to buy the
11  stock of companies.
12      Q.  Do you know how many transactions?
13      A.  No.
14      Q.  You mentioned earlier the number of transactions
15  that you'd been involved in when you were working with
16  Fortrend.
17      A.  Mm-hmm.
18      Q.  How many of those transactions was Rabobank
19  involved in financing?
20      A.  At least five.
21      Q.  And you also mentioned -- I guess you mentioned
22  one that was about 130 million.
23      A.  Yes.
24      Q.  Were there any other in the --
25      A.  There was -- sorry.

41 (Pages 158 to 161)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:   Craig Hoffman**

Page 162

1    Q. -- in that range?
2    A. That was a $100 million deal, yes.
3    Q. Was Rabobank involved in those two deals?
4    A. Rabobank was involved in the $100 million deal
5 but not the $132 million deal.
6    Q. Who was involved in the $132 million deal?
7    A. I don't recall because it -- it literally
8 occurred right after I got there.
9    Q. And you were working on Fortrend deals for how
10 many years?
11    A. From 1996 to 1999. So about three -- almost
12 four years because it was beginning of '96 to the end of
13 '99.
14    Q. Did Fortrend have the relationship with Rabobank
15 at the time you started working with Fortrend?
16    A. No, it did not.
17    Q. Do you know how that relationship formed?
18    A. Yes.
19    Q. Could you tell us.
20    A. One of the other independent contractors at
21 Fortrend lived on the floor of a building with the
22 chairman of -- not chairman. I'm sorry -- a high-level
23 executive at Rabobank. And he discussed, you know, our
24 business and what we were doing. And they forged a
25 relationship to lend money to transactions that we were

Page 163

1 involved with.
2    Q. How many other people like you were working with
3 Fortrend?
4    A. About -- it fluctuated greatly while I was
5 there. But there were about four or five that were in
6 Fortrend, in the Fortrend office.
7    Q. And were you doing the same sorts of things
8 that you were doing?
9    A. Yes, although I played a larger deal mechanic
10 role than many of them. Many of them were more
11 concentrated on just finding deals.
12    Q. And was that because of your background?
13    A. Yes.
14    Q. All right. I want to -- let me just go through
15 my notes real quick.
16       All right. Could you explain -- you've talked a
17 little bit about working capital adjustments -- post
18 closing working capital adjustments. Can you explain to
19 us what those are.
20    A. When you -- when you purchase a company, there
21 are usually liquid assets in the company that in many
22 cases sellers simply feel is extra value on top of the
23 other assets of the company for which when you're going to
24 buy the company you then have to pay them an extra amount
25 for those liquid assets.

Page 164

1    Q. Can you give us some examples?
2    A. Yeah. For example, if you were going to buy a
3 company and there was $1 million of cash on the balance
4 sheet but an underlying business that made $10 million
5 that you thought was worth a hundred you would pay them a
6 hundred for that underlying business and then add the
7 million dollars to it because that's liquid cash that you
8 bought with the entity.
9       And the problem with it is that you don't know
10 the specific amount at any one given time because there
11 are constantly ebbs and flows of those amounts. So you
12 develop a schedule that's going to have an adjustment to
13 it that you say okay, at point time in time we're going to
14 close the transaction. But at some point in the future
15 we're going to come back and make an adjustment based on
16 what the liquid assets were actually as of that date after
17 we calculate it some number of days later.
18    Q. And did you -- did you -- was that a process
19 that was anticipated in connection with the stock
20 purchase?
21    A. Yes.
22    Q. And was that a process that was also anticipated
23 in connection with the asset sale?
24    A. Yes.
25    Q. And I think you testified earlier that there was

Page 165

1 a discrepancy in -- that that wouldn't necessarily match
2 up.
3    A. Yes.
4    Q. And could you -- I may have asked you this and I
5 apologize but can you recall the details of why those
6 didn't match up?
7    A. No, I can't. I'm sorry.
8    Q. Do you recall that in the end they didn't match
9 up?
10    A. No. I'm sorry. I have a vague recollection of
11 that because I believe that happened after I was already
12 gone. And I believe Howard Teig called me on that.
13    Q. What do you remember Howard Teig calling you on
14 that?
15    A. I believe -- I remember Howard being confused
16 that there was a payment that had to go out the door for
17 the working capital adjustment.
18    Q. Do you remember who the payment was going to?
19    A. I believe it would have gone to Langley, yes.
20    Q. And do you know whether there was an offsetting
21 payment coming from Midcoast?
22    A. I don't know.
23       MR. STERN: Let me show you a document which now
24 is all messed up in the stack here.
25       Why don't we mark this Hoffman Exhibit 1.

