Witness:   Howard Teig

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

```
ENBRIDGE ENERGY COMPANY,       )
INC. AND ENBRIDGE MIDCOAST     )
ENERGY, L.P. f/k/a ENBRIDGE    )
MIDCOAST ENERGY, INC. f/k/a    )
MIDCOAST ENERGY RESOURCES,     )
INC.,                          )
          Plaintiffs           )
                               )
vs.                            ) CASE NO. H-06-0657
                               )
UNITED STATES OF AMERICA,      )
          Defendant.           )
```

ORAL DEPOSITION

HOWARD TEIG

May 25, 2007


ORAL DEPOSITION OF HOWARD TEIG, produced as a

witness at the instance of the Defendant and duly sworn,

was taken in the above-styled and numbered cause on the

25th day of May, 2007, from 10:00 a.m. to 3:10 p.m.,

before Kelly Hanna, Certified Shorthand Reporter in and

for the State of Texas, reported by computerized

stenotype machine at the offices of Vinson & Elkins LLP,

First City Tower, 1001 Fannin Street, Suite 2300,

Houston, Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

HUNDT REPORTING
214-220-1122

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

---

Page 2

APPEARANCES

FOR ENBRIDGE ENERGY COMPANY, INC. AND
ENBRIDGE MIDCOAST ENERGY, L.P.:

   Mr. Karl S. Stern
   Vinson & Elkins LLP
   1001 Fannin Street, Suite 2300
   Houston, Texas 77002-6760
   Telephone: 713.758.4780
   Fax:  713.615.5258
   E-mail: kstern@velaw.com

FOR DEFENDANT:

   Mr. David B. Coffin
   Mr. Herb Linder
   United States Department of Justice
   Tax Division
   717 N. Harwood, Suite 400
   Dallas, Texas 75201
   Telephone: 214.880.9749
   Fax:  214.880.9721
FOR THE WITNESS:
   Mr. James M. Lynch
   Winston & Strawn
   35 W. Wacker Drive
   Chicago, Illinois 60601
   Telephone: 312.558.5935
   Fax:  312.558.5700
   E-mail: jlynch@winston.com
ALSO PRESENT:
   Kelly Hanna, CSR, RPR, CRR, CMRS
   Ms. Jana Jordan, Enbridge Energy Company, Inc.

---

Page 3

INDEX
                   PAGE

HOWARD TEIG
Examination by Mr. Coffin ....................   4
Examination by Mr. Stern ....................  129
Further Examination by Mr. Coffin ............  144
Signature Page  ..............................  151
Court Reporter's Certificate .................  153

EXHIBITS

EXHIBIT        DESCRIPTION       PAGE
No. 1   Fax Cover Sheet dated 8/17/00   134
      (Teig to Morelli)(KPLB-0578-580)
No. 2     Fax dated 9/8/00 (Dill to   137
      Teig)(ENB006081-083)
No. 3   String of e-mails (DOJ034441)   140
No. 4   Fax Cover Sheet dated 8/15/00   142
      (Teig to Forster)(ENB006098)
No. 5   2000 U.S. Corporation Income   147
      Tax Return (DOJ014972-15007)

---

Page 4

          HOWARD TEIG,
having been first duly sworn, testified as follows:
          EXAMINATION
   Q.  (BY MR. COFFIN) Please state your name for the record.
   A.  Howard Teig, T-E-I-G.
   Q.  And, Mr. Teig, I understand you've given your deposition several times before; is that correct?
   A.  Yes.
   Q.  Okay.  And I just wanted to go over some of the ground rules before we get started.  I'll ask the questions.  I ask that you answer truthfully and honestly and to the best of your ability.  I'll try not to interrupt you, if you'll try not to interrupt me so the court reporter can get a good clean record.  If you don't understand a question, just ask me to restate it; and I would be happy to.  If you need to take any breaks, just ask me.  Your lawyer or Mr. Stern may object to some of the questions I ask; and if that happens, I would ask you to go ahead and answer unless Mr. Lynch advises you not to answer the question.  Do you understand those ground rules?
   A.  Yes.  Can I ask one question?
   Q.  Sure.
   A.  If I want to, can I ask for an interruption to

---

Page 5

ask a question of my attorney outside?
   Q.  Sure.  Yes, you may.
       What is your current business address, sir?
   A.  410 Jericho, J-E-R-I-C-H-O, Turnpike, Suite 320, Jericho, New York 11753.
   Q.  And is that your residential address as well?
   A.  No.
   Q.  What is your residential address?
   A.  15 Montgomery Place, M-O-N-T-G-O-M-E-R-Y, Jericho, New York 11753.
   Q.  Mr. Teig, I sent Mr. Lynch some documents for you to look at prior to this deposition.  Have you received and reviewed those documents?
   A.  Yes.
   Q.  Have you reviewed anything else to prepare for this deposition?
   A.  Yes.
   Q.  What else did you review?
   A.  I received another set of documents last night that I reviewed.  I'm not sure who they came from.
      MR. LYNCH:  Came from Vinson & Elkins.
   Q.  (BY MR. COFFIN) Mr. Stern?  Okay.
   A.  And I also had read my deposition on the same matter from 2003.

---

**HUNDT REPORTING**
**214-220-1122**

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

Witness:  Howard Teig

Page 6

1     Q.   Okay.  A deposition or an interview with the
2  IRS?
3     A.   I'm not sure of the distinction.
4     Q.   Was it on the K-Pipe matter?
5     A.   Yes.
6     Q.   Okay.  All right.  Have you talked to anybody
7  other than Mr. Lynch about your testimony today?
8     A.   No.
9     Q.   Okay.  Give me your education.
10    A.   Although -- excuse me.
11    Q.   Go ahead.
12    A.   Although I've mentioned that I'm down here for
13  a deposition.
14    Q.   Okay.  How about your -- give me your
15  educational background beginning with high school,
16  please.
17    A.   I graduated in 1969 from Stamford High School
18  in Connecticut, S-T-A-M-F-O-R-D.  I then graduated in
19  1973 from the University of Connecticut with a Bachelor
20  of Science with a major in accounting.  I graduated some
21  years later, 1980 about, from Long Island University,
22  C.W. Post Center where I received a Master's of Science
23  with a major in taxation.  I also have passed the CPA
24  exam sometime in the -- I think it was 1979.
25    Q.   Do you have any other professional

Page 7

1  accreditations or licenses other than a CPA?
2     A.   No.  None other than that and, you know, just
3  belonging to the organizations, the federal -- you know,
4  the national and the state organization.
5     Q.   You're talking about --
6     A.   One more thing.
7     Q.   Sure.
8     A.   At one point a few years ago, and I don't know
9  if it's still active, I passed the Series 7 test of --
10  under the NASD, and I've also passed the Series 28 test,
11  I think it is, for the -- under the NASD rules or the
12  SEC, whichever it is.  So, I guess I'm accredited, one,
13  as a FINOP and two, as a -- whatever 7 allows me to do.
14    Q.   What is the first one you said, FIN --
15    A.   FINOP.
16    Q.   What is that?
17    A.   That's the financial person for a broker
18  dealer.
19    Q.   All right.  Give me your work history since you
20  graduated from Stamford, Connecticut in 1969.
21    A.   Including summer times?
22    Q.   I'm sorry.  That was the high school you went
23  to, right?
24    A.   Yes.
25    Q.   Okay.  How about from the University of

Page 8

1  Connecticut in 1973?
2     A.   Starting in June of '73 I worked for an
3  accounting firm in West Hartford, Connecticut.  Name was
4  Cohen, Rosenfeld & Company, C-O-H-E-N R-O-S-E-N-F-E-L-D
5  and Company.  They were in West Hartford.  I worked
6  there through the fall of '75 in -- I think it was
7  October.
8           In November of '75 I worked for a firm in
9  Great Neck, New York by the name of Silverman,
10  S-I-L-V-E-R-M-A-N, and Mordfin, M-O-R-D-F-I-N.  I was
11  there through June of '76 for about a month over the
12  summer, six weeks or a month.
13          I worked for a firm, Kranz & Company.  I
14  think it's spelled K-R-A-N-Z & Company.  Then in
15  September of '76 I joined a firm, Anchin, Block &
16  Anchin, A-N-C-H-I-N, Block, B-L-O-C-K, & Anchin.  I
17  stayed there through October of '79.
18          In November of '79 I joined a firm which
19  is now called BDO Seidman.  They had different names
20  before, but it's today known as BDO Seidman,
21  S-E-I-D-M-A-N.  I was there through September -- August
22  of 1987.
23          From September of '87 through June 24,
24  1988 I was in partnership with someone.  The name of the
25  firm was Steinbach, S-T-E-I-N-B-A-C-H, & Teig.  And then

Page 9

1  starting June 24, 1988 I've been on my own as a sole
2  practitioner.
3     Q.   And what's the name of that business?
4     A.   Howard B. Teig, CPA.
5     Q.   Through the years have you done -- what kind of
6  accounting work -- I assume you've done accounting work;
7  is that right?
8     A.   Yes.
9     Q.   Okay.  Have you done auditing-type work,
10  financial statement auditing?
11    A.   In prior years.  Not currently, but in prior
12  years, yes.
13    Q.   Okay.  And I assume you've done some tax work
14  as well?
15    A.   Yes.
16    Q.   Is that tax consulting or tax compliance work?
17    A.   Both.
18    Q.   Okay.  So, you've consulted on transactions and
19  you've prepared tax returns; is that right?
20    A.   Yes.
21    Q.   Okay.
22    A.   Not in all those years, but within those --
23  within this overall time period.
24    Q.   Sure.  Okay.  And with Howard B. Teig, CPA,
25  what is the primary source of your revenues?  What is

3  (Pages 6 to 9)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

---

Page 10

1  the service that you perform, primarily?
2      A.  It's generally tax work and tax returns, tax
3  compliance work, paying bills for some people.  So,
4  write-up services.  In the past I did compilation
5  reports, and generally that's been it.
6      Q.  Okay.  Now, is there any -- with regard to
7  Howard B. Teig, CPA, any tax consulting work where you
8  advised on tax transactions?
9      A.  Yes.  Although I'd like -- I'm not sure what
10  the word "advise" in this case means.
11      Q.  Well, tell me -- tell me what you think -- what
12  kind of -- I'm sorry -- consulting work you've done.
13      A.  I've been asked to analyze transactions to draw
14  conclusions about what, you know, what the transactions
15  were about, is there a way at times to structure a
16  transaction sometimes differently.  I can't remember
17  necessarily specific transactions -- specific situations
18  of that last part, but I know that I've done that.
19      Q.  All right.  Are you familiar with an entity
20  known as Fortrend International, LLC?
21      A.  Yes.
22      Q.  Tell me how you're familiar with that entity.
23      A.  I was their accountant from '96 to '99.
24      Q.  Okay.  And what kind of services did you
25  perform for Fortrend International, LLC?

Page 11

1      A.  Write-up services, general bookkeeping, tax
2  return.  In addition, I would work on some of their
3  transactions doing various tasks, due diligence, looking
4  at contracts, analyzing assets that, you know, that they
5  may have been acquiring, that they may have had in
6  inventory, keeping track of things for them in that
7  regard.  At times, if necessary, I may have signed
8  things such as checks or contracts.  I don't -- in one
9  scenario that I recall I was named an officer of a
10  company, although that was not the general rule.  And
11  periodically I would go on meetings with them -- with
12  the, you know, various people there to discuss potential
13  transactions with potential people.
14      Q.  Okay.  Now, who were the principals of --
15  Fortrend was an LLC; is that correct?
16      A.  Yes.
17      Q.  Who were the members of that entity?
18      A.  One -- there was a company, as I recall, named
19  Avanti, A-V-A-N-T-I, something.  I don't remember what
20  Avanti's full name was, and the other name was -- I
21  forget at this time.
22      Q.  The other name of?
23      A.  The other LCC member.
24      Q.  Okay.  Was it Jeffrey Furman?
25      A.  Jeffrey Furman was, as I understand, the

Page 12

1  principal, general shareholder of Avanti.
2      Q.  Okay.
3      A.  And then he served as -- I guess he had a title
4  of managing -- I recall the title of managing director
5  of Fortrend.
6      Q.  So, there was just one other member of Fortrend
7  International, LLC, and you don't recall the name of
8  that member.  Was it a corporation or an individual or
9  something else?
10      A.  I don't recall at this point in time.  It was
11  an entity that was the member.  It was not an individual
12  that was the member.
13      Q.  Did you have any direct or indirect ownership
14  in that entity?
15      A.  No.
16      Q.  Okay.  Did you ever have any indirect or direct
17  ownership in Fortrend International, LLC?
18      A.  No.
19      Q.  What period of time did you provide accounting
20  services?  You said '96 through '99.  Do you recall the
21  months?
22      A.  Well, let me back up a second in answering that
23  about the start date.  The principal -- the main people
24  of Fortrend used to work for another company and they
25  started Fortrend probably in the fall of '95 and I did

Page 13

1  some work for them in the fall of '95, October,
2  approximately, and -- and then there was more work
3  started really in February is where it became more
4  actively involved on my part.
5      Q.  February of '96?
6      A.  February of '96.  But there was some work
7  starting in October of '95.  And I continued doing work
8  for them until sometime, to the best of my
9  recollection -- to the best of my recollection, the
10  summer of 2000.
11      Q.  And was Fortrend still in existence in the
12  summer of 2000?
13      A.  At that time, yes.
14      Q.  And you said the people who started Fortrend --
15  would -- would Furman, Mr. Furman have been one of them?
16      A.  Yes.
17      Q.  Okay.  Who else was involved?
18      A.  Fred Forster, F-O-R-S-T-E-R.
19      Q.  Okay.  Do you recall working with an individual
20  by the name of Larry Austin?
21      A.  Yes.
22      Q.  Okay.  Tell me who Larry Austin was.
23      A.  Larry Austin was an independent person who was
24  engaged by Fortrend on a transaction-by-transaction
25  basis to serve as the administrator of companies that

4 (Pages 10 to 13)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

Page 14

1   were acquired.
2      Q.   When you say "administrator," what do you mean
3   by that?
4      A.   To be officer, director, to serve as the
5   officer and directors of the company, you know, to do
6   whatever else on a day-to-day basis was required, sign
7   checks, pay bills, whatever was required on a daily
8   basis.
9      Q.   Did you have occasion to work with Mr. Austin
10   on a regular basis?
11      A.   Yes.
12      Q.   And those -- and that work would have been with
13   regard to your work for Fortrend; is that correct?
14      A.   And the companies that may have been acquired.
15      Q.   Do you recall -- when you say companies that
16   may have been a part of Fortrend, do you recall the
17   names of those companies?  Or just tell me what -- the
18   names you do recall.
19      A.   Well, in answering that, the ownership was not
20   of -- by Fortrend directly.  There were other entities
21   that they owned that -- that actually did the
22   acquisition of companies.  And it was the same
23   Mr. Foremen and -- Mr. Furman and Mr. Forster.  And, so,
24   they were not necessarily Fortrend.  You know, it was
25   sort of would fall under the same umbrella, if I can

Page 15

1   think about it as that viewpoint.
2      Q.   Uh-huh.
3      A.   They were -- these other companies were under
4   the same umbrella.  So, the transactions -- some of them
5   that they acquired was one Ourso, O-U-R-S-O.  There was
6   this transaction, K-Pipe.  There was -- right now I'm
7   drawing a blank on others, but there were probably
8   somewhere between 10 and 15 other entities, but I
9   just -- oh, another one was Qius, Q-I-U-S.
10      Q.   Q-I-U-S?
11      A.   Yes.  And then there were, as I said, there
12   were other transactions that right this moment I can't
13   think of names; but there were, say, between 10 and 20.
14      Q.   Okay.  So, with regard to these 10 and 20 other
15   entities, did you perform services on -- for those other
16   entities at the direction of Mr. Furman or at the
17   direction of Fortrend?
18      A.   Not necessarily at the direction.  More of a
19   general understanding.
20      Q.   Okay.  Explain what the understanding was.
21      A.   I was the CPA.  I was -- I understood that I
22   was being asked on a regular basis to provide accounting
23   services in the area of due diligence, tax return
24   preparation, analyzing, you know, the financial
25   statements that companies may have had, the tax returns

Page 16

1   that they may have had, and then to continue preparing
2   tax returns ongoing for any transaction that was
3   acquired, although the services did differ on a
4   transaction-by-transaction basis.  I may not have done
5   all of that on every transaction.
6      Q.   Generally describe what -- the business -- what
7   business Fortrend was in or what did it do.
8      A.   It was -- I think about it as being in the
9   arbitrage.  It was in the business of earning an
10   economic profit, cash profit from being able to sell
11   assets at a price which were greater than the cost that
12   Fortrend incurred to buy the assets or, you know, buy
13   the entities that had the assets.
14      Q.   Were you familiar with -- I'm going to list
15   some entities and ask if you were familiar with them.
16   Ashfield Investments Limited?
17      A.   Yes.
18      Q.   Okay.  What was your familiarity with Ashfield
19   Investments?
20      A.   That might have -- I'm sorry.  Ashfield.
21         MR. LYNCH:  Howard, if you're not sure.  I
22   mean, answer questions where you know the answer, but I
23   don't want you to speculate or if you are speculating,
24   which I would discourage, state that -- if you're not
25   sure, tell him you're not sure.  I just want to make

Page 17

1   sure we've got a clear record.
2      Q.   (BY MR. COFFIN) Was there another entity named
3   Ashfield that you were thinking about that may not have
4   been Ashfield Investments Limited?
5      A.   I just know Ashfield.  I can't remember -- the
6   Ashfield that I'm thinking of would invest in
7   transactions and would sell its interests or rights to
8   the contract prior to closing.  So, it would earn a
9   profit from having basically sold its interest in -- in
10   a potential transaction.
11      Q.   Okay.  And what kind of transactions were
12   those?  You said it would invest in transactions.
13      A.   The type that I just described that Fortrend
14   did where it would buy stock of companies and then sell
15   the assets and earn an arbitrage profit.
16      Q.   So, Ashfield would invest in those types of
17   transactions?
18      A.   They would be part of the buying group that
19   would buy the entity that owned the assets, and they
20   would sell their interests to someone else.
21      Q.   Or, so, it was similar to the K-Pipe Group in
22   this case; is that right?
23      A.   I'm not sure what you mean by "the K-Pipe Group
24   in this case."
25      Q.   Well, the transaction in this case deals with

5  (Pages 14 to 17)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

Page 18

1  K-Pipe Group who bought -- bought stock and sold assets,
2  right?
3      A.  Oh, yes.
4      Q.  Was Ashfield a similar type of company?
5      A.  It would have been one of -- it would have been
6  an investor in a transaction like that that you just
7  described.
8      Q.  Okay.  So, it's an investor or --
9      A.  An investor.
10     Q.  Okay.  And who were the principals of Ashfield?
11     A.  I don't know.
12     Q.  Do you know who the management of Ashfield was?
13     A.  It was a company not in the United States.
14     Q.  Okay.  What's the name of that company?
15     A.  I don't know.
16     Q.  Did you prepare the tax returns for Ashfield?
17     A.  No.
18     Q.  How did you become familiar with Ashfield?
19     A.  Through Fred Forster.
20     Q.  Okay.  What did Mr. Forster tell you about it?
21     A.  Basically they were to be an investor in this
22  transaction or that transaction.
23     Q.  How about Cronulla Corporation,
24  C-R-O-N-U-L-L-A, Corporation?
25     A.  Similar fact pattern.

