1

1

2

3

4

5

6

7

8                        INTERVIEW OF

9                  RONALD LOUIS CHACHERE

10                   JANUARY 14, 2004

11

12

13

14

15

16

17

18

19         BE IT REMEMBERED that on the 14th day of

20   January, 2004, beginning at 9:04 a.m. at the offices of

21   Enbridge, Inc., 1100 Louisiana Street, 34th Floor,

22   Houston, Texas 77002, before Meredith A. Shoemaker, a

23   Certified Shorthand Reporter in and for the State of

24   Texas, RONALD LOUIS CHACHERE appeared and under oath

25   answered the questions propounded to him as follows:

```
 1                      A P P E A R A N C E S

 2

 3   FOR THE INTERNAL REVENUE SERVICE:

 4        Ms. Linda Creswell  MC: 4636NFTW
          Revenue Agent
 5        Internal Revenue Service
          2601 Meacham Blvd., Suite 550
 6        Fort Worth, Texas 76136

 7        Ms. Yvonne Peters
          Office of Chief Counsel
 8        Attorney -- LMSB
          Jackson Federal Building
 9        915 Second Avenue, Room 2710, M/S 670
          Seattle, Washington 98174
10

11
     FOR MIDCOAST ENERGY RESOURCES:
12
          Mr. Karl S. Stern
13        Ms. Wendy Trahan Salinas
          Vinson & Elkins, L.L.P.
14        2300 First City Tower
          1001 Fannin Street
15        Houston, Texas 77002-6760

16

17   ALSO PRESENT:

18        Ms. Jana Jordan

19

20

21

22

23

24

25
```

3

```
 1                    EXAMINATION   INDEX

 2                                              PAGE

 3  RONALD LOUIS CHACHERE

 4       Examination by Ms. Creswell            6

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                        EXHIBIT  INDEX

 2   No.  Description                        Page

 3   1    November 19, 1999, Chachere invoice   11
          to Midcoast Energy Resources, Inc.;
 4        Bates Stamps CHA 5-1075 through
          CHA 5-1083
 5
     2    August 30, 1999, "Redline" redraft    13
 6        of Agreement and Plan of Merger

 7   3    September 20, 1999, Hoffman letter    22
          to Robert; Bates Stamps MID 2.1-439
 8        through MID 2.1-440

 9   4    September 30, 1999, Furman letter     33
          to Tutcher
10
     5    September 30, 1999, Furman letter     42
11        to Langley; Bates Stamps 000442-444

12   6    October 7, 1999, Fax Transmittal      46
          from Chachere to Monaldo, with
13        attachments; Bates Stamps KP1657-1676

14   7    October 8, 1999, Pryde e-mail to      49
          Chachere, et al.; Bates Stamp KP1656
15
     8    October 12, 1999, Fax Transmittal     53
16        from Chachere to Pryde and Kaitson,
          with attachments;
17        Bates Stamps KP1392-1398

18   9    October 14, 1999, Fax Transmittal     58
          from Chachere to Pryde, with
19        attachment; Bates Stamps KP1448-1450

20   10   Stock Purchase Agreement By and       65
          Between K-Pipe Merger Corporation and
21        Dennis M. Langley;
          Bates Stamps 000232-269
22
     11   Stock Purchase Agreement Schedule     66
23        Preamble; Bates Stamps 000270-338

24   12   October 25, 1999, Pryde e-mail to     72
          Chachere, et al.; Bates Stamp KP1136
25
```

1                    EXHIBIT   INDEX   CONTINUED

2   No.   Description                                    Page

3   13   October 28, 1999, Facsimile                      76
         Transmittal from Kaitson to
4        Pride (sic) with attachments;
         Bates Stamps KP1301-1325
5
    14   November 2, 1999, Pryde e-mail to                83
6        Chachere, et al., with attachment;
         Bates Stamps KP1421-1434
7
    15   November 4, 1999, Fax Cover Sheet                95
8        from Kaitson to Pryde and Cave, with
         attachment; Bates Stamps KP1463-1465
9
    16   November 2, 1999, Pryde e-mail to                97
10       Chachere, et al., with attachment;
         Bates Stamps KP1480-1481
11
    17   Undated letter agreement executed               99
12       by Langley and Austin; Bates Stamps
         CHA 5-964 through CHA 5-966
13
    18   November 3, 1999, Palmisano e-mail              100
14       to Kaitson, et al.;
         Bates Stamp KP1682
15
    19   Asset Purchase Agreement;                       107
16       Bates Stamps MID 2.1-16 through
         MID 2.1-44
17
    20   Butcher Interest Partnership General            110
18       Partnership Agreement;
         Bates Stamps 001031-1040
19

20

21

22

23

24

25

1                    (The witness was sworn.)

2                    MS. CRESWELL:  The interview with Ron

3    Chachere -- the testimony of Ron Chachere is being given

4    at the office of Enbridge Energy, located at

5    1100 Louisiana Street, Houston, Texas, on January the

6    14th, 2004, at 9:00 a.m., about the Federal income tax

7    liability of Midcoast Energy Resources for the 2000 tax

8    year.

9                    Present are Linda Creswell, IRS revenue

10   agent; Yvonne Peters, IRS counsel; Ron Chachere,

11   interviewee; Wendy Salinas with Vinson & Elkins and

12   counsel for Midcoast; Karl Stern with Vinson & Elkins

13   and counsel for Midcoast; and Jana Jordan, employee of

14   Midcoast.

15                   The questions are asked by Linda Creswell

16   and Yvonne Peters, and the answers are given by Ron

17   Chachere.

18                   This interview is being recorded, as

19   Mr. Chachere was previously notified; and the recording

20   is by means of a court reporter.  Mr. Chachere has

21   presented himself voluntarily to be interviewed.

22                   RONALD LOUIS CHACHERE,

23   having been first duly sworn, testified as follows:

24                         EXAMINATION

25   BY MS. CRESWELL:

1    Q    Mr. Chachere, would you please state your name

2    and spell it for the record?

3    A    Yes.  Ronald Louis Chachere, C-h-a-c-h-e-r-e.

4    Q    Please state your name and your home address.

5         MS. PETERS:  He just gave his name.

6    Q    (BY MS. CRESWELL)  I'm sorry.  Your home

7    address.

8    A    That's 2814 Bretshire, Corpus Christi,

9    Texas 78414.

10   Q    And will you agree to review the transcript of

11   the interview and sign it?

12   A    Yes, I will.

13   Q    Okay.  The first few questions are just

14   background questions.

15        Is there any reason why you would not be

16   able to understand and answer the questions that are

17   asked today?

18   A    No.

19   Q    Are you taking any medication that would affect

20   your ability to understand or respond meaningfully?

21   A    No.

22   Q    Okay.  If you need clarification, please feel

23   free to ask me; and I'll try to --

24   A    All right.

25   Q    -- rephrase the question --

1    A    Sure.

2    Q    -- or have Ms. Peters do so.

3              Mr. Chachere, how did you prepare for the

4    interview today?

5    A    Well, I basically just looked at my billing

6    sheet and looked over some materials that I had, you

7    know, given for presentation to you; and that's it.

8    Q    Who assisted you in your preparation, if

9    anyone?

10   A    Well, I didn't have any assistance other than I

11   discussed the fact that the interview would take place

12   and what to expect, from the two attorneys that are here

13   with me.

14   Q    The first questions that we'll be going through

15   are general background questions about yourself and

16   generally about the transaction in question.

17              What's your educational background,

18   Mr. Chachere?

19   A    I have a B.B.A. in finance from Texas A & M

20   University.  I have a J.D. from The University of Texas

21   law school.

22   Q    And how long have you practiced law?

23   A    A little over 30 years.

24   Q    What's your area of expertise?

25   A    Primarily oil and gas.

9

1    Q    Okay.  When did Midcoast become your client?

2    A    Oh, from virtually their inception back --

3  that's probably about 1991 or so.

4    Q    Generally what type of work have you done for

5  Midcoast over the years?

6    A    Deals, mainly buying assets or buying the stock

7  of companies.

8    Q    Would that have held true in the '99 year also

9  and the 2000 year?

10    A    Yes, it would have.

11    Q    Okay.  Can you tell me about the type of work

12  that you currently perform for Enbridge Midcoast?  Is it

13  the same type of --

14    A    It's the same type of work, yes.

15    Q    Do you assist or did you assist with any FERC

16  regulatory filing?

17    A    Yes.

18         Well, no, not with FERC.  No, I would not

19  do that.

20    Q    No FERC work at all?

21    A    No.

22    Q    Okay.  Are you familiar with the acquisition of

23  the assets of The Bishop Group by Midcoast in 1999?

24    A    Yes, I am.

25    Q    Okay.  Can you just generally give me what your

1  role was in that transaction?  What type of work did you

2  do?

3     A    Okay.  I was basically a transactional attorney

4  involved in drawing documents to document whatever deal

5  they made on it.

6     Q    Would you term that also assisting with

7  negotiations, or is that beyond the scope of the work

8  that you --

9     A    I don't believe I was directly involved in

10  negotiations.  Primarily I would be just instructed on

11  what negotiations took place and what the deal was or at

12  that point in time, what it was.

13     Q    And then framing that within the language of

14  the document?

15     A    Yes.

16     Q    Okay.  So you would have drafted various

17  documents for the transaction.

18     A    Yes.

19     Q    Okay.  We're going to move now on to more

20  specific questions about the various documents; and

21  trying to go through these documents, we decided that

22  probably the easiest way, the way that made the most

23  sense for us and, hopefully, for you, too, would be to

24  go through those billing records that you discussed that

25  you had gone through.  I think that will lead us

1  through --

2      A    I agree.

3      Q    -- chronologically.

4            MS. CRESWELL:  Enter the invoice from

5  Ronald Chachere to Midcoast Energy Resources for

6  services rendered from August the 16th, 1999, through

7  November the 9th, 1999, into the record as Exhibit 1.

8  This document is numbered CHA 5-1075 through CHA 5-1083.

9      Q    (BY MS. CRESWELL)  Have you seen this document

10  before, Mr. Chachere?

11      A    Yes, I have.

12      Q    And are you familiar with its contents?

13      A    Yes.

14      Q    Good.

15            MS. CRESWELL:  I will just note for the

16  record that this billing record is in regards to the

17  acquisition of Kansas Pipeline and is from Ronald

18  Chachere.  The invoice is to Midcoast Energy Resources.

19      Q    (BY MS. CRESWELL)  Is that correct?

20      A    Yes, ma'am.

21      Q    Okay.  What I'd like to do is just kind of go

22  through some of the dates here; and then as we have

23  other exhibits to enter that might reference one of

24  these dates, that's what we will do.

25            Let's start first with the date of

1  8/24/99, and that is from Exhibit 1.

2              Further, this particular entry says that

3  "Further work on 'redline' changes to representations

4  and warranties, and other provisions; telephone

5  discussion with Lon Mitchell."

6              Is that what you're seeing there at the

7  entry of 8/24/99?

8      A    That's correct.

9      Q    Okay.  Can you tell me who Lon Mitchell is?

10      A    He was an employee of Midcoast Energy

11  Resources, Inc., that, I believe, worked in the -- under

12  the -- in the accounting department.

13      Q    Okay.  What was his actual involvement in the

14  transaction, Mr. Chachere, if you recall?

15      A    Well, I think that as far as with me, it was

16  just basically what you see in that entry there.

17      Q    So it would have been the nuts and bolts of the

18  accounting-type --

19      A    Yeah.  If you look on 8/25/99, it says

20  "Redrafting of provisions as to calculation of

21  'Adjustment Value' in accordance with written

22  recommendations of Lon Mitchell."

23              So he was, in effect, giving me his input

24  on a certain portion of the purchase document, how to

25  structure it from his viewpoint.

1            MS. CRESWELL:  Enter redline redraft

2  Agreement and Plan of Merger into the record as

3  Exhibit 2.  This exhibit consists of pages 1 through 35.

4       Q    (BY MS. CRESWELL)  Have you seen this document

5  previously, Mr. Chachere?

6       A    Back in 1999, I believe.

7       Q    Okay.  Are you familiar with its contents?

8       A    Well, I haven't read it over; but I was

9  familiar with it back then, yes.

10       Q    Can you refer back now, Mr. Chachere, to

11  Exhibit 1?

12            The date would be 8/30 of '99.

13            This particular entry has various

14  components to it, "discussion with Attorney

15  Kaitson . . . preparation of e-mail message as to

16  specific provisions to review; review of redrafted

17  'Agreement and Plan of Merger.'"

18            Do you see that?

19       A    Yes.

20       Q    Is Exhibit 2, which we have just talked about,

21  the Agreement and Plan of Merger, is Exhibit 2 redline

22  redraft Agreement and Plan of Merger, is this the

23  agreement that's referred to in Exhibit 1 on the date of

24  8/30/99?

25       A    I believe it is.

1    Q    Okay.  Who did the redrafts of Exhibit 2?

2    A    Well, I assume I did it.  I don't specifically

3  recall, but I certainly was working on it.  So I assume

4  that I did this redraft.

5    Q    Exhibit 2 appears to be a stock purchase

6  followed by a merger.

7         Is that your understanding of this

8  document?

9    A    Yes.

10   Q    Is this a version of the Agreement and Plan of

11  Merger referred to again in Exhibit 1 on 8/20?

12   A    It should be, yes.  It should be a redline

13  redraft of that one referred to on 8/20 that was

14  submitted.

15   Q    I'd like to go through a few more dates on

16  Exhibit 1 and just confirm that that is the same

17  Agreement and Plan of Merger.

18         Can you look at 8/27/99 of Exhibit 1,

19  which is making reference to another redline redraft?

20         Would that also be the Agreement and Plan

21  of Merger?

22   A    Yes, it would be.

23   Q    Okay.

24   A    There may have been, you know, several redline

25  redrafts.

1     Q     Right.  Right.

2                   And then on 9/8 of Exhibit 1, is this the

3   Agreement and Plan of Merger also?

4                   It's talking about a redline redraft

5   there.

6     A     I believe so.

7     Q     Then on 9/9 of Exhibit 1, again, it's using

8   that phrase, "redline redraft."

9                   Would that also be the Agreement and Plan

10  of Merger?

11    A     On which date?

12    Q     9/9 --

13    A     9/9.

14    Q     -- of Exhibit 1.

15    A     I assume so.

16    Q     Okay.  And then lastly on 9/14 of Exhibit 1, it

17  says "Work on revisions to provisions."

18                  Would that also be provisions of the

19  Agreement and Plan of Merger?

20    A     I assume so.

21    Q     Okay.  Thank you.

22                  If you now, Mr. Chachere, would refer to

23  9/8 of Exhibit 1, the date 9/8, this entry has to do

24  with a meeting in Kansas City and mentions a gentleman

25  by the name of Bill Bray.

1             Can you tell me who Bill Bray was?

2      A     Bill Bray is an executive with Midcoast Energy

3 Resources, Inc.; and I don't recall at that time whether

4 he was actually an employee or a consultant at that

5 time.

6      Q     Okay.  What type of work was he doing, or what

7 was his job responsibility with Midcoast?  Do you recall

8 that?

9      A     Currently he's head of business development,

10 and I believe at that time he was developing business

11 for Midcoast.

12     Q     What would have been his role in this

13 particular transaction?

14     A     Oh, I think basically bring the deal to the

15 table and possibly, you know, help with the due

16 diligence.

17     Q     If you would now refer to Exhibit 1, the entry

18 for 9/9, which among other activities contains a phone

19 call discussion with -- pardon me.  I meant to say

20 "9/20."  I'm not sure what I said.  I may have said

21 "9/9."  Let me start again.

22             Please refer to 9/20 of Exhibit 1, which,

23 among other things, contains a phone call and discussion

24 with an attorney by the name of Graham Taylor.

25             Can you tell me who Graham Taylor is,

1  Mr. Chachere?

2      A    Yes.  He was the lead attorney representing the

3  Fortrend group that came in.

4      Q    Had you ever had any contact with Graham Taylor

5  before this transaction?

6      A    No.  I've never heard of him before.

7      Q    Do you know what -- did he work for an outside

8  law firm, or was he a --

9      A    Yes.  He worked for LeBoeuf Lamb.  He's a

10 partner in LeBoeuf Lamb out of San Francisco.

