Tino Monaldo Transcript.txt

THE FEDERAL INCOME TAX LIABILITY

Of DENNIS LANGLEY

for the 1999 Tax Year

THE SUMMONS INTERVIEW OF TINO MONALDO, produced,

sworn and examined on the part of the IRS pursuant to

notice between the hours of eight o'clock in the

forenoon and six o'clock in the afternoon of said

Wednesday, the 19th day of November, 2003, at the IRS

Office, in the City of Kansas City, County of Jackson

and State of Missouri, before me,

BRENDA BROLL
Certified Court Reporter #468
Certified Shorthand Reporter

a Notary Public within and for the State of Missouri,

in a certain cause now pending.

APPEARANCES

For the IRS:
Ms. Linda Creswell,
IRS Revenue Agent
2601 Meacham Blvd., Suite 550
Ft. Worth, Texas 76137

Ms. Yvonne Peters, Attorney
Office of Chief Counsel
Jackson Federal Building
915 Second Avenue
Room 2710, M/S 670
Seattle, WA 98174

For Dennis Langley:
Mr. John M. Edgar
Edgar Law Firm, LLC
4520 Main Street, Suite 1650
Kansas City, Missouri 64111

- 2 -                                                   INDEX

Stipulations.....page 6
Witness TINO M. MONALDO, sworn in.....page 7
Examination by Ms. Creswell and Ms. Peters.....page 7
Examination by Mr. Edgar.....page 181
Continued Examination by Ms. Peters.....page 187
Witness Excused.....page 190
Signature of Witness.....page 191
Errata Sheet.....page 192
Notarial Certificate.....page 193
EXHIBITS
Exhibit Number One marked.....page 7
(1) Summons

Tino Monaldo Transcript.txt

Exhibit Number Two marked.....page 28
(2) Letter of Intent
Exhibit Number Three marked.....page 74
(3) Project Development Agreement
Exhibit Number Four marked.....page 82
(4) Project Development and MRG Interests Agreement
Exhibit Number Five marked.....page 84
(5) Option Agreement
Exhibit Number Six marked.....page 89
(6) KPC Guaranty
Exhibit Number Seven marked.....page 90
(7) Guaranty

                    - 3 -                    Exhibit Number Eight marked.....page
98
(8) Fax dated 10/28 and Attachments
Exhibit Number Nine marked.....page 116
(9) Fax from Yvette Korb
Exhibit Number Ten marked.....page 120
(10) Fax dated 10/11/99 and Security Agreement
Exhibit Number Eleven marked.....page 125
(11) Fax dated 10/12/99
Exhibit Number Twelve, Thirteen marked.....page 128
(12) Stock Purchase Agreement dated 10/25/99
(13) Stock Purchase Agreement Preamble
Exhibit Number Fourteen marked.....page 132
(14) Fax dated 10/7/99 and Attachments
Exhibit Number Fifteen marked.....page 134
(15) E-mail dated 10/8/99
Exhibit Number Sixteen marked.....page 135
(16) Guaranty
Exhibit Number Seventeen marked.....page 137
(17) KPC Guaranty
Exhibit Number Eighteen marked.....page 140
(18) Fax dated 10/14/99
Exhibit Number Nineteen marked.....page 145
(19) E-mail from Jim Pryde to Ron Chachere
Exhibit Number Twenty marked.....page 156
(20) Letter from K-Pipe Merger Corporation

                    - 4 -                    Exhibit Number Twenty-one
marked.....page 164
(21) Fax dated 11/4/99 to Jim Pryde from Chris
Kaitson
Exhibit Number Twenty-two marked.....page 168
(22) E-mail dated 11/2/99
Exhibit Number Twenty-three marked.....page 171
(23) E-mail dated 11/3/99
Exhibit Number Twenty-four marked.....page 175
(24) E-mail from Jim Pryde
Exhibit Number Twenty-five marked.....page 176
(25) E-mail from Jim Pryde
Exhibit Number Twenty-six marked.....page 178
(26) Fax from Jim Pryde

                    - 5 -                              STIPULATIONS
     It is hereby stipulated and agreed, by and
between counsel for the respective parties that
the summons interview of the witness, TINO M.
MONALDO, may be taken at this time and place on
behalf of the IRS, and all objections as to
time, place, and manner of taking the same are
hereby waived and that said summons interview

                    Tino Monaldo Transcript.txt
may be taken by the use of the Stenomask closed
microphone and later transcribed under my
direction.
        It is stipulated and agreed by and between the
parties and the witness that he is to sign this
deposition at or before the time of trial of
this cause; that presentment of the deposition
by the court reporter to the witness for his
reading and signature before it is filed with
the court being hereby waived; further, that if
this deposition is not signed by time of trial,
it may be submitted and considered in evidence
the same as if he had read and signed said
deposition.

                    - 6 -   1                         TINO M. MONALDO
 2    called as a witness herein, having been first
 3    duly sworn, was examined and testified as
 4    follows upon,
 5                        EXAMINATION
 6    BY MS. CRESWELL AND MS. PETERS:
 7    WHEREIN, EXHIBIT NUMBER ONE was marked for
 8    identification.
 9    MS. CRESWELL: Let's begin and I'll just read a
10    few words' first to set the stage.  The
11    testimony of Tino Monaldo is being given at the
12    office of IRS Counsel, Chief Counsel, located at
13    2345 Grand Boulevard, Suite 301, Kansas City,
14    Missouri on November 19, 2003 at almost 10:15.
15    It's about the Federal Income Tax Liability of
16    Dennis Langley for the 1999 tax year.  And
17    present are Linda Creswell, Internal Revenue
18    Service Revenue Agent; Yvonne Peters, IRS
19    Attorney; Tino Monaldo, who is the witness; and
20    John Edgar, who is the Representative and
21    Attorney for Dennis Langley.  The questions are
22    being asked by Linda Creswell and Yvonne Peters
23    and the answers are given by Tino Monaldo.
24    MR. EDGAR: Ms. Creswell, I propose before we
25    went on the record that we enter into the
                    - 7 -

 1    stipulation to the effect that to the extent
 2    that the questions may encroach on privileged
 3    areas that to the extent that I permit him to
 4    answer without asserting the privilege that his
 5    answers aren't deemed to be a waiver of the
 6    privilege.  So, I want you to be able to go as
 7    freely as you can and let's not worry about
 8    where the edges of the privilege are and I
 9    understand that's agreeable to you.
10    MS. CRESWELL: So noted for the record.
11    MR. EDGAR: Great.  Thank you.
12    MS. CRESWELL: This interview is being recorded
13    as Mr. Monaldo was previously notified and the
14    recording is by means of a court reporter.  Mr.
15    Monaldo is present as a result of a summons that
16    is entered into the record as Exhibit One.  And
17    Mr. Monaldo, here is a copy, or this is not a
18    copy, this is the original summons.  If you
19    wouldn't mind just comparing the original
20    summons with the copy that we have provided and
21    that will go on the record to assure yourself
                    Page 3

Tino Monaldo Transcript.txt
22    that that is the correct summons.
23    MR. MONALDO: Well, I haven't read it word for
24    word to compare, but it looks similar.
25    MS. CRESWELL: Okay.  Thank you.  And if I could
                              - 8 -

1    have back the original.  Thank you.
2    MR. MONALDO: Is this mine?
3    MS. CRESWELL: Yes, that one is yours.
4  Q.   (Ms. Creswell) Mr. Monaldo, could you state your
5       name and spell it for the record, please?
6  A.   Sure.  Tino M. Monaldo.  M-O-N-A-L-D-O.  First
7       name is T-I-N-O.  Middle initial M as in
8       Michael.
9  Q.   (Ms. Creswell) If you could state your home
10      address, please?
11 A.   9105 West 146th Street, Overland Park, Kansas,
12      66221.
13 Q.   (Ms. Creswell) Mr. Monaldo, will you agree to
14      review the transcript?  I know you're getting a
15      copy.  When you get the transcript, will you
16      review it and sign it, so that we'll know that
17      it's an-
18 Q.   (Ms. Peters) And make any corrections.
19 Q.   (Ms. Creswell) And make any corrections, right.
20 A.   Sure.  I would be happy to.
21 Q.   (Ms. Creswell) You did provide documents
22      pursuant to this summons.  Do you have other
23      documents at this time that you need to present
24      to us?
25 A.   No.  Just what was turned over.
                              - 9 -

1  Q.   Did you provide all the documents that were
2       required under the summons?
3  A.   I believe I did, yes.
4  Q.   Is there any reason why you would not be able to
5       understand and answer the questions that we're
6       asking today?
7  A.   I don't think so.
8  Q.   Are you taking any medication that would affect
9       your ability to understand or respond
10      meaningfully to the questions?
11 A.   No.
12 Q.   If you need clarification on any question,
13      please let me know and I'll try to rephrase it,
14      so we can have a clear understanding.  The first
15      questions that I'll be asking are just on the
16      preparation for this summons interview.  How did
17      you prepare for the interview today, Mr.
18      Monaldo?
19 A.   I think I looked at the answers that were
20      provided, I think, in the data request number
21      two, which I think was several pages of
22      responses to questions.
23 Q.   I'm not sure I'm-
24 A.   - some documents.
25 Q.   (Ms. Peters) I think he means the IDR.
                              - 10 -

1  A.   IDR.  I'm sorry.
2  Q.   (Ms. Creswell) Oh, okay.
3  A.   Look at the IDR.
                              Page 4

Tino Monaldo Transcript.txt

```
 4  Q.  (Ms. Peters) So, you looked at the question and
 5      the answers that were provided?
 6  A.  Correct.
 7  Q.  (Ms. Creswell) That would have been the document
 8      request that was issued to Mr. Langley?
 9  A.  Yes.
10  Q.  Have you spoken with Dennis Langley about what
11      he testified to at his summons interview?
12  A.  If I had, it was briefly.  But I have reviewed
13      the transcript.
14  Q.  That was my next question, if you had reviewed
15      the transcript.  And you're citing that you did
16      so.  Did you discuss Mr. Langley's interview
17      with any of the other persons who were present
18      at his interview?
19  A.  Have I discussed?
20  Q.  His interview with any of the other persons?
21      Mr. Edgar was present, Mr. Kleban...
22  A.  I'm not sure if this is privileged or not, but I
23      have had conversations with Mr. Edgar and Mr.
24      Kleban.
25  Q.  The next questions are just a few background
                          - 11 -

 1      questions about yourself, Mr. Monaldo.  Can you
 2      tell me what your educational background is?
 3  A.  Graduated from Law School, Washington
 4      University, 1982.  College at George Washington
 5      University in Washington, D.C., 1979.
 6  Q.  How long have you practiced law?
 7  A.  Since May of graduating in 1982.
 8  Q.  And when did Dennis Langley become your client?
 9  A.  I have represented Dennis Langley or his
10      clients, or his companies, probably as far back
11      as soon after graduating law school.
12  Q.  Specifically, what type of work did you do for
13      the Bishop Group, specific responsibilities that
14      you had when you worked with them?
15  A.  Corporate documentation.  I guess the best way
16      to describe it would be I was outside counsel
17      working for my own law firm, but had a lot of
18      duties that one might characterize as general
19      counsel.  For example, if we had a rape case
20      going on, somebody had to be the relayor of
21      information and facts between the regulatory
22      counsel in Washington, D.C. or Jefferson City or
23      Topeka, Kansas and the company, so that the
24      company wouldn't be calling - the lawyers
25      wouldn't be calling fifteen people inside the
                          - 12 -

 1      company for information on what to file in a
 2      regulatory pleading, so I would say I would be
 3      the liaison.  If we had litigation, you know,
 4      garden variety litigation you would have in the
 5      company, I would be the liaison with outside
 6      counsel.
 7  Q.  So, let me make sure that I'm understanding.
 8      Were you - you would retire as a - in your own
 9      practice.  Were you an employee?
10  A.  No.  Tino Monaldo is a law firm.  I practiced
11      law.  I've not been an employee and you can call
12      it retainer, I generally dole on an hourly basis
```

Page 5

                         Tino Monaldo Transcript.txt
13      and sometimes a contingency.  But mostly
14      business, I would say the business work, but
15      anytime you're in a company, there maybe from
16      time to time the real estate situation that
17      comes up or the right of way situation that
18      comes up or contract negotiations on the gas
19      transportation agreement.  Whatever needed for a
20      pipe line company.
21  Q.  (Ms. Peters)What about like internal matters for
22      employee disputes or problem, just employees
23      being let go, that kind of thing?  Did you
24      handle that, as well, or did they have someone
25      else?
                              - 13 -

1   A.  That was typically handled by HR, but I'm sure
2       if there was a situation about, I really can't
3       think of one off the top of my head, but I, you
4       know, if in helping formulate procedures, so
5       that when you do let somebody go, you have that
6       interview, you make sure that, you know.  So, I
7       think generally speaking, but I can't think of a
8       real ever bad case we had with an employee that
9       required a - but if there would have been one,
10      I'm sure I would have been involved to some
11      extent.  Again, the liaison between whatever
12      specialist you hire.  I guess you could say I'm
13      a jack of all trades, so.  Master of none.
14  Q.  (Ms. Creswell) You referenced HR.  How-
15  A.  Each and every employee situation.
16  Q.  (Ms. Peters) Human Resources.
17  Q.  (Ms. Creswell) Of Human Resources.
18  A.  Human Resources.
19  Q.  (Ms. Creswell) I know there is a gentleman, an
20      employee, by the name of Howard and I was trying
21      to recall his last name, but-
22  A.  HR would be, she has to deal with employee
23      matters.  I may deal with human relations.  But
24      I would say, you know, typical contracts that
25      didn't require extreme expertise, I would
                              - 14 -

1       probably handle.  If it was something that was
2       highly regulatory or highly specialized, I would
3       be the eyes and ears of the company and.
4   Q.  So, back in, if I'm understanding correctly,
5       back in the 1990 year, you were not an employee.
6       Are you currently employed by any of Mr.
7       Langley's-
8   A.  I'm sorry.
9   Q.  -in '99?
10  A.  I was not an employee in 1999.
11  Q.  Right.  But currently, are you an employee-
12  A.  No.  I'm not.
13  Q.  -of any of the corporations that Mr. Langley
14      still owns-
15  A.  No.  I'm not.
16  Q.  -or of Mr. Langley?  Okay.
17  Q.  (Ms. Peters) Were you on his board of directors
18      for any of his companies?
19  A.  No.  I was not.  '99 or before, no.  I was not.
20  Q.  Currently are you?
21  A.  I don't think so.
                         Page 6

Tino Monaldo Transcript.txt
```
22 Q.  Were you at anytime?
23 A.  Not that I recall.
24 Q.  Not that you know.  Okay.
25 Q.  (Ms. Creswell) The next few questions regard the
                        - 15 -

 1      sale of the Bishop Group stock by Dennis
 2      Langley.
 3 A.   Just so there's not - I see a question mark on
 4      that.  Because I'm an officer of some of these
 5      corporations now.  But prior to 1999, I was not
 6      an officer or a director.  And so Dennis, you
 7      know, Dennis wouldn't get me caught in that kind
 8      of detail.  But since 2000, I've been an officer
 9      to some of his development companies where we go
10      out looking for other projects.  But at the
11      time, I was not an officer or director.  Not
12      that's it unusual for a lawyer to be an officer
13      or director, but at the time I wasn't, now I'm
14      an officer.
15 Q.  (Ms. Peters) So, for example, because Management
16      Resources Group, I guess that's what it's
17      called, are you an officer for that company?
18 A.   Yes.  I am.
19 Q.  (Ms. Creswell) Mr. Monaldo, when did you learn
20      that Mr. Langley wished to sell his interest in
21      the Bishop Group?
22 A.   I think sometime in the spring of '99.  The
23      concept of the divestiture of the company came,
24      started being talked about.
25 Q.  Did you actually become involved at that
                        - 16 -

 1      particular time or was it at a later date?
 2 A.   At that time.
 3 Q.  What was your role with respect to the sale?
 4 A.   It's a long hitch, but I would say I would be
 5      acting as outside counsel providing general
 6      counsel advice on matters relating to the
 7      mechanics of accomplishing the sale.
 8 Q.  So, did you actually go through the process of
 9      drafting documents, attending negotiations with
10      Mr. Langley or with any of the other
11      representatives of his corporations?
12 A.   I would have been at a good number of
13      negotiations.  I would have been involved with
14      Chase.  I would have been involved with the
15      management presentations, what we call dog and
16      pony shows, where companies come in, you put on
17      an hour presentation of your company's revenues,
18      expenses, business plans and then we would break
19      out of those sessions and answer questions.  I
20      typically got with answering questions regarding
21      pending - at the time, if I recall, we had a
22      number of pending's, significant pending
23      regulatory matters that parties would have
24      questions about, because regulatory matters
25      affect your revenue string, so buyers would be
                        - 17 -

 1      interested in what the revenue string was going
 2      to be and try to evaluate how they're going to
 3      price it.  So, question marks about litigation
```
                        Page 7

Tino Monaldo Transcript.txt

```
 4       or regulatory matters would be questions that
 5       would have been addressed to me in large part.
 6  Q.   So, it sounds like you would have been very
 7       actively involved in the - pretty active
 8       participant in representing Mr. Langley and his
 9       business interests?
10  A.   I don't know if I would use the word
11       participant, but I was active as counsel for
12       Dennis and some of his companies.
13  Q.   Was there actually an engagement letter between
14       you and Mr. Langley, specifically for your work
15       on that sale?
16  A.   You know, I don't recall that.  If you have a
17       document that might refresh my memory on that,
18       but I...
19  Q.   No.  I was just asking.  For this particular
20       transaction, were you paid any differently than
21       you normally would have been paid as his outside
22       counsel?  Was it still a by the hour
23       arrangement?
24  A.   Well, there's two types of arrangements.  One
25       would be a contingency and one would be an
                          - 18 -

 1       hourly.  I think in this particular case there
 2       was an hourly arrangement between him and I and
 3       the companies and my stock.  But it seems to me
 4       that there was some sort of, there may have been
 5       a contractual relationship that dealt with if
 6       the company was sold and I don't recall exactly
 7       what that was at the time.  Right now I don't
 8       recall it.
 9  Q.   (Ms. Peters) Were you specifically representing
10       Mr. Langley or Bishop Group or which entity?
11  A.   Both.
12  Q.   Both.  Okay.
13  A.   Both.  I mean, there was agreements that
14       involved Kansas Pipeline and Bishop Group and
15       there are agreements that involved Dennis
16       Langley personally.  So, both.
17  Q.   (Ms. Creswell) This is kind of a broad question,
18       Mr. Monaldo, but what's your understanding of
19       the overall, the big picture, of this
20       transaction?
21  A.   The big picture?
22  Q.   The big picture of the transaction.  Where Mr.
23       Langley settled his interest in the Bishop
24       Group?
25  A.   Well, that is a broad question.
                          - 19 -

 1  Q.   Very broad, yes.
 2  A.   I would say this.  Mr. Langley built the
 3       pipeline company up from nothing to a thirty
 4       percent market share in Kansas City.  The pipe
 5       was full.  We couldn't move any more gas
 6       physically through the pipes, so our methods of
 7       growth were limited.  And the market was at a -
 8       in 1999, was at a pretty good time.  We had a
 9       couple choices.  We could take the company
10       public to liquify his investment or we could
11       just sell his stock in the company and he could
12       liquify the investment.  So, the overall picture
```

Tino Monaldo Transcript.txt

13    was it was, didn't have to sell, but appeared at
14    the time to be the right time to maximize his
15    value in what he built to that date.  So, I
16    think that was the underlying motive.
17 Q.  Can you explain to me how the federal energy
18    regulatory agency's involvement might differ if
19    it was a stock sale as opposed to structured as
20    an asset sale?
21 A.  The FERC, if someone were to sell that pipeline
22    as opposed to sell stock, you don't need
23    permission from FERC to sell the stock in a
24    company and change control.  But if you sell the
25    asset like a piece of pipe, you would have to
                              - 20 -

1     get FERC's permission.  Matter of fact, in some
2     cases if you wanted to decertify a pipe or
3     remove yourself from a customer, you have to get
4     FERC permission.  So, FERC, I don't know if
5     you've ever practiced before FERC, but it is an
6     agency that is very, very bureaucratically heavy
7     and very time consuming, so one would have to
8     get permission from FERC, file a pleading, go
9     through a notice period, wait for people to
10    intervene, wait for people to complain about not
11    wanting your transaction be approved, have a
12    hearing, file testimony and maybe a year or
13    later, a year and a half later, you might get
14    approval.  So, it's a-
15 Q.  So, it would be iffy.  You wouldn't even know
16    going into the process whether they would
17    approve the sale.  Is that what you're saying?
18 A.  Typically, when - it does happen where people
19    sell assets that are FERC regulated and they
20    have to go get FERC approval and it takes a very
21    long time.  A, you don't know.  B, you open your
22    books and records to your customers who have the
23    right to intervene and ask questions, which is
24    kind of an unusual thing in our system, but your
25    competitors can come in and find out all about
                              - 21 -

1     your business, because of FERC's going to ask
2     you those questions.  So, FERC could slow down
3     and potentially deny you the right to sell an
4     asset, where if it's a change of control by
5     stock sale and that's not required.
6  Q.  The next questions, Mr. Monaldo, are about the
7     various participants and names and such that we
8     have seen in the documents that you provided.
9     Did you know James Pryde?
10 A.  He's an attorney at Bryan Cave.
11 Q.  And who did, did he represent Mr. Langley in the
12    Bishop Group and those entities, also?
13 A.  Yes.
14 Q.  What part did he play at the sale of the Bishop
15    Group, Dennis Langley?
16 A.  He would have been a less of an negotiator, more
17    of a draftsman.  Scrivener, I guess, of
18    documents when requested.
19 Q.  What about Chris Fisher?  Do you know Chris
20    Fisher?
21 A.  I think he was an attorney at Brian Cave.  An
                              Page 9

Tino Monaldo Transcript.txt

```
22      associate, maybe.
23 Q.   And Joyce Essig, E-S-S-I-G, if I'm saying that
24      correctly?
25 A.   I don't recall that name.  Actually, it may be a
                              - 22 -

1       secretary or word processor or - I don't think
2       it's an attorney.
3  Q.   How about Chris Kaitson?  Do you know Chris
4       Kaitson?
5  A.   He was an attorney for, I think an in-house
6       attorney for Midcoast.
7  Q.   (Ms. Peters) Who?
8  A.   Midcoast.  M-I-D-C-O-A-S-T.
9  Q.   (Ms. Creswell) What part would he have played in
10      the sale of the Bishop Group by Mr. Langley?
11 A.   He was one of the potential, his company was one
12      of the potential buyers, one of the bidders.
13 Q.   Do you know Chip Berthelot.  And that's B-E-T-H-
14      E-L-O-T.  I may not-
15 A.   (Ms. Peters) B-E-R-T-
16 Q.   (Ms. Creswell) B-E-R-T-H-E-L-O-T?  Pardon me.
17 A.   I believe he was an officer of some sort at
18      Midcoast.
19 Q.   And Richard, it's spelled R-O-B-E-R-T, but I
20      would think it's pronounced Robert.  I may
21      incorrect there, but-
22 A.   I think he was an officer at Midcoast, as well.
23 Q.   What role would he have played in the sale?
24 A.   He was a representative of Midcoast, which is
25      one of the bidders for the company.  Or for the
                              - 23 -

1       stock.
2  Q.   Cynthia Morelli?  Do you know Cynthia Morelli?
3  A.   She was an attorney for Fortrend.  LeBuef Lamb I
4       think was the firm.
5  Q.   I'm sorry, the firm was?
6  A.   LeBuef Lamb.
7  Q.   And what part would she have played in the sale?
8  A.   Well, she would have been the legal
9       representative for Fortrend and all the
10      negotiations with Fortrend.  The process of back
11      and forth.
12 Q.   Do you know who Craig Hoffman is?
13 A.   He was a representative of Fortrend, as well.
14 Q.   Did he play a different role than Cynthia
15      Morelli?
16 A.   Cynthia was an attorney for a third-party law
17      firm.  Craig Hoffman was - I don't know what I
18      can say.  I knew he was an employee, but he was
19      with Fortrend.
20 Q.   Do you know who Gary Wilcox is?
21 A.   Fortrend had accounts from Price Waterhouse and
22      I think - you said Gary Wilcox?
23 Q.   Uh-huh.
24 A.   I think that he was either a representative of
25      Fortrend or an accountant with-
                              - 24 -

1  Q.   Accountant.
2  A.   Did I say accountant?  He was with Price
3       Waterhouse.
```
                              Page 10

Tino Monaldo Transcript.txt

4  Q.   What makes you think that Fortrend, that the
5       Price Waterhouse was representing Fortrend, if
6       you know?
7  A.   I just remember Price Waterhouse being in our,
8       in the data room and being at some meetings.
9  Q.   When Fortrend was present?
10 A.   I might not have a letter saying they were, but
11      you just know they are there on behalf of
12      Fortrend.  I believe they did due diligence on
13      their behalf.
14 Q.   So, what role would Mr. Wilcox have played?  Was
15      he reviewing the records in the data room, that
16      sort of thing, or was there a more-
17 A.   Well, I assume.  But I can't say I specifically
18      saw them in the data room.  I recall he was at
19      the management presentation and Price Waterhouse
20      people were in the data room, so I assume he had
21      some role with evaluating the company,
22      evaluating, you know, the purchase.
23 Q.   (Ms. Peters) And your understanding was that he
24      was from TWC representing Fortrend.  Is that
25      correct?
                            - 25 -

