1

1

2

3

4

5

6

7

8                         INTERVIEW OF

9                       DAN C. TUTCHER

10                      JANUARY 13, 2004

11

12

13

14

15

16

17

18

19          BE IT REMEMBERED that on the 13th day of

20   January, 2004, beginning at 9:07 a.m. at the offices of

21   Enbridge, Inc., 1100 Louisiana Street, 34th Floor,

22   Houston, Texas 77002, before Meredith A. Shoemaker, a

23   Certified Shorthand Reporter in and for the State of

24   Texas, DAN C. TUTCHER appeared and under oath answered

25   the questions propounded to him as follows:

2

```
 1               A P P E A R A N C E S

 2

 3   FOR THE INTERNAL REVENUE SERVICE:

 4        Ms. Linda Creswell  MC: 4636NFTW
          Revenue Agent
 5        Internal Revenue Service
          2601 Meacham Blvd., Suite 550
 6        Fort Worth, Texas 76136

 7        Ms. Yvonne Peters
          Office of Chief Counsel
 8        Attorney -- LMSB
          Jackson Federal Building
 9        915 Second Avenue, Room 2710, M/S 670
          Seattle, Washington 98174
10

11
     FOR MIDCOAST ENERGY RESOURCES:
12
          Mr. Karl S. Stern
13        Ms. Wendy Trahan Salinas
          Vinson & Elkins, L.L.P.
14        2300 First City Tower
          1001 Fannin Street
15        Houston, Texas 77002-6760

16

17   ALSO PRESENT:

18        Ms. Jana Jordan

19

20

21

22

23

24

25
```

