# KANSAS PIPELINE COMPANY

## CONFIDENTIAL OFFERING MEMORANDUM

### June 1999

KPI3154

*KANSAS PIPELINE COMPANY*

 CHASE

DOJ026833

**The Bishop Group, Ltd.**

**Confidential Information Memorandum**

**June 1999**

---

**CONFIDENTIAL**

---

The information and data contained in this Confidential Information Memorandum ("Memorandum") are being provided on behalf of The Bishop Group, Ltd. ("Bishop" or the "Company") by its advisor, Chase Securities Inc. ("Chase" or the "Advisor"), solely for the purpose of assisting the recipient ("Recipient") in conducting its own independent evaluation and analysis of the Company. As a precondition to Bishop authorizing the Recipient to review the Memorandum, the Recipient acknowledges and agrees with the following: (a) the Memorandum is being provided in accordance with and pursuant to the terms of that certain Confidentiality Agreement by and between Bishop and the Recipient; (b) Bishop and the Advisor expressly disclaim any and all liability and responsibility for and associated with the quality, accuracy, completeness or materiality of the Memorandum; (c) the Recipient will conduct its own independent evaluation and analysis of the Memorandum and satisfy itself as to the quality, accuracy, completeness and materiality of the same; and (d) the Recipient will rely solely on its own independent evaluation and analysis of the Memorandum when deciding whether or not to submit a bid, enter into a definitive purchase agreement and/or consummate a transaction. The Recipient further acknowledges and agrees that only the express representations and warranties contained in a definitive written purchase agreement (when and if the same is executed) shall be binding on the parties. If the Recipient determines that it cannot (or is unwilling to) comply with the foregoing preconditions to the disclosure of the Memorandum, it should immediately notify Chase in writing of said fact and discontinue the review and return the Memorandum.

Bishop reserves the right to negotiate with one or more interested parties at any time and to enter into a definitive agreement for a transaction without prior notice to the Recipient or other interested parties. Bishop also reserves the right, for any or no reason, at any time and in any respect, to terminate discussions with any or all interested parties or to negotiate in its sole discretion with any interested party with respect to a potential transaction. Bishop also reserves the right to modify, at any time, any procedures relating to the sales process without assigning any reason thereto. Finally, Bishop reserves the additional rights agreed to by your signing of the Confidentiality Agreement relating to the potential sale of the Company.

In furnishing this Memorandum, neither Bishop nor the Advisor undertakes any obligation to provide the Recipient with access to any additional information. This Memorandum shall not be deemed an indication of the state of affairs of the Company nor shall it constitute an indication that there has been no change in the business or affairs of the Company since the date hereof.

KPI3155

DOJ026834

All communications, inquiries and requests for information relating to these materials should be addressed to the Chase persons listed below, as representatives of the Company. **The management of the Company should not be contacted directly.**

## CHASE SECURITIES INC.

**Richard Betz**

Managing Director -NY
Tel: (212) 270-6971
Fax: (212) 270-2519
E-mail: Richard.Betz@Chase.com

**William Manias**

Vice President - TX
Tel: (713) 216-6386
Fax: (713) 216-8882
E-mail: William.Manias@Chase.com

**George Manahilov**

Analyst - NY
Tel: (212) 270-4762
Fax: (212) 270-2519
E-mail: George.Manahilov@Chase.com

**James Bold**

Managing Director - NY
Tel: (212) 270-3710
Fax: (212) 270-2131
E-mail: James.Bold@Chase.com

**Vean Gregg**

Associate -TX
Tel: (713) 216-8848
Fax: (713) 216-8882
E-mail: Vean.Gregg@Chase.com

**Chase Securities Inc.**

270 Park Avenue
New York, NY 10017
Telephone: (212) 270-6000
Fax: (212) 270-2519

**Chase Securities Inc.**

600 Travis Street
Houston, Texas 77002
Telephone: (713) 216-4865
Fax: (713) 216-8882

June 1999

KPI3156

Copy Number: *5 B*

**KANSAS PIPELINE COMPANY**

 CHASE

DOJ026835

# *Table of Contents*

*Page*

**I.    EXECUTIVE SUMMARY**

   Business Description ........................................................................ 1
   Schematic View of Pipeline .............................................................. 2
   Investment Considerations .............................................................. 2

**II.   OVERVIEW OF PROCESS AND TIMETABLE** ........................................ 4

**III.  BUSINESS OVERVIEW AND HISTORY**

   Partnership Structure ...................................................................... 5
   Corporate Organization Chart ......................................................... 5
   MarGasCo. Partnership .................................................................... 6
   Historical Timeline ........................................................................... 6

**IV.   FINANCIAL HIGHLIGHTS**

   Condensed Income Statement ...................................................... 10
   Condensed Balance Sheet ............................................................ 10
   Contract and Revenue Summary ................................................... 11
   Rates and Tariffs ........................................................................... 11
   Operating Expense Summary ........................................................ 12

**V.    BUSINESS GROWTH OPPORTUNITIES**

   LDC By-Pass Opportunites ........................................................... 13
   Capacity Expansion Opportunities ................................................ 13


**APPENDICES**

   OPERATIONS OVERVIEW .................................................................. A

   ADDITIONAL SYSTEM INFORMATION ................................................. B

   INDUSTRY OVERVIEW ....................................................................... C

   MARKET DEMOGRAPHICS ................................................................. D

   MANAGEMENT .................................................................................... E

   AUDITED FINANCIAL STATEMENTS .................................................... F

   DETAILED MAP .................................................................................. G

KPI3157

KANSAS PIPELINE COMPANY



# Executive Summary

KPI3158

# EXECUTIVE SUMMARY

**BUSINESS DESCRIPTION**

Kansas Pipeline Company (the "Company" or "KPC") is a Kansas general partnership headquartered in Lenexa, Kansas, which owns and operates a regulated natural gas pipeline system (the "System"). The System extends into two major segments from northwestern and northeastern Oklahoma into Kansas City, Kansas, and via a river crossing, into Kansas City, Missouri. The System interconnects with the local gas distribution facilities of the Company's two principal customers: Kansas Gas Service ("KGS"), a division of Oneok Inc., the successor to Western Resources, Inc. ("WRI"), in Wichita and Kansas City, Kansas; and Missouri Gas Energy ("MGE"), a division of Southern Union Company ("SU"), the successor to WRI, in Kansas City, Missouri. As currently configured, the System is capable of delivering approximately 120 million cubic feet per day ("MMcf/d") and 21 MMcf/d of natural gas into the Kansas City and Wichita marketplaces, respectively. New pipeline facilities were put in place in 1997 to transport gas under new 20-year contracts to KGS in Paola, Osawatomie and Ottawa, Kansas ("Small Town Contracts").

The pipeline assets of KPC were held in three partnerships prior to May 11, 1998. KansOk Partnership ("KOP"), a Kansas general partnership, owned intrastate pipelines whose rates were determined by the Federal Energy Regulatory Commission ("FERC"). Kansas Pipeline Partnership ("KPP") owned an intrastate pipeline in Kansas whose rates were regulated by the Kansas Corporation Commission ("KCC"). Riverside Pipeline Company ("RPC"), L.P., a Kansas limited partnership owned interstate pipeline assets in Kansas, Oklahoma and Missouri, which connected KOP to KPP assets at the state line of Kansas and Oklahoma and which connected KPP assets to Missouri.

Effective May 11, 1998, after more than two years of jurisdictional procedures before FERC, the assets of KPP, KOP and RPC were consolidated into one single FERC regulated entity: KPC. KPC's initial rates, by Order of FERC, were approximately equal to its then existing rates. FERC has ordered KPC to file a Section 4 Rate Case by September 10, 1999.

KPC derives approximately 95% of its net revenues from a series of long-term firm transportation contracts (the "Base Load Contracts") with KGS and MGE. These contracts provide a steady and predictable cash flow stream. Pricing under the KGS and MGE contracts has been recently approved by FERC as permitted non-conforming contracts. These contracts have a primary term through October 31, 2009. Another recent contract with KGS runs from 2009 to October, 2014, while one other recent contract expires in 2007. The recent Small Town Contracts with KGS will remain effective through October 1, 2017.

Currently, KPC employs approximately 64 personnel. Prior to 1999, Kansas Pipeline Operating Company ("KPOC"), previously a wholly owned subsidiary of Syenergy Pipeline Company, L.P., ("Syenergy"), a Kansas limited partnership, and then a wholly owned subsidiary of KPC thereafter, had employed the personnel to operate the system and perform the day-to-day operations.

KPC is owned by Syenergy (approximately 99.9%) and by Bishop Pipeline Company ("BPC"), a Kansas corporation (approximately 0.1%). Two previous limited partners of Syenergy were Chase Manhattan Capital

KPI3159

DOJ026838

Corporation ("CMCC") and EON Syenergy DR II Company ("EON"), which is operated by Trust Company of the West. Their interests were purchased by BPC in 1997.

The ultimate owner of KPC is Bishop, a Kansas corporation, which is owned 100% by Dennis M. Langley.

### SCHEMATIC VIEW OF PIPELINE



- —— Panhandle Eastern Pipeline
- —— Synergy Pipeline (the system)
- —— Transok, Inc. (leased line)
- ☐ Major Producing Areas
- ★ Interconnects (Delivery)
- ★ Interconnects (Receipt)
- ● Underground Storage Field

### INVESTMENT CONSIDERATIONS

♦ **Kansas City Market Share** KPC and Williams Gas Pipeline Central, Inc. ("Williams"), an affiliate of The Williams Companies, Inc., are the only two natural gas pipelines providing complete access into the metropolitan Kansas City market (including downtown) with multiple connections to the principal local distribution companies serving the market and access to the major centers of industrial demand for natural gas. KN Energy, Inc. ("KN") also provides access to the south side of the Kansas City metro area.

♦ **Firm Revenue Stream** More than 95% of the current net revenues are derived from long-term firm transportation contracts with the local distribution companies in Kansas City, KGS and MGE, through at least 2009.

♦ **Current Rates Recently confirmed by FERC** KPC recently completed a Section 7 proceeding including review of the rate base and operating expenses. KPC expects to confirm or exceed current rates in a Section 4 filing scheduled for September, 1999.

KPI3160

*KANSAS PIPELINE COMPANY*     CHASE

DOJ026839

- ◆ **Growth Opportunities** Market share growth opportunities exist:
  - — Growing markets in Kansas City and Wichita
  - — By-pass opportunities with industrial and utility customers in the Kansas City area
  - — Upgrades to the western portion of the system
  - — Right-of-way corridor for additional installations along the route

- ◆ **Possible Synergies** Operating efficiencies are achievable for suppliers or marketers with pipeline operations.

- ◆ **Trading Optionality**
  - — Ability to diversify supply sources within Mid-Continent and Rocky Mountain regions to take advantage of basis differentials
  - — Utilization of the system's swing capacity to maximize synergies with marketing operations

- ◆ **Transaction Flexibility** Single owner presents flexibility in negotiating a transaction. Preference will be given to tax-efficient structures.

KPI3161

*KANSAS PIPELINE COMPANY* 

# Overview of Process and Timetable

KPI3162

DOJ026841

# OVERVIEW OF PROCESS AND TIMETABLE

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| **July 1999** | | | | | | |
|  |  |  |  | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| **August 1999** | | | | | | |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 |  |  |  |  |

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| **September 1999** | | | | | | |
|  |  |  | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 |  |  |

| | |
|---|---|
| **June 21** | □ Distribute Confidentiality Agreements |
| **July 1** | □ Distribute Offering Memoranda |
| **July 21** | □ Preliminary Indications of Interest Due |
| **July 28** | □ Open Data Room / Distribute Bid Letter and Purchase and Sale Agreement |
| **Aug. 19** | □ Final Bids Due |
| **Aug. 26** | □ Buyer Due Diligence |
| **Sept. 22** | □ Definitive Agreement (s) Negotiated and Signed with Selected Buyer |

*The above timetable is preliminary and subject to change per KPC's discretion.*

**KPI3163**

- The transaction will be structured as a sale of Bishop.

- The Indication of Interest should include the following:

    (i) a preliminary non-binding indication of the cash and/or stock consideration that the prospective purchaser, based on the information reviewed to date, would be prepared to pay;

    (ii) the identity of the prospective purchaser, including other participants in the proposed transaction, if any;

    (iii) an indication of the source and availability of the funds that would be utilized to consummate the proposed acquisition;

    (iv) an outline of additional information required by the prospective purchaser in order to make a definitive acquisition proposal;

    (v) an estimate of the time and a summary of the approvals and any other conditions (including financing) required to make a definitive proposal and to complete the proposed transaction; and

    (vi) the name and telephone number of the person Chase should contact in responding to or clarifying the Indication of Interest.

- The above Indication of Interest must be delivered to Chase by 5 p.m. on the date indicated above.

**KANSAS PIPELINE COMPANY**

**CHASE**

# Business Overview and History

KPI3164

DOJ026843

# BUSINESS OVERVIEW AND HISTORY

**PARTNERSHIP STRUCTURE**

The assets that comprise the system were consolidated into KPC effective May 11, 1998. Prior to that date the assets were held in the name of KPP, KOP and RPC. Also, prior to May 11, 1998, the current transportation agreement with MGE had been a sales contract for the same volumes and held by Mid-Kansas Partnership ("MKP"), a Kansas general partnership. The structure evolved historically as a function of the timing of acquisitions, regulatory considerations, geography and services provided.

Syenergy is the managing general partner and 99.9% owner of MarGasCo Partnership ("MarGasCo"), an Oklahoma general partnership established to conduct the independent non-regulated marketing functions of the System. The other general partner of MarGasCo is BPC (0.1%).

KPC is not subject to the provisions of the Public Utility Holding Company Act of 1935 because it does not engage in direct retail sales of natural gas.

**CORPORATE ORGANIZATION CHART**



(1) FERC regulated pipeline.

(2) BPC is a General Partner ("GP") with 0.1% ownership and Syenergy is a General Partner ("GP") with 99.9% ownership. Kansas Pipeline Partnership, KansOk Partnership, and Riverside Pipeline Company, L.P., which are all direct or indirect subsidiaries of Syenergy, became inactive after the consolidation of all pipeline assets into KPC in 1998.

(3) Non-regulated marketing entity.

Inactive subsidiaries not shown include E&C Group Inc., Management Resources Group Ltd., The Bishop Corporation, Kansas Pipeline Partnership, KansOk Partnership, and Riverside Pipeline Company, L.P.

