UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ENBRIDGE ENERGY COMPANY, INC. AND ENBRIDGE MIDCOAST ENERGY, L.P. f/k/a ENBRIDGE MIDCOAST ENERGY, INC. f/k/a MIDCOAST ENERGY RESOURCES, INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | CIVIL NO. H-06-0657 |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

UNITED STATES OF AMERICA'S
RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

DONALD J. DEGABRIELLE, JR.
United States Attorney

DAVID B. COFFIN
Oklahoma Bar No. 15740
Trial Attorney
U. S. Department of Justice
Tax Division
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9749
(214) 880-9741 (FAX)

AUGUST 2007

TABLE OF CONTENTS

A. INTRODUCTION . . . 1

B. UNITED STATES' RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS . . . 3

1. Fortrend's Entry into the Transaction . . . 3

2. Fortrend's Financing of the Stock Purchase . . . 5

3. The Project Development Agreements (PDAs) . . . 6

4. Efforts to disguise the True Nature of the Transaction . . . 7

a. The Guarantee . . . 7

b. Non-liquidation Provision . . . 8

c. PWC's Instruction to Retain Assets . . . 8

C. THE RESPONSE OF THE UNITED STATES TO PLAINTIFFS' ARGUMENTS . . . 10

1. K-Pipe was not the owner of the Bishop Stock for tax purposes . . . 10

2. Midcoast assumed the benefits and burdens of ownership of the Bishop Stock . . . 13

3. K-Pipe was a Conduit . . . 22

4. K-Pipe's role as intermediary should not be respected for tax purposes . . . 26

5. Disallowance of Midcoast's basis step-up is proper under the step transaction doctrine . . . 30

6. PWC's heavy hand in the transaction is factually relevant . . . 31

7. Midcoast is not entitled to a stepped-up basis in the Bishop assets . . . 32

8. Midcoast is not entitled to deduct the termination payment . . . 33

9. Midcoast is not entitled to any claimed losses with respect to the Butcher Interest Partnership . . . 33

a. The Butcher Interest had no value. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

b. The termination constituted a deemed dividend from MIDLA to Enbridge and a deemed contribution from Enbridge to KPC. . . . . . . . . . . . 36

c. The termination agreement was a transaction between related parties. . . . . . . 36

d. Any loss is offset by gain from the termination of the obligation To make the Butcher Interest payment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

10. Midcoast is liable for penalties under I.R.C. §6662 . . . . . . . . . . . . . . . . . . . . . . . 37

D. THE UNITED STATES SHOULD PREVAIL ON ALL ISSUES PRESENTED BUT IN THE EVENT PLAINTIFFS PREVAIL ON ANY ANCILLARY ISSUES, THE UNITED STATES IS ENTITLED TO SET OFF ANY REFUND BECAUSE PLAINTIFFS ARE ADDITIONALLY LIABLE FOR GROSSLY OVERVALUING THE BASIS IN THE BISHOP ASSETS . . . . . . . . . . . . . . . . . . . . . . 37

E. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## TABLE OF AUTHORITIES

## FEDERAL CASES

*A. J. Industrial, Inc. v. United States*, 503 F.2d 660 (9th Cir. 1974) ....34

*Andantech, LLC v. Commissioner*, 331 F.3d 972 (D.C. Cir. 2003) ....32

*Arevalo v. Commissioner*, 469 F.3d 436 (5th Cir. 2006), *cert. denied*, 127 S.Ct. 1339 (2007) ....11, 15

*Blueberry Land Co. v. Commissioner*, 361 F.2d 93 (5th Cir. 1966) ....10, 13, 22

*Buchine v. Commissioner*, 20 F.3d 173, 181 (5th Cir. 1994) ....4

*Commissioner v. Brown*, 380 U.S. 563 (1965) ....20, 21, 22

*Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945) ....2, 13, 22, 24, 25, 26

*Compaq Computer Corp. v. Commissioner*, 277 F.3d 778 (5th Cir. 2001) ....20, 21

*Davant v. Commissioner*, 366 F.2d 874 (5th Cir. 1966) *cert. denied*, 386 U.S. 1022 (1967) ....10, 22

*Esmark, Inc. & Affiliated Cos. v. Commissioner*, 90 T.C. 171 (1988), *aff'd without published opinion*, 886 F.2d 1318 (7th Cir. 1989) ....22, 30, 31

*Gregory v. Helvering*, 293 U.S. 465 (1935) ....26

*Gulf Oil Corp. v. Commissioner*, 914 F.2d 396 (3d Cir. 1990) ....34

*H.J. Heinz v. United States*, 76 Fed. Cl. 570, 585 (2007) ....29

*Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990)* ....39

*IES Industrial, Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001) ....20

*Kimball v. United States*, 371 F.3d 257 (5th Cir. 2004) ....31

*Klamath Strategic Investment Fund, LLC v. United States*, 99 A.F.T.R. 2d 2007-850 ....37, 38

*Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122 (D. Conn. 2004), *aff'd without published opinion*, 150 Fed. Appx. 40 (2d Cir. 2005) ....40

*Northern Indiana Public Service Co. v. Commissioner,* 115 F.3d 506, 513 (7th Cir. 1997) ....................29

*Patterson v. Belcher,* 302 F.2d 289, 295 (5th Cir. 1962), *cert. denied,* 371 U.S. 921 (1962) ....................37

*Reef Corp. v. Commissioner*, 368 F.2d 125 (5th Cir. 1966) ....................22

*Santa Monica Pictures, LLC v. Commissioner*, T.C. Memo. 2005-104 ....................38, 39

*Stewart v. Commissioner*, 714 F.2d 977 (9th Cir. 1983) ....................26

*Sun Properties, Inc. v. U.S.* 220 F.2d 171, 174 (5th Cir. 1955) ....................31

*Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988)* ....................39

*TransCapital Leasing Associates 1990-II L.P. v. United States,* 97 A.F.T.R.2d 2006-1916 (W. D. Texas March 31, 2006), *aff'd without published opinion,* ____ Fed. Appx. ____, 2007 U.S. App. LEXIS 20106 (5th Cir. August 23, 2007) ....................2

*United Parcel Service v. Commissioner,* 254 F.3d 1014 (11th Cir. 2001) ....................28

*U.S. v. Cumberland Public Serv. Co.*, 338 U.S. 451 (1950)....................24, 25

*Weiner v. United States, 389 F.3d 152 (5th Cir. 2004)* ....................39

**FEDERAL STATUTES**

I.R.C. § 61 ....................36

I.R.C. § 165 ....................34

I.R.C. § 267 ....................36

I.R.C. 332 ....................11, 32

I.R.C. 334(b) ....................11, 32

I.R.C. § 482 ....................26

I.R.C. § 6662 ....................36

I.R.C. § 6662(a) ....................38

I.R.C. § 6662(b)(3) ....................38

I.R.C. § 6662(e) ....................................................................................................38

I.R.C. § 6662(h) ........................................................................................37, 38, 39

Treas. Reg. §§ 1.165-1(b) ..........................................................................................34

Treas. Reg. § 1.6662-5 ...........................................................................................37, 39

MISCELLANEOUS

Ginsburg & Levin, Mergers, Acquisitions and Buyouts (2006), ¶ 107.2.5. ...............14

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENBRIDGE ENERGY COMPANY, INC. AND ENBRIDGE MIDCOAST ENERGY, L.P. f/k/a ENBRIDGE MIDCOAST ENERGY, INC. f/k/a MIDCOAST ENERGY RESOURCES, INC.,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

CIVIL NO. H-06-0657

**UNITED STATES OF AMERICA'S**
**RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

The United States of America responds to the Plaintiffs' Motion for Summary Judgment.[1]

## A. INTRODUCTION

Plaintiffs have filed their Motion for Summary Judgment and Memorandum in Support ("Memorandum"), which tells only a portion of the story here. The Government refers this Court to the United States of America's Motion for Summary Judgment and Brief in Support ("Government's Brief") for "the rest of the story."

Plaintiffs assert that the Government is attempting to transform by chemical science the transaction that occurred. The Government's position, not supported by chemical science but by sound law, is that the stepped-up basis of the Bishop Assets held by Midcoast—solely obtained by the use of an intermediary summoned by Midcoast—must be adjusted downward to reflect a carryover basis, because this was the incidence of taxation that would have occurred had the intermediary not been injected into the transaction.

[1] On August 20, 2007, Plaintiffs filed their Response to the United States' Motion for Summary Judgment. When deemed necessary, the United States has replied to matters Plaintiffs raised there.

Plaintiffs cannot provide any facts or argument to sustain another result, other than their sole argument that the "form" of the transaction must be respected. As the United States has pointed out in the Government's Brief, Midcoast violated the principles of several corporate statutes, using the schemes and services of high-priced promoters and tax consultants, in an attempt to accomplish matters not intended by Congress in drafting the Internal Revenue Code. When this situation arises, courts must consider the following:

> The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

*Commissioner v. Court Holding Co.*, 324 U. S. 331, 334 (1945).

Here, there is but one result. Any other would allow savvy promoters and tax consultants to profit and companies like Midcoast to avoid the statutory principles and tax regimes implemented by Congress, all at the expense of the United States Treasury. Midcoast wanted the Bishop assets, and it used the United States Treasury to help it finance the transaction by avoiding the corporate level tax from the gain that was inherent in the depreciated assets.

Very recently, the Fifth Circuit made it absolutely clear that it will reject abusive tax shelters consisting of complex fact patterns which produce tax write-offs through artificial creations of tax avoidance structures. *See TransCapital Leasing Associates 1990-II L.P. v. United States*, 97 A.F.T.R.2d 2006-1916 (W. D. Texas March 31, 2006), *aff'd without published opinion*, ____ Fed. Appx. ____, 2007 U.S. App. LEXIS 20106 (5th Cir. August 23, 2007), ("TCLA 1990-II"). TCLA 1990-II involved a 20 to 1 write-off. Here, given that Midcoast paid a 5% fee,

calculated based on the step-up in basis (which would be deducted as depreciation on Midcoast's tax returns), the write-off of 20 to 1 is equally offensive. It is clear that the Court has a duty and responsibility to strike transactions that exist solely to alter tax liabilities, and this is what should occur here. As such, Plaintiffs' Motion for Summary Judgment must be denied and the United States' granted in full.