42 (Pages 162 to 165)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:  Craig Hoffman**

| Page 166 |
|---|

1          (Plaintiff's Exhibit 1 marked
2          for identification.)
3  BY MR. STERN:
4      Q.  Hand you what's been marked Hoffman Exhibit 1.
5  Have you ever seen this before?
6      A.  Yes.
7      Q.  What is this?
8      A.  It is a reconciliation of the asset purchase
9  price for the sale to Midcoast.
10     Q.  Does this have anything to do with the working
11 capital adjustments?
12     A.  Yes.  It's the working capital adjustment is
13 noted here in the adjustments box in the upper left
14 corner.
15     Q.  1.8 million?
16     A.  Yes.  So that would have been the expected
17 working capital adjustment for the K-Pipe entity from the
18 Midcoast entity.
19     Q.  Do you know when this document was prepared?
20     A.  I don't.
21     Q.  If you can look at 326.  Let me get this out of
22 the way.
23          And if you could read this string of e-mails.
24 Just take your time --
25     A.  Okay.

| Page 167 |
|---|

1      Q.  -- and I would like you to explain what this
2  says to you about the discrepancy between the working
3  capital adjustment for the asset sale versus the stock
4  purchase from K-Pipe's perspective.
5      A.  (Witness complies.)
6          It looks like there were several things that
7  were involved in the true-up differences, one of which was
8  a liability inside the entity for $200,000.
9      Q.  Inside what entity?
10     A.  Inside the Bishop Group.
11     Q.  And so would that have been obtained by K-Pipe?
12     A.  Yes.
13          Then there was 44,000 that looks like it was
14 accrued interest income from -- from the stock purchaser.
15 So we were supposed to get 50,000 or so from the stock
16 purchaser in accrued interest to date.  Again, it would
17 have been a true-up of the amount as of the date of the
18 stock deal.  And then there is -- well, the Butcher
19 Interest.  But that's not part of the working capital
20 adjustment, I don't believe.  Although it might have been.
21          So we may -- it says here, "Howard says that the
22 bottom line is we may owe via the true-up $252,000 less
23 possibly $44,000," which I probably -- I'm sorry.  I
24 probably estimated the $50,000 at closing.  It turned out
25 to be 44 that we would have expected from Langley's side

| Page 168 |
|---|

1  for that interest.  And then there would have been owed to
2  the stock seller about 423 in total.
3      Q.  423,000?
4      A.  Yeah.
5      Q.  Owed to Langley?
6      A.  No.  Owed to the seller and/or the government
7  for the $200,000 tax liability, is what it appears.
8      Q.  Who is the seller?
9      A.  I'm sorry.  The seller is Langley, yes.
10     Q.  Okay.
11     A.  And then there was the Butcher Interest as well
12 where we were -- and, actually, I see in the text here
13 that it was in fact we could put the Butcher Interest to
14 Midcoast.
15     Q.  All right.  From this can you tell whether
16 K-Pipe had to pay out to both?
17     A.  K-Pipe had to pay out.
18     Q.  To?
19     A.  To both parties.  Because it owed accrued
20 interest in Midcoast and it owed the other liabilities to
21 Langley.
22     Q.  How much did it have to pay out to Langley?
23     A.  It looks like we had to pay -- I'm sorry.  It's
24 actually complicated to try to figure out.  Hang on one
25 moment.