Page 19

1      Q.  Also an investor?
2      A.  Yes.
3      Q.  Now, have you ever heard the phrase "Midco
4  transaction"?
5      A.  Yes.
6      Q.  What is your understanding of what a Midco
7  transaction is?
8      A.  It's a -- an entity is formed to acquire the
9  stock of -- of a company that would like to sell its
10  business, and so it would close on that transaction and
11  then Midco would cause the target company to sell the
12  assets to a third party.
13     Q.  Okay.  Can we agree that the transaction at
14  issue in this case was a Midco transaction?
15     A.  Yes, following that definition as I just
16  subscribed.
17     Q.  Sure.  JRCR Corp., are you familiar with that
18  entity?  Oh, let me back up.
19          With regard to Cronulla, who were the
20  principals of Cronulla Corporation?
21     A.  I don't know.
22     Q.  Did you prepare the tax returns for Cronulla?
23     A.  No.
24     Q.  How did you become familiar with Cronulla?
25     A.  Either through Mr. Furman or Forster.  I don't

Page 20

1  recall.
2      Q.  Are you familiar with JRCR Corp.?
3      A.  Yes.
4      Q.  Okay.  What do you know about JRCR Corp.?
5      A.  I had prepared tax returns for it.  At some
6  point, you know, in 1988 it owned the company that
7  acquired the stock of a company from Fruit of the Loom;
8  and I don't recall exactly beyond that, you know,
9  what -- what it did.  I think it was just an investment
10  company, but I don't recall specifically.
11     Q.  Okay.  Who were the stockholders of JRCR Corp.?
12     A.  I don't remember at this time.
13     Q.  Do you know who -- who you dealt with at JRCR
14  Corp.?
15     A.  Not at this time.
16     Q.  Was JRCR Corp. in any way related to Mr. Furman
17  or Mr. Forster?
18     A.  I can't say for sure at this point in time.
19     Q.  Okay.  How about affiliated with either of
20  those two?
21     A.  I can't say for sure at this time.  I don't
22  have that -- I can't recall.  It's just too long.
23     Q.  So, 1988 was the last time you dealt with JRCR
24  Corp.?
25     A.  No, I didn't say that.

Page 21

1      Q.  Okay.
2      A.  It was -- I dealt with it for several years
3  after.  I don't remember when my association in any form
4  ended.  I don't recall who owns it, you know, et cetera.
5  I just -- it's a name that I remember.  I don't really
6  recall much besides what I've said that it ever did.
7      Q.  How about Riversea Corp., R-I-V-E-R-S-E-A,
8  Corp.?  Are you familiar with that entity?
9      A.  Yes.
10     Q.  What do you remember about that entity?
11     A.  I remember -- well, partly -- may I ask a
12  question?
13     Q.  Sure.
14     A.  When I -- am I allowed to make reference to the
15  documents here?
16     Q.  Yeah.  And we'll get there.  If you would
17  rather wait until we get there --
18     A.  Well, I mean, what I'm saying here -- and maybe
19  this is just an understanding I need to have -- I
20  certainly remember the name as -- I remember the name
21  after having seen it in the book that you sent me.
22     Q.  Okay.
23     A.  And, you know, so, I do remember it in that
24  context; and maybe it brought back some memories.
25     Q.  All right.  What do you remember about it?

6  (Pages 18 to 21)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

Page 22

1     A.  I remember that it acquired some assets or
2  company or something, you know, as this -- as is shown
3  here.
4     Q.  Did you prepare or perform any services for
5  Riversea Corp.?
6     A.  Not that I ever -- not that I recall.
7     Q.  Do you recall who you ever -- if you ever dealt
8  with anybody at Riversea Corp.?
9     A.  My recollection is I would have dealt with
10  Mr. Austin.
11     Q.  Larry Austin?
12     A.  Yes.
13     Q.  Did you know if Larry Austin was a stockholder
14  in Riversea Corp.?
15     A.  I do not believe he was.
16     Q.  Do you recall what his relationship was with
17  Riversea Corp.?
18     A.  I'm not sure I ever knew if there was a formal
19  relationship.
20     Q.  Under Mr. Austin ask you to do something on
21  behalf of Riversea Corp.?
22     A.  I don't recall.
23     Q.  Okay.  Do you recall how you associate RiverSea
24  Corp. with Mr. Austin?
25     A.  I think he introduced it to me in the context

Page 23

1  of, for example, the transaction referred to here.
2     Q.  Did you see documents signed by Mr. Austin on
3  behalf of Riversea Corp.?
4     A.  I don't recall who would have signed it -- who
5  would have signed documents.
6     Q.  Did you perform any services for Mr. Furman on
7  a personal level?
8     A.  I don't believe so, other than occasionally he
9  would ask me, like a personal income tax question, just
10  in passing.
11     Q.  How did you first become associated with
12  Mr. Furman?
13     A.  He was a consultant to a company that I
14  obtained as a client in 1988.
15     Q.  What was the name of that company?
16     A.  Can I just talk to Mr. Lynch for a second?
17     Q.  Sure.
18        (Recess taken from 10:31 to 10:32.)
19     Q.  (BY MR. COFFIN) Do you have an answer?
20     A.  I don't recall at this time the name of the
21  entity itself.
22     Q.  And then in 1988 you met Mr. Furman; is that
23  right?
24     A.  Yes.
25     Q.  So, how did your relationship blossom from that

Page 24

1  point on?
2     A.  Can you define "blossom"?
3     Q.  Yeah.  I think you did a lot of work for him
4  after that, right?
5     A.  I didn't really do work for him until when I
6  said earlier, 1995.
7     Q.  Okay.  Well, then what happened from 1988 to
8  1995 that you began to take on more work for Mr. Furman?
9     A.  Well, he was -- as I said, he was a consultant
10  to that company.  I did the Canon work for that company,
11  and he left -- he stopped his association in -- I keep
12  saying 2000 -- 1995 and asked if I would help him.  So,
13  I did.
14     Q.  And have you performed any services for
15  Mr. Forster personally?
16     A.  No.
17     Q.  How about any entities or any affiliated -- any
18  affiliated entities with Mr. Forster?  Have you
19  performed any services for any of those?
20     A.  Under the Fortrend umbrella that I described,
21  yes.  I'm not sure beyond that what you mean by
22  "affiliated entities."
23     Q.  Okay.  Do you recall the names of those
24  entities?
25     A.  Well, we -- I think we just talked about those,

Page 25

1  didn't we?
2     Q.  Okay.  I didn't know if there were any more.
3     A.  Nothing different than that umbrella, or at
4  least nothing that I can recall different than that
5  umbrella.
6     Q.  Sure.  Do you recall an entity by the name of
7  Stallwalker, Inc.?
8     A.  Yes.
9     Q.  Okay.  Do you associate anybody with that
10  entity?
11     A.  Larry Austin.
12     Q.  Do you know what kind of business Stallwalker,
13  Inc. is or -- is it in business, some type of business?
14     A.  I believe that's the entity that he used to
15  administer companies.
16     Q.  Did you prepare the tax returns for
17  Stallwalker, Inc.?
18     A.  Not that I recall.
19     Q.  Did you do any work for Stallwalker, Inc.?
20     A.  Outside of the companies in that umbrella, I
21  don't believe so.
22     Q.  How about Chenery Associates, C-H-E-N-E-R-Y,
23  Associates?
24     A.  I have heard the name.
25     Q.  Do you associate anybody else -- anybody with

7 (Pages 22 to 25)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:  Howard Teig**

Page 26

1 that entity?
2     A.  Two people.
3     Q.  Who would that be?
4     A.  Larry Austin and Roy Hahn, H-A-H-N.
5     Q.  The first name again?
6     A.  Roy.
7     Q.  Roy Hahn.  What do you recall about Chenery
8 Associates?
9     A.  Not much.  I'm not sure I really knew what they
10 ever did or do.
11     Q.  Okay.  Was Mr. Austin a principal of that
12 entity?
13     A.  I can't say.
14     Q.  Okay.  How did you associate Mr. Austin with
15 that entity?
16     A.  I'm not sure whether he ever told me that he
17 worked under that or whether it was -- I saw it in print
18 somewhere or hearsay.  It could have been a combination
19 of all those, but I'm just not really sure which one or
20 which ones.
21     Q.  All right.  How about Robinson Ranchero
22 Citizens Council?
23     A.  I've heard that name.
24     Q.  You have?  Okay.  What do you -- who do you
25 associate with that entity?

Page 27

1     A.  In what capacity?
2     Q.  Just any -- how do you remember that entity?
3     A.  I heard it through Mr. -- through Mr. Austin.
4     Q.  What did Mr. Austin tell you about it?
5     A.  It was an Indian -- it was either an Indian
6 tribe or a company or company owned by an Indian tribe
7 somewhere out in California somewhere.
8     Q.  How about Robinson Trust Company?
9     A.  That would have been the same answer.
10     Q.  Intercontinental Pacific Group?
11     A.  I know that.
12     Q.  Okay.  What do you know about that entity?
13     A.  It was in -- let me see where to start.  I
14 prepared tax returns for it starting in, I think, '95
15 through today.  I am today an officer of the company,
16 CFO.  That its principal shareholder has been
17 historically Doug Wolf, that it has acquired assets
18 through the years, typically in the leasing area,
19 equipment leasing area.  I'm not sure what else to say.
20     Q.  Do you associate Mr. Austin with that entity at
21 all?
22     A.  No.
23     Q.  How about Forster?
24     A.  Years gone by he was, I believe, an officer,
25 perhaps VP, of that entity.

Page 28

1     Q.  Perhaps the what?
2     A.  A vice president.
3     Q.  Okay.  Do you recall what year that would have
4 been?
5     A.  From 1988 up to and including 1995.  I don't
6 recall after.
7     Q.  Okay.  How about Mr. Furman?  Do you associate
8 Mr. Furman with that entity?
9     A.  I believe he was a consultant to that company.
10     Q.  Were you ever a stockholder in that company?
11     A.  No.
12     Q.  Who were the other -- you said the principal
13 shareholder was historically Doug Wolf.  Do you recall
14 any other shareholders?
15     A.  Directly or indirectly?
16     Q.  Sure.
17     A.  There were some interests that I can't recall
18 in the '90s what their names are who owned it.  Starting
19 in 2000, there was a gentleman, Richard Buckingham, who
20 was a shareholder starting in 2000, I think it was or
21 2001.  I forget which year.  And there may have been
22 other parties.  I just can't recall their names.
23     Q.  Okay.  With regard to Mr. Furman, do you recall
24 what years he was a consultant to the company?
25     A.  '88 to '95.

Page 29

1     Q.  How long were you -- you said you're an officer
2 and a CFO.  How long have you had those positions with
3 Intercontinental Pacific Group?
4     A.  I'm sorry.  Did you say officer and CFO?
5     Q.  That's what I wrote down.  Is that incorrect?
6     A.  Yeah.  My title as an officer is CFO.
7     Q.  I'm sorry.
8     A.  It's not --
9     Q.  Okay.
10     A.  I can only guess it's 2000, maybe late '90s.  I
11 don't recall exactly when.
12     Q.  What's the business of Intercontinental Pacific
13 Group?
14     A.  I've already answered that.
15     Q.  Oh, you did?
16     A.  Yes, sir.
17     Q.  Answer it one more time for me, please.
18         Oh, you said engaged assets?
19     A.  It acquired assets, typically leasing assets.
20     Q.  Okay.
21     A.  And did some consulting work.
22     Q.  How did you get to be the CFO of that company?
23     A.  I don't know if I recall that.
24     Q.  Do you recall who asked you to become the CFO?
25     A.  No.  I just know it happened.

8 (Pages 26 to 29)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

Witness:   Howard Teig

Page 30

1    Q.  How much of your time do you spend performing
2  CFO functions for that company?
3    A.  As needed?  It's hard to -- it varies.
4    Q.  Okay.  Have you performed any services for
5  Mr. Austin personally?
6    A.  I don't believe so, other than perhaps a
7  periodic question that he's asked me in passing.
8    Q.  Do you know Craig Hoffman?
9    A.  Yes.
10    Q.  How do you know Craig Hoffman?
11    A.  He was a consultant to Fortrend.
12    Q.  Did you perform any services for Mr. Hoffman
13  personally?
14    A.  No.
15    Q.  I'm sorry.  I don't recall.  Did you say -- do
16  you prepare the tax return for Fortrend International?
17    A.  I did.
18    Q.  You did up through 2000?
19    A.  I believe '99.
20    Q.  '99.  Okay.  At that time do you recall who its
21  employees were?
22    A.  I believe the employees were just like
23  receptionists.  I'm not sure what employees, if any, it
24  had.  I just don't recall.
25    Q.  Okay.  Do you recall who -- did Fortrend have

Page 31

1  an office?
2    A.  Yes.
3    Q.  In New York City?
4    A.  Yes.
5    Q.  Where else?
6    A.  San Francisco.
7    Q.  Where did Craig Hoffman reside or work?  Which
8  office did he work out of?
9    A.  New York.
10    Q.  Do you recall who else was in the New York
11  office?
12    A.  Howard Cramer, would have been Tex Calderone.
13  I don't remember what her real first name is.  There
14  were -- I sat there.
15    Q.  Oh, you had an office there as well?
16    A.  I had a desk there, yes, when I was working for
17  them that I was able to use.  Also for a while there was
18  Harry Zelnick, I think it's Z-E-L-N-I-C-K.  I may be
19  wrong on that.  Jim Rhodes, R-H-O-D-E-S, and then there
20  were other people who sat in that office who, you know,
21  who rented space who weren't employees -- who weren't
22  doing work for Fortrend but just rented space.
23    Q.  Did Mr. Furman keep an office there?
24    A.  Yes.
25    Q.  How about Mr. Forster?

Page 32

1    A.  No.
2    Q.  How about Mr. Austin?
3    A.  No.
4    Q.  Are you familiar with the law firms that
5  Fortrend typically did business with?
6    A.  I believe so.
7    Q.  Okay.  Give me those names.
8    A.  One was Pillsbury, P-I-L-L-S-B-U-R-Y, Madison,
9  M-A-D-I-S-O-N, and Sutro, S-U-T-R-O.  Another one was
10  Manatt, M-A-N-A-T-T, I think, Phelps, P-H-E-L-P-S, and
11  Phillips.  There was some --
12    Q.  Chamberlain Hrdlicka?
13    A.  Yes.  Chamberlain is C-H-A-M-B-E-R-L-A-I-N
14  Hrdlicka is H-R-D-L-I-C-K-A.  It's a much bigger name.
15  The principal lawyer at Pillsbury moved around a couple
16  times.  And, so, there may have been other firms that
17  they used; but it was really because they followed the
18  services of the attorney.
19    Q.  Was that Graham Taylor?
20    A.  Yes.  There may have been other firms but none
21  that I can recall at this time.
22    Q.  Okay.  Do you recall the accounting firms that
23  Fortrend typically did business with?
24    A.  I don't -- on a regular basis, I don't think
25  there were any.

Page 33

1    Q.  Other than Howard B. Teig, CPA?
2    A.  No.
3    Q.  Do you recall Fortrend using or consulting with
4  any of the Big 5 accounting firms or whatever it was at
5  the time?
6    A.  Perhaps.  I don't recall, though.
7    Q.  Do you recall if they ever consulted with
8  Arthur Andersen?
9    A.  Perhaps.  I can't recall.
10    Q.  PriceWaterhouseCoopers?
11    A.  Perhaps.  I can't recall.
12    Q.  Coopers & Lybrand or --
13    A.  You can go through all of them.  They're the
14  same.  Same answer.
15    Q.  All right.  I guess PWC is actually Coopers.
16        Do you recall talking to any individuals
17  at any of those accounting firms or from any of those
18  accounting firms?
19        MR. LYNCH:  Can you narrow your question?
20  Are you talking about ever?
21    Q.  (BY MR. COFFIN) With regard to Fortrend.
22    A.  With regard to Fortrend itself?
23    Q.  Or any of the umbrella entities that you
24  described earlier.
25    A.  Well, certainly, it was mentioned in here, E&Y.

9  (Pages 30 to 33)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

---

Page 34

1    Q.   Uh-huh.
2    A.   So, I did speak with E&Y.  You know, I can
3  guess that in the due diligence period that there were
4  other firms, you know, that, you know, other accounting
5  firms, you know, other companies that, you know, they
6  were looking to acquire, they may have had, you know,
7  major accounting firms.
8          By the way, another law firm was Battle,
9  B-A-T-T-L-E, Fowler, F-O-W-L-E-R.
10   Q.   Did you ever talk personally to any of the
11 accounting firms, anybody in the accounting firms with
12 regard to transactions that Fortrend was engaged in?
13   A.   I can't recall.  Maybe, maybe not.  Other than
14 E&Y in the context of this matter.
15   Q.   And I know you're familiar with an entity by
16 the name of Signal Capital Associates, LP; is that
17 right?
18   A.   Yes.
19   Q.   We'll call it SCALP?
20   A.   Okay.
21   Q.   When did you first become associated or
22 introduced to SCALP?
23   A.   '94.
24   Q.   Okay.  And how did that occur?
25   A.   I was a shareholder of the general partner.

---

Page 35

1    Q.   Who was the general partner?
2    A.   Signal Capital Associates, Inc.
3    Q.   Have you performed services for SCALP since
4  1994?
5    A.   Yes.
6    Q.   Okay.  What's the nature of those services?
7    A.   I prepared tax returns through '99.  I also
8  kept the books and records and kept track of assets that
9  they had.
10   Q.   And I understand with regard to the assets that
11 SCALP had, was there an inventory of assets that you had
12 put together?
13   A.   I did not put together.
14   Q.   Okay.  Who put -- let me back up.  And this
15 inventory of assets, I understand, had the tax basis
16 associated with those assets; is that correct?
17   A.   Yes, it did have tax basis.
18   Q.   Okay.  And what kind of assets were they?
19   A.   There was an investment in Canadian dollars and
20 the British pound and then there were securities' stocks
21 of companies that they owned cash and I think generally
22 that's it.
23   Q.   Okay.
24         MR. LYNCH:  Can we take a break for just a
25 couple minutes?

---

Page 36

1          (Recess taken from 10:53 to 11:06.)
2    Q.   (BY MR. COFFIN) Back on the discussion about
3  SCALP, who are the managers of SCALP?
4    A.   When?
5    Q.   Back in 1999.
6    A.   Well, it was a partnership.  So, you mean
7  general partner?
8    Q.   Who was -- no.  Managing is more what I want to
9  know.  Was it the general partner who was managing the
10 entity?
11   A.   Yes.
12   Q.   Okay.  And the general partner was Mr. Furman;
13 is that right?
14   A.   Yes.
15   Q.   How long has Mr. Furman been the general
16 partner of SCALP?
17   A.   Since the end of '96.
18   Q.   Was SCALP -- was it another entity prior to
19 changing its name to SCALP?
20   A.   Yes.  Originally DWJ Partnership, and then
21 DWJ&R Partnership.
22   Q.   Who is the shareholder or the general partner
23 of SCALP currently?
24   A.   I don't know.
25   Q.   Okay.  At what point in time was Signal Capital

---

Page 37

1  Associates, Inc. the general partner of SCALP?
2    A.   I'm sorry.  Please repeat that.
3    Q.   I thought you testified earlier that you were a
4  shareholder of the general partner who was Signal
5  Capital Associates, Inc.?
6    A.   Correct.
7    Q.   When was that?
8    A.   When was what?
9    Q.   When were you the shareholder of the general
10 partner?
11   A.   December '94 to November '96.
12   Q.   And in November of '96 did Mr. Furman then
13 become the general partner of SCALP?
14   A.   Yes.
15   Q.   In addition to Mr. Furman, back in 1999, who
16 were the other partners of SCALP?
17   A.   Fred Forster; Michael Hall; Kanawha
18 Enterprises, K-A-N-A-W-H-A; Autochton Associates,
19 Autochton is A-U-T-O-C-H-T-O-N, something like that.
20   Q.   Were those limited partners or general
21 partners?
22   A.   Limited.
23   Q.   Do you know who owns the entity currently?
24   A.   No.
25   Q.   And you dealt with -- tell me what -- did you

---

10  (Pages 34 to 37)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

Witness:   Howard Teig

Page 38

1  provide services to SCALP?
2     A.  Yes.
3     Q.  And what were those services?
4     A.  I maintained its books and records, prepared
5  its tax returns and kept track of its assets.
6     Q.  And what period of time did you do this work?
7     A.  Well, from '94 I was providing that service
8  through '99, perhaps the first part of 2000.
9     Q.  Are you familiar with the Midco transaction
10 that's at issue here?
11    A.  Yes, I'm familiar with the transaction.
12    Q.  Have you provided any services with regard to
13 the transaction?
14    A.  For what period?
15    Q.  Any time at all.
16    A.  Yes.
17    Q.  Okay.  Describe those services, please.
18    A.  In 1999, I -- I was asked -- I was -- it was
19 indicated to me that SCALP, using that terminology,
20 wanted to make a contribution of assets; and since I
21 kept track of all the assets, if I could assist in
22 identifying which assets should be contributed.  And
23 then later on, actually in 2000, I provided information
24 regarding, you know, to E&Y, you know, for them to use
25 in the preparation of their tax return -- preparation of

Page 39

1  return they prepared.
2     Q.  Which return was that?
3     A.  I can only say generically K-Pipe.  I'm not
4  sure what the exact name was.
5     Q.  Okay.  We'll look at it in a second.  And who
6  asked you to perform services with regard to this Midco
7  transaction?
8     A.  Well, the first part of it where the
9  contribution aspect that I referred to, which was
10 keeping track of the assets and identifying them, that
11 came from a combination, I believe, of Mr. Furman and
12 Mr. Hoffman.  The latter part, which was assisting --
13 you know, providing information to E&Y, that was really
14 more my general understanding of just something I needed
15 to do.
16    Q.  With regard to the contribution-type services
17 you described, when did that occur during the year?  You
18 said 1999?
19    A.  For this transaction?
20    Q.  Yes, sir.
21    A.  It was around the time of the transaction,
22 which I think here was -- I remember the book said it
23 was November 8th, I believe, '99.  So, it was on or
24 around then.  I don't recall the exact time -- exact
25 date.