11     Q    What was his role in the transaction, Graham

12 Taylor?

13     A    He was the lead attorney representing his

14 client.

15     Q    Was he someone that you would have dealt with

16 fairly regularly?

17     A    You mean at this time, during this transaction?

18     Q    Uh-huh.

19     A    I don't see him listed before.  That must have

20 been my first contact with him on that date.

21     Q    Okay.  This entry of 9/20/99 of Exhibit 1 also

22 mentions an Attorney Greene.

23          Can you tell me who attorney Greene is?

24     A    I think that that's a -- where is it -- but I

25 think that that must be a --

1    Q    It's down at the very last wording there on

2   9/20.

3    A    That's probably my mistake in not putting

4   "Graham" and putting "Greene."

5    Q    Oh, okay.  So a typo perhaps.  That should have

6   been --

7    A    Well, it's not really a typo, because I kept

8   time slips and I would write on the time slips and then

9   my secretary would just take the time slips and, you

10   know, make out the billings.  And I'm sure I -- I do

11   them very hurriedly, and I probably wrote down "Greene"

12   instead of "Graham."

13          I was probably thinking of Graham Greene

14   is what -- I think.

15    Q    Okay.  The entry, again, on 9/20 of Exhibit 1

16   mentions "Pipeline Holding Partners."  I'm not familiar

17   with that entity.

18          Who is Pipeline Holding Partners?

19    A    That was the name, I think, that was given to

20   me that would be involved in the transaction that Graham

21   Taylor would be representing, the name of the company.

22    Q    Okay.  So that was the name that was given to

23   you by --

24    A    Yeah, I'm sure --

25    Q    -- Graham Taylor.

1      A      -- that was the name at the time; and I wrote

2  it down on the time slip.

3      Q      Okay.

4              MS. PETERS:  So that would be an entity

5  affiliated with Fortrend or what --

6              THE WITNESS:  Yes, it would be Fortrend,

7  yeah.

8      Q      (BY MS. CRESWELL)  Okay.  So starting at 9/20,

9  no further reference is made to the Agreement and Plan

10  of Merger.

11              Can you tell me what happened to that

12  Agreement and Plan of Merger that was referenced

13  previously?

14      A      Oh, I don't specifically remember.  I mean, I'm

15  having to go back and try to recall just basically on

16  this descriptive stuff on the billing; but I don't

17  specifically recall what happened to that document or

18  that, you know, draft or whatever.

19              MS. PETERS:  Do you know if that was ever

20  completed or executed or --

21              THE WITNESS:  No, it wasn't executed

22  because this was between, you know, Bishop Group

23  Limited, Dennis M. Langley, and Midcoast -- you know,

24  Midcoast Acquisition Company.  So it was not completed.

25              MS. PETERS:  Do you have -- do you know

1  why it was not completed?

2               THE WITNESS:  Well, we began working on a

3  deal with the Fortrend group, who had come in and

4  apparently was going to buy the stock of -- from Langley

5  and then sell assets out to Midcoast.

6               Now, we didn't stop working with Langley

7  or his attorneys.  In other words, we went on two

8  tracks.  We kept one track where we were still trying to

9  make a deal with them and do a purchase agreement with

10 them; and we had a second track where we were

11 negotiating and trying to do a deal with the Fortrend

12 group.

13              MS. PETERS:  And how were those two tracks

14 different?

15              THE WITNESS:  Well, one, we were dealing

16 directly with Langley and his attorneys to see if we

17 could come to terms with them.  The other one, we were

18 dealing with the attorneys for the Fortrend group.  It

19 was two different transactions.

20              MS. PETERS:  Uh-huh.

21              And what was the substance of your

22 transaction with Langley after the point where Fortrend

23 comes into the picture?

24              THE WITNESS:  The substance of it?

25              MS. PETERS:  What kind of a transaction

1  was it?

2                THE WITNESS:  A stock purchase.

3                MS. PETERS:  So in your discussions with

4  Fortrend, the discussions -- I'm sorry.

5                So in your understanding of the

6  transaction that was being negotiated between Midcoast

7  and Mr. Langley, who was actually going to execute that

8  agreement in its final form for the stock?

9                THE WITNESS:  Whoever the stockholders

10  were.  I mean, I don't recall.  I mean, Langley was the

11  ultimate entity, if you will; but there were -- you

12  know, there were holding companies and I don't remember

13  what all, but basically it was a deal with Langley, you

14  know.

15                MS. PETERS:  And who was going to be

16  purchasing the stock?

17                THE WITNESS:  Midcoast Energy Resources

18                MS. PETERS:  And so in the agreement that

19  you're negotiating with Langley, all of these different

20  drafts about the stock, those agreements state that

21  they're between Langley and Midcoast?

22                THE WITNESS:  I don't have any of them;

23  but I assume so, yeah.  That's my recollection, that we

24  were on two tracks at the time.

25                MS. PETERS:  Okay.

1            MS. CRESWELL:  Enter a letter regarding

2    confidentiality from Fortrend to Midcoast and dated

3    September the 20th, 1999, into the record as Exhibit 3.

4    This letter is numbered MID 2.1-439 through MID 2.1-440.

5        Q    (BY MS. CRESWELL)  Have you ever seen this

6    document, Mr. Chachere?

7        A    I don't remember it.

8        Q    Do you recognize the handwriting -- or the

9    signature, I should say, that's on page 2 of the

10   document?

11       A    The signature of Richard Robert, that looks

12   like his signature.  That was squiggle marks that he

13   makes.

14       Q    Do you recognize the signature above his,

15   "Craig Hoffman"?

16       A    No, ma'am.

17       Q    And could you flip back to page 1?

18            Do you recognize the handwriting that's

19   there on the first page?

20       A    No, ma'am.

21       Q    Okay.  If you'll look in the bulleted first

22   paragraph there in Exhibit 3, there is reference made on

23   the third sentence down to "Evaluation Materials."

24            Did you ever see the evaluation materials

25   that's referenced there?

1     A     I don't know what evaluation material they're

2   referring to.  I mean, I would have to read the

3   document.  I don't recall.  I just don't recall any,

4   being involved with it.

5     Q     It would have been evaluation material provided

6   from Fortrend --

7     A     Right.

8     Q     -- to Midcoast.

9            The letter goes on to state that the

10  evaluation material is to be promptly returned to

11  Fortrend.

12           So, again, refreshing your memory, do you

13  recall ever having seen any evaluation material?

14    A     I don't recall this letter, and I don't recall

15  being involved with that aspect of it.

16           MS. PETERS:  Did you receive any materials

17  that you were told you needed to return?

18           THE WITNESS:  I just don't have any

19  recollection of it.

20           MS. PETERS:  This 9/20/99 entry on

21  Exhibit 1 that references a Purchase and Sale Agreement,

22  was this an agreement already in process when you

23  received it; or what kind of -- what was that?

24           THE WITNESS:  I don't specifically recall.

25  I'd just have to read back through this and see if I can

1  figure out what it was, but I don't have any -- it's

2  been more than four years ago.  I just don't remember.

3          MS. PETERS:  Okay.  On the entry dated

4  9/21/99 on Exhibit 1, it says "Work on draft of Purchase

5  and Sale Agreement between Pipeline Holdings Partners

6  and Midcoast for certain assets."

7          THE WITNESS:  Okay.  Well, that tells me

8  it was with the Fortrend group, whom I was told the

9  buyer would be Pipeline Holdings Partners.  So that

10  tells me it was a Purchase and Sale Agreement between

11  Midcoast and Pipeline Holdings Partners.

12          MS. PETERS:  Was that agreement ever

13  completed, or did that -- what happened to that

14  agreement?

15          THE WITNESS:  Well, an asset purchase

16  agreement was completed and a deal done, a transaction

17  done and assets purchased, yes.

18          MS. PETERS:  Okay.  Is this draft, then,

19  the --

20          THE WITNESS:  That would be the genesis of

21  it, I would say, yeah.  I mean, that's -- I believe that

22  would be correct.

23          MS. PETERS:  And was that Purchase and

24  Sale Agreement, this original document that you started

25  with in the drafting process, would that have come from

1  Fortrend?

2             THE WITNESS:  It either came from Fortrend

3  or from us; and I don't remember who -- you know, who it

4  came from.  I'm assuming that we drew it up, but I don't

5  specifically recall.

6             MS. PETERS:  Okay.

7      Q    (BY MS. CRESWELL)  How did you know to contact

8  Graham Taylor?  Did someone give you his name or --

9      A    Yes.

10      Q    Do you recall who?

11      A    No, ma'am.  It would be somebody in the

12  Midcoast group.

13      Q    Someone at Midcoast?

14      A    Yeah.

15      Q    Okay.  Let's look now at Exhibit 1,

16  Mr. Chachere, on the date 9/22.  There's a reference

17  there to an Attorney Cynthia Morelli.

18             Who is Attorney Cynthia Morelli?

19      A    She was an associate with LeBoeuf Lamb that

20  worked directly under Graham Taylor on this transaction,

21  and she was also from San Francisco.

22      Q    Okay.  So she was also representing the

23  Fortrend entity.

24      A    Yes.

25      Q    If you could now look at the date of 9/23 of

1  Exhibit 1, there's a reference made there to a Barbara

2  Jordan.

3             Who is Barbara Jordan?

4     A     I'm trying to remember.  I'm assuming she

5  worked for Midcoast, and I just can't recall --

6     Q     Okay.

7     A     -- for sure.

8     Q     Okay.  If you'll move now to the dates of 9/27,

9  9/28, and 9/29 of Exhibit 1, this has to do with a

10 meeting in Kansas City where various documents were

11 worked on and various persons were met with; is that

12 correct?

13    A     Yes.

14    Q     What was discussed at the meetings with -- over

15 these three days with Attorney Monaldo and various other

16 individuals?

17    A     Again, I just don't have any specific

18 recollection of those meetings.  I'm having to rely

19 strictly on this --

20    Q     Right.  I was hoping maybe --

21    A     -- Exhibit 1.

22    Q     -- as you read through, there might be

23 something that would jog your memory.

24    A     If there's something in here, I'm -- you know,

25 that's what I'm going on is just reading that --

1    Q    Right.

2    A    -- but specifically I don't recall.

3    Q    Would you -- would you know what documents

4  would have been worked on?

5    A    Well, a stock purchase agreement would have

6  been worked on, I believe; and then there were ancillary

7  agreements with that.

8    Q    And if I remember correctly, Mr. Monaldo or

9  Attorney Monaldo was a representative of Dennis Langley

10  and The Bishop Group; is that correct?

11    A    He was one of the attorneys --

12    Q    Okay.

13    A    -- yes.

14    Q    And Attorney Pryde, I believe, worked for Bryan

15  Cave, who represented --

16    A    Yes, ma'am.

17    Q    -- Dennis Langley and The Bishop Group; is that

18  correct?

19    A    Right.

20         Monaldo was out of another little town in

21  Kansas, and he was basically Langley's personal attorney

22  is the way I would couch it.

23    Q    Okay.  Okay.  If you would now, Mr. Chachere,

24  look at the date of 9/30 of Exhibit 1, the last sentence

25  of this particular entry references "receipt and review

1  of changes suggested by Price, Waterhouse, Coopers to

2  the Letter of Intent and telephone discussion with Chris

3  Kaitson concerning same."

4            Do you see that?

5  A    Yes, ma'am.

6  Q    What was the role of PricewaterhouseCoopers in

7  this transaction?

8  A    They were accountants for Midcoast Energy

9  Resources, Inc., and advised them on tax matters.

10  Q    Did any of the parties of

11  PricewaterhouseCoopers represent any other ends of this

12  transaction or any other people, or was it just Midcoast

13  that they were representing?

14  A    I'm not aware of them representing anybody

15  else.

16  Q    Okay.  Did they assist with the actual drafting

17  of the documents?

18  A    One of their -- yes, one of their attorneys who

19  was a CPA and an attorney did primarily.

20  Q    Which attorney would that have been, if you

21  recall?

22  A    Well, from reviewing this, it was Gary Wilcox.

23  Q    Did he also assist with the document

24  negotiation, Mr. Wilcox?

25  A    Which document negotiation?

1          MS. PETERS:  Did he participate in

2     negotiations of the transaction?

3          THE WITNESS:  Well, let me say this:  The

4     process is an evolving process.  He was not involved

5     initially; but later on, my client brought him in and

6     needed some expertise beyond what -- Tom Palmisano was

7     the guy that was involved for Pricewaterhouse, who's not

8     an attorney, I don't believe.  He's an accountant, a

9     CPA.

10         And I believe it was on his recommendation

11    that Gary Wilcox came in; and he was, you know, the tax

12    expert.  And, yes, he did the structuring at a certain

13    point in time.

14         MS. PETERS:  At what point did he come in?

15    Was there a particular point in time that Gary Wilcox

16    became involved?

17         THE WITNESS:  Well, I remember when we

18    started negotiating with Fortrend, he was -- you know,

19    he came in.

20    Q    (BY MS. CRESWELL)  So that would have been

21    around 9/20, referencing Exhibit 1, where reference is

22    made to Graham Taylor?  Would that be somewhere in that

23    time frame?

24    A    I assume that's right.  I don't specifically

25    recall.  Again, I'm just having to rely on these notes.

1     Q     Right.  I understand.

2               So as far as contact with Pricewaterhouse,

3     would it normally have been Gary Wilcox that you would

4     have dealt with or --

5     A     Well, I really -- that was not my role.  Okay?

6     So I didn't really normally deal with

7     PricewaterhouseCoopers.  You know, that would be Richard

8     Robert, yeah.

9               MS. PETERS:  Why would Gary Wilcox have

10    contacted you or had any discussion with you?

11              THE WITNESS:  Contacted me?

12              MS. PETERS:  Or why would you have had any

13    discussions with Gary Wilcox or any contact with him?

14              THE WITNESS:  My client brought him in to,

15    you know, help structure the transaction with regard to

16    Fortrend.

17              MS. PETERS:  Did he ever contact you

18    individually to convey information or to ask a question

19    or --

20              THE WITNESS:  Well, I mean, I remember

21    seeing him in Kansas City and I was involved in some

22    meetings with him, but it wasn't me directly.  I mean,

23    it was -- I mean, I was in the group, I guess.  So I'm

24    not following exactly what you want but --

25              MS. PETERS:  Did you exchange e-mails with

1  him or --

2          THE WITNESS:  Probably not because most

3  everything was done in Kansas City; and so even the

4  drafting, the documents that were typed and so forth,

5  was with Bryan Cave's typing pool.

6          Now, I did go back to Corpus in between

7  and there was some drafting done there, but I don't

8  recall specifically any e-mails with Gary.

9          MS. PETERS:  What was your understanding

10  of the relationship between Gary Wilcox and Fortrend?

11          THE WITNESS:  I don't know of any

12  relationship between Gary Wilcox and Fortrend.  He was

13  with PricewaterhouseCoopers representing Midcoast Energy

14  Resources.

15          MS. PETERS:  What was your understanding

16  of how Fortrend became involved with this transaction?

17          MR. STERN:  I'm going to object and

18  instruct the witness not to answer to the extent that

19  answering would require you to reveal any confidential

20  communications with your client.  Otherwise, you're free

21  to answer.

22          THE WITNESS:  Would you repeat the

23  question?

24          MS. PETERS:  What was your understanding

25  of how Fortrend became involved in this transaction?

1                    THE WITNESS:  I don't have personal

2    knowledge of how they got involved in it.

3                    MS. PETERS:  Did you ever meet with anyone

4    from Fortrend?

5                    THE WITNESS:  Craig Hoffman.

6                    MS. PETERS:  And what was your

7    understanding of what Craig Hoffman's role was in the

8    transaction?

9                    THE WITNESS:  He was an executive for

10   Fortrend, I believe.  I mean --

11                   MS. PETERS:  Did he participate in any

12   negotiations or drafting?

13                   THE WITNESS:  He was at some meetings.  I

14   know that.

15                   MS. PETERS:  Were all the meetings held in

16   Kansas City, or were some held in Houston?

17                   THE WITNESS:  There was one meeting held

18   in Houston.