1  A.   I believe Gary Wilcox was with Price Waterhouse.
2       I can't be certain, but I believe he was.
3  Q.   And what your understanding what Price
4       Waterhouse was doing was that it was looking
5       through the data on behalf of Fortrend or for
6       some other party?  Or do you know?
7  A.   I believe they were doing it on behalf of
8       Fortrend.
9  Q.   (Ms. Creswell) Here's another name.  I'm going
10      to give it a stab.  Do you know Ron Chachere,
11      Chachere?
12 A.   Ron Chachere.  He was an attorney, I believe,
13      for Midcoast.  One of the bidders.
14 Q.   And his name is spelled C-H-A-C-H-E-R-E, for the
15      record.  And he's an attorney?
16 A.   That's correct.  To my understanding, yes.
17 Q.   What role did he play, Mr. Monaldo?
18 A.   He was just another legal representative like
19      Chris Kaitson in the give and take process of a
20      bid.
21 Q.   Do you know Jeff Furman?
22 A.   I don't know that I ever met Jeff Furman, but I
23      think he was one of the signature parties on
24      some documents on behalf of Fortrend.
25 Q.   Do you know Fred Forster, F-O-R-S-T-E-R?
                            - 26 -

1  A.   I don't recall that name.
2  Q.   Do you know Larry Austin?
3  A.   Larry Austin, I believe, was an official with
4       Fortrend.
5  Q.   What part, or what role, did he play in the
6       sale?  Did he go to the data room?  Was he
7       actively-
8  A.   You know, I don't recall that he was at any of
9       the meetings.  I think he was.  If he was, he
10      wasn't at very many, but I know he was a
11      signature party and I do recall happen to, I
12      just recall having phone calls with him

Page 11

Tino Monaldo Transcript.txt
```
13    sometimes.  Not that many.
14 Q. How about Howard Teig?  Did you ever meet or do
15    you know Howard Teig?
16 A. Do not know him.  I've not met him, but I
17    believe he was a - from the documents, he was a
18    representative of Fortrend.
19 Q. So, can you tell me again who the primary
20    representatives of Fortrend were that you
21    recall?
22 A. Well, I recall dealing with Craig Hoffman.  And
23    again, I don't know all the names, but I believe
24    it was accountants from Price Waterhouse.  And
25    then Cynthia Morelli.  And then I think there
                        - 27 -

1     was another attorney besides LeBuef Lamb.
2 Q.  (Ms. Peters) Graham Taylor?
3 A.  That name sounds familiar.  An older gentleman.
4    MS. CRESWELL: Anything else there, Yvonne?
5    MS. PETERS: No.
6    MS. CRESWELL: The next questions that we'll be
7    talking about have to do with the engagement
8    letter with Chase, which we will enter as
9    Exhibit Two, unless you see something else that
10   we need to add.
11   WHEREIN, EXHIBIT NUMBER TWO was marked for
12   identification.
13 Q. (Ms. Peters) So, when you, you said you
14    participated in negotiations a lot.  Correct?
15    Is that what you did?
16 A. I was at meetings where terms were negotiated,
17    yes.
18 Q. When you were negotiating, at what point were
19    you really negotiating terms of the sale and
20    with whom?  I guess my question is, at what
21    point did you narrow the field as far as who was
22    interested parties and who were those interested
23    parties that you were moving past just an offer
24    having been submitted by them?
25 A. If I understand your question correctly, I think
                        - 28 -

1     sometime in July or August, expressions of
2     interest came in from a number six, seven, eight
3     companies.  And then after we waded through
4     those offers in consultation with Chase and it
5     took a - the field then got narrowed through
6     July, August and September.
7 Q.  Was that field narrowing, because you found some
8     of the - I mean, what basis was it narrowing on?
9 A.  When you have an auction process, you tend to
10    narrow it based upon whose really interested in
11    paying the highest price and then when you
12    narrow it to three or four companies at a time,
13    then you kind of try to talk them and motivate
14    them to increase their price and so that process
15    just continued until we eventually culminate in
16    a sale.
17 Q. So, are you saying that by July you were down to
18    three or four people, three or four entities are
19    interested or what are you just saying?
20 A. It's more of a process deal because - it's hard
21    to say at any one time you would narrow it
```

```
                    Tino Monaldo Transcript.txt
22      specifically.  Let me give you an example.  When
23      you've got - it's kind of like having a garage
24      sale at your house.  You've got three people
25      that want that old mirror.  Well, you want to
                            - 29 -

1       make sure that people think the other person
2       wants it more, so you try to motivate them to
3       get the price up.  So, you don't want to narrow
4       it to one party, because then that one party,
5       they think they're the only bidder left and
6       nobody else is going to top them, you don't get
7       the price up, because I've been on the other
8       side of the auction process.  You don't make
9       your first offer is not your best offer.  So,
10      you know, it's kind of like buying a house, you
11      start high and low and you work yourself, you
12      work yourself to the point you need to be, so
13      over a period of time the parties were
14      eliminated either by they decided to back out,
15      they didn't want to bid any more or several
16      parties had prices that were higher and,
17      therefore, they were more attractive to us if
18      their prices were higher.  So, it was more about
19      - I can't really say there was a date by which,
20      okay, boom, people were cut off, it was more of
21      a fluid process.  It was more gradual than just
22      an event.
23 Q.   So, what were the parties that you were left
24      with that were primarily interested?
25 A.   I think initially it would have been - I say
                            - 30 -

1       initially - the parties that I remember being
2       really in play would have been Midcoast,
3       Fortrend, a company in the name of Buckeye and I
4       recall Enron, because I can recall making a trip
5       out to Ohio to meet with the folks in Buckeye.
6       So, I would say my recollection is we had four
7       players after the, you know, sometime in August
8       we were seriously still thinking about four
9       players as being meaningful possibilities.
10 Q.   So, by September, how do you narrow that down,
11      because some of those parties are falling out or
12      were focusing further on some parties or were
13      you still looking at all of those parties?
14 A.   Well, sometime in September we must have
15      narrowed it, because we signed a letter of
16      intent with, a non-binding letter of intent,
17      with the Fortrend folks.  But my recollection is
18      we still had people in mind in case the deal
19      with Fortrend did not get from the non-binding
20      letter of intent to a detailed contract stage.
21 Q.   So, when you have these people in play and
22      you're trying to get your highest price, your
23      best purchaser, at what point do you start
24      drafting an agreement with them?  Do you wait
25      until you've signed a letter of intent?  Do you
                            - 31 -

1       always sign a letter of intent?  Is there a
2       certain process that you go through prior to
3       starting to draft a contract with them?
                         Page 13
```

Tino Monaldo Transcript.txt

4  A.  Every case is different.  I think in this
5      particular case, we started off with a form
6      agreement and I don't recall getting to any
7      drafting stage until later on, but it's - just
8      understand how complicated it is.  It's not just
9      price, there are other terms and conditions that
10     are material in a transaction and this
11     particular one, there were a number of terms
12     that were important, that went beyond just price
13     and so you're trying to get your best overall
14     package.
15  Q.  So, what would be your most important terms
16     besides price, in this transaction that you
17     recall?
18  A.  In this transaction, a couple of things.  One,
19     at the time right away for cable communications
20     was a hot item.  I don't know what you recall
21     back then, but people were laying fiber optics
22     in pipelines.  It was a huge revenue earner for
23     pipelines.  And one of the important things that
24     we tried to get, that was contemplated, was the
25     right to retain a right of way usage or license
                    - 32 -

1      inside of the existing Kansas Pipeline right of
2      way, so that if we were ever able to find a
3      cable communications company, we wanted to
4      retain that right, because that was of value.
5      Some buyer may not be willing to pay you cash
6      for it, but if we could retain it and it proved
7      to be value that could be earned from that, that
8      would be one example of value.
9  Q.  So, there was price and you were interested in
10     retaining the right of way.  And was the right
11     of way retained, ultimately?
12  A.  Ultimately, we did not retain the right of way.
13  Q.  Were there any other terms that were very
14     important to you like price?
15  A.  Yeah.  There was.  Even though the pipeline
16     physically was full, I believe the consensus was
17     that there was still value to be hung off of the
18     Kansas Pipeline and treated as other projects,
19     if you worked long enough, you could develop.
20     And the way you do that is you sign other
21     contracts with other shippers that might require
22     the construction of new pipe.  Again, at the
23     time, if you recall, a building, a natural gas
24     powered power plant was the hot thing.  And
25     there was some opportunities we thought in
                    - 33 -

1      Kansas to lay pipe off of Kansas Pipeline to
2      areas where they needed natural gas powered
3      power plants and that would enhance the value of
4      the company.  We thought we could do that, so I
5      guess, like for the seller, we want our cake and
6      eat it, too.  Could we sell the stock in the
7      company and still retain the right to develop
8      off the pipeline.  And so negotiating a private
9      development in it with the company was an
10     enhancer to the value that we would have
11     received, because it gave Dennis an opportunity
12     to earn a dollar later, if he was able to
                    Page 14

Tino Monaldo Transcript.txt
```
13      perform a certain function.  So, the seller may
14      not pay you cash for that, but it had given you
15      the right to do that, it gave you an opportunity
16      potentially to earn more money.  So, that was
17      another item that I recall being important.
18  Q.  We have some, I guess project development
19      agreements.  Are those the agreements that
20      you're referring to?  Was there an ultimate
21      agreement that was entered into?
22  A.  There are ultimate agreements that was entered
23      into dealt with that, those kind of
24      opportunities that were, to some extent, were
25      retained if we could perform.
```
                            - 34 -

```
1   Q.  We have some questions on those later, we'll
2       just save those for later.  Were there any other
3       items that were really significant as far as the
4       terms goes?
5   A.  There very well could have been.  I can't think
6       of anything other than those two.
7   Q.  There was also a consulting agreement that-
8   A.  I also know the form of payment was stock versus
9       cash.  Is somebody going to pay you in stock or
10      is somebody going to pay you in cash.  So, that
11      would have been something that would have - it's
12      another factor that would have been taken into
13      consideration.
14  Q.  And Mr. Langley received cash.  Is that correct?
15      In addition to his stock redemption?
16  A.  I think the buyer paid cash, yes.
17  Q.  And I was asking about the consulting agreement,
18      was that a significant term or was that not-
19  A.  The consulting agreement, I think that you're
20      referring to, really wasn't significant.  But,
21      of course, frankly it was something that the
22      buyer wanted, because when you've got, as you
23      can imagine, when you've got seventy employees
24      and a lot of regulatory proceedings going on and
25      there's some institutional memory that if we
```
                            - 35 -

```
1       just - Dennis just walked away and said here's
2       the company and here's my stock and you go try
3       to - Dennis actually had testified in some of
4       those cases, so requiring him to come back and,
5       you know, be involved in the case, was something
6       that was requested, but it was not a huge, it
7       was not a money maker.  As a matter of fact, I
8       think it was more, it was as far as our time
9       commitment to perform some of those services to
10      provide testimony or answer questions regarding
11      those cases was more of a pain in the neck to be
12      honest with you.
13  Q.  And when you're talking about proceeding, are
14      you talking about the FERC proceedings?
15  A.  Well, there was a FERC proceeding.  I think
16      there was maybe a couple still pending before
17      the Kansas Corporation Commission.  There was, I
18      think, a couple pending still before the
19      Missouri Public Service Commission.  When you're
20      regulatory, regulated by companies, it seems
21      like you always have cases pending.
```
                            Page 15

Tino Monaldo Transcript.txt

22  Q.   So, it wasn't in regards with to a specific
23       pending item or-
24  A.   I think the call to consulting agreement gave
25       them the right to ask us to provide services to
                              - 36 -

1        them up to a certain number of hours per year at
2        a certain rate.  And I believe they ultimately
3        used that to get assistance on the FERC case,
4        the Kansas case and I think some proceedings in
5        Missouri.
6   Q.   Just for purposes of clarifying for us, what in
7        this transaction, when you-
8   A.   Let me just back up.  Real services were
9        provided in that consulting agreement, so.
10       Believe me, we had to, Dennis had to file
11       testimony, he had to read stuff, he had to
12       actually be involved and testify at FERC on
13       rates of the company whose stock he had just
14       sold.  So, it was a real time commitment, it
15       wasn't just money flowing one way, it was a real
16       time commitment.
17  Q.   I guess back to my question about, at what point
18       did you get into the drafting stage?  You've
19       described, I guess the most important points of
20       what you and Mr. Langley were looking for from
21       the sale and you've described who you're - the
22       bidders narrowed down the field of the bidders.
23       Were you getting into any written descriptions
24       of what the terms of an agreement potentially
25       would be?  Other than the form agreement that
                              - 37 -

1        was specifics of the agreement with any of these
2        bidders?
3   A.   I recall that sometime in September there had to
4        have been drafts of - a drafting of a letter of
5        intent.
6   Q.   So, that would have been with Fortrend.  Is that
7        correct?
8   A.   They ultimately signed a letter of intent, yes.
9   Q.   So, there were several letter of intents?
10  A.   There may have been.
11  Q.   There may have been.
12  A.   I don't recall.
13  Q.   So, I guess my question is, would you have been
14       drafting documents, or part of documents, for a
15       sale agreement with multiple parties at the same
16       time?
17  A.   I think so.
18  Q.   So, when you entered into-
19  A.   I think the idea of being you're wanting to
20       answer as many as you can.
21  Q.   Sure.  Sure.  So, as you progressed, would you
22       first want to be entered into a letter of intent
23       before you start drafting a contract or would
24       you go ahead and start drafting terms prior to
25       entering into a letter of intent?  Or is there a
                              - 38 -

1        particular process that you would go through?
2   A.   In this case or just in general?
3   Q.   In this case.  In moving toward finalizing an
                       Page 16

Tino Monaldo Transcript.txt

```
 4      agreement with this potential party?
 5  A.  Well, in this case with Fortrend, there was a
 6      letter of intent before, I believe, generally
 7      before there was changes to the form of the
 8      agreement.  But it's possible we tried to do
 9      something with the form agreement and just
10      decided that let's get a letter of intent done
11      first.  I don't recall.
12  Q.  Did you have a letter of intent signed with any
13      of the other parties that you were-
14  A.  No.  No.  We didn't sign a letter of intent with
15      anybody else.
16  Q.  Okay.
17  A.  Did I answer your question?  Because I'm not
18      sure if I did.
19  Q.  Well, do you want to speak maybe generally a
20      little bit about the process of going from a
21      bidder to actually entering into a contract and
22      balancing-
23  A.  No.  I was confused.  I didn't know if you had
24      thought I didn't answer the question.
25  Q.  No.  That's not what I thought.  I just wasn't
```
                            - 39 -

```
 1      sure that the process is really clear to me.
 2      So, let's just use this as maybe what I
 3      understand this is correct.  You have, say
 4      you're down to your four bidders that you all -
 5      they think all of them have potential to meet
 6      your four primary objectives for your sale.  And
 7      you're just trying to maximize those four items
 8      from each of those possible buyers.  How do you
 9      get past it just being kind of this dance of
10      these four parties, typically?  When does
11      something get into writing and how does that
12      process work?
13  A.  On this case, at some point in time before
14      September, whatever late September when the
15      letter of intent was signed, a decision must
16      have had to been made that Fortrend came closest
17      to providing the best package on those four
18      issues and perhaps some others.  So, at that
19      point in time, after that a letter of intent,
20      and I guess a more detailed negotiations took
21      place with respect to the stock sale agreement.
22  Q.  Did you meet with people from Fortrend,
23      yourself?
24  A.  Yes.
25  Q.  And when did you first meet with them?
```
                            - 40 -

```
 1  A.  I think the first meeting would have been the -
 2      I know it was preceded by a phone call, but we
 3      did a full-blown management presentation, dog
 4      and pony, where they showed up and their people
 5      showed up and we went through everything we did,
 6      just like we do with any other company.  So, it
 7      would have been prior to - the first meaningful
 8      meeting would have been at that point.  I can't
 9      remember if that was July or August, but it
10      would have been a full-blown presentation.
11  Q.  (Ms. Creswell) And that is before having access
12      to the data room or is that part of the data
```
                            Page 17

Tino Monaldo Transcript.txt

13     room?
14 A.  Typically, you come in and you get your
15     presentation and then you get access to the data
16     room.  And then they look at what they wanted to
17     look at or make copies of whatever they wanted
18     to make and look at to take with them.  Or, like
19     I said, the breakout sessions, if they had a
20     question about X line Z they would ask me or
21     somebody else about that.
22 Q.  (Ms. Peters) So, who would you have met with
23     that was from Fortrend or from any party that
24     was representing Fortrend?
25 A.  There was a number of people, but the person I
                  - 41 -

1      remember is the owner would have been Craig
2      Hoffman.  And then Wilcox is with Price
3      Waterhouse as opposed to Fortrend, Wilcox.  And
4      then Cynthia Morelli spent time in Kansas City,
5      so probably her, as well.  And then obviously a
6      lot of it gets taken care of by phone after
7      that.
8 Q.  So, when you did your dog and pony show, they
9      came here to Kansas City?
10 A.  They came to Kansas City, yes.
11 Q.  So, the PWC person, Mr. Wilcox and -
12 A.  Mr. Hoffman-
13 Q.  Mr. Hoffman and Ms. Morelli.
14 A.  -and whoever else they would have... And there
15     were other people there, I just don't...
16 Q.  And you would have been doing the presentation
17     along with who else from Bishop Group?
18 A.  Typically, it would be Dennis, myself, somebody
19     from Chase, probably Rick Betz.  There would
20     have been other people of Bishop there, but I
21     don't recall specifically who.
22 Q.  After you did this presentation and they wanted
23     more information from the data room, did they
24     have to enter into the mutual confidentiality
25     agreement to gain access or what was the
                  - 42 -

1      requirement to get access to the data room?
2 A.  I think Chase had people sign confidentiality
3      agreements before they got in the data room.
4 Q.  So, before this show that you presented?
5 A.  I think it could have been contemporaneous with
6      it, but I think everybody before - by the time
7      they got into the data room I would have hoped
8      that Chase would have had them sign a
9      confidentiality agreement.
10 Q.  We just didn't see any records for Fortrend
11     coming into the data room like you have provided
12     us with records of other parties, mutuality,
13     confidentiality, mutual confidentiality
14     agreement and other sign in and sign out sheets.
15 A.  I'm assuming Chase had them to sign those, but I
16     can assure you that they were in the data room,
17     because everybody was.
18 Q.  Was it, or do you know, if it was PWC that was
19     in the data room or do you know specifically who
20     from Fortrend would have been in the data room
21     or would it have been anybody?
                  Page 18

Tino Monaldo Transcript.txt

22 A.    Well, I can totally recall is people from
23       Fortrend/Price Waterhouse after the management
24       presentation went to see all the documents.  And
25       who actually walked in the room and sat down and
                          - 43 -

1        started looking, I wouldn't have no way of
2        knowing who actually saw it, but they certainly
3        had questions for me that I verbally would have
4        answered that day.
5  Q.    (Ms. Creswell) Is it true-
6  A.    Typically, these things would last all day,
7        where they come in, do a management
8        presentation, they break for lunch and they do
9        the break out sessions and then go to the data
10       room.
11 Q.    So, you would do it at Brian Cave where the data
12       room was located.  Is that where-
13 A.    Yes.
14 Q.    (Ms. Creswell) Was Brian Cave the custodian of
15       records for the data room as far as a log of who
16       went in, what they wanted to make copies of,
17       that kind of thing?  Or was that something that
18       you were responsible for?
19 A.    I don't recall.  It might have been Brian Cave.
20       And I'm not sure how - since documents weren't -
21       I don't think documents were allowed to go out
22       and copies were made, so I don't know what kind
23       of security procedure they had for documents
24       going out.  But I assume it would have just been
25       copies.
                          - 44 -

1  Q.    (Ms. Peter) I think what we're looking for is a
2        copy of the mutual confidentiality agreement
3        they would have signed and so we would know who
4        signed off on that.  And then the other
5        companies had their sign in, sign out sheet,
6        whoever wanted to go into the document room and
7        if they need request for copies of specific
8        documents and you provided us with that - to
9        have those, but we're looking for that for
10       Fortrend/PWC.  Do you know where that might be?
11 A.    I can do some more looking, but I would assume
12       if we had done it for one, when had done it for
13       the other.
14 Q.    So, you might have it or Brian Cave?
15 A.    If I have it, I would have found it in my
16       documents there, but I can-
17 Q.    Yeah.  We're not saying you're hiding anything.
18 Q.    (Ms. Creswell) No.
19 Q.    (Ms. Peters) Just if you can check, and then if
20       you know who might have it, we can ask them.
21 A.    I'm assuming if Brian Cave had it, they would
22       have turned it over.
23 Q.    Okay.  Yeah.  I'm not saying that they're hiding
24       anything either, just maybe it was missed
25       somewhere or-
                          - 45 -

1  A.    Yeah.  I don't know what kind - how strict the
2        procedures were in check in and out.  I can tell
3        you that specifically recall answering - and I'm
                          Page 19

Tino Monaldo Transcript.txt
```
 4        sure I answered questions for every group that
 5        came in there, would have answered regulatory
 6        questions and things of that nature.
 7     MS. CRESWELL: Is everybody doing okay or does
 8     anyone need a quick break?
 9  A.   I'm fine.  Let's keep rolling.
10  Q.   (Ms. Creswell) Okay.  That's fine.
11  A.   Unless you need a break, John?
12     MR. EDGAR: Not yet.  Doing all right at the
13     moment.
14     MS. PETERS: Do you want to take just ten minutes
15     and-
16     MS. CRESWELL: I'm all right.  I just thought I'd
17     ask.
18     MS. PETERS: Do you want to take about ten
19     minutes and make sure you've got your - or are
20     you okay?
21     MS. CRESWELL: I'm okay.
22     MS. PETERS: Okay.  Okay.
23     MS. CRESWELL: Let's, you know, maybe we will.
24     MS. PETERS: Okay.  Why don't we just take maybe
25     ten minutes, if you don't mind, and we'll just,
                        - 46 -

 1     we're going to, based on what you've said so
 2     far, kind of-
 3     MS. CRESWELL: Reorganize our documents.
 4     (Off the record)
 5  Q.   (Ms. Creswell) We're back on the record and I
 6        would like to remind Mr. Monaldo that he is
 7        still under oath.  The next very few questions
 8        will have to do with contact with Midcoast.  Can
 9        you recall, Mr. Monaldo, when contact with
10        Midcoast was first made about the sale of the
11        Bishop Group?
12  A.   I think they were contacted by Chase as part of
13        Chase's obligation to get the word out to as
14        many companies as possible.
15  Q.   So, that would have been at the very beginning,
16        essentially, of the process.  Is that correct?
17  A.   Well, near to the beginning.  I know a lot of
18        times Chase would have done that whether that
19        was May, June or July.
20  Q.   Can you just describe how the negotiations with
21        Midcoast actually progressed?
22  A.   Midcoast made an offer, or offered an expression
23        of interest, which was basically a non-binding
24        player you send out when you think you might
25        want to be interested in buying something.  And
                        - 47 -

 1        from that, whenever that was maybe - you would
 2        have to show me the document, but I'm just
 3        recalling somewhere in July and August we would
 4        have evaluated Midcoast's offer of interest just
 5        like anybody else's.  And I think we continued
 6        to talk to them throughout the September time
 7        frame, even through our discussions with
 8        Fortrend and Enron and Buckeye.  And I believe
 9        we still continued to talk to them into October
10        until we signed a definitive contract with
11        Fortrend.
12  Q.   So, the definitive contract, would that have
```
Page 20

Tino Monaldo Transcript.txt

```
13      been the letter of intent?
14  A.  No.  We continued to - we talked with Midcoast
15      after the letter of intent was signed, as well
16      as, if I'm recalling correctly, Enron and
17      perhaps some discussions with Buckeye, phone
18      calls.
19  Q.  (Ms. Peters) So, the definitive contracts with
20      Fortrend without doing the stock purchase
21      agreements?
22  A.  That would have been the October, I think, 25th.
23      24th, 25th, 26th, whatever that was with Fortrend,
24      which, I guess, they set up a company called K-
25      Pipe Merger Corp.
                          - 48 -

1   Q.  (Ms. Peters) So, that stock purchase agreement.
2   Q.  (Ms. Creswell) So, the discussions then with
3       Midcoast would have ended at the time of the
4       stock purchase agreement that was signed with K-
5       Pipe Merger, which was October 25th.  Is that
6       correct?
7   A.  But I don't look at it as an event that is -
8       it's just kind of a process.  I assume as we got
9       closer to getting something successful with
10      Fortrend, we would have started talking less to
11      Midcoast or Enron or anybody else about -
12      because as we got closer to a sale of somebody
13      that was going to meet our best package, so to
14      speak.  I can't say it ended on a particular
15      date, but I would suspect it would have declined
16      to some extent.
17  Q.  Maybe this is my ignorance, but once the stock
18      purchase agreement is signed with a party, does
19      that cease the potential for the sale to one of
20      those other parties that you have been
21      previously been negotiating with?
22  A.  Not necessarily, unless that assumes that the
23      person who signed the stock purchase agreement
24      with you actually closes and meets the
25      obligations to close.
                          - 49 -

1   Q.  Well, sure.  But at that point, you would have
2       done, I would assume, enough due diligence to
3       know that they would have the resources to
4       complete the-
5   A.  That was the hope and belief, yes.  But like
6       when you do a real estate contract, if you've
7       got a real estate contract and you're selling
8       your house, you don't just forget about the
9       buyers who might be willing to step in if buyer
10      number one for some reason didn't fulfill their
11      obligations.
12  Q.  So, until the date of closing, then there would
13      have been the potential for discussions, I
14      guess, with Enron, with Buckeye, with Midcoast,
15      with any of those parties.  Is that correct?
16  A.  Well, the potential would be there, but my
17      recollection is as we got closer to the
18      definitive contract, we would be focusing on
19      Fortrend more than anybody else.
20  Q.  What was your understanding as to why the stock
21      sale to Midcoast could not be consummated?  I
                          Page 21
```