3

```
1                    EXAMINATION   INDEX

2                                              PAGE

3  DAN C. TUTCHER

4       Examination by Ms. Creswell              5

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                              EXHIBIT  INDEX

2   No.   Description                              Page

3   1     August 30, 1999, Tutcher letter to        58
          Gregg, with attachments;
4         Bates Stamps 002195-2204

5   2     August 30, 1999, "Redline" redraft        60
          of Agreement and Plan of Merger
6
    3     September 20, 1999, Hoffman letter        64
7         to Robert, with attachments;
          Bates Stamps MID 2.1-439 through
8         MID 2.1-442

9   4     October 7, 1999, Midcoast Energy          72
          Resources, Inc., Board of Directors
10        Meeting Minutes;
          Bates Stamps MID 1.1-1 through
11        MID 1.1-2

12  5     November 8, 1999, Midcoast Energy         72
          Resources, Inc., Board of Directors
13        Meeting Minutes;
          Bates Stamps MID 1.1-3 through
14        MID 1.1-4

15  6     September 30, 1999, Furman letter         85
          to Tutcher; Bates Stamps MID 2.1-3
16        through MID 2.1-6

17  7     September 30, 1999, Furman letter         85
          to Langley; Bates Stamps 000442-444
18
    8     February 24, 2000, Midcoast Energy        92
19        Resources, Inc., Board of Directors
          Meeting Minutes;
20        Bates Stamps MID 1.1-12 through
          MID 1.1-17
21
    9     November 4, 1999, Fax Cover Sheet         96
22        from Kaitson to Pryde and Cave,
          with attachment;
23        Bates Stamps KP1463-1465

24  10    Undated letter agreement executed         98
          by Langley and Austin; Bates Stamps
25        CHA 5-964 through CHA 5-966

1                    (The witness was sworn.)

2                    MS. CRESWELL:  The testimony of

3   Dan Tutcher is being given at the office of Enbridge

4   Energy, located at 1100 Louisiana Street, Houston,

5   Texas, on January the 13th, 2004, at 9:00 a.m. about the

6   Federal income tax liability of Midcoast Energy

7   Resources for the 2000 tax year.

8                    Present are Linda Creswell, revenue agent

9   with the Internal Revenue Service; Yvonne Peters,

10  counsel with the Internal Revenue Service; Dan Tutcher,

11  who is the interviewee, currently is the president of

12  transportation south --

13                   THE WITNESS:  I'm vice-president of

14  transportation south.

15                   MS. CRESWELL:  Okay.

16                   -- with Midcoast/Enbridge Energy; Wendy

17  Salinas and Karl Stern, who are counsel for Midcoast

18  with Vinson & Elkins; and Jana Jordan, who is an

19  employee for Midcoast.

20                   I hope I got everybody correct.

21                   The questions are being asked by Linda

22  Creswell and Yvonne Peters, and the answers are given by

23  Dan Tutcher.

24                   The interview is being recorded, as

25  Mr. Tutcher was previously notified; and the recording

1  is by means of a court reporter.

2            Mr. Tutcher has volunteered -- has

3  voluntarily presented himself to be interviewed.

4            And we thank you for that.

5                 DAN C. TUTCHER,

6  having been previously duly sworn, testified as follows:

7                 EXAMINATION

8  BY MS. CRESWELL:

9     Q    Mr. Tutcher, could you please state your name

10 and spell it for the record?

11    A    Dan C. Tutcher, T-u-t-c-h-e-r.

12    Q    And please state your home address.

13    A    2207 Twin Oaks Boulevard, Kemah, K-e-m-a-h,

14 Texas.

15    Q    Mr. Tutcher, will you agree to review the

16 transcript after it is completed and sign it if it is

17 correct or make any corrections as you feel is

18 necessary --

19    A    Certainly.

20    Q    -- to your testimony?

21            Thank you.

22            Is there any reason why you would not be

23 able to understand and answer the questions that we're

24 asking today?

25    A    Well, not having heard them yet, I don't know;

1  but as far as I know, I should able to answer anything.

2     Q    Are you taking any medication that would affect

3  your ability to understand and respond in a meaningful

4  way to the questions?

5     A    No.

6     Q    Again, if you need clarification on any

7  question asked, please feel free to speak up.

8     A    Okay.

9     Q    Just one background question as far as

10  preparing for the interview:  How did you prepare for

11  the interview today, Mr. Tutcher?

12     A    I had a couple of hours yesterday just

13  discussing topics and kind of going over things with

14  both counsels that are present as well as Jana.

15     Q    Okay.  The first questions will be general

16  background questions and general questions about the

17  transaction that we're talking about; and we will get

18  into that, the transaction, in a little bit.

19              Can you tell me, Mr. Tutcher, what your

20  educational background is?

21     A    I have a Bachelor's of Business Administration

22  from Washburn University.

23     Q    Where is Washburn?

24     A    Washburn is Topeka, Kansas -- it's a pretty

25  good law school, actually -- which is where I'm from.

1    Q    Can you tell me about what you did

2  professionally before coming to Midcoast?

3    A    I have been part of the petroleum industry ever

4  since I was a teenager.  My family background was that

5  we had a retail propane company, and so I went into the

6  family business right after college.

7               Got involved in acquiring and constructing

8  pipelines and gas processing plants to get further

9  upstream in the business in the early Seventies and was

10 involved in the NP side as well during my 20's and 30's

11 and then lived in the Midwest in the Kansas City area

12 because primarily the family company was around there.

13              My father died in the mid-Eighties; and

14 that was when I made the move to Houston, very shortly

15 after that, and started various pipeline companies,

16 processing -- gas processing companies and, to a limited

17 extent after that point, a little bit of E&P.  But for

18 the most part, I've always been involved in the pipeline

19 and natural gas liquids business.  So I'm mostly in

20 private companies.

21              After moving to Houston, I started a

22 company with a partner called Gulf Gas Utilities that

23 was primarily sort of centered around deregulation of

24 natural gas and the pipelines that might be available to

25 be built to sort of administer that change in

1  regulations.

2            And so that company was sold; and then I

3  formed, with a couple of partners, Midcoast Energy in

4  the late Eighties, which was the same type of operation,

5  which was basically building small pipelines to, for the

6  most part, handle downstream markets and gather gas

7  pretty much in the Gulf Coast and the Midwest.

8            And then that company was taken public in

9  the early Nineties, continued to grow, and was acquired

10  by Enbridge in 2001.

11    Q    Wow.  You've had a very -- you've been right in

12  this business from the very start.

13    A    I have ever since, really, for the most part,

14  when I was a teenager when I worked for the family

15  company.  So I've always been involved in the NGL

16  business.

17    Q    Well, my next question was about when you began

18  working for Midcoast.  I did not realize that you

19  actually were in on the ground floor to form the

20  business itself.

21    A    Myself and two other people were the founders,

22  the original founders.

23    Q    Are they still involved in the business, these

24  two other --

25    A    No.  When Enbridge acquired Midcoast, they

1  both, for the most part, were bought out.

2      Q    Who were those two other individuals?

3      A    Both from Corpus Christi.  The first

4  gentleman's name is Kenneth Holmes, H-o-l-m-e-s, and

5  Stevens Herbst, H-e-r-b-s-t.

6      Q    You've kind of answered some of the next

7  questions, too.  I was going to ask:  What type of work

8  did you do for the corporation?

9          It sounds like you kind of brought it

10 along the whole -- the whole way.

11     A    Yeah.  And for the most part, I have, like I

12 said, been involved in that type of business either from

13 the field side of it all the way to the management side

14 of it all my life.  So --

15     Q    And one question was:  When did you become a

16 shareholder?

17          I guess when it went public and it went

18 from a partnership structure, then, to a corporate

19 structure.  So you have been --

20     A    In terms of public shares, that was -- as I

21 said, Midcoast was formed in 1989; and I owned

22 50 percent of the company then.  And then it was taken

23 public in 19 -- actually in 1992, we acquired a shell.

24 So we were technically public from 1992 on, but it

25 really wasn't heavily traded or anything.  And we did

1  what, for the most part, was an IPO in 1997.

2      Q    Okay.  Tell me a little bit just about how your

3  job responsibilities have evolved as Midcoast has grown

4  and now has been -- the form has changed somewhat.

5      A    Sort of from an inception?

6      Q    Uh-huh.

7      A    Okay.  In the late Eighties, basically we

8  started from scratch with a very minute amount of

9  capital from all the three founders that I mentioned and

10  built a couple of smaller end user pipelines that came

11  on common carriers and then were basically used to

12  transport natural gas to end users and they became our

13  customers.

14          I did everything from the standpoint of,

15  you know, being involved in somewhat of the engineering

16  to somewhat of the field work and then the finance side

17  of the business and then basically just -- I was

18  president of the company from inception.

19          That grew through the late Eighties, early

20  Nineties, and mostly via acquisition.  However, a lot of

21  new pipelines -- or, rather, a lot of grass roots

22  pipelines were built along the way, too; but most of the

23  major growth was via acquisitions.  And I, for the most

24  part, was involved from soup to nuts on all those

25  transactions and in the financing thereof.

1            And as I said, it grew exponentially from

2    about '92 through '96 or '7.  That was when a lot of the

3    El Pasos and the Williams and the Kochs and the rest of

4    the world were either merging -- and a lot of that

5    merger and acquisition activity spun off a lot of their

6    smaller pieces of pipe that were available for

7    acquisition, which was sort of what we built the company

8    on.

9            And then via the IPO in '97 -- I, of

10   course, was still president and CEO -- it went through

11   the IPO process, did a number of financings and

12   continued the acquisition side.  The capital raising

13   became about as important as the day-to-day running of

14   the company at that particular point.  And then right up

15   through the end of 2001 when we had decided that the

16   acquisition trail that we had been on for all those

17   years had been -- was sort of becoming a bit of a

18   problem in that we were competing with, for the most

19   part, MLP's like Kinder Morgan and some of those, who

20   had lower costs of capital than we did.

21           So we kind of looked around and decided

22   that it was maybe time to look for a suitor or an exit

23   strategy.  Everyone else exited.  I'm still here.

24           And basically what the reasoning behind

25   that was is that Enbridge is a very large Canadian

1  company.  They've been very successful.  They own the

2  largest crude oil -- longest crude oil pipeline in the

3  world as well as the biggest LDC in Canada.  So they

4  were very successful and had some international

5  operations as well; but in terms of their growth, the

6  next horizon for them was really south of the border on

7  the United States side.

8           They didn't want to do what some of their

9  other -- Canadian companies have done like TransCanada

10  and a couple of others.  They didn't want to just come

11  down and buy assets.  They wanted to buy sort of a

12  management team.

13           And so that really kind of fit well with

14  where I was at.  I think I wanted to make sure that all

15  of our people were held together and that we still had a

16  good organization going forward.  So it fit very well,

17  and we decided that that was -- probably after having

18  talked to a dozen or so companies, we decided that they

19  were probably the best acquirer for what we needed to

20  do.

21           And then they, of course -- as I said,

22  because they bought what, for the most part, was a

23  management team rather than a bunch of assets, I agreed

24  to stay on, not from a financial perspective or a legal

25  perspective but just from a standpoint of helping them

1  get their feet on the ground for -- in the United

2  States.  And, obviously, two and a half, almost three

3  years later, I'm still here.  So --

4      Q    The next questions are, again, general

5  questions about the business of Midcoast back in '99;

6  but it sounds to me from what you're telling me that the

7  business of Midcoast in '99 was more or less acquisition

8  of smaller pipelines, putting those types of packages

9  together.  Some building, I guess, also.

10             Is that a fair --

11     A    Yeah, some grass roots projects and some

12  expansions, extensions to existing systems and so forth

13  and trying to pull some together, a lot of growth on the

14  gathering side of the business and so forth; but we were

15  still very much on the acquisition trail at that point.

16     Q    In 1999, as you recall, of course, Midcoast

17  acquired the assets of The Bishop Group.

18             Can you tell me just a little bit about

19  why Midcoast would have been interested in those

20  particular assets?

21     A    We had -- we had acquired two interstate

22  pipelines already, one of which was called AlaTenn and

23  one of which was called Mid Louisiana; and we felt like

24  that they were the type of assets that we were very much

25  interested in owning and that we had always tried to

1    be -- unlike our friends in the old building over here,

2    we were never much involved in marketing.  We were

3    always pretty much involved in owning hard assets that

4    had good cash flows associated with them, and interstate

5    pipelines are very -- being regulated vehicles, for the

6    most part, throw off very stable cash flows, long-term

7    contracts.

8              So it was just the kind of business that

9    we really wanted to be in, things that had long-term

10   cash flows associated with them.  So that was our

11   interest originally in looking at the Kansas Pipeline

12   thing.

13             Quite frankly, we weren't looking at them.

14   We were looking at another pipeline at that particular

15   point in time when they came to us.

16   Q     Which assets were acquired, Mr. Tutcher?

17   A     Were acquired in that transaction?

18   Q     In that particular -- right.

19   A     The Kansas -- the entities, I can't name off

20   all of those right now; but in terms of what the real

21   physical assets were, it was a converted crude oil

22   pipeline that started in Oklahoma.  It was owned by

23   Phillips Petroleum originally and went up to supply the

24   Phillips refinery in Kansas City.

25             There were also some gathering lines that

1   came down -- out to central Kansas and then southeastern

2   Kansas as well; but that all fed the Phillips refinery.

3   That was converted to natural gas in, I think, the

4   mid-Eighties to supply Kansas City with part of their

5   natural gas supply.

6                    And it was converted by two different

7   groups.  One group actually was owned by John Connally

8   here in Texas, and that was the gathering side of the

9   business called -- I think it was Bam (phonetic) Energy

10  back then.  And the other group was -- I think was

11  originally called the Kansas Pipeline Group or something

12  like that, and that was a bunch of Kansas City

13  businessmen or Atchison and Kansas City businessmen that

14  took over the downstream side or the market side.

15                   Eventually via two or three bankruptcies

16  and whatever, I think they all came together; and it

17  became, under Dennis Langley, one operating entity -- or

18  not one entity.  He had a dozen entities but -- so that

19  was the physical asset that we bought, a gas line that

20  connected very big gas supplies in Oklahoma to markets

21  in Wichita and Kansas City, for the most part.

22      Q    Okay.  Can you tell me about your participation

23  in the transaction, just in a general sense, and, you

24  know, what your role was exactly in that acquisition?

25      A    The initial contact by Dennis Langley was made

1   to me via one of our employees, who was Bill Bray, our

2   vice-president of business development; and it was just

3   sort of a get acquainted-type meeting where he came to

4   my offices because he supposedly was in Houston to talk

5   to several companies about selling Kansas Pipeline.

6            And initially, as I said, we weren't

7   necessarily interested because we were looking at

8   another acquisition that we thought was pretty high on

9   our radar screen; and I had really, for the most part,

10  known that pipeline and that Kansas City area for the

11  years and years that I'd been in business up in Kansas

12  and Missouri.  So we weren't too excited about it

13  originally.

14           And then he continued to pursue sort of

15  trying to get us to look at his offering memorandum that

16  he was about to put out to everybody, which we did; and

17  at that particular point in time, I sort of had Bill

18  Bray and the business development people looking to see

19  if we had an interest.

20           Eventually we determined that it might be

21  a little bit more interesting than what I originally

22  thought.  So we went through a series of meetings to try

23  to understand it, decided we would make an offer to see

24  if we were anywhere close from a dollar-and-cents

25  perspective; and when it turned out we were, we went

1   into a series of due diligence meetings, negotiations.

2   And that lasted right up until the time that we signed

3   the transaction.

4              But in terms of what I did personally, I

5   had a lot of meetings -- or a lot of conversations with

6   Dennis Langley; and I sat in on most of the meetings

7   early on and particularly when it was about to -- just