KPI3165



DOJ026844

## MarGasCo. Partnership

MarGasCo is owned by Syenergy and BPC. It is a non-regulated marketing company that buys and sells natural gas to industrial users generally located in the Wichita and Kansas City metropolitan areas. MarGasCo employs two persons who handle the marketing activities. MarGasCo anticipates net revenue in 1999 of approximately $400,000.

## Historical Timeline

The principal physical assets, which comprise the System, were originally part of a crude oil gathering and refined fuels transmission system owned by Phillips Petroleum Company ("Phillips"). The System previously transported crude oil, natural gas, and refined petroleum products to a Phillips refinery located in the Fairfax industrial district of Kansas City, Kansas. Phillips originally built the pipeline between 1933 and 1975. Based on miles of pipe, 30% of the System was constructed after 1970, 28% was constructed between 1960 and 1969, and 42% of the System predates 1960. All of the System was built using steel pipe and is cathodically protected. The System has experienced few corrosion-induced leaks over its life. In the early 1980s, Phillips decided to shut down the Kansas City refinery and subsequently sold the pipelines in two packages.

One package, representing the eastern portion of the System, was purchased in 1984 by Kansas Pipeline Company, L.P. ("KPCLP"), a partnership owned 50% by KPCLP, the general partner, and 50% by Oklahoma Gas Pipeline Company ("OGPC"), an affiliate of Santa Fe International Corporation. OGPC subsequently sold its interest to GGSI Gas Co. ("GGSI"), an affiliate of Adobe Resources, Inc. In 1988, First Reserve Pipeline Company, Inc. purchased the 50% limited partner interest of GGSI and Kansas Pipeline Joint Venture ("KPJV") purchased the general partner interest of KPCLP. The general partners of KPJV were Omega Intrastate Pipeline Company and Kansas Gas Transmission, Inc., a subsidiary of Bishop.

Following a lengthy process of hydrostatic testing, engineering design, certification, and construction, the pipeline commenced deliveries of natural gas in November 1986. Natural gas sold by KPCLP was predominantly supplied by sources connected to the Panhandle Eastern Pipe Line Company ("Panhandle") and the Phenix Transmission Company ("Phenix") systems (described below). In 1988, KPCLP was successful in negotiating a Base Load Sales Contract with WRI. This contract called for the delivery of, on average, 9 MMcf/d of natural gas for redelivery by WRI to its Kansas City, Kansas residential and small commercial customers.

In late 1983, Phillips sold the second package comprising the western portion of the Phillips pipeline to Phenix, a Kansas based intrastate pipeline company which was owned by a Texas joint venture, consisting of Chapman Energy, Bam Energy and Christie Energy. Phenix purchased the assets with the intent of converting the pipeline to a captive natural gas system to transport gas produced by Phenix's joint venture partners. The system was to gather and transport gas from a significant number of wells the partners intended to drill in central and western Kansas. Phenix commenced natural gas service in 1984.

*1988*

In 1988, Bishop began working on a strategic plan to acquire and construct pipelines capable of moving significant amounts of natural gas from the gas fields in Kansas and Oklahoma to WRI and the greater Kansas City area. These pipelines offered the only effective means of competing with Williams, the primary supplier of natural gas to the Kansas City metropolitan market.

KPI3166



DOJ026845

Key to this strategic plan was combining and operating on an economically efficient basis the two halves of the Phillips crude system sold separately in 1983 and 1984. As mentioned, Bishop, through its subsidiary Kansas Gas Transmission, had a significant interest in KPCLP. Finally, in late 1989, Bishop completed the acquisition of the western segment owned by Phenix from the joint venture partners. This acquisition was financed with a loan from Trust Company of the West ("TCW"), an institutional money management firm located in Los Angeles. In 1990, Bishop successfully negotiated an agreement to purchase the remaining assets of KPCLP, giving Bishop control over these assets.

Concurrent with the acquisition of these segments, Mid-Kansas Gas Gathering Company, L.P. ("MKGGC"), a predecessor to MKP, was formed by Bishop and was awarded an incremental Base Load Sales Contract with WRI. The contract called for the sale of approximately 11 MMcf/d to WRI for redelivery by WRI to its residential and small commercial customers in Kansas City, Missouri. The contract was for a term of three years and commenced with the 1990-1991 heating season, which began on November 1, 1990. When combined with the pre-existing 9 MMcf/d contract signed in 1988 between KPCLP and WRI, total System throughput to WRI for gas sales reached approximately 20 MMcf/d. The terms of both contracts were intended to synchronize the System with Williams Natural Gas' ("WNG") contract cycle and provide for market sensitive pricing. WRI agreed to purchase gas under both contracts at a price per Mcf no greater than WNG's approved tariff rates minus $0.15.

In order for the System to be able to perform at levels required under the contracts, approximately $24 million of capital expenditures were required. These projects included adding three key compressor stations to the System (Pawnee Station, Beaumont Station and Ottawa Station) and extending the Oklahoma portion of the pipeline by creating the Riverside East Leg and the KOP East Leg to interconnect with the Transok system in Oklahoma. In addition, a separate construction project was undertaken at a cost of $1.3 million to build a segment of pipeline, Riverside, to span the Missouri River and connect to WRI's distribution system in Kansas City, Missouri. In conjunction with the 1990 restructuring, Pilko & Associates was retained to prepare an environmental risk assessment of the System. The report, dated May 1990, found the System virtually free of environmental concerns.

To raise the capital required to complete the acquisition of the interests in KPCLP and to complete the required capital projects, Bishop entered into an agreement with OKM, whose general partner was an affiliate of The Ram Group of Tulsa, Oklahoma, and whose limited partner was CMCC. Pursuant to this agreement, OKM purchased a 50% interest in the assets, which comprised KPCLP and the Phenix system. OKM and Bishop each contributed their respective 50% interest in the above assets to newly created general partnerships. In addition, OKM and Bishop formed partnerships to hold assets associated with the Oklahoma extension (i.e. RPC), and the new Base Load Sales Contract to WRI in Missouri (i.e. MKP, MKGGC's successor). Collectively, the new partnerships (KOP, RPC, KNP, and KPP) were designated as the Pipeline Partnerships. Additionally, OKM supplied 50% of the capital necessary to carry out the $24 million capital plan. This transaction closed in June 1990 and resulted in the formation of the Bishop/OKM Partnership Group. OKM financed its acquisition with the proceeds of a $37 million loan from The Chase Manhattan Bank N.A. ("CMB") as well as with equity contributed by the partners.



DOJ026846

Construction on the capital projects commenced in the summer of 1990 and was completed in February 1991.

**1991**

Based on the successful operation of the System during the 1990-91 heating season, the Company initiated discussions with senior representatives of WRI regarding the potential for the System to become a more important component of WRI's supply base. This was appealing to WRI as the utility had concluded that it was not prudent to have only one primary supply source.

In connection with its expansion efforts, management determined that in order to expand the System significantly and access additional capital, the ownership structure and control provisions would need to be greatly simplified. Consequently, the ownership interests held separately by BPC and OKM were consolidated into a single holding partnership, Syenergy, with BPC and OKM as the general partners.

In August 1991, WRI amended the existing firm sales contracts and executed new firm transportation contracts. The amendments and the new contracts increased WRI's average daily usage of the System from approximately 20 MMcf/d (7.3 Bcf annually with a maximum daily quantity ("MDQ") of 81.332 MMcf/d) to approximately 30 MMcf/d (11.3 Bcf annually with a MDQ of 130 MMcf/d) as of January 1, 1993. This increase allowed the System to deliver gas to the Wichita market, removing the pricing provisions contained in the old contracts, which tied the System's pricing to that of WNG, and extended the final maturity of the pre-existing contracts to October 31, 2009.

Based on the strength of these amended contracts, Bishop was able to refinance the BPC and OKM acquisition debt at the new holding entity level through a $91 million term loan facility with CMB. Proceeds from this transaction were used to refinance existing long-term debt of $76 million, finance approximately $7 million of additional capital expenditures, make distributions to partners of $3 million, and pay fees and provide general working capital of $4 million.

During the course of the negotiations, the general partner of OKM decided to exit Bishop to focus on their core oil and gas operations. The remaining partners applied their share of the $3 million distribution discussed in the preceding paragraph along with $2 million of additional contributed capital to purchase OKM's stake.

The restructuring transaction closed as of October 30, 1991 with Bishop as the owner of 99.9% of the interests in each of the partnership entities which, directly or indirectly, control the various assets and sections of the System.

**1992**

On June 15, 1992, Bishop issued $91 million in senior notes to institutional investors maturing December 30, 2008. Proceeds from the note offering were used to repay the CMB bank debt and to provide funds for certain capital projects including the addition of 1,478 Bhp compressor units at both the Ottawa and the Pawnee stations. The proceeds were used to fund renovations on P-10/20 and P-80 lines (including gel pigging and valve replacements), the renovations on the P-30 line consisting of road crossings for MAOP upgrade, line lowering and cathodic protection upgrades at designated locations across the entire System, and the construction of delivery stations for additional delivery points into WRI's distribution system.

KPI3168



DOJ026847

On November 20, 1992, the North Wichita Meter Station with delivery capacity of 37.5 MMcf/d for sales to WRI was completed. This station represented the initial entry of the Company into a local distribution system outside of the Kansas City Metropolitan Area.

*1993*

First deliveries under the amendments and new agreements executed with WRI in October, 1991 were commenced January 1, 1993.

*1994*

Effective January 31, 1994, WRI transferred and assigned all of its interest in the sales and transportation agreements with the Company regarding the Missouri properties to MGE in conjunction with the purchase by MGE of certain WRI assets.

*1995*

In the first quarter of 1995, the Company executed five new firm transport and/or sales contracts with WRI and MGE, more than doubling the system's contract MDQ with new volumes to commence in 1997 after regulatory approval and construction.

*1996*

After incurring delays in obtaining an interconnect from Panhandle, RPC and KPP participated in a complaint proceeding against Panhandle before FERC. As a result of FERC's Show Cause Order in the spring of 1996, Panhandle granted an interconnect to RPC and KPP. Despite the enormous efforts to construct about 36 miles of new transmission pipeline connecting Panhandle's mainlines (30 miles south of Kansas City) to the distribution system of MGE and KGS, the two largest expansion contracts with KGS and MGE and the associated construction project were sold to KN in November, 1996. The sale was competed to avoid the risk of losing these contracts due to construction delays.

*1997*

About $4.5 million of new pipeline facilities were constructed and connected to KGS's local distribution systems in Ottawa, Osawatomie and Paola and are currently in operation today serving KPC's 20-year contracts to these towns, referred to above as the Small Town Contracts.

*1998 and 1999*

The FERC accepted KPC's offer to become FERC regulated and granted KPC's initial rates approximately equal to those rates, which KPC previously had been charging as three (3) separate pipeline entities. KPC filed and FERC approved KPC's initial tariff. KPC also filed its contracts with KGS and MGE as non-conforming transportation contracts, which FERC approved in April, 1999, subject to rehearing. A 1997 settlement between KPC's predecessors, WRI, and the KCC was not accepted by FERC as part of the otherwise approved non-conforming contracts.

KPI3169

 CHASE

DOJ026848

# Financial Highlights

KPI3170

DOJ026849

# FINANCIAL HIGHLIGHTS

**CONDENSED INCOME STATEMENT** [1]

| ($ millions) | 1997 | 1998 | 1999 E |
|---|---|---|---|
| Net Operating Revenues [2] | 30.3 | 32.0 | 31.1 |
| Operating Expenses [2] | 15.2 | 12.3 | 11.7 [3] |
| **EBITDA** | 15.1 | 19.7 | 19.4 |
| Depreciation & Amortization | 4.9 | 4.2 | 4.2 |
| **EBIT** | **10.3** | **15.4** | **15.2** |

**CONDENSED BALANCE SHEET**

| | 1997 | 1998 |
|---|---|---|
| **Assets** | | |
| Utility Plant | 88.9 | 91.3 |
| Less: Accum. Depreciation | (24.7) | (27.5) |
| Total utility plant | 64.2 | 63.7 |
| Other Assets | 13.2 | 13.5 |
| Current Assets | 20.6 | 22.9 |
| **Total Assets** | **98.0** | **100.1** |
| **Capitalization and Liabilities** | | |
| Capitalization | | |
| Partners' Capital | 13.0 | 22.5 |
| Long-term Debt | 64.4 | 60.3 |
| Total Capitalization | 77.4 | 82.8 |
| Other Liabilities | 2.4 | 2.9 |
| Current Liabilities | 18.2 | 14.4 |
| **Total Capital and Liabilities** | **98.0** | **100.1** |

KPI3171

[1] Effective May 11, 1998, KPC became a FERC regulated entity providing only transportation of natural gas.
[2] Prior to becoming a FERC regulated entity KPC was selling as well as transporting natural gas, therefore net operating revenues in 1997 and 1998 are derived by netting $61.8MM and $22.2MM of natural gas purchases expense against $80.4MM and $26.9MM of natural gas sales in 1997 and 1998, respectively.
[3] Operating expenses in 1999 include a normalized level of professional fees due to higher expenses associated with the FERC Section 4 filing in September 1999 (a detailed breakdown of 1999 projected expenses is shown on page 12).