**B. UNITED STATES' RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS**

Plaintiffs omit material facts from their Statement of Facts in the Memorandum in Support of their Motion for Summary Judgment ("Memorandum") which are essential to a proper analysis of the transactions at issue. Those facts show (1) that Midcoast inserted K-Pipe in its transaction with Langley solely to alter tax consequences, (2) that Midcoast effectively financed the stock purchase, and (3) Midcoast's and PWC's efforts to disguise the true nature of the transaction. In the Statement of Facts in its Brief in Support of its Motion for Summary Judgment ("Government's Brief"), the United States sets forth a comprehensive recitation of the pertinent facts.[2] Rather than burden the Court with a detailed list of the shortcomings of Plaintiffs' Statement of Facts, the United States will highlight some of the important facts Plaintiffs omitted.

*1. Fortrend's Entry into the Transaction*

On page 5 of their Memorandum, Plaintiffs offer the following vague explanation of how

---

[2] The United States apologizes for inadvertently mischaracterizing Midcoast CEO's Tutcher's testimony in its argument, as pointed out in Plaintiffs' Response to United States of America's Motion for Summary Judgment, p. 10. Mr. Tutcher's correct testimony was contained in the factual portion of the United States' Motion for Summary Judgment, p. 21. Additionally, Plaintiffs complain that the United States failed to attach exhibits it cited in its Motion for Summary Judgment and Brief in Support. Except for those noted below, the Government filed the exhibits electronically within the appendices but failed to attach them to the courtesy copies transmitted to Plaintiffs and to the Court. These omissions have been corrected. Government exhibits G-231 and G-330 were not filed electronically but will be filed with this pleading, along with new Government exhibit G-46.

Fortrend was injected into the transactions: "a company called Fortrend International, L.L.C. ("Fortrend") was informed of the fact that Langley wanted to sell the Bishop Stock and that Midcoast was interested in buying the Bishop assets."

Plaintiffs fail to disclose that upon the advice of PWC, Midcoast decided to engage in a Midco transaction to bridge the gap between what Langley wanted for Bishop and what Midcoast was willing to pay, and that *Midcoast* contacted Fortrend to act as the intermediary—to purportedly buy the Bishop Stock and sell the Bishop assets to Midcoast.[3] Moreover, Plaintiffs withhold the facts concerning Fortrend's fee. The amount Fortrend/K-Pipe would earn for its role in the Midco transaction was not based on any arm's-length negotiation related to the market values of the Bishop assets.[4] Rather, it was directly based on the tax benefits Midcoast would obtain using the intermediary transaction. Midcoast simply agreed to Fortrend's customary fee for Midco transactions: 5% of the basis step-up obtained using the Midco transaction. Moreover, it is apparent Midcoast knew Fortrend would not pay taxes on the gain from the alleged asset sale because Fortrend would claim bogus losses generated to offset the gain.[5] (See

---

[3] This case involves "substance over form" tax issues, the effects of which are contested by the United States. To simplify the discussion in this pleading, the Government does not always use "alleged," "purported" or similar words to describe the events and transactions. No concession should be inferred from this simplification.

[4] In Plaintiffs' Response to the United States' Motion for Summary Judgment, Plaintiffs assert that Fortrend/K-Pipe conducted substantial due diligence. Plaintiffs' can only provide self-serving testimony to show that Fortrend/K-Pipe conducted any due diligence. Fortrend's Hoffman cannot recall specifically any due diligence he conducted and he just generally believed it occurred (see Hoffman, pp. 41-42, 131-132, and 169-170), and Midcoast's Kaitson only testified he saw Morelli in the data room. There is no objective evidence that Fortrend/K-Pipe conducted meaningful due diligence or negotiations obviously necessary in a $200 million deal. *See* Report of Gov't Expert J. T. Atkins, p. 7, attached to Plaintiffs' Motion to Exclude Expert Testimony of J.T. Atkins (the Government hereby incorporates by reference Mr. Atkins' report into this record). K-Pipe's representatives appear nowhere on the data room logs that were kept by Langley's law firm. As such, Plaintiffs' self-serving testimony should be wholly rejected given the overwhelming objective evidence showing otherwise. *See Buchine v. Commissioner,* 20 F.3d 173, 181 (5th Cir. 1994) (self-serving testimony wholly rejected when not supported by objective evidence).

[5] Any assertion that Midcoast management and PWC personnel did not know that K-Pipe would use bogus losses to offset the gain from the sale of the Bishop Assets is baseless given that PWC is an internationally recognized accounting firm who previously represented Fortrend in other intermediary transactions, and Midcoast's CFO,

Government's Brief pp. 15-20).

Plaintiffs also assert that "Fortrend had no prior relationship with Midcoast," but fail to advise the Court that Midcoast's tax advisors, PWC, had a previously represented Fortrend in other intermediary transactions. (See Government's Brief pp. 16-17). Therefore, Plaintiffs attempt to distance itself from Fortrend is disingenuous and must be rejected.

*2. Fortrend's Financing of the Stock Purchase*

On page 6, Plaintiffs state that the "letter of intent was non-binding and was subject to, among other things, K-Pipe's obtaining of satisfactory financing as well as the negotiation and execution of a definitive agreement. It was not conditioned on K-Pipe's ability to re-sell any or all of the Bishop assets." On page 10, Plaintiffs state that "K-Pipe financed its acquisition of the Bishop Stock through a loan from Rabobank Nederland ("Rabobank"). Rabobank had a prior relationship with Fortrend and had financed other Fortrend deals. Midcoast had no relationship and had no involvement in arranging K-Pipe's Rabobank financing."

Plaintiffs fail to explain the crucial role Midcoast played in K-Pipe's financing. Rabobank agreed to loan K-Pipe the funds to acquire the Bishop Stock, provided that Midcoast place an amount equal to the loan amount and interest plus $1 million into an escrow account at Rabobank as security for the loan. Obviously, neither K-Pipe, nor its parent, K-Pipe Holding,

---

Robert, was an auditor for Arthur Andersen, LLP, likely trained to carry a healthy skepticism for unusual transactions. Obviously, the only way they would not have know is if they all took a "don't ask, don't tell" approach in this matter. In any event, the fact that they all feign a lack of knowledge is evidence in and of itself that Midcoast failed to conduct the requisite due diligence in this transaction. *See* Testimony of Gov't Expert J.T. Atkins, pp. 86-89. In the end, however, whether Plaintiffs knew or not is unnecessary in finding in favor of the Government, given the overwhelming facts in this case establishing that K-Pipe's insertion was solely tax motivated.

Moreover, along the same lines, Plaintiffs' claim that the Government attempts to attribute knowledge to Midcoast based on one of Fortrend's promotional brochures (G-330, G-330.1) misstates the Government's Statement of Facts. In its Brief, the Government never asserted that such materials were distributed to Midcoast. However, the materials do clearly describe the Midco transaction executed in this case, as testified to by Fortrend's Hoffman (Government's Brief, pp. 18-19).

would, or could for that matter, provide any assets for the security Rabobank required. Midcoast agreed to borrow funds from Bank of America to provide the security for the stock purchase. In accordance with the Escrow Agreement, by November 8, 1999, all funds borrowed by Midcoast and documents necessary to consummate the asset purchase were executed and placed into escrow with Rabobank. Also on the same date, Midcoast and Bank of America executed an instruction to Rabobank to disburse the funds in the escrow account to K-Pipe on November 9, 1999, thereby securing Rabobank's loan to K-Pipe. Only upon receipt of that instruction did Rabobank fund its loan to K-Pipe to acquire the Bishop Stock.[6] (Escrow Agreement, G-1.60; Security and Assignment Agreement, G-149; *see* Government's Brief pp. 29-31).

*3. The Project Development Agreements (PDAs)*

On page 7, Plaintiffs provide an abbreviated discussion of the Project Development Agreement. Plaintiffs fail to explain that the PDAs were a way for Midcoast to try and bridge the gap between what Langley was asking for the Bishop Stock and what Midcoast was willing to pay. After K-Pipe was inserted into the transaction, and even after Midcoast purportedly abandoned the purchase of the Bishop Stock, Midcoast continued to negotiate the PDAs.

Plaintiffs state that "Midcoast became so concerned about a continuing relationship with Langley through a KPC obligation under the PDA that Midcoast indicated it would not buy the assets from Bishop unless some provision was made for the termination of the PDA." Plaintiffs

[6] This Court should note that Appendix I to Plaintiffs' Memorandum completely misstates the flow of funds between the parties. Plaintiffs' Appendix I shows that K-Pipe paid Bishop creditors State Street Bank and Chase Bank in the amounts of $73,288,380 and 6,012,164, respectively. However, these payments were made from the Escrow Account (funded by Midcoast's $198 million borrowing) to Bishop's creditors, and were never deposited into or paid from K-Pipe's bank account. Any assertion that K-Pipe paid these debts is patently false. *See* Rabobank wire transfer instruction, Plaintiffs' Exhibit 33, also labeled as G-140, stating "In accordance with the Escrow Agreement, [Rabobank has] received instructions to make the following payments, and debit account 18359(Midcoast Energy Res.-Escrow Acct." As Plaintiffs point out, K-Pipe's bank account was numbered 18313, and 18359 was the Escrow Account. See also, Government's Brief, pp. 49-50.

fail to advise that Midcoast decided it did not want Langley's participation in the pipeline through the PDAs *before* the PDAs were executed. Nor do Plaintiffs mention that Midcoast management reported to its Board of Directors that as a result of that decision, the consideration for the Kansas Pipeline acquisition was increased by $13.75 million.[7] Moreover, Plaintiffs omit the fact that the purported "Option" to terminate the PDAs was a device suggested by PWC's Wilcox simply to provide Midcoast with beneficial tax treatment.[8] (See Government's Brief pp. 36-39).

*4. Efforts to Disguise the True Nature of the Transaction*

Plaintiffs ignore completely the steps taken by Midcoast and K-Pipe, at PWC's insistence, to thwart an IRS attach on the legitimacy of the Midco transaction and to give it the *appearance* of a bona fide business transaction. These steps are detailed below.

a. The Guarantee

Langley wanted Midcoast to guarantee three provisions of its Stock Purchase Agreement with Fortrend that held particular importance for him. The provisions that concerned Langley (¶¶ 8.10, 8.11, and 5.4) addressed his tax treatment of the proceeds from the stock sale, employee retirement benefits, and his redemption of certain Bishop assets. Initially, the guarantee was expressly transferred to Midcoast in certain provisions of the Asset Purchase Agreement between K-Pipe and Midcoast, but this direct guarantee gave Wilcox "heartburn." Wilcox was concerned with Midcoast providing a direct guarantee of certain obligations to Langley under the Stock Purchase Agreement because it would link Midcoast to the stock purchase and undermine the

[7] Initially management reported to the Board that the additional consideration would be $13.6 million. (Government's Brief, p. 37).