| Page 169 |
|---|

1      Q.  If you can just give me an order of magnitude.
2      A.  A couple hundred thousand.
3      Q.  How much did K-Pipe have to pay to K-Pipe?
4      A.  It looked like 44,000, 50,000.
5      Q.  At any time prior to the asset sale to Midcoast,
6  did you become aware of any agreement or contract between
7  Midcoast and Langley for Midcoast's acquisition of stock
8  from Langley?  A binding agreement.
9      A.  No.
10          MR. STERN:  Pass the witness.
11          MR. COFFIN:  You caught me by surprise.
12          MR. STERN:  Do you want to sit here?
13          MR. COFFIN:  No.
14          MR. STERN:  Well, he'll look at you.
15          (Discussion held off the record.)
16          THE VIDEOGRAPHER:  Do you guys want to go off
17 the record or...
18          MR. STERN:  Nah.
19          THE VIDEOGRAPHER:  Just quick switch?
20          MR. COFFIN:  Quick switch.
21               FURTHER EXAMINATION
22  BY MR. COFFIN:
23     Q.  You were talking about the due diligence that
24 you conducted on behalf of Fortrend of the Bishop Group.
25 Do you recall specifically what you learned about the

43  (Pages 166 to 169)

9230bd6f-ed11-442a-994b-826142d0b85f

**Witness:  Craig Hoffman**

Page 170

1  Bishop Group's liabilities?
2      A.  No.  It's been too long.
3      Q.  And when you testified earlier about the events
4  or what would occur after -- before and after the letters
5  of intent were executed, were you talking generically or
6  do you specifically recall negotiating the terms of the
7  agreement?  And if so -- let me stop there.
8      A.  More generically.  I'm afraid I don't remember
9  too many specific negotiations or terms at this point.
10     Q.  And same thing with regard to your testimony
11  about the due diligence that was conducted when you
12  analyzed assets, you look at liabilities.  Do you recall
13  specifically what happened, of what you looked at, or is
14  it more generically?
15     A.  More generic recollection.
16     Q.  When you were conducting negotiations on behalf
17  of K-Pipe or Fortrend with regard to the stock purchase,
18  was PriceWaterhouseCoopers ever present either in the room
19  or on the phone?
20     A.  Present.  I don't recall.
21     Q.  Is it possible that they were present?
22     A.  It's possible, yes.
23     Q.  Same question with regard to Midcoast.  Was
24  Midcoast ever in the room or on the telephone call
25  participating in the negotiations occurring between

Page 171

1  Fortrend, K-Pipe, and Langley?
2      A.  I don't recall specific -- specifically, no.
3      Q.  Is it possible that they were present?
4      A.  It is -- there's possibility of it, yes.
5      Q.  You talked about the profit analysis on the
6  Butcher Interest.
7      A.  Yes.
8      Q.  Who performed the profit analysis?
9      A.  I believe I did.
10     Q.  Are there documents to that effect or were there
11  documents to that effect?
12     A.  There was a spreadsheet.
13     Q.  And that would have been -- that would have
14  remained with Fortrend after you left?
15     A.  Yes, it would have.
16        MR. COFFIN:  I've got no further questions.
17        THE VIDEOGRAPHER:  Counsel?
18        MR. STERN:  No.
19        THE VIDEOGRAPHER:  Anybody else?
20        This concludes these proceedings; number of
21  videotapes used was three.  We are now going off the video
22  record.  The time is 4:46 p.m.  Thank you.
23        (The proceeding adjourned at 4:46 p.m.)
24        _____
25            CRAIG HOFFMAN

Page 172

1  STATE OF CALIFORNIA      )  ss.
2
3        I hereby certify that the deponent in the
4  forgoing deposition was by me duly sworn to testify to
5  tell the truth, the whole truth and nothing but the truth
6  in the within-entitled cause; that said deposition was
7  taken at the time and place therein stated; that the
8  deposition is a true record of the deponent's testimony as
9  reported to the best of my ability by me, a duly certified
10  shorthand reporter and a disinterested person, and was
11  thereafter transcribed under my direction into typewriting
12  by computer.
13        I further certify that I am not interested in
14  the outcome of the said action, nor connected with, nor
15  related to any of the parties in said action, nor to their
16  respective counsel.
17        IN WITNESS WHEREOF, I have hereunto set my hand
18  this 21st day of May, 2007.
19
20
21        _____
22            HEIDI BELTON, CSR #12885, RPR
23
24
25

44 (Pages 170 to 172)

9230bd6f-ed11-442a-994b-826142d0b85f