Page 40

1     Q.  And what parameters were you given as to what
2  assets would be transferred over or, what did you say,
3  contributed?
4     A.  Contributed.  I was informed that there was a
5  need for assets, which if and when disposed of, would
6  produce an ordinary loss of X and a capital loss of Y.
7     Q.  But you don't -- I take it you don't recall the
8  amounts?
9     A.  Correct.
10    Q.  And who would have set those parameters?
11 Either Mr. Furman or Hoffman or both?
12    A.  Most likely Mr. Hoffman.
13    Q.  And once they gave you the parameters, how did
14 you go about doing that?
15    A.  Well, as I said, I kept track of the inventory.
16 So, I would look at the inventory and see what seemed to
17 fit, you know, those parameters; and then I would
18 identify them for Mr. -- well, combination to Mr. Furman
19 for his handling the assignment of the currency -- the
20 foreign currency, and I would contact the attorneys for
21 the assignment of the -- any -- any stocks that they
22 had.
23    Q.  Okay.
24    A.  In fact, I would contact the attorneys about
25 both, also.

Page 41

1     Q.  Would you have been contacted or requested by
2  anybody at Fortrend to perform services prior to the
3  closing date of the Midco transaction at issue here?
4     A.  I don't recall ever doing anything prior.
5     Q.  Okay.  You mentioned earlier you would do some
6  due diligence work occasionally?
7     A.  In this case I know I definitely did not do any
8  due diligence.
9     Q.  And how do you know you definitely did not do
10 any?
11    A.  Because I recall that Mr. Hoffman did it.
12 Having said that, though, it is possible that I may have
13 read the contracts prior to the actual closing.  It's
14 possible.  I may have had a conversation prior to
15 closing.  So, I don't want to just imply that I did
16 absolutely nothing; but I prepared nothing.  I may have
17 just read some things.  I may have talked to people
18 about things.  So, that's possible.
19    Q.  Okay.  Now, why would you have -- and I'm not
20 saying -- I'm just curious.  You're not a lawyer; is
21 that right?
22    A.  Correct.
23    Q.  Why would you be reviewing contracts on behalf
24 of Fortrend?
25    A.  Just reading it.  I have a long history in

11  (Pages 38 to 41)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

---

Page 42

1  reading contracts and -- and just part of my -- I guess
2  part of my skills is being able to read a contract,
3  generally understand it, provide comments, both from
4  accounting natures and just general.
5      Q.  With regard to your work on this particular
6  Midco transaction, did you ever have any conversations
7  with any representatives or employees or management from
8  Midcoast?
9      A.  I don't recall any.
10     Q.  Are you familiar with --
11     A.  Can I go back a minute, though?
12     Q.  Sure.
13     A.  In the process of preparing the information for
14  E&Y after the fact, in the year 2000, it's possible that
15  I may have had some contact with someone at Midcoast
16  because I believe that they may have been the holder of
17  the records of the business for the activity prior to
18  closing.  So, it's possible I may have had some -- and I
19  seem to have some -- read something here that may refer
20  to that.  So, I may have had some contact with some
21  people in that context only.
22     Q.  Are you familiar with transactions labeled by
23  the IRS as lease stripping transactions or lease strips?
24     A.  Yes.
25     Q.  What's your understanding of what a lease strip

---

Page 43

1  is?
2      A.  It -- a lease strip transaction was -- is --
3  was a transaction where it was generally a leasing
4  transaction where there would be a party that owned an
5  asset.  They would lease it further on to a user, a
6  entity would then lease it further on to a user, a
7  third-party user.  Typically, the stripping part of it
8  is when the user would pre-pay all of his rent for the
9  entire lease term to the directing lessee and that money
10  would be held aside in an escrow account, defeasance
11  type of arrangement.  And, so, what you had is a
12  transaction where, you know, where there would be a
13  party that would be the lessee of an asset and would be
14  a sublessor and what it had was an obligation to pay
15  rent in the future and it also had an asset which was
16  the proceeds from having sold its right to receive or
17  have received the pre-payment of rent from the actual
18  user.  And, so, it would have had that asset.  It would
19  have had that future liability.  That was a -- what I
20  always thought of as a lease stripping transaction.
21     Q.  Okay.  Did those types of transactions, if you
22  recall, typically involve tax neutral entities who
23  eventually recognized or absorbed the income resulting
24  from the sale of the rental stream?
25     A.  Yes.  I'm sorry.  Can I go back and may I ask

---

Page 44

1  just to repeat that question?
2          (The record was read as requested.)
3      A.  I'm not sure of your use of the word
4  "recognized."
5      Q.  (BY MR. COFFIN)  Okay.  Was allocated the income
6  resulting from the sale of the rental stream?
7      A.  Yes.
8      Q.  And did those types of transactions have
9  anything to do with the inventory of assets you
10  maintained or accounted for owned by SCALP?
11     A.  Can you please repeat that?
12         (The record was read as requested.)
13     A.  Indirectly.
14     Q.  (BY MR. COFFIN)  Okay.  Isn't it true that the
15  basis of those assets that you maintained or accounted
16  for in SCALP was derived from these lease-stripping
17  transactions that occurred in the '90s?
18     A.  Yes.
19         MR. STERN:  Objection, leading.
20         MR. LYNCH:  You already answered it.
21     Q.  (BY MR. COFFIN)  Are you aware of how Fortrend
22  made -- profited in Midco transactions such as the one
23  at issue here?
24     A.  Yes, and I explained that earlier.
25     Q.  Okay.  Is that the arbitrage profit you

---

Page 45

1  explained?
2      A.  Yes, sir.
3      Q.  Do you know if that, in fact, existed in this
4  case?
5      A.  I would believe so.
6      Q.  And why do you think that?
7      A.  Some recollection.
8      Q.  Do you know how the amount of the profit was
9  determined or calculated?
10     A.  I -- in this case I can't say.
11     Q.  Okay.  On a general basis, do you know how
12  Fortrend would try to determine the amount of arbitrage
13  profit as you labeled it would be calculated?
14         MR. STERN:  Objection, form.
15     A.  Do I answer?
16         MR. LYNCH:  If you know the answer, answer
17  the question.
18     A.  The -- I'm sorry.  Could you please repeat the
19  question?
20         (The record was read as requested.)
21     A.  Well, it would be calculated -- it would be
22  determined as a function of what the value of the assets
23  were, less what they sold -- they were able to buy the
24  stock for.
25     Q.  (BY MR. COFFIN)  Okay.  How did they -- do you

---

12  (Pages 42 to 45)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

| Page 46 |
| --- |

1  know how Fortrend valued the stock that they were
2  purchasing?
3     A.  They would look at the value of the underlying
4  assets and apply a discount -- the assets and
5  liabilities and apply a discount.
6     Q.  What kind of discount?
7     A.  It would be based upon the inherent tax -- the
8  inherent gain that might be realized when the assets
9  were sold.
10     Q.  Could you be more specific on that?
11     A.  I'm not sure how to be.
12     Q.  Okay.  Well, if you have a -- if you have a
13  transaction where you have assets minus liabilities is
14  100 million and you know that the inherent gain on the
15  sale of the assets would be 50 million, how would you
16  calculate the amount of the purchase price for the
17  stock?
18          MR. STERN:  Objection, form.
19          MR. LYNCH:  I don't know specifically what
20  your question is then.
21          MR. COFFIN:  Well, this is just an
22  example.  I would like for him to -- if he is aware of
23  how it was calculated.
24     Q.  (BY MR. COFFIN) You said the discount was based
25  on the inherent gain that would result from the sale of

| Page 47 |
| --- |

1  the asset.  So, how is the discount determined?
2     A.  There would be some agreement between the
3  parties based upon that $50 million gain.
4     Q.  Which parties?
5     A.  The Fortrend and its umbrella and the stock
6  seller.
7     Q.  So, when you said they would take the assets
8  minus liabilities and apply a discount to it, they would
9  actually reduce the price or reduce the assets minus
10  liabilities component of the formula?
11     A.  What do you mean by "reduce"?  Reduce what?
12     Q.  Well, you said it was a discount.  I associate
13  that with a reduction in price.
14     A.  Well, I said they would -- they would agree
15  upon -- they would agree upon a discount based upon the
16  $50 million in your example.
17     Q.  And how would they come up with the amount of
18  the discount?
19     A.  It varied in different situations.
20     Q.  Was it a percentage?
21     A.  Sometimes.
22     Q.  Was there a percentage that Fortrend tried to
23  shoot for in these types of transactions?
24     A.  Sometimes.
25     Q.  Okay.  What was that percentage?

| Page 48 |
| --- |

1     A.  As a -- generally 10 percent.
2     Q.  And then it varied from 10 percent, either
3  higher or lower?
4     A.  I believe so.
5     Q.  Okay.  And the transactions that you were
6  associated with, do you recall what the bottom
7  percentage was and what the top percentage was?
8     A.  No.
9     Q.  Did it ever go down to 7 percent?
10     A.  I don't recall.
11     Q.  So, they would take the 10 percent, multiply it
12  by the -- the gain inherent on the resulting sale of the
13  assets; is that right?
14     A.  Correct.
15     Q.  And then --
16          MR. STERN:  Objection, form.
17     Q.  (BY MR. COFFIN) And then what would they do
18  with that -- with the product of that computation?
19     A.  Well, citing your example.
20     Q.  Uh-huh.
21     A.  And using just as an example the 10 percent,
22  they would take the $50 million income -- the income tax
23  resulting from the gain, and they would apply, say,
24  10 percent.  And, so, they would take a discount of
25  $5 million, 10 percent of $50 million, and apply that as

| Page 49 |
| --- |

1  a discount from the value of the assets net of the
2  liabilities.
3     Q.  The evidence in this case shows that Fortrend
4  paid -- and this was through K-Pipe at closing -- paid
5  PriceWaterhouseCoopers a finder's fee of roughly
6  $958,000.  Do you recall seeing that?
7          MR. STERN:  Objection, form.
8     A.  I recall only from what I saw in these papers
9  that there was a payment somewhere here.  I don't know
10  anything about that.  I don't recall anything about it.
11     Q.  (BY MR. COFFIN) Okay.  Was it common for
12  Fortrend to pay fees to accounting firms or law firms in
13  Midco transactions?
14     A.  I don't recall.
15     Q.  Do you recall if Fortrend paid any such -- any
16  types of fees to accounting firms or law firms for
17  introductory reasons?
18          MR. STERN:  Objection, form.
19     Q.  (BY MR. COFFIN) Have you ever dealt with Ian
20  Shackter?
21     A.  For some reason the name sounds familiar, but I
22  can't remember if I have or even in -- in what context.
23     Q.  Okay.  He worked with PriceWaterhouseCoopers.
24     A.  Okay.

**HUNDT REPORTING**
**214-220-1122**

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

---

Page 50

1    Q.  Does that help you recall?
2    A.  No.  It may be a somewhat common name to me,
3  for all I know.
4    Q.  Gary Wilcox?
5    A.  Not -- I'm not sure I recall that name.
6    Q.  Tom Palmisano?
7    A.  No.
8    Q.  Robert Whitten?
9    A.  No.
10   Q.  Dennis McErlean, M-c-E-R-L-E-A-N?
11   A.  No.
12   Q.  Do you know if Fortrend engaged
13  PriceWaterhouseCoopers for the Midco transaction at
14  issue here?
15   A.  I don't know whether I have -- I don't know if
16  I have a recollection or if I ever knew.  But at this
17  time I certainly have no recollection.
18   Q.  Let's go to our exhibits, please.  Let's start
19  with Exhibit 145.  We may be going back and forth
20  through this binder, but I'm going to try to ask my
21  questions chronologically.  Do you see 145, sir?
22   A.  Yes.
23   Q.  Okay.  Have you seen this document prior to
24  today, Mr. Teig?
25   A.  I can't recall.  Before today, yes.

---

Page 51

1    Q.  Last night or before I sent it to you?
2    A.  Before I -- before I got this book, I can't
3  recall.
4    Q.  Turn to -- you will see in the bottom
5  right-hand corner there are a couple numbers.  I want
6  you to refer to ENB-DOJ No. 28698.
7    A.  Okay.  You're testing me for my vision.
8    Q.  It looks like this is a wire instruction signed
9  by Larry Austin on behalf of K-Pipe Group, Inc. dated
10  November 9 of 1999, and one of the wire instructions is
11  to pay Mr. Austin $312,260.  Do you see that?
12   A.  Yes.
13   Q.  Do you know what type services Mr. Austin
14  provided in this Midco transaction?
15   A.  As I indicated earlier, I believe that he was
16  the administrator of the -- of the company that was
17  acquired.
18   Q.  And did you deal with Mr. Austin in relation to
19  the services you performed on this transaction?
20   A.  Perhaps, but I can't recall specifically.
21   Q.  I think the evidence in this case shows that
22  Mr. Austin signed certain documents and maybe an
23  intended closing of the transaction.  My question to you
24  is:  Are you aware of anything else that Mr. Austin may
25  have done for K-Pipe Group?

---

Page 52

1    A.  Not specifically.  I'm sorry.  Could you please
2  repeat that last question?
3         (The record was read as requested.)
4    A.  Once again, no, other than to serve as, you
5  know, an officer, director of the company, as I
6  mentioned before, and then serve in whatever capacity it
7  required.
8    Q.  (BY MR. COFFIN) And the wire above that is a
9  wire to Lebouef, Lamb for $299,750 with a reference
10  Fortrend International, K-Pipe and Graham Taylor.
11   A.  Yes.
12   Q.  Did you deal with Graham Taylor on a regular
13  basis?
14   A.  Yes.  Although could you define "regular"?
15   Q.  Well, not only in this transaction, but in
16  other Midco transactions as well?
17   A.  In other -- yes.  In other transactions, yes.
18   Q.  What types of services did Mr. Taylor provide
19  to Fortrend?
20   A.  In some cases it was serving as the corporate
21  attorney, you know, handling the asset, you know, the
22  stock agreement, being involved in whatever corporate
23  attorney would do.  And in other cases he may have
24  written opinions -- or his firm rather -- or maybe he
25  wrote on behalf of his firm.

---

Page 53

1    Q.  Okay.  Do you know how -- was his firm paid by
2  the hour for their services?
3    A.  I don't know.
4    Q.  In conjunction with your work for Fortrend, did
5  you review bank statements?
6    A.  Probably -- most likely, yes, because I saw a
7  reference to that somewhere else in this book.
8    Q.  Okay.  And is that how you would generally
9  prepare accounting entries and journal entries for each
10  entity?
11   A.  It would be part of the -- certainly part of
12  the procedures.
13   Q.  Were you involved at all, as far as reviewing
14  invoices from vendors or creditors, in determining that
15  somebody from Fortrend needed to pay that particular
16  invoice?
17   A.  Most likely, yes.
18   Q.  Would you review invoices from Graham Taylor
19  and his law firm?
20   A.  I may have.
21   Q.  Who had check signing authority for the entity
22  such as K-Pipe Group?
23        MR. STERN:  Objection, form.
24        MR. LYNCH:  If you know.
25   A.  Well, from this piece of paper I can presume

---

14  (Pages 50 to 53)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:  Howard Teig**

Page 54

1  that Larry Austin did, since he signed this asking the
2  bank to send wires.
3      Q.  (BY MR. COFFIN) Would Mr. Furman typically have
4  check signing authority on the bank account as well?
5      A.  I can't recall.
6      Q.  And, so, once you reviewed an invoice and
7  determined it needed to be paid, who would you take that
8  information to?
9          MR. STERN:  What are you talking about?
10  You are talking about a whole bunch of different
11  entities.  Are you talking about -- what bank account?
12  What are you talking about?
13          MR. COFFIN:  I thought he just said he
14  reviewed invoices for Fortrend.
15          MR. STERN:  Are you talking about Fortrend
16  or K-Pipe?
17      A.  Fortrend or K-Pipe?  Are you asking Fortrend or
18  K-Pipe?
19      Q.  (BY MR. COFFIN) For Fortrend.
20      A.  For Fortrend?
21      Q.  Uh-huh.
22      A.  For Fortrend I saw the bills.  There was an
23  account in New York, an account in San Francisco.  For
24  the account in New York paying the bills, I -- I
25  generally would prepare the checks and bring them to

Page 55

1  Mr. Furman to sign.
2          For the bills in San Francisco, I had
3  nothing to do with them.
4      Q.  Okay.  Now, did you do this -- perform the same
5  function for the entities that you described under the
6  umbrella Fortrend?
7      A.  I don't think I -- I didn't generally prepare
8  checks.  Certainly I didn't -- I didn't do that.  It
9  varied what I did.
10      Q.  But the question is:  Did you review those
11  invoices, though?
12      A.  For any of the entities?
13      Q.  Yeah, for any of the entities under the
14  umbrella that you described earlier for Fortrend.
15      A.  I may have reviewed some.
16      Q.  Turn to, on the bottom right-hand corner 28625.
17      A.  (Witness complies.)
18      Q.  I'm sorry.  28623.  They appear to be out of
19  order, don't they?
20          MR. LYNCH:  Yeah.  It's towards the end.
21  It's the last page.  Have you got it?
22      Q.  (BY MR. COFFIN) Okay.  This represents a wire
23  transfer from K-Pipe Group, Inc. to you, Mr. Teig, of
24  $75,000.  Do you recall receiving that $75,000?
25      A.  I can presume I did.

Page 56

1      Q.  And why were you paid the $75,000?  Do you
2  recall?
3      A.  To provide the services that I've described.
4      Q.  Had you --
5      A.  And to continue to prepare tax returns if and
6  when necessary.
7      Q.  Okay.  So, as of this date, you received this
8  November 9 of 1999, had you performed any services for
9  K-Pipe Group?
10      A.  Well, we've already discussed that.
11      Q.  Well, I thought you said -- you said sometime
12  in November; but my question is up to November 9 of
13  1999.
14      A.  But I also indicated that I can't -- I said
15  that I may have looked at documents and things prior to
16  the closing date.  I can't be sure.
17      Q.  Okay.  Would that have been the only types of
18  services you would have done prior to the closing date?
19      A.  And also I can't be sure about the timing of
20  that other aspect that I talked about already, which was
21  when Mr. Hoffman and Furman contacted me and asked me to
22  look at the records of SCALP for the inventory.  I don't
23  know the timing of that.
24      Q.  Do you know how your fee was determined?
25      A.  No.

Page 57

1      Q.  Did you have some kind of an arrangement with
2  Mr. Furman or with Fortrend that you would be paid on
3  these Midco transactions?
4      A.  Yes.  Yes, an understanding.
5      Q.  Okay.  And I'm curious as to how an amount
6  would be determined by Fortrend unilaterally without --
7      A.  Fortrend would tell me, and I would say okay.
8      Q.  And do you know how Mr. Furman or Fortrend
9  would come up with that number?
10      A.  No.
11      Q.  Did you ever question Mr. Furman or anyone at
12  Fortrend as to how they came up with that number?
13      A.  Yes.
14      Q.  And what was the answer to that question?
15      A.  It was an inconclusive answer which led to my
16  ceasing to do work for them in 2000.
17      Q.  When you were -- were you keeping -- you were
18  keeping the books and records of K-Pipe Group; is that
19  correct?
20      A.  No.  No.
21      Q.  What kind of functions or services did you do
22  for K-Pipe Group, Inc.?
23      A.  For what year?
24      Q.  For 1999.
25      A.  I assembled the information based upon various

15  (Pages 54 to 57)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:  Howard Teig**

Page 58

1  sources and provided that information or summarized it
2  in providing it to E&Y.
3      Q.  Do you know if the K-Pipe Group, Inc., and I'm
4  talking about post November 8 of 1999, if that entity
5  maintained books and records?
6      A.  How would you define "books and records"?
7      Q.  Did they have a formal accounting ledger or
8  computerized accounting system in place?
9      A.  I don't believe so.
10     Q.  Did they have bank statements, check copies?
11     A.  They would have had bank statements and, if
12  applicable, copies of checks.
13     Q.  Any other types of books and records that the
14  entity would have maintained after November 8th of 1999?
15     A.  Someone kept track of the cash flows, ins and
16  outs.
17     Q.  Who would that have been?
18     A.  Often it was Mr. Forster.
19     Q.  Turn back to 28626, please.
20     A.  (Witness complies.)
21         MR. STERN:  Can we take a quick break?
22         (Recess taken from 11:47 to 11:57.)
23     Q.  (BY MR. COFFIN) All right.  We're looking at
24  Exhibit 125, and I asked you to turn to ENB-DOJ-28626.
25  Are you there?