19                   MS. PETERS:  And was Craig Hoffman present

20   at that meeting?

21                   THE WITNESS:  No.  That was not with

22   Fortrend.

23                   MS. PETERS:  Okay.

24       Q    (BY MS. CRESWELL)  Let me back up, if I could,

25   just a minute, Mr. Chachere.

1            You've stated with PricewaterhouseCoopers

2    that you did have some contact with Gary Wilcox and

3    Paul -- Tom Palmisano.

4            Were there any other persons with

5    Pricewaterhouse that you dealt with?

6        A    Not that I recall.

7        Q    Okay.

8            MS. CRESWELL:  Enter letter of intent from

9    K-Pipe Holdings Partners to Midcoast dated September

10   the 30th into the record as Exhibit 4.  This document

11   consists of pages 1 through 4.

12       Q    (BY MS. CRESWELL)  Are you familiar with this

13   document, Mr. Chachere?

14       A    I'm sure I was in 1999.  I'm not familiar with

15   it at this point.

16       Q    So you think you would have seen this document

17   in 1999; is that correct?

18       A    Yes, ma'am.

19       Q    Can you confirm the signatures on the last

20   page?

21       A    I believe that's Dan Tutcher's signature.  The

22   one for K-Pipe Holdings, I wouldn't know.

23       Q    Okay.

24            MS. PETERS:  Did you have any contact with

25   Jeff Furman?

1          THE WITNESS:  The name kind of rings a

2    bell, but I don't really -- I can't picture him.  I

3    don't remember him at all.

4    Q    (BY MS. CRESWELL)  Is this a letter that you

5    would have drafted?

6    A    I don't think that I drafted this, but I don't

7    really -- I don't really recall.

8    Q    What was your understanding as to whether

9    Mr. Langley was negotiating with other buyers at this

10   particular time, September the 30th, other than

11   Midcoast?

12          MR. STERN:  Would you read that question

13   back?

14          MS. CRESWELL:  Sure.

15          Would you like for me to just restate it,

16   if that's okay?

17          MR. STERN:  Yeah.

18          MS. CRESWELL:  On September 30th, what was

19   Mr. Chachere's understanding as to whether Mr. Langley

20   was negotiating with other buyers other than Midcoast?

21   A    Well, he was apparently negotiating with

22   Fortrend at that time; and I believe at the time we were

23   concerned that he might be negotiating with yet another

24   party also.

25   Q    (BY MS. CRESWELL)  You don't recall the other

1  party's --

2      A    No.  We didn't know -- I think my client may

3  have suspected who it was, but I don't remember the name

4  or whatever.

5      Q    Were you aware at the time this document was

6  signed, which is Exhibit 4 --

7                MS. PETERS:  Is this the letter of intent

8  that's referred to on the entry for 9/30/99 in Exhibit 1

9  where it says "Letter of Intent" toward the bottom?

10                THE WITNESS:  I assume it must be.  I

11  mean, that seems logical to me it is that one; but I

12  don't have any independent recollection of that.  I'm

13  just relying on this rendition on the billing.

14                MS. PETERS:  So when this says

15  "receipt" -- in Exhibit 1 here on 9/30/99, it says

16  "receipt and review of changes suggested by Price,

17  Waterhouse, Coopers to the Letter of Intent," who would

18  have sent you the suggestions referred to?

19                THE WITNESS:  Well, it would either have

20  to be -- I mean, I don't know who sent them to me.  I

21  mean, it could have come from Richard Robert.  It could

22  have come from, you know, my client but -- I mean, if

23  that's what you're asking.  I don't know who it came

24  from but --

25                MS. PETERS:  Was -- in the course of this

1  transaction, was it normal for Pricewaterhouse to review

2  documents that you were negotiating?

3            THE WITNESS:  Was it normal?

4            MS. PETERS:  Uh-huh.

5            THE WITNESS:  In this transaction, yeah.

6  They were involved -- Tom Palmisano was involved, I

7  believe, right from the beginning, although I wasn't,

8  you know, corresponding with him about it.  It would be

9  Richard Robert would be getting advice, as he would in

10 any deal; and then he would just put -- give us the

11 input of it, you know.  That would be a typical deal

12 that Midcoast would do.  They would get tax advice from

13 whoever their tax adviser was, and it would be passed on

14 by Richard Robert.

15           MS. PETERS:  Okay.

16      Q    (BY MS. CRESWELL)  Was Dennis Langley aware

17 that you had entered into this letter of Exhibit 4, to

18 your knowledge?

19      A    I do not know.

20      Q    Okay.

21           MS. PETERS:  Would this letter of

22 intent -- which is also referenced in Exhibit 1 on

23 9/24/99, it appears -- would this letter of intent have

24 been a topic at the meeting with Attorney Monaldo,

25 Pryde, Dennis Langley where it says, 9/26/99, "including

1  review of draft documents"; "work on documents," also on

2  9/27/99?

3              THE WITNESS:  Again, I don't remember what

4  was discussed at those meetings.  I just don't have any

5  recollection of it, you know.

6              MS. PETERS:  What other documents would

7  you have been discussing with them?

8              THE WITNESS:  Well, stock purchase

9  agreement that we were working on and ancillary

10 agreements with that.

11             MS. PETERS:  At this point in Exhibit 1,

12 there's just the mention of the letter of intent and the

13 Purchase and Sale Agreement.

14             Does that appear to be accurate to you?

15             THE WITNESS:  Is that what, now?

16             MS. PETERS:  I just don't see a mention of

17 "stock purchase agreement" in this portion of the

18 document, Exhibit 1.  I don't see a mention of the Stock

19 Purchase Agreement until 10/7.

20             MR. STERN:  Other than the Agreement and

21 Plan of Merger in August?

22             I'm going to object to the extent you're

23 talking about a specific portion.  I don't see it

24 divided up into portions.

25             MS. PETERS:  Up until -- up until -- well,

1  the last point at which we see any mention of the

2  Agreement and Plan of Merger appears to be August 30th;

3  and then there's some references to redline revisions,

4  as we discussed earlier, and that those were likely the

5  Agreement and Plan of Merger.

6            Then we discussed that that Agreement and

7  Plan of Merger was abandoned approximately 9/20/99 and

8  replaced with a Purchase and Sale Agreement, which

9  appears to be for certain assets and between Pipeline

10  Holding Partners and Midcoast.

11            THE WITNESS:  No, I didn't say --

12            MS. SALINAS:  I think we're

13  mischaracterizing his testimony, because he never said

14  that they abandoned the Stock Purchase Agreement.

15            THE WITNESS:  Yeah, you're -- I can answer

16  that.

17            MS. PETERS:  Okay.  Why don't you.

18            Thank you.

19            THE WITNESS:  The Agreement and Plan of

20  Merger, I didn't say that that was abandoned.  I said

21  that we were on two tracks after 9/20.  In other

22  words --

23            MS. PETERS:  Okay.  So what happened --

24            THE WITNESS:  -- we're still trying to do

25  a deal -- we're still trying to do a deal with

1  Langley --

2                MS. PETERS:  Okay.

3                THE WITNESS:  -- and at the same time,

4  we're on a second track because another buyer is in

5  trying to do a deal with him and we're trying to do a

6  deal with that buyer to buy assets if they consummate

7  the deal.

8                MS. PETERS:  Okay.

9                THE WITNESS:  Now, the documents evolved,

10  you know.  I mean, this -- I think the Agreement and

11  Plan of Merger was the document that came from Bryan

12  Cave; and so, you know, in the negotiation process, I

13  mean, you've got a -- I'm going to characterize it as a

14  big fish out there, and he's wanting to do a deal as

15  quick as he can.  He's got -- in these pipeline

16  transactions, they've got all kinds of potential buyers.

17  It's a matter of who's going to pay the best price and

18  get the deal done the quickest.

19                So, I mean, you're going in and you're

20  trying to do a transaction, but you haven't even done

21  all your due diligence.  I mean, you're working on

22  multiple things all at one time.

23                So the agreement may start out as an

24  Agreement and Plan of Merger and then it evolve into a

25  stock purchase or in this case, it evolves that another

1   buyer came in and then all of a sudden, you know, we're

2   trying to buy assets from this other buyer and then

3   there may have been a third buyer that he's sitting and

4   negotiating with at the same time.

5           So all of this is just going on at the

6   same time.  So I can't -- you know, the transaction with

7   Langley was not abandoned.

8           Now, what the nomenclature on the document

9   is, I don't know, at that time.

10          MS. PETERS:  So at the point where you

11  begin to negotiate with Fortrend to purchase assets of

12  Bishop Group, are you continuing to negotiate with

13  Bishop Group to purchase their stock?

14          THE WITNESS:  Yes, because if the deal

15  falls through with Fortrend, either from Fortrend buying

16  it from Langley or us buying it -- well, if it falls

17  through that way, we don't have a deal.  We can't -- so,

18  you know, my client wanted these assets.  So, you know,

19  they're not going to abandon the thing and then let him

20  go to this third party that's out there.  I mean,

21  they're keeping him on the string, in effect, still

22  negotiating.

23          MS. PETERS:  So at the meeting in

24  Kansas City on the 26th of September through, it

25  appears, the 28th, what documents would have -- would

1   you have been discussing with Attorney Monaldo,

2   Attorney Pryde, and Dennis Langley?  What agreements

3   would you have been discussing with them?

4            THE WITNESS:  It would have been documents

5   between -- a deal between Midcoast and Langley.  It

6   would have been, you know, a purchase of the stock, I

7   believe, and a bunch of ancillary agreements that go

8   with it.

9            For instance, I notice this guy -- if you

10  look on 9/28, it says "Attorney Chris Fisher."

11           Okay.  He was an attorney with Bryan Cave

12  that they brought in to deal with easements.  In other

13  words, when you're buying these assets or you're buying

14  the company that owns the assets, whatever the

15  transaction is -- I mean, basically what my client was

16  looking at was a pipeline through the heart of

17  Kansas City that they viewed as a very, very valuable

18  asset.

19           Okay.  Langley was a very shrewd

20  character, and he's also an attorney.  He's extremely

21  intelligent.  He wanted to keep, as I recall, rights for

22  laying fiber optic lines and so forth through these

23  easements.  So he brought in this guy, Chris Fisher.

24           Now, I remember having very heated

25  discussions with Fisher negotiating about, you know,

1   what rights that they would cut -- in effect, cut out

2   and keep; and Fisher was trying to keep for Langley

3   these certain rights through the pipeline easements,

4   which were -- as I recall, they were not very -- the

5   easements were not very wide.

6              And so you had a lot of pipe running

7   through it, and I think you're going through the old

8   part of Kansas City.  There's no way to put in bigger

9   pipelines and so forth and maybe put in the fiber optic

10  and meet all the regulations and everything.  And as I

11  recall, Langley wanted those rights to be paramount.

12             Well, here we're going to pay a huge sum

13  of money; and he's wanting to keep certain rights in

14  those easements to maybe lay fiber optic that might

15  interfere with operations.

16             So I do recall that when I see the name

17  there.  So we were discussing all that pretty heavily.

18             MS. CRESWELL:  Enter letter of intent from

19  K-Pipe Holdings Partners to Dennis Langley dated

20  September the 30th into the record as Exhibit 5.  This

21  document is numbered 000443 through 000444.

22   Q    (BY MS. CRESWELL)  Are you familiar with this

23  document or this letter, Mr. Chachere?

24   A    Not at this time.  I may have been, you know,

25  back in 1999.

43

1     Q     Did you see this document or have you seen this

2  document before?

3     A     I don't -- I don't recall if I have or not.

4     Q     Okay.  Could you flip over to page 3 and

5  confirm the signature on this document?

6     A     There's a signature purportedly of Dennis M.

7  Langley, but I'm not familiar with his signature.

8     Q     Okay.

9          MS. PETERS:  Were you aware that

10  Mr. Langley was entering into a letter of intent with

11  K-Pipe Holdings Partners?

12          THE WITNESS:  Yes, I'm -- yes, I'm sure I

13  was.  I mean, they would have to have something to start

14  their transaction.  So for buying assets from K-Pipe,

15  I'm sure I was aware that they entered into a letter of

16  intent.  I was aware they were entering -- or trying to

17  enter into a purchase agreement.

18          MS. PETERS:  Were you aware of the terms

19  of their letter of intent?

20          THE WITNESS:  I do not recall.

21     Q     (BY MS. CRESWELL)  If you could refer back,

22  Mr. Chachere, to Exhibit 1, the date of 9/27 -- okay.

23  We may have already covered this.  It says "working

24  on" -- "work on the documents."

25     A     Yeah.  My testimony was and what my belief is,

44

1  we were working on documents between Langley and

2  Midcoast, including, what I was talking about, all those

3  ancillary agreements.

4      Q    Okay.  If you could refer to Exhibit 1,

5  Mr. Chachere, the date of 10/1, there is reference made

6  to a person or an attorney by the name of Darryl

7  Haggerman.

8              Could you tell me who Darryl Haggerman is?

9      A    He was an employee of Midcoast Energy

10  Resources, Inc., in the business development department.

11  He's not an attorney, though.

12      Q    Okay.

13      A    I think he's an engineer.

14      Q    Could you describe what his role would have

15  been?

16      A    Well, I don't recall specifically; but looking

17  at this entry of 10/1/99, I must have called him asking

18  about information that would need to be completed on

19  the -- on the premerger notification form to be filed

20  with the FTC and Department of Justice.

21      Q    This entry on Exhibit 1 dated 10/1/99 also

22  makes reference to a Jan Warren.

23              Can you tell me who Jan Warren, he or she,

24  is?

25      A    It would be a she, a female; and she also was

1    an employee of Midcoast Energy Resources, Inc.  And I

2    don't remember what capacity.  I can't even picture her

3    face in my mind.

4        Q    Okay.

5             MS. PETERS:  This also mentions on 10/1/99

6    obtaining a check for 45,000.

7             What was that for?

8             THE WITNESS:  That would be the filing

9    fee.  When I, you know, filed with the Department of

10   Justice, I had to tender a 45,000-dollar fee.

11       Q    (BY MS. CRESWELL)  Moving on to the entry in

12   Exhibit 1 of the date 10/7/99, it mentions discussions

13   with attorney Jim Zakoura and regarding "implied

14   covenant of good faith and fair dealing."

15            Can you tell me who Jim Zakoura is?

16       A    He was a local attorney in, I think, Overland

17   Park, Kansas, that we were given his name.  I wanted

18   local counsel to ask some questions about some issues

19   that came up.

20       Q    And what is meant by the "covenant of good

21   faith and fair dealing"?

22            I don't understand that.

23       A    That would apply to -- specifically to Kansas

24   law, I believe, and was involved in some of the

25   documents issues with respect to that implied covenant

1    under Kansas law.

2       Q    Okay.  Exhibit 1 on 10/7 refers to various

3    handwritten requests -- requested changes to the Stock

4    Purchase Agreement.

5               Is the Stock Purchase Agreement ultimately

6    entered into between Langley and K-Pipe Merger?

7               It's found on the third line of the entry

8    on 10/7 of Exhibit 1.

9       A    No.  That would be a stock purchase agreement

10   between Midcoast and Langley.

11              MS. CRESWELL:  Enter a Fax Transmittal

12   dated 10/7/99 from Ronald Chachere to Tino Monaldo

13   regarding Stock Purchase Agreement and schedules into

14   the record as Exhibit 6.  This document is numbered

15   KP1657 through KP1676.

16      Q    (BY MS. CRESWELL)  This appears to be edits,

17   drafts to the Stock Purchase Agreement; is that correct,

18   Mr. Chachere?

19      A    To a stock purchase agreement, yes, ma'am.

20      Q    To a stock purchase agreement.

21              Are you familiar with this document?

22      A    It's my handwriting on it.

23      Q    Okay.  That was my next question.

24      A    Yeah.  But I don't specifically recall it.

25      Q    Okay.  Is this your handwriting that's found on

1   the actual Fax Transmittal sheet --

2        A    Yes, ma'am.

3        Q    -- the bold handwriting?

4        A    Yes.

5        Q    Can you identify the handwriting on the

6   subsequent pages, the bold handwriting, to be yours?