Tino Monaldo Transcript.txt

```
22      mean, why that deal could not be worked as
23      opposed to the deal with Fortrend?  Was it a
24      money thing?  You had indicated earlier that-
25 A.   Are you saying why we chose Fortrend over
                        - 50 -

1       Midcoast or Enron?
2  Q.   Right.
3  A.   I think in each case it would have, it probably
4       would have been some difference.  With respect
5       to Enron, and this is just my recollection,
6       because I - with respect to Enron, I'm not sure
7       that their price ever got up to where I thought
8       they were when they expressed an interest and I
9       think they were leaning towards wanting to do -
10      my recollection is a stock transaction and thank
11      god we didn't take Enron.  With respect to
12      Midcoast, I don't, I think on two of the three
13      major issues, A, being just price, Fortrend was
14      the highest.  Although we didn't sign the right
15      of way deal with them, I thought they were less,
16      they were more receptive to it than the others.
17      And they ultimately signed a - they ultimately
18      agreed to a project development agreement
19      between Kansas Pipeline and MRG that was very
20      important, very important to us.  So, I think -
21      I mean, those are the two, in my mind those are
22      the two reasons why Fortrend was the successful
23      bidder.  The cash price and the project
24      development agreement.
25 Q.   Did it seem somewhat unusual to you that a
                        - 51 -

1       company that had no oil and gas background would
2       have been one of the big contenders in this
3       purchase?
4  A.   No.  Not at all.  Buckeye didn't have gas
5       experience, they were involved.  Haddington was
6       basically a fairly successful group of
7       investors, but I don't think they had any
8       pipeline experience.  And if you look back at
9       this time, the hay days to go and blow days of
10      the very - 1999 was a very busy time for
11      acquisitions, so a lot of people were looking to
12      get involved in an area of energy that they
13      thought was profitable, whether they had
14      experience or not.  And you can always hire.
15      You can always hire management.
16 Q.   (Ms. Peters) Was there any concern about the
17      success of the project development agreement
18      where the entity controlling the Kansas Pipeline
19      Company had no experience in oil and gas?
20 A.   No.  I actually thought that would - from my
21      perspective, the fact that they did not.  The
22      fact - it was more likely they were going to be
23      wanting to work with us on project development,
24      because we had the experience.  So, it was just
25      the opposite.  I mean, they more likely they
                        - 52 -

1       would have needed our involvement to make the -
2       remember these project developments were
3       projects that did not exist, projects that we
```
Page 22

Tino Monaldo Transcript.txt

```
 4      try to create new business for Kansas Pipeline.
 5  Q.  But wouldn't you want the project to expand or
 6      to, I guess, add additional pipeline off of the-
 7  A.  Kansas Pipeline.
 8  Q.  -Kansas Pipeline that already existed?
 9  A.  That's correct.
10  Q.  (Ms. Creswell) What did you know about the
11      entity called Fortrend when you were first
12      approached by them or what type of things did
13      you find out about them?
14  A.  I think Chase related to us that they were a
15      company that, I can't remember whether they
16      would have said this to me or whether Chase
17      would have related it to me, but they were a
18      company that had done several billion dollars
19      worth of transactions.  They were a company, you
20      know, obviously not as big as R.J. Nabisco,
21      whatever, they just buy companies.  And they had
22      been successful in doing that and Chase verified
23      that they had the, you know, the credibility to
24      get this transaction done.
25  Q.  So, Chase was the one that initially verified
                          - 53 -

 1      their - the potential that they had as a buyer
 2      or?
 3  A.  They would have done that with - for example, I
 4      didn't know anything about Haddington before I
 5      met them.  And I'd heard of Buckeye, but I
 6      didn't know anything real about them.  I had
 7      heard about, obviously, Enron and Reliant and I
 8      hadn't personally heard about Midcoast, so
 9      whoever made it to that stage, I'm assuming,
10      would have had some credibility in Chase's eyes
11      to be a credible buyer.
12  Q.  (Ms. Peters) So, Chase kind of pre-screened your
13      buyers or?
14  A.  I was relying upon them to do that.
15  Q.  So, that was your expectation of what you were
16      doing?
17  A.  We're paying a success for a commission.  They,
18      you know, they - there were other
19      responsibilities.
20  Q.  Do you know if they - how they found Fortrend or
21      Fortrend found them or being Chase, was it Chase
22      that brought Fortrend?
23  A.  I believe it was.  I assume it's just based upon
24      their knowledge base of potential buyers out
25      there.  It's kind of like the idea behind
                          - 54 -

 1      finding a real estate with a multi listing.
 2      Everybody thinks that they can sell their house
 3      or their company by themselves.  So, that's what
 4      you hire them for, to get the word out.
 5  Q.  (Ms. Creswell) When did you first learn about
 6      Fortrend?
 7  A.  I think I answered before, sometime around the
 8      time that they came into the data room and we
 9      did a presentation.  I don't recall if that was
10      late July or early August, but probably sometime
11      shortly before then, because I'm thinking if
12      they're going to come into the for a management
```

Page 23

Tino Monaldo Transcript.txt

```
13   presentation, we probably knew they were coming
14   before they showed up that day.  So, I suppose
15   it was sometime before they came into the data
16   room and we made a presentation that Chase said
17   you guys have to put your suits on again and do
18   another dog and pony.  Because we probably did -
19   I mean, we did a number of those.
20 Q.  That must be exhausting.
21 A.  Well, it's just-
22 Q.  Part of the-
23 A.  If you're doing it six or seven times, it's not
24   as exciting as the first time and then you're
25   repeating yourself, so.
                                    - 55 -

1 Q.  (Ms. Peters) So, you had never heard of Fortrend
2    prior to them coming into-
3 A.  I hadn't heard of Fortrend.  I hadn't heard of
4    Haddington and a number of others.
5 Q.  (Ms. Creswell) Do you know about an entity
6    called Signal Capitol Associates, Limited
7    Partnership?
8 A.  Don't know them, but I think they were one of
9    the signature parties on one of the documents,
10   either the stock purchase or the letter of
11   intent.  They're a signature party of one of the
12   documents that I - when I refer to Fortrend, I'm
13   in my mind thinking K-Pipe Merger, the entity we
14   ultimately dealt with.  So, he was with - that
15   company was part of that.
16 Q.  Some type of an affiliation is that your
17   understanding?
18 A.  Some type, but I don't know what.
19 Q.  With Fortrend?
20 A.  Correct.
21 Q.  Do you know any of Signal Capitol's directors or
22   officers?
23 A.  No, ma'am.
24 Q.  Are you familiar with the entity called K-Pipe
25   Holding Partners, Limited Partnership?
                                    - 56 -

1 A.  I'm not.  If they're on a document, I don't
2    recall their name.  I recall K-Pipe Merger
3    Corporation.  If that's another affiliate, or if
4    they signed a document and I don't recall their
5    name, you would have to show it to me.
6 Q.  Do you know of any relationship specifically
7    between Signal Capitol Associates and K-Pipe
8    Holding Partners?
9 A.  Did you say K-Pipe Holdings?
10 Q.  Right.
11 A.  I said I heard of K-Pipe Merger, but not K-Pipe
12   Holdings.
13 Q.  Right.  So, I'll put a no for that answer to
14   that question.  Do you know what the
15   relationship is between Fortrend and Signal
16   Capitol Associates, specifically?
17 A.  No.  I do not.  Unless it's shown on the
18   signature block.  How they're signing for each
19   other.
20 Q.  The next series of questions have to do with how
21   Fortrend and SCALP, which is Signal Capitol
                                 Page 24
```

Tino Monaldo Transcript.txt
```
22      Associates, became involved in the transaction.
23      And some of these questions I think we have
24      already gotten the answer to, so I'm just going
25      to kind of scan down and if you see something
                        - 57 -

1       I've missed, Yvonne, please jump in.
2   MS. PETERS: Did you want to ask about the
3       meetings.
4   MS. CRESWELL: Yeah.
5   Q.  (Ms. Creswell) You did mention, Mr. Monaldo,
6       that you had done the initial presentation where
7       Fortrend was, and their representatives were
8       there.  Were there any other meetings other than
9       that initial meeting and then the data room
10      meetings that you recall ever being involved
11      with, with Fortrend or SCALP?
12  A.  I recall there being other meetings with
13      Fortrend after that.  I mean, it's easy because
14      to remember our presentation, but I recall
15      specifically.  I remember on a couple of
16      occasions, at least, they would come into town
17      to do additional due diligence or to sit across
18      the table and talk about things like the right
19      of way and project development, although
20      sometimes you can do that also by phone, as
21      well.  So, there were some other meetings.
22  Q.  Who else would have been present?  Do you recall
23      if the people from Price Waterhouse were present
24      at those other meetings, also?
25  A.  I think they were at some of those, because I
                        - 58 -

1       remember meeting Price Waterhouse more than just
2       at the initial presentation, but I can't place a
3       name for you right now.
4   Q.  Do you recall if minutes or notes were kept of
5       any of those other meetings?
6   A.  If I had them, I would have - they would have
7       been delivered.  I don't recall.
8   Q.  (Ms. Peters) When you say someone from Price
9       Waterhouse and then you said you weren't sure
10      who from Price Waterhouse.  Is that what you
11      were saying?
12  A.  I remember that, my recollection is that when
13      Fortrend showed up, they had some accountants
14      with them.  So, I'm assuming that they're Price
15      Waterhouse accountants, but-
16  Q.  So, it wasn't always Gary Wilcox that came with
17      them?
18  A.  Not that I - I wouldn't recall that.  I wouldn't
19      recall that.
20  Q.  You wouldn't recall if-
21  A.  And it's not unlikely for a company to send
22      their lower level accounting associate to come
23      in there and go blind looking at five hundred
24      pages of documents.
25  Q.  But in the initial meeting, you recall that Gary
                        - 59 -

1       Wilcox was present?
2   A.  I think he was.
3   Q.  (Ms. Creswell) Mr. Monaldo, did you ever attend
```

Tino Monaldo Transcript.txt

```
 4      meetings where representatives of Midcoast were
 5      present?
 6  A.  Yes.
 7  Q.  Would that have been also the same type of
 8      meetings that you had with Fortrend, the
 9      original management presentation and then the
10      data room type of meetings?
11  A.  There was a management presentation to Midcoast
12      and I'm sure there was a breakout session with
13      them, as well.
14  Q.  Do you recall who was present as representatives
15      for Midcoast?
16  A.  At the management presentation?
17  Q.  Uh-huh.
18  A.  It's easy to say who I think might have been
19      there, but the only person that I can remember
20      that was definitively there would have been
21      Chris Kaitson.
22  Q.  (Ms. Peters) Do you know who their accountants
23      were for Midcoast?  Did they have an accounting
24      firm that was going to handle them?
25  A.  You know, they probably did, but I can't
                            - 60 -

 1      remember a name right now.
 2  Q.  (Ms. Creswell) Was the stock purchase agreement
 3      that was entered into by Dennis Langley on
 4      October the 25th with K-Pipe Merger Corporation,
 5      was that ever discussed with Midcoast?
 6  A.  Well, stock purchase agreements drafts would
 7      have been exchanged with Midcoast with respect
 8      to a possible transaction with Midcoast.  I
 9      don't know if that was your question.
10  MR. EDGAR: No.  I don't think it was.
11  Q.  I don't think it was, but I thank you for your
12      answer.
13  MS. PETERS: No.  I don't think that's what you
14      meant to ask.
15  MS. CRESWELL: Okay.
16  Q.  (Ms. Creswell) So, back to where-
17  A.  Let's read back my answer.  What did I answer?
18  Q.  You answered - I'll let you, can you read that
19      back rather than...
20  (Wherein, the court reporter read back the last
21  question and answer.)
22  Q.  I'll repeat the question.  Was the stock
23      purchase agreement entered into by Dennis
24      Langley on October the 25th with K-Pipe Merger
25      ever discussed with Midcoast?
                            - 61 -

 1  A.  I'm not sure, now I'm not sure what you mean,
 2      was it ever discussed with Midcoast.  At what
 3      point in time?  We were negotiating with both
 4      parties about a possible stock sale agreement.
 5  MR. EDGAR: As I understand, they're not asking
 6  you about the one you're negotiating with
 7  Midcoast.  They're asking you about the one you
 8  negotiated with Fortrend.  Did you ever talk
 9  with Midcoast about that?
10  A.  Well, I'm assuming since after we had signed it
11      with Midcoast, or Fortrend and Midcoast, we were
12      advised by Midcoast and Fortrend that there was
```

Page 26

Tino Monaldo Transcript.txt
```
13      going to be a - there maybe a transaction
14      between the two of them that Midcoast would - I
15      don't recall sending that agreement to them.
16      I'm assuming now that they would have got a copy
17      of it from Fortrend.
18 Q.   (Ms. Peters) What about the terms of that
19      agreement that you entered into with, or that
20      Mr. Langley entered into with K-Pipe Merger?
21      Did you discuss those terms with Midcoast?
22 A.   I'm going to try to answer that.  I'm not sure
23      if this is the answer you're - there were
24      contracts going to each party, when negotiating
25      with both parties.  So, I haven't compared each
                         - 62 -

1       version, but I'm assuming there were
2       similarities in terms that would have been gone
3       in a draft to Fortrend or a draft to Midcoast,
4       because we're trying to get a deal, our deal is
5       our deal, and Fortrend signed the deal we were
6       looking for.
7    MR. EDGAR: I'm going to get in the way here, but
8       I think they're asking once you've signed that
9       SPA with Fortrend, then did you discuss that
10      agreement with Midcoast?  Isn't that what you're
11   asking?
12 Q.   (Ms. Peters) Well, yes.
13 A.   Well, okay.  And I think I answered that.  I
14      think after once we were advised that there was
15      going to be a potential transaction between
16      Midcoast and Fortrend, I'm assuming there was
17      some discussion about it.
18 Q.   At what point were you, did you become aware
19      that there was a transaction between K-Pipe and
20      Midcoast?
21 A.   Sometime shortly before closing with Fortrend
22      and after we had already signed an agreement
23      with Fortrend.
24 Q.   So, the agreement was signed on October 25th.
25      Is that correct?
                         - 63 -

1  A.   That's my recollection, yes.
2  Q.   It was, let's see the payment was on the 8th?
3  A.   Closing was on the 8th.
4    MS. CRESWELL: Right.
5  Q.   (Ms. Peters) With Mr. Langley?
6  A.   Correct.
7  Q.   For the stock purchase agreement.  What about
8       the-
9    MS. PETERS: Go ahead.
10 Q.   (Ms. Creswell) I wanted to make sure that I made
11      a note of your response, Mr. Monaldo.  You said
12      you had became aware, was it shortly before the,
13      shortly before the closing on November the 8th.
14      Is that correct?
15 A.   Sometime, you know, it was sometime between
16      after we signed the agreement with Fortrend and
17      when we closed with Fortrend.
18 Q.   So, it would have been sometime between October
19      the 25th and November the 8th then?
20 A.   Right.  And the 8th was a Monday, so probably
21      sometime before October 25th and November 5th.
```
Page 27

Tino Monaldo Transcript.txt

22 Q.   (Ms. Peters) What kind of contacts did you have
23       with Midcoast between those two dates after you
24       knew they were involved in this transaction?
25 A.    I generally recall having a conversation with

- 64 -

1        Chris Kaitson, because, and Fortrend's counsel,
2        because we were being asked to look at what's
3        the word, a guaranty, that any party that would
4        take control of Kansas Pipeline would have to
5        sign to guaranty - remember the project
6        development group we talked about that was value
7        to us, an opportunity to earn money in the
8        future.  Typical thing you do as a lawyer is
9        make sure that if somebody takes over that
10       contract, whoever takes over that company would
11       have to guaranty those obligations.  So, there
12       was discussion about the need for Midcoast if
13       there was going to be transaction to sign then.
14 Q.    (Ms. Creswell) I've got another question back to
15       this FERC.  Why would K-Pipe Merger then or how
16       would they have been able then to have sold
17       those assets to Midcoast quickly if, from what
18       you described earlier, that FERC was very strict
19       with going through this process.  I'm not
20       following that.
21 A.    I have no idea how Midcoast and Fortrend did
22       whatever they did, because I didn't, quite
23       frankly I didn't see their agreement before we
24       closed and I have not seen it after we closed,
25       so I don't know what they did.

- 65 -

1 Q.     Was that curious to you that they would be able
2        to make that work?
3 A.     Until you brought that up, I hadn't thought
4        about that to be honest with you.  My goal at
5        that point in time was to make sure my client
6        met his contractual obligations.  So, I don't
7        know what their transaction was.
8   MS. CRESWELL: We will enter the letter of intent
9   dated September 30, 1999 as Exhibit Two.
10 Q.    (Ms. Creswell) This letter of intent is between
11       K-Pipe Holding Partners and Dennis Langley.  And
12       again, it's dated September 30, 1999.  The
13       letter consists of three pages with an
14       additional fourth page as the signature page and
15       there is a fax sheet on the back where
16       apparently-
17 A.    Can I clarify something?
18 Q.    Sure.
19 A.    You had said K-Pipeline Holdings Partners and I
20       said I didn't recall them at the time if they
21       signed something.  And it looks like they signed
22       something.  It looks like they were the limited
23       partnership and signed a letter of intent and
24       Signal Capitol signed as the general, or as the
25       limited partner, and then Furman as the general

- 66 -

1        partner.
2 Q.     Right.  Thank you for pointing that out.  Who
3        drafted this letter of intent?

Page 28

Tino Monaldo Transcript.txt

```
 4  A.  I'm sure both parties had a hand in Fortrend and
 5      us.  We had a hand in drafting this.
 6  Q.  Would that have been something that you would
 7      have been involved in, Mr. Monaldo?
 8  A.  I'm pretty sure I would have been.
 9  Q.  (Ms. Peters) Who else drafted documents for Mr.
10      Langley and his firm?
11  A.  As I said, Jim Pryde was a scrivener, you know.
12      If we wanted something, say Jim, this is what we
13      want drafted.  It would have been more of Dennis
14      and I would be the negotiator and Jim was the
15      drafter.
16  Q.  (Ms. Creswell) Do you recall if anyone made any
17      changes or additions to the provisions of this
18      letter?
19  A.  After it was signed?
20  Q.  No.  As it was being, as it was being
21      negotiated?  Is that the...
22  A.  You know, I don't know.  But I would assume that
23      people generally don't sign documents as is.
24      I've seen some, there was some.  But I can't
25      recall.
```

                              - 67 -

```
 1  Q.  Was Midcoast involved in the drafting of this
 2      document to Mr. Langley?
 3  A.  Was what?
 4  Q.  Was Midcoast involved in the drafting of this
 5      document to Mr. Langley from K-Pipe Holding
 6      Partners?
 7  A.  Not that I'm aware of, no.  Can I just peruse
 8      this for a second?
 9  Q.  Sure.
10  A.  I haven't seen this in weeks.
11  Q.  Sure.
12  A.  Okay.
13  Q.  On page one, paragraph one, down towards the
14      middle, states that the seller shall sell the
15      stock to the buyer for a purchase price equal to
16      approximately a hundred and eighty-eight million
17      less a certain debt.  How was that purchase
18      price determined, Mr. Monaldo?
19  A.  By us, but I'm not sure I understand the
20      question.  It was a negotiated price.
21      Typically, when you buy, when you buy something
22      you buy in revenue string, so I'm sure a
23      negotiation would have been with Fortrend as
24      what really are revenues, what are really our
25      revenue projections, how real are they, what are
```

                              - 68 -

```
 1      our expense projections, how real are they and
 2      then the marketplace tells you do you sell them
 3      for a multiple of seven, eight, nine, ten,
 4      eleven, twelve.  And my recollection is we
 5      negotiated and we would argue that our revenues
 6      are going to be a certain level.  And the reason
 7      I say that is you go to paragraph two, they must
 8      have - there must have been a discussion that
 9      our revenues were 29.5 million a year.  If we
10      think they are going to be higher and they don't
11      think we're going to be higher, what this seems
12      to say is, look, pay us our 188 million based
```

                              Page 29

Tino Monaldo Transcript.txt

```
13        upon the 29.5.  If you do better than 29.5, we
14        want half of it.  So, that may - at least at the
15        letter of intent stage, that was the way to
16        compromise our belief that the price should be
17        higher and their belief that maybe the - they
18        weren't willing to say the revenues were going
19        to be more than 29.5.  So, it would have been a
20        part of a negotiation as to what your revenues
21        and expenses would have been.
22   Q.   And you would have been present at the
23        negotiation meetings for the purchase price.  Is
24        that correct?
25   A.   I can't say I was at every one, but I was
                                - 69 -

 1        present at many negotiations.
 2   Q.   (Ms. Peters) So, in the final price, if I
 3        understand, it was about one eighty-nine, which
 4        is pretty close to this.  Plus, I think,
 5        whatever adjustments?
 6      MS. CRESWELL: Yeah.
 7   Q.   (Ms. Peters) And then it's - maybe's, we don't
 8        have those stock purchase agreements in front of
 9        us, but maybe we'll need to get to that one when
10        we get to that.  But it appeared that the net
11        revenue interest, fifty percent division here
12        has been dropped out of the stock purchase
13        agreement.  Is that...
14   A.   I don't think that division was from the stock
15        purchase agreement.
16   Q.   (Ms. Peters) So, you had by that time hammered
17        out that, or came to a better agreement as far
18        as what, when you were talking about a purchase
19        price, about what income string would be
20        actually sold.  Would that be...
21   A.   I don't know that I would - I know that it was
22        better.  What ended up happening was there was,
23        you know, we got a price of whatever - what did
24        you say it was?
25   Q.   (Ms. Peters) I think it was one eighty-nine,
                                - 70 -

 1        without the-
 2   A.   Sometime between the 30th of September and the
 3        October 25th, Fortrend was no longer willing to
 4        pay a particular.  Nor were they willing to do a
 5        quit claim assignment of these rights of way.
 6        It appears though that we were successful in
 7        getting a slightly higher price and were able to
 8        get a private development agreement that was we
 9        found that at the time, there was not a project
10        development agreement in place, so we would get
11        a project development agreement that was
12        favorable, that we found acceptable.  But my
13        recollection, go back to your earlier question,
14        is a hundred and eighty-eight was based upon
15        parties deciding what they believe revenues
16        would really be and what they really believed
17        the expenses would be and how do you discount
18        that, how do you put a risk factor into the
19        purchase price.
20   Q.   (Ms. Creswell) One of the next questions I think
21        we've already answered and it was how did Mr.
```
                                Page 30

Tino Monaldo Transcript.txt
```
22    Langley and the Bishop Group evaluate Fortrend
23    and SCALP.  But from what I'm remembering that
24    you said earlier, you relied upon Chase to
25    actually do the preliminary investigation to
```
                              - 71 -

```
 1         assure you that they were who they said they
 2         were, presented themselves to be.  Is that
 3         correct?
 4    A.   I rely on Chase with respect that Fortrend,
 5         Midcoast, Haddington, all the people that
 6         were...
 7    Q.   (Ms. Peters) I think what Linda is referring to
 8         is paragraph number four which says, it's the
 9         transaction between... Satisfactory review of
10         legal and financial aspects of, and then it
11         lists a few items.  And I think her question was
12         more about if anything specific happened down in
13         the area you're aware of as far as looking into
14         Fortrend or K-Pipe Holding's financial legal
15         aspects, besides relying on Chase?
16    A.   This is in the same context of this.  This is
17         typically boilerplate.  It's what they call an
18         out clause.  In the sense that either party can
19         say well I'm not satisfied with my due diligence
20         and so the buyer can walk.  So, it's fairly
21         standard language to have in a non-binding
22         letter of intent.
23    Q.   (Ms. Creswell) So, do you recall if you would
24         have seen or if anyone with the Bishop Group or
25         a representative from Mr. Langley's would have
```
                              - 72 -

```
 1         looked at financials or anything else from
 2         Fortrend?
 3    A.   I can say that I relied on Chase.  I can't tell
 4         you what specifically they would have done for
 5         Fortrend or a Buckeye or Haddington or Midcoast.
 6    Q.   You did say that this paragraph four is a kind
 7         of a boilerplate type thing, but it also makes
 8         reference to-
 9    A.   One thing I might add, you know, the marketplace
10         speaks in the sense that if you're willing to
11         spend hundreds of thousands of dollars paying
12         high-priced lawyers to do due diligence in
13         accountants, you're spending money, so typically
14         you don't take on those kind of - I'm speaking
15         in general now, not just Fortrend, anybody, you
16         don't enter into this unless you really think
17         you can come up with the money, whether it's
18         through debt or not, debt or equity.
19    Q.   So, the fact that they were present and-
20    A.   To me the fact somebody's spending, you know,
21         all the money with Price Waterhouse and their
22         San Francisco counsel, they're a serious player.
23    MS. CRESWELL: We will enter project development
24    agreement into the record as Exhibit Three.
25    A.   Well, there's two of them.
```
                              - 73 -

```
 1    Q.   (Ms. Peters) Yeah.  We have this one.
 2    WHEREIN, EXHIBIT NUMBER THREE was marked for
 3    identification.
```
                              Page 31

Tino Monaldo Transcript.txt

4  Q.   (Ms. Creswell) This is the project - Exhibit
5       Number Three is the project development
6       agreement by and between MarGasCo Partnership
7       and Management Resources Group, LLC.  Is this
8       one of the agreements that was referred to in
9       the letter of intent?
10 A.   There were two of them, yes, MRG and MarGasCo.
11      Wait one minute, so you understand.  There was
12      an MRG under the umbrella of the Bishop Group
13      and Management Resources Group, LTD.  MarGasCo
14      was underneath the umbrella of Bishop Group.
15      Management Resources Group, LLC was our new
16      energy company, so this agreement was between
17      MRG, LLC and MarGasCo or MRG, LLC and Kansas
18      Pipeline, not with the MRG, LTD., that stayed
19      under Bishop Group.
20 Q.   So, this new Management Group, LLC is that owned
21      by Dennis Langley, also?
22 A.   Yes.
23 Q.   (Ms. Peters) Does someone else own that, as
24      well, or just Dennis Langley?
25 A.   I think 99.9 percent is owned by Sub S
                        - 74 -