8   really trying to understand the assets, I sat in on,

9   personally, a lot of those meetings.  When it came down

10  to the final negotiations, for the most part, some of

11  the guys that worked for me, my CFO and my COO, did most

12  of the heavy lifting there.

13      Q    Who were they?

14      A    That was Chip Berthelot, B-e-r-t-h-e-l-o-t, who

15  was the COO; and Richard Robert, spelled "Robert," was

16  the CFO.  And then a number of other -- I mean, our

17  general counsel and a bunch of our regulatory folks and

18  a lot of outside counsel that were involved in looking

19  at this thing.  So --

20      Q    Chris Kaitson, would he have been one of --

21      A    Yeah, he was general counsel in-house for the

22  company.  Uh-huh.

23      Q    And then Ron --

24      A    Ron Chachere.

25      Q    -- Chachere.

1     A     Right.

2     Q     Would he also have been more heavily involved

3  in the negotiation end than you?

4     A     Yes, he would have been.

5           And then as well, we had a lot of outside

6  counsel.  We had, I believe, two of our Washington,

7  D.C., FERC counsels involved; and then we had -- as I

8  recall, we had a couple -- we had local representation

9  in Kansas City.  We had probably a half dozen outside

10  attorneys that were really looking -- the main reason

11  being there were a lot of lawsuits involved in the --

12  with Langley and his group and a lot of regulatory

13  issues pending.  So we had to have a lot of legal

14  counsel on this thing.

15     Q     Do you recall the name of the FERC counsel that

16  you retained?

17     A     (No verbal response.)

18     Q     I mean, if you can't, that's fine.  I can

19  always --

20     A     Yeah.  I know I can see his face.  I'm just

21  trying to think of his name.

22     Q     Okay.  Describe him.  Maybe I'll know him.

23           THE WITNESS:  Jana, who was -- it was --

24  oh, golly.

25     Q     (BY MS. CRESWELL)  We're going to go through

1  some names later whose names are in some of these

2  documents --

3      A    Okay.  It will come to me.

4      Q    -- and some you've already cleared up, but that

5  may remind you of --

6              MS. PETERS:  With all the regulatory items

7  that came along with Mr. Langley's assets, was that

8  normal that you'd have that many --

9              THE WITNESS:  No.

10             MS. PETERS:  -- issues with FERC?

11             THE WITNESS:  No.  And it wasn't just

12  FERC.  If it was just FERC, it wouldn't have been that

13  big an issue; but we had -- obviously there was a rate

14  case coming up.  So preparing for that and trying to get

15  your arms around a rate case was an extremely difficult

16  thing because there's just a lot of subjective opinions

17  that go into trying to handicap with what the dollars

18  and cents involved in those things are.

19             But, secondarily, he had regulatory

20  problems with the Kansas Corporation Commission, with

21  the Missouri Public Service Commission, as well a couple

22  of state lawsuits with his customers, Kansas Gas

23  Service, which was the main LDC that was the main

24  customer in Kansas; and I think there was even one

25  pending with the -- what was Southern Union but the

1   Missouri side of the LDC in Kansas City and a couple of

2   others.

3              I mean, there was just litigation going

4   everywhere, be it regulatory or, even in some cases,

5   civil suits.

6              MS. PETERS:  So in other companies that

7   you've acquired, you don't see that.

8              THE WITNESS:  Well, from the -- from the

9   FERC perspective -- for example, when we acquired

10  AlaTenn, yeah, we had a lot of regulatory handicapping

11  to do on that one, too, but not a myriad of other suits

12  that went along with it from the state level and from

13  a -- and from a civil suit level either.  This was just

14  a highly complex thing to really rattle through with

15  regard to the lawsuits and the regulatory issues that

16  were going on.

17             That's a long-winded answer to say:  No,

18  most of them are not that heavily involved.

19  Q    (BY MS. CRESWELL) So you stated that you did

20  attend meetings with Langley and his representatives and

21  Bishop Group people.

22             Can you name the people that normally

23  would have been on the Langley-Bishop side that would

24  have been there at meetings with you?

25  A    Well, I can name a few of them.  He had his

1    Washington, D.C., counsel, which is regulatory

2    counsel -- and I think he did other things for him --

3    which was Heller Ehrman -- and what was the guy's

4    name -- who eventually became our counsel after the fact

5    and represented us in the -- because he was already in

6    the middle of the rate case; and so he continued on to

7    work for us after the fact, after they closed.  I can't

8    thank of his name, but it was Heller Ehrman.

9              He had Tino somebody or other that was his

10   sort of in-house counsel, a couple of his in-house

11   accounting types.  I don't know whether it was -- seems

12   like his CFO was a part it, and I'm having trouble with

13   remembering these names.

14       Q    Okay.  Then we'll just flip on over and get to

15   that -- to that section.

16              Can you tell me if

17   PricewaterhouseCoopers -- did they assist Midcoast in

18   the transaction?

19       A    Yeah.  They had to do an evaluation for us,

20   yes.  They were our auditing firm at that particular

21   point in time.

22       Q    Right.  And that was before you had your tax

23   department in-house.  So --

24       A    Correct.

25       Q    -- they were handling --

1      A      They were our tax advisers at that point.

2      Q      What specifically, Mr. Tutcher, was PWC's role

3   in this transaction?  How involved were they?

4      A      Well, as I recall, Richard Robert drew upon

5   their tax and their accounting knowledge and whatever

6   expertise he didn't have in-house or whatever people he

7   didn't have, just warm bodies to throw at the problem

8   in-house.  He, for the most part, relied on them quite a

9   lot and their judgment of a lot of different issues

10  involving us; and I think, if I recall right, it was

11  pretty much from inception.

12     Q      Okay.  Who at PWC do you know specifically?

13  Can you mention any names at PWC that would have been

14  involved?

15     A      I can't even remember what our audit partner's

16  name was at that point in time.  It seems like the tax

17  guy was Palmisano or something like that.  I know

18  those -- and then whoever our audit partner was at that

19  point.  It's since changed.  That's why I don't recall.

20  It's been quite a while.

21     Q      Well, let me make sure that I'm understanding

22  with PWC -- when they became involved -- or how they

23  became involved, I should say.

24             You had an ongoing relationship with

25  PWC -- is that correct --

1     A     They were our public auditors, correct.

2     Q     -- for this --

3     A     And they were also our tax advisers at that

4  point.

5     Q     Right.

6     A     And, as well, I think they were even doing

7  maybe some consulting for us and different things.  They

8  were our -- you know, they signed off on all of our SEC

9  documents whenever we had gone to the public markets and

10 so forth; and they gave us comfort letters and, you

11 know, everything that your auditing firm would normally

12 have done, even preEnron and before.

13     Q     So when Dennis Langley then approached you, did

14 you -- did Midcoast then go to PWC and tell them that

15 this situation existed or -- and then brought them in at

16 that point or --

17     A     I don't remember whether we had them up there

18 at our initial big meeting, and I'm sure that they

19 weren't necessarily terribly involved in just the real

20 preliminary look at it.  Now, when we got into it and,

21 you know, decided we may go ahead and make an offer on

22 the transaction, I'm sure we had consulted them by that

23 point; but I don't remember exactly when they entered

24 the deal.

25     Q     Do you remember when Fortrend became involved?

1     A     In the -- in the -- sort of midway through the

2    thing at some point in time; and, again, the dates are

3    pretty fuzzy to me.  I don't remember exactly what stage

4    we were in at that point.

5     Q     Do you know how they became involved or who

6    brought them in?

7     A     As we were negotiating this transaction, we --

8    the difference between what we were willing to pay

9    Mr. Langley for it and what he was asking for it was a

10   pretty significant difference; and at one point in time,

11   I remember Richard Robert came to me and said that

12   Price -- our CFO came to me and said that

13   Pricewaterhouse had an outfit that might be able to

14   bridge some of the differences we had and that he would

15   be, you know, an adviser to Langley and be able to help

16   him out in some way, shape, or form to get closer to the

17   number that we had arrived at that we felt the company

18   was worth.

19                And from that point forward -- and then

20   Pricewaterhouse was who had brought them to Richard or

21   suggested them to Richard and asked if he was interested

22   in pursuing it; and then my answer was, you know, if

23   Mr. Langley wants to do that and understand what's going

24   on there, then that's fine.  Anything that helps us get

25   to the right price.

1      Q      So the primary purpose, then, if I'm

2    understanding, again, correctly, for using Fortrend in

3    the deal was to bridge the gap between what Mr. Langley

4    was willing to sell -- or what he wanted to sell the

5    stock for and what you wanted to purchase the stock for.

6      A      When we looked at the entire entity of

7    Langley's, whether it's The Bishop Group or the whole

8    group of companies and the group that we were dealing

9    with, he wanted to sell us the stock and we said,

10   "That's fine," but obviously, you know, that will cause

11   us to arrive at a price that's probably less than what

12   we would pay for the assets.  So we said, "Fine.  Here

13   is what we will pay for the stock."

14              And he said, "Well, that's off by" -- I

15   don't know -- "25 or 30 percent," or whatever the number

16   was, "by what I think I can get from other companies."

17              And I said, "Well, that's fine."

18              So he continued to throw things out that

19   he called gap closers or something, some nomenclature

20   like that; and there were two or three things that made

21   some sense, some things that we said that we would --

22   you know, give him future interests in or something like

23   that to try to bring his asking price back to what our

24   purchase price was.

25              When this came up, I said to Richard,

1  "Well, if this will help him get closer, then fine.  He

2  can talk to them and determine whether or not that helps

3  us bridge that gap that he's talking about."

4       Q    So the way you're -- and maybe I'm not

5  understanding this correctly, but the way you're

6  explaining it sounds to me like Pricewaterhouse brought

7  Fortrend in to assist Mr. Langley.

8            Is that what you're saying, or was it --

9       A    Well, they brought Fortrend -- they mentioned

10 to us that they may have some -- a company that would be

11 willing to help -- in some way, shape, or form would

12 help Mr. Langley bridge the gap that he was trying to

13 get and asked if they could approach Mr. Langley on it.

14           And I said, "I don't have a problem

15 whatsoever with them doing that."

16      Q    So after Fortrend came in, how exactly did the

17 transaction change at that point --

18      A    Well --

19      Q    -- or evolve, I should say?

20      A    Yeah.  Well, you know, after that initial

21 contact that Richard told me about, as far as I know,

22 they got together; and I wasn't ever a part of any of

23 those conversations.  I don't know how they got together

24 with Langley or how he ever determined that that was the

25 right way to do things; but it changed the transaction

1   to where we would be, at that particular point in time,

2   dealing with them as the seller rather than Langley

3   going forward.

4                   And exactly when that time was, I can't

5   recall datewise.  I'm sure we've got documents that kind

6   of show when all that transpired.

7   Q    I'm going to go through several names with

8   Fortrend and just see if you had any contact with them

9   and if you're familiar with them.

10                  The first is Craig Hoffman.

11                  Did you ever meet him, Mr. Tutcher?

12  A    No.

13  Q    Have you ever heard his name?

14  A    No.

15  Q    Fred Forster?

16  A    No.

17  Q    Okay.  Jeff Furman?

18  A    No.

19  Q    Howard Teig, T-e-i-g?

20  A    There was a Howard in Langley's company, but

21  that was -- Teig doesn't sound like the right -- was he

22  with Langley or --

23  Q    No.

24  A    Okay.  No.

25  Q    And his last name is spelled T-e-i-g; but it's

1  pronounced "Teig," kind of like Tide detergent.

2              Larry Austin?

3     A    No.

4     Q    I have a few questions about the Federal Energy

5  Regulatory Commission, or FERC.  That won't take very

6  long, and you may have answered some of these

7  previously.

8              When you acquired The Bishop Group assets,

9  there were matters outstanding before the FERC, correct?

10    A    Correct.

11    Q    Was there more than one matter outstanding?

12              There was the rate case.

13    A    I mean, the rate case was the majority.  I'm

14  tying to think if there was any peripheral issue that

15  was hanging around at that point.

16              For the most part, it was the rate case.

17  I don't -- there may have been some other things, but I

18  don't recall.

19    Q    Can you just explain a little bit about that

20  and how it was resolved?

21              Because it was kind of in the middle of

22  it --

23    A    Right.

24    Q    -- when -- okay.

25    A    Before the F.E.R.C., they had had initial rates

1  set with they and their customers with the understanding

2  that those rates would be in effect until their first

3  rate case was due, which was, I think, about three years

4  into the contract or something like that; and so all the

5  preparation for that rate case was just in the -- it was

6  right in the starting position as we started to acquire

7  Kansas Pipeline.

8              So we sort of took over in midstream, if

9  you will, with the rate case; and we, of course,

10  in-house and with experts from -- regulatory experts in

11  Washington as well as FERC counsel in Washington, we

12  sort of got our arms around and handicapped what we

13  thought was going to be the cost of service in that

14  pipeline going forward and proceeded with the rate case.

15             We could never, ever reach -- over the

16  course of the next two years, we could never, ever reach

17  a settlement with about four different parties on the

18  other side, which was the Missouri Public Service, the

19  Kansas Corporation Commission; and although they were

20  the real drivers because they were allowing Kansas Gas

21  Service and Missouri Gas Service to either pass through

22  the rates that we charged or not allowing them, they

23  were really driving them in their negotiations.

24             So at the end of the day, you were really

25  negotiating with the two state agencies; and we could

1 never reach agreement post our acquisition with those

2 four entities.  And so we ended up having to go through

3 a full-blown rate case, a full hearing before the

4 F.E.R.C., which is --

5     Q    Which you were not aware of, I guess, at the

6 time of the acquisition?  Did you know it was going to

7 progress in that manner or --

8     A    No.  We thought that we would have had a

9 reasonable chance of having a settlement with the

10 customers.  What we didn't really handicap very well was

11 the animosity there was built up between Langley as well

12 as the Public Service Commission, on both sides, and the

13 customers.  I mean, it was really a nasty battle that we

14 inherited.

15     Q    How was that ever resolved?

16     A    Well, it was resolved via the full-blown rate

17 case that happened.  So eventually the FERC had to rule

18 on exactly what that cost of service was, and it was

19 quite a bit less than what we had anticipated.

20     Q    How much longer did that drag on?

21     A    Almost two years, I think.

22              THE WITNESS:  Jana, didn't it?

23              MS. JORDAN:  Just last year.

24     A    Yeah.  So, yeah, maybe almost three by the time

25 we actually got to the end of the settlement, because

1   you get a settlement and then the intervenors come back

2   and appeal and it goes to -- there were just all kinds

3   of -- the legal fees on it were just horrendous for two

4   or three years.

5       Q    (BY MS. CRESWELL)  How does FERC operate so far

6   as to -- what does it look at to examine or to resolve

7   matters such as that?

8       A    Well, I'm not the greatest FERC expert; but

9   there are a dozen things that go into their

10  cost-of-service calculations.  I mean, everything from

11  how much -- the legal fees, the cost of the physical

12  operation, all the filings that are done on an F-2,

13  which just basically says your general administrative

14  and your corporate overhead as well as your field

15  operations and so forth, and adding all those things

16  together.

17              And then there are a lot of other

18  financial considerations that go into:  What is your

19  depreciation over so many years, and is it allowed for

20  this?  Is it allowed for that?  A very complex set of

21  probably 20 different criteria that they look at

22  seriously that have big effects on the rate that you can

23  charge.

24              And you, of course -- you file one set

25  saying -- claiming that this is what your actual costs

1   are and all of your customers file another set and never

2   the twain shall meet until you either have a --

3   negotiate a settlement in advance or you get to actually

4   have the hearing before the FERC, which is what happened

5   in this instance.

6       Q    What interest would FERC have in the sale of a

7   company owning FERC-regulated assets or assets that were

8   already in litigation for rates?

9       A    Well, I don't know that they would have any

10  interest in the company that was selling.  They just

11  have an ongoing interest in the rates charged by the