**KANSAS PIPELINE COMPANY**    10    

DOJ026850

**CONTRACT AND REVENUE SUMMARY**

Much of the System capacity is dedicated to the Base Load Contracts with KGS and MGE. Collectively these contracts call for the System to provide KGS and MGE approximately 11.3 Bcf per annum with a maximum daily quantity of 130,000 MMBtu/d through their primary term of October 31, 2009. An additional contract with KGS runs from 2009 to 2014, and provides for transportation of 62,568 MMBtu/d into Kansas City, Kansas. The Small Town Contracts have a primary term through 2017. KGS and MGE then sell the natural gas delivered by the System to the utilities' residential and small commercial base load customers in Kansas City and Wichita, Kansas and Kansas City, Missouri.

| Customer | Delivery Location | Expiration Date | Max. Daily Volume (MMBtu) | Annual Volume (MMBtu) | Current Rates (in cents) | | Annual Revenue [1] |
|---|---|---|---|---|---|---|---|
| | | | | | Reservation ($/MMBtu/Month) | Commodity (Cents/MMBtu) | |
| Missouri Gas Energy [4] | Kansas City, Missouri | 2009 | 46,332 | 3,200,000 | 20.2944 | 0.0625 | $11,483,378 |
| Kansas Gas Service [3,4] | Kansas City, Kansas | 2009 | 35,000 | 3,333,302 | 15.2864 | 0.0078 | $6,446,288 |
| Kansas Gas Service [3,4] | Kansas City, Kansas | 2009 | 13,784 | 1,194,463 | 19.9649 | 0.0625 | $3,377,008 |
| Kansas Gas Service [4] | Kansas City, Kansas | 2009 | 13,784 | 1,194,463 | 19.9649 | 0.0625 | $3,377,008 |
| Kansas Gas Service [4] | Wichita, Kansas | 2009 | 10,550 | 770,000 | 11.4561 | 0.0588 | $1,495,618 |
| Kansas Gas Service [4] | Wichita, Kansas | 2009 | 10,550 | 770,000 | 11.4561 | 0.0588 | $1,495,618 |
| Kansas Gas Service | Kansas City, Kansas | 2007 | 5,700 | 503,700 | 15.2864 | 0.0078 | $1,049,519 |
| Kansas Gas Service | Ottawa, Kansas | 2017 | 6,900 | 579,255 | 6.1639 | 0.0286 | $526,938 |
| Kansas Gas Service | Paola/Osawatomie, KS | 2017 | 6,857 | 513,075 | 10.7126 | 0.0348 | $899,331 |
| Atmos Energy | Heritage Park, Kansas | 2003 | 4,000 | 1,460,000 | n/a | 0.3078 | $449,388 |
| Atmos Energy | New Strawn, Kansas | 2003 | 500 | 6,704 | n/a | 1.4300 | $9,587 |
| Atmos Energy | Cedar Creek, Kansas | 1999 | 5,000 | 42,694 | n/a | 1.5000 | $64,041 |

| Total Transportation Net Revenue [2] | $30,673,721 |
|---|---|

1) Annual revenue = maximum daily volume x 12 months x current reservation rate + annual volume x current commodity rate, except for revenues from the Atmos Energy contracts which are equal to annual volume x current commodity rate

2) Transportation net revenue excludes approximately $400,000 of estimated net revenue for MarGasCo marketing activities

3) Volumes transported under these contracts have been extended under a new contract from 2009 to 2014

4) Base Load Contracts

**RATES AND TARIFFS**

Additional detailed information about particular rates and tariffs in the various zones is available via the Federal Energy Regulatory Commission website at the following reference:

http://www.ferc.fed.us/gas/gastariffs/htmlall/t23725.htm

and the Company's website at:

http://www.kansaspipeline.com

KPI3172

---

***KANSAS PIPELINE COMPANY***  11   **CHASE**

DOJ026851

### OPERATING EXPENSE SUMMARY

| Total 1999 Projected Operating Expenses ($ in thousands) | |
|---|---:|
| Transok transportation charges | $1,368 |
| Compensation and benefits | 4,072 |
| Travel and entertainment | 404 |
| Insurance | 201 |
| Other general and administrative [1] | 3,172 |
| Operating and maintenance (field personnel) | 791 |
| **Cash expenses excluding property taxes** | **$10,008** |
| Property taxes, including new construction | 1,677 |
| **Total Cash Expenses** | **$11,685** |

[1] *Other G&A and professional fees shown at a normalized level due to higher anticipated costs associated with the FERC Section 4 Case to be filed by September 1999*

KPI3173

**KANSAS PIPELINE COMPANY**          12           **CHASE**

DOJ026852

# Business Growth Opportunities

KPI3174

DOJ026853

# BUSINESS GROWTH OPPORTUNITIES

**LDC BY-PASS OPPORTUNITIES**

KPC has identified several opportunities to by-pass the local distribution companies ("LDC") and directly serve large customers within the KPC service territory. The most significant opportunities exist along the highly industrialized areas in Fairfax and Kansas City, Kansas. KPC is one of only two pipelines with right-of-way ("ROW") within the utility corridor that serves this industrial area. Auto manufacturing, food processing, agribusiness and ammonia processing are some of the businesses operating within the area. Since these industries are generally contiguous with the utility corridor, by-pass laterals typically would not be more than 1.5 miles from existing KPC facilities. The vast majority of the KPC ROW to and within the corridor has multiple line/use rights. Since this existing corridor is effectively fully developed, most projects for additional utility access, which do not utilize the Company's existing ROW, would be significantly more expensive.

KPC estimates that approximately 75,000 MMBtu/d of by-pass opportunities exist within an economically feasible distance of existing ROW in the Fairfax/Kansas City, Kansas area. Several of the target industries have approached KPC predecessor entities about by-passing existing LDC service in the past. Prior to becoming a FERC regulated entity, KPC could not grant these customer requests because the state certificate under which KPC operated precluded LDC by-pass. These restrictions no longer exist under KPC's FERC certificate. KPC believes that approximately 10,000 MMBtu/day of additional Kansas by-pass opportunities exist outside the Fairfax/Kansas City, Kansas area.

**CAPACITY EXPANSION OPPORTUNITIES**

The KPC system as currently configured is effectively fully subscribed. KPC has identified certain system enhancements designed to increase available peak throughput and allow for additional firm transportation contracts. These enhancements include adding compression facilities and refurbishing existing pipeline assets on the western portion of the system, but do not involve installing significant amounts of new pipe.

KPC estimates that approximately 73,000 MMBtu/d of firm capacity can be made available with a capital investment of approximately $14.0 million and an increase in annual cash operating expenses of $1.3 million per year. Of this 73,000 MMBtu/d additional capacity, approximately 35,000 MMBtu/d can be delivered to market zones in the eastern portion of the KPC system, while the remaining 38,000 MMBtu/d can be made available to delivery points on the western portion of the KPC system.

KPI3175

*KANSAS PIPELINE COMPANY*   13    CHASE

DOJ026854

# Operations Overview

KPI3176

DOJ026855

# OPERATIONS OVERVIEW

**KANSAS PIPELINE EAST AND WEST LEGS**

KPP was a Kansas general partnership formed on June 22, 1990 to own those portions of the System located in Kansas that were formerly owned by KPCLP. Those assets are now owned and operated by KPC. System sections owned by KPP include two segments referred to individually as "Kansas Pipeline East Leg" and "Kansas Pipeline West Leg".

Kansas Pipeline West Leg consists of two parallel pipelines and associated common ROW that originate downstream of the Master Gas interconnect with Kansas Natural East Leg in southwestern Franklin County, Kansas. It extends northeasterly for approximately 78 miles to an interconnect point with MGE's local distribution facilities in Platte County, Missouri. These pipelines consist of one 8" diameter pipeline and another pipeline with a 27 mile, 12" diameter section (originating downstream of Master Gas) and a 51 mile, 10" section. There is one compressor station on the Kansas Pipeline West Leg, the "Ottawa Station", which is located in central Franklin County, Kansas. The Ottawa Station contains three compressors, which were installed in 1990 each rated at 1,215 Bhp, and a fourth compressor rated at 1,478 Bhp, which was added in 1992. Interconnects on the Kansas Pipeline West Leg pipelines (other than those mentioned above) include: five interconnects with KGS's Kansas City, Kansas local distribution facilities at points in Franklin and Wyandotte Counties, Kansas, an interconnect with Atmos Energy Corporation in Johnson County, Kansas, an interconnect with Kansas Pipeline East Leg (described below) and an interconnect with MGE. Kansas Pipeline West Leg is used to support the System's Kansas City related gas sales and transportation activities. Given the System's current hydraulic configuration, Kansas Pipeline West Leg is capable of delivering approximately 116 MMcf/d of gas into Kansas City. The Kansas Pipeline West Leg pipelines were part of the original Phillips crude oil and products pipeline purchased by KPCLP in 1984. The pipelines were converted for use as natural gas pipelines in 1985. The Ottawa Station was constructed in 1990.

Kansas Pipeline East Leg consists of a single 6" diameter pipeline and associated ROW originating at a point in central Miami County, Kansas (the Phillips Paola terminal), and extending northward for approximately 50 miles to an interconnect with Kansas Pipeline West Leg's facilities in northern Wyandotte County, Kansas (near the Fairfax industrial district of Kansas City, Kansas). Kansas Pipeline East Leg has no compressor stations along its route. In addition to the interconnects mentioned above, Kansas Pipeline East Leg is also interconnected with Panhandle's system in central Miami County, Kansas; Atmos Energy at Heritage Park in Johnson County, Kansas; KGS in Paola and Osawatomie in Miami County, Kansas; and KGS's Mission District local distribution facilities at three points in northern Johnson County, Kansas. Kansas Pipeline East Leg is used to support the System's Kansas City related gas sales and transportation activities. Given the System's current hydraulic configuration, Kansas Pipeline East Leg is capable of delivering approximately 12 MMcf/d of gas into Kansas City. The Kansas Pipeline East Leg pipeline was part of the original Phillips crude oil and products pipeline purchased by KPCLP in 1984. The pipeline was converted for use as a natural gas pipeline in 1985.

KPI3177



DOJ026856

| KANSAS NATURAL EAST AND WEST LEGS | KNP was a Kansas general partnership formed on June 22, 1990, to own those portions of the System located in Kansas that were formerly owned by Phenix. In 1995, KNP's assets were merged with those of KPP under approval by the KCC. System sections formerly owned by KNP include two segments referred to individually as "Kansas Natural West Leg" and "Kansas Natural East Leg". |
|---|---|

Kansas Natural East Leg consists of: (a) two parallel pipelines and associated common ROW that originate at an interconnect with KansOk East Leg in southern Cowley County, Kansas and extend northward for approximately 72 miles into northern Greenwood County, Kansas, where they interconnect with (b) three parallel pipelines sharing a common ROW that extends northeasterly from that point for approximately 53 miles to an interconnect with Kansas Pipeline's facilities in southwestern Franklin County, Kansas. The two parallel pipelines are comprised of one 8" diameter pipeline (the "P-40 Line"), another pipeline with a 6 mile, 12" diameter section (the "P-110 Line," originating at the KansOk East Leg interconnect and extending northward for 6 miles), and a 66 mile, 10" diameter section (the "P-30 Line"). The pipelines referred to under (b) above consist of two 8" diameter pipelines (the "P-50 and P-70 Lines") and one 12" diameter pipeline (the "P-60 Line"). There is one compressor station on the Kansas Natural East Leg, the "Beaumont Station", which is located on the P-30 and P-40 Lines in southern Greenwood County, Kansas. The Beaumont Station houses three compressors; each rated at 1,215 Bhp. Additional interconnects on Kansas Natural East Leg include: an interconnect with Panhandle in Coffey County, KS, Kansas Natural West Leg in northern Greenwood County, Kansas and central Coffey County, Kansas. Kansas Natural East Leg is used to support the Systems' Kansas City related gas sales and transportation activities. Given the System's current hydraulic configuration, Kansas Natural East Leg is capable of delivering approximately 95 MMcf/d of gas as to the interconnect with Kansas Pipeline's facilities. These lines were part of the original Phillips crude oil and products pipeline purchased by Phenix Transmission Company in 1983. Those lines were converted for use as natural gas pipelines in 1985. The P-110 Line and the Beaumont Station were constructed in 1990.

Kansas Natural West Leg consists of: (a) one 8" diameter pipeline and associated ROW (the "P-80 Line") originating at an interconnect with KansOk's West Leg in southern Comanche County, Kansas and extending northeasterly for approximately 220 miles to an interconnect with Kansas Natural East Leg at the Coffey/Andersen County Lines, Kansas, and (b) two parallel 6" diameter pipelines and associated common ROW (the "P-10 and P-20 Lines") originating in central Rice County, Kansas and extending eastward for approximately 105 miles to an interconnect with Kansas Natural East Leg in northern Greenwood County, Kansas. There are no compressor stations on the Kansas Natural West Leg system. Interconnects on the Kansas Natural West Leg pipelines (other than those mentioned above) include: an interconnect with Panhandle's system on the P-80 Line in northern Harper County, an interconnect with WNG on the P-80 Line in northern Butler County, Kansas, an interconnect with Atmos Energy Corporation at New Strawn in Coffey County, Kansas, and an interconnect with Mid-Continent Market Center ("MCMC") on the P-10 and P-20 Lines in central McPherson County, Kansas. Interconnects are also maintained with the industrial customers served along this portion of the System. Construction was completed to provide interconnects between the local distribution facilities of KGS in Wichita, Kansas (located in northeastern Sedgwick County) and the P-80 Line. Kansas Natural West

KPI3178

**KANSAS PIPELINE COMPANY**   A - 2   ◆ CHASE

Leg is used to provide gas sales and transportation services to industrial customers along its portion of the System. Beginning in 1993 (as per the terms of the Base Load Contracts), Kansas Natural West Leg began delivering 1.54 Bcf per annum with a MDQ of 21,100 MMcf/d to KGS in Wichita, Kansas. Given the System's current hydraulic configuration, the P-80 Line is capable of delivering approximately 22 MMcf/d of gas along its route and the P-10 and P-20 Lines are capable of delivering approximately 10 MMcf/d of gas along their route. The Kansas Natural West Leg pipelines and associated facilities were part of the original Phillips crude oil and products pipeline purchased by Phenix in 1983. The pipelines were converted for use as natural gas pipelines in 1984.

**KANSOK EAST AND WEST LEGS**

KPC's assets were formerly held by KOP, a Kansas general partnership formed on June 22, 1990 to own those portions of the System located entirely in Oklahoma. This section includes two distinct segments referred to individually as "KansOk East Leg" and "KansOk West Leg."

KansOk East Leg consists of: (a) one 12" diameter pipeline and associated rights-of-way (the "P-100 Line") originating at an interconnect with Transok system in Pawnee County, Oklahoma and extending approximately 41 miles northward through Pawnee and Osage Counties, Oklahoma to an interconnect with Kansas Natural East Leg, and (b) one 8" diameter pipeline (the "P-40 Line") originating at an interconnect with the P-100 Line in central Osage County, Oklahoma and extending approximately 15 miles northward (running parallel to the P-100 Line) to an interconnect with Kansas Natural East Leg. There is one compressor station on the KansOk East Leg, the "Pawnee Station," which is located on the P-100 Line at the Transok interconnect point. The Pawnee Station contains four compressor units, each rated at 1,478 Bhp. The interconnects discussed above are the only ones on this segment of the System. KansOk East Leg is used to support the System's Kansas City related gas sales and transportation activities. Given the System's current hydraulic configuration, KansOk East Leg is capable of delivering approximately 95 MMcf/d of gas to Kansas Natural's West Leg. The P-40 Line was part of the original Phillips crude oil and products pipeline purchased by Phenix Transmission Company in 1983. The P-40 Line was converted for use as a natural gas pipeline in 1984. The P-100 Line and the Pawnee Station were constructed in 1990.