[8] Plaintiffs also fail to explain why the tax treatment it is claiming with regard to the $10.75 million payment is inconsistent with Midcoast's financial reporting of the payment.

appearance of separateness between the stock purchase and Midcoast's asset purchase. However, because Langley would not agree to the deal without the guarantee, Wilcox, while negotiating the terms of K-Pipe's Stock Purchase Agreement, hid the guarantee by using two guarantees. In the first guarantee, Kansas Pipeline Company, one of the assets to be acquired by Midcoast, guaranteed K-Pipe Merger's obligations to Management Resources Group, LLC, (Langley's wholly owned entity outside Bishop) under ¶¶ 8.10, 8.11, and 5.4 of the Stock Purchase Agreement. In the second guarantee, Midcoast guaranteed the first guarantee. (See Government's Brief pp. 32, 33).

b. Non-liquidation Provision

PWC's Wilcox was also concerned about the appearance of K-Pipe's brief ownership of the Bishop assets so Midcoast's representatives asked Langley to include a provision in the Stock Purchase Agreement in which K-Pipe represented that it would not liquidate Bishop for at least two years. Langley representatives, however, communicated that he did not care if Bishop was liquidated and suggested that the non-liquidation clause was better suited to the Asset Purchase Agreement between K-Pipe Merger and Midcoast. Wilcox explained that he did not want the provision in the Asset Purchase Agreement because it would look inconsistent with Midcoast's desired tax treatment of the transaction and insisted that the non-liquidation clause appear in either the Stock Purchase Agreement or in a side letter between K-Pipe Merger and Langley. Wilcox stated, "it should definitely NOT be in the asset purchase agreement as an asset buyer would be [expected to be] indifferent." Ultimately, the provision appeared in a side letter between Langley and K-Pipe Merger. (See Government's Brief pp. 39, 40).

c. PWC's Instruction to Retain Assets

On page 10, Plaintiffs state that "Bishop retained certain assets, including a $10 million

195248.1.
247971.1

cash reserve, certain causes of action against third parties, and a contractual royalty interest known as the Butcher interest." Plaintiffs, however, fail to provide any objective evidence showing why K-Pipe retained the assets, *i.e.*, Plaintiffs fail to give a bona fide business purpose. The undisputed facts show the assets were "retained" only at the insistence of PWC's Wilcox, obviously to disguise the tax avoidance nature of the Midco transaction. In the hand written notes of Wilcox of PWC from the planning stages of the transaction, under a list he made of "Critical Factors in Avoiding Agency," Wilcox wrote: "Better if [Intermediary] retains some significant assets such as [accounts receivables] to interfere [with] step transaction doctrine." (G-201, PWC 1289.) Later he wrote: "Possible for Fortrend to retain significant passive assets? Retain [property] and lease or license to Midcoast? [Accounts receivables]?" (G-201, PWC 1304.) (See also Government's Brief p. 41).

Of the assets Plaintiffs claim were retained, the Butcher Interest was the only asset of arguable substance.[9] Plaintiffs acknowledge that K-Pipe contributed the Butcher Interest to the Butcher Interest Partnership and that it received a $6.225 million distribution from the partnership. Plaintiffs, however, offer no explanation as to why the Butcher Interest Partnership was formed, what was its business purpose, and how the partners intended to make money. An email from Fortrend's counsel, Morelli, however, revealed why the Butcher Interest Partnership was formed, and is worth repeating here:

> The Butcher Interest Partnership, you may recall, was entered into at the insistence of PWC in order to add 'substance' and 'good facts' to this Midco transaction.

(G-326, quotations in original). Thus, it is obvious that by all accounts, the Butcher Interest

---

[9] As explained in the Government's Brief, the $10 million cash retained was merely a wash. As for the causes of action against the third-parties supposedly retained by K-Pipe, Plaintiffs fail to produce evidence showing these actions had any value or that K-Pipe ever even pursued them. Once again, there is no objective evidence supporting Plaintiffs' assertions.

Partnership was not formed for a bona fide business purpose, but only to create the appearance of a business purpose.

With regard to K-Pipe's liabilities supposedly retained, Midcoast assumed all liabilities related to the Kansas Pipelines via its purchase of the general partnership interests, and Midcoast even assumed the liabilities of Syenergy Pipeline Company, L.P., one of the partnerships supposedly retained by K-Pipe. (*See* Assumption Agreement, G-1.13). There is no objective evidence showing that K-Pipe assumed any meaningful obligations.

Finally, Plaintiffs' assertion that K-Pipe retained assets and liabilities and continued "in existence" after closing the asset sale is hollow. The tax returns filed by K-Pipe for the years 1999 through 2002 reveal that it had virtually no assets or economic activity except for the movement of cash, and the subsidiaries it owned (including Bishop and related entities) were all shell entities. (See G-254, G-260, G-261, G-262). As a result, these shell entities were useless for any purpose, including any indemnification with regard to Langley, or for any supposed liabilities assumed. Therefore, Plaintiffs' assertion that "Bishop Continued to Exist" holds no weight for purposes of this analysis.

**C. THE RESPONSE OF THE UNITED STATES TO PLAINTIFFS' ARGUMENTS**

*1. K-Pipe was not the owner of the Bishop stock for tax purposes.*

In section II of its Memorandum, Plaintiffs argue that the evidence establishes Midcoast never acquired or otherwise became the owner of the Bishop Stock. Plaintiffs' argument hinges only on the "form" of the transactions that its advisors put in place to disguise the true nature of the transaction. While it is correct that K-Pipe acquired title to the Bishop Stock, it did not get beneficial ownership—that went to Midcoast. Accepting the form of the transaction, as Plaintiffs advocate, would defeat the statutory purpose of the Code and regulations governing the

acquisition of assets held by corporations. Plaintiffs' argument must, therefore, be rejected. *See Davant v. Commissioner*, 366 F.2d 874, 879-80 (5th Cir. 1966) *cert. denied*, 386 U.S. 1022 (1967); *Blueberry Land Co. v. Commissioner*, 361 F.2d 93, 101 (5th Cir. 1966). Contrary to its assertions, the undisputed facts show that Midcoast did, in substance, acquire the Bishop stock, liquidate Bishop under I.R.C. § 332, consequently leaving it owner of the Bishop's assets outright with a carryover basis under I.R.C. § 334(b).

Plaintiffs cite *Arevalo v. Commissioner*, 469 F.3d 436 (5th Cir. 2006), *cert. denied*, 127 S. Ct. 1339 (2007), which addressed the issue of whether a taxpayer owned assets for tax purposes. In *Arevalo*, the taxpayer actually possessed legal title. The Court in *Arevalo* noted that in the context of a sale, however, when determining the ownership of an asset for tax purposes, courts look at many different factors indicative of ownership, not just the passage of bare legal title. *Arevalo*, 469 F.3d at 439. The Court stated that if the benefits and burdens of ownership have not passed from the seller to the purchaser, then it will disregard the transfer of formal legal title when determining ownership of an asset for tax purposes. *Id.* In the end, it is clear that *Arevalo* actually supports the Government's position in that the Fifth Circuit agreed that when examining transactions for purposes of determining the resulting tax consequences, substance governs over form. *Id.* at 439.

In this case, the form of the purported transaction was a sale of the Bishop Stock to K-Pipe and simultaneously a sale of the Bishop assets to Midcoast. However, the purchase of stock should be disregarded for tax purposes even though legal title in the Bishop Stock passed to K-Pipe. When K-Pipe acquired the Bishop Stock, all steps to sell the Bishop assets to Midcoast had been completed. The funds and all the documents for the consummation of the "asset sale" were fully executed and held in escrow. Indeed, Plaintiffs acknowledge in its Statement of Facts

that on November 5, 1999, K-Pipe and Midcoast executed the Asset Purchase Agreement,[10] before the purported stock purchase closed. Moreover, the "asset sale" effectively closed on November 8, 1999, because on that date, as called for in the Escrow Agreement, the final condition precedent to the asset purchase was met; Midcoast and Bank of America provided written notice to Rabobank to remit and deliver the "Escrowed Property" which was the $198 million. (*See* G-46).

Consequently, and as planned, K-Pipe never had any opportunity for profit or risk of loss from operation of the Bishop business. It was obligated to convey the entire business to Midcoast. The funds that K-Pipe received from Midcoast for the Bishop assets were obligated to Rabobank to repay the Rabobank loan that K-Pipe used to acquire the Bishop Stock.[11] K-Pipe's "profit" in the transaction, the 5% of the basis step-up, was agreed to before either transaction was consummated. Moreover, there is no objective evidence—correspondence, offers, meeting notes or the like -- indicating that K-Pipe or Fortrend even negotiated the purchase price for the Bishop Stock. One must conclude that because Midcoast's "price" for the business would be Langley's required stock price plus the 5% fee to K-Pipe, Midcoast negotiated K-Pipe's price for the stock, thereby, capping K-Pipe's profit to only its fee. Therefore, K-Pipe had no ability to make a profit outside of the fee charged for "using" the intermediary transaction.[12]

The Midco transaction employed by Midcoast divorced the beneficial ownership of Bishop from title to the paper shares. K-Pipe ended up with legal title to the paper shares and Midcoast ended up with beneficial ownership. In its benefits and burdens analysis, Plaintiffs

---

[10] Plaintiff's Memorandum, page 9.

[11] It is important to note that Rabobank, obviously knowing that K-Pipe's sale of the assets to Midcoast was a foregone conclusion, did not even take a security in those assets or the partnership interests (See Government Brief, pp. 29-30).

[12] Such actions – parties not negotiating for their own self-interest—are commercially unreasonable and evidence that the insertion of K-Pipe had no legitimate business purpose. See Report of Government Expert J.T. Atkins, p. 6.

merely focus on K-Pipe's receipt of the paper shares. Once again, Plaintiffs rely only on the form of the transaction, not its substance. As set forth in the Government's Brief, pp. 70-72, accepting the form of the transaction at issue would defeat the purpose of the statutory and regulatory provisions addressing the acquisition of assets held in corporate form. Accordingly, Plaintiffs' argument cannot stand. To reflect the substance of the transaction, K-Pipe's ownership of Bishop must be disregarded for tax purposes, and hence Midcoast is deemed to have purchased the Bishop Stock and liquidated Bishop, resulting in an adjustment to the Bishop assets to their carry over basis from the stepped-up basis reported in Midcoast's returns.