Page 59

1      A.  Yes, sir.
2      Q.  Okay.  This appears to be a wire instruction
3  from Mr. Austin on behalf of K-Pipe Group to Rabobank
4  requesting that wires of $1,451,000 be sent to each
5  Cronulla Corporation and to Ashfield International,
6  Limited.  Are you aware of what the purpose of these
7  wires would be?
8      A.  I don't recall -- I can't recall at this time,
9  although I probably saw documents back then; and I would
10  only be able to presume today.
11     Q.  Did you see any documents that I sent to you
12  earlier this week that might give you -- that may cause
13  you to recall better what these wires would be for?
14     A.  Well, the documents that you gave me would
15  allow me to only presume.
16     Q.  Okay.
17     A.  But that's not a -- but not based upon fact.
18  It's based upon a guess on my part.
19     Q.  Okay.  Can you give me an educated guess on
20  that?
21     A.  Yes.  The -- one of the other documents you
22  sent somewhere in this packet --
23     Q.  Look at 233.  Maybe that will help.
24     A.  No, it wasn't.  I don't know what 233 is but --
25  oh, 233?

Page 60

1         MR. STERN:  Are you talking about
2  Government Exhibit 233?
3         MR. COFFIN:  Yes.
4      Q.  (BY MR. COFFIN) Does that help at all?  If
5  not --
6      A.  I don't think so.
7      Q.  -- you can look at 321.
8      A.  Yes, that's what I was looking for.
9      Q.  Okay.
10     A.  321 on the tip of page -- that's Government
11  72831 shows that Ashfield and --
12         MR. STERN:  Whoa.  Okay.
13         THE WITNESS:  Do you see the page?
14         MR. STERN:  Yeah, I see it.
15     A.  It shows that -- that section shows, first of
16  all, it's a limited partnership agreement, and it shows
17  that the limited partners were Ashfield and Cronulla,
18  however you pronounce it.  And they were each 48 percent
19  partners.  As I say, my presumption based upon that and
20  as I said earlier is that -- I mentioned that Ashfield
21  and Cronulla would have sold their interests, I would
22  have expected they would have sold their interest in the
23  partnership.  This dollar -- these dollars on the first
24  exhibit, 28626, while I can't verify that the number is
25  exactly that, I would presume it to have been for that

Page 61

1  purchase of their partnership interest.
2      Q.  (BY MR. COFFIN) Okay.  And do you know why they
3  would have sold their partnership interests?
4      A.  To get money.
5      Q.  Okay.  So, as of October 20 of '99, according
6  to this limited partnership agreement, they were one of
7  the initial limited partners --
8      A.  Yes.
9      Q.  -- on a combined basis 96 percent?
10     A.  Yes.
11     Q.  And then the wire is dated November 9 or
12  November 10 of '99.  So, sometime around then they would
13  have sold their interest in the -- in the partnership?
14     A.  As I said, that would be a presumption on my
15  part.
16     Q.  Okay.  So, the question arises why do they get
17  in it just for, you know, less than a month -- why do
18  they get into the partnership for less than a month and
19  then -- and then get out of the partnership?
20         MR. LYNCH:  If you don't know, you don't
21  know.
22     A.  I'm not sure.  I can't recall now why.
23     Q.  (BY MR. COFFIN) Can you give me an educated
24  guess on why that would happen?
25     A.  Well, the getting out was there was the

**HUNDT REPORTING**
**214-220-1122**

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:  Howard Teig**

Page 62

1  opportunity to sell their interest and make money.  So,
2  they would have been willing to do at that point.  I
3  don't recall, though, the specifics of this or
4  necessarily any other situation why they came in, why
5  they went out, other than to make money.
6      Q.  Okay.  And how would they make money on the
7  transaction, if you know?
8      A.  $1,451,000 was -- let's presume to be the sales
9  price for each of those parties, and their capital
10  contribution was $48,000.  That's a million four plus.
11  That's how they make money.
12     Q.  Okay.  And on the wire instruction back on 145
13  it says "Call Fred Forster" for each of the entities.
14  Do you see that under "Reference"?
15     A.  Yes.
16     Q.  Now, I can't recall.  Did you testify that
17  Forster was associated with either of these entities?
18     A.  I had said earlier that -- that I learned of --
19  at least of Ashfield through Mr. Forster and that
20  Cronulla, I had heard of either through Mr. Furman or
21  Mr. Forster.
22     Q.  Now, these are wire instructions.  My question
23  to you, Mr. Teig, is whether you ever -- do you recall
24  ever seeing any bank statements or anything from K-Pipe
25  showing that these payments of $1,451,000 actually went

Page 63

1  out to those entities?
2      A.  At this time I can't recall seeing it.
3  However, there is e-mail traffic somewhere in this book
4  that indicates that -- that I provided the bank
5  statements to Ernst & Young.  And, so, therefore, I have
6  to presume that I did see them to be able to provide
7  that information and that this would have been on there.
8      Q.  Okay.  Do you know if those two entities
9  provided any benefits or services to the K-Pipe Group?
10     A.  I don't know.
11     Q.  Were there any tax-related benefits those
12  entities may have provided to the K-Pipe Group?
13     A.  None that I recall.
14     Q.  Any idea how the amounts were determined, the
15  $1,451,000?
16     A.  No.
17     Q.  Would it have anything to do with any of the
18  basis that may have been contributed in those assets
19  that you mentioned earlier?
20     A.  I can't recall.
21     Q.  Turn to Government Exhibit 324, please.
22     A.  (Witness complies.)
23     Q.  Have you seen this document prior to me sending
24  it to you earlier this week, Mr. Teig?
25     A.  I can't recall.  Possibly.

Page 64

1      Q.  Say that again.
2      A.  I cannot recall.  Possibly.
3      Q.  Possibly you did see it.  Is that what you
4  mean?
5      A.  Correct.
6      Q.  Okay.  Do you know who may have drafted it?
7      A.  It's possible that I did.
8      Q.  Why do you think that it may have been you?
9      A.  Excuse me?
10     Q.  Why do you think that it may have been you?
11     A.  Because it would not have been abnormal for me,
12  as part of the recordkeeping for SCALP, to -- once I've
13  been asked to identify assets -- to have prepared a
14  piece of paper like this and to have given it to
15  Mr. Furman for his signature and forwarding on to the
16  appropriate party.
17     Q.  Okay.  Did you see bank statements held by
18  SCALP -- I'm sorry.
19         Did you see bank statements for accounts
20  held by SCALP in the Grand Cayman?
21     A.  At some point in time I did.
22     Q.  Do you have any idea as to whether this request
23  was ever transmitted to the recipient Mrs. -- or the
24  addressee, Mrs. Kerry Ramoon?
25     A.  I would have to presume, but I don't know for

Page 65

1  sure.
2      Q.  What would be the -- or what was the purpose of
3  this request?
4      A.  Two purposes.  One was to assign it -- the
5  ownership of 158,620 Canadian dollars from SCALP to
6  K-Pipe, Inc -- K-Pipe Group, Inc. and then the third --
7  the second, rather, is to ask that those Canadian
8  dollars be converted into U.S. dollars and deposited
9  into the account of K-Pipe Group.  So, first was the
10  transfer/assignment/contribution; and second is the
11  conversion from foreign currency to U.S. currency.
12     Q.  Okay.  And the purpose of the conversion, was
13  that to generate some tax loss?
14     A.  The effect of converting from Canadian dollars
15  to U.S. dollars was the recognition of a loss for U.S.
16  income tax purposes.
17     Q.  Okay.  And the Canadian dollars, it's my
18  understanding from your testimony earlier had some --
19  had some basis, some tax basis in it that was generated
20  by lease-stripping transactions that occurred in the
21  '90s; is that correct?
22     A.  It was part of the ultimate origin, if that's
23  what you're asking.
24     Q.  Part of the ultimate origin.  Okay.  Were there
25  other parts?

17 (Pages 62 to 65)

**Witness:   Howard Teig**

1    A.  Well, there was series of -- there's other
2  transactions that took place before the assets were, you
3  know, in currency.
4    Q.  Now, did K-Pipe Group, Inc. actually have an
5  account, a bank account there at the Grand Pavilion --
6  I'm sorry -- MeesPierson Cayman Limited?  Did it have an
7  account there?
8    A.  I don't believe it did.
9    Q.  How then would you -- how could they -- how
10  could the bank irrevocably transfer the Canadian dollars
11  to K-Pipe Group, Inc. if there was no account there?
12    A.  You have to ask the bank.
13    Q.  Turn to 326, please.  This is a string of
14  e-mails, I believe, between you and Ms. Cynthia Morelli?
15    A.  Yes.
16    Q.  Do you recall the subject matter of these
17  e-mails?
18    A.  Not without reading it.
19    Q.  Okay.  Prior to receiving the documents I sent
20  over earlier this week, did you recall seeing these
21  e-mails from Mrs. Morelli?
22    A.  Please repeat that question.
23       (The record was read as requested.)
24    A.  I can't recall.
25    Q.  (BY MR. COFFIN) Do you have any doubts that you

1  received these e-mails from Ms. Morelli to you and that
2  you transmitted e-mails back to her?
3    A.  Unless one would presume that these e-mails
4  records were fraudulently prepared, I would have to
5  presume that I did get them.
6    Q.  Who was Ms. Morelli?
7    A.  Based upon what I'm reading here, she was an
8  attorney at Lebouef, Lamb.
9    Q.  And it looks like the correspondence actually
10  begins on DOJ-11574.  Do you see that at the bottom?  I
11  think that was the first e-mail that was transmitted.
12  Yours dated --
13    A.  It says "I have spoken to"?
14    Q.  Yes.
15    A.  Okay.
16    Q.  Have you read this e-mail?
17    A.  I read it since I got the book.
18    Q.  Okay.  Do you recall what the subject matter of
19  the e-mail was?
20    A.  Can I take a moment and just look at it again?
21    Q.  Yes; yes.
22    A.  It appears to have been a reconciliation of
23  working capital.
24    Q.  Between --
25    A.  Or referred to a reconciliation of working

1  capital.
2    Q.  Okay.  Between which parties?
3    A.  Well, actually -- yeah.  This would have been a
4  task that would have been called for in the Stock
5  Purchase Agreement between -- was it K-Pipe and the
6  company that it acquired.  I forget that name now.
7    Q.  The Bishop Group Limited?
8    A.  Is that the name?  I don't remember.
9    Q.  Uh-huh.
10    A.  And it would have been an agreement there that
11  would have provided, as I said earlier, there would have
12  been a calculation of the assets less liabilities, and
13  this would have been that calculation.  So, later on
14  there would have been a true-up, so to speak.  We're
15  saying that -- which is to compare what the actual
16  numbers were versus what the expected numbers were at
17  the time of closing or the estimated numbers were at the
18  time of closing.
19    Q.  Okay.  Do you recall the matters dealing with
20  the Butcher Interest Partnership?
21    A.  Very vaguely.
22    Q.  What do you recall about it?
23    A.  $6,225,000.  I remember seeing that number and
24  hearing about it; but beyond that, I don't really
25  remember much about it.

1    Q.  Okay.  And there's a -- in the text there it
2  says the question is what do we have to do to monetize
3  partnership interest, which was an interest in the
4  Butcher Interest Partnership.  Do you recall what that
5  may have been regarding?
6    A.  Just specifically what you read.
7    Q.  Okay.
8    A.  How do you capture money out of it?  That would
9  confirm what I said earlier which was that I didn't know
10  much about it.
11    Q.  Okay.  And then the reply by Ms. Morelli starts
12  on 011573?
13    A.  Uh-huh.
14    Q.  Do you see that?  She says "The Butcher
15  Interest Partnership, you may recall, was entered into
16  at the insistence of PWC in order to add 'substance' and
17  'good facts' to this Midco transaction."  Do you see
18  that?
19    A.  Yes.
20    Q.  And then she goes on to how to monetize the
21  partnership interest.  Do you recall her making those
22  comments in this e-mail?
23    A.  Only when I read it now.
24    Q.  Okay.  Do you know -- did you ever talk to her
25  about her comments in this e-mail?

18  (Pages 66 to 69)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

---

Page 70

1    A.  Possibly.  I can't recall.
2    Q.  Did you agree with her statement there about
3  the Butcher Interest Partnership?
4    A.  I -- I don't think I have the ability to
5  comment on that.
6    Q.  Do you have any idea how the Butcher Interest
7  Partnership -- strike that -- the Butcher Interest, how
8  that was valued by K-Pipe?
9    A.  No.  Or I can't recall at least at this time.
10    Q.  Do you recall talking to anyone else at
11  Fortrend about Ms. Morelli's characterization of the
12  Butcher Interest Partnership?
13    A.  I can't recall.
14          MR. COFFIN:  Let's go off the record for a
15  second.
16          (Recess taken from 12:18 to 12:43.)
17    Q.  (BY MR. COFFIN) Mr. Teig, I have a few
18  follow-up questions with regard to some testimony, some
19  earlier testimony, and in relationship to SCALP, the
20  limited partnership.  Back in 1999 you mentioned that
21  Mr. Furman was the general partner?
22    A.  Yes.
23    Q.  What was his percentage interest in SCALP at
24  the time?
25    A.  Approximately 70, 70.

---

Page 71

1    Q.  Seventy.  And you mentioned Mr. Forster was
2  also a limited partner?
3    A.  Yes.
4    Q.  What was his percentage interest, if you
5  recall?
6    A.  I don't recall.
7    Q.  Okay.  Was it 10 percent?  20 percent?  Or more
8  like 1 or 2 percent?
9    A.  I -- it was less than 20, but I don't remember
10  how much.
11    Q.  Okay.  And we looked at the wire transfer to
12  Ashfield and Cronulla of $1.45 million.  Do you recall
13  that?
14    A.  Yes.
15    Q.  And we also looked at the partnership agreement
16  that showed the the -- those entities paid $48,000 for
17  their interest in K-Pipe Holding Partners.
18          Do you recall that?
19    A.  Yes.
20    Q.  My question is:  Why would -- do you know why
21  would K-Pipe Group then pay $1.45 million to each of
22  those entities for their interest in the limited
23  partnership?
24    A.  I don't think K-Pipe did.
25    Q.  Okay.  Tell me who you think paid it.

---

Page 72

1    A.  I think in this -- can I just check one thing
2  first?
3    Q.  Sure.
4    A.  What was the -- oh, here it is.  I believe,
5  once again based upon the document that you provided in
6  Section 321.
7    Q.  Government Exhibit 321?
8    A.  Yes.
9    Q.  Uh-huh.
10    A.  The Limited Partnership Agreement that SCALP
11  acquired the interests of both of the other limited
12  partners, Ashfield and Cronulla and, therefore, it
13  paid -- it acquired the interest, and since at that
14  point in time it owned 100 percent of the interest --
15  would have owned 100 percent of the interest of K-Pipe,
16  it caused K-Pipe to pay the money on its behalf.
17    Q.  Okay.
18    A.  Once again, that would be my presumption.
19    Q.  Sure.  And the question that follows, then, why
20  would SCALP pay 1.45 million for each of those
21  partnership interests when just prior to that the
22  capital contributions were only $48,000?
23          MR. STERN:  Objection, form.
24    Q.  (BY MR. COFFIN) You mentioned earlier that they
25  made money on the transaction, Cronulla and Ashfield, by

---

Page 73

1  contributing $48,000 each?
2    A.  Yes.
3    Q.  And then later selling for $1.45 million to
4  SCALP.  So, why would SCALP pay so much more for those
5  interests in the partnerships?
6          MR. LYNCH:  Objection.
7    A.  I don't know.
8    Q.  (BY MR. COFFIN) We talked about the $75,000
9  that you were paid from K-Pipe Group, Inc.?
10    A.  Yes.
11    Q.  Was that actually earned from K-Pipe Group,
12  Inc. or was it a payment from SCALP?
13    A.  I never thought about that.
14    Q.  Okay.  Did you ever receive any more money from
15  K-Pipe Group, Inc.?
16    A.  Not that I recall.
17    Q.  Were you paid similar amounts at the closings
18  of other Midco transactions?
19    A.  What do you mean by "similar amounts"?
20    Q.  $75,000.
21    A.  Maybe.
22    Q.  Were you paid fees -- any fees at all at the
23  closing of other Midco transactions?
24    A.  Yes.
25    Q.  Okay.  Do you remember the range of those

---

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

---

Page 74

1  amounts?
2       A.  I think it was 5,000 to $250,000.
3       Q.  What was the name of the entity that paid you
4  the $250,000?
5       A.  Ourso.
6       Q.  Spell that one again, please.
7       A.  O-U-R-S-O.
8       Q.  And when did that occur?
9       A.  '96.
10           MR. LYNCH:  Can I ask a clarifying
11  question?  In each of those transactions were those, in
12  general, the only fees that you charged those entities?
13           THE WITNESS:  Yes.
14           MR. LYNCH:  So, it was a one-time bill.
15           THE WITNESS:  One-time bill.
16           MR. LYNCH:  And what was it designed to
17  do?
18           THE WITNESS:  It was designed to pay me
19  for any of the services I had rendered historically and
20  any of the services I would be rendering in the future.
21  I guess just to expound upon that one, the Ourso
22  payment, at one point I actually did an analysis,
23  summary, to try to, you know, go back and look at what
24  was my actual time, you know, that I spent.  And when I
25  looked at it historically from '96 through, I think it

---

Page 75

1  was 2003, I actually think I lost money on that.  I got
2  250; but when I went back and looked at all of my time
3  from starting in '95 or '96, running right through 2003,
4  I think I had spent something like that or I had -- I
5  should have been billing something like that $220,000 or
6  $300,000.  So, I actually lost money.  Although it may
7  seem like a large number, at the end of the day, since
8  it was for future services, also, or at least my
9  understanding was future services, I never got another
10  penny, it sounds good; but it's not always as good as
11  you think.
12       Q.  (BY MR. COFFIN)  What was your hourly billing
13  rate at the time?
14       A.  I can't recall at this point, but it was not an
15  unreasonable number.  It was certainly less than a
16  national firm, less than even a Midco -- mid firm,
17  mid-size firm.  I kept it lower, both myself and the
18  people who work for me.
19       Q.  Did you do a similar type analysis for the fees
20  that were earned on the K-Pipe Group transaction?
21       A.  No.
22       Q.  Okay.  Turn to 233, please.
23       A.  (Witness complies.)
24       Q.  Are you familiar with this memorandum, sir?
25       A.  You mean prior to?

---

Page 76

1       Q.  Prior to receiving, yes.  I'm sorry.
2           MR. STERN:  Prior to receiving it
3  yesterday?
4           MR. COFFIN:  Whenever --
5           THE WITNESS:  Prior to receiving it this
6  week.
7       A.  I recall preparing a memo.  I can't recall
8  specifically whether it was this exact thing or not, but
9  I -- because my name is on it, I would presume that I
10  did write it.
11       Q.  (BY MR. COFFIN)  Okay.  I assume that you
12  prepared this memo in response to a request by Ernst &
13  Young, would that be correct?
14       A.  A general request.
15       Q.  A request for information from Ernst & Young?
16       A.  Correct.
17       Q.  And as far as you know, is this a -- is the
18  entire memo, does it contain an accurate description
19  about the activities of -- of K-Pipe?
20       A.  If I wrote it, it was accurate based upon what
21  I knew or would have concluded based upon my having read
22  documents, reading whatever it is that I needed to read
23  in order to know that I could draw a conclusion and say
24  these -- these pieces of information.
25       Q.  Okay.  Typically, what kind of things did you

---

Page 77

1  review?
2       A.  It could have been the Stock Purchase
3  Agreement.  It could have been the asset agreement.  It
4  could have been the working capital adjustment.  It
5  could have been the information.  It could have been
6  bank statements.  It could have been various other
7  documents, invoices.  It could have been, you know,
8  prior transactions that I would have known something.
9  It could have been the records of SCALP that I referred
10  to multiple times already.  Could have been any one of
11  these things, if -- if not more.
12       Q.  Okay.  And underneath the heading "Contribution
13  of Assets," do you see that?
14       A.  Yes.
15       Q.  It says "The K-Pipe Group was effectively
16  wholly owned by a partnership, Signal Capital
17  Associates, LP, on the closing date.  SCALP's address
18  and EIN are," and it lists those items.  Now, does that
19  conflict with what we saw earlier on the Limited
20  Partnership Agreement?  Because it looked like, in the
21  Limited Partnership Agreement, that Ashfield and
22  Cronulla actually owned 95 percent of K-Pipe at the
23  time.
24       A.  Well, you have to go back to my presumption
25  that I made earlier in response to your other questions.