7        A    I believe so --

8        Q    Okay.

9        A    -- although some of it is not mine.  There are

10  apparently comments that were made to changes is what I

11  think I'm looking at.  So not all of those comments

12  would be mine.

13       Q    The handwriting that's standing out to me is

14  found on page KP1659, which is the third page over.

15  There's a paler or a less distinct handwriting on the

16  top right-hand margin:  question mark, "distribution of

17  excluded assets."

18            Do you recognize that lighter handwriting?

19       A    No, ma'am.

20            MS. PETERS:  Is that the handwriting

21  you're referring to when you said --

22            THE WITNESS:  Yeah, that's correct.

23  That's what I'm referring to that looks like a --

24            MS. PETERS:  That is not your handwriting.

25            THE WITNESS:  That is not mine, yes.

1     Q     (BY MS. CRESWELL)  Okay.  Exhibit 1 -- back to

2  Exhibit 1, on the date 10/7 refers to drafts of the

3  Stock Purchase Agreement and is the fax transmittal

4  Exhibit 6, which we have just looked at.

5               Is that one of the drafts that Exhibit 1

6  is referencing on 10/7?

7     A     I don't recall.  I suppose so.  I don't recall

8  specifically.

9               MS. PETERS:  Well, does it seem right to

10  you that --

11              THE WITNESS:  Yeah, it does.  It says

12  "10/7."  It's a fax.  I would assume it is, but I just

13  don't have independent recollection of it.

14    Q     (BY MS. CRESWELL)  Okay.  Let's refer now back

15  to Exhibit 1 to the date 10/8.  This entry refers to

16  review and revisions of various documents.

17              Does that appear to be a correct summary

18  of that entry, Mr. Chachere?

19    A     On 10/8?

20    Q     Yes, sir.

21    A     It says:  "Receipt and review of revised

22  schedules to Stock Purchase Agreement; receipt and

23  review of and making of handwritten revisions to the

24  Security Agreement Project Development Agreement" --

25  now, what is the question?

1    Q    Okay.  I was just confirming that we were on

2  the same -- on the same entry there on Exhibit 1.

3              MS. CRESWELL:  Enter Fax Transmittal

4  dated -- okay.

5              Enter e-mail dated 10/8/99 from James

6  Pryde to Ron Chachere, Chris Kaitson, Y. Korb, and Tino

7  Monaldo regarding the Stock Purchase Agreement into the

8  record as Exhibit 7.  This document is numbered 002678.

9    Q    (BY MS. CRESWELL)  Are you familiar with this

10  e-mail, Mr. Chachere?

11    A    I don't recall it.  I have no independent

12  recollection of it.

13    Q    I'll give you a minute to look at it and see if

14  you recall the contents.

15    A    Okay.

16              (Reading silently.)

17              Again, I just don't have any specific

18  recollection but --

19    Q    Does it seem familiar to you, the contents seem

20  familiar?

21    A    Some of it, I think, would be, yeah.  I mean,

22  I --

23    Q    Is this an item -- is this Exhibit 7 an item

24  referenced to in Exhibit 1 on the date 10/8?

25              The first line is talking about receipt

1    and review of revised schedules to the Stock Purchase

2    Agreement.

3                    Would this -- would Exhibit 7 have been

4    the actual revised schedules?

5        A    Well, I mean, it says it's attached as a

6    revised blackline Stock Purchase Agreement.  So looks

7    like it's talking about the body of it rather than

8    schedules on the -- on the e-mail.

9                    MS. PETERS:  No. 2 on the e-mail of

10   Exhibit 7 states "Company Disclosure Schedule"?

11                   THE WITNESS:  Okay.  Yeah.

12                   MS. PETERS:  Were those schedules attached

13   to the Stock Purchase Agreement?

14                   THE WITNESS:  I don't remember.  I assume

15   they were.  I mean, that's what the e-mail's saying.  I

16   mean, I don't remember but --

17       Q    (BY MS. CRESWELL)  Okay, Mr. Chachere, that

18   Paragraph 1 that's numbered Paragraph 1 in Exhibit 7,

19   says that the:  "Dates in Article 2 and 11 have not been

20   approved by Dennis."

21                   Is that "Dennis" Dennis Langley they would

22   be referring to there?

23       A    That's the only Dennis I was familiar with in

24   the transaction, yes.

25       Q    Okay.  Paragraph 4 also makes reference to

1   "Dennis."

2              Again, would that have been Dennis

3   Langley?

4      A    It would have to be, yes.

5      Q    Okay.  Paragraph 4 also makes reference to

6   "Tino."

7              Would that be Tino Monaldo?

8      A    Yes.

9      Q    Okay.  There is also a reference on Paragraph 3

10  of Exhibit 7 to "PDA."

11             Would that be "project development

12  agreement"?

13     A    I'm sure it is, yes.

14     Q    And then Paragraph 3 also makes reference to

15  "CRIA."

16             What is that?

17     A    I can't think what that is.

18             Oh, contingent revenue interest agreement.

19     Q    Oh, okay.

20             Do you have -- thank you for coming up

21  with that acronym, but do you know what that would be

22  associated with?

23     A    I believe -- and, again, I'm very cold on all

24  this and I have not reviewed any of these documents, but

25  Langley was going to, in effect, keep a revenue interest

1  or revenue stream.  And the way he was going to do it is

2  intercompanywise or with affiliates.

3              So, in essence, see, he's putting a deal

4  out there that he's going to sell; but at the same time,

5  he's negotiating trying to keep whatever he can syphon

6  off or keep.  And one of the things was a contingent

7  revenue interest in -- and I believe it had to do with

8  possibly maybe adding new business to the existing

9  pipeline.

10             He would, in effect, get what we would

11  refer to as a kicker.  In other words, he would get a

12  certain portion of that revenue, maybe for a certain

13  period of time, because, I mean -- so he would attribute

14  more value than just the cash; and so he would come up

15  with these agreements that he wanted to put into place.

16             So when you bought either the stock or the

17  assets, you were, in effect, inheriting those

18  obligations.

19     Q     Did that ever become part of the final deal?

20  Do you know?

21     A     I believe it did, yeah.  I'm pretty sure it

22  did.

23             MR. STERN:  We've been going over an hour.

24             You want to take a break?

25             MS. CRESWELL:  Oh, yeah.  I was so

1  fascinated -- thank you.

2            We'll go off the record and take a break.

3            (A break was taken from 10:13 to

4            10:24 a.m.)

5    Q    (BY MS. CRESWELL)  I'd like to remind you,

6  Mr. Chachere, that you are still under oath.

7            If you would refer now to Exhibit 1, the

8  date of 10/11 of Exhibit 1.  This entry makes reference

9  to a man by the name of Don Whittington.

10           Can you identify Don Whittington?

11   A    He's also an employee of Midcoast Energy

12  Resources, Inc.  He works in the regulatory field.

13   Q    Okay.

14           MS. CRESWELL:  Enter Fax Transmittal dated

15  10/12/99 from Ron Chachere to Jim Pryde and Chris

16  Kaitson into the record as Exhibit 8.  Attached to this

17  Fax Transmittal is a draft of a Security Agreement, and

18  this document is numbered KP1392 through KP1398 and

19  Bates stamped 002414 through 002420.

20           MR. STERN:  Could we just have the source

21  of these documents?

22           MS. CRESWELL:  Pardon?  I'm sorry?

23           MR. STERN:  These weren't produced by

24  Midcoast?

25           MS. PETERS:  No.

1                  MS. CRESWELL:  No.

2                  MR. STERN:  So what is the source?

3                  (Sotto voce discussion.)

4                  MS. PETERS:  It's Bryan Cave.

5                  MS. CRESWELL:  Bryan Cave.

6                  MS. SALINAS:  There's two different Bates

7  numbers on there.

8                  Are they both Bryan Cave's Bates numbers?

9                  MS. CRESWELL:  No.  The top number, the

10  002414, is my Bates stamp.

11                  MS. SALINAS:  Oh, okay.

12                  MS. CRESWELL:  The second one is the Bryan

13  Cave.

14                  MS. SALINAS:  Is the Bryan Cave.

15                  MS. CRESWELL:  Right.

16                  MS. SALINAS:  Okay.

17                  MS. CRESWELL:  Yeah.

18      Q    (BY MS. CRESWELL)  Okay.  Are you familiar with

19  this document, Mr. Chachere?

20      A    I don't recall it specifically, but I am

21  familiar with the project development agreement.  I

22  don't specifically remember the Security Agreement, but

23  it is my handwriting on it.

24      Q    That was going to be my next question.

25                  Can you identify the -- there's a bold

1   handwriting, and then there is a -- again, a lighter or

2   smaller, finer handwriting.

3               Which is your --

4        A    Mine would be the bold -- bolder handwriting.

5        Q    Okay.  And that bold handwriting is found

6   throughout the document.

7               Would that be, the same handwriting, your

8   handwriting?

9        A    Yes.

10       Q    Okay.  Can you identify that -- the finer or

11   lighter handwriting that's found --

12       A    No, ma'am.

13       Q    -- also throughout?

14              MS. PETERS:  On that first -- page 2415 is

15   the Bates number -- it says "Richard Robert."

16              Would that be his handwriting or just a

17   reference to him?

18              THE WITNESS:  I'm assuming it's a

19   reference, but I really don't know.

20              MS. PETERS:  Okay.

21       Q    (BY MS. CRESWELL)  If you would now, again,

22   look back at Exhibit 1 for the date 10/12, that's making

23   reference to a revised Security Agreement on the first

24   line of that entry, on 10/12 in Exhibit 1.

25              Is this the version referred to in

1  Exhibit 1 on 10/12?

2      A    I'm sure it must be, yes.

3      Q    Okay.

4      A    It's the same date on the fax, it's attached to

5  it.  So --

6      Q    Was Exhibit 8 -- was Exhibit 8 part of the

7  project development agreement?

8      A    Well, I haven't read through it right now and I

9  don't specifically recall this instrument, but just

10  looking at it generally now, it has to do, I believe,

11  with securing the obligations on the project development

12  agreement is what it looks like.

13      Q    Okay.  Was the project development agreement --

14  I believe there were two of them.

15           Were they negotiated by Langley and

16  Midcoast?

17      A    Yes.

18      Q    Who participated in the negotiations for those

19  project development agreements?

20      A    Well, I know I was involved and I'm sure Tino

21  Monaldo was involved and I'm sure Jim Pryde was

22  involved.  And then from the Midcoast side, I don't

23  specifically remember; but, you know, it would have to

24  be the executives involved, you know, and probably Jim

25  Berthelot and/or Richard Robert.  I would not -- I would

1   be just the attorney involved.

2       Q    Did anyone with Fortrend participate in the

3   project -- in the negotiations for the project

4   development agreements?

5       A    I don't recall.

6       Q    Can you refer, Mr. Chachere, to Exhibit 1, the

7   entry for 10/13?

8                (Sotto voce discussion.)

9       Q    (BY MS. CRESWELL)  Yvonne is reminding me that

10  you have identified Chris Fisher.

11               I'm sorry.  I missed that.  His name is

12  about halfway down in this entry but --

13      A    He was an attorney that worked for Bryan Cave

14  that was brought in specifically to deal with --

15      Q    That's right.

16      A    -- with the -- you know, the easement issue.

17      Q    Yes.  I do remember now.  Thank you.

18               MS. PETERS:  These easement issues, that

19  was part of your Stock Purchase Agreement negotiations

20  as opposed to the project development agreement?

21               THE WITNESS:  I believe so.  It would have

22  to be, yeah.

23               MS. PETERS:  Okay.

24               MS. CRESWELL:  Enter Fax Transmittal and

25  fax dated 10/14 from Ronald Chachere to Jim Pryde into

1   the record as Exhibit 9.  This exhibit is numbered

2   KP1448 through KP1450.

3        Q    (BY MS. CRESWELL)  I'll give you a minute to

4   look at this document.

5        A    (Reading silently.)

6        Q    Are you familiar with this document,

7   Mr. Chachere?

8        A    Not at this time.  I must have been back in

9   1999.

10        Q    Did you -- would you have assisted with

11   drafting this document?

12        A    Yes.

13        Q    And the attachment, specifically?

14        A    Right.  Yes.

15        Q    Okay.  Is the Stock Purchase Agreement referred

16   to on the Fax Transmittal sheet the agreement ultimately

17   entered into between Langley and K-Pipe Merger on

18   October the 25th?

19        A    I don't think so.

20        Q    Okay.  Why do you say that?

21        A    Because I don't recall being involved with

22   their Stock Purchase Agreement.

23        Q    Okay.  What had led -- back to the fax.

24             What had arisen that led to your response

25   to Jim Pryde about suggested revisions as stated on the

1  Fax Transmittal sheet?

2      A    Would you repeat that?  I'm sorry.

3      Q    Yeah.  The message that's here on the Fax

4  Transmittal sheet, what had arisen -- just -- can you

5  give me your thoughts?  What led to your response there?

6      A    Well, I don't know specifically what led to it;

7  but I know generally I was having difficulty with Pryde,

8  because we were in Kansas most of the time working on

9  the documents.  We would submit handwritten changes that

10 we would ask to go through their typing pool overnight

11 and come back redlined with requested changes that we

12 wanted.  We'd get them back the next day; and they

13 wouldn't have all of our changes, which is very unusual

14 in an, you know, attorney-to-attorney relationship.

15     Q    Right.

16     A    And so it was very frustrating.

17          And then I guess this must have been the

18 time I confronted him about it.

19     Q    What was his response to that?

20          That would seem rather unusual.

21     A    It's a pretty cavalier attitude, like, you

22 know, "We don't have to do it.  We're just going to

23 accept those that we're willing to accept, and that's

24 what we're going to give you back," which made our job a

25 lot more difficult.

1     Q     Very frustrating, I imagine.

2     A     Yes.

3     Q     If you could now -- again, with Exhibit 9, if

4   you could flip to the last page, which is -- which is

5   numbered KP1450, there's a reference there to a tax

6   sharing agreement and that Richard Robert is having the

7   tax sharing agreement reviewed by Midcoast's tax

8   advisers.

9              Who exactly would that have been?

10     A     PricewaterhouseCoopers.

11     Q     Would that have been something that Gary Wilcox

12   would have been involved with?

13     A     Possibly, yes.

14              MS. PETERS:  Would that be Tom --

15              THE WITNESS:  Palmisano.

16              I mean, those are the only two that I

17   visited with.  I don't know if there were additional

18   people working, you know, with PWC; but I'm presuming it

19   would be those two, though.

20     Q     (BY MS. CRESWELL)  Okay.  If you could now

21   reference back again to Exhibit 1, the date of 10/14,

22   various things are included there on that entry; but the

23   sixth line down does state "faxing of same to Attorney

24   Pryde with a message."

25              Would that be referencing Exhibit 9,

1  Mr. Chachere, which is, of course, the Fax Transmittal

2  to Jim Pryde?

3      A    I presume so because it's -- the Fax

4  Transmittal is dated 10/14/99.

5      Q    Okay.  If you could now, again, refer to

6  Exhibit 1, the dates here would be 10/20 and 10/21.

7              10/20 states:  "To Kansas City regarding

8  discussions with Richard Robert and Chip Berthelot;

9  extensive meetings with Attorney Monaldo, Attorney

10 Pryde, Attorney Fisher, Attorney Kaitson, et al, working

11 on agreements."

12             And then 10/21:  "Continuation of meetings

13 and work on documents."

14             Is that correct, Mr. Chachere?

15     A    That's what the entry says, yes, ma'am.

16     Q    Okay.  Do you recall this meeting in

17 Kansas City?

18     A    Not specifically, no.

19     Q    The entry makes reference to discussions.

20             Do you remember what was discussed?

21     A    Well, I see Attorney Fisher's name in there.

22 So that tells me -- and he was brought in specifically

23 for the easement problem.  So I know that that was --

24 that had to be discussed.  I mean, we had extensive

25 discussions and blow-ups about that.

1    Q    Do you recall specifically what documents would

2  have been included there, as referenced on 10/21 of

3  Exhibit 1?

4    A    No, ma'am.  The only thing I can say is with

5  Fisher's name, it would be whatever document, you know,

6  dealt with the easement situation.