1       Corporation that he owns and .01 percent is
2       owned by him individually.  But ultimately he's
3       a hundred percent owner of Management Resources,
4       LLC.
5  Q.   (Ms. Creswell) Did you negotiate this agreement,
6       Mr. Monaldo?
7  A.   I am sure I would have been involved in this,
8       although I think these two agreements were very
9       important to Mr. Langley, because this is his
10      opportunity to make an impact in the future, so
11      he would have been involved, as well.
12 Q.   What about Mr. Pryde?  Would he have also been
13      involved?
14 A.   I'm sure he was involved to some extent, but
15      this would have been a contract I think that
16      Dennis and I would have been more involved,
17      because it was so particular to the industry.
18      Having said that, I haven't read it in quite
19      some time.  How about you summarizing to me to
20      refresh my memory.
21   (Off the record)
22 Q.   But I really was giving you time to look at it,
23      if you wanted to look at it.
24 Q.   (Ms. Peters) Browse briefly.
25 A.   You know, maybe I could just tell you what I
                        - 75 -

1       recall generally.  But if you want to get
2       specific, it's going to really take more-
3  Q.   (Ms. Peters) No.  Why don't you go generally and
4       then see-
5  A.   The general concept there was two agreements.  I
6       think one dealt, one agreement dealt with one
7       types of projects and one agreement dealt with
8       different types of projects.  One might have
9       been marketing electricity and one might have
10      been more natural gas related.  And there was
11      some exclusivity between us and Kansas Pipeline
12      and MarGasCo and us about when they move forward
                        Page 32

Tino Monaldo Transcript.txt

```
13      with these types of projects, whether they were
14      electrical or gas.  And it was again an
15      opportunity for us to be the exclusive party
16      through which Kansas Pipeline had to use certain
17      pipeline projects.  An example I just recall in
18      my mind was that if we laid pipeline from Kansas
19      Pipeline in Wichita to a gas powered power plant
20      that somebody wanted to build, we would have the
21      opportunity, the first right, exclusive right to
22      participate in that new pipeline.  That was an
23      opportunity for Dennis to make money beyond
24      price that he got for the stock, because he
25      thought there was some value.  And then there
                         - 76 -

1       were other projects that there were maybe less
2       exclusivity to, but still part of the project,
3       whether it be an electric generation facility or
4       marketing off the pipeline.  That's my
5       recollection without reading them of the two
6       project development agreements.  In either
7       event, we had some exclusivity and if there was
8       a penalty, if they wanted to take away our
9       ability to be a participant in these projects,
10      they could - I think there was a penalty or fee
11      by which they could cancel the agreements, which
12      would then restore the value that Dennis thought
13      he should have gotten if he had to sell this
14      stock without these participation agreements or
15      project development agreements.  That was the
16      concept how he got from a hundred and eighty-
17      nine to a higher value.  Dennis thought there
18      was a higher value.  This was one way for him to
19      carve it out to prove he could provide my value.
20 Q.   (Ms. Creswell) So, has any pipeline been
21      expanded or any work been done under Exhibit
22      Three, this project development agreement?
23 A.   No.
24 Q.   And at the times this agreement was executed,
25      who was the owner of MarGasCo Partnership?
                         - 77 -

1  A.   Well, the reason - I can't remember the exact.
2       It was part of the Bishop Group umbrella.  It
3       was underneath Bishop Group.  I can't tell you
4       whether it was Syenergy or whomever, but the
5       Bishop Pipeline Company that-
6  Q.   So, Mr. Langley was the ultimate owner at this
7       point?
8  A.   That's correct.
9  Q.   Who owns MarGasCo currently, do you know?
10 A.   I do not know.
11 Q.   (Ms. Peters) This agreement says that it's dated
12      as of the 24th day of October 1999.  Do you know
13      if any changes were made to this agreement after
14      the 24th of October 1999?
15 A.   Not that I recall.  These agreements were put in
16      place.  The reason they had to be negotiated
17      with, Fortrend was, you know, part of the deal
18      was we were going to have the rights to do
19      projects with Kansas Pipeline/MarGasCo.  So,
20      they were buying, in essence, these obligations
21      of Kansas Pipeline.  So, even though they were
```

Page 33

Tino Monaldo Transcript.txt

```
22      between a company owned by Dennis and a company
23      owned by Dennis, the party, it was going to own
24      MarGasCo or Kansas Pipeline.  I think Fortrend,
25      with this new holding company, would have to
```
                              - 78 -

```
 1      agree to understand what they were, the life
 2      obligations they're buying.  So, this is
 3      negotiated with Fortrend.
 4  Q.  At this point, didn't you know that the assets
 5      were going to be sold to Midcoast?  That that
 6      had come into-
 7  A.  No.  That would have been after the definitive
 8      agreement would have been signed.
 9  Q.  (Ms. Peters) Did you have any negotiations with
10      Midcoast about a project development agreement?
11  A.  Sure.  During October when we were still
12      negotiating with all parties, I'm assuming.  I
13      can't sit here and say I remember a specific
14      negotiation, but I'm assuming we would have had
15      negotiations with Midcoast about revenue, what
16      do you call it, that revenue interest you
17      referred to, or project development agreements
18      or I think I even already said that those are
19      the three or four major factors that were
20      discussed with all parties, so that would have
21      included Midcoast in September and October.
22  Q.  How about after the 24th day of October 1999,
23      would you have been negotiating with Midcoast
24      about a project development agreement at that
25      point?
```
                              - 79 -

```
 1  A.  I don't think so.  Not after we would have
 2      signed with Fortrend.  Unless they asked about
 3      it.  Well, let me back up.  There had been some
 4      discussion, because the guaranty they were
 5      signing, that they had to sign of change
 6      controlled debt, was guarantying the obligation
 7      of the Kansas Pipeline MRG, LLC project
 8      development agreement.  But they didn't have any
 9      right to - I mean, there wasn't any negotiation.
10      They had to sign a guaranty if Fortrend expected
11      to change control.
12  Q.  So, as far as the terms of this specific
13      agreement here, Midcoast didn't have input into
14      the terms of this agreement?
15  A.  This agreement was agreed to with Fortrend.
16      What I'm saying to you is, I'm sure they would
17      have seen an agreement like this, or somewhat
18      similar to this, during September or October
19      whenever the drafts of this were being worked
20      out, because we were trying to get a deal with
21      either one of them.
22  Q.  But this agreement that you entered into with
23      the expectation that they sold to Fortrend, this
24      one here, Exhibit Three.  Did you discuss the
25      terms of this agreement with Midcoast?  Of this
```
                              - 80 -

```
 1      agreement, not an agreement, I've been calling
 2      it an agreement, but a term that became part of
 3      this agreement with Midcoast?
```
                              Page 34

Tino Monaldo Transcript.txt

```
 4  A.   I'm saying I don't think so, because this was
 5       already signed with Fortrend.  So, any
 6       discussion with Midcoast would have been
 7       relating to the need to sign a guaranty, you're
 8       referring to Linda, of the KPC-MRG, LLC icon.
 9  Q.   So, Midcoast would not have tie-
10  A.   I think it's a guaranty, a one or two page
11       document that had to be signed.
12  Q.   So, Midcoast would not have had input into this
13       agreement?
14  A.   No.   But I've already clarified there would have
15       been discussions about project development
16       agreements with Midcoast, because-
17  MR. EDGAR: She didn't ask about that.
18  Q.   Right.  I'm asking about this agreement.  They
19       would not?
20  A.   Not that I recall, no.
21  MS. PETERS: Do you want to go through, since we
22  kind of talked about that one?
23  MS. CRESWELL: Yes.  Well, we need to go ahead
24  and enter project development agreement into the
25  record as Exhibit Four.
```
                              - 81 -

```
 1       WHEREIN, EXHIBIT NUMBER FOUR was marked for
 2       identification.
 3  A.   Just out of curiosity, how many exhibits do you
 4       have, so I can-
 5  Q.   (Ms. Creswell) There are going to be twenty-
 6       five.
 7  MR. EDGAR: How many?
 8  MS. CRESWELL: Twenty-five.
 9  Q.   (Ms. Creswell) This project development
10       agreement is by and between Kansas Pipeline and
11       Management Resources Group, LLC.  Is this also
12       one of the agreements that was referred to in
13       the letter of intent, section two, which is
14       Exhibit Two?
15  A.   Section what, ma'am?
16  Q.   Section two of Exhibit Two.
17  Q.   (Ms. Peters) Down at the bottom.
18  A.   Where?
19  Q.   (Ms. Creswell) Section three.
20  Q.   (Ms. Peters) Right here.  I think you already
21       mentioned that there were two of them and
22       Linda's just confirming that this was the second
23       one.
24  Q.   (Ms. Creswell) Yeah.
25  A.   Yeah.
```
                              - 82 -

```
 1  Q.   Very briefly, can you tell - or did you already
 2       go through what the purpose of this one was?
 3  A.   I would stand by my earlier statement that I
 4       can't right now differentiate between which
 5       agreement said which, but generally these two
 6       agreements were intended to do, to add value if
 7       Dennis could perform by assisting and adding
 8       projects off the Kansas Pipeline.
 9  Q.   Do you know if any projects have been worked on
10       or completed or anything under the terms with
11       this project development agreement?
12  A.   Not that I'm aware of.
```
                              Page 35

Tino Monaldo Transcript.txt

13 Q.   I remember your answer about Midcoast's
14       involvement in the project development
15       agreement, Exhibit Four, is there-
16 MS. PETERS: Three.
17 Q.   (Ms. Creswell) Pardon me, Exhibit Three.  And I
18       need to ask the same thing about Exhibit Four.
19       Would Midcoast have been a party to the
20       negotiations of this project development
21       agreement?
22 A.   Can I say the same answer?  Because that would
23       be the same answer.  The same information.
24 MS. CRESWELL: Exhibit Four, which is a project
25 development agreement, has a bate stamp number
                          - 83 -

1        of 000565 through 000630.  And Mr. Monaldo says
2        that he is confirming this same answer that he
3        had as to Midcoast's involvement with Exhibit
4        Four as he did for Exhibit Three.
5  A.    Just so it's clear, I'm not taking the time to
6        go through it and examine it.  I assume that
7        there's bate stamps and these come from Brian
8        Cave that they've copied correctly the
9        appropriate document.
10 MR. MONALDO: Can we just keep going?
11 MS. CRESWELL: Would you all like to keep going
12 for a little while longer?
13 MS. PETERS: Want to stop at 12:30?
14 MS. CRESWELL: 12:30?  Would that be good?  And
15 we can take a very short lunch.
16 (Off the record)
17 Q.   (Ms. Creswell) The next Exhibit-
18 A.   I want to get to at least number ten.
19 MR. EDGAR: This guy's a slave driver, I'm
20 telling you.
21 MS. CRESWELL: The next Exhibit is an option
22 agreement, which will be entered into the record
23 as Exhibit Five.
24 WHEREIN, EXHIBIT NUMBER FIVE was marked for
25 identification.
                          - 84 -

1  Q.   (Ms. Peters) It's bate number 559 to 564 and it
2        appears to be referencing the two previous
3        exhibits, Exhibit Three and Exhibit Four.  Is
4        that your understanding of the option agreement
5        that it ties into those two project development
6        agreements?
7  A.    It seems to, yes.
8  Q.    Have you seen this document before?
9  A.    I've seen it before, I haven't seen it for a
10       while.  But, yes.
11 Q.    Did you negotiate this agreement or-
12 A.    I'm sure I would have been involved, yes.
13 Q.    It appears to be effective as of the 24th day of
14       October 1999, which is the same as the other
15       two, as the two project development agreements.
16       And our question was whether any option was
17       exercised under the option agreement?
18 A.    Yes.
19 Q.    What option was exercised?
20 A.    I think you see it.
21 Q.    And when was that exercised?
                          Page 36

Tino Monaldo Transcript.txt
22  A.   Sometime in the first quarter of, I'm going to
23       say first quarter, it could be the first two
24       quarters, of the year 2000.
25  Q.   Now, it says that the time period for the option
                          - 85 -

1        agreement is January 31st, ends January 31,
2        2000.
3   A.   That's correct.
4   Q.   Is that right?
5   A.   Uh-huh.
6   Q.   So, when they exercised the option, did they do
7        it untimely or am I misunderstanding?
8   A.   I'm just telling what my recollection was.  I
9        can't pin down a date.  I just believe it was
10       the first two quarters.
11  Q.   Sometime in the first half of January.
12  A.   Of 2000.
13  Q.   Do they pay the fee that goes along with
14       cancelling or exercising an option?
15  A.   Yes.  They would have paid a fee.  I can't tell
16       what it was exactly that amount, but there would
17       have been a fee paid.  In that range, yes.
18  Q.   Did they provide the documents, it says that
19       notice is to be provided to you and Mr. Langley
20       on the second page?
21  A.   I'm assuming they did, yes.
22  Q.   Would you have a copy of that?
23  A.   I probably do.  I mean I can guess.
24  Q.   Could you check and get us a copy?  And is that
25       - I guess this is an obvious question, but so
                          - 86 -

1        that's the reason why nothing was, no activity
2        took place under the two project development
3        agreements?
4   A.   Well, after.  Whenever they paid it.  There were
5        efforts made to try.  I mean, I'm sure we were
6        working on trying to get a project with what,
7        you know, whoever was the LDC owner, from then
8        until whenever they chose to terminate.
9   Q.   It wasn't a complete lack of interest on Mr.
10       Langley's part.  There were projects that were
11       attempted to be proceeded under these
12       agreements?
13  A.   That's what I recall, yes.  I'm thinking my
14       recollection is there was gas powered power
15       plants that needed alternative supplies of gas
16       and Wichita was one thing that we were
17       potentially looking at.  I can't remember the
18       time frame, we might have been looking at, or
19       thinking about trying to acquire some of the
20       local distribution company assets, but obviously
21       after it was terminated there was no need to
22       pursue that.
23  Q.   In attempting to, I guess, fulfill the contract
24       here, who was Mr. Langley, and I guess,
25       Management Resources Group, LLC, who were they
                          - 87 -

1        working with?  Meaning who was in control of
2        Kansas Pipeline and MarGasCo when these were
3        being attempted to be implemented?
                          Page 37

                          Tino Monaldo Transcript.txt
4  A.   Well, I assume it would have been the Midcoast
5       folks.  Because this was after, this is after
6       closing.
7  Q.   Do you know of anyone else that had owned these
8       two entities in that time frame?
9  A.   During that time frame, no.
10 Q.   It's not meant to be a trick question or
11      anything.
12 A.   Do you understand the concept of this?  Because
13      I think - I'm probably talking too much.
14 Q.   (Ms. Creswell) Go ahead.
15 Q.   (Ms. Peters) I'm not sure what you're referring
16      to.  The concept of the option agreement or the
17      concept of the project development agreements?
18 A.   The project development agreements, the
19      philosophy behind the project development
20      agreements.  That was an opportunity for Dennis
21      to show that he could, his preferred value was a
22      higher value and this is his way to earn that
23      additional value.
24 Q.   Sure.  Yeah.  So, the purchase price wasn't just
25      the one eighty-nine.  In addition-
                             - 88 -

1  A.   It was an opportunity to earn more.
2  Q.   Sure.  Or to further develop your company.
3  A.   Yeah.
4     MS. CRESWELL: Our next Exhibit will be the KPC
5     guaranty of the project development agreement.
6     Enter that into the record as Exhibit Six.
7     WHEREIN, EXHIBIT NUMBER SIX was marked for
8     identification.
9  Q.   (Ms. Creswell) This exhibit is bate stamp number
10      000660 through 000661.
11 A.   Okay.
12 Q.   This appears to be a guaranty from Kansas
13      Pipeline Company to Management Resources, LLC.
14 A.   Management Resources Group, LLC.
15 Q.   Right.  Group, LLC.  Again, did Midcoast of any
16      of its representatives negotiate with the Bishop
17      Group, or K-Pipe Group, or the representatives
18      of the Bishop Group, about what became the final
19      guarantees of the project development
20      agreements.
21    MS. PETERS: This is a different thing.  Do you
22    want to this guarantee or...
23    MS. CRESWELL: Well, this one is the one that I
24    had as Exhibit Six.  If you need to rephrase my
25    question, please do.
                             - 89 -

1  Q.   (Ms. Creswell) Did you negotiate this agreement,
2       Mr. Monaldo?
3  A.   I assume I was involved in it, yes.
4  Q.   (Ms. Peters) Basically, we just want you to
5       identify that this is a guaranty between Kansas
6       Pipeline and Management Resources Group and that
7       at that time, we have it signed by Howard Lubow.
8  A.   This is a Kansas Pipeline Guaranty of them,
9       MarGasCo's obligations under MarGasCo's project
10      development agreement, that's correct.
11 Q.   This guaranty is coming from Kansas Pipeline.
12      Is that correct?
                          Page 38

Tino Monaldo Transcript.txt

13 A.   That's correct.
14   MS. CRESWELL: We'll enter something called
15   Guaranty (Parent) from Midcoast Energy Resources
16   into the record as Exhibit Seven.
17   WHEREIN, EXHIBIT NUMBER SEVEN was marked for
18   identification.
19 Q.   (Ms. Creswell) This guaranty is from Midcoast
20     Energy Resources and it's pursuant to the
21     requirements of project development agreement
22     dated October the 24th by and between MarGasCo
23     and MRG and an irrevocably be guaranteed to
24     Management Resources, LLC.  Did you draft this
25     agreement, Mr. Monaldo?
                              - 90 -

1 A.   I'm sure I was involved in this document like
2     the others, yes.
3 Q.   Do you know when this agreement was negotiated?
4 A.   It has a, if you look on the bottom left hand
5     corner, it says it - it looks like it was
6     printed November 9th, so it looks like it was
7     signed around that date.
8 Q.   On the second page, can you tell me who is
9     signing for Midcoast Energy Resources?  Whose
10    signature that is?
11 A.   You know, I remember this was a sloppy signature
12    and so I can't guarantee I know the exact name,
13    but I - it's either Robert or Chip Berthelot,
14    Berthelot.  But I-
15   MR. EDGAR: That's the most bizarre signature
16   I've ever seen.
17 A.   I remember knowing at the time, but right now my
18    memory -
19 Q.   Who else would have had input into the drafting
20    of this particular guaranty?
21 A.   If I remember correctly, this guaranty was an
22    attached arm to the stock purchase agreement, so
23    I'm assuming that the form existed, the
24    substance of this document existed with the
25    actual stock purchase agreement, because
                              - 91 -

1     typically when you - good lawyering is when you
2     have an agreement.  In the event of a change of
3     control, you want to make sure that the, you
4     know, the guaranty is in place.  So, this would
5     have been part of the drafting of the stock
6     purchase agreement.  Midcoast would have signed
7     this as a condition.  We're trying to provide a
8     parent, a guaranty of that project development
9     and it would have been a required obligation
10    under the project development agreement.
11 Q.   (Ms. Peters) Now, this guaranty though is for
12    more of a project development agreement.  In the
13    middle of that first paragraph on the first
14    page.
15 A.   The project does, guarantees that MarGas,
16    remember MarGasCo, Kansas Pipeline, we just
17    talked about, guaranty the obligations of
18    MarGasCo, so it looks like this guaranty
19    requires the assumption of the guaranty of both
20    the MarGasCo agreement and the Kansas Pipeline
21    guaranty.
                              Page 39

Tino Monaldo Transcript.txt
```
22 Q.   Then it says, all liabilities, obligations,
23       covenants and agreements of the subsidiaries
24       contained and the project development agreement
25       dated October 25, 1999, which I assume is a
                          - 92 -

1        typographical error.  You didn't have, did you
2        have a project development agreement dated
3        October 25, 1999?
4  A.    I think those are the two we were just referring
5        to.  This is the-
6  Q.    They're dated October 24th.
7  A.    Then it just must be a typo.
8  Q.    Right.
9  A.    This guarantees, guarantying the obligations of
10       Kansas Pipeline to MRG, LLC under the MarGasCo
11       agreement.  The project development, Kansas
12       Pipeline project development agreement, the
13       consulting and the consulting agreement.  And
14       the reason being is those are the entities that
15       - Kansas Pipeline was the party that was going
16       to pay Dennis for MRG, LLC in the future.  So,
17       it was a condition for there to be a change,
18       somebody's got to step in and guaranty those
19       obligations.
20 Q.    Sure.  I just wanted to make sure that we all
21       had the same agreements and that there wasn't
22       some other agreement-
23 A.    No.  That must just be a typo.
24 Q.    When did you first - was this the document that
25       first indicated to you that Midcoast was
                          - 93 -

1        involved in a transaction with K-Pipe Merger or
2        Fortrend?
3  A.    That goes back to our discussion on/or about
4        sometime after October 25th and before closing.
5  Q.    So, it would have been specifically due to this
6        document, but that's when your - or was there a
7        specific?
8  A.    That's when Fortrend and Midcoast, when we got a
9        hold of this guaranty, that's when we would have
10       been aware that there was going to be
11       potentially a transaction between the two.
12   MR. EDGAR: You don't mean this one.  You mean
13   the form.
14 A.    Right.  The form.
15   MR. EDGAR: Yes.
16 A.    Whenever that was-
17   MR. EDGAR: I'm sorry.
18 Q.    (Ms. Peters) What was it that indicated to you
19       that there was a transaction between Fortrend/K-
20       Pipeline?
21 A.    As I think I said earlier, when we got a copy of
22       the request of the Midcoast Fortrend - a
23       document looked like this.  Okay.  Where
24       Midcoast was proposing with Fortrend to execute
25       this document as a condition of there being a
                          - 94 -

1        change of control.  And that would have been
2        that October 28th date that we talked about.
3  Q.    So, the form document, not all typed up, but
```
Page 40

Tino Monaldo Transcript.txt

```
 4      with the blanks?
 5  A.  I think they're the same thing.  My recollection
 6      is they're the same thing.  If there are changes
 7      you have to point them out.  I mean, the
 8      substance of the agreement was already in place
 9      in the stock purchase agreement in case there
10      was a change of control at anytime.  One, five,
11      ten years later.
12  Q.  So, was this - how did you see this?  Was it
13      mailed to you or was it - or did you just happen
14      up on it?  I mean, was - I guess I'm still
15      confused.  At what point did you-
16  A.  The October, the October 28th time frame is when
17      I'm telling you we would have been aware if
18      there was going to be change.
19  Q.  How did you become aware of Midcoast being
20      involved in the Fortrend transaction?
21  A.  I can't tell you whether it was a phone call
22      from them to us or whether it was this fax they
23      sent us, but obviously it centered around this
24      issue would have been when they - I don't want
25      to speak for them, but if they're going to do a
                              - 95 -

 1      transaction that require, if Fortrend is going
 2      to get involved in a transaction that requires
 3      them to get this signed so they're not in breach
 4      of their agreement to us, they would have to
 5      approach us to get, to give us, to meet the
 6      obligations under the project development
 7      agreement that there be an assumption of these
 8      liabilities.
 9  Q.  So, then did you see any other versions of this
10      document or is this the only one that Fortrend
11      or Midcoast-
12  A.  I think it's when the documents were turned over
13      that there was maybe one or two drafts of this.
14  Q.  They were sending it to you to let you know that
15      they were fulfilling, they being Fortrend,
16      obligations under your agreement.  Is that why
17      they were sending it to you?  Or why were they
18      sending it to you?
19  A.  I think I've answered that.  Under the project,
20      as I recall, the project development agreements
21      where Mr. Langley and MRG could earn money or
22      the consulting agreement where we could, where
23      there was money to be made.  If there was going
24      to be a change of control of the party
25      obligated, the underline stock purchase
                              - 96 -

 1      agreement said any change of control party would
 2      have to sign this, otherwise Fortrend would be
 3      in default.  And I think there's some default
 4      provisions that would have been triggered if
 5      whoever bought this now or ten years from now
 6      would have had to sign.
 7  Q.  So, that would be a yes?  They were informing
 8      you that they were complying with the-
 9  A.  They would have had to.  They would have had to,
10      yes.  To not be in breach.
11  MR. EDGAR: Time for lunch break?
12  (Lunch break)
```

Page 41

Tino Monaldo Transcript.txt
13   MS. CRESWELL: Okay.  We're back on the record.
14  A.   Linda, can I clarify just a couple of things,
15        because towards the end there I think I was
16        answering multiple questions at multiple times
17        and my have confused you.  You would refer to
18        this as an asset sale agreement, or somebody
19        referred to it as asset sale, and I just want to
20        clarify that I did not know at the time we
21        closed with Fortrend, I don't know now what the
22        exact nature of their transaction was, that was
23        the one thing I - if it wasn't clear, I wanted
24        to make clear.  The other is, was reference to
25        this agreement as the guaranty.  This document
                              - 97 -