12  company that's being sold.

13            Did that -- is that what you're asking?

14      Q    Okay.  Say that again.

15            MS. CRESWELL:  Or, Yvonne, clarify what

16  I'm trying --

17            MS. PETERS:  We spoke to Mr. Langley, and

18  he said he could not possibly have sold the assets of

19  his company without getting the approval of FERC and

20  that FERC would not allow -- give such approval.

21            And so we were just wondering -- just kind

22  of to get your side insofar as, if you know, for

23  purposes of FERC regulation, whether FERC requires some

24  sort of filing when a company who has a FERC-regulated

25  pipeline has decided to either sell the pipeline or sell

1  a subsidiary owning a pipeline.

2            THE WITNESS:  Well, let me think back on

3  that.  I'm not sure I can give you the legally correct

4  answer on that, but I was going to say it seems to me

5  like we have to have approvals of FERC on all the

6  pipelines we have bought and/or sold that are FERC

7  regulated.

8            MS. PETERS:  Would they have any ability

9  to prevent the sale of a pipeline?

10            THE WITNESS:  Let's see.  Do they have the

11  ability to control the ownership of the pipeline?

12            MS. PETERS:  Uh-huh.

13            THE WITNESS:  I think probably only

14  peripherally from the standpoint of, you know, they

15  can -- they set your cost of service.  So whatever they

16  want to do along those lines, they can probably

17  indirectly affect whether something sells or doesn't

18  sell.  I don't know whether they can just restrict the

19  ownership of a pipeline or not.  It doesn't seem to me

20  that they can; but, you know, that's purely speculation

21  on my part.

22            MS. PETERS:  Sure.  Sure.

23    Q    (BY MS. CRESWELL)  The next questions -- and

24  whenever anybody needs a break, please feel free to --

25  I'll try to watch my watch also.

1           The next questions are about the various

2    participants in the transaction, some which we have

3    touched on and some which we have not.

4           And you have stated that you did know or

5    meet Dennis Langley at the time --

6       A    (Nodded head up and down.)

7       Q    -- that he did approach you -- or did approach

8    Midcoast with an opportunity to sell -- he was wanting

9    to sell his stock in The Bishop Group.

10          On -- in ongoing terms, what part did

11   Mr. Langley play in the negotiations and in the

12   transaction?

13      A    I think from start to finish he was very active

14   in most all phases of it.

15      Q    So he would have actually been one that would

16   have sat down and -- at meetings and discussed various

17   terms and contracts, that sort of thing?

18      A    Yeah.  I mean, he certainly would have been

19   there a good share of the time on most of those

20   meetings.  Uh-huh.  He was very proactive with regard to

21   that side of it.

22          MS. PETERS:  Did he meet with you-all

23   after Fortrend came in to facilitate the transaction?

24          THE WITNESS:  He was in the office down

25   here at one time near the closing.  I don't know if it

1   was necessarily a meeting or whether he was just in town

2   and stopped in.  I didn't meet with him post that that I

3   can recall.

4           MS. PETERS:  Do you know if

5   representatives of Midcoast --

6           THE WITNESS:  Could have.  They may have.

7   I don't really remember.

8       Q    (BY MS. CRESWELL)  I know project development

9   agreements were entered into with Mr. Langley.

10          Did you have any contact with him in

11  regards to those project development agreements,

12  Mr. Tutcher?

13      A    Well, yeah.  That was a real critical part of

14  the negotiations from Day One.

15      Q    Right.

16      A    It was, again, his way to bridge the gap

17  between what we were willing to pay and what he was

18  asking; and it got extremely complicated with regard to

19  this development arrangement that we had with him as

20  well as two or three other side arrangements that he

21  wanted to have be part of the deal that he felt he could

22  attribute value to to close that gap.

23          And as all of our guys worked through

24  it -- and I wasn't terribly active in negotiating all

25  those different arrangements.  It was more Chip and

1  Richard and some of our b-dev guys.

2                    But they kept coming back to me and

3  saying, "Well, is this -- here's where we are."

4                    And I'd say, "Well, okay.  Let's take the

5  next step and see where we end up at the end of the

6  day."

7                    And it just got more convoluted and more

8  convoluted and more convoluted during all these

9  negotiations.  And finally at the end of the day, we had

10  a document that we thought, for the most part, was

11  pretty much agreeable; or we had an arrangement that we

12  thought was pretty much agreeable.

13                    And, you know, I looked at this; and at

14  the time, Midcoast was not a huge company.  I mean, I

15  think our market cap at that particular point in time

16  was maybe 150 million or something like that.  So this

17  was a very, very -- this was far and away the biggest

18  transaction we had ever done, and so it was very

19  important that we get it right.  And I was nervous about

20  the whole thing.

21                    And just to tell a little story that I've

22  told everybody is that I went home after we -- thinking

23  that we had pretty much hammered out most of the deal

24  points and had a very sleepless night and the next

25  morning got up and called together all my guys in the

1   company which were involved in this thing, as well as

2   Herbst and a couple of other people on the board of

3   directors, and said, "Here's where I'm at with this,

4   guys; and, quite frankly, I'm just not comfortable.  I

5   feel like all of these ongoing arrangements and

6   agreements that we have for future development and all

7   the things that we have tied ourselves to Dennis Langley

8   going forward are unquestionably going to end up at some

9   point in time in litigation.  It's too complicated, and

10  there are too many gray areas.  It's just not papered

11  well.  It's just not -- I'm just uncomfortable going

12  forward with this."

13          I said, "The issue will probably be -- if,

14  in fact, we do get in a litigation with him, it won't be

15  for a million dollars or $2 million.  It's going to be

16  for 40 million or 50 million."

17          And that's probably one of the few things

18  that can take apart a very good company, as Midcoast is

19  right now.

20          And so at that point in time, I just

21  called Dennis up and said, you know, "This is too

22  convoluted.  It's gotten there.  I'm not trying to

23  retrade.  I'm just telling you we're not going to do the

24  deal as is."

25          And at that point in time, he said, "Well,

1   I'm really disappointed," and whatever and called back

2   and said, "Is there a price at which you would do it?"

3                   And finally we just kind of arrived at

4   getting rid of all of these agreements and all of this

5   ongoing type of arm-in-arm transactions we had talked

6   about with him and then increasing the price slightly

7   over what we originally had handicapped it.  And that

8   was kind of where -- and then it got back on track after

9   that point.

10                   But the basic crux of it was that I

11  just -- when I -- when we went back to start negotiating

12  after that fell apart at that point in time was that I

13  told all my advisers, all my guys in-house, as well as

14  our outside counsel that, you know, I wanted to be --

15  completely be able to completely separate ourselves from

16  Langley post this transaction; and that was the goal

17  that they set about doing after that.

18      Q    You had commented earlier, stated that his

19  price was somewhere here; and the final -- your final

20  price was somewhere here (indicating).

21                   How far apart was it?  Do you recall rough

22  numbers at all?

23      A    You know, very rough numbers, because it was --

24  you know, there were a lot of balance sheet adjustments.

25  There were a lot of adjustments for cash on the balance

1   sheets; but it was like maybe 175 versus 210 originally

2   or something like that, as I recall.  And at the end of

3   the day, I think we were maybe at 185 or something like

4   that or -- we were probably -- I think the closing deal

5   was something over 190 and that was the way it was

6   announced in the paper, but that included some cash on

7   the balance sheet and some other things.  So the basic

8   thing that we calculated our rates of return and our

9   return on equity at were, I think, somewhere in the

10  185 million-dollar range or something like that.

11      Q    So when you had that conversation with

12  Mr. Langley or determined with your people that it was

13  not worth these project development agreements and

14  whatever the side agreements were to continue on with

15  Mr. Langley, you would be better off to separate

16  yourself, is that --

17      A    Yeah.  Well, let me clarify that.

18           It wasn't that we determined what they

19  were worth.  We determined what a handicap it was going

20  to be going forward.  They were worth nothing to us.

21  They were worth something to him.

22      Q    To him, right.

23      A    And I just said, you know, "I'm sorry.  This is

24  not going to be an ongoing transaction with you."

25           And most of that stemmed from the

1   standpoint of -- I mean, you could just tell the man was

2   in -- every time he had had a relationship with --

3   whether it was one of his customers or a regulatory

4   agency or the state democratic committee or whatever it

5   was, he had always ended up in litigation with them; and

6   so that was just the main reasoning behind us wanting to

7   cut the thing off completely at the time when we

8   finished the transaction.

9       Q    At -- timelinewise, can you say when Fortrend

10  then entered the picture, kind of with your last

11  statements in mind?

12      A    Not really.  I mean, it was -- it was all -- I

13  mean, it was post our doing that, as I recall, or having

14  that little breakup with the idea of the contracts, as I

15  recall; but I'm not even sure about that.

16           MS. PETERS:  But that was before the

17  closing of the actual purchase that you decided to not

18  continue with the project development agreement?

19           THE WITNESS:  It was close to that, but it

20  was like -- I mean, between the HSR filing and when it

21  was actually closed and then when we actually signed the

22  contract and all the different moving dates, I don't

23  recall exactly what happened when.

24           MS. PETERS:  Well, we have some exhibits

25  that might help you recall.

1              I just have one question.

2              So with the project development agreement,

3    it sounds like from what you're saying that that was

4    something that Mr. Langley wanted, not something that

5    you requested or, I guess, commenced.

6              Would --

7              THE WITNESS:  That's correct.

8              MS. PETERS:  -- that be, correct?

9              THE WITNESS:  That's exactly correct.

10             MS. PETERS:  And for -- what was your

11   understanding of why that -- he wanted that agreement?

12             There are some obvious things; but was

13   there something in particular that he wanted to get out

14   of that, as you understood it?

15             THE WITNESS:  Well, that's just what I've

16   been saying all along.  It was his way of, in his mind,

17   bridging whatever the value gap was between what we were

18   offering and what he was asking; and I guess in his own

19   mind, he perceived value in ongoing development.

20             I think part of it, for example, was that

21   if we got a rate -- a cost of service from the FERC

22   above a certain amount, he'd get half of it.  Seems like

23   there were some refunds from some places that he'd get

24   part of it back and then as well as -- you know, he had

25   grandiose plans of having electric generating facilities

1  and pipelines being built to them and Indian lands

2  development somewhere and something else.

3              So, I mean, in his mind, I assume they

4  created value.

5              MS. PETERS:  Okay.

6              THE WITNESS:  To us, they created negative

7  value.

8              MS. PETERS:  Okay.  Okay.

9      Q    (BY MS. CRESWELL)  Do you know James Pryde,

10 Mr. Tutcher?

11      A    James Pryde.

12      Q    P-r-y-d-e.

13      A    Jim Pryde.

14      Q    Yeah.  Jim Pryde.

15      A    Was he a lawyer?

16      Q    Yes.

17      A    Yeah.  For --

18      Q    Bryan Cave?

19              Does that --

20      A    Yeah.  Okay.

21      Q    -- ring a bell?

22              Bryan Cave, as I recall, is representing

23 Mr. Langley; is that correct?

24      A    That sounds right.

25      Q    Okay.  Do you recall what role he would have

1    played in the purchase?

2       A    We were, for the most part, in their offices.

3    So I assume he was probably kind of the lead counsel on

4    this transaction for him.

5       Q    Did you have -- how much contact did you have

6    with him?

7       A    Oh, I mean, I guess it depends on how you

8    define "contact"; but, I mean, for example, we had --

9    the first big meeting we had up there, we probably had

10   35 people in the room, probably half of which were ours

11   and half with them.  And I couldn't tell you which Jim

12   Pryde was from the other 15 attorneys in the room.

13      Q    What about Tino Monaldo?

14      A    He was -- as I recall, he was an employee -- he

15   was either an employee or a consultant to Dennis

16   Langley.

17      Q    Okay.

18      A    And he was, you know, one of the big leaders,

19   one of the people who was always answering the

20   questions, one of the main negotiators for him, and so

21   forth.  So he was very much involved in the whole

22   process.

23      Q    Okay.  Chris Fisher?

24      A    I don't remember that name.

25      Q    Okay.  We asked about Chris Kaitson.  So I

1  think we've covered Mr. Kaitson.

2              And Richard Robert.  I was hoping I was

3  saying that name correctly.

4      A    Uh-huh.

5      Q    And Chip Berthelot.

6              And Ron Chachere.

7      A    Uh-huh.

8      Q    Do you know Cynthia Morelli?

9      A    I don't remember that name either.

10     Q    Okay.  And Gary Wilcox?  Do you know Gary

11  Wilcox?

12     A    That name's familiar, but I can't think what

13  he -- who he was or what he did.

14     Q    Okay.  I believe the rest we've covered.

15              The next questions have to do with the

16  progression of events and the structure of the actual

17  transaction.

18              My first question was:  How did you learn

19  of Mr. Langley's desire to sell his stock?  But you've

20  answered that one, that he did approach Midcoast.

21     A    The first actual meeting was that he came to

22  the office ostensibly just to meet me, as a

23  get-together, because we had tried to do some business

24  with them companywise, tried to do some business with

25  them, attach some pipelines to KPC and so forth in the

1  past; but he and I had never met.  So ostensibly he was

2  down here to meet other people; but as he did and we had

3  our first meeting, it was sort of like, "Well, are you

4  interested?"

5              And at that point in time, for the most

6  part, I said, no, we weren't; and then after that, it

7  was meetings with the rest of our group.

8     Q     It was my understanding that Chase Securities

9  kind of handled -- on Mr. Langley's end handled for him

10  the actual way that the offers would be submitted and

11  such.

12             Did you deal with Chase?

13    A     Yeah, Chase was very much involved in the

14  process.

15    Q     But it was after Mr. Langley's --

16    A     After that very first visit, yes.

17             In fact, I think, for the most part, he

18  was down here, he told me, to meet with Enron, I know;

19  but it seems to me like he was down here meeting with

20  Chase at that particular meeting, too, now that you say

21  that.

22    Q     So after you had the meeting with Mr. Langley

23  and then made the decision that maybe you were

24  interested, then did you contact Chase or how

25  technically did that go or do you recall?

1     A     You know, as I recall, one of our people,

2  probably Bill Bray, because he was sort of the contact

3  man, I'm sure was contacted by Chase; and that was what

4  started it off.  And Bill came to me and said, "Do we

5  want to look at this?"

6               And I said, "Well, at least" -- I mean, we

7  looked at everything.  That was just the way we did

8  business.  If something came in the door, until we saw

9  something we didn't like about it, we'd take it to the

10  next step.  So I'm probably sure that's kind of how it

11  transpired after that.

12     Q     So to your knowledge, was Mr. Langley

13  negotiating with other prospective stock purchasers at

14  the same time he was negotiating with you folks?

15     A     He was negotiating with other buyers.  Whether

16  or not it was stock purchasers, I don't know; but, I

17  mean, he was certainly -- he led us to believe that

18  there were at least three or four or maybe at one point

19  in time he might have tried to convince us there were a

20  dozen people out there trying to buy it.

21     Q     Do you recall -- you mentioned Enron.

22               Did he --

23     A     He mentioned -- he kept using Enron, and so

24  that was one he specifically mentioned to us.  I'm

25  trying to think if he ever actually said other names or

1  if we just sort of imputed those names, but there

2  were -- you know, as I said, he led us to believe that

3  there were always four or five people out there trying

4  to compete on this.

5       Q    Was there ever a point in time when Mr. Langley

6  led you to believe that he was only negotiating with

7  Midcoast?

8       A    Yeah.  I mean, even though he had these people,

9  it was sort of like he was holding them at bay if we

10  could strike a deal, if I can characterize it that way.

11  He never necessarily quit negotiating with them or told

12  them, "No.  We've got an exclusive deal"; but as long as

13  we were moving forward, he kept indicating to us that,

14  you know, if we could get a transaction done, then we'd