KansOk West Leg consists of a single 8" diameter pipeline and associated right of way (the "P-80 Line") originating at an interconnect with the Inland Gathering Company (an affiliate of Slawson Exploration Company) in the southwest corner of Harper County, Oklahoma and extending for approximately 57 miles northeast through Harper and Woods Counties, Oklahoma to an interconnect with Kansas Natural West Leg in southern Comanche County, Kansas. KansOk West Leg has no compressor stations along its route. KansOk West Leg has one interconnect with ANR (American Natural Resources), a wholly owned subsidiary of The Coastal Corporation, in northeastern Harper County, Oklahoma. KansOk West Leg is used to supply gas into the southwest Kansas portion of KPC's facilities for sale to industrial customers along that section of the System. Given the System's current hydraulic configuration, KansOk West Leg is capable of delivering approximately 22 MMcf/d of gas into southwestern Kansas. The KansOk West Leg pipeline was a part of the original Phillips crude oil and products pipeline purchased by Phenix in 1983. The pipeline was converted for use as a natural gas pipeline in 1984.

KPI3179



DOJ026858

**RIVERSIDE EAST AND WEST LEGS**

RPC is a Kansas limited partnership formed on March 2, 1989 to own those portions of the system that cross state lines. Those assets are now owned and operated by KPC. These sections include three distinct segments referred to individually as "Riverside," "Riverside West Leg" and "Riverside East Leg."

Riverside consists of a single 12" diameter pipeline and associated ROWs originating at an interconnect with KPP's facilities in Wyandotte County, Kansas (Kansas City, Kansas) and extending approximately 1.6 miles (including a river crossing over the Missouri River) to an interconnect with MGE's local distribution facilities in Platte County, Missouri (Kansas City, Missouri). Riverside has no compressor stations along its route and no interconnects other than those mentioned above. Riverside supports the System's Kansas City, Missouri related gas sales and transportation activities. Given the System's current hydraulic configuration, Riverside is capable of delivering approximately 70 MMcf/d to the MGE interconnect. The Riverside pipeline was constructed in 1990.

Riverside West Leg consists of a single 8" diameter pipeline and associated ROWs (the "P-80 Line") originating at an interconnect with KOP West Leg's facilities in northern Woods County, Oklahoma and extending less than 1 mile (across the Oklahoma/Kansas border) to an interconnect with KPP West Leg's facilities in southern Comanche County, Kansas. Riverside West Leg has no compressor stations along its route and no interconnects other than those mentioned above. Riverside West Leg supports the System's western Kansas related gas sales and transportation activities. Given the System's current hydraulic configuration, Riverside West Leg is capable of delivering approximately 22 MMcf/d of gas to the Kansas Natural West Leg interconnect. The Riverside West Leg pipeline was part of the original Phillips crude oil and products pipeline purchased by Phenix Transmission Company in 1983. The pipeline was converted for use as a natural gas pipeline in 1984.

Riverside East Leg consists of: (a) one 12" diameter pipeline and associated ROW (the "P-100 Line"); and (b) one 8" diameter pipeline (the "P-40 Line"), which runs parallel to and within the same ROWs as the P-100 Line. These lines originate at interconnects with KOP East Leg's facilities in northern Osage County, Oklahoma and extend less than 1 mile (across the Oklahoma/Kansas border) to interconnects with Kansas East Leg's facilities in southern Cowley County, Kansas. Riverside East Leg has no compressor stations along its route and no interconnects other than those mentioned above. Riverside East Leg is used to support the System's Kansas City related gas sales and transportation activities. Given the System's current hydraulic configuration, Riverside East Leg is capable of delivering approximately 95 MMcf/d of gas to the KNP interconnect. The P-40 Line was part of the original Phillips crude oil and products pipeline purchased by Phenix Transmission Company in 1983. The P-40 Line was converted for use as a natural gas pipeline in 1984. The P-100 Line was constructed in 1990.

**TRANSOK SYSTEM**

As the System is currently configured, the two methods of sourcing supply involve utilizing Transok's Oklahoma intrastate pipeline system and accessing gas supplies through the Kansas Natural West Leg.

The Transok arrangement provides KPC with firm leased space on the Transok system. This effectively allows KPC to utilize Transok, up to leased space capacity, as an extension of the System into major producing fields. KPC's customers can therefore purchase gas from any field or any

CHASE

KPI3180

DOJ026859

producer, which accesses the Transok pipeline and ship that gas through the Transok pipeline to the System. In short, the Transok system greatly expands KPC's access to substantial gas reserves in Oklahoma and Texas.

| | |
|---|---|
| **DESCRIPTION OF TRANSOK SYSTEM** | Transok is an Oklahoma-based intrastate natural gas gathering and transmission company strategically positioned to supply natural gas for electricity generation to the Public Service of Oklahoma ("PSO"). In May 1999, Transok was acquired from Tejas Corp, an affiliate of Shell Oil, by Enogex Inc., an affiliate of Oklahoma Gas & Electric. |

The Transok system has an estimated transmission capacity of 1.4 Bcf/d with current transport volumes averaging 600 MMcf/d on an annual basis. Recently, the Transok system has been expanded by the purchases of the Tex-Con, Reliance, Cresent, WAGGS (West Anadarko Gas Gathering Systems) and NAGS (North Anadarko Gathering System) pipeline systems. PSO's usage of the Transok system is approximately 225 MMcf/d and all such gas is purchased under long-term contracts with producers. PSO also purchases some peak gas requirements directly from Transok during the summer months. Total utilization of Transok by PSO has never exceeded 450 MMcf/d, assuring adequate capacity on the Transok system for non-affiliated entities.

Transok currently is tied directly (via wellhead, plant residue or split connected) to approximately 1.8 Bcf of daily gas deliverability. Approximately 1.2 Bcf of Transok's 1.8 Bcf daily deliverability is from the Anadarko Basin and about 0.15 Bcf/d comes from the Lower Hugoton Field. The balance of the gas comes from the Arkoma Basin. Anticipating increased supplies from the Arkoma Basin, one of the largest natural gas reservoirs in the United States, Transok recently constructed additional pipeline capacity in this area. In addition to this supply, Transok has a 26 Bcf storage field with a working capacity of 13 Bcf and winter sustained daily deliverability of approximately 180 MMcf/d.

| | |
|---|---|
| **DESCRIPTION OF TRANSOK CONTRACT** | This Amended Lease Agreement between Transok and KPC, gives KPC priority access to 90 MMcf/d of capacity on the Transok system. This Amended Lease expires in 2009 with KPC having the option to extend for two years. This allows KPC's customers to purchase gas from independent producers connected to the Transok system and ship this gas to the Transok interconnect with the Kansok East Leg. Access to this capacity is subject only to the prior right of PSO and a third party. PSO is a summer peaking utility and has the greatest need for capacity in the summer while KGS/MGE are winter peaking utilities; therefore, PSO usually does not compete with KPC for capacity on the Transok system. The demand requirements of the third party are less than one-third of that required by the system. KPC pays Transok a monthly lease fee and additional fees-based upon the specific Transok line segment used. |

KPI3181

---

***KANSAS PIPELINE COMPANY*** A - 5           **CHASE**

DOJ026860

# Additional System Information

KPI3182

# ADDITIONAL SYSTEM INFORMATION

**ENVIRONMENTAL RISKS**

Certain environmental risks are associated with the operation of natural gas pipelines. Historically, the most serious of these has been the presence of PCB's, which were once used as a fire retardant in equipment lubricants. This practice was discontinued prior to the conversion of the System to natural gas service.

In conjunction with the 1990 restructuring and the 1992 private placement, Pilko and Associates, an environmental risk consulting firm based in Houston, was engaged to perform an extensive environmental review of the System's assets. Pilko conducted interviews with Company management, reviewed historical information regarding the System's assets, and visited numerous sites.

The only major issue identified was in the 1990 report by Pilko concerning ground water contamination at the site of the old Phillips Petroleum refinery in Kansas City, a site adjacent to one of KPC's terminal facilities. Phillips is cleaning up the site with no liability to KPC. No other conditions identified in the Pilko report present any significant liability to KPC and KPC was found to be in compliance with all necessary environmental permits.

**REGULATORY AND LEGAL ENVIRONMENT**

Regulation of KPC's tariff structure and other aspects of its pipeline business can result in distortions of revenues and expenses and swings in operating as well as net income from year to year. Revenues and expenses are often recognized in years subsequent to the year in which they were actually earned or incurred. Swings in operating income from year to year should be expected as long as KPC remains subject to federal regulation.

KPC received a favorable order from the FERC in April 1998. In return for accepting the FERC as the regulating authority, KPC's current rates have been approved as interim rates with no refunds until a new rate case is filed, which must be done by September 10,1999. Once FERC receives the rate filing, it could take 2-3 years for FERC to approve the filing.

**EMPLOYEES BY FUNCTION**

The company currently employs (or is actively seeking personnel for) 64 full-time positions. Approximately 34 of these positions are field personnel. The remaining 30 positions are corporate personnel.

| Field Personnel | Positions |
|---|---|
| Vice President (1), Directors (3) and Support Staff | 9 |
| System Controllers | 5 |
| Operations Personnel in the Field | 20 |
| Total | 34 |

| Corporate Personnel | |
|---|---|
| Office of the CEO, Project Development, Government Affairs, and Support Staff | 8 |
| COO/CFO, Accounting, Regulatory Affairs, Policy, & Information Systems, and Office Support Staff | 22 |
| Total | 30 |

KPI3183

CHASE

DOJ026862

| SAFETY AUDIT | KPC is currently in compliance with all safety audits. A detailed description of KPC's safety audit history is available upon request. |
|---|---|
| LEGAL PROCEEDINGS | Recently, KGS filed a Lawsuit in Johnson County District Court, Case No. 99 C 06574, to which KPC has not responded. KGS is seeking to have the Court interpret and possibly set aside KGS's existing contracts with KPC because of allegations that the KCC Settlement of July, 1997, between KPC, the KCC and KGS's predecessor, WRI, was not accepted by FERC. KGS describes the KCC Settlement as providing for lower rates to be charged by KPC than those rates now prescribed by FERC. KPC intends to vigorously defend its rights and contracts in this litigation and to adhere to FERC jurisdiction over its rates and terms of service. |

A more detailed discussion of the Company's legal proceedings is available upon request.

KPI3184

**KANSAS PIPELINE COMPANY**    B - 2      CHASE

DOJ026863

# Industry Overview

KPI3185

DOJ026864

# INDUSTRY OVERVIEW

**GENERAL OVERVIEW**

Various regulatory and market trends have combined to increase competition for pipelines in recent years, and for the energy industry in general. The factors affecting the industry include: federal and state regulatory efforts, such as the FERC's various initiatives to increase competition in both the gas and electric industries; the overall availability of energy nation-wide at relatively low prices; competition from producers and other sellers and brokers of gas for the retail and wholesale markets; expansion of competition among distribution companies for industrial and commercial customers; competition with existing and proposed pipelines and projects to import gas from Canada and other foreign countries; and competition with other energy forms, such as electricity, fuel oil and coal.

**COMPETITION**

Competition in the markets served by KPC continues to increase. As the gas industry has restructured and government regulations have changed, a marketplace has evolved with traditional and new competitors including oil and electric companies, other gas companies, producers seeking to gain direct access to the Company's customers, and gas brokers and dealers seeking to supplant supplies with spot market gas.

Natural gas faces price competition with other energy forms, and certain of the distribution companies' industrial customers have the ability to switch to fuel oil or coal if desired, as natural gas is sold in competition principally with fuel oil, coal, liquefied petroleum gases, electricity, and heavy crude oil. An important consideration in the industry is the ability of natural gas to compete with alternate fuels, which are fuels to which a potential end user of gas may switch depending on the price of the fuel and other factors. In addition, competition is increasing among LDCs to provide gas sales and transportation services to commercial and residential customers. Currently, local distribution companies operate in what are essentially dual markets -- a traditional utility market, where a utility has an obligation to provide service and offers a "bundled" package of services to all customers; and a "contract" market, where obligations are defined by contract terms. In the latter market, large customers can elect individually or in various combinations whatever gas supplies, storage and/or transportation services they require.

**FERC REGULATION**

Since 1985, the FERC has endeavored to enhance competition in natural gas markets by making natural gas transportation more accessible to natural gas buyers and sellers on an open and non-discriminatory basis. These efforts culminated in Order No. 636 and various rehearing orders ("Order No. 636"), which mandated a fundamental restructuring of interstate natural gas pipeline sales and transportation services. The order included the "unbundling" by interstate natural gas pipelines of the sales, transportation, storage, and other components of their service, and required these pipelines to separately state the rates for each unbundled service. The courts have largely affirmed the significant features of Order No. 636 and numerous related orders pertaining to the individual pipelines, although certain appeals remain pending and the FERC continues to review and modify its open access regulations. Order No. 636 has ended interstate pipelines' traditional role as wholesalers of natural gas, and substantially increased competition in natural gas markets.

The FERC requires pipeline rates that permit pipelines to recover substantially all of their fixed costs, a return on equity, and income taxes in the capacity reservation component of their rates. The FERC has recently

KPI3186



CHASE

DOJ026865

begun a broad review of its transportation regulations, including how they operate in conjunction with state proposals for retail gas marketing restructuring, whether to eliminate cost-of-service rates for short-term transportation, whether to allocate all short-term capacity on the basis of competitive auctions, and whether changes to its long-term transportation policies may also be appropriate to avail a market bias toward short-term contracts. While any resulting FERC action would affect the industry only indirectly, these inquiries are intended to further enhance competition in natural gas markets, while maintaining adequate consumer protections.

## HISTORICAL TRENDS

Unlike oil and petroleum products, natural gas is almost exclusively transported by pipeline. Pipeline customers fall into four general categories: marketers, regulated LDCs (which hold most of the primary contracts for pipeline capacity), large end-users, and retail. Historical trends have included the following:

- A structural shift toward a more balanced market with both firm, long-term, contracts and the purchase of interruptible capacity.