*2. Midcoast assumed the benefits and burdens of ownership of the Bishop Stock.*

In section III of its Memorandum, Plaintiffs argue that the Government's contention that K-Pipe never assumed the benefits and burdens of Bishop Stock ownership does not defeat summary judgment.

Plaintiffs argue in section IIIA that even if the Government ignores Langley's sale of stock to K-Pipe then the only logical conclusion that can be drawn is that Langley caused Bishop to sell the assets to Midcoast. For support, Plaintiffs argue that in *Blueberry Land Co. v. Commissioner*, 361 F.2d 93, 101 (5th Cir. 1966), and *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945), the courts affirmed the liability of the purported stock seller and did not disturb the treatment of the asset buyer. Plaintiffs' argument is unfounded. The appropriate tax treatment to be accorded in a transaction rests on the substance of the transaction. In addition to justifying disregarding the participation of the intermediary, in both cases the facts warranted a finding that the corporations, in substance, sold assets. The facts in this case, however, warrant a finding that the substance of the transaction was an acquisition of the Bishop Stock by Midcoast, leaving it with a carry over basis in the assets.

The undisputed evidence establishes that Langley would only sell his stock; he would not sell the Bishop assets because of the negative tax consequences. As explained in the Government's Brief, because Langley was emphatic that he would only sell stock, the only route to a basis step up for a purchaser of his stock was a section 338 election. A section 338 election, however, would result in a deemed asset sale by the Bishop, and Midcoast would be liable for the resulting tax on the gain from the sale.[13] Midcoast opted not to pursue the section 338 route. Rather, to satisfy Langley's insistence on a stock purchase and to get a basis step-up, Midcoast inserted an intermediary, K-Pipe, into the transaction; effectively financed K-Pipe's acquisition of the Bishop Stock; and through this scheme, acquired the Bishop assets. After the transaction, K-Pipe engaged in no business activity. Substantively, K-Pipe only acquired bare legal title to the Bishop stock while Midcoast acquired beneficial ownership. For tax purposes, Midcoast is deemed to have acquired the Bishop Stock and received the Bishop assets in a section 332 liquidating distribution, thereby getting a carryover basis in the assets. (See Government's Brief, p. 60).

Plaintiffs argue that the Government should be seeking to collect its tax from Langley. The facts of this case do not warrant a deficiency against Langley. There is no dispute that Midcoast summoned Fortrend to facilitate it in an intermediary transaction. Therefore, the Government is correct in adjusting Midcoast's tax returns for the insertion of the intermediary. Of course, had the Government been looking to solely collect the largest amount of tax resulting from the shelter transactions, it could have sought to recharacterize the transaction as to Bishop and Langley, which would have resulted in immediate recognition and taxation of the amount of

[13] The present value of the depreciation deductions from the asset step up if a section 338 election is made is generally significantly less than the present value of the corporate level tax. Ginsburg & Levin, Mergers, Acquisitions and Buyouts (2006), ¶ 107.2.5. Midcoast was apparently aware of this principle, thereby not choosing the section 338 route.

the step-up – almost $150 million. This amount of additionally tax, if sought, would have increased the Treasury's coffers by at least $50 million.[14] Obviously, the Government did not seek solely to pursue the most tax, but rather, it reviewed the facts of the transaction and proceeded accordingly.

Plaintiffs should not complain that the Government has the wrong taxpayer. Midcoast agreed to indemnify Langley in the event the IRS challenged the characterization of the transaction on his tax return and therefore, Plaintiffs would be liable to Langley for the $50 million plus in additionally taxes that Bishop would have paid to the IRS.[15] In the end, Plaintiffs are better off paying the taxes here rather than paying Bishop/Langley under the indemnification agreement.

Plaintiffs argue in section IIIB that K-Pipe assumed the benefits and burdens of ownership of the Bishop Stock under what it refers to as the *Arevalo* test. Plaintiffs focus on whether K-Pipe bore risk in the transactions and avers that the evidence establishes that such risk existed. It is noteworthy that Plaintiffs frame the issue as to whether K-Pipe bore risk *in consummating the transactions* rather than whether K-Pipe bore the risk from ownership of the Bishop Stock. The United States does not challenge that engaging in a Midco transaction was, from a tax standpoint, a risky proposition, and that the parties to the transaction, including K-Pipe and Midcoast, bore that risk. That risk, however, is irrelevant to an inquiry as to whether K-Pipe acquired the benefits and burdens of ownership of the Bishop Stock, especially because it

---

[14]This computation is a rough estimate of taxes resulting only from the gain that Bishop would have recognized had it sold the assets to Midcoast, and is calculated by taking the corporate tax rate of 35% and multiplying it against the adjustments made by IRS to K-Pipe's 1999 return totaling $144,640,020 (*see* Plaintiffs' Exhibit 16.1), which equals $50,624,007.

[15] Indeed, as Plaintiffs have pointed out, Langley sued Midcoast and Fortrend on this indemnification when the IRS proposed changes to his tax return. As pointed out by the IRS agent, the IRS took a "whipsaw" position – an inconsistent position with regard to Langley – to protect the interests of the Government. See Deposition of Creswell, attached to Plaintiffs' Memorandum, pp. 19-23.

was planned that K-Pipe would have nothing from which to pay the tax from the gain on the asset sale.

Plaintiffs attempt to show some risk and first argue that K-Pipe was exposed to the risk of any fluctuations in value of the Bishop Stock. In support, it claims that "if for any reason Midcoast failed to close on the purchase of [the] Bishop assets, it was K-Pipe that was exposed to the effect that failure would have on the Bishop Stock." This claim is baseless. Under no circumstances, once the stock sale closed, could Midcoast fail to close on the purchase of the Bishop assets. Because Midcoast's loan from Bank of America was used as security for K-Pipe's Rabobank loan to purchase the Bishop Stock, the stock purchase and the asset purchase effectively occurred simultaneously, as neither bank wanted to be exposed to risk. This was accomplished through the mechanism of the escrow.[16] The fact that the closing of the asset purchase occurred one day after the closing of the stock purchase was of no consequence because the delay did not affect the legal rights and obligations of the parties under the agreements and did not expose K-Pipe to any risk. It was preconceived that Midcoast would end up with all the assets and the various transactional agreements provided protections to all parties that this would occur in all events.

Plaintiffs next generally claim that K-Pipe had "potential exposure to known and unknown liabilities."[17] This too is unfounded. Plaintiffs cite to absolutely no evidence that K-

[16] Section 2.6 of the Asset Purchase Agreement specifically provides that "[o]n November 8, 1999, the Preliminary Cash Consideration and all documents required by Section 2.7 shall be deposited by the parties with the Escrow Agent pursuant to the Escrow Agreement."

[17] Plaintiffs cite to an indemnification provision in the Stock Purchase Agreement between Langley and K-Pipe, and assert that such indemnification was capped thereby providing a financial risk to K-Pipe if "Langley would not perform." A closer review of the indemnification in the Stock Purchase Agreement reveals that Langley agreed to indemnify not only K-Pipe but also expressly agreed to indemnify "[K-Pipe's] successors and assigns as to all or part of the assets of [Bishop]." This fact supports the Government's position that it was pre-conceived and pre-determined that K-Pipe would, in all events, convey the Bishop Assets to Midcoast.

Pipe had any actual exposure. Plaintiffs merely allude to "potential exposure." Real exposure, however, rested with Midcoast because Midcoast acquired the general partnership interests that held the pipeline assets. Therefore, any real risk of potential liabilities followed the partnership interests and clearly was with Midcoast. Additionally, as discussed above, even if K-Pipe had any exposure, such exposure was inconsequential; once it laundered the assets, providing a step-up in basis to Midcoast, there was no further activity; K-Pipe, and the entities within it, were mere shells.

Plaintiffs claim further that Bishop, K-Pipe and Fortrend were exposed to potential liabilities assumed under the Stock Purchase Agreement. Plaintiffs argue in support that K-Pipe, on behalf of itself and its affiliates, agreed to indemnify Langley with respect to certain matters after the closing of the stock sale; that Fortrend guaranteed these indemnities; and that Langley sued Bishop, K-Pipe and Fortrend in 2004 to enforce certain of these indemnity obligations. This argument rings hollow.

First, after K-Pipe disposed of its assets to Midcoast, it was a mere shell, and therefore, any obligations it owed were inconsequential (as the IRS has recently determined). Second, it is a commercial reality that despite the indemnities between Fortrend, K-Pipe and Langley, once Langley received his money and was fully paid,[18] K-Pipe and Fortrend had discharged all meaningful obligations to Langley, except one – any liability owing to Langley pursuant to an IRS examination of his or Bishop's tax returns. (See Stock Purchase Agreement, G-2.34, Article VII). Of course, once Langley was subject to IRS examination, he sued *Midcoast*, K-Pipe and Fortrend to collect under this indemnification. Midcoast and Fortrend caused exposure to

[18] As discussed in the Government's Brief, it was always determined that Midcoast, not K-Pipe, would pay Langley the $10.75 deferred purchase price payment. Therefore, K-Pipe had no exposure to Langley after the stock sale except for any obligations resulting from a potential IRS exam of Langley's returns.

Langley by inserting a Midco into the transaction. Certainly, the creation of an obligation from a bogus tax shelter transaction cannot constitute legitimate risk, or a factor in favor of finding that K-Pipe had the benefits and burdens of ownership of the Bishop Stock.

Plaintiffs claim next that K-Pipe was exposed to tax liabilities with respect to the taxable gain from the sale of the Bishop assets. A Midco transaction is an effort to shift the tax liability that results from the sale of appreciated assets to an intermediary which attempts to evade the tax through varying and improper methods. (See Government's Brief, p. 7) The tax benefits that Midcoast claimed as a result of using the Midco transaction were only possible because of the taxes K-Pipe evaded. Plaintiffs' assertion that the tax avoidance nature of the Midco scheme provides evidence of the bona fides of the transaction is ludicrous. To the contrary, it shows that the transaction was completely tax motivated and lacking in any real substance. K-Pipe had no real risk of paying taxes resulting from the asset sale because the scheme under which it was formed and operated was designed to evade the payment of taxes.