**HUNDT REPORTING**
**214-220-1122**

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

Witness: Howard Teig

Page 78

1  If you recall, I said in connection with the payment of
2  the million 451 to each of Ashfield and Cronulla. I
3  indicated that it was a presumption that it was for a
4  payment for their interest in the partnership, but I
5  also indicated at that point in time that I could not
6  indicate as to when the agreement was made. I probably
7  could see it, but I don't recall seeing it or I don't
8  recall exactly what it said. But it is very possible
9  that that agreement was entered into prior to the actual
10  closing of the -- of the purchase of the stock. And
11  based upon this language here, I can only presume that
12  to be the result.
13     Q.  Okay.
14     A.  That the actual closing did occur before that.
15     Q.  And, again, you would have looked at the
16  agreement you think at the time or what would you have
17  looked at to be able to say that that --
18     A.  Whatever was available.
19     Q.  Okay.  Which you can't recall specifically at
20  this time?
21     A.  Correct.
22     Q.  Okay.  And the next item where it says "On
23  November 8" of '99?
24     A.  Yes.
25     Q.  And it mentions -- it says "SCALP contributed

Page 79

1  pursuant to a plan which would qualify under Section 351
2  of the Internal Revenue Code," and it shows 45 percent
3  of SCALP's holdings in Petro Holdings, LP; 36.75 percent
4  of SCALP's holdings in Universal Merit Securities; and
5  158,620 Canadian dollars.
6          Now, are these the assets that you
7  mentioned earlier that you were involved in as far as
8  determining which ones that SCALP would contribute to
9  K-Pipe?
10     A.  These were part of the assets --
11     Q.  Okay.
12     A.  -- that I referred to earlier.
13     Q.  Okay.  And there were more assets, is that what
14  you're saying, that SCALP actually owned?
15     A.  I would believe -- I can't say for sure; but I
16  believe, yes.
17     Q.  Okay.  And would it be other securities or
18  other forms of currency or both?
19     A.  Both.
20     Q.  Do you remember specifically what kind of
21  currency it was?
22     A.  Either Canadian -- if they owned currency, it
23  was either Canadian dollars or British pound sterling.
24     Q.  Okay.  And from where would SCALP have gotten
25  those assets?  Do you recall?  The interest in Petro

Page 80

1  Holdings, Universal Merit Securities and the Canadian
2  dollars?
3     A.  Petro Holdings and Universal Merit would have
4  been the result of them -- of SCALP having assigned some
5  asset to a prior in exchange for stock in those
6  companies.  So, this would have been in effect an
7  allocation the percentages specified of their ownership
8  interests that they had in each of those companies.
9     Q.  Okay.  And then below, it says "SCALP's
10  aggregate tax basis in the assets was $145,411,651," and
11  then you've got the breakdown.  Can you tell me how
12  those interests obtained those high tax basis?
13     A.  Well, for -- for Petro and Universal, they --
14  SCALP would have assigned some assets in exchange for
15  stock of that in a transaction which qualified for
16  Section 351 treatment, which, as a result, provides
17  carryover basis -- not only to the recipient of the
18  assets -- of the basis that they received, but also the
19  stock that the transfer gets back, also picks up the
20  carryover basis that it assigns.  It basically moves
21  over to the stock.  And this, therefore, would have been
22  a computation of that basis.
23     Q.  Did you perform that computation?
24     A.  I believe I would have, yes.
25     Q.  Okay.  And the same, I assume, for Universal?

Page 81

1     A.  Correct.
2     Q.  And then the Canadian dollars, tell me how that
3  generates or how that Canadian dollar amount, $158,620
4  had such a high tax basis.
5     A.  It actually goes back to a series of
6  transactions, you know, in '96, '94; and actually a lot
7  of those transactions are discussed in more detail in
8  the tax opinions that were provided.
9          Now, it -- you know, not only these, but I
10  think there were other tax opinions that were provided.
11  And, so, I had read those tax opinions, relied upon the
12  information and the conclusions reached in those
13  opinions by law firms, such as Chamberlain, Hrdlicka;
14  confirmed by Sherman & Sterling; referred to by other
15  lawyers, maybe Manatt, Phelps; Pillsbury, Madison,
16  Sutro; or whatever; and, you know, used the information
17  from those opinions to arrive, you know, to arrive at
18  the information.
19     Q.  Are those -- the transactions you said, you
20  described, which generated the high tax basis in these
21  Canadian dollars, are those described in some of the tax
22  opinions that I've given to you?
23     A.  I believe so.
24     Q.  Can you see which ones?
25     A.  If you look in your Government Section 257 --

21  (Pages 78 to 81)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

---

Page 82

1    actually 256 and 257 -- are they different?
2         MR. COFFIN:  Let's go off the record for a
3    second.
4         (Discussion off the record)
5       A.  It actually -- the transactions were really
6    discussed in 256, 257, I think also 258 and 9.  I
7    haven't just now read, or even in conjunction with
8    having received these, I haven't read the, you know,
9    these opinions in detail.
10      Q.  (BY MR. COFFIN) Okay.
11      A.  There was also another opinion that I recall
12   having seen that described the transaction, and I
13   thought that was written -- I think that was January in
14   '87.  I thought it was written sometime after that.
15      Q.  Do you recall who was the author of that
16   opinion?
17      A.  I can't recall absolutely at this point.
18      Q.  Look at 258.  Did you say written after January
19   of '97 or did you say --
20      A.  I believe so.
21      Q.  Okay.
22      A.  Okay.
23      Q.  Okay.  There's still another tax opinion you
24   think?
25      A.  I believe so.

---

Page 83

1       Q.  Okay.  It was dated sometime after January of
2    '97?
3       A.  Yes.
4       Q.  And who did you say was the author?  I'm sorry.
5       A.  I can't recall.
6       Q.  Okay.  Could it have been Chamberlain or any of
7    those law firms you mentioned earlier?
8       A.  It most certainly would have been one of those
9    firms I mentioned.
10      Q.  Okay.  Now, the -- again, at the bottom of 233.
11      A.  Yes.
12      Q.  The amount of the tax basis and the assets that
13   I believe you -- was $145,411,651, and is that
14   something -- an amount that Mr. Furman or Mr. Hoffman
15   would have given you saying "We need this much tax basis
16   in certain assets to be contributed over to K-Pipe"?
17      A.  No, not like that.
18      Q.  Okay.  How was the instruction typically given
19   from Mr. Furman and Mr. Hoffman?
20      A.  It would have been something -- just using
21   these numbers as a guide, okay?
22      Q.  Uh-huh.
23      A.  They would have, for example, in this case,
24   most likely, as I said earlier, that I communicated with
25   Mr. Hoffman, he may have said to me that, you know,

---

Page 84

1    we're looking -- that we need to have -- we need SCALP
2    to contribute assets with -- that were produced with a
3    tax basis for capital purposes of approximately maybe
4    $105 million or $106 million, and something that will
5    produce ordinary losses or at least have ordinary
6    characteristics of some number like 41 million or
7    40,000,500 or 40 million or something like that.  And,
8    so, he would have given me some number, you know; and I
9    would have had to have worked to see -- I would have had
10   to go through the inventory to see what would have made
11   sense to fit those parameters.
12      Q.  Do you recall in the inventory what the total
13   amount of tax basis was available?
14      A.  At the time of this?
15      Q.  Yes.
16      A.  No.
17      Q.  At one time was there over $800 million of tax
18   basis available, according to that inventory?
19      A.  I don't think -- I don't think it ever reached
20   800.
21      Q.  Okay.  793 million?
22      A.  I saw the 793 in one of the opinions by
23   Chamberlain, but I actually thought that the number that
24   I had used at one point in keeping books and records was
25   closer to 750; but it was somewhere between 750 and 793.

---

Page 85

1    I don't have those records anymore, so I can't verify
2    that.
3       Q.  And, again, the origination of the basis of
4    that -- that amount of basis was lease-strip
5    transactions that occurred in the past?
6       A.  My recollection is yes.
7       Q.  Now, the 145 million of basis, again, now, is
8    there any relationship to that figure, the 145 million,
9    and the amounts that were wired to each Cronulla and
10   Ashfield International?
11      A.  I don't believe there were.
12      Q.  Okay.  Because the amounts that were wired were
13   1,451,000 which would indicate maybe 1 percent each.
14      A.  I can only stand by what I said.
15      Q.  You mentioned capital loss and ordinary loss.
16   The Canadian dollars, the conversion of that amount
17   under the Tax Code result in ordinary losses?
18      A.  Yes.
19      Q.  Okay.  And the other two Petro and Universal
20   would result in capital losses --
21      A.  Correct.
22      Q.  -- on the sale of those?
23      A.  Correct.
24      Q.  On the next page under the heading "Disposition
25   of Assets," other than I guess -- when those assets were

---

22  (Pages 82 to 85)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

Witness:   Howard Teig

Page 86

1  disposed, the resulting loss was a tax loss; is that
2  correct?
3      A.  Correct.
4      Q.  Okay.  Was there any other purpose for the sale
5  of those assets that you know of?
6          MR. STERN:  Objection, form.
7      A.  My understanding was that there was a goal to,
8  at the time of the contribution, to provide extra
9  capital to the company.  So, as you can see from the
10 journal entry, there was approximately $700,000 of cash
11 provided to that company to be able to use to spend
12 however it felt it needed it.  So, that would have been
13 its objective, and it would have been achieved by that.
14     Q.  (BY MR. COFFIN) Okay.  And how do you know
15 that?  Do you recall talking to somebody about that?
16     A.  I remember conversations with Mr. Furman and
17 Forster.
18     Q.  At that period of time hadn't the sale of the
19 assets to Midcoast already occurred as of December of
20 '99?
21     A.  Yes.
22     Q.  So, wouldn't K-Pipe have had those funds or any
23 profit, arbitragized profit you mentioned earlier, to
24 the working cash considerations?
25         MR. STERN:  Objection, form.

Page 87

1      A.  Presumably they had some assets -- some
2  liquidity value, but they obviously felt they needed
3  more.
4      Q.  (BY MR. COFFIN) With regard to the journal
5  entries at the top of that second page, the comment you
6  made is "The fair market value of the Petro and
7  Universal assets has been based upon the values realized
8  later in the year since no appraisals of values were
9  obtained at the time of the contribution."
10         Was there a reason why no appraisals were
11 obtained?
12     A.  They just weren't.
13     Q.  Was there an instruction to not get appraisals
14 or just no instruction at all?
15     A.  I believe the latter.
16     Q.  And we discussed the JRCR Corp. and Riversea
17 Corp. I think earlier in your testimony.
18         Does this -- looking at this, does this
19 refresh your recollection at all as to who may have been
20 the principals or owners of either of those
21 corporations?
22     A.  Which ones?
23     Q.  Riversea Corp. and JRCR Corp.?
24     A.  JRCR, no.  I don't think you ever asked me
25 about Riversea.

Page 88

1      Q.  Oh, okay.  Well, are you aware of the owners or
2  principals of Riversea Corp.?
3      A.  Only hearsay.
4      Q.  Okay.  What do you know about that?
5      A.  I had been led to believe that the owners were
6  that Robinson group of parties that you mentioned,
7  Robinson Renterio, Robinson Trust.
8      Q.  And I think -- did you testify that that was
9  your -- it's your belief that that was associated with
10 an Indian tribe?
11     A.  Yes.
12     Q.  Robinson Ranchero Citizens Council or Robinson
13 Trust Company?  Any association with either Mr. Furman
14 or Mr. Forster?
15     A.  I do not believe so.
16     Q.  Did you perform any accounting work for
17 Riversea Corp.?
18     A.  No.
19     Q.  Were you aware that Larry Austin had some
20 association with Riversea Corp.?
21     A.  What do you mean by "association"?
22     Q.  Did you have a contact at Riversea Corp. that
23 was Larry Austin?
24     A.  I had indicated earlier that -- at least I
25 believe I indicated earlier that Mr. Austin was how I

Page 89

1  learned of Riversea.
2      Q.  Okay.  You may have.  Your memory is better
3  than mine.
4          Did Mr. Austin represent Riversea?
5      A.  Other than, as I indicated earlier, I don't --
6  I don't know if he did or did not.  At least I don't
7  recall.
8      Q.  Mr. Austin is an attorney; is that correct?
9      A.  Yes.
10     Q.  Okay.  So, when I said "represented," I meant
11 in that capacity.
12     A.  I don't know what capacity he may or may not
13 have represented Riversea.  Or I can't recall at this
14 time would probably be better to say.
15     Q.  And the cash activities on the third page of
16 Government Exhibit 233, do you recall where you would
17 have gotten this information?
18     A.  It would have -- as you had asked me earlier,
19 it would have started off from the bank statement
20 because you had asked me if I had ever seen any bank
21 statements, and this would have come from the bank
22 statement in combination with other information that I
23 need to support the transactions that were listed here,
24 me thinking that each cash movement is ultimately a
25 transaction.

23  (Pages 86 to 89)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:  Howard Teig**

Page 90

1    Q.  Okay.  There's an entry in the middle of the
2  page "Cash 10,039,536" that's a debit and then a credit
3  to cash State Street Bank for the same amount.  Do you
4  recall what the purpose of that entry was or transfer
5  was?
6    A.  No, I do not.
7    Q.  Did K-Pipe maintain a bank account at State
8  Street Bank?
9    A.  I don't recall.  I don't know if I knew.
10    Q.  On the final page of that document at the top
11  you say "The above cash transactions result in a cash
12  balance of $1,214,473."  Do you know whatever happened
13  to that cash balance?
14    A.  No.  Well, today I don't know.
15    Q.  Back then you may have known, I guess?
16    A.  I may have known only because, as you know from
17  later in the years, the year 2000, I prepared the tax
18  return.  So, one presumably would assume that I, in
19  preparing that tax return, would have had information to
20  support the decline of that balance of a million 214 at
21  the end of that year.
22    Q.  Okay.  Turn to Government Exhibit 234.
23      MR. LYNCH:  I thought that's where we
24  were.
25      THE WITNESS:  We were at 33.  Where is 34?

Page 91

1      MR. LYNCH:  I don't have a 34.
2    A.  I don't have a 34.
3      MR. COFFIN:  You don't?
4      THE WITNESS:  Somebody better go back --
5  you must have left it in Chicago.
6      MR. LYNCH:  I don't think I did.  Not this
7  one.
8    Q.  (BY MR. COFFIN) I only have one question on
9  this document.  Do you recall receiving this document?
10    A.  I cannot recall at this time.
11    Q.  When you got a request like this, how would you
12  usually proceed in responding?
13    A.  I would have used every effort possible to me,
14  as I would with anyone asking me questions, and provide
15  the information.
16    Q.  Would you have taken it to Mr. Furman or
17  Mr. Austin or Mr. Forster?
18    A.  Whoever was necessary.
19      MR. LYNCH:  It's right here.  These are
20  some supplemental documents.  I apologize.
21      MR. COFFIN:  That's okay.  Just put it in
22  that binder.
23    Q.  (BY MR. COFFIN) Look at Government Exhibit 235.
24    A.  (Witness complies.)
25    Q.  And then turning back to 234 where E&Y had

Page 92

1  requested certain information, and then you e-mailed
2  them back on August 30 with an attachment containing
3  responses.  Would you agree that these are your
4  responses to the their e-mail?
5    A.  I think it's logical to conclude that.
6    Q.  Unfortunately, the memo is dated December 5th
7  of 2003.
8    A.  I can't explain that.
9    Q.  Can you still conclude, though, that
10  this is probably your response to their earlier request?
11    A.  I think so, and I can't find a reason why it's
12  possible to have had a December 5, 2003 date.  In some
13  cases it's happened to me before, and I can only presume
14  that it happened here is I had an auto update, some
15  feature of Word, to provide me an auto update of dates.
16  And when I last opened it or saved it might have been
17  this date.
18    Q.  Okay.  Did the IRS -- has the IRS requested
19  information from you or documents recently in
20  conjunction with this examination?
21      MR. STERN:  What examination?
22    Q.  (BY MR. COFFIN) The examination of Midcoast.
23    A.  Midcoast?
24    Q.  Uh-huh.
25    A.  I don't think I've ever heard from the IRS

Page 93

1  other than this -- other than this matter.
2    Q.  Okay.  What about the exam of K-Pipe Group?
3  Did you get a request for information from the IRS?
4    A.  Yes.
5    Q.  And did you provide documents?
6    A.  I would have to go back and refer to my
7  testimony of 2003; but as I recall from my reading of
8  that just this week, is that I had limited amount of
9  information at that point in time to submit.
10    Q.  Since then have you found any more information?
11    A.  No.
12    Q.  On the memorandum, Item No. 5 and 6, you advise
13  that SCALP acquired Petro Holdings, LP during July of
14  '99 and that SCALP acquired Universal Merit Securities
15  during June of '99.  Could you tell me from where did
16  SCALP acquire those interests?
17    A.  I can't remember who from.
18    Q.  Could you tell me what kind of transactions?
19  Were they purchase transactions or 351 transactions?
20    A.  The fact that there was, from the earlier memo,
21  the fact that there was basis of whatever the amounts
22  were that add up to the 145 total approximate or 105
23  with respect to these two in total, would lead me to
24  believe that there was, at a minimum, a contribution of
25  assets by SCALP into these entities.  Was there also

HUNDT REPORTING
214-220-1122

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

---

Page 94

1  acquisition of these companies separate and apart from
2  that? I can't recall.
3      Q.   Item No. 10 on the next page talking about the
4  allocation of the proceeds among the various assets, do
5  you see that?
6      A.   Yes.
7      Q.   Can you tell me why is that important?
8      A.   Because the government in -- the government, in
9  their rules and regulations, requires one to report your
10  proceeds on Schedule D or 4797 or wherever else within
11  your tax return when you -- when you sell an asset. So,
12  this was basically provided to E&Y to allow them to
13  follow the government regulations.
14      Q.   Was the allocation ever determined, to your
15  recollection?
16      A.   I can't recall.
17      Q.   Do you remember if you assisted in providing
18  the allocation at all?
19      A.   I would not have done that. It would have only
20  been third-party information provided to me, if I had it
21  ever, and I can't recall at this time if I ever saw it.
22          By the way, in fact, as confirmation of
23  that, there was an e-mail in the package that you sent
24  me that basically said -- it was an e-mail from E&Y to
25  me asking me for the 8594, which is the schedule where

---

Page 95

1  you show the allocation. And I had said I never had it,
2  I never got it; and that's just basically a summary of
3  the e-mails. I never saw it. So, at that time I can
4  only respond, you know, that that was what happened.
5      Q.   Okay. Do you recall -- if you'll flip through
6  the next pages, can you tell me which e-mail it was?
7      A.   Excuse me?
8      Q.   If you will flip through the next exhibits, I'm
9  sorry.
10      A.   Which exhibits?
11          MR. STERN: What are they? I don't have
12  your notebook.
13          MR. LYNCH: 237, 239.
14          MR. COFFIN: 232 as well.
15      A.   Well, it appears on 236 and 237 that -- and
16  239 -- let me hold off on 239 for a second because I've
17  got to look at that -- but on 236 and 237 it appears
18  these are e-mail communications between myself and E&Y
19  in which they've asked me for information. I've
20  provided responses or at least tried to discuss things
21  that they've inquired about.
22          239, let me look at it. 239 effectively
23  is a narration between E&Y and myself in their
24  preparation of their -- of the tax return for 1999, as
25  is the next section. You said 240?