7    Q    Sounds like Langley and his group were really

8  trying to drive a hard bargain.

9           Okay.  If you would refer now to

10  Exhibit 1, the dates of October the 22nd, 23rd, and

11  24th:  "Continued extensive meetings with and work on

12  documents with all parties and attorneys, including Gary

13  Wilcox and Tom Palmisano, Craig Hoffman, Attorney

14  Morelli, Attorney Monaldo, Attorney Pryde, Attorney

15  Kaitson, Richard Robert and Chip Berthelot; return to

16  Corpus Christi."

17           In this respect in referencing Gary

18  Wilcox, could you explain to us what he was working on

19  at this point in regards to the transaction, if you can

20  recall that from this entry?

21    A    He would have been working on the transaction

22  between K-Pipe Partners and Midcoast.

23    Q    Would that have been the same answer as far as

24  Paul -- Tom Palmisano, also in reference to the dates of

25  10/22, 23, and 24 of Exhibit 1?

1     A    I believe so, yes.

2     Q    Okay.  Do you have any specific recollections

3  of Craig Hoffman at this meeting, what he would have

4  been concerned with or what he would have been

5  negotiating for?

6     A    I believe that he was, you know, an executive

7  with Fortrend.

8     Q    Was he an attorney?  Do you recall?

9     A    No, I don't think so.

10         MS. PETERS:  And what was Fortrend doing

11  at this meeting?

12         THE WITNESS:  Well, Fortrend was the group

13  that formed the K-Pipe Partners that bought the stock --

14  ultimately bought the stock from Langley and then sold

15  certain assets to Midcoast.

16     Q    (BY MS. CRESWELL)  It sounds like from reading

17  Exhibit 1 on the dates of 22, 23, and 10/24 that you

18  were still in Kansas City.  I'm not seeing that you

19  returned but -- so essentially you have been there, you

20  know, several days.  It sounds like a pretty rigorous

21  meeting that you were going through.

22         Specifically can you can elaborate on the

23  continuity of those meetings through that time period?

24     A    Well, I don't recall specifically; but, I mean,

25  I'm just having to pick up, the same as you, looking at

1   those dates, that we were up there for a long period of

2   time.

3              I remember at one point -- and I don't

4   know if it was during this point or not; but Langley

5   says, "If anybody leaves, the deal's off."

6       Q    Wow.

7       A    We wanted to leave for the weekend and then

8   come back on Monday, you know; and I don't know if that

9   was this period of time or not.  But, you know, I mean,

10  we were working on the deal with -- obviously with

11  K-Pipe at that point.

12             MS. PETERS:  Do you recall which document

13  you would have been working on at this time?

14             THE WITNESS:  Well, with K-Pipe, it would

15  be, you know, the asset purchase agreement or whatever

16  we called it, you know, to buy, again, certain assets if

17  they closed their deal with Langley.  Then we would buy

18  certain assets from them.

19             MS. PETERS:  Uh-huh.

20             And with Langley, what were you working

21  on?

22             THE WITNESS:  Probably the project

23  development agreement, because -- and maybe the

24  contingent interest revenue agreement, because those

25  were two of the ancillary deals that I was telling you

1  before that he was going to put in -- no matter who

2  bought it, he was going to put that in the deal.

3            So if we ended up buying directly with

4  him, then we were going to inherit it directly.  If we

5  bought assets, we were going to be -- from K-Pipe, we

6  were going to be stuck with buying those assets.  So

7  basically it was, you know, a part of our due diligence

8  at that point in time as to whatever he was going to

9  strap on, if you will, onto that corporation or those

10  entities or whatever, whatever obligations.

11            We were very concerned about that.  I

12  mean, we're not -- you know, we're not going to buy

13  assets from K-Pipe Partners and then be blind about some

14  deal that's entered into in the eleventh hour that we're

15  not aware of.  So, you know, we were directly involved

16  with those issues because, you know, if we bought

17  directly or if we bought assets, we were going to be

18  hung with it.

19            So -- and Langley, you know, he wasn't

20  going to put those in place unless he sold -- sold the

21  assets or the companies.  I mean, that was just

22  something that he was going to put in place only if a

23  deal went down.  So we had to be working on all that at

24  that point in time.

25            MS. CRESWELL:  Enter Stock Purchase

1  Agreement By and Between K-Pipe Merger Corporation and

2  Dennis Langley into the record as Exhibit 10.  This

3  exhibit is Bates stamped 000232 through 000269.

4           MS. SALINAS:  Who was the source of these

5  documents -- or this document with this Bates stamp?

6           MS. CRESWELL:  This is from K-Pipe.

7           Enter the Stock Purchase Agreement

8  Schedule Preamble into the record as Exhibit 11.  This

9  exhibit is numbered 00270 through 000338.

10     Q   (BY MS. CRESWELL)  Mr. Chachere, are you

11  familiar with Exhibits 10 and 11?

12     A   I mean, I don't -- I assume I was back at some

13  point in time, but I don't recall when.  I'm not

14  familiar with them at this point.  I have not looked at

15  them in four years, I guess.

16     Q   Is this the final -- or these the final

17  documents whose negotiations are referred to in

18  Exhibit 1 as the Stock Purchase Agreement?

19           MR. STERN:  Objection to the form.

20           There are multiple references to stock

21  purchase agreements.  It's not specific.

22           MS. PETERS:  Is this Stock Purchase

23  Agreement referred to in Exhibit 1?

24           THE WITNESS:  I don't think so.  I mean, I

25  don't recall working on any Stock Purchase Agreement

1   between K-Pipe and Langley.

2       Q    (BY MS. CRESWELL)  So if you would refer

3   back -- I know you've got a lot of papers there, but if

4   you could refer back to Exhibit 6.

5       A    Which one was 6?

6       Q    I'm so sorry you're not marking yours.

7             It's the fax dated 10/7.

8       A    Okay.  I have it.

9       Q    Okay.  That is referencing a Stock Purchase

10  Agreement and schedules also.

11            Is this a different Stock Purchase

12  Agreement than we have entered as Exhibits 10 and 11?

13            MR. STERN:  I'm going to object to your

14  characterization of the document.  It's not an

15  agreement.  It's a draft.

16            MS. PETERS:  Please answer the question.

17            Is Exhibit A a portion of --

18            MR. STERN:  Exhibit what?

19            MS. CRESWELL:  Exhibit 6.

20            MS. PETERS:  I'm sorry.

21            Exhibit 6, 10/7/99, how is that related to

22  Exhibit 10, the Stock Purchase Agreement between K-Pipe

23  Merger and Dennis Langley?

24            THE WITNESS:  I don't know.  I mean, I

25  would just have to -- I don't recall.  I do not recall

1   working on any stock purchase agreement between -- or

2   drafts of stock purchase agreements between Langley and

3   K-Pipe.

4                    MS. PETERS:  Uh-huh.

5                    And this handwriting here on page 6 of

6   Exhibit No. 6, is that is your handwriting?

7                    THE WITNESS:  The bold portion is, yes.

8                    MS. PETERS:  And Article II, Purchase and

9   Sale, 2.1, some of these items here in your handwriting

10  appear in this Stock Purchase Agreement between K-Pipe

11  Merger and Dennis Langley.

12                   THE WITNESS:  Come again?

13                   MS. PETERS:  Some of your handwriting that

14  is here in Exhibit 6 appears in the final agreement

15  between K-Pipe Merger and Dennis Langley, Exhibit 10.

16                   So, for example, on page 7 of Exhibit 10,

17  under Article II, Purchase and Sale, it states:  "Upon

18  the terms and subject to the terms and conditions of

19  this Agreement at the Closing, but effective as of the

20  Effective Time, Buyer will purchase from Stockholder,

21  and Stockholder will sell to Buyer, the Common Stock for

22  the Purchase Price."

23                   In Exhibit 6 on page 6 -- or it's page 2

24  of the exhibit, but it's apparently page 6 of this

25  draft --

1                    THE WITNESS:  Okay.  I'm on page 6 on the

2    draft, but where are you on the executed Stock

3    Purchase --

4                    MS. PETERS:  I'm on page 7.

5                    THE WITNESS:  Page 7.  Okay.

6                    (Reading silently.)

7                    MS. PETERS:  Do you see that paragraph,

8    Article II, Purchase and Sale --

9                    THE WITNESS:  Uh-huh.

10                   MS. PETERS:  2.1?

11                   And in the draft, it has the same revised

12   wording:  "Upon the terms and subject to the terms and

13   conditions of this Agreement"; and in your handwriting,

14   it says "at the closing, but."  And there's another

15   apparent addition, "effective as of the Effective Time,"

16   which is redlined, "Buyer will purchase from

17   Stockholder, and Stockholder will sell to Buyer, the

18   Common Stock for the Purchase Price," which is the

19   paragraph we find in the Stock Purchase Agreement

20   between K-Pipe Merger and --

21                   THE WITNESS:  Right.  I'm following you.

22                   MS. PETERS:  Do you see that those are the

23   same with the changes in the draft?

24                   THE WITNESS:  Yes.  Yes.  Yes.

25                   MS. PETERS:  Were you aware that your

1  drafting changes would end up in an agreement between

2  K-Pipe Merger and Mr. Langley?

3             MR. STERN:  I'm going to object to the

4  form of the question.  It assumes facts not established.

5             MS. PETERS:  Were you aware that your

6  changes in the draft of your Stock Purchase Agreement

7  with Mr. Langley would end up in an agreement between

8  Mr. Langley and K-Pipe Merger?

9             MR. STERN:  Same objection.

10            MS. PETERS:  Please answer the question.

11            You need to answer the question.

12            THE WITNESS:  I don't recall being aware

13  of it, no.

14            MS. PETERS:  But you were aware that

15  Mr. Langley was negotiating an agreement with K-Pipe

16  Merger?

17            THE WITNESS:  Yes.

18            MS. PETERS:  And it was a stock sale

19  agreement.

20            THE WITNESS:  Yes.

21            MS. PETERS:  And you, being Midcoast, was

22  negotiating with Mr. Langley during this same time

23  period for -- regarding a Stock Purchase Agreement.

24            THE WITNESS:  We were on a second track

25  negotiating a stock purchase agreement.  For how long, I

1  don't specifically remember.

2            I mean, I'm having to go back and look at

3  the billing and try to figure it out from there.

4            MS. PETERS:  Sure.

5            THE WITNESS:  I do not recall

6  participating or giving anything for -- between K-Pipe

7  and Langley.

8            Now, I mean, Bryan Cave could have put

9  that in; or they could have given a copy to Fortrend.  I

10  don't know, but I don't remember ever giving anything or

11  working on a stock purchase agreement between K-Pipe and

12  Langley.  I don't believe that I would have done that.

13            MS. PETERS:  Okay.

14            THE WITNESS:  So I have to -- my

15  presumption is that they just took the same language,

16  which is -- and used it in their document, which, you

17  know -- I mean, that's --

18            MS. PETERS:  Okay.

19            But you can kind of see our question about

20  your meeting, then, on the -- between the 22nd and 24th

21  that's shown in Exhibit 1.

22            Mr. Langley executed the Stock Purchase

23  Agreement on the 25th of October.

24            Do you want to do that e-mail?

25            MS. CRESWELL:  Yeah.

1              Enter e-mail dated 10/25/99 from James

2  Pryde to Ron Chachere, Chip Berthelot, Chris Kaitson,

3  Tino Monaldo, Y. Korb into the record as Exhibit 12.

4  This document is numbered KP1136.

5      Q   (BY MS. CRESWELL)  This e-mail is referencing

6  clean copies to be -- of what we believe are the final

7  documents.

8              What are those clean copies of?

9              Pardon me.

10             Are you familiar with this document?

11     A   I don't remember it; but, you know, I'm not

12  saying I didn't receive it by any means.  I just don't

13  remember it.

14             MS. PETERS:  Well, we understand that

15  Mr. Langley executed the Stock Purchase Agreement that

16  we have here as Exhibit 10 between himself and K-Pipe

17  Merger on October 25th.

18             This references:  "Dennis plans on

19  executing the SPA this evening" --

20             MR. STERN:  Could you speak up?

21             I'm sorry.  I'm having a hard time hearing

22  you.

23             MS. PETERS:  I'm sorry.  Let me speak up a

24  little louder.

25             This e-mail, Exhibit 12, states that:

1  "Dennis plans on executing the SPA this evening" --

2  which I understand stands for "Stock Purchase

3  Agreement."

4              Would you agree that that's --

5              THE WITNESS:  Yes, ma'am.

6              MS. PETERS:  -- what the initials stand

7  for?

8              THE WITNESS:  Yes.

9              MS. PETERS:  -- "and we have requested

10  signatures by K-Pipe and Fortrend also."

11              Our belief is that that would be

12  referencing Exhibit 10.

13              Is that -- would that be consistent with

14  what your belief about what the attachment would be to

15  this, or would it possibly be a different document?

16              THE WITNESS:  I mean, I don't have any

17  specific recollection of it; but, I mean, I would draw

18  that same conclusion.

19              MS. PETERS:  Okay.  So given that

20  Mr. Langley appears to have signed this Stock Purchase

21  Agreement on 10/25, we were interested in this meeting

22  that is referenced in your billing records on 10/22,

23  10/23, and 10/24 in which it -- you are meeting with

24  representatives from PWC, representatives from Fortrend,

25  representatives from Mr. Langley and Bishop Group.

1                    And you can, I think, at this point,

2    understand why we were interested in that particular

3    date, given that this agreement becomes final the

4    subsequent day.

5                    Let me just confirm what your testimony

6    was as far as this date and what documents you were

7    working on.

8                    You were working on a stock purchase

9    agreement on that date?

10                   MR. STERN:  What date?

11                   MS. PETERS:  Do you recall?

12                   THE WITNESS:  No, I don't -- I do not --

13                   MS. PETERS:  10/22 through 10/24.

14                   You don't recall what document you were

15   specifically working on.

16                   THE WITNESS:  No.  No.  I mean -- no.  I

17   mean, I would think that since it involved Monaldo and

18   Pryde, I mean, it had to encompass those ancillary

19   agreements that we were going to inherit one way or

20   another, if we bought it directly or if we bought

21   assets.

22                   MS. PETERS:  The project development

23   agreement?

24                   THE WITNESS:  The project development

25   agreement, I'm sure that was involved; but whether a

1  stock purchase agreement was still involved, I don't

2  know.  I just don't recall, but it doesn't make sense to

3  me that it would be at that point in time.  I mean --

4           MS. PETERS:  Okay.  So we have a draft of

5  a Stock Purchase Agreement in Exhibit 6 that's dated

6  10/7 that's a draft, and we have -- we have a draft of a

7  Stock Purchase Agreement in Exhibit 9 that's dated

8  10/14.

9           And it sounds like from what you've just

10 said that somewhere between 10/14 and this meeting on

11 10/22 through 10/24 you were not negotiating a stock

12 purchase agreement any longer with Mr. Langley?

13          MR. STERN:  I'm going to object to your

14 repeated characterization of the entry from October 22

15 through 24 as a meeting.

16          MS. PETERS:  It says "continued extensive

17 meetings."

18          MR. STERN:  Plural.

19          MS. PETERS:  Okay.  Well, several

20 meetings.

21          So over that period of time, 10/22 through

22 10/24, it sounded like from what you said just a moment

23 ago that this Stock Purchase Agreement for which we have

24 drafts in Exhibit 6 and Exhibit 9, you were no longer

25 discussing with --

1                    THE WITNESS:  I don't think so.  I don't

2    have any specific recollection, but it wouldn't make

3    sense to me.  I mean, at some point in time, it would be

4    like, "Okay.  Langley's going to do the deal with

5    Fortrend."  So there would be no reason for us to be

6    involved negotiating further with Langley on our own

7    stock purchase if it looks like a deal has gelled with

8    Fortrend.  Then we've got to get our deal done with

9    Fortrend to buy assets is what I believe the scenario

10   would be during that period of time.

11                   MS. PETERS:  Okay.

12                   THE WITNESS:  But, again, I'm just piecing

13   it together.

14                   MS. PETERS:  Sure.

15                   THE WITNESS:  I just don't remember

16   specifically, but that's what logically comes to me and

17   what I can piece together.