1         was, there's a form like this document in a
2         stock purchase agreement without Midcoast's name
3         on it.  Midcoast's name was not on it until I
4         would have seen it sometime in late October.
5   Q.   (Ms. Peters) Okay.  Okay.
6   A.   Maybe that was clear, but it wasn't clear to me
7         so I've explained it to you.
8   Q.   (Ms. Peters) And we'll have the stock purchase
9         agreement in a little bit and we can always
10        point out that form so it's real clear for the
11        record that that's the form you're looking at.
12  A.   If you understood what I said, that's fine.
13  Q.   You want to make it clear for, you know, by the
14        time the transcript gets back and if there's any
15        confusion later on.
16   MS. CRESWELL: I want to remind Mr. Monaldo that
17        he is still under oath.  And our next exhibit,
18        this is Exhibit Number Eight.
19   WHEREIN, EXHIBIT NUMBER EIGHT was marked for
20        identification.
21  Q.   (Ms. Creswell) And is a fax transmittal cover
22        sheet from Midcoast to Jim Pride dated 10-28 and
23        there is several attachments if you would like
24        to glance at that, Mr. Monaldo.  The bate stamp
25        number numbers, the document begins at 002323
                              - 98 -

1         and ends at 002347.
2   A.   Okay.  I've looked at the document.
3   Q.   Have you ever seen this document before, Mr.
4         Monaldo?
5   A.   I seem only to recollect seeing, I remember
6         seeing pages bate stamps 24 and 25 and 26, the
7         call back.  And I'm assuming I would have seen
8         the balance of it at the time, but.
9   Q.   Part of this Exhibit Eight is an attachment
10        titled Project Participation Agreement.
11  A.   Okay.
12  Q.   And that begins on bate stamp 002327.  There's
13        some handwriting at various spots throughout
14        this exhibit.  Do you recognize the handwriting?
15  A.   What page are you referring to?
16  Q.   2327.  Project Participation Agreement.  About
17        four pages back.
18  A.   No.  I do not.
19  Q.   Do you know who drafted this agreement?
20  A.   I'm not sure I understand the question.  These
21        are drafts of documents.
                        Page 42

Tino Monaldo Transcript.txt

22  Q.   I guess I -
23  A.   The fax cover sheet seems to say it's coming
24       from Midcoast to Jim Pryde dated October 28,
25       1999.
                              - 99 -

1   Q.   If you would refer back now to, help me with the
2        Exhibit Number, Yvonne, because-
3      MS. PETERS: Three.
4   Q.   (Ms. Creswell) Is it Three?  Okay.  If you would
5        refer back to Exhibit Three, which is the
6        project development agreement between MarGasCo
7        Partnership and Management Resources, LLC.
8   A.   Okay.
9   Q.   And of Exhibit Eight, if you will look at bate
10       stamp number 2328, which is the second page of
11       the project participation agreement.
12  A.   Okay.
13  Q.   And then Exhibit Three, section 1.3, which is on
14       page two.
15  A.   Page two of Exhibit Three?
16  Q.   That's correct.  And they should all have the -
17  A.   - on it?
18  Q.   That should also be section 1.3.  Yes.  You're
19       at the right spot.
20  A.   Okay.
21  Q.   It appears that the handwritten changes that
22       we're finding in Exhibit Eight have been
23       incorporated into this Exhibit Four.  If you
24       would like to take just a minute to assure
25       yourself that that's when it occurs.
                              - 100 -

1        Particularly the inserts, the handwritten insert
2        at the top of the page where the - okay, it says
3        at any time prior to the expiration of the term
4        of the agreement as to-
5   A.   Yeah.  I see that.
6   Q.   -MRG.  Okay.  And then there's one right under
7        paragraph 1.3 that says, prior to the date of -
8        well, exercise of the early MRG Exclusive Draft
9        Term Option and then down at the bottom of the
10       page in Article Two it says, similarly during
11       the term of this agreement as to system
12       electrical projects applied to any early system,
13       electrical project termination, MRG, shall
14       submit to MarGasCo all such electrical projects
15       which it then desires to develop MarGasCo.  It
16       does look like that the corrections...
17  Q.   (Ms. Peters) And then on page two of Exhibit
18       Three, whose handwritten changes are word for
19       word on that document.  Do you see that?
20  A.   I lost you.  What page are you on?
21  Q.   You're looking at Exhibit Eight with the bate
22       stamp number -
23  A.   I'm looking at Exhibit Three.
24  Q.   Three, right.  Okay.  In Exhibit Three, page
25       two, in paragraph -
                              - 101 -

1   A.   Exhibit Three, page two, okay.
2   Q.   No.  It - yes.
3   Q.   (Ms. Creswell) Yes.
                           Page 43

Tino Monaldo Transcript.txt

4  Q.   (Ms. Peters) So, that's section 1.3.
5  A.   Okay.  What's your question?
6  Q.   (Ms. Creswell) Exhibit Three is dated 10/24/99
7       that is the corrected version.
8  Q.   (Ms. Peters) That's the version of these
9       written, these written, handwritten items
10      incorporated into it.  Do you see that those
11      handwritten items are incorporated into the
12      Exhibit Three?
13 A.   I see some of the language, yes.
14 Q.   (Ms. Creswell) Exhibit Three is dated 10/24 and
15      Exhibit Eight is dated 10/28.  So, from these
16      dates it appears that the final document, which
17      is Exhibit Three, was in existence before the
18      revision of Exhibit Eight.  Is that-
19 Q.   (Ms. Peters) I guess my question is what would
20      be the correct date of Exhibit Three given that
21      the (inaudible) dated October 28th and if you
22      look on Exhibit Eight the page one, it's bate
23      stamp 2327.  It says 10/28/99 handwritten
24      revision is made as per discussion with Dan
25      Tutcher.
                          - 102 -

1  A.   What agreement?
2  Q.   It's Exhibit Eight, right there.  So, we're a
3       bit confused about the date of Exhibit Three
4       considering these changes, according to this,
5       were made per a discussion with Dan Tutcher and
6       there's a date of the 28th on Exhibit Eight.  Is
7       there an explanation for why these changes would
8       be in a document dated 10/28, yet incorporated
9       in a document dated 10/24?
10 A.   Well, it appears that Exhibit Three is October
11      24th.  It appears that when on October 28th when
12      - that Midcoast through its fax to Jim Pryde is
13      requesting changes to his inserting its name
14      into the guaranty form and-
15 Q.   We're not asking about the guaranty form right
16      now.  What we're asking about is-
17 A.   Well, I'm trying to answer you.
18 Q.   Oh, okay.
19 A.   When they're asking for changes to the guaranty,
20      it appears that they're asking for some changes,
21      suggesting changes, to the actual agreement that
22      already exists that changes be made to that
23      prior to the resumption of it, or the guaranty
24      of it.
25 Q.   This says on page two here, with bate stamp 2328
                          - 103 -

1       of Exhibit Eight, this says for section 1.3-
2  A.   I'm sorry.  You lost me.  Where are you now?
3  Q.   On the top of the page where it says section
4       1.3.  Right here.  Question 1.3.  It says, added
5       between the word project and the word buy is
6       this phrase, at any time prior to the expiration
7       of the term of this agreement as to MRG
8       exclusive projects.  That's a change that
9       appears to be coming from Midcoast.  Right?
10 A.   Well, it's on their fax, so-
11 Q.   It's on their fax sheet.
12 A.   Correct.
                          Page 44

Tino Monaldo Transcript.txt

13  Q.   And then, look at Exhibit Three, page two,
14       section 1.3, it says at anytime prior to the
15       expiration of the term of disagreement.  It
16       says, at anytime prior to the expiration of the
17       term of this agreement as to early MRG exclusive
18       projects.
19  A.   Okay.
20  Q.   And as I understood your answer to the prior
21       question was, when Midcoast wanted to enter into
22       the guaranty agreement then once it changes to
23       the project participation agreement.  The
24       project participation agreement, however, that
25       is Exhibit Three, which is already entered into
                          - 104 -

1        by Mr. Langley, already had those changes in it.
2        Right?  By based on what you said.  I don't
3        understand.
4   A.   You've lost me.  In answer to your question was
5        it appears that at the time - before they agreed
6        to assume the obligations of the agreements by
7        guarantying them, that is documents that were
8        signed by MarGasCo/Kansas Pipeline, they're
9        requesting changes to the underlying agreements
10       themselves.  And so it appears from what you've
11       said that they were made, that they were made
12       for the agreement, it modified the October 24th
13       agreement.
14  Q.   (Ms. Creswell) So, this is not even the final
15       agreement, perhaps.  Is that what you're saying?
16  A.   No.  This is the final agreement, but often
17       times you can just restate it as of that date,
18       so apparently these were inserted in response to
19       the request before they assumed the obligation
20       with the guaranty that those changes were made.
21  Q.   (Ms. Peters) So, you're telling me that this
22       contract, Exhibit Three, is not the actual
23       contract that was entered into on April 24th by
24       Mr. Langley?
25  A.   No.  I think it is.  I think it was just some of
                          - 105 -

1        the language was restated in there.
2   Q.   Some of the language was restated in here?
3   A.   Correct.  There was a full set of documents that
4        were in place on October 24th or 25th, whatever
5        date it was, and it appears that prior to
6        closing, some of the document was modified to
7        meet the request of Fortrend that the-
8   Q.   Prior to what closing?
9   A.   Closing with Fortrend.  Remember October 28th
10       when Mr. David - our closing with Fortrend was
11       November 8th.
12  Q.   Yes.
13  A.   Sometime after October 28th, or October 28th and
14       after, a request was made before Midcoast is
15       going to sign this guaranty.  They're requesting
16       certain changes to the form guaranty which are
17       just minor, putting in some dates, and then
18       they're requesting, what appear to be to me,
19       non-substantial changes to the underline project
20       development agreement.
21  Q.   So, Midcoast is suggesting some changes to the
                          Page 45

Tino Monaldo Transcript.txt
22     agreement.  Right?
23 A.  That's what - I've already said that already.  A
24     fax from them to Jim Pryde and if this is their
25     handwriting, their suggesting the changes.
                          - 106 -

1  Q.  That was on October 28th?
2  A.  That's correct.
3  Q.  And the closing was on the-
4  A.  With Fortrend, was the 8th.
5  Q.  Right.  Between with the one with Fortrend was
6      on the 8th.  So, would it be fair to conclude
7      then, that Midcoast already knew on October 28th
8      that Fortrend had entered into an agreement with
9      Mr. Langley about Bishop Group?
10 A.  You asking me what Midcoast knew?
11 Q.  I'm asking you, if Midcoast had that document
12     and Midcoast had this guaranty, why would they
13     be sending this to Jim Pryde on 10/28 with
14     changes to this agreement?
15 A.  I think I've answered that.  Before they were
16     going to sign - apparently before they were
17     going to sign a guaranty to assume obligations
18     of the pre-existing Kansas Pipeline/MarGasCo
19     project development agreements, they are
20     requesting changes to the agreement that they
21     were being asked to assume, so it must have
22     meant they had a copy of-
23 Q.  Well, my question is, if they were being - they
24     wanted to assume an agreement, the project
25     development agreement having entered into
                          - 107 -

1      between Mr. Langley and Kansas Pipeline Company
2      and MarGasCo.  And you have said that your
3      understanding when that agreement was entered
4      into was that Fortrend was going to acquire
5      those entities.  Is that correct?
6  A.  You lost me.  Our contract was with Fortrend, so
7      when we signed with Fortrend-
8  Q.  My question is, I'm asking you if this is
9      correct, is that your understanding at the time
10     Mr. Langley entered into the project development
11     agreements, which was October 24th.  Right?
12 A.  When Kansas Pipeline signed those, yes.
13 Q.  Yes.
14 A.  Okay.
15 Q.  Was that Fortrend was going to acquire those
16     entities other than the Management-
17   MR. EDGAR: Resources Group.
18 Q.  -Resources Group?
19 A.  No.  They were going to acquire the stock of
20     Bishop Group.  Management Resources, LTD was
21     staying under the umbrella of Bishop Group.
22 Q.  My question is, was your understanding at the
23     time, on October 24th, that Fortrend was going
24     to acquire Kansas Pipeline Company and MarGasCo?
25 A.  I believe it's a purchase of Bishop Group stock,
                          - 108 -

1      yes.
2  Q.  Yes.
3  A.  Okay.
                        Page 46

Tino Monaldo Transcript.txt

```
 4  Q.  So, if that was your understanding on the 24th
 5      and we talked about the guaranty and the
 6      assumption agreement and why you were, why Mr.
 7      Langley was sent this, just before lunch.
 8      Right?
 9  A.  Correct.  We talked about it, yes.
10  Q.  So, my question is, this is now, this document,
11      this guaranty, Exhibit Eight, was entered into
12      on the 28th, or these changes were apparently
13      written down on the 28th, to both the guaranty
14      and to the project development agreement.
15      Wouldn't Midcoast have known, because it got
16      this guaranty not from you, but from Fortrend.
17      Right?  Where did it get the draft in this-
18  A.  Your assumption is from Fortrend, so I would
19      agree with your assumption.  They got it from-
20  Q.  Well, where do you think - did you give them a
21      draft guaranty agreement?
22  A.  No.  They would have gotten it from Fortrend.
23  Q.  And I think previously you said that you
24      received a copy of this from Midcoast, or it was
25      somehow, somehow that-
                      - 109 -

 1  A.  I think it was either from Fortrend or Midcoast.
 2  Q.  Fortrend or Midcoast.  This would be Exhibit
 3      Seven.
 4  A.  I'm looking at Exhibit Eight.  I'm looking at
 5      Exhibit Eight.
 6  Q.  If you look back at Exhibit Seven, we were
 7      talking about before lunch.
 8  A.  Okay.  That's the signed version, yes.
 9  Q.  Yes.  With what we thought was maybe Richard
10      Robert's signature on the second page.  That was
11      the one that you had received either from
12      Fortrend or Midcoast.
13  A.  Okay.
14  Q.  How else could Midcoast have gotten this
15      document...  Midcoast, if it got this document
16      and this guaranty from Fortrend, it must have
17      known that you had engaged, or were planning to
18      engage, on a transaction with Fortrend.
19      Wouldn't you agree?
20  A.  Well, yeah.  If they got the copy from Fortrend
21      that would...
22  Q.  Where else would they have gotten the copy for
23      that?
24  A.  From Fortrend.
25  Q.  So, on 10/28-
                      - 110 -

 1  A.  You've got to understand, when we were talking
 2      with Enron and Fortrend and Midcoast, we weren't
 3      hiding the fact that we were negotiating with
 4      other parties.  That's how you, that's what you
 5      do in a bid process.
 6  Q.  I'm not suggesting that you were hiding
 7      anything.  I'm just clarifying what Midcoast
 8      would have known on 10/28 when they faxed these
 9      changes to Jim Pryde.
10  A.  That makes sense.
11  Q.  Now, it's not entirely clear to me on this
12      project development agreement.  As I understand
```
Page 47

Tino Monaldo Transcript.txt
```
13      what you said was that it must have been when
14      Midcoast was entering into and hammering out the
15      terms of the guaranty that they wanted changes
16      to the project development agreement.  And as I
17      understand what your explanation was that these
18      changes appear to be from 10/28 and this
19      document, although it appears to be dated 24th
20      day of October 1999, that it would have been
21      conformed to what was agreed with Midcoast.  Is
22      that correct?
23  A.  That's correct.
24  Q.  So, what was the document that Mr. Langley
25      originally signed?  Is there a copy of that
                        - 111 -

1       document or where is that?
2   A.  Well, it appears what was signed is what's being
3       marked up here from Midcoast.  What I explained
4       before, it's not uncommon in a transaction with
5       that many pages that sometimes pages are inner-
6       lineated and a document that was dated and
7       executed on the 24th would have slight
8       modifications to it before closing.
9   Q.  So, then what you suggest to me is that this
10      project development agreement that's Exhibit
11      Three, that the changes suggested by Midcoast
12      were added to this project development agreement
13      before November 8th when stock purchase
14      agreement closed with Fortrend.  Would that be
15      correct?
16  A.  Correct.
17  Q.  Was it considered that the project development
18      agreement was enforceable on the 24th when Mr.
19      Langley first signed it or was it not a true
20      agreement until the stock purchase agreement
21      closed on November 8th?
22  A.  I would consider it a binding agreement between
23      Kansas Pipeline and MRG, LLC on the 24th.
24  Q.  On the 24th.  So, then changes made to that
25      agreement, you're suggesting these changes were
                        - 112 -

1       minor, so it didn't cause that to be a new
2       agreement when you made the changes to the
3       agreement.  And then resigned it?
4   A.  I had to go through it.  I mean, I don't recall
5       there being major, major huge issues there, but
6       it would still be the same agreement and
7       modified from the original version, but still
8       the same agreement.
9   Q.  But the original agreement, the project
10      development agreement, if I understand what
11      you're saying, was between Mr. Langley and
12      Kansas Pipeline and MarGas Company?
13  A.  It was between MarGasCo and MRG, LLC.
14  Q.  I'm sorry.  MRG, LLC owned by Mr. Langley and
15      Exhibit Four, which was Kansas Pipeline Company
16      and MRG, LLC.  With the thought being that
17      Fortrend would acquire those two entities
18      through some ownership chain of MarGas Company
19      and Kansas Pipeline Company.  Right?
20  A.  That's correct.
21  Q.  And when we asked you about whether you had any
```
Page 48

Tino Monaldo Transcript.txt
```
22      concerns, or anyone had any concerns, about
23      Fortrend who has no oil or gas experience in a
24      mutual private development agreement to do oil
25      and gas type activities, you said that everybody
                              - 113 -

1       thought that was great, because, I'm
2       paraphrasing you, because Fortrend didn't have
3       any experience, they could really use the
4       services of Management Resources Group and that
5       would be kind of a good fit.  Is that a fair -
6    A. No.  I wouldn't - I don't think that's what I
7       said.  What I was referring to was that it was
8       the same topic.  It's close, but what I was
9       saying was, that a company that wasn't steep in
10      pipeline experience would find it more valuable
11      to them to have somebody like us still somewhat
12      involved on project development, because of our
13      experience.  So, it was, to some extent, made
14      our negotiation with Fortrend easier, because
15      they would want to have a project developer that
16      was familiar with the system that could,
17      perhaps, bring additional value.  That's what I
18      think I was answering.
19   Q. So, did Fortrend participate in negotiations on
20      the project development agreement?
21   A. I've answered that, yes.  They did.
22   Q. So, when Midcoast, by these suggestions on the
23      28th, were the negotiations with Midcoast in
24      addition to these suggested terms or did they
25      just provide these terms?
                              - 114 -

1    A. Well, I'm sure that if they sent the terms,
2       there would have been some discussion with them
3       about the terms.
4    Q. So, after this project development-
5    A. Excuse me.  With-
6    Q. I'm sorry.
7    A. - fortune, it could have been with Fortrend or
8       Midcoast.
9    Q. So, your discussions from Perspective Management
10      Resources Group, did you have any negotiations
11      with Midcoast about the project development
12      agreement?
13   A. I'm sure I would have been involved in the
14      process of the guaranty being signed and the
15      underlined agreements being slightly modified,
16      yes.
17   Q. Yes.  You did.  Okay.
18      MS. CRESWELL: The next exhibit is a fax, I
19      believe would be Exhibit Nine.  Is that correct?
20      MS. PETERS: Yes.
21      MS. CRESWELL: This is a fax from Yvette Korb
22      dated 10/13-
23      MR. MONALDO: What number is this?  Nine?
24      MS. CRESWELL: Number nine, yes.  It is bate
25      stamp number 002374 and it is addressed to
                              - 115 -

1       various individuals.
2       WHEREIN, EXHIBIT NUMBER NINE was marked for
3       identification.
```
                                Page 49

Tino Monaldo Transcript.txt

4   Q.   (Ms. Creswell) Are you familiar with this
5        document, Mr. Monaldo?
6   A.   I don't recall it.  But if it was turned over, I
7        probably would have seen it at some point in
8        time.
9   Q.   Is the e-mail address lawyertm@southwind.net, is
10       that your e-mail address or is that somebody-
11  A.   It would have been at the time, yes.
12  Q.   The e-mail is from Yvette Korb.  Could identify
13       who Yvette Korb is?
14  A.   She was the secretary of Bishop Group.
15  Q.   Could you identify who the e-mail is addressed
16       to?
17  A.   It looks like it's self explanatory.  C.
18       Kaitson, Chip B. and R. Chachere, so it looks
19       like it's going to Midcoast.
20  Q.   And it looks like James J. Pryde, Jim Pryde, is
21       also in there as an addressee and he is with
22       Brian Cave.  It also states that attached to
23       this e-mail is a project development agreement,
24       a revenue interest agreement and a non-fiduciary
25       duty language insert.  Were you involved in the
                            - 116 -

1        negotiations for any of these?
2   A.   Well, I've said I was, yes.
3   Q.   You were.  Okay.  I didn't know that we had
4        brought up this non-fiduciary duty language
5        insert, but.  I don't even know what that is.
6        What is that, non-fiduciary duty language
7        insert?
8   A.   You would have to show me and I - it's probably
9        from some provisions some of one of these
10       agreements.  Unless you showed it to me, I
11       wouldn't be able-
12  Q.   You aren't familiar with that language.
13    MS. CRESWELL: Did you need to ask anything else
14    about this?
15  Q.   (Ms. Peters) Is the revenue interest agreement,
16       would that be that term that we talked about
17       earlier as far as in that letter of intent with
18       Fortrend, that was described in there, I'm not
19       saying it's the same one, but where it would be
20       based on the twenty-nine -
21  A.   I'm sure all parties would have discussed a net
22       revenue sharing concept like we talked about.
23       If you believe X dollars is what the revenue is
24       and we think it's better, well, if it's better,
25       we wanted to get the benefit of it.  If you're
                            - 117 -

1        not wanting to pay us cash now, you got to pay
2        us over time, so I'm assuming it's to that
3        concept, because we go back to the four things
4        we try to negotiate, those four major things.
5   Q.   Right.  Right.  Okay.  And then the first item
6        is the project development agreement and this is
7        dated 10/13/99.  Do you recall what your
8        discussions were with Midcoast at that time as
9        far as project development agreement?
10  A.   I think I've answered that.  We were negotiating
11       with Midcoast and Fortrend and on kind of a dual
12       track, so I'm assuming we would have been
                        Page 50

                    Tino Monaldo Transcript.txt
13    negotiating a project development agreement with
14    them.  Remember I said we were negotiating with
15    both parties at the same time.
16 Q.  And that then turned into the same project
17    development agreement.  Right?
18 A.  You're using the word same.  It was with
19    Fortrend, the ultimate one that was signed.
20 Q.  The one that's signed with Fortrend, but as we
21    just talked about there were parts of the
22    agreement that was originally signed with
23    Fortrend that were changed per the request of
24    Midcoast.  Is that fair to say?
25 A.  I think we dealt with that, yes.
                        - 118 -

1 Q.  So, the ultimate agreement, including the
2    changes by Fortrend, or by Midcoast, on October
3    28th, would have created the end result.  You
4    entered into the same agreement, I guess?
5 A.  I wouldn't characterize it as a prior to
6    Midcoast agreeing to sign a guaranty agreement.
7    They would have requested certain changes and
8    some of those changes appear to have been made.
9 Q.  Were the only differences between the agreement
10    that Mr. Langley entered into on October 24th
11    for the project development agreement and the
12    agreement, as we have it present in our Exhibit
13    Four - no.  I'm sorry, Three.  The changes that
14    Midcoast suggested.
15 A.  I don't know.  There may have been some typo's,
16    but - so, I don't know the answer to that
17    question.
18 Q.  Other than changes suggested by Midcoast to that
19    agreement, who else would have suggested changes
20    to that agreement other than typo's?
21 A.  Well, I think I'm already agreeing with you that
22    some of those changes by Midcoast, that were
23    requested by Midcoast, is a condition of them
24    signing the guaranty, were made.
25 Q.  Okay.  But was there any other party that would
                        - 119 -

1    have suggested changes to that agreement other
2    than Midcoast?
3 A.  I guess Midcoast and Fortrend were requesting
4    changes.
5 Q.  Anyone else?
6 A.  Not that I recall, no.
7    MS. CRESWELL: The next exhibit, this will be
8    Exhibit Number Ten and it is a revised security
9    agreement with an e-mail cover letter, which is
10    dated 10/11/99.  Bate stamp number 002399 to
11    002404.
12    WHEREIN, EXHIBIT NUMBER TEN was marked for
13    identification.
14 Q.  (Ms. Creswell) Are you familiar with - I'll give
15    you a minute to look at the security agreement
16    if you would like, Mr. Monaldo.
17 A.  Do you have a question?
18 Q.  Are you familiar with this agreement?
19 A.  I can't say that I've seen it in a while, but I
20    recall discussions regarding something like
21    this.
                        Page 51

Tino Monaldo Transcript.txt
```
22 Q.   Do you know who drafted this agreement?
23 A.   I don't know who the original - I don't recall
24      who would have been the original scrivener of
25      this.
                        - 120 -

1  Q.   Do you know if there was a final agreement of
2       this document?
3  A.   Well, I believe there was not.  This was part of
4       the negotiations with Midcoast it looks like and
5       I remember it was with Fortrend.  So, no.  I do
6       not believe there was a - ever an agreement like
7       this signed by anybody.
8    MS. CRESWELL: Do you have anything else on this
9  one?
10 Q.   (Ms. Peters) Is this fax, that appears to be
11      dated October 11th from Jim Pryde.  I'm not sure
12      who Lori Brewer is.  Do you know who that is?
13 A.   You know, she might have been Jim's secretary at
14      the time at Brian Cave.
15 Q.   Or Therecia Johnson?
16 A.   Where do you see that?
17 Q.   On the second line, right under two.
18 A.   I don't see it.
19 Q.   Oh.  There's your name and then right before it
20      it says Johnson, Therecia?
21 A.   You know, I think she was a secretary, too.  But
22      I'm not sure.
23   MR. EDGAR: She was.
24 Q.   And then it also appears to go to Ron Chachere
25      and Chris Kaitson from Midcoast.
                        - 121 -

1  A.   Okay.
2  Q.   And I guess this agreement, on which page, this
3       is the first page.  It says, this security
4       agreement was made and entered into this blank
5       day October 1999 between K-Pipe Holding Partners
6       and MarGasCo's Partnership.  And then it just
7       mentions Kansas Pipeline and... I understand
8       you saying that there was negotiations going on
9       with Midcoast the same time there were
10      negotiations going on with Fortrend, but why
11      would you send documents that appears you are
12      contemplating entering into with K-Pipe Holding
13      Partners, LP, if Fortrend was negotiating to
14      representatives of Midcoast?
15 A.   I don't know the exact answer to that question,
16      but I would assume we were running this -
17      negotiating with two parties trying to get the
18      best deal.  We're trying to get a commitment
19      from Midcoast to pledge certain collaterals and
20      back up the project development agreement that
21      was still being negotiated with.
22 Q.   You're trying to get Midcoast - I'm sorry.
23      You're trying to get Midcoast to pledge certain
24      collateral?
25 A.   One of the things, it appears that one of the
                        - 122 -

1       things that we wanted to have was collateral to
2       back up a project development, to back up the
3       project development agreement.
                        Page 52
```