15  continue on and he wouldn't talk any further with anyone

16  else.

17       Q    Was there an expectation on your part of

18  confidentiality about your dealings with Mr. Langley and

19  The Bishop Group?

20       A    Yeah.  I'm quite sure we had confidentialities

21  going both directions executed with him, as I recall.

22       Q    Okay.

23            MS. PETERS:  So if you -- for an example

24  of what your expectation of the confidentiality was, if

25  Langley had sent a draft of a document that he was

1  negotiating with another potential purchaser to you to

2  encourage you to increase your bid or responding in some

3  way, would you have considered that a violation of

4  confidentiality with that?

5            Or let me put it the other way.

6            If it was you he was negotiating with and

7  he sent a document of a draft of a document that you and

8  he or his representatives had been working on to another

9  party to encourage them to increase their bid, would you

10 have considered that a violation of the confidentiality

11 agreement that you had with him; or is that --

12           THE WITNESS:  Okay.  You'll have to give

13 me the scenario again.

14           MS. PETERS:  Okay.

15           THE WITNESS:  Okay.

16           MS. PETERS:  Suppose Mr. Langley and you

17 were drafting a possible agreement to purchase his

18 assets and he had another party out here who he was also

19 potentially going to sell his assets to and this

20 agreement was just a draft you were in the process of

21 negotiating with him.  There was no agreement that this

22 was an exclusive deal.  You maybe had an idea there

23 would be other parties out there; and he sent a copy of

24 that draft that you and he had worked on, clearly a

25 draft, to another party to encourage them to --

1                    THE WITNESS:  To a competitor in the

2    process?

3                    MS. PETERS:  Right.

4                    Would you have considered that a violation

5    of your confidentiality agreement with --

6                    THE WITNESS:  I mean, you know, off the

7    top of my head, as you describe it, I probably would

8    have, yeah.  I mean, I guess there probably could be

9    extenuating circumstances to cause that; but off the top

10   of my head, it would seem that that would be a

11   violation, yes.

12                   MS. PETERS:  And the confidentiality

13   agreement, as you recall, was that the agreement that

14   Chase had sent to you?

15                   THE WITNESS:  You know, we get --

16                   MS. PETERS:  You don't know?

17                   THE WITNESS:  -- we get so many different

18   ones in all the time, and sometimes it comes from the

19   banker.  Sometimes it comes directly from the company.

20   I don't really recall which one it was.

21                   MS. PETERS:  Okay.  Okay.

22      Q    (BY MS. CRESWELL) So just to kind of set the

23   stage as to where we left off, once Fortrend entered the

24   deal, then you begin negotiating an asset purchase with

25   Fortrend --

1    A    As I recall.

2    Q    -- if that is correct.

3              What corporate or other ownership

4    structures did you create within Midcoast to actually

5    receive those -- the assets, which were primarily that

6    Kansas pipeline?

7    A    I don't know that we did.  If we did, I don't

8    recall what they would have been.

9              You're suggesting that we --

10   Q    Did they go into a subsidiary of Midcoast to be

11   held within the corporate structure?

12   A    I don't really remember, to tell you the truth.

13   Q    Okay.  We've talked a little bit about these

14   other agreements that you were working through with

15   Mr. Langley, and let's just go through those to make

16   sure that we're understanding.

17             There were two project development

18   agreements, as I understand; and from what you have

19   indicated, those were agreements that Mr. Langley was

20   pushing for.  Those were sticking points on his end that

21   he would like to have seen brought to fruition in the

22   deal, if that is correct.

23   A    I think that's correct.

24   Q    Okay.  Were consulting agreements entered into,

25   too?  Was that part of what Mr. Langley was hoping to

1  achieve other than these --

2      A      Probably somewhere in those agreements there

3  were consulting -- there were the words "consulting" --

4  or, I mean, yeah.  I mean, he was trying to add value

5  every place he could and keep a hook in us every place

6  he could going forward.  So I've got to think that, you

7  know, not only him but it seems like there were even

8  some of the people that had worked for him that we were

9  having to take on as consultants.

10             You know, we talked about -- I mean,

11  things like the office space, we were supposed to take

12  over; and there was value associated with that, just

13  various things like that.  But it was, as I said, a very

14  complicated, convoluted thing and I've got to think

15  probably there was "consulting" in there somewhere, but

16  I don't specifically remember.

17             MS. PETERS:  Did they provide you with

18  consulting services on the FERC matter or did you just

19  use their counsel after you acquired it or do you

20  recall?

21             THE WITNESS:  Potentially they did because

22  it seemed like -- for example, they had a lot of the

23  documents sort of codified; and we had no way of, you

24  know, bringing a lot of that stuff that -- there were,

25  like, literally over 10,000 documents requested by the

1  FERC and by the intervenors.  So getting that stuff

2  together, it seems to me like we used some of their

3  people after the fact to do that.  I don't remember

4  whether we paid them consulting fees or that was just

5  part of the transaction or what the deal was but --

6      Q    (BY MS. CRESWELL)  Are you familiar with the

7  flight systems agreement?  Does that sound familiar to

8  you, Mr. Tutcher?

9      A    No.

10     Q    Okay.

11     A    Flight systems agreement.

12     Q    Flight systems agreement.

13     A    No.

14     Q    Tax indemnity agreement?

15     A    No.

16     Q    Okay.  Stock redemption agreement.

17     A    No.

18          I mean, you know, I'm sure these were part

19  of -- those names sound familiar to me; but

20  specifically, I don't know what you're referring to.

21     Q    Okay.  What about the Butcher Interest?

22     A    The Butcher Interest, as I recall, was an

23  override on the pipeline that was held outside of the

24  FERC-regulated entity; and as I recall, we had a lot of

25  problems trying to figure out what we were going to do

1    with that.  It was -- it had -- as I recall, it was

2    just, as I said, an override.  So there were not a lot

3    of expenses involved in it.  It was something that, as I

4    recall, was probably -- we felt like Midcoast wanted it

5    because it was going to be a source of cash flow that

6    went straight to our bottom line.  So it was something

7    we wanted.

8                    And there was a lot of controversy

9    swirling around it because I think it -- you know, we

10   were trying to figure out, No. 1, whether it was legal

11   in the eyes of the F.E.R.C., how they were going to

12   treat it, whether they might have to become part of the

13   rate base.  There were a lot of things swirling around

14   it, but I do -- you know, I think we had to -- as I

15   recall, we had to handle it sort of separately.

16       Q    So of these items listed, the Butcher Interest

17   really was one that Midcoast saw as an enhancement --

18       A    Yes.

19       Q    -- to the deal.

20       A    Yes.

21       Q    Okay.

22                    MS. PETERS:  And when you say "override,"

23   could you explain that a little bit?

24                    THE WITNESS:  Well, I mean, it's kind of

25   an odd arrangement that, as I recall, Langley had.  It

1    was -- you know, the pipeline makes X amount of money in

2    Kansas Pipeline Corporation, which was the regulated

3    entity.  I think that's the correct regulated entity.

4                  And it had to -- it had to pay another

5    entity out there, this Butcher Interest, however --

6    wherever that name came from, it had to pay part of its

7    income out to that other interest; and as I recall, the

8    real dilemma swirled around whether or not that could be

9    part of your cost of service or whether the FERC was

10   going to disallow it or whether there was even ever a

11   legal right to do that.

12                  I think at the end of the day, we

13   determined there was; and we went ahead and bought it.

14                  MS. PETERS:  So that was a payment to --

15   that was a payment that had nothing to do with the FERC

16   regulation or the amount of the gas pipeline?

17                  THE WITNESS:  I don't want to say that a

18   hundred percent to be the case because I don't remember

19   exactly how the FERC treated it.  All I know is that we

20   had problems trying to determine whether or not it

21   was -- he could regulatorially make those payments as it

22   was structured.  And I think eventually we determined

23   that he could and I think we went ahead and bought that,

24   but, again, I don't remember it exactly.

25                  MS. PETERS:  Were those payments based on

1    the amount of -- the amount of gas flowing through the

2    pipeline, or was there some basis for the payment?

3            THE WITNESS:  I think it was based on

4    Btu's or something, but I don't really recall the

5    specifics of it.

6       Q    (BY MS. CRESWELL) I think some of these next

7    questions we've already answered, if Yvonne would glance

8    over them just to make sure; but they're asking about

9    what were the key items of the -- for Midcoast.

10           And it sounds like you would be

11   interested, of course, in the Butcher Interest; and

12   perhaps Mr. Langley was interested in the project

13   development agreements and some of those other types

14   of --

15       A    Let me clarify the Butcher Interest thing.

16       Q    Okay.

17       A    We would have had an interest in it if we could

18   understand it and if there weren't all of these things

19   attached to it.

20       Q    Apparently that was your problem, too.

21       A    Well, yeah, it's a problem with everything that

22   had to do with this.  You know, we didn't know whether

23   it was going to be still -- we didn't know whether it

24   was worth anything or not.  So we weren't sure whether

25   we wanted to buy it or not.  We just didn't -- we didn't

1  opine on that until we could get it clarified.  You

2  know, before the FERC and with outside counsel, that

3  just didn't happen early on.  We just didn't understand

4  how it worked.

5      Q    Okay.  Did the purchase price include all of

6  those components as we've kind of been talking about, or

7  would some of the payments be deferred or stated

8  separately?

9      A    I think some of them were stated separately and

10  deferred or not necessarily -- I mean, it wasn't we were

11  going to buy all of this at once.  It seemed to me like

12  we had several documents involved that we -- I think the

13  Butcher Interest was one of them that we weren't -- you

14  know, it wasn't necessarily part of the deal.  It was

15  sort of an option at the end of the day --

16      Q    Okay.

17      A    -- that we would have that we weren't

18  necessarily -- until we could fathom through what all

19  these things meant.  I think there were two or three

20  things that didn't settle out till after the fact.

21              MS. CRESWELL:  Okay.  Okay.  I think we

22  need a little break, if that's okay with the rest of

23  you.

24              I don't know.

25              Ten minutes, is that sufficient?

58

1              (A break was taken from 10:10 to

2              10:26 a.m.)

3              MS. CRESWELL:  I'd like to remind you,

4    Mr. Tutcher, that you still are under oath; and we'll

5    continue with the interview.

6              We'd like to enter our first exhibit.

7              Enter the letter from Midcoast to Chase

8    Securities as Exhibit 1.  This document is Bates stamped

9    002195 through 002204.

10             On August the 30th, 1999, Midcoast sent

11   Chase Securities a letter proposing the purchase of

12   stock and a redlined redraft of a document titled

13   "Agreement and Plan of Merger."

14   Q    (BY MS. CRESWELL)  Mr. Tutcher, I'll give you a

15   minute to look at the letter; but I'd like to ask you if

16   you're familiar with this letter.

17   A    I glanced at it yesterday as we were going over

18   things; but I didn't read it, you know, word for word

19   all the way through.

20   Q    Okay.  Would you confirm that it's your

21   signature that's found on page 2 of the letter?

22   A    It is.

23   Q    Okay.  Can you tell me whose handwriting this

24   is on the first page down towards the bottom?

25   A    Not really.

1    Q    The second page of the letter, it appears to be

2  the same handwriting.

3    A    Yeah.  It just doesn't look familiar to me.  I

4  don't know who did this.

5    Q    Okay.  The bottom of the first page of

6  Exhibit 1, which is "(iii)," does mention -- and on over

7  onto the second page, does mention some of those

8  supplemental offers that we had talked about or touched

9  on previously.

10           Can you tell me again, Mr. Tutcher, how

11 these provisions would have arisen?

12   A    They were, as I said, proposed by Langley

13 and/or his group of people as a means to get to the

14 purchase price or as gap closers, as he called them, I

15 think, was the correct -- the words that he used, to get

16 from where our offer was to where he thought was -- I

17 guess he placed values on these things to get him up to

18 that value that he felt he needed.

19   Q    How much negotiation would have taken place

20 prior to this offer?

21   A    Well, I'm assuming, you know, just because of

22 all of this -- what you just mentioned under (iii) here,

23 because there was a lot of negotiation that went into

24 the -- you know, all of the whistles and bells that he

25 wanted to add and contracts and the relationships he

1   wanted to have going forward.  So I assume we probably

2   had quite a bit of negotiation at this point.

3       Q    Okay.  And would that contact have been with

4   Chase and Langley or Chase only or in combination?

5       A    You know, I think Chase, for the most part, was

6   there at every meeting we had.  So it would have been

7   both.

8       Q    Okay.

9            MS. CRESWELL:  Enter the redline redraft

10  Agreement and Plan of Merger as Exhibit 2.  This is a

11  draft document entered into between Midcoast Energy

12  Resources, Midcoast Acquisition Company, The Bishop

13  Group, and Dennis Langley and consists of pages 1

14  through 35.

15      Q    (BY MS. CRESWELL)  It appears that this is the

16  redline.

17           Are you familiar with this -- this redline

18  draft, Mr. Tutcher?

19      A    Well, I mean --

20      Q    You've had --

21      A    -- again, I glanced at it yesterday.  I didn't

22  read it all the way through.

23      Q    But you have seen it before?

24      A    Uh-huh.

25      Q    Okay.

1      A    I'm sure I have.

2      Q    Okay.  It appears that this is the redline

3  draft that is referred to in Exhibit 1 on page 2,

4  Section -- Paragraph (viii).

5      A    Okay.  It appears what, now?

6      Q    It appears that -- yeah, now that you've found

7  the spot on the letter --

8      A    Okay.

9      Q    -- it is talking about a redline revision.

10     A    Where were you on the letter?

11     Q    Yes.  It's on the second page, (viii).  It says

12  "The Agreement."

13     A    Okay.

14          (Reading silently.)

15     Q    On the second line, "which is a redlined

16  revision of the agreement" --

17     A    Okay.

18     Q    -- it appears that this is the redline that is

19  associated with the letter, Exhibit 1 and Exhibit 2.

20          Does that look to be correct?

21     A    Well, this says "transmitted to us on

22  August 18th" in the letter; and this says "August 30th"

23  in the agreement.  So I don't know whether it is or not.

24          MS. PETERS:  Well, I think the -- I think

25  it is "a redlined revision of the agreement that you

1  transmitted to us on August 18th."

2              On August 18th, Chase had sent an

3  agreement that was not redlined; and you redlined it.

4              THE WITNESS:  Okay.

5              MS. PETERS:  I think we're just trying

6  to -- this attachment was not included with the letter.

7              THE WITNESS:  On the letter?

8              MS. PETERS:  Apparently it was e-mailed to

9  Chase.  So we were just trying to get an idea of whether

10 this would most likely be the one.

11             THE WITNESS:  Most likely.  I mean, I

12 don't know for sure.

13             MS. PETERS:  Okay.  Okay.

14    Q    (BY MS. CRESWELL)  It appears that the redline,

15 Exhibit 2, was a template document?  Would you agree?

16    A    I really don't know what a template document is

17 but --

18             MS. PETERS:  I think --

19    A    You mean was it just a document that we used

20 that we were working through, both the attorneys were

21 sending back and forth?

22             Yes.

23             If that's a template document, that's what

24 it was.

25    Q    (BY MS. CRESWELL)  Were the redline changes, to

1  your knowledge, made by Midcoast?

2      A     You know, we'd have to go through every one of

3  them one by one for me to -- and I'm not even sure I

4  could give you an answer then if we did.

5      Q     Okay.  This offer is an offer to purchase

6  Langley's stock -- is that correct, Mr. Tutcher -- as

7  stated on the letter --

8      A     Yes.

9      Q     -- Exhibit 1?

10     A     Yes, that's correct.

11     Q     Did Midcoast ever bring up the purchase of --

12 purchase of assets with Mr. Langley?

13     A     Well, I mean, when we originally -- as I said

14 earlier, when we originally had the -- talked about

15 price in general, you know, we said, "Obviously if we

16 are going to" -- he said he wanted to sell the stock.

17              We said, "If we are going to buy the

18 stock, it will affect our purchase price, because

19 obviously the assets will be of less value in terms of

20 what depreciable -- depreciation we can take going

21 forward.  So we can buy the stock.  It's just going to

22 affect the purchase price."

23              Did that answer your question?

24     Q     I think so.  Yes.

25              Okay.