- Retail marketers, such as power companies, are buying based upon their customer base that they supplement with cost-effective peaking services. Industrial and commercial users are also beginning to buy direct from the interstate system rather than the LDCs.

- Based on EIA consumption projections, the market for natural gas is expected to continue to grow at about 2% p.a. for the next 10 years (1999-2008). Excluding demand in the supply areas, this translates to a projected increase in annual consumption of 1.2Tcf, or 3.3Bcf/d, by the year 2001.



Source: Energy Information Administration

KPI3187



DOJ026866

## INDUSTRY DRIVERS

It is anticipated that demand growth will drive higher regulated and unregulated earnings opportunities. That, combined with higher prices, would improve industry sentiment while an improving regulatory environment would also lead to better trading multiples and more merger and acquisition activity. Contributing to overall demand is electric utility gas usage. The electrical industry's demand continues to be very strong, increasing by over 8% from 1997 levels. New gas-fired peaking facilities and the replacement of inefficient and costly fuel oil and nuclear generating facilities will continue to be the primary demand drivers. Currently, natural gas-fired electric generating facilities comprise only 20% of the total electric utility generating capacity in the U.S. The biggest unknown in the demand growth forecasts in natural gas will be the demand for new gas-fired power plants. Currently 150,000 MW of capacity is replaced each year with new gas-fired power plants; this would add 150-175 Bcf of annual demand and represent a growth rate of 4-5% for utility demand. New pipeline construction, increased utilization of existing pipeline and distribution facilities, enhanced marketing and brokering opportunities and electric generation needs all result from increased demand growth.

## SUPPLY

Cambridge Energy Research Associates ("CERA") projects wet gas capacity to decline significantly – by 1.5 Bcf/d – in 1999. Further declines of 0.7 Bcf/d are expected before a reversal in the trend in 2001 and 2002. The projected recovery will result from increased gas related drilling driven by the even higher gas prices expected in late 1999 and 2000 and significant new reserves from both the deepwater and recent shallow water subsalt discoveries.

## DEMAND

In 1998, the extreme heat led to the largest summer spike yet in gas demand for power generation. A continuation of this heat trend in 1999 could cause demand to reach as high as 16.4 Bcf per day – a significant increase over even last year's record August level.

Conversely, the residential and commercial sectors have witnessed two years of unusually dampened demand caused by a reduced need for winter heating. CERA expects a large departure from recent trends projecting residential and commercial winter heating demand in 1999 to reach 13.4 Bcf/d and 8.9 Bcf/d, respectively, and in 2000 an increase to 13.8 Bcf/d and 9.1 Bcf/d, respectively.

Overall, demand for natural gas is expected to be higher in 1999 versus 1998, with demand pressure intensifying toward the end of this year. CERA expects total US consumption to recover to 22.0 Tcf for 1999, more than 500 Bcf above the 1998 level and roughly the same level as 1997. Demand is expected to rise further in 2000, with the extent of these gains constrained by supply availability. Therefore by 2000, continued demand strength couple with lower supply availability and less storage will provide price support.

## STORAGE

Despite an ongoing overhang, the gas market has avoided the extreme price collapse that could have been caused by excessive storage inventories. In the winter of 1998-99, the cold that lingered into late March in the East allowed storage inventories to be emptied sufficiently so that penalties could be avoided and gas markets prices could hold in the $1.60-$1.80 per MMBtu range.

KPI3188

---

***KANSAS PIPELINE COMPANY*** C - 3



DOJ026867



Source: Cambridge Energy Research Associates, March 1999

**INDUSTRY FORECASTS**   Over the last few years, the natural decline in productive capacity is only now beginning to be reflected in gas prices. It has been masked by successive mild winters, a decline in industrial demand and the resulting record surplus of gas in storage. Presently, the supply decline has reduced the storage overhang and the overall supply uncertainty has raised concerns about future deliverability resulting in a strong forward price curve. CERA's projected Henry Hub prices are outlined below.



Source: Cambridge Energy Research Associates, March 1999

KPI3189

---

**KANSAS PIPELINE COMPANY**   C - 4    CHASE

DOJ026868

**INDUSTRY TRENDS**

Consolidation continues in the gas midstream sector with the recent acquisition announcements of Dominion Energy's plan to merge with Consolidated Natural Gas, El Paso's plan to merge with Sonat, and NiSource's recently announced hostile takeover attempt of Columbia Energy. These mergers further reduce the already dwindling number of major independent gas midstream companies and all remaining asset-based gas midstream companies may be considered possible merger candidates. This process is driven in part by a fundamental reality: electrical utilities represent the most cash-rich segment of the broader energy midstream sector. These companies typically have broad-based skill sets, market knowledge, and strategic assets. The major goal of many players in this process is participation in the emergence of a powerful energy midstream sector capable of delivery of multiple forms of energy across numerous markets. This is a major factor behind the drive for scale through diversification.

KPI3190

CHASE

DOJ026869

# Market Demographics

KPI3191

DOJ026870

# MARKET DEMOGRAPHICS

**KANSAS CITY**

In the past two decades, Kansas City has positioned itself as a major regional center of commerce. The city boasts an economic base that includes a strong presence in telecommunications, electronics, health care, banking, financial services and its long-time mix of manufacturing and agribusiness. Kansas City is centrally located making it a transportation and communications hub. The city is the nation's second largest rail center and also provides businesses with access to major inland waterways via port facilities on the Missouri River. Kansas City is at the intersection of three interstate highways (I-29, I-35 and I-70) and is one of only five United States cities served by three interstate highways.

**POPULATION**



Percent Change in Population
1990-1998

| | |
|---|---|
| High | 17.4 to 45.4 |
| Similar to US Percent (8.7) | 8.7 to 17.3 |
| | 4.4 to 8.6 |
| Low | -13.8 to 4.3 |

Source: Population Estimates Program, US Bureau of the Census

TABLE 1: Population Growth Rates

| | 1980-1990 | 1990-1996 |
|---|---|---|
| Chicago | 1.6% | 4.4% |
| Dallas | 32.6% | 13.9% |
| Denver | 14.2% | 15.0% |
| Kansas City | 9.3% | 6.8% |
| Minneapolis | 15.3% | 8.9% |
| **US Average** | **9.8%** | **6.7%** |

*Source: US Bureau of the Census*

TABLE 2: Population Growth Rates

| Population by year | Kansas City, Missouri | Kansas City – Metro Area |
|---|---|---|
| 1998 | 440,232 | 1,690,343 |
| 1995 | 443,878 | 1,663,453 |
| 1990 | 435,136 | 1,582,875 |
| 1980 | 448,028 | 1,327,106 |

*Source: US Bureau of the Census*

KPI3192

***KANSAS PIPELINE COMPANY*** D - 1

 CHASE

DOJ026871

**EDUCATIONAL ATTAINMENT**

TABLE 3: Educational Background by Segment

| Persons 25 years or older, 1990 | Kansas City, Missouri | Kansas City Metro Area | United States |
|---|---|---|---|
| Total Persons 25+ | 284,971 | 1,021,454 | 158,868,436 |
| College Graduates | 77,909 | 293,830 | 42,102,178 |
| High School Graduates | 224,560 | 840,426 | 119,524,718 |

**INDUSTRY**

Kansas City possesses a broad and diverse economy. The economic base has expanded beyond the traditional mix of manufacturing and agribusiness to include telecommunications, banking, finance and the service sector. The Kansas City region with employment of 329,010 in 1993 comprises the largest work force of all the substate regions. This region employed an estimated 32,590 more workers in 1993 than the second largest region, South Central Kansas. The production, construction, operating, maintenance and material handling class of workers occupied 22.9% of the total employment in this region in 1993. Ranking second in employment size, the professional, paraprofessional, and technical group picked up 20.0% of total employment. Clerical and administrative support and the service occupations followed with 19.7 and 15.6% of total employment, respectively. This ranking is expected to remain the same through 2005, with a total projected employment of 394,450.

**EMPLOYMENT**

Major employers include: AT&T, TransWorld Airlines, JC Penney, Hallmark Cards, Sprint, Health Midwest, Farmland Industries, Yellow Freight, and Hoechst Marion Roussel Pharmaceuticals.

TABLE 4: Employment

| Annual Workdays Lost per 100 currently employed persons above 18 years of age | |
|---|---|
| Kansas City | *277.2* |
| Cleveland | 404.6 |
| Denver | 413.0 |
| St. Louis | 482.0 |
| U.S. Average | *537.1* |
| Dallas | 548.0 |
| Atlanta | 552.9 |
| Tampa | 656.4 |
| Buffalo | 893.3 |

*Source: US Bureau of Labor Statistics, 1998*

KPI3193

**KANSAS PIPELINE COMPANY** D - 2

 CHASE

DOJ026872

TABLE 5: Average Unemployment Rates for 1990-1998

| Year | Kansas City Metro Area | United States |
|------|------------------------|---------------|
| 1990 | 4.8 | 5.6 |
| 1991 | 5.5 | 6.8 |
| 1992 | 4.8 | 7.5 |
| 1993 | 5.1 | 6.9 |
| 1994 | 4.6 | 6.1 |
| 1995 | 4.3 | 5.6 |
| 1996 | 4.2 | 5.4 |
| 1997 | 4.0 | 4.7 |
| 1998 | 3.6 | 4.3 |

*Source: US Bureau of the Census*

Total employment in the Kansas City area is expected to grow 19.9% according to the US Bureau of Labor Statistics, from 329,010 in 1993 to 394,450 in 2005. The services industry division will lead in job creation with 30.2% growth between 1993 and 2005. In contrast, employment in the mining industry division is expected to decline by 4.8%. The table below shows Kansas City area employment by industry for base year 1993 and projected year 2005.

### Kansas City Area Employment by Industry Sector
#### 1993 - 2005



*Source: US Bureau of Labor Statistics, 1998*

Employment projections for the Kansas City area indicate the strongest growth in service-producing industries. In 1993, these industries employed 78.5% of the Kansas City area labor force, with goods-producing industries employing 16.4%. It is projected that by 2005, 80.8% of workers in the Kansas City area will be employed in service-producing industries with only 14.9% employed in goods-producing industries.

**WICHITA**

Total covered employment for the Wichita area was 277,127 in 1997, with 243,554 from Private establishments and 33,573 from Government. Manufacturing and Services provided the most employment in the Private sector with 71,872 and 70,849, respectively. Mining reported the smallest employment of 1,399. The weekly average wage for all industries for this period was $595. Private ownership firms reported average wages of $606, and Government paid an average of $519.

Total employment in the Wichita MSA continues to grow at a strong pace. In 1997, 10,100 net new jobs were added, for a growth rate of 3.8%. This

● CHASE

KPI3194

DOJ026873

represents 24.3% of the 41,600 total jobs added statewide during the same time period.

Over 60 new retail establishments opened in Wichita during 1997, with at least half being new restaurants. New national retail stores include Restoration Hardware, Ann Taylor, Old Navy, Williams Sonoma, Linens'nThings, and Lowe's Home Improvement Warehouse.



**Wichita MSA Wholesale and Retail Trade Employment (1980-1997)**

Source: Kansas Department of Human Resources



**Wichita MSA Wholesale and Retail Trade Earnings (1980-1996)**

Source: Bureau of Economic Analysis

### Wichita MSA Trade Establishments and Covered Employment

| Wholesale and Retail Trade | Number of Establishments | Average Employment |
|---|---|---|
| Wholesale Trade | 1,258 | 16,126 |
| Durable Goods | 872 | 10,171 |
| Nondurable Goods | 386 | 5,955 |
| Retail Trade | 2,824 | 46,464 |
| Eating and Drinking Places | 917 | 17,700 |
| Food Stores | 243 | 6,442 |
| General Merchandise | 77 | 5,772 |
| Misc. Retail | 678 | 5,410 |
| Auto Dealers, Service St. | 383 | 5,150 |
| Building Material-Garden | 136 | 2,434 |
| Apparel and Accessories | 174 | 1,868 |
| Furniture and Home Furn. | 216 | 1,705 |

Source: KDHR Annual Employment and Wages, Third Quarter 1997

### Wichita MSA Hourly Earnings by Occupation

| Occupation | Average Hourly Wage |
|---|---|
| Cashiers | $6.06 |
| First Line Supervisors and Managers | 12.66 |
| Freight, Stock, and Material Movers | 7.91 |
| General Office Clerks | 8.14 |
| Order Clerks, Material and Merchandise | 10.59 |
| Order Fillers, Wholesale and Retail | 9.96 |
| Retail Salespersons | 7.63 |
| Stock Clerks, Sales Floor | 6.94 |
| Stock Clerks, Stock Room or Warehouse | 9.23 |

Source: KDHR Oct-Dec 1996 Kansas Wage Survey

KPI3195


CHASE

DOJ026874

# Management

KPI3196

DOJ026875

# MANAGEMENT

### DENNIS M. LANGLEY

**CURRENT EMPLOYER:**

The Bishop Group, Ltd. and Kansas Pipeline Company
President, Chief Executive Officer and Chairman of the Board
8325 Lenexa Drive, Suite 400
Lenexa, KS 66214
(913) 888-7139
Period of employment: 1979 to present

**PAST EMPLOYMENT EXPERIENCE:**

I.    Job Title: Attorney and Partner
       Employer: Schmidt & Langley, Chtd.
       Period of Employment: 1978 to 1985
       A small law firm consisting of up to eight attorneys. Specialized in business organizations,
       regulatory, oil and gas, and environmental law.

II.   Job Title: Majority Counsel for the United States Senate Judiciary Sub-Committee
       Sub-Committee Chairman: Senator Joseph R. Biden, Jr., Democrat, Delaware
       Period of Employment: 1977 & 1978

III.  Job Title: Undergraduate Instructor/Coach of Debate and Forensics
       Employer: The Catholic University of America, Washington, D.C.
       Period of Employment: September, 1973 to June, 1977

IV.   Job Title: Debate and Speech Coach
       Employer: Our Lady of Good Counsel High School, Wheaton, Maryland
       Period of Employment: September, 1971 to May, 1972

V.    Job Title: Millright, Pipe Fitter, Instrument Fitter, Rigger and Laborer
       Employer: Dresser Engineering, Tulsa, OK
       Period of Employment: 1966 to 1971

**UNDERGRADUATE EDUCATION:**

The Catholic University of America, Washington, D.C.
B.A.: May, 1973 GPA: 3.82 Major: General Semantics/Philosophy

**GRADUATE EDUCATION:**

The Catholic University of America, Washington, D.C. – M.A. in Communication, 1973

**PROFESSIONAL EDUCATION:**

The Catholic University of America School of Law, Washington, D.C.
J.D.: May, 1977.