In its next claim, Plaintiffs indirectly acknowledge that K-Pipe's "profit" from the purchase of the Bishop Stock and sale of the Bishop assets was fixed in advance. Plaintiffs assert, however, that K-Pipe was exposed to risk because it was exposed to the costs incurred in connection with its obligations to professionals and other advisors retained in connection with the transaction—advisors such as PWC. Payments to PWC, and the other recipients of the fee, were contingent upon the Midco transaction being executed. It is obvious that incurring costs associated with facilitating a tax avoidance strategy is not the same as incurring costs associated with operating an on-going enterprise or costs of holding legitimate investment property. Such costs are not relevant to determining whether K-Pipe had the benefits and burdens of ownership of the Bishop Stock.

Grasping to establish any risk, Plaintiffs argue that the price K-Pipe was to pay Langley for the Bishop Stock and the price Bishop was to receive from Midcoast for the Bishop assets was subject to uncertainty due to post closing adjustments. Post closing adjustments have nothing to do with being exposed to risk. They are merely adjustments to the purchase price necessary to take into account financial information that was unavailable to the parties prior to closing. Moreover, the post-closing adjustments settled on by the parties were only a minute fraction of the amount Midcoast paid for the Bishop business, and as such, were immaterial.

In its final claim, Plaintiffs repeat its assertion that K-Pipe was exposed to risk from the transaction with Langley before it closed on the Bishop Stock. It claims that once K-Pipe entered into the Stock Purchase Agreement on November 8, 1999, it was obligated to perform under that agreement whether or not Midcoast executed the Asset Purchase Agreement. As discussed above, Plaintiffs' claim is baseless, especially given that they acknowledge three sentences later in their brief that Midcoast had completed its portion of the transaction, executing the Asset Purchase Agreement on November 5, 1999.[19] Plaintiffs also assert that K-Pipe was exposed to risk because it agreed in a November 4, 1999 letter agreement to pay Langley a $15 million break up fee if the transaction did not close by November 15, 1999. Plaintiffs acknowledge that Midcoast agreed by letter dated November 5, 1999, to indemnify K-Pipe with virtually an identical indemnification to K-Pipe of the same amount, but claims that there were gaps with the indemnification and that K-Pipe was thus exposed to risk. .

Midcoast bore all of the risk resulting from the break-up fee indemnifications, because it, not K-Pipe, deposited $14 million in escrow to pay the break up fee. K-Pipe never put any

[19] "[T]he escrow funds were released to Midcoast upon the execution of the Asset Purchase Agreement on November 5 . . . ." Plaintiffs also acknowledge that the Asset Purchase Agreement was executed on November 5, 1999, in their Statement of Facts (Plaintiff's Memorandum, page 9).

monies whatsoever into an escrow account or provided other security in favor of Langley in the event it did not close the stock purchase. There is no evidence that K-Pipe's even had the capacity to put up any security or pay such amount. K-Pipe's security was Midcoast, and obviously, all the parties knew Midcoast would pay this $15 million fee in the event the transactions did not close.

Plaintiffs conclude by arguing that the risks it claims that K-Pipe was exposed to are sufficient to establish that K-Pipe was the substantive owner of the Bishop Stock. Plaintiffs cite *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778 (5th Cir. 2001) and *Commissioner v. Brown*, 380 U.S. 563 (1965) in support of its argument. Plaintiffs' reliance on these cases, however, is hopelessly misplaced.

The issue in *Compaq* was whether Compaq's trading activity in American Depository Receipts ("ADRs") had economic substance. Unlike the issue in this case, it did not involve the use of an intermediary. The fact pattern and issue in *Compaq* were identical to that of *IES Indus., Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001). The Fifth Circuit relied on *IES* in support of its holding that Compaq's ADR trading had economic substance. The Court cited the Eighth Circuit's finding that:

> the ADR transactions had not been conducted by alter egos or by straw entities created by the taxpayer simply for the purpose of facilitating the transactions. Instead, "all of the parties involved . . . were entities separate and apart from IES, doing legitimate business before IES started trading ADRs and (as far as we know) continuing such legitimate business after that time."

*Compaq*, 277 F.3d at 784.

The same cannot be said about the transaction at issue. K-Pipe was inserted in the transaction by Midcoast simply to alter tax consequences. K-Pipe did not engage in legitimate business before the transaction; it was specifically formed for the Midco transaction. Nor did it

engage in legitimate business after the transaction; it was a mere shell kept around at the insistence of PWC to give the transaction the appearance of legitimacy.

Moreover, the transactions at issue in *Compaq* "occurred on a public market, not in an environment controlled by Compaq or its agents." *Compaq*, 277 F.3d at787. Here, although Langley marketed the Bishop Stock to several different parties, there is not a shred of evidence that K-Pipe ever sought to sell the Bishop assets to anyone other than Midcoast. The market related to the transaction at issue in this case, contrary to the market in *Compaq*, was a closed market brokered by PWC wherein the ultimate result was predetermined – a transfer of the Bishop assets from K-Pipe to Midcoast with the tax basis in the assets "laundered" and stepped-up.

The Fifth Circuit in *Compaq* also found that Compaq's ADR transaction was not solely motivated by the tax consequences of the transaction; that Compaq actually and legitimately sought profit. *Compaq*, 277 F.3d at 787. Again, the same cannot be said about the transaction at issue. The undisputed facts show that K-Pipe was brought into the transaction on the advice of PWC solely to give Midcoast a tax benefit which made paying Langley's asking price for Bishop palatable to Midcoast. Midcoast obtained no economic benefit from bringing K-Pipe in the transaction, apart from the tax benefits it would receive via the future depreciation deductions. In the end, *Compaq* does not aid Plaintiffs in Midcoast's use of an abusive tax shelter transaction.

Plaintiff cites *Brown* for the proposition that repaying a loan to buy a business only from income produced by the business purchased is not a basis to invalidate the sale. *Brown*, however, is readily distinguishable from the instant case. In *Brown*, stock in a closely-held corporation was sold to an exempt organization at a reasonable price in return for a note which

was to be paid within 10 years from income to be derived from the assets of the purchased business. In the instant case, K-Pipe needed a loan to acquire the Bishop Stock so that it could sell the Bishop assets to Midcoast. Rabobank agreed to fund K-Pipe's purchase only if Midcoast deposited funds equal to the loan amount plus its fees in an account as security for, and to repay, the loan. The funds that Bank of America loaned to Midcoast to acquire the Bishop assets were used for that purpose. In essence, Rabobank agreed to loan K-Pipe the purchase price, if beforehand, Midcoast gave Rabobank $198 million to repay the loan. This is simply not the same situation as at issue in *Brown*.

*3. K-Pipe was a Conduit.*[20]

In section V of its Memorandum, Plaintiffs argue that K-Pipe was not a conduit. As set forth in the Brief of the United States, the Fifth Circuit addressed the issue of conduits in *Davant v. Commissioner*, 366 F.2d 874, 879-80 (5th Cir. 1966) *cert. denied*, 386 U.S. 1022 (1967); *Blueberry Land Co. v. Commissioner*, 361 F.2d 93, 101 (5th Cir. 1966); and *Reef Corp. v. Commissioner*, 368 F.2d 125 (5th Cir. 1966). Plaintiffs, however, begin its argument by citing *Esmark, Inc. & Affiliated Cos. v. Commissioner*, 90 T.C. 171 (1988), *aff'd without published opinion*, 886 F.2d 1318 (7th Cir. 1989).

In *Esmark*, that case the Tax Court held that in order to disregard an entity as a conduit, the entity must be a mere intermediary in a transaction where the true obligation, legal or otherwise, runs between other parties. *Esmark*, 90 T.C. at 194. Plaintiffs argue that K-Pipe was

[20] Plaintiffs argue that K-Pipe was not an agent. The Government does not address the issue because such a finding is not a prerequisite to the arguments advanced by the Government. Perhaps a better characterization, however, is that Midcoast, PWC, and K-Pipe were co-conspirators in formulating a plan to evade taxes.

not a conduit because Langley and Midcoast did not reach an agreement for a sale of stock.[21] While it is correct that Langley and Midcoast did not formally enter into the Stock Purchase Agreement, it is apparent the only reason they did not do so is because Fortrend was able step in on the deal. (See Kaitson Dep. pp. 150-51). Midcoast did, however, continue to negotiate the principal provisions of that agreement. As set forth in the Government's Brief, Midcoast continued to review and negotiate provisions of the Stock Purchase Agreement even after Fortrend entered the picture. (Government's Brief, pp. 26, 28, 31, 32, 39, 42). Plaintiffs even acknowledge that Midcoast continued to negotiate with Langley after K-Pipe was involved. (Memorandum, p. 7). It is obvious why this occurred. Midcoast inserted K-Pipe in the transaction to purportedly buy the Bishop stock and sell it the Bishop assets. Thus, all aspects of the Stock Purchase Agreement that affected those assets were of critical importance to Midcoast. Plaintiffs also do not provide any specific discussion in its Statement of Facts concerning the matters that Fortrend/K-Pipe did negotiate, because obviously there were no material provisions negotiated by K-Pipe.

In addition to the aspects of the Stock Purchase Agreement that affected the Bishop assets, the facts compel the conclusion that Midcoast negotiated the purchase price for the Bishop Stock. It is undisputed that the fee that K-Pipe would earn for its role in the transaction was 5% of the step-up in basis Midcoast would get in the Bishop assets. Therefore, Langley's selling price plus 5% of the step-up was the cost to Midcoast of inserting K-Pipe. It is clear that

---

[21] Plaintiffs also argue that the intermediary must be an agent or related party, however, *Esmark* makes no such requirement. Plaintiffs also argue that a prerequisite in applying the conduit theories used in *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945), and the Fifth Circuit cases of *Davant v. Commissioner*, 366 F.2d 874 (5th Cir. 1966), *Blueberry Land Co. v. Commissioner*, 361 F.2d 93 (5th Cir. 1966), and *Reef Corp. v. Commissioner*, 368 F.2d 125 (5th Cir. 1966), is that this Court must find that Langley and Midcoast had reached an agreement for a stock purchase before K-Pipe was inserted. A careful review of these cases reveals that a pre-existing agreement between the principals is not a requirement in utilizing the conduit theory.

the price K-Pipe would pay for the Bishop Stock had a direct relationship with the price Midcoast would pay for the Bishop assets. As a result, Midcoast, rather than K-Pipe, continued negotiating with Langley with regard to the stock purchase price. Indeed, there is not one iota of objective evidence – correspondence, emails, etc. – showing that K-Pipe negotiated any price terms.