---

Page 96

1      Q.   (BY MR. COFFIN) Yeah, 240 is one as well.
2      A.   240 is also -- it appears to be, you know, all
3  that, just part of the give and take back and forth
4  conversations between myself and E&Y.
5      Q.   All right. Did you look at 232 as well? I
6  just want to know if it's the same type of stuff.
7      A.   Yes.
8      Q.   All right. One of the e-mails, 232 talks about
9  Mr. Hoffman's departure from Fortrend. Do you recall
10  Mr. Hoffman leaving Fortrend?
11      A.   Yes.
12      Q.   Do you recall what the circumstances were
13  surrounding his departure?
14      A.   He chose to go off into a new venture. He was
15  working with -- in some capacity in a -- I guess it's a
16  type of equity hedge fund.
17      Q.   Okay. Turn to 238, please.
18      A.   Where is it?
19          MR. LYNCH: Hold on just a second. Here
20  it is.
21      Q.   (BY MR. COFFIN) This looks like e-mail
22  correspondence between you, Mr. Furman, Mr. Forster,
23  Alice Dill, Lily Young and Larry Austin; is that
24  correct?
25      A.   Correct.

---

Page 97

1      Q.   Who is Alice Dill?
2      A.   She at the time was a paralegal who did work
3  for Fortrend.
4      Q.   Did she have a lawyer she was working with as
5  well at Fortrend or just --
6      A.   Just.
7      Q.   Just herself. Okay. What about Lily Young?
8      A.   Lily did bookkeeping work for Fred Forster.
9      Q.   Have you had a chance to look at the text of
10  your e-mail?
11      A.   Uh-huh.
12      Q.   Okay. Had there been -- was there a problem
13  from -- in getting a response from Mr. Furman or
14  Mr. Forster?
15      A.   Well, only -- based upon the first sentence, I
16  would obviously have to say yes. It says I sent a
17  couple of e-mail -- I sent a couple of messages. The
18  fact that I sent a couple prior to this means that they
19  didn't respond, meaning that there must have been some
20  problem. Could have been anything. They just chose to
21  ignore me. It's possible.
22      Q.   With regard to the true-up, was that something
23  that you recall discussing with them?
24      A.   At some point.
25      Q.   You do recall!

25  (Pages 94 to 97)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:  Howard Teig**

Page 98

1     A.  Yes.
2     Q.  Was that ever resolved between Midcoast and
3  Fortrend?
4     A.  I can't -- I can't remember.  Was it with
5  Midcoast?  I'm not -- was it with Midcoast?  I don't
6  recall if it was even with Midcoast or with the sellers
7  of the shares, which is not Midcoast.
8        MR. STERN:  Or both.
9     A.  Or both, yeah.  Actually I guess when -- when
10  you read --
11     Q.  (BY MR. COFFIN) The second paragraph says "I
12  need to know whether you intend to pay the amount due to
13  Midcoast Energy."  Is that the true-up amount or a
14  true-up amount?
15     A.  One second.  Let me read this again.
16        When I read this, and then I recall from
17  something else, there was actually two true-ups.  There
18  was a true-up on the stock purchase and a true-up on the
19  asset agreement.  And since at the time K-Pipe owned --
20  I think you said it was Bishop -- it would have handled
21  the true-up with Midcoast and it also would have handled
22  the true-up with the sellers of Bishop.  So, it was
23  effectively in the middle, thus Midco, between the two
24  parties in negotiating of both true-ups in trying to
25  resolve them, and this was part of it.

Page 99

1     Q.  Okay.  And in either instance do you recall if
2  the true-up was ever resolved between the two parties?
3     A.  I can't recall.
4     Q.  Give me just a second here.  On 239 this is
5  more requests and discussion with Ernst & Young
6  between -- between you and Ernst & Young; is that
7  correct?
8     A.  Yes.
9     Q.  In the middle of the page it says "I have also
10  reduced retained earnings for the 2,902,000 distribution
11  to SCALP."  Was there a 2,902,000 distribution to SCALP?
12     A.  Absolutely, and I described it earlier.  It's
13  twice the million 451 that was ultimately paid.  As you
14  recall, I indicated that the payment was not made by
15  K-Pipe but was effectively, you know, to Cronulla and
16  Ashfield, the million 451, that the payment actually
17  came by SCALP and it physically may have come out at the
18  direction of SCALP out of K-Pipe.  This e-mail is
19  basically confirming that.  Million 451 times two is
20  2 million 902.
21     Q.  But it says "distribution to SCALP."
22     A.  Sure.
23     Q.  I see.
24     A.  Because SCALP was the sole owner at the time,
25  and therefore -- it's an obligation of SCALP.

Page 100

1     Q.  Okay.  And then from SCALP it went to pay
2  Ashfield and Cronulla?
3     A.  Correct.
4     Q.  Go to 246, please.  This appears to be some
5  more e-mail correspondence between you and Bruce Snyder
6  of Ernst & Young, correct?
7     A.  Yes.
8     Q.  Dated?
9     A.  September 14th.
10     Q.  September 14th, 2000; and you say you spoke to
11  Fred Forster.  "His thought is not to make the election
12  to forego the carryback.  There is no intention to use
13  the carryback either forward or back and Fortrend
14  recognizes the audit risk associated with the carryback.
15  However, he sees no benefit making the election now."
16        Do you remember what this was about?
17     A.  Sure.
18     Q.  How was the carryback generated?
19     A.  It would have been the -- tax return for
20  1999 that E&Y prepared.  That, based upon this, that
21  return showed a loss on Page 28; and at the time of that
22  loss, you automatically assumed under IRS laws that you
23  carried the loss back until unless you make a formal
24  election to carry it forward.  And, so, this was a
25  request by E&Y as to how to proceed, whether to just let

Page 101

1  it -- not to say anything and, therefore, have it
2  effectively carryback first, then carry forward or to
3  elect the -- the waiver to carry it back.
4     Q.  Okay.  And then it says "There is no intention
5  to use the carryback either forward or back."
6     A.  Uh-huh.
7     Q.  And why is that?  Or why wouldn't they elect to
8  use it either forward or back?
9     A.  Because they probably were not expecting to
10  have sufficient -- to pay income taxes that would have
11  generated the need to get money back.  So, the loss is
12  effectively non-usable against anything.
13     Q.  Could it not be carried back into the
14  operational income of the Bishop group?
15     A.  It -- I would have to think -- probably could
16  have been, but there was a decision made.
17     Q.  Okay.  It says "Fortrend recognizes the audit
18  risk associated with the carryback."  What's the audit
19  risk?
20     A.  If you file a carryback claim and ask for
21  income taxes in excess of $1 million from the Internal
22  Revenue Service, it's subject to an automatic review by
23  the Joint Committee, which is a very in-depth audit of
24  the company; and it's an automatic audit.  And, so, they
25  decided there was -- they were not going to put

26 (Pages 98 to 101)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

Page 102

1    themselves subject to that.
2        Q.   Look at 254. That's the tax return of K-Pipe
3    Group, Inc. for 1999; and you mentioned that the
4    carryback was listed on -- a loss is on certain pages of
5    the return?
6        A.   I've got a section with nothing in it. I have
7    a 2000 return.
8        Q.   Say that again?
9        A.   I thought later on I had a 2000 return. Wait a
10   minute. Maybe not. No, you know something? It was put
11   after 259.
12       Q.   So the tab was in the wrong place?
13       A.   No.  There's some stuff on 259, and then they
14   put in the return after 259. The return should actually
15   be under 249, I guess.
16       Q.   Take a look at 254, please, which, I believe is
17   the return, correct?
18       A.   I'm going to put it in the right place. Bear
19   with me. Yes.
20       Q.   Okay. Now, you mentioned there is the loss,
21   the carryback loss or the loss that could have been
22   carried back or carried forward?
23       A.   Oh, actually -- I guess looking at the '99
24   return --
25            MR. LYNCH: Hold on a second.

Page 103

1        A.   I don't -- I didn't think you could carry back
2    capital -- I don't think you can do the waiver of
3    capital losses. I thought that was an automatic. I
4    thought it was only operating -- I'm not sure whether --
5    my understanding of the tax law, maybe I'm wrong on
6    this, is that the ability to waive the carryback was
7    with excepted operating losses, the amounts reflected on
8    Line 29.  And yet it appears on -- on this return that
9    on Schedule D that there was a capital loss reflected
10   here. I did not think that that ability to carry back
11   or waive -- or the ability to forego the carryback
12   applied to capital losses. I could be wrong on that.
13   Maybe that's what E&Y was pointing out that issue.
14   Maybe there was an ability to carry back capital losses
15   that either I knew at that time or I never knew existed.
16       Q.   (BY MR. COFFIN)  Okay.
17       A.   If you recall also from another e-mail, if you
18   recall from another e-mail in this whole traffic, I said
19   I never saw the tax returns before they were finalized.
20   So, I would never have known what these numbers were.
21       Q.   I see. So, I guess I'm a little unclear then.
22   Was there an ability to carry back or carry forward this
23   capital loss on Schedule D of the return?
24       A.   My understanding was that capital losses have
25   to be carried back, and then whatever is not used,

Page 104

1    carried forward. Based upon the e-mail that you
2    originally pointed me to, it appears that E&Y was asking
3    me about that because the amount on Page 1 of the return
4    is not a loss. So, therefore, they must have been
5    thinking about the capital. I did not think the rules
6    applied to capital losses, and there was only ordinary.
7    But, you know -- you know -- now I forget what the
8    question was.
9        Q.   So, at the time -- at the time of the e-mail
10   was -- who was correct at that time? Was E&Y correct
11   about the ability to carry forward --
12       A.   I'm not going to judge whether they were right
13   or wrong.
14       Q.   Okay.
15       A.   As I told you, I'm not -- maybe I was -- I
16   already said in the beginning, I may have been wrong in
17   my recollection of what the law was at that time about
18   this issue.
19       Q.   But in any event you would have talked to
20   Mr. Forster about that?
21       A.   I said it in the e-mail, so I must have.
22       Q.   So, there was some misunderstanding between you
23   and E&Y at the time?
24       A.   That's my thought today. Was that my thought
25   back then?  I can't recall.

Page 105

1        Q.   I think you answered my question. Did you ever
2    review this return before it was filed?
3        A.   No. I said that there was even an e-mail
4    confirming that I had not seen the return -- somewhere
5    in this packet there's an e-mail confirming that -- or
6    this one -- that I never saw the return itself before it
7    was finalized.
8        Q.   Do you know if anybody else at Fortrend would
9    have reviewed the -- the tax return before it was filed?
10       A.   The answer would have been only Mr. Austin. He
11   would have received it on what I saw on September 15th.
12   If he chose to look at it that day, he may have as the,
13   you know, officer of the company.  I -- I don't know
14   whether he did or did not. I don't believe anyone else
15   at Fortrend would have handled that.
16       Q.   Look at Government Exhibit 249, please.
17       A.   (Witness complies.)
18       Q.   Prior to me sending you this document,
19   Mr. Teig, had you had a chance to -- or had you seen
20   this document before?
21       A.   Perhaps.
22       Q.   Would somebody have asked you to review it?
23       A.   I would presume that they would have, but I
24   just can't recall whether I saw it or not.
25       Q.   Do you know who would have requested it?

**HUNDT REPORTING**
**214-220-1122**

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

Page 106

1     A.   Who would have requested that I saw it?  Is
2  that your question?  That I reviewed it, I mean?
3          I would presume Mr. Austin or Mr. Furman;
4  but I can't be sure because, as I said, I don't recall
5  if I saw it.
6     Q.   And it's signed by Mr. Furman.  Do you
7  recognize his signature on the back page?
8     A.   Yes.
9     Q.   Okay.  Do you think it was prepared in
10  conjunction with the Midco transaction at issue here?
11     A.   It was prepared in conjunction with Manatt
12  Phelps having issued an opinion and asking for
13  representation of the facts that were incorporated into
14  their opinion.
15     Q.   And with regard to their opinion, which is in
16  Government Exhibit 250, would that have been prepared --
17  well, let me back up.  Would you have reviewed the tax
18  opinion, too, at the time, in November of 2000?
19     A.   I can presume that I would have.
20     Q.   And who from Fortrend would have requested that
21  Manatt prepare this tax return?
22     A.   Either Furman or Forster.
23     Q.   Do you know what purpose or why they would make
24  such a request?
25     A.   Oh, absolutely.  Just as I indicated to you

Page 107

1  that I would like to rely upon opinions and that I have
2  done so in computing the basis and that I referred to
3  the Chamberlain opinions that we went back and looked
4  at.  So, too, Mr. Furman and Forster would have wanted
5  to make sure that what they were doing was in compliance
6  with tax law and they would have wanted confirmation of
7  that from a third party, a party such as a law firm who
8  was able to render an opinion that the facts and
9  circumstances were correct and that they could rely upon
10  the transaction that they -- the transactions that they
11  did in, you know, in producing the tax returns that E&Y
12  produced so that the numbers were properly reflected.
13     Q.   Okay.  Go back to 249, please, which is the
14  representation letter.
15     A.   Uh-huh.
16     Q.   Item No. 2 deals with the basis of the assets
17  that were contributed to SCALP; is that correct?
18     A.   Yes.
19     Q.   And the amount --
20     A.   Contributed by SCALP.
21     Q.   Contributed by SCALP.  I'm sorry.  And the
22  amount shows a total of $138,666,295 do you see that?
23     A.   Yes.
24     Q.   Then you go back to 233, and the tax basis that
25  you had listed in your memo of these three assets was

Page 108

1  145,411,651.  Do you recall what the difference would
2  be?
3     A.   Well, the answer is "no."
4     Q.   And you could see the difference in the
5  individual amounts assigned to each asset, if you
6  compared the two documents.
7     A.   Right.  I recalled this question was asked of
8  me in 2003 by the Internal Revenue Service, and it had a
9  similar answer at that point in time that I could not
10  explain the difference at this time -- at that time, and
11  that holds true today.
12     Q.   All right.  And Item No. 3 on 249 still, "Both
13  Parent and Subsidiary had substantial non-tax business
14  reasons for engaging in the Contribution."
15          What was the non-tax business reason?
16     A.   Well, as I had indicated earlier, it was the
17  view of both parties to provide additional capital to
18  the company to be able to pay for expenses, current and
19  future, that expected to be incurred.  There may have
20  been others, but those are the ones that I recall or
21  that's the one I recall.
22     Q.   It says both "Parent and Subsidiary entered
23  into the Contribution with a view toward making an
24  economic profit apart from tax consequences."
25          Do you know what that economic profit was

Page 109

1  that was anticipated?
2     A.   I can't be sure.
3     Q.   And these documents, including the tax
4  opinions, were drafted in November of 2000 over a year
5  after the Midco transaction at issue in this case
6  closed?
7     A.   I'm sorry.  Please state it again.
8          MR. LYNCH:  He's just pointing to the date
9  of the opinions.
10     Q.   (BY MR. COFFIN) The dates of the opinions were
11  more than a year after the Midco transaction had closed
12  in this case.
13     A.   Uh-huh.
14     Q.   Do you know why so far into the future the
15  opinion was obtained?
16     A.   No.  Or at least I don't recall at this time.
17     Q.   Okay.  And I'm sorry.  Back on 249, Item 12 it
18  says "The Contribution occurred under a plan agreed upon
19  before the Contribution in which the rights of the
20  parties were defined."  Do you know what the plan was?
21     A.   It was a plan of contribution.
22     Q.   Was there a written plan that you know of?
23     A.   I believe there should have been.  I would
24  expect there would have been.
25     Q.   Okay.  Do you recall seeing one?

28  (Pages 106 to 109)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:  Howard Teig**

Page 110

```
1     A.  I can't recall.
2     Q.  And the tax opinion, 250, did you rely on that
3  opinion for any reason?
4     A.  Well, ultimately -- well, no, as I said, I
5  can't -- it's unclear to me about the difference of the
6  numbers that we spoke about.  But in general, I guess in
7  conversing with E&Y, as you pointed out, this opinion is
8  dated after the return was filed.  I probably had had
9  conversations -- I would have thought I would have had
10  conversations with people at Mannat Phelps to understand
11  that they were comfortable with the transaction and that
12  the issuance of the opinion was somewhat of a formality
13  at that point in time.  I believe I would have been
14  uncomfortable providing information to E&Y that would
15  result in something contrary to what I had -- where the
16  opinion would have had a contrary result to what I had
17  known.
18     Q.  Okay.  252, please.  Do you recall the subject
19  matter of this e-mail between you and Mr. Austin?
20     A.  I have a vague recollection of E&Y having
21  messed up somewhere, but that it didn't provide -- it
22  didn't result in any bottom line error, "bottom line"
23  being tax liability being due.  Thus, my reference to
24  CYA.
25     Q.  Okay.  So, you don't recall whether or not --
```

Page 111

```
1  it appears they double counted basis of 69 million.  So,
2  would that have resulted -- would that increase the --
3  the loss or --
4     A.  Well, if you recall, there was a capital loss
5  somewhere -- I think there was a capital gain of 13,000
6  in 1999 and a capital loss of 103.  If I presume that's
7  correct, that's a 90 million-dollar net capital loss.
8  I'm presuming what they are saying is that the 69 comes
9  off of the 103 -- off the 90 resulting -- and there
10  should have only been a $21 million net capital loss
11  carryover into the future years.
12     Q.  Okay.
13     A.  As I said, thus the reference of CYA.
14     Q.  Do you have 253?
15     A.  Yes, now I do.
16     Q.  Okay.  This is a letter dated October 10 of
17  2000 signed by Larry Austin to Bruce Snyder of Ernst &
18  Young; and it appears that this is what resulted from
19  the conversations you had with E&Y in the prior exhibit,
20  the e-mail?
21     A.  Uh-huh.  It seems to match up identically to
22  what I just went through without even realizing it.
23     Q.  Would you have reviewed this document before
24  Mr. Austin signed it?
25     A.  Maybe.  It's not illogical to think that
```

Page 112

```
1  Mr. Austin would have asked me about it.
2     Q.  Okay.  And the last sentence says "Instead by
3  receipt of this letter you have my assurance that the
4  amount of the capital loss carryover or carryback will
5  be adjusted by the exact amount of approximately
6  69 million duplication amount to the correct and
7  appropriate amount."
8     A.  Which is my reference from -- using my numbers
9  from 90 down do 21.
10     Q.  Was that correction ever made or adjusted?
11     A.  The only way I can verify this at this time is
12  if I go and look at the 2000 return that you've included
13  somewhere in this package that I prepared, and that
14  would most likely indicate.
15     Q.  Yeah, I don't think it's in there.
16     A.  Maybe it was '99.  I thought there was some
17  return somewhere that I prepared.  Maybe it was in this
18  packet.
19          MR. STERN:  I think it was in that
20  package.  We tried to give him more information just so
21  he could be fully informed.
22          MR. COFFIN:  Let's take a restroom break.
23          (Recess taken from 1:55 to 2:07.)
24     Q.  (BY MR. COFFIN) Okay.  Let's go to Government
25  Exhibit 321, please.  And we've looked at this several
```

Page 113

```
1  times.  Mr. Teig, would you have had occasion to review
2  this document back in 1999?
3     A.  I might have seen it.
4     Q.  Okay.  Who would draft something like this?  Do
5  you know?
6     A.  A lawyer.
7     Q.  Do you know which lawyer it could have been?
8     A.  Not definitely.
9     Q.  Would it have been somebody from one of the
10  firms you just mentioned or you mentioned earlier?
11     A.  I would presume.  I would presume it would have
12  been someone from Lebouef, Lamb; but I may not be right.
13     Q.  But you do recall reviewing this document; is
14  that correct?
15     A.  I don't recall reviewing it.  It's very
16  possible I have seen it.  And I'm not sure what you mean
17  by "reviewing it."
18     Q.  Well, did you have occasion to look at it; and
19  for what reason would you have looked at it?
20     A.  Just as far as recordkeeping activity,
21  functions go that I mentioned, or providing information
22  to E&Y.
23     Q.  Do you know if the $48,000 contributed by
24  Ashfield and Cronulla would have been deposited in a
25  bank account?
```

29  (Pages 110 to 113)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

Witness:  Howard Teig

Page 114

1    A.  No idea or no recollection.  I don't know
2  which.
3    Q.  All right.  Now we're to the Government
4  Exhibit 255, please.  We're going to go back to the
5  early '90 years or middle '90 years with these exhibits.
6  This particular tax opinion by Chamberlain, Hrdlicka to
7  DWJ&R Leasing, L.P.  Tell me again who DWJ&R Leasing,
8  L.P. was.
9    A.  It was a partnership.
10   Q.  Is it the predecessor to SCALP?
11   A.  Yes.
12   Q.  Okay.  And in '94, did you have occasion to
13  review this particular opinion?
14   A.  I know I saw it.  I don't know if I -- in '94
15  if I reviewed the opinion itself.
16   Q.  Okay.
17   A.  I would have -- hold on a second.
18   Q.  Let me put it this --
19   A.  I think I would have reviewed some aspects of
20  the opinion.
21   Q.  Okay.  Would you have reviewed it -- would you
22  have relied upon it in performing services for K-Pipe or
23  SCALP with regard to this -- the Midco transaction at
24  issue here?
25   A.  Ultimately, this, as well as the other opinions

Page 115

1  that are referred to.  Not by itself, but all of them
2  together.
3    Q.  Are you familiar with the entity Atrium Finis,
4  F-I-N-I-S?
5    A.  Yes.
6    Q.  Okay.  What do you know about that entity?
7    A.  It was a partnership, a British partnership.
8    Q.  And Equilease Leasing?
9    A.  I remember that it was -- it was a partnership.
10  I don't know -- it was a partnership.
11   Q.  Equilease Leasing Associates is the name of
12  that, right?
13   A.  Yes.
14   Q.  Are you familiar with a gentleman by the name
15  of Joel Malin?
16   A.  Yes.
17   Q.  Okay.  How did you know about Mr. Malin?
18   A.  I had known him through the years in connection
19  with certain transactions.
20   Q.  Do you associate him with Equilease Leasing
21  Associates?
22   A.  In some capacity.
23   Q.  And when you talked about the partnership
24  earlier, Autochton Associates, do you associate
25  Mr. Malin with that entity?