18                   MS. PETERS:  Okay.

19                   MS. CRESWELL:  Enter fax transmittal dated

20   10/28 from Midcoast to Jim Pryde into the record as

21   Exhibit 13.  Attachments to the fax are the Guaranty

22   (Parent-Assumption Agreement), the Guaranty (KPC), and

23   Project Participation Agreement between MarGasCo

24   Partnership and Management Resources Group, L.L.C.  This

25   document is numbered KP1301 through KP1325 and Bates

1  Stamp numbered 002323 through 002347.

2      Q    (BY MS. CRESWELL)  Do you need a moment to

3  familiarize yourself with that document, Mr. Chachere?

4      A    Okay.

5              (Reading silently.)

6              Okay.

7      Q    Are you familiar with this document?

8      A    Not really.  I don't specifically remember it.

9  I remember there were some Guaranty agreements, but I

10  don't specifically remember this one.

11      Q    Can you identify the handwriting on the first

12  page, which is KP1301?

13      A    No, ma'am.

14      Q    Okay.  That's not your handwriting, then, on

15  that fax transmittal sheet?

16      A    No.

17      Q    Can you identify the handwriting throughout the

18  document?

19              It looks to me to be the same bold

20  handwriting.

21              Would you just confirm that that --

22      A    Well, it looks like my handwriting.

23      Q    Okay.  I don't see any different handwriting

24  throughout the document other than yours.  I've flipped

25  through it pretty quickly but --

1      A     I didn't look through every page; but, you

2   know, unless there's some notes like on some of the

3   others, I believe it would all be mine.

4      Q     The only handwriting that looks a little bit

5   different to me is found on KP1305 and it may just have

6   been that you were using a different pen, but it appears

7   to be maybe a different handwriting, the numbers where

8   it says "p" -- "page 1, 2, 3, 4."

9      A     No, that is not my handwriting.

10     Q     Okay.

11     A     Nor that "Participation."  I don't think that's

12  mine either.

13     Q     Okay.

14            MS. PETERS:  And up in the right-hand

15  corner --

16            THE WITNESS:  Up in the right-hand

17  corner --

18            MS. PETERS:  -- "Handwritten revisions

19  made as per discussion with Dan Tutcher" --

20            THE WITNESS:  That's my handwriting, yes.

21     Q     (BY MS. CRESWELL)  Those were the only two --

22  or only one spot that looked to be a different

23  handwriting.

24     A     Okay.

25     Q     Let's refer back now to Exhibit 1, date of

1   10/28.

2                Would Exhibit 13 that we just discussed,

3   would that be what is being referenced here in Exhibit 1

4   on 10/28?

5                It says -- the entry on Exhibit 1, date

6   10/28, states:  "Discussions with Dan Tutcher concerning

7   Project Development Agreement issues; making of further

8   revisions; discussions with Dennis Langley; return to

9   Corpus; telephone discussions with Chip Berthelot."

10       A    That would be a portion of this, yeah.  It says

11   "Project" -- "Development" is scratched out --

12   "Participation Agreement."

13       Q    Okay.  Do you know at what point was the

14   decision made that the project development agreements

15   would not be fulfilled or the option to terminate them

16   would be exercised?

17       A    At what point in time?

18       Q    Uh-huh.

19       A    Well, I think it was an option, as you say, to

20   cancel it -- right --

21       Q    Right.

22       A    -- by making a payment?

23       Q    Uh-huh.

24       A    So I think that that's what Midcoast preferred

25   to do if they were financially able to do it; but that

1    would have been, I think, after the closing.

2       Q    Right.

3               But was the -- do you know when the

4    decision was made to not fulfill that or --

5       A    Well --

6               MR. STERN:   I'm going to object to that.

7               MS. CRESWELL:   Okay.

8               MS. PETERS:   It was our understanding that

9    prior to the closing with -- K-Pipe and Dennis Langley's

10   closing on the 8th and 9th that a decision had been made

11   at Midcoast that Midcoast wasn't interested in pursuing

12   the items within the project development agreement and

13   that the option would be exercised to terminate them.

14              THE WITNESS:   Okay.   I don't know when

15   they made the decision to --

16              MS. PETERS:   Okay.

17              THE WITNESS:   But I can tell you about

18   this, because this was -- I came back.   I called Dan.

19              MR. STERN:   I'm going to instruct you not

20   to disclose confidential communications with the client.

21   If they're not confidential, that's fine; but,

22   otherwise, it's privileged.

23              MS. PETERS:   Were you aware before the

24   closing that the -- it was planned for the project

25   development agreement not to be pursued?

1              THE WITNESS:  I was aware that we wanted

2   to have that option where we could undo it and not have

3   any further dealings with Dennis.

4              MS. PETERS:  Where you could terminate it.

5              THE WITNESS:  Where we could terminate it,

6   yes.

7              It was structured that way --

8              MS. PETERS:  Was that option part of the

9   structure of the project development agreement from the

10  onset of the project development agreement, or was that

11  something --

12             THE WITNESS:  No, ma'am.

13             MS. PETERS:  About what point was the

14  option agreement added?

15             THE WITNESS:  Well, I'd have to look at

16  these time sheets and also the travel time to try to

17  figure out when but --

18             MS. PETERS:  If you would take a moment.

19  An approximate time.  I mean, if it was halfway through

20  your negotiations or kind of an idea.

21             THE WITNESS:  I'm going to say

22  October 26th.

23             MS. PETERS:  Oh, okay.

24             THE WITNESS:  I believe that's correct.

25             MS. PETERS:  Once that option agreement

1  was added, it looks like there's continuous --

2  continuing revision on the project development

3  agreement.

4           So was there a continuing attempt to try

5  to find an agreement that was workable for everyone?

6           THE WITNESS:  Yes.

7           MS. PETERS:  So even though you added that

8  option agreement, it was kind of an easy exit in case

9  nothing worked out?  Was that the feeling, or what was

10  the thought?

11           THE WITNESS:  Yeah.  I think so, yeah.

12           MS. PETERS:  Okay.

13  Q    (BY MS. CRESWELL)  If we could refer to

14  Exhibit 1, the date of 11/2, that entry states:

15  "Continued work on issues and document revisions,

16  inclusive of various discussions with parties and

17  attorneys, etc."

18           Is that what you're seeing there,

19  Mr. Chachere?

20  A    Are you asking about the project development

21  agreement?

22  Q    No.  Just as I'm reading the entry on 11/2.

23  A    That's what it says.

24  Q    Okay.

25           MS. CRESWELL:  Enter e-mail cover sheet

1    and attachment dated 11/2/99 from James Pryde to Ron

2    Chachere, Chip Berthelot, Chris Kaitson, Craig Hoffman,

3    Cynthia Morelli, Tino Monaldo, and Y. Korb regarding

4    changing -- regarding changes in Stock Redemption

5    Agreement per R. Chachere into the record as Exhibit 14.

6    This document is numbered KP1421 through KP1434.

7         Q    (BY MS. CRESWELL)  I'll give you a minute to

8    look through that if you need to, Mr. Chachere.

9         A    (Reading silently.)

10             Okay.

11        Q    Okay.  Is this document familiar to you?

12        A    No, I don't specifically recall it; but I'm

13   sure at the time, you know, I probably did.

14             MS. PETERS:  Would you have made changes

15   to this document as it states on the --

16             THE WITNESS:  I don't have any

17   recollection of doing that, but I have no reason to

18   think that the e-mail is wrong.

19             MS. PETERS:  Okay.

20        Q    (BY MS. CRESWELL)  If you would look at page

21   KP1422, which is the second page in, about halfway down

22   in Paragraph 1, it's headed "Sale of Stock"; and it

23   says:  "Stockholder shall assign, sell and transfer to

24   Company" a number of shares, "13,005.2625 shares of

25   common stock of the Company."

1          Do you know how the number of shares

2   redeemed was determined?

3        A    No, ma'am.

4        Q    Okay.

5             MS. PETERS:  Would someone have just

6   provided you with that number; or where would that

7   number have come from, from your perspective?

8             THE WITNESS:  I don't know, but I

9   wouldn't -- I mean, that would be outside my area of

10  involvement really.  I mean, I --

11       Q    (BY MS. CRESWELL)  Right.

12            Mr. Langley was redeemed of these shares

13  and did receive assets in return for the redemption as

14  the document states.

15            To your knowledge, were these assets that

16  Langley wanted; or were they assets that Midcoast did

17  not want?  Do you have a --

18       A    I don't know.  I just don't recall.

19       Q    Do you know how the Stock Redemption Agreement

20  was negotiated?

21       A    No, ma'am.

22            MS. PETERS:  Okay.  If you would, look at

23  your Stock Purchase Agreement, which is Exhibit 11.

24            It's actually the preamble, the schedules.

25            THE WITNESS:  I've got that.

1                    MS. PETERS:  And on page Bates stamped 332

2     toward the bottom --

3                    THE WITNESS:  All right.

4                    MS. PETERS:  -- is Schedule 5.4B, Stock

5     Redemption Agreement.

6                    And in comparing this to the exhibit we

7     were just discussing -- which, I think, is Exhibit 14,

8     Stock Redemption Agreement attached to the e-mail -- the

9     shares of stock in the e-mail attachment is 13,005.2625;

10    and the shares of stock in the Stock Redemption

11    Agreement, which is part of the Stock Purchase Agreement

12    between K-Pipe and Dennis Langley, is 13,005.2642.

13                   And in every other way that I've been

14    looking at this document, they are the same and

15    consistent with the changes that it appears you

16    requested on --

17                   THE WITNESS:  Let me make one --

18                   MR. STERN:  I'm going to object --

19                   MS. PETERS:  -- this first agreement on

20    11/2/99.

21                   Do you want to compare the two documents?

22                   MR. STERN:  I'm going to object to the

23    characterization of the document -- or documents.

24                   MS. PETERS:  So this draft of 11/2/99,

25    Exhibit 14, and the Schedule 5.4 to the Stock Purchase

1  Agreement, Exhibit 11, appear to me to be exactly the

2  same, including, for example, on page 5 of Exhibit 14,

3  this draft Stock Redemption Agreement, the title

4  "Vice President" appears on page 5 of this attachment,

5  5.4B in Exhibit 11.

6            MR. STERN:  Same objection.

7            MS. PETERS:  Do you see anything different

8  between these two documents?

9            THE WITNESS:  Well, I mean, I haven't

10 checked every word of it; but I'll take your word for

11 it.  I mean, I just don't remember it; but, I mean --

12 and it's a third party saying these are my changes.  I

13 don't remember, you know, making any of these changes.

14 I'm not saying I didn't, but I just don't recall it.

15            MS. PETERS:  Sure.

16            THE WITNESS:  But I will say this:  I

17 don't -- I mean, would not make the change for the

18 number of shares.

19            MS. PETERS:  Well, I'm assuming that

20 someone told you that's what the number should be.

21            THE WITNESS:  Well, you know, someone

22 could have told me; or Pryde just could have done that

23 on his own.  I mean, I don't know where that came from

24 at all.

25            MS. PETERS:  But he did send this.

1              THE WITNESS:  Even though he's saying in

2    the e-mail "per Ron Chachere," that doesn't mean that

3    it's -- what he's saying is right, because as I

4    mentioned before, he would make some of our changes; and

5    some he wouldn't.  And, you know, I don't recall if he

6    added stuff or not; but he could very well have done

7    that on his own.

8              MS. PETERS:  Okay.  Now, I notice that the

9    date here on Exhibit 14 is 11/2/99; and this Stock

10   Purchase Agreement between K-Pipe Merger and Dennis

11   Langley, Exhibit 10, which was executed on 10/25/99, and

12   including the Exhibit 11, the schedule preamble, which

13   includes the Stock Redemption Agreement, would have been

14   part of -- is part of that Stock Purchase Agreement.

15             I guess I'm curious as to these changes

16   taking place after the Stock Purchase Agreement was

17   executed.

18             Would you have any idea about what was

19   taking place that there would be these changes on 11/2

20   that seemed to appear in a document executed

21   October 25th?

22             THE WITNESS:  I have no clue.  I just

23   don't --

24             MS. PETERS:  And also why would Mr. Pryde

25   be sending you -- if they were not your changes, why

1  would he even be sending you changes to this?

2            THE WITNESS:  Well, I can think of a

3  reason.  I mean, it's like -- I was talking about those

4  project development agreements.  We're going to be

5  either buying it directly from Langley, either the

6  assets or stock; or we're going to be buying it

7  indirectly.  In any case, whatever Langley is doing in

8  the eleventh hour that involves the -- Fortrend, we --

9  as part of our due diligence, we're saying, "What's

10  going on here?"

11            At that time, we knew -- I mean, I knew

12  what Langley was capable of; and we were wanting to --

13  it would be just part of our normal due diligence.

14  We're not going to go blindly, just buy assets, and not

15  know what's transpiring on the transaction that may be

16  right ahead of us.

17            So -- and at the same time, you know, I

18  mean, Langley is wanting to sell.  So if we're saying we

19  needed something for due diligence, then I'm sure

20  they're cooperating, you know.

21            That's a scenario I see that fits.

22            MS. PETERS:  So would Midcoast have had

23  input into the transaction between Langley and Fortrend?

24            THE WITNESS:  In that sense, indirectly,

25  in that if we're having these ancillary agreements that

1  we're going to inherit with a project development

2  agreement or his -- whatever he's doing internally --

3  and I don't know what this was all about but -- and I'm

4  referring to this Stock Redemption Agreement; but

5  whatever he's doing there, we have to be comfortable

6  that we're actually buying what we think we're buying.

7                   And it was a very convoluted, complex

8  transaction.  It was -- I mean, it took a whole team of

9  people.  And, again, we're negotiating at the same time

10  we're drawing documents and trying to -- this thing's

11  evolving, you know; and it doesn't really settle down

12  until everybody is inked up and closed, you know.

13                   I mean, in this deal, you didn't know

14  whether it would close and -- or whether something would

15  blow apart.  I mean, somebody could have come in even

16  after it's inked up and made Langley a better offer; and

17  it might have blown the deal apart.  It was very

18  tenuous.

19                   So I just don't recall all the specifics,

20  but I do recall -- I mean, it was the most complex

21  transaction I've ever been involved with; and it would

22  be -- I mean, it would only be prudent that we would be

23  knowing what's going on between Langley and K-Pipe.  I

24  mean, they were up there the same time we were, on

25  opposite sides of the building, you know.

1           And they were negotiating and then they'd

2    come negotiate with them.  We're negotiating with

3    Langley and his attorneys, and I don't know who's giving

4    what to whom.  But I'm sure that if K-Pipe is going to

5    buy it, they're not going to want to buy it unless

6    they're going to, you know, sell us some of the assets.

7    So they're going to want us not to back out either.  So

8    they have something to be concerned about.

9           So, I mean -- I mean, there were two

10   transactions going on at the same -- well, actually

11   three for some period of time, three transactions going

12   on at the same time.  And like I said before, we

13   suspected there was a fourth with another buyer that he

14   was negotiating, because we never -- I never saw Jim

15   Pryde's office, and he was not there all the time.  And

16   we suspected he was off drafting stuff with another

17   buyer.

18           I mean, these assets were highly prized

19   assets for long-haul pipeline companies.  I mean, it was

20   sitting in the heart of the midland.  It goes down and

21   has connections into Oklahoma with OneoK, I recall; and

22   it was -- so it was very tenuous.

23           MS. PETERS:  And you said that this was

24   the most complicated deal you have done?

25           THE WITNESS:  Uh-huh.

1          MS. PETERS:  About how many deals have you

2  done where you're -- you said originally that that was

3  your main practice; is that accurate?

4          THE WITNESS:  My main practice is oil and

5  gas; and the pipeline, I got off into pipeline

6  transactions because of my two clients at Corpus Christi

7  that also dabble in oil and gas and in pipelines and,

8  you know, formed up with Dan Tutcher.

9          So basically you're -- you know, it

10  doesn't matter what type of assets you're buying or

11  selling or what type of company; it's transactional

12  work.

13          MS. PETERS:  Sure.

14          THE WITNESS:  So it just fits but --

15          MS. PETERS:  So about how many years of

16  asset acquisitions or stock purchases have you -- have

17  you done?