Tino Monaldo Transcript.txt

```
 4  Q.   And you thought you would get the collateral
 5       from Midcoast?
 6  A.   We thought we would get the collateral from
 7       whoever ended up being the buyer from us.
 8  Q.   But I'm still curious as to why you would send a
 9       draft of an agreement with another party's name
10       in it that you're negotiating to sell your stock
11       to, to their, I guess as you describe it, their
12       rival party?
13  A.   Other than we're just trying to get the - we're
14       trying to get a - same answer I gave before.
15       We're trying to get that with either party that
16       would end up being the ultimately best bidder.
17  Q.   Do you typically when you have several bidders
18       send drafts of agreements with one bidder to a
19       different bidder?
20  A.   I'm not sure I understand that question.
21  Q.   Well, if you're negotiating with say three
22       parties to sell the same assets, party A, B and
23       C.   And you're drafting an agreement with party
24       A and you're in the middle of drafting that, do
25       you typically send that draft to party B?
                        - 123 -

 1  A.   I don't know how to describe typical.  I don't
 2       perceive it as being that big of a deal.
 3       Although the concept was to have a security.  It
 4       wasn't executed by anybody.  The concept was to
 5       have collateral.
 6  Q.   Well, would party A is negotiating wants party B
 7       to know their terms their negotiating with you
 8       on or would they, would that ever be a problem?
 9       Is there some type of confidentiality between
10       your negotiations with one party that's in the -
11       that's trying to purchase the same asset as
12       another party?
13  A.   You're going to have to rephrase it.  I'm not
14       sure I followed the question.
15  Q.   Well, would in this instance-
16  A.   I'm not sure if you're asking me what was done
17       or what's typical or what's typical in this
18       case, what's done in the industry.  I mean, I'm
19       not sure what - I mean, I'm not trying to be
20       evasive, I'm-
21  Q.   I don't think you - I'm just curious as to why
22       this agreement, draft of an agreement, with K-
23       Pipe Holding Partners is being sent to Midcoast
24       when Midcoast does not appear anywhere in this
25       agreement.  And you are telling me that you are
                        - 124 -

 1       negotiating with Midcoast a separate set of
 2       agreements for the same purchases?
 3  A.   I've said that we were on kind of a dual track
 4       to try to see what's the best deal we get from
 5       whomever, so there would have been documents
 6       going each direction, yes.
 7  Q.   So, from receiving this document, do you think
 8       that it would have been an indication to
 9       Midcoast if they weren't already aware of the
10       fact that you were in a process of negotiating
11       with K-Pipe Holdings?
12  A.   Yes.
```

Page 53

Tino Monaldo Transcript.txt

13    (Off the record)
14    MS. CRESWELL: The next exhibit that will be
15    entered into the record is a fax from Ronald
16    Chachere, if I'm saying that correctly, to Jim
17    Pryde and Chris Kaitson.  It's dated 10/12 and
18    it will be Exhibit Number Twelve(sic).  The bate
19    stamp number is 002414 ending with 002420.
20    WHEREIN, EXHIBIT NUMBER ELEVEN was marked for
21    identification.
22 A.    Okay.
23 Q.    (Ms. Creswell) Can you tell me again, Mr.
24    Monaldo, who Ronald Chachere is?
25 A.    He's an attorney working for Midcoast.
                          - 125 -

1  Q.    And Jim Pryde is from Brian Cave and is
2     representing, or represents Dennis Langley and
3     his companies.  Correct?
4  A.    Yes, ma'am.
5  Q.    And Chris Kaitson represents Midcoast, also, if
6     I remember correctly.  Are you familiar with the
7     document that's attached to this fax
8     transmittal?
9  A.    It looks like a markup of, it appears to be a
10    markup of a security agreement.
11 Q.    Whose bold handwriting is found throughout the
12    agreement?  There's one handwriting that's quite
13    bold and the other that is much smaller or using
14    a smaller tipped pen.  Do you know who the bold
15    handwriting would be from?
16 A.    I do not know.
17 Q.    So, could you identify whose lighter handwriting
18    that would be?
19 A.    No.  I can't.
20    MS. CRESWELL: Do you want to -
21 Q.    (Ms. Peters) I see on the page number, the bates
22    number of 2415.  I see a Mr. Robert's name
23    written there.  Do you see that?
24 A.    Yes.
25 Q.    It appears that that looks like a security
                          - 126 -

1     agreement that was sent to you and Mr. Chachere,
2     which we identified as Exhibit Ten.  Would you
3     agree to that?
4  A.    I think I've said it appears to be that
5     document.
6  Q.    So, I'm curious about these markups, they appear
7     to come from Mr. Chachere, his quite extensive
8     changes, but he doesn't make any changes to the
9     K-Pipe something Partners, LP as being a party
10    to the agreement.  Why is Mr. Chachere making
11    changes to an agreement between, contemplated
12    between K-Pipe and Management Resources Group?
13 A.    I can't tell you whether these are Ron
14    Chachere's changes, so I can't speculate why he
15    would change one thing, but not the other.
16 Q.    Why is he making any changes to this agreement?
17 A.    Well, as I said to you before, we are
18    negotiating with Midcoast and Fortrend and
19    having, continue to have some discussions with
20    Enron through October, so this was never signed,
21    but it was discussed as something we would want
                          Page 54

Tino Monaldo Transcript.txt

```
22      from Midcoast and then they sent their changes
23      back and with the markup.
24  Q.  Is this same type holding partners several times
25      in here.  He never changes that does he?
                          - 127 -

1   A.  Well, you keep saying he.  I can't tell you -
2       it's not crossed out.
3   Q.  Whoever has made these changes was writing this
4       fax from Ron Chachere and there's no - even the
5       signature block here has K-Pipe Holding
6       Partners.
7     (Off the record)
8   A.  Which one was this just now, Eleven or Ten?
9   Q.  (Ms. Creswell) This is Eleven.
10    MS. PETERS: Why don't we take a ten minute break
11    real quick?
12    WHEREIN, EXHIBIT NUMBERS TWELVE AND THIRTEEN
13    were marked for identification.
14    MS. CRESWELL: We'll go back on the record and
15    I'll remind Mr. Monaldo that he is still under
16    oath.  We had discussed earlier the form of the
17    guaranty and I think we made reference, or
18    perhaps you made reference, that it may have
19    been in the stock purchase agreement.  And we
20    did find it.  It's located in the project
21    development agreement.  Just for the record,
22    that's where the blank form is.
23    MS. PETERS: And that's Exhibit Four.
24    MS. CRESWELL: Right.
25    MS. PETERS: Bates number 628 and 629.
                          - 128 -

1   Q.  (Ms. Peters) Is that what you were referring to,
2       Mr. Monaldo, when you were speaking of the form
3       that was then used for several different
4       guaranties that we discussed already today?
5   A.  I believe it was this one right here.
6   Q.  Oh.  A different one.  Okay.
7   A.  Exhibit 6.4 B.  I think at this point in time,
8       before we spend more time on it, I think it's
9       6.4 B.
10  Q.  What were you looking at?  I see the guaranty
11      right here.  Oh.  Okay.  So, this guaranty on,
12      looks like 6/28, is - it is different.  Okay.
13      So, it's a guaranty dated 6/22, was the form.
14      Right?
15  A.  I'm saying that that's the form that deals with
16      the change of control.
17  Q.  Right.  Okay.
18    MS. CRESWELL: The next exhibit is the stock
19    purchase agreement.
20    MR. MONALDO: This is number Twelve?
21    MS. CRESWELL: This is number Twelve.  It's the
22    stock purchase agreement dated October the 25th
23    1999.  Bate Stamp number 000232 to 0006, pardon
24    me, 000269.  And I would like to also enter the
25    stock purchase agreement preamble.
                          - 129 -

1   MR. EDGAR: This makes the stock go down on all
2   of us.
3   MS. CRESWELL: They sure do.  We're making
```

Page 55

Tino Monaldo Transcript.txt

4   progress now.  And the stock purchase agreement
5   schedule preamble will be Exhibit Number
6   Thirteen.  Bate stamp 000270 to 000338.
7  Q.   (Ms. Creswell) Mr. Monaldo, can you tell me who
8       was present at the closing?
9  A.   On behalf of Dennis Langley it was Yvette Korb
10      in New York.
11 Q.   And as representatives of K-Pipe Merger
12      Corporation?
13 A.   I believe Cynthia Morelli was there.  And I
14      believe Craig Hoffman was there.  And there were
15      probably several other associate attorneys with
16      documents lined on desks and et cetera.  You
17      know, it's documents you're exchanging,
18      certificates, all that for the closing.  What I
19      remember is Craig Hoffman and Cynthia Morelli.
20  (Off the record)
21  MS. CRESWELL: I do need to confirm, also, that
22  Exhibit Twelve and Thirteen are actually part of
23  the signed agreement of the stock purchase
24  agreement.
25 A.   Well, this number Thirteen is the schedules that
                          - 130 -

1       are referred to in the stock purchase agreement.
2  Q.   That's correct.  I entered these as two separate
3       exhibits, but they're really one document.  Is
4       that correct?
5  A.   Yeah.  I think they're copies of this.
6   MS. CRESWELL: Anything else that you need on
7   this?
8   MS. PETERS: Ummm.
9  Q.   (Ms. Creswell) Did Midcoast, or any
10      representatives of Midcoast, negotiate with the
11      Bishop Group, or K-Pipe Group, or the
12      representatives of the Bishop Group, or K-Pipe
13      Group, about the provisions which became part of
14      the final stock purchase agreement entered into
15      between K-Pipe Merger and Dennis Langley?
16 A.   Boy that was a long question.
17 Q.   I know.
18 A.   Can I look at it?
19 Q.   Sure.
20  MS. PETERS: Explain the question to him, Linda.
21 Q.   (Ms. Creswell) Was Midcoast involved in the - or
22      are there any of their representatives, involved
23      in the negotiation or the provisions involved in
24      these two documents?
25 A.   No.  Those are with Fortrend.
                          - 131 -

1  Q.   One more question about the closing and who was
2       at the closing.  Do you recall if anyone from
3       Price Waterhouse, Gary Wilcox in particular, was
4       there at that closing?
5  A.   I can't say if I remember anybody from Price
6       Waterhouse was there.
7   MR. MONALDO: Is this Fourteen?
8   MS. PETERS: Yes.
9   MS. CRESWELL: Fourteen.  That's correct.  A fax
10  from Ron Chachere to Tino Monaldo with a copy to
11  Jim Pryde and Chris Kaitson dated 10/7/99 into
12  the record as Exhibit Fourteen.  Bate stamps
                        Page 56

Tino Monaldo Transcript.txt
13   number 002679 through 002698.
14   WHEREIN, EXHIBIT NUMBER FOURTEEN was marked for
15   identification.
16  Q.   (Ms. Creswell) I'll give you a minute to look at
17       this, Mr. Monaldo, if you would like?
18  A.   Do you have any questions?
19  Q.   Are you familiar with this document?
20  A.   Not specifically, but it appears to be a fax
21       from Ron Chachere to myself.
22  Q.   Whose handwriting is on the face of this fax
23       where it says regarding stock purchase agreement
24       and schedules guaranty?
25  A.   I don't know for sure.  But since this is a fax
                           - 132 -

1        to me, I assume it's either Ron Chachere or
2        somebody from his office.
3   Q.   If you flip over to the attachment, there's also
4        handwriting there.  Would you have any idea
5        whose handwriting that is?
6   A.   No.
7   Q.   The attachment contains double underlines.  Do
8        you have any idea who did the double underlines?
9   A.   No.  It would be our side or Ron Chachere.  I
10       don't know for sure who did it.
11  Q.   Did you participate in the drafting of this
12       document?
13  A.   As I said, I was involved in negotiations with
14       Midcoast, so I'm sure I would have been involved
15       in changes that were being discussed.
16  Q.   Page twenty-two, if you'll flip to that, makes
17       reference down towards the bottom of the page in
18       paragraph 8.14 to KPC or KPC Pipeline assets and
19       then in parens it says new party.  What was
20       meant by that?
21  A.   Where are you reading from?
22  Q.   Look right here where I've highlighted it.  It's
23       about half way down.
24  A.   Okay.  What's your question?
25  Q.   It makes reference to new party.  What's meant
                           - 133 -

1        by that?
2   A.   Well, it appears that new party is just an
3        acronym.  If you go back, it's defining, it's a
4        defined term for a concept and the concept is,
5        whoever, if there is a change in control in the
6        future, the party that's coming in, that's
7        taking control, is referred to as quote "new
8        party" rather than have to restate every time
9        you're talking about the party that was changing
10       control and going through this fifty percent
11       definition just, that's just an acronym for a
12       defined term, which defined term for us all.
13  MR. MONALDO: Could we break at 3:00 o'clock just
14       so I can make a phone call?
15  MS. CRESWELL: Sure.  Just remind us if we-
16  MR. MONALDO: I'm asking you to remind me.
17  MS. CRESWELL: We'll enter an e-mail from James
18       Pryde to Ron Chachere, Chris Kaitson, Yvette
19       Korb and Tino Monaldo dated 10/8/99 into the
20       record as Exhibit Fifteen.
21  WHEREIN, EXHIBIT NUMBER FIFTEEN was marked for
                           Page 57

Tino Monaldo Transcript.txt

22   identification.
23 A.   Okay.
24 Q.   (Ms. Creswell) Are you familiar with this
25       document, Mr. Monaldo?

                       - 134 -

1 A.   I don't independently recall it, but it says it
2       was an e-mail to me.
3 Q.   This exhibit refers to, or Exhibit Fifteen,
4       refers to Dennis.  Is that Dennis Langley?
5 A.   What line?
6 Q.   Line one.  Well, I shouldn't say it's line one.
7       It's number one.
8 A.   Well, I'm assuming that's referring to Dennis
9       Langley.
10 Q.   And number three, on that first line, makes
11      reference to PDA.  Does that mean project
12      development agreement?
13 A.   I believe so.
14 Q.   And then the next line down makes reference to
15      CRIA.  What does that acronym stand for?
16 A.   You know, I don't recall at this point.  I
17      believe it's contingent revenue interest
18      agreement that sharing arrangement we talked
19      about.
20   MS. CRESWELL: We will enter a guaranty from
21   Fortrend International to Dennis Langley dated
22   10/25/99 into the record as Exhibit Sixteen.
23   WHEREIN, EXHIBIT NUMBER SIXTEEN was marked for
24   identification.
25 A.   Okay.

                       - 135 -

1 Q.   (Ms. Creswell) Are you familiar with this
2       agreement, Mr. Monaldo?
3 A.   It appears to be the guaranty that Fortrend
4       signed when we executed the stock purchase
5       agreement.
6 Q.   Is this an agreement that you would have drafted
7       or negotiated?
8 A.   I would have been involved in this document,
9       yes.
10 Q.   Why was a guaranty from Fortrend sought?
11 A.   Well, I just - pretty straight forward.  We had
12      told you that we had been - Chase had confirmed
13      to us that Fortrend was capable of doing a
14      transaction this size.  They apparently had
15      formed some sort of new company, K-Pipe Merger
16      Corporation.  And going into this deal, we
17      wanted the company that, you know, was the meat
18      and potatoes to be backing up the stock purchase
19      agreement.  So, we could look to Fortrend, not
20      the new corp - it would appear to be a new
21      corporation they were setting up for this
22      transaction.  Which is not uncommon to set up a
23      subsidiary to do a new transaction.
24 Q.   So, who would have requested this agreement?
25      Would it have been Mr. Langley?
                       - 136 -

1 A.   Of course it would have been our side that would
2       have wanted that kind of guaranty protection.
3   MS. CRESWELL: Anything else?
                     Page 58

Tino Monaldo Transcript.txt

```
 4   MS. PETERS: No.
 5   MR. MONALDO: Seventeen?
 6   MS. CRESWELL: Yes, sir.  We'll enter the
 7   guaranty KPC from Kansas Pipeline Company to
 8   Dennis Langley regarding the stock purchase
 9   agreement, section's 8.10, 8.11 and 5.4 into the
10   record as Exhibit Seventeen.
11   WHEREIN, EXHIBIT NUMBER SEVENTEEN was marked for
12   identification.
13 Q.   (Ms. Creswell) Are you familiar with this
14   document, Mr. Monaldo?
15 A.   I think it was one of the documents that was
16   executed on or about the 24th or 25th of October.
17   So, yes.  I'm familiar with that.
18 Q.   And did you participate in its negotiation or
19   drafting?
20 A.   I would have been involved, yes.
21 Q.   Why would this guaranty have been needed since
22   you had the guaranty from Fortrend that was our
23   last Exhibit Number Sixteen?  Why did you feel
24   like you needed this extra...
25 A.   Well, on the legal parlance it's called belt and
                         - 137 -

 1   suspenders.  You get a guaranty from everybody
 2   you can get a guaranty from, parent,
 3   subsidiaries.  In this case, KPC was a
 4   subsidiary of Bishop Group, so we have Fortrend,
 5   K-Pipe Merger and then the underlying entities
 6   as just belts and suspenders.
 7 Q.   (Ms. Peters) I just have a question.  This
 8   guaranty the blank form appears to be attached
 9   to the project development agreement as in
10   Exhibit Four?
11 A.   What page is that?
12 Q.   Page ten, bates stamp 628 to 630.
13 A.   I'm looking at 628.  And your question is?
14 Q.   My question is, is this the same form that was
15   just later the names were put in to pertain to
16   the - what's that, K-Pipe Merger Corporation?
17   Does that look correct?
18 A.   I haven't gone through it word by word, but it
19   looks like that form, which is attached to the
20   project development agreement, is in fact what
21   Kansas Pipeline - the project development
22   agreement says Kansas Pipeline assigned this
23   guaranty.  That's the form, as an exhibit.  And
24   then the actual document-
25 Q.   Oh.  Okay.
                         - 138 -

 1 A.   It's kind of like selling real estate.
 2 Q.   Right.
 3 A.   Parties will sign the attached real estate deed.
 4   This is the actual deed.  This is the actual
 5   guaranty.
 6 Q.   So, part of the agreement of the project
 7   development agreement was that Kansas Pipeline
 8   Company would guaranty part of the stock
 9   purchase agreement.  Does that sound like a fair
10   summary?
11 A.   Correct.  Back to the belt and suspenders
12   approach.
```

Tino Monaldo Transcript.txt

```
13 Q.   (Ms. Creswell) We're still looking at Exhibit
14       Seventeen.
15 A.    Okay.
16 Q.    Is there a reason why this guaranty was entered
17       into on November the 2nd and the stock purchase
18       agreement in the other guaranty, which was
19       Exhibit Sixteen, were signed on 10/25?
20 A.    What other guaranty are you referring to?
21 Q.    The Fortrend.
22 A.    I don't know.  This is basically, at this point
23       in time until we've closed with Fortrend, is an
24       internal document, so I guess it just was a
25       schedule that didn't get signed until later, but
                          - 139 -

1        it was the same form.
2  MR. MONALDO:  This one mine?
3  MS. CRESWELL:  This one is mine, with the yellow
4  sticky.  Anything else you need Yvonne?
5  MS. PETERS:  No.
6  MS. CRESWELL:  We'll enter a fax from Ron
7  Chachere to Jim Pryde with copies to Tino
8  Monaldo, Dennis Langley, Chris Kaitson, Richard
9  Robert and Chip Berthelot dated 10/14/99 into
10 the record as Exhibit Eighteen.  Bate stamps
11 number 002470 through 002472.
12 WHEREIN, EXHIBIT NUMBER EIGHTEEN was marked for
13 identification.
14 A.    Number Eighteen?
15 Q.    (Ms. Creswell) Yes, sir.  Are you familiar with
16       this document, Mr. Monaldo?
17 A.    Not independently, but I'm sure - it says I
18       probably received a copy of it at the time.
19 Q.    Is this a document that you would have assisted
20       with drafting?
21 A.    Well, probably not.  It appears to be a problem
22       that Mr. Chachere has with the position we have
23       taken in the negotiation of the stock purchase
24       agreement with Midcoast.
25 Q.    (Ms. Peters) Look on the last page.  It
                          - 140 -

1        references a tax sharing agreement.  It says
2        Richard Robert is having the tax sharing
3        agreement reviewed by Midcoast's tax advisors.
4        What kind of tax sharing agreement were you
5        contemplating with Midcoast?
6  A.    I don't recall specifically, but since the stock
7        of Bishop Group was being sold, the parties
8        signing the tax return for Bishop Group for 1999
9        would be different under a different ownership.
10       So, typically in a stock sale you have a tax
11       sharing agreement to make sure the party who is
12       filing the return is obligated for liabilities
13       accrued after closing and the party who owned
14       the company, Dennis Langley, before closing has
15       paid all the withholding taxes.  Does that make
16       any sense?
17 Q.    (Ms. Peters) Uh-huh.
18 Q.    (Ms. Creswell) Uh-huh.
19 A.    Bishop Group got tax withholding liabilities, so
20       the tax sharing is just to set forth that even
21       though somebody's buying the stock, we better
```

Page 60

Tino Monaldo Transcript.txt
```
22      have paid all the taxes due up to that date.
23  Q.  (Ms. Peters) And was the tax sharing agreement
24      as part of the stock purchase agreement that was
25      entered into between Langley and Fortrend or K-
                        - 141 -

1       Pipe Merger?
2   A.  I believe there was.
3   Q.  (Ms. Creswell) If you'll look back at Exhibit
4       Thirteen and that's bate stamp 320.
5   A.  Okay.
6   Q.  That's referencing the tax sharing agreement
7       there.
8   A.  Right.
9   Q.  (Ms. Peters) Did you have a standard tax sharing
10      agreement language that you were contemplating
11      with both K-Pipe Merger and Midcoast or did you
12      have a different language that you were
13      contemplating with those two parties?
14  A.  I can't tell you that there was a specific one
15      that was negotiated with Midcoast.  All I can
16      tell you is typically when you have a stock sell
17      agreement you're going to have a stock - or tax
18      sharing agreement, because somebody's got to -
19      the parties have to agree in writing who's
20      paying for all the taxes that are due by the
21      corporation prior to closing.  Who's paying the
22      taxes, withholding taxes, income taxes, et
23      cetera, after the closing.  And my understanding
24      is under this tax sharing agreement, Dennis was
25      on the hook for taxes that would have accrued
                        - 142 -

1       prior to the closing and thereafter.  So, to
2       answer your question typically tax sharing
3       agreements are fairly straightforward.
4   Q.  (Ms. Creswell) But then on the hook after, them
5       being whom?
6   A.  Fortrend.
7   Q.  Fortrend.  Then why would Midcoast here - Am I
8       missing something?
9   Q.  (Ms. Peters) Would this have been the same
10      agreement?
11  A.  You keep using the word same agreement.  We were
12      negotiating a stock purchase agreement that
13      would have had features in it with Midcoast that
14      would have features in it with Fortrend.
15      Anybody would have closed in a minute.
16  Q.  I'm wondering what the difference was between
17      the features that you were contemplating with
18      Midcoast for a stock purchase agreement that you
19      tell me you're contemplating with them at the
20      same time that you're contemplating a stock
21      purchase agreement with Fortrend?
22  A.  The document you just gave me is a good example.
23      I mean, Midcoast is asking for something that
24      was unacceptable to us.  And this Exhibit Number
25      Eighteen, they're saying that if we were to do a
                        - 143 -

1       deal with Midcoast, they would have to arrange
2       and inter-creditor agreement between what
3       appears to be their bank and our banks.  And
```
Page 61

Tino Monaldo Transcript.txt

4    that it appears that he's saying to Jim Pryde,
5    you're not making any of our changes and - no.
6    Apparently Jim Pryde has informed them that
7    we're not making these changes and one of those
8    changes is their request for an inter credit
9    agreement.  That was not favorable to us.  We
10   didn't want to give that as a condition to
11   closing, so that appears to be a different term
12   on the stock purchase agreement.
13 Q.  At this point of 10/14/99?
14 A.  Correct.  As I told you, we were negotiating
15   with both parties.  One point that was being
16   negotiated was their request that they have the
17   right to not do a deal with us if the banks
18   didn't agree.  And that was not acceptable to
19   us.  Which is actually a fairly major point.
20   (Off the record)
21   MR. MONALDO: Okay.  What number is this?
22   MS. CRESWELL: Okay.  This is Exhibit Number
23   Nineteen.  This is an e-mail from James Pryde to
24   Ron Chachere, Chip Berthelot, Chris Kaitson,
25   Craig Hoffman, Cynthia Morelli, Tino Monaldo and
- 144 -