```
 1              MS. CRESWELL:  Enter the confidentiality

 2  agreement dated September the 30th, (sic) 1999, from

 3  Fortrend, addressed to Richard Robert with Midcoast,

 4  into the record as Exhibit 3.  The document is numbered

 5  MID 2.1-439 through MID 2.1-442.

 6      Q    (BY MS. CRESWELL)  On September the 20th -- are

 7  you familiar with this document, Mr. Tutcher?

 8      A    I don't believe I looked at this one recently.

 9  I mean, I may have seen it in the past but not --

10      Q    On September the 20th, 1999, Midcoast signed a

11  confidentiality agreement with Fortrend; is that

12  correct?

13      A    According to this, that is -- what date did you

14  say?

15      Q    September the 20th, 1999.

16      A    Yes, that looks to be correct.

17      Q    Okay.  And could you confirm whose signature is

18  found on --

19      A    How could you miss Richard Robert's signature?

20              That's the worst signature I've ever seen

21  in my life; and, yes, it's his.

22      Q    Unless you knew that was "Richard Robert," it

23  would be difficult to read it.

24      A    I absolutely know that's "Richard Robert."

25      Q    Okay.
```

1            MS. PETERS:  It has a "CK" next to it?

2            THE WITNESS:  "CK" is -- you know, as a

3   matter of course, Chris Kaitson, general counsel,

4   usually signs off on a document before we sign it -- or

5   initials a document before we sign it.

6            MS. PETERS:  Okay.

7     Q    (BY MS. CRESWELL)  Can you identify whose

8   handwriting is found on this document on the first page?

9     A    Well, it's either Kaitson maybe or Richard, I

10  would guess, because they both initialed it, "CK" and

11  "RR"; but I don't know who -- no, I guess I really can't

12  identify the exact writing.

13    Q    Were you aware of this agreement at the time

14  that it was signed, Mr. Tutcher?

15    A    Probably not specifically.  I mean, they

16  wouldn't have necessarily brought it to my attention;

17  and I don't recall it.  So --

18    Q    Okay.  The agreement refers to evaluation

19  materials, which was found on the first page in the

20  first bulleted paragraph right here (indicating).

21            Did you ever see these evaluation

22  materials from Fortrend?

23    A    You know, I may have.  I don't recall them,

24  though.

25    Q    Do you know who else would have been aware of

1  this confidentiality agreement besides Mr. Robert and

2  Mr. Kaitson?

3      A    Probably Mr. Berthelot.  You know, potentially

4  Mr. Bray.  And, you know, probably myself.  I'm sure

5  somebody mentioned it to me at one point in time.  I

6  just don't recall, though.

7              And, you know, I would guess probably our

8  other -- our outside counsel was probably aware of it.

9  I mean, anybody that was kind of involved at that point.

10     Q    Did Midcoast give these evaluation materials to

11  any other party, to your knowledge?

12     A    I don't really know.

13     Q    Okay.  Do you know what --

14     A    By "any other party," do you mean, for example,

15  our counsel or --

16     Q    Counsel, right.

17     A    I would assume so, but I really don't know.

18     Q    Don't know?

19              Do you know what happened to the materials

20  that were referred to in this agreement?

21     A    No.

22     Q    Did Midcoast pay any fee to Fortrend to obtain

23  access to the evaluation materials?

24     A    I don't -- I don't know, but I would -- my

25  assumption is no; but I don't know the answer to that,

1  frankly.

2            Did we pay them a fee to obtain materials

3  that we would have used in evaluation?

4     Q    That's right.

5     A    I don't know why we would have; but, I mean, I

6  suppose we could have.  I wouldn't assume so.

7     Q    Did Midcoast pay Fortrend a fee for services

8  that they provided?

9     A    Not that I'm aware of -- or not that I recall

10  anyway.

11     Q    What was your understanding of how Fortrend

12  would be paid?

13     A    Well, as I said, when Fortrend came into the

14  picture, PWC's group, whichever part of PWC brought them

15  to us, I would assume that they were going to be paid by

16  Langley in some way, shape, or form because we -- I

17  mean, we were not going to be involved in dealing with

18  them at all; and we were not going to pay them any fees

19  or consulting fees or anything like that as far as I --

20  as far as I knew.  So I assume the other side had to be

21  paying them.

22     Q    I'm a little bit confused and maybe everyone

23  else understands it, but I'm a little bit confused.

24            PWC -- you were PWC's client with a

25  long-standing relationship there obviously because of

1  the work of various things that they did for Midcoast

2  over the years.

3      A    We were their audit client.

4      Q    Right.

5      A    We were their -- they did a lot of our SEC work

6  for filings, for public offerings, and for -- they did a

7  lot of our work with lending institutions.

8      Q    Right.

9      A    And they did a lot of our tax work, because as

10  we pointed out, we didn't have any in-house tax

11  expertise at that point in time.  And they may even have

12  done -- I don't remember whether they had a consulting

13  group that was a part of it or not, but they did a lot

14  of work for us on an ongoing basis.

15      Q    But from what you're saying or if I'm

16  understanding correctly, then PWC had a tie with Langley

17  with the Fortrend people.

18              Is that -- am I understanding that

19  correctly?

20      A    Well, what happened was some faction of PWC --

21  and it wasn't necessarily one that we were normally

22  doing business with or it wasn't our tax group or it

23  wasn't our auditor or anything else -- said, "There is a

24  company called Fortrend," or whatever the name of the

25  outfit was, "that we think could help bridge the gap

1   between what you're willing to pay and what Langley is

2   asking on this purchase price.  Do you have any problem

3   with us taking those people to Dennis Langley?"

4           And that was what happened from there; and

5   that was where we exited, you know, dealing with that

6   whole thing.

7   Q    I guess I'm viewing things too narrowly.  PWC

8   is a huge outfit.

9   A    I mean, certainly PWC was very much aware of

10  what we were trying to accomplish and that was --

11  Q    Right.

12  A    -- obviously why they brought this --

13  Q    Right.

14  A    -- in, but it was for the benefit of trying to

15  bridge the gap for Langley's -- what he wanted.

16  Q    Okay.  Did Fortrend meet with Midcoast again,

17  to your knowledge, and present the proposal of this

18  confidentiality agreement?

19  A    Certainly not with me, and I don't know that --

20  I don't think that they did with anybody that I'm aware

21  of.

22  Q    Okay.

23           MS. PETERS:  Did they ever meet with

24  Midcoast?

25           THE WITNESS:  Well, they may have; but

1  I -- not that I was involved in.  So I don't really

2  recall whether they did or not, but I don't know whether

3  they did -- I don't recall them having done so.

4       Q    (BY MS. CRESWELL)  The next question, you may

5  have answered.  I'm just going to rephrase it in my own

6  words and see if you concur.

7                 The question was:  If Fortrend did not

8  make a presentation to Midcoast, how was -- how was this

9  conveyed or how was Fortrend's plan or scheme conveyed

10 to Midcoast?

11                So you're saying it would have been

12 through PWC.

13      A    That probably is correct.  And, as I said, they

14 didn't make a presentation to me anyway; and I don't

15 recall them having made a presentation to anybody else.

16 That's not to say it didn't happen but --

17      Q    Right.

18      A    -- my recollection is that that's how it was

19 done.

20      Q    Okay.  Mr. Tutcher, what were your thoughts on

21 Fortrend's involvement?  Did you have any concerns or

22 any -- what were you -- what was your thought process at

23 that time?

24      A    Well, just exactly the same thing that it had

25 been before.  We wanted a very clean transaction.  I

1   didn't really want anything going forward with

2   Mr. Langley, any connection with him whatsoever from a

3   standpoint of -- again, I felt he was litigious; and,

4   secondarily, he was -- he was -- any association with

5   the regulatory agencies, we were doing it -- he had an

6   ongoing piece of it or interaction with us in some way,

7   shape, or form, it was going to be a problem for us.

8   I -- that was my thought process.

9        Q    So you saw that as a benefit, obviously.

10       A    Yes.  I saw removing myself from him, one more

11  step was fine or -- and certainly just wanting to, you

12  know, not have anything to do with anything to do with

13  him whatsoever, whether it was through this or anything

14  else.  We wanted to make sure that all of the things

15  that he wanted to accomplish with ongoing relationships

16  were stopped.

17            MS. PETERS:  What was your understanding

18  of what specifically Fortrend would do?

19            THE WITNESS:  My understanding was that

20  they would step into his shoes and would sell us assets

21  rather than stock; and, therefore, it changed the

22  dollars and cents that we would pay for it because it

23  affected what the basis was in the assets as we took

24  them over.

25            MS. CRESWELL:  Enter Midcoast Energy

1   Resources board of directors' meeting of October the

2   7th, 1999, into the record as Exhibit 4.  This exhibit

3   is numbered MID 1.1-1 through MID 1.1-3.

4       Q   (BY MS. CRESWELL)  Exhibit 4 is the record of

5   the Midcoast board of directors approving to proceed

6   with the purchase of The Bishop Group; is that correct,

7   Mr. Tutcher?

8               I mean, take time to --

9       A   Yeah, I'm reading through it --

10      Q   -- review it.

11      A   -- but that probably is a correct statement.

12              MS. CRESWELL:  Enter Midcoast Energy

13  Resources board of directors' meeting of November

14  the 8th, 1999, into the record as Exhibit 5.  This

15  exhibit is numbered MID 1.1-3 through MID 1.1-4.

16      Q   (BY MS. CRESWELL)  Are you familiar with this

17  exhibit, Exhibit 5, Mr. Tutcher?

18              Take your time to look at it if you need.

19      A   Yeah.  I mean, I haven't read it word for word

20  yet; but it looks to be exactly as you describe it.

21      Q   Exhibit 5 is a record of the board of

22  directors' meeting on November the 8th, which states in

23  regards to the Kansas Pipeline acquisition:

24  "Mr. Berthelot opened the meeting by noting that

25  management believed it was necessary for the Board to

1    re-approve the Kansas Pipeline acquisition because it

2    had changed sufficiently since the Board originally

3    approved the deal."

4              Could you explain something about that,

5    Mr. Tutcher, how it had changed since the October

6    the 7th meeting, which was entered as Exhibit 4?

7    A    If you recall my sleepless night description --

8    Q    Yes, I do.

9    A    -- I think that's exactly what happened in the

10   interim here, which was basically, as I told you, I

11   called Dennis Langley at one point in time and informed

12   him that we were not going to go -- you know, these

13   agreements that he had were too convoluted and that, you

14   know, it was going to have to be a clean transaction and

15   we were going to have to eliminate all of that stuff;

16   and for that, we might be willing to pay some additional

17   money.

18             And "13.6," it surprises me that it was

19   that high.  There probably were some other things

20   involved in that, too; but that was the basic crux of, I

21   think, the change between the two -- between the two

22   times.

23             MS. PETERS:  And when this says "purchase

24   price," it's confusing to me --

25             THE WITNESS:  You're on No. II on the

1 second letter (sic)?

2                MS. PETERS:  Yeah.

3                THE WITNESS:  Okay.

4                MS. PETERS:  Further down in that

5 paragraph under "Kansas Pipeline Acquisition":  "As

6 consideration the purchase price has been increased" --

7                THE WITNESS:  Right.

8                MS. PETERS:  -- I guess I'm a little bit

9 confused about which purchase price.

10               Did you previously have a purchase price

11 for -- because ultimately your purchase price was paid

12 to Fortrend, correct?

13               THE WITNESS:  I mean, I don't know which

14 purchase price we're referring to there either.  Okay?

15               MS. PETERS:  Okay.

16               THE WITNESS:  I mean, this -- this could

17 have been any one of the different --

18               MS. PETERS:  Was there a purchase price

19 associated with the project development agreement, or

20 was that just an agreement that was part of the overall

21 package of the acquisition?

22               THE WITNESS:  I think it was just a part

23 of the package that was an overall agreement.  I think

24 the purchase price that we're referring to would have

25 been some purchase price that had to do with the overall

1  acquisition rather than -- if you're saying, "Does that

2  equate to a purchase price for the" -- if that word --

3  that phrase "purchase price" means for the agree --

4           MS. PETERS:  The project development

5  agreement.

6           THE WITNESS:  -- the project development

7  agreement, no.

8           MS. PETERS:  Okay.

9           THE WITNESS:  I mean, I think what I'm

10 saying here -- what I was referring to there is that

11 13.6 is an increase in the overall purchase price of the

12 transaction; and the reason we're doing that is we're

13 doing away with all of these agreements.

14           So I guess you could somehow equate that

15 to be --

16           MS. PETERS:  And the project development

17 agreement, that was negotiated with Mr. Langley; is that

18 correct?

19           THE WITNESS:  That's correct.

20           MS. PETERS:  So it was not negotiated with

21 Fortrend.

22           THE WITNESS:  No.

23           MS. PETERS:  Okay.

24           THE WITNESS:  You know, I'm saying that.

25 I can't -- I can't think that it was ever a negotiating

1  point with Fortrend because I'd think all of that -- I

2  had already thrown out all of that stuff before Fortrend

3  came into the picture.

4          MS. PETERS:  You had thrown out the --

5          THE WITNESS:  Thrown out the -- I mean,

6  that concept of things going forward with Langley.  So

7  that being part of it, yes.

8      Q    (BY MS. CRESWELL)  And so Langley knew that you

9  were going to be acquiring the assets and you would be

10 assuming that -- the project development agreements; is

11 that right?

12     A    No.  I think -- now, I don't know what Langley

13 knew at this point; but I would assume Langley knew that

14 the project development agreements were going away.

15     Q    Right.

16     A    Now, whether he knew we were buying the assets,

17 I don't know what he knew from that perspective; but he

18 certainly knew -- I mean, I'm not positive; but at this

19 time frame, he certainly had -- we had already had that

20 discussion when I said, "We're not going to have a

21 relationship going forward."  So he knew that those

22 agreements were going to go away, if that's what you

23 asked.  I think I'm answering it right.

24     Q    Okay.  So Midcoast's final price for the assets

25 paid -- the final price that Midcoast paid to Fortrend

1  for the assets was?

2     A    I don't recall.  I mean, as I said, as I

3  recall, it was in the hundred -- I can remember the

4  press release and I can remember the press release was

5  like 190-something, but, again, that's -- you know,

6  those numbers moved back and forth so much because of

7  the balance sheet adjustments and so forth.  So the real

8  net -- the real true worth may have been 205 or it may

9  have been 185, but I remember an announcement of

10  190-something.  So --

11    Q    And part of that purchase price, if I'm

12  remembering correctly, was used to pay the existing debt

13  of The Bishop Group or its --

14    A    Of somebody anyway, yeah.

15    Q    Is that correct?

16    A    There was debt associated with it that was paid

17  off, correct.

18    Q    Do you recall, Mr. Tutcher, how much was

19  borrowed to finance the purchase?

20    A    From the Midcoast perspective?

21    Q    From the Midcoast perspective.

22    A    I mean, I could give you a rough estimate,

23  because, for the most part -- I mean, I think we had

24  done two equity offerings that year; and we always, for

25  the most part -- I mean, the way the company worked, the

1   way our financials generally worked was we tried to

2   maintain about a fifty-fifty debt-to-equity ratio at the

3   end of the day; and what we would do would be we would

4   go out, leverage -- we would acquire $50 million worth

5   of assets, for example, or maybe a hundred million over

6   the course of time and then we would come back and we

7   would issue enough equity to bring us back down to a

8   fifty-fifty debt-to-equity.

9        Q    Right.

10       A    And I think we had done a couple of offerings

11  earlier that year.  So we already had some reserve.  And

12  I would guess that we were shooting at the end of the

13  day to have about 50 percent of that be debt and

14  50 percent of it be equity.

15       Q    Okay.

16       A    So what it was specifically at posttransaction,

17  I don't know.

18       Q    Who was your lender?

19       A    We had a consortium of banks, and I want to say

20  the lead bank at that point in time was B of A.

21       Q    Okay.  Bank of America?

22       A    Uh-huh.

23       Q    I think we've answered these last three

24  questions but I'm going to, again, go over them and

25  pardon me if I'm -- if we're repeating ourselves.

1               From what you said earlier, there was a

2    difference between what you would have been willing to

3    pay for the stock from Mr. Langley and what the asset --

4    there's going to be a difference in there.  You would be

5    willing to pay more for the assets than for the stock

6    because of the additional depreciation deduction.

7               Is that what I heard you say earlier?

8    A    That's pretty much correct, yeah.  Right.

9    Q    Okay.  All right.  Okay.  From the drafts and

10   the documents that we have looked at, it appears that

11   drafting continued into November about some of those

12   agreements, the product development agreements and the

13   stock purchase agreement.  Some of these agreements are

14   dated "as of," and we were -- I was unclear as to

15   exactly what that "as of" meant.

16              Do you -- were the documents completed and

17   signed in October or simply dated "as of" and then

18   actually executed at a later date?

19              I guess the terminology, that may not be

20   something that you --

21   A    I really don't know what they're referring to

22   there.  I mean, I could guess for you; but that --

23   Q    Okay.  Do you know when the asset purchase

24   agreement would have been executed; or is that, again,

25   something that you wouldn't --

1     A     Not without seeing the actual document, I don't

2   know exactly when it was.

3     Q     Okay.  The next question, I think you may have

4   answered also; but, to your knowledge, did Dennis

5   Langley or his representatives know about your plan to

6   purchase the assets from K-Pipe Merger?

7     A     Oh, I don't know what they knew or didn't know.

8     Q     Okay.  Thank you.

9           Was Midcoast involved in the negotiations

10  of the stock purchase agreement entered into between

11  Dennis Langley and K-Pipe Merger?

12    A     Not that I'm aware of.

13    Q     Okay.  Was Langley or The Bishop Group involved

14  in negotiating the terms of the asset purchase

15  agreement?

16    A     I really don't know one way or the other.  I

17  would not think so, but I don't know.  I mean, as far as

18  I know, that was between us and them -- I mean us and

19  K-Pipe or Fortrend or whoever it is.

20    Q     Documents obtained to date seem to show that

21  Midcoast and Bishop/Langley worked together to draft the

22  stock purchase agreement, including the stock redemption

23  agreement, the tax indemnification agreement entered

24  into between Langley and K-Pipe.

25    A     I'm sorry.  Say that again for me?

1      Q     Yeah.  And I will reread it.

2                  MS. CRESWELL:  And can you rephrase it in

3      a more clear manner?

4                  MS. PETERS:  Well, the drafting of the

5      documents for the stock purchase agreement -- do you

6      understand what the stock purchase agreement --

7                  THE WITNESS:  The drafting of the

8      documents of the stock purchase agreement between?

9                  MS. PETERS:  Between -- what is ultimately

10     entered into between Mr. Langley and K-Pipe Merger.

11                 THE WITNESS:  Okay.

12                 MS. PETERS:  It appears from the documents

13     that we have -- and we'll certainly ask Mr. Chachere

14     tomorrow since he appears to have been more involved in

15     the negotiations -- that Midcoast and Mr. Langley

16     drafted that agreement.

17                 THE WITNESS:  Drafted the agreement --

18                 MS. PETERS:  The stock purchase agreement

19     that was entered into between Mr. Langley and K-Pipe

20     Merger, K-Pipe Merger being an entity provided by

21     Fortrend.

22                 THE WITNESS:  Okay.

23                 MS. PETERS:  So our question is:  Is that

24     accurate, or what is your understanding of how that

25     document was drafted?

1                    THE WITNESS:  I wouldn't think that Ron

2    Chachere would have been a part of that, but I really

3    don't know.

4                    MS. PETERS:  Okay.

5        Q    (BY MS. CRESWELL)  We've spoken with

6    Mr. Langley and with Tino Monaldo about how various

7    documents were drafted; and, in essence, their comments

8    were that they were drafting and negotiating two

9    different agreements at the same time, one with Midcoast

10   and then a completely separate one with Fortrend.

11                   MS. PETERS:  Being stock purchase

12   agreements --

13                   MS. CRESWELL:  Right.

14                   THE WITNESS:  Okay.

15                   MS. PETERS:  -- the elements of that

16   agreement.

17                   MS. CRESWELL:  Right.

18       Q    (BY MS. CRESWELL)  The Fortrend one went

19   through while the agreement with you folks obviously did

20   not go through.

21                   Can you provide comments on that

22   statement?

23       A    Well, I mean, I don't know what was going on

24   between Fortrend and them.  I know that we were

25   negotiating a stock agreement.  I mean, obviously

1  we've -- you know, we've seen copies of that.

2            So I know that we were simultaneously --

3  and obviously at the end of the day, we didn't do a

4  transaction with them.  We did the transaction with

5  K-Pipe.  I'm not really aware of what went on with them

6  and K-Pipe or Fortrend behind the scenes.

7            MS. PETERS:  Well, let me just say that as

8  far as the initial agreement that we've shown you,

9  the -- we have -- I guess it's Exhibit 2, the Agreement

10 and Plan of Merger -- that agreement appears to be

11 negotiated until approximately the point in time where

12 the confidentiality agreement is signed.

13            THE WITNESS:  The confidentiality

14 agreement with Fortrend?

15            MS. PETERS:  With Fortrend.

16            THE WITNESS:  Okay.

17            MS. PETERS:  At that point, the

18 negotiations change; and there are exchanges of

19 documents relating to the stock purchase agreement

20 and --

21            THE WITNESS:  Exchanges of documents

22 between --

23            MS. PETERS:  Between Midcoast and --

24            THE WITNESS:  Fortrend.

25            MS. PETERS:  -- Langley --

1                THE WITNESS:  And Langley.

2                MS. PETERS:  -- about the stock purchase

3    agreement that Langley is apparently going to enter into

4    with K-Pipe Merger, the entity of Fortrend.

5                So I guess our question is -- and

6    certainly we'll discuss this with people who were more

7    hands-on in the negotiations; but from what we have at

8    this point, it appears that all of the parties were

9    negotiating these agreements at this point where

10   Fortrend entered the picture.

11               So we were just wondering what your

12   awareness was of that situation or if you had a comment

13   on that situation.

14               THE WITNESS:  Okay.  I apologize, but I'm

15   going to have to go back and understand exactly which

16   situation that you're asking was I aware of.

17               MS. PETERS:  That Fortrend, Langley, and

18   Midcoast all understood that the transaction was a stock

19   purchase facilitated by Midcoast, followed by an asset

20   purchase -- facilitated by Fortrend, followed by asset

21   purchase -- well, let me start again -- that the

22   agreement took place in the manner in which Midcoast and

23   Langley were drafting a stock purchase agreement that

24   Langley and Fortrend executed.

25               THE WITNESS:  I don't really have any -- I

1  don't know why we would have done that, but I certainly

2  don't have any knowledge of us having done that at that

3  point either.

4            MS. PETERS:  Okay.

5            MS. CRESWELL:  Okay.  Enter letter of

6  intent dated September the 30th, 1999, between Midcoast