KPI3197



DOJ026876

# Audited Financial Statements

KPI3198

DOJ026877

Consolidated Financial Statements
and Other Financial Information

Syenergy Pipeline Company, L.P.

Years ended December 31, 1998 and 1997
with Report of Independent Auditors

KPI3199

W11980064-KC

DOJ026878

Syenergy Pipeline Company, L.P.

Consolidated Financial Statements
and Other Financial Information

Years ended December 31, 1998 and 1997

## Contents

Report of Independent Auditors ................................................................................... 1

Audited Consolidated Financial Statements

Consolidated Balance Sheets ..................................................................................... 2
Consolidated Statements of Operations ...................................................................... 4
Consolidated Statements of Capitalization ................................................................. 5
Consolidated Statements of Cash Flows ..................................................................... 6
Notes to Consolidated Financial Statements .............................................................. 8

Other Financial Information

Consolidating Balance Sheet ..................................................................................... 22
Consolidating Statement of Operations ...................................................................... 24
Consolidating Statement of Capitalization .................................................................. 25

KPI3200

W11900464-KC

DOJ026879

**ΞIJ ERNST & YOUNG** LLP

■ One Kansas City Place
1200 Main Street
Kansas City
Missouri 64105-2143

■ Phone· 816·474·5200

## Report of Independent Auditors

The Partners
Syenergy Pipeline Company, L.P.

We have audited the accompanying consolidated balance sheets of Syenergy Pipeline Company, L.P. (Syenergy) as of December 31, 1998 and 1997, and the related consolidated statements of operations, capitalization and cash flows for the years then ended. These financial statements are the responsibility of Syenergy's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Syenergy Pipeline Company, L.P. at December 31, 1998 and 1997, and the consolidated results of its operations and its cash flows for the years then ended in conformity with generally accepted accounting principles.

Our audits were conducted for the purpose of forming an opinion on the basic consolidated financial statements taken as a whole. The accompanying consolidating information is presented for purposes of additional analysis and is not a required part of the basic consolidated financial statements. Such information has been subjected to the auditing procedures applied in our audits of the 1998 basic consolidated financial statements and, in our opinion, is fairly stated in all material respects in relation to the 1998 basic consolidated financial statements taken as a whole.

*Ernst + Young LLP*

March 15, 1999

KPI3201

W115��064-KC

Ernst & Young LLP is a member of Ernst & Young International, Ltd.

1

DOJ026880

# Syenergy Pipeline Company, L.P.

## Consolidated Balance Sheets

| | December 31 | |
| --- | --- | --- |
| | 1998 | 1997 |
| **Assets** | | |
| Utility plant: | | |
| Gas plant in service | $ 89,859,271 | $88,458,574 |
| Construction work-in-progress | 1,409,450 | 423,042 |
| | 91,268,721 | 88,881,616 |
| Less accumulated depreciation | (27,531,853) | (24,661,725) |
| Total utility plant | 63,736,868 | 64,219,891 |
| | | |
| Other assets: | | |
| Transaction costs, net of accumulated amortization of $3,565,178 in 1998 and $3,062,532 in 1997 | 5,322,818 | 5,825,464 |
| Certification costs, net of accumulated amortization of $360,913 in 1998 and $323,650 in 1997 | 110,694 | 147,957 |
| Filing costs, net of accumulated amortization of $1,794,733 in 1998 and $1,509,073 in 1997 | 1,068,523 | 844,441 |
| Regulatory assets, net of accumulated amortization of $763,018 in 1998 and $559,548 in 1997 | 6,242,271 | 6,379,674 |
| Other property, plant and equipment, net of accumulated depreciation of $85,550 in 1998 and $77,453 in 1997 | 715,190 | 21,287 |
| Total other assets | 13,459,496 | 13,218,823 |
| | | |
| Current assets: | | |
| Cash | 13,808,145 | 12,411,969 |
| Accounts receivable: | | |
| Customer, net of allowance of $794,533 in 1998 and $283,926 in 1997 | 4,848,800 | 7,073,149 |
| Affiliates | 1,577,220 | 118,695 |
| Other | 691,176 | 393,471 |
| Other current assets | 1,966,966 | 598,005 |
| Total current assets | 22,892,307 | 20,595,289 |
| Total assets | $100,088,671 | $98,034,003 |

KPI3202

2

W11980064-KC

DOJ026881

|  | December 31 | |
| --- | --- | --- |
| | **1998** | **1997** |
| **Capitalization and liabilities** | | |
| Capitalization: | | |
| Partners' capital *(Note 3)* | $ 22,509,753 | $13,036,392 |
| Long-term debt *(Note 4)* | 60,306,598 | 64,370,335 |
| Total capitalization | 82,816,351 | 77,406,727 |
| | | |
| General partner's interest in Partnerships | 148,689 | 133,116 |
| | | |
| Restricted pipeline royalties *(Note 6)* | 2,741,482 | 2,276,501 |
| | | |
| Current liabilities: | | |
| Accounts payable: | | |
| Trade | 2,714,880 | 5,620,798 |
| Affiliates | 87,686 | 509,570 |
| Provision for refund *(Note 1)* | — | 451,620 |
| Accrued property taxes | 735,918 | 991,469 |
| Other accrued liabilities | 779,928 | 945,602 |
| Current maturities of long-term debt *(Note 4)* | 4,063,737 | 3,698,600 |
| Revolving credit facilities *(Note 4)* | 6,000,000 | 6,000,000 |
| Total current liabilities | 14,382,149 | 18,217,659 |
| Total capitalization and liabilities | $100,088,671 | $98,034,003 |

*See accompanying notes.*

KPI3203

DOJ026882

# Syenergy Pipeline Company, L.P.

## Consolidated Statements of Operations

|  | Year ended December 31 | |
|  | 1998 | 1997 |
| --- | --- | --- |
| Operating revenues *(Note 6)*: | | |
| Natural gas sales | $26,939,011 | $80,438,246 |
| Transmission | 27,207,461 | 11,722,388 |
| Total operating revenues | 54,146,472 | 92,160,634 |
| | | |
| Operating expenses *(Note 6)*: | | |
| Natural gas purchases and transmission costs | 22,174,004 | 61,811,026 |
| Other operating and maintenance expenses | 10,814,709 | 13,225,799 |
| Taxes other than income taxes | 1,478,470 | 1,989,372 |
| Depreciation and amortization | 4,243,479 | 4,862,269 |
| Total operating expenses | 38,710,662 | 81,888,466 |
| | | |
| Operating income | 15,435,810 | 10,272,168 |
| | | |
| Other income (expense): | | |
| Interest income | 942,417 | 1,525,455 |
| Interest expense | (6,953,182) | (7,304,742) |
| Gain on disposal of assets | 64,984 | 10,420 |
| Adjustments required by regulatory orders *(Note 2)* | – | (9,182,135) |
| Other | (1,095) | 3,316,804 |
| Total other expense | (5,946,876) | (11,634,198) |
| Income (loss) before general partner's interest | 9,488,934 | (1,362,030) |
| General partner's interest in income of Partnerships | (15,573) | (4,422) |
| Net income (loss) | $ 9,473,361 | $ (1,366,452) |

*See accompanying notes.*

KPI3204

W11980064-KC

4

DOJ026883

# Synergy Pipeline Company, L.P.

## Consolidated Statements of Capitalization

| | | Partners' Capital | | | | | |
|---|---|---|---|---|---|---|---|
| | Bishop Pipeline Company (General Partner) | Bishop Gas Transmission Company | Chase Manhattan Capital Corporation | EON-Synergy DRII Company | Bishop Pipeline Company (Limited Partner) | Long-Term Debt | Total |
| Balance at December 31, 1996 | $17,588,829 | $2,854,957 | $7,972,741 | $850,719 | $ — | $68,068,935 | $97,336,181 |
| Net income (loss) | (671,684) | (169,840) | 567,334 | 35,809 | (1,128,071) | — | (1,366,452) |
| Purchase of partnership interests | — | — | (8,540,075) | (886,528) | 9,426,603 | — | — |
| Withdrawal by partner | (11,299,535) | (3,564,867) | — | — | — | — | (14,864,402) |
| Net change in long-term debt | — | — | — | — | — | (3,698,600) | (3,698,600) |
| Balance at December 31, 1997 | 5,617,610 | (879,750) | — | — | 8,298,532 | 64,370,335 | 77,406,727 |
| Net income | 5,335,864 | 1,011,433 | — | — | 3,126,064 | — | 9,473,361 |
| Net change in long-term debt | — | — | — | — | — | (4,063,737) | (4,063,737) |
| Balance at December 31, 1998 | $10,953,474 | $ 131,683 | $ — | $ — | $11,424,596 | $60,306,598 | $82,816,351 |

*See accompanying notes.*

5

KPI3205

W11980044.KC

DOJ026884

# Syenergy Pipeline Company, L.P.

## Consolidated Statements of Cash Flows

|  | Year ended December 31 | |
| --- | ---: | ---: |
|  | **1998** | **1997** |
| **Operating activities** | | |
| Net income (loss) | $ 9,473,361 | $ (1,366,452) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | |
| Depreciation and amortization | 4,243,479 | 4,862,269 |
| Provision for doubtful accounts | 510,607 | 245,733 |
| General partner's interest in income of Partnerships | 15,573 | 4,422 |
| Adjustments required by regulatory orders | – | 9,182,135 |
| Gain on disposal of assets | (64,984) | (10,420) |
| Restricted pipeline royalty payables | 464,981 | 421,798 |
| Changes in other assets and liabilities: | | |
| Accounts receivable: | | |
| Customer and other | 1,416,037 | 11,493,051 |
| Affiliates | (1,458,525) | (91,279) |
| Accounts payable: | | |
| Trade | (2,905,918) | (10,962,415) |
| Affiliates | (421,884) | (120,612) |
| Provision for refund | (451,620) | (6,095,128) |
| Accrued property taxes | (255,551) | (57,903) |
| Other current assets and liabilities, net | (1,609,399) | (4,828,955) |
| Net cash provided by operating activities | 8,956,157 | 2,676,244 |
| | | |
| **Investing activities** | | |
| Additions to utility plant | (2,675,149) | (4,243,188) |
| Payments of filing costs | (509,742) | (1,268,910) |
| Additions to regulatory assets | (66,067) | (266,685) |
| Additions to other property, plant and equipment | (702,000) | (3,483) |
| Proceeds from sale of assets | 91,577 | 15,161 |
| Net cash used in investing activities | (3,861,381) | (5,767,105) |

KPI3206

DOJ026885

# Syenergy Pipeline Company, L.P.

## Consolidated Statements of Cash Flows (continued)

| | Year ended December 31 | |
| | 1998 | 1997 |
|---|---|---|
| **Financing activities** | | |
| Increase in revolving credit facilities | $ — | $ 6,000,000 |
| Payments on long-term debt | (3,698,600) | (13,366,270) |
| Withdrawal by partners | — | (14,864,402) |
| Net cash used in financing activities | (3,698,600) | (22,230,672) |
| | | |
| Net increase (decrease) in cash | 1,396,176 | (25,321,533) |
| Cash at beginning of year | 12,411,969 | 37,733,502 |
| Cash at end of year | $13,808,145 | $12,411,969 |

*See accompanying notes.*

KPI3207

W11980044.KC

DOJ026886

## 1. Summary of Significant Accounting Policies

### Organization, Significant Transactions and Basis of Presentation

Syenergy Pipeline Company, L.P. (Syenergy) was formed as a limited partnership which holds ownership interests in the following consolidated partnerships: Kansas Pipeline Company (KPC), formerly known as Riverside Pipeline Partnership, Mid-Kansas Partnership (MKP) and MarGasCo Partnership (MarGasCo), collectively referred to as the Partnerships. Syenergy is wholly owned by Bishop Pipeline Company (Bishop) and a subsidiary of Bishop.

The Partnerships own and operate interstate natural gas pipelines in the states of Oklahoma, Kansas and Missouri and acquire natural gas from independent producers for resale.

Syenergy and Bishop own a 99.9% and a 0.1% general partnership interest in the Partnerships, respectively.

In 1998, pursuant to a Federal Energy Regulatory Commission (FERC) order, Syenergy completed a restructuring which resulted in combining into KPC the former businesses of KansOk Partnership (KOP), Kansas Pipeline Partnership (KPP), Riverside Pipeline Partnership (RPP) and Riverside Pipeline Company, L.P. (RPCLP). In addition, on December 31, 1998, Kansas Pipeline Operating Company (KPOC) was also merged into KPC. These restructurings have been accounted for as a combination of entities under common control in a manner similar to a pooling-of-interests with the assets and liabilities recorded at historical costs.

KPC and certain major customers have contracts permitting KPC to charge the maximum rate authorized by the applicable regulatory agency for transportation of gas through KPC's pipelines. Additionally, effective May 11, 1998, the price of natural gas transportation services to certain major customers of KPC became regulated by the FERC. As KPC's transmission rates and operations are regulated, KPC is subject to the requirements of Statement of Financial Accounting Standards (SFAS) No. 71, "Accounting for the Effects of Certain Types of Regulation." This accounting requires that certain costs and revenues be recorded in a manner to reflect the economic effects of rate regulation.

All significant interpartnership balances and transactions have been eliminated.

KPI3208

DOJ026887

## 1. Summary of Significant Accounting Policies (continued)

### Revenue Recognition

The Partnerships recognize revenues from t he transportation and sale of natural gas as services are rendered or as product is delivered to customers.

### Use of Estimates

The preparation of consolidated financial statements in conformity with generally accepted accounting principles (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. During the year, a $923,030 trade liability was written off into income, due to a change in facts, which did not exist at December 31, 1997.

### Reclassification

Certain amounts in the accompanying 1997 consolidated financial statements have been reclassified to conform to the presentation of amounts in the 1998 consolidated financial statements. These reclassifications had no effect on results of operations in either year.

### Utility Plant

Utility plant is stated at cost. For constructed assets, these costs include contracted services, materials and indirect charges for engineering, supervision and general and administrative costs. Utility plant includes allowance for funds used during construction (AFUDC). For the year ended 1997, the amount of AFUDC capitalized was $225,052. Depreciation is provided on the straight-line method over the useful lives of the assets ranging from three to 43 years.