This conclusion is supported by the facts surrounding the PDAs. When Midcoast was negotiating the purchase of the Bishop Stock with Langley, giving Langley an interest in the Kansas Pipeline through the PDAs was a way to keep down the price Midcoast would have to pay Langley for the Bishop Stock. After Midcoast allegedly bowed out of the stock purchase and K-Pipe was brought in, however, Midcoast continued to negotiate the PDAs with Langley. Midcoast was obviously still trying to keep the stock price down. After Midcoast advised Langley that it did not want a continuing relationship with him via the PDAs, Langley requested more money for the Bishop Stock. Midcoast, not K-Pipe, reached an agreement to provide Langley with $13.75 million of additional consideration. Langley and Midcoast (with the assistance of PWC's Wilcox) agreed to structure the payment as follows: $3 million added to the purchase price for the Bishop Stock and $10.75 million paid to "terminate" the PDAs. Again, K-Pipe had no involvement in a matter that affected the price it would have to pay for the Bishop Stock. Therefore, the true obligation existed between Langley and Midcoast as K-Pipe had no benefits or burdens associated with the transaction other than those obligations that affected the tax reporting of Langley. Therefore, even under *Esmark*, which is not controlling, Plaintiffs' arguments fail.

Plaintiffs next discuss *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945) and *U.S. v. Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950) and argue that the case at hand is factually

akin to *Cumberland* and not *Court Holding*. *Cumberland* and *Court Holding* both involved a corporation's distribution of assets to its shareholders followed by, in form, a sale of the assets by the shareholders to a third party. The Court in *Cumberland* looked at Congressional intent with respect to the applicable provisions of the Code. It noted that the corporate tax was aimed primarily at the profits of a going concern and that Congress imposed no tax on liquidating distributions, whatever the motive for the distribution. *Cumberland*, 338 U.S. at 454, 455. Thus, a genuine liquidating distribution to shareholders of property followed by a sale of same by the shareholders did not result in tax to the corporation. Thus, the question in *Cumberland*, similar to *Court Holding*, was whether the reported tax treatment of the asset sales was consistent with what Congress intended. The resolution of that question turned on the facts of each case. The Court in *Court Holding* found that the facts in that case supported the conclusion that there was no genuine liquidating distribution of the corporate assets to the shareholder and that the corporation, not the shareholders, sold the assets. *Court Holding Co.*, 324 U.S. at 333-34. The Supreme Court cited the lower court's findings that the terms of sale were substantially those of the previous oral agreement; one thousand dollars already paid to the corporation was applied as part payment of the purchase price; the corporation never really abandoned its sales negotiations; and the corporation never dissolved. *Id.*

The Court in *Cumberland*, on the other hand, found that the facts in that case, which showed that the corporation played no role in the asset sale, supported the conclusion that the shareholders received the corporate assets in partial liquidation and that the sale of assets was made by the shareholders rather than the corporation. *Cumberland*, 338 U.S. at 455.

Plaintiffs assert that because Langley and Midcoast never reached an agreement, *Cumberland* applies. The decision in Cumberland, however, did not turn on whether the parties

reached a pre-existing agreement or not. It turned on the substance of the transaction. Nevertheless, as discussed above, the only reason no agreement was reached between Langley and Midcoast is because Midcoast found Fortrend and inserted it as a conduit in the transaction. There is no evidence that negotiations had come to a complete halt between Langley and Midcoast on the stock purchase. Further, as discussed in the Government's Brief and in this Response, the facts in this case show that, like *Court Holding Co.*, the form chosen by Midcoast was inconsistent with the substance of the transaction. Midcoast inserted K-Pipe into the transaction; it effectively financed and negotiated the stock purchase; and it took on the substantive benefits and burdens of ownership of the business that was represented by the Bishop Stock. Accordingly, Plaintiffs' assertion that the Midcoast transaction falls squarely in the category of *Cumberland* is completely without merit.

Plaintiffs wrap up their argument by asserting that typically, conduit cases involve transfers of assets between related entities. In support, Plaintiffs cite *Stewart v. Commissioner*, 714 F.2d 977, 988 (9th Cir. 1983). Plaintiffs' assertion is plainly erroneous. There is no case law providing that the conduit theory only applies to transactions involving related entities. Indeed, none of the three Fifth Circuit conduit cases cited by the United States in its Brief involved related parties. (See Government's Brief, pp. 74-77). Moreover, the reason the *Stewart* case involved related entities was because it was an I.R.C. § 482 case. Section 482 is only applicable to transactions involving related parties.[22]

*4. K-Pipe's role as intermediary should not be respected for tax purposes.*

In section VI of its Memorandum, Plaintiffs argue that the sale of stock by Langley and

[22] Section 482 authorizes the Commissioner to allocate income between "two or more organizations, trades, or businesses . . . owned or controlled . . . by the same interests, . . . if he determines that such . . . allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

the sale of assets by K-Pipe were not sham transactions. Plaintiffs' argument is premised on the errant contention that K-Pipe's purchase of the Bishop Stock and its sale of the Bishop assets to Midcoast were two distinct transactions that should be separately analyzed. Plaintiffs' sole support for that errant view is the transactional documents; the form put in place to produce a tax benefit. The undisputed facts conclusively establish that the stock purchase and the asset sale were inextricably linked; that one would not have happened without the other; that they were two components of a tax-avoidance scheme known as a Midco transaction:

1. Midcoast wanted to purchase Langley's Bishop Stock but was unwilling to pay Langley's price.

2. PWC suggested using a Midco transaction to bridge the gap.

3. In the Midco transaction that PWC suggested, an entity would purchase the Bishop Stock and sell the Bishop assets to Midcoast, giving Midcoast a step-up in the bases of the Bishop assets and thus higher depreciation deductions.

4. Midcoast decided to pursue the Midco transaction and contacted Fortrend, a facilitator of Midco transactions known to PWC.

5. Fortrend agreed to form an entity (K-Pipe) to buy the Bishop Stock and sell the Bishop assets to Midcoast. Fortrend and Midcoast agreed that Fortrend's fee would be 5% of the basis step-up that was obtained using the Midco transaction.

6. K-Pipe received financing to purchase the Bishop Stock based on the funds Midcoast would use to purchase the Bishop assets. At time of the closing of the stock acquisition, K-Pipe and Midcoast executed all documents necessary to consummate the asset acquisition.

Given these undisputed facts, Plaintiffs' insistence that the stock transaction and asset transaction be viewed in isolation is asking the Court to don blinders to the role of K-Pipe and the intention of the parties and must be rejected. As set forth in the Government's Brief at pp. 91-96, in examining the Midco transaction in its entirety, it is clear that K-Pipe's role lacked economic substance.

One of the primary factual underpinnings of Plaintiffs' argument that there is no sham is the following claim on page 37 of its Memorandum:

> K-Pipe bought the Bishop Stock from Langley, and in so doing assumed the benefits and burdens of ownership of the Bishop Stock, because K-Pipe also intended to make money. K-Pipe was interested in purchasing the Bishop Stock because '[K-Pipe] had the opportunity to profit if [it] bought the [Bishop] company.' This profit was based on K-Pipe's efforts to 'try to negotiate the best [it] could' and to 'try to sell [the assets] for as high as [it] could and buy [the stock] for as low as [it could]. K-Pipe succeeded in making money—as evidenced by the $3.7 million profit realized from the transaction. These facts speak for themselves in terms of the economic substance and business purpose of K-Pipe's purchase of Bishop Stock from Langley, and establish that the transaction was not a sham.

Plaintiffs' assertion is inconsistent with the undisputed facts. As discussed above and in the Government's Brief at pp. 42, 43, 79, 80, the amount that K-Pipe would earn for its role as intermediary in the transaction was 5% of the step-up in the basis of the Bishop assets that Midcoast would obtain using the Midco transaction. The way that K-Pipe would receive its 5% was merely structured as the difference between what it would pay for the stock and get for the assets. In addition, if the taxes from the sale of the Bishop assets were taken into account, not only would K-Pipe not have made a profit, but it would have incurred a huge loss. The taxes resulting from the sale of the Bishop assets were over $50 million. *See* footnote 14, *supra*. If K-Pipe's pre-tax "profit" was $3.7 million, as Plaintiffs assert, had K-Pipe paid the taxes that were properly due, it would have incurred a loss of over $46.3 million. K-Pipe, however, as Midcoast knew, never intended to pay those taxes. It improperly offset the gain from the asset sale with bogus losses. The fee K-Pipe would earn as a facilitator of a tax shelter does not qualify as a bona fide business purpose.

In their Response to the United States of America's Motion for Summary Judgment, Plaintiffs cite to *United Parcel Service v. Commissioner*, 254 F.3d 1014 (11th Cir. 2001) ("*UPS*")

as support, asserting that K-Pipe had genuine obligations to Langley, and therefore, the Court here cannot disregard the insertion of K-Pipe. The "genuine obligation" relied upon by the Court in *UPS*, however, was a genuine obligation enforceable by an unrelated party—a real insurance policy between UPS and National Union Fire Insurance Company. *UPS*, 254 F.3d at 1018. As discussed above, K-Pipe had no real and genuine obligations. After the transactions were consummated, K-Pipe existed merely as a shell at the insistence of PWC and never had any real and enforceable obligations to Langley, Rabobank, or anyone else, because Midcoast agreed to assume all the risk.

Plaintiffs' reliance on *Northern Indiana Public Service Co. v. Commissioner,* 115 F.3d 506, 513 (7th Cir. 1997) is also misplaced for the same reasons, *i.e.*, K-Pipe was merely transitory, engaged in absolutely no business activity for profit, and existed only as a mere skeleton.

As discussed in the Government's Brief, the Court's inquiry must focus on the particular transaction that gave rise to the tax benefit. The transaction that gave rise to the tax benefit was the insertion of K-Pipe as the intermediary. *See e.g., H.J. Heinz v. United States*, 76 Fed. Cl. 570, 585 (2007) (taxpayer carries the burden of proving that the portion of the transaction in question--purchase and transfer of shares by intermediary-- had both business purpose and economic substance). Midcoast does not and cannot show how the insertion of K-Pipe somehow created a legitimate economic benefit in Midcoast's favor or promised some form of profit, except for the depreciation deductions that were generated. Accordingly, K-Pipe's role should be disregarded because the transaction lacked economic substance.