Page 116

1    A.  Once again in some capacity.
2    Q.  There is a couple of other entities listed
3  there, Capital Asset Partners.  Are you familiar with
4  that entity?
5    A.  As I was Equilease.
6    Q.  Okay.  Was Mr. Malin associated with Capital
7  Asset Partners?
8    A.  Well, in some capacities as the party who --
9  and what I mean by "in some capacity," as the party who
10  may have introduced me, you know, indirectly to these
11  entities.
12   Q.  Okay.  And then CMA Leasing Associates, are you
13  familiar with that entity?
14   A.  The same.
15   Q.  Okay.  Of these partnerships, did they
16  ultimately -- did they have ultimate -- let me strike
17  that.
18        Were tax-neutral entities the ultimate
19  owners of those partnerships listed there?
20   A.  I'm sorry?  Say that again.
21   Q.  Were tax-neutral entities the ultimate owners
22  in each of these entities listed here?
23   A.  I believe no knowledge -- I believe I have no
24  knowledge.
25   Q.  CMA Leasing Associates, was that the same CMA

Page 117

1  that was in the tax court case involving CMA
2  Consolidated, Incorporated?
3    A.  I don't believe I know that.
4    Q.  Okay.  This opinion, does it describe a lease
5  stripping transaction?
6    A.  Have to read it.
7    Q.  Okay.  Look at the Summary of Transactions.
8    A.  If you look at Items A through E, it's
9  effectively very similar to the way I described it
10  earlier.
11   Q.  Okay.
12   A.  Oh, and just to correct one thing, I guess now
13  reading this I made a mistake earlier.  Atrium Finis is
14  a Delaware partnership.  I had said it was -- I don't
15  think I said it was somewhere else, different
16  jurisdiction, but it's Delaware.
17   Q.  All right.  Do you know who the principals of
18  Atrium Finis were?
19   A.  When?
20   Q.  Back in the time of this opinion, July of '94.
21   A.  Yes.
22   Q.  Who were they?
23   A.  Michael Hall and Douglas Mullins.
24   Q.  Okay.  How about Equilease Leasing?
25   A.  I don't believe I recall that.

30  (Pages 114 to 117)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

Page 118

1    Q.  Capital Asset Partners?
2    A.  The same.
3    Q.  You don't recall?
4    A.  Correct.
5    Q.  CMA Leasing Associates?
6    A.  I don't recall.
7    Q.  Are you familiar with somebody by the name of
8  Joel Klein?
9    A.  Excuse me?
10    Q.  Joel Klein?
11    A.  Yes.
12    Q.  What did you know about Joel Klein?
13    A.  I believe he kept some form of the -- some form
14  of records in connection with Equilease, Capital Asset
15  and CMA.
16    Q.  Okay.  How about Patton Corregan?
17    A.  Yes.
18    Q.  How did you know Mr. Corregan?
19    A.  He was an associate of Mr. Klein, and
20  previously I had known him when he was a lawyer in a law
21  firm.
22    Q.  Was either Mr. Klein or Mr. Corregan associated
23  with Mr. Malin, to your knowledge?
24    A.  Business associates.  I don't know anything
25  further that than.

Page 119

1    Q.  Did you know a gentleman by the name of Jim
2  Thomas?
3    A.  Yes.
4    Q.  What did you know about Mr. Thomas?
5    A.  Jim Thomas was -- he is now deceased.  He's an
6  individual who represented -- represented companies that
7  were owned by an Indian tribe.
8    Q.  Do you recall what tribe that was?
9    A.  The Iowa Tribe of Oklahoma.
10    Q.  And how did you become -- how did you -- did
11  you know Mr. Thomas?
12    A.  I've met him several times, spoken to him.
13    Q.  How did you develop a relationship with him?
14    A.  I met him in conjunction with several
15  transactions.
16      MR. LYNCH:  Hey, David, does this have
17  something to do with this case?
18      MR. COFFIN:  Yeah.
19      MR. LYNCH:  What, may I ask, is that?
20      MR. COFFIN:  Well, these are all
21  lease-stripping transactions.
22      MR. LYNCH:  That preceded --
23      MR. COFFIN:  Yeah.
24      MR. LYNCH:  I see.  Okay.  Go ahead and
25  ask.

Page 120

1    Q.  (BY MR. COFFIN) Iowa Tribe of Oklahoma, to your
2  knowledge, was it involved in any of the lease-stripping
3  transactions?
4    A.  Which ones?
5    Q.  Any of the transactions that preceded -- or
6  that are referred to, I guess, in this July 25, 1994 --
7    A.  Not to the best of my knowledge.
8    Q.  -- opinion.  Okay.  Are you aware of the court
9  case CMA Consolidated versus Commissioner?
10    A.  No.
11    Q.  Are you aware that the IRS has challenged
12  lease-stripping cases in tax court and in -- in tax
13  court?
14    A.  Not -- no.
15    Q.  Were you aware that the government in general
16  has been successful in challenging lease-stripping cases
17  in the Federal courts?
18    A.  Yes.
19    Q.  How are you aware of that?
20    A.  Hearsay.
21    Q.  Were you aware of the court decision
22  TransCapital Leasing Associates versus United States?
23    A.  What was the entity again?
24    Q.  TransCapital Leasing Associates versus United
25  States.

Page 121

1    A.  I don't know if I was or I am.  I can't recall.
2    Q.  Are you aware of a court case involving
3  TransCapital Leasing?
4    A.  I don't recall.
5    Q.  Were you aware of a Nicole Rose court case?
6    A.  Yes.
7    Q.  Wasn't that a lease-stripping transaction that
8  was challenged in that case?
9    A.  Yes.
10    Q.  Are you aware of the decision in that case?
11    A.  Yes.
12    Q.  Was it favorable for the government?
13    A.  Yes.
14    Q.  Look at government --
15    A.  Excuse me one second.
16      THE WITNESS:  Can I just talk to you
17  outside?
18      MR. LYNCH:  Sure.
19      (Recess taken from 2:19 to 2:20.)
20    Q.  (BY MR. COFFIN) Did you want to clarify
21  anything?
22    A.  It's getting cloudy.
23    Q.  With regard to the amount of the tax basis that
24  you said earlier was in between 750 and $793 million, do
25  you recall how many lease-stripping transactions

31 (Pages 118 to 121)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

---

Page 122

1  resulted in that amount of tax basis?
2      A.  Not exactly.
3      Q.  Was it 20?  More than 20?
4      A.  I believe more.
5      Q.  Okay.  Would it surprise you if it was 28?
6      A.  Wouldn't surprise me.
7      Q.  Okay.  And look at 256, please.
8      A.  (Witness complies.)
9      Q.  Had you seen this tax opinion before?
10     A.  Yes.
11     Q.  Was it something you relied on in conjunction
12  with the services you performed for K-Pipe?
13     A.  Yes, in conjunction with the other opinions.
14     Q.  Okay.  And I assume associated with your work
15  you did with SCALP as well, right?
16     A.  Correct.
17     Q.  Same question for 257.
18     A.  Same answer.
19     Q.  Let's go through it real quick.  Have you seen
20  this document before?
21     A.  Yes.
22     Q.  Okay.  Did you rely on this document in
23  conjunction with the services you performed for K-Pipe?
24     A.  Yes, in conjunction with the other opinions.
25     Q.  Okay.  And for the services you performed for

---

Page 123

1  SCALP?
2      A.  Yes.
3      Q.  Same question for 258, sir.  Have you ever seen
4  this opinion, tax opinion?
5      A.  Yes.
6      Q.  Did you rely on this tax opinion in performing
7  services for SCALP and K-Pipe?
8      A.  I have to go back and read the whole thing, but
9  I don't think so.
10     Q.  You don't think so?
11     A.  I don't think so because I don't think it was
12  on point.  I think that the other opinion that's not
13  here was more on point, but I would have to go back and
14  reread this whole thing.  I may be wrong in that
15  conclusion without reading the whole thing.
16     Q.  Look at the Page 13 of that opinion.
17     A.  (Witness complies.)
18     Q.  That first paragraph, would you have relied on
19  that statement in performing services for K-Pipe or
20  SCALP?
21     A.  Bear with me one quick second.
22     Q.  Sure.
23     A.  I can't be sure at this time.
24     Q.  Are you on the page I'm asking you?
25     A.  Uh-huh.

---

Page 124

1      Q.  How about Paragraph 7 down at the bottom,
2  talking about the adjusted basis that SCALP had in the
3  SCHC stock?
4      A.  Can I speak with my counsel for a second?
5      Q.  Sure.
6          (Recess taken from 2:24 to 2:26.)
7      Q.  (BY MR. COFFIN) Was there a question on the
8  table?
9      A.  This Section 7, as well as the other sections
10  in this -- on this page are really statements which, you
11  know, ultimately at some point or another in some
12  transaction I did rely upon, as did other people, and
13  ultimately they are relevant to the ultimate facts that
14  you've asked me about pertaining to SCALP, et cetera,
15  although this is not the opinion itself whereupon the
16  discussion came about where SCALP had basis in currency.
17     Q.  Okay.
18          MR. COFFIN:  Read back that last part,
19  please.
20          (The record was read as requested.)
21     Q.  (BY MR. COFFIN) We were talking about 258,
22  correct?
23          MR. LYNCH:  Yes.
24     A.  Yes, sir.
25     Q.  (BY MR. COFFIN) Page 5 of the opinion,

---

Page 125

1  Paragraph 4 references your name; is that correct?
2      A.  Yes.
3      Q.  Beginning at Paragraph 1.  I'm sorry.
4      A.  I'm sorry?
5      Q.  Paragraph 1 it mentions you for the first time,
6  I think.
7      A.  Yes.
8      Q.  Okay.  Tell me what your role was in the
9  reorganization of DWJ&R and SCHC Exchange or you can
10  just tell me -- is this an accurate depiction of what
11  happened?
12     A.  It's an accurate depiction of what happened.
13     Q.  Are you talking about just these Paragraphs 1
14  through 6 or all of the facts as listed?
15     A.  All of the facts as listed.  I went through too
16  many reading them to note that.
17     Q.  Page 7, Paragraph 2 mentions Nicole Rose Corp.
18  Is that the same Nicole Rose that was involved in the
19  court case we mentioned earlier?
20     A.  Yes.
21     Q.  And you prepared the tax returns for the Nicole
22  Rose Corporation; is that correct?
23     A.  Yes.
24     Q.  And this opinion was issued after IRS notice
25  95-53.  Do you recall what that notice is regarding?

---

HUNDT REPORTING
214-220-1122

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

Page 126

1    A.  Is that the one issued in October 2000 --
2  October 1993?
3    Q.  It's regarding lease-stripping transactions.
4    A.  Is that the October -- was it issued
5  October 13, 1993?  Because if not, I don't remember the
6  exact reference number to the --
7    Q.  Do you recall an IRS notice dealing with
8  lease-stripping transactions?
9    A.  Yes.
10   Q.  And it came out in 1995, right?
11   A.  Was it -- okay.  It came out sometime.
12   Q.  Was there ever any concern with you that you
13  had relied on tax opinions dealing with lease-stripping
14  transactions, knowing that the IRS was going to come out
15  and challenge those later?
16   A.  At the time the transaction was entered into,
17  the notice was not out; and I always view the notice as
18  a prospective action.  It was not a retroactive action;
19  and, therefore, I felt that any of the transactions
20  which were historically done, which is the ones which
21  were effectively referred to within this opinion and all
22  the other opinions, and for which were the 28 that you
23  referred to, that those all occurred prior to the
24  issuance of the notice and, therefore, could be relied
25  upon because it was a change of law.  Not retroactively,

Page 127

1  either.
2    Q.  Look at 259, please.  Same question.  Is this a
3  tax opinion that you reviewed and relied upon in
4  performing services for K-Pipe and SCALP?
5    A.  Yes.  This is part of the overall other
6  opinions, too.
7    Q.  And then look at Government Exhibit 251,
8  please.
9    A.  (Witness complies.)  Yes.
10   Q.  This opinion is dated September 24, 2002.
11      Do you recall ever seeing this opinion?
12   A.  I'm not sure I ever saw it.
13   Q.  It's dated subsequent to the period that you
14  worked for SCALP and Fortrend, correct?
15   A.  Yes.
16   Q.  Would you have any occasion to have reviewed it
17  in any event?
18   A.  I -- I don't know.
19   Q.  Okay.  Are you familiar with an entity known as
20  CIS Credit Corporation?
21   A.  I've heard of it.
22   Q.  Do you know who the principals or management
23  may be of that company?
24   A.  No.  Or if I did, I don't recall now.
25   Q.  How about the Clooneen, C-L-O-O-N-E-E-N, Trust?

Page 128

1    A.  I've heard of it.
2    Q.  Do you associate Mr. Forster with the Clooneen
3  Trust?
4    A.  In at least as a capacity of having told me
5  about it.  I'm not trying to imply that he's an officer
6  or director or has any authority over it.
7    Q.  I think we had a question on the table before
8  we broke on the last -- for the last break.
9        Did you look at the 2000 return for
10  K-Pipe?
11   A.  Oh, I didn't see the adjustment to the
12  Schedule D for that amount.  So, I can't recall at this
13  point what might have happened.
14   Q.  And that's the $69 million --
15   A.  Yes.
16   Q.  -- of carryover or carryback?
17   A.  Right.  Well, no -- yes.  It's a question of
18  whether there's any adjustment to the carryover
19  carryback.  I didn't see any reference in the 2000
20  return for it.
21   Q.  Give me one second here.
22   A.  Sure.
23   Q.  Do you know if K-Pipe ever earned any money
24  from the royalties paid by the Butcher interests?
25   A.  I can't recall.

Page 129

1        MR. COFFIN:  Okay.  I'll pass the witness.
2        MR. LYNCH:  He's going to ask you
3  questions.  That's what that means.
4            EXAMINATION
5    Q.  (BY MR. STERN) I just want to make sure I
6  understand what your role was in connection with the
7  transaction that's at issue in this proceeding.  Do you
8  understand what transactions are at issue in this
9  proceeding?
10   A.  Just to be sure, could you explain?
11   Q.  Well, as I understand it, it's K-Pipe's
12  purchase of stock -- Bishop Group stock from Dennis
13  Langley, and then K-Pipe's sale of assets to Midcoast.
14   A.  Okay.
15   Q.  Do you understand that?
16   A.  Yes.
17   Q.  And what was your role in that transaction
18  before it closed?  Those transactions.  Excuse me.
19   A.  I believe the only role I had was, as I've
20  expressed before, where in anticipation of the closing,
21  Mr. Hoffman would have told me that we wanted assets
22  with certain attributes.  I would have looked at SCALP's
23  inventory thinking about that.  I may have, although I
24  can't be sure, read documents associated with the
25  transactions.

33  (Pages 126 to 129)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

Page 130

1    Q.  Before the transactions closed, did you have
2  any contact with anyone representing Midcoast, to your
3  knowledge?
4    A.  To my knowledge, no.
5    Q.  All right.  After the transactions closed, what
6  was your role?  How would you describe it?
7    A.  My role was, A, to provide the information to
8  E&Y necessary for them to prepare the tax returns; and
9  in addition, from all the documents that I've seen, both
10  in what you provided to me, as well as by the
11  government, it was also to be involved in the process of
12  a true-up that was referred to earlier.
13    Q.  Anything else?
14    A.  Subsequent year tax returns, you know, 2000 or
15  so later.  Also 1999 tax return for SCALP.  There might
16  have been odds and ends, but those are the primary
17  things.
18    Q.  Other than providing information that it may
19  have ended up with as a result of the transactions, did
20  Midcoast have any role in the preparation of the tax
21  returns for K-Pipe for 1999 or 2000 or 2001?
22    A.  I'm sorry.  Could you please repeat that?
23    Q.  Let me ask it a different way.  You had
24  mentioned that you may have had some contact with
25  Midcoast because Midcoast ended up with operating

Page 131

1  assets; and, as I understand it, you may have required
2  some records related to those assets in preparation of
3  the tax returns.
4    A.  Correct.
5    Q.  And other than the possibility that you had
6  that type of contact with Midcoast, can you think of any
7  other contact you would have had with Midcoast in
8  connection with the preparation of the returns for
9  K-Pipe?
10    A.  No.  Other than the effect of the true-up.
11    Q.  And where did -- where did E&Y come from?
12    A.  It was in the contract in the stock purchase
13  contract where K-Pipe acquired Bishop from Mr. Langley.
14  There was reference in there that -- I'm not sure
15  whether E&Y specifically was identified or Mr. Langley's
16  or the sellers' accountant who prepared the returns.
17  So, it was part of the negotiation in the acquisition of
18  the stock of -- of Bishop by K-Pipe.
19    Q.  Just so I understand, K-Pipe acquired the stock
20  in Bishop Group?
21    A.  Correct.
22    Q.  And as part of that transaction, K-Pipe was
23  required to have Ernst & Young or Mr. Langley's
24  accountants prepare the tax returns for the full year?
25    A.  For 1999, yes.

Page 132

1    Q.  And who paid Ernst & Young?  Who was supposed
2  to pay Ernst & Young for that work?
3    A.  I can't recall that.
4    Q.  Was it either K-Pipe or Mr. Langley?
5    A.  Presumably, but I can't recall.
6    Q.  And on the true-up, there was a true-up -- it
7  was a working capital true-up?
8    A.  Yes, sir.
9    Q.  What is "working capital"?
10    A.  "Working capital" is usually defined as current
11  assets minus current liabilities.  Current assets will
12  be effectively items of cash or cash equivalents or
13  items that can be anticipated to be turned into cash
14  within 12 months, and liabilities that occurred are
15  things which are expected to be paid within a 12-month
16  period.
17    Q.  And as I understand it, at the closing of a
18  stock sale, there is an estimate of what working capital
19  is at the time of the sale?
20    A.  Correct.
21    Q.  And, then, as -- as events unfold, that
22  estimate may be higher or may be lower or may be exactly
23  right?
24    A.  Correct.
25    Q.  And the true-up is to adjust whatever was --

Page 133

1  adjust from the estimate to reality?
2    A.  Correct.
3    Q.  And there was a similar adjustment that's made
4  after an asset sale?
5    A.  It was -- seemed to be provided in this.
6    Q.  All right.  And what was your -- what was your
7  role in connection with the -- the true-up between
8  Mr. Langley and K-Pipe?
9    A.  Well, based upon my recollection mostly, which
10  is based upon these documents that I have looked at
11  again, is someone identified me as the party to contact
12  and someone provided me with the information schedules
13  or whatever, both that which was provided at the time of
14  the closing, as well as when the actual computations as
15  you referred to it, were made.  And, so, I communicated
16  with those representatives of, let's say Mr. Langley, in
17  the case of the stock purchase to review that.
18    Q.  All right.  And reached a determination of what
19  was -- what was owed to which party?
20    A.  Correct, either up or down, as you say.
21    Q.  Yeah.  And the same process -- you were
22  involved in the same process between K-Pipe and
23  Midcoast?
24    A.  Apparently.  Once again, based upon this.
25    Q.  Okay.  I just want to go through some of these

34  (Pages 130 to 133)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

Page 134

1   documents, and I'm afraid -- some of them may already
2   been marked as government exhibits.  So, let me just
3   make sure.
4           MR. STERN:  Let me mark this as Teig
5   Exhibit 1.
6           (Teig Exhibit No. 1 marked)
7       Q.  (BY MR. STERN) Can you identify Teig Exhibit 1
8   as a memo from you to Cynthia Morelli dated August 17,
9   2000?
10      A.  I'm not sure of your question.  I see it.
11      Q.  Is this a memo that you wrote to Ms. Morelli
12  dated August 17, 2000?
13      A.  I would -- I would think I did.
14      Q.  All right.  In the memo you wrote "attached are
15  the two true-up computations I received.  As you can
16  see, both appear to have a balance due.  To the stock
17  sellers, $108,435 is due, while $144,443 is due to the
18  asset buyers."  Do you see that?
19      A.  Yes, sir.
20      Q.  And then the second page of Exhibit 1 to your
21  deposition is -- what is that?  Is that the asset
22  schedule?
23      A.  Yes.  That's the label at the top.
24      Q.  Okay.  It shows 144,000 that's referenced in
25  your memo?