18          THE WITNESS:  Well, basically from the

19  startup of Midcoast, I would say.  So --

20          MS. PETERS:  Which, I think, was '91?

21          THE WITNESS:  Yeah.

22          I mean, I'd done some before; but, I mean,

23  basically that's where -- you know, they were constantly

24  looking to acquire assets --

25          MS. PETERS:  Okay.

1                    THE WITNESS:  -- and build their company.

2                    MS. PETERS:  So that was mainly your

3    experience with acquisitions was with Midcoast?  Is

4    that --

5                    THE WITNESS:  Well, I had other deals,

6    smaller deals.  Yeah, not pipeline deals but other types

7    of businesses, acquisitions and sales, right, before

8    that.

9                    MS. PETERS:  Okay.  So your main

10   experience with pipeline-type acquisitions --

11                   THE WITNESS:  Yes.

12                   MS. PETERS:  -- was with Midcoast.

13                   THE WITNESS:  Well, no.  It started before

14   that with another company in Corpus Christi for a number

15   of years.  We sold -- ended up selling off most all

16   their assets.

17                   MS. PETERS:  Okay.

18                   THE WITNESS:  So it was probably for a

19   period of four or five years before 1991, I was --

20                   MS. PETERS:  And what made this deal more

21   complicated than other transactions?

22                   THE WITNESS:  Just Langley, basically,

23   with him trying to -- you know, with the project

24   development agreement, the contingent revenue interest

25   agreement, all these various entities and, you know, his

1   various financing situations that were involved; and

2   there would be a lot more expenses incurred if you paid

3   off debts early and -- that he had and things -- just a

4   whole string of stuff, you know.

5               MS. PETERS:  Okay.

6               THE WITNESS:  And --

7               MS. PETERS:  So in other deals that you

8   did, was there this third party that helped facilitate

9   the deal; or was that a new component for you?

10              MR. STERN:  Objection to the form to the

11  extent that you're saying the third party facilitated

12  the deal.

13              MS. PETERS:  Go ahead and answer the

14  question.

15              THE WITNESS:  I mean, we've -- we've been

16  on the side where we've bought assets and flipped them

17  immediately.  We knew we were going to buy them, and we

18  had the buyer lined up.  And I can't remember if we had

19  the agreement in place or not, but we probably did.

20              In other words, we'd buy assets from a

21  company; and then we would -- Midcoast would sell them.

22  I remember a transaction like that, yeah.  It's not --

23  it's not unusual in that sense that you would buy.  I

24  mean, there's any number of reasons that you can't -- I

25  mean, maybe the ultimate buyer can't deal with that

1  particular person that owns the company or something; or

2  there's some other reason.  I don't know.

3            MS. PETERS:  Do you see --

4            THE WITNESS:  So it's not unusual, no.

5            MS. PETERS:  -- stock purchases

6  immediately followed by asset sales?

7            THE WITNESS:  What I'm thinking of was

8  assets, you know.

9            MS. PETERS:  Uh-huh.

10           Do you see the stock purchases followed by

11 assets sales, or have you not seen that?

12           THE WITNESS:  I haven't been directly

13 involved with it, but I don't think that's anything

14 unusual.

15           MS. PETERS:  Okay.

16      Q   (BY MS. CRESWELL)  Could we refer back to

17 Exhibit 1, Mr. Chachere, to the entry for November

18 the 4th of 1999?

19           And that entry states:  "Continued work on

20 the transaction, including completion of Asset Purchase

21 Agreement and $14 million Escrow Agreement."

22           Are you seeing that entry?

23      A   Yes, ma'am.

24      Q   Okay.

25           MS. CRESWELL:  Enter Fax Cover Sheet and

1 partially executed side letter from K-Pipe Merger

2 Corporation to Midcoast into the record as Exhibit 15.

3 This document is numbered KP1463 through KP1465 and also

4 is Bates Stamp numbered 002485 through 002487.

5       Q   (BY MS. CRESWELL)  Have you had time to glance

6 at this document?

7       A   Yes.

8       Q   Okay.  Are you familiar with this document,

9 Mr. Chachere?

10      A   I vaguely remember it, yes.

11      Q   Would you confirm the signature on the last

12 page of the document?

13      A   That appears to be Richard Robert's signature.

14      Q   Okay.

15              MS. PETERS:  And the initials next to the

16 signature, "CK," would those be --

17              THE WITNESS:  I assume that's "Chris

18 Kaitson."  He was general counsel.

19      Q   (BY MS. CRESWELL)  Why would Chris Kaitson send

20 this document to Jim Pryde, who is with Bryan Cave and

21 representing Dennis Langley?

22              MR. STERN:  Objection.  No foundation.

23      Q   (BY MS. CRESWELL)  This document --

24              MS. PETERS:  On the first page, the Fax

25 Cover Sheet attached to this document, dated

1  November 4th, 1999, states that it's to Jim Pryde, Chris

2  Kaitson.  "Attached is a partially executed side

3  letter."

4              Do you see that on this cover sheet?

5              THE WITNESS:  Yes.

6              MS. PETERS:  And the letter appears to be

7  between K-Pipe Merger and Midcoast and appears to

8  reference the Asset Purchase Agreement, dated as of

9  November 5th, and discusses closing and states that for

10  each day the closing is delayed beyond November 9,

11  Midcoast will pay to K-Pipe $21,500.

12              Do you see that?

13              THE WITNESS:  Yes.

14              MS. PETERS:  Okay.  Why would Midcoast be

15  sending -- considering that this is between K-Pipe and

16  Merger (sic), be giving a copy of this to the

17  representatives of Mr. Langley?

18              MR. STERN:  Objection.  No foundation.

19              MS. PETERS:  Please answer the question.

20              THE WITNESS:  I don't know.  I just

21  presume that Pryde asked for it.

22              MS. PETERS:  Why would --

23              THE WITNESS:  Why would he ask for it?

24              MS. PETERS:  Yeah.  Why would he be

25  interested?

1           THE WITNESS:  I would just be trying to

2  get into his mind and speculate.  I don't know why but I

3  presume he asked for it and Chris Kaitson sent it to

4  him.

5           MS. PETERS:  The provisions in this letter

6  about the closing dates and amounts for failure to close

7  timely, who -- how were those terms decided upon?

8           THE WITNESS:  I don't have any

9  recollection of that.  I don't know that I was involved

10  with that portion of it.

11           MS. PETERS:  Uh-huh.

12           MS. CRESWELL:  Enter a redline draft

13  letter from Midcoast to Dennis Langley into the record

14  as Exhibit 16.  This document is numbered KP1480 to

15  KP1481.

16           This consists of an e-mail cover sheet

17  from James Pryde to Ron Chachere, Chip Berthelot, Chris

18  Kaitson, Tino Monaldo, and does have a handwritten note

19  that does say it's "never used."  The subject is

20  "Changes in Midcoast Side Letter per Ron's Request."

21      Q    (BY MS. CRESWELL)  Are you familiar with this

22  document, Mr. Chachere?

23      A    I don't specifically remember it.

24      Q    How was this agreement negotiated?

25           MR. STERN:  Objection.  Assumes facts not

1  established.

2      A    I don't know.  I don't have any recollection,

3  and I don't know that I was involved with the

4  negotiation part of it.  It appears I was involved with

5  the drafting portion of it because of the e-mail.

6                MS. PETERS:  Now, this is a draft of a

7  letter between Midcoast and Dennis Langley referencing

8  the Stock Purchase Agreement dated as of October 25th

9  between Dennis Langley and K-Pipe Merger.

10                "A closing has been set under the Purchase

11  Agreement for November 5, 1999."

12                Then it references closing dates and an

13  amount of 21,500 for delays in closing beyond

14  November 8th.

15                (Sotto voce discussion.)

16                (A lunch break was taken from 11:41 a.m.

17                to 1:21 p.m.)

18                MS. CRESWELL:  I'd like to remind

19  Mr. Chachere that he is still under oath.

20                THE WITNESS:  Yes.

21                MS. CRESWELL:  Thank you.

22                Before we left, we had entered -- before

23  we left for the lunch break, we had put two exhibits

24  into the record, Exhibit 15 and Exhibit 16; and I'd like

25  to enter another one at this point.

1                Enter letter from K-Pipe Merger

2    Corporation to Dennis Langley into the record as

3    Exhibit 17.  This document is composed of pages 1 and 2

4    with an additional signature page numbered as page 2.

5       Q    (BY MS. CRESWELL)  I'll give you a moment,

6    Mr. Chachere, to look through this document.

7       A    Okay.

8                (Reading silently.)

9                (Discussion off the record.)

10      Q    (BY MS. CRESWELL)  Have you had time to look

11   over the document?

12      A    Yes, I have.

13      Q    Exhibit 17 is a letter from K-Pipe Merger

14   Corporation to Dennis Langley and it is referencing a

15   Stock Purchase Agreement and does provide for penalties

16   for delay in the closing, a 21,500-dollar penalty, and

17   then down towards the bottom, it references a

18   15 million-dollar penalty if there is a failure to

19   close.

20                Are you familiar with this document,

21   Mr. Chachere?

22      A    I have seen it before, yes.

23      Q    Okay.  Can you tell me in what context you've

24   seen it?

25      A    Well, I don't remember when I saw it; but it

1    would have to be in the closing documents between K-Pipe

2    and Langley.  So I know I at least saw it at that point

3    in time.  I remember being aware that there was that

4    type of consideration for delay on closing and also the

5    penalty if the stock purchase didn't close.  I remember

6    vaguely those numbers and so forth.

7        Q    Do you know who participated in the negotiation

8    of this agreement?

9        A    No, ma'am.

10            MS. CRESWELL:  Enter e-mail dated 9/11/03

11   from Thomas Palmisano for PricewaterhouseCoopers to

12   Chris Kaitson with Midcoast into the record as

13   Exhibit 18.  The document is numbered KP1682.

14       Q    (BY MS. CRESWELL)  If you'd take just a minute

15   to familiarize yourself with that one.

16       A    Okay.

17            (Reading silently.)

18       Q    Are you familiar with this document?

19       A    I do not remember it.

20       Q    Okay.  Can you identify the handwriting there?

21       A    Yes.  The handwriting is mine.

22       Q    Okay.  Do you know who had input into this

23   document?

24            MS. PETERS:  This is -- just so you know,

25   we're just trying to get an idea of how the input was

1  into this particular item just to see about the

2  relationships of the parties in the transaction.

3                THE WITNESS:  Right.

4                MS. PETERS:  And it looks like there's

5  really two e-mails here.  The first one is from Chris

6  Kaitson.

7                THE WITNESS:  It's from Palmisano, I

8  think, is the first one, right?

9                MS. PETERS:  Right.  I think the first

10 one --

11               THE WITNESS:  Or is the bottom one the

12 first one?

13               MS. PETERS:  The bottom one --

14               THE WITNESS:  The bottom one's the first

15 one, yeah.

16               MS. PETERS:  -- I think, comes first.  It

17 appears to be from Chris Kaitson, and he's sending it to

18 himself and then to Cynthia Morelli and Gary Wilcox and

19 Graham Taylor and Richard Robert --

20               THE WITNESS:  Right.

21               MS. PETERS:  -- and Ron Chachere and Tom

22 Palmisano.  And then Tom Palmisano responds.

23               THE WITNESS:  Okay.

24               MS. PETERS:  And I guess our interest is

25 this comment on that first e-mail that's at the bottom

1  of the e-mail, where it says:  "PWC's other comments are

2  being addressed, but item 3 (per Jim Pryde) does not

3  belong in the SPA," which we understand to be "Stock

4  Purchase Agreement."

5                  Does that sound correct?

6                  THE WITNESS:  That's correct.

7                  MS. PETERS:  Okay.  "They have no reason

8  to be interested in such 2 year period.  What about

9  putting it in the Asset Agreement or a side letter."

10                 And then Item 3 just below that says:

11  "Stock Purchase Agreement.  Add a representation . . .

12  in the SPA to the effect that K-Pipe has no plan or

13  intention to liquidate The Bishop Group, Ltd., and in

14  any event will not liquidate such corporation for at

15  least two years."

16                 Then at the top -- do you see that, No. 3

17  there?

18                 THE WITNESS:  Yes.

19                 MS. PETERS:  And then at the top, there's

20  a response from Tom Palmisano that:  "This is a very

21  important representation which needs to be in either the

22  SPA or a side letter between K-Pipe and Langley.  This

23  should definitely NOT be in the asset purchase agreement

24  as an asset buyer would be indifferent."

25                 And what was your understanding of why it

1   was a very important representation?

2           MR. STERN:  Objection.  No foundation.

3           THE WITNESS:  I don't specifically recall;

4   but, I mean, in my mind, I'm thinking that -- you know,

5   I didn't understand all -- and I still don't; but I

6   think this is Gary Wilcox structuring it, saying to us,

7   "This is important that this be done in the structure."

8   And we're just following his advice is what I believe.

9           MS. PETERS:  Okay.  So Gary Wilcox, then,

10  is providing input into an item that's ultimately

11  located in Exhibit 17, this letter between Dennis

12  Langley and K-Pipe Merger?  Would that be accurate?

13          THE WITNESS:  Well, I don't -- I mean,

14  Item 3 says "Stock Purchase" here; and I'm just reading.

15  I don't recall.  I don't know if it was in there or not,

16  but that's what I'm surmising from reading it.

17          MS. PETERS:  On Exhibit 17 on No. 2 --

18          THE WITNESS:  Okay.  No. --

19          MS. PETERS:  -- which is K-Pipe

20  Merger/Dennis Langley, that letter we just handed you.

21          THE WITNESS:  This one (indicating)?

22          MS. PETERS:  No.

23          THE WITNESS:  This one (indicating)?

24          MS. PETERS:  Yes.

25          No. 2, it just says:  "K-Pipe represents

1  and warrants to Langley that K-Pipe has no plan or

2  intention to liquidate the Company and agrees it will

3  not liquidate the Company for at least two years after

4  the closing date."

5              That appears to be this -- what the

6  e-mail, Exhibit 18, is referring to.

7              THE WITNESS:  I would agree.

8              MS. PETERS:  Okay.  As far as this e-mail,

9  it also -- Exhibit 18 refers to -- it says:  "PWC's

10  other comments are being addressed"; and then we don't

11  actually have much of their other comments except for

12  No. 4.

13              Was it common for -- during this

14  transaction, for PWC to submit comments via e-mail to

15  Midcoast as far as what would be in the agreement,

16  similar to this e-mail that we have here?

17              THE WITNESS:  I don't remember.  I mean,

18  they would make comments, whether it would be orally if

19  we're in a meeting, if they weren't available.  You

20  know, I don't know if it was common; but I guess it

21  occurred, yeah.

22              MS. PETERS:  Okay.  But this type of input

23  into the agreements, was that something that PWC did?

24              THE WITNESS:  Well, again, this gets back

25  to the -- in my mind, to the due diligence-type part of

1  it.  In other words, we've got to make sure that the

2  transaction ahead of us is not going to come unraveled.

3  So we're relying on PWC and say, "What needs to be done

4  here?" is what I'm getting out of all this.  I mean,

5  that -- yeah.

6              MS. PETERS:  Okay.  So they did -- they

7  did have input into drafting items?

8              THE WITNESS:  You know, I guess from the

9  standpoint of these issues that could affect Midcoast --

10             MS. PETERS:  Right.

11             THE WITNESS:  -- but not in the sense that

12 we're going to go in and negotiate the deal or

13 something.  I mean, it would be -- you know, I mean, it

14 would be very limited, like the role that I was talking

15 about with those ancillary agreements.  It would be,

16 like, "Okay.  If it's going to have a big effect on

17 Midcoast" -- I mean, it's no secret -- I mean, Fortrend

18 is buying from Langley; and we're going to buy certain

19 assets from Fortrend if they make the deal work.

20             So we, again, have got to make sure that

21 certain things are structured where it can work for us.

22 So I think that that's what PWC was doing in a very

23 limited situation.

24             And on the other hand, Langley was

25 allowing it because -- I mean, he knew that assets were

1  going to be sold by Fortrend, K-Pipe.  So that's what I

2  see going on here.