1    Yvette Korb dated 11/2/99.  This will be Exhibit
2    Number Nineteen.  Bate stamp 002443 to 002456.
3    And the subject of the cover letter here is the
4    changes to the stock redemption agreement per R.
5    Chachere.
6    WHEREIN, EXHIBIT NUMBER NINETEEN was marked for
7    identification.
8 Q.  (Ms. Creswell) Are you familiar with this
9    document, Mr. Monaldo?
10 A.  Yes.  I'm familiar with the stock redemption
11   agreement those - that's to Bishop Group and
12   Dennis Langley.
13 Q.  (Ms. Peters) I'm sorry?
14 A.  Stock redemption agreement's between Bishop
15   Group and Dennis Langley?
16 Q.  Oh.  I got it.
17 Q.  (Ms. Creswell) Did you assist with the
18   negotiation of this agreement?
19 A.  Actually, it was an internal document to the
20   need for the stock redemption agreement was
21   Bishop Group was being sold to Fortrend.  The
22   stock of Bishop Group was being sold to
23   Fortrend, but there were certain assets inside
24   of Bishop Group, which were not going with the
25   sale.  Like an office building in Hutchinson,
- 145 -

1    some vehicles, possibly - there's probably a
2    list in your documents some computers, some
3    office furniture, maybe some vacant land and
4    those were being pulled out, or distributed to
5    Dennis via the stock redemption agreement.  That
6    was the vehicle to remove that from the stock
7    sale.
8 Q.  (Ms. Peters) Were those kind of contracts
9    changes in stock redemption agreement per R.
10   Chachere and his representing Midcoast.  And I
11   don't really understand why Mr. Chachere is
12   making changes to what you have termed as an

Page 62

Tino Monaldo Transcript.txt

13      internal document?
14 A.   Well, if you look at the date, it's November 2,
15      1999.  So, it's after we've been made aware that
16      there's potentially going to be a change of
17      control of Kansas Pipeline.  And I assume since,
18      just like they're wanting some changes to the
19      assumption agreement and whatever-
20 Q.   Could change of controller of Kansas Pipeline
21      meaning, meaning what?
22 A.   The contract -
23 Q.   I'm sorry.  I'm sorry.
24 A.   Your question was, why would Mr. Chachere be
25      commenting on the stock redemption agreement?
                        - 146 -

1  Q.   Yes.
2  A.   And I'm saying similar, since this is after
3       October 28th and they're being asked to assume
4       and/or guaranty the Kansas Pipeline obligations,
5       to guaranty the Kansas Pipeline guaranty.  And
6       just like they suggested changes to one other
7       document, I can't remember, apparently to
8       satisfy themselves, they're making a suggested
9       change to the document that's pulling out, or
10      dividending up or distributing to Dennis in some
11      fashion, property out of Bishop Group.
12 Q.   So, items of this stock redemption agreement is
13      part of the stock purchase agreement and which
14      is made up of Exhibit Twelve and Thirteen.  And
15      that it's on the bate's number page 332.
16 A.   What, page thirteen or Exhibit Thirteen?
17 Q.   (Ms. Creswell) Right.
18 Q.   (Ms. Peters) Yeah.  Of Exhibit Thirteen.
19 A.   Okay.  What bate stamp number?
20 Q.   Find 332.  And this was the stock purchase
21      agreement that we were provided that we were
22      told and entered into on October 26, 1999.  And
23      these changes are dated 11/2/99 here.  And I
24      guess I'm a bit confused here, too, because this
25      number three representations, 3A, the changes by
                        - 147 -

1       Mr. Chachere on A, he seems to draw a line
2       through, it says representations of company,
3       company is incorporated into duly organized,
4       validly existing and in good standing under the
5       laws of the State of Kansas.  Company has the
6       power to execute and deliver this agreement and
7       to carry out the transactions hereunder
8       contemplated.  Then there's a whole couple other
9       sentences here from Mr. Chachere has drawn a
10      line through, which gives me the impression that
11      the previous document it contained that
12      information and he's suggesting that it be
13      eliminated.  And then when I look at Exhibit
14      Thirteen, the stock purchase agreement, bates
15      number 332, 3A, I see representations of
16      company, company is a corporation duly
17      organized, validly existing and in good standing
18      under the laws of the State of Kansas.  Company
19      has the power to execute and deliver this
20      agreement and carry out the transactions here
21      under contemplated.  And there are additional
                        Page 63

Tino Monaldo Transcript.txt

```
22      items in paragraph A.  Can you see that, what
23      I'm talking about?
24 A.   I think so.
25 Q.   So, my question is, if this is the agreement
                        - 148 -

 1      that Mr. Langley executed on the 25th and this
 2      is the agreement as changed - I guess my
 3      question is why are these two items the same?
 4      One is dated 11/2, please make these changes,
 5      eliminate these two sentences in section 3A, but
 6      what I understood Mr. Langley signed on the 25th
 7      was an agreement that never had those sentences
 8      in the first place.  So, why would Mr. Chachere
 9      be requesting those sentences being removed?
10 A.   Similar to what I said before.  Midcoast, they
11      were being told that there's a possible change
12      of control provisions.  So, he, on behalf of
13      Midcoast, I guess, they're making suggestions to
14      changes they would like to see made and that
15      particular change is of little significance, so
16      I'm assuming it was made and just inserted and
17      restated.  As I talked to you about before the
18      other document were some, what I considered,
19      inconsequential changes were made and it appears
20      there were changes made to this agreement,
21      modifications to it, but it was still the same
22      agreement between Bishop Group and Dennis
23      Langley.
24 Q.   So, then this paragraph number one here on
25      Exhibit Nineteen is a sale stock, share holder
                        - 149 -

 1      or, I'm sorry, stock holder shall assign sale
 2      and transfer to company and then with a red line
 3      through it, it says 13,583.2625 and that was
 4      replaced was 13,005.2625 shares of common stock
 5      of the company the shares.  And then I look over
 6      here at this agreement in Exhibit Thirteen and I
 7      see number one, it says 13,005.2625 shares.  Are
 8      you telling me that that was just a
 9      typographical change that they were making a
10      minor correction, so they just did after the
11      fact?
12 A.   Well, whether they did it or we did it, but
13      obviously prior to closing we had to correct the
14      - correctly state the right amount of shares
15      that had been redeemed.
16 Q.   And you're telling me the interest that Midcoast
17      had in its stock redemption agreement was
18      because they signed, or they took over the - I'm
19      sorry, that they signed that guaranty for the
20      project development agreement, that's where
21      their interest in this agreement stems from?
22 A.   I can't speak what their interest was other than
23      the fact that they requested from us.  So what I
24      consider inconsequential changes to this
25      particular agreement and those changes were
                        - 150 -

 1      made.  I mean-
 2 Q.   So, when Midcoast-
 3 A.   I mean, the change is inconsequential.  This
                        Page 64
```

Tino Monaldo Transcript.txt

4      particular change.
5  Q.   So, when Midcoast sends the guaranty for the
6      project development agreement, my understanding
7      was that you said that by becoming a party to
8      that agreement, essentially, that they wanted to
9      make some changes to that agreement and that
10     that was why you were willing to take comments
11     from them for that agreement?  I guess my
12     question is, for that agreement, for the project
13     development agreement, I can see that Midcoast
14     had some direct interest in that agreement, but
15     what is the relationship between this agreement,
16     the stock redemption agreement, and Midcoast's
17     interest in the stock redemption agreement, but
18     you are willing to take changes that they
19     suggest?
20 A.   As I said, I don't know what documentation they
21     had with Fortrend at the time.  I don't know
22     what the legal significance of his deal with
23     Fortrend meant, but this was not a big change.
24 Q.   But your agreement here, the stock purchase
25     agreement, was only between Mr. Langley and K-
                        - 151 -

1      Pipe.  Correct?
2  A.   Right.
3  Q.   And yet Midcoast is suggesting changes, which
4      appear in this agreement.  Why is Midcoast
5      making changes, any change, whether it is
6      typographical or not, why is Midcoast suggesting
7      those changes?
8  A.   And I'm saying, I don't know what, why they were
9      making that request, but it wasn't that big a
10     deal.  We were a few days away from closing with
11     Fortrend-
12 Q.   So, you don't know why Midcoast was making those
13     requests.  Is that what you're telling me?
14 A.   I'm telling you I could not speculate as to why,
15     because I haven't seen their documentation as to
16     what their deal was.
17 Q.   But why would you, as representing Mr. Langley,
18     make the changes that Midcoast is suggesting?
19 A.   We had an obligation to close - this is getting
20     to a broader issue and one of the points I think
21     is being missed is we had an obligation, Dennis
22     Langley, had an obligation to close with
23     Fortrend.  And in every contract there is a
24     concept called, you know, acting in good faith.
25     Every contract comes with the obligation to act
                        - 152 -

1      in good faith.  If we didn't close with
2      Fortrend, we could be held in breach.  You know,
3      we certainly can't control what Fortrend did
4      with Midcoast, but we had an obligation to close
5      with Fortrend.  And there's nothing that
6      prevents, in our agreement, that prevents them
7      from having a change of control event.  So, you
8      know, we're not going to be bullheaded and say
9      you can't close an agreement with us, because
10     we're going to object to a minor change.  You
11     know-
12 Q.   But it wasn't Fortrend suggesting this change,
                      Page 65

                            Tino Monaldo Transcript.txt
13         it was Midcoast.  Right?
14  A.     Well, I perceived it to be both of them wanting
15         a change, so both of them wanting a change.
16  Q.     Both of them.  This is changes in stock
17         redemption agreement per R. Chachere.  Did he
18         also act on behalf of Fortrend?
19  A.     No.  You missed-
20  Q.     I don't understand why-
21  A.     Let me finish my answer, please?  I'm telling
22         you my perception is that both parties wanted
23         this change.  You know-
24  Q.     That both parties - I'm sorry.
25  A.     Okay.  I'm sorry.  I've got to quit thinking
                            - 153 -

1          about my 3:00 o'clock phone call and just answer
2          the question.
3   MS. PETERS: Do you want a break?
4   MR. MONALDO: No.  I don't.  I don't want a
5   break.  I want to get through this.
6   A.     October 28th comes around, we're made aware that
7          there could be a change in control provision.
8          Okay?  My client has signed an agreement and
9          says he's going to sell his stock for a certain
10         price.  It's not as if he has this great option
11         just to back out.  You know, a company can buy
12         or sell their stock or assets, or whatever they
13         do, at anytime they choose.  We had built in a
14         provision that said if you're going to do that,
15         you have to, you know, sign this guaranty grant.
16         Fortrend was able to get Midcoast to sign the
17         guaranty agreement, so we're obligated to close.
18         Okay?  So, despite whether it's a minor change
19         or not a minor change, to not, in my opinion, to
20         not make a minor change, which has no impact on
21         us whatsoever, would have been acting in bad
22         faith.  So, I would have recommended to go ahead
23         and make the change, so Fortrend, so we're not
24         stopping Fortrend from meeting its obligations.
25  MR. EDGAR: Could I offer one other note?
                            - 154 -

1   MS. PETERS: Sure.
2   MR. EDGAR: If the stock redemption was also part
3   of the stock purchase agreement.
4   MS. PETERS: Yes.
5   MR. EDGAR: You know.  Okay.
6   MS. PETERS: Okay.  Correct.
7   MR. EDGAR: So-
8   A.     And part of the - my recollection is part of the
9          guaranty of Kansas Pipeline was to assume stock
10         purchase obligations.  And part of Fortrend's
11         guaranty was to assume obligations of the stock
12         purchase.  So, you know, I guess we could
13         speculate that's perhaps why they're interested
14         in having input on that document.  But it is a
15         minor change.  It's, you know, the language that
16         was deleted says Bishop Group warrants title to
17         Dennis Langley.  Well, I guess their position
18         would have been, well, Dennis ought to know
19         whether he has title to those vehicles or not.
20         So, they asked to have that warranty language
21         taken out.
                            Page 66

Tino Monaldo Transcript.txt
22  MS. CRESWELL: Do you want to go make your phone
23  call?
24  MR. MONALDO: No.  We can keep going.
25  MS. PETERS: You don't want to do that now?
                          - 155 -

1   MR. MONALDO: You can go a few more minutes if
2   you've got a couple more - I see the stack
3   growing smaller.
4   MS. CRESWELL: I don't want to take
5   responsibility for you to missing that phone
6   call.
7   MR. MONALDO: This was what, Thirteen?  No.  This
8   was Eighteen.
9   MS. PETERS: It's nineteen.
10  MS. CRESWELL: It was nineteen.  Yeah.  That's
11  right.  This will be Exhibit Twenty.  This is an
12  undated letter from K-Pipe Merger Corporation to
13  Dennis Langley entered into the record as
14  Exhibit Twenty.  Bate stamps number 000447 to
15  000449.
16  WHEREIN, EXHIBIT NUMBER TWENTY was marked for
17  identification.
18  Q.   (Ms. Creswell) Are you familiar with this one,
19       Mr. Monaldo?
20  A.   Yes.  I am.
21  Q.   Did you draft this agreement?
22  A.   I was involved, yes.
23  Q.   Do you know who else was involved in drafting
24       this agreement?
25  A.   I'm assuming Jim Pryde would have been the
                          - 156 -

1        scrivener, but I'm sure I would have negotiated
2        this.
3   Q.   The first paragraph of the first page of Exhibit
4        Twenty reads this letter is being executed and
5        delivered contemporaneously with the execution
6        of the purchase agreement and as an amendment
7        thereto.  Do you know why this phrase was added?
8   A.   I'm assuming that that line just says this
9        extension of time modifies the original closing
10       date of the purchase agreement.  It's saying a
11       letter agreement is an amendment to the purchase
12       agreement.
13  Q.   So, even though this letter is undated, it does,
14       it is issued contemporaneously with the purchase
15       agreement, which would have been October the
16       25th.  Is that correct?
17  A.   No.  I recall this agreement being signed
18       November 4th or November 5th.  Because I recall
19       that we closed within a few days after a weekend
20       and Monday was the 8th, so I believe this would
21       - presume this was executed pretty close to
22       November 5th, 4th or 5th.  It was an amendment to
23       the October 25th stock purchase agreement.
24  Q.   (Ms. Peters) So, what does it mean then, when it
25       says this letter agreement is being executed and
                          - 157 -

1        delivered contemporaneously with the purchase
2        agreement?
3   A.   Being signed about this - contemporaneous means
                      Page 67

Tino Monaldo Transcript.txt

4       about the same time and it's an amendment to
5       that agreement.  November 4th or 5th is
6       contemporaneous with-
7  Q.   With October 25th?
8  A.   I guess I don't read it the way you're reading
9       it.  I mean, it doesn't say simultaneously.
10 Q.   I'm just asking.  So, your view is that October
11      5th is contemporaneous with November - I'm
12      sorry, did you say 4th or 5th?
13 A.   4th or 5th.
14 Q.   Is that what you're saying?
15 A.   I'm saying that the stock purchase agreement was
16      signed October 25th and this amendment, I
17      believe, was signed the 4th or 5th of November.
18 Q.   Are you also saying that in your view it's
19      contemporaneous, those two dates?  October 25th
20      and that November 4th or 5th?
21 A.   Yes.
22 Q.   (Ms. Creswell) Paragraph one, there on that
23      first page, reads K-Pipe in its sole option can
24      cause the closing to be extended no later than
25      November the 8th, 1999 upon notice to Langley.
                    - 158 -

1       Then it goes on to spell out that if it is after
2       November, if it's delayed beyond November the
3       8th, that there is a penalty in there at twenty-
4       one thousand five hundred dollars for each day
5       that the close is delayed beyond November the
6       8th.  And then on down in the paragraph if the
7       close under the purchase agreement does not
8       occur on or prior to November the 15th, other
9       than failure by Langley to make the deliveries
10      then K-Pipe will pay to Langley, fifteen million
11      on November the 16th as Langley's remedy.  Why
12      were those provisions added?  Or that - well,
13      those provisions in paragraph one?
14 A.   Well, K-Pipe was requesting an extension beyond
15      that original November 5th date and we gave them
16      that extension.  But as a condition to that,
17      there was consideration the other way.  They
18      would have to pay a sizeable dollar amount per
19      day for each day beyond November 8th.  And if
20      they didn't close, they were basically agreeing
21      to fifteen million dollars of liquidated
22      damages.  So, I think they paid it with due
23      consideration for that extension.
24 Q.   Then paragraph two on that same page states that
25      K-Pipe represents and warrants to Langley-
                    - 159 -

1  A.   I'm sorry.
2  Q.   The first page, paragraph two, K-Pipe represents
3       and warrants to Langley that K-Pipe has no plan
4       or intention to liquidate the company and agrees
5       it will not liquidate the company for at least
6       two years after the closing date.  Why was that
7       paragraph added?
8  A.   I think that paragraph adds additional
9       protection to Dennis, but I can't sit here and
10      cite chapter and verse of tax code why it might
11      grant him protection.
12 Q.   At this point, if I'm remembering the dates
                    Page 68

Tino Monaldo Transcript.txt
```
13       correctly, and I may not be, but at this point
14       you did know that there was a deal to sell to
15       Midcoast?  That Fortrend did have something
16       going on with Midcoast?
17  A.   What I knew at the time was there was a
18       potential change of control provision, but I
19       didn't know what the nature of it was.
20  Q.   What would have been your definition of that
21       liquidate?
22  A.   You know, I'd have to go back and, you know, it
23       may have been tax advice I got from somebody,
24       but my belief is that would have been a
25       subsequent event that we would not have wanted
                          - 160 -

1        to take place.  So, that's why we would have
2        asked for a warrant that they would not
3        liquidate.
4   Q.   Was there any remedy that you could have taken,
5        or that Mr. Langley could have taken, if that
6        did occur?
7   A.   Well, it would have been a breach of that
8        agreement.  And if there were damages incurred,
9        I assume we could have, we can pursue that.
10  Q.   (Ms. Peters) I'm sorry. A breach of which
11       agreement?  This agreement or?
12  A.   If the liquidation occurred and they would have
13       violated their warranty, in which case-
14  Q.   The warranty in the stock purchase agreement?
15  A.   Well, no.
16  Q.   For the warranty-
17  A.   Let me finish my - what I'm trying to say here
18       is, that if they breached this warranty and this
19       extension agreement and they would appear to be
20       liable for whatever damages were incurred for
21       liquidating prior to the two years.
22  Q.   Without this, that provision in this document
23       was defining that there wouldn't be a remedy if
24       it was liquidated?
25  A.   That I can't answer your question on that.
                          - 161 -

1   Q.   Why was there a concern about K-Pipe selling
2        their assets or liquidating the company?  Why
3        did it matter to Mr. Langley?
4   A.   As I said, I'm assuming that we got tax advice
5        that told us that we would not want somebody
6        liquidating Bishop Group.  So, that's a
7        provision we would have asked for.  But I said I
8        can't cite you chapter and verse of a code
9        provision that-
10  Q.   So, let me just restate that to so I'll
11       understand what you're saying.  That this
12       provision was added, because there were concerns
13       that if the company was liquidated within two
14       years by K-Pipe Merger, there might be some sort
15       of tax implications to Mr. Langley?
16  A.   All I can tell you is, we apparently wanted some
17       protection from a liquidation.  I would have to
18       go back, to be honest with you, and research
19       what that protection was.
20  Q.   So, you're not sure what, why you or Mr. Langley
21       were concerned about the liquidation within two
```
Page 69

Tino Monaldo Transcript.txt

22       years?
23  A.   I'll stand on my earlier answer.  Obviously we
24       wanted it, because we asked for it and obviously
25       it may have had some implications to us, but I
                          - 162 -

1        can't sit here and tell you I remember whatever
2        research I would have done at the time, but
3        specifically wanted that language in there.
4   Q.   (Ms. Creswell) Who at this particular time was
5        providing tax advice to Mr. Langley?
6   A.   It would have been prior tax advice given to me
7        and it could have been Brian Cave, it could have
8        been Laura(ph) King.
9   MS. PETERS: Did you want to do your phone call
10      now?
11  MS. CRESWELL: Yeah.  You're worrying me.  So, go
12      do your phone call.
13  MR. MONALDO: How many more documents do we have?
14  MS. CRESWELL: There aren't very many.
15  (Off the record)
16  MS. CRESWELL: Okay.  Are we ready?  I would like
17      to remind you, Mr. Monaldo, that you still are
18      under oath.  This is Exhibit Twenty-one and it
19      is a fax from Chris Kaitson with Midcoast Energy
20      Resources to Jim Pryde with Brian Cave.  It's
21      dated November th 4th and is entered into the
22      record as Exhibit Twenty-one.  Bate stamps
23      number 002485 through 002487.  The topic of this
24      Exhibit is a partially executed side letter from
25      K-Pipe Merger Corporation to Midcoast.
                          - 163 -

1        WHEREIN, EXHIBIT NUMBER TWENTY-ONE was marked
2        for identification.
3   Q.   (Ms. Creswell) Are you familiar with this
4        document, Mr. Monaldo?
5   A.   No.  I don't think so.  I don't independently
6        recall this, but if it went to Jim Pryde then,
7        I'll assume he received it.
8   Q.   I'm just curious as to why a document that is
9        from K-Pipe Merger to Midcoast is being sent to
10       Jim Pryde who represents the Bishop Group and
11       Dennis Langley and is referencing an asset
12       purchase agreement?
13  A.   I don't know, other than they had already told
14       us there's a potential transaction between the
15       two parties.  Between Midcoast and Fortrend.
16  Q.   This document does reference an asset purchase
17       agreement and it states that Midcoast at its
18       sole option can cause the closing to be extended
19       to no later than November the 15th by written
20       notice, but as a condition of such extension,
21       Midcoast will pay to K-Pipe twenty-one thousand
22       five hundred dollars for each day the close is
23       delayed beyond November the 9th.  And then it
24       goes on to say, toward the bottom part of that
25       paragraph, that Midcoast will pay to K-Pipe
                          - 164 -

1        fourteen million on November the 16th if it does
2        not, if the closing does not occur prior to
3        November the 15th.  And this again is in regard
                          Page 70

Tino Monaldo Transcript.txt

```
 4        to an asset purchase agreement between Midcoast
 5        and K-Pipe Merger Corporation.  If we could
 6        compare this particular exhibit, which is
 7        Exhibit Twenty-one, to the exhibit that we just
 8        looked at, which is Exhibit Twenty, the wording
 9        is quite similar.  Exhibit Twenty-one is
10        referencing an asset purchase agreement.
11        Exhibit Twenty is referencing a stock purchase
12        agreement.  The parties are different.  Exhibit
13        Twenty is Dennis Langley and K-Pipe Merger
14        Corporation.  Exhibit Twenty-one is K-Pipe
15        Merger Corporation and Midcoast.  The numbers as
16        far as the penalties that the party would pay is
17        the same, twenty-one thousand five hundred.  The
18        larger penalty for not closing is a million
19        dollars different, it's fifteen million on
20        Exhibit Twenty and it's fourteen million on
21        Exhibit Twenty-one.  However, the similarities,
22        I think, are evident.  Do you agree, Mr.
23        Monaldo, that the documents have some
24        similarities?
25  A.    Well, it appears, at this time it appears that
                          - 165 -

 1        K-Pipe had some sort of transaction with
 2        Midcoast and they extended the closing date and
 3        have applied some penalties.
 4  Q.    Would there be a reason why the numbers would be
 5        - well, between one thousand five hundred, would
 6        be the same there, as far as the penalty?
 7  A.    If you're asking me about their document, you
 8        would have to ask them.  I can't speak to why
 9        they did that.
10  Q.    (Ms. Peters) Well, why does your document,
11        Exhibit Twenty, say twenty-one thousand five
12        hundred for each day the close is delayed?  Why
13        was that number picked?
14  A.    Why was that number picked?  Because I think
15        that's approximates that - I believe they're
16        already paying the interest believed by virtue
17        of the underlying agreement Fortrend was paying
18        a purchase price that was adjusted at closing to
19        pay additional interest on our senior secured
20        note.  So, hypothetically, because November 5th
21        there's less interest to be paid if you close on
22        November 8th.  I believe the twenty-one thousand
23        five hundred dollars approximates that, so as a
24        condition to our extension to Fortrend, we
25        basically were asking for twice the interest we
                          - 166 -

 1        were-
 2  Q.    (Ms. Peters) You were expecting to get the
 3        money-
 4  A.    Let me finish my-
 5  Q.    Oh.  I'm sorry.  I thought you were finished.
 6  A.    That twenty-five, you asked how did I get to the
 7        twenty-one thousand five hundred.  I believe
 8        that approximates, in our deal with Fortrend,
 9        what approximately what the interest was on our
10        senior secured note.  So, as a consideration for
11        them getting an extension, they're paying us not
12        only the interest, but paying that penalty on
```
Page 71