7  and K-Pipe Holdings Partners into the record as

8  Exhibit 6.  This exhibit is numbered MID 2.1-3 through

9  MID 2.1-6.

10            I'm short one of these.  I apologize.

11            Enter letter of intent dated September

12  the 30th, 1991 (sic), between K-Pipe Holdings Partners

13  and Dennis Langley into the record as Exhibit 7.  This

14  exhibit is numbered 000442 through 000444.

15     Q     (BY MS. CRESWELL)  Have you ever seen Exhibit 7

16  before, Mr. Tutcher?

17     A     Exhibit 7 is K-Pipe to Midcoast?

18     Q     It is K-Pipe -- it's K-Pipe to Mr. Langley.

19     A     Okay.

20            I don't believe I have, no.

21     Q     Yeah, take a minute to look at it.

22     A     (Reading silently.)

23            No, I don't think I've ever seen this.

24     Q     Okay.  Were you aware that Langley entered into

25  this type of agreement?

1                THE WITNESS:  Was this part of the

2  documents we looked at yesterday?

3                I don't recall it if it was.

4      A    No.  So I don't think -- okay.

5      Q    (BY MS. CRESWELL)  Okay.

6                MS. SALINAS:  That's not our Bates stamp.

7                THE WITNESS:  Okay.

8                MR. STERN:  And just for clarification,

9  are these y'all's notes?

10                MS. SALINAS:  On which document?

11                MR. STERN:  The Midcoast letter.

12                MS. CRESWELL:  Are there notes in the

13  margin on your copy?

14                MR. STERN:  (Indicating.)

15                MS. CRESWELL:  Yes.

16                MR. STERN:  I must have gotten your copy.

17                MS. CRESWELL:  Well, maybe that's why

18  we're short a copy.

19                MR. STERN:  As long as the one that's part

20  of the record doesn't have the notes --

21                MS. PETERS:  Yeah.  I don't think that one

22  does.

23                (Discussion off the record.)

24      Q    (BY MS. CRESWELL)  Mr. Tutcher, are you

25  familiar with Exhibit 6, which is the letter to

1  Midcoast?

2      A    Uh-huh.  I did glance through it yesterday.

3      Q    Okay.  And would you confirm your signature on

4  page 4?

5      A    Yes.

6      Q    Okay.  On September the 30th, 1999, Midcoast

7  entered into a letter of intent with K-Pipe Holdings,

8  which is Exhibit 6; is that correct, Mr. Tutcher?

9      A    That appears to be what we did with this

10  document.  Uh-huh.

11      Q    Okay.  Was Midcoast aware at this time that

12  Langley was also entering into a letter of intent with

13  K-Pipe Holdings, which is shown as Exhibit 7?

14      A    Well, was I specifically aware that they were

15  doing that?

16              No.  But, I mean, obviously these are the

17  assets we had been looking at with Langley; and

18  certainly K-Pipe was going to sell them to us.

19  Obviously they were doing -- yeah, they were doing

20  something similar to that.  I don't know that I would

21  have known the exact form of the transaction but --

22      Q    To your knowledge, was Midcoast involved in the

23  drafting of the letter of intent between Langley and

24  K-Pipe Holdings, which is Exhibit 7?

25      A    Not to my knowledge.  I don't know why we would

88

1   have been, but not to my knowledge.

2       Q     Had any meetings with Langley and Midcoast been

3   held apprising Mr. Langley of the new structure of the

4   transaction?

5       A     Between Midcoast and Langley?

6       Q     Uh-huh.

7       A     Not that I was a part of anyway or that I'm

8   aware of.

9             And by "the new structure," you're talking

10  about the K-Pipe thing.

11      Q     Yes, that's correct.

12      A     Okay.  No.

13      Q     How were the terms of the letter of intent of

14  Exhibit 6, which is the Midcoast/K-Pipe Holdings letter

15  that you were somewhat familiar with, how were those

16  terms decided upon?  Do you know, Mr. Tutcher?

17      A     Not each particular, specific term; but I guess

18  in general what -- how we arrived at it was just like we

19  really had, for the most part, from the time we started

20  looking at this with Langley, which was going through

21  and modeling what the effects of each one of these

22  clauses would have on the return -- on our rates of

23  return and what the structure would look like post the

24  deal.  And I assume that we, you know -- we arrived at

25  these numbers that are put in here, you know, based on

1  that analysis.

2              Did that answer it?

3    Q    Yes, that helped.

4    A    Okay.

5    Q    At the bottom of page 1, Paragraph 1 does

6  mention a purchase price of 187.8 million and then does

7  talk about a 10 million-dollar sinking fund.

8              Can you explain -- or can you tell me

9  who -- or give me names of the persons at Midcoast who

10  would have been involved with coming up with that

11  187.8 million?

12   A    It would have been Berthelot and Robert; and

13  probably, for the most part, when you start talking

14  about debts and sinking funds and everything else, it

15  would have been more Richard Robert than anything else

16  would be my guess.

17   Q    Okay.  Do you know enough or can you tell me

18  about that 10 million-dollar sinking fund?  Is that

19  something you could explain?

20   A    Let me read through the whole paragraph --

21   Q    Yeah, please do.

22   A    -- again and see if I can refresh my memory.

23              (Reading silently.)

24              I'm just kind of recalling off the top of

25  my head that that had something to do with the debt, you

1  know, when we acquired -- when we took over part of the

2  debt; and I think it had to do with whether or not we

3  assumed some debt or we didn't assume some debt.  I

4  think that's what it was -- kind of how it was

5  structured, but that's pretty distant recognition.

6      Q    Okay.  If you'll flip to page 2 of the same

7  exhibit, which is Exhibit 6, Paragraph a. mentions a

8  perpetual net revenue interest and describes that.

9            Do you know, Mr. Tutcher, if that was part

10 of the final agreement?

11     A    (Reading silently.)

12           I don't know whether it was or not.  That

13 almost looks like the Butcher Interest; but I'm not sure

14 whether it was or not, which was sort of a separate

15 issue.

16     Q    Paragraph b. on that same page, the last part

17 of that page, Paragraph b(i) and (ii), discusses

18 licensing agreements and telecommunications and -- was

19 any of that part of the final agreement, to your

20 knowledge?

21     A    You know, it seems to me like what -- how we

22 ended up -- some document I read yesterday sort of

23 pointed this out to me that how we ended up was that

24 we -- some of these things were still part of the

25 agreement, but we had the right -- the unilateral right

1   to cancel them at some point in the future, as I recall.

2   So whether or not these were, you know, an actual part

3   of the final purchase and sale agreement, they may well

4   have been.  I'm not -- unless I look at it, I really

5   wouldn't know.

6       Q    Okay.  Paragraph c. on page 3 of Exhibit 6 is

7   referring to contract rights of Dennis Langley.

8              Would that be those project development

9   agreements perhaps?

10      A    That's probably what it refers to.  Uh-huh.

11      Q    Okay.  And then Paragraph 3 on that same page

12  does refer to the Butcher Interest, and we've talked --

13      A    Right.

14      Q    -- we've talked some about that.

15      A    Right.

16             MS. PETERS:  So ultimately how did you

17  handle the Butcher Interest?

18             THE WITNESS:  The Butcher Interest?

19             MS. PETERS:  Yeah.

20             THE WITNESS:  You mean ultimately did we

21  acquire them?

22             MS. PETERS:  Yeah.

23             THE WITNESS:  Yeah.  And I want to say it

24  was after we closed the purchase of the big transaction.

25  I think it was maybe three or four months later we

1  decided that we would -- that the Butcher Interests

2  were -- I think we'd made -- gotten through looking at

3  whether or not there was a problem with the FERC and so

4  forth, and I think we made the decision at that point to

5  close on that.

6              MS. PETERS:  Okay.

7              MS. CRESWELL:  Karl, I don't have you a

8  copy here either.  I apologize.

9              MR. STERN:  That's all right.

10             MS. CRESWELL:  Enter Midcoast's board of

11  directors' meeting dated February the 24th, 2000, into

12  the record as Exhibit 8.  The document is numbered

13  MID 1.1-12 through MID 1.2-16.

14    Q    (BY MS. CRESWELL)  Are you familiar with these

15  minutes --

16    A    No, I haven't read them.

17    Q    -- Mr. Tutcher?

18             If you'd like to --

19             MS. PETERS:  I think the only part is

20  the --

21             THE WITNESS:  Is there a specific piece I

22  need to look at?

23             MS. PETERS:  There is.  I think it's --

24    Q    (BY MS. CRESWELL)  Page 5 --

25    A    Okay.

1     Q     -- Paragraph D --

2     A     Uh-huh.

3     Q     -- where it talks about "in January we

4  terminated the project development agreement with

5  Mr. Langley.  Mr. Tutcher reviewed for the Board that we

6  had elected to eliminate this agreement at the last

7  minute prior to closing the KPC purchase," is that what

8  you remember, Mr. Tutcher?

9     A     Yeah.  I'm reading the rest of it here.

10    Q     Okay.  Yeah.

11    A     (Reading silently.)

12          Yes, that kind of makes sense.  It kind of

13  goes back to, again, the sleepless-night negotiation the

14  next day.

15    Q     Why did you choose not to terminate it

16  officially until January of 2000 instead of back in the

17  1999 year?

18    A     We were talking about this yesterday, and it

19  came back to my mind.

20          I believe -- and I'd really have to talk

21  to Richard Robert to find out, but I believe that at one

22  point in time when we increased the purchase price that

23  we were topping out our borrowing capacities.  And it

24  seems to me like we postponed part of this for that

25  reason.  That kind of is a recollection I have, but I'm

1    not positive about it.

2                   But I guess I would add that I certainly

3    had every intention of canceling those agreements all

4    along.

5        Q    That's pretty clear.

6                   MS. PETERS:  So with the -- it looks like

7    maybe this ties into your having a cash flow problem,

8    but you wanted to use stock as part of the purchase

9    payment.

10                   THE WITNESS:  Yeah.  I believe it was --

11    as I said, I think it was bumping up against a loan

12    covenant; and it was just -- it was one of those things

13    that was going to take some time to rectify.  I mean,

14    you couldn't just pull all the banks together, get

15    changes to the documents, and so forth.

16                   That's kind of how I remember that

17    happened; and I think that was one of the reasons that

18    stock was thrown in there as maybe an option because

19    that would have hit the equity side, obviously, instead

20    of the --

21                   MS. PETERS:  Sure.

22                   THE WITNESS:  Which was not something,

23    again, I really wanted because I really didn't want

24    Dennis Langley as a shareholder either.

25                   MS. PETERS:  Sure.

1                    Well, it doesn't look like he was amenable

2    to this stock at whatever value that you had determined

3    it was.

4                    Do you recall the negotiations about stock

5    with him at all?

6                    THE WITNESS:  Not really; but when you

7    talk about the values, I mean, we wouldn't -- certainly

8    wouldn't have done anything other than what the public

9    price was at that point in time.  So --

10                    MS. PETERS:  I was just a little bit

11    curious --

12                    THE WITNESS:  That sounds -- I mean --

13                    MS. PETERS:  -- whether he wanted big

14    discounts and --

15                    THE WITNESS:  You know, it probably -- I'm

16    sure, knowing Dennis, that was proposed, that we get him

17    some huge discount to the stock; and we obviously were

18    not willing to do that --

19                    MS. PETERS:  Okay.

20                    THE WITNESS:  -- or could not

21    fiduciarily do that --

22                    MS. PETERS:  Sure.

23                    THE WITNESS:  -- in any way, shape, or

24    form.

25                    MS. PETERS:  Sure.  Okay.

1                MS. CRESWELL:   Enter fax cover sheet dated

2    November the 4th and a letter from K-Pipe Merger

3    Corporation to Midcoast into the record as Exhibit 9.

4    This document is numbered KP1463 through KP1465.

5        Q    (BY MS. CRESWELL)   Are you familiar with this

6    document, Mr. Tutcher?

7        A    I didn't read this one yesterday.   So, no, not

8    really.

9        Q    Okay.   If you'd like to take a minute to go

10   through it.

11       A    (Reading silently.)

12                (There was a brief off-the-record

13                interruption in the proceedings by one

14                of the witness' staff.)

15       A    Okay.

16       Q    (BY MS. CRESWELL)   Just to kind of summarize

17   what this document is saying, it is discussing closing

18   and that closing will be extended no later than

19   November the 15th and that if that is the case, Midcoast

20   would have to pay K-Pipe $21,500 for each day that the

21   close was delayed beyond November the 9th.

22                And then on down in the document, it says

23   that Midcoast will pay K-Pipe 14 million on November

24   the 16th, 1999, as K-Pipe's sole remedy for Midcoast's

25   failure to close.

1              So that essentially is that document.

2              Why, Mr. Tutcher, was an agreement like

3  this needed?

4      A    Again, I'm going from rough recollection; but

5  we were, you know, in negotiations with K-Pipe to get

6  the thing done.  And I don't remember exactly why we set

7  these particular dates as targets, but I do remember

8  that the 14 million was sort of a break-up fee-type

9  transaction.  So, in other words, if the transaction

10  didn't take place, we would owe a break-up fee to them.

11              I don't recall where the twenty-one, five

12  came from or why there was that discrepancy between the

13  9th and the 15th; but I assume it was just us getting

14  our house in order financially to be able to pay K-Pipe

15  in a timely manner when we acquired the company.

16      Q    Do you know when this agreement was executed?

17              It makes reference to the asset purchase

18  agreement dated as of November the 5th, '99, in the

19  first sentence; but do you know when this letter was

20  actually executed?

21      A    I really don't.  The date on the fax looks to

22  be 11/4.  So it must have been right around that time

23  frame sometime.

24              MS. PETERS:  Do you know any particular

25  concern about the timeliness of the closing, or was it

1   just --

2                   THE WITNESS:  Concern by --

3                   MS. PETERS:  By Mr. Langley or K-Pipe

4   Merger that it wasn't going to close on time?

5                   THE WITNESS:   I mean, I, you know -- short

6   of the fact that obviously we had some real significant

7   dates here and some real significant penalties, there

8   must have been at that point in time a real drive to get

9   it done, certainly with those dates certain; but I don't

10  know what -- I can't remember what the drivers were

11  behind that.

12                  MS. CRESWELL:  Enter a letter from K-Pipe

13  Merger to Dennis Langley into the record as Exhibit 10.

14  This document is numbered CHA 5-964 through CHA 5-9 --

15  yeah, it's just one -- no.  It is two pages -- 966.  The

16  ending number is CHA 5-966.

17      Q    (BY MS. CRESWELL)  Are you familiar with this

18  document, Mr. Tutcher?

19      A    No.

20      Q    Okay.

21      A    I haven't seen it before, to my knowledge.

22      Q    I'd just like to call your attention to a few

23  things in this document that are quite similar to the

24  document -- or to Exhibit 9, which we entered

25  previously.

1              Down in Paragraph 1, towards the middle of

2    Paragraph 1 of Exhibit 10, there is another penalty

3    clause for delaying of the closing.  In this instance,

4    it says K-Pipe will pay to Langley $21,500 for each day

5    the close is delayed beyond November the 8th.

6              And then on down towards the bottom of

7    Paragraph 1, it does say that K-Pipe will pay to Langley

8    15 million on November the 16th as Langley's sole remedy

9    for K-Pipe's failure to close.

10             And then also on Exhibit 10 on

11   Paragraph 2, the exhibit states that K-Pipe represents

12   and warrants to Dennis Langley that K-Pipe has no plan

13   or intention to liquidate the company and agrees it will

14   not liquidate the company for at least two years after

15   the closing date.

16             What -- what would be your thoughts on

17   that liquidation clause, Mr. Tutcher?

18   A    Well, like I said, never having seen this

19   document before, I don't know that I do necessarily have

20   any thoughts.  I mean, obviously it flies in the face of

21   what actually happened later; but I don't know why it

22   was -- I really can't opine on what they were trying to

23   accomplish.

24   Q    Okay.  So you were not aware that this letter

25   was being entered into --

1      A    No.

2      Q    -- between Langley and K-Pipe Merger.

3      A    No.

4      Q    Okay.

5      A    I mean, let me back up.

6              To say that I am unaware that there wasn't

7    a transaction going on between Langley and K-Pipe would

8    be -- but I don't -- the specifics of this letter, I'm

9    not familiar with.

10             MS. PETERS:  Did you have any particular

11   comments that you wanted to make?

12             We've pretty much finished.  So if there

13   was anything that you wanted to clarify or other

14   comments that you wanted to make.

15             We can take a minute if you want to talk

16   to your counsel and come back or --

17             THE WITNESS:  Well, maybe I ought to just

18   chat with them and see if they have some thoughts that I

19   haven't thought of.

20             MS. PETERS:  Okay.  How about ten

21   minutes --

22             THE WITNESS:  Sure.

23             MS. PETERS:  -- and then we'll just come

24   back.

25             (A break was taken from 11:23 to

1            11:30 a.m.)

2            THE WITNESS:  I just have two

3  clarifications that counsel pointed out, one, that I was

4  a little muddled or unclear about.

5            Again, the sleepless night.  And as I

6  compared the two -- I think at one point in time I said

7  as I compared these two board meetings, October 7th and

8  November 8th, I think I said that that sleepless night

9  occurred between them.

10            And as I reread the minutes of the

11  October 7th meeting, obviously down in the last

12  paragraph there, it says that we had a provision to buy

13  out Langley; and so obviously that was -- my sleepless

14  night syndrome was before that board meeting.

15            I just didn't read it all the way through

16  when we talked about it before.

17            MS. PETERS:  On the one dated --

18            THE WITNESS:  October 7th.

19            MS. PETERS:  -- October 7?

20            THE WITNESS:  Uh-huh.

21            MS. PETERS:  Which paragraph?

22            THE WITNESS:  Okay.  The last paragraph.

23  As you read down through there:  "A Project Development

24  Agreement also gives Mr. Langley certain exclusive

25  rights with regard," such and such and such and such,

1  "for seven years.  There is a provision such that we can

2  buy-out his upside sharing agreement for the greater of

3  $30 million."

4              So I think that my concerns probably were

5  before this meeting.

6              MS. PETERS:  Okay.

7              THE WITNESS:  And I think I said --

8              MS. PETERS:  So you had concerns pretty

9  early on.

10             THE WITNESS:  Yeah.  Absolutely.

11             MS. PETERS:  Okay.  And although -- from

12  what we have for the project development agreement, it

13  looks like there was an option agreement entered into,

14  which perhaps this is referencing, for you to buy out

15  the interest; but there's a lot of negotiations that go

16  on after October 7.

17             So were you having sleepless nights and

18  kind of negotiating and having sleepless nights at the

19  same time and just making sure that you had an out, or

20  do you recall how --

21             THE WITNESS:  There was a specific

22  sleepless night that said, "We are not going to have any

23  more -- we're not going to negotiate any further with

24  Dennis Langley with regard -- that we don't have a

25  specific out to where we are disconnected from him

1  totally at the end of the day."

2          MS. PETERS:  Okay.

3          THE WITNESS:  So that was a one-event

4  deal.

5          I mean, yeah, I did have some sleepless

6  nights in between; but that was the --

7          MS. PETERS:  Okay.

8          THE WITNESS:  -- that was the epiphany, if

9  you will.

10          MS. PETERS:  Do you recall if the option

11  agreement was already in place and it was a sleepless

12  night that, "We're just going to definitely exercise the

13  option agreement"?

14          THE WITNESS:  I think what happened when I

15  called him back was I said, you know, "We are not going

16  to have these going forward."

17          And he said, "Well, maybe we want to keep

18  part of them," and, "Can we structure this thing to

19  where you just -- if you don't want to have that

20  relationship, we'll turn them into -- you can have the

21  option of whether or not to go forward?"

22          MS. PETERS:  Oh, okay.

23          THE WITNESS:  And that was where we kind

24  of tried to -- so there was some negotiations after

25  that, but the point was clear that we didn't want to

1  have any ongoing relationship unless we wanted it.

2            MS. PETERS:  Right.

3            MS. CRESWELL:  So Mr. Langley knew that he

4  would never perform services under those project

5  development agreements.

6            THE WITNESS:  Yeah.  And, you know, I

7  guess as I -- the reason I say what I just said is that

8  I recall him -- he piqued our curiosity a couple of

9  times.  I mean, the guy's a great salesman; and he's a

10  very smart man.  And, you know, it was sort of like he

11  wouldn't ever tell us in some cases what these future

12  things might be.

13            And so until we got to the -- sort of the

14  end of the day, maybe to hear -- or at least a little

15  further into it, we didn't completely exclude it right

16  then; but we wanted to make sure we had the right to

17  exclude it.  We wanted to hear kind of what he had to

18  say maybe a little bit more, and it turned out that at

19  the end of the day that it was just all smoke and

20  mirrors.

21            So does that make --

22            MS. CRESWELL:  Uh-huh.

23            MS. PETERS:  So was this -- do you recall

24  the overall purchase -- we talked about the purchase

25  price before and perhaps you don't recall this, but was

1   that including this -- I know the 10.5 or 7.5 million

2   came in January of 2000 and then it references a

3   purchase price adjustment.

4            Is that encompassed in your -- maybe you

5   still can't answer this question, but I guess we're

6   still curious as far as which purchase price is this

7   referencing here.

8            Do you know?

9            THE WITNESS:  Well, no, I don't --

10           MS. PETERS:  Okay.

11           THE WITNESS:  -- specifically, because

12  those things, as I said, they moved around a lot with

13  regard to what the balance sheet looked like, with

14  regard to different times when -- I mean, we tried to

15  negotiate what the buyout cost, for example, of that --

16  of those agreements we talked about.  We didn't

17  negotiate that for some period of time.

18           So at one point in time, it might have

19  been something different than what the end result was.

20  So there were negotiations that went on dollars and

21  centswise all along until such time as we quit talking

22  to him and started talking to K-Pipe.

23           MS. PETERS:  Okay.

24           THE WITNESS:  The other issue was -- you

25  know, I made a comment about your K-Pipe Merger letter

1  here, the one to Langley, this last one we looked at, I

2  think.

3                  MS. PETERS:  Okay.

4                  THE WITNESS:  And under "2" you said:

5  "K-Pipe represents and warrants to Langley that K-Pipe

6  has no plan or intention," and I made a comment that it

7  sort of flies in the face of what happened and I guess I

8  didn't read this very carefully.

9                  What I meant when I said that was --

10  obviously we ended up buying all these assets, and this

11  was obviously referring to the company that they bought.

12                  So I really didn't have any business

13  opining on that one way or the other.

14                  MS. CRESWELL:  Okay.  So we're referring

15  now to Exhibit 10, for the record, just to make sure

16  that we're --

17                  THE WITNESS:  Is that it?

18                  MS. CRESWELL:  Yes --

19                  THE WITNESS:  I'm referring to this

20  paragraph right here.

21                  MS. CRESWELL:  -- that is Exhibit 10.

22                  THE WITNESS:  Paragraph 2 of Exhibit 10, I

23  made a comment earlier; and I obviously hadn't read it

24  very closely.

25                  MS. CRESWELL:  Okay.