Expenditures for maintenance and repairs are charged to operations as incurred. Expenditures for renewals and betterments which materially extend the useful lives of assets or increase their productivity are capitalized.

KPI3209

DOJ026888

## 1. Summary of Significant Accounting Policies (continued)

### Transaction Costs

Transaction costs include loan fees and legal expenses associated with the formation of Syenergy and the Partnerships and replacement of a term note with the Senior Secured Notes in 1992. The transaction costs are being amortized on a straight-line method over 16 to 18 years.

### Certification Costs

Certification costs include costs incurred by the Partnerships in connection with the filing of applications for orders and certificates authorizing the transportation, purchase and resale of natural gas. Such costs are being amortized on a straight-line basis over 10 years.

### Filing Costs

Filing costs include costs incurred by the Partnerships in connection with the filing of applications for orders for changes in existing rates and/or rate design. Costs of $2,353,513 are being amortized on a straight-line basis over three to five years. Additional costs of $509,743 will be amortized over the period(s) stated in final rate case orders to be issued by the governing regulatory agency in the future.

### Regulatory Assets

Regulatory assets include certain prior year costs that were approved for future rate recovery in commission orders received from the Kansas Corporation Commission (KCC) during 1995. The rate orders specified that $6.1 million of costs classified as accounts receivable at December 31, 1994 would be recovered from future rates. Accordingly, the unamortized balance of $5.3 million and $5.5 million of these costs at December 31, 1998 and 1997, respectively, has been reclassified as regulatory assets and is being amortized on a straight-line basis over 30 years. The remaining net regulatory asset balance of $0.9 million at December 31, 1998 and 1997 will be amortized over the period(s) stated in final rate case orders to be issued by the FERC in the future.

KPI3210

DOJ026889

## 1. Summary of Significant Accounting Policies (continued)

### Natural Gas Futures Contracts

MarGasCo utilizes natural gas futures contracts to hedge its financial exposure, pursuant to fixed-price sales commitments, resulting from fluctuations in the price of natural gas. Gains and losses are recognized concurrent with the recognition of the economic impact of the underlying exposures using the deferral method of accounting. Under the deferral method, gains and losses resulting from changes in value of hedge contracts are deferred in other liabilities and assets and recognized as a component of the cost of natural gas purchases when the anticipated purchase occurs.

### Income Taxes

The accompanying consolidated financial statements do not include a provision for income tax. Since Syenergy and the Partnerships are not subject to tax, the partners include their proportionate share of taxable income or loss in their income tax returns.

### Cash

For the purpose of the consolidated statements of cash flows, Syenergy considers cash to include currency on hand and demand deposits with banks or other financial institutions.

### Natural Gas Sales

Prior to FERC regulation, certain Partnerships recorded natural gas sales to major customers under long-term contracts based on an estimated average price for natural gas purchases throughout the term of the contract period. Differences between authorized prices based on the actual cost of natural gas and the estimated average price charged are settled either contractually or through regulatorily authorized Purchased Gas Adjustments.

### Provision for Refund

The amount of provision for refund at December 31, 1997 was paid to customers in 1998.

KPI3211

DOJ026890

## 2. Regulatory Adjustments

In July 1997, KPP entered into a Global Settlement with Western Resources, Inc. and the KCC regarding a number of issues under review before the KCC, the FERC, the Kansas Court of Appeals and the Missouri Public Service Commission (MPSC). The Global Settlement, entered into while under the jurisdiction of the KCC, established transportation rates for Western Resources, Inc., recognized the elimination of Market Entry costs from current rates, authorized the recovery of certain transition and contract reformation costs, and provided for the unbundling and transfer of supply functions to Western Resources, Inc. This settlement arose from proceedings initiated by the KCC in a review of KPP's services to Western Resources, Inc. during a period when KPP was under the jurisdiction of the KCC. As a result of the Global Settlement, the remaining unamortized Market Entry costs of $9.2 million were written off in 1997. The adjustment to reflect the write-off of these costs is reflected in the 1997 consolidated statement of operations as an adjustment required by regulatory orders.

## 3. Partners' Capital

In connection with the formation of Syenergy, significant debt was obtained to finance the purchase of the Partners' interests. As the historical cost basis of certain assets acquired was not revalued, the transactions to effect the formation of Syenergy resulted in an initial partners' deficit of $10,100,695.

Upon formation of Syenergy, Bishop, as the sole general partner, and Bishop Gas Transmission Company, Chase Manhattan Capital Corporation and EON-Syenergy DRII Company, as the limited partners, had sharing percentages and ownership interests of 55.625%, 10.8477%, 30.2949% and 3.2324%, respectively.

In 1997, Bishop Pipeline Company purchased the limited partnership interests in Syenergy previously owned by Chase Manhattan Capital Corporation and EON-Syenergy DRII Company. As a result, Bishop Pipeline Company has a sharing percentage of 55.625% related to its general partnership interest and 33.5273% related to its limited partnership interests as of December 31, 1998 and 1997.

The Syenergy Partnership Agreement (the Partnership Agreement) requires that the capital accounts for each partner be maintained in accordance with tax regulations. Income, loss and distributions are generally to be allocated in accordance with the sharing percentages of the partners with the exception of certain Syenergy transaction costs for which the amortization is allocated solely to the limited partners. In addition, the

KPI3212

DOJ026891

### 3. Partners' Capital (continued)

Partnership Agreement provides that no limited partner can be allocated losses for any year to the extent that such allocation would create or increase the deficit in the limited partner's tax basis capital account. Because the tax basis capital accounts of limited partners at the date of partnership formation exceeded those determined in accordance with GAAP by approximately $18 million, income, loss and distributions for financial reporting purposes are allocated based on sharing percentages unless the capital deficit of the limited partners for financial reporting purposes exceeds approximately $18 million.

Upon termination of Syenergy, all assets are to be sold, unless otherwise agreed upon by the partners in writing. The proceeds will be used to pay off debt to third parties and then to pay off any debt owed to the partners. All remaining assets, subject to the special allocation of transaction costs, will be allocated to the partners based on their capital balances.

### 4. Borrowings

**Long-Term Debt**

Long-term debt consists of the following:

|                      | 1998          | 1997         |
|----------------------|---------------|--------------|
| Senior Secured Notes | $64,370,335   | $68,068,935  |
| Less current portion | (4,063,737)   | (3,698,600)  |
|                      | $60,306,598   | $64,370,335  |

The 9.64% Senior Secured Notes were issued on June 22, 1992. Principal and interest on the Senior Secured Notes is due semiannually on each June 30 and December 30 until the principal is paid in full. The Senior Secured Notes mature on December 30, 2008. These borrowings are collateralized by substantially all the assets of Syenergy and the Partnerships. The Senior Secured Notes contain various restrictive covenants which include requirements for the maintenance of specific financial ratios and certain other provisions limiting the incurrence of additional debt, payment of distributions and capital expenditures. Syenergy is required to maintain specified cash reserves in order to permit the payment of distributions. The specified cash reserve balance was $10,000,000 as of December 31, 1998 and 1997.

KPI3213

DOJ026892

## 4. Borrowings (continued)

Long-term debt maturities during each of the next five years are as follows:

| Year | Amount |
|------|--------|
| 1999 | $4,063,737 |
| 2000 | 4,464,923 |
| 2001 | 4,905,715 |
| 2002 | 5,390,023 |
| 2003 | 5,922,143 |

### Revolving Credit Facilities

In 1997, Syenergy and MarGasCo had available credit facilities from a primary lending bank totaling $7,500,000 and $15,000,000 for the issuance of letters of credit, respectively. During 1998, management reevaluated its credit needs and chose to reduce the MarGasCo credit facility to $7,500,000 from $15,000,000. These facilities require payment of a commitment fee at an annual rate of 1/2% of the unused portion and 1.6% of the amount of letters of credit outstanding. These facilities expire June 30, 1999. The Syenergy credit facility allows Syenergy to choose between various interest rate options. At December 31, 1998, the interest rate options available were (i) the base rate, as defined, plus a borrowing margin of 1% or (ii) the Eurodollar rate plus a borrowing margin of 2%. The amounts drawn against the Syenergy credit facility at December 31, 1998 and 1997 were $6,000,000. Letters of credit totaling $480,000 and $1,638,000 were issued against the available balance of the MarGasCo credit facility at December 31, 1998 and 1997, respectively. These letters of credit were issued to support obligations under gas purchase contracts entered into by MarGasCo.

Syenergy paid $7,042,207 and $7,236,117 in interest relating to the 9.64% Senior Secured Notes and revolving credit facilities during the years ended December 31, 1998 and 1997, respectively.

KPI3214

DOJ026893

## 5. Major Customers

Operating revenues consist of sales of natural gas to industrial users, sales for resale and transportation revenues relating to customers in the states of Kansas, Missouri, Colorado and Oklahoma. Two customers have outstanding accounts receivable balances of $2,021,199 and $2,020,862 at December 31, 1998 and comprise approximately 35% and 41% of total 1998 operating revenues, respectively. (See also *Note 6*).

## 6. Contract Commitments

### Revenue Commitments

The Partnerships had long-term sales contracts through October 2009 with two major customers in which the Partnerships had committed to make available for sale up to 105,666 Mcf of natural gas per day. However, the respective gas supply functions were assigned to those customers on August 1, 1997 and June 1, 1998. The elimination of these supply services has had no and is not expected to have any material impact on the Partnerships' gross margin.

The Partnerships have long-term transportation contracts through October 2009 with two major customers in which the Partnerships have committed to transport up to 149,457 Mcf of natural gas (which includes the 105,666 Mcf mentioned in the preceding paragraph) per day based on rates authorized by the FERC. Certain sales and transportation contracts totaling 62,568 MMBtus per day have been extended on a transportation-only basis through October 2014. In addition, transportation contracts totaling 13,757 MMBtus per day extend to March and September 2017.

### Purchase Commitments

The Partnerships have an agreement (the Agreement) to lease capacity of 90,000 MMBtus per day in an Oklahoma intrastate pipeline system for the purpose of providing intrastate gas transportation services. Monthly rental payments are based on the actual volume of MMBtus transported through the leased pipeline, as defined, subject to minimum monthly payments. The minimum monthly payments are derived from minimum yearly lease obligations stipulated in the Agreement. Beginning November 1, 1998, the minimum yearly lease obligation for the subsequent 12-month period is $1,524,000. For the 12-month periods ended October 31, 1997 and 1998, the minimum

KPI3215

DOJ026894

## 6. Contract Commitments (continued)

yearly lease obligation was $1,320,000. The Agreement is effective until October 31, 2009. The Partnerships incurred expenses under the Agreement of $1,461,741 and $1,748,893 for the years ended December 31, 1998 and 1997, respectively.

### Other Commitments

Pursuant to a contractual agreement, Syenergy is obligated to pay a royalty to certain affiliated parties based on 1.5% of total transportation revenues plus the gross margin on gas sales. Accrued royalties of $2,741,482 and $2,276,501 at December 31, 1998 and 1997, respectively, have been recorded. The timing of such royalty payments is restricted by the terms of a Syenergy credit agreement.

## 7. Retirement Plan

KPC has a retirement plan that qualifies as a 401(k) plan as defined by the Internal Revenue Code and covers all eligible pipeline employees. Employees may make voluntary contributions of pretax wages up to 22% of their annual salary as of December 31, 1998. KPC may match up to 50% of the first 6% of employee contributions. For the years ended December 31, 1998 and 1997, KPC incurred $56,212 and $66,582, respectively, of employer matching contribution expense.

## 8. Operating Leases

Syenergy paid $583,724 and $442,440 in rental expense for buildings and miscellaneous operating equipment during 1998 and 1997, respectively.

Aggregate future minimum lease payments under noncancelable operating leases (excluding the Oklahoma intrastate pipeline system lease discussed in *Note 6*) at December 31, 1998 were as follows:

| Year | Amount |
|------|--------|
| 1999 | $ 530,633 |
| 2000 | 437,032 |
| 2001 | 106,367 |
| 2002 | 94,824 |
| 2003 | 92,412 |
| Thereafter | 1,327,500 |

KPI3216

DOJ026895

## 9. Contingencies

### Regulatory Contingencies

During 1995, KPP, KOP, KPOC and RPCLP received an order from the FERC requiring the Partnerships to show cause why they should not be viewed collectively as one interstate pipeline system subject to FERC jurisdiction and, alternatively, why KOP, by itself, should not be considered an interstate pipeline subject to FERC jurisdiction.

KPP received a regulatory order from the KCC in December 1996 requiring a write-off of certain deferred costs, a refund of revenues received as a result of the inclusion of these costs in the rate base and a refund of revenues received from direct bills related to these deferred costs. Upon appeal, the Kansas Court of Appeals granted a stay of the order in March 1997, which required, among other things, that the Partnerships deposit, under bond, the amount of $7.2 million related to amounts previously collected from customers for potential future refunds if ultimately required.

Pursuant to the terms of a July 1997 Global Settlement, KPP refunded $7.7 million to one of its customers in September 1997, and KPP wrote off remaining unamortized Market Entry costs of $9.2 million. In addition, KPP received a payment of $7.5 million representing compensation for transition and contract reformation costs under the settlement agreement.

In October 1997, the FERC entered an Order which asserted its jurisdiction over KPC, set final rates associated with KOP proceedings then pending, established initial rates for the jurisdictional pipeline entities, and required the unbundling and assignment of gas supply services. The Syenergy pipeline entities filed a motion for reconsideration in November 1997, based on rate, service, unbundling and other matters contained in the FERC Order. The FERC granted KOP's request in December 1997 and stayed all issues, except its findings with regard to KOP rates, which it made final at that time.

In February 1998, KPC filed a motion acceding to FERC jurisdiction and requesting interim relief. In April 1998, the FERC issued an Order which lifted its stay on the October 1997 Order, granted KPC's motion acceding to FERC jurisdiction and requesting interim relief, and instructed KPC to file an Natural Gas Act Section 4 rate case within 16 months of the effective date of the FERC's assertion of jurisdiction.

Also in 1998, the KCC issued an order dismissing consideration of the sale in prior years of contracts to a third party.