*5. Disallowance of Midcoast's basis step-up is proper under the step transaction doctrine.*

In section VII of its Memorandum, Plaintiffs argue that the step transaction doctrine cannot be invoked to convert Midcoast into a stock purchaser. Once again, Plaintiffs' argument rests on its claim that there are "two inherently distinct transactions" at issue in this case. Plaintiffs assert that because the case at hand involves two distinct transactions with distinct results that were independently fruitful to three unrelated parties, they cannot be stepped together. (Memorandum, p. 41). As discussed above and in the Government's Brief, when the substance of the transactions is examined, it follows that they were not distinct, nor independently fruitful. The sole purpose of inserting K-Pipe was to get Midcoast the step-up in basis resulting in higher depreciation deductions. Consequently, Plaintiffs' argument has no merit. As set forth in the Government's Brief at pp. 84-91, disallowance of Midcoast's basis step-up is proper under the step transaction doctrine.

Additionally, with regard to the step transaction doctrine, Plaintiffs' reliance on *Esmark v. Commissioner,* 90 T.C. 171 (1988) is misplaced. There, the Commissioner argued that a company's (Mobil Oil Corp.) acquisition and subsequent disposition of the taxpayer's publicly held shares must be disregarded. The Tax Court disagreed, stating that the taxpayer had three routes to achieve its business objectives. *Id*. at 196. The Court found that each route required two steps and no route was more "direct" than the other; therefore, the Tax Court could not recast the transaction just because the taxpayer chose the path expected to result in the least amount of tax. *Id.*

Here, on the other hand, Midcoast had one objective – to get the Kansas Pipelines for operation. Langley refused to entertain an asset purchase, and the only direct route available to

Midcoast was a stock purchase.[23] It is undisputed that Midcoast sought out Fortrend to become the stock purchaser, which in turn, would sell the pipelines to Midcoast, thus providing higher depreciation deductions in the future. Unlike the facts in *Esmark*, Midcoast took an indirect route just for tax benefits.[24]

*6. PWC's heavy hand in the transaction is factually relevant.*

In section VIII of its Memorandum, Plaintiffs desperately argue that evidence reflecting tax planning by Midcoast does not create a fact issue. The United States agrees that there is no fact issue, but asserts wholeheartedly that the overwhelming undisputed evidence supports summary judgment in favor of the Government. Plaintiffs are correct in asserting that tax planning is a normal part of business, but a transaction motivated solely by tax planning with no business or corporate purpose is nothing more than a contrivance without substance that is rightly ignored for purposes of the tax computation. *Kimball v. United States*, 371 F.3d 257, 264 (5th Cir. 2004), *citing Gregory v. Helvering*, 293 U.S. 465, 469 (1935). The insertion of K-Pipe was motivated solely by tax planning and nothing else.[25]

---

[23] Plaintiffs state on p. 31 in their Response to the United States' Motion for Summary Judgment that "Midcoast's final position was as direct owner of a majority of the assets previously owned by Bishop," and basically that only an asset sale from K-Pipe to Midcoast would lead to those consequences. Such is not the case, As explained in the Government's Brief (p. 71) the Code allows a procedure where a stock purchaser can liquidate the target corporation with no taxable gain, allowing the stock purchaser to hold the assets of the corporation outright, albeit with a carryover basis in the assets. I.R.C. sections 1001, 332, 334. In substance, this is how Midcoast now holds the Bishop assets.

[24] In *Esmark*, another factor in the taxpayer's favor was that Mobil's purchase of stock occurred in the open market – a factor which the taxpayer could not control. Here, the evidence shows that after August 15, 1999, there was a closed market with Midcoast as the sole suitor for Langley's stock. (See Report of Government Expert J.T. Atkins, p. 10). Of course, around the same time, Midcoast brought in and directed Fortrend to purchase Langley's stock – a matter which Midcoast did control, negotiating the terms of the stock purchase agreement and even assisting in Fortrend's financing. These facts are clearly distinguishable from those in *Esmark.*

[25] Plaintiffs cite to the Fifth Circuit case *Sun Properties, Inc. v. U.S.* 220 F.2d 171, 174 (5th Cir. 1955), for the proposition that "a tax avoidance motive must not be considered as evidence that a transaction is something different from what it purports to be," However, Plaintiffs fail to address the Court's further statement that "[t]ransactions are

Upon the advice and, in some cases, the insistence of PWC, steps were taken to create appearances to disguise the true nature of the Midco transaction. For example, the facts show that PWC insisted that K-Pipe stay in existence for two years and retain assets to give substance to the transactions and interfere with the step transaction doctrine. K-Pipe did stay in existence and did retain an indirect interest in the Butcher Interest. However, K-Pipe's following of advice from Midcoast's tax advisor, PWC, both undermines the parties' alleged independence, and the business purpose of K-Pipe's actions.

The evidence shows that the Butcher Interest Partnership was formed at the insistence of PWC to add substance and good facts to the Midco transaction. The basic inquiry when determining whether a partnership is valid for tax purposes is "whether, all facts considered, the parties intended to join together as partners to conduct business activity for a purpose other than tax avoidance." *Andantech, LLC v. Commissioner,* 331 F.3d 972, 978 (D.C. Cir. 2003). Clearly, the fact that the Butcher Interest Partnership was formed at the insistence of Midcoast's tax advisors to disguise the true nature of the Midco transaction undermines any claim that Midcoast and K-Pipe intended to join together as partners to conduct business activity for a purpose other than tax avoidance. There was no bona fide business purpose here with regard to the insertion of K-Pipe as an intermediary. Therefore, the evidence concerning PWC is wholly relevant and should be considered by the Court.

*7. Midcoast is not entitled to a stepped-up basis in the Bishop assets.*

In section IX of its Memorandum, Plaintiffs argue that Midcoast is entitled to a stepped-up basis in the Bishop assets based on the premise that K-Pipe's role in the Midco transaction

properly subject to careful scrutiny when the only ascertainable motive is tax avoidance . ." *Id.* (citations omitted). Here, it is clear that tax avoidance is the only ascertainable motive.

should be respected. As shown in the Government's Brief and in this Response, K-Pipe's role in the Midco transaction should not be respected; that in substance Midcoast acquired the Bishop Stock, liquidated Bishop under I.R.C. 332, and as a result, under I.R.C. 334(b), Midcoast has a carryover basis in the Bishop assets.[26]

*8. Midcoast is not entitled to deduct the termination payment.*

In section X of its Memorandum, Plaintiffs argue that Midcoast is entitled to deduct $10,750,000 purportedly paid to terminate the PDAs. As set forth in the Government's Brief, pp. 113, 114, the $10,750,000, that Midcoast paid to Langley was nothing more than additional consideration for the Bishop Stock. Upon the advice of PWC, the payment was structured to appear to be a termination payment for the PDAs; however, once again, the form does not reflect the substance as is clear from Minutes of Midcoast's Board of Directors Meeting of February 24, 2000, which explains the true nature of the $10.75 million payment as follows:

> Mr. Robert reported that in January we terminated the project development agreement with Mr. Langley. Mr. Tutcher reviewed for the Board that we had elected to eliminate this agreement at the last minute prior to closing the KPC purchase. We negotiated a $13.75 million increase in the purchase price with $3 million paid at closing and the other $10.75 million to be paid anytime before January 31.

*9. Midcoast is not entitled to any claimed losses with respect to the Butcher Interest Partnership.*

In section XI of its Memorandum, Plaintiffs argue that Midcoast is entitled to a $182,138 flow-through loss from the Butcher Interest Partnership in 2000. As set forth in the Government's Brief, pp. 99-102, Midcoast is not entitled to any flow-through losses from the Butcher Interest Partnership because it was a sham. As noted above and in the Government's Brief, Midcoast and K-Pipe did not intend to join together as partners to conduct business

[26] Such a result would be consistent with the fact that Midcoast's corporate tax returns subsequently showed that it owned the assets (partnership interests) outright. Obviously, Midcoast's depreciation deductions since 1999 would be adjusted downward to reflect the reduction in the asset bases to carryover from their stepped-up values.

activity for a purpose other than tax avoidance. Indeed, nothing is more telling than the Morelli email (which Plaintiffs barely address) advising that the Butcher Interest Partnership was formed at the insistence of PWC to add good facts and substance to the Midco transaction.

Plaintiffs claim further that they are entitled to a $5,775,416 loss because MIDLA (a subsidiary of Midcoast) abandoned the Butcher Interest in 2001. According to Plaintiffs, MIDLA received the Butcher Interest when the Butcher Interest Partnership was terminated in 2000. Plaintiffs state that MIDLA, the purported owner of the Butcher Interest, entered into a Termination Agreement in 2001, with Enbridge Pipelines (KPC), the party which purportedly was obligated to make payment under the Butcher Interest. Plaintiffs assert that the consummation of the Termination Agreement constituted an abandonment for tax purposes, entitling MIDLA to a loss under I.R.C. § 165.

To take an abandonment loss under §165(a), "a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and . . . sustained during the taxable year." Treas. Reg. §§ 1.165-1(b) and (d). Section 165(a) losses "have been referred to as abandonment losses to reflect that some act is required which evidences an intent to discard or discontinue use permanently." *Gulf Oil Corp. v. Commissioner*, 914 F.2d 396, 402 (3d Cir. 1990) (citing *A. J. Indus., Inc. v. United States*, 503 F.2d 660 (9th Cir. 1974)). In order for a loss of an intangible asset to be sustained and to be deductible, there must be: (1) an intention on the part of the owner to abandon the asset, and (2) an affirmative act of abandonment. *Gulf Oil*, 914 F.2d at 402 (quoting *A.J. Indus*., 503 F.2d at 670).

The only evidence Plaintiffs cite in support of its claim of abandonment is the Termination Agreement. Plaintiffs' claim has two fatal problems. First, the agreement clearly recites that the termination of the Butcher Interest was "for value and consideration received."

According to the agreement, therefore, rather than being abandoned, the Butcher Interest was released for valuable consideration. Secondly, the year of the purported abandonment cannot be established from the agreement. The parties to the agreement were Enbridge Pipelines (KPC) ("KPC") and Enbridge Pipelines (MIDLA) Inc. ("MIDLA"). According to the agreement, it was executed as of January 1, 2001. The document could not have been executed on January 1, 2001, however, because Enbridge did not acquire Midcoast until May of 2001. Consequently, it cannot be determined from the agreement when it was executed and thus when the "termination" purportedly took place. The only thing that is certain from this document is that Plaintiffs have admittedly backdated it, again attempting to create tax incidents for an interest (Butcher Interest) previously used solely to create tax incidents. Obviously, two wrongs do not make a right, and Plaintiffs' attempt to manufacture a tax deduction must be denied.