Page 135

1       A.  Correct.
2       Q.  And I take it that the rest of the schedule is
3   showing how that 144,000 is calculated?
4       A.  Yes, I would believe so.
5       Q.  All right.  And the next page, final page of
6   the exhibit, relates to the stock sale?
7       A.  Correct.
8       Q.  And you see down at the bottom the amount owed
9   by K-Pipe to Langley as being $108,435?
10      A.  Yes.
11      Q.  So, according to your memorandum and these
12  schedules, K-Pipe was in a position of owing money to
13  both the party it bought stock from and the party it
14  sold assets to?
15      A.  Correct.
16      Q.  Do you know why, if the true-up is to adjust
17  from estimates to what actually occurs, why K-Pipe would
18  be owing money on both sides?
19      A.  Without looking at the details, do you want me
20  to answer in general?
21      Q.  Can you just think of reasons where that might
22  be the case?
23      A.  Different items -- different items of assets
24  and liabilities that would be included.  For example,
25  maybe there was some corporate assets that were not sold

Page 136

1   to Midcast but were still, you know, retained and,
2   therefore, were part of the computation as between
3   Langley and K-Pipe.
4       Q.  And if these were perfect back-to-back
5   transactions, wouldn't you expect the amount --
6       A.  You would expect it to be -- if it was perfect
7   back-to-back transactions, you would expect that
8   whatever you owed to one side or the other would be a
9   receivable from the other side.
10      Q.  Do you have Government Exhibit 326?
11          MR. LYNCH:  Yes, we do.  Government
12  Exhibit 326 is in there, yes.
13      Q.  (BY MR. STERN) Can you identify -- you've
14  already discussed this exhibit, Government Exhibit 326
15  with Mr. Coffin, but the top you have an e-mail from
16  Cynthia Morelli to you dated August 18, 2000.
17          Do you see that?
18      A.  Yes, I see it.
19      Q.  And it talks about true-up, right?
20      A.  Yes.
21      Q.  And there's apparently some issue about
22  $44,000?
23      A.  Can I take a moment?
24      Q.  Yeah, take a moment and read it.
25      A.  (Witness reviews document.)

Page 137

1       Q.  Okay.  I would like to focus on -- apparently
2   there was some issue about $44,000?
3       A.  Reading this, yes.
4       Q.  Can you tell what that was?
5       A.  Not exactly.  I mean, it appears to relate to
6   interest, and it appears to address the -- the item that
7   you were talking about before about having a perfect
8   back-to-back versus not having a perfect back-to-back.
9   There is some ambiguity here as to what was actually
10  going on.  That was my interpretation of what I just
11  read.
12      Q.  Okay.  Let's look at -- let's mark this as Teig
13  Exhibit 2.
14          (Teig Exhibit No. 2 marked)
15      Q.  (BY MR. STERN) Can you identify Teig Exhibit 2
16  as a letter from Alice Dill to Midcoast Energy Resources
17  dated September 8, 2000, and another letter from Ernst &
18  Young to Alice Dill the same date?
19      A.  I see both, yes.
20      Q.  And there's a fax cover sheet from Ms. Dill to
21  you?
22      A.  Yes.
23      Q.  Who is Alice Dill?
24      A.  I identified her before.  She was a paralegal
25  who worked for Fortrend.

**HUNDT REPORTING**
**214-220-1122**

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

---

Page 138

1   Q.  And the letter to Midcoast is to Richard
2  Robert; and Ms. Dill wrote:  "Our accountant has advised
3  us that your firm is due $144,443.  Our records reflect
4  that there is an offset amount due us of $42,428."
5          Do you see that?
6      A.  Yes, sir.
7      Q.  Now, do you think you're the accountant she's
8  referring to?
9      A.  I believe so from the other correspondence that
10  we've seen.
11     Q.  And the $42,428 offset, do you know what that
12  is?
13     A.  At this point I certainly don't recall.  I
14  don't know now whether I've ever known.
15     Q.  Okay.  The final sentence says "As such,
16  enclosed please find our check in the amount of $102,015
17  representing the difference."  Do you see that?
18     A.  Yes, sir.
19     Q.  And do you have any reason to believe that that
20  payment was not made to Midcoast?
21     A.  I have no reason.
22     Q.  Do you know whether a payment was ever made to
23  Dennis Langley on the $108,000 that was owed to him?
24     A.  I currently have no recollection.  Don't know
25  if I ever had knowledge.

---

Page 139

1      Q.  Do you know whether Midcoast ever disputed the
2  offset?
3      A.  Same answer.  I don't -- I certainly don't
4  recall now and don't know if I ever knew.
5      Q.  And in the final page there's a check of
6  $40,000 to Mr. Snyder that's referenced in the letter,
7  right?
8      A.  Well, not to Mr. Snyder.  To his attention.
9      Q.  To his attention.  It's payable to Ernst &
10  Young?
11     A.  Yes, I would believe so.  I would presume so
12  from the letter.
13     Q.  Okay.  Do you know what that was for?
14     A.  Sure.  It was referred to in one of the
15  e-mails.  It was their accounting fee.  They indicated
16  they refused to issue the tax returns for 1999 until
17  they received their payment both of 40,000 and the
18  subsequent invoice that they were about to be rendered.
19  This appears to be payment of that first $40,000 that
20  was mentioned that had been outstanding for some time.
21     Q.  And presumably the second invoice was paid
22  since they issued the tax returns?
23     A.  Correct.
24          MR. COFFIN:  Objection, leading.
25     Q.  (BY MR. STERN) And who was paying Ernst &

---

Page 140

1  Young?
2      A.  Well, based upon this letter, I think it's safe
3  to assume that K-Pipe paid.
4      Q.  So, K-Pipe paid Dennis Langley's accounting
5  firm to prepare the K-Pipe return?
6      A.  Yes, based upon this letter.
7      Q.  Okay.  That's consistent with your memory,
8  isn't it, after being refreshed by all these documents?
9      A.  Yes; yes.
10          MR. STERN:  Let's mark this as Teig
11  Exhibit 3.
12          (Teig Exhibit No. 3 marked)
13     Q.  (BY MR. STERN) Is this an e-mail from Fred
14  Forster to you dated September 10, 2000?
15     A.  I presume it was based upon the way it's
16  identified at the top.
17     Q.  And Mr. Forster wrote "If we are indeed
18  obligated to pay Midcoast $100,000, then we must agree
19  to pay it.  My suggestion is that it gets paid out of
20  the $400,000 tax refund.  Remember K-Pipe has been sold
21  by SCALP and has no money until K-Pipe gets the tax
22  refund."  Do you see that?
23     A.  Yes.
24     Q.  Do you know what that tax refund is?
25     A.  I recall from somewhere in all of this stuff

---

Page 141

1  that there were a couple of tax refunds expected to be
2  coming in from federal and state governments.
3      Q.  And those would have been coming in to K-Pipe?
4      A.  Yes, or -- should be because they were the tax
5  return preparer.  And, in fact, if you go to the 1999
6  return prepared by E&Y provided for the Government's
7  Exhibit 254.
8          MR. COFFIN:  That's correct.
9      A.  It shows there to be an overpayment of 974-plus
10  thousand dollars.  So, I can only presume that
11  Mr. Forster is referring to that refund.
12     Q.  (BY MR. STERN) And do you know whether that
13  refund was used to pay the $100,000 that was owed to
14  MidCoast?
15     A.  I currently certainly have no recollection, and
16  I don't know if I ever had any knowledge of that.
17     Q.  Just based on this format, do you know what
18  that number after the break in the page after
19  Mr. Forster's e-mail says "Howard Teig wrote" or
20  "Howard Teig wrote"?  Do you know what that is?  Have
21  you ever seen that before?  Is that something
22  Mr. Forster wrote or is that something that --
23     A.  I would guess is that he might have cut and
24  pasted something that may be in another e-mail.  I don't
25  know.

**HUNDT REPORTING**
**214-220-1122**

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

Page 142

1    Q.  I see.  Thank you.
2    A.  But that's a guess.  Because it doesn't make
3  reference to e-mail addresses.
4          MR. COFFIN:  A lot of times when you reply
5  to an e-mail, it puts that down there for you.
6          THE WITNESS:  No, but usually it would
7  still say a reference to an e-mail address.  And there's
8  no reference to an e-mail address.  It just simply says
9  I wrote.
10          MR. STERN:  All right.  Where are we?
11  No. 4?
12          (Teig Exhibit No. 4 marked)
13    Q.  (BY MR. STERN) I hand you what's been marked
14  Teig Exhibit 4.  This is a memo that you wrote to
15  Mr. Forster dated August 15, 2000.
16    A.  Uh-huh.
17    Q.  Is that a "yes"?
18    A.  Yes.
19    Q.  And in it you set forth the status of the
20  true-up?
21    A.  Correct.
22    Q.  And, again, it notes "The computations show
23  that Midcoast Energy as the buyer is entitled to a
24  refund of $144,443, while the stock sellers" -- would
25  that be Langley?

Page 143

1    A.  Yes.
2    Q.  Are entitled to 108,435, right?
3    A.  Correct.
4    Q.  "The asset buyers are very anxious for their
5  money."  Apparently you had been in communication with
6  the asset buyers?
7    A.  We can presume such.
8    Q.  "The amount due to the stock sellers will be
9  reduced by the tax cost, if any, associated with the
10  1999 tax returns."  Do you know what that means?
11    A.  I can't recall at this time.  Oh, I'm sorry.
12  Just to go back.  What that would mean is that if there
13  was a tax --
14          MR. LYNCH:  It would have reduced the
15  amount.
16    A.  If there was a tax liability owed on the 1999
17  tax returns that K-Pipe had to pay, it would have gone
18  as a further adjustment to the 108,000.
19          MR. STERN:  Bear with me a minute.  David,
20  will you stipulate to the admissibility of 233?
21          MR. COFFIN:  What is 233?
22          MR. STERN:  It's Government 233.
23          MR. COFFIN:  Yes.  This is the memo
24  between Mr. Teig and Mr. Lacy --
25          MR. STERN:  Yes.

Page 144

1          MR. COFFIN:  -- and Ms. Fox?  Yes.
2          MR. STERN:  Let's take a real quick break.
3  I may be done.
4          MR. COFFIN:  I may have four questions.
5          MR. LYNCH:  All right.
6          (Recess taken from 3:01 to 3:02.)
7    Q.  (BY MR. STERN) Mr. Coffin asked you about
8  various transactions that generated losses within
9  K-Pipe?
10    A.  I'm not sure I recall.
11    Q.  Well, maybe I'm not saying it right.  I'm not a
12  tax person.  But there was -- there were losses that
13  were in K-Pipe that offset the gain from the
14  transactions at issue in this proceeding?
15    A.  I would presume you're referring to the item in
16  this 233 memo?
17          MR. LYNCH:  Yes.
18    Q.  (BY MR. STERN) Yes.
19    A.  Okay.
20    Q.  Did you ever discuss those with anyone at
21  Midcoast?
22    A.  I would have -- no.
23          MR. STERN:  Pass the witness.
24          FURTHER EXAMINATION
25    Q.  (BY MR. COFFIN) Okay.  With regard to Teig

Page 145

1  No. 1, Mr. Teig, did you prepare the schedules attached
2  to the fax cover sheet?
3    A.  No.
4    Q.  Do you know who prepared those?
5    A.  No -- well, no.  At least today, I can't
6  recall.  I'm not sure if I knew who exactly prepared
7  them back then.
8    Q.  Did you go through and -- did you go through
9  and, I want to say audit, but verify the numbers on --
10  on the schedules?
11    A.  I can only believe I must have.
12    Q.  Okay.  And Teig 2 is dated September of 2000.
13  Were you still working for Fortrend in September of
14  2000?
15    A.  I know earlier before I said that I stopped
16  doing work in the summer of 2000 for Fortrend.  One
17  would -- one would think if I was correct in that
18  statement that I was fuzzy on -- on this exercise.  You
19  know, I certainly would have continued doing some work
20  for Fortrend, you know, in -- in 2000 and given the fact
21  that it appears I paid -- I did the 2000 tax return,
22  which obviously was done -- it was completed
23  September 14th by me in that year tells me I did some
24  work, but I -- I think what I was referring to earlier
25  is the work that I did that, when I stopped doing work

37 (Pages 142 to 145)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

**Witness:   Howard Teig**

---

Page 146

1  for Fortrend, probably I'm now presuming is now new
2  work, new transactions, and that if I had gotten paid on
3  something like K-Pipe, that I did the tax returns and I
4  continued my services for some time.  So, I would
5  presume at the -- at September 2000 that I must have
6  still been doing something certainly to be able to have
7  prepared -- to have provided and have dialogue with E&Y
8  towards the preparation of the '99 return, but I believe
9  that I stopped all new services sometime in mid-summer
10 2000.
11      Q.  Teig 3, there's a statement in there by
12 Mr. Forster to you that "Remember K-Pipe has been sold
13 by SCALP and has no money."  Do you recall the
14 circumstances surrounding the sale of K-Pipe by SCALP?
15      A.  What do you mean "the circumstances
16 surrounding"?
17      Q.  Do you remember who the buyer was?
18      A.  Can I refer to -- well, if I can refer to a
19 document --
20      Q.  Sure.
21      A.  -- that was provided to me, it was in the year
22 2000 tax return.  I'll just pull out the page --
23      Q.  Can we mark that as Teig 5?
24          MR. STERN:  Let's do that.  Teig 5,
25 please.

---

Page 147

1          (Teig Exhibit No. 5 marked)
2      A.  I'll show it to you when I find it.  On Page 9,
3  statement No. 2, it shows that the company is owned by
4  Baguette.
5      Q.  Okay.  It's Baguette Holdings LLC; is that
6  right?
7      A.  Yeah, that's what it says there.
8      Q.  Okay.  Do you know who the principals of
9  Baguette Holdings LLC?
10     A.  My recollection is Alice Dill.
11     Q.  Do you know why SCALP sold K-Pipe?
12     A.  At this time I can't recall.  I'm not sure I
13 knew; but certainly at this time, I can't recall.
14     Q.  Subsequent to K-Pipe's purchase of stock and
15 sale of assets to Midcoast, do you recall any activities
16 that K-Pipe engaged in for an economic profit?
17     A.  I can't recall what transactions it did,
18 period.  So, I can't recall whether they were for
19 economic profit or merely collection of assets that were
20 on hand.  I just can't recall its activities.
21     Q.  Can you show me on Teig 5, which is the 2000
22 return, where we talked about earlier, the $69 million
23 of carryover or carryback?
24     A.  I already mentioned to you --
25     Q.  It was not on there, correct?

---

Page 148

1      A.  Correct.  I mentioned that I already had not --
2  I could not find it on this return.
3      Q.  Where would it appear on the return, had it
4  been on here?
5      A.  Well, it should have shown up on Schedule D.
6  There's a line that says unused -- there's a line under
7  both short and long-term section that says "Unused
8  Carryovers."  No, I guess it's just in the short-term
9  section.
10         MR. LYNCH:  Well, it shows unused
11 carryovers of zero.
12     A.  It shows unused carryovers of zero.
13         MR. LYNCH:  So, it's not that they
14 overstated -- the return doesn't overstate the unused
15 carryovers.
16     A.  It certainly doesn't overstate it.  It just
17 doesn't show up.
18     Q.  (BY MR. COFFIN) So, can we conclude there was
19 no adjustment made?
20     A.  No, you can't include such.
21     Q.  Okay.
22     A.  Because as you recall, it was a notional
23 adjustment only as a result of the no upward or downward
24 adjustment of ultimate tax liability, and, therefore, it
25 being a notional adjustment, which is why E&Y wanted to

---

Page 149

1  make a CYA letter.  It provided no effect to anything,
2  no gain or loss.
3          MR. LYNCH:  In other words, E&Y -- just to
4  be clear about this -- E&Y saw that the capital losses
5  were overstated by 69 million or whatever it was in '99.
6  They decided -- the parties decided they were not going
7  to change the returns because it didn't affect the tax
8  liability in '99 at all, and what E&Y wanted to make
9  sure of was that they got a certification that the
10 capital losses that shouldn't properly have been
11 reported on the '99 return were not used in the 2000 or
12 subsequent return.  And what this thing shows is a
13 capital loss -- it doesn't show any capital loss
14 carryover.  So, obviously it's consistent with the fact
15 that nobody was trying to use the capital losses that
16 had been incorrectly reported on the '99 return.
17     A.  Right.  And actually there's one further point.
18 If you recall, there was an e-mail that we discussed
19 that said Mr. Forster said that he would not use the
20 capital losses either as a carryback or carryover.  So,
21 possibly -- and I can only say possibly -- that maybe
22 this was an intentional exclusion of the $21 million
23 capital loss carryover.
24     Q.  (BY MR. COFFIN) The 21 million, which would
25 have been the correct amount?

---

38 (Pages 146 to 149)

99e2cb46-fb1a-4a14-a739-6f9e9a61061e

Witness:   Howard Teig

Page 150

1      A.   Correct.  And, you know, as I know, the
2   government generally doesn't object if you choose not to
3   claim a deduction.
4           MR. STERN:  You haven't been around these
5   guys.
6           MR. COFFIN:  Okay.  No further questions.
7           MR. STERN:  Nothing further from me.
8           (Proceedings concluded at 3:10 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 152

1      I, HOWARD TEIG, have read the foregoing deposition
2   and hereby affix my signature that same is true and
3   correct, except as noted above.
4
5        _____
6               HOWARD TEIG
7   THE STATE OF _____)
8   COUNTY OF _____)
9
10     Before me, _____, on this day
11  personally appeared HOWARD TEIG, known to me or proved
12  to me on the oath of _____ or through
13  _____ (description of identity card
14  or other document) to be the person whose name is
15  subscribed to the foregoing instrument and acknowledged
16  to me that he/she executed the same for the purpose and
17  consideration therein expressed.
18     Given under my hand and seal of office on this _____
19  day of _____, _____.
20
21        _____
22          NOTARY PUBLIC IN AND FOR
            THE STATE OF _____
23  My Commission Expires: _____
24
25

Page 151

1              CHANGES AND SIGNATURE
2   WITNESS NAME: Howard Teig
3   DATE OF DEPOSITION: May 25, 2007
4   PAGE LINE  CHANGE            REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 153

1   STATE OF TEXAS
2   COUNTY OF HARRIS
3
4          REPORTER'S CERTIFICATE
5       ORAL DEPOSITION OF HOWARD TEIG
6            May 25, 2007
7
8      I, the undersigned Certified Shorthand Reporter in
9   and for the State of Texas, certify that the facts
10  stated in the foregoing pages are true and correct.
11     I further certify that I am neither attorney or
12  counsel for, related to, nor employed by any parties to
13  the action in which this testimony is taken and,
14  further, that I am not a relative or employee of any
15  counsel employed by the parties hereto or financially
16  interested in the action.
17     SUBSCRIBED AND SWORN TO under my hand and seal of
18  office on this the _____ day of _____,
19  _____.
20        _____
         Kelly Hanna, CSR, RPR, CRR, CMRS
21        Texas CSR 1654
         Expiration: 12/31/2007
22        Firm Registration No.:  347
         703 McKinney Avenue
23        Suite 207
         Dallas, Texas 75202
24        214.220.1122 - 214.220.1127
25

39 (Pages 150 to 153)

HUNDT REPORTING
214-220-1122

99e2cb46-fb1a-4a14-a739-6f9e9a61061e