3                  MS. PETERS:  Okay.

4                  THE WITNESS:  I don't understand the tax

5  part of it; but to the extent it was communicated to us,

6  we just sent it on to Langley to say it's got to be --

7  or to K-Pipe's lawyers, saying, it needs to be in there,

8  you know.

9                  MS. PETERS:  So let me see if I'm

10  understanding what you're saying is that PWC, more or

11  less, made comments about --

12                  THE WITNESS:  Things that would need to be

13  in the agreement that could affect us; and when I say

14  "us," I'm saying "Midcoast," obviously, that if things

15  were not correct on this one side of the transaction, it

16  could affect this other side of the transaction.

17                  So we were -- I assume we were asking

18  PWC -- I mean, I wasn't talking directly to them about

19  all these issues; but, you know, "What needs to be done

20  here?"

21                  MS. PETERS:  Okay.

22                  THE WITNESS:  And then apparently there

23  was this communication back and forth with other

24  parties, say, you know, "If you're doing to deal, this

25  is what we need," the same as I'm saying that I was

1  involved in those agreements for project development and

2  the contingent revenue interest agreement and all of

3  that, because it was going to affect us long-term.

4             And this is another aspect of what's going

5  to affect us; but it's from, you know, the tax angle of

6  it, which PWC was advising Midcoast.

7             And then Midcoast was relying it on,

8  saying, you know, "This is what we expect if we're going

9  to be able to enter into an agreement."

10            So that's what I'm gleaning out of this.

11            MS. PETERS:  Okay.  Okay.

12     Q    (BY MS. CRESWELL)  Okay.  Mr. Chachere, if you

13  would look back at Exhibit 1; and the date would be

14  11/4.  It says:  "Continued work on the transaction,

15  including completion of Asset Purchase Agreement and

16  $14 million Escrow Agreement"; is that correct?

17     A    Yes, ma'am.

18            MS. CRESWELL:  Enter Asset Purchase

19  Agreement into the record as Exhibit 19.  It is numbered

20  pages 1 through page 30.

21     Q    (BY MS. CRESWELL)  The Asset Purchase Agreement

22  is made and entered into as of November the 5th by and

23  among K-Pipe Merger Corporation and Midcoast Energy

24  Resources; is that correct?

25     A    That's correct.

108

1    Q    Does the Purchase and Sale Agreement, which is

2  referenced in Exhibit 1 on the date of 9 -- 9/21 --

3              MS. CRESWELL:  Am I in the right spot, or

4  am I in the wrong spot?

5              MS. PETERS:  11/4.

6    Q    (BY MS. CRESWELL)  Okay.  Is this Asset

7  Purchase Agreement that's referenced on 11/4, is that

8  this agreement, Exhibit 19?

9              Does that make sense?

10    A    Yeah.  I understand what you're saying.

11              MS. PETERS:  You might just clarify it a

12  little bit so we're all looking for it.

13              MS. CRESWELL:  Okay.  We have just entered

14  the Asset Purchase Agreement, which is Exhibit 19, into

15  the record; and hopefully we're looking at the correct

16  date, November the -- well, the entry on Exhibit 1 is

17  November the 4th; and it does say:  "Continued work on

18  the transaction, including completion of the Asset

19  Purchase Agreement."

20    Q    (BY MS. CRESWELL)  Would this be the agreement

21  that was worked on on November the 4th, as referenced in

22  Exhibit 1?

23              Is Exhibit 19 what is referenced in

24  Exhibit 1?

25    A    I believe it would have to be.

1    Q    Thank you.

2    A    It's got a different nomenclature on it but --

3    Q    Thank you very much.

4         If you would again look at Exhibit 19,

5    please, Mr. Chachere; and look at page 8.

6    A    All right.

7    Q    Down at the bottom, Paragraph 2.5(c), this

8    refers to a cause of action?

9         I'll let you glance at that for a moment.

10   A    All right.

11   Q    Was -- this is talking about excluded assets.

12        Was this something that K-Pipe wanted to

13   retain in the deal, this particular cause of action, or

14   that Midcoast did not want to have included as part of

15   the purchase; or are you familiar with this clause?

16   A    You know, I just vaguely remember the name

17   "Western Resources" and "OneoK"; but I just don't

18   recall, you know, who negotiated what or what -- you

19   know, who wanted what.  I don't know that I was involved

20   in that.  I mean, I would just be told what the deal was

21   and work from that.

22        MS. PETERS:  I just have one question

23   here:  We had talked before, when we were discussing the

24   September 20th items, about the Purchase and Sale

25   Agreement.  It's called Purchase and Sale Agreement on

1   9/20; and then 9/21, it says "for certain assets."

2                Was that the agreement that evolved into

3   Exhibit 19 or did you stop and start over or kind of

4   what was its heritage?

5                THE WITNESS:  The one -- you're talking

6   about 9/21 with Pipeline Holdings Partners?

7                MS. PETERS:  Right.

8                Did it evolve into this or did --

9                THE WITNESS:  That's what I'm thinking,

10  yes.  I think that I -- I must have been told that the

11  entity buying it, its name is Pipeline Holdings

12  Partners.  Then Fortrend actually formed -- used another

13  name or changed their mind or something.

14               And the draft that we -- the nomenclature

15  of the draft at that time, I guess, was "Purchase and

16  Sale" and it ended up through -- you know, various

17  versions, ended up being called Asset Purchase

18  Agreement, but I believe it's the same thing, yeah.

19               MS. PETERS:  Okay.

20               MS. CRESWELL:  Enter Butcher Interest

21  Partnership General Partnership Agreement into the

22  record as Exhibit 20.  This document is Bates Stamp

23  numbered 001031 through 001040.  This is a General

24  Partnership Agreement entered into between Mid Louisiana

25  Gas Company and K-Pipe Group, Inc., as of the 8th day of

1  November, 1999.

2                  Do you think we have the --

3      Q    (BY MS. CRESWELL)  Are you familiar with this

4  partnership agreement?

5      A    Somewhat, yes.

6      Q    We've gone -- did you assist with drafting the

7  partnership agreement?

8      A    I believe so.

9      Q    And if you would just confirm the signature

10  over on page 7 of that partnership agreement.

11     A    Looks like Richard Robert's signature; and from

12  what I recall of Larry Austin, that looks like his

13  signature, too.

14                 MS. PETERS:  What was Larry Austin's role

15  in the transaction?

16                 THE WITNESS:  He was president of this

17  K-Pipe Group, Inc. -- I don't know -- or maybe president

18  of several entities; and I think his wife was the

19  secretary of it or something.

20                 MS. PETERS:  Did you ever meet with him?

21                 THE WITNESS:  At closing, I did.

22                 MS. PETERS:  At closing.

23                 THE WITNESS:  Uh-huh.

24                 MS. PETERS:  Now, did you go to both of

25  the closings, the one on the 8th and the one on the 9th?

1                THE WITNESS:  No.  I was up there in

2    LeBoeuf Lamb's offices, but I was on a different floor.

3                MS. PETERS:  On the 8th.

4                THE WITNESS:  Yeah, whatever the time

5    periods were, yeah.

6                I was not at their closing, no.  I was up

7    in New York and, you know, at LeBoeuf Lamb's offices;

8    but I was not at their closing, no.  I don't even think

9    I was on the same floor they were on.

10   Q    (BY MS. CRESWELL)  If I'm understanding the

11   Butcher Interest in a limited way, the Butcher Interest

12   is something that was not -- that was separately stated

13   in the Asset Purchase Agreement.

14               Can you tell us what you know about that

15   and how that evolved into this partnership agreement?

16   A    Well, I think the Butcher Interests were a

17   stream of revenue interests, if you will, an intangible

18   right to revenues, if I recall correctly, that was --

19   you know, was an asset that Langley had amongst all

20   these entities and so forth.

21               How it evolved into this, you know, I

22   don't remember.  I mean, I did not structure it.  I did

23   some drafting on it, you know, was told, "This is what

24   needs to be done"; and that's all I really recall.

25   Q    On page 2 of the partnership agreement, which

1   is Exhibit 20, Paragraph 6.02, down towards the bottom,

2   does indicate that -- it says -- that would be

3   Midcoast if I'm -- or Mid Louisiana Gas Company did

4   contribute $225,000 to the partnership and its capital

5   account.

6              Is that what you're seeing there at that

7   paragraph, Mr. Chachere?

8        A    Yes, ma'am.

9        Q    And Midcoast Louisiana Gas was a subsidiary

10   of -- Mid Louisiana -- sorry -- Mid Louisiana was a

11   sub -- or is -- or was in 1999 and 2000 a sub of

12   Midcoast; is that correct?

13        A    Yes.  Yes.

14        Q    Do you have any idea --

15        A    It may have been indirect.  I don't remember,

16   but it was one of the Midcoast entities.

17        Q    Right.

18              Would you have any idea why the Butcher

19   Interest was transferred into a partnership?

20        A    No, ma'am.

21        Q    Okay.  At this point in time when the

22   partnership interest -- or the partnership agreement was

23   entered into between Mid Louisiana and K-Pipe, there

24   were the two partners, do you know anything about when

25   or why Midcoast acquired the full interest in the

1  Butcher Interest --

2      A    No, ma'am.

3      Q    -- and bought out the other partner?

4           Okay.  On 11/5 -- if you would refer back

5  to Exhibit 1, on 11/5, there is a mention of an Attorney

6  Davis?

7      A    I'm not seeing 11/5.

8           MR. STERN:  Down at the bottom.

9           THE WITNESS:  Oh.  It's just out of order.

10     A    Okay.  Let me look at that.

11          (Reading silently.)

12          I can't remember the -- Midcoast had a

13 lender involved and the lender, of course, had an

14 attorney and that may have been who it was but -- that's

15 what I'm thinking, but I don't remember his full name.

16          MS. PETERS:  Was Midcoast's lender Bank of

17 America?

18          THE WITNESS:  I believe so.  I believe

19 that's right.

20     Q    (BY MS. CRESWELL)  I have a couple more

21 questions in regards to Fortrend, if you'll bear with me

22 on that.

23          Mr. Chachere, do you have -- do you have

24 any feeling or any knowledge or -- what the business of

25 Fortrend was, as you understood it?  What was their

1  business?

2      A     I don't know.  I was not involved in that part

3  of it, you know.  I was just told that Fortrend is

4  coming in and, you know, that we might be able to make a

5  deal with them to buy the assets.  I was just told to

6  draw documents and talk to their attorneys.

7      Q     What was your understanding of Fortrend's role?

8      A     They were a buyer of the -- potential buyer of

9  the stock from Langley's companies -- or of Langley's

10  companies and that Midcoast would try to make a deal to

11  buy certain assets from Fortrend's entity.

12             MS. PETERS:  As we discussed earlier, the

13  original draft was -- between Langley and Midcoast was a

14  stock purchase.

15             Was there a particular reason why the

16  stock purchase didn't go through?

17             THE WITNESS:  You know, I don't know all

18  the ins and outs of that.  I know there were issues.

19  Obviously tax issues were involved.  There were

20  regulatory issues, selling stock versus selling assets.

21  Rate case issues could be involved, whether you had to

22  go in and have -- establish new rates if you bought

23  assets.  I remember vaguely some stuff about all of

24  that; but I was not involved in deciding, you know,

25  whether it was going to be an asset purchase or a stock

1  purchase or -- it didn't make any difference to me.

2             MS. PETERS:  So when you say "regulatory

3  issues of buying stock versus buying assets," what are

4  you referring to?

5             THE WITNESS:  Well, the pipelines, I think

6  most of the assets were FERC regulated; and so I think

7  there -- I'm not a regulatory lawyer; but I think there

8  are issues involved with the transfer of assets between,

9  you know, regulated -- FERC-regulated assets, you know.

10             MS. PETERS:  Can FERC -- what is FERC's

11  role, to the extent that you understand it, when there

12  is a transfer of a regulated asset?

13             MR. STERN:  Objection.  No foundation.

14             MS. PETERS:  What do they do?

15             THE WITNESS:  I really don't know.  It's

16  outside my area, really.

17             MS. PETERS:  Have you ever been involved

18  in a transaction where FERC, because of the regulatory

19  issues associated with the assets, prevented the sale

20  from going through?

21             THE WITNESS:  I have; but in the context I

22  remember it was, it was what's referred to as an

23  abandonment.  In other words, the assets would be

24  abandoned from FERC regulation; become

25  nonjurisdictional, if you will; and then purchased.  And

1  so the deal would be contingent upon, you know, the

2  spin-down, so to speak, by FERC of an order.  I've been

3  involved with that type of transaction.

4               MS. PETERS:  Okay.

5               THE WITNESS:  Now, whether that was

6  involved here, I don't know.  You just asked me what all

7  might be involved, and I'm just trying to think of

8  what -- kind of recall in the back of my mind might have

9  been issues.

10              MS. PETERS:  Okay.  Did you want to take a

11  minute and come back?

12              See if there are any other comments that

13  you have, and then we can do that.

14              (A break was taken from 1:53 to 1:55 p.m.)

15              (Proceedings concluded at 1:55 p.m.)

16

17

18

19

20

21

22

23

24

25

1                         CHANGES AND SIGNATURE

2     PAGE   LINE   CHANGE                    REASON

3     _____  _____  _____    _____

4     _____  _____  _____    _____

5     _____  _____  _____    _____

6     _____  _____  _____    _____

7     _____  _____  _____    _____

8     _____  _____  _____    _____

9     _____  _____  _____    _____

10    _____  _____  _____    _____

11    _____  _____  _____    _____

12    _____  _____  _____    _____

13    _____  _____  _____    _____

14    _____  _____  _____    _____

15    _____  _____  _____    _____

16    _____  _____  _____    _____

17    _____  _____  _____    _____

18    _____  _____  _____    _____

19    _____  _____  _____    _____

20    _____  _____  _____    _____

21    _____  _____  _____    _____

22    _____  _____  _____    _____

23    _____  _____  _____    _____

24    _____  _____  _____    _____

25    _____  _____  _____    _____

119

```
 1  PAGE   LINE   CHANGE               REASON

 2  _____  _____  _____     _____

 3  _____  _____  _____     _____

 4  _____  _____  _____     _____

 5  _____  _____  _____     _____

 6         I, RONALD LOUIS CHACHERE, have read the
    foregoing interview and hereby affix my signature that
 7  same is true and correct, except as noted above.

 8
                          _____
 9                        RONALD LOUIS CHACHERE

10

    THE STATE OF TEXAS      )
11
    COUNTY OF HARRIS        )
12

13         Before me, _____, on this
    day personally appeared RONALD LOUIS CHACHERE, who
14
           ____ a) is personally known to me or
15
           ____ b) proved to me under oath or
16
           ____ c) proved to me through _____
17              (description of identity card or other
                document)
18
    to be the person whose name is subscribed to the
19  foregoing instrument and acknowledged to me that they
    executed the same for the purposes and consideration
20  therein expressed.

21      Given under my hand and seal of office this _____ day
    of _____, 2003.
22

23
                          _____
24                        NOTARY PUBLIC IN AND FOR
                          THE STATE OF TEXAS
25
```

1  STATE OF TEXAS                :

2  COUNTY OF HARRIS              :

3

4              I, Meredith A. Shoemaker, a Certified

5  Shorthand Reporter in and for the State of Texas, hereby

6  certify that the facts stated by me in the caption

7  hereto are true; that the foregoing interview of RONALD

8  LOUIS CHACHERE, the witness hereinbefore named, was

9  taken by me in machine shorthand, the said witness

10  having been by me first duly sworn under oath, and later

11  transcribed from machine shorthand to typewritten form

12  by me.

13              I further certify that the above and

14  foregoing interview, as set forth in typewriting, is a

15  full, true, and correct transcript of the proceedings

16  had at the time of taking said interview.

17              Given under my hand and seal of office

18  on this 23rd day of January, 2004.

19

20                          _____
                            Meredith A. Shoemaker, CSR
                            Texas CSR No. 7202
21                          Expires:  12/31/2005

22  ALLIED ADVANCED REPORTING, INC.
    1647 Colquitt
23  Houston, Texas 77006
    713.524.6777
24  800.223.9409
    713.524.6888 (FAX)
25  aari@alliedadvancedreporting.com