Tino Monaldo Transcript.txt
```
13        top of that if they didn't close before November
14        8th.  That's how I would have arrived at that
15        number.
16   Q.   What was your senior secured note? I'm not clear
17        what you're referencing there.
18   A.   The Kansas Pipeline had a debt obligation.  And
19        the proceeds from the sale were to pay that off,
20        so if the closing date on your house changes,
21        there's more interest to pay at closing and if
22        we're extending it, we don't want to pay that
23        extra interest.
24   Q.   And the fifteen million, why was that number
25        chosen?
```
                          - 167 -

```
1    A.   Why fourteen was chose?
2    Q.   Yeah.  Why fifteen?  Your document says fifteen.
3    A.   Simply, obviously liquidated damages and the
4         penalty, the higher it is the better for us.
5         So, it appears to be the highest number we could
6         negotiate.  If they would have said twenty, I
7         would have - twenty.  I mean, inn essence,
8         that's the walk-away fee.  If they weren't going
9         to do it, we walk away with fifteen million
10        dollars.  It's a pretty steep motivation for
11        them to close.
12   MR. MONALDO:  What number was that one?
13   MS. PETERS:  Twenty-one.
14   MR. MONALDO:  That was.  No.  This one you just
15        did.
16   MS. CRESWELL:  The one we just did was Twenty-
17        one.  The one I'm handing you now is Twenty-two.
18        Exhibit Number Twenty-two is an e-mail from
19        James Pryde to Ron Chachere, Chip Berthelot,
20        Chris Kaitson and Tino Monaldo dated 11/2/99 and
21        is bate stamps number 002502 and 002503.  The
22        attachment to this e-mail is a draft of a letter
23        between Midcoast and Dennis Langley and is
24        referencing a stock purchase agreement.
25   WHEREIN, EXHIBIT NUMBER TWENTY-TWO was marked
```
                          - 168 -

```
1         for identification.
2    Q.   (Ms. Creswell) Are you familiar with this
3         document, Mr. Monaldo?
4    A.   I don't recall it.  On the front side it appears
5         to say that it was, somebody's handwriting says
6         it was a never used document.
7    Q.   Do you know whose handwriting that is?
8    A.   No.  I do not.
9    Q.   Is it the document that you may have drafted or
10        would have drafted?
11   MS. PETERS: It's from Midcoast.
12   Q.   (Ms. Creswell) Oh.  I'm sorry.  It's from
13        Midcoast.  Good enough.  Okay.  This document
14        does reference a stock purchase agreement, but
15        it is similar to the other two documents, the
16        previous exhibits that we looked at, in that
17        there is a twenty-one thousand five hundred-
18        dollar penalty for, as a penalty for not closing
19        timely, but this penalty would be paid from
20        Midcoast to Mr. Langley.  And then the bottom of
21        the paragraph references the fifteen million
```
                          Page 72

Tino Monaldo Transcript.txt

22     dollar penalty for non-closure.  Again, this is
23     similar to Exhibits Twenty-one and Twenty-two,
24     except the payment is directly from Midcoast to
25     Dennis Langley instead of the two separate

                   - 169 -

1     agreements as we talked about previously.  It
2     appears that this exhibit was drafted, but never
3     used.  However, it is dated on 11/2, which is
4     after Exhibit Twenty-one.  The date on Exhibit
5     Twenty-one, which is November the 4th.
6  MS. PETERS: Before.
7 Q.  (Ms. Creswell) Pardon me.  It is before.  It's
8     Exhibit Twenty-two is dated 11/2/99 and Exhibit
9     Twenty-one is dated 11/4.  Can you explain or
10    comment on this particular exhibit?
11 A.  As I said, it says never used at the top of the
12    fax page.  It just says this change is requested
13    by Ron at Midcoast.  So, I assume it looks like
14    it may have been discussion about Midcoast
15    requesting a direct extension from Dennis and
16    apparently that was rejected or never
17    implemented.
18 Q.  (Ms. Peters) Why would Midcoast consider paying
19    directly to Langley for a closing of the stock
20    purchase agreement?
21 A.  I'm sorry?
22 Q.  Why would Midcoast consider paying to Langley an
23    amount for a delay in the closing or agreement
24    where Midcoast is not a party?
25 A.  I don't know.  Obviously their attorney must

                   - 170 -

1     have thought it was of some need to them, but it
2     was obviously rejected by us and not used.
3 Q.  What would be Midcoast's interest in the stock
4    purchase agreement?
5 A.  I think you've the question before and the best
6    answer I can give is the one I understand and
7    that's their guaranty that they signed of the
8    KPC - the parent guaranty that they signed
9    guaranteed certain obligations of Kansas
10    Pipeline.  And my recollection is that KPC
11    guaranty also guaranteed obligations of K-Pipe
12    under the stock purchase agreement.  So, I can't
13    tell you what's in the mind of their counsel,
14    but if they're assuming control and that's why
15    they needed to sign the parent guaranty, I
16    assume they've chosen in some fashion to
17    evaluate the underlying transaction, but I can't
18    assume what they thought.
19  MS. CRESWELL: Enter an e-mail dated 11/3/99
20    regarding Price Waterhouse Cooper, or PWC,
21    issues into the record as Exhibit Twenty-three
22    and it's bate stamp number 002704.
23  WHEREIN, EXHIBIT NUMBER TWENTY-THREE was marked
24  for identification.
25 Q.  (Ms. Creswell) Do you know whose handwriting

                   - 171 -

1     this is down at the bottom, Mr. Monaldo?
2 A.  No.  I don't.
3 Q.  It's signed Ron.  Would it be safe to assume

                  Page 73

Tino Monaldo Transcript.txt
```
 4      that that would be Ron Chachere?
 5   A. Is there a question pending?
 6   Q. Let me say it again.
 7   A. I'm sorry.  I didn't know if I forgot the
 8      question.
 9   Q. (Ms. Peters) Your question was whether or not it
10      was Ron Chachere.
11   Q. (Ms. Creswell) Right.  Yeah.  This handwritten
12      note at the bottom, it says Ron.  Could we
13      assume that that is Ron Chachere?
14   A. I can't assume.  I mean, it says Ron.  It could
15      be Ron, but I don't know his handwriting, so.
16   Q. Okay.  And Jim.  Would you have an idea as to
17      who the Jim is referencing or referring to?
18   A. I don't know for sure.  I assume it's Jim Pryde,
19      but.
20   Q. This Thomas Palmisano, at the top of the e-mail
21      where it says from Thomas J., can you tell me
22      who that is?
23   A. Sounds like the - the name sounds familiar from
24      Price Waterhouse, but I don't recall spending
25      any significant time with him.  So, I don't know
```
                              - 172 -

```
 1      him, no.
 2   Q. Are you familiar with this document, Mr.
 3      Monaldo?
 4   A. No.  I'm not.  I'm trying to see if I got a copy
 5      of this, but...
 6   Q. Yeah.  It's a little difficult to read.  The
 7      copy is not very good, either.  It would appear
 8      to me that Ron Chachere, his handwriting looks
 9      familiar on some other documents that we have
10      seen, is addressing Jim Pryde in regard to the
11      stock purchase agreement.  And specifically
12      about adding a representation in the stock
13      purchase agreement to the effect that K-Pipe has
14      no plan or intention to liquidate the Bishop
15      Group for at least two years, which we've talked
16      about previously.  What would be your thoughts
17      as to why Ron would be telling Jim to add that
18      provision?
19   A. Well, I can't say that Ron is saying it, as I
20      don't know that this is Ron - I don't the answer
21      to that.
22   Q. Then at the top of the document this is from
23      Thomas Palmisano, which his e-mail address is
24      Price Waterhouse Cooper's.  It does say this is
25      a very important representation which needs to
```
                              - 173 -

```
 1      be in either the SPA or a side letter between K-
 2      Pipe and Langley.  This should definitely not be
 3      in the asset purchase agreement as an asset
 4      buyer would be indifferent.  I'm just wondering
 5      why this gentleman from Price Waterhouse Cooper,
 6      Thomas Palmisano, would be commenting about that
 7      particular clause?
 8   A. Since I'm not familiar with the document, I
 9      don't know.
10   Q. (Ms. Peters) Who was it that - it was my
11      understanding, based both in our discussion of
12      Mr. Langley and earlier with you today, that
```
                              Page 74

Tino Monaldo Transcript.txt
```
13      that was a clause that Mr. Langley wanted in the
14      agreement or in the side letter.  Was that
15      something that Mr. Langley suggested or that
16      someone else suggested?
17 A.   I don't know what Mr. Langley said about that
18      particular phrase, so I can't address what he
19      said.  And earlier today, I believe, I thought
20      since it was in there we had asked for it, but I
21      don't exactly recall.  I think I said the tax
22      rationality, legal rationale.
23 MR. MONALDO: There's two more.
24 MS. PETERS: Actually-
25 MS. CRESWELL: There's three.
```
                              - 174 -

```
1  MS. PETERS:  -there's three.
2  MR. EDGAR: I think it's three after this.
3  MS. PETERS: There's two after this one.
4  MS. CRESWELL: Okay.  This will be Exhibit
5      Twenty-four and this is an e-mail from James
6      Pryde to Joyce Essig, Gary Wilcox and Gary
7      Wilcox.  It is dated 11/2/99.  Bate stamp number
8      002480.
9  WHEREIN, EXHIBIT NUMBER TWENTY-FOUR was marked
10     for identification.
11 Q.  (Ms. Creswell) Paragraph E states regarding
12     covenant of K-Pipe not to liquidate Bishop.
13     Isn't that better suited in the APA between K-
14     Pipe and MC as we do not care if they liquidate.
15     James Pryde, if I'm remembering correctly is
16     with Brian Cave and this does represent Mr.
17     Langley and the Bishop Group.  And Gary Wilcox
18     of Price Waterhouse Cooper who you've indicated
19     was representing Midcoast - pardon me, Fortrend
20     and Joyce Essig, I am not remembering who that
21     lady is.
22 MS. PETERS: I think he said he thought she was a
23     secretary.
24 MS. CRESWELL: James Pryde secretary.  Does that
25     sound correct?
```
                              - 175 -

```
1  MR. EDGAR: No.  I don't think that was the name
2      of her.
3  MS. PETERS: No.
4  MS. CRESWELL: No.
5  MS. PETERS: No.
6  Q.  (Ms. Creswell) I guess the crux of the question
7      is why would James Pryde be e-mailing Gary
8      Wilcox that question?
9  A.  I don't know.  I'm not familiar with this
10     document.
11 Q.  (Ms. Peters) Why would Mr. Pryde say we do not
12     care if they liquidate, which seems to be
13     contrary to what you have told us?
14 A.  I don't know why he's saying that.
15 Q.  And MC here, I'm interpreting to mean Midcoast.
16     Is that what that is intending to mean?
17 A.  I'm not familiar with the document.  It seems
18     reasonable, but I wouldn't know.
19 MS. CRESWELL: The fax from James Pryde to Craig
20     Hoffman, Cynthia Morelli, Tino Monaldo and
21     Yvette Korb dated 11/25/99 is entered into the
```
                         Page 75

Tino Monaldo Transcript.txt
22  record as Exhibit Twenty-five.  The bate stamp
23  number is 001951.
24  WHEREIN, EXHIBIT NUMBER TWENTY-FIVE was marked
25  for identification.
- 176 -

1  Q.  (Ms. Creswell) This fax was from James Pryde and
2      was sent on 10/25/99 at 6:19 p.m. that's shown
3      at the top of the fax.  Do you see that Mr.
4      Monaldo?
5  A.  Uh-huh.
6  Q.  The message says that the final documents,
7      except the project development agreement, are
8      attached and that Dennis plans to execute the
9      SPA at 7:00 p.m. central time.
10 A.  Okay.
11 Q.  Is the stock purchase agreement what is meant by
12     SPA?
13 A.  I believe so, yes.
14 Q.  And is Dennis making reference to Dennis
15     Langley?
16 A.  Yes.
17 Q.  All of the recipients of the correspondence are
18     either representatives of Fortrend, SCALP or Mr.
19     Langley and the Bishop Groups.  Is that correct?
20 A.  Jim Pryde was an attorney for us.
21 Q.  Right.
22 A.  Craig Hoffman and Cynthia Morelli were Fortrend
23     and then myself and Korb were on our side of the
24     equation and it seems to confirm that the stock
25     purchase agreement was signed on October 25th.
- 177 -

1  MR. MONALDO: I'm sorry.  This was twenty-
2  MS. CRESWELL: Yes.  That's twenty-five and the
3      last Exhibit is Twenty-six.  Okay.  This is a
4      fax from James Pryde to Craig Hoffman - pardon
5      me, to Ron Chachere, Chip Berthelot, Chris
6      Kaitson, Tino Monaldo and Y. Korb and it's dated
7      10/25/99 and it will be Exhibit Number Twenty-
8      six.  Bate stamp number 002958.
9  WHEREIN, EXHIBIT NUMBER TWENTY-SIX was marked
10     for identification.
11 Q.  (Ms. Creswell) This fax was sent also on 10/25,
12     as was Exhibit Twenty-five; however, this fax
13     was sent at 6:21 p.m., several minutes after the
14     last exhibit.  The message indicates that the
15     attachment is of the final documents and refers
16     to Dennis.  Can we assume that Dennis is again
17     Dennis Langley?
18 A.  Yes.
19 Q.  And that the SPA is referring to the stock
20     purchase agreement.  This message was sent to
21     Ron, Chip, Chris, who are all representatives of
22     Midcoast.  Is that correct?
23 A.  That's who they are, yes.
24 Q.  Why then would James Pryde be sending a copy of
25     the stock purchase agreement to Midcoast if it
- 178 -

1      was entered into by K-Pipe Merger and Dennis
2      Langley?
3  A.  Well, I'm not sure what was in his mind, but I'm
Page 76

Tino Monaldo Transcript.txt

```
 4        assuming since we had been negotiating with both
 5        parties separately on a dual track, we were
 6        letting them know we had - we were doing the
 7        deal with Fortrend.
 8   Q.   (Ms. Peters) And you would do that by sending
 9        them the final documents with stock purchase
10        agreements?
11   A.   I'm assuming we probably told them, as well.
12   Q.   So, they would have known on 10/25 that you were
13        doing a deal with Fortrend and very precisely
14        what that deal was.  Right?
15   A.   It appears that they were sent the documents.
16        They would know what our final agreement was.
17   Q.   And since it says Dennis plans on executing this
18        stock purchase agreement this evening and the
19        time this is sent is 6:21 p.m.  That would be
20        the expectation that Midcoast would do in
21        response?
22   A.   I'm not sure what you mean.  We sent-
23   Q.   Well, I understand what you said as being that
24        you were trying to get the best deal from the
25        bidders and so you're informing Midcoast of this
                         - 179 -

 1        deal with Fortrend so that you could get a -
 2        pressure them to give you a better deal.  And my
 3        question to you is, you sent them this stock
 4        purchase agreement, which has we have it in the
 5        record here, it's at 6:21 p.m. and told them
 6        that Dennis plans on executing it this evening.
 7        What kind of response did you expect from them
 8        as far as giving you a better bid based on what
 9        they saw you entering into with Fortrend and in
10        such a short time frame?
11   A.   You're asking me what I thought their response
12        would have been to Jim.  I don't know what Jim
13        was expecting, but I don't know that I was
14        expecting a response.  I mean, as I said before,
15        if we're negotiating with multiple parties, if
16        we fell out of bed with Fortrend and if they
17        didn't consummate, we would have, I'm sure,
18        talked to Enron and Midcoast, whoever else was a
19        potential bidder if this wasn't consummated.
20   Q.   So, were there other parties that you were
21        negotiating with contemporaneously with your
22        negotiations with Midcoast and Fortrend?
23   A.   Not at this time.  Prior to that, I believe,
24        there were still some discussions going on less
25        frequently into, perhaps, late September into
                         - 180 -

 1        October with Enron, but it would have been
 2        narrowed down to Midcoast and to Fortrend by the
 3        time we got through October.
 4   Q.   Did you discuss any specific terms of agreement
 5        with Enron?
 6   A.   I don't believe we got to the stock sale
 7        drafting stage with Enron.  By that time we had
 8        focused on Fortrend and Midcoast.
 9     MS. PETERS: Do you have something else?
10     MR. EDGAR: Could I ask a few questions?
11     MS. CRESWELL: Sure.
12     (Off the record)
                    Page 77
```

Tino Monaldo Transcript.txt
13    MR. EDGAR: Let me just ask a few short
14    questions.
15                    EXAMINATION
16    BY MR. JOHN M. EDGAR:
17 Q.   Mr. Monaldo, did you have occasion to ask
18      Fortrend if they represented any other party?
19 A.   Yes.  There was a meeting I was at with Dennis
20      Langley and some representatives of Fortrend and
21      their response to Dennis was that they were not
22      representing anybody else.
23 Q.   Did you suspect that they were representing
24      someone else when you asked that question?
25 A.   We had been involved with litigation with
                        - 181 -

1       Williams Natural Gas, for a century it seems
2       like, and they tried to keep us out of the
3       marketplace.  There was a concern that somehow
4       Williams might be sending in a shrill or
5       somebody to poke around our financial revenues
6       and so Dennis asked to eliminate that
7       possibility.
8  Q.   That's who you thought they might be
9       representing?
10 A.   That was Dennis' suspicion, yes.
11 Q.   Did you, prior to signing the stock purchase
12      agreement, did you negotiate at the same time
13      with Fortrend and Midcoast?
14 A.   Yes.  I think I testified we were negotiating on
15      two separate tracks with both companies.
16 Q.   Did you continue after the stock purchase
17      agreement to negotiate with Fortrend and
18      Midcoast?
19 A.   Well, after the 28th of October, after we had
20      signed with Fortrend and then we found out
21      Midcoast was doing some sort of transaction
22      with, potentially with Fortrend, I think I
23      testified that there was some requests made by
24      Midcoast to modify some documents, but we were
25      just negotiating with respect to Fortrend on
                        - 182 -

1       October 25th, that's who we were trying to close
2       with.
3  Q.   Had Fortrend failed or refused to close, would
4       you have gone back to Midcoast?
5  A.   We had made a decision to sell the stock of the
6       company and that was kind of a strategic
7       decision.  Like I said before, it was a good
8       time to get out, the pipe was full.  I'm certain
9       if Fortrend hadn't closed, that we would have
10      picked up the phone and called Midcoast and
11      probably would have called Enron and anybody
12      else that was a second tier player that didn't
13      win the actual stock deal and would have gone
14      down the list and tried to resurrect the deal
15      with somebody else.
16 Q.   As you were negotiating with Fortrend and
17      Midcoast leading up to the signing of the stock
18      purchase agreement, were there pricing
19      differences between what was being offered by
20      the two companies?
21 A.   My recollection is that Midcoast was not - had a
                        Page 78

                          Tino Monaldo Transcript.txt
22      price that was lower than Fortrend's.
23  Q.  And was that true clear up until the time you
24      signed the stock purchase agreement?
25  A.  That's my recollection, yes.
                              - 183 -

1   Q.  Do you recall any other objections that you had
2       to the deal that was proposed by Midcoast?
3   A.  I think what I had said earlier was that
4       Fortrend was willing to execute a project
5       development agreement on a memorable basis to
6       Dennis, but gave him an opportunity to earn
7       additional value if we could grow Kansas
8       Pipeline afterwards.  It was not cash that the
9       buyer was willing to pay then, but Fortrend was
10      willing to give us a better, in my opinion, a
11      good opportunity to earn elsewhere, also.  Just
12      from looking at these documents that were
13      presented today, it appears that Midcoast had an
14      unreasonable request that we rejected.  That is
15      they wanted some sort of inner creditor
16      agreement, which would have in effect allowed
17      our bank to step in and decide whether the deal
18      was going to be approved, so we rejected that.
19      I think that was in mid October sometime.
20  Q.  Did that cause you to - was that part of the
21      reason you rejected Midcoast as the purchaser?
22  A.  I believe so, because we would not have wanted
23      to be in a situation where our bank would have
24      controlled our destiny.
25  Q.  Did Midcoast ever propose to you, or discuss
                              - 184 -

1       with you, an asset purchase?
2   A.  No.  All of our discussions with any of the
3       bidders was that it was going to be a stock
4       sale.
5   Q.  Right.  But specifically with respect to
6       Midcoast, did they ever propose, even propose to
7       you an asset purchase?
8   A.  I don't recall ever seeing an asset purchase
9       agreement from Midcoast.
10  Q.  If Fortrend didn't close on the purchase of the
11      stock, were they liable under the stock purchase
12      agreement to pay you anything?
13  A.  If who?
14  Q.  If Fortrend didn't close on the purchase of the
15      stock under the stock purchase agreement, were
16      they obliged to pay you anything?  Is there a
17      break up fee in other words?
18  A.  There was an extension letter.  There was a,
19      what I call liquidated damages, but a penalty.
20      If they didn't close and it wasn't our fault,
21      they had to pay fifteen million dollars.  The
22      walk-away fee and liquidated damages I think of
23      them as the same thing.
24  Q.  Wasn't that already in the stock purchase
25      agreement?  And specifically I direct your
                              - 185 -

1       attention to Exhibit Twelve and section 11.2 of
2       the stock purchase agreement?
3   A.  Yes.  It appears to be at 11.2.
                          Page 79

Tino Monaldo Transcript.txt

```
 4  Q.  So, that obligation arose out of the stock
 5      purchase agreement?
 6  A.  That was restated in the -
 7  Q.  In the extension letter?
 8  A.  In the extension letter.
 9  Q.  Was Fortrends purchase of your stock conditioned
10      upon anything?
11  A.  Not so long as we delivered the stock, they were
12      obligated to pay.
13  Q.  Let me specifically direct your attention to
14      section 10.2, the stock purchase agreement.  Are
15      those the conditions that were preconditions for
16      Fortrends purchase of Dennis Langley's stock?
17  A.  Yes.  I was answering a more general question.
18      If we delivered the stock, they had to pay, but
19      every stock purchase agreement has conditions to
20      closing for the buyer.
21  Q.  And you had to perform all your obligations
22      under the stock purchase agreement?
23  A.  That's correct.
24  Q.  Did you also, did your representations and
25      warranties have to be true for them to have an
```
                       - 186 -

```
 1      obligation to close?
 2  A.  Article 10 lists a number of obligations that we
 3      had to meet and one of them dealt with
 4      representations and warranties being correct.
 5  Q.  Did you also have to deliver a closing
 6      certificate for them to have an obligation to
 7      purchase your stock?
 8  A.  I believe we would have had to have a closing
 9      certificate to say that whatever we reped and
10      warranted was true at closing.
11  Q.  Did you provide any indemnification to Fortrend
12      for tax liabilities?
13  A.  I don't think so.
14  Q.  Did you arrange or assist Fortrend in paying
15      their financing?
16  A.  No.
17  MR. EDGAR: That's all I have.
18                  CONTINUED EXAMINATION
19  BY MS. PETERS:
20  Q.  (Ms. Peters) You suggested a minute ago, you
21      mentioned that one of the features you liked in
22      your transactions for Fortrend is that they were
23      willing to enter into the project development
24      agreements.  Is that correct?
25  A.  What I said was my recollection was that I
```
                       - 187 -

```
 1      believe the were favorable to Dennis Langley's
 2      project development agreement.  It was one of
 3      the considerations as well as the higher price.
 4  Q.  That was one of the considerations for why you
 5      and Mr. Langley chose to go with Fortrend over
 6      Midcoast?
 7  A.  It's a combination of - a few things to remember
 8      right now are price, more favorable, more
 9      willingness to negotiate the project development
10      agreement and then this issue about inner credit
11      agreements and banks having say-so.
12  Q.  So, just a little clarification on the dates
```
                       Page 80

Tino Monaldo Transcript.txt
13     here.  The project development agreement was
14     entered into October 25th, 1999 or October 24th,
15     1999.
16 A.  24th or 25th.
17 Q.  Okay.  And the option agreement to cancel the
18     project development agreement was also entered
19     into October 24th, 1999, that's what we talked
20     about earlier.  And then you said that they had
21     exercised that option sometime in early 2000.
22 A.  That's my recollection, yes.
23 Q.  And paid the penalty for exercising the option
24     and the agreement said that that last exercise
25     option date was January 31, 2000, so it was
                        - 188 -

1      probably, I would guess, timely done or maybe
2      you would have had a further dispute with them.
3      I was just wondering if there was since the
4      project development agreement was a component
5      that you were so interested in, if there was
6      some feeling that you had been tricked by
7      Fortrend or by Midcoast into entering into a
8      project development agreement which only a few
9      months later they exercised the option to
10     cancel, despite the fact that you've got a
11     penalty payment for their choosing to cancel.
12 A.  I don't know if I used the word tricked.  We had
13     negotiated with Fortrend in the Kansas Pipeline
14     document that terminating it early before we had
15     an opportunity to claim value to it, was worth
16     ten plus million dollars and it was paid, so I
17     don't know that I feel - because it was
18     terminated, I don't know if I would use the word
19     tricked.
20 Q.  So, were you surprised when you found out that
21     Midcoast was entering into that guarantee of the
22     project development agreement?
23 A.  I there was a degree of didn't know that was
24     going to happen.
25     MS. PETERS: Do you have anything else on that?
                        - 189 -

1      MR. EDGAR: Thank you very much.
2      MS. CRESWELL: Thank you.
3          (Witness Excused)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
                        Page 81

Tino Monaldo Transcript.txt
22
23
24
25

- 190 -

SIGNATURE SHEET
FOR
TINO M. MONALDO

_____
Signature of Witness

Subscribed and sworn to before me, this _____ day of
_____, 200___.

_____
Notary Public within and for said
County and State

My Commission Expires: _____

Langley Tax Liability

- 191 -

ERRATA SHEET

PAGE/LINE CHANGE/CORRECTION    REASON

_____
Signature of Tino M. Monaldo

Subscribed and sworn to before me, this _____ day of
_____, 200___.

_____
Notary Public

My Commission Expires: _____

- 192 -

NOTARIAL CERTIFICATE

STATE OF MISSOURI            )
                            ) ss
COUNTY OF CLAY              )

 I, BRENDA BROLL, a Notary herein and for the County of Clay
and State of Missouri, do certify that pursuant to notice to
interview at 2345 Grand, in the City of Kansas City, County of
Jackson and State of Missouri, came before me:

Tino Monaldo Transcript.txt
TINO M. MONALDO

who was by me duly sworn to testify the whole truth of his
knowledge of the matters in controversy aforesaid, was examined
and his examination then taken down by use of the Stenomask
closed microphone by me and afterwards under my direction was
typed.

- 193 -

 I further certify that I am not counsel, attorney or
relative of either party, of clerk or stenographer of either
party or of the attorney of either party, or otherwise interested
in the event of this suit.

 Given under my hand and notarial seal at my office in said
County and State, this 19th day of November, 2003.

Brenda Broll, CCR-CSR
Notary Public

My Commission Expires:
(MO)December 6, 2003
(KS)May 1, 2005

COSTS:

- 194 -