```
 1                    THE WITNESS:  And I think that's all that

 2   I have in terms of any clarifications.

 3                    MS. PETERS:  Okay.

 4                    MS. CRESWELL:  I think we've concluded the

 5   interview.

 6                    (Proceedings concluded at 11:36 a.m.)

 7                    (Tutcher Exhibit Nos. 1-10 were marked

 8                    by the reporter.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        CHANGES AND SIGNATURE

2    PAGE   LINE   CHANGE                    REASON

3    _____  _____  _____     _____

4    _____  _____  _____     _____

5    _____  _____  _____     _____

6    _____  _____  _____     _____

7    _____  _____  _____     _____

8    _____  _____  _____     _____

9    _____  _____  _____     _____

10   _____  _____  _____     _____

11   _____  _____  _____     _____

12   _____  _____  _____     _____

13   _____  _____  _____     _____

14   _____  _____  _____     _____

15   _____  _____  _____     _____

16   _____  _____  _____     _____

17   _____  _____  _____     _____

18   _____  _____  _____     _____

19   _____  _____  _____     _____

20   _____  _____  _____     _____

21   _____  _____  _____     _____

22   _____  _____  _____     _____

23   _____  _____  _____     _____

24   _____  _____  _____     _____

25   _____  _____  _____     _____
```

```
 1   PAGE   LINE   CHANGE                  REASON

 2   ____   ____   _____      _____

 3   ____   ____   _____      _____

 4   ____   ____   _____      _____

 5   ____   ____   _____      _____

 6          I, DAN C. TUTCHER, have read the foregoing
     interview and hereby affix my signature that same is
 7   true and correct, except as noted above.

 8
                         _____
 9                       DAN C. TUTCHER

10

     THE STATE OF TEXAS       )
11
     COUNTY OF HARRIS         )
12

13          Before me, _____, on this
     day personally appeared DAN C. TUTCHER, who
14
            ____ a) is personally known to me or
15
            ____ b) proved to me under oath or
16
            ____ c) proved to me through _____
17               (description of identity card or other
                 document)
18
     to be the person whose name is subscribed to the
19   foregoing instrument and acknowledged to me that they
     executed the same for the purposes and consideration
20   therein expressed.

21      Given under my hand and seal of office this _____ day
     of _____, 2003.
22

23
                         _____
24                       NOTARY PUBLIC IN AND FOR
                         THE STATE OF TEXAS
25
```

1  STATE OF TEXAS                :

2  COUNTY OF HARRIS              :

3

4           I, Meredith A. Shoemaker, a Certified

5  Shorthand Reporter in and for the State of Texas, hereby

6  certify that the facts stated by me in the caption

7  hereto are true; that the foregoing interview of

8  DAN C. TUTCHER, the witness hereinbefore named, was

9  taken by me in machine shorthand, the said witness

10  having been by me first duly sworn under oath, and later

11  transcribed from machine shorthand to typewritten form

12  by me.

13           I further certify that the above and

14  foregoing interview, as set forth in typewriting, is a

15  full, true, and correct transcript of the proceedings

16  had at the time of taking said interview.

17           Given under my hand and seal of office

18  on this 23rd day of January, 2004.

19

                                    _____
20                                  Meredith A. Shoemaker, CSR
                                    Texas CSR No. 7202
21                                  Expires:  12/31/2005

22  ALLIED ADVANCED REPORTING, INC.
    1647 Colquitt
23  Houston, Texas 77006
    713.524.6777
24  800.223.9409
    713.524.6888 (FAX)
25  aari@alliedadvancedreporting.com