KPI3217

DOJ026896

## 9. Contingencies (continued)

As part of an annual Actual Cost Adjustment review by the MPSC of charges paid by one of the Partnerships' customers to its suppliers, the MPSC staff has recommended a disallowance of approximately $4.5 million paid by this customer to the Partnerships for gas supply between July 1996 and June 1997. Both the customer and the Partnerships vigorously oppose this recommendation on the grounds that a previous settlement with the MPSC precludes it from disallowing these charges. In addition, the Partnerships have filed motions to dismiss due to MPSC's lack of jurisdiction and failure to provide sufficient evidence. These motions are now under appeal, and the MPSC is precluded from taking further action until further court order. While management believes the MPSC staff recommendation is without merit and materially overstated, any potential disallowance, which would be charged to income when any resulting refund became probable, by the MPSC would be mitigated by an extension in the term of the customer contract as provided for in the contract.

The Partnerships cannot predict the outcome of the current pending or any future FERC, KCC, MPSC or any other regulatory actions (including the above mentioned proceedings) now or in the future. Future additional adjustments to the Partnerships' net assets to reflect the economic effects of future rate regulations are possible.

### Billing Disputes

As of December 31, 1998, the Partnerships have billing disputes with customers totaling approximately $1,430,000. Appropriate reserves have been provided for these disputes. Management cannot predict the final outcome of these disputes but believes they will not result in a material effect on Syenergy's consolidated financial statements.

## 10. Affiliated Nonrecurring Reimbursements

In 1997, a consulting firm completed a review of the transfer pricing and cost allocation methodologies between Syenergy and Bishop which had commenced in the prior year. Of the $2.9 million of originally identified costs incurred by Bishop on behalf of Syenergy, the consulting firm concluded that $1.4 million of those costs should be allocated to Syenergy and reimbursed to Bishop of which $0.8 million was included in other operating and maintenance expense in 1997 and $0.6 million was recorded in 1996. An officer of Bishop owns an interest in the consulting firm. The above review was substantially complete prior to the officer joining Bishop.

KPI3218

DOJ026897

## 10. Affiliated Nonrecurring Reimbursements (continued)

In another matter, Bishop reimbursed the Partnerships in 1999 approximately $1,370,000 of legal costs related to litigation previously filed by Syenergy, Bishop and certain other affiliates.

## 11. Employment Contract

The Partnerships are reviewing the terms of an employment contract between the Partnerships and an affiliate and its president to determine whether the president is entitled to additional compensation up to $600,000 under the terms of the contract. The review is expected to be completed in 1999.

## 12. Financial Instruments and Fair Values

The Partnerships estimate the fair value of their financial instruments using available market information and appropriate valuation methodologies. As a result, the following estimates do not necessarily represent the values the Partnerships could realize in a current market exchange. Although management is not aware of any factors that would affect the estimated fair values at December 31, 1998, those amounts have not been comprehensively revalued for purposes of these financial statements since that date. Therefore, estimates of fair value at December 31, 1998 may differ significantly from the amounts presented below. The carrying amounts of the Partnerships' financial instruments at December 31, 1998 were as follows:

|  | 1998 | |
| --- | --- | --- |
|  | Carrying Amount | Estimated Fair Value |
| Financial assets: | | |
| Cash | $13,808,145 | $13,808,145 |
| Financial liabilities: | | |
| Senior Secured Notes | 64,370,335 | 70,523,643 |

At December 31, 1998, the carrying values of the Partnerships' cash approximates fair value. The estimated fair value of the Senior Secured Notes is based on the present value of estimated future cash flows using a discount rate based on the risks involved.

KPI3219

W11M0464.KC

19

DOJ026898

### 12. Financial Instruments and Fair Values (continued)

MarGasCo utilizes natural gas futures contracts to hedge its financial exposure, pursuant to fixed-price sales commitments, resulting from fluctuations in the price of natural gas. At December 31, 1998, MarGasCo had 150 futures contracts for the purchase of 1,500,000 MMBtus of natural gas. The natural gas futures contracts outstanding as of December 31, 1998 expire at various dates through April 2000. At December 31, 1998, MarGasCo had deferred losses on its natural gas futures contracts of $443,860.

At December 31, 1997, MarGasCo had no outstanding natural gas futures contracts and had not purchased or sold any natural gas contracts during the previous year.

### 13. Year 2000 Issue – Unaudited

The year 2000 issue affects the Partnerships' installed computer systems, software applications and other business and operating systems that have time-sensitive programs that may not properly reflect or recognize the year 2000. Because many computers and computer applications define dates by the last two digits of the year, "00" may not be properly identified as the year 2000. This error could result in miscalculations or system failures. The year 2000 issue may also affect the systems and applications of the Partnerships' customers, vendors or affiliates.

The Partnerships have developed a plan to identify and address the year 2000 issue. They have completed an inventory and year 2000 assessment of their principal computer systems, software applications and other business and operating systems. At December 31, 1998, the Partnerships are 90% complete on the remediation phase of their information technology exposures and expect to complete software replacement by June 30, 1999. Programs are being replaced with packaged software which is year 2000 compliant; thus, no further compliance testing has been performed. The Partnerships are 70% complete with the remediation phase of their operating equipment and expect to complete their remediation efforts by April 30, 1999. At December 31, 1998, the Partnerships had not tested their remediated operating equipment; however, once the testing is completed, the operating equipment will be ready for immediate use. Testing and implementation of affected equipment is expected to be complete by July 30, 1999. The Partnerships are using both internal and external sources to identify, correct or reprogram and to test their systems for year 2000 compliance. The Partnerships are also contacting others with whom they conduct business to receive the proper warranties and assurances that those third parties are, or will be, year 2000 compliant.

KPI3220

DOJ026899

### 13. Year 2000 Issue – Unaudited (continued)

The Partnerships expect to incur between $5,000 and $20,000 to achieve year 2000 compliance. If compliance is not achieved in a timely manner by the Partnerships, their affiliates or any significant third party, the year 2000 issue could have a material adverse effect on the Partnerships' operations. However, the Partnerships are focusing on and addressing all aspects of their operations that may be affected by the year 2000 issue. The Partnerships have contingency plans for certain critical applications which involve, among other actions, manual workarounds and adjusting staffing strategies to mitigate to the extent possible the effects of any year 2000 noncompliance.

### 14. Recently Issued Accounting Pronouncement

In June 1998, the Financial Accounting Standards Board issued SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities." This standard requires all derivatives to be measured at fair value. Gains and losses from changes in derivative values are to be accounted for based on how the derivative was used and whether it qualifies for hedge accounting. When adopted in January 2000, this statement is not expected to have a material impact on Syenergy's consolidated financial statements.

KPI3221

DOJ026900

# Other Financial Information

KPI3222

W11700064-KC

## Syenergy Pipeline Company, L.P.

### Consolidating Balance Sheet

### December 31, 1998

| | Syenergy Pipeline Company, L.P. | Kansas Pipeline Company | Mid-Kansas Partnership | MarGasCo Partnership | Elimination Entries | Consolidated Total |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Utility plant: | | | | | | |
| Gas plant in service | $ — | $ 89,859,271 | $ — | $ — | $ — | $ 89,859,271 |
| Construction work in progress | — | 1,409,450 | — | — | — | 1,409,450 |
| | | 91,268,721 | — | — | — | 91,268,721 |
| Less accumulated depreciation | — | (27,531,853) | — | — | — | (27,531,853) |
| Total utility plant | — | 63,736,868 | — | — | — | 63,736,868 |
| Other assets: | | | | | | |
| Transaction costs, net | 303,788 | 5,019,030 | — | — | — | 5,322,818 |
| Certification costs, net | — | 110,694 | — | — | — | 110,694 |
| Filing costs, net | — | 1,068,523 | — | — | — | 1,068,523 |
| Regulatory assets, net | — | 6,242,271 | — | — | — | 6,242,271 |
| Other property, plant and equipment, net | — | 702,000 | — | 13,190 | — | 715,190 |
| Investment in subsidiaries | 111,772,812 | — | — | — | (111,772,812) | — |
| Total other assets | 112,076,600 | 13,142,518 | — | 13,190 | (111,772,812) | 13,459,496 |
| Current assets: | | | | | | |
| Cash | (21,668,778) | 30,177,721 | 501,941 | 4,797,261 | — | 13,808,145 |
| Accounts receivable: | | | | | | |
| Customer, net | — | 3,300,980 | — | 1,547,820 | | 4,848,800 |
| Affiliates | — | 1,577,220 | — | — | | 1,577,220 |
| Intercompany | 2,340,342 | — | — | — | (2,340,342) | — |
| Other | 131,924 | 559,252 | — | — | — | 691,176 |
| Other current assets | — | 591,415 | — | 1,375,551 | — | 1,966,966 |
| Total current assets | (19,196,512) | 36,206,588 | 501,941 | 7,720,632 | (2,340,342) | 22,892,307 |
| Total assets | $ 92,880,088 | $113,085,974 | $501,941 | $7,733,822 | $(114,113,154) | $100,088,671 |

22

KPI3223

W11990066 SEC

DOJ026902

Syenergy Pipeline Company, L.P.

Consolidating Balance Sheet (continued)

December 31, 1998

| | Syenergy Pipeline Company, L.P. | Kansas Pipeline Company | Mid-Kansas Partnership | MarGasCo Partnership | Elimination Entries | Consolidated Total |
|---|---|---|---|---|---|---|
| **Capitalization and liabilities** | | | | | | |
| Capitalization: | | | | | | |
| Partners' capital | $22,509,753 | $104,817,675 | $501,214 | $6,602,612 | $(111,921,501) | $ 22,509,753 |
| Long-term debt | 60,306,598 | — | — | — | — | 60,306,598 |
| Total capitalization | 82,816,351 | 104,817,675 | 501,214 | 6,602,612 | (111,921,501) | 82,816,351 |
| | | | | | | |
| General partner's interest in Partnerships | — | — | — | — | 148,689 | 148,689 |
| | | | | | | |
| Restricted pipeline royalties | — | 2,740,755 | 727 | — | — | 2,741,482 |
| | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable: | | | | | | |
| Trade | — | 1,668,233 | — | 1,046,647 | — | 2,714,880 |
| Affiliate | — | 87,686 | — | — | — | 87,686 |
| Intercompany | — | 2,340,342 | — | — | (2,340,342) | — |
| Accrued property taxes | — | 735,918 | — | — | — | 735,918 |
| Other accrued liabilities | — | 695,365 | — | 84,563 | — | 779,928 |
| Current maturities of long-term debt | 4,063,737 | — | — | — | — | 4,063,737 |
| Revolving credit facilities | 6,000,000 | — | — | — | — | 6,000,000 |
| Total current liabilities | 10,063,737 | 5,527,544 | — | 1,131,210 | (2,340,342) | 14,382,149 |
| Total capitalization and liabilities | $ 92,880,088 | $113,085,974 | $501,941 | $7,733,822 | $(114,113,154) | $100,088,671 |

23

KPI3224

W11980044-KC

DOJ026903

Syenergy Pipeline Company, L.P.

Consolidating Statement of Operations

Year ended December 31, 1998

| | Syenergy Pipeline Company, L.P. | Kansas Pipeline Company | Mid-Kansas Partnership | MarGasCo Partnership | Elimination Entries | Consolidated Total |
|---|---|---|---|---|---|---|
| Operating revenues: | | | | | | |
| Natural gas sales | $ — | $11,175,951 | $14,095,806 | $11,266,641 | $ (9,599,387) | $26,939,011 |
| Transmission | — | 31,521,834 | — | — | (4,314,373) | 27,207,461 |
| Other | — | 316,008 | — | — | (316,008) | — |
| Total operating revenues | — | 43,013,793 | 14,095,806 | 11,266,641 | (14,229,768) | 54,146,472 |
| Operating expenses: | | | | | | |
| Natural gas purchases and transmission costs | — | 11,508,959 | 13,873,087 | 10,705,718 | (13,913,760) | 22,174,004 |
| Other operating and maintenance expenses | 59,853 | 10,663,654 | 41,061 | 363,675 | (313,534) | 10,814,709 |
| Taxes other than income taxes | — | 1,478,470 | 86 | — | (86) | 1,478,470 |
| Depreciation and amortization | 31,977 | 4,128,641 | 2,388 | 82,861 | (2,388) | 4,243,479 |
| Total operating expenses | 91,830 | 27,779,724 | 13,916,622 | 11,152,254 | (14,229,768) | 38,710,662 |
| Operating income (loss) | (91,830) | 15,234,069 | 179,184 | 114,387 | — | 15,435,810 |
| Other income (expense): | | | | | | |
| Income from subsidiaries | 15,572,219 | — | | | (15,572,219) | — |
| Interest income | 939,918 | 329 | 782 | 1,388 | — | 942,417 |
| Interest expense | (6,946,946) | (6,236) | — | — | — | (6,953,182) |
| Gain on disposal of assets | — | 64,984 | — | — | — | 64,984 |
| Other | — | (1,010) | — | (85) | — | (1,095) |
| Total other income (expense) | 9,565,191 | 58,067 | 782 | 1,303 | (15,572,219) | (5,946,876) |
| Income before general partner's interest | 9,473,361 | 15,292,136 | 179,966 | 115,690 | (15,572,219) | 9,488,934 |
| General partner's interest in income of Partnerships | — | — | — | — | (15,573) | (15,573) |
| Net income | $ 9,473,361 | $15,292,136 | $ 179,966 | $ 115,690 | $(15,587,792) | $ 9,473,361 |

24

WI1160064.KC

KPI3225

DOJ026904

Syenergy Pipeline Company, L.P.

Consolidating Statement of Capitalization

Year ended December 31, 1998

| | Syenergy Pipeline Company, L.P. | Kansas Pipeline Company | Mid-Kansas Partnership | MarGasCo Partnership | Elimination Entries | Consolidated Total |
|---|---|---|---|---|---|---|
| Balance at December 31, 1997 | $77,406,727 | $ 89,525,539 | $321,248 | $6,486,922 | $ (96,333,709) | $77,406,727 |
| Net income | 9,473,361 | 15,292,136 | 179,966 | 115,690 | (15,587,792) | 9,473,361 |
| Net change in long-term debt | (4,063,737) | - | - | - | - | (4,063,737) |
| Balance at December 31, 1998 | $82,816,351 | $104,817,675 | $501,214 | $6,602,612 | $(111,921,501) | $82,816,351 |

KPI3226

25

W1100004.KC

# Detailed Map

KPI3227

DOJ026906



DOJ026907