In addition to the above reasons, Plaintiffs are not entitled to its claimed loss because: (1) the Butcher Interest had no value; (2) the termination constituted a deemed dividend from MIDLA to Enbridge and a deemed contribution from Enbridge to KPC; (3) the termination agreement was a transaction between related parties; and (4) any loss is offset by gain from the termination of the obligation to make the Butcher Interest payments. These will be discussed below.

a. The Butcher Interest had no value.

When Langley owned Bishop, the Butcher Interest was a wash and held no value to Bishop. KPC was obligated to make payment to another Bishop-owned entity. Moreover, as noted by the FERC administrative judge, Midcoast acknowledged that no payments had been made under the Butcher Agreement for ten years. In addition, the judge took issue with the validity of the interest when he found that the "continuing Butcher Interest payments are clearly

not a result of arms-length negotiations because the payments are owed in perpetuity, which amounts to flagrant usury." K-Pipe's transfer of the Butcher Interest to the Butcher Interest Partnership to give substance to the Midco transaction does not imbue the Butcher Interest with value.[27] Because it never possessed value, there was no loss of an interest to be deducted by MIDLA. In the unlikely event the Court finds the Butcher Interest had value, the Government argues the following three alternative theories.

b. The termination constituted a deemed dividend from MIDLA to Enbridge and a deemed contribution from Enbridge to KPC.

Enbridge owned both MIDLA and KPC. KPC was obligated to make payment under the Butcher Interest to MIDLA. The termination of the Butcher Interest relieved KPC of the obligation to pay MIDLA. Because of the relationship of the parties, the termination constitutes a deemed dividend of the Butcher Interest to Enbridge and a contribution by Enbridge to KPC. Effectively, this was also a wash transaction, resulting in no loss to deduct.

c. The termination agreement was a transaction between related parties.

I.R.C. § 267 provides that no deduction shall be allowed in respect of any loss from the sale or exchange of property, directly or indirectly, between related parties. In substance, the termination agreement constituted a sale or exchange. As noted above, the agreement provides that the termination was agreed to for valuable consideration. It was therefore a sale or exchange of property. Because KPC and MIDLA were related, no loss is allowable.

---

[27] The Court should note that there is absolutely no evidence establishing an independent value of the Butcher Interest. Although K-Pipe received $6.225 million for the interest upon contributing it to the sham Butcher Interest Partnership, it is clear that this payment was merely a portion of the purchase price Midcoast paid for the Bishop Group. Indeed, in their Appendix I, Plaintiffs have shown this $6.225 million as part of their calculation of the supposed "pre-tax profit" earned by K-Pipe resulting from K-Pipe's purported asset sale. Plaintiffs cannot meet their burden of production in this regard. The Butcher Interest, as part of the Bishop Group, had no independent value and cannot form the basis for any deduction.

        d. Any loss is offset by gain from the termination of the obligation to make the Butcher Interest payment.

Even if MIDLA's claimed abandonment loss is proper, Plaintiffs must report KPC's gain from relief of its obligation to make the Butcher Interest payments, which again offsets the claimed loss. I.R.C. § 61.

*10. Midcoast is liable for penalties under I.R.C. § 6662.*

In section XII of its Memorandum, Plaintiffs argue that because its tax reporting is correct, no penalty is applicable. The Government has shown that Plaintiffs' tax reporting flowed from an abusive tax shelter, and for the reasons set forth in its Brief, pp. 105-113, Midcoast is liable for the 20-percent penalty under I.R.C. § 6662(a). Additionally, Plaintiffs' citation to *Klamath Strategic Investment Fund, LLC v. United States*, 99 A.F.T.R. 2d 2007-850 as supportive of their proposition that they are not liable for penalties, is unpersuasive. In *Klamath,* the taxpayers relied on several professionals, and none of those professionals were paid a finder's fee by the promoter, like in this case. Therefore, *Klamath* is easily distinguishable and the 20% penalty against Midcoast here is completely justified.

**D. THE UNITED STATES SHOULD PREVAIL ON ALL ISSUES PRESENTED BUT IN THE EVENT PLAINTIFFS PREVAIL ON ANY ANCILLARY ISSUES, THE UNITED STATES IS ENTITLED TO SET OFF ANY REFUND BECAUSE PLAINTIFFS ARE ADDITIONALLY LIABLE FOR GROSSLY OVERVALUING THE BASIS IN THE BISHOP ASSETS**

The United States believes it is entitled to summary judgment on all issues presented in its Motion for Summary Judgment and Brief in Support. However, in the e vent the Court finds that Plaintiffs are entitled to relief under any ancillary issues, the United States asserts that the 40-percent gross valuation misstatement penalty under I.R.C. § 6662(h)(1) is appropriate and should be offset against any relief to which this Court determines Plaintiffs may be entitled.

The Government's right of setoff is a well-known principle:

> The taxpayer is not entitled to a refund for the years in which he claims such refunds are due if he still owes taxes for the years involved. The Director is entitled to set off any monies still owing to the Government against the amounts claimed for refund.

*Patterson v. Belcher,* 302 F.2d 289, 295 (5th Cir. 1962), *cert. denied,* 371 U.S. 921 (1962).

The statutory framework for gross valuation misstatement is as follows.  A 20-percent accuracy-related penalty applies to the extent that any portion of an underpayment is attributable to any "substantial valuation misstatement". I.R.C. §§ 6662(a) and (b)(3).  There is a "substantial valuation misstatement" if "the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed * * * is 200 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)" I.R.C. § 6662(e)(1)(A).

In the case of a "gross valuation misstatement", the penalty increases from 20 to 40 percent. There is a "gross valuation misstatement" if the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed is 400 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). I.R.C. §§ 6662(e)(1) and (h)(2).   There is no disclosure exception to this penalty. Treas. Reg. § 1.6662-5(a).

In its 2000 tax return, Midcoast improperly stepped-up its basis in the Bishop assets, reporting a $193,443,640 basis in the tangible assets and a $8,747,068 basis in the intangible assets. The correct basis of the total assets was $34,116,022.  Because Midcoast claimed basis

was more than 400-percent of the correct amount of the adjusted basis, Plaintiffs are liable for the 40-percent gross valuation misstatement penalty under I.R.C. § 6662(h)(1). *See Santa Monica Pictures, LLC v. Commissioner*, T.C. Memo. 2005-104.

Plaintiffs may argue (as found in *Klamath Strategic Investment Fund, LLC v. United States*, 99 A.F.T.R. 2d 2007-850) that as a matter of law, an overvaluation penalty cannot apply when the IRS totally disallows a deduction or credit, and that this case is similar to the situation in which the IRS totally disallows a deduction or credit.[28] However, here, the IRS did not totally disallow Midcoast's deductions, only those associated with the inflated bases Midcoast claimed. Moreover, unlike in *Klamath*, the plain language of the statute and regulations under I.R.C. § 6662(h)(1) leads to the result that the penalty is applicable.

Section 6662(e) and (h) refers to an underpayment that is attributable to a "valuation misstatement". The statute defines "valuation misstatement" to include overstatements of "adjusted basis". Specifically, a substantial or gross valuation misstatement occurs where "the value of any property (*or the adjusted basis of any property*)" claimed on any tax return is at least 200 percent (for a substantial valuation misstatement or 400 percent (for a gross valuation misstatement) of "the amount determined to be the correct amount of such valuation *or adjusted basis* (as the case may be)". I.R.C. § 6662(e)(1)(A) (emphasis added). Consequently, Congress did not limit the definition of a "valuation misstatement" to instances involving inflated valuations but included within that definition instances involving inflated adjusted bases. *See* Treas. Reg. § 1.6662-5(h)(2), *Example 2* ("Partnership P * * * claims a $40,000 basis in a depreciable asset which, in fact, has a basis of $15,000. The determination that there is a substantial valuation misstatement is made solely with reference to P by comparing the $40,000

---

[28] The United States disagrees with this holding in *Klamath.*

basis claimed by P with P's correct basis of $15,000."); and *see e.g.*, Treas. Reg. 1.6662-5(d), *Examples 1-3* (all dealing with overstatements of adjusted basis in assets). On the basis of the statutory definition, and the underlying regulations, it is clear that the I.R.C. § 6662(h) penalty is applicable.[29] In rough terms, Midcoast overstated the adjusted bases in the assets by over 588 percent, claiming a $200 million basis in assets that had a correct basis of $34 million. As such, if the Court finds that Plaintiffs are entitled to any relief, such amounts should be offset by the 40 percent penalty, applied against the underpayment resulting from Plaintiffs' gross valuation misstatement. *See e.g., Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122 (D. Conn. 2004), *aff'd without published opinion*, 150 Fed. Appx. 40 (2d Cir. 2005).

[29] Plaintiffs may assert, similar to the taxpayers' arguments in *Klamath*, that *Todd v. Commissioner*, 862 F.2d 540 (5th Cir. 1988), *Heasley v. Commissioner*, 902 F.2d 380 (5th Cir. 1990) and *Weiner v. United States*, 389 F.3d 152 (5th Cir. 2004) all render the gross valuation misstatement inapplicable here. None of these cases, however, dealt with the definition of a "valuation overstatement" under I.R.C. § 6662 or the application of the penalty to the reporting of inflated adjusted bases in properties. *See Santa Monica Pictures, LLC v. Commissioner*, T.C. Memo. 2005-104 (distinguishing *Todd* for that very reason). Moreover, none of those cases dealt with the facts here – a corporation engaging in a tax shelter for the specific purpose of overstating the basis in properties.

**E. CONCLUSION**

Plaintiffs are correct in asserting that there is no fact issue in dispute. However, a review of the entire record of material undisputed facts, as set out in the United States of America's Motion for Summary Judgment and Brief in Support, leads to the obvious conclusion that summary judgment on all issues must be sustained in favor of the Government.

DONALD J. DEGABRIELLE, JR.
United States Attorney

David B. Coffin
DAVID B. COFFIN
Oklahoma Bar No. 15740
Trial Attorney
U. S. Department of Justice
Tax Division
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9749
(214) 880-9741 (FAX)

ATTORNEYS FOR THE UNITED STATES

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing **UNITED STATES OF AMERICA'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** has been served automatically through the Notice of Electronic Filing on August 30, 2007, to the following:

Karl S. Stern, Esq.
Vinson & Elkins, LLP
2300 First City Tower
1001 Fannin Street
Houston, TX 77002-6760

/S/DAVID .B COFFIN
DAVID B. COFFIN